Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

IN RE: NATIONAL       : MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION           :
----------------------------------------
                      : CASE NO.
THIS DOCUMENT        : 1:17-MD-2804
RELATES TO ALL CASES:
                      : Hon. Dan A.
                      : Polster

- - -
Tuesday, December 4, 2018
- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of
LISA WALKER, taken pursuant to notice,
was held at Golkow Litigation Services,
One Liberty Place, 1650 Market Street,
Suite 5150, Philadelphia, Pennsylvania
19103, beginning at 9:12 a.m., on the
above date, before Amanda Dee
Maslynsky-Miller, a Certified Realtime
Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1  APPEARANCES:
2
3      SEEGER WEISS, LLP
       BY: DAVID R. BUCHANAN, ESQUIRE
4          SCOTT SIEGEL, PARALEGAL
           ELINA RAKHLIN, PARALEGAL
5      77 Water Street
       8th Floor
6      New York, New York 10005
       (212) 584-0700
7      Dbuchanan@seegerweiss.com
       Representing the Plaintiffs
8
9
10     BRANSTETTER, STRANCH & JENNINGS, PLLC
       BY: JOE P. LENISKI JR., ESQUIRE
11     223 Rosa L. Parks Avenue
       Suite 200
12     Nashville, Tennessee 37203
       Joeyl@bsjfirm.com
13     Representing the Staubus
       Plaintiffs
14
15
16     GOODELL, DEVRIES, LEECH & DANN, LLP
       BY: ROBERT A. LIMBACHER, ESQUIRE
17     BY: ADAM S. TOLIN, ESQUIRE
       Two Commerce Square
18     2001 Market Street, Suite 3700
       Philadelphia, Pennsylvania 19103
19     (267) 765-3600
       Rlimbacher@gdldlaw.com
20     Atolin@gdldlaw.com
       Representing the Defendant,
21     Endo Pharmaceuticals
22
23
24

Page 3

1  APPEARANCES: (Continued)
2
3      WILLIAMS & CONNOLLY LLP
       BY: JOSHUA D. TULLY, ESQUIRE
4      725 Twelfth Street, N.W.
       Washington, D.C. 20005
5      (202) 434-5000
       Jtully@wc.com
6      Representing the Defendant,
       Cardinal Health
7
8
9      REED SMITH LLP
       BY: ANNE E. ROLLINS, ESQUIRE
10     Three Logan Square
       1717 Arch Street, Suite 3100
11     Philadelphia, Pennsylvania 19103
       (215) 851-8100
12     Arollins@reedsmith.com
       Representing the Defendant,
13     AmerisourceBergen
14
15
16     JONES DAY
       BY: SHIRLETHIA V. FRANKLIN, ESQUIRE
17     51 Louisiana Avenue, N.W.
       Washington, D.C. 20001
18     (202) 879-3939
       Sfranklin@jonesday.com
       Representing the Defendant,
19     Walmart
20
21
22
23
24

Page 4

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4      HUGHES HUBBARD & REED LLP
       BY: TINA M. SCHAEFER, ESQUIRE
5      2345 Grand Boulevard
       Suite 2000
6      Kansas City, Missouri 64108
       (816) 709-4159
7      Tina.schaefer@hugheshubbard.com
       Representing the Defendant,
8      UCB, Inc.
9
10     FOX ROTHSCHILD LLP
       BY: EILEEN OAKES MUSKETT, ESQUIRE
11     1301 Atlantic Avenue
       Midtown Building, Suite 400
12     Atlantic City, New Jersey 08401
       (609) 348-4515
13     EMuskett@foxrothschild.com
       Representing the Defendant,
14     Validus Pharmaceuticals LLC
15
16
17     COVINGTON & BURLING LLP
       BY: J. ALEJANDRO BARRIENTOS, ESQUIRE
18     One CityCenter
       850 Tenth Street, NW
19     Washington, DC 20001
       (202) 662-5331
20     Abarrientos@cov.com
       Representing the Defendant,
21     McKesson Corporation
22
23
24

Page 5

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4      ULMER & BERNE LLP
       BY: PAUL J. (PJ) COSGROVE, ESQUIRE
5      600 Vine Street
       Suite 2800
6      Cincinnati, Ohio 45202
       (513) 698-5000
7      Pcosgrove@ulmer.com
       Representing the Defendant,
8      Gemini Laboratories, LLC,
       Arkansas (Elllington) State
9      Court Case
10
11     ALLEGAERT BERGER & VOGEL LLP
       BY: JOHN S. CRAIG, ESQUIRE
12     111 Broadway, 20th Floor
       New York, New York 10006
13     (212) 616-7075
       Jcraig@abv.com
14     Representing the Defendant,
       Rochester Drug Corporation
15
16
17
18  ALSO PRESENT:
    Dan Lawlor, Videographer
19  Jobina Jones-McDonnell, In-house, Endo
20
21
22
23
24

2  (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

- - -
I N D E X
- - -

Testimony of: LISA WALKER

By Mr. Buchanan          13, 601
By Mr. Leniski              503
By Mr. Limbacher          555

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION          PAGE

Endo-Walker
Exhibit-1   PAR_OPIOID_MDL_
          0001596408-442        78

Endo-Walker
Exhibit-2   EPI000620553-554       208
Endo-Walker
Exhibit-3   ENDO_OPIOID_MDL_
          05948286-292        223
Endo-Walker
Exhibit-4   UPSSCS0002032-051     240

Endo-Walker
Exhibit-5   ENDO_OPIOID_MDL_
          05968962-963        247

Endo-Walker
Exhibit-6   No Bates
          8/9/12 E-mail from Larry
          Shaffer to Lisa Walker,
          Subject: FW: UPS's Know Your
          Customer Program   258

Page 8

- - -
E X H I B I T S
- - -
NO.        DESCRIPTION          PAGE
Endo-Walker
Exhibit-17  ENDO_OPIOID_MDL_
          02426557-560        378
Endo-Walker
Exhibit-18  ENDO_OPIOID_MDL_02426078  385

Endo-Walker
Exhibit-19  ENDO_OPIOID_MDL_
          04881787-791        389

Endo-Walker
Exhibit-20  Clawed Back
          Endo_Opioid_MDL_
          01602884-890        408
Endo-Walker
Exhibit-21  ENDO_OR-CID-00694084-087  414

Endo-Walker
Exhibit-22  ENDO00259233-235       427
Endo-Walker
Exhibit-23  No Bates
          6/8/17 FDA News Release   444
Endo-Walker
Exhibit-24  ENDO_DATA-OPIOID_
          MDL-00000022,
          With Attachment       446

Endo-Walker
Exhibit-25  ENDO_OPIOID_MDL_
          02062332-333        469

Page 7

- - -
E X H I B I T S
- - -
NO.        DESCRIPTION          PAGE
Endo-Walker
Exhibit-7   ENDO_OPIOID_MDL_
          02448133-142        263
Endo-Walker
Exhibit-8   ENDO_OPIOID_MDL_05950068,
          With Attachment       305
Endo-Walker
Exhibit-9   UPSSCS0002916-935     317

Endo-Walker
Exhibit-10  UPSSCS0002991-3029     317
Endo-Walker
Exhibit-11  ENDO_OPIOID_MDL_
          02060862-891        318
Endo-Walker
Exhibit-12  ENDO_OPIOID_MDL_
          02988138-145        323
Endo-Walker
Exhibit-13  ENDO_OPIOID_MDL_
          01680920-975        330
Endo-Walker
Exhibit-14  ENDO_OPIOID_MDL_
          05948106-137        355
Endo-Walker
Exhibit-15  ENDO_OPIOID_MDL_
          05962953-956        359
Endo-Walker
Exhibit-16  ENDO-CHI_LIT-001444050-053  367

Page 9

- - -
E X H I B I T S
- - -
NO.        DESCRIPTION          PAGE
Endo-Walker
Exhibit-26  ENDO_OPIOID_MDL_
          01681499-501        475
Endo-Walker
Exhibit-27  ENDO_OPIOID_MDL_
          02290107-110        485
Endo-Walker
Exhibit-28  ENDO_DATA-OPIOID_MDL
          00000019, With Attachment  492
Endo-Walker
Exhibit-29  ENDO_OPIOID_MDL_
          01030692-698        509
Endo-Walker
Exhibit-30  ENDO_OPIOID_MDL_
          01033927-929        541
Endo-Walker
Exhibit-31  ENDO_OPIOID_MDL_
          00299957-0030002      564
Endo-Walker
Exhibit-32  ENDO_OPIOID_MDL_
          01239751-753        580
Endo-Walker
Exhibit-33  PAR_OPIOID_MDL_
          0000404095-097       587
Endo-Walker
Exhibit-34  ENDO_OPIOID_MDL_
          05948292-287 (Pages in
          Reverse sequential order)  590

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              - - -
2          E X H I B I T S
3              - - -
4    NO.      DESCRIPTION        PAGE
5    Endo-Walker
     Exhibit-35  ENDO_OPIOID_MDL_
6         00852918-925        616
7    Endo-Walker
     Exhibit-36  PAR_OPIOID_MDL_
8         0000404285         629
9    Endo-Walker
     Exhibit-37  No Bates
10        7/16/13 E-mail from Laurel
          McDermott to Sanjay Patel;
11        Subject: SOMS Customer
          Letter & Sales Rep Talking
12        Points            640
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
1              - - -
2      DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page Line   Page Line   Page Line
7    None
8
9
10   Request for Production of Documents
11   Page Line   Page Line   Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line   Page Line
17    12    1
18
19
20   Question Marked
21   Page Line   Page Line   Page Line
22    22   14   64   10
      59    4   290   14
23
24
```

Page 12

```
1              - - -
2           (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9              - - -
10          VIDEO TECHNICIAN:  We are
11   now on the record.  My name is Dan
12   Lawlor.  I'm a videographer with
13   Golkow Litigation Services.
14   Today's date is December 4, 2018,
15   and the time is 9:12 a.m.
16          This video deposition is
17   being held in Philadelphia,
18   Pennsylvania, in the matter of
19   National Prescription Opiate
20   Litigation, MDL Number 2804.  The
21   deponent is Lisa Walker.
22          Counsel will be noted on the
23   stenographic record.  The court
24   reporter is Amanda Miller and will
```

Page 13

```
1    now swear in the witness.
2              - - -
3           LISA WALKER, after having
4    been duly sworn, was examined and
5    testified as follows:
6              - - -
7           EXAMINATION
8              - - -
9    BY MR. BUCHANAN:
10     Q.   Good morning, Ms. Walker.
11   My name is Dave Buchanan.
12          Can you state your full name
13   for the record, please?
14     A.   Lisa Walker.
15     Q.   And you're local here in the
16   Malvern area; is that right?
17     A.   Yes, correct.
18     Q.   And your current employer,
19   ma'am?
20     A.   Endo Pharmaceuticals.
21     Q.   And how long have you been
22   with Endo?
23     A.   Twenty years.
24     Q.   You started in 1998?
```

4 (Pages 10 to 13)

Page 14

```
 1        A.   Yes.
 2        Q.   Were you with the
 3   predecessor company that was within
 4   DuPont, or a predecessor company that was
 5   involved in selling the same products
 6   that Endo ultimately sold?
 7        A.   Yes, I also worked for
 8   DuPont.
 9        Q.   So let's run through that a
10   little bit and figure out exactly where
11   you fit in the scheme of things.
12        First of all, before we get
13   too far down the road, have you been
14   deposed before?
15        A.   No, I have not.
16        Q.   I'm sure you've had some
17   time with counsel to get ready for today,
18   fair?
19        A.   Yes.
20        Q.   And you met with counsel
21   over a period of days?
22        A.   Yes.
23        Q.   And who did you meet with?
24        A.   Bob and Alex and Jobina.
```

Page 15

```
 1        Q.   And how much time did you
 2   spend doing that?
 3        A.   About four days.
 4        Q.   Four full days?
 5        A.   No, just a few hours each
 6   day.
 7        Q.   And when was the last time
 8   you did that?
 9        A.   Yesterday.
10        Q.   Okay.  Twenty hours all
11   told?  What's a good estimate?
12        A.   I don't recall.  Probably
13   about 20 or so.
14        Q.   So I'm going to ask you
15   questions throughout the day.  I hope you
16   had a chance to discuss what the process
17   would involve with counsel before you got
18   here.
19        You're the guest of honor
20   today, so if you need a break, just let
21   me know.  Is that okay?
22        A.   Yes.
23        Q.   And if you don't understand
24   a question, just please ask me to restate
```

Page 16

```
 1   it so I can reframe it and be as clear as
 2   I can, okay?
 3        A.   Uh-huh.
 4        Q.   And I guess by the nod of
 5   your head and the lack of an audible
 6   response, I need to remind you of that.
 7        The court reporter is here
 8   and is going to take everything down.
 9   The video may capture things in a
10   different way, but we do need to make
11   sure that you provide an audible
12   response, okay?  A yes or no if it's a
13   yes-or-no question, fair?
14        A.   Yes.
15        Q.   We'll probably go an hour
16   and-a-half or so between breaks.  If you
17   need something earlier, just let me know,
18   okay?
19        A.   That's fine.
20        MR. LIMBACHER:  Counsel,
21   just so you're aware, I think it
22   would be my preference if we stop
23   roughly about every hour.
24        MR. BUCHANAN:  Well, as I
```

Page 17

```
 1   said, the witness is the star of
 2   the show.
 3   BY MR. BUCHANAN:
 4        Q.   So we'll proceed until you
 5   tell us you need a break.
 6        Fair, ma'am?
 7        A.   Yes.
 8        Q.   Okay.  So let's dial back
 9   the clock a little bit.
10        1998 to present, an Endo
11   employee?
12        A.   That's correct.
13        Q.   Prior to that point in time,
14   a DuPont employee?
15        A.   That's correct.
16        Q.   So the check you were
17   getting prior to 1998 came from E.I.
18   dupont de Nemours or some other company?
19        A.   It came from DuPont Merck
20   Pharmaceuticals.
21        Q.   Got you, okay.
22        And how long did you work
23   with them?
24        A.   Nine years.
```

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.   So that takes you back to
2  '89 or '90?
3    A.   1989 I started.
4    Q.   Working in Wilmington?
5    A.   No, out in Barlemo Plaza.
6    Q.   That's Delaware?
7    A.   Yes.
8    Q.   And what was your position
9  with DuPont, ma'am?
10    A.   When I started, I worked
11  off -- I worked in the mailroom pushing
12  the mail cart.
13    Q.   Okay.  So you worked in that
14  function from 1989 or so, and then you
15  advanced in the ranks at DuPont?
16    A.   Correct.  I moved to the
17  customer service department at DuPont
18  Merck around '91, '92.
19    Q.   Within DuPont Merck, did
20  they have a product line that was
21  controlled substances?
22    A.   Yes, they did.
23    Q.   And we're going to talk
24  about controlled substances at various

Page 19

1  points during today.
2          And do you understand what
3  those are?
4    A.   Yes.
5    Q.   And what are they?
6    A.   Controlled substances?
7    Q.   Yes.
8    A.   They are opioid products,
9  pain products that are stored differently
10  than other products within the warehouse.
11    Q.   Do you have -- you do have a
12  water if you need?
13    A.   Yes.
14    Q.   I'll need one throughout the
15  day, so please excuse me if I'm doing
16  that as I'm asking questions.
17          All right.  So DuPont had a
18  product line that was controlled
19  substances, fair?
20    A.   Yes.
21    Q.   And, obviously, when you're
22  in the mailroom, you probably didn't have
23  direct responsibility for oversight of
24  controlled substances.

Page 20

1          But did that change over the
2  years?
3          MR. LIMBACHER:  Object to
4  form.
5          THE WITNESS:  It didn't, no.
6  I had no control over that when I
7  worked at DuPont.
8  BY MR. BUCHANAN:
9    Q.   Oh, I see, okay.
10          So what was your role and
11  function at DuPont between '89/'90 and
12  '98?
13    A.   Like I said, I worked in the
14  mailroom.  And then I was a clerical -- I
15  was a clerk within the customer service
16  department.  And then I became a customer
17  service rep.
18    Q.   Okay.  And as customer
19  service rep, what did you do for DuPont?
20    A.   Order entry, putting in
21  orders.
22    Q.   Customers would send in
23  orders, you would receive them
24  physically, probably, by fax or mail?

Page 21

1    A.   At that time, yes.
2    Q.   And then you would
3  physically key them into a computer
4  system and track the orders?
5    A.   Yes.
6    Q.   And was that really the
7  extent of your exposure to controlled
8  substance orders at that point in time?
9    A.   Yes, that's correct.
10    Q.   You weren't responsible for
11  filling the orders?
12    A.   No, I was not.
13    Q.   You weren't responsible for
14  selling to customers?
15    A.   No, I was not.
16    Q.   As a customer service rep,
17  you were the liaison between DuPont Merck
18  and the end customer, in terms of getting
19  their order physically input into the
20  system so it could be fulfilled?
21    A.   The end customer would be
22  the wholesaler.
23    Q.   Got it.
24          So DuPont Merck had

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    wholesale customers?
2        A.   Yes.
3        Q.   Distributors as customers?
4        A.   I just -- I don't recall.
5    It was 20 years ago.  Mostly wholesalers.
6        Q.   Okay.  Let's step back in
7    time prior to your time at DuPont Merck.
8            Did you have any role and
9    involvement in the pharmaceutical
10   industry prior to 1989 or '90?
11       A.   No.
12       Q.   And what was your prior
13   employment?
14       A.   Prior to DuPont?
15       Q.   Yes.
16       A.   I was in college.
17       Q.   All right.  Graduated when?
18       A.   I graduated college in 1995.
19       Q.   Okay.  Started college when?
20       A.   Right after high school,
21   '87.
22       Q.   Got you.
23            So you were working at
24   DuPont while you were finishing college?

Page 23

1        A.   That's correct.
2        Q.   Okay.  And where did you go
3    to school?
4        A.   Wilmington College.
5        Q.   And that's Wilmington,
6    Delaware?
7        A.   Yes.
8        Q.   And you graduated with a
9    degree in some specialty?
10       A.   Business management,
11   Bachelor's.
12       Q.   Got you.
13            Did you go on to any
14   postgraduate further education?
15       A.   No.
16       Q.   Any certificate programs
17   anywhere, ma'am?
18       A.   No.
19       Q.   Any focus on medicine or
20   healthcare as part of your education?
21       A.   No.
22       Q.   So your education, we can
23   fairly characterize as was in business?
24       A.   Correct, yes.

Page 24

1        Q.   So since college, since
2    starting college, you've really had two
3    employers, DuPont Merck and Endo?
4        A.   That is correct.
5        Q.   You're still in the area
6    here?  Home?
7        A.   Home is in Pennsylvania,
8    yes.
9        Q.   And work every day, you're
10   driving out to Malvern?
11       A.   Yes.
12       Q.   And that's the home base for
13   Endo today?
14       A.   Yes.
15       Q.   Okay.  And your paycheck
16   today, what's the logo on the top, or
17   what's the name of the company that sends
18   your paycheck to you?
19       A.   Endo Pharmaceuticals.
20       Q.   Got you.
21            And is Endo Pharmaceuticals
22   a subsidiary, as you understand it, to
23   Endo the parent?
24            MR. LIMBACHER:  Object to

Page 25

1    form.
2    BY MR. BUCHANAN:
3        Q.   If you know.
4        A.   I don't know.  I can't
5    confirm.
6        Q.   Okay.  Endo Pharmaceuticals
7    has been in the business of selling
8    branded -- among other things, but in the
9    business of selling branded opioid
10   products for the time that you've been at
11   the company, fair?
12            MR. LIMBACHER:  Object to
13   form.
14            THE WITNESS:  Yes.
15   BY MR. BUCHANAN:
16       Q.   Endo Pharmaceuticals is a
17   manufacturer of opioids?
18            MR. LIMBACHER:  Object to
19   form.  Foundation.
20            THE WITNESS:  It depends on
21   what your definition of
22   "manufacturer" is.
23            Yes, we do own the products,
24   but we don't physically

Page 26

1      manufacture the products.
2   BY MR. BUCHANAN:
3      Q.   I understand.
4          You contract out to other
5   people to make them --
6      A.   Correct.
7      Q.   -- for you, but ultimately
8   on the label and everything it will say
9   you're the manufacturer, right?
10      A.   Yes.
11      Q.   And that's been true since
12   you've been there?
13          MR. LIMBACHER:  Object to
14      form.
15          THE WITNESS:  Yes.
16   BY MR. BUCHANAN:
17      Q.   Could you run through some
18   of the names of the products that are --
19   branded opioids that you've had a role
20   and involvement with while you've been at
21   Endo?
22      A.   Percocet, Opana, Zydone,
23   Belbuca.
24      Q.   That's a newer one?

Page 27

1      A.   Yes.
2      Q.   Percocet is a combination
3   narcotic together with aspirin -- or
4   acetaminophen, excuse me?
5          MR. LIMBACHER:  Object to
6      form.
7   BY MR. BUCHANAN:
8      Q.   Withdrawn.
9          Percocet is a combination of
10   acetaminophen and a narcotic?
11          MR. LIMBACHER:  If you know.
12          THE WITNESS:  I don't know
13      the -- I can't confirm the actual
14      ingredients of the product.
15   BY MR. BUCHANAN:
16      Q.   Do you know whether
17   Percocet, ma'am, has an active narcotic
18   in it?
19      A.   I know that Percocet is an
20   opioid, yes.  But the active ingredient,
21   I can't confirm that.
22      Q.   You don't know whether it's
23   oxycodone, hydrocodone, something else,
24   oxymorphone?

Page 28

1          MR. LIMBACHER:  Object to
2      form.
3          THE WITNESS:  I can't
4      confirm that, no.
5   BY MR. BUCHANAN:
6      Q.   Is it fair to say, ma'am,
7   over the time that you've been at Endo,
8   Endo has manufactured and shipped
9   billions of Percocet pills?
10          MR. LIMBACHER:  Object to
11      form.
12          THE WITNESS:  I can't
13      confirm the dollar value that you
14      just said.
15   BY MR. BUCHANAN:
16      Q.   I wasn't talking dollar
17   value.
18          Just billions of pills?
19          MR. LIMBACHER:  Same
20      objection.
21          THE WITNESS:  I can't
22      confirm the number of pills.
23   BY MR. BUCHANAN:
24      Q.   Let's talk about the

Page 29

1   positions, I guess, you had -- well, let
2   me finish this thread first.  Withdrawn.
3          Is it fair to say, ma'am,
4   over the time that you've been at Endo,
5   Endo has shipped hundreds of millions of
6   Opana pills?
7          MR. LIMBACHER:  Object to
8      form.
9          THE WITNESS:  Again, I can't
10      confirm the actual number of
11      pills.
12   BY MR. BUCHANAN:
13      Q.   I'm not asking for the
14   actual number.
15          Do you have a sense, though,
16   that over the time that you were there,
17   Endo has shipped hundreds of millions of
18   Opana ER pills?
19          MR. LIMBACHER:  Same
20      objection.
21          THE WITNESS:  Again, I'm
22      sorry, I can't confirm that
23      number.
24   BY MR. BUCHANAN:

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 30 |
|---|---|
| 1 | Q.   Endo was making a lot of |
| 2 | opioids, fair? |
| 3 | MR. LIMBACHER:  Object to |
| 4 | form. |
| 5 | THE WITNESS:  We make |
| 6 | opioids, yes. |
| 7 | BY MR. BUCHANAN: |
| 8 | Q.   You made a lot? |
| 9 | MR. LIMBACHER:  Object to |
| 10 | form. |
| 11 | THE WITNESS:  I'm not -- I |
| 12 | can't confirm that.  I don't know |
| 13 | what your definition of "a lot" |
| 14 | is.  I'm not going to -- I can't |
| 15 | answer that. |
| 16 | BY MR. BUCHANAN: |
| 17 | Q.   What's your definition of "a |
| 18 | lot," ma'am? |
| 19 | MR. LIMBACHER:  Same |
| 20 | objection.  Object to form. |
| 21 | BY MR. BUCHANAN: |
| 22 | Q.   Would 100 million be a lot? |
| 23 | A.   I can't speak to the number |
| 24 | of pills.  And I'm not going to speak to |

|  | Page 31 |
|---|---|
| 1 | the number -- the dollar value. |
| 2 | I can't.  That's not -- |
| 3 | that's not within my role.  I don't know. |
| 4 | Q.   Well, you saw orders cross |
| 5 | your desk, right? |
| 6 | A.   Yes. |
| 7 | Q.   And one of your jobs was to |
| 8 | evaluate orders if they were excessive, |
| 9 | right? |
| 10 | A.   Yes. |
| 11 | Q.   So what's a lot? |
| 12 | MR. LIMBACHER:  Object to |
| 13 | form. |
| 14 | THE WITNESS:  That's not a |
| 15 | fair question.  I don't know |
| 16 | what -- it depends what you're |
| 17 | talking about, a lot.  Each |
| 18 | customer is different.  Each |
| 19 | wholesaler is different. |
| 20 | BY MR. BUCHANAN: |
| 21 | Q.   What's excessive? |
| 22 | MR. LIMBACHER:  Object to |
| 23 | form. |
| 24 | THE WITNESS:  We had, you |

|  | Page 32 |
|---|---|
| 1 | know, programs in place to monitor |
| 2 | excessive orders. |
| 3 | BY MR. BUCHANAN: |
| 4 | Q.   I'm just asking you what |
| 5 | excessive was. |
| 6 | MR. LIMBACHER:  Object to |
| 7 | form.  You're asking for a |
| 8 | definition from a dictionary? |
| 9 | MR. BUCHANAN:  Counsel, you |
| 10 | get to object to form. |
| 11 | MR. LIMBACHER:  No.  I'm |
| 12 | asking you to rephrase your |
| 13 | question, please. |
| 14 | MR. BUCHANAN:  No, that's |
| 15 | not the way it works. |
| 16 | MR. LIMBACHER:  I don't |
| 17 | understand. |
| 18 | MR. BUCHANAN:  It's my right |
| 19 | to rephrase my question.  Your |
| 20 | role is to tell me whether you |
| 21 | have an objection to form, for my |
| 22 | benefit. |
| 23 | MR. LIMBACHER:  And I'm |
| 24 | objecting -- I'm objecting to your |

|  | Page 33 |
|---|---|
| 1 | question. |
| 2 | MR. BUCHANAN:  I'll ask you |
| 3 | if I need clarification. |
| 4 | MR. LIMBACHER:  I'm |
| 5 | objecting to your question. |
| 6 | I don't think we're here to |
| 7 | ask her for definitions of |
| 8 | individual words. |
| 9 | MR. BUCHANAN:  Move to |
| 10 | strike, counsel. |
| 11 | MR. LIMBACHER:  You have to |
| 12 | put it into some kind of context. |
| 13 | MR. BUCHANAN:  Just mark the |
| 14 | transcript, please. |
| 15 | BY MR. BUCHANAN: |
| 16 | Q.   Ma'am, I'd just like to |
| 17 | know, during your time at Endo, am I |
| 18 | correct that you had a role and |
| 19 | involvement for the monitoring of |
| 20 | suspicious orders? |
| 21 | A.   Yes. |
| 22 | Q.   Monitoring for suspicious |
| 23 | orders, among other things, includes |
| 24 | monitoring for excessive orders, right? |

9  (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.  Yes.
2    Q.  Excessive by quantity,
3  right?
4    A.  We had an excessive -- we
5  had an excessive program and SOM programs
6  in place, yes.
7    Q.  And that was among your role
8  and functions over the time at Endo,
9  fair?
10    A.  Correct.
11    Q.  Okay.  So I'd like to know,
12  what's an excessive order?
13    MR. LIMBACHER:  Object to
14    form.
15    THE WITNESS:  We have
16    programs in place that monitor our
17    excessive orders and SOM programs
18    in place.  And those orders come
19    in, and they're reviewed and
20    they're released as necessary.
21    I'm not providing a
22    definition of an excessive order.
23  BY MR. BUCHANAN:
24    Q.  Well, you looked at the

Page 35

1  orders when they came across your desk?
2    A.  Yes.
3    Q.  Or came across your computer
4  screen?
5    A.  Me or somebody on my team,
6  yes.
7    Q.  And when you did that, one
8  of the things you were looking for was
9  whether they were excessive, right?
10    A.  We had a program in place
11  that would monitor our excessive orders.
12    Q.  Is that a yes answer to my
13  question, ma'am?
14    A.  We had --
15    MR. LIMBACHER:  Object to
16    form.
17  BY MR. BUCHANAN:
18    Q.  Is that a yes answer?
19    MR. LIMBACHER:  Object to
20    form.
21    THE WITNESS:  We had a
22    program in place that monitored
23    our excessive orders.
24  BY MR. BUCHANAN:

Page 36

1    Q.  I'm asking whether you
2  examined the orders?
3    A.  Yes.
4    Q.  Thank you.
5    A.  Based on our program.
6    Q.  And so over the course,
7  ma'am, of looking at those orders, you
8  saw orders for thousands and thousands
9  and tens of thousands of purchases for
10  bottles of Percocet, true?
11    MR. LIMBACHER:  Object to
12    form.
13    THE WITNESS:  I don't recall
14    actual numbers of bottles that
15    customers may or may not have
16    ordered.
17  BY MR. BUCHANAN:
18    Q.  You don't recall even having
19  the sense, ma'am, that in the orders that
20  you reviewed, tens of thousands of
21  bottles of Percocet, 100 and 500 count,
22  were purchased containing narcotics that
23  you manufactured, "you" meaning Endo?
24    MR. LIMBACHER:  Object to

Page 37

1    form.
2    THE WITNESS:  I can tell you
3    that our customers placed orders,
4    they went through our excessive
5    program and our SOM program, and
6    they were reviewed and released
7    based on -- based on our program.
8    That's what I can tell you.
9  BY MR. BUCHANAN:
10    Q.  As the person -- were you, I
11  mean, the person with that responsibility
12  within Endo with regard to branded
13  products?
14    MR. LIMBACHER:  Object to
15    form.  Time period.
16    THE WITNESS:  Repeat your
17    question.
18  BY MR. BUCHANAN:
19    Q.  Were you that person within
20  Endo who had responsibility for
21  ordering -- reviewing orders to determine
22  if they were suspicious?
23    MR. LIMBACHER:  Object to
24    form.

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    THE WITNESS: What time
2  frame are you asking about?
3  BY MR. BUCHANAN:
4    Q.   That was a good tip from
5  your counsel, I guess.
6    MR. BUCHANAN: Counsel, I'm
7  going to ask you, if you have a
8  form objection, please state a
9  form objection. I'll decide
10  whether I need to re-ask it.
11    MR. LIMBACHER: And I will
12  make my objections as I think is
13  appropriate.
14    MR. BUCHANAN: That's
15  coaching.
16    MR. LIMBACHER: And I don't
17  appreciate the speeches, okay.
18    MR. BUCHANAN: Then you
19  should ask -- you should make
20  appropriate objections.
21    MR. LIMBACHER: I think I'm
22  doing that.
23    MR. BUCHANAN: This
24  deposition is supposed to proceed

Page 39

1  as if it was in court, unless this
2  witness is going to show up in
3  court.
4  BY MR. BUCHANAN:
5    Q.   Ma'am, are you planning to
6  come to court?
7    MR. LIMBACHER: Object to
8  form.
9    MR. BUCHANAN: Withdrawn.
10  BY MR. BUCHANAN:
11    Q.   When this case goes to trial
12  in September of this year, September of
13  2019, if we request your presence at
14  court, are you willing to come to
15  Cleveland and make your presence there
16  live?
17    MR. LIMBACHER: Object to
18  form.
19    THE WITNESS: If that's the
20  recommendation of my counsel, then
21  I will do that.
22  BY MR. BUCHANAN:
23    Q.   Okay. It would not be too
24  inconvenient for you to attend, correct?

Page 40

1    MR. LIMBACHER: Object to
2  form.
3    THE WITNESS: If that's the
4  recommendation of my counsel.
5  BY MR. BUCHANAN:
6    Q.   Thank you.
7    You stated that it depends
8  on what time as to what your role and
9  function would have been with regard to
10  suspicious orders.
11    Did I understand your
12  request for clarification correctly?
13    A.   Yes.
14    Q.   So when you started with
15  Endo, what was your role and function in
16  1998?
17    A.   I was a contract analyst.
18    Q.   At what point in time did
19  you have a role and function that gave
20  you oversight of suspicious orders?
21    MR. LIMBACHER: Object to
22  form.
23    THE WITNESS: I became the
24  director of the group in 2015.

Page 41

1  BY MR. BUCHANAN:
2    Q.   My question was, at what
3  point in time did you have a role and
4  function that gave you oversight of
5  suspicious orders?
6    MR. LIMBACHER: Object to
7  form.
8    THE WITNESS: I've always
9  been part of the customer service
10  and distribution group my entire
11  time at Endo. The ultimate
12  responsibility became when I
13  became a director in 2015.
14  BY MR. BUCHANAN:
15    Q.   Okay. When did you have any
16  oversight and responsibility for
17  monitoring for suspicious orders of your
18  customers?
19    A.   I don't recall.
20    MR. LIMBACHER: Object to
21  form.
22    THE WITNESS: Sorry.
23    I don't recall. I've been
24  with the company for 20 years.

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Some time during that time frame.
2    I don't recall the exact time.
3    BY MR. BUCHANAN:
4        Q.   Can you identify somebody --
5    is there a time frame when you recall
6    that you did have that responsibility --
7            MR. LIMBACHER:  Same
8    objection.
9    BY MR. BUCHANAN:
10       Q.   -- prior to 2015?
11       A.   No, I don't recall the exact
12   date.
13       Q.   Well, if you weren't looking
14   at suspicious orders, ma'am, who was, or
15   orders to assess whether they were
16   suspicious, who was doing that?
17       A.   It could have been me.  It
18   could have been my boss at the time.  It
19   could have been somebody on the team.
20   There's a variety of people.
21       Q.   Okay.  What was the name of
22   your group?
23           Withdrawn.
24           What was the name of the

Page 43

1    group that had responsibility for
2    examining orders to see whether or not
3    they were suspicious?
4            MR. LIMBACHER:  Object to
5    form.
6            THE WITNESS:  Customer
7    service.
8    BY MR. BUCHANAN:
9        Q.   Customer service?
10       A.   It's the customer service
11   team, yes.
12       Q.   So the role and
13   responsibility -- withdrawn.
14           The group responsible for
15   evaluating orders to determine if they
16   were suspicious was in the customer
17   service function?
18       A.   Within Endo, yes.
19       Q.   Did Endo have a regulatory
20   group?
21       A.   So let me -- maybe I should
22   provide some clarification.
23           So Endo has a third-party
24   logistics company, UPS Supply Chain

Page 44

1    Solutions, that does all of our
2    warehousing and distribution for us.
3    They also have an SOM program.
4            So there's a group of --
5    within customer service that manages
6    these orders.  And there's also the
7    regulatory group at UPS that does another
8    review of the orders.
9            So I wanted to make some
10   clarification there.
11       Q.   Within the labeling of the
12   products that you sold, the narcotics,
13   Endo is listed as the manufacturer?
14           MR. LIMBACHER:  Object to
15   form.
16           THE WITNESS:  Yes.
17   BY MR. BUCHANAN:
18       Q.   Okay.  Is UPS listed as the
19   manufacturer?
20       A.   No.
21       Q.   So getting back to my
22   question, the customer service function
23   is not within the regulatory group at
24   Endo, fair?

Page 45

1        A.   Yes, that's correct.
2        Q.   The customer service
3    function is not in the, quote, compliance
4    group within Endo --
5        A.   That's correct.
6        Q.   -- fair?
7            The customer service
8    function is not in a DEA compliance
9    group, fair?
10       A.   At Endo, yes.
11           But, if I can also add,
12   again --
13       Q.   That was my only question,
14   ma'am.
15           MR. LIMBACHER:  You can
16   finish your answer.
17           Go ahead.
18           THE WITNESS:  Thank you.
19           MR. BUCHANAN:  Does it go to
20   my question?
21           MR. LIMBACHER:  You can
22   finish your answer.
23           She's entitled to finish her
24   answer.  You interrupted her,

12  (Pages 42 to 45)

Page 46

```
 1          counsel.
 2               MR. BUCHANAN:  I don't think
 3    so.  I think, counsel, you'll have
 4    an opportunity -- you'll have an
 5    opportunity to direct examination.
 6               MR. LIMBACHER:  I think it
 7    was pretty clear you interrupted
 8    her.
 9          So why don't you go ahead
10    and finish your answer, if you
11    remember at this point.
12               MR. BUCHANAN:  I'll read the
13    question back to you, ma'am.
14               MR. LIMBACHER:  Why don't
15    you read the partial answer that
16    she gave and maybe that will
17    refresh her as to where she was
18    trying to go when you interrupted
19    her.
20    BY MR. BUCHANAN:
21          Q.   The customer service
22    function is not in a DEA compliance
23    group, fair?
24          A.   Yes.
```

Page 47

```
 1          Q.   Thank you.
 2          A.   But what I wanted to add to
 3    that, so as I stated, our products are
 4    shipped under -- let me back up.
 5          Endo has a 3PL, third-party
 6    logistics company, which is UPS Supply
 7    Chain Solutions.  Our products are
 8    shipped under UPS's DEA license.  UPS
 9    also has their own SOM program, which is
10    part of the regulatory group.
11          So the Endo products are
12    shipped and monitored -- sorry, the Endo
13    products are monitored through Endo's SOM
14    program and UPS's SOM program.  So I
15    wanted to make that clear to everybody
16    here.
17               MR. BUCHANAN:  I'll move to
18    strike as nonresponsive.
19    BY MR. BUCHANAN:
20          Q.   Do you remember my question?
21          A.   Yes, I remember your
22    question.
23          Q.   And what was it?
24          A.   If the customer service team
```

Page 48

```
 1    was part of regulatory.
 2          Q.   And is it?
 3               MR. LIMBACHER:  Object to
 4    form.  Asked and answered.
 5               THE WITNESS:  No, it's not.
 6    BY MR. BUCHANAN:
 7          Q.   Thank you.
 8          I was asking you earlier
 9    when you evolved into an oversight
10    responsibility or had some responsibility
11    for suspicious order monitoring.
12          Can you describe for me,
13    ma'am, when you had some responsibility
14    for that --
15               MR. LIMBACHER:  Object to
16    form.
17    BY MR. BUCHANAN:
18          Q.   -- for the first time?
19          A.   Can you clarify that?
20          Q.   In what way?
21          A.   I don't understand your
22    question exactly.
23          Q.   Okay.  As I understand it,
24    ma'am, and your company has told us, that
```

Page 49

```
 1    you had responsibility for suspicious
 2    order monitoring.
 3          When did you first have that
 4    responsibility?
 5          A.   So Endo has always had an
 6    excessive program in place since '99, and
 7    it's evolved over time.
 8          Q.   Okay.
 9          A.   I've always been part of the
10    customer service and distribution group
11    my entire -- my entire time at Endo.  I
12    became the director in 2015.
13          So the ultimate
14    responsibility was 2015.  But I've been
15    part of the team the entire time I've
16    been at Endo.
17          Q.   Who had that responsibility
18    in 2010?
19               MR. LIMBACHER:  Object to
20    form.
21               THE WITNESS:  I was not the
22    director of the group back then,
23    but it was part of my
24    responsibility, along with other
```

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    team members.
2  BY MR. BUCHANAN:
3      Q.    Who was more senior to you
4  with that responsibility, then, in 2010?
5      A.    There was a director of the
6  team.
7      Q.    And who was that person?
8      A.    Her name was Jill Connell.
9      Q.    And would Ms. Connell review
10  the orders to determine whether they were
11  suspicious?
12      A.    No, no.  She would if I
13  needed her to.  But no, it was my
14  responsibility, or somebody on my team.
15      Q.    So as of 2010, I understand
16  Ms. Connell was senior to you, but you
17  had the responsibility for overseeing
18  whether the orders were suspicious or
19  not?
20          MR. LIMBACHER:  Object to
21      form.
22          THE WITNESS:  Yes.
23  BY MR. BUCHANAN:
24      Q.    Okay.  Let's dial the clock

Page 51

1  back to 2005.
2          Was there somebody more
3  senior to you, as of 2005, who had
4  responsibility to determine if the orders
5  were suspicious or not?
6      A.    Jill Connell was still --
7  was still the director at the time.
8      Q.    And was her role and
9  function in 2005 similar, in that
10  ultimately you could have asked her but
11  you handled it on a day-to-day basis?
12          MR. LIMBACHER:  Object to
13      form.
14          THE WITNESS:  Yes.
15  BY MR. BUCHANAN:
16      Q.    And that was the process and
17  structure that Endo had created to
18  oversee suspicious order monitoring of
19  its branded controlled substances, true?
20      A.    But --
21          MR. LIMBACHER:  Object to
22      form.
23  BY MR. BUCHANAN:
24      Q.    Is that a yes?

Page 52

1      A.    It is.
2          But I'd like to add.
3      Q.    Thank you.
4      A.    Again, I want to remind
5  everybody that Endo, we've had a
6  partnership with UPS Supply Chain
7  Solutions since 2000, who also had their
8  own SOM program.  So they were also part
9  of the equation of monitoring orders for
10  Endo.
11      Q.    I understand.
12          Endo is the manufacturer,
13  correct?
14          MR. LIMBACHER:  Object to
15      form, asked and answered.
16          THE WITNESS:  Yes.  Endo is
17      the manufacturer.
18          But our products, again, are
19      shipped under the UPS DEA license,
20      so they are part of the equation.
21  BY MR. BUCHANAN:
22      Q.    And we'll talk about UPS.  I
23  understand they had a role and function
24  during various points in time.

Page 53

1          I want to focus on Endo's
2  and your role and function, fair?  Is
3  that okay?
4      A.    Yes.
5      Q.    Okay.  I just want to
6  understand.  You had that responsibility
7  on a day-to-day basis -- withdrawn.
8          Focusing on suspicious order
9  monitoring, you had that responsibility
10  through the customer service function
11  within Endo, fair?
12          MR. LIMBACHER:  Object to
13      form.
14          THE WITNESS:  Yes.
15  BY MR. BUCHANAN:
16      Q.    For orders of Endo-branded
17  products, correct?
18      A.    What time frame are you
19  speaking of?
20      Q.    I'm speaking of from 1998
21  until present.
22      A.    Yes.
23      Q.    Okay.  So at all times that
24  you've been at Endo?

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1      A.   Yes, I've been part of the
2  same group for the entire time I've been
3  at Endo.
4      Q.   And one component of your
5  responsibilities within that group has
6  been to monitor for suspicious orders,
7  fair?
8          MR. LIMBACHER:  Object to
9  form.  Asked and answered.
10          THE WITNESS:  Yes.
11  BY MR. BUCHANAN:
12      Q.   Can you tell me at what
13  point in time you identified your first
14  suspicious order?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  I don't
18  recall.
19  BY MR. BUCHANAN:
20      Q.   I guess, can you tell me at
21  what point in time you reported your
22  first suspicious order to the DEA?
23          MR. LIMBACHER:  Object to
24  form.

Page 55

1          THE WITNESS:  I don't -- we
2  haven't.  I never -- I don't
3  recall.
4  BY MR. BUCHANAN:
5      Q.   Has Endo ever reported a
6  suspicious order for one of its branded
7  products to the DEA?
8          MR. LIMBACHER:  Object to
9  form.
10          THE WITNESS:  No, we have
11  not.
12          If I could remind you again,
13  our products are shipped under
14  UPS's license.  So the person
15  reporting a suspicious order would
16  be UPS and not Endo.
17  BY MR. BUCHANAN:
18      Q.   Okay.  Let's stay with my
19  question first.
20          Has Endo ever reported a
21  suspicious order for one of its branded
22  products to the DEA?
23      A.   Not --
24          MR. LIMBACHER:  Object to

Page 56

1  form.
2          THE WITNESS:  Not that I
3  recall.
4  BY MR. BUCHANAN:
5      Q.   And you've been in that role
6  and function, the "role and function"
7  being monitoring for suspicious orders,
8  since 1998?
9          MR. LIMBACHER:  Object to
10  form.
11          THE WITNESS:  Yes.
12  BY MR. BUCHANAN:
13      Q.   You've seen thousands and
14  thousands and thousands of orders for
15  opioid products since 1998, true?
16      A.   We've had orders since 1998,
17  yes.
18      Q.   A lot of them?
19      A.   It depends on what your
20  definition of "a lot" is.
21      Q.   Okay.  My definition would
22  be orders for billions and billions of
23  opioid pills.
24          MR. LIMBACHER:  Object to

Page 57

1  form.  Asked and answered.
2          THE WITNESS:  I can't speak
3  to billions of pills.
4          But I can remind you again
5  that we've had an excessive
6  program in place since -- since
7  2000, since Endo -- you know,
8  since Endo started.  And orders
9  have been monitored since the
10  beginning.
11  BY MR. BUCHANAN:
12      Q.   So orders have been
13  monitored and, to the best of your
14  knowledge, Endo has never reported a
15  single order as a suspicious order to the
16  DEA; is that correct?
17          MR. LIMBACHER:  Object to
18  form.
19          THE WITNESS:  As I recall,
20  yes.
21  BY MR. BUCHANAN:
22      Q.   You highlighted that UPS
23  also was involved in your supply chain,
24  fair?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1     A.   Yes.
2          MR. LIMBACHER:  Object to
3     form.  Misstates her testimony.
4          MR. BUCHANAN:  And, again,
5     it's object to form.  Don't
6     characterize whether I've
7     misstated any testimony.
8          MR. LIMBACHER:  I'm entitled
9     to make my objections --
10         MR. BUCHANAN:  You are not.
11         MR. LIMBACHER:  -- counsel.
12         MR. BUCHANAN:  You are not.
13         MR. LIMBACHER:  I'm not
14    limited to simply saying the three
15    words "object to form."
16         MR. BUCHANAN:  I would
17    invite you, in any courtroom, to
18    do that and see if you don't get a
19    reprimand from the court.
20         MR. LIMBACHER:  I've been in
21    many courtrooms, counsel --
22         MR. BUCHANAN:  This is
23    supposed to proceed --
24         MR. LIMBACHER:  -- and I've

Page 59

1     made objections many, many times
2     in front of a lot judges.  So
3     don't lecture me, please.
4          MR. BUCHANAN:  This is
5     supposed to proceed as if it's in
6     court.  I'll mark the transcript.
7     BY MR. BUCHANAN:
8          Q.   With regard to UPS's role in
9     overseeing -- withdrawn.
10         With regard to UPS's role in
11    fulfilling Endo's orders -- would that be
12    a fair characterization of one of their
13    roles, fulfilling Endo's orders?
14         MR. LIMBACHER:  Object to
15    form.
16         THE WITNESS:  They are a
17    part of the logistics company,
18    yes.  They do warehousing and
19    distribution for Endo.
20    BY MR. BUCHANAN:
21         Q.   I just want to make sure I'm
22    characterizing it in a way that's
23    reasonable from your perspective.
24         So with regard to their role

Page 60

1     in fulfilling orders, you identified that
2     they have a suspicious order monitoring
3     program as well, right?
4          A.   Yes, they do.
5          Q.   And of the orders that --
6     withdrawn.
7          Do I understand the workflow
8     correctly, that Endo is the manufacturer,
9     has relationships with customers of many
10    forms, true?
11         MR. LIMBACHER:  Object to
12    form.
13         THE WITNESS:  Our customers
14    for the opioid products are our
15    wholesalers.
16    BY MR. BUCHANAN:
17         Q.   You have wholesale
18    customers, true?
19         A.   Yes.
20         Q.   Companies like McKesson and
21    Cardinal and AmerisourceBergen, correct?
22         A.   That's correct.
23         Q.   You have other distribution
24    partners that you sell to as well, right?

Page 61

1          MR. LIMBACHER:  Object to
2     form.
3          THE WITNESS:  We have the
4     big three that you mentioned, plus
5     we have some regional wholesalers.
6     BY MR. BUCHANAN:
7          Q.   Do you sell direct to any
8     retail pharmacies?
9          A.   No, we do not.
10         Q.   Not today?  Not ever?
11         A.   Today, no.  We sold to
12    retail distribution centers many years
13    ago.
14         Q.   And just give me a window
15    for when that was happening.
16         MR. LIMBACHER:  Object to
17    form.
18         THE WITNESS:  Prior to 2005,
19    2006, if I recall correctly.
20    BY MR. BUCHANAN:
21         Q.   Okay.  So the orders come in
22    to Endo, as I understand the workflow.
23         Endo has a sales team that
24    interacts with the wholesale distributor

Page 62

1  customers, true?
2      A.   There is a sales team, yes.
3      Q.   Those sales folks do
4  whatever -- you're not in a sales
5  function, per se?
6      A.   No, I'm not.
7      Q.   You are in the business
8  side, though, of fulfilling orders, fair?
9      A.   Yes.
10     Q.   So those orders come in,
11 they either get keyed in or
12 electronically submitted to Endo?
13         MR. LIMBACHER:  Object to
14     form.
15 BY MR. BUCHANAN:
16     Q.   True?
17     A.   Yes.
18     Q.   There is some review that is
19 conducted of those orders at Endo --
20         MR. LIMBACHER:  Object to
21     form.
22 BY MR. BUCHANAN:
23     Q.   -- correct?
24     A.   Yes.  They go through

Page 63

1  multiple checks and balances within our
2  system.
3      Q.   And then they are
4  transmitted, ultimately, to your
5  third-party logistics company.
6          That would be UPS?
7      A.   Yes.  We send to them -- we
8  send the orders to them electronically
9  for fulfillment.
10     Q.   So you are the first check
11 on an order, "you" being Endo?
12         MR. LIMBACHER:  Object to
13     form.
14         THE WITNESS:  Endo is, yes.
15 BY MR. BUCHANAN:
16     Q.   And you and your team are
17 the people within Endo that are
18 monitoring for suspicious orders --
19     A.   We have a --
20     Q.   -- within Endo?
21     A.   We have a program within our
22 SAP system, yes.
23     Q.   And am I correct, then, in
24 understanding your testimony, ma'am, that

Page 64

1  since the time you've been at Endo,
2  between 1998 and present, no order has
3  been flagged as suspicious by you?
4          MR. LIMBACHER:  Object to
5      form.
6  BY MR. BUCHANAN:
7      Q.   By your group?
8          MR. LIMBACHER:  Misstates
9      her testimony.
10         MR. BUCHANAN:  I'll move to
11     strike again, counsel.
12         And mark the transcript,
13     please.
14 BY MR. BUCHANAN:
15     Q.   You can answer.
16     A.   Am I supposed to answer?
17     Q.   He'll do that throughout the
18 day, and it's supposed to be for my
19 benefit and not yours.  And I can reframe
20 my question if I need to.
21         So you can answer.
22     A.   So when orders -- if I --
23 could you make sure I understand your
24 question?  Could you please repeat it?

Page 65

1      Q.   Am I correct in
2  understanding your testimony, ma'am, that
3  since the time you've been at Endo,
4  between 1998 and present, no order has
5  been flagged as suspicious by your group?
6          MR. LIMBACHER:  Object to
7      form.
8          THE WITNESS:  So all orders
9      are -- that Endo receives go
10     through our SOM program, and there
11     is checks and balances within that
12     program.
13         MR. BUCHANAN:  I'm going to
14     move to strike as nonresponsive.
15 BY MR. BUCHANAN:
16     Q.   Can you answer my question,
17 ma'am?
18         Have you ever --
19     A.   Not that I recall, no.
20     Q.   Okay.  So over the course of
21 the 20 years that you've been in that
22 role, you have never flagged an order as
23 suspicious within your group at Endo,
24 true?

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1          MR. LIMBACHER:  Object to
2     form.  Misstates her testimony.
3          THE WITNESS:  Not that I
4     recall.
5     BY MR. BUCHANAN:
6          Q.   Let's talk about UPS.
7          So after the order clears
8     the Endo internal systems, through the
9     magic of electronics, somehow that order
10    is transmitted to UPS and captured by
11    their order processing system.
12          Would that be fair?
13          A.   The orders are sent to UPS
14    for fulfillment, yes.
15          Q.   And you said UPS has their
16    own checks where they monitor for
17    suspicious orders?
18          A.   Yes, they do.
19          Q.   And to the best of your
20    knowledge, ma'am, has UPS ever identified
21    any order that you have cleared as a
22    suspicious order?
23          MR. LIMBACHER:  Object to
24     form.

Page 67

1          THE WITNESS:  Not that I
2     recall, no.
3     BY MR. BUCHANAN:
4          Q.   And has UPS ever reported a
5     suspicious order for any Endo product
6     over the 20 years that you've been
7     working with them or their predecessor?
8          MR. LIMBACHER:  Object to
9     form.
10          THE WITNESS:  Not that I
11     recall.
12     BY MR. BUCHANAN:
13          Q.   So sitting here today, to
14     the best of your knowledge, as a person
15     who's had the role and responsibility
16     within Endo for looking at suspicious
17     orders, you're not aware of any orders
18     the company has received in 20 years that
19     have been reported to the DEA as
20     suspicious orders; would that be fair?
21          MR. LIMBACHER:  Object to
22     form.
23          THE WITNESS:  Like I stated,
24     we have an excessive program, SOM

Page 68

1     program, in place, orders go
2     through that program.  And they
3     are reviewed and released as
4     necessary.
5          And, no, nothing has been --
6     that I recall, nothing has been
7     reported to the DEA.
8     BY MR. BUCHANAN:
9          Q.   So the answer to my question
10    would be, over the 20 years you're not
11    aware of any order that's been
12    identified, by either Endo or UPS for an
13    Endo product, that's been identified as a
14    suspicious order, fair?
15          MR. LIMBACHER:  Object to
16     form.
17          THE WITNESS:  Not that I
18     recall.
19     BY MR. BUCHANAN:
20          Q.   Okay.  To clarify
21    organizationally, when we talk about
22    Endo, at a point in time, Endo acquired
23    another company known as Qualitest.
24          Do you recall that?

Page 69

1          A.   Yes.
2          Q.   Qualitest had its suite of
3     products; Endo Pharmaceuticals had its
4     suite of products, true?
5          A.   That's correct.
6          Q.   Qualitest was largely
7     focused on generics, while Endo was
8     focused on the branded, fair?
9          MR. LIMBACHER:  Object to
10     form.
11          THE WITNESS:  Yes.
12     BY MR. BUCHANAN:
13          Q.   Is that your understanding?
14          A.   Yes, correct.
15          Q.   There was a group over in
16    Qualitest that had a role and function,
17    at a point in time, with regard to
18    suspicious order monitoring of their
19    products, right?
20          A.   Yes, they did.  I can't
21    speak to it, but they did.
22          Q.   Okay.  With regard to Endo
23    Pharmaceutical's products, that role and
24    function resided -- currently resides

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  with you as the last stop and previously
2  was one of your functions, right?
3           MR. LIMBACHER:  Object to
4      form.
5           THE WITNESS:  Was one of
6      my --
7  BY MR. BUCHANAN:
8      Q.   Was one of your
9  responsibilities?
10     A.   Yes, correct.
11     Q.   You testified on a few
12 occasions, ma'am, that during your time
13 over the last 20 years at Endo there was
14 an excessive order program that was in
15 place.
16          Do you recall that?
17     A.   Yes, there was.
18     Q.   I understand your testimony
19 that you never identified an order over
20 the 20 years within Endo as being
21 suspicious.
22          Do you recall that
23 testimony?
24          MR. LIMBACHER:  Object to

Page 71

1      form.  Asked and answered.
2           THE WITNESS:  Yes.
3  BY MR. BUCHANAN:
4      Q.   Did you ever identify an
5  order as excessive?
6           MR. LIMBACHER:  Object to
7      form.
8           THE WITNESS:  So as I
9      stated, you know, we have an
10     excessive program within Endo,
11     orders go through that program.
12     And if they kick out for any
13     reason, they are reviewed and
14     released as necessary.
15 BY MR. BUCHANAN:
16     Q.   Okay.  And when I said
17 "excessive," that is one of the things
18 that is reviewed in that program?
19     A.   Yes.
20     Q.   Over the course of your
21 years with Endo, ma'am, has the excessive
22 order program identified excessive
23 orders?
24          MR. LIMBACHER:  Object to

Page 72

1      form.
2           THE WITNESS:  Yes.  They
3      have been flagged as excessive.
4      But they are reviewed, like I
5      stated, and there's reasons that
6      you can release orders that are
7      flagged as excessive.
8  BY MR. BUCHANAN:
9      Q.   Okay.  And would it be fair,
10 ma'am, that over the years, you have
11 indeed identified orders as excessive in
12 quantity, true?
13          MR. LIMBACHER:  Object to
14     form.
15          THE WITNESS:  Yes, orders
16     that kicked out as excessive.
17 BY MR. BUCHANAN:
18     Q.   Would it be fair, ma'am,
19 that over the years at Endo, you
20 identified orders of unusual frequency?
21          MR. LIMBACHER:  Object to
22     form.
23          THE WITNESS:  What's your
24     definition of "unusual frequency"?

Page 73

1  BY MR. BUCHANAN:
2      Q.   Do you have one?
3      A.   I'm asking you what your
4  definition is.
5      Q.   I'll work with yours.
6           Do you have a definition of
7  "unusual"?
8           MR. LIMBACHER:  Object to
9      form.
10          THE WITNESS:  It depends.  I
11     don't know what you're asking.  So
12     you need to clarify for me.
13 BY MR. BUCHANAN:
14     Q.   Okay.  Did you understand
15 that one of your roles and functions, in
16 looking for suspicious orders, was to
17 look for orders of unusual frequency?
18     A.   Unusual frequency, it
19 depends.  I mean, there's a lot of
20 reasons orders may kick out as excessive.
21 It could be a holiday buying period.  It
22 could be a supply issue.  It could be a
23 back order.  It could be customers are
24 consolidating.

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    There's many reasons that
2  are valid that orders would kick out as
3  excessive.
4       Q.  My question was simple.  And
5  it was really, just, did you understand
6  that one of your roles and functions, in
7  looking at suspicious orders, was to look
8  for orders of unusual frequency?
9       Did you understand that was
10  one of your roles and functions, ma'am?
11       MR. LIMBACHER:  Object to
12  form.
13       THE WITNESS:  What I can
14  tell you is we had an excessive
15  program.  And orders went through
16  that excessive program and orders
17  potentially kicked out as
18  excessive.  And then they are
19  reviewed.
20       That's how I'm going to
21  answer that question.
22  BY MR. BUCHANAN:
23       Q.  Okay.  Was one of your roles
24  and functions in looking at orders that

Page 75

1  came through your excessive program to
2  look for orders of unusual frequency?
3       MR. LIMBACHER:  Object to
4  form.
5       THE WITNESS:  I'm not -- I
6  think I answered your question.
7  BY MR. BUCHANAN:
8       Q.  Is that one of the things
9  you looked at, ma'am?
10       MR. LIMBACHER:  Object to
11  form.
12       THE WITNESS:  We had an
13  excessive program in place.  The
14  orders went through that excessive
15  program.  And they kicked out if
16  anything was beyond what the
17  program was in place.
18  BY MR. BUCHANAN:
19       Q.  Okay.
20       A.  And to review it.  And I
21  gave you specific answers as to -- or
22  specific reasons as to why orders may
23  have kicked out.
24       Q.  Okay.  Is one of the reasons

Page 76

1  unusual frequency?
2       MR. LIMBACHER:  Object to
3  form.  Vague.
4       THE WITNESS:  It's -- you
5  have to -- we can go round and
6  round about this.  But I don't
7  understand what you're asking, or
8  it's very vague what you're
9  asking.
10  BY MR. BUCHANAN:
11       Q.  Do you understand, ma'am,
12  that as a manufacturer of narcotics, Endo
13  had an obligation to maintain effective
14  controls to prevent diversion?
15       Did you have an
16  understanding of that at any point in
17  time?
18       MR. LIMBACHER:  Object to
19  form.
20       THE WITNESS:  Yes.  And as I
21  explained, we had the appropriate
22  checks and balances in place
23  within our system.
24       Can we take a break soon,

Page 77

1  please?  Can we take a break soon?
2       MR. LIMBACHER:  Sure.
3  Counsel, is that all right?  Is
4  this an appropriate place to take
5  a break?
6       MR. BUCHANAN:  I said the
7  witness can take one when she
8  wanted to, so I'll respect that.
9       MR. LIMBACHER:  Thank you.
10       VIDEO TECHNICIAN:  Off the
11  record.  The time is 9:54.
12       - - -
13       (Whereupon, a brief recess
14  was taken.)
15       - - -
16       VIDEO TECHNICIAN:  We're
17  going back on the record.
18  Beginning of Media File Number 2.
19  The time is 10:10.
20  BY MR. BUCHANAN:
21       Q.  Ma'am, did there come a time
22  in 2017 when you were approached by those
23  within Endo for information to respond to
24  a congressional inquiry concerning Endo's

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  practices with regard to suspicious order
2  monitoring?
3      A.   Are you speaking of the
4  McCaskill?
5      Q.   Yes.
6      A.   Yes.
7      Q.   You're familiar with that
8  inquiry?
9      A.   Yes, I am.
10      Q.   And you provided information
11  in connection with it, true?
12      A.   Yes.
13      Q.   You've seen the response
14  that was sent to the Senate in connection
15  with that inquiry?
16      A.   Yes.
17      MR. BUCHANAN:  Can we get
18  669, please?
19      MR. SIEGEL:  Endo Walker
20  Number 1.
21      - - -
22      (Whereupon, EndoWalker
23  Exhibit-1,
24  PAR_OPIOID_MDL_0001596408-442, was

Page 79

1      marked for identification.)
2      - - -
3  BY MR. BUCHANAN:
4      Q.   You can do this either way,
5  whatever is most convenient for you,
6  ma'am.  We have it on the screen, and
7  there should have been two passed, one
8  that has the actual exhibit sticker on
9  it.
10      MR. BUCHANAN:  And one for
11  you, counsel.
12  BY MR. BUCHANAN:
13      Q.   I'm passing you what we
14  marked as Exhibit-1 to your deposition,
15  ma'am.  It's an attachment to the
16  transmittal to the Senate in connection
17  with this inquiry.
18      Did you -- just take a few
19  moments to turn the pages.  I'll zoom in
20  fairly specifically on Endo's response.
21  And "Endo" meaning Endo Pharmaceutical.
22      A.   Uh-huh.
23      Q.   I just want to make sure
24  this is something that you've seen and

Page 80

1  are familiar with.
2      A.   Yes, I've seen it.
3      Q.   You've seen it in the
4  ordinary course, or just seen it getting
5  ready for today?
6      MR. LIMBACHER:  Object to
7  form.
8      THE WITNESS:  I've seen it
9  when we were putting it together.
10  BY MR. BUCHANAN:
11      Q.   Okay.  You worked
12  internally, I assume also with outside
13  counsel at that time, in connection with
14  responding to the inquiry?
15      A.   Yes.
16      MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19      Q.   Okay.  And this is the
20  attachment that accompanied the letter,
21  and there were other attachments, but one
22  of the attachments that accompanied the
23  letter.
24      Do you recognize it?

Page 81

1      A.   I do.
2      Q.   Let's go to -- would it be
3  fair, ma'am, that there was an inquiry
4  from Ranking Member McCaskill in the
5  summer of 2017 asking for particular
6  information from Endo in various areas,
7  true?
8      A.   Yes, that's correct.
9      Q.   Point one that's on the
10  first page, it says, Please describe any
11  suspicious order monitoring program Endo
12  and its subsidiaries have implemented,
13  including efforts to monitor, investigate
14  or report suspicious transactions between
15  its distributors and pharmacies and
16  efforts to analyze information related to
17  chargeback requests.
18      Did I read that correctly?
19      A.   Yes.
20      Q.   When you turn to the second
21  page -- and the first page is talking
22  about Par's SOM program.
23      Par is the successor by name
24  to Qualitest?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.   That's correct.
2    Q.   So we can understand, this
3  first piece they're referring to that
4  portion of the business that was either
5  Par or Qualitest in prior years, fair?
6         MR. LIMBACHER:  Object to
7    form.
8         THE WITNESS:  Yes, that's
9    correct.
10 BY MR. BUCHANAN:
11   Q.   When we go forward in time,
12 we see -- I shouldn't say "forward in
13 time" -- to the second page of the
14 document, it talks about Endo's SOM
15 program?
16   A.   Yes.
17   Q.   How do you pronounce that as
18 somebody in the field?  Do you pronounce
19 it SOM or S-O-M?  What's your parlance?
20   A.   I mostly say SOM.
21   Q.   Got you.
22        And did this, at the time,
23 ma'am, fairly summarize the then-current
24 practices of Endo with regard to

Page 83

1  suspicious order monitoring?
2         MR. LIMBACHER:  Object to
3    form.
4         THE WITNESS:  Yes, this is
5    our current SOM program.
6  BY MR. BUCHANAN:
7    Q.   And this was the program --
8  this is the program today?
9    A.   Yes, as of --
10        MR. LIMBACHER:  Object to
11   form.
12        THE WITNESS:  Yes, as of
13   today.  Yes.
14 BY MR. BUCHANAN:
15   Q.   And the program in 2017?
16   A.   Correct.
17   Q.   Endo changed its SOM program
18 at some point in time, 2014, 2015, true?
19   A.   In 2014 we made enhancements
20 to it, yes.
21   Q.   So this would describe the
22 as-enhanced program?
23   A.   That would be correct.
24   Q.   Am I correct, ma'am, that

Page 84

1  what this describes is essentially what
2  you were describing to us earlier today,
3  and that would be an order management
4  monitoring within the company's SAP
5  system?
6         MR. LIMBACHER:  Object to
7    form.
8         THE WITNESS:  Yes.  Our SOM
9    program is within our SAP system.
10 BY MR. BUCHANAN:
11   Q.   So what the company does is
12 it gets orders, they get either input or
13 electronically transmitted into the
14 company's SAP system today, correct?
15   A.   Yes.
16   Q.   Then there's an algorithm in
17 that particular system that evaluates
18 orders across different metrics; would
19 that be fair?
20   A.   Yes.
21   Q.   Which you told -- this
22 inquiry, responded to the Senate inquiry
23 was, it evaluates individual orders based
24 on quantity, size and frequency, QSF; is

Page 85

1  that right?
2    A.   Yes.
3    Q.   And then if the system
4  identifies a flag, then you have to clear
5  it, right?
6         MR. LIMBACHER:  Object to
7    form.
8         THE WITNESS:  If orders are
9    flagged, they are kicked out on
10   the report and they are reviewed
11   and then cleared.
12 BY MR. BUCHANAN:
13   Q.   And what the company did in
14 response to this inquiry is actually
15 produced, I believe, the orders that had
16 been flagged by its system over a
17 multi-year period of time and sent that
18 to the ranking member, fair?
19   A.   The orders that were
20 provided for this document were only for
21 certain states.  I believe it was only
22 for the state of Missouri.
23   Q.   Let's look at that.
24        It would be Exhibit B, is

22  (Pages 82 to 85)

Page 86

1    that correct, where that was attached?
2        A.   Yes.
3        Q.   And looking at Exhibit B,
4    and I may refer, at times, to dot
5    numbers, you'll see them in the top right
6    corner, .14, for example.
7            So we're on .14 of Exhibit-1
8    to your deposition.  Confusingly, this
9    page is named Exhibit B.  But let's look
10   at that, for example.
11           Are these -- are these
12   orders that were identified by the
13   algorithm as orders requiring further
14   investigation?
15       A.   Yes.
16       Q.   Okay.  And so what we see
17   here when we look at it is the ship date,
18   the customer, customer name, customer
19   address, results of the investigation.
20           Do you see that?
21       A.   Uh-huh.
22       Q.   And then we see the ultimate
23   outcome on the right, right?
24           MR. BUCHANAN:  Is it

Page 87

1            possible to blow that up so we can
2            see the headings a little better?
3    BY MR. BUCHANAN:
4        Q.   Is that more discernible to
5    you, ma'am?
6        A.   I can see it.  It's fine.
7        Q.   Investigative results, that
8    would be the fourth column.
9            And then the fifth column
10   says what?
11       A.   The action that was
12   required.
13       Q.   Okay.  And so what we see
14   are, I don't know, pages on pages of
15   orders that fit the description of the
16   inquiry.
17           Was that just the state of
18   Missouri that you reported out?
19       A.   Correct.
20       Q.   So pages on pages of orders
21   for customers for the state of Missouri
22   that were flagged by the system as
23   excessive by one of those QSF factors,
24   right?

Page 88

1            MR. LIMBACHER:  Object to
2    form.
3            THE WITNESS:  Yes.
4    BY MR. BUCHANAN:
5        Q.   And those QSF factors would
6    be, you know, excessive by quantity,
7    excessive by size or excessive by
8    frequency or unusual in that regard,
9    right?
10           MR. LIMBACHER:  Object to
11   form.
12           THE WITNESS:  By quantity,
13   size or frequency, yes.
14   BY MR. BUCHANAN:
15       Q.   And so these all -- all
16   these orders tripped the wire, so to
17   speak, and got kicked out and required
18   some review; is that right?
19       A.   Yes.
20       Q.   And these are orders that
21   would have been internally investigated
22   by you or your team, fair?
23       A.   Yes, correct.
24       Q.   Okay.  And so I guess the

Page 89

1    far right column, we're back on .14,
2    please, we see kind of the results of
3    these outcomes -- or outcome or results
4    or action for each of these orders
5    following the investigative review by
6    your team, right?
7        A.   I'm sorry, say that one more
8    time.
9        Q.   Yeah.  So we see, in the far
10   right column, is the outcome of your
11   investigation, what happened with the
12   order --
13       A.   Right.
14       Q.   -- right?  Okay.
15           And for that first one
16   there, in May of 2014, what was the
17   conclusion?
18       A.   It was cleared after it was
19   reviewed.
20       Q.   How about for the next one?
21       A.   Cleared after review.
22       Q.   How about the next one?
23       A.   It's the same.  Cleared
24   after review.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.   How about after that?
2    A.   It was cleared after review.
3    Q.   Would it be fair to say, I
4  guess, if we went through this
5  exercise -- we're now at
6  AmerisourceBergen; is that right?
7    A.   Yes.
8    Q.   And the flag is pended due
9  to order history is the investigative
10  reason.
11        Do you see that?
12    A.   Yes.
13    Q.   And you see cleared after
14  review, cleared after review, cleared
15  after review, cleared after review for
16  all these lines on this page on .14; is
17  that fair?
18    A.   That's correct.
19    Q.   And that would have been
20  cleared after review by you or your team?
21    A.   Yes.
22    Q.   And it wasn't a secret that
23  you and your team were doing this within
24  Endo, right?

Page 91

1        MR. LIMBACHER:  Object to
2    form.
3        THE WITNESS:  No.
4  BY MR. BUCHANAN:
5    Q.   I mean, you provided
6  reports, on a weekly or monthly basis, of
7  the orders that were investigated and
8  their status, right?
9        MR. LIMBACHER:  Object to
10    form.
11        THE WITNESS:  Repeat your
12    question.
13  BY MR. BUCHANAN:
14    Q.   You provided reports on the
15  orders that were pended and then cleared,
16  correct?
17    A.   No.  Reports were not
18  provided.
19    Q.   And then we see on the next
20  page, if we go to .15, let's just start
21  at the top again.  I guess we're still in
22  AmerisourceBergen.
23        And, again, this would just
24  be orders into Missouri, right?

Page 92

1    A.   Yes.
2    Q.   And what was the result, now
3  we're up to, I guess, 2014 for
4  AmerisourceBergen, or 6/27 of 2014.  It's
5  page .15 on the top right corner.
6        What was the outcome of that
7  particular order that was pended due to
8  order history?
9    A.   Cleared after review.
10    Q.   How about the next one?
11    A.   The same.
12    Q.   The next one?
13    A.   The same.
14    Q.   How about for the rest of
15  this page?
16    A.   Cleared after review.
17    Q.   A few dozen orders here for
18  AmerisourceBergen.
19        And then moving into Express
20  Scripts, orders were pended or held
21  initially or kicked out of the system for
22  various reasons, and then in each
23  instance, after a physical review by a
24  person, you or somebody on your team,

Page 93

1  they were cleared?
2        MR. LIMBACHER:  Object to
3    form.
4        THE WITNESS:  Correct.
5  BY MR. BUCHANAN:
6    Q.   And when we say "cleared
7  after review," that means that, then,
8  they are okay from your perspective with
9  regard to UPS, right?
10        MR. LIMBACHER:  Object to
11    form.
12        THE WITNESS:  Cleared after
13    review means they were cleared
14    from Endo's SAP system, but then
15    they were sent to UPS.  And then
16    they also went through UPS's SOM
17    program before they were
18    ultimately shipped out.
19  BY MR. BUCHANAN:
20    Q.   And then you would, under
21  your protocol, receive calls, from time
22  to time, from UPS about orders that were
23  kicked out of their system, correct?
24    A.   UPS will only reach out to

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  me if they needed additional information
2  about an order.
3       Q.   So if they reached out to
4  you in connection with an order that was
5  pended by their system, they might call
6  you in the first instance, correct?
7            MR. LIMBACHER:  Object to
8       form.
9            THE WITNESS:  Repeat that.
10 BY MR. BUCHANAN:
11      Q.   Yes.
12      So UPS, you said, had their
13 own system to review?
14      A.   That's correct.
15      Q.   They had their own
16 algorithm, correct?
17      A.   Yes.
18      Q.   And sometimes there's things
19 that they couldn't address internally
20 within their system, correct?
21           MR. LIMBACHER:  Object to
22      form.
23           THE WITNESS:  If they needed
24      to, they would have reached out

Page 95

1       for additional information.
2  BY MR. BUCHANAN:
3       Q.   And you recall that over the
4  years they did?
5       A.   A few times, yes.
6       Q.   And in each instance when
7  they called you, you cleared it after
8  review, correct?
9            MR. LIMBACHER:  Object to
10      form.
11           THE WITNESS:  I would
12      provide information that UPS
13      needed, depending on what they
14      would need.
15 BY MR. BUCHANAN:
16      Q.   In no instance did you guide
17 UPS not to ship an order, correct?
18           MR. LIMBACHER:  Object to
19      form.
20           THE WITNESS:  UPS makes that
21      ultimate decision whether or not
22      to ship an order.
23      I would just provide
24      information to what UPS needed.  I

Page 96

1  would not tell them to ship or not
2  ship.
3  BY MR. BUCHANAN:
4       Q.   UPS did not reach out to
5  your customers directly, correct?
6       A.   No, they do not.  They reach
7  out to the client.
8       Q.   Right.  So in terms of any
9  assessment with regard to whether an
10 order was suspicious or not, they did not
11 relate or communicate directly with
12 Endo's customers, fair?
13      A.   Correct, right.  They
14 reached out to the client.
15      Q.   Any communication in that
16 regard, with regard to the ultimate
17 purchaser, I should say the ultimate
18 purchaser, in this instance, we're
19 looking on this page, the first line is
20 AmerisourceBergen Corporation, that would
21 have been Endo's customer for that
22 particular order, fair?
23           MR. LIMBACHER:  Object to
24      form.

Page 97

1            THE WITNESS:  Yes, yes.
2  BY MR. BUCHANAN:
3       Q.   So this was pended due to
4  order history.  And then we see, for many
5  of these on this page -- actually, all of
6  them on this page, they were cleared
7  after review, correct?
8       A.   Yes.
9       Q.   If it went to UPS, then it
10 tripped a wire there, they would, if they
11 needed more information and even
12 information from a customer, they would
13 reach out to Endo in the first instance,
14 not AmerisourceBergen, correct?
15           MR. LIMBACHER:  Object to
16      form.
17           THE WITNESS:  If they needed
18      information, yes.
19 BY MR. BUCHANAN:
20      Q.   Okay.  And at no point, to
21 your knowledge, did UPS ever reach out to
22 a customer of Endo's like
23 AmerisourceBergen for information to
24 clear an order or not, fair?

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1      A.   Not that I recall, no.  They
2   reach out to the client.
3      Q.   And you were the primary
4   point of contact with UPS?
5      A.   Yes.
6         MR. LIMBACHER:  Object to
7   form.
8   BY MR. BUCHANAN:
9      Q.   So we're on .16.  We've been
10  looking at orders into Missouri for Endo
11  products, Endo opioid products over the
12  years.
13        I guess we're still in
14  AmerisourceBergen now, moving into
15  Express Scripts at the bottom.
16        Can you tell us what the
17  result of your inquiry was, again, on the
18  first one here?  What is that, August of
19  2014?
20        MR. LIMBACHER:  Object to
21  form.
22        THE WITNESS:  Cleared after
23  review.
24  BY MR. BUCHANAN:

Page 99

1      Q.   And again on this page,
2   cleared after review, cleared after
3   review, cleared after review, cleared
4   after review, cleared after review,
5   cleared after review, cleared after
6   review, order on order on order, fair?
7      A.   Correct.
8      Q.   That was the determination
9   with Endo with regard to each of these
10  orders, correct?
11     A.   Yes.
12     Q.   And you understand that when
13  it was cleared after review, from your
14  perspective, from Endo's perspective, it
15  was okay if UPS fulfilled the order,
16  fair?
17        MR. LIMBACHER:  Object to
18  form.
19        THE WITNESS:  No.  When the
20  orders are cleared from Endo, we
21  know that once they hit UPS's
22  system, they go through UPS's SOM
23  program.  And, yes.
24  BY MR. BUCHANAN:

Page 100

1      Q.   From Endo's perspective, the
2   order -- at that point in time, Endo did
3   not flag an order as suspicious at that
4   point in time, fair?
5      A.   Depends on what your
6   definition of "suspicious" is.
7   Suspicious as in it was flagged from our
8   SOM program?
9      Q.   Well, is that suspicious?
10     A.   It --
11        MR. LIMBACHER:  Object to
12  form.
13        THE WITNESS:  No, not really
14  suspicious, it just -- more
15  information needed to be done with
16  that particular order.
17  BY MR. BUCHANAN:
18     Q.   Okay.  And with regard to
19  each of the orders we see on 669.16, the
20  top right corner of Exhibit-1 to your
21  deposition, we see all those orders were
22  cleared, correct?
23     A.   Uh-huh.
24     Q.   After review, right?

Page 101

1      A.   Yes.
2      Q.   Let's go to .17.
3         Similar format.  Orders on
4   orders for various of Endo's customers,
5   correct?
6      A.   Yes.
7      Q.   There's various reasons why
8   they were kicked out of the SAP system,
9   correct?
10     A.   Correct.
11     Q.   And on the right, the
12  results of the investigation are noted,
13  fair?
14     A.   Yes.
15     Q.   And with regard to the
16  first, what was the result?
17     A.   Cleared after review.
18     Q.   And the second?
19     A.   The same.
20     Q.   The third?
21     A.   The same.
22     Q.   The next?
23     A.   The same.
24     Q.   For each one on this page,

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1      again, ma'am?
2          A.    That's correct.
3          Q.    Cleared after review?
4          A.    Uh-huh.
5          Q.    Okay.  And so what had to
6      happen is, the system flagged these
7      orders as orders that tripped the
8      algorithm for being excessive as to
9      quantity or frequency -- what was the
10     other QSF?
11         A.    Quantity, size and
12     frequency.
13         Q.    There you go.
14             They got kicked out of the
15     system or flagged within the system as
16     orders to be further investigated, right?
17             MR. LIMBACHER:  Object to
18     form.
19             THE WITNESS:  Yes.
20     BY MR. BUCHANAN:
21         Q.    When the system -- within
22     the system's perspective, these were
23     orders that needed to be physically
24     reviewed to determine if they were

Page 103

1      suspicious or not, fair?
2              MR. LIMBACHER:  Object to
3      form.
4              THE WITNESS:  They needed to
5      be reviewed, yes.
6      BY MR. BUCHANAN:
7          Q.    And at least with regard to
8      each of the orders that had been flagged
9      for further review on this page, the
10     determination of the human beings within
11     Endo that reviewed those orders is that
12     they were cleared for review, cleared,
13     correct, following review?
14         A.    They were -- correct.
15         Q.    Let's go to the next page,
16     .18.
17             Again, we're still just
18     looking at orders in Missouri, right?
19         A.    Yes.
20         Q.    And looking at
21     AmerisourceBergen, among other ordering
22     entities, customers of Endo, correct?
23         A.    Correct.
24         Q.    We see the rationale, at

Page 104

1      least on the first line, pended due to
2      order history.  We see underneath that,
3      other investigative results, pended due
4      to order history, pended due to order
5      history, correct?
6          A.    Yes.
7          Q.    And off to the right, we see
8      the response of your investigations, you
9      and your team's investigations, right?
10         A.    That's correct.
11         Q.    And in each case, cleared
12     after review, cleared after review,
13     cleared after review, cleared after
14     review, cleared after review?
15         A.    They were.  Yes, they were.
16             But as a reminder, once we
17     cleared them, they still go through UPS's
18     SOM program before they were a shipment
19     out to customers.
20         Q.    And you've told us already
21     that Endo, in circumstances where an
22     order would be flagged by UPS, if UPS
23     required additional information, they
24     would reach out to you, right?

Page 105

1          A.    Correct.  Yes, they would.
2          Q.    Can you recall a single
3      order that you were contacted on by UPS
4      that you directed them not to ship?
5              MR. LIMBACHER:  Object to
6      form.
7              THE WITNESS:  Not that I
8      recall.
9      BY MR. BUCHANAN:
10         Q.    Can you recall a single
11     order that got kicked out by UPS's system
12     that you identified as suspicious if they
13     asked for additional information from
14     you?
15             MR. LIMBACHER:  Object to
16     form.
17             THE WITNESS:  They've asked
18     for additional information on
19     occasion, yes.
20     BY MR. BUCHANAN:
21         Q.    Can you identify any order
22     that they asked you about that you
23     subsequently confirmed, yes, it's
24     suspicious?

27  (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1          MR. LIMBACHER: Object to
2     form.
3          THE WITNESS: Not that I
4     recall.
5     BY MR. BUCHANAN:
6     Q.   Can you identify any order
7     that wasn't shipped by virtue of any of
8     the flags that were tripped in the system
9     following your reviews?
10          MR. LIMBACHER: Object to
11     form.
12          THE WITNESS: By Endo and
13     UPS's review?
14     BY MR. BUCHANAN:
15     Q.   Yes.
16     A.   Not that I recall.
17     Q.   Just looked at .17. Let's
18     go to .18.
19          Again, we're looking at
20     additional purchase orders from various
21     Endo customers through the years.
22          Still limited to Missouri,
23     correct?
24          MR. LIMBACHER: Object to

Page 107

1     form.
2          THE WITNESS: Yes.
3     BY MR. BUCHANAN:
4     Q.   Is it your understanding
5     this entire Attachment B relates to
6     Missouri, ma'am?
7     A.   Yes, that's correct.
8     Q.   Okay. We're on .18.
9          And we see orders from
10     AmerisourceBergen, among others, that
11     were pended due to order history,
12     correct?
13     A.   Correct.
14     Q.   And off to the right, we see
15     the results, cleared after review,
16     cleared after review, et cetera, et
17     cetera, right?
18     A.   Yes, they were.
19     Q.   None on this were held,
20     correct?
21     A.   No, they were not.
22     Q.   None were cancelled and no
23     one was reported?
24     A.   That's correct.

Page 108

1     Q.   Okay.
2          .20, same story?
3     A.   After the review, yes, they
4     were cleared.
5     Q.   .21, same story?
6          MR. LIMBACHER: Object to
7     form.
8          THE WITNESS: Yes.
9     BY MR. BUCHANAN:
10     Q.   I guess there was an
11     objection, so let me be more specific.
12          .21 reflects orders that
13     Endo received from Endo's customers,
14     correct?
15     A.   Yes, these are Endo's
16     customers' orders.
17     Q.   These are customer orders
18     into Missouri only, correct?
19     A.   Yes, into Missouri only.
20     Q.   There's a listing for a
21     reason for an investigation, correct?
22          Do you see that?
23     A.   Yes.
24     Q.   And then there's the outcome

Page 109

1     of that. And it says, Cleared after
2     review, correct?
3     A.   That's correct.
4     Q.   In each instance on this
5     page, was every order cleared after
6     review?
7     A.   They were cleared after
8     review. And, again, they went through
9     UPS's SOM program before they were
10     shipped.
11     Q.   Yes. And I'm focused on
12     Endo's review in the first instance,
13     okay?
14          These were all cleared by
15     Endo's review, correct?
16     A.   I understand that. But I
17     just wanted to point out that they also
18     go through UPS's SOM program.
19     Q.   And sitting here today,
20     ma'am, there are no orders that you're
21     aware of that weren't also cleared after
22     review by UPS, correct?
23          MR. LIMBACHER: Object to
24     form. Asked and answered.

28 (Pages 106 to 109)

Page 110

1      THE WITNESS:  They went
2   through UPS's SOM program.
3   BY MR. BUCHANAN:
4      Q.   Right.  And to the best of
5   your knowledge, even those that tripped
6   whatever algorithm they had, based on
7   either their own determination or their
8   interactions with you, they were all
9   cleared for review -- cleared to ship?
10     A.   They were, yes.
11          MR. LIMBACHER:  Object to
12  form.  Asked and answered.
13  BY MR. BUCHANAN:
14     Q.   Okay.  Let's go to .22.
15          Again, ma'am, now we're into
16  2015.  This looks like a sheet of just
17  AmerisourceBergen orders.
18          These were Endo's customers,
19  right?
20     A.   Uh-huh.
21     Q.   Orders through Endo,
22  correct?
23     A.   Yes.
24     Q.   Kicked out of the system

Page 111

1   because they tripped one of the
2   algorithms the company created to monitor
3   for suspicious orders, correct?
4          MR. LIMBACHER:  Object to
5   form.
6          THE WITNESS:  They were
7   kicked out for further review,
8   yes.
9   BY MR. BUCHANAN:
10     Q.   And when a human got
11  involved and looked at the orders, each
12  one of these orders was cleared, correct?
13     A.   That's correct.
14     Q.   Okay.  Let's go to page .23.
15          Just satisfy yourself,
16  ma'am, that we're still looking at Endo's
17  customers here.
18     A.   They are.
19     Q.   These are Endo orders?
20     A.   They are.
21     Q.   There is a computer
22  algorithm that was represented, in the
23  front of this Exhibit-1, to Congress that
24  identified orders of unusual QS&F.

Page 112

1      Do you recall that?
2      A.   They went through --
3          MR. LIMBACHER:  Object to
4   form.
5          THE WITNESS:  Sorry.
6          They went through our
7   excessive program and they kicked
8   out for further review, yes.
9   BY MR. BUCHANAN:
10     Q.   And the further review was,
11  what, for QS&F?
12          MR. LIMBACHER:  Object to
13  form.
14          THE WITNESS:  For the
15  quantity, size and frequency, yes.
16  BY MR. BUCHANAN:
17     Q.   So the company created an
18  algorithm in its order system, it
19  identified orders, and then,
20  notwithstanding that, those orders were
21  cleared and forwarded to UPS for
22  processing, correct?
23          MR. LIMBACHER:  Object to
24  form.

Page 113

1          THE WITNESS:  They were.
2          Another point of
3   clarification, you keep talking
4   about quantity, size and
5   frequency.  And another piece of
6   this was also reviewing the class
7   of trade as well.
8          So these orders also looked
9   on other wholesalers' ordering
10  patterns as well.
11  BY MR. BUCHANAN:
12     Q.   And the system, each of
13  these orders, by -- and these are big
14  customers, right?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  We had three
18  big wholesalers which you know,
19  Endo as -- yes, correct.
20  BY MR. BUCHANAN:
21     Q.   So they are buying lots of
22  product, correct?
23          MR. LIMBACHER:  Object to
24  form.

29  (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1      THE WITNESS: They are
2   buying product.
3   BY MR. BUCHANAN:
4      Q.   Okay.  You don't have a
5   sense of whether it was a lot or not?
6      MR. LIMBACHER:  Object to
7   form.
8      THE WITNESS:  I can't tell
9   by this information, no.
10  BY MR. BUCHANAN:
11     Q.   And then after these orders
12  get kicked out by the algorithm, a human
13  being looks at them and cleared them
14  all --
15     MR. LIMBACHER:  Object to
16  form.
17  BY MR. BUCHANAN:
18     Q.   -- right?
19     A.   Yes.
20     Q.   We see that on the
21  right-hand column on the screen, or on
22  the document itself?
23     A.   Yes.
24     Q.   Okay.  Let's go to .23.

Page 115

1      And you can look at it just
2   quickly, ma'am, and satisfy yourself that
3   we're still just looking at orders in
4   Missouri.
5      A.   Uh-huh.
6      Q.   Still looking at
7   AmerisourceBergen orders.
8      Came in to you, they tripped
9   the wire in your SAP system, correct?
10     MR. LIMBACHER:  Object to
11  form.
12     THE WITNESS:  Correct.
13  BY MR. BUCHANAN:
14     Q.   All right.  Then a human
15  being got involved and cleared them --
16     MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19     Q.   -- right?
20     A.   Yes.
21     Q.   And you sent them off to UPS
22  for fulfillment, correct?
23     A.   After they've gone through
24  UPS's SOM program.

Page 116

1      Q.   And I think you have told us
2   already, ma'am, that if something got
3   flagged by their system and they required
4   information about the order, they would
5   contact you?
6      A.   If they required
7   information, yes.
8      Q.   And you do recall that
9   happening from time to time, correct?
10     A.   From time to time.
11     Q.   And you recall clearing
12  those orders, correct?
13     MR. LIMBACHER:  Object to
14  form.  Misstates her testimony.
15     THE WITNESS:  I provided
16  information to UPS.  They had the
17  ultimate decision whether or not
18  to ship it or not.
19  BY MR. BUCHANAN:
20     Q.   Right.  You provided the
21  same type of information that you would
22  consider in internally clearing the
23  order, correct?
24     A.   No, it --

Page 117

1      MR. LIMBACHER:  Object to
2   form.
3      THE WITNESS:  No, it would
4   depend on what they needed.
5   BY MR. BUCHANAN:
6      Q.   Understood.
7      Their order could kick out
8   of their system for a different reason
9   than it would for yours, right?
10     A.   Potentially, yes.
11     Q.   All right.  Let's go to .24.
12     We're still in orders that
13  were from Missouri customers of Endo,
14  right?
15     A.   Yes.
16     Q.   Buying narcotics, right?
17     MR. LIMBACHER:  Object to
18  form.
19  BY MR. BUCHANAN:
20     Q.   You can answer.
21     A.   Yes.
22     Q.   Orders getting kicked for
23  tripping a wire for one of the quantity,
24  size and frequency characteristics,

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  right?
2       MR. LIMBACHER:  Object to
3   form.
4       THE WITNESS:  Correct.
5  BY MR. BUCHANAN:
6       Q.   And notwithstanding that
7  they are getting flagged, these orders
8  are not being reported to the DEA,
9  correct?
10      MR. LIMBACHER:  Object to
11  form.
12      THE WITNESS:  These orders
13  kick out through our SOM program
14  for further review, correct.
15  BY MR. BUCHANAN:
16      Q.   The answer to my question,
17  just as a factual matter, ma'am, none of
18  these orders that we've looked at to this
19  point, and we're now up to .24, were
20  reported to DEA, correct?
21      MR. LIMBACHER:  Object to
22  form.
23      THE WITNESS:  No, not that I
24  recall.

Page 119

1  BY MR. BUCHANAN:
2       Q.   And after your review of the
3  orders on .24, they were cleared, right?
4       A.   Cleared to go to UPS through
5  their SOM program before shipping.
6       Q.   And which you note here is
7  cleared after review; that's what you
8  stated here, correct?
9       MR. LIMBACHER:  Object to
10  form.
11      THE WITNESS:  They are
12  cleared from Endo's SAP system,
13  and then they still go to UPS
14  through their SOM program before
15  shipping.
16  BY MR. BUCHANAN:
17      Q.   Let's stay with what's
18  written on this document back to the
19  Senate inquiry on .24.
20      What was the outcome listed
21  on the first line?
22      A.   Cleared for review.
23      Q.   Cleared after review, is
24  that what it says?

Page 120

1       A.   Sorry.  Cleared after
2  review.
3       Q.   And the next one says what?
4       A.   The same thing.
5       Q.   And the whole column says
6  that, right?
7       A.   Correct.
8       Q.   Let's go to .25.
9       You've got a lot of orders
10  into Missouri, don't you?
11      MR. LIMBACHER:  Object to
12  form.
13      THE WITNESS:  There's orders
14  into Missouri, yes.
15  BY MR. BUCHANAN:
16      Q.   In fact, these pages that
17  we've been looking at are all orders to
18  big entities, AmerisourceBergen, Express
19  Scripts.  I think we saw --
20      A.   Well, if you look about
21  Express Scripts, that was for a patient
22  assistance program, which is different
23  than a regular order.  So that's
24  different.

Page 121

1       Q.   We can agree
2  AmerisourceBergen is a big company?
3       A.   Yes.
4       MS. ROLLINS:  Object to the
5  form.
6       MR. LIMBACHER:  Object to
7  form.
8  BY MR. BUCHANAN:
9       Q.   Big customers of yours?
10      A.   They are.
11      Q.   So we're on here again and
12  we've got all these orders that are
13  tripping the wire by your internal
14  algorithm, true?
15      MR. LIMBACHER:  Object to
16  form.
17      THE WITNESS:  These went
18  through our excessive program,
19  yes, and needed -- for further
20  review.
21  BY MR. BUCHANAN:
22      Q.   And when a human being got
23  involved on .24, each of these orders was
24  cleared after review, correct?

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1          MR. LIMBACHER:  Object to
2     form.
3          THE WITNESS:  Correct.
4     BY MR. BUCHANAN:
5          Q.   Okay.  Let's go to .25.
6          Still looking at Endo's
7     customers?
8          A.   Yes.
9          Q.   Still looking at Missouri
10    orders?
11         A.   Yes.
12         Q.   Still seeing the reason
13    reported, in the fourth column, why it
14    triggered an investigation?
15         A.   Correct.
16         Q.   And still seeing the outcome
17    on the right as cleared after review?
18         A.   Correct.
19         Q.   In each instance for each
20    order, correct?
21         A.   Yes.
22         Another point of
23    clarification, this is -- each one of
24    these lines is not each order.  There's,

Page 123

1     you know, multiple lines on one order.
2     So I don't want you all to think this is,
3     you know, just all individual orders.
4          Q.   So what you're saying, if I
5     understand your testimony, ma'am, is that
6     there's, in fact, multiple line items
7     that fill this order?
8          A.   Correct, right.
9          MR. LIMBACHER:  Object to
10    form.
11    BY MR. BUCHANAN:
12         Q.   So let's now go to .26, for
13    example.  And thank you for that
14    clarification.
15         A.   Right.
16         Q.   We're looking at an order
17    from AmerisourceBergen, a ship date of
18    April 3, 2015, right?
19         A.   Yes.
20         Q.   Okay.  The order -- that's
21    the date the product was shipped,
22    correct?
23         A.   Based on what this is
24    saying, correct.

Page 124

1          Q.   That particular order
2     shipment might involve multiple line
3     items and different bottle counts for
4     different products, correct?
5          MR. LIMBACHER:  Object to
6     form.
7          THE WITNESS:  Uh-huh.
8     BY MR. BUCHANAN:
9          Q.   All right.  And where would
10    you go to figure out what was in that
11    order?
12         MR. LIMBACHER:  Object to
13    form.
14         THE WITNESS:  Our SAP
15    system.
16    BY MR. BUCHANAN:
17         Q.   How long have you been using
18    that to track your orders?
19         A.   Twenty years.
20         Q.   And so how would you figure
21    out what composed each of these orders?
22         A.   There's reports that kick
23    out from SAP.
24         Q.   And what's that report

Page 125

1     called?
2          A.   Orders on hold report, I
3     believe.
4          Q.   Okay.  And so the status of
5     all these orders would be orders on hold,
6     prior to them being cleared?
7          MR. LIMBACHER:  Object to
8     form.
9          THE WITNESS:  Correct.
10    BY MR. BUCHANAN:
11         Q.   So any order that has been
12    flagged, at any point in time by Endo's
13    algorithm, would have been an order on
14    hold, right?
15         MR. LIMBACHER:  Object to
16    form.
17         THE WITNESS:  Yes.
18    BY MR. BUCHANAN:
19         Q.   And then the order status
20    can be changed, right?
21         MR. LIMBACHER:  Object to
22    form.
23         THE WITNESS:  After review.
24    It can be released for shipping,

32 (Pages 122 to 125)

Page 126

1    yes.
2    BY MR. BUCHANAN:
3        Q.    So within your system, an
4    order that trips the wire, so to speak,
5    is an order on hold?
6            MR. LIMBACHER: Object to
7    form.
8            THE WITNESS: Correct.
9    BY MR. BUCHANAN:
10       Q.    And then I think you said
11   after it clears review it's then released
12   for shipping?
13       A.    It's released to UPS for the
14   order to go through UPS's SOM program
15   before it's released for shipping.
16       Q.    So what's the actual -- if
17   we had the screen in front of us right
18   now, SAP is the database-type program?
19       A.    It's an ERP system.
20       Q.    So you interact -- what's
21   the name of your implementation of it?
22   Like, does it have an application name or
23   something?
24       A.    I know it as SAP.

Page 127

1        Q.    What do you log into, to
2    review orders that have been held or
3    pended?
4        A.    SAP.
5        Q.    Okay. And then do you go to
6    a particular module in that to review
7    pended orders?
8        A.    There's -- yes, there's
9    screens within SAP that shows orders on
10   hold.
11       Q.    And so you can -- orders on
12   hold have to be reviewed by a human
13   being, as we've been discussing, right?
14           MR. LIMBACHER: Object to
15   form.
16           THE WITNESS: Correct.
17   BY MR. BUCHANAN:
18       Q.    And when that's done -- and
19   what are the status flags for a
20   particular order?
21       A.    Say your question again.
22       Q.    So one of the -- one of the
23   flags, it sounds like, is hold, right?
24           MR. LIMBACHER: Object to

Page 128

1    form.
2            THE WITNESS: We have a
3    variety of holds. SOM is not just
4    the only hold an order can go on.
5    BY MR. BUCHANAN:
6        Q.    Does the system track the
7    reason for the hold?
8        A.    Yes, it does.
9        Q.    Okay. So you can go in and
10   search for orders that are on hold for
11   SOM, right?
12       A.    Yes.
13       Q.    That is -- that's an order
14   status field in the SAP system?
15       A.    Yes.
16       Q.    Okay. And when you go in to
17   manually release the order, you know,
18   following review, do you change a flag,
19   or do you change a note in the record?
20           MR. LIMBACHER: Object to
21   form.
22           THE WITNESS: You add a
23   reason code.
24   BY MR. BUCHANAN:

Page 129

1        Q.    Okay. And you add a reason
2    code for why it's okay to release?
3            MR. LIMBACHER: Object to
4    form.
5            THE WITNESS: Correct.
6    BY MR. BUCHANAN:
7        Q.    Okay. And then how does the
8    status of the order change on the basis
9    of the order code that's been changed?
10       A.    The order is no longer on
11   hold.
12       Q.    And so what is the current
13   status of that order after the order is
14   no longer on hold?
15       A.    I'm not quite sure I know
16   what you're asking.
17       Q.    At one point you said ready
18   to ship.
19           Is that a -- is that a
20   status within Endo's order system for a
21   file that's been cleared?
22           MR. LIMBACHER: Object to
23   form.
24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.   For an order that's been
2  cleared?
3    A.   So if you want to get into
4  the details of SAP, you have an order.
5  And when the order has cleared any hold,
6  then a delivery is created, and that's
7  the EDI document that's sent to UPS.
8    Q.   Okay.  Is there a status
9  notation for the file -- for the order,
10  excuse me?
11    MR. LIMBACHER:  Object to
12  form.
13    THE WITNESS:  No, not
14  necessarily a status.  There's an
15  order and then there's a delivery.
16  You have -- if you have a delivery
17  note, then we know the order has
18  been sent to UPS.
19  BY MR. BUCHANAN:
20    Q.   I see.  So when the hold is
21  released, then a delivery message is sent
22  to UPS?
23    A.   Correct.  A delivery is
24  created, and that's the EDI document that

Page 131

1  gets sent to UPS.
2    Q.   How long has SAP been used
3  as your system?
4    A.   Twenty years.
5    Q.   Since you've been there?
6    A.   Correct.
7    Q.   And this workflow that you
8  just described -- withdrawn.
9    I understand that the
10  release codes have changed over the
11  years, fair?
12    A.   Yes.
13    Q.   You've made modifications to
14  the SAP system in certain ways, right?
15    A.   Correct.  We've had upgrades
16  over the years.
17    Q.   In one respect, you've
18  changed release codes or added additional
19  release codes, fair?
20    A.   We've -- yes, we've upgraded
21  our SOM program throughout the years.
22    Q.   And in 2014, 2015, you made
23  some changes to the excessive order
24  algorithm, correct?

Page 132

1    MR. LIMBACHER:  Object to
2  form.
3    THE WITNESS:  Yes.
4  BY MR. BUCHANAN:
5    Q.   Okay.  Has the practice,
6  though, of when you release a hold on an
7  order and the creation of a delivery that
8  gets sent to UPS, has that changed in the
9  last 20 years?
10    A.   Ask your question again,
11  please.
12    Q.   And I apologize, you know,
13  there's -- I don't have entire visibility
14  to what your system looks like.
15    I'm just trying to follow
16  what the workflow is.  An order trips the
17  wire, the excessive order algorithm of
18  the day, a human being intervenes to
19  review the order.
20    Do I understand that
21  correctly?
22    MR. LIMBACHER:  Object to
23  form.
24    THE WITNESS:  Yes.

Page 133

1  BY MR. BUCHANAN:
2    Q.   That has been the practice
3  since you've been there, true?
4    A.   That is correct.
5    Q.   The algorithms may have
6  adjusted over the years, correct?
7    MR. LIMBACHER:  Object to
8  form.
9    THE WITNESS:  Yes.
10  BY MR. BUCHANAN:
11    Q.   And some of the reason codes
12  have changed over the years, correct?
13    A.   Correct.
14    Q.   But when the order is
15  cleared after review, how does the order
16  status change?
17    A.   When the order is no longer
18  on hold, a delivery note is created, and
19  that's the EDI document that's sent to
20  UPS.
21    Q.   What is EDI?
22    A.   Electronic data --
23  electronic data interchange, sorry.
24    Q.   And that may have been my

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  hang up.
2      A.  I'm sorry.
3      Q.  There's some corporate speak
4  that I'm not following.  But I appreciate
5  that.
6          After the order is cleared,
7  an electronic -- an EDI delivery note is
8  created and transmitted to UPS, right?
9      A.  Correct.
10     Q.  At that point, it's in their
11 system?
12         MR. LIMBACHER:  Object to
13 form.
14         THE WITNESS:  Correct.
15 BY MR. BUCHANAN:
16     Q.  All right.  I think we were
17 on .26 of Exhibit-1 to your deposition.
18 We're looking at Exhibit B.
19         And to re-orient us, this is
20 a transmittal back in response to a
21 Senate inquiry, correct?
22     A.  Uh-huh.
23     Q.  Okay.  Let's go to -- and,
24 again, I'm not sure if we did it on this

Page 135

1  page, but following human intervention,
2  all these orders that were, I think you
3  said kicked out of the system as flagged
4  as tripping one of the quantity, size or
5  frequency metrics in your suspicious
6  order algorithm, these were subject to
7  human review, right?
8          MR. LIMBACHER:  Object to
9  form.
10         THE WITNESS:  Yes.
11 BY MR. BUCHANAN:
12     Q.  And following human review,
13 they were all cleared after review,
14 correct?
15         MR. LIMBACHER:  Object to
16 form.
17         THE WITNESS:  Correct.  They
18 were cleared.
19 BY MR. BUCHANAN:
20     Q.  And as you've described the
21 system, after that point in time a
22 delivery note would be created and
23 transmitted to UPS, correct?
24         MR. LIMBACHER:  Object to

Page 136

1  form.
2          THE WITNESS:  Correct.  And
3  at that point, it goes through
4  UPS's SOM program before release
5  for shipping.
6  BY MR. BUCHANAN:
7      Q.  When you transmit the
8  delivery note to UPS, does UPS learn of
9  whether the order had been held and
10 released and if so released, the release
11 code?
12     A.  No, they do not.  They do
13 their own independent check within their
14 own SOM program.
15     Q.  To your --
16     A.  It doesn't --
17     Q.  Go ahead.  I'm sorry.
18     A.  Regardless of what Endo
19 does, UPS continues to do their SOM
20 check.
21     Q.  So to the best of your
22 knowledge, when UPS gets information on
23 the order, at least electronically, it
24 doesn't include any information as to

Page 137

1  whether it had been held or the reason it
2  was released?
3      A.  No, it does not.  All they
4  do is get the order that -- who ordered
5  it and what they're ordering.
6      Q.  Any further information that
7  was required from the company, with
8  regard to the company -- withdrawn.
9          Any further information
10 required from Endo, with regard to Endo's
11 customer's order from Endo, would be
12 provided by you or your team?
13         MR. LIMBACHER:  Object to
14 form.
15         THE WITNESS:  If UPS needed
16 any additional information, they
17 would come to me.
18 BY MR. BUCHANAN:
19     Q.  Right.  And that was the way
20 your work constructions worked and your
21 understanding of their process, right?
22         MR. LIMBACHER:  Object to
23 form.
24         THE WITNESS:  Correct.

35  (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    BY MR. BUCHANAN:
2        Q.   Because Endo's customers
3    were not direct customers of UPS, at
4    least with regard to the orders of
5    interest, correct?
6        A.   Repeat that, please.
7        Q.   Yeah.
8            Endo maintained the
9    relationship with AmerisourceBergen,
10   correct?
11       A.   Yes, correct.
12       Q.   Certainly with regard to the
13   orders that are reflected in Exhibit B
14   that we've been reviewing, correct?
15       A.   Yes.  Endo maintained the
16   relationship with AmerisourceBergen.
17       Q.   And so any follow-up with
18   the customer, any due diligence that
19   would be conducted with regard to
20   customers was allocated to Endo, not UPS,
21   correct?
22           MR. LIMBACHER:  Object to
23   form.
24           THE WITNESS:  Yes, that's

Page 139

1    correct.
2    BY MR. BUCHANAN:
3        Q.   Okay.  I think we're on .27,
4    ma'am, just scrolling through this.
5            And, again, we're looking at
6    orders of Missouri customers.  And I
7    think we've got Express Scripts and
8    several other entities on this one.
9            Satisfy yourself, ma'am,
10   that .27, again, is only customers from
11   Missouri?
12       A.   Agreed.
13       Q.   And you identify the reason
14   why further investigation was required,
15   correct?
16       A.   Correct.
17       Q.   And then the result of the
18   investigation off on the right, right?
19       A.   Correct.
20       Q.   And, again, we see cleared
21   after review, cleared after review,
22   cleared after review, and so on, on this
23   page, correct?
24       A.   That's correct.

Page 140

1        Q.   And as you've described the
2    system to us, as I understand it, once
3    the hold was lifted and the reason code
4    put into your SAP system, a delivery note
5    would issue to UPS for their process,
6    correct?
7        A.   Yes.
8        Q.   Okay.  Let's go to .28.
9            Again, same document,
10   similar format, Endo's customers on the
11   left?
12       A.   Yes.
13       Q.   These would be the ship
14   dates from those customers, correct?
15       A.   Correct.
16       Q.   And as I understand it, for
17   example, if we're looking at Pharmacy
18   Buying Association -- and that's not one
19   of the big three distributors you were
20   talking about before, right?
21       A.   No.  It's a smaller regional
22   wholesaler.
23       Q.   So you mentioned there was
24   McKesson, AmerisourceBergen.

Page 141

1            We also had smaller regional
2    distributors and wholesalers that are
3    also customers of Endo?
4        A.   Correct.
5            MR. LIMBACHER:  Object to
6    form.
7            THE WITNESS:  Yes.
8    BY MR. BUCHANAN:
9        Q.   Pharmacy Buying Association
10   is one example of that?
11       A.   Yes.
12       Q.   And, again, we have the
13   reason codes, and we have the result.
14           The reason code is why they
15   were flagged, right?
16       A.   Correct.
17       Q.   For quantity, frequency,
18   size, et cetera, right?
19       A.   Yes.
20       Q.   And then we have the result
21   of that investigation, true?
22       A.   Correct.
23       Q.   And in each instance, what
24   did you write?

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1     A.   Cleared after review.
2     Q.   And that's, in fact, what
3  happened?
4     A.   That's correct.
5     Q.   And when the hold was
6  lifted, UPS got the delivery note and
7  they went through their process, right?
8     A.   They went through the rest
9  of their process.
10    Q.   Let's go to 29.  And we
11 don't need to do too many more of these.
12    You can satisfy yourself
13 quickly by turning on .29, ma'am, were
14 these all Missouri customers of Endo?
15    A.   They are.
16    Q.   In each instance on the
17 right, after the trip wire was triggered,
18 a review conducted and each of these
19 orders was cleared, correct?
20    A.   Yes, correct.
21    MR. LIMBACHER:  Object to
22    form.
23    THE WITNESS:  Yes, correct.
24 BY MR. BUCHANAN:

Page 143

1     Q.   And you've clarified for us,
2  at least to help our understanding, that
3  each of these ship dates actually
4  represents multiple line items within
5  them, correct?
6     A.   They could.
7     MR. LIMBACHER:  Object to
8     form.
9     THE WITNESS:  Yes.  You
10    can't tell by this document, but,
11    yes.
12 BY MR. BUCHANAN:
13    Q.   Well, do you understand
14 where it says ship date, is that a unique
15 order, or could that be, you know, five
16 different orders that got wrapped up into
17 one particular outbound delivery on that
18 date?
19    MR. LIMBACHER:  Object to
20    form.
21    THE WITNESS:  You don't -- I
22    can't tell that by this
23    information.
24 BY MR. BUCHANAN:

Page 144

1     Q.   Okay.  So that's -- ship
2  date is not the same as order date in all
3  instances, right?
4     A.   Correct.
5     Q.   And to your -- well, you
6  were involved in preparing this?
7     A.   Yes.
8     Q.   Did you see a version of
9  this or create a version of this that
10 didn't just list ship dates but actually
11 listed all the orders?
12    MR. LIMBACHER:  Object to
13    form.
14    THE WITNESS:  Not that I
15    recall.
16 BY MR. BUCHANAN:
17    Q.   Well, if all of the orders
18 that composed these shipments were
19 listed, there would be a lot more rows,
20 right?
21    MR. LIMBACHER:  Object to
22    form.
23    THE WITNESS:  I don't -- I
24    don't have that data.  I can't

Page 145

1     confirm or deny that.  I would
2     need the data to confirm that.
3  BY MR. BUCHANAN:
4     Q.   Well, I thought you were
5  clarifying for us earlier, ma'am, that
6  each of these rows is a shipment date and
7  not necessarily just a single order?
8     MR. LIMBACHER:  Object to
9     form.
10    THE WITNESS:  That's
11    potential --
12    MR. LIMBACHER:  Asked and
13    answered.
14    THE WITNESS:  Sorry.
15    That's potential, yes.
16 BY MR. BUCHANAN:
17    Q.   Okay.  And so I guess what
18 you were indicating in response to
19 Ranking Member McCaskill's inquiry was
20 this was just a deliverable to these
21 customers on that date, right?
22    MR. LIMBACHER:  Object to
23    form.
24 BY MR. BUCHANAN:

37  (Pages 142 to 145)

Page 146

1    Q.   That's shipped on that date?
2    A.   From what I can tell from
3  this document, this -- this was an order
4  shipped on this date that kicked out
5  our -- within our excessive SOM program.
6       But what I don't know, and
7  what you can't tell from this, is if this
8  is potentially just one line on the order
9  or multiple lines on the order.  And I
10  don't have that information on this
11  report.
12    Q.   Okay.  If you wanted to get
13  a report of -- I've seen references to
14  pended orders and held orders.
15       Do you use that term the
16  same way?
17       MR. LIMBACHER:  Object to
18  form.
19  BY MR. BUCHANAN:
20    Q.   Are they interchangeable?
21       MR. LIMBACHER:  Object to
22  form.
23       THE WITNESS:  Yes.
24  BY MR. BUCHANAN:

Page 147

1    Q.   Okay.  Sometimes when UPS
2  was communicating with the company, they
3  would use the term "pended" as well.
4       I mean, did you understand
5  that to be an order they were holding?
6    A.   Yes.
7    Q.   Okay.  Is it your
8  understanding, ma'am, that from the
9  SAP -- the company's SAP system you can
10  get a list of any order that was held due
11  to tripping some component of the
12  company's suspicious order monitoring
13  system?
14       MR. LIMBACHER:  Object to
15  form.
16       THE WITNESS:  Yeah, I
17  believe that information is
18  available.
19  BY MR. BUCHANAN:
20    Q.   And how would you get it?
21    A.   We would have to contact our
22  SAP team.
23    Q.   And what would you ask for?
24    A.   It would depend on what the

Page 148

1  request is.
2       What are you asking?
3    Q.   I'm asking if you wanted to
4  get a list of all the orders that were
5  held --
6    A.   For --
7    Q.   -- or pended, to enable --
8  pended for suspicious order or excessive
9  quantity or tripping, whatever the
10  company's algorithm was at the particular
11  point in time, and subsequently
12  investigated and the reason for the --
13  clearing the order, what type of report
14  would you ask for?
15       MR. LIMBACHER:  Object to
16  form.
17       THE WITNESS:  Are you asking
18  for orders from a certain time in
19  history, or you're asking for
20  orders today?  Or currently on
21  hold?
22  BY MR. BUCHANAN:
23    Q.   Historical.
24       As we're looking at here,

Page 149

1  historical shipments, I'm asking about
2  historical orders.
3    A.   We would have to ask the SAP
4  team to go back into the history tables
5  within SAP to pull the data.
6    Q.   Okay.  Were you involved in
7  the generation of Exhibit B?
8       MR. LIMBACHER:  Object to
9  form.
10       THE WITNESS:  Yes.  From
11  what I remember, yes.
12  BY MR. BUCHANAN:
13    Q.   And how did you go about
14  preparing Exhibit B?
15       Exhibit B would be the
16  attachment to Exhibit-1 to your
17  deposition.
18    A.   I would have to go back to
19  the SAP team to pull the data.
20    Q.   Is that how you did it when
21  you created Exhibit B?
22       MR. LIMBACHER:  Object to
23  form.
24       THE WITNESS:  From what I

Page 150

1    remember, yes.
2  BY MR. BUCHANAN:
3        Q.   Okay.  Were you the liaison
4  with the SAP team to create Exhibit B?
5        A.   Yes.
6        Q.   And so to the best of your
7  memory, ma'am, does Exhibit B reflect,
8  you know, with each row, the shipments of
9  that day to that customer in the
10  aggregate, for whatever orders composed
11  that shipment?
12        MR. LIMBACHER:  Object to
13  form.
14  BY MR. BUCHANAN:
15        Q.   Or is each one an individual
16  order?
17        MR. LIMBACHER:  Same
18  objection.
19        THE WITNESS:  I don't know.
20  I would have to go back and
21  research to determine exactly what
22  was asked.
23  BY MR. BUCHANAN:
24        Q.   Okay.  Let's kind of refocus

Page 151

1  on Exhibit-1, .29, top right corner.
2        And with regard to these
3  from the -- these shipments, the first
4  line says, what is it, October 28, 2015,
5  we agree that it tripped the wire with
6  regard to your system and it was cleared
7  after review, correct?
8        MR. LIMBACHER:  Object to
9  form.
10        THE WITNESS:  I'm sorry,
11  which page are you on again?  29?
12  BY MR. BUCHANAN:
13        Q.   I was on .29, I'm looking at
14  the top right corner.
15        A.   Yes, cleared after review.
16        Q.   And so, too, with the rest
17  on this page, correct?
18        A.   Correct.
19        Q.   Still Missouri customers,
20  correct?
21        A.   Yes.
22        Q.   Let's go to .30.
23        Endo customers?
24        A.   Yes.  This is an Endo

Page 152

1  customer.
2        Q.   From Missouri?
3        A.   Yes.
4        Q.   And cleared after review?
5        A.   Correct.
6        Q.   Let's go to .31.
7        MR. LIMBACHER:  Sorry, Dave,
8  did somebody join on the phone?
9        Maybe somebody signed off.
10        MR. COSGROVE:  Yes, this is
11  PJ Cosgrove, Ulmer Berne, for
12  Gemini Laboratories in New York
13  case.
14  BY MR. BUCHANAN:
15        Q.   Let's go to .31.  We're in
16  Exhibit-1 to your deposition, Exhibit B,
17  looking at the list of orders into --
18  shipped into Missouri.
19        Again, Endo customers,
20  correct?
21        A.   Yes, correct.
22        Q.   They tripped the QSF wire,
23  correct?
24        MR. LIMBACHER:  Object to

Page 153

1  form.
2        THE WITNESS:  They kicked
3  out of our excessive program,
4  correct.
5  BY MR. BUCHANAN:
6        Q.   You said "excessive
7  program," that was your SOM program?
8        A.   SOM program, sorry.
9  Interchangeable.
10        Q.   Interchangeable to you?
11        A.   Yes.
12        Q.   And then an investigation
13  was conducted, in each instance, in each
14  row, cleared after review was the -- what
15  was reported out to the ranking member on
16  this one, correct?
17        A.   Yes.
18        Q.   All right.  Let's go to .32.
19        More of the same, ma'am?
20        A.   Correct.
21        Q.   Okay.  Still Endo customers
22  from Missouri?
23        A.   They are.
24        Q.   Tripped the wires?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1      MR. LIMBACHER: Object to
2   form.
3      THE WITNESS: They did.
4   BY MR. BUCHANAN:
5      Q.   And I'm using that term, and
6   I just want to make sure, is that a fair
7   characterization --
8      A.   I would say they were kicked
9   out.
10     Q.   Kicked out is what --
11     A.   They were pend, held.
12     Q.   Okay. So the system was
13  kicking them out and you were putting
14  them back in?
15        MR. LIMBACHER: Object to
16  form.
17        THE WITNESS: No, they were
18     kicked out and they were reviewed.
19     And then they were released to
20     UPS, which, again, went through
21     UPS's SOM program before shipping.
22  BY MR. BUCHANAN:
23     Q.   I wasn't trying to fuss with
24  you. You said just "kicked out."

Page 155

1        If they were kicked out, you
2   brought them back into the flow, right?
3        MR. LIMBACHER: Object to
4   form.
5        THE WITNESS: Kicked out was
6     the word you used, but -- so they
7     went through our SOM -- they went
8     through our SOM program, they were
9     held, they were reviewed, and then
10     they were released to UPS.
11  BY MR. BUCHANAN:
12     Q.   Got you.
13     A.   And once they got to UPS,
14  they went through UPS's SOM program --
15     Q.   Right.
16     A.   -- before they were shipped.
17        MR. BUCHANAN: Move to
18     strike.
19  BY MR. BUCHANAN:
20     Q.   I think we're on .32.
21        Again, all these orders,
22  ma'am, tripped one of the thresholds in
23  your algorithm, correct?
24        MR. LIMBACHER: Object to

Page 156

1   form.
2   BY MR. BUCHANAN:
3      Q.   "Your" being Endo, correct?
4      A.   Yes.
5      Q.   And when I say "your
6   algorithm," I mean, this was a corporate
7   system, SAP, correct?
8      A.   The algorithm was in our SAP
9   system, that's correct.
10     Q.   The SAP system is a kind of
11  corporate database maintained by Endo
12  corporate, correct?
13     A.   It's our ERP system, yes.
14     Q.   What does ERP mean?
15     A.   I don't know. I don't know
16  off the top of my head.
17     Q.   Is that how orders get
18  placed?
19     A.   Yes.
20     Q.   And this QSF system that was
21  talked about, that's not something that
22  was just -- that you created on your
23  local desktop using Excel or something,
24  right?

Page 157

1      A.   No. It's within the SAP
2   system.
3      Q.   Okay. A system created by
4   the people in IT at Endo for the team's
5   use, correct?
6        MR. LIMBACHER: Object to
7     form.
8        THE WITNESS: Yes.
9   BY MR. BUCHANAN:
10     Q.   Okay. And so it trips
11  whatever that algorithm said was unusual
12  quantity, size or frequency.
13        And then it was held, right?
14     A.   Held for review, yes.
15     Q.   And following your review,
16  ma'am, or your team's review, in each
17  instance on this page, .32, cleared after
18  review, correct?
19     A.   Correct. And then released
20  to UPS.
21     Q.   And then we go to .33.
22        More of the same, Missouri
23  customers of Endo, correct?
24     A.   Yes.

40 (Pages 154 to 157)

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1        Q.   Tripped the wires and held,
2   correct?
3            MR. LIMBACHER:  Object to
4   form.
5            THE WITNESS:  Correct.
6   BY MR. BUCHANAN:
7        Q.   When the human beings got
8   their hands on the order, they were
9   cleared after review, correct?
10           MR. LIMBACHER:  Object to
11   form.
12           THE WITNESS:  After they
13   were reviewed, yes.
14   BY MR. BUCHANAN:
15       Q.   Okay.  So, too, on .34.
16           More Endo customers from
17   Missouri?
18       A.   Yes.
19       Q.   Tripped the wire in Endo's
20   suspicious order monitoring system,
21   correct?
22           MR. LIMBACHER:  Object to
23   form.
24           THE WITNESS:  Correct.  And

Page 159

1            then they were reviewed and sent
2            to UPS for shipping.
3   BY MR. BUCHANAN:
4        Q.   Okay.  And then the
5   conclusion of your team was cleared after
6   review in each instance of these,
7   correct?
8        A.   Yes.
9            But as a reminder, once they
10   get to UPS, they go through UPS's SOM
11   program --
12           MR. BUCHANAN:  Move to
13   strike.
14           THE WITNESS:  -- before they
15   are released for shipping.
16           MR. BUCHANAN:  Move to
17   strike the nonresponsive portion.
18   BY MR. BUCHANAN:
19       Q.   We're on to .35.  And this
20   looks like the last of the orders just in
21   Missouri.
22           Again, Endo customers from
23   Missouri, correct?
24       A.   Yes.

Page 160

1        Q.   And these tripped the wire
2   in Endo's suspicious order system,
3   correct?
4            MR. LIMBACHER:  Object to
5   form.
6            THE WITNESS:  They were
7   reviewed.
8   BY MR. BUCHANAN:
9        Q.   And then they were reviewed
10   by a human being, and the hold was lifted
11   and they were -- a delivery note was sent
12   to UPS, fair?
13           MR. LIMBACHER:  Object to
14   form.
15           THE WITNESS:  It was sent to
16   UPS, yes.
17   BY MR. BUCHANAN:
18       Q.   And what's noted on the far
19   right is cleared after review, correct?
20       A.   Correct.
21       Q.   Okay.  I just want to
22   understand.
23           After looking at Exhibit-1,
24   I think what's happening today, or at

Page 161

1   least in 2017, is it correct, ma'am, that
2   what was described in the response, in
3   Exhibit-1 to the Ranking Member
4   McCaskill, that that accurately reflects
5   what you're doing today?
6            MR. LIMBACHER:  Object to
7   form.  Did you want her to review
8   the first several pages of the
9   exhibit?
10           MR. BUCHANAN:  I thought we
11   did.
12   BY MR. BUCHANAN:
13       Q.   You have before you an
14   Exhibit-1, ma'am.
15           I think you told us part was
16   for the generic business, Qualitest and
17   Par, correct?
18           MR. LIMBACHER:  I think you
19   told us that, but --
20           THE WITNESS:  Yes, the
21   beginning is for Par, our generics
22   division.
23   BY MR. BUCHANAN:
24       Q.   And the second part is for

41  (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    the branded division, correct?
2        A.   Yes.
3        Q.   And the part that's
4    summarized in Exhibit-1 for the branded
5    division, Endo, that's what the company
6    is doing to this day, correct?
7            MR. LIMBACHER:  Object to
8    form.
9            THE WITNESS:  Yes.  Endo has
10   an SOM program in place.
11   BY MR. BUCHANAN:
12       Q.   And as reflected in
13   Exhibit-1, that is what Endo's SOM
14   program is today?
15           MR. LIMBACHER:  Object to
16   form.
17           THE WITNESS:  We have an SOM
18   program in place.  Orders are
19   reviewed, if they are pended or
20   held or kicked out, whatever word
21   you want to use.
22   BY MR. BUCHANAN:
23       Q.   Is the branded arm of Endo
24   reviewing IMS data concerning its

Page 163

1    products with regard to suspicious order
2    evaluation?
3            MR. LIMBACHER:  Object to
4    form.  Foundation.
5            THE WITNESS:  I can't speak
6    to IMS data.  That's not part of
7    my responsibility.
8    BY MR. BUCHANAN:
9        Q.   Do you understand what IMS
10   data is?
11       A.   I know what IMS data is,
12   yes.  But that's not part of my
13   responsibility.
14       Q.   What is IMS data?
15       A.   It's prescription data for
16   the products.
17       Q.   And you can see down to the
18   prescriber level.  You can also see at
19   the pharmacy level.
20           Are you aware of that?
21           MR. LIMBACHER:  Object to
22   form.
23           THE WITNESS:  I know what
24   IMS data is, yes.

Page 164

1    BY MR. BUCHANAN:
2        Q.   How about Wolters Kluwer; do
3    you use Wolters Kluwer data for anything?
4            MR. LIMBACHER:  Object to
5    form.
6            THE WITNESS:  I can't speak
7    to that.  I don't know.
8    BY MR. BUCHANAN:
9        Q.   Do you conduct due diligence
10   visits as part of your SOM program today?
11           MR. LIMBACHER:  Object to
12   form.
13   BY MR. BUCHANAN:
14       Q.   For branded?
15       A.   So our generic division,
16   which has the same customers as our
17   branded division, performed site visits
18   for our customers and the branded
19   division utilized that data.
20       Q.   When did you start doing
21   that for branded, ma'am?
22       A.   Our generic division has
23   always done site visits.
24       Q.   When did they start doing

Page 165

1    that?
2        A.   I don't recall the actual
3    date.
4        Q.   Do you have confidence they
5    were doing that back in 2010?
6            MR. LIMBACHER:  Object to
7    form.  Foundation.
8            THE WITNESS:  I can't -- I
9    don't recall.  I can't speak to
10   that.
11   BY MR. BUCHANAN:
12       Q.   If I understand your
13   testimony, the branded arm of Endo, or
14   Endo Pharmaceuticals, is relying on due
15   diligence visits of Par?
16           MR. LIMBACHER:  Object to
17   form.  Misstates her testimony.
18   BY MR. BUCHANAN:
19       Q.   Is that right?
20       A.   The Par generics division
21   did customer site visits, that's correct.
22   And Endo has the same limited customer
23   base and Par had the same customers.
24           Actually, Par had more

42 (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

```
 1    customers than Endo.
 2        Q.   And that's a good thing to
 3    do?
 4            MR. LIMBACHER:  Object to
 5    form.
 6    BY MR. BUCHANAN:
 7        Q.   Site visits?
 8        A.   I can't really speak to
 9    that.
10        Q.   Well, you said --
11        A.   Par did it.  Par -- yes, I
12    mean, it's important to do site visits.
13        Q.   And it sounded like, from
14    your answer, that Endo was relying on
15    site visits that Qualitest or Par are
16    conducting as part of their process --
17            MR. LIMBACHER:  Object to
18    form.
19    BY MR. BUCHANAN:
20        Q.   -- is that right?
21        A.   I know that Par/Qualitest
22    did site visits of the customers, yes.
23        Q.   But correct me if I'm
24    misunderstanding your testimony, ma'am.
```

Page 167

```
 1            I thought you answered to me
 2    that, when I asked do you conduct site
 3    visits on branded, that you were relying
 4    on site visits that Qualitest or Par
 5    conducted?
 6        A.   Our generic --
 7            MR. LIMBACHER:  Object to
 8    form.
 9            THE WITNESS:  Our generic
10    division, yes, that's correct.
11    BY MR. BUCHANAN:
12        Q.   So am I understanding your
13    testimony that you consider that part of
14    your efforts to combat diversion?
15            MR. LIMBACHER:  Object to
16    form.
17            THE WITNESS:  I don't know
18    how to answer that.
19            Could you say your question
20    again?
21    BY MR. BUCHANAN:
22        Q.   So am I understanding your
23    testimony correctly that you consider
24    those due diligence visits of Par and
```

Page 168

```
 1    Qualitest to be part of Endo's efforts to
 2    prevent -- to combat diversion of its
 3    branded products?
 4            MR. LIMBACHER:  Object to
 5    form.
 6            THE WITNESS:  One thing that
 7    is slightly different between
 8    branded and generics is branded
 9    has the same customer base.  We
10    don't add new customers, as the
11    generic division may or may not
12    do.
13            So we have the same customer
14    base as our generic group.  So we
15    partnered with our generic group,
16    and we used their site visits of
17    the branded customers, because
18    it's the same customer base.
19            The generics may have more.
20    We have a limited customer base,
21    and that's the same customer base
22    that our generics also have.
23    BY MR. BUCHANAN:
24        Q.   Okay.  So have you ever been
```

Page 169

```
 1    on a due diligence visit for one of
 2    Endo's customers?
 3        A.   No.
 4        Q.   Have you ever been on a due
 5    diligence visit for one of Endo's
 6    customer's customers?
 7            MR. LIMBACHER:  Object to
 8    form.
 9            THE WITNESS:  No.  Our
10    customer is the wholesaler.
11    BY MR. BUCHANAN:
12        Q.   Do you recognize a
13    responsibility by Endo to know its
14    customers?
15            MR. LIMBACHER:  Object to
16    form.
17            THE WITNESS:  Yes.
18    BY MR. BUCHANAN:
19        Q.   To ensure that its customers
20    are not engaging in -- withdrawn.
21            And to ensure that its
22    customers have good suspicious order
23    monitoring systems?
24        A.   I know that our customers,
```

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    the wholesalers, have an SOM program in
2    place.
3         Q.   You're aware that they've
4    gotten -- they've had some problems, some
5    of your customers, true?
6         A.   I can't --
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  I can't speak
10   to that.
11   BY MR. BUCHANAN:
12        Q.   You're aware that some of
13   Endo's customers had their registrations
14   pulled?
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  I can't speak
18   to that.
19   BY MR. BUCHANAN:
20        Q.   You don't have an awareness
21   of that?
22        A.   I have an awareness, yes.
23   But I don't have any details that I can
24   provide.

Page 171

1         Q.   Well, did you attempt to
2    ensure that the customers you were
3    selling Endo's products to had good
4    suspicious order monitoring practices?
5              MR. LIMBACHER:  Object to
6    form.
7              THE WITNESS:  I know that
8    the wholesalers have SOM programs
9    in place.
10   BY MR. BUCHANAN:
11        Q.   And so please tell us about
12   how you conducted your due diligence on
13   that.
14             MR. LIMBACHER:  Object to
15   form.
16             THE WITNESS:  We just know,
17   just -- you know, our customers
18   have told us that they have SOM
19   programs in place.
20   BY MR. BUCHANAN:
21        Q.   Okay.
22        A.   I don't have the details of
23   those programs.  I just know that they
24   have one in place.

Page 172

1         Q.   Okay.  Well, as part of
2    evaluating your customer's due diligence
3    programs, did you collect them?
4         A.   No.  But our customer is the
5    wholesaler.  Who they ship to is on them,
6    not on Endo.
7         Q.   And the answer to my
8    question, just so I'm clear, is no?
9              You didn't collect them; is
10   that correct?
11             MR. LIMBACHER:  Object to
12   form.
13             THE WITNESS:  Did I collect
14   what?
15   BY MR. BUCHANAN:
16        Q.   Did you collect the SOM
17   programs and evaluate the SOM programs of
18   Endo's customers?
19             MR. LIMBACHER:  Object to
20   form.
21             THE WITNESS:  No, I did not.
22   BY MR. BUCHANAN:
23        Q.   Okay.
24        A.   Our Qualitest group may

Page 173

1    have, as part of their site visits.
2         Q.   Do you have an awareness,
3    sitting here today, as to what your
4    customers' SOM program looks like that
5    you were selling Endo-branded
6    pharmaceuticals to?
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  No, all I know
10   is they have an SOM program in
11   place.
12   BY MR. BUCHANAN:
13        Q.   Okay.  And have you seen the
14   SOM program for any of Endo's customers?
15             MR. LIMBACHER:  Object to
16   form.  Asked and answered.
17             THE WITNESS:  No, I have
18   not.
19   BY MR. BUCHANAN:
20        Q.   And have you personally
21   asked for it from any of Endo's
22   customers?
23        A.   I know that our wholesalers
24   have an SOM program in place.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1      Q.   I don't think you're
2  following my question.  Let me see if I
3  can read it back.
4           Have you personally asked
5  for any of Endo's customers' SOM
6  programs, ma'am?
7      A.   I can tell you that I know
8  our wholesalers have an SOM program in
9  place.  I do not know any details behind
10  that SOM program, but I know they have
11  one in place.
12      Q.   My question is, have you
13  ever asked for any of your
14  wholesalers' --
15      A.   Not that I --
16      Q.   -- programs?
17      A.   Not that I recall.
18           MR. LIMBACHER:  We've been
19  going about an hour, Dave, is this
20  a good time to stop?
21           MR. BUCHANAN:  If you need
22  it, it's fine.
23           MR. LIMBACHER:  Thank you.
24           VIDEO TECHNICIAN:  Going off

Page 175

1  record.  The time is 11:14.
2           - - -
3           (Whereupon, a brief recess
4  was taken.)
5           - - -
6           VIDEO TECHNICIAN:  We're
7  going back on the record.  This is
8  the beginning of Media File Number
9  3.  The time is 11:33.
10  BY MR. BUCHANAN:
11      Q.   Ms. Walker, we're back on
12  the record.
13           You're still under oath.
14  You understand that, correct?
15      A.   Yes, I do.
16      Q.   I want to take us back to
17  your Exhibit-1.  You have the report.  It
18  says, Attachment.
19           With regard to Ranking
20  Member McCaskill's July 26, 2017 letter,
21  Endo provides the following response.
22           We were talking about Item
23  1, Please describe any suspicious order
24  monitoring program Endo and its

Page 176

1  subsidiaries have implemented, including
2  efforts to monitor, investigate or report
3  suspicious transactions between its
4  distributors and pharmacies and efforts
5  to analyze information related to
6  chargeback requests.
7           Do you see that?
8      A.   Yes, I do.
9      Q.   Okay.  There's a summary of
10  Par's SOM program on the front page,
11  correct?
12      A.   Yes.
13      Q.   And on the second page, we
14  begin the characterization of Endo's SOM
15  program.
16           Do you see that?
17      A.   I do see that.
18      Q.   Okay.  In regards to the
19  request from Ranking Member McCaskill
20  about chargeback information, I don't see
21  any response with regard to what Endo
22  does in that regard.
23           Do you?
24           MR. LIMBACHER:  Object to

Page 177

1  form.
2           THE WITNESS:  No.
3  Chargeback data is not listed
4  under the Endo SOM program.
5  BY MR. BUCHANAN:
6      Q.   So describe how Endo branded
7  uses chargeback data in connection with
8  its suspicious order monitoring program.
9      A.   Endo does not use the
10  chargeback data with our SOM program.
11      Q.   It doesn't use it today?
12      A.   No, we do not.
13      Q.   Didn't use it, obviously, in
14  2017 during the time of this, correct?
15      A.   That's correct.  In the --
16      Q.   And didn't --
17           MR. LIMBACHER:  Sorry, were
18  you finished in your answer?
19  BY MR. BUCHANAN:
20      Q.   Did you use it in 2017?
21      A.   No, we did not.
22           But I just wanted to point
23  out, the reason for that is the branded
24  opioid products are not on retail

45  (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    contracts, which is different from the
2    generics division. So that's the reason
3    why chargeback data was not utilized.
4        Q.   Does the company not have
5    any chargeback agreements with any of its
6    distributors for branded products?
7        A.   I can't speak to chargeback
8    contracts, because that's not my area. I
9    just know that the branded opioids are
10   not on retail-type contracts like
11   generics are. That's the only thing that
12   I can -- that I can speak of.
13       Q.   Well, is it your testimony,
14   ma'am, that the company does not have
15   chargeback data for branded products?
16           MR. LIMBACHER: Object to
17       form.
18           THE WITNESS: I can't
19       confirm that. There may be some,
20       but I know they're not on retail
21       contracts. There may be -- I
22       don't want to speculate, because
23       it's not my area of
24       responsibility. But there may be

Page 179

1        some government contracts where
2        there are branded opioid products.
3    BY MR. BUCHANAN:
4        Q.   Do you know, in connection
5    with your agreements with UPS over the
6    years, there's been provisions with
7    regard to chargeback data with regard to
8    Endo?
9            MR. LIMBACHER: Object to
10       form.
11           THE WITNESS: UPS --
12   BY MR. BUCHANAN:
13       Q.   And who is going to handle
14   that responsibility?
15       A.   UPS does not handle any of
16   our chargeback data. Because, again,
17   retail contracts are not for branded
18   opioid products. There are no retail
19   contracts for that.
20       Q.   What is a chargeback, ma'am?
21       A.   You want me to explain what
22   a chargeback is?
23       Q.   Sure.
24       A.   A chargeback is, for

Page 180

1    example, if we charge the wholesaler $10
2    and then there's a retail contract for $5
3    and the wholesaler charges it for $5 to
4    XYZ retailer, the wholesaler charges us
5    back the difference between $10 and $5.
6        Q.   And you're saying your
7    relationships with the wholesalers did
8    not permit them to do that with regard to
9    branded products?
10       A.   No, that's not --
11           MR. LIMBACHER: Object to
12       form. Misstates her testimony.
13           THE WITNESS: No, that's not
14       what I'm saying.
15           What I'm saying is, number
16       one, chargebacks and contracts is
17       not my responsibility. But from
18       what I know, branded opioid
19       products are not on any retail
20       contract. So there would be no
21       reason for the chargeback -- for
22       the wholesalers to send us
23       chargeback data if they're not on
24       contract.

Page 181

1    BY MR. BUCHANAN:
2        Q.   I'm just asking as a factual
3    matter.
4            Does the company have
5    chargeback data with regard to its
6    branded opioid products; yes or no?
7            MR. LIMBACHER: Object to
8        form. Asked and answered.
9            THE WITNESS: I can't
10       confirm that. Like I said --
11   BY MR. BUCHANAN:
12       Q.   Do you know?
13       A.   I told you what I know. But
14   I -- I know they're not on retail
15   contracts, but I do not know -- I
16   believe, but I do not know if they're on
17   any government contracts. You have to
18   speak to somebody else within the
19   company.
20       Q.   So you disagree with others
21   within Endo who state that the company
22   has more chargeback data on branded
23   products?
24           MR. LIMBACHER: Object to

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  form.
2        THE WITNESS:  I don't know
3  what that -- I don't know who
4  would say that.  I can't confirm
5  or deny that.
6  BY MR. BUCHANAN:
7        Q.   You said you can't confirm
8  or deny that.
9        I mean, is this not your
10  area, ma'am?
11       A.   It's not my area.
12       Q.   So let's now step back.
13       Have you ever asked for
14  chargeback data with regard to branded
15  products?
16       A.   No, I have not.
17       Q.   Have you ever used
18  chargeback data as part of a suspicious
19  order monitoring protocol?
20       MR. LIMBACHER:  Object to
21  form.
22       THE WITNESS:  No.
23  BY MR. BUCHANAN:
24       Q.   When you look at the

Page 183

1  company's response to Senator McCaskill,
2  would you agree with me that there's no
3  statement in the response that the
4  company doesn't use chargeback data for
5  its branded products because the
6  chargeback data for branded products
7  would be of no use?
8        MR. LIMBACHER:  Object to
9  form.
10  BY MR. BUCHANAN:
11       Q.   Would you agree it says
12  nothing like that?
13       MR. LIMBACHER:  The document
14  speaks for itself.  If you want
15  her to tell you what the document
16  says --
17       MR. BUCHANAN:  I don't, I
18  just want her to answer my
19  question.
20       MR. LIMBACHER:  -- then
21  you're going to have to give her
22  the opportunity to read the entire
23  document.
24  BY MR. BUCHANAN:

Page 184

1        Q.   Feel free to read --
2        MR. LIMBACHER:  Do you want
3  her to do that?
4  BY MR. BUCHANAN:
5        Q.   Feel free to read the
6  characterization of Endo's SOM process,
7  ma'am.
8        MR. LIMBACHER:  So starting
9  on the second page and going
10  through to the fifth page, I
11  believe.
12       THE WITNESS:  That's Par's.
13  BY MR. BUCHANAN:
14       Q.   Have you had a chance to
15  review it, ma'am?
16       A.   I have.
17       Q.   What answer did Endo provide
18  to Ranking Member McCaskill with regard
19  to its efforts to analyze chargeback
20  requests on its branded products?
21       MR. LIMBACHER:  Object to
22  form.
23       THE WITNESS:  It's not
24  listed.

Page 185

1  BY MR. BUCHANAN:
2        Q.   Decided not to answer the
3  request?
4        MR. LIMBACHER:  Object to
5  form.
6        THE WITNESS:  I can't speak
7  to that.  I don't know.  It's not
8  listed.
9  BY MR. BUCHANAN:
10       Q.   You reviewed this response
11  before it went in, fair?
12       A.   Yes.
13       MR. LIMBACHER:  Object to
14  form.
15  BY MR. BUCHANAN:
16       Q.   I'm assuming others within
17  the organization reviewed it as well,
18  correct?
19       A.   Yes.
20       Q.   Do you have an awareness of
21  that?
22       A.   Yes.  Yes, an awareness.
23       Q.   Folks in senior management
24  reviewed it, to your knowledge?

47 (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1          MR. LIMBACHER: Object to
2     form.
3     BY MR. BUCHANAN:
4          Q.   Do you know?
5          A.   I don't know.
6          Q.   Okay.  We can agree that the
7     company, in responding to this inquiry,
8     didn't state that it doesn't use
9     chargeback information because it would
10    be of no value with regard to branded
11    products, correct?
12         MR. LIMBACHER: Object to
13    form.  The document speaks for
14    itself.
15    BY MR. BUCHANAN:
16         Q.   We can agree it doesn't say
17    that?
18         A.   After reading it, it does
19    not mention any chargeback data.
20         Q.   We can agree it doesn't say
21    that the company doesn't have chargeback
22    data with regard to branded products,
23    correct?
24         MR. LIMBACHER: Object to

Page 187

1     form.
2          THE WITNESS:  I don't think
3     it says that, it's just
4     chargebacks is just not listed.
5     BY MR. BUCHANAN:
6          Q.   It says nothing?
7          A.   Right.  It doesn't say one
8     way or the other.  It's just not listed.
9          Q.   It ignores the request?
10         MR. LIMBACHER: Object to
11    form.
12         THE WITNESS:  I -- it's not
13    listed.  That's all I can tell
14    you.
15    BY MR. BUCHANAN:
16         Q.   Well, the company did
17    provide something with regard to what
18    Qualitest was doing, right?
19         A.   Yes.
20         Q.   As part of your role and
21    function, or, I guess, as an employee of
22    Endo, do you complete periodic reviews of
23    your own performance, ma'am?
24         A.   Yes.  We do it every year.

Page 188

1          Q.   You've had some role and
2     involvement with regard to chargebacks
3     over the years; isn't that true?
4          A.   Years ago, yes.
5          Q.   So the company does have
6     chargeback data on its branded products,
7     correct?
8          MR. LIMBACHER: Object to
9     form.
10         THE WITNESS:  Yes.
11    BY MR. BUCHANAN:
12         Q.   And chargeback data provides
13    information at the retail level, correct?
14         A.   From what I know of
15    chargeback data for branded opioid
16    products, there are no -- they are not on
17    retail contracts, so you would not have
18    any chargeback data for retail.
19         Q.   Okay.  Have you looked at
20    the chargeback data for branded opioid
21    products, ma'am?
22         MR. LIMBACHER: Object to
23    form.
24         THE WITNESS:  Not recently,

Page 189

1     no, because it's not my area of
2     responsibility.
3     BY MR. BUCHANAN:
4          Q.   Have you examined chargeback
5     data for Endo's branded work to see
6     whether it has information at your
7     customers' customer level?
8          MR. LIMBACHER: Object to
9     form.
10         THE WITNESS:  No, I have
11    not.
12    BY MR. BUCHANAN:
13         Q.   At any point in time, when
14    you've had a role or responsibility for
15    suspicious orders within suspicious order
16    monitoring within Endo, you haven't
17    considered chargeback data, true?
18         MR. LIMBACHER: Object to
19    form.
20         THE WITNESS:  I had the
21    information that I needed to do my
22    job.
23    BY MR. BUCHANAN:
24         Q.   Not my question, ma'am.

48  (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1        Just as a factual matter, in
2   doing your job, at any point in time did
3   you consider chargeback data as part of
4   the suspicious order monitoring function?
5        A.   No.
6        Q.   As part of your doing your
7   job, did you ever consider IMS data as
8   part of doing suspicious order
9   monitoring?
10        MR. LIMBACHER:  Object to
11   form.
12        THE WITNESS:  IMS is not
13   part of my job responsibility.
14   BY MR. BUCHANAN:
15        Q.   And you never considered it,
16   then, certainly, as part of suspicious
17   order monitoring, fair?
18        MR. LIMBACHER:  Object to
19   form.
20        THE WITNESS:  Not
21   particularly in my role.  But
22   there may have been other people
23   within Endo that has done
24   something with that data.  But not

Page 191

1   me.
2   BY MR. BUCHANAN:
3        Q.   Within --
4        A.   And I can't speak to other
5   roles within the company.
6        Q.   Within the suspicious order
7   monitoring role or function of Endo
8   branded products, to the best of your
9   knowledge, IMS data has never been a
10   component of that analysis, correct?
11        MR. LIMBACHER:  Object to
12   form.  Foundation.
13        THE WITNESS:  I had enough
14   data to do my job.  The IMS data
15   is part of another area of
16   responsibility within Endo.  They
17   may have.  I can't speak to it,
18   but they may have done something
19   with that.
20   BY MR. BUCHANAN:
21        Q.   The answer to my question,
22   then, would be, no, you didn't analyze
23   IMS data as part of your role and
24   function in suspicious order monitoring,

Page 192

1   fair?
2        MR. LIMBACHER:  Object to
3   form.
4        THE WITNESS: I had --
5        MR. LIMBACHER:  Misstates
6   her testimony.
7        THE WITNESS:  I had the data
8   that I needed to do my job.
9   BY MR. BUCHANAN:
10        Q.   Was that data IMS data,
11   ma'am?
12        A.   There's other -- IMS data is
13   not part of my responsibility.
14        Q.   Ma'am, just tell me, did you
15   consider IMS data in connection with your
16   role and function of monitoring
17   suspicious orders for Endo; yes or no?
18        MR. LIMBACHER:  Object to
19   form.  Asked and answered.
20        THE WITNESS:  I had the data
21   that I needed to do my job.  IMS
22   data is within another area within
23   Endo.  There's other people that
24   reviewed that data.  I did not.

Page 193

1   BY MR. BUCHANAN:
2        Q.   Did the other people within
3   Endo review IMS data for suspicious order
4   monitoring?
5        A.   I can't speak to that other
6   area of responsibility.  It's not my
7   area.
8        Q.   To the best of your
9   knowledge, sitting in this chair today,
10   Endo did not consider IMS data as part of
11   its suspicious order monitoring function,
12   correct?
13        MR. LIMBACHER:  Object to
14   form and foundation.
15   BY MR. BUCHANAN:
16        Q.   To the best of your
17   knowledge.  That's all we can get today,
18   ma'am.
19        A.   And I'm going to tell you
20   again, I had enough data -- I had the
21   data to do my job.  The IMS data was in
22   another area of responsibility within
23   Endo.  What they did or did not do with
24   that data, I cannot speak to.

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1        Q.   At any point in time, did
2   Endo ask one of its customers, one of its
3   distributor or wholesaler customers, to
4   reduce its order size to account for
5   pharmacy customers or other customers of
6   concern?
7        MR. LIMBACHER:  Object to
8   form.
9        THE WITNESS:  Not that I
10  recall.
11  BY MR. BUCHANAN:
12       Q.   Are you familiar with the
13  phrase "know your customer's customer"?
14       A.   Yes.
15       Q.   What does that mean, or what
16  does that mean to you, ma'am?
17       A.   Knowing who our customers
18  ship to.
19       Q.   Knowing whether they have a
20  proper purpose, right?
21       MR. LIMBACHER:  Object to
22  form.
23       THE WITNESS:  Potentially,
24  yes.

Page 195

1   BY MR. BUCHANAN:
2        Q.   At any point in time, did
3   Endo guide its distributor or wholesaler
4   customers to reduce the size of its
5   orders to account for certain of their
6   customers engaged in suspicious
7   activities?
8        MR. LIMBACHER:  Object to
9   form.
10       THE WITNESS:  Not that I
11  recall.
12  BY MR. BUCHANAN:
13       Q.   Do you have an awareness,
14  ma'am, that Qualitest did that at some
15  point in time?
16       A.   No.  That's the generics
17  division, no.
18       Q.   You didn't have visibility
19  to what the generic team was doing with
20  regard to their suspicious order
21  monitoring protocol?
22       MR. LIMBACHER:  Object to
23  form.
24       THE WITNESS:  No.

Page 196

1   BY MR. BUCHANAN:
2        Q.   So if Qualitest was, in
3   fact, guiding distributor and wholesaler
4   customers at a point in time, let's say
5   2014, that they would have to reduce
6   their orders to account for certain
7   customers of concern, that would be news
8   to you sitting here today?
9        MR. LIMBACHER:  Object to
10  form.
11       THE WITNESS:  That's the
12  generic side of the business.
13  That's not branded.  It's
14  different.
15  BY MR. BUCHANAN:
16       Q.   Well, you had interactions
17  with the generic side of the business,
18  correct?
19       A.   Yes, but not detail of what
20  they're shipping and not shipping, no.
21       Q.   Are you saying you didn't
22  have visibility to Qualitest's SOM
23  program?
24       A.   No, I did not.

Page 197

1        MR. LIMBACHER:  Object to
2   form.
3        THE WITNESS:  Sorry.
4        MR. LIMBACHER:  Asked and
5   answered.
6   BY MR. BUCHANAN:
7        Q.   To be clear, Qualitest and
8   Par, as the name changed, report to the
9   same corporate parent that Endo
10  Pharmaceuticals did, correct?
11       MR. LIMBACHER:  Object to
12  form.
13       THE WITNESS:  Yes.
14  BY MR. BUCHANAN:
15       Q.   You did not think it would
16  be of interest as to what your peer
17  company, owned by the same parent, was
18  doing with regard to suspicious order
19  monitoring?
20       MR. LIMBACHER:  Object to
21  form.
22       THE WITNESS:  That was not
23  part of my responsibility.  We
24  also have two different ERP

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  systems. So no.
2  BY MR. BUCHANAN:
3      Q.   Let's look at the document
4  we've been looking at, Exhibit-1.
5      669.2 is the page reference
6  at the top right. It's Exhibit-1. To
7  further supplement Par's SOM compliance
8  efforts, Par's DEA compliance team
9  reviews available chargeback data twice
10  per year. Chargebacks provide
11  transactional data of Par NDC numbers at
12  the pharmacy level. The chargeback
13  information for secondary customer
14  purchases is compared ████████
15  ████████     If chargeback information
16  indicates a customer facility of
17  interest, Par follows these general
18  guidelines.
19      And then it continues.
20      Do you see that?
21      A.   Yes.
22      Q.   First, you saw this,
23  obviously, in 2017, correct?
24      A.   Correct.

Page 199

1      Q.   The company is not -- "the
2  company" being the one that you're
3  employed by, Endo Pharmaceuticals, has
4  not changed its SOM program since 2017,
5  correct?
6      A.   No, we have not changed it.
7      Q.   Okay. Do you agree that
8  chargebacks provide transactional data of
9  Par NDC numbers at the pharmacy level?
10      A.   I can't speak to what Par
11  does and does not do. I don't know their
12  systems.
13      Q.   Do you agree, as a general
14  matter, chargebacks provide transactional
15  data of NDC numbers at the pharmacy
16  level?
17      MR. LIMBACHER: Object to
18  form.
19      THE WITNESS: Yes.
20  BY MR. BUCHANAN:
21      Q.   Do you agree that it's
22  reasonable to compare chargeback
23  information for secondary customer
24  purchases to ████████     as Par

Page 200

1  does?
2      MR. LIMBACHER: Object to
3  form.
4      THE WITNESS: I can't speak
5  to that.
6  BY MR. BUCHANAN:
7      Q.   Do you think it's a
8  reasonable thing to do?
9      MR. LIMBACHER: Object to
10  form.
11      THE WITNESS: I can't speak
12  to that. I don't manage the
13  generics.
14  BY MR. BUCHANAN:
15      Q.   If you were told to do that,
16  you certainly should do it, right?
17      MR. LIMBACHER: Object to
18  form.
19      THE WITNESS: I don't manage
20  the generics.
21  BY MR. BUCHANAN:
22      Q.   Would you agree that if you
23  were told by the DEA to do it, you should
24  do it?

Page 201

1      MR. LIMBACHER: Object to
2  form.
3      THE WITNESS: If chargeback
4  data was available.
5  BY MR. BUCHANAN:
6      Q.   Okay. It then notes that
7  various -- Exhibit-1, on Page 2, then
8  notes various things that can be done in
9  result of review of chargeback data.
10      Do you see that, ma'am?
11      A.   Yes.
12      Q.   Including chargebacks being
13  denied for lack of information or
14  inadequate information.
15      Do you see that? Second
16  bullet.
17      A.   I see the second bullet.
18      Q.   The customer of Par can then
19  be notified and asked for due diligence
20  information on secondary customers,
21  correct?
22      A.   I see it listed here, yes.
23      Q.   And then the third bullet is
24  what, ma'am?

51  (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1      A.  Par's customers can be asked
2  to stop distributing the Par item in
3  question to that secondary customer, and
4  the secondary customer can be reported to
5  the DEA as a potentially suspicious
6  customer.
7      Q.  In your view, ma'am, is that
8  a reasonable due diligence measure?
9          MR. LIMBACHER:  Object to
10     form.
11         THE WITNESS:  This is the
12     generics.  I can't speak to the
13     generics.  This is -- you are
14     speaking about generic product.  I
15     can't speak to the generics.
16  BY MR. BUCHANAN:
17     Q.  You have responsibility for
18  branded?
19     A.  Correct.  Branded.
20     Q.  Okay.  At what point in
21  time, ma'am, did you ask for chargeback
22  data on branded?
23         MR. LIMBACHER:  Object to
24     form.

Page 203

1  BY MR. BUCHANAN:
2      Q.  Just I want to know
3  factually, at what point in time did you
4  ask for it?
5      A.  So I'm going to try to
6  explain this one more time.
7          The branded and generic
8  products are different entities.  There
9  are no -- from my knowledge and what I
10  know, there are no branded contract --
11  retail contracts, which means you do not
12  have chargeback data for the branded
13  opioid products.  So you can't ask for
14  data that you do not have.
15     Q.  Do you remember my question?
16     A.  And I believe I answered it.
17     Q.  Factually, at what point in
18  time did you inquire about the use of
19  chargeback data?  Just let me know when
20  you did.
21     A.  How can you ask --
22         MR. LIMBACHER:  Object to
23     form.
24         THE WITNESS:  How can you

Page 204

1  ask for data that you don't have?
2  BY MR. BUCHANAN:
3      Q.  Would it surprise you,
4  ma'am, if there was chargeback data at
5  the pharmacy level for branded?
6          MR. LIMBACHER:  Object to
7      form.
8          THE WITNESS:  From what I
9      know, the chargeback data --
10  BY MR. BUCHANAN:
11     Q.  Would that surprise you?
12     A.  It probably would.
13         MR. LIMBACHER:  Let her
14     finish her answer, please.
15  BY MR. BUCHANAN:
16     Q.  Okay.
17     A.  But from what I know, the
18  chargeback data that we have for opioids
19  is related to the government contracts.
20  Again, contracts are not my area of
21  expertise, but that's my general
22  knowledge.
23     Q.  Okay.  And just to get an
24  answer to my question, it would surprise

Page 205

1  you if the company had chargeback data
2  for branded opioids at the pharmacy
3  level, correct?
4          MR. LIMBACHER:  Object to
5      form.
6          THE WITNESS:  Yes.
7  BY MR. BUCHANAN:
8      Q.  And we can agree that when
9  the company was responding to the Senate
10  inquiry here in 2017, it said nothing
11  about its ability or inability to get
12  chargeback data on its branded products,
13  correct?
14         MR. LIMBACHER:  Object to
15     form.  Asked and answered.
16         THE WITNESS:  Yes, that's
17     not listed in the document.
18  BY MR. BUCHANAN:
19     Q.  Okay.  You spent some time
20  in discussing with me -- or we spent some
21  time together talking about Exhibit-1,
22  with regard to what Endo was doing in
23  2017 with regard to suspicious order
24  management.

52  (Pages 202 to 205)

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Do you recall that
2 discussion last hour?
3    A.  Yes.
4    Q.  It would be fair that prior
5 to 2014, Endo had a limited SOM program,
6 correct?
7         MR. LIMBACHER:  Object to
8    form.
9         THE WITNESS:  We had an SOM
10    program in place.  We did, yes.
11 BY MR. BUCHANAN:
12    Q.  It was a limited program?
13         MR. LIMBACHER:  Object to
14    form.
15         THE WITNESS:  We had a
16    program in place, and it changed
17    in 2014.
18 BY MR. BUCHANAN:
19    Q.  It was a limited program?
20 Are you hearing that word when I ask the
21 question?
22    A.  Yes, I hear it.  But what
23 I'm answering your question is we had an
24 SOM program in place.  And it changed in

Page 207

1 2014.
2    Q.  Was it limited prior to
3 2014, ma'am?
4         MR. LIMBACHER:  Object to
5    form.
6         THE WITNESS:  We had an SOM
7    program in place.
8 BY MR. BUCHANAN:
9    Q.  I'm aware that you did.
10    I'm asking you --
11    A.  I'm glad.
12    Q.  -- to characterize it.
13    Was it limited prior to
14 2014?
15    A.  It depends on what your
16 definition of "limited" is.  But we had a
17 program in place.
18    Q.  How about by your
19 definition, was it limited?
20         MR. LIMBACHER:  Object to
21    form.
22         THE WITNESS:  We had a
23    program in place and it changed
24    and it was -- it was changed and

Page 208

1 it was upgraded in 2014.
2 BY MR. BUCHANAN:
3    Q.  By your definition of
4 limited, ma'am, was it a limited program?
5         MR. LIMBACHER:  Object to
6    form.
7         THE WITNESS:  We had one in
8    place.  We can go round and round
9    about this.  But we had one in
10    place.
11 BY MR. BUCHANAN:
12    Q.  Okay.
13         MR. BUCHANAN:  Can I please
14    have 596 as next in order?  I
15    think we're up to only Exhibit-2.
16         MR. SIEGEL:  Walker-2.
17         - - -
18         (Whereupon, EndoWalker
19    Exhibit-2, EPI000620553-554, was
20    marked for identification.)
21         - - -
22         MR. BUCHANAN:  We'll get a
23    copy over to you.  It's on your
24    screen while we're getting it to

Page 209

1 you.
2 BY MR. BUCHANAN:
3    Q.  You're obviously an Endo
4 employee between '98 and present,
5 correct, ma'am?
6    A.  Yes.
7    Q.  Who is Mark Collins?
8         MR. LIMBACHER:  Hold on.
9    Can we get the exhibit in front of
10    her, and then you can start asking
11    her questions?
12         MR. BUCHANAN:  Fair enough.
13 BY MR. BUCHANAN:
14    Q.  Who is Mark Collins, ma'am?
15    A.  He worked at Endo.
16    Q.  And what's his job?
17    A.  I don't know exactly what
18 his job title was, but he was in the REMS
19 division, the REMS group.
20    Q.  What's REMS?
21    A.  Risk -- some type of risk
22 management.
23    Q.  He's in the risk management
24 group at Endo Pharmaceuticals?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1      A.   I believe so.
2      Q.   So on the branded side,
3  fair?
4      A.   Uh-huh.
5      Q.   So he reaches out to you
6  here in, what's this, October 2013,
7  right?
8      A.   Uh-huh.
9      Q.   Is that a yes answer, ma'am?
10     A.   Yes.  Sorry.
11     Q.   Sorry, I understood it, but
12  the transcript might not.
13     A.   My apologies.
14     Q.   All right.  So this is
15  October 2013.
16         You understood, in 2013, on
17  the generics side of the business, they
18  had a sit-down with the DEA.
19         Do you recall that?
20     A.   I know of that, yes.
21     Q.   And they said there were
22  gaps in the company's suspicious order
23  monitoring practices.
24         Do you recall that?

Page 211

1         MR. LIMBACHER:  Object to
2     form.
3         THE WITNESS:  All I know is
4     that there was a meeting.  I don't
5     know the details of that meeting.
6  BY MR. BUCHANAN:
7     Q.   And DEA provided guidance as
8  to what an appropriate suspicious order
9  management program looked like.
10        Are you aware of that?
11        MR. LIMBACHER:  Object to
12     form.
13        THE WITNESS:  Again, I know
14     of a meeting, I don't know the
15     details of that meeting.
16  BY MR. BUCHANAN:
17     Q.   Well, did the branded folks,
18  to your recollection, share with you what
19  the DEA -- excuse me, withdrawn.
20        Did the generic folks, the
21  Qualitest team or management of Endo,
22  share with you what the DEA said you had
23  to be doing as part of a good suspicious
24  order monitoring program?

Page 212

1      A.   I don't recall the details.
2      Q.   Okay.  So you got this
3  outreach.  And we'll start at the bottom,
4  I think that's probably the best way to
5  read the e-mail.
6         Monday, October 28th, 2013.
7  And Mark Collins is asking you -- and
8  this would have been, to your
9  understanding, after the DEA meeting?
10     A.   I don't know when the DEA
11  meeting was.
12     Q.   Okay.  I'll represent to you
13  it was in March of 2013.
14     A.   Okay.
15     Q.   Okay.  So just looking at
16  our calendar, at least the document, we
17  know this is about six months after that
18  meeting, correct?
19     A.   Uh-huh.
20     Q.   Okay.  So you get an
21  outreach from Mark.  He wants to know
22  what data streams you have that can
23  provide insight into suspicious ordering
24  activities, right?

Page 213

1      A.   Yes.
2      Q.   So, Opana ER, I mean, first
3  comes to market when?
4      A.   Some time in 2006, if I
5  remember the year.
6      Q.   Okay.  So some time in 2006,
7  Opana risk -- Opana ER enters the market,
8  and there's a reformulation that occurs
9  and it's released in, what is that, 2012?
10     A.   I don't know the dates off
11  the top of my head.
12     Q.   This could get confusing in
13  the deposition because I think the
14  company kept the same name, Opana ER.
15        What do you -- what did you
16  used to call it within the company, the
17  newer version of Opana ER?
18     A.   We've always just called
19  it -- I've always just called it Opana
20  ER.
21     Q.   Do you have an
22  understanding, ma'am, that the drug was
23  reformulated a point in time?
24     A.   Yes.  I can't tell you the

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    exact dates, but, yes.
2        Q.   That's fine.  I just want to
3    make sure we're communicating clearly.
4            Would it be fair for me to
5    call it the reformulated Opana ER if we
6    have to be specific about something, and
7    would you understand what I'm talking
8    about?
9        A.   That's fine.
10       Q.   So Opana ER is brought to
11   market, as you said, in 2006.
12           And you're getting an
13   outreach here, seven years later, from
14   Mr. Collins looking for data streams that
15   could provide insight into suspicious
16   ordering activities.
17           Do you see that?
18           MR. LIMBACHER:  Object to
19       form.  Asked and answered.
20           THE WITNESS:  Yes.
21   BY MR. BUCHANAN:
22       Q.   Okay.  And then you respond
23   and seem to attach something, an SOM
24   white paper, by way of summary.

Page 215

1            And then you also provide a
2    text response as well, correct?
3        A.   Yes.
4        Q.   And your response to him is
5    that, In Endo's SAP system, we have a
6    limited SOM program.
7            Let's pause there for a
8    moment.
9            Your words, limited program,
10   correct?
11           MR. LIMBACHER:  Object to
12       form.
13           THE WITNESS:  Yes.  But we
14       had an SOM program in place.  And
15       at this time, we also -- you got
16       to remember, we also had UPS as
17       well.
18   BY MR. BUCHANAN:
19       Q.   Okay.  And your words for
20   Endo's SOM program, as of October 2013,
21   is it was a limited program, correct?
22       A.   We had an excessive --
23           MR. LIMBACHER:  Object to
24       form.

Page 216

1            THE WITNESS:  -- program in
2        place, we did, yes.
3    BY MR. BUCHANAN:
4        Q.   Okay.  And the excessive
5    program, as you characterized it in your
6    writing, was a limited SOM program,
7    correct?
8            MR. LIMBACHER:  Object to
9        form.  Asked and answered.
10           THE WITNESS:  We had one in
11       place, yes.
12   BY MR. BUCHANAN:
13       Q.   You had a limited SOM
14   program in place?
15           MR. LIMBACHER:  Object to
16       form.  Asked and answered.
17           THE WITNESS:  We had an SOM
18       program in place, yes.
19   BY MR. BUCHANAN:
20       Q.   You're fussing with what you
21   wrote before?
22           MR. LIMBACHER:  Object to
23       form.  Argumentative.
24           The document speaks for

Page 217

1    itself, counsel.
2    BY MR. BUCHANAN:
3        Q.   I'm just wondering, do you
4    have a problem with what you wrote in
5    2013?
6            MR. LIMBACHER:  Object to
7        form.  Argumentative.
8            THE WITNESS:  We had an SOM
9        program in place.
10   BY MR. BUCHANAN:
11       Q.   And the way you
12   characterized that in your response to
13   Mr. Collins, October 28th -- 29th, 2013,
14   is you have a limited SOM program,
15   correct?
16           MR. LIMBACHER:  Object to
17       form.
18           THE WITNESS:  We have an SOM
19       program in place.
20           And as I stated here, if you
21       keep reading my paragraph, that we
22       utilized UPS, who has -- who has
23       an SOM program in place.  And all
24       of our products are shipped under

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1     UPS's DEA license.
2         So as I explained it here.
3  BY MR. BUCHANAN:
4     Q.    That's fine.
5         And in terms of
6  characterizing Endo's SOP program, you
7  characterized it as a limited -- excuse
8  me, in terms of characterizing Endo's SOM
9  program, you characterized it as a
10  limited program in 2013, fair?
11        MR. LIMBACHER:  Object to
12  form.
13  BY MR. BUCHANAN:
14     Q.    That's what you wrote?
15     A.    Okay.  But -- yes.
16     Q.    Thank you.
17     A.    And we have an SOM program
18  in place.  And we also utilized UPS's SOM
19  program in place, which is also written
20  here.  And the document was provided to
21  Mark about their SOM program.
22     Q.    At this point in time, in
23  2013, would you have been the person in
24  charge of Endo's SOM program, ma'am?

Page 219

1     A.    It fell under my
2  responsibilities, yes.
3     Q.    Okay.  And then you describe
4  essentially what your SOM program is,
5  this limited SOM program.
6         And it looks at buying -- at
7  your buying, in parens, wholesaler's
8  customers' three-month and twelve-month
9  history.  And if any order is above the
10  three- or twelve-month, it goes on hold
11  until it is reviewed by customer service.
12        Let's pause for a moment.
13        Was that accurate?  Was that
14  an accurate statement of your program as
15  of October 29, 2013?
16     A.    Yes.
17     Q.    Okay.  Once the orders were
18  released from the system, they were sent
19  to the warehouse for processing.
20  However, before they are released to
21  ship, they are reviewed by UPS Supply
22  Chain Solutions.
23        Did I read that correctly?
24     A.    Yes.

Page 220

1     Q.    You're not the only one who
2  has characterized Endo's SOM program as
3  limited, are you?
4         MR. LIMBACHER:  Object to
5  form.
6         THE WITNESS:  I can't speak
7  to how other people describe it.
8  BY MR. BUCHANAN:
9     Q.    Okay.
10        MR. BUCHANAN:  Can I have
11  603, please?
12        MR. SIEGEL:  Walker-3.
13        MR. BUCHANAN:  Actually,
14  Scott, before we do that, I have
15  another document.  Don't put the
16  sticky on.
17        Thank you.  Can I have 679
18  as Walker-3.
19        MR. SIEGEL:  Walker-3.
20        MR. BUCHANAN:  Do we have
21  this one in redacted form, please?
22  Can we put the redacted version
23  up, please?  Take it off the
24  screen.

Page 221

1         We received a notice last
2  night of a document with one
3  sentence, I think, you wanted
4  redacted.  I was told you were
5  going to produce a redacted
6  version today.  I just drew a
7  black line over the -- what was
8  indicated as the portion you
9  wanted redacted.
10        Before we display it on the
11  screen, I'd like counsel to see
12  it.
13        MR. TOLIN:  Thank you.
14        MR. BUCHANAN:  If you have
15  what is going to be produced as
16  the redacted version, I'd be happy
17  to work with it.
18        MR. LIMBACHER:  Thank you.
19  Let me see.
20        MR. TOLIN:  Let me make sure
21  it's a duplicate document.
22        It looks like part of the
23  e-mail chain, including the part
24  that was clawed back and redacted,

56  (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    is included as part of the
2    document that you had marked.
3        So the document that I have
4    here is not as inclusive, in terms
5    of --
6        MR. BUCHANAN:  Can I see the
7    one that you've --
8        MR. TOLIN:  Yes.  Maybe you
9    can just use that one.  Sorry.
10       MR. BUCHANAN:  That's fine.
11   I believe it's fine.  Let me look
12   at it.
13       MS. RAKHLIN:  It's a
14   different version.
15       MR. BUCHANAN:  It's a
16   different document.
17       Counsel, if you can just
18   look at the portion that's been
19   redacted and confirm that you have
20   no objection to the document's
21   use.
22       MR. LIMBACHER:  Can we take
23   a short break?
24       MR. BUCHANAN:  That's fine.

Page 223

1        VIDEO TECHNICIAN:  Going off
2    the record.  The time is 12:08.
3        - - -
4        (Whereupon, a brief recess
5    was taken.)
6        - - -
7        VIDEO TECHNICIAN:  Going
8    back on the record.  This is the
9    beginning of Media File Number 4.
10   The time is 12:11.
11       - - -
12       (Whereupon, EndoWalker
13   Exhibit-3,
14   ENDO_OPIOID_MDL_05948286-292, was
15   marked for identification.)
16       - - -
17   BY MR. BUCHANAN:
18       Q.   Ms. Walker, we've passed you
19   Exhibit-3 to your deposition.  It's an
20   e-mail chain from early 2015.
21       MR. BUCHANAN:  On the
22   screen, please, could you take
23   that down.  What we need to do
24   is -- can I see the version that's

Page 224

1    been redacted.  Can you hold it
2    up, please?
3        - - -
4        (Whereupon, a discussion off
5    the record occurred.)
6        - - -
7    BY MR. BUCHANAN:
8        Q.   Ms. Walker, this is an
9    e-mail from you to Mr. Collins and Mr.
10   O'Brien in early 2015.
11       Mr. Collins is that same
12   person you were talking about a moment
13   ago?
14       A.   Yes.
15       Q.   Kevin O'Brien, who is he?
16       A.   He was my boss at the time.
17       Q.   And what was his role and
18   function within Endo?
19       A.   I don't know exactly what
20   his title was, but I reported in to him.
21       Q.   Effectively, what was his
22   function?
23       A.   I think he was over multiple
24   different groups within Endo, including

Page 225

1    myself.
2        Q.   Mr. Collins reaches out to
3    you.
4        Again, you understand he was
5    in risk management for the company?
6        A.   Yes.
7        Q.   And asks you for an overview
8    of Endo's SOM program, correct?
9        A.   Correct.
10       Q.   And you provide that back to
11   him?
12       A.   Yes.
13       Q.   So we see on the attachment
14   on the next page, please, 679.2,
15   suspicious order monitoring summary SOM
16   process flow.
17       Do you see that?
18       A.   Yes.
19       Q.   Okay.  And then current
20   process.
21       Do you see the colon there?
22       A.   Yes.
23       Q.   And the current process,
24   first bullet, what did you write, ma'am?

57 (Pages 222 to 225)

Page 226

1    A.   Limited SOM program in the
2 current SAP system.
3    Q.   Okay.  And this was not only
4 your summary, ma'am, this was a summary
5 that had been, if we go to the first page
6 again, approved by legal and Brian
7 Lortie, correct?
8    A.   That's correct.
9    Q.   So this was the company's
10 assessment of its current process as of
11 January 2015, correct, ma'am?
12    MR. LIMBACHER:  Object to
13 form.
14    THE WITNESS:  Yes.
15 BY MR. BUCHANAN:
16    Q.   Not just Ms. Walker, but the
17 company, this has been reviewed through
18 the various channels of review before it
19 went to Mr. Collins, correct?
20    MR. LIMBACHER:  Object to
21 form.  Foundation.
22    THE WITNESS:  This was the
23 new SOM program we put in place in
24 May of 2014.

Page 227

1 BY MR. BUCHANAN:
2    Q.   And my question was, this
3 document that you forwarded along had
4 been reviewed by those in legal to sign
5 off on before you forwarded it to Mr.
6 Collins and Mr. O'Brien, correct?
7    MR. LIMBACHER:  Object to
8 form.
9    THE WITNESS:  It was
10 reviewed by legal, yes.
11 BY MR. BUCHANAN:
12    Q.   Thank you.  You can set that
13 aside.
14    Am I correct, based on your
15 summary of your role and
16 responsibilities, that in 2007 and 2008,
17 you also had responsibility for
18 suspicious order monitoring?
19    A.   Sorry, time frame again?
20    Q.   2007, 2008.
21    A.   It was part of my
22 responsibility.
23    Q.   Okay.
24    MR. BUCHANAN:  Can I have

Page 228

1 640, please?
2 BY MR. BUCHANAN:
3    Q.   In the mid 2000s, ma'am,
4 you're aware that concerns were expressed
5 about abuse, diversion, deaths,
6 overdoses, with regard to opioid
7 products, fair?
8    A.   I knew there was --
9    MR. LIMBACHER:  Object to
10 form.
11    THE WITNESS:  I knew there
12 was concern about opioids, yes.
13 BY MR. BUCHANAN:
14    Q.   You knew that you operated
15 within that closed system of opioid
16 manufacture, distribution and sale?
17    MR. LIMBACHER:  Object to
18 form.
19    THE WITNESS:  I knew that we
20 had opioids, yes.
21 BY MR. BUCHANAN:
22    Q.   Did you appreciate, ma'am,
23 that before you could be engaged in the
24 manufacture, distribution and sale of

Page 229

1 opioids, you had to be a registrant?
2    MR. LIMBACHER:  Object to
3 form.
4 BY MR. BUCHANAN:
5    Q.   Are you aware of that?
6    A.   I know that the Endo Malvern
7 site does not have a DEA license, because
8 we don't have product there.
9    But, yes, I do know that
10 people have to be registered.
11    Q.   Okay.  To manufacture, to
12 sell, to distribute, you've got to be a
13 registrant, fair?
14    MR. LIMBACHER:  Object to
15 form.  Foundation.
16    THE WITNESS:  To distribute
17 and manufacture, yes.
18 BY MR. BUCHANAN:
19    Q.   Is it your understanding,
20 ma'am, that Endo did not need a
21 registration with the DEA to do the
22 business it did?
23    MR. LIMBACHER:  Object to
24 form.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1      THE WITNESS:  The Endo
2   Malvern site did not need one,
3   because there are no products at
4   that site.
5  BY MR. BUCHANAN:
6      Q.   Did Endo need a
7   registration, to your understanding --
8      MR. LIMBACHER:  Object to
9   form and foundation.
10  BY MR. BUCHANAN:
11     Q.   -- to engage in its business
12  as a manufacturer of opioids?
13     MR. LIMBACHER:  Object to
14  form and foundation.  Misstates
15  prior testimony.
16     THE WITNESS:  I'm not in
17  regulatory.  You would have to
18  speak to them about that.
19  BY MR. BUCHANAN:
20     Q.   Did you have an
21  understanding, ma'am, that to be making,
22  marketing, talking about your opioid
23  products that you had to have a
24  registration?

Page 231

1      MR. LIMBACHER:  Object to
2   form and foundation.  Asked and
3   answered.
4      THE WITNESS:  I know that
5   the site that would make product
6   or the site that would distribute
7   product needed a DEA license.
8  BY MR. BUCHANAN:
9      Q.   Were you ever asked by any
10  of your customers for your DEA
11  registrations for purposes of your role
12  and function in this closed system of
13  opioid distribution?
14     A.   When our customers ask for
15  Endo's DEA license, UPS Supply Chain
16  Solutions' DEA license is provided,
17  because all of Endo products are shipped
18  under UPS's license.
19     Q.   As a manufacturer of opioid
20  products, when UPS asked you for your
21  registration, did you provide them with a
22  registration?
23     MR. LIMBACHER:  Object to
24  form and foundation.

Page 232

1      THE WITNESS:  I cannot
2   recall if UPS asked for our
3   license.
4  BY MR. BUCHANAN:
5      Q.   You don't recall ever having
6   to provide your registration to UPS --
7      A.   I am not --
8      MR. LIMBACHER:  Object to
9   form and foundation.
10  BY MR. BUCHANAN:
11     Q.   -- as --
12     A.   I'm not in regulatory.  I
13  can't speak to Endo's, if we did or did
14  not have a DEA registration.
15     I can only speak to the fact
16  that UPS had one because they did the
17  distribution.
18     Q.   I'm just trying to
19  understand.
20     From your perspective,
21  ma'am, is it your belief that you could
22  operate in this closed system of opioid
23  manufacture, distribution and sale
24  without having a registration?

Page 233

1      MR. LIMBACHER:  Objection.
2   Form and foundation.
3  BY MR. BUCHANAN:
4      Q.   Is that your understanding?
5      MR. LIMBACHER:  Misstates
6   her testimony.
7      THE WITNESS:  The only thing
8   that I can tell you is I know that
9   UPS had a license, because they do
10  the distribution of Endo's opioid
11  products.  And at sites that
12  actually make the product, which
13  are contract manufacturing sites,
14  had a license to make the product.
15     I cannot speak to Endo's
16  specifically, because I don't
17  know.
18  BY MR. BUCHANAN:
19     Q.   So Endo -- what do you
20  consider Endo in connection with
21  Percocet; what is Endo?
22     MR. LIMBACHER:  Object to
23  form and foundation.
24     THE WITNESS:  Endo owns the

59  (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1      NDA to -- for Percocet.  But Endo
2  building does not make it or
3  distribute it.
4  BY MR. BUCHANAN:
5      Q.   Is Endo a manufacturer?
6          MR. LIMBACHER:  Object to
7  form and foundation.  Asked and
8  answered.
9          THE WITNESS:  On the
10  definition of manufacturer, yes.
11  BY MR. BUCHANAN:
12     Q.   When the product is sold,
13  there's prescribing information, there's
14  risk management information, there can be
15  patient information for Endo's products,
16  fair?
17     A.   That's not my area of
18  responsibility.  I can't speak to that.
19     Q.   Have you ever looked at the
20  labeling for Endo's opioid products,
21  ma'am?
22     A.   I've seen the labeling
23  that's on the bottle.
24     Q.   And on the bottom of the

Page 235

1  bottle, does it say, not on the bottle --
2  I'm sorry, withdrawn.
3          On the label, the
4  prescribing information that's provided
5  to doctors, have you ever looked at that?
6      A.   The package insert, is that
7  what you're referring to?
8      Q.   Yes.
9      A.   Not in detail, no.
10     Q.   Have you ever looked to see
11  who is listed on the back of it?
12          MR. LIMBACHER:  Object to
13  form.
14          THE WITNESS:  No, I haven't.
15  BY MR. BUCHANAN:
16     Q.   As the manufacturer?
17     A.   I know the bottle has it.
18     Q.   And who does it list?
19     A.   Endo.
20     Q.   Okay.  It lists Endo as the
21  manufacturer, right?
22     A.   Yes.
23     Q.   Okay.  So I'm trying to
24  understand, ma'am, are you saying that

Page 236

1  Endo could operate in this closed system
2  of -- well, withdrawn.
3          Do you have an
4  understanding, ma'am, that manufacture,
5  distribution and sale of opioids in this
6  country requires a permission slip of
7  sorts?
8          MR. LIMBACHER:  Objection.
9  Form and foundation.
10  BY MR. BUCHANAN:
11     Q.   Do you have that
12  understanding?
13          MR. LIMBACHER:  Asked and
14  answered.
15          THE WITNESS:  My
16  understanding is, within my role,
17  which is distribution, our
18  products are shipped under UPS
19  Supply Chain Solutions's DEA
20  license.  That is the customer --
21  that is the distribution site that
22  has the DEA license.  That is what
23  I know.  I cannot speak to any
24  other part of it.

Page 237

1  BY MR. BUCHANAN:
2      Q.   Does Endo have a
3  registration that applies to its
4  activities with regard to Opana and
5  Percocet, ma'am?
6          MR. LIMBACHER:  Objection.
7  Form and foundation.  Asked and
8  answered.
9          THE WITNESS:  You would need
10  to speak to other areas within
11  Endo.  I can't -- I don't know.  I
12  don't have the answer.
13  BY MR. BUCHANAN:
14     Q.   Have you ever discussed with
15  law enforcement authorities or the DEA --
16  have you ever been a part of
17  communications with the DEA, ma'am?
18          MR. LIMBACHER:  Object to
19  form.
20          THE WITNESS:  No, I have
21  not.
22  BY MR. BUCHANAN:
23     Q.   Have you ever been a part of
24  discussions with those in regulatory as

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    to Endo's registration status?
2       A.   No, I have not.
3       Q.   If I were to ask you, ma'am,
4    what registration with the DEA, to your
5    understanding, authorized Endo's
6    activities with regard to Percocet and
7    Opana ER, what would you state?
8            MR. LIMBACHER:  Object to --
9    objection.  Form and foundation.
10           THE WITNESS:  I would state
11       that all of Endo's products are
12       shipped under UPS Supply Chain
13       Solutions's DEA license, and they
14       have a DEA license.
15   BY MR. BUCHANAN:
16       Q.   That's for shipping and
17   handling?
18       A.   And that is my
19   responsibility.
20       Q.   So the role and function
21   that you were engaged in with regard to
22   suspicious order monitoring, you were
23   just doing that as a responsible company,
24   is that your testimony, ma'am?

Page 239

1            MR. LIMBACHER:  Objection.
2    Form.
3    BY MR. BUCHANAN:
4        Q.   Or were you doing that as a
5    DEA registrant?
6            MR. LIMBACHER:  Objection.
7    Form.  Asked and answered.
8            THE WITNESS:  I can't speak
9        to Endo's DEA registration.  I can
10       speak to the fact that UPS Supply
11       Chain Solutions had a DEA
12       registration, a valid one, and our
13       products are shipped under UPS
14       Supply Chain Solutions's DEA
15       license.
16       And Endo had a SOM program
17       in place.  And so did UPS Supply
18       Chain Solutions.  That's what I
19       can speak to.
20           MR. BUCHANAN:  Can I please
21       have 737, Scott?  You can just
22       pass it over to the witness.
23       Thank you.
24           MR. SIEGEL:  This is marked

Page 240

1    as Exhibit-4?
2            MR. LIMBACHER:  Yes, I think
3    we're at 4.
4              - - -
5       (Whereupon, EndoWalker
6    Exhibit-4, UPSSCS0002032-051, was
7    marked for identification.)
8              - - -
9    BY MR. BUCHANAN:
10       Q.   I'm passing you Exhibit-4 to
11   your deposition, ma'am.  It's a Know Your
12   Customer checklist.
13       Do you see that?
14       A.   Yes.
15       Q.   You were a customer of UPS,
16   fair?
17       A.   We were a client of UPS,
18   yes.
19           MR. LIMBACHER:  Take your
20       time and review the document.
21           THE WITNESS:  Okay.
22   BY MR. BUCHANAN:
23       Q.   In connection with your
24   dealings with UPS over the years, and

Page 241

1    after a point in time, I guess, in the
2    last few years, you started to get some
3    questionnaires from UPS, fair?
4        A.   Yes.
5        Q.   Were you the person who
6    completed those questionnaires?
7        A.   I am.
8        Q.   Look before you, ma'am, and
9    just satisfy yourself, for example, the
10   one on the first page, last two numbers
11   32, are --
12       A.   32.
13       Q.   -- is your 2016 response to
14   their questionnaire; is that right?
15       A.   Yes.
16       Q.   Okay.  And scrolling
17   forward -- and, by the way, who is Ms.
18   Lindell?
19       A.   She works for UPS in the
20   regulatory group.
21       Q.   Okay.  Somebody that you
22   dealt with there?
23       A.   Yes, I have.
24       Q.   Okay.  Scroll forward.

61 (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    And do you see, I believe
2  the last two numbers would be 40, do you
3  see your Know Your Customer checklist
4  from Endo for 2015 there?
5    A.   Yes.
6    Q.   And in the bottom right
7  corner, it says effective date June 11,
8  2013 for the form.
9    Do you see that?
10    A.   June 11, 2013, yes.
11    Q.   And you understand, though,
12  that you're providing this information --
13  you completed these for UPS, or for
14  your -- in response to the UPS request,
15  correct?
16    A.   I did.
17    Q.   Okay.  And you were accurate
18  when you did that?
19    MR. LIMBACHER:  Object to
20  form.
21    THE WITNESS:  I was what?
22  Sorry.
23  BY MR. BUCHANAN:
24    Q.   You were trying to be

Page 243

1  accurate when you did that?
2    A.   Yes.
3    Q.   Scrolling forward to 2046,
4  bottom right corner, the Bates numbers,
5  this would be Endo's response as of July
6  of 2013, fair?
7    A.   Yes.
8    Q.   Let's scroll to Page 2049,
9  again, in your 2013 response.
10    It asks, Question 15, What
11  methods of payment are you going to
12  accept from your customers?
13    A.   I'm sorry.  What page are
14  you on?
15    Q.   It's 2049.  It's on the
16  screen, if that's easier.
17    A.   No, I have it.  Thank you.
18    Q.   Then you're asked the
19  question, Do you conduct on-site visits
20  of your customers, yes or no?
21    Do you see that?
22    A.   Yes, Number 16, yes.
23    Q.   And you said no, right?
24    A.   Correct.

Page 244

1    MR. LIMBACHER:  Object to
2  form.
3  BY MR. BUCHANAN:
4    Q.   That's the box you checked,
5  correct, ma'am?
6    A.   Yes.
7    Q.   Okay.  Let's scroll forward
8  in the document to Page 2043.
9    I guess we should have read
10  the sentence that was in the box, I
11  apologize.
12    You noted, Not at this time,
13  but Endo should have a program in place
14  by the end of 2013.
15    Do you see that?
16    A.   I do.
17    Q.   Okay.  And Endo didn't have
18  that program in place by the end of 2013,
19  correct?
20    A.   We utilized what Qualitest
21  was doing.
22    Q.   Let's look at what you said
23  next year when you answered this request.
24    I'm sorry, this would be

Page 245

1  2015.  Can we go to 2043?
2    Do you conduct on-site
3  visits of your customers?
4    What did you say?
5    A.   No.
6    Q.   Any explanation provided to
7  UPS?
8    A.   No explanation.
9    Q.   Okay.  So as of 2015, in
10  response to the question from, I guess,
11  your fulfillment company, do you conduct
12  on-site visits of your customer, Endo's
13  response was what, ma'am?
14    A.   What page?
15    Q.   2043.  The one on the
16  screen, I'm sorry, if that's easier.
17    A.   2043.  It says no.
18    Q.   Thank you.
19    And scroll forward in time
20  to 2035.  We're now in 2016.  You're
21  asked the question in Number 16.
22    Could you read that, ma'am?
23    A.   Yes.  It says no.
24    Q.   Do you conduct on-site

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    visits of your customers?
2         And Endo replied?
3    A.   No.
4    Q.   And that was a true
5    statement?
6    A.   Correct.  Right.  Endo did
7    not.
8    Q.   And we can agree you
9    provided no explanation as to some other
10   source that was doing the customer review
11   for you, correct?
12   MR. LIMBACHER:  Object to
13   form.  The document speaks for
14   itself.
15   THE WITNESS:  No.
16   BY MR. BUCHANAN:
17   Q.   You filled this out, right?
18   A.   Right.  No, I did not
19   explain about Qualitest.
20   Q.   Okay.  And was UPS shipping
21   for Qualitest in 2013, ma'am?
22   A.   No, they were not.
23   Q.   In 2014?
24   A.   No.

Page 247

1    Q.   In 2015?
2    A.   No.
3    Q.   2016?
4    A.   No.
5    Q.   You can set that aside,
6    ma'am.
7         MR. BUCHANAN:  Next in
8    order, Scott, 753.
9         MR. LIMBACHER:  Dave,
10   whenever it's a good time to break
11   for lunch.  It's 12:30.
12        MR. BUCHANAN:  This will
13   take five minutes.  Fair?
14        MR. LIMBACHER:  That's fine.
15        MR. SIEGEL:  This is marked
16   as Walker-5.
17             - - -
18        (Whereupon, EndoWalker
19   Exhibit-5,
20   ENDO_OPIOID_MDL_05968962-963 was
21   marked for identification.)
22             - - -
23   BY MR. BUCHANAN:
24   Q.   Ms. Walker, we're passing

Page 248

1    you what we're marking as Exhibit-5 to
2    your deposition.  It's Bates stamped
3    Endo_Opioid_MDL, last three digits 962.
4         It's an e-mail exchange
5    between you and your colleague, Kim
6    Lindell at UPS.  I said "your
7    colleague" --
8    A.   She works at UPS.
9    Q.   -- your counterpart at UPS?
10   A.   She works in the regulatory
11   group at UPS.
12   Q.   Okay.  We're looking here in
13   the summer of -- excuse me, April of
14   2014, starting at the bottom, please.
15   External, getting to know your customers.
16        Do you see that?
17   A.   Yes.
18   Q.   Actually, I should probably
19   start at the bottom of the first page, so
20   we orient ourselves.
21        You sent an e-mail off to
22   Ms. Lindell in April of 2014, right?
23   A.   Yes, that's what this is
24   stating.

Page 249

1    Q.   Subject, Getting to know
2    your customers?
3    A.   Yes.
4    Q.   I guess it says, Getting to
5    you your customers, but you were saying
6    getting to know your customers,
7    essentially?
8    A.   Correct.
9    Q.   Hi, Kim, there have been
10   many discussions around getting to know
11   your customers at Endo and Qualitest.
12   With that being said, I was under the
13   impression that UPS was not required by
14   the DEA to perform these audits.
15        And what did you write after
16   that?
17   A.   And it was the
18   responsibility of the manufacturers.
19   Q.   And it was the
20   responsibility of the manufacturers.
21        That's what you wrote?
22   A.   That's what I wrote.
23   Q.   And that was your
24   understanding as of that point in time,

63 (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    correct, ma'am?
2         A.    Correct.
3         Q.    Because after all, it was
4    the manufacturers who had the sales force
5    and the customers, right?
6              MR. LIMBACHER:  Object to
7    form.
8              THE WITNESS:  Yes.
9    BY MR. BUCHANAN:
10        Q.    Endo had the sales force,
11   Endo had the relationships with the
12   distributors and the wholesalers, Endo
13   had the relationship to the people who
14   were placing the orders, correct?
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  We had the
18   relationship with the wholesalers.
19   BY MR. BUCHANAN:
20        Q.    Okay.  So after you wrote,
21   it was the responsibility of the
22   manufacturers, you responded -- or
23   questioned, Can you confirm my assumption
24   is correct?

Page 251

1              Did I read that correctly?
2         A.    You did.
3         Q.    Endo was looking at an
4    outside vendor to perform these audits
5    and someone mentioned to me that they
6    thought UPS had to perform these audits
7    as well, which I do not believe is true.
8              Did I read that correctly?
9         A.    You did.
10        Q.    So as of this point in time,
11   in 2014, you were clear, at least, that
12   UPS was not going to your customers to
13   know them, correct?
14        A.    In 2014, correct.
15        Q.    Okay.  And you got a
16   response from UPS, correct?
17        A.    Yes.
18        Q.    From -- this is the person
19   in regulatory affairs at UPS, correct?
20        A.    Yes.  Kim is in the
21   regulatory group.
22        Q.    Did you reach out -- did you
23   reach out to compliance and regulatory
24   affairs at Endo on this issue?

Page 252

1         A.    I don't recall.
2         Q.    Okay.  The reply you got
3    from Ms. Lindell was, Hi, Lisa, UPS does
4    have a Know Your Customer program in
5    place.  However, as a 3PL provider --
6    let's pause.  What is a 3PL provider?
7         A.    Third-party logistics.
8         Q.    As a third-party logistics
9    provider, we do not maintain the
10   relationship with our clients' (Endo)
11   customers.
12             And that was true, right?
13   They don't have a relationship with your
14   customers?
15        A.    No, they don't.
16        Q.    You may recall the survey
17   that we asked you to complete, she asks
18   with a question mark on the end.
19             Do you see that?
20        A.    Yes.
21        Q.    Do you recall that we looked
22   at those surveys, the Know Your Customer
23   checklist surveys a moment ago?
24        A.    Yes.

Page 253

1         Q.    And do you recall you
2    answering that Endo does not, in fact, go
3    and conduct customer due diligence,
4    correct?
5         A.    That is correct.
6         Q.    The survey contains
7    questions about your SOM program, process
8    for vetting new customers, customer
9    types, et cetera.  This allows us to do
10   our due diligence to the extent that we
11   can.  Having said that, we believe that
12   the DEA requires both the manufacturer
13   and the distributor have a program in
14   place.
15             Did I read that correctly?
16        A.    You did.
17        Q.    And that was your
18   understanding as well, as you noted on
19   the prior page, correct?
20        A.    Uh-huh.
21             MR. LIMBACHER:  Objection to
22   form.
23   BY MR. BUCHANAN:
24        Q.    That's a yes answer, ma'am?

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    A.  Yes.
2    Q.  And then you replied to that
3  e-mail saying, So your Getting to Know
4  Your Customer program is around your
5  clients?
6        You're saying that to UPS,
7  correct?
8    A.  I am.
9    Q.  And "your clients," when
10  directing that to UPS, would be companies
11  like Endo, right?
12    A.  It would, yes.
13    Q.  And so your understanding,
14  ma'am, was that UPS's obligation was to
15  get to know companies like you, right?
16        MR. LIMBACHER:  Object to
17    form.
18        THE WITNESS:  In 2014, yes.
19  BY MR. BUCHANAN:
20    Q.  And that it was the
21  manufacturer's obligation get to know
22  their customers and their customers'
23  customers, correct?
24        MR. LIMBACHER:  Object to

Page 255

1  form.  Misstates the evidence.
2        THE WITNESS:  Based on what
3  I know, yes.
4  BY MR. BUCHANAN:
5    Q.  Okay.
6        MR. BUCHANAN:  I think it's
7    a good place to break.
8        MR. LIMBACHER:  Do you want
9    to read the response from UPS or
10    do you want me to do that?
11        MR. BUCHANAN:  We can.  I
12    think I just did.
13        MR. LIMBACHER:  No, I don't
14    think so.
15  BY MR. BUCHANAN:
16    Q.  Friday, April 11, 2014.  So,
17  Kim, Getting to Know Your Customer
18  program is around your clients.  Thanks.
19        You responded -- withdrawn.
20  Let me start this over.
21        Where were we?
22        MR. BUCHANAN:  Middle of the
23    page, please.
24        MR. LIMBACHER:  Lisa sent a

Page 256

1  question and then --
2        MR. BUCHANAN:  I have it.
3    Yes.
4  BY MR. BUCHANAN:
5    Q.  Hi, Kim, so your Getting to
6  Know Your Customer program is around your
7  clients.  Thanks.  Lisa.
8        Did I read that correctly,
9  ma'am?
10    A.  Yes, you did.
11    Q.  And the reply you got from
12  Ms. Lindell to you was, Yes, and, to some
13  degree, your customers, based on the
14  information that you provide us.  The
15  original plan was to survey your
16  customers, but in the end we went down a
17  different path.
18        Did I read that correctly?
19    A.  You did.
20    Q.  And a response to the Know
21  Your Customer checklist that you sent
22  back to Ms. Lindell in 2013, did you
23  provide them with due diligence
24  information on your customers?

Page 257

1        MR. LIMBACHER:  Object to
2    form.
3        THE WITNESS:  No.
4  BY MR. BUCHANAN:
5    Q.  It was Endo's view that that
6  information was -- of its customers was
7  Endo's information, correct?
8        MR. LIMBACHER:  Object to
9    form.
10        THE WITNESS:  Say that
11    again.
12  BY MR. BUCHANAN:
13    Q.  It was Endo's understanding,
14  or at least your understanding at that
15  time, that the responsibility for your
16  customers rested with the manufacturer,
17  correct?
18        MR. LIMBACHER:  Object to
19    form.
20        THE WITNESS:  Yes.
21        MR. BUCHANAN:  Thank you.
22  No further questions.
23        VIDEO TECHNICIAN:  Going off
24  the record.  The time is 12:37.

65  (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

```
1              - - -
2         (Whereupon, a luncheon
3    recess was taken.)
4              - - -
5         VIDEO TECHNICIAN:  We're
6    going back on record.  Beginning
7    of Media File Number 5.  The time
8    is 1:32.
9    BY MR. BUCHANAN:
10        Q.   Ms. Walker, are you ready to
11   proceed?
12        A.   Yes.
13        Q.   You remain under oath.
14             You understand that,
15   correct?
16        A.   Yes.
17             MR. BUCHANAN:  Could I have
18   749, please, Scott?
19             MR. SIEGEL:  Marked as
20   Exhibit-6.
21             - - -
22        (Whereupon, EndoWalker
23   Exhibit-6, No Bates, 8/9/12 E-mail
24   from Larry Shaffer to Lisa Walker,
```

Page 259

```
1    Subject: FW: UPS's Know Your
2    Customer Program, was marked for
3    identification.)
4              - - -
5    BY MR. BUCHANAN:
6         Q.   Ma'am, I'm passing you an
7    exchange from 2012.  It's an e-mail
8    exchange between yourself and Mr.
9    Shaffer, July 25, 2012.
10             Do you see it on the screen?
11   There's a copy, if that's more
12   convenient, to look at on paper.
13        A.   Yes.
14        Q.   Who is Mr. Shaffer?
15        A.   I believe he worked at
16   Qualitest.
17        Q.   Okay.  You see he's -- there
18   is an exchange among yourself and others
19   that starts this.  It's on July 23rd,
20   2012 from yourself to Margaret
21   Richardson.
22             Who is she?
23        A.   She was a lawyer at one time
24   at Qualitest.
```

Page 260

```
1         Q.   Okay.  Ms. Connell, Ms.
2    Hernandez are cc'd on this.  And it's
3    entitled, UPS's Know Your Customer
4    program.
5         Do you see that, ma'am?
6         A.   Yes.
7         Q.   And then you see that Mrs.
8    Hernandez -- or Ms. Hernandez flips it
9    over to Mr. Shaffer.
10             Is it Shaffer or Shaffer?
11   How do you pronounce that?
12        A.   I believe it was Shaffer.
13        Q.   Still with the company?
14        A.   I don't know.
15        Q.   Okay.  And he then provides
16   his comments on this.
17             Do you see that?  On the
18   first page.
19        A.   Yes, I see that.  I'm just
20   reading it.
21        Q.   It's July 25, 2012, 4:54
22   p.m., UPS's Know Your Customer program.
23   And he states, I just want to make sure
24   that I understand this.  The KYC
```

Page 261

```
1    documentation -- is that the way you
2    referred to Know Your Customer in your
3    field, ma'am?
4         A.   That's the way they refer to
5    it.  Not me.
6         Q.   Okay.  The KYC documentation
7    is in addition to an actual SOM system.
8    Please find my review with suggestions
9    below.
10             Have you seen this before,
11   ma'am?
12        A.   No, I have not.  I don't
13   recall seeing this.
14        Q.   We do see, I guess, at the
15   top of the page, if you read all the way
16   to the top, Mr. Shaffer forwarded it back
17   to you on August 9th, 2012, correct?
18        A.   Yes, I see that.
19        Q.   Hi, Lisa, per my voicemail,
20   below are my comments.  Thanks, Larry.
21             Do you see that?
22        A.   I do.
23        Q.   And then if you read down in
24   the Know Your Customer questionnaire,
```

66 (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  customer key rating -- let's pause for a
2  moment.
3          Does this look familiar to
4  you, ma'am?
5          MR. LIMBACHER:  Object to
6  form.
7  BY MR. BUCHANAN:
8      Q.   The Know Your Customer
9  questionnaire?
10     A.   Is this -- I don't know what
11 this is.  Is this UPS's customer program
12 questions?  Is that what this is?
13     Q.   Do you recall getting, from
14 UPS, a questionnaire for your
15 consideration and review?
16         We looked at some that were
17 completed, but do you recall getting an
18 electronic version from UPS with their
19 answer key?
20     A.   No, I do not recall.
21     Q.   We're going to pause on this
22 exhibit for a moment, ma'am.  And I'm
23 going to forward to you the exchange you
24 had with UPS concerning this, okay?

Page 263

1          MR. BUCHANAN:  What exhibit
2  are we up to, Scott?
3          MR. SIEGEL:  7.
4            - - -
5          (Whereupon, EndoWalker
6  Exhibit-7,
7  ENDO_OPIOID_MDL_02448133-142, was
8  marked for identification.)
9            - - -
10 BY MR. BUCHANAN:
11     Q.   It's Exhibit-566 in our
12 system, and it will be Exhibit-7 for the
13 deposition.
14         Do you have the exhibit
15 before you now, ma'am?
16     A.   I do.
17     Q.   So just take a moment to
18 turn the pages, and I'll just describe it
19 as you're looking at it.
20         This is an e-mail exchange
21 between yourself and a Warren Olson of
22 UPS, initially on May 22, 2012, with the
23 subject, Know Your Customer.
24         Do you see that?

Page 264

1          MR. LIMBACHER:  Take your
2  time and review the document.
3          THE WITNESS:  Yeah, I -- I
4  need to review this.
5  BY MR. BUCHANAN:
6      Q.   The earliest-in-time e-mail
7  is at the bottom of the page.
8          Do you see that?
9      A.   Are you referring to the
10 e-mail on May 22nd?
11     Q.   That's correct.
12     A.   I see the e-mail.
13     Q.   From a Mr. Olson at UPS to
14 yourself, correct?
15     A.   Uh-huh, yes.
16     Q.   And the subject is, Know
17 Your Customer, right?
18     A.   That's what the e-mail
19 states.
20     Q.   Attached are the files we
21 will be reviewing today.
22         That's what he says to you,
23 correct?
24     A.   Yes.  Can I read this

Page 265

1  document?  I need to understand what you
2  guys gave to me.
3      Q.   Sure.
4      A.   Okay.
5      Q.   And this was the initial
6  outreach you got from UPS concerning
7  their Know Your Customer program as they
8  were considering their next steps, right?
9          MR. LIMBACHER:  Object to
10 form.
11         THE WITNESS:  So this was --
12 this was prior to getting to know
13 the documents we looked at
14 earlier?
15 BY MR. BUCHANAN:
16     Q.   Exactly.
17     A.   I just want to make sure I
18 understand the time frame we're looking
19 at.
20     Q.   This is the summer of 2012,
21 correct?
22     A.   Yes.
23     Q.   And then we saw some
24 documents before lunch where you were

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  actually given a questionnaire for
2  yourself as a customer.
3       Do you recall that?
4       A.  Yes.
5       Q.   And you completed three
6  years' worth of those in the exhibit that
7  I marked, correct?
8       A.  Yes.
9       Q.   And then you had a further
10  exchange with somebody from -- Ms.
11  Lindell, I think, in UPS compliance,
12  concerning your role as a manufacturer in
13  reaching out to your customers.
14       Do you recall that
15  discussion earlier, before lunch?
16       MR. LIMBACHER:  Object to
17  form.
18       THE WITNESS:  Yes.  We
19  reviewed the documents before
20  lunch, correct.
21  BY MR. BUCHANAN:
22       Q.   And so you'll see, as you
23  turn the pages here, there's a sample
24  questionnaire that's sent to you.

Page 267

1       And then if you go to 566.5,
2  that's the number in the top right
3  corner, you will see some answer keys.
4       Do you see that?
5       A.  I do.
6       Q.   Okay.  And the answer key
7  includes whether the risk would be low,
8  medium -- or L, M and H.
9       Do you see that?
10       A.  Uh-huh, yes.
11       Q.   Okay.  And depending on what
12  your answers were to particular
13  questions, that would either lean more
14  towards low or more towards high, right?
15       A.  Say that again.
16       Q.   Did you understand that UPS
17  was going to assess the answers they
18  received from the questionnaires?
19       A.  I did not -- no, I don't
20  recall that.
21       Q.   Okay.  Nonetheless, they
22  sent you the questionnaires they were
23  contemplating and their rating keys,
24  right?

Page 268

1       MR. LIMBACHER:  Object to
2  form.
3       THE WITNESS:  That's what
4  you provided to me, yes.
5  BY MR. BUCHANAN:
6       Q.   And they told you, don't
7  tell anybody, right?
8       MR. LIMBACHER:  Object to
9  form.
10       THE WITNESS:  That's what it
11  says in the e-mail.
12  BY MR. BUCHANAN:
13       Q.   I've also attached the
14  updated questionnaires (and rating keys,
15  don't tell anyone.)
16       Did I read that correctly,
17  ma'am?
18       A.  Yes.
19       Q.   You forwarded the
20  questionnaire you received from UPS
21  internal to Endo, correct?
22       Withdrawn.
23       You forwarded the
24  questionnaire that you received from UPS

Page 269

1  to your colleague, Mr. Shaffer at the
2  other Endo company, Qualitest, correct?
3       A.  I -- I don't recall.  I'm
4  just going by what you provided to me,
5  and I'm trying to follow the sequence of
6  events.
7       Q.   Am I correct, ma'am, that if
8  you look at Exhibit-6 --
9       A.  Which is 6?  This is 6,
10  okay.
11       Q.   Exhibit-6 is your
12  later-in-time e-mail to -- from August of
13  2012.
14       Do you see that?  I'm sorry,
15  withdrawn.
16       The last-in-time e-mail is
17  an e-mail from Mr. Shaffer to yourself on
18  August 9, 2012, correct?
19       A.  I see that.
20       Q.   And the subject is,
21  Forwarding UPS's Know Your Customer
22  program.
23       Do you see that?
24       A.  Yes.

68  (Pages 266 to 269)

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    Q.   And then do you see below
2  that Mr. Shaffer has reproduced the
3  customer questionnaire, and he's got some
4  comments in there as well?
5        Do you see that?
6    A.   Selling products -- yes, I
7  see that.
8    Q.   And it seems that Mr.
9  Shaffer left you a voicemail with his
10  comments as well?
11    A.   That's what the e-mail
12  states.
13    Q.   Did you have interactions
14  with regulatory and Qualitest relating to
15  suspicious order practices?
16    A.   Not that I recall.
17    Q.   Is Mr. Shaffer in regulatory
18  at Qualitest?
19    A.   I do not believe he was, no.
20    Q.   What group was he in?
21    A.   I believe he was part of
22  transportation or security, if I remember
23  correctly.
24    Q.   Okay.

Page 271

1    A.   I could be wrong.  But I
2  don't know.
3    Q.   If we scroll down, do you
4  see the version of the questionnaire that
5  Mr. Shaffer commented on, correct?
6    A.   Uh-huh.
7    Q.   In his e-mail to you dated
8  July 25, 2012, right?
9    A.   Yes.
10    MR. LIMBACHER:  Object to
11    form.  It's an e-mail to Tracey
12    Hernandez.
13    MR. BUCHANAN:  I'm sorry.
14    THE WITNESS:  Sorry.
15  BY MR. BUCHANAN:
16    Q.   It was an e-mail from Mr.
17  Shaffer to Tracey Hernandez that was
18  forwarded to you a few weeks later,
19  correct?
20    A.   Yes.
21    Q.   Okay.  All right.  So in
22  this e-mail between Mr. Shaffer and Ms.
23  Hernandez that was forwarded to you, Mr.
24  Shaffer has got some comments on the

Page 272

1  questionnaire, fair?
2    A.   Based on what the e-mail
3  states.
4    Q.   I want to go down to
5  hotspots, Item 3.  By 2012, the CDC had
6  already identified the opioid crisis as
7  an epidemic.
8        Are you aware of that,
9  ma'am?
10    MR. LIMBACHER:  Object to
11    form.
12    THE WITNESS:  I knew there
13    was an epidemic.  I couldn't tell
14    you the year.
15  BY MR. BUCHANAN:
16    Q.   By 2012, had you, within
17  Endo, identified hotspots for
18  diversion-related activity?
19    MR. LIMBACHER:  Object to
20    form.
21    THE WITNESS:  I can't speak
22    to other parts of Endo.
23  BY MR. BUCHANAN:
24    Q.   I'm just asking within --

Page 273

1    A.   But, I mean, yes, we knew --
2  I knew --
3    Q.   Let me ask the question.
4    A.   -- that there was an opioid
5  epidemic, but I can't speak to other
6  areas within Endo.
7    Q.   This particular
8  questionnaire, 3, What geographic areas
9  will you be primarily distributing
10  product to, hotspot locations, Florida,
11  et cetera, equals H.
12        Do you see that?
13    A.   I do.
14    Q.   Did you recognize Florida as
15  a hotspot with regard to the opioid
16  epidemic in 2012, ma'am?
17    MR. LIMBACHER:  Object to
18    form.
19    THE WITNESS:  This
20    information that you're looking at
21    is regarding to our generics
22    division.  I can't speak to
23    anything.  This is generics.
24        Larry and Tracey are part of

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1     our generics division.  I can't
2     speak to any of this.
3     BY MR. BUCHANAN:
4         Q.   So stay with me just on the
5     branded side, then.
6             As just a factual matter, in
7     2012, had you in the branded side
8     identified Florida as a hotspot location?
9             MR. LIMBACHER:  Object to
10    form.
11            THE WITNESS:  We knew that
12            there was opioid epidemics
13            throughout the country.  I can't
14            confirm or deny -- I can't confirm
15            if we identified Florida back in
16            2012.
17    BY MR. BUCHANAN:
18        Q.   Okay.  Larry's comment here
19    says, Suggest:  Hotspot locations, and he
20    lists Florida.
21            Do you see that?
22        A.   I do see Florida.
23        Q.   Texas?
24        A.   Yes.

Page 275

1         Q.   Kentucky?
2         A.   I see that on your document.
3         Q.   Tennessee.
4             Do you see that?
5         A.   Yes.
6         Q.   California?
7         A.   Yes.
8         Q.   Illinois?
9         A.   Correct.  I see it.
10        Q.   Nevada?
11        A.   Yes.  But this is generics,
12    again.
13        Q.   All equals high, correct?
14        A.   But this is generics.
15        Q.   Do you understand that
16    there's only an opioid epidemic with
17    regard to generic drugs, ma'am?
18            MR. LIMBACHER:  Object to
19            form.  Argumentative.
20            THE WITNESS:  No.  What I'm
21            trying to tell you is I can't
22            speak to this document.  This has
23            to do with generics.
24    BY MR. BUCHANAN:

Page 276

1         Q.   I'm asking you a question,
2     though.
3             Do you understand that
4     there's only an opioid epidemic with
5     regard to generic drugs?
6         A.   I know --
7             MR. LIMBACHER:  Object to
8             form.
9             THE WITNESS:  I know that
10            there's an opioid epidemic
11            throughout the country.
12    BY MR. BUCHANAN:
13        Q.   And you all were making
14    opioid branded drugs, right, in the Endo
15    Pharmaceuticals arm, correct?
16            MR. LIMBACHER:  Object to
17            form.
18            THE WITNESS:  There's
19            branded opioid products, correct.
20    BY MR. BUCHANAN:
21        Q.   At this point in time, you
22    were making Opana ER, right?
23        A.   Yes.
24        Q.   Opana?

Page 277

1         A.   Yes.
2         Q.   Percocet?
3         A.   Yes.
4         Q.   Selling hundreds of millions
5     of pills every year?
6         A.   I can't speak to the
7     number --
8             MR. LIMBACHER:  Object to
9             form.
10            THE WITNESS:  -- to the
11            number of pills.
12    BY MR. BUCHANAN:
13        Q.   Would you dispute that you
14    were selling hundreds of millions of
15    pills every year, ma'am?
16        A.   I don't --
17            MR. LIMBACHER:  Object to
18            form.
19            THE WITNESS:  I don't know
20            the number of pills.
21    BY MR. BUCHANAN:
22        Q.   As part of your suspicious
23    order monitoring practice, ma'am, did you
24    look at hotspot locations and evaluate

70  (Pages 274 to 277)

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    your customers in particular with regard
2    to hotspot locations?
3              MR. LIMBACHER:  Object to
4    form.
5              THE WITNESS:  We had an SOM
6    program in place at both Endo and
7    UPS at that 2012.
8    BY MR. BUCHANAN:
9         Q.   Okay.  For example, did you
10   do any due diligence on your customers in
11   Florida?
12        A.   We had our SOM program in
13   place that looked at all orders.
14        Q.   Did you go and visit any
15   customers in Florida?
16             MR. LIMBACHER:  Object to
17   form.
18             THE WITNESS:  Did Endo?
19   Endo did not.  But as I stated
20   before, our Qualitest group
21   visited customers.
22   BY MR. BUCHANAN:
23        Q.   Not in 2012?
24             MR. LIMBACHER:  Object to

Page 279

1    form.
2              THE WITNESS:  I don't know
3    the exact date when they did.
4    BY MR. BUCHANAN:
5         Q.   Right.  Well, do you know
6    any of what Qualitest did, ma'am, other
7    than what you've been told in connection
8    with getting ready for today?
9              MR. LIMBACHER:  Object to
10   form.
11             MR. BUCHANAN:  I don't want
12   privileged.
13             MR. LIMBACHER:  I would
14   object to the statement by
15   counsel.
16   BY MR. BUCHANAN:
17        Q.   I'm assuming you spoke to
18   counsel to get ready for today, right?
19             MR. LIMBACHER:  And we've
20   covered that already.  Just, if
21   you could, rephrase your question,
22   please, counsel.
23   BY MR. BUCHANAN:
24        Q.   I don't want you to tell me

Page 280

1    what your counsel -- you and your counsel
2    discussed getting ready for today.
3              What's the earliest point in
4    time you have knowledge about Qualitest's
5    SOM practices, ma'am?
6              MR. LIMBACHER:  Object to
7    form.
8              THE WITNESS:  I can't speak
9    to Qualitest's SOM practice.
10   BY MR. BUCHANAN:
11        Q.   That's what I thought.
12             So with regard to branded's
13   practices, as of 2012, were you all
14   conducting due diligence visits on the
15   Florida customers?
16             MR. LIMBACHER:  Object to
17   form.  Asked and answered.
18             THE WITNESS:  As I stated
19   before, we had an SOM program in
20   place at both Endo and at UPS, and
21   that's how we reviewed our orders.
22   BY MR. BUCHANAN:
23        Q.   Okay.  And to answer my
24   question, though, were you conducting due

Page 281

1    diligence visits on your Florida
2    customers in 2012?
3              MR. LIMBACHER:  Object to
4    form.  Asked and answered.
5              THE WITNESS:  And within my
6    role, no.  But I can also not -- I
7    cannot speak to if anybody else
8    within Endo did anything within
9    the state of Florida.
10   BY MR. BUCHANAN:
11        Q.   Okay.  As I understand it
12   with regard to suspicious order
13   monitoring, that was your function within
14   the branded side, correct?
15        A.   Right.
16             MR. LIMBACHER:  Object to
17   form.
18   BY MR. BUCHANAN:
19        Q.   Did you ever conduct any due
20   diligence visits to Texas in 2012?
21             MR. LIMBACHER:  Object to
22   form.  Asked and answered.
23             THE WITNESS:  Within my
24   role, no.  But that doesn't

71  (Pages 278 to 281)

Page 282

```
 1        mean -- or I cannot speak to
 2   anything that was done within the
 3   Endo Corporation, if anybody else
 4   did.
 5   BY MR. BUCHANAN:
 6        Q.   You were in the suspicious
 7   order monitoring role for Endo?
 8            MR. LIMBACHER:  Object to
 9   form.  Asked and answered.
10            THE WITNESS:  Yes.
11   BY MR. BUCHANAN:
12        Q.   Okay.  Anyone do it for
13   Texas, Tennessee, California, Illinois,
14   any of the other states that were
15   identified as hotspots --
16            MR. LIMBACHER:  Object to
17   form.
18   BY MR. BUCHANAN:
19        Q.   -- in this e-mail that was
20   forwarded to you in 2012?
21        A.   Within my role --
22            MR. LIMBACHER:  Object to
23   form.
24            THE WITNESS:  -- no, but I
```

Page 283

```
 1        cannot speak to the rest of the
 2   company.
 3   BY MR. BUCHANAN:
 4        Q.   Are you aware of any that
 5   were conducted as of 2012 in these
 6   hotspots, ma'am?
 7            MR. LIMBACHER:  Object to
 8   form.
 9            THE WITNESS:  Within my
10   area, no.  But I cannot speak for
11   the rest of the company.
12   BY MR. BUCHANAN:
13        Q.   Sitting here today, you
14   can't say that any were conducted, fair?
15            MR. LIMBACHER:  Object to
16   form.
17            THE WITNESS:  Within my
18   role, no, but I cannot speak for
19   the rest of the company.
20   BY MR. BUCHANAN:
21        Q.   Let's focus now and zoom
22   down to Item 14.
23            There's a question about
24   whether you've got contract agreements
```

Page 284

```
 1   with customers that you provide products
 2   to.
 3            Do you see that?
 4        A.   Yes.  But this is the
 5   generics answering that question, not the
 6   branded side.
 7        Q.   And it was forwarded to you,
 8   right?
 9            MR. LIMBACHER:  Object to
10   form.
11            THE WITNESS:  Yes.  But it's
12   the generic side of the business
13   answering those questions.
14   BY MR. BUCHANAN:
15        Q.   If you could just stay with
16   my questions, ma'am, it's going to go a
17   lot faster today.
18            MR. LIMBACHER:  It would go
19   faster if you would listen to her
20   answers, counsel.
21            MR. BUCHANAN:  I don't think
22   we have a responsive answer, so
23   we'll just keep doing it until we
24   do.
```

Page 285

```
 1   BY MR. BUCHANAN:
 2        Q.   With regard to Item 14,
 3   there's a suggestion.
 4            Do you see that?
 5        A.   Yes, I see it.
 6        Q.   So in conjunction with this
 7   question, we should ask if they offer
 8   sales or promotions of products to
 9   customers.
10            Do you see that?
11        A.   It's written there, yes.
12        Q.   In the summer of 2014, one
13   of the things that -- excuse me.
14   Withdrawn.
15            In the summer of 2012, one
16   of the things that Qualitest was looking
17   at was its own Know Your Customer
18   program, right?
19            MR. LIMBACHER:  Object to
20   form.
21            THE WITNESS:  I can't
22   confirm that.
23   BY MR. BUCHANAN:
24        Q.   Okay.  It says, In
```

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    connection with this question, we should
2    ask if they offer sales or promotions of
3    products to customers.  This is an area
4    that could contribute to excessive
5    ordering, as well as the use of the
6    verbiage of sales and promotions is a red
7    flag in itself.
8              Do you see that?
9         A.   I see it.
10        Q.   Do you agree, ma'am, that
11   sales and promotions of controlled
12   substances are a red flag for suspicious
13   orders?
14             MR. LIMBACHER:  Object to
15        form.
16             THE WITNESS:  I can't speak
17        to sales.  Sales is not my
18        responsibility.
19   BY MR. BUCHANAN:
20        Q.   Well, your responsibility
21   was overseeing suspicious orders, fair?
22             MR. LIMBACHER:  Object to
23        form.
24             THE WITNESS:  My

Page 287

1    responsibility was shipping
2    product to wholesalers.  I'm not
3    responsible for sales.  I don't
4    promote the product.  I'm not
5    responsible for sales.
6    BY MR. BUCHANAN:
7         Q.   As part of looking at
8    whether orders were suspicious, did you
9    look to see whether or not the company
10   had promotions on its products?
11        A.   That's not part of my job
12   responsibility.  There's other areas
13   within Endo --
14        Q.   Did you --
15        A.   -- that's their
16   responsibility.
17        Q.   Did you consider, ma'am,
18   whether offering promotions and sales, in
19   and of itself, is a suspicious order?
20             MR. LIMBACHER:  Object to
21        form.
22             THE WITNESS:  My
23        responsibility is shipping the
24        product to the wholesalers.  Sales

Page 288

1    of the product is not my
2    responsibility.  It's with other
3    organizations within the company.
4    BY MR. BUCHANAN:
5         Q.   Did you consider, ma'am,
6    whether offering promotions and sales, in
7    and of itself, of a controlled substance
8    would constitute a suspicious order?
9         A.   My responsibility --
10             MR. LIMBACHER:  Object to
11        form.  Asked and answered.  And,
12        counsel, with all due respect,
13        you've asked the same question now
14        multiple times.
15             MR. BUCHANAN:  I'm entitled
16        to an answer.
17             You can answer, ma'am.
18             MR. LIMBACHER:  I know you
19        don't like the answer that you're
20        getting.
21             MR. BUCHANAN:  I just don't
22        like your speaking objections.
23             MR. LIMBACHER:  Well, I
24        don't appreciate you asking my

Page 289

1    witness the same question over and
2    over and over simply because it's
3    not fitting into your very nice,
4    neat script of what you think this
5    litigation is all about.
6             MR. BUCHANAN:  Can I have
7        the question read back, please?
8             MR. LIMBACHER:  So with all
9        due respect, counsel, at some
10        point in time you have to stop
11        asking the same question just
12        because you don't like the answer
13        you're getting.
14             MR. BUCHANAN:  Do you feel
15        better now?
16             MR. LIMBACHER:  That's
17        defined as harassment of a
18        witness.
19             MR. BUCHANAN:  Can I have my
20        question read back?
21             MR. LIMBACHER:  I don't
22        appreciate the sarcasm, either.
23        I'm doing my job just as you're
24        doing yours.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    MR. BUCHANAN: No, a
2 speaking objection is not your
3 job.
4    MR. LIMBACHER: My job is to
5 protect my witness and protect my
6 client.
7    MR. BUCHANAN: Not by --
8    MR. LIMBACHER: And if you
9 are asking inappropriate questions
10 over and over and over, after I've
11 been very patient, then I am
12 entitled to, in fact, obligated
13 to speak up.
14    MR. BUCHANAN: Please mark
15 the transcript.
16        - - -
17    (Whereupon, the court
18 reporter read the following part
19 of the record:
20    "Question: Did you
21 consider, ma'am, whether offering
22 promotions and sales, in and of
23 itself, of a controlled substance
24 would constitute a suspicious

Page 291

1 order?")
2        - - -
3    MR. LIMBACHER: Objection.
4 Form. Foundation. Asked and
5 answered.
6 BY MR. BUCHANAN:
7    Q.    You can answer.
8    A.    As I said previously, my
9 responsibility is shipping product to our
10 wholesalers. The sale of the product is
11 not my responsibility. There's other
12 areas within Endo that is responsible for
13 the sales and promotion of the product.
14    Q.    Did anyone within the
15 company, ma'am, ever tell you that, I
16 guess apart from this e-mail, that sales
17 or promotions of products to customers
18 could be a red flag for excessive
19 ordering?
20    A.    I had the necessary
21 information to do my job. My job was
22 shipping product to wholesalers. The
23 sale of the product is not within my area
24 of responsibility.

Page 292

1    Q.    Did you consider, ma'am,
2 sales and promotions a red flag with
3 regard to suspicious orders?
4    MR. LIMBACHER: Objection to
5 the form. Asked and answered.
6    THE WITNESS: I had the
7 necessary information to do my
8 job. My job was to ship to our
9 wholesalers. We had the necessary
10 SOM programs in place at Endo and
11 at UPS. The sale of the product
12 is with other areas within Endo.
13 It is not my responsibility.
14 BY MR. BUCHANAN:
15    Q.    And ship you did, right?
16    MR. LIMBACHER: Objection.
17    THE WITNESS: I shipped the
18 product within our SOM programs;
19 our program and at UPS's program.
20 BY MR. BUCHANAN:
21    Q.    Over and over and over and
22 over again for 20 years, when red flags
23 were raised, when wires were tripped and,
24 quote, a review was conducted, you

Page 293

1 cleared the orders and they shipped?
2    MR. LIMBACHER: Objection to
3 the form. Counsel --
4 BY MR. BUCHANAN:
5    Q.    True?
6    MR. LIMBACHER: -- save your
7 closing argument for the jury,
8 please.
9 BY MR. BUCHANAN:
10    Q.    You can answer that.
11    MR. LIMBACHER: Object to
12 form. Asked and answered.
13    THE WITNESS: I shipped the
14 product to our wholesalers.
15    And, again, and I'm going to
16 repeat this again and again, we
17 had the appropriate measures in
18 place at Endo and at UPS. We had
19 an SOM program in place. We
20 shipped to the wholesalers.
21 BY MR. BUCHANAN:
22    Q.    You were required to
23 maintain effective controls against
24 diversion, "you" being Endo, right?

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1      MR. LIMBACHER: Object to
2   form.
3      THE WITNESS: I cannot speak
4   for Endo as a company. I can
5   speak to my role within the
6   company.
7   BY MR. BUCHANAN:
8      Q.  You understood, ma'am,
9   operating within the closed system of
10  controlled substance distribution that
11  your company had an obligation to
12  maintain effective controls against
13  diversion, correct?
14     MR. LIMBACHER: Object to
15  form. Asked and answered.
16     THE WITNESS: There are
17  other areas within the company
18  that did many things regarding the
19  diversion of Opana that I cannot
20  speak to.
21     I can only speak to my job.
22  And my job was shipping to the
23  wholesalers.
24  BY MR. BUCHANAN:

Page 295

1      Q.  Did you have that
2   understanding, ma'am, that as a member of
3   the closed system for controlled
4   substance distribution that your company
5   had an obligation to maintain effective
6   controls against diversion; yes or no?
7      MR. LIMBACHER: Object to
8   the form and foundation.
9   BY MR. BUCHANAN:
10     Q.  Did you understand that?
11     MR. LIMBACHER: Asked and
12  answered.
13     THE WITNESS: I know that
14  Endo had a lot of different
15  programs in place to maintain --
16  sorry, wrong word -- to stop
17  diversion.
18     I cannot speak to all those
19  programs within Endo. I can only
20  speak to my job.
21  BY MR. BUCHANAN:
22     Q.  Okay. Within Endo branded,
23  ma'am, please share with us the other
24  effective controls the company maintained

Page 296

1   to prevent diversion that you know about.
2      MR. LIMBACHER: Object to
3   the form and foundation. You want
4   her to now testify about the
5   things she just told you she
6   couldn't testify about? Is that
7   the question?
8      MR. BUCHANAN: She said she
9   knows Endo has a lot of different
10  programs in place, so I'd like to
11  know what they are.
12     MR. LIMBACHER: And I can't
13  speak to all of those programs
14  within Endo, is her testimony.
15     So I want just to be clear
16  on the record that you're asking
17  her now to testify about things
18  that she's just said that she
19  cannot speak to. Is that what
20  we're doing now, counsel?
21     MR. BUCHANAN: You can
22  answer.
23     MR. LIMBACHER: Is that how
24  we're using our time?

Page 297

1      MR. BUCHANAN: We can
2   definitely use our time that way,
3   because she says she has knowledge
4   of it.
5   BY MR. BUCHANAN:
6      Q.  So please share with us,
7   ma'am, those effective controls against
8   diversion that you're aware of that Endo
9   had?
10     MR. LIMBACHER: Objection to
11  the form. Foundation. Asked and
12  answered.
13     THE WITNESS: Am I
14  answering? I'm sorry.
15  BY MR. BUCHANAN:
16     Q.  You can answer.
17     MR. LIMBACHER: Do you need
18  him to repeat the question?
19     THE WITNESS: Sure. Repeat
20  the question.
21  BY MR. BUCHANAN:
22     Q.  Please share with us, Ms.
23  Walker, the effective controls against
24  diversion that you're aware of that Endo

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    had.
2         MR. LIMBACHER:  Object to
3    the form and foundation.  Asked
4    and answered.
5         THE WITNESS:  I know that
6    Endo had other -- had programs in
7    place.  I can't speak to them.
8    They're not part -- they're not my
9    responsibility.
10   BY MR. BUCHANAN:
11        Q.   Are you aware of any?
12        MR. LIMBACHER:  Object to
13   form.  And foundation.
14        THE WITNESS:  There are
15   programs in place that Endo did.
16   I cannot speak to them.  I can't
17   speak for the company.  I can only
18   speak for myself and my job.
19   BY MR. BUCHANAN:
20        Q.   Your job, as I understand
21   it, ma'am, was head of suspicious order
22   monitoring, correct?
23        MR. LIMBACHER:  Object to
24   form.

Page 299

1         THE WITNESS:  Suspicious
2    order monitoring was part of my
3    job responsibility.
4    BY MR. BUCHANAN:
5         Q.   If we were to look for
6    Endo's SOPs on suspicious order
7    monitoring, we could see described at
8    least what Endo did in regard to standard
9    operating procedures with regard to
10   suspicious order monitoring, would that
11   be true?
12        MR. LIMBACHER:  Object to
13   form.
14        THE WITNESS:  I think we
15   already looked at the document
16   about our SOM program.
17   BY MR. BUCHANAN:
18        Q.   Does Endo even have SOPs for
19   suspicious order monitoring, ma'am?
20        MR. LIMBACHER:  Object to
21   form.
22        THE WITNESS:  We have that
23   document in place.  And many of
24   our SOPs are within UPS.

Page 300

1    BY MR. BUCHANAN:
2         Q.   Does Endo have SOPs for
3    suspicious order monitoring?
4         A.   We have --
5         MR. LIMBACHER:  Object to
6    form.
7         THE WITNESS:  We have the
8    document that we looked at, that
9    we have already reviewed.  That's
10   the only document that I know of.
11   BY MR. BUCHANAN:
12        Q.   Okay.  Endo has standard
13   operating procedures as a general matter,
14   correct?
15        MR. LIMBACHER:  Object to
16   form.
17        THE WITNESS:  I'm sure some
18   areas do.  I can't speak to those.
19   BY MR. BUCHANAN:
20        Q.   Have you seen lists of Endo
21   standard operating procedures?
22        A.   No, I don't recall.
23        Q.   Would it surprise you,
24   ma'am, that Endo doesn't have standard

Page 301

1    operating procedures for suspicious order
2    monitoring?
3         MR. LIMBACHER:  Object to
4    the form.  Argumentative.
5         THE WITNESS:  I have the
6    document that we've already
7    reviewed.  And we have UPS's
8    document.  And we have work
9    instructions within UPS.
10   BY MR. BUCHANAN:
11        Q.   The document that we
12   reviewed, could you identify it for the
13   record, just so we understand what you're
14   referring to as Endo's standard operating
15   procedures?
16        MR. LIMBACHER:  Object to
17   form.
18        THE WITNESS:  The document
19   that's attached to Number 3.  It's
20   this one.
21   BY MR. BUCHANAN:
22        Q.   What exhibit?
23        MR. LIMBACHER:  Exhibit-3.
24        THE WITNESS:  Exhibit-3.

76 (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    BY MR. BUCHANAN:
2        Q.   Thank you.  Let's go to the
3    next page, please.
4            I'm sorry, let's go back to
5    the first page, so we describe it for the
6    record.
7            This is an e-mail exchange
8    that you're having in 2015, I guess it
9    was an e-mail from Mr. Collins to
10   yourself on SOM program, to yourself.  I
11   think it says, Hi, Laura, but do you
12   understand that to be referring to you in
13   that e-mail, ma'am?
14       A.   Yes.
15       Q.   Hi, Laura.  Please provide
16   an update on Endo's SOM program, written
17   is fine.  Then he asks, Is this a joint
18   Endo/Qualitest program or does each
19   company have its own?
20           Do you see that e-mail?
21       A.   Yes.
22       Q.   And here is your response,
23   with your summary of the SOM program,
24   approved by legal and Brian Lortie,

Page 303

1    correct?
2        A.   Yes.
3        Q.   Who is Brian Lortie?
4        A.   At the time, he was -- I
5    don't know his title, but he was over the
6    branded division.
7        Q.   Okay.  And if we go to the
8    second page, this is the SOM's process
9    flow?
10       A.   Yes.
11       Q.   And the document that
12   describes your current process with a
13   limited SOM program and the current SAP
14   system, correct, ma'am?
15           MR. LIMBACHER:  Object to
16   form.  Asked and answered.  We
17   covered this document at great
18   length, counsel.
19           THE WITNESS:  We've already
20   covered this.
21   BY MR. BUCHANAN:
22       Q.   And this is the document
23   you're stating is the standard operating
24   procedure, or something that is

Page 304

1    functioning as one?
2            MR. LIMBACHER:  Object to
3    form.
4            THE WITNESS:  This is the
5    document that I have, yes.
6    BY MR. BUCHANAN:
7        Q.   It certainly doesn't state
8    standard operating procedure, does it?
9            MR. LIMBACHER:  Object to
10   form.  The document speaks for
11   itself.
12   BY MR. BUCHANAN:
13       Q.   Does it?
14       A.   No, it does not.
15       Q.   Standard operating
16   procedures within your company have a
17   standard form, correct?
18           MR. LIMBACHER:  Object to
19   form.  Foundation.
20           THE WITNESS:  I can't
21   confirm that.
22   BY MR. BUCHANAN:
23       Q.   You've never seen the
24   company's standard operating procedures,

Page 305

1    ma'am?
2            MR. LIMBACHER:  Object to
3    form.
4            THE WITNESS:  I've seen
5    some, I'm sure.
6    BY MR. BUCHANAN:
7        Q.   Okay.
8            MR. BUCHANAN:  Let's pass it
9    over.
10           MR. SIEGEL:  Walker-8.
11               -  -  -
12           (Whereupon, EndoWalker
13   Exhibit-8,
14   ENDO_OPIOID_MDL_05950068, With
15   Attachment was marked for
16   identification.)
17               -  -  -
18   BY MR. BUCHANAN:
19       Q.   I'm passing you, ma'am,
20   what's been marked as Exhibit-8 to your
21   deposition.
22           It's from this 2012 window
23   we were just looking at with regard to
24   the questionnaire.  The latest-in-time

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    e-mail is from you to a Mr. Koumou -- or
2    Ms. Koumou, Janice Koumou.
3         Do you see that?
4         MR. LIMBACHER: She doesn't
5    have it yet.
6         Now she's got it.
7    BY MR. BUCHANAN:
8         Q.   Do you see the
9    latest-in-time e-mail at the top from
10   yourself to Ms. Connell?
11        She was your boss at the
12   time?
13        A.   Jill was, yes.
14        Q.   And Janice Koumou, who is
15   she?
16        A.   I don't recall who she is.
17        Q.   And as you scroll into this,
18   you can see a list of company's various
19   SOPs, 674.7, the top right corner.
20        Do you see those?
21        A.   What number again?
22        Q.   674.7, top right corner.
23        A.   Yes.
24        Q.   And then it lists various

Page 307

1    SOPs on the left, the titles of the SOPs,
2    and the various departments that are
3    responsible for the SOPs.
4         Do you see those?
5         A.   I do.
6         Q.   Do you recognize those
7    departments as departments within Endo?
8         A.   I recognize those documents.
9         Q.   Information management
10   clinical, nonclinical, pharmaceutical
11   development, quality assurance, et
12   cetera.
13        Do you see those?
14        A.   I do.
15        Q.   And the various titles off
16   to the left, SOP tends to be embedded in
17   the name of the various documents,
18   correct?
19        A.   I see it, yes.
20        Q.   Just take a moment and
21   review and see, in this listing of SOPs
22   with the company in 2012, whether there
23   are any SOPs for suspicious order
24   monitoring, excessive order management,

Page 308

1    Know Your Customer, Know Your Customer's
2    Customer, things like that.
3         MR. LIMBACHER:  Object to
4    form.
5         THE WITNESS:  There's none
6    listed.
7         MR. LIMBACHER:  Well, he's
8    not --
9    BY MR. BUCHANAN:
10        Q.   To your knowledge, ma'am,
11   are there --
12        MR. LIMBACHER:  -- limiting
13   himself to just that one page, I
14   assume.
15        THE WITNESS:  I was just
16   looking at this one page.
17        MR. BUCHANAN:  Feel free to
18   turn the pages.
19        MR. LIMBACHER:  And, I'm
20   sorry, is the representation that
21   this is a complete listing of the
22   Endo SOPs?
23   BY MR. BUCHANAN:
24        Q.   You can answer, ma'am.

Page 309

1         MR. LIMBACHER:  I was asking
2    for a representation.
3         MR. BUCHANAN:  I cannot
4    represent what's in your internal
5    systems.  I only have what you
6    produced to me.
7         MR. LIMBACHER:  We don't
8    know if this is a complete listing
9    of the SOPs.
10        MR. BUCHANAN:  If you
11   produced them all to me, then I
12   suppose that would be the
13   representation.  But I don't know
14   what you chose to produce or not.
15   BY MR. BUCHANAN:
16        Q.   Have you had a chance to
17   look at it, ma'am?
18        A.   I have.
19        Q.   Did you see any SOPs for
20   suspicious order monitoring?
21        MR. LIMBACHER:  Object to
22   form.
23        THE WITNESS:  None were
24   listed, no.

78  (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    BY MR. BUCHANAN:
2         Q.   Did you see any for Know
3    Your Customer?
4              MR. LIMBACHER:  Object to
5    form.
6              THE WITNESS:  No.
7    BY MR. BUCHANAN:
8         Q.   Did you see any for customer
9    due diligence visits?
10             MR. LIMBACHER:  Object to
11   form.
12             THE WITNESS:  No.
13   BY MR. BUCHANAN:
14        Q.   Did you see any for the
15   assessment or utilization of chargeback
16   information --
17             MR. LIMBACHER:  Object to
18   form.
19   BY MR. BUCHANAN:
20        Q.   -- and evaluating suspicious
21   orders?
22        A.   No.
23        Q.   If we go to the first page
24   of this document, 674.1, I just wanted to

Page 312

1         Q.   Okay.  So one of the
2    documents you forwarded was this customer
3    service 2012 curriculum, correct?
4         A.   I see that attached, yes.
5         Q.   And then the other thing you
6    forwarded was master effective procedural
7    documents as of February 8, 2012,
8    correct?
9         A.   Say that again.  What do
10   you --
11        Q.   The other document that you
12   forwarded was master effective procedural
13   documents as of February 8, 2012,
14   correct?
15        A.   February 8th?
16        Q.   2/8/2012?
17        A.   I don't see 2/8/2012
18   anywhere.
19             MR. LIMBACHER:  He's
20   referring to here.
21             THE WITNESS:  Oh, that.
22   BY MR. BUCHANAN:
23        Q.   Do you see that?
24        A.   I see it, yes.

Page 311

1    call out, in your exchange with Ms.
2    Koumou, it appears that it's you
3    forwarding this list of documents,
4    correct?  There are two files that you
5    forwarded?
6         A.   I don't recall this document
7    at all.  Just from what you're showing to
8    me.
9         Q.   I'm reading the e-mail that
10   was produced to us.
11             Do you see two documents
12   attached, one, customer service 2012
13   curriculum is one item, ma'am?
14             MR. LIMBACHER:  Which e-mail
15   are you referring to, counsel?
16             MR. BUCHANAN:  It's 674.1.
17             MR. LIMBACHER:  But which
18   e-mail on that page?
19             MR. BUCHANAN:  It's the
20   latest in time.
21   BY MR. BUCHANAN:
22        Q.   Do you see it on the screen,
23   ma'am?  It's highlighted for you.
24        A.   I see it, yes.

Page 313

1         Q.   And do you recognize, ma'am,
2    these SOPs and procedural documents that
3    are listed here to be SOPs of the
4    company?
5         A.   This is back from 2012.  I
6    don't recall if these were effective or
7    not in 2012.
8         Q.   Well, certainly, at least
9    the name of the file that you sent in
10   this exchange with Ms. Koumou was, master
11   effective procedural documents as of
12   February 8th, 2012, correct?
13             MR. LIMBACHER:  Object to
14   form.
15             THE WITNESS:  That's what it
16   says.
17   BY MR. BUCHANAN:
18        Q.   And in that list of
19   documents, as of February 8, 2012, you
20   didn't see any SOPs related to suspicious
21   order monitoring, correct?
22             MR. LIMBACHER:  Object to
23   form.  Asked and answered.
24             THE WITNESS:  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    Suspicious order monitoring is not
2    listed here.
3          But I need to remind you all
4    again that back in 2012, UPS had
5    their own SOM program in place,
6    along with UPS -- along with Endo.
7    BY MR. BUCHANAN:
8          Q.   And their own host of
9    problems, right?
10         MR. LIMBACHER:  Object to
11   form.  Argumentative.
12         THE WITNESS:  What are you
13   asking?
14   BY MR. BUCHANAN:
15         Q.   I said -- you were
16   highlighting UPS.
17         You know they got written up
18   by the DEA, right?
19         MR. LIMBACHER:  Object to
20   form.  Argumentative.
21         THE WITNESS:  I don't know
22   what you're referring to.
23   BY MR. BUCHANAN:
24         Q.   Well, we talked about Know

Page 315

1    Your Customer.
2          How about know your vendor?
3    Did UPS get in trouble with DEA, ma'am?
4          MR. LIMBACHER:  Object to
5    form.  Foundation.
6          THE WITNESS:  I don't know
7    exactly what you are -- what
8    you're referring to.
9    BY MR. BUCHANAN:
10         Q.   What are you thinking of
11   when I say that?
12         MR. LIMBACHER:  Object to
13   form.
14         THE WITNESS:  I believe
15   you're referring to the UPS small
16   package side of the business,
17   which is completely different and
18   separate from the UPS Supply Chain
19   Solutions side of the business.
20         I believe that's what you
21   are referring to.
22   BY MR. BUCHANAN:
23         Q.   Did they enter into an
24   agreement with the DEA?

Page 316

1          MR. LIMBACHER:  Object to
2    form.
3          THE WITNESS:  I don't know
4    any details about that agreement,
5    if they did or if they didn't.
6    BY MR. BUCHANAN:
7          Q.   Were you aware of what was
8    going on with UPS?  Were they keeping you
9    aware of the investigation with the DEA?
10         MR. LIMBACHER:  Object to
11   form.
12         THE WITNESS:  I don't
13   recall.
14         MR. LIMBACHER:  And
15   foundation.
16         MR. BUCHANAN:  Now is
17   probably as good a time as any.
18   Let's talk about those agreements.
19   BY MR. BUCHANAN:
20         Q.   As I understand it, Endo was
21   utilizing UPS -- well, what is LHSI?
22         A.   Livingston Healthcare.
23         Q.   Did that get acquired by
24   UPS?

Page 317

1          A.   Yes, they did.
2          Q.   Endo was using UPS, or that
3    predecessor since '98, correct?
4          A.   We entered into an agreement
5    with them in January of -- sorry, in
6    April of 1999 is when they started.
7          Q.   Okay.
8          MR. BUCHANAN:  Can I have
9    597, 598 and 600 in sequence,
10   please?
11         MR. SIEGEL:  597 is
12   Exhibit-9.  598 is Exhibit-10.
13   And 600 is Exhibit-11.
14         - - -
15         (Whereupon, EndoWalker
16   Exhibit-9, UPSSCS0002916-935, was
17   marked for identification.)
18         - - -
19         (Whereupon, EndoWalker
20   Exhibit-10, UPSSCS0002991-3029,
21   was marked for identification.)
22         - - -
23         (Whereupon, EndoWalker

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    Exhibit-11,
2    ENDO_OPIOID_MDL_02060862-891, was
3    marked for identification.)
4              - - -
5         MR. BUCHANAN:  Can we start
6    with 597 on the screen, please?
7    That's Exhibit-9.
8    BY MR. BUCHANAN:
9         Q.    Ma'am, I'm passing you over
10   what's been marked as Exhibit-9 to your
11   deposition.  It's an agreement between
12   Endo Pharmaceuticals and Livingston
13   Healthcare Services, Inc.
14        MR. LIMBACHER:  She doesn't
15   have it yet, counsel.
16        This is 9, but not 10 and
17   11.
18        MR. BUCHANAN:  9 is what
19   we're referring to.
20        MR. LIMBACHER:  You want me
21   to show her 9 now --
22        MR. BUCHANAN:  Sure.
23        MR. LIMBACHER:  -- because I
24   got 9, 10 and 11.

Page 319

1    BY MR. BUCHANAN:
2         Q.    Do you have before you
3    what's been marked as Exhibit-9, an
4    agreement between Endo Pharmaceuticals
5    and Livingston Healthcare, ma'am?
6         A.    I have it.
7         Q.    Dated April 1, '99?
8         A.    Uh-huh.
9         Q.    Have you seen this agreement
10   before?
11        A.    I have, yes.
12        Q.    And was this the operating
13   agreement at the outset of the formation
14   of Endo with regard to the relationship
15   with Livingston Healthcare Services?
16        MR. LIMBACHER:  Object to
17   form.
18        THE WITNESS:  I believe so.
19   It was at the time.
20   BY MR. BUCHANAN:
21        Q.    Do you recognize this as the
22   earliest operative agreement between Endo
23   Pharmaceuticals and Livingston Healthcare
24   Services, which was later acquired by

Page 320

1    UPS?
2         A.    From what I remember, yes.
3         Q.    Okay.  Let's go to
4    Exhibit-10.
5         Exhibit-10 is an agreement
6    between Endo Pharmaceuticals and
7    Livingston Healthcare Services, Inc.,
8    effective February 1, 2000.  It states,
9    Execution copy February 1, 2000.
10        Do you recognize this,
11   ma'am, as the next agreement between Endo
12   Pharmaceuticals and Livingston Healthcare
13   Services, Inc. --
14        MR. LIMBACHER:  Object to
15   form.
16   BY MR. BUCHANAN:
17        Q.    -- with regard to what was
18   later called UPS's functions in
19   fulfilling Endo's orders?
20        MR. LIMBACHER:  Object to
21   form.
22        THE WITNESS:  UPS Supply
23   Chain Solutions, yes.
24   BY MR. BUCHANAN:

Page 321

1         Q.    Thank you.  Let's go to
2    Exhibit-11.
3         And I'll represent to you,
4    ma'am, that this is the next one that
5    we're aware of, I don't know if this is
6    the next one in sequence, the next one
7    they had, but Exhibit-11 is service
8    schedule Number 1, warehouse distribution
9    services, an agreement between UPS Supply
10   Chain Solutions, Inc. and Endo
11   Pharmaceuticals, Inc.
12        Do you recognize this
13   agreement, ma'am?
14        A.    I do.
15        Q.    Are you aware of any
16   agreements between Exhibit-10 and
17   Exhibit-11, date wise, meaning between
18   2000 and 2010, that concern the
19   relationship between Endo and UPS Supply
20   Chain Solutions?
21        MR. LIMBACHER:  Object to
22   form.
23        Counsel, do you have a date
24   on Exhibit-11?

81  (Pages 318 to 321)

Page 322

1           MR. BUCHANAN:  I think I
2    just said 2010.
3           MR. LIMBACHER:  I just can't
4    read the date on the top right
5    corner.
6           MR. BUCHANAN:  I think it's
7    in the second line.  You can
8    see --
9           MR. LIMBACHER:  Okay.  I
10   see.  Thank you.
11          THE WITNESS:  What was your
12   question, please?
13   BY MR. BUCHANAN:
14       Q.   My question was, are you
15   aware of any agreements between Endo and
16   UPS Supply Chain Solutions between in
17   that ten-year period other than, I
18   suppose, the two bookends we have,
19   Exhibits-10 and 11?
20       A.   From what I recall, I
21   believe this agreement and then we have
22   this new one.
23       Q.   Okay.
24       A.   I don't believe there was

Page 323

1    another agreement in between.
2        Q.   Okay.  So there were two --
3    the two originating agreements with
4    Livingston Healthcare and then we have
5    the 2010 agreement with UPS Supply Chain
6    Solutions; is that correct?
7           MR. LIMBACHER:  Object to
8    form.
9           THE WITNESS:  From what I
10   recall, yes.
11   BY MR. BUCHANAN:
12       Q.   Okay.  In connection with
13   your relationship with UPS, you crafted
14   work instructions over the years; is that
15   right?
16       A.   Yes, we have.
17          MR. BUCHANAN:  Could I
18   please have 656 and 655?
19          MR. SIEGEL:  655 is being
20   marked as Exhibit-12.
21               - - -
22          (Whereupon, EndoWalker
23   Exhibit-12,
24          ENDO_OPIOID_MDL_02988138-145, was

Page 324

1    marked for identification.)
2               - - -
3    BY MR. BUCHANAN:
4        Q.   Ma'am, what's marked as
5    Exhibit-12 is an e-mail from a Mr. Miller
6    at UPS to yourself, attaching -- the
7    subject is, WEP-04-04.03, order entry.
8           And on the next page, we see
9    a document named, Order entry for UPS
10   Supply Chain Solutions with the client
11   Endo Pharmaceuticals.
12          Do you see that?
13       A.   I do.
14       Q.   A document you're familiar
15   with?
16       A.   I am.
17       Q.   And is this the version of
18   Endo's work instructions with UPS from
19   this period of time in 2008, the
20   operative agreement?  I should say the
21   operative work instructions.
22       A.   During the time frame of
23   2008?
24       Q.   Yes, ma'am.

Page 325

1        A.   I would believe so.
2        Q.   Okay.
3        A.   There's no effective date,
4    so I don't know if we're looking at the
5    right document.
6        Q.   Where do you keep the work
7    instructions over the years that you've
8    had with UPS, ma'am?
9        A.   UPS --
10          MR. LIMBACHER:  Object to
11   form.
12          THE WITNESS:  They are a
13   UPS-controlled document, so they
14   rely -- they are housed with UPS.
15   But Endo, we receive copies of
16   them.
17   BY MR. BUCHANAN:
18       Q.   Right.  I take it, for this
19   relationship to work, you need to
20   understand what roles you have and what
21   roles they have, right?
22       A.   Correct.  The work
23   instructions are developed in conjunction
24   with both Endo and UPS, but they are a

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    UPS-controlled document.
2        Q.   Understood.  The work
3    instructions are what guide how they are
4    handling things within their walls but
5    they, nonetheless, provide you an
6    opportunity to give feedback because
7    you're hiring them to do that function,
8    right?
9            MR. LIMBACHER:  Object to
10   form.
11           THE WITNESS:  UPS has
12       corporate SOPs.  And then they
13       have client-specific work
14       instructions.  These work
15       instructions are for Endo, for the
16       Endo business.
17   BY MR. BUCHANAN:
18       Q.   Okay.  And so these would
19   have been shared with you, and you would
20   have had an opportunity to provide input
21   on them, correct?
22       A.   Yes.
23       Q.   And did you?
24       A.   I would assume I did, yes.

Page 327

1        Q.   Okay.  Do you keep a file of
2    these somewhere in your department?
3        A.   Yes.  I have a binder of
4    them.
5        Q.   You have the binder of the
6    current versions as well as the old
7    versions?
8            MR. LIMBACHER:  Object to
9    form.
10           THE WITNESS:  I normally
11       just keep the current versions.
12   BY MR. BUCHANAN:
13       Q.   Is this still the current
14   version of the -- what's referred to as
15   order entry or the work instructions for
16   order entry?
17       A.   As of today?
18       Q.   Yes.
19       A.   I do not believe so.  I
20   believe there's another version, but I
21   can't confirm that without having the
22   documents.
23       Q.   Aside from the sense you
24   have in your body right now that there is

Page 328

1    another version other than this one, are
2    you aware of many other versions of the
3    work instructions entitled order entry?
4            MR. LIMBACHER:  Object to
5    form.
6            THE WITNESS:  Based on UPS's
7        policy, most work instructions are
8        reviewed every two years.   So
9        since this is dated 2008, you
10       would assume that there's another
11       version.
12   BY MR. BUCHANAN:
13       Q.   Without assuming, are you
14   aware of any changes that have been made
15   to this work instruction?
16       A.   I would have to review this
17   work instruction and review the current
18   one that we have in place --
19       Q.   Okay.
20       A.   -- to confirm that.
21       Q.   And to review the current
22   one in place, you would go to the binder
23   you keep in your office, or in your work
24   space?

Page 329

1        A.   Yes.
2        Q.   Okay.
3        A.   Or UPS will send it to me
4    electronically.  Either one.
5        Q.   Have you ever asked UPS for
6    all the old work instructions?
7            MR. LIMBACHER:  Object to
8        form.
9            THE WITNESS:  The old work
10       instructions that are no longer
11       effective?  No.
12   BY MR. BUCHANAN:
13       Q.   In your practice when you've
14   asked UPS for a document, do they share
15   it with you?
16       A.   Yes.
17       Q.   As in the case of work
18   instructions, if you ask for one, they
19   would give it to you?
20       A.   For a work instruction, yes,
21   they would.
22       Q.   Okay.
23           MR. BUCHANAN:  Could we pass
24       the witness what we're marking as

83  (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

```
 1      656?
 2          MR. SIEGEL:  Walker
 3      Exhibit-13.
 4              - - -
 5          (Whereupon, EndoWalker
 6      Exhibit-13,
 7      ENDO_OPIOID_MDL_01680920-975, was
 8      marked for identification.)
 9              - - -
10      BY MR. BUCHANAN:
11          Q.   I'm passing you, ma'am,
12      what's been marked as Exhibit-13 to your
13      deposition.
14          A.   Thanks.
15          Q.   This is a work instruction
16      entitled, Order processing.
17              Do you see that?  I'm sorry.
18      There's a cover e-mail, I was going to
19      direct you to Page .12.  You're free to
20      look at the intervening pages, but --
21          A.   I see it.
22          Q.   Okay.  Can we go to .12?
23          A.   .12?  Order processing.
24      This one, order processing?
```

Page 331

```
 1          MR. LIMBACHER:  No, he's
 2      looking at these.
 3      BY MR. BUCHANAN:
 4          Q.   Top right corner, I'm sorry,
 5      ma'am.
 6          A.   This one?
 7          MR. LIMBACHER:  Yes.
 8      BY MR. BUCHANAN:
 9          Q.   Do you see that work
10      instruction?
11          A.   Order processing, I do.
12          Q.   Is that a work instruction
13      that you recognize?
14          A.   It is.
15          Q.   Something that's been shared
16      with you in the past?
17          A.   Yes, it has.
18          Q.   Is this the work instruction
19      with UPS that governs the handling of
20      orders for controlled substances?
21          MR. LIMBACHER:  Object to
22      form.
23          THE WITNESS:  Yes, it
24      references controlled substances.
```

Page 332

```
 1      BY MR. BUCHANAN:
 2          Q.   Okay.  Where are you
 3      referring?  What page are you on?  I just
 4      can't see over the table.
 5          A.   .15.
 6          Q.   Thank you.
 7              Would that be the controlled
 8      substance excess order check?
 9          A.   Yes.
10          Q.   And just to orient us,
11      ma'am, this would be UPS's workflow with
12      regard to order processing after its been
13      released to them by Endo, fair?
14          A.   No, that's incorrect.
15          Q.   Okay.  What is it?
16          A.   This is the process within
17      Endo's SAP system.  Once the order gets
18      down to UPS's SOM program, it's a
19      completely different group and a
20      different process that reviews those
21      orders.
22          Q.   Okay.  So let's make sure we
23      understand this now.  4.3.7, Controlled
24      Substance Excessive Order Check.
```

Page 333

```
 1              Do you see that heading?
 2          A.   I do.
 3          Q.   Customer service must print
 4      this report several times per day in
 5      order to resolve excessive order lines
 6      prior to cutoff time where feasible.
 7      This includes the release of CSOS orders.
 8              Do you see that?
 9          A.   I do.
10          Q.   CSOS, that's controlled
11      substance ordering system?
12          A.   Correct.  That's the
13      electronic version of a controlled order.
14          Q.   Right.  So in the old days,
15      it was more prevalent for people to fill
16      out a piece of paper and fax it or send
17      it; more recently, there's an electronic
18      system to allow controlled substance
19      orders to come in?
20          A.   Right.  Previously, it was a
21      DEA Form 222.  Now it's an electronic
22      version.
23          Q.   And then it says, next line
24      item, 4.3.7.2, The Endo associate
```

84  (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    director of customer service and
2    distribution either approves the order to
3    be released or contacts the customer to
4    obtain more information.
5         Did I read that correctly?
6    A.   You did.
7    Q.   If the order is greater than
8    the average of the customer's last three-
9    and twelve-month usage, the CMA contacts
10   Endo's associate director of customer
11   service.
12        Did I read that correctly?
13   A.   Uh-huh.
14   Q.   CMA is at UPS Supply Chain
15   Services?
16   A.   The CMA is another word for
17   customer service rep at UPS, yes.
18   Q.   ███████████████████████
███████████████████████████████████████
███████████████████████████████████████
22   A.   Yes.
23   Q.   Okay.  The associate
24   director may instruct customer service to

Page 335

1    contact the customer to verify the amount
2    ordered and request an explanation as to
3    why their order was excessive, new
4    customer, new contracts, increased sales
5    or release the order.
6         Do you see that?
7    A.   I do.
8    Q.   CMA must enter the
9    explanation in the order notes, along
10   with the contact name of the customer.
11        Did I read that correctly?
12   A.   Yes.
13   Q.   Next line says, The CMA
14   reviews excessive orders and releases
15   them from excessive hold ███████████
16   ████████████████.
17        Did I read that correctly?
18   A.   You did.
19   Q.   Were you aware of that?
20        MR. LIMBACHER:  Object to
21   form.
22        THE WITNESS:  Was I aware of
23   what?
24   BY MR. BUCHANAN:

Page 336

1    Q.   That the UPS customer
2    service rep would review excessive orders
3    and release them from excessive hold if
4    ████████████████████████████████
5    A.   So I want to make sure that
6    we're all clear on what we're actually
7    looking at.
8         So UPS Supply Chain
9    Solutions's customer service uses Endo's
10   SAP system.  So this is all related to
11   Endo SAP system.
12        So when you're talking about
13   UPS releasing orders, it's with -- this
14   is the Endo system.  When Endo's are
15   released and sent to UPS, it goes through
16   UPS's SOM program, which is completely
17   separate from any -- completely separate
18   from this work instruction document.
19        I just want to make sure
20   everybody is on the same page on how this
21   is working.
22   Q.   That's helpful to
23   understand.
24        What you're saying is that

Page 337

1    you had people physically seated in an
2    UPS facility that were actually working
3    on -- they were UPS employees, but they
4    were working on your SAP system?
5    A.   Yes.  The Endo customer
6    service group is at UPS, and they are
7    dedicated to Endo.
8    Q.   Okay.  Just in terms of
9    where they get their paycheck, are they
10   UPS employees or are they Endo employees?
11        MR. LIMBACHER:  Object to
12   form.
13        THE WITNESS:  They are UPS
14   employees.
15   BY MR. BUCHANAN:
16   Q.   Okay.  So the UPS employees
17   are the employees doing the first check
18   on Endo's rules for excessive order
19   monitoring?
20   A.   Correct.  In conjunction
21   with myself at Endo, yes.  Yes, that's
22   correct.
23        But just for clarification
24   again, the UPS SOM program and people are

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  not part of this group.  It's a
2  completely separate group within the
3  regulatory system.
4      Q.  Okay.  So let me just make
5  sure I'm understanding this, then.
6      So this controlled substance
7  excessive order check that's in the work
8  instructions for UPS, this is -- would
9  actually be what was, quote, Endo's
10  process within its SAP system as of this
11  point in time; is that fair?
12      A.  Right.  Whatever point in
13  time these work instructions are
14  effective.  I think this is under our
15  older program.  But yes.
16      Q.  So this is 2008.  And what
17  this says is, what we were looking at to
18  make an assessment of whether it's an
19  excessive order under Endo's rules at the
20  time was whether it was greater than the
21  ███████████████████████████████
23      A.  Right.  These was -- these
24  are work instructions before our update

Page 339

1  to SAP in '14.
2      Q.  Okay.  So that was the
3  general rule that you were applying to
4  flag an excessive order from Endo's
5  suspicious order monitoring process up
6  until 2014?
7      A  ██████████████████
9      Q.  As a practical matter, it
10  was UPS employees who would be reviewing
11  those flags?
12      A.  In conjunction with Endo;
13  based on Endo's processes and based on
14  Endo's direction, yes.
15      Q.  Right.
16      A.  Correct.
17      Q.  So they were UPS employees
18  assessing orders as to whether they were
19  excessive or not based on the algorithm
20  that's reflected in 4.3.7.3, correct?
21      MR. LIMBACHER:  Object to
22  form.  Misstates the document.
23  Misstates the evidence.  Misstates
24  her testimony.

Page 340

1      THE WITNESS:  What's the --
2  clarify your question.
3  BY MR. BUCHANAN:
4      Q.  Do you see 4.3.7.3?
5      A.  I do.
6      Q.  Is that the general
7  algorithm that was Endo's suspicious
8  order flag up until 2014?
9      A.  At this time the three- and
10  twelve-month, that's correct.
11      Q.  Up until 2014, correct?
12      A.  Yes.
13      Q.  Okay.  So that would have
14  been the -- what would have, quote,
15  tripped the wire up until 2014?
16      MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19      Q.  Correct?
20      A.  The order potentially could
21  kick out and a review would be done.
22      And, again, once the order
23  is released, it's sent to UPS and it goes
24  through UPS's SOM program, which is a

Page 341

1  completely separate group than this.
2      Q.  So what's happening here is
3  that the UPS employees are then reviewing
4  the orders that kick out, correct?
5      A.  The U -- to clarify, it's
6  the customer service team assigned to
7  Endo, not the regulatory team.  The UPS
8  customer service team assigned to Endo
9  looking at the Endo SAP system.
10      Q.  The UPS customer service
11  team that was performing at least the
12  first review of suspicious orders using
13  Endo's suspicious order or excessive
14  order test?
15      A.  Correct.  Right.
16      MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19      Q.  So orders that were kicked
20  out as being excessive by that test would
21  then get reviewed by the UPS customer
22  service people, right?
23      MR. LIMBACHER:  Object to
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1      THE WITNESS:  Correct.  In
2  conjunction with Endo, if they had
3  questions based on our work
4  instructions.
5  BY MR. BUCHANAN:
6      Q.   And by the work instructions
7  that you guys had agreed on, the customer
8  service representative from UPS could
9  release an excessive order if the ██████
10 ████████████████████████████████
11 correct?
12     MR. LIMBACHER:  Object to
13 form.
14     THE WITNESS:  That's what
15 this states, yes.
16 BY MR. BUCHANAN:
17     Q.   And that was the practice
18 that would have been followed under these
19 work instructions until they changed,
20 correct?
21     MR. LIMBACHER:  Object to
22 form.
23     THE WITNESS:  Correct.
24 BY MR. BUCHANAN:

Page 343

1      Q.   These were, quote, the rules
2  of the road for Endo's excessive order
3  flagging and clearing until 2014, right?
4      A.   Right.
5      MR. LIMBACHER:  Object to
6  form.
7      THE WITNESS:  Sorry.
8      But, again, you know, I'm
9  repeating myself, I know.  But
10 once they are released from our
11 system, they go through UPS's SOM
12 program before they are released
13 for shipping, which is a
14 completely separate algorithm,
15 separate system.
16 BY MR. BUCHANAN:
17     Q.   When did the work
18 instruction change with regard to
19 ██ ████████████████████████████
20
21     MR. LIMBACHER:  Object to
22 form.
23     THE WITNESS:  I don't have
24 the exact date, but when SAP

Page 344

1  probably upgraded their system in
2  '14.
3  BY MR. BUCHANAN:
4      Q.   Do you know that?
5      A.   Do I know the work
6  instructions change?  I know that we have
7  current work instructions, yes.
8      Q.   Do your current work
9  instructions, ma'am, do they allow an
10 order to be cleared if it's just less
11 ██████████
12     A.   I would have to look at the
13 current work instructions.  I can't
14 confirm that right now.
15     Q.   Okay.  In other words, when
16 we talk about an order clearing, that
17 means you don't have to do further
18 investigation ████████████████████████
19 ████████?
20     MR. LIMBACHER:  Object to
21 form.
22     THE WITNESS:  That's what it
23 states.
24 BY MR. BUCHANAN:

Page 345

1      Q.   Okay.  And that's what you
2  did?
3      MR. LIMBACHER:  Object to
4  form.
5      THE WITNESS:  We had an
6  excessive program in place, and we
7  reviewed them and we released the
8  orders as appropriate.
9  BY MR. BUCHANAN:
10     Q.   And one of the reasons to
11 release an order was if it was smaller
12 ████████████████?
13     A.   We had our program in place.
14     MR. BUCHANAN:  We're getting
15 some feedback on the phone.  I
16 don't know if somebody doesn't
17 have their phone on mute.
18 BY MR. BUCHANAN:
19     Q.   All right.  And so if the
20 order was ████████████, that
21 would be something that would have been
22 coordinated with the Endo supervisor; is
23 that right?
24     A.   Yes.

87  (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Q.   Is the Endo supervisor you?
2    A.   Probably at that time, yes.
3    Q.   Okay.  Were you ever
4  physically at the same facility, ma'am,
5  with these UPS customer service people
6  that were doing this first-level review?
7    A.   Yes, I visit the UPS sites.
8    Q.   Not a matter of whether you
9  visited them.
10       Were you physically ever
11  present and working in that environment?
12       MR. LIMBACHER:  Object to
13  form.
14       THE WITNESS:  No, I work out
15  of the Malvern office.  But I do
16  visit UPS.
17  BY MR. BUCHANAN:
18    Q.   Was that -- so that work was
19  happening remote from where you were on a
20  day-to-day basis?
21    A.   Yes.
22    Q.   Okay.
23       MR. LIMBACHER:  Whenever is
24  a good time to stop.

Page 347

1       MR. BUCHANAN:  Can you go a
2  few more minutes, just so I can
3  finish this?
4       MR. LIMBACHER:  Are you okay
5  for a few more minutes?
6       THE WITNESS:  Yes.
7  BY MR. BUCHANAN:
8    Q.   And then it says, The CMA
9  will release the excessive order based on
10  one of the following excessive release
11  codes.
12       Right?
13    A.   Yes, that was in our old
14  system.
15    Q.   And these were the
16  documents -- this was the documentation
17  you would log into the system, 8050,
18  release due to growth factor, right?
19    A.   Yes.
20    Q.   Customer tells you they're
21  selling more, release it --
22       MR. LIMBACHER:  Object to
23  form.
24  BY MR. BUCHANAN:

Page 348

1    Q.   -- right?
2    A.   We had our program in place,
3  and we reviewed them and we released
4  them, yes.
5    Q.   And then let's go to
6  4.3.7.9.  Endo's associate director of
7  customer service and distribution
8  reserves the right to reduce the quantity
9  ordered and/or advise the deletion of an
10  order.
11       Do you see that?
12    A.   Yes, I see it.
13    Q.   Is that you?
14    A.   Yes, it was at the time.
15    Q.   So you could structure an
16  order if it was excessive?
17    A.   I could what?
18    Q.   You could reduce the size of
19  an order so it stayed below an excessive
20  threshold and then still ship?
21       MR. LIMBACHER:  Object to
22  form.
23       THE WITNESS:  No, I don't
24  believe that's what that says.

Page 349

1  BY MR. BUCHANAN:
2    Q.   Does it say you had the
3  right to reduce the quantity ordered
4  and/or advise the deletion of an order?
5    A.   If we deemed it suspicious
6  and we didn't want to ship it, yes.  But
7  I don't recall us ever doing that.
8    Q.   Okay.  You don't recall ever
9  reducing the size of an order to allow it
10  to ship?
11    A.   No, I do not.
12       MR. LIMBACHER:  Object to
13  form.
14  BY MR. BUCHANAN:
15    Q.   Do you have an understanding
16  as to whether that would be appropriate
17  or not, ma'am?
18       MR. LIMBACHER:  Object to
19  form.
20       THE WITNESS:  We had an
21  excessive program in place that
22  monitored our orders, and we would
23  review and release.
24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1      Q.   Was it your understanding,
2  ma'am, that it was permissible for you to
3  reduce the size of the order so that it
4  would no longer be excessive in the
5  shipment and then clear it?
6      A.   I don't recall that.
7           MR. LIMBACHER:  Object to
8  form.
9  BY MR. BUCHANAN:
10     Q.   My question is, is it your
11 understanding that that would be
12 appropriate to do that?
13     A.   I don't recall.
14     Q.   In fact, did you later
15 learn, ma'am, that if you had done such a
16 thing that that would, in fact, be
17 something that you would have to report
18 to the DEA?
19          MR. LIMBACHER:  Object to
20 form.
21          THE WITNESS:  I don't
22      recall.  We had excessive programs
23      in place and so did UPS, and our
24      orders were monitored and they

Page 351

1      were shipped as appropriate,
2      between both the companies and
3      both our systems and both our
4      programs.
5  BY MR. BUCHANAN:
6      Q.   And if you had cut an order
7  and hadn't reported it to the DEA, that
8  would not be appropriate, would it,
9  ma'am?
10          MR. LIMBACHER:  Object to
11 form.  Foundation.
12          THE WITNESS:  I don't
13      recall.
14 BY MR. BUCHANAN:
15     Q.   If you had an order that was
16 excessive, in order to make it not
17 excessive as to quantity, as to size, as
18 to frequency, you had to reduce its size
19 or reduce the quantity, that would be
20 something you would have to report to the
21 DEA, right?
22          MR. LIMBACHER:  Object to
23      form.  Asked and answered.
24          THE WITNESS:  We had an

Page 352

1  excessive program in place and UPS
2  had an SOM program in place, and
3  orders were filtered through both
4  programs and reviewed and shipped
5  as necessary.
6      And I don't recall an order
7  being deemed as suspicious and
8  reported to the DEA.
9  BY MR. BUCHANAN:
10     Q.   Do you recall ever cutting
11 an order in size, ma'am --
12     A.   No, I do not.
13     Q.   -- so it was no longer
14 excessive in size?
15     A.   No, I do not.
16          MR. LIMBACHER:  Object to
17      form.  Asked and answered.
18          THE WITNESS:  I do not
19      recall.
20 BY MR. BUCHANAN:
21     Q.   Do you recall ever
22 authorizing people on your staff to cut
23 the size of an order so that it was no
24 longer excessive?

Page 353

1      A.   No.
2          MR. LIMBACHER:  Object to
3      form.  Asked and answered.
4  BY MR. BUCHANAN:
5      Q.   Would that be appropriate to
6  do, ma'am?
7          MR. LIMBACHER:  Object to
8      form.  Asked and answered.
9          THE WITNESS:  We had an
10      excessive program in place, at
11      both Endo and at UPS.
12 BY MR. BUCHANAN:
13     Q.   How is that responsive to my
14 question?
15     A.   I'm telling you what we had
16 in place.
17     Q.   I'm not asking you that.
18     A.   Well, that's what I'm
19 telling you.
20     Q.   I'm asking you -- the way
21 this works is we have questions and
22 answers.  I think you understand that by
23 this point in time.
24     My question to you, ma'am,

89 (Pages 350 to 353)

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    is, to your understanding, would it be
2    appropriate for a company to cut -- for
3    you, in your role in suspicious order
4    monitoring, to cut an order in size that
5    had been flagged as excessive and then
6    ship it once it's no longer excessive and
7    not report that to the DEA?
8            MR. LIMBACHER:  Object to
9    form.
10           THE WITNESS:  I don't
11   recall.
12           MR. BUCHANAN:  We can take a
13   break.
14           VIDEO TECHNICIAN:  We are
15   going off record.  The time is
16   2:36.
17               - - -
18       (Whereupon, a brief recess
19   was taken.)
20               - - -
21           VIDEO TECHNICIAN:  We're
22   back on the record.  Beginning of
23   Media File Number 6.  The time is
24   2:54.

Page 355

1            MR. BUCHANAN:  Can I have
2    659, please, Scott, next in order?
3            MR. SIEGEL:  659 is being
4    marked as Walker-14.
5               - - -
6        (Whereupon, EndoWalker
7    Exhibit-14,
8    ENDO_OPIOID_MDL_05948106-137, was
9    marked for identification.)
10              - - -
11   BY MR. BUCHANAN:
12       Q.   I'm passing you, ma'am,
13   what's been marked as Exhibit-14 to your
14   deposition.
15           It's an e-mail exchange.
16   I'm going to direct you to one of the
17   constituent e-mails.  It looks like this
18   was kind of assembled as a compilation of
19   some form.
20           I'm going to direct your
21   attention to .27, top right corner.  It's
22   an e-mail from yourself --
23       A.   Sorry, you said 27?
24       Q.   .27, yes, top right corner.

Page 356

1            It's an e-mail from yourself
2    to Kayla Keinhofer, Robert Stuart and
3    Doug Azzalina and a couple of ccs on
4    there.
5            Do you see that?
6        A.   Yes.
7        Q.   And it's referring to an
8    interaction that you had with McKesson in
9    2009 relating to the shipment or
10   nonshipment of orders.
11           Do you recall that?
12       A.   I'm sorry, I was reading the
13   document.
14           Can you please repeat that.
15       Q.   Sure.  It's recalling to
16   certain McKesson service level penalties?
17       A.   Okay, yes.
18       Q.   In your agreement with
19   McKesson, were you required to ship a
20   minimum percentage of their order,
21   regardless?
22           MR. LIMBACHER:  Object to
23   form.
24           THE WITNESS:  This is back

Page 357

1    from 2010.  I don't recall.  I
2    would have to look at the actual
3    document.
4    BY MR. BUCHANAN:
5        Q.   Let's read the e-mail,
6    Monday, May 10, 2010.
7            As we discussed last week
8    during our meeting, attached is the list
9    of POs that McKesson ordered during the
10   last two weeks in December.  This
11   spreadsheet lists the PO number, order
12   quantity, ship quantity and dates.  I
13   know within the agreement there is
14   language around us shipping at least 20
15   percent of their order quantities.  I'm
16   not sure of the exact language.
17           Did I read that correctly,
18   ma'am?
19       A.   Yes.
20       Q.   Are you familiar with
21   service level agreements you had with
22   various of your distributors over time?
23       A.   I know the generic side of
24   the business had service level

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1   agreements, yes.
2       Q.   Okay.  It notes on the
3   bottom, McKesson ordered three times
4   their normal order amount.
5           Do you see that?
6       A.   I do.
7       Q.   Would three times the normal
8   order amount be excessive, ma'am?
9           MR. LIMBACHER:  Object to
10  form.
11          THE WITNESS:  To ground
12          everybody, based on these dates,
13          this is during a holiday period,
14          there is a lot of shifting of
15          orders, shutdown periods, that
16          kind of stuff.
17              So just because it says
18          three times the normal amount,
19          that doesn't mean it's actually
20          excessive, it could be because of
21          the holiday period, because we had
22          shipped to them for multiple
23          weeks.
24  BY MR. BUCHANAN:

Page 359

1       Q.   You wouldn't be surprised if
2   that order would have tripped an
3   excessive flag, though, correct?
4       A.   Correct.  But there's a
5   valid reason that it would kick out as
6   excessive.
7           MR. BUCHANAN:  You can take
8   that down.  684, please, Scott.
9           MR. SIEGEL:  684 is
10  Exhibit-15.
11          MR. BUCHANAN:  And if you
12  could pull it up on the screen.
13          - - -
14          (Whereupon, EndoWalker
15          Exhibit-15,
16          ENDO_OPIOID_MDL_05962953-956, was
17          marked for identification.)
18          - - -
19  BY MR. BUCHANAN:
20      Q.   This is an e-mail from
21  February 21, 2012 from yourself to a Mr.
22  Jennings, Weeks and Cheryl Matz, all at
23  UPS.
24          There's a new exhibit coming

Page 360

1   over the table to you.  You can set that
2   one aside.
3       A.   Not this one?
4       Q.   We'll probably come back to
5   that one in a moment.
6           Do you have the e-mail
7   before you, ma'am?
8       A.   Yes, I do.
9       Q.   It's an e-mail exchange
10  between yourself, internal Endo people,
11  and UPS folks concerning some orders that
12  were coming in, correct?
13      A.   Yes.
14      Q.   I guess the earliest in time
15  would be back on, let's see, .2 at the
16  bottom, an e-mail from yourself on
17  February 21, 2012 to Patricia Drayton,
18  Linda Cichocki, Deborah Robertson and
19  others with UPS, correct?
20      A.   Yes.
21          MR. LIMBACHER:  Take your
22          time and read the document.
23          THE WITNESS:  I know what it
24          is.

Page 361

1   BY MR. BUCHANAN:
2       Q.   It's an order of Opana ER,
3   10 milligram, C-II.
4           Is that Schedule II?
5       A.   Yes, it is.
6       Q.   Controlled substances?
7       A.   Controlled substance II,
8   yes.
9       Q.   Which would fit; Opana ER
10  was a controlled substance, correct?
11      A.   Correct, it is.
12      Q.   And to finish the subject
13  line, it says, Please ship direct to the
14  FDCs, McKesson.
15          What's an FDC?
16      A.   Foreign distribution center.
17      Q.   It then lists all their POs
18  for the Opana.
19          Do you see that?
20      A.   Yes.
21      Q.   PO is a purchase order?
22      A.   Yes, it is.
23      Q.   And on the next page, you'll
24  see a very lengthy listing of Opana

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    purchase orders, correct?
2        A.   Correct.  Yes, this e-mail
3    is from McKesson.
4        Q.   And then if we follow up the
5    thread, we see at the top of Page 2, .2,
6    an e-mail from Ms. Matz.
7             And who is she with?  Is she
8    Endo or is she UPS?
9        A.   Cheryl Matz, she was with
10   Endo at the time.
11       Q.   And Endo, kind of in your
12   office there in Malvern, or was she down
13   sitting with the UPS employees?
14       A.   No, my office in Malvern.
15       Q.   And so she's saying, Hi,
16   Team, McKesson ordered more than their
17   allocated quantities, so in the unit ship
18   column I entered a revised quantity.
19   Please change the orders to reflect these
20   new quantities, and then you can release
21   these particular McKesson orders.
22   Cheryl.
23            Did I read that correctly?
24       A.   You did.

Page 363

1        Q.   And we see before that, all
2    the orders had gone on, quote, license
3    hold, correct?
4        A.   Yes, I see that.
5        Q.   And then you intervene, in
6    the middle of the page, you note, Cheryl
7    is reviewing the quantity.  Don't
8    review -- excuse me -- remove the manage
9    block until you hear from her or I.  You
10   can update the licenses in the meantime.
11            Correct?
12       A.   Yes, that's what it says.
13       Q.   And UPS gets back and says
14   they are going to work on the licenses
15   and wait for you on the quantities,
16   right?
17       A.   That's correct.
18       Q.   And then Cheryl, of course,
19   she changes the quantities, right?
20       A.   That's what it states.  I --
21   I'm -- I have stuff to add, but I'll wait
22   until you finish your questioning.
23       Q.   And then it's noted, further
24   upstream, Kathy Weeks -- who was Kathy

Page 364

1    Weeks with?
2        A.   Kathy worked for UPS.
3        Q.   And she notes, in the middle
4    of Page 1, The quantities have been
5    changed, correct?
6        A.   Yes.
7        Q.   And then, Orders can ship
8    out tomorrow following normal
9    verifications, SOM, et cetera.
10            That's from Mr. Jennings at
11   UPS, correct?
12       A.   That's correct.
13       Q.   And you say, Nice job
14   everyone, in your final e-mail in 2012
15   here, correct?
16       A.   Correct.
17       Q.   All right.  Then you say
18   you're going to look at the ABC orders
19   next?  Is that what you said?
20       A.   Yes, that's what I said.
21       Q.   Okay.
22       A.   So this e-mail --
23       Q.   I'm sorry, ma'am, there's
24   not a question.

Page 365

1            MR. LIMBACHER:  Do you want
2    to give her an opportunity to
3    provide some context?
4            MR. BUCHANAN:  I'm now
5    starting to get concerned about my
6    time.  So if you'd like to do it
7    on redirect, feel free.
8              - - -
9            (Whereupon, a discussion off
10   the record occurred.)
11             - - -
12           MR. LIMBACHER:  Did somebody
13   join?
14           THE WITNESS:  Can I provide
15   context with this, or are we
16   moving on?
17           MR. BUCHANAN:  There's not a
18   question pending, ma'am.
19           MR. LIMBACHER:  He doesn't
20   want you to do that now.
21           THE WITNESS:  Okay.
22   BY MR. BUCHANAN:
23       Q.   If we go to 683.6 on that
24   document, ma'am -- I'm sorry.

Page 366

1      A.   683 --
2           MR. LIMBACHER:  Which
3      document?
4           MR. BUCHANAN:  Do we need a
5      new one?
6           MS. RAKHLIN:  Yes, it's a
7      new exhibit.
8           MR. BUCHANAN:  Let's move
9      on.
10     BY MR. BUCHANAN:
11     Q.    Did you -- we talked about
12     chargeback data earlier today.
13          Do you recall that
14     discussion?
15     A.   I do.
16     Q.    Did you look at other
17     information as part of your suspicious
18     order monitoring process with regard to
19     customers of your customers and their
20     orders of Endo-branded products?
21          MR. LIMBACHER:  Object to
22     form.
23          THE WITNESS:  No, as I
24     stated before, we looked at the

Page 367

1      average three-month and
2      twelve-month quantities and class
3      of trade.
4      BY MR. BUCHANAN:
5      Q.   Okay.
6           MR. BUCHANAN:  Could I have
7      635 and 36, please?  Let's do 636,
8      Scott.
9           MR. SIEGEL:  636 is being
10     marked as Exhibit-16.
11               - - -
12          (Whereupon, EndoWalker
13     Exhibit-16,
14     ENDO-CHI_LIT-001444050-053, was
15     marked for identification.)
16               - - -
17     BY MR. BUCHANAN:
18     Q.    Ma'am, I'm passing what we
19     marked as Exhibit-16 to your deposition.
20          It's a -- if we scroll to
21     little number 51 on the bottom right
22     corner.
23          MR. LIMBACHER:  She doesn't
24     have it yet, Dave.

Page 368

1           MR. BUCHANAN:  Sorry about
2      that.
3           MR. LIMBACHER:  That's okay.
4      BY MR. BUCHANAN:
5      Q.    Do you see little 51 there
6      and little 52 in the bottom right
7      corners?
8      A.    51 and 52, yes, I see it.
9      Q.    This is a report for Opana
10     ER.
11          You all were selling Opana
12     ER in 2008, right?
13     A.    Yes, we were.
14     Q.    Okay.  This is a date of
15     reporting, it looks like it's running
16     from October 2007 to January 31, 2008.
17          Do you see that, ma'am?
18     A.    What was the date you gave?
19     Q.    October 1, 2007 to January
20     31, 2008, those are the dates I tried to
21     give.
22          Do you see those in the
23     document?
24     A.    I do.

Page 369

1      Q.    And the report date is April
2      25, 2008, right?
3      A.    Yes.
4      Q.    And it states, Enriched
5      channel sales by outlet, correct?
6      A.    Enriched channel sales by
7      outlet?
8      Q.    Do you see that, ma'am, on
9      the screen --
10     A.    You're on the next page,
11     sorry.
12     Q.    -- on the document, either
13     way?
14     A.    I see that, yes.
15     Q.    Does that refresh your
16     recollection, ma'am, that you actually
17     were tracking and did have, at least
18     within Endo, sales data by downstream
19     customers --
20          MR. LIMBACHER:  Object to
21     form.
22     BY MR. BUCHANAN:
23     Q.    -- for your products?
24     A.    This is part of the sales

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    team. It was not my area of
2    responsibility. And it was not provided
3    to me.
4        Q.   Okay. To be clear, this is
5    a document that was produced to us by
6    Endo. I just want to make sure you
7    understand that.
8        Do you have that
9    understanding, ma'am?
10       A.   I understand it was provided
11   by Endo.
12       Q.   Okay. And you understand
13   it's a report of channel sales data for
14   Opana ER, at least for the period stated
15   here, correct?
16       A.   I can't speak for Endo.
17   This is not my area of responsibility.
18       Q.   Okay. Opana ER is a branded
19   product?
20       A.   It is.
21       Q.   Branded opioid product?
22       A.   It's a branded opioid
23   product.
24       Q.   During this period of time,

Page 371

1    did you, in fact, have responsibility for
2    suspicious order monitoring for Endo?
3        MR. LIMBACHER: Object to
4    form. Asked and answered.
5        THE WITNESS: I did. But my
6    shipments were to the wholesalers.
7    BY MR. BUCHANAN:
8        Q.   And these would be, when we
9    see these entities, Smith's Food King,
10   Scott's Pharmacy, H&B Pharmacy, Kroger
11   Pharmacy, these would be downstream
12   customers, right, customers of your
13   customers?
14       MR. LIMBACHER: Object to
15   form.
16       THE WITNESS: Potentially.
17   But I was not provided this data.
18   BY MR. BUCHANAN:
19       Q.   And I guess, just as a
20   factual matter, then, this is not data
21   that you ever incorporated as part of
22   your suspicious order monitoring process
23   over the 20 years that you've been in
24   that position?

Page 372

1        MR. LIMBACHER: Object to
2    form.
3        THE WITNESS: No. My
4    shipments -- my shipments are to
5    the wholesalers.
6        MR. BUCHANAN: Move to
7    strike the nonresponsive portion.
8    BY MR. BUCHANAN:
9        Q.   This is not information that
10   you considered as part of your suspicious
11   order monitoring process; yes or no?
12       MR. LIMBACHER: Object to
13   form.
14       THE WITNESS: No, it was
15   not.
16   BY MR. BUCHANAN:
17       Q.   Thank you.
18       And the sales folks at Endo,
19   or the regulatory folks or the DEA
20   compliance folks at Endo never shared
21   with you that they had that information,
22   would that be true?
23       A.   I can't speak for what the
24   rest of the divisions did within Endo.

Page 373

1        Q.   Can you speak for yourself,
2    though, ma'am? Did the sales folks or
3    the regulatory folks or the DEA
4    compliance folks ever let you know that
5    they had information on downstream
6    customer purchases of company-branded
7    products?
8        MR. LIMBACHER: Object to
9    form.
10       THE WITNESS: This
11   information wasn't provided to me.
12       MR. LIMBACHER: Dave, do you
13   want me to cover the fact that
14   this information was provided --
15       MR. BUCHANAN: Move to
16   strike.
17       MR. LIMBACHER: -- by
18   IntegriChain, or do you want to
19   cover that now?
20   BY MR. BUCHANAN:
21       Q.   Did you have this
22   information?
23       MR. LIMBACHER: Object to
24   form.

Page 374

1     THE WITNESS:  I did not have
2  this information.  It's not my
3  area of responsibility.
4  BY MR. BUCHANAN:
5     Q.   Don't have knowledge either
6  way?
7     A.   It's not my area of
8  responsibility.
9        MR. BUCHANAN:  Then move to
10  strike your statements, counsel.
11        MR. LIMBACHER:  So you don't
12  want to cover it?
13        MR. BUCHANAN:  Now you're so
14  out of line.
15        MR. LIMBACHER:  It's a
16  simple question.
17        MR. BUCHANAN:  Could I
18  please have 640?
19  BY MR. BUCHANAN:
20     Q.   You had some role and
21  involvement over the years with HDMA; is
22  that fair?
23     A.   Yes.
24     Q.   And what's HDMA?

Page 375

1     A.   The Healthcare Distribution
2  Management Association.  It's where
3  wholesalers and manufacturers belong to
4  the same organization.
5     Q.   And you go to meetings from
6  time to time?
7     A.   I go to their annual -- at
8  least -- sorry, at least one meeting a
9  year, yes.
10     Q.   When did you start doing
11  that?
12     A.   I don't recall the exact
13  time.
14     Q.   Way back in time?
15     A.   Yeah, 2002, 2003, 2004.
16     Q.   Okay.  And you would get
17  together and you would talk with
18  distributors?
19     A.   Yes.  The meeting is
20  one-on-one appointments between the
21  wholesalers and the manufacturers.
22     Q.   Do you talk to other
23  manufacturers?
24     A.   I don't recall exactly, but

Page 376

1  I'm sure I have.
2     Q.   You talk to representatives
3  of chain pharmacies, correct?
4     A.   No.  The HDMA is just
5  wholesalers and manufacturers.
6     Q.   You don't recall discussing
7  things with --
8     A.   The retailers?
9     Q.   Yes.
10     A.   No.  The meeting I go to is
11  just wholesalers and manufacturers.
12     Q.   Okay.
13        MR. BUCHANAN:  Can I have
14  675?
15  BY MR. BUCHANAN:
16     Q.   Who is John Bullock, ma'am?
17     A.   He's a national account
18  executive for Endo.
19     Q.   And what's the -- what is a
20  national account executive?  A
21  salesperson?
22     A.   Salesperson as far as he
23  works with the wholesalers.
24     Q.   Okay.  And who is Mr.

Page 377

1  Grausso, Sal Grausso?
2     A.   He's my boss.
3     Q.   And what's his title?
4     A.   VP of patient access.
5     Q.   And that would have been --
6  how long has he been your boss?
7     A.   Two years, two and-a-half.
8     Q.   Since Ms. Connell left?
9     A.   No.  No.  I had somebody
10  else between Jill and Sal.
11     Q.   So what is the sequence of
12  your supervisors?  So there was Ms.
13  Connell for a number of years, correct?
14     A.   Many, many years, yes.
15     Q.   Did she start as your
16  supervisor when you began in '98?
17     A.   No.  There was another
18  person there.
19     Q.   And who was that other
20  person?
21     A.   Jeanie Dunk.
22     Q.   And after Ms. Connell, who
23  was the intervening person before Mr.
24  Grausso?

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    A.   If you would like to know
2  all my supervisors, I'll be happy to tell
3  them all to you.
4    Q.   I just want to know who was
5  between Ms. Connell --
6    A.   So there was, after Jill,
7  Kevin O'Brien.
8    Q.   Okay.
9        MR. BUCHANAN:  Can we pass
10       675 over?
11       MR. SIEGEL:  It will be
12       marked as Exhibit-17.
13           - - -
14       (Whereupon, EndoWalker
15       Exhibit-17,
16       ENDO_OPIOID_MDL_02426557-560, was
17       marked for identification.)
18           - - -
19  BY MR. BUCHANAN:
20    Q.   On your screen, ma'am, is an
21  e-mail from John Bullock.  It attaches
22  HDA follow-up from June of 2016.  That's
23  also the subject of the document.
24       Do you see it, ma'am?

Page 379

1    A.   Yes.
2    Q.   It states, Attached is an
3  overview from the Healthcare Distribution
4  Alliance conference that Lisa, Scott and
5  I attended last week.
6        You went to the meeting?
7    A.   Yes, I did.
8    Q.   Did you review the summary
9  that was provided here by Mr. Bullock?
10    A.   I may have at the time he
11  provided it to everybody.  I don't recall
12  exactly.
13    Q.   Was that part of your
14  standard practice, ma'am, at least when
15  you would come back from these meetings,
16  to prepare a summary to distribute to
17  others who weren't there?
18    A.   That's something that John
19  did, yes.
20    Q.   Okay.  And do you recall
21  this meeting?
22    A.   Yes.  It was the annual HDA
23  meeting that I go to.
24    Q.   And that was in Colorado?

Page 380

1    A.   Yes.
2    Q.   And it lists all the
3  customers that you had a chance to
4  interact with at the event --
5        MR. LIMBACHER:  Object to
6  form.
7  BY MR. BUCHANAN:
8    Q.   -- right?
9    A.   Yes, that's what's listed.
10    Q.   Cardinal, AmerisourceBergen,
11  HD Smith, NC Mutual, ANDA, PBA Health, et
12  cetera; you see the long list?
13    A.   Yes.
14    Q.   On the right column, you've
15  got McKesson, Value Drug, Smith and
16  others, right?
17    A.   Yes, they are listed.
18    Q.   And then you list highlights
19  of the conference -- or highlights of the
20  conference are listed off to the right?
21    A.   Yes.  John put this
22  together, yes.
23    Q.   Okay.  Have you seen this
24  before?

Page 381

1    A.   I may have back in 2016.  I
2  don't really recall the details of it.
3    Q.   It then talks about
4  highlights from the conference,
5  Cardinal -- We conducted several key
6  meetings with Cardinal and capped it off
7  with a dinner with Par, Endo and
8  Cardinal -- at a particular restaurant,
9  it looks like.
10        Do you see that?
11    A.   Yes, I see that.
12    Q.   National accounts
13  coordinated a dinner with Cardinal brands
14  and specialty to pull the two sides
15  together and cross-pollinate the two
16  sides and provide one front to Endo
17  Health Solutions.
18        Did I read that correctly?
19    A.   You did.
20    Q.   And that's what happened, to
21  the best you recall?
22    A.   Yes, yes.
23    Q.   Okay.  Then ABC, it lists as
24  another important customer with Endo.

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1    And we continue to forge a solid
2    partnership for brands, generics and
3    specialty.
4            Do you see that?
5        A.   I do see it.
6        Q.   And then finally, McKesson.
7    This has been a critical customer to
8    partner in 2016.  We started out the year
9    rocky with several issues -- and it
10   continues.
11           Do you see that?
12       A.   I do see it.
13       Q.   Do you recall some issues
14   with McKesson and being pressed to
15   release orders from them in 2016?
16           MR. LIMBACHER:  Object to
17   form.
18           THE WITNESS:  Not that I
19   recall, no.
20   BY MR. BUCHANAN:
21       Q.   I'm sorry, not that you
22   recall?
23       A.   Not that I recall.
24       Q.   Okay.

Page 384

1            THE WITNESS:  Not that I
2    recall.
3    BY MR. BUCHANAN:
4        Q.   How about aligning on a
5    strategy to exert pressure against
6    requirements that were being imposed with
7    regard to suspicious order monitoring?
8        A.   No.
9            MR. LIMBACHER:  Object to
10   form.
11           THE WITNESS:  Not that I
12   recall.
13   BY MR. BUCHANAN:
14       Q.   You don't remember ever
15   doing that through the HDMA?
16       A.   No.
17       Q.   Okay.
18           MR. BUCHANAN:  Could I have,
19   please, 676, Scott.  What's the
20   next in order?
21           MR. SIEGEL:  676 is
22   Exhibit-18.
23           - - -
24           (Whereupon, EndoWalker

Page 383

1            MR. BUCHANAN:  Can I please
2    have 676?
3    BY MR. BUCHANAN:
4        Q.   Who is Scott Littlefield?
5        A.   At the time, he was another
6    national account executive before he left
7    the company.
8        Q.   During these HDMA
9    conferences, would you discuss suspicious
10   order monitoring?
11           MR. LIMBACHER:  Object to
12   form.
13           THE WITNESS:  I don't
14   recall.  We could have.
15   BY MR. BUCHANAN:
16       Q.   Do you recall that at any of
17   the HDMA conferences you attended, ma'am?
18       A.   Not really, no.
19       Q.   Getting together with other
20   manufacturers, wholesalers and
21   distributors and aligning with regard to
22   what you were doing or not doing?
23           MR. LIMBACHER:  Object to
24   form.

Page 385

1    Exhibit-18,
2    ENDO_OPIOID_MDL_02426078, was
3    marked for identification.)
4            - - -
5    BY MR. BUCHANAN:
6        Q.   I'm passing you Exhibit-18,
7    ma'am.  It's an e-mail --
8            MR. LIMBACHER:  Can we wait
9    until she gets it in front of her?
10   BY MR. BUCHANAN:
11       Q.   -- from John Bullock to Lisa
12   Walker, cc, Scott Littlefield.  You
13   should have it on your screen.  And
14   hopefully it will get there in a second.
15           This is from June 2016, it
16   precedes your trip to Colorado in 2016
17   that we were just looking at, right?
18       A.   Yes.
19       Q.   From Mr. Bullock, Key topics
20   to cover at HDMA are the following.
21   Please add additional ones.
22           Do you see that?
23       A.   I do.
24       Q.   And you see, what's that,

97  (Pages 382 to 385)

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    about four bullets down, suspicious order
2    monitoring?
3         A.   I see that.
4         Q.   Were you going to be the
5    suspicious order monitoring contact at
6    that meeting?
7         A.   I don't recall what we were
8    scheduled to talk about, as far as SOM at
9    this meeting, or if we did.
10        Q.   You see the question at the
11   end, Who is the SOM contact?
12        A.   I do.
13        Q.   Do you recall ever being the
14   SOM contact for Endo at any meetings of
15   HDMA?
16        A.   No, not that I recall.
17        Q.   Who else would have been
18   discussing SOM -- well, what was the
19   travel group for this HDMA meeting?
20             MR. LIMBACHER:  Object to
21   form.
22             THE WITNESS:  The folks on
23   the -- on the e-mail, Scott, John
24   and I.

Page 387

1    BY MR. BUCHANAN:
2         Q.   Okay.  Among those three,
3    John was a national account executive?
4         A.   Correct.
5         Q.   Scott Littlefield was?
6         A.   A national account
7    executive.
8         Q.   And Lisa Walker was the head
9    of suspicious order monitoring at this
10   time?
11             MR. LIMBACHER:  Object to
12   form.
13             THE WITNESS:  No.  I was the
14   director of distribution and
15   customer service.
16   BY MR. BUCHANAN:
17        Q.   When did you take
18   responsibility formally within the
19   company?  I think you gave us a title in
20   2015?
21        A.   Of being a director?
22        Q.   What was --
23        A.   Is that what you're asking?
24        Q.   I'm sorry, at least

Page 388

1    functionally, were you functionally the
2    most senior person on suspicious order
3    monitoring as of 2015, ma'am?
4             MR. LIMBACHER:  Object to
5    form, foundation.  Asked and
6    answered.
7             THE WITNESS:  SOM was part
8    of my responsibilities, yes.
9    BY MR. BUCHANAN:
10        Q.   Well, who was senior to you
11   with regard to suspicious order
12   monitoring within Endo branded in 2015?
13             MR. LIMBACHER:  Object to
14   form.
15             THE WITNESS:  I guess it
16   would be me in 2015.
17   BY MR. BUCHANAN:
18        Q.   Okay.  So are you aware of
19   another of -- other than the three people
20   that are listed here that attended the
21   meeting and were the SOM contacts for
22   Endo at that meeting?
23        A.   Rephrase your -- sorry, say
24   your question again.

Page 389

1         Q.   Withdrawn.
2              I think you told us that the
3    attendees at the meeting in 2016 were the
4    three individuals listed here, correct?
5         A.   Yes, that's correct.
6         Q.   Okay.  Was there somebody
7    other than you who was the SOM contact
8    for Endo who attended that meeting?
9              MR. LIMBACHER:  Object to
10   form.
11             THE WITNESS:  No, it was me.
12   BY MR. BUCHANAN:
13        Q.   Okay.
14             MR. BUCHANAN:  Can I have,
15   please, Exhibit-640?
16             MR. SIEGEL:  640 is being
17   marked as Exhibit-19.
18             - - -
19             (Whereupon, EndoWalker
20   Exhibit-19,
21   ENDO_OPIOID_MDL_04881787-791, was
22   marked for identification.)
23             - - -
24   BY MR. BUCHANAN:

Page 390

1     Q.   Did you keep up to date,
2  ma'am, on what the FDA -- excuse me,
3  withdrawn.
4           Did you keep up to date with
5  regard to what the DEA was saying your
6  obligations were with regard to
7  suspicious order monitoring?
8           MR. LIMBACHER:  Object to
9  form.
10          THE WITNESS:  In what way
11  are you referring to?
12  BY MR. BUCHANAN:
13    Q.   Guidances they issued,
14  actions they were taking against
15  distributors, actions they were taking
16  against then customers.
17          Did you keep up to date with
18  what they were saying were a
19  manufacturer's obligations?
20    A.   I mean, I knew of them.  But
21  I don't know the details behind them or
22  anything, no.
23    Q.   Okay.  I'm passing you,
24  ma'am, what's been marked as Exhibit --

Page 391

1           MR. BUCHANAN:  Which Scott?
2           MR. SIEGEL:  640 is 19.
3           MR. BUCHANAN:  Thank you.
4  BY MR. BUCHANAN:
5     Q.   -- marked as Exhibit-19 to
6  your deposition.
7           This is an e-mail from your
8  boss to you in 2008, correct?
9     A.   Yes, that's what's listed.
10    Q.   Ms. Connell forwards you a
11  DEA notice, a letter and advisory from
12  January 11, 2008.
13          And when you go to the
14  attachment, you see a letter from the
15  Department of Justice Drug Enforcement
16  Administration, correct?
17    A.   Yes.
18          MR. LIMBACHER:  Take your
19  time and review the document.
20          THE WITNESS:  I see it.
21  BY MR. BUCHANAN:
22    Q.   You've seen it before?
23    A.   I don't really recall seeing
24  it before.

Page 392

1     Q.   You would agree, ma'am, as
2  somebody manufacturing, selling,
3  marketing controlled products, that it's
4  important to take measures to effectively
5  prevent diversion?
6           MR. LIMBACHER:  Object to
7  form.
8           THE WITNESS:  Yes.
9  BY MR. BUCHANAN:
10    Q.   This letter that was
11  received and, I guess, forwarded to you
12  by Ms. Connell -- and you both would have
13  been in that role and responsibility with
14  regard to suspicious orders at this time
15  line in January 11, 2008, right?
16    A.   We would.
17    Q.   Okay.  Let's look at the
18  attached letter.  I think it's .3.
19          Dear Registrant.  It says,
20  This letter is being sent to every entity
21  in the United States registered with the
22  Drug Enforcement Administration to
23  manufacture/distribute controlled
24  substances.  The purpose of this letter

Page 393

1  is to reiterate the responsibilities of
2  controlled substance manufacturers and
3  distributors to inform DEA of suspicious
4  orders in accordance with the 21 CFR
5  1301.74B.
6           Do you see that, ma'am?
7     A.   I do.
8     Q.   Now, looking at this, does
9  this refresh your recollection?
10    A.   Not really, because if you
11  remember, Endo's products are shipped
12  under UPS's DEA's license, so they are
13  the actual registrant.
14    Q.   So is it your view this
15  didn't apply to you?
16          MR. LIMBACHER:  Object to
17  form.  Foundation.
18          THE WITNESS:  I wouldn't say
19  it wouldn't apply.  But our
20  products are shipped under UPS's
21  license.  And in 2008, both of us
22  had an excessive or SOM program in
23  place.
24  BY MR. BUCHANAN:

99 (Pages 390 to 393)

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1       Q.   It will undoubtedly be for
2   somebody else to decide whether it
3   applied or not, ma'am.
4           What I'd like to understand
5   is what was your understanding back in
6   2008?
7           MR. LIMBACHER: Object to
8   form.
9   BY MR. BUCHANAN:
10      Q.   Was your understanding that
11  this letter applied to Endo and its
12  branded products, its branded opioid
13  products that it had sales reps pounding
14  the pavement on?
15      A.   I can't --
16          MR. LIMBACHER: Object to
17  form. Foundation. Argumentative.
18          THE WITNESS: I can't speak
19  to that.  This wasn't -- this was
20  just forwarded to me by my boss.
21  I'm not in regulatory for the
22  company.
23          Again, my responsibility at
24  this time was distribution.  And

Page 395

1   our products are shipped under
2   UPS's license, and they are
3   considered the registrant in that
4   respect.  I can't speak to sales.
5   I can't speak to regulatory.  It's
6   not my area of responsibility.
7   BY MR. BUCHANAN:
8       Q.   Just tell me so we
9   understand how you processed this at the
10  time.
11          When you received this, did
12  you say, doesn't apply to us?
13          MR. LIMBACHER: Object to
14  form.  Foundation.  I think she
15  already testified she doesn't
16  recall receiving it.
17          THE WITNESS: Right.  This
18  is back in 2008.  I don't recall.
19  BY MR. BUCHANAN:
20      Q.   Okay.
21          MR. BUCHANAN:  That's a very
22  helpful cue, counsel.
23          MR. LIMBACHER:  With all due
24  respect, counsel, you either

Page 396

1   forgot or ignored her prior
2   testimony.
3   BY MR. BUCHANAN:
4       Q.   Ms. Connell was your boss in
5   January of 2008?
6       A.   She was, yes.
7       Q.   She sent you, the person she
8   was supervising, a letter and advisory
9   from the DEA, correct?
10      A.   That's what this e-mail is
11  stating.
12      Q.   It said that manufacturers
13  and distributors had an obligation to
14  maintain effective controls against
15  diversion, correct?
16      A.   That's what the letter is
17  stating.
18      Q.   Did you understand that
19  Endo, at that point in time, had an
20  obligation to maintain effective controls
21  against diversion; yes or no?
22          MR. LIMBACHER:  Object to
23  form, foundation.  Asked and
24  answered.

Page 397

1           THE WITNESS:  And within my
2   role of distribution, we had an
3   excessive program in place, and as
4   did UPS.  And UPS is the
5   registrant, because all our
6   products are shipped under UPS's
7   license.
8           MR. BUCHANAN:  Move to
9   strike, nonresponsive.
10          THE WITNESS:  I can't
11  speak --
12  BY MR. BUCHANAN:
13      Q.   My question is with regard
14  to Endo.
15          With regard to Endo, ma'am,
16  did you understand, as of 2008, that Endo
17  had a responsibility to maintain
18  effective controls against diversion; yes
19  or no?
20          MR. LIMBACHER:  Object to
21  form.  And foundation.  Asked and
22  answered.
23          THE WITNESS:  Yes.  But I
24  can't speak to what other parts of

100  (Pages 394 to 397)

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    the company did at Endo.  I can
2    only speak to my area, which I've
3    explained many times.
4    BY MR. BUCHANAN:
5        Q.    So your understanding, as of
6    early 2008, was that Endo did, in fact,
7    have an obligation to maintain effective
8    controls against diversion, correct?
9            MR. LIMBACHER:  Object to
10           form.  And foundation.  Asked and
11           answered.
12           THE WITNESS:  Yes.
13   BY MR. BUCHANAN:
14       Q.    You've told us what your
15   role in that process was, correct?
16       A.    Yes.
17       Q.    To the extent Endo had other
18   measures within its walls that were
19   designed to maintain effective controls
20   against diversion, if I understand your
21   testimony today, you're not aware of what
22   those were, correct?
23           MR. LIMBACHER:  Object to
24           form.  Foundation.

Page 399

1            THE WITNESS:  I know that
2            Endo had, within other areas of
3            responsibility, different programs
4            and such in place.  But I can't
5            speak to those.  I don't know the
6            details behind those.  That's not
7            my area.
8    BY MR. BUCHANAN:
9        Q.    I understood that.  And I
10   was just trying to understand what we
11   could learn from you today.
12           So what we can learn from
13   you today is you understood, as of 2008,
14   Endo, as an entity, had an obligation to
15   maintain effective controls against
16   diversion, agreed?
17           MR. LIMBACHER:  Object to
18           form.  Foundation.  Asked and
19           answered multiple times.
20           THE WITNESS:  Yes.
21   BY MR. BUCHANAN:
22       Q.    You understood, frankly,
23   that your role, in whatever Endo was
24   doing, related to suspicious order

Page 400

1    monitoring, fair?
2        A.    The SOM program was part of
3    my role, yes.
4        Q.    And you understood that to
5    be a component of an effective control
6    against diversion, fair?
7            MR. LIMBACHER:  Object to
8            form.
9            THE WITNESS:  Yes.  In
10           conjunction with our 3PL, UPS
11           Supply Chain Solutions.
12   BY MR. BUCHANAN:
13       Q.    And it would be fair, ma'am,
14   that over -- in the years prior to the
15   date of this letter and in the years
16   after the date of this letter, at no
17   point in time did the company ever report
18   a suspicious order to the DEA, true?
19           MR. LIMBACHER:  Object.
20           Form.  Foundation.  Asked and
21           answered.
22           THE WITNESS:  Not that I
23           recall.
24   BY MR. BUCHANAN:

Page 401

1        Q.    And at no point in time did
2    the third-party logistics person that you
3    identified, UPS Supply Chain Solutions,
4    or its predecessor, report an order of an
5    Endo customer to the DEA as a suspicious
6    order, correct?
7            MR. LIMBACHER:  Objection.
8            Form and foundation.  Asked and
9            answered multiple times.
10           THE WITNESS:  Our customer
11           being the wholesalers, that is
12           correct.
13   BY MR. BUCHANAN:
14       Q.    Or one of your customers'
15   customers?
16       A.    I can't speak to that.  I
17   can speak just about the shipments to the
18   wholesalers.
19       Q.    Okay.  Directing your
20   attention to the third paragraph, ma'am.
21           It says, The regulation also
22   requires that the registrant inform the
23   local DEA division office of suspicious
24   orders when discovered by the registrant.

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1    Do you see that?
2    A.   I do.
3    Q.   It continues in that
4  paragraph, Registrants must conduct an
5  independent analysis of suspicious orders
6  prior to completing a sale, to determine
7  whether the controlled substances are
8  likely to be diverted from legitimate
9  channels.
10    Did I read that correctly?
11    A.   Yes.
12    Q.   The next paragraph states
13  that, The regulations specifically states
14  suspicious orders include orders of an
15  unusual size, orders deviating
16  substantially from a normal pattern, and
17  orders of an unusual frequency.
18    Do you see that?
19    A.   Yes.
20    Q.   In fact, you had an
21  algorithm in place around the same time
22  frame that would monitor orders for
23  unusual size, correct?
24    A.   Size being one of them, yes.

Page 403

1    Q.   And quantity?
2    A.   Correct.
3    Q.   And frequency?
4    A.   Correct.
5    And class of trade.
6    Q.   And in many instances, and
7  we just looked at the orders that were
8  shipped into Missouri, I believe that's
9  Exhibit-1 -- do you recall looking at
10  that this morning with me?
11    A.   I do.
12    Q.   In fact, each of those
13  orders had been -- had tripped the wire
14  in the system for unusual quantity, size
15  or frequency, fair?
16    MR. LIMBACHER:  Object to
17    form.  Asked and answered multiple
18    times.
19    THE WITNESS:  The orders
20    were reviewed through our SOM
21    program and UPS's SOM program,
22    yes.
23  BY MR. BUCHANAN:
24    Q.   That's not my question.

Page 404

1    My question was, each of
2  those orders referenced in Exhibit-1 that
3  we combed this morning had tripped one of
4  these flags for unusual frequency, size
5  or quantity, correct?
6    MR. LIMBACHER:  Object to
7    form.  Asked and answered.
8    THE WITNESS:  What we looked
9    at this morning, yes, order, size
10    and frequency.  Plus there was
11    also class of trade at that time
12    for those orders.
13  BY MR. BUCHANAN:
14    Q.   And each of those orders
15  were cleared by a human being after they
16  were looked at, correct?
17    MR. LIMBACHER:  Object to
18    the form and foundation.  Asked
19    and answered multiple times.
20    THE WITNESS:  They were
21    reviewed and released and sent to
22    UPS for processing, under their
23    own SOM program.
24  BY MR. BUCHANAN:

Page 405

1    Q.   Is that a yes answer to my
2  question, ma'am?
3    MR. LIMBACHER:  Object to
4    form.  Argumentative.
5    THE WITNESS:  I believe I
6    answered your question.
7  BY MR. BUCHANAN:
8    Q.   I don't think you did.
9    Each of those -- each of
10  those orders that tripped the flag that
11  was referenced in Exhibit-1 that we went
12  through in detail this morning were
13  ultimately cleared, after a human review,
14  and shipped --
15    A.   After they were --
16    Q.   -- correct?
17    MR. LIMBACHER:  Object to
18    form.
19    THE WITNESS:  Yes.  After
20    they were reviewed.
21    MR. LIMBACHER:  And asked
22    and answered multiple times.
23  BY MR. BUCHANAN:
24    Q.   Thank you.

102  (Pages 402 to 405)

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1  Are you familiar with some
2  of the other DEA decisions and guidances
3  with regard to suspicious order
4  monitoring, ma'am?
5  MR. LIMBACHER: Object to
6  form.
7  THE WITNESS: Such as?
8  BY MR. BUCHANAN:
9  Q.  The Southwood
10  Pharmaceuticals?
11  A.  I'm sorry, who?
12  Q.  The Southwood
13  Pharmaceuticals decision?
14  A.  I don't know who -- what
15  that is, or who they are.
16  Q.  Did you keep abreast of the
17  various decisions and guidances of the
18  DEA as it related to suspicious order
19  monitoring?
20  A.  Me personally, no.
21  Q.  There were those in
22  compliance and regulatory that you
23  assumed were looking at that?
24  MR. LIMBACHER: Object to

Page 407

1  form.
2  THE WITNESS: I would
3  assume, yes.
4  BY MR. BUCHANAN:
5  Q.  Okay. In 2017, there were
6  some safety issues that arose with Opana,
7  right?
8  MR. LIMBACHER: Object to
9  form.
10  THE WITNESS: All opioids
11  have potential safety issues and
12  risks.
13  BY MR. BUCHANAN:
14  Q.  I mean, did you know that
15  Opana, in particular, had some safety
16  issues that arose with it?
17  A.  It's listed on our package
18  insert, yes, or PI.
19  Q.  Did you know your Opana was
20  being diverted?
21  MR. LIMBACHER: Object to
22  form. Foundation.
23  THE WITNESS: I don't recall
24  that.

Page 408

1  MR. BUCHANAN: Could I have
2  562?
3  MR. SIEGEL: 562 being
4  marked as Exhibit-20.
5  - - -
6  (Whereupon, EndoWalker
7  Exhibit-20, Clawed Back,
8  Endo_Opioid_MDL_01602884-890, was
9  marked for identification.)
10  - - -
11  BY MR. BUCHANAN:
12  Q.  By 2011, ma'am, there were
13  congressional hearings happening, right?
14  Actually, they were happening well before
15  that, true?
16  MR. LIMBACHER: Object to
17  form.
18  THE WITNESS: I can't
19  confirm or deny that. I don't
20  know.
21  BY MR. BUCHANAN:
22  Q.  Did you -- I mean, did you
23  follow the broader climate and context
24  for the products that you were selling?

Page 409

1  A.  I know that there was an
2  opioid crisis, yes. But I don't -- the
3  details, I don't know what you're
4  showing. I don't have a document.
5  MR. BUCHANAN: Can the
6  witness have a copy, please?
7  MR. LIMBACHER: One second.
8  MR. BUCHANAN: What's the
9  exhibit number?
10  MR. SIEGEL: 20.
11  BY MR. BUCHANAN:
12  Q.  Hopefully you're passed
13  Exhibit-20, ma'am.
14  It's an --
15  A.  I don't have --
16  Q.  -- April --
17  A.  I don't have the document.
18  Q.  Your counsel has both
19  copies.
20  MR. LIMBACHER: Can I just
21  have a minute to confer with my
22  client?
23  MR. BUCHANAN: Okay.
24  MR. LIMBACHER: Thank you.

103 (Pages 406 to 409)

Page 410

1    VIDEO TECHNICIAN:  We're
2  going off record.  The time is
3  3:33.
4         - - -
5    (Whereupon, a brief recess
6  was taken.)
7         - - -
8    VIDEO TECHNICIAN:  We're
9  back on the record.  Beginning of
10  Media File Number 7.  The time is
11  3:36.
12    MR. LIMBACHER:  Having had a
13  chance to review what's been
14  marked as Plaintiffs' Exhibit
15  Number 20, our position -- and
16  having had an opportunity to
17  confer with my client, our
18  position is that this is -- on its
19  face, appears to be a privileged
20  document, also potentially
21  containing work product of Endo
22  counsel.
23    And I would request that it
24  be clawed back, pursuant to the

Page 412

1    MR. BUCHANAN:  So I don't
2  believe I'm permitted to continue
3  to examine unless you permit me to
4  do so; is that right?
5    MR. LIMBACHER:  No, I don't
6  believe you are permitted to go
7  further on this.
8    And if this is something we
9  need to confer on after the fact
10  and see if there's something we
11  can do about it.  But, again, my
12  position is, on its face, it
13  pretty clearly would appear to be
14  a privileged communication and it
15  would contain views and advice of
16  counsel to Endo.
17    MR. BUCHANAN:  In that
18  regard, we disagree.  I understand
19  I'm foreclosed from examining this
20  witness on it.
21    To the extent everyone is
22  inconvenienced with resuming this
23  witness, I assume we've all
24  considered that before you

Page 411

1  procedures that are set forth
2  under the orders in this
3  litigation.
4    MR. BUCHANAN:  I've reviewed
5  the memo.  It's a memo from Alston
6  and Bird to Endo Pharmaceuticals.
7  It does not appear to be either
8  communicating legal advice or
9  seeking information from which to
10  render legal advice.
11    It's a report of a public
12  hearing that was conducted before
13  Congress.
14    I don't understand what the
15  basis for a work product would be
16  claimed.  It's a -- essentially an
17  account of a public hearing.  But
18  if you're -- you are entitled to
19  assert what you're entitled to
20  assert.  I believe it's without
21  basis or foundation.  And we'll
22  sort it out on the back end.
23    MR. LIMBACHER:  Okay.  I
24  appreciate that.

Page 413

1  articulated that.
2    I will press on.
3    Could I have, please,
4  Exhibit-563?
5    MR. LIMBACHER:  Dave, if you
6  don't mind, just for the record,
7  I'm going to read the MDL Bates
8  numbers of Exhibit-20.
9    MR. BUCHANAN:  That's fine.
10    MR. LIMBACHER:  So we're all
11  clear on that.
12    MR. BUCHANAN:  Do you want
13  to -- I guess we can't really
14  attach it.
15    MR. LIMBACHER:  But just so
16  people know what we're talking
17  about, it's
18  Endo_Opioid_MDL_01602884 to
19  01602890.
20    MR. BUCHANAN:  Okay.
21  BY MR. BUCHANAN:
22    Q.  I'm passing you over what
23  we're marking next in order for your
24  deposition, ma'am.  It's a DEA drug

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1 intelligence brief.
2       - - -
3           (Whereupon, EndoWalker
4       Exhibit-21,
5       ENDO_OR-CID-00694084-087, was
6       marked for identification.)
7       - - -
8           MR. BUCHANAN:  What's next
9       in order, Scott?
10          MR. SIEGEL:  Being marked as
11      Exhibit-21.
12 BY MR. BUCHANAN:
13      Q.  Exhibit-21 to your
14 deposition, ma'am.
15          MR. BUCHANAN:  And I assume
16      we'll keep the Exhibit-20 for the
17      prior one that was identified and
18      clawed back, or at least the claw
19      assertion was made on the record.
20 BY MR. BUCHANAN:
21      Q.  Before you, ma'am, should
22 be, if it's making its way down the
23 table, a drug intelligence brief of the
24 DEA.

Page 415

1           Do you see that?
2       A.  I don't have it.
3       Q.  Hopefully you have it on
4  your screen.  From the Philadelphia
5  Division Intelligence Program.
6           Do you recall learning,
7  ma'am, of Opana or oxymorphone abuse?
8           MR. LIMBACHER:  Take your
9       time and review the document.
10      Object to form.
11          THE WITNESS:  I don't know
12      what this document is.  But I know
13      of the opioid abuse, yes.
14 BY MR. BUCHANAN:
15      Q.  As the person, ma'am, in
16 charge of suspicious order monitoring for
17 Endo branded -- would Opana be a branded
18 Endo product?
19      A.  It is.
20          MR. LIMBACHER: Object to
21      form.
22 BY MR. BUCHANAN:
23      Q.  This is one of those
24 products that would have been -- you

Page 416

1  would have received orders for within
2  Endo, would have been put into the SAP
3  system and processed by your group, and
4  then later on by UPS, correct?
5           MR. LIMBACHER:  Object to
6       form.
7           THE WITNESS:  Orders to
8       wholesalers, yes.
9  BY MR. BUCHANAN:
10      Q.  Okay.  We see here that
11 oxymorphone, brand name Opana, has been
12 reported by several sources of
13 information as the big thing right now in
14 pharmaceutical drug abuse in the region.
15          Do you see that, ma'am?
16      A.  Yes.
17      Q.  Is that news to you, that
18 Opana was being abused and was the big
19 thing right now, certainly in this region
20 not too far from Endo's headquarters?
21          MR. LIMBACHER:  Object to
22      form.
23          THE WITNESS:  I know that
24      there was an opioid epidemic, yes.

Page 417

1  BY MR. BUCHANAN:
2       Q.  And, in fact, oxymorphone,
3  that's the active ingredient in Opana?
4       A.  I believe so, yes.
5       Q.  That was the active
6  ingredient in Numorphan, the drug that
7  was withdrawn by Endo back in the '70s,
8  right?
9           MR. LIMBACHER:  Object to
10      form.  Foundation.
11          THE WITNESS:  I can't
12      confirm that.  I don't know.
13 BY MR. BUCHANAN:
14      Q.  Did you have that knowledge,
15 ma'am, that, in fact, Numorphan was
16 withdrawn from the market back in the
17 '70s, with the same active ingredient,
18 due to abuse?
19          MR. LIMBACHER:  Object to
20      form.  Asked and answered.
21          THE WITNESS:  No, I had no
22      knowledge of Numorphan being
23      withdrawn back in the 1970s.
24 BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1        Q.   Did you know that your
2   product, on the street, had a number of
3   slang terms and popular names for it,
4   because it was being traded in that
5   diverted market?
6            MR. LIMBACHER:  Object to
7   form.
8            THE WITNESS:  I know that
9   there was an opioid epidemic, yes.
10  BY MR. BUCHANAN:
11       Q.   Did you know that your
12  drugs, "your" being Endo's branded
13  opioids, were being sold in that market?
14           MR. LIMBACHER:  Object to
15  form.
16           THE WITNESS:  Me personally,
17  no.  I know that there was an
18  opioid epidemic.
19  BY MR. BUCHANAN:
20       Q.   Diverted from legitimate use
21  and used illicitly?
22           MR. LIMBACHER:  Object to
23  form.
24           THE WITNESS:  I don't know

Page 419

1        that.
2   BY MR. BUCHANAN:
3        Q.   Let's look at what it was
4   being called on the street.  Slang terms
5   for oxymorphone include Blues.
6            Did you know that?
7        A.   No, I did not.
8        Q.   How about Biscuits?
9        A.   No, I did not.
10       Q.   Blue Heaven?
11       A.   No.
12       Q.   New Blues?
13       A.   No.
14       Q.   Octagons?  Stop Signs?  Have
15  you heard of those?
16       A.   No -- well, I've heard of a
17  stop sign, but --
18       Q.   Not with regard to your
19  company's product?
20       A.   No.
21       Q.   Pink Heaven, did you know it
22  was referred to as that?
23       A.   No, I did not.
24       Q.   Pink Lady?  Mrs. O?  The

Page 420

1   Pink O?  OM?  The O Bomb?
2        A.   No, none of these.  I didn't
3   know Opana or oxymorphone was called any
4   of this.
5        Q.   At the point in time, ma'am,
6   that wholesalers were placing orders from
7   you, they were getting put into SAP, they
8   were tripping the wire on excessive size
9   or quantity or frequency, and you were
10  clearing those orders, time after time
11  after time after time, did you know that
12  your company's product had a dozen or 15
13  different street names for its illicit
14  use?
15           MR. LIMBACHER:  Object to
16  form and foundation.  Asked and
17  answered.
18           THE WITNESS:  No, I did not
19  know -- yes, I knew there was an
20  opioid epidemic.  No, I had no
21  idea Opana was named any of these
22  products.
23  BY MR. BUCHANAN:
24       Q.   Not one order, not one order

Page 421

1   for Opana was ever reported to the DEA as
2   suspicious, true, ma'am?
3            MR. LIMBACHER:  Object to
4   form.  Foundation.
5            THE WITNESS:  Our orders, as
6   I've explained, went through our
7   SOM program and UPS's SOM program.
8   They were reviewed and they were
9   released.
10           And no -- it depends on what
11  your definition of suspicious is.
12  We never stopped an order, because
13  they cleared our system, both
14  systems.
15  BY MR. BUCHANAN:
16       Q.   Every order that tripped the
17  wire on quantity, size and frequency was
18  cleared by a human being within Endo and
19  shipped?
20       A.   It was --
21           MR. LIMBACHER:  Object to
22  form.  Foundation.
23  BY MR. BUCHANAN:
24       Q.   Right?

Page 422

1     MR. LIMBACHER: Asked and
2 answered multiple times, counsel.
3     THE WITNESS: You keep
4 talking about order size and
5 frequency. You're also forgetting
6 about class of trade, which is
7 another element.
8 BY MR. BUCHANAN:
9     Q.   That, too?
10    A.   And the orders were
11 reviewed, they were released and they
12 were also sent to UPS for review and for
13 release as well.
14    Q.   And somehow, ma'am, your
15 drugs were the big thing right now, the
16 big thing right now on the streets, what,
17 ten miles from Malvern, Pennsylvania?
18    A.   I have --
19    MR. LIMBACHER: Object to
20 form. Foundation. Counsel --
21 BY MR. BUCHANAN:
22    Q.   Right?
23    MR. LIMBACHER: -- save the
24 speeching, the speechifying for

Page 423

1 the closing argument to the jury.
2     You're here to ask questions
3 about the facts and her personal
4 knowledge and experience. She's
5 told you she's not familiar with
6 these terms. She's given you what
7 information --
8     MR. BUCHANAN: Now you're
9 just -- now you're just breaking
10 every rule.
11 BY MR. BUCHANAN:
12    Q.   All right.
13    MR. LIMBACHER: You're
14 breaking every rule.
15    MR. BUCHANAN: Can I reread
16 the question?
17    Not at all. Are you going
18 to bring her to trial? If you're
19 going to bring her to trial, I'll
20 just stop.
21    MR. LIMBACHER: You're
22 breaking every rule.
23    MR. BUCHANAN: Are you
24 bringing her to trial? Because

Page 424

1 this is my one chance to ask this
2 witness questions --
3     MR. LIMBACHER: I am under
4 no obligation to respond to that
5 question.
6     MR. BUCHANAN: Then I'm
7 going to ask my questions as I see
8 fit.
9     MR. LIMBACHER: And I'm
10 going to object as I see fit, too.
11    MR. BUCHANAN: Well, then,
12 just object to form, as you're
13 required and permitted to do.
14    MR. LIMBACHER: I'm not
15 required to simply say object to
16 form.
17    MR. BUCHANAN: Yes, you are.
18    MR. LIMBACHER: Not under
19 these circumstances.
20    MR. BUCHANAN: Okay.
21    Can I have a reread of the
22 question before the speech?
23         - - -
24    (Whereupon, the court

Page 425

1 reporter read the following part
2 of the record:
3     "Question: And somehow,
4 ma'am, your drugs were the big
5 thing right now, the big thing
6 right now on the streets, what,
7 ten miles from Malvern,
8 Pennsylvania?")
9         - - -
10 BY MR. BUCHANAN:
11    Q.   Do you see that referenced
12 in the article, ma'am?
13    MR. LIMBACHER: Object to
14 form and foundation.
15    THE WITNESS: What am I
16 looking at again in the article?
17 BY MR. BUCHANAN:
18    Q.   The paragraph we looked at
19 under summary, May 2011, drug
20 intelligence brief, Philadelphia Division
21 Intelligence Program of the DEA, Opana,
22 oxymorphone abuse.
23    Do you see that, ma'am?
24    A.   It's written right here.

107 (Pages 422 to 425)

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1     Yes, I see it.
2         Q.   Oxymorphone, brand name
3     Opana, has been reported by several
4     sources of information as the big thing
5     right now in pharmaceutical drug abuse in
6     the region.
7             Did I read that correctly?
8             MR. LIMBACHER:  You read it
9     correctly this time.  And you read
10    it correctly the last time you
11    read it, too.
12    BY MR. BUCHANAN:
13        Q.   You can answer.
14        A.   I see it, yes.  That's the
15    way you read it.
16        Q.   Are you aware that those in
17    the DEA were saying that Opana misuse and
18    diversion was going to be the next
19    OxyContin epidemic?
20        A.   No, I didn't hear that from
21    the DEA.
22        Q.   Did anyone within Endo share
23    that with you?
24        A.   I cannot speak for other

Page 427

1     departments within Endo.
2         Q.   Did anyone within Endo share
3     that with you?
4         A.   No.
5             MR. LIMBACHER:  Object to
6     form.
7             MR. BUCHANAN:  564, please.
8             MR. SIEGEL:  564 is being
9     marked as Exhibit-22.
10            - - -
11            (Whereupon, EndoWalker
12        Exhibit-22, ENDO00259233-235, was
13        marked for identification.)
14            - - -
15            MR. BUCHANAN:  Pass it over,
16        please, Scott.
17    BY MR. BUCHANAN:
18        Q.   Ma'am, I'm passing you what
19    is an e-mail sent -- or a series of
20    e-mails sent in 2011 concerning DEA
21    representative comments.
22            I guess if we go to the
23    earliest-in-time e-mail, it's from June
24    25, 2011 from a few speakers.  Then

Page 428

1     there's a Vin Tormo forwarding this
2     e-mail along on June 27, 2011 to a series
3     of other employees of Endo.
4             Do you see that?
5         A.   June 27th?
6         Q.   In the middle of the second
7     page.
8         A.   I see it.
9         Q.   It says, FYI.
10            Do you see that paragraph?
11        A.   I do.
12        Q.   It's highlighted on the
13    screen, too, for your convenience.
14        A.   I got it.
15        Q.   One of our therapeutic
16    experts attending the ASIPP, American
17    Society of Interventional Pain
18    Physicians, meeting this past weekend and
19    informed Katherine Jackson, clinical
20    affairs manager/pain, Southeast, that a
21    speaker from the DEA made some comments
22    relating to Opana misuse and diversion.
23            Do you see that?
24        A.   I see it.

Page 429

1         Q.   We talked about that letter
2     from 2010 that you received in 2008 from
3     a Mr. Rannazzisi, do you recall that,
4     from the DEA?
5         A.   I didn't receive that.
6         Q.   Remember, Jill Connell sent
7     you a letter?
8         A.   She forwarded it to me, but
9     I didn't physically receive it from the
10    DEA.
11        Q.   Oh, I'm sorry.
12            You received that letter,
13    ma'am, as an attachment from your boss in
14    2008, correct?
15        A.   I don't -- according to the
16    e-mail, yes.  But I don't recall seeing
17    it.
18        Q.   Let's stay with the e-mail.
19            The e-mail reflects that
20    your boss forwarded to you a 2007 letter
21    from Mr. Rannazzisi of the DEA to
22    registrants, correct?
23        A.   Yes.
24        Q.   And we discussed a little

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1  bit the obligation, under the Controlled
2  Substances Act, to maintain effective
3  controls against diversion.
4          Do you recall our discussion
5  on that?
6          MR. LIMBACHER:  Object to
7  form.
8          THE WITNESS:  Yes.
9  BY MR. BUCHANAN:
10      Q.   Do you recall your
11  acknowledgment that that was your
12  understanding, that if somebody is
13  selling controlled substances, you, in
14  fact, had that obligation?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  Right.  And I
18      think I explained what my
19      obligation was.  And there was
20      other parts of the company and
21      their obligations that I can't
22      speak to.
23  BY MR. BUCHANAN:
24      Q.   So here we are in 2011.

Page 431

1  And, again, a statement about your
2  product, Opana, and misuse and diversion,
3  saying it was the next OxyContin
4  epidemic.
5          Do you see that?
6      A.   I see it in the e-mail,
7  sure.
8      Q.   Was that brought to your
9  attention by anybody within Endo?
10      A.   No.  This e-mail was not
11  brought to my attention.
12      Q.   So those within Endo,
13  whoever was told that, didn't share that
14  with you?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  Not that I
18      recall, no.
19  BY MR. BUCHANAN:
20      Q.   And we can see this
21  reference further below from a Mr. --
22  excuse me, Dr. Silverman, MD, that, I am
23  at the ASIFF national meeting in DC,
24  lecture on prescription drug abuse by

Page 432

1  director of abuse section, DEA.  He says
2  Opana is the next OxyContin epidemic.  He
3  says watch out for this drug.
4          Did I read that correctly?
5      A.   That's what it says in the
6  e-mail.
7      Q.   And that drug would have
8  been one of those drugs that you were
9  clearing orders for year after year after
10  year, at least in the Exhibit-1 that we
11  looked at, correct?
12          MR. LIMBACHER:  Object to
13  form.
14          THE WITNESS:  So if I can
15      remind you, I'm shipping to
16      wholesalers.  I'm not shipping to
17      retail pharmacies.  I'm shipping
18      to wholesalers.  And these orders
19      have gone through multiple SOM
20      programs at Endo and at UPS.
21  BY MR. BUCHANAN:
22      Q.   Okay.  In terms of the Know
23  Your Customer's Customer program, ma'am,
24  can you please describe the Know Your

Page 433

1  Customer's Customer program that Endo had
2  in 2011?
3          MR. LIMBACHER:  Object to
4      form and foundation.
5          THE WITNESS:  I can't recall
6      what we did back in 2011.
7  BY MR. BUCHANAN:
8      Q.   Didn't have a Know Your
9  Customer's Customer program in 2011, did
10  you, ma'am?
11          MR. LIMBACHER:  Object to
12      form and foundation.
13          THE WITNESS:  I can't recall
14      that.
15  BY MR. BUCHANAN:
16      Q.   And your customer's
17  customer, in the case of wholesale
18  customers, would be the very pharmacies
19  that you were just referring to, correct?
20          MR. LIMBACHER:  Object to
21      form and foundation.
22          THE WITNESS:  If that's who
23      the customers are.  I can't -- I
24      can't -- I don't know who their

109  (Pages 430 to 433)

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1    customers are.
2  BY MR. BUCHANAN:
3      Q.   Let's talk about Opana ER.
4         Opana ER is reformulated and
5  comes to market in 2011, right?  That was
6  your recollection at least earlier today.
7  Good enough for our conversation?
8      A.   Sure.  Some time in 2012.
9      Q.   It's on the market for
10 several years.
11        And you know there's some
12 safety issues that arise with that drug,
13 right?
14        MR. LIMBACHER:  Object to
15    form.
16        THE WITNESS:  There's
17    benefits to Opana.  And there are
18    safety issues with any opioid
19    medication.
20 BY MR. BUCHANAN:
21     Q.   Okay.  And doctors are still
22 prescribing the reformulated Opana ER
23 today?
24        MR. LIMBACHER:  Object to

Page 435

1    form and foundation.
2        THE WITNESS:  I can't speak
3    to what doctors are doing.
4  BY MR. BUCHANAN:
5      Q.   Well, we know you withdrew
6  it from the market, right?
7        MR. LIMBACHER:  Object to
8    form.  Misstates the evidence.
9        THE WITNESS:  I can't --
10    that's not part of my
11    responsibility.  That's somebody
12    else at Endo that worked with the
13    FDA on it.
14 BY MR. BUCHANAN:
15     Q.   Do you have that -- it's not
16 a matter of whose responsibility it is,
17 for the moment.
18        Do you have an awareness,
19 ma'am, that in 2017, the FDA said the
20 risks outweigh the benefits and asked you
21 to withdraw the drug?
22        MR. LIMBACHER:  Object to
23    form.
24        THE WITNESS:  I know that

Page 436

1    Endo withdrew the product from the
2    market, yes.
3  BY MR. BUCHANAN:
4      Q.   So Endo was told by the FDA
5  that the risks outweighed the benefit for
6  the product, right?
7        MR. LIMBACHER:  Object to
8    form and foundation.
9        THE WITNESS:  I don't know
10    that.  I don't know what decisions
11    were made at Endo and who they
12    talked to, as to why it was
13    withdrew from the market.
14        I just know that it was
15    withdrawn from the market.
16        MR. BUCHANAN:  Can I have
17    734, please?
18 BY MR. BUCHANAN:
19     Q.   Did you keep abreast of
20 these kind of reports on the street about
21 Opana being prone to abuse and misuse and
22 diversion?  Were you following news
23 reports, I mean, from the Philadelphia
24 office of the DEA?

Page 437

1        MR. LIMBACHER:  Object to
2    form.
3        THE WITNESS:  I knew that
4    there was an opioid epidemic.  But
5    there's other people within Endo
6    that would -- I would assume that
7    would follow that.  It's not my
8    area of responsibility.
9  BY MR. BUCHANAN:
10     Q.   Your area of responsibility
11 included suspicious order monitoring,
12 fair?
13     A.   For shipments to our
14 wholesalers.
15     Q.   Right.  And it's fair, if
16 you didn't clear those orders, they
17 wouldn't leave, right?
18     A.   Yes.
19     Q.   Okay.  So in order for those
20 drugs to get to the street, they had to
21 leave the manufacturers, right?
22        MR. LIMBACHER:  Object to
23    form.
24        THE WITNESS:  I had

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1    shipments to the wholesalers.
2        After that is not my
3    responsibility.
4    BY MR. BUCHANAN:
5        Q.   So your position, ma'am, is
6    Endo had no responsibility to the
7    customers -- to evaluate the customers of
8    Endo's customers?
9        A.   Endo had other --
10           MR. LIMBACHER:  Object to
11       form.  Misstates her testimony.
12       Nice try, counsel.
13   BY MR. BUCHANAN:
14       Q.   Please answer the question.
15       A.   There's other departments
16   within Endo that reviewed or potentially
17   had, you know, reviewed suspicious order
18   monitoring or the abuse out there.  That
19   was not me.
20       Q.   What other department within
21   Endo was clearing suspicious orders,
22   ma'am?
23           MR. LIMBACHER:  Object to
24       form.  Misstates her testimony.

Page 439

1            THE WITNESS:  Do I answer
2        that?
3            I do.
4    BY MR. BUCHANAN:
5        Q.   You do.
6        A.   But there's other areas
7    within Endo --
8        Q.   Okay.  And in terms of
9    clearing -- identifying suspicious orders
10   and releasing held orders, that was the
11   responsibility within your group,
12   correct?
13       A.   To shipments to wholesalers.
14   How can --
15       Q.   Do you have my question?
16       A.   Pardon?
17       Q.   Do you have my question,
18   ma'am?
19       A.   Yes, I have your question.
20   And I answered your question.
21       Q.   Let's stay with it, then.
22           In terms of identifying,
23   clearing, releasing suspicious orders,
24   that was a responsibility of your group,

Page 440

1    correct?
2            MR. LIMBACHER:  Object to
3        form.
4            THE WITNESS:  As I explained
5        throughout the entire day today --
6    BY MR. BUCHANAN:
7        Q.   Is that a yes?
8        A.   As I have explained --
9            MR. LIMBACHER:  Let her
10       finish her answer.
11           THE WITNESS:  -- throughout
12       the entire day --
13           MR. LIMBACHER:  She hasn't
14       interrupted you.
15           THE WITNESS:  -- throughout
16       the entire day today, Endo had
17       their own SOM program.  UPS Supply
18       Chain Solutions, our 3PL partner,
19       had their own SOM program.
20       Both -- orders were -- flow
21       through both programs before they
22       were shipped.
23   BY MR. BUCHANAN:
24       Q.   Okay.

Page 441

1        A.   I'm not quite sure how many
2    times I need to explain that.
3        Q.   You don't need to.  You
4    don't need to.
5            You just need to answer my
6    question, ma'am.
7        A.   I did answer your question.
8        Q.   Okay.  Then let's do it,
9    okay?
10           You talked about other
11   groups within Endo.
12       A.   I can't speak about other
13   groups within Endo.
14       Q.   Exactly.  So stay, please,
15   with your group.
16       A.   I am staying within my
17   group.
18       Q.   And please let me finish my
19   question.
20           Your group had the
21   responsibility for identifying a
22   suspicious order within Endo, correct?
23       A.   With shipment to
24   wholesalers, period.  Period.  Shipments

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    to wholesalers.
2         Q.   Orders from Endo's
3    customers, that was your job to identify
4    and report suspicious orders, right?
5         A.   Depends on what your --
6              MR. LIMBACHER:  Object to
7    form.  Foundation.  You've asked
8    this question --
9              THE WITNESS:  I don't know
10   how many times I have to do this.
11             MR. LIMBACHER:  -- multiple,
12   multiple times.
13   BY MR. BUCHANAN:
14        Q.   You can answer.
15        A.   How many times do I have to
16   answer the question?
17        Q.   You can just stay with my
18   question, and we'll be done.
19             MR. LIMBACHER:  Well, you've
20   asked it multiple times.  I think
21   you've got an answer on the record
22   many times.
23   BY MR. BUCHANAN:
24        Q.   Orders from Endo's

Page 443

1    customers --
2         A.   To wholesalers.
3         Q.   Whoever Endo's customers
4    are.
5         A.   Wholesalers, period.
6         Q.   Orders from Endo's
7    customers, it was your job to evaluate
8    those to identify if they were of unusual
9    size, quantity or frequency; yes or no?
10        A.   And class of trade.
11        Q.   And, later, class of trade?
12        A.   Yes.
13        Q.   Correct?
14             MR. LIMBACHER:  Object to
15   form.  Asked and answered.
16   BY MR. BUCHANAN:
17        Q.   No other group within Endo
18   was doing that, correct?
19             MR. LIMBACHER:  Object to
20   form.  Asked and answered.
21   BY MR. BUCHANAN:
22        Q.   No other group --
23        A.   Other groups within Endo may
24   have been monitoring different things,

Page 444

1    not shipments to wholesalers.
2         Q.   Okay.  And if you didn't
3    release those held orders, they didn't go
4    to the wholesalers, right?
5              MR. LIMBACHER:  Object to
6    form.  Argumentative.
7              THE WITNESS:  No, they
8    wouldn't have gone to the
9    wholesalers.
10   BY MR. BUCHANAN:
11        Q.   And you released every one
12   you got?
13        A.   Because they went through
14   our program and UPS's program.
15        Q.   Okay.  Let's talk about 734,
16   please.
17             MR. SIEGEL:  Exhibit-23.
18             - - -
19             (Whereupon, EndoWalker
20   Exhibit-23, No Bates, 6/8/17 FDA
21   News Release, was marked for
22   identification.)
23             - - -
24             MR. LIMBACHER:  We've been

Page 445

1    going about an hour, counsel.
2              THE WITNESS:  No, I want to
3    keep going and get this done.
4              MR. LIMBACHER:  We've been
5    going about an hour, so I would
6    like to --
7              MR. BUCHANAN:  The witness
8    wants to keep going.
9              MR. LIMBACHER:  With all due
10   respect, I'd like to take a break,
11   if now is an appropriate time.
12             MR. BUCHANAN:  That's fine.
13             MR. LIMBACHER:  Thank you.
14   Appreciate it.
15             VIDEO TECHNICIAN:  Off the
16   record.  The time is 3:57.
17             - - -
18             (Whereupon, a brief recess
19   was taken.)
20             - - -
21             MR. SIEGEL:  Exhibit-24.
22             - - -
23             (Whereupon, EndoWalker
24   Exhibit-24,

112  (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1    ENDO_DATA-OPIOID_MDL-00000022,
2    With Attachment, was marked for
3    identification.)
4              - - -
5         VIDEO TECHNICIAN: Going
6    back on the record. The beginning
7    of Media File Number 8. The time
8    is 4:11.
9         MR. SIEGEL: 652 is going
10   back on the record as Exhibit-24.
11        MR. LIMBACHER: I don't have
12   a 23.
13        MR. BUCHANAN: I think I
14   identified it, and we're getting
15   ready to pass it. It was a notice
16   from the FDA. I'm going to take
17   that out of order, so we'll get
18   back to 23 in a moment.
19   BY MR. BUCHANAN:
20        Q. I'm passing you what we're
21   marking as Exhibit-24.
22        MR. BUCHANAN: Counsel, to
23   save trees, I've only printed one
24   full copy of the exhibit. The --

Page 447

1    if you can read the full Bates
2    numbers on the record, I would be
3    grateful for the trees.
4         MR. LIMBACHER: Okay.
5    Exhibit-24 Bates numbers appear to
6    be Endo Opioid MDL22 through --
7         MR. SIEGEL: It's an Excel
8    file.
9         MR. TOLIN: It's Endo Data.
10        MR. LIMBACHER: Sorry, Endo
11   Data Opioid MDL22 -- I don't see
12   any Bates numbers after that.
13        MR. SIEGEL: It's a native
14   file.
15        MR. BUCHANAN: Thank you.
16   So it's a native file. The file
17   was produced at that particular
18   Bates reference, and it's an Excel
19   printout.
20        Can you please pass counsel,
21   Scott, for his convenience, the
22   first 25 pages or so. We are not
23   going to get beyond that. But the
24   witness should have the full

Page 448

1    version so the record has the full
2    version.
3    BY MR. BUCHANAN:
4         Q. Ma'am, I'm passing you what
5    we just marked as --
6         MR. BUCHANAN: Was that 24,
7    Scott?
8         MR. SIEGEL: Yes.
9    BY MR. BUCHANAN:
10        Q. -- Exhibit-24 to your
11   deposition.
12        It's a printout of an Excel
13   spreadsheet. I see you nodding.
14        Does it look familiar to
15   you, or at least a format you're familiar
16   with?
17        A. Yes.
18        Q. What is Exhibit-24?
19        A. It's a list of excessive
20   orders that were released -- reviewed and
21   released.
22        Q. This is a report that can be
23   generated from the company's SAP system?
24        A. Yes, it can.

Page 449

1         Q. And there are various fields
2    that are captured in this particular
3    report, fair?
4         A. Yes.
5         Q. And you can go in and you
6    can request a date window for the report;
7    is that fair?
8         A. The SAP team may be able to,
9    yes.
10        Q. Well, I mean, do you, as an
11   end user, have the ability to request an
12   SOM audit trail report?
13        A. No. The report that I
14   generate is just orders currently on
15   hold.
16        Q. That would be the current
17   pended or held orders?
18        A. Right.
19        Q. Okay. You do recognize the
20   format of this report as one that can be
21   generated from the company's data systems
22   with regard to orders in SAP?
23        MR. LIMBACHER: Object to
24   form and foundation.

113 (Pages 446 to 449)

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1     THE WITNESS:  If you got
2  this from our SAP team, then, yes,
3  this is how they generated the
4  data.
5  BY MR. BUCHANAN:
6     Q.   This was produced to me in
7  litigation, ma'am.  So --
8     A.   It looks like it was
9  generated from our SAP database.
10    Q.   Got you.  Okay.
11       You recognize a column where
12 the codes for why an order was held to be
13 flagged?
14    MR. LIMBACHER:  Object to
15 form.
16    THE WITNESS:  Yes.
17 BY MR. BUCHANAN:
18    Q.   What column would that be,
19 ma'am?
20    A.   I don't think there's any
21 column headers on here.
22    Q.   They are on the first page.
23 And if it's easier, we can have the
24 screen blow it up and --

Page 451

1     A.   No, that's okay.  The
2  release code, I'm assuming that's what
3  you're referring to.
4     Q.   Yes.  So on the screen
5  before you, it may be easier on your
6  eyes, certainly easier on mine, sales
7  doc, that would be a sales order number,
8  ma'am?
9     A.   Within SAP, yes.
10    Q.   That's a unique identifying
11 record within SAP?
12    A.   Yes.
13    Q.   Item, would that be the
14 company's item code for its products?
15    A.   No.  Item is the line number
16 of the order.
17    Q.   Understood.
18       So an order could have one
19 item, an order could have 100 items, and
20 this is the relevant line item within the
21 order?
22    A.   Right.
23       Just for clarification, so
24 you all know, our SAP items don't start

Page 452

1  with 1, they start with 10; so when you
2  see 60, it's not 60 lines.  Just for
3  clarification so everybody understands.
4     Q.   Line 10 is Line 1, Line 30
5  is Line 3?
6     A.   Yes, correct.
7     Q.   So let's scroll down to,
8  it's about five, that ends in 105.
9       Do you see that?
10    A.   I'm sorry, which number?
11    Q.   It's highlighted on your
12 screen for your convenience.
13       Do you see order sales doc
14 105?
15    A.   Yes.
16    Q.   Would that indicate, then,
17 we have a particular order within SAP,
18 the order code within SAP is 105, and
19 there are two line items that were held
20 in that particular order; is that the way
21 we should read this?
22    A.   Yes, Line 30 and Line 60.
23    Q.   And that would be Line --
24 Item 3 or Item 6?

Page 453

1     A.   Right.
2     Q.   What is SATY stand for,
3  ma'am?
4     A.   That's the order type.
5     Q.   Okay.  And what does that
6  mean?
7     A.   It's how the order was
8  generated to us.
9       So a ZCII order type is a
10 manual CT order.
11    Q.   And the one with the E on
12 the end is electronic?
13    A.   Correct.
14    Q.   And one came on the old DEA
15 forms, and the other came electronically?
16    A.   Yes, that's correct.
17    Q.   What does SORG, period,
18 mean?
19    A.   Sales org.  It's the sales
20 org within the system.
21    Q.   Would you expect that to be
22 0010 for every --
23    A.   For all of our opioids, yes.
24    Q.   And what does that indicate?

Page 454

1   That that's attributable to your internal
2   sales staff, is that what it's tracking,
3   or do you have knowledge?
4        A.   It's a financial code.  We
5   have different products that fall in
6   different sales orgs.  It's a financial
7   thing.
8        Q.   What does 0010 stand for?
9        A.   It's Endo Pharmaceuticals.
10       Q.   So you would expect that
11  maybe a different division of Endo, Inc.
12  might have different sales organizations?
13       A.   Depending on the product,
14  yes.  But for purposes of opioids, they
15  are all 0010.
16       Q.   SOMS release code, what is
17  that?
18       A.   That's the number within the
19  order when you release it.
20       Q.   I'm sorry, could you explain
21  that further?
22       A.   Each of the release codes
23  have different numbers.  So the number is
24  assigned to the order.  The long text

Page 455

1   explains the correlation between the long
2   text and the release code.
3        Q.   So we can fairly understand
4   that SOMS Release Code 3 means change in
5   order schedule?
6        A.   Right.
7        Q.   SOMS Release Code 1 means
8   new business, right?
9        A.   Right.
10       Q.   Net value.
11           MR. BUCHANAN:  Can you
12       scroll to the right a little?
13       Not so far, I'm sorry.  Right
14       about there.
15  BY MR. BUCHANAN:
16       Q.   So net value, that would be
17  the value of that line item in that
18  particular order?
19       A.   I don't know -- I would have
20  to look at the order in the system.  I
21  don't know if that's the net value of the
22  entire order or the net value of the
23  line.  I don't know that without looking
24  at the actual order in the system.

Page 456

1        Q.   If we go back to --
2        A.   I'm assuming it's the line,
3   but I don't want to confirm that.
4        Q.   Let's scroll down to the one
5   that ended in 005 -- I'm sorry, 105.
6            Do you see that there are
7   two line items in that order?
8        A.   1005, you said?
9        Q.   Yes.  105.  Do you see it on
10  the screen highlighted?
11       A.   Right.  And it's the same
12  dollar value?
13       Q.   I guess we would have to
14  look further.
15       A.   No.  I'm sorry, I'm pointing
16  to the screen.  The 1005 and both of them
17  say 37905, so, to me, that tells me
18  that's the value of the total order, not
19  the line item.
20       Q.   Okay.  I guess one way to
21  figure this out for sure would be to find
22  some other sales document, order numbers
23  that are identical, and see whether it's
24  always the same net value?

Page 457

1        A.   Right.
2        Q.   If they were different,
3   would that tell you that, in fact, that
4   was the value of the line item?
5        A.   The line, right.
6            MR. BUCHANAN:  Let's scroll
7       to the right.
8   BY MR. BUCHANAN:
9        Q.   Currency for the
10  transaction, is that what CURR stands
11  for?
12       A.   Yes.
13       Q.   Sold to, is that the
14  customer code for the particular entity?
15       A.   It's the sold to number of
16  the wholesaler, or the sold to name, yes.
17       Q.   Is that a registration
18  number or is that the internal client
19  number for Endo?
20       A.   Internal SAP number.
21       Q.   Fine.
22           NDC, that's the product NDC
23  code for the drug at issue?
24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    But on the screen, you guys
2  have it cut off.  It's not the correct
3  NDC number the way it's in Excel.
4    Q.   Yeah, that's an Excel thing.
5  If we expanded the column out, we would
6  see whatever the real NDC number is?
7    A.   Yes.
8    Q.   And you would expect, if we
9  expanded it out, that would be the NDC
10  number that correlated with the drug
11  dosage, unit count, et cetera --
12    A.   Uh-huh.
13    Q.   -- correct?
14    A.   Yes.
15    Q.   Because each dosage size and
16  unit count has a separate NDC number,
17  correct?
18    A.   Each product has a separate
19  NDC number.
20    Q.   And a product is not just
21  Opana ER, it's Opana ER, 15-milligram, 60
22  counts?
23    A.   Yes, correct.
24    Q.   100 counts would be a

Page 459

1  different product -- or a different NDC
2  number, correct?
3    A.   Yes.
4    Q.   Scrolling to the right, what
5  does PLNT stand for?
6    A.   Plant.  That's the
7  distribution center, 0020 means Memphis.
8    Q.   And that would be the UPS
9  facility where all orders were shipped
10  from?
11    A.   For the opioids, yes.
12    Q.   We have a net value.
13    Would the financial kind of
14  values be something you dealt with in
15  your day-to-day business, ma'am, the net
16  value of a given order?  Is that just --
17  is that something that's coming out of
18  the accounting function?
19    MR. LIMBACHER:  Object to
20  form.
21    THE WITNESS:  That's coming
22  out of -- that's coming off the
23  order.
24  BY MR. BUCHANAN:

Page 460

1    Q.   Okay.  Do you have
2  visibility to that in your day-to-day
3  job?  You can see what the net value and
4  the gross value is of orders?
5    A.   It's listed --
6    MR. LIMBACHER:  Object to
7  form.
8    THE WITNESS:  It's listed on
9  the order, yes.
10  BY MR. BUCHANAN:
11    Q.   Order quantity, ma'am, is
12  that quantity of the 60 count, or is that
13  in dosage units?
14    A.   That's the selling unit.  So
15  it's a 60-count bottle.
16    Q.   And then we see confirmed
17  quantity on the right.
18    Do you see that?
19    A.   Uh-huh.
20    Q.   And that would be the
21  quantity you actually shipped, right?
22    A.   Yes.
23    Q.   What we have -- I'm sorry,
24  we see on the left, order quantity.

Page 461

1  Immediately to the right of that, we see
2  cumulative confirmed quantity.
3    Is that how you understand
4  that abbreviation?
5    A.   That's just an SAP term.
6  It's the confirmed quantity.  Order
7  quantity is what the customer ordered,
8  and the confirmed quantity is what was
9  committed on the order to ship.
10    Q.   Well, then we see to the
11  right, Ship to party.
12    Do you see that?
13    A.   Yes.
14    Q.   Is that a quantity or is
15  that an address of where the stuff is
16  going?
17    A.   It's the ship-to party for
18  the address of who is receiving the
19  product.  It's an internal SAP number.
20    MR. BUCHANAN:  So if we
21  scroll to the left, please.  I'm
22  sorry, can you go to the left?  A
23  little further.  I just want to
24  identify.

116 (Pages 458 to 461)

Page 462

1    BY MR. BUCHANAN:
2        Q.   So we see it's sold to Smith
3    Drug Company, and on the right would be
4    the actual shipping address of Smith Drug
5    Company?  I'm sorry, the top line.
6        A.   That's correct.  You have a
7    sold to for the sold to location of the
8    wholesaler.  And then the ship to is who
9    is supposed to be getting the product for
10   that customer, for that wholesaler.
11       Q.   Smith Drug Company is a
12   wholesaler?
13       A.   They are, yes.
14           MR. BUCHANAN:  Let's go to
15       the right.
16   BY MR. BUCHANAN:
17       Q.   And we have the address
18   where it was shipped.
19           MR. BUCHANAN:  Keep
20       scrolling.  And I think that
21       encompasses all of our fields.
22       Great.
23   BY MR. BUCHANAN:
24       Q.   Does this system, which I

Page 463

1    understand to be an SOM audit trail,
2    identify the reason the order was held or
3    appended?
4           MR. LIMBACHER:  Object to
5       form.
6           THE WITNESS:  There is
7       details behind this as to why it
8       was held by order size or
9       frequency, yes, or class of trade,
10      benchmark.
11   BY MR. BUCHANAN:
12       Q.   So you can see the
13   particular reason it tripped the wire?
14       A.   Yes.  It gives you the data
15   as to why it was flagged.
16       Q.   In your SAP system?
17       A.   Yes.
18       Q.   Okay.  All right.  Ma'am,
19   you can set that aside.
20           I guess, just so the record
21   is clear, you can identify the order from
22   or the ship to state using that same
23   chart, correct, of the customer?
24       A.   Yes.  It gives you who the

Page 464

1    customer is and which DC it's shipping
2    to.
3        Q.   Great.  Thank you.
4           MR. BUCHANAN:  Scott, what
5       was the exhibit number we marked
6       734 as before the break?
7           MR. SIEGEL:  23.
8           MR. BUCHANAN:  I'm passing
9       you Exhibit-23, ma'am.
10   BY MR. BUCHANAN:
11       Q.   Do you recall before the
12   break we were talking about Opana ER.
13           And in 2017, do you recall
14   the FDA requesting the company to remove
15   Opana ER from the market, correct?
16       A.   Yes.
17       Q.   First paragraph states,
18   Today the U.S. Food and Drug
19   Administration requested that Endo
20   Pharmaceuticals remove its opioid pain
21   medication, reformulated Opana ER, from
22   the market.  After careful consideration,
23   the agency is seeking removal based on
24   its concern that the benefits of the drug

Page 465

1    may no longer outweigh the risks.
2           Do you see that, ma'am?
3        A.   Yes.
4        Q.   Is that your recollection of
5    what happened in the summer of 2017?
6        A.   I know the FDA made a
7    request for us to remove Opana.
8        Q.   Okay.
9           MR. BUCHANAN:  Could we
10      have, please, 646?
11   BY MR. BUCHANAN:
12       Q.   So they request in June that
13   the company remove Opana ER reformulated
14   from the markets, correct?
15       A.   Uh-huh.
16       Q.   Did you continue selling it
17   after that?
18           MR. LIMBACHER:  Object to
19      form.  Foundation.
20           THE WITNESS:  The company
21      worked with the FDA and a decision
22      was made, we sold it through
23      August 31st of '17.
24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1          Q.   So you kept selling it after
2   the request from the FDA to withdraw it
3   from the market?
4          A.   I know that --
5              MR. LIMBACHER:  Object to
6   form and foundation.
7              THE WITNESS:  I know that
8   Endo worked with the FDA on a
9   cease distribution date, and it
10  was August 31st, 2017. I don't
11  know the decisions behind that
12  date, but I know that our ship
13  date was August 31st.
14  BY MR. BUCHANAN:
15         Q.   Do you remember trying to
16  blow it out?
17             MR. LIMBACHER:  Object to
18  form.
19  BY MR. BUCHANAN:
20         Q.   Going out of business
21  pricing?
22             MR. LIMBACHER:  Object to
23  form.
24             THE WITNESS:  No.

Page 467

1   BY MR. BUCHANAN:
2          Q.   So in June of 2017, the FDA
3   requests Endo to withdraw Opana ER from
4   the market, correct?
5          A.   Yes.
6          Q.   The company doesn't
7   immediately withdraw it from the market,
8   right?
9              MR. LIMBACHER:  Object to
10  form.
11             THE WITNESS:  I know that
12  the company worked with the FDA on
13  the -- an agreed-upon cease
14  shipping date was determined, and
15  that was August 31st.
16  BY MR. BUCHANAN:
17         Q.   Okay.
18         A.   There are benefits to Opana,
19  so we had to ensure that patients that
20  are using it correctly continue therapy
21  until they moved to a different therapy.
22         Q.   Do you recall the statements
23  of the FDA that the benefits no longer
24  outweighed the risks of Opana?

Page 468

1              MR. LIMBACHER:  Object to
2   form.
3              THE WITNESS:  All I can tell
4   you is that Endo worked with the
5   FDA, and the agreed-upon cease
6   shipping date was August 31st,
7   2017.
8   BY MR. BUCHANAN:
9          Q.   Do you recall when the
10  company went and talked to the FDA, I
11  guess it was a teleconference, in July of
12  2017, that the FDA once again said that
13  the benefits no longer outweighed the
14  risks of Opana ER?  Do you recall that,
15  ma'am?
16             MR. LIMBACHER:  Object to
17  form and foundation.
18             THE WITNESS:  I don't know
19  the outcome of that
20  teleconference.  I don't know
21  anything that went into that.
22  BY MR. BUCHANAN:
23         Q.   But as a factual matter, the
24  company continued to ship the product --

Page 469

1              MR. LIMBACHER:  Object to
2   form.
3   BY MR. BUCHANAN:
4          Q.   -- until the end of August;
5   is that correct?
6              MR. LIMBACHER:  Object to
7   form.  Asked and answered.
8              THE WITNESS:  All I can tell
9   you is I know that the -- Endo and
10  FDA agreed that August 31st, 2017
11  was going to be our last shipping
12  date.  I don't know the details
13  behind that date.  I don't know
14  what went into it.  I can just
15  tell you that was my last shipping
16  date.
17             MR. BUCHANAN:  Did we pass
18  it over, Scott?
19             MR. SIEGEL:  This is being
20  marked as Exhibit-25.
21                 - - -
22             (Whereupon, EndoWalker
23  Exhibit-25,
24  ENDO_OPIOID_MDL_02062332-333, was

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    marked for identification.)
2         - - -
3    BY MR. BUCHANAN:
4         Q.   So this is an interaction
5    you're having, ma'am, after, I guess,
6    being alerted -- well, this is later in
7    time, right?
8              This is June 12, 2017.  This
9    would be after you got word of the FDA
10   requesting the withdrawal of Opana ER
11   from the market.
12             Do you recall that?
13        A.   Uh-huh.
14        Q.   Do you recall that?
15        A.   I'm sorry, the question?  I
16   was reading the e-mail so I can get up to
17   speed.
18             Say that again, please.
19        Q.   Do you recall that after,
20   what was it, early June 2017, the FDA
21   requested the withdraw of Opana ER from
22   the market?
23        A.   Yes.
24        Q.   And you recall -- I guess

Page 471

1    you were dealing and interacting with
2    various wholesalers, right?
3              MR. LIMBACHER:  Object to
4    form.
5              THE WITNESS:  Yes.
6    BY MR. BUCHANAN:
7         Q.   We're looking here at --
8              MR. BUCHANAN:  What did we
9    say this was, 26?
10             MR. SIEGEL:  25.
11   BY MR. BUCHANAN:
12        Q.   25, you're having some
13   interaction with Cardinal and McKesson
14   and with ABC, right?
15        A.   Yes.
16        Q.   Cardinal was looking into
17   what they were going to do, whether they
18   were going to continue to purchase this
19   drug that had been requested to be
20   withdrawn from the market, right?
21             MR. LIMBACHER:  Object to
22   form.
23             THE WITNESS:  Our
24   wholesalers were waiting for

Page 472

1    direction from Endo as to what we
2    were going to do after the FDA
3    made that announcement.
4    BY MR. BUCHANAN:
5         Q.   And on June 12, I guess, you
6    talked to ABC.  Is that
7    AmerisourceBergen, ma'am?
8         A.   Yes, it is.
9         Q.   And you write, We talked to
10   ABC and it's business as usual until they
11   hear direction from Endo.
12             Is that right?
13        A.   Correct.
14        Q.   Business as usual, they're
15   going to continue to buy?
16             MR. LIMBACHER:  Object to
17   form.
18             THE WITNESS:  Right.  Until
19   Endo made a decision of what we
20   were going to do.
21   BY MR. BUCHANAN:
22        Q.   And you talked to McKesson,
23   and McKesson was also saying shipping and
24   business as usual with regard to this

Page 473

1    drug that the FDA had said the benefits
2    no longer outweigh the risks; is that
3    right?
4              MR. LIMBACHER:  Object to
5    form.
6              THE WITNESS:  That's what
7    the FDA said, yes.  But Endo
8    continued to ship.
9    BY MR. BUCHANAN:
10        Q.   Yeah.  They did.
11             And they shipped until the
12   end of August 2017, right?
13             MR. LIMBACHER:  Object to
14   form.  Asked and answered multiple
15   times.
16             THE WITNESS:  I know that
17   date was agreed upon between Endo
18   and the FDA.
19   BY MR. BUCHANAN:
20        Q.   You shipped $50 million
21   worth of Opana ER after the FDA told you
22   that the benefits no longer outweigh the
23   risks, right?
24        A.   I can't --

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1          MR. LIMBACHER:  Object to
2    form.  Foundation.
3          THE WITNESS:  I can't
4    confirm the dollar value.  I don't
5    know.
6    BY MR. BUCHANAN:
7        Q.  Do you remember discounting
8    Opana ER to blow it out?
9          MR. LIMBACHER:  Object to
10   form.  Foundation.
11   BY MR. BUCHANAN:
12       Q.  In August of 2017, having
13   special programs with your wholesalers
14   for this drug for which the benefits no
15   longer outweighed the risk?
16         MR. LIMBACHER:  Object to
17   form.  Foundation.
18         THE WITNESS:  I know that we
19   had to stop shipping on August
20   31st, 2017.
21         And there are benefits to
22   Opana.
23   BY MR. BUCHANAN:
24       Q.  Not that are outweighed --

Page 475

1    not that outweigh the risks, that's what
2    you were told, right?
3          MR. LIMBACHER:  Object to
4    form.
5          THE WITNESS:  That's what
6    the FDA stated.
7    BY MR. BUCHANAN:
8        Q.  Right.
9          MR. BUCHANAN:  Can I please
10   have 645?
11         MR. SIEGEL:  645 is being
12   marked as Exhibit-26.
13         - - -
14         (Whereupon, EndoWalker
15   Exhibit-26,
16   ENDO_OPIOID_MDL_01681499-501, was
17   marked for identification.)
18         - - -
19   BY MR. BUCHANAN:
20       Q.  I'm passing you what has
21   been marked as Exhibit-26 to your
22   deposition, ma'am.
23         We're at the end of August
24   2017.  You send an e-mail out to several

Page 476

1    colleagues at UPS talking about the Opana
2    transition, right?
3        A.  Uh-huh.
4        Q.  Do you recall this e-mail,
5    ma'am?
6          MR. LIMBACHER:  Take your
7    time and read the document.
8    BY MR. BUCHANAN:
9        Q.  Do you recall this e-mail,
10   ma'am?
11       A.  I do.
12       Q.  So August 22nd, 2017 would
13   be the earliest in time.  It's the bottom
14   of the first page.
15         You note there's going to be
16   a lot of information that you're going to
17   outline below, and you then set forth
18   various categories of information, fair?
19       A.  Yes.
20       Q.  Okay.  Orders, Some
21   wholesalers are participating in a
22   transition program in which they can
23   purchase certain inventory to ensure
24   patients have enough during this period.

Page 477

1          Did I read that correctly?
2        A.  Yes, you did.
3        Q.  Yeah.  You have alerted the
4    UPS SOM team about this program as the
5    orders will be larger than normal, right?
6        A.  Uh-huh.
7        Q.  Is that right?
8        A.  Yes.
9        Q.  There is a promotion set up
10   in SAP that will need to be applied to
11   the orders.
12         Do you recall that?
13       A.  That's what you're stating,
14   yes.
15       Q.  Well, that's what you wrote,
16   right?
17       A.  Yes.
18       Q.  Okay.  And what you were
19   doing is you were giving these
20   distributors 20 percent off, right?
21         MR. LIMBACHER:  Object to
22   form.
23         THE WITNESS:  I believe it
24   was something like that, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    BY MR. BUCHANAN:
2         Q.   20 percent off on a drug
3    that the benefits no longer outweigh the
4    risks, that you're pushing out the door
5    in the last two weeks of August 2017
6    before the cutoff, do I understand that
7    correctly?
8              MR. LIMBACHER:  Object to
9    form.
10             THE WITNESS:  But there are
11   patients that use this product and
12   need this product, and we wanted
13   to ensure there was enough out
14   there for these patients during
15   the transition period so they can
16   work with their healthcare
17   provider to go on to some type of
18   other therapy.
19   BY MR. BUCHANAN:
20        Q.   Getting back to my question,
21   ma'am, do I have correctly what, in fact,
22   you were doing at the end of August of
23   2017?
24             MR. LIMBACHER:  Object to

Page 479

1    form.  I think she answered your
2    question.
3              THE WITNESS:  I answered
4    your question.  That's what we
5    were doing.  We were shipping
6    these orders to ensure that
7    patients that needed this product
8    had enough during the transition
9    period so they could work with
10   their healthcare provider to go on
11   a different therapy.
12   BY MR. BUCHANAN:
13        Q.   20 percent off?
14        A.   I -- that was --
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  I had nothing
18   to do with that.
19   BY MR. BUCHANAN:
20        Q.   Is that a true statement, 20
21   percent off?
22        A.   I think there was 20 percent
23   off.  But that has nothing to do with me.
24   I don't make those decisions --

Page 480

1         Q.   20 percent off --
2              MR. LIMBACHER:  Object to
3    form.
4    BY MR. BUCHANAN:
5         Q.   -- blowing the inventory out
6    to your wholesale customers, right?
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  We were not
10   blowing inventory out to our
11   customers.  We wanted to ensure
12   there was enough on the market so
13   patients had enough during this
14   transition period.
15   BY MR. BUCHANAN:
16        Q.   In fact, ma'am, you told the
17   FDA, in the summer of 2017, you were
18   going to stop producing Opana then,
19   right?
20             MR. LIMBACHER:  Object to
21   form.
22   BY MR. BUCHANAN:
23        Q.   Stop making it --
24             MR. LIMBACHER:  Are you

Page 481

1    suggesting --
2    BY MR. BUCHANAN:
3         Q.   -- in July of 2017?
4              MR. LIMBACHER:  -- that Mrs.
5    Walker --
6    BY MR. BUCHANAN:
7         Q.   Are you aware of that?
8              MR. LIMBACHER:  -- made that
9    representation?
10   BY MR. BUCHANAN:
11        Q.   Are you aware of that?
12             MR. LIMBACHER:  Aware of
13   what?  What is the question?
14             MR. BUCHANAN:  If you would
15   stop stepping on my question, you
16   can read it.
17             MR. LIMBACHER:  I object to
18   the form of your question,
19   because --
20   BY MR. BUCHANAN:
21        Q.   Go ahead, you can answer.
22             MR. LIMBACHER:  -- it's
23   vague and unclear who you're
24   talking about.

121  (Pages 478 to 481)

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1    THE WITNESS:  Clarify your
2    question, please.
3    BY MR. BUCHANAN:
4    Q.   Are you aware the company
5    represented to the FDA it was going to
6    stop making it in July of 2017?
7    MR. LIMBACHER:  Object to
8    form and foundation.
9    BY MR. BUCHANAN:
10   Q.   Stop making it then.
11   A.   We did stop making it.  We
12   did not make any more product.
13   Q.   So what you were doing,
14   then, at the end of the August of 2017
15   was blowing out your excess inventory for
16   20 percent off?
17   MR. LIMBACHER:  Object to
18   form and foundation.
19   THE WITNESS:  No.  We were
20   not.
21   MR. LIMBACHER:  Asked and
22   answered.
23   BY MR. BUCHANAN:
24   Q.   Is it not true that you

Page 483

1    offered a 20 percent discount on this
2    drug that the FDA had asked you to
3    withdraw from the market in June of 2017?
4    Is that true that you were doing that,
5    ma'am?
6    MR. LIMBACHER:  Object to
7    form.  Foundation.  Asked and
8    answered multiple times.
9    THE WITNESS:  I do not make
10   the decisions around any type of
11   promotion with our customers.
12   All I -- may I finish,
13   please?
14   All I can tell you is we --
15   MR. LIMBACHER:  You can
16   finish.
17   THE WITNESS:  All I can tell
18   you is we wanted to ensure that
19   there was enough inventory at the
20   pharmacies for patients as a
21   transition through this period as
22   they worked with a healthcare
23   provider to go on a different
24   therapy.

Page 484

1    BY MR. BUCHANAN:
2    Q.   Special offering for your
3    wholesalers, 20 percent discount on
4    Opana, before you voluntarily withdraw it
5    from the market on September 1, 2017;
6    that's what the company did, right?
7    MR. LIMBACHER:  Object to
8    form.  Foundation.  I don't know
9    what document you're reading from,
10   counsel.
11   BY MR. BUCHANAN:
12   Q.   Is that true?
13   MR. LIMBACHER:  Object to
14   form.  Foundation.
15   THE WITNESS:  I know that
16   there --
17   MR. LIMBACHER:  Asked and
18   answered.
19   THE WITNESS:  I don't make
20   the decisions around the offering
21   that was made.  That was not my
22   decision.
23   BY MR. BUCHANAN:
24   Q.   I just want to make sure the

Page 485

1    record is not fuzzy.
2    As a factual matter, are you
3    aware that two weeks before you were
4    scheduled to withdraw Opana ER from the
5    market, you offered your wholesalers a 20
6    percent discount on Opana ER?  Are you
7    aware of that?
8    A.   Yes, I am.
9    MR. LIMBACHER:  Object to
10   form.  Foundation.
11   MR. BUCHANAN:  Can I have,
12   please, 756?
13   MR. SIEGEL:  Being marked as
14   Exhibit-27.
15   - - -
16   (Whereupon, EndoWalker
17   Exhibit-27,
18   ENDO_OPIOID_MDL_02290107-110, was
19   marked for identification.)
20   - - -
21   BY MR. BUCHANAN:
22   Q.   I'm passing you, ma'am,
23   what's been marked as Exhibit-27 to your
24   deposition.

122  (Pages 482 to 485)

Page 486

1        It's an e-mail exchange
2  beginning August 17th, 2017, right?
3        A.   Yes.
4        Q.   It's going from a Mary Jo
5  Magrone to Sal Grausso.
6        He was your boss at that
7  point in time?
8        A.   He was.
9        Q.   Still is?
10       A.   Yes.
11       Q.   E-mail going to him and
12  others.  It says, Dear branded pricing
13  committee.
14       Do you see that?
15       A.   I do.
16       Q.   Attached for your review is
17  an Opana ER wholesaler promotion to be
18  offered immediately upon BPC approval.
19  The offering includes a 20 percent
20  reduction from WAC -- what's that, ma'am?
21       A.   WAC, wholesaler price, list
22  price.
23       Q.   Wholesaler price?
24       A.   List price.

Page 487

1        Q.   -- to be extended to the
2  wholesaler segment as an off invoice
3  discount.
4        What's that mean?
5        A.   They get 20 percent off the
6  list price.
7        Q.   And it looks like Ms.
8  Magrone is looking for a prompt response
9  so that this can be approved by the
10  pricing committee and get out to the
11  wholesalers, right?
12       MR. LIMBACHER:  Object to
13  form.
14       THE WITNESS:  Yes.  She sent
15  this to the pricing committee.
16  BY MR. BUCHANAN:
17       Q.   Is your boss on the pricing
18  committee?
19       A.   Sal Grausso is listed, yes.
20       Q.   And we see on the next page,
21  Background market overview.  On 9/1/17,
22  Endo will voluntarily withdraw Opana ER
23  from the market at the request of FDA.
24       Correct?

Page 488

1        A.   Correct.
2        Q.   You have that understanding,
3  ma'am, that the FDA had said the benefits
4  no longer outweigh the risks?  Are you
5  aware of that?
6        MR. LIMBACHER:  Object to
7        form.  Asked and answered.
8        THE WITNESS:  That's what
9        the FDA said.
10  BY MR. BUCHANAN:
11       Q.   Issued a release in June of
12  2017 to that effect, correct?
13       MR. LIMBACHER:  Object to
14       form.  Asked and answered.
15       THE WITNESS:  The FDA did,
16       yes.
17  BY MR. BUCHANAN:
18       Q.   Had an advisory committee,
19  what, back in March of 2017, correct?
20       MR. LIMBACHER:  Object to
21       form.  Foundation.
22       THE WITNESS:  I can't speak
23       to that advisory committee.  I
24       don't know what that is.

Page 489

1  BY MR. BUCHANAN:
2        Q.   So here we are two weeks
3  before the drug gets pulled, and the
4  background market overview reports to
5  your customer segment that you're going
6  to withdraw Opana ER at the request of
7  the FDA on September 1, 2017, right?
8        A.   That's what it states, yes.
9        Q.   Okay.  And then your
10  specific request, In support of the
11  above, this proposal requests approval
12  for the following wholesaler offering.
13       And, again, this is a
14  request for pricing approval to the brand
15  committee, correct?
16       MR. LIMBACHER:  Object to
17       form.
18       THE WITNESS:  It is.
19  BY MR. BUCHANAN:
20       Q.   Discount, 20 percent
21  discount from WAC given as an off invoice
22  discount, correct?
23       A.   Uh-huh.
24       Q.   Applied to all wholesalers,

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    right?
2         A.   If they participated.
3         Q.   Okay.  And you're offering a
4    one-time buy, right?
5         A.   It's a one-time order.  It's
6    a transition order.
7         Q.   And did you get any
8    excessive orders at the end of August
9    2017 for Opana ER?
10             MR. LIMBACHER:  Object to
11   form.
12             THE WITNESS:  I don't
13   recall.  I'm sure we did.  It's
14   probably in this listed.
15             But, again --
16   BY MR. BUCHANAN:
17        Q.   You would agree, ma'am, that
18   you didn't cease any orders, right?
19             MR. LIMBACHER:  Object to
20   form.
21             THE WITNESS:  We did not,
22   because this was a transition to
23   ensure our patients were properly
24   transitioned by their physician to

Page 491

1    another therapy, because they
2    could no longer take Opana.
3    BY MR. BUCHANAN:
4         Q.   Was that $100 million worth
5    of Opana that you sold, "you" being Endo,
6    after the FDA advisory committee in March
7    of 2017?
8         A.   I don't--
9              MR. LIMBACHER:  Object to
10   form and foundation.
11             THE WITNESS:  I have no
12   idea.  I can't confirm.  I don't
13   know what the sales were.
14   BY MR. BUCHANAN:
15        Q.   It sounds like you had
16   visibility, within your ordering system,
17   to the net revenue on a particular sale,
18   as well as the gross revenue, right?
19             MR. LIMBACHER:  Object to
20   form.
21             THE WITNESS:  It's on the
22   order.  But sales, that's not my
23   responsibility to know that.
24             MR. BUCHANAN:  651.

Page 492

1              - - -
2              (Whereupon, EndoWalker
3    Exhibit-28,
4    ENDO_DATA-OPIOID_MDL00000019, With
5    Attachment, was marked for
6    identification.)
7              - - -
8    BY MR. BUCHANAN:
9         Q.   I'm passing you next in
10   order, ma'am.
11             MR. SIEGEL:  It's being
12   marked as Exhibit-28.
13   BY MR. BUCHANAN:
14        Q.   Exhibit-28.
15             MR. LIMBACHER:  Can we pull
16   this up on the screen?  This is
17   produced natively, so let's go to
18   the first page of the spreadsheet.
19   Actually, let's go to the second
20   page of the spreadsheet.
21   BY MR. BUCHANAN:
22        Q.   Have you ever seen these
23   reports before?
24        A.   No.  I'm assuming this is

Page 493

1    out of SAP.
2         Q.   END contribution, MGN by
3    MPH.
4              Do you see that?
5         A.   I do.
6         Q.   Excluding Interco.
7              Do you see that?
8         A.   I do.
9         Q.   The product hierarchy lists
10   the product number and the product name.
11             Do you see that?
12        A.   Uh-huh.
13        Q.   You see what sheet we're on,
14   Opana ER.
15             Is that the sheet you're on?
16        A.   It just says, Opana.
17        Q.   If you go to the second
18   page.
19             You manufactured multiple
20   controlled substances, correct?
21             MR. LIMBACHER:  Object to
22   form.
23             THE WITNESS:  We do.
24   BY MR. BUCHANAN:

124  (Pages 490 to 493)

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1      Q.   Okay.  If we go to that page
2  that says Opana ER, you see revenue?  Do
3  you see the top line, revenue?
4      A.   Yes.
5      Q.   And then there's Period 1,
6  2, 3, all the way up to 12, and then a
7  year to date at the end.
8          Do you see that, ma'am?
9      A.   I do.
10     Q.   Do you recognize period 1 as
11 the first month of the year and period 2
12 the second month?
13     A.   Yes.
14     Q.   You're familiar with reports
15 that look like this, right?
16     A.   This is a financial report,
17 I don't -- this is not something I see or
18 generate.
19     Q.   Okay.  That FDA advisory
20 committee to consider Opana ER that was
21 in March; is that right?
22     A.   I don't know.
23     Q.   We see revenue of Opana ER
24 from March was about $26 million, right?

Page 495

1          MR. LIMBACHER:  Object to
2  form.  Foundation.
3          THE WITNESS:  It says $26
4  million.
5  BY MR. BUCHANAN:
6      Q.   From April was $17.9
7  million, right?
8          MR. LIMBACHER:  Same
9  objection.
10         THE WITNESS:  That's what it
11 states.
12 BY MR. BUCHANAN:
13     Q.   For May is $22.8 million,
14 right?
15         MR. LIMBACHER:  Form and
16 foundation.
17         THE WITNESS:  That's what it
18 states.
19 BY MR. BUCHANAN:
20     Q.   From June is $21.8 million,
21 right?
22         MR. LIMBACHER:  Form and
23 foundation.
24         THE WITNESS:  Uh-huh.

Page 496

1  BY MR. BUCHANAN:
2      Q.   From July is $12.2 million,
3  right?
4      A.   Yes.
5          MR. LIMBACHER:  Objection.
6  Form and foundation.
7  BY MR. BUCHANAN:
8      Q.   Period 8, it looks like you
9  sold more in August than you did in July,
10 right?
11         MR. LIMBACHER:  Objection.
12 Form and foundation.
13         THE WITNESS:  That's what
14 this report states.
15 BY MR. BUCHANAN:
16     Q.   As you're going out of
17 business with Opana ER?
18     A.   I can't speak to this
19 report.  I don't know what's generated
20 behind this report.  This is a financial
21 report.  I'm not in finance.  I can't
22 speak to it.
23     Q.   Okay.  It's over $100
24 million in sales between March and the

Page 497

1  time you withdrew it from the market.
2          Did you know that, ma'am?
3      A.   No.
4          MR. LIMBACHER:  Objection.
5  Form and foundation.
6          THE WITNESS:  I did not.
7  Again, this is a financial
8  report, I'm not in finance.
9  BY MR. BUCHANAN:
10     Q.   Did you know it was more
11 than $50 million in sales -- or $50
12 million in sales between June and August
13 before you took it off the market?
14         MR. LIMBACHER:  Objection.
15 Form and foundation.
16 BY MR. BUCHANAN:
17     Q.   When the FDA requested in
18 June that it be withdrawn?
19     A.   I can't speak to the finance
20 of the company.  I'm not in finance.
21     Q.   I just wanted to -- while
22 we're on this sheet, you see there's a
23 line item on this sheet for chargebacks?
24     A.   I do.

125 (Pages 494 to 497)

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1    Q.   Do you see each period is
2  reporting chargebacks?
3    A.   Yes.
4    Q.   And the sheet that we're
5  looking at is for Opana ER, correct?
6    A.   Yes.
7    Q.   All right.  Do you see for
8  August, Period 8 -- actually, if you look
9  about halfway down on the left, there is
10  a line item for sales promotions.
11         Do you see that?
12    A.   I do.
13    Q.   What sales promotion amount
14  was credited for January?
15    A.   Nothing.
16    Q.   What about was credited for
17  February?
18         MR. LIMBACHER:  Objection.
19  Form and foundation.  Objection to
20  all these questions with regard to
21  a document that she's told you
22  repeatedly she knows nothing
23  about --
24  BY MR. BUCHANAN:

Page 499

1    Q.   What amount --
2         MR. LIMBACHER:  -- and has
3  never seen before.
4         MR. BUCHANAN:  Move to
5  strike.
6         MR. LIMBACHER:  You're going
7  to have an opportunity to ask
8  these questions of people who
9  might actually know something
10  about it.
11  BY MR. BUCHANAN:
12    Q.   What amount for sales
13  promotions, ma'am, was credited for
14  Period 3, March of 2017?
15         MR. LIMBACHER:  Same
16  objection.  Form and foundation.
17         THE WITNESS:  Zero.
18  BY MR. BUCHANAN:
19    Q.   What amount was credited for
20  April?
21         MR. LIMBACHER:  Same
22  objection.  Form and foundation.
23         THE WITNESS:  Zero.
24  BY MR. BUCHANAN:

Page 500

1    Q.   What amount was credited for
2  May?
3         MR. LIMBACHER:  Same
4  objection.  Form and foundation.
5         THE WITNESS:  Zero.
6  BY MR. BUCHANAN:
7    Q.   How about June?
8         MR. LIMBACHER:  Same
9  objection.  Form and foundation.
10         THE WITNESS:  Zero.
11  BY MR. BUCHANAN:
12    Q.   July?
13         MR. LIMBACHER:  Same
14  objection.  Form and foundation.
15         THE WITNESS:  Zero.
16  BY MR. BUCHANAN:
17    Q.   And when you were blowing it
18  out in August, what amount was credited
19  for sales promotions?
20         MR. LIMBACHER:  Same
21  objection.  Form and foundation.
22  And argumentative.
23         THE WITNESS:  Blowing it out
24  is not my word.  We had to

Page 501

1  transition orders to our
2  wholesalers to ensure our patients
3  had enough inventory to get them
4  through the transition period as
5  they worked with their healthcare
6  provider on a new therapy.
7  BY MR. BUCHANAN:
8    Q.   What promotional amount did
9  you book on this sheet -- or the company
10  book on this sheet for promotional
11  activity of Opana in the days leading up
12  to its withdrawal from the market?
13         MR. LIMBACHER:  Objection.
14  Form and foundation.
15         THE WITNESS:  I'm not --
16  BY MR. BUCHANAN:
17    Q.   Just read the number, ma'am.
18    A.   It's 20 percent.  But that's
19  not my decision.  That's not my decision.
20         MR. BUCHANAN:  Let's take a
21  short break.
22         VIDEO TECHNICIAN:  We're
23  going off the record.  The time is
24  4:45.

126 (Pages 498 to 501)

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1            - - -
2        (Whereupon, a brief recess
3    was taken.)
4            - - -
5        VIDEO TECHNICIAN:  Going
6    back on the record.  The beginning
7    of Media File 9.  The time is
8    5:02.
9        MR. BUCHANAN:  Mrs. Walker,
10   I have no further questions at
11   this time, subject to the issues
12   with the document that was
13   withdrawn on the basis of
14   privilege, and any further
15   questions that I have in follow-up
16   to the questions of any other
17   counsel today.
18       I'll pass the witness.
19       MR. LENISKI:  Thank you.
20           - - -
21       EXAMINATION
22           - - -
23   BY MR. LENISKI:
24       Q.   Good afternoon, Ms. Walker.

Page 503

1    My name is Joe Leniski, and I represent
2    clients who are proceeding in state court
3    in Tennessee.
4        So my questions today will
5    be largely pertaining to the state of
6    Tennessee.
7        A.   Okay.
8        MR. LENISKI:  Before we
9    proceed, I just have to state on
10   the record, we have a standing
11   objection, and adopt for purposes
12   of today, former objections we
13   made in other depositions about
14   the failure to produce documents
15   timely and the failure to
16   refute -- or the documents that
17   refute their assertion that
18   witness has any Tennessee-specific
19   knowledge and because Tennessee
20   rules of civil procedure don't
21   place the same restrictions on the
22   Tennessee state plaintiffs as they
23   do the plaintiffs proceeding in
24   the MDL.

Page 504

1        But we're appearing today in
2    continuity of our respect for both
3    the letter and the spirit of the
4    state and federal cooperation
5    protocol, without waiving these
6    objections and the right to
7    redepose Ms. Walker if necessary.
8        MR. LIMBACHER:  We
9    understand your position.
10       MR. LENISKI:  Thank you.
11   BY MR. LENISKI:
12       Q.   So, Ms. Walker, I'm Joe
13   Leniski, as I stated, I'm from Tennessee.
14   I represent a different group of
15   plaintiffs than the folks who were asking
16   questions this morning.  And I don't have
17   nearly as many questions.
18       A.   That's good, I guess.
19       Q.   So you can take that for
20   what it's worth.
21       First question is, do your
22   job duties regarding distribution at Endo
23   involve any Tennessee-specific
24   responsibilities?

Page 505

1        A.   I do not ship to any
2    customers in the state of Tennessee, as
3    far as the wholesalers are concerned.
4        Q.   So, to your knowledge, in
5    your 20 years at Endo, you never shipped
6    product to a wholesaler located in the
7    state of Tennessee; is that your
8    testimony?
9        A.   No.  Let me -- let me back
10   up.
11       Our largest customer,
12   McKesson's distribution center used to be
13   in the state of Tennessee until they
14   moved it to Mississippi.  So I used to
15   ship to McKesson in Tennessee.
16       Q.   Do you recall when that was?
17       A.   When they moved to
18   Mississippi?  No.  Around '13, '14, '15.
19   I don't know the exact date.
20       Q.   Do you remember anyone on
21   your team that had any Tennessee-specific
22   responsibilities?
23       A.   On my team?  No.
24       Q.   Do you know whether

127 (Pages 502 to 505)

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1  Tennessee was a high-performing area as
2  far as Opana ER sales go?
3          MR. LIMBACHER:  Object to
4  form.
5          THE WITNESS:  I can't speak
6  to that.  I don't know.
7  BY MR. LENISKI:
8      Q.   Was the fact whether or not
9  Tennessee was a high-sales area for Opana
10 ER, was that relevant to your job duties?
11     A.   I only ship to wholesalers.
12 So once McKesson moved out of the state
13 of Tennessee into Mississippi, I didn't
14 ship to any wholesalers within the state
15 of Tennessee.
16     Q.   Which is not to say that you
17 weren't aware that Opana ER was being
18 prescribed and dispensed in the state of
19 Tennessee; is that your understanding?
20     A.   I don't have any
21 prescription data or dispense data.  That
22 wasn't part of my job responsibility.
23 That's another area within Endo.
24     Q.   So during your 20 years, did

Page 507

1  you have any awareness whether Opana ER
2  was being dispensed in the state of
3  Tennessee?
4      A.   No, I don't -- I can't
5  confirm that.
6      Q.   At least what you're
7  testifying to today is that was not
8  relevant to your job duties; is that what
9  you're testifying to?
10         MR. LIMBACHER:  Object to
11 form.
12         THE WITNESS:  That's
13 correct.  I only ship to
14 wholesalers.  So prescribing
15 information is not part of my job
16 responsibility.
17 BY MR. LENISKI:
18     Q.   Okay.  So in your role in
19 distribution, neither you nor your team
20 tracked the number of Opana ER units
21 being distributed in the state of
22 Tennessee?
23     A.   Not within my role, no.
24     Q.   And whether or not Tennessee

Page 508

1  was a state with rampant opioid abuse,
2  was that a factor relevant to your job
3  duties in distribution at Endo?
4          MR. LIMBACHER:  Object to
5  form.
6          THE WITNESS:  No, that
7  information wasn't provided to me.
8  BY MR. LENISKI:
9      Q.   Would you say that was
10 relevant to your job duties in Endo?
11         MR. LIMBACHER:  Object to
12 form.
13         THE WITNESS:  Prescription
14 data, again, is not part of my job
15 responsibility.  It's -- you know,
16 I don't have that information.
17 BY MR. LENISKI:
18     Q.   Okay.  And did you have any
19 knowledge about problem prescribers -- or
20 prescribers that Endo identified as being
21 problem prescribers in Tennessee during
22 your tenure?
23     A.   No.  Again, the sales data
24 and prescribing data is not within my

Page 509

1  area of responsibility.  I don't have
2  that information.  I don't have that
3  data.
4          MR. LENISKI:  This is
5  Exhibit-5.  Who else needs copies?
6          MR. LIMBACHER:  Thank you.
7          - - -
8          (Whereupon, EndoWalker
9  Exhibit-29,
10 ENDO_OPIOID_MDL_01030692-698, was
11 marked for identification.)
12         - - -
13 BY MR. LENISKI:
14     Q.   Ms. Walker, I've handed you
15 what we've identified as Exhibit-29 to
16 your deposition.
17         And my --
18     A.   Yes.
19     Q.   -- my question is going to
20 be whether or not you recognize this
21 document?
22     A.   This was an e-mail --
23     Q.   Okay.
24     A.   -- sent to me.

128 (Pages 506 to 509)

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1    Q.   So the first e-mail in the
2  chain on the very first page is from you
3  to Scott Littlefield, sent on March 28,
4  2012, correct?
5    A.   Yes.
6    Q.   And the subject is, Re,
7  pharmacies for Dr. Mohammed; is that
8  right?
9    A.   Yes.
10    Q.   Any reason to doubt you
11  received this e-mail in the normal course
12  of business during your time at Endo?
13    A.   No doubt.
14    Q.   So there's a chain of
15  e-mails here.  So if we go backwards in
16  the document to the page that ends Bates
17  stamp 698, you'll find the very first
18  e-mail in the chain, or the earliest
19  e-mail in the chain.
20    Would you agree?
21    A.   698, you said?
22    Q.   Yes.  The very last page --
23    A.   Yes.
24    Q.   -- of the exhibit.

Page 511

1    And there's an e-mail here
2  from Wendy Stiles to Autumn Jeter and
3  Zachariah Ballionger, dated Friday, March
4  9, 2012; is that right?
5    A.   Yes.
6    Q.   And the subject is,
7  Pharmacies for Dr. Mohammed; is that
8  right?
9    A.   Yes.
10    Q.   And in this e-mail, Ms.
11  Stiles -- first of all, do you know who
12  Wendy Stiles is?
13    A.   No, I don't.
14    Q.   What about Autumn Jeter?
15    A.   No.
16    Q.   Or Zachariah Ballionger?
17    A.   No.
18    Q.   In this e-mail, Ms. Stiles
19  is writing to Autumn Jeter.  She says,
20  Autumn, Dr. Mohammed contacted Zach last
21  week while we were at the national sales
22  meeting.  He stated he could not find
23  Opana ER for his current patients at any
24  pharmacy in Morristown, Tennessee, and

Page 512

1  was very upset because his current
2  patients on Opana ER could not fill their
3  prescriptions for the last two weeks.
4    Did I read that correctly?
5    A.   You did.
6    Q.   Was your practice to review
7  your e-mail chains that were forwarded to
8  your attention, even though you were not
9  included as a recipient?
10    MR. LIMBACHER:  Object to
11    form.
12    THE WITNESS:  I don't recall
13    if I went all the way back to this
14    beginning e-mail.  I don't know.
15  BY MR. LENISKI:
16    Q.   As you sit here today, you
17  don't recall whether or not you read this
18  e-mail?
19    A.   Right.  I don't know.
20    Q.   In any event, in the e-mail,
21  Ms. Stiles is making a reference to a Dr.
22  Mohammed.
23    Have you ever heard that
24  name before?

Page 513

1    A.   No, I have not.
2    Q.   At least not to your
3  knowledge?
4    A.   No, I have not.
5    Q.   Ms. Stiles goes on, Dr.
6  Mohammed is seeking assistance in getting
7  some Opana ER to his top three, or at
8  least top two pharmacies for the
9  Morristown, Tennessee area.
10    Did I read that correctly?
11    A.   You did.
12    Q.   And she goes on, Dr.
13  Mohammed is our top writer for the area,
14  and he stated he is having to switch
15  patients to OxyContin and doesn't want to
16  do that, because he will not switch them
17  back.
18    Did I read that correctly?
19    A.   You did.
20    Q.   Now, moving forward --
21    A.   Go ahead.
22    Q.   -- if you go to the next
23  page of the exhibit, ending 697.  At the
24  very bottom, Ms. Jeter has responded.

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1  She's got an @Endo.com
2  e-mail. Do you see that?
3  A.  Yes.
4  Q.  That still doesn't refresh
5  your recollection as to who she is?
6  A.  No.
7  The fact that the other
8  e-mail said something about the national
9  sales meeting, I'm assuming these are
10  sales reps.
11  Q.  Okay.
12  A.  Yes.  But that's just an
13  assumption.
14  Q.  That's fair.  So at the end
15  of the page, ending Bates stamp 697, Ms.
16  Jeter, if you go over to the last page,
17  her message is actually on the next page,
18  she responds to Ms. Stiles and says, I
19  have passed this along.  We'll see what
20  happens.
21  Is that correct?
22  A.  Where is that?
23  MR. LIMBACHER:  At the top
24  of the last page.

Page 515

1  BY MR. LENISKI:
2  Q.  Top of the last page, ending
3  698.
4  A.  Yes, I see that.  Yes.
5  Q.  On March 28, if you go back
6  to the page ending 697, Ms. Stiles writes
7  Ashley Baker.
8  Do you know that name?
9  A.  Ashley Baker?  Again, I am
10  assuming these are all sales reps within
11  Endo.
12  Q.  But you don't know who
13  Ashley Baker is?
14  A.  No, I don't know who she is.
15  Q.  Ms. Stiles writes Ashley on
16  March 28, 2012.
17  She's forwarding the e-mails
18  we just read below; is that correct?
19  A.  Yes.
20  Q.  She says, Ashley, this is my
21  top writer.  He is having a hard time
22  getting Opana for his current patients
23  and now switching them over to other
24  medications.  Need more information, let

Page 516

1  me know.
2  Did I read that correctly?
3  A.  I'm sorry, I may be a
4  page --
5  Q.  I'm on the page ending 697.
6  MR. LIMBACHER:  Middle of
7  the page.
8  THE WITNESS:  I see it.  I'm
9  sorry, I was a page ahead.
10  BY MR. LENISKI:
11  Q.  That's okay.
12  So in the middle of the
13  page, there's an e-mail from Wendy Stiles
14  to Ashley Baker where she's forwarding
15  the e-mails we read previously.
16  Do you agree?
17  A.  Yes.
18  Q.  And she says, This is my top
19  writer.  He is having a hard time getting
20  Opana for his current patients and now
21  switching them over to other medications.
22  Correct?
23  A.  Yes.
24  Q.  Immediately above that is an

Page 517

1  e-mail from Greg, and I'm not sure I'm
2  going to know how to pronounce that name.
3  A.  Yes.  I don't --
4  Q.  How do you pronounce that
5  name?
6  A.  I don't know.  He doesn't
7  work at Endo anymore.
8  Q.  It's spelled P-Y --
9  A.  Pyszczymuka, I don't know.
10  Q.  It's spelled
11  P-Y-S-Z-C-Z-Y-M-U-K-A.  Even as a person
12  of Polish descent, that one stumps me.
13  Do you know that name?
14  A.  Yes, I do know that name.
15  Yes.
16  Q.  Who is Greg -- Gregory?
17  A.  When he worked at Endo, he
18  was the product manager for Opana.
19  Q.  Okay.  And in what capacity
20  did you work with Greg?
21  A.  I didn't really work with
22  him.  I just knew that he was the product
23  manager for Opana.
24  Q.  So you never worked together

130 (Pages 514 to 517)

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    at all?
2        A.   No, not really.
3        Q.   What did you understand he
4    did, other than being product manager?
5        A.   He was the -- did the
6    marketing for Opana at the time.
7        Q.   Okay.
8        A.   I can't really speak to the
9    details behind that.
10       Q.   Okay.
11       A.   I don't know if you want to
12   go through this entire e-mail, but based
13   on -- I mean, I kind of know what's going
14   on, if you want me to explain what's
15   going on, or we can go through the entire
16   e-mail.
17       Q.   Give me a moment.  I do have
18   some specific questions about it.
19       A.   Sure.  That's fine.  I
20   didn't know if you had that or not.
21       Q.   And that was one of my
22   questions, was who this person is.
23           So if you kind of move
24   forward in the exhibit, you'll see

Page 519

1    there's a back-and-forth between Wendy
2    and Gregory that goes on that same day,
3    March 28th, 2012.
4            Do you agree?
5        A.   Yes.
6        Q.   And if we flip over to the
7    page ending 695 -- actually, sorry, 694,
8    Gregory has now forwarded this chain to
9    someone named Jason Jones.
10           Do you know who that is?
11       A.   He used to work at Endo,
12   yes.
13       Q.   And what was his job title?
14       A.   I don't remember what his
15   job title was at the time.
16       Q.   Did you ever work with
17   Jason?
18       A.   Yeah.  He was -- I believe
19   the national account executives reported
20   up through him, or worked with him.
21       Q.   And so on March 28th,
22   Gregory forwards the chain of e-mails to
23   Jason Jones, correct?
24       A.   Yes.

Page 520

1        Q.   Later that afternoon, Jason
2    Jones forwards -- if you look at the
3    e-mail immediately above on Page 694,
4    Jason Jones sends this chain of e-mails
5    to Scott Littlefield; is that correct?
6        A.   Yes.
7        Q.   And Scott Littlefield, I
8    think you testified this morning, you
9    understood him to be a national account
10   director at Endo, correct?
11       A.   He was, yes.
12       Q.   Okay.  And if you go over to
13   the very first page of the document.
14       A.   692?
15       Q.   Correct.
16       A.   Yes.
17       Q.   You are copied for the first
18   time in this chain, also on March 28th,
19   it's an e-mail from Jason Jones to Scott
20   Littlefield and yourself, correct?
21       A.   Yes.
22       Q.   Okay.  So you said you had
23   understanding of this document?
24       A.   Yes.

Page 521

1        Q.   Is it correct that Dr. --
2    someone named Dr. Mohammed in Tennessee
3    has complained to an Endo sales rep that
4    he can't -- his patients can't get Opana
5    ER at their pharmacies in his hometown?
6        A.   Correct.
7        Q.   And there's a sequence of
8    e-mails between Endo representatives
9    where those Endo representatives are
10   talking about potentially why wholesalers
11   haven't gotten their product, their Opana
12   ER, to those pharmacies; is that correct?
13       A.   Yes.
14       Q.   And the wholesalers
15   identified are AmerisourceBergen,
16   correct?
17       A.   Yes.
18       Q.   McKesson?
19       A.   I thought I just saw
20   AmerisourceBergen and Smith Drug.
21           Is there McKesson in here,
22   too?
23       Q.   Go ahead and take a look at
24   the page ending 696.

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1      A.   Oh, McKesson, I see McKesson
2   now, okay.
3      Q.   So McKesson was one of the
4   wholesalers that served these pharmacies,
5   or one of these pharmacies; is that
6   correct?
7          MR. LIMBACHER:  Object to
8   form.
9          THE WITNESS:  Based on this
10         e-mail, it says that their
11         supplier was McKesson.
12  BY MR. LENISKI:
13     Q.   Okay.  And then you see, I
14  think you already talked about it, Smith
15  Drugs, correct?
16     A.   Yes.
17     Q.   Were all three of those
18  wholesalers customers of Endo?
19     A.   They were.
20     Q.   Okay.
21     A.   They still are.
22     Q.   And according to the e-mail
23  chain, there were at least four
24  pharmacies identified in the Morristown,

Page 523

1   Tennessee area where Dr. Mohammed's
2   patients could not get their Opana ER; is
3   that right?
4      A.   Four.  I see four, yes.
5      Q.   Okay.  The first one, if you
6   look on the very last page of the
7   document, 698, we see Mike Pharmacy?
8      A.   Uh-huh.
9      Q.   And then Howard Pharmacy?
10     A.   Uh-huh.
11     Q.   And then Crescent Center
12  Drugs, correct?
13     A.   Yes.
14     Q.   And if you flip over to the
15  page ending 696, bottom of the e-mail
16  from -- in the middle of the page, Ms.
17  Stiles to Gregory says, Pharmacy Express
18  is another top pharmacy in the same area?
19     A.   I see that.
20     Q.   And they -- it's represented
21  from Ms. Stiles, they cannot order any of
22  the Opana ER strengths from their
23  wholesaler, Smith Drugs?
24     A.   Yes, I see that.

Page 524

1      Q.   Now, did you know anything
2   about these four pharmacies?
3          MR. LIMBACHER:  Object to
4   form.
5          THE WITNESS:  No, not about
6   those four pharmacies, just based
7   on this e-mail.
8          But I can explain the issue
9   that's going on at this time, if
10         this is an appropriate time for me
11         to talk about it.  Unless you have
12         more questions, so.
13  BY MR. LENISKI:
14     Q.   I think it will be easier to
15  if I just prompt the questions.
16     A.   That's fine.
17     Q.   So at the time of this
18  e-mail chain, you didn't know anything
19  about these four pharmacies; is that your
20  testimony?
21     A.   Right.
22     Q.   Do you know whether these
23  four pharmacies were considered high
24  dispensers of Opana ER?

Page 525

1          MR. LIMBACHER:  Object to
2   form.
3          THE WITNESS:  I don't know
4   that.
5   BY MR. LENISKI:
6      Q.   Do you know whether these
7   four pharmacies were ever associated with
8   diversion or other suspicious activity?
9      A.   I don't know that.
10     Q.   Okay.  So what's going on in
11  the e-mails is in order to get -- in
12  order to help Dr. Mohammed get Opana ER
13  to his patients, there's a discussion
14  among Endo representatives about getting
15  orders filled to the wholesalers who
16  serve those pharmacies; is that accurate?
17         MR. LIMBACHER:  Object to
18  form.
19         THE WITNESS:  Yes.
20  BY MR. LENISKI:
21     Q.   Okay.  And Ms. Stiles, just
22  to clarify what her role was, on page 695
23  of the document, do you see in the e-mail
24  on March 28, 2012, at the bottom of the

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    page, where she identifies her territory
2    as East Knoxville?
3        A.    My territory is East
4    Knoxville, yes.
5        Q.    She also mentions that four
6    of her pharmacies, in that same e-mail,
7    are in Sevierville or Pigeon Forge,
8    Tennessee; is that correct?
9        A.    Yes.
10       Q.    Now, does that also speak to
11   the fact that Ms. Stiles is probably a
12   sales rep with Endo Pharmaceuticals?
13           MR. LIMBACHER:  Object to
14   form.
15           THE WITNESS:  I would
16   assume, based on how the e-mails
17   are.
18   BY MR. LENISKI:
19       Q.    You had general knowledge at
20   Endo that they had territories they were
21   assigned to --
22       A.    Correct, yes.
23       Q.    Was it also your
24   understanding that they had particular

Page 527

1    physicians or healthcare providers they
2    were assigned to within those
3    territories?
4        A.    I mean, I don't know exactly
5    what the sales reps were assigned to, but
6    I know that they had territories.
7        Q.    Okay.  Did you or your team
8    perform any vetting of these four
9    pharmacies identified in this e-mail for
10   any misuse or diversion prior to shipping
11   the products to their wholesalers?
12       A.    No.  Because, like I said,
13   I'm not sure if this is the appropriate
14   time, but during this whole time frame,
15   Endo had a supply issue with Opana, which
16   is the reason why these pharmacies could
17   not obtain product.
18           It didn't have anything to
19   do with diversion.  It was because Endo
20   was on backorder for so long, and we were
21   in and out of backorder for months at a
22   time.
23       Q.    And what was the cause of
24   the backorder?

Page 528

1        A.    There was a manufacturing
2    issue at Novartis, who made it at the
3    time.
4        Q.    When the products were
5    ultimately shipped to the wholesaler
6    serving these pharmacies, was there any
7    consideration given to the volume of
8    Opana ER being written by Dr. Mohammed?
9        A.    No, we -- no, when I shipped
10   Opana during this time frame, during the
11   backorder, it was just ensuring all
12   wholesalers had inventory.
13       Q.    Did you or anyone else at
14   your team at Endo follow-up with Ms.
15   Stiles to ask any questions about Dr.
16   Mohammed's prescribing practices before
17   filling this shipment to wholesalers?
18           MR. LIMBACHER:  Object to
19   form.
20           THE WITNESS:  Not that I
21   recall, no.
22   BY MR. LENISKI:
23       Q.    Similar to your testimony
24   this morning, to your knowledge, the

Page 529

1    orders that were referred to in this
2    exhibit that went to the wholesalers
3    serving these pharmacies, those were all
4    cleared by Endo and UPS and shipped to
5    the wholesalers; is that correct?
6        A.    Yes.
7            But if I could just
8    elaborate on that a little bit.  During a
9    backorder situation, lots of times the
10   SOM, your averages kind of get out of
11   whack, because you're not shipping for
12   multiple periods of time and then you
13   start shipping again and then you stop
14   shipping.  So your averages kind of get a
15   little wacko.
16       Q.    But at the end of the day,
17   none of these orders were held?
18       A.    No, they were not.  They
19   cleared both programs.
20       Q.    Dr. Mohammed was identified
21   in these e-mails, at various times, as
22   the top writer for that area.
23           Did you read that?
24       A.    Yes.  When you pointed it

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1    out, yes.
2        Q.   Now, you understand -- did
3    you understand that to mean that Dr.
4    Mohammed was identified as Endo's highest
5    prescriber for Opana ER in that area?
6            MR. LIMBACHER:  Object to
7        form.
8            THE WITNESS:  No.
9    BY MR. LENISKI:
10       Q.   Had you ever heard the term
11   "top writer" used by others at Endo to
12   describe high-volume prescribers?
13       A.   I mean, I've heard that
14   terminology.
15       Q.   At Endo?
16       A.   Yes.
17       Q.   You've used it?  Have you
18   heard others at Endo use it to identify
19   high-volume prescribers?
20       A.   I've heard that terminology,
21   yes.
22       Q.   Have you ever referred to
23   any doctor as a high -- I'm sorry, a top
24   writer?

Page 531

1        A.   No, because my customer is
2    the wholesaler, not the doctor.
3        Q.   Can you recall hearing or
4    learning about other prescribers in
5    Tennessee being described by Endo as a
6    top writer?
7        A.   No.
8        Q.   To your knowledge, were top
9    writers important to Endo?
10       A.   That's all part of the sales
11   team.  I can't -- I can't speak to that.
12   That's not my area of responsibility.
13       Q.   So sitting here today,
14   you're not prepared to testify whether or
15   not that was something -- top writers
16   were important to Endo?
17           MR. LIMBACHER:  Object to
18       form.
19           THE WITNESS:  I can't -- I
20       can't speak to that.  I'm not on
21       the sales team.
22   BY MR. LENISKI:
23       Q.   Was it the case that top
24   writers were given particular attention

Page 532

1    with Endo when they reached out with
2    requests?
3            MR. LIMBACHER:  Object to
4        form.
5            THE WITNESS:  Again, I can't
6        speak to that.  I'm not part of
7        the sales team.
8    BY MR. LENISKI:
9        Q.   Did reading, in these
10   e-mails, that Endo's sales rep, who is
11   elevating her request to get Opana to
12   these pharmacies in Tennessee, that she
13   considered Dr. Mohammed her top writer,
14   did that have influence on your decision
15   to ship the product?
16       A.   No.  Again, during this time
17   frame, we were in a huge backorder
18   situation for Opana across all strengths.
19   So I was shipping product to all the
20   wholesalers to ensure all wholesalers had
21   inventory for all patients.
22           Because -- also, if you look
23   on, I think, Page 693, I mean, it states
24   what -- Smith Drug's order and what I

Page 533

1    allocated to them because of our
2    backorder situation and our supply issue.
3        Q.   Were Dr. Mohammed's
4    prescribing habits relative to your
5    decision to ship the orders referred to
6    in this e-mail?
7            MR. LIMBACHER:  Object to
8        form.
9            THE WITNESS:  No.
10   BY MR. LENISKI:
11       Q.   Did Endo put any special
12   monitoring in place to track prescribing
13   habits of what it called top writers?
14       A.   I can't speak to that.
15   That's not part of my responsibility.
16   That's within the sales department.  I
17   can't speak to that.
18       Q.   And I may have asked this
19   question, I forget.
20           Did you ever hear Dr.
21   Mohammed's name before this sequence of
22   e-mails?
23       A.   No.
24       Q.   So as you sit here today,

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1    then, you're not aware of any order
2    associated with Dr. Mohammed being
3    identified by Endo as suspicious?
4        A.   No.  Like I said, I can't --
5    I can't speak to the doctors.
6        Q.   Okay.  But it's also
7    correct, my understanding, that Endo has
8    never identified any order associated
9    with any prescriber in Tennessee as
10   suspicious, correct?
11           MR. LIMBACHER:  Object to
12           form.
13           THE WITNESS:  Again, I can't
14           speak to the doctors in Tennessee.
15           That's not part of my area of
16           responsibility.
17   BY MR. LENISKI:
18       Q.   But your testimony, just so
19   we're clear, this morning was no order
20   was ever deemed suspicious and held by
21   Endo or UPS; is that correct?
22       A.   To the wholesalers.
23           MR. LIMBACHER:  Object to
24           form.

Page 535

1    BY MR. LENISKI:
2        Q.   To the wholesalers?
3        A.   To the wholesalers, correct.
4        Q.   So any -- there's been no
5    order, to your knowledge, that was
6    specific, or where wholesalers were --
7    you knew their product was being
8    dispensed in the state of Tennessee that
9    was ever held or restricted from going
10   out on that basis?
11           MR. LIMBACHER:  Object to
12           form.
13           THE WITNESS:  No order.
14           They were released through Endo's
15           SOM program and UPS's SOM program.
16   BY MR. LENISKI:
17       Q.   If Dr. Mohammed, at this
18   time of these e-mails, had been flagged
19   for investigation by either state
20   officials in Tennessee or by federal
21   authorities for his prescribing
22   practices, would that information have
23   factored into your decision to ship the
24   product?

Page 536

1            MR. LIMBACHER:  Object to
2            form.
3            THE WITNESS:  I'm not
4            provided that information.  That's
5            part of our sales team.  That
6            information doesn't get to me.  I
7            ship to wholesalers.
8    BY MR. LENISKI:
9        Q.   If you had been told that
10   Dr. Mohammed was flagged for being under
11   investigation by state and/or federal
12   authorities for prescribing practices at
13   this time, would that have been
14   information factoring into your decision
15   to ship the product?
16           MR. LIMBACHER:  Object to
17           form.
18           THE WITNESS:  No.  Because
19           my shipments is to wholesalers.  I
20           can't factor in the doctor's
21           prescribing habits.
22   BY MR. LENISKI:
23       Q.   And that's true even if you
24   know that the wholesalers are shipping

Page 537

1    their product or distributing their
2    product to pharmacies specifically
3    identified by Dr. Mohammed as being used
4    by his patients?
5            MR. LIMBACHER:  Object to
6            form.
7            THE WITNESS:  Clarify that,
8            please.  I'm not quite sure I
9            understand what you're asking.
10   BY MR. LENISKI:
11       Q.   You said -- your testimony a
12   moment ago was, my shipments are to
13   wholesalers.  I can't factor in the
14   doctor's prescribing habits.
15       A.   Correct.  I can't.
16       Q.   And I said, and that's true
17   even if you know the wholesalers are
18   distributing their product to pharmacies
19   specifically identified to Endo by Dr.
20   Mohammed as being used by his patients?
21       A.   I have the right information
22   to do my job.  I can't speak to any --
23   anything related to the healthcare
24   providers.

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1      Q.   On 698 of this document, the
2  one ending 698, at the bottom of the
3  page, the very first e-mail in the chain
4  ends with the statement, Dr. Mohammed has
5  signed up to receive Opana ER updates,
6  and Zach and I are in the office weekly.
7          Did I read that correctly?
8      A.   You did.
9      Q.   Do you know what -- are you
10  aware of the -- what is being discussed
11  here about Dr. Mohammed being able to
12  sign up to receive Opana ER updates?
13      A.   No, I do not.  I don't.
14      Q.   You had no association with
15  that system?
16      A.   No, I -- no.
17      Q.   You don't know if anyone
18  could sign up for such a system?
19      A.   No, I don't have anything to
20  do with sales or doctors.
21      Q.   Okay.
22      A.   It's not part of my job
23  responsibilities.
24      Q.   I'm done with that document.

Page 539

1          Do you know who the risk
2  management team at Endo was?
3      A.   I know that there was a
4  cross-functional risk management team,
5  yes.
6      Q.   Do you recall ever being a
7  member of that team?
8      A.   No, I was not.
9      Q.   Do you recall being copied
10  on e-mails where the minutes of such
11  meetings were sent to you?
12      A.   I don't recall off the top
13  of my head, no.
14      Q.   Do you know why such minutes
15  of those risk management team meetings
16  would have been sent to you for your
17  review?
18          MR. LIMBACHER:  Object to
19  form.
20          THE WITNESS:  I believe my
21  boss at the time was part of that
22  team.  I was not.
23  BY MR. LENISKI:
24      Q.   I'm sorry.  And who was your

Page 540

1  boss at that time?
2      A.   Jill Connell.
3      Q.   And was she always a member
4  of the risk management team, to your
5  knowledge?
6      A.   To my knowledge, yes.
7      Q.   And when she ceased being
8  your boss -- when did you say that was?
9      A.   June of '13.
10      Q.   -- in June 2013, was your
11  new boss a member of that risk management
12  team?
13      A.   I don't believe so.  I
14  don't -- I know that team was still part
15  of Endo, but I think it may have changed
16  over the years of who was part of that
17  committee.  But I really can't speak to
18  that or confirm any of that.
19      Q.   And do you recall ever
20  attending a risk management team meeting?
21      A.   No, not that I recall.  I
22  may have.  I don't recall.
23          - - -
24          (Whereupon, EndoWalker

Page 541

1  Exhibit-30,
2  ENDO_OPIOID_MDL_01033927-929, was
3  marked for identification.)
4          - - -
5  BY MR. LENISKI:
6      Q.   Ms. Walker, I've handed you
7  a document we've identified as Walker
8  Exhibit-30 to your deposition.
9      A.   Uh-huh.
10      Q.   It's a chain of e-mails,
11  first e-mail on the first page is from
12  you to a number of individuals with
13  @UPS.com e-mail addresses dated November
14  29th, 2012.
15          When you've had a chance to
16  review, my question is going to be if you
17  recognize this document.
18      A.   Are you talking about the
19  e-mail that Peter Jennings sent to me?
20      Q.   I'm talking about the entire
21  exhibit.
22          Do you recognize the
23  document?
24      A.   Yeah, I mean, it's an e-mail

136 (Pages 538 to 541)

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1   between me and my UPS customer service
2   team.
3       Q.   Do you have any reason to
4   doubt that you received this e-mail in
5   the normal course of business on or about
6   the date of November 29th, 2012?
7       A.   I'm sure I did.
8       Q.   Okay.  Again, we have an
9   e-mail chain, which starts, if you flip
10  over the page at the bottom, 928.
11          There's an e-mail from
12  PBJ -- I'm sorry, PBJennings@UPS.com?
13      A.   Yes.
14      Q.   And that's Peter Jennings,
15  correct?
16      A.   It is.
17      Q.   And according to the e-mail,
18  his title was customer service
19  supervisor?
20      A.   He was, yes, at UPS.
21  Correct.
22      Q.   And he's e-mailing you
23  asking, Lisa, do you have more details
24  about what's going on with C-II products

Page 543

1   in Florida (the statewide restriction on
2   these products)?
3          Did I read that correctly?
4       A.   Yes.
5       Q.   And what did he mean by --
6   do you know what he meant by C-II
7   products?
8          MR. LIMBACHER:  Object to
9   form.
10         THE WITNESS:  C-II products,
11  yes, the controlled substance,
12  C-IIs.  Opioids, yes.
13  BY MR. LENISKI:
14      Q.   Schedule II controlled
15  products?
16      A.   Schedule IIs, yes.
17      Q.   That's correct?
18      A.   That's correct.
19      Q.   Flip over to page 928.  You
20  respond to Mr. Jennings on November 29th,
21  2012.
22         You say, I have no idea what
23  this is about.  Where did you hear this?
24      A.   Right.

Page 544

1       Q.   And then if you go to the
2   very next e-mail up at the top -- I'm
3   sorry, just up at the top of the previous
4   e-mail, he explains, We're getting calls
5   in the last week or two.  It sounds kind
6   of strange, but I think there is a
7   legitimate, full-fledged effort to
8   restrict C-IIs in the entire state of
9   Florida.  Sounds uncanny, but it's what
10  we're hearing.
11         Did I read that correctly?
12      A.   You did.
13      Q.   He even makes reference to
14  getting a call last week from a patient
15  about this issue; is that correct?
16      A.   That's what it states, yes.
17      Q.   And if you go up the e-mail
18  chain, after someone with the name it
19  looks like L-C-I-C-H-O-C-K-I?
20      A.   Linda Cichocki, yes.
21      Q.   What was what was her role
22  at UPS?
23      A.   She was a customer service
24  rep supporting Endo at UPS.

Page 545

1       Q.   She was on -- was she part
2   of the same team that Peter was?
3       A.   Yes.
4       Q.   So she writes, later on, on
5   November 29th and says, Pete, I just had
6   a call from a wheelchair-bound patient
7   who used our Opana locater service to
8   find her medication each month and this
9   month, just now when she called, she was
10  told the locater service is no longer
11  servicing the state of Michigan.  When I
12  asked -- when I called the Opana locater
13  service to ask about Florida, they stated
14  they can no -- they cannot tell me which
15  states they service or not, only do
16  searches by zip code.
17         Did I read that correctly?
18      A.   Yes.
19      Q.   Did you have an
20  understanding of what the Opana locater
21  service was at this time?
22      A.   When we had the supply issue
23  that I talked about earlier, Endo set up
24  a pharmacy locater so patients could find

137 (Pages 542 to 545)

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1    which pharmacies had Opana during our
2    supply issues.  That's what that was set
3    up for.
4        Q.   Where was that set up?  Was
5    it through a website?
6        A.   I don't know.  That wasn't
7    my responsibility.  That was done by the
8    marketing team.  I don't know where -- I
9    don't know what program or anything that
10   they used.
11       Q.   And was it intended to be
12   used by patients to be able to find Opana
13   to fill their prescriptions for Opana ER?
14       A.   During our supply disruption
15   only, yes.
16       Q.   How long did the Opana
17   locater service operate, to your
18   knowledge?
19       A.   All I can tell you is we had
20   our supply issue with Opana starting
21   December of '11 and went through mid
22   2012, third quarter of 2012.
23       Q.   This e-mail looks like it's
24   in November of 2012.  So the supply

Page 547

1    issues you're referring to have ended by
2    now; is that your testimony?
3        A.   That's what I recall, yes.
4        Q.   So there was something else
5    going on in the state of Florida that's
6    causing the issues in the e-mails,
7    correct?
8        A.   That's what --
9             MR. LIMBACHER:  Object to
10            form.
11            THE WITNESS:  That's what I
12            would believe, based on the
13            e-mails.
14   BY MR. LENISKI:
15       Q.   In fact, if we look at the
16   e-mail just immediately preceding -- or
17   following the e-mail we just read, if you
18   look at the Page 927, at the bottom
19   there's an e-mail from you to Linda,
20   Peter and others --
21       A.   The team, yes.
22       Q.   -- responding to Linda.  And
23   you say, There is plenty of Opana out in
24   the market.

Page 548

1        A.   Which tells me that our
2    supply issue was over at this point.
3        Q.   And you said, The Opana
4    locater service was really needed during
5    our shortage, correct?
6        A.   That's correct.
7        Q.   And you also go on, She
8    should be able -- I'm sorry, We should be
9    able to tell this patient she can call
10   any of her local pharmacies and with a
11   prescription, she should be able to have
12   it filled without any issues.
13            Correct?
14       A.   Right.  Based on the fact
15   that our wholesalers had inventory at
16   this time.
17       Q.   And, again, reading this
18   e-mail, it doesn't tell you or refresh
19   your recollection about how long the
20   Opana locater service was in effect?
21       A.   Right.  Based on reading the
22   e-mail and what I remember, I think it
23   was only during our shortage.
24       Q.   So the very next e-mail up

Page 549

1    on this exhibit, the same page, 927,
2    Peter Jennings responds to your e-mail
3    about their being plenty of Opana in the
4    market.
5            And he says, Hi All.  I was
6    down in Joanie's office a bit ago, and we
7    talked to regulatory directly.  And they
8    are not aware of any issue affecting
9    Florida, not as a state.
10            Correct?
11       A.   Right.  To confirm, when
12   he's saying "regulatory," that's UPS's
13   regulatory group.
14       Q.   Fair enough.
15            He goes on, There could be,
16   quote, pockets of pharmacies that might
17   be having DEA issues, but doesn't appear
18   to be a state thing.
19            Did I read that correctly?
20       A.   Yes.
21       Q.   Now he asks you, Lisa,
22   underline, regulatory is still looking
23   into it but was curious if anything pops
24   up information-wise on your end.

138  (Pages 546 to 549)

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1    Did I read that correctly?
2    A.   Uh-huh.
3    Q.   Okay.  And let's skip up to
4  the very top of the page, where you
5  appear to be responding to the team,
6  including Linda and Peter, on --
7    A.   Yes.
8    Q.   -- November 29th.
9    You say, I know that
10 Cardinal has really increased their SOM
11 program, so I'm wondering if they are
12 cutting them off because they are
13 ordering too much.
14   A.   Right.
15   Q.   Did I read that correctly?
16   A.   You did.
17   Q.   Now, on what were you basing
18 that observation?
19   A.   Again, it's just --
20   MR. LIMBACHER:  Object to
21 form.
22   THE WITNESS:  -- like I
23 stated, that's just my opinion.  I
24 guess, if I recall, just

Page 551

1  conversations maybe with Cardinal
2  back at that time.  I don't really
3  remember.
4  BY MR. LENISKI:
5    Q.   Well, you make the
6  statement, it's affirmative, Cardinal has
7  really increased their SOM program,
8  right?
9    A.   I state that, yes.  That's
10 what it says.
11   Q.   Do you know -- you remember
12 having discussions with Cardinal on that
13 point?
14   A.   I don't remember having
15 discussions with Cardinal directly.  It's
16 back in 2012.  I don't remember.
17   Q.   Do you recall whether -- or
18 why Cardinal had increased their SOM
19 program at this time of November 2012?
20   MR. TULLY:  Object to the
21 form.
22   THE WITNESS:  Probably
23 because of the opioid crisis,
24 everybody was redoing their SOM

Page 552

1    programs or making enhancements
2    and making changes.
3  BY MR. LENISKI:
4    Q.   Were you aware of other
5  wholesalers who were increasing their SOM
6  program at the same time, late 2012?
7    A.   No.  All I know is our
8  wholesalers have an SOM program.  I don't
9  know the details behind the programs.
10   Q.   Why did Peter believe you
11 might have information about this issue
12 that's affecting Florida and pharmacies
13 not being able to get Opana ER?
14   MR. LIMBACHER:  Object to
15 form.
16 BY MR. LENISKI:
17   Q.   Do you have any idea?
18   A.   Because UPS is our 3PL,
19 third-party logistics company, and we
20 partner with them on anything to do with
21 Endo's business.  So it's not unusual for
22 him to reach out.
23   Q.   Did you represent to Peter
24 that you had understanding about your

Page 553

1  wholesalers' SOM programs in addition to
2  Endo's SOM program?
3    A.   I don't recall.  I mean,
4  just based on what my e-mail says, yes.
5    Q.   Was that something you
6  tracked, was what your wholesalers were
7  doing with their SOM programs?
8    A.   No.  We just know that our
9  wholesalers have SOM programs.  I don't
10 know the details behind the SOM programs
11 at our wholesalers.
12   Q.   And then you go on to say,
13 in the same e-mail, All we can state is
14 that we have plenty of inventory and it's
15 not on backorder and our wholesalers have
16 it in stock.
17   Correct?
18   A.   That's correct.  At this
19 time, obviously, we were off our supply
20 issue and our wholesalers have inventory.
21 If the patients can't get it, that's not
22 my -- all we can tell them is that it's
23 not on backorder.
24   Q.   Other than individuals in

139 (Pages 550 to 553)

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1  this e-mail, did you discuss your
2  statement here that Cardinal may have
3  stopped shipping to Florida pharmacies
4  due to concerns about over-ordering with
5  anyone else at Endo?
6      A.  Not that I recall.
7      Q.  Never elevated that
8  observation to anyone else, to your
9  knowledge?
10     A.  Not that I recall.
11     Q.  Do you believe you're
12 obligated to do that?
13         MR. LIMBACHER:  Object to
14 form.
15         THE WITNESS:  No.
16         MR. LENISKI:  Ms. Walker,
17 pending any questions from
18 counsel, I think I'm finished.
19 Thank you very much.
20         MR. LIMBACHER:  Thank you.
21         VIDEO TECHNICIAN:  Going off
22 record.  The time is 5:42.
23              - - -
24         (Whereupon, a brief recess

Page 555

1  was taken.)
2              - - -
3         VIDEO TECHNICIAN:  We're
4  going back on the record.  The
5  beginning of Media File Number 10.
6  The time is 5:46.
7              - - -
8         EXAMINATION
9              - - -
10 BY MR. LIMBACHER:
11     Q.  Good evening, Mrs. Walker.
12 I know it's been a very long day, and I'm
13 sure you're very tired and are looking
14 forward to getting home.  But this is my
15 opportunity to ask you a few questions
16 and to kind of present you to the jury so
17 they have an opportunity to get to know
18 you just a little bit.
19         Can you tell us, and I know
20 some of these things we've covered
21 earlier, can you tell us, are you
22 currently employed at Endo?
23     A.  Yes, I am.
24     Q.  And when did you begin

Page 556

1  working for Endo?
2      A.  November 2nd, 1998.
3      Q.  And can you tell us your
4  current job title?
5      A.  I'm the director of
6  distribution and customer service for
7  Endo.
8      Q.  And before we get into your
9  job responsibilities and your history,
10 can you tell us, did you go to college?
11     A.  I did.
12     Q.  And where did you go?
13     A.  Wilmington College.
14     Q.  And when did you graduate?
15     A.  May of 1995.
16     Q.  What degree did you receive?
17     A.  Bachelor's in business
18 management.
19     Q.  And kind of walk us through,
20 very briefly, your work history after you
21 received your degree from Wilmington
22 College.
23         Where did you first work?
24     A.  I actually started working

Page 557

1  at DuPont in October of '89.  So I got my
2  degree at night going to Wilmington
3  College.
4      Q.  And when you first started
5  working at DuPont, what did you do?
6      A.  I delivered mail.  I pushed
7  a mail cart and delivered mail.
8      Q.  And about how long were you
9  doing that at DuPont?
10     A.  Probably about two years,
11 two-and-a-half, give or take.
12     Q.  And then at some point in
13 time, did you start to work in the
14 customer service department at DuPont?
15     A.  Yes.  Then I moved over to
16 the customer service department.  It was
17 DuPont Merck at the time.
18     Q.  And when did you join Endo?
19 I think you said 1998; is that right?
20     A.  Yes.  November of '98.
21     Q.  And in what department were
22 you first employed at Endo?
23     A.  I was -- I've always been in
24 the customer service and distribution

140  (Pages 554 to 557)

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1  department at Endo.
2      Q.    And have you received any
3  promotions over the 20 years that you've
4  been working for Endo?
5      A.    Yes, a few.
6      Q.    And tell us, what are the
7  different roles and job titles that
8  you've held at Endo?
9      A.    I came in as a contract
10  analyst.  Then I was promoted to
11  supervisor of distribution, manager of --
12  I forget the exact title.  Manager within
13  customer service, then associate director
14  and then director.
15      Q.    And when did you become
16  associate director of customer service at
17  Endo, if you remember?
18      A.    2003, 2004, something like
19  that.
20      Q.    And when did you become the
21  director of customer service?
22      A.    2015.
23      Q.    And what have been your
24  basic job responsibilities over time, as

Page 559

1  both associate director and director of
2  customer service in distribution?
3      A.    One of the main functions is
4  to manage the UPS relationship.  And then
5  anything around customer service and
6  distribution for the branded products.
7      Q.    And before we get into
8  details, has Endo's distribution team had
9  a monitoring program in place to track
10  suspicious orders of branded opioids?
11      A.    Yes, we did.
12      Q.    And since you've been at the
13  company, has Endo's distribution team
14  always had safeguards in place to prevent
15  diversion of Endo's opioids?
16          MR. BUCHANAN:  Objection to
17  form.
18          THE WITNESS:  Yes, we have.
19  BY MR. LIMBACHER:
20      Q.    Now, let's walk through how
21  an order for branded opioids comes in to
22  the company.
23          First, who are Endo's
24  customers for their branded opioids?

Page 560

1      A.    As it relates to opioids,
2  the customers are our wholesalers.
3      Q.    And are there any
4  particularly large wholesaler customers
5  that Endo sells its branded opioids to?
6      A.    We have three large
7  wholesale customers; AmerisourceBergen,
8  Cardinal and McKesson.
9      Q.    And are the majority of the
10  sales of branded opioids, as you
11  understand it for Endo, sold to those
12  three large national wholesalers?
13      A.    Yes.  I believe they make up
14  about 90 percent of the business.
15      Q.    Do pharmacies ever place an
16  order with Endo for branded opioids?
17      A.    No.
18      Q.    What about a doctor's
19  office, do they ever order opioids
20  directly from Endo?
21      A.    No.
22      Q.    And what about a pain
23  clinic, do they ever order branded
24  opioids directly from Endo?

Page 561

1      A.    No.
2      Q.    What about manufacturing of
3  the branded opioids at Endo sales, has
4  Endo itself manufactured those branded
5  opioids?
6      A.    We've always had contract
7  manufacturers for Endo.
8      Q.    And once the branded opioids
9  are manufactured by the contract
10  manufacturers, where are they stored?
11      A.    Once they're made, they are
12  shipped to UPS Supply Chain Solutions in
13  Memphis, Tennessee.  And that's where the
14  distribution is done, and that's where
15  they are stored.
16      Q.    And how long has that been
17  the case?
18      A.    We've been in Memphis since
19  April of 2000.
20      Q.    And is the warehouse that's
21  in Tennessee, is that guarded?
22      A.    Yes.
23      Q.    And how are the branded
24  opioids then distributed from Endo to the

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1    wholesaler customers that you identified?
2        A.    For the big three, they are
3    shipped on dedicated trucks directly from
4    the distribution center to the three big
5    wholesalers' national distribution
6    centers.
7        Q.    And what about for the other
8    regional wholesalers that you sell
9    branded opioids to?
10       A.    They are shipped -- because
11   of the order size, they are a little bit
12   smaller, so they are shipped UPS Second
13   Day Air.  And we use Second Day Air to
14   limit the time they're in transit.
15       Q.    And is there a company that
16   Endo has contracted with to actually
17   perform the distribution of the branded
18   opioids?
19       A.    UPS Supply Chain Solutions.
20       Q.    And is there a current
21   contract between Endo and UPS?
22       A.    Yes.
23       Q.    And what's the purpose of
24   that contract, as you understand it?

Page 563

1        A.    It's the contract that lays
2    out all the customer service functions
3    that they perform, plus the warehousing
4    and distribution and the freight that
5    they manage for Endo.
6        Q.    And I think we looked at
7    some of those contracts earlier, but how
8    long has Endo had that kind of a contract
9    with UPS to provide those services?
10       A.    Customer service started in
11   April of '99, and then distribution
12   started in April of 2000.
13       Q.    And has UPS had its own
14   suspicious order monitoring program that
15   it applies to orders for Endo's branded
16   opioids?
17       A.    Yes.
18       Q.    And how long has that been
19   the case, Mrs. Walker?
20       A.    It's been in their contract
21   since the beginning.
22       Q.    When Opana launched -- I
23   believe that was in 2006; is that right?
24       A.    Yes, I believe so.

Page 564

1        Q.    Did Endo have its own set of
2    processes to prevent suspicious orders
3    and diversion of Opana?
4        A.    We had an excessive program
5    in place at that time.
6        Q.    And are you familiar with
7    something that's referred to as Endo's
8    risk minimization action plan?
9        A.    I know that there was a risk
10   MAP cross-functional team at Endo.
11       Q.    Let me show you what we're
12   going to mark as the next exhibit.
13           MR. LIMBACHER:  Is that
14       Exhibit-31?
15           MR. TOLIN:  Yes.
16           - - -
17           (Whereupon, EndoWalker
18       Exhibit-31,
19       ENDO_OPIOID_MDL_00299957-0030002,
20       was marked for identification.)
21           - - -
22   BY MR. LIMBACHER:
23       Q.    And, for the record, this is
24   Bates marked Endo_Opioid_MDL299957

Page 565

1    through 300002.
2            And you see this document is
3    entitled, Risk Minimization Action Plan
4    for Opana ER?
5        A.    Yes.
6        Q.    And have you seen this
7    before?
8        A.    I have at some point, I
9    believe.
10       Q.    And in carrying out your job
11   responsibilities as -- well, let me back
12   up.
13           This is dated June of 2007;
14   is that right?
15       A.    Yes.
16       Q.    So at that time, in carrying
17   out your job responsibilities as the
18   assistant director of distribution, did
19   you provide information that went into
20   this document?
21           MR. BUCHANAN:  Objection to
22       form.  Foundation.
23           THE WITNESS:  I provided
24       information to my boss, who was

142  (Pages 562 to 565)

Page 566

1      part of the team at that time.
2   BY MR. LIMBACHER:
3      Q.   Okay.  And let me direct you
4   to Page 8 of Exhibit-31.
5      A.   Okay.
6      Q.   And near the bottom of the
7   page, right before the section heading,
8   Goals and Objectives, there's a paragraph
9   that states, In summary, Endo recognizes
10  that access to opioid analgesics is
11  critical for the millions of people
12  suffering from chronic pain but that the
13  risks of prescription opioids, including
14  addiction and diversion, must also be
15  addressed.  To that end, the following
16  risk MAP has been developed and was
17  implemented at the time Opana ER was
18  marketed.  It is Endo's belief that this
19  comprehensive risk MAP will help protect
20  the public and aid in minimizing the
21  abuse, misuse and diversion of its Opana
22  products.
23      Did I read that correctly?
24      A.   Yes, you did.

Page 567

1      Q.   And is that consistent with
2   your understanding of the purpose of this
3   risk MAP document that we're looking at?
4      A.   Yes.
5      Q.   And you were focused
6   primarily, I think you've told us
7   repeatedly throughout the course of the
8   day, on the issue of the suspicious order
9   monitoring program as it applied to your
10  customer service and distribution job
11  responsibilities; is that right?
12      A.   Right.  Right, with regards
13  to shipments to wholesalers.
14      Q.   So if I can direct you to
15  Page 23 of Exhibit-31, this risk
16  minimization action plan.
17      A.   I'm sorry, 23, you said?
18      Q.   Yes.
19      A.   Yes, okay.
20      Q.   And you see there in Section
21  3.4, part of Endo's risk minimization
22  action plan for Opana ER was -- involved
23  oversight of the distribution chain,
24  right?

Page 568

1      A.   Yes.
2      Q.   And you were involved in
3   some of this; is that correct?
4      A.   Correct.
5      Q.   And in the first paragraph
6   under Section 3.4, it says, As for all of
7   Endo's controlled substance products, the
8   manufacture and distribution chain is
9   highly controlled and closely monitored.
10  Endo employs sophisticated controls and
11  monitoring at its manufacturing sites, in
12  transit to Endo's distribution center, at
13  the distribution center, and in transit
14  to the wholesalers and large retail
15  chains with appropriate C-II vaults.  All
16  of Endo's manufacturing and distribution
17  sites are rigorously inspected by the
18  DEA, and all have close working
19  relationships with their respective law
20  enforcement agencies.
21      First of all, did I read
22  that correctly?
23      A.   You did.
24      Q.   And is that consistent with

Page 569

1   your understanding with regard to
2   oversight by Endo over the distribution
3   chain of its branded opioids?
4      MR. BUCHANAN:  Objection to
5   form.
6      THE WITNESS:  Yes, that's
7   correct.  That's correct.
8   BY MR. LIMBACHER:
9      Q.   And you have personal
10  knowledge with regard to what is set
11  forth in that language that I just read;
12  is that fair?
13      MR. BUCHANAN:  Same
14  objection.
15      THE WITNESS:  As far as it
16  relates to the distribution
17  center, yes.
18  BY MR. LIMBACHER:
19      Q.   Now, are there appendices to
20  the risk MAP document, do you recall?
21      A.   I believe there's a flow
22  chart.
23      Q.   Let's take a look, first of
24  all, at Appendix 2, which is on Page 42

Page 570

1    of Exhibit-31.
2         MR. BUCHANAN: Do you have a
3    Bates number, counsel?
4         MR. LIMBACHER: I'm sorry?
5         MR. BUCHANAN: Bates number?
6         MR. LIMBACHER: Page 42. So
7    just internal numbering, okay.
8         MR. TOLIN: He's asking for
9    the Bates number.
10        MR. LIMBACHER: Oh, you're
11   looking for the Bates number?
12        MR. LIMBACHER: That's fine.
13   I'm happy to use the internal
14   number. I just wanted to make
15   sure I'm on the same page.
16   BY MR. LIMBACHER:
17     Q.   This is what I'll call a
18   flow chart, does that make sense?
19     A.   Yes, it's a flow chart.
20     Q.   And it sets forth some of
21   the safeguards that Endo employed to
22   prevent opioid diversion, fair?
23     A.   Yes.
24     Q.   And, again, your focus was

Page 571

1    primarily with regard to distribution,
2    right?
3      A.   That's correct.
4      Q.   So let's look in the middle
5    of Appendix 2, where it provides what
6    some of these safeguards are that were in
7    place at the distribution center for the
8    branded opioids.
9      A.   Okay.
10     Q.   Okay. Can you kind of walk
11   us through what's set forth here?
12     A.   Sure. So once products
13   arrive at the distribution center from
14   the manufacturer, everything is shipped
15   from our manufacturer in a sealed truck.
16     So before the truck is
17   unloaded at the distribution center, the
18   receiving team will verify the
19   documentation that the seal on the truck
20   is still intact, that it's the same seal
21   that it left the manufacturing site with.
22   There's cameras involved, when the truck
23   is unloaded, as the product is moved into
24   the vault.

Page 572

1        When orders are picked, they
2   are picked by one person with an RF gun,
3   and then they are secondary checked by
4   another warehouse associate to ensure
5   that the order is correct. That states
6   the double check.
7        Controlled substances are
8   over packed, and what I mean by that is
9   if, for some reason, one wholesaler
10   ordered one case of product, that one
11   case is not shipped out the door, that
12   case is put into another brown box to
13   conceal the product that's actually in
14   the box.
15        And then before any product
16   is actually shipped out the door, a cycle
17   count is performed on all inventory to
18   make sure the inventory is correct.
19        That's just some of the few
20   that's listed here.
21     Q.   And if we can turn to the
22   next page, Page 43 of Exhibit-31,
23   identified as Appendix 3.
24        Are you with me?

Page 573

1      A.   Yes.
2      Q.   And this sets out some of
3   the order processing and distribution
4   safeguards that were implemented by Endo;
5   is that fair?
6      A.   Yes.
7      Q.   And tell us, what is the
8   excessive order management program that's
9   described here?
10     A.   So when this was created
11   back in 2007, it was our old excessive
12   program that we had in place. And it
13   looked at the customer's orders for the
14   past three-month and twelve-month
15   averages before anything issued.
16     Q.   And as the associate
17   director of customer service at this
18   time, did you have a role in monitoring
19   suspicious orders?
20     A.   It was part of my job, yes.
21     Q.   And looking at the middle of
22   Page 43, it talks about what it is that
23   the folks in the customer service and
24   distribution department, like yourself,

Highly Confidential - Subject to Further Confidentiality Review

Page 574

1  would do in the event that a particular
2  order was kicked out.
3        Do you see that?
4        A.  Yes.
5        Q.  And would your department
6  sometimes reach out to customers and ask
7  why they placed an order that was larger
8  than it -- historically had been placed?
9        A.  I'm sure -- I mean, I don't
10  recall specific examples, but I'm sure we
11  may have.
12        Q.  Right.
13        A.  Yes.
14        Q.  And depending on the
15  information that you got back from the
16  customers, would a decision be made as to
17  whether or not to release the order or
18  not?
19        A.  Yes.
20        Q.  If you look at the bullet
21  points that are down kind of in the
22  middle of Page 43 of this risk MAP
23  document -- are you with me?  The one
24  that says -- starting, Customer has

Page 575

1  acquired a new customer or new contract.
2        A.  Yes.
3        Q.  Are these examples of some
4  of the types of information that you
5  might be provided when you reach out to
6  customers to try to get information about
7  these orders that are getting kicked out?
8        A.  Yes.  I mean, some
9  customers, they change wholesalers, so
10  that would be an example.  I mean, sales
11  have just increased over time.  Customers
12  have consolidated warehouses, closed
13  warehouses.
14        Some of the other reasons
15  which aren't listed here, holiday buying
16  patterns is always one that triggers some
17  excessive orders.
18        Q.  Now, you were asked a lot of
19  questions earlier about efforts outside
20  of your customer service and distribution
21  department that Endo was making with
22  regard to trying to minimize the risk of
23  diversion.
24        Do you recall that?

Page 576

1        A.  Yes.
2        Q.  And you don't have any
3  personal knowledge about a lot of that;
4  is that fair?
5        A.  Yes, that's fair.
6        Q.  But a lot of that, a lot of
7  those efforts are described here in this
8  risk minimization action plan that we've
9  been looking at, Exhibit-31; is that
10  correct?
11        MR. BUCHANAN:  Objection to
12  form and foundation.
13        THE WITNESS:  Right.  This
14  MAP is multiple different
15  cross-functional teams within
16  Endo.  That is not part of my area
17  of responsibility.
18  BY MR. LIMBACHER:
19        Q.  And if you look at Table 2,
20  the table of -- I'm sorry, Page 2, the
21  table of contents of Exhibit-31, that
22  lays out some of the various ways and
23  safeguards that Endo implemented in an
24  attempt to minimize the risk of

Page 577

1  diversion?
2        MR. BUCHANAN:  Objection.
3  Form.
4        THE WITNESS:  Yes, correct.
5  Again, this is all different
6  groups within Endo.  That's not
7  part of my area of responsibility.
8  BY MR. LIMBACHER:
9        Q.  Right.  And that's why I
10  tried to focus you specifically on the
11  distribution information that's in this
12  particular document.
13        MR. BUCHANAN:  Objection.
14  Move to strike the colloquy.
15  BY MR. LIMBACHER:
16        Q.  But I want to direct you
17  to -- do you recall being asked
18  information by counsel with regard to
19  so-called IMS data or Wolters Kluwer
20  data?
21        A.  That was asked of me earlier
22  today, but that's not -- again, that's
23  our sales group.  That's not part of my
24  area of responsibility.

Highly Confidential - Subject to Further Confidentiality Review

Page 578

1       Q.   If you turn to Page 29 of
2   Exhibit-31.
3       A.   I'm sorry, 29?
4       Q.   Yes.
5       A.   Okay, I'm there.
6       Q.   And does this identify what
7   Endo was doing with regard to looking at
8   Wolters Kluwer data --
9           MR. BUCHANAN:  Objection to
10  form.
11  BY MR. LIMBACHER:
12      Q.   -- as part of this risk
13  minimization action plan?
14          MR. BUCHANAN:  Same
15  objection.
16          THE WITNESS:  It's -- that
17      data is listed.  But again, that's
18      not part of my area of
19      responsibility, so I really can't
20      speak to it.
21  BY MR. LIMBACHER:
22      Q.   I understand.
23          And if we go to Page 31 of
24  this document, under Section 4.2.

Page 579

1       A.   Yes.
2       Q.   I think you got asked a
3   couple of questions just a little while
4   ago with regard to Endo's risk management
5   team, which you said was a
6   cross-functional team?
7       A.   Yes.
8       Q.   You were not a member of
9   that team, as I understand it; is that
10  right?
11      A.   No, I was not.
12      Q.   But your boss was a member?
13      A.   At that time, yes.
14      Q.   And let's put Exhibit-31
15  aside.
16          Do you recall at some point
17  in time that UPS informed you that it was
18  implementing an enhanced suspicious order
19  monitoring program?
20      A.   Yes, I do remember.
21      Q.   And do you recall when that
22  was?
23      A.   I think it was early 2010.
24  I may not have the date correct.

Page 580

1       Q.   And at that time, do you
2   recall if they provided you with a
3   general description of their enhanced SOM
4   program in early 2010?
5       A.   Yes, they provided our
6   clients with -- some people call it a
7   white paper or executive summary.
8       Q.   Well, let's take a look at
9   that document, please.  We can mark that
10  as Exhibit-32.
11          -   -   -
12          (Whereupon, EndoWalker
13      Exhibit-32,
14      ENDO_OPIOID_MDL_01239751-753, was
15      marked for identification.)
16          -   -   -
17  BY MR. LIMBACHER:
18      Q.   Does Exhibit-32 appear to be
19  the executive summary or white paper that
20  UPS provided to Endo to describe their
21  enhanced SOM program?
22      A.   Yes, it is.
23          MR. BUCHANAN:  Objection to
24      form.

Page 581

1   BY MR. LIMBACHER:
2       Q.   And is this something that
3   you've seen before?
4       A.   Yes, I have.  Many times.
5       Q.   And what is your
6   understanding as to who created this
7   document?
8       A.   It was created by UPS's
9   regulatory group.
10      Q.   And if you could read for
11  the jury, under background on the first
12  page, what are they -- what is UPS
13  telling Endo as to the purpose of this
14  document?
15      A.   Do you want me to read this?
16  Or just --
17      Q.   Just read that first
18  paragraph for us, please, thank you.
19      A.   The purpose of the document
20  is to provide an executive summary of UPS
21  SCS suspicious order monitoring, SOM,
22  program.
23      Q.   And is UPS providing
24  information with regard to face-to-face

Highly Confidential - Subject to Further Confidentiality Review

Page 582

1  meetings that they had with the DEA prior
2  to the drafting of this executive
3  summary?
4          Do you see that in the third
5  paragraph?
6      A.  Yes.
7          MR. BUCHANAN:  Objection to
8      form.
9          THE WITNESS:  UPS won't
10      disclose their meetings, but they
11      just stated that they had a
12      meeting with the DEA.
13  BY MR. LIMBACHER:
14      Q.  Yeah.  Why don't you read
15  for the jury what's in the third
16  paragraph of the executive summary we've
17  marked as Exhibit-32?
18      A.  In face-to-face meetings,
19  UPS SCS has described to DEA its
20  third-party logistics provider role.  DEA
21  has been clear in its direction to UPS
22  SCS about its responsibilities as a
23  member of a registrant population.  DEA
24  expects UPS SCS to have an SOM program

Page 583

1  independent of any existing or future
2  client's SOM programs.
3      Q.  And was that consistent with
4  your understanding with regard to the UPS
5  SCS SOM program?
6      A.  Yes.
7          MR. BUCHANAN:  Objection to
8      form.
9          THE WITNESS:  Yes, I always
10      knew they had an independent
11      program than Endo's.
12  BY MR. LIMBACHER:
13      Q.  And could you read for the
14  ladies and gentlemen of the jury next
15  paragraph in this UPS executive summary?
16      A.  UPS SCS will make every
17  effort to communicate and work in
18  partnership with its clients to ensure
19  that all orders that call for a DEA
20  schedule listed drug products are
21  properly evaluated and determination of
22  suspicious is arrived at with the
23  appropriate input from the client and/or
24  customer requesting the order.  However,

Page 584

1  the ultimate responsibility of making a
2  suspicious order determination must
3  reside with UPS SCS regulatory affairs to
4  remain compliant with the DEA
5  requirements.
6      Q.  And, again, was that
7  consistent with your understanding as to
8  where the ultimate responsibility lied?
9          MR. BUCHANAN:  Objection to
10      form.
11          THE WITNESS:  Yes.  I always
12      knew it lied with UPS.
13  BY MR. LIMBACHER:
14      Q.  Were you also provided with
15  at least some information with regard to
16  the algorithm that UPS was utilizing as
17  part of its enhanced SOM program in early
18  2010?
19      A.  Yes.  I know that UPS's
20  program is considered confidential and
21  proprietary, but they provided a summary
22  to their clients.
23      Q.  And if you could read for
24  the jury the first paragraph, on the

Page 585

1  first page here, under the heading, UPS
2  SCS approach?
3      A.  The UPS SCS quality
4  assurance, QA/regulatory affairs, RA,
5  department has worked with the UPS
6  business information and analytics BIA
7  group to develop an algorithm for
8  statistical analysis for controlled
9  substance orders.  The UPS BIA department
10  includes Ph.D. statisticians who have
11  developed a sophisticated algorithm
12  advanced enough to evaluate order
13  quantity and frequency trends.  In
14  addition, the algorithm also evaluates
15  older trends across like customers
16  ordering these products and across the
17  entire UPS SCS customer database ordering
18  controlled substances.
19      Q.  And if you turn to the
20  second page of the UPS white paper, or
21  executive summary, is there more
22  information provided there describing
23  what the UPS SOM program was at this
24  point in time?

147  (Pages 582 to 585)

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1     A.   Yes.  It has a summary.
2     Q.   And, finally, turning to the
3  last page of the executive summary, if
4  you look down at the bottom, under
5  Paragraph Number 5, can you read for the
6  ladies and gentlemen of the jury what UPS
7  is telling you at this point?
8     A.   After thorough evaluations
9  have been conducted and an order is
10 deemed suspicious, the order must be
11 cancelled in the order management system
12 and the appropriate agency notification
13 made.  Any agency communication will be
14 documented and be provided to the client.
15    Q.   Now, did Endo have the right
16 to audit UPS under its distribution
17 contract, as far as you know?
18    A.   Yes, we do.
19    Q.   And did Endo ever conduct an
20 audit of UPS's suspicious order
21 monitoring program?
22    A.   Yes, we did.
23    Q.   Let's take a look at the
24 next document that we'll mark as Exhibit

Page 587

1  Number 33.
2              - - -
3        (Whereupon, EndoWalker
4     Exhibit-33,
5     PAR_OPIOID_MDL_0000404095-097, was
6     marked for identification.)
7              - - -
8  BY MR. LIMBACHER:
9     Q.   And this appears to be a
10 memo from Tracey Hernandez and Larry
11 Shaffer, DEA compliance, dated November
12 6th, 2013.  And it appears that you were
13 copied on this memo.
14       Do you see that?
15    A.   Yes, I do.
16    Q.   And the re line of the memo
17 is, Review of UPS suspicious order
18 monitoring activities.
19       Is that right?
20    A.   Yes, correct.
21       MR. BUCHANAN:  Is this 33,
22 counsel?
23       MR. LIMBACHER:  Yes, 33.
24       MR. BUCHANAN:  Thanks.

Page 588

1  BY MR. LIMBACHER:
2     Q.   And who is Tracey Hernandez?
3     A.   Tracey Hernandez was the DEA
4  compliance person at Qualitest/Par.
5     Q.   And did Tracey conduct the
6  audit of the UPS SOM system?
7     A.   Yes.  Tracey did the audit.
8     Q.   Were you present during the
9  audit?
10    A.   I was present, but I
11 didn't -- I didn't do the audit, but I
12 was present.
13    Q.   And do you recall if, as a
14 result of this 2013 audit of the UPS SOM
15 system, if Endo made any suggestions for
16 improvements of that system?
17    A.   I believe the
18 recommendations are on the next page.
19    Q.   Yeah.  If we look on the
20 second page of Exhibit-33, the Paragraph
21 Number 1, with the heading, DEA license
22 check, do you see that?
23    A.   I do.
24    Q.   And that paragraph reads as

Page 589

1  follows:  While UPS monitors the
2  expiration date of a customer's license,
3  they do not subscribe to any monthly
4  service that would provide information on
5  a customer's license suspension or
6  revocation.  Instead, they rely on the
7  customer themselves to be forthcoming and
8  notify them that their license has been
9  affected.  This presents a risk for
10 customers looking to circumvent the
11 controls and illegally obtain controlled
12 products.  There are several entities
13 that offer a monthly feed (NTIS, Metro,
14 to name a few) that compares your
15 customer files to the list of active
16 licenses.  Any licenses not matching are
17 flagged for further research.  It is
18 suggested that UPS subscribe to this
19 service or check each license on DEA's
20 website every time a controlled product
21 is being shipped.
22       Did I read that correctly?
23    A.   Yes, you did.
24    Q.   And do you recall, Ms.

148 (Pages 586 to 589)

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1    Walker, did UPS implement this suggested
2    improvement to their SOM program?
3         A.   I believe UPS now has a tool
4    where they pull the DEA licenses from.
5         Q.   Now, did Endo also make
6    enhancements to its own internal SOM
7    program in and around this time period of
8    late 2013, early 2014?
9         A.   We implemented our current
10   SOM program in May of '14.
11        Q.   Let me show you what we're
12   going to mark as Exhibit-34.
13             - - -
14             (Whereupon, EndoWalker
15   Exhibit-34,
16   ENDO_OPIOID_MDL_05948292-287,
17   (Pages in reverse sequential
18   order), was marked for
19   identification.)
20             - - -
21             MR. TOLIN:  Can we go off
22   the record for a second?
23             MR. LIMBACHER:  Sure.
24             VIDEO TECHNICIAN:  Going off

Page 591

1    record.  The time is 6:15.
2              - - -
3              (Whereupon, a brief recess
4    was taken.)
5              - - -
6              VIDEO TECHNICIAN:  Going
7    back on record.  The beginning of
8    Media File Number 11.  The time is
9    6:15.
10   BY MR. LIMBACHER:
11        Q.   Mrs. Walker, we've shown you
12   what we marked as Deposition Exhibit
13   Number 34, and I'm particularly focused
14   on the e-mail that you sent dated April
15   20, 2014.
16             Do you see that?
17        A.   Yes, I do.
18        Q.   And the subject there is,
19   SOM program, branded pharma, right?
20        A.   Yes.
21        Q.   And you prepared this e-mail
22   in April of 2014 summarizing changes to
23   Endo's internal SOM program?
24        A.   Correct, I did.

Page 592

1         Q.   And referring you to the
2    page that I believe is on the back of
3    this document at Bates number
4    Endo_Opioid_MDL_5948287, it says on the
5    top, SOM process flow?
6         A.   287, yes, I got it.
7         Q.   Are you with me?
8         A.   Yes, I am.
9         Q.   Does this describe the SOM
10   program that Endo implemented in 2014?
11        A.   Under the new process, yes,
12   it does.
13        Q.   And read for us the first
14   bullet under the new process there?
15        A.   Robust SOM program and the
16   new SAP system will be implemented on May
17   5th for the branded business unit.
18        Q.   And then the next bullet
19   point down, the one that starts, Branded
20   orders, could you read that for us as
21   well?
22        A.   Branded orders will go
23   through SOM checks in SAP and then again
24   at UPS under UPS's SOM program.

Page 593

1         Q.   And let's spend just a
2    minute talking about what this new
3    enhanced SOM program was at Endo.
4              If you can go down a little
5    bit further on this page, where it talks
6    about the calculations being based on 12
7    months of historical data, tell us, what
8    is the data that's being looked at under
9    the new, robust SOM program?
10        A.   So it looks at the quantity,
11   size and frequency by the ship to
12   customer for each particular NDC number.
13   And then it also looks at the quantity,
14   size and frequency for the class of trade
15   by NDC number.  So "class of trade" being
16   wholesalers.
17             So it takes the average of
18   all the wholesalers for that particular
19   class of trade for the past 12 months, by
20   NDC number.
21        Q.   And what is the significance
22   of having added the calculation of
23   averages for quantity, size and frequency
24   for class of trade?

Highly Confidential - Subject to Further Confidentiality Review

Page 594

1    A.  It looks at all --
2         MR. BUCHANAN:  Objection to
3    form.
4         THE WITNESS:  It looks at
5    all of the class of trades for the
6    customer.  So it looks at not just
7    the particular McKesson or ABC or
8    Cardinal, it looks at everything,
9    all wholesalers ordering that
10   product as a whole -- as a
11   benchmark.
12   BY MR. LIMBACHER:
13        Q.  And the benchmark that's
14   created through the calculation of this
15   average would include sales to the
16   regional wholesalers as well as the three
17   larger national wholesalers?
18        A.  Yes, that's correct.
19        MR. BUCHANAN:  Objection to
20   form.
21   BY MR. LIMBACHER:
22        Q.  And would that, then, result
23   in more orders being kicked out and being
24   subject to review as orders of interest?

Page 595

1    A.  Yes, it could.  Because --
2         MR. BUCHANAN:  Objection to
3    form.
4         THE WITNESS:  -- because if
5    you look -- because if you have
6    the big three wholesalers that
7    order X and the smaller ones may
8    order, obviously, a lower quantity
9    because they are smaller
10   customers, it could bring the
11   benchmark down for the class of
12   trade.
13   BY MR. LIMBACHER:
14        Q.  Now, did this Endo SOM
15   process that was enhanced in 2014, did
16   that replace the UPS SOM program, or did
17   the orders for Endo's brand opioids
18   continue to go through both the Endo SOM
19   process and the UPS SOM process?
20        MR. BUCHANAN:  Objection to
21   form.
22        THE WITNESS:  No.  All of
23   our orders always go through
24   Endo's SOM program.  And then once

Page 596

1    they are released, they go through
2    UPS's SOM program before they are
3    shipped.
4    BY MR. LIMBACHER:
5         Q.  And is what's described here
6    in the document we marked as Exhibit-34,
7    is that essentially still the suspicious
8    order monitoring program that's in place
9    at Endo today?
10        A.  Yes, it is.
11        Q.  Just a couple more
12   questions, Ms. Walker.
13        If you can look at the
14   exhibits that you were asked questions
15   about before, I'd like you to pull out
16   Exhibit-15 and Exhibit-22.  If you can
17   find those.
18        A.  If I have 15 and 22?  I'm
19   sorry, I guess I should have kept them in
20   numerical order.
21        Q.  That's okay.  It's been a
22   long day.
23        A.  22.  What's this one?
24   That's 24.  22, got it.

Page 597

1         Q.  You got it?
2         A.  Yes, I do.
3         Q.  Just a few questions.
4         With regard to Exhibit-15,
5    do you recall that you let counsel know
6    that you wanted to provide a little
7    context with regard to the e-mail
8    exchange that's shown here in Exhibit-15?
9         A.  Yes.
10        MR. BUCHANAN:  Objection to
11   form.
12        THE WITNESS:  Yes, I wanted
13   to provide some additional
14   information.
15   BY MR. LIMBACHER:
16        Q.  And this e-mail exchange, as
17   I recall, provides some information with
18   regard to what was happening to certain
19   orders; is that right?
20        A.  Right.  So if I can
21   interject.
22        So during this time frame, I
23   think I spoke about it earlier, too, this
24   is when Endo had a supply issue with

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1  Opana.  And because of the supply issues,
2  a lot of orders were being cut down.  A
3  lot of orders weren't shipped.  A lot of
4  orders were being held because we didn't
5  have inventory, then orders were being
6  shipped.
7      So this was a whole big
8  supply issue we had for multiple months
9  in regards to Opana.
10      And then the other thing,
11  too, to point out is the e-mail from
12  McKesson placing all these orders,
13  normally we ship to McKesson's central
14  distribution center.  But because of our
15  supply issue, we shipped some orders
16  directly out to McKesson's forwarding
17  distribution center so they got inventory
18  quicker for patients, which is an unusual
19  thing that we do.
20      Q.  So were any of the orders
21  that are being discussed in Exhibit-15,
22  were they being reduced in size because
23  they were excessive or suspicious orders?
24      A.  No.  They were being reduced

Page 599

1  in size because we didn't have enough
2  inventory to fill all the orders.
3      Q.  If you can turn to
4  Exhibit-22.  I don't know if you recall
5  being asked a number of questions with
6  regard to this series of e-mails.
7      Do you recall that?
8      A.  I remember discussing this
9  e-mail earlier today.
10      Q.  And the subject line is, DEA
11  representative comments on Opana.
12      Do you remember that?
13      A.  That's what the e-mail
14  states, yes.
15      Q.  And there's quite a few
16  e-mails that are going back and forth
17  from a number of different people in
18  Exhibit-22; is that right?
19      A.  Yes.
20      Q.  Is your name anywhere on any
21  of these e-mails that are a part of
22  Exhibit-22?
23      A.  No, they are not.
24      MR. LIMBACHER:  Thanks very

Page 600

1  much, Mrs. Walker.  I really
2  appreciate your time.
3      MR. BUCHANAN:  I'll have a
4  few follow-ups.  Can we go off?
5      VIDEO TECHNICIAN:  Going off
6  record.  The time is 6:23.
7      - - -
8      (Whereupon, a brief recess
9  was taken.)
10      - - -
11      VIDEO TECHNICIAN:  Going
12  back on the record.  This is the
13  beginning of Media File Number 12.
14  The time is 6:26.
15      MR. BUCHANAN:  Ms. Walker, I
16  have a couple of follow-up
17  questions following up on those
18  answers you provided to counsel a
19  moment ago.
20      - - -
21      EXAMINATION
22      - - -
23  BY MR. BUCHANAN:
24      Q.  If you could pull 34 up

Page 601

1  before you.
2      This is that e-mail exchange
3  where you connected -- I'm sorry, where
4  you attached a document entitled, SOMS
5  process flow.
6      Do you have that before you,
7  ma'am?
8      A.  This one?
9      Q.  Yes.
10      A.  Yes.
11      Q.  And I think you were asked
12  some questions about whether this was the
13  new, robust SOM program of Endo in 2014?
14      A.  Yes.
15      Q.  Okay.  And you were asked
16  what the significance of this new program
17  was.
18      Do you recall those
19  questions?
20      A.  Yes, I do.
21      Q.  We can agree, ma'am, that
22  regardless of how you changed your
23  algorithm, "you" being Endo, all that
24  change would do is identify additional

151  (Pages 598 to 601)

Highly Confidential - Subject to Further Confidentiality Review

Page 602

1  orders of interest that would be subject
2  to human review, fair?
3       A.  Yes, that's correct.
4       Q.  And in each instance before
5  this point in time, when an order of
6  interest was identified, it was cleared
7  by you and cleared for shipping, correct?
8       MR. LIMBACHER:  Object to
9  form.
10      THE WITNESS:  Under both
11  processes, yes.  It was cleared by
12  me or my team for shipping.
13  BY MR. BUCHANAN:
14      Q.  Right.  So this new, more
15  robust SOM program, even if it identified
16  additional orders of interest to be
17  reviewed as excessive for quantity,
18  excessive for size, or excessive for
19  frequency, there was still a human being
20  in your department that would be
21  reviewing the results of that order
22  flagged, correct?
23      A.  We would review it and,
24  again, they would go down to UPS to be

Page 603

1  reviewed by -- through their SOM program.
2       Q.  And in each instance, even
3  with this new robust SOM program, I
4  believe that's what it was characterized
5  as, either by you or by your counsel, you
6  cleared those orders, right?
7       MR. LIMBACHER:  Object to
8  form.
9       THE WITNESS:  After they
10  were reviewed, they were cleared
11  and sent to UPS for review.
12  BY MR. BUCHANAN:
13      Q.  Okay.  So in terms of
14  protecting the public from suspicious
15  orders and protecting the public from
16  diversion and protecting the public from
17  abuse of Opana, we can agree that
18  whatever you do -- did with regard to
19  your SOM program in 2014 did not block a
20  single shipment of Opana ER, correct?
21      MR. LIMBACHER:  Object to
22  form.
23      THE WITNESS:  They were
24  reviewed and released, yes, that's

Page 604

1  correct.
2  BY MR. BUCHANAN:
3       Q.  Did not block a single
4  shipment of Opana, correct?
5       MR. LIMBACHER:  Object to
6  form.
7       THE WITNESS:  No, we did
8  not.  They were reviewed and
9  released to UPS.
10  BY MR. BUCHANAN:
11      Q.  Did not block a single
12  shipment of Percocet, correct?
13      MR. LIMBACHER:  Object to
14  form.
15      THE WITNESS:  They were
16  reviewed and released, correct.
17  BY MR. BUCHANAN:
18      Q.  Narcotics and opioids
19  subject to abuse and subject to the
20  opioid epidemic with which our
21  communities are currently suffering,
22  correct, ma'am?
23      A.  So --
24      MR. LIMBACHER:  Object to

Page 605

1  form.  Argumentative.
2       THE WITNESS:  So, again, if
3  I can point out, you know, I'm
4  doing shipments to wholesalers.
5  There was other areas within Endo
6  that did other things to protect
7  the public, which I think we
8  discussed during our risk MAP.
9  BY MR. BUCHANAN:
10      Q.  And in staying with my
11  question, the narcotics that -- on the
12  orders you were shipping, Percocet, Opana
13  ER, Opana, those are the products that
14  were Class II branded drugs of Endo,
15  correct?
16      A.  Correct.
17      Q.  Those would have been the
18  orders you would have been reviewing,
19  under either the old, less robust SOM or
20  under the new, more robust SOM program,
21  correct?
22      A.  Yes.  They were reviewed at
23  Endo and, again, also reviewed at UPS
24  before shipping.

152  (Pages 602 to 605)

Page 606

```
1        Q.   Each and every one cleared
2   and shipped, correct?
3             MR. LIMBACHER:  Object to
4        form.
5             THE WITNESS:  That's my
6        understanding.
7   BY MR. BUCHANAN:
8        Q.   Okay.  You were asked some
9   questions about Exhibit-22.  I think the
10  question was, do you see your name
11  anywhere on here?
12           Exhibit-22, ma'am, was an
13  exchange where a number of folks within
14  Endo were discussing statements by the
15  DEA about Opana being subject to misuse
16  and diversion.
17           Do you recall that?
18       A.   That's what the e-mail
19  states.
20       Q.   That's what the e-mail
21  states.
22           And I think counsel asked
23  you whether you saw your name anywhere on
24  this thread, correct?
```

Page 607

```
1        A.   Correct.  And my name is not
2   on this thread.
3        Q.   Does it surprise you, ma'am,
4   that the DEA's concerns with regard to
5   Opana and the diversion and the abuse
6   were not shared with you?
7             MR. LIMBACHER:  Object to
8        form.
9             THE WITNESS:  Surprise?
10  BY MR. BUCHANAN:
11       Q.   Yes.
12           Are you surprised?
13           MR. LIMBACHER:  Object to
14       form.
15           THE WITNESS:  Again, there
16       is other areas within Endo that
17       did things to protect the public
18       from abuse of Opana.
19  BY MR. BUCHANAN:
20       Q.   Well, let's talk about that.
21  I think that was one of the items that
22  defense counsel discussed with you, the
23  risk MAP.
24           Do you recall that?
```

Page 608

```
1        A.   Yes.
2        Q.   If you told the FDA you were
3   going to do this stuff, you certainly
4   should have, right?
5             MR. LIMBACHER:  Object to
6        form.  Foundation.
7             THE WITNESS:  I can't speak
8        to the risk MAP.  I was not part
9        of this team.  I can only speak to
10       my area.
11  BY MR. BUCHANAN:
12       Q.   I didn't think you would be
13  able to speak to it either, but your
14  counsel decided to have you speak to it.
15  So we're going to talk about it.
16           MR. LIMBACHER:  Objection.
17       Move to strike.  I asked her
18       questions with regard to
19       distribution.
20           MR. BUCHANAN:  You asked her
21       questions with regard to the
22       broader risk MAP, counsel.  And
23       we'll discuss those.
24  BY MR. BUCHANAN:
```

Page 609

```
1        Q.   You would agree, ma'am, that
2   if the company represented that it was
3   going to undertake specific activities
4   with regard to abuse and diversion of
5   Opana ER, it certainly should have done
6   so, correct?
7             MR. LIMBACHER:  Object to
8        form and foundation.
9             THE WITNESS:  I can only
10       speak to the distribution.  I
11       can't speak to everything within
12       the risk MAP and what other
13       departments did.
14  BY MR. BUCHANAN:
15       Q.   You were talking about that
16  earlier with counsel on examination, do
17  you recall that just a few minutes ago?
18       A.   Rephrase your question.
19       Q.   Do you recall discussing
20  with counsel, just a few moments ago, the
21  other items that the company was
22  purportedly undertaking to minimize abuse
23  and diversion?  Do you recall that?
24           MR. LIMBACHER:  Object to
```

153 (Pages 606 to 609)

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1        form.
2             THE WITNESS:  We discussed
3        the distribution piece of this
4        map.
5    BY MR. BUCHANAN:
6        Q.    And you also discussed other
7    portions of the document.
8             Do you recall that?
9        A.   I think --
10            MR. LIMBACHER:  Object to
11       form.
12            THE WITNESS:  I think I
13       stated in that, that I can't speak
14       to other areas within the company.
15   BY MR. BUCHANAN:
16       Q.    Okay.  So should we
17   disregard your testimony as to whether
18   the company was doing or not doing that?
19            MR. LIMBACHER:  Object to
20       form.
21            THE WITNESS:  I don't think
22       you should disregard my testimony.
23       What I'm stating is, I can't speak
24       to other areas of the company.

Page 611

1        And I think I explained that
2        earlier as well.
3    BY MR. BUCHANAN:
4        Q.    And you can't speak to
5    whether or not the company did what was
6    represented in here, in terms of the
7    efforts to minimize or prevent abuse and
8    diversion, can you, ma'am?
9        A.   I can speak to the
10   distribution piece of this.
11       Q.    As to the nondistribution
12   pieces, which were called to your
13   attention, do you have any -- can you
14   shed any light on whether the company did
15   what was represented; yes or no?
16            MR. LIMBACHER:  Object to
17       form.
18            THE WITNESS:  It's not my
19       area of responsibility.  No, I
20       can't.
21   BY MR. BUCHANAN:
22       Q.    Okay.  With regard to
23   whatever efforts were highlighted to you
24   earlier, can we agree that at no point in

Page 612

1    time did any of these other risk
2    mitigation efforts that are represented
3    in this particular risk MAP, did any
4    other department within Endo bring to
5    your attention particular customers or
6    particular customers of customers to whom
7    you should not ship?
8             MR. LIMBACHER:  Object to
9        form.
10            THE WITNESS:  No, they
11       didn't.  But I can't speak to what
12       other areas of the company did or
13       did not do.
14   BY MR. BUCHANAN:
15       Q.    Well, we know shipments of
16   Opana ER and Percocet would not leave
17   this company without you clearing it,
18   right?
19            MR. LIMBACHER:  Object to
20       form.
21            THE WITNESS:  I shipped the
22       orders to wholesalers, yes.
23   BY MR. BUCHANAN:
24       Q.    So it would be fair to say,

Page 613

1    ma'am, that at no point in time in the, I
2    don't know, dozen or so years that there
3    was a risk MAP for Opana ER did anyone in
4    the company bring to you information
5    concerning one of the company's customers
6    or one of the company's customers'
7    customers identified through these other
8    areas and guide you not to ship to them,
9    did they?
10            MR. LIMBACHER:  Object to
11       form.
12            THE WITNESS:  I can't -- no,
13       they didn't.  I shipped to
14       wholesalers.  Again, I'm shipping
15       to the wholesalers.
16   BY MR. BUCHANAN:
17       Q.    At no point in time did the
18   company come to you, anybody within the
19   company come to you and identify
20   particular customers of those wholesale
21   customers as problematic, either through
22   Wolters Kluwer data or through IMS data
23   or through chargeback data, can we agree
24   to that?

154  (Pages 610 to 613)

Highly Confidential - Subject to Further Confidentiality Review

Page 614

1          MR. LIMBACHER:  Object to
2    form.
3          THE WITNESS:  The IMS data
4    and Wolters Kluwer data is not
5    part of my responsibility.
6    BY MR. BUCHANAN:
7      Q.   I understand.  And I think
8    you were read and shown portions of this
9    document that related to Wolters Kluwer
10   data.
11         Do you recall that?
12     A.   Right.  And I also stated
13   that's not part of my area of
14   responsibility.  I believe I stated that.
15     Q.   Did anybody within the
16   company who had that responsibility ever
17   come to you and discuss their findings
18   with regard to review of that data?
19     A.   No.  But that doesn't mean
20   they didn't do what they were supposed to
21   do within the company.  I can't speak to
22   that.
23     Q.   Do you have any knowledge
24   that they even did it?

Page 615

1          MR. LIMBACHER:  Object to
2    form.
3          THE WITNESS:  I can't speak
4    to that.
5          MR. LIMBACHER:  Foundation.
6          THE WITNESS:  It's not my
7    area of responsibility.
8    BY MR. BUCHANAN:
9      Q.   Okay.  We were just
10   discussing, ma'am, Exhibit-31, which was
11   the risk minimization action plan.
12         In connection with the
13   launch of Opana ER, the company went out
14   and engaged with various law enforcement
15   authorities, correct?
16     A.   I can't --
17         MR. LIMBACHER:  Object to
18   form.  Foundation.
19         THE WITNESS:  I don't know
20   that.  I can't confirm that.
21   That's not my area of
22   responsibility.
23         MR. BUCHANAN:  Can I please
24   have --

Page 616

1          MR. SIEGEL:  552 as
2    Exhibit-35.
3          - - -
4          (Whereupon, EndoWalker
5    Exhibit-35,
6    ENDO_OPIOID_MDL_00852918-925, was
7    marked for identification.)
8          - - -
9    BY MR. BUCHANAN:
10     Q.   I'd like to direct your
11   attention, after you get it, ma'am, to
12   Page 552.3.
13         It's a law enforcement
14   outreach Q and A.  And you'll see the
15   prior page, 552.2, identified
16   prescription drug surveillance systems
17   and -- excuse me.
18         Let's start on the first
19   page, please, actually.
20         This is July 17th, 2006
21   graphic for diversion control from a
22   David Kerr to Heather Mullen.
23         Do you know who they are?
24     A.   No.

Page 617

1      Q.   David Kerr, vice president,
2    business development?
3      A.   He worked at Endo.
4      Q.   If we go to Page 552.3, it
5    says, Law enforcement outreach Q and A.
6          And it runs through several
7    of the questions and answers with law
8    enforcement on issues concerning Opana,
9    correct?
10     A.   That's what the document
11   states.
12     Q.   Towards the bottom, it
13   states, Do you check with IMS or some
14   other service for high script levels.
15         Do you see that question?
16         Do you see that question,
17   ma'am?
18     A.   Yes.  I was trying to find
19   it.  Sorry.
20     Q.   At the bottom, it says, Endo
21   will be monitoring order levels through
22   Wolters Kluwer Health and will evaluate
23   this information at least quarterly
24   through its risk management group to

Highly Confidential - Subject to Further Confidentiality Review

Page 618

1    detect unusual trends.
2         Do you see that?
3         A.   Yes.
4         Q.   Were you ever -- did you
5    ever receive any information from the
6    risk management group concerning unusual
7    trends with regard to Opana?
8              MR. LIMBACHER:  Object to
9    form.
10             THE WITNESS:  That's not my
11        area of responsibility.
12   BY MR. BUCHANAN:
13        Q.   Okay.
14        A.   Again, they talked about
15   this Wolters Kluwer data.  That's not my
16   area.
17        Q.   In the middle of the second
18   page -- excuse me, the next page on this
19   Q and A, 552.4, it says, We check on
20   suspicious orders in our area and advise
21   DEA.
22             Do you see that, ma'am?
23        A.   Yes.
24        Q.   And what did you represent

Page 619

1    to law enforcement authorities that you
2    would do in that regard?
3              MR. LIMBACHER:  Object to
4    form.  She didn't represent
5         anything, counsel.
6    BY MR. BUCHANAN:
7         Q.   What does it state that Endo
8    would do, ma'am?
9              MR. LIMBACHER:  I don't see
10        her name anywhere on this
11        document.
12             THE WITNESS:  Correct.  I
13        can read it for you, if you want
14        me to.
15   BY MR. BUCHANAN:
16        Q.   Please.
17        A.   Endo will receive and
18   evaluate, at least quarterly, through its
19   risk management group, the Wolters Kluwer
20   Health information reflecting purchases
21   and prescribing patterns.
22        Q.   Let's focus on this one.
23   I'm sorry, I think you're on the prior
24   page, ma'am.

Page 620

1              We check on suspicious
2    orders in area and advise DEA.
3         Do you see that?
4         A.   Correct.  That's what I
5    read.
6         Q.   Oh, okay.  Maybe you skipped
7    the first couple words.
8              Endo will receive and
9    evaluate, at least quarterly, through its
10   risk management group, the Wolters Kluwer
11   data information reflecting purchases and
12   prescribing patterns.
13        Do you see that?
14        A.   I do.
15        Q.   If circumstances seem
16   suspicious, we will notify the law
17   enforcement and DEA.
18        Did I read that correctly?
19        A.   You did.
20        Q.   Okay.  We will monitor
21   orders for suspicious patterns.
22        Do you see that at the
23   bottom?
24        A.   Yes.

Page 621

1         Q.   The Endo ordering system
2    produces an excessive order report, which
3    is reviewed by the customer service
4    managers for approval.  An excessive
5    order is defined as any order that
6    exceeds the prior three-month average
7    shipped and/or any order that exceeds the
8    prior twelve-month average shipped.
9         Did I read that correctly?
10        A.   You did.
11        Q.   And that was essentially the
12   algorithm that was in place at that point
13   in time to identify suspicious orders?
14        A.   Correct.
15        Q.   And then what does it say in
16   terms of approval?
17        A.   Approval to release
18   excessive orders of products must be
19   issued by the vice president or senior
20   vice president of Endo.
21        Q.   Okay.  When you got
22   excessive orders, ma'am -- and you got a
23   lot of them, right?
24             MR. LIMBACHER:  Object to

156 (Pages 618 to 621)

Highly Confidential - Subject to Further Confidentiality Review

Page 622

1    form.
2        THE WITNESS: We had -- we
3    had orders that kicked out on our
4    report, yes.
5    BY MR. BUCHANAN:
6        Q.    And we spent a considerable
7    amount of time reviewing just those
8    orders in Exhibit-1 into the state of
9    Missouri, correct?
10       A.    We did.
11       Q.    And in this statement to law
12   enforcement, it states, The approval to
13   release excessive orders of product must
14   be issued by a vice president or senior
15   vice president of Endo.
16           Is that correct?
17           MR. LIMBACHER: Object to
18       form.
19           THE WITNESS: That's what it
20       states.
21   BY MR. BUCHANAN:
22       Q.    Who is your -- who was the
23   vice president up the line from you in
24   2007, ma'am?

Page 623

1        A.    I don't recall.
2        Q.    I'm sorry, 2006?
3        A.    I don't recall.
4        Q.    Were you a vice president?
5        A.    No.
6        Q.    Were vice presidents
7    releasing orders that were identified on
8    the excessive order sheet, ma'am?
9        A.    No.
10           MR. LIMBACHER: Object to
11       form.
12   BY MR. BUCHANAN:
13       Q.    Were senior vice presidents
14   of Endo the ones releasing excessive
15   orders --
16           MR. LIMBACHER: Object to
17       form.
18           THE WITNESS: No.
19   BY MR. BUCHANAN:
20       Q.    -- in 2006?
21           How about in 2010, were vice
22   presidents and senior vice presidents the
23   ones who were authorized to release
24   excessive orders?

Page 624

1        A.    Our orders went through our
2    SOM program and again at UPS. And no.
3        Q.    Stay with my question,
4    ma'am.
5           In 2010, were vice
6    presidents and senior vice presidents
7    those that were authorized to release
8    orders and excessive orders?
9        A.    No.
10       Q.    To the best of your
11   knowledge, ma'am, did a vice president or
12   senior vice president ever release an
13   excessive order?
14           MR. LIMBACHER: Object to
15       form.
16           THE WITNESS: Not to my
17       knowledge.
18   BY MR. BUCHANAN:
19       Q.    So if these were the
20   representations of the company to law
21   enforcement and the DEA in 2006, would it
22   be fair to say it wasn't done that way?
23           MR. LIMBACHER: Object to
24       form.

Page 625

1           THE WITNESS: I don't know
2    what this document is. I've never
3    seen this document until today.
4    So I don't know.
5    BY MR. BUCHANAN:
6        Q.    Looking at David Kerr, he
7    was, in fact, the vice president -- a
8    vice president with Endo Pharmaceutical,
9    Inc., correct?
10       A.    That's what it states on his
11   e-mail.
12       Q.    I am meeting with Philly DEA
13   tomorrow with Nick. I am digging around
14   for that one-page graphic that is the
15   risk MAP showing the control flow
16   provided by Jill Connell.
17           Jill was your boss?
18       A.    She was.
19       Q.    And, Do you have access to
20   that copy and can you send today?
21           There's a reply from Heather
22   Mullen.
23           Who is Heather?
24       A.    I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 626

1      Q.   Okay.  Yes, here it is.
2  Distribution chart, along with all the
3  docs that I put together that you might
4  use, in addition to a blue folder for law
5  enforcement meetings.
6         Do you see that?
7      A.   Yes.
8      Q.   Let me know if you need
9  anything else and let me know how it
10 goes.
11        Do you see that, ma'am?
12     A.   I do.
13     Q.   You were asked some
14 questions about Exhibit-15, which you
15 discussed in examination with me earlier
16 today.
17        Do you recall discussing
18 this e-mail thread, Exhibit-15, that
19 counsel just asked you some follow-up
20 questions on?
21     A.   Exhibit-15?
22     Q.   Yes.
23     A.   Yes.
24     Q.   Okay.  I think you said that

Page 627

1  there was a reason why these orders had
2  to be cut in size or downsized.
3         Do you recall that?
4      A.   Correct.  We had a supply
5  issue at this time on Opana.
6      Q.   We spent some time going
7  through a SAP report, a SOM audit trail
8  report.
9         Do you recall doing that
10 with me?
11     A.   I do.
12     Q.   Does that system, in fact,
13 track whether orders were cut in size?
14     A.   I would have to look at it
15 to confirm that.  But I would assume --
16     Q.   The order that you
17 received --
18     A.   -- yes.
19     Q.   Does it keep track of
20 whether the company, notwithstanding the
21 initial order that was provided by the
22 customer, cut the order in size?
23     A.   Yes, it keeps the history of
24 the order.

Page 628

1      Q.   So there's, in fact, an
2  audit trail tracking the circumstances
3  when the company cut order size?
4      A.   Within the order there is,
5  yes.
6      Q.   And are the reasons for that
7  cut documented in the order system?
8      A.   They should --
9         MR. LIMBACHER:  Object to
10 form.
11        THE WITNESS:  They should
12 be.
13 BY MR. BUCHANAN:
14     Q.   To your knowledge, they are?
15     A.   They should be, yes.
16     Q.   Okay.  You were shown a
17 document, 35, Exhibit-35, UPS audit.
18        Do you recall that?
19     A.   Yes.
20     Q.   That wasn't the first time
21 that you all audited UPS, correct?
22     A.   No.  UPS has been audited
23 many times over the years.
24     Q.   Okay.

Page 629

1         MR. BUCHANAN:  Could I have
2  578, please?
3         - - -
4         (Whereupon, EndoWalker
5  Exhibit-36,
6  PAR_OPIOID_MDL_0000404285, was
7  marked for identification.)
8         - - -
9         MR. SIEGEL:  578 being
10 marked as Exhibit-36.
11        MR. BUCHANAN:  Pass it over
12 to counsel, please, and one for
13 the witness.
14 BY MR. BUCHANAN:
15     Q.   I'm showing you what's been
16 marked as Exhibit-36 to the deposition.
17 A summary of teleconference with UPS
18 regarding SOMS, February 13, 2013.
19        Do you see that, ma'am?
20     A.   I do.
21     Q.   And you're listed as an
22 attendee at this meeting, right?
23     A.   Uh-huh.
24     Q.   Do you have it before you

158 (Pages 626 to 629)

Page 630

1   now? I'm sorry, I can't see over the
2   screen.
3       A.  I do, I have it.
4       Q.  Thank you.
5           I'd like to direct your
6   attention -- you see this list of
7   questions reflected here?
8       A.  I see them, yes.
9       Q.  And then you see answers
10  following the questions in a different
11  color?
12      A.  Yes.
13      Q.  Let's scroll down here.
14  Start with 8.
15          Have you ever reported a
16  suspicious order to any regulatory agency
17  for an Endo/Qualitest product?
18          Do you see that question to
19  UPS?
20      A.  I do.
21      Q.  And what was the answer,
22  ma'am?
23      A.  No.
24      Q.  Do you ever visit customers

Page 631

1   in person who are deemed suspicious?
2           Do you see that question?
3       A.  I do.
4       Q.  It says, Not currently.
5           Right?
6       A.  That's what it says.
7       Q.  It says, Clients may have
8   their sales reps visit customers.
9           Do you see that?
10      A.  Yes, I see it.
11      Q.  Vis-à-vis the relationship
12  with UPS, you were the client, right?
13          MR. LIMBACHER:  Object to
14      form.
15          THE WITNESS:  Yes.  Endo was
16      the client at this time.
17  BY MR. BUCHANAN:
18      Q.  Do I understand your
19  testimony correctly, ma'am, that to the
20  best of your knowledge, as of 2013, Endo
21  was not visiting any of its customers
22  that it deemed suspicious, correct?
23          MR. LIMBACHER:  Object to
24      form.  Foundation.  Misstates her

Page 632

1   testimony.
2           THE WITNESS:  I believe
3       Qualitest was doing customer site
4       visits.
5   BY MR. BUCHANAN:
6       Q.  As of February 13, 2013,
7   ma'am?
8       A.  I don't know the exact date
9   that Qualitest started doing customer
10  visits, but I know they did customer
11  visits.
12      Q.  At a point in time they did,
13  correct?
14      A.  Correct.  I don't know the
15  date when that started.
16      Q.  You know they revamped their
17  SOM system, too, after the DEA came and
18  knocked on their door in 2013, right?
19          MR. LIMBACHER:  Object to
20      form.
21          THE WITNESS:  I can't speak
22      to Qualitest's SOM program.
23  BY MR. BUCHANAN:
24      Q.  Then let's focus on Endo's

Page 633

1   SOM program.
2           At this point in time, in
3   February of 2013, are you aware of any
4   Endo employees going and visiting
5   customers that it deemed suspicious?
6           MR. LIMBACHER:  Object to
7       form.  Asked and answered.
8           THE WITNESS:  Not that I
9       recall.
10  BY MR. BUCHANAN:
11      Q.  Any customers of Endo
12  customers that it seemed suspicious?
13          MR. LIMBACHER:  Object to
14      form.  Asked and answered.
15          THE WITNESS:  Not that I
16      recall.
17  BY MR. BUCHANAN:
18      Q.  Okay.  There's also a
19  question about how do you know your
20  customer's customer.
21          Do you see that?
22      A.  Question 10 I'm assuming
23  you're referring to?
24      Q.  Yes.

Page 634

1    A.   Uh-huh.
2    Q.   It was a question that was
3   being put by Endo to UPS, right?
4    A.   Yes.
5    Q.   Okay.  And as of this point
6   in time, they didn't have that
7   functionality where they were visiting
8   customers' customers or knowing
9   customers' customers, right?
10       MR. LIMBACHER:  Object to
11   form.
12       THE WITNESS:  That's what it
13   states.
14  BY MR. BUCHANAN:
15   Q.   And you didn't either,
16  right?
17   A.   Endo did not provide -- do
18  not do site visits.  But I believe
19  Qualitest started to.  Again, I don't
20  know the exact date.
21   Q.   Let's just talk about Endo.
22       You do have knowledge about
23  Endo, correct?
24   A.   I do.

Page 635

1    Q.   And to the best of your
2   knowledge, Endo never conducted site
3   visits of its customers or its customers'
4   customers, correct?
5        MR. LIMBACHER:  Object to
6   form.  Asked and answered.
7        THE WITNESS:  Endo did not,
8   but our generics division,
9   Qualitest, did.
10  BY MR. BUCHANAN:
11   Q.   Do you know when that
12  started, ma'am?
13   A.   I do not know the exact date
14  at this time.
15   Q.   And you certainly couldn't
16  sit there and say they were doing it
17  prior to this teleconference, right?
18       MR. LIMBACHER:  Object to
19  form.
20       THE WITNESS:  No, I can't
21  confirm that.
22  BY MR. BUCHANAN:
23   Q.   Okay.  Who would be the
24  person to ask on that?

Page 636

1   A.   When Qualitest did their
2   site visits?
3    Q.   Uh-huh.
4    A.   Somebody from Qualitest.
5    Q.   Tracey Hernandez?
6    A.   That would be a person to
7   start with.
8    Q.   How about, Do you utilize
9   chargeback data?
10       That was a question from you
11  to UPS, right?
12   A.   That's correct.
13   Q.   Why were you asking UPS
14  whether they utilized chargeback data,
15  ma'am?
16   A.   Probably just trying to get
17  an understanding of their SOM program.
18   Q.   Did you, in fact, have an
19  understanding, at that point in time,
20  that the DEA wanted manufacturers to use
21  chargeback data?
22   A.   I can't recall.
23       MR. LIMBACHER:  Object to
24  form.

Page 637

1   BY MR. BUCHANAN:
2    Q.   Okay.  And they said, what?
3   They weren't doing that at that point in
4   time, right?
5        MR. LIMBACHER:  Object to
6   form.
7        THE WITNESS:  That's what it
8   states.
9   BY MR. BUCHANAN:
10   Q.   Okay.  Number 12, What type
11  of trending do you do, if any?
12       Do you see that question
13  from Endo to UPS?
14   A.   Uh-huh.
15   Q.   And why were you asking
16  about trending at that point in time?
17   A.   Probably just trying to get
18  an understanding of their SOM program.
19   Q.   Did you know that the DEA
20  was interested in manufacturers doing
21  trending analyses as of this point in
22  time?
23   A.   Not that I recall.
24       MR. LIMBACHER:  Object to

160  (Pages 634 to 637)

Highly Confidential - Subject to Further Confidentiality Review

Page 638

1      form.
2           THE WITNESS:  Not that I
3      recall.
4      BY MR. BUCHANAN:
5           Q.   As of this point in time, we
6      can agree that Endo wasn't doing
7      trending, correct?
8               MR. LIMBACHER:  Object to
9      form.  Misstates the evidence.
10              THE WITNESS:  Not that I
11     recall.
12     BY MR. BUCHANAN:
13          Q.   Okay.  Do you modify your
14     program based on current diversion
15     trends?
16              Do you see that item?
17          A.   I do.
18          Q.   And why were you asking UPS,
19     at this point in time, that question?
20          A.   Probably just trying to get
21     information about the SOM program.
22          Q.   In fact, you learned from
23     the DEA that they were interested in
24     manufacturers being sensitive to current

Page 639

1      diversion trends and modifying their
2      effective controls; isn't that right,
3      ma'am?
4           A.   I can't speak to that, no.
5           Q.   Okay.
6               MR. BUCHANAN:  Can I please
7      have 736?
8               How am I doing on time?
9               VIDEO TECHNICIAN:  You have
10     23 minutes.
11              MR. BUCHANAN:  Thank you.
12              Do you have it already over
13     there or you're waiting for it
14     from us?
15              MR. LIMBACHER:  What are we
16     talking about?
17              MR. BUCHANAN:  If we haven't
18     passed you a new exhibit, you
19     don't have it yet.
20              MR. LIMBACHER:  You have not
21     just yet.
22              MR. BUCHANAN:  Okay.
23              Can we agree, with all
24     counsel, to just do it on the

Page 640

1      screen and move this along?  We
2      can certainly supplement it for
3      the record and identify it by
4      Bates number.
5               MR. LIMBACHER:  Let's give
6      him just a minute or two more to
7      see.
8               MR. BUCHANAN:  If not, we'll
9      just make a copy outside.  It's
10     fine.
11              MR. LIMBACHER:  Do you have
12     a lot of questions?
13              MR. BUCHANAN:  I don't.
14              THE WITNESS:  I'm okay with
15     it on the screen, if you're okay
16     with it.
17              MR. LIMBACHER:  Let's just
18     see if he can find it.
19              MR. BUCHANAN:  Thank you.
20     Sorry to put you on the spot like
21     that, Scott.
22              MR. SIEGEL:  736, being
23     marked as Exhibit-37.
24              - - -

Page 641

1               (Whereupon, EndoWalker
2      Exhibit-37, No Bates, 7/16/13
3      E-mail from Laurel McDermott to
4      Sanjay Patel; Subject: SOMS
5      Customer Letter & Sales Rep
6      Talking Points, was marked for
7      identification.)
8               - - -
9      BY MR. BUCHANAN:
10          Q.   I'm passing over what we
11     marked as Exhibit-736 -- I'm sorry, 37.
12     Thank you.  It's been a day, my
13     apologies.
14              MR. LIMBACHER:  It's been a
15     long day.
16     BY MR. BUCHANAN:
17          Q.   It's an e-mail from Ms.
18     McDermott to yourself and two other
19     individuals.
20              Do you see this?
21          A.   Yes.
22          Q.   Sanjay Patel, Lisa Walker
23     and Kevin O'Brien as recipients?
24          A.   I see that.

161  (Pages 638 to 641)

Highly Confidential - Subject to Further Confidentiality Review

Page 642

1      Q.   Who is Laurel McDermott?
2      A.   She was an admin at the
3  time.
4      Q.   Sanjay Patel?
5      A.   I don't remember his title.
6      Q.   Which function?
7      A.   I believe supply chain,
8  maybe. I can't confirm.
9      Q.   Kevin O'Brien?
10     A.   He was my boss at the time.
11     Q.   So to three people in supply
12  chain?
13     A.   I was not part of supply
14  chain.
15     Q.   At this point in time?
16     A.   No, I was not.
17     Q.   What function would you
18  characterize your --
19     A.   I mean, I was in customer
20  service and distribution, but we were not
21  part of supply chain.
22     Q.   Understood, okay.
23          So yourself and your boss,
24  Mr. O'Brien.  The subject is, SOMS

Page 643

1  customer letter and sales rep talking
2  points.
3          Do you see that?
4      A.   I do.
5      Q.   It says, Hi, Brian, you may
6  recall from various discussions that on
7  March 6, 2013, DEA notified Endo at a
8  meeting that took place in Washington the
9  need to bolster the suspicious order
10  monitoring program.
11         Do you see that?
12     A.   Yes.
13     Q.   They presented over 200
14  slides of data showing Endo/Qualitest
15  product sales specifically for those
16  distributors and pharmacies for which
17  they considered outliers and potential
18  diversion.
19         Did I read that correctly?
20     A.   Uh-huh.
21     Q.   DEA has asked Endo to
22  improve -- do you see that, ma'am?
23     A.   I do.
24     Q.   -- initial order evaluation

Page 644

1  for direct customers.  UPS doing it for
2  Endo does not suffice.
3          Did I read that correctly?
4      A.   That's what it states.  But
5  that's incorrect, because remember, we
6  had a SOM program in place at this time,
7  and so did UPS.
8          MR. BUCHANAN:  Move to
9  strike.
10  BY MR. BUCHANAN:
11     Q.   It says, DEA has asked Endo
12  to improve initial order evaluation for
13  direct customers.  UPS doing it for Endo
14  does not suffice.
15          Did I read that correctly;
16  yes or no?
17     A.   Yes, you read it correctly.
18  But it's not a correct statement.
19     Q.   Thank you.  Let's go on.
20          DEA has asked Endo to
21  improve use of chargeback data to review
22  indirect customers.
23          Did I read that correctly?
24     A.   You did.

Page 645

1      Q.   DEA has asked Endo to
2  improve customer due diligence visits,
3  potentially of both direct and indirect
4  customers.
5          Did I read that correctly?
6      A.   You did.
7      Q.   In addition, they have
8  stated they will inspect Endo by end of
9  year to ensure the corrective actions
10  have been implemented.
11          Correct?
12     A.   That's what it states.
13          MR. LIMBACHER:  Can I just
14  put on the record an objection to
15  questions with regard to
16  Exhibit-37, to the extent it's
17  outside of the scope of the direct
18  examination.
19          MR. BUCHANAN:  I think it's
20  fully within the scope.  It's
21  fully within the scope.  But,
22  sure, you can state that.
23  BY MR. BUCHANAN:
24     Q.   Attached documents list the

Highly Confidential - Subject to Further Confidentiality Review

Page 646

1    requirements and the Qualitest progress
2    to date.  We are planning to update DEA
3    in approximately two months on the
4    progress we have made with Qualitest.  We
5    will need to similarly share our plans
6    with the branded products.
7            Did I read that correctly?
8        A.   You read it correctly, yes.
9        Q.   Did the DEA -- excuse me,
10   withdrawn.
11           We can agree that at no
12   point in time after this exchange and
13   after the meeting with the DEA in 2013
14   did Endo commence the use of chargeback
15   data to review indirect customers,
16   correct?
17           MR. LIMBACHER:  With regard
18   to branded opioids?
19           MR. BUCHANAN:  Yes.
20           THE WITNESS:  I was not part
21   of this discussion with the DEA on
22   March 6th, 2013.  And I think we
23   spoke earlier about the chargeback
24   data related to branded.

Page 647

1    BY MR. BUCHANAN:
2        Q.   Is that, then, you agree
3    with me, ma'am, that after this exchange
4    on which you're copied that purports to
5    memorialize or summarize, in some way, a
6    March 6th, 2013 DEA meeting, that after
7    that, the branded did not use chargeback
8    data to review indirect customers,
9    correct?
10           MR. LIMBACHER:  Object to
11   form.  Misstates her prior
12   testimony.
13   BY MR. BUCHANAN:
14       Q.   You can answer.
15           MR. LIMBACHER:  We can go
16   over it all over again if you
17   want.
18           MR. BUCHANAN:  I think a yes
19   would have been faster than your
20   speech.
21   BY MR. BUCHANAN:
22       Q.   Go ahead.
23       A.   No, we did not use
24   chargeback data.  But I believe I

Page 648

1    explained earlier as to why we did not.
2        Q.   And, again, confirming at
3    least their understanding, based on your
4    testimony today, customer due diligence,
5    in terms of Endo branded, were not
6    commenced of either direct or indirect
7    customers following the DEA visit,
8    correct, ma'am?
9            MR. LIMBACHER:  Object to
10   form.  Asked and answered.
11           THE WITNESS:  No, the
12   branded side did not.  But our
13   Qualitest partners did.
14   BY MR. BUCHANAN:
15       Q.   And did you keep a file of
16   the Qualitest due diligence visits in
17   your SOM group?
18       A.   No.  That was housed at
19   Qualitest.
20       Q.   So where would you go within
21   Endo, ma'am, to get the results of the
22   Qualitest due diligence visits so that
23   you could assess your customers and
24   customers of customers?

Page 649

1        A.   I would have gone to
2    Qualitest, if I needed to.
3        Q.   At what point in time did
4    you reach out to Qualitest and get the
5    results of their due diligence visits?
6            MR. LIMBACHER:  Object to
7    form.
8            THE WITNESS:  I didn't.
9    Because they didn't come to me
10   that there was an issue with the
11   Endo customers.
12   BY MR. BUCHANAN:
13       Q.   To the best of your
14   knowledge, ma'am, the results of the
15   Qualitest due diligence visits did not
16   impact any Endo customers, that's your
17   understanding.
18           MR. LIMBACHER:  Object to
19   form.
20           THE WITNESS:  That's my
21   understanding.
22           MR. BUCHANAN:  Thank you.
23   No further questions.
24           MR. LIMBACHER:  Can we just

163 (Pages 646 to 649)

Highly Confidential - Subject to Further Confidentiality Review

Page 650

1    take a very short break?
2         VIDEO TECHNICIAN:  Going off
3    the record.  The time is 6:57.
4              - - -
5         (Whereupon, a brief recess
6    was taken.)
7              - - -
8         MR. LIMBACHER:  No further
9    questions.  We are done.  Thank
10   you very much.
11             - - -
12        (Whereupon, the deposition
13   concluded at 7:02 p.m.)
14             - - -
15
16
17
18
19
20
21
22
23
24

Page 652

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8         After doing so, please sign
9    the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 651

1         CERTIFICATE
2
3
4         I HEREBY CERTIFY that the
5    witness was duly sworn by me and that the
6    deposition is a true record of the
7    testimony given by the witness.
8
9
10
         Amanda Maslynsky-Miller
11       Certified Realtime Reporter
         Dated:  December 5, 2018
12
13
14
15
16
17        (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24

Page 653

1         ------
          E R R A T A
2         ------
3    PAGE  LINE  CHANGE/REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____

164  (Pages 650 to 653)

Highly Confidential - Subject to Further Confidentiality Review

Page 654

1  ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do
    hereby certify that I have read the
    foregoing pages, 1 - 650, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7
8   _____
    LISA WALKER          DATE
9
10
    Subscribed and sworn
11  to before me this
    _____ day of _____, 20____.
12
    My commission expires:_____
13
14  _____
    Notary Public
15
16
17
18
19
20
21
22
23
24

Page 655

1          LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

165 (Pages 654 to 655)