Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION  |  MDL No. 2804
                                  |
 4   OPIATE LITIGATION            |  Case No. 17-MD-2804
                                  |
 5   This Document Relates to:    |  Judge Dan A. Polster
                                  |
 6   The County of Summit, Ohio,  |
     et al., v.                   |
 7   Purdue Pharma L.P., et al.   |
     Case No. 17-op-45004         |
 8                                |
     The County of Cuyahoga v.    |
 9   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45090         |
10                                |
     City of Cleveland, Ohio v.   |
11   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45132         |
12                                |
13
                  Thursday, December 13, 2018
14
                          - - -
15
            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                          - - -
18
            Videotaped deposition of PATRICIA WILLIAMS,
19      held at Foley & Lardner LLP, One Biscayne Tower,
        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:22 a.m., on the above date,
        before Susan D. Wasilewski, Registered
21      Professional Reporter, Certified Realtime
        Reporter, Certified Realtime Captioner.
22
                          - - -
23
                  GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG
         BY:  ELLEN RELKIN, ESQUIRE
 3            ADAM L. STOLTZ, ESQUIRE
         700 Broadway
 4       New York, New York 10003
         (212) 558-5526
 5       erelkin@weitzlux.com
         astoltz@weitzlux.com
 6       Representing the Plaintiffs
 7
         FOLEY & LARDNER LLP
 8       BY:  KATY E. KOSKI, ESQUIRE
         111 Huntington Avenue
 9       Boston, Massachusetts 02199
         (617) 342-4000
10       kkoski@foley.com
         Representing Anda, Inc., and the witness
11
12       WILLIAMS & CONNOLLY LLP
         BY:  JULI ANN LUND, ESQUIRE
13       725 Twelfth Street, N.W.
         Washington, D.C. 20005
14       (202) 434-5239
         jlund@wc.com
15       Representing Cardinal Health, Inc.
16
         REED SMITH LLP
17       BY:  CRISTINA CÁRDENAS, ESQUIRE
         1001 Brickell Bay Drive, Suite 900
18       Miami, Florida 33131
         (786) 747-0207
19       ccardenas@reedsmith.com
         Representing AmerisourceBergen Corporation and
20       AmerisourceBergen Drug Corporation
21
         JONES DAY
22       BY:  CHRISTOPHER M. LOMAX, ESQUIRE
         600 Brickell Avenue, Suite 3300
23       Miami, Florida 33131
         (305) 714-9700
24       clomax@jonesday.com
         Representing Walmart
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    MARCUS & SHAPIRA LLP
      BY:  JAMES F. ROSENBERG, ESQUIRE
 3    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
 4    (412) 471-3490
      rosenberg@marcus-shapira.com
 5    Representing HBC Service Company
 6
 7    ARNOLD & PORTER
      BY:  ZENO HOUSTON, ESQUIRE
 8    250 West 55th Street
      New York, New York 10019-9710
 9    (212) 836-8000
      zeno.houston@arnoldporter.com
10    Representing Endo Health Solutions Inc., Endo
      Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
11    Par Pharmaceutical Companies, Inc.,
      (f/k/a Par Pharmaceutical Holdings, Inc.)
12
13
      COVINGTON & BURLING LLP
14    BY:  MICHELLE Y. YOCUM  ESQUIRE
      One CityCenter, 850 Tenth Street, NW
15    Washington, DC 20001-4956
      (202) 662-6000
16    myocum@cov.com
      Representing McKesson Corporation
17
18
    ALSO PRESENT:
19
      ANTHONY BARBARO, Videographer
20
      BURTON KING, Weitz & Luxenberg
21
      SHA'HUNI ROBINSON, Weitz & Luxenberg
22
23
24
25
```

```
 1                       - - -
 2                     I N D E X
 3                       - - -
 4   Testimony of:  PATRICIA WILLIAMS              PAGE
 5        DIRECT EXAMINATION BY MS. RELKIN.............  10
 6
 7

                     E X H I B I T S
 8
                (Attached to the transcript)
 9
              ANDA-WILLIAMS DEPOSITION EXHIBITS       PAGE
10
     Exhibit 1    Curriculum Vitae - Patricia L.       16
11                Williams
12   Exhibit 2    Slide Presentation -                 49
                  Anda_Opioid_MDL_0000711452 through
13                711470
14   Exhibit 3    E-mail - Subject: Tussionex Item      85
                  201545
15                Anda_Opioids_MDL_0000107802 through
                  107803
16
     Exhibit 4    E-mail - Subject: C2 Promo with Teva  90
17                Fentanyl Patches...
                  Anda_Opioids_MDL_0000610875
18
     Exhibit 5    E-mail - Subject: Actavis Match to    94
19                Anda
                  Anda_Opioids_MDL_0000082451 through
20                82456
21   Exhibit 6    E-mail - Subject: May Marketing       95
                  Driver
22                Anda_Opioids_MDL_0000712121
23   Exhibit 7    E-mail - Subject: CII Actavis Credits 100
                  Anda_Opioids_MDL_0000629163 through
24                629165
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2               (Attached to the transcript)
 3      WILLIAMS DEPOSITION EXHIBITS                PAGE
 4    Exhibit 8    E-mail - Subject: Giant Eagle Stores   111
                   list FINAL Actavis Oxycodone CR &
 5                 Fentanyl Patch for Giant Eagle from
                   Anda
 6                 Anda_Opioids_MDL_0000630034 through
                   630042
 7
      Exhibit 9    E-mail - Subject: Success Story - Oxy  118
 8                 CR Made my Day!!
                   Anda_Opioids_MDL_0000629292
 9
      Exhibit 10   E-mail - Subject: PRODUCT UPDATE:      122
10                 Re-launch of Generic Oxycontin CR
                   (Oxycodone CR 10, 20, 40, 80mg) from
11                 Actavis
                   Anda_Opioids_MDL_0000635640 through
12                 635645
13    Exhibit 11   E-mail - Subject: Launch of Generic    129
                   Ultram ER Tomorrow
14                 Anda_Opioids_MDL_0000635385 through
                   635387
15
      Exhibit 12   E-mail - Subject: PRODUCT UPDATE:      131
16                 Re-launch of Generic Oxycontin CR
                   (Oxycodone CR 10, 20, 40, 80mg) from
17                 Actavis
                   Anda_Opioids_MDL_0000635359 through
18                 635369
19    Exhibit 13   E-mail - Subject: PRODUCT UPDATE:      136
                   Re-launch of Generic Oxycontin CR
20                 (Oxycodone CR 10, 20, 40, 80mg) from
                   Actavis
21                 Anda_Opioids_MDL_0000610604 through
                   610114
22
      Exhibit 14   E-mail - Subject: July Marketing       140
23                 Driver
                   Anda_Opioids_MDL_0000619354 through
24                 619357
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2             (Attached to the transcript)
 3    WILLIAMS DEPOSITION EXHIBITS                    PAGE
 4    Exhibit 15   E-mail - Subject: CII Products       143
                   Available in Florida Warehouse 20
 5                 Anda_Opioids_MDL_0000111359 through
                   111361
 6
      Exhibit 16   E-mail - Subject:  Launch Snapshot -  148
 7                 Suboxone Tabs Day 1
                   Anda_Opioids_MDL_0000849833 through
 8                 849834
 9    Exhibit 17   E-mail - Subject: Walgreens - Screen  156
                   Shot - Control Limits
10                 Anda_Opioids_MDL_0000566549 through
                   566551
11
      Exhibit 18   E-mail - Subject: Cust. # 206975 Van  170
12                 Buren Pharm.
                   Anda_Opioids_MDL_0000711549 and
13                 711550
14    Exhibit 19   E-mail - Subject: 360387 - Schaeper's 178
                   Pharmacy
15                 Anda_Opioids_MDL_0000560415 through
                   560417
16
      Exhibit 20   E-mail - Subject: Remedy - Control     185
17                 Requests
                   Anda_Opioids_MDL_0000133286 and
18                 133287
19    Exhibit 21   E-mail - Subject: acct# 206671         193
                   Anda_Opioids_MDL_0000109644 and
20                 109654
21    Exhibit 22   E-mail - Subject: TPS # 457843         197
                   Anda_Opioids_MDL_000072179
22
      Exhibit 23   E-mail - Subject: STATUS UPDATE:       200
23                 Collect Dispensing Data - Shared
                   Accounts (Buying Groups)
24                 Anda_Opioids_MDL_0000554323
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2            (Attached to the transcript)
 3    WILLIAMS DEPOSITION EXHIBITS                 PAGE
 4    Exhibit 24  E-mail - Subject: EPIC & IPA NJ-   206
                  Required Information
 5                Anda_Opioids_MDL_0000708146 through
                  708148
 6
      Exhibit 25  E-mail - Subject: Customer         216
 7                Questionnaire Meeting: Follow-Up Info
                  Anda_Opioids_MDL_0000607225 and
 8                607226
 9    Exhibit 26  E-mail - Subject: Control limit    222
                  review for account 477066
10                Anda_Opioids_MDL_0000109496
11    Exhibit 27  E-mail - Subject: CII Order: CHESTNUT  227
                  AID PHARMACY, Ship To: 210320, Over
12                the Limit, Status: Closed
                  Anda_Opioids_MDL_0000283889 and
13                203890
14    Exhibit 28  E-mail - Subject: Customer's Not    234
                  Actively Purchasing Controls (July 12
15                thru Jan 13)
                  Anda_Opioids_MDL_0000090024 and 90025
16
      Exhibit 29  E-mail - Subject: Accounts Shut Off  236
17                From Controls This Week
                  Anda_Opioids_MDL_0000711564 through
18                711567
19    Exhibit 30  E-mail - Subject: 802433 - drug Store  244
                  Columbus Ohio
20                Anda_Opioids_MDL_0000070549 and 70550
21    Exhibit 31  E-mail - Subject: Customer # 404255   247
                  Anda_Opioids_MDL_0000107989
22
      Exhibit 32  E-mail - Subject: LIMIT INCREASE ACCT  249
23                51180
                  Anda_Opioids_MDL_0000109372 through
24                109374
25
```

```
 1                    E X H I B I T S
 2            (Attached to the transcript)
 3    WILLIAMS DEPOSITION EXHIBITS                  PAGE
 4   Exhibit 33   E-mail - Subject: React  To Be Pulled  258
                  from Remedy
 5                Anda_Opioids_MDL_0000070803 and 70804
 6   Exhibit 34   E-mail - Subject: Keep Informed        262
                  Status Completion on Opportunity for
 7                COX PHARMACY #2 INC : 180217 :
                  Control Limit Increase Order Pending
 8                Anda_Opioids_MDL_0000134040 through
                  1304042
 9
     Exhibit 35   E-mail - Subject: (No subject)         266
10                Anda_Opioids_MDL_0000107933 and
                  107934
11
     Exhibit 36   E-mail - Subject: Pharmacy Sales-Data  269
12                Required (Follow up)
                  Anda_Opioids_MDL_0000559434 through
13                559437
14   Exhibit 37   E-mail - Subject: Know your customer   274
                  (KYC) - Revised Form Attached
15                Anda_Opioids_MDL_0000622234 through
                  622236
16
     Exhibit 38   E-mail - Subject: Pill mills JDE @     277
17                59213 BEST CARE PHARMACY INC
                  Anda_Opioids_MDL_0000622647 through
18                622649
19   Exhibit 39   E-mail - Subject: Act 404329-Memorial  281
                  Medical
20                Anda_Opioids_MDL_0000105787 through
                  105789
21
     Exhibit 40   E-mail - Subject: Exporters            287
22                Anda_Opioids_MDL_0000109029 and
                  109030
23
     Exhibit 41   Spreadsheets                           293
24                Anda_Opioids_MDL_000109031 and 109039
                  ** NOT ATTACHED TO TRANSCRIPT **
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Anthony Barbaro.  I am a videographer

 4       for Golkow Litigation Services.  Today's date is

 5       December 13th, 2018, and the time is 9:22 a.m.

 6              This video deposition is being held at

 7       2 South Biscayne Boulevard, Suite 1900, Miami,

 8       Florida, 33131, in the matter of Re: National

 9       Prescription Opiate Litigation being heard before

10       the United States District Court, Northern

11       District of Ohio, Eastern Division.

12              The deponent today is Patricia Williams.

13              Counsel, would you please identify

14       yourselves for the record.

15              MS. RELKIN:  Ellen Relkin from Weitz &

16       Luxenberg for the plaintiffs.

17              MR. STOLTZ:  Adam Stoltz of Weitz &

18       Luxenberg for the plaintiffs.

19              MS. KOSKI:  Katy Koski, Foley & Lardner, for

20       Anda, Inc., and the witness.

21              MS. LUND:  Juli Ann Lund from Williams &

22       Connolly on behalf of Cardinal Health.

23              MR. LOMAX:  Christopher Lomax from Jones Day

24       on behalf of Walmart.

25              MS. CARDENAS:  Cristina Cardenas, Reed
```

1        Smith, on behalf of AmerisourceBergen.

2            MS. RELKIN:  There are also two paralegals

3        from our firm.  Do you want them to announce?

4            MS. KOSKI:  That's okay.  And on the phone,

5        can you please enter your appearances?

6            MS. YOCUM:  Michelle Yocum from Covington

7        Burling on behalf of McKesson.

8            MR. HOUSTON:  Zeno Houston, Arnold & Porter,

9        appearing on behalf of the Endo and Par

10       defendants.

11           THE VIDEOGRAPHER:  The court reporter is

12       Susan Wasilewski, and she will now swear in the

13       witness.

14           THE COURT REPORTER:  Ma'am, would you raise

15       your right hand?

16           Do you solemnly swear or affirm the

17       testimony you're about to give will be the truth,

18       the whole truth, and nothing but the truth?

19           THE WITNESS:  I do.

20           THE COURT REPORTER:  Thank you.

21           PATRICIA WILLIAMS, called as a witness by

22       the Plaintiffs, having been duly sworn, testified as

23       follows:

24                    DIRECT EXAMINATION

25       BY MS. RELKIN:

 1    Q.   Okay.

 2    A.   Good morning.

 3    Q.   Good morning, Ms. Williams.  We met off the

 4  record.  I'm Ellen Relkin.  I'll be asking you some

 5  questions today.  I'm just going to go over some

 6  basic rules before we get into the testimony.

 7        First, it's important that you understand my

 8  question.  So if for any reason you don't, just tell

 9  me and I'll be happy to rephrase it.  If you want to

10  have the court reporter read the question back, she

11  can do that.  It's kind of magical technology.  It's

12  been around forever and it still works.

13        If you need a break for any reason, just let

14  us know.

15    A.   Okay.

16    Q.   It's assumed that if you answer the

17  question, you understand it.  That's why if you

18  don't understand it, make sure you request a reread

19  or an explanation.

20        Also, I do have a tendency to pause while

21  I'm talking sometimes so -- and natural conversation

22  is often you know where the question is going so the

23  witness chimes in the answer before the question is

24  all out and then the record gets really messy.

25    A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So give a second for me to be done before

 2   you answer.

 3        A.   Okay.

 4        Q.   And also this way your counsel can have time

 5   to object if she chooses to.

 6             All right.  Are you on any medications that

 7   would impact your ability to understand any

 8   questions or give clear answers?

 9        A.   No.

10        Q.   Okay.  Have you ever given a deposition

11   before?

12        A.   I'm not sure it would be called a

13   deposition.  I actually went to a -- like a mini

14   trial or arbitration several years ago when I was in

15   Anda.

16        Q.   What was that regarding?

17        A.   It was regarding a noncompete agreement.

18        Q.   Did it involve you as being -- as the person

19   at issue or you were just a witness?

20        A.   No, I was just a witness.

21        Q.   And what was the -- what was the noncompete?

22   It was between Anda and whom?

23        A.   It was between a former employee who had

24   signed a noncompete and had gone to work for another

25   company.
```

1     Q.   Who was that employee?

2     A.   The name of that employee was Maria Alonzo.

3     Q.   And what other company had she gone to?

4     A.   I believe she went to Cardinal -- Cardinal,

5   I believe.  I could be wrong.  I don't recall

6   exactly.  It was several years ago.

7     Q.   Got it.

8          Now, you are no longer an employee of Anda;

9   is that correct?

10    A.   That is correct.

11    Q.   But are you being represented by counsel

12  here?

13    A.   Yes, I am, by Katy.

14    Q.   And how did you come to get called, to learn

15  about appearing today?

16    A.   I received a call from the attorneys saying

17  that there was a --

18         MS. KOSKI:  Wait.  You can say you received

19     a call from the attorneys but don't discuss what

20     we discussed on the phone.

21         THE WITNESS:  Okay.  Okay.

22  BY MS. RELKIN:

23    Q.   Are you being paid for your time today?

24    A.   I'm not sure.  I believe so.

25    Q.   Okay.  And for any time in preparation your

 1    understanding is --

 2        A.   I'm sorry.  Not for my time at the

 3    deposition but the prep time, yes.

 4        Q.   And how much time did you spend in prep for

 5    the deposition?

 6        A.   Probably about six-and-a-half to seven hours

 7    yesterday, perhaps.

 8        Q.   So you met yesterday with counsel.  Did you

 9    meet any other days?

10        A.   No.

11        Q.   Okay.  And besides meeting with Katy, were

12    there any other attorneys you met with?

13        A.   Yes.  The other gentleman, Matt, I believe

14    is his name.  I forget his first name.  It's Katy's

15    partner.

16        Q.   And were there any other individuals in the

17    room?

18        A.   No.

19        Q.   Okay.  Did you review documents yesterday?

20        A.   There were a few documents, yes.

21        Q.   And did they help to refresh your

22    recollection?

23        A.   They did.

24        Q.   Can you categorize what type of documents

25    you reviewed?

1      A.   A few e-mails that had my name on it where I

2   had been copied, a couple e-mails that I had

3   written, and there was -- that was about it.

4      Q.   Separate from what you reviewed yesterday,

5   were you provided any documents to review before

6   coming in yesterday for preparation?

7      A.   No, ma'am.  No.

8      Q.   And about how many documents did you review?

9      A.   Yesterday?

10      Q.   Yes.

11      A.   Perhaps ten, in total.  I didn't count them

12   all.

13      Q.   Did they help refresh your recollection?

14      A.   Somewhat, uh-huh.

15      Q.   Okay.  So where do you work now?

16      A.   Right now I work for a company called The

17   CORE Group.

18      Q.   And is that in the food business, I

19   understand?

20      A.   It is.  It's a food broker.  I work as a --

21   I work from home, and I do sales support for them.

22      Q.   And your job before The CORE Group was at

23   Anda; is that right?

24      A.   That is correct.

25      Q.   Okay.  We'll mark your résumé as the first

```
 1    exhibit.

 2            (Anda-Williams Exhibit 1 was marked for

 3    identification.)

 4    BY MS. RELKIN:

 5       Q.  I'm going to give you a copy of what we

 6    marked.

 7            MS. RELKIN:  Of course, Counsel.

 8            Sha'Huni, can you pass this to counsel on

 9       the other side?  Thank you.

10    BY MS. RELKIN:

11       Q.  Ms. Williams, is this a true and accurate

12    copy of your CV?

13       A.  Yes, ma'am.

14            MS. KOSKI:  That was an example of wait

15       until she finishes the question before you

16       answer, just to help the court reporter out.

17            THE WITNESS:  Oh, I'm sorry.

18    BY MS. RELKIN:

19       Q.  And is it fair to say education-wise you

20    have -- you have a degree -- is that an associate's

21    degree at Valencia Community College?

22       A.  I worked towards that degree.  I never

23    officially finished.  I was following the

24    curriculum.

25       Q.  Understood.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So what does AA curriculum stand for?

 2      A.    Associate's of Arts.

 3      Q.    And you also indicate that SunTrust

 4   University Management School.  So what did you study

 5   there?

 6      A.    SunTrust had a week-long management class

 7   that they put upcoming managers and directors into

 8   that hosted a variety of topics from dealing with

 9   employees, HR issues, about the company, goals, how

10   to do performance reviews, you name it.  It kind of

11   covered the gamut of things a manager would be

12   responsible for.

13      Q.    And how long ago was that, approximately?

14      A.    Let's see.  I finished working for them in

15   2008.  I attended that when I -- I would say it was

16   probably around 2000, 2001.

17      Q.    So that was your -- your employment prior to

18   Anda?  Was that a bank?

19      A.    Correct.

20      Q.    SunTrust Bank?

21      A.    Correct.

22      Q.    And they sent you to that course?

23      A.    Yes.

24      Q.    And then you also said host of supervisory

25   management and call center-related courses.  That's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    during your career?

 2       A.   Correct.

 3       Q.   So just focusing on your Anda time period,

 4    what type of courses did you go to while you were at

 5    Anda?

 6       A.   At Anda.  While I was at Anda, we went to

 7    two seminars -- two three-day seminars on two

 8    different occasions that were call center-related,

 9    having to do with productivity, measurements in call

10    centers, how to motivate and engage your employees.

11    It was a wide range of topics, and there were

12    options to attend varying segments throughout that

13    two- or three-day seminar.

14            So we picked topics.  There were a number of

15    us that went from Sun -- from Anda, and we kind of

16    divvied those topics out and kind of blitzed it to

17    make sure we had an opportunity to maximize our time

18    there.

19       Q.   And you shared what you learned with your

20    other coemployees?

21       A.   Correct.  Correct.

22       Q.   Who else went to the course?

23       A.   The other -- on different occasions -- I

24    remember that one of the very first seminars we went

25    to, Brian Witte was there.  I remember that there
```

1    was, I believe, Paul Shermac was there.  I remember

2    a member of our training team, Megan Talber, was

3    there, and there -- Anita Isabella who was over our

4    reporting area.

5         So there was a group of us that went.

6    Q.   And this was just generic to call centers?

7    It was not specific to pharmaceutical industry?  Is

8    that --

9    A.   That is correct.

10   Q.   Did you ever attend any courses while you

11   were at Anda about the pharmaceutical industry?

12   A.   Courses -- not -- nothing -- that was

13   pertinent to call -- to call centers in a -- in a

14   pharmaceutical environment.

15        Is that what you're referring to?

16   Q.   Well, not just call centers.  Just while you

17   were at Anda did you go --

18   A.   Pharmaceuticals period?

19   Q.   Right.

20   A.   Other than the training that I sat through,

21   which was the same training that the new hires went

22   through.  I made sure that I attended all of that so

23   that I was very familiar with what the new hires

24   were experiencing in training.  But nothing beyond

25   that, and I -- in terms of formal training, I did

Highly Confidential - Subject to Further Confidentiality Review

1    have some time with members of varying departments

2    throughout the company, so I learned about the

3    pharmaceutical industry since I was obviously new to

4    that industry as a whole.

5        Q.   So with regard to the training that the new

6    hires went through that you also sat in on, you

7    described it as formal training.  Was it in a

8    classroom type of setting?

9        A.   Yes, it was.  Yes, it was.

10       Q.   Does Anda have a classroom within their --

11       A.   Yes, they do.

12       Q.   -- building?

13       A.   Yes, they do.

14       Q.   Again, you answered before --

15       A.   I apologize.

16       Q.   -- because I paused for a second.

17       A.   Okay.

18       Q.   And who ran that training program?

19       A.   The training manager.

20       Q.   Who was that?

21       A.   At the time, it was Megan Talber.

22       Q.   Does she work off of some written

23   curriculum?

24            MS. KOSKI:  Object to form.

25            THE WITNESS:  I'm sorry?

```
 1              MS. KOSKI:  You can answer.

 2              THE WITNESS:  Oh, okay.

 3       A.   There was formal curriculum that was

 4    available, yes.

 5       Q.   And you started at Anda in 2008.  So is that

 6    when you sat through the class?

 7       A.   That is correct.

 8       Q.   Did you sit through the class periodically

 9    over later years?

10       A.   I did.

11       Q.   And how many occasions, about?

12       A.   I would say probably three, maybe, for

13    varying topics that were being discussed.

14       Q.   Okay.  Do you recall any specific topics

15    where you came in over later years to sit in on the

16    program?

17       A.   There were times when I came in and actually

18    talked to all the new hire classes concerning what

19    to expect, how the goals would be set up, what to

20    expect from their managers, what to expect from me,

21    what kinds of things that they might go to a manager

22    for versus coming to me for.

23              They -- it allowed them to answer questions.

24    Many of them had questions about the incentive

25    program or compensation questions and so forth.  So
```

1    we were able to try to address those questions.

2        Q.    You know, I will turn back to that in a

3    minute.  I probably should -- just since I put your

4    résumé up, let me just for the record get the rest

5    of your background.

6            So when you were hired by Anda, it was in

7    2008?

8        A.    Correct.

9        Q.    What was the position you were hired for?

10       A.    I was hired for the director of inside

11   sales.

12       Q.    And what does inside sales mean?

13       A.    Inside sales was a group of sales

14   representatives that were on the telephone, and they

15   were selling all day long.  That was their job

16   responsibility.  They were not out in the field.

17   They were inside in a cubicle in a -- what I would

18   call a typical call center environment, probably 8X8

19   or 6X6 -- I don't know the exact measurement -- with

20   monitors in front of them.

21       Q.    And how many -- how many individuals were in

22   the inside sales group on the -- on the call center?

23       A.    Okay.  We had two different divisions.  I

24   was responsible for the pharmacy division, and then

25   there was another gentleman who was responsible for

```
 1    a division that we called Anda meds.  That was the

 2    division that sold to the physician side of the

 3    business.  You --

 4        Q.   What you sold the physicians, though, were

 5    pharmaceutical products?

 6        A.   Pharmaceutical products, injectables, OTCs,

 7    yes.

 8        Q.   You were about to say something.  I cut you

 9    off.

10        A.   You had asked how many employees that I

11    personally had.

12        Q.   Yes.

13        A.   It did fluctuate.  We were probably as low

14    as 60 -- 60, 65 at one point.  We did get to be

15    close to 75, 76.  So that number fluctuated as we

16    were bringing new hires in and people would

17    transition perhaps to other areas of the company.

18        Q.   And that was in your division, the pharmacy

19    division?

20        A.   That is correct.

21        Q.   Was there any educational requirement for

22    the new hires?

23        A.   They all needed to go through the new hire

24    training.

25        Q.   But prior to that, did they need a high
```

1    school diploma?  Did they need a college degree?

2    Were there any criteria for hiring a new hire?

3           MS. KOSKI:  Object to form.  You may answer.

4    A.   Yes, they -- a high school diploma was

5    required; obviously, some college was preferred; and

6    some sales experience was preferred.  However, we

7    did hire some folks without extensive sales

8    experience.

9    Q.   Okay.  Now let's go -- backing up with your

10   history, after you did some -- you did some

11   schooling at Valencia Community College?

12   A.   Correct.

13   Q.   How many -- how many semesters or courses?

14   A.   I had not quite 60 credits.

15   Q.   Is there any reason you didn't complete it?

16   A.   Yes.  I met my husband.  My husband obtained

17   full-time custody of his six-year-old daughter.  We

18   married, and I became a wife and a mom at the same

19   time and that was a full plate for me.

20   Q.   Got it.  Got it.

21          And then you went back to -- you went to the

22   workforce some years later?

23   A.   I was working the entire time.

24   Q.   So you were full-time mom and worked?

25   A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   I can relate.  We all can here, many of us.

 2            Then you went to SunTrust Bank; is that

 3  right?

 4       A.   That is correct.

 5       Q.   It looks like you had various jobs.  Why

 6  don't you -- I mean they are listed here on your

 7  résumé.  Your -- which was your first position?

 8       A.   The first position with SunTrust Bank was as

 9  an operations analyst in the correspondent banking

10  department.

11       Q.   And so did that have anything to do with

12  sales?

13       A.   No.

14       Q.   And obviously it had nothing to do with

15  pharmaceutical; is that right?

16       A.   That is correct.

17       Q.   And then you moved to what position?

18       A.   Then I moved to a position which was under

19  the marketing umbrella.  It was a new department

20  called relocation services.  We worked with realtors

21  and area building builders and developers to market

22  a program to help target people that were moving to

23  the area, to the Orlando area.  And we had a

24  relocation package that we mailed to them, and we

25  tried to secure their banking business before they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually arrived to make their transition for home

 2    buying that much easier.

 3        Q.   So when did you first get into the sales end

 4    of SunTrust Bank?

 5        MS. KOSKI:  Object to form.  Go ahead.

 6        A.   The sales role that I took on was first in

 7    the relocation services department.  We were

 8    actually promoting this program to area realtors.

 9           I had a number of sales reps that reported

10    to me.  These folks happened to be outside sales

11    reps.  These were not inside sales reps.  And they

12    were out, and I would accompany them on sales calls

13    that they were doing to their realtors in their

14    market, promoting this program, setting up

15    opportunities for them to discuss this program with

16    members of their staff so that they understood how

17    the program worked.

18           It was a free service that we offered to the

19    realtors, and that was really my first kind of

20    exposure into the sales arena.  Even though there

21    was not a cost involved in the sale, ultimately, I

22    became responsible for following up on those leads

23    and trying to sell banking services to those

24    individuals that we were targeting.

25        Q.   And the term you used, inside/outside,
```

Highly Confidential - Subject to Further Confidentiality Review

1    that's the same terminology that applies to Anda.

2    Is that a generic sales terminology?  "Inside"

3    meaning phone calls from the inside versus "outside"

4    meaning meeting with potential clients or customers

5    outside?  Is that fair to state?  Or if not, you

6    tell me.

7            MS. KOSKI:  Object to form.

8    A.    Let me --

9    Q.    Yeah.

10   A.    Let me clarify my understanding.

11   Q.    Let me have a cleaner question since I kind

12   of rambled there.

13   A.    Okay.

14   Q.    Can you explain your understanding of inside

15   sales versus outside sales?

16   A.    Certainly.

17           Outside sales are individuals whose primary

18   job responsibilities are out in the field, wherever

19   that field -- whatever that level of responsibility

20   takes them.

21   Q.    Right.

22   A.    In this case, it was a realtor offices,

23   development offices, and so forth, builders, what

24   have you.

25           Inside sales, in my vernacular, is people

Highly Confidential - Subject to Further Confidentiality Review

 1    that are sitting inside, normally on a telephone,

 2    making either inbound or getting and receiving

 3    inbound calls or they are making outbound calls.

 4          So there is even a distinction when you get

 5    into the call center sales arena of inbound or

 6    outbound, but outbound sales -- excuse me.  Outside

 7    sales normally means outside of the building.

 8    Q.   Got it.

 9          And that's the same whether it was during

10    your function at SunTrust Bank and at Anda?

11    A.   That is correct.

12    Q.   And when you said there is even a

13    distinction within sales, there is the outgoing

14    calls and the inbound calls.

15          Of the number of employees that you

16    supervised in the -- I guess the phone bank, what

17    was the breakout of inside versus outside?

18          MS. KOSKI:  Object to form.

19    BY MS. RELKIN:

20    Q.   Excuse me, strike that.

21          What was the breakout of inbound calls

22    versus outbound calls?

23    A.   While I worked for SunTrust?

24    Q.   No, no.  For Anda.

25    A.   Oh, for Anda.

```
 1              I would estimate that it was approximately

 2    85 to 90 percent outbound and about 10 to 15 percent

 3    inbound.

 4        Q.   And outbound means that these were sales

 5    reps --

 6        A.   Sales reps.

 7        Q.   -- calling potential customers?

 8        A.   That is correct.

 9        Q.   Is that the same thing as cold call?

10        A.   A cold call is when you are calling someone

11    who has had no prior dealings with the organization.

12    They have no account relationship with us, there was

13    no tie to the company, and a cold call was placed to

14    try to get them to eventually buy something from us.

15        Q.   Right.  Right.

16              So that would be part of the 85 percent

17    outbounds including cold calls?

18        A.   Including cold calls.

19        Q.   So what percent of the outbound was cold

20    calls?

21        A.   That varied by individual, and if you will

22    allow me to explain.

23              New hires, when they were brought on board,

24    did almost exclusively 100 percent outbound calling

25    because they didn't have an established book of
```

1    business yet.  They were calling on people that had

2    been in our database for years and had been called

3    for years, but the relationship had not turned into

4    an account relationship.

5         The larger that a sales rep's book of

6    business became, the more time they spent dealing

7    with their actual customers and clients and a little

8    less time on the outbound cold calling side.

9         I always highlighted to them the importance

10   of never stop cold calling because the moment you

11   stop cold calling is when your book of business

12   could dry up overnight.  They could run into credit

13   issues.  They could run into an issue where the

14   pharmacy closed.  There were a number of reasons why

15   an account would stop buying from us.

16        So I told them it's important for them, to

17   be able to hit their goals, to always continue to do

18   some cold calling.

19        Some reps would only be ten calls a day

20   because that's all they had the time for.  Others

21   would designate certain days of the week where they

22   would maybe designate their mornings.  So it really

23   did vary by individual.

24   Q.   All right.  And then just to finish up your

25   résumé, the first exhibit.

Highly Confidential - Subject to Further Confidentiality Review

1         Your last position at SunTrust Bank, what --

2   what did that entail?

3    A.  My last position with SunTrust Bank was the

4   vice president slash -- and I did have two titles --

5   VP and customer service manager.

6         We had a group of employees there.  We had

7   100-seat capacity, and we had roughly about 100 on

8   the customer service side that were under me.  And,

9   again, that fluctuated sometimes between 90 to 110,

10   but I would say the 100 was around the average.

11         And then there was also a sales group that

12   was managed by another individual.

13         And the role of the group that I managed was

14   mainly inbound customer calls from SunTrust

15   customers.

16    Q.  And I skipped that you were a sales manager

17   for the loan by phone department --

18    A.  Correct.

19    Q.  -- for the bank.

20    A.  Correct.

21    Q.  Did that involve outbound calls?

22    A.  Yes.  Some inbound and outbound.

23    Q.  So the bank would call people saying --

24   trying to sell loans?

25    A.  Correct.

```
 1      Q.   All right.  We'll move on.
 2           MS. KOSKI:  We'll make a little pile in case
 3      you want to go back to something.
 4           THE WITNESS:  Okay.
 5           Can I just add something?  Is it --
 6           MS. KOSKI:  No.  You've got to wait for a
 7      question.  Thanks.
 8           THE WITNESS:  Okay.  All right.
 9  BY MS. RELKIN:
10      Q.   What was the circumstance of you leaving
11  Anda?
12      A.   I was called into a meeting on a Monday
13  morning with Chip Phillips; with Karen Martin, who
14  was the -- over HR at that location; and Tom
15  Pflepsen.  And Chip conducted the meeting.  He told
16  me that a restructuring was going on within the
17  company and that my position was being eliminated
18  and that he was going to be taking over the sales
19  floor.
20      Q.   That was Chip Phillips?
21      A.   Correct.
22      Q.   Did that coincide with Anda being acquired
23  by another company?
24      A.   We had not been acquired by another company
25  at that time.  We were still under Allergan at that
```

Highly Confidential - Subject to Further Confidentiality Review

1    time.

2        Q.   Okay.  And when you were first hired by

3    Anda, it was Watson?

4        A.   That is correct.

5        Q.   And was your -- were you employed by Watson

6    as opposed to Anda or did you --

7        A.   Correct.

8        Q.   It was Anda?

9        A.   (Nodding head.)

10       Q.   Your paychecks came from a payroll check

11   that said Anda?

12       A.   Correct.

13       Q.   What was your understanding of the

14   relationship with Watson?

15           MS. KOSKI:  Object to form.  You can answer.

16       A.   Okay.  My understanding of it was that

17   Watson was the owner, the -- of the wholly owned

18   subsidiary of Anda.  They were a manufacturer.

19   However, we were a distributor.

20       Q.   And you distributed -- strike that.

21           Anda distributed Watson's generic products;

22   is that correct?

23       A.   That is correct.

24       Q.   Watson was a generic manufacturer; is that

25   right?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   They -- they did both, correct.  They had

2    some brand items, and they had some generic items.

3        Q.   And they made opioid products; is that

4    right?

5        A.   That is my understanding, yes.

6        Q.   Do you recall which opioid products Watson

7    made?

8        A.   I don't recall at that time, no.

9        Q.   Part of your responsibility was to direct

10   the sales force to sell opioid products made by

11   Watson; is that fair to state?

12            MS. KOSKI:   Object to form.

13       A.   I'd like to reclarify that statement,

14   because when we say "sell opioids," CIIs, which are

15   known as opioids, were not able to be keyed -- an

16   order could not be keyed by a sales rep.  There was

17   another process.

18       Q.   But to begin the process, to find a customer

19   who was interested in buying it, there were efforts

20   made by your sales force to contact pharmacies to

21   see if they were interested, understanding it still

22   had to go through some approval process; is that

23   right?

24       A.   That is -- that is correct.  However, when

25   we were approaching a customer about ordering and
```

1    dealing with us as a customer, it was for all their

2    generic needs.  It was not strictly for the opioids.

3        Q.   Is it your testimony that there were never

4    phone calls that were directed specifically to

5    promoting certain opioid products during certain

6    campaigns?

7            MS. KOSKI:  Object to form.  You may answer.

8        A.   There were some campaigns, for instance,

9    from -- on new launches of a new CII product where a

10   call would be placed specifically to educate the

11   customer that that product was now available.

12       Q.   And did it also educate the customer that

13   there were certain sales incentives, whether it was

14   coupons or discounts?

15           MS. KOSKI:  Object to form.

16       A.   We really didn't have anything in -- in

17   terms of coupons or incentives of that kind on a --

18   on a new market launch like that, normally, the

19   product comes out, and the role of the sales rep is

20   to educate the customer on what the product is and

21   what's available.

22       Q.   Educate and to try to get their purchase?

23       A.   And to try to get their purchase if they

24   qualified, if there was a need.

25       Q.   And separate from the new launch, there also

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were certain promotional efforts to promote certain

 2    CII products where discounts were given; isn't that

 3    fair to state?

 4         MS. KOSKI:  Object to form.

 5    A.   Can you clarify what you mean by discounts?

 6    Q.   Ten percent off, certain promotional

 7    pricing.

 8    A.   I know that we had some -- I know that we

 9    had some marketing -- what we called marketing

10    drivers that we utilized outbound calling for -- to

11    encourage customers to use CSOS for their CII

12    ordering, but I don't remember them having a

13    discount -- at a discounted rate.  It could have

14    been, but I don't recall.

15    Q.   And why don't you just describe what CSOS

16    is.

17    A.   CSOS is -- it stands for controlled

18    substance ordering system, and it is a platform that

19    allows pharmacies to place their controlled

20    substance orders, mainly CIIs, directly through a

21    computer rather than using a paper CII form.

22    Q.   And marketing driver, what is that?

23    A.   Marketing driver was one of the elements of

24    our sales reps' monthly score card.  The score card

25    was meant to measure the entire performance of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales rep; not just the calls, but how long they

 2    were on the phone, how many customers that they sold

 3    to, whether they hit their generic goal for that

 4    month.

