Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5   -----------------------------) MDL No. 2804

 6   IN RE:  NATIONAL PRESCRIPTION )

 7   OPIATE LITIGATION             )

 8   -----------------------------) Case No. 17-md-2804

 9   THIS DOCUMENT RELATES TO:     )

10   ALL CASES                     )

11   -----------------------------) Hon. Dan A. Polster

12

13                HIGHLY CONFIDENTIAL

14      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16              VIDEOTAPED DEPOSITION OF

17                    ELLEN WILSON

18

19                  January 24, 2019

20

21               Indianapolis, Indiana

22

23

24
```

Page 2

1
2
3
4
5       The videotaped deposition of ELLEN WILSON,
6  called by the Plaintiffs for examination, taken
7  pursuant to the Federal Rules of Civil Procedure of
8  the United States District Courts pertaining to the
9  taking of depositions, taken before JULIANA F.
10 ZAJICEK, a Registered Professional Reporter and a
11 Certified Shorthand Reporter, at the Indianapolis
12 Marriott Downtown, Texas Room, 350 West Maryland
13 Street, Indianapolis, Indiana, on January 24, 2019, at
14 4:40 p.m.
15
16
17
18
19
20
21
22
23
24

Page 3

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3      MOTLEY RICE LLC
        28 Bridgeside Boulevard
4       Mt. Pleasant, South Carolina 29464
        843-216-9250
5      BY:  MICHAEL E. ELSNER, ESQ.
            melsner@motleyrice.com
6
7  ON BEHALF OF THE PLAINTIFFS:
8      WEISMAN KENNEDY & BERRIS CO LPA
        1600 Midland Building
9       101 Prospect Avenue
        Cleveland, Ohio 44115
10      216-781-1111
       BY:  DANIEL P. GOETZ, ESQ.
11          dgoetz@weismanlaw.com
12
   ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
13 AMERISOURCEBERGEN DRUG CORPORATION:
14     JACKSON KELLY PLLC
        500 Lee Street East, Suite 1600
15      Charleston, West Virginia 25301-3202
        304-340-1018
16     BY:  JILL McINTYRE, ESQ. (Telephonically)
            jmcintyre@JacksonKelly.com
17
18 ON BEHALF OF CARDINAL HEALTH, INC.:
19     ARMSTRONG TEASDALE LLP
        7700 Forsyth Boulevard, Suite 1800
20      St. Louis, Missouri 63105
        314-621-5070
21     BY:  SARAH E. HARMON, ESQ.
            sharmon@ArmstrongTeasdale.com
22
23
24

Page 4

1  APPEARANCES: (Continued)
2  ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
   INC.:
3
       ZUCKERMAN SPAEDER LLP
4       1800 M Street, NW, Suite 1000
        Washington, D.C. 20036
5       202-778-1800
       BY:  R. MILES CLARK, ESQ.
6           mclark@zuckerman.com
        PAUL B. HYNES, JR., ESQ.
7           phynes@zuckerman.com
8
   ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
9  PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
   INC.:
10
       BAKER HOSTETLER
11      Key Tower
        127 Public Square, Suite 2000
12      Cleveland, OH 44114-1214
        216-861-6486
13     BY:  TERA N. COLEMAN, ESQ. (Telephonically)
            tcoleman@bakerlaw.com
14
15 ON BEHALF OF WALMART INC.:
16     JONES DAY
        77 West Wacker Drive
17      Chicago, Illinois 60601-1692
        312-269-4164
18     BY:  CHRISTINE D. PROROK, ESQ.
            (Telephonically)
19          cprorok@jonesday.com
20
   ALSO PRESENT:
21
       KAITLYN EEKHOFF, Law Clerk,
22         Motley Rice LLC
   THE VIDEOGRAPHER:
23     MR. ANTHONY MICHELETTO,
        Golkow Litigation Services.
24

Page 5

1             I N D E X
2
3  WITNESS:                    PAGE:
4  ELLEN WILSON
5      EXAM BY MR. GOETZ...................   7
6
7             *****
8
9           E X H I B I T S
10 CVS - WILSON EXHIBIT          MARKED FOR ID
11  No. 1    Handwritten drawing         87
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 6

1    THE VIDEOGRAPHER: We are now on the record. My
2  name is Anthony Micheletto. I am a legal vid --
3  videographer for Golkow Litigation Services.
4    Today's date is January 24th, 2019. The
5  time is 4:40 p.m. as indicated on the video screen.
6    This video deposition is being held in
7  Indianapolis, Indiana, in the matter of In Re National
8  Prescription Opiate Litigation, before the
9  United States District Court for the Northern District
10  of Ohio, Eastern Division.
11    Our deponent is Ellen Wilson.
12    Will counsel please identify yourselves
13  for the video record.
14    MR. GOETZ: Dan Goetz for the Plaintiffs.
15    MR. ELSNER: Michael Elsner for the Plaintiffs.
16    MS. HARMON: Sarah Harmon for Cardinal Health.
17    MR. CLARK: Miles Clark for Zuckerman Spaeder on
18  behalf of CVS Indiana, LLC, CVS RX Services, Inc., and
19  the witness.
20    MR. HYNES: Paul Hynes from Zuckerman Spaeder,
21  LLP, on behalf of CVS Rx Services, Inc., CVS Indiana,
22  LLC, and the witness.
23    THE VIDEOGRAPHER: Our court reporter today is
24  Juliana Zajicek.

Page 7

1    Please swear in the witness.
2    MS. MCINTYRE: Do you -- do you want to know who
3  is on the phone?
4    THE VIDEOGRAPHER: Yes, please.
5    MS. MCINTYRE: This is Jill McIntyre from
6  Jackson Kelly on behalf of AmerisourceBergen Drug
7  Corporation.
8    MS. PROROK: And this is Christine Prorok from
9  Jones Day on behalf of Walmart.
10    (WHEREUPON, the witness was duly
11    sworn.)
12    ELLEN WILSON,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15    EXAMINATION
16  BY MR. GOETZ:
17    Q.  Ms. Wilson, my name is Dan Goetz, and we
18  met briefly before this.
19    It is my understanding you had a death in
20  the family recently, correct?
21    A.  Correct.
22    Q.  I -- I can't tell you how much I
23  appreciate you changing your schedule and being here
24  today and accommodating us.

Page 8

1    And you also have a hard stop at 6:30,
2  correct?
3    A.  Yes.
4    Q.  Okay. We will do our best to be done and
5  if we are not done, then we'll figure out some way to
6  continue this testimony, okay?
7    A.  Okay.
8    Q.  What is -- if I ask you a question and you
9  don't understand it, please tell me.
10    A.  Okay.
11    Q.  And -- and I will rephrase it.
12    And by the same token, if you answer the
13  question, I'll assume you understood it.
14    Fair enough?
15    A.  Yes.
16    Q.  How far did you go in school?
17    A.  Just Grade 12.
18    Q.  Okay.
19    A.  12th grade.
20    Q.  I --
21    A.  Can you not hear me?
22    Q.  Because of the fan being right over me,
23  I -- I might need you to speak up a little.
24    A.  Okay.

Page 9

1    Q.  To 12th grade?
2    A.  True.
3    Q.  And when did you graduate?
4    A.  1989.
5    Q.  And after you graduated, where did you go
6  work?
7    A.  After high school?
8    Q.  Yes.
9    A.  I had my daughter, so I didn't work.
10    Q.  Okay. What was your first job after high
11  school?
12    A.  Phar-Mor.
13    Q.  And -- and what did you do at Phar-Mor?
14    A.  I was a cash register -- cashier.
15    Q.  And -- and how long were you there for?
16    A.  About three years.
17    Q.  And from when to when?
18    A.  From '9 -- I had her in '90, so that would
19  be '91 to '94.
20    Q.  And what did you do after Phar-Mor?
21    A.  While I was still at Phar-Mor, I went to
22  C -- or it would have been Hooks at -- in '93.
23    Q.  And what did you do at Hooks?
24    A.  I went to -- I started out in Flow 2 as a

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 order filler for probably six months and then I went
2 up to the Rx department.
3     Q.   And Hooks, that facility eventually became
4 a CVS facility, is that correct?
5     A.   Yes, it was.  It went from Hooks to Revco
6 to CVS.
7     Q.   And -- and when did it become a CVS
8 facility?
9     A.   I'm not sure.
10     Q.   Do you have an idea?
11     A.   No.
12     Q.   Okay.  And in '93 when you went to Hooks
13 Drugs and you said you were a Flow 2 order filler?
14     A.   Yes.
15     Q.   What is that, just briefly?
16     A.   It was a flow module that held toothpaste,
17 tooth brushes, mouth wash, shampoo.  That was it.  I
18 think that was it.
19     Q.   And -- and then you said you went to R --
20 the Rx department?
21     A.   The Rx department, yes.
22     Q.   Does that mean you were in the cage?
23     A.   No.  I started out in one of the flow --
24 one of the picking aisles in -- up in Rx.

Page 11

1     Q.   And how long were you there?
2     A.   In the Rx department?
3     Q.   Yes.
4     A.   From '93 until six months ago.
5     Q.   What happened six months ago?
6     A.   I went to inventory control.
7     Q.   There is a controlled substances cage at
8 the CVS Indiana distribution warehouse?
9     A.   Yes.
10     Q.   Okay.  When did you start working in that
11 cage?
12     A.   In '96, December of '96.
13     Q.   And you worked in that cage until when?
14     A.   Six months ago.
15     Q.   Okay.  And that controlled substances
16 cage, generally what does it hold when we talk about
17 controlled substances?
18     A.   There -- there is all kinds of drugs,
19 hydrocodone, testosterone, anything that you need a --
20 when you go to the doctor's office and they have a
21 little pad, any kind of controlled drug is what they
22 have in there.
23     Q.   Am I correct that that controlled
