```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
           Thursday, January 24, 2019
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
             Videotaped deposition of
15   MARIAN WOOD, taken pursuant to notice,
     was held at Homewood Suites by Hilton
16   4170 Philadelphia Road, Bel Air, Maryland
     21015, beginning at 9:33 a.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19                    -  -  -
20
21
22
          GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
EMMA KABOLI, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Ekaboli@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com
- and -
BY: MATTHEW R. LADD, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6141
Matthew.ladd@morganlewis.com
Representing the Defendant,
Rite Aid

Page 3

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

BLASINGAME, BURCH, GARRARD &
ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens Georgia 30601
(706) 707-2762
Ahughes@bbga.com
Representing the Plaintiffs

ARNOLD & PORTER KAYE SCHOLER LLP
BY: HEATHER A. HOSMER, ESQUIRE
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-5000
heather.hosmer@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals

GIBBONS PC
BY: PAUL E. ASFENDIS, ESQUIRE
One Pennsylvania Plaza
37th Floor
New York, New York 10119
(212) 613-2000
Pasfendis@gibbonslaw.com
Representing the Defendant,
AmerisourceBergen Corporation

Page 4

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

JONES DAY
BY: JASON Z. ZHOU, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
Jzhou@jonesday.com
Representing the Defendant,
Walmart

BAILEY & WYANT PLLC
BY: MICHAEL W. TAYLOR, ESQUIRE
500 Virginia Street East
Suite 600
Charleston, West Virginia 25301
(304) 345-4222
Mtaylor@baileywyant.com
Representing the Defendant,
West Virginia Board of Pharmacy

ALSO PRESENT:
Dan Lawlor, Videographer
Jeff Sayres, Trial Technician

Page 5

- - -
I N D E X
- - -

Testimony of: MARIAN WOOD

By Mr. Powers
By Mr. Lavelle

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION                  PAGE
Rite Aid-Wood
Exhibit-1    Rite_Aid_OMDL_0013471        70

Rite Aid-Wood
Exhibit-2    Rite_Aid_OMDL_0013855-858    82
Rite Aid-Wood
Exhibit-3    Rite_Aid_OMDL_0014804-874    103

Rite Aid-Wood
Exhibit-4    Rite_Aid_OMDL_0016253-255    131
Rite Aid-Wood
Exhibit-5    Rite_Aid_OMDL_0009868-877    153

Rite Aid-Wood
Exhibit-6    Rite_Aid_OMDL_0021630-643    165
Rite Aid-Wood
Exhibit-7    Rite_Aid_OMDL_0012519-520    172

Rite Aid-Wood
Exhibit-8    Rite_Aid_OMDL_0013106-107    180

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
1           - - -
2        E X H I B I T S
3           - - -
4  NO.     DESCRIPTION          PAGE
5  Rite Aid-Wood
   Exhibit-9   Rite_Aid_OMDL_0013110
6       With attachment        195
7  Rite Aid-Wood
   Exhibit-10   Rite_Aid_OMDL_0003635-671  198
8
   Rite Aid-Wood
9  Exhibit-11   Rite_Aid_OMDL_0012500-502  212
10 Rite Aid-Wood
   Exhibit-12   Rite_Aid_OMDL_0046566-567  217
11
   Rite Aid-Wood
12 Exhibit-13   Rite_Aid_OMDL_0015219    230
13 Rite Aid-Wood
   Exhibit-14   Rite_Aid_OMDL_0017238-242  237
14
   Rite Aid-Wood
15 Exhibit-15   Rite_Aid_OMDL_0015077-081  250
16
17
18
19
20
21
22
23
24
```

Page 7

```
1           - - -
2      DEPOSITION SUPPORT INDEX
3           - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line   Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17   8    1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24
```

Page 8

```
1           - - -
2        (It is hereby stipulated and
3  agreed by and among counsel that
4  sealing, filing and certification
5  are waived; and that all
6  objections, except as to the form
7  of the question, will be reserved
8  until the time of trial.)
9           - - -
10       VIDEO TECHNICIAN:  We are
11 now on the record.  My name is Ray
12 Moore, I'm a videographer for
13 Golkow Litigation Services.
14 Today's date is January 24th,
15 2019, and the time is 9:33 a.m.
16       This video deposition is
17 being held in Bel Air, Maryland,
18 in the matter, In Re National
19 Prescription Opiate Litigation for
20 the United States District Court
21 for the Northern District of Ohio,
22 Eastern Division, MDL Number 2804.
23       The deponent is Marian Wood.
24 Counsel will be noted on the
```

