Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4                       - - -

 5   IN RE:  NATIONAL            :

     PRESCRIPTION               :   MDL No. 2804

 6   OPIATE LITIGATION          :

     _____ :   Case No.

 7                              :   1:17-MD-2804

     THIS DOCUMENT RELATES      :

 8   TO ALL CASES               :   Hon. Dan A. Polster

 9                       - - -

10              HIGHLY CONFIDENTIAL

11     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

                         - - -

13

14        Videotaped deposition of LAURIE A. ZACCARO,

15   held at the offices of Buckley King, 1400 Fifth

16   Third Center, 600 Superior Avenue East, Cleveland,

17   Ohio  44114, on Wednesday, January 16, 2019,

18   commencing at 8:58 a.m., before Carol A. Kirk,

19   Registered Merit Reporter and Notary Public.

20

21                       - - -

22

23            GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com
```

```
 1                    A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3         LEVIN PAPANTONIO THOMAS MITCHELL
           RAFFERTY & PROCTOR P.A.
 4         BY:  JEFF GADDY, ESQUIRE
                 jgaddy@levinlaw.com
 5              LAURA DUNNING, ESQUIRE
                 ldunning@levinlaw.com
 6                (via teleconference and live stream)
           316 South Baylen Street, Suite 600
 7         Pensacola, Florida  32591
           205-435-7000
 8
 9    On behalf of Walgreens:
10         BARTLIT BECK LLP
           BY:  MARK L. LEVINE, ESQUIRE
11              mark.levine@bartlitbeck.com
           54 West Hubbard Street
12         Chicago, Illinois  60654
           312-494-4400
13
14    On behalf of Cardinal Health, Inc.:
15         PORTER WRIGHT MORRIS & ARTHUR LLP
           BY:  JILL G. OKUN, ESQUIRE
16              jokun@porterwright.com
           950 Main Avenue, Suite 500
17         Cleveland, Ohio  44113
           216-443-9000
18
19    On behalf of AmerisourceBergen Corporation:
20         JACKSON KELLY PLLC
           BY:  ANDREW N. SCHOCK, ESQUIRE
21              anschock@jacksonkelly.com
           50 South Main Street, Suite 201
22         Akron, Ohio  44308
           330-252-9060
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of Walmart:
 2         JONES DAY
           BY:  KRISTIN S.M. MORRISON, ESQUIRE
 3             kmorrison@jonesday.com
           901 Lakeside Avenue East
 4         Cleveland, Ohio  44114
           216-586-3939
 5
 6   On behalf of Endo Pharmaceuticals, Inc.,
     Endo Health Solutions, Inc., and Par Pharmaceutical
 7   Companies, Inc.:
 8         ARNOLD & PORTER KAYE SCHOLER, LLP
           BY:  ZENO HOUSTON, ESQUIRE
 9             zeno.houston@arnoldporter.com
                  (via videoconference and live stream)
10         250 West 55th Street
           New York, New York  10019
11         212-836-8000
12
13
14   ALSO PRESENT:
15      Katie Mayo, Levin Papantonio
        Rick Christian, Trial Technician
16      Frank Stanek, Videographer
17
18
19
20
21
22
23
24
```

```
 1        VIDEOTAPED DEPOSITION OF LAURIE A. ZACCARO

 2                  INDEX TO EXAMINATION

 3    WITNESS                                        PAGE

 4    LAURIE A. ZACCARO

 5        CROSS-EXAMINATION BY MR. GADDY:              10

          REDIRECT EXAMINATION BY MR. LEVINE         265

 6        RECROSS-EXAMINATION BY MR. GADDY:          277

          FURTHER REDIRECT EXAMINATION BY MR. LEVINE:  283

 7        FURTHER RECROSS-EXAMINATION BY MR. GADDY:   284

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF LAURIE A. ZACCARO
 2                  INDEX TO EXHIBITS
 3    WALGREENS-ZACCARO      DESCRIPTION               PAGE
 4    Walgreens-Zaccaro 1   Resume of Laurie A.         23
                            Zaccaro, P-WAG-02414
 5                          through 02414
 6    Walgreens-Zaccaro 2   E-mail to Store Mgr.        42
                            04202 from Ms. Zaccaro,
 7                          dated 4/22/2010,
                            Bates-stamped
 8                          WAGMDL00700993
 9    Walgreens-Zaccaro 3   E-mail chain ending with    65
                            an e-mail to Ms. Zaccaro
10                          from Store RxM 03310,
                            dated 8/9/2012, Bates-
11                          stamped WAGMDL00700314
                            through 700315
12
      Walgreens-Zaccaro 4   E-mail chain ending with    73
13                          an e-mail to Ms. Zaccaro
                            from Mr. Soder, dated
14                          8/10/2012, Bates-stamped
                            WAGMDL00700311 and 700312
15
      Walgreens-Zaccaro 5   E-mail chain to Messrs.      75
16                          Soder and Lucchetti from
                            Ms. Zaccaro, dated
17                          10/10/11, Bates-stamped
                            WAGMDL00700974 and 700975
18
      Walgreens-Zaccaro 6   HathiTrust document,        82
19                          Bates-stamped P-GEN-0047
20    Walgreens-Zaccaro 7   E-mail chain ending with   101
                            an e-mail to Ms. Foster
21                          from Ms. Zaccaro, dated
                            4/9/2013, with
22                          attachment, Bates-stamped
                            WAGMDL00674545 through
23                          674549
24
```

```
 1              INDEX TO EXHIBITS (CONT'D)
 2   WALGREENS-ZACCARO       DESCRIPTION            PAGE
 3   Walgreens-Zaccaro 8     E-mail chain ending with   115
                             an e-mail to Ms. Zaccaro
 4                           from Mr. Mormello, dated
                             7/10/2013, Bates-stamped
 5                           WAGMDL007000032 through
                             70060
 6
     Walgreens-Zaccaro 9     E-mail from Mail Rx,        129
 7                           dated 6/11/2012, with
                             attachment, Bates-stamped
 8                           WAGMDL00742641 through
                             742671
 9
     Walgreens-Zaccaro 10    Organizational chart for   143
10                           the Loss Prevention
                             Department, Bates-stamped
11                           WAGMDL00387633 and 387634
12   Walgreens-Zaccaro 11    E-mail to Mr. Lemmons       165
                             from Mr. Amos, dated
13                           1/18/2011, with
                             attachment, Bates-stamped
14                           WAGFLDEA00000867 through
                             871
15
     Walgreens-Zaccaro 12    E-mail chain ending with   171
16                           an e-mail from
                             Ms. Zaccaro, dated
17                           6/21/2012, Bates-stamped
                             WAGMDL00700940 through
18                           700942
19   Walgreens-Zaccaro 13    E-mail chain ending with   185
                             an e-mail from
20                           Ms. Zaccaro, dated
                             7/11/2007, Bates-stamped
21                           WAGMDL00701013 through
                             701016
22
     Walgreens-Zaccaro 14    Document titled            199
23                           "Intercepted/ Suspicious
                             Store Orders, Bates-
24                           stamped WAGMDL00491863
```

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   WALGREENS-ZACCARO      DESCRIPTION              PAGE

 3   Walgreens-Zaccaro 15  Documents Bates-stamped   205
                           WAGMDL00674562 through
 4                         674575

 5   Walgreens-Zaccaro 16  E-mail to Loss Prevention 212
                           Operations from
 6                         Mr. Jones, dated
                           12/31/2012, Bates-stamped
 7                         WAGMDL00700240 through
                           700241
 8
     Walgreens-Zaccaro 17  E-mail chain ending with  219
 9                         an e-mail to Ms. Bish
                           from Ms Diebert, dated
10                         3/25/2013, Bates-stamped
                           WAGMDL00092708 through
11                         92709

12   Walgreens-Zaccaro 18  E-mail chain ending with  228
                           an e-mail to Mr. Soder
13                         from Mr. Mills, dated
                           8/14/2013, Bates-stamped
14                         WAGMDL00095568 and 95569

15   Walgreens-Zaccaro 19  Spreadsheet Bates-stamped 235
                           WAGMDL00400358
16
     Walgreens-Zaccaro 20  U.S. Department of        241
17                         Justice/Drug Enforcement
                           Administration Subpoena,
18                         Bates-stamped
                           WAGMDL0093694 through
19                         493718

20   Walgreens-Zaccaro 21  E-mail to Loss Prevention 243
                           Operations from
21                         Mr. Svihra, dated
                           2/8/2013, Bates-stamped
22                         WAGMDL00700236 and 700237

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBIT (CONT'D)

 2    WALGREENS-ZACCARO      DESCRIPTION           PAGE

 3    Walgreens-Zaccaro 22  Document titled "DLPM   249

                            Goal Performance Rating

 4                          Guidelines," Bates-

                            stamped WAGMDL00709450

 5                          through 709469

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    - - -

2              P R O C E E D I N G S

3                    - - -

4              THE VIDEOGRAPHER:  We are now on

5        the record.  My name is Frank Stanek.  I

6        am a videographer for Golkow Litigation

7        Services.  Today's date is January 16,

8        2019, and the time is 8:58 a.m.

9              This video deposition is being

10       held in Cleveland, Ohio in re of

11       National Prescription Opiate Litigation

12       for the United States District Court for

13       the Northern District of Ohio, Eastern

14       Division.

15             The deponent is Laurie Zaccaro.

16             Will counsel please identify

17       themselves for the record.

18             MR. GADDY:  Jeff Gaddy with Levin

19       Papantonio for the Plaintiffs.

20             MR. LEVINE:  Mark Levine on behalf

21       of Walgreens and the witness.

22             MS. MORRISON:  Kristin Morrison

23       from Jones Day on behalf of Walmart.

24             THE COURT REPORTER:  Is there

```
 1              anyone on the phone?

 2                   THE VIDEOGRAPHER:  And the court

 3              reporter is Carol Kirk and will now

 4              swear in the witness.

 5                        - - -

 6                   LAURIE A. ZACCARO

 7     being by me first duly sworn, as hereinafter

 8     certified, deposes and says as follows:

 9                   CROSS-EXAMINATION

10     BY MR. GADDY:

11          Q.    Good morning, Ms. Zaccaro.

12          A.    Good morning.

13          Q.    Could you state your name for us,

14     please.

15          A.    Laurie Zaccaro.

16          Q.    And you work at Walgreens,

17     correct?

18          A.    Yes, I do.

19          Q.    Okay.  How long have you been with

20     Walgreens?

21          A.    Twelve years.

22          Q.    As a function of your job with

23     Walgreens, have you ever had to give testimony

24     like this before?
```

```
 1              A.    Yes.

 2              Q.    Okay.  In a deposition context or

 3    trial or both?

 4              A.    Deposition.

 5              Q.    Okay.  In what context was that?

 6              A.    It was with regards to safety and

 7    security concerns in an outside parking lot of

 8    one of our inner city stores.

 9              Q.    Okay.  Did it involve some lawsuit

10    that was filed against Walgreens?

11              A.    Yes.

12              Q.    Okay.  Did that case ever go to

13    trial that you know of?

14              A.    I'm unaware.

15              Q.    Okay.  Outside of that, have there

16    been any other occasions in which you've given a

17    deposition before?

18              A.    No.

19              Q.    Okay.  In the course of your work

20    with Walgreens, have you ever had the occasion

21    to testify at trial?

22              A.    No, I have not.

23              Q.    Okay.  In the course of your work

24    with Walgreens, have you ever had the
```

```
1    opportunity to meet with or work with any law

2    enforcement?

3           A.    Yes.

4           Q.    Okay.  Can you kind of describe

5    for me the circumstances generally in which that

6    would have occurred, and then maybe we can

7    follow up with some specifics.

8           A.    With law enforcement, I support

9    external investigations that they may be working

10   on.  And I also do ex- -- I'm -- like support

11   with DEA drug backs and take-backs and law

12   enforcement in community events.

13          Q.    Okay.  So I guess one thing I

14   should make clear is, you work in loss

15   prevention, correct?

16          A.    Correct.  I'm an asset protection

17   manager.

18          Q.    Okay.  And has that been your

19   title the entire 12 years you've been at

20   Walgreens?

21          A.    Yes, it has.

22          Q.    Okay.  I see references within

23   some of the documents that I've looked at to

24   district loss prevention managers or regional
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    loss prevention managers.

 2              How does -- where does asset

 3    protection manager fall within there?

 4         A.    Since my position with the

 5    company, our titles have changed --

 6         Q.    Okay.

 7         A.    -- a handful of times from loss

 8    prevention supervisor, district loss prevention

 9    manager, asset protection managers.  All of our

10    responsibilities have always stayed the same.

11    Our titles have changed more than once, though.

12         Q.    Okay.  During your 12 years at

13    Walgreens, has the amount of responsibilities

14    that you have changed, as far as the number of

15    stores or the number of people that you're in

16    charge of?

17         A.    Yes.

18         Q.    Okay.  Kind of walk me through

19    that progression, if you don't mind.

20         A.    When I first started with the

21    company, we were in larger districts where I had

22    one district of -- if I remember correctly, 26

23    or 27 stores.  In the last few years, there have

24    been some realigning with districts and sizes.
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    Now the districts average anywhere

 2      from 12 to 18 stores in a district.  And I'm

 3      responsible for four districts currently and

 4      have been for at least the last three years,

 5      three or four years, I believe.

 6            Q.    Okay.  Okay.  So you started with

 7      Walgreens approximately 2006; would that be

 8      right?

 9            A.    December 29, 2006.  Very end of

10      the year, yes.

11            Q.    Okay.  So from 2006 until how

12      long, until what year, would you say you had

13      about one district and 26 to 27 stores?

14            A.    The first eight years, eight or

15      nine.  We realigned our districts and did the

16      shifting in the last -- it was three or four

17      years.  I can't remember.

18            Q.    Okay.  So from '06 through

19      approximately 2013, 2014?

20            A.    Yes.

21            Q.    And when you -- in 2013, 2014 when

22      you began to oversee four districts, was that a

23      promotion, or was that just a realignment?

24            A.    It was just realignment.

```
1              Q.    Okay.  And what areas do you -- do

2     your stores cover?  And I guess first tell me

3     from '06 to the '13 and '14 range and then post

4     then.

5              A.    From '06 to the '13-'14 range, I

6     was in the Cleveland West district, which

7     covered -- I don't know how familiar you are

8     with Cleveland, but to the north along the Lake

9     and to west as far as Norwalk, which is almost

10    the central, northern part of Ohio, so -- and

11    then after that, once we shifted to multiple

12    districts, I now cover the north part of

13    Cleveland, the south part of Cleveland

14    currently, and then the north and south part of

15    Columbus.

16             Q.    Okay.  Is there a Walgreens office

17    that you work out of here in Cleveland?

18             A.    There is an area office located in

19    Warrensville Heights, Ohio.

20             Q.    Okay.  About how many folks are in

21    that office?

22             A.    Maybe -- well, we have five

23    districts, our director, our healthcare

24    supervisor and two admins.  So each district
```

```
 1    manager, five, six, seven, eight, nine -- ten or

 2    eleven of us.

 3          Q.    Is it primarily loss prevention

 4    folks in that office?

 5          A.    No, sir, it is not.

 6          Q.    Okay.  Okay.  So your current

 7    territory includes Cleveland, it also includes

 8    some areas of Columbus?

 9          A.    Correct.

10          Q.    And was there another city that I

11    missed?

12          A.    Cities down through between --

13    there's Mansfield is -- I go to Mansfield

14    locations and the suburbs, a lot of suburb

15    municipalities.

16          Q.    Okay.  Let me see if I can go back

17    to where I started originally and then I got

18    sidetracked.  But I was asking you about meeting

19    with law enforcement.

20          A.    Yes.

21          Q.    Tell me what agencies -- and let

22    me first focus on the -- more the enforcement

23    side.

24          A.    Okay.
```

```
 1              Q.    And then we can talk about the

 2    community involvement side.

 3              A.    Okay.

 4              Q.    So as it relates to enforcement,

 5    what agencies have you had the occasion to work

 6    with during the course of your time at

 7    Walgreens?

 8              A.    Ohio Board of Pharmacy primarily.

 9    And then I -- with matters with external law

10    enforcement support, it varies.  It depends on

11    what they might reach out to us for.  It could

12    be identity theft.  It could be prescription

13    doctor shopping with customers.  It could be

14    with doctors and prescriptions, and I'm -- my

15    involvement with that is primarily getting them

16    the evidence that is subpoenaed for matters that

17    they're investigating.

18              Q.    Okay.  So --

19              A.    It could be video.  It could be

20    documents.

21              Q.    -- is that primarily -- is that

22    generally with local law enforcement or is that

23    federal agencies or both?

24              A.    Primarily that's with Ohio Board
```

Highly Confidential - Subject to Further Confidentiality Review

1    of Pharmacy, with their investigators.

2         Q.    Okay.  Well, does the Ohio Board

3    of Pharmacy investigate the identity theft type

4    crimes that you were talking about?

5         A.    No.  That's more your local law

6    enforcement, but I don't have as many of those

7    as I do with the Board of Pharmacy.

8         Q.    What's your typical case with the

9    Board of Pharmacy?

10        A.    Theft.

11        Q.    Of what?

12        A.    Drugs.

13        Q.    Okay.

14        A.    They work with our pharmacy.  I do

15   investigations on the front end merchandise of

16   the stores with cash, cigarettes, merchandise.

17   I conduct those investigations myself.  But when

18   it's matters with anything with the pharmacy, we

19   notify the board and we work with the

20   investigators for pharmacy.

21        Q.    Okay.  So -- excuse me.  Okay.  So

22   just so we're clear, front end of the store is

23   everything that's not prescription drugs?

24        A.    Correct.

```
1          Q.    Is that fair?

2          A.    Correct.

3          Q.    Okay.  And so anything that's

4    behind the counter that requires a prescription

5    would be something that's investigated by the

6    Board of Pharmacy?

7          A.    Yes.

8          Q.    Okay.  And do you work with the

9    Board of Pharmacy, or is it more you supplying

10   them information?  Do they have their own

11   investigators?

12         A.    It varies.  I work with them, with

13   the internal things that they can't do that's

14   there, like once we put -- once we alert them,

15   notify them, we talk about where our confirmed

16   losses are, and then they will either do what

17   camera and video they need to put in place or I

18   may shift around -- if it's Walgreens cameras

19   that are being used, I will review that video.

20   They will review their own video.  It's in

21   connection together, really, the investigations

22   are.

23         Q.    Okay.  Have you worked with the

24   Board of Pharmacy on these types of issues your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    entire 12 years at Walgreens?

 2            A.    Yes, I have.

 3            Q.    Okay.  Okay.  I want -- and then

 4    the other issue that you brought up was your

 5    work with law enforcement in the community

 6    setting, correct?

 7            A.    Correct.

 8            Q.    Okay.  And I know you've been

 9    in -- I think you've told us you've been

10    involved in some of the drug take-back days that

11    the DEA puts on?

12            A.    Yes.

13            Q.    Okay.  Anything else in that

14    regard?

15            A.    No.

16            Q.    Okay.  Have you had any other

17    occasion other than those community events to

18    work with the DEA?

19            A.    I believe in the past there was a

20    meeting that they've done with Walgreens, with

21    compliance and making sure proper processes are

22    followed and procedures are followed with the

23    reporting and just making sure that we're all

24    working together on that.  There has -- I'm
```

```
 1   going back and I'm vaguely remembering, but I've

 2   had interactions with them for meetings, but

 3   nothing with investigations --

 4           Q.    Okay.  Do you recall --

 5           A.    -- that I can recall.

 6           Q.    Excuse me.  And I'm sorry for

 7   interrupting you.

 8           A.    That's okay.

 9           Q.    Do you recall attending any

10   meetings with the DEA?

11           A.    I believe there was at least one

12   that I can recall that they were at our office,

13   and it was more about the processes of

14   reporting, more informative.

15           Q.    Processes of reporting what?

16           A.    Reporting losses, reporting if

17   there is fraudulent prescriptions and a process

18   they wanted us to follow, which I wouldn't be

19   involved in that.  That would have been with

20   pharmacists to follow, but they give the

21   information to us, and our pharmacy supervisors

22   would have been there to then inform our

23   pharmacy managers and cascade that, making sure

24   that they're aware of the processes and
```

Highly Confidential - Subject to Further Confidentiality Review

1    following the processes.

2          Q.    Okay.  And this kind of segues

3    into what I'm wanting to get into next, because

4    I want to make sure I kind of have an

5    understanding of exactly what your role is and

6    what your duties are.

7                Do you recall approximately when

8    that DEA meeting was?

9          A.    No, I don't.  It's been several

10   years.

11         Q.    Okay.  More than three years ago?

12         A.    Yes.

13         Q.    Okay.  More than five years ago?

14         A.    Maybe.

15         Q.    Okay.

16         A.    I don't know.

17         Q.    Okay.  And what I think I heard

18   you just say is that some of the topics that you

19   remember from that meeting involved reporting

20   thefts of prescription drugs to the DEA,

21   correct?

22         A.    That is my area of work.  I do

23   theft and losses.

24         Q.    Okay.  And -- okay.  And the other

```
 1   area that I think I heard you say was covered in

 2   that meeting would have been identifying

 3   fraudulent prescriptions?

 4          A.    I believe.  I can't remember what

 5   the agenda was.  I know it was an informative

 6   meeting of the DEA outlining processes for -- if

 7   I recall correctly.  It had a lot to do with --

 8   there was a time I believe -- and I'm vaguely

 9   remembering -- of how they wanted us to -- or

10   how they wanted the pharmacists, rather, to

11   report suspicion with fraudulent prescriptions

12   and notifications.

13          Q.    That issue that you just said, the

14   pharmacists reporting suspicion with fraudulent

15   prescriptions, does that fall under your

16   purview?

17          A.    No, it does not.

18                       - - -

19       (Walgreens-Zaccaro Exhibit 1 marked.)

20                       - - -

21          Q.    Okay.  I'm going to show you what

22   I've marked as Exhibit Number 1.  This is a

23   resumé and a partial personnel file that was

24   provided to me.
```

```
 1                    Do you recognize that?

 2                    MR. GADDY:  This is P-WAG-2414.

 3           A.    Yes.  This is my past reviews.

 4           Q.    Okay.  And I'm going to primarily

 5     focus on the resumé that's on front right now.

 6     Do you have any idea how up to date this is?

 7           A.    This was updated -- it's been

 8     quite some time.  I haven't done anything with

 9     my resumé in a few years.

10           Q.    Okay.  So it looks like you have a

11     little bit of a history in law enforcement?

12           A.    I do.

13           Q.    Okay.

14           A.    Yes.

15           Q.    Just kind of walk me through, if

16     you don't mind, your history in law enforcement

17     and what you did before you got with Walgreens.

18           A.    So prior to Walgreens, I was a

19     parole officer for the State of Ohio for

20     approximately six years.  Prior to that, I was a

21     criminal bailiff for Lucas County probation,

22     which is a felony court, and I did that for a

23     couple years.

24                    Prior to being a bailiff, I was
```

 1    with the Women's Resource Center in Northern

 2    Michigan for about 18 months, I believe, where I

 3    was an advocate for victims of domestic abuse,

 4    assisting them through the criminal justice

 5    system as victims.  And prior to that, I was a

 6    probation officer with Lucas County adult

 7    probation for Common Pleas Courts there.

 8         Q.    Okay.  The most recent stint that

 9    you spent as a parole officer, where was that?

10         A.    Summit County --

11         Q.    Okay.

12         A.    -- which is Akron area.

13         Q.    Okay.  And you did that, it looks

14    like, for about six or seven years?

15         A.    Correct.

16         Q.    And just kind of generally what

17    were your job duties in that role?

18         A.    I supervised parolees coming out

19    of institutions for criminal offenses, managed

20    them, making sure that they were referred to

21    where they needed to do -- be for treatment,

22    maintaining work, approved housing wherever they

23    were residing.

24         Q.    Okay.  Did that involve -- would

Highly Confidential - Subject to Further Confidentiality Review

1    these folks be on a probation type situation

2    where they had conditions that they had to meet?

3           A.    Yes.

4           Q.    Okay.  And you would be in charge

5    of making sure they met those conditions?

6           A.    Yes.

7           Q.    Okay.  And examples of those types

8    of conditions would be restrictions on housing

9    and where they could live?

10          A.    Yes.

11          Q.    Would there be drug use or drug

12   testing type restrictions?

13          A.    Yes.  It could be drug.  It could

14   be anger management, depending on the nature of

15   their crimes that sent them to prison.

16          Q.    Okay.  What types of offenders did

17   you supervise?

18          A.    Anything from thieves to

19   murderers.

20          Q.    Okay.

21          A.    We had a sex offender unit.  So I

22   was not in the sex offender unit.  Mine was more

23   robberies, burglaries, assaults, murders.

24          Q.    Okay.  Did you have drug offenders

Highly Confidential - Subject to Further Confidentiality Review

1    that you supervised?

2         A.    Yes.  I'm sorry.  I did have drug

3    offenders as well.

4         Q.    Okay.  And as far as any component

5    of supervision that required drug testing, how

6    did that work?

7         A.    We had drug testing in our office,

8    and any time any offenders would come in for

9    drug testing or any time they would come in for

10   office visits, I would drug test them.  It was

11   random.  We had ability to test out in the

12   fields when we were doing their visits in home.

13   I never did that personally.

14        Q.    Okay.  If there were --

15             MR. HOUSTON:  I'm sorry.  I

16        apologize for the interruption.  I just

17        wanted to state my appearance on the

18        record.

19             THE COURT REPORTER:  Sorry.

20        You're going to have to speak up.

21             MR. GADDY:  A little bit louder,

22        please.  A little bit louder, please.

23             MR. HOUSTON:  I'm sorry.  This

24        is -- yeah.  I just wanted to state my

```
 1              appearance on the record.  I apologize

 2              for the late arrival.  This is Zeno

 3              Houston from Arnold & Porter on behalf

 4              of the Endo and Par Defendants.

 5   BY MR. GADDY:

 6         Q.    From time to time would your job

 7   duties as a parole officer require you to issue

 8   violation reports for people that you were

 9   supervising?

10         A.    Yes.

11         Q.    Okay.  What were the types of

12   things that could cause individuals to violate

13   their parole?

14         A.    New criminal offenses.  It could

15   be non-compliance with their drug and alcohol

16   treatment or any anger management counseling

17   that they're participating in.  It could be

18   because they moved without an approved address,

19   we have to go -- we would have to have gone and

20   inspect the homes and make sure they were

21   approved.

22              It could be -- if there was

23   restitution, if they had to pay restitution and

24   they weren't paying restitution.  It could be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   whatever their conditions were that they were

 2   non-compliant with.

 3          Q.    During your time as a parole

 4   officer, did you have individuals that you

 5   supervised that you saw struggle with drug abuse

 6   or drug addiction?

 7          A.    Yes.

 8          Q.    Okay.  Was that a common

 9   occurrence amongst folks that you supervised?

10          A.    I don't know how you would define

11   "common."  Did it happen?  Yes.  Did it happen

12   enough?  Yes.  Some came out, and some got it

13   right.  Some did not.

14          Q.    Okay.  During your time as a

15   parole officer, did you supervise individuals

16   who struggled with the use or abuse or addiction

17   to opioids?

18          A.    Yes.  But in that time, it was

19   more meth, the meth phase was our biggest

20   challenge.

21          Q.    Okay.  And that was in the 2000,

22   2006 time frame?

23          A.    Yeah.

24          Q.    Okay.  So we move on to your time
```

Highly Confidential - Subject to Further Confidentiality Review

1    at Walgreens, and what I want to do is go

2    through some of these bullet points and just

3    kind of ask you to expand on them a little bit.

4           A.    Okay.

5           Q.    The first bullet point that you

6    have here is that you "managed a region of

7    pharmacy retail stores" and you've already told

8    us about that, right?

9           A.    Mm-hmm.

10          Q.    Next thing you say you is you

11   "Partnered with area directors, district

12   managers, and operations trainers for the

13   successful execution of a company business plan

14   and/or initiatives."

15              Can you kind of explain what you

16   mean there?

17          A.    Supporting one another with

18   whatever initiatives were coming down.  And

19   mostly it was in the operations aspect,

20   different ways of doing things, changing things.

21   It might have been systems.  It could have been

22   changes with our realigning, supporting one

23   another that way.

24          Q.    What do you mean by "operations"?

```
 1              A.    Operations is more the front end

 2    of the store and the day to day -- it's

 3    pharmacy, too, I should say, where they're more

 4    focused on the operations, the profit, the

 5    sales, the receiving, the merchandising; whereas

 6    in our department, we're focused on theft,

 7    losses, supporting them with compliance matters.

 8              Q.    Okay.  The next bullet point, you

 9    say, "Identify shrink priorities and analyze,

10    develop, and implement shrink reduction plans."

11              Do you see that?

12              A.    Yes.

13              Q.    What is shrink?

14              A.    Shrink is losses in our retail

15    stores, what we should have compared to what we

16    don't have, the variance there in the -- that's

17    unaccounted for, and we support finding out how

18    it happened, why it happened and what we can do

19    to shift our focus from preventing it again.

20              Q.    Okay.  Generally speaking, shrink

21    is theft; is that fair?

22              A.    It could be theft, but we also

23    incur a lot of shrink in losses with paper

24    shrink because our own processes may not be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    getting -- being followed.

 2            Q.    Can you give me an example of

 3    that.

 4            A.    Do you want a front end or a

 5    pharmacy?

 6            Q.    Why don't we do the pharmacy.

 7            A.    A paper shrink in pharmacy might

 8    be an order was received and it is posted in our

 9    inventory management system, and if our staff,

10    whether it be technicians who did the receiving

11    of that order or whether it was a pharmacist who

12    did the receiving of that order, if they don't

13    post it and it doesn't get posted correctly and

14    timely, it's paper shrink.  It's saying that we

15    never received it --

16            Q.    So the books don't --

17            A.    -- but yet we paid for it.

18            Q.    So the books don't match?

19            A.    Correct.

20            Q.    Okay.  So that's not a situation

21    where you have actual loss.  That's a situation

22    where you -- you know, kind of an accounting

23    error type of issue?

24            A.    Paper shrink, we refer to that as.
```

1          Q.    Okay.  And is one of your roles as

2    a loss prevention person with Walgreens to

3    identify that and get it corrected?

4          A.    I support in identifying it, yes.

5          Q.    Okay.  Well, is the -- would it be

6    fair that the primary function that you serve is

7    product shrink?

8          A.    Yes.

9          Q.    Okay.  And --

10         A.    Cash also.

11         Q.    Okay.  Kind of describe for me

12   what the different roles or the different tasks

13   that you fulfill that kind of help with whether

14   it's cash or products?

15         A.    Once it's identified -- and I'm

16   not in the stores identifying it on most parts.

17   I'm contacted after there's a process that they

18   follow.  There are checks and balances to make

19   sure and confirm that it wasn't training error

20   or paper error.  Once it's a confirmed loss,

21   they will contact me, and then I will conduct

22   that internal investigation and interview.

23         Q.    Okay.  What are your other

24   primary -- what are your other primary job

1   duties other than the identification of and

2   investigation of theft or shrink?

3          A.    We do -- we do do some training.

4   We do do some audit review compliance to prevent

5   losses, making sure that we're -- it could be

6   compliance in checking our safety and security

7   systems.  It could be compliance in making sure

8   that processes are being followed.

9          Q.    Okay.  Do any of those -- any of

10  the training or the processes that you're -- the

11  training you're conducting or the processes that

12  you're reviewing have to do with the ordering or

13  dispensing of controlled substances?

