1     IN THE UNITED STATES DISTRICT COURT
2      FOR THE EASTERN DISTRICT OF OHIO
3             EASTERN DIVISION
4                  -  -  -
5   IN RE:  NATIONAL     :  MDL NO. 2804
    PRESCRIPTION OPIATE :
6   LITIGATION           :
    -----------------------------------------
7                        :  CASE NO.
    THIS DOCUMENT        :  1:17-MD-2804
8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
9                        :  Polster
10                 -  -  -
          Friday, August 3, 2018
11                 -  -  -
12  HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
13                 -  -  -
14          Videotaped deposition of
    CHRISTOPHER ZIMMERMAN, taken pursuant to
15  notice, was held at the law offices of
    Reed Smith, LLP, Three Logan Square, 1717
16  Arch Street, Suite 3100, Philadelphia,
    Pennsylvania 19103, beginning at 9:00
17  a.m., on the above date, before Amanda
    Dee Maslynsky-Miller, a Certified
18  Realtime Reporter.
19                 -  -  -
20
21
22
          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph| 917.591.5672 fax
              deps@golkow.com
24

Page 2

```
 1  APPEARANCES:
 2
 3      BARON & BUDD P.C.
        BY: MARK PIFKO, ESQUIRE
 4      BY: STERLING CLUFF, ESQUIRE
        15910 Ventura Boulevard
 5      #1600
        Encino, California  91436
 6      (818) 839-2333
        mpifko@baronbudd.com
 7      Scluff@baronbudd.com
 8      - and -
 9      BY:  SCOTT SIMMER, ESQUIRE
        Washington, DC
10      (202) 333-4562
        Ssimmer@baronbudd.com
11      Representing the Plaintiffs
12
13      REED SMITH, LLP
        BY: ROBERT A. NICHOLAS, ESQUIRE
14      BY: JOSEPHY J. MAHADY, ESQUIRE
        BY: JEFFREY R. MELTON, ESQUIRE
15      BY: SHANNON E. MCCLURE, ESQUIRE
        BY: THOMAS H. SUDDATH JR., ESQUIRE
16      Three Logan Square
        1717 Arch Street
17      Philadelphia, PA 19103
        (215) 851-8100
18      Rnicholas@reedsmith.com
        jmahady@reedsmith.com
19      Jmelton@reedsmith.com
        Smcclure@reedsmith.com
20      Tsuddath@reedsmith.com
        Representing the Defendant,
21      Amerisource Bergen Drug
        Corporation
22
23
24
```

Page 3

```
 1  APPEARANCES: (Continued)
 2
 3      COVINGTON & BURLING LLP
        BY:  EMILY KVESELIS, ESQUIRE
 4      850 Tenth Street, NW
        Suite 856N
 5      Washington, DC 20001
        202.662.5000
 6      ekveselis@cov.com
        Representing the Defendant,
 7      McKesson Corporation
 8
 9
10      MARCUS & SHAPIRA LLP
        BY:  JAMES F. ROSENBERG, ESQUIRE
11      One Oxford Centre
        35th Floor
12      Pittsburgh, PA 15219
        412.338.4683
13      rosenberg@marcus-shapira
        Representing the Defendant,
14      HBC Service Company
15
16      JONES DAY
        BY:  SARAH G. CONWAY, ESQUIRE
17      555 South Flower Street
        Los Angeles, California 90071
18      (213) 489-3939
        sgconway@jonesday.com
19      Representing the Defendant,
        Walmart
20
21
22
23
24
```

Page 4

```
 1  APPEARANCES:  (Continued)
 2
 3      PELINI CAMPBELL & WILLIAMS, LLC
        BY: ERIC J. WILLIAMS, ESQUIRE
 4      8040 Cleveland Avenue NW
        Suite 400
 5      North Canton, OH 44720
        330.305.6400
 6      ejwilliams@pelini-law.com
        Representing the Defendant,
 7      Prescription Supply, Inc.
 8
 9      WILLIAMS & CONNOLLY, LLP
        BY: MATTHEW C. MONAHAN, ESQUIRE
10      725 Twelfth Street, N.W.
        Washington, DC 20005
11      202.434.5000
        mmonahan@wc.com
12      Representing the Defendant,
        Cardinal Health
13
14
        ARNOLD & PORTER KAYE SCHOLER LLP
15      BY: SAMUEL LONERGAN, ESQUIRE
        250 West 55th Street
16      New York, New York  10019
        (212) 836-8000
17      samuel.lonergan@arnoldporter.com
        Representing the Defendant,
18      Endo Pharmaceuticals
19
20      BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
        BY: KATHERINE M. SWIFT, ESQUIRE
21      Courthouse Place
        54 West Hubbard Street, Suite 300
22      Chicago, Illinois  60654
        (312) 494-4400
23      kate.swift@bartlit-beck.com
        Representing the Defendant,
24      The Walgreens Company
```

Page 5

```
 1  VIA TELECONFERENCE:
 2
 3      LOCKE LORD LLP
        BY: BRANDAN MONTMINY, ESQUIRE
 4      2200 Ross Avenue
        Suite 2800
 5      Dallas, Texas  75201
        (214) 740-8000
 6      brandan.montminy@lockelord.com
        Representing the Defendant,
 7      Henry Schein Medical Systems, Inc.
 8
 9
10      ROPES & GRAY LLP
        BY: JESSICA F. SORICELLI, ESQUIRE
        BY: FEIFEI (ANDREA) REN, ESQUIRE
11      1211 Avenue of the Americas
        New York, New York  10036
12      (212) 596-9000
        Jessica.Soricelli@ropesgray.com
13      Andrea.Ren@ropesgray.com
        Representing the Defendant,
14      Mallinckrodt
15
16      MORGAN LEWIS & BOCKIUS, LLP
        BY: ELLIOT E. BROWN, ESQUIRE
17      1111 Pennsylvania Ave. NW
        Washington, D.C.  20004
18      (202) 739-3000
        elliott.brown@morganlewis.com
19      Representing the Defendants,
        Teva Pharmaceuticals, Inc.,
20      Cephalon, Inc., Watson
        Laboratories, Actavis LLC, and
21      Actavis Pharma, Inc.
22
23
24
```

Page 6

APPEARANCES: (Continued)
Via Teleconference:

JACKSON KELLY PLLC
BY: SAMANTHA M. D'ANNA, ESQUIRE
500 Lee Street East
Suite 1600
Charleston, WV 25301
(304) 340-1347
samantha.danna@jacksonkelly.com
Representing the Defendant,
Miami-Luken, Inc.

ZUCKERMAN SPAEDER LLP
BY: VANESSA I. GARCIA, ESQUIRE
485 Madison Avenue
10th Floor
New York, New York 10022
( 212) 704-9600
vgarcia@zuckerman.com
Representing the Defendant,
CVS Pharmacy

ALSO PRESENT:
David Lane, Videographer
Zac Hone - Trial Technician

---

Page 7

- - -
I N D E X
- - -

Testimony of:  CHRISTOPHER ZIMMERMAN

By Mr. Pifko                    11

- - -
E X H I B I T S
- - -

NO.              DESCRIPTION         PAGE

Amerisource Bergen - Zimmerman
Exhibit-1      Notice of Deposition   13
Amerisource Bergen - Zimmerman
Exhibit-2      *Skipped*

Amerisource Bergen - Zimmerman
Exhibit-3      Notice of 30(b)(6)
               Deposition         19

Amerisource Bergen - Zimmerman
Exhibit-4      2001 Chemical
               Handler's Notebook    131

Amerisource Bergen - Zimmerman
Exhibit-5      ABDCMDL 00279854-65   137
Amerisource Bergen - Zimmerman
Exhibit-6      ABDCMDL 00269683-694  145

Amerisource Bergen - Zimmerman
Exhibit-7      ABDCMDL 00000101-122  170
Amerisource Bergen - Zimmerman
Exhibit-8      ABDCMDL 00270533      248

Amerisource Bergen - Zimmerman
Exhibit-9      ABDCMDL 00273425      251

---

Page 8

- - -
E X H I B I T S
- - -

NO.           DESCRIPTION          PAGE

Amerisource Bergen - Zimmerman
Exhibit-10     ABDCMDL 00000099-100  283
Amerisource Bergen - Zimmerman
Exhibit-11     CAH_MDL_PRIORPROD_
               DEA_07_00880890-92    303
Amerisource Bergen - Zimmerman
Exhibit-12     MNKT1_0000291614-1620 328
Amerisource Bergen - Zimmerman
Exhibit-13     ABDCMDL 00278212      362
Amerisource Bergen - Zimmerman
Exhibit-14     ABDCMDL 00000124-147  380

Amerisource Bergen - Zimmerman
Exhibit-15     No Bates
               March 2017
               AmerisourceBergen Code
               of Ethics and
               Business Conduct      439
Amerisource Bergen - Zimmerman
Exhibit-16     No Bates
               West Virginia Case
               Document, Organization
               Charts           443
Amerisource Bergen - Zimmerman
Exhibit-17     ABDCMDL 00251392-94   451

Amerisource Bergen - Zimmerman
Exhibit-18     ABDCMDL 00002325-2334 453
Amerisource Bergen - Zimmerman
Exhibit-19     ABDCMDL 00002405-2418 459

---

Page 9

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page  Line       Page Line       Page Line
195    12
195    23
196    10
196    17

Request for Production of Documents
Page Line    Page Line     Page Line
None

Stipulations
Page Line    Page Line     Page Line
10    1

Question Marked
Page Line    Page Line     Page Line
None

---

Christopher Zimmerman (AmerisourceBergen)

Page 10

1                    - - -
2           (It is hereby stipulated and
3      agreed by and among counsel that
4      sealing, filing and certification
5      are waived; and that all
6      objections, except as to the form
7      of the question, will be reserved
8      until the time of trial.)
9                    - - -
10          VIDEO TECHNICIAN:  We are
11     now on the record.  My name is
12     David Lane, videographer for
13     Golkow Litigation Services.
14     Today's date is August 3rd, 2018.
15     Our time is 9:23 a.m.
16          This deposition is taking
17     place in Philadelphia,
18     Pennsylvania, in the matter of
19     National Prescription Opiate
20     Litigation.  Our deponent today is
21     Chris Zimmerman.  Our counsel will
22     be noted on the stenographic
23     record.
24          The court reporter is Amanda

Page 11

1      Miller and will now swear in the
2      witness.
3                    - - -
4           CHRISTOPHER ZIMMERMAN, after
5      having been duly sworn, was
6      examined and testified as follows:
7                    - - -
8           VIDEO TECHNICIAN:  Please
9      begin.
10                   - - -
11          EXAMINATION
12                   - - -
13     BY MR. PIFKO:
14          Q.   Good morning, Mr. Zimmerman.
15     My name is Mark Pifko, I'm counsel for
16     plaintiffs in this matter.  Just met a
17     few moments ago for the first time, off
18     the record.
19          You understand that you are
20     here as the company's designated witness
21     for certain topics?
22          A.   Correct.
23          Q.   The court reporter just
24     swore you in.  So you understand that

Page 12

1      your testimony here is under penalty of
2      perjury?
3           A.   Yes.
4           Q.   And that means that if you
5      are untruthful or dishonest in any way
6      you could be subject to penalties from
7      the court.
8           Do you understand that?
9           A.   Yes.
10          Q.   Do you intend to provide
11     cooperative testimony today?
12          A.   I do.
13          Q.   From time to time,
14     Amerisource's counsel might assert
15     objections.  Unless he instructs you not
16     to answer, I'm still entitled to an
17     answer.
18          Do you understand that?
19          A.   Yes.
20          Q.   We can take breaks -- I'm
21     sure that you went over all this in the
22     prep session with your lawyers.  We can
23     take breaks.  The only thing is unless
24     your counsel is going to be conferring

Page 13

1      with you about a privilege, we can't take
2      a break while a question is pending.
3           Do you agree to that?
4           A.   Yes.
5           MR. PIFKO:  Let's start by
6      handing him the 30(b)(6) notice
7      for Number 1.
8      BY MR. PIFKO:
9           Q.   While he's getting that, are
10     you under any medications or undergoing
11     any treatment of any kind that would
12     inhibit your ability to provide truthful
13     and accurate testimony today?
14          A.   No.
15          Q.   Is there any reason that you
16     can state why your deposition should not
17     go forward today?
18          A.   No.
19                   - - -
20          (Whereupon, Amerisource
21     Bergen-Zimmerman Exhibit-1, Notice
22     of Deposition, was marked for
23     identification.)
24                   - - -

BY MR. PIFKO:

Q.   I've just handed you what's marked as Exhibit-1, which is a first notice of deposition under Rule 30(b)(6).

It's got some topics on here, there are page numbers under there. The topics start on the bottom of the page, Page 6.

Do you see that?

A.   Yes.

Q.   Have you seen this document before?

A.   I don't believe so.

Q.   Have you seen these topics before?

A.   Let me take a quick look at them.

Q.   Sorry?

A.   I'm reading through these real quickly.

Q.   Just for housekeeping, we didn't go over that, but there are, again, I'm sure your counsel told you some of these things in preparing for the

depo, but there's a couple of ground rules that we have to remember because we're on the record here.  Try to annunciate clearly if you're providing an answer, give an audible response and don't say words like uh-huh and uh-uh because when you read it on the transcript, you can't tell if it's a yes or no.

Understood?

A.   Yes.

Q.   So you're reviewing the document right now?

A.   Yes.

Q.   To be clear, my question was if you had seen these topics before, which start on Page 6, and they're lettered A through O.

A.   Yes.

Q.   You have seen these topics before?

A.   I have.

Q.   Okay.  When was the first time you saw these?

A.   A couple of weeks ago, maybe.

Q.   And are you prepared to provide testimony on behalf of the company with respect to these topics?

A.   Within a certain time frame, yes.

Q.   I understand the time frame goes from -- up until the end of 2014; is that correct?

A.   Correct.

MR. NICHOLAS:  Just for the record, just one of these topics, Topic O, is one which I believe there's an agreement among counsel that we will respond to in writing as opposed to in testimony here today.

MR. PIFKO:  Well, we can meet and confer, but I don't intend to take testimony on that topic today in any event.

MR. NICHOLAS:  Well, just to be clear, though, I think there's

an agreement that we're responding to this in writing.

MR. PIFKO:  I'm not aware of such an agreement.  I'm not disputing -- or I'm not taking a position.

MR. NICHOLAS:  Okay.

MR. PIFKO:  But we can be clear that that's not part of the deposition today, however we end up handling it.

MR. NICHOLAS:  Okay.

BY MR. PIFKO:

Q.   And so you understand that you're also being deposed here in your individual capacity as well.

Do you understand that?

A.   Yes.

Q.   For the most part, you can imagine, the company is made up of many individuals, and so it's hard to have someone speak for the company.

So what we do in these situations is we have these topics and

Page 18

1 you, right now sitting in that chair for
2 the purpose of this case, are
3 AmerisourceBergen with respect to these
4 topics.
5        Do you understand that?
6        MR. NICHOLAS:  Object to the
7    form.
8        You can answer.
9        THE WITNESS:  Yes, I'm going
10    to be speaking on these topics.
11 BY MR. PIFKO:
12    Q.    And from time to time, I
13 might be asking, does AmerisourceBergen
14 do this or that?  And you'll be
15 answering, you know, so long as it's
16 within the scope of these topics, you'll
17 be answering on behalf of the company.
18        Do you understand that?
19        MR. NICHOLAS:  Same
20    objection.
21        But go ahead.
22        THE WITNESS:  Yes, I'll be
23    answering questions.
24 BY MR. PIFKO:

Page 19

1    Q.    And you understand that
2 you'll be answering them on behalf of the
3 company?  That's what I'm trying to get
4 at.
5        MR. NICHOLAS:  Same
6    objection.
7        You can answer.
8        THE WITNESS:  It depends on
9    whether it's as I'm representing
10    the company.  You also indicated
11    I'll be answering questions for
12    myself.
13 BY MR. PIFKO:
14    Q.    But with respect to these
15 topics, you understand that for the date
16 range we discussed, you'll be answering
17 on behalf of the company?
18    A.    Yes.
19    Q.    Okay.  And then I just
20 handed you what's marked as Exhibit-2.
21        - - -
22        (Whereupon, Amerisource
23    Bergen-Zimmerman Exhibit-3, Notice
24    of 30(b)(6) Deposition, was marked

Page 20

1    for identification.)
2        - - -
3 BY MR. PIFKO:
4    Q.    It's marked as Exhibit-3,
5 which is the notice that calls us here
6 today.
7        And it also, in addition to
8 calling for your 30(b)(6) testimony, it
9 calls for your individual testimony as
10 well.
11    A.    Okay.
12    Q.    Are you familiar with The
13 Controlled Substances Act?
14    A.    Yes.
15    Q.    How long have you been
16 working at AmerisourceBergen?
17    A.    Since January 1990.
18    Q.    And you are currently senior
19 vice president, chief compliance officer?
20    A.    Correct.
21    Q.    And you're also senior vice
22 president in charge of the -- what's your
23 exact title for the aspect of the company
24 that deals with compliance with the CSA?

Page 21

1    A.    So I'm senior vice president
2 of corporate security and regulatory
3 affairs.
4    Q.    And you guys called that
5 CSRA within your company?
6    A.    That's the abbreviation,
7 yes.
8    Q.    So if I use the term "CSRA,"
9 you understand what that means?
10    A.    Yes.
11    Q.    AmerisourceBergen is a
12 registrant under The Controlled
13 Substances Act, correct?
14    A.    We are a DEA registrant,
15 correct.
16    Q.    Have you ever heard the
17 term, I think -- I'm from California, we
18 drive a lot there, there's a phrase they
19 use that says, driving is a privilege,
20 not a right.
21        Have you ever heard that
22 kind of a phrase before?
23    A.    Not really.
24    Q.    AmerisourceBergen sells

Page 22

1 drugs, correct?
2      A.   Correct.
3      Q.   Included among those drugs
4 are controlled substances, correct?
5      A.   Yes.
6      Q.   And it's AmerisourceBergen's
7 position as a registrant that allows the
8 company to sell controlled substances,
9 correct?
10          MR. NICHOLAS:  Object to the
11     form.
12          THE WITNESS:  We have a
13     controlled substance registration
14     that allows us to distribute.
15 BY MR. PIFKO:
16     Q.   And absent that
17 registration, it's not legal for
18 AmerisourceBergen to sell controlled
19 substances, correct?
20     A.   Correct.
21     Q.   So do you understand that
22 along with the privilege and the right
23 to -- the ability to sell controlled
24 substances, certain duties are attached

Page 23

1 to that as well.
2          Do you understand that?
3          MR. NICHOLAS:  Object to the
4     form.
5          THE WITNESS:  I'm not sure
6     what you're referring to as
7     "duties."
8 BY MR. PIFKO:
9     Q.   Okay.  You understand there
10 are restrictions on what you can do as an
11 entity selling controlled substances,
12 correct?
13     A.   There's requirements that we
14 follow.  I don't know if I'd refer to
15 them as restrictions, but there's
16 regulatory requirements that we have to
17 adhere to.
18     Q.   Right.  So my question is,
19 the ability to sell controlled substances
20 also comes with certain obligations,
21 correct?
22          MR. NICHOLAS:  Object to the
23     form.
24          Go ahead.

Page 24

1          THE WITNESS:  Can you say
2     your question one more time?
3 BY MR. PIFKO:
4     Q.   The ability to sell
5 controlled substances also comes with
6 certain obligations that you must follow,
7 correct?
8          MR. NICHOLAS:  Same
9     objection.
10          THE WITNESS:  It's the
11     obligations of the requirements of
12     the Code of Federal Regulations.
13 BY MR. PIFKO:
14     Q.   And specifically, that's The
15 Controlled Substances Act, correct?
16     A.   The regulations from the
17 act, correct.
18     Q.   So The Controlled Substances
19 Act and the regulations that follow,
20 correct?
21     A.   Yes.
22     Q.   Do you know what a duty to
23 maintain effective controls is?
24          MR. NICHOLAS:  Object to the

Page 25

1     form.
2          THE WITNESS:  I'm not sure
3     what your question is.  We -- I'm
4     not sure what your question is.
5 BY MR. PIFKO:
6     Q.   Have you heard the phrase,
7 "duty to maintain effective controls"?
8     A.   No.
9     Q.   You've never heard that term
10 before?
11     A.   No.
12     Q.   Do you have an understanding
13 that under The Controlled Substances Act,
14 AmerisourceBergen has a duty to maintain
15 effective controls to prevent diversion
16 of certain substances?
17     A.   Yes.  We have to maintain
18 effective controls from diversion.  I
19 just don't know duty was included in that
20 or not.
21     Q.   I'll represent to you that
22 the word "duty" is in there.
23          So you do understand that
24 you have an obligation to maintain

Christopher Zimmerman (AmerisourceBergen)

Page 26

¹ effective controls as part of your
² serving as a registrant and selling
³ controlled substances?
⁴     A.   Yes, we have an
⁵ obligation -- there's a regulatory
⁶ responsibility to have effective controls
⁷ to prevent diversion.
⁸     Q.   What's your understanding of
⁹ what that means?
¹⁰     MR. NICHOLAS:  Object to the
¹¹ form.  I object to the question.
¹² It's too big.
¹³     THE WITNESS:  I guess --
¹⁴ that's an overarching statement.
¹⁵     If you can clarify what
¹⁶ instances within the Code of
¹⁷ Federal Regulations you're
¹⁸ referring to with the effective
¹⁹ controls, there's several
²⁰ different areas in there.
²¹     MR. PIFKO:  We're going to
²² have to not have any speaking
²³ objections.  Saying "too big" is
²⁴ not an objection, and it's

Page 27

¹ obviously influencing the
² witness's testimony.
³     So you can state your
⁴ objection with clarity.  You can
⁵ state form or foundation.  But
⁶ that's all you can do, okay?
⁷     MR. NICHOLAS:  Mark, I
⁸ appreciate the instruction, but
⁹ I'm going to have to handle my own
¹⁰ objections the way I see fit.
¹¹     MR. PIFKO:  If you're going
¹² to be coaching the witness
¹³ throughout the day, we're going to
¹⁴ stop the deposition, we're going
¹⁵ to seek sanctions and we're going
¹⁶ come back here.
¹⁷     Do you understand that?
¹⁸     MR. NICHOLAS:  You can do
¹⁹ whatever you think you need to do.
²⁰ I'm not coaching the witness.  I'm
²¹ stating what I think are
²² appropriate objections in the
²³ appropriate manner.  And you can
²⁴ proceed.

Page 28

¹     MR. PIFKO:  Well, if you
² tell the witness the question is
³ too big and then he responds, I
⁴ don't know how to answer it, it's
⁵ too big, then we've got a problem
⁶ here because you're telling him
⁷ what to say.
⁸     Do you understand?
⁹     MR. NICHOLAS:  No, I'm not
¹⁰ telling him what to say.  I'm
¹¹ making an objection.  So why don't
¹² you just go ahead?
¹³     MR. PIFKO:  I hope that we
¹⁴ can have compliance with the rules
¹⁵ here.  And understanding that
¹⁶ we're going to be doing that, I'm
¹⁷ going to proceed.
¹⁸ BY MR. PIFKO:
¹⁹     Q.   You have a duty to maintain
²⁰ effective controls to prevent against
²¹ diversion, correct?
²²     A.   Correct.
²³     Q.   Do you understand what that
²⁴ means?

Page 29

¹     A.   Yes, I understand what that
² means.
³     Q.   What is your understanding
⁴ of what that means?
⁵     A.   We have to have effective
⁶ controls to prevent diversion, both on
⁷ the physical security operational side,
⁸ as well as ensuring we only distribute to
⁹ licensed entities, and a duty to report
¹⁰ suspicious orders.
¹¹     Q.   You mentioned there, "duty
¹² to report suspicious orders."
¹³     If I refer to that as the
¹⁴ "reporting requirement," do you have an
¹⁵ understanding of that?
¹⁶     A.   If you are referring to the
¹⁷ regulation that we have to design and
¹⁸ operate a system to identify suspicious
¹⁹ orders and report those suspicious orders
²⁰ to DEA, yes.
²¹     Q.   Okay.  So at various points
²² today we might refer to that as the
²³ "reporting requirement."
²⁴     Will you understand that?

Christopher Zimmerman (AmerisourceBergen)

Page 30

1    A.   Yes.  If that's the
2 definition we're going to go with, yes.
3    Q.   Okay.  There's also a
4 requirement to provide records of all
5 your shipments through the ARCOS system.
6         Are you familiar with that?
7    A.   Only certain drugs are
8 within the -- are considered ARCOS
9 products.  So not all controlled
10 substances are reported through ARCOS.
11   Q.   Fair enough.
12        But to the extent a
13 substance is under the requirement to
14 report to ARCOS, you understand that
15 there's an obligation to do so, correct?
16   A.   Yes.
17   Q.   Okay.  You understand that
18 the reporting to ARCOS is different than
19 the reporting of a suspicious order,
20 correct?
21   A.   Yes.
22   Q.   So complying with the ARCOS
23 requirement does not equate to compliance
24 with the suspicious order reporting

Page 31

1 requirement.
2        Do you understand that?
3    A.   Yes.
4    Q.   Have you heard of the
5 shipping requirement?
6    A.   No.
7    Q.   Are you familiar with the
8 Masters Pharmaceutical case?
9    A.   I've seen it, yes.
10   Q.   Are you aware that that case
11 discusses something called the shipping
12 requirement?
13   A.   I've seen that reference to
14 shipping requirement.
15   Q.   Do you know what that is?
16   A.   No.
17   Q.   You have no understanding of
18 what the shipping requirement is?
19   A.   I've never seen it in the
20 Code of Federal Regulations.
21   Q.   Do you understand that in
22 addition to reporting a suspicious order
23 to the DEA, AmerisourceBergen is required
24 to -- not to ship a suspicious order as

Page 32

1 well?
2    A.   I don't -- I don't think
3 there's a requirement not to ship.  We do
4 not ship suspicious orders.
5    Q.   So it's your position that
6 there's no requirement under the law to
7 not ship a suspicious order?
8    A.   Not that I know of.
9    Q.   You testified in the West
10 Virginia Attorney General litigation in
11 2016, correct?
12   A.   Yes.
13   Q.   Let's back up for a second.
14        When we talk about this idea
15 to prevent diversion, do you have an
16 understanding of why there is such a
17 requirement?
18        MR. NICHOLAS:  Object to the
19   form.
20        THE WITNESS:  There's
21   certain -- as a distributor, the
22   DEA outlines certain requirements
23   that distributors -- I'll speak as
24   for a distributor -- has to adhere

Page 33

1   to in order to maintain effective
2   controls to prevent diversion.
3        And those are the -- those
4   are the regulations that our
5   company follows, and those are the
6   ones we have implemented in order
7   to maintain our registration.
8 BY MR. PIFKO:
9    Q.   Right.  So what I'm trying
10 to understand is, do you have an
11 understanding about what the purpose is
12 of those rules?
13        MR. NICHOLAS:  Object to the
14   form.
15        THE WITNESS:  The purpose is
16   to maintain effective controls
17   within the distribution center.
18 BY MR. PIFKO:
19   Q.   And why do we want to do
20 that?
21        MR. NICHOLAS:  Object to the
22   form.
23        THE WITNESS:  Because those
24   are the requirements of the

Christopher Zimmerman (AmerisourceBergen)

Page 34

1    regulations.
2  BY MR. PIFKO:
3      Q.   Do you have an understanding
4  about why those are the requirements of
5  the regulations?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  Those are the
9      regulations that we have to follow
10     in order to keep our registration.
11     To be a distributor, you have to
12     meet those requirements in the
13     regulations.
14 BY MR. PIFKO:
15     Q.   Are you familiar with the
16 scheduling system of controlled
17 substances?
18     A.   I understand that there's
19 Schedules 1 through IV, yes.
20     Q.   Do you know what a Schedule
21 I substance is?
22     A.   I believe -- I don't know
23 the official, but it's no -- I believe it
24 references there's no medical purpose.

Page 35

1      Q.   How about Schedule II, do
2  you know what a Schedule II substance is?
3      A.   It's a Schedule II
4  controlled substance, yes.
5      Q.   But what's -- what are
6  attributes of a Schedule II substance --
7          MR. NICHOLAS:  Object.
8  BY MR. PIFKO:
9      Q.   -- based on your
10 understanding?
11         MR. NICHOLAS:  Object to the
12     form.
13     Go ahead.
14         THE WITNESS:  The Schedule
15     II, III, IV, V are all scheduled
16     as to their potential for abuse.
17 BY MR. PIFKO:
18     Q.   Do you understand that a
19 Schedule II substance has a high
20 potential for abuse?
21     A.   It's higher than III and IV
22 and V.
23     Q.   Do you understand that the
24 United States government has said that a

Page 36

1  Schedule II substance has a high
2  potential for abuse?
3          MR. NICHOLAS:  Object to the
4      form.
5          THE WITNESS:  I don't know
6      that.  But it's a Schedule II.
7  BY MR. PIFKO:
8      Q.   What do you mean by, "I
9  don't know that but it's a Schedule II"?
10     A.   You asked if I knew whether
11 the government stated -- I don't know if
12 the government stated that.  But I know,
13 by it being a Schedule II, it has a high
14 potential of abuse.
15     Q.   So you do know that a
16 Schedule II substance has a high
17 potential for abuse, correct?
18     A.   That's why it's a Schedule
19 II.
20     Q.   And you know that this case
21 primarily concerns Schedule II
22 substances?
23     A.   I don't know -- I don't know
24 that.

Page 37

1      Q.   We'll get into that.
2      A.   Okay.
3      Q.   Do you know what a Schedule
4  III substance is?
5      A.   It's a controlled substance
6  that has a -- that has a potential of
7  abuse but not as high as a Schedule II.
8      Q.   So a Schedule I -- Schedule
9  II substance has a high potential for
10 abuse and a Schedule III substance has a
11 potential for abuse but may be less high
12 than Schedule II, correct?
13     A.   Correct.
14     Q.   You understand that this
15 case concerns opioid products, correct?
16     A.   Correct.
17     Q.   Do you know what an opioid
18 product is?
19     A.   A product that contains
20 opioid.
21     Q.   Do you know what the word
22 "opioid" means?
23     A.   I believe that's the active
24 ingredient in the drug.

Christopher Zimmerman (AmerisourceBergen)

Page 38

1    Q.   Do you know what the active
2  ingredient in morphine is?
3    A.   I don't know.
4    Q.   The word "opiate," it
5  derives from opium.
6        Do you understand that?
7    A.   Yes.
8    Q.   Opium comes from a poppy
9  flower.
10       Do you understand that?
11   A.   I understand that, yes.
12   Q.   So a product that is an
13  opioid is derived from the opium.
14       Do you have an understanding
15  of that?
16       MR. NICHOLAS:  Objection.
17       THE WITNESS:  I don't know
18   the medical makeup and how -- of
19   how an opioid is manufactured.  I
20   don't know that.
21  BY MR. PIFKO:
22   Q.   But you understand that the
23  active ingredient is derived from some
24  opiate-like substance?

Page 39

1        MR. NICHOLAS:  Objection.
2    Asked and answered.
3        THE WITNESS:  I know it's an
4    opioid.  I don't know the
5    derivatives.
6  BY MR. PIFKO:
7    Q.   Can you name any substances
8  that you understand to be classified as
9  an opioid?
10   A.   Oxycodone, hydrocodone are
11  the two major ones.
12   Q.   Any others?
13   A.   I know those for sure.  I
14  don't want to speculate on some of the
15  others.
16   Q.   Do you have an understanding
17  that at certain relevant time periods in
18  this case certain hydrocodone combination
19  products were classified as Schedule III
20  substances?
21   A.   Yes.
22   Q.   And they were later
23  reclassified as a Schedule II substance.
24       Do you understand that?

Page 40

1    A.   Yes.
2    Q.   When we use the word
3  "diversion," do you have an understanding
4  about what that means?
5    A.   It depends on the context.
6    Q.   In the context of The
7  Controlled Substances Act.
8        MR. NICHOLAS:  Object to the
9    form.
10       THE WITNESS:  So diversion
11   is that a drug that's -- well,
12   again, it depends.  Even with
13   controlled substances, it could
14   be -- it could have several
15   different meanings.  So if it's
16   diverted from theft, it could be a
17   diversion because of a bad
18   prescription.
19       It's when a drug -- I've
20   seen it referenced as a drug that
21   leaves the normal distribution
22   channels.
23  BY MR. PIFKO:
24   Q.   Okay.  What's the normal

Page 41

1  distribution channel?
2    A.   That -- the closed system of
3  manufacture to DEA registrant distributor
4  to DEA registrant dispenser.
5    Q.   Do you have an understanding
6  about what the closed system is?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  The closed
10   system as it pertains to?
11  BY MR. PIFKO:
12   Q.   Well, you just used it in
13  your answer, so I want to know what you
14  were referring to.
15   A.   The closed system of
16  controlled substances?  I just want to
17  make sure I understand your question.
18   Q.   You talked about a drug
19  leaving the normal channels within the
20  closed system.  So I'm trying to
21  understand what you meant by "closed
22  system."
23   A.   I said distribution channel,
24  I didn't say closed system.

Christopher Zimmerman (AmerisourceBergen)

1    Q.   I think you said within the
2  closed system, or something to that
3  effect.
4    A.   I thought I said
5  distribution channel.
6    Q.   We don't need to fight about
7  what you said or didn't say.
8         What I just want to know,
9  your -- do you have an understanding
10  about what the closed system is under The
11  Controlled Substances Act?
12         MR. NICHOLAS:  Object to the
13    form.
14         THE WITNESS:  The closed
15    system, as I've heard it referred
16    to, is that the DEA sets the
17    quotas of how much product can be
18    produced, then manufactured; those
19    products are transferred to the
20    distributor through ARCOS, which
21    is maintained -- transferred to
22    the distributor.
23         And then the distributor
24    transfers to the pharmacy or the

1    dispenser with an ARCOS
2    transaction, which closes the
3    distribution, as far as DEA
4    tracking goes.
5  BY MR. PIFKO:
6    Q.   So there are legitimate
7  channels of distribution within that
8  system, correct?
9         MR. NICHOLAS:  Object to the
10    form.
11         THE WITNESS:  That is the --
12    that is the legitimate
13    distribution channel.
14  BY MR. PIFKO:
15    Q.   Okay.  And then there could
16  be -- a channel of distribution outside
17  of that system, that would be
18  illegitimate, correct?
19         MR. NICHOLAS:  Object to the
20    form.
21         THE WITNESS:  I can't say
22    what type of other distribution.
23    I can only comment on our
24    distribution system.

1  BY MR. PIFKO:
2    Q.   Well, you said that that's
3  the legitimate one, the one you just
4  described, correct?
5    A.   That's the -- you asked me
6  what the closed distribution was, and
7  that's what the closed distribution is.
8    Q.   And you understand that your
9  duty to prevent diversion is to prevent
10  applicable controlled substances from
11  exiting that system?
12         MR. NICHOLAS:  Object to the
13    form.
14         THE WITNESS:  Our
15    responsibility is to ensure that
16    we distribute FDA-approved drugs
17    from the -- that we maintain in
18    our distribution centers to
19    licensed entities.
20  BY MR. PIFKO:
21    Q.   And what do you mean by
22  "licensed entities"?
23    A.   Pharmacies, hospitals, DEA
24  registrants and State Board of Pharmacy

1  registrants.
2    Q.   And you understand that
3  those registrants also have duties to
4  maintain effective controls as well?
5         MR. NICHOLAS:  Object to the
6    form.
7         THE WITNESS:  They have
8    their own regulations that they
9    must follow, correct.
10  BY MR. PIFKO:
11    Q.   So the idea of preventing
12  diversion is to prevent substances from
13  getting into illegal hands, correct?
14         MR. NICHOLAS:  Object to the
15    form.
16         THE WITNESS:  Each
17    registrant has its
18    responsibilities to maintain
19    effective controls to prevent
20    diversion.  We maintain those
21    within our registrant's capacity,
22    correct.
23  BY MR. PIFKO:
24    Q.   Can you give me an example

Page 46

1 of diversion?
2          MR. NICHOLAS: Objection.
3 Object to the form.
4          THE WITNESS: As I stated,
5     diversion can be many different
6     things. So I need some more
7     clarification of what type of
8     diversion you're talking about.
9 BY MR. PIFKO:
10     Q.   Let's make it specific to
11 the issues in this case.
12          So, again, you understand
13 this case concerns opioid products,
14 correct?
15     A.   Correct.
16     Q.   And those are, for the most
17 part, Schedule II substances under The
18 Controlled Substances Act, correct?
19     A.   Correct.
20     Q.   Okay. Can you give me an
21 example of what it means to have an
22 opioid product diverted, as we were
23 talking about this under The Controlled
24 Substances Act?

Page 47

1          MR. NICHOLAS: Object to the
2     form.
3          THE WITNESS: There's a lot
4     of different ways drugs can be
5     diverted from our distribution
6     center. Diversion could be if
7     we -- if we, not ABC -- but if a
8     company diverted product to an
9     unlicensed location, a
10     nonregistered location, that could
11     be diversion.
12 BY MR. PIFKO:
13     Q.   Any other --
14          MR. NICHOLAS: Object to the
15     form.
16          THE WITNESS: I'm not going
17     to sit here and try to list all
18     the areas that could be -- where
19     diversion could occur, because we
20     could be here for a long time.
21          And that's why you have
22     effective controls to prevent
23     diversion.
24 BY MR. PIFKO:

Page 48

1     Q.   Well, it's your -- among the
2 responsibilities you have with the
3 company, one of them is to manage the
4 company's efforts to maintain effective
5 controls against diversion, correct?
6     A.   Correct.
7     Q.   And so I understand that
8 maybe there might be several examples,
9 but I'd like to get your understanding of
10 the types of situations we're talking
11 about here.
12          So you talked about sale to
13 an unlicensed --
14          MR. NICHOLAS: I'm going
15     to -- I want to interpose an
16     objection. This is not coaching,
17     but the question is tremendously
18     broad.
19          MR. PIFKO: You can say
20     broad as an objection.
21     "Tremendously" is not necessary.
22     That's -- we're good here.
23          MR. NICHOLAS: Okay. Broad.
24     So I would ask you to narrow it.

Page 49

1          MR. PIFKO: Your objection
2     is noted.
3          MR. NICHOLAS: The witness
4     has asked you to narrow it.
5 BY MR. PIFKO:
6     Q.   So you're the person from
7 AmerisourceBergen who is responsible for
8 ensuring compliance with The Controlled
9 Substances Act requirement to maintain
10 effective controls against diversion,
11 correct?
12     A.   Yes.
13     Q.   And so I'd like an example,
14 a bunch of examples, of what diversion
15 is, from you.
16          MR. NICHOLAS: Same
17     objection.
18          Go ahead.
19          THE WITNESS: So what we do
20     to prevent diversion is --
21 BY MR. PIFKO:
22     Q.   I'm not asking what you do
23 to prevent diversion --
24          MR. NICHOLAS: Hold on.

Christopher Zimmerman (AmerisourceBergen)

Page 50

BY MR. PIFKO:

Q. -- just an example of what diversion is.

MR. NICHOLAS: Hold on. Let's stay on the record.

You can't interrupt him when he's answering the question.

MR. PIFKO: He needs to answer the question asked. I don't -- we're not going to have speeches where he talks about things that aren't asked.

MR. NICHOLAS: You didn't hear his answer. He said five words, and you interrupted him.

MR. PIFKO: He said what we do to prevent diversion. And that's not what I asked. I asked what diversion is.

MR. NICHOLAS: Those were his first five words. You're going to have to let him answer the question.

You're going to have to

Page 51

let -- you ask a question, the witness is then entitled to say what he wants in answering the question.

MR. PIFKO: He's not entitled to say anything he wants, he's entitled to answer the question.

MR. NICHOLAS: No, he's entitled to say what he wants -- what he believes is answering the question, and then you can ask another question. So don't interrupt him again, please.

BY MR. PIFKO:

Q. I'm sure that in preparing for this deposition, your counsel told you to listen to the question. So I want you to be very careful and listen to the questions that I ask, okay?

Do you understand that?

A. Yes.

Q. And so, again, if you don't understand a question, you let me know,

Page 52

and I'll rephrase it. And we'll work through it. But I would appreciate your testimony in responding to exactly the questions that I ask.

Do we have an agreement about that?

MR. NICHOLAS: Objection. Because he's been doing that.

THE WITNESS: I'm trying to answer your question, but you won't let me give my -- I did state that there's a lot of different areas where diversion could occur.

And you asked for a list of them. I'm going to tell you how we prevent diversion and then from that area, anywhere in there, a diversion can occur.

And that's how I was going to answer the question.

So we first have physical security controls to prevent diversion; we have cages and

Page 53

vaults that are required by the CFR.

We have -- we do background checks on our employees. We do due diligence of our customers to ensure that they're licensed and in good standing with the DEA and Boards of Pharmacy.

So there's a whole host of things that we do within the -- as a licensed distributor, to prevent diversion.

If we weren't doing those things, diversion could occur at any one of those steps. So if we didn't --

BY MR. PIFKO:

Q. That's not the question I asked. I asked you to give examples of diversion. You're giving me examples of prevention of diversion and that's not the question that was asked.

MR. NICHOLAS: I object.

BY MR. PIFKO:

Page 54

1    Q.   We'll go through it -- we'll
2 go through it again.
3         So let's talk about
4 diversion of a Schedule II controlled
5 substance at a pharmacy.
6         Can you explain what
7 potential areas of diversion are in that
8 context?
9         MR. NICHOLAS:  Object to the
10 form.
11        THE WITNESS:  I'm not
12 responsible for the diversion that
13 occurs within a pharmacy.  If a
14 pharmacy has -- is filling
15 prescriptions that are invalid or
16 if a pharmacy is selling
17 prescriptions -- not
18 prescriptions -- or diverting
19 drugs out the back door, you know,
20 I have no eyes to that.
21 BY MR. PIFKO:
22   Q.   Okay.  But those are some
23 examples of a pharmacy filling
24 prescriptions or selling controlled

Page 55

1 substances without a valid prescription,
2 that would be a diversion, correct?
3   Q.   As it stands -- is my
4 understanding, yes.
5   Q.   And if -- you said if
6 there's -- the pills are flowing out the
7 back door without being sold to anyone or
8 theft, or something like that, that would
9 be diversion, correct?
10   A.   That could be a type of
11 diversion, yes.
12   Q.   What about a prescription
13 that's written by a doctor who doesn't
14 have a valid DEA registration, is that --
15 if someone sells pills to somebody who
16 has that kind of a prescription, is that
17 diversion?
18        MR. NICHOLAS:  Object to the
19 form.
20        THE WITNESS:  That would be
21 the responsibility of the
22 pharmacy.  I mean, the distributor
23 has no line of sight on the doctor
24 who is writing prescriptions to

Page 56

1 the pharmacy.
2 BY MR. PIFKO:
3    Q.   Do you understand why we
4 want to prevent these diversion
5 activities to occur?
6         MR. NICHOLAS:  Object to the
7 form.  Asked and answered.
8         THE WITNESS:  When you say
9 "we," I'm not understanding your
10 question of who is the "we."
11 BY MR. PIFKO:
12   Q.   We're all Americans here,
13 and the law is a law of the American
14 jurisprudence, and it's requiring that.
15 And so when I say "we," I mean the people
16 of the United States.
17        So the question is, do you
18 understand why, when enacting that law,
19 we want to prevent diversion in the way
20 we just described?
21        MR. NICHOLAS:  Well, I'll
22 object to the form of that
23 question.
24        THE WITNESS:  That's why

Page 57

1 there's DEA regulations, because
2 of the -- to prevent diversion.
3 BY MR. PIFKO:
4    Q.   And is diversion a good
5 thing?
6         MR. NICHOLAS:  Object to the
7 form.
8         THE WITNESS:  Is diversion a
9 good thing?  I don't think so.
10 BY MR. PIFKO:
11   Q.   Why not?
12        MR. NICHOLAS:  Objection.
13 Object to the form.
14        THE WITNESS:  In the context
15 of -- in the context of diversion
16 from a licensed entity, that's --
17 that's not good.
18 BY MR. PIFKO:
19   Q.   And why not?
20   A.   Because it's in violation of
21 the regulation.
22   Q.   Is there -- other than it
23 violating the regulation, is there any
24 impact of diversion?

Christopher Zimmerman (AmerisourceBergen)

Page 58

1      MR. NICHOLAS: Object to the
2 form.
3      THE WITNESS: I'm -- I'm not
4 understanding your question.
5      If there's diversion of the
6 product, that's -- as I indicated,
7 that's against the regulations.
8 That's a bad thing.
9 BY MR. PIFKO:
10   Q.  What I'm trying to
11 understand is, these are situations that
12 the regulations are designed to prevent
13 from occurring, correct?
14   A.  Yes.
15   Q.  And I'm trying to understand
16 why is it that we would have regulations
17 to prevent these things from occurring.
18      Do you have an understanding
19 of that?
20      MR. NICHOLAS: I'll object
21 to the form.
22      THE WITNESS: It's the same
23 reason why we have regulations for
24 the approval of the drugs, of how

Page 59

1 you store and manage the drugs and
2 how -- you know, that's the basis
3 of our system.
4 BY MR. PIFKO:
5   Q.  And what is the reason for
6 that?
7      MR. NICHOLAS: This has been
8 asked and answered about seven or
9 eight times now. I will object.
10      THE WITNESS: The reason is
11 to have effective controls to
12 prevent diversion. I think I've
13 said that several times.
14 BY MR. PIFKO:
15   Q.  And why do we want to
16 prevent diversion?
17      MR. NICHOLAS: Objection.
18 Asked and answered. You're asking
19 the same question again and again.
20 And he's answering it again and
21 again.
22      THE WITNESS: What's the
23 question one more time? I mean --
24 BY MR. PIFKO:

Page 60

1   Q.  I'm going to give you an
2 opportunity to speak.
3      But what I'm hearing -- and
4 so you correct me if I'm wrong, but what
5 I'm hearing from you is that
6 AmerisourceBergen Corporation has zero
7 understanding of why we should stop
8 diversion under The Controlled Substances
9 Act?
10      MR. NICHOLAS: I'll object
11 to the form of the question.
12 That's a false statement.
13      THE WITNESS: That's not
14 what I'm saying.
15 BY MR. PIFKO:
16   Q.  The jury is watching the
17 video and that's what they're seeing,
18 because that's what I'm seeing.
19      MR. NICHOLAS: You don't
20 need to grandstand with references
21 to the jury --
22      MR. PIFKO: And I --
23      MR. NICHOLAS: -- just ask
24 the questions.

Page 61

1 BY MR. PIFKO:
2   Q.  I genuinely would like a
3 response. And I'm sure that you can
4 provide an answer. I'm trying to get
5 that from you.
6      MR. NICHOLAS: The witness
7 has been providing an answer.
8      You can go ahead.
9      THE WITNESS: And what was
10 that, I mean, your last statement,
11 that AmerisourceBergen has --
12 BY MR. PIFKO:
13   Q.  So I've asked you, why do we
14 want to prevent diversion? And what I'm
15 hearing back is, that's what the rule is.
16      And I'm trying to
17 understand, is it AmerisourceBergen's
18 position in this litigation that other
19 than following the rules, there's no
20 reason, it has no understanding of why
21 we're trying to prevent diversion?
22      MR. NICHOLAS: Object to the
23 form of the question.
24      THE WITNESS: I think I've

Christopher Zimmerman (AmerisourceBergen)

Page 62

1  answered the question, and I --
2  your understanding or your
3  statement that we don't have any
4  other intent other than following
5  the regulations is incorrect.
6      I mean, there's rules and
7  regulations in place for the
8  proper manufacture, distribution,
9  dispensing of, in this case,
10  controlled substances.
11      And that's because these
12  items, the opioids, you said, have
13  a potential for abuse.  So you
14  have to have additional
15  requirements to make sure you're
16  handling them properly.
17      And each registrant in the
18  channel has a responsibility.  ABC
19  has our responsibilities.  We take
20  them very seriously.  We make sure
21  we only buy them from
22  manufacturers.  We store them
23  properly.  We make sure they're
24  checked, double-checked,

Page 63

1  triple-checked.  We make sure
2  they're stored appropriately in
3  cages and vaults.  We vet our
4  employees.  We train our
5  employees.  We vet our customers.
6      And we take it very
7  seriously.  So we only distribute
8  products to those pharmacies and
9  dispensers and hospitals that are
10  in good standing with DEA and the
11  Board of Pharmacy.  So we adhere
12  to our requirements.
13      Those drugs aren't diverted
14  while they're under our control.
15  I don't know how much more clearly
16  I can state that.
17  BY MR. PIFKO:
18      Q.  We'll get into that later.
19  There's a lot of misstatements in your
20  thing, but we don't have to argue about
21  that.
22      MR. NICHOLAS:  I'll object
23  to that and --
24  BY MR. PIFKO:

Page 64

1      Q.  We'll establish --
2      MR. NICHOLAS:  Hold on.
3  BY MR. PIFKO:
4      Q.  -- we're going to establish
5  that later.
6      MR. NICHOLAS:  I'm going to
7  object to that and move to strike
8  the mischaracterization and the
9  inappropriate characterization
10  slander in the testimony.
11      Proceed, but please don't --
12      MR. PIFKO:  I --
13      MR. NICHOLAS:  Please don't
14  tell him he's making false
15  statements.
16  BY MR. PIFKO:
17      Q.  I think we were getting
18  closer there when you said we want to
19  prevent diversion because these drugs
20  have a potential for high abuse.
21      You said that, correct?
22      MR. NICHOLAS:  Object to the
23  form.
24      Go ahead.

Page 65

1      THE WITNESS:  Again, I
2  don't -- we, as distributors,
3  don't -- don't identify what drugs
4  are -- have high abuse.  That's
5  done by DEA and FDA.
6      We have a -- we are a
7  distributor, we have our
8  requirements that we must follow
9  to protect those drugs while
10  they're under our control.  And we
11  take that very seriously and we do
12  that.
13      I'm not understanding what
14  more you want from me, other than
15  our regulatory and our obligations
16  to protect and ensure those drugs
17  are not diverted while under our
18  control.
19  BY MR. PIFKO:
20      Q.  And you want to ensure that
21  they're not diverted while they're under
22  your control because they have a high
23  potential -- whether you said it or
24  not -- because they have a high potential

Christopher Zimmerman (AmerisourceBergen)

Page 66

1 for abuse under the system; is that
2 correct?
3         MR. NICHOLAS:  Object to the
4     form of the question.
5         THE WITNESS:  Because they
6     are a controlled substance and
7     because they're a prescription
8     product.
9         We treat our prescription
10    drugs with the same manner as the
11    opioids.  I mean, we have
12    additional controls, depending
13    upon whether it's Schedule II or
14    III through IV, whether they're in
15    a vault or a cage.
16        But we protect all the
17    product, we prevent diversion from
18    all products.
19 BY MR. PIFKO:
20    Q.   Do you have an understanding
21 that we want to prevent the unlawful
22 distribution of opioids to protect the
23 public health?
24        MR. NICHOLAS:  Objection.

Page 67

1     Object to the form.
2         THE WITNESS:  Can you state
3     that question again, please?
4 BY MR. PIFKO:
5     Q.   Do you have an understanding
6 that you're required to prevent diversion
7 of opioid products to protect the public
8 health?
9         MR. NICHOLAS:  Object to the
10    form.
11        THE WITNESS:  I understand
12    that we have an obligation to have
13    effective controls to prevent
14    diversion because of our
15    regulatory responsibilities and
16    duties.  And that's what we
17    implement.
18        I'm not here to comment
19    on --
20 BY MR. PIFKO:
21    Q.   That's not -- you can answer
22 yes or no.  That wasn't an answer to my
23 question.
24        So my question is, do you

Page 68

1 have an understanding that you're
2 required to prevent diversion of opioid
3 products to protect the public health?
4         MR. NICHOLAS:  Objection.
5     The witness is not required to
6     answer yes or no.  And he has
7     answered the question.
8         THE WITNESS:  And I -- I --
9     I think I stated what our
10    obligations are under the
11    requirements.
12 BY MR. PIFKO:
13    Q.   I'm not asking what your
14 obligations are under the requirements.
15    I'm asking you if the
16 company understands that the reason for
17 preventing diversion of opioid products
18 is, in part, to protect public health?
19        MR. NICHOLAS:  I'll object
20    to the form of the question.  And
21    add as a basis at this point that
22    I don't believe any of this is
23    covered in any of the topics of
24    your 30(b)(6) notice.

Page 69

1         So we're way far afield
2     here.
3         THE WITNESS:  And I'm not --
4     I don't want to comment on what
5     our duty is to public health.
6 BY MR. PIFKO:
7     Q.   So you have no comment about
8 whether you have a duty to protect public
9 health?  Is that your answer?
10    A.   We have a duty to have
11 effective controls to prevent diversion
12 as the products are within our
13 distribution channel.
14        And we have a duty to ensure
15 that we only sell products to licensed
16 pharmacies and dispensers and hospitals.
17 And that is our duty.
18    Q.   In carrying out your duty to
19 prevent diversion, does AmerisourceBergen
20 consider the impact on the public?
21        MR. NICHOLAS:  Object to the
22    form of the question.  This is not
23    in your notice.  You're way far
24    afield.  You've asked this

Christopher Zimmerman (AmerisourceBergen)

Page 70

1  question many, many times.  And
2  it's been answered.
3          THE WITNESS:  I think I said
4  what I feel our duty is, to ensure
5  we have proper controls to prevent
6  diversion while the drugs are
7  within our control.
8  BY MR. PIFKO:
9      Q.   You're not answering the
10 question.  I didn't ask you what your
11 duty was.
12         I asked you if, in carrying
13 out your duty, does AmerisourceBergen
14 consider the impact on the public?
15         MR. NICHOLAS:  Object to the
16 form of the question.  He has been
17 answering the question a number of
18 times.  I suggest that we move on.
19         THE WITNESS:  I think I've
20 answered the question.
21 BY MR. PIFKO:
22     Q.   You haven't.  It's very
23 clear, you have not answered the
24 question.

Page 71

1          MR. NICHOLAS:  Object.
2  That's just a statement.  There's
3  nothing for you to say right now.
4          MR. PIFKO:  Yeah, there is.
5  I've --
6          MR. NICHOLAS:  There's no
7  question pending.
8          MR. PIFKO:  -- I've asked
9  the question and we haven't had an
10 answer.  I've been trying to ask
11 it for the last ten minutes.
12         THE WITNESS:  And I've
13 answered --
14         MR. PIFKO:  And I still
15 haven't gotten an answer --
16         THE WITNESS:  -- the
17 question of what our
18 responsibilities are.
19 BY MR. PIFKO:
20     Q.   I'm not asking you -- but
21 that's not what the question is.
22     A.   That's my answer.
23     Q.   You're not answering the
24 question.  You can't just make up an

Page 72

1  answer to a question that's not being
2  asked.  Let's start over here.
3          I'm trying to ask, does
4  AmerisourceBergen consider public health
5  when it's carrying out its duty to
6  prevent diversion?
7          MR. NICHOLAS:  Object to the
8  form of the question.  Asked and
9  answered.  Outside the scope of
10 the notice.
11         THE WITNESS:  We consider
12 our responsibilities that we're
13 obligated to follow to ensure that
14 products are handled
15 appropriately, safely and securely
16 within the supply channel under
17 our control.
18 BY MR. PIFKO:
19     Q.   Is public health one of
20 those considerations?
21         MR. NICHOLAS:  Object to the
22 form of the question.  Come on.
23         THE WITNESS:  It's not
24 something that -- our

Page 73

1  consideration is how we -- who we
2  purchase the products from, how we
3  store the products and who we
4  distribute those products to.
5          We don't have any effect on
6  the public health through
7  prescriptions that are being
8  written, the pharmacies that are
9  filling them.  We have no control
10 over that.
11         Our responsibility is, in
12 the supply chain, is to ensure
13 that we buy FDA-approved drugs, we
14 keep them securely and we give
15 them to those that dispense those
16 drugs.
17         And the duty that they have,
18 I'm not going to comment on it.
19         And I think I've answered
20 what our responsibility is within
21 the supply chain.
22 BY MR. PIFKO:
23     Q.   And I'm not trying to put
24 answers in your mouth.  I'm trying to

Christopher Zimmerman (AmerisourceBergen)

Page 74

1  understand what your answer is.
2      A.   But that's my answer.
3      Q.   But my question is, is
4  public health one of those
5  considerations?  Is it or isn't it?
6          You just tell me.  I'm
7  not -- you say whatever answer you want
8  to say.
9          MR. NICHOLAS:  He's answered
10  the question many, many times.
11  You keep asking him the same
12  question over and over.
13          MR. PIFKO:  He's not
14  answering the question.
15          MR. NICHOLAS:  I'll object.
16          MR. PIFKO:  You can object,
17  but he's not answering.
18          MR. NICHOLAS:  I'm
19  objecting.  You're saying he's not
20  answering the question and I'm
21  saying he is and he says he is.
22          THE WITNESS:  I mean, I can
23  restate that again.
24  BY MR. PIFKO:

Page 75

1      Q.   Well, I'll represent to you,
2  you haven't said the word "public health"
3  once when you've talked about what
4  considerations come into
5  AmerisourceBergen's factors when they're
6  complying with the statutes.
7          So I understand from that
8  that public health is not one of those
9  considerations.  Is my understanding
10  correct?
11          MR. NICHOLAS:  Objection.
12  Object to the form of the
13  question.  You're just bullying
14  the witness.
15          THE WITNESS:  Our role
16  within the supply chain is from
17  the manufacturer to
18  the dispenser --
19  BY MR. PIFKO:
20      Q.   I'm not asking what your
21  role is.
22          MR. NICHOLAS:  Don't
23  interrupt him, please.
24          THE WITNESS:  We're not

Page 76

1  selling to the public.
2          So, again, you're asking me
3  a question that doesn't apply on
4  the distribution side, because
5  we're selling it --
6  BY MR. PIFKO:
7      Q.   I'm not asking about
8  compliance.
9          MR. NICHOLAS:  You're
10  interrupting the witness.
11          THE WITNESS:  We're buying
12  it from the manufacturer and we're
13  selling it -- we're selling it to
14  a pharmacy or hospital that has
15  obligations of who they dispense
16  those to and what prescriptions
17  they fill.
18          We're in the middle of the
19  chain.  The public health, we
20  don't deal with the public health.
21  BY MR. PIFKO:
22      Q.   So you don't think about the
23  public health in carrying out your role
24  in the distribution chain, correct?

Page 77

1          MR. NICHOLAS:  Object to the
2  form of the question.
3          THE WITNESS:  I've answered
4  the question several times.  I
5  think I've made it clear what our
6  role is in the distribution --
7  BY MR. PIFKO:
8      Q.   I didn't ask you what your
9  role is.  That's not the question.
10  You've got to answer the question.
11      A.   I did answer the question.
12      Q.   Do you consider public
13  health when you're carrying out your
14  duties under the statute, under The
15  Controlled Substances Act?
16          MR. NICHOLAS:  Objection.
17  I'm going to suggest that the
18  witness does not have to answer
19  this question for the millionth
20  time.
21          MR. PIFKO:  He's not.  This
22  is a yes-or-no question.
23          MR. NICHOLAS:  No, it's not
24  a yes-or-no question.

Christopher Zimmerman (AmerisourceBergen)

Page 78

1    MR. PIFKO:  It is.
2    MR. NICHOLAS:  He does not
3 have to answer any question yes or
4 no.  He's answering the question
5 the way he sees fit.
6 BY MR. PIFKO:
7    Q.   Do you consider public
8 health when you're carrying out your
9 duties under The Controlled Substances
10 Act?
11    MR. NICHOLAS:  Asked and
12 answered.  Same objections.
13    THE WITNESS:  I mean, I
14 am --
15 BY MR. PIFKO:
16    Q.   It's a yes-or-no question.
17    A.   It's not a yes-or-no
18 question.
19    Q.   It is.
20    A.   I've explained it to you,
21 and we can go through it again, of where
22 we fit in the supply channel.
23    Q.   I didn't ask where you fit
24 in the supply channel.

Page 79

1    A.   I know, but --
2    MR. PIFKO:  We're going to
3 call Cohen, because this is pure
4 gamesmanship.
5 You know, sir, I asked him,
6 is public health a consideration
7 in your compliance with the
8 statute?  And he won't answer.
9 He's telling me what his duties
10 are.  I'm not asking.  It's a
11 yes-or-no question.
12    MR. NICHOLAS:  He's answered
13 many, many times.
14    MR. PIFKO:  The court is not
15 going to appreciate answers like
16 this, okay?  It's a
17 plain-and-simple situation.
18 BY MR. PIFKO:
19    Q.   I'm asking you, does public
20 health play into your considerations when
21 you're carrying out your duties under The
22 Controlled Substances Act?
23 It's a yes-or-no question.
24    A.   It's not a yes-or-no

Page 80

1 question.  We can -- I guess we can go
2 back-and-forth here for a while, but we
3 aren't -- we do not distribute to the
4 public.  We distribute --
5    Q.   I didn't ask you if you
6 distribute to the public.
7    A.   I know.  I'm explaining --
8    MR. NICHOLAS:  You're asking
9 about public health.  He's
10 describing the public.
11    THE WITNESS:  I'm
12 explaining -- we don't sell -- the
13 public health -- we don't sell to
14 the public.  We sell to the
15 pharmacies who dispense
16 prescriptions written by doctors.
17 And we buy from manufacturers.
18 We aren't -- we do not
19 distribute to the public health.
20 And you're asking me a question --
21 BY MR. PIFKO:
22    Q.   I didn't ask you if you
23 distribute to the public health.
24 When you carry out your

Page 81

1 duties to maintain effective controls,
2 I'm asking if you consider the impact of
3 them on public health when you carry out
4 your duties?
5    A.   We consider the duties and
6 we ensure that we follow those duties.
7 And that's what we consider.
8 However you want to phrase
9 it, we can -- again, we can discuss this
10 for however long you want to spend on
11 this.  But I think I'm being responsive
12 to your question.  I think I've explained
13 it clearly.  And it's not the answer you
14 might want.
15 But I'm just trying to --
16    Q.   But you're not answering --
17 I don't care.  You can say yes or no.  I
18 don't care what your answer is.
19 You've just -- you've got to
20 say whether public health is a
21 consideration of the company when it's
22 carrying out its duties under The
23 Controlled Substances Act.  That's all
24 I'm asking you.

Page 82

1    A.   And I answered the question.
2    Q.   You didn't.
3    A.   I did answer the question.
4    Q.   You never once said that
5 AmerisourceBergen considers public
6 health --
7    A.   And I explained --
8    Q.   -- when carrying out its
9 duties.
10   A.   I explained our process and
11 I explained what we take into
12 consideration, where we are within the
13 supply chain.
14   Q.   And you agree that public
15 health isn't one of those things?
16        MR. NICHOLAS:  That is not
17   what he said.  But you're just
18   arguing.  I mean, why are you
19   arguing?  Why don't you just ask
20   him --
21        MR. PIFKO:  I'm trying to
22   get your answer to the question.
23        MR. NICHOLAS:  You have a
24   30(b)(6) notice with topics.

Page 83

1        MR. PIFKO:  And he's burning
2   the time.  We've burned 20 minutes
3   here.
4        MR. NICHOLAS:  You're
5   burning the time.  It's Topics A
6   through N.  You haven't started on
7   a single topic.  And you haven't
8   asked him -- shown him a single
9   document.
10        So who is burning the time?
11        MR. PIFKO:  I'm going to ask
12   the question one more time.  And
13   if I don't get an answer, we're
14   going to go and we're going to
15   call the court and we're going to
16   discuss your evasive answers here.
17   Because we're not going to be
18   doing this all day.  And this
19   whole last 20 minutes does not
20   count towards my time on this
21   deposition, because you're just
22   wasting everyone's time here.
23 BY MR. PIFKO:
24   Q.   So again for clarity --

Page 84

1        MR. NICHOLAS:  I agree time
2   is being wasted by you.
3 BY MR. PIFKO:
4   Q.   -- for clarity, the question
5 being asked to you:  In carrying out its
6 duties to prevent diversion of Control II
7 substances under the controlled schedules
8 act -- under The Controlled Substances
9 Act, does AmerisourceBergen consider the
10 impact on the public health?
11        MR. NICHOLAS:  Object to the
12   form.  All my same objections.
13        THE WITNESS:  Again, we
14   ensure that we have products that
15   we distribute to the pharmacies
16   that are made available to the
17   pharmacies to be able to dispense
18   to the public.
19        I'm not sure -- you're
20   asking me a question that I've
21   answered several times, given
22   where we fit in the supply
23   channel, given our
24   responsibilities.  And as the head

Page 85

1   of that department, my job is --
2   my -- what we consider is we
3   consider that those products are
4   handled appropriately and
5   distributed in an appropriate
6   manner to the licensed entities
7   that we sell to.
8        And, you know --
9 BY MR. PIFKO:
10   Q.   Is the impact --
11   A.   That's the answer.
12   Q.   -- on the public health one
13 of those considerations?
14        MR. NICHOLAS:  Object to the
15   form.
16        THE WITNESS:  The impact on
17   the public health is -- is the
18   whole supply channel.
19        You're asking me a question
20   that we don't interface with the
21   public.  You're asking me that --
22   we interface with the pharmacy and
23   the dispenser and we only have our
24   obligations.  And our

Christopher Zimmerman (AmerisourceBergen)

Page 86

1 understanding and our part in the
2 supply channel is in that -- in
3 that realm.
4      We aren't in the realm of
5 the patient that's coming in or
6 the doctor writing the
7 prescription or what
8 considerations they take before
9 they write a prescription. We
10 aren't involved in any of that,
11 and nor should we be.
12      We're responsible for making
13 sure the product gets from the
14 manufacturer to the pharmacy. And
15 we have an obligation, if there's
16 a suspicious order, to report it.
17      We're not -- we don't have
18 an obligation to vet doctors and
19 understand patient/doctor
20 relationships and all these other
21 areas. That's not our role in the
22 supply chain.
23 BY MR. PIFKO:
24      Q.   So you don't consider public

Page 87

1 health when you're carrying out your role
2 in the supply chain; is that correct?
3      MR. NICHOLAS: Object to the
4 form of the question. You're
5 mischaracterizing --
6 mischaracterizing testimony.
7      THE WITNESS: I think I've
8 answered the question.
9 BY MR. PIFKO:
10      Q.   I asked you a question.
11      You don't consider public
12 health when you're carrying out your role
13 in the supply chain; is that correct?
14      MR. NICHOLAS: Object to the
15 form of the question. All the
16 same reasons.
17      THE WITNESS: I think I've
18 answered -- I've answered the
19 question. I mean --
20 BY MR. PIFKO:
21      Q.   Answer that question,
22 please.
23      A.   I did answer that question.
24      Q.   You have not.

Page 88

1      A.   I did. We consider --
2      Q.   Am I correct that
3 AmerisourceBergen does not consider the
4 public health when carrying out its
5 duties to prevent diversion under The
6 Controlled Substances Act?
7      MR. NICHOLAS: Object to the
8 form.
9      THE WITNESS: We consider
10 the -- we consider that pharmacies
11 have product accessible to fill
12 the patients' prescriptions.
13 However you want to interpret
14 that, that's up to you.
15      But that is -- the answer
16 is, our consideration is making
17 sure drugs are available. If that
18 means taking into consideration
19 the public safety -- or whatever
20 the -- what you're hammering on
21 here, what is the question?
22 BY MR. PIFKO:
23      Q.   Public health.
24      A.   Public health.

Page 89

1      We make sure we have
2 products available that are safe and
3 secure to supply to the pharmacies. If
4 that means that's considering public
5 health, then that's your interpretation.
6      But to say that we don't
7 have any -- that I haven't answered the
8 question, I don't think that's correct.
9      Q.   How about, you're talking
10 about supplying a prescription, a valid
11 prescription.
12      How about, does
13 AmerisourceBergen consider the public
14 health when trying to prevent Control II
15 substances from getting into illegal
16 hands?
17      MR. NICHOLAS: Same
18 objection.
19      THE WITNESS: It's the same
20 question. It's the same answer as
21 the last question.
22 BY MR. PIFKO:
23      Q.   What's your answer?
24      MR. NICHOLAS: Same

Page 90

1  objection.
2      THE WITNESS:  We adhere to
3  our regulatory requirements within
4  the confines of a distributor.
5  And whether that's the
6  consideration of our
7  requirements -- I mean, that's --
8  that is our role.  And that is
9  what we consider.
10     We want to make sure that we
11  only buy from appropriate sources,
12  store correctly, and we only sell
13  to legitimate sources.
14  BY MR. PIFKO:
15     Q.   We talked about how Schedule
16  II substances have a high potential for
17  abuse, correct?
18     A.   They are Schedule II drugs,
19  yes.
20     Q.   And the statute says that
21  Schedule II substances have a high
22  potential for abuse, correct?
23     A.   That's why they're Schedule
24  II, correct.

Page 91

1      Q.   Does AmerisourceBergen
2  consider the impact on the communities it
3  serves if these Schedule II substances
4  get into the wrong hands?
5      MR. NICHOLAS:  Object to the
6  form.  Outside the scope of the
7  30(b)(6) notice as well.
8      THE WITNESS:  Can you
9  restate your question?
10     MR. PIFKO:  Can you read
11  back the question, please?
12      - - -
13     (Whereupon, the court
14  reporter read the following part
15  of the record:
16     "Question:  Does
17  AmerisourceBergen consider the
18  impact on the communities it
19  serves if these Schedule II
20  substances get into the wrong
21  hands?")
22      - - -
23     THE WITNESS:  Again, we
24  consider who -- we consider our

Page 92

1  regulatory responsibilities of who
2  we distribute products to.
3      We can only control what we
4  can control.  We can only control
5  who we sell drugs to.  And we
6  consider the impact to ensure that
7  we only sell to licensed
8  registrants.  And that's the
9  consideration we make and that's
10  our obligation under the
11  regulations.
12  BY MR. PIFKO:
13     Q.   Does AmerisourceBergen
14  believe it has a responsibility to
15  protect people in the communities it
16  serves from falling victim to abuse of
17  Schedule II substances?
18     MR. NICHOLAS:  Object to the
19  form.  It is not an appropriate
20  question in this deposition.  It's
21  outside the scope of the 30(b)(6)
22  notice.
23     THE WITNESS:
24  AmerisourceBergen has its

Page 93

1  obligation to ensure that -- I
2  mean, you're asking the same
3  question, and the answer is the
4  same.
5      We have regulatory
6  responsibilities that are imposed
7  on the distributor that we must
8  adhere to in order to prevent
9  diversion, which we do diligently.
10  And we ensure that the customers
11  that we sell to are appropriately
12  licensed and that -- while those
13  drugs are under our control.
14     That's what we take into
15  consideration and that's what we
16  do diligently.
17  BY MR. PIFKO:
18     Q.   So does the company consider
19  the adverse impacts of substances that it
20  sells in the communities that it sells?
21     A.   Our duty is not to determine
22  the types of the products.  We only sell
23  FDA-approved drugs.  We don't approve the
24  drugs.  We don't schedule the drugs.  We

Christopher Zimmerman (AmerisourceBergen)

Page 94

1  don't put them into classifications.  We
2  don't prescribe the drugs.  And we don't
3  dispense the drugs.
4        All we do is make sure we
5  buy the drugs that are ordered from our
6  licensed customers, FDA and DEA-approved
7  drugs, and we distribute to them and make
8  sure that they have the appropriate
9  schedules.
10       We have nothing to do with
11 the approval of drugs.  We have --
12 nowhere in our scope do we have that
13 responsibility, nor should we.
14       MR. PIFKO:  We're going to
15 take a break.
16       VIDEO TECHNICIAN:  Going off
17 the record.  The time is 10:20
18 a.m.
19             - - -
20       (Whereupon, a brief recess
21 was taken.)
22             - - -
23       VIDEO TECHNICIAN:  We're
24 back on record.  The time is 10:35

Page 95

1  a.m.
2  BY MR. PIFKO:
3     Q.   One little housekeeping
4  thing we forgot to talk about, although
5  I'm sure your counsel discussed it with
6  you before your -- when you were
7  preparing for the deposition.
8        But one of the rules of the
9  jurisdiction where we're in is that
10 you're not allowed to confer about the
11 substance of your testimony during our
12 breaks.
13       Do you understand that?
14    A.   Yes.
15    Q.   During the last break, did
16 you confer with your counsel about the
17 substance of your testimony?
18    A.   No.
19    Q.   Do we have an agreement that
20 going forward, you're not going to be
21 doing that during any break?
22    A.   Yes.
23    Q.   Okay.  Great.
24       Do you understand that the

Page 96

1  opioid products at issue in this
2  litigation can be dangerous?
3        MR. NICHOLAS:  Object to the
4  form.
5        THE WITNESS:  They're
6  Schedule -- by Schedule II, they
7  are -- that, by itself, identifies
8  them as such.
9  BY MR. PIFKO:
10    Q.   And because they're highly
11 addictive, right?
12       MR. NICHOLAS:  Object to the
13 form.  This is outside the scope
14 of the 30(b)(6).
15       Are you now -- I do want to
16 start making it very clear on the
17 record when we're on -- in
18 30(b)(6) and when we're not.  I
19 understand he's also testifying as
20 an individual.
21       Can we be clear that this
22 line of questioning, for example,
23 is outside the scope of the
24 30(b)(6) notice?

Page 97

1        MR. PIFKO:  You can object
2  to scope, and we can fight about
3  it later.  I don't think we're
4  going to agree on the record about
5  what's part of it or not.
6        MR. NICHOLAS:  Well, okay.
7  Then I'll just have to keep saying
8  the objection all the time.
9        Object to the scope.
10       Would you mind if I ask
11 you --
12       MR. PIFKO:  Let's just ask
13 the question over again.
14       MR. NICHOLAS:  -- can you
15 identify the section?
16       MR. PIFKO:  I'm not going to
17 get into that right now.
18 BY MR. PIFKO:
19    Q.   I'm going to ask you the
20 question again, sir, so we have a clear
21 record.
22       MR. NICHOLAS:  Well, just
23 since we're making a clear record,
24 for the record, I would ask that

Page 98

1    you identify, if you consider this
2    to be within the 30(b)(6) notice,
3    tell us which topic we're within.
4        MR. PIFKO:  Understood.  We
5    can meet and confer about that
6    after the deposition.
7        MR. NICHOLAS:  After the
8    deposition is too late.  The
9    deposition will be over.  But,
10   okay.  I've made my request for
11   the record.
12   BY MR. PIFKO:
13       Q.   So sorry.  Let's start over
14   with that.
15       You testified that the
16   controlled substances at issue in this
17   litigation, the opioid products, are --
18   can be potentially dangerous because
19   they're Schedule II and they are highly
20   addictive, correct?
21       MR. NICHOLAS:  Object to the
22   form.
23       Go ahead.
24       THE WITNESS:  They are

Page 99

1    Schedule II because there's a
2    potential for abuse.
3    BY MR. PIFKO:
4        Q.   And because there's a
5    potential for abuse, that makes --
6    there's a potential danger associated
7    with them, correct?
8        MR. NICHOLAS:  Object to the
9    form.  Outside the scope of the
10   30(b)(6).
11       THE WITNESS:  It's their
12   potential for abuse that makes
13   them a Schedule II and they have
14   additional security requirements.
15   BY MR. PIFKO:
16       Q.   So you don't have any
17   understanding about -- beyond the fact
18   that they're Schedule II, about what that
19   means for these products?
20       MR. NICHOLAS:  Object to the
21   form.  Outside the scope of the
22   30(b)(6).
23       THE WITNESS:  I'm not
24   understanding what your question

Page 100

1    is.
2    BY MR. PIFKO:
3        Q.   We agree that they're
4    Schedule II?
5        A.   Correct.
6        Q.   And we agree that a Schedule
7    II product has been classified by the
8    United States government as highly
9    addictive, agreed?
10       A.   High potential of abuse.  I
11   don't know -- you're saying "addictive."
12   I know the regulatory requirement is
13   abuse.
14       Q.   Do you have an understanding
15   that a product that has a high potential
16   for abuse can be dangerous to people
17   taking it?
18       MR. NICHOLAS:  Object to the
19   form.  Outside the scope of the
20   notice.
21       THE WITNESS:  I'm not -- I'm
22   not a medical doctor.  I can't
23   comment on that.
24   BY MR. PIFKO:

Page 101

1        Q.   So you have no
2    understanding?
3        MR. NICHOLAS:  Object to the
4    form.  Outside the scope.
5        THE WITNESS:  I have no
6    understanding of -- that they have
7    a high abuse potential, yes, I do
8    have an understanding of that.  If
9    that correlates to dangerous, I
10   mean, if that's your correlation.
11   BY MR. PIFKO:
12       Q.   I'm not making -- I'm just
13   asking for your answer.  You can give me
14   whatever answer you'd like, as far as --
15   as long as you answer the question.
16       But my question just was, do
17   you have an understanding that if --
18   because the pills have a high potential
19   for abuse, that they could cause
20   potential danger to people?
21       MR. NICHOLAS:  Objection.
22   Outside the scope.
23       THE WITNESS:  I don't know
24   that for sure.

Christopher Zimmerman (AmerisourceBergen)

Page 102

BY MR. PIFKO:

1 Q. Do you have an understanding
2 that a drug that has a high potential for
3 abuse could cause death to people who
4 consume that drug?
5 MR. NICHOLAS: Objection.
6 Outside the scope.
7 THE WITNESS: I don't know.
8 I don't know.
9 I mean, drugs -- people can
10 overdose on drugs, and I'm aware
11 of that, yes.
12 BY MR. PIFKO:
13 Q. Do you have an understanding
14 that someone is more likely to suffer
15 harm from a Schedule II drug than a drug
16 that's not a Schedule II drug?
17 MR. NICHOLAS: Objection.
18 Outside the scope.
19 THE WITNESS: I don't know
20 that.
21 BY MR. PIFKO:
22 Q. Let's go back to our duties
23 to prevent diversion.

Page 103

1 You recall discussing that?
2 MR. NICHOLAS: Object to the
3 form.
4 THE WITNESS: Yes.
5 BY MR. PIFKO:
6 Q. You agree that
7 AmerisourceBergen has a duty to prevent
8 diversion of controlled -- I keep messing
9 that up.
10 You agree that
11 AmerisourceBergen has a duty to prevent
12 diversion of Schedule II substances?
13 MR. NICHOLAS: Object to the
14 form. I'm not sure it's within
15 the scope either. But I
16 definitely object to the form.
17 THE WITNESS: We have a duty
18 to -- we have an obligation to
19 prevent diversion while the drugs
20 are under our control.
21 BY MR. PIFKO:
22 Q. And if you don't carry out
23 that duty, diversion can occur, correct?
24 MR. NICHOLAS: Objection.

Page 104

1 Outside the scope.
2 THE WITNESS: It calls for a
3 conclusion. I don't know that.
4 BY MR. PIFKO:
5 Q. You don't know either way?
6 A. I don't know --
7 Q. If AmerisourceBergen does
8 not maintain effective controls to
9 prevent diversion of Schedule II
10 substances, they can be diverted,
11 correct?
12 MR. NICHOLAS: Object to the
13 form. Outside the scope.
14 THE WITNESS: Again, if we
15 don't adhere to our effective
16 controls to prevent diversion,
17 yes, diversion could occur.
18 BY MR. PIFKO:
19 Q. Let's discuss some of the
20 company's policies and procedures with
21 respect to diversion.
22 Before we do that, do you
23 agree that the laws and regulations with
24 respect to preventing diversion remain --

Page 105

1 have remained unchanged for the last 45
2 years?
3 MR. NICHOLAS: Object to the
4 form. Outside -- definitely
5 outside the scope.
6 THE WITNESS: The CSA was
7 passed in 1970 and in -- the
8 federal regulations that regulate
9 our responsibilities have not
10 changed.
11 BY MR. PIFKO:
12 Q. So it's your understanding
13 that there haven't been changes with
14 respect to the duties to prevent
15 diversion since the passage of the
16 statute?
17 MR. NICHOLAS: Object to the
18 form. Outside the scope. You're
19 asking him a legal question.
20 THE WITNESS: The
21 regulatory -- the regulations have
22 not changed.
23 BY MR. PIFKO:
24 Q. So AmerisourceBergen has the

Christopher Zimmerman (AmerisourceBergen)

Page 106

1  same duty under the regulations today as
2  it did in 1990, correct?
3      MR. NICHOLAS:  Object to the
4  form.  You're asking him a legal
5  question.  Outside the scope.
6      THE WITNESS:  We have a
7  requirement to have effective
8  controls to prevent diversion.
9  BY MR. PIFKO:
10     Q.   And that requirement hasn't
11 changed since the passage of The
12 Controlled Substances Act, correct?
13     MR. NICHOLAS:  Object to the
14 form.  Calls for a legal
15 conclusion.  Outside the scope.
16     THE WITNESS:  I'm not aware
17 if the regulations have changed.
18 BY MR. PIFKO:
19     Q.   You're familiar with the --
20 AmerisourceBergen's practices and
21 procedures under The Controlled
22 Substances Act going back to the '80s,
23 correct?
24     A.   The '90s.

Page 107

1      Q.   Okay.  The '90s.
2      And you testified about the
3  company's practices with respect to
4  preventing diversion dating back to the
5  '90s in connection with the West Virginia
6  litigation, correct?
7      MR. NICHOLAS:  Objection.
8  Outside the scope.
9      Go ahead.
10     THE WITNESS:  I don't
11 remember, but --
12 BY MR. PIFKO:
13     Q.   You testified in 2006,
14 correct?
15     A.   2006?
16     Q.   '16, sorry.
17     A.   Yes.
18     Q.   In preparing for this
19 deposition, did you review your
20 transcript of that proceeding?
21     A.   I looked at it, yes.
22     Q.   When was the last time you
23 looked at it?
24     A.   A couple of weeks ago.

Page 108

1      Q.   Sorry, I'm not quite as
2  organized as I want to be.
3      From the time you started
4  with AmerisourceBergen -- let's back up.
5      You started working for
6  AmerisourceBergen in the 1990s?
7      A.   January, correct.
8      Q.   Do you remember the exact
9  date and year?
10     A.   January 2nd, 1990.
11     Q.   Okay.  From the time that
12 you started with AmerisourceBergen until
13 about 1998, AmerisourceBergen's
14 monitoring protocol was that every order
15 that exceeded the threshold was deemed to
16 be suspicious, correct?
17     MR. NICHOLAS:  Object to the
18 form.  Outside the scope.
19     THE WITNESS:  So when I
20 started with the company, the
21 process was a two-step process.
22 It was an excessive order report
23 that was produced monthly to send
24 to DEA, and then we also had a

Page 109

1  manual process at the distribution
2  centers where the order fillers
3  would identify suspicious orders
4  and report those.
5  BY MR. PIFKO:
6      Q.   And the orders were reported
7  after they were shipped, correct?
8      MR. NICHOLAS:  Object to the
9  form.  Outside the scope.
10     THE WITNESS:  Correct.
11 BY MR. PIFKO:
12     Q.   Prior to 2007,
13 AmerisourceBergen's system shipped all
14 orders at night and reported any orders
15 that it deemed to be suspicious the next
16 day, correct?
17     MR. NICHOLAS:  Objection.
18 Outside the scope.
19     THE WITNESS:  That was the
20 program that we developed in
21 conjunction with DEA over a
22 two-year process, that we tested a
23 new -- a process of reporting
24 suspicious orders that we

Christopher Zimmerman (AmerisourceBergen)

Page 110

1  developed with DEA and then worked
2  with them for two years testing
3  the program until they approved
4  the program in '98.
5  BY MR. PIFKO:
6      Q.   I'm not asking for
7  approvals, or I didn't ask you the
8  formulation for the policy.  I just asked
9  if that was a correct statement about
10  what the practice was.
11          So I'll just -- let's get a
12  clear answer to the question.
13      A.    That was the practice that
14  we did in conjunction with DEA's
15  guidance.
16      Q.    Just so we have a clear
17  record, the practice was to ship the
18  orders at night, and then the next day
19  any orders that were identified as
20  suspicious were then reported to the DEA;
21  is that correct?
22      A.    Correct.
23      Q.    Are you familiar with the
24  term "threshold"?

Page 111

1      A.    Yes.
2      Q.    That's an attribute of your
3  suspicious order monitoring system,
4  correct?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  You need to
8      put it into context of time,
9      because the program has been
10      enhanced over the years.
11  BY MR. PIFKO:
12      Q.    Well, for the time period
13  for which you're here to testify, which
14  ends in 2014, at all times there's been
15  some threshold requirement in the system,
16  correct?
17      A.    Correct.
18      Q.    Can you tell me what a
19  threshold is?
20          MR. NICHOLAS:  Object to the
21      form.
22          THE WITNESS:  A threshold is
23      the -- is a trigger that we have
24      put into the program to create --

Page 112

1      to identify an order of interest
2      for further review.
3  BY MR. PIFKO:
4      Q.    And so the threshold is the
5  first step in the suspicious order
6  monitoring program, correct?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  It is a step.
10  BY MR. PIFKO:
11      Q.    Is there a step before the
12  threshold?
13      A.    We train our employees at
14  the distribution centers also to be aware
15  of, and train them on suspicious orders.
16  And if they identify a suspicious order,
17  they're to report it.
18      Q.    The threshold is a key
19  factor that's used to identify
20  potentially suspicious orders, correct?
21          MR. NICHOLAS:  Object to the
22      form.
23          THE WITNESS:  It's an
24      identifier that we use

Page 113

1      systematically to trigger a
2      potential order of interest.
3  BY MR. PIFKO:
4      Q.    What other identifiers does
5  AmerisourceBergen use to identify a
6  potential order of interest?
7          MR. NICHOLAS:  What time
8      period?  Are we in the same time
9      period?
10          Before you answer, I'd like
11      to know what --
12          MR. PIFKO:  That's a
13      fact-related objection.  You can't
14      make that objection.  You can
15      object vague, and that's all you
16      can say.
17          MR. NICHOLAS:  I wasn't
18      objecting.  I was asking you to
19      clarify the question.
20          MR. PIFKO:  I'm asking the
21      witness a question.
22          THE WITNESS:  Can you
23      restate the question, please?
24          MR. PIFKO:  Now you've

Page 114

1 tainted the record.
2     MR. NICHOLAS: I didn't
3 taint the record, I just wanted
4 clarification.
5     MR. PIFKO: You have, but --
6     THE WITNESS: Just repeat
7 the question. I'll answer you,
8 just repeat the question.
9 BY MR. PIFKO:
10     Q. My question was --
11     MR. PIFKO: Can you read
12 back the question?
13         - - -
14     (Whereupon, the court
15 reporter read the following part
16 of the record:
17     "Question: What other
18 identifiers does AmerisourceBergen
19 use to identify a potential order
20 of interest?")
21         - - -
22     THE WITNESS: As I indicated
23 prior, the manual process of we
24 train our distribution center

Page 115

1 employees that work in the cages
2 and vaults, if they see an
3 unusually large order or frequency
4 or pattern that they feel could be
5 potentially suspicious, then they
6 are to report that, in addition
7 to -- you asked if there was
8 another. There it is, that's the
9 other.
10 BY MR. PIFKO:
11     Q. So employees who work in the
12 cages look for an order of unusual size,
13 frequency or deviation from the normal
14 pattern?
15     A. And the vault. We train
16 them to look for that, correct.
17     Q. When you say "and the
18 vault" --
19     MR. NICHOLAS: Object to the
20 form.
21     I will restate for the
22 record that we need some clarity
23 as to what time period we're
24 talking about during this whole

Page 116

1 line of questioning.
2     MR. PIFKO: Again, that's a
3 speaking objection, it's not
4 appropriate.
5     MR. NICHOLAS: It's not an
6 objection. I'm asking for clarity
7 so the record is clear.
8     MR. PIFKO: The witness is
9 answering my question, so we're
10 having a conversation here. And
11 you're interrupting.
12     Please continue, sir.
13     MR. NICHOLAS: I object to
14 the lecture to me.
15     Go ahead.
16     THE WITNESS: And you
17 mentioned that -- I think your
18 question was cage or vault?
19 BY MR. PIFKO:
20     Q. You used the word -- you
21 used the word "vault" originally, you
22 said something about the "cage" and then
23 you said something about the "vault."
24     And my question to you is,

Page 117

1 what do you mean by "vault"?
2     A. So Schedule II products are
3 maintained in the vault. Schedule III
4 through IVs are maintained in the cage.
5 Both have a suspicious order reporting
6 requirements, so we train those
7 associates in both areas.
8     Q. So there's -- associates in
9 the cage are trained on, to report an
10 order that deviates from the usual
11 pattern or is of an unusual size or
12 frequency, correct?
13     MR. NICHOLAS: Object to the
14 form.
15     Go ahead.
16     THE WITNESS: Both cage and
17 vault associates are trained in
18 the same manner, to identify --
19 yes, exactly.
20 BY MR. PIFKO:
21     Q. I was going to ask that. I
22 was just making my written record here
23 for that. So just, again, for clarity of
24 the record.

Christopher Zimmerman (AmerisourceBergen)

1      The employees in the cage
2  can identify an order of interest by
3  identifying that order as being of an
4  unusual size, frequency or deviating from
5  the normal pattern?
6           MR. NICHOLAS:  Object to the
7      form.
8           THE WITNESS:  As I
9      indicated, they are trained, if
10     they identify something of such,
11     they are to report it.
12 BY MR. PIFKO:
13     Q.   And the same is true with
14 respect to employees in the vault?
15     A.   Correct.
16          MR. NICHOLAS:  Object to the
17     form.
18 BY MR. PIFKO:
19     Q.   And the other way an order
20 can be identified as an order of interest
21 is if it exceeds a threshold that's
22 defined by AmerisourceBergen?
23          MR. NICHOLAS:  Object to the
24     form.

1      THE WITNESS:  There's a
2      threshold that identifies a
3      potentially -- an order of
4      interest, not a suspicious order.
5      And that is -- that is determined
6      by a threshold.
7  BY MR. PIFKO:
8      Q.   Are there any other ways an
9  order can be identified as an order of
10 interest?
11          MR. NICHOLAS:  Object to the
12     form.
13          I really would appreciate,
14     for the record, some clarity as to
15     the time frame that we're talking
16     about.
17          Are you still unwilling to
18     do that?  It seems very -- it
19     seems very plain vanilla.
20          MR. PIFKO:  We're talking
21     about the time period for which
22     you were designated, sir.
23          THE WITNESS:  Not that I am
24     aware of.

1  BY MR. PIFKO:
2      Q.   Let's talk about the
3  pre-2007 period and thresholds within
4  that period.
5           Do you have an understanding
6  of how AmerisourceBergen calculated
7  thresholds before 2007?
8           MR. NICHOLAS:  Objection.
9      Outside the scope.
10          These are being answered in
11     his individual capacity.
12          THE WITNESS:  In what time
13     period?
14 BY MR. PIFKO:
15     Q.   Well, let's start, you
16 testified in West Virginia that there
17 were certain changes made with respect to
18 the calculation of thresholds from the
19 1990s to 2007, correct?
20          MR. NICHOLAS:  Same
21     objection.
22          THE WITNESS:  There was a
23     change in '98.
24 BY MR. PIFKO:

1      Q.   Okay.  Before 1998, what was
2  the method of calculating a threshold at
3  AmerisourceBergen?
4           MR. NICHOLAS:  Same
5      objection.  Outside the scope of
6      the 30(b)(6).
7           THE WITNESS:  The method of
8      calculating the threshold prior to
9      that was that you would -- all
10     pharmacies would be in one
11     category, hospitals would be in
12     another category.  You take all
13     the pharmacies within that
14     category and divide by the number
15     of pharmacies to come up with an
16     average volume for the month per
17     drug category.  And then there was
18     a multiplier of three.  Any order
19     that was over the threshold amount
20     would be produced an excessive
21     order report.
22 BY MR. PIFKO:
23     Q.   But it would still be
24 shipped?

Christopher Zimmerman (AmerisourceBergen)

Page 122

1    A.   The product?
2    Q.   Yes.
3    A.   Yes.
4    Q.   After 1998, what was the
5  practice with respect to calculating
6  thresholds?
7        MR. NICHOLAS:  Same
8  objection.  Outside the scope.
9        THE WITNESS:  So in 1996, we
10 worked with DEA, for two years,
11 on -- in order to provide DEA with
12 more -- we feel, more accurate
13 information, that we worked on a
14 project to where we would identify
15 a customer based upon its own
16 purchase history versus all
17 pharmacies in one big bucket.
18      And then we calculated a
19 rolling four-month average of that
20 pharmacy's purchases.  And then
21 created a multiplier of three to
22 identify a trigger that would
23 identify a suspicious order.
24 BY MR. PIFKO:

Page 123

1    Q.   That practice was in place
2  from 1998 to when?
3        MR. NICHOLAS:  Object to
4  the -- objection.  Scope.  Same
5  objection as I've been stating.
6        THE WITNESS:  So that -- so
7  once we got approval from DEA to
8  enact that program nationally, we
9  tested it for -- with one DEA
10 office and then several, and then
11 Washington, D.C. approved it for
12 national use throughout in 1998.
13      And that was the practice
14 until 2007.
15 BY MR. PIFKO:
16   Q.   So to be clear, from 2007 --
17 I'm sorry, from 1998 to 2007, the
18 practice was to take a specific
19 customer's order history over the prior
20 four-month period and then average the
21 order history and multiply that by three,
22 and that would be its threshold, correct?
23   A.   That was the agreed-upon
24 process through our testing with DEA over

Page 124

1  that two-year period.
2        We continued to make changes
3  in the program, and that was the final
4  calculation that we came up with.
5    Q.   And that calculation was
6  used from 1998 to 2007?
7    A.   Yes.
8    Q.   Something happened in 2007,
9  correct?
10   A.   Yes.
11   Q.   You had an enforcement
12 action brought against you by the DEA,
13 correct?
14   A.   Correct.
15   Q.   The three times multiplier,
16 where does that come from?  Scratch that
17 question for a second.
18      You agree that throughout
19 the time period we just discussed, from
20 the 1990s to 2007, there was always a
21 three times multiplier used in connection
22 with calculating the threshold, correct?
23   A.   So for -- so from 1990 to
24 '98, the excessive report for ARCOS

Page 125

1  items, which would be your Schedule II
2  and reportable IIIs had a three times
3  multiplier.  Non-ARCOS items, I think it
4  might have been six; it might have been a
5  higher multiplier.
6        Our program that we
7  implemented in '98 set them all at three.
8    Q.   And do you know what the
9  methodology was in calculating that three
10 times multiplier?
11       MR. NICHOLAS:  Object to the
12 form.  And same objection, as to
13 outside -- as to the scope here of
14 all these questions.
15       THE WITNESS:  So the three
16 times multiplier had been in place
17 when I came on board in 1990.  And
18 that was the program that we were
19 submitting and working with DEA in
20 1990 all the way up to '96.
21      And then when we started to
22 work on the new program in
23 conjunction with DEA and testing
24 it and refining it for that

Christopher Zimmerman (AmerisourceBergen)

Page 126

1 two-year period, the three times
2 multiplier was the multiplier that
3 we -- that, in conjunction with
4 the DEA, decided to use.
5 BY MR. PIFKO:
6    Q.   So you don't know where it
7 came from, because it was already in
8 place when you started at the company?
9        MR. NICHOLAS:  Object to the
10 form.  Outside the scope.
11       THE WITNESS:  It was --
12 correct, it was in place.
13       And then in '96, '7, '8,
14 right in that time period, the
15 Methamphetamine Control Act was
16 passed.  And part of that act
17 required the -- it didn't require,
18 it mandated a Suspicious Order
19 Task Force to come up with a
20 process to identify suspicious
21 orders and report it to DEA.
22       I participated on that task
23 force, and that was what came up.
24 And it was with enforcement,

Page 127

1 state, federal and industry.  And
2 we met quarterly.  And the
3 Suspicious Order Task Force
4 mandated by the Methamphetamine
5 Control Act came up with the same
6 process with the three times
7 multiplier.  And that's the same
8 one we used, which kind of is in
9 line with what we used in '90,
10 what we used in '98, and what we
11 implemented in 2007.
12 BY MR. PIFKO:
13    Q.   And so your three times
14 multiplier came from being involved with
15 the task force on -- what did you say?
16 The Methamphetamine Act?
17    A.   The three time --
18       MR. NICHOLAS:  Object to the
19 form.  Scope.
20       Go ahead.
21       THE WITNESS:  So the three
22 times multiplier was already in
23 place in 1990, and those were the
24 reports we were submitting to DEA.

Page 128

1        And then in '96, when we
2 started working with DEA, we came
3 up and we mutually decided on a
4 three times multiplier.
5        And then the Suspicious
6 Order Task Force was assembled
7 and, again, through their meetings
8 with enforcement agencies and
9 regulators and industry, they came
10 up with a process to identify
11 systematic -- a systematic
12 approach for reporting suspicious
13 orders, and that was a three times
14 multiplier as well.
15 BY MR. PIFKO:
16    Q.   This three times multiplier
17 that you relied on through this task
18 force, was there any written
19 documentation establishing that?
20    A.   It was in the chemical
21 handling handbook published by the DEA.
22    Q.   And that's a document that
23 you relied on for the three times
24 multiplier?

Page 129

1    A.   That was --
2        MR. NICHOLAS:  Same
3 objection.  Objections to the form
4 and outside the scope.
5        Go ahead.
6        THE WITNESS:  Again, what
7 time frame are you talking about?
8        When we worked with DEA, we
9 relied on our negotiations with
10 DEA.  And then in 2007, when we
11 were implementing a new enhanced
12 program, again, in conjunction
13 with DEA, we came up with the
14 three times multiplier.  Referring
15 back to the handling manual that
16 was published by DEA, has --
17 identifying a suspicious order
18 systematically, it was three times
19 multiplier.
20 BY MR. PIFKO:
21    Q.   So what I'm asking you is,
22 the three times multiplier that you're
23 relying on with respect to the handling
24 manual that was published by DEA,

Page 130

1 that's -- what that's called?
2     A.   Your question is what the
3 manual is called?  Chemical handling
4 guide, I believe.  I can't -- I don't
5 know the exact name.  It was also on the
6 DEA's website for some time.
7     Q.   Did you produce a copy of
8 that guide, to your knowledge?
9         MR. NICHOLAS:  Who are you
10 talking about?  Are you talking
11 about --
12        MR. PIFKO:  The company.
13        MR. NICHOLAS:  -- in this
14 litigation?
15        MR. PIFKO:  Yes.
16        THE WITNESS:  In this --
17        MR. NICHOLAS:  Objection.
18 BY MR. PIFKO:
19     Q.   If you know.
20     A.   I don't know.
21        MR. NICHOLAS:  For the
22 record, since the implication is
23 that maybe we were supposed to
24 produce the document or

Page 131

1 something --
2        MR. PIFKO:  No accusations.
3 Just asking.
4        MR. NICHOLAS:  Good.  It's a
5 DEA document prior to 2006.
6            - - -
7        (Whereupon, Amerisource
8 Bergen-Zimmerman Exhibit-4, 2001
9 Chemical Handler's Notebook, was
10 marked for identification.)
11            - - -
12 BY MR. PIFKO:
13     Q.   I'm handing you what's
14 marked as Exhibit-4.
15     A.   Thank you.
16     Q.   Do you have Exhibit-4 in
17 front of you?
18     A.   Uh-huh.
19     Q.   Are you reviewing Exhibit-4?
20     A.   Yes.
21     Q.   Have you seen this document
22 before?
23     A.   I've seen a version of it.
24 I'm not sure what version this is.

Page 132

1     Q.   I'll represent to you that
2 this is the 2001 version.
3     A.   Okay.
4     Q.   Do you believe you've seen
5 this before?
6     A.   I've seen -- I don't know if
7 I've seen this version, but I've seen it.
8     Q.   And when you refer to the
9 Chemical Handler's Manual, this is what
10 you're referring to?
11     A.   Yes.  And, again, it was
12 also on the website as well.
13     Q.   When you talk about the
14 three times multiplier -- there's page
15 numbers on the bottom here, Page 43.
16 They are side-by-side columns, Appendix
17 E-3.
18        Can you turn to that?
19     A.   Uh-huh.
20     Q.   Are you there?
21     A.   Yes.
22     Q.   On Page 43, the page on the
23 right, you see there it says, Suspicious
24 order reporting system for use in

Page 133

1 automated tracking systems.
2        Do you see that?
3     A.   What page are you on?
4     Q.   It's 43 on the very bottom.
5     A.   Okay.
6     Q.   Are you there?
7     A.   Yes.
8     Q.   Appendix E-3.
9        Do you see that at the top
10 of that page?  Is that the page you're
11 looking at?
12     A.   Yes.
13     Q.   And it says, Suspicious
14 order reporting system for use in
15 automated tracking systems.
16        Do you see that?
17     A.   Yes.
18     Q.   Okay.  Is this where the
19 three times multiplier that you were
20 talking about comes from?
21     A.   This is -- yeah, the basis
22 of it.
23     Q.   And it says there -- there's
24 terms and definitions and then it's got

Page 134

1 these numbers, 1, 2, 3, 4. And then it
2 has, Note.
3         Do you see that?
4     A.   Yes.
5     Q.   And it says, Factor equals
6 3.
7         Do you see that?
8     A.   Yes.
9     Q.   Is that what you were
10 talking about?
11    A.   Yes.
12    Q.   And you worked with the task
13 force that was responsible for coming up
14 with this manual?
15    A.   I participated on it. I
16 wasn't the -- the industry could have one
17 member, but there was a group of people
18 within the industry.
19    Q.   Did you help in drafting any
20 of the language that was in the manual?
21    A.   I don't recall.
22    Q.   Do you recall if the DEA
23 asked you for comment on the final
24 version of the manual?

Page 135

1     A.   I don't.
2     Q.   Your work on this task force
3 was through the Healthcare Distribution
4 Alliance, which I guess was under a
5 different name at that time?
6     A.   They had the -- yeah, there
7 was -- I think there was one member, one
8 slot on the task force for the
9 wholesaler. It was through the HDMA at
10 the time, I believe it was called.
11    Q.   And so the DEA said that the
12 HDMA could have a member participate on
13 the task force, and you were the selected
14 member; is that correct?
15    A.   No.
16        MR. NICHOLAS:  Objection to
17    the form.
18        Go ahead.
19        THE WITNESS:  No.  No, I was
20    not. I said I participated. The
21    group --
22 BY MR. PIFKO:
23    Q.   There was someone else who
24 was the HDMA member?

Page 136

1     A.   There was a designee of one
2 person. It wasn't me. I wasn't the
3 one-person designee.
4     Q.   Do you know who that was?
5     A.   I don't.
6     Q.   Do you know what company
7 they worked for?
8     A.   I want to say it was
9 Cardinal or McKesson, but I'm not sure.
10 It wasn't ABC.
11    Q.   Did you work with anyone
12 from Cardinal or McKesson -- so I asked
13 you who the designated person was, and
14 you said maybe it was Cardinal or
15 McKesson.
16        Setting aside who the
17 designated person was, when you were
18 involved with this task force, did you
19 work with anyone from McKesson or
20 Cardinal on the task force?
21        MR. NICHOLAS:  Object to the
22    form.  Scope.
23        Go ahead.
24        THE WITNESS:  I can't

Page 137

1    remember who specifically was
2    involved.
3 BY MR. PIFKO:
4     Q.   But you generally feel like
5 maybe McKesson or Cardinal was involved?
6        MR. NICHOLAS:  Object to the
7    form.
8        THE WITNESS:  Again, I don't
9    know exactly who was involved. I
10    wouldn't be comfortable saying who
11    exactly that would be.
12 BY MR. PIFKO:
13    Q.   In 2007, there was a DEA
14 enforcement action against
15 AmerisourceBergen, correct?
16    A.   Yes.
17        - - -
18        (Whereupon, Amerisource
19    Bergen-Zimmerman Exhibit-5,
20    ABDCMDL 00279854-54, was marked
21    for identification.)
22        - - -
23 BY MR. PIFKO:
24    Q.   I'm handing you what is

Christopher Zimmerman (AmerisourceBergen)

Page 138

1 marked as Exhibit-5. This is a document
2 Bates labeled ABDCMDL 00279854 to 65.
3         Have you seen this document
4 before?
5     A.   Yes.
6     Q.   Can you tell me what this
7 is?
8     A.   This is our settlement and
9 release agreement with the DEA for
10 Orlando distribution center.
11     Q.   So as a result of the
12 enforcement action with the DEA, this was
13 the agreement that was reached between
14 AmerisourceBergen and the DEA, correct?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  This is the
18     agreement, yes, that was made
19     after the order to show cause.
20 BY MR. PIFKO:
21     Q.   Was there any money paid,
22 under this agreement, from
23 AmerisourceBergen to the United States
24 government?

Page 139

1     A.   No.
2     Q.   But as a result of this
3 agreement, AmerisourceBergen changed its
4 suspicious order monitoring program,
5 correct?
6         MR. NICHOLAS:  Object to the
7     form.
8         Go ahead.
9         THE WITNESS:  It modified
10     the existing program, yes.
11 BY MR. PIFKO:
12     Q.   Can you tell me how the
13 agreement modified the existing program?
14         MR. NICHOLAS:  Object to the
15     form.
16         THE WITNESS:  So through
17     negotiations with DEA and in
18     enhancing our existing order
19     monitoring program that we had in
20     place at the time, DEA wanted us
21     to include a more in-depth due
22     diligence process in addition to
23     ensuring that we only distribute
24     products to licensed individuals.

Page 140

1         And they also wanted us to
2     modify our suspicious order
3     monitoring program to stop orders
4     that we believed -- stop orders
5     that could possibly be suspicious
6     and then to any suspicious -- any
7     order we deem suspicious should
8     not be shipped.
9 BY MR. PIFKO:
10     Q.   Did AmerisourceBergen agree
11 to do that?
12     A.   We modified our program per
13 this agreement, correct.
14     Q.   Can we refer to this
15 agreement as the shipping requirement?
16         MR. NICHOLAS:  Object to the
17     form.
18 BY MR. PIFKO:
19     Q.   If I say "shipping
20 requirement," can we have an
21 understanding that I'm referring to the
22 idea that you're not supposed to ship an
23 order that's deemed to be suspicious?
24         MR. NICHOLAS:  I'll object

Page 141

1 to the form.
2         I want to understand, are
3     you asking the witness if
4     heretofore we can refer to this
5     agreement as the shipping
6     requirement?  Because if so, I'd
7     object to that.
8 BY MR. PIFKO:
9     Q.   Do you understand the
10 question?
11     A.   Do you want to repeat it?
12     Q.   All I'm asking is if, for
13 ease of reference, going forward, we can
14 refer to the idea that you don't ship an
15 order that's been identified as
16 suspicious as the shipping requirement?
17         MR. NICHOLAS:  I'll object
18     to the form.  And the language.
19         THE WITNESS:  We never --
20     the shipping requirement was never
21     discussed in this document and is
22     not a term that we had used in
23     presentations or requirements.
24         We chose, through our work

Christopher Zimmerman (AmerisourceBergen)

Page 142

1    with the DEA, that if we
2    defined -- ABC defined an order as
3    suspicious, that we would report
4    it and would not ship it.
5  BY MR. PIFKO:
6    Q.   Did DEA ever tell you that
7  there was a -- prior to entering into
8  this agreement, did DEA ever tell you
9  that an order that's suspicious should
10 not be shipped?
11       MR. NICHOLAS:  Object to the
12   form.
13       THE WITNESS:  Did DEA ever
14   tell us?  No.
15 BY MR. PIFKO:
16   Q.   We talked about this
17 Chemical Handler's Manual and how it
18 provided guidance on the three times
19 threshold requirement, correct?
20   A.   Yes.
21   Q.   Did you take any guidance
22 from that manual about the idea of not
23 shipping an order that's deemed to be
24 suspicious?

Page 143

1        MR. NICHOLAS:  Object to the
2    form.  Outside the scope.
3        THE WITNESS:  No.
4  BY MR. PIFKO:
5    Q.   Let's take a look at that
6  manual again.  I'd like to direct your
7  attention to Page 21 of that document.
8  Exhibit-4, for the record.
9        Looking at the second full
10 paragraph of Page 21, can you read that
11 to me?
12   A.   On Page 21?  You want me to
13 read it out loud?
14   Q.   Yes, please.
15   A.   When a regulated person
16 suspects that an order may be intended
17 for illicit purposes, good practice
18 requires that every reasonable effort be
19 made to resolve those suspicions.  In
20 addition to making the required reports,
21 the transaction should not be completed
22 until the customer is able to eliminate
23 the suspicions.  The distributor may have
24 to forego some transactions.

Page 144

1    Q.   That's good.  Thank you.
2    A.   Do you want me to read the
3  whole thing?
4    Q.   That's all I was asking you
5  to read.
6        MR. NICHOLAS:  You asked him
7    to read the whole thing.
8        MR. PIFKO:  You can read to
9    yourself the rest of that
10   paragraph, if you please.  But all
11   I wanted you to read for the
12   record was that portion.
13       MR. NICHOLAS:  You asked
14   him, for the record, to read the
15   whole paragraph.  Are you now
16   telling him you don't want him to
17   read the whole paragraph?
18       MR. PIFKO:  You don't need
19   to read any more.
20 BY MR. PIFKO:
21   Q.   Did you ever consider
22 foregoing some transactions, as a result
23 of reading this document?
24       MR. NICHOLAS:  Object to the

Page 145

1    form.  Outside the scope.
2        THE WITNESS:  No.
3        - - -
4        (Whereupon, Amerisource
5    Bergen-Zimmerman Exhibit-6,
6    ABDCMDL 00269683-694, was marked
7    for identification.)
8        - - -
9  BY MR. PIFKO:
10   Q.   I'm handing you what has
11 been marked as Exhibit-6.  For the
12 record, these are a series of letters
13 from the Department of Justice, Bates
14 labeled ABDCMDL 00269683 to 694.
15       For the record, there's four
16 letters in this packet.  This is how they
17 were produced.  They are dated -- the one
18 in the back is the earliest, it's on Page
19 ABDCMDL 00269691, and it's dated
20 September 27th, 2006.  And there's
21 another one dated February 7th, 2007;
22 another one dated December 27th, 2007;
23 and another one with a stamp on it, June
24 12th, 2012.

Christopher Zimmerman (AmerisourceBergen)

Page 146

1 Have you seen these before?
2 A. I have.
3 Q. These are what we refer to
4 as the Dear Registrant letters.
5 Have you heard that term
6 before?
7 A. I have, since -- yep. Yes.
8 Q. Did AmerisourceBergen
9 receive these letters from the Department
10 of Justice? Let's start with the first
11 one, dated September 27th, 2006, Bates
12 label ABDCMDL 00269691.
13 Are you there?
14 A. Yes.
15 Q. Okay. Did AmerisourceBergen
16 receive a copy of this letter?
17 A. I believe one or more of our
18 distribution centers did.
19 Q. When you were at the
20 company, at that time, did you receive a
21 copy of that letter?
22 A. I eventually saw a copy of
23 the letter. I never received one from
24 DEA.

Page 147

1 Q. But someone in the company
2 provided one to you?
3 A. Yes.
4 Q. And it was on or around the
5 time of the letter?
6 A. It was some time after. I
7 don't recollect how far after.
8 Q. Like a month after, or less?
9 A. It could have been a month
10 or two.
11 Q. But not, like, a year later?
12 MR. NICHOLAS: Object to the
13 form.
14 THE WITNESS: Not that I
15 recollect.
16 BY MR. PIFKO:
17 Q. I want to point you to some
18 provisions in this letter. There's a
19 heading, Background.
20 Do you see that?
21 A. What page are you on?
22 Q. On ABDC 00269691.
23 MR. NICHOLAS: Could the
24 witness have the opportunity to

Page 148

1 just review the letter before you
2 ask -- before he's asked questions
3 about portions of it?
4 MR. PIFKO: You can review
5 the letter.
6 BY MR. PIFKO:
7 Q. Do you believe this a --
8 while you're reviewing it, do you believe
9 this is a true and correct copy of the
10 September 27th, 2006 letter from the
11 Department of Justice?
12 MR. NICHOLAS: Object to the
13 form.
14 THE WITNESS: It looks the
15 same.
16 BY MR. PIFKO:
17 Q. And this is something that
18 the company would have maintained in its
19 files in the ordinary course of business?
20 MR. NICHOLAS: Could you let
21 him finish reading the letter,
22 please, before you ask?
23 BY MR. PIFKO:
24 Q. I just wanted to ask you

Page 149

1 about a couple of provisions in the
2 letter.
3 A. Just one second.
4 Okay.
5 Q. My last question was, is
6 this letter something that would have
7 been maintained by the company in the
8 ordinary course of business?
9 A. We would have it.
10 Q. So let's go to the first
11 page of this letter which, again, for the
12 record, is ABDCMDL 00269691.
13 Are you there?
14 A. Page 1, yes.
15 Q. Okay. There's a heading
16 here, Background.
17 Do you see that?
18 A. Oh, yes. At the top. Yes.
19 Q. It says, As each of you is
20 undoubtedly aware, the abuse (nonmedical
21 use) of controlled prescription drugs is
22 a serious and growing health problem in
23 this country.
24 Do you see that?

Page 150

1    A.   Yes.
2    Q.   Do you agree that the DEA
3  communicated that to AmerisourceBergen on
4  September 27th, 2006?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  So it states.
8      It's stated in the letter.
9  BY MR. PIFKO:
10    Q.   And you agree that the
11  Department of Justice communicated that
12  to AmerisourceBergen?
13          MR. NICHOLAS:  Object to the
14      form.
15          THE WITNESS:  We received
16      this letter, yes.
17  BY MR. PIFKO:
18    Q.   The letter also says, The
19  CSA was designed by Congress to combat
20  diversion by providing for a closed
21  system of drug distribution in which all
22  legitimate handlers of controlled
23  substances must obtain a DEA
24  registration, and as a condition of

Page 151

1  maintaining such registration, must take
2  reasonable steps to ensure that their
3  registration is not being utilized as a
4  source of diversion.
5          Do you see that?
6    A.   Yes.
7    Q.   Do you agree with that
8  statement?
9          MR. NICHOLAS:  Object to the
10      form.
11          THE WITNESS:  We have a
12      responsibility to make sure we
13      have adequate controls to prevent
14      diversion, yes.
15  BY MR. PIFKO:
16    Q.   And so you agree with the
17  characterization here in this letter?
18          MR. NICHOLAS:  Object to the
19      form.  The letter is the letter.
20          THE WITNESS:  I agree that
21      we must adhere to our regulatory
22      requirements under the Code of
23      Federal Regulations.
24  BY MR. PIFKO:

Page 152

1    Q.   It then says, If the closed
2  system is to function properly as
3  Congress envisioned, distributors must be
4  vigilant in deciding whether a
5  prospective customer can be trusted to
6  deliver controlled substances only for
7  lawful purposes.
8          Do you see that?
9    A.   I do.
10    Q.   Do you agree with that
11  statement?
12          MR. NICHOLAS:  Object to the
13      form.
14          THE WITNESS:  I think -- I
15      think there's a lot of inference
16      there.
17  BY MR. PIFKO:
18    Q.   In what way?
19    A.   Congress -- he's indicating
20  what Congress envisioned.  I'm not sure
21  what they're basing -- I'm not sure where
22  they're drawing that from.
23    Q.   So you don't agree with that
24  statement?

Page 153

1          MR. NICHOLAS:  That's not
2      what he said.  Objection.
3          THE WITNESS:  I'm just
4      stating that there's a statement
5      made in there that Congress
6      envisioned what the scope was.
7          And I'm not sure what
8      they're basing that upon.  If I
9      could see some documentation of
10      what Congress indicated as the --
11      you know, of our duty of
12      vigilant -- deciding whether a
13      customer can be trusted to
14      deliver, that's what they
15      envision, I'd like to know in what
16      context.
17  BY MR. PIFKO:
18    Q.   I'm just asking if -- I'm
19  not asking you what DEA meant.
20          I'm asking, based on your
21  understanding of what that sentence
22  means, do you agree with it?
23    A.   I don't know --
24          MR. NICHOLAS:  Object to the

Christopher Zimmerman (AmerisourceBergen)

Page 154

1  form.
2      THE WITNESS:  I don't know
3  what they envisioned.  I don't
4  know what they're basing that on.
5      You're asking me to make a
6  conclusion off of something I
7  don't have all the facts about.
8  BY MR. PIFKO:
9      Q.   So you don't have an
10 understanding either way about whether
11 distributors must be vigilant in deciding
12 whether a prospective customer can be
13 trusted to deliver controlled substances
14 only for lawful purposes?
15     A.   We need --
16     MR. NICHOLAS:  Object to the
17 form.
18     Go ahead.
19     THE WITNESS:  We need to
20 ensure that the customers that we
21 sell to have been appropriately
22 licensed and in good standing with
23 DEA and the Boards of Pharmacy.  I
24 agree with that.

Page 155

1  BY MR. PIFKO:
2      Q.   It says, Congress has
3  expressly declared that the illegal
4  distribution of controlled substances has
5  a substantial and detrimental effect on
6  the health and general welfare of the
7  American people.
8      Do you see that?
9      A.   Yes.
10     Q.   Do you agree with that
11 statement?
12     MR. NICHOLAS:  Object to the
13 form.
14 BY MR. PIFKO:
15     Q.   It's cites 21 USC.8012.
16     A.   If Congress has expressly
17 declared that, then I agree that Congress
18 expressly declared that there's a
19 substantial and detrimental effect to the
20 American wellbeing.
21     Q.   Do you have an understanding
22 that in attempting to prevent illegal
23 distribution of controlled substances,
24 the company's actions can have an impact

Page 156

1  on the health and general welfare of the
2  American people?
3      MR. NICHOLAS:  Object to the
4  form.
5      THE WITNESS:  Can you just
6  restate that?
7  BY MR. PIFKO:
8      Q.   I said, do you have an
9  understanding that in attempting to
10 prevent illegal distribution of
11 controlled substances, that the company's
12 actions can have an impact on the health
13 and general welfare of the American
14 people?
15     MR. NICHOLAS:  Object to the
16 form.
17     THE WITNESS:  Yeah, I -- can
18 you break it into two or three
19 questions?  Because you lumped a
20 lot in there.  Can you --
21 BY MR. PIFKO:
22     Q.   What part is tricking you
23 up?
24     A.   The first part.

Page 157

1      Q.   We agree that
2  AmerisourceBergen has a duty to take
3  actions to prevent illegal distribution
4  of controlled substances, agree?
5      MR. NICHOLAS:  Object to the
6  form.
7      THE WITNESS:  We have a duty
8  to make sure that we follow our
9  regulatory responsibilities to
10 prevent diversion, I agree.
11 BY MR. PIFKO:
12     Q.   And then the question is, in
13 carrying out that role, do you believe
14 that AmerisourceBergen's actions can have
15 an impact on the health and general
16 welfare of the American people?
17     MR. NICHOLAS:  Object to the
18 form.
19     THE WITNESS:  Again, we go
20 back to what we were talking about
21 before, is that, yes, we have to
22 follow our policy and procedure to
23 ensure that we have effective
24 controls to prevent diversion.

Christopher Zimmerman (AmerisourceBergen)

Page 158

```
1        And I'm not sure what more
2   we can say.  We have an obligation
3   to ensure that we get medications
4   to the pharmacies in need.  And,
5   yes, we do have an obligation to
6   help with providing access for
7   medications to the patients that
8   need them, which I guess would be
9   the public.
10  BY MR. PIFKO:
11       Q.   How about in preventing
12  illegal substances from being
13  distributed, do you believe that
14  AmerisourceBergen's actions can have an
15  impact on the health and general welfare
16  of the American people?
17           MR. NICHOLAS:  Object to the
18  form.
19           THE WITNESS:  As long as
20  we -- again, this implies chain
21  under our control, we can do what
22  we can under our control and our
23  responsibilities and we do that
24  diligently.
```

Page 159

```
1        And, you know, that's -- and
2   by not having a diversion
3   occurring within the distribution
4   centers, then that's how we impact
5   the health and welfare of the
6   public, by not having that occur
7   within our distribution centers.
8   BY MR. PIFKO:
9        Q.   Okay.  And if it does occur,
10  it could have an adverse impact on the
11  health and general welfare of the
12  American public, correct?
13           MR. NICHOLAS:  Object to the
14  form.
15           THE WITNESS:  I don't know
16  that.  Again, we can go
17  back-and-forth again.  I think we
18  covered this ground.
19       But we have an obligation to
20  have effective controls to prevent
21  diversion, which we follow.  And
22  we also have an obligation to
23  ensure that we get FDA-approved
24  medications to the pharmacies that
```

Page 160

```
1   need to dispense them to their
2   patients and that there's access
3   to patients that have been issued
4   a prescription and fill it at the
5   pharmacy, which would have an
6   impact on the health and safety of
7   the public.
8   BY MR. PIFKO:
9        Q.   So you said by not having a
10  diversion occurring within the
11  distribution center, then that's how we
12  impact the health and welfare of the
13  public.
14           MR. NICHOLAS:  Object to the
15  form.
16  BY MR. PIFKO:
17       Q.   Do you recall saying that?
18           MR. NICHOLAS:  Object to the
19  form.  Are you asking what he said
20  a minute ago and just reading the
21  transcript?  Is that what you're
22  doing?
23           THE WITNESS:  We have an
24  obligation to maintain -- I -- I
```

Page 161

```
1   don't understand what you mean by
2   that.
3   BY MR. PIFKO:
4        Q.   All I'm asking is, you just
5   said:  By not having diversion occurring
6   within the distribution centers, then
7   that's how we impact the health and
8   general welfare of the public.
9        A.   That's a --
10       Q.   That's a quote I just read
11  from the transcript.
12       A.   Then that's --
13       Q.   Okay.  Do you agree to
14  having said that?
15       A.   -- what I stated.
16       Again, it goes back to the
17  same issue that you have been asking me,
18  and I've answered it several times, of
19  what our role in the supply channel is,
20  how we -- what things we have in place to
21  prevent diversion.  And that is our role
22  and responsibility.
23       We don't touch the patient.
24       Q.   I haven't asked you a
```

Christopher Zimmerman (AmerisourceBergen)

Page 162

1  question.
2      A.   I know you haven't.  But you
3  continue --
4          MR. NICHOLAS:  Let him
5  finish.
6  BY MR. PIFKO:
7      Q.   You're giving a speech.
8          All I asked you --
9      A.   Well, you're reading back
10  what I just said.
11     Q.   The question I asked is what
12  you said.  Did you say that?  And you're
13  giving a speech.
14         MR. NICHOLAS:  Hold on.
15  Hold on.  If you're going to go
16  back and read him a portion of
17  what he just said a minute ago --
18         MR. PIFKO:  I didn't ask him
19  to give a speech.
20         MR. NICHOLAS:  I think you
21  then can also let him answer your
22  question.
23         MR. PIFKO:  No.  I just
24  said, did you say that?  That's

Page 163

1  all the question was.  And he goes
2  on a five-minute speech.
3          That's not what the question
4  was.
5          MR. NICHOLAS:  First of all,
6  it's been about 20 seconds that
7  he's talking.  If he wanted to
8  talk for an hour, he could.  But
9  he's not doing that.  He's trying
10  to answer your questions.
11         MR. PIFKO:  All my question
12  was, was did I read it right?
13         MR. NICHOLAS:  You're just
14  arguing with him.
15         MR. PIFKO:  No, my question
16  was --
17         MR. NICHOLAS:  You're just
18  arguing.
19         MR. PIFKO:  You're wasting
20  our time, okay?
21         MR. NICHOLAS:  Just ask him
22  questions.  Yeah --
23  BY MR. PIFKO:
24     Q.   I'm trying to ask you a

Page 164

1  question, sir.  I don't want a speech to
2  questions I'm not asking.
3          All I asked you was if I had
4  read that portion correctly?
5          MR. NICHOLAS:  You know
6  what, you don't tell him that you
7  don't want a speech or you do want
8  a speech.  Let him answer your
9  questions.  Don't lecture him.
10         MR. PIFKO:  We're going to
11  have to have this transcript
12  evaluated by the court for your
13  lack of cooperation and we're
14  going to seek appropriate remedies
15  at the appropriate time.
16         MR. NICHOLAS:  That's fine.
17  Do whatever you want.  Let him
18  answer your questions.
19         MR. PIFKO:  I'm trying to
20  ask him, but he's not letting me
21  ask questions, because he's
22  talking about and giving speeches.
23         MR. NICHOLAS:  He's not
24  letting you answer questions

Page 165

1  because he is answering questions.
2          MR. PIFKO:  He's talking
3  about things I'm not asking him.
4          MR. NICHOLAS:  You're just
5  arguing.  Go ahead.
6  BY MR. PIFKO:
7      Q.   You said -- I'm reading from
8  the transcript -- By not having diversion
9  occurring within the distribution center,
10  then that's how we impact the health and
11  general welfare of the public.
12         Agreed?
13     A.   That's what I said.
14     Q.   Okay.  And so my question
15  is, if diversion does occur, then that
16  could have an adverse impact on the
17  health and welfare of the public.
18         Do you agree?
19         MR. NICHOLAS:  Object to the
20  form.  You really are arguing.
21         Go ahead.
22         THE WITNESS:  If there's
23  diversion occurring -- I mean,
24  that's the reason why we have

Christopher Zimmerman (AmerisourceBergen)

Page 166

1     controls in place, to protect and
2     to guard against diversion.
3          If a diversion occurs, then
4     that would have an impact.
5   BY MR. PIFKO:
6     Q.   Thank you.
7          Let's go to the second page
8   of the letter, ABDCMDL 00269692.
9          Are you on that page?
10    A.   Yes.
11    Q.   I want to read you a section
12  from the second paragraph there; second
13  paragraph, second sentence.
14         Moreover, all registrants,
15  manufacturers, distributors, pharmacies
16  and practitioners share responsibility
17  for maintaining appropriate safeguards
18  against diversion.
19         Do you agree with that
20  statement?
21    A.   Yes.
22    Q.   It says, a little bit
23  further down, Given the extent of
24  prescription drug abuse in the United

Page 167

1   States, along with the dangerous and
2   potentially lethal consequences of such
3   abuse, even just one distributor that
4   uses its DEA registration to facilitate
5   diversion can cause enormous harm.
6          Do you agree with that
7   statement?
8          MR. NICHOLAS:  I'll object
9     to the form.  And ask if you're
10    going to read portions of this
11    paragraph, that you read the first
12    sentence of the paragraph as well.
13         THE WITNESS:  I don't know
14    the answer to your question.
15    Because -- I don't know.
16  BY MR. PIFKO:
17    Q.   Let's go down a little bit
18  further toward the third-to-last
19  paragraph.
20         In addition -- it says,
21  Thus, in addition to reporting all
22  suspicious orders, a distributor has a
23  statutory responsibility to exercise due
24  diligence to avoid filling suspicious

Page 168

1   orders that might be diverted into
2   other-than-legitimate medical,
3   scientific, and industrial channels.
4          Do you see that?
5     A.   I do.
6     Q.   Do you agree with that
7   statement?
8          MR. NICHOLAS:  Object to the
9     form.
10         THE WITNESS:  Given the --
11    no, I don't agree.
12  BY MR. PIFKO:
13    Q.   And what's the basis for
14  your disagreement?
15    A.   Because up until this
16  letter, all of our interactions with DEA
17  and our consultations and meetings and
18  presentations, there had never been any
19  indication, up until this time, that we
20  were to avoid filling suspicious orders.
21  It's the first time I've seen that
22  statement.
23    Q.   Let's go to the third page,
24  ABDCMDL 00269693.  Tell me when you're

Page 169

1   there.
2     A.   Yes.
3     Q.   Do you see the heading at
4   the top is, Circumstances That Might Be
5   Indicative of Diversion?
6          Do you see that?
7     A.   Yes.
8     Q.   It's got a list of four
9   items.
10         Do you see that?
11    A.   Yes.
12    Q.   Do you believe that the DEA
13  communicated this information to you?
14         MR. NICHOLAS:  Object to the
15    form.
16         THE WITNESS:  In this
17    letter?  We received this letter,
18    yes.
19  BY MR. PIFKO:
20    Q.   And then there's another
21  paragraph with ten items.
22         Do you see that?
23    A.   Yes.
24    Q.   Do you believe that the DEA

Christopher Zimmerman (AmerisourceBergen)

Page 170

1 communicated this information to you?
2          MR. NICHOLAS:  Object to the
3     form.
4          THE WITNESS:  In -- with
5     this letter, yes.
6          - - -
7          (Whereupon, Amerisource
8     Bergen-Zimmerman Exhibit-7,
9     ABDCMDL 00000101-122, was marked
10    for identification.)
11         - - -
12 BY MR. PIFKO:
13    Q.   I'm handing you what has
14 been marked as Exhibit-7.
15         Please take a moment to
16 review this document and let me know when
17 you're done.
18         For the record, it's Bates
19 labeled ABDCMDL 00000101 through 122.
20         Let me know when you're done
21 reviewing the document, sir.
22    A.   Okay.
23    Q.   Have you seen this document
24 before?

Page 171

1    A.   I don't know if I've seen
2 this exact document, but I've seen
3 presentations that have this material in
4 them.
5    Q.   When you say that, what do
6 you mean by that?
7          MR. NICHOLAS:  Object to the
8     form.
9          THE WITNESS:  I'm saying
10    that many of these slides in here
11    look familiar.  I don't know if
12    I've seen this exact presentation.
13 BY MR. PIFKO:
14    Q.   Okay.  You say you've seen
15 some of the slides but maybe not all of
16 the slides, or do you think you've seen
17 all of the slides?
18         MR. NICHOLAS:  Object to the
19    form.
20         THE WITNESS:  I think
21    I've -- I can't say I've seen
22    every single slide, but I'm
23    familiar with the information.
24 BY MR. PIFKO:

Page 172

1    Q.   Do you have any reason to
2 dispute that this is a document from
3 AmerisourceBergen's files?
4    A.   No.
5    Q.   Do you dispute that this is
6 a true and correct copy of what was in
7 this document?
8    A.   I don't know that, because
9 I'm not familiar with this presentation.
10   Q.   You just took some time to
11 review the presentation, correct?
12   A.   Yes.
13   Q.   The title of the
14 presentation, on the first page, is, ABC
15 Diversion Control Program, Effective June
16 25, 2007.
17        Do you see that?
18   A.   Yes.
19   Q.   You're familiar with the
20 changes that AmerisourceBergen made to
21 its diversion control program as a result
22 of the settlement with the DEA, correct?
23   A.   Correct.
24   Q.   Does this reflect changes

Page 173

1 that were made to the policy as a result
2 of that settlement?
3          MR. NICHOLAS:  Object to the
4     form.
5          THE WITNESS:  Yes, I believe
6     so.
7 BY MR. PIFKO:
8    Q.   Having reviewed this
9 document, do you believe this document
10 discusses the nature of
11 AmerisourceBergen's program as of June
12 25th, 2007?
13         MR. NICHOLAS:  Object to the
14    form.
15         THE WITNESS:  I believe so.
16 BY MR. PIFKO:
17    Q.   Do you know who Steve Mays
18 is?
19   A.   Yes.
20   Q.   Is he someone that works
21 under you?
22   A.   Yes, he does.
23   Q.   Does he still work at the
24 company?

Page 174

1   A.   He does.
2   Q.   His title at this time is
3 senior director, corporate security and
4 regulatory affairs.
5       Do you see that?
6   A.   Yes.
7   Q.   When he was in that title,
8 he reported to you?
9   A.   Yes.
10   Q.   Was he a direct report to
11 you at this time?
12   A.   He was.
13   Q.   Did you instruct him to give
14 presentations about AmerisourceBergen's
15 diversion control program as it was
16 changed from the DEA settlement?
17   A.   He did presentations, yes.
18   Q.   Do you know to whom he did
19 presentations?
20   A.   I don't know specifically.
21   Q.   You said you've seen
22 versions of this document.
23       Do you believe this was
24 something that would have been presented

Page 175

1 to people inside the company?
2       MR. NICHOLAS:  Object to the
3   form.  Mischaracterizes the
4   testimony.
5       THE WITNESS:  It doesn't say
6   who this was actually presented
7   to.  So I don't know.
8 BY MR. PIFKO:
9   Q.   Let's go to the first page
10 of the document here.  It says,
11 Regulatory responsibility.
12       Do you see that?
13   A.   Yes.
14   Q.   Have you seen this slide
15 before?
16   A.   I understand -- I don't know
17 if I've seen this slide.  But, yes, I've
18 seen a slide that has this information on
19 it, yes.
20   Q.   Can you tell me what this
21 is?
22       MR. NICHOLAS:  Object to the
23   form.
24       THE WITNESS:  It's just a

Page 176

1 statement of the CFR1301.71.
2 BY MR. PIFKO:
3   Q.   It's a statement of
4 AmerisourceBergen's regulatory
5 responsibility under this provision; is
6 that correct?
7       MR. NICHOLAS:  Object to the
8   form.
9       THE WITNESS:  It's the
10   statement of -- for all
11   distributors.  It's 1301.71(a).
12 BY MR. PIFKO:
13   Q.   I'm not trying to trick you
14 into something.
15       I'm just asking, is it your
16 understanding that 1301.71(a) applies to
17 AmerisourceBergen?
18       MR. NICHOLAS:  Object to the
19   form.
20       Go ahead.
21       THE WITNESS:  It does apply
22   to AmerisourceBergen as a
23   registrant.
24 BY MR. PIFKO:

Page 177

1   Q.   And it says, All applicants
2 and registrants shall provide effective
3 controls and procedures to guard against
4 theft and diversion of controlled
5 substances.
6       Do you see that?
7   A.   Yes.
8   Q.   Do you agree that's what it
9 says?
10   A.   That's what it says.
11   Q.   And you agree that's a
12 regulatory responsibility that
13 AmerisourceBergen has?
14   A.   Yes.
15   Q.   Let's go to the next page.
16 It says, How?
17       Do you see that?
18   A.   Yes.
19   Q.   Do you have an
20 understanding, then, this is how
21 AmerisourceBergen is supposed to carry
22 out its responsibility to provide
23 effective controls and procedures to
24 guard against theft and diversion of

Page 178

1  controlled substances?
2        MR. NICHOLAS:  Object to the
3     form.
4        THE WITNESS:  It appears
5     that it lists the different
6     elements under that section and
7     states the relating Code of
8     Federal Regulation's section and
9     how companies may -- again, I
10    don't know who this was to,
11    whether it was internally, to
12    distributors.  I'm not sure who
13    the customer was of the
14    presentation.
15        But it's just reiterating
16    items that fall underneath each of
17    the CFR sections.
18 BY MR. PIFKO:
19    Q.   Do you believe -- or do you
20 have an understanding that
21 AmerisourceBergen has a responsibility to
22 comply with the CFR sections identified
23 here?
24        MR. NICHOLAS:  Object to the

Page 179

1     form.
2        THE WITNESS:  These are
3     sections that we -- that fall
4     under the distributor
5     requirements, yes.
6 BY MR. PIFKO:
7    Q.   And do you believe that they
8 apply to AmerisourceBergen?
9    A.   Yes.
10    Q.   Under CFR1301.74 -- do you
11 see that at the bottom?
12    A.   Yes.
13    Q.   It says -- for all the other
14 ones above, it says a statement of the
15 regulation with a short summary, and it
16 says, No problem.
17        Do you see that?
18    A.   I'm sorry, where?
19    Q.   If you look at each
20 regulation, it's got a number, a bold
21 heading, a subject of that, and then it
22 has a brief summary of it.
23        Do you see that?
24    A.   Yes.

Page 180

1    Q.   And afterwards it says, No
2 problem.
3        Let's look at the first one.
4    A.   Yes.
5    Q.   Physical security controls.
6 No problem.
7        Do you see that?
8    A.   Yes, I see that.
9    Q.   Records and reports of
10 registrants.  No problem.
11        Do you see that?
12    A.   Yes.
13    Q.   Orders for filling -- for
14 Schedule I and II controlled substances.
15 No problem.
16        Do you see that?
17    A.   Yes.
18    Q.   Other security controls-make
19 a good faith inquiry; report suspicious
20 orders; report significant losses.  Gray
21 area.
22        Do you see that?
23    A.   Yes.
24    Q.   Do you have an understanding

Page 181

1 about what it means by "gray area"?
2    A.   I think what they're
3 referring to, under these regulations,
4 are -- say 1301.72, physical security
5 controls, that the DEA has been very
6 specific.
7        So vaults need to have
8 poured-in-place concrete, 8 inches thick,
9 half-inch rebar, 6 inches on center.  And
10 cages have to be developed of 10-gauge
11 steel.  Openings can't be more than 2.5
12 inch diameter across.  The structure has
13 to be built on 6-inch -- 1-inch posts
14 with 6 inches apart.  They're very
15 specific.
16        With regards to reports, it
17 explains exactly how often you have to do
18 inventories, how to annotate it.  It's
19 black-and-white.
20        And then also with the
21 schedule order 222 forms, it states that
22 you can't complete a line that has any
23 alterations.  It's very black-and-white.
24        And when it gets to

Christopher Zimmerman (AmerisourceBergen)

Page 182

1 reporting suspicious orders, it's very --
2 a gray area, because it's not
3 black-and-white.  It doesn't say over
4 five or less than four.  And with
5 significant losses, there's no
6 definition.  Is it a thousand?  Is it
7 one?  Is it five?  Is it 10,000?
8         So that's, I believe, I
9 don't want to speak for Steve Mays, but I
10 believe that's the inference, is that DEA
11 has been very diligent about laying out
12 responsibilities, black-and-white,
13 through all these requirements, and then
14 this one area is -- they're not very
15 specific at all.  It's very open-ended.
16         If that makes sense.
17         Q.   Let's go to the next page.
18         It's got another CFR section
19 here -- well, actually, the one we were
20 just talking about, part of it.
21         Do you see that?
22         A.   Yes.
23         Q.   It says, The registrant
24 shall design and operate a system to

Page 183

1 disclose to the registrant suspicious
2 orders of controlled substances.  The
3 registrant shall inform field diversion
4 office of the administration in his area
5 of suspicious orders when covered by the
6 registrant.
7         Do you see that?
8         A.   Yes.
9         Q.   Do you agree that that's a
10 regulatory responsibility that
11 AmerisourceBergen has?
12         MR. NICHOLAS:  Object to the
13         form.
14         But go ahead.
15         THE WITNESS:  Yes.
16 BY MR. PIFKO:
17         Q.   Let's go to the next page.
18         Are we there?
19         A.   Yes.
20         Q.   Okay.  Again, it says,
21 Regulatory responsibility.  It's got
22 three bullet points.
23         The first one says,
24 Reporting suspicious orders to DEA does

Page 184

1 not relieve the distributor of the
2 responsibility to maintain effective
3 controls to prevent diversion.
4         Do you see that?
5         A.   Yes.
6         Q.   Do you have an understanding
7 about what that means?
8         MR. NICHOLAS:  Object to the
9         form.
10         THE WITNESS:  That you can't
11         just have a system that has --
12         that reports suspicious orders and
13         not have -- not have effective
14         controls in all the other areas we
15         just mentioned.  It doesn't
16         relieve your responsibility to
17         maintain effective controls.
18 BY MR. PIFKO:
19         Q.   Right.  So just reporting a
20 suspicious order doesn't discharge your
21 responsibility under The Controlled
22 Substances Act, correct?
23         A.   For recordkeeping, all those
24 other ones we kind of just went through.

Page 185

1 They are all grouped under the same
2 section, effective controls to prevent
3 diversion, 1301.  All of these are in
4 1301.
5         So just doing one of 1301,
6 74, doesn't relieve you of all the other
7 items under 1301.71.
8         Q.   The next bullet point says,
9 DEA cannot/will not tell a distributor if
10 an order is or is not legitimate; and/or
11 if the distributor should or should not
12 ship an order.
13         Do you see that?
14         A.   Yes.
15         Q.   Is that consistent with your
16 understanding of the DEA's position?
17         A.   Yes.  At the time of this
18 presentation, yes.
19         Q.   Then it says, Distributor
20 must make a business decision whether or
21 not to ship the order.
22         Do you see that?
23         A.   Yes.
24         Q.   What does that mean?

Christopher Zimmerman (AmerisourceBergen)

Page 186

1    A.  That was the discussion in
2 our negotiations with DEA, is that you
3 have to make a business decision whether
4 you want to complete the transaction.
5 It's up to the business to make that
6 decision.
7    Q.  What's a business -- what's
8 a business decision mean?
9      MR. NICHOLAS: Objection.
10 Object to the form. You're asking
11 him what the DEA meant by
12 "business"?
13      MR. PIFKO: I didn't ask him
14 that. You're telling him what to
15 say. Stop doing that.
16      THE WITNESS: The
17 business -- the decision is based
18 upon the information you have and
19 whether -- again, this talks --
20 this isn't talking about shipping
21 a suspicious order, this is
22 talking about shipping an order.
23    So if a customer has a
24 patient need that they need to

Page 187

1 fulfill, then we need to make a
2 decision whether we ship that
3 product or not. It's our decision
4 whether we ship the product. It's
5 not the DEA's decision.
6 BY MR. PIFKO:
7    Q.  Is AmerisourceBergen a
8 for-profit business?
9    A.  We are a business that makes
10 profit, yes.
11    Q.  You don't understand this
12 bullet point to be referring to
13 suspicious orders?
14      MR. NICHOLAS: Object to the
15 form.
16      THE WITNESS: No, it's not
17 in reference to suspicious orders
18 at all.
19 BY MR. PIFKO:
20    Q.  It's just saying the
21 distributor can decide whether to ship
22 any order that it is presented with?
23    A.  Correct.
24    Q.  And you say that the DEA

Page 188

1 told you this?
2    A.  If you go to the one above
3 it, DEA will not tell a distributor you
4 should or should not ship an order.
5    There's nothing about
6 suspicious order in that statement.
7    And then the second one is
8 we have to -- we have to make a decision
9 on what orders we ship and which orders
10 we do not ship. We also have to make a
11 decision which orders are suspicious and
12 we need to report.
13    Q.  You said earlier, just a few
14 moments ago, that was the discussion in
15 our negotiations with DEA, is that you
16 have to make a business decision whether
17 to -- you want to complete the
18 transaction.
19    Do you recall saying that?
20      MR. NICHOLAS: I'll object
21 to this. I'll object to the
22 practice of apparently trying to
23 cross-examine Mr. Zimmerman with
24 testimony he's given in this

Page 189

1 deposition.
2    This is a 30(b)(6). You're
3 supposed to be seeking
4 information.
5    THE WITNESS: I would need
6 to read two or three questions
7 before that and after to
8 understand the context of my
9 statement. You're reading a
10 statement. I'm not sure --
11 BY MR. PIFKO:
12    Q.  All I'm asking you --
13    A.  -- the back-and-forth.
14    Q.  -- do you recall saying the
15 discussion in our -- that was the
16 discussion in our negotiations with DEA,
17 is that you have to make a business
18 decision whether you want to complete the
19 transaction?
20    A.  And what was the question?
21    Q.  What I want to know is, what
22 discussions did you have with the DEA
23 about making business decisions about
24 completing transactions?

Christopher Zimmerman (AmerisourceBergen)

Page 190

1 MR. NICHOLAS: Object to the
2 form.
3 Go ahead.
4 THE WITNESS: And so you
5 asked me what our discussion is
6 about making transactions, and my
7 response was it's our decision.
8 Yes, I said that.
9 BY MR. PIFKO:
10 Q. So you said that you
11 discussed this business decision in your
12 negotiations with DEA.
13 MR. NICHOLAS: Object to the
14 form.
15 THE WITNESS: I said --
16 MR. NICHOLAS: This is
17 cross-examination.
18 Go ahead.
19 THE WITNESS: If there's
20 confusion, I said that came --
21 that was brought up by DEA. It
22 wasn't brought up by ABC.
23 That was -- that business
24 decision context is, you can find

Page 191

1 previous DEA presentations where
2 they make that statement. That
3 isn't an ABC term. That was a DEA
4 term. Just to clarify the record.
5 BY MR. PIFKO:
6 Q. That's what I'm trying to
7 get at.
8 A. Okay. Thanks.
9 Q. Is -- so it's your testimony
10 that the DEA told you that you must make
11 a business decision whether or not to
12 ship an order?
13 MR. NICHOLAS: Objection.
14 Object to the form.
15 THE WITNESS: They stated,
16 their terms, not mine, that the
17 business -- it's up to the
18 companies to make a business
19 decision of what they ship and
20 what they don't ship. They are
21 not going to tell a distributor
22 what you can ship and what you
23 can't ship, which refers back to
24 the bullet above, the one about

Page 192

1 the business decision.
2 BY MR. PIFKO:
3 Q. And when did they tell you
4 that? You said in your negotiations?
5 A. In negotiations in 2007.
6 Q. And they made a presentation
7 to you?
8 A. In 2005.
9 Q. And they used that exact
10 language, the business decision, that's
11 in quotes?
12 A. I believe so. I believe so.
13 Q. Do you have a copy of that
14 presentation that you believe that DEA
15 made to you in your office somewhere?
16 A. We may have it somewhere,
17 yes.
18 Q. Did you make any attempts to
19 look for it?
20 MR. NICHOLAS: Objection.
21 We're making productions as we're
22 required to do in this case.
23 THE WITNESS: Is there a
24 question?

Page 193

1 BY MR. PIFKO:
2 Q. I asked if you made any
3 attempt to look for that document?
4 A. No, I did not.
5 Q. Is that something -- you
6 said you might have that in your office
7 somewhere?
8 A. I won't have -- no, I don't
9 have that in my office. We may have it
10 on file or in storage or something. It's
11 from years ago.
12 MR. NICHOLAS: Again, just
13 in case there's any implication on
14 the record that we haven't
15 produced something we were
16 supposed to produce.
17 MR. PIFKO: Again, the
18 speaking -- I got it. There's no
19 implication. The record is what
20 it is.
21 MR. NICHOLAS: Good. That's
22 all I want to hear. There's no
23 implication. That's fantastic
24 news.

Christopher Zimmerman (AmerisourceBergen)

Page 194

1    Go ahead.
2  BY MR. PIFKO:
3    Q.   Was anyone else present at
4  this presentation that you're referring
5  to?
6    A.   Steve Mays.
7    Q.   And who specifically from
8  the DEA was there?
9    A.   I was not there.  I
10 believe -- I believe Mike Mapes.
11   Q.   Anyone else?
12   A.   I don't know, because I
13 wasn't there.
14   Q.   Did you undertake any
15 effort, in connection with preparing for
16 this deposition, to learn about
17 communications with the DEA that might
18 have occurred?
19   A.   In what context?
20   Q.   Concerning The Controlled
21 Substances Act.
22       MR. NICHOLAS:  Object to the
23   form.
24       THE WITNESS:  I'm not

Page 195

1    understanding your question.  I'm
2    sorry.
3  BY MR. PIFKO:
4    Q.   I'm just asking if you tried
5  to learn about the company's
6  communications with the DEA in connection
7  with preparing for this deposition.
8    A.   Yes.
9    Q.   Did you ask anyone about
10 that meeting that we were just talking
11 about where Steve Mays and maybe Mike
12 Mapes was there?
13   A.   I think --
14       THE WITNESS:  Is that a
15   legal question?
16       MR. NICHOLAS:  To the extent
17   this question invades the
18   attorney-client privilege, don't
19   answer it.  I'll instruct you not
20   to answer it.
21 BY MR. PIFKO:
22   Q.   All I'm asking is if you
23 asked anyone other than counsel about
24 this meeting where -- in 2005 between

Page 196

1  Steve Mays and maybe Mike Mapes from the
2  DEA?
3        MR. NICHOLAS:  If you can
4    answer that and it doesn't involve
5    attorney-client communications,
6    that's fine.  If not, please don't
7    answer.
8        THE WITNESS:  I can't
9    answer.
10 BY MR. PIFKO:
11   Q.   So the only conversations
12 you may have had about this meeting
13 were -- involved counsel?
14       MR. NICHOLAS:  I'm going to
15   instruct him not to answer.
16 BY MR. PIFKO:
17   Q.   You're unable to answer any
18 questions about inquiries about this
19 meeting based on the attorney-client
20 privilege; is that correct?
21       MR. NICHOLAS:  I'll instruct
22   him not to answer.  I'm
23   instructing him not to answer.  He
24   doesn't have to answer questions

Page 197

1    about this.
2        MR. PIFKO:  I'm trying to
3    understand the privilege that's
4    being asserted here.
5        MR. NICHOLAS:  It's the
6    attorney-client privilege.
7        MR. PIFKO:  So the witness
8    is being instructed not to answer
9    any questions about efforts he
10   undertook to learn about this
11   meeting; is that correct?
12       MR. NICHOLAS:  No, not at
13   all.
14       MR. PIFKO:  That's what I'm
15   trying to understand.  So I'm
16   asking the witness --
17       MR. NICHOLAS:  If the
18   witness undertook any efforts
19   in -- at the direction of or, you
20   know, in conjunction with attorney
21   communications, then I'm only
22   instructing him to answer in that
23   respect.
24 BY MR. PIFKO:

Page 198

1    Q.   Aside from any efforts at
2  the direction of counsel or in
3  conjunction with an attorney, did you
4  engage in any efforts to learn about this
5  DEA meeting between Steve Mays and Mike
6  Mapes in 2005?
7    A.   No.
8    Q.   You don't know if anyone
9  else was present besides the two of them?
10   A.   I don't know.
11   Q.   Let's go to the next page.
12      MR. NICHOLAS:  For planning
13   purposes, purely a scheduling
14   thing, after you get through this
15   document --
16      MR. PIFKO:  We'll take a
17   break.
18      MR. NICHOLAS:  For lunch or
19   a short break, whatever you
20   prefer.
21  BY MR. PIFKO:
22   Q.   I'm on ABDCMDL 0000106.
23      Are you there?
24   A.   Yes.

Page 199

1    Q.   It says, ABCD -- sorry.
2  ABC's diversion control program.  It's
3  got some bullet points here.
4      Are you familiar with these?
5    A.   Yes.
6    Q.   "Know your customer" due
7  diligence.
8      Know your customer is in
9  quotes.
10      What does that mean?
11      MR. NICHOLAS:  Object to the
12   form.
13      THE WITNESS:  Through our --
14   in our negotiations, as I
15   indicated, that one of the changes
16   that we enhanced in our program
17   was a, as it's in quotes, "know
18   your customer" due diligence
19   process that we added.
20  BY MR. PIFKO:
21   Q.   And what does it mean to
22  know your customer?
23   A.   So part of --
24      MR. NICHOLAS:  Object to the

Page 200

1  form.
2      Go ahead.
3      THE WITNESS:  So part of our
4  agreement was to, we created a
5  questionnaire that would be
6  completed by the customer and our
7  sales individual, which included,
8  you know, questions about the
9  pharmacy, the pharmacist in
10  charge, prior history, those type
11  of questions.
12      And then also it included
13  pictures of the inside and the
14  outside of the facility.  And then
15  we would take that 590 form back
16  to CSRA, and they would then
17  verify the information, do some
18  checks on the pharmacy and the
19  pharmacist in charge in order to
20  know our customer, in addition to
21  verification of the licenses.
22  BY MR. PIFKO:
23   Q.   At what point in the process
24  was this Form 590 used --

Page 201

1      MR. NICHOLAS:  Object to the
2  form.
3  BY MR. PIFKO:
4    Q.   -- in connection with the
5  customer relationship?
6    A.   It was used prior to
7  onboarding the customer, after 2000 --
8  after June 2007.
9    Q.   Okay.
10   A.   Yeah, 2007.
11   Q.   So after June 25th, 2007,
12  AmerisourceBergen implemented this Form
13  590 "know your customer" program for all
14  new customers?
15   A.   Yes.
16   Q.   What about for existing
17  customers who are already customers as of
18  June 25th, 2007, do they have an
19  obligation to fill out a Form 590?
20   A.   No.  And that was done --
21  that was part of the negotiation process
22  with DEA, that any customer, moving
23  forward, needed this "know your customer"
24  process implemented.

Page 202

1    Q.   And so it's your
2  understanding that there was no "know
3  your customer" requirement for existing
4  customers as of June 25th, 2007?
5        MR. NICHOLAS:  Object to the
6  form.
7        THE WITNESS:  So prior -- I
8     mean, the regulation requires a
9     good faith inquiry that they're
10    properly licensed, and we did
11    that.  We ensured that all
12    pharmacies were licensed by both
13    DEA and any state regulatory
14    authorities prior to that; in
15    addition to the other information
16    obtained from a customer, credit
17    information, that type.
18  BY MR. PIFKO:
19    Q.   So other than credit
20  information and, as you say, a good faith
21  inquiry that they're properly licensed,
22  there was no other "know your customer"
23  requirements for existing customers as of
24  June 25th, 2007?

Page 203

1        MR. NICHOLAS:  Object to the
2     form.  I'm not sure that was his
3     testimony.
4        Go ahead.
5        THE WITNESS:  So as I
6     stated, the "know your" -- the
7     big -- the "know your customer"
8     due diligence process was an
9     addition to the 590 questionnaire.
10    And we had sales individuals that
11    would go to the facility before we
12    opened them up, of course, and
13    then collect, as I indicated, the
14    credit information, the licensing
15    information.  And that was -- that
16    was pretty much the process prior
17    to 2007.
18  BY MR. PIFKO:
19    Q.   And it's the sales
20  associate's job to obtain the information
21  about the customer?
22    A.   I'm not -- are you
23  referencing the 590 or are we talking
24  about pre --

Page 204

1    Q.   Pre 2007.
2    A.   Pre it was my department's
3  responsibility to collect the licensing
4  information and maintain, through
5  systems, an auditing function, to ensure
6  that the customers retained their license
7  and that they were scheduled in the
8  appropriate schedules, II, III, IV and V
9  that we talked about, and ensure that we
10  were properly loaded and maintained.
11    Q.   And then post June 25th,
12  2007, it was the sales associates'
13  responsibility to fill out the Form 590
14  based on information from the customer?
15        MR. NICHOLAS:  Object to the
16    form.
17        THE WITNESS:  They would, in
18    conjunction with the customer,
19    complete the information on the
20    form.  And then they would provide
21    that to my department.
22        And we would do all the
23    verification and background
24    information and due diligence

Page 205

1     prior to opening the account.  So
2     the salesperson was merely there
3     to collect the information, and
4     then my group would verify that.
5  BY MR. PIFKO:
6    Q.   What efforts did you take to
7  verify that information?
8    A.   So we would go on state
9  Board of Pharmacy sites; we would, you
10  know, ensure that the pharmacist was
11  properly licensed; we would look at
12  enforcement action or history, DEA
13  history, if they had any.  And those type
14  of things.
15    Q.   Anything else?
16        MR. NICHOLAS:  Object to the
17    form.
18        Go ahead.
19        THE WITNESS:  I'm sure there
20    was a lot more.  That's -- off the
21    top of my head, and that's what we
22    did.
23  BY MR. PIFKO:
24    Q.   You can't think of anything

Christopher Zimmerman (AmerisourceBergen)

Page 206

1 else, sitting here today?
2        MR. NICHOLAS: Object to the
3 form. He just told you.
4        MR. PIFKO: You have to stop
5 this, he just told you. You can
6 object. You can say your
7 objection. But you can't tell him
8 stuff. You keep doing that. It's
9 improper.
10        MR. NICHOLAS: I don't keep
11 doing it. But sometimes I get a
12 little exacerbated, because I
13 think you're being unfair to the
14 witness.
15        THE WITNESS: That's what I
16 remember.
17 BY MR. PIFKO:
18    Q.   That's all you remember?
19    A.   At the moment, yes.
20    Q.   After filling out this form,
21 was there any ongoing responsibility of
22 the sales associate to obtain "know your
23 customer" information about
24 AmerisourceBergen's customers?

Page 207

1    A.   Not in the -- in the sense
2 that they regularly visit their customers
3 and that relationship, but not from a
4 regulatory standpoint.
5    Q.   How about anyone else at the
6 company; did anyone else at the company
7 undertake an effort to know your
8 customer, perform "know your customer"
9 due diligence after the Form 590 was
10 filled out?
11        MR. NICHOLAS: Object to the
12 form.
13        THE WITNESS: I guess I'm
14 not understanding your question.
15        The "know your customer" due
16 diligence process was for the
17 onboarding of new customers. Once
18 they were onboarded, they were
19 treated like -- I mean, they were
20 customers. So there wouldn't be
21 ongoing diligence; there could be,
22 depending upon the activity of the
23 customer.
24 BY MR. PIFKO:

Page 208

1    Q.   Well, that's what I'm trying
2 to understand.
3        So you're saying different
4 things, and we're going to -- I'm going
5 to ask you so we get an understanding.
6        You just said the "know your
7 customer" due diligence process was for
8 the onboarding of new customers. But
9 then you said once they were onboarded,
10 they were treated -- there was --
11 depending on the activity.
12        So I'm just trying to
13 understand. This "know your customer"
14 due diligence, this is just a process for
15 onboarding new customers; is that
16 correct?
17    A.   Correct. At this time, in
18 2007.
19    Q.   At any time after 2007 was
20 there an expansion of the "know your
21 customer" due diligence process beyond
22 the onboarding of a new customer?
23    A.   It continually changed over
24 time and enhanced. The form would -- you

Page 209

1 know, we would add more information as we
2 went. So as we gained more information
3 and knowledge, we would -- the form would
4 change. So it did change over time.
5        And then there was ongoing
6 due diligence of the customers, I think
7 is what you were getting at.
8    Q.   And what kind of ongoing due
9 diligence was there? Let's be specific
10 about what time periods we're talking
11 about.
12        So in June 25, 2007, what
13 ongoing due diligence was conducted by
14 AmerisourceBergen of its customers?
15    A.   So that would almost
16 probably fall under the investigations
17 bucket, depending upon the activity of
18 the customer, whether they wanted
19 changes, whether they were, you know,
20 being changed in the program, whether
21 they were increasing sales or changing
22 areas of service, we may have to do
23 additional due diligence on those
24 customers to support whatever activity

Christopher Zimmerman (AmerisourceBergen)

Page 210

1  was occurring.
2      Q.   Who would be responsible for
3  performing that due diligence?
4      A.   That would be the diversion
5  control folks.
6      Q.   And when you say they wanted
7  changes, what kind of changes do you
8  mean?  Like changes to their thresholds?
9      A.   That could be one.  If they
10 took on new business, if they took on a
11 new nursing home that required additional
12 prescriptions that were going to be
13 flowing through the customer; whatever
14 things could impact their business.
15     Q.   Any other types of things,
16 like when you talk about changes that a
17 customer would request, that you're
18 referring to?
19         MR. NICHOLAS:  Object to the
20     form.
21         THE WITNESS:  I mean,
22     there's a whole host of things
23     that could go into whether they
24     required due diligence.  Whether

Page 211

1      they had -- you know, if there was
2      an issue, if we had a suspicious
3      order being reported, we may
4      perform additional due diligence.
5      There's a whole host of
6      other things that could occur that
7      would create due diligence.
8  BY MR. PIFKO:
9      Q.   And this is as of June 25th,
10 2007?
11     A.   This was -- yes, this is the
12 program that we rolled out.
13     Q.   But I'm talking about this
14 due diligence that you were just talking
15 about.
16     A.   Yes.
17     Q.   That's effective as of that
18 time period?
19     A.   Yes.
20     Q.   Okay.  At any point in time
21 later, up to the end of 2014, was there
22 changes to -- additional layers of due
23 diligence that the company added?
24         MR. NICHOLAS:  Well, I'll

Page 212

1  object to the form.  There's been
2  testimony on this.
3          Go ahead.
4          THE WITNESS:  I mean, the
5      due diligence didn't stop.  I
6      mean, it continued whether --
7      depending on what the issues were,
8      and it's still in place today.
9  BY MR. PIFKO:
10     Q.   I guess what I'm trying to
11 get at is whether there were any specific
12 articulated, expressed policies
13 concerning due diligence that were added
14 after June 25th, 2007.
15         MR. NICHOLAS:  Object to the
16     form.  We're talking now between
17     2007, 2014, right?
18         MR. PIFKO:  Correct.
19         THE WITNESS:  I don't know.
20 BY MR. PIFKO:
21     Q.   Let's go to the next page.
22         MR. NICHOLAS:  It's a longer
23     document than I thought, so I may
24     ask to take a break before you get

Page 213

1      through it.
2          MR. PIFKO:  I'm not going to
3      go through the entire history.  I
4      only have a couple more pages I
5      want to ask about.
6  BY MR. PIFKO:
7      Q.   ABDCMDL 0000107.
8          Are you there?
9      A.   Yes.
10     Q.   This page provides some
11 additional discussion of the Form 590 you
12 were just talking about and the "know
13 your customer" due diligence.
14         Do you see that?
15     A.   Yes.
16     Q.   It says, Retail chain
17 pharmacies are exempted.
18         Do you see that?
19     A.   Yes.
20     Q.   What does that mean?
21         MR. NICHOLAS:  Object to the
22     form.
23         If you know.
24         THE WITNESS:  So part of our

Christopher Zimmerman (AmerisourceBergen)

Page 214

1  negotiations with DEA, as we were
2  developing this new, enhanced
3  program, was who would this apply
4  to. And they exempted retail
5  chain pharmacies, I believe it
6  was, over ten. There was a number
7  that constituted chain. And that
8  was during the negotiation process
9  with DEA.
10 BY MR. PIFKO:
11     Q.   And so the DEA told
12 AmerisourceBergen that they could exempt
13 them from this process?
14     A.   Yes.
15     Q.   Was that in writing?
16     A.   That was the program we
17 developed. That was the program they
18 reviewed before they released our
19 license. They went out and audited five
20 of our facilities and inspected our
21 program and processes and our 590 forms,
22 and they gave us our license back.
23     Q.   Were there any meetings at
24 which you participated with DEA where

Page 215

1  that was discussed?
2     A.   Yes.
3     Q.   Was there more than one?
4     A.   So during this process of
5  April, when we had our first immediate
6  suspension order, through August, there
7  was a negotiation process where I was
8  down there almost once a week with DEA
9  talking about the enhancements that they
10 would like us to put into our programs.
11         And it was a back-and-forth
12 and a negotiation. And we talked about
13 the thresholds, we talked about due
14 diligence. And we would provide the form
15 that we proposed and we would go back and
16 forth, add this, delete this, this.
17 Should it apply to hospitals? Should it
18 apply to retail? What about chains?
19         All of that was discussed
20 because they wanted to get this right out
21 of the gate. So there's a lot of
22 discussion.
23         And once we came up with an
24 acceptable program, they said, okay, from

Page 216

1  June until August, we want you to
2  implement the program and then we're
3  going to come in and audit you. We'll
4  give you a two-month run to make sure
5  you're completing your processes. And if
6  it's acceptable, after we do five
7  inspections at your facilities and your
8  corporate headquarters, then we will
9  release you.
10         So there was a lot of
11 meetings and a lot of discussions around
12 a lot of these -- a lot of these points.
13     Q.   Did you have an
14 understanding as to why retail chain
15 pharmacies, as you said, of ten or more,
16 were exempted from this requirement?
17     A.   Because at the time, the
18 issue was a lot was around Internet
19 pharmacies. And part of the 590 form, in
20 addition to the pharmacists in charge,
21 they also wanted ownership information.
22         So a lot of the due
23 diligence was around who owned the
24 pharmacy. And it was a process. They

Page 217

1  figure chains are a corporate entity,
2  they're all owned by -- so a lot of the
3  information really didn't apply. And
4  that was a lot of the discussion of why
5  the chains were exempted.
6     Q.   Any other aspects that you
7  can recall about why chains were
8  exempted?
9     A.   Not that I can remember.
10     Q.   Let's go to Page, only two
11 more pages after, to 109.
12         Are you there?
13     A.   Yes.
14     Q.   The second bullet point
15 says, Historically controlled
16 substance/listed chemical order
17 monitoring process has been based --
18 order monitoring has been based on a
19 ship-and-report process.
20         Do you see that?
21     A.   Yes.
22     Q.   That's what we talked about
23 earlier, that prior to this date,
24 AmerisourceBergen's procedure was to ship

Christopher Zimmerman (AmerisourceBergen)

Page 218

1 the orders, and if there was anything
2 suspicious, they would report it the next
3 morning or day?
4        MR. NICHOLAS:  Object to the
5    form.  Outside the scope.
6        Go ahead.
7        THE WITNESS:  The process
8    prior to this was the one that was
9    previously accepted by DEA in
10   collaboration, and the process was
11   to report the orders the
12   following -- it could be day, week
13   or month.  It was up to the
14   regional DEA office of how they
15   wanted the information.
16 BY MR. PIFKO:
17   Q.   Okay.  But the emphasis
18 here, it's in bold, is ship and report.
19        So the idea is you're
20 shipping first to the customer and then
21 later you're reporting?
22   A.   Correct.
23   Q.   And then it says, now --
24 well, it says, ABC's OMP process is now

Page 219

1 based on:  Identify, capture,
2 investigate, and report suspicious
3 orders; all prior to shipment.
4        And "prior to shipment" is
5 in bold.
6        Do you see that?
7   A.   Yes.
8   Q.   What does that mean?
9   A.   It means now that instead of
10 reporting orders the next day, week,
11 month, that you had to have a system that
12 we developed, with whatever the threshold
13 trigger, algorithm, whatever you want to
14 call it, would identify an order of
15 interest and then it was up to the -- up
16 to us to then have to investigate that --
17 capture, stop it, review it and then
18 either determine whether it was
19 suspicious or not.  And you could either
20 release it, reject it or report it.
21   Q.   At this time, if an order
22 was suspicious, was it
23 AmerisourceBergen's policy to ship the
24 order?

Page 220

1        MR. NICHOLAS:  At which
2    time?
3        THE WITNESS:  Yeah, after
4    2000 --
5 BY MR. PIFKO:
6   Q.   I'm talking June 25th, 2007.
7   A.   After we implemented the new
8 program, our policy was not to ship a
9 suspicious order, an order we deemed to
10 be suspicious.
11   Q.   I'm asking just because this
12 says -- we were just talking about
13 reporting, but I'm talking about whether
14 you actually completed the shipment.
15        So you're saying your
16 policy, as of June 25th, 2007 was not to
17 ship an order that you deemed to be
18 suspicious?
19   A.   Correct.
20   Q.   Okay.
21   A.   It could have been June
22 27th.  Again, the final order wasn't
23 released until August.
24        So, again, I don't want you

Page 221

1 to hold me to -- it could be -- I think
2 it was implemented on June 25th.  It
3 could have been July 1.  I'm not --
4   Q.   So in the summer --
5   A.   -- but that was our
6 negotiated process.  And when we got --
7 when DEA audited our facilities, it was
8 in place, whether it was this date or the
9 day before or the day after.  I just want
10 to be clear that --
11   Q.   On or around the summertime
12 of 2007, we can agree about that?
13   A.   Yes.  It was between the
14 time we lost our license until we got it
15 back.
16   Q.   I think just one more page,
17 and then we can take a break.
18        Go to 114, please.
19        Are you there?
20   A.   Yes.
21   Q.   The third bullet point says,
22 Each distribution center (DC) is
23 responsible for initial review of all
24 orders in OMP review.

Christopher Zimmerman (AmerisourceBergen)

Page 222

1    Do you see that?
2    A.   Yes.
3    Q.   And then it says, If the DC
4  can determine the order is not
5  suspicious, the DC will release the
6  order.
7    So is this saying it's up to
8  the distribution center to make the
9  determination about whether an order is
10 suspicious or release it?
11   A.   They have the first look at
12 the order.  Because, again, remember,
13 orders are processed at night, shipped
14 the next day.  These are -- these are
15 products that pharmacies need -- are
16 expecting that next morning, to service
17 their patients.
18   So if a hospital orders --
19 say a Cleveland Clinic order comes
20 through, they have the first look to see
21 if it's a suspicious order, and if not,
22 they can release that order.
23   Q.   And the distribution center
24 staff who is responsible for making this

Page 223

1  determination is warehouse managers, case
2  clerks, data processing people; is that
3  correct?
4    A.   They are what we refer to as
5  responsible person.  And we provide
6  specific training in that area.
7    Q.   What does a "responsible
8  person" mean?
9    A.   The person that has the
10 responsibility to review these incoming
11 orders that have been hit as a
12 potential order of interest.  And they
13 receive special training in what to look
14 for, how to process them.  And they
15 have -- and the initial training and then
16 annual training thereafter.
17   Q.   And this is done -- we
18 talked about the timing of shipments come
19 in at night and are shipped in the
20 morning, this is done at night?
21   A.   This is done at night,
22 correct.
23   The first wave.  Any --
24 any -- the training is that if they have

Page 224

1  any question, they kick it up to
2  corporate.  This was the process in place
3  when DEA inspected our facilities.  They
4  talked to the folks that were these
5  responsible people in charge, they
6  watched how they reviewed the orders and
7  the process.
8    So before they approved it,
9  they actually saw it in action and who
10 was reviewing them at the DC.  And then
11 also which orders they were kicking up
12 and what we were reviewing at corporate.
13   And then a report was --
14 anything that was released that night by
15 the responsible person, we got a report
16 that the manager reviewed the very next
17 day, just in the event that maybe there
18 was an issue with training or they didn't
19 understand, we would be able to -- there
20 was also a QA function to that as well.
21   We just didn't have everyone
22 review orders and have the ability to
23 release them.
24   MR. PIFKO:  We can take a

Page 225

1  break.
2    VIDEO TECHNICIAN:  Going off
3  the record.  The time is 12:30
4  p.m.
5    - - -
6    (Whereupon, a luncheon
7  recess was taken.)
8    - - -
9    VIDEO TECHNICIAN:  We're
10 back on the record.  The time is
11 1:19 p.m.
12 BY MR. PIFKO:
13   Q.   Let's go back to Exhibit-6,
14 the stack of Dear Registrant letters.
15   Let's go two pages in to the
16 second -- or the Dear Registrant letter
17 dated December 27th, 2007.
18   Do you see that?  It's on
19 Bates label ABDCMDL 00269685.
20   Are you there, sir?
21   A.   Yes.
22   Q.   Did AmerisourceBergen
23 receive this letter?
24   MR. NICHOLAS:  Could you

Christopher Zimmerman (AmerisourceBergen)

Page 226

1 just ask him to take -- give him
2 just a minute to take a quick look
3 at it and make sure he's familiar
4 with the document before he
5 responds to these questions.
6         MR. PIFKO:  I think we went
7 over these before.
8         MR. NICHOLAS:  I think you
9 showed him the one and asked him
10 that question.  He didn't look at
11 all the letters.  He looked at
12 one.
13        THE WITNESS:  Okay.
14 BY MR. PIFKO:
15     Q.   Are you ready?  It's a
16 two-page letter here.
17     A.   Yes.
18     Q.   Did AmerisourceBergen
19 receive this letter?
20     A.   I believe so, at the
21 distribution centers.
22     Q.    And that would have been on
23 or around the date of this letter,
24 December 27th, 2007?

Page 227

1     A.   I would assume so.
2     Q.   Let's go to the second
3 paragraph, last sentence -- or, sorry,
4 second-to-last sentence.
5         Accordingly, DEA does not
6 approve or otherwise endorse any specific
7 system for reporting suspicious orders.
8 Past communications with DEA, whether
9 implicit or explicit, that could be
10 construed as approval of a particular
11 system for reporting suspicious orders
12 should no longer be taken to mean that
13 DEA approves a specific system.
14        Do you see that?
15     A.   Yes.
16     Q.   Were you aware that that was
17 a statement that the DEA had made to
18 AmerisourceBergen at that time?
19     A.   Yes.
20     Q.   Did you discuss that with
21 anyone at the company?
22     A.   No.
23     Q.   Earlier you testified that
24 certain aspects of AmerisourceBergen's

Page 228

1 CSA compliance were discussed with DEA.
2         Generally, do you recall
3 that?
4     A.   We've had ongoing
5 communications with DEA since I started
6 with the company.  I referenced our
7 negotiations with them in '96 to '98,
8 with the suspicious order monitoring
9 program, which resulted in an approval
10 letter.  And then the negotiations, in
11 2007.
12        So we've had ongoing -- and
13 we also provided training for DEA
14 diversion investigators from '99 to 2004
15 or '05.  So we've had an open dialogue
16 with DEA since I've been with the
17 company.
18     Q.   Did anyone at the company
19 discuss this statement with the DEA and
20 how it impacted some of the prior
21 discussions that you may have had with
22 them?
23        MR. NICHOLAS:  Object to the
24 form.

Page 229

1        THE WITNESS:  No.
2 BY MR. PIFKO:
3     Q.   For example, with respect to
4 the business decision that we talked
5 about in Exhibit-7 that you recalled
6 having been derived from a meeting in
7 2005, did anyone say to the DEA, as a
8 result of this December 27th, 2007
9 letter, we can no longer rely on that?
10        MR. NICHOLAS:  Object to the
11 form.  Only if you're asking about
12 any conversation anyone at the
13 company ever had.  I don't know
14 how he can answer that.
15        But go ahead.
16        THE WITNESS:  Can you
17 restate that or paraphrase the
18 question, please?
19 BY MR. PIFKO:
20     Q.   Do you remember that
21 Exhibit-7 talked about the business
22 decision about whether to ship an order?
23     A.   Yes.
24     Q.   You remember testifying that

Christopher Zimmerman (AmerisourceBergen)

Page 230

1 that was derived from a conversation with
2 the DEA in 2005?
3      A.   It wasn't derived from a
4 conversation.  It was -- it was -- you
5 had asked about the quotations of the
6 business decision, and that was a slide
7 on a DEA slide, not ABC slide.
8      Q.   From a -- you said from a
9 presentation between Steve Mays and Mike
10 Mapes in 2005?
11      A.   From a presentation from DEA
12 to Steve Mays.
13      Q.   Did anyone, at this time,
14 reach out to the DEA and say, we can no
15 longer rely on that presentation?
16           MR. NICHOLAS:  Object to the
17      form.
18           THE WITNESS:  No.
19 BY MR. PIFKO:
20      Q.   This letter also says, in
21 the second paragraph, Filling a monthly
22 report -- Filing a monthly report of
23 completed transactions, e.g., excessive
24 purchase report or high unit purchases,

Page 231

1 does not meet the regulatory requirement
2 to report suspicious orders.  Registrants
3 are reminded that their responsibility
4 does not end merely with the filing of a
5 suspicious order report.
6           Do you see that?
7      A.   Are you in the --
8           MR. NICHOLAS:  Could you
9      highlight it on the screen?
10           MR. CLUFF:  We're putting it
11      up now.  It was actually the third
12      paragraph.
13           THE WITNESS:  I didn't see
14      that.  Sorry.
15           What line in the third
16      paragraph?  I just want to make
17      sure, if I'm commenting on this.
18           And your question?  I'm
19      sorry.
20 BY MR. PIFKO:
21      Q.   You see that, first, was the
22 question?  You do see it now?
23      A.   Yes.
24      Q.   Okay.  Did AmerisourceBergen

Page 232

1 agree that its responsibility continued
2 after the filing of a suspicious order
3 report?
4           MR. NICHOLAS:  Object to the
5      form.
6           THE WITNESS:  I mean, the
7      program we developed, which is
8      pretty much two months, three -- a
9      few months before this letter, is
10      pretty much in line with this
11      letter, in that -- in the way that
12      this is written, I'm not sure if
13      they're referring that an order
14      that hits a -- they're calling it
15      an excessive purchase, meet the
16      requirements of suspicious order,
17      is that an order of interest or a
18      suspicious order?
19           So I'm not really sure of
20      the context of their statement.
21 BY MR. PIFKO:
22      Q.   Well, he's saying,
23 Responsibility does not end merely with
24 the filing of a suspicious order report.

Page 233

1           So he's talking about
2 suspicious orders.
3           Do you see that?
4      A.   Yes.
5      Q.   So my question is, does
6 AmerisourceBergen agree that its
7 responsibility extends beyond the filing
8 of a suspicious order report?
9           MR. NICHOLAS:  Object to the
10      form.
11           But go ahead.
12           THE WITNESS:  I'm not really
13      sure of the context of -- once we
14      file the suspicious order report,
15      I'm not necessarily saying that
16      there's any additional
17      responsibility we have after the
18      filing of the suspicious order
19      report.
20 BY MR. PIFKO:
21      Q.   So you disagree with that
22 statement, is that what I'm hearing you
23 say?
24           That's fine, whatever you're

Christopher Zimmerman (AmerisourceBergen)

Page 234

1 saying. I just don't understand your
2 answer.
3        MR. NICHOLAS: Object to the
4    form.
5        Go ahead.
6        THE WITNESS: Yes.
7 BY MR. PIFKO:
8    Q.   Yes, you disagree?
9    A.   I disagree -- let me read it
10 on the page, so I can make sure that --
11        So again, it depends on the
12 context of the sentence. Our registrants
13 are reminded that their responsibility
14 does not end merely with the filing of a
15 suspicious order.
16        That's correct. We have
17 other responsibilities to have adequate
18 controls to prevent diversion, other than
19 the filing of a suspicious order. So I'm
20 not sure if their statement is in the
21 context of filing a suspicious order and
22 the totality of the distributor's
23 responsibility.
24    Q.   Well, let me ask a different

Page 235

1 question.
2        Regardless of what this
3 letter says or doesn't say, does
4 AmerisourceBergen agree that with respect
5 to a suspicious order, its
6 responsibilities under The Controlled
7 Substances Act don't end by merely filing
8 a suspicious order report?
9        MR. NICHOLAS: Object to the
10    form.
11        THE WITNESS: I think my
12    last answer is the -- is the same
13    answer.
14        That filing a suspicious
15    order does not meet all the
16    requirements of -- to have an
17    effective controls for diversion.
18        So my answer is the same.
19 BY MR. PIFKO:
20    Q.   Do you believe that
21 AmerisourceBergen is required to conduct
22 due diligence of a suspicious order even
23 after a suspicious order report is filed?
24        MR. NICHOLAS: Object to the

Page 236

1    form. Outside the scope.
2        THE WITNESS: I don't think
3    that is in line with the
4    regulatory responsibilities of a
5    distributor, to define a program
6    to report suspicious orders.
7 BY MR. PIFKO:
8    Q.   Let's go to the last
9 sentence of that paragraph.
10        It says, Reporting an order
11 as suspicious will not absolve the
12 registrant of responsibility if the
13 registrant knew or should have known that
14 controlled substances were being
15 diverted.
16        Do you see that?
17    A.   I do see that.
18    Q.   Do you agree with that
19 statement?
20    A.   If I had more understanding
21 of what should have -- what they're
22 constituting as should have known.
23    Q.   Do you believe that if
24 AmerisourceBergen knows that controlled

Page 237

1 substances are being diverted, it has to
2 do more to prevent diversion beyond just
3 reporting it?
4        MR. NICHOLAS: Object to the
5    form. Could you be more specific
6    with the question?
7        THE WITNESS: It's a
8    hypothetical question, I think.
9 BY MR. PIFKO:
10    Q.   You can't give an answer to
11 the question?
12    A.   If we -- I think, if a
13 distributor knows that a pharmacy and --
14 they know that they're diverting, then
15 they have responsibility to react.
16    Q.   So do you agree that the
17 company has a responsibility to act?
18    A.   If they have --
19        MR. NICHOLAS: Object to the
20    form.
21        Go ahead.
22        THE WITNESS: If they know
23    there's a pharmacy that's -- that
24    they know is diverting product.

Christopher Zimmerman (AmerisourceBergen)

Page 238

BY MR. PIFKO:

Q.   Okay.  So just, again, I'm not trying to misstate your testimony, I just want to get a clear record.

So it's my understanding that what you just said is if AmerisourceBergen knows that a pharmacy is diverting product, it has a responsibility to act; is that correct?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  It depends on the circumstances.  You asked me a hypothetical question.

So, again, and I'm not sure, again, when we put the context of diversion, what we're talking about.

If a pharmacy has an employee that was arrested for diverting product, they put a bottle in their pocket, the reaction is going to be different.  So it all depends upon the

Page 239

totality of the circumstance.

I can't give you a general answer that if there's a pharmacy that's diverting, depending upon what that type of diversion is, what that action will be.

BY MR. PIFKO:

Q.   But you agree that some action may be -- it depends on the nature of the diversion -- the action would depend on the nature of the diversion, but some action would be required?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  It depends on the circumstances.  And, again, it's a case-by-case basis, depending upon the totality of the circumstances, of what the reaction would be.  There isn't a must.

BY MR. PIFKO:

Q.   So is it your testimony that there are circumstances where

Page 240

AmerisourceBergen would know about diversion and not be obligated to act?

MR. NICHOLAS:  Object to the form.  I think you're now just arguing.

THE WITNESS:  Again, it all depends on the circumstances of the case.

BY MR. PIFKO:

Q.   Well, so, if it depends on the circumstances, there must be circumstances where AmerisourceBergen would know of diversion and you don't believe they would be required to act.

MR. NICHOLAS:  Object to the form.  This isn't --

MR. PIFKO:  You've got to stop.  You have to stop.

You can object in a normal objection way, you can say form.  You can say foundation.  You can state a legal objection.

But you are coaching the witness.  You have done

Page 241

textbook -- there is case law addressing exactly what you're doing in this district, and you need to stop, okay?

MR. NICHOLAS:  Listen.  Now you're going to let me speak for a minute.

MR. PIFKO:  No, I'm not.  You need to stop this right now.

MR. NICHOLAS:  I read the transcript of your defense of the Merrill Gordon.

MR. PIFKO:  We're not talking about anything right now.  And all I did -- and all I did was state my objections with clarity and specificity.  And I did not coach the witness at one moment of the deposition.

You are telling -- you said things like "if you know."  You said that before the last break.

MR. NICHOLAS:  Is that so horrible?

Christopher Zimmerman (AmerisourceBergen)

1      MR. PIFKO:  Because there's
2  case law prohibiting that kind of
3  conduct.  That is directing the
4  witness.  If you know, that's
5  directing the witness to say I
6  don't know.
7      You cannot do that.  Just
8  stop.
9      MR. NICHOLAS:
10  Unfortunately --
11     MR. PIFKO:  Am I going to
12  get your agreement that you're
13  going to comply with the law?
14     MR. NICHOLAS:  I've been
15  complying with the law the entire
16  time.
17     I read your deposition.
18     MR. PIFKO:  You've been
19  coaching the witness.
20     MR. NICHOLAS:  I have not.
21     MR. PIFKO:  You have.
22     MR. NICHOLAS:  I read your
23  transcript of the Merrill
24  Gordon --

1      MR. PIFKO:  I never once
2  said facts --
3      MR. NICHOLAS:  I never saw
4  anything like it.
5      MR. PIFKO:  -- in my
6  objections.
7      MR. NICHOLAS:  It was an
8  incredible thing.  I'm like Mother
9  Teresa compared to you in that
10  deposition.
11     MR. PIFKO:  I disagree.
12     MR. NICHOLAS:  I'm sure you
13  do disagree.
14     MR. PIFKO:  We're moving on.
15  You need to stop, okay?
16     MR. NICHOLAS:  I will
17  continue to do exactly what I
18  think is appropriate in this
19  deposition, as needed.
20  BY MR. PIFKO:
21     Q.   I'm trying to get an answer
22  from you, and I'm just trying to
23  understand what your testimony is, okay?
24     So I've asked you if

1  AmerisourceBergen is aware of diversion,
2  do you believe that beyond reporting it
3  to the DEA, the company has a
4  responsibility to take some action?
5      A.   It depends on the
6  circumstances.  We had an investigation,
7  we were working with DEA, and they had
8  diversion at a pharmacy and we were told
9  to continue servicing them during the
10  course of the investigation.
11     There's an instance where we
12  knew of diversion and we didn't take any
13  action because we were working with the
14  DEA.
15     Every instance is different.
16  You're asking me to give you a blanket
17  response to situational instances.  And I
18  can't.  There's -- no two are alike.  And
19  I can't give you a single answer to your
20  response, because it depends.
21     It depends.  If DEA wants us
22  to continue servicing them and there's a
23  diversion, then we would have no action.
24     Q.   What pharmacy are you

1  referring to where there was diversion
2  and the DEA told you to continue
3  servicing them?
4      MR. NICHOLAS:  I'm going to
5  caution the witness that if
6  there's -- for any reason, this is
7  an ongoing investigation and
8  confidential --
9      MR. PIFKO:  He raised the
10  issue.
11     MR. NICHOLAS:  I don't care.
12  If it's confidential and he's not
13  supposed to disclose the name of
14  it for legal reasons, then he
15  shouldn't do it.
16     THE WITNESS:  And it's some
17  time ago and outside the scope.
18     MR. PIFKO:  You're not
19  allowed to object to outside the
20  scope, sir.
21     MR. NICHOLAS:  Well, he's
22  not objecting.
23     MR. PIFKO:  He just said
24  it's outside the scope.

Christopher Zimmerman (AmerisourceBergen)

Page 246

1    MR. NICHOLAS: I don't know
2  that --
3    MR. PIFKO: You're a fact
4  witness here as well as a 30(b)(6)
5  witness. You need to answer my
6  questions.
7    THE WITNESS: I don't know
8  the name of the pharmacy, but we
9  received recognition from the DEA
10  for participation in the
11  investigation.
12  BY MR. PIFKO:
13    Q.   When was that?
14    A.   It was 2002 or 2004, I can't
15  remember the time frame.
16    But after the course of the
17  investigation, the prosecution, we
18  received a certificate of recognition
19  from the DEA. That's the case I'm
20  referring to.
21    Q.   So it was a concluded
22  investigation, correct?
23    A.   Yes.
24    Q.   Okay. Where was this

Page 247

1  pharmacy? What state?
2    A.   It was in New Jersey.
3    Q.   Okay. What type of pharmacy
4  was it?
5    A.   I don't -- I mean, you're
6  talking about something that happened 16
7  years ago. I know we received a
8  recognition for participation in the
9  investigation. And, you know, I don't
10  know the name of the pharmacy. I don't
11  know the --
12    Q.   Can you recall any other
13  pharmacies where the DEA told you to
14  continue shipping to them despite knowing
15  about diversion?
16    A.   I don't.
17    Q.   So that's only happened, to
18  your knowledge, on one occasion?
19    MR. NICHOLAS: Object to the
20  form.
21    THE WITNESS: That I'm aware
22  of right now. And I'm not saying
23  that that hasn't occurred within
24  my department and with other

Page 248

1  individuals.
2    You're asking me as a -- as
3  a -- this gets to the part of am I
4  a 3 -- what is it?
5    MR. NICHOLAS: 30(b)(6).
6    THE WITNESS: 30(b)(6) or me
7  personally.
8  BY MR. PIFKO:
9    Q.   Do you know if that pharmacy
10  in New Jersey was put on the do not ship
11  list?
12    MR. NICHOLAS: Object to the
13  form. Outside the scope.
14    THE WITNESS: I don't know.
15  I don't know.
16  BY MR. PIFKO:
17    Q.   I'm handing you what is
18  marked as Exhibit-8.
19    - - -
20    (Whereupon, Amerisource
21  Bergen-Zimmerman Exhibit-8,
22  ABDCMDL 00270533, was marked for
23  identification.)
24    - - -

Page 249

1    MR. PIFKO: For the record,
2  it's a single-page document Bates
3  labeled ABDCMDL 00270533. It's
4  dated Monday, August 7th, 2017.
5  BY MR. PIFKO:
6    Q.   And I will represent to you
7  that the metadata that accompanied this
8  document says that it came from your
9  files, Mr. Zimmerman.
10    So please take a moment to
11  review it and let me know when you're
12  done.
13    A.   Yes.
14    Q.   Are you done?
15    A.   I am.
16    Q.   Okay. Do you recognize this
17  document?
18    A.   I don't -- I guess it's a
19  document.
20    Q.   Do you recall writing this?
21    A.   It was notes, yes.
22    Q.   What was it notes for?
23    A.   I think I was -- for -- I
24  was probably meeting with somebody, so I

Christopher Zimmerman (AmerisourceBergen)

Page 250

1 was just jotting down some points.
2     Q.    BOD, is that board of
3 directors?
4     A.    Board of -- where?
5     Q.    It's on the subject line.
6     A.    I think it was supposed to
7 be -- I'm not sure. I don't know if it
8 should have been BOP or BOD. Board of
9 Pharmacy. I'm not sure. I can't
10 remember.
11     Q.    What would CS mean?
12 Controlled substances?
13     A.    I don't recall.
14     Q.    TPs, does that mean anything
15 to you?
16     A.    I'm guessing -- if I had to
17 guess, I would say talking points.
18     Q.    So it could be board of
19 directors, controlled substances, talking
20 points?
21        MR. NICHOLAS: Object to the
22     form.
23        THE WITNESS: I'm not sure.
24           - - -

Page 251

1        (Whereupon, Amerisource
2     Bergen-Zimmerman Exhibit-9,
3     ABDCMDL 00273425, was marked for
4     identification.)
5           - - -
6 BY MR. PIFKO:
7     Q.    I'm handing you what is
8 marked as Exhibit-9.
9        I'm not going to ask you any
10 questions about Exhibit-9 at the moment.
11 I just am asking if this refreshes your
12 recollection?
13        It's a PowerPoint,
14 regulatory compliance update, meeting of
15 the board of directors, dated August 10,
16 2017. And the subject line of your
17 e-mail is BOD, CS, TPs, 8/10/17.
18        So just as a question, does
19 this refresh your recollection as to what
20 BOD, CS, TPs 8/10/17 is?
21     A.    It would appear to be for
22 this slide deck.
23     Q.    We can put Exhibit-9 aside.
24        For the record, Exhibit-9 is

Page 252

1 a native PowerPoint dated or Bates number
2 ABDCMDL 00273425.
3        Going back to Exhibit-8.
4        You're the top person in
5 compliance, correct?
6     A.    Yes.
7     Q.    Do you -- in connection with
8 that role, do you meet regularly with the
9 board of directors?
10     A.    I meet with a committee of
11 the board.
12     Q.    How often do you meet with
13 them?
14     A.    Once a quarter.
15     Q.    Okay. And you've spoken
16 with them about diversion control?
17     A.    Yes.
18     Q.    Other than this meeting,
19 have you spoken with them about diversion
20 control on other occasions?
21     A.    Yes.
22     Q.    Is diversion control a
23 subject that you speak with them on every
24 meeting that you have?

Page 253

1     A.    No.
2     Q.    Would you say diversion
3 control is something that you regularly
4 talk about them with or only on specific
5 occasions?
6     A.    Not regularly.
7     Q.    Do you know what the purpose
8 of this meeting on August 10th, 2017 was?
9        MR. NICHOLAS: I'll object
10     at this point to the scope. This
11     doesn't fall within any of the
12     topics. And the time period is
13     off.
14 BY MR. PIFKO:
15     Q.    Sir, did you hear the
16 question?
17     A.    What was the question?
18     Q.    The question was, do you
19 know what the purpose of this meeting on
20 August 10th, 2017 was?
21     A.    I think there was a
22 regularly scheduled board meeting.
23     Q.    But what I'm asking is, why
24 were you writing notes to present to them

Christopher Zimmerman (AmerisourceBergen)

Page 254

1 on diversion control?
2        MR. NICHOLAS:  Objection.
3    These are being answered in his
4    individual capacity.
5 BY MR. PIFKO:
6    Q.   To clean that up, all
7 questions on this right now are in the
8 individual capacity.  I'll let you know
9 when we're switching gears.
10    A.   To provide them update on
11 our regulatory compliance.
12    Q.   But you said you don't meet
13 with them regularly about diversion
14 control.
15        So what I was trying to
16 understand was, why this meeting on
17 diversion control at this time?
18        MR. NICHOLAS:  Object to the
19    form.
20        Go ahead.
21        THE WITNESS:  We were
22    updating them on the diversion
23    control program.
24 BY MR. PIFKO:

Page 255

1    Q.   You said there's a committee
2 that you -- that you meet with.
3        Is there a name for this
4 committee?
5    A.   It's the audit committee.
6    Q.   How many members of the
7 board of directors sit on that committee?
8    A.   I believe it's four.
9    Q.   Do you know which specific
10 individuals?
11    A.   The names?
12    Q.   Yes.
13    A.   Lon Greenberg, David Durkin.
14 And they just changed this last quarter,
15 so I'm not sure if Mike Long is still on
16 the committee or not.  Mike Long.  And I
17 can't think of the other.
18    Q.   Okay.  Let's go back to
19 Exhibit-8.
20        I do want to -- for the
21 record to be clear, I'm asking you this
22 as a 30(b)(6) witness.
23        You state here, These
24 requirements -- well, actually, let's

Page 256

1 back up.
2        You have a sentence here
3 that, The Controlled Substance Act,
4 passed in 1970, is the statute
5 establishing U.S. drug requirements for
6 the storage and distribution of
7 controlled substances as stipulated in
8 the Code of Federal Regulations and
9 enforced by the Drug Enforcement
10 Administration.
11        Primarily, you must have a
12 DEA distributor registration to
13 distribute controlled substances.  You
14 can only distribute controlled substances
15 to a DEA-registered location.  You must
16 have adequate controls in place to
17 prevent diversion; cages, vaults, alarms,
18 background checks, et cetera.  And, you
19 must have a system to identify suspicious
20 orders and report those orders to DEA
21 when discovered.
22        Do you see that?
23    A.   Yes.
24    Q.   It says, These requirements

Page 257

1 have gone unchanged for the past 45
2 years.
3        Do you see that?
4    A.   Yes.
5    Q.   Do you agree with that
6 statement?  You wrote it.
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  I did write --
10    yes, I wrote it.
11 BY MR. PIFKO:
12    Q.   And you agree with it?
13        MR. NICHOLAS:  Object to the
14    form.
15        THE WITNESS:  Yes.
16 BY MR. PIFKO:
17    Q.   At the bottom here, it says,
18 In 2014, ABC -- and we haven't talked
19 about that on the record, but ABC refers
20 to AmerisourceBergen Corporation,
21 correct?
22    A.   Correct.
23    Q.   Okay.  It says, ABC
24 voluntarily -- and there's more to the

Christopher Zimmerman (AmerisourceBergen)

Page 258

1  sentence, you can read it.
2          But my question to you is,
3  did AmerisourceBergen voluntarily take on
4  certain activities with respect to
5  controlling diversion that it didn't
6  believe were in the statute?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  No.  We were
10     just enhancing our program, as
11     I -- as it has stated.
12  BY MR. PIFKO:
13     Q.   But by enhancing your
14  program, is it your position that you
15  voluntarily undertook to engage in
16  certain activities that you weren't
17  required to do under the statute?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  The
21     regulations designed a program to
22     identify and report suspicious
23     orders.  We had that in place.  We
24     still have it in place.  We had it

Page 259

1      in place before and after any
2      enhancements.
3          The enhancements were just
4      done about how we identified --
5      and how the process worked.  We
6      didn't -- a requirement never
7      changed.  And our program really
8      never changed.  Just some of the
9      mechanisms, some of the data that
10     we were receiving to provide, you
11     know, more in-depth, line-of-sight
12     when reviewing orders, those type
13     of things, we continued to enhance
14     our program.
15         But the program itself of
16     having a program to identify an
17     order of interest, review the
18     order, determine whether it's
19     suspicious, and if we determined
20     it's suspicious reporting it into
21     the DEA, that's never changed.
22  BY MR. PIFKO:
23     Q.   Why undertake voluntarily --
24  voluntary enhancements, as you're talking

Page 260

1  about in this document?
2          MR. NICHOLAS:  Object to the
3      form.  Outside the scope of the
4      notice, I think.  It's not in any
5      of the topics.
6          But go ahead.
7          THE WITNESS:  I think,
8      through my discussions here today,
9      we've shown from 1990 through now,
10     we always -- we've always been
11     working to improve our program.
12     And we started with '96, then '98.
13     And we've always continued, even
14     between '98 and 2007, there were
15     enhancements to the program.
16     There was enhancements from 2007
17     forward.  And we continue to
18     enhance the program.
19         We're not -- this is a note
20     I wrote in order to remind me to
21     talk about the enhancements to the
22     program that we continue to do.
23     And that's what this document is,
24     is just my notes as a reminder to

Page 261

1      just make sure I hit certain
2      points.
3  BY MR. PIFKO:
4      Q.   Do you believe that
5  AmerisourceBergen has any duties to
6  prevent diversion outside of the
7  regulations under The Controlled
8  Substances Act?
9          MR. NICHOLAS:  Object to the
10     form.  Not within the scope of
11     the -- I don't know if you're
12     asking him as an individual or
13     under the 30(b)(6) thing, but it's
14     not covered by 30(b)(6) topics.
15     I'll object to it.
16         THE WITNESS:  I think we
17     have a responsibility to comply
18     with the federal regulations and
19     state Board of Pharmacy
20     regulations as it respects to the
21     handling, storage and distribution
22     of controlled substances.
23  BY MR. PIFKO:
24     Q.   But do you believe that

Christopher Zimmerman (AmerisourceBergen)

Page 262

1 there's any other requirements to prevent
2 diversion outside of The Controlled
3 Substances Act or State Pharmacy Board
4 rules?
5         MR. NICHOLAS:  Object to the
6     form.  Same objection I just
7     stated.
8         THE WITNESS:  I'm not aware
9     of any other requirements.
10 BY MR. PIFKO:
11     Q.    Does AmerisourceBergen
12 undertake any actions to prevent
13 diversion for reasons beyond what is
14 required in The Controlled Substances
15 Act?
16         MR. NICHOLAS:  Object to the
17     form.  Outside the scope.  And I
18     don't understand the question.
19     And I don't know if the witness
20     does.
21         THE WITNESS:  Can you state
22     that one more time, please?
23 BY MR. PIFKO:
24     Q.    Does AmerisourceBergen

Page 263

1 undertake any actions to prevent
2 diversion for reasons beyond what is
3 required in The Controlled Substance Act?
4         MR. NICHOLAS:  All the same
5     objections.
6         Go ahead.
7         THE WITNESS:  Most -- our
8     processes are formulated around
9     the controlled -- not The
10     Controlled Substance Act, but the
11     Code of Federal Regulations.  And
12     all the processes that we go
13     through are to support those
14     regulations.
15 BY MR. PIFKO:
16     Q.    So AmerisourceBergen doesn't
17 engage in any diversion-related processes
18 for reasons outside of the Code of
19 Federal Regulations?
20         MR. NICHOLAS:  Objection to
21     the form of the question.
22         THE WITNESS:  I'm not
23     understanding your question.
24         I mean, we have processes in

Page 264

1     place to comply with the
2     regulations.
3         I don't know of any other
4     requirements outside than the
5     Board of Pharmacy and the DEA
6     requirements that you're referring
7     to.
8 BY MR. PIFKO:
9     Q.    All I'm asking, so you just
10 said you had processes in place to comply
11 with the regulations, agreed?
12     A.    Yes.
13     Q.    Do you have processes in
14 place that are -- to prevent diversions
15 that are for reasons that aren't required
16 under the statute --
17         MR. NICHOLAS:  Objection.
18 BY MR. PIFKO:
19     Q.    -- the federal statute?
20         MR. NICHOLAS:  Object to the
21     form.  Same objections.
22         THE WITNESS:  I think all of
23     our processes all work back to the
24     federal regulations.

Page 265

1 BY MR. PIFKO:
2     Q.    This document, Exhibit-8,
3 says, In 2007, working with FDA as a
4 result of the suspension of our Orlando
5 DEA registration for sales practices to
6 Internet pharmacies, ABC enhanced its
7 program once again by -- and then it's
8 got four items listed there.
9         Do you see that?
10     A.    Yes.
11     Q.    Is that an accurate
12 recitation of what AmerisourceBergen did
13 as a result of the suspension of its DEA
14 registration?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  Yes.
18 BY MR. PIFKO:
19     Q.    It says here that -- Number
20 4 says that, Amerisource completely
21 changed their order monitoring process to
22 include holding and not shipping any
23 order that exceeded that pharmacy's peer
24 group threshold.

Christopher Zimmerman (AmerisourceBergen)

Page 266

1      Do you see that?
2      A.   Yes.
3      Q.   And then it says, ABC was
4   the first company in the industry to
5   implement an SO hold, which is now the
6   standard in the industry and a component
7   for every distributor's SOM program.
8      Do you see that?
9      A.   Yes.
10      Q.   SO, I assume, means
11   suspicious order?
12      A.   I would assume that's what
13   it meant.  It's an order of interest
14   hold, suspicious order hold.
15      Q.   And SOM means suspicious
16   order monitoring?
17      A.   Yes.
18      Q.   You testified earlier that
19   there's -- AmerisourceBergen does not
20   believe it's obligated under the law to
21   not ship an order that's suspicious.
22      Do you recall saying that?
23      MR. NICHOLAS:  Object to the
24   form.

Page 267

1      THE WITNESS:  Can you
2      restate that again?  I'm not sure
3      I understood it correctly.
4   BY MR. PIFKO:
5      Q.   I believe I understood your
6   testimony earlier to say that you did not
7   believe that AmerisourceBergen is
8   required, under the law, to not ship an
9   order that it identifies as suspicious;
10   is that correct?
11      A.   My statement was that the
12   regulation itself states that you must
13   operate a system to identify and report a
14   suspicious order.  There's no statement
15   of shipping, not shipping, holding an
16   order.
17      Q.   So at this time, what was
18   the reason that you implemented the
19   shipping -- or suspicious order hold,
20   which you said includes the orders of
21   interest?
22      A.   Because we wouldn't have
23   gotten our DEA registration back without
24   implementing that process in our

Page 268

1   negotiations with DEA.  They wanted us to
2   come up with a program.
3      And two key components of
4   that program is they wanted us to have an
5   enhanced due diligence, and then the
6   other one was to change the process of
7   shipping orders and reporting them after
8   the fact.
9      And that was through the
10   negotiations.  And we implemented that
11   program.  That was the program I
12   indicated that DEA came in and inspected.
13   And whether they approved it or not,
14   based upon their inspections, I think in
15   the order, it states if we weren't in
16   compliance, then they would not return
17   our license back to us.
18      And then a couple of months
19   later, they had us -- had me do a
20   presentation at their DEA conference to
21   industry going through these processes.
22      Q.   You say that
23   AmerisourceBergen was the first company
24   in the industry to implement such a

Page 269

1   process of holding a suspicious order.
2      Do you see that?
3      A.   Yes.
4      Q.   What's the basis for that?
5      A.   Based upon my discussions
6   with DEA in 2007.
7      Q.   You're aware that there's an
8   opioid crisis in America, correct?
9      A.   Yes.
10      Q.   Did AmerisourceBergen ever,
11   at any point, think to itself, could we
12   do more to prevent diversion as a result
13   of the opioid crisis?
14      MR. NICHOLAS:  Object to the
15   form.  It's outside the scope as
16   well.
17      THE WITNESS:  And I'm not
18   sure I understand the time frame
19   you're talking about.
20      We always want to make sure
21   that we're following the
22   appropriate policy and procedures
23   and working with DEA on these
24   issues, you know, whether it's

Christopher Zimmerman (AmerisourceBergen)

1 methamphetamine abuse or any other
2 area.
3 And in the past, we had a
4 great working relationship with
5 the DEA to resolve these issues.
6 When it was methamphetamine, they
7 passed a bill, enacted regulations
8 and requirements, as we talked
9 about, with the handling.
10 But in the opioid crisis,
11 there's no implementation of
12 bills, there was no -- there was
13 no input from DEA like they had in
14 past crises, for the opioid
15 crisis.
16 We worked with DEA in 2007.
17 We felt we built a program that
18 was, again, I think,
19 state-of-the-art in the industry.
20 And that was the program we
21 implemented.
22 We shared our program with
23 all the other industry
24 memberships. It wasn't -- we were

1 open about our process. And, you
2 know, I think that, on itself,
3 shows the efforts of
4 AmerisourceBergen.
5 BY MR. PIFKO:
6 Q. I'm going to ask this
7 question two different ways.
8 First, from -- for the
9 30(b)(6) period of the deposition, the
10 time period, are you aware of any
11 meetings where the company discussed the
12 opioid crisis and what steps it could
13 take to improve its diversion control
14 measures to address those issues?
15 MR. NICHOLAS: Object to the
16 form.
17 THE WITNESS: We
18 regularly -- the department
19 regularly meets and discusses our
20 programs and processes and what we
21 do at the distribution centers,
22 but also with this program as
23 well. And it's open dialogue.
24 And if there's areas we can

1 do that to enhance our program, we
2 do. It's not -- it's not static.
3 We don't just implement it in 2007
4 and there's just no changes. It's
5 a constant.
6 BY MR. PIFKO:
7 Q. Right. But I'm asking if
8 you had a specific discussion about
9 changing or adding to the program as a
10 result of issues stemming from the opioid
11 crisis?
12 MR. NICHOLAS: Object to the
13 form. You're arguing.
14 THE WITNESS: I don't know
15 if there was a specific meeting
16 titled exactly how you're stating
17 it. No, I don't know.
18 BY MR. PIFKO:
19 Q. Okay. I told you I would
20 ask you the question a different way.
21 Now as an individual -- or
22 as the chief compliance officer and the
23 head of the CSRA, are you aware of any
24 conversations, at any time when you

1 worked at the company, where there was
2 discussion of improving diversion control
3 measures specifically in response to the
4 opioid crisis?
5 MR. NICHOLAS: Object to the
6 form.
7 THE WITNESS: As I
8 previously stated, there is always
9 discussions about our program and
10 our processes, not just with the
11 suspicious order monitoring but
12 how we handled things across the
13 scope of the distribution center
14 and all of our requirements.
15 So you're asking me, did
16 have -- can I point to one
17 specific meeting? Not that I'm
18 aware of. But it was a topic that
19 we generally discussed.
20 VIDEO TECHNICIAN: Going off
21 the record. 2:01 p.m.
22 - - -
23 (Whereupon, a brief recess
24 was taken.)

Page 274

1           - - -
2           MR. NICHOLAS:  Counsel
3    produced -- showed us a copy of
4    what has been marked as Exhibit-9
5    in this deposition.  The cover
6    page says, Regulatory Compliance
7    Update, and the document is dated
8    August 10th of 2017.
9           This document was produced
10   in its entirety by mistake.  It
11   is -- there are portions of it
12   that are privileged.  We are going
13   to redact the document now so that
14   it retains the cover page and
15   Pages 11 through 18.  The balance
16   of the document is privileged.
17          Counsel for the other side
18   has agreed, not only not to pursue
19   anything on those other pages, but
20   also to redact and return the
21   privileged pages, which we
22   appreciate.
23          And I think that completes
24   the record.

Page 275

1           Let me just check with my
2    people to make sure I'm not
3    missing something, okay?
4           We are all good.  We can
5    proceed.
6           VIDEO TECHNICIAN:  We're
7    back on the video record.  The
8    time is 2:15 p.m.
9    BY MR. PIFKO:
10   Q.    Let's go back to Exhibit-9.
11          I want to direct your
12   attention to Page 16.  Tell me when
13   you're there.
14   A.    Yep.  Yes.
15   Q.    This is a PowerPoint
16   presentation and the language below are
17   comments.
18          Do you see that?  There's
19   comments in black and comments in red.
20          Do you recall writing the
21   comments?
22   A.    No.
23   Q.    Did you put this PowerPoint
24   presentation together or did someone do

Page 276

1    it at your direction?
2           MR. NICHOLAS:  Object to the
3    form.
4           THE WITNESS:  I don't
5    believe it was me.
6    BY MR. PIFKO:
7    Q.    Do you believe that David
8    May could have put this together for you?
9           MR. NICHOLAS:  Go ahead.
10          THE WITNESS:  He could have.
11   BY MR. PIFKO:
12   Q.    This is talking about
13   program enhancements on the slide.
14          Do you see that?
15   A.    Yes.
16   Q.    On the slide itself.
17   A.    So I'm clear, is this my
18   capacity as an individual?  Because it's
19   outside the scope of what I prepared for
20   on the --
21   Q.    Well, I'm asking you as an
22   individual -- well, and I'm going to --
23   it's going to be related to everything.
24          So your counsel can object

Page 277

1    as he deems to be appropriate once he
2    hears the questions.
3           So it says in the red, just
4    below the note section -- do you see
5    that?
6    A.    Yes.
7    Q.    -- per Eric.
8           Who is Eric?
9    A.    I am not sure.  It could be
10   an attorney.
11   Q.    Is there someone Eric on the
12   board of directors?
13   A.    No.
14   Q.    Is there someone Eric on
15   your staff?
16   A.    There is an Eric on my
17   staff.
18   Q.    Which Eric?
19   A.    There's an Eric Cherveny in
20   our group.
21   Q.    What's Eric's job at this
22   time, in 2017?
23   A.    Eric is the director of
24   diversion control, I believe is his

Christopher Zimmerman (AmerisourceBergen)

Page 278

1 title.
2     Q.   So he's the head of the
3 diversion control division of the CSRA?
4     A.   No.  David May is the head.
5     Q.   Oh, director -- so director
6 is not the top position.
7         What's David May's title?
8     A.   David May is vice president.
9     Q.   So Eric, I'm going to
10 butcher his name, Cherveny -- did I get
11 it right?
12    A.   Cherveny.
13    Q.   Cherveny.
14        He's below -- just below
15 David May?
16    A.   Correct.
17    Q.   And he's in charge of --
18 he's the director of the diversion
19 control program for the company?
20    A.   Correct.
21    Q.   It says here, We are trying
22 to make the best decisions we can to
23 protect the public while assuring legit
24 customers get their meds.  That is all

Page 279

1 the diversion control function is
2 concerned with.
3         Do you see that?
4     A.   Yes.
5     Q.   Do you agree with that
6 statement?
7         MR. NICHOLAS:  Object to the
8     form.
9         But go ahead.
10        THE WITNESS:  I agree our
11    struggle is to assure that
12    legitimate customers get their
13    medications while assuring that we
14    report suspicious orders.
15 BY MR. PIFKO:
16    Q.   And protecting the public
17 while, at the same time, assuring legit
18 customers get their meds?
19        MR. NICHOLAS:  Same
20    objection.
21        THE WITNESS:  I mean, it
22    goes back to -- it goes back to
23    the earlier discussion, that those
24    are the words that they wrote in

Page 280

1 the notes.
2 BY MR. PIFKO:
3     Q.   So you don't necessarily
4 agree with that?
5     A.   I think I stated -- I'll
6 state -- I agree that we have a -- we
7 have a responsibility to assure that we
8 have adequate controls in place to
9 protect against diversion and we have a
10 duty to ensure that legitimate patients
11 have access to much needed medications.
12    Q.   It says here -- it mentions
13 a civil action in Georgia.
14        Do you see that?  In the
15 note at the top.
16    A.   I see that.
17    Q.   Do you know what action that
18 is?
19    A.   I do not.
20    Q.   Do you recall discussing
21 that the diversion control function of
22 the company is concerned with making
23 decisions to protect the public with Mr.
24 May?

Page 281

1         MR. NICHOLAS:  Object to the
2     form.
3         THE WITNESS:  Can you state
4     your question again?
5 BY MR. PIFKO:
6     Q.   Well, this idea, We are
7 trying to make the best decisions we can
8 to protect the public while assuring
9 legit customers get their meds.  That is
10 all the diversion control function is
11 concerned with.
12        That sentence, I'm asking if
13 you discussed that -- concepts in that
14 sentence with Mr. May?
15    A.   Not specifically as worded
16 here.
17    Q.   Do you remember discussing
18 protection of the public and the
19 diversion control function with Mr. May?
20    A.   We have many discussions
21 about our -- how the program -- how the
22 program works and our obligation to
23 the -- make sure we're in compliance but
24 also our obligation to make sure

Page 282

1 legitimate patients have access to
2 medications.
3     Q.   Did Mr. May ever tell you
4 that he believes the diversion control
5 function is concerned with protecting the
6 public?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  I don't
10    recall.
11 BY MR. PIFKO:
12    Q.   How about Eric Cherveny, did
13 he ever discuss the diversion control
14 function and it being concerned with
15 protecting the public?
16    A.   I don't recall any
17 conversation to that, no.
18        MR. NICHOLAS:  Object to the
19    form.
20 BY MR. PIFKO:
21    Q.   It says here, We may have to
22 get pretty specific with how we revise
23 the forms to assuage any concern they may
24 have that we are justifying the Short

Page 283

1 Form 590.
2     Do you see that?
3     A.   Where are you?  Are you on
4 the same side?
5     Q.   Same page.
6     A.   Where in the note text?
7     Q.   Second red paragraph.
8     A.   I see that.
9     Q.   What's the Short Form 590?
10 Was there a discussion about shortening
11 the form?
12    A.   I don't know.  I don't
13 recall.  These aren't my notes written on
14 here.
15    Q.   Did you give this
16 presentation to the board about -- I
17 believe it's titled, CSRA Diversion
18 Control?
19    A.   I believe David May did.
20    Q.   Were you present at the
21 presentation?
22    A.   Yes.
23         - - -
24         (Whereupon, Amerisource

Page 284

1         Bergen-Zimmerman Exhibit-10,
2     ABDCMDL 00000099-100, was marked
3     for identification.)
4         - - -
5 BY MR. PIFKO:
6     Q.   I'm handing you what is
7 marked as Exhibit-10.  It's a two-page
8 document Bates labeled ABDCMDL 00000099
9 and 100.
10        I'll represent to you that
11 the metadata showed June 30th, 2007 as
12 the date for this.
13    A.   What date?  I'm sorry.
14    Q.   June 30th, 2007.
15        Let me know when you're done
16 reviewing it.
17    A.   And you said this is from
18 June?
19    Q.   I believe that's what the
20 metadata says.
21    A.   All right.
22    Q.   Are you familiar --
23    A.   2007.
24    Q.   -- with this document?

Page 285

1     A.   I can't recall specifically
2 the document.
3     Q.   Do you recall having
4 guidelines for threshold reviews?
5     A.   Yes.
6     Q.   Does this appear to be a
7 true and correct representation of
8 guidelines for threshold reviews for
9 which you were familiar?
10        MR. NICHOLAS:  Object to the
11    form.
12        THE WITNESS:  At the time in
13    June of 2007?  Yes.
14 BY MR. PIFKO:
15    Q.   It says at the bottom, Based
16 upon past sales data of retail
17 pharmacies, controlled substance
18 purchases account for approximately ■
19 percent of the average retail pharmacy's
20 total purchases from AmerisourceBergen
21 Corporation.
22        Do you see that?
23    A.   Yes.
24    Q.   Then it says, Based upon

Christopher Zimmerman (AmerisourceBergen)

1 sales volume and controlled substances,
2 CS ratio, CSRA has been able to place all
3 retail pharmacy accounts into one of four
4 categories, which determines how CSRA
5 will approach adjustments to the
6 account's established threshold levels.
7          Do you see that?
8     A.   Yes.
9     Q.   Do you recall having
10 stratifications for threshold levels
11 based on the controlled substances ratio?
12    A.   I'm sorry, your question is,
13 again? I'm sorry.
14    Q.   Do you recall having
15 stratifications for threshold levels
16 based on controlled substances ratios?
17    A.   The thresholds were based
18 upon the size of the customer.
19    Q.   This talks about adjustments
20 to the account's threshold levels based
21 on the dollar volume and the controlled
22 substances ratio.
23    A.   Yes.  So this document was
24 in June, keep in mind the time frame,

1 this is in the middle of our
2 negotiations.  So we haven't signed off
3 on our new program.
4          So in order to first get it
5 up and running, we had to take just a
6 quick swath of our total customer base
7 and make four categories.  So we threw
8 all the customers into those four
9 categories based on volume, not anything
10 else.
11          And then we had this
12 guideline, said take a look now and
13 further -- get more scientific with the
14 customers to make sure they were
15 appropriately sized, and their thresholds
16 were created.
17          And so, again, this would be
18 something that we would have been working
19 with DEA as we went through this process.
20 And so once we first got the customers in
21 their class, just based on dollar volume,
22 the average pharmacy is ■ percent,
23 unless it had some, you know, other
24 areas.  So then we went through and took

1 a look at the thresholds to better gauge
2 them for the customer and their business.
3          Again, with the intent of
4 ensuring that customers that had
5 legitimate medical need for the product
6 was able to get it.
7     Q.   Let's look at the fourth
8 category.
9          These are customers that
10 have low-dollar volume, high-controlled
11 substances ratio.
12          Do you see that?
13    A.   Yes.
14    Q.   It says, Customers in this
15 category are generally secondary accounts
16 and account for the majority of the OMP
17 issues.
18          Do you see that?
19    A.   I see that.
20    Q.   Do you know what that means?
21    A.   That means that you could
22 have a customer, it could be a large
23 account -- so in the distribution
24 environment, most pharmacies have

1 multiple accounts and -- just in the
2 event that they need product that their
3 primary distributor can't distribute, or
4 in the effect that they have different
5 pricing structures on different products
6 from different distributors.  So they
7 have more than one account.
8          So if you had a large
9 account that was a small dollar volume --
10 I mean, it could be a $2 million account,
11 for us it might be a $10,000 account,
12 because it's secondary, but it's a
13 million-dollar operation and they're
14 buying higher level controls, they're
15 going to hit on the OMP.
16          And that's what's referenced
17 to a low-dollar high-ratio secondary
18 account.
19    Q.   And so when you say "hit on
20 the OMP," because you mentioned this
21 paragraph we were at on the first page,
22 about the ■ percent ratio of controlled
23 substances to total volume --
24    A.   That's for a regular -- so

Page 290

1 if a pharmacy buys 100 percent of their
2 purchases, in this average, at that time,
3 ■ percent, if you have a secondary
4 account, they might be buying
5 different -- disproportionate --
6 disproportionate amount of percentages
7 from different distributors, but their
8 overall purchase is going to be ■
9 percent.
10   Q.   Right.
11   A.   Does that explain that?
12   Q.   So there's a statement here,
13 Sales, the VP/DCM, and potentially the
14 RVP, should closely evaluate the business
15 decision to service these accounts.
16       First question, VP/DCM, who
17 are those people?
18   A.   That's the distribution
19 center manager.
20   Q.   VP, who is that?
21   A.   That's their title.
22   Q.   That's one title, okay.
23       So that's the top person at
24 any particular distribution center?

Page 291

1   A.   Correct.
2   Q.   Regional vice president,
3 what would that refer to here?
4   A.   Regional vice president for
5 distribution.
6   Q.   Okay.  Is that -- that
7 person's above the specific distribution
8 center?
9   A.   Yeah, so the distribution
10 center -- the VP/DCM is of the
11 distribution center.  And then RVP may
12 have four or five distribution centers
13 under them.
14   Q.   So they're talking about a
15 business decision to service these
16 accounts.
17       Do you see that?
18   A.   Yes.
19   Q.   Why would they be having a
20 business decision about whether they want
21 to service these accounts?
22       MR. NICHOLAS:  Object to the
23 form.
24       THE WITNESS:  Whether they

Page 292

1 want to be a secondary supply to
2 these accounts.  I mean, it's a
3 business decision.
4       What's the dollar volume of
5 their purchasing?  Is it -- do
6 they want to continue business
7 with them?
8 BY MR. PIFKO:
9   Q.   Why wouldn't you want to
10 continue business with them?
11       MR. NICHOLAS:  Object to the
12 form.
13       THE WITNESS:  Because it
14 depends upon how much volume
15 they're purchasing.  So, you know,
16 just to have a pharmacy account,
17 you need to purchase a certain
18 level of volume, just to break
19 even because of the pick, pack,
20 ship process and overhead
21 operating cost.
22       So just because a pharmacy
23 does $10,000 worth of business, it
24 may cost you $50,000 to carry it.

Page 293

1 So there's a business decision
2 depending, is it a secondary
3 account, because we may be getting
4 all their business or is it a
5 secondary account that we're
6 servicing them in the event they
7 need product?  That's the business
8 decision.
9 BY MR. PIFKO:
10   Q.   When you say it's a
11 secondary account, we may be getting all
12 their business, what do you mean?
13 They're just a small account?
14   A.   No, no, no.  If they are a
15 secondary account, they're not getting
16 all -- they're secondary with us, so
17 they're only getting a small portion of
18 our business.
19       So they need to make a
20 decision -- again, I don't know if
21 they're profitable, maybe they are, maybe
22 they're not.  There's a business
23 decision.
24   Q.   It says here, under Item B,

Christopher Zimmerman (AmerisourceBergen)

Page 294

1 Is AmerisourceBergen Corporation
2 assisting/enabling its competitors to
3 retain primary accounts by providing
4 these accounts with, quote, high-risk
5 controlled substances because the primary
6 distributor has limited the account's
7 controlled substances quantities to limit
8 its exposure.
9         Do you see that?
10     A.   Yes.
11     Q.   Do you have any
12 understanding what that's about?
13     A.   That's a question.  Yes.
14     Q.   Is that a consideration that
15 Amerisource looks at when they're looking
16 at the dollar volume and controlled
17 substances ratio of certain accounts?
18         MR. NICHOLAS:  Object to the
19 form.
20         THE WITNESS:  As I
21 indicated, the decision is, if
22 they are a secondary account, why
23 are they a secondary account?  And
24 what products are we supplying

Page 295

1 them?  And it's a business
2 decision whether we want to
3 continue.
4         We're not raising their
5 threshold.  We're not -- you know,
6 they're not -- we're not diverting
7 product.  So it's a business
8 decision of whether they want to
9 maintain these customers.  It's as
10 simple as that.
11 BY MR. PIFKO:
12     Q.   The way I read this, it
13 seems to me like they're saying, if we're
14 going to service this low-dollar,
15 high-volume controlled substances
16 account, they could be a primary customer
17 of another distributor and we're helping
18 them buy more controlled substances and
19 do we want to do that?
20         MR. NICHOLAS:  Object to the
21 form.
22 BY MR. PIFKO:
23     Q.   Do you agree with that?
24         MR. NICHOLAS:  Object to the

Page 296

1 form.
2         THE WITNESS:  No.  I think I
3 stated that they are a secondary
4 account.  And there's a question,
5 it's not a statement, it's a
6 question of whether that's --
7 that's occurring.  I don't know.
8         These are licensed
9 pharmacies that we're secondary
10 because most -- a lot of our
11 primary customers may have a
12 secondary account.  That's just
13 the nature of the industry in the
14 supply chain.
15 BY MR. PIFKO:
16     Q.   Right.  So I'm not saying
17 that that is occurring.
18         I'm just saying that that's
19 what this is addressing; it's saying if
20 there's an account that's a low-dollar
21 account and they're buying a lot of
22 controlled substances, one consideration
23 we should have is if we're helping a
24 competitor account -- or the primary

Page 297

1 account of a competitor, are we helping
2 them buy more controlled substances?  We
3 should think about that if we're going to
4 service this account.
5         MR. NICHOLAS:  Objection.
6 BY MR. PIFKO:
7     Q.   Do you agree that that's
8 what they're asking?
9         MR. NICHOLAS:  Object to the
10 form.
11         THE WITNESS:  Again, it's a
12 question.  It's not a statement.
13         Again, it's just something
14 that's listed here as a question.
15 If it's a secondary account, is it
16 an account we want to continue
17 servicing because we're going to
18 retain the business, or is it a
19 secondary account that we're not
20 going to -- we're not going to
21 continue servicing as secondary
22 because we're not going to get the
23 business?
24 BY MR. PIFKO:

Christopher Zimmerman (AmerisourceBergen)

Page 298

1  Q.  But -- okay.  I agree A
2  says, Is there a potential to transition
3  this secondary account to primary?
4       Agree.  It sounds like
5  they're saying, can this customer become
6  a primary customer, maybe that's a reason
7  we want to work with them.
8       But B, I'm not saying a
9  specific instance, I'm just asking you,
10  it appears that what they're asking --
11  they're talking about limiting -- a
12  competitor wanting to maybe limit its
13  exposure by having this customer buy from
14  you.
15       And I'm just asking, is that
16  what they're -- is that a risk that the
17  company is looking at here when they're
18  considering this issue?
19       MR. NICHOLAS:  Object to the
20  form.
21       THE WITNESS:  It doesn't
22  have anything to do -- it doesn't
23  have anything to do with the
24  competitor.  It has to do with the

Page 299

1  customer.
2       They may be choosing to buy
3  their controlled substances from
4  us versus our competitor
5  because -- for whatever reason.
6       So I don't want you to read
7  too much into that, other than the
8  fact that this question is, is
9  this an area that they're buying
10  their controls from us while
11  buying non-controls from another
12  one.
13       And if that's the case, is
14  that -- is that what we want to
15  do?  Do we want to service that
16  account?
17  BY MR. PIFKO:
18       Q.  Right.  Because I'm
19  literally reading the document.  It says,
20  Is AmerisourceBergen assisting/enabling
21  its customers?  And then it talks
22  about -- or competitors.
23       And it talks about limiting,
24  are they wanting to limit their exposure?

Page 300

1  That's what the consideration is here.
2       MR. NICHOLAS:  Object to the
3  form.  We're kind of going round
4  and round.
5       THE WITNESS:  Again, the
6  consideration is not that -- and
7  we don't know if the primary is
8  limiting their controls.  All we
9  know is we have a secondary
10  account that is buying a high
11  volume of controls, which could be
12  because they're buying less
13  controls from our competitor, and
14  is that the account -- the kind of
15  account we want as a secondary
16  account?
17  BY MR. PIFKO:
18       Q.  Let me ask you a different
19  question.
20       If you knew that an account
21  was buying controls from you to skirt
22  thresholds set by one of your
23  competitors, is that an account you would
24  want to service?

Page 301

1       MR. NICHOLAS:  Object to the
2  form.
3       Go ahead.
4       THE WITNESS:  I wouldn't
5  know.  I mean, I don't know if
6  that's occurring.  You're giving
7  me a hypothetical.
8       Again, you know, it all
9  depends upon the circumstances of
10  the customer, the account, when
11  their contract is going to expire.
12  There's a lot of business -- other
13  things that are involved in that
14  decision.
15  BY MR. PIFKO:
16       Q.  So you can't say for sure
17  that if you knew a customer was coming to
18  you because they were told no from their
19  primary supplier, you can't say that
20  that's not somebody you would want to
21  work with?
22       MR. NICHOLAS:  Wait a
23  minute.  Object to the form.
24  Mischaracterizes the testimony.

Christopher Zimmerman (AmerisourceBergen)

Page 302

1    THE WITNESS:  I'm not going
2  to answer a hypothetical.
3    You're throwing, if somebody
4  did X, would we do Y?  I'm just
5  not in a position to make those
6  kinds of statements.
7  BY MR. PIFKO:
8    Q.   So it wouldn't bother you if
9  a company was coming to you to circumvent
10 a competitor's controlled substances
11 requirements?
12   MR. NICHOLAS:  Object to the
13  form.  Asked and answered.
14  Mischaracterizes the testimony.
15  Probably way outside the scope of
16  the 30(b)(6) as well.
17   THE WITNESS:  Again, you're
18  giving me a hypothetical set of
19  circumstances and you want me to
20  give you an answer.  And I can't,
21  because I don't know the -- all
22  the -- whatever else you're
23  including in your hypothetical.
24    - - -

Page 303

1    (Whereupon, Amerisource
2  Bergen-Zimmerman Exhibit-11,
3  CAH_MDL_PRIORPROD_DEA_07_00880890-
4  92, was marked for
5  identification.)
6    - - -
7  BY MR. PIFKO:
8    Q.  I'm handing you what is
9  marked as Exhibit-11.
10   It's a document produced by
11 Cardinal Health in this matter, which we,
12 under the protective order, obtained
13 prior approval to use it in this
14 deposition.  It's Bates labeled
15 CAH_MDL_PRIORPROD_DEA07_00880890 to 92.
16   It's an e-mail at the top
17 from Steve Reardon, dated September 11,
18 2007, to Mr. Zimmerman.  The subject is,
19 Summary of September 7th meeting with DEA
20 and attachments.
21   Let me know when you're done
22 reviewing it.
23   A.  Okay.
24   Q.  Do you recall receiving this

Page 304

1  e-mail?
2    A.  I don't.
3    Q.  Do you have any reason to
4  believe this is not a true and correct
5  copy of an e-mail that you received?
6    A.  No, I don't doubt that.
7    Q.  We did talk about the HDMA a
8  little bit earlier.
9    Did you serve -- did you
10 serve, in any capacity, on any committee
11 or board or group within the HDMA?
12   A.  At some point, I was on the
13 regulatory affairs committee.  And now
14 I'm on the public -- I think they call it
15 the public policy committee.
16   Q.  Do you believe that you were
17 on the regulatory affairs committee at
18 around the time this e-mail was sent in
19 September of 2007?
20   A.  Could have been, yes.
21   Q.  Do you recall what your
22 responsibilities were as a member of the
23 regulatory affairs committee?
24   A.  As a member, I mean, we

Page 305

1  would talk about regulatory issues facing
2  wholesalers.
3    Q.  Regulatory issues concerning
4  The Controlled Substances Act; is that
5  correct?
6    A.  It could be a whole host of
7  things.  It could be destruction.  It
8  wasn't only for controlled substances.
9  Anything involving wholesale distribution
10 in the healthcare chain.
11   Q.  But that could include
12 controlled substances?
13   A.  Yes.
14   Q.  Okay.  How about diversion
15 control, would that include that?
16   A.  Yes.
17   Q.  Do you recall HDMA setting
18 up a meeting with members of the DEA
19 around this time in 2007?
20   A.  I don't.
21   Q.  This is around the time of
22 some of the Dear Registrant letters.
23   Do you agree?
24   A.  Yes.  Yes.

Page 306

1    Q.   Do you recall there being
2  more activity between members of the
3  industry and DEA at that time?
4    A.   As I previously stated, I
5  mean, when I started, we met with DEA
6  every six months and it was a regular
7  activity.  And then with the training
8  program, we met with them a lot more;
9  there was a lot more communication.
10     In 2007, this came shortly
11 after -- this is probably within weeks
12 after we got our distribution center back
13 and implemented our new program.  So
14 there was a lot of activity on this
15 subject matter.
16   Q.   Do you know why the HDMA
17 would have been having a meeting with the
18 DEA at this time?
19     MR. NICHOLAS:  Object to the
20 form.
21     THE WITNESS:  As I
22     indicated, at that time, they
23     would meet regularly with them; if
24     not every six months, every year.

Page 307

1  I don't know if this is a regular
2  meeting that they have to discuss
3  issues with distributors or
4  distributors wanting
5  clarification.
6      I'm not really sure what the
7  nexus of this meeting was about.
8  BY MR. PIFKO:
9    Q.   Did you ever attend DEA
10 conferences?
11   A.   Yes.
12   Q.   How often does the DEA put
13 on conferences?
14   A.   I believe every other year
15 for distributors, and then the other
16 years pharmacy practitioners.  I'm not
17 positive about that.
18     But I know our meetings
19 are -- usually every two years, DEA will
20 have an industry meeting for
21 distributors.
22   Q.   Do you always attend those?
23   A.   I attended a lot of them
24 earlier on.  I probably haven't attended

Page 308

1  one in years.  People on my staff attend
2  them.
3    Q.   When do you recall having
4  last attended one?
5    A.   It may have been 2009.  I am
6  not sure if I attended one in 2011.  But
7  I know I haven't attended one for the
8  last, you know, years.
9    Q.   You've always -- someone
10 from Amerisource has always been sent to
11 one of these conferences?
12   A.   Usually, yes.
13   Q.   And do they continue to this
14 day?
15   A.   Yes.
16   Q.   Do you know if there was one
17 in 2016?
18   A.   I don't know if it's 2016 or
19 2017, but they have them every two years.
20   Q.   Okay.  Does anyone take
21 notes at these meetings?
22   A.   I don't know if HDA as --
23 does that or not.  I don't know.
24   Q.   Do you direct any of your

Page 309

1  staff members to take notes of the
2  meetings if you don't attend?
3    A.   They would -- I would assume
4  they would take notes.  DEA usually
5  provides the slides that they produce at
6  the industry conferences.  I'm not sure
7  if they put them on their website -- I'm
8  not sure if they put them on their
9  website or not.
10   Q.   Do you discuss the
11 presentations or the conferences with
12 other members of the HDMA?
13   A.   Do we discuss the DEA
14 conferences with HDMA members?  Most of
15 them are usually there.  I shouldn't say
16 all of them, but a lot of the members are
17 there at the DEA conference.
18   Q.   So you meet with each other
19 while you're at these conferences?
20 You're there together?
21   A.   Yes.
22   Q.   Do you discuss diversion
23 control while you're at these
24 conferences?

Christopher Zimmerman (AmerisourceBergen)

Page 310

1    MR. NICHOLAS:  I'm going to
2  just object to the questions, only
3  to the extent that the witness
4  said he hasn't been to one of
5  these conferences himself since
6  2009 or maybe 2011.
7    So I want to make sure the
8  record is clear that we're, you
9  know -- he's not talking about --
10  he can only talk about what he can
11  talk about.
12    Go ahead.
13    THE WITNESS:  Years back,
14  yeah, we would talk about
15  regulatory issues or how we do
16  things or, you know, what -- those
17  type of things.
18 BY MR. PIFKO:
19    Q.   Is there a meeting through
20  the HDMA, after these conferences, where
21  the members get together and discuss what
22  was said at the conference and their
23  views on the information that the DEA
24  might have shared at the conference?

Page 311

1    MR. NICHOLAS:  Same
2  objection for the same reason.
3    THE WITNESS:  My
4  recollection was that, you know,
5  there would be discussions prior
6  to the meetings if there's
7  questions that we wanted to bring
8  up, as an industry.
9    I don't recall if there was
10  a structured debrief or anything
11  like that after.
12 BY MR. PIFKO:
13    Q.   Let's look back at
14  Exhibit-11.
15    It says here -- well, first,
16  do you know who Brian Cherico is?
17    A.   I'm not familiar with Brian.
18    Q.   How about Steve Reardon?
19    A.   Yes.
20    Q.   Who is Steve Reardon?
21    A.   He was -- I don't know if
22  he's director or senior director or vice
23  president of regulatory.  I've known him
24  for quite some time.

Page 312

1    Q.   Do you know if he still
2  works at Cardinal Health?
3    A.   He does not.
4    Q.   Does he work for another
5  distributor, do you know?
6    A.   He's retired.
7    Q.   How about Anita Ducca, do
8  you know who that is?
9    A.   I believe -- yes, I do.
10    Q.   Who is she?
11    A.   I believe she's vice
12  president of regulatory affairs for HDMA.
13    Q.   So then Brian sends this to
14  Steve Reardon, and says, Steve, pasted
15  below please find the summary of HDMA's
16  meeting with the DEA last Friday.  Please
17  let me know if you need anything else.
18    Do you see that?
19    A.   Yes.
20    Q.   And then it's got a summary
21  of the meeting here.
22    It says, Key takeaways from
23  the meeting were -- do you see where that
24  is?

Page 313

1    A.   Yes.
2    Q.   DEA's policy was to expect
3  more than just reporting suspicious
4  orders.  If there was a suspicious order,
5  the distributor should either stop the
6  delivery or should evaluate the customer
7  further before delivering it.
8    Do you see that?
9    A.   Yes.
10    Q.   Did you have an
11  understanding, at that time, that that
12  was DEA's position?
13    A.   Yes.  This was the program
14  that we had just negotiated.
15    Q.   It says, Simply complying
16  with the suspicious orders regulatory
17  requirement does not mean, in the
18  agency's view, that the registrant is
19  maintaining an effective program to
20  detect and prevent diversion.
21    Do you see that?
22    A.   Yes.
23    Q.   Did you have an
24  understanding that that was the DEA's

Page 314

1  position at the time?
2      A.   As I previously indicated,
3  there's many requirements to have
4  adequate controls to prevent diversion,
5  other than just to report a suspicious
6  order, yes.
7      Q.   It then says, DEA indicated
8  that they did not have the resources to
9  inspect every pharmacy; therefore, it was
10 important for the distributor to, quote,
11 know their customers, end quote.
12         Do you see that?
13     A.  I see that.
14     Q.   Did you have an
15 understanding that that was the DEA's
16 position at the time?
17     A.  I've never seen it stated as
18 such, that a lack of resources by DEA
19 imposes a requirement upon a registrant
20 over and above their regulatory
21 responsibilities.
22     Q.   Well, they sent this e-mail
23 to you saying this in 2007.
24     A.  Yes.

Page 315

1      Q.   Do you recall discussing
2  that with anyone?
3      A.  No.
4      Q.   Do you recall being shocked
5  that that was a new position of the DEA
6  of which you weren't familiar with?
7      A.  No.
8      Q.   Okay.  So that's consistent
9  with the DEA's position as far as you
10 knew at the time?
11         MR. NICHOLAS:  Object to the
12     form.
13         THE WITNESS:  You had stated
14     that -- in our negotiation, they
15     wanted us to enhance our due
16     diligence process.  What I don't
17     recall them saying is that we
18     can't -- we don't have resources
19     to do this, so we want you to do
20     that.  I don't recall that.
21         I recall them wanting us to
22     enhance our due diligence process,
23     yes.
24 BY MR. PIFKO:

Page 316

1      Q.   Upon receiving this e-mail,
2  did AmerisourceBergen take any steps to
3  respond to the idea that DEA did not have
4  adequate resources to inspect pharmacies
5  and, therefore, it was important for them
6  to, quote, know their customer?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  No.  This
10     is -- like I indicated previously,
11     this is maybe a couple of weeks
12     after we negotiated our program
13     which contained the "know your
14     customer."  So there's no use to
15     respond to this.  This is our
16     program.
17 BY MR. PIFKO:
18     Q.   Let's go to the next page.
19         It says, DEA provided
20 examples of what a wholesale distributor
21 should do to, quote, know their
22 customers, end quote, and what to look
23 for.
24         Do you see that?

Page 317

1      A.  Yes.  I see that, yes.
2      Q.   Do you recall getting
3  guidance from the DEA on what you should
4  do to know your customers?
5          MR. NICHOLAS:  Object to the
6      form.  It seems like you'd want to
7      call his attention to the
8      additional sentences in the
9      paragraph to help answer the
10     question.
11         THE WITNESS:  As I
12     indicated, we had had these
13     discussions with the DEA in
14     developing our program and the
15     discussions about the form, yes.
16 BY MR. PIFKO:
17     Q.   Did you understand that the
18 DEA wanted you to inspect pharmacies?
19     A.  Part of our due diligence
20 program was to have a site visit and
21 complete a form, yes.
22     Q.   This is what -- the new
23 customer onboarding you talked about?
24     A.  Correct.

Page 318

1    Q.   Did you have an
2    understanding that you should inspect
3    customers who are existing customers?
4        A.   No.
5        Q.   It says, They -- referring
6    to the DEA -- also mentioned such actions
7    as, quote, doing Google searches, end
8    quote, to determine if the pharmacy's
9    name was affiliated with an Internet site
10   and getting information from the state as
11   to the nature and number of prior legal
12   actions against a pharmacy.
13       Do you see that?
14       A.   Yes.
15       Q.   Did you have an
16   understanding that the DEA expected you
17   to do those things?
18       MR. NICHOLAS:  Object to the
19   form.
20       Go ahead.
21       THE WITNESS:  That was
22   contained in our form, and that
23   was part of our process.
24   BY MR. PIFKO:

Page 319

1        Q.   But, again, that was limited
2    to -- to the extent it was part of your
3    process, it was limited to the new
4    customer due diligence?
5        A.   At this date, yes.
6        Q.   At a later date, that kind
7    of investigation was more than just new
8    customer due diligence?
9        A.   Yeah.  We would go back and
10   start to populate our -- even though our
11   agreement with DEA was anything going
12   forward, we would start completing 590
13   forms for our existing customers as well.
14       Q.   Other than completing 590
15   forms, did your efforts to do these
16   initial investigations include anything
17   else?
18       MR. NICHOLAS:  Asked and
19   answered.
20       Go ahead.
21       THE WITNESS:  The 590 form
22   is the basis of the -- that's the
23   questionnaire that starts the
24   investigation, the Google searches

Page 320

1    and the checks with the state and
2    federal agencies.
3        So the form is the beginning
4    of the investigation process.  And
5    so when I say the 590, I should
6    probably clarify better, that's
7    the entire investigation process
8    and onboarding.  And we started
9    doing that with existing customers
10   as well.
11   BY MR. PIFKO:
12       Q.   Would you do it with any
13   frequency of existing customers, or would
14   you just do it once, get the form and
15   then move forward?
16       MR. NICHOLAS:  Object to the
17   form.
18       THE WITNESS:  Again, in
19   this -- we're talking the date of
20   this letter, we were just
21   implementing our program.  So, you
22   know, we moved forward from that.
23       But in 2007, as of this
24   date, August, whatever, we were

Page 321

1    doing new customer due diligence
2    at this time.
3    BY MR. PIFKO:
4        Q.   How about after that; at any
5    period up until the end of 2014, did
6    AmerisourceBergen have any specific
7    frequency with which it would conduct
8    investigations of its customers through
9    the Form 590?
10       MR. NICHOLAS:  Object to the
11   form.
12       Go ahead.
13       THE WITNESS:  If there were
14   issues with the pharmacy or
15   changes, whether they wanted a
16   threshold increase, changes in the
17   operation of the pharmacy, we
18   would get an updated 590 and
19   conduct an investigation to
20   substantiate whatever the request
21   was, or the issue.
22   BY MR. PIFKO:
23       Q.   But there was no set, we're
24   going to do it every six months, every

Christopher Zimmerman (AmerisourceBergen)

Page 322

1  year, whatever, kind of thing?
2          MR. NICHOLAS:  Object to the
3      form.
4          THE WITNESS:  I don't
5      recall.
6  BY MR. PIFKO:
7      Q.   It says, towards the bottom,
8  second-to-last bullet point, DEA also
9  indicated that they were not going to
10  make a decision for the wholesale
11  distributor as to when an order was
12  suspicious.  They feel this is up to the
13  distributor.
14          Do you see that?
15      A.   Yes.
16      Q.   Did you understand that the
17  determination of whether an order was
18  suspicious was up to you?
19      A.   Yes.
20      Q.   The last bullet point says,
21  DEA suggested that distributors should
22  check on the pharmacy's prescribing
23  physicians.  They pointed to some states
24  having online systems by which a

Page 323

1  distributor could check to see if a
2  prescribing physician had a valid DEA
3  registration.  DEA suggested that
4  distributors ask who the doctors are that
5  are prescribing, where the pharmacy is
6  geographically with respect to its
7  prescribing doctors, and the patient
8  population.
9          Do you see that?
10      A.   Yes.
11      Q.   Did you have an
12  understanding that that's what you were
13  supposed to do, from the DEA?
14          MR. NICHOLAS:  Object to the
15      form.
16          Go ahead.
17          THE WITNESS:  I believe
18      that's what we were doing.
19  BY MR. PIFKO:
20      Q.   You believe that's what you
21  were doing in connection with the Form
22  590 process?
23      A.   Yes.  Correct.
24      Q.   At one point, you said that

Page 324

1  you gathered those forms for new
2  customers from when you started the
3  program in 2007.  And at some point you
4  started doing it for existing customers.
5          Do you recall at what point
6  that was?
7      A.   I don't know specifically.
8      Q.   Would it have been in 2009?
9      A.   It could have been the next
10  week, if there was an issue, you know,
11  if -- you go back to this -- the other
12  document you showed, that if a customer
13  was going to be looking to be resized, it
14  would be a 590.  If it was an existing
15  customer, we would get a 590.
16          Any new customer at ABC
17  onboarding created a 590; any change, we
18  would capture the 590 as well.  It could
19  be -- it wasn't in 2009, we started doing
20  that, we started doing that immediately.
21      Q.   I thought I heard you say,
22  though, at some point, you undertook a
23  process to get Form 590s for all your
24  existing customers.

Page 325

1          Did I mishear you?
2      A.   So at some point, if we had
3  a customer that was a 20-year customer,
4  had never placed an order that ever met
5  the requirement, had never had an issue,
6  we started to process that, even though
7  we never had an issue with this customer
8  for 15 years, let's start to get a 590.
9          If you had a customer that
10  wanted to do a change in its business
11  activity or what have you, we would get a
12  590 on those.
13      Q.   I'm just trying to
14  understand, the first thing that you just
15  mentioned of getting them for any -- any
16  customer, when was the time period when
17  you believe that was started?
18      A.   I don't recall.
19      Q.   Was it recently?
20      A.   I don't -- I'm not sure what
21  "recently" means, but it wasn't, like,
22  this year.  It's been -- we started that
23  process a while back.
24      Q.   Two years ago?

Page 326

1    A.   I don't know.  I don't know.
2    Q.   Well after 2007?
3    A.   I don't know.  After 2007,
4  we were getting 590s on existing
5  customers, as we were building our
6  program.
7    Q.   I'm just asking about this
8  process that you said, at some point, you
9  undertook an effort to get it from
10  existing customers, just going through
11  and getting them, regardless of whether
12  there was an incident.
13        And I'm just trying to
14  understand --
15    A.   And I don't know --
16    Q.   -- about when that happened.
17    A.   -- when that happened.  I
18  don't know.
19    Q.   Do you recall taking any
20  action, as a result of receiving this
21  e-mail describing the DEA's position on
22  the issues we just discussed?
23        MR. NICHOLAS:  Object to the
24  form.

Page 327

1        THE WITNESS:  I'm not sure
2  what action -- I don't recall
3  getting the e-mail, so I don't
4  recall reading the e-mail and then
5  any action.
6        This is two weeks after we
7  put our program in place, which is
8  pretty much the points that
9  they're hitting on.
10        And I think this is in
11  September.  And I spoke at their
12  conference, I think it was
13  November, and covered pretty much
14  these same points.  So our program
15  was already meeting these
16  requirements.
17        MR. NICHOLAS:  Mark before
18  you go to another document, it's
19  been two hours.  Can we take a
20  break?
21        MR. PIFKO:  Sure.
22        VIDEO TECHNICIAN:  Going off
23  the record.  3:05 p.m.
24        - - -

Page 328

1        (Whereupon, a brief recess
2  was taken.)
3        - - -
4        VIDEO TECHNICIAN:  We're
5  back on record at 3:26 p.m.
6        - - -
7        (Whereupon, a discussion off
8  the record occurred.)
9        - - -
10        (Whereupon, Amerisource
11  Bergen-Zimmerman Exhibit-12,
12  MNKT1_0000291614-1620, was marked
13  for identification.)
14        - - -
15  BY MR. PIFKO:
16    Q.   I've just handed you what's
17  marked as Exhibit-12.  It's a document
18  Bates labeled MNKT1_0000291614 through --
19        MR. CLUFF:  This is another
20  one --
21  BY MR. PIFKO:
22    Q.   -- 1620.
23        MR. CLUFF:  -- where we
24  obtained permission from

Page 329

1  Mallinckrodt's counsel prior to
2  its use today.
3        MR. NICHOLAS:  Okay.
4  BY MR. PIFKO:
5    Q.   Could you take a minute to
6  take a look at this document, please?
7    A.   Yes.
8    Q.   Let me know when you're
9  done.
10        I was only going to ask you
11  about a couple of things on here, in the
12  interest of time.  Feel free to look at
13  it, but I can direct you to the couple of
14  questions.
15        Have you seen this document
16  before?
17    A.   I don't recall seeing it
18  before.
19    Q.   It says, HDMA, DMC expo,
20  2011.
21        Do you know what an HDMA,
22  DMC expo is?
23    A.   HDMA has an annual
24  management conference, I'm assuming

Christopher Zimmerman (AmerisourceBergen)

Page 330

1 that's what they're referring to.
2    Q.   When you were on -- you've
3 been -- you've had a role with respect to
4 the HDMA for a long time now, right?
5 You've had different roles.
6       I think -- I forget, but you
7 were on one committee and then you're on
8 some other committee now, right?
9    A.   That's correct.
10   Q.   So you've always had an
11 affiliation with the HDMA?
12   A.   Yes.
13   Q.   Have you attended this
14 conference in the past?
15   A.   I have.
16   Q.   Do you believe you attended
17 this one?
18   A.   I may have.  It's like with
19 the other one, I don't -- I haven't
20 attended them the last -- for years.  I
21 just don't know when -- when I stopped
22 attending.
23   Q.   You see at the top here, it
24 says, Attendees included

Page 331

1 AmerisourceBergen, Cardinal, H.D. Smith,
2 McKesson, Lilly, Johnson & Johnson,
3 Purdue, Sanofi, Aventis, AmeriCares and
4 many more.
5       Do you see that?
6    A.   Yes.
7    Q.   So you believe you would
8 always send someone to these conferences
9 if you didn't attend yourself?
10   A.   Yes.
11   Q.   I just want to know, I want
12 to ask you about your familiarity with
13 some of the topics that were discussed
14 here.
15       This is -- the notes here
16 are about a specific DEA session that
17 occurred on March 7th at this conference.
18       Do you see that just on the
19 first page at the top?
20   A.   Yes. ^^
21   Q.   Do you know who Cathy
22 Gallagher is?
23   A.   I do.
24   Q.   Is that someone you've

Page 332

1 interacted with before?
2    A.   I have.
3    Q.   It says she's chief policy
4 and liaison, Drug Enforcement
5 Administration.
6    A.   Correct.
7    Q.   What did she do, as far as
8 your interactions with her?
9    A.   She would be one, if we had
10 a policy question or a process question,
11 that we would either write to her or call
12 her.
13   Q.   It says here, Cathy gave a
14 brief overview of hot topics current
15 within the DEA.
16       Do you see that?
17   A.   Yes.
18   Q.   In conferences -- in HDMA
19 conferences you do remember attending, do
20 you remember the DEA presenting current
21 topics of interest to the members of the
22 industry at these conferences?
23   A.   Yes.  There was usually a
24 segment that DEA presented at.

Page 333

1    Q.   One of these, if you scroll
2 way down to the bottom,
3 second-to-the-last bullet point, Increase
4 of ER visits are 97 percent contributable
5 to pharmaceuticals; opioids are the most
6 frequent.
7       Do you see that?
8    A.   Yes.
9    Q.   Do you recall that being a
10 topic of discussion within the industry
11 in 2011?
12       MR. NICHOLAS:  Object to the
13   form.
14       THE WITNESS:  No.
15 BY MR. PIFKO:
16   Q.   Do you recall discussing
17 that with anyone at the HDMA at any
18 point?
19   A.   I don't recall discussions
20 regarding emergency room visits, no.
21   Q.   Do you have any reason to
22 dispute this fact?
23       MR. NICHOLAS:  Object to the
24   form.

Christopher Zimmerman (AmerisourceBergen)

Page 334

1       THE WITNESS:  I'm assuming
2   that these are bullet points based
3   upon DEA slides.  So, I mean, this
4   is what DEA presented.
5   BY MR. PIFKO:
6       Q.   Let's turn to the next page.
7           Look at the heading, Rogue
8   Pain Clinics in Florida.
9           Do you see that?
10      A.   Yes.
11      Q.   It talks about Operation
12  Pill Nation, it looks like some sort of
13  enforcement initiative.
14          And then it says, Problem
15  now is migration, quotes, vast
16  majority of patients are visiting Florida
17  from out of state.
18          It mentions various states,
19  including Ohio.
20          Do you see that?
21      A.   Yes.
22      Q.   Do you recall ever
23  discussing the topic of migration amongst
24  members of the industry or with HDA?

Page 335

1       MR. NICHOLAS:  Objection.
2   Not to the form, but to the fact
3   that I think this is completely
4   outside the scope of the 30(b)(6),
5   unless you can tell me --
6       MR. PIFKO:  He's the had
7   representative.  I believe you
8   designated him for that topic.
9       THE WITNESS:  I don't
10  recall.
11  BY MR. PIFKO:
12      Q.   Did you undertake any
13  activities, in preparing for this
14  deposition, to familiarize yourself with
15  HDMA presentations?
16      A.   I did not review any HDMA
17  presentations.
18      Q.   Did you talk to anybody to
19  familiarize yourself with
20  AmerisourceBergen's role in participating
21  in HDMA-related events?
22      MR. NICHOLAS:  Hold on.
23  I'll object only to the extent
24  that this may invade the

Page 336

1   attorney-client privilege.
2       Otherwise, you can answer.
3       THE WITNESS:  No.
4   BY MR. PIFKO:
5       Q.   Aside from communications
6   with the HDMA and this conference, are
7   you familiar with the idea of migration?
8       MR. NICHOLAS:  Objection.
9   Outside the scope of the 30(b)(6).
10      THE WITNESS:  I'm not -- in
11  what context?
12  BY MR. PIFKO:
13      Q.   Well, okay, you're the top
14  dog with respect to the CSRA and
15  compliance at the company.
16          And I just want to know, in
17  serving in that role at the company, if
18  this idea of out-of-state people going to
19  different states to buy pills and
20  migrating them back to their hometown, if
21  that's something that you are familiar
22  with?
23      A.   I've seen articles that
24  reference that.

Page 337

1       Q.   When do you believe you've
2   seen articles about that?
3       A.   I can't cite specific ones.
4       Q.   How about general ones?
5       A.   I can't cite general ones.
6       Q.   So you can't cite any is
7   what you're saying?
8       MR. NICHOLAS:  You're asking
9   him to cite an article?
10  BY MR. PIFKO:
11      Q.   You've referenced that
12  you've seen articles, but you can't
13  identify a specific article, correct?
14      A.   Correct.
15      Q.   When do you believe you
16  might have first heard of the idea of
17  migration?
18      MR. NICHOLAS:  Objection.
19  Outside the scope.
20      Are you asking him in the
21  30(b)(6) context or otherwise?
22      MR. PIFKO:  Individually.
23      MR. NICHOLAS:  Individually.
24      Go ahead.

Christopher Zimmerman (AmerisourceBergen)

Page 338

1    THE WITNESS:  Was it ever
2  discussed, the term migration, as
3  you're stating it, of people that
4  were getting prescriptions filled
5  and then -- from out of state?  I
6  mean, I had read articles on that
7  and I was aware of it.
8  BY MR. PIFKO:
9    Q.   Okay.  So migration is not a
10  term that you're familiar with, but you
11  are familiar with the idea of someone
12  traveling to a state and getting a
13  prescription and exporting it back to
14  somewhere else, correct?
15    MR. NICHOLAS:  Object to the
16  form.
17    THE WITNESS:  The specific
18  information that I had on that, on
19  the articles, was that -- whether
20  they were referring to some
21  arrests that were made by some
22  individuals who had gotten
23  prescriptions filled in another
24  state, and they arrested them in

Page 339

1  another state.  If that makes
2  sense.
3  BY MR. PIFKO:
4    Q.   Did you ever attempt to
5  adopt any policies and procedures at
6  AmerisourceBergen to address issues with
7  patients filling -- from out of state
8  coming to fill prescriptions in another
9  state?
10    A.   We had no line of sight of
11  the prescriptions that are filled at the
12  pharmacy and where the patients are
13  coming from.
14    We deliver our products to
15  the licensed pharmacy.  And then they
16  have a responsibility to ensure that the
17  prescriptions that they fill are
18  legitimate, as does the doctor who writes
19  them.
20    The distributor is two steps
21  removed from that process.
22    Q.   Does AmerisourceBergen
23  undertake any effort to understand where
24  a pharmacy's customers come from when it

Page 340

1  does business with them?
2    MR. NICHOLAS:  Object to the
3  form.
4    THE WITNESS:  No.
5  BY MR. PIFKO:
6    Q.   Does AmerisourceBergen
7  undertake any effort to understand the
8  identity of the doctors who write the
9  majority of a particular pharmacy's
10  prescriptions?
11    MR. NICHOLAS:  Object to the
12  form.
13    THE WITNESS:  As I indicated
14  in the 590, that we do ask for the
15  prescribers and that we would do a
16  check on the top prescribers for
17  the pharmacy.
18  BY MR. PIFKO:
19    Q.   So in the 590 you ask for
20  the top prescribers?
21    A.   Yes.
22    Q.   Top what?  Top ten?  Top
23  five?
24    A.   I'm not -- I'm not sure what

Page 341

1  it is today.  And as I said, it's changed
2  over time.  So I'm not sure if it's five
3  or ten or --
4    Q.   I would be able to know that
5  by looking at the 590 form over the
6  various iterations of it?
7    MR. NICHOLAS:  Object to the
8  form.
9    THE WITNESS:  I would -- it
10  would depend on how the question
11  is asked on the form.  I don't
12  have it in front of me.
13  BY MR. PIFKO:
14    Q.   Well, I'm just trying to
15  understand what the company's policy was.
16  And if you don't know, that's fine.
17    I'm trying to understand
18  where I would go to find that information
19  out.
20    So if I wanted to know
21  where -- or when you say the top
22  prescribers, if I wanted to know top how
23  many prescribers, how would I find that
24  out?

Christopher Zimmerman (AmerisourceBergen)

Page 342

1      A.   The 590.  I'm not sure if
2  the question says the top five
3  prescribers or the top prescribers or the
4  top six.  I don't know every word.
5      Q.   So if I had copies of every
6  iteration of the 590, I would know what
7  the practice was at any particular moment
8  in time?
9          MR. NICHOLAS:  Object to the
10     form.
11         THE WITNESS:  Again, the
12     form speaks for itself.
13 BY MR. PIFKO:
14     Q.   But the form would tell me
15 that -- whatever information you're
16 seeking?
17         MR. NICHOLAS:  Object to the
18     form of the question.
19         THE WITNESS: The form has
20     the requirements that we include
21     on the customer due diligence.
22 BY MR. PIFKO:
23     Q.   So then you said that -- so
24 someone writes who the top prescribers

Page 343

1  are on the form.
2          Then what does the CSRA do
3  with that information?
4      A.   Then they verify that the
5  physicians are in good standing to
6  prescribe.
7      Q.   And where do you check to do
8  that?
9      A.   I would have to defer to the
10 person that's performing the
11 investigation, what websites they refer
12 to.  Whether it's the Board of Pharmacy
13 or -- I'm not sure exactly.
14     Q.   Do they check the geographic
15 location of the doctor in comparison to
16 the location of the pharmacy?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  I don't know.
20 BY MR. PIFKO:
21     Q.   How would I find that
22 information out?
23         MR. NICHOLAS:  Objection.
24     Object to the form of the

Page 344

1  question.
2          THE WITNESS:  You have to
3      ask the person that's performing
4      that function.
5  BY MR. PIFKO:
6      Q.   Who is responsible for
7  performing that function currently?
8      A.   David May is the one who
9  oversees that department.
10     Q.   So someone under him would
11 be responsible for doing that?
12     A.   Yes.
13     Q.   Okay.  David May joined the
14 company in 2014.
15         Who served in his role prior
16 to him?
17     A.   Ed Hazewski.
18     Q.   If I wanted to know, for an
19 earlier time period, what the company's
20 practices were with respect to what they
21 look at, with respect to prescribing
22 physicians, would I ask him?
23     A.   Yes.
24     Q.   And how far back was his

Page 345

1  tenure in that position?
2      A.   2008, I believe.  Somewhere
3  around there.
4      Q.   Is he still with the
5  company?
6      A.   Yes.
7      Q.   What's his current role?
8      A.   He's director diversion
9  control.
10     Q.   In obtaining information
11 about a pharmacy, does AmerisourceBergen
12 investigate the type of doctor who is
13 writing prescriptions in comparison to
14 the type of pills he's prescribing, he or
15 she is prescribing?
16         MR. NICHOLAS:  Hold on.
17     I'll object to the form.  I also
18     would appreciate it if you would
19     put this into some time frame.
20         MR. PIFKO:  For the time
21     period for which you're a
22     30(b)(6).
23 BY MR. PIFKO:
24     Q.   Let me ask the question,

Christopher Zimmerman (AmerisourceBergen)

Page 346

1  just to get a cleaner record.
2       During the time from prior
3  to -- from -- prior to 2015, in obtaining
4  information about a pharmacy's
5  prescribing physicians, does
6  AmerisourceBergen undertake any effort to
7  evaluate the nature of the physician in
8  comparison with the nature of the
9  medicine that's being prescribed?
10      MR. NICHOLAS:  Object to the
11  form.
12      THE WITNESS:  I don't know
13  what medicine -- we get the top
14  prescribers for the form, but it
15  doesn't indicate what medicines
16  they're prescribing.
17 BY MR. PIFKO:
18   Q.   Do you ask, with respect to
19  opioids or controlled substances -- let
20  me just -- with respect to controlled
21  substances, do you ask who the top
22  prescribers are of controlled substances?
23      MR. NICHOLAS:  Objection.
24      THE WITNESS:  I don't know

Page 347

1  exact -- if that's the wording of
2  the question.  I don't know.
3 BY MR. PIFKO:
4   Q.   So you don't know if the
5  question just asks for the top
6  prescribing physicians for all things
7  that they sell, or if it's just for
8  controlled substances?
9   A.   Correct.
10  Q.   Based on what you know,
11 would it be a red flag if a pharmacy was
12 writing -- filling a substantial number
13 of prescriptions from an out-of-area
14 doctor?
15      MR. NICHOLAS:  Object to the
16  form.
17      THE WITNESS:  Again, I don't
18  know the specific circumstances.
19  I don't know.
20 BY MR. PIFKO:
21   Q.   That's not something that
22 you're familiar with?
23      MR. NICHOLAS:  That's not
24  what he said.  Objection.

Page 348

1       Go ahead.
2       THE WITNESS:  I'm not
3  understanding your question.
4 BY MR. PIFKO:
5   Q.   I'm trying to assess
6  whether, in evaluating activity at a
7  pharmacy, AmerisourceBergen considers the
8  fact that a large volume of prescriptions
9  are being written by an out-of-area
10 doctor for that pharmacy?
11      MR. NICHOLAS:  Objection.
12      THE WITNESS:  I would need
13  to know the totality of the
14  information.  It goes back to a
15  hypothetical of giving me a
16  specific, if X then Y.  I can't
17  give you that.  I don't know.
18      I don't know if the pharmacy
19  is on the border of -- he's in one
20  state and the pharmacy is across
21  the border.  I don't know.  I
22  don't know.
23 BY MR. PIFKO:
24   Q.   I'm asking a more general

Page 349

1  question.
2       Is that -- is that --
3  generically, is that information that you
4  would seek out, or is that something that
5  you're not interested in?
6       MR. NICHOLAS:  I'll object
7  to the form of the question.
8       THE WITNESS:  I would have
9  to defer to the people that are
10  doing the checks on the
11  prescribers.
12 BY MR. PIFKO:
13   Q.   Let's talk a little bit more
14 about this document, Exhibit-12.
15      It says, below the migration
16 discussion, Identifying a rogue clinic.
17      Do you see that?
18  A.   Yes.
19  Q.   Cash-only operation.
20      Do you see that?
21  A.   Yes.
22  Q.   Does AmerisourceBergen
23 evaluate the percentage of cash versus
24 insurance payments that are made to a

Christopher Zimmerman (AmerisourceBergen)

Page 350

1 pharmacy with respect to controlled
2 substances?
3        MR. NICHOLAS:  Object to the
4    form.
5        THE WITNESS:  We -- part of
6    the 590 form has that information.
7 BY MR. PIFKO:
8    Q.   Do you do anything to verify
9 that information, like check accounting
10 records from a pharmacy?
11        MR. NICHOLAS:  Object to the
12    form.
13        THE WITNESS:  We do not have
14    any way to confirm whether people
15    are paying cash or not.
16 BY MR. PIFKO:
17    Q.   It says down here, Drugs
18 prescribed are cocktail drugs.
19        Do you see that?
20        Oxy/hydro/Xanax.  Do you see
21 that?
22    A.   Yes.
23    Q.   Do you know what
24 oxy/hydro/Xanax is referring to?

Page 351

1    A.   I do not.
2    Q.   Oxycodone, hydrocodone and
3 Xanax, does that sound right?
4    A.   I mean, I see those -- that
5 on here.  I'm not sure what they're
6 referring to as "cocktail."
7    Q.   Does AmerisourceBergen
8 evaluate whether a pharmacy is filling
9 multiple prescriptions at one time for
10 certain combinations of controlled
11 substances?
12    A.   We don't have that
13 information.  We don't have patient -- or
14 prescriber dispensing information.
15    Q.   It talks about site visits
16 in the next line.
17        Do you see that?
18    A.   Yes.
19    Q.   Do you train your sales
20 associates to observe signs of diversion
21 when they are at a customer site?
22    A.   Yes.
23    Q.   What do you train them to
24 look for?

Page 352

1    A.   We have a presentation that
2 they go through of some of -- long lines,
3 a lot of cash transactions.  There's a
4 whole host of things that we ask them to
5 take a look at.
6    Q.   And then what do you do with
7 that information if they report it back
8 to you?
9    A.   If they report it back to
10 us, we would investigate.
11    Q.   What would an investigation
12 entail?  Who would take that up?
13        MR. NICHOLAS:  Let me just
14    interpose an objection to make
15    sure I understand the time frame
16    that we're talking about and
17    whether he's talking about as an
18    individual or in his 30(b)(6)
19    capacity.
20 BY MR. PIFKO:
21    Q.   In his 30(b)(6) capacity is
22 what I'm asking.
23        MR. NICHOLAS:  2007 to 2014.
24        THE WITNESS:  And what was

Page 353

1    your question?  I'm sorry.
2 BY MR. PIFKO:
3    Q.   So we talked about efforts
4 that the company may undertake to have
5 its sales associates observe signs of
6 diversion at a pharmacy, okay?
7    A.   Yes.
8    Q.   So I asked, if a sales
9 associate reports back to the company,
10 during the time period for which you're a
11 30(b)(6) representative, what does the
12 company do with that information?
13    A.   We would investigate.
14    Q.   And is there a specific
15 department who is responsible for
16 investigating it?
17    A.   It could be the diversion
18 control department.  It could be the
19 security group.  It could be our
20 consultant that we utilize.  It could be
21 any of those areas.
22    Q.   Is there a set way that you
23 decide who is going to investigate it?
24    A.   It depends on the

Page 354

1 circumstances, location, those type of
2 criteria.
3      Q.   So you evaluate the
4 circumstances and location of the
5 incident, and that's how you decide who
6 is going to investigate it?
7           MR. NICHOLAS:  Object to the
8      form.
9           THE WITNESS:  Yes.  That's
10      part of the criteria of deciding
11      who is going to be performing the
12      investigation, depending upon,
13      again, what the issue is with the
14      pharmacy.
15 BY MR. PIFKO:
16      Q.   Can you identify any
17 occasions where a sales associate, during
18 the relevant time period for which you
19 are a 30(b)(6), has identified suspicious
20 conduct and the company conducted an
21 investigation?
22      A.   I'd have to result back to
23 those records.  I don't --
24      Q.   What records would I look at

Page 355

1 to know that information?
2           MR. NICHOLAS:  Let me make
3      sure I clarify that you're talking
4      about the Track 1 jurisdictions
5      now, right?
6           MR. PIFKO:  Well, I'm
7      talking about their policies and
8      procedures in general.
9           MR. NICHOLAS:  But you asked
10      him about identifying particular
11      instances.  So I assume that we're
12      talking about Track 1
13      jurisdictions; is that correct?
14           MR. PIFKO:  I was talking
15      about any jurisdiction.
16           MR. NICHOLAS:  Well, then, I
17      object.  It's overbroad and not
18      within the scope of the deposition
19      at all.
20           Go ahead.
21 BY MR. PIFKO:
22      Q.   So my question was, what
23 records would I look at to know whether a
24 sales associate had reported suspicious

Page 356

1 activity?
2           MR. NICHOLAS:  Same
3      objection.  And objection to form.
4           THE WITNESS:  It would --
5      the time frame you're talking
6      about, it would be in our
7      investigative -- investigation
8      records.
9 BY MR. PIFKO:
10      Q.   Is there a specific name?
11 Just investigative records?
12           MR. NICHOLAS:  Object to the
13      form.
14           Go ahead.
15           THE WITNESS:  It's where we
16      maintain our investigations, yes.
17 BY MR. PIFKO:
18      Q.   Have you ever heard the term
19 "due diligence files"?
20      A.   Yes.
21      Q.   Is that the same thing as
22 your investigation records, or is that
23 something different?
24      A.   It could be.  There could be

Page 357

1 a record of the investigations within the
2 due diligence file.  But it also could be
3 in an investigation file, depending upon
4 the type and scope of the investigation.
5      Q.   Who is responsible for
6 maintaining investigation files at the
7 company?
8      A.   Bruce Gundy.
9      Q.   How long has he had that
10 responsibility?
11      A.   During the scope of 2007 to
12 2014.
13      Q.   Okay.  Do you know who has
14 that responsibility currently?
15      A.   Bruce Gundy, same person.
16      Q.   Does AmerisourceBergen
17 believe it's everybody in the company's
18 responsibility to prevent diversion?
19           MR. NICHOLAS:  Object to the
20      form.  It's an unfair question.
21           Go ahead.
22           THE WITNESS:  We believe
23      that everyone has a responsibility
24      for compliance and need to conduct

Christopher Zimmerman (AmerisourceBergen)

Page 358

1    themselves such.
2  BY MR. PIFKO:
3      Q.   Do you know if your sales
4  associates receive bonuses from hitting
5  sales targets?
6      A.   I don't know --
7          MR. NICHOLAS:  Hold on.
8      This witness is not designated on
9      the topic of compensation, as you
10     know.  So he's not in a position
11     to answer that.  There are other
12     people who can answer that
13     question, but not him.
14         MR. PIFKO:  It's a
15     foundational question.
16         MR. NICHOLAS:  Well, I mean,
17     this isn't his topic.
18         MR. PIFKO:  Okay.  But he
19     said he doesn't know, so we got
20     the answer.
21 BY MR. PIFKO:
22     Q.   Do you think there's a
23 potential conflict in having someone who
24 is bonus driven be responsible for

Page 359

1  identifying diversion?
2          MR. NICHOLAS:  Objection.
3      Hold on.  This isn't his area.
4      It's not his area.  You didn't
5      designate him for this area.  You
6      have someone who you're going to
7      depose on the issue of
8      compensation.
9          MR. PIFKO:  It has to do
10     with suspicious order monitoring
11     processes and protocols.
12         THE WITNESS:  Can you
13     restate the --
14         MR. PIFKO:  Yeah.
15         In any event, you can object
16     to scope, and we can fight about
17     the impart of his testimony later.
18 BY MR. PIFKO:
19     Q.   So the question is, do you
20 think there is a potential conflict in
21 having someone who is bonus driven be
22 responsible for identifying diversion?
23         MR. NICHOLAS:  Same
24     objection.  Also, object to the

Page 360

1  form.
2          THE WITNESS:  When the
3      premise of your question is if
4      they're bonus driven, I don't know
5      that.  And as you -- and as I
6      indicated previously, all of our
7      associates have a role in their
8      responsibility to make sure that
9      we operate in compliance,
10     regardless of what their role is;
11     whether they're an order filler,
12     salesperson, record keeper.
13 BY MR. PIFKO:
14     Q.   Okay.  But if someone has a
15 compensation structure that's based on
16 increasing sales, do you see that as at
17 odds with identifying diversion?
18         MR. NICHOLAS:  Objection.
19     Not within the scope of his areas.
20     And I object to the form of the
21     question.  It's a hypothetical
22     question as well.
23         THE WITNESS:  It's a
24     hypothetical question.

Page 361

1          It goes back to the --
2      you're giving me a set of
3      potential facts and asking me to
4      arrive at a conclusion.  It would
5      depend upon the situation.
6          I don't think -- what you're
7      inferring, I don't think, is
8      correct.
9  BY MR. PIFKO:
10     Q.   What am I inferring?
11         MR. NICHOLAS:  Hold it.
12     Hold it.  Object to the form of
13     the question.
14         The question is, what am I
15     inferring?  I object to the form
16     of the question.  I suggest we
17     move on to some facts and not
18     looking for sound bites.
19 BY MR. PIFKO:
20     Q.   I asked you what you thought
21 I was inferring.
22         MR. NICHOLAS:  Same
23     objections.
24         THE WITNESS:  Can you repeat

Christopher Zimmerman (AmerisourceBergen)

Page 362

1    the question?
2  BY MR. PIFKO:
3      Q.   I asked you, do you think
4  there's a potential conflict in having
5  someone who is bonus driven be
6  responsible for identifying diversion?
7      A.   My answer is no.
8             - - -
9      (Whereupon, Amerisource
10  Bergen-Zimmerman Exhibit-13,
11  ABDCMDL 00278212, was marked for
12  identification.)
13             - - -
14  BY MR. PIFKO:
15      Q.   I'm handing you what is
16  marked as Exhibit-13.  For the record,
17  it's a single-page document, Bates
18  labeled ABDCMDL 00278212.  And the
19  metadata reflects that it's from your
20  files, Mr. Zimmerman.
21         Let me know when you're done
22  reviewing it.
23      A.   Okay.
24      Q.   Do you recall this document?

Page 363

1      A.   I do not.
2      Q.   Do you recall writing this
3  document?
4      A.   No.
5      Q.   Do you have any reason to
6  dispute that this is a true and correct
7  document that came from your files?
8         MR. NICHOLAS:  Object to the
9      form.
10         THE WITNESS:  I don't know
11      where it came from.
12  BY MR. PIFKO:
13      Q.   Well, you understand that in
14  litigation, documents come with
15  information that tells you where they
16  came from, as far as whose computer, et
17  cetera?  Do you understand that?
18      A.   Yes.
19      Q.   Well, this came from your
20  computer.
21         MR. NICHOLAS:  I think the
22      hang up here is you're just
23      telling him stuff, and he has,
24      really, no way of knowing.

Page 364

1  BY MR. PIFKO:
2      Q.   That's what the document
3  says, okay?
4         Do you dispute that it came
5  from your computer?
6         MR. NICHOLAS:  Object to the
7      form.
8         THE WITNESS:  I don't know
9      if it came -- I mean, you're
10      telling me it came from my
11      computer.  I don't recall ever
12      seeing this document.
13  BY MR. PIFKO:
14      Q.   Do you know what this
15  document is about?
16      A.   I've never seen this
17  document.
18      Q.   Your testimony is you've
19  never seen this document?
20      A.   I don't recall ever seeing
21  this document.
22      Q.   Do you recall ever
23  discussing this with anyone?
24         MR. NICHOLAS:  Object to the

Page 365

1      form.
2         THE WITNESS:  This document?
3  BY MR. PIFKO:
4      Q.   The subject matter of this
5  document.
6      A.   As we previously discussed,
7  we talked about low-volume accounts, so
8  I've had discussions regarding that.
9      Q.   Do you see here it says --
10  it's talking about -- so it's talking
11  about those types of customers,
12  low-volume, high-controlled substances
13  customers.
14         It says, I'm rather
15  concerned -- I'm in the middle of the
16  document.
17         I'm rather concerned about
18  your pharmacy for a different reason.
19  Based on your overall volume with us,
20  your percentage of C-II orders is high
21  and may be deemed suspicious by either
22  our OMP system or regulatory authorities.
23  This puts your account with
24  AmerisourceBergen at significant risk of

Christopher Zimmerman (AmerisourceBergen)

Page 366

1  closure or exposure to regulatory and
2  enforcement agencies.
3      Do you see that?
4      A.  I do.
5      Q.  Do you recall being
6  concerned about certain customers because
7  of their percentage of controlled
8  substances with respect to their overall
9  volume?
10     MR. NICHOLAS:  Object to the
11  form.
12     THE WITNESS:  As I
13  indicated, that was one of the
14  areas we were looking at, our
15  low-volume, higher-percentage
16  secondary accounts and whether
17  we -- you know, how we handled
18  those accounts.
19 BY MR. PIFKO:
20     Q.  Did you ever undertake
21  efforts to report accounts for such
22  activity?
23     MR. NICHOLAS:  Object to the
24  form.

Page 367

1      THE WITNESS:  Report in what
2  way?
3  BY MR. PIFKO:
4      Q.  As being suspicious.
5      A.  If they placed an order that
6  met our suspicious order criteria, we
7  would have.
8      Q.  Do you think it's
9  appropriate to provide guidance to a
10  customer on how to circumvent your
11  suspicious order monitoring program?
12     MR. NICHOLAS:  Object to the
13  form.
14     THE WITNESS:  I don't
15  think -- I'm not sure what your
16  question -- again, you're asking
17  me another hypothetical question
18  and asking me to give you a
19  response that -- again, I can't --
20  I'm not going to answer a
21  hypothetical.
22 BY MR. PIFKO:
23     Q.  So your position, the jury
24  is watching --

Page 368

1      A.  Yes.
2      Q.  -- is, you don't have a
3  position on whether it's appropriate to
4  give guidance to a customer on how to
5  escape your suspicious order monitoring
6  program?
7      MR. NICHOLAS:  Well, that is
8  not what he said.  I object to the
9  characterization of his testimony.
10  I object to the reference to the
11  jury, which is bullying and
12  harassing.
13     And why don't you just ask
14  him a factual question?
15     Go ahead.
16     THE WITNESS:  We don't give
17  guidance to our customers on how
18  to circumvent our system.
19 BY MR. PIFKO:
20     Q.  Do you believe that it's
21  inappropriate to do so?
22     MR. NICHOLAS:  Object to the
23  form.
24     THE WITNESS:  Again, to do

Page 369

1  what?
2  BY MR. PIFKO:
3      Q.  To tell a customer how not
4  to be caught by your system or the DEA's
5  system for engaging in suspicious
6  activity.
7      MR. NICHOLAS:  Object to the
8  form.
9      THE WITNESS:  Again --
10     MR. NICHOLAS:  What DEA
11  system are you talking about?
12     THE WITNESS:  Again, we have
13  a program that we implement and we
14  have our processes in place.  And
15  we don't -- and part of that
16  process is not to tell customers
17  how to get around the system, or
18  however you worded it.
19     But that's not how our
20  program works.
21 BY MR. PIFKO:
22     Q.  So here, after saying to
23  this category of customers, based on your
24  overall volume with us, your percentage

Christopher Zimmerman (AmerisourceBergen)

Page 370

1 of C-II orders is high and may be deemed
2 suspicious by either our OMP system or
3 regulatory authorities, this document
4 then goes on to say, The way I see it is
5 that you have a couple of options.
6 First, you can make ABDC your primary
7 wholesaler and shift all purchases to us.
8 The second option is we arrange a
9 short-term transition process and you
10 stop buying controlled -- Schedule II
11 controlled substances from ABDC and shift
12 them to whomever you're buying other
13 products.  The third option would be to
14 do nothing, but this is not a feasible
15 long-term decision.
16       Do you see that?
17    A.   I see that.
18    Q.   Do you think that's
19 appropriate guidance to give to a
20 customer?
21       MR. NICHOLAS:  Hold on.
22 Objection.  You are
23 mischaracterizing the witness's
24 testimony.  The witness has said

Page 371

1 he never -- he didn't write the
2 document.  He's never seen the
3 document.
4       So I object to the line of
5 questions.  This is not 30(b)(6)
6 material.  I don't know why --
7 it's not within --
8       MR. PIFKO:  You're over the
9 top with your objections.
10       MR. NICHOLAS:  It's not
11 within --
12       MR. PIFKO:  Okay.  Scope.
13       MR. NICHOLAS:  -- his
14 personal knowledge.
15       MR. PIFKO:  Scope.  Scope,
16 and all the objections you want to
17 make.  You need to stop speaking
18 to the witness, okay?
19       MR. NICHOLAS:  I'm not
20 speaking to the witness.  I'm
21 speaking to you.
22       MR. PIFKO:  You are.  He's a
23 smart guy.  Obviously, he picks up
24 on this stuff.  It has happened

Page 372

1 throughout the day.
2       MR. NICHOLAS:  I'm speaking
3 to you.  And I'm speaking for the
4 record.
5       THE WITNESS:  I don't know
6 who this document was --
7 BY MR. PIFKO:
8    Q.   That's not my question.  I
9 didn't ask you who wrote the document, I
10 didn't ask you any of that.
11       I asked you if this kind of
12 language is an appropriate communication
13 to a customer?
14       MR. NICHOLAS:  Objection to
15 the form of the question.
16       THE WITNESS:  I don't know
17 if -- I don't know if it's a
18 communication to a customer.
19 You're asking me a question with a
20 conclusion that this is a
21 communication to a customer.  And
22 you want me to answer the
23 question.  I don't know it's a
24 communication.

Page 373

1 BY MR. PIFKO:
2    Q.   If this is communicated to a
3 customer, is this an appropriate message
4 to be communicated to a customer?  It's a
5 simple question.
6       MR. NICHOLAS:  Object to the
7 form of the question.  Whether
8 it's a simple question or not,
9 it's not a fair question.
10 BY MR. PIFKO:
11    Q.   AmerisourceBergen's position
12 is you don't know if this is an
13 appropriate type of conduct; is that what
14 I'm hearing from you?
15       MR. NICHOLAS:  That's not
16 what he said.
17       THE WITNESS:  I don't know
18 what -- who wrote it, who the
19 audience is, and what the
20 conversation is.  It says, Talking
21 points.
22       Is it -- either you bring us
23 your full business or we can't
24 sell you controls, that's the --

Christopher Zimmerman (AmerisourceBergen)

Page 374

1  that's the option. Is that an
2  appropriate discussion? I think
3  so.
4  BY MR. PIFKO:
5      Q.   How about telling someone
6  that they can stop buying controlled
7  substances from you and shift them to
8  somebody else?
9          MR. NICHOLAS: Object to the
10  form of the question. You're just
11  arguing.
12         THE WITNESS: I think I
13  answered your question.
14  BY MR. PIFKO:
15     Q.   You talked about the first
16  suggestion. I'm asking about the second
17  one.
18         MR. NICHOLAS: Object to the
19  form. Object to the debating.
20         THE WITNESS: I answered one
21  and two. One is bring us all your
22  business or, two, stop buying
23  C-IIs from us.
24  BY MR. PIFKO:

Page 375

1      Q.   And buy them from someone
2  else? Do you think it's an
3  appropriate --
4      A.   Buy it from their primary
5  vendor.
6      Q.   So you think this is an
7  appropriate message to send to people?
8          MR. NICHOLAS: Object to the
9  form of the question. It's not
10  his message.
11         THE WITNESS: Is your
12  question is it appropriate for
13  customers to buy from a
14  wholesaler?
15  BY MR. PIFKO:
16     Q.   My question is, is this an
17  appropriate message to communicate to
18  customers?
19         MR. NICHOLAS: Object to the
20  question. We're obviously
21  disagreeing as to what is the
22  "this." So it's an unfair
23  question.
24         But he's answered it anyway.

Page 376

1  It's asked and answered.
2          THE WITNESS: It's the same
3  answer.
4  BY MR. PIFKO:
5      Q.   I don't believe I've gotten
6  an answer, so I'm going to ask you again.
7      A.   Is it appropriate to tell a
8  secondary customer that either they bring
9  us their full book of business or we're
10  going to stop selling you controlled
11  substances? Is that your question?
12     Q.   I'm asking this message in
13  here.
14         I'm asking if this message
15  is an appropriate message to communicate
16  to customers?
17         MR. NICHOLAS: Object to the
18  form. Because that's how he's
19  reading the message in here. So
20  he's answering --
21         MR. PIFKO: Again, you're
22  coaching him.
23         MR. NICHOLAS: No, I'm not.
24  You're not listening to his

Page 377

1  answers.
2          MR. PIFKO: You're coaching
3  him. And, honestly, if you keep
4  this up, I'm going to seek to have
5  you removed from defending any
6  depositions in this case, okay?
7          MR. NICHOLAS: That's fine.
8          MR. PIFKO: It's fine to
9  object vigorously and be
10  passionate about your position.
11  But you're going way above and
12  beyond, and you've been doing it
13  all day long.
14         And we are going to read the
15  transcript and it's going to show
16  all the discussion you're having,
17  asking facts, telling me what to
18  ask. That is not okay.
19         MR. NICHOLAS:
20  Unfortunately --
21         MR. PIFKO: You look like
22  you've been practicing long enough
23  to know that.
24         MR. NICHOLAS: If you're

Christopher Zimmerman (AmerisourceBergen)

Page 378

1  telling me -- if you're telling
2  me --
3        MR. PIFKO:  I understand
4  it's a big case and you're
5  stressed out.
6        MR. NICHOLAS:  If you're
7  telling me I look old, I'm
8  insulted.
9        MR. PIFKO:  But you have to
10  conduct yourself accordingly.
11        MR. NICHOLAS:  I think
12  you're making a comment on my
13  personal look.  You think I look
14  old?
15        MR. PIFKO:  I don't think
16  you look old.  I think you're an
17  established practitioner and I
18  think you know better and you know
19  that you know better.  And you're
20  playing games here, and it needs
21  to stop.
22        MR. NICHOLAS:  Are you going
23  to let me say something?
24        MR. PIFKO:  No, I'm not here

Page 379

1  to ask you questions.
2        MR. NICHOLAS:  Whether you
3  do or not, I'm --
4        MR. PIFKO:  No, you're not
5  entitled -- you're not the
6  witness.  You're not entitled to
7  talk.  You're just continuing the
8  problem right now.
9  BY MR. PIFKO:
10    Q.   So I'm asking you, sir, you
11  read this document, you did, do you think
12  this is a message that is appropriate to
13  communicate to consumers -- customers?
14        MR. NICHOLAS:  Object to the
15  form.
16        THE WITNESS:  I don't know
17  what the message was.  I don't
18  know who wrote the message.  I
19  don't know who the audience of the
20  message was.  I don't know.
21        You're asking me to commit
22  to something -- I don't know who
23  wrote this.  I don't know the
24  talking points.  I don't know -- I

Page 380

1  don't know what their inference
2  was in writing this.
3  BY MR. PIFKO:
4    Q.   So you can't provide an
5  opinion about whether this is an
6  appropriate message to send to somebody?
7        MR. NICHOLAS:  Object to the
8  form.
9        THE WITNESS:  And, again,
10  it's a talking point, and it's not
11  being sent to anyone.  I don't
12  know -- you're asking me to give
13  you an answer to something I don't
14  know about.
15  BY MR. PIFKO:
16    Q.   All right.  That's your
17  position.  That's fine.
18             - - -
19        (Whereupon, Amerisource
20  Bergen-Zimmerman Exhibit-14,
21  ABDCMDL 00000124-147, was marked
22  for identification.)
23             - - -
24  BY MR. PIFKO:

Page 381

1    Q.   I'm handing you what is
2  marked as Exhibit-14.
3    A.   Thank you.
4    Q.   Bates labeled ABDCMDL
5  00000124 through 147.
6        According to the metadata on
7  this document, it has a doc date of
8  December 31st, 2007.
9    A.   Okay.
10    Q.   Have you seen this document
11  before?
12    A.   It looks like a
13  presentation.
14    Q.   Do you know what it's a
15  presentation for?
16    A.   It says the sales associate
17  role.
18    Q.   And the sales associate role
19  in what?
20    A.   In diversion control.  I
21  mean, that's the title of the
22  presentation.
23    Q.   Is this something you
24  reviewed in preparing for your

Page 382

1 deposition?
2     A.   I believe I've seen a copy
3 of this, yes.
4     Q.   In your undertaking to
5 familiarize yourself with the company's
6 diversion control practices and policies,
7 did you obtain an understanding of what
8 the purpose of this presentation was for?
9     A.   It was for the sales -- I
10 believe it was for the sales group.
11     Q.   Do you know when it was
12 given to them?
13     A.   I don't.
14     Q.   Do you know who would have
15 given this presentation to them?
16     A.   I believe it was Ed
17 Hazewski.
18     Q.   He was someone who was under
19 your chain of authority?
20     A.   Yes.
21     Q.   At that time, was he a
22 direct report to you?
23     A.   I don't believe so.
24     Q.   There was one person in

Page 383

1 between you and him?
2     A.   Yes, I believe so.
3     Q.   Are the statements in here
4 consistent with your understanding of
5 what AmerisourceBergen's program was and
6 the training that was provided to sales
7 associates --
8         MR. NICHOLAS:  Object to the
9     form.
10 BY MR. PIFKO:
11     Q.   -- with respect to diversion
12 control?
13         MR. NICHOLAS:  Object to the
14     form.
15         Go on.
16         THE WITNESS:  I mean, this
17     is -- you want me to generally
18     comment on the entire -- the
19     presentation itself?
20 BY MR. PIFKO:
21     Q.   Well, you reviewed the
22 document.
23         A lot of these slides we've
24 seen before in earlier documents, agreed?

Page 384

1     A.   That's correct.  A lot of
2 the information is the same that we've
3 reviewed.
4     Q.   Let's look at Page ABDCMDL
5 00000130.
6         Are you there?
7     A.   Yes.
8     Q.   Do you know what this slide
9 is about?
10     A.   It looks like it has -- the
11 title is -- the slide is titled,
12 Suspicious Order Investigation.
13     Q.   Aside from reading the
14 document, do you know what this is about?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  It's about
18     suspicious order investigation.
19     I'm not sure what your question
20     is.
21 BY MR. PIFKO:
22     Q.   I'm asking if -- are these
23 parameters consistent with a specific
24 type of investigation that you're

Page 385

1 familiar with?
2     A.   These are some of the
3 components that the diversion group will
4 review, yes.
5     Q.   Where would they get this
6 information from?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  I'm not --
10 BY MR. PIFKO:
11     Q.   Would this be on the Form
12 590?
13         MR. NICHOLAS:  Object to the
14     form.
15         Go ahead.
16         THE WITNESS:  The Form
17     590 -- they may reference the Form
18     590, they may have a monthly
19     report that has the controlled
20     substance ratio.  They look at
21     purchase history.
22         I mean, as it's here, it's
23     all -- it could be in different
24     areas that they look.

Page 386

BY MR. PIFKO:

Q. Are sales associates instructed to gather this information and provide it to the CSRA?

A. No.

Q. Let's go to the part where it's got these pictures, starting on 141.

A. Yes.

Q. It says, Red flag. Do you see that?

A. Yes.

Q. Do you have an understanding about why that's a red flag?

A. A line out front of the pharmacy.

Q. Why is that a red flag?

A. A red flag is -- and, again, you have to take it in context. Is this, you know -- is this in the middle of the day? Is it the beginning of -- is it prior to opening? It could be a red flag.

And so a lot of these are examples that could be; not necessarily

Page 387

are, but could be.

Q. Why could this be a red flag?

A. Because you have people waiting in line for prescriptions.

Q. And why is that a potentially bad thing?

A. It's not --

MR. NICHOLAS: Object to the form.

Go ahead.

THE WITNESS: It's not a potentially bad thing, it's just not -- I think it could be unusual.

BY MR. PIFKO:

Q. And why would that be unusual?

A. I know the pharmacy I go to, there's not a line out the front. But that doesn't mean -- there could not -- be another reason, like they're giving free hot dogs that day. I don't know. I'm just saying, there's a

Page 388

line out in front of the pharmacy. But that's something that the sales associates, if they see that, they need to inquire about that.

Q. I'm not the one who wrote red flag here.

It says red flag, so I'm just trying to understand why --

A. You were asking me why --

Q. -- why someone would consider that to be a red flag?

MR. NICHOLAS: Object to the form.

BY MR. PIFKO:

Q. So am I understanding, your testimony is that a line outside the pharmacy would be unusual and that's why it's a red flag?

MR. NICHOLAS: Object to the form.

THE WITNESS: As I stated, it could be. Again, we're trying to provide examples of things that -- to look for. And a line,

Page 389

they should probably find out, are they giving away free hot dogs or why is there a line out the door?

It's just something that they should inquire about or report back to us about.

BY MR. PIFKO:

Q. Is there an illicit reason why there could be a line?

MR. NICHOLAS: Object to the form.

THE WITNESS: Is there an illicit reason? I mean, if they're lined up there -- and, again, I don't know, it could be a sign, if pharmacies -- has an increased business, to require a line out the door, we would want to look into it as to why.

It's just a data point that we would want additional information on.

BY MR. PIFKO:

Q. Could a line out the door of

Christopher Zimmerman (AmerisourceBergen)

Page 390

1 a pharmacy be an indicator of illegal
2 conduct?
3       A.   Again, you're asking me
4 could it?  And, again, it's a
5 hypothetical.  It's one point in the
6 investigation, or one point of
7 information that we would want, as the
8 department, to then do additional
9 investigations.
10        They may not even sell
11 controlled substances, then it would not
12 be -- you know, it may not be illicit
13 behavior.  I don't know the full
14 circumstances.
15        But it's just an example of
16 one thing, a data point, that if they see
17 they should report back so we can look
18 into it.
19       Q.   Okay.  And you're head of
20 the department that would look into it,
21 right?  And you were during the period
22 from 2006 to 2014, correct?
23       A.   Yes.
24       Q.   What would -- someone

Page 391

1 reports, one of my accounts has a big
2 line out the door.
3         What would you do with that
4 information?
5       MR. NICHOLAS:  Object to the
6 form.
7       THE WITNESS:  Again, it's a
8       hypothetical.  But we would find
9       out what was occurring at the
10       pharmacy, look at past purchasing
11       history.  We would do an
12       investigation.
13 BY MR. PIFKO:
14       Q.   What would past purchasing
15 history tell you?
16       A.   The volume, percentage,
17 types of products.  Again, a full scope
18 of an investigation.
19       Q.   Let's look at the next
20 picture.
21         It says, Red flag.  And it's
22 got a picture in the window that says, No
23 insurance for any Roxicodone.
24         Do you see that?

Page 392

1       A.   I think that's what it says.
2 It's kind of a bad picture, but yeah.
3       Q.   I think it's actually better
4 smaller.
5         Again, I'm not the one that
6 created this document, sir, your company
7 created it.  I'm just asking why the
8 company felt that this was indicia of a
9 red flag?
10       A.   Again, this is another -- an
11 example, if they have cash only, we only
12 dispense products for cash, that would be
13 something that we would want to look into
14 and find out more information on the
15 pharmacy.
16       Q.   And why would you want to
17 look into that?
18       A.   Because it's one point of --
19 it's one more point that could include a
20 pharmacy that we may not want to do
21 business with.
22         These could be either for
23 existing customers or potential new
24 customers.  We would not open up -- no

Page 393

1 point in even doing the investigation.
2 We would not open up a customer that does
3 all cash.
4       Q.   What's the problem with a
5 customer that does all cash?  Why is
6 that --
7       A.   It's just --
8       Q.   -- a potential thing that
9 you would be concerned about?
10       A.   It's just -- it's just not a
11 customer that we want to do business
12 with.
13       Q.   And why is that?
14       A.   Because it doesn't -- we
15 decided we're not going to do business
16 with certain types of customers.  It
17 doesn't mean that there's a diversion
18 going on, it's just a customer that --
19 again, we deal -- health products that
20 usually they service government, they
21 service private payer, public payer,
22 insurance, some cash business.  And then
23 we want to see a full complement.
24         It's just one more thing

Christopher Zimmerman (AmerisourceBergen)

Page 394

1 that we put in our 590, to give us a good
2 picture of a customer before we start to
3 do business with them.
4     Q.   Again, I'm not -- I didn't
5 come up with this example, you did.
6         And my question is, I
7 just -- I'm hearing that you're saying,
8 well, someone who does all cash is
9 someone that we don't want to do business
10 with.
11         But I'm not getting a clear
12 answer as to why that is not someone you
13 want to do business with?
14     MR. NICHOLAS:  I'll object
15 to the form of the question and
16 the characterization of the
17 testimony.  I think he's answered
18 the question.
19     But go ahead.
20     THE WITNESS:  Because we
21 just don't want to do business.
22 We choose not to do business with
23 them.
24 BY MR. PIFKO:

Page 395

1     Q.   How about a pharmacy like
2 this that says no insurance for --
3 specifically for Roxicodone, a C-II
4 substance?
5     MR. NICHOLAS:  Same
6 objection.
7     THE WITNESS:  Isn't that
8 what -- isn't that what it says?
9 BY MR. PIFKO:
10     Q.   It says Roxicodone.
11     A.   And what was your question?
12     Q.   I said a pharmacy
13 specifically that doesn't take insurance
14 for a Schedule II controlled substance,
15 is that a particular red flag?
16     A.   It would depend on the
17 circumstances.  I mean, it depends on the
18 area, and there are certain areas that
19 have a large cash business.
20         It depends on the -- again,
21 the totality of the information.  This is
22 just one data point.  A line is a data
23 point.  A sign is a data point, one that
24 includes an investigation.  And if our

Page 396

1 investigation is, we just don't want to
2 choose to do business -- again, these are
3 all licensed -- both of these are
4 licensed pharmacies with the DEA and the
5 Board of Pharmacy.
6     Q.   Do you know specifically
7 what pharmacies these are?
8     A.   I don't.
9     Q.   How do you know they're
10 licensed pharmacies?
11     A.   Obviously, somebody went in
12 there, either -- they went to the
13 location and they took the picture.
14         I think this red -- one
15 line, I think, is from DEA, I believe.
16     Q.   So you've seen that picture
17 before?
18     A.   I believe so.
19     Q.   How about this other one,
20 the one we're looking at now?
21     A.   I mean, I see this picture,
22 yes.
23     Q.   But you think that's -- you
24 said --

Page 397

1     A.   I've seen --
2     Q.   -- the line was from DEA,
3 that was the prior picture.
4         I'm asking about this one.
5     A.   I've seen these
6 presentations.  I'm not sure where they
7 came from.
8     Q.   But you know they're
9 licensed pharmacies?
10     A.   I'm assuming they're
11 licensed, my assumption on my part.
12     Q.   You're willing to assume
13 that?
14     MR. NICHOLAS:  For the
15 purposes of right now answering
16 your question here?
17     MR. PIFKO:  Again, you're
18 guiding him.  You're guiding him.
19     MR. NICHOLAS:  But you're
20 trying to create a very misleading
21 record.
22     MR. PIFKO:  I'm not.  I'm
23 asking questions.  You're guiding
24 him.  You're coaching him.  You

Christopher Zimmerman (AmerisourceBergen)

Page 398

1 literally are telling him --
2    MR. NICHOLAS:  I'm not --
3 this is --
4    MR. PIFKO:  You're literally
5 putting words into his mouth.
6 You're asking him to say, yes, I'm
7 admitting that for purposes of
8 here.
9    MR. NICHOLAS:  You're
10 just --
11    MR. PIFKO:  I'm being nice
12 to you, but you're really over the
13 top here.
14    MR. NICHOLAS:  If this is
15 nice, I'd hate to see you when you
16 weren't nice.
17 BY MR. PIFKO:
18    Q.   Can you answer the question,
19 please?
20    A.   Please, what was the
21 question again?
22    Q.   How do you know that the
23 picture in Number -- the second one that
24 we're looking for in 142 is a licensed

Page 399

1 pharmacy?
2    A.   I don't know for sure.
3    Q.   You've been telling me,
4 hypothetical, I don't know this, I don't
5 know that.  But you're willing to just
6 jump in and say you think it's a licensed
7 pharmacy.  That seems unusual to me.
8    MR. NICHOLAS:  Objection.
9 Object to the form.
10    THE WITNESS:  The
11 presentation is to the sales
12 associates that deal with our
13 customers, which are licensed
14 pharmacies.
15    So my -- again, maybe it was
16 an assumption I shouldn't have
17 made.  But we give them
18 indicators, these slides of
19 examples of things, of red flags
20 that they need to bring to our
21 attention so we can do additional
22 due diligence and investigation,
23 if need be, if they're an existing
24 customer; or things that they need

Page 400

1 to be aware of if it's a potential
2 customer that they're looking to
3 do business with.
4 BY MR. PIFKO:
5    Q.   Is there a normal ratio of
6 cash to insurance that you're aware of
7 for pharmacies?
8    MR. NICHOLAS:  Object to the
9 form.
10    THE WITNESS:  No, not that
11 I'm aware of.
12 BY MR. PIFKO:
13    Q.   At any point in your history
14 working with the company, are you aware
15 of some sort of ratio that's typical as
16 far as cash to insurance for a pharmacy?
17    MR. NICHOLAS:  Object to the
18 form.  I assume these are --
19 you're asking him as an individual
20 now?
21    MR. PIFKO:  Yes, that
22 question was.
23    MR. NICHOLAS:  Okay.
24    THE WITNESS:  Not that I'm

Page 401

1 aware of.
2 BY MR. PIFKO:
3    Q.   Let's look at the next
4 picture here.
5    Have you seen this picture
6 before?
7    A.   I have.
8    Q.   You have?
9    A.   In other presentations, yes.
10    Q.   Where do you believe you
11 first saw this picture?  In a DEA
12 presentation or --
13    A.   I don't know.  I don't
14 recall.
15    Q.   Why is this a red flag?
16    A.   I would think because of the
17 term "free samples."
18    Q.   It says, Pain Relief Center.
19 What kind of free samples
20 would be --
21    A.   I don't --
22    Q.   Don't know?
23    A.   Right.
24    Q.   Why is that a concern?

Page 402

1   A.   To find out what the free
2 samples are that they're giving out in a
3 pain relief center.
4   Q.   Because they could be
5 controlled substances and you shouldn't
6 be giving those out for free, right?
7   A.   It could be controlled.
8 That's the question, is what free samples
9 are they giving out?
10   Q.   Let's look at the next
11 picture.
12        Have you seen this before?
13   A.   I've seen this picture
14 before.
15   Q.   What is this a picture of?
16   A.   This is a picture of a
17 pharmacy.
18   Q.   How do you know it's a
19 pharmacy?
20   A.   Because that's -- when we
21 had the -- this was -- again, that's why
22 it's in the deck.
23   Q.   Did you create the deck?
24   A.   I did not create the deck.

Page 403

1 But I've seen this picture before and
2 it's been used in presentations, much
3 like with these other pictures, regarding
4 red flags when you visit a pharmacy.
5   Q.   So you know for a fact this
6 is a pharmacy?
7   A.   I don't know for a fact this
8 is a pharmacy.
9   Q.   Why is this a potential red
10 flag?
11   A.   Because there's nothing
12 going on here.  There's nothing on the
13 walls, it looks like it's not even an
14 open business.
15   Q.   And why is that a concern?
16   A.   Because it doesn't look like
17 there's any business that's occurring
18 there.
19   Q.   So why wouldn't you want to
20 sell controlled substances to this kind
21 of a pharmacy?
22   A.   You may.  It depends.  It's
23 just another flag.  I mean, it could be a
24 closed-door pharmacy that services

Page 404

1 nursing homes and has no foot traffic in.
2 It could be a legitimate reason.
3        But it's something that they
4 should acknowledge and report so that we
5 can confirm what type of business is
6 occurring, who the customer base is.  And
7 that's the purpose of that slide there.
8   Q.   Let's look at the next one.
9        Have you seen this before?
10   A.   I don't recall seeing this
11 one before.
12   Q.   Do you understand what it's
13 communicating here?
14   A.   It's communicating that --
15 it's communicating that people are in
16 Florida getting their prescriptions
17 filled.
18   Q.   And they're not from
19 Florida, right?
20        MR. NICHOLAS:  Object to the
21 form.  You're asking him now in
22 his individual capacity, right?
23 Because this is not part of a
24 30(b)(6).

Page 405

1        MR. PIFKO:  It's a training
2 document about the company's
3 diversion policies.
4        MR. NICHOLAS:  Object to the
5 scope.  Object to the form.
6 Go ahead.
7        THE WITNESS:  That's what
8 the comic infers.
9 BY MR. PIFKO:
10   Q.   That they're out-of-state
11 people coming to Florida to buy pills,
12 right?
13   A.   It doesn't say out of state.
14   Q.   It says, tourists.
15 Tourists, thank God.  May I suggest
16 restaurants?  Hotels?  Destinations?
17        And the guy says back, We're
18 just here to buy some pills -- some pain
19 pills.
20        So it's suggesting that
21 they're from out of state.
22   A.   Suggesting they're tourists.
23   Q.   And they came from out of
24 state to Florida, he has a shirt that

Page 406

1 says Florida, to buy pills?
2         MR. NICHOLAS:  Object to the
3     form.
4 BY MR. PIFKO:
5     Q.   Is that what it's saying?
6     A.   It's not saying they're from
7 out of state.  But that's what it's
8 inferring, that tourists are buying pills
9 in Florida.
10     Q.   That's consistent with the
11 issue that we talked about in Exhibit-12,
12 do you recall that?  The HDMA meeting
13 with the DEA, people coming to Florida to
14 buy pills and take them to other states.
15     Do you recall that?
16     A.   Yes.
17     Q.   This is consistent with that
18 idea, right?
19         MR. NICHOLAS:  Object to the
20     form.
21         THE WITNESS:  That's --
22     that's what this is inferring,
23     yes, this comic strip.
24 BY MR. PIFKO:

Page 407

1     Q.   So as of the date of this
2 document, the company knew that that was
3 a concern, agree?
4     A.   It was another -- again, I
5 don't know who put this in here and what
6 the inference of the comic strip was.
7 It's not a picture of the red flags like
8 the previous ones are.
9         But that's the inference, is
10 that people were coming to Florida to get
11 their prescriptions filled.
12     Q.   And then it says, Coming to
13 a state near you.
14     A.   That's the title.
15     Q.   What does that mean?
16     A.   I don't know.
17         MR. NICHOLAS:  Object to the
18     form.
19 BY MR. PIFKO:
20     Q.   This is a company training
21 document about diversion control
22 practices, agree?
23         MR. NICHOLAS:  Object to the
24     form.

Page 408

1 BY MR. PIFKO:
2     Q.   It's what you said it was.
3     A.   It's -- yes, a presentation
4 to the sales group.  Yes.
5     Q.   So the company is
6 acknowledging that there are -- there is
7 an issue with people from out of state
8 buying pills somewhere, agree?
9         MR. NICHOLAS:  Object to the
10     form.
11         THE WITNESS:  It indicates
12     that that is another flag that
13     should be considered, correct.
14 BY MR. PIFKO:
15     Q.   This is a comic.
16     Does the company think that
17 diversion is a -- is funny?
18         MR. NICHOLAS:  Object to the
19     form.  That's a pretty obnoxious
20     question.
21         THE WITNESS:  Absolutely
22     not.
23 BY MR. PIFKO:
24     Q.   Does the company take its

Page 409

1 diversion control practices serious?
2     A.   Yes.
3     Q.   Do you know why they would
4 use a comic in a document like this to
5 communicate this message?
6         MR. NICHOLAS:  I'll object
7     to the form.
8         THE WITNESS:  It's the slide
9     that's -- that's the slide that --
10     I mean, I'm not sure what your
11     question is.
12     Why would they pick this
13     slide?
14 BY MR. PIFKO:
15     Q.   And use humor to communicate
16 something serious like this.
17         MR. NICHOLAS:  I'll object
18     to the form and to the
19     offensiveness of the question.
20     Go ahead.
21         THE WITNESS:  I don't think
22     it's depicted in humor.  I think
23     it's stating another red flag, if
24     you see people that are not from

Page 410

1 the area getting their
2 prescription filled.
3 BY MR. PIFKO:
4     Q.   Did the company do anything
5 to address the potential for out-of-state
6 people potentially coming somewhere and
7 buying pills from a pharmacy?
8     A.   We have no control over
9 where people go and get their
10 prescriptions filled.  We don't know
11 where they come from.
12     Q.   It says, Coming to a state
13 near you.
14         Do you know if the company
15 conducted any research about people pill
16 shopping in different states?
17         MR. NICHOLAS:  Object to the
18     form.  We're here on the Track 1
19     case, or cases.  So I want to make
20     sure that the record is clear that
21     these questions are pertaining to
22     the Track 1 jurisdictions.
23         MR. PIFKO:  I'm asking about
24     the company's policies right now.

Page 411

1         MR. NICHOLAS:  As they
2     pertain -- well, you're asking
3     specific questions.
4 BY MR. PIFKO:
5     Q.   Do you need me to read back
6 the question?
7     A.   Yes.  I didn't know, was
8 there a policy question?
9     Q.   I said, it says, Coming to a
10 state near you.
11         Do you know if the company
12 conducted any research about people pill
13 shopping in different states?
14     A.   No.
15     Q.   Have you heard the term
16 "blue highway" before?
17     A.   No.
18     Q.   You don't know what that is?
19     A.   I have not heard that term.
20     Q.   How about The Oxy Express,
21 have you heard of that before?
22     A.   I'm not sure what it's in
23 reference to, but --
24     Q.   You don't know anything

Page 412

1 about that?
2     A.   No.
3     Q.   The last page has some
4 individuals.
5         We talked about Ed?
6     A.   Yes.
7     Q.   Do you know who he is?
8     A.   Ed Hazewski?  Yes, director
9 of diversion control.
10     Q.   How about the other people
11 in here?
12     A.   Dave Breitmayer was in the
13 diversion control group, as well as Kevin
14 Kreutzer.  And I'm not sure if their
15 title is investigator or specialist, but
16 they're in the diversion control group,
17 as well as Joe Tomkiewicz.
18         MR. PIFKO:  Let's take a
19     break.
20         VIDEO TECHNICIAN:  Going off
21     the record.  The time is 4:40 p.m.
22         - - -
23         (Whereupon, a brief recess
24     was taken.)

Page 413

1         - - -
2         VIDEO TECHNICIAN:  We're
3     back on the record at 5:00 p.m.
4 BY MR. PIFKO:
5     Q.   Does AmerisourceBergen take
6 it upon itself to obtain information
7 about pill mill doctors in connection
8 with its diversion control program?
9         MR. NICHOLAS:  Are we in
10     30(b)(6) time here?
11         MR. PIFKO:  Yes.
12         THE WITNESS:  As I
13     indicated, part of our 590 is to
14     ask for prescriber data.  I mean,
15     that's the information we gather.
16         I'm not sure whether -- we
17     don't know whether -- what these
18     doctors are associated with.  But
19     we do collect physician
20     information.
21 BY MR. PIFKO:
22     Q.   Do you have a process for
23 collecting information, from anywhere,
24 about pill mill, bad doctors?

Christopher Zimmerman (AmerisourceBergen)

Page 414

1    A.   We -- no.  We collected the
2  information on the top prescribers.  But
3  no, we don't have a database.
4    Q.   If you had information that
5  there was a pill mill doctor in an area,
6  would you tell a pharmacy about it?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  I don't know
10   how we would know that
11   information.
12 BY MR. PIFKO:
13   Q.   If you did know it --
14   A.   I don't -- again, I don't
15 see how we would have that information
16 unless -- again, we vet our pharmacy
17 customers.  We don't just vet doctors.  I
18 mean, it's not -- that's not who --
19 that's not our process.
20       Our process is, the
21 pharmacies that we distribute to, that we
22 ask for their prescribers they have on
23 there and then we see if there's any
24 action taken against them.

Page 415

1    Q.   And if one of your
2  manufacturers -- or what you call the
3  manufacturers, you're the customer of the
4  manufacturer of pharmaceuticals, if they
5  told you about pill mill doctors, what
6  would you do with that information?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  I'm really not
10   sure what information they would
11   provide, and, again, in what
12   context.
13 BY MR. PIFKO:
14   Q.   If they had information
15 from, like, the things we were talking
16 about, seeing lines out the door or
17 something, from their own operations and
18 they shared that with you, would you
19 share it with a pharmacy?
20       MR. NICHOLAS:  Object to the
21   form.
22       THE WITNESS:  I am not
23   sure -- I am not sure what that
24   information would be.  Again, I

Page 416

1  don't think we have an obligation,
2  not knowing the specific
3  circumstances of whatever that
4  information that they receive.  So
5  I -- I don't know.
6  BY MR. PIFKO:
7    Q.   You don't know or --
8    A.   Yeah, I said that -- can you
9  ask the question one more time?  Because
10 I think I answered it, but I'll answer it
11 again.
12   Q.   Let's ask a simpler
13 question.
14       Does AmerisourceBergen
15 maintain a database where it keeps
16 information about bad doctors?
17   A.   Not that I'm aware of.
18   Q.   If you received such
19 information, what would you do with it?
20       MR. NICHOLAS:  Object to the
21   form.
22       THE WITNESS:  I don't know
23   what that information would be.
24   If it was information regarding a

Page 417

1  doctor that -- again, I hate to
2  speculate.
3        But if it had to do with one
4  of our pharmacy customers, then we
5  would look into that.
6  BY MR. PIFKO:
7    Q.   What if Allergan sent you a
8  list of bad doctors and said, we know
9  about these pill mill doctors, what would
10 you do with it?
11       MR. NICHOLAS:  Object to the
12   form.
13       THE WITNESS:  I don't know.
14   I mean, I'd have to see the list.
15   I don't know what the context is
16   behind the list.  I don't know
17   what the documentation of -- of --
18   that Allergan is concluding that
19   they're pill mill doctors.
20       I'm not -- it all depends on
21   what the information is and how
22   they arrived at that information.
23 BY MR. PIFKO:
24   Q.   What if they had a news

Christopher Zimmerman (AmerisourceBergen)

Page 418

1 story that was about a physician getting
2 his office raided because he was a pill
3 mill doctor and they sent that to you,
4 what would you do with that information?
5         MR. NICHOLAS:  Object to the
6     form.
7         THE WITNESS:  We would
8     verify to see if it was a customer
9     of ours.
10 BY MR. PIFKO:
11     Q.   I'm talking about a doctor,
12 though.
13         You don't -- do you sell
14 directly to doctors?
15     A.   We could -- if it was a
16 clinic, sometimes we will sell to a
17 doctor, because clinics usually aren't
18 licensed.  So it depends upon the
19 practice.
20     Q.   So what I'm asking, though,
21 is if you found out and verified a news
22 story about a legal issue with a doctor
23 being raided because he was a pill mill,
24 would you tell pharmacies in the area

Page 419

1 about that information?
2         MR. NICHOLAS:  Object to the
3     form.
4         THE WITNESS:  I don't know.
5     I don't think so.
6 BY MR. PIFKO:
7     Q.   Would you undertake any
8 investigation to learn if a pharmacy was
9 filling prescriptions from that doctor?
10     A.   I don't know.
11     Q.   Are you aware of a process
12 the company has to do that?
13     A.   It depends on the
14 information as it comes into the
15 diversion control group.  Again, I
16 don't -- I would need to understand the
17 information coming in and what the
18 circumstances are and if they have that
19 information.
20         I can't tell you here, right
21 now, what their investigation process
22 was, given this information that I'm not
23 really sure that you're referring to.
24     Q.   Well, so based on your

Page 420

1 inability to give specifics, it doesn't
2 sound like you have a standard protocol
3 for dealing with that kind of
4 information.
5         Would you agree with me
6 about that?
7     A.   We have a protocol when we
8 receive information, that we investigate.
9         And, again, I don't
10 understand what information you're
11 talking about; depending on what that
12 information is depends upon what kind of
13 investigation is done, if any.
14     Q.   If you had information that
15 a doctor in an area lost their license,
16 would you undertake an effort to learn if
17 your pharmacy clients were filling
18 prescriptions from that doctor?
19     A.   I don't know.
20     Q.   Do you have an established
21 procedure for doing that now?
22     A.   Again, I'm not sure how that
23 information is coming in and what the
24 diversion control group does with that

Page 421

1 information, based upon the circumstances
2 of whatever occurred with that doctor.
3     Q.   So if I sent you the name of
4 a doctor who had been -- lost her license
5 in the Philadelphia area, it was
6 verified, would you tell any pharmacies
7 in the area?
8         MR. NICHOLAS:  Object to the
9     form.
10         THE WITNESS:  Again,
11     you're -- it's a hypothetical.  I
12     don't know the basis of the
13     revocation of the license.  We
14     can't just send notices out of --
15     to pharmacies disparaging a
16     doctor.  I'm not sure what the
17     circumstances are.
18         And the pharmacy has a
19     requirement that they also need to
20     ensure -- they have a regulatory
21     responsibility to ensure they only
22     fill prescriptions from
23     appropriately licensed doctors.
24 BY MR. PIFKO:

Christopher Zimmerman (AmerisourceBergen)

Page 422

1    Q.   And would you undertake any
2  effort to learn that a pharmacy wasn't --
3  was filling prescriptions from a doctor
4  who wasn't licensed?
5         MR. NICHOLAS:  Object to the
6    form.
7         THE WITNESS:  We would not
8    know all the doctors that they're
9    filling prescriptions for.  You
10   know, we ask for the top
11   prescribers out of the due
12   diligence process.
13        But if they're filling
14   prescriptions for 30 different
15   doctors and one of the 30 had
16   their license revoked, we wouldn't
17   know that.
18 BY MR. PIFKO:
19   Q.   Would it bother you to know
20 that you sold pills to a pharmacy that
21 was filling orders from an unlicensed
22 doctor?
23        MR. NICHOLAS:  Object to the
24   form.  You mean personally?  Or the

Page 423

1  company?  When?  Can you be more
2  specific?
3         THE WITNESS:  Again, it
4    depends -- we can't control who
5    the pharmacy fills their
6    prescriptions for.  We have to
7    ensure that the pharmacies that we
8    do business with are appropriately
9    licensed.
10        And if a pharmacy has --
11   again, I don't know the
12   circumstances of the case, if
13   you're referring to a case or if
14   this is a hypothetical.  But if
15   the pharmacy was filling
16   prescriptions from a doctor that
17   wasn't licensed, then, yes, that
18   would bother me.
19 BY MR. PIFKO:
20   Q.   Why would that bother you?
21   A.   Because they weren't meeting
22 their regulatory responsibilities.
23   Q.   But that's not information
24 that you seek to obtain on your own?

Page 424

1         MR. NICHOLAS:  Object to the
2    form.
3         THE WITNESS:  What
4    information?
5  BY MR. PIFKO:
6    Q.   Information about whether a
7  customer is filling prescriptions from an
8  unlicensed doctor.
9    A.   No, that's not a
10 requirement.  Our requirement is to
11 ensure that we sell to licensed
12 pharmacies.  The pharmacies have an
13 obligation, a regulatory obligation, to
14 ensure that the prescriptions that they
15 fill are coming from licensed physicians.
16        I mean, it's part of the
17 closed loop, closed distribution.  Each
18 segment has their responsibilities in
19 order -- in order to ensure compliance.
20   Q.   What about recordkeeping
21 with respect to controlled substances; do
22 you understand that pharmacies have
23 recordkeeping obligations?
24   A.   I would assume so, yes.

Page 425

1    Q.   You have recordkeeping
2  obligations, right, about what comes in
3  and what goes out?
4    A.   Yes.  We have recordkeeping
5  responsibilities.
6    Q.   And what's that designed to
7  detect?
8         MR. NICHOLAS:  Object to the
9    form.
10        THE WITNESS:  It depends
11   upon what recordkeeping.  I mean,
12   we have invoices.  We have pick
13   tickets.  We have receiving
14   documents.  We have inventory
15   records.
16 BY MR. PIFKO:
17   Q.   What I'm getting at is, one
18 of the things that recordkeeping is
19 designed to detect is loss or theft,
20 right?
21   A.   I mean, there's
22 recordkeeping requirements to ensure that
23 you have an accountability for the
24 products that you've received and

Christopher Zimmerman (AmerisourceBergen)

Page 426

1 distributed.
2    Q.   Well, if I know that I took
3 10,000 pills in and I sold 8,000 but I
4 have nothing left in my store, that's
5 something I want to know because maybe
6 they got stolen or, you know, there's an
7 issue there.  That's part of why you keep
8 records.
9       Can we agree about that?
10   A.   For accountability, yes.
11   Q.   Yes, okay.
12       So if you knew that a
13 pharmacy wasn't maintaining accurate
14 records to control for theft or loss, is
15 that something you would want to know
16 about?
17       MR. NICHOLAS:  Wait a
18 minute.  I'll object to the form
19 of the question.  None of this is
20 within the scope of the topics.
21 You're asking him about a
22 pharmacy's obligations.  And that
23 is not one of the topics.
24       MR. PIFKO:  Again, the

Page 427

1 speaking objections are over the
2 top.
3       MR. NICHOLAS:  But you're
4 not -- you're outside the scope.
5       MR. PIFKO:  It's about the
6 diversion control policies, okay?
7 We can argue -- all you say is
8 objection, scope, and we can argue
9 about what it is or what it isn't
10 afterwards.
11       It's really over the top,
12 what you're doing.
13       MR. NICHOLAS:  This isn't a
14 topic -- I have to be able to say
15 it's not a topic.
16       MR. PIFKO:  You can say
17 objection, scope.  And we --
18 that's the end of it.  We can
19 fight about it all you want later.
20       THE WITNESS:  So our
21 policies are with respect to
22 recordkeeping for
23 AmerisourceBergen distribution.
24 We don't have policies regarding

Page 428

1 pharmacies' recordkeeping
2 requirements.
3 BY MR. PIFKO:
4    Q.   Do you undertake any due
5 diligence to ensure that the pharmacies
6 to whom you're selling are complying with
7 their recordkeeping requirements?
8       MR. NICHOLAS:  Objection to
9 form.  Objection to scope.
10       THE WITNESS:  In the course
11 of an investigation, we may look
12 deeper at what's occurring at the
13 pharmacy.  Depending upon --
14 again, depending upon the
15 circumstances of the incident.
16 BY MR. PIFKO:
17   Q.   As a general matter, you
18 don't seek to collect information about a
19 pharmacy's recordkeeping obligations?
20       MR. NICHOLAS:  Same
21 objection.
22       THE WITNESS:  No.  That's
23 the pharmacy's obligations.
24 BY MR. PIFKO:

Page 429

1    Q.   Would it concern you if you
2 sold opioid pills to a pharmacy that had
3 significant unreported theft?
4       MR. NICHOLAS:  Objection to
5 form.  And objection to scope.
6       Are you asking him
7 individually?
8       THE WITNESS:  Can you ask
9 the question one more time?
10 BY MR. PIFKO:
11   Q.   Would it concern you if you
12 sold opioid pills to a pharmacy that had
13 significant unreported theft?
14       MR. NICHOLAS:  Same
15 objection to the same question.
16       THE WITNESS:  And, again, it
17 would depend upon the
18 circumstances.  I don't know -- I
19 would need to understand the -- I
20 need to understand the
21 information.
22       You're giving me, again, a
23 hypothetical where a pharmacy has
24 internal theft, and would I be

Christopher Zimmerman (AmerisourceBergen)

Page 430

1  concerned?  Well, I would be
2  concerned, if they had internal
3  theft for the pharmacy.  And we
4  would definitely -- but it's
5  far -- I don't know the specifics
6  that -- I don't have any
7  specifics.  You're not giving me
8  any specifics.
9  BY MR. PIFKO:
10  Q.  I'm going to go back to
11 document Number 10.
12  Let me know when you're
13 there.
14  A.  Yes.
15  Q.  We discussed this earlier
16 this morning.  I want to direct you to
17 the middle of the document.
18  It says, CSRA continues to
19 work with sales and distribution center
20 management to establish adequate
21 threshold levels for retail pharmacies to
22 provide protection to AmerisourceBergen,
23 while limiting the impact to
24 AmerisourceBergen accounts.

Page 431

1  Do you see that?
2  A.  Yes.
3  Q.  Is that how the company
4 designs its diversion control policies,
5 by seeking to provide protection to the
6 company while limiting impact to its
7 accounts?
8  MR. NICHOLAS:  Objection to
9  the form.
10  THE WITNESS:  We develop our
11  programs to ensure compliance with
12  regulatory requirements, which is
13  protecting the company.
14 BY MR. PIFKO:
15  Q.  What about limiting the
16 impact to AmerisourceBergen's accounts?
17  MR. NICHOLAS:  Object to the
18  form.
19  THE WITNESS:  I'm not sure
20  what limiting the impact to ABC
21  accounts is.
22 BY MR. PIFKO:
23  Q.  Does AmerisourceBergen have
24 interest in protecting anyone other than

Page 432

1  itself when it complies with The
2  Controlled Substances Act?
3  MR. NICHOLAS:  Object to the
4  form.
5  THE WITNESS:  I think, as I
6  indicated before, that we provide
7  a valuable service to the supply
8  chain.  And one that we take
9  seriously.  And one that -- again,
10  if we don't follow the rules and
11  regulations, then we can't supply
12  these medications to pharmacies
13  and hospitals.  So we take our
14  responsibility very seriously.
15  And by implementing our
16  policy and procedures and ensuring
17  we follow them protects our
18  customers, because they wouldn't
19  be able to access these products
20  if we weren't able to sell them to
21  them.
22  MR. PIFKO:  I'm going to
23  play a video.
24  (A video was shown.)

Page 433

1  MR. NICHOLAS:  Before you
2  ask --
3 BY MR. PIFKO:
4  Q.  Did you think --
5  MR. NICHOLAS:  -- a
6  question, I'm going to interpose
7  an objection to the playing of
8  this video in this context in this
9  deposition.
10  I think it's totally
11  inappropriate, and I object to it.
12 BY MR. PIFKO:
13  Q.  Did you think that you
14 should be providing protection to anyone
15 else other than AmerisourceBergen when
16 implementing your diversion control
17 practices?
18  MR. NICHOLAS:  I object to
19  the form of the question.  It's
20  outside the scope.  It's an
21  inappropriate question.  It
22  doesn't seek any information
23  that's pertinent to any of the
24  topics on your list.  I object to

Christopher Zimmerman (AmerisourceBergen)

Page 434

1    it.
2         THE WITNESS:  Your question?
3    BY MR. PIFKO:
4         Q.   Having seen the video, do
5    you think that you should provide
6    protection to anyone else besides
7    yourself when you're implementing your
8    diversion control practices?
9         MR. NICHOLAS:  I'll object
10   to the form of the question.  It
11   mischaracterizes prior testimony.
12        THE WITNESS:  As I
13   indicated, that we take our
14   responsibility very seriously,
15   regardless of the video.
16        I understand about the
17   opioid crisis, and it doesn't --
18   it's impacted my family as well.
19   It's impacted a lot of our
20   employees as well.  We understand
21   what the circumstances are.
22        And no, we aren't just about
23   protecting AmerisourceBergen.  We
24   have a job to do.  We have a job

Page 435

1    to make sure that the medications
2    that we receive are properly
3    stored and secure, in order to
4    make them available for customers
5    and patients that need them.
6         These are -- these drugs are
7    approved by the FDA.  And we sell
8    them to licensed pharmacists who
9    fill prescriptions written by a
10   licensed doctor.
11        Again, I'm not -- what we do
12   is to ensure that the integrity of
13   the product makes it to a licensed
14   pharmacy in order for the patient
15   to have that product available.
16   We implement our policy and
17   procedures to ensure that we don't
18   have diversion.  And that is the
19   responsibility we take, not just
20   because -- just looking out for
21   AmerisourceBergen, we supply 30
22   percent of the -- 25 to 30 percent
23   of the products within the United
24   States.

Page 436

1         And in order to do so, we
2    need to continue to do our
3    business diligently and in
4    compliance and in a safe -- in a
5    safe manner, to ensure that
6    product supply to the hospitals
7    and pharmacies and doctors is
8    available.  So it's not just about
9    AmerisourceBergen.
10   BY MR. PIFKO:
11        Q.   This is one of the biggest
12   public health crises in America.  And you
13   guys are in the center of it.
14        Do you think that you could
15   have done more to protect the communities
16   around you?
17        MR. NICHOLAS:  I'll object
18   to the form of the question.  It's
19   argument.  It's unfair.
20        I'm going to let him answer.
21        THE WITNESS:  I've
22   explained -- I've explained the
23   process and the safeguards that we
24   have in place and the things that

Page 437

1    we've done and the training that
2    we've done in this area.
3         It's a crisis.  I don't know
4    why, when we had a methamphetamine
5    crisis, that there was call to
6    action by legislature to include
7    additional requirements.  I'm not
8    sure why they didn't do that in
9    1990, '91, '92, all the way to
10   today.  They issue a guidance --
11   they issue -- DEA has issued
12   guidance letters.
13        And if it's a crisis, I
14   would expect them to have a
15   call-to-arms and have everybody
16   come to Washington, D.C. and --
17   like we did with the chemicals,
18   and create a solution, or at least
19   work on a solution.
20        We are -- as a private
21   industry, we are trying to do --
22   we are not trying to do, we are
23   doing what we need to do to
24   protect the supply channel with

Christopher Zimmerman (AmerisourceBergen)

Page 438

1  the information that we have and
2  that's available to us.
3       And we take that very
4  seriously.  I take that very
5  seriously.  The company takes it
6  very seriously.
7  BY MR. PIFKO:
8       Q.   Do you think that you have
9  any responsibility for the opioid crisis?
10      MR. NICHOLAS:  Object to the
11  form of the question.  It's
12  outside the scope.
13      Go ahead.
14      THE WITNESS:  As I
15  indicated, that our responsibility
16  in the opioid crisis is to ensure
17  that those products that we buy
18  from the manufacturers that have
19  been -- that have been approved by
20  DEA, through quotas to manufacture
21  and distribute, and our job is to
22  make sure when those opioids are
23  within our control, that we
24  maintain adequate security for

Page 439

1  those products, and recordkeeping.
2       We also make sure that we
3  vet our customers that we sell to,
4  which are licensed pharmacies by
5  the DEA and the Board of Pharmacy.
6  And we distribute those products
7  in a safe and secure manner.
8  BY MR. PIFKO:
9       Q.   Do you think you've done
10 enough?
11      A.   I think we are doing -- we
12 are always continuing to try to do more.
13 We're continually working with our
14 partners.  We've been working with
15 legislation to try to create solutions
16 that would impact distribution that may
17 help in this situation.  And we continue
18 to do that.
19           - - -
20      (Whereupon, Amerisource
21 Bergen-Zimmerman Exhibit-15, No
22 Bates, March 2017
23 AmerisourceBergen Code of Ethics
24 and Business Conduct, was marked

Page 440

1  for identification.)
2           - - -
3  BY MR. PIFKO:
4       Q.   I'm handing you what has
5  been marked as Exhibit-15.
6       A.   Thank you.
7       Q.   For the record, this is a
8  March 2017 code of ethics and business
9  conduct of AmerisourceBergen, which was
10 obtained from the company's website.  I
11 just want to ask you a quick couple of
12 questions about this.
13      You're the chief compliance
14 officer, right?
15      A.   Correct.
16      Q.   You have responsibility --
17      MR. NICHOLAS:  These are in
18 his individual capacity; is that
19 right?
20      MR. PIFKO:  Yes.
21 BY MR. PIFKO:
22      Q.   You have responsibility for
23 this document?
24      A.   Yes.

Page 441

1       Q.   This document doesn't
2  mention The Controlled Substances Act
3  once.
4       You can look through it, but
5  would you agree with me?
6       A.   I don't know.  I mean, I can
7  read it.
8       Q.   I'll represent to you it
9  doesn't refer to The Controlled
10 Substances Act.  You can look at the
11 table of contents here, compliance with
12 laws, Page I here.
13      Is The Controlled Substances
14 Act one of the laws that's mentioned
15 here?
16      MR. NICHOLAS:  I'll object
17 to the form of the question.
18      You probably need to read
19 the entire document to really
20 answer a question like this.
21      But go ahead.
22      THE WITNESS:  What was your
23 question?  I'm sorry.
24 BY MR. PIFKO:

Christopher Zimmerman (AmerisourceBergen)

Page 442

1    Q.   It's got a discussion of
2  compliance with laws here in the table of
3  contents.
4    A.   Okay.
5    Q.   You agree that The
6  Controlled Substances Act is not one of
7  those laws that's listed here?
8        MR. NICHOLAS:  Object to the
9    form.  I'll object to the form.  I
10   think the question is misleading.
11       THE WITNESS:  In the section
12   that says, Associates must comply
13   with all applicable laws,
14   regulations and rules, including
15   but not limited to those described
16   below.
17 BY MR. PIFKO:
18   Q.   Does it mention The
19 Controlled Substances Act?
20       MR. NICHOLAS:  Object to the
21   form.
22       THE WITNESS:  It doesn't
23   state that.
24            - - -

Page 443

1        (Whereupon, Amerisource
2    Bergen-Zimmerman Exhibit-16, No
3    Bates, West Virginia Case
4    Document, Organization Charts, was
5    marked for identification.)
6            - - -
7  BY MR. PIFKO:
8    Q.   I'm handing you what is
9  marked as Exhibit-16.  It's a document
10 that was used in your deposition in the
11 West Virginia litigation.
12       Do you recall this document?
13   A.   Yes.  I believe from the
14 West Virginia case.
15   Q.   Do you agree this is a true
16 and correct copy of the exhibit that
17 was -- 1 was attached to your West
18 Virginia litigation as referenced here on
19 the first page of the document?
20       MR. NICHOLAS:  Object to the
21   form --
22       THE WITNESS:  Do I --
23       MR. NICHOLAS:  -- in the
24   sense that I don't know if he

Page 444

1  remembers or knows.
2        MR. PIFKO:  You're coaching
3    him.
4        MR. NICHOLAS:  Well, this is
5    just housekeeping.  It's silly.
6    It's stupid.
7        THE WITNESS:  Your question
8    was?
9  BY MR. PIFKO:
10   Q.   Is this a true and correct
11 copy of the document that was --
12   A.   It appears to be.  It
13 appears to be.
14   Q.   Okay.  Is this from your
15 files?
16       MR. NICHOLAS:  Objection to
17   the form.
18       THE WITNESS:  I don't know
19   where it came from.
20 BY MR. PIFKO:
21   Q.   What is this document?  Can
22 you tell me what it is?
23   A.   It looks like -- it looks
24 like a series of org charts.

Page 445

1    Q.   Is this an accurate
2  depiction of the -- your department, the
3  CSRA?
4        MR. NICHOLAS:  When?
5        THE WITNESS:  Yeah, which --
6  BY MR. PIFKO:
7    Q.   Well, it's got various
8  periods on it.  The whole document.
9        MR. NICHOLAS:  I think you
10   have to focus the question for
11   him.
12       THE WITNESS:  Which one?
13 BY MR. PIFKO:
14   Q.   Every single page, you're at
15 the top.
16       MR. NICHOLAS:  I'll object
17   to the form.  I'm not seeing any
18   dates on the document at all.
19       THE WITNESS:  I don't see
20   any dates either.
21 BY MR. PIFKO:
22   Q.   Your name is at the top of
23 each one of these pages, correct?
24   A.   But what year?

Christopher Zimmerman (AmerisourceBergen)

Page 446

1    Q.   You're going to tell me.
2 You're the expert here.  It's your
3 department.  This is your document, not
4 mine.
5        Let's look at the first
6 page.
7    A.   Okay.
8    Q.   That's your name at the top
9 of this, right?
10    A.   Yes.
11    Q.   When you look at this and
12 see the people here and the positions
13 here, can you tell me when this was?
14        MR. NICHOLAS:  Objection.
15    Outside the scope.  Object to the
16    form.
17        THE WITNESS:  Possibly 2007.
18    I'm not sure exactly.
19 BY MR. PIFKO:
20    Q.   It says, Associates assigned
21 to provide resources for the diversion
22 control program.
23        Do you see that?  On the
24 left at the top, under the word, Current.

Page 447

1    A.   Yes.
2    Q.   And then underneath there,
3 it says, Everyone already has a full-time
4 job.
5        Do you see that?
6    A.   Yes.
7    Q.   That's because the people
8 responsible to provide resources for the
9 diversion control program had other
10 responsibilities, right?
11        MR. NICHOLAS:  Object to the
12    form.
13        THE WITNESS:  We already had
14    diversion control.  We just --
15    this is in 2007.  So part of their
16    jobs was already in diversion
17    control.
18 BY MR. PIFKO:
19    Q.   Part of their job what?
20    A.   Was part -- was for
21 diversion control.
22    Q.   Right.  So all of these
23 people had other jobs as well, correct?
24        MR. NICHOLAS:  Object to the

Page 448

1    form.
2        THE WITNESS:  In a sense
3    they had other duties in addition
4    to diversion control.  As we
5    indicated with investigations,
6    they also investigated theft.  You
7    had -- you have regional directors
8    that also ensure compliance with
9    other -- not just the controlled
10    substance requirements but also
11    security and prescription drug
12    requirements that always had
13    controlled substances and
14    diversion as well.
15 BY MR. PIFKO:
16    Q.   Let's look -- can you point
17 me to where the investigations department
18 is?  Who it that -- who is on this first
19 page?
20    A.   Bruce Gundy.
21    Q.   So there's four
22 investigators underneath him?
23    A.   Correct.
24    Q.   Does he perform

Page 449

1 investigations himself?
2    A.   Yes.
3    Q.   If we look at the next page,
4 there's Bruce Gundy.
5        And how many people are
6 under him?
7    A.   Three.
8    Q.   The next page?
9    A.   I can't really read it.
10    Q.   It's next to Mr. Hazewski.
11        MR. NICHOLAS:  Hazewski.
12        MR. PIFKO:  Sorry.
13        THE WITNESS:  Are you
14    referring to Bruce or Ed?
15 BY MR. PIFKO:
16    Q.   Bruce.
17        You were trying to look for
18 his department.  How many people were
19 in --
20    A.   Yes.
21    Q.   -- his department on the
22 third page?
23    A.   He has two.
24    Q.   Two.

Christopher Zimmerman (AmerisourceBergen)

Page 450

1 And then let's look at the
2 next page, how many?
3 A. Two.
4 Q. And the last page?
5 A. Two.
6 Q. And all those investigators
7 have duties other than diversion control,
8 correct?
9 MR. NICHOLAS: Object to the
10 form.
11 THE WITNESS: Yes. But
12 as -- so after the first one,
13 there's a diversion control
14 department, which had
15 investigators contained within
16 there that moved from Bruce to
17 diversion control.
18 So now you had diversion
19 control doing investigations, as
20 well as Bruce's people doing
21 investigations.
22 The regional directors also
23 performed investigations, and same
24 with the senior directors as well.

Page 451

1 And then you had a
2 compliance staff at each of the
3 distribution centers. We have 26
4 distribution centers, all with a
5 compliance staff of either two to
6 six individuals. So -- also with
7 a role within -- looking into
8 these issues.
9 BY MR. PIFKO:
10 Q. Let's look at the last page
11 for completeness here.
12 Four people as investigators
13 there?
14 A. Yes. Four investigators
15 under Bruce. And then you see
16 investigators under diversion control.
17 - - -
18 (Whereupon, Amerisource
19 Bergen-Zimmerman Exhibit-17,
20 ABDCMDL 00251392-94, was marked
21 for identification.)
22 - - -
23 BY MR. PIFKO:
24 Q. I'm handing you what is

Page 452

1 marked as Exhibit-17.
2 Have you seen this before?
3 It's ABDCMDL 00251392 through 94. I just
4 have some quick questions about this.
5 Are you familiar with this
6 policy and procedure?
7 A. I've seen it, yes.
8 Q. It says that this is retail
9 pharmacy targeted visits.
10 What is that?
11 A. Retail targeted visit; that
12 we've identified a pharmacy that they
13 want to do additional investigation --
14 Q. Okay.
15 A. -- which consisted of a
16 targeted visit.
17 Q. I want to direct your
18 attention to the bottom where it says, 2,
19 pre-visit preparation.
20 Are you there?
21 A. Yes, I am.
22 Q. It says, The CSRA
23 representative conducting the visit will
24 request, in writing, that the account

Page 453

1 manager contact the owner/pharmacist in
2 charge, inform him/her of the visit and
3 ensure that the owner, person in charge,
4 or their designee, will be present on the
5 arranged date in order to give their
6 undivided attention to the CSRA
7 representative for a minimum of one hour.
8 The account manager is responsible for
9 coordinating the visit date and time with
10 the owner and/or person in charge or
11 their designee.
12 Do you see that?
13 A. Yes.
14 Q. So I just want to confirm,
15 under AmerisourceBergen's policy for
16 investigating and visiting pharmacies,
17 the owner or person in charge or designee
18 is provided advanced notice of those
19 visits, correct?
20 A. Yes. We need them there in
21 order to conduct our site visit.
22 - - -
23 (Whereupon, Amerisource
24 Bergen-Zimmerman Exhibit-18,

Christopher Zimmerman (AmerisourceBergen)

Page 454

1 ABDCMDL 00002325-2334, was marked
2 for identification.)
3 - - -
4 BY MR. PIFKO:
5 Q. I'm handing you what is
6 marked as Exhibit-18. It's a memorandum
7 to distribution center associates, from
8 you and Frank Napoli, dated June 29,
9 2007, Bates numbered ABDCMDL 00002325
10 through 2334.
11 Take your time to review it.
12 I only have a couple little questions
13 about it.
14 MR. NICHOLAS: While he's
15 reviewing, can we know how much
16 time is left?
17 VIDEO TECHNICIAN: There is
18 42 minutes.
19 MR. NICHOLAS: Thank you.
20 Are you going to take the
21 full 42?
22 MR. PIFKO: We'll see. It's
23 actually earlier than I thought it
24 would be.

Page 455

1 MR. NICHOLAS: Me, too.
2 - - -
3 (Whereupon, a discussion off
4 the record occurred.)
5 - - -
6 THE WITNESS: Okay.
7 BY MR. PIFKO:
8 Q. Can you tell me what this
9 is?
10 A. This is a document that we
11 sent to the distribution centers, because
12 this is -- as we were building our new
13 program, as we were working with DEA
14 to -- building the new program, explain
15 the changes that were going to be made.
16 Q. So this is like a training
17 guidance document for distribution center
18 people on how we use the new computer
19 system and deal with suspicious order
20 requirements; is that correct?
21 A. With the changes that we
22 were making, yes.
23 Q. I want to direct your
24 attention to ABDCMDL 00002328.

Page 456

1 It's talking about different
2 codes that can be entered, if an order
3 exceeds a threshold, agree?
4 A. Code that -- yes.
5 Q. Under the code, AD approved
6 by DIV, allocate -- do you see that?
7 A. Yes.
8 Q. What does that mean?
9 A. Division would be the DIV.
10 Q. Do you know what allocate
11 means there?
12 A. In the system, at the time
13 when they placed an order -- when a
14 customer places an order, let's say
15 there's ten on the -- our inventory is
16 ten on the shelf and you place an order
17 for two, it will allocate those two.
18 So I'm assuming that if it's
19 approved by division, you would allocate
20 the amount of product that the customer
21 is ordering at the time.
22 Q. Scrolling down to the first
23 bullet point under there, it says, Know
24 your customer means -- let me back up.

Page 457

1 If the -- it says, This code
2 should be used by the distribution center
3 associate during the initial review. If
4 the distribution center associate
5 determines that the order quantity is not
6 suspicious (based on "know your customer"
7 philosophy) the order can be released.
8 "Know your customer" means
9 knowing which accounts are hospitals, DOD
10 accounts, the warehouse, or a chain or
11 grocery customer, or another large
12 customer that has a known, legitimate and
13 well-established need for high volumes of
14 controlled drugs and listed chemicals.
15 Do you see that?
16 A. Yes.
17 Q. Okay. Is that an accurate
18 statement of what the "know your
19 customer" philosophy meant at that time?
20 MR. NICHOLAS: Object to the
21 form.
22 THE WITNESS: In this
23 instance, for the distribution
24 centers, it was for the

Christopher Zimmerman (AmerisourceBergen)

Page 458

1   distribution centers, their
2   customer base.
3          So part of our negotiations
4   with DEA, in 2007, is they wanted
5   to make sure that the distribution
6   centers had an understanding of
7   the customers that they were
8   servicing as well.
9          And that was what the
10  training for the responsible
11  person in charge consisted of.
12  And that's what they're referring
13  to.
14         So DOD accounts, this is in
15  the height of the Iraq War, and we
16  didn't want to be not holding up
17  orders to the DOD at this time.
18  So if they came through at night
19  and it wasn't something -- you
20  know, it wasn't suspicious, then
21  they had the ability to release
22  that order.
23  BY MR. PIFKO:
24     Q.   How about chain or grocery

Page 459

1   customers?
2     A.   It was all depending upon
3   their knowledge of the customer that they
4   were servicing from the distribution
5   center day in and day out.
6          And these were all things we
7   were discussing with the DEA when we were
8   talking about holding -- because, again,
9   keep in mind, before 2007, orders were
10  reported after the fact.  So DEA -- if
11  DOD or Cleveland Clinic placed an order
12  for medication that they needed the very
13  next day, they would get it; and if it
14  was suspicious, we would report it.
15         With this the new program,
16  now you could be impacting patient care
17  at a hospital, surgery center or DOD, in
18  the event that in the middle of the night
19  they had to release that order.
20         - - -
21         (Whereupon, Amerisource
22    Bergen-Zimmerman Exhibit-19,
23    ABDCMDL 00002405-2418, was marked
24    for identification.)

Page 460

1          - - -
2   BY MR. PIFKO:
3     Q.   I'm handing you what has
4   been marked as Exhibit-19.  It's a
5   document Bates labeled ABDCMDL 00002405
6   through 2418.
7          Take your time to review it,
8   but, again, I just have some questions
9   about specific areas in here.
10         Let me know when you're
11  ready.
12     A.   Okay.
13     Q.   Are you ready?
14         This document is titled,
15  Order Monitoring Program, OMP, Setting
16  the Record Straight.
17         Do you see that?
18     A.   Yes.
19     Q.   And it's talking about the
20  difference between the non-SAP, or S-A-P,
21  and the post-SAP system.
22         Can you explain what that is
23  about?
24     A.   So we moved -- SAP is an

Page 461

1   operating platform that a lot of
2   manufacturers operate on, and we moved to
3   that operating platform.
4          So this is a move from the
5   old operating platform for the company to
6   the new SAP operating platform.
7     Q.   And prior to the SAP system,
8   the system you employed was called STAR?
9     A.   I believe so.
10     Q.   I want to direct your
11  attention to Page 5 of the document.
12  That's 2409.
13         Let me know when you're
14  there.
15     A.   Yes.
16     Q.   Frequently asked questions.
17         Do you see that?
18     A.   Yes.
19     Q.   These are questions that a
20  customer might ask?
21     A.   No.  These are to the
22  distribution centers.
23     Q.   Okay.  By the way, have you
24  seen this document before?

Christopher Zimmerman (AmerisourceBergen)

Page 462

1    A.   I have seen the document
2  before.
3    Q.   Okay.  It says, How are
4  thresholds tracked for multiple accounts
5  using the same DEA registration number?
6         Do you see that?
7    A.   What number?
8    Q.   Two.
9    A.   Yes.
10   Q.   So prior to the
11 implementation of this system, someone
12 with a single registration -- DEA
13 registration number could have multiple
14 accounts with AmerisourceBergen, correct?
15   A.   So some pharmacies will set
16 up multiple accounts at a location to
17 have their front end on one account and
18 their pharmacy on another account.  And,
19 so they could have more than one account
20 number.
21        But under the account
22 number, we would code the schedules as,
23 no, so they couldn't order controlled
24 substance.  So we would roll it under the

Page 463

1  one account that was actually purchasing
2  the controlled substances.
3    Q.   Well, it says here that
4  pre-SAP, under the STAR system, each
5  account had its own threshold.  And after
6  the SAP system, thresholds are now based
7  on a single DEA registration number
8  rather than on the account number, agree?
9    A.   They are based on the -- one
10 DEA number.  And before, it was more of a
11 manual process, yes.
12   Q.   What do you mean "before it
13 was more of a manual process"?
14   A.   You had to go in and code
15 the other accounts as no, for controls.
16   Q.   How would one do that?
17   A.   They go in the -- so when
18 you put in a DEA number, in addition to
19 our system, they have to have a valid DEA
20 number and expiration date.  And you have
21 to go in and click the schedules that
22 they're licensed to; there's II, IIN,
23 III, IIIN, IV and V.  So you would go in
24 and, yes or no, and you would say no for

Page 464

1  all the controls.
2    Q.   So why would it say each
3  account had their own threshold?
4         MR. NICHOLAS:  Object to the
5    form.
6         THE WITNESS:  I don't know.
7  BY MR. PIFKO:
8    Q.   Were there thresholds for
9  things other than controlled substances?
10        MR. NICHOLAS:  Object to the
11   form.
12        THE WITNESS:  I would only
13   be speculating.
14 BY MR. PIFKO:
15   Q.   So it's possible that before
16 the SAP system, an account -- each
17 account within the same registration
18 number could have had controls?
19   A.   Again, I don't know what
20 the -- so, as I indicated, the front end
21 in the pharmacy, the list of chemicals,
22 pseudoephedrine is a front-end item which
23 would require a DEA number but not a
24 control schedule.

Page 465

1         I'm not sure if that's what
2  they're referring to.
3    Q.   But it's possible that at
4  that time, under the STAR system, an
5  account -- you could have one DEA
6  registration and order controls under two
7  accounts, correct?
8         MR. NICHOLAS:  Object to the
9    form.  Outside the scope.
10        THE WITNESS:  That was
11   not -- that was not the procedure.
12 BY MR. PIFKO:
13   Q.   But it's possible?
14        MR. NICHOLAS:  Objection.
15        THE WITNESS:  I can't say if
16   it occurred or not.
17 BY MR. PIFKO:
18   Q.   Let's go to Page 6.
19        There's a heading that says,
20 What can a distribution center do to
21 release orders being held due to order
22 monitoring program?
23        Do you see that?
24   A.   Yes.

Christopher Zimmerman (AmerisourceBergen)

Page 466

1      MR. NICHOLAS:  I'm sorry,
2  can you just do that again?  Which
3  one -- which number are we on?
4  BY MR. PIFKO:
5      Q.   11, Page 5.  What can a
6  distribution center do to release orders
7  being held due to order monitoring
8  program, question mark.
9          Do you see that?
10     A.   I'm sorry, now you confused
11 me.
12         MR. NICHOLAS:  11.
13         THE WITNESS:  Number 11?
14         MR. NICHOLAS:  Yes.
15         MR. PIFKO:  You can look on
16 the screen in front of you as
17 well.
18 BY MR. PIFKO:
19     Q.   I really want to direct your
20 attention to the next page, under that
21 same heading, under 11, it says, Bottom
22 line, historically each distribution
23 center had the ability to review held
24 orders and apply their best judgment in

Page 467

1  releasing individual orders.  Most sales
2  associates have had accounts exceed their
3  thresholds at some point in time.
4  However, the distribution center had the
5  ability to, quote, make the call, end
6  quote, after conducting their review,
7  which led to customers receiving their
8  orders.  As we deploy SAP to our
9  distribution centers, the order
10 monitoring program management process
11 becomes more systemic and less arbitrary.
12         Do you see that?
13     A.   I see that.
14     Q.   Do you agree that prior to
15 the SAP system, there was a degree of
16 arbitrariness in the distribution
17 center's ability to decide whether to
18 fill an order that was over a threshold?
19         MR. NICHOLAS:  Object to the
20 form.  Also object on grounds of
21 scope.
22         THE WITNESS:  I don't -- I
23 believe they had the same -- they
24 had the same requirements pre-SAP

Page 468

1  and post-SAP, to review orders and
2  release if they believe they
3  weren't suspicious.
4  BY MR. PIFKO:
5      Q.   That's not what it says
6  here.
7          It says that pre-SAP, once
8  an order -- once an account exceeded the
9  threshold on a drug family, the
10 distribution center had the ability to
11 release the order upon review.
12         It says, Under the post-SAP,
13 the distribution center has the ability
14 to review and release the order that
15 caused the account to exceed their
16 ordering threshold.  However, any
17 additional order for that specific drug
18 family will automatically be rejected
19 upon submission.
20         Do you see that?
21     A.   Is that in that same --
22     Q.   Same section, 11.
23         Do you agree that this
24 document says, As we deploy SAP to our

Page 469

1  distribution centers, the order
2  monitoring program management process
3  becomes more systemic and less arbitrary?
4          Do you agree that's what it
5  says?
6      A.   That's what it says, yeah.
7      Q.   So do you agree there was
8  some degree of arbitrariness in the
9  pre-SAP system?
10         MR. NICHOLAS:  Object to the
11 form.
12         THE WITNESS:  Again, they
13 have the same -- so pre-SAP --
14 again, pre-SAP, they could release
15 the order.  Post-SAP, they still
16 could release the order if they
17 felt it wasn't suspicious.  The
18 next order would get flagged
19 systematically.
20 BY MR. PIFKO:
21     Q.   And in the old system, the
22 next order would not get flagged and they
23 could continue to, as this says, quote,
24 make the call?

Page 470

1  A.  It would get flagged and
2 they have to do a review.
3  Q.  They could decide to release
4 it?
5  MR. NICHOLAS:  Object to the
6  form.
7  THE WITNESS:  If they --
8  based upon the review and their
9  recommendation, they could do
10  that.
11 BY MR. PIFKO:
12  Q.  So you would agree that
13 there was some degree of arbitrariness to
14 the old system?
15  MR. NICHOLAS:  Object to the
16  form.
17  THE WITNESS:  Again, it was
18  based upon their training and
19  review of whether they released
20  the order or not.
21  And, again, I wasn't aware
22  they couldn't do it after the SAP.
23  They have the ability to review an
24  order that hits the monitoring

Page 471

1  system.  And if they have -- they
2  believe -- they determine that
3  it's not suspicious, they have the
4  ability to release the order.  And
5  then the next day it's on a report
6  that's reviewed by a management
7  person.
8 BY MR. PIFKO:
9  Q.  So it's your testimony that
10 there's -- nothing about the system was
11 arbitrary at all?
12  MR. NICHOLAS:  Object to the
13  form of the question.
14  THE WITNESS:  Arbitrary in
15  what way?
16 BY MR. PIFKO:
17  Q.  About deciding whether to
18 fill an order after the threshold has
19 been exceeded.
20  A.  It was up to them, based
21 upon their training and their knowledge
22 of the customer, the product, the amount,
23 the totality of the circumstances, to
24 make a decision whether they released

Page 472

1 that order or not.
2  Q.  Do you believe the
3 distribution center people had sufficient
4 training?
5  A.  Yes.
6  Q.  Is there documentation of
7 the training they had?
8  A.  Yes.
9  Q.  Is it something other than
10 what we've seen today?
11  MR. NICHOLAS:  Object to the
12  form.
13  THE WITNESS:  I'm not sure.
14  In here?
15 BY MR. PIFKO:
16  Q.  Yes.
17  A.  No, I've not seen it.
18  Q.  What was the name of the
19 training that they were provided?
20  A.  I think it's responsible
21 person in charge training.
22  Q.  Is that just a document they
23 read or is there a class?
24  A.  No, you go through a -- and,

Page 473

1 again, it depends on the time frame
2 you're talking about as well.  So it's
3 continued to evolve over time.
4  In addition, we also do
5 annual training for compliance critical
6 employees at the distribution center, and
7 that's tracked as well.
8  Q.  Let's go down on the same
9 page that we were just on, under Item 12.
10  It says, We cannot disclose
11 to our accounts that we are notifying the
12 DEA or the state.  This is a suspicious
13 order monitoring program.  Notifying a
14 customer that they have been reported to
15 the DEA or state would defeat the purpose
16 of the monitoring program.
17  Do you see that?
18  A.  I see that.
19  Q.  Do you agree with that
20 statement?
21  MR. NICHOLAS:  Object to the
22  form.
23  But go ahead.
24  THE WITNESS:  I don't agree

Christopher Zimmerman (AmerisourceBergen)

Page 474

1   with that.
2  BY MR. PIFKO:
3      Q.   Why not?
4      A.   I don't think it defeats --
5  I don't think it defeats the purpose of
6  the monitoring program.  The monitoring
7  program is designed for us to monitor
8  controlled substance orders and come up
9  with a program to detect and report
10  suspicious orders.
11      Q.   And so if a customer knows
12  how the program functions, they could
13  adjust their orders to evade detection
14  under the program, agree?
15      A.   The purpose of the document
16  is, so, again, and I think it was
17  referenced in the DEA letters, that the
18  vast majority of the distributors and the
19  pharmacies are operating in compliance
20  and are distributing much-needed
21  medications to patients that come in the
22  next day.
23          We're on a just-in-time
24  inventory.  Customers place orders up

Page 475

1  until 5 o'clock at night, and then they
2  get it the next day.  So pharmacies
3  aren't carrying their inventory.  They
4  are expecting, when they place an order,
5  that the patients are going to get their
6  prescription the next day.
7          So we try to ensure that we
8  have a process in place that, one, meets
9  our regulatory responsibility to prevent
10  diversion through suspicious order
11  reporting; but also to make sure that our
12  customers have much-needed medications
13  available to them for the prescriptions
14  that they're filling by licensed doctors.
15          And this is a program -- and
16  that's why we have a person at the
17  distribution center in the middle of the
18  night reviewing these orders, that have
19  been trained, so they're not holding up
20  these orders so the next day the person
21  isn't able to get their medication.
22      Q.   Are you ready to answer my
23  question?
24          I asked you, if a customer

Page 476

1  understands how the threshold program and
2  your order monitoring program works, do
3  you think that they can adjust their
4  ordering practices to circumvent the
5  program?
6      MR. NICHOLAS:  Object to the
7      form.  Object to the snarky
8      comment at the beginning of the
9      question.  No need for it.
10      THE WITNESS:  When we
11      implemented the program in 2007,
12      this was a change in the industry.
13      And customers -- it caused chaos
14      in the marketplace, because
15      customers were expecting these
16      orders to come and they were not.
17          And they weren't because
18      they were diverting products, it
19      was because of their ordering --
20      however they had ordered the
21      product, the system would flag it
22      as a potentially suspicious order,
23      order of interest.
24          And after review, it wasn't

Page 477

1  suspicious.  By that time, they've
2  now delayed service to their
3  patients for no fault of their
4  own.  And so when the order
5  monitoring process was rolled out,
6  pharmacies weren't trying to
7  divert product or get around the
8  system, they were just trying to
9  understand how they can order
10  product so they could get it to
11  their patients.
12      Your question -- I take your
13  question, first, that we are --
14  our customer base is trying to get
15  around the system so they can buy
16  much more opioids to divert, and
17  that's not the case.
18  BY MR. PIFKO:
19      Q.   You were providing an answer
20  that was targeted towards this document.
21          I'm just asking more
22  generally, if you believe that if a
23  customer has transparency into the
24  threshold system and the order monitoring

Christopher Zimmerman (AmerisourceBergen)

Page 478

1 program, that that can adversely impact
2 diversion because they could adjust their
3 activity to evade your system?
4         MR. NICHOLAS:  Object to the
5     form.  Asked and answered.
6         THE WITNESS:  I don't agree
7     with that.
8         MR. PIFKO:  We're going to
9     take a break.
10        VIDEO TECHNICIAN:  Going off
11    the record.  6:02 p.m.
12             - - -
13        (Whereupon, a brief recess
14    was taken.)
15             - - -
16        VIDEO TECHNICIAN:  Back on
17    the record at 6:11 p.m.
18 BY MR. PIFKO:
19    Q.   If I wanted to ask you about
20 the company's records regarding specific
21 sales of controlled substances products
22 in the Track 1 jurisdictions -- are you
23 familiar with what the Track 1
24 jurisdictions are?  If I use that term,

Page 479

1 does that mean anything to you?
2    A.   Not exactly.  I've seen it,
3 but I don't --
4    Q.   Sorry.  Let me ask it a
5 different way.
6        If I wanted to talk to
7 someone who was familiar with the
8 company's records of which products they
9 shipped to specific customers and amounts
10 and when, who would that be?
11        MR. NICHOLAS:  I'll object
12    to the form.
13        THE WITNESS:  I believe if
14    you're just looking for data, it
15    would be somebody in our IT
16    department.
17 BY MR. PIFKO:
18    Q.   But to understand how the
19 system works?
20        MR. NICHOLAS:  Object to the
21    form.
22        THE WITNESS:  The system --
23    the suspicious order monitoring
24    system or our operating system?

Page 480

1 BY MR. PIFKO:
2    Q.   Well, okay.  Based on your
3 production, and we were just looking at
4 the SAP and the STAR system, it's my
5 understanding that in the STAR system
6 time period, there's one document that
7 tells you what orders -- what orders were
8 placed and whether they were shipped.
9 There's another document that tells you
10 if there was an investigation, and
11 there's another document that tells you
12 if there was a report to the DEA.
13        Are you familiar with that
14 idea?
15        MR. NICHOLAS:  Object to the
16    form.
17        THE WITNESS:  I don't know
18    the specifics of the -- how it was
19    developed.  I assume you're
20    talking about 2007 to --
21 BY MR. PIFKO:
22    Q.   The STAR system from 2007 to
23 2012.
24    A.   Right.  I was involved --

Page 481

1 when I was negotiating the settlement
2 with DEA, our IT group was having
3 discussions with DEA as well.  And I'm
4 not sure how they structured it.
5        I'm not sure what your
6 question is.
7    Q.   Is there someone, though,
8 from the CSRA who would be familiar about
9 how the system works and what the data in
10 the different databases reflects?
11        MR. NICHOLAS:  Object to the
12    form.
13        THE WITNESS:  I am not sure
14    who that would be.  It would be
15    somebody, I would think, in our IT
16    group.
17 BY MR. PIFKO:
18    Q.   Is there a specific type of
19 title that that person would have?
20        MR. NICHOLAS:  Object to the
21    form.
22        THE WITNESS:  I don't know
23    who would -- I don't know that
24    person.

Christopher Zimmerman (AmerisourceBergen)

Page 482

BY MR. PIFKO:
Q.   What about for your
investigations and due diligence files,
who would be familiar with those?
A.   That would be, if they are
CSRA files, that would be my department,
or our department.
Q.   Who within your department
would have the most expertise about that?
MR. NICHOLAS:  Object to the
form.
THE WITNESS:  What time
frame?
BY MR. PIFKO:
Q.   Well, let's -- any time
frame.  Tell me.
A.   We've changed systems
through the course.  In addition to the
SAP, we have also changed internal
systems within CSRA.
Q.   Okay.  How about for the --
2007 to 2012?
A.   The investigation,
investigations would probably be, you

Page 483

want a name?
It would probably be Bruce
Gundy.  And Steve Mays, who you've
mentioned.  He has some system
responsibilities -- not responsibilities,
but knowledge within CSRA as well.
Q.   And then how about for the
more recent period, 2012 to present, do
you know?
MR. NICHOLAS:  Object to the
form and to the scope, to some
extent.
THE WITNESS:  If your
question is who in CSRA would have
that information up to the
present, I assume, would be --
David May would have information
regarding that process.
And then Bruce Gundy is also
still in investigations.  He would
be that person for investigations.
BY MR. PIFKO:
Q.   Okay.  Thanks.
In preparing for this

Page 484

deposition, did you understand yourself
to be designated to testify about topics
concerning the company's involvement with
the had?
A.   Yes.
Q.   What steps did you take to
become familiar with the company's
involvement with the had?
A.   I had my personal
involvement with the -- we talked about
the committees I participated on.  I
reviewed the had document, I can't
remember the title of it, the guidelines.
And that's pretty much it.
Q.   Did you talk to anyone
besides reviewing your own documents?
A.   Outside -- no.  Outside of
counsel, no.
Q.   Did you review any documents
that weren't your own documents?
A.   I indicated the document of
the had guidelines.  That's not my
document, but I reviewed that document.
Q.   There's many people at the

Page 485

company who have participated with the
had, correct?
A.   Yes.
Q.   Who all, to your knowledge,
has participated in the had?
A.   It's a lot.
Q.   Okay.
A.   It could be 50.  Because
they have different segments, whether
it's tax, whether it's procurement,
whether it's government affairs.
Q.   How about with respect to
diversion issues?
A.   It would be Steve Mays,
David May.
Q.   Steve Mays, has he been
involved in the had?  What is the time
period?
A.   He's been involved with the
regulatory affairs committee for years
prior to 2007.
Q.   Prior to 2007?
A.   Yes.  I believe so.
Q.   Does he still have

Christopher Zimmerman (AmerisourceBergen)

Page 486

1  involvement with the had?
2      A.   Yes.
3      Q.   I understand that there's a
4  gap in your document production from
5  August 24th, 2007 to July 15th, 2010.
6      Do you have any reason to
7  believe that there would be documents not
8  in your system from then from you?
9      A.   No.
10     Q.   Were you still working for
11  the company during that time period?
12     A.   Yes.
13     Q.   Did you have a computer and
14  e-mail during that time period?
15     A.   I did.
16     Q.   Are you aware of any system
17  crashes during that time period?
18     MR. NICHOLAS:  Let me
19         interpose an objection to the
20         extent that I personally don't
21         know if the representation you're
22         making is right about the
23         documents.
24         But go ahead and ask your

Page 487

1  questions.
2      THE WITNESS:  What was the
3  last question?  Sorry.
4  BY MR. PIFKO:
5      Q.   I was just asking if you
6  were aware of any system failures or
7  crashes of servers during that time
8  period at the company?
9      A.   Not that I know of.
10     MR. PIFKO:  Okay.  Well,
11  it's my understanding that there's
12  that gap in those documents and
13  there may be other documents that
14  might come into the production.
15     So subject to additional
16  documents that might be produced,
17  we will reserve our right to
18  recall.  And I'm sure we can meet
19  and confer about it if we have a
20  dispute.
21     And other than that, I don't
22  have any questions for you at the
23  moment.
24     MR. NICHOLAS:  Give me,

Page 488

1  like, ten seconds to decide
2  whether to ask him any questions.
3      MR. PIFKO:  Sure.
4      VIDEO TECHNICIAN:  Going off
5  the record.  6:19 p.m.
6         - - -
7      (Whereupon, a brief recess
8  was taken.)
9         - - -
10     VIDEO TECHNICIAN:  Back on
11  record at 6:22 p.m.
12     MR. NICHOLAS:  I have no
13  questions for the witness.  So,
14  Mr. Zimmerman, thank you very much
15  and you're excused.  Although you
16  can sit here to listen to us argue
17  about one last thing.
18     Just you said -- you said,
19  you know, five minutes ago that
20  there was a gap in the documents.
21  It's the first I've heard of that.
22  You haven't raised that with us up
23  until now.
24     I suspect there's not a gap

Page 489

1  in the documents.  But in any
2  event, this is all my way of
3  saying we don't necessarily agree
4  that you're going to be able to
5  come back, you know, for another
6  deposition.  That's something
7  we'll have to fight about.
8      MR. PIFKO:  I agree.  That
9  was my statement, that we can meet
10  and confer about it.
11     So we can dispute about
12  whether that happens or not.
13     MR. NICHOLAS:  Okay.  I've
14  got nothing else.
15     VIDEO TECHNICIAN:  This ends
16  today's deposition.  We're going
17  off the record at 6:23 p.m.
18         - - -
19     (Whereupon, the deposition
20  was concluded at 6:23 p.m.)
21         - - -
22
23
24

Christopher Zimmerman (AmerisourceBergen)

Page 490

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated:  August 6, 2018

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 491

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 492

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

Page 493

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages,  1 - 489, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
CHRISTOPHER ZIMMERMAN        DATE

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Christopher Zimmerman (AmerisourceBergen)

Page 494

1       LAWYER'S NOTES

2  PAGE  LINE

3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____