```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4                        -  -  -

 5

     IN RE:  NATIONAL            :   MDL NO. 2804
 6   PRESCRIPTION OPIATE         :
     LITIGATION                  :
 7                               :

     ------------------------------------------------
 8   THIS DOCUMENT RELATES TO    :  CASE NO.
     ALL CASES                   :  1:17-MD-2804
 9                               :
                                 :  Hon. Dan A.
10                               :  Polster
11                        -  -  -
12                   February 8, 2019
13                        -  -  -
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16                 Continued videotaped deposition
     of CHRISTOPHER ZIMMERMAN taken pursuant to notice,
17   was held at the law offices of Reed Smith LLP, Three
     Logan Square, 1717 Arch Street, Suite 3100,
18   Philadelphia, Pennsylvania, beginning at 1:44
     p.m., on the above date, before Ann Marie
19   Mitchell, a Federally Approved Certified Realtime
     Reporter, Registered Diplomate Reporter,
20   Registered Merit Reporter and Notary Public.
21
                          -  -  -
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

```
 1    APPEARANCES:

 2

 3         BARON & BUDD, P.C.
           BY:  MARK PIFKO, ESQUIRE
 4         15910 Ventura Boulevard
           Suite 1600
 5         Encino, California 91436
           (818) 839-2333
 6         mpifko@baronbudd.com
           Representing the Plaintiffs
 7

 8
           BARON & BUDD, P.C.
 9         BY:  WILLIAM POWERS, ESQUIRE
           600 New Hampshire Avenue NW
10         The Watergate, Suite 10-A
           Washington, DC 20037
11         (202) 333-4562
           wpowers@baronbudd.com
12         Representing the Plaintiffs

13

14         REED SMITH LLP
           BY:  ROBERT A. NICHOLAS, ESQUIRE
15         BY:  JOSEPH J. MAHADY, ESQUIRE
           BY:  SAMANTHA L. ROCCHINO, ESQUIRE
16         Three Logan Square
           1717 Arch Street, Suite 3100
17         Philadelphia, Pennsylvania 19103
           (215) 851-8100
18         rnicholas@reedsmith.com
           jmahady@reedmith.com
19         srocchino@reedsmith.com
           Representing AmerisourceBergen Drug
20         Corporation

21

22

23

24
```

```
 1   APPEARANCES (cont.'d):

 2

 3        JONES DAY
          BY:  ADAM HOLLINGSWORTH, ESQUIRE
 4        North Point
          901 Lakeside Avenue
 5        Cleveland, Ohio 44114
          (216) 586-3939
 6        ahollingsworth@jonesday.com
          Representing Walmart
 7

 8
          COVINGTON & BURLING, LLP
 9        BY:  MEGHAN E. MONAGHAN, ESQUIRE
          One City Center, 850 Tenth Street, NW
10        Washington, DC 20001
          (202) 662-5272
11        mmonaghan@cov.com
          Representing McKesson Corporation
12

13
          WILLIAMS & CONNOLLY LLP
14        BY:  KATELYN ADAMS, ESQUIRE
          725 Twelfth Street, N.W.
15        Washington, DC 20005
          kadams@wc.com
16        (202) 434-5000
          Representing Cardinal Health
17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE/STREAM:

 2

 3         BARON & BUDD, P.C.
           BY:  W. SCOTT SIMMER, ESQUIRE
 4         BY:  GRETCHEN KEARNEY, ESQUIRE
           600 New Hampshire Avenue NW
 5         The Watergate, Suite 10-A
           Washington, DC 20037
 6         (202) 333-4562
           ssimmer@baronbudd.com
 7         gkearney@baronbudd.com
           Representing the Plaintiffs
 8

 9
           BARON & BUDD, P.C.
10         BY:  STERLING CLUFF, ESQUIRE
           BY:  JAY LICHTER, ESQUIRE
11         15910 Ventura Blvd
           Suite 1600
12         Encino, California 91436
           (818) 839-2333
13         cluff@baronbudd.com
           jlichter@baronbudd.com
14         Representing the Plaintiffs
15

16         GREENE KETCHUM FARRELL BAILEY & TWEEL LLP
           BY:  PAUL THOMAS FARRELL JR., ESQUIRE
17         419 Eleventh Street
           Huntington, West Virginia 25701
18         (304) 525-9115
           Representing the Plaintiffs
19

20
           THE LANIER LAW FIRM
21         BY:  EVAN M. JANUSH, ESQUIRE
           Tower 56
22         126 East 56th Street, 6th Floor
           New York, New York 10022
23         (212) 421-2800
           evan.janush@lanierlawfirm.com
24         Representing the Plaintiffs
```

```
 1    APPEARANCES VIA TELEPHONE/STREAM (cont.'d):

 2

 3        BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
          BY:  ALEXANDRA K. HUGHES, ESQUIRE
 4        440 College Avenue
          Suite 320
 5        Athens, Georgia 30601
          (706) 744-4135
 6        ahughes@bbga.com
          Representing the Plaintiffs

 7

 8        BAILEY & WYANT, PLLC
          BY:  HARRISON M. CYRUS, ESQUIRE
 9        500 Virginia Street East
          Suite 600
10        Charleston, West Virginia 25301
          (304) 345-4222
11        hcyrus@baileywyant.com
          Representing the West Virginia Board of Pharmacy

12

13        REED SMITH LLP
          BY:  ANNE E. ROLLINS, ESQUIRE
14        Three Logan Square
          1717 Arch Street, Suite 3100
15        Philadelphia, Pennsylvania 19103
          (215) 851-8100
16        arollins@reedsmith.com
          Representing AmerisourceBergen Drug
17        Corporation

18

19        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:  SEAN A. McCORMICK, ESQUIRE
20        777 South Figueroa Street
          44th Floor
21        Los Angeles, California 90017
          (213) 243-4000
22        sean.mccormick@arnoldporter.com
          Representing Endo Health Solutions; Endo
23        Pharmaceuticals, Inc.; Par Pharmaceutical
          Companies, Inc. f/k/a Par Pharmaceutical
24        Holdings, Inc.
```

```
 1    APPEARANCES VIA TELEPHONE/STREAM (cont.'d):

 2

 3         ROPES & GRAY LLP
           BY:  LUKE D. RILEY, ESQUIRE
 4         Prudential Tower
           800 Boylston Street
 5         Boston, Massachusetts 02199
           (617) 951-7000
 6         luke.riley@ropesgray.com
           Representing Mallinckrodt
 7

 8
           BARNES & THORNBURG LLP
 9         BY:  MONIQUE HANNAM, ESQUIRE
           11 South Meridian Street
10         Indianapolis, Indiana 46204
           (317) 236-1313
11         monique.hannam@btlaw.com
           Representing HD Smith
12

13
           VIDEOGRAPHER:
14             DAVID LANE
15
           TRIAL TECHNICIAN:
16             ZACH HONE
17
           ALSO PRESENT:
18
               ELIZABETH CAMPBELL, ESQUIRE
19             AmerisourceBergen Drug Corporation
20
21         ALSO PRESENT VIA TELEPHONE/STREAM:
               JUSTIN L. MANN, Law Clerk
22             Ropes & Gray LLP
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            TIFFANY ELLIS
              Weitz & Luxenberg P.C.
 2
 3            JOSH GAY
              Levin Papantonio Thomas Mitchell
 4            Rafferty Proctor P.A.
 5
              EMMA KABOLI
 6            Baron & Budd, P.C.
 7
              ALEX SHERMAN
 8
 9                     -   -   -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                        -   -   -
 2                     I N D E X
 3                        -   -   -
 4
 5   Testimony of:  CHRISTOPHER ZIMMERMAN
 6    By Mr. Pifko                        11
 7
                          -   -   -
 8
                      E X H I B I T S
 9
                          -   -   -
10
11   NO.                 DESCRIPTION        PAGE
12   Zimmerman    PowerPoint entitled        44
     V2-1         "Regulatory Compliance
13                Update Meeting of the
                  Board of Directors August
14                10, 2017," Bates stamped
                  ABDCMDL00273425
15
     Zimmerman    Email chain, top one dated  52
16   V2-2         16 Sep 2014, Bates stamped
                  ABDCMDL00277299 through
17                ABDCMDL00277301
18   Zimmerman    FY14 Performance            59
     V2-3         Evaluation Form for Chris
19                Zimmerman, Bates stamped
                  ABDCMDL00383869 through
20                ABDCMDL00383874
21   Zimmerman    Email chain, top one dated  80
     V2-4         30 Mar 2011, Bates stamped
22                ABDCMDL00267230 through
                  ABDCMDL00267232
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Zimmerman    Email dated 17 Oct 2017,      89
        V2-5         Bates stamped
 2                   ABDCMDL00272819
 3      Zimmerman    Pay Change History, Bates     103
        V2-6         stamped ABDCMDL00383878
 4
        Zimmerman    Map Chart, Bates stamped x    104
 5      V2-7         through x
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

          Direction to Witness Not to Answer

 5

                      Page Line

 6

 7

 8

 9      Request for Production of Documents

10                    Page Line

11

12

13

                        Stipulations

14

                      Page Line

15

16

17

18

                      Question Marked

19

                      Page Line

20

21

22

23

24
```

```
 1                  THE VIDEOGRAPHER:  We're now on

 2          the record.  My name is David Lane,

 3          videographer for Golkow Litigation

 4          Services.  Today's date is February 8,

 5          2019.  Our time is 1:44 p.m.

 6                  This deposition is taking place

 7          in Philadelphia, Pennsylvania in the

 8          matter of the National Prescription

 9          Opiate Litigation, MDL.

10                  Our deponent today is Chris

11          Zimmerman.  Counsel will be noted on the

12          stenographic record.

13                  Our court reporter today is Ann

14          Marie Mitchell and will now swear in our

15          witness.

16                       -  -  -

17                  CHRISTOPHER ZIMMERMAN, after

18          having been duly sworn, was examined and

19          testified as follows:

20                       -  -  -

21                  EXAMINATION

22                       -  -  -

23   BY MR. PIFKO:

24          Q.    Good afternoon, Mr. Zimmerman.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    My name is Mark Pifko.  We met some months ago

2    when I deposed you before.

3                   Do you recall?

4         A.     Yes, I do.

5         Q.     Okay.  So the court reporter has

6    just placed you under oath.  It's the same oath

7    you took when you were deposed before.

8                   Understood?

9         A.     Yes.

10        Q.     Okay.  And that means that if

11   you're untruthful or intentionally misleading or

12   dishonest in some way, you could be subject to

13   penalties from the court.

14                  Do you understand that?

15        A.     Yes.

16        Q.     Do you intend to provide truthful

17   and accurate testimony today?

18        A.     I do.

19        Q.     Are you undergoing any medical

20   treatment or suffering from any condition that

21   would inhibit your ability to provide truthful

22   and accurate testimony today?

23        A.     No.

24        Q.     Is there any reason that you can
```

Highly Confidential - Subject to Further Confidentiality Review

1   state as far as why this deposition should not go

2   forward?

3           A.      No.

4           Q.      All right.  The -- 2007

5   AmerisourceBergen entered into a settlement

6   agreement with the DEA.  Correct?

7           A.      Yes.

8           Q.      And prior to that, there was an

9   order to show cause that was sent to

10  AmerisourceBergen.  Correct?

11          A.      Correct.

12          Q.      And you're familiar with the

13  order to show cause?

14          A.      I know we got an order to show

15  cause, yes.

16          Q.      Okay.  You were the top person

17  with respect to diversion control at the time.

18  Correct?

19          A.      I was in charge of regulatory --

20  corporate security and regulatory affairs is the

21  department I was responsible for.

22          Q.      But diversion control was under

23  your authority.  Correct?

24          A.      That aspect would be one of the

1    aspects under my control, yes.

2         Q.    And to this day, it's still --

3    diversion control is something that's underneath

4    your purview.  Correct?

5         A.    Correct.

6         Q.    And you're the top person with

7    respect to diversion control issues.  Correct?

8         A.    I'm the top person in charge of

9    that department that diversion control reports up

10   to, yes.

11        Q.    I understand you have other

12   responsibilities as well.  Correct?

13        A.    Yes.  I have dedicated people

14   underneath me responsible for diversion control

15   as well.

16        Q.    So you are familiar with the

17   order to show cause that was sent to

18   AmerisourceBergen at that time.  Correct?

19        A.    At that time, we had an order to

20   show cause, yes.

21        Q.    Do you have an understanding

22   about what specifically it was that led the DEA

23   to suspend the registration of the Orlando

24   facility?

