# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*The County of Cuyahoga, Ohio*, et al. *v.*<br>*Purdue Pharma L.P.*, et al.<br>Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

## DEFENDANT WALMART INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDMENT BY INTERLINEATION TO THE THIRD AMENDED COMPLAINT

Defendant Walmart Inc. ("Walmart") hereby answers the Amendment by Interlineation to the Third Amended Complaint (*In re Nat'l Prescription Opiate Litig.*, Case No. 17-md-2804 (N.D. Ohio), ("MDL"), ECF No. 2944) ("Amendments") filed in *County of Cuyahoga, Ohio v. Purdue Pharma L.P.*[1]

Unless expressly stated otherwise, Walmart denies each and every allegation contained in the Amendments, including any allegations contained in the preamble, unnumbered and

---

[1] This Answer responds only to the Amendment by Interlineation to the Third Amended Complaint (MDL ECF No. 2944) filed in *County of Cuyahoga, Ohio v. Purdue Pharma L.P.*, No. 17-OP-45004 (N.D. Ohio), and does not respond to the Amendment by Interlineation to the Third Amended Complaint filed in *County of Summit, Ohio v. Purdue Pharma L.P.*, No. 18-OP-45090 (N.D. Ohio). On December 18, 2018, the Court previously required Walmart to respond only to the Second Amended Complaint filed by Summit County and did not require Walmart to respond to the Second Amended Complaint filed by Cuyahoga County (MDL ECF No. 1203). On April 25, 2019, Special Master Cohen ruled that Walmart did not have to answer the Third Amended Complaint filed by Summit County as Walmart's answer to the Second Amended Complaint was deemed operative (MDL ECF No. 1576). To date, neither the Court nor Special Master Cohen have ordered Walmart, or any Defendant, to answer the Third Amended Complaint filed by Cuyahoga County. In fact, on December 13, 2019, Special Master Cohen stated that the Track 1B Defendants "need only file answers to the Amendments-by-Interlineation." Special Master Cohen confirmed on December 21, 2019 that "the Answers Defendants are required to file . . . should be responsive only to the paragraphs in the Amendments by Interlineation . . . and not the full Complaints." Consequently, this Answer responds only to the Amendments by Interlineation as filed by Cuyahoga County (MDL ECF No. 2944) and not the remaining allegations set forth in Cuyahoga County's Third Amended Complaint. Walmart reserves the right to answer the remaining allegations set forth in Cuyahoga County's Third Amended Complaint at any time or as ordered by the Court. Walmart files this Answer to comply with the directives of the Court and the Special Master and without prejudice to the Motion to Dismiss previously filed at MDL ECF No. 3036.

numbered paragraphs, titles, headings, subheadings, footnotes, images, characterization of documents, and stricken words, and specifically denies any liability to Plaintiffs. To the extent not expressly denied, all allegations for which Walmart denies possessing knowledge or information sufficient to form a belief are denied. Walmart reserves the right to seek to amend and supplement its Answer as may be appropriate or necessary.

## PREAMBLE

Plaintiff County of Cuyahoga, Ohio (the "County" or "Plaintiff"), respectfully submits the following Amendment by Interlineation to the Third Amended Complaint (Dkt. No. 1465). This Amendment by Interlineation includes dispensing-related claims against the CVS, Walgreens, Rite Aid, Walmart, HBC/Giant Eagle and Discount Drug Mart Entities, described further below, who collectively purchased more than 300 million estimated 10mg equivalent pills in the County from 2006 to 2014, the years for which ARCOS data is available. Over the same time period, individually, CVS purchased more than 106 million, Walgreens more than 116 million, Rite Aid more than 53 million, Walmart more than 7 million, and Giant Eagle more than 25 million, and Discount Drug Mart more than 21 million, estimated 10mg equivalent pills in Cuyahoga County.

**ANSWER:**   The unnumbered first paragraph, which summarizes Plaintiffs' claims, does not require a response. To the extent a response is required, Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart and Walmart denies the allegations contained in the unnumbered first paragraph as they apply to Walmart. The remaining allegations contained in the unnumbered first paragraph are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

## PARTIES

### 7. HBC and Giant Eagle Entities

1. Defendant HBC Service Company ("HBC") is an operating division of Defendant Giant Eagle, Inc. ("Giant Eagle"). HBC operated as a licensed wholesale distributor in Ohio, licensed by the State of Ohio Board of Pharmacy. Giant Eagle is a Pennsylvania corporation with its principal place of business in Washington, Pennsylvania. At all times relevant to this Complaint, HBC distributed and Giant Eagle dispensed prescription opioids in Ohio and Plaintiff's community specifically.

**ANSWER:** The allegations contained in Paragraph 1 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### 8. CVS Entities

2. Defendant CVS Indiana L.L.C., is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Defendant CVS Rx Services, Inc. is a New York corporation with its principal place of business in Woonsocket, RI. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy, Inc. is a wholly owned subsidiary of CVS Health Corporation. Defendant CVS Pharmacy, Inc. is both a DEA registered "distributor" and a DEA registered "dispenser" of prescription opioids and is registered to do business in Ohio. Defendant Ohio CVS Stores, LLC is an Ohio corporation with its principal place of business in Rhode Island, and is registered to do business in Ohio.

**ANSWER:** Paragraph 2 states legal conclusions to which no response is required. To the extent a response is required, Walmart is without knowledge or information sufficient to form a

belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5). Responding further, the allegations contained in Paragraph 2 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

3.      Defendants CVS Indiana L.L.C., CVS Rx Services, Inc., CVS Pharmacy, Inc., and Ohio CVS Stores, LLC are collectively referred to as "CVS." CVS, conducts business as a licensed wholesale distributor and dispenser. At all times relevant to this Complaint, CVS distributed and/or dispensed prescription opioids throughout the United States, including in Ohio and Cuyahoga County ~~Plaintiffs' communities~~ specifically.

**ANSWER:**    The allegations contained in Paragraph 3 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

## 9.      **Rite Aid Entities**

4.      Defendant Rite Aid Corporation is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania. Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. is a subsidiary of Rite Aid Corporation and is itself a Maryland corporation with its principal office located in Camp Hill, Pennsylvania. At all times relevant to this Complaint, Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. distributed prescription opioids throughout the United States, including in Ohio and Cuyahoga County specifically. Defendant Rite Aid Headquarters Corporation is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania. Rite Aid

Headquarters Corp., by and through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and pharmacy operator.

**ANSWER:**   The allegations contained in Paragraph 4 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

5.       During the relevant time period, and as further alleged below, Rite Aid entities also owned and operated pharmacies in the County through Defendant Rite Aid of Ohio, Inc. Defendant Rite Aid of Ohio, Inc. is an Ohio corporation with its principal place of business in Ohio. Rite Aid of Ohio, Inc. was in the business of holding and operating retail pharmacies in Ohio, including in Cuyahoga County, on behalf of its parent company Rite Aid Corporation. Rite Aid of Ohio, Inc. orders of controlled substances came from Rite Aid of Maryland, Eckerd Corporation—another Rite Aid subsidiary—and other wholesalers. These controlled substances are distributed and dispensed according to practices and procedures established by Rite Aid Corporation and Rite Aid Headquarters Corporation. Defendants Rite Aid Corporation, Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., and Rite Aid of Ohio, Inc. are collectively referred to as "Rite Aid."

**ANSWER:**   The allegations contained in Paragraph 5 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

6.       Rite Aid Corporation established national policies and procedures governing the dispensing of controlled substances throughout the United States that it directed and intended

that those policies and procedures would be implemented by its subsidiaries on a nationwide basis including, specifically, in Ohio and Cuyahoga County. At all times relevant to this Complaint, Defendant Rite Aid Corporation was responsible for directing and implementing policies and procedures governing the dispensing of controlled substances by its subsidiaries, including but not limited to Rite Aid of Ohio, Inc., throughout the United States, including in Ohio and the County specifically.

**ANSWER:**    The allegations contained in Paragraph 6 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### 10.    Walgreens Entities

7.    Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant Walgreen Eastern Co., Inc. is a New York corporation with its principal place of business in Deerfield, Illinois. Defendants Walgreen Co. and Walgreen Eastern Co. are collectively referred to as "Walgreens." Walgreens conducts business as a licensed wholesale distributor. During the relevant time period, and as further alleged below, Walgreens entities also owned and operated pharmacies in the County. At all times relevant to this Complaint, Walgreens distributed and dispensed prescription opioids throughout the United States, including in Ohio and Cuyahoga County ~~Plaintiffs' communities~~ specifically.

**ANSWER:**    The allegations contained in Paragraph 7 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

8.    Expanding its dispensing operations, Walgreens also acquired a number of former Rite-Aid stores, including in the County. Walgreens is liable as a successor for these stores' prior conduct, as well as for its own operations.

**ANSWER:**    The allegations contained in Paragraph 8 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### 11.    **Walmart Entities**

9.    Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in ~~Bentonville,~~ Arkansas.  Walmart, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and as a dispenser. Defendant Wal-Mart Stores East, Inc. is a Delaware corporation with its principle place of business in Arkansas. Defendants Walmart Inc. and Wal-Mart Stores East, Inc. are collectively referred to as "Walmart." At all times relevant to this Complaint, Walmart distributed and dispensed prescription opioids throughout the United States, including in Ohio and Cuyahoga County ~~Plaintiffs' communities~~ specifically.

**ANSWER:**    Walmart admits that effective February 1, 2018, Wal-Mart Stores, Inc. changed its name to Walmart Inc. Walmart admits that Walmart Inc. is a corporation organized under Delaware law with its principal place of business in Arkansas. Walmart further admits that for a time period prior to April 2018, Walmart, through its subsidiary, distributed certain prescription medication to certain of its own stores in the United States, including in Ohio and Cuyahoga County. Walmart admits that for a time period prior to April 2018, it was properly licensed to conduct business relating to distributing of controlled substances. Walmart admits that it is

properly licensed to conduct business relating to dispensing of controlled substances. Walmart denies the remaining allegations contained in Paragraph 9.

10.     Collectively, Defendants CVS, Rite Aid, Walgreens, Walmart, Discount Drug Mart, and Giant Eagle are referred to as "National Retail Pharmacies." Defendants AmerisourceBergen, Anda, Cardinal, Discount Drug, HBC, Henry Schein, McKesson, Miami-Luken, Prescription Supply, and the National Retail Pharmacies are collectively referred to as the "Distributor Defendants."

**ANSWER:**     Paragraph 10 purports to recite the shorthand terms that Plaintiffs define for their use in their Complaint, and such allegations do not require a response from Walmart. To the extent a response is required, Walmart denies the allegations contained in Paragraph 10 as they apply to Walmart.

