IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE:                          Case No. 1:17MD2804
NATIONAL PRESCRIPTION           Cleveland, Ohio
OPIATE LITIGATION
                                January 29, 2020
                                9:11 a.m.



- - - - -



**SEALED** TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

BEFORE THE HONORABLE DAN A. POLSTER,

UNITED STATES DISTRICT JUDGE



- - - - -



Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                         7-189 U.S. Court House
                         801 West Superior Avenue
                         Cleveland, Ohio  44113
                         216-357-7087
                         Susan_Trischan@ohnd.uscourts.gov

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Peter H. Weinberger, Esq.
                                 Hunter J. Shkolnik, Esq.
 3                               Donald A. Migliori, Esq.
                                 Mildred Conroy, Esq.
 4                               Joseph F. Rice, Esq.
                                 Paul J. Hanly, Jr., Esq.
 5                               Jayne Conroy, Esq.
                                 Frank L. Gallucci, III, Esq.
 6                               Michael J. Fuller, Jr., Esq.
                                 Paulina do Amaral, Esq.
 7                               Salvatore C. Badala, Esq.
                                 Peter James Mougey, Esq.
 8                               Bonnie A. Kendrick, Esq.
                                 Mark P. Pifko, Esq.
 9                               James W. Ledlie, Esq.
                                 Laura Fitzpatrick, Esq.
10                               Pearl Robertson, Esq.
                                 David Ackerman, Esq.
11                               Michael Elsner, Esq.

12    For the Defendants:        Eric R. Delinsky, Esq.
                                 Timothy D. Johnson, Esq.
13                               Kelly A. Moore, Esq.
                                 John Lavelle, Esq.
14                               Tara Fumerton, Esq.
                                 Tina M. Tabacchi, Esq.
15                               Robert M. Barnes, Esq.
                                 Kaspar J. Stoffelmayr, Esq.
16                               Kate Swift, Esq.

17
      ALSO PRESENT:              Special Master David Cohen
18                               Special Master Francis McGovern

