## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | |
| THIS DOCUMENT RELATES TO: | MDL No. 2804 |
| *The County of Summit, Ohio*, et al. *v. Purdue Pharma L.P.*, et al. Case No. 18-op-45090 | Case No. 1:17-md-2804 |
| | Judge Dan Aaron Polster |
| *The County of Cuyahoga, Ohio*, et al. *v. Purdue Pharma L.P.*, et al., Case No. 17-op-45004 | |

## DECLARATION OF ALEX J. HARRIS

Pursuant to 28 U.S.C. § 1746, I, Alex J. Harris, hereby declare as follows:

1. I am an associate in the Denver, Colorado office of Bartlit Beck LLP, counsel for Walgreen Co. and Walgreen Eastern Co., Inc. (together, "Walgreens") in the above-captioned cases.

2. I submit this declaration on behalf of Walgreens in support of the Pharmacy Defendants' Motion for Summary Judgment Based on Statutes of Limitations and for the purpose of transmitting to the Court true and correct copies of the documents attached hereto.

3. Attached as Exhibit 1 is a copy of excerpts from the expert report of Robert L. Brunner submitted on behalf of Walgreens on May 10, 2019 in the above-captioned cases.

4. Attached as Exhibit 2 is a copy of an active Ohio Board of Pharmacy license for the Walgreens distribution center in Perrysburg, Ohio.  This license was obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

5.      Attached as Exhibit 3 is a copy of an inactive Ohio Board of Pharmacy license for Walgreen Co.  This license was obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

6.      Attached as Exhibit 4 is copy of an inactive Ohio Board of Pharmacy license for Walgreen Eastern Co., Inc.  This license was obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

7.      Attached as Exhibit 5 is a copy of excerpts from Walgreen Co.'s 10-K for the Fiscal Year ended August 31, 2000.

8.      Attached as Exhibit 6 is a copy of excerpts from Walgreen Co.'s 10-K for the Fiscal Year ended August 31, 2012.

9.      Attached as Exhibit 7 is a copy of excerpts from Walgreen Co.'s 2012 Annual Report.

10.     Attached as Exhibit 8 is a copy of excerpts from Walgreen Co.'s 10-Q for the Quarterly Period ended May 31, 2013.

11.     Attached as Exhibit 9 is a PDF of a DEA press release dated June 11, 2013 and available at https://www.dea.gov/press-releases/2013/06/11/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under.

12.     Attached as Exhibit 10 are PDFs of news articles from June 2013, available at:

- https://www.nytimes.com/2013/06/12/business/walgreen-to-pay-80-million-settlement-over-painkiller-sales.html
- https://www.wsj.com/articles/SB1000142412788732490400457853974377532083 34
- https://www.reuters.com/article/us-walgreen-settlement/walgreen-in-record-80-million-settlement-over-painkillers-idUSBRE95A13220130611

- https://www.usatoday.com/story/news/nation/2013/06/11/walgreens-drug-oxycodone-license-80-million/2412451/

13.     Attached as Exhibit 11 are PDFs of archived versions of the DEA website as of July 3, 2013 and March 1, 2017 from Archive.org, available at:

- https://web.archive.org/web/20130704181754/https://www.justice.gov/dea/divisions/mia/2013/mia061113_appendixb.pdf
- https://web.archive.org/web/20170301061238/https://www.dea.gov/divisions/mia/2013/mia061113_appendixb.pdf

14.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on this 19th day of June, 2019.

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, 12th Floor
Denver, CO 80202
(303) 592-3197

# EXHIBIT 1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION

-------------------------------------------------------

THIS REPORT RELATES TO:

*Track One Cases*

**MDL No. 2804**
**Case No. 1:17-MD-02804**
**Judge Dan Aaron Polster**

---

**EXPERT REPORT OF**

**ROBERT L. BRUNNER**

May 10, 2019

---

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

report.  I have also had a conversation with John Merritello, Manager - Walgreen Co.  A detailed list of the materials I reviewed is contained in Appendix B.

### IV.    SUMMARY OF OPINIONS

#### A.    Opinion No. 1 – Walgreens' Data.

18.    It is my opinion, to a reasonable degree of certainty, that Walgreens' transactional data produced at WAGMDL00773926 is a reliable source of information as it pertains to Walgreens' distribution of eight pharmaceutical opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the period August 1, 2002 to April 9, 2014.

#### B.    Opinion No. 2 – The ARCOS Data.

19.    Subject to a small number of adjustments described in more detail in Section V of my report, I conclude with a reasonable degree of certainty that the DEA-produced ARCOS Data is a reliable source of information as it pertains to Walgreens' distribution of certain pharmaceutical opioids to Walgreens pharmacies located in Cuyahoga County and Summit County, Ohio for the periods January 1, 2006 through April 9, 2014.[3]

#### C.    Opinion No. 3 – McCann's methodologies for flagging transactions in the ARCOS and Walgreens' Data do not provide information about any particular transaction beyond an initial triggering transaction.

20.    I have reviewed the McCann Report and the work papers and incomplete computer code made available to me one month after McCann issued his first report.  Based on that review, it is my opinion that McCann's five methodologies are arbitrarily applied across all

---

[3] As supplemented by Walgreen's data for October 2007 (*See* McCann paragraph 96 at 39) and adjusted to reflect six Walgreens pharmacies in Cuyahoga County that shared three Buyer DEA Numbers.  The ARCOS Data is through 12/31/2014; however, Walgreens made no shipments of the any of the relevant drugs into Cuyahoga or Summit Counties after April 9, 2014.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 22 - Annual shipments of Oxycodone by Walgreens Distributors to Walgreens Stores in Cuyahoga County, by drug strength**



### G.  Opinion No. 7 - Additional Tables and Charts Summarizing Walgreens' Data

74.      Presented below and at Appendix **H** are a series of additional tables and charts that summarize and illustrate Walgreens' transactional data where Walgreens was a distributor of hydrocodone or oxycodone to Walgreens pharmacies in Cuyahoga and Summit County, Ohio during the period August 1, 2002 through April 9, 2014.  Because McCann limited his flagging analyses to hydrocodone and oxycodone, I have done the same with respect to my presentation of data. Again, Walgreens did not ship any of the relevant drugs into Cuyahoga or Summit County after April 9, 2014.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a)      Two tables each of the 59 Walgreens pharmacies located in Cuyahoga and

Summit County, OH showing the volume of hydrocodone and oxycodone shipped

by Walgreens' distributors to Walgreens pharmacies for the period August 1,

2002 through April 9, 2014.  See Table 1.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table 2 – Walgreens Pharmacies in Cuyahoga and Summit County with Open and Close Dates, and Minimum and Maximum Transaction Dates**

