# EXHIBIT 3

Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | MDL No. 2804 |
| PRESCRIPTION OPIATE | ) | |
| LITIGATION | ) | Case No. |
| | ) | 1:17-MD-2804 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Hon. Dan A. |
| ALL CASES | ) | Polster |
| | ) | |

— — —

Monday, May 13, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

Videotaped Deposition of JAMES E. RAFALSKI, held at Weitz & Luxenburg PC, 3011 West Grand Avenue, Suite 2150, Detroit, Michigan, commencing at 9:20 a.m., on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  A. I guess that's Mr. Prevoznik's
2  issue to comment on.
3      I'm not sure, under my
4  authorization from the DEA, if I even knew I
5  could comment on that.
6  Q. In your report -- and you can
7  turn to the pages if you want. Starting on
8  page 40, you make reference to five different
9  methodologies that address the issue of the
10 number of suspicious orders that were and
11 weren't reported in the Track 1
12 jurisdictions, correct?
13 A. I think I report dosage amounts
14 based on the methodologies.
15 Q. I'm sorry. I'm sorry. I
16 apologize. Dosage amounts.
17     So we're talking about the
18 number of -- however you want to describe it,
19 the number of pills or the number of dosage
20 amounts of pills that are going into these
21 jurisdictions over a period of time; is that
22 right?
23 A. Yes, based on that particular
24 methodology.
25 Q. Okay. Well, you say that

Page 163

1  particular methodology. You used -- you
2  referenced five methodologies, correct?
3  A. Yes, sir.
4  Q. Okay. Did you figure out those
5  methodologies yourself, or did Mr. McCann do
6  that?
7  A. No, those are mine based on --
8  Q. These five methodologies are
9  yours?
10 A. Yes. Well, they are
11 methodologies that are mirroring suspicious
12 order systems that are utilized by one or
13 more companies in my report.
14 Q. Okay. So did you -- you put
15 these -- did you put these charts together
16 yourself?
17 A. No, I did not.
18 Q. Who put the charts together?
19 A. I -- I'm sorry.
20     Well, this is based on
21 McCann's -- Mr. McCann takes -- took my
22 methodology, and these were the results of
23 his application of my methodology to the
24 ARCOS data.
25 Q. I see.

Page 164

1  So you -- you came up with
2  these five methodologies?
3  A. Yes, sir.
4  Q. Okay. And tell me -- tell me
5  why you chose these five methodologies. I
6  think you started to do it, but just go ahead
7  and explain it to me.
8  A. Well, because these are
9  methodologies that were used by one or more
10 companies in my report, during the time frame
11 of my report. Each one of these were not
12 invented by me, but they were actually used.
13 Q. Okay. Can you -- let's start
14 with the first one. Methodology A is maximum
15 monthly trailing six-month threshold.
16     Can you explain to me what you
17 were trying to express here?
18 A. Well, this is the Masters case
19 methodology.
20 Q. Okay.
21 A. Or I shouldn't say methodology.
22 This is their suspicious order system. So
23 it's a rolling six-month, and it looks for a
24 current month that exceeds the highest
25 previous amount in the six months.

Page 165

1  Q. Okay. And so when you refer to
2  flagged orders, you've got -- you know, your
3  top column, it's a grid.
4  A. Yep.
5  Q. And from left to right, across
6  the top, first it's the name of the
7  distributor. Then it says: Flagged orders
8  of oxycodone (dosage units). Then it says:
9  Flagged orders of hydrocodone (dosage units).
10     Let's just take
11 AmerisourceBergen, since this is the first
12 one.
13 A. Okay.
14 Q. Okay. Go down to orders of
15 oxycodone (dosage units), and then it says
16 the number, which is 50,578,040.
17     What's that a number of, dosage
18 units?
19 A. Yes.
20 Q. Okay. And then what does the
21 86% of total dosage units mean? What is
22 that -- 86.5% of what?
23 A. Of the amount that was
24 distributed during the time period stated
25 above into the CT1 jurisdiction.

Page 170

1  A.  I think that's kind of a
2  hypothetical question.
3  Q.  No, it's not hypothetical.  You
4  told me that -- you told me that you obtained
5  records from plaintiffs' counsel, correct?
6  A.  And it's my belief that I had
7  access to all the records.  Now, there's no
8  way that I would know if that occurred or
9  not.  That's -- I'm hopeful, as their expert
10  opinion, that I had access to all of the
11  records.
12      I can't affirmatively say that
13  they gave me every record.  I -- that's why
14  it's kind of a hypothetical.
15  Q.  Well, right now it is a
16  hypothetical because we really have no idea
17  what records you were provided, what records
18  you were provided and what you weren't
19  because I think you told us that you didn't
20  write down all the records that were provided
21  to you.
22  A.  Well, I would say that in
23  regards to this matter, I reviewed sufficient
24  due diligence records to draw -- to make my
25  opinion.

