# EXHIBIT 2

**(Rafalski Deposition Transcript)**

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION             )   Case No.
                            )   1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6   ALL CASES             )   Polster
                            )
 7
 8
 9                    __ __ __
10              Monday, May 13, 2019
                      __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, held at Weitz & Luxenburg PC, 3011
17   West Grand Avenue, Suite 2150, Detroit,
     Michigan, commencing at 9:20 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                      __ __ __
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I guess that's Mr. Prevoznik's

2    issue to comment on.

3         I'm not sure, under my

4    authorization from the DEA, if I even knew I

5    could comment on that.

6    Q.    In your report -- and you can

7    turn to the pages if you want.  Starting on

8    page 40, you make reference to five different

9    methodologies that address the issue of the

10    number of suspicious orders that were and

11    weren't reported in the Track 1

12    jurisdictions, correct?

13    A.    I think I report dosage amounts

14    based on the methodologies.

15    Q.    I'm sorry.  I'm sorry.  I

16    apologize.  Dosage amounts.

17         So we're talking about the

18    number of -- however you want to describe it,

19    the number of pills or the number of dosage

20    amounts of pills that are going into these

21    jurisdictions over a period of time; is that

22    right?

23    A.    Yes, based on that particular

24    methodology.

25    Q.    Okay.  Well, you say that

Highly Confidential - Subject to Further Confidentiality Review

```
1    particular methodology.  You used -- you

2    referenced five methodologies, correct?

3         A.    Yes, sir.

4         Q.    Okay.  Did you figure out those

5    methodologies yourself, or did Mr. McCann do

6    that?

7         A.    No, those are mine based on --

8         Q.    These five methodologies are

9    yours?

10        A.    Yes.  Well, they are

11   methodologies that are mirroring suspicious

12   order systems that are utilized by one or

13   more companies in my report.

14        Q.    Okay.  So did you -- you put

15   these -- did you put these charts together

16   yourself?

17        A.    No, I did not.

18        Q.    Who put the charts together?

19        A.    I -- I'm sorry.

20              Well, this is based on

21   McCann's -- Mr. McCann takes -- took my

22   methodology, and these were the results of

23   his application of my methodology to the

24   ARCOS data.

25        Q.    I see.
```

Highly Confidential - Subject to Further Confidentiality Review

1          So you -- you came up with

2    these five methodologies?

3          A.     Yes, sir.

4          Q.     Okay.  And tell me -- tell me

5    why you chose these five methodologies.  I

6    think you started to do it, but just go ahead

7    and explain it to me.

8          A.     Well, because these are

9    methodologies that were used by one or more

10   companies in my report, during the time frame

11   of my report.  Each one of these were not

12   invented by me, but they were actually used.

13         Q.     Okay.  Can you -- let's start

14   with the first one.  Methodology A is maximum

15   monthly trailing six-month threshold.

16         Can you explain to me what you

17   were trying to express here?

18         A.     Well, this is the Masters case

19   methodology.

20         Q.     Okay.

21         A.     Or I shouldn't say methodology.

22   This is their suspicious order system.  So

23   it's a rolling six-month, and it looks for a

24   current month that exceeds the highest

25   previous amount in the six months.

Highly Confidential - Subject to Further Confidentiality Review

1    there's any actual written reference to

2    records or the retention of records in that

3    section?

4          A.     Well, so in the maintenance of

5    effective controls?

6          Q.     Yeah.

7          A.     It doesn't specifically say

8    that, if that's what you're...

9          Q.     Okay.  Okay.  Now -- so just --

10   we'll break for lunch, but just so I

11   understand, the methodologies that -- the

12   five methodologies described here were

13   selected -- were identified or selected by

14   you.  Is that -- based on what you saw the

15   various companies had done over the years; is

16   that correct?

17         A.     Yes, sir.

18         Q.     And you provided just those

19   methodologies, the concepts, to Mr. McCann

20   and he plugged in the numbers; is that

21   correct?

22         A.     Yes, but just as a

23   clarification, I personally didn't discuss

24   that with Mr. McCann.  I discussed it with

25   counsel and then counsel relayed that to

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NICHOLAS:

2         Q.    -- at least for the purposes of

3    your numbers?

4              MR. FULLER:  Object to form.

5         A.    It's not an assumption.  It's

6    based on my review of records and depositions

7    and documents that I couldn't find a time

8    period where I believed there was sufficient

9    due diligence -- well, there was actually a

10   complete failure.

