# EXHIBIT 3

1

```
       IN THE UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF OHIO

                   EASTERN DIVISION

                       - - -


  IN RE:  NATIONAL         :  HON. DAN A.
  PRESCRIPTION OPIATE      :  POLSTER
  LITIGATION               :
                           :
  APPLIES TO ALL CASES     :  NO.
                           :  1:17-MD-2804
                           :

          - HIGHLY CONFIDENTIAL -

  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                     VOLUME I

                       - - -

                 April 17, 2019

                       - - -


          Videotaped deposition of
  THOMAS PREVOZNIK, taken pursuant to
  notice, was held at the law offices of
  Williams & Connolly, 725 12th Street,
  Washington, D.C., beginning at 9:11 a.m.,
  on the above date, before Michelle L.
  Gray, a Registered Professional Reporter,
  Certified Shorthand Reporter, Certified
  Realtime Reporter, and Notary Public.

                       - - -


         GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
```

103

1   system in use by wholesale drug
2   distributors for controlled substances,
3   do you see that reference that you just
4   read?
5        A.   Yes.
6        Q.   Is it fair to say then,
7   there was in fact at this point in time,
8   in 1998, a DEA-approved suspicious order
9   monitoring system for controlled
10  substances?
11       A.   I would say no, because
12  there was never a -- DEA never had an
13  approved system.  The system that the
14  statute requires and the regulations
15  require is the registrant is to design
16  and operate that system.
17            They come to us and they
18  say, here's our system, and we may have
19  discussions with them about it.  So you
20  can have a great system in paper, but
21  when you implement it, are you actually
22  implementing what you say.
23            So that's part of our job,
24  when we go out there for schedule

104

1  investigation, is to look at that program
2  and are they doing what they're saying,
3  is it actually detecting suspicious
4  orders.
5      Q.   So, Mr. Prevoznik, try to
6  listen to my question and answer it.  I
7  realize that you would like to speechify
8  a little bit and get out your talking
9  points, but please restrain --
10          MR. FINKELSTEIN:  Try not to
11      argue with the witness.
12 BY MS. MAINIGI:
13      Q.   -- from doing that.
14          MR. FINKELSTEIN:  You can
15      ask your questions.  And you're
16      not here to abuse him.
17 BY MS. MAINIGI:
18      Q.   So, Mr. Prevoznik, let's
19  back up.  The DEA helped to write this
20  report, right?
21      A.   Correct.
22      Q.   And someone from the office
23  of diversion control at the DEA was in
24  fact the chair of the group that wrote

108

1   Q.   And did you read far enough
2   in the report to see that there was, in
3   fact, an algorithm that was contained as
4   an exhibit to the report?
5   A.   Do you have a page number?
6   Q.   Sure:  Bates Number 2247.
7        Did you review this page
8   previously?
9   A.   Yes.
10  Q.   Okay.  And -- and this page
11  essentially contains a calculation or
12  algorithm for both List I chemicals and
13  Schedule II controlled substances,
14  correct?
15  A.   Correct.
16  Q.   Now, DEA did not require
17  distributors to use a particular
18  algorithm or metric to identify excessive
19  purchases of controlled substances,
20  correct?
21  A.   Could you please repeat
22  that?
23  Q.   DEA did not require that a
24  distributor use a particular calculation

109

[4/17/2019] Prevoznik 4-17-19

1  or algorithm to identify excessive
2  purchases of controlled substances,
3  correct?
4     A.   Correct.
5     Q.   But, the DEA was aware that
6  certain registrants were using a
7  calculation or metric or algorithm to
8  identify an excessive purchase, correct?
9           MR. FINKELSTEIN:  Objection.
10       Vague as to time.
11           THE WITNESS:  I -- I just
12       want to make sure I'm clear on
13       this.  We're talking about
14       excessive purchases or are we
15       talking about suspicious orders?
16  BY MS. MAINIGI:
17     Q.   Well, right now I'm talking
18  about excessive purchase reports in this
19  time period.
20           Was the DEA aware that in
21  approximately the 1998 time period, that
22  distributors were using a particular
23  algorithm or calculation to identify
24  excessive purchases of controlled

128

1           Was the DEA aware that
2  certain employees had, in fact, blessed
3  the excessive purchase reporting systems?
4           MR. FARRELL:  Objection.
5       Foundation.
6           THE WITNESS:  I don't know
7       which employees you're speaking
8       of.
9  BY MS. MAINIGI:
10      Q.   Just employees.  Is -- is it
11 fair to say that the DEA did, in the late
12 '90s and early aughts, from time to time
13 review the reporting systems of
14 distributors and essentially give them a
15 yay or nay as to whether they thought
16 that the reporting system was suspicious?
17          MR. FARRELL:  Objection.
18      Foundation.
19          MR. FINKELSTEIN:  Objection.
20      Vague.
21          THE WITNESS:  You lost me on
22      the last part.
23 BY MS. MAINIGI:
24      Q.   Okay.  Let me start over.

