EXHIBIT 8

1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3   IN RE:  NATIONAL      :  MDL No. 2804
    PRESCRIPTION OPIATE   :
4   LITIGATION            :  Case No. 17-md-2804
                          :
5   APPLIES TO ALL CASES  :  Judge Dan Aaron Polster
                          :
6                         :

7

8                   HIGHLY CONFIDENTIAL

9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                  DECEMBER 13, 2018

13                      - - - -

14   VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S

15        DESIGNATED 30(B)(6) REPRESENTATIVE,

16                  JAMES TSIPAKIS,

17   taken pursuant to notice, was held at Marcus & Shapira,

18   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania

19   15219, by and before Ann Medis, Registered Professional

20   Reporter and Notary Public in and for the Commonwealth

21   of Pennsylvania, on Thursday, December 13, 2018,

22   commencing at 9:09 a.m.

23                      - - - -

24          GOLKOW LITIGATION SERVICES
        877.370.3377 phone | 917.591.5672 fax
25                  deps@golkow.com

96

```
 1        A.   Yes.  Sorry, yes.

 2        Q.   Who at the warehouse was aware of the

 3   ordering patterns?

 4        A.   So the warehouse had a superintendent of

 5   the warehouse.  There was specialized, highly

 6   trained individuals that worked the controlled

 7   substance cage that were the same folks that

 8   picked the orders day in and day out.

 9        Q.   From 2009 until October 2014, was there

10   one superintendent of the warehouse, or were there

11   multiple?

12        A.   I believe there was one.

13        Q.   And who was that?

14        A.   Walter Durr.

15        Q.   So you said below Walter, there would

16   have been I think what you referred to as pickers?

17        A.   Folks who would fulfill the orders, yes.

18        Q.   In laymen's terms, can you describe to

19   me what a picker does?

20        A.   Sure.  An order comes in.  And for

21   whatever product they need to get, they go to the

22   shelf, the particular shelf in the warehouse, and

23   they pick the order.

24        Q.   Is it as simple as walking to a shelf

25   and there's a bottle of pills on the shelf, and
```

99

```
 1        Q.   This is all getting back to
 2   identification of suspicious orders.  So my
 3   question is:  From HBC who had that obligation to
 4   identify suspicious orders?  And I think you've
 5   identified Mr. Durr and these pickers.  But if I'm
 6   missing somebody, I want you to tell me.
 7        A.   So in our suspicious orders would have
 8   been identified certainly from the warehouse,
 9   certainly folks in corporate that were -- from the
10   procurement team buying into the warehouse.  They
11   would know if there's any spike in pattern of
12   product being demanded to be shipped to the
13   warehouse, et cetera.
14        It's not just the warehouse.  It's also the
15   folks that do the procurement of these products as
16   well would identify any deviation.  If all of a
17   sudden they're buying X and now they're being
18   asked to buy Y, they would identify that.
19        Q.   Was there any written list of items that
20   these people in procurement or people like
21   Mr. Durr, the superintendent of the warehouse,
22   were supposed to be on the lookout for?
23        A.   Not that I could find.
24        Q.   Was there any report that was generated
25   on a daily, weekly, monthly, yearly basis,
```

100

1    quarterly basis that Mr. Durr or these procurement

2    people could look at to evaluate the pattern of

3    orders?

4         A.   I'm sorry.  Can you ask that again?

5         Q.   What I'm asking about is whether or not

6    there was any report that was generated daily or

7    weekly or monthly or quarterly or annually that

8    was kind of on a set basis distributed to anybody,

9    whether it's Mr. Durr, whether it's these people

10   from procurement, whether it's the pickers, to

11   where they can have an opportunity to look at and

12   review the pattern of orders going to each of the

13   different pharmacies.

14        A.   Not that I could find specifically, but

15   certainly from the procurement side, et cetera,

16   there's reports of what they're buying and

17   selling, sure.

18        Q.   Explain to me what you mean by the

19   procurement side.

20        A.   So from the procurement side, the folks

21   in the warehouse don't do purchasing.  There's a

22   group that does purchasing.  So those folks that

23   do purchasing would absolutely know what's being

24   bought and what's being sold.

25        Q.   And who were those folks from 2009

117

1      A.   Yes.

2      Q.   I think you said that at some point in

3  time, there was a threshold program implemented?

4      A.   Yes.

5      Q.   When did HBC first start utilizing a

6  threshold program?

7      A.   A threshold program with some IT

8  enhancements were put into place roughly in 2013.

9      Q.   Do you know what month in 2013 or season

10  even?

11      A.   I don't recall exactly in 2013.

12      Q.   And were thresholds set for every

13  prescription drug or just controlled substances?

14      A.   Controlled substances.

15      Q.   And that included Schedule III

16  controlled substances?

17      A.   Yes.

18      Q.   How were thresholds established?  Let me

19  back up before you answer that.  I'm making an

20  assumption that threshold is a monthly ordering

21  threshold.  Am I wrong on that?

22      A.   So the threshold established was using

23  diligence that was ascertained at the time from

24  DEA that a 3X threshold to be established, a

25  monthly threshold, to your point, using 12 months

118

1    of trailing data, 3X the average for that month.

