# EXHIBIT 9

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL       : MDL No. 2804
PRESCRIPTION OPIATE   :
LITIGATION            : Case No. 17-md-2804
                      :
APPLIES TO ALL CASES  : Hon. Dan A. Polster
                      :
                      :


HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


- - - -

DECEMBER 20, 2018

- - - -

VIDEOTAPED DEPOSITION OF JOSEPH EDWARD MILLWARD,

taken pursuant to notice, was held at Marcus &

Shapira, One Oxford Center, 35th Floor, Pittsburgh,

Pennsylvania 15219, by and before Ann Medis,

Registered Professional Reporter and Notary Public in

and for the Commonwealth of Pennsylvania, on

Thursday, December 20, 2018, commencing at 9:07 a.m.

- - - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

168

1       And then ultimately, in the last statement on
2   the controlled substances dispensing guidelines, a
3   pledge to the pharmacist that if they determine a
4   prescription was not legitimate or a doctor
5   couldn't justify its use and they chose not to
6   fill it, the company would support them.
7       Q.   But before we talked about the types of
8   diversion, and you said theft; right?
9       A.   Correct.
10      Q.   So you've got written policies in place
11  at the retail pharmacy level to prevent theft;
12  correct?
13      A.   Correct.
14      Q.   Explain to me in the overall suspicious
15  order monitoring system how what happens at the
16  retail operations or what happens at corporate has
17  an impact on a suspicious order monitoring system
18  at the HBC warehouse.
19      A.   Again, it goes down to the levels, the
20  integrated levels of control, that we spoke about,
21  over.
22      Q.   Specifically, what is the integration
23  though?
24      A.   The store level responsibilities to
25  prevent the opportunity for theft and diversion or

[12/20/2018] Millward122018

169

1  theft at the store level.  On the handling of the
2  medication, pharmacies, for example, are required
3  to do a physical inventory every month.  And
4  that's a standard of practice across retail, or at
5  least in my experience through Rite-Aid and Giant
6  Eagle, as an example of one of those control
7  mechanisms.
8       Q.   You keep using the word "integrated,"
9  integrated system.  How is that policy in place at
10 a retail pharmacy to prevent theft, how is that
11 integrated into what HBC is doing at their
12 warehouse?
13           MR. KOBRIN:  Object to form.
14           THE WITNESS:  Having control of the
15 product the entire -- so Giant Eagle has control
16 of that product the entire way from when it comes
17 into the distribution center to when it goes to
18 the end user patient, and those policies and
19 dispensing procedures and pharmacy laws, rules and
20 regulations all play roles into ensuring that --
21 play a role that the medications are dispensed
22 appropriately for legitimate prescriptions, and
23 have procedures in place that if there is a
24 discrepancy that's found, that it is investigated
25 and reported as appropriate, as required.

[12/20/2018] Millward122018

170

```
 1   BY MR. HUDSON:
 2        Q.   Let me ask you this:  How many shipments
 3   to retail pharmacies, Giant Eagle retail
 4   pharmacies, did Giant Eagle retail pharmacies
 5   report to the DEA as being suspicious?
 6             MR. KOBRIN:  Object to form.
 7             THE WITNESS:  Timeframe, please.
 8   BY MR. HUDSON:
 9        Q.   Ever.
10        A.   I can't speak for anything beyond or
11   prior to my time.
12        Q.   2009 to 2016 then.  Are you aware of any
13   Giant Eagle retail pharmacy that ever reported to
14   the DEA a suspicious order of controlled
15   substances?
16        A.   A Giant Eagle pharmacy?
17        Q.   Yes.
18        A.   Reporting a suspicious order?
19        Q.   Correct.
20        A.   Suspicious prescription?  Because the
21   pharmacy would see the prescription.
22        Q.   A suspicious order.  If it's an
23   integrated system, are you saying that the retail
24   pharmacies are playing some role in trying to
25   identify orders of unusual size?
```

[12/20/2018] Millward122018

171

1       A.    The system is designed to prevent orders
2  of unusual size or to identify and call them out.
3       Q.    Right.  So is it your testimony that
4  Giant Eagle retail pharmacies, as part of their
5  integrated system, actually played a role and
6  tried to identify orders of unusual size?
7       A.    I believe there were two orders that
8  were identified and reported.
9       Q.    And those were of buprenorphine?
10      A.    Buprenorphine, yes.  You can say
11 Subutex, which is the brand name of the single
12 entity.
13      Q.    Neither one of those were hydrocodone
14 combination products; right?
15      A.    That is correct.
16      Q.    Both of those were orders that were
17 detected at HBC or were those detected by retail
18 pharmacies?
19      A.    They were detected --
20            MR. KOBRIN:  Object to form.
21            THE WITNESS:  They were detected
22 corporately.
23 BY MR. HUDSON:
24      Q.    And when you say corporately, what do
25 you mean?

