EXHIBIT 14

1

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL       :  MDL No. 2804
     PRESCRIPTION OPIATE    :
 4   LITIGATION             :  Case No. 17-md-2804
                            :
 5   APPLIES TO ALL CASES   :  Hon. Dan A. Polster
                            :
 6                          :

 7

 8                   HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                   JANUARY 4, 2019

13                       - - - -

14       VIDEOTAPED DEPOSITION OF ANTHONY MOLLICA,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 4, 2019, commencing at 8:06 a.m.

21                       - - - -

22             GOLKOW LITIGATION SERVICES
            877.370.3377 phone | 917.591.5672 fax
23                   deps@golkow.com

24

25
```

60

1   requirements being held based on legal

2   requirements, et cetera.

3       Q.   Let's just, if we could, make a list of

4   these policies.  So the first that I heard was

5   good decisions on dispensing.

6       A.   We supported pharmacists' right to make

7   professional judgments as to what was proper and

8   improper in terms of dispensing, made sure the

9   pharmacists knew that they had the right, final

10  right of decision making when it came to

11  dispensing.

12      We had our controlled substance procedures

13  that we made sure was distributed.  We had audit

14  procedures that were done quarterly and documented

15  in accordance with what our procedures and

16  policies were at the time.  We had practices in

17  terms of document retention and what needed to be

18  done in terms of proper ordering, training,

19  training on -- we had manuals and references

20  regarding not only the DEA, but Pharmacy Act and

21  fraud, waste and abuse policies, CBTs, annual

22  meetings with a lot of discussions of what the

23  obligation of pharmacists were and helped in any

24  way.

25      We've had DEA inspections which were never --

61

1    never got any feedback that we weren't doing

2    anything other than what was required from us from

3    a legal perspective.

4        Q.   So I just want to make sure I've got an

5    exhaustive list.  One was good decisions on

6    dispensing.  Then you said you gave pharmacists or

7    professionals the ability to make professional

8    judgments on dispensing controlled substances?

9        A.   Yeah, supported by the Pharmacy Act,

10   yes.

11       Q.   And then the second one was controlled

12   substance procedures?

13       A.   Again, Giant Eagle had a controlled

14   substance policy that's part of the control box,

15   and the company made sure that we communicated

16   what those procedures are to the pharmacy.

17       Q.   And what were those policies?

18       A.   I can't recite them.  It was part of the

19   control box.

20       Q.   When you say control box, what do you

21   mean by that?

22       A.   There was a physical box in every

23   pharmacy that was a single place to look for

24   procedures, documents, records, that type of

25   thing.  We called it the control box.

62

1        Q.   It was a control box for Schedule II

2   controlled substances?

3        A.   Yes.  It had other information in there.

4   It was all controls, but Schedule II was part of

5   that.

6        Q.   Do you know if the control box -- if

7   Schedule III controlled substances would be

8   contained in the control box?

9        A.   Well, just general --

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  Not to my knowledge.  I

12   don't think there's specific -- like DEA manuals

13   aren't specific just to that.  They're all

14   inclusive of the thing.

15  BY MR. HUDSON:

16       Q.   So all controlled substances would be in

17  the control box?

18            MR. KOBRIN:  Object to form.

19            THE WITNESS:  Information regarding,

20  yeah.

21  BY MR. HUDSON:

22       Q.   Information regarding controlled

23  substances.  So it's not like a physical box that

24  you put certain controlled substances into?

25       A.   Oh, no, no.  I'm talking about

63

1    documentation here.  No.  Controlled substances,

2    Schedule IIs, were kept in lock and key, in safes.

3    III through Vs would be distributed in the

4    pharmacy in a proper fashion in accordance with

5    the law.

6         Q.   The control box then would be a box that

7    would have policies or procedures in it?

8         A.   Policies, procedures, the records in

9    terms of ordering and dispensing, all the

10   reference materials, fraud, waste and abuse, the

11   technician certifications, those types of things.

12        Q.   And would there be a control box that

13   would be contained at each Giant Eagle retail

14   pharmacy?

15        A.   Yes.

16        Q.   And would the control box contain the

17   same basic set of -- would you call them policies

18   or procedures or how would you describe them?

19        A.   Both.

20        Q.   Would there be things beyond just

21   policies and procedures in the control box?

22        A.    I don't recall exactly what was in each

23   tab of the box, but things like the order records.

24   If you had CIIs, those order records would be

25   maintained, or dispensing logs associated with it.

64

1          At one time I want to say that there was

2     records of the actual audits we would do monthly,

3     but that moved over to an electronic format, and I

4     can't recall if that was part of the box after

5     that.

6          Q.   The third thing I had was audit

7     procedures.  So if you could, just describe for me

8     what the audit procedures were.

9          A.   First of all, the state and local

10    authorities would do audits at will.  In terms of

11    ours, we did quarterly audits that were all

12    inclusive of operational practice.  That included

13    making sure that the box was in order and the

14    things that needed to be there were in there.

15         Every month we would audit every controlled

16    substance.  Annually we would do a hand count of

17    every controlled substance in the pharmacy.  We

18    would do routine audits, virtual inventory logs,

19    lots of stuff like that.

20         Q.   So for those audits of controlled

21    substances, would you do a physical count of each

22    prescription --

23              MR. KOBRIN:  Object to form.

24    BY MR. HUDSON:

25         Q.   -- or each bottle?  Describe for me what

65

