EXHIBIT 16

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3    IN RE:  NATIONAL        :  MDL No. 2804
      PRESCRIPTION OPIATE     :
 4    LITIGATION              :  Case No. 17-md-2804
                              :
 5    APPLIES TO ALL CASES    :  Hon. Dan A. Polster
                              :
 6                            :

 7

 8                    HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10


11                         - - -

12                    JANUARY 16, 2019

13                         - - -

14        VIDEOTAPED DEPOSITION OF GEORGE CHUNDERLIK,

15    taken pursuant to notice, was held at Marcus &

16    Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17    Pennsylvania 15219, by and before Ann Medis,

18    Registered Professional Reporter and Notary Public in

19    and for the Commonwealth of Pennsylvania, on

20    Wednesday, January 16, 2019, commencing at 9:04 a.m.

21                         - - -

22             GOLKOW LITIGATION SERVICES
           877.370.3377 phone | 917.591.5672 fax
23                  deps@golkow.com

24

25
```

185

1    A.   A copy -- I don't know if was a
2    formalized policy as on Exhibit 18.  My
3    recollection is that we would have provided a
4    summary of our program versus a written policy as
5    shown in Exhibit 18.
6    Q.   And what is your recollection of -- at
7    this time in January of 2014, what was the system
8    or what was the suspicious order monitoring?  What
9    was happening at that time?
10   A.   At that point in time, as we've seen, we
11   had daily reports based upon stores that may have
12   exceeded the threshold that we had set up, and if
13   stores flagged on those reports, they were
14   followed up on, and that was part of the
15   explanation in this document.
16   Q.   So at this point in time in January of
17   2014, to the best of your recollection, the system
18   that was in place was the daily threshold reports
19   that you've talked about; correct?
20   A.   Correct, yes.
21   Q.   Now, at some point in 2015, did Giant
22   Eagle take steps to open a new distribution
23   facility where Giant Eagle was going to become a
24   distributor of Schedule II controlled substances?
25   A.   Yes.  We began processes.  We began the

[1/16/2019] Chunderlik011619

214

1  already discussed.
2  BY MR. HUDSON:
3      Q.  Other than store number 8, any other
4  investigations you recall?
5      A.  There were some.  I can't remember
6  specific stores.
7      Q.  Do you remember who you talked to at
8  those stores?
9      A.  I would talk to the pharmacy manager.
10     Q.  Do you remember the names of anybody in
11 particular that you talked to between 2009 and
12 2014?
13          MR. KOBRIN:  Object to form.
14          THE WITNESS:  I would have talked to the
15 pharmacy manager.  Whether they've changed from
16 that point in time, I'm not sure, but I don't
17 recall the specific pharmacist that I talked to.
18 When I make a call to the pharmacy, I always ask
19 for the pharmacist in charge or the pharmacy
20 manager.
21 BY MR. HUDSON:
22     Q.  What particular information did you ask
23 for when you made those calls?
24          MR. KOBRIN:  Object to form.
25          THE WITNESS:  I would ask about if there

215

1  is any -- some of the questions that we had on
2  our -- on one of the previous forms that we
3  discussed that had some of those six questions on
4  there.
5  BY MR. HUDSON:
6      Q.   Did you ask the same questions every
7  time, or did they change?
8      A.   They may have change a little bit.
9      Q.   As you sit here today, can you remember
10 any specific questions that you asked any
11 pharmacist at any particular store between 2009
12 and 2014?
13     A.   Some of the things that I was most
14 interested in when I asked were information on
15 pain clinics, if there were any new physicians in
16 the area.
17     Q.   Anything else that you asked?
18     A.   There may have been, but I can't recall
19 specifically.
20     Q.   Did you ever uncover that there were
21 ever pain clinics or new physicians in the area?
22     A.   Yes.
23     Q.   And would that cause you to have a
24 suspicion that there would be a heightened risk
25 for diversion?

216

1    A.   I wouldn't necessarily say a heightened
2    risk.  I knew that there were probably going to be
3    more prescriptions coming from those facilities.
4    We look to fill prescriptions, legitimate
5    prescriptions.  I had no reason to believe that if
6    a physician has written a prescription, that the
7    pharmacy was going to do their due diligence to
8    determine if that was a legitimate prescription or
9    not.
10   Q.   Other than asking the pharmacist whether
11   there were new physicians or pain clinics in the
12   area, anything else that you can recall doing your
13   due diligence to investigate flagged orders?
14        MR. KOBRIN:  Object to form.  Asked and
15   answered.
16        THE WITNESS:  Other than that, there may
17   have been situations where I had asked about
18   specifically what types of prescriptions that they
19   were seeing from the pain clinic or from the
20   physician's offices and if there was any reason
21   why they had a reason -- if there weren't any pain
22   clinics or new offices being opened, what the
23   pharmacy would have thought was a reason for the
24   increase in purchases in prescriptions.
25

[1/16/2019] Chunderlik011619

235

1    parentheses it says CSOS.  Right?
2         A.   Yes.
3         Q.   When was the CSOS system implemented, if
4    you know?
5         A.   At the retail location, my recollection
6    is around April of 2015.
7         Q.   Then the next bullet point is the OMS.
8    Is that a reference to the order monitoring
9    system?
10        A.   Yes.
