EXHIBIT 17

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF OHIO

3             EASTERN DIVISION

4

5    ------------------------) MDL No. 2804

6    IN RE:  NATIONAL          )

7    PRESCRIPTION OPIATE       )

8    LITIGATION                )

9    ------------------------) Case No. 17-md-2804

10   THIS DOCUMENT RELATES TO:)

11   ALL CASES                 )

12   ------------------------) Hon. Dan A. Polster

13

14             HIGHLY CONFIDENTIAL

15      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

16

17          VIDEOTAPED DEPOSITION OF

18               RANDY HEISER

19

20            February 19, 2019

21

22         Pittsburgh, Pennsylvania

23

24

1    distributor of controlled substances for a little less

2    than two years while you were still there?

3         A.    That's -- well, I don't recall when we

4    actually brought the controls in.  I know that we

5    started with generics and then my recollection is at

6    some point we added the controls.  That dating sounds

7    about correct, but I don't recall the exact date.

8         Q.    Sure, sure.

9              And the records will reflect what they

10   were.  And, again, I'll -- I'll represent to you that

11   they show that -- that the -- the controlleds started

12   in -- in about November of 2009 --

13        A.    Okay.

14        Q.    -- so...

15             During that time period, do you have any

16   recollection of whether or not HBC designed a system

17   to identify suspicious orders of controlled

18   substances?

19        A.    We had an integrated system in place to

20   monitor the movement of all controls.  It started as

21   we received product from the warehouse.  It was

22   scanned and electronically recorded.  When it was

23   placed on the shelves, again, it was scanned and

24   electronically recorded.  When it was dispensed or

1    when it was -- an order was picked based upon a

2    store's order, it was scanned and electronically

3    recorded.  When the totes were placed in a truck, it

4    was scanned and electronically recorded.  When those

5    delivery vehicles arrived at the Giant Eagle location,

6    the totes were scanned and electronically recorded.

7    When the merchandise was unpacked, it was, again,

8    scanned and electronically recorded.  When we

9    dispensed the product through our dispensing system,

10   the product was scanned and electronically recorded.

11   When we gave the medicine to the patient, it went

12   through our cash register, it was scanned and

13   recorded.

14          We also had corporate oversight of both

15   the stores and the warehouse.  The warehouse had

16   buyers that were monitoring from a human perspective

17   the orders that were placed by the stores and also the

18   orders that were placed to the manufacturers.  The

19   system to monitor the store activity involved our

20   pharmacists who are required to on a monthly basis

21   compare dispensing activity to purchase activity,

22   identify discrepancies, and try to find out what

23   those -- why those discrepancies occurred.

24          Our district managers were responsible to

1    verify that that analysis of dispensing activity

2    versus purchasing activity was being conducted

3    properly.  And our vice president of pharmacy

4    operations was responsible to see that our district

5    managers were performing those particular follow-ups.

6            So we had a -- a fully integrated system

7    of controls in place to be sure that we were trying to

8    detect and prevent any type of theft or diversion.

9        Q.    My question was more specific.  My

10   question was:  Did HBC design a system to identify

11   suspicious orders of controlled substances?

12           So my question is what -- to you, what is

13   a suspicious order of a controlled substance?

14       A.    I mean, we -- me -- our integrated system

15   looked for, you know, any -- any types of -- of

16   deviations.  Our focus was on theft and the -- you

17   know, ways to -- to get it -- get it out if anyone was

18   taking it out of the system.

19           The buyers were looking at, you know,

20   orders as they were coming in.  So if someone, you

21   know, was on -- if they saw something that came in and

22   they said they wanted 40 pieces and they have never

23   ordered 40 pieces, they would typically call to see if

24   it was a -- a fat finger situation or if the system,

35

1    10, the companies responded, and do you see at the

2    bottom of Page 9, the first written policy identified

3    is there at that Bates range and then it says it's

4    effective from 8/1 of 2014.

5          Do you see -- do you see that at the

6    bottom?

7        A.    I see the sentence:  "Apparent version of

8    HBC policy effective 8/1 of 2014."

9        Q.    Okay.  And then if we look to the next

10   page, I think you'll see that the rest of the written

11   policies identified become later, you know, later in

12   time as opposed to earlier in time.

13         My -- my -- given that the company has

14   identified the first written policy as being

15   August 1st of 2014, my question is simply:  Do you

16   have any recollection of any written policies or

17   procedures relating to suspicious order -- a

18   suspicious order monitoring system that were in effect

19   prior to August 1st of 2014?

20       A.    I mean, I think I've already described

21   these integrated systems that were in place to monitor

22   the movement of all products throughout the Giant

23   Eagle supply chain.

24       Q.    And can you say under oath today whether

36

```
 1    or not that integrated system had components that were

 2    specifically designed to identify suspicious orders of

 3    controlled substances?

 4         MR. KOBRIN:  Object to form.

 5    BY THE WITNESS:

 6         A.    I think I've already described how the

 7    system was in place to -- to monitor the movement and

 8    to identify anything that was out of line.

 9    BY MR. HUDSON:

10         Q.    Right.  And as part of that, do you know

11    as you sit here today whether or not that involved

12    monitoring and identifying orders of controlled

13    substances of unusual size?

14         MR. KOBRIN:  Object to form, asked and answered.

15    BY THE WITNESS:

16         A.    I -- I think I've already answered the

17    fact that we had people at a corporate level that were

18    monitoring the orders that were sent from the store to

19    the HBC warehouse.  Those buyers were also monitoring

20    the orders that were sent from the warehouse to the

21    manufacturers.

22    BY MR. HUDSON:

23         Q.    So who -- who at corporate was monitoring

24    orders of controlled substances to identify those of
```

37

1    unusual size?

2        MR. KOBRIN:   Object to form.

3    BY THE WITNESS:

4        A.    I think I already -- I already stated they

5    were -- they were pharmacy buyers that were

6    responsible for monitor -- monitoring those orders.

7    BY MR. HUDSON:

8        Q.    And who were the pharmacy buyers, what

9    were their names?

10       A.    I don't recall.

11       Q.    What did the pharmacy buyers do to monitor

12   the orders to try to identify those of unusual size?

13       A.    They are -- they are looking at the orders

14   that came from the pharmacies before they actually

15   submit their orders into the manufacturers.

16       Q.    How often did they review those orders?

17       A.    I don't recall.

18       Q.    Well, what was the criteria being applied

19   to try to determine whether it was an order of unusual

20   size?

21       A.    I don't recall.

22       Q.    How many orders did the pharmacy buyers

23   identify during the time that you were there that --

24   that were identified as being potentially suspicious