# EXHIBIT 25

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
                       - - -
 3   IN RE:  NATIONAL           :  HON. DAN A.
     PRESCRIPTION OPIATE        :  POLSTER
 4   LITIGATION                 :  MDL NO. 2804
                                :
 5   This document relates to:  :  Case No. 17-MD-2804
                                :
 6   The County of Summit, Ohio :
     Ohio et al. v. Purdue Pharma :
 7   L.P., et al., Case No.     :
     17-OP-45004                :
 8                              :
     The County of Cuyahoga v.  :
 9   Purdue Pharma Purdue Pharma :
     L.P., et al., Case No.     :
10   18-OP-45090                :
11                      - - -
12           - HIGHLY CONFIDENTIAL -
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13
                       VOLUME I
14                      - - -
                    May 9, 2019
15
16           Videotaped deposition of
     CRAIG J. McCANN, Ph.D., CFA, taken
17   pursuant to notice, was held at the law
     offices of Morgan Lewis & Bockius, LLP,
18   1111 Pennsylvania Avenue, NW, Washington,
     D.C., beginning at 10:03 a.m., on the
19   above date, before Michelle L. Gray, a
     Registered Professional Reporter,
20   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
21
                       - - -
22
           GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    your analysis in your expert reports?
 2         A.    I don't.  If I do, it's
 3    inadvertent.
 4         Q.    Okay.  You also don't
 5    have -- you do not have listed here the
 6    Controlled Substances Act; is that
 7    correct?
 8         A.    Correct.
 9         Q.    Did you review that in whole
10    or in part in connection with the opioids
11    litigation work you've done?
12         A.    If I did, I don't recall.
13         Q.    Did you rely on it in any
14    way with respect to any of the opinions
15    you've put forth?
16         A.    No.
17         Q.    So you didn't review
18    Title 21, Section 1301.74(b) from the
19    Code of Federal Regulations, correct?
20         A.    Not that I'm aware of.  If
21    you put it in front of me, I may
22    recognize the text.  But I don't -- I
23    don't recall it by that citation.
24         Q.    Well, did you rely on any
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   regulations in connection with forming

 2   the opinions in your expert reports?

 3          A.    Not directly.  There may be,

 4   at a second remove, an impact of a -- a

 5   regulation on my thinking.  But -- the

 6   data, but not -- not directly.

 7          Q.    What do you mean by second

 8   remove impact?

 9          A.    Well, at a high level what I

10   think I did was to determine whether the

11   transactions that the defendants reported

12   to the DEA in realtime match the

13   transactions that they report to the

14   court in this case.

15                And there's a couple of

16   different ways of thinking about that,

17   framing that exercise.

18          Q.    Sure.

19          A.    But I understand that the

20   defendants are required by regulation or

21   law to report those transactions timely

22   and accurately to the DEA through ARCOS.

23   And so one interpretation of what I did

24   was to -- to take the transactions that
```

Highly Confidential - Subject to Further Confidentiality Review

1  the defendants produced in this case, and
2  determine whether the defendants produced
3  their actual transactions in these 14
4  opioids.  And a way to do that is to say,
5  well, in addition to whatever
6  responsibility the defendants have to the
7  court in this case, they had separate
8  from that in realtime, a responsibility
9  to report the transactions to ARCOS.  And
10 so I then compare those two datasets.
11             So when I say sort of at a
12 second remove, regulation may impact my
13 opinion, it's at a -- a tenuous
14 connection.  What I'm really doing is
15 just comparing two datasets.  But my
16 thinking about that is probably informed
17 by an understanding that the defendants
18 both had a responsibility to the court,
19 and then, through regulation, had a
20 responsibility to accurately and timely
21 report their transactions.
22        Q.   When you say responsibility
23 of the court, you are talking about in
24 discovery in this litigation?

1      A.    Yes.

2      Q.    And you made mention that
3 defendants are required by regulation to
4 report their data timely and accurately.
5 Are you referring to ARCOS when you made
6 that statement?

7      A.    Yes.

8      Q.    Are you making any opinions
9 in any of your expert reports whether any
10 defendant did or did not comply with
11 their reporting obligations vis-a-vis
12 ARCOS?

13      A.    I don't think so.  It's
14 certainly not an opinion that I
15 expressed.  We see some gaps in the ARCOS
16 data.  But I don't know if that result --
17 if that resulted from a defendant not --
18 not timely reporting transactions or not.
19 That's a slightly different question.

20      Q.    When you interacted with
21 current or former DEA personnel with
22 respect to the ARCOS data, did any of
23 them tell you that any of the defendants
24 did not meet their obligations with

