EXHIBIT 26

CONFIDENTIAL

Whitelaw Compliance Group, LLC.

# Examination of Compliance Standards for Opioid Manufacturers and Distributors

| Prepared For | Prepared By |
|---|---|
| UNITED STATES DISTRICT COURT<br>FOR THE<br>NORTHERN DISTRICT OF OHIO, EASTERN DIVISION<br><br>*IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION*<br><br>Case No. 18-OP-45132 (N.D. Ohio)<br>MDL No. 2804<br>Case No. 17-md-2804<br>Judge Dan Aaron Polster | Dr. Seth B. Whitelaw<br><br>President & CEO<br>Whitelaw Compliance Group, LLC.<br><br>April 15, 2019 |

# Table of Contents

PART I: QUALIFICATIONS, SCOPE & METHODOLOGY....1

1 QUALIFICATIONS....1

2 SCOPE & METHODOLOGY....2

2.1 SCOPE....2

2.2 METHODOLOGY....3

PART II: COMPLIANCE PROGRAM STANDARDS....4

3 UNDERSTANDING THE CONTEXT....4

3.1 GENERAL OVERVIEW OF COMPLIANCE....5

3.2 THE INTERLOCKING RELATIONSHIP BETWEEN SUSPICIOUS ORDER MONITORING, CONTROLLED SUBSTANCES, AND CORPORATE COMPLIANCE PROGRAMS....6

4 COMPLIANCE STANDARDS FOR CORPORATE COMPLIANCE PROGRAMS (1991 TO THE PRESENT)....7

4.1 FEDERAL SENTENCING GUIDELINES FOR ORGANIZATIONS....7

4.2 OIG COMPLIANCE PROGRAM GUIDANCE....11

4.3 AFFORDABLE CARE ACT....12

4.4 DOJ & OIG PROGRAM EFFECTIVENESS GUIDANCE....13

5 COMPLIANCE STANDARDS FOR CONTROLLED SUBSTANCES (1970 – THE PRESENT)....13

5.1 CONTROLLED SUBSTANCES ACT....13

5.2 DEA CONTROLLED SUBSTANCES REGULATIONS....15

5.3 DEA GUIDANCE ON CONTROLLED SUBSTANCES....16

5.3.1 CONTROLLED SUBSTANCES SECURITY MANUAL & SUSPICIOUS ORDER TASK FORCE (1997 TO 2004)....16

5.3.2 THE CHEMICAL HANDLER'S MANUAL....17

5.3.3 THE DEA INDUSTRY INITIATIVE....18

5.3.4 DEA LETTERS TO ALL REGISTRANTS (A.K.A. THE RANNAZZISI LETTERS) (2006 TO 2012)....19

5.3.5 MASTERS PHARMACEUTICAL CASE....20

5.4 INDUSTRY GUIDANCE....21

PART III: DEFINING WHAT GOOD LOOKS LIKE....23

6 APPLYING THE STANDARDS....23

6.1 GENERAL PRINCIPLES....24

6.1.1 CORPORATE COMPLIANCE PROGRAMS....24

6.1.2 SUSPICIOUS ORDER MONITORING PROGRAMS ..... 26
6.2 COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ..... 27
6.2.1 ATTRIBUTES ..... 28
6.3 WRITTEN STANDARDS & EDUCATION ..... 29
6.3.1 ATTRIBUTES ..... 30
6.4 MONITORING, AUDITING & INVESTIGATIONS ..... 32
6.4.1 ATTRIBUTES ..... 34
A. Distributors ..... 34
B. Manufacturers ..... 36
6.5 CORRECTIVE ACTIONS & RISK ASSESSMENTS ..... 37
6.5.1 ATTRIBUTES ..... 38
6.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ..... 39
6.6.1 DISCIPLINE ..... 40
6.6.2 AVOIDING "BAD ACTORS" – EMPLOYEES OR CUSTOMERS ..... 40
6.6.3 ATTRIBUTES ..... 41
6.7 MANUFACTURER – PRESCRIBER RELATIONSHIP ..... 42
7 MEASURING WHAT GOOD LOOKS LIKE ..... 43
PART IV: REPORT OVERVIEW ..... 44
8 EXECUTIVE SUMMARY ..... 44
8.1 GROUP 1 DISTRIBUTORS ..... 44
8.2 GROUP 2 DISTRIBUTORS ..... 45
8.3 MANUFACTURER GROUP ..... 47
8.4 AN INTEGRATED ECOSYSTEM ..... 48
A. Euclid Family Pharmacy ..... 49
B. CVS Store 3322 ..... 51
C. CVS Store 4800 ..... 52
PART V: INDIVIDUAL COMPANY REVIEWS ..... 53
9 MCKESSON CORPORATION ..... 53
9.1 BACKGROUND ..... 53
9.2 EXECUTIVE SUMMARY ..... 54
9.3 IMPACT ..... 54
9.4 COMPANY COMMITMENT – COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ..... 59

