# **EXHIBIT B**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 352

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4
                   ~~~~~~~~~~~~~~~~~~~~
 5
      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
 6    OPIATE LITIGATION
 7                                     Case No. 17-md-2804
 8                                     Judge Dan Aaron
      This document relates to:        Polster
 9
      The County of Cuyahoga v. Purdue
10    Pharma L.P., et al.
      Case No. 18-OP-45090
11
      City of Cleveland, Ohio v. Purdue
12    Pharma L.P., et al
      Case No. 18-OP-45132
13
      The County of Summit, Ohio, et al.
14    v. Purdue Pharma L.P., et al.
      Case No. 17-OP-45004
15
                   ~~~~~~~~~~~~~~~~~~~~
16
                         Volume III
17                Continued deposition of
                       PATRICK LEONARD
18
                        May 23, 2019
19                       8:01 a.m.
20
                         Taken at:
21                     Ulmer & Berne
              1660 W. 2nd Street, Suite 1100
22                    Cleveland, Ohio
23           Renee L. Pellegrino, RPR, CLR
24        THIS TRANSCRIPT HAS BEEN DEEMED HIGHLY
     CONFIDENTIAL, ATTORNEYS' EYES ONLY AND MAY BE
25       SUBJECT TO A PROTECTIVE ORDER OR OTHER
                       STIPULATIONS
```

1  for DEA and DOJ, have you spoken with anyone
2  about this case since last we saw you?
3       A.    No, sir.
4       Q.    How many investigations, sir, have
5  you worked on while assigned to the TDS?
6       A.    I have no idea.
7       Q.    Well, is it more than ten?
8       A.    Yes.
9       Q.    Is it more than a hundred?
10      A.    Doubtful, no.
11      Q.    It is more than 50?
12      A.    It could be close to 50.
13      Q.    And for how many of those were you
14 the lead agent?
15      A.    Maybe a third.
16      Q.    And who determines whether you're --
17 or how is it determined whether you're the lead
18 agent or an assisting agent on any particular
19 investigation?
20      A.    One is if I get the complaint, if I
21 start it and run with it.  Some of the ones that
22 I was the lead on were because they were City of
23 Akron cases that I charted and did through the
24 DEA, so those -- I would be lead on all of
25 those.  Or if referrals came from either Denise

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 393

1  Q.  And did you contact any distributors
2  of medications and say they shouldn't distribute
3  to pharmacies where Dr. Harper might be writing
4  prescriptions?
5  A.  No.  I had conversations with
6  pharmacists who would ask me if they should fill
7  for Dr. Harper, and I would tell them straight
8  up that if you feel this is a legitimate
9  prescription for a legitimate medical purpose,
10  then you can fill it; if you think this is an
11  overprescribing physician, it's your name and
12  your reputation and your business that's going
13  to be liable.  And that was the extent of it.
14  Let them make the decision whether they felt it
15  was necessary or legal to fill the prescription.
16  Q.  Did a pharmacist ever ask you how
17  you define medical prescription for a legitimate
18  medical purpose?
19           MR. BENNETT:  Objection.  Scope.
20           You can answer.
21  A.  No.
22  Q.  How do you define legitimate medical
23  prescription for a legitimate medical purpose?
24           MR. BENNETT:  Objection.  Vague.
25  Scope.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 394

1          You can answer.
2     A.   Again, this is why we need a medical
3  expert when we do these cases, but when you're
4  writing for the holy trinity, and I've got
5  patients from offices that have died from
6  overdoses, I think common sense dictates on some
7  of it that some of the pharmacists should be
8  able to see what the prescriptions are and
9  refuse to fill.
10    Q.   I didn't follow writing for the holy
11 trinity.
12    A.   Holy trinity was when they're
13 getting 180 oxycodone, 90 methadone and 90 Xanax
14 all from the same doctor every month on the same
15 script, same three scripts.
16    Q.   Other than that?
17         MR. LEDLIE:  Object to the form.
18 Vague.
19    A.   Other than that, what?
20    Q.   So I take it you would, in your view
21 the -- well, let me ask it this way:  Is the
22 holy trinity -- could that ever be for
23 legitimate medical purposes?
24         MR. BENNETT:  Objection.
25    A.   Again, I'm not a medical -- I'm not

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 396

1 they're not supposed to be.
2     Q. We can agree that the pharmacist
3 doesn't have the blood test results for the
4 individual patient?
5     MR. LEDLIE: Objection to the form.
6 Calls for speculation.
7     A. Yes, we can agree the pharmacist
8 doesn't have that information.
9     Q. We can agree that distributors of
10 the pharmaceuticals don't have the medical
11 records of the patients who are being prescribed
12 medications?
13     A. I would agree with that, yes.
14     Q. And neither do the manufacturers of
15 the medications?
16     A. And I would agree with that as well.
17     Q. The Harper case, did that get
18 started on a tip from a pharmacist?
19     MR. LEDLIE: Object to the form of
20 the question and objection to the extent it
21 calls for the divulging of any non-public police
22 investigative techniques.
23     MR. BENNETT: Objection. Scope. I
24 would join counsel.
25     MR. BLOCK: This is a closed case