# EXHIBIT 13

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL            )   MDL No. 2804
     PRESCRIPTION OPIATE        )
 4   LITIGATION                 )   Case No.
                                )   1:17-MD-2804
 5                              )
     THIS DOCUMENT RELATES TO   )   Hon. Dan A. Polster
 6   ALL CASES                  )
                                )
 7
 8
 9                       — — —
10           Friday, December 14, 2018
                         — — —
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                         — — —
13
14
15
16       Videotaped Deposition of PATSY LITTLE,
     held at Stone Pigman Walther Wittmann LLC,
17   909 Poydras, Suite 3150, New Orleans,
     Louisiana, commencing at 8:06 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                         — — —
23
24            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
25                 deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    After Hours, which was an acute care setting.
 2    I worked at St. Elizabeth Hospital and I
 3    worked for Infusion Network.
 4         Q.    Okay.  Thank you for that.
 5               Then in 2005 you went to
 6    Louisiana State to get your master's degree,
 7    correct?
 8         A.    That's correct.
 9         Q.    Did you begin working with
10    Walmart directly after graduating with your
11    master's degree?
12         A.    About six or seven months
13    later.
14         Q.    And what were you hired at
15    Walmart to do?
16         A.    To be a buyer in the pharmacy
17    department.
18         Q.    In 2008 when you began at
19    Walmart, did you have any specific areas
20    of -- that you were responsible for buying?
21         A.    Yes.
22         Q.    Okay.  What were those areas?
23         A.    I don't remember exactly.  I
24    know skin health, antibiotics, and I don't
25    really remember the others.
```

```
 1          Q.    Okay.  When did you first have
 2   responsibility for buying prescription
 3   opiates?
 4          A.    It would have been maybe a year
 5   later, a year and a half later, something
 6   like that.
 7          Q.    So sometime in the 2009 time
 8   frame?
 9          A.    Yes.
10          Q.    Okay.
11          A.    Probably.
12          Q.    And at that time, Walmart was
13   already purchasing prescription opiates,
14   correct?
15          A.    That's correct.
16          Q.    And Walmart was already
17   distributing prescription opiates; is that
18   correct?
19          A.    That's correct.
20          Q.    Do you have any idea when
21   Walmart began distributing prescription
22   opiates?
23          A.    I do not.
24          Q.    What change occurred, if any,
25   between the time you began at Walmart and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. CIULLO:  Objection, form.
 2                  MS. FUMERTON:  Objection, form.
 3          A.      If that had happened, it
 4     wouldn't be for marketing to a consumer
 5     level.  It would really just be a rebate or a
 6     cost of good adjustment.
 7     BY MR. BOWER:
 8          Q.      What's your basis for that
 9     statement?
10          A.      Because we never did anything
11     that would promote an opioid to the customer,
12     to the end customer user, the patient that
13     would pick up the prescription.
14          Q.      And how do you know that?
15          A.      Because we had a pretty firm
16     stance on that while I was there.
17          Q.      And where did you learn of that
18     stance?
19          A.      I had asked to put a cough
20     medicine on the $4 program at one time and
21     was told that anything with controlled
22     substances, we generally would not advertise
23     or talk to the consumer about.
24          Q.      Would you talk to your
25     pharmacists about those prescription opiates?
```

```
 1                 MS. FUMERTON:  Objection, form.
 2         A.      I don't think I'm -- I think
 3   they're lowering the cost of my goods by
 4   ███████.  I don't think it's a payment for
 5   me to buy the product.
 6   BY MR. BOWER:
 7         Q.      Is there a reason you're
 8   quibbling with their description of marketing
 9   fee?
10                 MS. FUMERTON:  Objection, form.
11                 MR. CIULLO:  Join.
12         A.      They have "marketing fee" in
13   quotation marks.  I just don't -- I think
14   we'd have to understand what they mean by
15   "marketing fee" being in quotation marks.
16   BY MR. BOWER:
17         Q.      Well --
18         A.      To me it means a rebate -- it
19   goes against cost of good.
20         Q.      What's your basis for that
21   statement?
22         A.      Because that's the way I've --
23   I would always attribute that, and because we
24   did not market C-IIs to end user customers.
25         Q.      Why would Walmart receive a
```