# EXHIBIT 19

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION, | ) ) ) ) ) | MDL No. 2804<br>Case No.<br>1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | ) ) ) | Hon. Dan A. Polster |

— — —

Tuesday, January 22, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

    Videotaped 30(b)(6) Deposition of Walmart, through the testimony of Susanne Hiland, held at 4206 South J.B. Hunt Drive, Rogers, Arkansas, commencing at 8:22 a.m., on the above date, before Debra A. Dibble, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Captioner, Certified Realtime Reporter and Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  is that correct?
2     A.  Yes.
3     Q.  In any of those instances, were
4  you providing testimony on behalf of Walmart?
5     A.  Yes.
6     Q.  In other words, that was -- you
7  were providing testimony on behalf of the
8  corporation as you are today; is that
9  correct?
10    A.  Correct.
11    Q.  Do you recall in what cases you
12 provided that testimony?
13        MS. TABACCHI:  Objection, form.
14        THE WITNESS:  It would have
15    been all of them except the workmen's
16    comp case.
17    Q.  (BY MR. BOWER) So prior to
18 today, you've provided testimony in behalf of
19 Walmart in approximately six to eight cases.
20 Would that be accurate?
21    A.  That's accurate, yes.
22    Q.  So it seems like you're fairly
23 familiar with the ground rules for a
24 deposition.  Would that be accurate?

Page 15

1     A.  Yes.
2     Q.  Okay.
3         And so just to make sure we're
4  all on the same page, I just want to go over
5  a couple of those rules, just so there's no
6  issues moving forward.  I think probably the
7  most important one is to make sure that you
8  understand my question.  So if at any point
9  you don't understand the question, please
10 just let me know and I'll try to rephrase it.
11 Okay?
12    A.  Okay.
13    Q.  If you don't ask me to rephrase
14 it, I'll assume that you understand the
15 question as I asked it.  Okay?
16    A.  Okay.
17    Q.  And you understand that your
18 answers today are on behalf of Walmart;
19 correct?
20    A.  Yes.
21    Q.  And that tomorrow you will be
22 providing your own fact testimony; is that
23 correct?
24    A.  Yes.

Page 16

1     Q.  And do you understand,
2  therefore, that the testimony you will give
3  today can be binding on the corporation?
4     A.  Yes.
5     Q.  Okay.  How long have you been
6  working at Walmart?
7     A.  29 years.
8     Q.  And I don't want to spend too
9  much time on your employment history, but can
10 you just -- let's start maybe in 2005, give
11 or take.  Going forward.  Okay?
12    A.  Yes.
13    Q.  What was your position in 2005?
14    A.  At the start of 2005, I was a
15 regional director for operations.  And then I
16 transitioned to a director of professional
17 services.
18    Q.  And when would that transition
19 occur?
20    A.  March of 2005.
21    Q.  Okay.
22        During that time period, did
23 you have oversight over Walmart pharmacies?
24        MS. TABACCHI:  Object to the

Page 17

1     form.
2         THE WITNESS:  In the regional
3     role I had oversight, yes.
4     Q.  (BY MR. BOWER) And what about
5  in the director role?
6     A.  In the director role, I had
7  responsibilities for Board of Pharmacy
8  issues.
9     Q.  What was your next position at
10 Walmart?
11    A.  The next position was a
12 promotion to senior director.  It was the
13 same department, but we -- the name of the
14 department changed to regulatory affairs.
15    Q.  And when did that occur?
16    A.  2009.
17    Q.  And just generally what were
18 your duties and responsibilities as the
19 senior director in regulatory affairs?  Is
20 that an accurate description of your title at
21 that time?
22    A.  That was my title.
23    Q.  Okay.
24        And what were your -- just a

