# EXHIBIT 20

```
 1                UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3    IN RE: NATIONAL              )   MDL No. 2804
      PRESCRIPTION OPIATE          )
 4    LITIGATION,                  )   Case No.
                                   )   1:17-MD-2804
 5                                 )
      THIS DOCUMENT RELATES TO     )   Hon. Dan A.
 6    ALL CASES                    )   Polster
                                   )
 7
 8                          ___ ___ ___
 9              Wednesday, January 23, 2019
                            ___ ___ ___
10
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                 CONFIDENTIALITY REVIEW
                            ___ ___ ___
12
13
14
15        Videotaped Deposition of SUSANNE
      HILAND, held at 4206 South J.B. Hunt Drive,
16    Rogers, Arkansas, commencing at 8:25 a.m., on
      the above date, before Debra A. Dibble,
17    Certified Court Reporter, Registered
      Diplomate Reporter, Certified Realtime
18    Captioner, Certified Realtime Reporter and
      Notary Public.
19
20                          ___ ___ ___
21
22
                  GOLKOW LITIGATION SERVICES
23            877.370.3377 ph | fax 917.591.5672
                       deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    said, "I wouldn't necessarily bring this up,
 2    but if they discuss anything about continuing
 3    education programs for our DRs, I would like
 4    to know what they consider acceptable
 5    programs."
 6              First off, why are you
 7    suggesting that Mr. Harris not specifically
 8    or necessarily bring that topic up?
 9         A.   I don't recall specifically.  I
10    think we had access to some training, but we
11    weren't members of HDMA, so -- so some of the
12    training that might have applied to this
13    certification might not have been available
14    to us.
15              I don't know that it was all
16    that important and not a significant concern.
17              That's what I recall about that
18    continuing education.  I don't recall if
19    there's anything else that I had in mind at
20    that time.
21         Q.   So based on that, is it
22    possible you didn't want to call attention to
23    the fact that Walmart wasn't a member of the
24    HDMA and therefore might not have some of the
25    training that could be applied to the VAWD
```

```
 1        A.     This was part of the program
 2   that we put in place to address, enhance
 3   additional monitoring of oxycodone 30, and it
 4   included -- that plan included the mandatory
 5   checking of prescription monitoring programs
 6   when oxycodone 30 prescriptions were filled,
 7   as well as a requirement for our pharmacists
 8   to gain access to their state prescription
 9   monitoring programs, if access was allowed at
10   the state level.
11        Q.     And why, at that time, did
12   Walmart decide that it needed additional
13   monitoring of oxycodone 30s?
14        A.     We had received information
15   from a DEA agent that oxycodone 30 was on
16   their radar to be -- I mean, just to kind of
17   simplify.
18               That they had heightened
19   concerns about oxycodone 30.  During that
20   meeting they indicated that Walmart was not a
21   focus of the concerns that they had, but we
22   wanted to proactively establish additional
23   due diligence to ensure that we didn't become
24   part of the DEA's concern around oxy 30.
25        Q.     And this plan that was outlined
```

 1           Q.     So this letter opens -- the
 2    opening paragraph asks Senator Harkin to
 3    fight prescription diversion abuse.  Right?
 4           A.     Yes.
 5           Q.     Okay.  And you ascribe the
 6    matter as urgent; is that right?
 7           A.     Yes.
 8           Q.     And this is in -- this is in
 9    2012?
10           A.     Yes.
11           Q.     Why in 2012 did you feel that
12    the matter was urgent?
13           A.     This was part of efforts that
14    we had ongoing.  This was in the -- kind of
15    in the same time frame that we were hearing
16    about the oxy 30 issues from the DEA.  I know
17    that there were actions taken against some of
18    our competitors around their dispensing
19    habits, and so we were seeing the issues
20    related to opioid use continuing to rise,
21    just coming from an environmental scan.
22           Q.     Did you say opioid use or
23    opioid abuse?
24           A.     I meant abuse, if ...
25           Q.     So the reason why, in August of

```
 1    2012, you believe the matter was urgent was
 2    because of the conversations you had had with
 3    the DEA regarding oxy 30 and the fines and
 4    penalties that were leveled against folks who
 5    were similarly situated to Walmart in the
 6    dispensing and distribution of opioids.
 7              MS. TABACCHI:  Object to the
 8         form.
 9              THE WITNESS:  Really what we
10         were -- what we were seeing as a
11         continuing issue related to the opioid
12         abuse.
13         Q.   (BY MR. INNES)  Okay.  And you
14    mentioned that the DEA told you that they
15    weren't focused on Walmart in particular for
16    oxy 30s at that point in time; right?
17         A.   That is correct.
18         Q.   And these actions that you
19    referenced were brought against companies
20    other than Walmart?  That's right?
21         A.   Correct.
22         Q.   So why would a warning from the
23    DEA that you weren't a concern, that Walmart
24    wasn't a concern and actions against
25    companies other than Walmart create this
```