# EXHIBIT D

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )     MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )     Case No.
                              )     1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )     Hon. Dan A.
 6   ALL CASES                )     Polster
                              )
 7
 8                     __ __ __
 9             Tuesday, January 22, 2019
                      __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15         Videotaped 30(b)(6) Deposition of
     Walmart, through the testimony of Susanne
16   Hiland, held at 4206 South J.B. Hunt Drive,
     Rogers, Arkansas, commencing at 8:22 a.m., on
17   the above date, before Debra A. Dibble,
     Certified Court Reporter, Registered
18   Diplomate Reporter, Certified Realtime
     Captioner, Certified Realtime Reporter and
19   Notary Public.
20
                      __ __ __
21
22
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24             deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    reporter today is Debbie Dibble.  And

2    she will please now swear in the

3    witness.

4              SUSANNE HILAND,

5    having first been duly sworn, was examined

6    and testified as follows:

7              DIRECT EXAMINATION

8    BY MR. BOWER:

9         Q.    Good morning, Ms. Hiland.  How

10   are you today?

11        A.    I'm fine, thank you.

12        Q.    Have you ever provided sworn

13   testimony on behalf of Walmart in the past?

14        A.    I have.

15        Q.    Okay.  And when was the first

16   time you provided such testimony?

17        A.    It would have been sometime in

18   the late '90s.

19        Q.    And what was that regarding?

20        A.    A workmen's comp case.

21        Q.    Was that a deposition?

22        A.    Yes, it was.

23        Q.    And where was that case

24   located, if you can recall?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      Okay.

3              And so just to make sure we're

4      all on the same page, I just want to go over

5      a couple of those rules, just so there's no

6      issues moving forward.  I think probably the

7      most important one is to make sure that you

8      understand my question.  So if at any point

9      you don't understand the question, please

10     just let me know and I'll try to rephrase it.

11     Okay?

12     A.      Okay.

13     Q.      If you don't ask me to rephrase

14     it, I'll assume that you understand the

15     question as I asked it.  Okay?

16     A.      Okay.

17     Q.      And you understand that your

18     answers today are on behalf of Walmart;

19     correct?

20     A.      Yes.

21     Q.      And that tomorrow you will be

22     providing your own fact testimony; is that

23     correct?

24     A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you understand,

2    therefore, that the testimony you will give

3    today can be binding on the corporation?

4    A.    Yes.

5    Q.    Okay.  How long have you been

6    working at Walmart?

7    A.    29 years.

8    Q.    And I don't want to spend too

9    much time on your employment history, but can

10   you just -- let's start maybe in 2005, give

11   or take.  Going forward.  Okay?

12   A.    Yes.

13   Q.    What was your position in 2005?

14   A.    At the start of 2005, I was a

15   regional director for operations.  And then I

16   transitioned to a director of professional

17   services.

18   Q.    And when would that transition

19   occur?

20   A.    March of 2005.

21   Q.    Okay.

22         During that time period, did

23   you have oversight over Walmart pharmacies?

24         MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2                     THE WITNESS:  In the regional

 3              role I had oversight, yes.

 4              Q.     (BY MR. BOWER) And what about

 5       in the director role?

 6              A.     In the director role, I had

 7       responsibilities for Board of Pharmacy

 8       issues.

 9              Q.     What was your next position at

10       Walmart?

11              A.     The next position was a

12       promotion to senior director.  It was the

13       same department, but we -- the name of the

14       department changed to regulatory affairs.

15              Q.     And when did that occur?

16              A.     2009.

17              Q.     And just generally what were

18       your duties and responsibilities as the

19       senior director in regulatory affairs?  Is

20       that an accurate description of your title at

21       that time?

22              A.     That was my title.

23              Q.     Okay.

24                     And what were your -- just a
```

Highly Confidential - Subject to Further Confidentiality Review

1    general description of your duties and

2    responsibilities in connection with that

3    title.

4         A.    I began to supervise the

5    directors that had responsibility for Board

6    of Pharmacy regulation.

7              I also had responsibility for

8    our licensing and registration function for

9    our facilities.  And I had federal regulatory

10   responsibility as it related to our licensed

11   pharmacies.

12             MS. TABACCHI:  Zach, of course,

13        you're welcome to inquire about the

14        witness's personal background, but

15        this is all beyond the scope of the

16        notice.

17             MR. BOWER:  I'm just trying to

18        get, like I said, a very high level.

19             MS. TABACCHI:  I just want to

20        make sure we're on the same page.  I'm

21        not going to object to every question

22        during this portion.

23             MR. BOWER:  No, I understand.

24        I'm just going to move quickly through

Highly Confidential - Subject to Further Confidentiality Review

1      this.

2          Q.     (BY MR. BOWER)  And what was

3  your next role at Walmart after senior

4  director of regulatory affairs?

5          A.     For a short period of time in

6  July 2011, I was senior director of

7  compliance and quality assurance.

8          Q.     So that was in 2011; is that

9  correct?

10         A.     Yes.

11         Q.     And then your next role after

12 that was?

13         A.     February 2012 of -- I'll likely

14 not get the title correct, but it was senior

15 director of clinical quality assurance.

16         Q.     Okay.

17         A.     And that was the general title.

18 I'd have to look back to get the title

19 exactly correct.

20         Q.     Approximately how many titles

21 would you say you've had at Walmart in your

22 29 years?

23         A.     One -- a different one every

24 three years approximately.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      What's your current title?

 2          A.      My current title -- on paper my

 3     title is Senior Director II, business

 4     strategy.   That's an HR title.

 5               In function, my title is senior

 6     director of professional relations,

 7     professional practice standards and clinical

 8     services.

 9          Q.      Do you believe you are the

10     person at Walmart with the most knowledge of

11     Walmart's maintenance and effective controls

12     against diversion?

13               MS. TABACCHI:  Object to the

14          form.

15               THE WITNESS:  I believe that

16          I'm prepared to speak to that topic on

17          behalf of Walmart.

18               MR. BOWER:  I move to strike

19          that answer.

20          Q.      (BY MR. BOWER)  I just would

21     ask you to please carefully listen to my

22     questions and answer the questions that I

23     ask.  Okay?

24          A.      Yes.
```

