# EXHIBIT F

Highly Confidential - Subject to Further Confidentiality Review

```
              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
                    EASTERN DIVISION

IN RE: NATIONAL              )    MDL No. 2804
PRESCRIPTION OPIATE          )
LITIGATION,                  )    Case No.
                             )    1:17-MD-2804
                             )
THIS DOCUMENT RELATES TO     )    Hon. Dan A.
ALL CASES                    )    Polster
                             )


                          — — —
             Tuesday, January 15, 2019
                          — — —

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
                          — — —



       Videotaped Deposition of GREGORY BEAM,
   held at 4206 South J.B. Hunt Drive, Rogers,
   Arkansas, commencing at 8:36 a.m., on the
   above date, before Debra A. Dibble, Certified
   Court Reporter, Registered Diplomate
   Reporter, Certified Realtime Captioner,
   Certified Realtime Reporter and Notary
   Public.



                          — — —
              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
                    deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Janssen.
 2                 MR. ANDERSON:  Jon Anderson,
 3            Jackson Kelly on behalf of
 4            AmerisourceBergen.
 5                 VIDEOGRAPHER:  The court
 6            reporter today, Debbie Dibble, will
 7            please swear in the witness.
 8                 GREGORY BEAM,
 9     having first been duly sworn, was examined
10     and testified as follows:
11                 DIRECT EXAMINATION
12     BY MR. ECKLUND:
13         Q.    Good morning, Mr. Beam.
14     Moments ago the court reporter asked you to
15     take an oath.  What does that oath mean to
16     you today?
17         A.    That means under perjury of
18     law, I am bound to tell the truth.
19         Q.    And the whole truth?
20         A.    The whole truth.
21         Q.    Everything that you can recall,
22     your entire recollection?
23         A.    Yes, sir.
24         Q.    So throughout the day, that's
25     the expectation.
```

```
 1                    February 1st, 2011.  Is that
 2     when you started at Walmart?
 3           A.       No, sir.
 4           Q.       When did you start at Walmart?
 5           A.       I started October of 2006.
 6           Q.       And what was your title in
 7     October 2006?
 8           A.       In October 2006, I hired as a
 9     drug diversion coordinator.
10           Q.       And was that your first
11     occasion as a drug diversion coordinator, or
12     did you come from another company with that
13     experience?
14           A.       I came from another company as
15     a district loss prevention supervisor.
16           Q.       Which company?
17           A.       Walgreens.
18           Q.       And within Walgreens, were you
19     responsible for drug diversion?
20           A.       Among other things, yes.
21           Q.       What other responsibilities did
22     you have within Walgreens?
23           A.       We had theft.  Shrink.  As well
24     as HR and employees relations matter.
25           Q.       When you talk about theft, are
```

Highly Confidential - Subject to Further Confidentiality Review

1    time I came on with Walmart.
2         Q.    And in 2006, you transitioned
3    from Walgreens to Walmart?
4         A.    Correct.
5         Q.    Okay.  And where did you begin
6    working within Walmart?  What part of the
7    country?
8         A.    Here.
9         Q.    In Bentonville or Rogers?
10        A.    In Rogers.
11              I'm sorry, Bentonville.  Home
12   office.
13        Q.    Okay.  So you start in
14   Bentonville, home office, and at that point
15   you had a somewhat different job
16   responsibility than what you had at
17   Walgreens; correct?
18        A.    Correct.
19        Q.    Okay.  How did you become
20   trained in your new role and responsibility
21   within Walmart?
22        A.    That was -- came from both
23   personal knowledge as well as experience in
24   some of the drug investigations that were
25   completed as special agent with OSI, as well

```
 1     as conducting similar pharmacy-related
 2     investigations within Walgreens.
 3          Q.    Okay.  And when you began at
 4     Walmart, were you focused on one category of
 5     pharmacy products, all categories of pharmacy
 6     products?
 7          A.    We were focused on pharmacy
 8     operations in total, which means all
 9     categories of pharmacy products and process.
10          Q.    And did you have interactions
11     with the office of the inspector general in
12     your role within Walmart when you began?
13               MR. VARNADO:  Object to the
14          form.
15               THE WITNESS:  Not that I
16          recall.
17               (Phone interruption.)
18               VIDEOGRAPHER:  8:54.  We are
19          off the video record.
20               (Recess taken, 8:57 a.m. to
21          8:58 a.m.)
22               THE VIDEOGRAPHER:  8:58.  We
23          are on the video record.
24          Q.    (BY MR. ECKLUND)  Mr. Beam,
25     before the break, which was caused by hold
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              at trends, yes, we looked at trends.
 2              And that was a part of the continuing
 3              feedback loop to the field in these
 4              training sessions.
 5         Q.   (BY MR. ECKLUND) You mentioned
 6    that sometimes good people make bad
 7    decisions.  Did you report any of those good
 8    people who made these bad decisions to local
 9    law enforcement?
10         A.   We did.
11         Q.   How many?
12         A.   In fact, every investigation
13    where diversion is proven, we have the
14    evidence, that information is referred for
15    prosecution and police are notified in each
16    individual case.
17         Q.   Okay.  So in every instance
18    where you have sufficient information, where,
19    using your term, where diversion is proven,
20    and where you have the evidence, that
21    information is referred to prosecution and
22    police are notified in each individual case.
23              Did you -- when you had
24    occasions to suspect diversion, did you refer
25    that information, whether it was proven or
```

```
 1    not proven, just suspected, to DEA?
 2              MR. VARNADO:  Object to form.
 3              THE WITNESS:  That information
 4         was reported if there were losses
 5         connected.  But in terms of referring
 6         for local law enforcement, we did not
 7         refer to local law enforcement unless
 8         there is prosecutable evidence there.
 9         Q.    (BY MR. ECKLUND)  I was
10    specifically asking about DEA.  So it would
11    have been reported to DEA.  And then as far
12    as referral for prosecution asks you
13    employees who were involved, that was only
14    when you felt that the evidence was clear?
15    That there was prosecutable evidence?
16         A.    Yes.
17         Q.    Okay.
18         A.    And the -- in reporting to the
19    DEA, each one of these investigations are
20    coordinated through compliance, who completes
21    the 106s, per their guidelines.  And per
22    their instructions.
23              What we do is submit the facts
24    to local law enforcement, our state law
25    enforcement, for additional action to include
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prosecution.
 2        Q.    Okay.  Okay.  We were talking
 3    earlier about the definition of diversion.
 4    You gave me your definition.  I'm wondering
 5    whether the intended purposes and
 6    unaccountable losses were factors as well.
 7              So we talked about theft.  Do
 8    you recall that?
 9        A.    (Witness nods.)
10        Q.    And we talked about illicit
11    use, the child taking the product from a
12    parent.  What about any other deviation from
13    what the intended path for that pill was?  Is
14    that considered within Walmart as part of
15    diversion?
16              MR. VARNADO:  Object to form.
17              THE WITNESS:  Once the
18        prescription is -- a legitimate
19        medical prescription is received and
20        filled, there is not necessarily a
21        feedback loop that comes back to the
22        company that would reflect that.
23              So I'm -- I can't sit here and
24        answer the end consumption of a
25        legitimate prescription that left our
```