# EXHIBIT K

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5

    IN RE NATIONAL PRESCRIPTION   | Case No. 17-MD-2804

 6                                |

    OPIATE LITIGATION             | Hon. Dan A. Polster

 7                                |

    APPLIES TO ALL CASES          |

 8

 9                     - - -

10            Friday, November 16, 2018

11                     - - -

12

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13

                 CONFIDENTIALITY REVIEW

14

                       - - -

15

16

17

         Videotaped deposition of CHAD DUCOTE, held

18    at the offices of Mitchell Williams,
      4206 South J.B. Hunt Drive, Suite 200, Rogers,

19    Arkansas, commencing at 8:04 a.m., on the above
      date, before Susan D. Wasilewski, Registered

20    Professional Reporter, Certified Realtime
      Reporter and Certified Realtime Captioner.

21

22

23                     - - -

24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax

25                 deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Dan Lawlor.  I'm a videographer of

 4       Golkow Litigation Services.

 5              Today's date is November 16, 2018, and the

 6       time is 8:04 a.m.

 7              This video deposition is being held in

 8       Rogers, Arkansas, in the matter of National

 9       Prescription Opiate Litigation, MDL Number 2804.

10       The deponent is Chad Ducote.

11              Counsel will be noted on the stenographic

12       record.

13              The court reporter is Susan Wasilewski and

14       will now swear in the witness.

15              THE COURT REPORTER:  Sir, would you raise

16       your right hand.

17              Do you solemnly swear or affirm the

18       testimony you're about to give will be the truth,

19       the whole truth, and nothing but the truth?

20              THE WITNESS:  Yes.

21              THE COURT REPORTER:  Thank you.

22              CHAD DUCOTE, called as a witness by the

23       Plaintiffs, having been duly sworn, testified as

24       follows:

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DIRECT EXAMINATION

 2    BY MR. INNES:

 3        Q.   Good morning, Mr. Ducote.  My name is

 4    Michael Innes.  I represent the plaintiffs in this

 5    case.  Thank you for being here today.  Thank you

 6    for starting a little bit earlier than usual.  I do

 7    appreciate that.

 8             Could you state your full name for the

 9    record.

10        A.   Full name is Chad Edward Ducote.

11        Q.   What is your current occupation?

12        A.   Current occupation is Division Vice

13    President for Supply Chain.

14        Q.   And for what company?

15        A.   Walmart.

16        Q.   Thank you.

17             You understand that you're under oath,

18    right?

19        A.   Yes.

20        Q.   And are you taking any medication or is

21    there any other reason that would interfere with

22    your ability to answer my questions fully and

23    truthfully today?

24        A.   No.

25        Q.   Some basic ground rules -- well, let me
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   That, I do not recall exactly.

 2     Q.   Do you recall sitting in a classroom for

 3   that class?

 4     A.   I don't recall.  I do -- if I -- it most

 5   likely was online for that course.  I just don't

 6   recall exactly.

 7     Q.   What grade did you get in that class?

 8     A.   An A.  I do recall that.

 9     Q.   That's good.  You don't recall going to

10   class, but you got an A.  I wish I could have done

11   that.

12     A.   I just recall.  I think I've made As in all

13   the courses.

14          MS. FUMERTON:  Easy answer, then.

15   BY MR. INNES:

16     Q.   Let's continue right up the page here.

17     A.   Okay.

18     Q.   You were a pharmacy intern, cashier, cart

19   pusher, sales associate, unloader from February '92

20   to December '97.