 5          And a marketing driver was introduced

 6    through our marketing department for various

 7    initiatives that the company wanted to use the sales

 8    force to promote.

 9    Q.   What percentage of time did the sales force

10    devote to calls involving CIIs as compared to other

11    pharmaceutical products?  Did marketing driver or

12    any part of the sales report break that out?

13          MS. KOSKI:  Object to form.

14    A.   There was no measurement of that to my

15    recollection.  That was a very, very, very small

16    percentage of times that were dedicated to that, any

17    kind of a CII initiative.

18          Our main focus was overall generics.  We

19    stocked over 11,000 SKUs of generic products.  That

20    was our business.

21    Q.   Of which some were opioids?

22    A.   Of which some were, correct.

23    Q.   And the profit margin on the CIIs was a

24    favorable profit margin, wasn't it?

25    A.   I cannot speak to that.  I had nothing to do
```

```
 1    with pricing, nor involved in that.

 2        Q.   During the various training programs that

 3    took place in that special training room, did you

 4    ever attend or come to learn of training where the

 5    sales force or anyone else was educated about the

 6    different CII products?

 7             MS. KOSKI:  Object to form.

 8        A.   Yes.

 9        Q.   And what -- describe for me as best as you

10    can recall what was said at those meetings.

11             MS. KOSKI:  Object to form.

12        A.   There was a complete training on -- on CIIs,

13    who we sold to, who we didn't sell to, the different

14    types of control products, what the process was if a

15    customer wanted to order one.

16             We were real -- on the CII side, it was

17    really a service we provided because our sales reps

18    were not able to key those orders in.  The customer

19    had to fill out a form, send it to us, and the sales

20    floor did not touch that order.  It was handled by

21    another member of my department with different

22    access to enter that CII order into our TPS ordering

23    system.

24        Q.   Who was that?

25        A.   Latoya Samuels was the person who
```

1    predominantly had that responsibility.

2        Q.   But before it went to Latoya Samuels, a

3    salesperson was interacting with the pharmacy

4    customer, discussing the sale of CII products,

5    correct?

6        A.   They could have been, or it could have been

7    that the customer had the CII form already, filled

8    it out, and just sent it in to our warehouse; the

9    sales rep did not touch that order.

10       Q.   Well, sales reps did touch some of the

11   orders.

12            What do you mean by "touch" an order?

13       A.   "Touch" -- okay.  What I mean by that, they

14   did not key the order into the system.

15       Q.   Just with their hands, they did not enter

16   it?

17       A.   They did not, correct.

18       Q.   But they still had communications with their

19   customer about it?

20       A.   Correct.  They would see that an order had

21   been processed.

22       Q.   Who -- who led that training program which

23   discussed the CIIs?

24            MS. KOSKI:  Object to form.

25       A.   I don't recall specifically who conducted

```
 1    all of the sessions.  I do remember that our

 2    compliance department attended and was there most --

 3    for most of those trainings.  I can't say they were

 4    there for all of them because I did not personally

 5    attend all of those, but they were there at the ones

 6    that I was there.

 7          Megan, again, was our trainer, and she, with

 8    the compliance department, had put training together

 9    to make sure that our new hires and the entire floor

10    knew what our processes were.

11    Q.   Do you know whether Megan is still with the

12    company?

13    A.   She is not.

14    Q.   Do you know where she is now?

15    A.   North Carolina, I believe.

16    Q.   Do you know -- do you stay in touch with

17    her?

18    A.   Occasionally.

19    Q.   Where in North Carolina?

20    A.   I don't know the actual city.

21    Q.   And I think we have her last name on the

22    record, but what is it again?

23    A.   Talber.

24    Q.   And who does she work for now?

25    A.   I believe she's a stay-at-home mom, and she
```

Highly Confidential - Subject to Further Confidentiality Review

1    homeschools her children.

2         Q.   Do you have Facebook communications with

3    her?

4         A.   Occasionally.  Occasionally.

5         Q.   What other former coemployees are you still

6    in touch with?

7              MS. KOSKI:  Object to form.

8         A.   Former employees?

9         Q.   Anyone you worked with.

10        A.   There is a couple of sales managers.

11        Q.   Who are they?

12        A.   Vickie Shalley.  Vickie Shalley-Held was

13   actually her hyphenated last name.

14        Q.   Where is she now?

15        A.   She is now a realtor.

16        Q.   Where?

17        A.   Better Homes and Garden Realty -- Better

18   Homes and Garden Real Estate.  I believe it's in

19   Plantation.

20        Q.   Florida?  Florida, right?

21        A.   Correct.

22        Q.   Anyone else besides Vickie?

23        A.   When you -- can you clarify what you mean by

24   stay in touch with?

25        Q.   Send a Christmas card --

1     A.   Oh.

2     Q.   -- speak to them intermittently, ever get

3   together intermittently, send an e-mail, Facebook

4   hellos.

5     A.   Every once in a while Vickie and I will chat

6   or I'll respond to something on Facebook.  Is it

7   every day, no.

8     Q.   Besides Vickie, from the date you left Anda,

9   did you ever get together physically with any of

10   your former coworkers?

11     A.   Yes.  I've gotten together with a couple:

12   my former boss, who was Kim Poropat.

13     Q.   Is she still there?

14     A.   No.

15     Q.   Where did she go?

16     A.   I don't believe she's working.

17     Q.   Did you leave around the same time you left?

18     A.   No.  She left maybe a year, year-and-a-half

19   later.

20     Q.   Do you know the circumstance of her leaving?

21     A.   I do not.

22     Q.   Besides  -- besides Kim Poropat, anyone

23   else?  Vickie and Kim.  Who else?

24     A.   That's --

25     Q.   Those are the only two people?

1      A.   Megan every once in a while, but nobody on a

2   regular basis.

3      Q.   The training sessions you said compliance

4   attended -- these are the training sessions

5   regarding the CII opioid products -- did compliance

6   speak at the program?

7      A.   Yes.

8      Q.   So when I heard "attendance," it seemed to

9   me like more like they were in the audience, but

10   they were part of the presentation?

11      A.   They were -- they were -- they were there,

12   uh-huh.

13      Q.   So who spoke at the program?

14      A.   I recall Robert Brown speaking.

15      Q.   And how regular were these programs?  Was it

16   an annual thing or some other periodic basis?

17      A.   I don't remember that there was a set

18   schedule.  If we felt a refresher was needed, we

19   would go back and conduct a refresher.  That was

20   part of our ongoing business and protocol with

21   anything that we felt the floor needed a refresher

22   on.

23      Q.   Did -- besides Robert Brown presenting, who

24   else presented?  Megan and Robert Brown and who

25   else?

1      A.   I -- I believe at the session that I was at,

2      that I believe Emily Schultz was at as well, and

3      I -- I remember Mike Cochrane being there for a

4      short time, but I don't -- I cannot remember whether

5      he was there for the entire program.

6      Q.   How long was the program?

7      A.   I don't recall.  It was probably close to an

8      hour.

9      Q.   And were there handouts?

10     A.   I don't recall if there were handouts, but I

11     know we had screens and there were overheads that

12     were used for all of the -- it was an entire, like,

13     PowerPoint presentation that was put together.

14     Q.   Thank you.

15          MS. RELKIN:  Speaking of screens, this

16          screen is not on.  Is there a way to put that on

17          so everybody else can get the benefit of looking

18          at the exhibits?

19          THE VIDEOGRAPHER:  They have the monitors

20          there.

21          MS. RELKIN:  Oh, you all can see it?  Okay.

22     BY MS. RELKIN:

23     Q.   So there were PowerPoint slides?

24     A.   (Nodding head.)

25     Q.   Since you've been to more than one of them,

Highly Confidential - Subject to Further Confidentiality Review

1    did they look like repeat slides, some of them, some

2    maybe new ones?

3         MS. KOSKI:  Object to form.

4    A.   I can't answer that.  They looked all

5    uniform.

6         MS. RELKIN:  I call for production of the

7         training slide PowerPoints.  We'll obviously

8         follow up.

9    BY MS. RELKIN:

10   Q.   Was there any discussion of the addictive

11   nature of CII pharmaceutical products during the

12   program?

13        MS. KOSKI:  Object to form.

14   A.   I believe it was discussed.  I just can't

15   say how much time was spent on it.

16   Q.   What do you recall being discussed?

17   A.   I recall being discussed who we could sell

18   to, who we could not sell to, the different levels

19   of products that were out there and the different

20   C -- well, there is a CII category, there's a CIII,

21   there's CIV.

22        But CII was really the opioids, so this was

23   really all-inclusive of mainly CIIs.

24   Q.   And what do you recall being instructed

25   about who you could not sell to?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Physicians.  We didn't sell to physicians.

2    We didn't sell to wholesalers.  We didn't sell to

3    pain management clinics.  We didn't sell to diet

4    clinics.  There might have been some reference to

5    repackagers.  Repackagers are people that take a

6    product and then repackage it.  I believe that was

7    the context of it.

8       Q.    Why were those category of potential

9    customers off-limits?

10            MS. KOSKI:  Object to form.

11      A.    That was a decision made by the management

12    team.

13      Q.    Did you have any understanding why you could

14    not sell to them?

15      A.    My understanding, that was a decision that

16    was made by the management team, that we were not

17    going to sell to physicians.

18      Q.    But did you have an understanding of why

19    they did not want or they decided not to sell to

20    physicians?  Did it have something to do with --

21      A.    I'm --

22            MS. KOSKI:  Let her finish.

23    BY MS. RELKIN:

24      Q.    -- risk of diversion?

25            MS. KOSKI:  Object to form.

```
 1    BY MS. RELKIN:

 2        Q.   Strike that.

 3             Sitting here, are you saying you have no

 4    understanding whatsoever of the basis for why a

 5    decision was made not to sell to physicians?

 6             MS. KOSKI:  Object to form.

 7        A.   I was not part of the discussion that went

 8    on as to why the physicians were not going to be

 9    sold to.  We were all aware as an organization and

10    individuals.  We read the papers.  We knew what was

11    going on.  And it was no surprise when that decision

12    was made, that we were not going to be selling to

13    them.  This was not our livelihood.  This was not

14    what we came to work to do every day, was

15    concentrate on CII sales.  We came to sell generic

16    products, and that's -- that was the focus of our

17    business.  This was a very small subset of what our

18    sales reps sold.

19        Q.   And when you say you knew what was going on,

20    you read the papers, are you talking about opioid

21    addiction?

22        A.   Correct.

23        Q.   And are you talking about pill mills?

24        A.   Correct.

25             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RELKIN:

 2        Q.   And what was your understanding of what a

 3    pill mill is?

 4        A.   Our understanding of a pill mill was

 5    physicians that were really doing some very

 6    questionable things and that were in essence

 7    creating lines of people waiting to get products

 8    that -- or scripts for products from a physician

 9    that was possibly doing unethical things.

10        Q.   And that there were patients or individuals

11    who were addicted who were searching out for --

12        A.   Searching out, correct.

13        Q.   -- for prescriptions?

14        A.   Correct.  Correct.

15        Q.   You said a decision was made not to sell to

16    physicians.  At some point prior to that, sales of

17    CII were made by Anda to physicians; is that right?

18             MS. KOSKI:  Object to form.

19        A.   My understanding is that yes.

20             Again, I didn't manage that side of the --

21    that side of the business.

22        Q.   So your side of the business was --

23        A.   Pharmacies.

24        Q.   -- strictly pharmacies?

25        A.   Independent pharmacies.  We didn't deal with
```

```
 1    the Walgreens or the CVSs or the larger chains.

 2    Those were all handled through our national account

 3    team.

 4       Q.   Vickie Mangus and others?

 5       A.   That is correct.

 6            MS. KOSKI:  Sorry, I hate to do this.  Can

 7    we take a quick break?

 8            MS. RELKIN:  Sure.

 9            THE VIDEOGRAPHER:  Off the record at 10:07.

10        (Recess from 10:07 a.m. until 10:16 a.m.)

11            THE VIDEOGRAPHER:  The time is 10:16 a.m.

12    We're now back on the video record.

13            (Anda-Williams Exhibit 2 was marked for

14    identification.)

15            MS. KOSKI:  Is this the one you want the

16    witness to have?

17            MS. RELKIN:  Oh, yeah.  There should be an

18    extra one there for you.

19            MS. LUND:  Can we put one on the Elmo maybe?

20            MS. RELKIN:  Yeah.  Which is the way to zoom

21    in?

22            THE VIDEOGRAPHER:  I gotcha here.  Do you

23    want to zoom in or zoom out?

24            MS. RELKIN:  Make it a little easier to

25    read, bigger.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Can anybody read that?  It's small, so --
 2      okay.
 3              MS. KOSKI:  She needs to see it if she
 4      highlights something.  So I --
 5   BY MS. RELKIN:
 6      Q.   Ms. Williams, I show you what we just marked
 7   as Exhibit 2, which look to be PowerPoint slides
 8   titled "Controlled Substances, Know Your Customer."
 9              Is this the slides that you were describing
10   that were shown at the training session?
11      A.   Yes.
12      Q.   Okay.  And the term "know your customers,"
13   is that a term in the industry regarding the sale of
14   CII substances to pharmacies?
15              MS. KOSKI:  Object to form.
16      A.   Yes.
17      Q.   Is that also a term used for pharmacies
18   for -- for their customers, the individual patients
19   bringing in scripts?
20      A.   I can't answer what the pharmacy lingo is,
21   but it was part of our pharmacy lingo.
22      Q.   And your understanding was that meant that
23   Anda employees should know their customers, the
24   individual pharmacies?
25      A.   Do their best, yes.
```

1      Q.   Okay.  And the purpose of that was -- was

2   what?

3           MS. KOSKI:  Object to form.

4      A.   The purpose of understanding -- of knowing

5   the customer?

6      Q.   Yes.

7      A.   To know about them, to know what kinds of

8   clients that they sold to, what was the market that

9   they were in.

10          Part of our role as sales reps was to be a

11  consultant to them, not just call them and read

12  specials off for the day.  It was to understand

13  their business and how we could partner with them as

14  a business partner to meet their needs.

15     Q.   Was your understanding that "know your

16  customer" was something targeted to the CIIs to make

17  sure that you knew what your customer with the

18  pharmacy was doing with the product?

19          MS. KOSKI:  Object to form.

20     A.   It was part of getting to know the entire

21  customer, no matter what they bought from us.  We

22  still wanted to know who they were, what did their

23  storefront look like.  We would Google search their

24  location to determine where were they, what kind of

25  a market were they serving.  We wanted to know as

```
 1    much about them as we possibly could.  How long they

 2    were in business, who their primary was.

 3           We -- we -- Anda was never desirous of being

 4    the primary for our independent pharmacies.  We'd

 5    like to be their primary secondary.  That was the

 6    goal.

 7       Q.   But the title of this presentation,

 8    "Controlled Substances" -- it would help if I had

 9    the cap off -- "Know Your Customer" -- so while

10    generally it makes sense that you are selling

11    something, whatever the product is, you want to know

12    your customer, it makes you a better salesperson --

13       A.   Right.

14       Q.   -- makes you more helpful to them, here,

15    there was a focus on "know your customer" with

16    regard to controlled substances; fair to state?

17       A.   Yes.

18       Q.   And that's because you wanted to make sure

19    it wasn't a fly-by-night operation that was

20    operating virtually out of a truck?

21       A.   Right.

22           MS. KOSKI:  Object to form.

23       Q.   Right?

24           That's why you wanted photographs of where

25    they were; is that right?
```

```
 1      A.    Uh-huh.

 2            MS. KOSKI:  You have to give a verbal

 3      answer.

 4      A.    Yes.

 5      Q.    I neglected to give you that instruction.

 6            Even though a nod of the head or "uh-huh" is

 7      what we do in ordinary conversation, the court

 8      reporter needs an oral answer.

 9            Okay?

10      A.    Yes.

11      Q.    Thank you.  You got it.

12            All right.  One of the topics here was

13      "Increases and Control Limit Increases and

14      Corrective Adjustments"; is that right?

15            In terms of the module overview --

16            MS. KOSKI:  If you look on the screen, you

17      can see what she's talking about.

18      BY MS. RELKIN:

19      Q.    I'm sorry.  It's the second slide.

20      A.    Okay.  Yes.

21      Q.    And that was something that was important to

22      your staff, right?

23      A.    Right.

24      Q.    And we'll go over some of the documents

25      regarding that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KOSKI:  It is the same as the one in
 2      front of you.
 3            THE WITNESS:  Uh-huh.
 4            MS. KOSKI:  Yeah.
 5   BY MS. RELKIN:
 6      Q.  I'm not going to go through the whole slide.
 7   I just want to touch on a few things.
 8            The slides took you through the overall
 9   eligibility requirements, right, in terms of whether
10   a customer was even eligible to buy the CII
11   products?
12      A.  Correct.
13      Q.  Is that fair to state?
14      A.  Yes.
15      Q.  And there is a compliance department as we
16   discussed, right?
17      A.  (Nodding head.)
18      Q.  But before compliance dealt with a customer,
19   the sales force was -- the beginning of the contact
20   with the customer; is that fair to state?
21            MS. KOSKI:  Object to form.
22      A.  Correct.
23      Q.  Which is why sales needed to know at least
24   some of these basics, if not more, of dealing with
25   controlled substances before it even got to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance?

 2        A.    That is correct.

 3        Q.    In terms of the notion of "know your

 4    customer," are you familiar with the concept that

 5    the sales force should be the eyes and ears of the

 6    company since they were more directly interacting

 7    with the customer?

 8            MS. KOSKI:  Object to form.

 9        A.    Could you restate the question?

10        Q.    Have you heard the term "eyes and ear of the

11    company"?

12        A.    Correct.

13        Q.    And what's your understanding of that in

14    this context?

15        A.    In the context of this particular module?

16        Q.    Yeah.

17        A.    Yeah.

18        Q.    So this issue, yeah.

19        A.    Okay.  To help us understand what's going

20    on, what they are hearing from their customers, what

21    are their customers hearing, what -- what our sales

22    managers were hearing from the clients that they

23    spoke to.

24            Because sometimes if there was a question,

25    the sales rep would escalate the call to the sales
```

1      rep -- from the sales rep to the sales manager,

2      excuse me.  So it means being alert.  Being -- being

3      alert to things that the company may need to know

4      about.

5          Q.   Including whether there was something

6      suspicious about the potential customer?

7          A.   Correct.

8              MS. KOSKI:  Object to form.

9      BY MS. RELKIN:

10         Q.   Okay.  What are some of the concerns that

11     might trigger a sales rep to notify their sales

12     manager or compliance about concerns about a

13     customer in the context of CII sales?

14             MS. KOSKI:  Object to form.

15         A.   In the context of CII sales, if they -- if

16     they saw changes in the patterns of the customer

17     ordering, they would see those -- those orders

18     coming through, they don't -- as we talked earlier,

19     they don't -- they didn't key them, but if they saw

20     unusual patterns, they normally would inquire what

21     was going on.

22             Sometimes there was a national account

23     initiative that was driving that.  Other times it

24     could have been the customer that was just -- they

25     were approved, but they hadn't been buying the

Highly Confidential - Subject to Further Confidentiality Review

1    controls and then they started buying the controls

2    from us.

3         There could have been a variety of reasons

4    why they would have seen a change.

5    Q.   And change in pattern, would that include an

6    appreciable increase in the volume of opioids that

7    were being requested for purchase?

8    A.   Correct.

9    Q.   And did it also include within the opioid

10   family if there was a surge in OxyContin or

11   fentanyl, that that would trigger concerns?

12        MS. KOSKI:  Object to form.

13   A.   Yes, I think that would fall in that same

14   category of any CII that was -- any pattern that was

15   outside of the customer's normal realm was something

16   we talked to them about making us aware of.

17   Q.   And when it was a new customer, so you

18   didn't know what their normal realm was, what were

19   your sales reps instructed to look for?

20        MS. KOSKI:  Object to form.

21   A.   We did not sell CIIses to brand new

22   customers until they had several months' worth of

23   history.  We needed to know a little bit more about

24   the pattern of their business before we would send

25   the request to the compliance department to see if

```
 1    they would turn on control purchases.

 2        Q.   So if a new customer called that was -- you

 3    had never sold to before and they were a pharmacy

 4    in -- pick a place, somewhere in Ohio -- that never

 5    sold -- you never sold to them before, what was

 6    required to do before you could provide them with

 7    the CII product?

 8        A.   We normally had -- we requested that they

 9    complete a questionnaire so that we could get to

10    know more about their business.  That questionnaire

11    was sent with the new account package that was

12    mailed out by the marketing department.  The sales

13    rep would request that packet get mailed from

14    marketing.  Marketing would send that packet out and

15    the know your customer -- I'm sorry, the question

16    your customer questionnaire was included in that

17    packet.

18             They would return that information back to

19    us, and we would get a copy of their DEA license and

20    their state license before we would be able to even

21    start the process of trying to open an account. The

22    new account process itself was several steps.

23        Q.   And would you get the DEA and state license

24    from them?

25        A.   We would get the DEA and state license from
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    the pharmacy that was asking to open an account with

2    us, yes.

3         Q.   Okay.  And then what?

4              MS. KOSKI:  Object to form.

5         A.   In terms of what the next step in the new

6    account process would be?

7         Q.   Yes.

8         A.   Okay.  The sales rep would obtain those

9    documents, something called a load sheet was

10   completed by the sales rep that was putting all the

11   pertinent information that was required in our

12   system to load a new customer.  That was put on a

13   form and it was sent to our customer maintenance

14   department and to the compliance department with a

15   copy of the DEA license and the state license.

16        Q.   Okay.  And then what was the next step?

17        A.   Then we waited.

18        Q.   For?

19        A.   We had to wait for customer maintenance to

20   load all that information into the system as a new

21   record, and then it was compliance would do the

22   ultimate verification and approval to open up that

23   account.

24        Q.   Was there any minimum waiting period?

25             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

 1        A.    To open the account and start buying, once

 2    the account was open, they could start purchasing

 3    right away, but not CIIs.   Typically not CIIs.

 4            Typically we would get -- we would wait at

 5    least 90 days, if not longer, and we did not offer

 6    that.  It was not something that we were -- it was

 7    part of the sales rep's presentation as soon as a

 8    new account opened to, oh, we can sell you CIIs.

 9            It was really designed to open the account

10    so that we could get them to start buying generic

11    products from us.

12        Q.   So there never were situations where a sales

13    rep made a cold call to a pharmacy and said, yes, we

14    could use some oxy or some other CII and then steps

15    would be taken to get it to them?

16            MS. KOSKI:   Object to form.

17    BY MS. RELKIN:

18        Q.   Is that your testimony?

19        A.   That would have been a red flag, and that's

20    the way the reps were trained.  And that was even

21    touched on in this, even though it wasn't in

22    writing.  If you're getting a call out of the blue

23    from a customer who you've never -- who we've never

24    dealt with before and that's what their first

25    question to you is, that's a big red flag.

```
 1      Q.   What if it went the other way?  Were there

 2   sales reps from Anda who, in their tasks, the

 3   younger rookies who were making cold calls to get

 4   new business, did they ever make cold calls to

 5   pharmacies offering CIIs during these initial

 6   overtures to the new company?

 7         MS. KOSKI:  Object to form.

 8      A.   That was not how they were trained.

 9      Q.   Do you recall that ever occurring?

10      A.   I do not recall ever hearing it.  Since I

11   didn't hear every call that the sales reps made, I

12   can't vouch for every single call.

13      Q.   By the way, with regard to the calls that

14   the sales reps made, were they monitored or audited?

15      A.   Yes, they were.

16      Q.   What was the process for that?

17      A.   We used a system called Call Copy.  Call

18   Copy is a software program -- a monitoring software

19   program where calls are recorded, and we had a QA

20   department, quality assurance department, that fell

21   under the training umbrella.

22      Q.   And what percentage -- strike that.

23         Were all of the calls recorded?

24      A.   I can't say that they were all recorded

25   because, by law, there were a couple customers that
```

 1   had requested not to be mon -- to be recorded, and

 2   by law we had to comply with that.  But I would say

 3   a good 85 to 90 percent of the calls were recorded.

 4       Q.   And was that the salesperson, when they

 5   picked up the phone, they pushed a button to record,

 6   or how did that work?

 7       A.   It worked automatically, and they had to

 8   have a certain greeting that they had to use to

 9   disclose to the customer that they were on a

10   recorded line.  So their greeting would be:  Hello,

11   this is Patricia Williams.  I'm calling you today on

12   a recorded line.  Either how can I help you or can

13   we talk a little bit about your business today.

14       Q.   Got it.  If a customer said I don't want

15   this to be recorded, was that a red flag to you?

16       A.   A red flag?  It was not a red flag from the

17   standpoint of, oh, I wonder why.  It was a -- it was

18   just that we, legally, based on all the research

19   that had been done on the topic of recording, we

20   knew that we needed to take that next step and we

21   needed to be able to comply with that.

22            So it was more of a legal requirement that

23   we were obligated to follow.

24       Q.   But there was no concern that if a customer

25   was touchy about having the call recorded, that they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    may have been seeking CIIs inappropriately?

 2         A.   Not -- no, I don't recall that really being

 3    of a big concern.  The sales reps would try to

 4    educate the client or the customer as to why we did

 5    that.  It was for their coaching and development.

 6              Just because you have a sales rep doesn't

 7    mean that they are the perfect salesperson.  So we

 8    were constantly coaching, monitoring, developing,

 9    getting feedback from QA, going back to the sales

10    rep, saying, okay, you've positioned it this way; it

11    would have been better to maybe have positioned it a

12    different way.

13              You know, they weren't perfect people, and

14    we did our best to try to make them as professional

15    as we possibly could.

16         Q.   If there were -- if QA folks who were

17    monitoring the calls thought that there was

18    something inappropriate in which the reps were

19    conducting the calls, especially with regard to

20    CIIs, were they ever terminated?

21              MS. KOSKI:  Object to form.

22         A.   Was the employee ever terminated?

23         Q.   Yes.

24         A.   It would depend on what the context of the

25    call was.  Mainly, we used the coaching and feedback
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as -- we used the tool of the QA feedback as helping

 2    them to become better.  Maybe the way they said it

 3    was technically -- technically right, but the way

 4    they said it may have led the customer to have a

 5    little bit different impression than what they

 6    should have had.  And we would go back and help them

 7    to rephrase that and fine-tune their sales pitch.

 8         Q.   As you sit here, can you recall any

 9    situations where an employee was terminated by Anda

10    because of inappropriate efforts to sell opioids to

11    customers?

12             MS. KOSKI:  Object to form.

13         A.   I cannot recall.

14         Q.   Sitting here, can you recall any employees

15    who were disciplined or schooled due to QA people or

16    others seeing that they were doing something

17    inappropriate in their efforts to sell CII opioids

18    to customers?

19             MS. KOSKI:  Object to form.

20         A.   Yes, I believe they were.

21         Q.   Can you tell me about what you recall?

22         A.   I -- I recall that we had a few reps that

23    just were not positioning our -- our position as a

24    company correctly.

25             When decisions were made to cut off a
```

```
 1   customer from buying controlled substances, the way

 2   that they explained that to the customer may not

 3   have been as professional as it should have been or

 4   it may have led the customer to believe well, if I

 5   do this, I can do this, kind of thing. So when we

 6   caught that, we sat down.  We sat with the rep.  We

 7   coached them through a different kind of dialogue to

 8   have.

 9          I can remember some of the sales managers

10   having those conversations with them over a period

11   of time.  Do I remember a specific rep?  No, but I

12   know that those kinds of conversations and coaching

13   development opportunities did go on.

14   Q.   You can't recall any particular rep who was

15   disciplined for their --

16   A.   I cannot as I'm sitting here, no.

17   Q.   And let me just finish the question.

18   A.   I'm sorry.

19   Q.   You can't recall as you're sitting here any

20   individual rep -- sales rep who was disciplined by

21   Anda management for inappropriate conduct in

22   promoting or selling opioids to pharmacy customers?

23   A.   I cannot recall.

24   Q.   When you left the company, were you provided

25   with any severance?
```

1    A.   Yes.

2    Q.   And was that a package that they offered to

3    you?

4    A.   Yes.

5    Q.   Was that offered to you during that same day

6    when you had the meeting when you learned that your

7    position was being -- what's the terminology -- the

8    position was eliminated?

9    A.   I was notified that there would be something

10   forthcoming, but I did not get it that day.

11   Q.   How soon afterwards did you get it?

12   A.   I actually got the package about two months

13   later.

14   Q.   Was there any intervention in between where

15   you sought counsel against the company?

16        MS. KOSKI:   Object to form.

17   A.   No.

18   Q.   Would you -- would you describe your leaving

19   the company to be that you left on good terms?

20   A.   Yes.

21   Q.   Do you have any pension with Anda or any of

22   its owners?

23   A.   No, ma'am.

24   Q.   Did they have a pension plan?

25   A.   No.  They had a 401(k).

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Who did you report to, starting -- it may

 2    have changed over time -- so when you joined the

 3    company?  Was that in 2008?

 4        A.   Yes.  I joined August the 4th, 2008.  At

 5    that time, I reported to Kim Bloom.  Her name is now

 6    Kim Poropat.  She reverted back to her maiden name

 7    after a divorce.  And I reported to her for

 8    approximately a year, year-and-a-half.

 9        Q.   Okay.  And then?

10        A.   And then I was promoted to executive

11    director of sale -- of inside sales.  Kim

12    transitioned to another role within the organization

13    and I started reporting to a Brian Witte, W-i-t-t-e.

14    And I remained reporting to Brian until the day that

15    I left.

16        Q.   Your compensation, was there a base pay and

17    a commission component?

18        A.   My base pay was -- there was a base, and

19    then there was an annual percentage component.  If

20    the company made plan, there were a number of

21    factors that had to have been met, and it could have

22    been up to 20 percent of my annual income if all of

23    those factors aligned.

24        Q.   Was that based by any metrics of sales from

25    your unit?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, it was.

 2      Q.   What was the ratio between -- understanding

 3   that your commission could change over time, because

 4   it wasn't always the same --

 5      A.   Correct.  I was not a commission-based sales

 6   manager or director.  I was paid a salary.  I did

 7   not get commission on sales.

 8      Q.   Okay.  So what -- what would you refer to --

 9   we know the base pay is the regular.

10      A.   Correct.

11      Q.   And then this --

12      A.   It was an annual bonus.

13      Q.   It was a bonus?

14      A.   Correct.  It was an annual bonus.

15      Q.   And so was it generally your bonus was about

16   20 percent of your overall compensation package?

17      A.   I had the availability of going up to 20

18   percent if all of the metrics that I was held

19   accountable during that year were met and the

20   company made plan and there was a component, I

21   believe, originally at the Watson level and how well

22   Watson did as an organization as well.

23      Q.   You were with the company for, what, about

24   seven or eight years?

25      A.   I was hired on August the 4th of 2008, and
```

1    my severance package date on there has that my

2    ending date was June the 29th of 2015.

3        Q.   Okay.  So during those years, how many of

4    the years did you get to the 20 percent?  And if you

5    don't get to the 20 percent bonus, what were the

6    varying -- what were the lowest bonus that you got

7    in any given year?

8        MS. KOSKI:  Object to form; compound.

9    BY MS. RELKIN:

10       Q.   Good point.  What was the lowest bonus you

11   had in any given year, if you can recall?

12       A.   I can't recall.  It fluctuated every year.

13       Q.   So --

14       A.   I remember a 9 percent.  I remember a 15

15   percent.  I remember nothing or very little.  I

16   don't -- I don't have those numbers memorized.

17       Q.   You got 20 percent at least one year?

18       A.   I believe so.  I believe so.

19       Q.   Were there stock options or stocks provided

20   as well?

21       A.   Yes, there were some stock options.

22       Q.   And the stock was with Watson?

23       A.   It was originally with Watson, and then

24   everything transitioned over to Actavis, and then

25   from Actavis it transitioned over to Allergan.

```
 1        Q.   And do you have stock in Watson, Actavis,

 2   and Allergan?

 3        A.   No longer.

 4        Q.   Did you -- when did you sell that stock?

 5             MS. KOSKI:  Object to form.

 6        A.   I exercised those options over a period of

 7   years -- and I did hold onto a significant amount of

 8   them and got rid of those in 2016.

 9        Q.   Now Anda is owned by Teva; is that right?

10        A.   That is correct.

11        Q.   Do you have any stock in Teva?

12        A.   No.

13        Q.   And you talked about base pay and then the

14   bonus, which was the varying percentages?

15        A.   Varying, uh-huh.

16        Q.   On top of that, there would be stock

17   options; is that right?

18        A.   The -- there was a -- what was called a

19   long-term incentive was there were stock options,

20   part of the long-term incentive.  So some years

21   there would be some stock options offered to me and

22   other years there were not.

23             I was offered an initial group of shares as

24   well if I retained and stayed on with the company

25   for a period of time -- I think it was two years or
```

 1    four years -- payable incrementally as I had

 2    longevity with the company.

 3        Q.   And when the company -- when Watson sold to

 4    Actavis, you kept your Watson stock options and then

 5    you also then got Actavis?  Is that how it worked?

 6        MS. KOSKI:  Object to form.

 7        A.   It had -- they had to all be converted over.

 8    They all were converted over, because at the time of

 9    the conversion, none of my stock options were

10    payable.

11        Q.   Got it.

12        A.   They weren't payable until future dates.

13    There was nothing payable to me immediately.

14        Q.   What was the approximate amount of your --

15    of the sale of all your options?

16        MS. KOSKI:  Object to form.

17        A.   Over the entire course of the time that I

18    was with the company?

19        Q.   Yes.  Until when you sold in 2016, yeah.

20        A.   Okay.  May I ask another -- another

21    question?

22        Q.   Sure.

23        A.   A clarifying question?

24        There was a price that the stock was given

25    to me at, and then there was the price that it was

```
 1    actually sold at if there was an appreciation time

 2    frame.  Okay.  Which of those numbers would you

 3    like?

 4        Q.   Why don't you give both, the best that you

 5    can recall.

 6        A.   I want to say that I had a total combined of

 7    about 3,000, maybe 3,200, shares over a period of

 8    time, and those did appreciate.  Because they were

 9    issued at all different amounts, from $35 up to over

10    $190, depending on what the share price was going

11    for, for which company we were under at that time.

12             And then, obviously, Allergan, which is when

13    it was finally sold -- when I actually sold the

14    majority -- I think I may have sold a few shares

15    right after year number four that I was with the

16    company, because I think that was the first time

17    that I was eligible to actually exercise the option.

18        Q.   Right.

19        A.   And I want to say then I maybe took what was

20    the equivalent of 100 shares, maybe 200 shares.  I

21    don't recall.  I'd have to look.

22        Q.   And then when you sold the bulk of them in

23    2016, how much did you receive?

24        A.   I netted about -- let me think here.  It was

25    about $600,000, I believe.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   In addition to the stock options, the base

2    pay, and the annual bonus, you said there was a

3    401(k).

4           Did they match that as well?

5      A.   Yes, they did.

6      Q.   And up to what percent?

7      A.   They matched like 2 percent.  I believe it

8    was 2 or 3 percent, up to 6 percent, from what I can

9    recall.  And I believe it did change.  I believe it

10   started out as 2 -- 2 percent, and then it -- I

11   believe it went to 3.

12     Q.   You said it went up to 3, not --

13     A.   I believe so.

14     Q.   -- not 6 percent?

15          MS. KOSKI:  Object to form.

16   BY MS. RELKIN:

17     Q.   If you put up to 3, they matched 3?

18     A.   Correct.

19     Q.   Got it.

20     A.   Sorry I didn't explain that correctly.

21     Q.   What was -- with regard to your bonus, what

22   was the highest bonus you received the year you hit

23   20 -- or the year or years -- or what amount of

24   money was that?

25          MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1       A.   I don't recall the amount.

2       Q.   Approximately.

3       A.   I don't recall.  I know there -- I remember

4   somewhere -- it was around $15,000.  I really don't

5   recall the numbers.

6       Q.   And your base pay was?

7            MS. KOSKI:  Object to form.

8       A.   I was hired in at $110,000.  My base pay

9   when I left was 185.

10      Q.   And what was the severance that they

11  provided?

12      A.   Thirty-nine months.

13      Q.   So you got your base pay for 39 months?

14      A.   I apologize.  I'm so sorry.

15      Q.   That's a good deal.

16      A.   Please strike that.  It was for 9 months.

17  It was 39 weeks, not 39 months.

18      Q.   I would say that's very generous.

19           So you got nine months --

20      A.   Correct.

21      Q.   I'm sorry to have been intrusive, but this

22  is what we do.

23           Would you agree with the statement that

24  there is an inherent tension between Anda's desire

25  to sell and make profit and the responsibility to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ensure they were not selling to customers who were

 2   allowing controlled substances to get diverted?

 3           MS. KOSKI:  Object to form.

 4           Are you asking her opinion about that

 5      statement?

 6           MS. RELKIN:  Yes.

 7           MS. KOSKI:  Not a fact question but her

 8      opinion?

 9   BY MS. RELKIN:

10      Q.   In your experience as sales manager for

11   inside sales at Anda, did you perceive that there

12   was inherent tension between the goal of selling and

13   making profit for the company and the imperative to

14   avoid sales to inappropriate customers who might be

15   placing suspicious orders?

16           MS. KOSKI:  Object to form.

17      A.   Was there tension?  I don't consider it a

18   tension.  Were we all aware of our obligation?  Yes.

19   To do things ethically and to be an ethical member

20   of the community, absolutely.

21           Did we -- did I ever feel that the sale of

22   the CIIs inhibited my ability to reach my goals?

23   No, because it was a small portion of our business.

24           Our generic sales were what really drove our

25   business, and although CIIs were a part of that,
```

Highly Confidential - Subject to Further Confidentiality Review

1   they didn't -- my goals were not given to me as

2   you've got to hit this much in a CII goal on a

3   monthly basis, on a yearly basis.  I was given a

4   brand goal, I was given a generic goal.  Out of all

5   the SKUs that we offered, that were -- those were my

6   directives.

7       Q.   Well, were there circumstances where one of

8   your sales reps had a good customer who was a big

9   purchaser of the other non-CIIs, but they also were

10  seeking more and more CII products that was of

11  concern?

12          MS. KOSKI:  Object to form.

13      A.   I recall that we had a number of sales reps

14  that were relaying what the customer wanted us to do

15  in terms of requesting -- we talked about

16  requesting, you know, control increases, and we had

17  processes for those and those were sent to the

18  compliance department to review.

19          It was the compliance department's decision

20  as to whether to approve those or not.  It was

21  communicated back as to whether those would be

22  approved or not, and that would then be communicated

23  back to the customer.

24      Q.   In those circumstances, you had sales reps

25  who were concerned that if they didn't provide their

1    customers with the increase or the amount of opioids

2    that they were seeking, that they would lose the

3    customer business for all purposes; isn't that true?