24 substance cage at CVS held Schedule III, IV and V

Page 12

1 drugs?
2     A.   No.
3     Q.   Okay.  What did it hold?
4     A.   It hold -- held hydrocodone, testosterone,
5 I can't even -- I don't even know the name of some of
6 the drugs in there.
7     Q.   Anything else you can remember?
8     A.   The names of the drugs?
9     Q.   Yes.
10     A.   No.
11     Q.   In -- in '96 when you started in the cage,
12 what training did you receive?
13     MR. HYNES:  Objection to form.
14     Go ahead.
15 BY THE WITNESS:
16     A.   I received training from a lady named
17 Charlotte Rucker in there.  She trained me on what to
18 do.
19 BY MR. GOETZ:
20     Q.   Was it training on the job?
21     MR. HYNES:  Objection to form.
22 BY THE WITNESS:
23     A.   Yes.
24 BY MR. GOETZ:

Page 13

1     Q.   How long did you work with Charlotte
2 Rucker after she trained you?
3     A.   Two months.  Probably two months because
4 she retired.
5     Q.   From -- from '96 until 2014, September
6 of 2014, can you tell me any other training you
7 received other than that training on the job by
8 Charlotte Rucker?
9     MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11     A.   What other kind of training.  No, I -- no.
12 I -- the supervisor would come in if there was, like,
13 a new procedure, by new procedure I mean they would
14 type out a form and it said step for step what to do
15 in that cage and it would hang on the board for
16 anybody that came in there.  We would -- they would
17 teach -- we would review it step for step exactly what
18 to do when you were in the cage.
19 BY MR. GOETZ:
20     Q.   First, who was your supervisor in 2006?
21     A.   Steve -- I believe it was Steve Campbell.
22 Steve -- we had two supervisors, Steve Campbell and
23 Robert Richardson.
24     Q.   And who was the supervisor in 2007?

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1   A.   I'm not sure what year Steve left the
2   company, but then we went to Gary Lamberth and Dan
3   Deaton.
4   Q.   And how long were they your supervisor?
5   A.   Gary Lamberth was from, I'm not sure
6   exactly when he started there, but he recently left
7   the company.
8   Q.   Was -- was Gary Lamberth your supervisor
9   from around 2007 through September of 2014?
10  A.   I believe so.
11  Q.   When you said when there was a new
12  procedure they would type it up and put it on a -- on
13  the -- on a board, a bulletin board, is that what you
14  said?
15  A.   A bulletin board, yes.
16  Q.   What type of procedure are you talking
17  about?
18  A.   It's exactly what they expect out of you
19  every single day as far as, like, when you pick up the
20  order exactly what to do with the -- what to do with
21  that when you pick up the order and when you pick it
22  and when you send it to the checker and then you give
23  it to the checker and they scan the items and then
24  after they scan the items what to do, how to tie it

Page 15

1   up, how to stack it, and where to push it in that
2   procedure.
3   Q.   And -- and -- and how often would these
4   procedures come out?
5   MR. HYNES:  Objection to form.
6   BY THE WITNESS:
7   A.   I'm not sure.
8   BY MR. GOETZ:
9   Q.   Do you -- do you know what a -- a -- a
10  huddle guide is?
11  A.   No.
12  Q.   Okay.  Did any of these procedures from
13  '06 until September of '14 deal with suspicious order
14  monitoring?
15  A.   Yes.
16  Q.   Okay.  When did those come out?
17  A.   From the day that I started in the cage,
18  Charlotte emphasized that until the time I left the
19  cage.
20  Q.   Okay.  Charlotte then?
21  A.   Charlotte would.
22  Q.   I'm -- I'm asking about the written --
23  A.   Oh, the written.
24  Q.   -- these written procedures that you

Page 16

1   said --
2   A.   It has always been in effect.
3   Q.   Okay.  The written procedures have?
4   A.   Yes.
5   Q.   And so you -- you have to then tell me
6   more generally what they said?  What did they say?
7   MR. HYNES:  Objection to form.
8   BY THE WITNESS:
9   A.   On the -- as far as you want to know what
10  the paper said?
11  BY MR. GOETZ:
12  Q.   Yes.
13  A.   I don't recall.
14  Q.   Okay.  There has been testimony in this
15  case that there were no written policies or procedures
16  governing suspicious order monitoring until August
17  of 2010, okay.
18  A.   Um-hum.
19  Q.   Am -- am I understanding you to say that
20  that's not correct?
21  MR. HYNES:  Objection to form, lack of
22  foundation.
23  BY THE WITNESS:
24  A.   I don't know exactly what year that went

Page 17

1   into effect, but I've known across the board since the
2   day that I started in that cage there has always been
3   a suspicious order, if you think that that order is
4   too big or if it's a -- a red flag, you are to call
5   Sherri.
6   BY MR. GOETZ:
7   Q.   I -- I'm not asking you about what the
8   procedure was, I'm asking about written procedures.
9   When you said --
10  A.   Oh.
11  Q.   -- that there are written procedures they
12  would post on a bulletin board, what -- my question is
13  about written procedures governing suspicious order
14  monitoring and -- and what your job is as -- in the
15  cage as it relates to that.
16  So that -- do you understand my question
17  is from -- from 2006 until September of 2014, what
18  written procedures governing suspicious order
19  monitoring in your job specifically in the cage do you
20  remember?
21  A.   I don't --
22  MR. HYNES:  Objection to form.
23  Go ahead.
24  BY THE WITNESS:

Page 18

1  A.  I don't remember.
2  BY MR. GOETZ:
3  Q.  So you don't -- when we were talk -- you
4  said there's procedures, you were talking about you
5  just knew what to do?
6  A.  Yes.
7  MR. HYNES:  Objection.
8  BY MR. GOETZ:
9  Q.  People had told you what to do, Ms. Rucker
10 had told you what to do?
11 A.  Uh-huh.
12 MR. HYNES:  Objection to form.
13 BY MR. GOETZ:
14 Q.  Is that correct?
15 A.  Yes.
16 Q.  And -- and maybe other people, your other
17 supervisors had told you what to do?
18 MR. HYNES:  Objection to form.
19 BY THE WITNESS:
20 A.  Yes.
21 BY MR. GOETZ:
22 Q.  Okay.  In 2006, how many pharmacies did
23 the Indiana distribution center service?
24 A.  I don't know.

Page 19

1  Q.  Do you have a guess?
2  MR. HYNES:  Objection; asked and answered.
3  BY THE WITNESS:
4  A.  No.
5  BY MR. GOETZ:
6  Q.  Do you have an estimate?
7  MR. HYNES:  Objection; asked and answered, calls
8  for speculation.
9  BY THE WITNESS:
10 A.  No.
11 BY MR. GOETZ:
12 Q.  Well, you -- you filled the orders,
13 correct, for all of the pharmacies that were receiving
14 controlled substances from the Indiana distribution
15 center?
16 MR. HYNES:  October to form.
17 BY THE WITNESS:
18 A.  Yes.
19 BY MR. GOETZ:
20 Q.  And -- and you -- you -- you have no idea
21 how many there were in 2006?
22 A.  No.
23 Q.  What about in 2007?
24 A.  No.

Page 20

1  Q.  What about in 2008?
2  A.  No.
3  Q.  What about in 2009?
4  A.  No.
5  Q.  What about in 2010?
6  A.  No.
7  Q.  What about in 2011?
8  A.  No.
9  Q.  What about in 2012?
10 A.  No.
11 Q.  What about in 2013?
12 A.  No.
13 Q.  What about in 2014?
14 A.  No.
15 Q.  Can you tell me -- you -- you left the
16 cage six months ago.  What about in 2018?
17 A.  No.
18 MR. HYNES:  Objection to form.
19 BY MR. GOETZ:
20 Q.  Do you know who -- who Gary Milikan is?
21 A.  Yes.
22 Q.  Mr. Milikan testified that from '06 to '14
23 there were approximately 1500 pharmacies served, 1500
24 in 2006 and it stayed the same.

Page 21

1  Do you disagree with that amount?
2  MR. HYNES:  Objection to form, lack of
3  foundation.
4  You may answer.
5  BY THE WITNESS:
6  A.  I really don't know.
7  BY MR. GOETZ:
8  Q.  In 2006, how big was the cage?
9  MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11 A.  Like the square footage, I don't know.
12 BY MR. GOETZ:
13 Q.  Could you draw it?
14 MR. HYNES:  Objection to form.
15 BY MR. GOETZ:
16 Q.  Could you?
17 A.  In 2006, yes.
18 Q.  Would you draw it for me, please?
19 A.  Should I -- I mean, I -- if -- are you
20 asking for square footage on the sides?
21 Q.  I'm asking for -- for some idea if the
22 cage is the size of a football field or if the cage is
23 the size of -- of this room or a bathroom?  I'm trying
24 to get some idea as to the size of that cage in 2006

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 and then we'll go -- my understanding, Mr. Hynes can
2 object, that that cage underwent one change at least
3 from '06 to '14 and we'll talk about that, okay?
4    A.   Okay.
5       (Indicating.)
6    Q.   Thank you.
7    THE WITNESS:  I'm sorry.
8    MR. HYNES:  No, you're fine.
9 BY MR. GOETZ:
10    Q.   May I come over there and ask you some
11 questions?  Do you mind if I look over your shoulder?
12    A.   No.  Go ahead.
13    MR. GOETZ:  Do you mind, Mr. Hynes?
14    MR. HYNES:  No.
15 BY MR. GOETZ:
16    Q.   Where -- where this says holding cage
17 right here?
18    A.   Um-hum.
19    Q.   Is -- is that, like, a separate cage?
20    A.   This -- there was a door right here.
21    Q.   Wait.  Could you -- could you put where
22 there is a door?
23    A.   There is a door about right in here.