Page 9

```
1  stenographic record.  The court
2  reporter is Amanda Miller and will
3  now swear in the witness.
4           - - -
5        MARIAN WOOD, after having
6  been duly sworn, was examined and
7  testified as follows:
8           - - -
9          EXAMINATION
10          - - -
11 BY MR. POWERS:
12     Q.   Good morning, Ms. Wood.
13     A.   Good morning.
14     Q.   My name is Will Powers, and
15 I represent the plaintiffs in this
16 litigation.
17       Can you just state your full
18 name and spell it for the record?
19     A.   Marian Louise Wood.
20 M-A-R-I-A-N, L-O-U-I-S-E, W-O-O-D.
21     Q.   Great.  And we're here for
22 your deposition today.
23       Do you understand that?
24     A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  Q.   Have you ever been deposed
2  before?
3      A.   Yes.
4      Q.   When was that?
5      A.   Somewhere between 2009 and
6  2014.
7      Q.   And what was that in
8  connection with?
9      A.   EEOC.
10     Q.   Ever been deposed besides
11 that EEOC deposition?
12     A.   No.
13     Q.   And what was that EEOC
14 deposition about?
15     A.   An employee, they wanted to
16 limit where he could go because he had a
17 disability and they were concerned with
18 his safety, and they were saying that we
19 couldn't limit where he could go.
20     Q.   Were you a witness in that
21 proceeding?
22     A.   Yes.
23     Q.   You were not a party in that
24 proceeding?  You weren't being sued or

Page 11

1  the one doing the suing?
2      A.   No.
3      Q.   You have been deposed
4  before, but I want to go over some ground
5  rules just so we're all on the same page
6  before we get started.
7          Because the court reporter
8  is here writing everything down that is
9  being said, I want to make sure that only
10 one of us is talking at a time.  So even
11 though you may anticipate a question or
12 think you know where I'm going with
13 something, I just ask you to allow me to
14 finish my question before you start
15 speaking, and I'll do likewise for you.
16         Is that okay?
17     A.   Yes.
18     Q.   And also for the same reason
19 that the court reporter needs to take a
20 written record of this deposition here
21 today, I need verbal answers from you so
22 that she can get them down on the
23 transcript; so no uh-uhs, uh-huhs, nods
24 of the head or shakes of the head,

Page 12

1  something like that.
2          Is that okay?
3      A.   Yes.
4      Q.   And if there's any reason
5  you don't understand a question or it
6  requires some sort of clarification,
7  explanation of the words I'm using,
8  anything like that, just let me know and
9  I can clarify the question.
10         Is that okay?
11     A.   Yes.
12     Q.   So if you answer my
13 questions, we'll agree that you
14 understand the question that has been
15 asked, okay?
16     A.   Yes.
17     Q.   Are you currently suffering
18 from any medical disease or illness that
19 in any way interferes with your ability
20 to answer truthfully and completely my
21 questions here today?
22     A.   I don't believe so.
23     Q.   Are you taking any
24 medication or drugs that may in any way

Page 13

1  interfere with the testimony you're going
2  to give here today?
3      A.   No.
4      Q.   And you were just sworn in
5  by the court reporter.
6          Do you understand that the
7  court reporter has put you under oath
8  here today just as you would be in a
9  courtroom at trial?
10     A.   Yes.
11     Q.   So because you're under
12 oath, if you lie or provide intentionally
13 misleading answers, you may be subject to
14 criminal or civil penalties.
15         Do you understand that?
16     A.   Yes.
17     Q.   And we can take breaks when
18 you need them.  I just ask, if there's a
19 question pending, that you answer the
20 question before we take a break.
21         Is that okay?
22     A.   Yes.
23         MR. LAVELLE:  The witness
24 reserves the right to consult with

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 counsel on issues of privilege.
2 BY MR. POWERS:
3    Q.   And as your counsel just
4 did, your counsel may object from time to
5 time to my questions, but I'm still
6 entitled to an answer to my question
7 unless he specifically instructs you not
8 to answer.
9       Is that okay?
10    A.   Yes.
11    Q.   Okay, Ms. Wood, I want to
12 start with your educational background.
13       Did you complete high
14 school?
15    A.   Yes.
16    Q.   Where was that?
17    A.   Northern High School.
18    Q.   And is this here in
19 Maryland?
20    A.   It's in Baltimore.
21    Q.   And what year was that?
22    A.   '73 -- I went through and
23 finished 12th grade, but I didn't get my
24 diploma.  They -- I had to finish one

Page 15

1 more course.  So --
2    Q.   Did you ever finish that
3 course?
4    A.   Yes.
5    Q.   When did you --
6    A.   I got my diploma.
7    Q.   What was your diploma date?
8    A.   '73, I believe.
9    Q.   Any education beyond high
10 school?
11    A.   No.
12    Q.   Any certifications of any
13 kind beyond high school?
14    A.   Where I worked before, I
15 would take classes on different things,
16 interviewing techniques, security.
17    Q.   And you say where you worked
18 before, do you mean before you were
19 working at Rite Aid?
20    A.   In different places that I
21 worked.
22    Q.   Where did you work before
23 Rite Aid?
24    A.   Let's see, before Rite Aid I

Page 16

1 worked at Joseph's Country Inn
2 Restaurant.  I worked at Caldor, Best
3 Products, Johnny Unitas Golden Arm
4 Restaurant.  I think that's it.
5    Q.   Where did you work -- let me
6 ask the question differently.
7       When did you first start
8 working at Rite Aid?
9    A.   1998.
10    Q.   Did you ever work at
11 anywhere dealing with controlled
12 substances or pharmacy before starting
13 working at Rite Aid?
14    A.   No.
15       MR. LAVELLE:  Object to
16    form.
17 BY MR. POWERS:
18    Q.   What did you do immediately
19 preceding starting to work at Rite Aid?
20    A.   Can you repeat that?
21    Q.   Sure.
22       When did you -- so you first
23 started working at Rite Aid in 1998.
24 What was the job you had immediately

Page 17

1 preceding starting to work at Rite Aid?
2    A.   Joseph's Country Inn.
3    Q.   And when you started working
4 at Rite Aid in 1998, what was your
5 position?
6    A.   I started as an inventory
7 control partner.
8    Q.   And where was your job
9 located, like, in Maryland or somewhere
10 else?
11       MR. LAVELLE:  Object to
12    form.
13       THE WITNESS:  Perryman.
14 BY MR. POWERS:
15    Q.   And when you say "Perryman,"
16 you mean the Perryman distribution
17 center?
18    A.   Yes.
19    Q.   Have you worked at the
20 Perryman distribution center from 1998
21 continuously until now?
22    A.   I'm not employed there.
23    Q.   When did you stop being
24 employed at Rite Aid?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   October of 2014.

2    Q.   Between 1998 and 2014, when

3 you were employed at Rite Aid, did you

4 work only at the Perryman distribution

5 center?

6    A.   As far as I can remember.

7    Q.   So when we talk about your

8 employment at Rite Aid, we can agree that

9 we're just talking about between '98 and

10 2014.

11        Is that okay?

12   A.   Yes.

13   Q.   So you started in 1998 at

14 Rite Aid as an inventory control partner.

15        What were your job duties as

16 an inventory control partner?

17   A.   We would start out by -- we

18 were just starting out, so we would --

19 they would run picks, and then we would

20 audit the totes.

21   Q.   When you say "we were just

22 starting out," what do you mean by that?

23   A.   It was a startup.  We were

24 opening the building.

Page 19

1    Q.   So the Perryman facility

2 opened around 1998, then?

3    A.   Yes.

4    Q.   How long were you an

5 inventory control partner for?

6    A.   I can't be exact.

7    Q.   Approximately.

8    A.   I don't remember.

9    Q.   What was your next position

10 after an inventory control partner?

11   A.   I believe I went to regional

12 cigarettes.

13   Q.   What was your job title at

14 that point?

15   A.   I don't remember.

16   Q.   And when you say "regional

17 cigarettes," is that the department name,

18 or something else?

19        MR. LAVELLE:  Object to

20 form.

21        THE WITNESS:  Can you repeat

22 that?

23 BY MR. POWERS:

24   Q.   Sure.

Page 20

1        You said you went to go work

2 in regional cigarettes.

3        What do you mean by

4 "regional cigarettes"?  Is that the

5 department?  Is that the unit?  What is

6 it -- how does that fit into the

7 organizational structure?

8    A.   Regional --

9        MR. LAVELLE:  Object to

10 form.

11        THE WITNESS:  Okay.  It's a

12 department within Perryman.

13 BY MR. POWERS:

14   Q.   And when you were an

15 inventory control partner before that,

16 was that in a separate department?

17   A.   Yes.

18   Q.   What department was that in?

19   A.   Inventory control.

20   Q.   When you were in the

21 regional cigarettes department, what were

22 your job responsibilities?

23   A.   Supervising the personnel,

24 making a schedule.

Page 21

1    Q.   What were the personnel you

2 were supervising doing?

3    A.   They were picking and

4 stamping and packing cigarettes.

5    Q.   Anything else besides

6 supervising them and making a schedule

7 that you did while you worked in the

8 regional cigarettes department?

9    A.   We would inventory.

10   Q.   Anything else?

11   A.   I don't remember.

12   Q.   How long did you work in the

13 regional cigarettes department?

14   A.   I don't remember.

15   Q.   What did you do after the

16 regional cigarettes department?

17   A.   I went into Rx.

18   Q.   And when you say "Rx," is

19 that shorthand for pharmacy department?

20   A.   Yes.

21   Q.   And is that a separate

22 department from the inventory control and

23 regional cigarettes departments?

24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    Q.   Do you remember when you
2  started in the Rx department?
3    A.   No.
4    Q.   Even if you don't remember
5  exactly, do you have an approximation
6  about when you started in the Rx
7  department?
8    A.   It could have been around
9  2000.
10   Q.   But it's safe to say that
11 you've been working in the Rx department
12 long -- never mind.  Scratch that.
13        And did you stay in the Rx
14 department from around 2000 until when
15 you left Rite Aid in 2014?
16   A.   No.
17   Q.   Where did you move after the
18 Rx department?
19   A.   For a time in there, I moved
20 over to what was called the replenishment
21 department.
22   Q.   And when did you do that?
23   A.   I don't remember.
24   Q.   Approximately when did you

Page 23

1  move over to the replenishment
2  department?
3    A.   2007 or '08.
4    Q.   And do you know how long you
5  stayed in the replenishment department
6  for?
7    A.   Not really.
8    Q.   Can you approximate how long
9  you stayed in the replenishment
10 department?
11   A.   If I guess, it might have
12 been about a year.
13   Q.   So you would have been in
14 the replenishment department from about
15 2007 or 2008, and then you left around
16 2008 to 2009, something like that?
17   A.   I don't remember.
18   Q.   And after the replenishment
19 department, where did you go next?
20   A.   I went back into Rx, the
21 pharmacy department.
22   Q.   And when you went back to
23 the Rx department after being in the
24 replenishment department, is that where

Page 24

1  you stayed until 2014?
2    A.   Yes.
3    Q.   Going back to your first
4  time in the pharmacy department
5  between -- around 2000 to 2007, what was
6  your job title?
7    A.   When I first went in, I went
8  in as assistant manager in the controlled
9  drug cage.
10   Q.   Did you have any other
11 titles during that 2000 to 2007 time
12 frame?
13   A.   Can you repeat that?
14   Q.   Sure.
15        When you were in the
16 pharmacy department the first time,
17 between approximately 2000 to 2007, did
18 you have any other titles besides
19 assistant manager of the controlled drug
20 cage?
21   A.   Yes.
22   Q.   What were those titles?
23   A.   DEA coordinator.
24   Q.   Anything else?

Page 25

1    A.   Department manager.
2    Q.   Anything else?
3    A.   When I stepped down from
4  being department manager, I was -- I went
5  down to the lead level, supervisor level,
6  which is the DEA coordinator level.
7    Q.   Just so I have the sequence
8  correct here.
9        So you started in the
10 pharmacy department as an assistant
11 manager of the controlled drug cage.
12 Then you moved to the DEA coordinator
13 position.  Then department manager.  And
14 then you stepped back down to the DEA
15 coordinator.
16        Do I have that sequence
17 correct?
18   A.   No.
19   Q.   Okay.  Can you correct me?
20   A.   From department manager, I
21 stepped down into a lead-type position in
22 the cage until I went into replenishment.
23   Q.   When you say "lead type," I
24 thought you said that that's sort of like

Page 26

1  a DEA coordinator.
2      A.   It's a lead, it would be the
3  level, it's not a -- the DEA coordinator
4  didn't really have a level.  But when I
5  stepped down, I stepped down to the -- to
6  an hourly, that's probably more
7  appropriate.
8      Q.   So the department manager
9  would be above the DEA coordinator
10 position?
11     A.   Yes.
12     Q.   And the DEA coordinator
13 position would be qualified as a lead
14 position?
15     A.   The best that I can
16 remember.
17     Q.   And those lead level
18 positions, those are all hourly
19 positions; is that right?
20     A.   I want to correct something.
21     Q.   Sure.
22     A.   The coordinator, when I was
23 there, it was assistant manager level,
24 because I was assistant manager.

Page 27

1      Once I left, it was taken by
2  a lead level, which is hourly.
3      Q.   Is assistant manager level
4  higher than a lead --
5      A.   Yes.
6      Q.   -- level?
7      MR. LAVELLE:  Wait until the
8  question is finished before you
9  answer the question.
10     THE WITNESS:  Sorry.
11     MR. LAVELLE:  No problem.
12     MR. POWERS:  It's okay.
13 Just so we're clear.  I know you
14 can anticipate, like a normal
15 conversation, you would -- that
16 would be fine.  But just here, let
17 me finish my question completely,
18 and then you can answer.
19 BY MR. POWERS:
20     Q.   How come you left the
21 pharmacy department to go to the
22 replenishment department?
23     A.   An opening came up, and I
24 wanted to take it.

Page 28

1      Q.   So it was your decision to
2  move from the pharmacy department to the
3  replenishment department?
4      A.   Yes.
5      Q.   What did you do in the
6  replenishment department?
7      A.   I did clerical work.
8      Q.   And what was your title
9  while you were in the replenishment
10 department?
11     A.   I don't remember.
12     Q.   Did you have multiple titles
13 while you were in the replenishment
14 department?
15     A.   I don't remember.
16     Q.   But you were only there, in
17 the replenishment department, for about a
18 year-ish, you said?
19     A.   About.
20     Q.   How come you left the
21 replenishment department and went back to
22 the pharmacy department?
23     A.   The opening came back up for
24 a DEA coordinator.

Page 29

1      Q.   So when you went back to the
2  pharmacy department after being in the
3  replenishment department, you came back
4  as a DEA coordinator; is that right?
5      A.   I believe so.
6      Q.   Did you have any other
7  titles between when you came back to the
8  pharmacy department and when you left
9  Rite Aid in 2014, besides DEA
10 coordinator?
11     A.   Can you repeat that?
12     Q.   Sure.
13      When you were in the
14 pharmacy department after you were in the
15 replenishment department, did you have
16 any other titles besides DEA coordinator?
17     A.   Not that I recall.
18     Q.   So you were a DEA
19 coordinator the entire time that you were
20 in the pharmacy department, after being
21 in the replenishment department?
22     A.   Yes.
23     Q.   What were your job
24 responsibilities as a DEA coordinator

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 during that time frame?
2    A. To oversee people, some
3 training, recordkeeping.
4    Q. So you said "oversee people,
5 some training, and recordkeeping."
6      Anything else?
7    A. Inventories.
8    Q. Anything else?
9    A. Communications. Helping out
10 in the cage when needed.
11      That's all I can remember
12 right now.
13    Q. You said you had the
14 position of DEA coordinator.
15      Are there more than one DEA
16 coordinator?
17      MR. LAVELLE: Object to
18    form.
19      THE WITNESS: I don't
20    understand.
21 BY MR. POWERS:
22    Q. Are there multiple DEA
23 coordinators at the Rite Aid facility in
24 Perryman?

Page 31

1    A. We had a security version of
2 DEA coordinator who would handle all the
3 cameras and security, audits.
4    Q. What was the title of that
5 position?
6    A. I believe it was security
7 DEA coordinator.
8    Q. Who held that position?
9    A. The only one that I can
10 recall is Larry Ringgold.
11    Q. My question, though, is,
12 besides yourself, were there any other
13 DEA coordinators at Perryman?
14      MR. LAVELLE: Object to the
15    form. Objection. Asked and
16    answered.
17      THE WITNESS: I'm confused.
18 BY MR. POWERS:
19    Q. Sure.
20      Did anyone else have the
21 same title as you? Were there multiple
22 DEA coordinators?
23    A. There was others, yes.
24    Q. Who were those DEA

Page 32

1 coordinators?
2    A. It was Debra Chase.
3    Q. Anyone else?
4    A. I don't think so.
5    Q. How about from when you were
6 in the pharmacy department before you
7 went to the replenishment department,
8 were there other DEA coordinators at that
9 time period?
10    A. Not that I recall.
11    Q. How about when you became
12 department manager, who was the DEA
13 coordinator at that point?
14    A. That was Debra Chase.
15    Q. So besides yourself and
16 Debra Chase, was there anyone else that
17 ever held the position of DEA coordinator
18 at the Perryman facility, to the best of
19 your knowledge?
20    A. That's all I can remember.
21    Q. Who was your department
22 manager when you were in the pharmacy
23 department?
24    A. One of them was Clint. I

Page 33

1 can't remember his last name.
2    Q. Anybody else?
3    A. I believe so, I just can't
4 remember right now.
5    Q. And am I correct that as a
6 DEA coordinator, you would have been
7 reporting to the department manager?
8    A. Yes, at times.
9    Q. Who else would you report
10 to?
11    A. The GM, general manager.
12    Q. Who was the GM while you
13 were a DEA coordinator?
14    A. There were several. Gary
15 Kanopka.
16    Q. I've got to ask you your
17 best attempt at spelling his last name.
18    A. K-O-N-O-P-K-A.
19    Q. Besides Gary Konopka, who
20 else?
21    A. Oh, my gosh. I can remember
22 a couple, but I can't say positive it was
23 when I was in pharmacy, because we went
24 through several.

Page 34

1  Q.  Who were the other ones you
2 remember?
3  A.  Steve Lawrence.
4  Q.  Anyone else?
5  A.  Tim Peifley.
6  Q.  And do you know how to spell
7 Peifley?
8  A.  P-E-I-F-L-E-Y, I think.
9  Q.  Any other GMs?
10  A.  I believe there was, I just
11 don't remember.
12  Q.  So besides the department
13 managers and the general managers, was
14 there anyone else you would have reported
15 to as the DEA coordinator?
16  A.  The ops manager.
17  Q.  Who were the ops managers
18 you remember?
19  A.  There was Keith Frost.  I
20 know I had Robyn Stasney at one time, I
21 just don't remember when.
22  Q.  I'm sorry, what's the
23 spelling of Robyn's last name?
24  A.  S-T-A -- S-T-A-S-N-E-Y --

Page 35

1 N-Y.  I'm sorry, I'm not sure.
2  Q.  That's fine.  It's not a
3 spelling test.
4   Anyone else who was an ops
5 manager besides Frost and Stasney?
6  A.  I don't remember.
7  Q.  Besides the department
8 managers, the GMs and the ops managers,
9 anyone else you would have reported to as
10 a DEA coordinator?
11  A.  Kevin Mitchell.
12  Q.  What was Kevin Mitchell's
13 position?
14  A.  He was the regulatory
15 compliance manager.
16  Q.  Anyone else who was a
17 regulatory compliance manager?
18  A.  There was -- I'm not sure of
19 the titles, but I believe there was a
20 Chris Belli.
21   That's all I remember right
22 now.
23  Q.  Besides everyone we've
24 talked about so far, anyone else that you

Page 36

1 reported to as a DEA compliance manager?
2  A.  There might have been.  I
3 just don't remember right off.
4  Q.  Even if you don't remember
5 the name, how about the general position
6 name that you would have reported to?
7  A.  I don't remember.
8  Q.  Did you report to the
9 Government Affairs Office at all?
10  A.  At times, yes.
11  Q.  Were they your -- would you
12 consider them your supervisors?
13  A.  I'm confused.
14  Q.  Okay.  I'm just trying to
15 figure out the chain of command.
16   So did you report to the
17 Government Affairs Office or just deal
18 with the Government Affairs Office?  Do
19 you understand the distinction?
20  A.  I --
21   MR. LAVELLE:  Object to
22 form.
23   THE WITNESS:  Repeat it one
24 more time.

Page 37

1 BY MR. POWERS:
2  Q.  Sure.
3   You're familiar with the
4 Government Affairs Office, right?
5  A.  Yes.
6  Q.  Would you consider them your
7 supervisors?
8  A.  I don't think I did, no.
9  Q.  But you did deal with people
10 from the Government Affairs Office; is
11 that right?
12  A.  Yes.  Yes.
13  Q.  Who did you deal with from
14 the Government Affairs Office?
15  A.  The only one I can remember
16 right now is Janet Hart.
17  Q.  Okay.  I want to go back to
18 your job duties as a DEA coordinator.
19   How were you trained for
20 your job as a DEA coordinator?
21  A.  Kevin Mitchell and I would
22 read through the CFR, the DEA regulatory
23 compliance.  That's all I remember right
24 now.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   Did anyone else train you
2  besides Kevin Mitchell?
3    A.   We would have an outside
4  agency come in and give us guidance.
5    Q.   Who was that outside agency?
6    A.   Buzzeo.
7    Q.   I'll talk about that in a
8  second.
9         Going back to your training
10  with Kevin Mitchell, you said you read
11  the CFR and you looked at DEA regulatory
12  compliance, right?
13    A.   Yes.
14    Q.   Anything else?
15         MR. LAVELLE:  Objection.
16  Asked and answered.
17         THE WITNESS:  I don't
18  remember.
19  BY MR. POWERS:
20    Q.   Were there any formal Rite
21  Aid training materials that you received
22  to train you as a DEA coordinator?
23    A.   We had -- we had a manual.
24  We had the regulatory compliance.

Page 39

1         I don't remember.
2    Q.   You mentioned a manual.
3  What was -- do you remember the name of
4  that manual?  Did it have a name?
5         MR. LAVELLE:  Object to
6  form.
7         THE WITNESS:  Did it have a
8  name?  I don't remember.
9  BY MR. POWERS:
10    Q.   Was that a hardcopy manual?
11    A.   Yes.
12    Q.   You mentioned an outside
13  agency that came in and trained you.
14  When did that occur?
15    A.   They didn't train me, they
16  were a training tool.
17    Q.   Okay.  Can you explain the
18  distinction there?
19    A.   They would -- they came in
20  and audited us and would give us guidance
21  in any area that we might need it.
22    Q.   How often did Buzzeo come in
23  and audit you?
24    A.   I'm not sure.

Page 40

1    Q.   More or less than ten times?
2    A.   I believe it was less than
3  ten times.
4    Q.   More or less than five
5  times?
6    A.   I believe it was less than
7  five times.
8    Q.   And they -- when Buzzeo came
9  and, you said, audited you, was that
10  while you were a part of the pharmacy
11  department?
12    A.   Yes.
13    Q.   Was it part -- was it when
14  you were part of the pharmacy department
15  after being in the replenishment
16  department?
17    A.   No.
18    Q.   It was before you went to
19  the replenishment department when Buzzeo
20  came and audited you?
21    A.   Yes.
22    Q.   Did Buzzeo ever come after
23  you left the replenishment department and
24  went back to the pharmacy department?

Page 41

1         MR. LAVELLE:  Object to
2  form.
3         THE WITNESS:  Can you repeat
4  that?
5  BY MR. POWERS:
6    Q.   Sure.  Maybe it will be
7  helpful to clarify.
8         You were in the pharmacy
9  department in two different time periods,
10  right?
11    A.   Yes.
12    Q.   So you were in the pharmacy
13  department before you went to the
14  replenishment department, and then you
15  were in the pharmacy department after you
16  left the replenishment department, right?
17    A.   Yes.
18    Q.   So can we agree that we can
19  refer to the time period when you were in
20  the pharmacy department before you went
21  to the replenishment department as your
22  first time in the pharmacy department?
23         Is that okay?
24    A.   Yes.

Page 42

1 Q. And then we can refer to the
2 time you were in the pharmacy department
3 after you left the replenishment
4 department as your second time in the
5 pharmacy department.
6 Is that okay?
7 A. Yes.
8 Q. Okay. So just so we're
9 clear, when Buzzeo came and audited you,
10 that was during your first time in the
11 pharmacy department; is that right?
12 A. Yes.
13 Q. Did they ever -- did Buzzeo
14 ever come and audit the pharmacy
15 department during your second time in the
16 pharmacy department?
17 A. I don't recall.
18 Q. You don't recall them ever
19 coming during that second time in the
20 pharmacy department?
21 MR. LAVELLE: Object to
22 form. Objection. Asked and
23 answered.
24 THE WITNESS: I don't

Page 43

1 recall.
2 BY MR. POWERS:
3 Q. And when Buzzeo came, was
4 that physically that Buzzeo came to the
5 Perryman facility?
6 A. Yes.
7 Q. Do you know who came, as
8 part of the Buzzeo team, to the Perryman
9 facility?
10 A. The first time that I recall
11 it was Ron Buzzeo.
12 Q. Anyone else besides Ron
13 Buzzeo?
14 A. I don't remember.
15 Q. What kind of things did Ron
16 Buzzeo do with you during that audit?
17 A. He did an audit of what a
18 DEA audit would be.
19 Q. Was it sort of a practice
20 DEA audit?
21 MR. LAVELLE: Object to
22 form.
23 THE WITNESS: Repeat that.
24 BY MR. POWERS:

Page 44

1 Q. Sure.
2 When Ron Buzzeo did his
3 audit, was it to prepare Rite Aid for an
4 actual DEA audit?
5 A. Okay, I'm confused.
6 When he came, he came to
7 audit us and help us see if we needed to
8 work on anything.
9 Q. And was the purpose of the
10 audit to prepare the Perryman facility
11 for a DEA audit?
12 A. No, it was to make sure we
13 were prepared.
14 Q. Prepared for a DEA audit?
15 A. Yes.
16 Q. Okay. And when Ron Buzzeo
17 came and did this audit, did he give you
18 any written materials?
19 A. I don't remember.
20 Q. Do you know if he prepared
21 any written materials generally?
22 A. I don't remember.
23 Q. Do you know if anyone at
24 Rite Aid got any written materials from

Page 45

1 Ron Buzzeo as a result of that audit?
2 A. I think Kevin might have --
3 might have sent out a Sysm or something.
4 That's the only thing I can think of.
5 Q. I'm sorry, you said might
6 have sent out a Sysm.
7 What is that?
8 A. An e-mail type -- it's --
9 SYSMs are kind of like e-mails for the
10 system.
11 Q. And is that S-Y-S-M?
12 A. Yes.
13 Q. And was that a separate
14 system from your e-mail system at Rite
15 Aid?
16 A. Yes.
17 Q. How is it different?
18 A. I don't know.
19 Q. Would you use the Sysm for
20 different things than you did use e-mail
21 for?
22 A. I believe we used the Sysm
23 first, and then we went -- I don't
24 remember.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.   Did the Sysm and e-mail
2  exist at the same time period?
3    A.   I don't remember.
4    Q.   Could you e-mail -- strike
5  that.
6         Could you use the Sysm to
7  contact people outside of Rite Aid?
8    A.   I'm confused.
9    Q.   Sure.
10   A.   No.  You could only use it
11 to contact people within the system.
12   Q.   So Sysm was a Rite Aid
13 internal system?
14   A.   I believe, yes.
15   Q.   Did you have a different
16 e-mail address from, for lack of a better
17 term, a Sysm address?
18        MR. LAVELLE:  Object to
19   form.
20        THE WITNESS:  I don't
21   remember.
22 BY MR. POWERS:
23   Q.   Do you remember when Rite
24 Aid stopped using Sysm?

Page 47

1    A.   No.
2    Q.   Do you remember if it was
3  before your second time in the pharmacy
4  department?
5    A.   I don't remember.
6    Q.   Was Rite Aid still using
7  Sysm when you left in 2014?
8    A.   I don't remember.
9    Q.   And you stated that the
10 Buzzeo company may have come multiple
11 times to audit the Perryman facility.
12        Do you know, during any one
13 of those times, did Buzzeo give any
14 written materials to anyone at Rite Aid?
15   A.   I don't remember.
16   Q.   Did you personally ever get
17 any written materials as a result of one
18 of these Buzzeo audits?
19   A.   I don't remember.
20   Q.   Who would have gotten
21 written materials from a Buzzeo audit?
22        MR. LAVELLE:  Object to
23   form.
24        THE WITNESS:  I don't --

Page 48

1  BY MR. POWERS:
2    Q.   Do you remember if there was
3  any meetings or phone calls to discuss
4  the results of the Buzzeo audits?
5    A.   I know there was discussion.
6  I just can't tell you when, who.
7    Q.   Who would have been involved
8  in those discussions?
9    A.   Well, I know Kevin Mitchell
10 would.
11   Q.   Anyone else you can think
12 of?
13   A.   I'm not sure.
14   Q.   And we've been talking about
15 the Buzzeo company doing these audits.  I
16 think you first mentioned them in the
17 context of training.
18        Are you saying that the
19 audits are the same thing as the
20 training?
21   A.   When he first came in, it
22 was a guide, used as a guide to me; it
23 was a type of training to see, you know,
24 what to expect, what we need to do.

Page 49

1         So, yes, I guess you could
2  consider it a type of training.  But it
3  wasn't -- it wasn't, like, directly
4  teaching me.  It was just more like
5  guidance.
6    Q.   Besides the audits, was
7  there any separate training that Buzzeo
8  did during your time at Rite Aid?
9    A.   We went to Buzzeo
10 conferences.  I could not tell you when.
11 I know I went to at least two.
12   Q.   You said "we went to Buzzeo
13 conferences."
14        Who are you referring to
15 when you said "we"?
16   A.   Other people from Rite Aid,
17 Kevin Mitchell, being one.  I can't
18 remember, but I believe Barbara from
19 California went, the DEA coordinator in
20 California.
21        That's all I can remember.
22   Q.   Do you remember Barbara's
23 last name?
24   A.   Barbara -- Barbara -- no.

Page 50

1    Q.   If I said Lusaro, does that
2  sound --
3    A.   Yes.
4    Q.   -- familiar?
5      MR. LAVELLE:  Just wait
6    until the -- the question is
7    finished before you answer.
8      THE WITNESS:  Sorry.
9      MR. LAVELLE:  That's okay.
10   We just need to make sure the
11   record is clear.
12 BY MR. POWERS:
13   Q.   So I'll ask that again.
14     The Barbara that went with
15 you to the Buzzeo conferences, was that
16 Barbara Lusaro?
17   A.   I remember her being at at
18 least one.
19   Q.   But her name was Barbara
20 Lusaro?
21   A.   I believe.
22   Q.   Do you know if you went to
23 those Buzzeo conferences during your
24 first time in the pharmacy department?

Page 51

1    A.   I believe I went to at least
2  one of them, yes.
3    Q.   Did you go to a Buzzeo
4  conference during your second time in the
5  pharmacy department?
6    A.   I believe I went to one.
7    Q.   Do you know where that
8  Buzzeo conference was?
9    A.   The first one was in Crystal
10 City.  The second one was in -- it was
11 the National Harbor.
12   Q.   And that's National Harbor
13 in Maryland, outside of DC?
14   A.   Yes.
15   Q.   Did any other DEA
16 coordinators go to those Buzzeo
17 conferences?
18   A.   I remember Barbara being at
19 one.  That's all I remember.
20   Q.   How about Kimberly Birklin,
21 did she ever go to a Buzzeo conference?
22   A.   I can't remember.
23   Q.   Besides the Buzzeo audits
24 and the Buzzeo conferences, anything else

Page 52

1  that Buzzeo did with you while at the --
2  you were at Rite Aid?
3    A.   I believe they came in at a
4  time to help format specific procedures
5  for VAWD verification.
6    Q.   Do you remember when that
7  was?
8    A.   No.
9    Q.   Was that during your first
10 time in the Rx department or your second
11 time in the Rx department?
12   A.   I don't remember.
13   Q.   And when you say format
14 procedures for log verification, can you
15 explain what you mean by that?
16   A.   VAWD is a verified
17 accredited wholesale certification, and
18 they wanted our procedures in a specific
19 format.  And so we thought we would bring
20 Ron in and --
21   Q.   I'm sorry, I think I
22 misheard you before.
23     You said "VAWD"
24 verification, not "log" verification; is

Page 53

1  that correct?
2    A.   VAWD.
3    Q.   V-A-W-D?
4    A.   Yes.
5    Q.   So the Buzzeo firm helped
6  you format procedures for VAWD
7  verification?
8    A.   Yes.
9    Q.   And were written materials
10 generated as part of that interaction
11 with Buzzeo?
12   A.   Yes.  I believe they came up
13 with -- using our procedures, came up
14 with the formatted -- a formatted
15 version.
16   Q.   And when you say "formatted
17 version," what do you mean by that?
18   A.   The way it's -- the way it's
19 put into the book, the way it's
20 paragraphed and headings and numbers, and
21 the way it's formatted.
22   Q.   Is the way that the written
23 document is formatted important for the
24 VAWD certification?

Page 54

1    A.   I believe it was important
2  to VAWD.
3    Q.   Did Buzzeo give you
4  substantive feedback on what the actual
5  document should say?
6    A.   I don't recall that.
7    Q.   So was Buzzeo there just to
8  help with the technical formatting of the
9  actual document?
10    MR. LAVELLE:  Object to
11  form.
12    THE WITNESS:  Can you repeat
13  that?
14  BY MR. POWERS:
15    Q.   Sure.
16    Was Buzzeo's role in helping
17  for the VAWD certification just to help
18  you format and put numbers and paragraphs
19  on the document?
20    A.   Okay, I'm confused.
21    Can you repeat that one more
22  time?
23    Q.   Sure.
24    So when Buzzeo came in to

Page 55

1  help you with the VAWD verification -- is
2  it verification or certification?
3    A.   It was certification.
4    But it wasn't Buzzeo, it was
5  one of his employees.
6    Q.   So when I say "Buzzeo" here,
7  I just mean the Buzzeo company.
8    Is that what it was called
9  at that point?
10    A.   Yes.
11    Q.   So someone from the Buzzeo
12  company came in and helped with the VAWD
13  certification; is that right?
14    A.   They helped format the
15  manual.
16    Q.   And what manual was that?
17    A.   The VAWD manual.
18    Q.   And is the VAWD manual a
19  Rite Aid document?
20    A.   Yes.
21    Q.   And when you say they
22  "helped format the VAWD manual," what do
23  you mean by that?
24    A.   They helped put it in a

Page 56

1  format that VAWD wanted to see it in.
2    Q.   And when you say "put it in
3  a format that VAWD wanted to see it in,"
4  are you talking about just things like
5  putting in page numbers and numbering
6  paragraphs and maybe changing fonts, or
7  are you talking about something more
8  substantive?
9    MR. LAVELLE:  Object to
10  form.
11    THE WITNESS:  From what I
12  can remember, it was they just --
13  they wanted a specific form, and
14  that's what I can remember.
15  BY MR. POWERS:
16    Q.   But my question is, did the
17  Buzzeo company provide any substantive
18  feedback on what should be in that VAWD
19  manual, besides the formatting of it?
20    MR. LAVELLE:  Object to
21  form.  Objection.  Asked and
22  answered.
23    THE WITNESS:  I don't
24  remember.

Page 57

1  BY MR. POWERS:
2    Q.   Besides the Buzzeo audits,
3  the Buzzeo conferences and the assistance
4  with the VAWD verification, did Buzzeo's
5  company ever do anything else for Rite
6  Aid?
7    A.   I don't remember.
8    Q.   I want to go back to the
9  Buzzeo conferences for a second.
10    Did you ever receive any
11  written materials as a result of
12  attending one of those conferences?
13    A.   I believe I did.
14    Q.   And what did you do with
15  that written material?
16    A.   I probably would have kept
17  it in my office so that anyone could see
18  it.
19    Q.   Did you receive that written
20  material in hardcopy form?
21    A.   I believe so.
22    Q.   Do you know if you received
23  it in electronic form?
24    A.   I don't remember.

Page 58

1     Q.   What kind of materials did
2 you receive from the Buzzeo conferences?
3     A.   They were just like little
4 pamphlets or flyer-type things.
5     Q.   And you said you kept those
6 in your office so anyone can see them.
7     Do you know if anyone ever
8 came in and referenced those materials?
9     A.   I want to clarify, it wasn't
10 a lot. It was just a few flyers and
11 things.
12     I don't recall who all would
13 have seen them.
14     Q.   Did you ever talk to anyone
15 about what you learned at those Buzzeo
16 conferences?
17     A.   Yes.
18     Q.   Who?
19     A.   Whoever my manager was at
20 the time.
21     Q.   Do you remember who the
22 manager was you talked to about the
23 Buzzeo conferences?
24     A.   No.

Page 59

1     Q.   When you say "manager,"
2 would that have been the general manager
3 or the department manager?
4     MR. LAVELLE: Object to
5 form.
6 BY MR. POWERS:
7     Q.   Or someone else?
8     MR. LAVELLE: Same
9 objection.
10     THE WITNESS: Can you repeat
11 that?
12 BY MR. POWERS:
13     Q.   You said you would talk to
14 whoever your manager was at the time
15 about the Buzzeo conferences you went to,
16 right?
17     A.   Yes.
18     Q.   I'm just trying to figure
19 out what manager you're talking about.
20     Who would be the manager you
21 talked to?
22     A.   I don't recall.
23     Q.   And when you say "manager,"
24 do you mean department manager? General

Page 60

1 manager? Regulatory compliance manager?
2 Which manager?
3     MR. LAVELLE: Object to
4 form.
5     THE WITNESS: I don't
6 remember the specific manager.
7 BY MR. POWERS:
8     Q.   Do you remember talking to
9 anyone besides your manager about those
10 Buzzeo conferences?
11     A.   I don't remember.
12     Q.   But it's safe to say you
13 didn't come back and hold some sort of
14 discussion with the staff about what you
15 learned at the Buzzeo conferences?
16     MR. LAVELLE: Object to
17 form.
18     THE WITNESS: If I learned
19 anything that was different or
20 new, I would have -- I believe I
21 would have shared it with the
22 employees and my manager.
23 BY MR. POWERS:
24     Q.   And when you say "the

Page 61

1 employees," who would -- who would that
2 have been?
3     A.   The employees in the
4 controlled drug cage.
5     Q.   How would you have shared
6 that information with them?
7     A.   Probably in the morning
8 meeting.
9     Q.   What are morning meetings?
10     A.   To go over anything we
11 needed to let them know, anything that
12 was going on.
13     Q.   Did you have a morning
14 meeting every morning?
15     A.   I don't remember.
16     Q.   Was there any regular
17 schedule that the morning meetings
18 happened on?
19     A.   I don't remember.
20     Q.   Who would attend the morning
21 meetings?
22     A.   The employees.
23     Q.   When you say "the
24 employees," you mean the controlled cage

Page 62

1  employees, or all the employees?
2      MR. LAVELLE: Object to
3  form.
4      THE WITNESS: The control --
5  Sorry.
6      MR. LAVELLE: It's okay.
7      THE WITNESS: The controlled
8  cage employees.
9  BY MR. POWERS:
10     Q.   Just so I have it clear, the
11 morning meetings were for controlled cage
12 employees only; is that right?
13     A.   The meeting that I would
14 have in the cage, would be for the cage,
15 yes.
16     MR. LAVELLE: Counsel, we've
17     been going for about an hour, or
18     close to an hour. Can we take a
19     break when convenient?
20     MR. POWERS: Yes. Maybe
21     just a couple more questions, and
22     then we can take a break.
23     MR. LAVELLE: Okay. Thank
24     you.

Page 63

1  BY MR. POWERS:
2      Q.   Besides training with Kevin
3  Mitchell and the Buzzeo trainings we've
4  just discussed, did you have any other
5  trainings for your role as DEA
6  coordinator?
7      A.   Other than reading the
8  manuals and the CFR, I don't recall.
9      MR. POWERS: Okay. We can
10     take a break now.
11     MR. LAVELLE: Thank you.
12     VIDEO TECHNICIAN: The time
13     is now 10:25 a.m. We are going
14     off the record.
15         - - -
16     (Whereupon, a brief recess
17     was taken.)
18         - - -
19     VIDEO TECHNICIAN: The time
20     is now 10:42 a.m. We are back on
21     the record.
22 BY MR. POWERS:
23     Q.   Welcome back, Ms. Wood.
24 Before we took a break, we were

Page 64

1  discussing the Buzzeo conferences.
2      Do you recall that?
3      A.   Yes.
4      Q.   What was discussed at those
5  Buzzeo conferences you went to?
6      A.   I don't remember everything.
7      Q.   To the best of your
8  recollection, what was discussed?
9      MR. ZHOU: Can someone
10     unmute the line?
11     MR. POWERS: Sorry
12     about that. Can you hear us now?
13     MR. ZHOU: Yes, we can hear
14     you now.
15 BY MR. POWERS:
16     Q.   So before we got interrupted
17 there, to the best of your recollection,
18 what was discussed at the Buzzeo
19 conferences you attended?
20     A.   I'm drawing a blank.
21     Q.   Do you remember anything at
22 all?
23     A.   Not right this minute, no.
24     Q.   At the Buzzeo conferences

Page 65

1  you attended, were suspicious order
2  monitoring programs discussed?
3      A.   I couldn't swear to it.
4      Q.   What do you mean by you
5  "couldn't swear to it"?
6      A.   I really don't remember
7  every -- I don't remember what all was
8  discussed.
9      Q.   We talked a little bit about
10 who you talked with at the distribution
11 center about your time at the Buzzeo
12 conferences, right?
13     A.   Yes.
14     Q.   Did you ever discuss the
15 Buzzeo conferences with anyone outside of
16 the distribution center?
17     A.   I would have probably talked
18 to Kevin, but -- if he didn't go. But I
19 believe he was there.
20     Q.   Anyone else besides Kevin
21 you would have talked to about them?
22     MR. LAVELLE: Object to
23     form.
24     THE WITNESS: I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 remember.
2 BY MR. POWERS:
3    Q.   How about other distribution
4 center employees, did you ever talk to
5 them about what happened at the Buzzeo
6 conferences?
7    A.   I don't remember.
8    Q.   I've been using the word
9 "talk."
10       When I say "talk," I mean
11 communicate in any way, whether it's
12 phone, e-mail, anything.
13       Is your answer the same?
14    A.   I don't --
15       MR. LAVELLE:  Object to
16 form.
17       THE WITNESS:  I don't
18 remember.
19 BY MR. POWERS:
20    Q.   And I realize when we were
21 going through your job history, I didn't
22 ask, after leaving Rite Aid in 2014, what
23 did you do after that?
24    A.   I took about two weeks off,

Page 67

1 and then got a job with another company.
2    Q.   What company was that?
3    A.   MTM Ventures.
4    Q.   What does MTM Ventures do?
5    A.   It's a trucking company.
6    Q.   How long did you work at MTM
7 Ventures for?
8    A.   I'm currently there.
9    Q.   Why did you leave Rite Aid
10 in 2014?
11    A.   My -- they were closing the
12 pharmacy for distribution, and my
13 position was going away.
14    Q.   Did you ever try to get
15 another position at Rite Aid not in the
16 pharmacy department?
17    A.   No.
18       MR. POWERS:  So as I told
19 Mr. Lavelle before the deposition
20 started, we had some issues with
21 our documents.  So these are
22 actually double-sided copies, most
23 of them are double-sided copies
24 from our own binders, and we don't

Page 68

1 have, other than for the witness,
2 additional hardcopy documents.
3       We can work out with counsel
4 about how we want to put the
5 documents in the final record.
6 But for now, and if it's all right
7 with Mr. Lavelle, I'm just going
8 to hand the witness a hardcopy
9 version, but it has three-hole
10 punches from our own binder.  It's
11 no different than what was in the
12 database itself.
13       Is that okay?
14       MR. LAVELLE:  Yes, that's
15 fine, as long as I can look at the
16 document along with the witness.
17       MR. POWERS:  Right.  And
18 we'll have it up on the screen as
19 well for other counsel at the
20 table,  so they can -- so everyone
21 can be on the same page with the
22 exhibits.
23       MR. LAVELLE:  And as we have
24 done in a couple of other

Page 69

1 depositions where we had some
2 document production issues, we can
3 confer after the deposition on
4 getting an agreed-upon set of
5 exhibits substituted in to attach
6 to the transcript.
7       MR. POWERS:  Yes, that's
8 fine.
9 BY MR. POWERS:
10    Q.   Ms. Wood, I'm going to hand
11 you what's been marked as Wood Exhibit-1.
12 It is a printout of a spreadsheet with
13 the Bates number Rite_Aid_OMDL_0013471.
14       Why don't you take a minute
15 and look at that document?
16       - - -
17       (Whereupon, Rite Aid-Wood
18 Exhibit-1, Rite_Aid_OMDL_0013471,
19 was marked for identification.)
20       - - -
21 BY MR. POWERS:
22    Q.   And I'll tell you right now,
23 it's somewhat -- it's somewhat long.  So
24 I'm just going to ask you a couple of

Page 70

1 questions about specific parts of it.
2        So, hopefully, that will
3 help you review it more quickly.
4        MR. LAVELLE:  The print is
5 small, so --
6        THE WITNESS:  It is.
7        MR. LAVELLE:  -- if you have
8 trouble seeing the print --
9        MR. POWERS:  If you look at
10 it on the screen, it might be a
11 little bit more easy to read.
12        MR. LAVELLE:  But just take
13 a look at the document and when
14 you've had a chance to eyeball it
15 all, you can tell him that you're
16 ready to answer questions about
17 it.
18 BY MR. POWERS:
19     Q.   Do you know what this
20 document is in Exhibit-1?
21     A.   Yes.
22     Q.   What is the document?
23     A.   It's the government agency
24 correspondence.

Page 71

1     Q.   What does the document
2 reflect?
3     A.    It reflects communications
4 to us or to government agencies.
5     Q.   And would this sort of
6 government agency correspondence log
7 reflect all communications that the
8 Perryman distribution center had with
9 government agencies?
10     A.   I believe so.
11     Q.   And it looks like, on the
12 first page of Exhibit-1, it has a column
13 there that says, Person making contact,
14 over on the left.
15        Do you see that?
16     A.   Yes.
17     Q.   And it looks like your name
18 appears in that column, right?
19     A.   Yes.
20     Q.   Does that column represent
21 the person who spoke with the government
22 agency?
23     A.   Not necessarily.
24     Q.   Can you explain what that

Page 72

1 column is, then?
2     A.   That is saying who -- it
3 wasn't necessarily a conversation.  In
4 this case, it was a fax, it was a person
5 sending a fax.
6     Q.   But the person making
7 contact column would represent the person
8 who initiates the particular contact; is
9 that right?
10     A.   Yes.
11     Q.   And that could be either
12 someone from Rite Aid or it can be
13 someone from a government agency, right?
14     A.   Yes.
15     Q.   Could it be anyone else in
16 that column?
17     A.   I'm not sure.
18     Q.   And then it looks like
19 there's a reason/result column.
20        Do you see that?
21     A.   Yes.