14         A.    I do not do those trainings.

15         Q.    Okay.

16         A.    I don't speak to those, because my

17  area is loss and theft, not necessarily the

18  ordering and receiving.  I know that there are

19  processes, but I can't articulate --

20         Q.    Do you have --

21         A.    -- what they are.

22         Q.    Do you have any responsibilities

23  whatsoever for the ordering or receiving of

24  controlled substances?

```
1              A.    No, I do not.

2              Q.    Okay.  Do you have any

3    responsibilities related to the dispensing of

4    controlled substances?

5              A.    No, I do not.

6              Q.    Do you have any responsibilities

7    related to the identification of fraudulent

8    prescriptions?

9              A.    No, I do not.

10             Q.    Do you have any responsibilities

11   that are related to the identification of

12   potential customers who may be engaging in

13   doctor shopping?

14             A.    No, I do not.

15             Q.    Do you have any responsibilities

16   related to making a determination as to whether

17   or not a particular prescription should be

18   filled?

19             A.    No, I do not.

20             Q.    If we keep going down the list,

21   the next bullet point says you "conduct detailed

22   internal and external investigations."

23                   Let me stop there.  Obviously

24   you've told us a little bit about some of the
```

```
 1    investigations you would conduct if you -- if

 2    somebody identifies either paper shrink or

 3    product or cash shrink to you, correct?

 4          A.    Correct.

 5          Q.    Okay.  Do -- I've used a couple of

 6    phrases.  When I say "fraudulent prescription,"

 7    you know what I mean by that, right?  Or tell --

 8    do you know what I mean by that?

 9          A.    I know what I -- how I define

10    "fraudulent prescription."  I don't know if it

11    is the same of what --

12          Q.    Well, let's just use your

13    definition.  Tell us what your definition is.

14          A.    A fraudulent prescription to me

15    is -- would be considered if a patient brought

16    in a prescription that has been altered, if it

17    has been -- I'm aware that sometimes we have

18    notices from doctor's office that doesn't come

19    to me.  I'm just aware -- made aware of them,

20    that maybe a prescription pad was stolen from a

21    doctor's office, and somebody begins, then,

22    writing prescriptions and falsifying

23    prescription signatures and doctors and

24    everything else.  So to me, that's what a
```

Highly Confidential - Subject to Further Confidentiality Review

1   fraudulent prescription would resemble.

2        Q.    Okay.  And I think that's a fair

3   definition.  So let me make sure I understand.

4   If somebody comes into a Walgreens store and

5   they have one of these fraudulent prescriptions,

6   it's not your job to make that determination on

7   the front end, correct?

8        A.    Correct.  I don't even see the

9   prescriptions.

10        Q.    Okay.  If one is identified, so,

11   for example, if a pharmacist realizes that

12   they've been handed a fraudulent prescription,

13   do you ever play a role in -- do you ever get

14   looped into that?

15        A.    There are occasions -- some

16   pharmacists will know exactly how to handle it.

17   Other pharmacists may contact me.  They may

18   contact -- we used to have in place pharmacy

19   supervisors.  They may contact the district

20   managers advising that "I think I suspect.  What

21   should I do?"

22            And then I will -- I can give them

23   direction.  "If you think or suspect, what have

24   you done?  Did you call the doctor's office to

1   verify it?"  Which is really the only thing I

2   would tell them to do, call the doctor's office

3   to verify it before you report it to our Board

4   of Pharmacy.

5          Q.    Okay.  So kind of using the

6   decision tree that you gave us there, so a

7   person comes in and presents a fraudulent

8   prescription and this particular pharmacist

9   knows what to do.  Would you ever hear about it

10  in that situation?

11         A.    No.

12         Q.    Okay.

13         A.    The only time I might hear about

14  it is if the law enforcement reaches out to me

15  with subpoenas and needing copies of the

16  prescriptions for their purposes of their

17  investigation.

18         Q.    So they might ask you to pull the

19  video from when the person came in?

20         A.    Correct.

21         Q.    They might ask you to get a copy

22  of the prescription from the pharmacist?

23         A.    Correct.

24         Q.    Okay.  But other than that, you're

Highly Confidential - Subject to Further Confidentiality Review

1    not doing any investigation or any oversight of

2    that?

3         A.    No, I am not.

4         Q.    Okay.  So the second situation

5    where a person comes in, presents a fraudulent

6    prescription, and the pharmacist, for whatever

7    reason, doesn't know what to do, you may get a

8    phone call in those situations?

9         A.    Yes.

10        Q.    Okay.  And what I think I heard

11   you just say is you would advise them to call

12   the doctor and see if he could verify the

13   prescription?

14        A.    Take what steps that they have and

15   have been provided to follow and make sure you

16   verify it and -- I wouldn't be able to tell them

17   beyond the appearance of the script or what

18   they're looking for in passing.  I just know

19   sometimes what alerts them to suspect that it's

20   a fraudulent prescription.

21        Q.    Okay.  And other than giving

22   them -- the pharmacist this information, that I

23   presume a pharm -- the pharmacist would --

24   should have access to independently, correct?

1          A.     Correct, but some of them are --

2    there's a lot they do.  Some of them -- some of

3    them are not confident.  They want to make sure

4    they're handling it correctly.  Mostly that's

5    what it is when they contact me.  "I know I'm

6    supposed to."

7              "Yes, follow that process."

8          Q.    Okay.  There's nothing -- there's

9    no information that you and you alone have that

10   they're having to contact you to get?

11         A.    No.

12         Q.    All the information that you give

13   them is information they could pull

14   independently?

15         A.    Yes, they can.

16         Q.    Okay.  Outside of telling those

17   particular pharmacists that either may not know

18   what to do or may just want the assurance that

19   they're doing the right thing and providing them

20   with that information, do you have any other

21   involvement in those situations?

22         A.    No, I do not.

23         Q.    Okay.  That bullet point continues

24   to read, "conduct detailed internal and external

Highly Confidential - Subject to Further Confidentiality Review

1    investigations."  And it says, "For resolution

2    of losses of pharmaceuticals."  And then it

3    lists some other areas there.

4              In what ways would you conduct

5    investigations for the loss of pharmaceuticals?

6         A.    Walgreens, we have exception

7    reports that capture when changes of inventory

8    on hands come.  So part of that would be once we

9    identify and have a confirmed loss, then I would

10   do the investigation in connection with -- I

11   would contact the Board of Pharmacy.

12             We would coordinate that with --

13   usually it's our pharmacy manager, unless the

14   pharmacy manager is the one suspected of the

15   theft, and then we would do the monitoring, the

16   video, and eventually sit down and talk to the

17   person.

18        Q.    Okay.

19             MR. GADDY:  Can you pull

20        P-WAG-Y2366.

21   BY MR. GADDY:

22        Q.    How long has -- have you received

23   exception reports at Walgreens?

24        A.    They've been available since I've

1    been with the company.

2                       - - -

3        (Walgreens-Zaccaro Exhibit 2 marked.)

4                       - - -

5        Q.    Okay.  Let me show you what I'm

6    marking as Exhibit 2.  Do you recognize --

7    obviously it's an e-mail, but then there's, it

8    looks like, a chart copied and pasted below

9    that.

10                Do you recognize that, the chart

11   specifically?

12       A.    Yes.

13       Q.    Is this an exception report?

14       A.    Yes.

15       Q.    Okay.  Do you mind just kind of

16   walking me through, because I saw some of these

17   and I'll admit I don't completely understand

18   them.  So I'm hoping you can kind of explain to

19   me what I'm -- what we're looking at here.

20       A.    So what this captures is the

21   13-week history, the chart we're talking about,

22   correct.

23       Q.    Okay.

24       A.    And it captures when there is high

1    risk activity of the drug --

2            Q.    Okay.

3            A.    -- that would require additional

4    review.  This was referred to as your LPxRx

5    report.

6            Q.    What does that mean?

7            A.    Loss prevention pharmacy report.

8            Q.    Okay.

9            A.    In this 13-week for each drug,

10   sometimes -- and it's not uncommon -- we'll just

11   take the first drug, the 5/500 hydrocodone where

12   you see an adjustment of 488 were done.

13           Q.    What does -- can you tell me what

14   "adjustment" means?

15           A.    They changed that on hands.  The

16   change of the on hands could happen one of two

17   ways.  Either a technician goes to fill the drug

18   and it's not there and they make the adjustment,

19   or we fill more than what our system says we

20   had, then the system will make an automatic

21   adjustment.

22                 That's the posting thing I

23   mentioned earlier.  If they don't post it, our

24   system doesn't know we have it, and then they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    fill something that our system doesn't believe

 2    is there.  And so the system will make the

 3    adjustment.

 4               We have two separate systems for

 5    inventory and then for the pharmacy fill.  So if

 6    they're not done right and each system isn't

 7    done correctly --

 8         Q.    That's where you get some of those

 9    accounting type errors?

10         A.    Yes.

11         Q.    Okay.

12         A.    And so -- but typically in these

13    situations, this captures -- what we would be

14    looking for is what we received -- this is what

15    would flag me in what I do, in my role for theft

16    and loss -- is what we receive, we would expect

17    that our total purchases come pretty close to

18    what our sales are.  So then that way we have

19    the sales of -- we have in stock what we filled.

20               If you start seeing a whole bunch

21    more and we're not getting fills, it's "Why do

22    we -- why are we receiving all of this?  Is

23    somebody going into the ordering system and

24    increasing orders so those won't be captured?"
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Could be, maybe not.  I'm not sure.  That's what

 2    we find out when we go in for the interview.

 3             But when you have an adjustment,

 4    sometimes you can go in and do an on-hand count

 5    and let's just say somebody maybe posted that

 6    receipt finally, you go and you do an on-hands

 7    count and you adjust it right back up.

 8             During this time, this report

 9    captured all kinds of things, and it was

10    oftentimes a page, two pages long.  We have

11    since changed our filtering at the support

12    office is what they did, and it now captures

13    only the -- it's truly unaccounted for.  We need

14    to figure out where it's at.  So ...

15         Q.   Okay.  Let me see if I can ask you

16    a couple of specific questions to make sure that

17    I can understand this.

18         A.   Okay.

19         Q.   So first off, this is a report --

20    it looks like the date of the e-mail is

21    April 2010?

22         A.   I see that, yes.

23         Q.   Okay.  Would this have been the

24    format that you received exception reports in

1    from going all the way back to '06?

2          A.    Yes.

3          Q.    Until about when?

4          A.    Our new HR XD was -- and I'm

5    roughly estimating --

6          Q.    Sure.

7          A.    -- four, five years ago, maybe.

8          Q.    Okay.  So '13, '14 time frame?

9          A.    Yes.

10          Q.    Okay.  And so if I look at the

11    chart, it looks like the far left-hand column,

12    which is, looks like, Control WIC, that's the --

13    that's a code that correlates to the particular

14    drug?

15          A.    Yes.

16          Q.    Okay.  And the next column is an

17    actual description of the drug?

18          A.    Correct.

19          Q.    Okay.  And, again, if we're just

20    using the top line as an example of the

21    description, this particular drug, it's

22    hydrocodone?

23          A.    Correct.

24          Q.    Okay.  And the next column says On

1    Hand.

2            A.    Yes.

3            Q.    Does that mean how much is

4    supposed to be sitting on the shelf at the

5    pharmacy?

6            A.    That's when the report is

7    generated.  What it is capturing, what our

8    systems are saying is on hand.

9            Q.    So that's what the computer is

10   telling you is sitting on the shelves at the

11   pharmacy?

12           A.    Yes.  But this is also -- you

13   should know, is not a live update.  This report

14   would have only updated -- should have been once

15   a week but sometimes systems go down.  They are

16   computers, so ...

17           Q.    Okay.  What's the warehouse column

18   telling us?

19           A.    How many was received from our

20   warehouse, our distribution center.

21           Q.    And are these -- these numbers

22   that we're looking at, is that number of pills?

23           A.    Yes.

24           Q.    Okay.  So that's number of pills

Highly Confidential - Subject to Further Confidentiality Review

```
 1    or number of dosage units; is that fair?

 2           A.    Yes.

 3           Q.    Okay.  So for this particular

 4    store -- and, again, I think you said this was a

 5    13-week average or a 13-week report?

 6           A.    Thirteen-week, yes.

 7           Q.    So for this 13-week period, this

 8    particular store had ordered 20,500 of these

 9    hydrocodone pills?

10           A.    That's what the report says, yes.

11           Q.    Okay.  What's Vendor?

12           A.    That is where they would order if

13    we didn't have it in stock.

14           Q.    So is that where they would have

15    to get pills from Cardinal Health or something

16    like that?

17           A.    Yes.

18           Q.    So your system would tell you how

19    many pills came in from the Walgreens

20    distribution center, as well as how many came in

21    from any outside vendors?

22           A.    Yes.

23           Q.    Okay.  And the next column says

24    Total Purchase.  So is that -- is that adding up
```

Highly Confidential - Subject to Further Confidentiality Review

1    the Warehouse and the Vendor?

2           A.    Yes.

3           Q.    Okay.  What is Claims?

4           A.    Claims could be if it was -- if

5    products expired, we have a process to claim

6    those.  If it is maybe a wrong fill and a

7    customer brings it back because they got

8    something wrong or there was something -- we

9    can't refill that and sell that drug, so then it

10   goes into that process.  We have to adjust that.

11          Q.    Is that essentially when a

12   pharmacy has to return a product?

13          A.    Yes.

14          Q.    Okay.  Okay.  And then the

15   Adjustments?

16          A.    Yes.

17          Q.    So let's skip that one for just a

18   minute, and let me ask you about the other two.

19          A.    Okay.

20          Q.    So Sales?

21          A.    Yes.

22          Q.    Tell me what that means.

23          A.    The quantity of pills that were

24   prescribed and sold -- prescribed, filled, and

```
1    sold in that 13-week period.

2           Q.    Okay.  So I guess, in theory,

3    should the amount on hand be the difference

4    between the total purchased and the sales?

5           A.    You would expect that that would

6    balance.  And then you have an overbuy of 424,

7    but you see the bottle count was a 500-count

8    bottle.  So clearly they needed that bottle of

9    500 for the difference of the 424, so ...

10          Q.    Okay.  I'm sorry.  You lost me.

11          A.    Well, you have an overbuy of 424.

12          Q.    Okay.  What's "overbuy" mean?

13          A.    We don't want them to have in

14   stock any more than they need.  If you have --

15   we've had instances in the past -- I personally

16   have never had a case, but I'm just -- I know

17   that some cases and investigations in -- that

18   come about we're aware that the technicians at

19   one time were able to -- and this was before I

20   was with the company -- were able to manually

21   adjust the order quantities.

22                So if you have a technician who

23   connects the dots and has been there for a while

24   and did the inventory ordering, they could have
```

Highly Confidential - Subject to Further Confidentiality Review

1    known, if they were stealing that drug, that

2    they couldn't run out for a prescription fill,

3    so they would increase those orders.  But, of

4    course, if they're stealing, it wouldn't reflect

5    in the sales.

6              This is the whole analyst stuff

7    that we look at for justifying why we have so

8    many.  So when we're assessing that, what I will

9    always look at is, like, "Yeah, 424 is a lot,

10   why do we have that many extra," considering how

11   many orders they get in one week and stuff.

12             But if you look at the

13   description, that 500 on the very end of that

14   drug means it's a 500-count bottle.

15        Q.    Okay.

16        A.    So we would have needed that 424

17   overage because we opened that bottle to be able

18   to do fills.

19        Q.    Gotcha.  Okay.  So what I hear you

20   to be saying is that Walgreens has a goal of not

21   having a lot of extra pills on the shelf?

22        A.    I don't know what their goal is.

23   In my line of work and what I look at as far as

24   theft and losses, it can be an indicator of

1    there could be a problem.

2          Q.    Okay.  So if there's a lot of

3    pills on hand, that's a flag to you of something

4    that you need to look into?

5          A.    For what I look into, yes.

6          Q.    Okay.  And what -- it looks like,

7    if you look at the bottom of this e-mail, you

8    write to Brian, and Brian would be the -- he'd

9    be the head pharmacist at this particular store?

10         A.    Going back -- I mean --

11         Q.    Would he be a pharmacist?

12         A.    I sent it to the store manager

13   e-mail address --

14         Q.    Mm-hmm.

15         A.    -- and I can't remember who was

16   the store manager or the pharmacy manager there

17   at that time.

18         Q.    Okay.  Okay.  So there's a

19   difference between the store manager and

20   pharmacy manager?

21         A.    Yes.

22         Q.    Okay.  So you say, "Hi Brian, I

23   was reviewing your LPxRx report and there

24   would -- and would like to have the on hands of

1    the hydrocodone APAP 5/500 verified."

2              What -- is it fair to say that

3    what popped out to you when you looked at this

4    particular exception report was the 2,122 pills

5    that were supposedly on hand?

6         A.    No.  What would have stuck out to

7    me was the adjustment of 488.

8         Q.    Okay.  So we never -- I never got

9    back to that column.

10        A.    Yes.

11        Q.    Can you explain to me what that

12   means.

13        A.    That would have been positive or

14   negative adjustments that were done with the on

15   hands of that drug.

16        Q.    Is that somebody at the pharmacy

17   who was manually making that change into the

18   system?

19        A.    It could be, but it could also be

20   the system making the change.  As I said before,

21   if you have something -- if you -- if we don't

22   post a receiving order and our system doesn't

23   know we have that order, but then we fill it,

24   the system says, "How did you fill what you

Highly Confidential - Subject to Further Confidentiality Review

1    don't have?"

2              So the system will make that

3    adjustment.

4         Q.    Okay.  In that situation that you

5    just described where you fill a prescription

6    where whoever had -- did not properly intake it

7    and post it, you would see a positive adjustment

8    there, right?

9         A.    No.  It would be a negative

10   because the system corrects what it thinks it

11   should be.

12        Q.    Okay.

13        A.    So we're out 488.  It doesn't post

14   positive -- the only time it will adjust

15   positive is if, one, when you post the receipt

16   or, two, if you do an on-hands review and count

17   it and verify it and realize that you actually

18   have more.  And then you make the positive

19   adjustment.

20        Q.    So when you see this negative

21   adjustment of 488, what does that tell you?

22        A.    It needs to be -- the inventory on

23   hands would need to be verified to make sure

24   it's correct.  And if it's not offset, then I

Highly Confidential - Subject to Further Confidentiality Review

1    would ask them to continue to count on an

2    average of two to four times per week to assess

3    if it's a theft concern.

4            Q.    Okay.  So when you see this, your

5    concern is that 488 pills may have gone missing?

6            A.    Correct.

7            Q.    Okay.  So just so I can kind of

8    close out the loop on this, walk me through the

9    extent of your investigation as far as what you

10   would do after seeing an exception report such

11   as this.

12           A.    If the drugs can't be accounted

13   for and we don't know where they're at and we

14   count again and realize we have more missing,

15   then I reach out to the Board of Pharmacy and we

16   begin working together and collaborating

17   together on cameras, counts.

18           Q.    Okay.  And when you're having

19   adjustments like this in these investigations,

20   what type of theft -- what type of thefts are

21   possible?

22           A.    Anything.

23           Q.    Okay.  This could be anything from

24   somebody jumping over a counter and taking a

```
 1    bottle to a pharmacist or a pharmacy tech --

 2            A.    Stealing.

 3            Q.    Okay.  During your time at

 4    Walgreens, have you had situations where you've

 5    had customers steal prescription pills?

 6            A.    Customers?

 7            Q.    Or outside -- out --

 8    non-employees.

 9            A.    Non-employees?  In the form of

10    burglary and robberies, yes.

11            Q.    Okay.  During your time at

12    Walgreens, have you had situations where you've

13    had employees involved in thefts of controlled

14    substances?

15            A.    Employees as in technicians,

16    pharmacists?

17            Q.    Correct.

18            A.    Both, yes.

19            Q.    Okay.  And has that happened over

20    the course of your career going back to 2006?

21            A.    Yes.

22            Q.    Okay.  And as you sit here today,

23    do you recall approximately how many times

24    you've been involved in investigations with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Board of Pharmacy regarding thefts of controlled

 2    substances from Walgreens' stores where

 3    pharmacists or pharmacy technicians were the

 4    targets of those investigations?

 5         A.    I would roughly estimate five to

 6    six investigations in the pharmacy for theft of

 7    drugs a year.

 8         Q.    Okay.  Have you been involved in

 9    any that resulted in arrests?

10         A.    Yes.

11         Q.    Okay.  Approximately how many?

12         A.    All of ours result in arrests.

13    And to be clear, it is the Board of Pharmacy

14    investigators who file those charges.

15         Q.    Okay.  So I think we determined

16    earlier that from 2006 until approximately 2013

17    or 2014, your area encompassed what I think you

18    called Cleveland West?

19         A.    Correct.

20         Q.    Okay.  And that was about -- was

21    it about 15 stores in Cleveland?

22         A.    That was about 27 stores.

23         Q.    Sorry.  About 27 stores.

24               And based on what you just told
```

1    me, would it be fair to say that from 2006

2    through approximately 2013, 2014 that you were

3    involved in five to six investigations a year

4    during that time frame that resulted in the

5    arrests of a Walgreens' technician or a

6    Walgreens' pharmacist for theft of controlled

7    substances?

8         A.    Yes.  And when I say "on average,"

9    one year might only have --

10        Q.    Sure.

11        A.    -- three investigations.  The next

12   year, which is very uncommon, but I had, I

13   think, three investigations in one month another

14   year.  So when I say "on average," if you

15   average it out from year over year like that.

16   About five to six, yes.

17        Q.    Okay.  Since 2013, 2014, the

18   number of stores you supervise has increased?

19        A.    Yes.

20        Q.    By about three or four times?

21        A.    Yes.

22        Q.    Okay.  You have about 75 stores

23   now?

24        A.    In between 60 and 65.

1          Q.     Okay.  Are you seeing more

2     investigations because you have more stores?

3          A.     No.

4          Q.     Still about five to six a year?

5          A.     Yes.

6          Q.     Are you still reviewing exception

7     reports on a regular basis?

8          A.     I do review them, but it is the

9     expectation of our pharmacy managers to review

10    those.

11         Q.     Okay.  Who has the primary

12    responsibility for reviewing the exception

13    reports?

14         A.     The pharmacy manager and store

15    manager.

16         Q.     Okay.  And if the pharmacy manager

17    sees something like what you flagged here at

18    this particular store with the negative

19    adjustment of 488 on the controlled substance

20    hydrocodone, what is the pharmacy manager

21    supposed to do?

22         A.     It varies.  It depends on the

23    person.  Some pharmacy managers will reach out

24    and say, "Hey, just so you know, if you see

1    this, this is what it was.  This is what I was

2    able to determine."

3              Some pharmacy managers, unless it

4    is a loss, a confirmed, like, "I don't know

5    where it's at," then they'll call me.  But if

6    they can account for it, I may not hear anything

7    from -- it just -- it depends on that pharmacy

8    manager and how they do their job.

9         Q.    When you get involved into these

10   investigations, like you -- you know, you ask

11   for -- it looks like you ask the store

12   manager -- either the pharmacy manager or the

13   store manager to look into this, correct?

14        A.    Yes.

15        Q.    And I guess there's the

16   possibility they can write you back with an

17   explanation that would put it to rest; is that

18   fair?

19        A.    Yes.

20        Q.    Okay.  And there's other times

21   where maybe the explanation isn't fully

22   sufficient or they're not able to give you a

23   good answer; is that fair?

24        A.    Yes.

```
 1              Q.     In those situations -- I think
 2     I've heard you mention an interview.  Do you
 3     take charge -- are you still in charge at this
 4     point and are you doing follow-up or is it
 5     turned over to the Board of Pharmacy?
 6              A.     So once a loss, a true loss, is
 7     confirmed, I immediately notify our Board of
 8     Pharmacy, an investigator.  We then will plan
 9     how to go forward.  I will communicate next
10     steps and directives to the pharmacy manager on
11     how to go forward, which typically is counting
12     the drugs every day and doing it manually so we
13     know and confirm the loss.  And then --
14              I lost my train of thought, the
15     question that you were trying to get to.  What
16     was your question again?
17              Q.     Sure.  So -- I think you answered
18     it, but what I was asking about was where -- how
19     long you stay involved.  And what I heard you
20     just say is, as soon as you confirm a theft,
21     it's turned over to the Board of Pharmacy?
22              A.     No.  I stay involved until the
23     end.
24              Q.     Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    And I will do the interview with

2     the board investigator.  The board investigator

3     will always lead the interviews, and if I need

4     to interject or ask questions, I will -- I'm

5     always given the opportunity at the end or I

6     will interject during the course of that

7     interview.

8          Q.    Okay.  Other than using these

9     exception reports for the purpose that we just

10    went over to identify loss or potential theft,

11    is there any other reason for which you utilize

12    the exception reports?

13         A.    Compliance, making sure that --

14         Q.    What do you mean by "compliance"?

15    Compliance with what?

16         A.    Making sure that they're following

17    the right processes, posting or something like

18    that.  Like if I'm identifying large overbuys.

19    I'll start looking into some of their receiving

20    and posting and then I'll challenge them on if

21    I'm noticing unposted receipts or receipts that

22    were posted weeks after the product was arrived.

23    So ...

24         Q.    Okay.  So that would be compliance

```
 1    with internal Walgreens' policies and

 2    procedures; is that fair?

 3         A.    That, yes.

 4         Q.    Okay.

 5         A.    Primarily these are used for

 6    theft, identifying theft, for me, the way I look

 7    at these.

 8         Q.    Okay.

 9         A.    The way I analyze these reports

10    and my purpose for them.

11         Q.    Outside of utilizing them for

12    theft and compliance with Walgreens' ordering

13    policies and procedures, are there any other

14    reasons for which you use the exception reports?

15         A.    No, not that I can think of,

16    anything I can think of at this time.

17         Q.    Are there any other reports that

18    you receive in the course of your work as a loss

19    prevention person with Walgreens that contains

20    information about the pharmacy, period, whether

21    it's dispensing histories or ordering histories

22    or anything like that, or is it just the

23    exception report?

24         A.    So there's tabs for all of that.
```

1        Q.     What do you mean by "tabs"?

2        A.     On our exception base reporting

3    dashboard.  There's tabs for sales.  There's

4    tabs for inventory.  There's tabs for

5    performance and training.  I don't usually go

6    into them.

7        Q.     Okay.

8        A.     Very rarely.

9        Q.     Are there any other -- any other

10   reports outside of the exception dashboard that

11   you receive related to the pharmacy?

12       A.     Our -- that are not generated --

13   these are generated regularly.  The other

14   reports that I may access is into our SIMS

15   system, which is our inventory management

16   system, but that is just going in and verifying

17   that myself.  Once I see something like this,

18   then I will start reviewing more of the actual

19   inventory reports.

20       Q.     Okay.

21       A.     So I don't know if those would

22   necessarily be considered exception reports.

23   It's more inventory reporting.

24       Q.     Okay.  Are there any reports that

Highly Confidential - Subject to Further Confidentiality Review

1  you review for the purpose of determining

2  whether or not a particular store is dispensing

3  an excessive volume of controlled substances?

4          A.    I'm not -- that's not my area with

5  the dispensing.  I don't monitor any of that.

6          Q.    Do you do any analysis of

7  dispensing of controlled substances whatsoever?

8          A.    No.  My area is on loss and theft.

9          Q.    Okay.  And has that been true for

10  the entire 12 years that you've been at

11  Walgreens?

12          A.    Yes.

13          Q.    Okay.

14                      - - -

15      (Walgreens-Zaccaro Exhibit 3 marked.)

16                      - - -

17          Q.    Let me show you what I'll mark as

18  Exhibit 3.  I'm going to look at what I think

19  are a couple more of these exception reports.

20          A.    Okay.

21          Q.    And do you recognize this document

22  as an e-mail chain between you and another store

23  manager?

24          A.    Cecey was our pharmacy manager --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.

 2              A.    -- at the time.

 3              Q.    So Cecey was the pharmacy

 4    manager --

 5              A.    Mm-hmm.

 6              Q.    -- of this particular store?

 7              A.    Yes.

 8              Q.    Okay.  And if we start at the

 9    bottom, very bottom of the first page, it looks

10    like this chain starts with an e-mail from you

11    on July 31st of 2012, correct?

12              A.    Yes.

13              Q.    Okay.  And there's a couple people

14    who -- or I guess it looks like you e-mail to

15    the store manager who happened to be Cecey.

16              A.    The RxM is a pharmacy manager

17    e-mail address --

18              Q.    Gotcha.

19              A.    -- where MGR is the store manager

20    e-mail.  So it looks like I sent it to the

21    pharmacy manager, and I copied our store manager

22    and Matt Soder, who would have been our pharmacy

23    supervisor for that district at the time.

24              Q.    Okay.  Is Matt Soder your
```

Highly Confidential - Subject to Further Confidentiality Review

1    supervisor or --

2            A.    No.

3            Q.    You all are separate?

4            A.    So in a district team at that

5    time, you had a loss prevention manager, a

6    pharmacy supervisor, a district manager, and a

7    district trainer.  So it was a team of four of

8    us for one specific district.

9            Q.    Okay.  So the same 27 or so stores

10   that you served as the loss prevention manager

11   for at that time, Matt would have served as the

12   pharmacy supervisor?

13           A.    Yes.

14           Q.    Okay.  So it looks like you e-mail

15   Cecey, and you say, "Hi Cecey.  Please review

16   and verify the on-hands of the hydrocodone as

17   noted below from the LPxRx.  Almost two

18   500-count bottles?  Please update me with your

19   findings."

20                 Do you see that?

21           A.    Yes.

22           Q.    Okay.  And so, again, you're

23   asking about a -- hydrocodone, which is a

24   controlled substance, correct?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    Yes.

 2          Q.    Okay.  And if we turn the page, is

 3     this another one of these exception reports?

 4          A.    Yes.

 5          Q.    Okay.  And it looks like -- if we

 6     look at the top of the next page, it looks like

 7     this was for Store 3310?

 8          A.    Yes.

 9          Q.    And that's a store in Cleveland,

10     Ohio?

11          A.    Yes.

12          Q.    Okay.  And this report looks to be

13     a little bit different.  It looks like maybe you

14     ran a report just for that particular drug, the

15     hydrocodone?

16          A.    Yes.

17          Q.    Okay.  And some of the columns are

18     similar, but some of them are different.  So if

19     you don't mind telling me -- tell me on this

20     chart what it is that jumped out at you that

21     made you reach out to Cecey?

22          A.    The adjustment for negative 911.

23          Q.    Okay.  Why is that of concern to

24     you?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    That would be almost two full

2    bottles of 500-count bottles.

3          Q.    Okay.  And somewhere in the

4    system, the system is telling you that

5    potentially two 500-count bottle of hydrocodone

6    have gone missing?

7          A.    Yes.

8          Q.    Okay.  And obviously that's

9    something you want to follow up on, right?

10         A.    Yes.

11         Q.    Okay.  If we go back to the first

12   page, it looks like -- it looks like you

13   followed up with him after about a week or so

14   went by and you hadn't heard back from him?

15         A.    Yes, which is why I -- with Cecey

16   she was not a pharmacy manager to follow up.

17   She wasn't very dependable to follow up on

18   things always when it comes up to things.  It

19   was a very high-volume pharmacy.

20               So certain pharmacy managers, if

21   I -- having worked with them, know the history

22   of their follow-through sometimes, I will CC the

23   store manager and the pharmacy supervisor to --

24         Q.    Okay.  You would agree with me

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that it's a pretty serious concern if you

 2   potentially have two 500-count bottles of

 3   hydrocodone that have gone missing, right?

 4        A.   Yes.

 5        Q.   Okay.  That's something that you

 6   definitely would want to stay on top of and --

 7        A.   Yes.

 8        Q.   -- be diligent about?

 9        A.   Yes.

10        Q.   Okay.  So it looks like

11   approximately a week and a half later you follow

12   up with her asking her to look into it again?