```
 1                   MR. NICHOLAS:  Object to the

 2           form.

 3                   THE WITNESS:  The -- my

 4           recollection, it had to do -- the order

 5           to show cause had to do with distribution

 6           of controlled substances and I believe

 7           possibly to an internet pharmacy.  I'm

 8           not -- I don't recall specifically.

 9   BY MR. PIFKO:

10           Q.    Okay.  What I'm trying to get at,

11   though, is I understand you're -- well, I

12   shouldn't assume that.

13                   What I'm trying to get at is,

14   what specifically did the DEA contend that

15   AmerisourceBergen did wrong that led it to

16   suspend the registration of the Orlando facility?

17                   MR. NICHOLAS:  Object to the

18           form.

19                   THE WITNESS:  I would need to --

20           I don't recall exactly what was written

21           in the order to show cause from 11 years

22           ago.  If I saw the document, I could

23           refresh my memory.

24   BY MR. PIFKO:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      One of the things that -- after

2   the suspension order, AmerisourceBergen as part

3   of the settlement agreement with the DEA

4   undertook some changes to its diversion control

5   policies and procedures.  Correct?

6      A.      We made some enhancements and

7   changes to the program.  Correct.

8      Q.      Okay.

9      A.      At the request of DEA.

10      Q.      One of those changes was the

11   initiation of a process by which

12   AmerisourceBergen would not ship an order that it

13   had deemed to be suspicious.  Correct?

14      A.      That was part of the settlement

15   agreement, yes.

16      Q.      Okay.  That was not something the

17   company was doing prior to that settlement

18   agreement.  Correct?

19      A.      Correct.

20      Q.      Are you aware that -- do you know

21   who David May is?

22      A.      Yes.

23      Q.      He's someone who works for you.

24   Correct?

```
 1              A.      Correct.

 2              Q.      He had a lengthy history with the

 3      DEA.  Correct?  Prior to joining

 4      AmerisourceBergen?

 5              A.      Correct.

 6              Q.      Are you aware that he was deposed

 7      in this case as well?

 8              A.      Yes.

 9              Q.      The day after your first

10      deposition?

11              A.      Yes.

12              Q.      And he served as a 30(b)(6) for

13      the company.  Correct?

14              A.      I believe so.  For a certain time

15      period.

16              Q.      Okay, right.  So you served as a

17      30(b)(6) for certain issues, and he did as well.

18      Correct?

19              A.      Correct.

20              Q.      And the distinction between you

21      was that he provided testimony from a time period

22      more recently than you did.  Correct?

23              A.      Correct.

24              Q.      Do you remember the time period
```

1    of which you were designated?

2              A.    I don't know when it started.  I

3    mean, I have been with the company a long time.

4    But I think it was up till 2014 was my time

5    period.

6              Q.    So Mr. May covered those same

7    topics but with respect to the time period 2015

8    going forward.  Correct?

9              A.    That's my understanding.

10             MR. NICHOLAS:  Object to the

11        form.

12             And just I will remind everyone

13        for the record that today Mr. Zimmerman

14        is testifying as a fact witness, not as a

15        30(b)(6) witness, pursuant to Special

16        Master Cohen's order.

17   BY MR. PIFKO:

18             Q.    Are you aware that Mr. May

19   testified that under the Controlled Substances

20   Act there is a, what we call the shipping

21   requirement, which is a requirement that if you

22   identify an order as suspicious, you cannot ship

23   it --

24             MR. NICHOLAS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2   BY MR. PIFKO:

 3        Q.      -- unless you've performed the

 4   requisite due diligence to clear the order?

 5              MR. NICHOLAS:  Object to the

 6         form, mischaracterizes the testimony.

 7              Go ahead.

 8              THE WITNESS:  I don't know what

 9         Mr. May attested to.

10   BY MR. PIFKO:

11        Q.    Okay.  Well, I'll represent to

12   you that he testified that there is a shipping

13   requirement under the Controlled Substances Act.

14              I'd like to know if you believe

15   that there is a controlled -- a shipping

16   requirement under the Controlled Substances Act.

17              MR. NICHOLAS:  Object to the

18         form, mischaracterizes the testimony.

19              Go ahead.

20              THE WITNESS:  My understanding of

21         the regulation is that we have a

22         responsibility to report suspicious

23         orders.  I have not seen any inference or

24         reference to a shipping requirement
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              within the regulations.

 2   BY MR. PIFKO:

 3        Q.    Do you have any way to explain

 4   why Mr. May would say there is a shipping

 5   requirement and you would say there's not?

 6              MR. NICHOLAS:  Object to the

 7        form, mischaracterizes the testimony.

 8        Go ahead.

 9              THE WITNESS:  I don't know.  I

10        can't speak for Mr. May.

11   BY MR. PIFKO:

12        Q.    So if Mr. May said that, would

13   you believe he's just wrong?

14              MR. NICHOLAS:  Object to the

15        form.

16              THE WITNESS:  I don't know the

17        context or -- of his statement.  And

18        when he referred -- I don't -- I can't

19        answer that question.

20   BY MR. PIFKO:

21        Q.    I believe one of the things we

22   talked about when you were deposed before was the

23   Masters Pharmaceutical decision from the DC

24   Circuit.
```

```
1                    Do you recall discussing that?

2                    MR. NICHOLAS:  Object to the

3          form.

4                    Go ahead.

5                    THE WITNESS:  Yeah.  I remember

6          it being mentioned, yes.  Not

7          specifically, but yes.

8  BY MR. PIFKO:

9          Q.    And you have some familiarity

10  with that decision.  Correct?

11         A.    A little, yes.

12         Q.    You understand, as we discussed

13  in your deposition, that the case says that

14  there's something called a shipping requirement.

15  Correct?

16                   MR. NICHOLAS:  Object to the

17         form, mischaracterizes his testimony,

18         calls for a legal analysis.  He's a fact

19         witness.

20                   THE WITNESS:  I don't know that.

21  BY MR. PIFKO:

22         Q.    Okay.  So sitting here today, you

23  have no explanation for why Mr. May would say

24  there was a shipping requirement, but you don't
```

```
 1   contend that there is?

 2              MR. NICHOLAS:  Object to the

 3         form, mischaracterizes the testimony,

 4         asked and answered, bickering.

 5              THE WITNESS:  I don't know what

 6         the context of the discussion that you

 7         and Mr. May had and with him to --

 8         whatever comment he made, if he did.  But

 9         my answer is, I'm not aware of the

10         shipping requirement as stipulated in the

11         federal regulations.

12   BY MR. PIFKO:

13         Q.    If there is no requirement that

14   you not ship an order that's deemed to be

15   suspicious, why would the company have agreed to

16   undertake such a requirement?

17         A.    Because that was part of our

18   negotiations in order to get our registration

19   reinstated, was to implement a program that

20   halted orders that we deemed to be suspicious.

21         Q.    Why would you have to agree to

22   something that's not in the regulations?

23              MR. NICHOLAS:  Object to the

24         form.
```

```
 1                    THE WITNESS:  It was the

 2           negotiation.  That's what we agreed upon.

 3    BY MR. PIFKO:

 4           Q.    It was something that the DEA

 5    asked you to agree to?

 6           A.    Yes.

 7           Q.    Did you tell the DEA they were

 8    wrong?

 9                    MR. NICHOLAS:  Object to the

10           form.

11                    THE WITNESS:  It was a part of

12           the negotiation process of the areas that

13           we would implement that would enhance our

14           program.  That was one of the items that

15           we had discussed, in addition to others,

16           was that we would not ship an order that

17           we deemed to be suspicious.

18    BY MR. PIFKO:

19           Q.    Were you one of the people who

20    was negotiating the settlement agreement with the

21    DEA?

22           A.    Yes.

23           Q.    And did you ever tell the DEA

24    that you felt that wasn't a requirement under the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    law that they were asking you to do, to halt the

 2    shipment of orders that you had identified as

 3    suspicious?

 4                   MR. NICHOLAS:  Object to the

 5          form.

 6                   THE WITNESS:  Yes.

 7    BY MR. PIFKO:

 8          Q.    You did tell them that you

 9    thought that was wrong?

10          A.    During the negotiations, yes.

11          Q.    Okay.  What specifically did you

12    tell them?

13          A.    I told them that our requirement

14    is to report suspicious orders, and the way we've

15    been doing it for the previous 17 years was to

16    report after the fact.  And that has been the way

17    we've been doing it for 17 years.  We negotiated

18    with DEA with the program in '98, which they were

19    well aware that we were shipping the products --

20    we were reporting them after we ship the

21    products, and that was approved by DEA.

22                   So my previous negotiations with

23    DEA, what the regulations state, there's no --

24    nowhere that I could find that says you can't
```

```
 1    ship an order that has been reported as

 2    suspicious.  In fact, it's the way it's been

 3    done.

 4                   This was a change in the

 5    industry.  No one else was stopping orders.  We

 6    had never done it in the past.  So again, that

 7    was my understanding.

 8                   So in the negotiation process, I

 9    said, this is the way we've been doing it.  This

10    has been approved by DEA in the past.  It's been

11    inspected by DEA.  Our -- DEA audits our

12    distribution centers.  And in all of our audits,

13    they've never once said that you're not supposed

14    to ship an order that you deem to be suspicious.

15    So my -- that was my response into the

16    negotiation was, I don't agree with that.

17         Q.    And what was their response when

18    you said that?

19                   MR. NICHOLAS:  Object to the

20         form.

21                   THE WITNESS:  I mean, do you want

22         to go back and forth through the

23         negotiations or -- I mean...

24    BY MR. PIFKO:
```

```
1         Q.     Well, I want you to tell me what

2   they said in response to you saying that to them.

3              MR. NICHOLAS:  Same objection.

4              THE WITNESS:  They disagreed at

5         that time.

6   BY MR. PIFKO:

7         Q.     What did they say was the basis

8   for their disagreement?

9              MR. NICHOLAS:  Object to the

10        form.

11             THE WITNESS:  They wanted that

12        order not to be shipped if it's deemed to

13        be suspicious.  I mean, that's what they

14        said.

15  BY MR. PIFKO:

16        Q.     They didn't tell you why?

17        A.     No.

18        Q.     And you just ended up agreeing to

19  it?

20             MR. NICHOLAS:  Object to the

21        form.

22             THE WITNESS:  In order to -- as

23        part of the negotiation, that was an area

24        that we agreed upon in order to get our
```

```
 1              license reinstated in Orlando, yes.

 2    BY MR. PIFKO:

 3         Q.     Did you agree to anything

 4    specific related to internet pharmacies in the

 5    settlement agreement in order to get your license

 6    back or lift -- the suspension lifted at the

 7    Orlando facility?

 8         A.     I don't recall.

 9         Q.     You don't believe there was

10    anything specific to internet pharmacies in the

11    settlement agreement?

12         A.     I don't -- I don't recall.

13         Q.     Okay.  The changes that you made

14    in response to the settlement agreement with --

15    that were made as a result of the suspension of

16    the Orlando facility, those were systemic

17    companywide changes.  Correct?

18              MR. NICHOLAS:  Object to the

19         form.

20              Go ahead.

21              THE WITNESS:  Yes.  Part of the

22         negotiation was that, even though it was

23         the Orlando distribution center's license

24         that was suspended, that they wanted us
```

Highly Confidential - Subject to Further Confidentiality Review

1          to implement a program for all of our

2          drug company distribution centers.

3    BY MR. PIFKO:

4          Q.    They wanted you to make changes

5    companywide.  Correct?

6          A.    They wanted us to implement the

7    program companywide, correct.

8          Q.    And that's what you did.

9    Correct?

10         A.    Yes.

11         Q.    And the programs that you

12   implemented, those weren't specific to internet

13   pharmacies.  Correct?

14         A.    The program was -- regardless of

15   an internet pharmacy or not, I mean, if we

16   identified an order that we deemed to be

17   suspicious, we would not ship it and report it to

18   DEA.  So it was an internet pharmacy, that would

19   apply.

20               And then we have an additional

21   due diligence process that was also negotiated --

22   negotiated on the front end as well.

23         Q.    But that was for a broad array of

24   customer types.  Correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yeah, all retail pharmacies.  All

 2   pharmacies licensed as retail pharmacies.

 3              Q.     And the due diligence requirement

 4   you're saying that you -- didn't apply, however,

 5   to chain pharmacies.  Correct?

 6                     MR. NICHOLAS:  Object to the

 7              form.

 8                     THE WITNESS:  Part of our

 9              negotiations was identifying the program

10              and what was -- what aspects it would

11              cover, would it include hospitals,

12              Department of Defense.  Chains were

13              discussed.  And part of the negotiation

14              was that it was determined that a chain

15              of ten or more stores would not be

16              included in the due diligence process,

17              still in the order monitoring process.

18   BY MR. PIFKO:

19              Q.     This implementation of a shipping

20   requirement or an agreement not to ship an order

21   that had been identified as suspicious, that

22   applied regardless of the customer type.

23   Correct?

24              A.     Correct.
```

1      Q.      For all customers of

2   AmerisourceBergen.  Correct?

3      A.      Correct.

4      Q.      I'm handing you what was -- you

5   said something -- before I get to that.