### FACTUAL ALLEGATIONS

**A.      The National Retail Pharmacies' Obligations Are Responsible for Guarding Against Diversion from Their Retail Stores.**

1.     The National Retail Pharmacies have common-law and statutory duties to guard against, and not fuel, diversion. In addition to their responsibilities as distributors, as dispensers, they must maintain effective systems to guard against diversion at the pharmacy level. Under the common law, the National Retail Pharmacies had a duty to exercise reasonable care in delivering dangerous narcotic substances. Defendants breached their duty to exercise reasonable care in delivering narcotic substances and both created and failed to prevent a foreseeable risk of harm to Cuyahoga County. As the supply of opioids and the evidence of addiction to and abuse of these drugs grew, these Defendants were again reminded of both the nature and harms of opioid exposure and use.

**ANSWER:**    Paragraph 1 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 1 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 1 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

2.      Each Defendant assumed a duty, when speaking publicly about opioids and their efforts and commitment regarding diversion of prescription opioids, to speak accurately and truthfully.

**ANSWER:**     Paragraph 2 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 2 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 2 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

3.      Under the federal Controlled Substances Act ("CSA") and Ohio controlled-substances laws, they likewise were required to design and operate effective systems to guard against diversion. *See, e.g.*, 21 U.S.C. § 823. Federal regulations issued under the CSA also mandate that all registrants "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Defendants also have independent duties under Ohio law. The Ohio Administrative Code imposes obligations and duties upon

"licensees" and "registrants" to "provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs." O.A.C. § 4729-9-05(A). These duties extend to manufacturers, wholesalers, and pharmacies alike.

**ANSWER:**    Paragraph 3 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 3 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 3 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

4.    The National Retail Pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Pharmacists must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a); *see also* O.A.C. §§ 4729-5-21(A), 4729-5-30(A). The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."

**ANSWER:**    Paragraph 4 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Paragraph 4 states legal conclusions to which no

response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 4 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 4 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

5.      Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist.

**ANSWER:**     Paragraph 5 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 5 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 5 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

6.      Although it acts through its agents, the pharmacy, as the DEA registrant, is ultimately responsible to prevent diversion, as described above. To that end, the Tenth Appellate District of the Court of Appeals of Ohio has determined that the Ohio Administrative Code "places the ultimate responsibility upon the 'registrant' … to provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs."

**ANSWER:**      Paragraph 6 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, Paragraph 6 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal

11

conclusions stated in Paragraph 6 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 6 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

7.      Thus, in addition to their duties as distributors, the National Retail Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:**    Paragraph 7 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 7 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 7 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

> **B.      The National Retail Pharmacies Understood Both the Existence and the Importance of their Obligations to Guard Against Diversion at the Pharmacy Level.**

8.      The National Retail Pharmacies were well aware of these obligations. DEA has repeatedly emphasized that retail pharmacies, including the National Retail Pharmacies, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion. When red flags appear, the pharmacy's "corresponding responsibility"

under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.

**ANSWER:**    Paragraph 8 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Paragraph 8 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 8 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 8 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

9.      Not only do National Retail Pharmacies often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, out-of-state license plates, and cash transactions, and other significant information – but they also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with the other Distributor Defendants and Marketing Defendants, these data points give the National Retail Pharmacies insight into prescribing and dispensing conduct that enables them to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

**ANSWER:**    Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the remaining allegations contained in Paragraph 9 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 9 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without

knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

10.     The DEA has also repeatedly affirmed the obligations of National Retail Pharmacies to maintain effective controls against diversion in regulatory action after regulatory action. In addition, the DEA, among others, has provided extensive guidance to National Retail Pharmacies concerning their duties to the public. In particular, the guidance advises how to identify red flags and other evidence of diversion.

**ANSWER:**     Paragraph 10 refers to documents that speaks for themselves, and Walmart denies any characterizations thereof. Responding further, Paragraph 10 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 10 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 10 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

11.     For example, DEA guidance instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by the National Retail Pharmacies' diversion control systems.

**ANSWER:**    Walmart denies the allegations contained in Paragraph 11 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 11 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

12.    Other signs of diversion can be observed through data available to the National Retail Pharmacies. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in illegitimate prescribing.

**ANSWER:**    Walmart denies the allegations contained in Paragraph 12 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 12 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

13.    The DEA has also conducted meetings with retail pharmacies, including the National Retail Pharmacies. For example, in December 2010, DEA hosted a meeting with CVS's representatives and counsel and advised CVS of the "red flags . . . that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose."

**ANSWER:**    Paragraph 13 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

14.     Examples of red flags that the DEA identified during its meeting with CVS include:

a.  many customers receiving the same combination of prescriptions (*i.e.*, oxycodone and alprazolam);

b.  many customers receiving the same strength of controlled substances (*i.e.*, 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam);

c.  many customers paying cash for their prescriptions;

d.  many customers with the same diagnosis codes written on their prescriptions (*i.e.*, back pain, lower lumbar, neck pain, or knee pain);

e.  individuals driving long distances to visit physicians and/or to fill prescriptions.

**ANSWER:**     Paragraph 14 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

15.     As another example, in a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as: large numbers of customers who: receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

**ANSWER:**     Paragraph 15 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

16.     In 2006, the National Association of Chain Drug Stores ("NACDS") issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs. The Model Compliance Manual notes that a Retail Pharmacy may:

> Generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:
>
> - Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.
>
> Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.
>
> - Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

**ANSWER:**     Paragraph 16 refers to a document that speaks for itself, and Walmart denies any characterizations thereof.

17.     According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

**ANSWER:**     Paragraph 17 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 17 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 17 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required,

17

Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

18.    The National Retail Pharmacies also have particularly detailed information that would have put them on notice of, and could have been used to prevent, diversion. At the pharmacy level, the National Retail Pharmacies would have been able to observe customers, including, for example, customers with insurance coverage making cash payments. They could also identify customers filling prescriptions at multiple pharmacy branches or from different doctors, or patterns of unusual or suspicious prescribing from a particular medical provider. Indeed, CVS Health president and CEO Larry Merlo has described the company as "America's front door to health care with a presence in nearly 10,000 communities across the country," and this position as allowing it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."

**ANSWER:**    Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the remaining allegations contained in Paragraph 18 as they apply to Walmart. Moreover, Paragraph 18 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 18 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 18 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

19.     As explained above, in addition to their duties as distributors, the National Retail Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations. Specifically, the National Retail Pharmacies had a duty to analyze data and the personal observations of their employees for known red flags such as (a) multiple prescriptions to the same patient using the same doctor; (b) multiple prescriptions by the same patient using different doctors; (c) prescriptions of unusual size and frequency for the same patient; (d) orders from out-of-state patients or prescribers; (e) an unusual or disproportionate number of prescriptions paid for in cash; (f) prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:**     Paragraph 19 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 19 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 19 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

20.     As described above and further below, the National Retail Pharmacies also possessed sufficiently detailed and valuable information that other companies were willing to pay them for it. As both national pharmacy chains and distributors, the Chain Pharmacies have

especially deep knowledge of their retail stores' orders, prescriptions, and customers. This is underscored by the fact that Walgreens is able to sell the contents of its patients' prescriptions to data-mining companies such as IMS Health, Inc. In 2010, for example, Walgreen's fiscal year 2010 SEC Form 10-K disclosed that it recognizes "purchased prescription files" as "intangible assets" valued at $749,000,000. Walgreens could, and did, use "[d]ata mining . . . across Walgreens retail pharmacies to determine the maximum amount that a pharmacy should be allowed to receive . . . ." in setting ceilings for its stores. More recently, as part of an agreement with AmerisourceBergen, Walgreens gained even more insight, as Walgreens has the ability to nominate up to two members of the Board of Directors of AmerisourceBergen. Currently, Walgreen's Co-Chief Operating Officer, who oversees Walgreens' business operation, including distribution, sits on the AmerisourceBergen Board of Directors.

**ANSWER:**    Paragraph 20 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the other allegations contained in Paragraph 20 as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 20 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

21.    Similarly, CVS Caremark's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some consulting services." He

also testified that CVS would provide the vendors with "prescriber level data, drug level data, plane level data, [and] de-identified patient data."

**ANSWER:**    Paragraph 21 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 21 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

22.    Each of the National Retail Pharmacies had complete access to all prescription opioid dispensing data related to its pharmacies in the County, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around the County, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around the County. Each of the National Retail Pharmacies likewise had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around the County, complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around the County, and complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around the County. Further, each of the National Retail Pharmacies had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around the County and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around the County.

**ANSWER:**    Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the remaining allegations contained in Paragraph 22 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 22 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

23.    As described further below, the National Retail Pharmacies failed to fulfill their legal duties and instead, routinely dispensed controlled substances while ignoring red flags of diversion and abuse. The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing Plaintiff's community.

**ANSWER:**    Paragraph 23 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the legal conclusions stated in Paragraph 23 and further denies the allegations contained therein as they apply to Walmart. Moreover, the remaining allegations contained in Paragraph 23 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

i.    **CVS**

1.    **CVS Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores.**

24.    By 2009, CVS Pharmacy, Inc. owned and/or operated more than 9,000 pharmacies in the United States. According to its website, CVS now has more than 9,900 retail locations. At all times relevant herein, CVS pharmacies sold controlled substances, including

FDA Schedule II and FDA Schedule III controlled substances otherwise known as opiate narcotics or opioids.

**ANSWER:**    The allegations contained in Paragraph 24 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

25.    Until October 6, 2014, CVS pharmacies ordered and were supplied FDA Schedule III hydrocodone combination products (HCPs) from a combination of outside vendors and CVS distribution centers. CVS pharmacies also received Schedule II opioids from outside vendors, including Cardinal and McKesson.

**ANSWER:**    The allegations contained in Paragraph 25 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

26.    CVS Pharmacy, Inc. instituted, set-up, ran, directed and staffed with its own employees the majority of the SOM functions for its dispensing arms.

**ANSWER:**    The allegations contained in Paragraph 26 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

27.    CVS also lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved over time. Not until 2012 did CVS create guidelines explaining in more detail the "red flags" or cautionary signals

that CVS pharmacists should be on the lookout for to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances are issued for a legitimate medical purpose.

**ANSWER:**    Paragraph 27 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 27 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

28.    Even so, CVS's conduct, and the volume it dispensed in the County thereafter indicates that its policies were not applied. Further, as discussed elsewhere in the Third Amended Complaint, CVS had performance metrics in place that pressured pharmacists to put profits ahead of safety. Concerning the metrics at CVS, one pharmacist commented that, "You get stressed, and it takes your mind away from the actual prescriptions." Another former CVS pharmacist recalled that "[e]very prescription [wa]s timed," and a backlog would pop up in color on pharmacists computer screens if they fell behind. Additionally, CVS has faced discrimination complaints alleging that the company's "Metrics" system set unobtainable goals — or at least, goals that could not be obtained without violating the laws and practice rules governing pharmacists' professional responsibilities, edging out older pharmacists.

**ANSWER:**    Paragraph 28 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 28 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient

to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

29.     A nationally-known expert and teacher of pharmacology commented in the media that the pace and pressure of prescription quotas appeared to be having an impact on accuracy. He described data from the FDA's Adverse Event Reporting System as showing a 450% increase in reported medication errors since 2010. Anecdotally, he also "heard some pharmacists say, 'It's a blur as to what happened during the day and I can only pray I didn't make any serious mistakes.'"