19

20

21
      Proceedings recorded by mechanical stenography;
22    transcript produced by computer-aided transcription.

23

24

25
```

1          WEDNESDAY, JANUARY 29, 2020, 9:11 A.M.

2               THE COURT:  All right.  Good morning.

3     Please be seated.

4               All right.  This is a status conference in

09:11:29  5     the Track 1B case, it's Summit and Cuyahoga Counties

6     against six pharmacies, CVS, Rite Aid, Walgreen, Discount

7     Drug Mart, HBC, and Walmart.

8               We've got the lawyers for the plaintiffs

9     and the six defendants.

09:11:51 10               I want to say a few things and then I want

11     to open it up for discussion.

12               When we last met, the six defendant

13     pharmacies made it very clear that they did not want the

14     Court having -- or the Special Masters having any ex

09:12:20 15     parte discussions with either side regarding really

16     anything to do with this case, particularly anything to

17     do with resolution.

18               I have, obviously, been having ex parte

19     discussions at the request of all sides with everyone

09:12:43 20     else in the case, all of the plaintiffs' lawyers, the

21     Attorneys General, the manufacturers and the

22     distributors.

23               In fact, most of the day today when I'm

24     done with this conference is going to be devoted to that.

09:12:58 25     I've done it because everyone has wanted me to.  And

1    anything -- I'd say about 95 percent of what we've been

2    able to accomplish in the MDL, me and my team, has been

3    because of those separate discussions.

4                    I've been able to figure out what each side

09:13:17  5    wanted to do, how they wanted to do it, how I

6    could -- where there was some common ground, how we could

7    move things forward.

8                    Obviously, if these defendants don't want

9    that, that's okay, but you and your clients need to

09:13:33  10    understand that the only things I can accomplish in an

11    MDL are through those private discussions.

12                    Obviously, I can try your case, and I will

13    try this case, which is the only one I can try of the

14    pharmacies because it's in this district.  I can try this

09:13:54  15    case without any ex parte discussions, and if that's what

16    you want, I'll do it.

17                    But I'll have no choice but then to, you

18    know, remand all the other cases involving the pharmacies

19    to my colleagues around the country.  Trust me, I don't

09:14:10  20    want to do it.  They want to receive the cases even less.

21    But if that's what you all want, that's what I'll do.

22                    You know, the pharmacies haven't been named

23    in all 2,500, but I guess you're named in about a

24    thousand.  If that's what I need to do, that's what I'll

09:14:30  25    do.

1           So I think the defendants need to decide

2    sort of how they want to proceed.  If you want me to just

3    try your case and whenever it happens, it happens, and

4    I'll, you know, send all the other ones back around the

09:14:51 5    country and you can be dealing with a thousand different

6    Judges, that's fine.

7           If you share the interest with all the

8    other defendants in this case in trying to manage this on

9    some -- a large level and move on with your businesses,

09:15:08 10    then I suggest you permit me to try and engage in that.

11           But that's your choice.  I don't force it

12    on anyone.  I haven't forced it on any of the other

13    defendants.  Trust me, it's all been voluntary.

14           This trial, I can't tell at the moment what

09:15:29 15    this trial is about, okay, and I'm going to make some

16    strong suggestions, but it's only a suggestion.

17           The plaintiffs have a right, you've got a

18    right to try whatever case you want, and once you make it

19    clear what your case is, then the defendants have a right

09:15:45 20    to defend it.

21           They don't have a right to take years in

22    discovery defending a case that you don't have, but they

23    have a right to take whatever's reasonable to develop the

24    evidence to defend the case that you're choosing to

09:15:59 25    bring.

1           Now, I thought that the plaintiffs'

2    allegations against the pharmacy are based on -- it's a

3    systems case, whether -- the question is whether any or

4    all of these six pharmacy defendants had a corporate

09:16:20  5    system in place to make sure that each individual, each

6    individual pharmacy was doing what it was supposed to do

7    in monitoring controlled substances that were going out

8    of that pharmacy.

9           Did you have a system to monitor that and

09:16:41 10    to make sure that each pharmacy -- that's CVS, Walgreen,

11    Rite Aid -- in Summit and Cuyahoga County did what it was

12    supposed to do?  And if you had a system, did you use it?

13    We all know sometimes corporations have systems, they are

14    window dressing.  Sometimes they're real.  All right?

09:17:01 15           And it shouldn't take long to develop, to

16    do the discovery, to answer those questions, and then put

17    it in front of a jury.

18           And it shouldn't be -- shouldn't be hard

19    for the defendants to develop the evidence, if they

09:17:18 20    wanted to defend that case, to do it.

21           And the issue is going to be historic.

22    It's not what you can find out today about some

23    prescription that was issued ten years ago and what the

24    facts are and what the doctor did or didn't do with that

09:17:35 25    particular patient.  No one cares.

1          It's what the defendants saw in a given

2     year.  We'll pick 2014.  Okay.  Did they have a system in

3     place to determine if there was something suspicious

4     going on in Cuyahoga County?  What did they see?  And

09:17:58  5     what did they do with what they saw?  And all that's

6     historic.  It's in the documents.  It's not something

7     that has to be re-created now.

8          And it can be presented to a jury in a

9     relatively short time, and they can decide whether or not

09:18:15 10     the defendants contributed to a public nuisance, because

11     the only thing that's being tried is public nuisance.

12          And again, we're not trying -- the jury is

13     not going to be involved in determining whether or what

14     remedies there should be if there is liability.  It's

09:18:33 15     liability up or down as to each defendant separately.

16          And then if the jury finds liability,

17     public nuisance liability as to any defendant, there will

18     be some separate proceeding in front of the Court, an

19     evidentiary proceeding, and I'll decide remedy.

09:18:48 20          That's how it works in Ohio.

21          So I believe that a trial as I've outlined,

22     we can have discovery, we can have motions, we can try it

23     at the end of this year.

24          Now, the plaintiffs have asked, they've

09:19:07 25     asked for another month for discovery and keeping the

1    trial the beginning of October, leaving me no time to

2    deal with all the motions.

3              Well, that's not possible.  I barely had

4    enough time with the schedule that we had with the

09:19:23   5    manufacturers and distributors, and I essentially put in

6    place the same schedule.

7              So I believe if you feel you need another

8    month, we could move the trial back, start it, say,

9    November 9th.

09:19:42  10              I'm figuring the plaintiff should easily be

11    able to do their case in a week, and if there are all six

12    defendants and they do two-and-a-half days, that's three

13    weeks, you know, so the case would go to the jury around

14    December 14th, which would give them a week to deliberate

09:20:00  15    before Christmas week.

16              So I can do that.

17              But again, that depends on the plaintiffs

18    making it clear that the case is focusing on the

19    defendants' system of compliance and monitoring and

09:20:17  20    whether, A, they had one and, B, if they had one, did

21    they use it.

22              And if that's the case, if that's the case

23    you're bringing, we don't need a whole lot of the

24    individual granular data.

09:20:31  25              And obviously if that's the case, we're not

1     going to have third party complaints against doctors

2     because it doesn't matter.  That's not the case that's

3     being brought, so you've got no reason to bring all these

4     doctors in because the focus is going to be not on what

5     doctors did or didn't do, but what the defendants did or

6     didn't do.

7           And that's where it should be.  You're the

8     ones that are being sued.

9           So again, I can't -- you know, I'm not

10     going to tell the plaintiffs what kind of case they want.

11     You, you know, I didn't tell you what kind of case to

12     bring against the manufacturers or distributors.  I made

13     some suggestions.

14           As a result of those suggestions and

15     working with both sides, we did get the case ready for

16     trial, and we were ready to go and the trial would have

17     fit in within the allotted time.  We were ready to do it.

18     And I think it would have been an intelligible trial for

19     that jury.

20           So that's my suggestion, but, you know,

21     they are only suggestions.

22           If the plaintiffs want some -- you know, if

23     your focus is going to be on thousands of individual

24     prescriptions, then I don't, you know -- then defendants

25     can defend that case and I won't -- doesn't even make

1    sense to even set a trial date because we have to

2    determine who's going to be in the case.

3              And if there are all these third party

4    complaints, you know, we don't even know who they are

09:22:02  5    until you identify the prescriptions.

6              So I wouldn't even purport to set a trial

7    date.  And if that's what we're going to do, obviously

8    long before that case is going to come to trial, I will

9    ask the MDL panel to send all the other thousand cases

09:22:18 10    against the pharmacies back around the country because I

11    won't have any MDL function with those cases.

12              And it's not fair to me to hold cases.  We

13    get -- you know, all these cities and counties are

14    clamoring for their trials.  They can get them.

09:22:37 15              So I'd like to hear from all of you

16    because, as I said, I'm -- you know, these are my

17    thoughts, my suggestions, but I don't, you know, I don't

18    tell the plaintiffs what to do, I don't tell the

19    defendants what to do.

09:22:54 20              MR. WEINBERGER:  On behalf of the

21    plaintiffs, if I may respond, Peter Weinberger, Your

22    Honor.

23              I guess we owe you a bit of an apology,

24    Your Honor, because if we haven't made clear up until now

09:23:07 25    that what you've suggested in terms of how we might

1    present our cases is exactly what we were going to do,

2    then I'm sorry that we haven't made that clear.

3                We totally agree that this is a case about

4    the defendants' systems, and it is the -- it is then

09:23:29   5    relying on statistical analysis of the data to determine