| Buyer DEA Number | Store Number | Address | County | Open Date | Close Date | Min Txn Date [3] | Max Txn Date |
|---|---|---|---|---|---|---|---|
| BW4096322 | 3313 | 5264 LEE RD MAPLE HEIGHTS OH | CUYAHOGA | 8/4/1994 | | 8/5/2002 | 4/4/2014 |
| BW4096358 | 3307 | 15609 LAKE SHORE BLV CLEVELAND OH | CUYAHOGA | 8/11/1994 | | 8/1/2002 | 4/4/2014 |
| BW4096360 | 3309 | 3121 CLARK AVE CLEVELAND OH | CUYAHOGA | 8/23/1994 | 1/28/2009 | 8/6/2002 | 1/23/2009 |
| BW4096360 | 12444 | 3415 CLARK AVENUE CLEVELAND OH | CUYAHOGA | 1/29/2009 | | 2/4/2009 | 4/4/2014 |
| BW4108797 | 3234 | 4281 W 130TH ST CLEVELAND OH | CUYAHOGA | 9/8/1994 | | 8/1/2002 | 4/4/2014 |
| BW4129842 | 3226 | 6410 BROADWAY AVE CLEVELAND OH | CUYAHOGA | 9/23/1994 | | 8/2/2002 | 4/4/2014 |
| BW4129854 | 3238 | 14525 EUCLID AV EAST CLEVELAND OH | CUYAHOGA | 10/6/1994 | | 8/5/2002 | 4/2/2014 |
| BW4129866 | 3326 | 4365 MAYFIELD RD SOUTH EUCLID OH | CUYAHOGA | 9/29/1994 | | 8/2/2002 | 4/3/2014 |
| BW4129878 | 3235 | 16400 CHAGRIN B SHAKER HEIGHTS OH | CUYAHOGA | 10/7/1994 | | 8/2/2002 | 4/3/2014 |
| BW4139564 | 3312 | 22401 LAKE SHORE BLVD EUCLID OH | CUYAHOGA | 9/15/1994 | | 8/1/2002 | 4/4/2014 |
| BW4147307 | 3310 | 16803 LORAIN AVE CLEVELAND OH | CUYAHOGA | 9/29/1994 | | 8/1/2002 | 4/4/2014 |
| BW4387759 | 3256 | 11401 UNION AVE CLEVELAND OH | CUYAHOGA | 5/19/1995 | | 8/5/2002 | 4/2/2014 |
| BW4673554 | 3314 | 5400 PEARL PARMA OH | CUYAHOGA | 12/6/1995 | | 8/1/2002 | 4/9/2014 |
| BW5624184 | 3308 | 4265 STATE RD CLEVELAND OH | CUYAHOGA | 11/21/1997 | | 8/7/2002 | 4/2/2014 |
| BW5688176 | 4159 | 6300 PEARL RD PARMA HEIGHTS OH | CUYAHOGA | 1/30/1998 | | 8/1/2002 | 4/4/2014 |
| BW5837945 | 4130 | 3020 MAYFIEL CLEVELAND HEIGHTS OH | CUYAHOGA | 6/5/1998 | | 8/2/2002 | 4/3/2014 |
| BW5961063 | 4202 | 127 E PLEASANT VAL SEVEN HILLS OH | CUYAHOGA | 8/15/1998 | | 8/1/2002 | 4/7/2014 |
| BW5985998 | 4685 | 2135 WARRENSVILLE SOUTH EUCLID OH | CUYAHOGA | 8/29/1998 | | 8/1/2002 | 4/4/2014 |
| BW6156396 | 4684 | 12777 ROCKSID GARFIELD HEIGHTS OH | CUYAHOGA | 1/13/1999 | | 8/1/2002 | 4/3/2014 |
| BW6577312 | 5030 | 6605 MAYFIELD MAYFIELD HEIGHTS OH | CUYAHOGA | 11/27/1999 | 7/30/2014 | 8/6/2002 | 4/4/2014 |
| BW6631560 | 5473 | 25524 CENTER RIDGE RD WESTLAKE OH | CUYAHOGA | 1/30/2000 | | 8/6/2002 | 4/4/2014 |
| BW6704185 | 5206 | 11701 DETROIT AVE LAKEWOOD OH | CUYAHOGA | 4/21/2000 | | 8/2/2002 | 4/4/2014 |
| BW7200633 | 5550 | 21010 CENTER RIDGE ROCKY RIVER OH | CUYAHOGA | 4/7/2001 | | 8/6/2002 | 4/2/2014 |
| BW7664130 | 6659 | 4071 LEE RD CLEVELAND OH | CUYAHOGA | 3/11/2002 | | 8/6/2002 | 4/4/2014 |
| BW8142159 | 6889 | 6270 SOM CENTER RD SOLON OH | CUYAHOGA | 1/31/2003 | | 1/30/2003 | 4/3/2014 |
| BW8393441 | 5031 | 7260 PEARL  MIDDLEBURG HEIGHTS OH | CUYAHOGA | 8/1/2003 | | 7/28/2003 | 4/4/2014 |
| BW8904206 | 7474 | 751 RICHMOND  RICHMOND HEIGHTS OH | CUYAHOGA | 8/6/2004 | | 8/2/2004 | 4/4/2014 |
| BW8963224 | 2226 | 5090 TURNEY R GARFIELD HEIGHTS OH | CUYAHOGA | 8/30/2004 | | 8/30/2004 | 4/3/2014 |
| BW9066982 | 1234 | 6 E BAGLEY RD BEREA OH | CUYAHOGA | 1/14/2005 | | 1/18/2005 | 4/4/2014 |
| BW9497327 | 2132 | 6900 ROCKSIDE RD INDEPENDENCE OH | CUYAHOGA | 10/28/2005 | | 10/25/2005 | 4/4/2014 |
| BW9507786 | 10032 | 8966 BRECKSVILLE R BRECKSVILLE OH | CUYAHOGA | 10/31/2005 | | 11/10/2005 | 3/28/2014 |
| BW9507798 | 10030 | 4507 CLARK AVE CLEVELAND OH | CUYAHOGA | 10/29/2005 | 1/27/2009 | 11/1/2005 | 1/20/2009 |
| BW9507837 | 10029 | 27251 WOLF RD BAY VILLAGE OH | CUYAHOGA | 11/7/2005 | | 11/8/2005 | 4/4/2014 |
| BW9509588 | 10033 | 647 BROADWAY AVE BEDFORD OH | CUYAHOGA | 10/29/2005 | 1/31/2007 | 11/3/2005 | 1/31/2007 |
| BW9509588 | 10220 | 520 BROADWAY AVE BEDFORD OH | CUYAHOGA | 2/1/2007 | | 2/5/2007 | 4/4/2014 |
| BW9525176 | 10028 | 20145 VAN AKEN  SHAKER HEIGHTS OH | CUYAHOGA | 11/7/2005 | 7/26/2006 | 11/22/2005 | 7/21/2006 |
| BW9525188 | 10026 | 19001 EUCLID AVE EUCLID OH | CUYAHOGA | 11/4/2005 | 12/31/2009 | 11/17/2005 | 12/31/2009 |
| BW9525188 | 10710 | 20485 EUCLID AVE EUCLID OH | CUYAHOGA | 1/1/2010 | | 1/5/2010 | 4/4/2014 |
| BW9866863 | 9073 | 20200 VAN AKEN  SHAKER HEIGHTS OH | CUYAHOGA | 7/27/2006 | | 7/31/2006 | 4/3/2014 |
| FW0022614 | 10328 | 7888 YORK RD PARMA OH | CUYAHOGA | 10/27/2006 | | 10/20/2006 | 4/2/2014 |
| FW0329931 | 9407 | 14815 MADISON AVE LAKEWOOD OH | CUYAHOGA | 7/6/2007 | | 6/28/2007 | 4/4/2014 |
| FW1058557 | 11558 | 5644 MAYFIELD RD LYNDHURST OH | CUYAHOGA | 9/19/2008 | | 9/15/2008 | 4/2/2014 |
| FW1270785 | 12014 | 19980 W 130TH ST STRONGSVILLE OH | CUYAHOGA | 3/11/2009 | | 3/5/2009 | 4/3/2014 |
| FW1270800 | 12445 | 24590 LORAIN RD NORTH OLMSTED OH | CUYAHOGA | 3/19/2009 | | 3/13/2009 | 4/2/2014 |
| FW2207125 | 12634 | 1415 ROCKSIDE RD PARMA OH | CUYAHOGA | 9/16/2010 | | 9/9/2010 | 4/4/2014 |
| BW4129880 | 3278 | 834 W MARKET ST AKRON OH | SUMMIT | 9/8/1994 | | 8/1/2002 | 4/2/2014 |
| BW4129892 | 3279 | 1303 COPLEY RD AKRON OH | SUMMIT | 9/16/1994 | | 8/1/2002 | 4/2/2014 |
| BW4139540 | 3281 | 1130 S ARLINGTON ST AKRON OH | SUMMIT | 9/22/1994 | | 8/2/2002 | 4/2/2014 |
| BW4208965 | 3276 | 1925 W MARKET ST AKRON OH | SUMMIT | 10/27/1994 | | 8/2/2002 | 4/3/2014 |
| BW4550287 | 3572 | 2645 STATE RD CUYAHOGA FALLS OH | SUMMIT | 8/17/1995 | | 8/2/2002 | 4/2/2014 |
| BW5523469 | 3741 | 302 CANTON RD AKRON OH | SUMMIT | 9/12/1997 | | 8/1/2002 | 4/2/2014 |
| BW5629615 | 4295 | 2086 GRAHAM RD STOW OH | SUMMIT | 11/29/1997 | | 8/5/2002 | 4/2/2014 |
| BW6026668 | 4776 | 900 WOOSTER RD N BARBERTON OH | SUMMIT | 9/26/1998 | | 8/1/2002 | 4/3/2014 |
| BW6353572 | 4775 | 9043 DARROW RD TWINSBURG OH | SUMMIT | 7/10/1999 | | 8/1/2002 | 4/2/2014 |
| BW6819924 | 5904 | 830 BRITTAIN RD AKRON OH | SUMMIT | 7/21/2000 | | 8/5/2002 | 4/3/2014 |
| BW8807402 | 7719 | 663 E AURORA RD MACEDONIA OH | SUMMIT | 6/11/2004 | | 6/9/2004 | 4/4/2014 |
| FW0581480 | 11143 | 3009 W MARKET ST FAIRLAWN OH | SUMMIT | 11/15/2007 | | 11/12/2007 | 4/3/2014 |
| FW1142962 | 11748 | 361 E WATERLOO RD AKRON OH | SUMMIT | 11/13/2008 | | 11/11/2008 | 4/2/2014 |
| FW1641489 | 12543 | 755 HOWE AVE CUYAHOGA FALLS OH | SUMMIT | 9/25/2009 | | 9/22/2009 | 4/2/2014 |

[1] Walgreens Pharmacy Information provided by John Merritello, Manager at RxInventory Control at Walgreens.

[2] Source of Transaction Dates: Walgreens Transactional Data from 8/1/2002 - 4/9/2014 Produced 2/5/2019 (WAGMDL00773926).

[3] Minimum Transaction Dates may preceed the store open date by no more than 8 days. Pharmacies stock their shelves before opening.

56

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 10th day of May 2019, in Chicago, IL.

Robert L. Brunner

# EXHIBIT 2



# License Look Up

6/17/2019 9:11 PM

## WALGREENS

| | |
|---|---|
| Status | Active |
| Sub-Status | |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 011347450 |
| License Issue Date | 01/07/2003 |
| License Expiration Date | 06/30/2019 |
| License Effective Date | 07/01/2018 |
| Street Address | 28727 OREGON ROAD |
| City | PERRYSBURG |
| State | OH |
| Zipcode | 43551 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| | | Active | Mon Feb 02 00:00:00 GMT 2009 | |

Current date & time: **6/17/2019 9:11 PM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 3



# License Look Up

6/17/2019 9:11 PM

## WALGREEN CO.

| Status | Inactive |
|---|---|
| Sub-Status | Closed |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 011342500 |
| License Issue Date | 02/07/2003 |
| License Expiration Date | 06/30/2007 |
| License Effective Date | 05/16/2006 |
| Street Address | 15998 WALGREENS DRIVE |
| City | JUPITER |
| State | FL |
| Zipcode | 33478 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| | | Active | | |

Current date & time: **6/17/2019 9:11 PM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 4



# License Look Up

6/17/2019 9:12 PM

## WALGREEN EASTERN CO., INC.

| | |
|---|---|
| Status | Inactive |
| Sub-Status | Closed |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 012315150 |
| License Issue Date | 05/30/2013 |
| License Expiration Date | 06/30/2014 |
| License Effective Date | 05/30/2013 |
| Street Address | 125 N. COMMERCE WAY |
| City | BETHLEHEM |
| State | PA |
| Zipcode | 18107 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| | | Active | Mon Mar 04 00:00:00 GMT 2013 | |

Current date & time: **6/17/2019 9:12 PM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 5

# WALGREEN CO

## FORM 10-K
### (Annual Report)

## Filed 11/29/2000 For Period Ending 8/31/2000

| | |
|---|---|
| Address | 200 WILMOT RD |
| | DEERFIELD, Illinois 60015 |
| Telephone | 847-940-2500 |
| CIK | 0000104207 |
| Industry | Retail (Drugs) |
| Sector | Services |
| Fiscal Year | 08/31 |

Generated by **EDGAR Online Pro**
http://pro.edgar-online.com



Contact **EDGAR Online**
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

The company employs approximately 116,000 persons, about 42,000 of whom are part-time employees working less than 30 hours per week.

(d) Financial information about foreign and domestic operations and export sales.

All the company sales occur within the continental United States and Puerto Rico. There are no export sales.