Page 171

1  Q.  Now, sticking with that for a
2  minute, just because you did not review due
3  diligence records from 2010, 2011, 2012 --
4  let's assume you didn't see due diligence
5  records or as many as you would have liked.
6  That doesn't mean that the due diligence
7  wasn't done, does it?
8  A.  Well, as far as the DEA is
9  concerned, if there's no documentation or
10  record of it, a due diligence file, my
11  opinion would be based on that that doesn't
12  exist.
13  Q.  Well, we've already discussed
14  the fact that there was no requirement in the
15  regulations as to the retention of due
16  diligence records --
17      MR. FULLER:  Object to form.
18  BY MR. NICHOLAS:
19  Q.  -- for any period of time,
20  right?
21      MR. FULLER:  Object to form.
22      That's not the witness's testimony.
23  A.  So I don't think that's exactly
24  what my statement was.  I think my statement
25  was is that it wasn't contained as a required

Page 172

1  record in the recordkeeping section of the
2  CFR.
3  BY MR. NICHOLAS:
4  Q.  Yeah.
5  A.  But it was of my opinion that
6  it's covered under the maintenance of
7  effective controls, and it would be my
8  opinion as -- with my experience and my
9  training and my knowledge, is that it should
10  be kept forever.  It's a historical record,
11  and it should be kept by the registrant much
12  greater than two years.
13  Q.  Now, you keep saying that the
14  requirement to maintain records is contained
15  in the section pertaining to maintenance of
16  effective controls, but just so the record is
17  clear, there's nothing in the section on the
18  maintenance of effective controls that makes
19  any reference to records, correct?
20  A.  Well, I --
21      MR. FULLER:  Form.
22  A.  I think within the statements,
23  that's what that statement means.
24  BY MR. NICHOLAS:
25  Q.  Means.  But I'm asking whether

Page 173

1  there's any actual written reference to
2  records or the retention of records in that
3  section?
4  A.  Well, so in the maintenance of
5  effective controls?
6  Q.  Yeah.
7  A.  It doesn't specifically say
8  that, if that's what you're...
9  Q.  Okay.  Okay.  Now -- so just --
10  we'll break for lunch, but just so I
11  understand, the methodologies that -- the
12  five methodologies described here were
13  selected -- were identified or selected by
14  you.  Is that -- based on what you saw the
15  various companies had done over the years; is
16  that correct?
17  A.  Yes, sir.
18  Q.  And you provided just those
19  methodologies, the concepts, to Mr. McCann
20  and he plugged in the numbers; is that
21  correct?
22  A.  Yes, but just as a
23  clarification, I personally didn't discuss
24  that with Mr. McCann.  I discussed it with
25  counsel and then counsel relayed that to

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  Mr. McCann. And then it didn't come -- I
2  didn't have -- I've never had a personal
3  discussion with Mr. McCann about this. It
4  was relayed through attorneys and back.
5      Q.   Okay. Now, there are five
6  methodologies here. Which one are you
7  endorsing?
8      A.   None.
9      Q.   You don't endorse any of them?
10     A.   No, sir.
11     Q.   Okay.
12     A.   I used these methodologies
13 because they were used by the industry. So I
14 didn't want to impose a methodology that
15 wasn't, you know, recognized or utilized by
16 one or multiple distributors.
17         MR. NICHOLAS: Okay. Okay.
18 Let's take a break.
19         THE VIDEOGRAPHER: Going off
20 the record at 12:46 p.m.
21         (Recess taken, 12:46 p.m. to
22 1:30 p.m.)
23         THE VIDEOGRAPHER: We're back
24 on the record at 1:30 p.m.
25         MR. FULLER: Counsel, I think

Page 175

1  Mr. Rafalski had something he wanted
2  to clarify related to his last -- or
3  your last question.
4          THE WITNESS: I don't know if
5  it was the last or one of the last. I
6  apologize, I think I was more focused
7  on going to the bathroom than the
8  question.
9          But you asked if I endorsed a
10 methodology.
11         MR. NICHOLAS: Uh-huh.
12         THE WITNESS: I guess I
13 understood -- or I believed that
14 question was asking if I endorsed a
15 methodology as a suspicious order
16 system or whether I endorsed it as one
17 of my methodologies.
18         So I'm -- I answered it because
19 I thought you thought I would endorse
20 it as a suspicious order system, so
21 I'm not sure how you asked that
22 question. So I --
23 BY MR. NICHOLAS:
24     Q.   Okay. No, I appreciate that.
25 I'm glad you did the clarification.

Page 176

1          So you don't -- so --
2      A.   I didn't want to say that I
3  didn't endorse my own methodology.
4      Q.   Okay. So of these five, which
5  methodology, if any, do you favor or endorse
6  for purposes of the analysis you're doing?
7      A.   That would be the Masters.
8      Q.   Okay.
9          MR. FULLER: Which is the first
10 one, right?
11         THE WITNESS: And that's --
12 yes, that's methodology one.
13     A.   And essentially because it has
14 been reviewed and an order issued -- or an
15 opinion issued by the D.C. court.
16 BY MR. NICHOLAS:
17     Q.   Now, just work with me here,
18 because I want to make sure I'm understanding
19 what you're saying and also what you're not
20 saying, okay?
21         Let's just look at the column
22 for -- I'm on page 41.
23     A.   Okay.
24     Q.   The column for, I don't know,
25 flagged orders of oxycodone dosage units, and

Page 177

1  you go right down each company, all right.
2  You've got one, two, three, four, five
3  companies, and in the case of each one,
4  you've got a parenthetical that says that
5  somewhere between -- that identifies
6  somewhere between 86.5% and 95.3% of total
7  dosage units, okay?
8      A.   Yes, sir.
9      Q.   All right. And that means
10 what? Is that the number of dosage units
11 that in your opinion should not have been
12 shipped?
13     A.   Well, in my report, if we -- I
14 actually make a statement in regards to that
15 on page 46.
16     Q.   Okay.
17     A.   So it starts after the
18 footnote 151: However, it is my opinion to a
19 reasonable degree of professional certainty
20 that applying the tests set forth in the
21 Masters Inc. and Drug Enforcement
22 Administration provides a reasonable estimate
23 and initial trigger on a first step to
24 identifying orders of unusual size.
25     Q.   So are you saying that --