11             There was the failure to stop

12   suspicious orders, there was ineffective

13   suspicious order systems, but in regards to

14   what caused these large numbers, it was the

15   failure to have the maintenance of effective

16   controls to prevent diversion, which is the

17   act of the due diligence, the reviewing those

18   orders to approve them as was detailed in the

19   Masters opinion.

20   BY MR. NICHOLAS:

21        Q.    Okay.  Now, see if we can agree

22   on one thing here, which is this:  There

23   could be an order of unusual size or

24   frequency or pattern that is shipped.

25   Whether it should have been or shouldn't have

Highly Confidential - Subject to Further Confidentiality Review

1    been, we can put aside for another day.

2    Okay?  Let's just say that there's an order

3    of unusual size, frequency, pattern, that, in

4    fact, was shipped and it -- you can even

5    say -- and let's say it should have been

6    reported as a suspicious order, but it

7    shipped.  All right?

8                 Do you agree that even though

9    that order was shipped and even though you

10   say it shouldn't have been shipped, it

11   doesn't necessarily mean that the pills that

12   underlie that order are going to be diverted.

13   You don't know.

14                 MR. FULLER:  Object to form.

15   BY MR. NICHOLAS:

16        Q.     Correct?

17        A.     So I'll answer that question by

18   saying that if it's identified as suspicious

19   order by unusual size or unusual frequency or

20   deviating form -- you know, substantial

21   deviation from a pattern, so to me that puts

22   it as a probable, greater than 51% that it's

23   going to be diverted because it's been

24   identified.

25                 So I can't draw the conclusion

1    that I don't know that it's going to be

2    diverted.  I probably can't draw a definitive

3    statement that it is, but I'm going to say

4    that it's more probable because the system

5    identified it.

6         Q.    So you got it at 51% above,

7    it's going to be diverted; is that what

8    you're telling me?

9         A.    Well, that's the definition of

10   probable.  If it's an effective suspicious

11   order system, I believe the percents would

12   rise much higher than that, but I guess that

13   depends on the effectiveness of the

14   suspicious order system.

15        Q.    Where are you getting that

16   percent from?  Where are you getting that

17   from, just your own --

18        A.    What?

19        Q.    The 51, the probable, where are

20   you getting that it's probable?

21        A.    That's my belief of what

22   probable means.

23        Q.    Okay.  Other than your belief,

24   is it written down anywhere?  Is there any

25   research on that?  Is there any data on that?

Highly Confidential - Subject to Further Confidentiality Review

1    Is this just -- just your belief?

2           A.     Not that I can cite.

3           Q.     Okay.

4                  MR. FULLER:  Vegas odds.

5                  MR. NICHOLAS:  Okay.

6    BY MR. NICHOLAS:

7           Q.     Did you look at any individual

8    orders from any pharmacies in the Cuyahoga or

9    Summit Counties?

10          A.     I looked at some DEA 222 forms,

11   but I believe my recollection, it was out of

12   maybe the Boston area, so I would say no.

13          Q.     Okay.

14          A.     No original records.  I

15   reviewed no original records.

16          Q.     You reviewed data that was in

17   the aggregate, right, totals?  Correct?

18          A.     No.  I reviewed -- so just so

19   we're clear on, you know, what we're talking

20   about, so there's no confusion.

21          Q.     Uh-huh.

22          A.     So to me, in the DEA world, an

23   original record is the actual DEA order form,

24   the invoice or a CSOS electronic order form.

25   So that's what I would consider an original

1    defendant a little bit.

2         A.    Oh, okay.

3         Q.    So if there's 13 defendants, is

4    it roughly spread evenly, divided by 13, you

5    get a rough approximation?

6         A.    Well, I think I spent a little

7    more time on the distributors until I did

8    the -- instead of the manufacturers.  I would

9    say I probably spent more time in totality

10   and individually in -- as far as just at the

11   distributors.

12              I would probably say pretty

13   equal except with Henry Schein, because

14   that's a smaller distributor and there was

15   less documents and less information to

16   review.

17        Q.    So for each of the larger

18   distributors, we're talking something in the

19   range of 50 or 60 hours each; is that fair?

20        A.    I guess that could be a

21   possible --

22              MR. FULLER:  Object to form.

23        A.    I guess it could be a possible

24   approximation.

25   BY MR. PYSER:

1     Q.     Okay.  But you're the -- you're

2  the guy, you're the expert on what's an

3  effective SOM system and what's not an

4  effective SOM system for the plaintiffs,

5  right?

6     A.     I am.

7     Q.     And there's not another

8  individual who's been designated as an expert

9  by the plaintiffs to help you in analyzing

10  whether or not a SOM system is compliant or

11  noncompliant?

12     A.     That is a correct statement,

13  yes, sir.

14     Q.     Okay.  And sitting here today,

15  you don't know the number of suspicious

16  orders that Henry Schein has distributed into

17  Summit County?

18     A.     If you're asking do I have a

19  specific number of orders, I do not.