129

1              We -- we established before
2    that the DEA today does not review
3    reporting systems, right?
4              MR. FINKELSTEIN:  Objection.
5         Mischaracterizes the witness's
6         testimony.
7              THE WITNESS:  I mean, we --
8         we reviewed McKesson's, the new
9         one.
10   BY MS. MAINIGI:
11        Q.   And you left it --
12        A.   -- we reviewed it, we -- we
13   did not -- we --
14             MR. FINKELSTEIN:  Let the
15        witness answer the question.
16             THE WITNESS:  I don't know
17        what you mean by the term
18        "blessing it."
19   BY MS. MAINIGI:
20        Q.   Okay.
21        A.   Because as I had said
22   previously, that you -- you can write the
23   best system in the world, but if you
24   don't implement it and you don't stick to

[4/17/2019] Prevoznik 4-17-19

130

1  it, it doesn't mean anything.
2          So that's part of our
3  review, when we go out and do schedule
4  investigations, is to review, are they
5  factually, in fact -- did -- is -- are
6  they operating a system that can detect a
7  suspicious order.
8  BY MS. MAINIGI:
9       Q.   And that's something that
10 the DEA reviews periodically as part of
11 its auditing process, correct?
12      A.   Correct.
13      Q.   So as part of the audit
14 process, operating systems that are
15 designed to review suspicious orders are
16 reviewed by the DEA?
17      A.   Well, it's not just the
18 schedule.  I mean it could be a
19 pre-registration, somebody is coming on
20 and they have -- we have to go through
21 the whole public interest of, you know,
22 what do you have in place to operate and
23 detect a system.  So it's not just a
24 schedule investigation.  There are

131

1  schedule investigations that we follow
2  up, and we do that as well.  So it comes
3  in -- it comes in various times that
4  we're going to review somebody's
5  operating system, whether we're on
6  schedule investigation, or whether we're
7  doing an investigation on a pharmacy or
8  something like that, where we're going to
9  look at how many SORs were submitted or
10 not submitted, or we're going to look at
11 the ARCOS data, how much did they buy.
12         We're going to look at
13 various things to make the determination
14 on what is going on.
15      Q.   And if either in the
16 pre-registration process or in the audit
17 process the DEA determines that a
18 registrant's system is not adequately
19 detecting suspicious orders, is that
20 something that is conveyed to the
21 registrant?
22      A.   Yeah, we -- we would tell
23 them, you need to add something.
24      Q.   It's clear in the Rannazzisi

179

1          the characterization.
2                THE WITNESS:  Nationwide,
3          correct.
4    BY MS. MAINIGI:
5          Q.    Instead, one-off guidance
6    was perhaps provided in the context of
7    individual distributor meetings, correct?
8          A.    Yes.  Along with the MOAs
9    and the settlements that were done.
10         Q.    And is there documentation
11   of what was said at the individual
12   distributor meetings?
13         A.    It would be the PowerPoints
14   and the report -- after report.
15         Q.    And this is an internal DEA
16   report?
17         A.    Yes.
18         Q.    And have you reviewed those
19   internal DEA reports for the purpose of
20   preparing for your testimony today?
21         A.    Some of them.
22         Q.    Now, does the DEA agree that
23   there's more than one way to design and
24   operate a system that can identify and

180

1  report suspicious orders?
2      A.  Yes.
3      Q.  And there's no single
4  feature that makes a suspicious order
5  monitoring system compliant, correct?
6      A.  Correct.
7      Q.  And the DEA leaves it up to
8  the registrant to design a system that
9  works with its own business model and
10 customer base, correct?
11     A.  Correct.
12     Q.  Does it matter to the DEA
13 whether a registrant reviews orders
14 manually or uses an automated system?
15     A.  No, it doesn't matter.
16     Q.  Other than requiring that
17 the report, suspicious order report
18 clearly indicate that the order is
19 suspicious, does DEA require suspicious
20 order reports to follow a particular
21 format?
22     A.  That's correct.
23     Q.  Let me ask the question
24 again.  The DEA does not require

181

1 suspicious order reports to follow a
2 particular format, correct?
3        A.   Well, I mean, they have to
4 follow what the regs say about unusual
5 size, unusual patterns, or frequency.  I
6 mean, that's in there.  We also ask that
7 the red flags and, you know, looking at
8 newspapers articles to see, you know,
9 what the overdoses are.  You know, are
10 they looking at more than just the data,
11 because the data is only as good as --
12 you know, you can set the threshold too
13 high, you can set it too -- it's never
14 going to pick up something, or you're not
15 going to see patterns, because it's a new
16 customer that gets onboarded, and they're
17 already high, and you don't question it
18 or you don't look at it, you don't see
19 the population size, you don't see what's
20 their percentage of control versus not
21 control.  I mean, there's a lot of
22 different factors that go in it.  So
23 however they design it, they need to get
24 the big picture so that they truly know