2        Q.   Let me say it back to you to make sure I

3    understand it.  This threshold program which was

4    first begun in 2013 set a threshold at 3 times the

5    average amount of that substance that was

6    distributed over the last 12 months?

7        A.   So 3X the company average for that

8    chemical.  So it was at the GPI level.  So the

9    chemical would include all the drugs having that

10   chemical in it, 3X using 12 months of trailing

11   data, 3X the company average for that chemical,

12   that product.

13       Q.   So you explained two things there.

14   First of all, it was based on the chemical?

15       A.   GPI level, yes.

16       Q.   Does that mean that Lortab and Vicodin

17   don't get different thresholds.  They're all under

18   the same threshold?

19       A.   It's all lumped together as one

20   threshold.

21       Q.   Because that's the same combination of

22   hydrocodone and acetaminophen?

23       A.   It's looking at the active ingredient,

24   yes.

25       Q.   As far as how the threshold is set, if

119

1  HBC had sold a hundred HCP products over a month

2  for the last 12 months, the threshold for the next

3  month would have been 300; is that fair?

4      A.   Well, the threshold was -- yes.  Let me

5  just play that back.  So it would be 3X again at

6  the GPI level of that GPI using the 12 months

7  worth of data, yes.

8      Q.   So months 1 through 12 Giant Eagle

9  pharmacies had ordered 100 hydrocodone combination

10  products?

11      A.   All included.

12      Q.   Correct.  Then in month 13 the threshold

13  would be 300?

14      A.   Well, it uses the average of the 12

15  months of data.  When the new month comes on, the

16  furthest out drops off.  It's a rolling 12 months

17  worth of data, yes.

18      Q.   But I have that math right, in month 13,

19  the threshold would be 300 because the prior 12

20  months, the average was 100?

21      A.   But again, it uses the last 12 months.

22  So assuming that it was a hundred all those

23  months, it would be 3X which would be 300, yes.

24      Q.   You said it was a rolling system.  So at

25  the 13th month, instead of HBC distributing a

1    hundred HCPs and it distributed 200, the threshold

2    for the 14th month would be different.  It would

3    not be the same 300 because that last month would

4    have affected the average; correct?

5         A.   Each datapoint adds to the average.  And

6    certainly the reason for that is there's

7    seasonality in our business as well where products

8    change over time, yes.  The demand for products

9    change over time.

10        Q.   When you say seasonality, do you mean

11   different times of years or do you mean --

12        A.   Yes.  Different times of year, cough and

13   cold season versus summer months, yes.

14        Q.   Is there a hydrocodone combination

15   product season?

16        A.   Well, certainly hydrocodone products in

17   cough syrups, it is more prevalent during cough

18   and cold season than it is during summer months.

19        Q.   I think I heard you mention that HBC

20   received guidance from the DEA that a 3 times

21   average was an appropriate threshold.

22        A.   What I said is during the due diligence

23   to set the threshold, information was derived from

24   the DEA published websites on a 3X threshold that

25   they used for list chemicals, and that's where our

121

1    3X number was derived from.

2        Q.   You're talking about the chemical

3    handler's manual?

4        A.   From what I -- to prepare for this, it

5    was based on written DEA inference on a website or

6    a manual, I'm not sure where it was derived from,

7    but the DEA itself was establishing a 3X

8    threshold, and the team adopted that rationale.

9        Q.   Are you testifying that the DEA had

10   suggested a 3X threshold for opioids?

11       A.   I'm testifying that the HBC warehouse

12   and the team involved found data that pointed to a

13   3X threshold tier, and that's what they adopted.

14       Q.   But for opioids.  That's my question.

15   Are you testifying that HBC had information from

16   the DEA that they were approving or ratifying or

17   blessing, whatever verb you want to use, a 3X

18   threshold in 2013 for opioids?

19       A.   No.  That is not what I'm saying.

20       Q.   Then help me understand.

21       A.   What I'm saying is in the diligence to

22   set the threshold, Giant Eagle inferred from

23   information that they gleaned from the website, a

24   manual, whatever it was, that established a 3X

25   threshold is where they want -- the DEA was -- the

122

1    DEA over the years has not been clear about what

2    their expectations were of any threshold.

3        So it left each registrant to set whatever

4    parameters and controls that they deemed

5    appropriate.  So our team used whatever they could

6    find that was reasonably available and reasonable

7    to set our thresholds.

8        Q.   The DEA never told HBC that a three

9    times average was appropriate; correct?

10       A.   Directly, no, never.

11       Q.   Did DEA indirectly tell HBC that a three

12   times average was appropriate?

13       A.   What I'm saying is the HBC set its

14   threshold based on information that it gleaned

15   from a DEA -- just like you showed me earlier, a

16   page from the DEA website.  There was information

17   that they used from DEA and inferred to use a 3X

18   threshold.

19       HBC set the threshold, but it wasn't just

20   some arbitrary number they picked.  There was

21   information they used to get to a 3X threshold.

22       Q.   I'll show you what I'll mark as No. 13.

23            (HBC-Tsipakis Exhibit 13 was marked.)

24   BY MR. GADDY:

25       Q.   I'm showing you a June 2, 2012 letter

162

1    requirement or procedure in place to do any

2    maintaining or logging of any type of due

3    diligence or investigatory type efforts to clear

4    or justify orders that were received that may be

5    over thresholds or may be otherwise indicative of

6    diversion?