172

1      A. In the office we created a reporting
2 system to see if there were -- among the other
3 tools that we had and the other policies and
4 procedures in place, a tool to assist us in
5 looking at, as I stated earlier, looking at
6 monitoring drug movement throughout the
7 organization.
8      Q. And was that the threshold reports?
9      A. Threshold was a tool that assisted in
10 the process.
11      Q. When was this process put in place?
12      A. Specific date I don't recall. You may
13 have to refresh me. But I would say somewhere
14 2013-ish.
15      Q. Who put the process or practice in
16 place?
17      MR. KOBRIN: Object to form.
18      THE WITNESS: It was a team approach.
19 BY MR. HUDSON:
20      Q. Was this the project with Kayla Voelker?
21      A. Correct.
22      Q. And she then created the daily
23 suspicious reports?
24      A. Well, the white board planning would
25 have been involving more Shawn Boyton. Kayla was

205

1    A.   Anybody who received the report could
2  reach out.  Nothing precluded those individuals
3  from doing so.
4    Q.   Was there a process in place?  How did
5  you decide who did what?
6    A.   The process would be either George or I
7  would reach out to that pharmacy district leader
8  to contact, contact either by phone, email or
9  physical on-site visit.
10    Q.   Then as a result of that review or
11  investigation, if there was reason to believe that
12  the order was not legitimate, then you would
13  report that to the DEA and stop the shipment?
14    A.   So based on their -- so the PDL is --
15  the report triggers the PDL's review of the store.
16  Report is forwarded down.  Ultimately, they're the
17  one going in or having that discussion.
18       And then if the movement is deemed as -- so
19  if the movement is deemed as suspicious in the
20  case of a store where we had a change in
21  prescribing pattern, then shipments to the store
22  would be deemed suspicious, stopped and reported
23  to the DEA.
24    Q.   In your time at Giant Eagle, there were
25  only two times that reports were made to the DEA;

[12/20/2018] Millward122018

206

1 correct?

2     A. That's correct.

3     Q. So in your time at Giant Eagle, you're

4 aware of only two suspicious orders that existed

5 of shipments from HBC to Giant Eagle; correct?

6     A. There were two occasions when the

7 movement, in this case not theft, but an unusual

8 prescribing pattern of buprenorphine products were

9 flagged or stopped, reported. The store was --

10 shipments to the store for that chemical were

11 halted and the -- which then the team interviewed,

12 retrained on the controlled substance dispensing

13 guidelines, the guidelines in the pharmacist

14 manual from the DEA, as far as understanding and

15 catching red flags, dispensing red flags, in this

16 case, prescriptions from a set of -- subset of

17 prescribers.

18     Q. I guess what I was getting at is all

19 suspicious orders from Giant Eagle -- I'm sorry --

20 from HBC to Giant Eagle were reported to the DEA;

21 correct?

22     MR. KOBRIN: Object to form.

23     THE WITNESS: The two suspicious orders

24 identified were reported to the DEA.

25

[12/20/2018] Millward122018

244

1  prescription was -- that they acted in the course
2  of their professional practice as the pharmacist
3  in determining that.
4      Q.  But as a pharmacist, how do you know if
5  the prescription is coming from a legitimate
6  doctor or an illegitimate doctor?
7          MR. KOBRIN:  Object to form.
8          THE WITNESS:  That's a very interesting
9  question.  You have to do your due diligence and
10 make your individual determination based on the
11 prescription, the prescribing pattern of the
12 physician, the patient, to determine is this a --
13 is it being used for legitimate use.  It could be
14 talking to the patient, saying, why are you using
15 this.
16      In our controlled substance dispensing
17 guidelines, it's called out for the pharmacists
18 are empowered to call the doctor to get the
19 diagnoses, to get -- as far as even getting
20 progress notes.  We coach them to say -- the
21 burden of proving that it's a legitimate
22 prescription falls onto the prescriber before they
23 fill that -- before they make that fill or do not
24 fill determination.  That's how our pharmacists
25 were trained and coached.