```
 1    that procedure looked like.

 2              MR. KOBRIN:  Object to form.

 3              THE WITNESS:  Which procedure?

 4    BY MR. HUDSON:

 5         Q.   The audit procedure.

 6         A.   Which one?

 7         Q.   For reviewing inventory.

 8         A.   Every month there was a requirement to

 9    hand count every CII narcotic, record that against

10    what was dispensed.

11         Q.   Was the process the same for Schedule II

12    controlled substances versus Schedule III

13    controlled substances?

14         A.   Schedule IIIs through Vs, there was -- I

15    believe the state requires it every two years.  We

16    did it annually.

17         Q.   So was the monthly audit procedure

18    focused exclusively on the Schedule II controlled

19    substances?

20         A.   That particular procedure was about

21    control IIs, yes.

22         Q.   So there was not a monthly audit

23    procedure that applied to Schedule III controlled

24    substances?

25              MR. KOBRIN:  Object to form.
```

66

1        THE WITNESS:  First of all, there was a

2   daily audit of all controls.  We had a virtual

3   log.  Every pharmacist got the chance to see the

4   virtual inventory dispensings and what was being

5   ordered on a nightly basis.

6        Records were printed every night in terms of

7   what was dispensed on the controlled substance.

8   I'm speaking specifically to a required audit

9   which was a monthly procedure, not day in/day out

10  operating procedures.

11       There was daily monitoring of who could touch

12  the safe, who could count.  If anything, I think

13  we always erred on the side do more rather than

14  less when it came to procedures with controlled

15  substances.

16  BY MR. HUDSON:

17       Q.   Were Schedule IIIs though in the vault?

18       A.   I don't recall Schedule IIIs being in

19  the vault.  Actually, Vicodin or hydrocodone

20  products, at one time I believe we made -- we

21  treated them with the same control II substance

22  policy.  I don't recall the dates around that, but

23  I do recall moving the hydrocodone combination

24  products into the safe or at least a portion of

25  those.  I don't recall the specifics of that.

106

1    after the settlement to address the accusations by

2    Ohio that the internal controls were inadequate?

3              MR. KOBRIN:  Object to form.  It

4    misrepresents the evidence.

5              THE WITNESS:  I know that as a result of

6    any incident, and especially ones like this, that

7    Giant Eagle took many actions to continually try

8    to improve and build new mousetraps when it comes

9    to internal controls and how we measure them.

10   BY MR. HUDSON:

11       Q.   Anything more specific you can say about

12   specific actions or steps Giant Eagle took after

13   the settlement with the Ohio Board of Pharmacy in

14   2011?

15       A.   Sure.  I mean, I can't say that they're

16   specific to this particular situation, but from

17   2011 moving forward, there were things like moving

18   to more virtual inventory and moving away from

19   paper to electronics.  There was a company called

20   Supply Logics that Giant Eagle engaged to bring

21   more visibility to this.  You could see if an

22   associate was manipulating an internal control or

23   changing an inventory figure to read more

24   favorably on a report.  Heightened awareness in

25   terms of physical audits that we would do, more

107

1    training.

2        We always tried to use situations where bad

3    players is an opportunity to reevaluate and come

4    up with new procedures to stay ahead of it.

5        Q.   In your mind, did the procedures at

6    Giant Eagle become better at detecting diversion

7    over time?

8        A.   I would like to think they became

9    better.  That was always the goal, was to make it

10   better and better.  You don't know what you don't

11   know.  But when you see a weakness in an area or

12   if someone can exploit it, you work to try to stop