11        Q.   Is that the new system that's going to
12   be implemented --
13        A.   Yes.
14        Q.   -- in conjunction with this policy?
15        A.   Yes.
16        Q.   The OMS uses algorithms to identify
17   controlled substance orders that require
18   investigation and documentation before releasing
19   the order for distribution.
20             Then there's a sub-bullet there.  The OMS
21   algorithm generates limits based on monthly
22   thresholds and ordering characteristics specific
23   to the following.  Then it lists pharmacy
24   location, chemical, generic product indicater,
25   National Drug Code and ordering pattern; correct?

[1/16/2019] Chunderlik011619

236

1  A. Yes.
2  Q. If you could, just compare for me how
3  comprehensive these algorithms are for monitoring
4  orders compared to the previous daily threshold
5  reports that we talked about.
6  A. I think we modified the algorithm to --
7  we modified the algorithm that we were using to
8  identify any type of suspicious order or any type
9  of order.
10 Q. So now the monitoring is going to be
11 specific to the actual pharmacy location; right?
12 A. Yes.
13 Q. That was not something that -- the daily
14 threshold reports that were implemented in October
15 of 2013, not something they were able to do;
16 right?
17 A. That's correct.
18 Q. And then here it also indicates that
19 this monitoring is going to involve not just
20 monthly thresholds, but also ordering
21 characteristics; correct?
22 A. That's correct.
23 Q. That's something that the prior daily
24 threshold reports were not able to do; right?
25 A. Which bullet are you referring to?

[1/16/2019] Chunderlik011619

237

1    Q.   The clear bullet, the first.
2    A.   I wouldn't necessarily say that our
3  previous system was not able to do some of these
4  things as well.
5    Q.   We've looked at the reports before, but
6  the daily threshold reports that began being
7  generated in October of 2013, those were monthly
8  or those were thresholds of orders based upon
9  monthly rolling data; right?
10   A.   Right, but they were chemical, generic
11 product indicator, National Drug Code as well.  I
12 kind of want to make that distinction there.  We
13 have bullets that look like we've added these
14 types of things, but they were part of the
15 original one as well.
16   Q.   The original one in October of 2013
17 created thresholds based on GPI; right?  The
18 generic product indicator was --
19   A.   At the GPI 10 level.
20   Q.   Right.  And then it was specific that
21 thresholds were company-wide, but not store or
22 location specific; right?
23   A.   Correct.
24   Q.   And then the daily threshold reports,
25 those didn't include -- there was no data that was

238

1  being mined to create algorithms to flag or
2  monitor ordering characteristics, right, or
3  ordering patterns?
4         MR. KOBRIN:  Object to form.
5         THE WITNESS:  We have those reports
6  where we could -- I mean, they do show pattern.
7  They have the potential to show patterns.
8  BY MR. HUDSON:
9     Q.   They show a pattern as it relates to
10 orders, but only the subset of orders that would
11 be exceeding a threshold; right?
12     In other words, the only thing being flagged
13 in the daily threshold reports that were in
14 existence from October of 2013 were orders that
15 were exceeding the threshold; right?
16         MR. KOBRIN:  Object to form.
17         THE WITNESS:  Those are the orders.
18 When a store -- the first time a store went over
19 the threshold, they would flag on the report, and
20 they could have the potential to stay on that
21 report till the end of the month, yes.
22 BY MR. HUDSON:
23     Q.   Right.  But if there wasn't an order
24 going from HBC to a pharmacy that tripped over the
25 threshold, that order would not be on those daily

[1/16/2019] Chunderlik011619

259

1   over the receipt of controlled substances it was
2   handling when it determined it was in compliance
3   with the security requirements?
4       A.   Yes.
5       Q.   Did HBC consider the physical security
6   features of its facility --
7       A.   Yes.
8       Q.   -- when it determined it was in
9   compliance with the security requirements?
10      A.   Yes.
11      Q.   Did HBC get frequent visits from the
12  DEA?
13      A.   They got visits from the DEA, yes.
14      Q.   What was the purpose of those visits?
15      A.   To do reconciliation audits to see if we
16  were also complying with the security requirements
17  that were required as part of the Act and that we
18  had controls in place.
19      Q.   Did the DEA ever tell HBC that they were
20  not meeting the security requirements under the
21  regulations, under the regulation related to the
22  Controlled Substances Act?
23      A.   Not that I know of, no.
24      Q.   With respect to the HBC warehouse that
25  you visited, do you recall whether it had a locked

[1/16/2019] Chunderlik011619

260

1  cage?
2      A.  Yes, it did.
3      Q.  Was there controlled access to that
4  cage?
5      A.  There was controlled access, yes.
6      Q.  Do you know whether that cage was
7  inspected and approved by the DEA?
8      A.  It was, yes.
9      Q.  Do you know if admittance to that cage
10 was controlled and limited to only certain
11 personnel?
12     A.  Yes.
13     Q.  When you visited HBC warehouse, was it
14 clear that they had taken any steps in order to be
15 compliant with the Controlled Substances Act?
16     A.  Yes.
17     Q.  So the people at the HBC warehouse were
18 aware of the Controlled Substances Act?
19         MR. HUDSON:  Object to the form.
20         THE WITNESS:  Yes.
21 BY MR. KOBRIN:
22     Q.  Do you know whether the people at the
23 warehouse were aware of the Controlled Substances
24 Act?
25     A.  Yes.

[1/16/2019] Chunderlik011619

264