```
 1   respect to reporting ARCOS data?
 2        A.    No.
 3        Q.    Are you making any opinions
 4   in any of your expert reports about
 5   defendants' failure to comply with their
 6   discovery obligations in this litigation?
 7        A.    Well, it's not an opinion.
 8   I think some of our observations have
 9   informed further discovery production.
10   And I expect may continue to.
11              AmerisourceBergen provided
12   data yesterday in discovery that we
13   identified in the March 25th report
14   hadn't been produced before.  So I
15   don't -- that's not an opinion really,
16   but it -- it is a comment on the
17   discovery, at least the production that
18   we've received.  And I expect there may
19   be more production.  But it's not -- it's
20   not opinion.
21        Q.    Okay.  You didn't list in
22   your materials considered any, what we
23   call "dear registrant" letters which are
24   letters from the DEA to registrants
```

Highly Confidential - Subject to Further Confidentiality Review

 1    regarding suspicious order monitoring.
 2    Did you review any in connection with
 3    forming any of your opinions?
 4         A.    Not that I recall.
 5         Q.    Okay.
 6         A.    I'm sorry, the answer would
 7    definitely be no, because if I saw
 8    something like that, it didn't in any way
 9    inform any of my opinions.  My opinions
10    are really about the data.  Not about --
11    about some subject matter conduct by any
12    of the parties.
13         Q.    Aside from any documents
14    cited in your expert reports, did you
15    review any documents produced by
16    defendants regarding their own suspicious
17    order monitoring programs?
18         A.    I don't think I did
19    personally, but my staff did see some
20    suspicious order monitoring reports.  I
21    know that we received some.  They didn't
22    inform any of my opinions.
23         Q.    Okay.  What did they
24    receive?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    I don't know.
 2         Q.    Do you know regarding which
 3   defendants?
 4         A.    No.  I'm sorry.  I might
 5   have answered a little too quickly to the
 6   prior question.
 7               I think what my recollection
 8   is, that I was told, that we received
 9   kind of a hodge-podge of e-mails or
10   memos, that the reporting wasn't
11   particularly systematic or organized, to
12   the best of my recollection.
13               As I said, it didn't
14   inform -- wasn't used in any way in my
15   analysis and didn't inform in any way my
16   opinions.  But that's my recollection of
17   what we received.
18         Q.    And are you referring to
19   actual suspicious order reports or are
20   you referring to suspicious order
21   monitoring programming?
22               I just want to make sure we
23   are talking about the same thing.
24         A.    I've told you everything I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Yep.
 2          A.    I'm just saying that you
 3    take the -- the data that we've prepped,
 4    and apply these formulas to it, you get
 5    particular results.
 6          Q.    And is that also true not
 7    only about whether those algorithms, the
 8    assumptions, are appropriate, but also
 9    true that you are not making any opinion
10    as to whether they are legally required?
11          A.    Right.  I think all of these
12    issues are being handled by other
13    experts.  I -- as you said a minute ago.
14    And I didn't take it as a pejorative.
15    I'm just serving as a calculator.
16          Q.    And in this Paragraph 21 you
17    use the -- the phrase "algorithms" to
18    discuss what's being applied in
19    Section 9.  But you also use the word
20    "approaches" later I believe.
21                Are you saying the same
22    thing?
23                So are -- in -- calling it
24    algorithms here in Paragraph 21, are you
```