9.4.1 McKesson's culture demonstrates a lack of commitment & support for complying with its controlled substances obligations. ..... 60

9.4.2 McKesson's contention that the SOM requirements were too vague for it to design & operate an effective SOM program is specious. ..... 64

9.4.3 McKesson's organizational design of the controlled substances program reflects a lack of support for controlled substances compliance efforts. ..... 65

9.4.4 McKesson failed to resource the controlled substances program appropriately ..... 68

9.5 Program Core - Requirements, Education, Detection & Corrections ..... 70

9.5.1 McKesson's Code of Conduct does not meet generally accepted compliance standards ..... 70

9.5.2 McKesson's standards outlining its controlled substances program were poorly organized and drafted undermining the primary purpose for creating standard policies and procedures. ..... 71

A. Drug Operations Manual, Section 55 ..... 71

B. Lifestyle Drug Monitoring Program ..... 73

C. Controlled Substances Monitoring Program ..... 73

9.5.3 McKesson's *ad hoc* approach to controlled substances education for its employees did not and still does meet generally accepted compliance standards. ..... 74

9.5.4 As early as 2005, McKesson knew its SOM program was not in compliance with DEA requirements. ..... 76

9.5.5 McKesson's LDMP continued the company's non-compliance due to poor program design and implementation. ..... 77

A. Establishing the Thresholds ..... 77

B. The Daily Dosage Summary Report ..... 78

C. LDMP Escalation Process ..... 79

9.5.6 Under the CSMP, threshold setting combined with other techniques resulted in a SOM program that continued to be non-compliant with the basic DEA requirements for controlled substances, as well as the terms of the company's 2008 settlement agreement. ..... 80

A. Establishing Thresholds ..... 81

B. Threshold Buffers ..... 82

C. Threshold Disclosures ..... 84

D. Exceeding the Threshold (TCRs and Level 1-3 Review) ..... 86

E. Customer Due Diligence or Level 1 Review ..... 87

9.5.7 McKesson's Internal Audit process was ineffectual and not a reasonable control to detect non-compliance. ..... 90

A. 2007 Report ..... 91

B. 2010 Report ..... 92

C. 2012 Report ..... 92

9.5.8 McKesson failed to undertake appropriate corrective actions to ensure its controlled substances program was compliant with its regulatory obligations. ..... 93

9.5.9 No evidence was presented that McKesson had a formal risk assessment process during the period. ..... 94

9.6 Program Changes (2014 to Present) ..... 95

9.6.1 THE AGI ENGAGEMENT ........ 95

A. The Multiple-Threshold Model ........ 95

B. Non-Model Thresholds ........ 96

9.6.2 MCKESSON'S IMPLEMENTATION OF THE AGI MODEL. ........ 97

9.7 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ........ 98

9.7.1 DESPITE REPEATED BREACHES OF COMPANY POLICIES AND DEA SOM REQUIREMENTS, MCKESSON FAILED TO DISCIPLINE THOSE INVOLVED. ........ 98