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1   general description of your duties and
2   responsibilities in connection with that
3   title.
4        A.   I began to supervise the
5   directors that had responsibility for Board
6   of Pharmacy regulation.
7             I also had responsibility for
8   our licensing and registration function for
9   our facilities.  And I had federal regulatory
10  responsibility as it related to our licensed
11  pharmacies.
12            MS. TABACCHI:  Zach, of course,
13       you're welcome to inquire about the
14       witness's personal background, but
15       this is all beyond the scope of the
16       notice.
17            MR. BOWER:  I'm just trying to
18       get, like I said, a very high level.
19            MS. TABACCHI:  I just want to
20       make sure we're on the same page.  I'm
21       not going to object to every question
22       during this portion.
23            MR. BOWER:  No, I understand.
24       I'm just going to move quickly through

Page 19

1   this.
2        Q.   (BY MR. BOWER)  And what was
3   your next role at Walmart after senior
4   director of regulatory affairs?
5        A.   For a short period of time in
6   July 2011, I was senior director of
7   compliance and quality assurance.
8        Q.   So that was in 2011; is that
9   correct?
10       A.   Yes.
11       Q.   And then your next role after
12  that was?
13       A.   February 2012 of -- I'll likely
14  not get the title correct, but it was senior
15  director of clinical quality assurance.
16       Q.   Okay.
17       A.   And that was the general title.
18  I'd have to look back to get the title
19  exactly correct.
20       Q.   Approximately how many titles
21  would you say you've had at Walmart in your
22  29 years?
23       A.   One -- a different one every
24  three years approximately.

Page 20

1        Q.   What's your current title?
2        A.   My current title -- on paper my
3   title is Senior Director II, business
4   strategy.  That's an HR title.
5             In function, my title is senior
6   director of professional relations,
7   professional practice standards and clinical
8   services.
9        Q.   Do you believe you are the
10  person at Walmart with the most knowledge of
11  Walmart's maintenance and effective controls
12  against diversion?
13            MS. TABACCHI:  Object to the
14       form.
15            THE WITNESS:  I believe that
16       I'm prepared to speak to that topic on
17       behalf of Walmart.
18            MR. BOWER:  I move to strike
19       that answer.
20       Q.   (BY MR. BOWER)  I just would
21  ask you to please carefully listen to my
22  questions and answer the questions that I
23  ask.  Okay?
24       A.   Yes.

Page 21

1        Q.   The question is, do you believe
2   that you are the person at Walmart with the
3   most knowledge of Walmart's -- strike that.
4             Do you believe you are the
5   person at Walmart with the most knowledge on
6   Walmart's maintenance of effective controls
7   against diversion?
8             MS. TABACCHI:  Object to the
9        form, asked and answered.
10            THE WITNESS:  Yes.
11       Q.   (BY MR. BOWER)  How did you
12  prepare for today's deposition?
13       A.   I interviewed current and
14  former Walmart associates, I prepared with
15  counsel, and I reviewed documents.
16       Q.   Okay.  Let's take those one at
17  a time.  Get just a little more detail on
18  that.  Which former associates did you speak
19  with in preparation for today's deposition?
20       A.   I spoke to Scott Culver.
21       Q.   Are there any other former
22  employees you spoke with in connection with
23  preparation for today's deposition?
24       A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1      form.
2              THE WITNESS:  No, this was
3      additional procedure that included
4      other things that were occurring at
5      the DC.
6      Q.    (BY MR. BOWER) Okay.  And
7  then, if you go back to -- you mentioned that
8  bullet point 3 has some additional kind of
9  procedures that aren't reflected in tab 2;
10 correct?
11     A.    Correct.
12     Q.    And what did you mean by that?
13     A.    So in addition to the
14 distribution from logistics to the diversion
15 control coordinator, those 4 percent reports
16 were sent to operations leadership.
17     Q.    And what -- for what reason
18 were they sent to the operations leadership?
19     A.    It was information just to
20 share from an overall -- it was a data point
21 that we had so that they had more information
22 about their stores.
23           And if an order had never
24 arisen to be -- to their attention, they just