1    that his associates would have with DEA

2    providing reporting, working collaboratively

3    with the DEA and the process that the

4    associates went through to understand orders

5    that were outlier orders as they processed

6    orders through the distribution center.

7        Q.    And what was the process that

8    the associates went through to understand the

9    orders that were outliers?

10       A.    Much of it was

11   experience-based.  There were very tenured

12   associates, and their jobs were

13   specifically -- they were specifically

14   assigned to the controlled substance

15   processing areas.  And so they were very

16   familiar with practices and what might be out

17   of the ordinary.

18       Q.    What specifically would they

19   look for?

20       A.    They would be looking for

21   orders that were of an unusual size.  They

22   would be monitoring for any type of an order

23   that was requested outside of a normal

24   ordering schedule that Walmart had

Highly Confidential - Subject to Further Confidentiality Review

1    established.  And those were the -- those

2    were the things that they were looking for.

3        Q.      What do you mean by "normal

4    ordering schedule that Walmart had

5    established"?

6        A.      So for Walmart, the way that

7    our distribution was set up, every pharmacy

8    only received an order once a week.  And so

9    that was the schedule.  It was -- it was a

10   certain set of stores that would order four

11   days out -- one day of the week, but we only

12   distributed four days out of the week.  And

13   so they could see also if there were manual

14   orders coming in or requests for some

15   different order schedule.

16       Q.      So they were, for example,

17   looking at as to whether a store ordered more

18   than once a week?  Is that correct?

19       A.      What they would look for is --

20   there was a process for a store to order

21   outside of their normal pattern, so they

22   would be looking for those.  And then

23   understanding why they needed it outside of

24   that normal day.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.      And what would they look for

2   with respect to normal pattern?

3   A.      That -- so that would be one of

4   the patterns that they would look for, was

5   order pattern, was it outside of the cycle.

6   The other thing that they would do is reach

7   out to stores and have conversations about

8   the needs if they noticed there was something

9   out of the ordinary.

10  Q.      And this was occurring as of

11  1996.  Is that your understanding?

12  A.      My understanding was that there

13  were -- there were processes in place before

14  we distributed C-IIs, and that started in

15  2002.  So that when the DC was opened in

16  2002, there had been a lot of conversations

17  with the DEA prior to that, around current

18  processes, what needed to carry over and how

19  to open that building.

20  Q.      Is it your testimony that

21  Walmart did not distribute C-IIs prior to

22  2002?

23  A.      We did not self-distribute

24  C-IIs prior to that time.

Highly Confidential - Subject to Further Confidentiality Review

1       MS. TABACCHI:  Object to the

2       form.

3       THE WITNESS:  In -- can you

4       specify a time frame?

5       Q.    (BY MR. BOWER)  Sure.  Prior to

6   2006.

7       A.    Those interactions would be

8   with Scott Culver.  Scott relayed that he

9   interacted with the DEA prior to 2006 in his

10  role.

11      Q.    Did Mr. Culver convey to you

12  that he relied on those interactions with the

13  DEA in determining what policy would be used

14  to monitor for orders of controlled

15  substances?

16      MS. TABACCHI:  Object to the

17      form.  Beyond the scope.

18      You may answer.

19      THE WITNESS:  What he conveyed

20      to me was that he worked interactively

21      with the DEA around requirements and

22      understanding what their expectations

23      were that ranged from physical

24      security of the buildings, the

1          shipping mechanisms to ensure safe

2          transport, as well as any reporting or

3          processes that the associates were

4          conducting as they were order

5          monitoring.

6          Q.    (BY MR. BOWER)  And how many

7    associates during this time period that you

8    covered with Mr. Culver were -- had the

9    responsibility to review orders of controlled

10   substances?

11              MS. TABACCHI:  Object to the

12         form.  Beyond the scope.

13              THE WITNESS:  There would be a

14         number of associates in the

15         distribution center, depending on the

16         distribution center.  But it would be

17         limited to the management of those

18         distribution centers.

19         Q.    (BY MR. BOWER) Well,

20   approximately how many associates in each

21   distribution center would have that

22   responsibility?

23              MS. TABACCHI:  Object to the

24         form.  Beyond the scope.

1    for unusual orders of unusual size as the

2    orders were being processed.

3          Q.    And how would they determine

4    whether an order was of unusual size?

5          A.    These were --

6                MS. TABACCHI:  Beyond the

7          scope.

8                THE WITNESS:  These were

9          long-tenured associates that

10         understood the business and the fact

11         that we were self-distributing.  So

12         they saw the -- they saw the patterns.