21          Was that at Walmart?

22     A.   Yes.

23     Q.   You then went to be a pharmacist or pharmacy

24   manager from '97 -- December '97 to June 1999, also

25   at Walmart?
```

1    A.   Yes.

2    Q.   You then rose to the level of manager of

3    pharmacy recruiting June 1999 to August 2002, also

4    at Walmart?

5    A.   Yes.

6    Q.   You then moved to divisional compliance

7    director, also at Walmart, in August 2004?

8    A.   You skipped one role, but yes.

9    Q.   I'm sorry.  I did.

10         You were the director of training and

11   development, also at Walmart, from August 2002 to

12   August 2004?

13   A.   Yes.

14   Q.   Thank you for correcting me on that.

15         Then you became a divisional compliance

16   director from August 2004, for about 18 years, to

17   July 2010; is that right?

18         MS. FUMERTON:  No.  Objection; form and to

19      the math, I guess.

20   BY MR. INNES:

21   Q.   I'm just reading the document.

22         MS. FUMERTON:  I think that this can be

23      easily clarified.

24   A.   Yes, that's -- I was going to clarify.  It

25   was six years.  The LinkedIn profile did some odd

Highly Confidential - Subject to Further Confidentiality Review

1    math on that.

2        Q.   To be clear, divisional compliance officer

3    at Walmart from July 2004 to July 2010?

4        A.   Yes.

5        Q.   And what were your duties as a divisional

6    compliance director?

7        A.    In that role, I was responsible for

8    Louisiana, Mississippi, and Tennessee, that

9    territory, and it was operational compliance, which

10   is really more some auditing functions.

11       Q.   What do you mean by auditing functions?

12       A.    We would look at things such as food safety

13   to make sure that our stores -- we -- our stores

14   have a great deal of -- great deal of different

15   types of products that we prepare, so we would go in

16   to make sure they were properly preparing food

17   products, things of that nature.

18       Q.   So in that role did you deal with

19   pharmaceuticals?

20       A.   There was a time where we did.

21       Q.   And within that time did you deal with

22   Schedule II narcotics?

23            MS. FUMERTON:  Objection; form.

24       A.   Not specifically with Schedule II narcotics.

25       Q.   Did you do -- did you deal with Schedule III

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, I wouldn't say -- maybe I misstated

 2    that.  I wouldn't say my primary focus was food

 3    safety.  That's the topic that seemed to come up a

 4    great deal.

 5      Q.   Schedule II narcotics did not come up as a

 6    topic?

 7           MS. FUMERTON:  Objection; form.

 8      A.   Yes, it did.

 9      Q.   In what context?

10      A.   Recordkeeping.

11      Q.   Did Schedule III come up?

12      A.   Yes, recordkeeping again.

13      Q.   Following your divisional compliance

14    director position, you moved to the Walmart --

15    general manager at a Walmart Distribution Center in

16    Opelousas?

17      A.   Opelousas.

18      Q.   Opelousas, Louisiana?

19      A.   Yes.

20      Q.   And you served in that role from July 2010

21    to July 2014?

22      A.   Yes, that's correct.

23      Q.   And what were your duties as the general

24    manager of that distribution center?

25      A.   The primary duties was supervision of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FUMERTON:  Objection; form.

 2      A.   Not that I'm aware of.

 3      Q.   Do you have any knowledge of any enforcement

 4   actions regarding firearms at that distribution

 5   facility?

 6      A.   No.

 7              MS. FUMERTON:  Just give me one second to

 8      object.  Just a reminder.

 9              THE WITNESS:  Sorry.

10   BY MR. INNES:

11      Q.   Following your general manager position, you

12   moved to Senior Director II, Pharmacy Supply Chain;

13   is that correct?

14      A.   Yes.

15      Q.   And you held that position from August 2014

16   to June 2017; is that correct?

17      A.   Yes.

18      Q.   And that was in -- it's in Bentonville,

19   Arkansas?

20      A.   Yes.

21      Q.   So you relocated from Opelousas, Louisiana,

22   to Bentonville?

23      A.   Yes, I did.

24      Q.   I'm going to pass over that one right now.

25   We're going to spend a lot of time on that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   It did.  I'll ask you to turn to the third
 2   page of this document.  You've had a chance to
 3   review that; is that correct?
 4        A.   Yes.
 5        Q.   I don't know if we have a bad copy on that
 6   as well, but that is document ending in 22384.
 7             Are you familiar with this document?
 8        A.   Yes.
 9        Q.   You've seen it before?
10        A.   Yes.
11        Q.   Can you explain to me what this represents?
12        A.   What this represents is VAWD, verified
13   accredited wholesale distributor, was doing -- there
14   were certain policies and procedures that they
15   recommended that were put in place based on their
16   review, and this was an output of that process.
17        Q.   You referred to the VAWD.  Could you --
18        A.   Verified accredited wholesale distributor.
19        Q.   And it was important -- well, and the VAWD,
20   did they confer accreditations on distributors?
21        A.   I'm not sure from the legal sense exactly
22   how that plays out, but they do give accreditation.
23        Q.   Did Walmart apply for accreditation?
24        A.   Yes.
25        Q.   Was it important that Walmart got that
```