4        A.    That is true, yes.  They were very

5    concerned.  The sales reps were paid a -- depending

6    on whether they were a new hire or a more seasoned

7    sales rep, were paid 9 -- the more seasoned sales

8    reps were paid $9 an hour, and theirs was entirely

9    almost commission based.  So an impact of a customer

10    leaving and taking not only the CII but all of their

11    generic business absolutely would have been of

12    concern to a sales rep.

13          However, that being said, they understood

14    that if something were to happen with that customer

15    and that customer ultimately resulted in something

16    further down the line happening to Anda, none of

17    them wanted to be in that position.  So they were

18    kind of torn.  They were torn to trying to be the

19    customer advocate but also making sure they did the

20    right thing for the company.

21        Q.   And some of them tried to push the envelope?

22        A.   Yes.  Salespeople try to do that, but those

23    are the ones that we had to constantly bring back

24    and remind them of what their job and

25    responsibilities were.

```
 1      Q.   Isn't it fair to state that there are a
 2    number of e-mails where the sales reps would
 3    advocate to increase the limit because the customer
 4    was an important customer to the company?
 5           MS. KOSKI:  Object to form.
 6      A.   There were customers that were not only
 7    important to the customer -- to the company, they
 8    were important to them and the sales rep and their
 9    income.
10      Q.   And they advocated, please increase the
11    limit?
12      A.   They would.
13      Q.   Or please give us an extension on the
14    paperwork?
15      A.   They did that initially when these processes
16    of how to go about requesting the increase began,
17    but after a period of time and more education and
18    more knowledge about the subject, more understanding
19    of what was going on in the market, that became less
20    and less an issue.
21      Q.   When you say more understanding of what was
22    going on in the market, what do you mean?
23      A.   Meaning the abuse that was happening.
24           And we educated them at every opportunity
25    that we could of scenarios where a pharmacy had been
```

 1    shut down by the DEA, what that reason was, if we

 2    knew it.  We used those as training opportunities so

 3    that we really helped them to get a better

 4    perspective.

 5          They were very focused on them themselves,

 6    and we needed to bring them up and bring that

 7    understanding back to the role of the company, the

 8    role they played within the company.

 9    Q.   Chronologically, when you joined the

10    company, you're aware at that point there was a

11    problem with opioid abuse; is that fair to state?

12    A.   To be honest, no.  In 2008, I don't recall

13    that being something that I was dealing with in the

14    role that I had.

15          I was being charged with putting programs

16    together for the sales force under Kim Bloom's

17    direction.  I was putting recognition programs

18    together.  I was working with training on the

19    curriculum.  I was working with a lot of other

20    initiatives.  So there was no emphasis in my world

21    at the time on anything on CIIs.

22    Q.   When did you first become aware of opioid

23    abuse problems?

24          MS. KOSKI:  Object to form.

25          Are you asking her personally?

```
 1              MS. RELKIN:  Yes.

 2       A.    I would say it would probably have started

 3  somewhere in the late 2009, 2010.  And the reason I

 4  say that is because the compliance team at that time

 5  started asking for more participation from our sales

 6  floor to help them in being those eyes and ears,

 7  helping them to get updated customer questionnaires.

 8              They had always used a customer

 9  questionnaire, but we wanted to get current ones and

10  make sure we were keeping them on a current basis.

11  And so the sales floor and sales reps were asked,

12  because of their role with the customer, to try to

13  help us in that initiative.

14       Q.    The initial training regarding opioids, for

15  example, what's in this slide deck of Exhibit 2,

16  fair to state that that did not begin until 2010?

17       A.    There was other training that went on.  I

18  remember training when I first went into new hire

19  training in 2008 that had to do with controlled

20  substances.  I think this was a refreshed module of

21  one that may have been already out there and updated

22  with the decisions that management team had made,

23  but this was not the first training that had ever

24  occurred on it, no.

25       Q.    So it's your testimony that training began
```

1    when you were a new hire in 2008?

2        A.   Correct.

3        Q.   Was it less detailed?

4        A.   I think it was a little bit less detailed.

5    It was more about what CSOS was, what -- why would a

6    customer use CSOS, what was the process for ordering

7    a CII.

8            We were not forbidden from ordering and

9    fulfilling an order for a CII.  We did it every day

10   for our clients.  There were control limits in place

11   from the -- way before I started, and I'm sure they

12   probably are even more so now.  But those limits

13   were always in place.

14           So there could never be a time when the

15   sales rep just went willy-nilly and started, you

16   know, shooting tons of CII products out there.

17   There was always a limit to the amount of ordering

18   that that customer could do for any CII product.

19       Q.   You talked about the salespeople had their

20   regular wage was $9 an hour, and then they got

21   commission.  What was the typical breakout of how

22   much of their compensation was commission?

23           MS. KOSKI:  Object to form.

24       A.   I would say on the average, for a seasoned

25   representative, it was probably 90/10.  They had a

Highly Confidential - Subject to Further Confidentiality Review

```
1    very, very, very small base.  New hires were paid
2    $15 an hour for the first two years unless their
3    book of business grew substantially to the point we
4    had -- I had a formula that I was able to utilize to
5    determine when did it make sense to move them from
6    what we called the rookie plan to become a
7    full-fledged sales rep, actually graduate them, so
8    to speak, or promote them to a full sales rep
9    status, at which point they would earn the $9 and
10   their commission would be enough to sustain that
11   difference.
12       Q.   I see.
13            So the new hires started at $15?
14       A.   Correct.
15       A.   Because they had very little -- they had no
16   accounts.  They started with zero.  Zero accounts.
17   And then as their book of business grew -- some
18   sales floors -- just a little bit of call center
19   education.
20            Some call centers, the sales floor is
21   territorial about their accounts, meaning if I am a
22   sales rep and I have 100 accounts, I'm always going
23   to be worried that somebody is going to try to steal
24   my account.  That was not the way at Anda.  Anda
25   never operated under that type of feeling, as long
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as I was there.
 2            When you got an account and you opened that
 3    account and you cultivated that account, that
 4    account was yours.  And the only time that we would
 5    move that account was if there was some kind of
 6    major customer issue that -- interaction issue that
 7    happened between the customer and the sales rep
 8    where the customer physically asked for a change in
 9    their sales rep, or if the sales rep left the
10    company.
11            So to that end, they were encouraged to
12    continue to grow their book of business.
13       Q.   Did the sales force also get a bonus based
14    on performance?
15       A.   They did.  Theirs was a quarterly bonus
16    based on a variety of call center metrics:  talk
17    time, number of accounts that they had sold to, a
18    variety of --
19       Q.   Did any of the metrics that were used to
20    formulate their quarterly bonus give credit for
21    sales reps pointing out potential suspicious orders
22    for -- concerning customers?
23            MS. KOSKI:  Object --
24       Q.   -- with regard to opioids?
25            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, ma'am.

 2      Q.   Was there any incentive provided to any of

 3   the employees at Anda to detect suspicious orders?

 4          MS. KOSKI:  Object to form.

 5      A.   An incentive?  No.  We didn't bring an

 6   incentive to bring something to our attention that

 7   we needed to have brought to our attention.

 8      Q.   You indicated there was no competition

 9   within the sales force, people respected each

10   other's customers.

11          Was there some point in time where you were

12   concerned about sales reps working after hours,

13   after the 9:00 shutdown?

14      A.   Yes.  Yes.

15      Q.   What was that about?

16      A.   We had -- we had about five or six sales

17   reps, and these were all senior sales reps, and our

18   senior sales reps were on salary versus a hourly

19   rate.  And we were just concerned that they were

20   staying there unsupervised.

21          We normally had a sales manager on every

22   night until 9:00 o'clock, but some of our senior

23   sales account managers liked to stay until 9:15,

24   9:30.

25          Technically our phones closed at
```

```
 1    9:00 o'clock.  So we wanted them really off the

 2    phone and leaving for the night and --

 3        Q.   Well, they weren't hourly.  They were

 4    salaried, and they were senior.

 5             So what was the concern?

 6        A.   The concern was that they were in a building

 7    alone and that there was no managerial supervision

 8    there, and we were -- all we did, we just asked them

 9    if they could please try to leave when the sales

10    manager left.

11             It wasn't a question of --

12             MS. KOSKI:  Just wait for another question.

13             THE WITNESS:  Okay.

14             MS. KOSKI:  Sorry to interrupt you.

15             THE WITNESS:  That's okay.

16             MS. KOSKI:  Question, answer; question,

17        answer.

18             MS. RELKIN:  We'll mark this as Exhibit 3.

19             (Anda-Williams Exhibit 3 was marked for

20    identification.)

21    BY MS. RELKIN:

22        Q.   Before I turn to this exhibit, were those

23    after hours sales calls recorded as part of the QA

24    system?

25        A.   All their calls were recorded regardless of
```

 1    the time unless we had specifically taken that

 2    particular customer off of call recording.

 3        Q.   Was there any concern that the sales folks

 4    were spying on what was going on in compliance?

 5             MS. KOSKI:  Object to form.

 6        A.   In compliance?  I don't ever recall that.

 7    Compliance was at the very opposite end of the

 8    building from where sales was.

 9        Q.   Got it.  Okay.

10             So what we've marked as Exhibit 3 is

11    produced from your files, and it's

12    Anda_Opioids_MDL107802.

13             Let me know when you have a chance to look

14    at this.  We can start from the bottom.

15        A.   I am.  This was a CIII.

16        Q.   So this e-mail is from Seth Rudnick to you

17    regarding touch X item with a number there.

18             And do you see that?

19        A.   Yes.

20        Q.   Mr. Rudnick says:  Pat, I don't know if this

21    needs to be addressed, but I noticed there is no

22    limit for this item.  It's a control item, and after

23    mentioning to several customers, I found out is

24    commonly abused.

25             We have strict limits and policies in place

Highly Confidential - Subject to Further Confidentiality Review

1   on all controls now, but a customer could buy every

2   bottle we have of this if they wanted to.  I thought

3   I should let you know about it.

4           And he's a senior account sales manager?

5   A.   Yes, he was.

6   Q.   And then --

7   A.   This was a new CIII, obviously, that came

8   in.

9           MS. KOSKI:  Just wait for a question.

10  BY MS. RELKIN:

11  Q.   Is it correct that you then responded

12  to Mike -- you forwarded this to Patrick Cochrane

13  and Michael Cochrane?

14  A.   Correct.

15  Q.   What did you say to them?

16  A.   I said that I didn't see it was assigned to

17  a particular control group.  Would this be in the

18  default "other" category.

19  Q.   And what did Patrick Cochrane say?

20  A.   Patrick Cochrane said that the item was in

21  the hydrocodone family, but it was considered a

22  CIII, so I don't know exactly what the makeup of the

23  hydrocodone was.  What is leading him to believe

24  that a customer could order more than their limit

25  allows?

```
1          I said:  Thanks for the information.  As to

2     your question, I'll address that with him shortly.

3          I don't -- I don't know if he went in and

4     tried to order something and saw that he could

5     order -- because on CIIIs, sales reps were able to

6     key those orders in.  They could not key or punch in

7     any CII orders, but a CIII or a CIV, that could have

8     been done.

9          So I think he was questioning was the setup

10    of the item done properly in the system when it was

11    launched.

12    Q.   Patrick Cochrane said:  What is leading him

13    to believe that a customer could order more than the

14    limit allows?

15         And then you said to him:  Thanks for your

16    info.  As to your question, I've addressed that with

17    him separately.

18         So do you remember a discussion with

19    Mr. Rudnick?

20    A.   I'm sure I did.  I had a good relationship

21    with Seth, and Seth was always the eyes and ears for

22    the company and was always looking out for the

23    right -- doing the right thing.

24    Q.   Do you remember what the outcome was?

25    A.   I do not recall what the outcome of this
```

```
 1   was.  I do not.

 2       Q.  But when you said the limits are always in

 3   place, here's an instance where a product in the

 4   hydrocodone family had no limits; isn't that

 5   correct?

 6       A.  According to this e-mail, correct.

 7       Q.  One more question about your employment

 8   situation.

 9           When you got a severance package, was there

10   a termination agreement?

11       A.  Yes.

12       Q.  Okay.  And was there a nondisparagement

13   clause in that?

14           MS. KOSKI:  Object to form.

15       A.  Nondisparagement?  Yes.

16       Q.  And what that means is that you weren't

17   supposed to say anything negative about the company;

18   is that right?

19       A.  Correct.  Uh-huh.

20       Q.  And were there any enforcement consequences

21   if you did say anything negative about the company?

22       A.  I would have to go back and re-read that

23   document.  I don't recall the consequences.

24       Q.  I'm going to be asking some questions about

25   promotional efforts and sales of CIIs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. RELKIN:  Could I have an exhibit
 2      sticker?  We'll mark this as Exhibit 4.
 3            (Anda-Williams Exhibit 4 was marked for
 4      identification.)
 5            MS. RELKIN:  Here's one more if somebody
 6      needs it.
 7   BY MS. RELKIN:
 8      Q.   What I've marked as Exhibit 4 is stamped
 9   Number 0610875 from Anda files, your custodial file.
10            And do you see that this is an e-mail from
11   Marc Falkin on December 12th, 2008, and you were one
12   of the recipients; is that fair to state?
13      A.   Uh-huh.  Yes.
14      Q.   And the topic was "CII Promo with Teva
15   Fentanyl Patches"; is that right?
16      A.   Yes.
17      Q.   And promo means promotion; is that right?
18      A.   Correct.
19      Q.   And fentanyl patches, fentanyl, is certainly
20   a controlled substance, a CII opioid product,
21   correct?
22      A.   I do not recall if fentanyl is a CII.  I
23   know there -- I don't believe it is.  I would have
24   to double-check.  The oxys definitely were.  The
25   oxys were the CII here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did you ever get any training from anyone at

 2    Anda that fentanyl was one of the deadliest of the

 3    opioid products?

 4            MS. KOSKI:  Object to form.

 5        A.   I do not recall, no.

 6        Q.   And if you're not sure it's a CII, what was

 7    your impression of what it was?

 8        A.   I thought it was a CIII, or possibly a CIV.

 9    I would have to double-check.

10        Q.   Did you understand that fentanyl was a

11    synthetic opioid?

12        A.   At the time that this was written back in

13    2008, I was only on board about five months, not

14    even that, and I was brand new to the world of

15    pharmaceuticals, so -- right.

16        Q.   Understood.

17            But then you were there for many years where

18    you interacted with pharmaceuticals?

19        A.   Correct.

20        Q.   And your testimony now is that you were not

21    under the impression at that time period that

22    fentanyl was a CII product; is that right?

23            MS. KOSKI:  Objection; mischaracterizes her

24        testimony.

25        A.   I would have to go back and refresh my
```

1    memory on that.

2        Q.   Well, in any event, you see that the -- it

3    says "CII Promo with Teva Fentanyl Patches,"

4    correct?

5        A.   Correct.

6        Q.   And Teva is a large generic pharmaceutical

7    company, correct?

8        A.   Uh-huh.  Yes.

9        Q.   They ultimately have acquired Anda; is that

10   right?  They are the current owner of Anda?

11       A.   They are now.

12       Q.   And it -- Marc Falkin said to you and

13   others:  George and I have established the following

14   to help move the Teva product.

15           What does that mean, help move a product?

16       A.   To help sell the product.

17       Q.   And what does he describe there?

18       A.   For every four units of a Teva patch,

19   customers could get 5 percent one unit of the oxy 40

20   or 80 or two units of the Dava oxy 10 or 20.

21       Q.   And then it goes on to provide additional

22   promotional discounts for the Teva patches; is that

23   right?

24       A.   Correct, according to what's read here.

25       Q.   It says:  Purchasing at least four Teva

1    patch in any combination then qualifies customers to

2    purchase other CIIs at 5 percent off, including the

3    Teva patches, excluding branded CIIs.

4         Is that right?

5    A.   Yes.

6    Q.   And what does this mean, 60 days dating on

7    CII orders the rest of the month?

8    A.   That meant that most customers were given 30

9    days to pay their bill, and they were offering

10   extended dating to give customers a little bit

11   longer time to pay.

12   Q.   So this was clearly a promotional effort to

13   encourage customers to purchase Teva fentanyl

14   patches and the Dava brand oxy 40 or 80; is that

15   right?

16        MS. KOSKI:  Object to form.

17   A.   That is correct.

18   Q.   And did you know that the Dava oxy 40 or 80

19   was the generic for the brand name for oxy?

20        MS. KOSKI:  Object to form.

21   A.   Was I aware -- can you repeat that?

22   Q.   Were -- withdrawn.

23        Does this document help refresh your

24   recollection that, in fact, there were promotional

25   efforts made to sell --

```
 1      A.   Yes.

 2      Q.   -- CIIs?

 3           MS. KOSKI:  Let her finish.

 4           (Anda-Williams Exhibit 5 was marked for

 5      identification.)

 6           MS. RELKIN:  I'm sorry.  I didn't give the

 7      witness -- can you pass --

 8      BY MS. RELKIN:

 9      Q.   I've just marked as Exhibit 5 a document

10      that was produced from your files, Number 08 --

11      just -- I'm just going to read the numbers,

12      scratching out the zeros:  82451.

13           THE VIDEOGRAPHER:  It's okay.  You hit the

14      backlight.

15           MS. RELKIN:  How do we fix that?

16           (Discussion off the record.)

17           MS. KOSKI:  For the record, it's

18      double-sided.

19           MS. RELKIN:  Yes, it's double-sided.

20      A.   Ooh.  Okay.

21      Q.   This is an e-mail chain starting on

22      May 21st, 2012, and then it -- the final e-mail is

23      June 20th of 2012.

24           And recognizing that you were not -- you

25      were not on the original e-mail chains, but I think
```

Highly Confidential - Subject to Further Confidentiality Review

1    you got looped in.

2          Do you see where you got looped in here?

3          MS. KOSKI:  Take your time if you need to

4    read the --

5          MS. RELKIN:  Yeah.

6          You know what, I'm going to come back to

7    this exhibit, okay?  So we'll just move on to

8    another exhibit, and we'll come back to this one.

9    This one has an accompanying spreadsheet, it's

10   kind of complicated.

11         Okay?

12         MS. KOSKI:  Okie-dokie.  You can can just

13   set it aside.  She's saying she's not going to

14   ask you the questions.

15         THE WITNESS:  Right.

16         MS. RELKIN:  This will be Exhibit 6.

17         (Anda-Williams Exhibit 6 was marked for

18   identification.)

19   BY MS. RELKIN:

20   Q.   This has been marked as Exhibit 6.  It was

21   stamped from your files, Number 712121.  It's a

22   short e-mail.

23         This is an e-mail from Ken Fenster on April

24   20th, 2010, to you and others; is that right?

25   A.   Yes.

1    Q.    Who is Ken Fenster?

2    A.    He was the director of marketing.

3    Q.    And the subject matter is "May Marketing

4    Driver," and I think you used the term driver before

5    again?

6    A.    Yes.

7    Q.    Can you explain what that is again?

8    A.    The sales reps had a monthly scorecard, kind

9    of like a report card, on their performance, and the

10   sales reps would earn throughout the month something

11   called PMs.  That stood for promotional money.

12         There were items that maybe were overstocked

13   on.  They could have been items that we just needed

14   to -- we had excess inventory that we were trying to

15   move.

16         So the company would put 25 cents on it or

17   50 cents on it or a dollar to move those products.

18   These are not specific to CIIs.  Okay?  These are

19   all kinds of generics.  In order for the -- those

20   PMs would accumulate through the month, sometimes

21   $100, $200, $300, sometimes more depending on how

22   much they sold.

23         The marketing driver was part of their

24   scorecard.  So they needed to hit at least a three

25   on their scorecard and hit their marketing driver

1    for them to earn that PM money.

2        Q.   Got it.  Okay.

3        A.   And they were typically deemed to be

4    initiatives to help drive incremental business.

5        Q.   Okay.  So this was -- the attachment is

6    called "May Marketing Driver 04, Data Review, CII

7    sales, 90 plus days."

8             And what does this describe here?

9        A.   It describes what the marketing driver was

10   for that month.  It was focusing in on trying to

11   have customers contacted that had not purchased a

12   CII from us but -- that were eligible but had not,

13   to contact them and see if we could be their

14   supplier and if there was a need.

15       Q.   So he advised that in order to achieve your

16   May marketing driver, you must get X number of

17   customers to order a CII by CSOS or paper that have

18   not ordered in the past 90 days or more?

19       A.   Uh-huh.

20       Q.   And this was going out to all the sales

21   reps; is that right?

22       A.   Correct.  And each sales rep had a different

23   category.  Like they were -- it mentions if they

24   were less than two years, they needed two accounts.

25   If they were -- excuse me -- a more seasoned

1    representative, five, and then all others were

2    eight.

3        Q.   Which means that the "all others," for

4    example, needed to get eight new customers -- eight

5    customers who were existing customers who had not

6    previously bought opioids to start buying CII

7    products from Anda, correct?

8            MS. KOSKI:  Object to form.

9        A.   It was an initiative to see whether we

10   could -- yes, whether we could sell more CIIs to

11   those customers that were eligible but were

12   certainly going somewhere else at that time to

13   purchase those generics sales.

14       Q.   And going further down, he says:  Most reps

15   have 50-plus accounts that have not ordered a CII in

16   90-plus days.  A handful of reps may have a few who

17   do not solicit accounts in their name but should be

18   plenty left over as opportunities for all reps.

19           Is that right?

20       A.   Uh-huh.

21       Q.   And so it was deemed an opportunity to take

22   customers who were buying the nonopioid products to

23   now start selling them opioid products; true?

24           MS. KOSKI:  Object to form.

25       A.   This doesn't stipulate whether they were

Highly Confidential - Subject to Further Confidentiality Review

```
 1    purchasing other control products.  It's just the

 2    focus on the CIIs.

 3        Q.   Okay.

 4        A.   So these customers could have been

 5    purchasing a CIII or a CIV, or even a CV, from us,

 6    but they were going elsewhere -- more than likely to

 7    their primary -- for their CIIs.  And we were just

 8    trying to skim off a little bit of that -- a little

 9    bit of that business.

10        Q.   So these were customers who had not

11    purchased a -- ordered a CII in 90-plus days, and

12    you were trying to get some of their business?

13        A.   Correct.

14             Again, we were not prevented from selling

15    CIIs.  We had our controls in the background and the

16    limits in place for every customer and every family

17    that that customer may want to purchase.  So it was

18    not off the table to try to promote additional items

19    to them.

20        Q.   But earlier when you said CIIs really wasn't

21    important to the company, here, there is an

22    effort -- this shows -- does this refresh your

23    recollection -- strike that.

24             The distinction with your earlier testimony

25    that CIIs were not important, the focus of the
```

company was selling their other generic pharmaceutical products, does this help refresh your recollection that there were indeed promotional efforts to try to expand the market to sell opioids to existing customers?

MS. KOSKI: Object to form. Mischaracterizes her testimony.

You can answer.

A. There were opportunities, yes, such as this from time to time. Was this an every month event, month in and month out? No.

Q. That wasn't my question, whether there was a month in, month out.

My question was: Does this help refresh your recollection that there were indeed promotional efforts to try to expand the market to sell opioids to existing customers?

MS. KOSKI: Asked and answered. Go ahead.

A. Yes.

MS. KOSKI: Ellen, I think I set up lunch today for 12:30. It's only 11:30 now, but for your planning purposes.

MS. RELKIN: Okay. Thank you.

(Anda-Williams Exhibit 7 was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RELKIN:

 2        Q.   This will be Exhibit 7.

 3            MS. KOSKI:  This is another double-sided

 4        exhibit.

 5    BY MS. RELKIN:

 6        Q.   So, Ms. Williams, what we've marked as

 7    Exhibit 7 is another document produced from your

 8    files stamped 629163, and it -- as counsel

 9    indicated, it is double-sided.  It's an e-mail chain

10    start with a forward of an e-mail.

11            The e-mail was from Cathy Novaro to Vickie

12    Shalley.  That's your friend Vickie who you still

13    stay in touch with; right?

14        A.   Yes.

15        Q.   And it was copied to Ken Fenster, and the

16    subject was "CII Actavis Credits," and it indicated:

17    Attached is Barry Koran's CII Actavis promotion

18    credit accounts.  Please let customer service know

19    if you want them reversed.

20            And that's just the stepping stone for my

21    questions to you.

22            That was then forwarded --

23            MS. KOSKI:  I don't know if she's listening.

24        I think she's reading.

25        A.   Yeah, this is totally unfamiliar to me.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    don't understand this.

 2         MS. KOSKI:  Now, if you've read it, wait for

 3     a question.

 4    BY MS. RELKIN:

 5     Q.   Just for clarification, in terms of the

 6    chain of this e-mail, you're on the top that it was

 7    forwarded to you from Vickie Shalley on

 8    January 19th, 2010.

 9         Do you see that?

10     A.   Yes.

11     Q.   Okay.  Again, the same subject matter about

12    Barry Koran, Actavis CII Credits.

13         I'm going to focus here on the e-mail from

14    Vickie Shalley to Barry Koran.

15         And do you want to read into the record what

16    he said -- what she said to him?

17     A.   She said:  Barry, please let me know what

18    this is all about.  Reply for me by e-mail in case I

19    need to escalate it.

20     Q.   Okay.  If you can turn to the first page of

21    the document.

22     A.   Okay.

23     Q.   The first page.

24     A.   Uh-huh.

25         MS. KOSKI:  If you look on the screen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RELKIN:

 2        Q.   Yeah, I'll just direct your attention to the

 3    area I wanted to discuss.

 4        A.   Oh, okay.

 5        Q.   If you look at the screen, Vickie Shalley to

 6    Barry Koran, this is 1:52 p.m.?

 7        A.   I see.

 8        Q.   And she said:  I contacted Cathy Novaro on

 9    this.  Basically I had several customers with

10    credits showing from Actavis promo.  I did not push

11    the promo, but I always push CIIs.  I was pushing

12    the OxyContin with several customers, and I noticed,

13    because of the sale of Oxy, their other item orders

14    were being credited, large numbers -- or large

15    dollar sign, dollar sign.

16             MS. RELKIN:  I'm tapping it.  Sorry.

17    BY MS. RELKIN:

18        Q.   Do you recall seeing this e-mail?

19        A.   Uh-uh.

20             MS. KOSKI:  Answer verbally.

21        A.   No, I don't recall.

22        Q.   You see this e-mail was ultimately forwarded

23    to you?

24        A.   I do see that, but I don't recall this.

25        Q.   You don't recall any conversation of
```

```
 1    concern?

 2       A.   I'm sorry, I don't.

 3       Q.   But do you see that Vickie said she always

 4    pushes CIIs?

 5            MS. KOSKI:  Object to form.

 6       A.   No.  Barry said this to Vickie.  It's to

 7    Vickie from Barry.

 8       Q.   Oh, you are correct.  I stand corrected.  So

 9    Barry Koran said to Vickie:  I always push CIIs.

10            Correct?  Do you recall Barry Koran?

11       A.   Yes.  He was one of our senior account

12    managers.

13       Q.   Did he get disciplined for any of his

14    conduct in marketing -- strike that.

15            Did he ever get disciplined for any of his

16    conduct in selling CIIs?

17            MS. KOSKI:  Object to form.

18       A.   Not that I can recall, no.

19       Q.   Do you find anything problematic with his

20    outlook that he always pushes CIIs?

21            MS. KOSKI:  Object to form.

22            Are you asking as she sits here right now?

23       She said she didn't remember the e-mail.

24            MS. RELKIN:  Fair enough.

25    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So as -- as -- did he report to you?

 2        A.    He reported to Vickie.

 3        Q.    Okay.  And you never had a conversation with

 4   Vickie about his comment about pushing -- always

 5   pushing CIIs?

 6        A.    I don't recall.

 7        Q.    Do you recall ever having an issue with

 8   Barry Koran about his approach to CII sales?

 9        A.    No, I do not recall.

10        Q.    Any other problem with Barry Koran?

11        A.    I had other issues with Barry Koran.  I

12   loved him, but we had a love/hate relationship.  I

13   wanted him on the phone more than what he was, and

14   he tended to want to do his own thing.

15              But in terms of trying to sell, he always

16   was selling to people who had the ability and had

17   the limit in place to be able to promote the item.

18   Whether the customer was buying from us or not, that

19   limit was in place.  It was assigned by compliance,

20   and that was our role.  Our role was to sell, and

21   CIIs were not off the table.

22              They, again -- he had -- certain customers

23   had -- certain sales reps had certain customers that

24   were buying their CIIs from a lot of other sources,

25   and our job was to try to get incremental sales.
```

1    And if we could do it through generic sales, brand

2    sales, CII sales, that was a sales rep's job.

3       Q.   One other comment here I didn't highlight

4    was -- this was dealing with getting credits, and he

5    said:  The customers are being unnecessarily

6    credited due to their large usage of the Oxy.

7           Do you see that?

8       A.   Yeah, I'm --

9       Q.   Large -- large usage of the Oxy is one of

10   the factors that goes into our red flag of a concern

11   about suspicious ordering; is that fair to state?

12          MS. KOSKI:  Object to form.

13      A.   I guess it would have to be in the context

14   of what that customer was typically doing.  They

15   could have been legitimately approved to order the

16   Oxy, which they would have had to have been in order

17   to even get it from us.

18          But I don't know what this credit was all

19   about, and I don't recall what this promotion was

20   about.  This is 2010.  It's just not ringing a bell

21   at all.

22      Q.   The question is whether a customer that has

23   a large usage of Oxy, whether that is a concern, a

24   flag to consider in whether the usage is

25   appropriate, that it's a large usage.

```
 1      A.   Not necessarily.  A large usage of Oxy by

 2   our standards may have been a drop in the bucket

 3   compared to what the customer was actually

 4   purchasing elsewhere.  So the terminology itself

 5   was -- is not -- looks alarming now, looking back on

 6   it; at the time, I just don't recall.  I don't

 7   recall this -- the e-mail.  I don't recall what

 8   these credits were about.

 9      Q.   So when you said a large usage of Oxy by --

10   may have been a drop in the bucket compared to what

11   the customer was actually purchasing elsewhere, are

12   you saying they could have been purchasing even more

13   Oxy elsewhere?

14      A.   What I'm saying is when they are saying

15   large usage of Oxy, I don't know if he's talking

16   about the large usage from just us -- what they were

17   getting from us or if he knew something about the

18   customer, meaning that they were buying a large

19   amount of Oxy in total from all of their suppliers.

20      Q.   Is that something that the sales reps were

21   supposed to ascertain, whether their customers were

22   buying large amounts of Oxy elsewhere?

23      A.   Sometimes -- I apologize.

24           Sometimes the customers would volunteer that

25   information.  Oh, I'm getting it from this or I have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a limit of this amount at this particular

 2    distributor, why can't you match that.

 3           So sometimes that did come up and hear of

 4    information that would indicate when the customer's

 5    patterns were.

 6    Q.   But the sales reps were not instructed to

 7    try to elicit that information from the customer?

 8    So for example, if the customer called and said I

 9    want 1,000 oxys, the sales reps didn't say, how much

10    are you getting from your primary supplier?

11    A.   Not typically.

12    Q.   So you wouldn't necessarily know whether

13    they are getting a large amount from the other?

14    A.   Correct.  Correct.  Barry -- Barry had had

15    most of his customers over 20 years, the same

16    customers over 20 years, so he knew these folks,

17    many of them, very, very, very well.  It -- what

18    he's speaking to here, I can't answer.

19    Q.   Even though your job and your department's

20    job was to sell product, with regard to the CII

21    sales, isn't it fair to state your job was also to

22    look for suspicious orders?

23           MS. KOSKI:  Object to form; mischaracterizes

24      her testimony.

25    A.   To look for suspicious orders?  That was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    primarily a compliance function because they

 2    reviewed all the CII orders that went out before

 3    they were shipped.

 4        Q.   Right.  But we've talked about, know your

 5    customer?

 6        A.   Correct.

 7        Q.   And that involved the sales force as well?

 8        A.   Correct.  And if we -- if we saw something

 9    or the sales reps were supposed to bring it to our

10    attention if they noticed something.  Again, that

11    was an education process.  It was happening over

12    time, 2008, 2009, 2010, we started seeing a

13    turnaround in how they were absorbing the

14    information and that became less of a question.

15        Q.   What became less of a question?

16        A.   What I mean less of a question, I mean less

17    of a reason for -- how could I -- I need to reword

18    that.

19             There were less instances of the sales reps

20    not diving into an issue, meaning if they saw

21    something like this, that they would start bringing

22    it to the attention of their manager.

23        Q.   You're saying over time --

24        A.   They were getting better and better at it.

25    At first it was, you know, it was a hit, it was a
```

Highly Confidential – Subject to Further Confidentiality Review

 1    hit to them if somebody was taken off of controls

 2    and we continued to educate them about bringing

 3    these things to our attention, letting us know if

 4    there is something suspicious going on.

 5        Q.    But here in the context with -- of

 6    Exhibit 7, we have a seasoned sales rep, as you

 7    said, Barry had been with the company for many

 8    years, right?

 9        A.    Uh-huh.

10        Q.    And the reason why this was brought to the

11    attention of Vickie Shalley, and ultimately others,

12    was not for him not to flag, oh, there is a concern

13    about this customer, instead it was for him to flag

14    that there should not be a refund --

15            MS. KOSKI:  Objection.

16        Q.    -- a credit?

17            MS. KOSKI:  Sorry.  Objection; lack of

18        foundation.

19        Q.    Is that -- he was complaining that those

20    customers, three particular customers, are being

21    unnecessarily credited due to their large usage of

22    the oxy, and he said, I would like to save the

23    company money as well as myself on this.  So he did

24    not want to give them that credit for the oxy

25    purchase so that there could be higher commissions

Highly Confidential - Subject to Further Confidentiality Review

     1    on his end and the company's end, correct?

     2         MS. KOSKI:  Objection; lack of foundation.

     3         You can answer if you know.

     4         A.   That's the way it would appear.

     5         Q.   Okay.  And in terms of -- you talked about

     6    the evolving nature over time of there's a greater

     7    awareness of the opioid epidemic over the years.  Is

     8    it fair to state that in 2010 the culture was such

     9    that as far as you know, there was no concern or

    10    uproar over a seasoned sales rep saying he always

    11    pushes oxy?

    12         A.   Not at that time.

    13         Q.   Okay.  Would you say that in later years

    14    there would have been an uproar with that mentality?

    15         MS. KOSKI:  Object to form.

    16         Q.   Is that a yes?

    17         MS. KOSKI:  I just objected to form.  You

    18    can answer.

    19         A.   Yes.

    20         (Anda-Williams Exhibit 8 was marked for

    21    identification.)

    22    BY MS. RELKIN:

    23         Q.   I've just marked as Exhibit 8 a document

    24    numbered 630034, which is an e-mail -- well, it's a

    25    series of e-mails and I'm going to primarily focus

Highly Confidential - Subject to Further Confidentiality Review

```
1    on the e-mail from you, which is in the front of the

2    document, the first page of the document -- take it

3    back, it's not from you.  It's to you.  Strike that.

4            The bottom part of the first page --

5    A.   Correct.

6    Q.   -- is an e-mail from you?

7    A.   "Guys, any ideas on what the issues are?"

8    Q.   Right.  From Patricia.  Patricia-Anda

9    Williams, it looks like your middle name is Anda.

10   But we know it's not.  That is just how it looks.

11   A.   There were two Patricia Williams in the

12   organization and was given to me to decipher me from

13   the other person because we were always getting our

14   e-mails crossed.

15   Q.   And the other was a Patricia Watson?

16   A.   There was another Patricia Williams.

17   Q.   In the Watson piece?

18   A.   I don't recall where that -- I think it was

19   an outside sales rep somewhere in the Midwest.

20   Q.   And so this was from you --

21           THE VIDEOGRAPHER:  Hit it again.  One more

22   time.

23   Q.   -- to Frank Sanchez, and who was Frank

24   Sanchez?

25   A.   Frank Sanchez was one of our sales reps.
```

 1      Q.   The subject was, "Giant Eagle Stores Updated

 2   List Final Actavis Oxycodone CR & Fentanyl Patch for

 3   Giant Eagle from Anda."

 4           And what did you say?

 5      A.   I said, "Guys, any ideas on what the issues

 6   are?  Appears only three stores have placed CII

 7   orders since the last report was run.  We'd love to

 8   get some feedback on what you're hearing."

 9           Giant --

10           MS. KOSKI:  Wait for a question.

11      Q.   And you were expressing concern that there

12   were only three stores who placed opioid orders

13   since the last report was run.  Is that fair to

14   state?

15           MS. KOSKI:  Object to form.

16      A.   I was doing some investigative work for the

17   national account team because Giant Eagle was one of

18   the national account chains that was on our floor

19   and we took direction from national accounts on

20   certain initiatives that they were working with a

21   chain on.

22           Frank, Gary Louis Charles and Kimberly were

23   all members of the sales floor that had Giant Eagle

24   stores assigned to them to call on and when they

25   were given an initiative by the national account

Highly Confidential - Subject to Further Confidentiality Review

```
 1    manager, who at this time was Jennifer Jaumotte, we
 2    were -- there was some kind of promotion that was
 3    going on with that Giant Eagle store where an
 4    agreement had been reached that they were -- for
 5    some period of time were going to order those CIIs
 6    from us.  And so we were asked to call and get some
 7    feedback as to why they hadn't placed their CII
 8    orders, because typically Giant Eagle would have a
 9    directive coming down from the Giant Eagle corporate
10    to say to all their stores for this particular
11    product on this particular time period, we want you
12    to order those from Anda.
13        Q.   And the particular CIIs was Actavis
14    oxycodone CR and fentanyl patch, correct?
15        A.   Correct.
16        Q.   And was this some kind of arrangement with
17    Actavis to promote their oxycodone?
18        A.   It must have been, yes, and they were
19    working at the national account level to get that
20    product -- those two products into those stores.
21        Q.   Okay.  And then there was a response from
22    Gary Louis -- is it Gary Louis Charles?
23        A.   Correct.
24        Q.   Okay.  There was a response from Gary Louis
25    Charles on December 23rd, 2009, and he said,
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1     "Apparently the stores --

 2          Again.

 3          THE VIDEOGRAPHER:  You got it.

 4          MS. RELKIN:  Technology challenged.

 5     Q.   He said, "Apparently the stores do not

 6     realize it is not optional."

 7          Do you see that?

 8     A.   Yes.

 9     Q.   He said, "I've had several stores recently

10     say to me that it's not worth their while dispensing

11     the generic for just a limited period of time.  They

12     don't want the hassle of billing their patients for

13     generic one time then having to switch them all back

14     to brand pay.  They are being rather reluctant.  I

15     think we may need the director to re-issue

16     the directive."