24    Q.   Okay.  And so you -- you wrote door,

Page 23

1 correct?
2    A.   Um-hum.
3    Q.   And so what was the holding cage?
4    A.   It was after you stood in these two
5 locations right here and you put --
6    Q.   Wait.  So you need to put -- we are going
7 to try and show a jury some day, so you need to mark
8 those, please.
9    A.   This is a picking station right here.
10    Q.   Could you fill that in with "picking
11 station"?
12    A.   I mean a checking -- checking location,
13 because the picking rack was here and on this side.
14 This is a -- this is where the merchandise was at.
15    Q.   So that -- that picking rack is full of
16 all of the products in the cage?
17    A.   Yes.
18    Q.   Okay.  And are there two racks?
19    A.   Yes, because you walked in a U to pick the
20 stuff.  You started here and worked your way down and
21 you went in a cir -- in a --
22    Q.   And -- and -- and when we talk about
23 racks, I'm -- I'm envisioning something like what we
24 see at Home Depot or what -- what do they look like,

Page 24

1 those racks?
2    MR. HYNES:  Objection to form.
3 BY THE WITNESS:
4    A.   They are pretty -- well, yeah -- no, they
5 are not really at -- I wouldn't say at, like, Home
6 Depot.  They are dark blue and they have shelves on
7 them that kind of lean like this and the merch -- and
8 they put the merchandise on it and it kind of slides down
9 to the end and there's, like, a lip right here that
10 keeps the bottles, the merchandise and the boxes from
11 falling down onto the floor and then --
12 BY MR. GOETZ:
13    Q.   So be -- before we continue -- and this is
14 helpful -- Mr. Milikan had testified that there were
15 pallets somewhere.
16    MR. HYNES:  Objection; lack of foundation.
17       Go ahead.
18 BY MR. GOETZ:
19    Q.   Where there pallets somewhere in there?
20    A.   Yes, there are pallets.
21    MR. HYNES:  Same objection.
22 BY MR. GOETZ:
23    Q.   Could you show those pallets, please?
24    A.   The pallets were back here.

Page 25

1    Q.   Could you label those pallets, please.
2    A.   (Indicating.)
3    Q.   And -- and are those what -- what I
4 envision standard wooden pallets with product on top
5 of it?
6    A.   Yes.
7    MR. HYNES:  Objection; form.
8 BY MR. GOETZ:
9    Q.   They would be moved by a forklift?
10    A.   Yes.
11    Q.   Okay.  How big do you think those pallets
12 are?
13    MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15    A.   I don't know.
16 BY MR. GOETZ:
17    Q.   Would you be -- and -- and would you be
18 picking product off the pallets or would the pallets
19 be used to re-stack the picking racks?
20    A.   They would be merchandise that needed to
21 go on the picking rack.
22    Q.   Okay.  And as part of your job, would you
23 also move product from the pallets to the picking
24 rack?

Page 26

1    A.    No.  That was the stocker's job.
2    Q.    Okay.  So there was a picker, a packer and
3  a stocker in the cage?
4    A.    We had two pickers and two checkers and
5  then we had one guy that stocked.
6    Q.    And would the guy stock at night?
7    A.    No.  It was during the day when we were
8  there.
9    Q.    Okay.  So there were -- typically there
10  were up to five people sometimes in this cage, and we
11  are talking about 2006, okay?
12    A.    Yes.
13    Q.    Okay.  And so you had -- what is a holding
14  cage?  That's how we kind of started talking about
15  this.
16    A.    After we got done standing here scanning
17  the totes that people had picked, you would stack them
18  on top of a roller and then you would go through this
19  door and put them in order of the batches and they'd
20  stack them right here.  And then when they called off
21  batches, like Batch 1 is on the line, you would unlock
22  this gate, put it on the conveyor system that was out
23  here, and then you would lock it back and go back
24  around the corner to your picking station.

Page 27

1    Q.    So -- and so this what you wrote, can I
2  write "gate," may I write "gate"?
3    A.    Yes.
4    Q.    That would be correct?
5        And so the holding cage where the
6  completed totes that had already been picked, had
7  already been checked, and were now ready to go to
8  shipping?
9        MR. HYNES:  Objection to form.
10  BY MR. GOETZ:
11    Q.    Is that correct?
12    A.    Yes.
13    Q.    How -- how big -- this up -- this area up
14  here, I'm going to label it A, how long do you think
15  that was?
16        MR. HYNES:  Objection to form.
17  BY THE WITNESS:
18    A.    I don't know.
19  BY MR. GOETZ:
20    Q.    Do you have an eye -- any idea?
21    A.    No.
22    Q.    Was it the length of a football field?
23    A.    No.
24    Q.    How much shorter than a football field?

Page 28

1    A.    I would say it held -- six pallets could
2  go before it -- you had an open space and then you
3  went to the picking rack.
4    Q.    Okay.  So you had -- on the left you could
5  hold six pallets?
6    A.    Um-hum.
7    Q.    And then a picking rack.  How long was the
8  picking rack?
9    A.    I don't know.
10    Q.    How -- how long relative to the pallets?
11        MR. HYNES:  Objection to form, asked and
12  answered.
13  BY THE WITNESS:
14    A.    I don't know.
15  BY MR. GOETZ:
16    Q.    Okay.  Down on the bottom, I'm going to
17  label this B, so down above B where that picking rack,
18  all of that space is, what is that?
19        MR. HYNES:  Objection to form.
20  BY THE WITNESS:
21    A.    This area had a shelf that was too high
22  and the stocker could stand behind the -- behind this
23  picking rack and as he was cutting open the boxes, he
24  could lay it on there so that he had a place to cut

Page 29

1  that stuff open, but on the first level and on the
2  third level of this pick -- or shelving would hold
3  merchandise that went on to backups.
4  BY MR. GOETZ:
5    Q.    So am I correct that down here under B
6  there would be more shelving?
7    A.    Yes.
8    Q.    Could you -- could you put that in there,
9  please?
10    A.    (Indicating.)
11    Q.    And that shelving would also hold
12  additional product for the stocker to put onto the --
13  to the picking racks?
14    A.    Yes.
15    Q.    And the sliding doors, is that where the
16  product came in?
17    A.    Yes.
18    Q.    Okay.  How -- how tall were the picking
19  racks?
20        Thank you, Ms. Wilson.
21        How tall were the picking racks?
22    A.    I'm not sure.
23    Q.    How tall were the shelving racks?
24    A.    I'm not sure.

Page 30

1    Q.   How tall was the cage?
2    A.   I'm not sure.
3    Q.   Do you have any idea?
4    A.   No.
5    Q.   Mr. Milikan testified that he thinks the
6 cage -- strike that.
7         That 2006 cage underwent some changes, am
8 I correct?
9    A.   Yes.
10   Q.   When did it undergo changes?
11   A.   I don't know.
12   Q.   Do you have an idea?
13   A.   No.
14   Q.   Mr. Milikan testified that it was after
15 2008 but before 2012.
16        Does that help you at all?
17   MR. HYNES:  Objection to form, lack of
18 foundation, asked and answered.
19 BY THE WITNESS:
20   A.   I don't know.
21 BY MR. GOETZ:
22   Q.   You have no idea when it underwent a
23 change?
24   A.   No.

Page 31

1    Q.   Do you know what it did to the size of the
2 cage when it changed in -- when it changed?
3    MR. HYNES:  Objection to form.
4 BY THE WITNESS:
5    A.   It added more space.
6 BY MR. GOETZ:
7    Q.   By a factor of what?
8    MR. HYNES:  Objection to form.
9 BY MR. GOETZ:
10   A.   We -- they moved the cage from upstairs --
11 they moved the whole Rx department from the upstairs
12 to downstairs to give us more space.
13 BY MR. GOETZ:
14   Q.   So they -- they moved the -- when you say
15 the -- they moved the whole Rx department, what are
16 you talking about?
17   A.   All of the picking racks and the -- all of
18 the -- yeah, the modules, all of the picking racks
19 because we had five and they moved us all downstairs
20 to two.
21   Q.   I don't understand what you are saying.
22        Did -- did they add more products into the
23 cage?
24   A.   No.

Page 32

1    Q.   So are you telling me that before they
2 expanded the cage, they had two cages?
3    MR. HYNES:  Objection to form.
4 BY THE WITNESS:
5    A.   No.  The -- the controlled drugs were in
6 this cage and then they had a whole other area for all
7 of the other Rx merchandise.
8 BY MR. GOETZ:
9    Q.   Okay.  And so they -- that's why I said,
10 when they expanded the cage size, they added more
11 products into the cage?
12   A.   No.  When we moved downstairs they added
13 more space to the whole Rx department, but in the
14 cage, they made the cage bigger downstairs, but it was
15 just for the controlled drugs in that cage.
16   Q.   When they made the cage bigger, they did
17 not add additional products to the cage?
18   MR. HYNES:  Objection to form.
19 BY THE WITNESS:
20   A.   Not at the beginning.
21 BY MR. GOETZ:
22   Q.   All right.  When did they do that?
23   MR. HYNES:  Objection to form.
24 BY THE WITNESS:

Page 33

1    A.   I'm -- I don't know.
2 BY MR. GOETZ:
3    Q.   I'm -- I'm -- so I'm just trying to
4 understand, and I know you are in a rush and -- and
5 I'm trying to abide -- Mr. Milikan testified --
6 Mr. Hynes can object -- that the cage expanded because
7 they added the PSE items, pseudoephedrine?
8    A.   At first the cage moved downstairs, PSE
9 stayed upstairs in the -- which this old area, that's
10 where PS -- they picked PSE for a very short period of
11 time. I can -- I don't know the timeframe, but I know
12 they stayed up there.  And then --
13   Q.   When -- when -- when you say -- I'm sorry.
14   MR. HYNES:  Let her finish with the question.
15 BY MR. GOETZ:
16   Q.   Go ahead.
17   A.   They stayed upstairs because they
18 didn't -- when they first built the cage downstairs
19 for the controlled drugs, they left the PSE because
20 they wanted them to be separate, so that's why they
21 left them upstairs and moved us downstairs.
22        And then they redid the cage again and
23 made it so that a conveyor went down the middle of the
24 cage, they kept controlled drugs on one side, PSE side

Page 34

1 on the other side.
2   Q.   In 2006 where was the cage?
3     MR. HYNES:  Objection to form.
4 BY THE WITNESS:
5   A.   I don't know.
6 BY MR. GOETZ:
7   Q.   You don't know if it was on the second
8 level or the first level?
9   A.   I don't know for sure.
10   Q.   That cage you just drew, was that at --
11 at -- to the best of your recollection what the cage
12 looked like in 2006?
13     MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15   A.   Yes.
16 BY MR. GOETZ:
17   Q.   Okay.  And where was that cage?
18   A.   That was upstairs.
19   Q.   That was upstairs?
20   A.   Um-hum.
21   Q.   When did the cage move to the first floor?
22   A.   I don't know.
23   Q.   You have no idea?
24   A.   No.

Page 35

1   Q.   That cage that you just drew, did that
2 cage contain hydrocodone combination products?
3   A.   It contained just the controlled by
4 itself.
5   Q.   And -- and what did -- are hydrocodone
6 combination products part of the control?
7   A.   Yes.
8   Q.   Do you know what else consisted of, in
9 2006, part of the control group other than hydrocodone
10 combination products?
11   A.   No.
12   Q.   What about in 2007?
13   A.   No.
14   Q.   What about in 2008?
15   A.   No.
16   Q.   What about in 2009?
17   A.   No.
18   Q.   What about in 2010?
19   A.   No.
20   Q.   What about in 2011?
21   A.   No.
22   Q.   What about in '12?
23   A.   No.
24   Q.   '13?

Page 36

1   A.   No.
2   Q.   '14?
3   A.   No.
4   Q.   Okay.  How many products were in the cage
5 in 2006?
6   A.   I don't know.
7   Q.   You have -- I mean, you -- you were in
8 there from 1996 until 2014, correct -- or until six
9 months ago, correct?
10   A.   Yes.
11   Q.   All right.  Do you know how many products
12 were there in 2007?
13     MR. HYNES:  Objection to form.  Asked and
14 answered.
15 BY THE WITNESS:
16   A.   No.
17   Q.   What about in 2008?
18   A.   No.
19   Q.   What about in 2009?
20     MR. HYNES:  Same objection.
21 BY THE WITNESS:
22   A.   No.
23 BY MR. GOETZ:
24   Q.   What about in 2010?

Page 37

1     MR. HYNES:  Same objection.
2 BY THE WITNESS:
3   A.   No.
4 BY MR. GOETZ:
5   Q.   What about in 2011?
6     MR. HYNES:  Same objection.
7 BY THE WITNESS:
8   A.   No.
9 BY MR. GOETZ:
10   Q.   What about in 2012?
11     MR. HYNES:  Same objection.
12 BY THE WITNESS:
13   A.   No.
14 BY MR. GOETZ:
15   Q.   2013?
16     MR. HYNES:  Same objection.
17 BY THE WITNESS:
18   A.   No.
19 BY MR. GOETZ:
20   Q.   2014?
21     MR. HYNES:  Same objection.
22 BY THE WITNESS:
23   A.   No.
24 BY MR. GOETZ:

Page 38

1    Q.   Can you tell me how many products were in
2  there six months ago?
3    A.   No.
4    Q.   Do you remember the cage changing between
5  2006 and 2014?  Do you remember that there were
6  changes to the cage?
7    MR. HYNES:  Objection; asked and answered.
8  BY THE WITNESS:
9    A.   Yes.
10 BY MR. GOETZ:
11   Q.   All right.  What changes do you remember
12 occurring?
13   MR. HYNES:  Objection; asked and answered.
14 BY THE WITNESS:
15   A.   We moved from -- I believe we moved from
16 the upstairs to the downstairs during that pie -- time
17 period, but I don't know the exact year we moved.
18 BY MR. GOETZ:
19   Q.   Okay.  Any -- anything else that you
20 remember?
21   A.   No.
22   Q.   When you moved downstairs, did the
23 configuration change -- did the configuration of the
24 cage change?

Page 39

1    A.   The configuration, you mean the size?
2    Q.   Yeah, or the shape or if there were four
3  rows of -- of picking racks or anything related to
4  that.
5    MR. HYNES:  Objection to form.
6  BY THE WITNESS:
7    A.   It was just bigger.  The picking racks
8  were the same, there were still two.  He had more
9  space for pallets.  And they had a lot more shelving.
10 BY MR. GOETZ:
11   Q.   A lot more shelving.
12   A.   Um-hum.
13   Q.   There has been testimony that -- that
14 Mr. Milikan thought that the cage size doubled?
15   MR. HYNES:  Objection.
16 BY MR. GOETZ:
17   Q.   Is that consistent with your memory?
18   MR. HYNES:  Objection to form, lack of
19 foundation.
20 BY THE WITNESS:
21   A.   I don't remember.
22 BY MR. GOETZ:
23   Q.   Okay.  In -- in 2006, how many people were
24 in the cage?

Page 40

1    MR. HYNES:  Objection; asked and answered.
2  BY THE WITNESS:
3    A.   I don't remember.
4  BY MR. GOETZ:
5    Q.   In 2007 how many people were in the cage?
6    A.   I don't remember.
7    Q.   In 2008 how many people were in the cage?
8    A.   I don't remember.
9    Q.   What about in 2009?
10   A.   No, I don't remember.
11   Q.   2010?
12   A.   I don't remember.
13   Q.   '11?
14   A.   I don't remember.
15   Q.   '12?
16   A.   I don't remember.
17   Q.   '13?
18   A.   I don't remember.
19   Q.   '14?
20   A.   I don't remember.
21   Q.   Other than Sherri Hinkle -- do you know
22 who Sherri Hinkle is?
23   A.   Yes.
24   Q.   Who is that?

Page 41

1    A.   That is the Rx inventory control girl.
2    Q.   And -- and what does that mean?
3    A.   She would -- for us in the cage, it would
4  mean she is the girl that we would go to if we had any
5  problems as far as, like, the quantity, that some --
6  that one of the stores ordered, we would go to her, if
7  we had an out, we would go to her.
8    Q.   Well, did she -- was she also a picker?
9    A.   No.
10   Q.   No.
11      Would -- did she do -- check the totes?
12   A.   No.
13   Q.   So she -- was she in the cage?
14   A.   No.
15   Q.   Was she ever in the cage with you?
16   A.   She would come in the cage and get our
17 orders if we had an issue, she would come in the cage
18 and get those orders and then leave.
19   Q.   So if -- if you saw an order that you
20 thought was problematic, you would notify Sherri and
21 she'd come in and -- and grab that order?
22   A.   Yes.  We would either call Sherri and we
23 would meet her or she would come in the cage and get

Page 42

1 it or we would call our supervisor.
2   Q.   All right. But -- but from '06 to '14,
3 you never remember her as a picker or a packer?
4   A.   No.
5   Q.   How often in 2000 -- what was -- was
6 Sherri there from 2006 to 2014?
7   A.   Yes.
8   Q.   And was she serving that role of Rx
9 inventory control?
10   A.   Yes.
11   Q.   How often in 2006 would you call her about
12 an order?
13   MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15   A.   I don't know.
16 BY MR. GOETZ:
17   Q.   Was it daily, weekly, monthly?
18   A.   I don't --
19   MR. HYNES:  Objection, asked and answered.
20   Go ahead.
21 BY THE WITNESS:
22   A.   I don't remember.
23 BY MR. GOETZ:
24   Q.   You have no idea?

Page 43

1   A.   No.
2   Q.   Do you know what she would do with an
3 order in 2006 that you called her about?
4   MR. HYNES:  Objection to form.
5 BY THE WITNESS:
6   A.   If we called her to come in and get an
7 order, she would go either call the store or talk to
8 the supervisor.
9 BY MR. GOETZ:
10   Q.   What supervisor?
11   A.   The Rx supervisor.
12   Q.   And who was that?
13   A.   At 2006, I don't remember.
14   Q.   Okay. And -- and what would that person
15 do?
16   A.   I don't --
17   Q.   Do you know what -- what -- what the Rx
18 supervisor would do?
19   A.   I don't know.
20   Q.   All right. You -- you know Sherri Hinkle
21 would call the store?
22   MR. HYNES:  Objection to form.
23 BY MR. GOETZ:
24   Q.   Is that what you just testified to?

Page 44

1   A.   Yes, she would either talk to the
2 supervisor or call the -- call the store herself.
3   Q.   And do you know if they did anything else?
4   A.   No.
5   Q.   Would she come back to you and tell you
6 whether or not the order was okay?
7   A.   Yes, she would come back or the Rx
8 supervisor would come back and tell us what to do with
9 it.
10   Q.   Whether or not you could pick the order?
11   A.   Yes.
12   Q.   And whether or not you could pack the
13 order?
14   A.   Yes.
15   Q.   Would that usually be in the same day?
16   A.   Oh, yes.
17   Q.   And how long would that take them to come
18 back and tell you?
19   MR. HYNES:  Objection to form.
20 BY THE WITNESS:
21   A.   I don't know. I think it just depended on
22 how long the store would take, I -- or how long it
23 would take for her to get ahold of the supervisor or
24 if she called the store. It just depended.

Page 45

1 BY MR. GOETZ:
2   Q.   Is it your understanding that either she
3 or the supervisor, they would call the store to
4 determine whether or not they could ship it?
5   MR. HYNES:  Objection to form.
6 BY THE WITNESS:
7   A.   I don't know.
8 BY MR. GOETZ:
9   Q.   Do you know of anything else they did?
10   A.   No.
11   Q.   Would they call the -- do you know what
12 "fat finger" is?
13   A.   No.
14   Q.   Have you heard the term "fat finger"?
15   A.   No.
16   Q.   Never?
17   A.   No.
18   Q.   In 2006, what were the names of the people
19 in the cage?
20   A.   I don't know.
21   Q.   What about in 2007?
22   A.   I don't know.
23   Q.   What about in 2008?
24   A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 　Q.　What about in 2010?
2 　A.　I don't know.
3 　Q.　2011?
4 　A.　I don't know.
5 　Q.　You can't -- you don't remember anybody's
6 name.
7 　　　What about in 2012?
8 　A.　Lori Huddleston.  Lori Huddleston.
9 　Q.　In 2012?
10 　A.　Yes.
11 　Q.　What did Lori do?
12 　A.　She either packed or picked the orders
13 like I did.
14 　Q.　Is -- is the -- the packer the person
15 that -- that sits at that table and checks the order
16 and then packs it, is that what a packer is?
17 　A.　Yes.  We stand at the table and...
18 　Q.　And the picker is the one that actually
19 goes to the picking racks and fills the tote and then
20 brings it to the checker?
21 　A.　Yes.
22 　Q.　What about in 2013, do you remember
23 anybody in the cage?
24 　A.　Lori Huddleston.

Page 47

1 　Q.　Anybody else?
2 　A.　I don't remember.
3 　Q.　What about in 2014?
4 　A.　Lori Huddleston.
5 　Q.　Anybody else?
6 　A.　I don't remember.
7 　Q.　How many orders per day would you pick in
8 2006?
9 　MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11 　A.　I don't remember.
12 BY MR. GOETZ:
13 　Q.　What a -- so, in 2000 -- between 2018 and
14 2006, did the number of orders you picked per day
15 change?
16 　MR. HYNES:  Objection to form.
17 BY THE WITNESS:
18 　A.　I don't remember.
19 BY MR. GOETZ:
20 　Q.　All right.  How many orders per day would
21 you pick in 2007?
22 　A.　I don't know.
23 　Q.　What about 2008?
24 　A.　I don't know.

Page 48

1 　Q.　What about 2009?
2 　A.　I don't know.
3 　Q.　What about 2010?
4 　A.　I don't know.
5 　Q.　What about in 2011?
6 　A.　I don't know.
7 　Q.　What about 2012?
8 　A.　I don't know.
9 　Q.　2000 -- 2013?
10 　A.　I don't know.
11 　Q.　2014?
12 　A.　I don't know.
13 　Q.　Do you remember how many you picked in
14 2018, you were just there six months ago, do you
15 remember how many orders per day you'd pick?
16 　A.　No, I don't.
17 　Q.　Do you remember how many products would be
18 in each order?
19 　A.　No.
20 　Q.　There could be over a hundred products in
21 each order, correct?
22 　MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24 　A.　I don't know.

Page 49

1 BY MR. GOETZ:
2 　Q.　Well, you would start -- you would -- you
3 would pick a store to pick and you would walk all
4 around the picking rack picking all of the products
5 that that store had ordered and -- and fill the tote,
6 correct?
7 　MR. HYNES:  Objection to form.
8 BY THE WITNESS:
9 　A.　Yes.
10 BY MR. GOETZ:
11 　Q.　And -- and there has been testimony that
12 that could exceed a hundred.
13 　　　Do you have a reason to dispute that?
14 　MR. HYNES:  Objection to form, lack of
15 foundation.
16 BY THE WITNESS:
17 　A.　I don't know.
18 BY MR. GOETZ:
19 　Q.　So do you -- in 2006 do you know how many
20 products were in a typical order?
21 　A.　No.
22 　Q.　What about in 2007?
23 　A.　No.
24 　Q.　2008?

Page 50

1   A.  No.
2   Q.  2009?
3   A.  No.
4   Q.  2010?
5   A.  No.
6   Q.  2011?
7   A.  No.
8   Q.  2012?
9   A.  No.
10   Q.  2013?
11   A.  No.
12   Q.  2014?
13   A.  No.
14   Q.  Ms. Wilson, I -- I really do appreciate
15 you being here, and -- and so please don't take this
16 as disrespectful, and I know you've had a really hard
17 week. We are trying to figure out what the pickers
18 and packers did as it relates to suspicious order
19 monitoring, and so I'm curious if -- if there would be
20 anybody that would actually have, if you know, anybody
21 that -- from 2006 to '14 would actually have a -- a
22 better memory of what was happening --
23   MR. HYNES: Objection.
24 BY MR. GOETZ:

Page 51

1   Q.  -- at that time.
2   A.  I don't know.
3   Q.  Okay. Did you speak to anybody other than
4 your counsel about today's testimony?
5   A.  No.
6   MR. HYNES: Objection to form.
7 BY MR. GOETZ:
8   Q.  You didn't talk to your spouse?
9   A.  No.
10   Q.  You didn't talk to anybody at work about
11 this testimony?
12   A.  No.
13   Q.  Did -- did you prepare for today's
14 testimony?
15   A.  Just talked to him.
16   Q.  And -- and how long did you talk to him?
17   A.  A couple of hours yesterday and a couple
18 of hours today.
19   Q.  And -- and any -- any other time?
20   A.  No.
21   Q.  Did you review documents?
22   A.  No.
23   Q.  How many days per week would you work in
24 2006?

Page 52

1   A.  Five.
2   Q.  And -- and how many hours per day?
3   A.  Eight hours.
4   Q.  And was that pretty much consistent from
5 2006 to 2014?
6   A.  Yes.
7   Q.  And you would be judged in the cage on
8 accuracy?
9   A.  Yes.
10   Q.  What else would you be judged on in the
11 cage?
12   A.  Your quality.
13   Q.  Which is what? How is that different than
14 accuracy?
15   A.  Yeah, well, I guess it's the same thing.
16 It would -- yeah. Accuracy -- I'm -- yeah. It's the
17 same thing.
18   Q.  Would you be judged on anything other than
19 accuracy?
20   A.  No.
21   Q.  No.
22   There were multiple cameras in the cage?
23   A.  Yes.
24   Q.  You were reprimanded because of excessive

Page 53

1 talking and goofing around in the cage.
2   Do you remember that?
3   MR. HYNES: Objection to form.
4 BY THE WITNESS:
5   A.  Yes.
6 BY MR. GOETZ:
7   Q.  And what was that about?
8   MR. HYNES: Objection to form.
9 BY THE WITNESS:
10   A.  I don't remember the conversation, but Deb
11 Foster and I, we would talk quite a bit in there.
12 They caught us one time in there talking and...
13 BY MR. GOETZ:
14   Q.  And who is Deb Foster?
15   A.  She used to be in the cage. I'm not sure
16 what year she was in the cage, but she -- Deborah
17 Foster also worked in the cage.
18   Q.  Do you know when Deborah Foster left the
19 cage?
20   A.  She retired in 2018.
21   Q.  Do you know where Deborah Foster lives?
22   A.  I have a general idea. I don't know the
23 exact address.
24   Q.  Can you give me the city?

Page 54

1  A.  Indianapolis.
2  Q.  Do you have an estimate how long you were
3 in the cage with Deborah Foster?
4  MR. HYNES:  Objection to form.
5 BY THE WITNESS:
6  A.  I don't -- I don't remember.  I don't
7 know.
8 BY MR. GOETZ:
9  Q.  Was Ms. Foster reprimanded as well?
10  MR. HYNES:  Objection to form.
11 BY THE WITNESS:
12  A.  I don't know.
13 BY MR. GOETZ:
14  Q.  Between 2006 and 2018, did the activity of
15 the cage change, in other words, if we were to see a
16 video today of what the cage looks like, would that be
17 pretty similar to what it looked like in 2006?
18  MR. HYNES:  Objection to form.
19 BY THE WITNESS:
20  A.  You want to know if the cage looks like it
21 did now -- from 2006 to now?
22 BY MR. GOETZ:
23  Q.  No, ma'am.
24  So you just left the cage?

Page 55

1  A.  Yes.
2  Q.  Six months ago, correct?
3  A.  Yes.
4  Q.  If we were to see a video of what that
5 cage looked like six months ago, the activity, because
6 they were recording it, the activity of what the cage
7 looked like, the speed with which you had to pick,
8 would -- would that -- would that be similar to what
9 we would see if we had video from 2006?
10  MR. HYNES:  Objection to form.
11 BY THE WITNESS:
12  A.  I don't know.
13 BY MR. GOETZ:
14  Q.  Your job stayed pretty much the same,
15 correct?
16  A.  Yes.
17  Q.  Okay.  The speed with which you picked
18 stayed pretty much the same, correct?
19  A.  Yes.
20  Q.  It is not as though it would be as though
21 I'm looking at vastly different environments or
22 technology being used, correct?
23  MR. HYNES:  Objection to form.
24 BY THE WITNESS:

Page 56

1  A.  We have computers now that we used now.
2 We didn't -- we didn't use those in 2006.
3 BY MR. GOETZ:
4  Q.  What do those computers do?
5  A.  You -- they have a scanner and a computer
6 screen and a printer and you scan the order and it --
7 on the computer screen it pops up everything that you
8 have in that order and you scan every bottle.  And so
9 after you scan it, you put it in the tote and the
10 computer will tell -- and it -- once you scan it, it
11 will say, Okay, you scanned one, and then you go to
12 another one and you scan one and until you get a
13 pert -- your -- it should be a perfect screen on that
14 screen.  Your order should be perfect, everything that
15 that order says you should have.
16  Q.  It counts down?
17  A.  Yes.
18  Q.  It counts down.
19  A.  It counts down.
20  Q.  Okay.  And so before when you would pick,
21 would you -- would you check it off by -- on a piece