22     Q.   What does that column show?
23     A.   That's the reason for the
24 contact.

Page 73

1     Q.   And then the person
2 contacted column, I take that to be the
3 person who was being contacted by either
4 someone from Rite Aid or someone from the
5 government agency; is that right?
6     A.   Yes.
7     Q.   Where is this log kept at
8 the distribution center?
9     A.   It was kept -- to the best
10 of my knowledge, it was kept in the DEA
11 office.
12     Q.   Where is the DEA office?
13     A.   It was on the mezzanine
14 level.
15     Q.   But that would have been at
16 the Perryman distribution center?
17     A.   Yes.
18     Q.   And was this kept in
19 electronic form?
20     A.   Yes.  But it doesn't mean it
21 couldn't have possibly been a
22 handwritten.
23     Q.   Okay.  Can you explain that
24 to me?

Page 74

1    A.   Something could have been
2  handwritten on it, on the log.
3    Q.   So there was a copy that
4  existed in hardcopy as well?
5    A.   I'm trying to remember.
6        I believe that it was put in
7  electronic form.
8    Q.   So was there a hardcopy that
9  then was transcribed into an electronic
10  form and that's how it was kept?
11        MR. LAVELLE:  Object to
12    form.
13        THE WITNESS:  I'm trying to
14    remember.
15        I believe that it was all
16    electronic, and the pages were
17    printed into the binder.  I
18    believe.
19  BY MR. POWERS:
20    Q.   So to the best of your
21  recollection, the entries were made
22  electronically and then those pages were
23  printed out and put in a hardcopy copy of
24  the correspondence, the government

Page 75

1  correspondence log?
2    A.   Yes, that's what I remember.
3    Q.   Who would use this
4  government correspondence log?
5    A.   I would put entries in.
6  Debra Chase would.  I think that's all.
7    Q.   So even if, like on Page 1
8  here, about halfway down, for the date
9  4/4/12, it looks like the name Keith
10  Frost is in the column for person making
11  contact.
12        Do you see that?
13    A.   Yes.
14    Q.   So even though Keith Frost
15  is the person making contact, you would
16  be the one to write in this log?
17    A.   I believe he would give me
18  the information and I would enter it.
19    Q.   So the person in the person
20  making contact column would not
21  necessarily be the one who made the
22  entries into this log; is that right?
23    A.   Not necessarily.
24    Q.   Would anyone ever go back

Page 76

1  and consult this log after the entries
2  were made?
3    A.   I don't remember.
4    Q.   Why did you keep this
5  government agency correspondence log?
6    A.   I believe it's something
7  that we were supposed to maintain.
8    Q.   You said you were supposed
9  to maintain it.
10        Do you know why you were
11  supposed to maintain it?
12    A.   I can't remember.
13    Q.   Do you know what required
14  you to maintain it?
15        MR. LAVELLE:  Object to
16    form.  Objection.  Asked and
17    answered.
18        THE WITNESS:  I can't
19    remember.
20  BY MR. POWERS:
21    Q.   Do you know if it was a DEA
22  regulation that required you to have a
23  log like this?
24    A.   I can't remember.

Page 77

1    Q.   Do you know if it was a Rite
2  Aid policy that you had to have a log
3  like this?
4    A.   I can't remember.
5    Q.   And was this kept up until
6  the time you left Rite Aid in 2014?
7    A.   I believe so.
8    Q.   Would records of DEA contact
9  be in any other place besides in this log
10  reflected in Exhibit-1?
11    A.   I'm not sure.
12    Q.   How about, to the best of
13  your knowledge, was there any other place
14  that contact with s government agency was
15  kept, besides in a log like the one
16  represented in Exhibit-1?
17        MR. LAVELLE:  Object to
18    form.
19        THE WITNESS:  To the best of
20    my knowledge, there might have
21    been one up in the front offices.
22    But I -- I'm not positive.
23  BY MR. POWERS:
24    Q.   The front offices at the

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 Perryman distribution center?
2     A.   Yes.
3     Q.   And if you'd turn to Page 9
4 of Exhibit-1.  And the page numbers are
5 in the bottom right-hand corner, and it's
6 about a quarter of the way down the page.
7 It's for the date of 9/17/09.
8         The first entry there with
9 Kevin Johnson in the first column, do you
10 see that?
11         It might be easier here on
12 the screen, too.  He has it highlighted
13 for you.
14         Do you see that on the
15 screen?
16     A.   Yes.
17     Q.   So we're looking at Page 9
18 of Exhibit-1.
19         And in the reason/result
20 column there, it says, DEA inspection,
21 Kevin Johnson and William Reed.
22         Do you see that?
23     A.   Yes.
24     Q.   Can you tell me what that

Page 79

1 reflects?
2     A.   That we had a DEA inspection
3 with Agents Kevin Johnson and William
4 Reed.
5     Q.   So would this log, this
6 government agency correspondence log,
7 have a record of every time the Perryman
8 distribution center got a visit from the
9 DEA?
10     A.   That was the intent of it.
11     Q.   How about, would this log
12 represent or have a record of every time
13 the Perryman distribution center was
14 visited by any government agency?
15     A.   This log would only be
16 anything involving the controlled drug
17 cage.
18     Q.   So this log is specifically
19 for the controlled drug cage, not the
20 Perryman distribution center at large?
21     A.   The best that I can
22 remember.
23     Q.   So any audits of the
24 controlled drug operations at the

Page 80

1 Perryman facility by a government agency
2 would be reflected on a log like in
3 Exhibit-1?
4     A.   That was the intent.
5     Q.   I think you said before that
6 you never went back and referenced this
7 log yourself after the entries were made.
8         But do you know if anyone
9 else would go back and reference this log
10 for any reason?
11     A.   I don't know.
12     Q.   Would anyone else besides
13 the people who worked in the controlled
14 drug cage have access to this log?
15     A.   Not that I know of.
16         Can I --
17     Q.   Go ahead.
18     A.   -- change that?
19         When you say that, like if a
20 boss or something wanted to see it, they
21 could.  But they would have to come up
22 and look at it.
23     Q.   Did anyone ever do that?
24     A.   I don't recall.

Page 81

1     Q.   When you say "a boss," that
2 would mean someone who wasn't working
3 full time in the controlled drug cage,
4 but would be a manager of someone who
5 worked in the controlled drug cage; is
6 that right?
7     A.   It would be a department
8 manager, ops manager, general manager
9 or --
10     Q.   You can put that Exhibit-1
11 to the side.
12         And just so we're clear, we
13 talked about it a little bit before, but
14 Rite Aid distributed controlled
15 substances from the Perryman distribution
16 center, correct?
17     A.   Yes.
18     Q.   And that was up until 2014,
19 right?
20     A.   Yes.
21         - - -
22         (Whereupon, Rite Aid-Wood
23 Exhibit-2,
24 Rite_Aid_OMDL_0013855-858, was

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    marked for identification.)
2              - - -
3    BY MR. POWERS:
4        Q.   I'm going to hand you what's
5    been marked as Exhibit-2.  This is Bates
6    number Rite_Aid_OMDL_0013855 through
7    3858.  It's a double-sided exhibit.
8            Take a look at Exhibit-2.
9        A.   It starts back here, right?
10       Q.   Yes.  It would start from
11   the back forward, yes.
12           And I'll represent to you
13   the form on the very last page of
14   Exhibit-2 is actually the attachment to
15   the e-mail chain that's reflected in the
16   other pages of Exhibit-2.
17           I'll direct your attention
18   to the page ending in Bates number 3856.
19   It's the back of the first page in that
20   Exhibit-2.
21           The second e-mail on the
22   page there looks like it is Keith Frost
23   sent an e-mail to you, ████@riteaid.com.
24           Do you see that?

Page 83

1        A.   Yes.
2        Q.   And it looks like Keith
3    Frost asks you, Marian, can you fill this
4    out and return to Jessica Dowel and cc me
5    and Kevin?  Thanks, Keith.
6            Do you see that?
7        A.   Yes.
8        Q.   Who is Jessica Dowel?
9        A.   I don't remember.
10       Q.   What is Keith Frost asking
11   you to fill out here?
12       A.   I don't remember this, but I
13   assume it's this, because it's attached.
14       Q.   When you say "this," it
15   looks like you're referring to the last
16   page of Exhibit-2, which is the
17   attachment to the e-mail.
18           Going back to the e-mails
19   themselves, it looks like Keith Frost
20   asked you to fill it out.  And then
21   eventually, at the top of Exhibit-2, the
22   first page, Bates number 3855, you say,
23   Jessica, I faxed the completed copy to
24   you.  It would not let me fill in the top

Page 84

1    questions.
2            Do you see that?
3        A.   Yes.
4        Q.   And the date on this e-mail
5    is, it looks like, March 31st, 2011.
6            Do you see that?
7        A.   Yes.
8        Q.   And I have a question for
9    you.
10           In the cc line, there's a
11   Marian L. Wood, spelled M-A-R-I-A-N, and
12   it looks like it's from a Marion Wood,
13   M-A-R-I-O-N.
14           Do you see that?  What is
15   the difference there?
16       A.   None that I know of.
17       Q.   Well, they looks like
18   they're spelled differently, right, the
19   two Marians?
20       A.   Yes.
21       Q.   Is that both your e-mail
22   address?
23       A.   I don't understand.
24       Q.   So it looks like there's a

Page 85

1    Marian spelled with an A and a Marion
2    spelled with an O.
3            Do you see that?
4        A.   Yes.
5        Q.   Are those people reflected
6    in those two different spellings both
7    you?
8        A.   As far as I know.
9        Q.   Do you know why there's a
10   difference in spelling?
11       A.   I don't know.
12       Q.   Is it because one is the
13   e-mail address and one is the Sysm
14   address?
15       A.   I don't know.
16       Q.   But you don't know any other
17   Marian Woods that worked at Rite Aid, do
18   you?
19       A.   No.
20       Q.   In that top e-mail, it says
21   that you faxed the completed copy to
22   Jessica Dowel, right?
23       A.   Yes.
24       Q.   And it looks like there's an

Page 86

1  attachment there. And it says, Form, a
2  long underscore, V9distributors.doc.
3       Do you see that?
4       A.   Yes.
5       Q.   And I'll represent to you
6  that the form that is that attachment is
7  the last page of Exhibit-2.
8       How come Keith Frost asked
9  you to fill out this form?
10      MR. LAVELLE:  Object to
11 form.
12 BY MR. POWERS:
13      Q.   Do you know why Keith Frost
14 asked you to fill out this form?
15      A.   I assumed he thought I knew
16 the answers.
17      Q.   And the top of the last page
18 of Exhibit-2, it looks like the date
19 there is July 27th, 2018.
20      Do you see that?
21      A.   Yes.
22      Q.   It appears to me that date
23 is wrong, because this was attached to an
24 e-mail in 2011.

Page 87

1       Would you agree with me?
2       A.   I guess.
3       Q.   But you were not working at
4  Rite Aid in 2018, right?
5       A.   2018, no.
6       Q.   And what is this form that
7  you filled out on the last page of
8  Exhibit-2?
9       A.   I can't say that I filled
10 this form out, if it's 2018.
11      Q.   Well, I'll tell you that the
12 form represented in Exhibit -- the last
13 page of Exhibit-2 was the one attached to
14 this e-mail chain from 2011 in the
15 documents that we have.
16      So it looks like you said, I
17 faxed a completed copy to you in the
18 first e-mail there.
19      So it looks like, from that
20 e-mail, that you did complete this form,
21 even if the date on it is wrong, right?
22      MR. LAVELLE:  Objection to
23 the form of the question.
24      THE WITNESS:  I don't feel

Page 88

1  comfortable saying yes with that
2  date on it. And I don't recall
3  this document, so.
4  BY MR. POWERS:
5       Q.   Did you ever fill out a
6  document similar to this?
7       A.   I don't remember.
8       Q.   I'm going to direct you down
9  to the last question there in this form,
10 on the last page of Exhibit-2.
11      It says, Does your company
12 refrain from filling orders issued by
13 practitioners based solely on an online
14 questionnaire, without the benefit of a
15 medical exam or bona fide doctor/patient
16 relationship?
17      Do you see that?
18      A.   Yes.
19      Q.   How would you have answered
20 that question when you were at Rite Aid
21 in 2011 when these e-mails were sent?
22      MR. LAVELLE:  Object to
23 form.
24      THE WITNESS:  I don't know,

Page 89

1  because it's not something I -- I
2  don't know.
3  BY MR. POWERS:
4       Q.   Do you know if Rite Aid
5  refrained from filling orders issued by
6  practitioners based solely on an online
7  questionnaire without the benefit of a
8  medical exam or bona fide doctor/patient
9  relationship?
10      A.   That's not my area.
11      Q.   Whose area would that have
12 been?
13      A.   If I'm reading this right,
14 it sounds like a pharmacist.
15      Q.   How about the question above
16 that, If you have an Internet site, does
17 it refrain from facilitating the
18 acquisition of controlled substances from
19 a practitioner with whom the buyer has no
20 prior personal relationships?
21      Do you see that?
22      A.   Yes, I see it.
23      Q.   Would you have been the
24 person who would have been able to answer

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 that question in 2011?
2 MR. LAVELLE: Object to
3 form.
4 THE WITNESS: I don't recall
5 this at all, so --
6 BY MR. POWERS:
7 Q. I'm not asking now if you
8 recall this particular document.
9 I'm just asking you, who
10 would have been the person, in 2011, who
11 would have been able to certify the
12 answer to that question that I just read
13 to you?
14 A. Can you repeat the question?
15 Q. Who at Rite Aid would have
16 been able to answer and certify a
17 question about whether Rite Aid has an
18 Internet site and whether that Internet
19 site refrains from facilitating the
20 acquisition of controlled substances from
21 practitioners with whom the buyer has no
22 prior personal relationship?
23 MR. LAVELLE: Object to
24 form.

Page 91

1 THE WITNESS: I don't know.
2 I don't --
3 BY MR. POWERS:
4 Q. You don't know who at Rite
5 Aid would be able to answer that
6 question?
7 MR. LAVELLE: Object to
8 form. Objection. Asked and
9 answered.
10 THE WITNESS: I'm not sure
11 how to answer that.
12 BY MR. POWERS:
13 Q. You're not sure how to
14 answer that question, or you're not sure
15 who would have been able to answer that
16 question?
17 A. Both.
18 MR. LAVELLE: Object to
19 form.
20 BY MR. POWERS:
21 Q. But you would not have been
22 the person to answer that question; is
23 that right?
24 A. I don't recall.

Page 92

1 Q. When you were working at
2 Rite Aid, did you have, as part of your
3 job responsibilities, the knowledge to
4 answer the question in that row I just
5 read?
6 MR. LAVELLE: Object to
7 form.
8 THE WITNESS: I can't
9 remember.
10 BY MR. POWERS:
11 Q. Moving up to the next one,
12 above that column we were just looking
13 at, the one that starts, Do you
14 refrain -- do you see where I'm at?
15 A. Yes.
16 Q. Who at Rite Aid would be
17 able to have answered this question in
18 2011, Do you refrain from offering to
19 facilitate the acquisition of controlled
20 substances from a practitioner with whom
21 the buyer has no prior personal
22 relationship?
23 MR. LAVELLE: Object to
24 form.

Page 93

1 THE WITNESS: I don't know.
2 BY MR. POWERS:
3 Q. Would that person have been
4 you?
5 A. I don't recall.
6 Q. Could you have answered this
7 question about whether Rite Aid refrained
8 from offering to facilitate the
9 acquisition of controlled substances from
10 a practitioner with whom the buyer has no
11 prior personal relationship in 2011 has
12 MR. LAVELLE: Object to
13 form.
14 THE WITNESS: I don't
15 remember what I would have known
16 back then.
17 BY MR. POWERS:
18 Q. Moving up to the next row.
19 That row asks, Does your
20 company refrain from affiliation with an
21 Internet site that solicits or services
22 orders for controlled substances?
23 Would you have been able to
24 answer this question in 2011?

Page 94

1        MR. LAVELLE:  Object to
2    form.
3        THE WITNESS:  I feel the
4    same with the whole thing.
5    BY MR. POWERS:
6        Q.   When you say "the whole
7    thing," you mean every single question on
8    the last page of Exhibit-2?
9        A.   What I've read, I just
10   don't -- I don't recall it.  And I don't
11   recall if I -- I can't say right now
12   that, yes, I did or didn't know all this.
13       But I don't -- I don't
14   remember.
15       Q.   Moving up one more row, it
16   asks, Does your company have a
17   documented, quote, suspicious order
18   monitoring program, end quote, as
19   required by DEA per 21 C.F.R. 1301.74(b)?
20       Do you see that?
21       A.   Yes.
22       Q.   Would you have been the
23   person who could answer this question
24   that I just read in 2011?

Page 95

1        MR. LAVELLE:  Object to
2    form.
3        THE WITNESS:  I did know,
4    yes, that we had a suspicious
5    order monitoring.
6        But I still don't remember
7    any of this.
8    BY MR. POWERS:
9        Q.   I'm not asking if you
10   specifically remember this particular
11   form.
12       I'm just saying that
13   question on this form, could you have
14   answered that question in 2011?
15       MR. LAVELLE:  Object to
16   form.  Objection.  Asked and
17   answered.
18       THE WITNESS:  I don't
19   remember.
20   BY MR. POWERS:
21       Q.   You were the DEA
22   coordinator, right?
23       A.   Yes.
24       Q.   And this is talking about

Page 96

1    DEA regulations, right?
2        A.   Yes.
3        Q.   Did Rite Aid have a
4    documented suspicious order program in
5    2011?
6        MR. LAVELLE:  Object to
7    form.
8        THE WITNESS:  We had a
9    monitoring program.
10   BY MR. POWERS:
11       Q.   Is that different than a
12   suspicious order monitoring program?
13       A.   It was -- it was
14   excessive/suspicious.
15       Q.   Are excessive orders
16   different than suspicious orders?
17       A.   Yes.
18       Q.   How so?
19       A.   Excessive is when they're
20   over ordered, they're not necessarily
21   suspicious.
22       Q.   What do you mean by "over
23   ordered"?
24       A.   Over ordered as in ordered

Page 97

1    too many of what was allowed.
2        Q.   How did you determine what
3    was allowed?
4        A.   We had a -- we had an --
5    order monitoring limits for different
6    counts, pill counts.
7        Q.   Were those called
8    thresholds?
9        A.   Yes.
10       Q.   And this question asks, in
11   the last page of Exhibit-2, whether Rite
12   Aid has a documented suspicious order
13   monitoring program.
14       Do you know if Rite Aid had
15   a documented suspicious order monitoring
16   program?
17       A.   I'm not sure how to answer
18   that.
19       Yes, we had a program.  Yes.
20   I believe, yes.
21       Q.   How was it documented?
22       A.   Can you repeat that?
23       Q.   How was the suspicious order
24   monitoring program Rite Aid had

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  documented?
2      A.   Are you saying how was the
3  program documented?  I'm -- can you
4  repeat that?
5      Q.   Sure.
6           You testified earlier that
7  Rite Aid had a suspicious/excessive order
8  monitoring program, right?
9      A.   Yes.
10     Q.   How was that program
11 documented?
12     A.   I'm not sure how to answer
13 that.
14          We have a log that we would
15 write the orders in.  But I'm having a
16 problem answering this because we never
17 had a suspicious order.  So I don't know
18 if I'm answering this correctly.
19     Q.   My question now is not about
20 whether or not you had a suspicious order
21 or not.
22          My question is just, was the
23 suspicious/excessive order monitoring
24 program that Rite Aid had documented in

Page 99

1  any way?
2           MR. LAVELLE:  Object to
3      form.
4           THE WITNESS:  I'm very
5      confused.  I'm sorry.
6  BY MR. POWERS:
7      Q.   Okay.  What are you confused
8  about?
9      A.   We had a -- the order
10 monitoring that could -- had we had
11 suspicious orders, would have been along
12 with that.  But I can't remember exactly
13 the wording of what we did have.
14     Q.   Was the suspicious/excessive
15 order monitoring program written down
16 anywhere?
17     A.   Yes.
18     Q.   Where was it written down?
19     A.   In the procedure manual.
20     Q.   Anywhere else?
21     A.   I don't remember.
22     Q.   You also mentioned some
23 logs.
24          What were those logs you

Page 100

1  talked about earlier?
2      A.   They were logs that we used
3  to note orders that were above what was
4  allowed.
5      Q.   And that would have been
6  above-threshold orders, right?
7      A.   Also anything that just
8  didn't look right.  So it wasn't
9  necessarily always above the threshold.
10     Q.   Besides those logs and the
11 procedure manual, was the
12 suspicious/excessive order monitoring
13 program at Rite Aid documented anywhere
14 else?
15     A.   I'm drawing a blank.  I
16 don't know.
17     Q.   You were the DEA
18 coordinator, though, right?
19     A.   Yes.
20     Q.   You don't know where it was
21 besides those two locations?
22     A.   I don't --
23          MR. LAVELLE:  Object to
24     form.  Objection.  Asked and

Page 101

1      answered.
2           THE WITNESS:  I don't
3      recall.
4  BY MR. POWERS:
5      Q.   The last -- or the top row
6  there on the last page of Exhibit-2 says,
7  Does your company verify that your
8  customers have a suspicious order
9  monitoring program as described by 21
10 C.F.R. 1301.74(b)?
11          Do you see that?
12          MR. LAVELLE:  Object to
13     form.
14          THE WITNESS:  Yes.
15 BY MR. POWERS:
16     Q.   Do you know who the
17 customers here would be for Rite Aid
18 referred to in this question?
19     A.   I'm not sure.
20     Q.   And just to be clear,
21 besides the second row there about the
22 suspicious order monitoring program as
23 required by DEA, the other questions,
24 you're not sure who at Rite Aid would

Page 102

1 have been able to answer those questions,
2 right?
3        MR. LAVELLE:  Object to
4    form.  Objection.  Asked and
5    answered.
6        THE WITNESS:  No.
7 BY MR. POWERS:
8    Q.   And just to be clear, I
9 asked, you're not sure, and you answered
10 no, meaning --
11    A.   I'm not sure.
12    Q.   Okay.  Do you remember if
13 anyone else besides yourself filled out a
14 form similar to this one in the last page
15 of Exhibit-2?
16        MR. LAVELLE:  Object to
17    form.
18        THE WITNESS:  I don't know.
19 BY MR. POWERS:
20    Q.   Did you ever fill out any
21 other forms that were sent by
22 pharmaceutical manufacturers?
23    A.   I don't recall.
24    Q.   You can put that exhibit to

Page 103

1 the side.
2        MR. LAVELLE:  You can put it
3    over there.
4        Great.  Thank you.
5        - - -
6    (Whereupon, Rite Aid-Wood
7    Exhibit-3,
8    Rite_Aid_OMDL_0014804-874, was
9    marked for identification.)
10        - - -
11 BY MR. POWERS:
12    Q.   I'm going to hand you what's
13 been marked Wood Exhibit-3.  It's a
14 document with the Bates number
15 Rite_Aid_OMDL_0014804 through 14874.
16        Once again, it's sort of a
17 lengthy document.  If you want to flip
18 through it and familiarize yourself with
19 it, I'm only going to ask you questions
20 about a specific page.
21        Are you familiar with this
22 document in Exhibit-3?
23    A.   I believe so.
24    Q.   What is the document in

Page 104

1 Exhibit-3?
2    A.   The DEA regulatory
3 compliance.
4    Q.   And is this the same
5 document you referred to before that you
6 used in your training with Kevin
7 Mitchell?
8    A.   I believe so.
9    Q.   I think you referred to it
10 as the DEA regulatory compliance manual
11 before.
12        Is that the same thing as
13 what's in Exhibit-3?
14    A.   I believe so.
15    Q.   Where was this document kept
16 at the distribution center?
17    A.   I believe it was in the DEA
18 office.
19    Q.   Was it kept in hardcopy?
20    A.   Yes.
21    Q.   Was -- were electronic
22 versions of this document made available
23 to anyone?
24    A.   I'm not sure.

Page 105

1    Q.   So if it was kept in the DEA
2 office, who would have had access to this
3 document?
4    A.   I guess anyone that wanted
5 to see it.
6    Q.   I'm going to direct your
7 attention to the page with the Bates
8 number 14828.
9        Do you see that in the
10 bottom right-hand corner?  The title of
11 that page I'm looking for is, Section VI,
12 Suspicious Order Monitoring.
13        Are you on that page?
14    A.   Yes.
15    Q.   Is this what you were
16 referring to in your previous testimony
17 about the documented suspicious order
18 monitoring program?
19    A.   Yes.
20    Q.   Just this page here?
21    A.   Can you repeat that?
22    Q.   Sure.
23        When we talked about the
24 suspicious/excessive monitoring program

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 Rite Aid had, does this page here in
2 Exhibit-3, Page 14828, is that the extent
3 of the excessive/suspicious order
4 monitoring program that Rite Aid had?
5     MR. LAVELLE:  Object to
6 form.
7     THE WITNESS:  This is one of
8 them.
9 BY MR. POWERS:
10    Q.   One of what?
11    A.   The order monitoring.
12    Q.   The other being the logs you
13 talked about?
14    A.   The training, we also had
15 one for training.
16    Q.   So you have this page here
17 in Exhibit-3, Page 14828; you have the
18 logs; and then you have a third document,
19 a training document; is that right?
20    A.   I believe.
21    Q.   Let's look at this page here
22 in Exhibit-3, Page 14828.
23     Look at the -- Paragraph
24 Number 1 there.  It says, All orders

Page 107

1 containing controlled substances are
2 reviewed and verified for order quantity
3 and size to not exceed the determined
4 order history threshold.
5     Do you see that?
6    A.   Yes.
7    Q.   How were the orders reviewed
8 and verified?
9    A.   The orders themselves, they
10 came through our automated system.  So --
11    Q.   How were those orders that
12 came through the automated system
13 reviewed and verified?
14    A.   Okay, I'm confused.
15    Q.   Okay.
16    A.   I can only comment on what
17 came through to us to pick.
18    Q.   Okay.  So how were the
19 orders that came through to the Perryman
20 distribution center reviewed and verified
21 pursuant to this policy?
22    A.   We had an established
23 threshold.  And if -- any orders that
24 were above that, we would put in the log

Page 108

1 and call the store, if we could, and
2 verify the quantity.
3     But they were never allowed
4 to get over the threshold.
5    Q.   So in your review of the
6 order, you just looked to see if it
7 exceeds the threshold, right?
8    A.   Yes.
9    Q.   In the second sentence in
10 Paragraph Number 1, it says, Any order
11 exceeding the threshold is immediately
12 forwarded to the department manager for
13 further investigation.
14     Who would the department
15 manager referred to here be?
16    A.   Whoever the manager was at
17 the time.
18    Q.   When it says "department
19 manager," that's a different position
20 than the DEA coordinator?
21     MR. LAVELLE:  Object to
22 form.
23     THE WITNESS:  I'm sorry, can
24 you repeat?

Page 109

1 BY MR. POWERS:
2    Q.   Sure.
3     I'm just trying to figure
4 out who the department manager that these
5 orders exceeding the threshold would have
6 been forwarded to.
7    A.   I don't know that they were
8 forwarded to the department manager.  I'm
9 kind of confused a little bit.
10     The orders that were above
11 the threshold would have been logged and
12 called.  They wouldn't necessarily be
13 taken all the way to the department
14 manager level.
15    Q.   So in your experience, the
16 department manager was not always
17 forwarded the orders that came in above
18 the threshold; is that right?
19    A.   Yes.
20    Q.   So that would have been a
21 violation of this policy, as it's written
22 right here, right?
23     MR. LAVELLE:  Object to
24 form.

Page 110

1    THE WITNESS: I'm not sure.
2 BY MR. POWERS:
3    Q.   I mean, as I read this, it
4 says, Any order exceeding the threshold
5 is immediately forwarded to the
6 department manager for further
7 investigation, right?
8        And what you're saying is
9 that they were not always forwarded to
10 the department manager, right?
11       MR. LAVELLE: Object to
12    form.
13       THE WITNESS: I'm not sure
14    that -- I don't -- I don't
15    believe -- the only way I could
16    answer this is while we were
17    working -- I don't know how to
18    answer this.
19       I don't know how to answer
20    you.
21 BY MR. POWERS:
22    Q.   And it says here the
23 department manager is forwarded these
24 orders for, quote, further investigation,

Page 111

1 right?
2    A.   Yes, that's what it says.
3    Q.   Do you know of any time that
4 a department manager did further
5 investigation of an order that came in
6 over the threshold?
7    A.   I believe we -- we
8 determined this as if it were suspicious,
9 it would go to the department manager
10 level. But I can't -- I don't know.
11    Q.   But it doesn't say --
12    A.   I can't remember.
13    Q.   I'm sorry. Are you done?
14    A.   Yes.
15    Q.   But it doesn't say only
16 involve department managers when the
17 order is suspicious, right?
18       It says, Any order exceeding
19 the threshold should be immediately
20 forwarded to the department manager,
21 right? That's what it says?
22       MR. LAVELLE: Object to
23    form.
24       THE WITNESS: That's what it

Page 112

1 says.
2 BY MR. POWERS:
3    Q.   And you don't know of any
4 department manager that did an
5 investigation after being forwarded an
6 order that was above threshold, right?
7    A.   Not department manager, no.
8    Q.   Moving down to the Paragraph
9 Number 2, Suspicious orders include
10 orders of unusual size, orders deviating
11 substantially from a normal pattern, and
12 orders of unusual frequency.
13       Do you see that?
14    A.   Yes.
15    Q.   How did you determine if
16 these orders were of unusual size?
17    A.   When an order came down --
18 we basically went with the threshold.
19 When an order came down, it needed to be
20 within the threshold. If it was over the
21 threshold, then we would log it in the
22 book. Or if it just seemed unusual, we
23 would log that as well.
24    Q.   So in terms of unusual size,

Page 113

1 it was, basically, whether or not the
2 order exceeded the threshold? That's
3 what qualified it as unusual, right?
4       MR. LAVELLE: Object to
5    form.
6       THE WITNESS: Not
7    necessarily.
8 BY MR. POWERS:
9    Q.   Besides exceeding -- let me
10 back up, actually.
11       So if the order exceeded the
12 threshold, would you qualify that as an
13 unusual sized order?
14    A.   If it exceeded the
15 threshold, we would call on it, yes.
16    Q.   When you say -- what do you
17 mean when you say "we would call on it"?
18    A.   When it lit up and it was
19 above the threshold, we would try to stop
20 the pick and call the store and let them
21 know that it exceeds the threshold, we
22 can't -- that we are not going to be able
23 to send it to them.
24    Q.   Besides when an order

Page 114

1 exceeded the thresholds, how would you
2 determine if an order was of unusual
3 size?
4     A.   Sometimes it just seemed too
5 high for what that item was picking that
6 day.  And we would -- it just looked out
7 of the ordinary, so we would call and
8 verify it.
9     Q.   When you say it "looked out
10 of the ordinary," was that just based on
11 your own personal experience?
12     A.   Based on the pattern of the
13 day, something is picking 2, 2, 2, and
14 then something comes up 10, you just
15 might want to call on it.  And we would
16 do that.
17     Q.   The next one there, it
18 says -- back in Paragraph 2, it says,
19 Orders deviating substantially from a
20 normal pattern.
21         Do you see that?
22     A.   Uh-huh.
23     Q.   How did you determine
24 whether an order deviated substantially

Page 115

1 from a normal pattern?
2     A.   I'm not sure.
3     Q.   Did you ever determine
4 whether an order deviated from a normal
5 pattern yourself?
6         MR. LAVELLE:  Object to
7 form.
8         THE WITNESS:  I'm not sure
9 how to answer that.  The orders
10 came down to us that were --
11 electronically.
12         So I'm not sure how to
13 answer that.
14 BY MR. POWERS:
15     Q.   Who would determine whether
16 an order was deviating substantially from
17 a normal pattern?
18     A.   I'm not sure.
19     Q.   Would it be the pickers who
20 would have to determine that?
21     A.   Oh, okay.  While a picker is
22 picking and they see something unusual,
23 even if it's within the threshold, yes,
24 they would.

Page 116

1     Q.   So it was the picker's
2 responsibility to determine whether an
3 order deviated substantially from a
4 normal pattern?
5     A.   Not necessarily.
6     Q.   Who else could make that
7 determination?
8     A.   I'm not sure that was within
9 our area that we could do that.
10     Q.   When you say "our area,"
11 whose area?
12     A.   The DC, the department doing
13 the picking.
14     Q.   So the distribution center
15 itself did not determine whether orders
16 deviated substantially from a normal
17 pattern?
18         MR. LAVELLE:  Object to
19 form.
20         THE WITNESS:  The orders
21 were generated.  It came down
22 electronically.  And we would pick
23 what was lit up to pick.
24         I'm not sure that that was

Page 117

1 something that we could detect.
2 BY MR. POWERS:
3     Q.   Who would detect that?
4     A.   I believe it could -- I'm
5 not sure.
6         Give me -- let me read this
7 again.
8         We Pick to Lights.  So I'm
9 not sure that we would know a pattern,
10 because we only pick what is generated
11 from the system.
12     Q.   And when you say "we,"
13 you're referring to the distribution
14 center employees?
15     A.   The pickers, the people
16 doing the picking.
17     Q.   How about the next one
18 there, orders of unusual frequency?
19         Do you see that in Paragraph
20 Number 2?
21     A.   Yes.
22     Q.   Who would be responsible for
23 recognizing orders of unusual frequency?
24     A.   To my knowledge, the orders

Page 118

1 could only generate through the
2 replenishment system. So I don't know
3 how to answer that.
4         There are only -- the orders
5 only come down guided by the
6 replenishment or the corporate system.
7 So they would determine the frequency of
8 what we were picking.
9     Q.   Okay.  I understand that the
10 replenishment system generates the
11 orders, right?
12     A.   Yes.
13         Excuse me.  I'm not sure
14 it's just replenishment, but --
15     Q.   The orders get generated by
16 a system?
17     A.   Yes.
18     Q.   Okay.  By the Rite Aid
19 ordering system, we'll call it.
20         Is that okay?
21     A.   Okay.
22     Q.   So the Rite Aid ordering
23 system generates orders that go to the
24 DC, right?

Page 119

1     A.   Yes.
2     Q.   And the DC center -- the
3 distribution center employees, are they
4 able to identify orders of unusual
5 frequency?
6     A.   As I am understanding it,
7 no.
8     Q.   Are the DC employees able to
9 identify orders that deviate
10 substantially from a normal pattern?
11         MR. LAVELLE:  Object to
12     form.  Objection.  Asked and
13     answered.
14         THE WITNESS:  That's what I
15     was going to say, that's what I
16     was talking about earlier.
17 BY MR. POWERS:
18     Q.   And your answer earlier was
19 that the DC employees were not able to
20 identify orders that deviated
21 substantially from a normal pattern,
22 right?
23         MR. LAVELLE:  Object to
24     form.

Page 120

1         THE WITNESS:  I didn't know
2     that's what you just asked me.
3 BY MR. POWERS:
4     Q.   So my question was, the DC
5 employees were not able to identify
6 orders that deviated substantially from a
7 normal pattern, right?
8         MR. LAVELLE:  Object to
9     form.
10         THE WITNESS:  Can you repeat
11     that?
12 BY MR. POWERS:
13     Q.   Sure.
14         The DC employees were not
15 able to identify orders that deviated
16 substantially from a normal pattern,
17 correct?
18         MR. LAVELLE:  Object to
19     form.
20         THE WITNESS:  Only as I
21     stated before.
22 BY MR. POWERS:
23     Q.   What did you state before?
24 Sorry.

Page 121

1         MR. LAVELLE:  Object to
2     form.
3         THE WITNESS:  Do I answer?
4         MR. POWERS:  You can go
5     ahead and answer.
6         THE WITNESS:  When I stated
7     that they -- while they were
8     picking, if they saw a quantity
9     that looked like it was too much,
10     even though it was within the
11     threshold, that's what I meant
12     when they can --
13 BY MR. POWERS:
14     Q.   But that goes to the size of
15 the order, correct?
16         MR. LAVELLE:  Object to
17     form.
18         THE WITNESS:  The -- repeat
19     that again.
20 BY MR. POWERS:
21     Q.   You said that the pickers,
22 if they saw a quantity that looked like
23 it was too much.
24         So you're talking about the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 size of the order there, right?
2     MR. LAVELLE: Object to
3     form.
4     THE WITNESS: The quantity,
5     yes.
6 BY MR. POWERS:
7     Q. But the distribution center
8 employees would not have an ability to --
9 have an ability to notice whether the
10 orders coming through the ordering system
11 were deviating from a normal pattern,
12 right?
13     MR. LAVELLE: Object to
14     form.
15     THE WITNESS: I believe I
16     stated before, no, I don't believe
17     we would be able to.
18 BY MR. POWERS:
19     Q. And when you say "we," you
20 mean the distribution center employees?
21     A. Yes.
22     MR. LAVELLE: Counsel, we've
23     been going for over an hour. Can
24     we take a break?

Page 123

1     MR. POWERS: I have a couple
2     more questions on this document,
3     and then we can take a break. Is
4     that all right?
5     Is that okay with you?
6     THE WITNESS: Yes.
7 BY MR. POWERS:
8     Q. In Paragraph 3 there, it
9 says, A review is performed to determine
10 the legitimacy of the order.
11     Do you see that?
12     A. Yes.
13     Q. Who performed that review?
14     A. Okay. This is -- in what
15 respect?
16     Q. I'm just asking what it
17 means when it says on this page, A review
18 is performed to determine the legitimacy
19 of the order?
20     What does that mean?
21     A. Well, on this page, it's
22 saying it's a suspicious order. So a
23 review would be determined if it were a
24 suspicious order.

Page 124

1     Q. How do you determine whether
2 it's a suspicious order?
3     A. I'm drawing a blank. I'm
4 sorry.
5     What was the question?
6     Q. So you said a review would
7 be determined if it were a suspicious
8 order.
9     I'm asking, how do you
10 determine whether something is a
11 suspicious order or not?
12     A. If an order came down that
13 was large and we called and whatever --
14 let's see here.
15     Okay. When the orders came
16 down, we would check on the quantity if
17 it was too large. And we never had a
18 suspicious order, that's why I'm having a
19 little bit of a problem here.
20     I don't know. I'm drawing a
21 blank right now.
22     Q. So this page we've been
23 looking at here, Page 14828, is this
24 procedure outlined in this document how

Page 125

1 to determine whether an order is
2 suspicious?
3     A. I believe so. It's to
4 detect suspicious orders.
5     Q. So then moving back to
6 Paragraph 3, it says, A review is
7 performed to determine the legitimacy of
8 the order, right?
9     I'm just asking who did that
10 review.
11     A. When we had -- when the
12 order came down, it was too much, the
13 pickers would call the stores.
14     Q. And is that the review
15 referred to in Paragraph 3 here?
16     A. If -- I'm not sure how to
17 answer this. If something would have
18 come up that just didn't, you know,
19 didn't seem right, then it would have
20 been reviewed or elevated.
21     Q. But that's my question.
22     Who would have done that
23 review?
24     A. I guess it would start with

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 the lead or the coordinator, department
2 manager.
3     Q.   Did you personally do any
4 reviews like you are talking about?
5     A.   I'm not sure I understand
6 what you mean by "review."
7     Q.   I'm talking about when you
8 referred to an order coming in that
9 looked unusual for any way -- for any
10 reason, and you said a review was done,
11 right?
12     A.   No.  I said that we called
13 the store to verify it.
14     Q.   So calling the store to
15 verify the order is different than the
16 review outlined here in Paragraph 3 in
17 Exhibit-3?
18         MR. LAVELLE:  Object to
19     form.
20 BY MR. POWERS:
21     Q.   Is that right?
22     A.   What was that?
23     Q.   So we've been talking about
24 the first sentence of Paragraph 3, which

Page 127

1 says, A review is performed to determine
2 the legitimacy of the order.
3         Do you see that?
4     A.   Yes.
5     Q.   Is that review talked about
6 in that sentence different than calling
7 the store that placed the order?
8         MR. LAVELLE:  Object to
9     form.
10         THE WITNESS:  I'm not sure
11     how to answer it.  I don't know.
12 BY MR. POWERS:
13     Q.   Did you do anything else
14 when an order came in over threshold
15 besides call the store?
16     A.   If it -- repeat that.
17     Q.   Did you do anything else
18 when an order came in over threshold
19 besides call the store that placed the
20 over-threshold order?
21     A.   I don't remember.
22     Q.   And just to be clear, you
23 don't remember doing anything besides
24 calling the store; is that right?

Page 128

1         MR. LAVELLE:  Object to
2     form.
3         THE WITNESS:  I'm saying I
4     don't remember if we did anything
5     else.
6 BY MR. POWERS:
7     Q.   In Paragraph 4 there, it
8 says, An order which is determined to be
9 suspicious will be immediately reported
10 to the corporate office, who will notify
11 the local DEA field division office of
12 the Administration.
13         Do you see that?
14         MR. LAVELLE:  Object to
15     form.
16         THE WITNESS:  I see it.
17 BY MR. POWERS:
18     Q.   During your time at Rite
19 Aid, no order was ever determined to be
20 suspicious; is that right?
21     A.   I don't recall any.
22     Q.   And then Paragraph 5 there
23 says, If a suspicious order is reported
24 to corporate, the corporate Government

Page 129

1 Affairs will determine whether to, quote,
2 ship, unquote, or, quote, do not ship,
3 unquote.
4         Do you see that?
5     A.   Yes.
6     Q.   I take it, then, if you
7 never had any suspicious orders, you
8 never got a decision from the corporate
9 Government Affairs Office whether to ship
10 or do not ship; is that right?
11     A.   Yes.
12     Q.   Do you know who at
13 Government Affairs would have made a
14 decision to ship or not ship?
15     A.   I am not sure.  Probably
16 Janet Hart.
17     Q.   Paragraph 6 there on Page
18 14828, says, All discussions,
19 investigations and reports will be
20 maintained in the file designated, quote,
21 suspicious orders.
22         Do you see that?
23     A.   Yes.
24     Q.   Where is that file kept?

Page 130

1    A.   I'm confused.  We didn't
2 have any, so there wasn't a file.
3    Q.   So there was no file, to
4 your knowledge, that was designated a
5 suspicious order file during your time at
6 Rite Aid; is that right?
7    A.   That I can recall.
8       MR. POWERS:  Okay.  We can
9    take a break now.
10      VIDEO TECHNICIAN:  The time
11   is now 11:54 a.m.  We are going
12   off the record.
13         - - -
14      (Whereupon, a luncheon
15   recess was taken.)
16         - - -
17      VIDEO TECHNICIAN:  The time
18   is now 12:40 p.m.  We are back on
19   the record.
20 BY MR. POWERS:
21   Q.   Welcome back, Ms. Wood.
22   A.   Thank you.
23         - - -
24      (Whereupon, Rite Aid-Wood

Page 131

1    Exhibit-4,
2    Rite_Aid_OMDL_0016253-255, was
3    marked for identification.)
4          - - -
5 BY MR. POWERS:
6    Q.   I'm going to hand you what
7 has been marked as Wood Exhibit -- sorry,
8 you can put that to the side -- Wood
9 Exhibit-4, which is Bates numbered
10 Rite_Aid_OMDL_0016253 through 6255.
11      Take a look at that
12 document.
13      Are you familiar with the
14 document in Exhibit-4?
15   A.   Yes.
16   Q.   What is the document in
17 Exhibit-4?
18   A.   It's a controlled drug
19 above-average order monitoring program.
20   Q.   Did you author this
21 document?
22   A.   I believe so.
23   Q.   Why did you author this
24 document?

Page 132

1    A.   As a training tool.
2    Q.   Do you know when the first
3 version of this document in Exhibit-4 was
4 first written by you?
5       MR. LAVELLE:  Object to
6    form.
7       THE WITNESS:  I believe once
8    I became DEA coordinator, I used
9    it as a training -- created them
10   as training tools.
11 BY MR. POWERS:
12   Q.   And was that during your
13 first stint in the pharmacy department?
14   A.   Yes.
15   Q.   And who would you use this
16 document in Exhibit-4, the controlled
17 drug above-average order monitoring
18 program, to train with?
19      Who would you train with
20 this document here in Exhibit-4?
21   A.   Okay.  The employee
22 working -- that was going to work in the
23 cage.
24   Q.   So you would use this

Page 133

1 document in Exhibit-4 to train all of the
2 employees that would have worked in the
3 controlled drug cage at the Perryman
4 distribution center; is that right?
5    A.   Yes.
6    Q.   And it looks like there are
7 signature pages on the -- or a signature
8 page on the last page of Exhibit-4.
9       Is that something you would
10 get signed after the training?
11   A.   Yes.
12   Q.   And when you say you use
13 this in training the controlled cage
14 employees, how would you use this
15 document?
16      MR. LAVELLE:  Object to
17   form.
18      THE WITNESS:  When we were
19   training, we would use -- we would
20   give them this form to read, and
21   then explain it.
22      Once we were sure they
23   understood, we would have them
24   sign it.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

BY MR. POWERS:

Q. And when you first authored this document in Exhibit-4, what did you rely on to put this document together?

A. My knowledge and the threshold and what we would do to monitor these.

Q. How did you gain your knowledge about what should go in this document in Exhibit-4?

A. I'm not sure. I'm sure other tools, but I don't remember exactly.

Q. Do you remember anything you used to inform you about what to put in this particular document in Exhibit-4?

A. Well, I know I used the threshold numbers to put in here. Probably -- I'm not sure.

Q. Did you consult any documentation to put -- to write the exhibit here in Exhibit-4?

MR. LAVELLE: Object to form.

Page 135

THE WITNESS: I'm not -- I don't remember.

BY MR. POWERS:

Q. Did you refer to any documents produced by or written by Buzzeo to put together Exhibit-4?

A. I don't remember.

Q. Did you talk to anyone about what should be in this controlled drug order -- controlled drug above-average order monitoring program document?

A. I don't remember.