13        A.   Yes.

14        Q.   Okay.  It then looks like you get

15   a response from the store manager but not from

16   Cecey, correct?

17        A.   That came from RxM, so that would

18   have been from Cecey.  And if you see on the

19   bottom, it's her -- she has her name on the

20   bottom of the e-mail, too.

21        Q.   Gotcha.  Thank you.

22             And so she writes, "I had them

23   count it overnight when it would be most

24   accurate and we are over by five.  Was there an
```

1    adjustment prior to 6-12 for a +?  That was the

2    day after inventory."

3              Can you tell me what she's saying

4    there?

5         A.    I don't recall the plus 5 by 5

6    tablets or five bottles and was there an

7    adjustment prior to 6/12 for a positive.

8    These -- the dates that you have on your time

9    stamp of that report are the week ending date.

10   So the week ending 7/24, we received 2,000 from

11   the warehouse, total purchases.

12              So it could have been in a

13   combination of three orders kind of thing.  So

14   they get a 13-week view.  I have the ability to

15   do a 52-week review, which I -- it's not

16   uncommon for me to go in -- if we can't account

17   for this 911 that are missing, I'll go back even

18   further to see, we may have had a positive

19   adjustment somewhere that would offset this,

20   that somebody went in and positively adjusted

21   it.

22        Q.    Okay.  And when -- again, when

23   you're talking about two 500-count bottles of

24   hydrocodone, that's -- you're definitely going

1   to do that follow-up investigation, right?

2          A.    Yes.

3          Q.    Okay.  Does her answer here, in

4   that e-mail we just read, does that solve the

5   problem for you?

6          A.    No.

7          Q.    Okay.  So it looks like you

8   respond to her just above that and you tell her

9   you're concerned about the almost two 500-count

10  bottles that are unaccounted for, correct?

11         A.    Yes.

12         Q.    Okay.  And it looks like she

13  writes back, "Yes, me and you both.  Did you

14  look further back for adjustments?"

15                Do you see that?

16         A.    Yes.

17         Q.    Do you recall whether or not this

18  situation ever got resolved?

19         A.    I do not recall.

20         Q.    Okay.  Is Cecey still a pharmacist

21  with Walgreens?

22         A.    No.

23         Q.    Okay.  When did she leave; do you

24  know?

```
 1              A.    I can't say.  I know she stepped

 2    down from her position.  I know she went to an

 3    overnight store and that did not work out and

 4    she left, but I can't -- I don't know when her

 5    separation was.  I truly don't.  I can't

 6    remember.

 7                        - - -

 8        (Walgreens-Zaccaro Exhibit 4 marked.)

 9                        - - -

10              Q.    Okay.  Let me show you what I'll

11    mark as Exhibit Number 4, which is going to be

12    along the same line.  And if --

13              MR. GADDY:  It's P-WAG-2340.

14    BY MR. GADDY:

15              Q.    And if you look at the bottom of

16    the page, you see it's the same e-mail that we

17    were just looking at?

18              A.    Yes.

19              Q.    Okay.  And then we also, in the

20    middle of the page -- middle of the first page,

21    we see that same follow up that we just looked

22    at, right?

23              A.    Yes.

24              Q.    Okay.  And then you get an e-mail
```

1    from the pharmacy supervisor, Matt, correct?

2          A.   Yes.

3          Q.   Okay.  And he says -- and this --

4    and he writes only to you.  He takes the folks

5    from the store off, correct?

6          A.   Yes.

7          Q.   Okay.  And he says, "Please keep

8    me posted.  I would be careful about using

9    e-mail on these just in case we have someone who

10   can access.  Might tip them off."

11              Correct?

12         A.   Yes.

13         Q.   Fair to say that Matt's worried

14   about a theft situation and that maybe the

15   person responsible for the theft was on one of

16   those list serves?

17         A.   It's not uncommon for pharmacists

18   to open e-mail and close them down and just

19   leave the links on, and there have been

20   instances where people go in and start checking

21   e-mail and -- because they're worried about

22   what's going on if they're in connection with

23   the theft.

24              So he was just, as a reminder to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me, don't send the e-mails in too detail,

 2    because if somebody walks by, looks over the

 3    shoulder, sees it, then they become alerted that

 4    they know about the theft.

 5            Q.    As kind of one of a best practices

 6    type rules for you in doing your job in loss

 7    prevention when you're looking into some of

 8    these adjustments that you would see in the

 9    exception reports, you had to be cognizant of

10    how transparent you were?

11            A.    Yes.

12            Q.    Okay.  You had to be careful to

13    not provide too much information because you

14    might be alerting the pharmacists or the

15    pharmacy techs who were actually involved in the

16    theft; is that fair?

17            A.    Yes, that would be fair.

18            Q.    And that was something that you

19    had to take into account when conducting these

20    type of investigations, correct?

21            A.    Correct.

22                          - - -

23        (Walgreens-Zaccaro Exhibit 5 marked.)

24                          - - -
```

```
 1              Q.    Okay.  I'll show you P-WAG-2359,

 2    which is -- involves the same store, I believe.

 3              Do you recognize this as another

 4    e-mail chain?  If you look at the top e-mail, it

 5    looks like it's between you and, again, Matt

 6    Soder --

 7              A.    Soder, yes.

 8              Q.    Soder.  I'm sorry.  The pharmacy

 9    supervisor?

10              A.    Yes.

11              Q.    Okay.  And the subject of this

12    e-mail is "C-II access and key control"?

13              A.    Yes.

14              Q.    You say, "Hi Matt and John, one

15    other issue at #3310" -- and you're referring to

16    a store number there?

17              A.    Yes.

18              Q.    Okay.  Would this be the same

19    store with Cecey that we were just talking

20    about?

21              A.    Yes, it would be.

22              Q.    "One other issue at #3310 that

23    came up this morning that I remembered needing

24    to be reviewed.  Techs being given the C-II keys
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to access C-IIs."

 2                    And again, that's talking about

 3    Schedule II controlled substances, correct?

 4           A.    Correct.

 5           Q.    That includes the drugs like

 6    OxyContin, oxycodone, hydrocodone, those types

 7    of drugs?

 8           A.    Yes.

 9           Q.    Okay.  "Techs being given the C-II

10    keys to access C-IIs and count them for

11    prescriptions and returning the C-IIs to the

12    cabinet.  What is your stance on this?  Below is

13    the policy I found pertaining to this."

14                    Do you see that?

15           A.    Yes.

16           Q.    Okay.  And it looks like the

17    policy -- it looks like you just copied and

18    pasted it into the e-mail here?

19           A.    I did, yes.

20           Q.    And the policy is Preventing

21    Diversion of Controlled Substances?

22           A.    Yes.

23           Q.    And the first sentence of the

24    basic policy says, "It is Walgreens' policy to
```

Highly Confidential - Subject to Further Confidentiality Review

1    practice due diligence in preventing theft or

2    loss of controlled substances."

3            Correct?

4    A.    That's what it says, yes.

5    Q.    Okay.  And the second heading

6    there is "Security Measures."

7            Do you see that?

8    A.    Yes, I do.

9    Q.    Okay.  And specifically I'm

10   looking at the second bullet point.  It says,

11   "Only a pharmacist" -- excuse me.  "Only a

12   pharmacist shall have a key to the C-II cabinet,

13   and only a pharmacist is permitted to open the

14   C-II cabinet or retrieve or replace medications

15   from the C-II cabinet."

16           Do you see that?

17   A.    Yes.

18   Q.    And as far as you're aware, has

19   that always been the rule and practice at

20   Walgreens while you've been there?

21   A.    It is my understanding, which is

22   why it came to question to me when it was

23   brought up.

24   Q.    And if you go down to the bottom

1    of the page, it says -- and you're referring to

2    the policy, "It does not restrict techs from

3    counting for filling scripts.  I don't feel they

4    should be given keys to access the cabinet to

5    retrieve and/or return C-IIs.  I was advised

6    today by staff that Cecey is giving techs the

7    keys to retrieve and/or return C-IIs to the

8    cabinet."

9            Do you see that?

10    A.    Yes.

11    Q.    Okay.  And why did you raise this

12    with the pharmacy supervisor?  And who is

13    Mr. Lucchetti?

14    A.    He would have been the district

15    manager at the time.

16    Q.    Okay.  And so what would -- where

17    would he have fallen in the hierarchy?  Would he

18    have been a supervisor of the different regional

19    groups?

20    A.    Of the district.

21    Q.    Of the district.

22    A.    He would oversee the district --

23    or the district manager is over the store

24    managers.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  So why did you feel the

 2    need to bring this to the attention of Mr. Soder

 3    and Mr. Lucchetti?

 4            A.    A tech brought it to my attention

 5    when I was at the store.  So I then looked into

 6    it, and then notified Matt who is over the

 7    pharmacy managers because he would have

 8    addressed the non- -- the violation of the

 9    policy and any discipline.

10            Q.    And fair to say this policy's in

11    place to limit access to the controlled

12    substances?

13            A.    Yes.

14            Q.    And why would that be?

15            A.    I don't know why they want to

16    limit the access, but it's -- they're controlled

17    drugs and there's a law that states only

18    pharmacists have access to those and that

19    they're kept secured.

20            Q.    Okay.  But --

21            A.    I think there's -- I don't -- I'm

22    not going to comment on the law that way,

23    but ...

24            Q.    Sure.  So you're not saying
```

Highly Confidential - Subject to Further Confidentiality Review

1    there's a law but there's definitely a Walgreens

2    policy?

3              A.    I know it's a policy.

4              Q.    Okay.  The title of this

5    particular policy is "Preventing Diversion of

6    Controlled Substances."

7                    Do you see that?  Very top of the

8    policy.

9              A.    Oh, yes.  I'm sorry.  I see that.

10             Q.    Do you know what "diversion" is in

11   this context?

12             A.    Diversion as it applies to safety

13   and security and what we do is the theft and

14   loss of drugs.

15             Q.    Okay.

16             A.    Diversion on this is how I would

17   apply it.  I don't know how the company -- what

18   their definition is.  I don't do the policies.

19   I don't write the policies.

20             Q.    Okay.  So go back to your -- you

21   still have your resumé there?

22             A.    Yes.

23             Q.    Are there any other general duties

24   that you have that you don't believe you've told

Highly Confidential - Subject to Further Confidentiality Review

```
 1   me about?

 2           A.    I mean, I'm involved in store

 3   visits.  I give direction on -- you know, with

 4   policies and how to be compliant with the

 5   policies.  I do compliance review.  We do

 6   audits.  I do internal and external -- I assist

 7   external and I conduct internal investigations.

 8           Q.    And is all of that geared towards

 9   identifying potential loss, potential shrink,

10   potential theft?

11           A.    I would say yes.

12           Q.    Okay.  Are you familiar with what

13   might be called a trigger report?  Does that

14   mean anything to you?

15           A.    No.

16           Q.    Okay.  Let me show you what I'll

17   mark as Exhibit Number 6.

18                        - - -

19       (Walgreens-Zaccaro Exhibit 6 marked.)

20                        - - -

21   BY MR. GADDY:

22           Q.    And this is P-GEN-47.  This is

23   a -- I'll represent to you this is a transcript

24   of some testimony in front of Congress.  And
```

```
 1    this is before your time with Walgreens.  But if

 2    you look at the first page, do you see the

 3    heading here says "OxyContin:  Its Use and

 4    Abuse."

 5                 Do you see that?

 6        A.    I see that it says that, yes.

 7        Q.    And if you keep reading, it looks

 8    like this was presented to Congress in August of

 9    2001.

10                 Do you see that?

11        A.    I do see that.

12        Q.    Okay.  When you started at

13    Walgreens in 2006, did Walgreens provide you

14    with any training or education on controlled

15    substances and the use or abuse of controlled

16    substances?

17        A.    I don't recall specific.

18        Q.    Okay.  That's fair.  If you look

19    up in the very top right-hand corner, there's

20    kind of a numbering system and the first page

21    ends 001.

22                 Do you see that?

23        A.    Yes.

24        Q.    Okay.  Can you flip with me to
```

```
 1   page 6?

 2          A.    The 006, using that number?

 3          Q.    Yes, ma'am.

 4          A.    Okay.

 5          Q.    And, again, at the top of the

 6   page, you see the heading of this "OxyContin:

 7   Its Use and Abuse," and then the date below

 8   there is Tuesday, August 28, 2001.

 9                Do you see that?

10          A.    I see what you've read, yes.

11          Q.    Okay.  And if you go down a couple

12   of paragraphs, there's a sentence that starts

13   "The use and abuse of OxyContin."

14                Are you with me?

15          A.    Yes, I am following you.

16          Q.    Okay.  You see there it's says,

17   "The use and abuse of OxyContin provides quite a

18   dilemma for us in Congress and for the American

19   public.  For some, OxyContin is the angel of

20   mercy.  For others, it is the angel of death.

21   To those who suffer severe chronic pain, it

22   brings welcome relief.  But for those who abuse

23   this highly addictive drug, it can bring even

24   greater suffering."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2         A.    I see what you've read, yes.

 3         Q.    Okay.  Do you recall being given

 4    any training or education by Walgreens about the

 5    abuse and addiction related to specifically

 6    OxyContin when you began your career at

 7    Walgreens?

 8         A.    I don't recall.

 9         Q.    Okay.  Do you recall at any time

10    during your time at Walgreens being given any

11    education or training by Walgreens about the

12    abuse, addiction, or diversion related to these

13    controlled substances?

14         A.    I don't recall.

15         Q.    Okay.  It goes on to say, "Today,

16    we hear from law enforcement officers who argue

17    that OxyContin is quickly becoming the abuser's

18    drug of choice, surpassing heroin and cocaine in

19    some jurisdictions."

20                    Do you see that?

21         A.    I do see what you've read, yes.

22         Q.    In the -- between the 2006 up

23    until the -- kind of where it seems like there

24    were changes made, '13 and '14, were you aware
```

1    that controlled substances, such as OxyContin,

2    were being abused by people?

3              MR. LEVINE:  Objection to form.

4              You can go ahead and answer.

5         A.    I know that there was a problem

6    with that just based on media and reports on the

7    news that you see.

8         Q.    And --

9         A.    I did not go searching for the

10   information.

11        Q.    And my question is back into the

12   time frame of 2006 to 2013 and '14.  Do you

13   believe that you had an understanding during

14   that time frame that drugs like OxyContin were

15   being abused?

16        A.    I know that they were abused, but

17   I don't know to the extent, by who, under what

18   circumstances, and how they were getting

19   obtained or anything.

20        Q.    Sure.  Did you have a general

21   understanding that controlled substances, such

22   as OxyContin, were being abused from your time

23   in law enforcement as a parole officer?

24        A.    I know that there were drugs that

Highly Confidential - Subject to Further Confidentiality Review

1    were abused.  I don't know that it was OxyContin

2    specifically.

3            Q.    Okay.  Well, what about

4    prescription drugs?  Did you have an

5    understanding that controlled substances, which

6    were prescription drugs, were being abused, from

7    your time as a parole officer?

8            A.    I don't know what specific drugs

9    were being abused when I was a parole officer.

10   I know our concentration was on meth because

11   that was the issue that we were combating.

12           Q.    Okay.  And that was in the 2000 to

13   2006 time frame?

14           A.    Yes.

15           Q.    Okay.  If you turn to page 11 for

16   me, please, again just using the numbers at the

17   top of the page.

18                 And do you see that in the --

19   towards the top there, you see that we get into

20   the testimony of Terrance Woodworth, Deputy

21   Director, Office of Diversion Control.

22                 Do you see that?

23           A.    I do see that.

24           Q.    Are you familiar with the fact

Highly Confidential - Subject to Further Confidentiality Review

1    that DEA has an Office of Diversion Control?

2          A.    I do not know what offices they

3    have.

4          Q.    Okay.  Have you ever heard of the

5    Office of Diversion Control before?

6          A.    No, I have not.

7          Q.    Okay.  There's an association,

8    National Association of Drug Diversion

9    Investigators.

10               Are you familiar with that?

11         A.    No.  I've never heard of that.

12         Q.    Okay.  If you look down at the

13   bottom of the page, it says -- and I'm starting

14   with the paragraph "During the last two years."

15               Do you see where I am?

16         A.    Yes, I do, sir.

17         Q.    It says, "During the last two

18   years, DEA has noted a dramatic increase in the

19   illicit availability and abuse of OxyContin.  As

20   early as 1999 DEA assisted the State of Maine in

21   the investigation of an organized ring of

22   individuals who used forged, stolen, and altered

23   prescriptions to divert thousands of dosage

24   units of OxyContin to abusers."

1          And I'll stop there for a minute.

2    I've read that correctly?

3          A.    That's what you've read.

4                MR. LEVINE:  Objection.  Lacks

5          foundation.

6          A.    You did read that correctly.

7          Q.    Okay.  And we talked a little bit

8    earlier about fraudulent prescriptions, and I

9    think you gave me some examples that would

10   include some of the things that were mentioned

11   here?

12               MR. LEVINE:  Objection to form.

13         Q.    If there was some particular --

14   well, let me strike that and ask it this way:

15   During your time at Walgreens, did you ever

16   encounter an investigation that involved any

17   type of drug ring in any of your stores?

18         A.    No, I have not.

19         Q.    Okay.  Is that something that you

20   would have been -- that would have fallen into

21   your purview, to take on an investigation into

22   an organized drug ring?

23         A.    Only if it was internally.  If it

24   was externally, I would not have been involved

Highly Confidential - Subject to Further Confidentiality Review

1    in that.

2            Q.    Okay.  It goes on to say, "While

3    OxyContin diversion and abuse appear to have

4    begun more in rural areas, such as Appalachia,

5    it now has spread to urban areas.  To date, at

6    least 14 states have experienced abuse and

7    diversion of OxyContin, including the State of

8    Pennsylvania and New Hampshire."

9            Do you see that?

10           A.    I do see --

11           MR. LEVINE:  Objection.  Lacks

12      foundation.

13           A.    I do see what you've read.

14           Q.    If you turn for me, please, to

15   page 15, and I'm going to start down at the

16   bottom of this page.  There's a sentence, bottom

17   middle of the page, that starts "And a

18   phenomenon."  It's about four lines up from the

19   bottom.

20           A.    Oh, I do see it.  I'm sorry.

21           Q.    No, you're fine.

22           It says, "And a phenomenon we call

23   doctor shopping."

24           Are you familiar with the phrase

```
 1    "doctor shopping"?

 2         A.    I am familiar with that phrase,

 3    but it's nothing that I would be involved with

 4    in investigating.

 5         Q.    Okay.  Tell me what that means to

 6    you, "doctor shopping."

 7         A.    A person who is going from

 8    emergency room to emergency room to emergency

 9    room, to different doctors, and getting multiple

10    prescriptions --

11         Q.    Okay.

12         A.    -- for the same drug.

13         Q.    Okay.  What it says there is,

14    "That is individuals that go from doctor to

15    doctor faking illnesses to obtain several

16    prescriptions of the same drug."

17               That sounds pretty similar to your

18    definition, right?

19         A.    Yes, that's what it --

20         Q.    Okay.  And you said that's not

21    something that you would be involved in?

22         A.    No.

23         Q.    Do you have any responsibilities

24    for identifying that if it's happening at any of
```

1  your stores?

2        A.    No, I do not.

3        Q.    Do you have any responsibility for

4  investigating that if it's happening at any of

5  your stores?

6        A.    No, I do not.

7        Q.    Okay.  It then goes on to say,

8  "Dealers or abusers also who then burglarize

9  pharmacies."

10            Do you see that?

11        A.    Yes, I see that.

12        Q.    Does that fall within your

13  purview, investigating burglaries of pharmacies?

14        A.    I would -- I'm notified of a

15  burglary.  That is when I go -- the pharmacist

16  would be responsible for identifying what all

17  was taken in a burglary, and I would be involved

18  with supplying whatever evidence for the police

19  in their investigation.

20        Q.    Okay.  But that's going to be an

21  investigation that's led by an outside agency,

22  correct?

23        A.    Law enforcement would handle that.

24  It's a criminal --

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    Okay.

2            A.    -- criminal activity.

3            Q.    And then last sentence we'll read,

4     it says, "And we have had several armed

5     robberies across the states of individuals

6     breaking into pharmacies and seizing OxyContin

7     at gunpoint."

8                  Do you see that?

9            A.    I do see what you read there.

10           Q.    During the course of your time at

11    Walgreens, have any of the pharmacies that

12    you've been involved in supervising been robbed?

13           A.    Yes, there's been robberies.

14           Q.    Okay.  And have there been

15    robberies where the targets of the robberies

16    were controlled substances, such as OxyContin,

17    oxycodone, hydrocodone, those types of drugs?

18           A.    Yes, those have been targeted

19    drugs.

20           Q.    Okay.  And, in fact, I think I saw

21    in some of the documents that Walgreens has

22    recently had to take the step of installing

23    time-delayed safes into a lot of their stores,

24    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    I actually led that project.
2    Every store in Ohio now has steel structured
3    time-delayed safes.
4           Q.    Okay.  And that was in response to
5    robberies where the targets of those robberies
6    were controlled substances?
7           A.    I don't know what the response was
8    or why we did it.  I just led to make sure that
9    the rollout and the project went smoothly.
10          Q.    Okay.  Those are safes for holding
11   drugs, correct?
12          A.    Correct.
13          Q.    And safes for holding the -- it's
14   not safes for holding blood pressure medicine,
15   but safes for holding --
16          A.    Controlled drugs.
17          Q.    -- controlled substances, correct?
18          A.    Yes.
19          Q.    Okay.
20                MR. LEVINE:  We've been going
21          almost an hour and a half.  Is it a good
22          time for a break?
23                MR. GADDY:  Yeah, absolutely.
24                THE VIDEOGRAPHER:  Off the record,
```

Highly Confidential - Subject to Further Confidentiality Review

1           10:26.

2                   (Recess taken.)

3                   THE VIDEOGRAPHER:  On the record,

4           10:37.

5    BY MR. GADDY:

6           Q.    And, Ms. Zaccaro, I should have

7    told you this at the beginning.  But whenever

8    you want to take a break, restroom, comfort,

9    whatever, just let me know.

10          A.    Okay.  Thank you.

11          Q.    Sure.  One last thing we're going

12   to look at in this document, page 25, using the

13   same numbering system, I'm going to look at the

14   very top of that page, and do you see where it

15   says "The third"?

16          A.    Yes, I see.

17          Q.    It says, "The third and often

18   largest diversion method are pill mill

19   operations where corrupt doctors or pharmacists

20   conspire with pill traffickers to write or fill

21   fraudulent prescriptions for ghost patients and

22   then sell the drugs on the street at up to

23   100 percent profit."

24                  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, I seen what you've read.

 2              Q.    Are you familiar with the phrase

 3    "pill mill"?

 4              A.    Yes, vaguely.

 5              Q.    What does it mean to you?

 6              A.    Doctors writing prescriptions

 7    and -- for people that don't exist and going out

 8    and --

 9              Q.    Is investigating or identifying

10    pill mills something that falls within your

11    purview?

12              A.    No, it does not.

13              Q.    Let me jump back to your resumé

14    now, which is P-WAG-2414.  And --

15              A.    May I take this?

16              Q.    -- turn with me, please, if you

17    look, it's about six or seven pages in, at the

18    very bottom right-hand corner it says "5 of 17."

19                    Are you with me?

20              A.    Yes, I see that.

21              Q.    And as you can see, the bulk of

22    this is blacked out or redacted, so I just have

23    a couple questions for you.  In the middle --

24    top middle of the page, you see there's a place
```

```
 1    where you made some comments, correct?

 2         A.    Correct.

 3         Q.    And the second sentence there, it

 4    says, "I have requested training for drug

 5    diversion by the Ohio Board of Pharmacy, which

 6    is pending approval and should be scheduled."

 7              Do you see that?

 8         A.    Yes.

 9         Q.    Did you undergo training for drug

10    diversion by the Ohio Board of Pharmacy?

11         A.    I don't recall.

12         Q.    Okay.  Do you recall ever

13    undergoing any training from the Ohio Board of

14    Pharmacy?

15         A.    The only thing that I can recall

16    going to the Ohio Board of Pharmacy and

17    participating in anything was a roundtable.

18         Q.    Okay.  What was the topic?

19         A.    I don't remember.

20         Q.    Okay.  When you see the phrase

21    "drug diversion" in that sentence, what are you

22    referring to there?

23         A.    "Drug diversion," to me, as I

24    define it for how it applies to me, is theft and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   losses.
 2          Q.    Okay.  So as best as you can tell,
 3   would this be training related to theft or
 4   losses of controlled substances within the
 5   pharmacy?
 6          A.    I don't remember what I was --
 7   this was a review from a few years ago.
 8          Q.    Sure.
 9          A.    I don't remember what I was
10   identifying or capturing there.
11          Q.    What I'm trying to -- what I'm
12   trying to make sure is that there's not some
13   increased role or duty or task that you were
14   involved in or performed that you haven't told
15   me about already.
16                So we've spent a lot of time, I
17   think, with you telling me about your primary
18   duties related to loss or theft within the
19   pharmacy and looking at those adjustment reports
20   or exception reports, correct?
21          A.    Correct.
22          Q.    Okay.  Would this have been
23   anything outside of that?
24          A.    Not that I can think of at this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   time.

 2           Q.    Okay.  You weren't looking into

 3   training on identifying doctor shopping or

 4   fraudulent prescriptions, correct?

 5           A.    I don't remember.  I don't think I

 6   would, because it's outside of my area.

 7           Q.    Okay.  If you did, it wasn't

 8   anything that you've used in the course of your

 9   employment?

10           A.    No, it wouldn't have been.

11           Q.    Okay.  This wouldn't have been any

12   training on analyzing or making decisions about

13   the size of orders of controlled substances for

14   pharmacies?

15           A.    No.

16           Q.    Okay.  That's nothing that you've

17   even --

18           A.    I would never be involved in the

19   ordering.

20           Q.    Okay.  If you'd flip for me about

21   20 pages or so, it's going to be the next set of

22   numbering.  And on the bottom right-hand corner

23   you should have page 5 of 15.

24           A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Are you with me?

 2              A.    I am.

 3              Q.    Okay.  And it looks originally --

 4    or first you talk about some training and

 5    education that you've undergone, and in

 6    parentheses there it says "Medication Disposal."

 7                    Do you see where I am?

 8              A.    Yes.

 9              Q.    It says, "Current issues and legal

10    considerations for pharmacists, update on

11    federal controlled substance dispensing

12    responsibilities."

13                    Do you see that?

14              A.    Yes.

15              Q.    Okay.  And you go on to say, "I

16    coordinated and participated in the DEA drug

17    take-back event with the Medina County Drug Task

18    Force resulting in a successful collection of

19    231 pounds of prescription drugs."

20                    Do you see that?

21              A.    Yes, I see that.

22              Q.    Okay.  And that was -- earlier

23    this morning we were talking about some of your

24    interactions with law enforcement.  I think you
```

```
 1    mentioned some of the community involvement, and

 2    that would be what you're talking about here,

 3    this drug take-back day with the DEA that you

 4    did?

 5           A.    Yes.

 6           Q.    Okay.  I'm going to show you what

 7    I'll mark as Exhibit 7.

 8                     - - -

 9       (Walgreens-Zaccaro Exhibit 7 marked.)

10                     - - -

11    BY MR. GADDY:

12           Q.    And this is P-WAG-2265.  And do

13    you recognize this as being an e-mail from you.

14    It looks like it was sent to a Ms. Foster at

15    DOJ.

16                 Do you see that at the very top?

17           A.    Yes.  I'm sorry.

18           Q.    Do you know who Denise Foster is?

19           A.    I believe she was the contact

20    person with the DEA office that we coordinated

21    hosting the event for.

22           Q.    Okay.

23           A.    The drug take-back event.

24           Q.    Okay.  And if you flip the page,
```

```
 1    do you see one of the press releases about this

 2    particular event?

 3            A.    Yes --

 4            Q.    Okay.

 5            A.    -- I see that.

 6            Q.    And just reading the -- starting

 7    at the beginning, it says, "On April 27 from

 8    10:00 to 2:00, the Medina County Drug Task Force

 9    and the DEA will give the public its sixth

10    opportunity in three years to prevent pill abuse

11    and theft by ridding their homes of potentially

12    dangerous, expired, unused, and unwanted

13    prescription drugs."

14                 Do you see that?

15            A.    I do see what you've read, yes.

16            Q.    Okay.  And does that -- is that

17    describing this DEA drug take-back event that

18    you participated in?

19            A.    Yes.

20            Q.    Okay.  And is this an event that

21    you had participated in previously or is this

22    the first time?

23            A.    This would have been the first

24    event that I was involved with.
```

1          Q.    Okay.  And in the next paragraph

2    it says, "Last September, Americans turned in

3    244 tons of prescription drugs at over 5,200

4    sites operated by the DEA and its thousands of

5    state and local law enforcement partners.  In

6    its previous take-back events, the DEA and its

7    partners took in over 2 million pounds, over

8    1,000 tons, of pills."

9               Do you see that?

10         A.    I do see what you've read, yes.

11         Q.    The next paragraph, it says, "This

12   initiative addresses a vital public safety and

13   public health issue."

14               You agree with that sentence, that

15   the excess pills that -- particularly controlled

16   substances that individuals may have in their

17   homes can constitute a public safety and health

18   issue?

19         A.    I don't know.  I can't speak for

20   people's drugs in their homes and how they're

21   handling those.

22         Q.    Okay.  It says, "Medicines that

23   languish in home cabinets are highly susceptible

24   to diversion, misuse, and abuse."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.    Yes, I see that.

 3          Q.    This -- we see the term

 4    "diversion" there, and it looks like it's used a

 5    little bit differently in the context that

 6    you've used it.

 7                    Would that be fair?

 8          A.    Yes.  This wasn't my press

 9    release.

10          Q.    No.  Sure.

11          A.    Okay.

12          Q.    And I'm not -- yeah, no.

13          A.    So I don't know how -- I can't

14    speak to how they applied the term diversion in

15    this release.

16          Q.    The concept of pills being stored

17    in a medicine cabinet and being obtained and

18    used by somebody other than who the prescription

19    was written for, would that be diversion in your

20    mind, or would that be something else?

21          A.    I don't know.

22          Q.    Okay.  Is that something, other

23    than this -- outside of this context as far as

24    drug take-backs, is that something that you've
```

1    ever been involved in, investigating or policy

2    or anything in that regard?

3            A.    For diversion?

4            Q.    Correct.

5            A.    Only the internal investigations

6    and matters of the theft and loss --

7            Q.    Okay.

8            A.    -- is the extent of my

9    involvement.

10           Q.    Okay.  How was it that you came to

11   be involved with this particular drug take-back

12   program?

13           A.    We network in our communities with

14   law enforcement to the extent of introducing

15   ourselves, giving business cards when those

16   opportunities come up, just knowing who to

17   contact if they need any support or assistance

18   with investigations or anything.

19                 The drug take-back -- how I became

20   aware of drug take-back day, I can't recall in

21   particular.  It may have been just in passing,

22   in conversation.  It could have come from our

23   support -- I don't know.

24           Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    And for the drug take-back, we

2    work with law enforcement local, not the DEA.

3          Q.    Okay.  Let me ask you this:  You

4    referenced this earlier, that you've seen in the

5    news media references to issues of abuse and

6    addiction related to opioids; is that fair?

7          A.    Yes, that's fair.

8          Q.    Okay.  Have you seen references in

9    the news media to there being an opioid crisis

10   or an opioid epidemic or things of that nature?