6              You said something earlier that

7   this shipping requirement wasn't anything anyone

8   else was doing.

9              Do you recall saying that a few

10  minutes ago?

11     A.      I wasn't aware of any of the

12  other companies that were stopping orders that

13  they deemed to be suspicious.

14     Q.      Okay.  And how do you know that

15  no one else was doing that?

16             MR. NICHOLAS:  Object to the

17         form.

18             THE WITNESS:  Because after

19         the -- once we -- once we implemented our

20         new program, we were the only ones that

21         were halting orders that we deemed to be

22         suspicious.

23  BY MR. PIFKO:

24     Q.      Did you review the diversion

```
 1    control policies and practices of every other

 2    distributor?

 3          A.      No, I did not.

 4          Q.      So you don't really know if

 5    that's true or not?

 6          A.      I -- only from -- through

 7    discussions.

 8          Q.      Discussions with whom?

 9          A.      My counterparts.

10          Q.      Which counterparts?

11          A.      The other distribution companies.

12          Q.      Which companies?

13          A.      Cardinal, McKesson, some of the

14    smaller ones -- you know, it was at a HDA meeting

15    where I did a presentation.  There was

16    discussions at that meeting.

17          Q.      When was that?

18          A.      2007, I think.  2007, I believe.

19    The end of 2007.

20          Q.      So at the end of 2007, you

21    participated in an HDA meeting with other

22    distributors, and you discussed who was -- had a

23    shipping requirement and who didn't?

24                  MR. NICHOLAS:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              form.

2                      THE WITNESS:  Let me clarify.

3                      It was a DEA conference in 2007.

4              It wasn't a HDA conference.  It was a DEA

5              conference.  Sorry about that.

6    BY MR. PIFKO:

7              Q.     So regardless of the type of

8    conference, you had a discussion with other

9    distributors at the end of 2007 about diversion

10   control issues, which included whether they were

11   implementing a shipping requirement?

12             A.     I did a presentation on our

13   program that had a requirement to not ship orders

14   that we deemed to be suspicious, and they were

15   present at the meeting.

16             Q.     And they told you that that

17   wasn't a requirement that any of them had?

18             A.     I don't recall that being a

19   specific statement.  I don't remember the

20   word-for-word conversation, but there was

21   conversations about that process and whether it's

22   legal and what the regulations imply, you know.

23   Just general conversation.

24             Q.     As part of this conference or on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the side after the conference?

 2                   MR. NICHOLAS:  Object to the

 3           form.

 4                   THE WITNESS:  I don't recall if

 5           there was a question and answer, if it

 6           came up during the question and answer or

 7           if it was immediately after or in between

 8           sessions.  I don't recall.

 9    BY MR. PIFKO:

10           Q.    Do you recall any specific people

11    with whom you had that discussion?

12           A.    No.

13           Q.    Do you recall any specific

14    companies with whom you may have had that

15    discussion?

16           A.    It wasn't like a point of

17    discussion.  It was common discussions about the

18    requirement of -- you know, the regulations did

19    not indicate that you have to stop orders

20    before -- if you deemed them suspicious.  And

21    then, you know, our program had that and what was

22    the basis upon our decision to do that.

23           Q.    And what did you tell them?

24           A.    It was in our negotiation with
```

```
 1    DEA.

 2           Q.      What did they tell you about

 3    whether that wasn't required?

 4                   MR. NICHOLAS:   I'm going to

 5           object to the form.

 6                   THE WITNESS:   I think -- I mean,

 7           their -- again, that was the discussion.

 8           It wasn't a long, lengthy debate.   I

 9           mean, we had our program in place, and

10           that was our program.   I was explaining

11           what our program was.

12    BY MR. PIFKO:

13           Q.      Other than that discussion, did

14    you have any other discussions with anyone about

15    whether other companies had a shipping

16    requirement?

17           A.      I don't recall.

18           Q.      So sitting here today, that's the

19    only such discussion that you recall as to

20    whether other companies had a shipping

21    requirement?

22           A.      No.  There was a lot of

23    discussions.  I mean, through our organization,

24    HDA, we would meet and discuss regulatory
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    requirements and processes.

 2         Q.    You participated regularly in HDA

 3    meetings regarding DEA regulatory requirements

 4    and diversion issues?

 5              MR. NICHOLAS:  Object to the

 6         form.

 7              THE WITNESS:  I had -- and I'm

 8         not sure what time frame you're talking

 9         about, but I've been -- worked with HDA,

10         NWD and HDMA, all the different names

11         prior to that, throughout my career,

12         which consists of meetings, meetings with

13         DEA, meetings with HDA, joint meetings.

14         And discussions are about regulatory

15         requirements.

16    BY MR. PIFKO:

17         Q.    Through meetings with the HDA,

18    you had discussions with other distributors about

19    regulatory requirements?

20              MR. NICHOLAS:  Object to the

21         form.

22              THE WITNESS:  We would have

23         discussions about general -- well, either

24         new regulatory requirements that were
```

```
1            being proposed, whether it's in the state

2            or the government, existing

3            interpretation of the requirements, but

4            that would be something that we would

5            talk about.

6   BY MR. PIFKO:

7            Q.    And one of the things you

8   discussed was the shipping requirement?

9                 MR. NICHOLAS:  Object to the

10           form.

11                THE WITNESS:  Again, it depends

12           on what time frame.  If it was after 2007

13           and our program had -- and again, we

14           never called it the shipping requirement.

15           Our requirement was that we did not ship

16           an order that we deemed to be suspicious.

17           And I would have probably had that

18           discussion after we implemented the

19           program.

20  BY MR. PIFKO:

21           Q.    Before you implemented the

22  program, did you ever have a discussion with

23  other distributors about whether there was a

24  shipping requirement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      No, not that I can recall.

 2              Q.      And so after you implemented that

 3    under the settlement agreement, you believe that

 4    you discussed the shipping requirement with other

 5    distributors at the HDA meetings.  Correct?

 6                      MR. NICHOLAS:  Object to the

 7              form, asked and answered.

 8                      THE WITNESS:  I had a

 9              presentation at the DEA conference where

10              I explained our program, which included

11              not shipping orders that we deemed to be

12              suspicious.  And we've had -- we had

13              discussions at HDA meetings.  I, you

14              know, can't point to how many times or

15              the specific conversation, but we would

16              have discussed that.

17    BY MR. PIFKO:

18              Q.      What was the nature of the

19    discussions about the shipping requirement at HDA

20    meetings that you recall?

21                      MR. NICHOLAS:  Object to the

22              form.

23                      THE WITNESS:  I mean, that's

24              pretty much -- there's not much
```

```
 1              discussion.  Either you ship it or you

 2              don't.  We don't ship orders that we deem

 3              to be suspicious.  That's the extent of

 4              the discussion.

 5   BY MR. PIFKO:

 6              Q.    And other companies told you that

 7   they did?

 8                   MR. NICHOLAS:  Object to the

 9              form.

10                   THE WITNESS:  I don't know if

11              they ever said they did.  I just know

12              what we did.  And my conversation was

13              what ABC was doing and that was our

14              program.

15   BY MR. PIFKO:

16              Q.    And did they ever say, why you're

17   doing that, we don't agree that's a requirement?

18                   MR. NICHOLAS:  Asked and

19              answered.

20                   THE WITNESS:  I don't know

21              exactly if that's how the conversation

22              went, but I'm sure there was questions of

23              people of why you're changing your

24              practices that you've been -- had in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              place for the past 17 years.
 2   BY MR. PIFKO:
 3         Q.    Did anyone ever say you should
 4   fight that, it's not a requirement under the law?
 5         A.    I don't recall that discussion.
 6         Q.    So to your knowledge, no one ever
 7   said that?
 8               MR. NICHOLAS:  Object to the
 9         form.
10               THE WITNESS:  I -- again, not
11         that I recall.
12   BY MR. PIFKO:
13         Q.    Any other way that you believe
14   you would know whether all -- other distributors
15   didn't have that requirement?
16               MR. NICHOLAS:  Object to the
17         form.
18               THE WITNESS:  No, not that I can
19         think of.
20   BY MR. PIFKO:
21         Q.    So this DEA meeting and
22   discussions you had at the HDA are the only such
23   discussions?
24         A.    Can you ask me that question?
```

Highly Confidential - Subject to Further Confidentiality Review

1  Because I want to make sure I understand the

2  question on the table.

3        Q.    Yeah.  I'm just trying to --

4  that's what we do at depositions.

5        A.    Yeah.

6        Q.    You said that no one else had a

7  requirement of -- that they would not ship an

8  order that they deemed to be suspicious.  And I'm

9  trying to understand the basis for your saying

10  that.

11              MR. NICHOLAS:  Object to the

12        form.  I think you're mischaracterizing

13        the testimony.

14              THE WITNESS:  As I explained,

15        that prior to our implementing the

16        program that stopped orders to be

17        suspicious, the practice had always been

18        that you report suspicious orders -- you

19        have to have a system to report

20        suspicious orders.  That reporting was

21        always after the order was shipped.