**ANSWER:**     Paragraph 29 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

30.     This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate. Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor." In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per

pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."

**ANSWER:**    Paragraph 30 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Walmart denies the allegations contained in Paragraph 30 as they apply to Walmart. The remaining allegations contained in Paragraph 30 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### 2. CVS Failed to Maintain Effective Controls Against Diversion from its Cuyahoga County Pharmacies.

31.    Through 52 pharmacies in Cuyahoga County, CVS purchased more than 106 million estimated 10mg equivalent pills in Cuyahoga County from 2006 to 2014, the years for which ARCOS data is available. Over the same time frame, CVS was responsible for 18.54% of the estimated 10mg equivalent pills purchased in the County.

**ANSWER:**    The allegations contained in Paragraph 31 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

32.     As a vertically integrated distributor and dispenser of prescription opioids, CVS knew or should have known that an excessive volume of pills was being sold into Cuyahoga County.

**ANSWER:**     The allegations contained in Paragraph 32 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

33.     The sheer volume of prescription opioids distributed to and dispensed by CVS pharmacies in and around Cuyahoga County is indicative of potential diversion and required appropriate due diligence.

**ANSWER:**     The allegations contained in Paragraph 33 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

34.     Discovery will reveal that CVS knew or should have known that its pharmacies in Ohio, and the surrounding area, including West Virginia, Michigan, and Kentucky, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued

for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:** Paragraph 34 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Paragraph 34 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 34 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 34 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

35.     Failures regarding dispensing in CVS's Florida stores also allowed diverted opioids to be funneled into Summit County [sic]. The well-travelled path between Florida and Ohio is described in the Third Amended Complaint, and further with respect to pharmacy stores below.

**ANSWER:**     The allegations contained in Paragraph 35 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

36.     CVS also saw huge increases in the quantity of oxycodone it dispensed in Florida from 2006 to 2010. For example, starting with an already high baseline, a single CVS ordered approximately four times the amount of oxycodone a typical pharmacy orders in one year in 2006. By 2010, the same pharmacy's 10-month history showed quantities more than thirty times the amount of oxycodone a typical pharmacy orders in one year, and the pharmacy's supervisor could not explain why the volume was so high. During that time, Cardinal was the pharmacy's main distributor, and two of CVS's Florida pharmacies were among Cardinal's top four retail pharmacy customers, dispensing a staggering amount of oxycodone compared to Cardinal's other Florida customers. Interviews with employees of these pharmacies revealed that they routinely observed red flags and obvious signs that they were filling illegitimate prescriptions. One set a daily limit of oxycodone 30mg prescriptions the pharmacy would fill each day, basing the limit on the amount in stock that day, so as to ensure that the "real pain patients" could get their prescriptions filled. The pharmacy usually reached its limit by lunchtime each day, and at times within 30 minutes of opening. Customers, aware that prescriptions were first come, first serve, would line up outside the store as early as 7:45 AM. An employee acting as "bouncer" included escorting off the premises customers who were "hooked" on opioids and became belligerent if their prescriptions were refused among his job duties. Although CVS/Caremark, Inc. had in place dispensing guidelines for controlled substances prescriptions, these guidelines were not followed at these stores. Rather, they dispensed controlled substances prescriptions despite the existence of "warning signs" in the guidelines.

**ANSWER:**     Paragraph 36 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 36 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a

response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

37.     Because of its vertically integrated structure, CVS has access to complete information regarding red flags of diversion across its pharmacies in and around Cuyahoga County, but CVS failed to utilize this information to effectively prevent diversion.

**ANSWER:**     The allegations contained in Paragraph 37 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

38.     The available information included the fact that a CVS pharmacy on Brookpark Road in Cleveland was subject to Cardinal Health compliance for several years starting as early as 2005 and continuing through as late as 2017. As early as 2005, the pharmacy was exceeding thresholds set by the distributor, and for several months in 2007 it was over three times the monthly limit set by Cardinal for oxycodone. In 2013, the pharmacy received a failing score from Cardinal.

**ANSWER:**     The allegations contained in Paragraph 38 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

39.     The pharmacy was the largest dispenser of opioid dosage units in the County between 2008 and 2012. The graph below shows a comparison between this Brookpark Road

CVS store — purchasing over four times the average pharmacy purchasing volumes, both in Ohio and nationally, from 2006 to 2014 based on the ARCOS data for that time:



**ANSWER:**    The allegations contained in Paragraph 39, including the graph, are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

40.    Evidence of diversion also should have been apparent from the conduct of CVS's own employees. For example, a CVS pharmacist in Lakewood, Ohio was investigated for possible diversion or wrongful prescription of opioids and had his license revoked in 2002.

**ANSWER:**    The allegations contained in Paragraph 40 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

41.     Meanwhile, despite the conduct described above, CVS has attempted to portray itself as a good corporate citizen, not a cause of the opioid crisis. To that end, it claims to be "playing an active role in the search for solutions to the opioid crisis in a number of ways."

**ANSWER:**     The allegations contained in Paragraph 41 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

42.     Confirming its systemic failures to implement and adhere to adequate controls against diversion, CVS has repeatedly faced enforcement actions. In addition to those listed in the Third Amended Complaint, as recently as March 2019, CVS Pharmacy, Inc. (including all of its relevant subsidiaries and affiliates) entered into a $535,000 settlement with the U.S. Attorney's Office for the District of Rhode Island, acting on behalf of the United States and the DEA's Providence Office. In connection with the settlement, a DEA agent stated: "Pharmacies put patients at risk when they dispense Schedule II narcotics, which have the highest potential for abuse, without a valid and legal prescription.

**ANSWER:**     Paragraph 42 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 42 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

43.     In August of 2018, CVS paid $ 1 million to resolve allegations that CVS pharmacies throughout the Northern District of Alabama violated record-keeping requirements

under the CSA and its implementing regulations, the largest civil fine paid in Alabama by a DEA registrant.

**ANSWER:**    The allegations contained in Paragraph 43 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

44.    In June of 2018, CVS paid $1.5 million to resolve allegations that CVS pharmacies in Long Island, New York failed to timely report the loss or theft of controlled substances, including hydrocodone, recognized as one of the most commonly diverted controlled substances.

**ANSWER:**    The allegations contained in Paragraph 44 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

45.    In 2013, CVS agreed to pay $11 million to resolve allegations it violated the CSA and related federal regulations at its retail stores in Oklahoma and elsewhere by: (1) creating and using "dummy" DEA registration numbers on dispensing records, including records provided to state prescription drug monitoring programs; (2) filling prescriptions from prescribers who lacked current or valid DEA numbers; and (3) substituting the DEA number of non-prescribing practitioners for the DEA numbers of prescribers on prescription records.

**ANSWER:**    The allegations contained in Paragraph 45 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is

required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### ii. Walgreens

### A. Walgreens Failed to Maintain and Apply Adequate Policies and Procedures, and Used Those It Did Develop for Show, Not Real and Lasting Change.

46. Although Walgreens purported to have in place "Good Faith Dispensing" ("GFD") Policies for many years, it failed to meaningful apply policies and procedures, or to train employees in its retail pharmacies, on identifying and reporting potential diversion.

**ANSWER:** The allegations contained in Paragraph 46 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

47. In 2009, the DEA issued an Order to Show Cause regarding Walgreens's dispensing practices at a San Diego pharmacy. Although the Order addressed this specific location, the response, including Walgreens' internal assessment of its compliance, or lack thereof, revealed systemic failures from which its Summit County [sic] pharmacies would not have been exempt. Indeed, during the course of the investigation, Walgreens internally noted that it currently had "no training" internally for employees dispensing controlled substances. Ultimately, in 2011, Walgreens and the DEA entered a Memorandum of Agreement regarding all "Walgreens… pharmacy locations registered with the DEA to dispense controlled substances," requiring Walgreens to implement significant nationwide controls lacking in its operations.

**ANSWER:** Paragraph 47 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 47 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a

response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

48.     Meanwhile, related to its Florida operations, Walgreens, while nominally implementing required controls, sought to avoid "documenting [its] own potential noncompliance" regarding "legitimate indicators of inappropriate prescriptions."

**ANSWER:**    The allegations contained in Paragraph 48 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

49.     Walgreens knew that the DEA was conducting a "crackdown on Florida pharmacies where the market is notorious for illicit prescription painkillers" and that Walgreens's own pharmacies accounted for 53 of the top 100 retail sellers of oxycodone in Florida. Walgreens also knew these pills being sold into the "epicenter[s] of [the] notorious well-documented epidemic of prescription drug abuse[,] . . . were migrating to other states," and that many "prescriptions [were] not for a legitimate medical purpose." In addition, Walgreens received presentations highlighting an Ohio drug ring's trips to Florida to get pills, and significant volumes of opioid prescriptions from Florida doctors for Ohio and Kentucky patients being filled in Ohio.

**ANSWER:**    Paragraph 49 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 49 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient

to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

50.     Even so, Walgreens still failed to maintain effective control against diversion, including from its Florida stores. Its misconduct continued even after a local police chief in a Florida town started writing letters to two of its pharmacies, which had been the site of multiple arrests "stemming from the prescriptions they filled" and asked for their help "in 'dealing with the prescription medication epidemic.'" The same police chief also met with Walgreens Loss Prevention officials in February 2011, seeking to bring awareness to the problems. Elevating the concerns, he also "sent identical letters to the Chairman and CEO of Walgreens."; the letters described the "bastion of illegal drug sales" that Walgreens pharmacy parking lots had become and sought "their support and assistance in combating the prescription drug epidemic."

**ANSWER:**     Paragraph 50 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 50 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

51.     In 2013, Walgreens reached a Memorandum of Understanding ("2013 MOA") with the U.S. Department of Justice and the DEA to resolve multiple Orders to Show Cause and Immediate Suspension Orders against it. As part of the agreement, Walgreens "acknowledge[d] that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations." The 2013 MOA required Walgreens to, among other things,

"maintain a compliance program in an effort to detect and prevent diversion of controlled substances" as required by law.

**ANSWER:**    Paragraph 51 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 51 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

52.    As reported by the United States Attorney For the Southern District of Florida, the settlement, resulted in a then-record breaking fine for widespread violations of the law:

> Walgreens (Walgreens), the nation's largest drug store chain, has agreed to pay $80 million in civil penalties, resolving the DEA's administrative actions and the United States Attorney's Office's civil penalty investigation regarding the Walgreens Jupiter Distribution Center and six Walgreens retail (collectively "Registrants") in Florida. The settlement further resolves similar open civil investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the Controlled Substances (the Act).
>
> The settlement, the largest in DEA history, resolves allegations that the Registrants committed an unprecedented number of record-keeping and dispensing violations under the Act. According to documents filed in the underlying administrative actions, the Registrants negligently allowed controlled substances listed in Schedules II - V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black market sales.
>
> …
>
> U.S. Attorney Wifredo A. Ferrer stated, "Prescription drug abuse is a tremendous problem in Florida and throughout the country. Every day, individuals die from prescription drug overdoses. The record-keeping requirements of the Controlled Substances Act and DEA regulations are designed to prevent prescription pain killers, like oxycodone, from ending up on our streets. For this reason, we cannot allow pharmacies to circumvent their regulatory record-keeping and dispensing obligations."