6    whether or not they complied with the systems.

7                I would just add one other thing.

8                It's not just whether or not they had the

9    systems and complied with their own systems, it's whether

09:23:44 10    or not their systems were adequate under the law and

11    under the regulations.

12                And it isn't just what they saw based upon

13    their own systems, it's what they should have seen in

14    terms of identifying prescriptions that would have been

09:24:00 15    red flags.

16                And so --

17                THE COURT:  All right.  I mean, what they

18    should -- but again --

19                MR. WEINBERGER:  Red flags --

09:24:08 20                THE COURT:  -- red flag, you don't have to

21    go back and determine what exactly the situation was with

22    each red flag unless the defendants made a diligent

23    investigation, in which case the documents would show

24    what the situation was because they would have

09:24:26 25    investigated it.

1           If they didn't investigate it, that's the

2    end of it and you tell the jury, "Look, there was a red

3    flag and they did nothing.  Okay.  Draw your conclusion.

4    Here's a red flag.  They did nothing."

09:24:41  5           So it should be -- the point is it should

6    be apparent from the documents, all right, whether they

7    had a system, whether the system was effective.

8           In other words, if it didn't -- if there

9    were a whole lot of red flags and it wasn't triggered,

09:24:57 10   you can argue, "Well, the system wasn't worth much

11   because here were all these suspicious things and they

12   didn't pop up."

13          Okay.  If it did pop up, what -- did they

14   do anything?  If they didn't, well, they had a system,

09:25:11 15   but it was window dressing.  If they did something, what

16   did they find, and was it a reasonable response?  All

17   right.  It's all historic.

18          So I think that's, if that's your case,

19   then you've got to make that clear, and then we can

09:25:30 20   streamline the discovery and we don't need third party

21   complaints and, you know, the documents will show what

22   they showed.  Obviously we will have some testimony about

23   it, but again the documents are going to drive this case.

24   And it's the defendants' own documents as to what they

09:25:47 25   had and what they did or what they didn't do.

1         So if that's your -- if that's your case,

2    then you need to make that clear and we'll structure

3    things, we'll limit things, and defendants can defend

4    that case.

5         And we can -- if the defendants want a

6    trial, we'll try it in early November.  But you -- it

7    hasn't been clear to me, it hasn't, you know, and to my

8    team that that's your case.

9         So I think you should file something and

10   make that very clear, and then I think look at the

11   schedule, both sides can look at the schedule and we'll

12   fit it in.

13        Again, I can move it back to November 9th,

14   but I have to have a reasonable time to evaluate the

15   motions that the defendants filed.  There were some very

16   serious motions that were filed in Track 1A, and I dealt

17   with them.  A lot of time and effort is being put -- and

18   money is being put into filing them.  I'm certain if I

19   don't have time to review them, it's not fair to anyone.

20   So I can do that.

21        But if that's -- so if that's what, you

22   know, if that's what the plaintiffs want, then the

23   defendants know that's the kind of case you're facing.

24        And again, you know right now, quite

25   frankly, you know right now, each of you, whether, A, you

1    had a system, whether you used the system, and whether it

2    was an adequate system.

3                    And, you know, so, you know, if you want a

4    trial, we'll, you know, we'll have a trial, I mean, on

09:27:30  5    that, and the jury can decide.

6                    Yes, Mr. Delinsky.

7                    MR. WEINBERGER:  May I just respond with a

8    couple of other points, if you don't mind, Mr. Delinsky?

9                    Again for purposes of being clear, we

09:27:47 10    agree, we totally agree with the Court.

11                    And in our discussions with the Special

12    Master and the defendants last Tuesday where we discussed

13    the data fields and we pruned down the data fields to 34

14    data fields, we did that because of the fact that that's

09:28:07 15    how we're -- those data fields are objective criteria,

16    and that's how we're going to prove the case, excuse me,

17    through objective red flag criteria.

18                    The other thing that we can't lose sight of

19    is that these defendants have also been sued as

09:28:26 20    distributors in that they distributed to themselves

21    certainly up until 2013 or 2014.  And so all of the

22    discovery with respect to their role as distributors to

23    themselves has already been developed and expert reports

24    have been issued and discovery depositions have been

09:28:50 25    taken.

1          So we're adding, obviously, the dispensing

2     claim under the parameters that you're suggesting, Your

3     Honor, in addition to the distribution claim.

4          THE COURT:  Well, I don't -- I

5     don't -- maybe you can educate me.

6          I don't understand how those are separate

7     claims because Walgreen, you know, distributed to

8     themselves, their own pharmacies, so the only pills they

9     are selling are out of their own pharmacies.

10         So whatever, whatever system --

11         MR. WEINBERGER:  So they were required to

12    have suspicious order monitoring systems under the DEA

13    regulations when they acted as distributors to

14    themselves.

15         So it's a separate -- it's a separate

16    analysis under separate regulations, and in the course of

17    developing the C-1 case against them as distributors, we

18    actually wanted to delve into some of the dispensing

19    information in discovery because we thought, obviously,

20    that that was relevant to their knowledge in terms of the

21    amount of drugs that they were distributing to

22    themselves.

23         Because we hadn't asserted dispensing

24    claims, we were somewhat limited in pursuing that

25    discovery.

1            I agree with you that --

2            THE COURT:  Let me -- but, Mr. Weinberger,

3    if the only pills they ended up selling were out of their

4    same pharmacies, the focus is going to be on what red

09:30:30 5    flags there were at the pharmacy level.  All right?

6            They're just distributing to themselves.

7    They're required to have it, they're required to have a

8    system in place to make sure that they themselves are

9    maintaining control over their own pills, which means

09:30:50 10    front door and back door.

11            In other words, for example, if you can

12    show that in given months, you know -- I'll use CVS just

13    because Mr. Delinsky stood up first -- that there were a

14    bunch of CVS pharmacies that were ordering -- they were

09:31:06 15    ordering 10,000 opioid pills a month and they only have

16    prescriptions for 8,000, and they're ordering another

17    10,000 the next month, you've got 2,000 pills that seem

18    to be going out the back door.

19            All right.  That should -- there should be

09:31:20 20    a system that flags that.

21            If there's not, that's a problem.  But

22    that's -- whether it's a pharmacy or distributor

23    themselves, it's the same -- it's the same thing.  I

24    don't think there's any -- seems to me it's the same

09:31:34 25    thing.

1          MR. WEINBERGER:  Well, they are very much

2     related, Your Honor, but to get a little bit granular

3     here, before 2014, the distribution that they engaged in

4     was distribution primarily of Hydrocodone directly to

09:31:52  5     their stores.

6          Prior to that time, or at that same time,

7     they were -- these retail pharmacies were obtaining Oxy

8     and the other opioids from the distributors, from the

9     other distributors.

09:32:07 10          So in terms of the distribution of

11     Hydrocodone to their own pharmacies, they had a

12     responsibility to have a suspicious order monitoring

13     system in place, and then at the dispensing level they

14     had the responsibility of having a system in place

09:32:29 15     to -- to determine what red flags would be seen in the

16     prescriptions that they were dispensing.

17          They are somewhat interrelated, but they

18     are separate claims.

19          THE COURT:  Well, to me it's the same

09:32:43 20     evidence, all right, to make sure that there's not a

21     problem with the front door and the back door.

22          It seems to me you have that responsibility

23     whether you're distributing it to yourselves or whether

24     you're buying it from someone else and dispensing, to

09:33:00 25     make sure that, you know, you're monitoring the

1    prescriptions you get to make sure to a reasonable degree

2    of professionalism that those are valid prescriptions and

3    you don't have people, you know, coming in with multiple

4    prescriptions or multiple prescriptions from the same

5    address, and that you make sure, you know, no one's

6    stealing them, selling them out the back door.

7              You've got that responsibility whether

8    you're a distributor or just a pharmacy.

9              So I think it's pretty much the same thing.

10             MR. WEINBERGER:  So the other thing is that

11   we agree that the discovery on these issues can be very

12   limited and focused, and our proposed schedule takes that

13   into account.

14             We certainly understand the fact that

15   there's less of a gap in time in our proposal between the

16   filing of *Daubert* motions and dispositive motions and the

17   trial, and so --

18             THE COURT:  There's almost none.  In fact,

19   you eliminated reply briefs.

20             MR. WEINBERGER:  Right.  So --

21             THE COURT:  I mean, so that, you can't do

22   that.

23             Okay.  So if you want that extra time,

24   we've got to move the trial back about a month.  If you

25   don't want it, then we can keep it in place, but, you

1    know, I can do it either way.

2                    MR. WEINBERGER:  We're comfortable with the

3    November 9th trial date, Your Honor.  Thank you.

4                    THE COURT:  All right.

09:34:17  5                    MR. DELINSKY:  May I address the Court,

6    Your Honor?

7                    THE COURT:  Yes, Mr. Delinsky.

8                    MR. DELINSKY:  All right.  Your Honor, what

9    I'd like to do is respond to some of the points you've

09:34:28 10   made --

11                   THE COURT:  All right.

12                   MR. DELINSKY:  -- about the scope of the

13   case, and then propose a solution, a case management

14   solution.

09:34:37 15                   In terms of the background issues, and I

16   don't mean to retread territory that we covered last

17   month, but I would be remiss if I didn't repeat the

18   following point again, which is that when we hear talk

19   about "Systems" at the defense level to monitor for red

09:35:01 20   flags, that is completely and totally, it's a legal or