3

Cautionary Note Regarding Forward-Looking Statements

Certain information in this annual report, as well as in other public filings, our web site, press releases and oral statements made by our representatives, is forward-looking information based on current expectations and plans that involve risks and uncertainties. Forward-looking information includes statements concerning pharmacy sales trends, prescription margins, number of new store openings, and the level of capital expenditures; as well as those that include or are preceded by the words "expects,""estimates,""believes" or similar language. For such statements, we claim the protection of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

The following factors, in addition to those discussed elsewhere in this annual report for the fiscal year ended August 31, 2000, could cause results to differ materially from management expectations as projected in such forward-looking statements: changes in economic conditions generally or in the markets served by the company; consumer preferences and spending patterns; competition from other drugstore chains, supermarkets, on-line retailers, other retailers and mail order companies; changes in state or federal legislation or regulations; the efforts of third party payers to reduce prescription drug costs; the success of planned advertising and merchandising strategies; the availability and cost of real estate and construction; accounting policies and practices; the company's ability to hire and retain pharmacists and other store and management personnel; the company's relationships with its suppliers; the company's ability to successfully implement new computer systems and technology; and adverse determinations with respect to litigation or other claims. The company assumes no obligation to update its forward-looking statements to reflect subsequent events or circumstances.

## Item 2. Properties

The number and location of the company's drugstores is incorporated by reference to the table under the caption "3,000 and Growing" on page 32 of the Annual Report. Most of the company's drugstores are leased. The leases are for various terms and periods. See the caption, "Leases" on page 26 of the Annual Report, which section is incorporated herein by reference. The company owns approximately 17% of the retail stores open at August 31, 2000. The company has an aggressive expansion program of adding new stores and remodeling and relocating existing stores. Net selling space of drugstores was increased from 29.2 million square feet at August 31, 1999, to 33.7 million square feet at August 31, 2000. Approximately 60% of company stores have been opened or remodeled during the past five years.

The company's retail drugstore operations are supported by nine distribution centers with a total of approximately 4.3 million square feet of space, of which 3.5 million square feet is owned. The remaining space is leased. All warehouses are served by modern distribution systems for order processing control, operating efficiencies and rapid merchandise delivery to stores. In addition, the company uses public warehouses to handle certain distribution needs. The company plans to, at a minimum, open or expand one distribution center a year for the next five years.

There are five principal office facilities containing approximately 700,000 square feet of which 500,000 square feet is owned and the remainder is leased. The company owns one mail service facility with a ground lease and leases two other facilities. The combined square footage of the facilities is approximately 187,000 square feet. The mail order and office facilities are adequate for current needs.

4

## Item 3. Legal Proceedings

On September 29, 1999, the company was served with an action based on the company's handling of partially filled prescriptions for private third-party plans by the Board of Trustees of the Carpenters & Millwrights of Houston & Vicinity Welfare Trust Fund, Civil Action No. 599CV216, which was filed in the United States District Court for the Eastern District of Texas. The complaint seeks certification as a class action, as well as damages and treble damages in excess of $1,000,000. Although the ultimate disposition of this suit cannot be forecast with certainty, management is of the opinion that this litigation should not have a material adverse effect on the company's consolidated financial

# EXHIBIT 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
**For the fiscal year ended August 31, 2012**

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the Transition Period From _____ to _____

Commission file number **1-604**.

## WALGREEN CO.

(Exact name of registrant as specified in its charter)

| Illinois | 36-1924025 |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| 108 Wilmot Road, Deerfield, Illinois | 60015 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(847) 315-2500**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($.078125 Par Value) | New York Stock Exchange |
| | The NASDAQ Stock Market LLC |
| | Chicago Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:    <u>None</u>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                         Accelerated filer ☐
Non-accelerated filer ☐                         Smaller Reporting Company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐  No ☒

As of February 29, 2012, the aggregate market value of Walgreen Co. common stock held by non-affiliates (based upon the closing transaction price on the New York Stock Exchange on February 29, 2012) was approximately $28.6 billion. As of August 31, 2012, there

brand name prescription drugs, the timing and severity of the cough, cold and flu season, significant acquisitions, dispositions and other strategic initiatives, the relative magnitude of our LIFO provision in any particular quarter, inflation and the other risk factors discussed under this Item 1A. Accordingly, we believe that quarter-to-quarter comparisons of our operating results are not necessarily meaningful and investors should not rely on the results of any particular quarter as an indication of our future performance.

**There are a number of additional business risks that could adversely affect our financial results.**

Many other factors could adversely affect our financial results, including:

· If we are unsuccessful in establishing effective advertising, marketing and promotional programs, our sales or sales margins could be negatively affected.

· Our success depends on our continued ability to attract and retain store and management and professional personnel, and the loss of key personnel could have an adverse effect on the results of our operations, financial condition or cash flow.

· Changes in accounting standards and the application of existing accounting standards particularly related to the measurement of fair value as compared to carrying value for the Company's reporting units, including goodwill and intangible assets, may have an adverse effect on the Company's financial condition and results of operations.

· Natural disasters, severe weather conditions, terrorist activities, global political and economic developments, war, health epidemics or pandemics or the prospect of these events can impact our store operations or damage our facilities in affected areas or have an adverse impact on consumer confidence levels and spending in our stores.

· The long-term effects of climate change on general economic conditions and the pharmacy industry in particular are unclear, and changes in the supply, demand or available sources of energy and the regulatory and other costs associated with energy production and delivery may affect the availability or cost of goods and services, including natural resources, necessary to run our business.

· The products we sell are sourced from a wide variety of domestic and international vendors, and any future inability to find qualified vendors and access products in a timely and efficient manner could adversely impact our business.

## Item 1B.  Unresolved Staff Comments

There are no unresolved staff comments outstanding with the Securities and Exchange Commission at this time.

## Item 2.  Properties

The Company's locations by state at August 31, 2012 and 2011 are listed below.

| State | 2012 | 2011 | State | 2012 | 2011 | State | 2012 | 2011 |
|---|---|---|---|---|---|---|---|---|
| Alabama | 106 | 101 | Louisiana | 151 | 147 | Oklahoma | 104 | 105 |
| Alaska | 5 | 5 | Maine | 15 | 14 | Oregon | 76 | 73 |
| Arizona | 254 | 254 | Maryland | 73 | 66 | Pennsylvania | 138 | 138 |
| Arkansas | 60 | 60 | Massachusetts | 179 | 180 | Rhode Island | 29 | 29 |
| California | 651 | 627 | Michigan | 233 | 230 | South Carolina | 114 | 110 |
| Colorado | 170 | 167 | Minnesota | 160 | 156 | South Dakota | 14 | 14 |
| Connecticut | 119 | 117 | Mississippi | 71 | 71 | Tennessee | 268 | 261 |
| Delaware | 68 | 67 | Missouri | 204 | 201 | Texas | 718 | 700 |
| District of Columbia | 5 | 3 | Montana | 14 | 13 | Utah | 44 | 43 |
| Florida | 878 | 864 | Nebraska | 62 | 61 | Vermont | 4 | 4 |
| Georgia | 204 | 203 | Nevada | 92 | 87 | Virginia | 143 | 133 |
| Hawaii | 13 | 11 | New Hampshire | 35 | 35 | Washington | 137 | 130 |
| Idaho | 41 | 42 | New Jersey | 205 | 199 | West Virginia | 22 | 21 |
| Illinois | 610 | 598 | New Mexico | 66 | 66 | Wisconsin | 234 | 231 |
| Indiana | 216 | 211 | New York | 526 | 524 | Wyoming | 11 | 11 |
| Iowa | 73 | 72 | North Carolina | 211 | 201 | Guam | 1 | 1 |
| Kansas | 71 | 69 | North Dakota | 1 | 1 | Puerto Rico | 113 | 110 |

| Kentucky | 103 | 102 | Ohio | 270 | 271 TOTAL | 8,385 | 8,210 |
|----------|-----|-----|------|-----|-----------|-------|-------|

The Company owns approximately 20% of the retail drugstore locations open at August 31, 2012. The remaining drugstore locations are leased. The leases are for various terms and periods. See Note 3, "Leases" on page 32 of the 2012 Annual Report, which section is incorporated herein by reference. The Company has a strategic expansion program of adding new stores and remodeling and relocating existing stores. Net retail selling space increased from 86 million square feet at August 31, 2011 to 87 million square feet at August 31, 2012. Not including the approximately 5,000 locations that were converted under the Customer Centric Retailing initiative concluded in fiscal 2012, approximately 28% of Company stores have been opened or remodeled during the past five years. As of August 31, 2012, we had opened or converted stores with our pilot "Well Experience" store format in approximately 350 locations, including a market-wide transformation in the Indianapolis area and new flagship stores in select markets including Chicago, New York City, Las Vegas and Puerto Rico.

The Company's retail store operations are supported by 18 major distribution centers with a total of approximately 10 million square feet of space, of which 15 locations are owned. The remaining space is leased. All distribution centers are served by modern systems for order processing control, operating efficiencies and rapid merchandise delivery to stores. In addition, the Company uses public warehouses to handle certain distribution needs.

The Company operates 31 principal office facilities containing approximately three million square feet, of which 18 locations are owned. The Company operates two mail service facilities containing approximately 237 thousand square feet, one of which is owned.

The Company also owns 32 strip shopping malls containing approximately 2 million square feet.

The foregoing does not include properties acquired in connection with the USA Drug transaction, which closed in September 2012. It also does not include properties of unconsolidated partially owned entities, such as Alliance Boots GmbH, of which we own 45% of the outstanding share capital.

## Item 3.  Legal Proceedings

The information in response to this item is incorporated herein by reference to Note 11 "Commitments and Contingencies" on pages 37 through 38 of the 2012 Annual Report.

## Item 4.   Mine Safety Disclosures

Not Applicable.