45 (Pages 174 to 177)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  that I don't know that it's going to be
2  diverted.  I probably can't draw a definitive
3  statement that it is, but I'm going to say
4  that it's more probable because the system
5  identified it.
6      Q.  So you got it at 51% above,
7  it's going to be diverted; is that what
8  you're telling me?
9      A.  Well, that's the definition of
10 probable.  If it's an effective suspicious
11 order system, I believe the percents would
12 rise much higher than that, but I guess that
13 depends on the effectiveness of the
14 suspicious order system.
15     Q.  Where are you getting that
16 percent from?  Where are you getting that
17 from, just your own --
18     A.  What?
19     Q.  The 51, the probable, where are
20 you getting that it's probable?
21     A.  That's my belief of what
22 probable means.
23     Q.  Okay.  Other than your belief,
24 is it written down anywhere?  Is there any
25 research on that?  Is there any data on that?

Page 191

1  Is this just -- just your belief?
2      A.  Not that I can cite.
3      Q.  Okay.
4          MR. FULLER:  Vegas odds.
5          MR. NICHOLAS:  Okay.
6  BY MR. NICHOLAS:
7      Q.  Did you look at any individual
8  orders from any pharmacies in the Cuyahoga or
9  Summit Counties?
10     A.  I looked at some DEA 222 forms,
11 but I believe my recollection, it was out of
12 maybe the Boston area, so I would say no.
13     Q.  Okay.
14     A.  No original records.  I
15 reviewed no original records.
16     Q.  You reviewed data that was in
17 the aggregate, right, totals?  Correct?
18     A.  No.  I reviewed -- so just so
19 we're clear on, you know, what we're talking
20 about, so there's no confusion.
21     Q.  Uh-huh.
22     A.  So to me, in the DEA world, an
23 original record is the actual DEA order form,
24 the invoice or a CSOS electronic order form.
25 So that's what I would consider an original

Page 192

1  record.  Also provided to me, there's the
2  ARCOS data, which is not an original record,
3  and there were some electronic databases that
4  appeared to me to be an electronic
5  spreadsheet or an electronic format of orders
6  that distributors or registrants had
7  submitted as part of the discovery.  But none
8  of those would be what I would consider an
9  original record.
10     Q.  Can you identify a particular
11 order from a particular pharmacy that you
12 believe should have been reported as
13 suspicious?
14     A.  Well, in my assignment to
15 create this and do the investigation to come
16 to this opinion, there wasn't a requirement
17 for me to actually find specific orders that
18 were suspicious.
19         First of all, it would require
20 the use of the suspicious order system of the
21 registrant, like what would be the criteria.
22 The -- and the thing I found in doing my
23 opinion is that probably the most critical
24 part of setting up a suspicious order system
25 is the due diligence or sometimes in the

Page 193

1  industry they call it the onboarding, and
2  that's to establish what the criteria is.  I
3  said earlier what the usual is.
4          And I found it difficult
5  because I didn't really find an adequate
6  effort to set up what actually would be a
7  usual or what would be an expected order.  So
8  for me to go in and try to make that kind of
9  analysis wouldn't be possible.
10     Q.  So sitting here today, you
11 can't identify a particular order from a
12 particular pharmacy that should have been
13 reported as suspicious that wasn't; is that
14 correct?
15         MR. FULLER:  Form.
16     A.  I don't know because I didn't
17 task myself to do that.
18 BY MR. NICHOLAS:
19     Q.  Sitting here today, can you do
20 it?  I know you didn't -- I know it wasn't
21 part of your job description here.  That's
22 all I want to know is can you do it today?
23 Is it part of your report?
24     A.  Well, actually, let me retract.
25 I think I did that and I think it's on

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1  see in McKesson's suspicious order monitoring
2  program?
3     A.  At the very end of the time
4  period, they contracted or -- a company
5  called AGI, and AGI did a -- was designing a
6  model for them, and I thought just by looking
7  what limited information I got, that I
8  thought there was some potential for that.
9         I'm not saying that I'm
10 approving it, and without actually doing a
11 lot more analysis, but I thought that that
12 was -- had the potential for a good system.
13    Q.  As you sit here today, do you
14 have any opinions on whether McKesson's AGI
15 suspicious order monitoring program complies
16 with the CSA and its regulations?
17    A.  No, I did not evaluate it
18 because it was at the end of the time frame.
19    Q.  Do you have any plans to make
20 that evaluation before trial?
21    A.  If required or requested.
22    Q.  Has anyone requested that you
23 do so today?
24    A.  No, sir.
25    Q.  So currently, as you sit here

Page 355

1  today, you have no opinion about whether or
2  not McKesson's AGI suspicious order
3  monitoring program complies with or does not
4  comply with the CSA, correct?
5     A.  I did not offer opinion on that
6  matter, sir.
7     Q.  You testified earlier about
8  ARCOS.  Are you familiar with the reports
9  generated from the ARCOS database?
10    A.  What type of reports are you
11 speaking of, sir?  Could you clarify?
12    Q.  The reports that a diversion
13 investigator can request from the ARCOS
14 database?
15    A.  Oh, so generated pursuant to a
16 request?  Yes, sir.
17    Q.  Okay.  And you saw those kind
18 of reports while you were a DEA diversion
19 investigator, correct?
20    A.  I requested those type of
21 reports as a diversion investigator.
22    Q.  On page 15 of your report --
23    A.  15?
24    Q.  15.
25        You discuss ARCOS, and in the