20     Q.     Okay.  In fact, you don't know

21  if any suspicious orders have been

22  distributed by Henry Schein into Summit

23  County, do you?

24     A.     I don't state that in my

25  report, no, sir.

1    Q.    Okay.  And similarly, you don't

2    know what, if any, orders that Henry Schein

3    distributed into Summit County were diverted?

4              (Document review.)

5    A.    I do not have knowledge of any

6    drugs that were diverted.

7    BY MR. JONES:

8    Q.    As part of your work in this

9    case, you reviewed Henry Schein's standard

10   operating procedures?

11   A.    Yes, sir.

12   Q.    Or SOPs?

13   A.    Yes, sir.

14   Q.    You also reviewed Henry Schein

15   witness deposition testimony?

16   A.    I'm just checking.  I don't

17   have a recollection of that.

18             (Document review.)

19   A.    Yes, sir, I believe I did.

20   BY MR. JONES:

21   Q.    Do you recall whose?

22   A.    Abreu.

23   Q.    Is that a man or a woman, do

24   you know?

25   A.    I don't recall.  I remember the

1
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
2
EASTERN DIVISION

3    IN RE: NATIONAL              )   MDL No. 2804
     PRESCRIPTION OPIATE         )
4    LITIGATION                   )   Case No.
                                  )   1:17-MD-2804
5                                 )
     THIS DOCUMENT RELATES TO    )   Hon. Dan A.
6    ALL CASES                    )   Polster
                                  )

7

8

9                        — — —
10              Tuesday, May 14, 2019
                         — — —
11

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                         — — —
13

14

15

16         Videotaped Deposition of JAMES E.
     RAFALSKI, VOLUME 2, held at Weitz &
17   Luxenburg PC, 3011 West Grand Avenue, Suite
     2150, Detroit, Michigan, commencing at
18   8:25 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21

22

23                       — — —
24         GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com

1    yesterday that you did not review any of the

2    flagged orders from Dr. McCann's analysis; is

3    that correct?

4         A.    I think my testimony in that

5    area was any specific orders.  That would be

6    correct of what my testimony was, yes.

7         Q.    You did not do any analysis to

8    see whether any specific suspicious order

9    caused the diversion of any specific pills

10   for nonmedical use, correct?

11        A.    In regards to Dr. McCann's --

12        Q.    Correct.

13        A.    That would be a correct

14   statement.  I didn't do a specific order of a

15   specific drug, if I understand your question

16   properly.

17        Q.    Well, you asked for a

18   clarification of whether I was speaking about

19   Dr. McCann's analysis.

20              You didn't do any analysis to

21   see whether any specific suspicious order

22   caused the diversion of any specific pills,

23   correct?

24              MR. FULLER:  Object to form.

25        A.    I think that's an accurate

Highly Confidential - Subject to Further Confidentiality Review

1    statement.

2    BY MS. SWIFT:

3        Q.    You testified yesterday that

4    you endorsed Flagging Method A, which you can

5    see at the top of page 41 of your report.

6    Because it -- is that correct?

7        A.    I think that's an accurate

8    statement.  It was -- I endorsed it because

9    it was utilized by the Masters

10   Pharmaceutical.

11       Q.    Is that the only reason you

12   endorsed Flagging Method A?

13       A.    No, that wouldn't be the only

14   reason, no, ma'am.

15       Q.    Did any of the plaintiffs'

16   lawyers instruct or suggest to you that you

17   use Flagging Method A?

18       A.    No.

19       Q.    What other reasons did you

20   endorse Flagging Method A?

21       A.    One, it was part of one of the

22   investigations I conducted, so I was familiar

23   with it.  I believe it was discussed at an

24   administrative hearing with the DEA,

25   subsequently reviewed by the D.C. Court, and

1          Q.     You don't have an opinion about

2     whether any particular order -- you didn't

3     look at any particular order to see whether

4     it was diverted to an illicit channel?

5          A.     I did not --

6          Q.     Okay.

7          A.     -- analyze all the orders and

8     try to find one or locate one that was

9     diverted.

10         Q.     You didn't analyze any of the

11    orders, correct, sir?

12         A.     That's correct.

13         Q.     You have no opinion about

14    whether any particular order that was flagged

15    as suspicious led to someone's addiction,

16    overdose or death, correct, sir?

17         A.     As of today, I have no opinion

18    on that matter.

19         Q.     Do you plan on coming up with

20    that opinion at some point after today?

21         A.     I can't rule that out if I'm

22    asked to look at that or I'm provided some

23    information I could review that would -- that

24    would indicate that.  So I can't rule out

25    that that would occur.