182

1  what is their customer doing.
2          Q.    Is there --
3                MR. FINKELSTEIN:  Hang on.
4          Five minutes ago, I asked for a
5          break.  We've been on the record
6          for more than an hour and a half.
7          Can you tell us when you are going
8          to be done?
9                MS. MAINIGI:  Just a couple
10         more minutes.
11 BY MS. MAINIGI:
12         Q.    Is the review -- is it fair
13 to say then that the identification of
14 suspicious orders can be a subjective
15 process?
16               MR. FINKELSTEIN:  Objection.
17         Vague.
18               THE WITNESS:  What do you
19         mean by "subjective"?
20 BY MS. MAINIGI:
21         Q.    Well, do you understand the
22 meaning of the word "subjective"?
23         A.    I'm asking you in terms of
24 this, what do you mean by subjective?

[4/17/2019] Prevoznik 4-17-19

395

1       that this is outside the scope.
2       I'll let the witness answer for
3       now if you have understanding.
4            THE WITNESS:  Yes.
5  BY MR. STEPHENS:
6       Q.   Is it also true under -- you
7  testified earlier today about the C.F.R.
8  regulations, correct?
9       A.   Correct.
10      Q.   And under Title 21 -- or I'm
11 sorry, under 21 C.F.R. 1301.71(b), it's
12 true that the regulation regarding
13 suspicious order monitoring does not
14 require strict compliance, it requires
15 substantial compliance?
16           MR. FINKELSTEIN:  Did you
17      mean 74?
18           MR. STEPHENS:  It might be
19      74.
20           MR. FARRELL:  1301.74(b)?
21           MR. STEPHENS: Yes.  No,
22      actually -- here.  Let me just
23      mark it.
24           (Document marked for

396

1          identification as Exhibit
2          DEA-Prevoznik-13.)
3     BY MR. STEPHENS:
4          Q.   I'll show the witness what's
5     been marked as Exhibit 13.
6          A.   So, (b)?
7          Q.   (B), right.
8          A.   Okay.
9          Q.   So (b) states substantial
10    compliance with the standards set forth,
11    right?
12         A.   Yes.
13         Q.   Okay.  And that could be
14    deemed sufficient, correct?
15         A.   Yes.  That's what it says.
16         Q.   It does not say strict
17    compliance, correct?
18         A.   Correct.
19         Q.   Like manufacturers and
20    distributors, DEA also considers doctors
21    who prescribe opioids to their patients
22    to be registrants?
23         A.   Correct.
24         Q.   Okay.  The prescribing

[4/17/2019] Prevoznik 4-17-19

410

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME II

- - -

April 18, 2019

- - -

Continued videotaped deposition of THOMAS PREVOZNIK, taken pursuant to notice, was held at the law offices of Williams & Connolly, 725 12th Street, Washington, D.C., beginning at 8:16 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

446

1      speculating on that, but, yes.
2   BY MR. STEPHENS:
3          Q.   Okay.  I'd like to continue
4   by asking you some additional questions
5   about interpretation enforcement of
6   Title 21 U.S.C. 23, the regulations and
7   how those relate to the design of a
8   reasonable SOMs system.  Okay?
9          A.   Yes.
10         Q.   Okay.  So yesterday you --
11  you testified about different
12  distributors having different business
13  models, right?
14         A.   Correct.
15              MR. FINKELSTEIN:  Objection.
16      Scope.  Characterization.
17  BY MR. STEPHENS:
18         Q.   Is it fair to say that a
19  SOMs systems is not a one-size-all
20  proposition, one-size-fits-all
21  proposition?
22         A.   Correct.
23         Q.   And DEA understands that not
24  all registrants distribute opioids to the

[4/18/2019] Prevoznik 4-18-19

447

1   same customers, right?

2        A.   Correct.

3        Q.   DEA understands that

4   registrants have different business

5   models?

6        A.   Correct.

7        Q.   And DEA expects that each

8   registrant will review its own business

9   model and design a SOM system that fits

10  its specific method of distribution?

11           MR. FINKELSTEIN:  Objection.

12       Vague.

13           THE WITNESS:  That's correct

14       as -- as per the regulations.

15  BY MR. STEPHENS:

16       Q.   Okay.  Some registrants

17  distribute to hospitals?

18       A.   Correct.

19       Q.   Some don't?

20       A.   Correct.

21       Q.   Some registrants distribute

22  to hospice centers?

23       A.   Correct.

24       Q.   Some don't?