7        A.   Yes.  Over time more systems were

8    developed and abilities, yes.

9        Q.   When did Giant Eagle or HBC put in place

10   a system that required employees to log or

11   maintain files that explained why particular

12   orders were cleared or not cleared?

13       A.   I can say from the diligence I had in

14   early 2017, a system was developed where

15   investigative notes and information could be

16   entered regarding orders that we wanted to look

17   at, orders of interest.

18       Q.   Prior to early 2017, HBC nor Giant Eagle

19   had any system that was dedicated to maintain

20   notes, reports or memos that would explain or

21   justify why particular orders were cleared or not

22   cleared?

23       A.   We didn't have a repository if that's

24   what you're asking.  There were certainly

25   definitive emails to the field, emails to the

163

```
1    warehouse, things of sorts that clearly show a

2    diligence of trying to run the ground on why an

3    order happened or what triggered, sure.

4         Q.   Can you say that that's the case for

5    every order that ever popped up on one of these

6    reports?

7         A.   I can say after reviewing and talking to

8    associates involved and folks that do report to

9    me, that every order that pops up of interest is

10   investigated and either cleared or not.

11        Q.   But you can't tell me as you sit here

12   today whether or not there's any documentation to

13   prove or disprove whether or not any or all of

14   those investigations actually happened?

15        A.   I can tell you that I don't know that I

16   have specific for each line item on -- well, from

17   2017 on, I can tell you we have a repository that

18   was built.  Prior to that, I cannot.

19        Q.   That's probably the easiest way to do

20   this.  Prior to early 2017, Giant Eagle nor HBC

21   had any repository or location, whether it's

22   physical or digital, to maintain any type of due

23   diligence reports or efforts; correct?

24        A.   There was no central repository.

25   Certainly if there was folders or emails or things
```

171

1   BY MR. GADDY:

2        Q.   Does HBC agree that orders are not

3   supposed to be shipped to the pharmacies until

4   they have been deemed not suspicious?

5             MR. BARNES:  Object to form.

6        You can answer.

7             THE WITNESS:  Again, in our system,

8   since we have line of sight from the warehouse all

9   the way out to the dispensing level, our

10  pharmacists are filling prescriptions pursuant to

11  legitimate prescriptions, which then generate

12  orders, and we ship those orders to the

13  pharmacies.

14  BY MR. GADDY:

15       Q.   My question is more about timing of the

16  shipping.  So we looked at some of these threshold

17  or we looked at one of these threshold reports.

18  And the reports indicate on their face that orders

19  of pills that exceeded the threshold were shipped

20  to the stores that were in excess of the

21  threshold.  And you told me that after the reports

22  are generated, they're looked at, and then some

23  level of investigation is done; is that correct?

24       A.   Correct.

25       Q.   You agree with me that any investigation

172

1    that was being done by Giant Eagle or HBC is

2    happening after the orders have been shipped;

3    correct?

4         A.   Perhaps, yes, perhaps.

5         Q.   Well, that's what the forms indicate;

6    correct?

7         A.   Well, some of them -- obviously looking

8    at some of these -- you mentioned this report is

9    on the 31st of the month.  So if you look at some

10   of these, as I testified earlier, some of these

11   would have already been cleared and some of them

12   you could already tell that there would be a false

13   positive.

14        So some of them you would have known -- you

15   would have known that -- you would have cleared

16   them early is what I'm trying to say knowing that

17   they were a false positive.

18        Q.   But by the time the procurement folks

19   see this report, the pills have already been

20   shipped; correct?

21        A.   They may have.  The report -- the report

22   generates early in the morning.  Stores don't

23   receive their orders till after they open.  So

24   they would have been shipped, but not received in

25   some cases, in transit.

173

1      Q.   Break that down for me.  You state the

2    reports are generated early in the morning.  What

3    does that mean?

4      A.   I'm not sure of the exact time, but

5    certainly before our pharmacies open for business.

6      Q.   What time do your pharmacies open for

7    business?

8      A.   Some open at 9:00.  Some open at

9    8:00 generally.

10      Q.   Let me just ask it this way.  Did HBC or

11    Giant Eagle have any policy in place that any

12    orders that popped on the threshold report were

13    not shipped until they've been cleared?

14      A.   Not that I could find a policy.

15      Q.   They're still operating under the

16    threshold policy today.  Today are these orders

17    shipped or are they blocked merely because they

18    come up on the report, or are they shipped and

19    then the diligence is performed?

20      A.   So in our experience, having looked at

21    reports having looked at thresholds, we generated

22    very few suspicious orders over the timeframe that

23    we've been operating.  So I guess I'm trying to

24    understand.

25          In our environment, we're able to intercept,

174

1    retrieve, quarantine product all the way up to the

2    time it gets to the store, after it lands at the

3    store, when in transit with the truck.  So we're

4    able to intercept -- the change of title never

5    happens.  Giant Eagle owns the product.  Giant

6    Eagle ships the product.  Giant Eagle receives the

7    product at the stores.  So I guess I'm just trying

8    to follow your question.

9         Q.   Frankly, I'm trying to following your

10   answer.  Because I said they're shipped before the

11   investigation happened, and your answer was, well,

12   the reports are generated early in the morning and

13   the pharmacies don't open until 8:00 or 9:00, so

14   maybe they haven't gotten there yet.