[12/20/2018] Millward122018

257

1  distributor of those products; correct?
2      A.   Again, I can't speak to what happened
3  before I was in the role, understanding -- with
4  that qualifier.
5      Q.   At least while you were there though,
6  you agree there was never a shipment of
7  hydrocodone combination products that were blocked
8  from shipment at HBC; correct?
9      A.   I'm not aware of any shipment that was
10 blocked.
11     Q.   You agree that during the time you were
12 the senior manager of compliance, there was never
13 a shipment of hydrocodone combination products
14 where you notified the DEA that they were a
15 suspicious order; right?
16     A.   Again, I'm not aware that there was a
17 flag that was deemed to be suspicious.
18          MR. HUDSON:  I don't have any further
19 questions.
20                    EXAMINATION
21 BY MR. KOBRIN:
22     Q.   Mr. Millward, you were asked earlier
23 today about stopping shipments on orders of
24 interest while they were being investigated.
25          Do you recall that line of questioning?

[12/20/2018] Millward122018

258

1      A.    I do.

2      Q.    Tell me, are there different means
3 through which Giant Eagle or HBC investigates an
4 order of interest?

5      A.    Yes. We talked at length about the
6 threshold or the Voelker report, so to speak, but
7 there were other systems in place. Giant Eagle
8 invested in two tools from a company by the name
9 of Supply Logics.

10      Supply Logics had two products, Pinpoint
11 Monitor and Pinpoint Audit, one looking at
12 pharmacy purchasing patterns, the other looking at
13 pharmacy dispensing patterns.

14      Giant Eagle also invested in a dedicated
15 person to review those or to have access and
16 review those tools to look for any -- really as a
17 redundant mechanism to look for any kind of
18 movement of controlled substances that could
19 potentially be a flag for investigation.

20      Q.    Just to clarify the record, are there
21 situations where through this investigation you
22 could stop an order of interest before it shipped?

23      A.    That is correct. If a report was
24 generated or a flag was generated, we had the
25 potential to stop the orders for that store until

259

1   an investigation could be fully fleshed out.
2       Q.   That was if a flag was generated by the
3   person you had hired to do investigation --
4       A.   Correct.
5       Q.   -- with this Supply Logic program?
6       A.   Correct.  His name was Jason Mullen.
7       Q.   And he could do these investigations and
8   he could stop the shipment when that store made an
9   order if he found there was a reason to
10  investigate that store; is that correct?
11      A.   That is correct.
12      Q.   Now, were there other situations in
13  which you could not necessarily stop a shipment
14  even after you identified an order of interest?
15      A.   So the Kayla report was a report that
16  came out the next day after a store had received
17  the order, and that's where that store had already
18  received it.  So it afforded the opportunity to
19  investigate at that point and stop future orders
20  it determined to be suspicious and then
21  subsequently reported as required.
22      Q.   Did you ever do that, stop future
23  orders?
24      A.   We did.
25      Q.   And was there anything else you could do

[12/20/2018] Millward122018

260

1  even if the order had been started to be filled at
2  the warehouse or even filled at the warehouse and
3  shipped?  Had you lost control of the order?
4      A.   Because, as stated earlier, Giant Eagle
5  distributed to itself, we were our customer, we
6  knew everything about the characteristics of our
7  store and had control of and control of the
8  product from where it entered into the DC till it
9  left in a prescription for an end user patient.
10     If something needed to be quarantined and
11 removed from dispensing stock, we had the ability
12 to have our stores pull that aside, if necessary,
13 to prevent it from being dispensed.
14     Q.   You talked about a visit to Purdue that
15 you made in order to see their practices.  Why did
16 Giant Eagle visit Purdue?
17     A.   It was a conference call.  It was a
18 conference call that we had.  And I believe Purdue
19 reached out to us through the purchasing group,
20 put in contact with me for George and I to have a
21 conference call, again, along the lines of the
22 Thrifty White, for example.
23     It was just another example of reaching out
24 to determine what are some other things other
25 organizations -- now Purdue being very different

[12/20/2018] Millward122018

261

1  from us as only a manufacturer and then a
2  distributor to distributors, not dispensing.
3      It was essentially used as intel or insight
4  as to what other organizations are doing so we can
5  continue, as I had spoken repeatedly, improve and
6  evolve and tighten our practices.
7      Q.   You said Purdue was very different from
8  you.  Can you elaborate on that?
9      A.   Purdue is a maker of brand -- well, most
10  known for Oxycontin.  We mentioned earlier
11  Hysingla, which was in an email.  And they are a
12  manufacturer that has a worldwide presence.
13      Q.   They are not, as Giant Eagle is, a
14  regional or, rather, as HBC is a regional
15  distributor to captive pharmacy purchasers?
16      A.   No.  They are not a regional distributor
17  for captive pharmacies.
18      Q.   Or a captive orderer, rather.
19      A.   Exactly.  The companies are very
20  different.
21      Q.   You also mentioned one of the things
22  that you found interesting at Purdue was that they
23  were tracking the percentage of cash purchases.
24  Do you recall that?
25      A.   I do.