13   someone from being able to exploit it.

14          (HBC-Mollica Exhibit 8 was marked.)

15   BY MR. HUDSON:

16       Q.   Let me hand you what I marked as

17   Exhibit 8.  For the record, Exhibit 8, the

18   internal number is P-HBC-1331.

19       Mr. Mollica, these emails were obviously

20   written after you left the company, so you haven't

21   probably seen them before would be my guess.

22       A.   Years after I left the company it looks

23   like.

24       Q.   And my focus is on the middle email from

25   Mr. Chunderlik to others, and the topic is Control

146

1          A.   I don't know what this document is.

2     What are these questions?  This SOM and

3     anti-diversion program piece, I just don't know

4     what this is.

5          Q.   That's what I'm getting at, is whether

6     you're able to say as you sit here today whether

7     or not Giant Eagle had written policies that were

8     specifically aimed at meeting these requirements

9     of 1301.74(b).

10              MR. KOBRIN:  Object to form.

11              THE WITNESS:  When you asked me -- to me

12     you're asking about a difference between a policy

13     that's of a distributor versus the pharmacy, and

14     I'm saying that it's the same company distributing

15     to itself.  So by definition, any and all of our

16     suspicious -- whether diversion related measures

17     that we had in place are going to be part of the

18     suspicious monitoring system, to my opinion.

19     BY MR. HUDSON:

20          Q.   Is there anything as you sit here today,

21     any manual or anything in writing?

22          A.   Everything that we have, our dispensing

23     procedures, our documentation tracking, our

24     requirements in training that we do with

25     technicians, all our procedures are going to be

147

1    part of that.

2        Q.   Those are all geared towards identifying

3    unusually large orders of controlled substances?

4        A.   That's not what it's asking on here.

5    It's asking about if there's suspicious

6    order monitoring.

7        Q.   What is a suspicious order?

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  I don't have a definition

10   of suspicious order.  If there are orders that

11   require, you know, a go look-see or further

12   information, we were going to go look and see.

13   BY MR. HUDSON:

14       Q.   Well, what does the regulation say about

15   a suspicious order?

16           MR. KOBRIN:  Object to form.  If you

17   want to show him the regulation, but I don't think

18   he should be expected to know that or should

19   testify to it.  I'm going to say don't answer

20   that.

21           MR. HUDSON:  Are you instructing him not

22   to answer?

23           MR. KOBRIN:  I think you should clarify

24   or tell him what you're doing.  I mean, you're

25   asking him to tell you about legal regulations

211

1        Q.   And when an employee violates Giant

2   Eagle's rules like this, are they disciplined or

3   fired?

4        A.   They're terminated immediately and where

5   it's appropriate, we report to the state Board.

6        Q.   In any organization that you've ever

7   been in, do they have a 100 percent record of

8   employees not stealing?

9        A.   Not the ones I've ever worked at, no.

10        Q.   In your experience, are internal

11   controls sometimes overridden by dishonest

12   employees?

13        A.   I've had situations where employees have

14   overridden internal controls, yes, to steal from

15   an organization, whether it's money, drugs, other

16   things, supplies.

17        Q.   So despite the company's best efforts to

18   put in controls, sometimes people commit criminal

19   acts?

20        A.   You're always trying to build a better

21   mousetrap because of those things.

22        Q.   Now, other than this thousand dollar

23   fine paid in connection with this incident, are

24   you aware of the Ohio State Board of Pharmacy

25   doing anything else with respect to this incident

212