```
 1   monitored by loss prevention?
 2        A.   Yes.
 3        Q.   Are the pharmacies monitored by loss
 4   prevention?
 5        A.   Yes.
 6        Q.   Are there internal audits of the
 7   pharmacies?
 8        A.   Yes.
 9        Q.   Are the pharmacists and the pharmacy
10   techs trained and supervised?
11        A.   Yes, they are.
12        Q.   In fact, you were involved in the
13   supervision of those pharmacy techs, weren't you?
14        A.   That's correct.
15        Q.   Does Giant Eagle impose policies and
16   procedures on pharmacists and pharmacy techs with
17   respect to the way it dispenses controlled
18   substances?
19             MR. HUDSON:  Object to the form.
20             THE WITNESS:  No, we do not.
21   BY MR. KOBRIN:
22        Q.   You don't impose any policies and
23   procedures about how they dispense prescriptions?
24        A.   We have a controlled drug dispensing
25   guideline that we have communicated out to our
```

[1/16/2019] Chunderlik011619

1   pharmacists and pharmacy team members.
2       Q.   And do you also have a DEA pharmacist
3   manual that you communicate out to your
4   pharmacists and team members?
5       A.   Yes, we do.
6       Q.   Is that available in every Giant Eagle
7   pharmacy?
8       A.   It is readily available at each Giant
9   Eagle pharmacy.
10      Q.   And you mentioned that Giant Eagle has
11  controlled substance dispensing guidelines.
12      A.   Yes, that's correct.
13      Q.   Does it include red flags, things to
14  watch for in terms of whether a prescription is
15  legitimate or not?
16      A.   That is correct, yes.
17      Q.   Could you look at Exhibit 10.  I'll find
18  it, too.  Earlier today opposing counsel had you
19  looking at the risk assessment red and green flags
20  that are listed under Section 3(b) in the email
21  from Joseph Millward in this exhibit.  Do you see
22  that?
23      A.   Yes, I do.
24      Q.   Are those red flags for the pharmacy or
25  are they for the warehouse?

266

1	A.	They would be for the pharmacy.
2	Q.	They would apply to the manner in which
3	pharmacists are judging potential customers who
4	come in; correct?
5	A.	That's correct.
6	Q.	Is that a kind of pharmacy control that
7	would be listed in the controlled substance
8	dispensing guidelines that are at every Giant
9	Eagle pharmacy?
10	A.	Yes; yes, sir.
11	Q.	To your knowledge, has the DEA ever
12	raised an issue about a pharmacy store's
13	compliance, a Giant Eagle pharmacy store's
14	compliance with the Controlled Substances Act?
15		MR. HUDSON:  Object to the form.
16		THE WITNESS:  No.
17	BY MR. KOBRIN:
18	Q.	We talked a little bit about controls at
19	pharmacies.  Are pharmacists required to
20	immediately update a store's controlled substance
21	inventory when it receives incoming orders?
22		MR. HUDSON:  Objection.  No foundation.
23		THE WITNESS:  The system can do that
24	whenever they receive the order into the pharmacy.
25

[1/16/2019] Chunderlik011619

267

1  BY MR. KOBRIN:
2      Q.   When a pharmacist fills a controlled
3  substance prescription, is the store inventory
4  immediately updated for outgoing prescriptions?
5      A.   Yes.
6      Q.   At the end of the day, is there a check
7  of remaining balances of the controlled substance
8  at the stores?
9      A.   In controlled substances and Schedule II
10 items, the pharmacy does a perpetual back count of
11 what should be remaining on the shelf after they
12 dispense a prescription.
13     Q.   What does that mean, a perpetual back
14 count?
15     A.   After each time a prescription goes