A. Donald Walker ........ 98

B. Blaine Snider ........ 99

C. William de Gutierrez-Mahoney ........ 99

9.7.2 MCKESSON ALSO FAILED TO CONSISTENTLY TERMINATE CUSTOMERS FOUND IN REPEATED BREACH OF THE SOM REQUIREMENTS. ........ 99

10 CARDINAL HEALTH, INC ........ 100

10.1 BACKGROUND ........ 100

10.2 EXECUTIVE SUMMARY ........ 100

10.3 IMPACT ........ 102

10.4 COMPANY COMMITMENT – COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ........ 104

10.4.1 CARDINAL'S CULTURE IS MYOPICALLY FOCUSED ON INCREASING REVENUES AND CUTTING COST WHILE DOWNPLAYING THE IMPORTANCE OF ETHICS AND COMPLIANCE. ........ 104

10.4.2 CARDINAL FAILED TO DESIGN AN ORGANIZATIONAL STRUCTURE WITH STRONG GOVERNANCE, MADE POOR STAFFING CHOICES AND WAS SLOW TO ADD RESOURCES TO THE SOM PROGRAM DEMONSTRATING A LACK OF COMMITMENT TO COMPLIANCE. ........ 106

10.5 PROGRAM CORE – REQUIREMENTS, EDUCATION, DETECTION & CORRECTIONS ........ 108

10.5.1 VIEWED HOLISTICALLY, THE CORE OF CARDINAL'S SOM PROGRAM DURING THE PERIOD RANGES FROM INCOMPLETE TO CONVOLUTED AND INCONSISTENT. ........ 108

10.5.2 CARDINAL HEALTH FAILED TO UNDERSTAND THAT IT AND NOT THE DEA WAS RESPONSIBLE FOR MAINTAINING AN EFFECTIVE PROGRAM TO DETECT AND REPORT SUSPICIOUS ORDERS AND PREVENT DIVERSION. ........ 109

10.5.3 CARDINAL'S EARLY CONTROLLED SUBSTANCES PROGRAM WAS NOT COMPLIANT WITH DEA REGULATORY REQUIREMENTS. ........ 109

10.5.4 CARDINAL'S EARLY TRAINING EFFORTS WERE NOT FIT FOR COMPLIANCE PURPOSES. ........ 112

10.5.5 CARDINAL'S SOM PROGRAM MODIFIED IN RESPONSE TO THE DEA ENFORCEMENT PROCEEDINGS FAILED TO MEET THE NECESSARY STANDARDS IN FIVE KEY AREAS: THRESHOLD SETTING, THRESHOLD INCREASES, DUE DILIGENCE, CUSTOMER MONITORING, AND INVESTIGATIONS. ........ 113

A. Establishing Thresholds ........ 114

B. Threshold Events ........ 116

C. New Pharmacy Questionnaire ........ 118

D. Anti-Diversion Alert Signals ........ 119

E. On-site Investigations ........ 122

F. QRA SOM Customer Analytics General Work Instructions ........ 123

  10.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ..... 125

10.6.1 CARDINAL DOES NOT ENFORCE THE STANDARDS OF THE PROGRAM, AND THUS THERE IS NO REAL ACCOUNTABILITY FOR THE PROGRAM'S LACK OF EFFECTIVENESS. ..... 125

11 AMERISOURCEBERGEN CORPORATION ..... 126

11.1 BACKGROUND ..... 126

11.2 EXECUTIVE SUMMARY ..... 128

11.3 IMPACT ..... 128

11.4 COMPANY COMMITMENT – COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ..... 131

11.4.1 THE "PRIVATE" VERSUS "PUBLIC" CULTURAL PARADOX WITHIN AMERISOURCEBERGEN HAMPERED ITS ABILITY TO CREATE AND MAINTAIN AN EFFECTIVE CONTROLLED SUBSTANCES COMPLIANCE PROGRAM. ..... 131

11.4.2 AMERISOURCEBERGEN HAS FAILED TO OPTIMIZE ITS ORGANIZATIONAL CONNECTIONS BETWEEN ABC'S CONTROLLED SUBSTANCES PROGRAM AND ABC'S CORPORATE COMPLIANCE PROGRAM. ..... 134