Page 255

1  had view to their stores and their purchases
2  if they appeared on that report.
3      Q.    Was that information used, for
4  example, to look for diversions at the
5  individual pharmacies?
6            MS. TABACCHI:  Object to the
7      form.
8            THE WITNESS:  It was not used
9      to look for a diversion.  It was a
10     data point if there was any
11     operational issues that arose.  And
12     the point of the diversion control
13     coordinator was to have a data point,
14     again, for their -- the work that they
15     are doing.
16     Q.    (BY MR. BOWER) So it wasn't --
17 is it a -- strike that.
18           These reports weren't
19 necessarily used to look for diversion, but
20 it was a data point that was considered in
21 where to look for diversion at the individual
22 pharmacies?  Would that be accurate?
23           MS. TABACCHI:  Object to the
24     form.

Page 256

1            THE WITNESS:  The -- in trying
2      to explain how we used them, because I
3      saw these as well.
4            The -- the way that these would
5      be used is to look to see if
6      pharmacies were appearing on the
7      4 percent report.
8            So as you were doing an
9      operational review, it would be a data
10     point to say, I've seen this, you
11     know, let me check it out if there's
12     anything there of concern.  There may
13     not have been.  And not -- obviously
14     not every store ever hit a 4 percent
15     report.  So it was just a data point
16     for the market director to have more
17     visibility into the operation of their
18     pharmacy.
19     Q.    (BY MR. BOWER) Okay.  Thank
20 you for that.
21           Now let's go to bullet point 4
22 for a minute.  Now we're in the time frame
23 2011 to 2015; correct?
24     A.    Correct.

Page 257

1      Q.    And this is when Walmart first
2  implemented order alerts in Reddwerks;
3  correct?
4      A.    Yes.
5      Q.    Do you know when in 2011
6  Walmart first implemented order alerts in
7  Reddwerks?
8      A.    I don't know the exact date.
9      Q.    Is that something you prepared
10 to testify on today?
11           MS. TABACCHI:  Object to the
12     form.
13           THE WITNESS:  I don't have an
14     exact date.
15     Q.    (BY MR. BOWER) Do you know
16 whether it was -- could it have been 2012?
17     A.    No.  It was 2011.
18     Q.    And what makes you so certain
19 it was 2011?
20     A.    Because of the documentation
21 I've been given.
22     Q.    Can you refer to the specific
23 document that you're thinking of?
24     A.    Yes.

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  Q. Okay.
2  A. Sorry, this is what I was
3  afraid of.
4  Q. And just while you're looking
5  at it, I just want to confirm for the record
6  that you are looking in a binder you brought
7  with you today for a document that would
8  provide you a more precise date for when
9  Walmart first began implementing order alerts
10 in Reddwerks; is that correct?
11 A. That is correct. And I had it
12 tabbed and I took my tab off, so I apologize
13 for the delay.
14     I have an SOP document that
15 talks about it.
16     It was an exhibit that was used
17 for a prior deposition.
18 Q. Well, look. I don't think we
19 need to waste time on the record.
20 A. I'm sorry.
21 Q. I don't want to make this a
22 test for you either.
23 A. I have it. I just took the tab
24 off.

Page 259

1  Q. So maybe at a break or
2  something, I can look for it and you can
3  confirm that's what you were looking
4  for.
5      So let's move on from that and
6  we'll come back to it later --
7  A. Okay.
8  Q. -- okay?
9      And at this point, when Walmart
10 first implemented order alerts in
11 Reddwerks --
12 A. If I may, I just found it.
13 Q. Oh, great. Okay.
14     So a document -- can you just
15 read the Bates number maybe into the record?
16 A. It is Bates No. 9226. It's
17 multiple -- I'm sorry, it was Exhibit 8 in
18 Sullins.
19 Q. Okay.
20 A. And it starts 9224. And the
21 information -- and that document starts with
22 a date of 9-30-2013, but the attachment is
23 dated 2011. And that's the attachment that I
24 was looking for.