13         They worked with it every single day.

14         Q.    (BY MR. BOWER)  They were using

15   their memory?  Is that correct?

16               MS. TABACCHI:  Object to the

17         form.

18               THE WITNESS:  They were using

19         their experience.

20         Q.    (BY MR. BOWER)  Were they using

21   any written information to make those

22   judgments?

23               MS. TABACCHI:  Object to the

24         form.  Beyond the scope.

1          THE WITNESS:  I see that, and I

2          also see in that sentence that -- the

3          point of working collaboratively with

4          the DEA, which I believe that we have

5          a history of doing.

6          Q.    (BY MR. BOWER)  Did Walmart

7     rely on guidance from the DEA in implementing

8     or designing its suspicious order monitoring

9     programs?

10          A.    We didn't solely rely on

11    guidance, but we certainly had conversations

12    with the DEA regarding our plans, and took

13    into consideration any recommendations,

14    thoughts, suggestions that they had for how

15    we established our policies and practices.

16          Q.    And what conversations are you

17    referring to specifically?

18          A.    We have -- so in speaking with

19    Scott Culver, Scott relayed the conversations

20    that he had with the DEA in establishing the

21    C-II facility, our distribution facility,

22    even before any plans were built.  Blueprints

23    were reviewed.  Contractors were -- or at

24    least DEA-approved contractors to build the

Highly Confidential - Subject to Further Confidentiality Review

1    facility.  Over multiple interactions with

2    the DEA, they've seen our processes.  They've

3    reviewed our reports.  They've asked for

4    additional information which we've provided.

5    And so we have a -- we have a long history of

6    interaction, positive interaction, and

7    collaborative interaction with the DEA.

8              Q.    (BY MR. BOWER)  Okay.  And now

9    I want to ask probably a better question than

10   the last one.  So my question is more focused

11   than that.  I want to ask specifically what

12   conversations has Walmart had with the DEA

13   regarding designing or implementing its

14   suspicious order monitoring program for

15   controlled substances?

16              MS. TABACCHI:  Object to the

17        form.

18              THE WITNESS:  The conversations

19        have occurred over time, again, as the

20        distribution center was established

21        and reporting was pulled and reviewed.

22        As a part, one part of our order

23        monitoring, the DEA reviewed those

24        reports, and at one point asked us to

1          begin sending those to them on a

2          regular basis.  I learned that through

3          a conversation with Scott Culver.

4                And then through the years, as

5          we've made certain changes, those

6          changes have been discussed through

7          audits that the DEA has conducted at

8          various of our facilities, where

9          they've -- they've actually asked to

10         review our order monitoring process.

11         It's a part of their audit on their

12         audit checklist, and we've -- we've

13         never had a reported deficiency in the

14         way that they've reviewed those

15         programs.

16         Q.    (BY MR. BOWER)  When was the

17    first time a conversation occurred between

18    someone at Walmart and someone at the DEA

19    regarding Walmart's design or implementation

20    of a suspicious order monitoring program?

21                MS. TABACCHI:  Object to the

22         form.

23                THE WITNESS:  So from an

24         overall perspective?

```
 1              MS. TABACCHI:  Beyond the scope
 2         of the notice from a time period
 3         perspective.  I'm sorry.
 4              THE WITNESS:  Before we
 5         started -- before we stood up the
 6         distribution center to distribute
 7         opioids, C-IIs, Scott Culver reached
 8         out to the DEA to understand, make
 9         sure that all of the plans that we had
10         that are inclusive of our obligations
11         around preventing diversion were
12         discussed with the DEA, and then,
13         again, ongoing conversations have
14         occurred as our program has evolved.
15         Q.    (BY MR. BOWER)  Were those
16    initial discussions that Scott Culver had
17    with the DEA specific to order monitoring?
18         A.    There were -- there were
19    conversations around reporting and what
20    was -- what was expected.  And how they --
21    how the operation would -- would be
22    established.
23         Q.    And what did Walmart understand
24    that the DEA expected at that time?
```

```
 1              MS. TABACCHI:  Beyond the
 2        scope.
 3              THE WITNESS:  That our --
 4              MS. TABACCHI:  You may answer.
 5              THE WITNESS:  So the way that
 6        our policies and procedures were set
 7        up reflected our understanding of what
 8        our obligations were at that time.
 9        Q.    (BY MR. BOWER)  Well, I'm just
10   trying to get a little bit more information
11   as to what Walmart understood the DEA
12   expected.
13              So from those conversations,
14   what did Mr. Culver take away as to what the
15   DEA would require from a monitoring program?
16              MS. TABACCHI:  Object to the
17        form.  Beyond the scope.
18              THE WITNESS:  We didn't discuss
19        in very specific detail any specific
20        ask.
21              What I do know is that the
22        programming that was implemented was
23        the result of those conversations.
24        Q.    (BY MR. BOWER)  Okay.  Were the
```

```
 1            there's not a change that's

 2            specifically tied to the letter.

 3       Q.    (BY MR. BOWER)  No one at

 4   Walmart was concerned that Walmart should no

 5   longer rely on implicit or explicit guidance

 6   from the DEA?

 7            MS. TABACCHI:  Object to the

 8            form.

 9            THE WITNESS:  So we continued

10            our collaborative work with the DEA.

11            But we didn't rely on a yes-or-no

12            opinion from the DEA.  We would put

13            policies, practices in place, and then

14            communicate with the DEA over time and

15            make changes if there were changes

16            that were suggested, and we

17            implemented changes to our policies

18            independently ahead of DEA approval or

19            blessing.

20       Q.    (BY MR. BOWER)  Is it Walmart's

21   testimony today that the DEA has ever

22   approved or blessed Walmart's policies for

23   monitoring orders of controlled substances?

24            MS. TABACCHI:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form.
 2                 THE WITNESS:  We've had
 3          conversations with the DEA where they
 4          agreed with the process that we
 5          were -- that we had implemented versus
 6          an outright approval.
 7          Q.    (BY MR. BOWER)  And when did
 8   those conversations occur, where the DEA
 9   occurred with the process that was
10   implemented?
11          A.    So Scott Culver relayed to me
12   the conversations that I testified to
13   earlier, with the DEA, around our early
14   programs.  And then we have, through audits
15   that were conducted, different -- at the
16   different distribution centers we have
17   associates relaying information from the DEA,
18   with no audit finding any deficiency.  And I
19   spoke to Mike Mullins, and he relayed to me
20   that on the DEA audit form, order monitoring
21   was one of the areas that they checked.  So
22   from that, we found -- we have not been aware
23   that we've had a deficiency in our program.
24          Q.    Well, my question is a little
```