17          Is that right?

18     A.   Mm-hmm.

19     Q.   So -- So basically the customers didn't want

20     to bother with the short term promotion for the

21     generic oxy and fentanyl but because it wasn't

22     optional, they had --  your salespeople had to make

23     sure the customers did indeed promote it, correct?

24          MS. KOSKI:  Object to form.

25     A.   We were asked --
```

```
 1        Q.   Wait.  I strike that back.  I used the word
 2   customers.  Let me rephrase.
 3             The gist of this --  is it fair to state --
 4   was that it was not optional for your sales reps to
 5   choose whether or not to promote this short-term
 6   promotion of Actavis oxycodone and fentanyl patch,
 7   they were required to?
 8        MS. KOSKI:  Object to form; mischaracterizes
 9        the document.
10        Q.   Is that correct?
11        A.   They were being asked by the national
12   account team to place those calls because the
13   national account director at Giant Eagle had sent
14   the directive to their stores that they were
15   supposed to take -- that the stores were supposed to
16   utilize Anda for those items.
17             Our role was to follow up with those stores
18   and encourage them to use it because it was coming
19   as a directive from their boss, so to speak.
20        Q.   And the national sales is part of Anda?
21        A.   National is part of Anda, correct, and the
22   national account team would many times give our
23   sales reps directives on calling initiatives on
24   specific chain events like this.
25        Q.   And part of the initiative underlying this
```

Highly Confidential - Subject to Further Confidentiality Review

1    was that there was some type of agreement between

2    Anda and Actavis to promote these generic products,

3    correct?

4        A.   Apparently, but where my reps got involved

5    would be that there was some agreement between Anda

6    and Giant Eagle to promote these, because the Giant

7    Eagle corporate is behind this, which happened for

8    many launch products.  I don't know if this was a

9    launch product or not, but this happened frequently.

10       Q.   But in terms of the chain of distribution,

11   so to speak, the generic manufacturer, Actavis, had

12   some type of arrangement with Anda to promote their

13   oxycodone and fentanyl patch and then --

14       A.   It would appear, and then they took it and

15   subdivided it down to targeted audiences for that

16   promotion.

17       Q.   Right.  Okay.  Thank you.

18           MS. KOSKI:  You still good?  Everyone good?

19           MS. RELKIN:  Yeah.  Is everyone good?  I

20       think we should just go straight through 12:30,

21       unless someone needs a break then this is a good

22       time.

23           MS. KOSKI:  So I did get a note that the

24       lunch will be here in a minute but it will wait

25       for us, so it's better for it to be here when you

 1      want a break --

 2              MS. RELKIN:  Yeah, right.

 3              MS. KOSKI: -- rather than it be late.

 4              MS. RELKIN:  Right.  So when you get the

 5      note it's here, you can let me know.

 6              MS. KOSKI:  I did.  It's here but you go to

 7      whenever --

 8              MS. RELKIN:  Oh, okay.

 9              MS. KOSKI:  Whenever you feel comfortable,

10      the lunch will be here.

11              MS. RELKIN:  Okay.

12              (Anda-Williams Exhibit 9 was marked for

13      identification.)

14      BY MS. RELKIN:

15      Q.   I've marked as Exhibit 9 a document numbered

16      629292 from your files, and as you can see, this is

17      an e-mail from Vickie Shalley to you and -- on

18      January 12th, 2010.  And what is the subject matter

19      of the e-mail?

20      A.   "Success Story - Oxy CR Made my Day."

21      Q.   And do you see that Vickie Shalley -- and

22      that was a forward of an e-mail that Vickie Shalley

23      sent to a number of individuals at Anda, right?

24      A.   Correct.

25      Q.   And these were -- these were mostly -- were

```
 1    these mostly sales reps?

 2         A.   These -- these were the sales reps on her

 3    team.

 4         Q.   On her team.  And it's the same subject

 5    matter, Oxy CR Made my day, success story, and what

 6    does she state?

 7         A.   She stated that these were Sam tips.

 8         Q.   What's a Sam tip?

 9         A.   A Sam was a senior account manager tip on a

10    way to boost sales.

11         Q.   Okay.  So that's -- that's what she said to

12    you, and in the earlier e-mail she advised people in

13    her sales unit, "It took only three customers to

14    order oxy today.  Oxy CR added about $13,000 in my

15    sales today!!"

16              Is that right?

17              MS. KOSKI:  Object to form.

18         Q.   And she provided two tips:  Check sales

19    advantage with the oxy item and call those customers

20    that bought it in the past and check your remedy and

21    call all CSOS live customers.

22              Is that right?

23         A.   Mm-hmm.

24         Q.   Yes?

25         A.   Yes.
```

1    Q.   Okay and can you explain what those tips

2    mean?

3    A.   What those tips mean is that -- Sales

4    Advantage was a platform system that allowed sales

5    reps to see the history of what their customers had

6    purchased and different products, and that's what he

7    was saying, check Sales Advantage for any customer

8    that they might have that was eligible to buy a CII

9    product and call those customers that bought it in

10   the past, and Remedy was another tool that they used

11   and what he was saying was that was anybody who was

12   on CSOS, call them and let them know that it's there

13   and if they want to order it, the customer will

14   order it.

15   Q.   And what is Remedy?

16   A.   Remedy was a call management system, but it

17   had many, many different uses.  It not only provided

18   the platform for keeping the agents on call

19   schedule, it gave the sales reps the ability to set

20   the call for a certain time.  Just a little bit of

21   additional education, the pharmacies that we called

22   on, typically, had time frames that they wanted --

23   that they requested to be called at.  I might want

24   to be called at 11:00 o'clock in the morning, I

25   might want to be called at 6:00 o'clock in the

1    evening.  Because they would accumulate orders at

2    their pharmacy all day long.  And so some pharmacies

3    would only want to be called once, some were twice,

4    sometimes were more than that, and that allowed them

5    to be able to then call that order in to their sales

6    rep.

7           So Remedy was able to be set up that allowed

8    the sells reps to schedule those calls at

9    appropriate times and then there was a list of all

10   the calls and all the times that they had scheduled.

11   So that it helped to keep them on track and moving

12   from one call to the next and they were encouraged

13   to make sure that their Remedy was full, so they had

14   a full day of calling so that they were productively

15   occupied throughout the day.

16       Q.   So it's basically a calendaring system for

17   the sales reps?

18       A.   It's kind of like that, correct, and it

19   served other functions down the road, we expanded

20   it.  It had a lot of functionality.  Most call

21   centers do utilize a call management system of some

22   kind and this was the solution that we used at Anda.

23       Q.   Do you know when those documents are

24   retained, the Remedy system?

25       A.   I believe so.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Let me just clarify, I misspoke when -- but

2   you understood what the document said.  I talked

3   about Vickie sending the e-mail.  The underlying

4   e-mail which talked about the success story was from

5   Erick Veloz, Senior Account Manager --

6        A.   Correct.

7        Q.   To Vickie; is that right?

8        A.   That's right.

9        Q.   And then it was, Vickie forwarded it to you?

10       A.   Right.  She sent it to her team and then

11  forwarded it to me.

12       Q.   But when you answered the question, you

13  understood what you were looking at, correct?

14       A.   Yes, I did.

15       Q.   Okay.  Thank you.

16            (Anda-Williams Exhibit 10 was marked for

17  identification.)

18            MS. KOSKI:  We're going to break soon for

19       lunch.  Are you okay?

20            THE WITNESS:  Sure.  I'm fine.  I'm fine.

21  BY MS. RELKIN:

22       Q.   Yeah, if you need a break, you let me know.

23            MS. KOSKI:  Oh, did you not get one?

24            MS. RELKIN:  Oh, whoops.  My bad.

25            MS. KOSKI:  I'm usually given the one with
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        the sticker.  It's easier to keep track.

2            MS. RELKIN:  Right.  Right.  The sticker is

3        here.

4    BY MS. RELKIN:

5    Q.   Okay.  So you take the time you need, but

6    for identification purposes what's marked as

7    Exhibit 10 is document number 635640, and it is

8    several pages again, it's double-sided, it goes

9    through page 645.  Much of it is just a large number

10   of e-mail addresses.

11           I'm going to focus on the content after all

12   the addresses, which is on page 5644.  Here we see

13   the subject matter of this e-mail is:  Product

14   Update Relaunch of Generic OxyContin CR, which is

15   oxycodone CR, 10, 20, 40, 80 milligrams from

16   Actavis.

17           This product update is the kind of subject

18   matter e-mail you would get periodically?

19   A.   Marc Falkin was the consummate promo

20   individual.  He was always putting promos together,

21   coming from marketing and yes, this is very typical

22   of things that he would put together.  Is it typical

23   of just CII?  No, he did this with all kinds of

24   promos.

25   Q.   So the product update was that there was a
```

Highly Confidential - Subject to Further Confidentiality Review

1    limited relaunch of generic OxyContin from Actavis,

2    right?

3        A.    Uh-huh.

4        Q.    And he labeled this internal communication,

5    "do not fax or mail."

6              Right?

7              MS. KOSKI:  Object to form.

8        Q.    Do you see that?

9              MS. KOSKI:  If you look on the screen, you

10       might be able to see it.

11       Q.    Yeah, it's under the product update.

12       A.    Internal communication, please do not fax or

13   mail.

14       Q.    And in terms of the billing items, he said:

15   "No further discounts or rebates apply."

16             Does that -- I infer from that that there

17   was some discount already applying and no further

18   would be applied.  Is that right?

19             MS. KOSKI:  Object to form.

20       A.    Uh-huh.  Correct.

21       Q.    Then he said, in terms of customer base:

22   Remember, a larger percentage of our inventory will

23   be made available to CSOS customers and then a

24   percentage of our inventory will be made available

25   to those customers who send in 222 forms.

Highly Confidential - Subject to Further Confidentiality Review

1        So what is he distinguishing there?

2     A.    What he is saying is that if the customer is

3   buying online through the CSOS portal, that they

4   were going to make the majority of the inventory

5   available to them and that there would also be some

6   percentage available to people who chose to use the

7   222 forms instead of using online.

8     Q.    Does that mean that it was anticipated that

9   there would be more demand than inventory available?

10    A.    That's what it seems to indicate, although I

11  don't intent -- recall the intent.

12    Q.    And would you have an understanding why

13  there would be a preference to make more of it

14  available to the CSOS customers as opposed to the

15  customers who send in the 222 forms?

16    A.    I don't know if that was because a lot of

17  the national account pharmacies were on CSOS, and so

18  just proportionately how customers were ordering

19  through us, more were ordering through CSOS than

20  through paper CII forms.  That is what I am taking

21  out of it.

22    Q.    Were the paper CII forms more for the

23  independent, smaller pharmacies?

24    A.    No, anybody could use a paper CII form.

25  Any -- the difference was really, it's kind of like

Highly Confidential - Subject to Further Confidentiality Review

1    getting older folks to utilize the new technology.

2    We had some older pharmacists that just refused to

3    hardly even touch an e-mail or do anything of that

4    nature.  So getting them set up on CSOS was unheard

5    of.  They liked their paper, they liked to fill out

6    the paper, send it in, have the order fulfilled,

7    sent back to them and that's the way they proceeded.

8        Q.   Then under promotion right below that he

9    says:  It's essential we try to add other CII

10   products to these orders, although not the only way

11   we will ship product.  Our goal is to reward our

12   loyal CII purchasing customers as best as we can.

13   Yet use this OxyContin CR product opportunity to

14   increase our reach in the market.

15        Did I read that accurately?

16       A.   Correct.

17       Q.   And then there was an expiration date for

18   the promotion and the promotion was providing a 10

19   percent discount on Actavis fentanyl patches, seven

20   percent discount on Actavis oxycodone, 15 and 30

21   milligrams, and then a five percent discount on

22   Watson CII products.

23        Is that right?

24       A.   Correct.

25       Q.   And the fentanyl patches went from the

```
1    dosage of 25 to 50 to 75 to 100; is that right?

2       A.    Correct.

3       Q.    Does this help refresh your recollection

4    that there certainly was at that time period an

5    effort to promote CII products and have maximized

6    sales of them?

7             MS. KOSKI:  Object to form.  Go ahead.

8       A.    Yes.

9       Q.    And finally, in the back page, which is the

10   end of that product update, this is page 645, it

11   states:  Product location.  Product will only be

12   made available in Ohio.  Thanks in advance to our

13   warehouse team for their work to make this launch

14   happen.

15            Do you understand why they were seeking to

16   make it at that point only available in Ohio?

17      A.    Ohio was, for quite some time, the primary

18   warehouse location that had the largest capacity for

19   controlled substances.  There were also -- there was

20   a capacity in the Weston office but it wasn't nearly

21   as big as the one in Ohio.

22      Q.    So does this mean that it would only be made

23   out of the Ohio office but it could be shipped

24   elsewhere, or it was only to be shipped proximal to

25   that warehouse in Ohio --
```

```
 1       A.   It was only going to the Ohio warehouse.

 2       Q.   It was only going -- so was the Ohio

 3  warehouse able to ship it anywhere or only ship it

 4  to pharmacies within Ohio?

 5       A.   To anywhere.

 6       Q.   Okay.  So when he says, "product will only

 7  be made available in Ohio," that just means the Ohio

 8  warehouse but it could go anywhere?

 9       A.   That is correct.

10       Q.   Okay.  And above that he did say:  Please

11  keep promoting other Actavis fentanyl patches or the

12  non- CII Bupropion XL.

13            Right?

14       A.   Yes.

15       Q.   Okay.  Do you have any recollection about

16  this particular promotional effort?

17       A.   Does anything specific stand out in my mind,

18  no.

19            MS. RELKIN:  Do you want to break for lunch

20       and then I can keep going or -- consensus -- yes.

21            MS. KOSKI:  Looks like maybe.

22            MS. RELKIN:  Majority wins.

23            THE VIDEOGRAPHER:  Off the record at 12:09.

24       (Recess from 12:09 p.m. until 12:49 p.m.)

25            THE VIDEOGRAPHER:  We're now back on the
```

```
 1        video record at 12:49.  This is the beginning of

 2        Media 2.

 3             (Anda-Williams Exhibit 11 was marked for

 4        identification.)

 5   BY MS. RELKIN:

 6        Q.   We'll mark another exhibit.  Ms. Williams,

 7   I'm showing you what's been marked as Exhibit 11,

 8   which is number 635385, and it is -- I pushed the

 9   wrong button here -- it's a three-page document

10   ending in 387.  You will see that it's an e-mail

11   chain starting with the first e-mail is from you

12   11/13/09 to Wayne Tischler, Don Moore, Emilio

13   Medina, Vickie Shalley, Valerie Nemia and Allison

14   Libschtein.

15             And that group of recipients, they are all

16   in the sales department?

17        A.   Those were all my sales manager.

18        Q.   Yeah.  And the subject was:  Launch of

19   Generic Ultram ER Tomorrow.

20        A.   Uh-huh.

21        Q.   Do you recall this launch?

22        A.   With the aid of this e-mail, yes.

23        Q.   Okay.  And you indicated that:  "As you've

24   heard we are launching Ultram ER, tramadol ER,

25   tomorrow and expect to have both PAR and PATRIOT,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the AG, product in."

 2           So is PAR and PATRIOT, the manufacturers,

 3    the generic manufacturers?

 4    A.    Correct.  Uh-huh.

 5    Q.    Okay.  What does the next paragraph state?

 6    A.    "We need to get as many sales reps here as

 7    possible for this launch.  It would be good for as

 8    many of you as can be here as well.  Sorry for the

 9    last minute notification but it is what it is."

10    Q.    And the next paragraph states?

11    A.    "This is a tremendous opportunity for us to

12    make up lost sales dollars and for sales reps to

13    supplement their monthly sales volume."

14    Q.    Do you understand what kind of product

15    Ultram is?

16    A.    It is a control product, yes, and this was a

17    Saturday launch.

18    Q.    So what does that mean, Saturday launch?

19    A.    That means that the majority of our sales

20    reps were not scheduled to be working.  We only had

21    a fraction of our sales reps working, they worked in

22    rotation on a Saturday and we had limited hours,

23    from -- generally from 10:00 to 4:00, and they would

24    take turns, like every fourth or fifth week they

25    would work.
```

```
 1            So we wanted to give everybody the

 2     opportunity to come if they wanted to, it wasn't

 3     mandatory but they were allowed and they were paid

 4     the overtime if they had already exceeded their 40

 5     for the week.

 6     Q.    Got it.

 7            (Anda-Williams Exhibit 12 was marked for

 8     identification.)

 9     BY MS. RELKIN:

10     Q.    I am marking another exhibit as Exhibit 12.

11     Here is a copy, and this is stamped number 634359

12     also from your files and it's a multiple page

13     double-sided document ending in number 634369.  And

14     because -- well, the front of it indicates that it's

15     an e-mail from Brian Witte to Marc Falkin and are

16     you a recipient there?

17     A.    Yes.

18     Q.    Patricia Anda Williams, but we'll start with

19     the back.  Again, it's one of these very long e-mail

20     listservs, is that for all the sales force?

21     A.    Let's see here.  The names on here are --

22     look like they are inclusive of both the Anda Meds,

23     which were the physicians side, some of them I'm

24     seeing on here.  The -- wow.  This went to

25     everybody, like in the whole company.  Yeah, this
```

```
 1    went to purchasing and pricing, everybody.

 2    Everybody.  It looks like he used an e-mail group

 3    list to the whole company almost.

 4        Q.   Got it.  And you said Anda Met --

 5        A.   Anda Meds, just think of it as the

 6    physicians side of the business.  They sold to

 7    physicians, hospitals and so forth.

 8        Q.   Do they still or did they discontinue

 9    physicians?

10        A.   I cannot speak for what's going on now.

11    When I left, there were still two separate

12    divisions.

13        Q.   But they were, at a certain point in time,

14    they were not selling CIIs to physicians; is that

15    correct?

16        A.   Correct.

17        Q.   But they were selling other products?

18        A.   Correct.

19        Q.   Got it.  Okay.  And just for time frame, it

20    is, as you can see, 2009?

21        A.   2009, correct.

22        Q.   Okay.  So turning to the content of this

23    very large e-mail, this is another product update,

24    relaunch of generic OxyContin for 10, 20, 40, 80

25    from Actavis; is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.

 2      Q.   And this is another internal communication,

 3   do not fax or e-mail, right?  I'm on page 368 near

 4   the back.

 5      A.   Okay.  I see it.  Okay.

 6      Q.   Do you see that Marc Falkin indicates:

 7   Sometimes toward the end of next week, approximately

 8   December 3rd or 5th, oxycodone CR, the generic for

 9   Purdue's OxyContin CR, will be launched by Actavis.

10   Their ability to launch the product is based on a

11   settlement with Purdue that will enable a limited

12   amount of inventory in the market.  Anda/VIP will

13   have a limited supply of this new allocation to

14   service our customers.

15        Do you recall this launch?

16      A.   Via this e-mail?  Yes.

17      Q.   And going down to the bottom section here it

18   talks about internal promotion.  Do you see that:

19   Sometimes toward the end of December, but likely

20   January, a limited amount of Actavis oxycodone CR

21   will be made available by rep from our

22   initial allocation of product -- depending on your

23   sales of Actavis fentanyl patches or the non-CII

24   Bupropion XL 150mg and 300 mg.

25        So what does that mean, this internal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    promotion?

 2       A.   Well, Marc was, again, the marketing -- the

 3    marketing director at the time, and he was always

 4    coming up with promotions for all things.  This

 5    looks like his idea, recommendation.  Let's see

 6    here.  Like I said, he sent it out to everybody.

 7    This was his idea of putting a promotion together

 8    for these products when they came in, which we had

 9    launches all the time, sometimes once a week,

10    sometimes two, three times a month, sometimes once a

11    month.  So having promotions in and around a launch

12    period was not unusual.  They were considered launch

13    initiatives and our manufacturers were asking us

14    to -- they gave all the, you know, all the details

15    on when the products were arriving so that we knew

16    how to plan the sales force.

17       Q.   Okay.  But there was -- there was -- this

18    internal promotion suggests that it would be

19    priorities given to getting this limited amount of

20    the Actavis oxycodone available based upon the

21    individual sales rep's sales of the Actavis fentanyl

22    patches or the non-CII Bupropion; is that right?

23       A.   That's what I'm reading here.

24       Q.   Okay.  So do you understand the basis for

25    that, if someone was doing well in selling the
```

1    fentanyl patch and the other product, that they

2    would have a leg up in getting access to the

3    oxycodone?

4         MS. KOSKI:  Object to form.

5    A.   The way I interpret this is that if you were

6    selling the Actavis fentanyl patch, you probably had

7    a pharmacy that was utilizing them, because they're

8    not going to buy them if they don't have a script

9    for them, so those were considered opportunities to

10   be able to introduce that other product because they

11   were utilizing the fentanyl patch.

12   Q.   Got it.  Then he just said:  "There is no

13   defined formula yet, just a good faith scenario that

14   those who also promote these other Actavis products

15   could pick up some additional oxy CR inventory to

16   sell as you see fit.  Details to follow."

17        Do you see that?

18   A.   Uh-huh.

19   Q.   And he was leaving the discretion of sales

20   reps to sell as they see fit, right?

21        MS. KOSKI:  Object to form.

22   A.   When we say "sell as they see fit," again,

23   on the CIIs they were not -- they could call up the

24   customer, mention it to them, but the customer would

25   be the one that would activate the need --

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Right.

 2       A.   -- based on scripts they had in the

 3   pharmacy.

 4       Q.   And then this -- on product location, it

 5   also said, product will only be made available in

 6   Ohio, and again, like we established with the prior

 7   exhibit, that means your Ohio warehouse?

 8       A.   Correct.

 9       Q.   But available to distribute anywhere?

10       A.   Correct, correct.

11       Q.   Okay.  That's it for this exhibit.

12            (Anda-Williams Exhibit 13 was marked for

13   identification.)

14   BY MS. RELKIN:

15       Q.   Another exhibit, this is -- is this 13?

16            MS. KOSKI:  Stretching exercises just to get

17   the exhibit.

18       Q.   We've marked as Exhibit 13, a document from

19   your files numbered 610604, and it goes through,

20   again, double-sided, and it goes through 614 and --

21            MS. KOSKI:  This is not the same --

22       A.   I think this is related to the same --

23            MS. KOSKI:  She can ask you --

24       A.   One is from Marc Falkin and one from Brian.

25            MS. KOSKI:  It looked similar to us but not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        identical, different Bates number anyway.

 2        Q.   Yeah.  Hold on a second.  Yeah, I'm just

 3   focusing on one part here, but does this relate to

 4   the same promotional effort?

 5        A.   Yes, it appears to be.

 6        Q.   Same -- same topic, December 1st, and maybe

 7   it's redundant but I had this marked for the comment

 8   that was said by Marc Falkin to those on the e-mail,

 9   including yourself:  We can make it a December event

10   regardless if we have enough oxy CR, which we

11   won't...

12             What -- how do you read that comment?

13             MS. KOSKI:  Are you asking if you read it

14        correctly?

15        Q.   No, I'm asking a question.  Do you

16   understand what he meant by "which we won't"?

17        A.   Marc was always one of the first to find out

18   what inventory of product we were or were not going

19   to get.  So it could have been that we were

20   anticipating a larger share of inventory coming in

21   and then that changed.  That happened all the time,

22   where we expected a certain amount but then we got

23   significantly less.

24        Q.   Yeah.  Or it could have been that it was

25   known that there was a lot of demand for OxyContin
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and you had a sweet amount and you knew with the

 2    special pricing, it's going to get gobbled up in the

 3    market, right?

 4         MS. KOSKI:  Object to form.

 5    A.   I can't speak to what his intent was on this

 6    e-mail.  I remember that there were a lot of ups and

 7    downs in the market in inventory, inventory.

 8    Q.   Inventory-wise, but in terms of demand for

 9    OxyContin, from the time you were at Anda until you

10    left, did you ever see a drop that all of the sudden

11    there was less demand for oxy?

12         MS. KOSKI:  Object to form.

13    A.   I personally did not watch those -- those

14    trends, because that was handled by our compliance

15    team.  I just know we sold a lot less because we had

16    a lot of customers that either we decided to not

17    sell to anymore for whatever reason, or they never

18    returned questionnaires to us.  I can't -- I can't

19    say.

20    Q.   But in terms of the demand, you're not

21    suggesting that you had any reason to believe that

22    demand was diminishing for OxyContin?

23    A.   I can't speak to the demand because I don't

24    know what was going on.  We only saw one little

25    piece of the Anda side.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And then Marc Falkin was proposing a contest

2    for the reps as follows, and then he said:  Rep rank

3    Sams, Rep rank up to 40, 41, rookies and rookies,

4    and essentially what was he saying?

5    A.   He was saying like we did for almost all of

6    our other product launches, we had contests galore

7    going on, daily, hourly, on calls, call time.  It

8    wasn't necessarily based on sales.  It could have

9    been anything having to do with the number of calls,

10   the outbound dials that they made showing their

11   effort to at least get the word out that we had the

12   product.

13   Q.   So -- and the purpose was to incentivize the

14   sales reps to be aggressive in selling the product?

15   A.   Correct, as was any launch product that we

16   did.

17   Q.   Then he gave an example.  He said:  You can

18   come up with the prizes.  We add all the sales of

19   non- oxy CII products on these orders and assign

20   points by item, and then he went on to say, for

21   example, Actavis fentanyl patches item rank, blank,

22   XXXX.

23        Right?  Is that right, that's what it says?

24   A.   That's what it says.

25   Q.   Okay.  Okay.  We can move on to the next

Highly Confidential – Subject to Further Confidentiality Review

```
 1    exhibit.

 2            (Anda-Williams Exhibit 14 was marked for

 3    identification.)

 4    BY MS. RELKIN:

 5        Q.   I've just marked as Exhibit 14, a stamped

 6    document 619354 through 357, double-sided, and this

 7    is an e-mail chain, on the front page, it's forward

 8    of a title called, July Marketing Driver, and it's

 9    dated August -- the top is dated August 5th, 2009.

10    The earlier e-mails may be the day before, and it's

11    from you on the top.  Is that right?

12        A.   Correct.

13        Q.   Okay.  And if we go to the earlier part of

14    the e-mail that was forwarded, it was -- it was --

15    it was forwarded by Ken Fenster but it was from

16    Kim --

17        A.   Kim Bloom.

18        Q.   Is that right?

19        A.   Uh-huh.

20        Q.   And that's actually dated, July 1st of 2009;

21    is that right?

22        A.   July -- yes, Kim's e-mail was to Ken on the

23    1st of July, correct.

24        Q.   And Kim was saying, should any sales rep

25    have any questions in regards to this driver, please
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    see your manager, and then she talks, quote:  As an

 2    extra kicker, should you hit all three components of

 3    these marketing drives -- driver number, dollars,

 4    right is that a dollar sign next to driver?

 5        A.   I think that's just drivers.

 6        Q.   Is that just an S?

 7        A.   That's what it looks.

 8        Q.   It's a capital S.  Okay.  Oops.  Sometimes S

 9    is used as a dollar sign in some of the e-mails; is

10    that right?  Have you seen that?

11        A.   Rarely.  Personally, I've rarely seen an S

12    for a dollar sign.

13        Q.   "We'll pay an extra 10 percent of your PMs

14    that are tied to the marketing driver, which is 25

15    percent of your overall PMs.  Do your best to hit

16    all three and earn more $$$$$."

17             Is that right?

18        A.   Uh-huh.

19        Q.   Okay.

20        A.   But I don't know what the driver was.  Let's

21    see --  oh, the driver is in the back.  Okay, got

22    it.

23        Q.   Do you see what the driver is?

24        A.   I see it.

25        Q.   And what is the driver?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    There were several.

 2        Q.    They are?

 3        A.    They had to sell five account -- a must buy

 4   five-line promo to five different accounts; number

 5   two, go to sales advantage, identify 10 customers in

 6   your account base that have never purchased one of

 7   the items below.  If these 10 customers buy one of

 8   the items they have never purchased, then you

 9   qualify.  For example, if four of the 10 customers

10   orders -- must have been an item number, of

11   number -- four of the 10 customers order another

12   number -- another item number, one customer orders a

13   Qualitest oxy and orders one Actavis oxy, then you

14   qualify.  Any number of 10 accounts will qualify as

15   long as each of the 10 accounts has never purchased

16   one of the items below.

17              Or, sell to two more customers than your

18   retention goal.

19              So I think that this is an S when you look

20   at this, because there were marketing drivers versus

21   marketing driver dollars.

22        Q.    And we're dealing with OxyContin, right, or

23   oxycodone?

24        A.    Was one of the ways to qualify.

25        Q.    That's it for that document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Anda-Williams Exhibit 15 was marked for

 2     identification.)

 3     BY MS. RELKIN:

 4        Q.   I'm marking Exhibit 15.  This is

 5     fast-forwarding 2009 to 2013.  This is a document

 6     stamped 111359 through 361, and do you see this is

 7     an e-mail on the top from Marc Falkin to a number of

 8     individuals, including yourself, and the subject is:

 9     CII Products Available in Florida Warehouse 20.

10              Do you see that?

11        A.   Uh-huh.

12        Q.   Okay.  And do you see it indicates on the

13     bottom of that first page:  Sales managers, attached

14     you will find a list of accounts by rep that have

15     purchased the CII items listed below through

16     warehouse 37.  We have good inventory here in

17     Florida, warehouse 20, that will need help moving

18     out.  Please distribute the list to your reps and

19     have them make contact with these accounts.  We have

20     plenty of CII packets with return envelopes to

21     Florida in stock.  More will be added today, that's

22     in italics, so the reps can send these out to their

23     customers.  These accounts have purchased the items

24     listed below within the past 120 days.

25              Do you recall this promotion?
```

```
 1       A.    With the aid of this e-mail, yes.

 2       Q.    And in addition to that, Ohio warehouse is,

 3    obviously, a warehouse in Florida, right?  Multiple

 4    warehouses in Florida?

 5       A.    We had a warehouse in Weston.

 6       Q.    And that's the one that's being referenced,

 7    that number, warehouse 20?

 8       A.    That's correct, and the reason that this was

 9    done was because you cannot use a CII form for

10    Florida if the customer had a CII form from Anda for

11    Ohio.  So a brand new set of forms would have to be

12    sent to the customer to be able to purchase and have

13    that order fulfilled out of the Weston warehouse.

14       Q.    And then the products that were listed,

15    there is two page of listings, Adderall is a

16    controlled substance, is it not?

17       A.    Yes.

18       Q.    And Concerta and Dexedrine, are those

19    controlled substances, as far as you know?

20       A.    I would have to double-check on that one.  I

21    don't --

22       Q.    Look on the next page, an easy one,

23    Duragesic?  You know that that was --

24       A.    Yeah.

25       Q.    That was an opioid, right?  And then
```

1    oxymorphone, that's an opioid as well, correct?

2        A.    Yes, all these -- I believe all these are

3    CIIs.

4        Q.    And Percocet, until you get to Ritalin,

5    which is -- which is the control but not a CII; is

6    that right?

7        A.    I would have to double -- I would have to

8    refresh my memory, it has been a couple of years on

9    what category these are in.

10       Q.    Sure, but most of the drugs on this page are

11   indeed opioids, right?

12       A.    Uh-huh.

13       Q.    And essentially this e-mail -- the

14   underlying e-mail was from Lori Sorenson to the

15   sales managers, correct?

16       A.    Correct.

17       Q.    And her goal was that we need help moving

18   out.  She's talking about moving out these

19   controlled substances to pharmacies who would then

20   sell it to patients, right?

21           MS. KOSKI:  Object to form.

22       A.    Correct.  Maybe they had excess ware --

23   inventory in the warehouse 37, and they were trying

24   to switch the customer from ordering what they would

25   normally order out of 20 and have them order out of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the Florida warehouse instead.  It was not in

 2    addition to, it was where the source of that product

 3    was that they were going to be ordering.

 4        Q.   Well, they were encouraging them to write

 5    letters to their customers, right?

 6        A.   They were encouraging them to contact their

 7    customers and to send CII packets for the Florida

 8    warehouse, because those forms, those 222 forms

 9    could not be used -- the ones that the customers had

10    could not be used in Florida.  They would need a

11    whole new set of forms.

12        Q.   You were there a long time, so there's a lot

13    of e-mails.  Sorry.

14             (Anda-Williams Exhibit 16 was marked for

15    identification.)

16    BY MS. RELKIN:

17        Q.   The next exhibit is 16.  That's for me.

18    That's for you.  Most of the e-mail -- most of it is

19    an address list.

20        A.   This is the same one that we covered before.

21        Q.   Is it?

22        A.   Uh-huh.

23        Q.   That's December 8th?

24             MS. LUND:  Copies?

25             MS. RELKIN:  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Let me -- although I can still
 2       have a copy because Patricia's doing my job and
 3       her job here.  Is this voicemail the same date?
 4              THE WITNESS:  Yes.
 5       Q.   It's discussing the same thing, but here
 6   what I wanted to ask you about is you said voice
 7   mail, that wasn't the identical exhibit, just the
 8   same topic, right?
 9              MS. KOSKI:  It's the same Bates number.
10              MS. RELKIN:  My bad.  My bad.  Why don't
11       we -- can we just -- we'll just reuse Exhibit 16.
12       We will just destroy this.  There is no reason to
13       mark the same exhibit twice.  Okay.
14              MS. KOSKI:  Because I think it's identical
15       to Exhibit 10 that you already marked.
16              MS. RELKIN:  Okay.  Okay.
17   BY MS. RELKIN:
18       Q.   And then let me just ask you, the top -- the
19   same exhibit said:  "Voicemail message sent as
20   requested."
21              Do you know what the voicemail was?
22       A.   The content was?  I can tell you that Marc
23   always liked to follow up every one of the e-mails
24   that he sent out to the floor with a voicemail.
25   That was his protocol, and as the director of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    marketing, we did our best to comply with his

 2    wishes, and so what we would have done in that

 3    scenario was to let them know what the promotion was

 4    to make sure that they read their e-mail and got the

 5    details of the promotion.

 6        Q.   All right.  So I'm going to reuse the

 7    Exhibit 16 stamp.

 8             MS. KOSKI:  Got it.

 9             MS. RELKIN:   Okay.

10             MS. KOSKI:  Just like it didn't happen.

11             (Anda-Williams Exhibit 16 was marked for

12    identification.)

13    BY MS. RELKIN:

14        Q.   I'm marking as Exhibit 16, a document

15    stamped 849833 through 835, and it's an e-mail

16    chain, the top is dated March 6th, 2013, and the

17    subject is:  Launch Snapshot Suboxone Tabs Day 1,

18    and we can go first to page -- chronologically

19    earlier for the context, page 800 -- page 834.  In

20    the middle of the page there is the e-mail from

21    Albert Paonessa and he is, do you want to explain

22    who he is?

23        A.   He was the then president of Anda.

24        Q.   And Mr. Brian Witte and William Versosky

25    and, again, it was Launch Snapshot Suboxone.  And
```

Highly Confidential - Subject to Further Confidentiality Review

1    the then president indicated that:  "We sold 579

2    bottles, IMS monthly average for independents is

3    159,000 bottles, 579 seemed low for launch day.

4    Thoughts?"

5            So is it fair to say that Albert Paonessa

6    was concerned that we just didn't sell enough of the

7    Suboxone?

8        A.   He thought it was low, yes, according to the

9    e-mail.

10       Q.   And by the way, IMS, are you familiar with

11   what that is?

12       A.   It's a database of drug use and average

13   uses.  We used to -- I personally didn't have access

14   to it but I know the marketing department and some

15   of the leadership team had access to it.  I think

16   Bill Versosky had access to it, which is maybe why

17   he was copied on this and it gave us average usage

18   of items throughout the United States, not just in

19   Florida or in Ohio.

20       Q.   That's why he was able the discern that the

21   amount of bottles you sold during this day one was

22   what he perceived to be low based on a monthly

23   average, nationally?

24       A.   Correct.

25       Q.   Do you know what Suboxone is?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    It is a controlled product.

 2      Q.    It's also a CII, right?

 3            And then you responded to that, first

 4      looking at the top -- the bottom of the first page,

 5      you responded on March 6th saying -- what did you

 6      indicate?

 7      A.    To Brian, I said:  We had about 4,000

 8      eligible customers to purchase this control item,

 9      call volume for most was above average, goals in

10      place at the sales manager level, contest points in

11      place, PM's in place for pre-booking efforts,

12      raffles/spins going on every hour, I'm meeting with

13      all the sale managers at 10:00 and assigning

14      goals for every sales rep level as discussed

15      earlier.  The most common thing we heard was that

16      most customers have switched over to using the film

17      rather than the tablets.

18      Q.    What did you mean by, "switching over the

19      film rather than the tablets?"

20      A.    There was a different kind of product that

21      they were purchasing instead, and then that was

22      clarified to me by Ken Fenster who said that he

23      should have told us earlier that they stopped making

24      the brand tabs a few weeks back anticipating the

25      launch that was occurring, and that in the meantime,
```

1    some of the customers had switched over to the film.

2    So selling to those customers can -- asking them to

3    go back to the old product was difficult.  That was

4    the feedback we were hearing from the floor.

5        Q.   The film was just a little thin strip that

6    would be put under the tongue?

7        A.   Correct.

8        Q.   Okay.  And then you indicated above that, at

9    11:22 a.m.:  "Wanted to add that we are proceeding

10   with disciplinary action on a few sales reps whose

11   call count was unacceptable."

12       A.   Yeah.

13       Q.   So does that mean you were going to

14   discipline sales reps who did not make sufficient

15   efforts and did not achieve the sales of Suboxone as

16   desired?

17            MS. KOSKI:  Object to form.

18       A.   Not the sales.  For every launch, every rep

19   was expected to put their all-out effort, calling

20   their entire database of customers for whatever the

21   launch was.  It didn't matter whether it was a

22   regular generic, whether it was a brand, whether it

23   was a CII.  If they were -- whatever product they

24   were eligible for, that was their -- that was their

25   mission.  Occasionally we would have reps that would

1    make an excuse for why they didn't make the all-out

2    effort, and to us on a launch day, that was

3    unacceptable because it was a known thing.  We did

4    launches all the time, and first day and second day

5    launch activity was critical for us to be able to

6    capture sales.

7         So if we felt somebody was underperforming

8    or had showed lack of an effort, we may have given

9    them a verbal warning and said," come on, get with

10   the program, put your effort into this, you're in

11   sales, this is what we expect you to do."

12   Q.   Disciplinary actions would just have been a

13   verbal warning?

14   A.   Yes, unless they had already previously had

15   something like that similar for another launch, and

16   then we would have gone down maybe the next level of

17   corrective action.

18   Q.   And the earlier reference to raffles, that

19   was on the sales floor?