22 of paper?
23  A.  No.  You would take the order and you
24 would manually, you would take it, you would take your

Page 57

1 finger, and, okay, I need two of these and so you
2 throw it in there.
3  Q.  Okay.
4  A.  You know, it's manually.
5  Q.  And -- and now you just scan it and it --
6 it takes it off and says to you, Ms. Wilson, you need
7 to go pick this next and it --
8  A.  Yeah.
9  Q.  But other than that, it -- it looks pretty
10 comparable, correct?
11  A.  Yes.
12  MR. HYNES:  Objection to form.
13 BY MR. GOETZ:
14  Q.  When you were looking for -- strike that.
15  MR. GOETZ:  May I have -- can you put up
16 Exhibit 6.
17  I only have one copy of this and it was
18 marked Exhibit 6 yesterday for Dugger.  Okay?
19  MR. HYNES:  Okay.
20  MR. GOETZ:  I'm just going to ask her a couple
21 of questions about it.
22  MR. HYNES:  That's fine.  That's fine.
23  This is the same document.
24  Do you want to direct her to a particular

Page 58

1 page or --
2 BY MR. GOETZ:
3    Q.   Well, I just -- first, could you go to
4 the -- I've handed you what's been marked as Exhibit 6
5 for Dugger.  We --
6        Do you know Terrence Dugger?
7    A.   Yes.
8    Q.   And you worked with him?
9    A.   I knew him.
10   Q.   Did --
11   A.   I didn't have very much contact with him.
12   Q.   Okay.  Could you turn to 88957, the next
13 page.
14       Do you recognize that document?
15   A.   No, I don't.
16   Q.   Have -- have you ever seen the CVS
17 Distribution Center Standard Operating Procedures
18 Manual?
19   A.   No.
20   Q.   Were you never given a copy of this?
21   MR. HYNES:  Objection; asked and answered.
22 BY THE WITNESS:
23   A.   No.
24 BY MR. GOETZ:

Page 59

1    Q.   Could you turn to -- do you see the front
2 page of this, it says "Revision Date, 8/25/10."
3        Do you see that?
4    A.   Yes.
5    Q.   Okay.  Could you turn to 88996.
6    THE WITNESS:  Yeah, I got makeup in my eye.
7    MR. HYNES:  Do you want to take a break?
8    MR. GOETZ:  Do you want to take a break?
9    THE WITNESS:  Yes.
10   MR. HYNES:  She has something in her eye.  Let's
11 take a quick break.  I'm sorry, Dan.
12   MR. GOETZ:  That's all right.
13   THE VIDEOGRAPHER:  We are off the record at
14 5:29 p.m.
15       (WHEREUPON, a recess was had
16        from 5:29 to 5:39 p.m.)
17   THE VIDEOGRAPHER:  We are back on the record at
18 5:39 p.m.
19 BY MR. GOETZ:
20   Q.   Are you better?
21   A.   I think so.
22   Q.   If you need to take a break at any time,
23 let me know, okay?
24   A.   Okay.

Page 60

1    Q.   You should not be miserable, all right?
2 So --
3    A.   Okay.
4    Q.   -- even if a question is pending and
5 your -- your eyes are hurting, let me know, okay.
6    A.   Okay.
7    Q.   I don't want to know what you talked about
8 with Mr. Hynes, but do you have an understanding of --
9 of why you are here testifying today?
10   A.   Yes.
11   Q.   All right.  And what is that
12 understanding, and I don't want to know what Mr. Hynes
13 told you, but generally what is that understanding?
14   A.   You just want to know what I did or do in
15 the cage, the -- the order -- the process of ordering
16 and the process of scanning and who I go to if I was
17 to have a problem with some of the orders, if I see
18 something is too big, who I go to.
19   Q.   Okay.  And you -- you said if an order is
20 too big.
21       Is -- is that when you would go to
22 somebody?  Is that when you'd go to Ms. --
23   A.   Yes --
24   Q.   -- Hinkle?

Page 61

1    A.   -- Sherri Hinkle.
2    Q.   Any other circumstances when you would go
3 to somebody?
4    A.   No.
5    MR. HYNES:  Objection to form.
6 BY MR. GOETZ:
7    Q.   How would you judge if an order was too
8 big?
9    MR. HYNES:  Objection to form.
10 BY MR. GOETZ:
11   Q.   Let me ask you a question because this is
12 actually important.
13       You said that you would go to Ms. Hinkle
14 if an order was too big, correct?
15   A.   Yes.
16   Q.   You would alert her?
17   A.   Yes.
18   Q.   So you would have to make that judgment,
19 correct?
20   A.   Yes.
21   Q.   How would you make that judgment?
22   MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24   A.   When you're in there day in and day out

Page 62

1 you just know when an order is too big.
2 BY MR. GOETZ:
3    Q.   Mr. Milikan testified it was a gut
4 feeling?
5    A.   Yes.
6    MR. HYNES:  Objection.
7 BY MR. GOETZ:
8    Q.   Would you agree it's a gut feeling?
9    A.   Yes.
10    Q.   Okay.  And I appreciate that, but
11 unfortunately we are going to have to explain to
12 experts and a jury what that means.
13        So what does that mean, that gut feeling?
14    MR. HYNES:  Objection to form.
15 BY THE WITNESS:
16    A.   You just know after you're in there day in
17 and day out what's a big number.  Like if they are
18 ordering, like, five, five, five and then all of a
19 sudden there is 150, that's a red flag.
20 BY MR. GOETZ:
21    Q.   When you say "they are ordering" --
22    A.   The --
23    Q.   -- "five, five, five"?
24    A.   On the pick document, if it says --

Page 63

1 every -- every item in that cage they want five and
2 then all of a sudden it shoots up to, like, 150, that
3 would be a red flag.
4    Q.   Okay.  So if -- if they want five
5 Amoxicillin and then 150 hydro, that's a problem.
6        Is that what I'm hearing you say?
7    A.   Amoxicillin is not in the cage.
8    Q.   So what is in the cage?  You talked about
9 testosterone.
10    A.   Testosterone.
11    Q.   If they want five units of -- of
12 testosterone and 150 of hydro, that to you is a sign
13 there is a problem?
14    A.   Yes.
15    Q.   What else is a sign that there is a
16 problem?
17    MR. HYNES:  Objection to form.
18 BY THE WITNESS:
19    A.   Charlotte Rucker, when she trained me, she
20 said as -- we have three different size bottles of
21 hydrocodone in the cage.  She said, As a rule you send
22 out 12 -- no more than 12 of the little ones, six of
23 the big ones and two to three of the bigger -- the
24 large size ones as a rule across the board.

Page 64

1 BY MR. GOETZ:
2    Q.   And that was in 1996?
3    A.   Yes.
4    Q.   And did you live by that rule for the --
5 for the remainder of your time there?
6    A.   Yes.
7    Q.   Okay.  And so what does 12 little hydros
8 mean?  I'm not sure.  Are we talking, when we say
9 "little," are you talking about the size?
10    A.   Yes, the size of the bottle.
11    Q.   Okay.  So we are not talking about the
12 dosage units?
13    A.   No.
14    MR. HYNES:  Objection to form.
15 BY MR. GOETZ:
16    Q.   Are you aware that hydrocodone came in
17 different dosage units?
18    A.   Yes.
19    Q.   All right.  What were the dosage units
20 that -- that were available in 2014?
21    MR. HYNES:  Objection to form.
22 BY THE WITNESS:
23    A.   I don't -- I don't know.
24 BY MR. GOETZ:

Page 65

1    Q.   What about in 2013?
2    A.   I don't know.
3    MR. HYNES:  Same objection.
4 BY MR. GOETZ:
5    Q.   What about in 2012?
6    MR. HYNES:  Same objection.
7 BY THE WITNESS:
8    A.   I don't know.
9 BY MR. GOETZ:
10    Q.   What about in 2011?
11    MR. HYNES:  Same objection.
12 BY THE WITNESS:
13    A.   I don't know.
14 BY MR. GOETZ:
15    Q.   What about in 2010?
16    MR. HYNES:  Same objection.
17 BY THE WITNESS:
18    A.   I don't know.
19 BY MR. GOETZ:
20    Q.   What about in 2009?
21    MR. HYNES:  Same objection.
22 BY THE WITNESS:
23    A.   I don't know.
24 BY MR. GOETZ:

Page 66

1    Q.   What about in 2008?
2    MR. HYNES:  Same objection.
3    BY THE WITNESS:
4    A.   I don't know.
5    BY MR. GOETZ:
6    Q.   2007?
7    MR. HYNES:  Same objection.
8    BY THE WITNESS:
9    A.   I don't know.
10   BY MR. GOETZ:
11   Q.   2006?
12   MR. HYNES:  Same objection.
13   BY THE WITNESS:
14   A.   I don't know.
15   BY MR. GOETZ:
16   Q.   Are you aware -- I understand you don't
17   understand the different dosage units.
18       Are you aware of how many different doses
19   were available?
20   MR. HYNES:  Objection to form.
21   BY THE WITNESS:
22   A.   I don't know.
23   BY MR. GOETZ:
24   Q.   From '06 to '14, do you have any

Page 67

1    understanding of how many different doses were
2    available?
3    MR. HYNES:  Same objection.
4    BY THE WITNESS:
5    A.   I don't know.
6    BY MR. GOETZ:
7    Q.   And -- and when you said 12 little, 12
8    little bottles, how many doses were in a little
9    bottle?
10   A.   I don't know.
11   Q.   How many doses were in a -- a big bottle?
12   A.   I don't know.
13   Q.   How many doses were in a -- a large
14   bottle?
15   A.   I don't know.
16   Q.   Under your theory you could order 11
17   little bottles of hydro all different doses and they
18   would be okay, correct?
19   MR. HYNES:  Objection to form.
20   BY THE WITNESS:
21   A.   Yes.
22   BY MR. GOETZ:
23   Q.   When you looked for a -- your gut feeling,
24   did you ever consider the -- the strength of the drug

Page 68

1    that you were shipping out?
2    A.   No.
3    Q.   I could order, under what you followed or
4    what CVS told you to follow, I could order a --