Q. Did you talk to Janet Hart about what should be included in this document in Exhibit-4?

A. I don't remember.

Q. You don't remember talking to anyone about what should be put in here?

MR. LAVELLE: Object to form.

THE WITNESS: I don't remember specifically, because it was a long time ago.

Page 136

BY MR. POWERS:

Q. When you put this written document together in Exhibit-4, was it just a written articulation of the policies that were already in place?

A. Can you repeat that?

Q. Sure.

When you put this controlled drug above-average order monitoring program document reflected in Exhibit-4 together, when you wrote it, was it just an articulation, meaning just writing down the policies that you were already following at that time?

MR. LAVELLE: Object to form.

THE WITNESS: This was made to be put in layman's terms for the pickers to follow.

BY MR. POWERS:

Q. Was it somewhere else written -- was the information in Exhibit-4 somewhere else not in layman's terms?

Page 137

A. I'm not sure how to answer that. But a lot -- some of these documents could be confusing, and we tried to make it as simplistic as possible so that it would -- for learning, you know, for -- easier for them to learn and understand.

Q. I guess what I'm asking, though, is, was this document new when you first wrote it? Was this a new procedure?

MR. LAVELLE: Object to form.

THE WITNESS: Only as I rewrote it. We did have a policy, but this is -- I rewrote it as a training tool.

BY MR. POWERS:

Q. You said you had a policy.

Was that policy written anywhere before this document in Exhibit-4?

A. I don't remember.

Q. The first paragraph, in all

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 caps there, says, The person who picks a
2 controlled drug order is responsible for
3 alerting the supervisor on duty of
4 unusually high order quantities.
5          Do you see that?
6     A.   Yes.
7     Q.   How did you explain, when
8 you were using this as a training
9 document, what constituted an unusually
10 high order quantity?
11    A.   As I recall, it would have
12 been -- it would have been large amounts
13 over the threshold.
14    Q.   Any other criteria, besides
15 being above the threshold, to determine
16 what is an unusually high order?
17    A.   Can you repeat that?
18    Q.   Were there any other
19 criteria, besides being above the
20 threshold, used to determine what
21 constituted an unusually high order
22 quantity?
23    A.   I believe it was mainly
24 anything above the threshold or anything

Page 139

1 that seemed too high.
2     Q.   When you say "seemed too
3 high," who made that determination?
4     A.   The picker.
5     Q.   What was the picker supposed
6 to rely on to make the determination if
7 something was too high?
8     A.   As I stated earlier, as
9 they're picking and something picks at a
10 certain amount and then all of a sudden
11 there's five times that, that would
12 trigger them to think, I wonder if this
13 is -- you know, if this is too much or
14 whatever. And they would call on it.
15    Q.   But there wasn't a set
16 criteria for that, right?
17    A.   No.
18    Q.   It's just what the picker
19 thought might be unusual?
20    A.   At that time, yes.
21    Q.   In the first paragraph
22 there, it says, in the second sentence,
23 The associates will look up the tote
24 number to identify the store the order is

Page 140

1 being picked for and immediately contact
2 the pharmacy manager or pharmacist on
3 duty to verify the ordered quantity.
4          Do you see that?
5     A.   Yes.
6     Q.   So this is referring to an
7 order that comes in over the thresholds,
8 and then a call is supposed to be placed
9 to that particular pharmacy that ordered
10 it, right?
11         MR. LAVELLE: Object to
12    form.
13         THE WITNESS: A call would
14    be placed if it could be placed.
15 BY MR. POWERS:
16    Q.   When could it not be placed?
17    A.   Usually, during the night
18 shift.
19    Q.   So is that if a store put in
20 an order at the end of the day and then
21 the order is being picked overnight, the
22 pharmacy -- excuse me, the distribution
23 center would not be able to contact that
24 pharmacy; is that right?

Page 141

1     A.   In the -- at night when they
2 pick, no, they couldn't, because the
3 stores would be closed. But they would
4 short it to the allowed threshold.
5     Q.   So if it came in and they
6 were picking the order overnight, they
7 wouldn't wait until the morning to call
8 the pharmacy, would they?
9     A.   It depends. But they have
10 to -- each order has to be completed
11 before they could go on. So they would
12 have to pick it complete.
13         And then if it's really
14 high, they would set it aside for us to
15 check on.
16    Q.   When you say "us," who are
17 you referring to?
18    A.   The early -- the morning
19 shift.
20    Q.   Did that ever happen, in
21 your experience?
22    A.   I vaguely remember, yes.
23    Q.   How often, when an order was
24 picked overnight, would it be left for

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  the morning shift to then call the
2  pharmacy about?
3      A.  Not very often.  Only if it
4  was unusual or --
5      Q.  But most of the time they
6  would just cut it down to the threshold
7  and ship it --
8      A.  It would be --
9      Q.  -- without calling the
10 pharmacy; is that right?
11         MR. LAVELLE:  Just wait
12     until the question is finished
13     before you answer the question.
14         THE WITNESS:  Yes.
15 BY MR. POWERS:
16     Q.  And it says here, If you are
17 able to call the pharmacy manager or
18 pharmacists, the person was to verify the
19 ordered quantity.
20         Do you see that?
21     A.  Where is that?
22     Q.  I'm sorry.  It's the last --
23 looking at the same sentence, the last
24 sentence of the first non-capitalized

Page 143

1  paragraph.  It's on the screen here, too.
2      A.  I'm sorry.
3      Q.  That's okay.
4      A.  Okay.
5      Q.  It says they were supposed
6  to -- the pharmacy manager or pharmacist
7  was supposed to be contacted to verify
8  the ordered quantity.
9          Do you see that, where we
10 are now?
11     A.  Yes.
12     Q.  Who would make that call to
13 verify the order quantity?
14     A.  The picker.
15     Q.  Would you ever make those
16 calls?
17     A.  Yes, on occasion.
18     Q.  Why would you make those
19 calls instead of the picker?
20     A.  If they were extremely busy.
21     Q.  Were the pickers often
22 extremely busy?
23     A.  We were busy.  I mean, I
24 don't know -- most of the time they were

Page 144

1  done by the picker.
2      Q.  And the picker was just
3  trying to make sure that the amount that
4  the store ordered was correct when they
5  called the pharmacy about the
6  over-threshold order, right?
7      A.  Repeat that.
8      Q.  When the picker called to
9  verify the ordered quantity, they were
10 just calling to see whether that quantity
11 was correct when it was entered into the
12 system by the pharmacy, right?
13     A.  Yes.
14     Q.  Then the next paragraph
15 there says, If the store verifies the
16 quantity is correct, the associate
17 notifies them that we cannot send more
18 than 50 units.  This amount is being
19 based on a six-week average movement test
20 of all controlled drugs.
21         Do you see that?
22     A.  Yes.
23     Q.  What is the average --
24 six-week average movement test of all

Page 145

1  controlled drugs?
2      A.  That was conducted by
3  corporate.
4      Q.  Who at corporate conducted
5  that?
6      A.  I believe it was -- I
7  believe it was Janet's team, but I'm not
8  positive.
9      Q.  Even though Janet's team may
10 have been the one conducting that average
11 movement test, do you know what that
12 average movement test consisted of?
13         MR. LAVELLE:  Object to
14     form.
15         THE WITNESS:  I'm not
16     positive, except for what it says
17     here, it was based on the
18     movement, average movement.
19 BY MR. POWERS:
20     Q.  In your understanding, what
21 does "the average movement" refer to
22 here?
23     A.  What the average sales for
24 the store had.

Page 146

1    Q.   The threshold was the same
2 for all Rite Aid stores that you
3 distributed to from the Perryman
4 distribution center, right?
5    A.   There were a few exceptions.
6    Q.   Besides those few
7 exceptions, it was all the same
8 threshold, right?
9    A.   I believe, yes.
10    Q.   So you wrote this document,
11 and you did not know what the average
12 movement test was; is that right?
13         MR. LAVELLE:  Object to
14    form.  Objection.  Asked and
15    answered.
16 BY MR. POWERS:
17    Q.   You can answer.
18    A.   Can you repeat that?
19    Q.   Sure.
20         You testified that you wrote
21 this form in Exhibit-4, right?
22    A.   Yes.
23    Q.   But you also testified that
24 you don't know what the six-week average

Page 147

1 movement test of all controlled drugs is,
2 right?
3         MR. LAVELLE:  Object to
4    form.
5         THE WITNESS:  What I said --
6    what I believe I said was this was
7    conducted by Janet's people.  And
8    for me to write it here, I got
9    that information from them.
10 BY MR. POWERS:
11    Q.   Did you ever come to an
12 understanding of what that test was and
13 how it was conducted?
14    A.   The only thing I know is
15 that it was based on a six-week average
16 movement.  Because that's what I was
17 told.
18    Q.   Did you ever ask what a
19 six-week average movement was?
20    A.   I don't believe so.
21    Q.   Then on the second page of
22 Exhibit-4, the Bates 16254, is that the
23 place in this document where you were
24 noting the exceptions to those blanket

Page 148

1 thresholds we were talking about?
2         MR. LAVELLE:  Object to
3    form.
4         THE WITNESS:  Repeat it.
5 BY MR. POWERS:
6    Q.   You said there were a couple
7 stores that had exceptions to the
8 universal threshold that Rite Aid had
9 when it was distributing controlled
10 substances, right?
11    A.   Yes.
12    Q.   Are those exceptions the
13 ones noted here on the second page of
14 Exhibit-4?
15    A.   I can't say these were all
16 the exceptions.  These were the
17 exceptions at that time this was written.
18    Q.   But that's where the
19 exceptions would have been noted?
20    A.   Repeat that.
21    Q.   But the second page of
22 Exhibit-4 would be where the exceptions
23 to the blanket threshold would have been
24 noted; is that right?

Page 149

1    A.   One of the places.
2    Q.   Where else would they have
3 been noted?
4    A.   There -- we had little
5 posters that we put in sleeves and put
6 them along the Pick to Light in the
7 replenishment area.
8    Q.   Anywhere else?
9    A.   Or verification area.
10    Q.   Anywhere else?
11    A.   I'm not sure.
12    Q.   Back to the first page of
13 Exhibit-4, the very first sentence in the
14 first lower-case paragraph there.
15         It says, When the Pick to
16 Light indicates quantities greater than
17 50 pieces of an item with a tab count of
18 100 or liquids, 10-tab count of 500, 5
19 for tab count of 1,000, the pick is
20 automatically stopped.
21         Do you see that?
22    A.   Yes.
23    Q.   Is that the threshold you're
24 talking about?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  A.  Yes.

2  Q.  And it looks like here
3 you're describing the threshold in terms
4 of tab counts, right?

5  A.  It's based -- it's actually
6 the selling units, 50 selling units or 5
7 selling units.

8  Q.  I'm sorry, I've never heard
9 the term "selling units" before.

10  Can you explain what that
11 is?

12  A.  The 50 -- it's for the --
13 okay.  50 pieces of the -- of an item
14 would be 50 selling units.  It's not 50
15 pills, it's 50 selling units.

16  Q.  So a selling unit could be
17 like a bottle of --

18  A.  Yes.

19  Q.  -- 100 pills?

20  MR. LAVELLE:  Please wait
21 until the question is finished
22 before you answer it.

23  THE WITNESS:  Sorry.

24  MR. LAVELLE:  That's okay.

Page 151

1  THE WITNESS:  Yes.

2  MR. LAVELLE:  It's okay.

3 BY MR. POWERS:

4  Q.  So is the threshold based in
5 selling units or was it based in
6 something else?

7  A.  The threshold was based by
8 the movement of the item.  And we put it
9 down into the pickers' selling units.

10  Q.  And you said before that all
11 the people who worked in the controlled
12 drug cage would have had to sign this
13 particular document, as reflected in
14 Exhibit-4.

15  Was anyone ever disciplined
16 for not following the procedures outlined
17 in Exhibit-4?

18  A.  I don't recall.

19  Q.  Is that -- is following the
20 procedures outlined in Exhibit-4
21 something that the pickers would have
22 been evaluated on in their job
23 assessments?

24  A.  They would have been

Page 152

1 evaluated on their performance, which all
2 procedures are part of.

3  Q.  So they would have been
4 evaluated on how well they adhered to
5 this controlled drug above-average order
6 monitoring program, but you're not aware
7 of anyone who was actually disciplined
8 for not following it, right?

9  MR. LAVELLE:  Object to
10 form.

11  THE WITNESS:  I don't
12 recall.  There -- can you repeat
13 your question?

14 BY MR. POWERS:

15  Q.  You don't recall anyone
16 being disciplined for not following the
17 above-average order monitoring program,
18 as reflected in Exhibit-4; is that right?

19  MR. LAVELLE:  Object to
20 form.  Objection.  Asked and
21 answered.

22  THE WITNESS:  Not that I
23 recall.

24 BY MR. POWERS:

Page 153

1  Q.  You can put that exhibit
2 aside.

3  - - -

4  (Whereupon, Rite Aid-Wood
5  Exhibit-5,
6  Rite_Aid_OMDL_0009868-877, was
7  marked for identification.)

8  - - -

9 BY MR. POWERS:

10  Q.  I'm going to hand you what
11 we marked as Exhibit-5, which is Bates
12 number Rite_Aid_OMDL_0009868 through
13 9877.

14  Go ahead and take a look at
15 that document.

16  In the first page of
17 Exhibit-5, it looks like this is an
18 e-mail chain.  And at the bottom there,
19 Kimberly Brown is forwarding you an
20 e-mail with the subject line, Cage trash
21 procedure.

22  And it says, Marian, please
23 forward any cage procedures that apply to
24 IB to Brian Sordillo.

Page 154

1    Do you see that?
2    A.   Yes.
3    Q.   Who is Kimberly Brown?
4    A.   She was the pharmacy
5 department manager.
6    Q.   Would that have been the
7 pharmacy department manager for Perryman?
8    A.   Yes.
9    Q.   Did she have responsibility
10 for any other distribution center besides
11 Perryman?
12    A.   Not to my knowledge.
13    Q.   And who is Brian Sordillo?
14    A.   According to this, he was
15 the inbound manager.
16    Q.   So "IB" means inbound?
17    A.   Yes.
18    Q.   And that would have been
19 also someone who worked at the Perryman
20 facility?
21    A.   Yes.
22    Q.   And then you reply, in the
23 top e-mail there, to Brian Sordillo and
24 Kim Brown, and you say, Brian, I am in

Page 155

1 the process of updating/completing our
2 files.  I am attaching the procedures
3 that I need the following people to sign
4 and return to me.  I need all four
5 procedures from each of these folks.  If
6 they have access to the cage, they need
7 to know these procedures.
8    Do you see that?
9    A.   Yes.
10    Q.   And it looks like underneath
11 the heading of this e-mail, there's a
12 couple of attachments.
13    And it looks like you attach
14 four procedures, right?
15    A.   Yes.
16    Q.   And these are the four
17 procedures that everyone working in the
18 cage needs to have, correct?
19    MR. LAVELLE:  Object to
20    form.
21    THE WITNESS:  These
22    particular procedures were just
23    for these people.  But anyone in
24    the cage would have these, yes.

Page 156

1 BY MR. POWERS:
2    Q.   Are these four procedures
3 the entirety of the procedures that
4 anyone in the cage would need to have had
5 read and signed?
6    MR. LAVELLE:  Object to
7    form.
8    THE WITNESS:  Okay.  Can you
9    repeat that?
10 BY MR. POWERS:
11    Q.   Are these four procedures
12 here on this e-mail as attachments the
13 only four procedures that everyone in the
14 cage would have needed to have read and
15 signed?
16    MR. LAVELLE:  Object to
17    form.
18    THE WITNESS:  No.
19    Can I explain this?
20 BY MR. POWERS:
21    Q.   Sure.
22    A.   Okay.  These four were given
23 to the receivers because they are the
24 only ones that would -- that they would

Page 157

1 have anything to do with.
2    Q.   So there's other procedures
3 that people working in the cage would
4 have needed to have read and signed
5 besides these four procedures; is that
6 right?
7    A.   Yes.
8    Q.   What other procedures would
9 they have needed to have read and signed?
10    MR. LAVELLE:  Object to
11    form.
12    THE WITNESS:  I can't say
13    exactly.  I can give you some.
14 BY MR. POWERS:
15    Q.   Sure.
16    A.   Picking procedures;
17 replenishment procedures; order
18 monitoring procedures; the trash is here;
19 exit.
20    I believe there were others,
21 I just don't remember exactly.
22    Q.   How come these people
23 identified in Exhibit-5 would not need to
24 have looked at the, or beyond looked,

Page 158

1 needed to have read and signed the
2 above-average order monitoring
3 procedures?
4      MR. LAVELLE:  Object to
5 form.
6      THE WITNESS:  They didn't
7 have anything to do with picking.
8 They only received product.
9 BY MR. POWERS:
10     Q.   So only the pickers would
11 have needed to have read and signed the
12 above-average monitoring procedures that
13 we just talked about in Exhibit-4?
14     A.   All regular cage personnel.
15 The receivers only needed to know these
16 things.
17     Q.   I'm going to direct your
18 attention to the Bates number 9874 in
19 Exhibit-5, which is the document
20 entitled, Drug Diversion Training.
21          Do you see that?
22     A.   Yes.
23     Q.   Who wrote this document?
24     A.   I prepared it.

Page 159

1      Q.   Did you prepare all the
2 procedures contained in Exhibit-5?
3      A.   Yes, I believe so.
4      Q.   Going back to the drug
5 diversion training, the Bates number 9874
6 and 9875, when did you prepare this
7 document first?
8      A.   That would have been in the
9 beginning.
10     Q.   When is "the beginning"?
11     A.   When I started in the cage
12 and creating the documents.
13     Q.   Why were you the person who
14 was tasked with preparing this document?
15     A.   I'm not sure.  I wanted to
16 have something that -- I just wanted to
17 have these for training purposes.
18     Q.   Did any training documents
19 exist about drug diversion before you
20 created this document with Bates 9874 to
21 9875?
22     A.   Yes.
23     Q.   What were those documents?
24     A.   It was the regulatory -- DEA

Page 160

1 regulatory compliance, I believe.
2      Q.   Was that the manual we
3 talked about earlier today?
4      A.   Yes.  I believe, yes.
5      Q.   When you put together the
6 drug diversion training document here in
7 Exhibit-5, what did you use to put this
8 document together?
9      A.   I used the CFR, which is the
10 Code of Federal Regulations.
11     Q.   Anything else besides the
12 CFR?
13     A.   This almost entire thing
14 came out of the CFR.
15     Q.   That wasn't really my
16 question, though.
17          Did you use anything besides
18 the CFR to put this document together?
19     A.   I don't remember.  I don't
20 think so.
21     Q.   Did you talk to anyone about
22 putting this document together?
23     A.   I believe I would have
24 talked to Kevin.

Page 161

1      Q.   Anyone besides Kevin?
2      A.   I don't remember.
3      Q.   So on the Page 9875, the
4 last paragraph there says, It is the
5 position of the DEA that employees who
6 possess, sell, use or divert controlled
7 substances will be subject themselves not
8 only to state or federal prosecution for
9 any illicit activity, but also shall
10 immediately become the subject of
11 independent action by their employer.  It
12 is the policy of Rite Aid that any
13 associate that engages in prohibited
14 conduct is subject to disciplinary
15 action, including suspension or
16 termination of employment.
17          Do you see that?
18     A.   Yes, sir.
19     Q.   Do you know if anyone at
20 Rite Aid, to the best of your personal
21 knowledge, was ever subject to
22 disciplinary action because of the
23 activities described in this particular
24 training?

Page 162

1    MR. LAVELLE: Object to
2 form.
3    THE WITNESS: I don't recall
4 anyone being -- what was -- can
5 you repeat the question?
6 BY MR. POWERS:
7    Q.   It says that it is the
8 policy of Rite Aid that any associate
9 that engages in prohibited conduct is
10 subject to disciplinary action.
11    Do you know of anyone,
12 during your time at Rite Aid, that was
13 subject to disciplinary action because of
14 the prohibited conduct explained in this
15 drug diversion training?
16    A.   Not that I recall.
17    Q.   These trainings we've been
18 talking about, the drug diversion
19 training in Exhibit-5, the other
20 procedures in Exhibit-5, where were those
21 signed copies of those procedures kept?
22    A.   All signed copies were kept
23 in a file, that person's name in the
24 file, in the DEA office.

Page 163

1    Q.   So were the files organized
2 by person or by the particular training
3 itself?
4    MR. LAVELLE: Object to
5 form.
6 BY MR. POWERS:
7    Q.   You can go ahead.
8    A.   The files that I maintained
9 were by person, with a checklist of every
10 procedure and the date they signed it,
11 along with the copy of their -- along
12 with their signature sheet.
13    Q.   So if you wanted to figure
14 out all the employees who signed the drug
15 diversion training, you would have to
16 individually go to each individual
17 person's file and collect them that way?
18    There's not a central
19 repository, here are all the drug
20 diversion sheets signed together?
21    MR. LAVELLE: Object to
22 form.
23    THE WITNESS: I'm not sure.
24 BY MR. POWERS:

Page 164

1    Q.   It's not a trick question.
2    I'm just trying to figure
3 out that the signed drug diversion
4 training sheets, they were organized and
5 filed by person who signed them, right?
6    A.   Yes.
7    Q.   So there wasn't a file
8 labeled, drug diversion signed sheets,
9 where everyone's drug diversion sheet was
10 in, right?
11    A.   I don't think so.
12    Q.   But you would be the person
13 who would know that, right?
14    A.   It was a long time ago.
15    Q.   But you would have -- you
16 would have been the person that kept that
17 file?
18    A.   Yes, I believe so.  Yes.
19    - - -
20    (Whereupon, Rite Aid-Wood
21    Exhibit-6,
22    Rite_Aid_OMDL_0021630-643, was
23    marked for identification.)
24    - - -

Page 165

1 BY MR. POWERS:
2    Q.   I'm going to hand you what's
3 been marked as Exhibit-6.  And this Bates
4 number is Rite_Aid_OMDL_0021630 through
5 1643.
6    Take a look at that.
7    Are you familiar with the
8 document in Exhibit-6?
9    A.   I'm not sure.
10    Q.   You don't recall this
11 document at all?
12    A.   I don't know.
13    Q.   It looks like on the first
14 page there of Exhibit-6, underneath those
15 boxes at the top, it says, Number ADM-23.
16    Do you know what that number
17 reflects?
18    A.   I'm not sure.
19    Q.   Did Rite Aid refer to
20 different policies and procedures with
21 these ADM numbers?
22    A.   I'm not sure.  Mainly
23 because this format doesn't look -- I
24 just don't recall it.

Page 166

1   Q.   Putting aside the formatting
2   for a second of Exhibit-6, did Rite Aid
3   have policies and procedures that it
4   referred to with ADM numbers?
5   A.   It looks vaguely familiar,
6   but I'm not sure.
7   Q.   It looks to me like this is
8   a procedure for regulatory inspections.
9        Does that look like the same
10  thing to you?
11       MR. LAVELLE:  Object to
12  form.
13       THE WITNESS:  It says
14  regulatory inspections.
15  BY MR. POWERS:
16  Q.   Do you recall having a
17  policy and procedure for regulatory
18  inspections while you were at Rite Aid?
19  A.   I'm pretty sure we had one,
20  yeah.
21  Q.   Does this look like that --
22  A.   I'm not sure.
23  Q.   -- policy -- sorry, let me
24  just finish my question.

Page 167

1        Does this look like that
2   policy and procedure in its substance,
3   even if it's not the exact format you
4   remember?
5   A.   It looks familiar, but I'm
6   just not -- I'm not sure.
7   Q.   You said you were pretty
8   sure that you had a policy and procedure
9   for regulatory inspections while you were
10  at Rite Aid.
11       Where was that procedure
12  kept?
13  A.   It would have been in the
14  procedural -- the -- I believe the
15  regulatory compliance procedure.
16       I know we used one of those
17  documents to help us train and -- for
18  inspections.
19  Q.   What is the regulatory
20  compliance procedure?
21  A.   Excuse me?
22  Q.   I asked where the procedures
23  for regulatory inspections were kept, and
24  you said, I believe it would have been

Page 168

1   kept in the regulatory compliance
2   procedure.
3        A.   I misspoke.  The regulatory
4   compliance book.
5   Q.   Is that the same book we
6   were looking at before?
7        MR. LAVELLE:  Object to
8   form.
9        THE WITNESS:  I believe so,
10  but I'm not positive.
11  BY MR. POWERS:
12  Q.   You can put aside Exhibit-6
13  for a second.
14       Going back to Exhibits-4 and
15  5 --
16       MR. LAVELLE:  You need to
17  pull up those, please.
18  BY MR. POWERS:
19  Q.   -- the training materials
20  that you wrote up --
21       MR. LAVELLE:  4 and 5.
22  BY MR. POWERS:
23  Q.   -- that you had the people
24  sign.

Page 169

1        MR. LAVELLE:  Here, give
2   them to me.
3        All right.  5 and 4.
4        THE WITNESS:  Okay.
5        MR. LAVELLE:  Put these over
6   by the court reporter.  Thank you.
7   BY MR. POWERS:
8   Q.   When did you go over those
9   training materials with employees at the
10  distribution center?
11  A.   When they came into the
12  cage.
13  Q.   Did you only go over those
14  policies when they first came into the
15  cage?
16  A.   Repeat that.
17  Q.   Did you only go over the
18  policies, as reflected in Exhibits-4 and
19  5, when the employees first started
20  working in the controlled drug cage?
21  A.   That's one of the times.
22       And then we would do, like,
23  refreshers.  We tried to do them at least
24  once a year to just go over the

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 procedures, for ones that had been there
2 a while.
3     Q.    You said you "tried" to go
4 over them once a year.
5         So that means that you
6 didn't necessarily do it once every year;
7 is that right?
8         MR. LAVELLE:  Object to
9     form.
10        THE WITNESS:  I'm not sure.
11 BY MR. POWERS:
12    Q.    Was there any requirement or
13 policy that said you had to do
14 retrainings on those once a year?
15    A.    I don't remember.  There
16 might have been, I just don't remember.
17    Q.    And besides training with
18 you on those policies that we're talking
19 about in Exhibits-4 and 5, would the
20 employees who worked in the controlled
21 drug cage ever get other training on drug
22 diversion and above-average order
23 monitoring procedures from anyone else?
24        MR. LAVELLE:  Object to

Page 171

1     form.
2         THE WITNESS:  If -- when
3     Debra was the DEA coordinator, she
4     might have.  So she could have as
5     well.
6 BY MR. POWERS:
7     Q.    Besides you and Debra, would
8 anyone else have trained the employees in
9 the controlled cage on the above-average
10 order monitoring and drug diversion
11 policies?
12    A.    I don't think so.
13    Q.    You can put those exhibits
14 back.
15        - - -
16        (Whereupon, Rite Aid-Wood
17    Exhibit-7,
18    Rite_Aid_OMDL_0012519-520, was
19    marked for identification.)
20        - - -
21 BY MR. POWERS:
22    Q.    I'm going to hand you what's
23 been marked as Exhibit-7.  And the Bates
24 number on this exhibit is

Page 172

1 Rite_Aid_OMDL_0012519 through 12520.  But
2 the attachment to this e-mail, the Bates
3 number, 12520, was actually an Excel
4 spreadsheet, so it's just the one Bates
5 number, even though it's multiple pages.
6         And it looks like the
7 Exhibit-7 is an e-mail from you to Kim
8 Brown and copying Debra Chase; is that
9 right?
10    A.    Yes.
11    Q.    And it looks like there's an
12 attachment on the e-mail, and it's a file
13 named, Threshold Limits.xls.
14        Do you see that?
15    A.    Yes.
16    Q.    Once again, it looks like
17 this e-mail is from Marian Wood and you
18 also cc a Marian Wood.
19        Why is that?
20    A.    To have one for my records.
21    Q.    So you would copy yourself
22 on e-mails that you sent to make sure it
23 went to your inbox to save it; is that
24 correct?

Page 173

1     A.    I believe, yes.
2     Q.    And then the actual
3 attachment to this e-mail, it looks like
4 this chart.
5         What is this chart?
6     A.    This is the forward pick
7 locations.  This is where you actually
8 pick the product into the tote from these
9 locations.
10    Q.    So the location -- so the
11 location is there in the left-hand
12 column, right?
13    A.    Yes.
14    Q.    Are those corresponding to
15 some physical location in the
16 distribution center?
17    A.    Yes.
18    Q.    So it's like a shelf that
19 has that particular numerical identifier?
20        MR. LAVELLE:  Object to
21    form.
22        THE WITNESS:  It's the pick
23    location within the controlled
24    cage.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

BY MR. POWERS:

Q. And then the next column over is item number.

What does that reflect?

A. Every SKU that we carry is given an item number to identify it.

Q. Then it looks like -- the next column over, description, it looks like the actual product itself, right?

A. Yes.

Q. And the next column is NDC number.

Is that the National Drug Code number?

A. Yes.

Q. And then the last column says, Pick limit.

What is that?

A. I believe this is the limits based on the threshold.

Q. How was this document used?

A. For some reason, Kim wanted this, and I sent it to her. I'm not sure -- I don't know that I know why --

Page 175

what it was used to --

Q. Did you prepare this document, the attachment, the daily inventory forward pick locations chart?

A. This is what we used to do our inventory every day. And since it had every SKU, it looks to me like she wanted to see what the limits were for each item.

Q. Okay. You said you used it to do your inventory each day.

Can you explain how you used this doing your inventory?

A. Well, the format is for that. These numbers on the side, this column, would be blank. And then these forms were printed out twice a day, day shift and night shift. And we would do a physical inventory of each pick location.

Q. Sorry, when you say "this column would be blank," you were motioning to the pick limit column?

A. I'm sorry, yes. The pick limit column would be the physical

Page 176

inventory column.

Q. So you would print this entire spreadsheet every day and use it in your inventory?

A. The -- twice a day. I'm assuming this is our entire -- it's about ten pages, I thought.

We would -- a form just like this, that would have every single forward pick location on it, day shift would count every location after every shift, and night shift would do the same.

Q. When you say "count each location," what do you mean by that?

A. Count what -- how many -- the physical inventory in that location.

Q. So you would go to the physical location of that particular item and see how many were actually in that location, like, meaning on the shelf or in the box or whatever they were held in; is that right?

A. Yes.

Q. And then after you do that,

Page 177

would that be reflected on this sheet again?

A. The physical count would go on the sheet.

What this one doesn't have was there was another column that had the system count. So we would verify our physical to our system count.

Q. So it looks to you like this chart in Exhibit-7 is actually missing a couple of columns?

A. For this purpose, it's not missing anything.

But when we do our physical inventory, it would have had at least one more column for the system. The pick limit column would say, Physical inventory. And then there would be a column saying the system inventory.

Q. How come this one says pick limit on it?

A. Because, apparently, I used this format to give her what she wanted. And I only put on what she needed at the

Page 178

1 time, what I believe she needed.
2          And I used this because it
3 had every single pick unit, forward pick.
4     Q.   Okay.  So what you're saying
5 is you adapted the forward pick location
6 sheet and instead of having the physical
7 location and the inventory columns, you
8 put in just a pick limit column because
9 that's what Kim Brown wanted; is that
10 right?
11          MR. LAVELLE:  Object to
12     form.
13          THE WITNESS:  Yes.
14 BY MR. POWERS:
15     Q.   So this was not a typical
16 format that you would have used in the
17 distribution center, as it is here in
18 this exhibit?
19     A.   As I said, this was made
20 specifically for whatever her request
21 was.
22     Q.   But my question is, this was
23 not a typical format of this document, it
24 was only for that particular request by

Page 179

1 Kim Brown?
2          MR. LAVELLE:  Object to
3     form.
4          THE WITNESS:  I believe so.
5          MR. POWERS:  We've been
6     going about an hour.  This is
7     actually a good time to break.
8          VIDEO TECHNICIAN:  The time
9     is now 1:30 p.m.  We're going off
10     the record.
11          - - -
12          (Whereupon, a brief recess
13     was taken.)
14          - - -
15          VIDEO TECHNICIAN:  The time
16     is now 1:44 p.m.  We are back on
17     the record.
18 BY MR. POWERS:
19     Q.   Welcome back, Ms. Wood.
20     A.   Thank you.
21     Q.   I'm going to hand you what's
22 been marked as Exhibit-8.  The Bates
23 number on this document is
24 Rite_Aid_OMDL_0013106 through 13107.  And

Page 180

1 13107 is another Excel spreadsheet, so
2 even though it spans multiple paper
3 pages, it was a single Bates number
4 because it was produced as an Excel
5 spreadsheet.
6          - - -
7          (Whereupon, Rite Aid-Wood
8     Exhibit-8,
9     Rite_Aid_OMDL_0013106-107, was
10     marked for identification.)
11          - - -
12 BY MR. POWERS:
13     Q.   Take a look at that exhibit
14 and let me know when you're done.
15          What is the document in
16 Exhibit-8?
17     A.   This is an
18 above-threshold --
19     Q.   An above-threshold log?
20     A.   Yes.
21     Q.   And it looks like, on the
22 first page of Exhibit-8, you are sending
23 an e-mail to Kevin Mitchell attaching the
24 threshold log, right?

Page 181

1     A.   Yes.
2     Q.   Why were you sending it to
3 Kevin Mitchell?
4     A.   I'm not -- I'm not sure.  He
5 had asked to send it, but I can't
6 remember exactly why.
7     Q.   Do you know what Kevin
8 Mitchell did with the above-threshold
9 logs after you sent them to him?
10          MR. LAVELLE:  Object to
11     form.
12          THE WITNESS:  I'm not really
13     sure.
14 BY MR. POWERS:
15     Q.   Do you have any idea?
16          MR. LAVELLE:  Object to
17     form.
18          THE WITNESS:  I might have
19     at one time.  I just don't
20     remember.
21 BY MR. POWERS:
22     Q.   How often did you send the
23 threshold logs to Kevin Mitchell?
24     A.   I'm not sure.  I'm not sure,

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  but it could be once a month.
2      Q.   Your best recollection is
3  that you sent them monthly?
4          MR. LAVELLE:  Object to
5  form.
6          THE WITNESS:  I think.
7  BY MR. POWERS:
8      Q.   Did you ever follow up with
9  Kevin Mitchell after you sent these
10 above-threshold logs?
11     A.   I don't recall.
12     Q.   Did Kevin Mitchell ever ask
13 you any questions after you sent one of
14 these above-threshold logs?
15     A.   Not that I can remember.
16     Q.   Did you send the
17 above-threshold logs to anyone else
18 besides Kevin Mitchell?
19     A.   I believe I might have sent
20 them to someone else in corporate when
21 Kevin wasn't with us anymore.
22     Q.   Besides sending them to
23 people in corporate, did you send them to
24 anyone else?

Page 183

1      A.   Not that -- not that I can
2  recall.
3      Q.   And looking at the actual
4  attachment, the Bates numbered document
5  13107, do you know why the first page is
6  different than the next pages, in terms
7  of formatting?
8      A.   I'm not sure, but I don't --
9  this page doesn't look familiar to me.
10     Q.   How about the second page,
11 the Page 2 of -- it has the little 2 in
12 the bottom right-hand corner, so I guess
13 it would be the third page of Exhibit-8?
14     A.   This looks like it came from
15 our order monitoring log.
16     Q.   And this looks like a
17 printout of an electronic version of this
18 document, right?
19     A.   Yes.
20     Q.   Was it kept in electronic
21 format at the distribution center?
22     A.   I believe -- I believe it
23 was just for this purpose.
24     Q.   You believe it was in

Page 184

1  electronic form just to send it to Kevin
2  Mitchell?
3      A.   Yes.
4      Q.   You kept a paper copy in the
5  actual distribution center?
6      A.   Yes, I'm pretty sure.
7      Q.   Looking at that page number
8  2 of 13107, it looks like there are
9  different columns, right?
10     A.   Yes.
11     Q.   And I'll direct your
12 attention to the row there with the date
13 12/6/10.
14         Do you see that?  It might
15 be easier if you look on the screen, he's
16 highlighting that.
17         It's the 12/6/10 row, Store
18 1587.
19         Do you see that?
20     A.   Yes.
21     Q.   And it looks like the
22 description for the item, the first item
23 there, is C3A hydrocod/AP7.5/750MG
24 500 TB, right?

Page 185

1      A.   Yes.
2      Q.   What is that?
3      A.   That is a controlled drug.
4  It's hydrocodone/APAP, 7.5, 500
5  milligram, 500 tab.
6      Q.   And it looks like the
7  quantity ordered column for that
8  particular drug is 11, and then the
9  allowable quantity column says 10.
10         What does that represent?
11     A.   I believe it to represent
12 the 11 was what was ordered and the 10 is
13 what we sent.
14     Q.   So that order would have
15 come in above the threshold, right?
16     A.   Yes.
17     Q.   And you cut it down, before
18 you shipped it, to the threshold of 10
19 units, right?
20     A.   Yes.
21     Q.   And then the reason column,
22 it says, Excessive order.
23         Do you see that?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1   Q.   What does "excessive order"
2   in the reason column mean?
3       A.   Well, that -- this is just
4   how -- this, what I think, is that they
5   put excessive because they weren't able
6   to speak to anyone.
7       Q.   How can you tell that they
8   weren't able to speak to anyone, from
9   this reason column?
10      A.   Because usually they would
11  put if they spoke to someone.
12      Q.   So if you go down further,
13  there's other entries, it looks like it's
14  the 12/8/10 entries for Store 2259, the
15  bottom row he just pulled up on the
16  screen there, the date is 12/8/10, the
17  store number is 2259, Item 89266.
18           Do you see that?
19      A.   Yes.
20      Q.   And on the reason column it
21  says, Debra S/W pharm/only wanted 30.
22      A.   Yes.
23      Q.   Is that what you're talking
24  about where it's noting that someone

Page 187

1   called the pharmacy to see if that order
2   number amount was correct?
3       A.   Yes.
4       Q.   So when it says just
5   excessive order, that means no one called
6   the pharmacy?
7       A.   I believe.
8       Q.   Besides calling the
9   pharmacy, was any other investigation
10  done when an order was an excessive
11  order?
12      A.   On instances like this, we
13  cut it down if -- can you repeat the
14  question?
15      Q.   Yes.
16           So my question is, very
17  simply, besides calling the pharmacy when
18  an order came in over the allowable
19  threshold, did you do any other
20  investigation?
21      A.   I don't remember, no.
22      Q.   You don't remember doing any
23  other investigation, is that what you're
24  saying?

Page 188

1       A.   I don't remember us doing
2   any other investigation.
3       Q.   So even though it says the
4   order is excessive, you did not do
5   anything besides possibly calling the
6   pharmacy, right?
7       A.   The term was just put there,
8   it wasn't necessarily that we thought it
9   was that excessive.  It was one unit
10  over.
11      Q.   Why would you put it there
12  if you did not think it was excessive?
13           MR. LAVELLE:  Object to
14      form.
15           THE WITNESS:  I believe it
16      was put there because we could not
17      reach the person at the pharmacy.
18  BY MR. POWERS:
19      Q.   You said "it wasn't
20  necessarily that we thought it was that
21  excessive."
22           But this log says excessive,
23  does it not?
24      A.   Yes, it does.

Page 189

1       Q.   Who would make the entries
2   into this excessive order log?
3       A.   Most of the entries were by
4   the picker.
5       Q.   Would you make entries into
6   this log?
7       A.   I would on occasion.
8       Q.   Anyone else besides the
9   pickers and yourself make entries into
10  this log?
11      A.   Debra.  I think that would
12  be it.
13      Q.   What did you do with the
14  paper copies of these excessive order
15  logs?
16      A.   They were maintained at the
17  DC.
18      Q.   Where were they maintained
19  at the DC?
20      A.   In the filing cabinet.
21      Q.   How long did you retain
22  these logs in that filing cabinet?
23      A.   I don't remember.
24      Q.   Did it have a disposal

Page 190

1  schedule for when you threw out
2  particular logs?
3      MR. LAVELLE:  Object to
4  form.
5      THE WITNESS:  The best that
6  I can remember, we had -- can you
7  repeat your question?
8  BY MR. POWERS:
9      Q.   Sure.
10      How long did you keep the
11  paper copy of the excessive order logs in
12  the filing cabinet at the DC?
13      A.   Okay.  That's not what you
14  asked me.
15      MR. LAVELLE:  Object to
16  form.
17      THE WITNESS:  We had -- our
18  files were kept for a
19  particular -- whatever time they
20  were supposed to be kept, and then
21  they would be disposed of whenever
22  the -- the word is missing me, but
23  then they would be disposed of.
24  BY MR. POWERS:

Page 191

1      Q.   Yes.
2      What I'm trying to figure
3  out is the time period that they were
4  supposed to have been kept; what is that?
5      A.   I don't remember.
6      Q.   Was it more or less than a
7  year?
8      MR. LAVELLE:  Object to
9  form.
10      THE WITNESS:  I don't
11  remember.
12  BY MR. POWERS:
13      Q.   You don't have any idea how
14  long the excessive order monitoring logs
15  were kept?
16      MR. LAVELLE:  Objection.
17  Asked and answered.
18      THE WITNESS:  I don't
19  remember.
20  BY MR. POWERS:
21      Q.   How would I find out that
22  information?
23      A.   Maybe call corporate.
24      Q.   So after you made these

Page 192

1  excessive order logs, what did you use
2  them for?
3      A.   We didn't necessarily use
4  them for anything.  We just maintained
5  them.
6      Q.   So you never went back and
7  looked at them after you filled them out
8  and put them in the filing cabinet?
9      MR. LAVELLE:  Object to
10  form.
11      THE WITNESS:  Not that I
12  recall.
13  BY MR. POWERS:
14      Q.   You never went back and
15  looked at them for ordering patterns, did
16  you?
17      A.   Not that I recall.
18      Q.   You never went back and
19  looked at them to see if a store had a
20  particular pattern in its ordering for
21  controlled substances, did you?
22      A.   I'm not sure if this is what
23  you want, but if we had a store we saw
24  constantly coming up, we would notify

Page 193

1  Janet or someone that, hey, this store
2  seems to be -- it was usually a
3  replenishment issue.
4      Q.   But you never -- but you
5  didn't look at the logs, the above-order
6  logs, to determine that, right?
7      A.   When we were filling them
8  out, if we saw the same store.  So that
9  was from the log that we would see it.
10      And if it was -- if we would
11  see the same store on a regular basis, we
12  would -- we would, when we notified the
13  store, would say, you know, you're
14  constantly over-ordering this, you might
15  want to cycle count it.  Or if you really
16  need it -- if they say, we need it for
17  our sales, then we have them contact
18  Government Affairs.
19      Q.   But there was no set
20  procedure to periodically go back and
21  look at these logs to determine
22  information about the ordering patterns
23  of particular stores, right?
24      MR. LAVELLE:  Object to

Page 194

1  form.
2      THE WITNESS:  Not that I
3  recall.
4  BY MR. POWERS:
5      Q.  I'm going to hand you what
6  has been marked as Exhibit-9, which is
7  Bates number Rite_Aid_OMDL_0013110.
8      Take a look at that.
9          - - -
10     (Whereupon, Rite Aid-Wood
11     Exhibit-9, Rite_Aid_OMDL_0013110,
12     with attachment, was marked for
13     identification.)
14         - - -
15 BY MR. POWERS:
16     Q.  In Exhibit-9 in front of
17 you, it looks like an e-mail, the bottom
18 one there is an e-mail from Andrea Bucher
19 to you, Kimberly Birklin and J. Wyatt.
20     Do you see that?
21     A.  Yes.
22     Q.  Who is Kimberly Birklin?
23     A.  I believe Kimberly was a DEA
24 coordinator in another DC.

Page 195

1      Q.  Do you remember which DC?
2      A.  I'm not sure.
3      Q.  How about J. Wyatt?
4      A.  I think that was Jen down at
5  the Tuscaloosa distribution center, I
6  think.
7      Q.  Was Jen also a DEA
8  coordinator?
9      A.  Yes.  She might have been a
10 manager, too.  I'm not sure.  But she did
11 do DEA things.
12     Q.  And it looks like she's
13 asking that -- Andrea Bucher is asking
14 for you, Kimberly and Jen to start
15 sending a copy of your spreadsheets to me
16 monthly.
17     Do you see that?
18     A.  Yes.
19     Q.  And it looks like she's
20 referring to those threshold logs that we
21 were just talking about in Exhibit-8,
22 right?
23     A.  Yes.
24     Q.  And you say above, in your

Page 196

1  e-mail back to Andrea Bucher, I've been
2  sending the threshold log and ARCOS to
3  Rick Chapman.  I will send them to you
4  now.  Do you want both?
5      Do you see that?
6      A.  Yes.
7      Q.  So it looks like you were
8  sending the threshold logs to Rick
9  Chapman, as well as Kevin Mitchell,
10 right?
11     A.  I don't know if it's "as
12 well as."  It might have been after Kevin
13 left.  I'm really not sure.
14     Q.  So you started sending, at
15 some point, to Rick Chapman, instead of
16 Kevin Mitchell --
17     MR. LAVELLE:  Object to
18     form.
19 BY MR. POWERS:
20     Q.  -- is that right?
21     A.  Apparently.
22     Q.  Why did you send to Rick
23 Chapman?
24     A.  At one point someone must

Page 197

1  have told me to.
2      Q.  Did you ever ask why you
3  were supposed to send them to Rick
4  Chapman?
5      A.  I don't remember.
6      Q.  Did you ever talk to Rick
7  Chapman about the threshold logs that you
8  sent him?
9      A.  I don't recall.
10     Q.  Do you know if Rick Chapman
11 did anything with the threshold logs that
12 you sent him?
13     A.  I don't know.
14     Q.  Do you know why Andrea
15 Bucher is asking for you to send her the
16 threshold logs?
17     A.  No.
18     Q.  You can put that exhibit
19 aside.
20         - - -
21     (Whereupon, Rite Aid-Wood
22     Exhibit-10,
23     Rite_Aid_OMDL_0003635-671, was
24     marked for identification.)

Page 198