11         A.    Yes.

12         Q.    Okay.  From -- do you agree or

13   disagree with the proposition that's been made

14   in the media and elsewhere that the country is

15   in the midst of an opioid crisis?

16         A.    I don't know.  I mean, I don't

17   know the statistics.  I know there's a crisis.

18         Q.    Let me ask you this:  Here in

19   Cleveland, do you ever see any evidence of what

20   you would -- what would be referred to as the

21   opioid crisis or opioid epidemic?

22         A.    Physically seeing it myself, no,

23   but I am aware of overdose matters in our stores

24   through our security operations center, because

```
 1    those are reported through our security

 2    operations center.  I'm aware that overdose

 3    victims are found in parking lots, not just at

 4    our Walgreens, they're found all over the place,

 5    and other retailers having the same concerns in

 6    the restrooms.

 7         Q.   Okay.

 8         A.   Where they come for a safe place

 9    to -- I don't know.  I don't know why they come

10    there.  I have my own opinions, but our

11    pharmacists are actually -- and they do.

12    They -- they're administering the naloxone and

13    the Narcan when we find these instances.

14         Q.   Okay.  So I understand you to be

15    saying that while maybe you haven't seen it

16    firsthand, that you're certainly aware of the

17    impact of the opioid crisis here in Cleveland?

18         A.   Yes.

19         Q.   Okay.  And it sounds like maybe

20    you're aware of it in a professional capacity

21    based on activity that occurs at the Walgreens'

22    stores?

23         A.   I agree, yes.

24         Q.   Okay.  And you mentioned
```

Highly Confidential - Subject to Further Confidentiality Review

1    incidences in store bathrooms.  Can you tell me

2    what you're talking about there?

3           A.    Our restrooms are public.

4    Folks -- it's happened.  I don't know how many

5    times to come up with a number.  I don't know.

6    I'm just aware of incidents where somebody will

7    walk in and find somebody on the floors.

8           Q.    Okay.  And these are people that

9    have -- that are overdosing?

10          A.    Some are medical emergencies.

11   Some -- but some of them are -- I don't know for

12   sure if it's overdosing.  I'm not the paramedics

13   who respond.  I'm not -- I don't know -- if an

14   overdosed person was laying in front of me, I

15   wouldn't know.

16          Q.    Okay.  Well, we started this

17   conversation in the context of your awareness of

18   an opioid crisis and their impacts in Cleveland

19   and what you -- one of the things that you

20   referred to were incidences that occurred within

21   Walgreens' bathrooms, correct?

22          A.    Yeah.

23          Q.    And what you're referring to there

24   is what you've interpreted as individuals who

1   are overdosing on opioids within Walgreens'

2   bathrooms?

3          A.    I know victims are found in the

4   restrooms.  I know -- I don't know if it's

5   overdosed on opioids.  I don't know if it's

6   medical conditions.  The general information

7   that we get is -- our operation center, security

8   operation center was notified of an unconscious

9   individual found in the restroom.

10             Store managers, in passing, have

11  made comments to me that it was an overdose.

12  What the overdose drug, I can't speak to.  I

13  wasn't there when it happened.

14         Q.    And these are incidents that have

15  happened in Walgreens' stores throughout the

16  State of Ohio?

17         A.    All over the company.  And not

18  just Walgreens' stores.  When we talk to our

19  colleagues in CVS and Targets, it's everywhere.

20         Q.    Okay.  And these are incidents

21  that are happening here in Cleveland also?

22         A.    Yes, it's happened in Cleveland.

23         Q.    Okay.  Are there reports related

24  to needles in store bathrooms or in Walgreens'

```
 1   stores?

 2           A.    I'm not aware.  I don't know.

 3   That's never been --

 4           Q.    Okay.  You also mentioned reports

 5   of individuals overdosing in parking lots?

 6           A.    They've been found in parking lots

 7   on some of the reports that I've seen.

 8           Q.    Okay.  And those are Walgreens'

 9   parking lots throughout the State of Ohio?

10           A.    Yes.

11           Q.    Okay.  And in your role in loss

12   prevention, do you have any job duties related

13   to these individuals who are overdosing in

14   Walgreens' bathrooms or overdosing in Walgreens'

15   parking lots?

16           A.    No.

17           Q.    Similar to what you told us about

18   the Walgreens' bathrooms, do you have

19   individuals -- or are you getting reports from

20   your colleagues about individuals who are having

21   these opioid-related overdoses at other

22   locations in their parking lots, whether it's

23   CVS or Target or Walmart or whatever?

24           A.    It's through hearsay that some of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the asset protection managers or law enforcement

2    may say, "Yeah, we're having this all over CVS,

3    Target.  It doesn't matter."

4              And, again, I can't state that

5    these are opioid overdoses.  I only know that

6    they are a person found unconscious.

7        Q.    Sure.  And these are people that

8    are being found unconscious in Walgreens'

9    bathrooms and/or parking lots?

10       A.    Yes.

11       Q.    Okay.  Has anybody at Walgreens

12   asked you or the loss prevention team to take

13   any steps to address those issues?

14       A.    No, they have not.

15       Q.    Do you know if there's any other

16   division or department or position at Walgreens

17   who's been asked to take any steps to address

18   those issues?

19             MR. LEVINE:  Objection.  Lacks

20        foundation.

21       A.    I don't know.  That's outside

22   of -- I can't speak for what other departments

23   are doing or --

24       Q.    Sure.  I'm just asking if you've

1   heard about any other departments or divisions

2   or positions?

3          A.    No, I'm not aware of any.  I'm

4   sorry.

5          Q.    Okay.  Do you know what the

6   standard operating procedure is to do in those

7   situations when an individual is found to have

8   been -- to have overdosed in the bathroom or

9   parking lot?

10          A.    I do not know what the store's

11   response is to that, as far as SO -- or I'm

12   sorry.  Standard operating procedure -- we call

13   it SOP.  I'm sorry.

14          Q.    Sure.  No.  That's fine.

15                Outside of knowing that there's

16   been individuals who have overdosed in

17   Walgreens' parking lots and bathrooms, are there

18   any other ways, from a professional level, as it

19   relates to your job with Walgreens that you're

20   aware of the impact of the opioid crisis here in

21   Cleveland?

22          A.    I mean, I know there's a crisis.

23   The extent of it -- I don't know the details,

24   the facts.  It's -- you know, it's all over the

1    media.  Other than sitting down and watching the

2    news and seeing what's going on, I don't know

3    what the statistics are.  I don't know the

4    greatness or magnitude of it.

5          Q.    Okay.  If you look at the bottom

6    of this paragraph here, it looks like it's the

7    last sentence about three lines up.  It starts,

8    "In addition to this."

9                I'm sorry.  I'm back to your

10   performance review.

11         A.    Oh, okay.  What page are you on?

12   I'm sorry.

13         Q.    Same one.  I'm sorry.  The 5 of

14   15.

15         A.    Okay.

16         Q.    It says, "In addition to this"

17   about three or four lines up from the bottom,

18   about in the middle of the page.

19         A.    Yes, I see where you are.

20         Q.    It says, "In addition to this,

21   I've coordinated with Cleveland market district

22   managers and Nancy Pommerening, Executive

23   Director of the Drug Awareness and Prevention

24   Inc., and Walgreens' participation for her

```
 1    mission to include drug awareness education in

 2    all of our public schools in the State of Ohio."

 3                 Do you see that?

 4         A.    Yes.

 5         Q.    Do you know what's being referred

 6    to there?

 7         A.    Yes.

 8         Q.    Tell me about that, please.

 9         A.    When I was working with local law

10    enforcement to coordinate Walgreens' hosting of

11    the drug take-back days, I was put in contact

12    with Nancy Pommerening.  She, like her title

13    speaks, is trying to get in place in every

14    school a 12-week curriculum focused on substance

15    abuse awareness in grades K through 12 in every

16    Ohio public and private school.

17                 As part of that, because she is a

18    non-profit organization and she was just coming

19    about, I asked her what Walgreens can do to

20    support her, because I thought it was a

21    wonderful initiative that she was doing.  And

22    Walgreens supported her.

23                 I was able to coordinate with the

24    district managers the donation of the teachers'
```

1    binders that would be used and the dividers that

2    she would use for the teachers' binders for

3    schools that signed -- that take on the

4    curriculum.  So ...

5           Q.    And why did you think that was an

6    important program to take on or to support?

7           A.    With the kids, starting before it

8    becomes a problem.  Get to them before the

9    awareness -- I mean, and her curriculum was very

10   in-depth and very geared towards, you know,

11   whatever age group.  And it talked about the

12   effects, how it starts, the -- I mean it was --

13   I was impressed.

14                     - - -

15      (Walgreens-Zaccaro Exhibit 8 marked.)

16                     - - -

17           Q.    Okay.  Let me show you what I've

18   marked as Exhibit 8.  And you recognize this as

19   an e-mail chain between you and a John Mormello.

20           MR. GADDY:  This is P-WAG-2280.

21           A.    Yes.

22           Q.    And it looks like your e-mail is

23   in the middle of the page here, and we can look

24   at that.  Maybe that will jog your memory about

1   what we're looking at.

2              You say, "Hello John.  I was

3   looking at the latest LP Connection on our home

4   page."

5              Is that some loss prevention --

6   that Loss Prevention Connection?

7        A.    Yes.

8        Q.    Is that an internal newsletter or

9   something like that?

10       A.    Yes.

11       Q.    "And read about the presentation

12   you gave to the eighth grade class for

13   prescription drug abuse.  I have been working

14   with a nonprofit organization whose mission it

15   is to have every public and private school in

16   Ohio incorporate a drug abuse awareness

17   curriculum in their science course.  This

18   program is NIDA.  To support this, the DMs in

19   Cleveland have approved the donation of supplies

20   for the teachers' manuals."

21              And that's what you were just

22   telling us about with the binders and dividers?

23       A.    Yes, sir.

24       Q.    And it looks like ultimately here

1    you were asking him for this PowerPoint that he

2    had presented, correct?

3         A.    Yes.

4         Q.    You go on to say, "We want to

5    offer a pharmacist to guest speak at the schools

6    for the portion of prescription drug abuse and

7    awareness.  I am interested in the PowerPoint

8    presentation you gave on this topic to possibly

9    build off of and/or use."

10         Correct?

11         A.    Yes.

12         Q.    Did you ever get to be involved in

13    any of these presentations?

14         A.    No.  I was not.

15         Q.    Okay.  Did -- were you able to

16    follow through with the commitment to donate the

17    binders and the dividers and things like that?

18         A.    And -- yes, and we've continued to

19    do that as recently as last year.  We're still

20    making donations.

21         Q.    Okay.  Is John a loss prevention

22    person?

23         A.    I don't know.

24         Q.    Okay.  But, regardless, this is a

Highly Confidential - Subject to Further Confidentiality Review

1    presentation that John gave to, it looks like,

2    an eighth grade class on prescription drug

3    abuse?

4          A.    Yes, that's what it looks like

5    based on --

6          Q.    Okay.  Do you recall if you did

7    anything with this presentation as presented to

8    you?

9          A.    No.  I did not do anything with

10   it.  I personally have -- can't recall using

11   that and presenting it for anything.

12         Q.    Okay.  Let's look at a couple of

13   the slides in here.

14         A.    Okay.

15         Q.    And this doesn't exactly have page

16   numbers, so I'm going to use the end of the

17   Bates number, which is just below the bottom the

18   right-hand corner of the slide.

19         A.    Okay.

20         Q.    So you see the presentation starts

21   on, what we'll call, page 33?

22         A.    Okay.

23         Q.    And it says "Prescription Drug

24   Abuse" -- and this is a presentation.  It says

Highly Confidential - Subject to Further Confidentiality Review

1    "By Walgreens."

2            Do you see that?

3        A.    Yes.

4        Q.    And if you turn to the next page,

5    it says, "What is prescription drug abuse?"  It

6    says, "When someone takes a medication that was

7    prescribed for someone else or takes their own

8    prescription in a way different from what was

9    originally prescribed."

10            Do you see that?

11        A.    Yes.

12        Q.    Do you have any disagreement with

13    this definition of drug abuse that was given in

14    the Walgreens' PowerPoint?

15        A.    I don't have a problem with that,

16    no.

17        Q.    Okay.  I'm going to turn two pages

18    to where it ends in 36, and it says "Common

19    Drugs of Abuse."

20        A.    Yes.

21        Q.    Do you see that?

22        A.    Yes.

23        Q.    And the first one listed there is

24    pain medication?

```
 1          A.    Yes.

 2          Q.    Is that consistent with your

 3   understanding, that pain medication is a common

 4   drug that's abused?

 5          A.    I don't know.  I wasn't the one

 6   who compiled this presentation.  So to speak on

 7   what their -- that person's intentions were with

 8   this statement, I can't speak to.

 9          Q.    Sure.  And I'm not asking you in

10   the context of this presentation.  I'm asking

11   you just generally, is it -- is that consistent

12   with your understanding that pain medications

13   are a drug that's commonly abused?

14          A.    I don't know.

15          Q.    Below that it says "Oxy, percs,

16   and Vikes."  Do you know what's being referred

17   to there?

18          A.    I don't know, but that would be,

19   to me, in my own experience, would be the street

20   names.

21          Q.    Okay.  Street names of what?

22          A.    OxyContin, Percocet, and Vicodin.

23          Q.    And those are drugs that you're --

24   you have somewhat of a familiarity with because
```

 1    they're sold in Walgreens' stores, correct?

 2          A.    Yes.

 3          Q.    Okay.  Do you encounter the street

 4    names of those drugs in your professional

 5    capacity and in any of the investigations that

 6    you would do?

 7          A.    I have encountered those names

 8    attending some law enforcement presentations,

 9    and their awareness, and they -- telling us, you

10    know, when you're attending those what is the

11    current targeted drug, the desired drug, what

12    the street names are.  So that's how I'm

13    familiar with those names.

14          Q.    Okay.  And your understanding is

15    those are all controlled substances?

16          A.    Yes.

17          Q.    Okay.  If you turn the page to 37,

18    do you see the title of the slide is Sources?

19          A.    Yes.

20          Q.    And it says, "Given for free by

21    friend or relative, purchased from a friend or

22    relative, stolen from a friend or relative, own

23    prescription, or drug dealers."

24                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes, I see that.

2          Q.    And fair to say that none of these

3    really fall into your purview, at least

4    professionally, in investigating any of these

5    types of diversion of controlled substances,

6    correct?

7          A.    Correct.

8          Q.    Okay.  If you flip for me two

9    pages, please, to the one ending in 39, and you

10   should see a graph of "Unintentional Drug

11   Overdose Deaths."

12               Do you see that?

13         A.    Yes, I see that.

14         Q.    And do you see -- using the key

15   that's right above the chart, that the top line

16   on the chart is going to relate to opioids, the

17   middle line on the chart is going to relate to

18   cocaine, and the one at the bottom is going to

19   relate to heroin.

20               Do you see that?

21         A.    I do see that.

22         Q.    And when -- it looks like,

23   according to this chart, beginning in about the

24   year 2000, the opioid and cocaine overdose
```

```
1    deaths were pretty much right on track.

2              Do you see that in the year 2000?

3              MR. LEVINE:  Objection.  Lacks

4         foundation.

5         A.    I do see that, but I don't know

6    where this came from or -- I wasn't the one who

7    presented this and who got the data.

8         Q.    I understand.  I'm not asking if

9    it's accurate.  I'm just asking ...

10        A.    That's what it does say, what you

11   said, yeah.

12        Q.    Okay.  And it looks like when you

13   started with Walgreens in 2006, that the opioid

14   deaths had gone, according to this chart, from

15   approximately 3,000 deaths per year up to

16   approximately 11,000 deaths per year.

17              Would that be fair?

18              MR. LEVINE:  Objection.  Lacks

19        foundation.

20        A.    I see what you've read and pointed

21   out, yes, but I don't know the statistics, I

22   mean, other than what is presented here, what

23   you've read.

24        Q.    Okay.  When you began with
```

1    Walgreens in 2006, do you recall getting any

2    training or education on the number of overdose

3    deaths related with opioids?

4            A.    I don't recall.

5            Q.    Okay.  Do you recall there being

6    any training or education on procedures,

7    protocols, policies, SOPs, related to dealing

8    with potential customers overdosing from opioids

9    either in your stores or in your parking lots?

10           A.    No.  That is outside of my area.

11   My training would be about theft and losses.

12           Q.    If you turn to the slide ending,

13   for me, in page 46.

14           A.    Yes.

15           Q.    Do you see another chart on this

16   page?

17           A.    Yes.

18           Q.    And it looks like at the bottom of

19   the chart, this has a citation.  It came from

20   the CDC.  Do you see that, Center for Disease

21   Control?

22           A.    Okay.  Yes, I see that.

23           Q.    And do you see that this chart

24   indicates the unintentional drug overdose deaths

1    from 1970 through 2007?

2         A.    Yes, I see that.  I thought it was

3    2006, though, on the chart.  Oh, I see.  Never

4    mind.  '07's got a --

5         Q.    Okay.  And when you started in --

6    with Walgreens in 2006, is it fair to say, based

7    on your previous answers, you didn't get any

8    training or education on the rise in the number

9    of opioid deaths related to narcotics; is that

10   correct?

11        A.    Not that I recall.

12        Q.    At any time since you started at

13   Walgreens, have you gotten any training or

14   education from Walgreens on the number of

15   opioid-related overdoses or opioid-related

16   overdose deaths, either nationally or locally in

17   Cleveland or in the territories that you cover?

18        A.    I don't know.  Not that I can

19   recall at this time.

20        Q.    Okay.  I'm still back on this

21   page 5 of 15.

22        A.    Okay.

23        Q.    And in the middle of the paragraph

24   there, there's a sentence that says -- starts,

1    "I assisted in the presentation."

2          A.    Yes.

3          Q.    "I assisted in the presentation of

4    information presented to the Cleveland market

5    for good faith dispensing during the Cleveland

6    market road show and presented the February 2013

7    focus on profit, good faith dispensing to store

8    managers during a manager's meeting and

9    discussed this during store visits."

10               Do you see that?

11         A.    Yes.

12         Q.    So there's a couple of terms there

13   I want to ask you about.  The first is the

14   "focus on profit."  What is that?

15         A.    That is a standard header, at the

16   time, our communications and my department, our

17   weekly -- I think they came down weekly or

18   monthly.  It didn't matter what information was

19   coming down, whether it was a change in a

20   process or just raising awareness in something.

21   It was just a standard focus on profit header.

22         Q.    Okay.  And so the focus on profit

23   is something that's consistently been on that

24   header of communications that are given to you

Highly Confidential - Subject to Further Confidentiality Review

1    throughout your time at Walgreens?

2          A.    As I recall, yes.

3          Q.    Okay.  And it goes on to say that

4    you "presented the good faith dispensing."

5                Do you see that?

6          A.    Yes.

7          Q.    What is that referring to?

8          A.    Walgreens has in place a good

9    faith dispensing policy and procedure.

10         Q.    And I'm aware of that, but my

11   understanding was that was more of a

12   pharmacist's program than a loss prevention

13   program.

14         A.    It is.

15         Q.    Does it have a loss prevention

16   aspect to it?

17         A.    No.  And it would have been --

18   anything that I would have done in it is -- this

19   is what it is.  This is what it's for.  I

20   wouldn't have gotten into the "You do this, you

21   do this, and then you have to do that."

22               So it was just communicating the

23   awareness, "Hey, it's there.  This is what it's

24   for."

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Who would have been the audience

2   for this presentation?

3          A.    Are you talking about the road

4   show, the market road show?

5          Q.    Yeah.  Let me ask about both

6   actually.  So what's the market road show?

7          A.    Every year there is a road show

8   for the store managers and pharmacy managers who

9   can attend, which there's usually a pretty good

10  turnout for that.  And the road show is

11  presented by your district, your region staff.

12  Sometimes we have people from our support office

13  that come to it.

14          But it's really every year just to

15  highlight our year and review, we've done this,

16  this, this, and this, and this is what we have

17  to look forward to coming up in next year.  It's

18  a highlight.

19          Q.    Would the good faith dispensing

20  have been an aspect of your presentation there?

21          A.    If it -- it says it was.  It would

22  have just been highlighting, and Walgreens has

23  in place, you know, the good faith dispensing.

24  It would have been a highlight.  It wouldn't
```

1    have been anything detailed.

2         Q.    Let me ask you this:  Are you

3    involved in writing or drafting the good faith

4    dispensing policy?

5         A.    Not at all.

6         Q.    Okay.  Are you involved in

7    training pharmacists on how to follow the good

8    faith dispensing policy?

9         A.    Not at all.

10        Q.    Okay.  Do you -- have you done

11   anything as it relates to the good faith

12   dispensing policy outside of communicate that it

13   exists?

14        A.    That would be the extent of it,

15   that I can recall.

16                      - - -

17      (Walgreens-Zaccaro Exhibit 9 marked.)

18                      - - -

19        Q.    Okay.  I'll show this that I'm

20   going to mark as Exhibit Number 9.  This is

21   P-WAG-2376.

22              And this looks like this is an

23   e-mail from June of 2012 that was sent from a

24   list serve to a bunch of list serves, correct?

```
 1              A.    Yes, that's what it looks like.

 2              Q.    Okay.  And it looks like -- I'm

 3    guessing at some of these acronyms, but I see

 4    some market loss prevention folks, district loss

 5    prevention managers.  Would you have been on one

 6    of these list serves?

 7              A.    The DLPMs, we would have been

 8    district loss prevention managers.

 9              Q.    Okay.  So this is an e-mail that

10    you would have received by way of being on that

11    list serve?

12              A.    Yes.

13              Q.    Okay.  And it indicates -- the

14    e-mail says, "Good morning.  Attached are the

15    materials that will be reviewed today during

16    today's videoconference, which include" -- it

17    talks about the "controlled substance action

18    PowerPoint, the good faith dispensing policy,

19    the focus on compliance survey and the focus on

20    compliance pain management cover letter."

21              Do did you see that?

22              A.    Yes, I see what you've read.

23              Q.    And if we flip to the very next

24    page, you see the first slide of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    PowerPoint, "Controlled Substance Action Plan."

 2         A.    Yes.

 3         Q.    Do you recall this PowerPoint

 4    presentation?

 5         A.    I do not from that far back.

 6         Q.    Do you recall having any

 7    involvement in a Controlled Substances Act

 8    action plan?  Does that mean anything to you?

 9         A.    I don't recall at this time.

10         Q.    If you'd turn to -- and these

11    slides are numbered, so I'm going to go to

12    slide 3.

13         A.    Okay.

14         Q.    And the title of the slide should

15    be "Overview."

16         A.    Yes.

17         Q.    Okay.  And it says, "Due to recent

18    action taken by the DEA, select policies and

19    procedures have been updated to ensure our

20    pharmacists and stores are compliant when

21    dispensing controlled substances."

22               Do you see that?

23         A.    I see that.

24         Q.    Was there ever a time in which
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   your duties ever changed to relate to controlled

 2   substances and ensuring compliance with

 3   dispensing policies for controlled substances?

 4          A.    No.  My area is on loss and theft,

 5   not -- I have no involvement in the dispensing.

 6          Q.    Okay.  And your area has always

 7   been on loss and theft?

 8          A.    Correct.

 9          Q.    Okay.  If you flip with me,

10   please, to page 11 -- or slide 11.  I'm sorry.

11          A.    Okay.

12          Q.    The title of this is "Exception

13   Stores."

14                Do you see that?

15          A.    I do see that.

16          Q.    It says that "Walgreens has taken

17   a proactive approach to minimize risk for

18   targeted stores that may be impacted in the

19   future.  District and Market Leadership,

20   including Loss Prevention, will be provided a

21   list of exception stores."

22                Do you see that?

23          A.    Yes, I see what you've read.

24          Q.    What does that mean?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1           A.    I don't know what the exception is
 2   that's being captured.  I don't know.
 3           Q.    Okay.  Let's look at the next
 4   bullet point.  It says, "Exception stores were
 5   identified using the following criteria:
 6   Controlled substance volume and trending,
 7   proportionality to total business, payment
 8   method."
 9                 Do you see that?
10           A.    I see what you've read, yes.
11           Q.    With that additional context, does
12   that help explain the previous bullet point
13   about loss prevention being provided a list of
14   exception stores?
15           A.    I don't know.  It may have.
16           Q.    Have you ever been provided a list
17   of exception stores?
18           A.    I don't recall.
19           Q.    Okay.  Do you recall ever taking
20   any action related to an exception store?
21           A.    I would -- no, I don't recall, but
22   I would not take action because the exception
23   criteria that was outlined here is not within my
24   area of theft and losses.  It's not uncommon for
```

1    our department to be shared and cascaded this

2    information as an FYI.  So we're aware of what

3    the operations, since we've partnered with the

4    operations and tried to support different

5    initiatives with the operations.  So we're

6    informed of their initiatives.

7            Q.    Does -- and that's what I'm just

8    trying to get an understanding of, is whether or

9    not this was you or somebody else.

10           A.    Yes.

11           Q.    Do you even know -- the term

12   "exception store," does that mean anything to

13   you?

14           A.    No.

15           Q.    Okay.  The last bullet point says,

16   "Working together, District LP Managers."  Is

17   that what you were?

18           A.    That would have been me, yes.

19           Q.    It says, "Working together,

20   District LP Managers and Pharmacy Supervisors

21   for these exceptions stores are required to

22   complete a Focus on Compliance Pain Management

23   survey."

24                 Do you see that?

1          A.      I do see that.

2          Q.      Have you ever heard of a Focus on

3    Compliance Pain Management survey?

4          A.      It doesn't -- no, I don't recall

5    ever hearing that.

6          Q.      Have you ever completed or

7    assisted a pharmacy in completing a focus on

8    compliant pain management survey, as far as you

9    know?

10         A.      Not to my knowledge, no.

11         Q.      Okay.  If you flip to --

12    looking -- using the Bates number on the bottom

13    right-hand corner, to page 658.

14         A.      Okay.

15         Q.      Do you see the title of this

16    document is "Focus on Compliance, June 2012"?

17                 Do you see that?

18         A.      Yes.

19         Q.      Have you ever seen this form

20    before?  And you can flip through it.  It's a

21    couple pages long.

22         A.      I have never seen this.

23         Q.      Okay.  You saw one of the previous

24    slides we looked at talked about that the loss

Highly Confidential – Subject to Further Confidentiality Review

1    prevention managers and the pharmacy supervisors

2    wouldn't be involved in receiving these and

3    having pharmacies fill them out.  That's never

4    anything you've been involved in, correct?

5          A.    No, I was not.

6          Q.    Do you have any knowledge or

7    understanding of any pharmacy supervisors that

8    have been involved in your districts doing

9    anything like this?

10         A.    Not that I'm aware of.  But, I

11   mean, without knowing who that exception list

12   was of stores, we may not have even had any

13   stores, and so he may possibly -- and I'm

14   speculating, and I shouldn't, and I realize

15   that, but unless he needed me for any input on

16   anything or reporting that I could provide him

17   as part of the analysis, that would have been

18   the only involvement.  But I do not remember

19   ever seeing this.

20         Q.    Have you ever been involved in any

21   training provided by Walgreens, that you can

22   recall, that discussed exception stores or what

23   those were or how they worked or anything along

24   those lines?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Not to my knowledge, no.  I don't

2   recall.

3          Q.     Let me ask you this:  Do you have

4   an understanding that a part of this case that

5   you're here for to provide testimony about

6   involves Walgreens distributing controlled

7   substances from their warehouses to their

8   stores?

9               Do you have that understanding?

10         A.     No, I don't.

11         Q.     Okay.  Do you have an

12  understanding that there was a period of time

13  where Walgreens had distribution centers where

14  they housed controlled substances and shipped

15  those to their own stores?

16         A.     I do know that we had a warehouse

17  that we used that did ship them.  I don't know

18  what the shipping practices or anything were.  I

19  don't do distribution.  Mine was all theft and

20  loss.  It would have been done by them.

21         Q.     Are there any portions of your job

22  that have ever touched on distribution?

23         A.     The only portion of my job is

24  there were occasions, and I can't speak to how

1    many, but it has happened where shipments were

2    sent whether from -- it could have been from a

3    vendor or from a warehouse that was missed and

4    not put in there.  And when the pharmacist on

5    duty receives controlled drugs, they have to

6    check it in item for item, and if it's not

7    there, there's a process that they have to

8    follow to notify the distribution.

9            Oftentimes they would call me in

10   the, "What do I do?" panic mode because the

11   Schedule II drug wasn't received.  And at our

12   distribution center we had an asset protection

13   loss prevention manager there that I would then

14   contact and see what -- on their end, and if

15   they can confirm or not confirm that it was or

16   was not put into the tote that was ultimately

17   shipped to the store.

18       Q.    Okay.  You're anticipating exactly

19   where I was going next, so ...

20       A.    Okay.  I'm sorry.

21       Q.    No.  No.  You did great.

22            So you have -- you are asset

23   protection as it relates to the store, correct?

24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what I think I heard you just

2    say is that the distribution centers had their

3    own asset protection folks?

4    A.    Yes.

5    Q.    Okay.  Which distribution centers

6    do you deal with?

7    A.    Just Perrysburg.

8    Q.    Okay.  And has that always been

9    the case?

10    A.    Yes.

11    Q.    Okay.  And how many loss

12    prevention or asset protection folks do they

13    have at Perrysburg?

14    A.    I'm not sure how many they have.

15    I can only speak that I spoke to, I think, three

16    people in all the years that I've been there.

17    Q.    Okay.  And as far as you know,

18    those three people were all there at the same

19    time or were they -- do you see what I'm getting

20    at?  I'm trying to find out if it's a team of

21    multiple folks --

22    A.    Yeah.  No.

23    Q.    -- or if it's one person?

24    A.    It was always one person, and the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    three -- the change in the three people were

 2    changes of position.

 3           Q.    So as far as you know, there's

 4    only been one person there at a time in the --

 5    serving as loss prevention or asset protection

 6    for the distribution center?

 7                 MR. LEVINE:  Objection.  Lacks

 8           foundation.

 9           A.    I don't know.  As far as I know.

10           Q.    Okay.  Are you aware of there ever

11    being more than one person in asset protection

12    or loss prevention at the distribution center at

13    one time?

14           A.    I don't know.

15                 MR. LEVINE:  Objection.  Lacks

16           foundation.

17           A.    I'm sorry.

18                 I don't know what their structure

19    is.

20           Q.    So my question is, do you know --

21    can you ever tell me of a time when there was

22    more than one person working in asset protection

23    in the distribution center?

24           A.    No, I can --
```

```
 1                MR. LEVINE:  Same objection.

 2        A.    I cannot.  I don't know.

 3        Q.    Okay.  And I think you told me

 4   that you've had interaction with the person or

 5   persons that were serving in that role for the

 6   purpose of verifying an order that was supposed

 7   to have been shipped to the pharmacy that maybe

 8   didn't show up like it was supposed to; is that

 9   fair?

10        A.    Yes.

11        Q.    Okay.  Any other context in which

12   you have interaction with these loss prevention

13   folks that work in the distribution center?

14        A.    That's all I can recall at this

15   time.

16        Q.    Are there any quarterly or annual

17   loss prevention meetings where loss prevention

18   folks from the different areas, whether it's

19   store or distribution center or corporate, all

20   get together?

21        A.    Not that I'm aware of, no.

22        Q.    Okay.  Are you aware of ever

23   attending any meeting or training session or

24   seminar or anything like that with the asset
```

1    protection person from the distribution center?

2         A.    Not that I can recall.  I don't

3    always know who's all in attendance either and

4    their titles and where they're from.

5         Q.    Okay.  Are there any loss

6    prevention meetings within Walgreens that you

7    attend that are bigger than just your district?