22              You know, you're asking me, did I

23        have discussions in 1990, in '91, '92.  I

24        don't -- I'm sure I probably did.  '95,

Highly Confidential - Subject to Further Confidentiality Review

```
 1          2000, 2004, possibly.  So that was the

 2          general knowledge of the program when I

 3          started with the company in 1990 until

 4          2007 when they said that we wanted you to

 5          implement a new process to where you

 6          don't ship it.

 7               Prior to that, my negotiations

 8          with DEA, working on a suspicious order

 9          program, it never even came up in the

10          conversation.  DEA never mentioned a

11          shipping requirement or stopping the

12          order.  We tested it for two years with

13          multiple DEA offices in the field, went

14          to Washington, DC, and Washington, DC

15          said, we approve your program.  There was

16          no mention of shipping requirements, no

17          mention of stopping orders.

18               So that was my belief, my

19          understanding.  If DEA -- if there was --

20          if DEA thought that there should be a

21          shipping requirement, I thought they

22          would have brought that in the

23          negotiations in the '90s when we're

24          devising the program.  They would have
```

```
 1           said, hey, Cardinal, McKesson, they're

 2           stopping the orders, why don't you guys

 3           enter that into your system.  Never came

 4           into the discussion.

 5               And again, this was a two-year

 6           process.  This isn't, you know, hey, can

 7           we do this.

 8               And so never a shipping

 9           requirement was mentioned.  We get to

10           2007.  We have an immediate suspension.

11           We come down there, and they put on the

12           table, we want you to stop orders that we

13           deem to be suspicious.  And my first

14           response is, where is that in the

15           regulations and why wasn't that ever

16           brought up in 1998 through our

17           negotiation, why hasn't it ever been

18           mentioned in the DEA audit, why isn't

19           it -- we've never had discussions about

20           that.  So --

21     BY MR. PIFKO:

22           Q.    What did they say in response to

23     that question?

24               MR. NICHOLAS:  Let him finish.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  We want to

 2           implement -- we want industry to stop

 3           shipping orders that they deem to be

 4           suspicious.  And in order for you to get

 5           your license back, we want you to

 6           implement that in your program.

 7                  Now, you know, that was the

 8           agreement we went in the negotiations,

 9           and that was what we implemented after

10           that.  We did, ABC.

11    BY MR. PIFKO:

12           Q.    When you said this was never

13    brought up before, what did they say about that?

14           A.    This is what we want to do now.

15    They didn't say anything about that.

16           Q.    When you said this wasn't a

17    requirement in the regulations, what did they say

18    in response to that?

19           A.    They didn't say anything.

20           Q.    When you say that you got a

21    system approved in Washington, when was that?

22           A.    1998, I believe.

23           Q.    And who specifically approved

24    that?
```

```
 1              A.      The chief of the diversion unit

 2    at DEA.

 3              Q.      Do you have a name?

 4              A.      Pat Good.

 5              Q.      Was --

 6              A.      I believe Pat Good was the chief

 7    at the time.

 8              Q.      That was something that was in

 9    writing?

10              A.      Yes.

11              Q.      I'm going to hand you what was

12    marked in your deposition before, but I think

13    there might have been some redactions, so I'm

14    going to remark it.

15                            -   -   -

16              (Deposition Exhibit No. Zimmerman

17              V2-1, PowerPoint entitled "Regulatory

18              Compliance Update Meeting of the Board of

19              Directors August 10, 2017," Bates stamped

20              ABDCMDL00273425, was marked for

21              identification.)

22                            -   -   -

23    BY MR. PIFKO:

24              Q.      As Zimmerman Volume 2, Number 1.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Thank you.

 2              Q.     For the record, this is a

 3   document Bates labeled ABDCMDL00273425.  And it

 4   was produced natively, so it's the same Bates

 5   number on every page.

 6                     MR. MAHADY:  Can we go off the

 7              record for one second?

 8                     Can I talk to you outside real

 9              quick?

10                     MR. PIFKO:  Sure.

11                     THE VIDEOGRAPHER:  Going off the

12              record, 2:12 p.m.

13                          -  -  -

14                     (A discussion off the record

15              occurred.)

16                          -  -  -

17                     THE VIDEOGRAPHER:  Back on record

18              at 2:13 p.m.

19   BY MR. PIFKO:

20              Q.     Okay.  So I just want to ask you

21   about a specific page on this document that we

22   had to get a court order to be able to ask you

23   about this after your deposition, or to have

24   access to this part of the document.
```

```
 1                   So if you want to turn to page 16
 2   of the PowerPoint, there's numbers on the left
 3   corner.
 4                   MR. NICHOLAS:  I'll object to the
 5            commentary, but I will ask -- I'm not
 6            going to say he has to read the whole
 7            thing again, but let him at least flip
 8            through it to refamiliarize himself with
 9            the document.
10   BY MR. PIFKO:
11        Q.    Take your time.  I just want to
12   ask you about something in the comments on the
13   page that has slide 16 on it.
14        A.    (Reviewing document.)
15              Okay.
16        Q.    There's a part here that's in
17   color in red on the document.
18              Are you on page 16 there?
19        A.    I am.
20        Q.    Okay.  So it says here, "We are
21   trying to make the best decisions we can to
22   protect the public while assuring legit customers
23   get their meds -- that is all the diversion
24   control function is concerned with."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      Do you see that?

 2          A.      I see that.

 3          Q.      Do you agree with that statement?

 4                      MR. NICHOLAS:  Object to the

 5              form.

 6                      THE WITNESS:  I don't know who

 7              wrote this or what the inference is to,

 8              but the general -- the general assumption

 9              that we want to make sure we have

10              medications available for those that need

11              them, I agree with.  And we have

12              processes in place to, you know, secure

13              the supply chain, I agree with that.  But

14              I don't know who wrote it.  I'm not sure

15              what the context is.

16  BY MR. PIFKO:

17          Q.      Okay.  But what about the part

18  about part of the diversion control function

19  being that you -- while you want to protect the

20  public while also assuring that customers get

21  their medicines, do you agree about that part of

22  it?

23                      MR. NICHOLAS:  Object to the

24              form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Go ahead.
 2                  THE WITNESS:  Again, our
 3           diversion control program is just one
 4           facet of our regulatory program and our
 5           CS array of security to protect the
 6           company in making sure that the
 7           medications that we buy are legitimate,
 8           are stored and distributed appropriately,
 9           and are available to the pharmacies when
10           they place an order.  And that is how our
11           process works.
12                  I don't know the person who
13           stated that and what they meant by that,
14           but that's how we ensure the integrity of
15           the supply chain, ensuring that patients
16           have medicines that's available to them
17           that are written by doctors and that
18           those medications have been stored and
19           distributed safely to a licensed
20           pharmacy.
21   BY MR. PIFKO:
22           Q.    Okay.  All I'm trying to ask you,
23   though, is in part of carrying out those duties,
24   if you believe that part of the idea of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   preventing diversion is to help protect the

 2   public from the consequences of a controlled

 3   substance that gets diverted.

 4                  MR. NICHOLAS:  Object to the

 5          form.

 6                  Go ahead.

 7                  THE WITNESS:  And I know we spoke

 8          this -- about this last time.  It depends

 9          how that drug is diverted.  And again,

10          our role in the supply chain that adds

11          protections to the public is to ensure

12          that the medications are available and

13          they have been stored and safely

14          distributed to a licensed dispenser.

15          That is our obligation, and that is how

16          our program is built.

17   BY MR. PIFKO:

18          Q.    Okay.  When you say safely

19   distributed --

20                  MR. NICHOLAS:  Let him finish.

21                  THE WITNESS:  Safely distributed

22          to a dispenser, a licensed location.

23   BY MR. PIFKO:

24          Q.    Right.  So when you say safely
```

Highly Confidential - Subject to Further Confidentiality Review

1    distributed, what do you mean, safely

2    distributed?

3           A.    Make sure that the transportation

4    companies that we use have been background

5    checked and that the product has been stored

6    appropriately and is delivered to the pharmacy

7    where the pharmacist signs for the product.

8           Q.    Right.  Because you don't want a

9    substance to be diverted from legitimate medical

10   channels.  Correct?

11          A.    Not while it's under our

12   distribution license.  Right?  So when we -- as

13   soon as we receive the product, it's under our

14   control.  And the way the federal regulations are

15   written, we're responsible to make sure we have

16   the adequate recordkeeping, storage requirements,

17   select drivers, ensure that the pharmacies are

18   appropriately licensed.  And so in that -- from

19   the time we sign for it till the time the

20   pharmacy signs for it, we want to make sure that

21   product is not diverted.  Correct.

22          Q.    And you understand that these are

23   substances that have a high potential for abuse

24   that you're distributing.  Correct?

```
 1                    MR. NICHOLAS:  Object to the

 2           form.

 3                    THE WITNESS:  We distribute

 4           all -- all medications, over the counter.

 5           A small subset of the product that we

 6           sell and distribute are controlled

 7           substances, and a smaller subset are

 8           Schedule II, which have a higher

 9           potential for abuse.  Correct.

10   BY MR. PIFKO:

11           Q.    Okay.  Well, Schedule II

12   substances have a high potential for abuse.

13   Agree?

14           A.    Correct.

15           Q.    And when you distribute those,

16   you want to make sure they don't get into the

17   wrong hands so that they're abused.  Correct?

18           A.    We want to make sure all of our

19   product that we sell doesn't get in the wrong

20   hands.

21           Q.    But that includes Schedule II

22   controlled substances?

23           A.    We want to make sure we sell to

24   licensed pharmacies.  Correct.  We have an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligation to make sure we only sell to licensed

 2    entities.

 3                          -   -   -

 4                    (Deposition Exhibit No. Zimmerman

 5            V2-2, Email chain, top one dated 16 Sep

 6            2014, Bates stamped ABDCMDL00277299

 7            through ABDCMDL00277301, was marked for

 8            identification.)

 9                          -   -   -

10    BY MR. PIFKO:

11            Q.     I'm handing you what's marked as

12    Zimmerman Volume 2, Exhibit 2.

13            A.     Thank you.

14            Q.     For the record, it's a

15    couple-page email, Bates labeled ABDCMDL00277299

16    through 301.

17                    Take a moment to review that.

18    Let me know when you're done.

19            A.     (Reviewing document.)

20                    Okay.

21            Q.     Okay.  I want to turn your

22    attention to -- well, have you seen this before?

23            A.     My name is on it.  I don't

24    specifically recall.
```

```
 1              Q.     This is an email that -- a

 2    portion of which you wrote.  Correct?

 3              A.     Yes.

 4              Q.     It says in the middle of the

 5    first page, there's an email from you dated

 6    September 16, 2014 to Rita Norton, Anne Oswalt,

 7    copying Steve Mays and David May.  The subject is

 8    "Update."

 9                     Do you see that?

10              A.     Uh-huh.

11              Q.     Do you agree this is an email you

12    wrote?

13              A.     It appears to be, yes.

14              Q.     I want to direct your attention

15    to language that starts on the bottom of the

16    first page and continues onto the second page.

17                     You say, "Doesn't the dispensing

18    of any controlled substance come with the

19    foreseeable risk of adverse health consequences

20    or misuse of the controlled substances?"

21                     Do you see that?

22                     MR. NICHOLAS:  I'm sorry, where

23         are you?

24                     THE WITNESS:  Yeah, where are
```

```
 1          you?

 2   BY MR. PIFKO:

 3          Q.     You can look at the screen in

 4   front of you to help you, too.

 5          A.     Oh.

 6                 MR. NICHOLAS:  I see.  Yep.

 7                 THE WITNESS:  Yes, I see that.

 8   BY MR. PIFKO:

 9          Q.     You said that.  Correct?

10          A.     It appears I wrote that, yes.

11          Q.     And you say -- you then say,

12   "Dispensed" -- on the second page, "Dispensed

13   controlled substances have the 'foreseeable risk'

14   of:  being given to a family member that they

15   were not originally prescribed for (husband,

16   wife, et cetera); removed from the medicine

17   cabinet by a family member or friend; the patient

18   can become addicted to the prescribed drug;

19   stolen; et cetera; all of which are foreseeable

20   and could have the adverse health consequences or

21   death due to the abuse or misuse of the

22   controlled substances."

23                 Do you see that?

24          A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     You said that.  Correct?

 2              A.     That's what I wrote.

 3              Q.     What was the basis for saying

 4    that at the time?

 5                     MR. NICHOLAS:  Object to the

 6              form.

 7                     THE WITNESS:  I think the basis

 8              of the comment was that we have no

 9              control -- all these things I indicate,

10              we have no control over that.  We

11              distribute to the licensed individuals,

12              but there's -- the risk is -- you know,

13              how the doctor prescribes it, if they

14              don't describe it -- prescribe it

15              appropriately, if the pharmacy isn't

16              monitoring it, if the patient doesn't

17              monitor it appropriately, if somebody has

18              it in their medicine cabinet and somebody

19              steals it, there's inherent risk to that

20              product.  That's why it's important that

21              everybody follows the regulatory

22              requirements.

23                     We have our requirements that

24              have nothing to do -- I'm just pointing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              out a fact that these medications have

 2              that has nothing to do with how we handle

 3              our regulatory responsibilities within

 4              the supply channel.

 5   BY MR. PIFKO:

 6         Q.     Okay.  But you agree that these

 7   are all foreseeable risks with the controlled

 8   substance.  Correct?

 9              MR. NICHOLAS:  Object to the

10              form.

11              THE WITNESS:  I believe that's

12              probably -- again, I shouldn't say

13              probably, but that's why they're a

14              controlled substance.

15   BY MR. PIFKO:

16         Q.     Right.  Because all these things

17   are potential consequences.  I mean, you're

18   saying it's obviously foreseeable, is what you're

19   saying.

20              MR. NICHOLAS:  Object to the

21              form.

22              THE WITNESS:  Not obviously

23              foreseeable.  I'm stating that there's a

24              reason why we store them in vaults and we
```

```
 1              have specific recordkeeping requirements,

 2              because of their potential for abuse.

 3    BY MR. PIFKO:

 4         Q.     And all --

 5         A.     Which implies that these

 6    products, that if somebody dispenses a Schedule

 7    II product, somebody is going to die because

 8    they're going to misuse it or it's going to get

 9    stolen, I don't agree with that.

10         Q.     Well, if there's a -- it's a

11    foreseeable risk, though, that all the these

12    things could happen.  That's exactly what you

13    said.

14         A.     They could happen.

15         Q.     I want to ask you about the New

16    Jersey United States Attorney investigation.

17              Are you familiar with that?

18         A.     In what context?

19         Q.     You're aware that there was a

20    criminal investigation of the company being

21    conducted by the United States Attorney.

22    Correct?

23         A.     I'm under -- yes.  I have that

24    understanding, that there was an investigation by
```

1    the US Attorney's Office.   Correct.