The settlement agreement covers conduct that was the subject of DEA's administrative actions and the U.S. Attorney's Office civil penalty investigation. [T]he six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate medical use. In addition, these retail pharmacies and *others elsewhere in the United States* failed to properly identify and mark, as required by DEA regulations, hardcopy controlled substance prescriptions that were outsourced to a "central fill" pharmacy for filling. Without Walgreens' retail pharmacies identifying these outsourced prescriptions, DEA could not accurately determine which prescriptions were filled from the retail pharmacies' own drug supplies and which prescriptions were filled by a "central fill." Consequently, DEA could not determine the accuracy of the retail pharmacies' drug records. The DEA's administrative actions demonstrated millions of violations of this type.

In addition to the $80 million civil penalty for the above violations, the settlement revokes the Registrants' ability to distribute or dispense controlled substances listed in Schedules II - V for two years, ending in 2014. As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct. Furthermore, Walgreens has agreed to create a Department of Pharmaceutical Integrity to ensure regulatory compliance and prevent the diversion of controlled substances. Walgreens has also agreed to enhance its training and compliance programs, and to no longer monetarily or otherwise compensate its pharmacists based on the volume of prescriptions filled.

**ANSWER:**     Paragraph 52 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 52 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

53.     Meanwhile, like CVS, Walgreens employed performance metrics for its pharmacists. One former Walgreens pharmacist described management critiques for "not going fast enough" in dispensing prescriptions and believed "[t]hey'd like you to fill one a minute if you could." She recalled there was even a timer to alert her if she was falling behind, and threats of reduced hours or a move to a different store or location. A March 2013 memo confirms that

volume targets included controlled substances as late as 2013 and even after the adopting of the GFD policy. Specifically, the memo states, as the response to an "[a]nticipated question" that "GFD concerns doesn't relieve you from trying to attain the numbers that have been set for you." As part of its settlement with the DEA, however, Walgreens agreed to exclude controlled substances calculation from bonus calculations from 2014 forward.

**ANSWER:**      Paragraph 53 refers to documents that speak for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 53 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

54.      Even after development and a relaunch of its GFD policy, Denman Murray, Director of Rx Supply Chain Retail, stated in his deposition that, "traditionally, we've always treated a controlled substance like any other, [a] widget's a widget to the system."

**ANSWER:**       Paragraph 54 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 54 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

**B.      Walgreens Failed to Maintain Effective Controls Against Diversion from Its Cuyahoga County Pharmacies.**

55.    Although Walgreens had access to significant information about red flags due to its vertical integration with its stores, Walgreens failed to use available information from indicating red flags in order to more effectively prevent diversion.

**ANSWER:**    The allegations contained in Paragraph 55 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

56.    Through 42 pharmacies in Cuyahoga County, Walgreens purchased more than 116 million estimated 10mg equivalent pills in Cuyahoga County from 2006 to 2014, the years for which ARCOS data is available. Over the same time frame, Walgreens was responsible for over 20% of the estimated 10mg equivalent pills purchased in the County.

**ANSWER:**     The allegations contained in Paragraph 56 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

57.    As a vertically integrated distributor and dispenser of prescription opioids, Walgreens knew or should have known that an excessive volume of pills was being sold into Cuyahoga County.

**ANSWER:**    The allegations contained in Paragraph 57 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

58.     The sheer volume of prescription opioids distributed to and dispensed by Walgreens pharmacies in and around Cuyahoga County is indicative of potential diversion required appropriate due diligence.

**ANSWER:**     The allegations contained in Paragraph 58 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

59.     Discovery will reveal that Walgreens knew or should have known that its pharmacies in Ohio, and the surrounding area, including West Virginia, Michigan, and Kentucky, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non- controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:**    Paragraph 59 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 59 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 59 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

60.    Because of its vertically integrated structure, Walgreens has access to complete information regarding red flags of diversion across its pharmacies in and around Cuyahoga County, but CVS failed to utilize this information to effectively prevent diversion.

**ANSWER:**    The allegations contained in Paragraph 60 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

61.    The available information from ARCOS included the fact that a Walgreens pharmacy in Cleveland consistently purchased at least 100,000 dosage units over the statewide and nationwide pharmacy average between 2006 and 2011. According to Walgreens's own distribution center data, the pharmacy nearly quadrupled its annual dosage units purchased from over 400% in just four years from 2002 to 2006.

**ANSWER:**    The allegations contained in Paragraph 61 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

62.     Evidence of diversion also should have been apparent from the conduct of Walgreens's own employees. For example, a Walgreens pharmacist in Cleveland had her license suspended indefinitely in January 2018 and later entered a guilty plea after being investigated for possible diversion or wrongful prescription of prescription opioids.

**ANSWER:**     The allegations contained in Paragraph 62 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

63.     Walgreens admits its role in the opioid epidemic, stating it has the "ability – and [] critical responsibility – to fight the opioid crisis" as the "nation's largest pharmacy chain" in a time when "[a]ddiction to prescription painkillers, heroin, and other opioids has surged, with opioid overdoses quadrupling in this decade" and "drug overdose deaths – the majority from prescription and illicit opioids" resulting in "more fatalities than from motor vehicle crashes and gun homicides combined." Walgreens also admits the "opioid crisis" is caused by "misuse, abuse and addiction" that result from the "flow of opioids that fuel the epidemic."

**ANSWER:**      The allegations contained in Paragraph 63 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### iii.     Rite Aid Failed to Maintain Effective Controls Against Diversion and Instead Fueled a Black Market in Cuyahoga County.

64.     Rite Aid's dispensing policies are described as practices the chain was "implementing" in a 2013 Purdue document, but as less detailed than those of CVS and Walgreens.

43

**ANSWER:**    Paragraph 64 refers to documents that speaks for themselves, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 64 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

65.    Meanwhile, through 32 pharmacies in Cuyahoga County, Rite Aid purchased more than 53 million estimated 10mg equivalent pills in Cuyahoga County from 2006 to 2014, the years for which ARCOS data is available. Over the same time frame, Rite Aid was responsible for 9.36% of the estimated 10mg equivalent pills purchased in the County.

**ANSWER:**    The allegations contained in Paragraph 65 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

66.    As a vertically integrated distributor and dispenser of prescription opioids, Rite Aid knew or should have known that an excessive volume of pills was being sold into Cuyahoga County.

**ANSWER:**    The allegations contained in Paragraph 66 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

67.     The sheer volume of prescription opioids distributed to and dispensed by Rite Aid pharmacies in and around Cuyahoga County is indicative of potential diversion required appropriate due diligence.

**ANSWER:**     The allegations contained in Paragraph 67 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

68.     Discovery will reveal that Rite Aid knew or should have known that its pharmacies in Ohio, and the surrounding area, including West Virginia, Michigan, and Kentucky, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non- controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

45

**ANSWER:**    Paragraph 68 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 68 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 68 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

69.    Because of its vertically integrated structure, Rite Aid has access to complete information regarding red flags of diversion across its pharmacies in and around Cuyahoga County, but Rite Aid failed to utilize this information to effectively prevent diversion.

**ANSWER:**     The allegations contained in Paragraph 69 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

70.    The available information included the fact that a Rite Aid pharmacy in Cleveland consistently purchased approximately three times as many opioid dosage units as the average pharmacy statewide and nationwide, according to ARCOS data. McKesson transaction data revealed that this Rite Aid nearly tripled its annual dosage unit purchases from 2005 to 2011, purchasing over five million dosage units of opioids in just over a decade. Yet Rite Aid never submitted a single suspicious order report from this location, which was among the three largest dispensers of dosage units in the County between 2009 and 2014.

**ANSWER:**    The allegations contained in Paragraph 70 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is

required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

71. The graph below shows a comparison between this Cleveland, Ohio Rite Aid store and average pharmacy purchasing volumes, both in Ohio and nationally, from 2006 to 2014 based on the ARCOS data for that time:



**ANSWER:** The allegations contained in Paragraph 71, including the graph, are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

72. Evidence of diversion also should have been apparent from the conduct of Rite Aid's own employees. For example, a Rite Aid pharmacist in Broadview Heights lost his license following an investigation for possible diversion or wrongful prescription of prescription opioids in August 2011.

**ANSWER:** The allegations contained in Paragraph 72 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is

required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

73.    As another example, other Rite Aid stores dispensed to customers of a notorious, convicted, Ohio pill mill doctor.

**ANSWER:**    The allegations contained in Paragraph 73 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

74.    Confirming its systemic failures to implement and adhere to adequate controls against diversion, Rite Aid has repeatedly faced enforcement actions. In addition to those listed in the Third Amended Complaint, as recently as January 2019, Rite Aid paid $177,000 into the Naloxone Fund for the State of Massachusetts to resolve allegations that it failed to follow regulations designed to prevent substance use disorder in its dispensing of controlled substances, including opioids. Evidencing the systemic nature of the problem, Rite Aid, as part of the agreement, agreed to improve its dispensing practices.

**ANSWER:**    The allegations contained in Paragraph 74 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

75.    In 2018, Rite Aid also agreed to pay a $300,000 settlement for filling Schedule III controlled substances prescriptions in excess of the maximum dosage units allowed to be dispensed at one time.

**ANSWER:**    The allegations contained in Paragraph 75 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

76.    In 2017, Rite Aid paid $834,200 in civil penalties to resolve allegations by the DEA that Rite Aid pharmacies in Los Angeles dispensed controlled substances in violation of the CSA. The DEA's "investigation revealed the incorrect or invalid registration numbers were used at least 1,298 times as a result of Rite Aid's failure to adequately maintain its internal database." Further evidencing the lack of internal controls, the settlement also "resolve[d] allegations that Rite Aid pharmacies dispensed, on at least 63 occasions, prescriptions for controlled substances written by a practitioner whose DEA registration number had been revoked by the DEA for cause."

**ANSWER:**    Paragraph 76 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 76 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### iv.    Walmart Failed to Maintain Effective Controls Against Diversion from Its Cuyahoga County Pharmacies.

77.    Walmart, throughout the relevant time period, owned and operated pharmacies throughout the United States, including pharmacies in Cuyahoga County.

**ANSWER:**    Walmart admits that it owned and operated certain pharmacies in the United States, including in Cuyahoga County. Walmart denies the remaining allegations contained in Paragraph 77.

49

78.     Walmart pharmacies in and around Cuyahoga County received distributions of prescriptions from Walmart's distribution centers and from other wholesale distributors, which enabled these pharmacies to have the same orders filled by both Walmart and a third-party distributor.

**ANSWER:**     Walmart admits that for a time period prior to April 2018, Walmart, through its subsidiary, distributed certain prescription medication to certain of its own stores in the United States, including in and around Cuyahoga County. Walmart admits that under certain circumstances certain of its stores in the United States, including in and around Cuyahoga County, had the ability to order certain prescription medications from a third-party distributor. Walmart denies the remaining allegations contained in Paragraph 78.