21   regulatory matter alien to us, foreign to us.  It is

22   utterly inconsistent with the law.

23                   There is a regulation governing

24   distribution that calls for systems, and that is the

09:35:31 25   regulation on which plaintiffs have built their

1    distribution case.

2                    There is no such regulation in federal law

3    or in state law that calls for systems when it comes to

4    dispensing.

09:35:51  5              THE COURT:  Well, I --

6              MR. DELINSKY:  You don't have to belabor

7    this point now.

8              THE COURT:  Mr. Delinsky, I invited you to

9    file, file that motion, and you all declined.

09:36:01 10                    You have been a little disingenuous in your

11    filings to the Sixth Circuit saying I didn't allow you to

12    file motions to dismiss, so I'm making this point very

13    clear now.

14                    We had this discussion last time, and you

09:36:13 15    raised this, and I said, "All right, that would go to the

16    whole case.  If you want to file that, file it."

17                    You said, "No."

18                    So I, you know -- the plaintiffs, the

19    plaintiffs are going to argue.  You know, if you want to

09:36:26 20    get up in front of a jury and say you have no

21    responsibility to have any system whatsoever to monitor

22    what your individual pharmacies are doing, you can make

23    that argument before a jury.

24              MR. DELINSKY:  Your Honor, we can make the

09:36:40 25    argument in summary judgment as well, and we will be

1    raising that issue --

2                    THE COURT:  All right, fine.

3                    MR. DELINSKY:  -- in summary judgment.

4                    THE COURT:  Okay.  Fine.

09:36:45 5          MR. DELINSKY:  I just would like to

6    know --

7                    THE COURT:  All right, fine, and I'll deal

8    with it.

9                    MR. DELINSKY:  Okay.

09:36:51 10         THE COURT:  If you convince me you're

11   right, fine.  But if I'm not convinced, it will go to the

12   jury and, if you lose, you can appeal on that.

13                   MR. DELINSKY:  But we just want -- I just

14   want to today -- and, Your Honor, I'm not going to get

09:37:02 15  into -- we were not disingenuous, I just want to put that

16   into the record, but we don't need to get into that now.

17                   THE COURT:  Well, I've said what I've said.

18                   MR. DELINSKY:  Well, Your Honor, we do

19   feel -- and I don't want to get sidetracked -- that we

09:37:17 20  have a right under Rule 12 to file the motions we wish to

21   file.

22                   THE COURT:  All right.  I don't want to

23   belabor.

24                   I just made a point that you, in your

09:37:26 25  filing with the Sixth Circuit, you said I categorically

1        denied you the right to file motions to dismiss, and I

2        didn't.

3                    I invited you to file one, if you felt that

4        under the law you had no obligation to have a

09:37:47   5    corporate-wide system and, therefore, the case should be

6        dismissed in total.  I invited that.  You said you don't

7        want to file that, so that's the only one we talked

8        about.

9                    So obviously you can -- you can make those

09:37:57  10    arguments in motions for summary judgment, and I'll look

11        at them very carefully.

12                    MR. DELINSKY:  But, Your Honor, moving on,

13        even if, let's assume that for the first time in the

14        history of pharmacy jurisprudence it is determined that

09:38:13  15    there is a legal obligation at a corporate level to

16        somehow have systems governing dispensing, let's assume

17        that, okay --

18                    THE COURT:  I don't think the plaintiffs'

19        case is you're required to have a system governing

09:38:29  20    dispensing.

21                    The plaintiffs' argument is that as part

22        of -- that there is a corporate responsibility if you

23        are -- if -- CVS is a pharmacy company, that's all you

24        have, all right.

09:38:45  25                    If you have thousands of pharmacies around

1    the country, and all of them have DEA controlled licenses

2    and they're handling DEA controlled substances, you have

3    some obligation at the corporate level to monitor

4    performance to make sure that these controlled substances

09:39:05  5    are being handled adequately and aren't being diverted or

6    misused.

7                        MR. DELINSKY:  Okay.

8                        THE COURT:  And you've got to -- all right?

9                        So that's the plaintiffs' argument, and if

09:39:17 10    they have sufficient evidence, they're going to argue

11    that, you know, you -- either you didn't have a system or

12    your system was inadequate or even if your system was

13    adequate, you didn't follow it, and as a result, you

14    contributed to a public nuisance in Summit and/or

09:39:34 15    Cuyahoga County.

16                        That's their case.

17                        MR. DELINSKY:  So, Your Honor, assuming

18    that that case was legally viable, that will be decided.

19    We maintain it's not.

09:39:44 20                        Assuming that case on liability could be

21    proven -- we assert it can't be -- there's another

22    element to the offense -- excuse me, Your Honor, my

23    criminal roots are taking hold -- there's another element

24    of the claim that we still get to defend against, and

09:40:04 25    that's the element of causation.

1          And I appreciate that there may be legal

2     fights over what causation means and what the standard is

3     in the context of nuisance, but nevertheless it does

4     exist.

09:40:18  5          THE COURT:  All right.

6          MR. DELINSKY:  And that is eligible, it's

7     more than eligible, that is a necessary area of discovery

8     as well.

9          So by way of example, suppose plaintiffs

09:40:35 10    produce an analysis that says for this -- that the

11     pharmacies -- we'll take CVS as a hypothetical example --

12     routinely filled a high volume of a powerful opioid that

13     was prescribed to multiple patients by a particular

14     doctor, okay, and that those were red flags and their

09:41:04 15    system messed up, if there even should be a system, let's

16     take that hypothetical.

17          CVS then has the right to collect discovery

18     on who that doctor was.

19          THE COURT:  Why?

09:41:16 20          MR. DELINSKY:  Because what if that doctor,

21     Your Honor, was an oncologist at the Cleveland Clinic?

22          THE COURT:  Well --

23          MR. DELINSKY:  Then it's because then there

24     is no link between the red flag that plaintiffs have

09:41:29 25    identified and the nuisance that they are seeking to

1    prove.

2    They have to establish a causal link of

3    some sort between the red flags that they will allege we

4    missed, and the public nuisance in the community.

09:41:47  5    Now, they are going to do that through

6    expert testimony and statistics, and we'll dispute that.

7    But we have the right to make our causation case through

8    fact witnesses, through fact discovery, and factual.

9    So --

09:42:09  10    THE COURT:  I mean, Mr. -- look, I suppose

11    if you want to say, all right, "We didn't have a system

12    and our system" -- or "Our system wasn't very good, but

13    even if we had had a good system and we had checked,

14    these would have been okay, so no harm, no foul."

09:42:27  15    I suppose you can make that defense, but

16    again, I mean, you know who these doctors are, all right.

17    If there's a -- I mean, you don't need a lot of

18    discovery.

19    MR. DELINSKY:  Well, but, Your Honor --

09:42:40  20    THE COURT:  I mean, if they are

21    red-flagging a particular -- a particular CVS pharmacy

22    near University Circle and you can say, "Hey, all these

23    prescriptions were coming from an oncologist at the

24    Clinic," okay, you know that.

09:42:54  25    I mean, you want to -- okay, the point is

1    you can call that doctor if you want.  You can say.

2    "Hey, even if we had -- even if we had had a system and

3    even if we had checked, it would have been fine.  Okay.

4    I mean, you can -- so it's no harm, no foul."

09:43:14  5          You can use that defense if you want, and

6    you can do your discovery because you'll see the red

7    flags.

8          You're not bringing that -- suing that

9    doctor or anything.  That doesn't help.  But if you want

09:43:23 10   to defend and say, "Hey, even if we had checked out these

11   red flags, there was nothing suspicious and so no harm,

12   no foul," you can make that defense.  So that's okay.

13          MR. DELINSKY:  Your Honor, that's going to

14   require time and discovery.  This is --

09:43:41 15          THE COURT:  Well, fit it in -- I don't

16   think it will take months and months.  You have until

17   November.

18          MR. DELINSKY:  Well, Your Honor, and I want

19   to take a pause here and just point something out about

09:43:51 20   the schedule plaintiffs built because I think it's

21   illustrative.

22          Plaintiffs allocated in the schedule 20

23   depositions to the defendants as a group.  We get roughly

24   three each.

09:44:06 25          THE COURT:  You can take more depositions

1     than that.

2                    MR. DELINSKY:  They have allocated to

3     themselves 57 depositions.

4                    And, Your Honor, we do have to stop, okay.

09:44:16  5     I appreciate this Court wants to move this case at

6     breakneck speed but --

7                    THE COURT:  No, it's not breakneck speed,

8     sir.  Breakneck speed would have been a lot sooner, okay.

9                    I'm using pretty much the same schedule as

09:44:30 10    I did with the manufacturers and distributors, and this

11    doesn't include -- it's a shorter trial because it's

12    not -- it's not damages abatement so I don't need all

13    that.  And it's also a simpler case because it's one

14    theory and it's all the same, they are all pharmacies.

09:44:48 15                    So it's a much simpler case.

16                    MR. DELINSKY:  But that's not fair, Your

17    Honor, for plaintiffs to get 57 depositions.

18                    THE COURT:  You can have more.  You can

19    take as many as you want.

09:45:01 20                    I'm not -- again, I mean, you guys passed

21    in the night with your -- you know, you didn't do what I

22    had directed you to do which is confer and come up with

23    something together.

24                    Yours, you know, plaintiffs' is unworkable

09:45:17 25    because it doesn't even give me time to read the motions,

1    and yours was another year-and-a-half and a five-month

2    trial.

3              So both of them I'm tossing.

4              You want to take more, you can take as many

09:45:29  5    depositions as you want.  I gave the distributors, I

6    don't know, and the manufacturers a couple hundred.  If

7    you want to take a couple hundred, take them.  You'll be

8    taking them around the clock.  I don't care.

9              I don't think they're necessary.  I don't

09:45:43 10    know who these people are that you're going to be

11    deposing.

12              MR. DELINSKY:  So, Your Honor, here's my