## Executive Officers of the Registrant

The following table sets forth, for each person serving as an executive officer of Walgreens as of October 19, 2012, the name, age and principal occupations and employment of such person for the past five years. Unless otherwise stated, employment is by Walgreens. Executive officers of Walgreens are elected annually by the Board of Directors and serve until a successor has been duly elected or appointed and qualified or until the officer's death, resignation or removal. There are no family relationships between any of the Company's executive officers or directors.

| Name and Business Experience | Age | Office(s) Held |
|---|---|---|
| Gregory D. Wasson<br>   President and Chief Executive Officer since February 2009<br>   Director since February 2009<br>   President and Chief Operating Officer – May 2007<br>   to February 2009<br>   Executive Vice President – October 2005 to May 2007<br>   President, Walgreens Health Services – March 2002 to<br>   May 2007<br>   Director of Alliance Boots GmbH since August 2012 | 54 | President and Chief Executive Officer |
| Sona Chawla<br>   President, E-Commerce since January 2011<br>   Senior Vice President, E-Commerce –  July 2008 to<br>   January 2011<br>   Vice President, Global Online Business, Dell, Inc. –<br>    December 2006 to May 2008 | 45 | President, E-Commerce |
| Kermit R. Crawford | 53 | President, Pharmacy, Health and |

# EXHIBIT 7



At the Corner of
Happy and Healthy

2012 Annual Report

Consolidated Statement of Comprehensive Income. Fair value changes in derivatives that are designated and qualify as cash flow hedges are recorded in other comprehensive income, with any ineffectiveness recorded in interest expense.

In January 2010, the Company terminated its existing one-month future LIBOR swaps that converted all $1.3 billion of its 4.875% fixed-rate debt to floating. Upon termination, the Company received payment from its counterpart that consisted of accrued interest and an amount representing the fair value of the swaps. The related fair value benefit attributed to the Company's debt continues to amortize over the life of the debt, which matures on August 1, 2013. The Company then entered into six-month LIBOR in arrears swaps with two counterparties for all of its $1.3 billion 4.875% fixed-rate debt.

In May 2011, the Company entered into interest rate swaps with two counterparties converting $250 million of its 5.250% fixed-rate notes to a floating interest rate based on the six-month LIBOR in arrears plus a constant spread. In March 2012, the Company entered into interest rate swaps with the same two counterparties converting an additional $250 million of its 5.250% fixed-rate notes to a floating interest rate based on the one-month LIBOR in arrears plus a constant spread. All swap termination dates coincide with the notes maturity date, January 15, 2019.

In the fourth quarter of fiscal 2012, the Company entered into three forward starting interest rate swap transactions locking in the then current interest rate on $1.0 billion of its anticipated debt issuance in connection with the Alliance Boots investment. The swaps were terminated subsequent to year end when the hedged debt was issued in September 2012. The swap transactions were designated as cash flow hedges.

The notional amounts of derivative instruments outstanding at August 31, 2012 and 2011, were as follows *(In millions)*:

|  | 2012 | 2011 |
| --- | --- | --- |
| Derivatives designated as hedges: |  |  |
| Interest rate swaps | **$1,800** | $1,550 |
| Forward interest rate swaps | **1,000** | — |

The changes in fair value of the notes attributable to the hedged risk are included in long-term debt on the Consolidated Balance Sheets (see Note 8) and amortized through maturity. At August 31, 2012 and 2011, the Company had net unamortized fair value changes of $40 million and $57 million, respectively. Changes in fair value of the cash flow hedges are included in other comprehensive income, with any ineffectiveness recorded directly to interest expense. Upon termination of the cash flow hedges, cumulative changes included in other comprehensive income will be amortized with the anticipated debt's cash flow. No material fair value changes or ineffectiveness was recorded through other comprehensive income in fiscal 2012.

The fair value and balance sheet presentation of derivative instruments at August 31, 2012, were as follows *(In millions)*:

|  | Location in Consolidated Balance Sheet | 2012 | 2011 |
| --- | --- | --- | --- |
| Asset derivatives designated as hedges: |  |  |  |
| Interest rate swaps | Other current assets | **$24** | $— |
| Forward interest rate swaps | Other non-current assets | — | — |
| Interest rate swaps | Other non-current assets | **39** | 63 |

Gains and losses relating to the ineffectiveness of the Company's derivative instruments are recorded in interest expense on the Consolidated Condensed Statement of Comprehensive Income. The Company recorded a $2 million gain in fiscal 2012 and $1 million in fiscal 2011.

## 10. Fair Value Measurements

The Company measures certain assets and liabilities in accordance with ASC Topic 820, Fair Value Measurements and Disclosures. ASC Topic 820 defines fair value as the price that would be received for an asset or paid to transfer a liability in

an orderly transaction between market participants on the measurement date. In addition, it establishes a fair value hierarchy that prioritizes observable and unobservable inputs used to measure fair value into three broad levels:

Level 1 – Quoted prices in active markets that are accessible at the measurement date for identical assets and liabilities. The fair value hierarchy gives the highest priority to Level 1 inputs.

Level 2 – Observable inputs other than quoted prices in active markets.

Level 3 – Unobservable inputs for which there is little or no market data available. The fair value hierarchy gives the lowest priority to Level 3 inputs.

Assets and liabilities measured at fair value on a recurring basis were as follows *(In millions)*:

|  | August 31, 2012 | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
| Assets: |  |  |  |  |
| Money market funds | $ 820 | $ 820 | $ — | $ — |
| Interest rate swaps | 63 | — | 63 | — |
| Forward interest rate swaps | — | — | — | — |
|  | August 31, 2011 | Level 1 | Level 2 | Level 3 |
| Assets: |  |  |  |  |
| Money market funds | $1,239 | $1,239 | $ — | $ — |
| Interest rate swaps | 63 | — | 63 | — |

Interest rate swaps are valued using the six-month and one-month LIBOR in arrears rates. See Note 9 for additional disclosure regarding financial instruments.

Assets measured at fair value on a nonrecurring basis were as follows *(In millions)*:

|  | August 31, 2012 | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- |
| Assets: |  |  |  |  |
| Alliance Boots call option | $ 866 | — | — | $866 |

The call option was valued using a Monte Carlo simulation using assumptions surrounding Walgreens equity value as well as the potential impacts of the certain provisions of the Purchase and Option Agreement dated June 18, 2012, by and among the Company, Alliance Boots and AB Acquisitions Holdings Limited.

The Company reports its debt instruments under the guidance of ASC Topic 825, Financial Instruments, which requires disclosure of the fair value of the Company's debt in the footnotes to the consolidated condensed financial statements. See Note 8 for further details.

## 11. Commitments and Contingencies

The Company is involved in legal proceedings, including the matters described below, and is subject to investigations, inspections, audits, inquiries and similar actions by governmental authorities, arising in the normal course of the Company's business. Litigation, in general, and securities and class action litigation, in particular, can be expensive and disruptive. Some of these suits may purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years. From time to time, the Company is also involved in legal proceedings as a plaintiff involving antitrust, tax, contract, intellectual property and other matters. Gain contingencies, if any, are recognized when they are realized. The results of legal proceedings are often uncertain and difficult to predict, and the costs incurred in litigation can be substantial, regardless of the outcome.

On a quarterly basis, the Company assesses its liabilities and contingencies for outstanding legal proceedings and reserves are established on a case-by-case basis for those legal claims for which management concludes that it is probable that a loss will be incurred and that the amount of such loss can be reasonably estimated. Management's assessment of current litigation and other legal proceedings, including the corresponding accruals, could change because of the discovery of facts with respect to legal actions or other proceedings pending against the Company which are not presently known. Adverse determinations by judges, juries or other parties

# Notes to Consolidated Financial Statements (continued)

could also result in changes to management's assessment of current liabilities and contingencies. The ultimate costs of resolving these claims may be substantially higher or lower than the amounts reserved. Due to the inherent difficulty of predicting the outcome of litigation and other legal proceedings, the Company cannot predict the eventual outcome of these matters, and it is reasonably possible that some of them could be resolved unfavorably to the Company. As a result, it is possible that the Company's results of operations or cash flows in a particular fiscal period could be materially affected by an unfavorable resolution of pending litigation or contingencies. However, based on its current knowledge, management does not expect reasonably possible losses relating to the outcome of current litigation and legal proceedings, after consideration of applicable reserves and rights to indemnification, to be material to the Company's consolidated financial position.

On April 4, 2012, the United States Drug Enforcement Administration (DEA) served administrative inspection warrants on six Walgreen retail pharmacies in Florida and removed certain controlled substance prescription records and other related documents. DEA also served an inspection warrant and an administrative subpoena for records on the Walgreens distribution center in Jupiter, Florida. DEA issued a separate administrative subpoena for records from the Walgreens facility in Orlando, Florida on August 8, 2012. On September 14, 2012, DEA served an Order to Show Cause (OSC) and Immediate Suspension Order (ISO) on the Jupiter Distribution Center and placed under seal the controlled substance inventory at that facility. Walgreens timely requested a hearing to demonstrate why DEA should not permanently revoke the controlled substance registration from the Jupiter Distribution Center. On October 10, 2012, Walgreens filed a petition in the U.S. Court of Appeals for the District of Columbia challenging DEA's authority to issue the ISO.

SEC regulations require disclosure of certain environmental matters when a governmental authority is a party to the proceedings and the proceedings involve potential monetary sanctions that management reasonably believes could exceed $100,000. On July 2, 2012, a number of California District Attorneys served the Company with a civil complaint filed in the Alameda County Superior Court alleging certain violations of the state's hazardous waste regulations related to the proper disposal of various materials from the Company's retail stores and seeking injunctive relief, civil penalties and certain fees and expenses. The California District Attorneys filed an amended complaint on July 12, 2012, and a motion for preliminary injunction on August 6, 2012. The Company intends to work with state and local officials in an effort to resolve this matter, but cannot predict the ultimate outcome of these efforts.

## 12. Capital Stock

The Board of Directors' long-term capital policy is to maintain a strong balance sheet and financial flexibility; reinvest in its core strategies; invest in strategic opportunities that reinforce its core strategies and meet return requirements; and return surplus cash flow to shareholders in the form of dividends and share repurchases over the long term. In connection with the Company's capital policy, its Board of Directors authorized a share repurchase program (2009 repurchase program) and set a long-term dividend payout ratio target between 30 and 35 percent of net income. The 2009 repurchase program, which was completed in September 2010, allowed for the repurchase of up to $2.0 billion of the Company's common stock. On October 13, 2010, the Board of Directors authorized the 2011 repurchase program, which was completed in July 2011, which allowed for the repurchase of up to $1.0 billion of the Company's common stock. On July 13, 2011, the Board of Directors authorized the 2012 repurchase program, which allows for the repurchase of up to $2.0 billion of the Company's common stock prior to its expiration on December 31, 2015. Activity related to these programs was as follows (In millions):

| Fiscal Year Ended | 2012 | 2011 | 2010 |
|---|---|---|---|
| 2009 stock repurchase program | $ — | $ 360 | $1,640 |
| 2011 stock repurchase program | — | 1,000 | — |
| 2012 stock repurchase program | 1,151 | 424 | — |
| | $1,151 | $1,784 | $1,640 |

The Company determines the timing and amount of repurchases from time to time based on its assessment of various factors including prevailing market conditions, alternate uses of capital, liquidity, the economic environment and other factors. The Company anticipates that the pace of any future share repurchase activity may be significantly curtailed from the levels achieved in the preceding two years due to its investment in Alliance Boots. The timing and amount of these purchases may change at any time and from time to time. The Company has repurchased and may from time to time in the future repurchase shares on the open market through Rule 10b5-1 plans, which enable a company to repurchase shares at times when it otherwise might be precluded from doing so under insider trading laws.