Page 356

1  third paragraph from the top of the page, you
2  say:  The ARCOS data, defendant transactional
3  data, and the SLCG reports generated
4  therefrom are consistent with the types of
5  data, facts, information, and reports I would
6  typical rely on in conducting the analysis
7  and reaching the opinions contained therein.
8         Do you see that?
9     A.  I do, sir.
10    Q.  Now, is it your opinion that
11 Dr. McCann's five threshold-based
12 methodologies can be used to identify
13 suspicious orders under Section 1301.74?
14        MR. FULLER:  Form, compound.
15    A.  You're asking this question
16 about Dr. McCann in regards to this
17 paragraph?
18 BY MR. EPPICH:
19    Q.  I can rephrase it.
20        Is it your opinion that the
21 five threshold-based methodologies used by
22 Dr. McCann and cited by yourself, that those
23 methodologies can be used to identify
24 suspicious orders under Section 1301.74?
25    A.  No, I think my opinion is clear

Page 357

1  that they aren't suitable suspicious order
2  systems.
3     Q.  Is it your opinion that
4  Dr. McCann's -- and I quote -- "flagged
5  orders" are suspicious orders under
6  Section 1301.74(b)?
7     A.  Are you jumping back to the
8  methodologies?
9     Q.  I'm just asking you a question,
10 sir.
11        MR. FULLER:  You can clarify
12    the question if you don't understand.
13 BY MR. EPPICH:
14    Q.  But, yes, under the
15 methodologies.  Under the methodologies, yes,
16 sir.
17    A.  No, those aren't suspicious
18 orders under the methodologies.  Those are
19 dosage units.
20    Q.  While you were at the DEA, and
21 the DEA was analyzing ARCOS data, did DEA use
22 any of Dr. McCann's five methodologies to
23 identify suspicious orders?
24    A.  When I was at the DEA?
25    Q.  Yes, sir.

90 (Pages 354 to 357)

Page 402

```
 1   Henry Schein's investigation?
 2      A.   Let me see if I state that in
 3   my report.  I don't have independent
 4   recollection of that.
 5      Q.   So you don't know one way or
 6   the other?
 7      A.   No, I'm not saying that.
 8      Q.   Okay.
 9      A.   I'm just saying I don't have a
10   direct recollection when you state it that
11   way.
12      Q.   How is that different than what
13   I asked?  Let me back up then.
14           Sitting here today, do you know
15   one way or the other whether or not Henry
16   Schein provided monthly suspicious order
17   reports along with the pended order reports?
18      A.   The statement I make in my
19   report is for the time period of 2009 to
20   2018, that there were no suspicious orders
21   reported in the CT1 jurisdiction.
22      Q.   Well, I know -- I --
23      A.   I --
24      Q.   Mr. Rafalski, I get that.
25      A.   Okay.
```

Page 403

```
 1      Q.   I mean, but that's specific to
 2   Summit County, isn't it?
 3      A.   Yes, sir.
 4      Q.   That doesn't pertain to Henry
 5   Schein and how they do business elsewhere,
 6   does it?
 7      A.   It does not.
 8      Q.   And you're familiar with Craig
 9   McCann's characterization of Henry Schein's
10   business in Summit County, are you not?
11      A.   No, I'm not sure what statement
12   you're making there.
13      Q.   Okay.  Are you familiar with --
14   do you know that he gave a deposition last
15   week?
16      A.   I -- he did give a deposition.
17      Q.   And you probably haven't had a
18   chance to review the testimony yet, have you?
19      A.   I have not.
20      Q.   Have you had a chance to talk
21   to him about it?
22      A.   No, sir.
23      Q.   Would it surprise you to know
24   that he characterized Henry Schein's dealings
25   with Summit County as de minimis?
```

Page 404

```
 1      A.   I would have no reason not to
 2   believe your statement that that's what he
 3   said.
 4      Q.   Do you know if DEA has ever
 5   expressed any criticisms about Henry Schein's
 6   suspicious order monitoring system?
 7      A.   I'm not aware of any
 8   communication from the DEA to Henry Schein in
 9   regards to that topic.
10      Q.   Mr. Rafalski, can reasonable
11   minds disagree as to whether or not an order
12   is suspicious?
13      A.   I think there's always the
14   potential for a disagreement of -- if you're
15   talking about designing a system and what's
16   suspicious.  I think it's the subsequent due
17   diligence that confirms or not the accuracy
18   of whether or not an order is suspicious.
19           So just the nature of an
20   agreement or disagreement on what defines a
21   suspicious order, you mean the definition of
22   it or what it is, I guess?
23      Q.   Can reasonable minds disagree
24   as to whether or not a particular order is
25   suspicious?
```

Page 405

```
 1      A.   I think, yes, I would answer
 2   yes to that question.
 3           MR. JONES:  All right.  No
 4   further questions.  I'll pass the
 5   witness.  Thank you.
 6           THE VIDEOGRAPHER:  Going off
 7   the record at 6:16 p.m.
 8           (Proceedings recessed at
 9   6:16 p.m.)
10           --o0o--
```