1    wouldn't have mattered in your hypothetical.

2                    Would you agree with me on

3    that?

4                    It's a risk of -- maybe we can

5    grant you that, but if the risk never came

6    home to roost, then it doesn't matter, but

7    you don't know that.

8         A.    Well, that's it.  The concept

9    of why we're not agreeing on this is the

10   suspicious order system and the effectiveness

11   of it and the due diligence is all based on

12   the risk of diversion.  It doesn't mean that

13   diversion is going to occur.  Just based on

14   the serious risk, and that's what makes it a

15   maintenance of effective controls requirement

16   by the law.

17        Q.    All right.  Take a look at

18   page 108.  So this -- I want to direct your

19   attention to the top of page 108.  You say:

20   Mortelliti testified that while he was

21   reviewing the IRR, every HCP order that

22   appeared on the IRR was referred out for

23   additional investigation which he believed

24   was necessary.

25                    With me so far?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. O'CONNOR:  Objection, form.

 2                    MR. FULLER:  I'm sorry, go

 3         ahead.

 4         A.      Any relevant transactions.

 5                    MR. FULLER:  I don't have

 6         anything further.

 7                    THE VIDEOGRAPHER:  Going off

 8         the record, 5:04 p.m.

 9                    (Recess taken, 5:04 p.m. to

10         5:14 p.m.)

11                    THE VIDEOGRAPHER:  We're back

12         on the record at 5:14 p.m.

13                       EXAMINATION

14    BY MR. MATTHEWS:

15         Q.      Good afternoon, Mr. Rafalski.

16    I already introduced myself to you but just

17    for the record, I'm James Matthews.  I

18    represent Anda Inc.

19         A.      Good afternoon.

20         Q.      How are you.

21                 I want to take you back to the

22    beginning of the day.  There were some

23    questions asked of you by Ms. Swift who

24    represented Walgreens.

25                 Do you remember that very
```

1  beginning of the day, right in the morning?

2        A.    I recall I was interviewed or

3  deposed about Walgreens.  I don't

4  specifically -- the questions, I don't

5  recall.

6        Q.    Okay.  You issued 183 --

7  180-some-odd-page report, right?

8        A.    Yes, sir.

9        Q.    And in that, you set forth your

10  opinions, and you told Ms. Swift that all of

11  your opinions are in that report, right?

12        A.    Of the companies that I

13  evaluated, the opinion -- of -- yes.

14        Q.    Yes.

15              And the bases for those

16  opinions, except insofar as they're based on

17  your own personal experience and knowledge,

18  are in the footnotes to that report, right?

19              MR. FULLER:  I'm going to

20        object, and if I can have a running

21        objection that this is outside my

22        cross.

23              MR. MATTHEWS:  That's fine, you

24        can have your objection, thank you.

25              MR. FULLER:  Thank you.

1          A.      I think it's an accurate

2    statement.  It was based on the review of the

3    records that I cited.

4    BY MR. MATTHEWS:

5          Q.      Okay.  There's not a single

6    document created by Anda Inc. cited in any of

7    the footnotes in your report, right?

8          A.      That's correct.

9          Q.      And that means that there's --

10   and there's no depositions of any Anda Inc.

11   employees cited in any of the footnotes of

12   your report, right?

13         A.      There is not.

14         Q.      In fact, you haven't done

15   anything to look at Anda's suspicious order

16   monitoring program, right?

17         A.      I have not.

18         Q.      And since there's no

19   information that would be the basis for any

20   opinions as to Anda's suspicious order

21   monitoring system in your report, it's safe

22   to say that there are no opinions about

23   Anda Inc. in your report, right?

24         A.      There's no opinions of Anda in

25   the current report, right here, no, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so I'd like you, if you

2  could, to just open your report to page 7.

3  You know that Anda, Inc. is one of the

4  defendants in this action, right?

5    A.    I believe so, yes, sir.

6    Q.    Okay.  Looking at page 7 of

7  your report, in the second full paragraph,

8  you wrote:  I am of the opinion to a

9  reasonable degree of professional certainty

10 that there was a systematic, prolonged

11 failure over many years by the defendant

12 manufacturers and distributors to maintain

13 effective controls against diversion of

14 legitimate opioid prescriptions into the

15 illicit market.

16         Did I read that correctly?

17   A.    You did.

18   Q.    So Anda is a defendant, right?

19   A.    Yes, sir.

20   Q.    And that opinion as described

21 on page 7 does not apply to Anda, right?

22   A.    As I sit here today, no, I have

23 not reviewed any records related to Anda.

24   Q.    Okay.  I want to ask one more

25 question following up on your testimony.