15        So my question is whether or not the orders

16   are shipped, whether or not there's a policy or a

17   rule, a procedure, that requires the orders to not

18   be shipped until somebody from procurement looks

19   at it and says, oh, that's a false positive, oh,

20   there's a justification for that.

21        Is there a policy, procedure or rule in place

22   that does such?

23        A.   No.

24        Q.   You mentioned just a few minutes ago

25   that I guess because you're shipping to your own

175

1   stores, I think the phrase you used was the title

2   never changes.

3       So what I'm asking about, are you aware of

4   instances where you've had to turn the truck

5   around and bring it back to the distribution

6   center because there's pills didn't need to go to

7   that store?

8       A.   In our history, we've only had very few

9   suspicious orders, so we haven't had an instance

10  where we needed to grab an order back.

11      Q.   You mentioned that you could go to a

12  store or quarantine an order at a store.  Has

13  there ever been an instance that you're aware of

14  where HBC or Giant Eagle has had to call the store

15  and tell them, don't open that tote, put that to

16  the side, we got to come, get it back from you

17  because that order shouldn't have been shipped?

18      A.   We haven't, but we've had instances

19  where we've shut off stores in the cases we've had

20  on our suspicious orders, shutting off stores from

21  being able to order any more product, either from

22  us or from our other wholesaler, our commercial

23  wholesaler.  So steps quickly can be put into

24  place.

25      Q.   And I'm going to ask you about the

176

```
 1    history of suspicious order reports in just a

 2    second.  So we'll get into that into a little bit

 3    of detail.  You don't remember any times where you

 4    had to turn a truck around, don't remember any

 5    times where you had to call a pharmacy and ask

 6    them to put a tote to the side and not open it;

 7    that hasn't happened?

 8         A.   Not that I've seen in what I've looked

 9    at.

10         Q.   So every time that orders have been

11    flagged or popped on this threshold report going

12    back to 2013, they've always been shipped, and

13    they've never been brought back?

14         A.   As far as I can tell, no.

15         Q.   From 2013 till we sit here today, every

16    order that's ever popped on HBC's or Giant Eagle's

17    threshold report as being over threshold has

18    always been shipped, has never been reported to

19    the DEA and has never been brought back?

20              MR. BARNES:  Wait a minute.  Object to

21    form.

22    BY MR. GADDY:

23         Q.   Is that correct?

24              MR. BARNES:  This is one report with a

25    hundred --
```

177

```
 1              MR. GADDY:  That's all I'm asking.  I'm

 2   asking him the question, not you.

 3              MR. BARNES:  Don't trick him.

 4              THE WITNESS:  Can you ask the question

 5   again, please?

 6   BY MR. GADDY:

 7        Q.   2013 through today, have there ever been

 8   any controlled substances that have been flagged

 9   on this report that have not been shipped to the

10   stores?

11              MR. BARNES:  Object to form.

12              THE WITNESS:  The orders that have been

13   flagged on this report were received by the

14   stores, is that your question?

15   BY MR. GADDY:

16        Q.   I think you answered my question.

17        So every report -- every entry that's flagged

18   here on this report was sent to the stores;

19   correct?

20        A.   Every entry on these stores, none of

21   them were flagged as suspicious.  They were all

22   investigated and cleared.

23        Q.   And that's fine if that's what the

24   answer is.  I'm just trying to make sure that's

25   clear.
```

178

```
 1        A.   That is the answer.  I'm telling you
 2   what happens.
 3        Q.   Going back to 2013, as we sit here
 4   today, every item that's showing up on this report
 5   has been investigated and cleared?
 6        A.   Yes.
 7        Q.   From 2009 until 2014 -- here I'm only
 8   asking about HBC; I'm not asking about the new
 9   Giant Eagle distribution center -- do you have any
10   understanding of how many orders for hydrocodone
11   combination products HBC received from Giant Eagle
12   pharmacies?
13        A.   I'm sorry.  One more time.  2009 to
14   2014?
15        Q.   Sure.  I'm only asking about HBC.  I'm
16   not asking about the Giant Eagle facility.
17        Do you have an understanding as to how many
18   orders for hydrocodone combination products HBC
19   received from Giant Eagle pharmacies?
20        A.   How many orders HBC -- I'm sorry.  I'm
21   just trying to follow.  How many orders HBC
22   received?
23        Q.   Correct.
24        A.   From Giant Eagle pharmacies?
25        Q.   Correct.
```

276

1          A.   Yes.

2          Q.   Can you just briefly summarize those for

3    us?

4               MR. GADDY:  Objection to form.

5               THE WITNESS:  Certainly there was a lot

6    of pop-up pharmacies on the internet that the DEA

7    was cracking down on and certainly there wasn't a

8    valid patient/prescriber relationship, and the DEA

9    had ramped up regulatory efforts against those to

10   curb them or shut them down.

11   BY MR. BARNES:

12         Q.   Did HBC or Giant Eagle at any time ever

13   supply an internet pharmacy at any time?

14              MR. GADDY:  Objection to form.

15              THE WITNESS:  No.

16   BY MR. BARNES:

17         Q.   Now, with respect to the physical

18   structure of the HBC warehouse, did you have a

19   locked cage?