```
1    other than what's revealed in this document?
2         A.   No, not to my -- not to my recollection.
3    I honestly can't remember if they did follow-up
4    inspections or things like that.  They may have.
5    I just don't recall.
6         Q.   And this was specifically directed at
7    one store, not the entire chain or the
8    corporation; is that correct?
9         A.   That's correct.
10        Q.   You said something about the DEA and the
11   Ohio State Board coming into these pharmacies for
12   spot audits, things of that nature.
13        A.   Correct.
14        Q.   Did the Ohio State Board of Pharmacy as
15   a result of this incident do anything with respect
16   to this store's ability to continue to fill
17   prescriptions?
18        A.   No.  Are you referring to any kind of
19   sanction?
20        Q.   Yes.
21        A.   No.
22        Q.   You talked a lot about the integrated
23   system of controls that Giant Eagle had, and I
24   don't want repeat all of that.  But I just want to
25   make sure for completeness of the record.
```

213

```
 1        Did Giant Eagle at all times hire licensed

 2   and trained pharmacists?

 3        A.   Yes.

 4        Q.   Did they train those pharmacists with

 5   respect to diversion?

 6        A.   Pharmacists are trained, are aware of

 7   the laws regarding diversion as part of licensure.

 8   But then, yes, we had training for pharmacists and

 9   reference material type of tools within the

10   pharmacy for them to reacquaint themselves with

11   those things at any time.

12        Q.   If a pharmacist doesn't follow Giant

13   Eagle policies and procedures or the law, what

14   happens?

15        A.   If a pharmacist doesn't follow the law,

16   they're terminated, many times reported to the

17   Board if we believe that whatever the termination

18   was a risk to public health.

19        Q.   And you talked earlier today about the

20   professional discretion and judgment that

21   pharmacists use.

22        Is that a line of control in your mind in

23   terms of avoiding diversion?  Is that the first

24   line of defense, that a pharmacist, licensed

25   pharmacist must review the prescription before
```

214

1    it's filled?

2         A.   Yes.  That's why pharmacies require

3    licensed pharmacists.  That's one of the reasons.

4         Q.   And pharmacies are assisted by

5    technicians in the pharmacy; is that right?

6         A.   Yes.

7         Q.   Are they trained and supervised by the

8    pharmacists themselves?

9         A.   They're trained both by the pharmacist,

10   but there's a formal technician training program

11   as well, a Giant Eagle certification program.

12        Q.   And the policies, some of the policies

13   that you referenced earlier today, do they include

14   the DEA pharmacist manual?

15        A.   Yes.

16        Q.   Are those in all of the pharmacies?

17        A.   Yes.

18        Q.   Do they include the Giant Eagle

19   Controlled Substance Dispensing Guidelines?

20        A.   Yes.

21        Q.   Are the pharmacists trained on those

22   dispensing guidelines?

23        A.   Yes.

24        Q.   Is that training monitored in some way?

25   In other words, can a pharmacist just skip that

215

1    training in some way?

2         A.   I can't imagine you could pass the state

3    Board exam if you skip it.

4         Q.   Does Giant Eagle make sure that the

5    pharmacists when they're hired, they actually

6    review these guidelines and are trained on them?

7         A.   Yes.  There's also computer-based

8    monitoring that had attestations.

9         Q.   In these so-called PMPs, like the OARRS

10   system, are those in all of the Giant Eagle

11   stores?

12        A.   To my knowledge, yes.

13        Q.   And are pharmacists --

14        A.   I can't recall what the State of West

15   Virginia was with that.  I can't remember if they

16   had electronic or some other system, but whatever

17   West Virginia had, we were complying with that

18   one.  I don't want to say it was exactly like

19   OARRS.  Each state has a right to be a little

20   different there.

21        Q.   Are those a resource tool for the

22   pharmacists to determine the legitimacy of

23   prescriptions?

24        A.   Yes.

25        Q.   You were asked a lot of questions today

225

1       A.   It was a small percentage.  Like I say,

2   I can't recall the exact NDCs that were in the

3   warehouse, but even in our overall dispensing,

4   it's a small number, small percentage.

5       Q.   This Exhibit 13, number (B)(4) talks

6   about location of the premises.  Were all these

7   Giant Eagle pharmacies inside Giant Eagle grocery

8   stores?

9       A.   Yes, with the exception of the examples

10  that I spoke to the gentleman about earlier.

11  There was two independently-owned grocery stores

12  in the Cleveland market that we had Giant Eagle

13  pharmacies in.

14      Q.   Those were transitioned then to Giant

15  Eagle stores?

16      A.   They were just -- no.  They never

17  transitioned to Giant Eagle stores.  We just took

18  the pharmacies out.

19      Q.   But being inside of a grocery store, is

20  that a level of control that you consider as part

21  of the security analysis?

22      A.   Not only were they delivered to a store,

23  but they were in cases where the pharmacy -- if

24  there was a situation where the pharmacy wasn't

25  open, they had to be delivered to a locked cage

226