16 through the filling process, the pharmacist is
17 required to go back and count the remaining
18 inventory that's in the -- for that product and
19 log it into the electronic database within our
20 pharmacy data management system.
21     Q.   Are you familiar with the term monthly
22 narc audit?
23     A.   I am, yes.
24     Q.   What is a monthly narc audit?
25     A.   The monthly narc audit is a program that

268

1  was developed by Giant Eagle to reconcile
2  inventory.  It will show the purchases for a given
3  time period as to when the audit was conducted and
4  show all dispensing.  And at the end of doing that
5  calculation, there is an actual -- there is an
6  expected on-hand count that is shown to the
7  pharmacy.
8       They do the count, and then they update it
9  with the actual count that is remaining in
10 inventory.
11      Q.   Do you also have annual audits of
12 inventories at Giant Eagle pharmacies?
13      A.   We do annual inventory counts at each
14 pharmacy, yes, of all controlled substances.
15      Q.   Can you tell me what a PDL is?
16      A.   PDL is an acronym at Giant Eagle for
17 pharmacy district leader.
18      Q.   What do the PDLs do?
19      A.   The PDLs -- each PDL has roughly 29 to
20 33 stores that they are responsible for business
21 oversight of a particular region.
22      Q.   Do they regularly visit the stores?
23      A.   They do regularly visit the stores, yes.
24      Q.   When the compliance team did due
25 diligence on any orders that flagged or any orders

269

1   that they wanted to investigate further, would the
2   PDLs be a good source of information as to what
3   was going on --
4       A.   The PDL is a very good source of
5   information, yes.
6       Q.   Did you and others at Giant Eagle
7   corporate office utilize the PDLs when doing due
8   diligence at stores and on orders?
9       A.   Yes, sir; yes.
10      Q.   Do PDLs conduct audits or inquiries
11  concerning procedures at the stores?
12      A.   They do.
13      Q.   Do they supervise the training of
14  pharmacists at all?  Are they involved in the
15  supervising and training of pharmacists?
16      A.   They do have a part in supervising the
17  training.  As part of their audit, they would look
18  to see if required training was being conducted by
19  the pharmacist or that team members were doing
20  some computer-based training programs that had
21  been assigned to them.
22      Q.   That would be like continuing education?
23      A.   Possibly, yes.
24      Q.   Do the stores, do the Giant Eagle
25  pharmacy stores work with local law enforcement?

270

1       A.   Yes, they do.
2       Q.   Do the Giant Eagle pharmacy stores work
3  with local police departments?
4       A.   Yes.
5       Q.   Do the Giant Eagle pharmacy stores work
6  with the Board of Pharmacy inspectors in each
7  state?
8       A.   Yes, they do.
9       Q.   Do the Giant Eagle pharmacy stores and
10 their employees work with DEA agents?
11      A.   They have, yes.
12      Q.   Would you characterize that relationship
13 between the stores and these law enforcement
14 agencies as a cooperative working relationship?
15      A.   Yes, I would, very cooperative.
16      Q.   In working with local law enforcement
17 and the DEA, has Giant Eagle been able to uncover
18 people who are attempting to pass bad scripts?
19      A.   Yes, we have.
20      Q.   Does Giant Eagle have a pharmacy
21 investigator?
22      A.   Yes, we do.
23      Q.   And does he also work with local law
24 enforcement in trying to apprehend people who are
25 passing bad scripts?

[1/16/2019] Chunderlik011619