11.4.3 WHILE THE NUMBER OF PERSONNEL ASSIGNED TO AMERISOURCEBERGEN'S CSRA FUNCTION GREW OVER TIME, THE COMPANY DID NOT UTILIZE THOSE RESOURCES TO ITS BEST ADVANTAGE. ..... 135

11.5 PROGRAM CORE – REQUIREMENTS, EDUCATION, DETECTION & CORRECTIONS ..... 138

11.5.1 PRIOR TO 2007, AMERISOURCEBERGEN'S TWO-PART CONTROLLED SUBSTANCES PROGRAM WAS AT BEST RUDIMENTARY, AND NOT COMPLIANT WITH DEA REGULATORY REQUIREMENTS. ..... 138

A. Excessive Order Reports ..... 138

B. Manual Distribution Center Process ..... 139

11.5.2 AMERISOURCEBERGEN'S ORDER MONITORING PROGRAM ("OMP") BETWEEN 2007 AND 2016 WAS RENDERED INEFFECTIVE BY A COMBINATION OF POOR DESIGN AND INCONSISTENT APPLICATION. ..... 139

A. Customer Size & Controlled Substances Ratio ..... 142

B. Rolling 30-Day Average ..... 144

C. OMP – Setting the Record Straight ..... 145

D. Low-Volume Accounts ..... 147

11.5.3 AMERISOURCEBERGEN'S POST-SETTLEMENT CUSTOMER DUE DILIGENCE PROGRAM WAS INEFFECTIVE AS A RESULT OF POOR DESIGN AND INCONSISTENT APPLICATION. ..... 148

A. The CSRA Form 590 ..... 149

B. "Verifying" CSRA 590 Data ..... 150

C. CSRA 590 Validation Project ..... 151

D. Process Not Followed ..... 151

11.5.4 LIKE ITS ORDER MONITORING AND CUSTOMER DUE DILIGENCE PROCESSES, ABC'S INVESTIGATIONS PROCESS SUFFERED FROM POOR DESIGN AND LACK OF CONSISTENCY RENDERING IT INEFFECTIVE. ..... 152

11.5.5 ALTHOUGH ABC MADE ADDITIONAL PROGRAM MODIFICATION IN 2016, CSRA RETAINED THE ABILITY TO NEGATE THE NEW CONTROLS BY SIMPLY ISSUING THRESHOLD ADJUSTMENTS. ..... 154

11.5.6 AMERISOURCEBERGEN'S TRAINING EFFORTS WERE INEFFECTIVE DUE TO AN APPROACH THAT WAS FRAGMENTED AND INCONSISTENT. ..... 154

11.5.7 ABC'S FAILURE TO IMPLEMENT A FORMAL CORRECTIVE ACTION PROGRAM CONTRIBUTED TO THE COMPANY'S CONTINUED INEFFECTIVE CONTROLLED SUBSTANCES COMPLIANCE PROGRAM. ..... 157

11.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ..... 158

11.6.1 AMERISOURCEBERGEN DOES NOT ENFORCE THE STANDARDS OF THE PROGRAM, AND THUS THERE IS NO REAL ACCOUNTABILITY FOR THE PROGRAM'S LACK OF EFFECTIVENESS. ..... 158

12 CVS HEALTH INC. ..... 159

12.1 BACKGROUND ..... 159

12.2 EXECUTIVE SUMMARY ..... 159

12.3 IMPACT ..... 161

12.4 COMPANY COMMITMENT – COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ..... 162

12.4.1 CVS' COMPLIANCE RECORD IS INDICATIVE OF A COMPANY THAT HAS A POOR COMMITMENT TO COMPLIANCE ..... 162

12.4.2 CVS' PENCHANT FOR COMPLEXITY AND COMPARTMENTALIZATION RESULTED IN A CONFUSING AND INEFFECTIVE ORGANIZATIONAL APPROACH TO CONTROLLED SUBSTANCES COMPLIANCE. ..... 163