Page 260

1  Q. And what -- what is the date on
2  the attachment specifically?
3  A. 12-20-2011.
4  Q. So sometime around the end of
5  2011. Agreed?
6  A. Yes. This is the SOP
7  enhancements.
8  Q. And on what basis is it your
9  testimony that this in fact went into place
10 at that date?
11 A. This is the document stating
12 the process that was in place.
13 Q. So let me just ask it
14 differently, then. Other than the document,
15 is there anything else that's informing your
16 testimony today with respect to when Walmart
17 first implemented order alerts in Reddwerks?
18 A. I spoke to Ramona Sullins about
19 the -- about the implementation of Reddwerks.
20 And there was no discrepancy in our
21 conversation about these documents and when
22 they were effective.
23 Q. So did Ms. Sullins confirm for
24 you that this policy in fact went into place

Page 261

1  on 12-20-2011?
2  A. We didn't talk about the exact
3  date. This is the order alert that's
4  reflected -- what we did talk about this is
5  this is the order alert and the documentation
6  that is reflected in the statement about the
7  Reddwerks alerting.
8  Q. So just so I'm clear as to this
9  date, other than the date reference on the
10 document itself, is there any other basis
11 that you're relying on for the initial
12 implementation of the alerts in Reddwerks?
13     MS. TABACCHI: Object to the
14 form.
15     THE WITNESS: The conversations
16 with Ramona Sullins.
17 Q. (BY MR. BOWER) And did
18 Ms. Sullins confirm to you that these
19 thresholds reflected in bullet point 4 in
20 fact began to be implemented on 12-20-2011?
21 A. I didn't ask her that specific
22 question. I was asking about time frame. It
23 says "approximately 2011." And so as we
24 talked about the process, my understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  was that is the correct time frame for these
2  alerts.
3     Q.   And other than your
4  understanding and the document itself, is
5  there any other basis for that testimony?
6          MS. TABACCHI: Object to the
7     form. Asked and answered.
8          THE WITNESS: My interview and
9     the date on this document.
10    Q.   (BY MR. BOWER) Did you, for
11 example, review any flagged orders during
12 this time period?
13    A.   I did not.
14    Q.   Okay. And I just want to ask a
15 little bit more. I understand -- strike
16 that.
17         Do you know whether during this
18 time period reflected in bullet point 4
19 there, whether Reddwerks was flagging orders
20 for non-controlleds of 50 bottles or more?
21    A.   Yes.
22         MS. TABACCHI: Object to the
23    form.
24         THE WITNESS: The Reddwerks

Page 263

1  system did flag non-controlled items
2  as well.
3     Q.   (BY MR. BOWER) In fact, during
4  this time period, Reddwerks was flagging any
5  order of greater than 50; isn't that correct?
6          MS. TABACCHI: Object to the
7     form. Beyond the scope.
8          THE WITNESS: That is part of
9     the SOP that was described in the
10    document.
11    Q.   (BY MR. BOWER) And then, I
12 want to talk a little bit about this
13 30 percent. And still on bullet point 4.
14    A.   Yes.
15    Q.   You're there? Okay.
16         What does that 30 percent
17 reflect? It says "higher than a rolling
18 four-week average for that item."
19         What does that mean?
20    A.   That means if the order
21 reflected higher than the average, that it
22 would flag.
23    Q.   And would it flag -- strike
24 that.

Page 264

1          Would that order flag
2  regardless of the amount ordered?
3          MS. TABACCHI: Object to the
4     form.
5          THE WITNESS: There were some
6     limits that were put in place specific
7     to that four-week average, but it was
8     at a later period.
9     Q.   (BY MR. BOWER) Okay. So
10 let's -- I'm -- and I think that's helpful.
11 I am a bit confused about those limits, so
12 I'd like to talk about those. Do you know
13 when those limits were first put in place?
14    A.   The 2011 order limits?
15    Q.   So bullet point 4 states
16 that -- I'm going to skip the first part, but
17 it states that "Orders for amounts 30 percent
18 higher than a rolling four-week average for
19 that item were flagged from 2011 to 2014."
20         Do you agree with that?
21         MS. TABACCHI: Object to the
22    form.
23         MR. BOWER: I'll strike it,
24    then.