1   bit different, though.  As you sit here

2   today, can you provide to us any specific

3   conversations where the DEA blessed or

4   otherwise endorsed Walmart's suspicious order

5   monitoring program?

6                   MS. TABACCHI:  Object to the

7           form.  Asked and answered.

8                   THE WITNESS:  No, I testified

9           that there was no specific deeming of

10          appropriateness.  There were reviews

11          of our processes over time and never a

12          deficiency noted.

13          Q.    (BY MR. BOWER)  Other than the

14  audits that you referenced, are there any

15  other specific instances where the DEA

16  reviewed Walmart's procedures for suspicious

17  order monitoring for controlled substances?

18                  MS. TABACCHI:  Object to the

19          form.

20                  THE WITNESS:  We've had

21          communication around specific tenets

22          of the order monitoring, but not a --

23          not a review.  So I think

24          communication, not necessarily a

1       the drug that was included in that

2       order.

3           Q.    (BY MR. BOWER)  Okay.  And

4   Walmart doesn't dispute that it had that

5   obligation in 2007; correct?

6               MS. TABACCHI:  Object to the

7           form.  What obligation?

8           Q.    (BY MR. BOWER) The obligation

9   that we've been talking about.  To --

10              MS. TABACCHI:  You're

11          paraphrasing.

12          Q.    (BY MR. BOWER)  -- report as

13  suspicious an order that deviates

14  substantially from a normal pattern.

15              MS. TABACCHI:  Object to the

16          form.

17              THE WITNESS:  Our programs were

18          in place to meet those obligations.

19          Q.    (BY MR. BOWER)  Did Walmart --

20  in 2000 -- let me strike that.

21              In January 2008, was Walmart

22  reporting as suspicious orders that deviated

23  substantially from a normal pattern, "yes" or

24  "no"?

1           MS. TABACCHI:  Object to the

2      form.

3           THE WITNESS:  If they were

4      determined to deviate from a pattern,

5      our program would have been to notify

6      the DEA.

7      Q.    (BY MR. BOWER)  And that's true

8   in January of 2008; correct?

9      A.    Yes.

10     Q.    Okay.  And in January 2008,

11  would Walmart have reported to the DEA an

12  order that deviated substantially from a

13  normal size?

14          MS. TABACCHI:  Object to the

15     form.

16          MR. BOWER:  I'll strike that.

17     Q.    (BY MR. BOWER)  Does Walmart

18  agree that in January of 2008, it was

19  obligated to report to the DEA orders that

20  deviated from a normal size?

21          MS. TABACCHI:  Object to the

22     form.  Calls for a legal conclusion.

23          THE WITNESS:  Yes.  Orders

24     deviating from -- I'm sorry.  I --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "orders deviating from a normal size,"

 2         are you reading that from the ...

 3         Q.    (BY MR. BOWER)  I'm not reading

 4    that from anywhere.  It's just a question.

 5              MS. TABACCHI:  That's the

 6         problem.

 7              MR. BOWER:  I don't think I

 8         have to read my questions from

 9         somewhere unless I'm familiar with

10         some --

11              MS. TABACCHI:  If you're going

12         to try to represent what the law is --

13              MR. BOWER:  I'm asking the

14         question.

15         Q.    (BY MR. BOWER)  Does Walmart

16    agree that in January of 2008, it had an

17    obligation to report orders that deviated

18    substantially from a normal size?

19              MS. TABACCHI:  Object to the

20         form.  Calls for a legal conclusion.