20   A.   We had things -- could I back up a second?

21   Q.   Sure.

22   A.   Okay.  As part of an education for call

23   centers, call centers are extremely tedious.  There

24   is a lot of energy, there is a lot of excitement.

25   There is lot of motivation that's required to keep

```
 1    people on the phone.  Basically chained to your desk

 2    with a phone, and to keep that drive going all day

 3    long, day in, day out, month in, month out.

 4         We had contests going on all the time.  Two,

 5    three, four, five different kinds of contests,

 6    sometimes, one for call count, one for talk time,

 7    how long did they actually keep the customer on the

 8    phone, did we actually make something or did we just

 9    dial, some for sales, obviously.  We were in sales,

10    that's what we do.

11         We had a wheel that's like one of those

12    wheel of fortunes, and it had little elements on it

13    and if they did well in a certain area or their name

14    was picked from a raffle, we allowed them to go up

15    and make a spin.  And their spin might have been

16    they got an extra half an hour for lunch or they

17    might have gotten a casual day, wear jeans for the

18    day, or they might have earned a $10 gift card.  So

19    it was something to keep them motivated and keep

20    them going.  That's how sales organizations and call

21    centers typically work.  Lots of contests, lots of

22    praise, lots of fun, keep the motivation high.

23         MS. KOSKI:  Just like law firms.

24    A.   If we don't they get discouraged and they

25    just become unhappy and leave.
```

Highly Confidential – Subject to Further Confidentiality Review

```
1      Q.   What was the average retention of a sales

2   rep?

3      A.   When I came on board with Anda, I was used

4   to a retention in the SunTrust world of less than

5   three years.  When I came to Anda, I was amazed at

6   how long their people were in the position.  In

7   fact, I almost made the comment, I remember one time

8   to Kim Bloom saying, are we sure this is a good

9   thing, because the average was seven-and-a-half

10   years.  That's uncall -- that's unheard of in sales.

11   Typically, it's one to two years.  That's an

12   industry standard.

13        And the fact that they were in the position

14   that long showed us a number of things:  That they

15   really liked what they were doing, they felt they

16   were being rewarded for it, they enjoyed the

17   position, and they wanted to keep doing it, and they

18   loved their customers.  And they continued to show

19   that longevity.

20      Q.   They make good money selling the

21   pharmaceutical products.

22      A.   They did, but they had to work for it, and

23   again, they had virtually very, very little base

24   commission, base pay.  Their base was very, very

25   low.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Right.  So their base was you said $9, and

2    90 percent of their income would be --

3      A.   Be commissions.

4      Q.   That's -- per hour, that adds up.  If $9 was

5    just 10 percent, that's a pretty good hourly wage.

6      A.   Okay.

7      Q.   Right?

8      A.   Yeah.  And it depends on the size of the

9    book that they had.

10     Q.   And did they also get stock options?

11     A.   No.

12     Q.   That's only for the managers?

13     A.   No.

14     Q.   You got stock options?

15     A.   I did.

16     Q.   Weren't you in management?

17     A.   I was.  Yeah.  I'm sorry.  Did I

18   misunderstand the question?

19     Q.   Yeah.  I said that was only for management?

20     A.   Correct.

21     Q.   Did you ever have any sales reps who said

22   that they had a moral or ethical problem promoting

23   opioid products?

24     A.   That came to me and expressed that?  No.

25     Q.   Did you hear about that anywhere in the

```
 1    company?

 2         MS. KOSKI:  Object to form.

 3    A.   I do not recall.  It doesn't ring a bell.  I

 4    would need something to jog my memory if something

 5    like that happened, but it doesn't come top of mind.

 6    Q.   And do you personally know anyone, or did

 7    you know of anyone in the company, who lost a family

 8    member or friend to opioid overdose?

 9         MS. KOSKI:  I'm going to object.  I'm going

10         to instruct you not to answer, the relevance of

11         that question, that's just a harassing question.

12         MS. RELKIN:  It's discovery.

13         MS. KOSKI:  You don't have to answer that

14         question.  What's the relevance of someone else's

15         personal family member's health to the --

16         MS. RELKIN:  It's not generically health,

17         it's whether she knew anyone who --

18         MS. KOSKI:  Anyone in the world, what does

19         that have to do with this case?

20         MS. RELKIN:  Personal friends/family of her

21         or other folks in the company.

22         MS. KOSKI:  You don't have to answer that

23         question if you're not comfortable answering it.

24    A.   I don't recall anybody coming forward.

25         (Anda-Williams Exhibit 17 was marked for
```

```
 1    identification.)

 2    BY MS. RELKIN:

 3        Q.   It's kind of small font.  The good news is

 4    the small font part on the top you don't have to

 5    worry about because that was a different witness.

 6    We'll focus on the larger font, which was your

 7    e-mail.  So this is Exhibit 17, number 566549

 8    through 550 -- no, through 551.  And the bigger font

 9    is an e-mail relatively bigger font, do you see

10    that?

11        A.   Uh-huh.

12        Q.   From you to Anda Pharmacy Group, Anda New

13    York Sales and Anda West Coast Group.

14        A.   Uh-huh.

15        Q.   So that's a pretty large listserv; is that

16    right?

17        A.   All of these three groups comprise all of

18    the pharmacy team.

19        Q.   Just sales or beyond sales?

20        A.   No, no, just sales.

21        Q.   And what did you say?

22        A.   I said that:  We've just been made aware

23    that control limits for your control eligible

24    customers will no longer be visible through TPS

25    order entry or Andanet.  Note, this does not mean
```

Highly Confidential – Subject to Further Confidentiality Review

```
1   there are no limits.  There will not be a hard stop

2   at order entry in TPS or through Andanet moving

3   forward.  However, all orders containing controlled

4   substances will be subject to review by our

5   regulatory compliance team.  If you receive a

6   scheduled drug order quantity from a control

7   eligible customer that is not significantly -- that

8   is significantly higher than normal for that

9   account, please proceed to key that order which be

10  reviewed by our regulatory compliance team.  If

11  additional follow-up is necessary, you will be

12  contacted by the regulatory compliance and/or we

13  will discuss with your customer as necessary.

14       Q.   So what did this mean that, "control limits

15  for your control eligible customers will no longer

16  be visible through the TPS order entry and Andanet?"

17       A.   Okay.  If you turn to the second page, this

18  is a screenshot from TPS.  TPS was short for Turning

19  Point System, that was the order entry system that

20  the sales reps used.  If you will see that item

21  number 7 in the center block, that used to --

22       Q.   There, the blank item?

23       A.   Correct.  In that space used to have the

24  ability for the sales reps to hit function 7 key and

25  at which point they would be able to see all the
```

```
 1   different control families and how much of that

 2   family that the customer had used.  That function

 3   was removed from TPS.  It was a management --

 4   executive management decision.  Obviously, we only

 5   found out about it after it had been taken off.  It

 6   did not mean that those control limits went away.

 7   All it meant was that the orders would flow through

 8   and that the compliance team was going to be

 9   reviewing every order before it went out.

10       Q.   And what was the reason for removing 7 for

11   the sales force?

12       A.   I don't know the full management decision.

13   I wasn't part of the management decision on that.

14       Q.   But there must have been some talk and

15   scuttlebutt when this change happened?

16            MS. KOSKI:  Object to form.  You can answer.

17       A.   Okay.  Whatever that scuttlebutt must have

18   been, I don't know that it was accurate.  What we

19   thought may have caused it, we had no idea.

20       Q.   What was the scuttlebutt that you did hear?

21            MS. KOSKI:  Object to form.

22       A.   The scuttlebutt that we heard was that they

23   just don't want us to see it anymore, and if they

24   don't see it, then they can't concentrate on it or

25   talk to the customer about it or say to the
```

 1    customer, oh, I see that you're at 900 of your 1,000

 2    pill limit, and have any kind of discussion.  They

 3    just simply would not have access to that

 4    information anymore.

 5        Q.   And was it deemed inappropriate for a sales

 6    rep to tell their customer, you're approaching your

 7    limit, you need to have it raised?

 8        A.   No, it was not deemed inappropriate.  Did we

 9    want to make that the focus of the conversation?

10    No.  Sometimes the customer would inquire, where am

11    I?  They would lose track, they are putting orders

12    in every single day and sometimes they would forget

13    how many times they ordered a controlled substance

14    from us and especially when they are ordering from,

15    possible, multiple sources.  And keep in mind too

16    that this would not include CIIs.  Because CIIs were

17    not handled through TPS, this was only for your

18    Schedule IIIs, IVs and Vs.

19        Q.   So how would -- the CII data was just not on

20    TPS at all?

21        A.   Correct.  The only thing that there was, was

22    on the very front screen, let's see if it even shows

23    it.  No, this particular picture does not.  There

24    was a section over on this right side, which is this

25    little box.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Over here?

2      A.   Yeah, this little box is hiding it.  Behind

3   that box was where we could see whether or not the

4   customer was turned on for controls or not.

5      Q.   I see.

6      A.   There was a flag there.  That, they could

7   see, they could also see whether the customer had

8   turned into us their questionnaire, their customer

9   questionnaire and so that it either had a yes and a

10   yes, or a no and a yes, or a yes and a no, or a no

11   and a no.

12      Q.   But if they were turned on for controls, you

13   turned on only controls beyond II; you are talking

14   about III and IV?

15      A.   It could include all controls.

16      Q.   You could tell until TPS was -- this was

17   shut off to the sales reps, the sales reps could

18   tell, of course, whether the customer had controls

19   turned on?

20          MS. KOSKI:  Object to form.

21      A.   Yes.

22      Q.   And that was okay for them to relay to their

23   customer?

24      A.   It was okay because we were able to see

25   where the customer was and answer their questions.

Highly Confidential - Subject to Further Confidentiality Review

```
1    Did we want them being proactive about it?  No.

2       Q.   Why did you not want them being proactive

3    about it?

4       A.   Because in all honesty of where we were with

5    the situation of -- with controlled substances and

6    those dialogues that we were having with customers

7    and trying to not make that a focus.

8       Q.   So the scuttlebutt was 7 was shut down for

9    the sales reps, it obviously was still available for

10   compliance?

11      A.   Correct.  They wanted to be the ones to make

12   the decision on whether an order should go through

13   or not, and we were fine with that.  It allowed

14   sales to do what we do best, which was sell and let

15   somebody else worry about that.

16      Q.   Up until this time period, May of 2013, when

17   this change was made, sales did have more of a role

18   in making those decisions?

19           MS. KOSKI:  Object to form.

20      A.   No.  We didn't -- we weren't able to make

21   the decision as to whether or not the order would go

22   through or not.  If the customer had the limit

23   available and the order was placed, the order went

24   through, not for -- not for a CII.  Again, the CII

25   was a totally different process, but for a CIII, CIV
```

1    and CV, if the customer ordered it and there was an

2    acceptable limit left on that customer's limit, the

3    order would process.

4        Q.    The part of the e-mail that's italicized,

5    your e-mail.

6        A.    Okay.

7        Q.    You said:  If you receive a schedule drug

8    quantity order from a control eligible customer --

9    let's go to that page.  This is the italicized

10   portion.

11            "If you receive a schedule drug quantity

12   order from a control eligible customer that is

13   significantly higher than normal for that account,

14   please proceed to key the order which will be

15   reviewed by our regulatory compliance team."

16       A.    Yes, and that was direct from the compliance

17   team.

18       Q.    And keying the order is just entering it

19   into the system?

20       A.    Correct.

21       Q.    Was there any requirement that they notify

22   compliance that, huh, this looks to be a

23   significantly higher than normal order, be on the

24   lookout?

25       A.    No, because compliance -- it was our

Highly Confidential - Subject to Further Confidentiality Review

1   understanding compliance had access to all the

2   customer's history and were able to see -- I never

3   saw those screens so I can't vouch for exactly what

4   they contained but I understand they were pretty

5   exhaustive.

6       Q.   Did this change generate some concern within

7   the sales team?

8            MS. KOSKI:   Object to form.

9       A.   Any time we made a change on anything, the

10  sales reps got upset.  Was this in particular

11  anything bigger than -- no.  You know, the first

12  couple days, oh, I wish I could see it, I wish I

13  could see it.  I wish I could see it.  I would

14  always say why, why does it matter, put the order

15  through.  We've got another set of eyes that's

16  watching it in the background, you don't have to

17  worry about that anymore.

18      Q.   Did you come to learn that Christine

19  forwarded your e-mail to Vicki Mangus?

20      A.   I didn't know that she forwarded it until

21  I'm seeing this right now.

22      Q.   And this is the tiny print, but do you see

23  the last clause she said:  Is there a potential that

24  we will report orders from them to the DEA as

25  suspicious?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yeah.   I see her -- I see her comments.

2      Obviously, there was dialogue going on between

3      Robert and her and, I think, it was specifically

4      regarding Walgreens.

5      Q.    When -- have you ever come to learn of

6      specific orders being reported as suspicious?

7      A.    I was not involved in the process of doing

8      anything behind the scenes to that order.   The

9      compliance team reviewed it.   There were occasions

10     when if a sales rep saw something, sometimes they

11     would mention it to their sales manager and the

12     sales manager would call compliance.   Was that

13     happening every single order?   I can't say it was

14     but I -- if somebody went from wanting 100 oxys and

15     suddenly they wanted to order 1,000 and the sales

16     rep saw that, knowing -- and through all of our

17     education with them, they may pick up the phone and

18     say, hey, I'm not sure about this order, but at that

19     point we were instructed, let it go, let it go,

20     don't worry about it, we have compliance on the back

21     end watching all of this.

22     Q.    I appreciate that, but that's to compliance.

23     My question is if -- did you ever come to learn

24     whether compliance reported to the DEA?

25     A.    Oh, I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Suspicious orders?

 2      A.   I have no idea, we were not privy to what

 3   they did with the DEA.

 4      Q.   So during all your years there, did you ever

 5   come to learn in any way that any particular

 6   customer order was reported to the DEA as being

 7   suspicious?

 8      A.   No, ma'am, I did not.

 9      Q.   Did you assume that there were some orders

10   that did get reported as being suspicious?

11         MS. KOSKI:  Object to form.  If you know.

12      A.   I can't say for sure.  I would hope that

13   some were.  We had some customers shut down from

14   controls, so I can only suspect that it did make it

15   either into the decision-making mode either strictly

16   on the Anda part or with assistance from the DEA.

17      Q.   And you would assume if a customer was shut

18   down by controls because their order tripped the red

19   flags it was too much, too much oxy, too much bad

20   combination, whatever?

21      A.   Correct.

22      Q.   You would assume that therefore it also got

23   reported to the DEA as a suspicious order, right?

24         MS. KOSKI:  Object to form; asked and

25         answered.
```

1    A.   I don't know what compliance's requirements

2    were with the DEA, so I really can't speak to that.

3    Q.   Was that not discussed during those training

4    sessions?

5    A.   What was discussed in the training sessions

6    was that they were in constant contact with the DEA.

7    The form that they were in contact with, how it was

8    conveyed, discussions, none of that where we shared

9    any privileged information on.

10   Q.   Was there any time that you learned of the

11   DEA ever conducting an inspection at Anda?

12   A.   We always found out afterward, two, three

13   weeks, sometimes later we would find out that they

14   had been there.

15   Q.   Okay.  So there were occasions where they --

16   A.   We never knew ahead of time.

17   Q.   How many occasions do you recall that you

18   learned that DEA was there?

19   A.   I maybe heard two, three times, maybe, that

20   they -- we found out two to three weeks later, or

21   maybe the week later, that they had visited and it

22   would come up in conversation, not because it was a

23   general broadcast announcement to the -- you know,

24   to all the employees, which it was not.

25   Q.   And did you ever see someone from the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Never.

 2      Q.   So it was more you heard again it was a

 3   scuttlebutt thing, DEA was here?

 4      A.   Not a scuttlebutt because every once in a

 5   while we would hear it from Robert Brown who had

 6   said, "Look, we were just visited by the DEA."

 7      Q.   And did they ask for documents --

 8      A.   I have no idea.  I have no idea how that

 9   interaction went.

10      Q.   During the time periods when the company was

11   being acquired, were there inspections?

12           MS. KOSKI:  Object to form.

13      A.   I do not know for a fact.  I would assume

14   that there would be if you're taking over a company,

15   you want to learn all the aspects of that company,

16   but what level of detail and what inspections were

17   done as part of that due diligence, I don't know.

18      Q.   You had no direct involvement in the

19   acquisitions; is that right?

20      A.   None.

21      Q.   Okay.  You were never interviewed by anyone

22   regarding acquisitions?

23      A.   Ung-ugh.

24      Q.   Did -- so when you started it was Watson?

25      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And then Actavis buys Watson; is that right?

 2           MS. KOSKI:  Object to form.

 3      A.   Watson, then Actavis, then Allergan, and

 4    then -- that was during my reign.  After I left,

 5    then Teva acquired them.

 6      Q.   Okay.  So during these transitions, did your

 7    job functions and the functions of your department

 8    change in any material way?

 9      A.   (Shaking head.)

10           MS. KOSKI:  You have to answer verbally.

11      Q.   No?

12      A.   No.

13      Q.   So there was no process change?

14      A.   As it relates to?

15      Q.   As a result of the acquisition by Actavis,

16    did you have to change any procedures because

17    Actavis liked things differently than Watson, for

18    example?

19      A.   On the sales floor, no, no.

20      Q.   It was all the same?

21      A.   We continued calling our customers just like

22    we did.  Customers would inquire about the

23    acquisition and obviously we shared the information

24    that we were given to share and, yes, it's going to

25    be happening but it's not going to impact the
```

1    distribution side.  Anda really remained its own

2    unit through all of those transitions, so we were

3    really the least impacted.

4        Q.   What about in terms of promotional efforts

5    or change in priorities to promote Actavis generic

6    drugs over other companies' generics, opioids

7    specifically?

8        A.   I can't say there was any difference than

9    what we had experienced through Watson and then

10   with -- and then with Actavis and then with

11   Allergan.  I mean, obviously, since they owned us,

12   there was a propensity to try to move those products

13   through their main -- one of their main distribution

14   centers, which was Anda, but it didn't stop us from

15   continuing to carry over 100 manufacturers.  In the

16   last year that I was there, they brought in more

17   brands than the -- than the company had ever had in

18   terms of other manufacturers, other than Actavis or

19   Allergan.

20           (Anda-Williams Exhibit 18 was marked for

21   identification.)

22   BY MS. RELKIN:

23       Q.   Now I'm going to get into issues about

24   control, when they get turned on, when they get

25   turned off and then evolve into the issue of

Highly Confidential - Subject to Further Confidentiality Review

```
1     extensions.

2         A.   Okay.

3         Q.   Kind of all the continuum of the controlled

4     part as it relates to sales.

5         A.   Okay.

6         Q.   Recognizing that you're not in compliance.

7         A.   Correct.

8         Q.   So I'll mark as Exhibit 18 -- so I've just

9     marked as Exhibit 18 a document stamped 711549

10    through 550, and as you can see in the top, you sent

11    an e-mail on December 8th, 2011, to Brian Witte

12    regarding a particular pharmacy, Van Buren Pharmacy.

13    Do you see that?

14        A.   Uh-huh.

15        Q.   And going earlier in time to understand the

16    context, since this was a forward of other e-mails,

17    this is all regarding this Van Buren Pharmacy where

18    Arthur Kasdin indicated to Wayne Tischler that he:

19    "Shipped a control on December 2nd, 2011, they just

20    recently qualified for controls, now all control

21    items are in red.  Please help."

22             So what does a control item in red mean?

23        A.   It would mean that the order was not going

24    to ship.

25        Q.   Okay.  And when Arthur -- when Arthur said,
```

1    please help, what did that mean?

2        A.    From the context of what I'm reading here,

3    they had turned them on for controls and then just a

4    few days later they turned them off, and that was

5    confusing to the sales rep as to why can they do it

6    a couple days ago and now they can't.

7        Q.    And Arthur Kasdin, he's a sales rep?

8        A.    He was a sales rep, he's since retired, and

9    Wayne Tischler was his sales manager.  So he went to

10   Wayne saying, "Can you help me understand what's

11   going on here?"  And even, obviously, from the

12   context, I did not even know what had happened

13   there.

14       Q.    Yeah.  So let's go to, to get a little more

15   information, Arthur Kasdin on December 7th, I guess

16   that's the next day, says:  "They were approved last

17   week for controls.  They got an increase this week

18   from 1,000 to 3,000 hydrocodone.  What has changed

19   since a few days ago?  I will probably lose all my

20   generic business with this account when I tell him

21   the news.  If he were denied controls from the

22   beginning, everything would be okay.  Can we at

23   least go back to the 1,000 limit on controls so I do

24   not have to lose an account that has been increasing

25   sales with us a lot since July.  I've worked very

```
 1    hard to develop a relationship with the tech to get

 2    him to buy more from Anda.  Please help.  Thank you,

 3    Arthur."

 4         And then it looks like Wayne Tischler

 5    forwarded this to you; is that right?

 6    A.   Correct.  Uh-huh.

 7    Q.   And what did you say?

 8    A.   Well, first of all -- wait a minute.  Hold

 9    on a second.  Denied controls.  Just wanted you to

10    see this.  I in turn forwarded this to Mike Cochrane

11    who is the head -- was the head of compliance and

12    asked if I could meet with him, because we -- this

13    was not the first customer we had heard that had

14    been turned off for controls and I wanted to

15    understand more so that I was prepared to answer the

16    questions from my staff.

17    Q.   Right.

18    A.   And my sales managers.  Everybody was like,

19    what's going on?

20    Q.   Right.  So your direct quote was "There has

21    been influx of accounts turned off for controls this

22    week and I'm trying to understand what is triggering

23    these.  Everyone is up in arms about their accounts

24    and lost generic business."

25    A.   Correct.
```

```
 1        Q.    "But I know there must be a -- but I know

 2   must be a sound process for what is being done."

 3        A.    Correct.

 4        Q.    And what happened thereafter?

 5        A.    It looks like this e-mail that Michael

 6   received, he must, maybe, have sent to Brian,

 7   because I didn't copy Brian on this, and then Brian

 8   sent it back to me.  So he had to have gotten it

 9   somehow and said, did I get any information on this,

10   and then I said:  "No, he never responded, I'll try

11   again today."

12            We had had a couple accounts that had been

13   turned off that week that had been with the company

14   for several years, quite a few years.

15        Q.    Well, actually, you said:  "We've had some

16   very long accounts shut off this week, some that

17   have been with us for over 10 years."

18            So what that means is these were long

19   standing customers who, at that time, their controls

20   were shut off, meaning they could no longer purchase

21   opioids from you?

22        A.    Any controls.

23        Q.    Any controls?

24        A.    Any controls, not only CIIs but all

25   controls.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And this must have been a fairly big deal on
 2   the floor.
 3      A.   Well, of course.  The root of this is in the
 4   comment that Arthur makes that he's going to lose
 5   all his generic business.  That was the concern,
 6   because they're commissioned salespeople.  So if you
 7   cut off controls and the customer gets upset, and
 8   they pull all their business with me, I've just lost
 9   a really, really good account and automatically my
10   pocketbook is hit.
11      Q.   Right.  So what happened here, do you
12   recall?
13      A.   I do not recall.  I do recall that the
14   compliance area went through complete reviews on a
15   regular basis in groups of accounts and were looking
16   to doing their due diligence since sometimes there
17   were groups of accounts that got turned off, and we
18   would inquire and find out that they had received
19   information from whatever source and made that
20   decision to turn them off.
21           What transpired, I mean there was an e-mail
22   here from Sabrina.  Sabrina was in the compliance
23   area and worked for Mike Cochrane, and -- because
24   Arthur even sends it to Sabrina and Sabrina responds
25   back and says:  "No, this was reviewed further and
```

```
 1    determined that we should not sell controls to this

 2    pharmacy going forward."

 3            So they didn't give the specifics on it,

 4    they just either found out something or investigated

 5    something a little bit further that led them to make

 6    that decision.

 7    Q.   Something further meaning, they found out

 8    there was some problem with regard to this

 9    pharmacy's sale of controlled substances?

10    A.   Yes, sir -- yes, ma'am.  I'm sorry.

11    Q.   But some of these were -- this was a

12    customer of 10 years?

13            MS. KOSKI:  Object to form.

14    Q.   Correct?

15    A.   Correct.

16    Q.   So it's unknown for how many years there

17    might have been a problem with this customer?

18            MS. KOSKI:  Object to form; mischaracterizes

19        the document.

20    Q.   Is that right?

21    A.   I can't say.

22    Q.   Do you know whether that pharmacy, Van Buren

23    Pharmacy, whether Anda reported this suspicious

24    order to the --

25    A.   I do not know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    -- to the DEA?

 2       A.    I do not know.

 3       Q.    Would you expect that they did?

 4             MS. KOSKI:  Object to form.

 5       A.    I can't answer for their protocols with the

 6    DEA.

 7       Q.    So sitting here, you don't know despite your

 8    years of service at Anda, whether it was required

 9    that when they discerned a suspicious order

10    concerning enough to shut off controls, whether they

11    also were required to report that to the DEA?

12             MS. KOSKI:  Object to form; asked and

13       answered.  Are you asking her a legal conclusion?

14             MS. RELKIN:  I'm asking her knowledge.

15             MS. KOSKI:  About a legal conclusion?

16             MS. RELKIN:  She worked in a regulated

17       industry, yeah.  It's not a legal conclusion.

18       It's guidelines and regulations governing her

19       industry.

20             MS. KOSKI:  So Special Master Collins

21       ordered that you can't ask questions about

22       someone's interpretation of the law.  I think

23       this question fairly calls for that.  You don't

24       have to answer.

25       Q.    I'm not asking for your interpretation.  I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    asking whether you were ever told by compliance at

 2    Anda whether, when they shut down controls, because

 3    it was a suspicious order, whether their protocol

 4    also included reporting it to the DEA?

 5        A.   They did --

 6            MS. KOSKI:  That's a different question.

 7    You can answer that one.

 8        A.   They did not share with us what their

 9    protocol was with the DEA.

10        Q.   And you didn't know one way or the other?

11        A.   (Shaking head.)

12            MS. KOSKI:  You have to answer out loud.

13        A.   I did not know, no.

14            MS. LUND:  Would this be a good time for a

15    break?

16            MS. RELKIN:  Sure.

17            THE VIDEOGRAPHER:  Off the record at 2:02.

18            (Recess from 2:02 p.m. until 2:14 p.m.)

19            THE VIDEOGRAPHER:  We're now back on the

20    video report at 2:14.

21            (Anda-Williams Exhibit 19 was marked for

22    identification.)

23                (Discussion off the record.)

24    BY MS. RELKIN:

25        Q.   So I've marked as Exhibit 19 a document
```

1    number 560415 and at the top you can see the e-mail

2    is from you to Robert Brown regarding Schaeper's

3    Pharmacy.  Do you see that?

4         Now, if you want we can -- to understand the

5    technology here, the very first e-mail that you're

6    not on but is forwarded to you, is from Tasha

7    Campbell to Alison Libschtein and Wayne Tischler,

8    who the Tasha Campbell?

9    A.    Tasha Campbell was one of the analysts in

10   Robert's area, Robert in the compliance area.

11   Q.    Got it.  And Alison Libschtein is in your

12   unit?

13   A.    Alison and Wayne both were sales managers

14   that reported to me, yes.

15   Q.    Right.  Okay.  And this is December 27th,

16   2013, and Tasha says:  "We have an order for 800

17   oxycodone 15 milligrams that is being held because a

18   customer has not previously ordered such a large

19   quantity of this item.  Please ask the customer to

20   provide us with the following.  A written

21   explanation for the reason of the size of this

22   order, an updated customer questionnaire, the most

23   recent three month's dispensing report and SOPs."

24         Further up the e-mail chain it indicates the

25   person who would have been in the position to do

Highly Confidential - Subject to Further Confidentiality Review

```
1    that, the main buyer, was not in that day.  "His

2    concern is that we do not pull the DEA.  He knows

3    that the order on hold will not be released and he

4    will communicate this with customer."

5         It looks like this e-mail that was from

6    Emilio Medina to Tasha Campbell got forwarded to

7    Anthony Pollio.  Who is Anthony Pollio?

8    A.   Anthony Pollio was one of our senior account

9    managers.

10   Q.   And then he forwarded it to you, is that

11   right, on December 30th?

12   A.   Correct.

13   Q.   So this is kind of during Christmas, New

14   Year's week?

15   A.   Correct.  Correct.

16   Q.   There is a little gap in time there.  Then

17   you send an e-mail on December 30th.

18   A.   To Robert.

19   Q.   Right, to Robert and what do you say?

20   A.   What I said was, I just made him aware of

21   what we had found out, that Tony Pollio had noticed

22   that the controls had been pulled from the customer:
```

Highly Confidential – Subject to Further Confidentiality Review

█ ████████████████████████████████

█ ████████████████████████ ██████

█ ███████████████████████████████████

█ ██████████████████████

 5      Q.   So when you say, "Reinstate the controls to

 6   allow us a few more days," that means you were

 7   asking compliance to let them continue to get the

 8   oxy until the paperwork comes in; is that right?

 9          MS. KOSKI:  Object to form.  Go ahead.

10      A.   We were just asking for them -- it was okay

11   for them to not release the order, but as long as we

12   could keep the controls open so that we allowed a

13   few more days to get all those documents that they

14   were requesting in the door, and get those to them

15   for a final decision.

16      Q.   And when you said that they wanted to order

17   a few more bottles, what was your understanding of

18   how many -- what was the discrepancy, recognizing

19   that they asked -- they said, we have an order for

20   800, because the customer has not previously ordered

21   such a large quantity of this item.

22          So what's the -- what's the difference in

23   quantity that you're aware of when you described it

24   as "a few more bottles," which doesn't sound like

25   it's as big a deal?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.
 2        A.   I don't recall the quantity.  I don't
 3   remember if they were 100s or a 200 bottle, what the
 4   quantity size of the bottles was that they were
```

████  ████████████    ████████████████████

████  ███████████████████████████████████

████  ████████████████████████████████████████

████  ████████████    ███████████████████████

████  ██████████████████████████████████████

█████  ███████████████████████████████████

█████  ███████████████████████████████████

█████  ████████████████████████

```
13        Q.   Do you know where Schaeper's Pharmacy is
14   based?
15        A.   I don't remember, ung-ugh.
16        Q.   Okay.  Then Robert Brown responded to you
17   and copied Tasha Campbell saying, this is on
18   December 30th, so it's your e-mail on December 30th
19   was 12:18 p.m. and then just a little bit more than
20   an hour at 1:22 p.m. Robert Brown says:  "The store
21   is now eligible to purchase controls.  We'll be
22   looking for all the requested information next week
23   in order to enable the customer to continue to
24   purchase controlled substances."
25              So controls was turned back on?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Uh-huh.

 2      Q.    Is that right?

 3      A.    Uh-huh.

 4      Q.    And then you sent an e-mail asking:  "Are

 5   you in today?  I have the dispense data from this

 6   customer to bring down to you."

 7      A.    We worked to get all the documents in by the

 8   31st, which was the following day, obviously that

 9   was around New Year's, New Year's Eve.

10      Q.    And Robert Brown indicated he's not in but,

11   "you can slide it under my door and I will review it

12   on Thursday."

13            Does Robert Brown keep his door locked?

14      A.    Yes.

15      Q.    And do you know the reason for that?

16      A.    I did not ever ask.

17      Q.    Was there anyone else at Anda who kept their

18   door locked?

19      A.    That I knew of?  No, I never really tried to

20   go into anybody's office and go look in there.  I

21   never attempted to go some place where it was

22   locked.

23      Q.    But did you know before this e-mail that

24   when he said, "slide it under my door," that he kept

25   his door locked?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   To be honest with you, I don't even think I

 2   checked the door.  I think his instructions were to

 3   slide it under the door and that's exactly what I

 4   did.  I'm not even sure if I tested the door that

 5   day.

 6        Q.   And then you did indeed slide it under the

 7   door.  Do you know what happened with this order?

 8        A.   I don't recall.

 9        Q.   Did they get approved?

10        A.   I don't recall.

11        Q.   And if you Google Schaeper's Pharmacy you

12   will see that they are based in Cincinnati, Ohio; do

13   you have any reason to disagree with that?

14        A.   No.

15        Q.   Did anyone in your department make a special

16   appeal to you for you to reach out to Robert Brown?

17   Was that Emilio Medina, did he come to you and --

18             MS. KOSKI:  Object to form.  You can answer.

19        A.   Hold on a second.  Give me a second here.

20   Because see, initially, Tasha sent this to Alison

21   and Wayne.  Alison and Wayne were on vacation

22   because they always were off the same week, and

23   Emilio was the backup manager.  So that's how it

24   wound up in Emilio's hands, he was one of the other

25   sales managers, so the attempt was made then to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    contact the customer, the main buyer, who would have

2    been able to help us wasn't there, yadda yadda

3    yadda, and then Tony sent it to me.

4         I don't -- there's no comment here.  I don't
```

■ ███████████████████████████████████

■ ████████   ██████████████████████   ████

■ █████████████████████████████████████

■ ███████  ████████████████████████████

■ ████████████████████████████████

■ █████████████████████   █████████████████

■ ███████████████████████████████

■ ████████████████████████

```
13        Q.   But when you indicated a few more bottles

14   sitting here, you don't know how many bottles, what

15   the discrepancy was?

16        A.   No.

17        Q.   Okay.

18        (Anda-Williams Exhibit 20 was marked for

19   identification.)

20   BY MS. RELKIN:

21        Q.   Still on the topic of control request, this

22   is Exhibit 20, which is stamped 133286 and the

23   e-mails are in August and September 2011.  Starting

24   at the beginning, there's an e-mail from Sabrina

25   Solis, she's in compliance, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, correct.

 2      Q.   To Emilio Medina who we just talked about

 3   and you are copied along with Emily Schultz and

 4   Emily Schultz was who again?

 5      A.   Emily Schultz worked for Mike Cochrane.

 6      Q.   So she's in compliance as well?

 7      A.   Yes.

 8      Q.   And Sabrina said:  "Today I had several

 9   requests from Flora Pajon for controls for Florida

10   accounts.  The appropriate dispensing data was not

11   attached on these requests.  Please ensure that all

12   these requests have summarized dispensing data

13   attached or on file as this is necessary to review

14   the accounts."

15           And then you responded and what did you

16   indicate?

17      A.   My comments were:  Sabrina, we have not

18   automatically been sending dispense data for every

19   increase request or adjustment.  If this is

20   something new we need to communicate that to the

21   entire sales floor both here and at VIP.  We

22   typically supply the customer questionnaire, that's

23   a given and when certain opportunities for increases

24   and/or adjustments have been made, sometimes

25   dispense data is requested and that is done.  I just
```

Highly Confidential - Subject to Further Confidentiality Review

1    want to be sure that I'm clear on the direction

2    going forward.

3        Q.    Okay.  So up until that time period, it was

4    not routine for sales to obtain from the customers

5    their dispensing data for all customers?

6        A.    For all customers, correct.

7        Q.    Who are seeking an increase, only some?

8        A.    We would do it when we were asked by

9    compliance to obtain it.

10       Q.    So this was a change and then as far as you

11   are aware; is that right?

12       A.    Uh-huh.

13       Q.    And then what does Emily Schultz say to you?

14       A.    Emily says:  "Pat, nothing has changed since

15   our meeting in January.  We still require dispensing

16   data for all new pharmacies.  I cannot find the

17   e-mail communication you sent out to the floor in

18   January regarding this because of the new e-mail

19   size quotas but I believe it was on January 17th.

20           The specific issues Sabrina was e-mailing

21   about was that Flora submitted seven opportunities

22   today all for new pharmacies in the Miami area.

23   Only two had dispensing data attached.  For new

24   pharmacies we must have dispense data."

25           Correct.  That was not a change and perhaps

```
 1    I was not aware that when these opportunities were

 2    submitted, that they were for new pharmacies,

 3    because that was part of our standard protocol.

 4        Q.   Yes.  And then you followed up by, I think,

 5    suggesting -- was that a meeting or a communication

 6    to clarify protocol; is that right?

 7        A.   Yes, and what I said was I think that would

 8    be really good.  I wasn't -- I wasn't aware these

 9    were for new pharmacies, so to my point what I just

10    said earlier.

11          So, no, that is no change from our existing

12    process, however I don't think that a touch base

13    with the sales managers would be a bad idea,

14    semiannual update so to speak.

15        Q.   And then you suggested proposed topics?

16        A.   Uh-huh.

17        Q.   And skipping to three, it was clarification

18    on new pharmacies needing dispense data?

19        A.   Uh-huh.

20        Q.   That was really the subject of the e-mail?

21        A.   Correct.

22        Q.   Then:  "What progress have we made as a

23    company getting control questionnaires in place?  I

24    don't think I've seen any new waves of

25    questionnaires being sent out.  Does that mean
```

1    they've all been sent out?  What percent of our

2    control buying base do we now have questionnaires on

3    file for."

4         So was that a concern of yours, that some of

5    your purchasing customers you did not have the

6    questionnaires on file for?

7    A.   We just noticed it when we were servicing

8    the customer.  I would occasionally go into TPS

9    accounts for various reasons and sometimes I noticed

10   that the flag was still no, and it was really for my

11   understanding and to help the floor understand.

12   They were doing things in waves, we called waves of

13   mailings and I just wanted to get an update on where

14   they stood.

15   Q.   And so -- and was it the responsibility of

16   sales to get the data, the dispensing -- the

17   questionnaires; is that right?

18   A.   They asked us for our assistance.

19   Q.   Let me rephrase my question.  I had too many

20   terms.

21        It was the sales department's responsibility

22   to reach out and get the questionnaires?

23   A.   Correct.

24   Q.   But when you made that comment had you

25   received any nudges or complaints from compliance

1    about the missing questionnaires?

2         MS. KOSKI:  Object to form.

3         MS. RELKIN:  What's wrong with nudge?

4         MS. KOSKI:  I had a problem with missing.

5    You can answer the question.  I'm objecting to

6    form.

7         THE WITNESS:  Oh.

8    A.   Can we restate the question, please.  Sorry.

9    Q.   When you made that comment, had you received

10   any complaints from compliance about questionnaires

11   they had not received yet expected?

12   A.   Where is that comment?  Are we referring

13   to --

14   Q.   Maybe you asked for progress about --

15   A.   Correct.

16   Q.   The company getting control

17   questionnaires --

18   A.   Correct.  Correct.

19   Q.   And you asked what percentage of our control

20   buying base do we now have questionnaires on file

21   for?

22   A.   Correct.

23   Q.   Does that not suggest that you didn't have

24   them for all?

25   A.   For all, correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Okay.

2        A.   That is correct.  They were working on it.

3    It was a very tedious time-consuming process, I

4    know.  They asked our assistance with it.  We

5    were -- we were getting them in the door as we could

6    and I just wanted an update.

7        Q.   Now, can you -- the next bullet point, can

8    you read that into the record?