5    11 bottles of -- of small hydro every -- every week,
6    correct, because these are weekly orders that you are
7    packing?
8    MR. HYNES:  Objection to form.
9    BY THE WITNESS:
10   A.   Yes.
11   BY MR. GOETZ:
12   Q.   Are they weekly orders that you were
13   packing?
14   A.   Yes.
15   Q.   Some stores actually would get orders
16   twice a week?
17   MR. HYNES:  Objection to form.
18   BY THE WITNESS:
19   A.   I don't know.
20   BY MR. GOETZ:
21   Q.   You don't know?
22   A.   No.
23   Q.   Do you know if some stores got orders more
24   than twice a week?

Page 69

1    A.   No.
2    Q.   Do you know what ARCOS is?  Have you ever
3    heard of ARCOS?
4    A.   No.
5    Q.   Okay.  Do you know what the data is that
6    the DEA maintained?
7    A.   No.
8    Q.   Do you know that the DEA maintained data
9    of how much that CVS Indiana distribution center was
10   shipping?
11   A.   No.
12   Q.   Okay.  Are you aware that -- that
13   sometimes from CVS Indiana distribution center they
14   might ship three or four days a week to the same
15   store?
16   MR. HYNES:  Objection to form.
17   BY THE WITNESS:
18   A.   No.
19   BY MR. GOETZ:
20   Q.   So as long as you weren't -- that one day
21   didn't exceed 12, they could -- they could get 11
22   little bottles of all different doses of hydro, all
23   different strengths of hydro every day of the week you
24   were open, correct?

Page 70

1    MR. HYNES: Objection to form.
2  BY THE WITNESS:
3    A. I don't know.
4  BY MR. GOETZ:
5    Q. I'm asking you under your system, you --
6  you wouldn't flag it, correct?
7    A. Right.
8    MR. HYNES: Objection to form, asked and
9  answered.
10 BY MR. GOETZ:
11   Q. You wouldn't notify Ms. Hinkle?
12      Could you go to --
13   THE COURT REPORTER: I'm sorry. I didn't get an
14 answer.
15   MR. HYNES: Same objection.
16      What was the question?
17   MR. GOETZ: Could you read back the question?
18      (WHEREUPON, the record was read by the
19      reporter as requested.)
20   THE WITNESS: Yes, yes.
21   MR. GOETZ: She said no. I --
22   THE COURT REPORTER: I'm sorry. I just
23 wasn't -- I didn't get the answer.
24   MR. HYNES: She said I don't know.

Page 71

1    THE WITNESS: I don't know.
2  BY MR. GOETZ:
3    Q. Do you -- so, what -- how -- if it didn't
4  violate your rule, would you notify Ms. Hinkle?
5    A. If it --
6    MR. HYNES: Objection to form.
7  BY THE WITNESS:
8    A. If it did not, no.
9  BY MR. GOETZ:
10   Q. Okay. And we know that under your rule,
11 11 little bottles of hydro, and you could have 11 of
12 each strength, does not violate your rule, correct?
13   MR. HYNES: Objection to form.
14 BY THE WITNESS:
15   A. Yes.
16 BY MR. GOETZ:
17   Q. And that is a daily -- that -- that's a --
18 you're looking at that order alone when you are making
19 that decision, correct?
20   MR. HYNES: Objection to form.
21 BY THE WITNESS:
22   A. Yes.
23 BY MR. GOETZ:
24   Q. You are not considering what -- what was

Page 72

1  shipped to them a week before, correct?
2    A. Correct.
3    Q. You are not considering what was shipped
4  to them a day before, correct?
5    MR. HYNES: Objection to form.
6  BY THE WITNESS:
7    A. Correct.
8  BY MR. GOETZ:
9    Q. You're not considering what was shipped to
10 them at all before you fill that order, correct?
11   MR. HYNES: Objection to form.
12 BY THE WITNESS:
13   A. Correct.
14 BY MR. GOETZ:
15   Q. Okay. Do you -- do you know what outside
16 vendors are?
17   A. No.
18   Q. All right. Have you ever heard the term
19 "outside vendors"?
20   A. No.
21   Q. When you were in the cage, is it fair to
22 assume you never considered what outside vendors were
23 shipping to the stores when -- when you decided
24 whether or not an order should be elevated to

Page 73

1  Ms. Hinkle?
2    MR. HYNES: Objection to form.
3  BY THE WITNESS:
4    A. No.
5  BY MR. GOETZ:
6    Q. Could you turn to Exhibit 6, please.
7    MR. HYNES: Is this the one you handed to us
8  before, Dan?
9    MR. GOETZ: Yeah, yes.
10   MR. HYNES: Is there a page number you want us
11 to go to?
12   MR. GOETZ: Could you look at 88996, please.
13   MR. HYNES: Okay. We are there.
14 BY MR. GOETZ:
15   Q. And -- and I know that you -- you
16 testified earlier you've never seen this document, but
17 I -- I just want to ask you a question about it.
18      This is a document from August 25th -- I
19 might have the date wrong, excuse me.
20      This is a document from August 25th, 2010,
21 and this section relates to prevention and monitoring
22 of controlled drug/suspicious orders.
23      Do you see that?
24   A. Oh, yes, I see it now.

Page 74

1  Q.   And it says, and I want to read to you the
2  general, it says:
3       "DEA regulations require that all
4  distributors must design a system to monitor, detect
5  and report any suspicious controlled drug orders.
6  Suspicious orders are those involving an extraordinary
7  quantity, an uncommon method of payment or delivery or
8  any other circumstance that may indicate that the
9  controlled drug will be used in violation of the law."
10      Did I read that correctly?
11  A.   Yes.
12  Q.   And so you understand when you talked
13  about your rule of thumb in the cage that you were --
14  that related to determining whether or not an order
15  was suspicious?
16  A.   Yes.
17  Q.   Okay.  And so that rule of thumb was your
18  way to determine whether or not the order was of
19  extraordinary quantity, as this says, correct?
20  MR. HYNES:  Objection to form.
21  BY THE WITNESS:
22  A.   Yes.
23  BY MR. GOETZ:
24  Q.   Okay.  Your rule of thumb re -- did not at

Page 75

1  all relate to whether or not there was an uncommon
2  method of payment, correct?
3  A.   Correct.
4  Q.   And it didn't relate to any other
5  circumstance that would indi -- indicate whether or
6  not that drug was going to be used in violation of the
7  law, correct?
8  MR. HYNES:  Object.  Objection to form.
9  BY THE WITNESS:
10  A.   Correct.
11  BY MR. GOETZ:
12  Q.   It -- have the -- between 2006 and 2014,
13  did the size of the little hydro bottles change?
14  MR. HYNES:  Objection to form.
15  BY THE WITNESS:
16  A.   I don't remember.
17  BY MR. GOETZ:
18  Q.   Did the size of the big hydro bottles
19  change between 2006 and 2014?
20  A.   I don't remember.
21  Q.   And did the size of the large hydro
22  bottles change?
23  A.   I don't remember.
24  Q.   And you -- in any event, if they did

Page 76

1  change, you did not change your -- your rule of thumb
2  that you were taught, correct?
3  MR. HYNES:  Objection to form.
4  BY THE WITNESS:
5  A.   Correct.
6  BY MR. GOETZ:
7  Q.   You said two to three large bottles of
8  hydro.
9      How would you decide whether it was two or
10  three?
11  A.   I don't remember.  I don't know.
12  Q.   Did you -- did -- did you train other
13  people in the cage?
14  A.   No.  Lori, Lori trained those people.
15  Q.   Lori Edelstein?
16  A.   Huddleston.
17  Q.   Huddleston.
18      Did they go by the same rule of thumb?
19  A.   I don't know.
20  Q.   Did you ever ask Lori what -- who -- how
21  she trained them?
22  A.   No.
23  Q.   Did you ever ask Lori -- did you ever ask
24  anybody how -- other than from your initial training

Page 77

1  how you should determine extraordinary quantity?
2  A.   No.
3  Q.   Nobody at CVS from the time you were
4  trained until 2014 ever told you you were doing it
5  incorrectly, did they?
6  MR. HYNES:  Objection to form.
7  BY THE WITNESS:
8  A.   No.
9  BY MR. GOETZ:
10  Q.   And, in fact, your reviews, other than the
11  reprimand and a few absences, were actually quite
12  good, weren't they?
13  A.   Yes.
14  Q.   When you would elevate an order to
15  Ms. Hinkle, how often would -- would that order get
16  shipped?  And I'm talking about hydrocodone?
17  MR. HYNES:  Objection to form.
18  BY THE WITNESS:
19  A.   Repeat the question.
20  BY MR. GOETZ:
21  Q.   So when you would elevate an order to
22  Ms. Hinkle, you -- you would -- there would be an
23  order that violated your -- your rules, and so you
24  would elevate that order.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    What percentage of those orders would get
2  shipped?
3      MR. HYNES:  Objection to form.
4  BY THE WITNESS:
5      A.  I don't remember.
6  BY MR. GOETZ:
7      Q.  Do you have any idea?
8      A.  No.
9      MR. HYNES:  Objection; asked and answered.
10  BY MR. GOETZ:
11      Q.  Would you usually be told that -- that it
12  was a pharmacist, that he made a mistake or she made a
13  mistake?
14      MR. HYNES:  Objection to form.
15  BY THE WITNESS:
16      A.  I don't remember.
17  BY MR. GOETZ:
18      Q.  Do you have any idea why -- what you were
19  told about why that order was of extraordinary
20  quantity?
21      MR. HYNES:  Objection to form.
22  BY THE WITNESS:
23      A.  No.
24  BY MR. GOETZ:

Page 79

1      Q.  You don't have any memory of ever -- of
2  anything you were ever told?
3      MR. HYNES:  Objection to form, asked and
4  answered.
5  BY THE WITNESS:
6      A.  No.
7  BY MR. GOETZ:
8      Q.  You -- CVS never trained you how to look
9  at the frequency of orders, did they?