```
1           - - -
2  BY MR. POWERS:
3      Q.   I'm going to show you a
4  document that's been now marked as
5  Exhibit-10.  And it's
6  Rite_Aid_OMDL_0003635 through 3671.
7           It's got a lot of pages in
8  here.  I'm going to ask you to review the
9  document, but I'll let you know that I am
10 going to direct you to a couple
11 particular places I want to ask questions
12 about.
13          What is the document in
14 front of you as Exhibit-10?
15     A.   This is a controlled drug
16 adjustment record.
17     Q.   What is a controlled drug
18 adjustment record?
19     A.   Any time we make an
20 adjustment to the inventory, it was
21 logged on here.
22     Q.   How is this different than
23 the above-average order log we just
24 talked about in the previous Exhibit-9
```

Page 199

```
1  and 8?
2      A.   This is when we had to make
3  an adjustment to the inventory.  One of
4  the reasons here was it's sent to
5  Medturn.
6      Q.   What is Medturn?
7      A.   Medturn is a reverse
8  distributor that we send any damages or
9  anything to.
10     Q.   Why do you have the two
11 different logs, the controlled drug
12 adjustment record and the above-average
13 log?
14     A.   It's two different logs.
15 This is -- this is when we have to
16 physically adjust in or out of inventory.
17     Q.   So this is really just a
18 record of how inventory has been
19 adjusted, right?
20     A.   Yes.
21     Q.   It doesn't really have
22 anything to do with monitoring for
23 above-threshold orders?
24          MR. LAVELLE:  Object to
```

Page 200