8         A.    We have our area teams, field

9    teams for the field people is what is considered

10   me in my role in the field.  We have meetings

11   together as groups for field APMs in our same --

12   within our same regions and markets.

13        Q.    Okay.  How many regions and

14   markets would be encompassed in that?

15        A.    It would just be the one.

16        Q.    Okay.  How many folks like you

17   would be at a meeting like that?

18        A.    We have done combined meetings

19   with neighboring regions, all field -- I cannot

20   recall a time that I've ever been in a meeting

21   with anybody from the distribution center.

22        Q.    Okay.  How many field folks in a

23   region?

24        A.    It varies.  In the region that I'm

1    in now, there's eight of us, where some regions

2    have an upwards of 26 in the same region.

3            Q.    Okay.

4            A.    It just depends on -- Chicago has

5    a lot of stores.

6            Q.    Sure.

7            A.    Chicago is going to have more

8    APMs.

9            Q.    Sure.

10           A.    So it just depends on the number

11   of stores in any given region and area.

12           Q.    Okay.  But what I hear you to be

13   saying is you're not involved in any regular

14   meetings with folks who are not APMs?

15           A.    We attend meetings with district

16   managers.  And, I mean, we attend meetings with

17   MVPs, market vice presidents.  I mean, we attend

18   other meetings, but we have --

19                      - - -

20       (Walgreens-Zaccaro Exhibit 10 marked.)

21                      - - -

22           Q.    Okay.  Let me show you what I've

23   marked as Exhibit Number 10.

24           A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And I'll represent to you this was

2    a document provided to us by -- by the

3    attorneys.  And you can see in the bottom

4    right-hand corner it's got a date on it of

5    July 18, 2012.

6              Do you see that?

7    A.    Yes, I see what -- that.

8              MR. GADDY:  This is P-WAG-2084.

9    Q.    And at the very top of the

10   document it says "Loss Prevention Department."

11             Do you see that?

12   A.    Yes, I see that.

13   Q.    Okay.  And it's not the easiest

14   document in the world to read, but I'm hoping

15   that you can explain to me some of it and clear

16   some things up.

17             So you see at the very top of the

18   chart there is an individual named Ken Amos.

19             Do you see that?

20   A.    Yes, I see that.

21   Q.    And do you know who that is?

22   A.    At the time he was our divisional

23   vice president.  He led our department.

24   Q.    Okay.  Did you have interactions

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with him?

 2           A.    No.

 3           Q.    Okay.  And it looks like below

 4   that, on the far right-hand side, there's an

 5   individual.  His first name is Steve.  I don't

 6   know if I can get the last name right.  But it

 7   says "LP Special Investigations"?

 8           A.    Steve Kroloff, yes.

 9           Q.    What is "LP Special

10   Investigations"?

11           A.    At this time our department also

12   did investigations with employee relations

13   matters.  It could have been claims of

14   discrimination, harassment.  And those

15   investigations tend to take a lot more time, a

16   lot more involved, a lot more reporting and

17   detailing.  And so they created a unit just

18   specifically to do those types of investigations

19   to take them off of our plates and give us more

20   time.

21           Q.    Okay.  But for our purposes, safe

22   to say that had nothing to do with controlled

23   substances?

24           A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.

 2          A.    I wouldn't think so.

 3          Q.    Okay.

 4          A.    I don't know what -- I can't speak

 5   to what type of cases are the cases that they

 6   had.  I didn't discuss those cases.

 7          Q.    Sure.

 8          A.    All I know, it was ER cases.

 9          Q.    ER?

10          A.    Employee relations.

11          Q.    Thank you.

12          A.    Your liability ones.

13          Q.    Okay.  It looks like the next one

14   over to the left is Megan Eicker, loss

15   prevention administration.  It looks like under

16   her is some training and enterprise record

17   stuff?  Is that --

18          A.    That's what it says, yes.

19          Q.    Okay.  Do you have any

20   understanding of whether or not that department

21   had anything to do with controlled substances?

22          A.    I don't know.

23          Q.    Okay.  The next entry is Jerry

24   Biggs, organized retail crime.
```

```
 1              A.     Mm-hmm.

 2              Q.     What's that referring to?

 3              A.     Organized retail crime are the

 4     very significant theft instances in stores, that

 5     is the taking of shelf sweeping, going to

 6     warehouses, cleaning it, selling it online,

 7     selling it's to the little ma and pa shops.

 8              Q.     These are like professional --

 9              A.     Rings.

10              Q.     Theft rings.

11              A.     Organized retail crime rings, yes.

12              Q.     Okay.

13              A.     Very organized.

14              Q.     From your experience, is this

15     related to the front end of the store or the

16     pharmacy?

17              A.     I don't know, but folks aren't

18     coming into the stores and stealing the drugs

19     unless it's a burglary or robbery, so I'm going

20     to safely assume that it's all general

21     merchandise in the front of the store.

22              Q.     Okay.

23              A.     But I don't know the details to

24     their investigations, and if it ever did or did
```

```
 1   not involve organized retail -- I mean,

 2   organized retail crimes is also stealing

 3   semi-trucks, and if it's a semi-truck filled

 4   about warehouse drugs, it could have.  I've

 5   never personally heard of that myself with

 6   Walgreens.

 7         Q.    Okay.  The next one over is Ed

 8   Svihra, director of healthcare loss prevention.

 9               Do you see that?

10         A.    Yes.

11         Q.    Did you know Mr. Svihra?

12         A.    Yes.

13         Q.    And what was -- professionally

14   what was your relationship with him?

15         A.    Professionally minimal with him.

16   I worked with Marcie more than anything.

17         Q.    Okay.  And what kind -- and Marcie

18   was below Ed?

19         A.    Yes.

20         Q.    And what was Marcie's role?

21         A.    She was a corporate pharmacy

22   manager for loss prevention.  And that

23   department in particular was folks that

24   supported us out in the field with reporting
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that we may not have access to for our

2    investigations.

3              We could get more detailed reports

4    of the same technician who always filled the

5    same drug, and we could kind of get the patterns

6    and histories and have a more -- instead of

7    going through lines and lines and lines and

8    lines and lines.

9         Q.   Okay.  In what context would you

10   be getting in touch with Marcie and asking her

11   for more detailed reports?

12        A.   To discuss maybe a -- and these

13   are all pharmacy contacts that we would have.

14   They're analysts that help us in the field.  So

15   if we identify a certain behavior that maybe one

16   of our reports would not help us or support us,

17   and we need additional -- more information, just

18   to kind of connect dots, they would be the ones

19   to say, "Yes, that's the report we can or cannot

20   do or we can narrow this search down for you

21   doing" -- and they would be able to provide us

22   the reports -- reporting that way.

23        Q.   Okay.  Is this -- would this still

24   be in the context of investigating these
```

1    negative adjustments or potential theft within

2    the pharmacy?

3          A.    Yes.

4          Q.    Okay.

5          A.    It would be related to that.

6          Q.    Are you ever dealing with Marcie

7    in the context of evaluating the amount of

8    controlled substances that a store is dispensing

9    or ordering from a distribution center?

10         A.    No.

11         Q.    Okay.  Do you know where Marcie

12   was located?  Is she in a distribution center?

13   Is she in Deerfield, or do you know?

14         A.    She's in our support office in

15   Chicago, Deerfield, yeah.  She would have been

16   out of there.  I believe.  She's not in the

17   distribution center, I do know that.

18         Q.    Okay.  And do you know -- do you

19   have an understanding of any other roles that

20   Marcie fills in that position?

21         A.    No, I do not.

22         Q.    Do you have an understanding of

23   what the primary duty is of the healthcare loss

24   prevention?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No, I do not.

 2            Q.    Okay.  There's another individual

 3     about halfway down that line under Marcie named

 4     Scott Jonkman?

 5            A.    Yes.

 6            Q.    Do you know him?

 7            A.    Yes, I know Scott.

 8            Q.    And explain to me your

 9     understanding of what Scott does and what his

10     role is?

11            A.    Same capacity as Marcie, for us,

12     in how I -- my contacts with him.

13            Q.    Okay.  Again, you get information

14     and reports for him to support your

15     investigations into potential theft from the

16     pharmacy?

17            A.    Theft and losses, yes.

18            Q.    Okay.  The next one over is LP

19     systems planning and analytics.  It looks like

20     Kristie Provost.

21                  Do you see that?

22            A.    Yes.

23            Q.    Are you aware of Kristie and her

24     department?
```

1          A.     I do know Kristie, but I don't

2    know what exact role they play.

3          Q.     Okay.  Do you know what Kristie --

4    specifically what her role is?

5          A.     It says here she was the director

6    of LP systems planning and analytics.

7          Q.     Outside of that, do you have any

8    understanding of what she does?

9          A.     No, I do not.

10          Q.     Do you ever have the need to

11    interact with Kristie or her office?

12          A.     Kristie has presented a few

13    trainings to our department.  One that sticks

14    out most with me -- and I believe she was at

15    that one -- was when we had a new case

16    management system.

17          Q.     Okay.  IT type stuff?

18          A.     Yeah, and she was involved with

19    some of her folks training us on how to navigate

20    that, how to enter, and how to -- and that was

21    just -- case reporting system is our case

22    management system, is what I'm referring to.

23          Q.     Okay.  Is that the SIMS program

24    or --

```
 1              A.    No.

 2              Q.    Okay.  This is an LP system?

 3              A.    Yeah, this is where we enter our

 4    case report details from investigations.  I

 5    guess I should be more specific.  When we have

 6    an investigation --

 7              Q.    Okay.

 8              A.    -- or a case, this is where we --

 9    the data system that we use to enter those

10    details and download evidence and so forth.

11              Q.    Okay.  In all of -- so we were

12    talking earlier about the investigations that --

13    that you do, and I might get this number a

14    little bit wrong, but I think you said about

15    five to six times a year you're involved in

16    investigation of loss or theft where the --

17    where a pharmacist or a pharmacy tech is a

18    target of that investigation, correct?

19              A.    On average, five to six cases on

20    average a year.

21              Q.    Okay.  And those types of -- any

22    notes or records that you make from those

23    investigations are kept within the system?

24              A.    Yes, it would have been, mm-hmm.
```

1          Q.     Okay.  And is that a system that

2     you have access to?

3          A.     Yes.

4          Q.     And is that a system where you can

5     go back historically over time and look at

6     previous investigations?

7          A.     It only goes back so far, because

8     it was a new system.  So from the time that it's

9     been in place.  I don't know what that looks

10    like and how they obtain information, stored

11    information before that.

12         Q.     Okay.  Do those systems contain,

13    you know, notes not only on how the

14    investigation got started, but your progress

15    over time with the investigation and ultimately

16    the outcome of your investigation?

17         A.     When you say "notes," I do mine,

18    and I can only speak for how I enter my case

19    details.  Mine are based entirely on facts.

20         Q.     Sure.  Entries maybe is a better

21    way.

22         A.     Facts.

23         Q.     Okay.  What do you mean?

24         A.     I found this on this date.  I did

Highly Confidential – Subject to Further Confidentiality Review

1    this on this date.  I contacted this person.

2    This interview was conducted on this date.

3    Person admitted to this, this, this or that.

4    This is the outcome.

5            Q.    Thank you.  But these are entries

6    that you make into that system?

7            A.    If it is my investigation and

8    case, yes.

9            Q.    Okay.

10           A.    Yes.

11           Q.    Okay.  And those are things

12   that -- those -- it would be expected that other

13   loss prevention managers utilized the same

14   system for any investigations that they

15   undertake for pharmacists or pharmacy techs who

16   are being investigated for theft of controlled

17   substances?

18           A.    That would be the expectation.  I

19   can't speak for folks -- other folks' work.

20           Q.    About how long has that system

21   been in place?

22           A.    Oh, my goodness, I don't know.

23   It's eight, nine -- seven, eight, nine years.  I

24   don't know.

```
 1              Q.    The bulk of your time at

 2     Walgreens, that system was in place?

 3              A.    To the best of my knowledge, yes.

 4              Q.    Okay.  How did you document your

 5     investigations before that system?

 6              A.    They were -- oh, I'm going back

 7     very far now.

 8              Q.    Sure.

 9              A.    It was on paper, and we stored

10     everything in files in locked cabinets.

11     Everything was always kept locked and secured.

12     And then there was a retention period locally

13     that we held those.  And then after so long,

14     then they were placed into DPI boxes and shipped

15     to support office.  And from there, I don't -- I

16     don't even -- I'm not involved in the shipping

17     or anything.  I've boxed them and given them to

18     my admin.

19              Q.    Sure.

20              A.    Beyond that, I don't know.

21              Q.    Do you still have any of the paper

22     files from any of the investigations that you

23     did?

24              A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  They would have been

 2    shipped where?

 3              A.    I don't know.  I don't know where

 4    they go from there.

 5              Q.    Okay.  But obviously you still

 6    have access to all the reports that you did in

 7    the database, correct?

 8              A.    Yes.

 9              Q.    What is the name of that database?

10              A.    APIS, A-P-I-S.

11              Q.    Okay.

12              A.    Don't ask me what the abbreviation

13    stands for.

14              Q.    I won't.

15              A.    Thank you.

16              Q.    Okay.  Let's go back to the

17    exhibit.  On the far left-hand column, it looks

18    like, as far as I can tell, there's no head over

19    there, but there are maybe four operation

20    directors, divisional loss prevention

21    operational directors.

22                    Do you see that?

23              A.    Yes.

24              Q.    And it looks like it's a --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    there's a Gordon Couffer, a John Jones, Doug

2    Lemmons, and a Mike Womersley.

3              Do you see that?

4        A.    Yes.

5        Q.    Would one of these four

6    individuals have been your ultimate supervisor?

7        A.    No.

8        Q.    Okay.  It looks like for each of

9    those people -- it says below them are market

10   loss prevention directors.  And then below the

11   market loss prevention directors there are

12   district loss prevention managers, correct?

13       A.    Yes.

14       Q.    And would that be the rectangle

15   that you would fall into?

16       A.    The very bottom one, yes, district

17   loss prevention manager.

18       Q.    Okay.  Which of these four

19   individuals would have been, I guess, your

20   supervisor's supervisor.

21             Does that make sense?

22       A.    Yes.  It would have been -- oh, my

23   gosh.  So those positions were eliminated

24   sometime ago, and I can't remember which
```

```
 1    division, because the market numbers and

 2    everything have all changed.

 3              Q.    Okay.

 4              A.    We went from markets to regions,

 5    but I believe I was -- what's the market

 6    numbers?  I can't read them?  For some reason I

 7    want to say market 7, the top one.

 8              Q.    Well, I think what they're

 9    indicating there is the number of market loss

10    prevention directors.

11              A.    Okay.

12              Q.    And then below that there's --

13              A.    Oh, yes, you're right.

14              Q.    Below that there's 92 district.

15              A.    Oh, I'm sorry.  You know what?  I

16    just saw the name.  I made it out on there.

17    John Jones would have been mine.

18              Q.    Okay.

19              A.    My manager's -- my director's boss

20    is who that would have been.

21              Q.    Okay.  So it --

22              A.    I couldn't see the name on here.

23              Q.    Oh, no, that's fine.

24              A.    Sorry.
```

```
 1              Q.    I know it's hard to time.  I'm

 2    sorry.

 3                    So who would -- so John Jones

 4    would have been the divisional loss prevention

 5    ops director who was over the area that you were

 6    covering in Ohio; is that correct?

 7              A.    I believe so at the time, yes.

 8              Q.    Okay.  And do you know -- I think

 9    you said the positions have changed.  Do you

10    know if John is still with Walgreens?

11              A.    He is not.

12              Q.    Okay.  Do you know when he left?

13              A.    I do not know.

14              Q.    Okay.  So below John it looks like

15    there were four market loss prevention directors

16    according to this.

17                    Do you see that?

18              A.    Yes.

19              Q.    Okay.  And who would your loss

20    prevention director have been?

21              A.    John Davis.

22              Q.    And is John Davis still with

23    Walgreens?

24              A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Do you know when he left?

2          A.    If memory is serving me correctly,

3    it's been three to four years ago.

4          Q.    Okay.  And what were John Davis'

5    duties as a market loss prevention director?

6          A.    I don't know.

7          Q.    In what ways did you interact with

8    him?

9          A.    He was my director.  He was my

10   boss.  He did my reviews.  He ...

11         Q.    Okay.  And so would it be fair to

12   say that the way that you interacted with John

13   Davis or the matters in which you interacted

14   with him about would have been related to

15   primarily theft and loss from the stores?

16         A.    Yes.

17         Q.    Do you know whether or not John

18   Davis had any responsibility regarding the

19   distribution of controlled substances from the

20   distribution centers to the stores?

21         A.    I don't know.

22         Q.    So we have loss prevention in the

23   stores, and you've told us that there was at

24   least a person who served as loss prevention in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the distribution center, right?

 2         A.    Yes.

 3         Q.    Okay.  And other than the limited

 4    interaction that you had with the distribution

 5    center person as far as them checking to see if

 6    a pill bottle hadn't made it on the truck or

 7    something like that, do you have any

 8    understanding of what the distribution center

 9    loss prevention person did on a daily basis?

10         A.    No, I do not.

11         Q.    Okay.  Are there any other

12    divisions or groups of loss prevention that

13    you're aware of like, for example, is there a

14    corporate loss prevention?

15         A.    I don't know.

16         Q.    Okay.  Do you see the distribution

17    loss prevention reflected on this organizational

18    chart?

19         A.    So I guess I want -- I'm not

20    understanding what you're asking with the

21    corporate loss prevention.

22         Q.    Okay.  Let me come right back to

23    that.

24         A.    Okay.
```

1    Q.    Let me ask this first:  Is there

2  anywhere on this organizational chart that you

3  see the distribution center loss prevention role

4  identified?

5    A.    No.

6    Q.    Okay.  Are you familiar with how

7  long that position has existed?  Has there been

8  a loss prevention person at the distribution

9  center the entire time you've been at Walgreens?

10    A.    Yes.

11    Q.    Okay.  But you don't see it

12  reflected on this organizational chart?

13    A.    No.

14    Q.    Okay.  So back to what you asked

15  about.  I asked is there a loss prevention

16  division within corporate, and I think you were

17  asking for some clarification on that.

18    A.    Yeah.

19    Q.    So we know there's loss prevention

20  in the stores?

21    A.    Correct.

22    Q.    We know there's at least a person

23  in the distribution center.  Are you aware of

24  any other locations, whether it's at a corporate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    level or whatnot, anything outside of what we've

 2    talked about already?

 3              So I'm not talking about the

 4    special investigations folks.  I'm not talking

 5    about the ER people, the organized crime folks.

 6    I'm not talking about that.

 7         A.   Okay.

 8         Q.   I'm talking about anything outside

 9    of that at a corporate level or any other level.

10    Are you aware of any other loss prevention teams

11    or groups or organizations?

12         A.   I am not, other than what is the

13    breakdown of this structure.  That's the only

14    thing I'm aware of.

15         Q.   Okay.  And the only thing you're

16    aware of that's not on this structure is the one

17    person at the distribution center?

18         A.   There's a distribution department

19    and an operations department.  I'm unfamiliar

20    with what that distribution structure is for our

21    roles and our titles or anything else.  I'm only

22    familiar with the operations structure, which is

23    what you presented here (indicating).

24         Q.   Okay.  So would it be fair to say
```

Highly Confidential - Subject to Further Confidentiality Review

1    that this loss prevention chart only relates to

2    operations, as far as you can tell?

3           A.    I don't know, but I would say,

4    yes, based on my knowledge.

5           Q.    Okay.  Do you have any familiarity

6    with or understanding of the federal rules or

7    regulations regarding the duty of a distributor

8    of a controlled substance, like Walgreens once

9    was, to be on the lookout for or detect

10   suspicious orders of opioids?

11          A.    I do not know.

12          Q.    Okay.  Do those -- does the phrase

13   "suspicious order reporting," does that mean

14   anything to you?

15          A.    No, it does not.

16          Q.    Is that anything that you've

17   encountered at your time at Walgreens?

18          A.    Not to my knowledge.  Not at all.

19          Q.    Okay.  I'll show you P-WAG-1014.

20   This is going to be Exhibit 11.

21                      - - -

22        (Walgreens-Zaccaro Exhibit 11 marked.)

23                      - - -

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. GADDY:

2           Q.    I want to show you a couple of

3    docs that kind of describe some situations and

4    ask you what role, if any, you would have in

5    these types of matters.  This is Exhibit 11.

6           A.    Okay.

7           Q.    And this is an e-mail chain

8    with -- the formatting is a little bit funky.

9    But if you look at the first page, you see this

10   is an e-mail with a couple folks that we just

11   saw their names on it.  One is Ken Amos who is

12   the vice president, correct?

13          A.    Yes.

14          Q.    Also on this e-mail chain is Doug

15   Lemmons who I think was one of these

16   divisional --

17          A.    Market director.

18          Q.    -- loss prevention ops directors?

19          A.    Yes.

20          Q.    And Ed Svihra who was in charge of

21   healthcare loss prevention, correct?

22          A.    Correct.

23          Q.    Okay.  Ed -- looks like there's

24   some stuff here that I can't see and ask you

1    about.

2              Do you know if any of those folks

3    are attorneys?

4         A.    I don't know.

5         Q.    Okay.  And if you'd look -- go to

6    the bottom of the page that ends 887.

7         A.    Okay.

8         Q.    Or actually, I guess, because of

9    formatting, it's the whole page.  But you see at

10   the top this looks like an e-mail from Ed

11   Svihra.

12             Do you see that?

13        A.    I see -- I don't know if it's

14   from.  It doesn't have the from, but in the

15   formats -- I don't know.

16        Q.    Okay.  Well, regardless, it has

17   Ed's name up there.  Then below there's the date

18   of January 14, 2011.

19             Do you see that?

20        A.    I do see that, sir.

21        Q.    And it looks this e-mail was to

22   Ken Amos and copied on it were Doug Lemmons and

23   Marcie Ranick.

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I do see that.

2            Q.    And Marcie is the person that you

3    talked about earlier that you would occasionally

4    get reports from to help you with your theft

5    investigations?

6            A.    I would contact her.  Whether she

7    pulled, generated, or anything, she may have had

8    one of her analysts and team members -- she may

9    have deferred to that.  But I did contact her --

10   I have contacted her in the past.

11           Q.    Okay.  And the subject of the

12   e-mail is Fort Pierce, and then the body of the

13   e-mail says, "Ken, here's some simple analysis

14   for the prescriptions at Store 4391 in Fort

15   Pierce, Florida."

16                 And you see at the top the chart

17   says, "Total prescriptions versus C-II

18   prescriptions"?

19           A.    I do see what you've read, yes.

20           Q.    Okay.  And if you flip to the next

21   page, it says for October, total prescriptions

22   rose 3.4 percent, and for C-II prescriptions,

23   they rose 137 percent.

24                 Do you see that?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              A.      I do see what you read, yes.

 2              Q.      And in November, 18.2 for total

 3    and 274 percent increase in Schedule II

 4    controlled substance prescriptions.

 5                      Correct?

 6              A.      I see what you've read, correct.

 7              Q.      And, again, in December, a quarter

 8    increase, 25 percent increase in total

 9    prescriptions, and a 212 percent increase in

10    Schedule II prescriptions, correct?

11              A.      Correct.  I see what you've read.

12              Q.      Okay.  It then gives a breakdown

13    of Schedule II prescriptions in the next chart,

14    correct?

15              A.      I don't know.  I've never seen

16    this.  I don't know what that breakdown is, what

17    it consists of.  I -- this is in Florida.  I'm

18    in Ohio.  I don't know.

19              Q.      Okay.  The title of the next chart

20    is "Breakdown of C-II Prescriptions."

21              A.      That's what it says, yes.

22              Q.      Okay.  And then if you look at

23    those charts, it gives the numbers -- or

24    purports to give the numbers for 2009, 2010, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    then the percentage of the increase in the last

2    column?

3         A.    That's what it says, yeah.

4         Q.    Okay.  And the percentage of

5    increases on a monthly basis, it's 137 percent

6    increase one month, then 274 percent increase,

7    then 212 percent increase, and then a

8    204 percent increase, correct?

9         A.    That is what it says, yes.

10        Q.    Okay.  Are -- and I'm asking about

11   this because three -- I think three of the four

12   people in this e-mail chain, or maybe all of

13   them, are loss prevention folks.

14             So my question for you is, do you

15   ever review this type of information for any of

16   the pharmacies that fall within your purview?

17             MR. LEVINE:  Objection to form as

18        to preamble.

19        A.    No.

20        Q.    Okay.

21        A.    We would focus on theft and

22   losses, not prescription quantities.

23        Q.    Are you aware of anybody within

24   Walgreens that is monitoring this type of

Highly Confidential – Subject to Further Confidentiality Review

```
 1    information for your stores?

 2                   MR. LEVINE:  Objection.  Lacks

 3           foundation.

 4           A.    I do not know.

 5           Q.    Okay.  Are you aware of anybody

 6    within loss prevention at Walgreens that looks

 7    at this type of information for your stores?

 8                   MR. LEVINE:  Same objection.

 9           A.    I do not know.

10           Q.    I'll show you another one.

11                   MR. GADDY:  P-WAG-2354.

12                        - - -

13        (Walgreens-Zaccaro Exhibit 12 marked.)

14                        - - -

15    BY MR. GADDY:

16           Q.    This is going to be Exhibit 12.

17           A.    Okay.

18           Q.    And this is back in Ohio, and it

19    looks like, if you look at the top, this is

20    another e-mail exchange between you and a

21    pharmacy manager.

22           A.    Michaela, yes.  She was the

23    pharmacy manager at that location then.

24           Q.    Okay.  So if we start -- it looks
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   like the first e-mail in this chain is at the --

 2   starts about halfway down the first page.

 3           A.    Okay.  Yes.

 4           Q.    It's an e-mail from you to

 5   Michaela on June 19th, 2012, correct?

 6           A.    That's what it says, yes.

 7           Q.    Okay.  You say, "Hello Michaela.

 8   Please review the large overbuys identified in

 9   the LPXRX report."

10               And then you give the drug numbers

11   there, correct?

12           A.    Yes.

13           Q.    And you say, "And verify that the

14   on-hands are correct.  Please update me as to

15   your findings."

16           A.    Yes.

17           Q.    Okay.  And is this similar to what

18   we looked at earlier in the day where this is

19   your exception report?

20           A.    Yes.

21           Q.    Okay.  And what you're looking for

22   in these types of reports are negative

23   adjustments that might catch your attention or

24   large amounts of on-hand product that might
```

```
1    catch your attention?

2           A.    Yes.  In this one, I was looking

3    at large overbuys.  So ...

4           Q.    With what does an "overbuy" mean?

5           A.    That is in the last column, and

6    that overbuy and how that number is -- comes

7    from is if you see the difference between your

8    total purchases, minus what has sold, that is

9    your number there.  So, in other words, we have

10   2,006 -- four bottles, because this is a

11   500-count bottle.  We have four bottles.  Why do

12   we need four bottles?

13          Q.    Okay.  So when you review this,

14   just looking at the very first line for the

15   hydrocodone, you're suspicious of why there's --

16   why the store needs to have four bottles on

17   stock?

18          A.    I ask questions why, yes.

19          Q.    Sure.  And that's part of your job

20   duties and it's something that you're supposed

21   to be doing as a loss prevention person,

22   correct?

23          A.    Correct.

24          Q.    Okay.  And if we look at the other
```

Highly Confidential - Subject to Further Confidentiality Review

1    ones that you were asking about, if we go to the

2    second page or, you know, the next page, you

3    asked about 683050, which is, I think, the

4    second one on that page?

5            A.    Reyataz, yes.

6            Q.    Okay.  And what caught your

7    attention about that one?

8            A.    Well, it would be three bottles,

9    180, but in particular, it's a very expensive

10   drug.

11           Q.    Okay.

12           A.    Which means if, we are not going

13   to fill from it and it doesn't get filled from,

14   we've just paid for something that we don't

15   need.  It's about the profit.  Because if they

16   expire and we don't fill it within those --

17   before the expiration dates, we have to return

18   them, and the credit that you get is much

19   different than what our cost is, and our costs

20   on that -- it's an HIV drug.  So yeah.

21           Q.    Okay.  So not only are you

22   reviewing these exception reports to look for

23   potential loss or theft, but you're also looking

24   for potential leakage as far as profits?

```
 1              A.    Yes, just to make sure that the

 2    store --

 3              Q.    Okay.  A little more than halfway

 4    down the page, there was another drug that you

 5    asked about, 427079.

 6                    Do you see that?

 7              A.    Yes.

 8              Q.    And that is an entry for oxycodone

 9    30 milligrams?

10              A.    That's what I see, yes.

11              Q.    And these are, looks like, 100

12    count bottles?

13              A.    Those are, yes.

14              Q.    And it looks like there's an

15    overbuy of over six bottles?

16              A.    Yes.

17              Q.    And why did that pique your

18    interest?

19              A.    In my mind, and what I focus on

20    and what I look at, that's more than what we

21    need.

22              Q.    Okay.  From your analysis, this

23    store had a lot of oxycodone on hand?

24              A.    Of this strength.  Without -- I
```

1    mean, I -- that doesn't -- all the strengths are

2    not even included on this report, but of this

3    strength, it captured it as an overbuy, a high

4    overbuy.

5          Q.    Okay.  There was enough oxycodone

6    on hand at this store that made you e-mail the

7    pharmacy manager and ask him about it; is that

8    fair?

9          A.    That's fair, yes.

10         Q.    Okay.  And if you go down, it

11   looks like three, there's an entry for 676915,

12   Hydromorphone that you asked about?

13         A.    I'm sorry, which one was that?

14         Q.    676915.

15         A.    Yes.

16         Q.    And that's for another controlled

17   substance, hydromorphone?

18         A.    Yes.

19         Q.    Okay.  And what was it that piqued

20   your interest and caused you to ask this

21   pharmacy manager about that particular drug?

22         A.    Again, from the very onset of my

23   e-mail, it was high overbuys.

24         Q.    So far it looks like this store

```
 1    has four extra bottles, 500-count bottles of

 2    hydrocodone, some HIV medication that you think

 3    they may have ordered too much of, six extra

 4    bottles of oxycodone 30 milligrams, and five

 5    extra bottles of hydromorphone that they have in

 6    stock, correct?

 7              A.    So -- yes.

 8              Q.    Go ahead.

 9              A.    But my inquiries also are because

10    you have to understand, and it's hard to

11    explain -- our ordering system in SIMS.  I don't

12    want to say our ordering system because I'm not

13    involved in that ordering system, but our SIMS.

14    If an order is generated and then somebody comes

15    in and starts a new order, if that order sits

16    there, we have been able to identify that it

17    will sometimes auto post on product that we

18    received or the product that posted was received

19    when we physically did not get that.

20                   So sometimes it's that paper

21    shrink in losses that I'm honing in and

22    narrowing.  When I see these overbuys, it may be

23    because these reports are capturing something

24    that isn't even there, actually.  So I'm more
```

```
 1    trying to make sure that our -- we don't have

 2    any theft or loss concerns in the form of making

 3    sure the product is -- we have it.

 4                    Also for our patients.  If we're

 5    posting product that we didn't receive and we

 6    get a prescription and we can't fill a

 7    prescription, we can't take care of our patients

 8    who are coming for their medicines.

 9                    So the -- there's a -- the

10    whole -- and I can't speak to June 19th of 2012

11    if that was my concern was, we have too many,

12    it's going to expire.  You know, and sometimes

13    the needs of these stores will sometimes know --

14    the pharmacy managers know that there might be a

15    buyout of a little ma and pa pharmacy down the

16    street.  So they increase their orders to make

17    sure that -- in the assumption that they're

18    going to be getting increased prescriptions for

19    things, they might -- I can't speak to the

20    store's ordering.