2           Q.     That was a stressful situation

3    for you?

4           A.     It's a situation that I have to

5    deal with.   Correct.



Highly Confidential - Subject to Further Confidentiality Review

██  █████████████

██  ████████  ████████████

██  ███████████████

██       ████████████████

██    ███████████

6    BY MR. PIFKO:

7         Q.     Specific -- I'm not saying that

8    you haven't had other stressful times in your

9    life and there's not -- many causes of stress.

10             All I'm asking is that dealing

11   with that United States Attorney's investigation

12   was a stressful situation for you.

13             Would you agree?

14             MR. NICHOLAS:  Same objection.

15        Same objection.

16             THE WITNESS:  I mean, it was --

17        there was some stress involved, but I

18        mean, it wasn't, you know -- again, it

19        wasn't anything -- anything different

20        than my regular course of work.

21                  -   -   -

22             (Deposition Exhibit No. Zimmerman

23        V2-3, FY14 Performance Evaluation Form

24        for Chris Zimmerman, Bates stamped

```
 1            ABDCMDL00383869 through ABDCMDL00383874,

 2            was marked for identification.)

 3                      -  -  -

 4  BY MR. PIFKO:

 5            Q.    Handing you what's marked as

 6  Zimmerman Volume 2, Exhibit 3.

 7            A.    Thank you.

 8            Q.    For the record, it's an

 9  eight-page document, Bates labeled

10  ABDCMDL00383869 through 76.

11                  And I just wanted to direct your

12  attention to page 6 of 8, which is the page that

13  has the Bates numbers 383874.  And there's a

14  section there that says, "Comments by John Chou,"

15  if you see that?

16                  MR. NICHOLAS:  Just for the

17            record, if you want to flip through the

18            entire document, you can.  I'm not saying

19            read it, the whole thing, but familiarize

20            yourself, you can certainly do that.

21                  THE WITNESS:  Okay.

22                  (Reviewing document.)

23  BY MR. PIFKO:

24            Q.    And it says specifically --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. NICHOLAS:  Let him --
 2                    MR. PIFKO:  I just want to tell
 3           him what I want him to look at.  He can
 4           look at whatever he wants, but I just
 5           want to tell him --
 6                    MR. NICHOLAS:  Let him tell you
 7           he's ready.
 8                    MR. PIFKO:  -- what I'm
 9           interested in.
10                    MR. NICHOLAS:  Yeah.  You can
11           tell him -- he can tell you when he's
12           ready.
13   BY MR. PIFKO:
14           Q.    Specifically I want you to focus
15   your attention on a specific section here, it
16   says, "This was a year in which he and his team
17   were dealing with significant stress from being
18   under the magnifying glass environment created by
19   the ongoing investigation of ABC's diversion
20   control program by the US Attorney's Office in
21   New Jersey."
22                    MR. NICHOLAS:  Can we at least
23           say the year?  Let him flip through --
24   BY MR. PIFKO:
```

1          Q.     This is a 2014 evaluation of you.

2    All I want to ask is if you agree that was a

3    stressful situation, as this comment says here.

4    That's all I'm asking you.

5                 You can see the section is up on

6    the page, on the screen in front of you as well.

7                 I'm just asking if that -- if you

8    agree with that statement.

9          A.     There was stress.  I don't agree

10   entirely.  I mean, if you look at the previous

11   page with my comments, I don't indicate that I

12   was stressed regarding the New Jersey -- I

13   stressed it was challenging, because a lot of the

14   things that we did during that year, opening up

15   new facilities, bringing on, you know, another

16   company, 100 percent increase in network costs,

17   there was a lot, tremendous amount of work.

18                 So there was maybe additional

19   stress.  To say -- I know John states here that

20   to the New Jersey -- I don't know if I completely

21   agree with that.

22         Q.     Okay.  Who is John?

23         A.     John Chou is my boss.

24         Q.     Okay.  It says -- what's his

Highly Confidential - Subject to Further Confidentiality Review

```
 1    title?

 2            A.    He's general counsel.

 3            Q.    Well, what was the New Jersey

 4    United States Attorney's investigation about, do

 5    you know?

 6                  MR. NICHOLAS:  Hold on.

 7                  I'll -- A, I'll object to the

 8            form.  B, to the extent the knowledge you

 9            have about the New Jersey investigation

10            is derived from conversations with or

11            communications with counsel, I'm

12            instructing you not to answer.

13                  THE WITNESS:  All my

14            communications regarding New Jersey was

15            with counsel.

16    BY MR. PIFKO:

17            Q.    Did Steve Mays ever call you

18    about the New Jersey United States Attorney's

19    investigation?

20            A.    In what context?

21            Q.    To tell you about it.

22            A.    We received a subpoena.  And, you

23    know, and we forwarded it on to legal.  But I'm

24    not sure how that -- how the mechanics -- the
```

```
1    mechanics work, whether -- how that process came
2    about, but, I mean, there was -- everyone knew
3    there was a subpoena that we received from New
4    Jersey.
5          Q.    So you heard from Steve Mays that
6    there was a subpoena from the United States
7    Attorney's Office in New Jersey?
8          A.    I don't know if I even -- I don't
9    know who -- if I heard from Steve -- I don't know
10   who I heard it from.  And I don't know if it came
11   in the mail.  Again, I can't recall.  It's
12   several years ago and how -- whether it started
13   with the subpoena or whether it was a phone call,
14   whether there was a meeting, but I know there was
15   some entry point contact with CSRA before we
16   moved it to the legal department.  I'm not sure
17   of the mechanics of that.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          Q.     So you don't know other than

17   counsel telling you what the investigation is

18   about?

19          A.     Is that -- what's the question?

20          Q.     My question is, you don't know

21   what the investigation is about, other than

22   counsel telling you?

23          A.     All my -- yes, with my

24   discussions with counsel.  Correct.

1      Q.    Did you produce any documents in

2   response to the subpoena?

3      A.    I'm sure we did.  I mean, if they

4   requested information, we would have pulled that

5   together, yeah.

6      Q.    Do you know what documents were

7   requested in the subpoena?

8              MR. NICHOLAS:  I'm going to

9         reiterate my instruction that if this --

10         the answer to this question necessitates

11         your relaying or knowing information

12         communicated to you through counsel, then

13         I instruct you not to answer.

14              THE WITNESS:  Correct.  I don't.

15   BY MR. PIFKO:

16      Q.    You don't know what documents

17   were requested?

18      A.    You were asking me -- I don't

19   recall what was.  And I'll -- what I -- you know,

20   there was discussions with legal.  I can't recall

21   what exactly it was.

22      Q.    Well, you said that Steve Mays

23   also talked to you about the subpoena as well?

24      A.    I don't know if Steve talked to

```
 1   me.  I can't recall how -- again, as I stated

 2   before, I don't know if we received a call from

 3   DEA or the US Attorney's Office or a subpoena

 4   came to the mail.  I don't remember the mechanics

 5   of when we initially found out.

 6           Q.    Did you ever see the subpoena

 7   yourself?

 8           A.    I don't recall.

 9           Q.    You don't know either way?

10           A.    I don't know either way.  I don't

11   recall if I saw the subpoena or not.

12           Q.    Did you spend a lot of time

13   dealing with the subpoena?

14           A.    Again, my conversations and

15   actions were all done under the direction of

16   counsel.

17           Q.    Okay.  That's not my question,

18   though.  You got to answer my question.

19                 I asked you if you spent a lot of

20   time dealing with the subpoena.

21                 MR. NICHOLAS:  Object to the

22           form.

23                 THE WITNESS:  So it was a long,

24           drawn-out process.  So, you know, I
```

```
 1              don't -- I mean, it was years, years of

 2              process.  So again, I'm not sure how to

 3              gauge that, whether it's -- your question

 4              is, did we produce a lot.  I don't know

 5              if over five years, I would -- a lot,

 6              yes, I assume we did.

 7   BY MR. PIFKO:

 8         Q.    Okay.

 9         A.    I can't tell you exactly what all

10   was produced, but, you know, that would all be

11   through the legal department.

12         Q.    So it's your testimony that you

13   dealt with the nature of this investigation over

14   the course of five years?

15         A.    I don't --

16              MR. NICHOLAS:  Object to the

17         form.

18              Go ahead.

19              THE WITNESS:  I don't know the

20         course.  It initiated I believe in 2012,

21         and that's what I know.

22   BY MR. PIFKO:

23         Q.    And when -- is it closed, to your

24   knowledge?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I don't know.
 2              Q.    Are you still dealing with it?
 3                    MR. NICHOLAS:  Object to the
 4          form.
 5                    THE WITNESS:  In what -- in what
 6          way?
 7    BY MR. PIFKO:
 8              Q.    You told me that you thought
 9    you've been dealing with it for five years.  I
10    mean, we have your performance evaluation here
11    that says it was a very stressful situation for
12    you to be dealing with it.
13                    I'm just asking how much time you
14    dealt with it, how long the process was.  I mean,
15    it's obviously something significant, so I want
16    to hear when you last dealt with it, was it
17    something you were dealing with every day?
18                    MR. NICHOLAS:  Object to the
19          form.
20                    You can answer, but only if it
21          doesn't get into attorney communications.
22                    THE WITNESS:  Yeah.  I wouldn't
23          feel comfortable answering that question.
24    BY MR. PIFKO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    I am not asking you the substance

 2    of the discussions.  I'm asking you the amount of

 3    time you spent.  You need to answer that

 4    question.

 5                    MR. NICHOLAS:  If you know.

 6              Object to the form.

 7                    MR. PIFKO:  Stop "if you know,"

 8              Bob.  Stop.

 9                    MR. NICHOLAS:  It's the first

10              time I've said it all day, Mark.

11                    MR. PIFKO:  Stop.

12                    MR. NICHOLAS:  Don't say --

13                    MR. PIFKO:  You've got a problem

14              with coaching witnesses.  Okay?  You need

15              to stop.  I'm done with it.  You say that

16              one more time, we're going -- we're going

17              to be done.

18                    MR. NICHOLAS:  Good.  Go ahead.

19                    MR. PIFKO:  I'm going to bring

20              him back again.  Okay?

21                    MR. NICHOLAS:  Just --

22                    MR. PIFKO:  We're going to go

23              this over and over again.

24                    MR. NICHOLAS:  Ask your -- you're
```

```
 1          badgering the witness.
 2                  MR. PIFKO:  No, I'm not.  You're
 3          trying to -- you coached him into not
 4          answering this question.  He knows all
 5          about this thing.  He just testified that
 6          he dealt with it for five years, and
 7          you're trying to get him to avoid talking
 8          about it.
 9                  MR. NICHOLAS:  Okay.  That's
10          offensive.  I object to that.  Don't talk
11          to me that way.
12                  MR. PIFKO:  And we're not killing
13          this time.
14                  MR. NICHOLAS:  Ask him your --
15                  MR. PIFKO:  We're not killing
16          this time you're interrupting for the
17          record.  Okay?
18                  MR. NICHOLAS:  I don't care if
19          you count this time or not.  I don't care
20          if you count these 30 seconds or not.  Go
21          ahead and ask your question.
22                  MR. PIFKO:  Okay.
23     BY MR. PIFKO:
24          Q.    Sir, I'm trying to get an
```

```
 1    accurate answer from you.  Okay?
 2                 I understand that your counsel is
 3    instructing you not to talk about the substance
 4    of discussions you had with counsel.  I'm not
 5    asking you about that.  Okay?
 6                 I just want to know how much time
 7    in your day over the course of years that this
 8    was going on that you were dealing with this.
 9                 MR. NICHOLAS:  Object to the
10          form.
11                 THE WITNESS:  Some days it would
12          be an entire day.  It may go two months
13          without any time.  It may be three days
14          at a time, then it may go months
15          without -- again, you're asking me to
16          give you an answer over a five-year
17          period of how much time I worked on it.
18          I can't -- if -- I don't know.
19    BY MR. PIFKO:
20          Q.    That's all the kind of answer I'm
21    looking at.
22                 So you believe it was roughly a
23    five-year period --
24          A.    I just --
```

```
 1              Q.      -- and that's about the rough

 2   time periods in any particular day that you might

 3   have dealt with it?

 4                      MR. NICHOLAS:  Object to the

 5              form.

 6                      THE WITNESS:  I threw out five

 7              years.  I don't even -- I don't know the

 8              investigation's closed.  I don't know the

 9              current status.  It started in 2012.  I

10              haven't done much in the last, you know,

11              bit.  So I don't -- I don't know.