79.     Through just nine pharmacies in Cuyahoga County, Walmart purchased more than seven million estimated 10mg equivalent pills in Cuyahoga County from 2006 to 2014, the years for which ARCOS data is available.

**ANSWER:**     Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

80.     The volume of prescription opioids dispensed by Walmart pharmacies in and around Cuyahoga County is indicative of diversion.

**ANSWER:**     Paragraph 80 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 80.

81.     As a vertically integrated distributor and dispenser of prescription opioids, Walmart knew or should have known that it was dispensing an excessive volume of pills into and around Cuyahoga County.

**ANSWER:**    Paragraph 81 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 81.

82.    Discovery will reveal that Walmart knew or should have known that its pharmacies in and around Cuyahoga County were: (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:**    Paragraph 82 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 82 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 82 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a

belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

83.     Walmart had complete access to all prescription opioid distribution data related to Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the remaining allegations in Paragraph 83.

84.     Walmart had complete access to all prescription opioid dispensing data related to Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart admits that at all times relevant to this litigation, it possessed certain data on prescription medication it distributed and dispensed. Walmart denies the remaining allegations in Paragraph 84.

85.     Walmart had complete access to information revealing the doctors who prescribed the opioids dispensed in Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

86.     Walmart had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

87.     Walmart had complete access to information revealing the opioids prescriptions dispensed by Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

88.     Walmart had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**      Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

89.     Walmart had complete access to information revealing the size and frequency of prescriptions written by specific doctors across Walmart pharmacies in and around Cuyahoga County.

**ANSWER:**     Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

90.     Yet, Walmart failed to put in place effective policies and procedures for the dispensing of prescription opioids.  In 2009, the DEA issued a Show Cause order seeking to revoke the registration of a Walmart pharmacy in California. The order alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California; (2) dispensed controlled substances . . . based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice . . . ; and (3) dispensed controlled substances to individuals that [the pharmacy] knew or should have known were diverting the controlled substances.

**ANSWER:**     Paragraph 90 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, Paragraph 90 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 90. Walmart denies the remaining allegations contained in Paragraph 90.

91.     In addition, a 2011 Memorandum of Agreement ("2011 MOA") arising out of the investigation states that the DEA also learned that the same pharmacy was allegedly dispensing controlled substances based on prescriptions that lacked valid DEA numbers and allegedly refilling controlled-substances prescriptions too early.

**ANSWER:**     Paragraph 91 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 91. Responding further, Paragraph 91 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Walmart denies the remaining allegations contained in Paragraph 91.

92.     Also, upon information and belief, the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level. Indeed, the 2011 MOA, which required Walmart to maintain a "compliance program," states that it is applicable to "all current and future Walmart Pharmacy locations."

**ANSWER:**     Walmart denies that "the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level." Responding further, Paragraph 92 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Walmart denies the remaining allegations contained in Paragraph 92.

     **v.**     **Giant Eagle Failed to Maintain Effective Controls Against Diversion from Its Cuyahoga County Pharmacies.**

93. Although Giant Eagle had access to significant information about red flags due to its vertical integration with its stores, it failed to use available information from indicating red flags in order to more effectively prevent diversion.

**ANSWER:** The allegations contained in Paragraph 93 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

94. HBC representatives have admitted that Giant Eagle pharmacy staff have diverted prescription opioids, amounting to tens of thousands of units.

**ANSWER:** The allegations contained in Paragraph 94 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

95. Red flags should also have been apparent given that the State of Ohio Board of Pharmacy found that Giant Eagle Pharmacy #4098, in Chardon, Ohio, "from May 1, 2009 through January 21, 2011, fail[ed] to provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs, to wit: the following controlled substances and dangerous drugs were stolen from the pharmacy yet internal control procedures failed to deter or detect the theft.":

| Drug | Strength | Shortage | Percent of Stock |
|------|----------|----------|------------------|
| hydrocodone with APAP | 5/325 | 1,321 | 53.92 |
| hydrocodone with APAP | 5/500 | (-648) | 0.65 |

| hydrocodone with APAP | 7.5/325 | 5,237 | 67.49 |
| hydrocodone with APAP | 7.5/500 | 6,161 | 72.06 |
| hydrocodone with APAP | 7.5/750 | 30,566 | 57.67 |
| hydrocodone with APAP | 10/325 | 5,282 | 75.67 |
| hydrocodone with APAP | 10/500 | 14,586 | 75.19 |
| hydrocodone with APAP | 10/650 | 5,523 | 82.07 |
| hydrocodone with APAP | 10/660 | 17,512 | 82.22 |
| hydrocodone with ibuprofen | 7.5/200 | 1,057 | 52.33 |
| carisoprodol | 350 | 7,556 | 27.68 |
| Suboxone | 8 | 553 | 20.04 |

The State Board further found that "[t]he drugs were stolen by an inadequately supervised technician who admitted to a Board agent that the drugs were diverted to her addicted husband and also sold to another individual." These figures demonstrate Giant Eagle's knowledge of and failure to prevent diversion.

**ANSWER:**    Paragraph 95 refers to a document that speaks for itself, and Walmart denies any characterizations thereof. Responding further, the allegations contained in Paragraph 95 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient

to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

96.      Additional unreported diversion from Giant Eagle pharmacies is evidenced in monthly narcotic audit reports and in the testimony of Giant Eagle Pharmacy District Leader Fred Bencivengo, who testified as to several instances in a single narcotic audit report where suspected diversions of opioids should have been but were not reported.

**ANSWER:**      The allegations contained in Paragraph 96 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

97.      The sheer volume of prescription opioids distributed to and dispensed by Giant Eagle pharmacies in and around Cuyahoga County is indicative of potential diversion required appropriate due diligence.

**ANSWER:**       The allegations contained in Paragraph 97 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

98.      Discovery will reveal that Giant Eagle knew or should have known that its pharmacies in Ohio, and the surrounding area, including West Virginia, Michigan, and Kentucky, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of

prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non- controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

**ANSWER:**    Paragraph 98 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 98 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 98 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

99.    In Cuyahoga County, Giant Eagle was responsible for over 254 million MMEs purchased from 2006 through 2014, the period for which ARCOS data is available. During that time, its 34 pharmacies accounted for 4.43% of the opioids purchased in the County.

**ANSWER:**    The allegations contained in Paragraph 99 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is

required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

### v.      DDM Failed to Maintain Effective Policies and Procedures to Guard Against Diversion from Its Retail Stores.

100.    Discount Drug Mart's ("DDM") is a family-owned and operated Ohio-based pharmacy chain that has approximately 74 stores and a little more than 4,000 employees.

**ANSWER:**    The allegations contained in Paragraph 100 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

101.    DDM's pharmacy stores are wholly owned and operated by DDM.

**ANSWER:**    The allegations contained in Paragraph 101 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

102.    DDM shipped schedules III-V controlled substances from its sole distribution center located in Medina, Ohio. That included hydrocodone until it became Schedule II in approximately 2014.

**ANSWER:**     The allegations contained in Paragraph 102 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

103.    Through just 15 pharmacies in Cuyahoga County, DDM purchased more than 21 million estimated 10mg equivalent pills in Cuyahoga County from 2006 to 2014, the years for which ARCOS data is available.

**ANSWER:**    The allegations contained in Paragraph 103 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

104.    Post-2014, DDM stores ordered schedule II drugs directly from Cardinal Health and McKesson.

**ANSWER:**    The allegations contained in Paragraph 104 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

105.    When hydrocodone switched from a Schedule III to a Schedule II drug around 2014, DDM stores began to receive hydrocodone from other distributors, such as Cardinal or McKesson, who implemented thresholds.

**ANSWER:**    The allegations contained in Paragraph 105 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

106.    However, prior to the switch, DDM stores did not have thresholds for how much they could order and did not have a policy concerning maximum quantities that could be on hand at a store.

**ANSWER:**    The allegations contained in Paragraph 106 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

107.    Once Cardinal implemented thresholds, it began cutting DDM store orders and reporting them as suspicious to the DEA. That was the first time a DDM order had ever been reported as suspicious to the DEA.

**ANSWER:**    The allegations contained in Paragraph 107 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

108.    DDM only distributed controlled substances to its wholly-owned pharmacies.

**ANSWER:**    The allegations contained in Paragraph 108 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

109.    DDM lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion. In 2013, DDM was in the final stages of implementing a more aggressive controlled substance monitoring system (handling, dispensing, and reporting) at store level and corporate; however, this was never put in place and no action has been taken.

**ANSWER:**    The allegations contained in Paragraph 109 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is

required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

110.    DDM's former Director of Pharmacy Operations testified that the success of DDM's SOM policies rose and fell with the trust they placed in their pharmacists and their ability to detect and prevent diversion at the store level.

**ANSWER:**    The allegations contained in Paragraph 110 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

111.    DDM trusted their pharmacists "implicitly" despite the fact that DDM's documents confirm that a number of pharmacy staff and/or pharmacists at various stores were (1) caught stealing and/or selling controlled substances, and (2) addicted to controlled substances.

**ANSWER:**    The allegations contained in Paragraph 111 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

112.    For example, in November 2001, DDM was on notice that a pharmacy technician was caught selling controlled substances to an undercover officer outside of a DDM pharmacy in Bellbrook, Ohio.

**ANSWER:**    The allegations contained in Paragraph 112 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

113.    In May 2005, DDM was on notice of a theft at store number 41 of large quantities of Vicodin and hydrocodone tablets. DDM's former Director of Pharmacy Operations testified that this was a pretty substantial instance of diversion but could not recall whether the shortage was due to employee theft or an outside burglary.

**ANSWER:**    The allegations contained in Paragraph 113 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

114.    In September 2013, DDM was on notice of "multiple episodes of technicians stealing controlled substances from the pharmacy."

**ANSWER:**    The allegations contained in Paragraph 114 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

115.    In September 2013, DDM was on notice that two pharmacy technicians at store numbers 19 and 35 were caught stealing drugs. One technician had a heroin addiction and "was trading what he stole from us for heroine as well as for the money to buy the heroin[]." Additionally, "[t]he people who he buys his heroine from encouraged/pushed him to get the job at DDM so he could have access to the Oxy, etc."

**ANSWER:**    The allegations contained in Paragraph 115 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

116.    DDM was on notice in November 2013 of shortages of pills at store number 30. DDM's former Director of Pharmacy Operations testified that this shortage suggested that either the staff pharmacist or someone else on her watch diverted those pills.

**ANSWER:**    The allegations contained in Paragraph 116 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

117.    DDM pharmacists also joked about reaching thresholds. For example, in April 2014, a DDM pharmacist at a Columbus, Ohio store stated in an email titled "Living on the edge baby!" that "Rx volume has increased and half of that increase are Narcs. Lol."

**ANSWER:**    The allegations contained in Paragraph 117 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

<u>**SIXTH CLAIM FOR RELIEF**</u>

**Common Law Absolute Public Nuisance**
**(Against All Defendants)**

118.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

**ANSWER:**    Walmart incorporates by reference its answers to all other allegations set forth above in this Answer as if fully set forth herein.