13    proposal.

14              Special Master Cohen and the parties have

09:45:54 15    agreed to an initial approach for the case whereby Step 1

16    will be a production of dispensing data.  And to be clear

17    on what that is, Your Honor, line item prescriptions and

18    information about each that each of the pharmacies will

19    produce to plaintiffs.

09:46:16 20              That's what dispensing data is, it's a line

21    item for each prescription written identifying what it

22    was for, how large the prescription was, who wrote it,

23    and related information.  We're going to produce that.

24              Plaintiffs then, in the second stage, Stage

09:46:44 25    2, are going to provide to us an identification of the

1    prescriptions that plaintiffs maintain bore red flags

2    that plaintiffs maintain the pharmacy should have

3    detected.

4              Until we see that, we are in the dark about

09:47:11 5    the scope of the case and the scope of discovery that we

6    need in the case.  We can't agree to a November 9th

7    trial, not knowing what that analysis looks like.

8              If that analysis should -- reveals a

9    hundred prescriptions, that's one situation.  If it

09:47:37 10    reveals five million, that's another.

11              We just don't know, Your Honor.  We do not

12    know.

13              We will know, I think the -- by the end of

14    March under the schedule, if that schedule ends up being

09:47:52 15    workable set by Special Master Cohen.

16              So our proposal would be that we at a

17    minimum be given the opportunity to review plaintiffs'

18    analysis, which will be the embodiment of their theory,

19    because we haven't seen it to date, and a submission

09:48:11 20    isn't good enough.  We need to see the actual numbers, we

21    need to see the analysis, we need to see what their case

22    is based on because we don't have it now.

23              And then we come back to talk schedule.

24              We think it's unfair to put us to the task

09:48:27 25    of trying to build a schedule, agree to a schedule

1    without having appreciation of the extent of plaintiffs'

2    case.

3                    THE COURT:  Well, I hear what you're

4    saying.

09:48:41    5           Has -- has there been discovery already, or

6    is there going -- to determine exactly what system of

7    monitoring/checking, if at all, each defendant had in

8    place?

9                    Has that -- have those documents been

09:49:00   10    produced?

11                   MR. DELINSKY:  For CVS they have been

12    produced at a policy level, and I believe that the

13    documents for all the defendants have been or are in the

14    process of being produced, but I can't speak for them.

09:49:15   15                   MS. FUMERTON:  Your Honor, Tara Fumerton --

16                   THE COURT:  Yes.

17                   MS. FUMERTON:  -- on behalf of Walmart.

18           If I may sort of just key back off of

19    something that Mr. Delinsky said and to respond to the

09:49:24   20    question that you just asked, I think the question you

21    asked is very important to this question because

22    plaintiffs have sat here now today and said what they're

23    looking for is whether or not we had adequate systems.

24                   THE COURT:  Right.

09:49:37   25                   MS. FUMERTON:  And that looks at our

1    policies --

2                    THE COURT:  Right.

3                    MS. FUMERTON:  -- and our procedures.

4                    And most of us have produced a substantial,

09:49:44  5    if not all of those policies and procedures already.

6                    THE COURT:  Okay.

7                    MS. FUMERTON:  The complicating factor here

8    is plaintiffs' request for dispensing data and their

9    request to analyze that data on a

09:49:57  10   prescription-by-prescription basis, which is what they

11   said they're going to do, and identify for us the

12   specific prescriptions that they allege should not have

13   been filled or --

14                   THE COURT:  Wait a minute.  Wait a minute.

09:50:10  15                   I don't think, Ms. Fumerton, they can't do

16   that.

17                   They can identify -- a red flag doesn't

18   mean that a prescription should not have been filled, all

19   right.  They can't do that.  I won't let them do that.  I

09:50:26  20   won't let anyone testify to that.  So if they're thinking

21   of doing that, it's out right now.

22                   All they can say is, "Look, something's

23   unusual or something's suspicious about this prescription

24   or this group of suspicions -- prescriptions, and you

09:50:45  25   should have asked -- you should have looked at it.  Okay.

1      Mr. Delinsky, there might be an innocent explanation,

2      okay, but you should have looked at it.

3                      "It's out of the ordinary.  It's a big jump

4      from last month.  It's a whole bunch of, you know, people

09:50:59  5      with the same address or the same number, whatever.  You

6      should have looked."

7                      And that's all they can say.

8                      Okay.  So if they are -- so -- and your

9      records would show whether you looked at all, okay, and

09:51:17  10      if you did, what explanation you found.  Okay.  So that's

11      what -- and I thought that that's what the case is going

12      to be about.

13                      They're not going to go and actually go to

14      the doctor and the patient and bring in testimony about

09:51:32  15      what actually happened.  The focus is going to be

16      historic.

17                      MS. FUMERTON:  So, Your Honor,

18      respectfully, I think they're trying to have it both

19      ways.

09:51:39  20                      They're saying it's about systems, but they

21      have already told us -- we spent a lot of time last week

22      walking through this -- that they are going to identify

23      specific prescriptions that they think should have

24      flagged.

09:51:50  25                      THE COURT:  Should have flagged, yes.

1    Okay.

2                        MS. FUMERTON:  And should have been

3    investigated.

4                        THE COURT:  Right.

09:51:54  5              MS. FUMERTON:  And so in response, we are

6    going to have to, for those specific prescriptions,

7    present an individual defense.

8                        So, respectfully, I would like to propose

9    an alternative.

09:52:04 10             THE COURT:  The defense is not going to be

11   actually what was or wasn't with the actual facts on the

12   prescription.

13                       You can say, "Hey, guess what?  All these

14   things you've identified as red flags, suspicious,

09:52:16 15   they're not, they're really ordinary and with no cause to

16   look at."  Okay.  Or you can say, "We looked at them, and

17   here's what we found because here's the documents that

18   show that we looked at them."

19                       MS. FUMERTON:  And how that happens is on a

09:52:30 20   prescription-by-prescription basis.  When the pharmacist

21   is presented with a prescription, they assess various

22   factors that is individualized to each individual

23   prescription.

24                       And so respectfully, I just wanted to throw

09:52:41 25   out sort of, you know, to the problem I think that we are

1    having, an alternative, an alternative way to possibly

2    streamline the case and that is forget about dispensing

3    data.  Let's not produce dispensing data.

4                If the argument here is that it's about

09:52:53  5    systems, they have Arcos' data.  They can talk about

6    numbers in the aggregate.  They can talk about systems.

7                And then that's going to solve a whole

8    bunch of these issues that we're having with respect to

9    the timing of all of this because one of the things

09:53:08 10    especially that I wanted to make sure that we noted about

11    Special Masters Cohen's ruling from the other night on

12    Monday is that into the schedule is built only 14 days

13    for us to identify additional data that needs to be

14    produced once they have provided us with their red flag

09:53:21 15    analysis and the specific prescriptions that they think

16    triggered that, triggered those red flags.  And that's

17    simply impossible for us to do.

18                Now, if they came back and said we have two

19    prescriptions that triggered this, maybe I could do it,

09:53:36 20    but I am kind of a betting woman and I would say that's

21    not what's going to happen.  They are going to find

22    thousands and thousands of prescriptions, if not hundreds

23    of thousands, if not millions.

24                So I think what we're talking about here is

09:53:49 25    the complication and why we're having such a hard time

1    with the schedule is the dispensing data.  And if this is

2    a systems case, let's not produce the dispensing data and

3    then we don't have to worry about that.

4                 THE COURT:  Well, I think, though, without

5    the dispensing data, they can't make their red flag

6    argument.  I mean, it's theoretical.

7                 In other words, it's going to -- patterns,

8    all right, are going to come out and should have -- if

9    they are there.  Look, I don't know if the plaintiffs

10   have a case at all.  I asked them that before.  I don't

11   know.  I'm agnostic.

12                They may have no case against any of the

13   six.  They may have a case against some of you.  I don't

14   know.

15                And I've been pleading with both sides to

16   do something streamlined so we know if there's a case at

17   all, okay, but -- and that's what I'm directing, and so

18   what we're going to do is this:  I'm going to modify the

19   schedule, move it back about a month, and you're going to

20   proceed as you are.

21                And the plaintiffs understand that if they

22   turn this into a dispensing case, I'm going to cancel the

23   trial date and, you know, you can have years, and I don't

24   care.  And I'm going to send all these back around the

25   country because there's nothing I'll be able to do with

1    it.  And every Judge is going to be wrestling with the

2    same thing.  I'll have no MDL function.

3              I'll try this case eventually.

4              Okay.  And if the plaintiffs want to have a

5    trial in November, they're going to have to produce a

6    case that can be discovered and defended.  Okay.  So the

7    ball's in the plaintiffs' Court.  So we'll see.

8              I'm not going to have a trial

9    that's -- that's unfair to one side or the other, but

10   it's up to the plaintiffs.  If they want a trial in

11   November, you're going to have to streamline and

12   structure that case so it can be investigated, developed,

13   defended by the defendants.

14             If you don't want that, that's okay, too.

15   I don't -- you know, I'll do something else in November.

16             Yes, Mr. Stoffelmayr.

17             MR. STOFFELMAYR:  Thank you, Your Honor.  I

18   wanted to maybe ask a more nuts and bolts question.

19             You said at the outset that the trial would

20   be limited to a liability on a public nuisance claim.

21             THE COURT:  Right.  It's only public

22   nuisance.