In addition, the Company continued to repurchase shares to support the needs of the employee stock plans. Shares totaling $40 million were purchased to support the needs of the employee stock plans during fiscal 2012 as compared to $244 million in fiscal 2011. At August 31, 2012, 58,849,238 shares of common stock were reserved for future issuances under the Company's various employee benefit plans.

## 13. Stock Compensation Plans

The Walgreen Co. Stock Purchase/Option Plan (Share Walgreens) provides for the granting of options to purchase common stock over a 10-year period to eligible non-executive employees upon the purchase of Company shares, subject to certain restrictions. Employees may purchase Company shares through cash purchases or loans. The option price is the closing price of a share of common stock on the grant date. Options may be granted under this Plan until September 30, 2012, for an aggregate of 42,000,000 shares of common stock. At August 31, 2012, there were 13,366,481 shares available for future grants. The options granted during fiscal 2012, 2011 and 2010 have a three-year vesting period.

The Walgreen Co. Executive Stock Option Plan provides for the granting of options to eligible key employees to purchase common stock over a 10-year period, at a price not less than the fair market value on the date of the grant. Under this Plan, options may be granted until January 13, 2020, for an aggregate of 63,400,000 shares of common stock. At August 31, 2012, 15,984,563 shares were available for future grants. The options granted during fiscal 2012, 2011 and 2010 have a three-year vesting period.

The Walgreen Co. Broad Based Employee Stock Option Plan provides for the granting of options to eligible non-executive employees to purchase common stock over a 10-year period, at a price not less than the fair market value on the date of the grant. Under this Plan, on March 11, 2003, substantially all non-executive employees, in conjunction with the opening of the Company's 4,000th store, were granted a stock option to purchase 100 shares. The Plan authorized the grant of an aggregate of 15,000,000 shares of common stock. At August 31, 2012, 7,905,555 shares were available for future grants. The options vested and became exercisable on March 11, 2006, and any unexercised options will expire on March 10, 2013, subject to earlier termination if the optionee's employment ends.

A summary of information relative to the Company's stock option plans follows:

| Options | Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value (In millions) |
|---|---|---|---|---|
| Outstanding at August 31, 2011 | 49,033,846 | $33.70 | 6.04 | $193 |
| Granted | 7,801,023 | 38.34 | | |
| Exercised | (3,245,380) | 27.46 | | |
| Expired/Forfeited | (3,553,520) | 35.22 | | |
| Outstanding at August 31, 2012 | 50,035,969 | $34.18 | 5.60 | $175 |
| Vested or expected to vest at August 31, 2012 | 29,037,001 | $35.35 | 3.90 | $108 |
| Exercisable at August 31, 2012 | 20,147,917 | $32.76 | 7.99 | $ 65 |

# EXHIBIT 8

10-Q 1 10-q.htm

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☑  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Quarterly Period Ended May 31, 2013**

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____to _____

Commission File Number
1-604

**WALGREEN CO.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Illinois | 36-1924025 |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| 108 Wilmot Road, Deerfield, Illinois | 60015 |
| (Address of principal executive offices) | (Zip Code) |

(847) 315-2500
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑      No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company.  See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑                                                                Accelerated filer ☐
Non-accelerated filer ☐ (Do not check if a smaller reporting company)         Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐      No ☑

The number of shares outstanding of the registrant's Common Stock, $.078125 par value, as of May 31, 2013 was 945,003,680.

| | | May 31, 2012 | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Money market funds | $ | 1,448 | $ 1,448 | $ - | $ - |
| Interest rate swaps[(1)] | | 67 | - | 67 | - |

[(1)]Interest rate swaps are valued using six-month and one-month LIBOR in arrears rates. See Note 8 for additional disclosure regarding financial instruments.

[(2)]The Company's warrants are valued at the date of issuance and the end of the period using a Monte Carlo simulation. Key assumptions used throughout the valuation include risk-free interest rates using constant maturity treasury rates; dividend yield for AmerisourceBergen's common stock; AmerisourceBergen's common stock price at valuation date; AmerisourceBergen's equity volatility; number of shares of AmerisourceBergen's common stock outstanding; the number of employee stock options and their exercise price; and the details specific to the warrants. The fair value of the Company's warrants on March 18, 2013 was $77 million. The Company recorded the fair value of its warrants as a non-current asset with a corresponding deferred credit in its Consolidated Condensed Balance Sheets. The deferred credit attributable to the warrants will be amortized over the life of the warrants. As of May 31, 2013, the fair value of the Company's warrants was $150 million, which resulted in the Company recording other income of $73 million for the three and nine month periods ended May 31, 2013 within its Consolidated Statements of Comprehensive Income. The increase in the fair value of the warrants during the third quarter was primarily attributable to the increase in the price of AmerisourceBergen's common stock. In addition, the Company recorded $4 million of other income relating to the amortization of the deferred credit in the three and nine month periods ended May 31, 2013.

## Note 10. Commitments and Contingencies

The Company is involved in legal proceedings and is subject to investigations, inspections, audits, inquiries and similar actions by governmental authorities, arising in the normal course of the Company's business, including the matters described below. Litigation, in general, and securities and class action litigation, in particular, can be expensive and disruptive. Some of these suits may purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years. From time to time, the Company is also involved in legal proceedings as a plaintiff involving antitrust, tax, contract, intellectual property and other matters. Gain contingencies, if any, are recognized when they are realized. The results of legal proceedings are often uncertain and difficult to predict, and the costs incurred in litigation can be substantial, regardless of the outcome. The Company believes that its defenses and assertions in pending legal proceedings have merit, and does not believe that any of these pending matters, after consideration of applicable reserves and rights to indemnification, will have a material adverse effect on the Company's consolidated financial position. However, substantial unanticipated verdicts, fines and rulings do sometimes occur. As a result, the Company could from time to time incur judgments, enter into settlements or revise our expectations regarding the outcome of certain matters, and such developments could have a material adverse effect on its results of operations in the period in which the amounts are accrued and/or its cash flows in the period in which the amounts are paid.

On a quarterly basis, the Company assesses its liabilities and contingencies for outstanding legal proceedings and reserves are established on a case-by-case basis for those legal claims for which management concludes that it is probable that a loss will be incurred and that the amount of such loss can be reasonably estimated. Substantially all of these contingencies are subject to significant uncertainties and, therefore, determining the likelihood of a loss and/or the measurement of any loss can be complex. With respect to litigation and other legal proceedings where the Company has determined that a loss is reasonably possible, the Company is unable to estimate the amount or range of reasonably possible loss in excess of amounts reserved due to the inherent difficulty of predicting the outcome of and uncertainties regarding such litigation and legal proceedings. The Company's assessments are based on estimates and assumptions that have been deemed reasonable by management, but that may prove to be incomplete or inaccurate, and unanticipated events and circumstances may occur that might cause the Company to change those estimates and assumptions. Therefore, it is possible that an unfavorable resolution of one or more pending litigation or other contingencies could have a material adverse effect on the Company's consolidated financial statements in a future fiscal period. Management's assessment of current litigation and other legal proceedings, including the corresponding accruals, could change because of the discovery of facts with respect to legal actions or other proceedings pending against the Company which are not presently known. Adverse rulings or determinations by judges, juries, governmental authorities or other parties could also result in changes to management's assessment of current liabilities and contingencies. Accordingly, the ultimate costs of resolving these claims may be substantially higher or lower than the amounts reserved.

On April 4, 2012, the United States Drug Enforcement Administration (DEA) served administrative inspection warrants on six Walgreen retail pharmacies in Florida and removed certain controlled substance prescription records and other related documents. On that same date, DEA also served an inspection warrant and an administrative subpoena for records on the Company's distribution center in Jupiter, Florida. DEA issued a separate administrative subpoena for records from the Company's mail service and central fill facility in Orlando, Florida on August 8, 2012. On November 29, 2012, DEA issued a separate administrative subpoena for records from the

Company's mail service and central fill facility in Tempe, Arizona. On February 5, 2013, DEA served an administrative inspection warrant and administrative subpoenas for records on the Company's distribution center in Perrysburg, Ohio. On September 14, 2012, DEA served an Order to Show Cause (OSC) and Immediate Suspension Order (ISO) on the Jupiter distribution center and placed under seal the controlled substance inventory at that facility. The DEA also issued an OSC to each of the six Company retail pharmacies that received inspection warrants in April 2012. As of May 31, 2013, the Company estimated that the potential realizable loss relating to the DEA matter in excess of amounts accrued in prior quarters was $25 million and increased its reserve by that amount.

On June 11, 2013, the Company entered into a settlement agreement with the DEA and the United States Department of Justice relating to the foregoing matter (see Note 17). The settlement agreement requires the Company to pay $80 million, which the Company had fully reserved, including the $25 million reserve accrued in the quarter ended May 31, 2013 described above.

SEC regulations require disclosure of certain environmental matters when a governmental authority is a party to the proceedings and the proceedings involve potential monetary sanctions that management reasonably believes could exceed $100,000. On July 2, 2012, a number of California District Attorneys served the Company with a civil complaint filed in the Alameda County Superior Court (the Court) alleging certain violations of the state's hazardous waste regulations related to the proper disposal of various materials from the Company's retail stores and seeking injunctive relief, civil penalties and certain fees and expenses. The California District Attorneys filed an amended complaint on July 12, 2012, and a motion for preliminary injunction on August 6, 2012. On December 13, 2012, the Court approved a settlement between the Company and the State of California. The settlement requires the Company to pay penalties and costs and fund supplemental environmental projects in the total amount of approximately $17 million, which was paid during the second fiscal quarter and includes certain injunctive relief.