Highly Confidential - Subject to Further Confidentiality Review

Page 480

1  distributor, when you were working as a
2  diversion investigator -- strike the
3  question.  Hold on a second.
4       A.   Can I speak to my counsel about
5  the --
6       Q.   No, that's okay.  We can move
7  on.
8       A.   -- Touhy authorization --
9       Q.   We can move on.
10      A.   -- that I have a question, with
11 him?
12      Q.   I don't have a lot of time, so
13 I'll just withdraw the last partial question
14 that I was just trying to ask --
15      A.   Okay.
16      Q.   -- and we'll move on.
17           Yesterday I believe you
18 testified that none of the five flagging
19 methods identified in your report are
20 suitable for suspicious order monitoring
21 systems.
22           Do you remember using the word
23 "suitable"?
24      A.   I do.  And I thought about that
25 testimony after I left yesterday, and I'd

Page 481

1  like to maybe correct it or make a statement
2  in regards to it.
3       Q.   Well, let me just ask you.
4  What did you mean when you said none of the
5  five flagging methods that you identify in
6  your report are suitable for suspicious order
7  monitoring systems?
8       A.   Well, specifically how they
9  would identify a suspicious order, two times,
10 three times, the 8,000 and the pickers and
11 packers program or the -- I think I don't use
12 that particular name -- the one -- the one
13 that I think that statement would indicate
14 that I would say that the Masters was not
15 suitable, and I -- I would disagree.
16           If I made that statement and
17 said that one was, I'd like to correct that
18 and say that I -- this would be a suitable --
19 potentially suitable suspicious order
20 program.
21      Q.   The Masters method that
22 identified 95% of Walgreens orders as
23 suspicious, that one is suitable?  Is that
24 your testimony, sir?  But none of the other
25 ones?

Page 482

1       A.   Just the trigger of the
2  six-month threshold, maximum monthly, just
3  the trigger that would identify the
4  suspicious order, that was, I believe, the
5  question I answered.  That methodology, not
6  the subsequent failure to do due diligence
7  and the identification of orders that
8  resulted from that.
9       Q.   My question was whether it's
10 your testimony that the Masters method, the
11 one that identified 95% of Walgreens orders
12 as suspicious, is the only one of your five
13 flagging methods that you believe is suitable
14 for identifying suspicious orders, yes or no,
15 please?
16           MR. FULLER:  Object to form,
17      vague.
18      A.   As a trigger mechanism or
19 threshold to establish that, an order as
20 being potentially suspicious, I would answer
21 yes to that question.
22 BY MS. SWIFT:
23      Q.   You've referred a couple of
24 times to this trigger mechanism, and I take
25 from your testimony that you're referring to

Page 483

1  the aspect of your methodology whereby after
2  the first order is flagged as suspicious, it
3  triggers every subsequent order to be flagged
4  as suspicious; is that correct, sir?
5           MR. FULLER:  Form, misstates
6      his report.
7       A.   No.
8  BY MS. SWIFT:
9       Q.   What do you mean by a trigger
10 mechanism?
11      A.   A threshold event.  Every
12 suspicious order system has to identify an
13 order, so that would be -- and I'm sorry if
14 that terminology is unfamiliar to you.  That
15 would be a trigger event or a threshold event
16 or something that stops the distribution of
17 an order and requires the registrant to take
18 some action; the unusual size, the unusual
19 frequency or deviating from a --
20 substantially from a pattern.
21      Q.   Besides the five flagging
22 methods that you identify in your report,
23 there may be other methods of identifying
24 suspicious orders that registrants use in the
25 real world, correct, sir?

19 (Pages 480 to 483)

Highly Confidential - Subject to Further Confidentiality Review

Page 496

1  database flagged under one of the flagging
2  methods, correct?  Not whether it's possible,
3  just how often that happened?
4     A.   No, I did not.
5     Q.   Okay.
6     A.   Because as my previous answer,
7  under those methodologies, it wouldn't
8  matter.
9     Q.   Let's go to page 46 of your
10 report, please, sir.  You say on page 46 that
11 you only presented data to an economist for
12 Flagging Method A, the Masters method,
13 correct?
14        MR. FULLER:  Where are you
15     reading from, Counsel?
16    A.   I don't think I said that.  I
17 think this statement is in relation to the
18 correction of my testimony that this is the
19 one system that I provide an opinion on that
20 has a reasonable degree of certainty that...
21 BY MS. SWIFT:
22    Q.   Did you provide any of the data
23 that appears in your report to an economist?
24        MR. FULLER:  Object to form.
25    A.   I don't recall doing that.  I

Page 497

1  do not believe so, no.
2  BY MS. SWIFT:
3     Q.   Do you have any understanding
4  about whether any of the data that appears in
5  your report was going to be passed on by the
6  plaintiffs' lawyers to some economist to make
7  use of that data?
8     A.   I believe there's a statement
9  of that in my report somewhere, that it could
10 be used.
11    Q.   Do you know whether that ever
12 happened?
13    A.   I don't believe it's happened.
14 If it has happened, no one's advised me.
15    Q.   Have you ever had a
16 conversation with any economist working for
17 the plaintiffs' lawyers about the data that
18 appears in your report?
19    A.   No, ma'am.
20    Q.   You testified --
21    A.   Can I just correct that a
22 little bit?
23        So in the course of meetings,
24 I've talked to a lot of people.  No one ever
25 I've talked to has identified themselves as

Page 498

1  an economist or I've never talked to anyone
2  with the purpose of giving these things to an
3  economist.  So I don't want to imply my
4  testimony is I've never talked to an
5  economist.  I'm not aware of it, but I'm just
6  kind of protecting the fact that if I did, I
7  wasn't even aware of it.
8     Q.   You never explained the data in
9  your report to anyone for the purpose of them
10 taking that data and using it to calculate
11 damages in this litigation?
12    A.   I have never done that.
13    Q.   You testified yesterday that
14 you provided the five flagging methods
15 discussed in your report -- you provided
16 those to plaintiffs' counsel by phone I
17 believe, you said to -- provided them to
18 Mr. Farrell.
19        Do you remember that testimony?
20    A.   I think that question was the
21 first time that I talked to somebody about
22 it.  So --
23    Q.   I'm trying to get at how the --
24        MR. FULLER:  Object to the form
25     of the last question.  I'm sorry.