20         A.   Yes.

21         Q.   Was there controlled access to that

22   locked cage?

23         A.   Yes.

24         Q.   Was that locked cage inspected and

25   approved by the DEA?

277

```
 1        A.   Yes.

 2        Q.   Was admittance to the locked cage

 3   limited to only certain personnel?

 4        A.   Yes.

 5        Q.   Was there limited entry for the number

 6   of personnel?

 7        A.   Yes.

 8        Q.   What was that number, do you recall?

 9        A.   Three or four individuals only.

10        Q.   Were they using any type of digital

11   inventory system with scanners and wrist bands and

12   things of that nature while they were inside the

13   controlled substance locked area?

14        A.   Yes.

15        Q.   Do you know the name of that system?

16        A.   I believe Volcom.  I think it's Volcom.

17        Q.   Can you spell that, please?

18        A.   V-O-L-C-O-M.

19        Q.   And is that system a form of a perpetual

20   inventory system?

21        A.   Yes.

22        Q.   Is that a type of internal control at

23   the warehouse?

24             MR. GADDY:  Objection to form.

25             THE WITNESS:  Sure, yes.
```

278

BY MR. BARNES:

    Q.   The controlled substance orders that
were picked at the warehouse, the HBC warehouse,
were they doublechecked before shipping?

    A.   Yes.

    Q.   Were there physical safeguards to
prevent theft and diversion at that warehouse?

    A.   Yes.

    Q.   Even while picking the orders?

    A.   Yes.

    Q.   Can you just describe a few of them?

    A.   So there would be daily audits,
backcounts.  The system would make sure that all
of the inventory would tie up.

    Q.   So if there was any product missing,
would it be found fairly promptly?

    A.   Oh, yes.

    Q.   Was there a daily warehouse inventory
for controlled substances?

    A.   Yes.

    Q.   Were there security guards and cameras
throughout the facility?

    A.   Yes, multiple.

    Q.   Besides the daily inventories, were
their yearly inventories and biannual DEA

279

1    inventories?

2        A.   Yes.

3        Q.   Was the warehouse overseen by the Giant

4    Eagle audit and accounting department?

5        A.   Sure, yes.

6        Q.   You were asked a lot of questions about

7    due diligence performed in the 2009 to 2013 time

8    period.  In fact, Exhibit 12 you were shown a few

9    minutes ago and you were asked whether you could

10   identify specific investigations for line items on

11   these reports.

12       Do you recall those questions?

13       A.   Yes.

14       Q.   How many transactions like that are we

15   talking about in any given -- any given month and

16   year?

17       A.   Thousands, millions, many items.

18       Q.   And you can't remember every one of

19   them?

20       A.   No.

21       Q.   And you didn't attempt to memorize every

22   one of them in preparation for your deposition?

23       A.   No.

24       Q.   Have you ever heard of the term CSOS

25   ordering system?

280

1          A.   Yes.

2          Q.   Is that something that was used for the

3    warehouse facilities?

4          A.   Yes.

5          Q.   When did that program start being used?

6          A.   I believe 2015.

7          Q.   Does that program have the ability to

8    stop an order if it exceeds a threshold?

9          A.   Yes.

10         Q.   Are you familiar with the Supply Logic

11   software program?

12         A.   Yes.

13         Q.   Is that another program that Giant Eagle

14   used at these warehouses?

15         A.   Yes.

16         Q.   And what did that allow Giant Eagle or

17   the warehouses to do?

18         A.   It would allow for us to see the ins and

19   outs of inventory and flag anything that had any

20   risk or things to look at out of the ordinary.

21         Q.   Is that a form of an internal control?

22              MR. GADDY:  Objection to form.

23              THE WITNESS:  Yes.

24   BY MR. BARNES:

25         Q.   Was that part of the overall security

281

1    system that HBC considered when it was trying to

2    comply and complying with the security

3    requirement?

4              MR. GADDY:  Objection to form.

5              THE WITNESS:  Yes.  More further, they

6    would look at patterns.  They would look at pretty

7    holistically the patterns and any deviations.

8    BY MR. BARNES:

9        Q.   You're a pharmacist; is that correct?

10       A.   Yes.

11       Q.   What kind of degrees in pharmacy do you

12   have?

13       A.   Bachelor of science in pharmacy.

14       Q.   And were you a practicing pharmacist in

15   a store for a period of time?

16       A.   Yes.

17       Q.   Was that for a different chain,

18   Albertsons?

19       A.   Yes.

20       Q.   Are you familiar with dispensing

21   practices and things of that nature?

22       A.   Yes.

23       Q.   In your direct testimony upon

24   questioning by Mr. Gaddy, you referenced this

25   integrated control system, and you referenced

282

1    three parts to it, at the warehouse, at corporate

2    and at the stores.  Do you recall that testimony?

3         A.   Yes.

4         Q.   At the stores are there internal

5    controls over controlled substances?

6         A.   Sure, yes.

7         Q.   Are there physical controls over

8    controlled substances?

9         A.   Yes.

10        Q.   Does that include vaults -- I'm sorry --

11   not vaults, but safes and things of that nature?

12        A.   Locked cabinets and safes, yes.

13        Q.   And who's allowed access to those locked

14   cabinets and safes?

15        A.   Only the pharmacist.

16        Q.   Does Giant Eagle have a mechanism to

17   train pharmacists to keep tight control over

18   controlled substances?