```
 1   within the store.

 2        Q.   Factor (B)(6) six talks about types of

 3   vaults and safes and other secure enclosures.

 4        Did the pharmacies at least to your knowledge

 5   keep any controlled substances in locked secure

 6   locations?

 7        A.   Every drug in the pharmacy is in a

 8   locked location in the pharmacy, and that's the

 9   reason why the state Boards have you send in

10   diagrams of physical barriers so every drug is

11   protected that way.  It doesn't matter if it's

12   controlled or not.  Narcotics inside of that

13   locked pharmacy are in a locked safe or locked

14   cabinet.

15        Q.   Did the Ohio State Board of Pharmacy

16   audit every store at least once per year?

17        A.   I don't know what their frequency was.

18   That sounds reasonable.  If you would ask me how

19   often I think, I would say once a year.

20        Q.   Did anybody from the Ohio State Board of

21   Pharmacy ever come to Giant Eagle to your

22   knowledge and say, hey, you're not meeting those

23   requirements?

24        A.   No.  In fact, we actually had a member

25   of the state Board who worked for us.
```

241

```
1          THE WITNESS:  I don't know.

2          MR. KOBRIN:  He talked about what was

3    done and the policies behind it and the reasons

4    behind it.

5    BY MR. HUDSON:

6      Q.   And I just want to make sure the record

7    is clear.  This is my only chance to talk to you.

8        There's no reason though why Giant Eagle

9    retail pharmacies nationwide couldn't have kept

10   some sort of record of suspicious or questionable

11   prescriptions that ended up not being filled, is

12   there?

13         MR. KOBRIN:  Are you asking if they

14   should have kept a record of the actual

15   prescriptions themselves?

16   BY MR. HUDSON:

17     Q.   Do you understand the question?

18     A.   You're asking me is there anything that

19   prohibited us from maintaining records of

20   prescriptions we did not fill?

21     Q.   Right.  In other words, if somebody came

22   in and handed you a prescription and you as a

23   licensed pharmacist applying your medical judgment

24   said, you know what, this doesn't seem right, I'm

25   not going to fill this prescription, is there any
```

242

1   reason why you can't write that down, take notes

2   on that, put it into a computer and then as an

3   organization log that to try to identify

4   suspicious or questionable opioid orders that are

5   being rejected?

6           MR. KOBRIN:  Object to form.

7           THE WITNESS:  For what reason?  There's

8   no requirement to do that, so it would have never

9   come up.

10          MR. HUDSON:  I don't have any further

11  questions.

12                  RE-EXAMINATION

13  BY MR. BARNES:

14     Q.   I just have one follow-up question.  The

15  formula type program that went into effect in

16  2013, in your view, was that an additional system

17  of controls on top of controls that were already

18  in existence?

19     A.   Yeah.  We're always checking in orders

20  and maintaining inventory requirements.  Like I

21  said, systems evolve in time, and that was an

22  example of one that evolved.

23          MR. BARNES:  Thank you.

24          THE WITNESS:  Thank you.

25          THE VIDEOGRAPHER:  2:01 p.m. we are off