A. CVS Entity Structure ..... 163

B. CVS Controlled Substances "Team" ..... 164

C. Integrating the Controlled Substances and Corporate Compliance Teams ..... 165

12.4.3 CVS ALSO FAILED TO PROPERLY RESOURCE ITS CONTROLLED SUBSTANCES COMPLIANCE EFFORTS THROUGHOUT THE PERIOD. 166

12.4.4 CVS'S TOLERANCE OF PROGRAM DOCUMENTATION THAT WAS EITHER NON-EXISTENT, INCOMPLETE OR INACCURATE IS INDICATIVE OF A COMPANY WITH A POOR COMPLIANCE CULTURE. ..... 167

12.5 PROGRAM CORE – REQUIREMENTS, EDUCATION, DETECTION & CORRECTIONS ..... 169

12.5.1 OVERALL CVS, FROM 2006 TO 2014, MAINTAINED AN INCOMPLETE AND DYSFUNCTIONAL ANTI-DIVERSION PROGRAM RELATED TO ITS DISTRIBUTION OF CONTROLLED SUBSTANCES. ..... 169

A. 2006 – 2009 ..... 169

B. 2009 - 2011 ..... 171

C. 2011 to 2014 ..... 178

12.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ..... 182

12.6.1 CVS DID NOT HOLD EMPLOYEES ACCOUNTABLE FOR FAILING TO MAINTAIN AND OPERATE AN EFFECTIVE ANTI-DIVERSION PROGRAM. 182

13 WALGREENS BOOTS ALLIANCE, INC. ..... 183

13.1 BACKGROUND ..... 183

13.2 EXECUTIVE SUMMARY ..... 185

13.3 IMPACT ..... 186

13.4 COMPANY COMMITMENT – COMPLIANCE CULTURE, ORGANIZATION & RESOURCES ..... 188

13.4.1 WALGREENS WAS SO FOCUSED ON THE RETAIL STORES THAT IT RESISTED AND ULTIMATELY FAILED TO ADOPT ANTI-DIVERSION MEASURES THAT WOULD REGULATE OR LIMIT A RETAIL STORE'S ABILITY TO OBTAIN UNCONTROLLED AMOUNTS OF OPIOID PRODUCTS. ..... 188

13.4.2 FROM 2008 TO 2013, WALGREENS HAS FAILED TO INTEGRATE ITS CONTROLLED SUBSTANCE COMPLIANCE EFFORTS WITH THE CORPORATE COMPLIANCE PROGRAM IN ANY MEANINGFUL WAY. .......... 189

A. Codes of Conduct .......... 189

B. Organization .......... 191

13.4.3 WALGREEN'S FAILURES TO DESIGNATE A "HIGH-LEVEL" INDIVIDUAL OR GROUP WITH SOLE RESPONSIBILITY FOR CONTROLLED SUBSTANCES COMPLIANCE OR PROVIDE ENOUGH RESOURCES FOR THE GROUP CONTRIBUTED TO ITS INEFFECTIVE AND DYSFUNCTIONAL ANTI-DIVERSION PROGRAM. .......... 192

A. Prior to September 2012 .......... 192

B. Formation of the Pharmaceutical Integrity Department .......... 193

13.5 PROGRAM CORE – REQUIREMENTS, EDUCATION, DETECTION & CORRECTIONS .......... 194

13.5.1 FROM 1998 TO 2014, WALGREENS OPERATED AN ANTI-DIVERSION PROGRAM THAT LACKED THE FUNDAMENTAL CONTROLS OF EVEN A FOUNDATIONAL COMPLIANCE PROGRAM. .......... 194

A. Written Standards .......... 194

B. Detection & Corrections .......... 198

C. Audits .......... 207

D. Education .......... 207

13.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT .......... 208

13.6.1 WALGREENS FAILED TO ENFORCE THE STANDARDS OUTLINED IN THE PHARMACY CODE AND THUS THERE IS NO REAL ACCOUNTABILITY FOR THE PROGRAM'S LACK OF EFFECTIVENESS. .......... 208