Page 265

1     Q.   (BY MR. BOWER) When was
2  Walmart flagging orders for amounts
3  30 percent higher than a rolling four-week
4  average?
5     A.   That began in 2011.
6     Q.   And that again -- that began on
7  or about 12-20-2011; is that correct?
8     A.   That's correct.
9     Q.   And how long did that process
10 continue without any order alerts in place?
11         MS. TABACCHI: Object to the
12    form.
13         THE WITNESS: So I think I'm
14    confused about any order limits.
15    Q.   (BY MR. BOWER) Okay.
16    A.   The alerts included order
17 limits.
18    Q.   Did the alerts include order
19 limits from their initial implementation?
20         MS. TABACCHI: Object to the
21    form.
22         THE WITNESS: The 50-bottle
23    alert was part of the initial
24    implementation.

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    MR. BOWER: I'll strike that.
2    I would like a clear question, so I'll
3    rephrase.
4    Q.    (BY MR. BOWER) From
5    approximately July 2012 until approximately
6    2015, what was the policy and procedure with
7    respect to orders of oxy 30 of over
8    20 bottles at DC 6045?
9    A.    So the policy was that if an
10   order came in for more than 20, the DC would
11   not ship more than 20, and those orders were
12   escalated for review.
13   Q.    During this time period, would
14   Walmart ever reduce the order to 20 and ship
15   the order without reviewing it?
16       MS. TABACCHI: Object to the
17   form.
18       THE WITNESS: We did reduce
19   those orders to 20 and ship.
20   Q.    (BY MR. BOWER) Did Walmart
21   review those orders before shipping them?
22       MS. TABACCHI: Object to the
23   form.
24       THE WITNESS: We reviewed those

Page 275

1    orders, every one of them that came
2    in. But the policy was we wouldn't
3    ship any more than 20, and so they'd
4    pass through and were processed.
5    Q.    (BY MR. BOWER) And then in
6    July of 2012, Walmart also starts beginning
7    to identify Schedule II substances -- strike
8    that.
9         In July 2012, Walmart also
10   begins to flag orders of more than 20 bottles
11   for Schedule II substances at DC 6045; is
12   that correct?
13   A.    Yes.
14       MS. TABACCHI: Object to --
15       Go ahead.
16   Q.    (BY MR. BOWER) And can you just
17   describe for us what that process was?
18       I know in here it says "for
19   further review and follow-up as needed."
20       Do you see that?
21   A.    Yes.
22   Q.    So let's say we're at the end
23   of 2012. An order for controlled substances
24   comes in for more than 20 bottles. What was

Page 276

1    the policy and procedure at Walmart DC 6045?
2    A.    So the report would be
3    circulated for review. A report would be
4    created and then circulated for review by the
5    DC associates. And it was forwarded on to
6    our asset protection team as well, to -- to
7    just take a review of that location.
8    Q.    And we've already seen
9    testimony by Mr. Abernathy on that procedure;
10   correct?
11   A.    Correct.
12   Q.    Okay. Is there anything about
13   the procedure described by Mr. Abernathy that
14   you would disagree with?
15       MS. TABACCHI: Object to the
16   form.
17       THE WITNESS: I'd have to
18   review. I did review his deposition,
19   but I don't review the exact
20   testimony, so I'd have to review it.
21   Q.    (BY MR. BOWER) Was there
22   anything as you sit here today testifying on
23   behalf of Walmart that you believe
24   Mr. Abernathy was incorrect about regarding