21              THE WITNESS:  If we detected an

22         order that deviated from size and

23         could not -- and could not explain the

24         reason for that, therefore deeming
```

Highly Confidential - Subject to Further Confidentiality Review

1          that order suspicious, we would have

2          contacted the DEA, notified the DEA.

3          Q.     (BY MR. BOWER)  So is it a true

4    statement that in January 2008, Walmart would

5    only contact the DEA for an order that it

6    determined was an unusual size if it could

7    not explain the reason for the size?

8               MS. TABACCHI:  Object to the

9          form.

10              THE WITNESS:  Our policies and

11         procedures incorporated an evaluation

12         of the order for many -- across the

13         circumstances of the order.

14              So there were several factors

15         that went into play.

16         Q.     (BY MR. BOWER)  Okay.  And

17   we'll get back to those specific programs in

18   a bit.  Let's just finish with this letter

19   while we have it in front of us.

20              Can we look for a moment at

21   that last sentence on that first page?

22              And I'll just read it for the

23   record.  "The determination of whether an

24   order is suspicious depends not only on the

Highly Confidential - Subject to Further Confidentiality Review

1    ordering pattern of the particular customer,

2    but also on the patterns of the registrant's

3    customer base and the patterns throughout the

4    relevant segment of the regulated industry."

5              Do you see that?

6    A.     Yes, I see that.

7    Q.     Did Walmart's policies and

8    procedures as of January 2008 take into

9    account this criteria as defined here by

10   Mr. Rannazzisi that I just read?

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  So our policies

14        and procedures were developed with our

15        understanding of what we were required

16        to -- our -- the obligations that we

17        had under the Controlled Substances

18        Act, in conversation with DEA agents

19        throughout the entirety of our

20        distribution of controlled substances.

21   Q.     (BY MR. BOWER)  Now, is it

22   Walmart's position that those conversations

23   somehow superseded this communication from

24   Mr. Rannazzisi?