9        A.   Where it starts, the risks?

10       Q.   Yes.

11       A.   Okay.  The risks -- the risks associated

12   with sending in a request for an increase -- oh,

13   that was one of the topics.  I've just recently sent

14   the sales manager some information based on some

15   things I've seen occur when dispensing data is
```

████  ██████████   ████████████████████████

████  ████████████████████████████████████████

████  ████████████████████████████████

████     ██    ██████████████████████████

████  ████████████████████████████████

████  ████████████████████████████████

████  ████████████████████████████████████

████   ██████

```
24            MS. KOSKI:  Object to form.

25       A.   No, the topic that I asked for here was to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    talk with the sales managers, because this was a

 2    recommendation that we meet with the sales managers

 3    to kind of do, a kind of, a midyear update.  And I

 4    just wanted to talk frankly with them about, you

 5    know, we were getting dispense data, we're seeing

 6    the whole nuts and bolts of what they are ordering

 7    across the board, not just from us, but from

 8    everyone.  So when that happens, we will likely --
```

███  █████████████████████████████████████

███  ████████████████████  █████████████████

███  ████  █████████████████████████████

```
12         Q.   Reality being not only were they getting

13    from you they were getting from all these other

14    places?

15         A.   That's correct.

16         Q.   They were purchasing from various sources?

17         A.   And until we saw the dispense data sometimes

18    we didn't know that.  We didn't see the aggregate

19    amount of everything that they were purchasing and

20    sometimes it was eye-opening.

21         Q.   What is your understanding of, if you have

22    any, of when you were required to get dispense data

23    from customers for controlled substances?

24         A.   Whenever compliance asked us to.  Most of

25    the time that would come when we were being -- sales
```

1    reps were submitting what's called an opportunity or

2    that's a work order through a system called Remedy,

3    we talked about Remedy a little bit earlier.  One of

4    the functions in Remedy gave the sales reps an

5    opportunity to submit to compliance a request for an

6    increase, or for a family that they were not

7    currently purchasing.  That Remedy opportunity went

8    to the sales manager to ensure that it was being

9    completed correctly before it went to compliance.

10   So the sales manager would review it, make sure the

11   dispense data was there.  If it was being requested,

12   or that the questionnaire was there, and then send

13   that on to compliance.  Compliance would then review

14   it, they get back to us and send the opportunity

15   back to the manager and to the sales rep and say

16   either it was approved, declined or we need more

17   information, please get us dispense data.

18       Q.   Do you know whether compliance was able to

19   get from IMS that dispense data on the particular

20   customers?

21            MS. KOSKI:  Object to form.

22       A.   I do not know.

23            (Anda-Williams Exhibit 21 was marked for

24   identification.)

25   BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  So what's marked as Exhibit 21 is
 2   stamped 109644 and it's an e-mail from Alex Romero
 3   to Vickie Shalley and then Vickie Shalley to Patrick
 4   Cochrane, Jay Spellman and copied to you and then
 5   response from Jay Spellman dated September 1st,
 6   2010.  And the topic was a particular account number
 7   206671.
 8        Is that right?
 9        A.   Correct.
10        Q.   Okay.  And do you see that Alex Romero
```

██ ███████████████████████████████     ███████████████████████

██ ██████████████████████████████████     ████████████

██ ████████████████████████████████████████

██ ████████████████████████████████████████

██ ████████████   ██████████████████████████████

██ ██████████████

```
17        Do you see that?
18        A.   Uh-huh.
19        Q.   So that's a big decrease from 5,000 to
20   1,000?
21        A.   Correct.
22        Q.   But this was a new account that was with you
23   for only three months but their starting number was
24   5,000; is that right?
25        A.   Correct.  That's the way it appears.
```

```
 1        Q.   That's a high number for a new account,

 2   isn't it?

 3        A.   There were set limits that were given and to

 4   be honest, I don't know -- I don't recall what the

 5   set limits were for new accounts.  And this was only

 6   opened September -- July, August -- this was only

 7   opened -- this was like a six-week old account.

 8        Q.   Which started at 5,000 got ratcheted down to

 9   1,000?

10        A.   Correct.  I have no idea -- no context here.

11   I have no idea why that change would have been made

12   or who would have requested --

13        Q.   Trigger --

14        A.   Something triggered it, something triggered

15   it and the only ones that would have had the ability

16   to reduce those at that time would have been a

17   member of the compliance team, and then Jay did have

18   access to -- I don't know why he was copied on this,

19   I don't really recall because Patrick -- Jay

20   reported to Patrick, and -- oh, you know what.  I

21   believe that Mike was on leave of absence.  I

22   remember he was on a leave of absence and for a

23   short time we were asked to send some things to

24   Patrick because Robert Brown was not yet on board.

25        Q.   So Mike -- we're talking about Mike
```

1    Cochrane?

2        A.    Correct.

3        Q.    He was on a leave of absence so things were

4    going to his brother, Patrick Cochrane?

5        A.    That's correct.

6        Q.    Okay.

7        A.    Yeah, right.  And I think Jay was kind of

8    set up as an interim, from what I can remember, just

9    to kind of take a look at -- help us out.

10       Q.    Vickie Shalley wrote to Patrick Cochrane and

11   Jay Spellman and copied you saying:  "Could you

12   please take a look at this account for Soma and

13   hydrocodone."

14             Right?  And Soma is --

15       A.    Soma is a control but I don't recall what C

16   level it is.

17       Q.    And you know that hydrocodone obviously --

18       A.    Hydrocodone is a CII but the Soma, I

19   believe, is a lower -- is a higher control number.

20       Q.    And you wrote back and why don't you read

21   for the record what you stated?

22       A.    Yes.  If they were just opened at the end of

23   July, I am surprised that they have the ability to

24   order controls at all.  I say leave it as it is,

25   it's way too early to consider any increases at

 1    all."

 2         And that's based on the protocol we were

 3    following at the time, where most new accounts did

 4    not get control limits turned on until we had a

 5    history.

 6    Q.   But this one did?

 7    A.   But this one did, but I don't recall if it

 8    was a brand new pharmacy or it was just a new

 9    pharmacy to us.

10    Q.   Do you remember as a result of discovering

11    that this new customer got such a high amount so

12    quickly, whether that triggered any further

13    scrutiny?

14    A.   I don't recall.

15    Q.   And do you know whether this was reported to

16    the DEA as a suspicious order?

17    A.   I do not know.

18         (Anda-Williams Exhibit 22 was marked for

19    identification.)

20    BY MS. RELKIN:

21    Q.   It's a little one.  Exhibit 22 is number

22    72179, and do you see that this is an e-mail from

23    you to Emily Schultz and Michael Cochrane on

24    March 8th, 2011?

25    A.   (Nodding head.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Yes?

 2      A.   Uh-huh.  Yes.

 3      Q.   And what did you indicate?

 4      A.   One of our sales reps, Maria Arango, felt

 5    that the limit on the oxy may be set too high.  I

 6    don't recall what the limit was but we were -- asked
```

███    ███████████████████████████████████

███    ████████████████████████████████████████

███    ████████████████████████████████████████████

███    █████████████████████████████

```
11      Q.   Okay.  You added some additional

12    information.  Why don't you just read what the --

13      A.   Okay.  "The Sales Rep (Maria Arango) on this

14    account feels that the limit on the oxy may be set

15    too high.  Can we --"

16           MS. KOSKI:  Slow down a little bit for the

17      reporter.

18           THE COURT REPORTER:  Thank you.

19           THE WITNESS:  So sorry.

20           MS. KOSKI:  Her fingers are smoking over

21      there.

22      A.   All right.

23           THE WITNESS:  Do you want me to repeat it

24      back?

25           THE COURT REPORTER:  Please.
```

1      A.    "The Sales Rep (Maria Arango) on this

2    account feels that the limit on the oxy may be set

3    too high.  Can we reduce this limit to 1000?  Looks

4    like they were purchasing a lot of oxy back in

5    May/June of 2010 and we don't want to open us up for

6    any issues."

7      Q.   All right.  What did you mean there, we

8    don't want to open this up for any issues?

9      A.   Any reason why anything should look -- any

10   suspicious orders or if the customer would order

11   more.

12     Q.   So the --

13     A.   It's based -- based on the history of the --

██     ████████████████████████████████████████████████

██     ████████████████████████████████████████████████

16   that limit was.  I don't recall.

17     Q.   So this was just a limit, not what they were

18   purchasing?

19     A.   That's correct, it's just the limit.  Yeah,

20   we're not saying that they were actually taking

21   advantage of it or actually purchasing it, it's just

22   what the limit was set at.

23     Q.   Do you recall having any discussions with

24   Maria Arango about what triggered her concern why

25   this should be reduced?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I don't.  I'm not saying I didn't but I

2   don't recall.

3             (Anda-Williams Exhibit 23 was marked for

4   identification.)

5        MS. RELKIN:  This is one of these horizontal

6        ones.  This is one that didn't have a Bates

7        number, so we have a cover page up front.  The

8        cover page was --

9        MS. KOSKI:  Produced in native or something?

10       MS. RELKIN:  Yeah, I guess that must be the

11       reason, or it looks like actually the original,

12       it looks like it was slightly cut off on the

13       bottom, if that's how the document was as

14       produced.  So the document number is 554323 and

15       this is Exhibit 23.

16  BY MS. RELKIN:

17       Q.   And do you see, Ms. Williams, this is an

18  e-mail from you on July 22nd, 2014 to Sabrina Solis,

19  Brian Witte, Dominic Floro and James Gatto copied to

20  a number of others from compliance on:  Status

21  Update Collect Dispensing Data - Shared Accounts

22  Buying Groups.

23            And if you can just explain what a buying

24  group is?

25       A.   A buying group was a group of pharmacies
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that paid a fee to a -- what's called a group

 2    purchasing organization to negotiate the best deals

 3    for them on pharmacy and pharmaceutical pricing.

 4    There were a number of those that were all managed

 5    by a national account manager, such as the Epic

 6    group, such as the IPA group, such as the KPPA

 7    group, those are just a few, and they were a

 8    consortium of pharmacies in a specific region.

 9         The national account manager would determine

10    what kind of calling needs that group of pharmacies

11    would require, and they were called a shared account

12    if they were brought to the floor, my sales floor or

13    Dominic's sales floor up in New York, and asked to

14    make calls to those customers.  So we developed a

15    relationship, our sales reps developed relationships

16    with those pharmacies at the request of the national

17    account team.

18    Q.   You used the term "calling need."  What does

19    that mean?

20    A.   Calling needs?  What their calling needs

21    were, meaning the Epic group or the KPPA group, the

22    management team of that group would meet with our

23    national account team and they would say, do you

24    want your pharmacies called?  How often do you want

25    them called?  Do you want them called once a day?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Called on the phone?

2       A.   Called on the phone.  Do you want them

3   called three times a week?  Do you want them called

4   twice a month?  Those guidelines is what national

5   accounts would then relay to the sales reps who were

6   part of that team.

7       Q.   So even though it was one overarching buying

8   group that negotiated the prices, Anda still had

9   individual contacts with those specific pharmacies

10  that were members of the buying group; is that

11  right?

12      A.   That's correct.

13      Q.   So your -- their needs were specific to

14  them?

15      A.   Correct.

16      Q.   It was just negotiated price?

17      A.   Correct.

18      Q.   And, therefore, did you need the same

19  documentation from them, questionnaires specific to

20  the pharmacy and dispensing data?

21      A.   Correct, and that's what they were asking

22  for our assistance on.  It said they did not have

23  dispensing data on file for these 200 some

24  locations.

25      Q.   Let's go to that other page.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.   Okay.

2      Q.   So this is Sabrina Solis?

3      A.   Uh-huh.

4      Q.   Is that right?

5      A.   Uh-huh.

6      Q.   And she's writing to you and to the others.

7      A.    Mm-hmm.  To Brian, to me, to my counterpart

8    in New York, that was Dominic Floro, and James Gatto

9    was in the Andanet department up in New York.

10     Q.   So she says that:  "The customers attached

11   are shared accounts; we do not have dispensing data

12   on file for these locations."

13     A.   Correct.

14     Q.   So they didn't know how much controlled

15   substances these perspective pharmacies had

16   received?

17     A.   Correct.

18     Q.   Had used in the past?

19     A.   Correct.

20     Q.   "Compliance has never attempted to collect

21   data from these locations since there is a business

22   type over each of these accounts."

23          So what does that mean?

24     A.   That means that the national account team

25   had a business type, meaning that that -- that group
```

Highly Confidential - Subject to Further Confidentiality Review

1    of accounts all fell under the national account

2    manager, and it was normally the national account

3    manager that would initiate the request for these

4    things.

5        Q.   So compliance never did, it was supposed to

6    be national accounts?

7        A.   Correct.

8        Q.   And then in the next bullet point is:  "Over

9    the last couple of weeks we met directly with the

10   national accounts team and we were advised that it's

11   best for the sales reps to collect data from these

12   customers."

13           Is that right?

14       A.   Correct.

15       Q.   And then:  "All of these accounts are

16   affiliated with a buying group."

17           So it would appear that the data had never

18   been collected from national accounts or in any

19   other way, which then triggered this request?

20       A.   That is correct.

21       Q.   To you?

22       A.   That is correct.  They had -- they had

23   customer questionnaires, they just didn't have the

24   dispense data.

25       Q.   And then in double asterisks and bigger font

```
 1    it says:  "We hope to collect dispensing data from

 2    these customers before July 15th in order to avoid

 3    disruption to control eligibility."

 4        A.    Uh-huh.

 5        Q.    So do you know whether these pharmacies in

 6    this buying group had indeed been receiving

 7    controlled substances without the dispensing data on

 8    file?

 9        A.    How many of them were actually buying

10    controls, I cannot say.  She did not include that

11    level of detail in the report.

12        Q.    So it's fair to say, this is an example

13    where something slipped through the cracks, that the

14    requisite documentation of the history of how much

15    controlled substances that were used by these

16    various pharmacies in this pharmacy group was not in

17    the possession of Anda yet they were approved for

18    controls?

19            MS. KOSKI:  Object to form.  You can answer.

20            THE WITNESS:  I can answer?

21            MS. KOSKI:  Yeah.

22        A.    It would appear that the data was missing.

23    They wanted our help in helping to collect it.  What

24    the reasons were for that missing data, I can't -- I

25    can't speak to.
```

```
 1      Q.   But these were not new customers, this was

 2   not a question of turning on a control?

 3      A.   That's right.

 4      Q.   This was a control that already was on?

 5      A.   Correct.

 6      Q.   Without the requisite documentation?

 7      A.   Correct.

 8           MS. KOSKI:  Object to form.

 9      A.   Correct, but the questionnaire was there but

10   not the dispensing data.

11           (Anda-Williams Exhibit 24 was marked for

12   identification.)

13   BY MS. RELKIN:

14      Q.   Next document.  I've marked as Exhibit 24 a

15   document stamped 708146.

16           MS. KOSKI:  This seems to be a long one, if

17      you need a second.

18      A.   Yeah, it's tied to the one -- the e-mail

19   before.

20      Q.   Right.

21           MS. KOSKI:  I just said it was a long

22      e-mail, if she needs to look at it, it's got a

23      lot of pages.

24      Q.   Oh okay.  That's why I presented it as the

25   next exhibit.  So the prior e-mail was July 22nd.
```

1   Fast-forward a few weeks, about three weeks, and

2   we're on August 14th.

3       A.   Correct.

4       Q.   And go to the first part of -- first e-mail

5   in the chain starts on page 2, and it's an e-mail

6   from Latoya Samuels to Al Paonessa, he's the

7   president, right?

8       A.   (Nodding head.)

9       Q.   And a number of other individuals in

10  compliance and management and yourself; is that

11  right?

12      A.   Correct.

13      Q.   Regarding Epic and IPA New Jersey, required

14  information, do you see it indicates that:  "The

15  attached report contains a list of active accounts

16  with the Epic and IPA NJ buying groups without a

17  questionnaire and/or dispensed data on file.  Many

18  accounts within the group purchase a high volume of

19  controls.  It is important for us to receive this

20  information to determine control eligibility as we

21  are required by the DEA to 'know our customers.'"

22          By the way, does that refresh your

23  recollection that the "knowing your customers" was a

24  DEA requirement?

25          MS. KOSKI:  Object to form.  You're asking

```
 1      for a legal conclusion.  She's not required to

 2      answer questions about a legal conclusion.

 3      Q.   Does -- did --

 4           MS. KOSKI:  You can ask her if that's what

 5      it says.

 6      Q.   Did your DEA compliance analyst, Latoya

 7  Samuels, in the ordinary course of business in an

 8  e-mail to you, indicate that it was required by the

 9  DEA to know our customers?

10      A.   Yes.

11      Q.   And then Ms. Samuels indicates:  "We have

12  been in communication with the NAMs for quite some

13  time, and they are well-informed regarding the

14  requirements and the current status.  They've been

15  working diligently with corporate and our sales team

16  to communicate this information to the customers."

17           And then deadlines were set, right, July

18  31st for Epic?

19      A.   (Nodding head.)

20      Q.   And do you see she indicates:  "We have made

21  numerous attempts to obtain this information over

22  the past year and to ensure we are in compliance

23  with guidelines set forth.  It is imperative for us

24  to review the information."

25           And then next bullet point, she goes on to
```

```
 1    say:  "With regard to IPA New Jersey, this is a

 2    larger group, and as a result, there are more

 3    accounts impacted.  While our goal still remains to

 4    have the questionnaire and/or dispensed data

 5    submitted for review, we will continue to work

 6    collaboratively with Rachelle to finalize these

 7    deadlines for these accounts to submit this

 8    information based on sales volume, sporadic sales

 9    trends, et cetera."

10          So with regard to Epic, it's more than a

11    year that this was an ongoing customer receiving

12    product, but the information required for compliance

13    was not yet available; is that right?

14       A.   Can I just say something here?  When these

15    accounts were first established and they were turned

16    on for controls, there was at that point some kind

17    of customer questionnaire that was completed.

18          Then that customer questionnaire was

19    revamped, enlarged upon, and I -- I remember that we

20    were asked to get the new questionnaire.  Now,

21    that's what I recall our mission on this being, is

22    that they wanted the new -- the updated one to come

23    in, not whether --

24       Q.   And the dispensing data, as well?

25       A.   And the dispensing data, correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   The dispensing data tells how many other

 2   opioids they have purchased and dispensed?

 3      A.   Correct.

 4      Q.   Not just from you, but from all the other

 5   suppliers?

 6      A.   Correct.  What documentation was in place

 7   for these accounts prior to that on the compliance,

 8   I have -- I have no knowledge of.

 9      Q.   But it -- they were nudging and nudging Epic

10   for a year?

11      A.   That's the way it sounds, yes.

12      Q.   But they didn't have it all yet?

13           MS. KOSKI:  I'm not objecting to your

14      nudging --

15      A.   I remember that.  I remember they were after

16   Epic all the time, and they --

17           MS. KOSKI:  Ah-ah, wait for a question.

18           THE WITNESS:  Okay.  Sorry.

19      Q.   How many pharmacies did Epic encompass?

20      A.   Oh, goodness.  I don't know the exact

21   number, but it was several hundred.

22      Q.   And --

23      A.   And it could -- it could have even been

24   closer to 6, 700 maybe.  It was a very, very large

25   group.
```

```
1       Q.   And you may have told me this, but where

2   were the pharmacies?

3       A.   Everywhere.  There were -- an opportunity

4   for somebody to be an Epic member no matter where

5   the pharmacy was.  There were some more

6   regionalized.  Like, KPPA was the Keystone something

7   of Pennsylvania, Keystone -- Keystone Consortium of

8   Pennsylvania or something of that nature.  IPA was

9   New Jersey, in and around New Jersey.

10      Q.   Okay.  And then Brian Witte writes --

11           MS. KOSKI:  That is the same document?

12           MS. RELKIN:  Yeah.

13      Q.   -- later that day, 7:18, saying:  "There is

14  another list being e-mailed around.  I assume I have

15  not responded or are on that other file?  Or is an

16  additional list of accounts we need data on?"

17           And then Robert Brown, director of

18  compliance, what does he state?

19      A.   He stated:  "The other list contains the

20  customers that we identified in June as not

21  submitting questionnaires and for whom we would give

22  until July 31st to provide that item.  This list is

23  only Epic and IPA New Jersey with whom we have been

24  working for quite some time to obtain both

25  questionnaires and dispense data which we have not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    received and for whom we gave until July 31st to

 2    submit."

 3        Q.   So for some of these, it was both

 4    questionnaires and dispense data that had not been

 5    provided yet?

 6        A.   (Nodding head.)

 7        Q.   Is that right?

 8        A.   Correct.

 9        Q.   And some of them had not provided

10    questionnaires at all, or at least the new ones?

11        A.   Correct.

12        Q.   Then if you go to the next page, this is the

13    next day, July 30th, Brian Witte writes to Robert

14    Brown first thing in the morning, 8:55, and he

15    states:  "Is there a complete list of all the

16    accounts getting shut off tomorrow?"

17             And are you on that?  You are.

18             And then what do we have?  We have Sabrina

19    Solis responding on August 2nd, a couple of days

20    later, and what does she state?

21        A.   She said:  "Please be advised the control

22    flag was flipped to 'N'" -- in quotes -- "for the

23    accounts attached.  We do not have any

24    questionnaires that have been -- that have not been

25    notated in TPS at this point, so everything received
```

```
1    is now in the system.  Please note that all Epic

2    accounts were given until August 14th to provide the

3    required data to us.  Over 60 accounts provided a

4    questionnaire to us in the last couple of days, so

5    they were not affected."

6        Q.   And when it's flipped to N, that means "no"?

7        A.   No.

8        Q.   So that means they can't get controls?

9        A.   No controls.

10       Q.   Because the system is shutting them down?

11       A.   Correct.

12       Q.   That's a shutdown, right?

13       A.   They can still purchase other generics,

14   no -- just no controls.

15       Q.   And then you respond on August 14th, so

16   that's almost two weeks later.  And what do you

17   indicate?

18       A.   I was sending an update to Brian, to

19   Dominic, and to Anita:  "Just got off the phone with

20   Robert to get a quick update on where we stand on

21   the accounts being shut off from control purchasing.

22   The attached list of 223 accounts were the ones that

23   were turned off last week.  Epic accounts are

24   scheduled to be cut off today.  Robert will be going

25   through the accounts impacted with Ryan.  IPA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    accounts shut off will be done in waves starting

 2    with the first group tomorrow, August the 15th.  And

 3    he is working directly with Rachelle.  We are

 4    starting to see some impact of these from last week.

 5    There have been a few accounts that have commented

 6    that they will stop ordering from us due to their

 7    controls being shut off, but so far they have also

 8    been unwilling to supply the required documents.

 9    Robert has seen an influx of dispense data,

10    questionnaires coming in the last few days,

11    primarily from the Epic accounts.  He mentioned that

12    some of them looked pretty bad, so more than likely

13    will not be opened up for controls."

14         Q.   This was a notable situation, was it not?

15         A.   (Nodding head.)

16         Q.   Hundreds of pharmacies got shut down from

17    being able to get controls because of the either

18    lack of paperwork or the paperwork they did provide

19    which looked pretty bad; is that correct?

20         A.   That is correct.

21         Q.   What happened after that?

22         A.   What happened after that, I recall was they

23    proceeded with shutting them down.  And they would

24    give them due dates, and if they didn't meet the due

25    dates, the account flag was moved to "N."  And no
```

```
 1    controls were able to be purchased until these

 2    documents were provided and reviewed by the

 3    compliance team.

 4        Q.   Was there any contact with the overarcher --

 5    overarching Epic and IPA buying group, whoever was

 6    in charge of that?

 7        A.   That was done at the national account level.

 8    That was not up to the sales group to do.  I would

 9    assume there were a lot of discussions that were

10    going on at that time.

11        Q.   Did you come to learn whether you did, in

12    fact, lose a substantial generic business for

13    noncontrolled substances as a result of the cutoff?

14        A.   We did.  They were measuring those results

15    for some time.  I remember seeing a few reports.  I

16    can't remember the numbers.  Some customers

17    eventually came back to us on the generic side.

18    Others we just lost.

19        Q.   Do you know whether any of these 223

20    accounts that were shut off the week before August

21    14th, whether any of them were reported to the DEA?

22        A.   I do not know.

23        Q.   And do you know whether the Epic accounts

24    which were scheduled to be cut off on August 14th

25    were reported to the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.   I do not know.

2      Q.   Do you know whether the DEA was ever

3    informed by anyone from Anda that the dispensing

4    data questionnaires for a number of them looked

5    pretty bad?

6      A.   I do not know.

7           (Anda-Williams Exhibit 25 was marked for

8    identification.)

9    BY MS. RELKIN:

10          MS. RELKIN:  You'll get -- yeah.

11          MS. KOSKI:  This is a long one to read.

12   BY MS. RELKIN:

13     Q.   I've marked as Exhibit 25 document number

14   607225, and it's a two-page document, goes to page

15   226.

16          We can start with the first of the chain

17   e-mail, which is from Sabrina Solis, 2/19/2013, to

18   you and a number of your colleagues.  And the

19   subject is:  "Customer questionnaire meeting,

20   follow-up info."

21          And do you see that Ms. Solace says:

22   "Attached you will find two reports as requested,

23   monthly controls sales dollar breakdown to identify

24   ██████████████████████████████████████

25   manager/rep assigned to account and the deadlines
```

1    assigned to each account based on control purchasing

2    volume."

3         And then she mentions that:  "Deadlines as

4    outlined in meeting."  And there was a deadline of

5    July 15th for cutoff date for lower volume accounts

6    and July 31st cutoff for higher volume accounts.

7         Do you have any recollection of this

8    meeting?

9    A.    Vaguely.

10   Q.    Robert Brown on July 18th writes to you and

11   a number of your colleagues about this, and what do

12   you see that he indicates?

13   A.    He indicates:  "Per our discussion and

14   agreement on June 19th and the attached e-mail,

15   customers who have not provided a Customer

16   Questionnaire will not be permitted to continue to

17   purchase controls.  Those customers who have a

18   history of lower purchase of those items were

19   removed from control eligibility earlier this week.

20   Those customers who have a higher volume of control

21   purchases will not be eligible to continue those

22   purchases after July 31st if a questionnaire is not

23   received.  We want to be sure that all of the sales

24   representatives are notifying their customers of

25   this date so that we can obtain the necessary

1   information and not disrupt buying pattern.  We have

2   heard from several sales representatives that they

3   were unaware of the July 15th cutoff date, and we

4   want to be sure that the customers have ample time

5   to provide the necessary information.  As you know,

6   our customers have been asked to supply this data

7   for the past three years and have received multiple

8   reminders during that period."

9        Do you want me to continue reading?

10   Q.   No.  That's -- that's fine.

11   A.   Okay.

12   Q.   So with regard to the last sentence, "As you

13   know, our customers are been asked to supply this

14   data for the past three years and have received

15   multiple reminders during this period," you were

16   aware of that?

17   A.   There were a number of initiatives to try to

18   get this information from the customers, yes.

19   Q.   And initiatives included compliance

20   enlisting your department to work on it?

21   A.   The national accounts -- I mean, it was a

22   companywide effort to get this data in.

23   Q.   And why was it so hard -- do you have any

24   understanding why it was so hard to get this data

25   from the customers?

1          MS. KOSKI:  Object to form.

2          Go ahead.  I'll let you know.  Otherwise,

3      it's just for the record.

4      A.   We -- what we heard from our customers was

5      that Anda was being ultraconservative, that they

6      weren't being asked to provide this data to anyone

7      else, including their primary.  So if the primary

8      wasn't being asked for it, why, as a secondary,

9      small distributor, was Anda taking the position of

10     requiring all this information for them to purchase

11     controls.

12          We heard this time and again.  I heard it

13     personally with a number of call escalations that I

14     handled.  So there was a reluctance on the part of

15     the pharmacy staff to provide this data to us.

16     Q.   In the meantime, these pharmacies were

17     receiving controlled substances, correct?

18     A.   Correct.

19          MS. KOSKI:  Object to the form.

20     Q.   Did they receive letters by certified mail

21     or Federal Express pressing the urgency of these

22     demands?

23     A.   I remember that there were waves -- like we

24     talked about, waves of communications going out to

25     these customers.  How they were sent, I can't speak

1    to, because that was done by the marketing

2    department in a mass mailing initiative on numerous

3    occasions.

4        Q.   Were there discussions within your

5    department or between your department and compliance

6    or marketing that maybe these customers were suspect

7    because why aren't they giving us this basic data?

8        MS. KOSKI:  Object to the form.

9        A.   I don't recall that that particular

10   discussion happened, just that we were relaying to

11   compliance what we were hearing from our customers

12   as to the reason they weren't supplying them.  They

13   weren't being required to do this anywhere else.

14   That's what they were telling us.

15       Robert informed us that that was not quite

16   the case, that after Anda started this protocol,

17   more and more of the smaller secondaries started

18   doing it, as well.

19       He had copies of questionnaires that he was

20   starting to start seeing from other smaller

21   distributors such as -- such as Anda.  So we knew

22   that the ball was catching fire, that it was

23   starting to become a regular thing.  I believe in my

24   heart of hearts that Anda was one of the first to do

25   it, if not the first, to start that process.

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.   And how did -- how did Robert Brown know
2    about other secondary distributors starting to adopt
3    these questionnaires, as well?
4         A.   Because he was in --
5              MS. KOSKI:  Object to form.
6              THE WITNESS:  Oh, sorry.
7              MS. KOSKI:  Go ahead.
8         A.   He mentioned to me on maybe twice, two other
9    occasions, that he sat in on meetings with other
10   groups.  There were conference calls that were held
11   for -- I -- I believe they were connected by the DEA
12   that would help to educate the distributors on
13   protocols and what was happening in the industry.
14   And they were taking that information and all
15   learning from it.
16        Q.   And were there meetings without the DEA, but
17   just with distributors, discussing what was going on
18   in the industry and best practices?
19        A.   There may have been.  I don't know for sure.
20        Q.   And do you know for sure that the meetings
21   that Robert Brown sat in on with these other
22   distributors and secondary distributors were --
23   involved the DEA?
24        A.   I --
25             MS. KOSKI:  Object to form.
```

1    A.   I can't say for sure.  The way he positioned

2    it with me was that there -- that he was privy to

3    information that was happening across the industry.

4    Q.   Do you know how many customers at this point

5    fell into this category of missing the

6    questionnaires and dispensing data?

7    A.   The exact number, I can't recall.  I

8    remember that we were seeing new numbers every week

9    as things were changing.  It was a very fluid

10   number.  So there were ones that were turned off,

11   and then they would create and bring their dispense

12   data in.  They would get turned back on if they were

13   deemed to be approved by compliance.  So it was an

14   ever-changing number.

15   Q.   The number was in the hundreds, though; is

16   that right?

17   A.   I believe so.

18        (Anda-Williams Exhibit 26 was marked for

19   identification.)

20   BY MS. RELKIN:

21   Q.   We've marked as Exhibit 26 a document number

22   109496.  And this is an e-mail from Jay Spellman on

23   September 13th, 2010 -- we're going back in time a

24   little bit -- to a number of Anda individuals,

25   managers, including yourself.  And the subject is:

Highly Confidential - Subject to Further Confidentiality Review

1     "Control limit review for account number 477706."

2          And do you see that Don Moore -- who is Don

3     Moore, by the way?

4     A.   He was one of my sales managers.

5     Q.   Okay.  He sends an e-mail to Patrick

6     Cochrane, Jay Spellman, and you, saying a customer

7     is being allowed to purchase 1,000 oxys, correct?

8     A.   Correct.

9     Q.   He indicated:  "I have a question about

10    47706, Sunset Prescription Pharmacy.  When the whole

11    CII issue started, he was cleared to buy CIIs, and

12    he bought CIIs all last month.  Now, all the sudden

20          Do you recall this particular event?

21    A.   Via this e-mail, yes.

22    Q.   Okay.  And --

23    A.   Refreshed my memory.

24    Q.   Jay Spellman says:  "I see his DEA is valid

25    and schedules are loaded, including CIIs.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1     think we should be increasing a new customer's oxy

2     limit at this time."

3          But do you see what this does mean is that

4     he was indeed approved and was receiving oxy and

5     just very quickly was looking for more, which was --

6     the more was denied?

7          MS. KOSKI:  Object to form; mischaracterizes

8        the document.

9          You can answer.

10    A.   I'm sorry.  What's the question?

11    Q.   That was probably poorly worded.  It's

12    getting late.

13         We know that Jay Spellman denied his

14    request --

15    A.   Correct.

16    Q.   -- to increase it?

17    A.   Correct.

18    Q.   Okay.

19         MS. KOSKI:  Object to the form.

20    Q.   But you also see from this document that

21    this very new customer, who had only started in

22    July, was already buying -- cleared to buy CIIs, and

23    he bought CIIs in the month of August?

24    A.   Uh-huh.

25    Q.   Is that a "yes"?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And remember kind of the beginning of this

3    deposition, I believe you testified to the effect

4    that new customers would not get controlled

5    substances, CIIs, right away.  Usually there was a

6    90-day waiting period.  Is that right?

7    A.    That was the general practice, yes.

8    Q.    So -- but this particular example is not

9    consistent with that?

10   A.    That is correct.

11   Q.    Do you recall having any meetings to try to

12   ascertain why this -- this customer, Sunset

13   Prescription Pharmacy, got oxy so quickly?

14        MS. KOSKI:  Object to form; mischaracterizes

15   the document.

16   A.    I don't recall.  There were a lot of

17   discussions going on with compliance, a lot of

18   information being shared, but I can't remember a

19   specific meeting about this specific customer.

20   Q.    And it could well be that this was not an

21   aberration; that customers did get cleared and

22   started getting it?

23   A.    It -- it's possible.  Maybe there was

24   something that was produced at the time when the

25   account was opened.  I don't know.  Maybe there was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a list of products that they had submitted as a type

 2    of a dispense data at that time.  I don't know.

 3    They -- the e-mail doesn't elaborate on that.

 4        Q.   You doing okay?

 5        A.   I'm doing just great.

 6             (Anda-Williams Exhibit 27 was marked for

 7    identification.)

 8    BY MS. RELKIN:

 9        Q.   I'm showing you what we marked as

10    Exhibit 27.  It's stamped 287484 through 485, and

11    the very top of the e-mail is from Jay Spellman to

12    Patrick Cochrane -- Cochrane, you, Michael Cochrane,

13    and Tim -- Kim Poropat.  And the subject is:

14    "Johnson Family Pharmacy LLC."

15             MS. RELKIN:  Okay.  I need a different

16        document.

17             MS. LUND:  The exhibit we have doesn't match

18        the Bates number you just read.

19             MS. RELKIN:  Yeah, yeah, yeah, yeah.  I

20        think I stamped -- what number do you have?

21             MS. KOSKI:  3889.

22             MS. RELKIN:  Do you all have 3889?

23             MS. LUND:  Uh-huh.

24             MS. RELKIN:  Okay.  And that's what -- what

25        I'm looking at doesn't -- that was just a goof.
```

```
 1      Thank you.

 2           For the record, what was marked 7484 is not

 3      the exhibit.  I apologize.

 4   BY MS. RELKIN:

 5      Q.   Ms. Williams, you have the 3889?

 6      A.   Yes.

 7      Q.   Okay.  Good.  That's the right one.

 8      A.   Okay.

 9      Q.   Okay.

10           MS. KOSKI:  So why don't you just redo that,

11      identify what Exhibit 27 is --

12           MS. RELKIN:  Yes.

13           MS. KOSKI:  -- on the record.

14           MS. RELKIN:  It looks like if I just change

15      it to my marked -- does anybody have an extra

16      copy that doesn't have my markings on it?

17           MS. LUND:  You can use mine.

18           MS. RELKIN:  Thank you.

19           (Anda-Williams Exhibit 27 was marked for

20   identification.)

21   BY MS. RELKIN:

22      Q.   So what we just marked as Exhibit 27 is, in

23   fact, the number 283889, and it's two pages, goes to

24   890.  And if we go to the beginning of the e-mail

25   chain, it's an e-mail from RemedySupport to Barry
```

1    Koran regarding Chestnut Aid Pharmacy.  And it says:

2    "Shipped to, over the limit, status closed," and

3    listed as importance, "high."

4           RemedySupport I assume is the computer

5    support from the Remedy Group?  You tell me.  Strike

6    it.

7           Who is RemedySupport?

8      A.   RemedySupport was an automatic e-mail system

9    that would notify the sales rep of anything relative

10   to the account.  If there was -- the CII group had

11   access to Remedy so that if there was a CSOS order

12   that was not able to be fulfilled for whatever

13   reason, through the automated system, they would

14   notify the sales rep.  And they would copy them on

15   that, and that's what you see there, that here's the

16   resolution.  I sent the order to the customer, but

17   only sent as much product as the limit would allow.

18     Q.   Okay.  So was the CII order -- order over

19   the limit?

20     A.   Correct.

21     Q.   And so does that mean that the customer got

22   some product, but only as much as the limit would

23   allow?

24     A.   Correct.

25     Q.   And then the status -- current status of the

Highly Confidential - Subject to Further Confidentiality Review

```
1    opportunity is closed, does that mean that the

2    customer is shut down for future shipment?

3        A.   No.  What that meant was that the customer

4    had reached their limit for that month.  And nothing

5    further was going to be sent out to them.

6        Q.   Are you familiar with the term kill --

7    "fill/kill"?

8        A.   Ung-ugh.

9        Q.   Huh.  Okay.  We heard about that from Vicki

10   Mangus.

11       A.   Fill/kill?

12       Q.   Fill/kill.

13       A.   Ung-ugh, no.

14            (Discussion off the record.)

15       A.   That might be a term that's used more on the

16   chain side, like the big chains, Walgreens and so

17   forth.

18            MS. KOSKI:  Don't guess.

19       A.   Yeah.  I don't know.

20       Q.   Did you have an understanding that when an

21   order exceeded limits, that it is permissible to

22   provide as much as was allowed under the limits and

23   just not send the remainder, as opposed to not

24   filling the complete order?

25       A.   I had seen this happen prior.  I can't
```

Highly Confidential - Subject to Further Confidentiality Review

1    remember the customer name, but I did hear this

2    happening before.  So I assume that this was the

3    protocol that was followed on CIIs.

4        Q.   But sitting here, do you know whether or not

5    that was the protocol, or the desired protocol, or

6    whether this was an aberration?

7        A.   No.  That -- they would send up to the limit

8    and then notify the sales rep accordingly.

9        Q.   And would they -- would they also notify the

10   DEA?

11       A.   I don't know what their protocol was.  That

12   was done -- the -- these folks were in the

13   warehouse.  They were not sitting on the sales

14   floor, and these were -- at this particular time,

15   most of the controls were being shipped out of the

16   Ohio warehouse, so these folks weren't even sitting

17   in -- anywhere near us.