10      MR. HYNES:  Objection to form.
11  BY THE WITNESS:
12      A.  No.
13  BY MR. GOETZ:
14      Q.  CVS never trained you to look for orders
15  that might be diverted to anything other than
16  legitimate medical channels, did they?
17      MR. HYNES:  Objection to form.
18  BY THE WITNESS:
19      A.  No.
20  BY MR. GOETZ:
21      Q.  They never trained you to look for orders
22  that might be diverted into other than legitimate --
23  legitimate scientific channels, did they?
24      MR. HYNES:  Objection to form.

Page 80

1  BY THE WITNESS:
2      A.  No.
3  BY MR. GOETZ:
4      Q.  They never trained you to look for orders
5  that -- strike that.
6          I just want to be clear, when -- when you
7  were packing an order, you had no idea about the
8  customers that were going to be purchasing those
9  drugs, did you?
10      MR. HYNES:  Objection to form.
11  BY THE WITNESS:
12      A.  No.
13  BY MR. GOETZ:
14      Q.  You had no idea about the past customers
15  that had purchased those drugs from that pharmacy, did
16  you?
17      MR. HYNES:  Same objection.
18  BY THE WITNESS:
19      A.  No.
20  BY MR. GOETZ:
21      Q.  You had no idea about how those customers
22  were going to pay for that -- those drugs, did you?
23      MR. HYNES:  Same objection.
24  BY THE WITNESS:

Page 81

1      A.  No.
2  BY MR. GOETZ:
3      Q.  You had no idea about how far customers
4  came to -- to that pharmacy to purchase those drugs,
5  did you?
6      MR. HYNES:  Same objection.
7  BY THE WITNESS:
8      A.  No.
9  BY MR. GOETZ:
10      Q.  You had no idea about the doctors that
11  prescribed those drugs?
12      MR. HYNES:  Same objection.
13  BY THE WITNESS:
14      A.  No.
15  BY MR. GOETZ:
16      Q.  You had no idea about whether or not those
17  individuals would be purchasing that hydrocodone in --
18  in combination with other drugs, did you?
19      MR. HYNES:  Objection to form.
20  BY THE WITNESS:
21      A.  No.
22  BY MR. GOETZ:
23      Q.  Have you ever heard of a drug cocktail?
24      MR. HYNES:  Objection to form.

Page 82

1 BY THE WITNESS:

2   A.   No.

3 BY MR. GOETZ:

4   Q.   CVS never trained you on -- on what

5 potentially dangerous drug cocktails were as it

6 relates to hydrocodone combination products?

7   MR. HYNES:  Objection to form.

8 BY THE WITNESS:

9   A.   No.

10 BY MR. GOETZ:

11   Q.   CVS never trained you on that if a

12 hydrocodone was being distributed with benzodiazapine

13 in a muscle relaxer in extraordinary quantities or in

14 large quantities that was indicative of diversion?

15   MR. HYNES:  Objection to form.

16 BY THE WITNESS:

17   A.   No.

18 BY MR. GOETZ:

19   Q.   You never heard of -- of what they called

20 "the drug trinity"?

21   MR. HYNES:  Objection to form.

22 BY THE WITNESS:

23   A.   No.

24 BY MR. GOETZ:

Page 83

1   Q.   You have no idea when you are filling that

2 prescription about the size of that pharmacy, do you?

3   MR. HYNES:  Objection to form.

4 BY THE WITNESS:

5   A.   No.

6 BY MR. GOETZ:

7   Q.   You have no idea whether or not that

8 pharmacy sits next to a hospital?

9   MR. HYNES:  Objection to form.

10 BY THE WITNESS:

11   A.   No.

12 BY MR. GOETZ:

13   Q.   You have no idea whether or not that

14 pharmacy is in a rural or an urban area?

15   MR. HYNES:  Objection to form.

16 BY THE WITNESS:

17   A.   No.

18 BY MR. GOETZ:

19   Q.   You have no idea about the theft of that

20 pharmacy?

21   MR. HYNES:  Objection to form.

22 BY THE WITNESS:

23   A.   No.

24 BY MR. GOETZ:

Page 84

1   Q.   In -- in 2013 or '14, did -- were you ever

2 informed of any of this?

3   A.   No.

4   MR. HYNES:  Objection to form.

5 BY MR. GOETZ:

6   Q.   Have you ever heard of a pill mill?  Do

7 you know what a pill mill is?

8   A.   No.

9   Q.   Are you aware whether or not the CVS

10 Indiana distribution center while you were there ever

11 reported a suspicious order of hydrocodone combination

12 products?

13   A.   No.

14   Q.   You are not aware of that?

15   A.   No.

16   MR. GOETZ:  Let's take a break.

17   MR. HYNES:  Okay.

18   THE VIDEOGRAPHER:  We are off the record at

19 5:59 p.m.

20     (WHEREUPON, a recess was had

21       from 5:59 to 6:07 p.m.)

22   THE VIDEOGRAPHER:  We are back on the record at

23 6:07 p.m.

24 BY MR. GOETZ:

Page 85

1   Q.   Ms. Wilson, there are stores that have

2 multiple orders in the same day, correct?

3   MR. HYNES:  Objection to form.

4 BY THE WITNESS:

5   A.   I don't know.

6 BY MR. GOETZ:

7   Q.   Do you -- are you not aware that -- you

8 don't ever remember picking two orders for the same

9 store?

10   A.   I don't remember.  I don't remember.

11   Q.   Okay.  Is it because you don't think it

12 happened or is it because you just -- you are picking

13 an order and you are looking at that store and

14 following your rule of thumb?

15   MR. HYNES:  Objection to the form.

16 BY THE WITNESS:

17   A.   They're -- they just are numbers, stores.

18 I don't look at the -- I mean, I don't say, Okay, I

19 picked 1333 and then -- or just -- they are just

20 numbers to me.

21   Q.   Okay.  You went and moved to inventory

22 control about six months ago?

23   A.   Yes.

24   Q.   And -- and what does that mean in your new

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 job?

2     A.   Inventory control is -- I work actually in

3 the twilight area and that's where -- if boxes get

4 lost somewhere in the warehouse, they bring them to

5 the twilight and then it is my job to find out where

6 they actually go, whether they go to the reserve or to

7 the picking location.

8     Q.   So are -- are you in inventory control for

9 the entire distribution center?

10     A.   Yes.

11     Q.   So it's not -- it's not just related to

12 controlled substances?

13     A.   No, I don't work in the Rx anymore.

14     Q.   And that distribution center distributes

15 products for the entirety of CVS, the front of the

16 store and the back of the store, correct?

17     A.   Yes.

18     Q.   So toothpaste, toilet paper, candy bars,

19 all of it?

20     A.   Yes.

21     MR. GOETZ: That is all I have. Thank you for

22 your time.

23     THE WITNESS: Thank you.

24     MR. GOETZ: And thank you for coming today.

Page 87

1     THE WITNESS: Thank you.

2     MR. HYNES: Thank you.

3     MR. GOETZ: Good luck.

4     THE VIDEOGRAPHER: We are off the record at

5 6:09 p.m. This concludes the videotape deposition of

6 Ellen Wilson.

7     (WHEREUPON, discussion was had

8     off the record.)

9     (WHEREUPON, the following proceedings

10     were had on the stenographic record

11     only:)

12 BY MR. GOETZ:

13     Q.   Ms. Wilson, is this the drawing you made?

14     A.   Yes.

15     Q.   We are going to mark this as Wilson

16 Exhibit 1, okay?

17     A.   Yes.

18     (WHEREUPON, a certain document was

19     marked CVS - Wilson Deposition

20     Exhibit No. 1, for identification, as

21     of 01/24/2019.)

22     MR. GOETZ: Okay. Thank you.

23     (Time Noted: 6:10 p.m.)

24     FURTHER DEPONENT SAITH NAUGHT.

Page 88

1     REPORTER'S CERTIFICATE

2

3     I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

4 a Certified Shorthand Reporter, do hereby certify:

5     That previous to the commencement of the

6 examination of the witness herein, the witness was

7 duly sworn to testify the whole truth concerning the

8 matters herein;

9     That the foregoing deposition transcript

10 was reported stenographically by me, was thereafter

11 reduced to typewriting under my personal direction and

12 constitutes a true record of the testimony given and

13 the proceedings had;

14     That the said deposition was taken before

15 me at the time and place specified;

16     That I am not a relative or employee or

17 attorney or counsel, nor a relative or employee of

18 such attorney or counsel for any of the parties

19 hereto, nor interested directly or indirectly in the

20 outcome of this action.

21     IN WITNESS WHEREOF, I do hereunto set my

22 hand on this 28th day of January, 2019.

23

24     JULIANA F. ZAJICEK, Certified Reporter

Page 89

1     DEPOSITION ERRATA SHEET

2

3

4 Case Caption: In Re: National Prescription

5     Opiate Litigation

6

7     DECLARATION UNDER PENALTY OF PERJURY

8

9     I declare under penalty of perjury that I

10 have read the entire transcript of my Deposition taken

11 in the captioned matter or the same has been read to

12 me, and the same is true and accurate, save and except

13 for changes and/or corrections, if any, as indicated

14 by me on the DEPOSITION ERRATA SHEET hereof, with the

15 understanding that I offer these changes as if still

16 under oath.

17

18     ELLEN WILSON

19

20 SUBSCRIBED AND SWORN TO

21 before me this     day

22 of     , A.D. 20___.

23

24     Notary Public

Highly Confidential – Subject to Further Confidentiality Review

Page 90

1          DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24          ELLEN WILSON

Page 91

1          DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24          ELLEN WILSON