```
1  form.
2          THE WITNESS:  Clarify that.
3  It doesn't have anything to do
4  with monitoring, it does not mean
5  that we didn't have to make an
6  adjustment due to monitoring.
7  BY MR. POWERS:
8      Q.   Who created these controlled
9  drug adjustment records?
10     A.   I believe I did.
11     Q.   Anyone else?
12     A.   Do you mean created the form
13 or that would enter into it?
14     Q.   That's a good distinction.
15          Who created the form in the
16 first instance?
17     A.   I believe I did.
18     Q.   And then who would be the
19 one filling out the different entries on
20 the -- on this controlled drug adjustment
21 record?
22     A.   It would be either -- in
23 this case, it would have been either me
24 or Debra.
```

Page 201

```
1      Q.   And that's -- it looks like
2  it's reflected in the top there, where it
3  says, Adjusted by Marian Wood/Debra
4  Chase?
5      A.   Yes.
6      Q.   And what does "adjusted by"
7  mean?
8      A.   We are the ones that
9  physically went to the system and either
10 added in or subtracted from the
11 inventory.
12     Q.   So if you look on the first
13 page of Exhibit-10, Bates number 3635,
14 the second-to-last entry from the bottom
15 there, the date is 12/31/2012, Item
16 Number 89895.
17          Do you see that row?
18     A.   Yes, sir.
19     Q.   It looks like the quantity
20 column says, Plus 35.
21          What does that reflect?
22     A.   That reflects that I added
23 35 -- if that was me, that I added 35
24 units into that location, that item.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    Q.   When you say "added into
2  that location," what does that mean?
3    A.   That it would -- at some
4  point, it had been subtracted out of the
5  location and I'm adding it back in.
6    Q.   When you say add it back in,
7  you're adding to the orders that are
8  being shipped to that particular store?
9    A.   No, sir.  I'm adding it into
10 the inventory within our pick slot.
11   Q.   Okay.  I'm just not familiar
12 with the terminology.
13       Can you explain it a little
14 bit?
15   A.   Go ahead and explain this
16 particular one, then, to give you an
17 explanation?
18   Q.   Sure.  Go through this
19 particular row, yes.
20   A.   This tells me that they
21 either hit the button wrong and confirmed
22 it, or they had to continue before they
23 could check on it.  So --
24   Q.   I'm sorry, who is "they"?