21            Q.    I understand that.

22            A.    Yeah.

23            Q.    And I'm not asking you to get

24    inside the mind of the pharmacist --
```

```
 1              A.    Yes.

 2              Q.    -- or the manager.

 3              A.    Bottom line is, is you have it.

 4    Is it there?  That's what I want to know.

 5              Q.    But what causes you to ask those

 6    questions is the fact that they have all these

 7    bottles of these controlled substances?

 8              A.    Yes.

 9              Q.    According to the printout.

10              A.    Because I'm aware of

11    investigations where people go in and increase

12    their orders as a means of having it there for

13    their own personal theft concerns.

14              Q.    Okay.  And this is information

15    that you've gathered from your career at

16    Walgreens investigating other cases where

17    pharmacists and techs have engaged in theft of

18    controlled substances from a Walgreens pharmacy?

19              A.    Yes.

20              Q.    The last drug that you asked about

21    is three from the bottom, 673036, alprazolam?

22              A.    Yes.

23              Q.    And same issue there, they have

24    them as three 500-count bottles on hand,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    according to the exception report?

 2         A.    Yes.

 3         Q.    Okay.  And so it looks like after

 4    you asked Michaela to provide you some

 5    information, it looks like she responded fairly

 6    quickly, the next day?

 7         A.    Yeah, Michaela is a good pharmacy

 8    manager.

 9         Q.    She said, "I actually did the

10    report this weekend.  I double checked these

11    particular drugs and the on hands are correct."

12              So she's telling you that what you

13    have listed in your exception report is

14    accurate?

15         A.    Well, this is an ending date

16    June 12th.  So her on-hands for the first

17    drug -- we're just going to take that.  It says

18    3893.  Her count may not have been 3893 that

19    day, but she does an on-hand actual live count

20    for that moment that day.  All the on-hands were

21    correct.

22         Q.    Okay.  So then she says, "For the

23    first drug," which was the IV medication that

24    you mentioned.  Says, "It's an IV med so we have
```

1    one extra bottle on the shelf because we are in

2    COE."

3                  What does that mean?

4         A.    I don't know what COE stands for,

5    but they are a store that has a high population

6    serving HIV patients.

7         Q.    Okay.  So then she says, for the

8    next one, the one that ends 915, which looks

9    like that's the hydromorphone?

10        A.    Yes.

11        Q.    She says, "The 8-milligram was on

12   back order for a while so we had increased the

13   4-milligram because we were having the scripts

14   changed, but believe me, we will go through

15   this."

16                  Do you see that?

17        A.    Yes.

18        Q.    What do you understand her to be

19   saying there?

20        A.    When we -- when it was on back

21   order, that means it wasn't available from the

22   vendor, the warehouse.

23        Q.    So it looks like there was --

24   maybe there were prescriptions being written for

```
 1   a particular --

 2           A.    Strength.

 3           Q.    -- strength, and to make sure that

 4   she could fill those prescriptions, she ordered

 5   what she could get, which was a lower strength

 6   and -- to be able to fill those prescriptions;

 7   is that your understanding?

 8           A.    I don't know.

 9           Q.    Okay.  But regardless, she says,

10   "But believe me, we will go through this."

11           Do you see that?

12           A.    Yes.

13           Q.    She's indicating to you that she

14   doesn't have any concern that she's going to be

15   able to dispense all that hydromorphone,

16   correct?

17           A.    I don't know what her intentions

18   were with that statement.

19           Q.    Okay.  In the next sentence she

20   says, "As far as the other drugs go, they are

21   highly," in all caps, "used medications and

22   we'll have no problem using them."

23           Do you see that?

24           A.    I see what she wrote, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  And by the other drugs, the

2    ones that she hadn't covered so far, that would

3    be the hydrocodone, correct?

4          A.    She didn't reference that WIC

5    number specifically.

6          Q.    Well, you asked about five --

7          A.    She said, as far as the other WIC

8    numbers, they are highly used.

9                I'm sorry.  What was your question

10   again?

11         Q.    Sure.  So you asked about five WIC

12   numbers, right?

13         A.    Correct.

14         Q.    You asked about the HIV drug?

15         A.    Right.

16         Q.    You asked about the hydromorphone?

17         A.    Correct.

18         Q.    And she gave you specific

19   explanations for the reasoning for those, right?

20         A.    Correct.

21         Q.    You also asked about hydrocodone,

22   oxycodone, and alprazolam, correct?

23         A.    Correct.

24         Q.    And what she wrote is, "As far as

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the other WIC numbers go, they are highly used

 2    medications and we'll have no problem using

 3    them."

 4           A.    Okay.

 5           Q.    Correct?

 6           A.    Yes.  I don't know what she means

 7    by "highly used."  I don't do the filling, the

 8    prescriptions, the -- I don't do any of that.

 9    My concern is on theft and loss, and my

10    response, the very next thing, "I just want to

11    make sure they were all here."

12           Q.    Okay.  Do any part of your duties

13    whatsoever involve looking out for the potential

14    that drugs are being dispensed to people that

15    shouldn't get them?

16           A.    No.

17           Q.    Okay.  When you see a pharmacy

18    manager tell you that hydrocodone, oxycodone,

19    and alprazolam, that the store has in quantities

20    that caused you to raise a question about why

21    they had that much, when they tell you that

22    they're highly used medications and that the

23    pharmacy will have no problem getting rid of

24    them, does that raise any red flags for you
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    whatsoever?

 2           A.    It wouldn't, because I'm not on

 3    the sales, the number of prescriptions they get

 4    for whatever drug.  This is a high-volume store,

 5    high-volume pharmacy.  They get a lot of

 6    prescriptions for all drugs.  I don't know.  I

 7    can't speak to that.  I don't have any

 8    involvement in that.  Mine is on theft and loss.

 9           Q.    Okay.  I show you P-WAG-2371,

10    which I'll mark as Exhibit 13.

11           A.    Okay.

12                       - - -

13        (Walgreens-Zaccaro Exhibit 13 marked.)

14                       - - -

15    BY MR. GADDY:

16           Q.    And this is an e-mail -- it looks

17    like, if you look at the very top of the page,

18    it's an e-mail between you and a store manager

19    from back in July of 2007.

20                 Do you see that?

21           A.    Yes.

22           Q.    Okay.  If you go to, it looks

23    like, the bottom of page 3.

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    It looks like -- we see the very

2    first e-mail in the exchange, and it looks like

3    it comes from the store manager of Store 5031,

4    and it's sent to you.  And the subject is "NSF

5    Checks."

6        A.    Correct.

7        Q.    What does that mean?

8        A.    Non-sufficient fund checks.

9        Q.    Okay.  So that's somebody that's

10   tried to pay with a check that didn't go

11   through?

12       A.    Correct.

13       Q.    Okay.  And if we turn the page and

14   go to the last page, it looks like that's the

15   entry that was copy and pasted and sent to you

16   by this particular store manager?

17       A.    Yes.

18       Q.    Okay.  And it seems to indicate

19   that a particular patient, a ████████, on a

20   date in May 2007 tried to write a check for

21   $1,018.88 and apparently that check bounced?

22       A.    Yes.

23       Q.    Okay.  And Ryan writes to you and

24   says, "Is there a way to see what she bought, et

```
 1   cetera, to see if we got scammed?  I saw it on

 2   and my NSF this month.  Wow."

 3              What is he -- explain for me what

 4   he's asking you to do there.

 5       A.    "Is there any way to see what she

 6   bought, et cetera, to see if we got scammed?"

 7              I don't know what he meant as far

 8   as "got scammed."  This is a loss that would

 9   have been incurred to the store.  We were out

10   the $1,018, which is why he brought it to my

11   attention.  I don't know what was bought with

12   that check.  It's not in this.  The only thing I

13   can speak to is my next comments where I ask

14   about prescriptions and if they were legit.

15       Q.    Okay.  So you reference -- it

16   looks like you reference a separate e-mail that

17   maybe we don't have?

18       A.    I don't know.  Yes.  I don't know.

19   I'm sorry.  I don't know.

20       Q.    No.  That's fine.

21              But you say, "Reference the

22   purchase item you detailed in the other email.

23   I am not sure.  Were the prescriptions legit?  I

24   am in Chicago for figures through Friday, but
```

```
 1    I'll definitely look into this.  My concern,

 2    too, is the amount and the controlled substance.

 3    Is this a customer or an employee?"

 4              Do you see that?

 5         A.    Yes.

 6         Q.    And it looks like Ryan responds to

 7    you above, and he says, "This is a customer.

 8    This script is legal.  She gets it monthly from

 9    Walgreens."

10         A.    Okay.

11         Q.    Correct?

12         A.    Yes.

13         Q.    Okay.

14         A.    So he would have obtained the

15    purchase details himself, and it looks -- I

16    don't know, but what is detailed here is what he

17    detailed in the other e-mail to me.

18         Q.    Okay.  If we keep reading, the

19    next thing is you write -- you ask Ryan, "Does

20    she usually write a check for it?"

21              And it looks like just above that

22    he responds, "That I am not sure of.  Matt said

23    she is in trouble with her narcotics.  She is

24    always trying to fill early.  He wasn't sure how
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    she pays.  Looking at history, usually her

 2    insurance covered it for a 30-dollar copay."

 3                Do you see that?

 4          A.    I do see that.

 5          Q.    And it looks like you follow up

 6    again and you ask Ryan, "Why not this time?"

 7                Presumably you're asking why

 8    didn't the insurance cover it this time?

 9          A.    I don't know.

10          Q.    Okay.  And if you look just above

11    that, Ryan responds, and he says, "Looking at a

12    history, she has paid for scripts before at

13    Store 10220, one for $347, one for $3,935 on

14    3/12 and 3/21.  She paid cash for a script at

15    Store 3281 on 4/4 for $676.  Then she came to

16    our store on 5/24 and paid cash of $1,018 and

17    that check bounced.

18                "We might need to check these

19    other stores to see if they have a bounced check

20    for these scripts."

21                Do you see that?

22          A.    Yes.

23          Q.    It goes on to say that, "She is on

24    third-party Ohio Med.  Matt said he thinks it
```

Highly Confidential - Subject to Further Confidentiality Review

1    was a prior authorization issue and she paid for

2    it because she couldn't wait for it.  But then

3    she went to Store 4159 the next day and got 90

4    more on her insurance."

5              Do you see that?

6         A.   Yes.

7         Q.   He then says, in all caps, "Major

8    issues here."

9         A.   Correct.

10        Q.   What are the major issues that's

11   being -- that are being identified?

12        A.   I don't know.

13        Q.   When you look at what Ryan wrote

14   you here, is there anything about that history

15   that he describes to you that raises any flags

16   for you?

17        A.   So one of the things that raises

18   flags to me is anybody paying cash for any

19   prescription.

20        Q.   Why does that raise a flag?

21        A.   Store pharmacists, in

22   conversations with me, have associated that to

23   fraudulent prescriptions.

24        Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Most people pay with their

 2    insurance or they're trying to deceit, hide or

 3    something.  I don't know for sure, but those are

 4    the things that caution -- that sticks out to

 5    them as red flags, and then they report it to

 6    the Board of Pharmacy.

 7            Q.     Okay.  Anything other than the

 8    cash payments that stand out to you?

 9            A.     The bounced check.  We're not

10    going to get paid.

11            Q.     Okay.  The -- not this e-mail from

12    Ryan but the previous one.  Do you see where he

13    says, "Matt said she's in trouble with her

14    narcotics.  She is always trying to fill early."

15                   Is the early refill, the attempts

16    to refill early, does that raise any flags for

17    you?

18            A.     It does, but that doesn't

19    necessarily mean that he filled it.  I don't

20    know if he filled it or not, but he may -- she

21    may have come in but that doesn't necessarily

22    mean that they filled it.  We have people coming

23    in for early fills on everything.  I've been in

24    passing in several pharmacies where I've been
```

```
 1    standing in earshot and patients are told, "I'm

 2    sorry.  This is -- you can't fill it until after

 3    this date."

 4            Q.    Okay.  And I'm not -- I'm not

 5    making any criticisms --

 6            A.    Yeah.  No.  I understand.

 7            Q.    -- about whether or not it was or

 8    wasn't filled.

 9            A.    Yeah.

10            Q.    I'm just asking whether or not

11    that's an issue that raises a flag for you.

12            A.    Not for me --

13            Q.    Okay.

14            A.    -- because I'm not with the

15    dispensing as much.  I would be more concerned

16    with the coaching and asking the questions for

17    the pharmacists or the pharmacy manager to make

18    sure that before we report anything, we know

19    what the concern is.  We're not just going to

20    suspect.  My feelings and how I do my work is

21    I'm not going to refer anything to anybody

22    unless we know for sure.

23            So my -- and Ryan, you should

24    note, is a registered pharmacist as well.  He's
```

Highly Confidential - Subject to Further Confidentiality Review

1    a registered pharmacist that is a store manager.

2    He's no longer with us, as of a couple years

3    ago, but he was also a registered pharmacist.

4         Q.    Okay.  And this type of

5    information, as far as how prescriptions are

6    paid for, is that something that you have any

7    involvement with reviewing or analyzing?

8         A.    No.

9         Q.    Okay.  How would -- obviously we

10   see how you're informed of it in this situation.

11   Is this the type of situation in which you would

12   learn that type of information?

13        A.    Not usually, no.

14        Q.    Okay.  How else would you ever

15   learn that information about how patients are

16   paying for their prescriptions?

17        A.    I wouldn't know.

18        Q.    Okay.

19        A.    It was just the comment that Ryan

20   made because it alerted him, knowing in his

21   experience as a pharmacist the flags that come

22   up with suspicion of, you know, deceit and

23   trying to obtain these drugs.

24        Q.    Okay.  But regardless of who

Highly Confidential - Subject to Further Confidentiality Review

1   brought it up or what flags were raised, it

2   looks like she was able to fill multiple

3   different prescriptions and pay cash on several

4   different occasions for those prescriptions?

5         A.    I don't know that.  I don't -- I

6   didn't see her history, but based on what Ryan

7   outlined there, that's what it says.

8         Q.    Okay.  If you go to the first page

9   at the bottom, it looks like you then raised the

10  question, "Is the same doctor writing all these

11  prescriptions?"

12              Correct?

13        A.    Yes.

14        Q.    Your mind is going to doctor

15  shopping?

16        A.    I'm just giving them any

17  possibilities of everything that we need to

18  present and rule out what our suspicions are,

19  what concerns are there, before they refer it to

20  the board.

21        Q.    Okay.  And Ryan responds to you

22  that, "Yes, it was the same doctor."  And then

23  your ultimate -- the last correspondence we have

24  is, you say, "Wow.  I know the pharmacy board

Highly Confidential - Subject to Further Confidentiality Review

1    has alerts in place for when someone has

2    multiple doctors.  Are you aware of anything in

3    place for anything like this?"

4              Tell us what you're saying there.

5         A.   I don't know what alerts they

6    have.  It's just been in passing in comments by

7    investigators that I've worked with from the

8    board.  I don't know what the alerts are.  I'm

9    just aware that they have something because

10   other investigators have said, "Oh, we know.  We

11   have flags," you know, just like there are

12   exceptions maybe -- I don't know.

13        Q.   Would this customer -- was this

14   customer cut off and prevented from filling

15   prescriptions anymore?

16        A.   I don't know.

17        Q.   Okay.  Is there any policy that

18   you're aware of within Walgreens that would have

19   said that this customer should have been cut

20   off?

21        A.   I don't know.  I don't do the

22   dispensing of the prescriptions.  I don't know

23   what SOPs they have to reference, follow, or

24   anything.  I -- ours is theft and loss.  We've

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lost out 1,800 bucks on an NSF check.  That's

 2    where I got looped in.

 3              The rest of it was all additional

 4    commentary from the store manager that really

 5    was nothing that I could do with, but I could at

 6    least give them direction on the right questions

 7    to make sure what our -- what we're reporting to

 8    the board.

 9              MR. GADDY:  Okay.  Ms. Zaccaro, if

10         this is a good time for you, I think

11         we'll break for lunch.

12              THE WITNESS:  That's okay.  I'm

13         always hungry.

14              MR. GADDY:  All right.  Great.

15         Thanks.

16              THE VIDEOGRAPHER:  Off the record,

17         12:21.

18                   - - -

19         Thereupon, at 12:21 p.m. a lunch

20         recess was taken until 12:58 p.m.

21                   - - -

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        Wednesday Afternoon Session

                          January 16, 2019

 2                        12:58 p.m.

 3                          - - -

 4              THE VIDEOGRAPHER:  On the record,

 5        12:58.

 6          CROSS-EXAMINATION (CONT'D.)

 7  BY MR. GADDY:

 8          Q.    Welcome back.

 9          A.    Thank you.

10          Q.    You mentioned earlier that there

11  were -- you could recall three different people

12  who had served as the asset protection person at

13  the distribution center in Perrysburg?

14          A.    Mm-hmm.

15          Q.    What were their names?

16          A.    Jeremy Willis, which is who was

17  there for quite some time.  There's a woman

18  there now who I've never dealt with anything

19  insofar as lost in transit.  I just know of her

20  because sometimes we have coordinated meetings

21  when I covered the Toledo area, we used that

22  facility because of the space, and I just -- I

23  recall somebody in between them, but I can't

24  remember the names.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So Jeremy Willis, a female

 2    now, and somebody in the middle that you don't

 3    remember?

 4              A.    I don't remember the names, yeah.

 5    I'm sorry.

 6              Q.    Okay.  Do you know a woman named

 7    Jenn Diebert?

 8              A.    Yes.

 9              Q.    Okay.  Is that the person -- the

10    female you're thinking of, or is that somebody

11    else?

12              A.    No, that's somebody else.

13              Q.    Okay.  In what capacity do you

14    know Jenn Diebert?

15              A.    Jenn Diebert, usually if there's

16    like fixtures that we might get from the

17    warehouse sent to the stores, sometimes if

18    they're out of stock with things, I can call

19    her.  If we're looking for something.  And I've

20    never dealt with Jen, in my recollection, with

21    matters in pharmacy, missing drugs.  I've always

22    worked with the APM.  Jenn I've dealt with for

23    matters from our front end operations,

24    merchandise concerns.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  What about Deb Bish?

 2          A.    Deb Bish, that name doesn't sound

 3   familiar.

 4          Q.    Okay.

 5          A.    I can't recall.

 6          Q.    I want to ask you a couple

 7   questions now about Walgreens' suspicious order

 8   monitoring program.  Does that mean anything to

 9   you?

10          A.    No.

11          Q.    Okay.  And I'm not trying to make

12   you an expert in something you don't know

13   anything about.  But I'm going to ask you about

14   some references to loss prevention that I see in

15   these policies and ask you if you can shed some

16   light on those references and what they might

17   mean by that.

18          A.    Okay.

19                       - - -

20      (Walgreens-Zaccaro Exhibit 14 marked.)

21                       - - -

22          Q.    First is P-WAG-5187, which I'll

23   mark as Exhibit 14.  And do you see this is a

24   Walgreens document entitled
```

```
 1    "Intercepted/Suspicious Store Orders"?

 2           A.    I see what you've read, yes.

 3           Q.    And it's got a project number, and

 4    it indicates that this is version 1 of that

 5    document, correct?

 6           A.    That's what it says, yes.

 7           Q.    And the date on this is

 8    February 2009?

 9           A.    That is what you're -- yes, I see

10    that.

11           Q.    Okay.  And it says this is

12    prepared by Ora Yelvington.  Do you know who

13    that is?

14           A.    That name is unfamiliar to me.  I

15    do not know.

16           Q.    Okay.  If you turn to -- at the

17    bottom right you'll see it says page 3 of 15.

18           A.    Yes, I see that.

19           Q.    Okay.  And at the top left of that

20    page, and it looks like the second heading down,

21    it says "Overview."

22                 Do you see that?

23           A.    Yes, "Overview."

24           Q.    The first sentence, it says, "The
```

1    Controlled Substances Act is the primary federal

2    law regulating the flow of controlled substances

3    into the marketplace for medical purposes."

4              Did I read that correctly?

5         A.   Yes, you read that correctly.

6         Q.   Do you have -- do you know what

7    the Controlled Substances Act is?

8         A.   No, I do not.

9         Q.   Okay.  It says, "Among other

10   requirements, the act requires that distributors

11   register with the DEA to sell controlled

12   substances to retail pharmacies and report to

13   the DEA suspicious orders."

14             Do you see that?

15        A.   That's what it says, yes.

16        Q.   Do you know what it means by

17   "suspicious orders"?

18        A.   I do not.  I'm with theft and

19   loss.  I don't know.

20        Q.   Okay.  Your job duties have

21   nothing to do with suspicious orders?

22        A.   Nothing at all.  I'm sorry.

23        Q.   It goes on to say, "The DEA is

24   requiring that Walgreens monitor orders for

```
 1    controlled substances that are placed at the

 2    stores and sent to our distribution centers for

 3    filling.  Such drugs are to be monitored for

 4    suspicious activity.  Suspicious orders are

 5    defined by the DEA in terms of an order size or

 6    order frequency."

 7              Do you see that?

 8         A.   Yes.  That's what it says.

 9         Q.   Okay.  And fair to say that you

10    don't have anything whatsoever to do with

11    analyzing orders of controlled substances for

12    whether or not they should be deemed suspicious?

13         A.   I do not have any involvement in

14    that, correct.

15         Q.   Okay.  If we continue reading, it

16    says, "The purpose of this project is to create

17    a process to systematically identify and prevent

18    suspicious orders based on a formula used to

19    determine inconsistent or suspicious ordering

20    patterns for controlled drugs.  Any C-II drug

21    orders that are deemed suspicious will be

22    flagged as suspicious and populated in a file to

23    be sent up centrally to loss prevention and Rx

24    services for review and analysis."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you see that?

 2          A.    I do see that, yes.

 3          Q.    Okay.  Prior to us just reading

 4    this -- the first version of this suspicious

 5    order policy, did you have any understanding

 6    that loss prevention had a role to play in

 7    suspicious order monitoring?

 8          A.    No.

 9          Q.    Okay.  Have you ever had any role

10    to play similar or consistent with what's being

11    described here?

12          A.    None.

13          Q.    Okay.  Are you aware of any

14    anybody within the loss prevention world at

15    Walgreens that is involved in this process?

16                MR. LEVINE:  Objection.  Lacks

17          foundation.

18          A.    I don't know.  I don't know the

19    responsibilities in the organization chart who

20    does what exactly or -- I do not know that.  I'm

21    sorry.

22          Q.    If you turn to page 6 of 15.  You

23    see there's a heading at the top of the page

24    that says Tolerance Limits?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I do see that.

2          Q.    Do you know what is meant by a

3     "tolerance limit"?

4          A.    I do not know.

5          Q.    Have you ever heard that term

6     before as it relates to controlled substances

7     within Walgreens?

8          A.    I have never.  To the best of

9     my -- I've never heard that term.

10         Q.    I have here -- we looked at the

11    first version of that policy, correct?

12         A.    Yes, we did.

13         Q.    I have here a version 2, a version

14    3, a phase 4, a phase 5, and I'll represent to

15    you -- we can look at them all if you want to.

16    But I'll represent to you that they all have the

17    same reference into orders being sent to loss

18    prevention and prescription services or Rx

19    services.

20              Is your answer going to change in

21    any way as to your involvement with the

22    suspicious order monitoring program that's

23    consistent with what we looked at there?

24         A.    No, it would not change.  I have

```
 1    no involvement.

 2                    - - -

 3        (Walgreens-Zaccaro Exhibit 15 marked.)

 4                    - - -

 5    BY MR. GADDY:

 6            Q.    Let me show what you what I'm

 7    going to mark as Exhibit 15.  This is

 8    P-WAG-2102.

 9            Do you recognize this document?

10            A.    No.

11            Q.    Okay.  Let's just look at the

12    first page and then we'll flip through and look

13    at some of the other ones.

14            A.    Okay.

15            Q.    You see at the very top, it looks

16    like it has Marcie's last name.  It says Ranick

17    at the top center of the page.

18            A.    Yes.

19            Q.    And below that it says "Order Item

20    Detail."

21            Do you see that?

22            A.    Yes.

23            Q.    Over to the right, it has the date

24    of August 18, 2010, and below that it says
```

Highly Confidential - Subject to Further Confidentiality Review

1    "Suspicious Order"?

2            A.    That's what it says, yes.

3            Q.    Have you ever seen a report like

4    this?

5            A.    No, I have not.

6            Q.    Okay.  In the item description it

7    says -- it's the first line above the first

8    line.  It says "Hydromorphone 2-milligram

9    tablet."

10               Do you see that?

11           A.    Yes, I see that.  That's what it

12   says.

13           Q.    Okay.  And then at the very --

14   below the double bars it has "Tolerance Limit

15   Quantity," and it has the number "4"?

16           A.    Yes.  It says that.

17           Q.    And then at the very bottom for

18   "Suspicious Reason Code," it says "T - Exceeds

19   Tolerance Limit."

20               Do you see that?

21           A.    Yes, I see that.

22           Q.    Okay.  Do you know what the

23   suspicious order report is?

24           A.    No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Is this the type of report that

2     you've ever reviewed during the course of your

3     career at Walgreens?

4          A.    I have never reviewed a report

5     like this.

6          Q.    Okay.  If you look at the next

7     page, up in the top right-hand corner it's got

8     the same date of 8/18/10, and below that it says

9     "Order Review."

10               Do you see that?

11         A.    Yes, I see that.

12         Q.    In the top middle of the page it

13    says what looks to be an abbreviation for loss

14    prevention, loss --

15         A.    Yes, it is.

16         Q.    Okay.  Is that an abbreviation

17    that you're familiar with?

18         A.    Yes.

19         Q.    Okay.  And it says, "Review Items

20    by Department," and the source name is

21    "President's Plaza."

22               Do you know what that is?

23         A.    I do not know.

24         Q.    Okay.  And then if you see, it

1    lists -- it has a list of items including -- it

2    looks like these are prescription drugs,

3    fentanyl, fentanyl, Focalin, hydromorphone.

4    Then at the bottom, two entries for morphine

5    sulfate.

6            Do you see that?

7        A.    Yes, I do see that.

8        Q.    This report is a little bit

9    different than the first one we looked at.

10            Do you recognize this report?

11        A.    No, I do not.

12        Q.    Okay.  This is not a report you've

13    ever seen before within Walgreens?

14        A.    No.  This has everything to do

15    with ordering, which I don't look into ordering.

16        Q.    Okay.  Turn with me, if you would,

17    please, to the page ending in 567 at the bottom

18    right.

19        A.    Okay.

20        Q.    And this is going to be a similar

21    report.  You see it looks like the date's the

22    same, August 18, 2010.  It says "Suspicious

23    Order" up in the top right-hand corner, correct?

24        A.    That's what it says, yes.

```
 1              Q.    It looks like it's got Marcie's

 2   name on it again, and then it says "Order Item

 3   Detail."

 4              Do you see that?

 5              A.    That's what it says, yes.

 6              Q.    And the item description, it looks

 7   like, is for codeine.  And the tolerance limit

 8   indicated under the second horizontal line is

 9   "20," correct?

10              A.    That's what it says, yes.

11              Q.    Okay.  What I'm interested in is,

12   it looks like there's a note written on the

13   page -- a circle around that 20 and note down

14   that says, "LP thinks tolerance too high."

15              Do you see that?

16              A.    It does say that, yes.

17              Q.    Would "LP" be a common

18   abbreviation for loss prevention?

19              A.    I know that it is a common

20   abbreviation for LP, but I don't know what it

21   was intended in this context.

22              Q.    Sure.

23              A.    I don't -- yeah, I didn't write

24   it.  I don't -- I've never seen this.
```

1        Q.    Okay.  Are you aware of any person

2    or division within loss prevention that reviews

3    reports like this?

4        A.    No.

5        Q.    Are you aware of anybody within

6    loss prevention at Walgreens that makes

7    decisions on things such as tolerance?

8        A.    No.  I don't even know what it is.

9        Q.    Okay.  Sorry to jump around, but

10   you told me that Jeremy Willis was at the

11   distribution center for some period of time.  Do

12   you recall when approximately he left?

13       A.    Three years ago, three or four

14   years ago.  He was in position as the loss

15   prevention manager at the distribution center,

16   and there was a -- maybe two or three years he

17   transitioned into the field in my role, in the

18   same role as I am in, and covered Dayton area

19   for a time.

20       Q.    2014-ish, '15-ish that he left?

21       A.    Yes.

22       Q.    Okay.  So from '06 to '14 or '15,

23   he was the person at the distribution center

24   that you would have corresponded with, as far as

1    loss prevention?

2           A.    Well, no.  He was no longer with

3    the company about three or four years ago.

4    So -- and then he was in the field position

5    that -- in my role for about two or three years.

6    So '06 to '12, maybe.

7           Q.    Okay.  And then '12 to '14-ish in

8    the field and then --

9           A.    Yes --

10          Q.    '14 --

11          A.    -- that sounds correct.  I don't

12   know for sure what his dates are.

13          Q.    Do you know whether or not

14   anybody -- from '06 to approximately '12,

15   whether or not Jeremy had anybody else working

16   with him in loss prevention?

17          A.    I don't know.  He was my direct

18   contact, and I don't know the structure of the

19   distribution center to know.

20          Q.    Okay.  Do you know what an

21   override request is?

22          A.    No.  It sounds -- when the stores

23   have to request to order it -- more than when --

24   what is recommended or suggested by the system.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2          (Walgreens-Zaccaro Exhibit 16 marked.)

 3                        - - -

 4          Q.    Let me show you what I'll mark as

 5    Exhibit 16.  This is P-WAG-2331.  And it looks

 6    like this is an e-mail from John Jones, who I

 7    think you had indicated would have been your

 8    supervisor's supervisor?

 9          A.    Correct.

10          Q.    Okay.  And this was sent

11    December 31st, 2012, and it looks like it was

12    sent to a list serve, all loss prevention

13    operations?

14          A.    Companywide, yes, it would have

15    been.

16          Q.    So this is an e-mail you would

17    have received?

18          A.    Yes.

19          Q.    Okay.  I'm sorry.

20          A.    I'm sorry.

21          Q.    And the subject line is "SIMS

22    Enhancement for Controlled Substance Orders,"

23    correct?

24          A.    Correct.
```

```
 1              Q.    And I think you told us before

 2      that SIMS is your ordering software that's

 3      utilized at Walgreens?

 4              A.    Yes.

 5              Q.    Okay.  It says, "The following

 6      message was sent to the stores via COMPASS on

 7      December 28th regarding an enhancement that has

 8      been deployed to SIMS to limit controlled

 9      substance orders, as well as to identify

10      training opportunities and ensure adherence to

11      good faith dispensing practices.  As inter-store

12      transfers could potentially increase, please

13      review the related policies on controlled

14      substance transfers in addition to the

15      information below."

16                   Do you see that?

17              A.    Yes, I see that.

18              Q.    Okay.  It references the process

19      there of inter-store transfers.

20                   Do you know what that is?

21              A.    Yes, I do know inter-stores

22      transfers.

23              Q.    What is that?

24              A.    That is one store may be short a
```

1    product.  Another store may have excess of that,

2    and a -- one store claims it out while the other

3    store returns it in, receives it in.

4         Q.    Okay.  You understand it correctly

5    that that might be where a particular Walgreens

6    does not have, in their opinion, enough of a

7    particular drug on stock and the Walgreens down

8    the street does, and so they might get that

9    store down the street to bring them some of that

10   drug?

11        A.    As I understand how they do it,

12   yes.

13        Q.    Okay.  Does that ordering system

14   go through SIMS and through the distribution

15   center, as far as you know, or does that happen

16   outside of that?