12   BY MR. PIFKO:

13              Q.      When was the last time you recall

14   having significant involvement with it?

15              A.      It's been a while.  I don't -- I

16   wouldn't feel comfortable picking a date.

17              Q.      More than a year?

18              A.      I don't think it's been -- I

19   don't think it's that long.  I don't know.

20              Q.      So sometime less than a year was

21   the last time you had significant involvement?

22                      MR. NICHOLAS:  Object to the

23              form.

24                      THE WITNESS:  It could have been
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              a year, it could have been six months.

 2              Again, my time -- I may -- I don't know.

 3              I don't know.  It wasn't last week or

 4              last month, I know that.

 5    BY MR. PIFKO:

 6         Q.    Okay.  But it's 2019 right now.

 7         A.    It wasn't 2019.

 8         Q.    So the last time you had

 9    significant involvement was in 2019?

10         A.    No, no, no.  It was not in 2019.

11         Q.    Okay.  It was sometime in 2018?

12              MR. NICHOLAS:  Object to the

13              form.

14              THE WITNESS:  Again, I don't know

15              exactly.

16    BY MR. PIFKO:

17         Q.    Roughly, I'm just asking you.

18              MR. NICHOLAS:  Object to the

19              form.

20              THE WITNESS:  I can't answer that

21              question.  I don't know what you're

22              considering considerable time.  And I

23              can't -- is considerable time five hours,

24              five days, five months?
```

```
 1                     And again, you're asking me to

 2             say how much -- how long of -- what's a

 3             significant amount of time?  To some

 4             people, a significant amount of time

 5             might be an hour-and-a-half for this

 6             deposition.

 7   BY MR. PIFKO:

 8             Q.    And you're --

 9             A.    But I'm just saying, what's a

10   significant amount of time.

11             Q.    In your understanding of the word

12   "significant," when was the last time that you

13   had a meaningful day where you dealt with the New

14   Jersey US Attorney's investigation?

15                     MR. NICHOLAS:  Object to the

16             form.

17                     THE WITNESS:  It's been a while.

18   BY MR. PIFKO:

19             Q.    Okay.

20             A.    It's been a while, more than a

21   year.

22             Q.    But less than two years?

23                     MR. NICHOLAS:  Object to the

24             form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Now, I can't --

 2          now -- you got me more than a year.  I

 3          don't know.

 4   BY MR. PIFKO:

 5          Q.    I'm just trying to get an

 6   estimate.  Okay?

 7          A.    I'm being completely honest with

 8   you.

 9          Q.    Okay.

10          A.    I don't know --

11          Q.    Okay.  Fair enough.

12          A.    -- if it was a year, 14 months,

13   16 months.  I don't know.

14                    MR. PIFKO:  Okay.  We're going to

15          take a short break.

16                    THE VIDEOGRAPHER:  Going off the

17          record, 2:42 p.m.

18                       -  -  -

19               (A recess was taken from

20          2:42 p.m. to 2:57 p.m.)

21                       -  -  -

22                    THE VIDEOGRAPHER:  Back on

23          record, 2:57 p.m.

24   BY MR. PIFKO:
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Welcome back.

2          A.      Yeah.

3          Q.      AmerisourceBergen for a lengthy

4    period of time had thresholds as a feature of its

5    order monitoring program.  Correct?

6          A.      That was one component.  Correct.

7          Q.      And those thresholds were set at

8    300 percent of the customer's ordering history?

9          A.      They were -- in what time frame?

10         Q.      Well, for a majority of the time

11   frame.

12         A.      So in the '90s, it was three for

13   I think ARCOS items and possibly a multiplier of

14   six for schedules -- nonreportables, so III, IVs

15   and Vs.

16                 And then when we entered into our

17   program in '98, they were a lot more flexible.

18   But there was a baseline threshold trigger of

19   about three times the average of the pharmacy's

20   based upon what classification they were in.

21         Q.      And what was the basis for using

22   that 300 percent?

23                 MR. NICHOLAS:  Object to the

24         form.

```
 1                    THE WITNESS:  So when I came on

 2            board in 1990, that was already the --

 3            and I'm not sure where that came from,

 4            but that was the number that we had used.

 5            That was the number we used when we

 6            started negotiating the new program with

 7            DEA and worked with them for years.

 8                    Again, there was no discussion of

 9            four or five or two.  That was the

10            threshold that we were working with DEA

11            for two years with, and that was the one

12            that we had.

13                    Now, offices had the ability to

14            change that triggering number.  And then

15            in 2007 we devised our program.  One

16            more -- once again, when we were

17            designing the program, negotiating with

18            DEA again, the trigger point for

19            identifying an order of interest was

20            three -- was three times based on the

21            average of the category they were in, the

22            customer.

23                              -   -   -

24                    (Deposition Exhibit No. Zimmerman
```

```
 1              V2-4, Email chain, top one dated 30 Mar
 2              2011, Bates stamped ABDCMDL00267230
 3              through ABDCMDL00267232, was marked for
 4              identification.)
 5                        -  -  -
 6    BY MR. PIFKO:
 7         Q.      You remember when we talked
 8    before, we were talking about the Chemical
 9    Handlers Manual?
10         A.      Yes.  We talked about that.
11         Q.      Do you remember discussing that?
12         A.      Yes.
13         Q.      Do you remember talking about how
14    the three times the multiplier was used because
15    of language in there?
16         A.      That was part of the discussion
17    when we were negotiating with DEA of the three
18    times.  At the time, that was the -- on the DEA's
19    website, identifying a potential suspicious order
20    for listed chemicals was three times.  And that
21    was just another element of the discussions.
22         Q.      I've handed you a three-page
23    email Bates labeled ABDCMDL00267230 through 32.
24    There's various discussion here, but I just
```

Highly Confidential - Subject to Further Confidentiality Review

1    wanted to, again, direct your attention to a

2    couple specific statements that you have in here

3    about the thresholds.

4            A.      (Reviewing document.)

5                    Okay.

6            Q.      All right.  So you comment here

7    on the first page.  In bullet point 2, you say,

8    "Threshold levels are already 300% over average."

9                    Do you see that?

10           A.      Yes.

11           Q.      What did you mean by that?

12           A.      The trigger for our program is

13   300 -- three times the average of the

14   classification of the pharmacy's -- so the

15   pharmacies are broken into categories.  And that

16   category takes the average of all pharmacies, and

17   then the multiplier 3 is put on there to trigger

18   anywhere that hits that threshold.

19           Q.      But the point that you're making

20   is that it's already 300 percent over.  There's

21   already a lot of buffer in there.  Agree?

22                   MR. NICHOLAS:  Object to the

23           form.

24                   Go ahead.

```
 1              THE WITNESS:  Again, that was
 2         the -- that was the agreed-upon trigger
 3         that we picked.  Because you're going
 4         to -- of course, you know, through the
 5         averages, you're get customers at the top
 6         of that range that order more and
 7         depending on the type of patients they
 8         serve.  There's a lot of different
 9         variables that creates, even within the
10         category, different levels.  So
11         300 percent was the triggering level.
12         And that's what it says there.
13    BY MR. PIFKO:
14         Q.   Well, let's look at a little
15    further down on the page.  There's a section here
16    you say, "First:  When an order is 'just 3% or
17    6%' over its threshold...it is actually 303...or
18    306% over...because we build a 300% float into
19    each threshold."
20              Do you see that part of the
21    email?
22         A.   I see that, yes.
23         Q.   The point is -- you're trying to
24    make there is, there's a lot of extra room in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    threshold.  Agree?

 2                   MR. NICHOLAS:  Object to the

 3            form.

 4                   THE WITNESS:  No.

 5    BY MR. PIFKO:

 6            Q.    When something is over, it's not

 7    just over a little bit, you're actually a lot

 8    over the average.

 9                   MR. NICHOLAS:  Object to the

10            form.

11                   THE WITNESS:  They're over the

12            average.  But again, it's customer

13            specific.  That's just the triggering

14            event to then review the characteristics

15            of that order on top of that.  But -- so

16            3 percent would be 303.  Just as I state,

17            it's --

18    BY MR. PIFKO:

19            Q.    It's actually 306 and 318.  Your

20    math there is incorrect.

21                   But the point you're trying to

22    make there is that when something is 1 percent

23    over or 2 percent over, it's not just 1 percent

24    over, it's actually 303 percent over.  Agreed?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. NICHOLAS:  Object.  Object to

 2         the predicate to the question and the

 3         commentary on the math.  And object to

 4         the form.

 5              THE WITNESS:  That's the

 6         statement.  That's the statement I have.

 7    BY MR. PIFKO:

 8         Q.    What are you trying to

 9    communicate there when you say when an order is

10    just 3 or 6 percent over, it's actually 303 or

11    306 percent?  What are you trying to communicate

12    by saying that?

13              MR. NICHOLAS:  Object to the

14         form.

15              THE WITNESS:  Exactly what I

16         state there.  I mean, there's not much

17         commentary to expand on.

18    BY MR. PIFKO:

19         Q.    That it's not a little bit over,

20    it's 303 or 306 percent over.  Correct?

21              MR. NICHOLAS:  Object to the

22         form.

23              THE WITNESS:  Yeah.  It's

24         3 percent over the threshold, but --
```

1          which is already established at three

2          times.  Correct.

3    BY MR. PIFKO:

4          Q.     Part of the reason that you have

5    that threshold is so that you won't interrupt the

6    customer's business.  Correct?

7          A.     It's the -- so the threshold has

8    been -- so the threshold was in place before we

9    blocked orders.  So the threshold was always

10   3 percent, even when we weren't stopping orders.

11   So for the first 17 years, when the agreed-upon

12   practice with DEA was that you reported

13   suspicious after and we wanted you to report

14   anything over 300 -- three times the average of

15   that category, that was how it was done.  There

16   was no impact to the customer, because it was

17   reported after the fact.

18          So the threshold trigger has

19   nothing to do with the impact of the -- on the

20   customer.  That's always been the trigger,

21   regardless of whether we stopped orders or

22   released orders.

23          Q.     So even in the time period when

24   you stopped the orders, it's your testimony that

1   the threshold has no design on not interrupting

2   the supply chain?

3          A.     Well, again, the whole purpose of

4   the threshold was to provide some type of

5   triggering event, because we process the amount

6   of volume that goes through our system.  And this

7   was the agreed-upon mechanism that we negotiated

8   with DEA as the triggering event.  Of course,

9   patient care is -- we want to make sure that the

10  patients have product that they need when they

11  come in for their -- when they get a prescription

12  filled.  So part of that is so you don't just

13  have a million orders flagging that aren't

14  suspicious or potentially suspicious.

15         Q.     You agree that your customers are

16  valued business partners, is a statement that the

17  company makes from time to time?

18                MR. NICHOLAS:  Object to the

19         form.

20                THE WITNESS:  I mean, our

21         customers are business partners of ours,

22         yes.

23  BY MR. PIFKO:

24         Q.     Are you familiar with what's

```
 1    called sometimes chargeback data or fee for

 2    services data?

 3             A.    I mean, I have heard of that.

 4    I'm not intricately knowledgeable about that.

 5             Q.    Okay.

 6             A.    We have a department that handles

 7    that type of stuff.

 8             Q.    Have you ever heard of 867 data

 9    or 852 data?  Do you know that term?

10             A.    I know there's numbers to data,

11    but I don't -- I couldn't tell you if those were

12    the correct three numbers to -- I have heard

13    people reference data with -- accustomed to

14    numbers like that.

15             Q.    You agree that AmerisourceBergen

16    provides transactional data back to the

17    manufacturers from whom it purchases products.

18    Correct?

19                   MR. NICHOLAS:  Object to the

20             form.

21                   THE WITNESS:  That's not my area,

22             and I -- you know, I don't know for sure.

23    BY MR. PIFKO:

24             Q.    You've never discussed that with
```

Highly Confidential - Subject to Further Confidentiality Review

1    anyone?

2         A.    I can't recall having that

3    discussion with anyone.

4         Q.    Okay.  You have zero familiarity

5    with the use of chargeback data or 852 data or

6    867 data?

7         A.    No.

8         Q.    What about IQVA data or IMS data,

9    are you familiar with that type of data?

10        A.    I know IMS is a data company

11   that -- is a data company that different

12   departments within the company uses.

13        Q.    Have you ever used that data in

14   connection with your diversion control programs?