119.    Defendants created and maintained a public nuisance which proximately caused injury to Plaintiff.

**ANSWER:**    Paragraph 119 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 119 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 119 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

120.    A public nuisance is an unreasonable interference with a right common to the general public.

**ANSWER:**    Paragraph 120 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 120 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 120 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

121.    Defendants have created and maintained a public nuisance by marketing, distributing, dispensing, and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiff's community, and Plaintiff and the residents of Plaintiff's community have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

**ANSWER:**    Paragraph 121 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 121 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 121 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

122.    The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

**ANSWER:**     Paragraph 122 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 122 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 122 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

123.    Defendants have created and maintained an absolute public nuisance through their ongoing conduct of marketing, distributing, dispensing, and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiff's community, flooded Plaintiff's community with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and the residents of Plaintiff's community.

**ANSWER:**    Paragraph 123 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 123 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 123 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

124.    Defendants know, and have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's communities.

**ANSWER:**    Paragraph 124 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 124 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 124 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

125.    Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's community. See Restatement (Second) of Torts § 821B.

**ANSWER:**    Paragraph 125 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 125 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 125 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

126.    The interference is unreasonable because Defendants' nuisance-creating conduct:

a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.    At all relevant times was and is proscribed by state and federal laws and regulations; and/or

c.    Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

**ANSWER:**    Paragraph 126 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 126 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 126 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

127.    The significant interference with rights common to the general public is described in detail throughout this Complaint and includes:

a.    The creation and fostering of an illegal, secondary market for prescription opioids;

b.      Easy access to prescription opioids by children and teenagers;

c.      A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

d.      Infants being born dependent on opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

e.      Employers have lost the value of productive and healthy employees; and

f.      Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

**ANSWER:**     Paragraph 127 states legal conclusions to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 127 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 127 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

128.    Defendants intentionally, unreasonably and/or unlawfully deceptively marketed and pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's community, and direct costs to Plaintiff and Plaintiff's communities.

**ANSWER:**     Paragraph 128 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 128 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 128 are not directed

69

toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

129.    Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff.

**ANSWER:**    Paragraph 129 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 129 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 129 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

130.    A violation of any rule or law controlling the sale and/or distribution of a drug of abuse in Plaintiff's community constitutes an absolute public nuisance. *See e.g.* R.C. § 4729.35 ("The violation by a . . . person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . . constitute[s] a public nuisance[.]").

**ANSWER:**    Paragraph 130 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 130 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 130 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to

such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

131.    In the sale, distribution, and dispensation of opioids in Ohio and Plaintiff's community, Defendants violated federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Ohio law, including, but not limited to, R.C. § 4729.01(F)~~)), R.C. §§4729.51 4729.53,~~ and O.A.C. §§ 4729-9-12, 4729-9-16, 4729-9-28, and 4729-9-05(A).

**ANSWER:**    Paragraph 131 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 131 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 131 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

132.    Defendants' unlawful nuisance-creating conduct includes violating federal and Ohio statutes and regulations, including the controlled substances laws, by:

   a.    Distributing, dispensing, ~~by distributors~~ and selling ~~by manufacturers of~~ opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

   b.    Distributing, dispensing, ~~by distributors~~ and selling ~~by manufacturers of~~ opioids without maintaining effective controls against the diversion of opioids;

   c.    Choosing not to effectively monitor for suspicious orders;

   d.    Choosing not to investigate suspicious orders;

   e.    Choosing not to report suspicious orders;

   f.    Choosing not to stop or suspend shipments of suspicious orders;

> g.    Distributing, dispensing, ~~by distributors~~ and selling ~~by manufacturers of~~ opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

**ANSWER:**    Paragraph 132 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 132 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 132 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

133.    Defendants' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes:

> a.    Distributing, dispensing, ~~by distributors~~ and selling ~~by manufacturers of~~ opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

> b.    Distributing and dispensing ~~by distributors and selling by manufacturers of~~ opioids without maintaining effective controls against the diversion of opioids;

> c.    Choosing not to effectively monitor for suspicious orders;

> d.    Choosing not to investigate suspicious orders;

> e.    Choosing not to report suspicious orders;

> f.    Choosing not to stop or suspend shipments of suspicious orders;

> g.    Distributing, dispensing, ~~by distributors~~ and selling ~~by manufacturers of~~ opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

**ANSWER:**     Paragraph 133 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 133 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 133 are not directed

toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

134.    Defendants intentionally and unreasonably distributed, dispensed, and sold opioids that Defendants knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

**ANSWER:**    Paragraph 134 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 134 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 134 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

135.    The Marketing Defendants intentionally and unreasonably engaged in a deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket in Plaintiff's community.

**ANSWER:**    The allegations contained in Paragraph 135 are not directed toward Walmart and therefore no response from Walmart is required. Paragraph 135 states a legal conclusion to which no response is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

136.     The Marketing Defendants intentionally and unreasonably misled Plaintiff, healthcare providers, and the public about the risks and benefits of opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

**ANSWER:**     The allegations contained in Paragraph 136 are not directed toward Walmart and therefore no response from Walmart is required. Paragraph 136 states a legal conclusion to which no response is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

137.     The Marketing Defendants violated Ohio and federal statutes and regulations, including the controlled substances laws, by engaging in the deceptive marketing of opioids, as described in this Complaint.

**ANSWER:**     The allegations contained in Paragraph 137 are not directed toward Walmart and therefore no response from Walmart is required. Paragraph 137 states a legal conclusion to which no response is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

138.     In the distribution, dispensation, and sale of opioids in Ohio and Plaintiff's community, Defendants violated and/or aided and abetted violations of R.C. § 2925.02(A), which states:

> "No person shall knowingly do any of the following:
>
> (1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or
>
> (3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause

serious physical harm to the other person, or cause the other person
to become drug dependent."

**ANSWER:**     Paragraph 138 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 138 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 138 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

139.    ~~Defendants are in the business of manufacturing, marketing, selling and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because~~ *inter alia* ~~these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.~~    Defendants are in the business of manufacturing, marketing, distributing, and/or dispensing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

**ANSWER:**     Paragraph 139 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 139 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 139 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

140.    Indeed, prescription opioids are akin to medical-grade heroin. Defendants' wrongful conduct of deceptively marketing and pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiff—exactly as would be expected when medical-grade heroin in the form of prescription opioids are is deceptively marketed, floods the community, and is diverted into an illegal, secondary market.

**ANSWER:**    Paragraph 140 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 140 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 140 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

141.    Defendants had control over their conduct in Plaintiff's community and that conduct has had an adverse effect on rights common to the general public. Marketing Defendants controlled their deceptive advertising and efforts to mislead the public, including their acts and omissions in detailing by their sales representatives, online communications, publications, Continuing Medical Education programs and other speaking events, and other means described in this Complaint. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants controlled the systems they developed to prevent diversion, whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

**ANSWER:**    Paragraph 141 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 141 as they

apply to Walmart. Further, the remaining allegations contained in Paragraph 141 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

142.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiff described herein.

**ANSWER:**    Paragraph 142 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 142 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 142 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

143.    Because of the Marketing Defendants' deceptive marketing of opioids and Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

**ANSWER:**    Paragraph 143 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 143 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 143 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to

such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

144.     The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiff's community and the harm inflicted outweighs any offsetting benefit.

**ANSWER:**     Paragraph 144 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 144 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 144 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

145.     The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

**ANSWER:**     Paragraph 145 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 145 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 145 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a

belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

146.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services.

**ANSWER:**    Paragraph 146 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 146 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 146 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

147.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

**ANSWER:**    Paragraph 147 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 147 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 147 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a

belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

148.    The nuisance created by Defendants' conduct is abatable.

**ANSWER:**    Paragraph 148 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 148 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 148 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

149.    Defendants' misconduct alleged in this case is ongoing and persistent.

**ANSWER:**     Paragraph 149 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 149 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 149 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

150.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

**ANSWER:**    Paragraph 150 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 150 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 150 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

151.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

**ANSWER:**    Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 pertaining to purported economic damages; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5). Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, Paragraph 151 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 151 and further denies the remaining allegations contained in Paragraph 151 as they apply to Walmart.

152.    Plaintiff seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

**ANSWER:**    Paragraph 152 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 152 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 152 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to

such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

153.    Plaintiff has suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Ohio citizens at large. These are harms that can only be suffered by Plaintiff.

**ANSWER:**    Paragraph 153 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 153 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, the remaining allegations contained in Paragraph 153 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

154.    Plaintiff is asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others.

**ANSWER:**    Paragraph 154 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 154 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 154 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

155.    The tortious conduct of each Defendant was a substantial factor in creating the absolute public nuisance.

**ANSWER:**    Paragraph 155 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 155 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 155 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

156.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

**ANSWER:**    Paragraph 156 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 156 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 156 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

157.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

**ANSWER:**    Paragraph 157 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 157 as they apply to Walmart. Walmart denies that Plaintiffs are entitled to relief on the claims asserted

against Walmart. Further, the remaining allegations contained in Paragraph 157 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

158.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

**ANSWER:**    Paragraph 158 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 158 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 158 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

159.    Plaintiff asserts this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71. In this Count, Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act.

**ANSWER:**    Paragraph 159 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the allegations contained in Paragraph 159 as they apply to Walmart. Further, the remaining allegations contained in Paragraph 159 are not directed toward Walmart and therefore no response from Walmart is required. To the extent a response to

such allegations is required, Walmart is without knowledge or information sufficient to form a belief as to their truth; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5).

160.    Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre and post- judgment interest.

**ANSWER:**    Walmart is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 160 pertaining to purported economic damages; such allegations are therefore deemed to be denied under Fed. R. Civ. P. 8(b)(5). Walmart denies that Plaintiffs are entitled to relief on the claims asserted against Walmart. Further, Paragraph 160 states a legal conclusion to which no response is required. To the extent a response is required, Walmart denies the legal conclusion stated in Paragraph 160 and further denies the remaining allegations contained in Paragraph 160 as they apply to Walmart.

## AFFIRMATIVE AND OTHER DEFENSES

Having answered the allegations of Plaintiffs' Amendments, and having denied any liability whatsoever, Walmart further denies any allegations that have not been expressly admitted and sets forth below its defenses. By setting forth these defenses, Walmart does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiffs. Moreover, Walmart does not intend these defenses to be, nor shall they be construed as, an acknowledgement that any particular issue or subject matter is relevant to Plaintiffs' allegations. Walmart does not admit or acknowledge that it bears the burden of proof or burden of persuasion with respect to any such defense. Upon completion of discovery, if the facts warrant, Walmart may withdraw any of these defenses as may be appropriate. Walmart reserves the right to (i) rely on any other applicable defenses set forth in any Answer or listing of affirmative defenses of any other Walmart in this Action, (ii) rely on any other defenses that may become apparent during fact or expert discovery in this matter, and (iii) to amend its Answer to assert any such defenses.

### FIRST DEFENSE

The Complaint fails to state facts sufficient to constitute a claim upon which relief may be granted against Walmart.