23             And liability under Ohio public nuisance

24   law is for the jury, but abatement, remedy, is for the

25   Court.  And I would do it at some subsequent time.

1          MR. STOFFELMAYR:  So two questions about

2     that.

3          One, I think that was news to at least some

4     of us that the trial would be so limited.

09:56:28  5          And other claims have not been dismissed.

6     Does that mean --

7          THE COURT:  I think they have been.  The

8     plaintiffs have said it's only -- it's public nuisance.

9          I think they've got conspiracy, but there's

09:56:39 10    no independent liability for conspiracy.

11         MR. STOFFELMAYR:  Right.  Well, it's one

12    thing to say that.  It's another thing to actually

13    dismiss the claims.

14         THE COURT:  Well, I'm saying it now.

09:56:48 15         Am I right?

16         MR. WEINBERGER:  You are correct.

17         THE COURT:  I think it's been filed.

18         All right.  It's done.  You're facing

19    public nuisance, that's your only -- and I've researched

09:56:56 20    this carefully and I had come to this conclusion with the

21    manufacturers and distributors, that under Ohio law,

22    public nuisance liability is for the jury.

23         And if and only if the jury finds

24    liability, what I'll call abatement or remedy,

09:57:17 25    abatement -- it's prospective, it's not retrospective;

1    it's prospective, monetary and/or injunctive -- is for

2    the Court to be decided at a subsequent evidentiary

3    proceeding.

4               MR. STOFFELMAYR:  And that, I think that

09:57:31  5    answers my second question is because when we were here

6    last year in October, we were anticipating that the jury

7    would decide past damages, including perhaps, which is

8    always the source of some confusion, on the public

9    nuisance claim, but prospective remedies would be for the

09:57:47 10   Court.

11              So if I'm understanding correctly, the

12    trial we're talking about now will be -- the only issues

13    to be tried will be liability on the public nuisance

14    claim in front of a jury, and then only prospective

09:57:59 15   remedies, whether they are in the form of an injunction

16    or monetary relief, would be for the Court at a separate

17    proceeding.

18              THE COURT:  Right.

19              MR. STOFFELMAYR:  But there will be no --

09:58:07 20   there will be no trial at any point of past damages.

21              THE COURT:  Right.

22              And so that's why I believe we can -- we

23    can do this trial in the time allotted.

24              I think it's, you know, it's fairly

09:58:20 25   straightforward.

1            MR. STOFFELMAYR:  And I think it will be

2       helpful for everyone going forward then, and you started

3       with this, if there's some sort of filing on the record

4       from the plaintiffs, something binding that we can point

09:58:32  5       to on points like that, and also very specifically on

6       exactly what -- exactly what is the case that we're

7       trying, because, at least for me and my client, you know,

8       that's evolving over time.

9            And if we have a clear target everyone can

09:58:48 10       look at and point to, I think that's going to be very

11       helpful rather than sort of a helpful discussion on the

12       record, but that's very different than, you know, here's

13       a clear and unambiguous sentence in a Court filing.

14            Thank you, Your Honor.

09:59:01 15            THE COURT:  All right.  Well, I'll direct

16       the plaintiffs to file something.  I think it's been

17       established that's the purpose of this hearing.

18            There's only going to be one trial.  So

19       whether these claims are dismissed with or without

09:59:26 20       prejudice doesn't matter because there will be only one

21       Track 1B trial.  So that's -- I've made that clear.

22            So it will be public nuisance only

23       liability.  If the jury finds liability against one or

24       more defendants, I'll figure out a subsequent proceeding

09:59:50 25       in front of me to determine abatement remedy, and when.

1     And, you know, I'll worry about that then.

2                So I think that's -- we'll do it one step

3     at a time.

4                We'll -- now, a number of depositions,

10:00:13  5     again I don't -- I mean, in Track 1A this was a -- I

6     mean, what happened is the plaintiffs made a proposal,

7     the defendants made a proposal, and I ended up giving

8     each side about half of what they want.

9                I think the plaintiffs wanted 800

10:00:31 10     depositions.  I think I gave them 400.  I don't know.

11                I didn't come up with these numbers, and

12     I'm not wedded to them, so I suggest you all, you know,

13     you figure it out.  I'm not, you know --

14                SPECIAL MASTER COHEN:  Judge, I'm going to

10:00:47 15     be meeting with the parties in the next ten days and

16     we're going to work that out.

17                THE COURT:  All right.  I think it should

18     be reasonable.  All right.

19                You now, you know, defendants understand

10:00:55 20     what the plaintiffs' case is going to be.  All right.

21     And it's going to be systems, orders that they believe

22     should have been -- should have prompted some inquiry.

23     And then the documents, each defendant's documents will

24     show whether or not you made an inquiry or not and what,

10:01:15 25     if anything, you found.

1           Okay.  That's there from the documents.  It

2      should be easy to uncover.  And then the parties can, you

3      know, do what they want with that.  And that to me is

4      a -- that's a manageable, sensible trial for the jury.

10:01:30  5           MR. BARNES:  Your Honor, can I address one

6      of your points?

7                Robert Barnes for Giant Eagle.

8                THE COURT:  Yes, Mr. Barnes.

9                MR. BARNES:  Thank you.

10:01:37 10           A couple aspects of this jump out.

11           We heard in Case Track 1A, when deposing

12      multiple DEA officials and looking at their materials,

13      they said time and again the overwhelming number of

14      prescriptions issued in this country were issued in good

10:01:56 15      faith by doctors practicing in good faith and pharmacists

16      filling in good faith.  And that really what it boiled

17      down to, if diversion was occurring, a small handful of

18      doctors were causing a lot of diversion.

19                So we start the proposition, in looking at

10:02:18 20      this case and looking at the dispensing case, you have

21      the DEA, the main law enforcement agency in charge of

22      this whole area of law saying, "We agree, almost every

23      prescription ever issued is perfectly fine."  So what we

24      have is a very small, tiny sliver of prescriptions that

10:02:36 25      were causing a problem.

1          And then the second thing the DEA has said

2     time and again is, "We are not the medical

3     professionals."

4          They have been asked repeatedly, "Give us

10:02:48  5     guidance.  What do you want us to do?  What -- what is a

6     good quantity?  What is a bad quantity?"

7          And the DEA says every time, "We're not

8     getting into that.  We don't train doctors.  We don't

9     send them through medical school.  We don't test them.

10:03:03 10          "But so we will not give you any guidance.

11    It's up to the medical professional to make that critical

12    decision."

13          And so in terms of how a pharmacy chain

14    looks at it, when a doctor issues a prescription, it's

10:03:21 15    because he's been trained, he or she has been trained.

16    He sees the patient.  He issues the prescription.

17          There are bad doctors out there, and

18    that's -- and that's something that's common knowledge.

19    But it's up to the DEA, the State Boards of Pharmacies to

10:03:37 20    investigate, to prosecute those sometimes with the

21    assistance.

22          I know representing Giant Eagle, we

23    routinely assist the DEA and the Ohio Board of Pharmacy

24    and the Pennsylvania Board of Pharmacy with

10:03:49 25    investigations.

1           But --

2           THE COURT:  I would like to jump in.

3           MR. BARNES:  -- my point, Your Honor, is

4    you have two professionals involved in the dispensing of

10:03:57 5    every prescription.

6           You have a doctor exercising medical

7    professional judgment, which the DEA says they're

8    entitled to do and they better do.

9           You have a pharmacist exercising

10:04:09 10   professional pharmacy judgment.

11          THE COURT:  Right.

12          MR. BARNES:  And so when analyzing

13   prescription dispensing, you cannot get away from the two

14   professional judgments that have been exercised.  Whether

10:04:22 15   you do it by statistical data and say, "Well, there's a

16   bunch of prescriptions here," the obvious first question

17   is who's writing these and who's filling these and why

18   are they doing that.

19          So you can't go into a room and then have

10:04:38 20   blue smoke come out of the chimney and say, "We've

21   decided, based upon crunching numbers alone, that these

22   prescriptions are bad or should not have been filled

23   because" --

24          THE COURT:  Oh, no.  Wait, Mr. Barnes.

10:04:50 25   You're making the same error that your colleague made.

1          The plaintiffs cannot, and I won't let

2     them, put in arguments, witnesses to say that these

3     prescriptions should not have been filled.

4          I won't permit that testimony.  All right.

10:05:06  5     It isn't going to happen.

6          All they can -- all they can argue is this

7     prescription or these group of prescriptions are out of

8     the ordinary and should have prompted some inquiry to

9     make sure that someone was exercising legitimate

10:05:27 10     judgment.

11          And I would say also that you can have

12     patients who are trying to take advantage of doctors, all

13     right.  Dr. A may say, "All right.  You need this drug,"

14     but Dr. A may not have known that that patient was going

10:05:39 15     to Drs. B, C, D and E and getting the same prescription

16     filled.

17          All right.  The pharmacy should have had a

18     system to track that, all right, and not let a given

19     patient fill five or six prescriptions for Oxycodone from

10:05:54 20     different doctors.  Pharmacies should be on top of that.

21          MS. MOORE:  Your Honor, Kelly --

22          THE COURT:  So I'm -- you know, this case

23     is not going to be about individual doctors exercising

24     their medical judgment.

10:06:06 25          It's going to be on whether or not these

1    defendants, these six pharmacies, had systems in place to

2    reasonably make sure that the drugs were only going to

3    the people who they were supposed to go to.

4              All right.  And if you had a doctor who was

5    doing something really crazy in your neighborhood, the

6    pharmacy should have been on top of that.

7              MS. MOORE:  Your Honor, Kelly Moore for

8    Rite Aid.

9              THE COURT:  Okay.  Yes, Ms. Moore.

10             MS. MOORE:  I think the issue does come