**Note 11. Stock Compensation Plans**

On January 9, 2013, the 2013 Walgreen Co. Omnibus Incentive Plan (the "Omnibus Plan") became effective and the Company first made award grants under the Omnibus Plan in the quarter ended May 31, 2013. The Omnibus Plan provides for incentive compensation to Walgreens non-employee directors, officers and employees, and consolidates into a single plan several previously existing equity compensation plans: the Executive Stock Option Plan, the Long-Term Performance Incentive Plan, the Broad Based Employee Stock Option Plan, and the Nonemployee Director Stock Plan (collectively, the "Former Plans"). As of the effective date of the Omnibus Plan, no further grants may be made under the Former Plans and shares that were available for issuance under the Former Plans and not subject to outstanding awards became available for issuance (in addition to newly authorized shares) under the Omnibus Plan.

Upon shareholder approval of the Omnibus Plan at the Company's Annual Meeting of Shareholders on January 9, 2013, a total of 60.4 million shares became available for delivery under the Omnibus Plan including: (i) 40.0 million newly authorized shares; (ii) 9.3 million shares previously available for issuance under the former Executive Stock Option Plan; (iii) 3.2 million shares previously available for issuance under the former Long-Term Performance Incentive Plan, and (iv) 7.9 million shares previously available for issuance under the former Broad Based Employee Stock Option Plan. In addition, in accordance with the Omnibus Plan, shares that are subject to outstanding awards under the Former Plans and the Share Walgreens Stock Purchase Plan that subsequently are cancelled, forfeited, lapsed or are otherwise terminated or settled without a distribution of shares also become available for awards under the Omnibus Plan.

The Company granted 367,222 and 8,572,886 stock options under the former Walgreen Co. Executive Stock Option Plan and the Omnibus Plan for the quarter and nine month periods ended May 31, 2013, respectively. This compares to 160,223 and 7,942,796 stock options granted in the quarter and nine month periods ended under the plans last year. Total stock-based compensation expense was $25 million for the quarter and $70 million for the nine month periods ended May 31, 2013 compared to $24 million and $77 million for the same periods last year. In accordance with Accounting Standards Codification (ASC) Topic 718 Compensation – Stock Compensation, compensation expense is recognized on a straight-line basis over the employee's vesting period or to the employee's retirement eligible date, if earlier. The recognized retiree eligible expense recorded in the current quarter and nine month periods was $3 million and $6 million, respectively, compared to $2 million for the quarter and $6 million for the nine month periods ended May 31, 2012. Compensation expense for the quarter and nine month periods may not be representative of compensation expense for the entire fiscal year.

The Company granted 1,611,056 and 2,528,378 restricted stock units under the former Walgreen Co. Long-Term Performance Incentive Plan and the Omnibus Plan for the quarter and nine month periods ended May 31, 2013, compared to 13,728 and 767,348 restricted stock units in the same periods last year. Dividends issued under the program, paid in the form of additional restricted stock units, totaled 13,976 units for the quarter and 53,441 units for the nine month periods ended May 31, 2013 versus 16,259 units and 47,904 units in the same periods last year. The Company also granted 20,967 and 915,013 performance shares under the former Walgreen Co. Long-Term Performance Incentive Plan and Omnibus Plan for the quarter and nine month periods ended May 31, 2013 versus 10,867 and 784,866 shares in the same periods last year. In accordance with ASC Topic 718, compensation expense is recognized on a straight line basis based on a three year cliff vesting schedule for restricted stock unit awards and straight line over a three year performance period, based on performance targets, for performance share awards. For the quarter and nine month periods

In July 2012, FASB issued Accounting Standards Update (ASU) 2012-02, which permits an entity to make a qualitative assessment to determine whether it is more likely than not that an indefinite-lived intangible asset, other than goodwill, is impaired. If an entity concludes, based on an evaluation of all relevant qualitative factors, that it is not more likely than not that the fair value of an indefinite-lived intangible asset is less than its carrying amount, it will not be required to perform the quantitative impairment for that asset. The ASU is effective for impairment tests performed for fiscal years beginning after September 15, 2012 (fiscal 2014), with early adoption permitted. The ASU will not have a material impact on the Company's reported results of operations and financial position.

In May 2013, the Financial Accounting Standards Board (FASB) reissued an exposure draft on lease accounting that would require entities to recognize assets and liabilities arising from lease contracts on the balance sheet. The proposed exposure draft states that lessees and lessors should apply a "right-of-use model" in accounting for all leases. Under the proposed model, lessees would recognize an asset for the right to use the leased asset, and a liability for the obligation to make rental payments over the lease term. When measuring the asset and liability, variable lease payments are excluded whereas renewal options that provide a significant economic incentive upon renewal would be included. The accounting by a lessor would reflect its retained exposure to the risks or benefits of the underlying leased asset. A lessor would recognize an asset representing its right to receive lease payments based on the expected term of the lease. The lease expense from real estate based leases would continue to be recorded under a straight line approach, but other leases not related to real estate would be expensed using an effective interest method that would accelerate lease expense. Comments are due by September 13, 2013. A final standard is currently expected to be issued in 2014 and would be effective no earlier than annual reporting periods beginning on January 1, 2017 (fiscal 2018 for the Company). The proposed standard, as currently drafted, would have a material impact on the Company's financial position and the impact on the Company's reported results of operations is being evaluated. The impact of this exposure draft is non-cash in nature and would not affect the Company's cash position.

### Note 17.  Subsequent Event

On June 11, 2013, the Company entered into an agreement with DEA and the United States Department of Justice settling all administrative and civil matters outstanding as of the date of the agreement (see Note 10). The settlement agreement requires the Company to pay $80 million, which the Company had fully reserved, including reserving $25 million in the quarter ended May 31, 2013. The agreement also requires the Company to surrender until May 2014 its DEA registrations for its six Florida pharmacies on which DEA served administrative inspection warrants in April 2012 and to surrender its DEA registration for its Jupiter, Florida distribution center until September 2014. Walgreens has taken steps designed to ensure that there is no disruption to the supply of medications to the Company's pharmacies as a result of this matter.

## Item 2.  **Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read together with the financial statements and the related notes included elsewhere herein and our consolidated financial statements, accompanying notes and Management's Discussion and Analysis of Financial Condition and Results of Operations contained in our Annual Report on Form 10-K for the year ended August 31, 2012. This discussion contains forward-looking statements that involve risks and uncertainties. Our actual results may differ materially from those discussed in forward-looking statements. Factors that might cause a difference include, but are not limited to, those discussed under "Cautionary Note Regarding Forward-Looking Statements" below and in Item 1A "Risk Factors" below, , and in our Annual Report on Form 10-K for the year ended August 31, 2012 and our Quarterly Report on Form 10-Q for the quarter ended February 28, 2013.*

### INTRODUCTION

Walgreens is principally a retail drugstore chain that sells prescription and non-prescription drugs and general merchandise. General merchandise includes, among other things, household items, convenience and fresh foods, personal care, beauty care, photofinishing and candy. Customers can have prescriptions filled in retail pharmacies as well as through the mail, and customers may also place orders by telephone and online. At May 31, 2013, we operated 8,560 locations in 50 states, the District of Columbia, Guam and Puerto Rico. Total locations do not include 374 Take Care Clinics that are operated primarily within other Walgreens locations or locations of unconsolidated partially owned entities such as Alliance Boots GmbH.

|  | Number of Locations | |
| Location Type | May 31, 2013 | May 31, 2012 |
| --- | --- | --- |
| Drugstores | 8,097 | 7,890 |
| Worksite Health and Wellness Centers | 369 | 362 |
| Infusion and Respiratory Services Facilities | 81 | 78 |
| Specialty Pharmacies | 11 | 11 |

# EXHIBIT 9



Menu ☰

**Home**

**Press Releases**

**2013**

**06**

**11**

Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act



**Drug Enforcement Administration**

Miami
Adolphus P. Wright, Special Agent in Charge
**@deamiamidiv**

**June 11, 2013**
**Contact:** Public Information Officer
**Phone Number:** (954) 660-4602
**FOR IMMEDIATE RELEASE**

# Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act

## Largest fine paid by a DEA registrant



DEA Investigators and law enforcement officers entering the distribution center.



DEA Investigators reviewing inventory in the distribution center.



L-R: AUSA Franklin Monsour, USAO Wifredo A. Ferrer, SAC Mark R. Trouville, Acting DSAC Michael Nussbaum. SAC Trouville announced the Walgreens Agreement and the Record of Settlement of $80 million.

**MIAMI** - Mark R. Trouville, Special Agent in Charge, Drug Enforcement (DEA), Miami Field Division, and Wifredo A. Ferrer, United States Attorney for the Southern District of Florida, announced that Walgreens (Walgreens), the nation's largest drug store chain, has agreed to pay $80 million in civil penalties,  resolving the DEA's administrative actions and the United States Attorney's Office's civil penalty

investigation regarding the Walgreens Jupiter Distribution Center and six Walgreens retail (collectively "Registrants") in Florida. The settlement further resolves similar open civil investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide, pursuant to the Controlled Substances (the Act).

The settlement, the largest in DEA history, resolves allegations that the Registrants committed an unprecedented number of record-keeping and dispensing violations under the Act. According to documents filed in the underlying administrative actions, the Registrants negligently allowed controlled substances listed in Schedules II - V of the Act, such as oxycodone and other prescription pain killers, to be diverted for abuse and illegal black market sales.

According to the most recent report from the U.S. Center for Disease Control and Prevention, prescription drug overdose deaths exceeded motor vehicle deaths and deaths from illegal street drugs, such as cocaine, heroin, and amphetamines, in 2009. Oxycodone is a powerful addictive narcotic that is one of the most abused prescription medications in Florida and throughout the United States. Walgreens' Distribution Center in Jupiter, Florida was the largest supplier of oxycodone to retail pharmacies in the State of Florida.

DEA Special Agent in Charge Mark R. Trouville stated, "National pharmaceutical chains are not exempt from following the law. This settlement sends out a clear message that all DEA registrants will be held accountable when they violate the law and threaten public health and safety. The DEA will continue its efforts to work with our registrants and our law enforcement partners to combat pharmaceutical drug abuse and diversion in Florida."