Page 499

1  BY MS. SWIFT:
2     Q.   I'm trying to get at how the
3  five flagging methods made their way from you
4  to Dr. McCann.
5         Do you have any idea how that
6  happened?
7     A.   There was a couple of different
8  discussions with the plaintiff attorneys.
9  I'm not sure who relayed it to Dr. McCann.  I
10 discussed it with Paul Farrell, Mr. Farrell a
11 couple of times; also with Mr. Fuller.  I'm
12 not sure who relayed it to him, but I
13 discussed the methodologies and how I wanted
14 them applied.
15    Q.   All of those conversations were
16 verbal, is that correct, not in writing?
17    A.   There was nothing in writing,
18 and they were verbal, either in person or on
19 a telephone.
20    Q.   I'm going to hand you what I'll
21 mark as Exhibit 20.
22        MS. SWIFT:  And, Counsel, I
23     apologize, I only have one extra copy.
24     Blame the hotel.  I'm not even going
25     to have a copy for myself.

23 (Pages 496 to 499)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 500

1            (Whereupon, Deposition Exhibit
2        Rafalski-20, Plaintiffs' Responses to
3        the Amended and Clarified Discovery
4        Ruling 12 Supplemental Interrogatory
5        Issued to Plaintiffs, was marked for
6        identification.)
7   BY MS. SWIFT:
8       Q.   Do you have that in front of
9   you, sir?
10      A.   I do.
11           THE WITNESS:  Trade you.
12      Sorry.
13  BY MS. SWIFT:
14      Q.   Well, first of all, have you
15  ever seen the document that I've marked as
16  Exhibit 20?
17      A.   I have, yes, ma'am.
18      Q.   The document I marked as
19  Exhibit 20 is a set of interrogatory
20  responses served by the plaintiffs on
21  January 25th, 2019, and if you go to -- I
22  believe it's the sixth page -- there's a list
23  of flagging methodologies prepared at the
24  very end of the written interrogatory
25  response.  Keep going.

Page 501

1            MR. FULLER:  It's not page
2       numbered.
3            MS. SWIFT:  I noticed that,
4       Mike.
5            MR. FULLER:  We'll blame
6       Mr. Moody or Mr. Farrell.
7   BY MS. SWIFT:
8       Q.   Do you have a list in front of
9   you, Mr. Rafalski, that lists five flagging
10  methodologies in the plaintiffs'
11  interrogatory response from January 25th?
12      A.   I do.
13      Q.   Are these your five flagging
14  methodologies?
15      A.   Yes, ma'am.
16      Q.   Which one is based on the
17  Masters case?
18      A.   4.
19      Q.   Am I correct based on your
20  testimony today and yesterday that you're not
21  planning to come to trial and offer testimony
22  about any of the flagging methods except the
23  Masters method?
24      A.   No, I don't think that's my
25  testimony.

Page 502

1       Q.   Okay.  All right.  Turning back
2   to your report -- you can set that aside,
3   we're done with it -- page 42, I'd like to
4   take a look at, please.
5            MR. FULLER:  I'm sorry,
6       Counsel, what page?
7            MS. SWIFT:  42.
8   BY MS. SWIFT:
9       Q.   If you had picked Flagging
10  Method B that's identified at the top of
11  page 42, instead of Method A, the Masters
12  method, what data would you have presented
13  for Walgreens?
14           MR. FULLER:  Object to form.
15      A.   I don't understand that
16  question.
17  BY MS. SWIFT:
18      Q.   Fair enough.
19      A.   I think I did pick
20  Methodology B, but so I don't understand.
21      Q.   Well, you said you endorsed
22  Method A and that's the only method you
23  endorsed, correct, because of the Masters
24  case and some other reasons?
25      A.   Well, I think I make that

Page 503

1   statement at the conclusion that we had
2   discussed --
3       Q.   Right.
4       A.   -- in regards to the Masters.
5       Q.   Right.  On page 46 you endorse
6   the Masters method, Method A, correct, sir?
7       A.   Well, I don't know that I
8   endorse the system.  I say that applying the
9   tests set forth in the Masters provides a
10  reasonable estimate and initial trigger.  I
11  say there's a reasonable.  I don't know that
12  I would say that it's an endorsement.  I say
13  that because in my -- extensively in my
14  training and in publications, DEA doesn't
15  endorse suspicious order systems.
16      Q.   You say in your report that you
17  are selecting Methodology A because of your
18  understanding that this litigation will be
19  advanced by selecting a methodology
20  quantifying a volume of pills that entered
21  CT1 jurisdictions, that's Summit and Cuyahoga
22  County, unlawfully and providing this data to
23  an economist to measure the harm caused by
24  this volume.
25           Correct, sir?