19        A.   Yes.

20        Q.   And is that monitored by loss prevention

21   and internal audit?

22        A.   Yes.

23        Q.   And are pharmacists and pharmacy techs

24   trained and supervised?

25             MR. GADDY:  Objection to form.

283

1          THE WITNESS:  Yes.

2    BY MR. BARNES:

3          Q.   Does Giant Eagle at the store level

4    impose policies and procedures on the pharmacists

5    and the pharmacy techs with respect to dispensing

6    prescriptions?

7          A.   Yes.

8          Q.   Are you familiar with the DEA pharmacist

9    manual?

10         A.   Of course, yes.

11         Q.   Is that something that's kept at every

12   Giant Eagle pharmacy?

13         A.   Yes.

14         Q.   And are the pharmacists required to

15   review it and sign off on it?

16         A.   Yes.

17         Q.   Does Giant Eagle have controlled

18   substance dispensing guidelines?

19         A.   Yes.

20         Q.   Do those guidelines include red flags,

21   things to watch for in terms of whether a

22   prescription is legitimate or not?

23         A.   Yes.

24         Q.   And are they required to review those

25   and sign off that they've been trained on it and

284

1    understand them?

2        A.   Yes.

3        Q.   And are all of Giant Eagle's pharmacists

4    licensed pharmacists with experience?

5            MR. GADDY:  Objection to form.

6            THE WITNESS:  Yes.

7    BY MR. BARNES:

8        Q.   Are there other manuals containing

9    policies at the store level related to controlled

10   substance other than the DEA pharmacist manual and

11   the controlled substance dispensing guidelines?

12       A.   Yes.

13       Q.   And do those policies include controls

14   over all controlled substances?

15       A.   Yes.

16       Q.   Do the stores interface with any

17   statewide systems to make sure that incoming

18   prescriptions are legitimate?

19       A.   Yes.

20       Q.   In the state of Ohio, is there a name

21   for that system?

22       A.   Sure.  It's the prescription drug

23   monitoring program, the OARRS program.

24       Q.   And is that something that the

25   pharmacists are trained to consult?

285

```
 1        A.   Yes.

 2        Q.   Will that provide some information about

 3   things like doctor shopping and people coming in

 4   from out of state, things of that nature?

 5             MR. GADDY:  Objection to form.

 6             THE WITNESS:  Yes.

 7   BY MR. BARNES:

 8        Q.   And do Giant Eagle pharmacists use that

 9   system?

10        A.   Regularly, yes.

11        Q.   Is the activity at the store level

12   reported to the DEA in terms of prescriptions

13   filled?

14        A.   Yes, yes.

15        Q.   Is the DEA -- does the DEA from time to

16   time visit the stores?

17        A.   Sure, yes.

18        Q.   Do they perform surprise audits and

19   things of that nature?

20             MR. GADDY:  Objection to form.

21             THE WITNESS:  Audits or if they're

22   coming in for investigations or other things that

23   they're working on, sure, yes.

24   BY MR. BARNES:

25        Q.   Do of the boards of pharmacy of the
```

286

1    states also interface with the stores?

2        A.   Yes.

3        Q.   Does the Ohio Board of Pharmacy

4    interface with the Giant Eagle stores in these two

5    counties at issue?

6            MR. GADDY:  Objection to form.

7            THE WITNESS:  Yes.

8    BY MR. BARNES:

9        Q.   Do they perform surprise audits and

10   inspections?

11           MR. GADDY:  Objection to form.

12           THE WITNESS:  Absolutely, yes.

13   BY MR. BARNES:

14       Q.   To your knowledge, has there ever been a

15   problem raised by the DEA or the Ohio Board of

16   Pharmacy related to any of the Giant Eagle

17   pharmacies in these two jurisdictions?

18           MR. GADDY:  Objection to form.

19           THE WITNESS:  Not to my knowledge, no.

20   BY MR. BARNES:

21       Q.   Are there controls over incoming orders

22   into the stores, including orders from the other

23   distributors?  McKesson, I guess, was the main

24   distributor of controlled substance IIs for this

25   time period; is that correct?

287

```
 1        A.   Correct.

 2        Q.   And when those came into the stores,

 3   were there special procedures over those incoming

 4   orders?

 5        A.   Yes.

 6        Q.   Were they treated differently than other

 7   incoming orders?

 8        A.   Absolutely, yes.

 9        Q.   Give us some samples of that.

10        A.   So those orders would need to be checked

11   in by a pharmacist, signed off on the pharmacist.

12   Right away when the couriers would drop off, it's

13   the expectation that the pharmacist would -- it

14   would be segregated.  They come in different totes

15   and they're handled differently.  And any

16   discrepancies are immediately noted or called in.

17        Q.   Is the pharmacist required to

18   immediately input -- update the store's controlled

19   substance inventory for incoming orders?

20        A.   Their onions?

21        Q.   Yes.

22        A.   Yes.

23        Q.   And when controlled substance

24   prescriptions are filled, is the inventory, the

25   store inventory immediately credited for the
```

288

1   outgoing prescription?

2       A.   Yes.

3       Q.   At the end of the day, is there a check

4   of the remaining balance of controlled substances

5   at the store?