14 MALLINCKRODT PHARMACEUTICALS .......... 208

14.1 BACKGROUND .......... 208

14.2 EXECUTIVE SUMMARY .......... 210

14.3 IMPACT .......... 212

14.4 COMPANY COMMITMENT - COMPLIANCE CULTURE, ORGANIZATION & RESOURCES .......... 213

14.4.1 MALLINCKRODT'S PUBLIC COMMITMENT TO ITS VALUES OF BEING PATIENT-CENTRIC AND DEMONSTRATING INTEGRITY DOES NOT MIRROR ITS ACTUAL PRACTICE. .......... 213

A. Code of Conduct .......... 214

B. Sales Representative Words and Actions .......... 214

14.4.2 MALLINCKRODT FAILED TO APPROPRIATELY ORGANIZE AND STAFF ITS ANTI-DIVERSION PROGRAM RENDERING IT INEFFECTIVE. 216

A. Organizing and Staffing the Controlled Substances Compliance Group .......... 216

B. Using the Mallinckrodt Sales Force .......... 217

14.5 PROGRAM CORE – REQUIREMENTS, EDUCATION, DETECTION & CORRECTIONS .......... 218

14.5.1 MALLINCKRODT'S POOR DOCUMENTATION PRACTICES WERE AN IMPEDIMENT TO THE COMPANY'S EFFORTS TO ESTABLISH AN EFFECTIVE DIVERSION PROGRAM. .......... 218

14.5.2 MALLINCKRODT USED THE ARTIFICE OF "PECULIAR ORDERS" TO AVOID REPORTING SUSPICIOUS ORDERS TO THE DEA. .......... 221

**14.5.3 THE MALLINCKRODT SUSPICIOUS ORDER PROGRAM WAS FLAWED BOTH IN ITS DESIGN AND IMPLEMENTATION RENDERING IT INEFFECTIVE TO DETECT SUSPICIOUS ORDERS. ... 223**

**A. The Peculiar Order Algorithm and Due Diligence ... 223**

**B. Howard Davis' Concerns ... 228**

**14.5.4 MALLINCKRODT FAILED TO EFFECTIVELY KNOW THEIR CUSTOMERS' CUSTOMER DESPITE HAVING ENOUGH INFORMATION TO CREATE A ROBUST SYSTEM TO DO SO. ... 230**

**A. The SOM Customer Checklist (a k.a. SOM Customer Questionnaire) ... 231**

**B. Chargeback Data ... 233**

**C. Chargebacks & DEA Enforcement Actions ... 234**

**14.6 ACCOUNTABILITY - CONSISTENT ENFORCEMENT ... 236**

**14.6.1 EVEN IN THE FACE OF CREDIBLE EVIDENCE, MALLINCKRODT FREQUENTLY FAILED TO HOLD ITS DISTRIBUTORS ACCOUNTABLE FOR NOT HAVING ADEQUATE SOM PROGRAMS ... 236**

**14.6.2 MALLINCKRODT FAILED TO HOLD EMPLOYEES ACCOUNTABLE FOR BEING NON-COMPLIANT AND OUT OF SYNC WITH ITS VALUES. 237**