Page 277

1    that procedure?
2        MS. TABACCHI: Object to the
3    form.
4        THE WITNESS: Again, as I
5    reviewed it, I would have to look at
6    it again for these specifics.
7    Q.    (BY MR. BOWER) But nothing
8    that you're prepared to identify today; is
9    that correct?
10       MS. TABACCHI: Object to the
11   form.
12       THE WITNESS: I didn't -- I
13   didn't prepare to comment on his
14   testimony.
15   Q.    (BY MR. BOWER) Okay. And you
16   agree here that Walmart is relying on his
17   testimony?
18       MS. TABACCHI: Object to the
19   form.
20       THE WITNESS: In terms of?
21   Q.    (BY MR. BOWER) In terms of
22   support for this procedure.
23   A.    Yes, he testified to the
24   procedure.

70 (Pages 274 to 277)

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  decision. If you're asking about
2  another Masters decision, please
3  clarify for the record so there's no
4  confusion.
5       Q.   (BY MR. BOWER) Do you agree
6  that Walmart was aware of the DEA case
7  against Masters prior to 2017?
8            MS. TABACCHI: This is beyond
9       the scope of the notice. The witness
10      can testify in her individual
11      capacity.
12           THE WITNESS: I see the
13      information in this email exchange.
14      Q.   (BY MR. BOWER) And are you
15 aware that -- strike that.
16           During this time period, was
17 Walmart a member of the NACDS?
18           MS. TABACCHI: Object to the
19      form.
20           THE WITNESS: Yes.
21      Q.   (BY MR. BOWER) Are you aware
22 that sometime in between September of 2015
23 and the time frame of the Masters decision,
24 NACDS submitted an amicus brief in the

Page 343

1  Masters case?
2            MS. TABACCHI: Object to the
3       form.
4            THE WITNESS: We weren't party
5       to the amicus brief.
6       Q.   (BY MR. BOWER) That wasn't my
7  question. Can you -- I'll read back my
8  question. Okay?
9            Are you aware that sometime
10 between September of 2015 and the time frame
11 of the Masters decision in 2017, that the
12 NACDS submitted an amicus brief in the
13 Masters case?
14           MS. TABACCHI: I'm just going
15      to caution the witness not to reveal
16      the substance of communications with
17      counsel. If you are aware of the
18      answer to Ms. Bower's question without
19      having discussed that with counsel,
20      you may answer.
21           THE WITNESS: I'm a member of
22      the NACDS Policy Council. And so
23      there may have been communication
24      about the Masters decision. I don't

Page 344

1  know the specifics around that
2  communication.
3       Q.   (BY MR. BOWER) As a member of
4  the policy -- when were you a member of the
5  policy council for NACDS?
6       A.   2007 to present.
7       Q.   As a member of the policy
8  counsel, would you not have reviewed amicus
9  briefs submitted in connection with
10 suspicious order monitoring?
11           MS. TABACCHI: Object to the
12      form.
13           THE WITNESS: No. That was --
14      there were other groups, and there was
15      a group -- a legal group that reviewed
16      and worked on amicus briefs, and I was
17      not a -- I was not a member of that.
18      Q.   (BY MR. BOWER) Was anyone from
19 Walmart aware that the NACDS would be
20 submitting an amicus brief in the Masters
21 case prior to its submission?
22           MS. TABACCHI: Object to the
23      form. Beyond the scope.
24           THE WITNESS: Through

Page 345

1  communication in policy council, it
2  may have -- it may have come up as a
3  topic. It likely did come up. I
4  don't have recollection of the timing
5  or the details of that information.
6       Q.   (BY MR. BOWER) Would you agree
7  that Walmart made changes to its suspicious
8  order monitoring program after the Masters
9  decision came out in 2017?
10           MS. TABACCHI: Object to the
11      form.
12           THE WITNESS: The changes that
13      we made were how we reported the
14      orders that we were reviewing.
15      Q.   (BY MR. BOWER) Would you agree
16 that Walmart began reporting more orders as a
17 result of Masters Pharmaceutical's decision?
18           MS. TABACCHI: Object to the
19      form.
20           THE WITNESS: We reported
21      orders of interest, and that was at a
22      rate that was higher than -- we had --
23      we had not previously been reporting
24      orders of interest before due