```
 1                    MS. TABACCHI:  Object to the
 2           form.
 3                    THE WITNESS:  We were working
 4           collaboratively with the DEA agents
 5           that we had on the ground that were in
 6           our buildings and saw our operations.
 7           And so as time went on, and our
 8           business evolved, our practices
 9           evolved, we remained in communication
10           with those DEA agents that were
11           actually in our buildings.
12           Q.     (BY MR. BOWER)  Okay.  But
13    Mr. Rannazzisi is telling you here, right,
14    that Walmart should not rely on
15    communications with the DEA; correct?
16                    MS. TABACCHI:  Object to the
17           form.
18           Q.     (BY MR. BOWER)  Do you agree
19    with that?
20                    MS. TABACCHI:  Mischaracterizes
21           the exhibit.  Object to the form.
22                    THE WITNESS:  We continued to
23           communicate with the DEA.  We had a
24           good collaborative relationship with
```

1    helpful.  It starts with "This regulation."

2    And it states, "This regulation clearly

3    places the responsibility on the registrant

4    to design and operate such a system.

5    Accordingly, DEA does not approve or

6    otherwise endorse any specific system for

7    reporting suspicious orders."

8              Do you see that?

9              MS. TABACCHI:  Object to the

10         form.  Lack of foundation.  Beyond the

11         scope of the notice.

12             THE WITNESS:  Yes, I see that.

13    Q.    (BY MR. BOWER)  So if, in fact,

14    Walmart did receive this letter in 2012, then

15    it was again put on notice that it shouldn't

16    rely on its communications with the DEA for

17    approving its program for monitoring orders

18    of controlled substances.  Correct?

19             MS. TABACCHI:  Object to the

20         form.  Calls for a legal conclusion.

21         Improper hypothetical.  Beyond the

22         scope of the notice.

23             THE WITNESS:  So -- so, again,

24         we weren't relying on them to endorse

1    a specific system.  I mean, I can't --

2    I can't read into what is intended by

3    this.  We knew that our responsibility

4    was our own responsibility.  And that

5    if there was a program in place, it

6    was ours to develop.

7         We did not rely on the DEA to

8    say, "This system is blessed, move

9    forward."

10        We implemented programs over

11   time, that we had communications with

12   the DEA, and had -- and did not have

13   an indication from them that there

14   were gaps.

15   Q.    (BY MR. BOWER) And during this

16   time period from 2006 through and after 2012,

17   Walmart was registered with the DEA to

18   manufacture or distribute controlled

19   substances; correct?

20        MS. TABACCHI:  Object to the

21   form.

22        THE WITNESS:  Can you state

23   your dates again?  I missed the date.

24   Q.    (BY MR. BOWER)  Sure.

Highly Confidential - Subject to Further Confidentiality Review

1    Beginning at least as early as January 1st,

2    2006, and through 2012, Walmart was

3    registered with the DEA to manufacture or

4    distribute controlled substances; correct?

5              MS. TABACCHI:  Object to the

6         form.  Misstates the witness's

7         testimony.

8              MR. BOWER:  Well, let me ask

9         it, then.

10        Q.    (BY MR. BOWER) Was Walmart

11   registered to distribute controlled

12   substances with the DEA?

13             MS. TABACCHI:  Object to the

14        form.  Time period.

15             MR. BOWER:  Ever.

16             THE WITNESS:  Yes.

17        Q.    (BY MR. BOWER)  During what

18   time period was Walmart registered?

19        A.    From the time period at least

20   from 2006 through the time that we ceased

21   distribution in 2018.

22        Q.    Okay.  And would you expect

23   that -- let me strike that.

24             Does that registration require

Highly Confidential - Subject to Further Confidentiality Review

1      MS. TABACCHI:  So you're not

2      asking her questions about this.  This

3      is just for her reference?

4      MR. BOWER:  Yes.  And I'm going

5      to have specific questions on it, I

6      believe.  But yes, it's mostly for her

7      reference and to confirm what's

8      written here.

9      Q.     (BY MR. BOWER) So the first

10  question would be what were Walmart's

11  policies and procedures in place in 2006, to

12  monitor for orders of controlled substances?

13      A.     So the policies that we had in

14  2006 included work that the associates in the

15  distribution center themselves would do based

16  on monitoring orders.

17      We were running -- and so -- so

18  as to those orders, if an order was

19  identified, they would alert a manager, and a

20  manager would work with the operations

21  leadership to determine the reason for that.

22      Q.     Now, if you look at Walmart's

23  responses to the combined discovery requests,

24  on page 4, the first bullet point, is that

1    the policy you're referring to?  Where it

2    says "From as early as 1994 until 2010,

3    employees in Walmart's pharmacy distribution

4    centers reviewed controlled drug stock

5    exception reports, followed up on orders by

6    speaking with pharmacists, and escalated

7    issues to market and/or regional leadership

8    as needed to investigate orders and to

9    resolve concerns."

10              Is that the policy you're

11   referring to?

12        A.    Yes.  As well as the bullet

13   that's at the very bottom of the page.  So

14   I'm on my document that, for the entire

15   relevant time period, our distribution

16   associates monitored orders.

17        Q.    Okay.  Now, let's go in 2006,

18   what specifically were the associates doing

19   to monitor orders?

20              MS. TABACCHI:  Object to the

21         form.

22              THE WITNESS:  They were

23         monitoring orders as they came into

24         the distribution center, and again

1   Walmart hold that order prior to shipping it?

2       A.      They would hold that order,

3   conduct outreach to understand the nature of

4   the order, and then at the -- at the point at

5   which they were able to clear that order,

6   they -- that's the point at which it would be

7   shipped.

8       Q.      And how -- how would Walmart go

9   about holding the order?

10      A.      It was a -- it was a procedure

11  within the -- within the distribution center

12  itself.  As -- as the orders were worked,

13  there was constant communication between the

14  associates and management.  And so they had

15  to pick up the phone and call the -- call a

16  store or market director at that moment.

17  That's the process that they went through.

18      Q.      Okay.  So let's just walk

19  through that process.  Okay?

20              We're in September 2007 in

21  DC 6045; okay?  An order comes in from Ohio

22  for ten bottles of Oxy 5s.

23              Okay?

24              100 dosages per bottle.  Okay?

1    Q.    (BY MR. BOWER)  And what

2    information would they seek from folks like

3    you during the 2007 time period?

4    A.    They would -- they would -- if

5    it was escalated to me, they would want to

6    know if I had information about a specific

7    order that they might be asking about.

8    Q.    What type of information would

9    you have access to that they wouldn't during

10    this time period?

11    A.    Well, I had supervision -- I

12    had responsibility for the pharmacies that

13    they were distributing to.

14        So could you -- I could go

15    physically stand in the pharmacy and

16    understand what the need for the order was

17    that was -- that they were questioning.

18    Q.    Wait, your answer to my

19    previous question was, "If it was escalated

20    to me, they would want to know if I had

21    information about a specific order that they

22    might be asking about."

23        What specific information would

24    they be seeking from folks that were in your

1    position?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  The purpose of

5            the order from the pharmacy that I

6            supervised.

7            Q.    (BY MR. BOWER)  And how would

8    the folks in your position determine what the

9    purpose of that order was?

10           A.    I would --

11                   MS. TABACCHI:  Object to the

12           form.

13                   THE WITNESS:  -- do one of

14           several things that might include

15           talking to a pharmacist, talking to a

16           pharmacy manager.  I could go on-site.

17           I could look at their -- the specifics

18           around that drug.