18       Q.   Okay.  So let's look at the e-mail chain,

19   then, after -- now that we're done with the robot

20   e-mail --

21       A.   Uh-huh.

22       Q.   -- we have the human e-mail, and we have

23   Barry Koran writing to Vickie Shalley --

24       A.   Uh-huh.

25       Q.   -- on September 24th.  And he indicates that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    he:  "Just got off the phone with Pat Burke, owner

 2    of the above and two other Epic pharmacies.  Furious

 3    about the CSOS system not notifying him about items

 4    not being shipped.  Needed number 700398 right away.

 ▮    ████████████████████████████████████████████

 ▮    ██████████████████████████████████████████████

 ▮    ███████████████████████  ██████████████████████████

 ▮    █████████████████████████████████████████

 ▮    ████████████████  ████████████████████████████████

 ▮    ████████████████████████████████████████

 ▮    ██████████████████████████████████████

 ▮    ████████████████████████████████████████████████

 ▮    ██████████  ██████████████████████████████

14    him was being monitored by QA so company hears for

15    themselves.  I am trying to write this e-mail as

16    accurately as possible.  Please advise."

17          He signs "Lt. Barry Koran."  Was he a

18    lieutenant once?

19      A.   It was a nickname he gave himself.

20      Q.   Lieutenant?

21      A.   Lieutenant.  Lieutenant Koran.

22          MS. KOSKI:  Objection.  You can't give

23    yourself a nickname.  That's just not how it

24    works.

25      Q.   He had not actually served?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   No, not to my knowledge.

2       Q.   Why did he give himself that nickname?  Is

3   he -- what did he think he was?

4       A.   He thought he was all that.

5       Q.   Why didn't he go for general?

6       A.   It was kind of done in a -- in a fun way.

7       Q.   Then Vickie forwards this e-mail up the

8   chain to you --

9       A.   Uh-huh.

10      Q.   -- and to Patrick Cochrane, Jay Spellman,

11  and Michael Cochrane.  And then Vickie writes to Jay

12  Spellman, Patrick Cochrane, and Michael Cochrane:
```

1    that correct?

2          MS. KOSKI:  Object to form.

3     A.   Based on this e-mail, yes.

4     Q.   Was that the protocol to have questionnaires

5    and dispensing data before increasing limits?

6          MS. KOSKI:  Object to form.

7     A.   I don't know what his authority limit was.

8    Again, this appears to be the -- 2010.  I'm just

9    trying to think.  We were moving in that direction

10   and getting all of that information, the dispense

11   data and the questionnaires on limit requests, so

12   this was a variance to that.

13    Q.   Do you recall any discussions about this

14   event?

15    A.   I do not.

16    Q.   This was Epic, and we know that Epic had

17   their accounts shut down later from the documents.

18    A.   From the group, right.

19          MS. KOSKI:  Object to form.

20    Q.   Sitting here, do you know whether these

21   specific Epic pharmacies were part of that shutdown?

22          MS. KOSKI:  I'm sorry.  Are you talking

23      about the document we were just looking at?

24          MS. RELKIN:  The document we were looking at

25      refers to Chestnut Aid Pharmacy and two other

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Epic pharmacies.

 2           MS. KOSKI:  Got it.  My bad.  I couldn't

 3      tell if you were looking at something else.

 4           MS. RELKIN:  Sure.

 5           (Anda-Williams Exhibit 28 was marked for

 6      identification.)

 7      BY MS. RELKIN:

 8      Q.   Marked as Exhibit 28, a document stamped

 9      90024 through 25.  And the first page of the e-mail

10      is from Sabrina -- on the bottom, from Sabrina Solis

11      to you and Christine Leon-Laurent, copied to other

12      managers.  Who is Christine Leon-Laurent?

13      A.   She was in national accounts.  She was the

14      operations manager.

15      Q.   Is that probably the Christine who Vicki

16      Mangus was mentioning?

17      A.   She's now Christine Johnson.

18      Q.   But it's all one and the same Christine.

19      And the subject matter is:  "Customers not actively

20      purchasing controls, July 12 through January 13."

21           And do you see she indicates:  "Please

22      review the list of accounts attached that are not

23      actively purchasing controls.  We would appreciate

24      if you can approve this list by Thursday 2/14 so we

25      can proceed with removing controls.  Notate any
```

1      accounts where you would prefer controls to remain.

2           "Please note that some of these accounts

3      have been reviewed previously and left alone.

4      However, several of these accounts have not

5      purchased controls in a year or even two.  Remember,

6      if and when -- if when a customer needs controls

7      again, we can review as a new customer with the

8      required information.  Thanks."

9           Do you remember this -- this happening?

10     A.    Uh-huh.

11     Q.    And do you understand the rationale for why

12     they wanted to shut down controls that had not --

13     customers who had not been actively purchasing the

14     controlled substances?

15     A.    There was just no need.  They weren't -- the

16     customers were not buying them.  Why keep the flag

17     turned to "yes" when the customer had demonstrated

18     that there was no purchasing need on their part?  So

19     they moved them to "no," and we can always revisit

20     the issue if the request came up.

21     Q.    And then you responded, saying:  "I gave the

22     sales managers until today to respond back on any of

23     these customers that there could potentially be an

24     issue.  I confirmed there were no concerns with any

25     of these accounts being turned off from the sales

Highly Confidential - Subject to Further Confidentiality Review

```
 1    manager here in Weston."

 2          So this correspondence indicates that

 3    compliance was checking with sales, if it was okay

 4    with sales for the compliance unit to shut down

 5    controls on customers, correct?

 6      A.   What they were --

 7          MS. KOSKI:  Object to form.

 8          THE WITNESS:  Sorry.

 9      A.   What they were asking us to do was, before

10    they shut them off, were we aware of any situations

11    that maybe we were in the process of getting

12    dispense data in, were there any that were currently

13    being looked at, so that we didn't go through double

14    working, turn it off and then turn it back on.  And

15    we really didn't have any of those situations.  So I

16    gave the blessing to go ahead and shut them off.

17          We weren't losing anything.  We weren't

18    losing sales from it.  There was no loss to the

19    company, other than just removing any potential

20    liability.  And we still had the possibility of

21    turning it back on in the future if they provided

22    what they needed.

23          (Anda-Williams Exhibit 29 was marked for

24    identification.)

25          THE WITNESS:  Boy, we kill the trees, huh?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KOSKI:  It's double-sided.

 2            MS. RELKIN:  This one is a single, but we

 3      did mostly double.

 4            We've marked as Exhibit 27 document 711564,

 5      and this is a series of e-mails.

 6            MS. ROBINSON:  This should be 29.

 7            MS. RELKIN:  What did I say?

 8            MS. ROBINSON:  27.

 9            MS. RELKIN:  Thank you.  29.  Long day.  Bad

10      eyes.

11            MS. KOSKI:  Long e-mail.

12            MS. RELKIN:  Long e-mail.

13      BY MS. RELKIN:

14      Q.   So the second page in this document -- the

15      third page starts from the very beginning, the

16      bottom of the third page.  It is an e-mail from

17      Sabrina Solis in compliance to Valerie Nemia, copied

18      to Michael Cochrane and Emily Schultz on December

19      6th, 2011.  Subject matter is:  "Need info."

20            Who is Valerie?

21      A.   Valerie was one of the sales managers that

22      reported to me.

23      Q.   And she said:  Hi, Valerie.  We removed

24      controls from the account below due to the fact that

25      no dispensing data was provided for review.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Thanks."

2          And then there's a number of different

3    pharmacies.  Do you see that?  Independents?

4    A.    Uh-huh.

5    Q.    All right?  And you then -- you sent an

6    e-mail to Sabrina, Emily, and Cochrane, and what did

7    you indicate?

8    A.    I asked for their help.  I asked them to

9    copy me on communications such as this.  Do you want

10   me to read this verbatim?  Okay.

11   Q.    That's fine.  Sure.

12   A.    Sales managers had started receiving these,

13   and it was like they didn't know what was going on.

14   So they came to me, and I had not seen it either,

15   and I hadn't been copied on it, so I asked for their

16   help.

17   Q.    That's -- that's --

18   A.    I did ask the question that in the future,

19   could we consider giving these accounts a 24 to

20   48-hour window to get the dispensing data in before

21   they were shut off.

22   Q.    And then did Sabrina --

23   A.    And then Sabrina -- yeah.  Sabrina responds

24   that she would be sure to copy me going forward.

25   She apologized, and then she provided some

1    background on it.

2         Q.   Okay.  And the background was:  "Anda

3    received a list of accounts with questionable

4    oxycodone purchases.  We notified the managers

5    related to these accounts to collect updated

6    dispensing data for our review.  We indicated that

7    if information was not received, we would follow up

8    shortly.  One month was given to collect this

9    information.  And during this time, out of about 80

10   accounts, data was collected for only about 20.  Our

11   suspicions were accurate based on the information we

12   reviewed.

13        "We cut off the remaining 60 or so accounts

14   after a month.  Dispensing data is now being

15   provided for these accounts, and we are evaluating

16   their control status individually.  Once again, our

17   concerns have been validated with the new dispensing

18   data provided this week."

19        That was gloomy news, was it not?

20        A.   It was.

21        Q.   That only 20 out of 80 responded and the

22   data that they did receive was not good, correct?

23        A.   Correct.

24        Q.   And that would mean that -- not good would

25   suggest that they had dispensing history that was

1    troublesome with regard to the opioids, right?

2          MS. KOSKI:   Object to form.

3     A.    Correct.

4     Q.    Then you wrote an e-mail on the front page,

5    at 5:46 p.m., on December 9th, to Brian Witte, Anita

6    Isabella, and Dominic -- who is Anita Isabella?

7     A.    Anita was the head of our sales reporting

8    team, and we relied on their team to give us a lot

9    of the data, number crunching, accounts, dollars.

10    Q.    And you indicated that you:  "Met with all

11   the sales managers this afternoon.  And they did

12   receive a communication from Sabrina Solis on

13   November 1st requesting dispense data for the list

14   of accounts that were under review.  The e-mail did

15   not say they would be turned off, but the tone of

16   the e-mail was such that each of them knew that if

17   it was not received, there was a likelihood that

18   they would be."

19          So this was an issue of concern -- explain.

20    A.    This was just an issue that I didn't -- I

21   wasn't copied on those e-mails.

22    Q.    Right.

23    A.    So I didn't know what was going on.

24    Q.    Right.

25    A.    And then we're getting the notification

```
 1    they're being turned off and I was, like, where did

 2    this stem from, only to find out that the managers

 3    had received these.

 4         But as you will see, I think there was a

 5    discussion that there was a launch or something and

 6    that there was -- I could be wrong.  I know Brian

 7    asked us to find out why they didn't know a month

 8    ago.  And then I -- so I did my due diligence.  I

 9    met with them.  I found out they were advised, but

10    some had not done their due diligence.

11         Q.   Got it.  Then the second paragraph, you

12    indicated -- why don't you read into the record the

13    second paragraph.

14         A.   "From that initial e-mail, each of them went

15    back to their sales reps to inform them that we

16    needed to get updated dispense data.  Some customers

17    were unwilling to provide the data, and in other

18    cases, reps requested the data, but never received

19    it from the customer, and some did.  But the

20    decision was still made validating the need for them

21    to be turned off.  Given that this was in the hype

22    of the Zyprexa launch, I believe that the sales

23    managers may not have done as much follow-up as they

24    should have.  They now know that when they receive

25    information such as this in the future from
```

1    compliance, they need to stay on top of the reps or

2    better yet, make the calls themselves directly.

3    Given I'll be copied on these in the future, I'll

4    make this a priority with the entire team to ensure

5    calls are made to the customers and follow-up is

6    done regardless of any other sales initiatives we

7    are involved in."

8        Q.   So when you provided the reason for not

9    getting the data from these customers who were not

10   being compliant, you didn't -- you didn't discuss

11   what you mentioned today about this was because Anda

12   was being overly cautious?  That wasn't a reason you

13   gave here?

14       MS. KOSKI:  Object to form.

15       Q.   Is that right?

16       MS. KOSKI:  Mischaracterizes prior

17   testimony.

18       A.   What we were discussing in this particular

19   situation was why they didn't act on the information

20   that they were sent.  That was the issue at hand for

21   me.  You were sent information from compliance.  You

22   were told to do a certain thing.  It appears from

23   our results so far, that you didn't do what you were

24   asked to do.  And going forward, you need to do a

25   better job at that.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Now, these -- some of these customers, when
2    they didn't get the questionnaires and dispensing
3    data in, they did get extensions?
4        A.   Some of them did, yes.  If they indicated to
5    us, "I'm sorry, I haven't gotten to it, I was on
6    vacation," this, whatever, if the reason seemed
7    plausible, we would ask for a two or three-day
8    extension.  But after that, if it wasn't in our
9    hands --
10       Q.   Some of the extensions were longer than two
11   or three days, weren't they?
12       A.   I'm sure there may have been some that may
13   have been a week, if somebody was on vacation for a
14   week.  That could have happened.
15       Q.   Some were 30 days?
16       A.   Rarely.
17       Q.   And when they got the extension, it wasn't
18   just a matter of not cutting off their controls, but
19   they were still receiving product; is that right?
20       A.   During the time that we were getting that
21   data in, correct.
22            MS. KOSKI:  Are you still doing okay?
23            THE WITNESS:  Uh-huh.  Is everybody else?
24            MS. KOSKI:  You have more energy than me.
25            THE WITNESS:  And I didn't even have coffee
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      today.

 2          MS. KOSKI:  I need more.

 3      Q.   With regard to Exhibit 29, the controls that

 4   were shut off for those customers, sitting here, you

 5   don't know whether compliance reported this to the

 6   DEA, do you?

 7      A.   I do not know.

 8      Q.   And again, you don't know whether or not

 9   they were required to?

10      A.   I do not know.

11      Q.   This is just backing up a few days from that

12   week in December in 2011.

13          (Anda-Williams Exhibit 30 was marked for

14   identification.)

15   BY MS. RELKIN:

16      Q.   This is Number 30, and the stamp number is

17   70549 through 50.  And I probably should have shown

18   you this e-mail first, since it's a week earlier.

19   And this is a series of e-mails from you.

20          You wrote an e-mail to Michael Cochrane,

21   Emily Schultz, and Sabrina Solis on December 5th,

22   2011, regarding:  "Drug Store Pharmacy, Inc., number

23   802433."  And you were talking about one of your --

24   is Jana Porter one of your sales reps?

25      A.   She was.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And she went to key in an order for the drug

 2   alprazolam.  That's a controlled substance, right?

 3        A.   It's a CIV.

 4        Q.   Does that still fit within the rubric of

 5   controlled?

 6        A.   It does.  It just doesn't require the C22

 7   form.

 8        Q.   Right.  Anyway, and she noticed that the

 9   control flag was set to "N."

10        A.   Uh-huh.

11        Q.   And you were complaining that you had not

12   received any communication about this shutdown,

13   right?

14        A.   Right.

15             MS. KOSKI:  Object to form.

16        Q.   And Jana was saying that they had been a

17   well-respected customer for years and have even

18   given discounts to many of our Ohio warehouse

19   employees that come there for prescriptions.  Can

20   someone look into this for us?"

21             And then you -- that was 11:01 a.m.  And at

22   5:48 p.m. you wrote an e-mail to Howard Davis.  Who

23   is Howard Davis?

24        A.   I'm trying to remember.  It doesn't even

25   ring a bell to me.  I know a lot of people in our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   company.  Who was Howard?

 2   Q.    I guess he was short-lived there.

 3         And what did you say to Howard?

 4         MS. KOSKI:  I'm going to object to the

 5   extent the first part was not included in the

 6   question.  I assume you didn't mean to.  "I guess

 7   he was short-lived there."

 8         MS. RELKIN:  Oh, yeah.  Okay.

 9         MS. KOSKI:  Strike that?

10         MS. RELKIN:  Strike that.

11   A.    I don't recall.  I --

12   Q.    Just -- did you write -- based on this

13   document, did you write to Mr. Howard Davis saying:

14   "Can we find out why this account was suddenly

15   turned off from buying controls?  Attached is my

16   e-mail from this morning.  We have not gotten a

17   response yet, and the customer needed to place an

18   order today.  We had no knowledge of why the control

19   flag was suddenly changed."

20         And this was referring to a drugstore in

21   Columbus, Ohio?

22   A.    Correct.  He -- I believe he was a member

23   of the -- of the compliance team.

24   Q.    Okay.

25   A.    But I do believe it was for a fairly short
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    period of time.

2       Q.   And then what did he say to you?

3       A.   He said:  "The Drug Store Pharmacy in

4    Columbus Ohio had a suspicious ordering pattern that

5    would have been difficult to defend if the DEA came

6    in and asked about it.  The account was turned off

7    from controlled substances on 12/5/11.  I regret any

8    confusion that you were not notified

9    contemporaneously of this action.  Howard."

10      Q.   So that was the same issue that brewed the

11   following week about not being notified?

12      A.   Correct.  And I believe they were right

13   around the same time frame.

14      Q.   Yes.

15      A.   Yeah.  Okay.

16           (Anda-Williams Exhibit 31 was marked for

17   identification.)

18           MS. RELKIN:  We're getting there.

19           MS. KOSKI:  Getting there like a 7:40 flight

20       getting there or -- just wondering.

21           MS. RELKIN:  I will do my best.

22           MS. KOSKI:  Okay.

23           MS. RELKIN:  Mine is, like, 8:00 or 7:59.

24           MS. KOSKI:  Yeah.

25           MS. RELKIN:  So we're in the same boat.
```

```
 1            MS. KOSKI:  All right.  I'm here.  I can go

 2       later, but you have your time.

 3   BY MS. RELKIN:

 4       Q.    Okay.  So what we've marked as Exhibit 31,

 5   stamped 107989, is an e-mail from Patrick Cochrane

 6   to you regarding a customer number 404255.  Strike

 7   the -- yeah.  So that's the top of the e-mail, but

 8   the bottom of the e-mail --

 9       A.    Uh-huh.

10       Q.    -- that's from you to him.

11       A.    Correct.

12       Q.    What did you say?

13       A.    I said:  This customer is waiting for an

14   order placed on 8/10.  I think I know the reason for

15   the delay, but DEA has not been deactivated at this

16   point.  Is this account under review?  Oxy order and

17   the history didn't look good to me."

18       Q.    And then what did Patrick Cochrane say?

19       A.    Patrick's response was:  "I'll look.  Not
```



Highly Confidential - Subject to Further Confidentiality Review

███████  ███████████████████████████████

███  ███  ████████████  ████████████

███  ███  ██████  ██████████████████████████████

███  ████████████████████████████████████

███  ███  ██████████████████████████

███  ██████████████████████████████████████████

███  ██████████████████

8        Q.    Do you know what happened with that order?

9        A.    I do not.  I don't recall.

10       Q.    And here, you were -- you were weighing in

11   to regulatory as kind of the eyes and ears of sales?

12       A.    I was bubbling up.  Yeah.  I was bubbling up

13   what -- something that didn't look right to me.

14       Q.    Okay.

15       A.    And typically, that's sometimes how that

16   happened, where I -- you know, a sales rep would

17   come to me and say, you know, "Can you help me find

18   out what's going on with this order?"  And then you

19   look at it and then -- hmm, interesting.

20       Q.    So that was August 13th, 2010.

21             (Anda-Williams Exhibit 32 was marked for

22   identification.)

23   BY MS. RELKIN:

24       Q.    I'm showing you a document that's from the

25   next month, so what we've marked as Exhibit 32 is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    stamped 109372, going to -- it's a three-page

 2    document.

 3          We'll go to the first -- beginning of the

 4    e-mail on the third page, which is Page 9374.  And

 5    do you see that Joe Falzone, manager of inside

 6    sales -- I take it back.

 7          Donna Rochin, who was she?

 8    A.    She was one of the sales representatives out

 9    on the West Coast in our Corona office.

10    Q.    So she didn't report to you?

11    A.    No.

12    Q.    She wrote on September 23rd, 2010 to Joseph

13    Falzone, and he was also in the California office?

14    A.    Joseph Falzone was a sales manager in

15    California.  We had about five or six sales reps out

16    there, and he reported to Dominic Floro in New York.

17    Q.    And the subject was:  "Limit increase

18    account number 51180."
```

███ ███████████████████████ ██████████

███ ███████████████████████████████████

███ ███████████████████████ █████████████████

███ ███████████████████████████████████

███ ████████████████████ ███████████████

███ █████████████████████████

```
25    A.    We found that to be the case a lot of times.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   What does that mean?

2    A.   Let's go back to the fact that most of our

3    pharmacies had a primary pharmacy that they worked

4    with.  The primary pharmacy, many, many, many times,

5    would come in and actually give that pharmacy a

6    computer and set up their system on the computer for

7    them, so all they have to do is go in and start

8    placing the orders.

9         But there were reporting capabilities that

10   were available in that system, but many of them

11   never learned how to utilize it or access it.  So

12   they would have to go back to their primary, get the

13   instructions on how to run the dispense data.  And

14   some of them were very reluctant and old school.

15   Q.   So then Joseph Falzone writes on September

16   23rd to Jay Spellman and copies Donna Rochin and

24        Do you see that?

25   A.   Those were -- yeah.  I'm assuming those are

1    his overall generic purchases or total purchases

2    from us.

3        Q.    You don't think that's just talking about

4    controlled substances?

5        A.    Oh, no, no.  I know Joe, and that's the way

6    he used to write.

13        Q.    For the hydrocodone?

14        A.    For the hydrocodone.

15        Q.    And then Jay Spellman says:  "If he didn't

16    know how to account for where his controlled

17    substances are being dispensed to, should we be

18    selling at all, much less requesting an increase?"

19    Right?

20            And what does Falzone say to Jay Spellman?

21        A.    "Spoke to Rafi.  Customer submits a report

22    directly to DEA on all controls on a weekly basis.

23    He does not run the report.  His software vendor

24    manages it for him.  'I hit a button.'  I'm

Highly Confidential - Subject to Further Confidentiality Review



```
 4      Q.   And then Jay Spellman says?

 5      A.   "Increase denied."

 6      Q.   And then Joe Falzone says?

 7      A.   Joe's response back to Jay was:  "I

 8   understand.  May I ask what your decision was based

 9   on?  I need information to salvage 150,000 a year of

10   business.  When I talk to Rafi, he will ask the

11   business decision behind this."

12      Q.   And then Jay Spellman says?  Can you read

13   that into the record?
```

```
21   business decision to grant the increase, so when I

22   sit across from the DEA, I can explain it properly."

23      Q.   A little warranted sarcasm there?

24           MS. KOSKI:  Object to form.

25      A.   That's how Jay was.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   And then you said:  "I forwarded this on to

 2   Dominic since Joe reports to him."

 3            Do you remember this event?

 4       A.   I remember this, yeah.

 5       Q.   Did Joe Falzone get -- other than the -- the

 6   response from Jay Spellman, which you just read, did

 7   Joe Falzone get disciplined in any way for his

 8   aggressiveness seeking to get this level increased?

 9       A.   I will let you speak with Dominic Floro

10   about that.

11       Q.   I'm not sure whether we're taking Dominic

12   Floro's deposition.

13       A.   Okay.

14       Q.   So can you please let me know?

15       A.   I know that there were numerous issues with

16   Joe Falzone that led to some documentation.

17       Q.   Was he terminated from the company?

18       A.   I do not recall if he -- yeah, I'm sorry, I

19   believe he was.  Now that I'm thinking about it, I

20   believe he was.

21       Q.   And that was about when?

22       A.   I want to say maybe 2000 -- late 2007.

23       Q.   '07 -- no.

24       A.   I'm sorry.  Where are we?

25       Q.   2010.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Oh, 2010.  I left in 2015, and Joe had been

 2    gone about a year, so I'm going to say about 2009.

 3      Q.   And what were the other issues besides this

 4    event?  Were they similar?

 5      A.   There were numerous issues with Joe.  There

 6    -- he is -- the overall management effectiveness.

 7      Q.   Did any of it have to do with CII products?

 8      A.   I don't recall that it was specifically

 9    about CII.  It was just a number and a variety of

10    issues --

11      Q.   Management is --

12      A.   -- that approved.

13      Q.   Management is a kind of general issue, so

14    can you give me more specifics?

15      A.   No, I really can't, because Dominic only

16    shared that there were issues and that he was being

17    put on a corrective action plan.

18      Q.   And do you know if there were any issues

19    with Paul Ravinoff?

20      A.   Can you elaborate on what kind of issues?

21      Q.   Regarding controlled substances.

22      A.   Regarding controls?  I can't recall.  I

23    can't recall of anything where there was

24    documentation on him specifically regarding

25    controls.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is he still with the company?

 2      A.   I do not know.

 3      Q.   Was he there when you left?

 4      A.   He was there when I left, yes.

 5      Q.   What about Wayne Tischler, any issues of

 6   concern that you were aware of?

 7      A.   No.

 8      Q.   Is he still with the company?

 9      A.   No, he is not.  He was laid off.

10      Q.   When was he laid off?

11      A.   I believe he was laid off about a year after

12   I was laid off.  I was laid off in 2015, so it would

13   have been around 2016.

14      Q.   What percentage of the force was laid off

15   during that time period?

16           MS. KOSKI:  Object to form.

17      A.   I don't know the percentage.  I just know

18   that most of the sales managers that used to report

19   to me are no longer there.

20      Q.   And a number of them were that -- was

21   that -- you were in '15.  The '16, that was the wave

22   when Teva acquired?

23      A.   There was -- my understanding was that there

24   was a wave in June, and then there was a wave in

25   July, and then there was a wave, I believe, in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    August or September.

 2        Q.   And that was under the Teva control at that

 3    point?

 4            MS. KOSKI:  Object to form.

 5        A.   I do not recall if Teva officially owned us

 6    at that point, but I believe it was in anticipation

 7    of them taking us over.

 8        Q.   Did you come to learn that, you know, Teva

 9    management came to the facility in Florida and, you

10    know, made management decisions as to staffing

11    and --

12        A.   No, I was not aware of that.

13        Q.   Okay.  By the way, on this --

14            MS. KOSKI:  I don't know how much longer you

15        have, but maybe a break if it's going to be a

16        long time.  I'm not pressuring you to make a --

17            MS. RELKIN:  No, I'm not -- I'm not wrapping

18        up in 10 minutes, so if you need a break --

19            MS. KOSKI:  Yeah.  Maybe let's take a

20        stretch break.

21            MS. RELKIN:  Okay.

22            MS. KOSKI:  We've been going for two hours.

23            THE VIDEOGRAPHER:  Off the record at 4:05.

24        (Recess from 4:05 p.m. until 4:18 p.m.)

25            THE VIDEOGRAPHER:  Now back on the video
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        record at 4:18.

 2   BY MS. RELKIN:

 3        Q.   Just going back to Exhibit 32, very briefly,

 4   when Jay Spellman indicated, "I am trying to salvage

 5   a 950 million dollar a year company, ours."  What

 6   was he referring to?

 7             MS. KOSKI:  Object to form.

 8        A.   Would you like my interpretation of what

 9   this e-mail means?

10        Q.   Yes.

11        A.   My interpretation of it is that he's there

12   to make sure that as a company we continue to

13   prosper, and that we don't have anything that would

14   cause a reason for the DEA to come and shut us down,

15   like they had come and shut other distributors down

16   over a period of time.

17        Q.   But when he used the word "salvage," doesn't

18   that note that there was already ongoing risks?

19        A.   That, I can't speak to.

20        Q.   So you are not aware of any particular event

21   in that time period --

22        A.   No.

23        Q.   -- where the company was on shaky ground?

24        A.   No.

25             (Anda-Williams Exhibit 33 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MS. RELKIN:

 3        Q.   We've marked as Exhibit 33 a document

 4    stamped 70803.  And this is e-mails between you and

 5    some of your colleagues in September of 2011.

 6            Do you see that the subject was:  "To be

 7    pulled from Remedy"?

 8        A.   Uh-huh.

 9        Q.   You indicated:  "We have just reviewed an

10    article about TPS number 205120, currently in react

11    status on the Anda side.  An employee of the

12    pharmacy has just been charged with selling

13    prescription painkillers as a side business, 700,000

14    pills, with a street value of over $7 million.

15            "As we understand from the owner of the

16    pharmacy, this employee was terminated as of this

17    past Friday.  However, I'm not sure what

18    implications are in store for the pharmacy itself,

19    given that it's likely some of these were coming

20    from within the store.

21            "We're not currently selling this pharmacy

22    and probably shouldn't be, given this situation.

23            "If everyone agrees, I say we deactivate

24    this react of the Anda side, search for any cold

25    call or react on the VIP side and shut them down."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you recall this?

 2      A.   I remember this, right.  We -- we read about

 3    this in the paper.

 4      Q.   It was just a local newspaper or a trade

 5    paper?

 6      A.   I believe -- no, I believe it was in the

 7    newspaper.

 8      Q.   And then you went and looked them up in your

 9    system?

10      A.   We saw that we were not selling to them, but

11    a react was a customer who had purchased from us at

12    one point and then stopped.

13      Q.   But they were still open in your system?

14      A.   They were still available as a lead in our

15    system.

16      Q.   And when you say, "As I understand from the

17    owner of the pharmacy," did you call the owner of

18    the pharmacy?

19      A.   I'm trying to remember.  I believe I did.  I

20    believe I did.

21      Q.   And what do you recall hearing from him,

22    other than what you --

23      A.   Whatever I put here.

24      Q.   And then you indicated next e-mail:  "Name

25    on the react is Pharmore Drugs in Skokie, Illinois."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Right?

 2       A.   Uh-huh.

 3       Q.   And then Amelia asked you:  "This account is

 4    already opened in TPS.  Should we just close it out?

 5    It is assigned to Mark Harmon."

 6            And you said:  Yes, I'm aware, but they've

 7    never bought from us.  We're pulling the DEA, and

 8    the account/react should be shut down."

 9            But then Mireya Bosch -- and who was she?

10       A.   She was in our database management group.

11       Q.   She responded:  "We have two cold calls in

12    our database associated with this customer, Anda

13    cold call number, Pharmore Pharmacy, and VIP cold

14    call, Pharmore Pharmacy.  Both leads are currently

15    coded as 995/777, out of business."

16            So anyway, you closed them down; is that

17    right?

18       A.   That was my recommendation, yes.

19       Q.   Okay.  Did this happen with some frequency,

20    that you'd read about a problem with a pharmacy

21    inappropriately selling opioids, and you went and

22    checked your database to make sure that you weren't

23    involved with them?

24       A.   If we saw something like that or it was

25    brought to our attention, we did that.  That was
```

Highly Confidential - Subject to Further Confidentiality Review

1    normally part of the protocol.  If the account was

2    opened, who had the account.

3           (Anda-Williams Exhibit 34 was marked for

4    identification.)

5    BY MS. RELKIN:

6    Q.   I'm showing you Exhibit 34, marked 134040,

7    and these are e-mails between you and colleagues on

8    February 9th of 2011 with a work log from February

9    8th, 2011.

10          So going to -- going to the work log on the

11   second page here, can you explain what the work log

12   is?

13   A.   The work log goes back to the opportunity in

14   Remedy, when a control increase was being requested,

15   they would put a request through, like a work order,

16   to request that the -- what the family was that they

17   were looking for an increase on and any particulars

18   about that.  Sometimes I was copied on those;

19   sometimes I was not.

20          The sales managers generally got involved

21   with reviewing these before they went to compliance

22   to ensure that the required dispense data was there.

23   And occasionally, I would interject a comment.

24   Q.   Before seeing this today, is this something

25   you were familiar with, you know, in terms of, like,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reviewing it recently?

 2        A.   It did -- this recently?  No.

 3        Q.   Okay.  But you recall this event?

 4        A.   Vaguely.

 5        Q.   Okay.  So do you see that a request was made

 6    for an increase in the order; is that right?

 7        A.   A request was made for a control limit

 8    increase, correct.

 9        Q.   Who wrote:  "Please note, an increase cannot

10    be processed without a current customer

11    questionnaire on file with compliance"?

12             Is that the computer that spits that out?

13        A.   Let me refresh my memory on how that worked.

14    I'm really trying to recall how that worked.  I

15    thought that the comment was put in there by someone

16    from the compliance team, but I don't see a name

17    like we've seen in the past, so -- because normally,

18    when it comes from someone specifically, it says,

19    like right here:  "Michael Cochrane has been

20    notified via e-mail."

21        Q.   All right.  Well, let's just get to your

22    comment.  On February -- February 8th is when the

23    original work log --

24        A.   Was started.

25        Q.   -- was started, right.  Thank you.  And then
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on February 9th, you -- it says:  "Patricia Williams
 2    has approved an approval request with the following
 3    comments:  Paul, be leery when they say ████
      ██ ████████████████████████████  ██████████████████
      ██ ████████████████████████████████████████████
      ██ ████████████████████████.......I'll put this through,
 7    but just some general information for you to know."
 8         Do you recall that?
 9    A.    Yes.
10    Q.    And do you recall debating whether or not to
11    put it through?
12    A.    What I was putting it through was not to
13    approve it.  I was putting it through to be approved
14    to be reviewed by compliance.  I was the middle
15    person in the middle.
16    Q.    And the increase, the controlled increase,
17    was for oxycodone, 1,000 of them; is that right?
18    A.    Correct.
19    Q.    To Cox Pharmacy?
20    A.    Correct.
21    Q.    And then Paul Ravinoff said:  "They have a
22    222 form on file, and we did not ship them the oxy
23    because the opportunity was not complete.  Is it
24    possible to fill that order now."
25         And then Emily Schultz asked:  "Which
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    warehouse is the form at"?

 2           Do you know what happened?

 3    A.    I don't.

 4    Q.    But it's your testimony that even though

 5    this says "approved," that that didn't affect

 6    anything until compliance --

 7    A.    Correct.

 8    Q.    -- reapproved it?

 9           MS. KOSKI:  Object to form.

10    A.    The process was that every -- every control

11    request of this nature had to go either through a

12    sales manager or through me, and if a reason -- his

13    sales manager was out, he may have come to me and

14    said, "Can you review this and get this over to

15    compliance?"

16    Q.    Why, when you were leery and you were

17    cautioning Paul Ravinoff to be leery about the --

18    what looked to be an excuse about the wholesaler

19    being out of stock, that you nevertheless approved

20    it?

21    A.    I --

22           MS. KOSKI:  Object to form.  Go ahead.

23    A.    I approved the opportunity to go to

24    compliance to be reviewed, but I was trying to share

25    information with him for further knowledge that just
```

 1    because the customer says "I need a limit" or "I'm

 2    at my max," it could mean something else.  I was

 3    trying to broaden his understanding of what that

 4    customer may actually be meaning.

 5        Q.   And the comment that you made here about

 6    being leery and you're not buying the justification,

 7    was that something that would be available to

 8    compliance to read?

 9        A.   Yes.

10             MS. KOSKI:  Object to form.  Sorry.  I

11        wasn't fast enough.

12             (Anda-Williams Exhibit 35 was marked for

13        identification.)

14    BY MS. RELKIN:

15        Q.   We've just marked as Exhibit 35 document

16    number 107933, and it's a series of e-mails from

17    August 26th of 2010.  And it starts with Rebecca --

18    Roberta Weiniger sending an e-mail to Vickie

19    Shalley.  And Robert Weiniger is who?

20        A.   Roberta Weiniger was a sales rep on Vickie

21    Shalley's team.

22        Q.   It indicates that a pharmacy with a certain

23    code number:  "Just called and would like to know

24    how does he get his oxycod increased.  He has a

25    nursing home and old people."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And then Vickie Shalley responds:  "First of

 2    all" -- and she -- Vickie Shalley forwards it with

 3    an e-mail to you copied and then Patrick Cochrane

 4    and Jay Spellman, and Kim Poropat -- saying:  "First

 5    of all, has the oxy/oxy combo been adjusted from

 6    yesterday?  If so, can you please take a look at

 7    this customer?  See e-mail below."

 8              And then Jay Spellman says:

 ███  ████████████████████████████████████

 ███  █████████████████████████████████████

 ███  ███████████████████████████████████

 ███  ███████████████████████  ████████████████

13    customer will not get an increase, and I have

14    retired the DEA and removed the schedule."

15              So "retired DEA" means he's been -- his

16    control has been pulled?

17    A.    Correct.

18    Q.    Because his volume looked to be

19    unacceptable; is that right?

20    A.    Correct.  Obviously, to Jay it did.

21    Q.    Does it look unacceptable to you, too?

22    A.    It looks high, yeah.

 ███      ███  █████████████████████████████

 ███  ██████████████████████████████████████████

 ███  █████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2      A.   This is where additional education and

 3   coaching of the sales reps was occurring at -- by

 4   the sales manager, and even the sales managers

 5   needed some coaching and development in that area as

 6   well.

 7      Q.   So then Vickie Shalley writes to Roberta

 8   Weiniger:  "Sorry, Roberta, but this is why I said

 9   to choose your battles wisely.  They now have pulled

10   the DEA altogether."  Right?

11      A.   (Nodding head.)

12      Q.   And "choosing battles" means leave well

13   enough alone.  They're getting some.  Don't push the

14   envelope and ask for more.  Is that right?

15              MS. KOSKI:  Object to form.

16              Go ahead.

17      A.   That's the way I would interpret it, yes.

18   Roberta was known for bubbling every little thing

19   up, every little thing, not just the DEA or CII

20   issue, but every little thing.  And Vicki was

21   constantly telling her, "Come on, not everything is

22   a fire, not everything is a fire."  In this

23   particular case, it's good she did.

24      Q.   Right, because then it resulted in getting

25   pulled instead of continuing to supply this sketchy
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy, right?

2        A.   Uh-huh.

3             MS. KOSKI:   Object to form.

4        Q.   Do you know whether this was reported as a

5    suspicious order to the DEA?

6        A.   I'm sorry, I do not know.

7             (Discussion off the record.)

8             (Anda-Williams Exhibit 36 was marked for

9    identification.)

10   BY MS. RELKIN:

11       Q.   So what we've marked as Exhibit 36 is

12   stamped 55934 through 37, and it's a series of

13   e-mails from February 17th of 2014.  And this is

14   regarding an extension of customers providing

15   information?

16       A.   Uh-huh.

17       Q.   Actually, the first of the e-mails on the

18   last page is really February 3rd of 2014 from Latoya

19   Samuels to you and Dominic Floro.  And what does

20   Ms. Samuels say to you?

21       A.   It reads that:  "We are following up with

22   you in regard to the status of the customers who

23   were required to provide dispensing data by January

24   the 31st for control eligibility determination.

25             "Please inform your teams that an extension

Highly Confidential - Subject to Further Confidentiality Review

 1    has been granted for those customers who have not

 2    yet provided this information.  Control purchasing

 3    privileges will be removed if the dispensing data is

 4    not provided by Friday, February the 21st."

 5         Would you like me to continue?

 6    Q.   That's fine.

 7    A.   Okay.

 8    Q.   So this looks like an extension was not two

 9    or three days, but more like three weeks; is that

10    right?

11    A.   From the February 3rd to the 21st, right.

12    Q.   And "Here is the status summary" below that.

13    What -- does this chart tell us that there were

14    one thousand eighty -- can you interpret what this

15    chart says?

16    A.   Give me just a moment.

17    Q.   Sure.

18    A.   Okay.  A count of customers --

19    Q.   "DD required" --

20    A.   Where no --

21    Q.   -- does that mean --

22    A.   -- where no dispensing data was required.

23    If it was not required, it was 373.  If it was

24    required, it was 710.

25    Q.   "DD" is dispensing data?