Page 203

1    A.   The picker.
2    Q.   Okay.
3    A.   So if it's -- once it's
4  picked, you cannot change it.  So that
5  would have been one that we would have
6  had to add back into the inventory.
7    Q.   When you say "the
8  inventory," that's the inventory at the
9  distribution center?
10   A.   Yes, sir.
11   Q.   So the picker overpicked by
12 35 and then you have to go back and add
13 it to the inventory, because that was not
14 ultimately shipped to the store.
15       Do I have that correctly?
16   A.   She picked what was on the
17 Lights.  And, yes, it was too much, and
18 that's why we had to make the adjustment.
19   Q.   So how do you know when the
20 picker has picked too much?
21   A.   They'll tell you.
22   Q.   Who tells you?
23   A.   The picker.
24   Q.   So the picker comes back to

Page 204

1  you and says, I made a mistake, I picked
2  too much, what do I do with this?
3    A.   She'll say, I made a
4  mistake, and I hit the button which
5  confirmed it instead of shorting it.  And
6  then she would bring the product and the
7  tote to us, and then -- whoever, me or
8  Debra, or whoever, the lead or manager,
9  and we would make the adjustment.
10   Q.   So this entry here, the
11 entry for 12/31/12 and Item Number 89895,
12 the picker actually picked above the
13 threshold that was established for that
14 particular item in the description
15 column; is that right?
16   A.   She accidentally picked what
17 was lit up.
18   Q.   So she should have picked --
19 she should have known that the threshold
20 was 5,000 dosage units and picked only up
21 to that amount; is that right?
22   A.   She would have known, he or
23 she would have known.  And if it was
24 picked, it was picked because she either

Page 205

1  made an error when she was shortening it,
2  or she had to continue and bring it to
3  our attention.
4    Q.   So the picker sometimes made
5  errors by not shortening the orders down
6  to what the threshold was; is that
7  correct?
8    A.   Yes, they --
9    Q.   And then in the reason
10 column for that row we've been looking
11 at, it looks like -- does that stand for
12 exceeded order Store 11297?
13   A.   Yes.
14   Q.   And it says, Bill 47, sent
15 12, credit 35.
16   A.   Correct.
17   Q.   What does that mean?
18   A.   That means -- once you hit
19 that confirm button, then it's going to
20 bill 47 units.  So we have to not only
21 add the inventory back into the forward
22 pick, we have to credit the store for
23 what they're being billed.
24   Q.   So these controlled drug

Page 206

1  adjustment records are really to keep
2  track of your billing records so you make
3  sure that you're billing in the correct
4  amounts for what was actually sent,
5  right?
6          MR. LAVELLE:  Object to
7      form.
8          THE WITNESS:  Not really.
9      They're kept to keep track of when
10     the adjustments are made to
11     inventory.
12 BY MR. POWERS:
13     Q.   But one of the purposes of
14 keeping track of the adjustments made to
15 inventory would be to make sure that your
16 bookkeeping is up to date, in terms of
17 what you're billing your stores for; is
18 that right?
19         MR. LAVELLE:  Object to
20     form.
21         THE WITNESS:  I'm not sure.
22     I'm not sure I understand what
23     you're saying.
24 BY MR. POWERS:

Page 207

1      Q.   It says here in the reason
2  column in this row that we've been
3  looking at, it says, Bill 47, sent 12,
4  credit 35, right?
5      A.   Yes.
6      Q.   Isn't that talking about how
7  you're accounting for the cost of the
8  pills to that particular store that
9  ordered them, right?
10     A.   They would be billed those
11 47 units, because we confirmed it.
12     Q.   Right.  But you would need
13 to make sure that they got a credit for
14 the stuff that was not actually sent to
15 them, correct?
16     A.   Yes.
17     Q.   And for the ones -- the
18 entries above this that are recalled,
19 sent to Medturn, those would also have an
20 effect on what was ultimately billed to
21 the store, right?
22     A.   Okay.  Can you repeat that?
23     Q.   The entries above in the
24 reason column say, Recall, sent to

Page 208

1  Medturn, right?
2      A.   Yes.
3      Q.   It would be important to
4  know if they were recalled and sent to
5  Medturn for budget purposes, right?
6      A.   They were sent because there
7  was a recall on the item and we had to
8  destroy it.  So it would have been
9  deleted from our inventory and sent to
10 the reverse distributor.
11     Q.   Did you still bill all the
12 stores for those items that were recalled
13 and sent to Medturn?
14     A.   No.
15     Q.   So the reason column is
16 really talking about how the items should
17 be accounted for in the billing for the
18 stores, right?
19         MR. LAVELLE:  Object to
20     form.
21         THE WITNESS:  I'm not sure
22     you're understanding me, or I'm
23     not understanding you.
24         This is telling you the

Page 209

1  disposition of this item and why
2      it was adjusted.
3          This particular item has
4      nothing to do with the store.
5  BY MR. POWERS:
6      Q.   But why the order was
7  adjusted and the disposition of the item
8  would be important, because you need to
9  know whether or not to bill for that
10 item, right?
11         MR. LAVELLE:  Object to
12     form.
13         THE WITNESS:  The reason is
14     there so that we know why it was
15     adjusted, what, six years later.
16     We tried to keep really good notes
17     of everything we did with our
18     inventory any time we made an
19     adjustment.
20 BY MR. POWERS:
21     Q.   Why would -- actually, back
22 up there.
23         Did anyone ever review these
24 controlled drug adjustment records?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    A.   I think so.
2    Q.   Who would do that?
3    A.   I believe these were sent --
4  I believe they were sent to corporate.
5  Oh, gosh, I got to remember.
6        I know any controlled
7  adjustments were sent to corporate,
8  because they had to adjust the ARCOS
9  reports.  So I would say that, yes, the
10  adjustment record was sent to ARCOS.
11        Also, when we were audited
12  by the DEA, they would want to see the
13  adjustments -- when they would give us
14  numbers to inventory, they would want to
15  see the adjustments on that item.
16    Q.   Besides using it -- sorry,
17  let me back up there.
18        Besides sending it to the
19  corporate office, did you send this to
20  anyone else?
21    A.   I really don't remember.
22    Q.   Did you go back and review
23  these logs for any purpose after you
24  filled them out?

Page 211

1    A.   Not that I can remember.
2    Q.   Do you know if anyone went
3  back and looked at these logs to
4  determine whether particular orders were
5  suspicious orders?
6    A.   Not that I can recall.
7    Q.   Do you know if anyone went
8  back and looked at these logs to
9  determine whether diversion was
10  occurring?
11    A.   Not that I recall.
12    Q.   We're done with that
13  exhibit.
14            - - -
15        (Whereupon, Rite Aid-Wood
16      Exhibit-11,
17      Rite_Aid_OMDL_0012500-502, was
18      marked for identification.)
19            - - -
20  BY MR. POWERS:
21    Q.   I'm going to hand you what's
22  been marked as Exhibit-11.  The Bates
23  number on this exhibit is
24  Rite_Aid_OMDL_0012500 through 2502.

Page 212

1        What is the document in
2  front of you in Exhibit-11?
3    A.   The one is a list of the
4  exceptions to the threshold that we would
5  have posted throughout the pick area.
6    Q.   And when you say one is,
7  you're referring to the document
8  reflected in the Bates number 12501?
9    A.   Yes.
10    Q.   What else -- what is the
11  last page of Exhibit-11?
12    A.   These are Suphedrine, My Way
13  was some type of noncontrolled, and
14  levonorgestrel was also a noncontrolled,
15  but they still -- but we still limited
16  them.  And that is what -- how many of
17  those we could pick.
18        MR. LAVELLE:  There's some
19        highlighting on this document?
20        Was it on the original as it was
21        produced?  I know we had some
22        issues with document production.
23        I just want to confirm.
24        MR. POWERS:  I believe so,

Page 213

1  but we can check that.
2        MR. LAVELLE:  When we get
3        the final version of it, we'll
4        just want to make sure that it
5        says it was produced.  That's
6        fine.
7  BY MR. POWERS:
8    Q.   So is 12052 another document
9  you would have posted in the controlled
10  cage?
11    A.   Yes.
12    Q.   Where would you post the
13  documents on Pages 12501 and 12502 of
14  Exhibit-11 in the controlled cage?
15    A.   The pick area is comprised
16  of roughly ten sections, and there would
17  be one posted in every section.
18    Q.   When you say "posted," it
19  would just be a paper copy posted on the
20  wall?
21    A.   It would be in a plastic
22  sheet, and it would be zip tied to the
23  actual pick slot of -- the end of the
24  pick slot.

Page 214

1    Q.   On the first page of
2  Exhibit-11, it looks like it's an e-mail
3  from you to a bunch of people in 2013,
4  right?
5    A.   Yes.
6    Q.   Who are the people you're
7  sending this e-mail to?
8    A.   That's what I was trying
9  to -- Rebecca Strickland, I don't
10  remember her.  Marcie Bolling was an
11  assistant manager in the pharmacy.  Debra
12  Chase.  Jerome Rapski was a lead on the
13  night shift.  And Linda Stuart was a lead
14  on the night shift.
15        So Rebecca might have been a
16  night manager.  I don't remember.
17    Q.   And you say to that group,
18  Team, the threshold exception list has
19  changed.  See attached.  Please be sure
20  to let your associates know.
21        Do you see that?
22    A.   Yes.
23    Q.   So this document that you
24  posted in the cages would change

Page 215

1  occasionally; is that right?
2    A.   They would be updated
3  occasionally, yes.
4    Q.   How often would they be
5  updated, do you know?
6    A.   No, not really.
7    Q.   And besides e-mailing this
8  group and posting a new hardcopy in the
9  cage itself, how would you let the
10  pickers know that the threshold
11  exceptions have changed?
12    A.   It would be posted, and we
13  would tell them.  That's why we let all
14  the managers and the leads know that when
15  they have their start-of-shift meeting,
16  to let everyone know of the changes.
17    Q.   So you would let the
18  managers know and the managers would have
19  to let the pickers know; is that correct?
20    A.   Not necessarily.  In this
21  case, these were night shift people.  So
22  I let them know so they can let their
23  people know.
24        I let our managers know for

Page 216

1  their information.  And, usually, it
2  would be me or Debra that would inform
3  the employees.
4    Q.   When you say "inform the
5  employees," would you verbally inform the
6  employees?
7    A.   Yes.
8    Q.   At one of those morning
9  meetings?
10    A.   Yes.
11    Q.   Do you know if there was a
12  policy or procedure about how the
13  threshold exceptions were to be posted in
14  the cages?
15        MR. LAVELLE:  Object to
16  form.
17        THE WITNESS:  I'm not sure I
18  understand.
19  BY MR. POWERS:
20    Q.   Was there something in a
21  policy manual that said you had to post
22  these in hardcopy in the cages?
23    A.   I don't recall.
24    Q.   Was this something that you

Page 217

1  thought would just be a good idea to do?
2    A.   I don't recall.
3    Q.   We're done with that one.
4        - - -
5        (Whereupon, Rite Aid-Wood
6        Exhibit-12,
7        Rite_Aid_OMDL_0046566-567, was
8        marked for identification.)
9        - - -
10  BY MR. POWERS:
11    Q.   I'm going to hand you what's
12  been marked as Exhibit-12.  It's a
13  document Bates labeled
14  Rite_Aid_OMDL_0046566 to 46567.
15        It looks like Exhibit-12 is
16  an e-mail from Andrea Bucher, in 2013, to
17  you, copying Christopher Belli and Amy
18  Knisely, right?
19    A.   Yes.
20    Q.   And Ms. Bucher says, Marian,
21  we have reviewed the purchase dispensing
22  prescription records for the following
23  Rite Aid stores and recommended the
24  following threshold amounts.

Page 218

1 Do you see that?

2 A. Yes.

3 Q. And there's a chart

4 underneath that on the bottom of the

5 page, the first page of Exhibit-12,

6 right?

7 A. Yes.

8 Q. And it looks like there's

9 store numbers, item numbers, drugs, and

10 then there's two final columns for

11 current threshold and new threshold,

12 right?

13 A. Yes.

14 Q. So is Andrea Bucher telling

15 you what the new thresholds are for

16 particular stores that had exceptions to

17 the threshold?

18 MR. LAVELLE: Object to

19 form.

20 THE WITNESS: As it states

21 here, she is telling us this is

22 the purchase dispensing and

23 prescription records for these

24 stores.

Page 219

1 BY MR. POWERS:

2 Q. Where are the purchase

3 dispensing and prescription records for

4 the stores on Exhibit-12?

5 A. She would have sent them to

6 us, and we would have kept them in a

7 file.

8 Q. So along with this e-mail

9 where she's lowering or adjusting the

10 thresholds, she would have sent you the

11 backup documentation about why that

12 decision was being made?

13 A. She would send us the

14 documentation they used, yes.

15 Q. And what would you do with

16 that documentation?

17 A. We would put it in the file.

18 Q. What file?

19 A. The file for exceptions.

20 Q. So you had an exceptions

21 file; is that right?

22 A. For the stores that had

23 exceptions.

24 Q. So for the stores here in

Page 220

1 Exhibit-12, the store numbers listed,

2 those were stores that Perryman would

3 have picked for?

4 A. I believe. I can't say

5 absolutely these are all our store

6 numbers, but --

7 Q. So the stores that had

8 exceptions that the Perryman distribution

9 distributed for would have files with the

10 purchase dispensing and prescription

11 information in there?

12 A. Yes.

13 Q. Were those hardcopy files?

14 A. Excuse me. I don't know --

15 we didn't have a full file of everything.

16 We would have the summary reports that

17 they would print out to give us for our

18 files that showed that the store sales

19 warranted the exception.

20 Q. So you had files for each

21 store that had an exception that the

22 Perryman distribution center distributed

23 to, right?

24 A. No. We had one file with

Page 221

1 all of them in it.

2 Q. Okay. In that one file you

3 would have, say, let's see, the first

4 entry here, you would have the purchase

5 dispensing and prescription records for

6 Store 408 that justified the threshold

7 amounts for that store?

8 A. Yes.

9 Q. Where was that file of the

10 exceptions kept in the distribution

11 center?

12 A. The file was kept in the

13 filing cabinet in the DEA office.

14 Q. Was it kept only in

15 hardcopy?

16 A. It was only the paper.

17 Q. Why did the distribution

18 center need those records about the

19 purchase dispensing and prescription

20 records for those stores?

21 A. I believe -- I'm not sure if

22 it was the policy or if it was

23 something -- but we wanted to -- we

24 wanted to have the documents to justify a

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  store getting an increase.
2      Q.   Why did you want to have the
3  documents at the distribution center?
4          MR. LAVELLE:  Object to
5      form.
6          THE WITNESS:  I believe I
7      said -- I believe I said to -- to
8      justify them getting an exception.
9  BY MR. POWERS:
10     Q.   Why was it important that
11 you were able to justify them getting an
12 exception?
13         MR. LAVELLE:  Object to
14     form.  Objection.  Asked and
15     answered.
16         You can answer.
17         THE WITNESS:  We like to
18     keep documents as best we could.
19     And for some reason, I'm thinking
20     that -- I don't know if we had to,
21     I can't remember, but I know we
22     wanted to keep them here -- keep
23     them on the premises to show why
24     we had an increase.

Page 223

1  BY MR. POWERS:
2      Q.   Did the distribution center
3  employees make a decision -- make the
4  decision whether or not a store was
5  excepted from the blanket threshold?
6      A.   Excuse me?
7          MR. LAVELLE:  Object to
8      form.
9          THE WITNESS:  Can you repeat
10     that?
11 BY MR. POWERS:
12     Q.   Did the distribution center
13 make the decision whether or not a
14 particular store would get an exception
15 to the blanket threshold?
16     A.   No, sir.
17         MR. LAVELLE:  Object to
18     form.
19         THE WITNESS:  Pardon me.
20     That decision was made by
21     corporate through the reports that
22     they ran.
23 BY MR. POWERS:
24     Q.   And those are the purchase

Page 224

1  dispensing and prescription record
2  reports?
3      A.   It was a summary report that
4  they would run for us to keep for our
5  records.
6      Q.   Do you know how the
7  corporate employees made the decision
8  about whether to give a store an
9  exception to the threshold?
10     A.   I'm not sure, but I think I
11 answered this, that they go by the sales
12 of the store, the units that they sell or
13 need, and that is what determines whether
14 they get the exception.
15     Q.   And who would have been
16 making that decision at the corporate
17 office?
18     A.   That would have been Andrea
19 Bucher and/or Janet Hart.
20     Q.   Did the distribution center
21 employees have any input into whether a
22 store would receive a threshold increase
23 or adjustment?
24     A.   Not that I know of.

Page 225

1          Can I --
2      Q.   Go ahead.
3      A.   Can I verify something?  If
4  we -- if I saw a pattern of a store or
5  caught one -- called a store and they
6  said, I really need this, you're cutting
7  me back, then I would suggest they
8  contact Janet Hart.
9          So I, as being in the
10 distribution center, I'm not sure if that
11 qualifies for what you said, your last
12 question.
13     Q.   So do you know, then, if
14 stores directly contacted Janet Hart to
15 get threshold increases?
16     A.   They would have to contact
17 either their PDM or Janet Hart for the
18 increases.
19     Q.   And a "PDM" stands for what?
20     A.   Pharmacy development
21 manager.
22     Q.   Did you ever personally
23 recommend that a store should have its
24 threshold adjusted?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.   I would recommend to a store
2  to speak to them, if they needed an
3  adjustment.
4    Q.   When you say if a store
5  "needed an adjustment," what do you mean
6  by "needed an adjustment"?
7    A.   Needed an exception.
8    Q.   To increase the amount of
9  controlled substances they could get?
10   A.   Yes.
11   Q.   Did you ever ask why they
12 needed to increase the amount of
13 controlled substances that store could
14 get?
15   A.   I don't recall exactly.  I
16 do recall stores saying to me that, I'm
17 next to a clinic, and I'm getting
18 bombarded, things like that.
19       But I had no say-so.  I
20 would always direct them to their PDM or
21 Janet Hart.
22   Q.   In the top e-mail on
23 Exhibit-12, it looks like you were
24 replying to Andrea Bucher.

Page 227

1        And you say, Store 3151,
2  4125 and 4594 have been lowered to the
3  threshold.  They are no longer on the
4  exception list.
5        What does "lowered to the
6  threshold" mean?
7    A.   We have the thresholds for
8  the different pill -- unit containers,
9  and according to her new reports, these
10 stores are now picking at the normal, so
11 they're coming off of an exception.
12   Q.   How would you actually lower
13 the threshold there?
14   A.   They would come off the
15 list.
16   Q.   And is that the list we
17 looked at, Exhibit-11, that you posted in
18 the cage?
19   A.   We wouldn't lower the
20 threshold.  We would lower -- we would
21 take away the exception.
22   Q.   But when you say, been
23 lowered to the threshold on the exception
24 list, was there a physical exception list

Page 228

1  that you had or kept?
2        MR. LAVELLE:  Object to
3    form.
4        THE WITNESS:  We had the
5    exceptions listed on a -- on a
6    poster that was in a sheet,
7    plastic sheet, in each picking
8    section.
9  BY MR. POWERS:
10   Q.   And that's what we talked
11 about in Exhibit-11, right?  That's the
12 exception list you're talking about?
13   A.   Yes.
14   Q.   Was that kept anywhere else
15 besides the sheets posted in the cage?
16       MR. LAVELLE:  Object to
17   form.  Objection.  Asked and
18   answered repeatedly.
19       THE WITNESS:  I'm sorry,
20   what was your question?
21 BY MR. POWERS:
22   Q.   You post the exception list
23 in the cage, right?
24   A.   Yes.