17        A.    I know it goes through SIMS

18   because they create the claim in SIMS, and then

19   it comes over as a receipt in receiving, which

20   is posted, just like a receipt that we would get

21   from the warehouse or vendors.

22        Q.    Okay.  Do you know whether or not

23   it goes to the folks at the distribution center?

24        A.    I do not know that.

```
 1              Q.    Okay.  The message down -- the

 2    message says "All Pharmacy Managers."  Then it

 3    says, "An enhancement has been developed due to

 4    the increased scrutiny from suppliers,

 5    wholesalers and the DEA with regard to the

 6    amount of controlled substances that can be

 7    ordered at any given time.  This enhancement is

 8    designed to comply with DEA regulations which

 9    require distributors to report controlled

10    substance orders of unusual size, orders

11    deviating substantially from a normal pattern

12    and orders of unusual frequency."

13              Do you see that?

14              A.    I do see that.  That's what it

15    says.

16              Q.    Okay.  Did -- let me ask you this:

17    Are you aware that the Walgreens' distribution

18    center in Jupiter, Florida was investigated by

19    the DEA and that as a result of that

20    investigation, Walgreens paid an $80 million

21    settlement to close out that investigation?

22              A.    So I'm aware that there was an

23    investigation.  I know that there was a

24    settlement.  I don't know the details of what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prompted during, before or after the

 2    investigation.  It was basically headlines that

 3    we were given --

 4          Q.    Okay.

 5          A.    -- or had been made aware.  I

 6    don't even know any of the details with it.

 7          Q.    Okay.  If I was to represent to

 8    you that that investigation was occurring

 9    between 2012 and that the settlement was paid in

10    June 2013, would that time frame sound

11    approximately accurate to you?

12          A.    I don't know.

13          Q.    Okay.  Would you have any reason

14    to disagree with that?

15          A.    I wouldn't have any reason to

16    disagree, but I don't know for certain that

17    those were your time frames.

18          Q.    But anyway, you see that there was

19    a communication given to all the pharmacy

20    managers that Walgreens was experiencing

21    increased scrutiny from, they say, suppliers,

22    wholesalers and the DEA regarding to the amount

23    of controlled substances?

24          A.    I do see that, yes.
```

```
 1              Q.    Okay.  And if we go down to the

 2    team member FAQs, do you see where that is?

 3              A.    Yes, I see that.

 4              Q.    And the first question is, "Why

 5    are my controlled substance orders being

 6    reduced?"

 7                    It says, "SIMS suggested and/or

 8    manually adjusted controlled substance orders

 9    will undergo a review process in comparison to

10    the amount of product your store is allotted

11    over a rolling six-week period.  The order

12    volumes may be adjusted systematically based on

13    pre-determined limits or thresholds in relation

14    to a store's prescription volume."

15                    Do you see that?

16              A.    I do see that.

17              Q.    Do you have any involvement in

18    your -- at any time that you've been at

19    Walgreens, with what we just read there as far

20    as threshold limits or pre-determined limits for

21    a particular store as it relates to controlled

22    substances?

23              A.    I do not have anything to do with

24    ordering whatsoever, so definitely not that
```

```
 1    either.

 2         Q.    Okay.  If you go down to the very

 3    bottom of the page, the last question is, "What

 4    do I need to do if I'm running low on a

 5    controlled substance?"

 6              Do you see that?

 7         A.    I do see that.

 8         Q.    Okay.  And there it says, "Contact

 9    your pharmacy supervisor to complete a

10    controlled substance override form located on

11    the RxS home page."

12              Do you see that?

13         A.    Yes, I do see that.

14         Q.    Okay.  And I started this by

15    asking you about override forms.  Is that

16    consistent with your understanding of what an

17    override request would be?

18              MR. LEVINE:  Objection.  Lacks

19         foundation.

20         A.    I know that there is a process and

21    a procedure in place.  I don't know what

22    prompted that.  I don't know what it is.  I

23    don't know thresholds or anything that limits,

24    restricts or -- I don't know what any of that
```

1    criteria is or why.

2                        - - -

3        (Walgreens-Zaccaro Exhibit 17 marked.)

4                        - - -

5        Q.    Okay.  Let me show you P-WAG-2261

6    that I will mark as Exhibit 17.

7        A.    Thank you.

8        Q.    Sure.  And I'll start about

9    halfway down the first page.  And it looks like

10   this is an e-mail from Matt Soder who I think

11   was the pharmacy supervisor in your district,

12   correct?

13       A.    Yes, he would have been the

14   pharmacy supervisor.

15       Q.    And this e-mail was sent to

16   RxIntegrity.

17             Do you see that?

18       A.    Yes, I do see that.

19       Q.    Okay.  Do you know what

20   "RxIntegrity" is or what that department is?

21       A.    It's a department in our support

22   office that I don't know what all they monitor,

23   oversee, or otherwise.

24       Q.    Do you have any interaction with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them whatsoever?

 2         A.    I'm copied on correspondence with

 3    them.

 4         Q.    What types?

 5         A.    If there is an audit in process as

 6    a result of the DEA 106 forms being submitted,

 7    which are forms notifying the DEA of confirmed

 8    losses, I am copied on correspondences sometimes

 9    between pharmacy managers, and would have been

10    pharmacy supervisors if there was concerned

11    about an inventory question, having not

12    necessarily to do with just on-hands, but it

13    might be in reference to paperwork or -- I'm --

14    directly, no, I don't have -- to the best of my

15    knowledge that I can recall anyways, where I've

16    ever e-mailed them or contacted them myself.

17         Q.    Okay.  Fair to say that your

18    interaction with them, even when you're copied

19    on correspondence with them, is -- goes back to

20    being related to theft or losses that you

21    investigate within the store?

22         A.    That's correct.

23         Q.    Okay.  All right.  So if we look

24    at this e-mail, the subject line is "Controlled
```

```
 1    substance order quantity override form."

 2         A.    Yes.

 3         Q.    Do you see that?

 4         A.    Yes.

 5         Q.    Looking at this e-mail, do you

 6    recall being copied on these?  Are these the

 7    e-mails that you receive or that you see?

 8         A.    I do not, and I don't even see

 9    where my name is anywhere on this.

10         Q.    Okay.  Let's keep looking.  So

11    first it says "store number" and it's got a

12    store number listed there, correct?  34640?

13         A.    Yes.

14         Q.    Okay.  Is that one of your stores?

15         A.    No.  That's not the correct store

16    number for the address.

17         Q.    Okay.

18         A.    So I don't know if there's --

19    sometimes there's different store

20    identifications, depending on how they're

21    listed.  The store -- if you go down where it

22    says "store" and you see "6574," that's the

23    actual store number.

24         Q.    Okay.  Is that one of your stores?
```

Highly Confidential – Subject to Further Confidentiality Review

1      A.     That would have been at that time,

2   yes.

3      Q.     Okay.  And it says this was

4   district number 277.  Was that your district?

5      A.     That was the Cleveland West

6   district that I was in, yes.

7      Q.     Okay.  Then it has the DM e-mail

8   address and that's John Lucchetti who we talked

9   about before, correct?

10     A.     Yes.

11     Q.     And he was the district manager?

12     A.     Yes.

13     Q.     And below that it's got the DLP

14   e-mail address and that's you, correct?

15     A.     It is, yes.  I don't even -- I've

16   never seen an order override request form.  I

17   don't know why we would be copied on it, but

18   okay.  I'm just surprised.  I'm like, "Why would

19   I have my name on there?"

20     Q.     Okay.  And you were the district

21   loss prevention person for this store, this

22   district, correct?

23     A.     Yes, I would have been.

24     Q.     Okay.  And then it's got the name

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of the pharmacy manager, Shane Burnsworth?

 2         A.    Yes.

 3         Q.    The name of the pharmacy

 4    supervisor?

 5         A.    Yes.

 6         Q.    And it's got a WIC number at the

 7    bottom.  Do you know what that corresponds to?

 8         A.    That is to the drug.

 9         Q.    Okay.

10         A.    The Walgreens' inventory.

11         Q.    And if you turn the page and look

12    at the top of the next page, it names the drug,

13    and it's oxycodone?

14         A.    It does name that, yes.

15         Q.    Okay.  And it indicates the

16    package size and then the order quantity needed,

17    and this particular store is requesting 2,500

18    per week.

19               Do you see that?

20         A.    It does say that, yes.

21         Q.    Okay.  It says, "Provide a

22    detailed explanation of this request, including

23    prescription sales history, 13-week item

24    movement, current on hand count, inventory
```

 1    adjustments, et cetera."

 2              Do you see that?

 3         A.    I do see that.

 4         Q.    Okay.  Let me stop right there

 5    before we get into this, but this is not a form

 6    that you've ever seen, correct?

 7         A.    I have never seen a form like

 8    this.

 9         Q.    Okay.  Have you ever been asked

10    questions about one of your stores submitting a

11    request like this?

12         A.    No.

13         Q.    Have you ever had the RxIntegrity

14    group e-mail you and say, "Laurie, this store

15    issued this request for this many more bottles

16    of oxycodone.  Can you look into this or gather

17    information for us," or anything like that?

18         A.    I have never been contacted for a

19    request like that whatsoever.

20         Q.    Okay.  I asked about RxIntegrity.

21    Anybody?  Matt Soder?

22         A.    No.

23         Q.    Anybody ever contact you about a

24    request like this?

```
 1              A.    No.  None.

 2              Q.    Okay.  So what that last thing

 3    asked for was a detailed explanation of the

 4    request, including the Rx sales history and the

 5    13-week item movement.

 6                    Would that be -- that's something

 7    you have access to, correct?

 8              A.    The SIMS 13-week item movement

 9    report is what that is referring to.

10              Q.    Okay.

11              A.    The exception reports that I have

12    mentioned 13-week movements for is an exception

13    report.

14              Q.    Okay.  So that's something

15    different than what's being referred to here?

16              A.    Yes.  SIMS is actual live time, 13

17    weeks in live time, where the reports and the

18    exception reports that we've talked about

19    earlier had end dates to those.  This is a live

20    ordering system.

21              Q.    Okay.  Anyway, in response to that

22    question, what's written here in this form is,

23    "SIMS is placing orders of roughly 1,000 tabs

24    weekly, two bottles, store sales history is for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2,000 to 2,500 tabs per week.  Need order

 2   increased to account for volume.  This store is

 3   high volume, filling 450 to 500 prescriptions

 4   per day."

 5               Did I read that correctly?

 6        A.    You read that correctly, yes.

 7        Q.    Okay.  And it's correct to say

 8   that you've never been contacted by anybody and

 9   asked to look into this explanation that's given

10   by this store and determine whether or not that

11   explanation is valid?

12        A.    No, and I wouldn't expect to,

13   because we don't do the ordering.  I don't --

14   I'm not involved with the ordering.

15        Q.    Okay.  And if you look up in the

16   e-mail chain, it looks like there's a response

17   from an individual Maria Makris.  It says, "On

18   behalf of RxIntegrity."

19               Do you see that?

20        A.    I do see that.

21        Q.    And she responds, it looks like

22   the same day, March 25th at 11:00 am.  It looks

23   like about three hours after the original

24   request was made.
```

```
 1                    Do you see that?

 2          A.    That's what it says, yes.

 3          Q.    And the e-mail goes to the

 4   Perrysburg sale coordinators?

 5          A.    Yes.

 6          Q.    Do you know who the sale

 7   coordinators are?

 8          A.    That would be Jennifer Diebert is

 9   who I know is the sales coordinator.

10          Q.    And she's at the distribution

11   center?

12          A.    Yes.

13          Q.    Okay.  And Maria says, "Please

14   process the order below, request for Store 6574

15   for" -- that WIC number, the oxycodone -- "times

16   five units."

17                    Do you see that?

18          A.    I do see that.

19          Q.    Okay.  And the units that were

20   being asked for were the 500-count bottles?

21          A.    It says package size 500, yes.

22          Q.    Okay.  Do you know whether or not

23   anybody did any investigation into this override

24   request?
```

```
 1                MR. LEVINE:  Objection.  Lacks

 2        foundation.

 3        A.    I don't know.  I don't know what

 4   their processes are.

 5                      - - -

 6      (Walgreens-Zaccaro Exhibit 18 marked.)

 7                      - - -

 8   BY MR. GADDY:

 9        Q.    Show you another one of these.

10   This is Exhibit Number 18, P-WAG-1469.

11        A.    Okay.

12        Q.    And we've got to go to the second

13   page to see the first e-mail in this chain.

14        A.    Okay.

15        Q.    But, again, this is a message

16   coming from Matt Soder, and, again, it goes to

17   RxIntegrity.

18                Do you see that?

19        A.    I do see that, yes.

20        Q.    Sent on August 12, 2013, correct?

21        A.    Correct.

22        Q.    And, again, it looks like this is

23   another one of these controlled substance order

24   quantity override forms, correct?
```

1          A.    I don't know what that form is or

2    what it looks like, but ...

3          Q.    Well, that's what the subject line

4    of the e-mail indicates that this is, correct?

5          A.    Yes.

6          Q.    Okay.  And once again, it's got

7    the district number, which is your district,

8    277?

9          A.    Yes.

10         Q.    And it's got your e-mail address

11   as the DLP, correct?

12         A.    It does.

13         Q.    Okay.  And if we go down, again,

14   it looks like the drug that's being requested is

15   oxycodone again?

16         A.    Yes, that's what it says.

17         Q.    And, again, they're asking for a

18   500-count bottle and indicate there that they

19   need three bottles.

20               Do you see that?

21         A.    Yes.

22         Q.    Okay.  And, again, it asks for, "A

23   detailed explanation of the request, including

24   the prescription sales history, 13-week item

Highly Confidential - Subject to Further Confidentiality Review

```
 1   movement, current on hand count, inventory

 2   adjustments, et cetera."

 3               Do you see that?

 4        A.    Yes.

 5        Q.    Okay.  And it doesn't look like --

 6   let's just read what they write.  It says, "This

 7   location has been out of the product above for

 8   multiple weeks.  RxS has visited the store."

 9               What's RxS?

10        A.    That's the abbreviated term of

11   pharmacy supervisor.  So Matt Soder's title.

12        Q.    Okay.  So Matt has visited the

13   store, reviewed the item movement, along with

14   the -- that's good faith dispensing policies?

15        A.    That's what -- how I recognize

16   GFD.

17        Q.    Okay.  It says, "Store is 24 hours

18   and close to local hospitals and ER.  Matt

19   indicates the state PMP is being utilized

20   appropriately, and the pharmacist denies

21   prescriptions when ethical issues arise.  I'm

22   also requesting review of the store order

23   limits."

24               Do you see that?
```

1          A.     I would.  And I would just point

2     out when you said RxM Matt, RxM would be the

3     store pharmacy manager who would have been Josh

4     Close.

5          Q.     Thank you for correcting me.  So

6     RxS would be Matt.  RxM would be --

7          A.     The store pharmacy manager.

8          Q.     Gotcha.  Thank you.

9                 So it's the store pharmacy manager

10    saying that the PMP is being used and the -- and

11    that the pharmacist denies prescriptions?

12         A.     When ethical issues exist.  That's

13    what it states, yes.

14         Q.     Okay.  It says, "I'm also

15    requesting a review of the store order limits."

16                Correct?

17         A.     It does say that, yes.

18         Q.     Okay.  And the story would be the

19    same with this one as it was with the last one

20    as far as you weren't asked to do any

21    verification of any of this information?

22         A.     I was not asked to do anything.

23         Q.     Okay.  Have you ever been asked to

24    do any verification of any controlled substance

Highly Confidential – Subject to Further Confidentiality Review

```
 1   override request?

 2           A.    No, I have never.

 3           Q.    Okay.

 4           A.    Not to the best of my

 5   recollection, but I don't believe I ever have.

 6           Q.    Okay.  If you look at the first

 7   page of this -- well, first of all, if you look

 8   at the original e-mail, it looks like it goes in

 9   on October -- on August 12th at 10:05 p.m.

10               Do you see that?

11           A.    I do see that.

12           Q.    And if you look right above it,

13   still on that page, you see the body of the

14   response, which is, "Please process the order

15   requested below"?

16           A.    Yes, I do see that.

17           Q.    And it says to give them three

18   bottles of the 500-count oxycodone?

19           A.    Yes, I do see that.

20           Q.    Okay.  And if we look at when that

21   response came in, it looks like it came in at

22   10:28 the very next morning, correct?

23           A.    August 13 -- yes, that's what it

24   indicates.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  If you look up at the next

 2    e-mail, it looks like somebody from Perrysburg

 3    chimes in and says, "This form was sent to

 4    AmerisourceBergen."

 5                    Do you see that?

 6              A.    It does say that.

 7              Q.    Do you recognize them as being one

 8    of the vendors --

 9              A.    Yes.

10              Q.    -- that Walgreens utilizes?

11              A.    Yes.

12              Q.    And if you look up at the next

13    e-mail in the chain, it looks like Matt chimes

14    in and says, "Patty, can you look at the order

15    ceiling for this store as well?  Can it be

16    slightly increased?"

17                    Do you see that?

18              A.    I do see that.  That's what it

19    says.

20              Q.    The concept of order ceiling for a

21    store for a drug like oxycodone, does that mean

22    anything to you?

23              A.    No.

24              Q.    Okay.  And then it looks like
```

Highly Confidential - Subject to Further Confidentiality Review

1    about two hours after Matt's e-mail asking for

2    the order ceiling -- or excuse me.  He asked for

3    that around lunch on the 13th.  It looks like

4    the next day that's sent to RxIntegrity and

5    ultimately there's a response from Steven Mills

6    that says he's gone ahead and raised the stores

7    allotment for the oxycodone.

8              Do you see that?

9        A.    I do see that.  That's what it

10   states.

11       Q.    And again, this is nothing that

12   you're ever brought into the loop on?

13       A.    Never.  Yeah.  I've never been

14   brought in on anything like this.

15       Q.    Are you even informed when a

16   override request is submitted?

17       A.    No.

18       Q.    Do you have any understanding of

19   how often they're approved or denied?

20       A.    I do not.

21       Q.    Okay.  Let me show you what I'll

22   mark as Exhibit 19.

23                    - - -

24       (Walgreens-Zaccaro Exhibit 19 marked.)

```
 1                       - - -

 2               MR. GADDY:  This is P-WAG-1618.

 3         A.    Thank you.

 4         Q.    And I'll represent to you that the

 5   spreadsheet is a document that we were provided

 6   by your attorneys that's a summary of the

 7   override request from Ohio.

 8         A.    Okay.

 9         Q.    And by no means do I intend to go

10   through that in detail with you.

11         A.    Thank you.

12         Q.    You're welcome.

13               And then attached to that you'll

14   see a 1618A and a 1618B.  And these are summary

15   pivot tables that have been generated based off

16   of the data in the spreadsheet.

17         A.    Okay.

18         Q.    So what I'm going to start out

19   looking at is -- and, again, what I -- I might

20   have said this already, but the spreadsheet

21   encompasses the override request from the State

22   of Ohio from 2013 through 2018.

23         A.    Okay.

24         Q.    But what I want to look at with
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you is 1618A.

2           A.    Okay.

3           Q.    And do you see where over in the

4    column on the left it states, "Request Status

5    Description" and "Request Reason Description."

6                 Do you see that?

7           A.    I do see that.  That's what it

8    says.

9           Q.    And then the column to the right

10   says, "Count of Override Requests

11   Approved/Rejected/Expired or Submitted."

12                Do you see that?

13          A.    I do see that, yes.

14          Q.    And do you see that for -- it says

15   "DM Approved" and over to the right it says

16   "371."

17                Do you see that?

18          A.    I do see that.

19          Q.    Okay.  And do you recall from the

20   override request forms that we just looked at,

21   the DM was listed on those forms, the district

22   manager?  Those last two -- last couple override

23   request e-mails that we looked at.

24          A.    I see that his e-mail is listed
```

Highly Confidential - Subject to Further Confidentiality Review

1    like mine.

2           Q.    Okay.

3           A.    I do not see where he is copied on

4    the e-mail correspondence, though.

5           Q.    Do you have any understanding of

6    how the process works about whether or not he

7    has to approve the override request before it's

8    submitted to RxIntegrity or anything of that

9    nature?

10          A.    No.  Again, this is outside of my

11   area with ordering.

12          Q.    Okay.  If we look at 1618A, do you

13   see that it's listed on this summary spreadsheet

14   here that the district manager approved 371

15   orders, and if you go down a couple lines, that

16   he rejected only six of those override requests?

17          A.    I see what you've read, and that

18   is what it reflects.

19          Q.    Okay.  And if you go down to the

20   second bolded line below that, do you see a

21   listing for RxI or RxIntegrity approved?

22          A.    I do see that.

23          Q.    And do you see that it indicates

24   355 of these override requests were approved by

Highly Confidential - Subject to Further Confidentiality Review

```
 1    RxIntegrity?

 2           A.     That's what it states, yeah.

 3           Q.     And then if you go down to the

 4    next bolded line, do you see where it indicates

 5    that there were five override requests that were

 6    rejected by RxIntegrity?

 7           A.     That's what it states, yes.

 8           Q.     So it indicates that RxIntegrity

 9    approved 355 override requests and rejected

10    five, correct?

11           A.     That's what it states, yes.

12           Q.     Okay.  If you turn the page to

13    1618B.

14           A.     Yes.

15           Q.     And, again, I'll represent to you

16    that this is a summary of data pulled from that

17    spreadsheet --

18           A.     Okay.

19           Q.     -- that includes the store number

20    and some of the folks that were listed in that

21    spreadsheet, such as the district manager, the

22    pharmacy manager, and the pharmacy supervisor,

23    as well as the folks from RxIntegrity who were

24    actually involved in the decision-making, okay?
```

```
 1              A.    Okay.

 2              Q.    The district manager --

 3              A.    Yes.

 4              Q.    -- what is the scope of that

 5    person's responsibility as far as stores?

 6              A.    I don't know what all they're

 7    expected to -- what their responsibilities are.

 8    I know their position in the hierarchy, but what

 9    they're directly responsible for, I don't know.

10              Q.    Okay.  Describe their position in

11    the hierarchy for me, please.

12              A.    They are over the store managers

13    in the stores.  I mean, store and pharmacy

14    managers now -- I guess our -- it's changed.  So

15    do you want what that was 2012, '13, '14, or do

16    you want it now?

17              Q.    The earlier.

18              A.    The earlier.  So every district

19    had a district manager who was over the pharmacy

20    manager and the trainer.  The pharmacy -- or the

21    pharmacy supervisor, the district trainer, and

22    then who was also over all the pharmacy managers

23    and the pharmacy -- or the store managers.

24              Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    We are -- asset protection was

 2    their own separate.  I was not under them.  I

 3    was under John Davis.  I supported the district

 4    manager and the district team.

 5              Q.    Was the district manager

 6    responsible for the same stores that you're

 7    responsible for, or did he have more or less?

 8              A.    So at this time, we had district

 9    teams, so it would have been the same group of

10    stores.

11              Q.    Okay.  I asked you about the DEA

12    investigation at the Jupiter distribution

13    center, and I think you told me you were

14    generally aware that that happened but you're

15    not aware of the details.  Is that fair?

16              A.    That's fair.

17              Q.    Okay.  Were you aware of the DEA

18    investigation that began at the Perrysburg

19    distribution center?

20              A.    I was aware there was an

21    investigation, but I don't know, again, the

22    details, the whos, the whats and hows and ...

23              Q.    Okay.  I'll show you what I'll

24    mark as Exhibit Number 20.  And this is
```

Highly Confidential - Subject to Further Confidentiality Review

1    P-WAG-16.

2                      - - -

3        (Walgreens-Zaccaro Exhibit 20 marked.)

4                      - - -

5    BY MR. GADDY:

6        Q.    And do you see the top of this

7    document says "U.S. Department of Justice Drug

8    Enforcement Administration Subpoena" at the top?

9        A.    That's what it says, yes.

10       Q.    Okay.  And do you see that the

11   subpoena was issued, it says, "to Walgreens

12   Corporation," on the left-hand side of the page?

13       A.    That's what it says, correct.

14       Q.    Okay.  And if you'd look in the --

15   to read at the beginning it says, "Greeting:  By

16   the service of this subpoena upon you by

17   Diversion Investigator Wayne Groves, who was

18   authorized to serve it, you are hereby commanded

19   and required to appear before Investigator

20   Groves, an officer of the DEA, to give testimony

21   and to bring with you and produce for

22   examination the following books, records, and

23   papers at the time and place herein set forth."

24                 And you see in the next paragraph

Highly Confidential - Subject to Further Confidentiality Review

1    it indicates, "Pursuant to an official

2    investigation being conducted by the DEA,

3    provide the following information, documentation

4    by Walgreens at Perrysburg."

5                    And then it has a colon.

6                    Do you see where I am so far?

7        A.    Yes, I do.

8        Q.    And it says, "Any and all written,

9    electronic records and correspondence regarding

10   the sales and purchases of controlled substances

11   between the dates of beginning of business

12   2/1/11 and close of business 2/5/13, to include

13   purchase orders, sales invoices, packing slips,

14   shipping documents and receiving documents,

15   powers of attorney, courier identification of

16   records."

17                   Do you see that?

18       A.    I do see that.  That's what it

19   states.

20       Q.    Okay.  How did you become aware

21   that an investigation had begun into the

22   Perrysburg distribution center?

23       A.    Hearsay --

24       Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    -- which is talk.  My director

 2   John Davis at the time may have done an

 3   informal, "Just so you are aware."

 4          Q.    Okay.  Do you recall what

 5   information you were provided?

 6          A.    That's about it.

 7          Q.    Okay.

 8          A.    There was an investigation going

 9   on.

10          Q.    Did you understand why there was

11   an investigation?

12          A.    No.

13          Q.    Okay.  Did you understand that it

14   had to do with controlled substances?

15          A.    No.  And I wouldn't expect to

16   understand.  It's -- I don't -- we're not with

17   the distribution of -- or the ordering or the

18   sales.

19          Q.    Okay.  I'll show you what I'll

20   mark as Exhibit 21.

21                        - - -

22       (Walgreens-Zaccaro Exhibit 21 marked.)

23                        - - -

24          A.    Thank you.
```

1          Q.    And do you recognize this to be --

2    this is P-WAG-2329.

3                And you recognize this to be an

4    e-mail from Ed Svihra?

5          A.    That's who it states it's from,

6    yes.

7          Q.    Okay.  And that was one of -- Ed

8    was one of the loss prevention executives?

9          A.    Yes.

10         Q.    Okay.  And, again, it looks like

11   this e-mail was sent February 8, 2013, and it

12   was sent, again, to the entire loss prevention

13   operations department, correct?

14         A.    That's what it states.

15         Q.    Okay.  And that would have

16   included you?

17         A.    Yes.

18         Q.    And the subject is "Important DEA

19   Reminder."  And it's addressed to All LP Field

20   Personnel, correct?

21         A.    Yes.

22         Q.    And is that how you've kind of

23   described what your role would have been as a

24   field person?

```
 1            A.    Yes.

 2            Q.    Okay.  It says, "This

 3    communication went to all DMs and RxSs."  So

 4    would that be district managers and pharmacy

 5    supervisors?

 6            A.    Yes.

 7            Q.    So, "This communication went to

 8    all district managers and pharmacy supervisors

 9    yesterday as a COMPASS entry.  It was unclear if

10    loss prevention was copied."

11            A.    Yes.

12            Q.    Okay.  What's the "COMPASS entry"?

13            A.    What COMPASS is, is it's a system

14    in place where our support office in corporate

15    sends down all company communication, alerts,

16    changes, do this, change that, sign this, sign

17    that, merchandise here, merchandise there.  It's

18    something very constant that comes down.

19                  AP is not on the distribution for

20    the COMPASS messages.  Anything that we get

21    forwarded, which is exactly what this is, is an

22    FYI.

23            Q.    Okay.  It says -- it's addressed

24    to the district and market leaders, and it says,
```

1    "On Wednesday, February 6, the DEA inspected the

2    Perrysburg distribution center in Ohio and

3    requested records pertaining to controlled

4    substances.  For your reference the following

5    COMPASS communication will be provided to your

6    stores today."

7              Correct?

8         A.    That's what it states, yes.

9         Q.    Okay.  And the message goes on to

10   say, "On Wednesday, February 6, DEA inspected

11   the Perrysburg distribution center in Ohio and

12   requested records pertaining to controlled

13   substances."

14        A.    Okay.

15        Q.    "Walgreens' policy is to cooperate

16   with regulatory agencies and law enforcement

17   consistent with our obligations under applicable

18   state and federal laws."

19             Did I read that correctly?

20        A.    Yes, that is correct.

21        Q.    During your time at Walgreens have

22   you ever had to deal with DEA coming into any of

23   your stores?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.

 2          A.    That's not to say they didn't come

 3   into the stores.  I'm all over the place.  They

 4   may have been in stores.

 5          Q.    You don't spend your average day

 6   within a particular store.  You have the office

 7   location that you work out of and you have 50 to

 8   60 stores that you're responsible for?

 9          A.    I'm driving all over, yes.

10          Q.    Okay.  You skip down, it says,

11   "The procedures below provide a brief overview

12   of steps to take in the event that you receive a

13   warrant at your location."

14                Do you see that?

15          A.    Yes.

16          Q.    It says, "Ask DEA agents for

17   identification and the purpose of their visit

18   and allow agents immediate access to the

19   pharmacy department and direct them to the

20   requested records."

21                Correct?

22          A.    That's what it states, yes.

23          Q.    Then it says, "District pharmacy

24   team members are not required to answer any
```

```
 1    questions, participate in interviews, or provide

 2    written statements to the DEA investigators.

 3    Participating in these requests may potentially

 4    expose the company and the individual team

 5    member to liability."

 6              Do you see that?

 7         A.    That's what it states, yes.

 8         Q.    Do you know what liability Ed

 9    Svihra was worried about exposing the company to

10    if the pharmacists were to talk to the DEA?

11              MR. LEVINE:  Objection to form.

12         Foundation.

13         A.    I don't know.

14         Q.    Do you know what liability Ed

15    Svihra was warning that the individual Walgreens

16    team members might be liable for if they were to

17    talk to the DEA?

18         A.    I don't know.

19              MR. LEVINE:  Objection to form.

20         Foundation.

21         A.    I'm sorry.  I don't know.

22         Q.    Okay.  Were you ever involved in

23    any meetings or do you know why the executives

24    at loss prevention were directing the Walgreens
```

```
 1    employees not to talk to the DEA?

 2           A.    I don't know why.

 3           Q.    None of your duties at any time at

 4    Walgreens has had anything to do with the

 5    ordering of controlled substances, correct?

 6           A.    None.

 7           Q.    The vast majority of your

 8    responsibilities have related to theft and loss

 9    prevention?

10           A.    Correct.

11                 MR. GADDY:  Okay.  Mark, I think

12           I'm about done.  I just got handed this

13           document.  If I could have a couple

14           minutes to look at it.

15                 MR. LEVINE:  Sure.

16                 THE VIDEOGRAPHER:  Off the record,

17           1:50.

18                 (Recess taken.)

19                 THE VIDEOGRAPHER:  On the record,

20           1:57.

21                       - - -

22         (Walgreens-Zaccaro Exhibit 22 marked.)

23                       - - -

24
```

Highly Confidential – Subject to Further Confidentiality Review

1   BY MR. GADDY:

2           Q.    Ms. Zaccaro, I'm going to show you

3   what I've marked as Exhibit 22.  It's --

4           A.    Thank you.

5           Q.    And if you don't mind for me, flip

6   to the second page and maybe we can make some

7   sense out of what this document is.