15        A.    I believe we piloted something

16   years back, but I don't know the specifics of

17   that.

18        Q.    What caused you to pilot that

19   data at some point in your history?

20        A.    I think they were -- they had

21   mentioned that they have certain data that -- and

22   then we -- I believe.  Again, I wasn't involved

23   with the pilot.  I don't know if they piloted it

24   or what, but at some time we had access to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    certain data the diversion control group piloted.

 2    It was years back.  I'm not sure when exactly.

 3         Q.    Who would have known about that?

 4         A.    David May.

 5         Q.    Do you have any understanding

 6    about how that data was used in connection with

 7    AmerisourceBergen's diversion control program?

 8         A.    I don't know exactly how it

 9    was -- you know, I'm -- not exactly, no.

10                     -  -  -

11              (Deposition Exhibit No. Zimmerman

12              V2-5, Email dated 17 Oct 2017, Bates

13              stamped ABDCMDL00272819, was marked for

14              identification.)

15                     -  -  -

16    BY MR. PIFKO:

17         Q.    Handing you what's marked as

18    Zimmerman Volume 2, Exhibit 5.  For the record,

19    it's a single-page document Bates labeled

20    ABDCMDL00272819.

21              Let me know when you're done

22    looking at that.

23         A.    (Reviewing document.)

24              Okay.
```

```
 1              Q.     Have you seen this before?

 2              A.     It has my name on it.

 3              Q.     Did you write this?

 4              A.     I would assume so.

 5              Q.     Do you remember writing this?

 6              A.     I don't remember writing it.

 7              Q.     This is about a 60 Minutes and

 8    Washington Post article.  Agree?

 9              A.     Yes.

10              Q.     And you're writing some comments

11    to, as you say, address the article.  Agree?

12              A.     Yes.

13              Q.     Why were you writing these

14    comments?

15              A.     I don't know -- I don't recall

16    writing them, but -- I don't know.  It looks like

17    notes to myself.

18              Q.     Item 1 here you say, "DEA sets

19    quotas for the amount of opioids to be

20    manufactured each year and DEA raised quotas over

21    1000%" over "Joe R."

22                     Do you see that?

23              A.     Yes.

24              Q.     Do you know who Joe R. referred
```

1    to here?

2              A.    Joe Rannazzisi.

3              Q.    What's the point you're trying to

4    make in item 1?

5                    MR. NICHOLAS:  Object to the

6              form.

7                    THE WITNESS:  Yeah.  I'm not

8              trying to make any points.  I'm just

9              making a note that DEA raised quotas over

10             1,000 percent.  Schedule II products have

11             to have quotas, and DEA controls how much

12             opioids are manufactured each year to be

13             distributed.

14   BY MR. PIFKO:

15             Q.    Do you know that the DEA

16   considers the prior year's disposal as part of

17   calculating the quota?

18                   MR. NICHOLAS:  Object to the

19             form.

20                   THE WITNESS:  I don't.

21   BY MR. PIFKO:

22             Q.    Have you ever been in a meeting

23   with HDA or anybody discussing the quotas?

24             A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Have you ever discussed the

2     quotas with any of your manufacturer clients or

3     customers?

4          A.      Not that I -- not that I know of.

5     We -- you know, as a distributor, we don't deal

6     with -- I mean, we're not involved in quotas.

7          Q.      How about, have you ever heard of

8     getting an allocation of a manufacturer's quota

9     for distribution?

10         A.      I'm not sure -- I know we get

11    allocated product on short supply items.  I'm not

12    sure if that's what you're referencing.

13         Q.      Have you ever like, for example,

14    applied to get a certain percentage of the

15    distribution of Schedule II controlled substances

16    manufactured by like Purdue?

17         A.      I wouldn't know that.

18         Q.      Who would know that?

19         A.      If it's a purchasing or

20    procurement, then it would be that -- global

21    sourcing is the name of the department that does

22    all the buying for the company.

23         Q.      Item number 2 here says, "DEA

24    issued registrations to pill mills that 'popped

```
 1    up' (Joe R's words) without due diligence

 2    enabling them to receive opioids from

 3    distributors under Joe R's oversight."

 4                 Do you see that?

 5         A.      Yes.

 6         Q.      What are you trying to convey

 7    here?

 8         A.      Again, these are just notes I had

 9    written down based upon the 60 Minutes interview

10    with Joe Rannazzisi.  And that was the statement

11    that he made, that he was referencing pill mills,

12    but he didn't indicate that the pill mills were

13    all vetted and approved and licensed in good

14    standing with DEA and the Boards of Pharmacy.

15         Q.      Was it --

16         A.      Go ahead.  I'm sorry.

17         Q.      Continue.

18         A.      No.

19         Q.      Was this something you were

20    writing because you intended to draft something

21    in response to the article?

22         A.      No.

23         Q.      Were you upset by the article in

24    the 60 Minutes story?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Was I upset?  No, I wasn't upset.
 2    I mean, I think the commentary -- you know,
 3    mentioning pill mills, that there is -- that this
 4    is a -- you know, these pills mills were popping
 5    up.  They weren't popping up.  DEA was licensing
 6    every one of these pill mills.
 7              So here's the head of the DEA --
 8    former DEA person blaming it on the pop up of the
 9    pill mills that his department licensed that
10    enabled that to occur.  And so, yeah, I get
11    frustrated, because we do what we're supposed to
12    do in the supply chain, and we're not an
13    enforcement agency, and the enforcement agency is
14    trying to blame it on the regulated wholesalers
15    when they're the ones who license these
16    pharmacies, they license these doctors, they
17    review all the information, they know every pill
18    that's sold.  They have full enforcement
19    discretion.  They can go into pharmacies, they
20    can raid pharmacies, they can go into doctors.
21    But instead, they're focusing on distributors
22    that have no line of sight to that, and then make
23    it sound that we're just selling to people that
24    aren't licensed, which is completely out of line.
```

```
 1                   We only sell to DEA licensed

 2      pharmacies and hospitals.  And we take our

 3      responsibilities very seriously.  So when I see a

 4      guy on 60 Minutes who -- we negotiated our deal

 5      with Joe Rannazzisi.  He negotiated our program

 6      and existence from 2007 forward.  And here he is

 7      making all these claims.  He was in the room

 8      across the table from me.  He agreed on

 9      everything that we put in place.  Everything.

10                   And then to have a 60 Minutes

11      article come out and kind of lambast what he

12      worked with us and negotiate is, yes,

13      frustrating.  Yeah.

14            Q.    So you feel that the DEA had

15      responsibility for the opioid crisis?

16                   MR. NICHOLAS:  Object to the

17            form.

18                   THE WITNESS:  I'm not -- again,

19            the opioid crisis is a huge -- I mean,

20            there's a -- you know, there's a lot of

21            areas that assumes that opioid crisis.

22            Does DEA, they set the quotas.  They

23            license the doctors.  They license the

24            pharmacies.  They have all the data.
```

```
 1            They have all the distribution.  They

 2            know how many pills are going to each

 3            pharmacy.  They know how many pills are

 4            going to what areas.  They have full --

 5            they have all that information.

 6                 Part of our deal in 2007 was to

 7            report every single controlled substance

 8            sale every day to DEA, which we did.

 9            Full transparency.  And that discussion

10            was in the event that we do find -- you

11            know, we know this is a new program and a

12            new area, so we want you to report every

13            order.  And if we see something

14            suspicious, we'll call you.  And then

15            we'll tweak it some more.

16                 We never received a call.  We

17            never received any other issues.  And now

18            we have him on 60 Minutes saying that

19            we're servicing all these -- you know,

20            the distributors are servicing these pill

21            mills, it's just -- again, I think

22            there's a lot of blame to go around, but

23            I can tell you that if a doctor didn't

24            write the prescription, then we wouldn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              sell it to the pharmacy and, you know, it

 2              wouldn't get into -- into the public.

 3   BY MR. PIFKO:

 4         Q.     The fourth one here, you say, the

 5   "opioid problem continuously got worse year over

 6   year under Joe's...rule."

 7                Do you see that?

 8         A.     I see that.

 9         Q.     Why did you think that was an

10   important note to make?

11                MR. NICHOLAS:  Object to the

12              form.

13                THE WITNESS:  Again, these are

14              just notes I was writing as he was --

15              as -- during the 60 Minutes.  And he's,

16              you know, discussing the problem with

17              opioids.  And he was in full control of

18              the DEA during that entire time.

19                Did he ever introduce legislation

20              or propose rules?  He was in charge.  Why

21              didn't he put proposed rules to further

22              regulate controlled substance

23              distribution?  Why didn't he create a

24              special license for pain management so we
```

```
 1            could focus on the issue and vet those,

 2            more importantly, and then let DEA have

 3            an idea for enforcement?  There was --

 4            why didn't he share the data that he was

 5            receiving so distributors could make more

 6            cognizant decisions based upon a full

 7            volume of information versus just what

 8            we're selling?

 9                 He was in charge of all that.

10            And during that time, we were trying to

11            open up a dialogue to how can we help to

12            the crisis, and we weren't getting any

13            communication.  So that's -- that's, you

14            know, why I wrote that the problem

15            continued to occur while he was in

16            charge.

17     BY MR. PIFKO:

18            Q.    You presided over

19     AmerisourceBergen's diversion control problem the

20     entire time as well.  Correct?

21            A.    We -- excuse me, can you state

22     that again?

23            Q.    You presided over

24     AmerisourceBergen's diversion control program
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   during the entire time as well.  Correct?

 2        A.     Yes.

 3        Q.     And the problem got worse under

 4   your tenure as well.  Correct?

 5               MR. NICHOLAS:  Object to the

 6          form.

 7               THE WITNESS:  Again, not based

 8          upon -- we were meeting all of our

 9          regulatory requirements.  We were going

10          to the Hill and proposing possible

11          solutions to open up and work with DEA.

12          We can't make new laws.  We can't make

13          new registrations.  We can't make

14          enforcement decisions.  We don't issue

15          DEA licenses.  DEA does all that.  But

16          for some reason --

17   BY MR. PIFKO:

18        Q.     You got your license --

19               MR. NICHOLAS:  Don't interrupt

20          him.

21               THE WITNESS:  But for some

22          reason, everyone expects the distributors

23          to be the enforcement agency, the

24          licensing agency.  It's ridiculous.  We
```

```
 1          have a --
 2   BY MR. PIFKO:
 3          Q.    You have your license
 4   suspended --
 5                MR. NICHOLAS:  Don't interrupt
 6          him.
 7                THE WITNESS:  We have a
 8          distribution license, which the
 9          regulations explain what our
10          responsibilities are.  We meet our
11          responsibilities.  I have been in charge
12          of it, yes, during that entire time, for
13          the last 30 years.  And I take it very
14          seriously.  And we do follow our
15          regulations, our responsibilities.
16                And when I think we can improve
17          it, I have done it in '98.  I did it in
18          2007.  I tried -- I have been trying
19          since 2007.  I've been on the Hill for
20          the last ten years hoping to try to
21          improve our relationships with DEA, open
22          up conversations, how can we solve the
23          crisis.
24                I have offered solutions,
```

1               licensing requirements, clearinghouses,

2               everything.  Zero.  We've asked for

3               meetings.  Zero.  I can't force

4               regulations.  And then I can't imply

5               those requirements onto our pharmacy

6               customers, who are licensed by DEA, who

7               have patients coming in.  I can't say to

8               ABC, you know what, we're just going to

9               stop selling opioids.  I can't do that,

10              because opioids are a legitimate

11              medication for the treatment of pain, and

12              there's patients that need them.

13       BY MR. PIFKO:

14              Q.    You've been --

15              A.    And so you guys -- again, you

16       want us to do everybody's job in the supply

17       channel.  We are doing our job.  We're also

18       offering solutions that we can control.

19              I can't control a doctor writing

20       prescription.  I can't control a pharmacist who

21       fills the prescription.  I control who we sell

22       to, to make sure that they're licensed and that

23       we vet them properly.  And we could provide

24       training the best we can.  But that's all I can

```
 1    control.

 2                    I can't control the pharmacy, I

 3    can't control the doctor, and I can't control

 4    DEA.

 5         Q.    But you haven't been complying

 6    with the law the entire time either.  You got an

 7    order to show cause.  You got a consent agreement

 8    with you.

 9                    MR. NICHOLAS:  Object to the

10         form.

11                    THE WITNESS:  But what -- so we

12         received an order to show cause.