### SECOND DEFENSE

Plaintiffs' claims are barred by the applicable statutes of limitations.

### THIRD DEFENSE

Plaintiffs' claims are barred by the applicable statute of repose.

### FOURTH DEFENSE

Plaintiffs' claims are barred by the doctrine of laches.

**FIFTH DEFENSE**

Plaintiffs' claims are barred or limited for lack of standing.

**SIXTH DEFENSE**

Plaintiffs' claims are barred by the voluntary payment doctrine.

**SEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack capacity to bring their claims, including claims indirectly maintained on behalf of their citizens and claims brought as *parens patriae*.

**EIGHTH DEFENSE**

Plaintiffs' claims are barred because Plaintiffs are not the real parties in interest.

**NINTH DEFENSE**

Plaintiffs' claims are not ripe and/or have been mooted.

**TENTH DEFENSE**

Plaintiffs' claims and damages are barred or limited, in whole or in part, by common law, statutory, and state constitutional constraints on the exercise of police powers by a municipality.

**ELEVENTH DEFENSE**

Plaintiffs' claims and damages are barred or limited by the political question and separation of powers doctrines and because their claims implicate issues of statewide importance that are reserved for state regulation.

**TWELFTH DEFENSE**

Plaintiffs' claims are barred by the doctrine of unclean hands.

**THIRTEENTH DEFENSE**

Plaintiffs' claims are barred by the doctrine of *in pari delicto*.

### FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, for failure to exhaust administrative remedies or to satisfy other procedural prerequisites.

### FIFTEENTH DEFENSE

Plaintiffs' claims are barred by the doctrines of estoppel, waiver, and/or ratification.

### SIXTEENTH DEFENSE

Plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel.

### SEVENTEENTH DEFENSE

Venue may be improper and/or inconvenient in this Court.

### EIGHTEENTH DEFENSE

Plaintiffs' claims are barred or limited by the terms and effect of any applicable consent judgment or settlement, including by operation of the doctrines of res judicata and collateral estoppel, failure to fulfill conditions precedent, failure to provide requisite notice, payment, accord and satisfaction, and compromise and settlement.

### NINETEENTH DEFENSE

Plaintiffs have failed to join all necessary parties, including without limitation health care providers, prescribers, patients, and other third parties whom Plaintiffs allege engaged in the unauthorized or illicit prescription, dispensing, diversion, or use of prescription opioid products.

### TWENTIETH DEFENSE

Plaintiffs' claims against Walmart do not arise out of the same transactions or occurrences as their claims against other defendants, as required for joinder of parties.

### TWENTY-FIRST DEFENSE

Plaintiffs' claims are barred to the extent they relate to Walmart's alleged lobbying or other activities protected by the First Amendment to the Constitution of the United States or by the Constitution of the State of Ohio or that of any other state whose laws may apply.

### TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that they violate the Due Process or Ex Post Facto clauses of the United States or Ohio constitutions.

### TWENTY-THIRD DEFENSE

Walmart's rights under the Due Process Clause of the U.S. Constitution and applicable state Constitution or statute are violated by any financial or other arrangement that might distort a government attorney's duty to pursue justice rather than his or her personal interests, financial or otherwise, in the context of a civil enforcement proceeding, including by Plaintiffs' use of a contingency fee contract with private counsel.

### TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that they violate the Dormant Commerce Clause of the United States Constitution.

### TWENTY-FIFTH DEFENSE

Walmart denies all types of causation, including without limitation, cause in fact, proximate cause and producing cause, with respect to the claims asserted against Walmart.

### TWENTY-SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Walmart did not proximately cause the damages complained of, and because the acts of other persons (including individuals engaged in the illegal distribution or use of opioids without a proper prescription) intervened between Walmart's acts and Plaintiffs' harms. Walmart had no legal duty to protect Plaintiffs

from the intentional criminal acts of third persons, which are superseding causes that extinguish any liability.

## TWENTY-SEVENTH DEFENSE

The injuries and damages claimed by Plaintiffs resulted from an intervening or superseding cause and/or causes, and any act or omission on the part of Walmart was not the proximate and/or competent producing cause of such alleged injuries and damages.

## TWENTY-EIGHTH DEFENSE

Plaintiffs' injuries and damages, if any, were due to misuse, illicit use, or abuse of the medications at issue on the part of the medication users, for which Walmart is not liable.

## TWENTY-NINTH DEFENSE

Any injuries and/or damages sustained by Plaintiffs may have been caused or contributed to by the negligence or actual conduct of Plaintiffs and/or other persons, firms, corporations, or entities over whom Walmart had no control or right of control and for whom it is not responsible.

## THIRTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because their alleged injuries or damages were caused by unforeseeable and uncontrollable forces over which Walmart had no control and for which Walmart is not responsible, including without limitation pre-existing or unrelated medical conditions.

## THIRTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any and all damages alleged by Plaintiffs were caused by misuse of the products involved, failure to use the products properly, and/or alteration or modification of, or criminal misuse or abuse of, the prescribed medications by third parties over whom Walmart had no control, for whom Walmart are not responsible, and that operated as superseding causes that extinguish any liability.

90

### THIRTY-SECOND DEFENSE

Plaintiffs would be unjustly enriched if allowed to recover on any of their claims.

### THIRTY-THIRD DEFENSE

Plaintiffs' claims are barred in whole or in part because Plaintiffs suffered no injuries or damages as a result of any action by Walmart.

### THIRTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the derivative injury rule and the remoteness doctrine bar Plaintiffs from recovering payments that they allegedly made on behalf their residents to reimburse any expenses for health care, pharmaceutical care, and/or other public services.

### THIRTY-FIFTH DEFENSE

Plaintiffs' claims are barred to the extent that Walmart has valid defenses that bar recovery by those persons on whose behalf Plaintiffs purportedly seek recovery.

### THIRTY-SIXTH DEFENSE

Plaintiffs' claims are subject to all defenses that could be asserted if Plaintiffs' claims were properly made by individuals on whose behalf or for whose alleged damages Plaintiffs seek to recover.

### THIRTY-SEVENTH DEFENSE

Plaintiffs have failed to comply with the requirement that they identify each patient in whose claim(s) they have a subrogation interest and on whose behalf they have incurred costs.

### THIRTY-EIGHTH DEFENSE

Plaintiffs fail to plead that they reimbursed any prescriptions for any opioid distributed by Walmart that harmed patients and should not have been prescribed or distributed, that Walmart

caused any health care provider to write any ineffective or harmful opioid prescriptions, or that any specific prescription was unauthorized, medically unnecessary, ineffective, or harmful.

### THIRTY-NINTH DEFENSE

Plaintiffs' claims are barred to the extent that Plaintiffs' alleged damages are speculative, uncertain, and hypothetical.

### FORTIETH DEFENSE

Any recovery by Plaintiffs may be barred, in whole or in part, by the principle of comparative or contributory fault.

### FORTY-FIRST DEFENSE

Any recovery against Walmart is barred or limited under the principles of assumption of the risk and informed consent.

### FORTY-SECOND DEFENSE

Plaintiffs' damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Walmart, and in the event that Walmart is found to be liable to Plaintiffs, Walmart will be entitled to indemnification, contribution, and/or apportionment.

### FORTY-THIRD DEFENSE

Walmart asserts its right to a proportionate reduction of any damages found against Walmart based on the negligence or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiffs.

### FORTY-FOURTH DEFENSE

A specific percentage of the tortious conduct that proximately caused the injury or loss to person or property is attributable to (i) each Plaintiff, (ii) other parties from whom Plaintiffs seek recovery, and (iii) persons from whom Plaintiffs do not seek recovery in this action, including,

but not limited to, prescribing practitioners, non-party pharmacies and pharmacists, individuals and entities involved in diversion and distribution of prescription opioids, individuals and entities involved in import, distribution, and sale of illegal opioids, individuals involved in procuring diverted prescription opioids and/or illegal drugs, delivery services, federal, state, and local government entities, and health insurers and pharmacy benefit managers. Ohio Revised Code § 2307.23.

## FORTY-FIFTH DEFENSE

Any verdict or judgment that might be recovered by Plaintiffs must be reduced by those amounts that have already indemnified or with reasonable certainty will indemnify Plaintiffs in whole or in part for any past or future claimed economic loss from any collateral source or any other applicable law.

## FORTY-SIXTH DEFENSE

If Walmart is found liable for Plaintiffs' alleged injuries and losses (which liability is specifically denied), the facts will show that Walmart caused fifty percent or less of the conduct that proximately caused such injuries or loss and is liable only for its proportionate share of the damages that represent economic loss. *See* Ohio Revised Code §§ 2307.22-.23. Any recovery by Plaintiffs must be reduced pursuant to Ohio Rev. Code §§ 2315.32-35 and 2307.23 to account for the acts or omissions attributable to Plaintiffs.

## FORTY-SEVENTH DEFENSE

The damages which Plaintiffs may be entitled to recover if liability is established (which liability is specifically denied) are capped pursuant to Ohio Revised Code §§ 2315.18 and 2315.21.

## FORTY-EIGHTH DEFENSE

Any damages that Plaintiffs may recover against Walmart must be reduced to the extent that Plaintiffs are seeking damages for alleged injuries or expenses related to the same user(s) of the subject drugs, or damages recovered or recoverable by other actual or potential plaintiffs. Any damages that Plaintiffs may recover against Walmart must be reduced to the extent they unjustly enrich Plaintiffs.

## FORTY-NINTH DEFENSE

Plaintiffs' claims against Walmart are barred to the extent they rely, explicitly or implicitly, on a theory of market-share liability.

## FIFTIETH DEFENSE

Plaintiffs' claims against Walmart are barred or limited by the economic loss rule.

## FIFTY-FIRST DEFENSE

Plaintiffs are barred, in whole or in part, from recovering costs incurred in providing public services by the free public services and/or municipal cost recovery doctrine.

## FIFTY-SECOND DEFENSE

Plaintiffs may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on its part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiffs' failure to mitigate damages, if any.

## FIFTY-THIRD DEFENSE

To the extent Plaintiffs attempt to seek equitable relief, Plaintiffs are not entitled to such relief because Plaintiffs have an adequate remedy at law.

**FIFTY-FOURTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because federal agencies have exclusive or primary jurisdiction over the matters asserted in the Complaint.

**FIFTY-FIFTH DEFENSE**

Plaintiffs' claims are preempted by federal law, including (without limitation) the federal Controlled Substances Act and the Food, Drug, and Cosmetic Act ("FDCA").

**FIFTY-SIXTH DEFENSE**

The conduct of Walmart conformed with the FDCA and the requirements of the Food and Drug Administration ("FDA"), and the activities of Walmart alleged in the Complaint conformed with all state and federal statutes, regulations, and industry standards based on the state of knowledge at the relevant time(s) alleged in the Complaint.

**FIFTY-SEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by conflict preemption as set forth in the United States Supreme Court's decisions in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011), and *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).