11   back to what Mr. Delinsky said to begin with which is we

12   are talking about two different regulations under the

13   CSA.

14             One is the suspicious order monitoring

15   regulation that applies to distribution and suspicious

16   wholesale orders.  That regulation on its face does not

17   apply to practitioners.

18             Pharmacies are registered under the DEA as

19   practitioners.

20             THE COURT:  All right.

21             MS. MOORE:  The regulation, as we

22   understand it from the amended complaints that the

23   plaintiffs are focusing on for their dispensing case, is

24   the one that requires pharmacists to exercise a

25   corresponding responsibility to not fill medically

1    unnecessary prescriptions.

2              The entire red flag analysis goes to

3    whether or not ultimately a pharmacist properly exercised

4    their corresponding responsibility to not fill a

10:07:30  5    medically unnecessary prescription.

6              So it does ultimately -- the CSA

7    requirement they're trying to hang their entire

8    dispensing case on, the entire red flags analysis, all

9    goes back to that regulation.

10:07:43  10             There is no way we can defend against that

11    without pointing out that it was an appropriate exercise

12    of corresponding responsibility on the pharmacist's part,

13    which goes to that very subject of was it a proper

14    prescription in the first place.

10:08:00  15             THE COURT:  Well, I disagree.

16             MS. MOORE:  And then did the pharmacist

17    fill properly.

18             THE COURT:  I disagree.

19             But, you know, that's --

10:08:04  20             MS. MOORE:  So, Your Honor --

21             THE COURT:  We're not going to be looking

22    at individual -- all right.  I've said all I've said, all

23    right, so it's up to the plaintiffs to structure and

24    streamline their case, and you can defend it.

10:08:17  25             If you want to call a bunch of doctors, you

1    know, as witnesses, I mean, you can use your time calling

2    a bunch of doctors, all right.

3                    I'm not telling you how you, you know, how

4    to defend your case, Ms. Moore.

10:08:26  5                MS. MOORE:  Your Honor, will you require

6    the plaintiffs to say that they are not relying on the

7    corresponding responsibility regulation?

8                    THE COURT:  I don't -- on what?

9                    MS. MOORE:  The regulation that they are

10:08:36 10   relying -- their entire case hinges on is the one that

11   requires the pharmacist to exercise professional judgment

12   to not knowingly fill a prescription that's not medically

13   necessary.

14                    THE COURT:  Right.  And they're saying --

10:08:50 15                MS. MOORE:  That's not the regulation they

16   are relying on.

17                    If they are relying on some sort of

18   suspicious order monitoring requirement that we don't

19   think legally exists, that's what we need to know.  We

10:09:01 20   need them to say it.

21                    But they can't have it both ways.  They

22   can't say, "Oh, yeah, it's just going to be a systems

23   case, Your Honor, but actually the regulation that we are

24   ultimately trying to prove was violated was the one where

10:09:09 25   the pharmacist didn't exercise the corresponding

1  responsibility," because that's the case we are going to

2  need to defend against.

3      THE COURT:  Well, I think I've said

4  everything I've said.

10:09:17  5      They're going to make their filing, and the

6  proof will be on what they do when they get your first

7  tranche of data.  All right.

8      All right.  Again, they're going to argue

9  to the jury that each, each defendant should have had

10:09:33 10  some system to make sure each of your individual

11  pharmacists was exercising their responsibility properly,

12  some checking, some system to check.  All right.  And if

13  you had it and also having it and using it.

14      And using it means, all right, if something

10:09:56 15  suspicious pops up, to make some reasonable inquiry.

16  That's what the case is going to be about.

17      And again, I don't know if they have a

18  case.  All right.  They may not have a case.  If all they

19  have is a, you know -- we'll just use CVS again or Rite

10:10:11 20  Aid, anyone -- if over five, six years they've got 10 or

21  15 red flags for five years, they don't have a case.  I'd

22  throw it out.  They'd drop it themselves, or if they

23  don't, it will go out.

24      The jury is not going to find that, you

10:10:26 25  know, whether you did or didn't monitor 15 red flags over

1    five years substantially contributed to public nuisance

2    in Summit or Cuyahoga County.

3              If there are hundreds and hundreds and

4    hundreds of red flags and it turns out you did nothing, a

10:10:40  5    jury could say, "Hey, you're part of the problem."  All

6    right.  So I don't know.

7              All right.  And obviously a red flag has to

8    be something that would reasonably prompt suspicion.  If

9    they have some cockeyed red flags, you can say, "Well,

10:10:57 10    that's not suspicious at all."

11             Okay.  So, I mean, this is a common sense

12    case.  They either -- and quite frankly, by now, I mean,

13    I'm surprised we're still even having these theoretical

14    discussions.

10:11:11 15             The data should have shown, all right,

16    whether there is anything or not.  But certainly by

17    March, you'll know, both sides will know.

18             MR. JOHNSON:  Your Honor.

19             THE COURT:  So I guess we'll figure out

10:11:23 20    when we'll reconvene.  I'll figure out when, you know,

21    when to reconvene.

22             Yes.  Yes, Mr. Johnson.

23             MR. JOHNSON:  I didn't mean to interrupt

24    you.

10:11:35 25             THE COURT:  No.  No.  I've spoken.

1          MR. JOHNSON:  On that subject I have a

2     suggestion.

3          THE COURT:  Okay.

4          MR. JOHNSON:  And you're talking about

10:11:38  5     common sense, and I think that this fits into that

6     category.

7               And we're going to know a lot more in March

8     when we do everything we've just been talking about.

9               And to me, it doesn't -- even though that's

10:11:54 10    the way I know that things are normally done down here

11    with case management orders, but I don't think this is a

12    normal case.  I think we really should just come back at

13    that critical point when we all know.  We're going to

14    have a lot of these questions that are being raised

10:12:13 15    answered.

16               Right now we're all shooting in the dark as

17    far as picking dates.

18               Special Master Cohen says he's going to, I

19    guess, start to set a number of depos and things like

10:12:26 20    that, if I understood you correctly.

21               I think that's all premature.  None of us

22    are going to know what the plaintiffs' case is -- maybe

23    even the plaintiffs -- until March.

24               So why don't we just -- we've got

10:12:40 25    everything in place to get to that point in time.  We can

1       then come back and all speak with some intelligence and

2       information to then plot out the rest of the case.

3                       Are the doctors going to be necessary?

4       Nail down what exactly the plaintiffs' case is, and go

10:13:02   5    from there.

6                       I don't see any wasted time.  We're just

7       going to know a lot more.

8                       But trying to throw all these dates out

9       there, including a trial date, we're just -- we don't

10:13:15  10    have enough information to know that.

11                      And I don't think it slows down the case.

12      The deadlines are kind of set, and that would seem to be

13      the logical time to then enter into more meaningful and

14      thoughtful schedules.

10:13:31  15                     THE COURT:  All right.  Well, I'm going

16      to -- this is what I'm -- I've already said what I've

17      said.

18                      I'm going to move the trial back to

19      November 9th and it will be roughly four, four weeks.

10:13:44  20                     We have March 26th scheduled, all right,

21      we're going to reconvene.  That's two months, exactly two

22      months from now.  And at that time a lot of this will be

23      produced.

24                      The defendants will see exactly what the

10:14:00  25    plaintiffs' case is, what -- how many red flags they

1    think there were, whether we have a hundred, whether we

2    have a million.  I, you know, I don't think it will be a

3    hundred.  My guess, it will be more than a hundred, less

4    than a million, but, you know, I don't know where, I

10:14:20  5    really don't.

6              And, you know, as I said, I know -- I'm

7    confident after 21 years on the bench I know how to

8    schedule a fair trial and how to run one, and I'm not

9    going to -- I'm not going to schedule an unfair trial.  I

10:14:39  10    don't -- I didn't with Track 1A.

11             I did have to move that trial date back.  I

12    didn't do it lightly, but when it became clear that the

13    trial would have been unfair, unmanageable on the first

14    deadline, I moved it, like any Judge would do, whether

10:14:57  15    it's a one-defendant case or a 20-defendant case.

16             So but I have also learned that I'm going

17    to have a structure and deadlines, and lawyers work to

18    deadlines.  So, you know, we're going to have one, and

19    then we'll see what this case looks likes on March 26th.

10:15:15  20             MS. FUMERTON:  Your Honor, Tara Fumerton

21    from Walmart again.

22             THE COURT:  Yes.

23             MS. FUMERTON:  Respectfully with the

24    March 26th date, under the current schedule plaintiffs

10:15:24  25    aren't actually going to be giving us their analyses and

1    the identified prescriptions until March 30th, so I would

2    respectfully request that they be -- that deadline for

3    them be moved up by a week at least so that we can have a

4    more meaningful discussion on the 26th as to what the

10:15:42  5    case is going to look like.

6             So if we can get their analyses, which they

7    probably, you know, should already have basically done

8    and they should only need to run the algorithm against

9    their data, it shouldn't take them very long to do that,

10:15:57  10    so it shouldn't be an issue to go, you know, by the 23rd

11    or even ten days earlier by March 20th, so that we have

12    at least a week to look at what their case is prior to

13    that status conference.

14             MR. WEINBERGER:  Your Honor, we -- we

10:16:16  15    believe we can do that, not having seen the data yet.

16             So, you know, we're comfortable with that,

17    with answering discovery with respect to our preliminary

18    analysis of the data.

19             I do want to make one -- a couple points in

10:16:33  20    response to my colleagues on the other side.

21             THE COURT:  All right.  Well, let me -- all

22    right.  Then I think that's a fair request because

23    otherwise our discussion would be too theoretical.

24             So I'll direct the plaintiffs produce their

10:16:48  25    red flag data no later than March 20th.