U.S. Attorney Wifredo A. Ferrer stated, "Prescription drug abuse is a tremendous problem in Florida and throughout the country. Every day, individuals die from prescription drug overdoses. The record-keeping requirements of the Controlled Substances Act and DEA regulations are designed to prevent prescription pain killers, like oxycodone, from ending up on our streets. For this reason, we cannot allow pharmacies to circumvent their regulatory record-keeping and dispensing obligations."

The settlement agreement covers conduct that was the subject of DEA's administrative actions and the U.S. Attorney's Office civil penalty investigation. More specifically, the settlement covers allegations against Walgreen's Jupiter Distribution Center and six Walgreens' retail pharmacies. First, the Jupiter Distribution Center failed to comply with DEA regulations that required it to report to the DEA suspicious prescription drug orders that it received from Walgreens' retail pharmacies. Walgreens' alleged failure to sufficiently report suspicious orders was a systematic practice that resulted in at least tens of thousands of violations and allowed Walgreens' retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone.

Second, the six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate medical use. In addition, these retail pharmacies and others elsewhere in the United States failed to properly identify and mark, as required by DEA regulations, hardcopy controlled substance prescriptions that were outsourced to a "central fill" pharmacy for filling. Without Walgreens' retail pharmacies identifying these outsourced prescriptions, DEA could not accurately determine which prescriptions were filled from the retail pharmacies' own drug supplies and which prescriptions were filled by a "central fill." Consequently, DEA could not determine the accuracy of the retail pharmacies' drug records. The DEA's administrative actions demonstrated millions of violations of this type.

In addition to the $80 million civil penalty for the above violations, the settlement revokes the Registrants' ability to distribute or dispense controlled substances listed in Schedules II - V for two years, ending in 2014. As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct. Furthermore, Walgreens has agreed to create a Department of Pharmaceutical Integrity to ensure regulatory compliance and prevent the diversion of controlled substances. Walgreens has also agreed to enhance its training and compliance programs, and to no longer monetarily or otherwise compensate its pharmacists based on the volume of prescriptions filled.

Since 2009, the DEA, along with its federal, state, and local counterparts, have partnered to combat the prescription drug abuse epidemic that has plagued Florida, culminating in Operation Pill Nation I and II and Operation Oxy Alley. These investigations have resulted in charges against more than 172 individuals, including 51 doctors and 24 clinic/pharmacy owners, the seizure of approximately 2.5 million dosage units of controlled substances, approximately $16.6 million, real property, and exotic cars. In addition, approximately 42 doctors and 11 pharmacies have lost their DEA registrations through the issuance of Immediate Suspension Orders. As well, approximately 192 doctors and 68 pharmacies have voluntarily surrendered their DEA registrations following an official visit from the DEA. Lastly, the DEA has also taken action against seven other Florida-based distributors.

This investigation was conducted by the DEA's Miami Field Office and the U.S. Attorney's Office for the Southern District of Florida, with the assistance of DEA's Office of Chief Counsel.

[Settlement and Memorandum of Agreement >>](#)

| Title | Download |
|-------|----------|
| mia061113_appendixa.pdf | Download → |

  

[Who We Are+](#)
[What We Do+](#)
[Resources+](#)
[Careers+](#)
[Doing Business with the DEA+](#)
[Policies+](#)

 **United States Drug Enforcement Administration**
DEA.gov is an official site of the [U.S. Department of Justice](#)

   Subscribe →

[Contact the Webmaster](#)

# EXHIBIT 10

Case: 1:17-md-02804-DAP Doc #: 3117-5 Filed: 01/31/20 42 of 54. PageID #: 482158
Walgreen to Pay $80 Million fine for control drugs to 2 the New York Times

# The New York Times

# *Walgreen to Pay $80 Million Fine in D.E.A. Inquiry*

**By Barry Meier**

June 11, 2013

The Walgreen Company, the nation's biggest pharmacy operator, agreed on Tuesday to pay $80 million to resolve federal charges that it failed to properly control the sales of narcotic painkillers at some of its outlets.

Officials at the Drug Enforcement Administration described the fine as the biggest ever paid by a pharmacy chain. As part of the settlement, the license of a Florida facility used by Walgreen to distribute controlled drugs was revoked for two years.

D.E.A. officials said that many of the drugs dispensed at the facility made their way to the black market, including oxycodone, a strong narcotic that is also the active ingredient in OxyContin.

Under the agreement, Walgreen committed to establish better internal controls. It acknowledged that practices at a distribution facility and some of its pharmacies in Florida did not meet standards.

Over the last year, federal officials have acted against several major wholesalers of prescription painkillers, like Cardinal Health, as well as drugstores. Such drugs are involved in some 16,000 overdose deaths annually.

Federal officials have said that distributors of painkillers often turn a blind eye to suspiciously large orders for medications by pharmacies, and that drugstores fail to properly identify customers who intend to divert drugs to the streets.

Case: 1:17-md-02804-DAP Doc #: 3117-5 Filed: 01/31/20 43 of 54. PageID #: 482159



Agents said Walgreen failed to properly control the sale of painkillers at some of its drugstores. Joe Raedle/Getty Images

Some distributors have sought to limit their liability by more closely monitoring distribution pipelines and cutting off customers. But patients say the crackdown has made it difficult for them to get needed medication, and some druggists complain that big distributors like Cardinal have clamped down on the amount of painkillers they can buy.

The black market has been rampant in Florida, where until recently hundreds of so-called pain clinics operated, including many where patients received prescriptions for opioids after cursory examinations. Since 2009, federal officials have brought charges against 59 doctors in connection with the illegal prescribing of painkillers.

In their action against Walgreen, federal officials said the chain had failed to properly account for the sales of painkillers or report suspicious sales. The Walgreen distribution facility in Florida once served as the largest supplier of prescription painkillers to pharmacies in that state, they said.

"National pharmaceutical chains are not exempt from following the law," Mark R. Trouville, a D.E.A. special agent in charge, said in a prepared statement.

In a statement released Tuesday, Walgreen, based in Deerfield, Ill., said, "As the largest pharmacy chain in the U.S., we are fully committed to do our part to reduce prescription drug abuse."

Case: 1:17-md-02804-DAP Doc #: 3117-5 Filed: 01/31/20 44 of 54. PageID #: 482160

The company said that it expected that the financial impact of the settlement and associated costs would lower results in the third quarter by about 4 to 6 cents a share. In fiscal 2012, Walgreen had sales of $72 billion.

Another major distributor, AmerisourceBergen, disclosed last June that it faced a federal criminal inquiry into its oversight of painkiller sales. West Virginia officials filed a lawsuit against 14 drug distributors, including Cardinal and AmerisourceBergen. The companies have denied wrongdoing.

A version of this article appears in print on June 11, 2013, on Page B1 of the New York edition with the headline: Chain to Pay $80 Million In Drug Fine

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/SB10001424127887324904004578539743775320834

LAW

# Walgreen in $80 Million Settlement Over Painkillers

*By Timothy W. Martin*

Updated June 11, 2013 7:43 p.m. ET

Walgreen Co. reached an $80 million settlement with federal authorities Tuesday over the drugstore chain's distribution of highly addictive painkillers in Florida, long the nation's epicenter of illicit prescription drug sales.

It is the largest fine related to the U.S. Drug Enforcement Administration's strategy of cracking down on rampant prescription drug abuse by targeting large corporations like Walgreen. As part of the settlement, Walgreen admitted it hadn't upheld its obligations as a DEA registrant, which requires the company to flag suspicious sales of prescription painkillers.

The DEA alleged that Walgreen, the nation's largest pharmacy chain, had committed an "unprecedented number" of record-keeping and prescription dispensing violations. The DEA licenses retail pharmacies that want to distribute controlled substances like opioid painkillers.

Walgreen had "negligently allowed" prescription painkillers "to be diverted for abuse and illegal black market sales," the DEA said. Tuesday's settlement covers six Walgreen pharmacies in Florida and a Jupiter, Fla., distribution facility, which will be blocked from shipping controlled substances until September of 2014.

"National pharmaceutical chains are not exempt from following the law," said Mark R. Trouville, head of Miami DEA office, in a statement.

"As the largest pharmacy chain in the U.S., we are fully committed to doing our part to prevent prescription drug abuse," said Kermit Crawford, a Walgreen president, in a statement. The settlement and associated costs will have an impact of four cents to six cents per share in its fiscal third quarter, Walgreen said.

The settlement also resolves civil investigations involving Walgreen by U.S. attorneys' offices in Colorado, New York and Michigan, as well as other DEA branches.



Other national pharmacy companies, like CVS Caremark Corp. and Cardinal Health Inc., have recently been targeted over pain pills by the DEA. Cardinal, one of the nation's largest drug wholesalers, reached a settlement last year with the DEA to halt controlled-substance shipments from a Lakeland, Fla., facility. In August, two subpoenas were issued by federal prosecutors and agents against a major wholesaler, AmerisourceBergen Corp.

The DEA said Walgreen's civil penalty was its largest-ever settlement, topping CVS's $75 million payment in 2010 over charges it illegally sold cold and cough medicines that were used to make methamphetamine, an agency spokeswoman said.

Oxycodone, hydrocodone and other prescription painkillers are legal drugs. Addicts and abusers like them because when consumed, via injecting, swallowing or inhaling, the pills can release a heroinlike high. In recent years, manufacturers like Purdue Pharma LP have launched reformulated versions of their pain drugs that make them harder to crush open or inject.

As part of the settlement, Walgreen promised to create a pharmaceutical integrity department intended to ensure regulatory compliance and monitor for potential controlled-substance diversion, according to the DEA release. Walgreen will also boost its training and no longer tie pharmacist compensation to prescription volume, the DEA said. The six Walgreen pharmacies in Florida targeted by federal agents won't be allowed to dispense painkillers or other controlled medications until May 2014, the company said.

Overdose deaths from painkillers totaled more than 16,500 in 2010, more than heroin and cocaine combined, according to government data.

The investigation was jointly conducted by the DEA's Miami field office and the U.S. attorney's office for the Southern District of Florida.

**Write to** Timothy W. Martin at timothy.martin@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.



 

**HEALTH NEWS**

JUNE 11, 2013 / 1:21 PM / 6 YEARS AGO

# Walgreen in record $80 million settlement over painkillers

Jonathan Stempel, Jessica Wohl

 

(Reuters) - Walgreen Co, the largest U.S. drugstore chain, has agreed to pay $80 million in civil penalties to resolve allegations that it violated federal rules governing the distribution of prescription painkillers.