24 (Pages 500 to 503)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 504

1  A. Yes.
2  Q. If you had picked Method B
3  instead of Method A, the data you would have
4  presented would have been very different,
5  correct, sir?
6  A. I wouldn't have picked that
7  method because it wouldn't be a reasonable
8  degree -- or it wouldn't have been a
9  suspicious order system that I would have
10  ever approved or not made comment on.
11       My opinion is that a fixed two
12  times a 12-month average would not be a
13  methodology that I would ever say to move
14  forward to be considered by the Court.
15  Q. I'm going to ask you with
16  respect, sir, to please listen to my
17  questions.
18  A. Okay.
19  Q. You picked --
20  A. Can I just --
21  Q. Go ahead.
22  A. It would be different results.
23  I would -- if that's the answer you want,
24  then the methodology of the A -- obviously,
25  it would be different results.

Page 505

1  Q. Method A, the Masters method,
2  identified 95% of Walgreens orders for
3  oxycodone and hydrocodone as suspicious,
4  correct, sir?
5  A. Yes, that's what the chart
6  says.
7  Q. If you had picked Method B,
8  that method identified just 49% of Walgreens
9  orders for oxycodone into Cuyahoga County as
10  suspicious, correct, sir?
11  A. That's what the information
12  says in the analysis.
13  Q. The number is different for
14  hydrocodone. If you had picked Method B,
15  that method identified 23% -- 23.7% of
16  Walgreens hydrocodone orders as suspicious,
17  correct, sir?
18  A. Yes. But again, I'm going
19  to restate. I would not have picked -- I
20  mean, I'm not going to disagree that the
21  figures are different, but I would not have
22  picked that.
23  Q. I get it.
24  A. But if I would have picked it,
25  they would be different.

Page 506

1  Q. Understood.
2  A. Okay. All right.
3  Q. You didn't pick Method B. You
4  picked Method A, that it flagged 95% of
5  Walgreens orders.
6  A. I didn't pick it because of the
7  percentage --
8  Q. Okay.
9  A. -- the percentage of how many
10  they flagged was not the factor that I used
11  to pick that. It was because of the review
12  by the D.C. Court and my familiarity with the
13  case, and the fact that I would see that that
14  could be a viable suspicious order trigger.
15  Q. If you had picked Method C,
16  which you can see on page 43 of your report,
17  you would have identified just 1.5% of
18  Walgreens orders for oxycodone in Cuyahoga
19  County as suspicious, correct, sir?
20  A. I do agree that that's the
21  number that it would have identified, but I
22  also would like to state it would be expected
23  that it would decrease because that's -- as
24  my opinion states, is ineffective three
25  times --

Page 507

1  Q. You didn't --
2  A. -- trigger.
3  Q. You can't vouch for the
4  accuracy of any of the numbers that appear in
5  these tables at pages 41 to 45 of your
6  report, correct, sir?
7  A. Mr. McCann would have to
8  testify to the accuracy. He did the
9  analysis.
10  Q. You just relied on what
11  Mr. McCann provided, correct, sir?
12  A. Yes, I did.
13  Q. You were -- strike that.
14       You don't have an opinion about
15  whether any particular order that you
16  identified or that Dr. McCann identified as
17  suspicious was diverted to an illicit
18  channel, correct, sir?
19  A. Well, I think based on the
20  methodologies and the lack of due diligence,
21  I think my -- these say that those were
22  diverted.
23  Q. My question was a little bit
24  different.
25  A. Okay.

25 (Pages 504 to 507)

Highly Confidential - Subject to Further Confidentiality Review

Page 512

1  Appendix 10, correct?
2      A.   Yes, I do.
3      Q.   And you can see the first page
4  of what I just handed you is page 226 of
5  1260.  Is that the page that you were citing
6  in footnote 489?
7      A.   Yes.
8      Q.   And then if you'll turn to
9  page 46 of what I just handed you, can you
10 confirm for me that that is page 856 that you
11 cited in your report?
12     A.   Page 46.  You mean page -- I'm
13 sorry, page 856?
14     Q.   I'm sorry.  To make this
15 easier -- this was the theory, anyway -- we
16 added page numbers at the bottom right.
17     A.   Okay.
18     Q.   So turn to page 46, and it's
19 double sided.
20     A.   Oh, all right.  I was confused
21 when you said -- I was looking for the...
22 okay.
23     Q.   Is page 46 also page 856 of
24 1260?
25     A.   Yes, ma'am.

Page 513

1      Q.   Is that the page 856 that you
2  cite in your report at page 114?
3      A.   Yes, ma'am.
4      Q.   Okay.  This Appendix 10 from
5  McCann's report is what you relied on to
6  determine total volume of oxycodone and
7  hydrocodone that Walgreens shipped into
8  Cuyahoga and Summit Counties; is that right?
9      A.   Yes, ma'am.
10     Q.   You only talk about oxycodone
11 and hydrocodone in your report, correct?
12     A.   Yes, ma'am.
13     Q.   Am I right that you don't have
14 any opinions about any other opioid pain
15 medications besides oxy and hydro?
16     A.   As of today I do not because I
17 was not requested to do any analysis on those
18 other drugs.
19     Q.   After -- turn back to page 1 of
20 Exhibit 21.  The page 1 of Exhibit 21 is a
21 table that shows overall numbers, Total
22 Shipments to Cuyahoga identified by
23 Methodology, Common Sense Method, Maximum
24 Monthly Trailing Six-Month Pharmacy Specific
25 Threshold, Walgreens to All Buyers, 1996 to