6       A.   Yes, and especially even more so on

7   CIIs.  They're backcounted on every fill.

8       Q.   What does it mean to backcount every

9   fill?

10      A.   The system will prompt for how many

11  pills are left in the bottle.  So if you had a

12  hundred pills to start and you filled 50, you

13  would expect to have 50 left in that bottle.  So

14  the backcount would be to ensure that you had 50

15  left in that bottle and inputting that that you do

16  have, in fact, 50.

17      Q.   Are you familiar with the term monthly

18  narc audit?

19      A.   Yes.

20      Q.   What is that?

21      A.   The requirement that all of our

22  pharmacies do a full inventory of CII narcotics in

23  our stores and some other products as well, not

24  just can CIIs, but some CIIIs.

25      Q.   So you have the daily perpetual

289

1   inventory and the monthly narc audits?

2       A.   Yes.

3       Q.   You also have the annual audits or

4   inventories of controlled substances at every

5   store?

6       A.   The DEA requires an biannual inventory.

7   We do an annual inventory on top, yes.  We do a

8   yearly inventory instead of biannual.

9       Q.   Can you tell us what a PDL is?

10      A.   PDL is a pharmacy district leader.

11      Q.   And what do they do?

12      A.   They supervise the stores.  They're

13  basically a district manager that oversees the

14  stores for all aspects of ensuring Pharmacy

15  Practice Act, DEA, company policy.  They're the

16  oversight for the stores, direct oversight for the

17  stores.

18      Q.   Do they regularly visit the stores?

19      A.   Yes.

20      Q.   Do they conduct audits or inquiries

21  concerning their procedures and things of that

22  nature?

23      A.   They do audits.  We also have an

24  internal audit that quarterly visits the stores

25  for a myriad of things, but yes.

290

```
 1         Q.   Is there any supervision of training of

 2   pharmacists?

 3         A.   Yes.

 4         Q.   Is that something a PDL does?

 5         A.   A PDL would definitely make sure any

 6   training that needs to be done or computer-based

 7   training is completed, and if there's any

 8   remediation that's needed, that's their job to

 9   make sure.

10         Q.   Do the stores work with local law

11   enforcement, police, board of pharmacy inspectors,

12   DEA agents?

13         A.   Oh, yes, all the time.

14              MR. GADDY:  Objection to form.

15   BY MR. BARNES:

16         Q.   Is that cooperative working

17   relationship?

18              MR. GADDY:  Objection to form.

19              THE WITNESS:  Very much so, yes.

20   BY MR. BARNES:

21         Q.   In working with local law enforcement

22   and DEA, have you been able to uncover people

23   attempting to pass bad scripts, things of that

24   nature?

25         A.   Yes.
```

291

```
1         Q.   Is there a pharmacy investigator?

2         A.   Yes.

3         Q.   Who is that?

4         A.   Rick Shaheen.

5         Q.   If how much experience does he have?

6         A.   He has a lot of experience.  He has a

7    background in law enforcement, attorneys general's

8    office, a very -- has a lot of contacts with DEA,

9    boards of pharmacy.  So he's been -- he's been in

10   the business a long time.

11        Q.   Does he spend a lot of time in the

12   stores?

13             MR. GADDY:  Objection to form.

14             THE WITNESS:  Yes.

15   BY MR. BARNES:

16        Q.   Does he also work individually with

17   local law enforcement and DEA?

18        A.   Yes.

19        Q.   Are you familiar with the term or the

20   acronym BOLO, B-O-L-O?

21        A.   Yes.

22        Q.   What is it?

23        A.   Be on the lookout for.  So he will send

24   out bulletins to the pharmacists when either law

25   enforcement will tell him that there's bad scripts
```

292

1    on the street or a prescription pad, for example,

2    if it's stolen or something, either if we have

3    information -- so Rick is involved with -- Rick

4    and Andrew, who work for Rick, are involved with

5    all of those activities and alert our stores as

6    soon as they know something and we disseminate

7    very quickly to all our stores.

8         Q.   And is that the type of information

9    that's also in the OARRS database, or is that

10   different?

11             MR. GADDY:  Objection to form.

12             THE WITNESS:  Different.

13   BY MR. BARNES:

14        Q.   Are there daily counts of certain drugs?

15        A.   Yes.

16        Q.   Does that include HCP, hydrocodone, or

17   HCP products?

18        A.   Yes.

19        Q.   Is there an electronic prescription

20   system with perpetual logs at the stores?

21        A.   Yes.

22        Q.   Is that a form of internal control?

23        A.   Yes.

24        Q.   Is there diversion training for pharmacy

25   employees on a yearly basis?

293

 1           MR. GADDY:  Objection to form.

 2           THE WITNESS:  Yes.

 3   BY MR. BARNES:

 4       Q.   Now, you were asked a lot of questions

 5   about so-called suspicious orders.  And I didn't

 6   hear a lot of questioning about diversion.

 7       Do you understand the term diversion?

 8           MR. GADDY:  Objection to the question,

 9   form of the question.

10           THE WITNESS:  Yes.

11   BY MR. BARNES:

12       Q.   What does the term diversion mean to

13   you?

14       A.   Diversion, theft, loss, things being

15   routed to folks that shouldn't have access to the

16   drugs or prescriptions.

17       Q.   If an order is suspicious, does that

18   mean it was diverted?