**APPENDICES ... 239**

**APPENDIX A: OPIOID PUBLIC HEALTH CRISIS – A BRIEF DISCUSSION ... 240**

**Figure 1: Opioid Public Health Crisis – A Brief Discussion ... 240**

**Figure 2: Oxycodone Distribution to Euclid by Distributor ... 242**

**APPENDIX B: APPLYING THE STANDARDS ... 243**

**Figure 1: Table of Standard Elements Found in Policies and Procedures ... 243**

**Figure 2: Controlled Substances Compliance ... 244**

**Figure 3: Corporate Compliance ... 245**

**APPENDIX C: MCKESSON KEY FACTS AND FIGURES ... 246**

**Figure 1: McKesson Self-Reported Data Points ... 246**

**Figure 2: McKesson Program Overview (Circa 2015) ... 247**

**APPENDIX D: CARDINAL HEALTH KEY FACTS AND FIGURES ... 248**

**Figure 1: Various Data Points ... 248**

**Figure 2: Table 5 -Customer Release Percentage ... 249**

**APPENDIX E: AMERISOURCEBERGEN KEY FACTS AND FIGURES ... 250**

**Figure 1: ABC 2009 Default Thresholds ... 250**

**Figure 2: ABC Diversion Control Policies and Procedures (SOPs) ... 250**

**Figure 3: West Virginia Suspicious Order Reports Submitted vs. Dosage Units Shipped ... 251**

**Figure 4: Summit & Cuyahoga Suspicious Orders Reports Submitted ... 252**

**APPENDIX F: CVS KEY FACTS AND FIGURES ... 253**

**Figure 1: CVS Entity Structure ... 253**

    **Figure 2: CVS Logistics Organization** ........ **253**

**APPENDIX G: WALGREENS KEY FACTS AND FIGURES** ........ **254**

**Figure 1: Handling Suspicious Drug Orders** ........ **254**

**Figure 2: Review of CSR History** ........ **255**

**APPENDIX H: MALLINCKRODT KEY FACTS AND FIGURES** ........ **256**

**Figure 1: Controlled Substances Compliance SOPs** ........ **256**

**Figure 2: "Peculiar Orders" Definition Changes** ........ **257**

**APPENDIX I: LIST OF MATERIALS CONSIDERED** ........ **259**

**A. Defendant Production Documents** ........ **259**

**B. United States Code & Statutes** ........ **270**

**C. Code of Federal Regulations, Federal Register Notices & Other Regulatory Information** ........ **270**

**D. Cases, Settlements & Corporate Integrity Agreements** ........ **271**

**E. Articles, Websites & Other General Reference Materials** ........ **272**

**F. Defendant Discovery Responses; MDL No. 2804 *IN RE: National Prescription Opiate Litigation*** ........ **275**

**G. Corporate Witness Depositions** ........ **276**

**H. Third-Party Witness Depositions** ........ **277**

**I. Other Non-Publicly-Available Materials** ........ **278**

**APPENDIX J: EXPERT'S BACKGROUND** ........ **279**

**Resume** ........ **279**

**Publications List** ........ **283**

**Prior Testimony** ........ **286**

# PART III: Defining What Good Looks Like

## 6 Applying the Standards

As discussed in Part II, by the mid-1990s, the concept of "what good looks like" was established both in the context of corporate and controlled substances (a.k.a. anti-diversion) compliance. From that point forward it was clear that companies in the pharmaceutical industry, including manufacturers and distributors of opioid products, could develop effective internal controls to achieve the objectives to prevent and detect criminal conduct by an organization's employees and agents working on behalf of the organization and to guard against theft and diversion of controlled substances.[94]

In the U.S., the basic regulatory construct for pharmaceuticals, regardless of the agency, is to provide the industry with "what" is expected, but not dictate "how" those expectations are achieved. The "how" is left to the individual organizations to determine the best methods to comply. This approach is true in the case of the OIG, DEA, and even the FDA.[95]

---

[94] *See* Appendix B, Figures 2 and 3 for diagrams outlining a controlled substances compliance program (a.k.a. anti-diversion program) and a corporate compliance program.

[95] *See, e.g.*, U.S. Sentencing Commission, *Guidelines Manual*, § 8A.1.2, comment. (n. 3k) (Nov. 1991) ["FSGs 1991"]; J. Rannazzisi letters to All Registrants (Sep. 27, 2006, Feb. 7, 2007, Dec. 27, 2007 and Jun. 12, 2012) (These letters were not McKesson specific but sent to all DEA registrants), MCKMDL00478906, MCKMDL00615308, MCKMDL00478910, MCKMDL00449807 ["DEA (date) Letter"]; U.S. Food and Drug Admin., Center for Drug Evaluation and Research, *Facts About the Current Good Manufacturing Practices (CGMPs)*, https://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm169105 htm, (page last updated Jun. 25, 2018) (last accessed Dec. 8, 2018) ("The CGMP requirements were established to be flexible in order to allow each manufacturer to decide individually how to best implement the necessary controls by using scientifically sound design, processing methods, and testing procedures.").