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1  policies in place in connection with its own
2  program; correct?
3      A.   We did not have a written
4  policy at that time.
5      Q.   And Walmart declined to go with
6  Buzzeo in 2010; correct?
7          MR. TABACCHI: Object to the
8      form.
9          THE WITNESS: We did not
10     proceed -- I don't know if we
11     declined.  We did not proceed with, to
12     my knowledge, any of these services
13     that they discussed with us.
14     Q.   (BY MR. BOWER)  And then from
15 2010 up until 2017, Walmart took it upon
16 itself to enhance its SOM program; correct?
17         MR. TABACCHI: Object to the
18     form.
19         THE WITNESS: We made
20     enhancements to our program over time.
21     Q.   (BY MR. BOWER)  And then
22 finally, at the end of 2017, Walmart decides
23 to go with Buzzeo; right?
24         MS. TABACCHI: Object to the

Page 435

1      form.
2          THE WITNESS: We did implement
3      Buzzeo at the end of 2017.
4      Q.   (BY MR. BOWER)  And was the
5  implementation of Buzzeo improvement of
6  Walmart's SOM program?
7          MR. TABACCHI: Object to the
8      form.
9          THE WITNESS: It was a
10     continuous evolution and improvement
11     in the automation of orders in how
12     they were flagged.
13     Q.   (BY MR. BOWER)  Okay.  And how,
14 if at all, did the change to Buzzeo impact
15 how orders of controlled substances were
16 flagged?
17         MR. TABACCHI: Object to the
18     form.
19         THE WITNESS: It specifically
20     sat ahead of the distribution system.
21     So an order was alerted -- an order
22     that was alerted came to the practice
23     compliance team before going to the
24     logistics team.  So that was an

Page 436

1  improvement.
2          Additionally, there was an
3  algorithm applied that Buzzeo
4  determined to set those thresholds.
5  So those were the largest changes
6  around how the program worked.
7      Q.   (BY MR. BOWER)  And up until
8  you changed to Buzzeo, did Walmart still have
9  in place its minimum thresholds of 20 for
10 titrated [sic] items of controlled
11 substances?
12         MR. TABACCHI: Object to the
13     form.
14         THE WITNESS: We had the
15     enhanced thresholds still in place.
16     Q.   (BY MR. BOWER)  And those
17 enhanced thresholds provided for a minimum
18 threshold of 20 per store per item for the
19 titrated items; correct?
20         MR. TABACCHI: Object to the
21     form.
22         THE WITNESS: Titrated?
23     Q.   (BY MR. BOWER) Traited.  Sorry.
24 Did I say "titrated"?

Page 437

1          MR. TABACCHI: You did.
2          MR. BOWER: I apologize.
3  Traited items.
4          THE WITNESS: The -- for a
5      traited item, the threshold was 20 or
6      2,000 dosage units.
7          MR. BOWER: Okay.
8          (Whereupon, Deposition Exhibit
9      Walmart 14, 11-30-17 email from Roxy
10     Reed.  Subj: DEA SOM reports,
11     WMT_MDL-000055271-55276, was marked
12     for identification.)
13     Q.   (BY MR. BOWER)  Would you agree
14 with me that when the change to Buzzeo was
15 made, more orders were flagged at Walmart?
16         MR. TABACCHI: Object to the
17     form.
18         THE WITNESS: There were more
19     orders that were flagged as orders of
20     interest for review and due diligence.
21         MR. BOWER: Okay.  You've been
22     handed what's been marked as
23     Exhibit 14.  Take a moment to review
24     it.  Let me know when you're finished.