19                   There were -- there was a lot

20           of information that I had access to,

21           because I supervised those pharmacies.

22           Q.    (BY MR. BOWER)  Well, let's

23    break that down.  You give us some things you

24    would do.  Right?  So what would you talk to

1    a pharmacist about?

2        A.    I would ask them why they

3    needed the order.

4        Q.    And would you rely on what they

5    told you?

6        A.    It would depend on the

7    circumstance --

8        Q.    Okay.

9        A.    -- of the response.

10       Q.    Can you recall any specific

11   time where you asked a pharmacist a question

12   and you needed more follow-up?

13              MS. TABACCHI:  Object to the

14         form.  Beyond the scope.

15              THE WITNESS:  I don't recall a

16         specific situation.

17       Q.    (BY MR. BOWER)  Not a single

18   time that you can recall specifically?

19              MS. TABACCHI:  Same objections.

20              THE WITNESS:  No, I --

21       Q.    (BY MR. BOWER)  Okay.  And the

22   second thing you mentioned was you could go

23   onsite.  What would you do when you went

24   onsite?

1    Q.    And this is when Walmart first

2    implemented order alerts in Reddwerks;

3    correct?

4    A.    Yes.

5    Q.    Do you know when in 2011

6    Walmart first implemented order alerts in

7    Reddwerks?

8    A.    I don't know the exact date.

9    Q.    Is that something you prepared

10   to testify on today?

11            MS. TABACCHI:  Object to the

12        form.

13            THE WITNESS:  I don't have an

14        exact date.

15   Q.    (BY MR. BOWER)  Do you know

16   whether it was -- could it have been 2012?

17   A.    No.  It was 2011.

18   Q.    And what makes you so certain

19   it was 2011?

20   A.    Because of the documentation

21   I've been given.

22   Q.    Can you refer to the specific

23   document that you're thinking of?

24   A.    Yes.

1    was that is the correct time frame for these

2    alerts.

3         Q.    And other than your

4    understanding and the document itself, is

5    there any other basis for that testimony?

6              MS. TABACCHI:  Object to the

7         form.  Asked and answered.

8              THE WITNESS:  My interview and

9         the date on this document.

10        Q.    (BY MR. BOWER)  Did you, for

11   example, review any flagged orders during

12   this time period?

13        A.    I did not.

14        Q.    Okay.  And I just want to ask a

15   little bit more.  I understand -- strike

16   that.

17             Do you know whether during this

18   time period reflected in bullet point 4

19   there, whether Reddwerks was flagging orders

20   for non-controlleds of 50 bottles or more?

21        A.    Yes.

22             MS. TABACCHI:  Object to the

23        form.

24             THE WITNESS:  The Reddwerks

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    No.  My question is Reddwerks

2    enhancements.

3    A.    The enhanced --

4    Q.    Yes.

5    A.    Okay.  Thank you.

6    Q.    Yeah.  Sorry.

7    A.    The enhanced thresholds were

8    calculated using a year's worth of shipment

9    data, and then applying a formula, which was

10   the average weekly order, plus three standard

11   deviations over that 52-week shipment date.

12   Q.    And when that formula was used,

13   would that provide the enhancements for a

14   particular store?

15         MS. TABACCHI:  Object to the

16         form.

17         THE WITNESS:  It was store and

18         item specific.  And there were

19         additional defaults that were applied

20         to those thresholds as they were

21         calculated.

22   Q.    (BY MR. BOWER) And can you

23   describe for us how those defaults -- let me

24   break that down a little bit.

Highly Confidential - Subject to Further Confidentiality Review

1    How did Walmart go about

2    determining what the defaults would be?

3         A.    So again, based on enhancing

4    what we had in place, we continued to use

5    that 50-unit limit.  It was applied a little

6    bit differently in this context because we

7    took -- we took the dosage units and dropped

8    those down to item units to not exceed

9    5,000 units.

10             There was a default minimum

11   alert of 2,000 units applied, and then for

12   non-traited items for that location, there

13   was a limit set for a thousand dosage units.

14        Q.    And I just have a couple of

15   questions to follow up on that.  But let me

16   ask you this:  What do you mean by

17   "non-traited items for that location"?

18        A.    So the -- for certain items, we

19   might have had two supplier agreements in

20   place.  And so stores would be traited for

21   one supplier's item.  And that normally

22   happened when there could be supply

23   interruption.

24             And so if, for some reason, the

1    bullet point in the combined discovery

2    responses for a moment if we could.  Same

3    bullet point referencing the enhanced

4    thresholds in Reddwerks.

5                 So Walmart states that it

6    "implemented enhanced thresholds in Reddwerks

7    and the tiered review process."

8                 Do you see that?

9         A.      Yes.

10        Q.      What is meant by a tiered

11   review process?

12        A.      The process began to move --

13   still the process at the distribution center

14   was in place.  But those alerts were then

15   reviewed by the logistics compliance team.

16   And then the tiering was that practice

17   compliance also was involved.  So there were

18   additional teams that were involved in the

19   review.

20        Q.      And is that tiered review

21   process reflected in any one of these written

22   policies and procedures on the previous page?

23        A.      Yes.

24        Q.      Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    And those would be -- and

2  again, I have these in date order.

3    Q.    Or if you give me the date, I

4  can point you to the tab.  I have the dates

5  in front of me.

6    A.    Sure.  That tiered review

7  process started in 2015, the Bates No. 963 --

8    Q.    Okay.

9    A.    -- on the distribution center

10  policy.

11    Q.    Okay.  So that would be tab 4

12  of Exhibit 7.  If you could just confirm.

13  Turn to tab 4.

14    A.    And actually, it's in effect in

15  September.  So tab 3.  It's also in effect in

16  this policy as well.

17    Q.    Okay.  So the tiered review

18  process that is referenced in the bullet

19  point three up from the bottom on the

20  following page is reflected in both tabs in 3

21  and 4; is that correct?

22    A.    It is.  That is correct.  It's

23  reflected in the procedure.

24    Q.    Now, how did the Reddwerks

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I see that.

2      Q.      Did Walmart's program, prior to

3   Masters, take into consideration that

4   reducing the size of an order in order to

5   ship the order and no longer trigger a hold

6   would be inappropriate?

7              MS. TABACCHI:  Object to the

8         form.  Beyond the scope of the notice.

9              I don't even understand what

10        you're asking.

11     Q.      (BY MR. BOWER)  Do you

12   understand what I'm asking?

13     A.      Can you repeat?

14     Q.      Sure.

15              Prior to Masters, did Walmart

16   have any policy and procedure in place that

17   would prevent an order from being reduced in

18   size and then shipped prior to due diligence

19   being performed?

20              MS. TABACCHI:  Object to the

21        form.

22              THE WITNESS:  I think there

23        were a couple of negatives in there.

24        So what -- our policies were designed

1          to detect orders of interest.  We

2          conducted due diligence.  And if an

3          order was determined to be suspicious,

4          we did not ship and notified DEA.

5      Q.    (BY MR. BOWER)  So let me just

6   revamp my question because I think you may

7   have misunderstood my question.

8          My question is this:  Prior to

9   Masters, did Walmart have any policy or

10  procedure in place that would prevent an

11  order from being reduced in size and then

12  shipped prior to due diligence being

13  performed?

14          MS. TABACCHI:  Object to the

15          form.

16          THE WITNESS:  That would

17          prevent an order from being ...

18          Our procedures in the

19          distribution center were specific to

20          oxycodone 30, and we did reduce

21          those -- we did reduce those orders.

22      Q.    (BY MR. BOWER)  Well, Walmart

23  didn't -- strike that.

24          Walmart's reduction of orders