```
 1      A.   Correct.  Dispensing data required.  So

 2   what -- the way I'm interpreting this is that 373,

 3   no dispensing data was required.  The 710,

 4   dispensing data was required.

 5      Q.   And it looked -- it looked like they didn't

 6   have the data on 710?

 7      A.   And of that number, it says 50 that have

 8   purchased the $100 or less of controlled substances

 9   within the last six months.

10      Q.   And they were asking you whether to remove

11   the controls for those 50 since they were so small,

12   basically?

13      A.   Correct.  And then Dominic --

14           MS. KOSKI:  Wait for a question.

15      Q.   And then the famous Dominic said -- Dominic

16   Floro -- scratch that.

17           So Dominic Floro, he weighs in, and he said

18   he doesn't think you should tell the reps about the

19   extension?

20      A.   Correct.  That's -- that's what he wrote,

21   yes.

22      Q.   He was basically -- if people knew the

23   extension, they might not work as quickly because

24   they think they have more time?

25      A.   That's what he wrote, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  And then Latoya Samuels said she was

 2   okay with his route doing that.  And then Robert

 3   Brown said -- excuse me.  I knew there was a piece

 4   here.

 5            This is you on the top.  You said:  "I've

 6   already notified our sales reps here of the new

 7   deadline.  We'd already done this before I received

 8   Dominic's e-mail."

 9            Right?

10        A.   Correct.

11        Q.   And then we have the same chart for the

12   deadlines; is that right?  Or did the numbers change

13   at all?

14        A.   I'm look -- that's what I'm looking at.

15        Q.   At 2/17.

16        A.   All the numbers do agree that's -- the total

17   of the 1083.  I'm just looking at how they're --

18   it's the same chart.

19        Q.   It looks like there was some progress.  They

20   got -- did they get more in or -- let's see.

21   Current DD required for 631, and it previously was

22   710.  So that means that they got some?

23        A.   (Nodding head.)

24        Q.   Right?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   All right.  And then it's -- Latoya Samuels

 2   noted:  "There are 631 outstanding.  The status

 3   pivot table has been revised to clarify."

 4        Do you know -- that was just days before the

 5   ultimate deadline -- how many of those 631

 6   ultimately provided the dispensing data?

 7      A.   I do not.

 8        MS. KOSKI:  Object to form.

 9      Q.   But based upon that extension, any of those

10   who did not should have been cut off, correct?

11      A.   That would be my understanding from the

12   context of all this written here, yes.

13      Q.   And was there a concern, when a company did

14   not provide the dispensing data, that there might be

15   reasons why they did not want to share that

16   information?

17        MS. KOSKI:  Object to form.  Concern by her,

18     by the witness?

19        MS. RELKIN:  By the company -- by the

20     pharmacies.  Strike that.

21      Q.   When a customer would not be compliant,

22   despite reminders and extensions, to not provide

23   dispensing data, did that trigger in your mind and

24   the compliance department, as far as you know,

25   greater concern about the prescribing -- the
```

1    dispensing habits of those pharmacies?

2        A.    I would say as a general rule, yes.

3    However, per our prior conversations, we did have a

4    lot of pharmacies that didn't know how to pull

5    these -- the -- this data.  And so the emphasis we

6    were putting on it, the emphasis was there.  The

7    calls were being made.  The fact that the pharmacies

8    were not adhering to our requests became of greater

9    and greater concern.

10       Q.    And that -- the last document we reviewed

11   was later in the game.  That was 2014; right?

12       A.    Correct.  And the process was evolving, if I

13   can share -- you know, over -- things that happened

14   in 2009 and 2010 and then 2011 and 2012, this was a

15   very evolving process.

16           So, you know, Remedy was being improved.

17   The processes and the drop-downs on the menus where

18   the reps were providing information, were -- it was

19   being enhanced and made better over a period of

20   time.

21       Q.    Okay.

22           (Anda-Williams Exhibit 37 was marked for

23   identification.)

24   BY MS. RELKIN:

25       Q.    I've just marked as Exhibit 37 document

Highly Confidential - Subject to Further Confidentiality Review

```
 1     number 622234 through 36, and it's a series of

 2     e-mails in June of 2014.  And it's -- the first

 3     e-mail is from Delores Sorenson, with the subject

 4     matter:  "Know your customer, KYC, revised form

 5     attached," with importance being "high."  And that

 6     was sent to the Anda Pharmacy Florida reps and

 7     managers, Anda New York sales, Anda West Coast

 8     Group, and Anda Pharmacy Group, correct?

 9          A.   Yes.

10          Q.   And Delores Sorenson was who?

11          A.   She was a member of the marketing team.

12          Q.   And do you see that it says under this -- is

13     that like a picture of an image of a magnifying

14     glass?

15          A.   Uh-huh.

16          Q.   With the customer being the image of a guy

17     in a suit with a briefcase, I guess, another guy.

18               Anyway, new question:  Under this image

19     there is a staple that says:  "Knowledge about a

20     customer is necessary to help determine some of the

21     financial risks we may face if providing service to

22     that customer."

23               Do you see that?

24          A.   Uh-huh.

25          Q.   And then this -- she attaches the form; is
```

1    that right?  That's the "Know Your Customer" form?

2    A.   Correct.

3    Q.   And that's different from a questionnaire?

4    A.   Yes.

5    Q.   And so was -- that required an additional

6    requirement before dispensing?  It was a

7    questionnaire, know your customer, and the

8    dispensing data?

9    A.   The "Know Your Customer" form was used by a

10   sales rep when they were opening up a brand new

11   account to remind them of the checklist of items

12   that were needed.  This didn't go to the customer.

13   This was mainly for the sales reps' and the sales

14   managers' usage.

15   Q.   Okay.  And then Vickie Held, and that's yet

16   another Vickie?

17   A.   Same person.  Vickie Shalley Held, she

18   married.

19   Q.   She said:  "Pat, wouldn't this have been a

20   good time to list the forms in the proper order?

21   We've been asking for this for some time now."

22        And you respond:  I had nothing to do with

23   any of this."

24        Did anything come of this?

25   A.   No.  These were -- these were documents that

1    were being revised from time to time.  And I did

2    share with Delores or -- we called her Laurie --

3    that the next time we updated, that we might want to

4    just kind of put them in a specific order.

5        Q.   But the focus of the -- Anda's concern in

6    knowing the customer for this comment is:  "To help

7    determine some of the financial risks we may face

8    with providing service to that customer."

9            It doesn't discuss the dangers of providing

10   controlled substances to customers who are at risk

11   for diversion; is that right?

12       A.   This did not have specific application to

13   CIIs and controlled substances.  This had to do with

14   knowing the entire body of your customer.  And when

15   she speaks of the financial risk, every time we open

16   an account for a customer, it was a financial risk.

17           Would they pay us?  What did -- how did we

18   expect payment?  Are they going to be set up on

19   credit terms?  Are we going to ask for funds up

20   front?

21           (Anda-Williams Exhibit 38 was marked for

22   identification.)

23   BY MS. RELKIN:

24       Q.   Speaking of financial risk, let's turn to

25   Exhibit 38, document number 622647 through 49, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this is an e-mail from June 10th of 2014.

 2           Start with the second page.  Do you see

 3    there is an e-mail from Michel -- Michel -- Michel

 4    Restrepo?

 5       A.   Yes, Michel.

 6       Q.   -- Michel, to customer maintenance, Lori

 7    Lombardi, Charlein Lemmon and others.  And the

 8    subject is:  "Pill mills JDE number 59213, Best Care

 9    Pharmacy Inc."

10           And do you see Michel Restrepo says:

11    "Please place the account on no ship status.  The

12    owner was arrested under charges of pill mills."

13           MS. RELKIN:  Okay.  What do we do?

14           THE VIDEOGRAPHER:  Hit it again, the red

15       button.

16           MS. RELKIN:  Technology and me.  Sorry.

17       Sorry, everybody.

18               (Discussion off the record.)

19    BY MS. RELKIN:

20       Q.   And so you have a credit analyst at Anda who

21    checks the viability of the customers?

22       A.   We had a whole credit department.

23       Q.   Did any of the credit analysis to the

24    financial soundness of the companies get relayed to

25    the compliance department as a factor in assessing
```

Highly Confidential - Subject to Further Confidentiality Review

1    the legitimacy of the customers?

2        A.   I don't know what their protocol was.  I

3    know that they reviewed every account that was

4    opened and checked their credit worthiness.  Some

5    they requested credit applications for, for

6    customers that were applying for credit.  But what

7    their communication with compliance was, I don't

8    know.

9        Q.   Okay.  Anyway, customer maintenance says --

10   advises a whole host of people:  "Complete.  The

11   account has been placed on no ship '7' per William

12   and Ryan today."

13           Then Lori Lombardi, who was she?

14       A.   Lori Lombardi was a senior account manager

15   on the pharmacy side.

16       Q.   And she sends an e-mail to Vickie Held

17   saying:  "Please look at their numbers.  Where can I

18   make this up?  Please speak with Pat."

19           And that's talking about you, right?

20       A.   (Nodding head.)

21       Q.   This was her account?

22       A.   Obviously, yeah.

23       Q.   And Vickie asks you:  "Can you take a look

24   at this account?  Their numbers are majority brands,

25   but Lori would like us to consider a goal adjustment

1   for both generic and brands.  I told her we do not

2   typically adjust for brands.  What are your

3   thoughts.  Also, the customer owes us $143,000.

4   Ouch."

5           And you advise what?

6   A.   I said:  You need to advise credit right

7   away to put this on no ship."  But if I had done my

8   due diligence, I would have realized that's where

9   this originated from.

10  Q.   Right.  How many other occasions of pill

11  mills like this where the pharmacy got arrested, who

12  were your customers -- were the pharmacists or

13  employees?

14  A.   That crossed my desk like this?  I can only

15  remember a few.  If there were others, I was not

16  there or made aware of it.

17  Q.   So when you say "a few," one handful?  Two

18  handfuls?

19          MS. KOSKI:  Object to form.

20  A.   I can only speak to those that I remember

21  coming across my desk.  Things that were directly

22  related to a pill mill, maybe five, four, five.  And

23  ours were mainly from things that we happened to see

24  in the newspaper, or if the sales rep heard

25  something from the customer that didn't sound right,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they were learning and learning and learning, and

 2    they would bring it to our attention.

 3         Q.   Just in terms of terminology, when there's

 4    e-mails that talk about "op" --

 5         A.   "Op"?

 6         Q.   Yeah -- is that referring to opportunity?

 7         A.   I would have to see it used.

 8         Q.   Okay.

 9              MS. RELKIN:   I'm getting down to the wire.

10              MS. KOSKI:   Okay.

11              (Anda-Williams Exhibit 39 was marked for

12    identification.)

13    BY MS. RELKIN:

14         Q.   What we've marked as Exhibit 39 is document

15    number 1015787 through 789.   These are e-mails from

16    February -- January and February of 2012.

17              Starting on the bottom, the second page --

18         A.   I remember this.

19         Q.   -- there is an e-mail from Deon Kenny to

20    Christine Leon-Laurent.   "Someone just tried to

21    order alprazolam from this act.   Very suspicious

22    call.   I did not get the phone number they were

23    calling from."

24              And Christine Leon-Laurent responds:   "By

25    the way, thank you for the heads-up.   Did you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    process an order?"
 2            And Deon said:  "No.  When I told him the
 3    act is not allowed to get controls, he quickly hung
 4    up."
 5            When it says "the act," what --
 6    A.    Account.
 7    Q.    Account.  Silly me.  Okay.
 8            And Deon Kenny was who?
 9    A.    She was a member of our bench team.  Our
10    bench team was a group of sales reps that would be
11    substitute sales reps for their primary sales rep
12    when they were on vacation or out sick.
13    Q.    Okay.  And then there is an e-mail in the
14    same chain from Christine Laurent that's on the
15    bottom of the first page.  "Patrick, a bench rep,
16    got another call from the suspicious Texas caller.
17    This is the number the call name in on.
18            "I spoke to -- the number -- buyer Suzie,
19    and she said no one called from there to place an
20    order.
21            "Are we able to see what accounts would be
22    in the delivery area?  Perhaps send a Remedy message
23    warning the reps?  Bench is particularly vulnerable
24    because they sell to customers they do not know
25    every day."
```

```
 1              So that's a problem with the bench system;

 2     is that right?

 3              MS. KOSKI:  Object to form.

 4         A.   The bench reps were not as familiar with an

 5     account as their actual account representative, so

 6     they wouldn't have known all the little nuances,

 7     maybe even the voice of the person, like a regular

 8     sales rep would.

 9         Q.   And you responded.  What did you indicate?

10         A.   My response to Patrick was:  "Can we talk

11     about this in the morning?  I'm getting more and

12     more suspicious about the aspect we talked about a

13     week or so ago.  How are they able to pick accounts

14     with a control flag of 'Y' without getting this from

15     someone?  "

16         Q.   Okay.  What were you referring to here?

17         A.   What I was referring to, we had this

18     situation -- this Memorial Medical, we had a variety

19     of callers calling from Texas that were not able to

20     validate the information on the account.  We didn't

21     feel comfortable.  They were hesitating.  They were

22     calling from numbers that, when we called back, we

23     could not reach, almost like a burner phone kind of

24     thing.  And we had notified the entire floor that

25     they needed to be extremely concerned.
```

```
1              When I was talking to Patrick about this, it

2      seemed like the suspicious callers kept calling

3      with -- on accounts and saying that they were

4      accounts who had a control, who had control

5      purchasing.

6              And my concern was:  Do we possibly have

7      something that we need to look at?  How can this be

8      happening?  Where would they be getting this

9      information from?

10             And I wanted to pick his brain on what he

11     thought, where this could be coming from.  Why was

12     it, when these callers called, they always picked an

13     account that had controls.  It was becoming

14     suspicious.

15     Q.   So it was either a rogue employee or a

16     hacker?

17     A.   We had no idea.

18     Q.   So was -- what did Patrick say?

19     A.   Patrick and I did meet, and I remember when

20     we talked about this, that there was even suspicion

21     about the Fed Ex carrier delivering packages, that

22     somehow they would be able to identify.  "Hey, I'm

23     delivering a controlled substance to a pharmacy."

24     And it could have been possible that somebody from

25     Fed Ex was actually then purporting to be that
```

```
 1    pharmacy calling and then maybe intercepting the

 2    package along the way.

 3         We talked through a lot of what-if

 4    scenarios.  We never came to any conclusion on this

 5    because every time it happened, we told them they

 6    didn't have control purchasing, and the calls

 7    stopped.

 8    Q.   Did you call the DEA?

 9    A.   I do -- I personally did not, but I did make

10    them aware of it.

11    Q.   Do you know whether compliance called the

12    DEA?

13    A.   I do not know.

14    Q.   So Patrick Cochrane's e-mail to you agreed

15    with you, and at the very end he said:  "Another

16    wholesaler has had the problem, and DEA was fully

17    aware."

18         Do you see that?

19    A.   So that would lead you to believe that he

20    had talked to them.

21    Q.   Well, do you know whether he had talked to

22    the DEA or whether it was a communication amongst

23    wholesalers?

24    A.   I do not know.

25    Q.   Was there any kinds of Listserv among
```

1    managers of the different wholesalers, you

2    communicate to keep track of, you know, rogue or

3    sketchy potential buyers?

4        A.   Not that I saw, nor that I was privy to, but

5    I can't speak for compliance.

6        Q.   Okay.  Were you members of any professional

7    organization of other wholesale distributors where

8    you would meet with colleagues?

9        A.   I was not, but I know that Robert Brown was.

10       Q.   Do you know what organization he was a

11   member of?

12       A.   I do not know.  He just spoke of getting

13   together with peers.

14       Q.   And with regard to this e-mail, even though

15   Patrick Cochrane was saying that another wholesaler

16   had the problem, the DEA was fully aware, you don't

17   know whether DEA became aware of the very problem

18   happening to Anda?

19       A.   I do not know.

20          MS. RELKIN:  All right.  I think I'm on the

21          last exhibit, and this one is going to require

22          pulling up the spreadsheet, so we need to use the

23          videographer's computer for that.  So anybody

24          who's streaming, if you're still there and

25          reading it, you're not going to be able to

Highly Confidential - Subject to Further Confidentiality Review

```
 1        stream, but you can still hear it.

 2             THE VIDEOGRAPHER:  Off the video record at

 3        5:03.

 4             (Recess from 5:03 p.m. until 5:06 p.m.)

 5             THE VIDEOGRAPHER:  Back on the record at

 6        5:06.

 7             (Anda-Williams Exhibit 40 was marked for

 8        identification.)

 9   BY MS. RELKIN:

10        Q.   What we've marked as Exhibit 40 is document

11   number 109029 through 30, 030.

12             And you see originally there was an e-mail

13   from Kim Poropat to you and others regarding

14   exporters.

15             Do you see it indicates that:  "Recently

16   Watson has discovered some of their product in Iran,

17   which prompted a review of our business practices

18   when selling product to customers who will

19   ultimately be taking product outside of the United

20   States.

21             "I've done a review with Anita's help in

22   identifying all customers that have purchased 100

23   units of any one product over the past year on any

24   one line.  I've gone through the report and removed

25   customers that do not export that I knew from being
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on the floor and eliminated some pharmacies that

 2    bought on specials that I felt were no risk.

 3    Attached is the customers that are left.  I've

 4    researched some and have entered comments.  The last

 5    column indicates that I am directing Tonya to matrix

 6    these customers out of being eligible to purchase

 7    Watson products at the very least.  I'd like to be

 8    able to find a way to identify them in TPS as known

 9    exporters.  Please discuss all others with your team

10    to help identify whether any of these other accounts

11    are transporting product out of the United States."

12          Do you recall this?

13    A.    Uh-huh.

14    Q.    And she indicates:  "I'd like to set up a

15    meeting next week to discuss possibly an approval

16    process for shipments to any of the customers that

17    export.  Watson is not ultimately opposed, but in

18    their case, it's better to ask for permission.  In

19    regards to other vendors, we'll need to discuss if

20    we continue our current practice or also ask for

21    permission."

22          Then she ends the paragraph by saying:

23    "Personally, I don't believe we should knowingly

24    sell to a trade class that is not noted as a

25    distributor when we know they're ultimately selling
```

Highly Confidential - Subject to Further Confidentiality Review

1    to someone else.  Please advise of your findings on

2    the spreadsheet by Friday if possible."

3            This was a significant event, was it not?

4    A.    Yes.  It was -- it was an interesting event,

5    but it was not -- I don't recall that this was

6    specifically about CIIs.  This was about Watson

7    products, some Watson products.

8    Q.    Well, Watson had CII products, as well?

9    A.    They -- they did, and I don't recall the --

10   what the full list of the -- when she did the

11   review, she said that she had done the review, and

12   that she had identified all the customers that had

13   purchased 100 units of any one product.  I remember

14   some vitamins being in there in that list.

15   Q.    Do you also remember that there were opioids

16   in there, too?

17   A.    Oh, there were?  Okay.  I don't --

18   Q.    Did you --

19   A.    I don't recall that the opioids were

20   involved in this.

21   Q.    We'll go over the spreadsheet in a minute.

22   A.    Okay.  Okay.

23   Q.    So did you spend time going over the

24   spreadsheet with Kim and others?

25   A.    I remember that she sent it to us, and then

Highly Confidential – Subject to Further Confidentiality Review

```
1    we had to work with our sales managers and sales

2    reps to find out what they knew about these

3    customers.

4        Q.   Right.  So you wrote to Kim and others:

5    "Kim, attached is a file of all the information

6    we've been able to gather thus far.  There are a few

7    stragglers, but for the most part, this is what

8    we've found."

9            So in a moment we're going to pull up the

10   spreadsheet, but my question is this e-mail from Kim

11   suggests that Anda was, in fact, selling to

12   customers who were not just pharmacies, but were

13   also selling it other -- otherwise; is that right?

14           MS. KOSKI:  Object to form.

15       A.   We had a variety of trade classes that we

16   sold to:  Wholesalers, other wholesalers.  We sold

17   to some repackagers.  We did sell to some other

18   pharmacies that were -- had some affiliations with

19   some other pharmacies.  So there was a variety of

20   trade classes that were reviewed in this process.

21       Q.   Okay.  And I want to focus just on CIIs.

22       A.   Okay.

23       Q.   Did you -- did you -- do you know whether

24   Anda sold any CIIs products or any controlled

25   substances to the repackagers and these other trade
```

1    classes, wholesalers, et cetera?

2        A.   At one point they did, but when we -- when

3    management made the list not to sell to the doctors

4    and the distributors and the repackagers and the

5    veterinarians, those -- all those trade classes were

6    completely eliminated.  They could not purchase from

7    us.

8        Q.   But up until that time, they did?

9        A.   I would think so, yes, because there was a

10   point in time when those -- when there was a line in

11   the sand between we're doing it today, we're not

12   doing it tomorrow.

13       Q.   And remind me again.  What was that date?

14       A.   I don't recall the date.

15       Q.   But you were at the company?

16       A.   I remember being at the company.  I want to

17   say it was somewhere in the neighborhood of late

18   2009, 2010.  I don't recall the exact date.

19       Q.   And during the time period preceding this

20   switchover, how were you able to do any kind of due

21   diligence investigation to find out where those

22   repackager and wholesalers -- what was happening to

23   the controlled substance products?

24           MS. KOSKI:  Object to the form.  Are you

25       asking if Ms. Williams did due diligence or did

1    Anda?

2         MS. RELKIN:  Well --

3         MS. KOSKI:  It's not clear from your

4    question.

5         MS. RELKIN:  Okay.

6    Q.   No.  I'm asking whether you knew of any

7    protocol Anda had which would encompass your unit --

8    strike that.

9         Were you aware of any protocol Anda had to

10   due diligence -- to do due diligence to ensure that

11   these repackagers and wholesalers were not wantonly

12   distributing opioid products?

13   A.   I am not.  I don't -- I don't recall.  I

14   didn't deal with them myself.  We had very, very few

15   of those across the floor.

16   Q.   And is one of the reasons why they stopped

17   that during this time period you estimate to be late

18   2009, 2010, was because of the concern that they

19   may -- the products may have gotten into the wrong

20   hands?

21        MS. KOSKI:  Object to form.

22   Q.   From that avenue of repackagers and

23   wholesalers?

24   A.   I don't know that this particular issue

25   factored into that decision, because this situation

Highly Confidential – Subject to Further Confidentiality Review

```
 1   happened in 2011, versus the decision that the

 2   management team had made back in that 2009, 2010

 3   time frame.  So whatever protocols had already been

 4   put in place were already in place for this

 5   particular situation.

 6       Q.   Okay.  So let's now switch to the

 7   spreadsheet that was referenced as the attached

 8   document, and that spreadsheet is number -- there is

 9   two spreadsheets, 109031 and 109039.

10           THE VIDEOGRAPHER:  Off the record at 5:13.

11           (Recess from 5:13 p.m. until 5:22 p.m.)

12           THE VIDEOGRAPHER:  Back on the record at

13       5:22.

14           (Anda-Williams Exhibit 41 was marked for

15       identification.)

16   BY MS. RELKIN:

17       Q.   So what we've marked virtually as Exhibit 41

18   is a spreadsheet with the number identified

19   previously.  And going to one of the items, Item

20   154, it's identified as retail independent, and then

21   the category is DVD2.

22           What is DVD?

23       A.   It was a pricing program that they were on.

24   We had -- it stood for deep value discount, and it

25   was just a -- had to do with the type of pricing
```

1   structure they were on.

2      Q.   Then there was a number there.  I could go

3   all the way up if you want me to --

4      A.   Could you?  Because I don't know what that

5   refers to.  I don't know if that was the account

6   number or if the that was a item number that she was

7   researching.

8           Okay.  That was the customer number.

9      Q.   You know what I'll do, is let me go to the

10  right so you can get familiar with all the

11  categories.  Then there is the customer name.

12     A.   Uh-huh.  The current sales rep.

13     Q.   Total units net and other units.

14     A.   Okay.

15     Q.   Watson units.

16     A.   Okay.  But we don't know what -- whether

17  those Watson units -- those were total Watson units,

18  regardless of what the item was.

19     Q.   Right.  Right.

20     A.   So it could have been OTCs.  It could have

21  been regular generics.  Okay.

22     Q.   Right.  Right.  You've educated me about

23  that.  So now I'm trying to identify whether on here

24  there are other narcotics.  And then it -- then it

25  has comments that --

```
 1      A.   Correct.  That's the piece that she asked us

 2   to advise of our findings.  We put our findings in

 3   the comment section, and I returned that file back

 4   to her.

 5      Q.   So if you look at the comments on the third

 6   item, it says:  "Suspicious large quantities for a

 7   retail pharmacy."

 8      A.   Correct, but it doesn't say which item.

 9      Q.   Okay.

10      A.   And it was not a Watson unit, but there was

11   something there that we looked at that --

12      Q.   It was -- it was --

13      A.   -- we felt that needed to be looked at.

14      Q.   It was a retail independent.  Okay.  And so

15   what other product would one deem suspicious in

16   quantities?

17           MS. KOSKI:  Object to form; no foundation.

18      A.   I don't know.  I would have to look at that

19   customer's history to be able to say what we were

20   looking at.

21      Q.   Well, in terms of your general

22   understanding, when the term "suspicious quantities"

23   were used --

24      A.   It could have been anything.  It could have

25   been OTCs.  It could have been that they were buying
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    1,000 units of vitamin A.  You know, anything that

 2    was unusually large quantity would have triggered a

 3    comment like that.

 4          Sometimes we had aspirin, just regular

 5    aspirin that was being shipped.  If it's --

 6          MS. KOSKI:  Wait for a question.

 7          THE WITNESS:  Okay.

 8          MS. LUND:  Can you tell me, does the

 9    spreadsheet bear the same AEO designation as the

10    e-mail it was attached to?

11          MS. KOSKI:  Yeah, likely the attachment

12    would be the same as the cover.

13          MS. LUND:  Thanks.

14    Q.   So --

15          MS. KOSKI:  It is likely, not unlikely.

16    Q.   -- the item I'm focusing is item 154, and

17    it's another retail independent and that was at

18    DVD2.  And then the pharmacy is Ultima Rx, which, if

19    you Google, it's a pharmacy in Florida and look at

██    ████████████████    ████████████████████

21    A.   Those are items.

22    Q.   Items?

23    A.   I'm assuming, what were F and G's total at

24    the top?

25    Q.   We'll go back to F and G.
```

```
 1              MS. KOSKI:  I'm going to object to the whole
 2        line of questioning.  There is no foundation.
 3        There is no indication this has anything to do
 4        with opioids or controlled substances or
 5        anything.  This hasn't laid that foundation.
 6              MS. RELKIN:  Well, this is something that
 7        the witness was involved in, in the e-mails,
 8        reviewing.
 9              MS. KOSKI:  You asked her, and she said she
10        doesn't know, so you're pointing out these
11        product numbers.
12   BY MS. RELKIN:
13        Q.   Well, you looked at this spreadsheet back
14   when that memo was written, correct?
15        A.   Correct.
16        Q.   Okay.  Who is Anita Isabella?
17        A.   She was the one who was from our database
18   management sales reporting area.
19        Q.   So F is total units net and G is other
20   units.  Okay?
21        A.   Okay.
22        Q.   So we'll go back to 154.  154, and that's
23   Ultima.  Are you familiar with that pharmacy?
24        A.   I remember hearing about it, but in terms of
25   knowing it intimately, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   What do you remember hearing about it?

 2        A.   They were a high volume producer, high

 3   volume sales.

 4        Q.   For opioids?

 5        A.   No, just overall sales, overall generic

 6   sales.

 7        Q.   There may have been opioids, too; you just

 8   don't know one way or the other?

 9        A.   I don't recall them having opioids, but I

10   cannot say and swear here on a stack of Bibles that

11   they were not.  I don't know what -- I don't know
```



```
17   listed as "suspicious large quantities for retail

18   pharmacy"?

19        A.   Correct.

20        Q.   You would agree that that number, even if

21   they were a high volume, that's still a "suspicious

22   large" number?

23        A.   And that's why it was --

24             MS. KOSKI:  Objection; no foundation.

25        Q.   And then was indicated:  "Investigating this
```

1    further."  Correct?  Did you ever come to learn what

2    happened with that investigation?

3        A.    I did not.

4        Q.    Now, even though this investigation was

5    generated because of Watson's discovery that some of

6    their product was being sold in Iran -- and we don't

7    know from that memo what the product was -- the team

8    you worked with to do this investigation was able to

9    do analysis, by looking at high volume sales in the

10   aggregate, to generate the suspicion to go on this

11   list; is that right?

12             MS. KOSKI:  Object to form.

13       A.    Correct.

14       Q.    There also was a -- some of the customers

15   that were listed distributor/wholesaler were --

16   looked to be -- claimed to be charity groups, like

17   Medicine for Missions Exporters, and I think there

18   was another medical-sounding charity group.

19             What was done to ascertain the legitimacy of

20   an entity claim to go be a charity group buying

21   product to ship outside of the country?

22             MS. KOSKI:  Object to form; no foundation.

23             If you know, you can answer.

24       A.    Could you repeat the question, please?

25       Q.    What due diligence investigation was done to

1    ascertain if some buyer claiming to be a mission or

2    charity was buying pharmaceutical product to ship

3    outside of the country?

4         MS. KOSKI:  Object to form; no foundation.

5         A.   I don't recall all the particulars on that.

6    We were -- I'm going to say I don't recall the

7    details.

8         Q.   So for example, here's another one.  Item

9    20, Meridian International, they are listed on this

10   chart -- actually, it said Meridian International

17        Do you know whether there was any

18   requirement for sale to entities that were shipping

19   pharmaceutical products abroad?

20        A.   No.

21        Q.   You don't know?

22        A.   No.  There was no requirement that they had

23   to ship to -- is that what you're asking, whether or

24   not they were required to ship to a mission?

25        Q.   No.  Just abroad.  What -- strike that.

```
 1              When you were -- when Anda was selling

 2      pharmaceutical product to entities, generally we've

 3      been talking about US pharmacies with DEA licenses,

 4      right?

 5          A.   Correct.

 6          Q.   Okay.  Some of these entities who were --

 7      claimed to be charities doing medical work outside

 8      of the country or other entities who might be

 9      repackaging and selling outside of the country, were

10      there any regulations you were working under to

11      determine whether or not you could sell to such an

12      entity?

13              MS. KOSKI:  Object to form; no foundation,

14          and calls for a legal conclusion.

15              Are you asking if there are any regulations?

16          Q.   Do you know whether they had DEA licenses?

17          A.   The missions?

18          Q.   Yeah.

19          A.   I do not know.

20          Q.   Was there any -- what was the process to

21      determine if they did?  Did that not go through

22      sales?

23          A.   We were selling -- when we did this due

24      diligence, we were asked to get additional

25      information on the sales to our legitimate pharmacy
```

```
 1    customers.  We gathered that information.  We turned

 2    that information back over to Kim Poropat, and they

 3    were looking to standardize the process.

 4        Q.   Do you know what happened to this

 5    investigation?  Did it terminate?  Was there a --

 6    was there an overall report written?

 7        A.   I do not recall seeing a report, no.

 8        Q.   Here's another one.  This is item 80.  It

 9    says:  "Suspicious large quantities for retail

10    pharmacy."  And the total number of units was

██    ██████████████████████

12        A.   They -- she had a customer that she was

13    doing almost all OTC products with.

14        Q.   That's Christina Duster?

15        A.   Christina Duster.

16        Q.   It was listed -- Freedom Health is the

17    customer?

18        A.   Yeah.  They are a vitamin only account.

19        Q.   Okay.  Who had these accounts --

20             MS. KOSKI:  Object to form; foundation.

21        Q.   -- on this spreadsheet?  Was there any

22    category of sales who was in charge of the wholesale

23    distributor?

24        A.   The -- these were spread across the whole

25    floor.  As you can see, the sales reps' name were --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there were some national account managers on there.

 2         Q.   Okay.

 3         A.   Sales reps on there.  There are -- there

 4    were some members from other departments, from the

 5    Anda meds team that were on there, some from VIP.

 6         Q.   Let's go to Item 154, who were that sales

 7    rep.

 8              Is Stephanie Steele a sales rep?

 9         A.   Yes, she was.

10         Q.   She was in Weston, Florida?

11         A.   Yes, she was.

12         Q.   Did anybody speak to her about what Ultima

13    Rx was buying?

14         A.   I'm positive they must have.

15         Q.   But you don't know what --

16         A.   I don't recall what the outcome of it was.

17         Q.   Is she still with the company, as far as you

18    know?

19         A.   I do not recall.

20         Q.   Was she with the company when you left?

21         A.   Christina?

22         Q.   Yeah.

23         A.   Yeah, she was with the company when I left.

24              MS. KOSKI:  The amount of time, Susan?

25              THE COURT REPORTER:  13 minutes -- 12
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      minutes.

 2           MS. RELKIN:  I'm just about finished with

 3      that.

 4              (Discussion off the record.)

 5           MS. KOSKI:  What is it that you have on the

 6      screen now?

 7           MS. RELKIN:  This is the companion document

 8      that was also referenced.  I identified both

 9      numbers.

10   BY MS. RELKIN:

11      Q.  Here's a Town Pharmacy which had units of

12      ████████  and it was a comment:  "Suspicious large

13      quantity for retail pharmacy."

14              And the rep was Andrea -- Andrea Cornelius.

15      Are you familiar with her?

16      A.  I am not.

17      Q.  Are you familiar with Town Pharmacy?

18      A.  No, I'm not.

19      Q.  Do you know what happened with that

20      investigation as to them?

21      A.  No, I do not.

22      Q.  Here we have a suspicious specific order

    ██    ████████    ██████████████████    ████████████

24      Miracle Lane Pharmacy.  Did you ever hear of that?

25      A.  That was a VIP rep up in New York, Becky
```

```
 1    Marlowe.
 2        Q.   Do you know why it was a suspicious specific
 3    order?
 4        A.   I do not know.
 5        Q.   Here's another "suspicious large quantities
 6    for retail pharmacy."  Danielle Cardiello is the
 7    rep?
 8        A.   Yes.
 9        Q.   Do you know her?
10        A.   Yes, she was.
11        Q.   She's still with the company, do you know?
12        A.   No, she's not.
13        Q.   Do you know where she is now?
14        A.   I do not know.
15        Q.   Okay.
16        A.   I believe she's retired.
17        Q.   And the pharmacy was -- the customer was
18    Park Court Services, Inc.
19             Do you know what they are?
20        A.   No.
21        Q.   Here's another "suspicious large quantities
22    for retail pharmacy," ████████████████████████████
23    James Hasket being the rep.
24        A.   He was a vitamin only account rep.
25        Q.   You're right.  There it goes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Here's someone listed as an exporter.  Were

 2      you able to sell controlled substances to exporters?

 3      A.   Ung-ugh.

 4      Q.   No?

 5      A.   Ung-ugh.

 6           MS. KOSKI:  Say it out loud.

 7      A.   No.

 8      Q.   Here's another one that's listed -- that

 9      looks like it's another vitamin only, Christina

10      Duster.

11      A.   They were flagged as suspicious for the

12      volume of the account, not necessarily -- it was the

13      volume that was causing the suspicion.

14      Q.   The volume is why would a local pharmacy in

15      Florida be buying --

16      A.   Correct.

        ■     ■     ████████████████████████████████

18      That, in and of itself, flagged suspicion?

19           MS. KOSKI:  I still haven't heard any

20           foundation that this has anything to do with

21           anything to do with this case.

22           MS. RELKIN:  Well, we may need more

23           discovery to find out what happened to the

24           investigation.  The company here is -- this looks

25           to be the same, it's that same Ultima pharmacy.
```

```
 1              MS. KOSKI:  This is the same spreadsheet,

 2       isn't it?  Those are the same numbers.

 3              MS. RELKIN:  They are the same numbers, so

 4       maybe they are -- they're similar.  They're two

 5       separate numbers, but there's two spreadsheets

 6       that were referenced in that.

 7              All right.  Well, we call for any discovery

 8       regarding what happened to this investigation,

 9       specifically what happened -- what the outcome

10       was of the investigation on the suspicious large

11       quantities for the Ultima prescription ▮▮▮▮▮

12       units.

13              Given the time constraints, and it's been a

14       long day for us, I thank you very much,

15       Ms. Williams, and we're concluded.

16              MS. KOSKI:  No questions.  Any questions in

17       the room?

18              MS. LUND:  No questions.

19              MS. KOSKI:  Any question on the phone?

20                     (No response.)

21              MS. KOSKI:  Hearing none, we're good.

22              THE VIDEOGRAPHER:  The time is 5 --

23              MS. KOSKI:  He said none.

24              THE VIDEOGRAPHER:  The time is 5:40 p.m.

25       This marks the end of the deposition.  We're now
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        off the record.
2            (Whereupon, the deposition concluded at
3     5:40 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of PATRICIA

 6   WILLIAMS was duly taken on Thursday,

 7   December 13, 2018, at 9:22 a.m. before me.

 8          The said PATRICIA WILLIAMS was duly sworn by

 9   me according to law to tell the truth, the whole

10   truth and nothing but the truth and thereupon did

11   testify as set forth in the above transcript of

12   testimony.  The testimony was taken down

13   stenographically by me.  I do further certify that

14   the above deposition is full, complete, and a true

15   record of all the testimony given by the said

16   witness, and that a review of the transcript was

17   requested.

18

19   _____

20   Susan D. Wasilewski, RPR, CRR, CCP

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6     REASON: _____

 7   _____   _____   _____

 8     REASON: _____

 9   _____   _____   _____

10     REASON: _____

11   _____   _____   _____

12     REASON: _____

13   _____   _____   _____

14     REASON: _____

15   _____   _____   _____

16     REASON: _____

17   _____   _____   _____

18     REASON: _____

19   _____   _____   _____

20     REASON: _____

21   _____   _____   _____

22     REASON: _____

23   _____   _____   _____

24     REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    through 312, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____    _____

13    PATRICIA WILLIAMS                              DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                              LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25