Page 229

1    Q.   Did you keep that list
2  anywhere else besides posting the
3  hardcopy in the cage?
4        MR. LAVELLE:  Object to
5    form.  Objection.  Asked and
6    answered repeatedly.
7        THE WITNESS:  Answer?
8  BY MR. POWERS:
9    Q.   Yes.
10   A.   We kept it at every pick
11 location.  I believe we kept it also
12 posted by the computer.  We posted it by
13 the entrance to the storage area we had.
14 And we would keep the reports in a file
15 in the office.
16   Q.   Do you know how often the
17 thresholds would be reevaluated?
18       MR. LAVELLE:  Object to
19   form.  Objection.  Asked and
20   answered.
21       THE WITNESS:  I don't
22   recall.
23 BY MR. POWERS:
24   Q.   We're done with that

Page 230

1 Exhibit-12.
2           - - -
3           (Whereupon, Rite Aid-Wood
4      Exhibit-13, Rite_Aid_OMDL_0015219,
5      was marked for identification.)
6           - - -
7 BY MR. POWERS:
8      Q.   I'm going to hand you what's
9 been marked as Exhibit-13.  It's an
10 e-mail with the Bates label
11 Rite_Aid_OMDL_0015219.
12           So looking at Exhibit-13, it
13 looks to be two e-mails from you.  The
14 one on the bottom of the page here, the
15 first e-mail, was sent from you to Janet
16 Hart and Andrea Bucher on January 5th,
17 2012, correct?
18      A.   Yes.
19      Q.   And you say, Janet, I
20 thought it might be time to run these
21 stores again.
22           Do you see that?
23      A.   Yes.
24      Q.   Why did you think it would

Page 231

1 be time to run the stores again?
2      A.   Just -- I'm not sure.
3 Probably because I wanted to make sure
4 that we keep checking on them.
5      Q.   Why did you want to make
6 sure you keep checking on them?
7           MR. LAVELLE:  Object to
8      form.  Objection.  Asked and
9      answered.
10           THE WITNESS:  I just wanted
11      to make sure that, you know, we
12      had -- things change, and I wanted
13      to stay as current and updated as
14      possible.
15 BY MR. POWERS:
16      Q.   And when you say that you
17 thought it might be time to run these
18 stores again, you're talking about
19 running the report to see if they
20 warranted threshold exceptions, right?
21           MR. LAVELLE:  Object to
22      form.
23           THE WITNESS:  Either warrant
24      the exceptions or remove the

Page 232

1 exception.
2 BY MR. POWERS:
3      Q.   And it looks like at the top
4 that you send another e-mail, again to
5 Andrea Bucher, this time on February
6 20th, 2012, that says, Andrea, did you
7 run these stores for me?  This data is
8 almost a year old.
9           Do you see that?
10      A.   Yes.
11      Q.   So you're saying there that
12 they have not reevaluated these
13 thresholds in almost a year, right?
14           MR. LAVELLE:  Object to
15      form.
16           THE WITNESS:  That's what it
17      says here.
18 BY MR. POWERS:
19      Q.   And were you worried that
20 these stores were receiving increased
21 amounts for almost a year without having
22 reevaluated the need for those increased
23 amounts?
24           MR. LAVELLE:  Object to

Page 233

1      form.
2           THE WITNESS:  Not
3      necessarily.  I wanted to make
4      sure that we kept on top of it and
5      that we kept as current and as
6      accurate records as possible.
7 BY MR. POWERS:
8      Q.   But it looks like Andrea
9 Bucher wasn't keeping as current and
10 accurate as possible, right?
11           MR. LAVELLE:  Object to
12      form.
13           THE WITNESS:  I can't say
14      that.
15 BY MR. POWERS:
16      Q.   I mean, you say the data is
17 almost a year old.
18           Isn't that not up to date?
19      A.   I don't know what up to date
20 is.  I don't remember if we had a time
21 limit.  I don't remember.
22      Q.   But it sounds like from this
23 top e-mail that you're concerned that the
24 data was a year old, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1     MR. LAVELLE: Object to
2  form.
3     THE WITNESS: I wasn't
4  concerned as if anything was
5  wrong. I just wanted to -- I just
6  wanted to try to keep current
7  records.
8  BY MR. POWERS:
9     Q.   Should Andrea Bucher have
10 been running these reports more
11 frequently?
12    MR. LAVELLE: Object to
13 form. Objection. Asked and
14 answered.
15    THE WITNESS: That's not for
16 me to say.
17 BY MR. POWERS:
18    Q.   In your opinion, should she
19 have been running these reports more
20 than -- more frequently than she was?
21    MR. LAVELLE: Object to
22 form. Objection. Asked and
23 answered repeatedly.
24    THE WITNESS: It's not for

Page 235

1  me to say.
2  BY MR. POWERS:
3     Q.   I'm not asking for anything
4  more than just your personal opinion,
5  whether these reports should have been
6  run more frequently than they were being
7  run.
8     MR. LAVELLE: Wait. He
9  hasn't asked a question. He's
10 just explaining what he's doing,
11 which is asking the same question
12 over and over again.
13    When he asks a question,
14 maybe you can answer it.
15 BY MR. POWERS:
16    Q.   So in your personal opinion,
17 should Andrea Bucher have been running
18 the threshold adjustment reports more
19 frequently than she was?
20    MR. LAVELLE: Object to
21 form. Objection. This is the
22 third time you've asked the same
23 question.
24    THE WITNESS: It's not for

Page 236

1  me to say.
2  BY MR. POWERS:
3     Q.   Who is it -- who is to say
4  that?
5     A.   I'm not really sure.
6     Q.   You were the DEA
7  coordinator, right?
8     A.   Yes.
9     Q.   You don't have an opinion on
10 whether the threshold exceptions for
11 controlled substances should have been
12 run more frequently than every year?
13    MR. LAVELLE: Object to
14 form. Objection. The fourth time
15 this question has been asked.
16    THE WITNESS: It's not for
17 me to say.
18    MR. POWERS: We can take a
19 break here.
20    VIDEO TECHNICIAN: The time
21 is now 2:44 p.m. We're going off
22 the record.
23       - - -
24    (Whereupon, a brief recess

Page 237

1  was taken.)
2       - - -
3     VIDEO TECHNICIAN: The time
4  is now 3:01 p.m. We are back on
5  the record.
6       - - -
7     (Whereupon, Rite Aid-Wood
8  Exhibit-14,
9  Rite_Aid_OMDL_0017238-242, was
10 marked for identification.)
11       - - -
12 BY MR. POWERS:
13    Q.   Welcome back, Ms. Wood.
14    I'm going to hand you what's
15 been marked as Exhibit-14. It is Bates
16 stamped number Rite_Aid_OMDL_0017238
17 through 17242.
18    Are you familiar with the
19 e-mail string represented in Exhibit-14?
20    A.   Yes, from what I just read.
21    Q.   When was the last time you
22 saw this e-mail string?
23    A.   The last time I saw this, I
24 saw some of it through my lawyer.

Page 238

1     Q.   And you're pointing to Mr.
2 Lavelle there?
3     A.   Yes, I'm sorry.
4     Q.   Going to the second-to-last
5 page of Exhibit-14, the Bates number 241,
6 it looks like this is an e-mail from
7 Pam --
8     A.   Mueller.
9     Q.   -- Mueller, is that how you
10 say it?
11         Who was Pam Mueller?
12     A.   She was the replenishment
13 buyer for pharmacy.
14     Q.   Did she work out of the
15 distribution center, or somewhere else?
16     A.   She worked out of corporate.
17     Q.   And she says in her e-mail,
18 All, please be advised the following MDs
19 have been created for distribution of
20 hydro/APAP.
21         Do you see that?
22     A.   Yes.
23     Q.   What is an "MD"?
24     A.   In this reference, I believe

Page 239

1 it's mass distribution.
2     Q.   What is a mass distribution?
3     A.   That's when they have,
4 like -- this is, like -- this is the only
5 one I remember ever seeing for the cage.
6         But say they get a new --
7 it's something new, they want to get it
8 in every store. It's a mass
9 distribution.
10     Q.   And it looks like this was a
11 mass distribution for hydro/APAP, right?
12     A.   Yes.
13     Q.   And then there's a little
14 chart there, and it has a couple of
15 different columns. And the column all
16 the way to the right says, AWP.
17         Do you see where I'm at?
18     A.   Yes.
19     Q.   What does "AWP" stand for?
20     A.   By the looks of it, it looks
21 like a price of some kind. But I
22 can't -- I don't know what AWP
23 specifically stands for.
24     Q.   So what happens with a mass

Page 240

1 distribution?
2     A.   The system would generate
3 orders, they would be picked and they
4 would sent to the stores.
5     Q.   So the mass distribution
6 refers to sending particular product from
7 the distribution center to the stores; is
8 that correct?
9     A.   To many stores, yes.
10     Q.   When you say "many stores,"
11 is that more than usual?
12     A.   The "mass" represents the
13 fact you want to try to get it, most
14 times, to every store, depending.
15         It's also a phrase when you
16 want to get something out.
17     Q.   So this was a mass
18 distribution to all the stores for
19 hydro/APAP, right?
20     A.   I don't know that. I'd have
21 to --
22     Q.   Isn't that what it says here
23 on the first page, MDs have been created
24 for the distribution of hydro/APAP?

Page 241

1     A.   Yes. But it doesn't say how
2 many stores.
3     Q.   I thought you said that the
4 mass distribution goes to all the stores?
5         MR. LAVELLE: Object to
6   form.
7         THE WITNESS: As I thought I
8   said, for the cage I had never
9   seen them before. But in the
10   distribution center, that's the
11   purpose.
12         But MD, it's kind of like a
13   catch phrase for a distribution.
14 BY MR. POWERS:
15     Q.   So when the mass
16 distribution came to the Perryman
17 distribution center, how was that
18 different than a regular order that came
19 in?
20     A.   I don't understand.
21     Q.   So you're saying a mass
22 distribution is not a regular ordering
23 process, right?
24     A.   No, it -- it's a -- it's a

Page 242

1 distribution, it's not necessarily
2 ordering.
3 Q. So the stores haven't
4 necessarily ordered the products that
5 you're shipping with the mass
6 distribution; is that right?
7 A. From what I know, it's
8 generated, usually, by the replenishment
9 team for what they want to get to the
10 stores.
11 Q. Do you know why this mass
12 distribution of hydro/APAP was generated
13 in 2011?
14 A. Reading this, it's saying
15 because the industry shortages.
16 Q. Why would you have a mass
17 distribution if there are industry
18 shortages?
19 A. I'm not sure I'm qualified
20 to answer that. That would be a
21 replenishment.
22 Q. You mean someone in the
23 replenishment department would have to
24 answer that question?

Page 243

1 A. Would know the answer.
2 Q. And then it looks like, in
3 this e-mail chain, you respond on the
4 page 7239, down there at the bottom, and
5 you say, Janet, I understand this to mean
6 that we are to ignore our threshold
7 policy for this item based on sales from
8 one store.
9 Do you see that?
10 A. Yes.
11 Q. So the mass distribution is
12 causing you to send product that is above
13 the threshold, right?
14 MR. LAVELLE: Object to
15 form.
16 THE WITNESS: I'm not sure
17 it was above the threshold.
18 BY MR. POWERS:
19 Q. You said, I understand this
20 to mean that we are to ignore our
21 threshold policy based -- on this item,
22 based on sales from one store, right?
23 MR. LAVELLE: Object to
24 form.

Page 244

1 THE WITNESS: I believe --
2 at the time, I did -- I was just
3 saying that we're to ignore our
4 policy. But I really -- I'm not
5 sure I knew the quantity. So I
6 was just --
7 BY MR. POWERS:
8 Q. So how did you know you were
9 ignoring the policy, then?
10 A. I'm trying to figure out why
11 I said that.
12 I guess at the time I
13 thought we were, and that's why I sent
14 that.
15 Q. And it looks like you were
16 not the only one who was concerned about
17 ignoring the threshold policy, because in
18 the next sentence, you say, Kevin is
19 unavailable and Kim, Barbara and I are
20 concerned about this.
21 Do you see that?
22 A. Yes.
23 Q. Who is Kim that you refer to
24 in that sentence?

Page 245

1 A. I believe that's Kim
2 Birklin.
3 Q. And she's another DEA
4 coordinator, right?
5 A. Yes.
6 Q. How about Barbara, who is
7 that in this sentence?
8 A. Barbara Lusaro in
9 California.
10 Q. And she's also a DEA
11 coordinator?
12 A. I believe so.
13 Q. So three DEA coordinators
14 are concerned about this mass
15 distribution ignoring the threshold
16 policy, right?
17 MR. LAVELLE: Object to
18 form.
19 THE WITNESS: We were
20 concerned that we didn't want to
21 go against the policy, and we
22 wanted to bring it to their
23 attention.
24 BY MR. POWERS:

Page 246

1    Q.   But Janet Hart responds, in
2  the e-mail above that, in the last three
3  lines, At present, please ship the
4  quantities identified by pharmacy
5  purchasing to the select group of
6  pharmacies.  The orders should not be cut
7  back.  This is a one-time purchase of the
8  500-tablet size.  The next shipment will
9  be the 100-packet size.
10       Right?
11   A.   Yes.
12   Q.   So Janet is ignoring your
13  concerns about this?
14       MR. LAVELLE:  Object to
15  form.
16       THE WITNESS:  I'm not sure
17  how to put this.
18       Not necessarily.  At that
19  point, she was stating things that
20  I might not have known.
21  BY MR. POWERS:
22   Q.   But she does not say that
23  she's concerned about this, right?
24       MR. LAVELLE:  Object to

Page 247

1  form.
2       THE WITNESS:  I can't answer
3  for her.
4  BY MR. POWERS:
5    Q.   In this e-mail, she does not
6  say that she is concerned, as you are,
7  right?
8    A.   It does not say that here.
9    Q.   You respond, in the top
10  e-mail on Page 17239, Janet, as always, I
11  am going to be the fly in the ointment.
12  I don't understand why we have to send
13  them all 16 at once, can't they get more
14  next week?  I have a problem with being
15  partially compliant on purpose.
16       Do you see that?
17   A.   Yes.
18   Q.   So you understood this to be
19  not compliant with the ordering policies
20  and shipping distribution policies,
21  right?
22       MR. LAVELLE:  Object to
23  form.
24       THE WITNESS:  I believe here

Page 248

1  what I was questioning is sending
2  that quantity.  But I'm really not
3  sure what that quantity -- what
4  store -- what of my stores were
5  going to get what quantity.
6  BY MR. POWERS:
7    Q.   But it's your understanding,
8  from what Janet is telling you to do,
9  that that would be only partially
10  compliant with the policies of Rite Aid,
11  right?
12       MR. LAVELLE:  Object to
13  form.
14       THE WITNESS:  That's what I
15  wrote here.
16  BY MR. POWERS:
17   Q.   But then you agree to do it,
18  anyway, right?
19       Because you say, We will
20  send according to MD going forward,
21  right?
22   A.   Yes.
23       MR. POWERS:  I think that's
24  all I have.  We can go off the

Page 249

1  record.
2       VIDEO TECHNICIAN:  The time
3  is now 3:15 p.m.  We are going off
4  the record.
5       - - -
6       (Whereupon, a brief recess
7  was taken.)
8       - - -
9       VIDEO TECHNICIAN:  The time
10  is now 3:32 p.m.  We are back on
11  the record.
12       - - -
13       EXAMINATION
14       - - -
15  BY MR. LAVELLE:
16   Q.   Good afternoon, Ms. Wood.
17  John Lavelle, representing Rite Aid.
18       I just have one particular
19  document I wanted to ask you a few
20  questions about, if I may.
21   A.   Yes, sir.
22   Q.   I want to show you what we
23  marked for identification as Exhibit
24  Wood-15.

Page 250

```
1              - - -
2         (Whereupon, Rite Aid-Wood
3    Exhibit-15,
4    Rite_Aid_OMDL_0015077-081, was
5    marked for identification.)
6              - - -
7  BY MR. LAVELLE:
8    Q.   Please take a look at that
9  and let me know when you're ready to
10 answer a couple questions about it.
11       MS. HOSMER:  Mr. Lavelle,
12   can you read the Bates number,
13   please?
14       MR. LAVELLE:  Yes, I'm
15   sorry, I should have done that.
16   It's Rite_Aid_OMDL_0015077 through
17   15081.
18 BY MR. LAVELLE:
19   Q.   Ms. Wood, are you ready to
20 answer some questions about this?
21   A.   Yes.
22   Q.   I've put in front of you
23 what we marked for identification as
24 Wood-15.  I just gave the Bates Number
```

Page 251

```
1  range.  And it's an e-mail chain with an
2  attachment.
3        Do you recognize this?
4    A.   Yes.
5    Q.   Did you have an e-mail
6  address, at Rite Aid, of
7  ████████ @riteaid.com?
8    A.   I believe.
9    Q.   Who is Kimberly Birklin?
10   A.   Kim was the DEA coordinator
11 at Liverpool DC, I think.
12   Q.   All right.
13   A.   Is it on here?
14   Q.   Since this is an e-mail
15 chain, let's go -- read it from bottom to
16 top, if we can.
17   A.   Liverpool.
18   Q.   So the bottom e-mail appears
19 to be from Ms. Birklin to you, dated
20 Monday, February 22nd, 2010.
21        Do you see that?
22   A.   Yes.
23   Q.   What does Ms. Birklin ask
24 you in this e-mail?
```

Page 252

```
1    A.   That she's working on her
2  SOP for excessive order monitoring, that
3  she already has logs in place, but she
4  wanted to compare what I have against
5  what she has.
6    Q.   Did you respond to Ms.
7  Birklin?
8    A.   Yes, I did.
9    Q.   There's an e-mail
10 immediately above the one that we just
11 looked at from you to Ms. Birklin.
12        Do you see that?
13   A.   Yes.
14   Q.   What did you say in your
15 response to Ms. Birklin?
16   A.   That I attached our policy
17 and that hers was more detailed and
18 building specific, and I also need to add
19 the procedure for exceptions.
20   Q.   Then you have another e-mail
21 at the top of this chain.
22        Do you see that?
23   A.   Yes.
24   Q.   And what did you say to Ms.
```

Page 253

```
1  Birklin in that e-mail?
2    A.   That I made some adjustments
3  to our order -- excessive order
4  monitoring procedure and that it was
5  attached.
6    Q.   All right.  And there is an
7  attachment to this e-mail; is that right?
8    A.   Yes.
9    Q.   Can you see from the e-mail
10 what the date was that you prepared this
11 attachment?
12   A.   It was revised on 2/2008.
13   Q.   No, I'm looking at the
14 e-mail.
15   A.   Oh, I'm sorry.
16   Q.   Can you look at the e-mail,
17 please?
18        What is the title of the
19 attachment?
20   A.   Above-average order
21 monitoring procedure.  And it was on
22 2/20/2010.
23   Q.   I see, under the received,
24 it says, Procedures - above-average order
```

1 monitoring procedure 2.10.doc.
2       Do you see that?
3    A.   Yes.
4    Q.   Do you understand what .doc
5 means when it refers to an attachment?
6 Is that a document?
7    A.   I don't think I do -- yes, I
8 believe so, a document.
9    Q.   Let's look at the attachment
10 to this e-mail. And it has a top on it
11 that says, Controlled drug above-average
12 order monitoring program.
13       Do you have that in front of
14 you?
15    A.   Yes.
16    Q.   Do you recognize this
17 document?
18    A.   Yes.
19    Q.   Did you prepare this?
20    A.   I believe so, yes.
21    Q.   Why did you prepare this?
22    A.   This was a procedure for
23 order monitoring.
24    Q.   We looked at another version

1 of this same document earlier during this
2 same deposition, did we not?
3    A.   Yes.
4    Q.   And what is marked as
5 Exhibit-4.
6       Do you remember being shown
7 that by plaintiffs' counsel and him
8 asking you questions about that?
9    A.   I remember seeing -- him
10 showing me one, yes.
11    Q.   So let's take a look at this
12 document. And I want to draw your
13 attention particularly to the section at
14 the bottom of this first page.
15       Do you see the paragraph
16 that starts with, When picking?
17       Do you see that?
18    A.   Yes.
19    Q.   Would you please read to the
20 members of the jury what you wrote here
21 in that paragraph?
22       MR. POWERS:  Objection.
23 Form.
24       MR. LAVELLE:  You can go

1 ahead.
2       THE WITNESS:  When picking,
3 if the quantity is below the
4 threshold, yet seems high or
5 unusual, the associate will, A,
6 call the store to verify the
7 quantity is accurate; or, B, pick
8 order complete and have the lead
9 designate or DEA coordinator
10 contact the store; C, if the
11 quantity is an error, notify the
12 store they will receive a credit
13 for the units picked that were not
14 shipped; and, D, the lead DEA
15 coordinator will fill out the
16 proper store credit forms and
17 submit to customer service.
18 BY MR. LAVELLE:
19    Q.   Now, what you just read to
20 us, is that a procedure that was followed
21 at the Perryman distribution center?
22    A.   We were doing this. And
23 when I was going over everything with
24 Kim, I realized that it wasn't in

1 writing. So that's why I updated it, so
2 that it would be in writing.
3    Q.   All right. So would it be
4 fair to say, then, that this was not a
5 new procedure when you wrote it in here
6 but was actually an established
7 procedure; is that right?
8       MR. POWERS:  Objection to
9 form.
10       THE WITNESS:  Sorry.
11 BY MR. LAVELLE:
12    Q.   Do you want me to repeat the
13 question?
14    A.   Please.
15    Q.   Let me repeat the question.
16       Was this a new procedure
17 when you wrote it up in February 2010?
18    A.   No.
19    Q.   So why did you add it to the
20 description in February 2010?
21    A.   Because it was something we
22 were practicing, and I wanted to make
23 sure we did put it on the procedure.
24    Q.   And for how far back in time

Page 258

1  is what we just read, that "when picking"
2  paragraph, is that an accurate
3  description of what you were doing at the
4  Perryman distribution center?
5       A.   Pretty much as long as I can
6  remember.
7       MR. LAVELLE:  Thank you, Ms.
8  Wood.  That's all I have.
9       MR. POWERS:  I'm just going
10  to have a few follow-up questions.
11  I think we need to switch seats
12  again.
13       VIDEO TECHNICIAN:  The time
14  is now 3:39 p.m.  We are going off
15  the record.
16       - - -
17       (Whereupon, a discussion off
18  the record occurred.)
19       - - -
20       VIDEO TECHNICIAN:  The time
21  is now 3:40 p.m.  We are back on
22  the record.
23       - - -
24       EXAMINATION

Page 259

1       - - -
2  BY MR. POWERS:
3       Q.   So, Ms. Wood, your counsel
4  was just going through Exhibit-15 with
5  you, right?
6       A.   Yes.
7       Q.   And it looks like the first
8  two pages of Exhibit-15 are e-mails
9  between yourself and Kimberly Birklin,
10  right?
11       A.   Yes.
12       Q.   And it looks like Kimberly
13  Birklin, in the first e-mail on the
14  bottom of the first page of Exhibit-15,
15  she's asking for your input about how she
16  should design her SOPs for excessive
17  order monitoring, right?
18       A.   Actually, she's just asking
19  to compare it to mine.
20       Q.   So she's asking to see the
21  Perryman SOPs for excessive order
22  monitoring in order to draw up her SOPs
23  for excessive order monitoring, right?
24       MR. LAVELLE:  Object to

Page 260

1  form.
2       THE WITNESS:  She was
3  working on her SOPs.  And, yes,
4  she wanted to compare it to ours.
5  BY MR. POWERS:
6       Q.   So you were working with
7  other DEA coordinators at different
8  distribution centers to put together SOPs
9  on excessive order monitoring, right?
10       MR. LAVELLE:  Object to
11  form.
12       THE WITNESS:  No.
13  BY MR. POWERS:
14       Q.   Why is that incorrect?
15       A.   I'm not working with her to
16  put together.  I already had one.  And
17  she was just asking me -- I believe that
18  Liverpool was new to the company, and I
19  believe she was just wanting to get
20  the -- what I had to compare to hers, to
21  make sure that it was what she wanted.
22       Q.   And it looks like in the
23  e-mail in the middle of the page there on
24  Exhibit-15, you say that the Liverpool

Page 261

1  SOPs on excessive order monitoring are
2  more detailed and building specific.
3       Do you see that?
4       A.   Yes.
5       Q.   So you were reviewing the
6  Liverpool SOPs on excessive order
7  monitoring, right?
8       A.   I only looked at what she
9  sent me.
10       Q.   But what she sent you was
11  the Liverpool SOPs on excessive order
12  monitoring?
13       A.   I believe.
14       Q.   So it's fair to say, then,
15  that you were exchanging the SOP policies
16  on excessive order monitoring between the
17  different distribution centers, right?
18       A.   We were exchanging --
19  there's a company policy.  We -- as
20  discussed before, we have it as a
21  training tool format.  And I believe
22  that's what she was doing as well.
23       Q.   But you were working with
24  her to help her put together her SOPs on

Page 262

1 excessive order monitoring, right?
2       MR. LAVELLE:  Object to
3   form.  Objection.  Asked and
4   answered.
5       THE WITNESS:  I don't feel I
6   was helping her.  I was just
7   showing her what I had.
8 BY MR. POWERS:
9   Q.   And she showed you what she
10 had with regards to excessive order
11 monitoring SOPs, right?
12      MR. LAVELLE:  Object to
13  form.  Objection.  Asked and
14  answered.
15      THE WITNESS:  Yes.
16      MR. POWERS:  That's all I
17  have.
18
19
20
21
22
23
24

Page 263

1       VIDEO TECHNICIAN:  The time
2   is now 3:43 p.m.  This concludes
3   today's deposition.  We're going
4   off the record.
5       - - -
6       (Whereupon, the deposition
7   concluded at 3:43 p.m.)
8       - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 264

1       CERTIFICATE
2
3
4       I HEREBY CERTIFY that the
5   witness was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
11  Amanda Maslynsky-Miller
12  Certified Realtime Reporter
13  Dated:  January 27, 2019
14
15
16
17
18
19      (The foregoing certification
20  of this transcript does not apply to any
21  reproduction of the same by any means,
22  unless under the direct control and/or
23  supervision of the certifying reporter.)
24

Page 265

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8       After doing so, please sign
9   the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 266

```
1        - - - - - -
2       E R R A T A
3        - - - - - -
4  PAGE  LINE  CHANGE/REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Page 268

```
1      LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Page 267

```
1     ACKNOWLEDGMENT OF DEPONENT
2
3         I,_____, do
4  hereby certify that I have read the
5  foregoing pages,  1 - 263, and that the
6  same is a correct transcription of the
7  answers given by me to the questions
8  therein propounded, except for the
9  corrections or changes in form or
10 substance, if any, noted in the attached
11 Errata Sheet.
12
13 _____
14 MARIAN WOOD          DATE
15
16
17 Subscribed and sworn
18 to before me this
19 _____ day of _____, 20____.
20
   My commission expires:_____
21
22 _____
   Notary Public
23
24
```