8           A.    Okay.

9           Q.    So if we look at the second page,

10  it looks like it's an e-mail from Megan Eicker

11  to Ed Svihra.

12                Do you see that?

13          A.    Yes.

14          Q.    And I think we saw both of them on

15  that organizational chart that we looked at

16  earlier, correct?

17          A.    Yes, we did.

18          Q.    Okay.  And Megan writes,

19  "Greetings Ed.  You have been designated as the

20  goal setting task force lead for the drug

21  diversion performance goal."

22                Do you see that?

23          A.    That's what it states, yes.

24          Q.    Okay.  It says, "Below are your

```
1    designated team members as well as some initial

2    ideas from the recent leadership meetings.  I

3    understand you've already begun formulating

4    recommendations for this goal as well.  Please

5    follow these next steps."

6              Do you see that?

7         A.   That's what it states, yes.

8         Q.   And one of the things that we

9    looked at earlier this morning was some of the

10   entries on your performance review, correct?

11        A.   Correct.

12        Q.   Okay.  There were different

13   categories of topics that you as the Walgreens'

14   employee are judged on both by yourself and by

15   your supervisors, correct?

16        A.   Based on performance, yes.

17        Q.   Okay.  And one of the things

18   that's being referenced here is a "drug

19   diversion performance goal."

20             Do you see that in the bolded

21   section of the first line?

22        A.   That's what it states, yes.

23        Q.   Okay.  Had -- are you familiar

24   with the drug diversion performance goal?
```

```
 1            A.    No, I'm not.

 2            Q.    Okay.  Let's flip to the -- back

 3    to the first page.  And do you see the top

 4    left-hand corner of this page, it says, "DLPM

 5    Goal Performance Rating Guidelines"?

 6                  Do you see that?

 7            A.    Yes.

 8            Q.    And that would stand for district

 9    loss prevention managers?

10            A.    I'm trying to think of the time

11    stamp, if this is like 2013.

12            Q.    The e-mail that we just looked at

13    was August 2012 --

14            A.    Yeah.

15            Q.    -- if that helps.

16            A.    I don't know what our DLPM title

17    was then, but we have been DLPMs.

18            Q.    Okay.  That would have been you?

19            A.    Yes, if that's what the DLPM is.

20            Q.    Okay.  And that's what you've been

21    referred to over your career, is as a DLPM,

22    district loss prevention manager?

23            A.    I have, yes.

24            Q.    Okay.  And so this says "District
```

```
 1    loss prevention manager goal performance rating

 2    guidelines."  And I wanted to start out under

 3    the column of "Goal."

 4              Do you see that?  It's the far

 5    left-hand column.

 6         A.   Yes.

 7         Q.   And it says, "The goal is to

 8    engage with pharmacy supervisor to assist market

 9    district community and store leadership in

10    addressing the nationwide prescription drug

11    abuse epidemic and associated drug diversion

12    activities."

13              Do you see that?

14         A.   That's what it states, yes.

15         Q.   Have you ever been told at any of

16    your time in your employment with Walgreens that

17    one of your performance measures on which you

18    were being evaluated by was this drug diversion

19    performance goal?

20         A.   Not to my knowledge.

21         Q.   Okay.  It goes on to say that --

22    it says, "Note:  Prescription drug diversion

23    may," and then it's got a list of several

24    different items.  "Involve prescription drug
```

 1   and/or pseudoephedrine product.  Refer to theft

 2   of drugs, refer to prescription misconduct,

 3   include dispensing prescriptions issued for

 4   other than legitimate medical purposes whereby

 5   prescriber acting outside the usual course of

 6   professional practice, refer to both internal

 7   and external losses, involve employee

 8   self-medication, and include privacy concerns if

 9   finished prescriptions are involved."

10            Do you see that?

11        A.    That's what it states, yes.

12        Q.    Okay.  Is this information that

13   was ever given to you as one of your particular

14   performance goals that you should try to meet in

15   your role as a district loss prevention manager?

16        A.    I don't remember.  Our goals, our

17   measures, our bands, everything changed from

18   year to year.  I don't remember if this was a

19   goal that was set for our department in that

20   time frame or not.

21        Q.    Okay.  There's a couple of

22   measures listed here, and the first one in the

23   first Measure box says, "Completion of various

24   self-education modules to fully understand the

Highly Confidential - Subject to Further Confidentiality Review

1    societal aspects of prescription drug abuse and

2    the effects this epidemic has on the district by

3    a date of December 1st, 2012."

4              Do you see that?

5        A.    That's what it states, yes.

6        Q.    Okay.  After reading that and

7    looking at the date that that was supposed to be

8    completed by, does that refresh your memory as

9    to something that you were asked to do with your

10   employment at Walgreens?

11       A.    I don't remember.

12       Q.    Let me just ask you without -- you

13   know, out of the context of this document, just

14   in general.

15             Have you ever either by way of

16   training or education for Walgreens or just on

17   your own time taken to educate yourself to fully

18   understand the societal impacts of the

19   prescription drug abuse and the epidemic in the

20   area that you serve in Ohio?

21       A.    So in the past -- and time stamps

22   on them, I can't remember -- I have been invited

23   with different law enforcement departments,

24   mainly members of drug task force in different

Highly Confidential - Subject to Further Confidentiality Review

```
 1    counties or municipalities.  One sticks out in

 2    particular with me was doctor shopping that was

 3    put on with Medina County Sheriff's Department.

 4    I was invited to attend.  I was in that room and

 5    I only know doctors were there because my

 6    dentist was in there and I was surprised to see

 7    her.

 8              So I have taken up a few

 9    invitations just on my own to -- the awareness

10    and stuff -- I mean, just to know what's going

11    on and anything that I could take to -- take

12    back to my stores and help them identifying

13    things when they feel that they need to report

14    things.

15         Q.   Were these things that you were

16    under the impression that you were expected to

17    be doing as part of your job at Walgreens?

18         A.   I don't know.  I seek to do a lot

19    of things in and outside of what is expected of

20    me.

21         Q.   Were you under the impression that

22    doing those things would be meeting some

23    performance goals or checking some box on a

24    yearly review?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't remember.

2          Q.    Okay.  The next entry states,

3     "Educate and collaborate with members of the

4     community by coordinating and conducting various

5     engagement events that address prescription drug

6     abuse and diversion by August 31, 2013."

7                Do you see that?

8          A.    Yes.

9          Q.    Okay.  Do you recall ever having

10    your performance at Walgreens judged based on

11    that guideline?

12         A.    I don't remember.  I don't

13    remember these goals from this time period, is

14    the bottom line.

15         Q.    Okay.  Do you have any memory

16    whatsoever of ever having a part of your

17    performance ratings, as a loss prevention

18    manager at Walgreens, being based on your

19    education and appreciation or involvement with

20    the drug epidemic related to opioids?

21         A.    I don't remember.

22         Q.    Okay.  The last measure says,

23    "Engage the use of the following tools," and the

24    first one is the exception report, correct?

```
 1              A.     Correct.

 2              Q.     And you've told us the only way

 3      you used that was to try to identify theft

 4      within the stores, correct?

 5              A.     Mm-hmm, or protect us from losses

 6      with overbuys and -- that way.

 7              Q.     Expired drugs and things like

 8      that?

 9              A.     Yeah.

10              Q.     Okay.  The second one, it says the

11      following tools, you should use a SIMS

12      reporting?

13              A.     Correct.

14              Q.     How would you use SIMS reporting?

15              A.     That's your live 13-week movement

16      reports that you can dig in a little further.

17      There's more details in there as far as when

18      product was received, when it was not.  It's

19      more live in realtime.

20              Q.     Would you be using that for the

21      same purpose as the exception report to identify

22      theft or loss within the stores?

23              A.     The way I would do it is if

24      there's something that flagged me on the LPxRx
```

1    report, I would then start digging further to

2    get more information and analyze things through

3    the SIMS reporting system.

4           Q.    But there's no other reason that

5    you're using the SIMS reporting system, other

6    than to identify theft and loss in the store?

7           A.    Yes.

8           Q.    Okay.  The -- yes, correct?

9           A.    Yes.

10          Q.    Sorry?

11          A.    I mean that's what I can recall

12   using it for at this moment.

13          Q.    Okay.  Okay.  The next one is

14   "Adjustment Alerts."  And we saw a couple of

15   times you raised questions about adjustments

16   that you saw in the exception reports.  Is the

17   adjustment alerts, is that a different report or

18   a different notification?

19          A.    I'm not aware of a report that is

20   titled "Adjustment Alerts."  I would associate

21   that, myself, with the LPxRx --

22          Q.    Okay.

23          A.    -- the exception reports, that way

24   that identifies when adjustments are made.

1    Q.    Okay.  The next entry is for

2  pseudoephedrine leads.

3    A.    Yes.

4    Q.    Do you know what's referenced

5  there?

6    A.    No.

7    Q.    Okay.  The next entry is

8  "Controlled substance monitoring leads."

9          Do you see that?

10    A.    That's what it states, yeah.

11    Q.    Is there any type of report or --

12  that you get or that you have the ability to

13  generate that would to be a controlled substance

14  monitoring lead?

15    A.    Not that I can think of.

16    Q.    Does that entry mean anything to

17  you?

18    A.    No.

19    Q.    Okay.  The next is "Electronic

20  prescribing of controlled substances lead."

21          Do you see that?

22    A.    I see that.

23    Q.    Does that mean anything to you?

24    A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Is that a report you've ever seen

 2    or utilized?

 3              A.     No.

 4              Q.     The next entry is, "Prescription

 5    drug monitoring program as mandated by the

 6    state."

 7                     Do you see that?

 8              A.     Yes.

 9              Q.     Okay.  And Ohio has a prescription

10    drug monitoring program, correct?

11              A.     I don't know.

12              Q.     Okay.  You ever have any

13    interaction whatsoever with the OARRS system,

14    O-A-R-R-S?

15              A.     I know of the system, but I have

16    never even seen it on a screen or looked at it.

17    I don't have access to it.

18              Q.     Okay.  Have you ever received

19    reports that were generated from OARRS, that

20    you're aware of?

21              A.     No.

22              Q.     Next one is, "Checking of patient

23    photo identification as mandated by the state."

24                     Do you see that?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1            A.    I see that.

 2            Q.    Do you ever get involved in

 3    verifying identifications of patients who have

 4    prescriptions filled?

 5            A.    No.

 6            Q.    The next one says, "Physical

 7    security opportunities."

 8                  Do you see that?

 9            A.    I do see that.

10            Q.    Do you know what's being

11    referenced there?

12            A.    Physical security is the safes,

13    the cameras, those controls in place.

14            Q.    And that's something that's --

15    that is a part of your duties that you --

16            A.    I would assess the need for that.

17            Q.    Okay.  Then the last entry there

18    is the, "Pain management focus on compliance

19    survey," and I think we looked at that earlier

20    and that was something you've never seen or had

21    any involvement with before, correct?

22            A.    I've never had any involvement,

23    yeah.

24            Q.    Okay.  If you flip to the page
```

1    that ends 463.  Do you see another similar

2    spreadsheet?

3            A.    Yes.

4            Q.    And, again, in the top left-hand

5    corner you see it says, "DLPM" -- district loss

6    prevention manager -- "goal performance rating

7    guidelines"?

8            A.    Yes.

9            Q.    Okay.  The performance goal here

10   states, "Assist market district community and

11   store level leadership with direction,

12   coordination and implementation of plans for

13   increasing sales and reducing loss through

14   improved high risk product availability,

15   guidelines with an emphasis on medium level

16   solutions."

17               Do you see that?

18           A.    Yes.

19           Q.    Do you understand what's being

20   referred to there?

21           A.    Yes.  That's all on front end

22   product.

23           Q.    Okay.  That's not related to the

24   pharmacy or controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    And I think it goes on to the next

 3      page also, if you want to look at that real

 4      quick and make sure your answer is the same.

 5              A.    Product -- yeah.  This has all

 6      been in connection with and associated with our

 7      front end merchandise.

 8              Q.    Okay.  None of that on that chart

 9      there has to do with the pharmacy or controlled

10      substances whatsoever, correct?

11              A.    Not to how I would apply it on my

12      knowledge of it.

13              Q.    Okay.  And as far as it relates to

14      controlled substances at Walgreens stores, the

15      entire time that your -- you've been to

16      Walgreens, your only duty or responsibility that

17      you've had with those controlled substances has

18      been monitoring to determine whether or not

19      you're having any internal loss or theft of

20      those products?

21              A.    Correct.

22              MR. GADDY:  Okay.  That's all that

23      I have for you right now, Ms. Zaccaro.

24              THE WITNESS:  Thank you.
```

```
 1                    MR. LEVINE:  This is Mark Levine,

 2           attorney for Walgreens.  Ms. Zaccaro, I

 3           have a few follow-up questions for you.

 4                    THE WITNESS:  Okay.

 5                       - - -

 6                    REDIRECT EXAMINATION

 7    BY MR. LEVINE:

 8           Q.    First, I want you to look at

 9    Exhibit 22.  That's the exhibit that Plaintiffs'

10    counsel has just been going through with you.

11    There are -- it appears to be a collection of

12    documents, e-mails and spreadsheets.  If you go

13    a little further, you'll see there's some

14    handwritten notes there.

15                    Do you see the handwritten notes?

16           A.    Yes.

17           Q.    Do you have any idea how this sort

18    of document marked as Exhibit 22 was compiled?

19           A.    I have no knowledge of how this

20    was compiled.

21           Q.    Have you ever seen this document

22    before?

23           A.    Not to my recollection, no.

24           Q.    And then you were shown the second
```

Highly Confidential - Subject to Further Confidentiality Review

1    page of the document, the one that ends 451, and

2    that's an e-mail from a Megan Eicker to Ed

3    Svihra dated August 31, 2012, right?

4         A.    Yes.

5         Q.    Okay.  And the very first page

6    there after it says -- or the first line,

7    "Greetings Ed," and then it says, "You've been

8    designated as the goal-setting task force lead

9    for the drug diversion performance goal.  Below

10   are your designated team members as well as some

11   initial ideas from recent leadership meetings."

12              Do you see that?

13        A.    Yes.

14        Q.    And then what's attached is a

15   spreadsheet called "Goal setting template,"

16   right?

17        A.    Yes.

18        Q.    And then if you go back to the

19   first page, that's -- of Exhibit 22 -- that's a

20   spreadsheet with "Goal Performance Rating

21   Guidelines," right?

22        A.    Yes.

23        Q.    Do you have any idea whether the

24   goal performance rating guidelines on the first

Highly Confidential - Subject to Further Confidentiality Review

```
 1    page of Exhibit 22 that Plaintiffs' counsel went

 2    through with you were ever instituted at

 3    Walgreens?

 4           A.    I don't recall.

 5           Q.    Do you remember anyone ever

 6    telling you that your -- the goals you had to

 7    meet as a loss prevention manager were the goals

 8    set forth -- included the goals set forth on the

 9    first page of Exhibit 22?

10           A.    No, I don't.

11           Q.    I want you to look -- thank you.

12    I want you to look at a different document now.

13           A.    Okay.

14           Q.    Exhibit 17.

15           A.    Okay.  Yes.

16           Q.    Exhibit 17, at the bottom of that

17    page, there's an e-mail from a Matt Soder to

18    RxIntegrity with a cc to Matt Soder.

19                 Do you see that?

20           A.    Yes.

21           Q.    And this is -- relates to this

22    controlled substance order quantity override

23    form; is that right?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    It lists -- in that first e-mail

 2    from Matt Soder, it lists your address as the

 3    DLP e-mail address.  What is "DLP"?

 4              A.    It would be district loss

 5    prevention.

 6              Q.    And were you the district loss

 7    prevention manager for that store?

 8              A.    During that time, yes.

 9              Q.    That's store -- is that store

10    6574?

11              A.    Yes.

12              Q.    Is there any indication on the

13    e-mail that the -- that is a request for an

14    override form actually went to you?

15              A.    Excuse me?  I'm sorry.

16              Q.    Is -- this information -- let's go

17    back.  The information -- it lists also an

18    address for a DM.  Is that a district manager?

19              A.    Yes.

20              Q.    That's John Lucchetti?

21              A.    Yes.

22              Q.    So Mr. Lucchetti's e-mail address

23    and your e-mail address, is that information

24    that relates to the store just like the address
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    for the store or the phone number is information

 2    related to the store?

 3            A.    Yes.

 4            Q.    Is there any indication in

 5    Exhibit 17 that Matt Soder's e-mail about a

 6    controlled substance order quantity override

 7    form went to you?

 8            A.    No.

 9            Q.    Did you even receive this e-mail?

10            A.    No, I did not.

11            Q.    Have you ever seen a controlled

12    substance order quantity override form before?

13            A.    I have never.

14            Q.    Okay.  You can put that aside.

15                  I want to talk a little bit about

16    people being unconscious in bathrooms or parking

17    lots at Walgreens.  Do you recall you testified

18    about that?

19            A.    Yes.

20            Q.    Do you know how often that happens

21    in Walgreens in the parts of Ohio that you're

22    responsible for on an annual basis?

23            A.    I couldn't put a number to it.

24    It's not every day.  It's maybe once or twice a
```

1    month.

2          Q.   Do you know how many of those were

3    opioid overdoses as opposed to heart attacks or

4    other medical conditions?

5          A.   I do not know how many were opioid

6    overdoses.

7          Q.   Thank you.

8               You were also asked about training

9    or education that you received or you didn't

10   receive.

11              Do you recall that?

12         A.   Yes.

13         Q.   I think you were asked questions

14   about whether you received training or education

15   on opioid deaths or opioid overdoses.

16              Do you recall that?

17         A.   Yes.

18         Q.   Do you expect to get training on

19   opioid deaths or opioid overdoses in your role?

20              MR. GADDY:  Objection to form.

21         A.   I would not expect to get that

22   training.

23         Q.   Why not?

24         A.   My area is losses with theft,

```
 1    shrink.

 2            Q.    Let's talk about theft by store

 3    employees.  I believe you testified that you saw

 4    five or six cases per year of pharmacists or

 5    technicians stealing drugs in your -- in the

 6    stores that you're responsible for; is that

 7    right?

 8            A.    Correct.

 9            Q.    Is that any kind of prescription

10    drug or just opioids?

11            A.    Any kind of prescription drug.

12            Q.    Is the number for opioids smaller?

13            MR. GADDY:  Objection.  Form.

14            A.    I don't know.

15            Q.    Well, are all the -- for -- in

16    your experience, is it more common to find the

17    pharmacist stealing drugs or the technician

18    stealing drugs?

19            A.    Tech --

20            MR. GADDY:  Objection.  Form.

21            A.    Sorry.

22            Technicians.

23            Q.    How common is it to find -- in

24    your experience, for the stores that you're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    responsible for, to find a pharmacist that's

 2    stolen prescription drugs?

 3                 MR. GADDY:  Objection.  Form.

 4         A.    Over the course of 12 years, I can

 5    recall off the top of my head three pharmacists.

 6         Q.    For all the stores you're

 7    responsible for?

 8         A.    Yes.

 9         Q.    Is there any reason it's more

10    difficult to detect a pharmacist stealing drugs

11    as opposed to a technician or someone else?

12         A.    They would have more access to

13    doing overrides, ordering, and telling me

14    information and details.

15         Q.    How does that allow pharmacists to

16    avoid detection?

17         A.    I'm sorry.  What was the question?

18         Q.    How could a -- why is it more --

19    why is it tougher to see if a pharmacist is

20    stealing drugs as opposed to a technician?

21         A.    They have the ability to hide it

22    in the systems.  They --

23         Q.    What systems are you talking

24    about?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              A.     Our inventory management systems,

 2     adjustment systems.

 3              Q.     I want to ask you about a

 4     particular pharmacist.  Are you familiar with

 5     someone named ███████████?

 6              A.     I am.

 7              Q.     Who is he?

 8              A.     He was the pharmacy manager at

 9     location in our Macedonia store, 7719 I believe

10     is the store number.

11              Q.     Is that Macedonia, Ohio?

12              A.     Correct.

13              Q.     Does ██████████ still work at

14     Walgreens?

15              A.     He does not.

16              Q.     What happened to him?

17              A.     After we were alerted of an

18     overdose of drugs for a suicide attempt, and as

19     we received information, he had -- come to find

20     out, he was self-medicating with some

21     alprazolams and antidepressants.  He -- then

22     there was a random drug test at the store and

23     Jeff knew he was going to test positive without

24     a legitimate prescription.
```

```
 1                    He then -- come to find out

 2    later -- took two at home drug tests, stole that

 3    from the store to take the test to make sure he

 4    knew -- or what he suspected was going to be the

 5    positive results from his drug tests.  And once

 6    he figured that out, he stole -- oh, I think it

 7    was five or six bottles of oxycodone and took

 8    them home that night and ingested three full

 9    bottles of oxycodone.

10            Q.    Was that part of the suicide

11    attempt?

12            A.    That was the suicide attempt.

13            Q.    Did he succeed?

14            A.    He did not.

15            Q.    Was he terminated by Walgreens?

16            A.    He was.

17            Q.    For what?

18            A.    Theft.

19            Q.    Did you -- after ▆▆▆▆▆▆

20    suicide attempt, did you investigate what

21    happened?

22            A.    Yes.

23            Q.    Is that how you became aware of

24    the drugs that he took and the theft?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    Did you receive a signed voluntary

3    statement from ███████████████?

4                MR. GADDY:  Objection.  Form.

5    Leading.

6          A.    I did receive a signed voluntary

7    written statement from him, and I also had a

8    verbal admission from him during the course of

9    my interview.

10         Q.    All right.  So did you interview

11   ████████████?

12         A.    I did.

13         Q.    Was anyone else there with you

14   during the interview?

15         A.    The pharmacy manager at the

16   time -- or I'm sorry.  Pharmacy supervisor would

17   have been Jaime Whited.  Jaime was there.

18         Q.    Did you -- do you typically

19   perform interviews of people when theft is

20   suspected?

21         A.    Yes.

22         Q.    Is that part of the ordinary

23   course of your job at Walgreens?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    And is it typical in your
2    interviews to have the person that you're
3    talking to make a voluntary statement where
4    they're willing to?
5         A.    Everybody is offered that
6    opportunity.
7         Q.    And did you offer that opportunity
8    to ███████ski?
9         A.    I did.
10        Q.    And did he take advantage of that
11   opportunity?
12        A.    He did.
13        Q.    And is that voluntary statement
14   from ████████ something you obtained in the
15   ordinary course of your business at Walgreens?
16        A.    Yes, it was.
17        Q.    And did you sign that voluntary
18   statement?
19        A.    I did.
20        Q.    And to your knowledge, based on
21   what you learned in your investigation, how many
22   times did ██████████ steal opioids from
23   Walgreens?
24        A.    That was the only time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    One time?

 2          A.    One time.

 3          Q.    And what was -- what use did he

 4   make of those opioids?

 5          A.    It was the suicide attempt.

 6                MR. LEVINE:  Nothing further.

 7                       - - -

 8                RECROSS-EXAMINATION

 9   BY MR. GADDY:

10          Q.    Ms. Zaccaro, as a district loss

11   prevention manager, does it matter to you

12   whether or not the person doing or committing

13   the theft is a pharmacy technician or the

14   pharmacist?

15          A.    It doesn't matter to me?  It all

16   matters to me.

17          Q.    You're concerned with all theft,

18   correct?

19          A.    I'm concerned with all theft.  I'm

20   probably just a little bit more disappointed

21   when it becomes the pharmacist.

22          Q.    But certainly --

23          A.    They work very hard for that.

24          Q.    Certainly it's a serious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    occurrence and something that Walgreens takes

 2    seriously if a pharmacy technician is

 3    stealing --

 4            A.    Yes.

 5            Q.    -- controlled substance, correct?

 6            A.    Yes.

 7            Q.    And it's absolutely something

 8    that's serious and something that Walgreens

 9    takes seriously if a pharmacist is stealing

10    controlled substances, correct?

11            A.    Yes.

12            Q.    Okay.  And I think, as you said,

13    about five to six times a year you're involved

14    in investigations that result in arrests of

15    either a pharmacist or a pharmacy technician

16    who's been stealing controlled substances?

17            A.    My investigations haven't just

18    been about controlled substances.  I -- we have

19    thefts of all kinds of drugs in the pharmacies.

20    I had an investigation for birth control pills.

21    Sometimes they're just taking what they need.

22            Q.    Okay.  And those investigations

23    have been, I think you said, on average about

24    five to six a year in which you've had
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigations into pharmacists or pharmacy

2    technicians related to their theft?

3          A.    Yes.

4          Q.    Okay.  The incident that you just

5    talked about with your counsel is not the only

6    incident of controlled substances being stolen

7    from your Walgreens store; is it?

8          A.    That's correct.

9          Q.    Okay.  You were also asked by your

10   attorney about the override form.

11               Do you recall that?

12         A.    Yes.

13         Q.    I think that was Number 17 that's

14   still in front of you.

15         A.    Oh, yes, yes.  I was trying to

16   connect the dots where --

17         Q.    I understand.  No doubt that that

18   e-mail was sent from the pharmacy supervisor,

19   Mr. Soder, to the RxIntegrity division, correct?

20         A.    Yes.

21         Q.    If the RxIntegrity division were

22   to have had any questions or would have wanted

23   to check in with loss prevention, would they

24   have had your contact information based on that

```
 1   e-mail?

 2          A.    Yes.  It's available to them.

 3          Q.    Okay.

 4          A.    It's also not uncommon for forms

 5   to auto populate all the information.  I can't

 6   speak to the form and how this was entered.

 7          Q.    Okay.  Well, whoever generated

 8   that form thought that it would be appropriate

 9   to have your contact information in there,

10   correct?

11                MR. LEVINE:  Objection to form.

12          A.    I don't know.

13          Q.    Okay.  In all the time that you've

14   been at Walgreens, has anybody from RxIntegrity

15   ever reached out to you to ask for additional

16   information about any of these override

17   requests?

18          A.    Not to my recollection, no.

19          Q.    Okay.  And the last thing I'll ask

20   you about are the individuals that have been

21   passed out or unconscious in the Walgreens'

22   bathrooms and the Walgreens' parking lots.

23          A.    Yes.

24          Q.    I know you told us earlier that
```

Highly Confidential - Subject to Further Confidentiality Review

1    you were told by some of the pharmacy

2    supervisors or pharmacy managers that some of

3    those people had overdosed.

4                    Do you recall that?

5         A.    It would have been store managers.

6         Q.    Okay.

7         A.    Pharmacy managers aren't always

8    aware of it.  Sometimes the store manager will

9    be the first to get the information and call

10   paramedics.

11        Q.    Okay.  And I think like we

12   covered, your -- you don't spend most of your

13   time in any particular store.  You're on the

14   road a lot and working out of your office, which

15   is not a Walgreens store, correct?

16        A.    Correct.

17        Q.    Okay.  But you're not changing the

18   testimony that you gave earlier that what you've

19   been told by pharmacy managers or store managers

20   is that from time to time people overdose in

21   Walgreens' bathrooms and Walgreens' parking

22   lots, correct?

23                    MR. LEVINE:  Objection to form.

24        A.    They're not always relating them

1    and associating them to overdose.  I -- my own

2    opinion is I think there's an assumption when

3    paramedics come and start administering the

4    naloxone and Narcan, it is those professionals

5    and experts who can identify what an overdose

6    victim does or does not look like.

7              So to know it was an opioid

8    overdose, my store managers I think make the

9    assumption, more than anything.  Again, I

10   haven't seen it directly.  I can only say that I

11   receive alerts from our security operations

12   center that are reported as unconscious person

13   found.

14        Q.   Okay.  And regardless, you get

15   these alerts, I think you said, a couple times a

16   month indicating there's been an unconscious

17   person found either in a Walgreens' bathroom or

18   a Walgreens' parking lot and oftentimes these

19   people are administered Narcan when the

20   paramedics --

21        A.   I don't know if they're

22   administered Narcan always.  I just get the

23   alerts that an unconscious person was observed.

24        Q.   Okay.  And you get those alerts

Highly Confidential - Subject to Further Confidentiality Review

```
1    from your stores throughout your area here in

2    Ohio?

3            A.     It covers my region.  So ...

4            Q.     Okay.  Which includes Cleveland,

5    correct?

6            A.     Yes.

7                   MR. GADDY:  Okay.  That's all I

8            have.

9                        -  -  -

10           FURTHER REDIRECT EXAMINATION

11   BY MR. LEVINE:

12           Q.     These people that were found

13   unconscious in bathrooms or parking lots where

14   there have been overdoses, do you know whether

15   the overdoses are from prescription opioids or

16   other prescription drugs or illegal drugs such

17   as heroin?

18           A.     So a lot of the comments, again,

19   that managers will make in the assumed overdose

20   is always with needles and believed to be with

21   heroin.

22                  MR. LEVINE:  Nothing further.

23                        -  -  -

24           FURTHER RECROSS-EXAMINATION
```

```
 1   BY MR. GADDY:

 2          Q.    I'd asked you earlier today about

 3   whether or not there were issues with needles in

 4   Walgreens' bathrooms or parking lots, and I

 5   thought you told me you'd never heard of that

 6   before.  Did I -- maybe I asked a bad question.

 7          A.    Well, I didn't see any like that

 8   before.

 9          Q.    Okay.  But you definitely heard

10   reports of needles in Walgreens' bathrooms or

11   parking lots?

12          A.    Managers have said that there's

13   needles that they find out in their parking

14   lots.  I thought you were referring to me

15   witnessing it and knowing and seeing it.

16          Q.    Okay.  No.  Fair clarification.

17          A.    I'm sorry.

18          Q.    No.  Thank you.

19                MR. LEVINE:  All done?

20                Reserve signature.

21                THE VIDEOGRAPHER:  Off the record,

22          2:29.

23             (Signature not waived.)

24                      - - -
```

Highly Confidential - Subject to Further Confidentiality Review

1                    Thereupon, at 2:29 p.m., on Wednesday,

2       January 16, 2019, the deposition was concluded.

3                          - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE

 2    STATE OF OHIO        :

                               SS:

 3    COUNTY OF _____:

 4

 5         I, LAURIE A. ZACCARO, do hereby certify that

 6    I have read the foregoing transcript of my

 7    cross-examination given on January 16, 2019; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11                      _____

                           LAURIE A. ZACCARO

12

13         I do hereby certify that the foregoing

14    transcript of the cross-examination of LAURIE A.

15    ZACCARO was submitted to the witness for reading and

16    signing; that after she had stated to the undersigned

17    Notary Public that she had read and examined her

18    cross-examination, she signed the same in my presence

19    on the _____ day of _____, 2019.

20

                        _____

21                         NOTARY PUBLIC - STATE OF OHIO

22

23    My Commission Expires:

24    _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2   STATE OF OHIO       :
                              SS:
 3   COUNTY OF FRANKLIN  :
 4           I, Carol A. Kirk, a Registered Merit
     Reporter and Notary Public in and for the State of
 5   Ohio, duly commissioned and qualified, do hereby
     certify that the within-named LAURIE A. ZACCARO was by
 6   me first duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the cause
 7   aforesaid; that the deposition then given by her was
     by me reduced to stenotype in the presence of said
 8   witness; that the foregoing is a true and correct
     transcript of the deposition so given by her; that the
 9   deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
             IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Columbus, Ohio
     on this 21st day of January 2019.
15
16
17
18                       _____
                         CAROL A. KIRK, RMR
19                       NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21                       - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1           DEPOSITION ERRATA SHEET

2    I, LAURIE A. ZACCARO, have read the transcript

     of my deposition taken on the 16th day of January,

3    2019, or the same has been read to me.  I request that

     the following changes be entered upon the record for

4    the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

5    original transcript

6    Page  Line  Correction or Change and Reason:

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____ Signature _____