13    BY MR. PIFKO:

14         Q.    You're not complying with the

15    law.  You're saying you're doing everything you

16    can.  You could start by complying with the law.

17                    Do you agree?

18                    MR. NICHOLAS:  Object to the

19         form.

20                    THE WITNESS:  I was -- we were

21         complying with the law.

22    BY MR. PIFKO:

23         Q.    Why did the DEA send you an order

24    to show cause?
```

```
 1              A.      I can't control the DEA.

 2              Q.      Why was the US Attorney's Office

 3        investigating you?

 4                      MR. NICHOLAS:  I object to the

 5              form.

 6                      THE WITNESS:  I can't control

 7              them either.  I don't know.  I know what

 8              we do, and I know the rules and our

 9              obligations under regulatory

10              requirements, and we uphold those.

11                            -   -   -

12                      (Deposition Exhibit No. Zimmerman

13              V2-6, Pay Change History, Bates stamped

14              ABDCMDL00383878, was marked for

15              identification.)

16                            -   -   -

17        BY MR. PIFKO:

18              Q.      I'm handing you what's marked as

19        Exhibit Zimmerman Volume 2, Exhibit 6.

20        ABDCMDL00383878.

21                      This is your salary history from

22        2002, June 16, 2002 to October 28, 2018.  Agree?

23              A.      That's what it looks like, yes.

24              Q.      And your salary is going up the
```

Highly Confidential - Subject to Further Confidentiality Review

1    whole time.  Agree?

2            A.    Yes.

3            Q.    It's nearly tripled from 2002 to

4    2018.  Agree?

5            A.    You indicate I'm not very good at

6    math, so I don't want to make a comment on that.

7            Q.    Well, it was ▮▮▮▮ in 2002, and

8    it's almost ▮▮▮▮ in October 28, 2018.  Agree?

9            A.    Yes.

10                      -  -  -

11            (Deposition Exhibit No. Zimmerman

12            V2-7, Map Chart, Bates stamped x through

13            x, was marked for identification.)

14                      -  -  -

15            MR. NICHOLAS:  Can we get a check

16            on the time while we're doing this?

17            THE VIDEOGRAPHER:  Five minutes

18            left.

19    BY MR. PIFKO:

20            Q.    I'm handing you what's marked as

21    Zimmerman Volume 2, Exhibit 7.

22            Is any part of your -- you're in

23    charge of diversion control.  Right?  You're the

24    top person at AmerisourceBergen responsible for

```
 1   preventing diversion.  Correct?

 2                  MR. NICHOLAS:  Object to the

 3           form.

 4                  THE WITNESS:  I have a -- I

 5           oversee the diversion control department.

 6           Correct.

 7   BY MR. PIFKO:

 8           Q.    And your salary is going up and

 9   you're getting, we can look at these, merit

10   adjustments, merit adjustments, merit

11   adjustments.

12                  Do you see them all over here?

13   Agree?

14           A.    I'm going back to this one?

15           Q.    Yeah.

16           A.    Yes.

17           Q.    Is any part of your salary based

18   on how well you're preventing diversion?

19                  MR. NICHOLAS:  Object to the

20           form.

21                  THE WITNESS:  I'm not sure.

22                  Can you restate that?

23   BY MR. PIFKO:

24           Q.    It's not, is it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. NICHOLAS:  Object it to that

 2          form.

 3                    MR. PIFKO:  There's no part of

 4          your --

 5                    MR. NICHOLAS:  He asked you

 6          restate a question.  You just said, "It's

 7          not, is it?"

 8   BY MR. PIFKO:

 9          Q.    There's no part of your salary

10   that is based on how well you're preventing

11   diversion.

12                    MR. NICHOLAS:  Object to the

13          form.

14   BY MR. PIFKO:

15          Q.    Agree?

16          A.    I would disagree.

17          Q.    You have a component of your

18   salary that's --

19          A.    My job is preventing diversion.

20   That's the basis of my department.  If we were

21   selling to unlicensed locations that result in

22   diversion, then yes.  If we had product that we

23   were -- that was flying out the back doors

24   because we didn't have adequate security, yes,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     that would be my responsibility.

2                    And we would -- and so we don't

3     have that happening.  We don't sell to unlicensed

4     locations.  We do report suspicious orders.  We

5     meet all of our regulatory responsibilities.  And

6     since we do, that's probably why I have gotten my

7     increases, because we haven't had those actions

8     taken against us in the 30 years I have been in

9     my role.

10                   We take those seriously.  I know

11    to you we don't.  But I do.  I take it

12    personally.  I spent my entire career --

13                   MR. NICHOLAS:  Don't interrupt.

14    BY MR. PIFKO:

15         Q.    You had an order to show cause --

16                   MR. NICHOLAS:  Don't interrupt.

17                   MR. PIFKO:  He's done.

18    BY MR. PIFKO:

19         Q.    You had an order to show cause

20    issued against you in 2007, and you had to

21    negotiate a settlement agreement.  In 2008, you

22    get a merit adjustment.  Agree?

23         A.    In 2007 we got an order to show

24    cause.  And the first question I asked him, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    said, what is this about.  And they said,

2    suspicious orders.  And they said -- I said,

3    well, what about our approved system.  They said,

4    what approved system.  They weren't even aware

5    the DEA had approved our system.

6              So there was a big

7    miscommunication between DEA when that happened.

8    So we went to negotiate.  There was never a -- we

9    didn't pay any fine.  We negotiated to help with

10   a program that we felt might enhance what we had

11   existingly for the good of the -- for the good of

12   the distribution chain.  And then they asked me

13   to --

14       Q.    Let's look at --

15       A.    Then they asked me to present at

16   their DEA conference, to share our program with

17   the other distributors.  So if we're such bad

18   actors, why are they asking us to present at the

19   DEA conference about our programs?

20       Q.    Let's talk about what's happening

21   to the country with respect to drug overdoses

22   while you're get merit bonuses and running the

23   diversion control program.

24       A.    Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Look at Exhibit 8.  Do you

 2   understand --

 3                      MR. NICHOLAS:  How much time?

 4              Two minutes?  Okay.

 5   BY MR. PIFKO:

 6              Q.      Do you understand how to read

 7   this?

 8              A.      Is there a page you want me to --

 9              Q.      The blue.  The blue is lower

10   death rates.

11                      You understand, as you scroll

12   forward from 1990 to 2000, the overdose death

13   rates are skyrocketing in the United States.

14                      MR. NICHOLAS:  If you're going to

15              give him a document like this, you're

16              going to need to let him look at it.

17                      THE WITNESS:  Okay.  I see it.

18   BY MR. PIFKO:

19              Q.      Do you agree that that's what's

20   happening in the country?

21              A.      That's what this map shows.

22              Q.      And while you're responsible for

23   preventing diversion, this is what's happening.

24              A.      I'm responsible --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. NICHOLAS:  Let him finish.

 2              THE WITNESS:  I'm responsible for

 3         diversion from my -- from our company.

 4         Correct.  I'm not responsible for

 5         diversion from the pharmacy, from the

 6         doctor, from the patient who has the

 7         pills that he's been prescribed that he's

 8         selling.  We don't -- we can't prevent

 9         that.  We -- our role in the supply chain

10         is defined by the Code of Federal

11         Regulations, and we meet all those

12         requirements.

13              And since it's -- you showed me

14         this year over year, where's the new

15         regulations every year from the

16         government imposing new requirements to

17         combat this?  Where are those?  Why isn't

18         DEA calling me and having conversations

19         about, hey, we've got a severe problem,

20         can you help us fix it?  Where is that?

21    BY MR. PIFKO:

22         Q.    What are your improvements doing

23    to resolve --

24         A.    I can't license them.  I can't
```

```
1   create a new license.  I've told them that that's

2   what we need.  These are things we can do to

3   help, that the distributor can do, that can

4   control.  If you license a pain clinic for -- to

5   dispense higher levels of opioids, then you could

6   put additional requirements on them.  It

7   identifies the manufacturer and the distributor

8   that they sell more.  If I have a retail pharmacy

9   that wants more, I can tell them go get the pain

10  license, it's going to cost you better -- it's

11  going to cost you some money and it's going to

12  cost you better education and more oversight by

13  DEA.

14            I can't control that, but it

15  seems like a simple fix to at least crack down on

16  some of this.  But nothing.  Nothing.  The

17  government's done nothing.

18       Q.    It's your testimony that --

19            MR. NICHOLAS:  We're at an

20       hour-and-a-half.  We're over --

21            MR. PIFKO:  No.  One more

22       question.

23            MR. NICHOLAS:  No.  I'm sorry,

24       Mark.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PIFKO:  I've got one more

 2        question.  I'm going to ask it.

 3              MR. NICHOLAS:  Mark --

 4              MR. PIFKO:  You've been talking.

 5        Okay?

 6              MR. NICHOLAS:  Mark, I have not

 7        been talking.

 8              MR. PIFKO:  I've got more

 9        question.  I'm going to ask it.

10              MR. NICHOLAS:  You've been

11        badgering with him questions that are

12        unnecessary.

13              MR. PIFKO:  I've got one more

14        question.

15              MR. NICHOLAS:  Hold on.

16              MR. PIFKO:  Let me ask my one

17        more question and we can be done.

18   BY MR. PIFKO:

19        Q.    My question is, you think you've

20   done everything you can do to prevent diversion?

21        A.    Yes.  I think -- I think me and

22   my team have done everything we can to prevent

23   diversion, over and above going to congress,

24   meeting with people, trying to get additional
```

```
1    requirements imposed, regulations.  We're waiting

2    for proposed rules, we keep hearing they're

3    coming out.

4                    We want to be part of the

5    solution.  But we can't do it one sided.  You

6    need the collaboration of all stakeholders, and

7    you can't have it without the regulators and the

8    enforcement agencies and the people who license

9    these doctors and these pharmacies.  We can't do

10   that.  Alls we can do is make sure we have

11   patient -- medication available for those

12   patients when they need it and that -- those

13   pharmacies are properly licensed.  And that's --

14   again, I think we do that.

15                    MR. NICHOLAS:  Okay.  We're done.

16          Thank you.

17                    THE VIDEOGRAPHER:  This ends

18          today's deposition.  We're going off the

19          record at 3:32 p.m.

20                    (Witness excused.)

21                    (Deposition concluded at

22          approximately 3:32 p.m.)

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                      CERTIFICATE

 3

 4

 5              I HEREBY CERTIFY that the witness
       was duly sworn by me and that the deposition is a
 6     true record of the testimony given by the
       witness.
 7
               It was requested before
 8     completion of the deposition that the witness,
       CHRIS ZIMMERMAN, have the opportunity to read and
 9     sign the deposition transcript.
10

11

12

13

               _____
14             ANN MARIE MITCHELL, a Federally
               Approved Certified Realtime
15             Reporter, Registered Diplomate
               Reporter, Registered Merit Reporter and
16             Notary Public
17

18

19              (The foregoing certification of
20     this transcript does not apply to any
21     reproduction of the same by any means, unless
22     under the direct control and/or supervision of
23     the certifying reporter.)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the appropriate

 6   space on the errata sheet for any corrections

 7   that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.

10              You are signing same subject to

11   the changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13              It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt of

16   the deposition transcript by you.  If you fail to

17   do so, the deposition transcript may be deemed to

18   be accurate and may be used in court.

19

20

21

22

23

24
```

```
 1                    -  -  -  -  -  -

                      E R R A T A

 2                    -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6        REASON:  _____

 7    _____  _____  _____

 8        REASON:  _____

 9    _____  _____  _____

10        REASON:  _____

11    _____  _____  _____

12        REASON:  _____

13    _____  _____  _____

14        REASON:  _____

15    _____  _____  _____

16        REASON:  _____

17    _____  _____  _____

18        REASON:  _____

19    _____  _____  _____

20        REASON:  _____

21    _____  _____  _____

22        REASON:  _____

23    _____  _____  _____

24        REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the foregoing

6    pages, 1 - 117, and that the same is a correct

7    transcription of the answers given by me to the

8    questions therein propounded, except for the

9    corrections or changes in form or substance, if

10   any, noted in the attached Errata Sheet.

11

12

13   _____

14    CHRISTOPHER ZIMMERMAN                    DATE

15

16

17   Subscribed and sworn

     to before me this

18   _____ day of _____, 20_____.

19   My commission expires:_____

20

     _____

21   Notary Public

22

23

24