**FIFTY-EIGHTH DEFENSE**

Plaintiffs' claims are preempted insofar as they conflict with Congress's purposes and objectives in enacting relevant federal legislation and authorizing regulations, including the Hatch-Waxman Amendments to the FDCA and implementing regulations. *See Geier v. Am. Honda Co.*, 529 U.S. 861 (2000).

**FIFTY-NINTH DEFENSE**

To the extent Plaintiffs assert claims that depend solely on violations of federal law, including any claims of a "fraud on the FDA" with respect to the Manufacturer Defendants'

disclosure of information related to the safety of their medications at issue, such claims are barred and should be dismissed. *See Buckman v. Plaintiffs' Legal Comm'n*, 531 U.S. 341 (2001).

## SIXTIETH DEFENSE

To the extent Plaintiffs assert claims that depend solely on violations of federal law, including any claims of "fraud on the Drug Enforcement Administration" ("DEA") with respect to Walmart's compliance with statutes or regulations administered and/or enforced by the DEA, such claims are barred and should be dismissed. *See Buckman v. Plaintiffs' Legal Comm'n,* 531 U.S. 341 (2001).

## SIXTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the deference that common law accords discretionary actions by the FDA under the FDCA and discretionary actions by the DEA under the Controlled Substances Act.

## SIXTY-SECOND DEFENSE

If Plaintiffs incurred the damages alleged, which is expressly denied, Walmart is not liable for damages because the methods, standards, or techniques of designing, manufacturing, labeling, and distributing the prescription medications at issue complied with and were in conformity with the laws and regulations of the Controlled Substances Act, the FDCA, and the generally recognized state of the art in the industry at the time the product was designed, manufactured, labeled, and distributed.

## SIXTY-THIRD DEFENSE

Plaintiffs' claims are barred to the extent they are based on any allegations involving failure to provide adequate warnings or information because all warnings or information that accompanied the allegedly distributed products were approved by the United States Food & Drug Administration for a product approved under the Federal Food, Drug, and Cosmetic Act

(21 U.S.C. Section 301 et seq.), as amended, or Section 351, Public Health Service Act (42 U.S.C. Section 262), as amended, or the warnings and information provided were those stated in monographs developed by the United States Food & Drug Administration for pharmaceutical products that may be distributed without an approved new drug application.

### SIXTY-FOURTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the learned intermediary doctrine.

### SIXTY-FIFTH DEFENSE

Walmart did not owe or breach any statutory or common law duty to Plaintiffs.

### SIXTY-SIXTH DEFENSE

Walmart appropriately, completely, and fully performed and discharged any and all obligations and legal duties arising out of the matters alleged in the Complaint.

### SIXTY-SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Walmart complied at all relevant times with all applicable laws, including all legal and regulatory duties.

### SIXTY-EIGHTH DEFENSE

To the extent that Plaintiffs rely on letters or other informal guidance from the DEA to establish Walmart's regulatory duties, such informal guidance cannot enlarge Walmart's regulatory duties in the absence of compliance by DEA with the requirements by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

### SIXTY-NINTH DEFENSE

Plaintiffs' claims are barred to the extent they are based on alleged violations of industry customs because purported industry customs do not create legal duties on Walmart.

### SEVENTIETH DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, by the Restatement (Second) of Torts § 402A, Comments j and k, and Restatement (Third) of Torts: Products Liability § 6.

### SEVENTY-FIRST DEFENSE

To the extent that Plaintiffs are alleging fraud, fraudulent concealment, or similar conduct, Plaintiffs have failed to plead fraud with sufficient particularity.

### SEVENTY-SECOND DEFENSE

Plaintiffs fail to plead any actionable misrepresentation or omission made by or attributable to Walmart.

### SEVENTY-THIRD DEFENSE

Plaintiffs' claims are barred in whole or in part because no conduct of Walmart was misleading, unfair, or deceptive.

### SEVENTY-FOURTH DEFENSE

Plaintiffs' claims may be barred, in whole or in part, because neither the users nor their prescribers of the medications distributed by Walmart, nor Plaintiffs themselves, relied to their detriment upon any statement by Walmart in determining to use the medications at issue.

### SEVENTY-FIFTH DEFENSE

Walmart is not liable for any statements in the Manufacturer Defendants' branded or unbranded materials.

### SEVENTY-SIXTH DEFENSE

Plaintiffs' nuisance claims are barred to the extent that they lack the statutory authority to bring a nuisance claim under Ohio law or their own applicable county or municipal codes or regulations.

## SEVENTY-SEVENTIETH DEFENSE

Plaintiffs' common law and statutory public nuisance claims are barred or limited to the extent that they have been abrogated or otherwise curtailed by the Ohio Products Liability Act, Ohio Rev. Code § 2307.71, *et seq*.

## SEVENTY-EIGHTH DEFENSE

Plaintiffs' claim of public nuisance is barred or limited because no action of Walmart involved interference with real property; illegal conduct perpetrated by third parties involving the use of an otherwise legal product does not involve a public right against the distributor sufficient to state a claim for public nuisance; the alleged public nuisance would have impermissible extraterritorial reach; and the alleged conduct of Walmart is too remote from the alleged injury as a matter of law and due process.

## SEVENTY-NINTH DEFENSE

Plaintiffs' claim for unjust enrichment is barred or limited because Walmart did not receive and retain any alleged benefit from Plaintiffs.

## EIGHTIETH DEFENSE

Plaintiffs' claims are barred, reduced, and/or limited pursuant to the applicable Ohio statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

## EIGHTY-FIRST DEFENSE

Plaintiffs' claims are barred, reduced, and/or limited to the extent that Walmart is entitled to a credit or setoff for any and all sums Plaintiffs has received in the way of any and all settlements.

## EIGHTY-SECOND DEFENSES

Plaintiffs' Complaint is barred, in whole or in part, by the doctrines of acquiescence, settlement, or release.

## **EIGHTY-THIRD DEFENSE**

Walmart's liability, if any, will not result from their conduct but is solely the result of an obligation imposed by law, and thus Walmart is entitled to complete indemnity, express or implied, by other parties.

## **EIGHTY-FOURTH DEFENSE**

Plaintiffs' claims for punitive or exemplary damages or other civil penalties are barred or reduced by applicable law or statute or, in the alternative, are unconstitutional insofar as they violate the Due Process Clauses of the United States Constitution, the Excessive Fines Clause of the Eighth Amendment of the United States Constitution, the Full Faith and Credit Clause of the United States Constitution, the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Sixth Amendment to the United States Constitution, and applicable provisions of the Constitution of Ohio or that of any other state whose laws may apply. Any law, statute or other authority purporting to permit the recovery of punitive damages or civil penalties in this case is unconstitutional, facially and as applied, to the extent that, without limitation, it:

(1) lacks constitutionally sufficient standards to guide and restrain the jury's discretion in determining whether to award punitive damages or civil penalties and/or the amount, if any;

(2) is void for vagueness in that it fails to provide adequate advance notice as to what conduct will result in punitive damages or civil penalties;

(3) unconstitutionally may permit recovery of punitive damages or civil penalties based on harms to third parties, out-of-state conduct, conduct that complied with applicable law, or conduct that was not directed, or did not proximately cause harm, to Plaintiffs;

(4) permits the imposition of punitive damages where the burden of proof is less than clear and convincing evidence;

(5) permits the imposition of punitive damages without bifurcating the trial and trying all punitive damages issues separately, only if and after a finding on the merits of the liability of the Walmart;

(6) permits the imposition of punitive damages without any predetermined limit on any such award;

(7) permits an imposition of punitive damages that allows for multiple punishments for the same alleged act(s) or omission(s);

(8) unconstitutionally may permit recovery of punitive damages or civil penalties in an amount that is not both reasonable and proportionate to the amount of harm, if any, to Plaintiffs and to the amount of compensatory damages, if any;

(9) unconstitutionally may permit jury consideration of net worth or other financial information relating to Defendants;

(10) lacks constitutionally sufficient standards to be applied by the trial court in post-verdict review of any award of punitive damages or civil penalties;

(11) lacks constitutionally sufficient standards for appellate review of any award of punitive damages or civil penalties;

(12) would unconstitutionally impose a penalty, criminal in nature, without according to Defendants the same procedural protections that are accorded to criminal defendants under the constitutions of the United States, this State, and any other state whose laws may apply; and

(13) otherwise fails to satisfy Supreme Court precedent, including, without limitation, *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991); *TXO Production Corp. v. Alliance Resources, Inc.*, 509 U.S. 443 (1993); *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996); *State Farm Ins. Co. v. Campbell*, 538 U.S. 408 (2003); and *Philip Morris USA v. Williams*, 549 U.S. 346 (2007).

## EIGHTY-FIFTH DEFENSE

To the extent that Plaintiffs seeks punitive, exemplary, or aggravated damages, any such damages are barred because the product at issue, and its labeling, were subject to and received pre-market approval by the FDA under 52 Stat. 1040, 21 U.S.C. § 301.

## EIGHTY-SIXTH DEFENSE

Plaintiffs' claims for punitive or exemplary damages are barred because Plaintiffs cannot prove by clear and convincing evidence that Walmart was grossly negligent and Walmart has neither acted nor failed to act in a manner that entitles Plaintiffs to recover punitive or exemplary damages.

## EIGHTY-SEVENTH DEFENSE

Plaintiffs cannot obtain relief on its claims based on actions undertaken by Walmart of which Walmart provided notice of all material facts.

## EIGHTY-EIGHTH DEFENSE

Walmart is entitled to, and claims the benefit of, all defenses and presumptions set forth in or arising from any rule of law or statute of this State or any other state whose substantive law might control the action.

## EIGHTY-NINTH DEFENSE

Walmart asserts all applicable defenses under Federal Rules of Civil Procedure 8(c) and 12(b) and/or Ohio Rules of Civil Procedure 8(C) and 12(B), as investigation and discovery proceeds.

## NINETIETH DEFENSE

To the extent they are not otherwise incorporated herein, Walmart incorporates as a defense the defenses and arguments raised in the motions to dismiss of the Manufacturer Defendants, Distributor Defendants, and Pharmacy Defendants in this case.

## NINETY-FIRST DEFENSE

Walmart adopts by reference any additional applicable defense pled by any other defendants not otherwise pled herein.

## JURY DEMAND

Walmart hereby requests a jury trial as to all issues or claims triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Walmart prays for relief from judgment from Plaintiffs as follows:

1. Plaintiffs take nothing by reason of this Complaint or these Amendments;

2. Walmart recovers its costs and attorneys' fees incurred herein; and

3. For such further and other relief as the Court deems proper.

Dated:  December 23, 2019

Respectfully submitted,


/s/ *Tara A. Fumerton*
Tara Fumerton
JONES DAY
77 West Wacker
Suite 3500
Chicago, IL  60601.1692
Telephone:     +1.312.782.3939
Facsimile:     +1.312.782.8585

Attorney for Defendant Walmart Inc.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 23, 2019, the foregoing was filed using the Court's CM/ECF filing system and will be served via the Court's CM/ECF filing system on all attorneys of record.


/s/ *Tara A. Fumerton*
Tara Fumerton