```
 1              Okay.  Yes, Mr. Weinberger.

 2              MR. WEINBERGER:  So with respect to the

 3    colloquy about the DEA and what I heard to be some of the

 4    way that the defendants think they're going to defend

 5    this case, I don't think we should leave this hearing

 6    today without reminding ourselves of the fact that the

 7    data that we have so far from Arcos indicates that

 8    120 billion opioids were distributed and dispensed over

 9    an eight-year period of time.

10              These pharmacies --

11              THE COURT:  In these counties, two

12    counties?

13              MR. WEINBERGER:  No, nationwide.

14              THE COURT:  Okay.  Right.

15              MR. WEINBERGER:  120 billion.

16              Now, we can -- you can do the math on the

17    per capita and our population.

18              So we also know that these pharmacy

19    defendants were the last line of defense in terms of

20    dispensing these 120 billion pills.

21              So to suggest that they -- that only the

22    doctors and only distributors or other defendants,

23    potential defendants, are responsible and they are not,

24    in terms of the system of dispensing these prescriptions,

25    just does not hold water, Your Honor.
```

1          THE COURT:  All right.  Well, look, that --

2     that would be -- your argument to the jury is that they

3     have some responsibility, and I don't think they're going

4     to get up in front of a jury and say they have no

10:18:36  5     responsibility.  I haven't heard that from any of the

6     lawyers.  And trust me, if any lawyer gets up there and

7     says that in front of a jury, you're going to guarantee a

8     defeat.

9          Okay.  The question is whether they

10:18:48 10     exercised their responsibility responsibly.  That's what

11     this case is going to be about.  And it's going to

12     be -- I believe it's going to be there from the historic

13     data.

14          And I don't know the answer to that.  And I

10:19:02 15     have no idea, of course, how a jury's going to conclude.

16     But that's what this -- yes, they are the last line of

17     defense, and so they, each pharmacy, has an individual

18     professional responsibility to look at every

19     prescription, make sure there's nothing strange or

10:19:21 20     suspicious about that prescription or the patient who's

21     coming in.  All right.

22          And your argument -- and I think a

23     reasonable jury would conclude that a corporation that

24     has a thousand pharmacies in Summit and Cuyahoga County,

10:19:38 25     has some responsibility on a corporate level to make sure

1     their employees are following the law, like any other

2     law.

3                     Okay.  That's your case.  And whether they

4     were or not, whether there was a system or not, that's

10:19:53 5     what the trial will show.

6                     Yes, Mr. Stoffelmayr.

7                     MR. STOFFELMAYR:  Thank you, Your Honor.

8                     I apologize for the one who brings up the

9     least interesting issues, but I have on our calendar a

10:20:03 10    status conference in February that we actually --

11                    THE COURT:  It's on.

12                    We'll have to figure out if we're going

13    to -- you know, I've learned you put something on every

14    month.  I mean, that doesn't mean you have to meet if

10:20:16 15    there's no reason to meet.

16                    I'll have to figure out whether, you know,

17    if there's -- if there's a reason to meet on this case on

18    that day in February, we'll meet.  If I conclude that

19    it's not a good use of resources, I'm not going to bring

10:20:30 20    people in just to say hi.

21                    MR. STOFFELMAYR:  Okay.  So the comments

22    about, just so we're clear, the comments about March,

23    you're not intending to cancel the February --

24                    THE COURT:  I haven't canceled it yet, but

10:20:42 25    I'm not going to just make people come in to say hi.

1          I'll figure out -- it's on the calendar, so

2     everyone's busy and including the Court and all these

3     lawyers, so you've got it there.

4                    MR. STOFFELMAYR:  Yes, sir.

5                    THE COURT:  So I'll figure out if we'll

6     need that February date.

7                    I know we'll need the March date.

8                    MR. STOFFELMAYR:  The other thing I was

9     going to request or listening to the discussion about

10    dispensing data, I think part of the confusion or ways in

11    which people may be kind of missing each other's point is

12    how the plaintiffs will show causation.

13                   We've heard a lot sort of about what the

14    responsibility is and, you know, we'll debate that later,

15    what the responsibility really is, and whether you

16    violated the responsibility or met the responsibility.

17    That will -- those are legal issues for later.

18                   But there's obviously also a causation

19    element.  And you can dismiss it as no harm, no foul, but

20    if there's no evidence of causation, you're going to have

21    to grant judgment as a matter of law.

22                   Whether someone gets up and argues --

23                   THE COURT:  Well, if they show that there

24    were thousands of red flags that the defendants ignored,

25    they're going to argue that that's a cause of the

1    problem.

2                    MR. STOFFELMAYR:  Right.  And I don't mean

3    to get into --

4                    THE COURT:  And you can argue that it's all

5    theoretical, and the jury can -- you know, you're

6    absolutely right, the jury's going to have to

7    show -- determine that whatever you did or didn't do was

8    a, I think, substantial cause of the public nuisance.

9                    MR. STOFFELMAYR:  Right.

10                   And I don't intend to engage in an argument

11   about what's good enough evidence, what's not good enough

12   evidence.  That's for later.

13                   My only request, because I think this will

14   help the parties, is that the plaintiffs' submission --

15   and I was going to request that you give us a due date so

16   we can all, you know, know when we'll see that -- that

17   the submission doesn't just describe how they intend to

18   show, you know, what was the duty, responsibility,

19   whatever you want to call it, how they intend to show

20   what was the breach, but also how they intend to show

21   causation.

22                   And if it's all blended together, that's

23   fine, but that would be enormously helpful for us so that

24   when we come back we can tell the Court, "Here's what we

25   need and here's why," so we're not talking about --

1          THE COURT:  The plaintiffs need to be as

2     specific as possible as to what their case is, what

3     you're alleging, what you're not alleging, and how did

4     you plan to show it.

10:22:53  5          All right.  And I would say today's the --

6          MR. WEINBERGER:  Your Honor, to -- I think

7     we have to all assume that the defendants have already

8     run their own data using many of the red flags that we

9     agreed upon last Tuesday.

10:23:16 10          So to suggest -- I mean, we will certainly

11    comply and submit a clarification as you have laid out,

12    but for them to suggest that they are in the dark on what

13    their data shows, it belies reality.

14          THE COURT:  All right.  Mr. Weinberger,

10:23:38 15    they, each defendant knows and has known for a long time,

16    A, whether they had a system and, B, whether they used

17    it.  Okay.  They know it.

18          I don't know it.  You may not know it.  But

19    they've known it for a long time, and whatever it is, it

10:23:55 20    is going to come out, but each of them know it.

21          So I'll just say by noon next -- noon on

22    Friday, the 7th, the plaintiffs are to make the filing

23    that we've discussed.

24          MR. STOFFELMAYR:  Thank you, Your Honor.

10:24:08 25          THE COURT:  And I'll get it -- I will get

         1     a -- I'll get a revised schedule out.

         2                    It's not going to say anything about the

         3     number of depositions, but I'm going to revise these

         4     dates for -- with a November 9th trial of four weeks.

10:24:31  5                    And again we'll definitely be meeting on

         6     March 27th.

         7                    And whether we meet February 27th --

         8                    MR. WEINBERGER:  March 26th, Your Honor.

         9                    THE COURT:  March 26th.  We're meeting

10:24:44 10     March 26th.

        11                    Whether we meet February -- February 27th

        12     remains to be seen.  It's still on there.  I don't want

        13     anyone canceling it.  There may be something we need to

        14     do.

10:25:00 15                    Okay.  Anything else?

        16                    Yes, Mr. Barnes.

        17                    MR. BARNES:  Just one minor matter.

        18                    On behalf of Giant Eagle, in your order

        19     denying summary judgment, one of our pharmacists was, I

10:25:11 20     think, inadvertently identified as a thief, and I think

        21     it was a mixing up of --

        22                    THE CLERK:  I believe that's fixed.

        23                    MR. BARNES:  Is that fixed?

        24                    THE CLERK:  I think so.  I'll double-check

        25     for you, but I think it is.

1          MR. BARNES:  All right.

2          THE COURT:  All right.  And that reminds

3     me, I had -- I want -- you know, while you're talking

4     about number of depositions and documents, whatever, I

10:25:37  5     want the parties to come up with a mechanism so that if

6     we have to try this case, it's going to be simple and

7     understandable for the jury.  They're just going to hear

8     CVS, Rite Aid, Walgreen's, Discount Drug Mart, whether

9     it's HBC or Giant Eagle, I don't care which one, and

10:25:59 10    Walmart.  They're not going to be hearing about all these

11    related family entities, and the jury forms and verdicts

12    are just going to be one name.

13          All right.  So you all figure out how to do

14    that.

10:26:09 15          We did it in Track 1A.  It's not hard to

16    do.  But no one's going to understand the difference

17    between different corporate entities.  All right.  I

18    don't, and no jury will.  So you figure it out, and don't

19    wait until November 3rd.

10:26:25 20          Yes, Mr. Delinsky.

21          MR. DELINSKY:  Thank you, Your Honor.

22          I appreciate what Your Honor's driving at

23    in terms of simplicity and the corporate names and not

24    having complicated corporate family trees, but there's a

10:26:37 25    feature of this upcoming trial that's different than

1    Track 1A, and that is Mr. Weinberger said the pharmacies

2    are being sued for two separate and independent

3    functions, and so there's the distribution function and

4    the dispensing function.

10:26:53 5              So there is going to have to be some method

6    of segregation.  Those are oftentimes -- those reflect

7    different DEA registrations held by different facilities.

8              So I just want to preview for the Court --

9              THE COURT:  Well, I'm going to -- the

10:27:08 10   plaintiffs' case is going to be unintelligible to a jury

11   if you're going to argue CVS Co., you know, on the

12   distribution side of it and CVS Inc. on the pharmacy side

13   of it.  No one is going to understand it.

14             So you figure that out.  All right.

10:27:32 15             Okay.  Anything else that anyone wanted to

16   raise?

17             MR. WEINBERGER:  Not on behalf of

18   plaintiffs, Your Honor.

19             Thank you.

10:27:39 20             MR. STOFFELMAYR:  No.

21             Thank you, Your Honor.

22             THE COURT:  Okay.  I appreciate it's been a

23   good discussion.

24             And again I'll let you know whether we need

10:27:45 25   to reconvene at the end of February, or whether it will

1   just be March.

2                 (Proceedings concluded at 10:28 a.m.)

3                         -   -   -   -

4                  C E R T I F I C A T E

5                 I certify that the foregoing is a correct

6   transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11  **/s/Susan Trischan**

12  /S/ Susan Trischan, Official Court Reporter

13  Certified Realtime Reporter

14

15  7-189 U.S. Court House

16  801 West Superior Avenue

17  Cleveland, Ohio 44113

18  (216) 357-7087

19

20

21

22

23

24

25