Cold and flu products are pictured on shelving during a private cocktail event celebrating the grand opening of drugstore chain Walgreens newest flagship store, and 8,000th store nationwide, on the famous corner of Sunset & Vine in Hollywood, California November 30, 2012. REUTERS/Fred Prouser

The U.S. Drug Enforcement Administration on Tuesday said the settlement is the largest in its history.

The DEA accused Walgreen of committing an "unprecedented" number of record-keeping and dispensing violations of the Controlled Substances Act.

As a result, the DEA said, Walgreen negligently allowed controlled substances such as the narcotic oxycodone and other prescription painkillers to be distributed to abusers and sold illegally on the black market.

"National pharmaceutical chains are not exempt from following the law," Mark Trouville, special agent in charge in the DEA's Miami field division, said in a statement. "All DEA registrants will be held accountable when they violate the law and threaten public health and safety."

Kermit Crawford, Walgreen president of pharmacy, health and wellness, in a statement said the company has taken and will take further steps to improve oversight and training "to ensure the appropriate dispensing of controlled substances and to improve collaboration across the industry."

The settlement with the Deerfield, Illinois-based company also resolves a probe by U.S. Attorney Wifredo Ferrer in Miami.

Walgreen operates more than 8,000 drug stores in all 50 U.S. states, the District of Columbia, and Puerto Rico.

As part of the settlement, Walgreen admitted that it failed to uphold its obligations as a DEA registrant.

Six Walgreen pharmacies in Florida and a distribution center in Jupiter, Florida were given a two-year ban from dispensing various controlled substances, the DEA said.

Walgreen also agreed to enhance training and compliance programs, and set up a Department of Pharmaceutical Integrity to help prevent similar violations.

Florida has long been considered a center of prescription drug abuse, and the DEA has dismantled dozens of sham clinics known as "pill mills" where doctors have written prescriptions for drug dealers and addicts.

The Centers for Disease Control and Prevention said the U.S. death rate from drug overdoses has more than tripled since 1990.

It said prescription painkillers, also known as opioid or narcotic pain relievers, were involved in more than 15,500 overdose deaths in the United States in 2009.

Walgreen said it previously set aside $80 million for a settlement, including $25 million in its fiscal third quarter, which ended May 31. It said it expects the accord to reduce that quarter's earnings by 4 to 6 cents per share.

Shares of Walgreen closed Tuesday down 11 cents at $49.54 on the New York Stock Exchange.

Reporting by Jonathan Stempel in New York and Jessica Wohl in Chicago; Editing by Gary Hill, Nick Zieminski and Steve Orlofsky

*Our Standards:*   *The Thomson Reuters Trust Principles.*

MORE FROM REUTERS

# Walgreens to pay $80 million for oxycodone violations

**Donna Leinwand Leger**, USA TODAY     Published 3:04 p.m. ET June 11, 2013 | **Updated 6:34 p.m. ET June 11, 2013**

### *Walgreens has been handed the largest fine in the history of the U.S. Controlled Substances Act*



*(Photo: Richard Drew, AP)*

Walgreens, the nation's largest drugstore chain, will pay $80 million in fines to end a DEA probe into allegations it allowed millions of controlled substances, including the highly addictive painkiller oxycodone, to reach the black market.

The settlement is the largest civil penalty paid under the Controlled Substances Act in Drug Enforcement Administration history, U.S. Attorney Wifredo Ferrer said Tuesday.

Walgreens committed "an unprecedented number" of record-keeping and dispensing violations, Ferrer said.

In September, the DEA accused Walgreens of endangering public safety and barred the company from shipping oxycodone and other controlled drugs from its Jupiter, Fla., distribution center. The distribution center was the largest supplier of oxycodone to retail pharmacies in Florida, the DEA said.

"The distribution centers are the first line of defense," Ferrer said.

As part of the settlement, the DEA suspended the controlled substance licenses for Walgreens' Jupiter distribution center until September 2014 and six of its Florida pharmacies until May 2014. The company has more than 800 pharmacies in Florida.

The settlement also closes similar investigation in Colorado, Michigan and New York, Ferrer said.

"As the largest pharmacy chain in the U.S., we are fully committed to doing our part to prevent prescription drug abuse," Kermit Crawford, president of Walgreens' pharmacy, health and wellness division, said in a statement. "We also will continue to advocate for solutions that involve all parties – including leaders in the community, physicians, pharmacies, distributors and regulators – to play a role in finding practical solutions that combat the abuse of controlled substances and ensure patient access to critical medications.

Walgreens has taken steps to enhance its ordering and inventory systems and train its employees "to ensure appropriate dispensing of controlled substances," Crawford said. Walgreens said it expects the fine to impact its stock 4 to 6 cents per share in the third quarter. Walgreens stock (WAG) closed down 11 cents at $49.54 a share Tuesday.

The Centers for Disease Control and Prevention has called abuse of prescription narcotics, particularly opioid pain relievers, an epidemic.

The DEA had previously revoked controlled substances licenses for two Florida CVS pharmacies. In October, Cardinal Health paid $34 million to settle claims it failed to report suspicious sales of painkillers. Since 2009, federal authorities have charged 51 doctors with controlled-substance violations and 192 doctors have voluntarily surrendered their DEA licenses.

The DEA said Walgreens failed to maintain proper controls to ensure it did not dispense drugs to addicts and drug dealers. The DEA requires drug distributors to notify the agency of unusually large or frequent retail pharmacy orders for controlled drugs.

Ferrer called Walgreens' failure to report suspicious orders a "systemic practice that resulted in tens of thousands of violations."

Six of Walgreens' Florida pharmacies ordered more than a million pills a year, the DEA said. In 2011, the average pharmacy in the U.S. ordered 73,000 oxycodone tablets a year. Pharmacists dispensed prescriptions from doctors even when Walgreens computer system flagged the doctors as problematic, Ferrer said.

One pharmacy in Fort Myers went from ordering 95,800 pills in 2009 to 2.2 million pills in 2011, the DEA said. Another pharmacy in Hudson, an area of about 34,000 people near Clearwater, purchased 2.2 million pills in 2011, the DEA said.

"Walgreens pharmacists blatantly ignored red flags," Miami field district Special Agent in Charge Mark Trouville said. "National pharmaceutical chains are not exempt from following the law."

*Follow Donna Leinwand Leger on Twitter @DonnaLeinwand*

Read or Share this story: http://usat.ly/13Aehos

# EXHIBIT 11



U.S. Department of Justice
Drug Enforcement Administration

*Office of the Administrator*                                                *Springfield, VA 22152*

September 13, 2012

IN THE MATTER OF

Walgreen Co.
15998 Walgreens Drive
Jupiter, Florida 33478

### ORDER TO SHOW CAUSE AND
### IMMEDIATE SUSPENSION OF REGISTRATION

**PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

**NOTICE** is hereby given to inform Walgreen Corporation ("Walgreens" or "Respondent") of the immediate suspension of Drug Enforcement Administration ("DEA") Certificate of Registration RW0277752, pursuant to 21 U.S.C. § 824(d), because such registration constitutes an imminent danger to the public health and safety. Notice is also given to afford Walgreens an opportunity to show cause before DEA in Arlington, Virginia, or a location designated by the Administrative Law Judge, on November 13, 2012 (if Walgreens requests such a hearing), as to why DEA should not revoke Walgreens's DEA Certificate of Registration RW0277752, pursuant to 21 U.S.C. § 824(a)(4), deny any pending applications for renewal or modification of such registration, and deny any applications for additional registration, pursuant to 21 U.S.C. § 823(b) & (e), because Walgreens' continued registration is inconsistent with the public interest, as that term is defined in 21 U.S.C. § 823(b) & (e). The basis for this Order to Show Cause and Immediate Suspension of Registration is set forth in the following nonexhaustive summary of facts and law (*see* 21 C.F.R. §§ 1301.36(e) and 1301.37(c), which DEA construes *in pari materia* in this context.)

1.  Walgreens' Jupiter Florida Distribution Center is registered with DEA as a distributor in Schedules II-V pursuant to DEA Certificate of Registration RW0277752 at 15998 Walgreens Drive, Jupiter, Florida 33478. DEA Certificate of Registration RW0277752 expires by its terms on May 31, 2013. The Jupiter Distribution Center is one of 12 Distribution Centers owned and operated by the Walgreen Corporation,



**U.S. Department of Justice**
Drug Enforcement Administration

*Office of the Administrator*                    *Springfield, VA 22152*

September 13, 2012

**IN THE MATTER OF**

Walgreen Co.
15998 Walgreens Drive
Jupiter, Florida 33478

### ORDER TO SHOW CAUSE AND
### IMMEDIATE SUSPENSION OF REGISTRATION

**PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

**NOTICE** is hereby given to inform Walgreen Corporation ("Walgreens" or "Respondent") of the immediate suspension of Drug Enforcement Administration ("DEA") Certificate of Registration RW0277752, pursuant to 21 U.S.C. § 824(d), because such registration constitutes an imminent danger to the public health and safety. Notice is also given to afford Walgreens an opportunity to show cause before DEA in Arlington, Virginia, or a location designated by the Administrative Law Judge, on November 13, 2012 (if Walgreens requests such a hearing), as to why DEA should not revoke Walgreens's DEA Certificate of Registration RW0277752, pursuant to 21 U.S.C. § 824(a)(4), deny any pending applications for renewal or modification of such registration, and deny any applications for additional registration, pursuant to 21 U.S.C. § 823(b) & (e), because Walgreens' continued registration is inconsistent with the public interest, as that term is defined in 21 U.S.C. § 823(b) & (e). The basis for this Order to Show Cause and Immediate Suspension of Registration is set forth in the following nonexhaustive summary of facts and law (*see* 21 C.F.R. §§ 1301.36(e) and 1301.37(c), which DEA construes *in pari materia* in this context.)

1. Walgreens' Jupiter Florida Distribution Center is registered with DEA as a distributor in Schedules II-V pursuant to DEA Certificate of Registration RW0277752 at 15998 Walgreens Drive, Jupiter, Florida 33478. DEA Certificate of Registration RW0277752 expires by its terms on May 31, 2013. The Jupiter Distribution Center is one of 12 Distribution Centers owned and operated by the Walgreen Corporation,