Page 514

1  2018, correct?
2      A.   Yes.
3      Q.   And it's a table that shows
4  numbers broken out by drug and by
5  transaction, dosage units, MME, and base
6  weight, correct?
7      A.   Yes.
8      Q.   After the table on page 1 of
9  Appendix 10, there's a series of bar graphs
10 showing, in the aggregate, Walgreens
11 shipments of oxy and hydro to its pharmacies
12 in the aggregate, correct?
13     A.   Yes, ma'am.
14     Q.   None of these charts shows any
15 data for any individual Walgreens pharmacy,
16 correct?
17          MR. FULLER:  Object to form.
18     A.   That's an accurate statement,
19 but they're all built upon individual orders.
20 BY MS. SWIFT:
21     Q.   I understand.
22     A.   Okay.
23     Q.   I'm just saying, when you're
24 flipping through Dr. McCann's charts that
25 display the results of his flagging

Page 515

1  methodologies, you can't tell anything about
2  any individual pharmacy, correct?
3      A.   I cannot by looking at these
4  charts.
5      Q.   Do you know how many Walgreens
6  stores there are in Cuyahoga County?
7      A.   I do not.
8      Q.   How about Summit County?
9      A.   I do not.
10     Q.   Do you know anything about the
11 geographic locations of any of Walgreens'
12 pharmacies in Summit or Cuyahoga County,
13 other than the fact that they're in those
14 counties?
15     A.   It doesn't appear in my
16 opinion, but during my review of data, I did
17 at one point take a look by just using the
18 Internet, Googling and looking at some of the
19 locations, but I didn't formulate a report on
20 that.
21          So I won't say that I never did
22 that, but I don't have any records or
23 documents that would record exactly the
24 distances and the locations.
25     Q.   You also didn't include in your

27 (Pages 512 to 515)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 516

1  report anything about the specific customer
2  base for any individual Walgreens pharmacy,
3  correct, sir?
4      A.   I did not.
5      Q.   Do you know how many of the
6  Walgreens pharmacies in Cuyahoga and Summit
7  County are on corner lots?
8      A.   I do not.
9      Q.   Do you know how many of the
10 Walgreens pharmacy in Summit and Cuyahoga
11 Counties are freestanding locations with
12 their own dedicated parking and a
13 drive-through window?
14     A.   I do not.
15     Q.   Do you know how much oxycodone
16 or hydrocodone Walgreens distribution centers
17 shipped to any one of those Walgreens
18 pharmacies?
19     A.   I do not.  I had not done that
20 analysis up to today.
21     Q.   You can't tell any of that from
22 the charts that are in Appendix 10, correct,
23 sir?
24     A.   That's correct.
25     Q.   All right.  You can set that

Page 517

1  one aside.
2           Turn, if you would, please,
3  sir, to page 117 of your report.  This is a
4  section within the Walgreens section about
5  the due diligence that you believe Walgreens
6  conducted, correct?
7      A.   Yes, ma'am.
8      Q.   Now, as I understand it, it's
9  your opinion that because you only saw a
10 limited number of e-mails about due diligence
11 that Walgreens performed 10, 12, 13 years
12 ago, that that means Walgreens performed no
13 other due diligence; is that correct?
14     A.   Not that was brought to my
15 attention in trying to formulate my opinion.
16     Q.   And in formulating your
17 opinion, you determined that Walgreens had
18 only conducted limited due diligence because
19 you only saw documentation of limited due
20 diligence, correct?
21     A.   That's the only basis I could
22 use to form my opinion.
23     Q.   You based your -- well, let me
24 ask you this.
25          Did you read any of the

Page 518

1  Walgreens depositions where Walgreens
2  witnesses talked about the kind of due
3  diligence that had been done?
4      A.   I read depositions or specific
5  parts of depositions relating to my report.
6  I -- you know, my training and experience has
7  said that if it's not written down, it
8  doesn't exist.  It needs to be documented.
9           So how I would look at that
10 kind of due diligence, if it was not a
11 recorded due diligence and there wasn't a
12 historical record, and it's not available for
13 future review for other incidences, I
14 wouldn't consider -- I mean, I'm not going to
15 deny that it would have occurred or would not
16 have occurred, but it's really not due
17 diligence if it's not recorded in a due
18 diligence file.
19     Q.   Well, there's a couple of
20 things going on in that answer.
21     A.   Sure.
22     Q.   I take from your testimony that
23 you are assuming, if Walgreens no longer
24 retains a document today, that that means
25 that document never existed, correct?

Page 519

1      A.   In my experience as a diversion
2  investigator, in conducting an investigation
3  or forming an opinion, yes, it doesn't exist.
4      Q.   Are you basing your opinion
5  that Walgreens did limited due diligence on
6  the documents cited in your report at
7  footnotes 499 and 500?
8           MR. FULLER:  Object to form.
9      A.   I believe I also cite 501, but
10 yes, ma'am.
11 BY MS. SWIFT:
12     Q.   Is that it, though, in terms of
13 the support you have for your opinion that
14 Walgreens performed limited due diligence is
15 based on the documents cited in notes 499,
16 500 and 501?
17     A.   Yeah, and the fact that they
18 didn't produce any prior to 2011, yes, ma'am.
19     Q.   I'll hand you one of those
20 documents that we'll mark as Exhibit 22.
21          (Whereupon, Deposition Exhibit
22     Rafalski-22, E-mail(s),
23     WAGFLDEA00000459 - WAGFLDEA00000460,
24     was marked for identification.)
25          ///

28 (Pages 516 to 519)