19           MR. GADDY:  Objection to form.

20           THE WITNESS:  No, not necessarily, no.

21   BY MR. BARNES:

22       Q.   In fact, what has HBC's and Giant

23   Eagle's experience been with respect to so-called

24   suspicious orders or flagged orders?  Have they

25   resulted in uncovering diversion?

294

1              MR. GADDY:  Objection to form.

2              THE WITNESS:  No.

3      BY MR. BARNES:

4          Q.   What happens to -- you were asked

5      questions on Exhibit 15 of these 10 million dosage

6      units in Cuyahoga County.  What happened to those

7      10 million units?  Where did they go?

8              MR. GADDY:  Objection to form.

9              THE WITNESS:  Assuming those were the 10

10     million units that we dispensed out of HBC, they

11     were dispensed to patients that were pursuant --

12     on a valid prescription.

13     BY MR. BARNES:

14         Q.   And how about the dosage units that went

15     out to Summit County presuming that these numbers

16     are correct?

17             MR. GADDY:  Same objection.

18             THE WITNESS:  The same.  Every single

19     one of them would have been dispensed pursuant to

20     a prescription by a licensed practitioner for

21     those patients.

22     BY MR. BARNES:

23         Q.   In your direct questioning today, were

24     you shown at any time any evidence, any document,

25     any piece of paper by plaintiffs' counsel

295

1    suggesting that any single one of these

2    prescriptions was anything other than a legitimate

3    prescription issued by a doctor who had a

4    legitimate license to issue it?

5            MR. GADDY:  Objection to form.

6            THE WITNESS:  No.

7    BY MR. BARNES:

8        Q.   Were you shown any evidence at any time

9    that any of these prescriptions caused anybody any

10   harm at any time in any jurisdiction?

11           MR. GADDY:  Objection to form.

12           THE WITNESS:  No.

13   BY MR. BARNES:

14       Q.   Did the DEA at any time inform HBC or

15   Giant Eagle that it was required to keep records

16   of every call, every conversation that was made

17   with respect to following up on orders of

18   interest?

19           MR. GADDY:  Objection to form.

20           THE WITNESS:  No.

21   BY MR. BARNES:

22       Q.   Did HBC and Giant Eagle keep those

23   records and emails in other types of files?

24       A.   Yes.

25       Q.   Is Giant Eagle's integrated system

296

1    designed to maintain the integrity of the closed

2    system of distribution from incoming at the

3    warehouse to outgoing at the stores?

4        A.   Yes.

5             MR. GADDY:  Objection to form.

6    BY MR. BARNES:

7        Q.   The system that was designed by Giant

8    Eagle, did you expect it to ever produce a

9    suspicious order?

10            MR. GADDY:  Objection to form.

11            THE WITNESS:  No.

12   BY MR. BARNES:

13       Q.   Before you had the threshold-based

14   system, you've already testified, I think, there

15   was one suspicious order?

16       A.   Yes.

17       Q.   And after you had the threshold-based

18   system, you had one suspicious order?

19       A.   One more, yes.

20       Q.   What does that tell you?

21            MR. GADDY:  Objection to form.

22            THE WITNESS:  That we had adequate

23   controls from the beginning.  Adding more layers

24   of controls didn't materially change the outcome

25   of the system we had in place.

305

```
 1        Q.   You mentioned the pharmacy investigator,

 2   Rick Shaheen; correct?

 3        A.   Yes.

 4        Q.   Does Mr. Shaheen have any training or

 5   education in detecting or identifying suspicious

 6   orders of controlled substances that would come

 7   from pharmacies?

 8        A.   Having met Mr. Shaheen and spending time

 9   with Mr. Shaheen and looking at his very diverse

10   background, I feel he's absolutely qualified to do

11   investigations to support our operation, yes.

12        Q.   I'm not questioning his qualifications

13   as a law enforcement officer or as a pharmacy

14   investigator.  What I'm asking is a little bit

15   different.

16        I'm asking whether or not you're aware of him

17   having any training or experience or education as

18   it relates to HBC's duty under the Controlled

19   Substance Act to design and operate a system to

20   detect suspicious orders.

21        A.   That I do not know, no.

22        Q.   We agree that HBC was under no

23   obligation to utilize a threshold system in 2013;

24   correct?

25        A.   Correct.
```

1        Q.    But HBC chose to do so; correct?

2        A.    As one level of control, yes.

3        Q.    And this was touched on a little bit

4    earlier, but I think with me you indicated that

5    the original methodology was flawed and was a

6    system that could produce false positives;

7    correct?

8        A.    Certainly.  When you do an average, yes,

9    it's possible, yes.

10       Q.    Then you also were asked after lunch

11   whether or not that same system could produce

12   false negatives, and you agreed that was also a

13   possibility; right?

14       A.    Possible, yes.

15       Q.    I might get these numbers wrong, but I

16   believe the example you gave to me when I was

17   asking questions this morning was that you had

18   some pharmacies that wrote 6000 scripts per month,

19   and you had some pharmacies that wrote 300 scripts

20   per month.

21       A.    If you mean dispense, yes, but that's

22   not just controlled substances.  That's total

23   prescriptions.  But yes.

24       Q.    Sure.  So just like I think the example

25   you pointed out or maybe one of your higher volume