```
 1              form.  Asked and answered.

 2                   THE WITNESS:  I think you have

 3              to consider the other parameters that

 4              were in place.  That in and of itself,

 5              the 50 alert did not -- there were

 6              always other elements in place.

 7              Q.    (BY MR. BOWER)  Does Walmart

 8         agree that it would be better to flag an

 9         alert and review it as a potential false

10         positive than to ship an order that was

11         potentially suspicious?

12                   MS. TABACCHI:  Object to the

13              form.

14                   THE WITNESS:  Our intent was

15              never to ship an order that was deemed

16              suspicious.

17              Q.    (BY MR. BOWER)  Well, let me

18         ask you this.  What would be worse, flagging

19         an order as a false positive or shipping a

20         suspicious order?

21                   MS. TABACCHI:  Object to the

22              form.

23                   THE WITNESS:  I think you have

24              to look at the circumstances.  Our
```

```
 1            intent was never to ship a suspicious

 2            order.  However, I think that if

 3            there's too many false positives, it

 4            could lead to missing --

 5                 I think one could lead to the

 6            other from an unintended consequence

 7            perspective.  That's why we were

 8            working to get it right knowing that

 9            neither situation was the ideal.  And

10            that's why we continued to adjust and

11            improve and make modifications to our

12            program over a continuum of time.

13                 MS. TABACCHI:  Can we just take

14            a break when you come to a right

15            moment?

16                 MR. BOWER:  Sure.  Go ahead.

17                 THE VIDEOGRAPHER:  4:20.  We

18            are off the video record.

19                 (Recess taken, 4:20 p.m. to

20            4:43 p.m.)

21                 THE VIDEOGRAPHER:  4:43.  We

22            are on the video record.

23            Q.    (BY MR. BOWER)  All right.

24       We're back on the record.  I just would ask
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. BOWER) Okay.  We're in

2    September of 2015.  Right?  This email?

3    A.    Yes.

4    Q.    When was the next point in time

5    that Walmart improved its review of orders of

6    interest?

7         MS. TABACCHI:  Object to the

8         form.

9         MR. BOWER:  I'll strike that.

10   Q.    (BY MR. BOWER)  After

11   September 21st, 2015, when was the next time

12   Walmart improved its suspicious order

13   monitoring program?

14        MS. TABACCHI:  Object to the

15        form.

16        THE WITNESS:  So there were

17        ongoing processes that were being

18        worked on, the most significant of

19        which was the switch from the

20        Reddwerks program to the Buzzeo

21        program that occurred in 2017.

22   Q.    (BY MR. BOWER)  Before we get

23   to the switch to Buzzeo in 2017, can you

24   provide any more specificity as to what you

1    A.    We were documenting before --

2  let me correct that.  We were documenting the

3  review of the orders of interest in Archer

4  with the Reddwerks enhancement.

5    Q.    So is it accurate, then, to say

6  that Walmart began documenting its review of

7  orders of interest in Archer on or about

8  August of 2015?

9    A.    We were documenting those

10  reviews with that Reddwerks enhancement.

11  That was part of the enhancement that was

12  implemented.

13    Q.    Let me try to get it a

14  different way.

15         When did Walmart first start

16  documenting its due diligence for orders of

17  interest in Archer?

18    A.    That was in -- that was in the

19  2015 time frame.

20    Q.    Can you put a finer point on

21  that than a 12-month period?

22         And again, just for the record,

23  you're referring to your binder that you

24  brought with you today?

Highly Confidential - Subject to Further Confidentiality Review

```
1    Okay?

2         A.     Okay.

3         Q.     Unless it's -- is it something

4    that your memory has been refreshed over the

5    break?

6         A.     It is information specific to

7    one of the exhibits.

8         Q.     Okay.  Well, I guess it's a

9    little bit unusual, but let's hear it.

10        A.     So in -- as we were talking

11   about the exhibit that -- I'll have to find

12   it -- that showed our reporting post

13   Masters --

14        Q.     Mm-hmm.

15        A.     -- of orders of interest, where

16   we reported orders of interest prior to due

17   diligence to determine whether or not they

18   were suspicious?

19        Q.     Okay.

20        A.     We did report those to DEA.

21   And after that reporting, we had two

22   different DEA offices contact us and ask us

23   why we were reporting those and asked us to

24   stop reporting.
```

1                  beyond the scope.  Object to the form.

2                       THE WITNESS:  My preparation

3              indicates that we did not participate

4              in marketing of opioids.

5          Q.    (BY MR. BOWER)  But my question

6    is a little bit different.  Did Walmart

7    consider that, marketing plans that were

8    going to be implemented by manufacturers in

9    deciding whether to purchase opioid products?

10                      MS. TABACCHI:  Objection.

11             Object to the form, beyond the scope.

12                      THE WITNESS:  I don't have that

13             detail.

14                      MR. BOWER:  Okay.

15         Q.    (BY MR. BOWER)  Would you agree

16   with me that Walmart -- sorry, just give me a

17   second.

18                      Would you agree with me that

19   Walmart was involved in NACDS going back to

20   the early 2000s?

21         A.    Yes.

22                      MS. TABACCHI:  Object to the

23             form.

24                      (Whereupon, Deposition Exhibit