# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL         )   MDL No. 2804
     PRESCRIPTION OPIATE     )
 4   LITIGATION              )   Case No.
                             )   1:17-MD-2804
 5                           )
     THIS DOCUMENT RELATES TO )  Hon. Dan A.
 6   ALL CASES               )   Polster
                             )
 7
 8
 9                   __ __ __
10            Monday, May 13, 2019
                     __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                     __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, held at Weitz & Luxenburg PC, 3011
17   West Grand Avenue, Suite 2150, Detroit,
     Michigan, commencing at 9:20 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                     __ __ __
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | fax 917.591.5672
                deps@golkow.com
25
```

1    Q.    Have you ever served as an

2    expert witness on a consulting basis before?

3    A.    No, sir, I have never served as

4    an expert in the capacity of a consultant.

5    Q.    Okay.  Have you ever written

6    any articles that were published?

7    A.    No, sir.

8    Q.    Have you ever written anything

9    of any kind that was published?

10   A.    As a police officer, I wrote an

11   article at the request of the Detroit News.

12   It was in regards to the effectiveness of the

13   DARE program.

14   Q.    Okay.  So you wrote something

15   for the Detroit -- is it the Detroit News?

16   A.    Detroit News, it's the

17   publication.

18   Q.    Did that used to be the Detroit

19   Free Press or is that a different paper?

20   A.    Different paper.  Still two

21   papers in Detroit.

22   Q.    Okay.  Was that like an op-ed,

23   like an editorial kind of thing?

24   A.    Sure.  They published two, I

25   guess, opinions, a pro and a con opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    Mine was the pro opinion of DARE, and there

2    was a side-by-side con opinion of the

3    effectiveness of that program.

4         Q.    Okay.  So you wrote that.  Is

5    there anything else you've ever written

6    that's been published?

7         A.    Not that I'm aware of, not that

8    I gave any authorization for, no, sir.

9         Q.    Okay.  Have you -- and this is

10   pretty obvious, but you're not an attorney;

11   is that correct?

12        A.    Not an attorney, no, sir.

13        Q.    So in giving your opinions

14   today, you're not trying to give legal

15   opinions; is that right?

16        A.    Well, the opinion I'm trying to

17   give is based on my training and experience

18   and my knowledge of the law and the

19   regulations that are required to be adhered

20   to by the companies.  I'm not publishing a

21   legal opinion as an attorney.

22        Q.    Well, what I'm asking you is

23   whether you -- are you offering today or in

24   your report a legal -- a legal conclusion?

25        A.    I think, yes, I am.

```
 1              Q.      Okay.  Let me ask you a little

 2      about the work you've done in connection with

 3      this report.

 4                      First of all, the report is 180

 5      pages, I believe.

 6              A.      It is, sir.

 7              Q.      Did you write it?

 8              A.      Yes, sir.

 9              Q.      Okay.  You wrote it yourself or

10      did you write it with help?

11              A.      I wrote it with help.

12              Q.      Okay.  How much time did you

13      spend preparing your report?

14              A.      Well, I didn't keep track if

15      you're going to ask me the exact hours, but I

16      would say a considerable amount of time.  It

17      pretty much consumed me.

18              Q.      When did you start working on

19      the report?

20              A.      Well, probably in the fall of

21      2018, I started having discussions about the

22      type of documents and records that I would

23      need, some of the topics in potential

24      depositions, questions I would need to

25      answer.  So I started to give the framework
```

1          So within those families,

2     there's -- my experience in doing these cases

3     is there's generally a hierarchy of drugs

4     where some drugs are ordered more often than

5     others.  They're just generally prescribed

6     more.

7          So during the course of when a

8     potential diversion would occur, there could

9     be one strength of drug which actually

10    occurred -- which really impacted what

11    happened in America -- the oxycodone 30

12    product became a highly abused product.  So

13    companies should or would want to monitor

14    within that drug family if there was a change

15    in pattern where one drug started to get

16    ordered in a much greater amount than the

17    other drugs.

18          Along those same lines, another

19    pattern is how companies order drugs.

20    Typically in the old days they used DEA

21    Form 222s.  That's a paper form with ten

22    lines.  Some companies generally order drugs

23    in the same manner.

24          I've reviewed countless number

25    of forms, and as you go through the forms day

1  by day, you'll see patterns on how drugs are

2  ordered, certain groups together.  In the

3  cases I've worked, when that pattern changes,

4  so an easy one would be all of a sudden you

5  see an order form with ten lines and all ten

6  lines have oxycodone 30.  If a company would

7  start to change a pattern of orders like

8  that, that would be an easy one.

9        Q.     Is it also possible that

10 patterns or size or frequency can change

11 suddenly based on changed circumstances in a

12 particular community?

13       A.     Sure, anything is possible.

14       Q.     Well, I don't just mean

15 anything is possible.  I mean, yes, anything

16 is possible, but I'd like to be a little more

17 specific.

18       A.     Okay.

19       Q.     Let's say -- let's say a

20 hospital opens up in an area.  Would that

21 change patterns and could it change ordering

22 patterns and size of orders and frequency of

23 orders?

24       A.     Well, I think that obviously

25 has a possibility to cause some change.  I'm

1    not sure that it would change the pattern.

2    It may change the amounts or the types.  So

3    another -- as was one of my examples, the

4    types could change.

5              Anytime a business model

6    changes or a new contract -- a better

7    example, if I could give you a better

8    example.

9         Q.    Sure.

10        A.    Is a pharmacy could enter into

11   a contract with a long-term care facility,

12   and if they didn't provide guidance or

13   information to their distributor, they could

14   just start ordering a controlled substance

15   that would be out of the norm of something

16   they ever ordered before.

17              That's kind of the essence of

18   the suspicious order system because you would

19   hope the system would trigger to stop that

20   order.  Then it requires some due diligence

21   where a company would actually call and they

22   would learn about that contract.  And then

23   subsequent to that, the distributor or the

24   person making the sale would probably confirm

25   that that actual contract occurred and that

Highly Confidential - Subject to Further Confidentiality Review

1    business relationship occurred.

2                   So...

3         Q.      So patterns can change?

4         A.      Sure.

5         Q.      Size can -- you know, unusual

6    size can change.  Frequency can change

7    depending on the circumstances that occur in

8    a particular community, right?

9         A.      I've learned in my experience

10   that the ordering and distribution of drugs

11   is not static.  It's heavily patterned,

12   especially the more the customers, the more

13   the established pattern, sizes and frequency.

14   But new drugs could be introduced.

15                   There's a lot of reasons why it

16   could change.  And that's not a bad thing,

17   but those are the things that would trigger

18   your system to stop an order and then you to

19   evaluate it to make sure that -- not you

20   personally, but so that it's evaluated, and

21   then there's no chance of diversion.

22        Q.      So while that investigation is

23   going on, you're saying that those drugs

24   should not be shipped to a place where let's

25   say there's a new -- a new long-term facility

 1              Do you agree with that

 2    statement that Mr. Rannazzisi made?

 3              MR. FULLER:  Form, outside of

 4         his scope.

 5         A.    Can you read it one more time

 6    for me?

 7    BY MR. NICHOLAS:

 8         Q.    Yes.

 9              DEA recognizes that the

10    overwhelming majority of registered

11    distributors act lawfully and take

12    appropriate measures to prevent diversion.

13         A.    Well, based on my work on this

14    matter and my review of records and systems,

15    which I didn't have any previous knowledge of

16    previous to when I did that, I would probably

17    disagree with that statement by

18    Mr. Rannazzisi, in looking at the historic

19    failures by the companies to be in compliance

20    with the suspicious order situation -- or

21    regulation and just a general broad

22    maintenance of effective controls to prevent

23    diversion.

24              MR. NICHOLAS:  It's been --

25         well, let's take a short break.  We'll

1    go another 45 minutes after that and

2    have lunch, if that's okay.

3              THE VIDEOGRAPHER:  Going off

4    the record, 11:34 a.m.

5              (Recess taken, 11:34 a.m. to

6    11:45 a.m.)

7              THE VIDEOGRAPHER:  We're back

8    on the record at 11:45 a.m.

9  BY MR. NICHOLAS:

10       Q.    The DEA requires the retention

11 of records to be for at least two years; is

12 that correct?

13             MR. FULLER:  Form.

14 BY MR. NICHOLAS:

15       Q.    By policy?

16       A.    Well, by regulation --

17       Q.    By regulation.

18       A.    -- the requirement is -- and

19 that two-year applies to required records.

20 So within the CFR, there are certain records,

21 examples would be biannual inventories, order

22 forms.  Any of the records that are in the

23 records section of the CFR have a two-year

24 retention.

25             And there's a carve-out that if

Highly Confidential - Subject to Further Confidentiality Review

1    a state has a longer retention period, that

2    the registrant could be subjected to that,

3    but that two years only applies to those

4    certain records that are cited in the CFR.

5         Q.    So -- but the carveout that

6    you're talking about doesn't apply to

7    suspicious order reports, right?  That's

8    within the two -- that's subject to the

9    two-year regulation?

10                MR. FULLER:  Form.

11        A.    No.  The suspicious order

12   reports aren't part of the two-year

13   retention.

14   BY MR. NICHOLAS:

15        Q.    They don't have to be retained

16   at all?

17        A.    Well, under my opinion, it

18   would be they would be retained forever.

19        Q.    Right, but, I mean, the

20   regulation doesn't require -- I understand

21   that might be your opinion, but is there any

22   regulation that says they have to be retained

23   for any length of time?

24        A.    I would say the maintenance of

25   effective controls to prevent diversion would

1    be applicable to say that they should retain

2    the suspicious order reports or any due

3    diligence related to them.

4         Q.    There are specific sections --

5    there are specific regulations that address

6    records retention, correct?

7         A.    Yes, sir.

8         Q.    And those --

9              MR. FULLER:  Form.

10   BY MR. NICHOLAS:

11        Q.    -- regulations identify the

12   categories of records that have to be kept

13   and for how long, correct?

14             MR. FULLER:  Form.

15        A.    The CFR does address that, but

16   those are the required records.  For example,

17   there are some records that registrants keep

18   in the course of their business that aren't a

19   required record.  So just so we're on the

20   same understanding as to -- the two-year

21   retention is only under those required

22   records; dispensing records for a dispensing

23   doctor, two-year retention; biannual

24   inventories, order forms, those are all part

25   of the required records.

```
1    BY MR. NICHOLAS:

2         Q.    So the things we're talking

3    about now, suspicious order reports or due

4    diligence documents, are not part of the

5    kinds of records that are required to be

6    retained under the CFR and the regulations?

7         A.    Well --

8         Q.    That's a yes or a no.

9              MR. FULLER:  Object to form.

10        He's already testified they were.

11             MR. NICHOLAS:  That's not what

12        he said.

13             Go ahead.

14             THE WITNESS:  So could you

15        restate the question?  I'm sorry.

16   BY MR. NICHOLAS:

17        Q.    Does the CFR or its regulations

18   require in writing and as identified

19   suspicious order reports?

20             MR. FULLER:  Form.

21             MR. NICHOLAS:  I'll ask it

22        again.  It was a crappy question.

23   BY MR. NICHOLAS:

24        Q.    Does the CFR identify

25   suspicious order reports as among the
```

1  documents that have to be retained for at

2  least two years?

3       A.    I would say yes, under the

4  maintenance of effective controls, but I

5  think there's not a lot of clarity on whether

6  that is essentially a required record.

7       Q.    Does the CFR identify due

8  diligence documents as documents that are

9  required to be retained for at least two

10 years?

11      A.    I'm going to respond the same:

12 Under maintenance of effective controls, I

13 think that requirement requires the retention

14 of due diligence records.  The CFR doesn't

15 speak specifically to a due diligence record,

16 but that would be a record that would be

17 maintained within the requirement of that

18 regulation.

19      Q.    For at least two years?

20      A.    Again, my opinion, they should

21 be kept permanently.

22      Q.    No, I'm not asking about your

23 opinion.  I'm asking under -- what the

24 requirement is under the law as you

25 understand it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Under the regulation as I
 2      understand it --
 3              Q.      Yeah.
 4              A.      -- it doesn't speak
 5      specifically to due diligence records.  So
 6      I -- a two-year retention -- if a registrant
 7      was to review the CFR, there's no mention of
 8      a due diligence record, so I would say it's
 9      not two years.
10              But again, I'd just restate
11      that I would see no reason why they wouldn't
12      retain them indefinitely.
13              Q.      Okay.  I just want to go back
14      for one second to when you said several times
15      that -- you talked about your understanding
16      about how the DEA -- or your belief that the
17      DEA does not -- has never given approvals of
18      suspicious order monitoring systems, and you
19      said that the manual said you're not supposed
20      to and all that.
21              When did you start at the DEA?
22              A.      2004.
23              Q.      Okay.  When you refer to the
24      manuals, to the Diversion Control Manual, you
25      were referring to a manual that you read in
```

1    communication on page 32 of my report.

2    BY MR. NICHOLAS:

3         Q.    Okay.  Hold up.  Yeah.

4               I just want to know -- I mean,

5    all I really wanted to know is did you put in

6    your report that Mr. Gitchel said in 1984

7    that the DEA doesn't approve --

8         A.    No, I think I may have

9    misspoke.  I think it was in regards to

10   stopping shipments of --

11        Q.    Okay.

12        A.    -- orders.

13        Q.    Okay.  All right.  That's fine.

14        A.    That's why I wanted to review

15   my report, to make sure.

16        Q.    This was an instance where you

17   reviewed your report and found something --

18   and found something that I agree -- supported

19   my point, so that's good.  I should let you

20   review your report more often.

21        A.    Yeah, you tried to stop me.

22   But I just want to be factually correct.

23   It's an important subject.

24        Q.    I appreciate it.

25        A.    And I had a recollection that

1    that was discussed, but it was about stopping

2    an order, so...

3         Q.    All right.  So since we are

4    talking about sort of what -- since you just

5    sort of brought up the shipping requirement.

6         A.    Yes, sir.

7         Q.    First of all, just so the -- so

8    we've got it on the record, what do you

9    understand -- it's a weird word, because it's

10   a shipping requirement, but it really -- it's

11   a reference to not shipping.

12              So can you just explain what

13   the shipping requirement is to your

14   understanding?

15        A.    Well, first, I've never --

16   there's never really been a formal term.  A

17   shipping requirement, I don't know if that's

18   an industry term or just somehow got created,

19   but it never was referred to as just a

20   shipping requirement.

21              I mean, it's -- it's the mere

22   fact that when a company uses a suspicious

23   order system and identifies a suspicious

24   order, they don't ship that order until they

25   dispel the suspicion about it and whether or

Highly Confidential - Subject to Further Confidentiality Review

1    not it's going to be diverted to ensure that

2    gets properly distributed.

3         Q.    Okay.  So let me ask a couple

4    of basic questions here.

5              Does the CFR or the regulations

6    related to the CFR on this subject say

7    anywhere that there is a requirement that

8    distributors not ship suspicious orders?

9         A.    I think they give guidance to

10   distributors under the maintenance of

11   effective controls.  Only saying that because

12   if a distributor discovers a suspicious

13   order, to ship it without dispelling the

14   suspicion, that kind of violates the

15   maintenance of effective controls.

16              So I don't want to say it's

17   just a commonsense interpretation, but to

18   identify something suspicious that is

19   suspicious of diversion and then just

20   shipping it without stopping it and

21   dispelling it, that's at the core of that

22   regulation.

23         Q.    Does the --

24         A.    And the law.

25         Q.    Does the regulation say

Highly Confidential - Subject to Further Confidentiality Review

1    anything about ship -- does the regulation in

2    words, words, say anything about shipping?

3            A.      No, in words, the regulation

4    does -- and just the --

5            Q.      It does or does not?

6            A.      It does not say the word

7    "shipping."

8            Q.      Okay.

9            A.      But again, I go back to the

10   maintenance of effective controls, and

11   secondly, it's been since the day I started

12   at DEA, that's been the interpretation of the

13   DEA, and I think there's been several

14   communications, Mr. Rannazzisi's letters.

15           Q.      Okay.

16           A.      All the way back -- now I can

17   go back to Mr. Gitchel's letter in 1984,

18   about stopping an order because that was the

19   topic that I discussed -- that I confused on

20   your earlier question.

21           Q.      Do you -- is it your testimony

22   that the decision as to whether to ship or

23   not to ship an order that's been reported to

24   the DEA is left to the discretion of the

25   distributor?

1    A.    So I think the discretion on

2    whether to ship or not ship is solely the

3    decision of the distributor.  The DEA doesn't

4    inform a distributor if or when to ship an

5    order or not to ship an order.  So the answer

6    to that would be yes.

7    Q.    And if a distributor asks the

8    DEA -- if the distributor came to the DEA and

9    said, we've got this order, we have questions

10   about it, should we ship it or not ship it,

11   the DEA won't answer that question?

12   A.    So I'm not sure that I'm

13   comfortable speaking for the entire DEA, but

14   how I'd like respond to that is through my

15   experience and what has occurred in the past.

16        So there may be a time when you

17   receive a call from a registrant that may ask

18   a question like that or a similar question,

19   so generally, you can -- first, I would

20   always state there's two -- two situations,

21   and we're just going to talk about suspicious

22   orders -- or, I mean, about distributions.

23        And first, I'll always state

24   that I can't tell a distributor when to ship

25   or not to ship, but I may ask a lot of

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And so when you refer to

2    flagged orders, you've got -- you know, your

3    top column, it's a grid.

4    A.    Yep.

5    Q.    And from left to right, across

6    the top, first it's the name of the

7    distributor.  Then it says:  Flagged orders

8    of oxycodone (dosage units).  Then it says:

9    Flagged orders of hydrocodone (dosage units).

10         Let's just take

11   AmerisourceBergen, since this is the first

12   one.

13   A.    Okay.

14   Q.    Okay.  Go down to orders of

15   oxycodone (dosage units), and then it says

16   the number, which is 50,578,040.

17         What's that a number of, dosage

18   units?

19   A.    Yes.

20   Q.    Okay.  And then what does the

21   86% of total dosage units mean?  What is

22   that -- 86.5% of what?

23   A.    Of the amount that was

24   distributed during the time period stated

25   above into the CT1 jurisdiction.

1    Q.    Okay.  And then moving across

2    to the 24th -- to the flagged orders of

3    hydrocodone dosage units, it's 24,412,050,

4    which represents 92.7% of the total dosage

5    units, correct?

6    A.    Yes, sir.

7    Q.    So are you saying -- well, what

8    are you saying when you express this?  I

9    shouldn't say.

10         I mean, you're showing it.

11   What does it mean?

12   A.    So the methodologies applied to

13   the distribution, once the suspicious order

14   is identified, the criteria I used is if

15   there was no due diligence to dispel the

16   suspicious order or it wasn't reported, then

17   every subsequent distribution would be a

18   suspicious order.

19   Q.    Let me -- I hate this

20   expression, but I'm going to have to unpack

21   that.

22         So the criteria you used -- you

23   say once the suspicious order is identified?

24   A.    By the company -- or by the

25   methodology, I'm sorry.

1        Q.      I mean, that's my first source

2    of confusion is, are these suspicious orders

3    or are these what you are suggesting should

4    have been suspicious orders, that you're

5    basing this on?

6        A.      Well, it's not suspicious --

7                MR. FULLER:  Objection to form.

8        A.      It's not suspicious orders.

9    It's dosage amounts that resulted from

10   suspicious orders.  So the methodology -- my

11   understanding of what Mr. McCann did -- and I

12   don't want to speak for him.

13   BY MR. NICHOLAS:

14       Q.      Okay.

15       A.      -- is he looks at the

16   distribution, the ARCOS data for the

17   distribution for AmerisourceBergen drug

18   company, he applies the methodology, and if

19   there are no suspicious orders, it just runs

20   along the distribution.

21               At some point, if there's a

22   month that exceeds the greatest month in the

23   previous six-month, that stops and it's a

24   suspicious order.  So at that point, if there

25   was a due diligence to dispel that suspicious

1    order, if I could find that in my

2    investigation, then it would continue on.

3                If there was no due diligence

4    and, as my report details, there wasn't

5    during the early time periods -- during most

6    of the time period there was no due diligence

7    to dispel suspicious orders, so every

8    subsequent order would become a suspicious

9    order.

10        Q.    On what basis are you saying

11   that there was no due diligence done to --

12   with regard to flagged orders?  What is your

13   basis for saying that?

14        A.    There were review of records

15   submitted on discovery.

16        Q.    Records for --

17        A.    Now, let me -- can I correct

18   this?

19        Q.    Yeah.

20        A.    I don't want to say none

21   whatsoever.  I believe that probably there

22   may have been some individual instances of

23   due diligence, but in a general statement, at

24   a systematic level, there was insufficient

25   due diligence.  Or none.

1    Q.    And what is your basis for that

2  statement?

3    A.    Reviewing records.

4    Q.    Reviewing records provided to

5  you by the plaintiffs?

6    A.    By the drug companies under

7  discovery.

8    Q.    You only had access to the

9  records that the drug companies supplied in

10  discovery to the extent they were sent to you

11  by the plaintiffs' lawyers that were

12  retaining you, correct?

13        MR. FULLER:  Object to form.

14    A.    I'm not sure how to answer that

15  because I guess I hope I got all the records.

16        Now, I'm not indicating that I

17  looked at every one, but I looked at enough

18  to draw a conclusion or an opinion that there

19  was insufficient due diligence.

20  BY MR. NICHOLAS:

21    Q.    Well, if you weren't sent

22  records that are -- that exist, how do you

23  know how many of the -- how many -- how do

24  you know whether you looked at a few, some,

25  most or all of the records?  How do you know?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I think that's kind of a

2     hypothetical question.

3          Q.      No, it's not hypothetical.  You

4     told me that -- you told me that you obtained

5     records from plaintiffs' counsel, correct?

6          A.      And it's my belief that I had

7     access to all the records.  Now, there's no

8     way that I would know if that occurred or

9     not.  That's -- I'm hopeful, as their expert

10    opinion, that I had access to all of the

11    records.

12              I can't affirmatively say that

13    they gave me every record.  I -- that's why

14    it's kind of a hypothetical.

15         Q.      Well, right now it is a

16    hypothetical because we really have no idea

17    what records you were provided, what records

18    you were provided and what you weren't

19    because I think you told us that you didn't

20    write down all the records that were provided

21    to you.

22         A.      Well, I would say that in

23    regards to this matter, I reviewed sufficient

24    due diligence records to draw -- to make my

25    opinion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now, sticking with that for a

2    minute, just because you did not review due

3    diligence records from 2010, 2011, 2012 --

4    let's assume you didn't see due diligence

5    records or as many as you would have liked.

6    That doesn't mean that the due diligence

7    wasn't done, does it?

8    A.    Well, as far as the DEA is

9    concerned, if there's no documentation or

10   record of it, a due diligence file, my

11   opinion would be based on that that doesn't

12   exist.

13   Q.    Well, we've already discussed

14   the fact that there was no requirement in the

15   regulations as to the retention of due

16   diligence records --

17           MR. FULLER:  Object to form.

18   BY MR. NICHOLAS:

19   Q.    -- for any period of time,

20   right?

21           MR. FULLER:  Object to form.

22   That's not the witness's testimony.

23   A.    So I don't think that's exactly

24   what my statement was.  I think my statement

25   was is that it wasn't contained as a required

Highly Confidential - Subject to Further Confidentiality Review

1    record in the recordkeeping section of the

2    CFR.

3    BY MR. NICHOLAS:

4         Q.    Yeah.

5         A.    But it was of my opinion that

6    it's covered under the maintenance of

7    effective controls, and it would be my

8    opinion as -- with my experience and my

9    training and my knowledge, is that it should

10   be kept forever.  It's a historical record,

11   and it should be kept by the registrant much

12   greater than two years.

13        Q.    Now, you keep saying that the

14   requirement to maintain records is contained

15   in the section pertaining to maintenance of

16   effective controls, but just so the record is

17   clear, there's nothing in the section on the

18   maintenance of effective controls that makes

19   any reference to records, correct?

20        A.    Well, I --

21              MR. FULLER:  Form.

22        A.    I think within the statements,

23   that's what that statement means.

24   BY MR. NICHOLAS:

25        Q.    Means.  But I'm asking whether

Highly Confidential - Subject to Further Confidentiality Review

1    you go right down each company, all right.

2    You've got one, two, three, four, five

3    companies, and in the case of each one,

4    you've got a parenthetical that says that

5    somewhere between -- that identifies

6    somewhere between 86.5% and 95.3% of total

7    dosage units, okay?

8         A.    Yes, sir.

9         Q.    All right.  And that means

10   what?  Is that the number of dosage units

11   that in your opinion should not have been

12   shipped?

13        A.    Well, in my report, if we -- I

14   actually make a statement in regards to that

15   on page 46.

16        Q.    Okay.

17        A.    So it starts after the

18   footnote 151:  However, it is my opinion to a

19   reasonable degree of professional certainty

20   that applying the tests set forth in the

21   Masters Inc. and Drug Enforcement

22   Administration provides a reasonable estimate

23   and initial trigger on a first step to

24   identifying orders of unusual size.

25        Q.    So are you saying that --

1        A.       Well --

2        Q.       -- this is the number of --

3                 MR. FULLER:  Well, go ahead and

4        finish your answer.

5                 MR. NICHOLAS:  Okay.  I thought

6        you were done.  Sorry.

7        A.       So -- and I can read the rest

8   of the paragraph.

9   BY MR. NICHOLAS:

10       Q.       Don't read.  I'd rather you

11  just tell me just in words, in your words,

12  what -- you know, what is it you're trying to

13  convey here?

14                Are you trying -- are you

15  trying to say, or are you saying that in your

16  opinion, 86.5% of the total dosage units for

17  Ameri- -- you know, under the

18  AmerisourceBergen drug thing, are dosage

19  units that should have been reported as

20  suspicious orders?

21       A.       I'm saying based on my

22  experience and my opinion, based on some

23  documents that when a suspicious order occurs

24  as a result of the methodology and there's no

25  action taken, no due diligence action taken

1    to dispel that suspicious order, that all

2    the -- all the orders from that point

3    forward, I'm considering them to be, you

4    know, the result of suspicious orders.

5                    Now, that --

6         Q.     Okay.  All right.  So my

7    question is -- all right.  So let me try

8    this.

9                    Are you suggesting in your

10   report that more orders should have been

11   reported as suspicious?

12        A.     Well, I don't think it suggests

13   that.  I'll restate it again.

14                   So when the system triggers a

15   suspicious order, it doesn't reset to the

16   next order to be a suspicious order.  So how

17   I interpret the regulations and how my

18   training is and how the Masters ruling and

19   some of the documents I've read in regards

20   from McKesson and Cardinal and Prevoznik's

21   deposition testimony, is that once a

22   suspicious order is identified by registrant,

23   it should be stopped and there should be a

24   due diligence to dispel whether or not that

25   suspicious order is in fact suspicious.

Highly Confidential - Subject to Further Confidentiality Review

```
1                 If the registrant takes no

2      action and just continues to ship subsequent

3      orders in that order, then they're all

4      suspicious orders.

5                 Now, my last paragraph kind of

6      sums up that this is how I applied this, and,

7      you know, it's in regards to how the court

8      would or would not accept it and there would

9      be other methodologies.  So that's how I

10     interpret it.

11          Q.    You know, on this subject I

12     think -- well, are you able to tell us -- are

13     you able to -- well, let's see.

14                Let's say an order is

15     identified by a distributor as suspicious,

16     okay?

17          A.    Yes, sir.

18          Q.    And it's reported to the DEA as

19     suspicious.

20          A.    Yes, sir.

21          Q.    Okay.  You agree that that

22     doesn't necessarily mean that that order --

23     that the pills associated with that order are

24     going to be diverted, right?

25          A.    No, I think that's exactly what
```

Highly Confidential - Subject to Further Confidentiality Review

1    it means.

2         Q.     You think every time that an

3    order is reported as suspicious that those

4    pills turn out to be diverted?

5         A.     I don't know that I could draw

6    that conclusion, but I --

7         Q.     That's the conclusion I'm

8    asking you about.

9         A.     Well, I wouldn't draw that

10   conclusion.  The only conclusion I would draw

11   is that if a registrant is adhering to the

12   law and the regulations and has a suspicious

13   order system in place and their system

14   identifies that, I would hope that they

15   believe that they're reporting to the DEA

16   what they believe to be a suspicious order.

17        Q.     I'm asking you a completely

18   different question, okay?

19               My question to you is:  When an

20   order was reported as suspicious -- strike

21   that.  Strike that, because I -- I asked a

22   confusing question.

23               I think what you're saying is

24   that there are -- but tell me if I'm wrong --

25   is that more orders should have been reported

1    as suspicious than were reported; is that

2    right?

3         A.    No.

4         Q.    Okay.  So you think that the

5    appropriate number of orders --

6         A.    I --

7         Q.    -- into Track 1 and Track 2

8    jurisdictions that were reported as

9    suspicious was indeed appropriate, that the

10   right number was reported?

11        A.    This methodology doesn't look

12   at it that way because there was no due

13   diligence so --

14        Q.    Hold on.  Let me stop you

15   there.

16             MR. FULLER:  Well, object --

17             MR. NICHOLAS:  Go ahead.  No,

18        I'm sorry.  You're right.  You're

19        right.  Go ahead.

20        A.    Because there was no due

21   diligence.  So the methodology is not applied

22   to identify future orders that are

23   suspicious, because when you don't dispel the

24   suspicion or the potential that it's going to

25   be diverted and you can clear it to say that

1   it's not going to be diverted, then every

2   subsequent order, in my -- in the way I've

3   applied this, would be a suspicious order

4   based on the policies and the guidance and my

5   experience with the DEA.

6   BY MR. NICHOLAS:

7        Q.    So your entire analysis here

8   rests on the premise that no due diligence

9   was done on the orders that you're reporting

10  on here; is that right?

11            MR. FULLER:  Object to form,

12        misstates his prior testimony.

13       A.    No -- either no or insufficient

14  due diligence.

15  BY MR. NICHOLAS:

16       Q.    Okay.  So there was either no

17  due diligence or insufficient due diligence

18  on, in the case of AmerisourceBergen,

19  50,578,040 dosage units.  That's what you're

20  suggesting?

21       A.    Just so that I'm clear so we

22  understand each other, that represents total

23  dosage units and it's not orders.  But, so at

24  some point, if there was an effective due

25  diligence, then I believe the methodology

 1    would start monitoring it again until the

 2    next instance where there would be a

 3    suspicious order, and then that would require

 4    due diligence whether or not to clear that.

 5            So it's -- you know, the

 6    critical thing I think that we -- that, you

 7    know, that we are having trouble

 8    communicating --

 9    Q.    We're definitely not

10    communicating right now and I'm sure I'm

11    not understanding this.

12    A.        -- back and forth is the

13    concept that when you don't do due diligence,

14    that that makes every subsequent order a

15    suspicious order.

16            Now --

17    Q.    That's what you're saying?

18    A.    Yes, if there is insufficient

19    or there's incomplete or there's no due

20    diligence.

21            Now, that's a methodology

22    that's, I think, up to the court whether or

23    not to accept, but that's -- so it's just as

24    long as you understand clearly on how I had

25    this methodology applied.

1    Q.    So again, your methodology

2    rests on your --

3        A.    Opinion.

4    Q.    -- conclusion or opinion that

5    either no due diligence was applied or

6    insufficient due diligence was applied -- you

7    know, was utilized by any of these companies,

8    and that results in these large numbers of

9    dosage units and these percentages; is that

10   right?

11       A.    Yes, sir.  My -- I'd like to

12   add to that as my final -- the final in

13   the -- on again, on 46, and this will maybe

14   be a clarification of what I said earlier,

15   the last sentence of the first paragraph:  I

16   say this understanding that the litigation

17   will be advanced by selecting a methodology

18   qualifying a volume of pills that entered the

19   CT1 jurisdictions unlawfully and providing

20   this data to an economist to measure harm

21   caused by this volume.

22       Q.    Yeah.  You say in the -- the

23   first sentence of that paragraph says:  I've

24   been asked to identify the number of opioid

25   pills that entered Cuyahoga and Summit

```
 1            A.      That's not what I respond --

 2      how I answered the question just a couple of

 3      questions ago.

 4                    So there could have been at

 5      some point for each of these companies where

 6      they designed or developed a system where

 7      they met the regulatory and the legal

 8      requirements.  They had due diligence.  They

 9      had an effective system, and they began to

10      identify suspicious orders, and they -- they

11      did a -- more than a cursory approval and

12      they did due diligence.  So that would stop

13      the count.

14                    And then the methodology would

15      be applied again, and every one that was

16      identified, if there was effective due

17      diligence, it wouldn't be counted as a

18      distribution to the CT1.

19            Q.      Did you stop the count at any

20      point in this analysis?

21            A.      No, sir.

22            Q.      And that's because you assumed

23      that there was no due diligence done at any

24      point from 1996 to your end date here --

25                    MR. FULLER:  Object --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NICHOLAS:

 2         Q.      -- at least for the purposes of

 3    your numbers?

 4              MR. FULLER:  Object to form.

 5         A.      It's not an assumption.  It's

 6    based on my review of records and depositions

 7    and documents that I couldn't find a time

 8    period where I believed there was sufficient

 9    due diligence -- well, there was actually a

10    complete failure.

11              There was the failure to stop

12    suspicious orders, there was ineffective

13    suspicious order systems, but in regards to

14    what caused these large numbers, it was the

15    failure to have the maintenance of effective

16    controls to prevent diversion, which is the

17    act of the due diligence, the reviewing those

18    orders to approve them as was detailed in the

19    Masters opinion.

20    BY MR. NICHOLAS:

21         Q.      Okay.  Now, see if we can agree

22    on one thing here, which is this:  There

23    could be an order of unusual size or

24    frequency or pattern that is shipped.

25    Whether it should have been or shouldn't have
```

1    been, we can put aside for another day.

2    Okay?  Let's just say that there's an order

3    of unusual size, frequency, pattern, that, in

4    fact, was shipped and it -- you can even

5    say -- and let's say it should have been

6    reported as a suspicious order, but it

7    shipped.  All right?

8              Do you agree that even though

9    that order was shipped and even though you

10   say it shouldn't have been shipped, it

11   doesn't necessarily mean that the pills that

12   underlie that order are going to be diverted.

13   You don't know.

14             MR. FULLER:  Object to form.

15   BY MR. NICHOLAS:

16       Q.    Correct?

17       A.    So I'll answer that question by

18   saying that if it's identified as suspicious

19   order by unusual size or unusual frequency or

20   deviating form -- you know, substantial

21   deviation from a pattern, so to me that puts

22   it as a probable, greater than 51% that it's

23   going to be diverted because it's been

24   identified.

25             So I can't draw the conclusion

```
 1    that I don't know that it's going to be
 2    diverted.  I probably can't draw a definitive
 3    statement that it is, but I'm going to say
 4    that it's more probable because the system
 5    identified it.
 6         Q.    So you got it at 51% above,
 7    it's going to be diverted; is that what
 8    you're telling me?
 9         A.    Well, that's the definition of
10    probable.  If it's an effective suspicious
11    order system, I believe the percents would
12    rise much higher than that, but I guess that
13    depends on the effectiveness of the
14    suspicious order system.
15         Q.    Where are you getting that
16    percent from?  Where are you getting that
17    from, just your own --
18         A.    What?
19         Q.    The 51, the probable, where are
20    you getting that it's probable?
21         A.    That's my belief of what
22    probable means.
23         Q.    Okay.  Other than your belief,
24    is it written down anywhere?  Is there any
25    research on that?  Is there any data on that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Is this just -- just your belief?

2          A.     Not that I can cite.

3          Q.     Okay.

4                 MR. FULLER:  Vegas odds.

5                 MR. NICHOLAS:  Okay.

6    BY MR. NICHOLAS:

7          Q.     Did you look at any individual

8    orders from any pharmacies in the Cuyahoga or

9    Summit Counties?

10         A.     I looked at some DEA 222 forms,

11   but I believe my recollection, it was out of

12   maybe the Boston area, so I would say no.

13         Q.     Okay.

14         A.     No original records.  I

15   reviewed no original records.

16         Q.     You reviewed data that was in

17   the aggregate, right, totals?  Correct?

18         A.     No.  I reviewed -- so just so

19   we're clear on, you know, what we're talking

20   about, so there's no confusion.

21         Q.     Uh-huh.

22         A.     So to me, in the DEA world, an

23   original record is the actual DEA order form,

24   the invoice or a CSOS electronic order form.

25   So that's what I would consider an original

Highly Confidential - Subject to Further Confidentiality Review

1    record.  Also provided to me, there's the

2    ARCOS data, which is not an original record,

3    and there were some electronic databases that

4    appeared to me to be an electronic

5    spreadsheet or an electronic format of orders

6    that distributors or registrants had

7    submitted as part of the discovery.  But none

8    of those would be what I would consider an

9    original record.

10        Q.    Can you identify a particular

11   order from a particular pharmacy that you

12   believe should have been reported as

13   suspicious?

14        A.    Well, in my assignment to

15   create this and do the investigation to come

16   to this opinion, there wasn't a requirement

17   for me to actually find specific orders that

18   were suspicious.

19             First of all, it would require

20   the use of the suspicious order system of the

21   registrant, like what would be the criteria.

22   The -- and the thing I found in doing my

23   opinion is that probably the most critical

24   part of setting up a suspicious order system

25   is the due diligence or sometimes in the

Highly Confidential - Subject to Further Confidentiality Review

1    industry they call it the onboarding, and

2    that's to establish what the criteria is.  I

3    said earlier what the usual is.

4               And I found it difficult

5    because I didn't really find an adequate

6    effort to set up what actually would be a

7    usual or what would be an expected order.  So

8    for me to go in and try to make that kind of

9    analysis wouldn't be possible.

10        Q.    So sitting here today, you

11   can't identify a particular order from a

12   particular pharmacy that should have been

13   reported as suspicious that wasn't; is that

14   correct?

15               MR. FULLER:  Form.

16        A.    I don't know because I didn't

17   task myself to do that.

18   BY MR. NICHOLAS:

19        Q.    Sitting here today, can you do

20   it?  I know you didn't -- I know it wasn't

21   part of your job description here.  That's

22   all I want to know is can you do it today?

23   Is it part of your report?

24        A.    Well, actually, let me retract.

25   I think I did that and I think it's on

1           A.      Well, I guess I'm going to not

2      answer, not based -- well, based on his

3      instruction, but it's because whether it's a

4      fact that's known by -- discoverable by just

5      the general public, and I -- I don't know, so

6      that kind of makes me not want to answer that

7      question because I don't know if a person

8      could just do some query from the general

9      public and obtain that answer.

10          Q.      Well, I can tell you that this

11     deposition is designated as a confidential

12     process to which the public does not have

13     access and will not have access.

14              So with that assurance, can you

15     answer the question now as to whether -- the

16     simple question of whether the DEA keeps

17     suspicious order reports on a database?

18              MR. FULLER:  No, Counsel, hold

19          on one second.  The Touhy request has

20          no bearing on whether this is kept

21          confidential or not.  Touhy

22          authorization says he can't testify to

23          anything that is not publicly known

24          and that he gained information during

25          his employment.  Touhy authorization

1          allows him to testify based on the

2          facts reviewed and provided in this

3          case.  So I'm still going to give him

4          the same instruction.

5                  I'll be honest with you, I

6          don't know if it's public knowledge or

7          not, whether it's in a database or

8          not.  It may be.

9                  MR. NICHOLAS:  Okay.

10   BY MR. NICHOLAS:

11        Q.    Do you agree with the statement

12   made by Mr. Rannazzisi in his deposition that

13   99% of doctors prescribe opioids for

14   legitimate medical purposes?

15        A.    I don't really have an opinion

16   or I really don't agree or disagree.  I don't

17   have sufficient knowledge or experience or

18   reviewed any studies to be able to make a

19   comment on that.

20        Q.    And do you agree with the

21   statement made by Mr. Patterson of the DEA,

22   formerly of the DEA, testifying in front of

23   Congress that 99.9% of doctors are trying to

24   do the right thing?

25        A.    My answer --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FULLER:  Form.
 2                    Go ahead.
 3          A.        My answer would be the same.
 4    I -- I don't know the pure math of that
 5    question, but with over 1 million doctors,
 6    99.9%, I'm not sure --
 7    BY MR. NICHOLAS:
 8          Q.        Do you think the vast majority
 9    of doctors are trying to do the right thing?
10                    MR. FULLER:  Form, scope.
11                    MR. NICHOLAS:  You can answer.
12          A.        I would agree with that, that I
13    have no experience or knowledge that says,
14    you know, anything otherwise than the vast
15    majority.  I guess we could maybe dispute
16    about what vast majority is, but...
17    BY MR. NICHOLAS:
18          Q.        When do you believe the opioid
19    crisis began?
20          A.        I would probably say the onset
21    would be the Internet pharmacy activity, the
22    illicit Internet pharmacy activity, I think
23    1999, around in that time period.
24          Q.        Okay.  When did you first
25    become aware that there was an opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Around that time?

2         A.     No.  Probably when I started my

3    employment with the DEA in the academy.

4         Q.     2004?

5         A.     Yes, sir.

6         Q.     Is there a point at which you

7    believe the opioid crisis became common

8    knowledge?

9         A.     Yes.

10        Q.     When is that?

11        A.     Well, could I get a

12   clarification of what you believe is common

13   knowledge?  Because what's common knowledge

14   to me is -- would you -- would your

15   definition of that be just if you were to

16   stop somebody and say what is an opioid?

17        Q.     How about known to government

18   entities, cities, towns, counties, states.

19             MR. FULLER:  Form.

20        A.     Well, I think it's -- I think

21   it probably coincided with when the Internet

22   pharmacy illicit conduct got to --

23   identified.  There was a study that was being

24   done and it was published and showed the

25   conduct of these Internet pharmacies and

Highly Confidential - Subject to Further Confidentiality Review

1    would consider to be overprescribing?

2    Because there's a couple of different ways I

3    think I could interpret that.

4         Q.    Did doctors prescribe too many

5    opioid -- well, strike that.  I'll try it

6    again.

7         A.    Let me --

8         Q.    Was there a period of time

9    when -- or do you believe doctors prescribed

10   more opioid pills than were medically

11   necessary for their patients?

12              MR. FULLER:  Object to form.

13        He's not a medical doctor.

14        A.    Well, my investigation into

15   some of them that I detailed as at least

16   bulleted in my report, would say that I would

17   ask -- answer that affirmatively because I

18   have some experience with doctors who did

19   issue illicit or diverted prescriptions.

20              So, you know, just in a general

21   answer would be yes.  Now, I'm not going to

22   qualify that with how many or what, but

23   that's one of the essences of how diversion

24   occurs.

25              ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NICHOLAS:

2         Q.    Are you able to tell -- well,

3    you wrote on your report on page 46, and we

4    read this already, that you had been asked to

5    identify the number of opioid pills that

6    entered Cuyahoga and Summit Counties

7    unlawfully, and then you went on to say it's

8    an impossible task, right?  Page 46, first

9    full paragraph.

10        A.    Yes.

11        Q.    Okay.  Are you able to tell us

12   the correct number of pills that should have

13   been shipped into Cuyahoga and Summit

14   Counties lawfully?

15        A.    No, sir, I cannot provide that

16   information -- or did I calculate that

17   information or --

18        Q.    Do you have any sense of it at

19   all?

20        A.    Well, I'm supportive of my

21   opinion, and that's the failures by the

22   registrants during the time period was a

23   significant contribution to diversion and the

24   amount of pills.  But to put a calculated

25   number, I can't do that.  My methodology has

Highly Confidential - Subject to Further Confidentiality Review

1    come to some conclusions based on, you know,

2    the due diligence factors.

3         Q.    And in some regards, you'd

4    almost have to be a doctor to know an answer

5    to a question like that, right?

6              MR. FULLER:  Form.

7         A.    Well, I think that would be one

8    aspect, to be a doctor.  But then, you know,

9    there's a lot of other factors that also

10   would be taken into consideration.

11   BY MR. NICHOLAS:

12        Q.    But, I mean, you don't feel

13   qualified to look at a prescription for a

14   patient and know whether that prescription is

15   appropriate or not, correct?

16        A.    Well --

17             MR. FULLER:  Same objection.

18        A.    I don't want to be

19   argumentative, but in my experience of doing

20   some cases, there have been instances where I

21   could look at a prescription, knowing how it

22   was written or the procedure that it was

23   used, and I could say that that was not a

24   legitimate prescription.

25             One example would be in one of

Highly Confidential - Subject to Further Confidentiality Review

1    the cases I worked, patients would meet

2    doctors -- not patients.  People would meet a

3    doctor in a parking lot, pay a hundred

4    dollars and get a prescription.  So I don't

5    know that I would have to be a doctor to be

6    able to say that wasn't a legitimate

7    prescription.

8    BY MR. NICHOLAS:

9         Q.    Fair enough.  Sounds like

10   you're a little bit of a doctor, a little bit

11   of a lawyer and a little bit of a witness.

12        A.    I just think that that doesn't

13   take either -- any of those quantifications

14   to say that there's something wrong with that

15   prescription.

16        Q.    Okay.  Just a little more, and

17   then I'll be done.

18             Now, you attended DEA basic

19   diversion investigator school in 2004; is

20   that right?

21        A.    Yes, sir.

22        Q.    Was that training at Quantico?

23        A.    Yes, sir, it was -- I don't

24   want to say custodial training.  It was a --

25   you actually stayed at the facility, 12-week

```
 1              Q.      Now, there are some customers,
 2      isn't it true, who are going to consistently
 3      order over these limits because they're large
 4      customers; isn't that right?
 5                      MR. FULLER:  Object to form,
 6              vague.
 7              A.      Well, I guess that is a
 8      possibility.  I didn't see anything that
 9      would not require an employee of Cardinal to
10      follow this procedure that would exempt any
11      type of customers or have them fail to take
12      this appropriate -- or this -- not
13      appropriate -- take this action as required.
14      BY MR. PYSER:
15              Q.      What the policy says is on a
16      daily basis, cage-involved personnel should
17      be policing and identifying individual orders
18      that appear excessive in relation to what
19      other customers are buying and/or the
20      customer's purchase history.  In these
21      situations DEA should be notified if possible
22      before the order is shipped and a copy of all
23      such orders should be maintained in the
24      division's suspicious order file, along with
25      the regulatory agency contact form noting any
```

1    specific instructions from DEA.

2              Correct?

3         A.    Yes, sir.

4              MR. FULLER:  And I don't know

5         what he's reading from, but if you

6         want to pull the policy to make sure

7         he's reading it accurately, you're

8         welcome to do so.  I don't know --

9              MR. PYSER:  Counsel, we can

10        drop the speaking objection.  He's

11        already answered.

12             MR. FULLER:  No, I won't drop

13        the speaking objections.

14   BY MR. PYSER:

15        Q.    So let's take an example, the

16   Cleveland Clinic.  They're in Cleveland,

17   Ohio.  It's a large medical facility.

18             Would you expect the

19   Cleveland Clinic to order, when they order

20   from Cardinal Health, more than 800 capsules

21   of hydrocodone at a time?

22        A.    I don't really have an opinion

23   either way.  It's a possible reasonable

24   assumption, but without seeing the

25   distribution datas or the purchasing

1    requests, I don't know.

2         Q.    And you haven't looked at that

3    information.  You haven't gotten to that

4    level of granularity in your work?

5              MR. FULLER:  Form.

6         A.    I didn't review the Cleveland

7    Clinic or the ingredient limit reports for

8    specifically looking for the Cleveland

9    Clinic.  I focused on the retail or the

10   pharmacies.

11   BY MR. PYSER:

12        Q.    Do you believe that Cardinal

13   Health should have stopped shipping

14   hydrocodone and other pain medicine to the

15   Cleveland Clinic based on the fact that there

16   were times when the Cleveland Clinic ordered

17   more than 800 tabs of hydrocodone at a time?

18        A.    So how I'll answer that is that

19   this policy was set up by Cardinal and it's

20   in response to how Cardinal identified the

21   scope of the businesses they supply.

22              So my opinion is based on the

23   policy that Cardinal set up.  I didn't set up

24   this policy for them; they did.  So if their

25   policy requires them to take an act and

1    they've set the limit up at 800 tablets, then

2    unless they modify their policy or they have

3    some exception, I -- this is their policy,

4    and this is what they're requiring their

5    employees to do.

6         Q.    Sir, do you think that it would

7    be appropriate to deny cancer patients at the

8    Cleveland Clinic medication based on this

9    absolute limit?  Yes or no?

10             MR. FULLER:  Object to form.

11             That wasn't the same question.

12        A.    Well, I think to answer that

13   question, if that did occur because they had

14   a defective suspicious order system, they

15   should correct that so that doesn't occur.

16             But so -- I guess that's a

17   hypothetical that I don't really want to

18   comment on, but the main thing that I want to

19   make sure is that -- on my statement is that

20   this is Cardinal's policy, and this is what

21   they're requiring their employees to do.

22   BY MR. PYSER:

23        Q.    Sir, where do you get the

24   opinion that there was no flexibility around

25   this policy and Cardinal Health had no choice

1    specifically say it's something they did or

2    didn't do.  I would just give them in some

3    matters guidance.  It would be a guidance

4    that -- because in most regulatory

5    investigations, I may ask to see some due

6    diligence on a specific customer, and

7    sometimes it would come up when I asked for

8    it that they -- the registrant would tell me

9    that it's not a required record.

10            So the option was this is -- as

11    part of a work plan or a regulatory

12    investigation, a registrant wouldn't have to

13    show me the due diligence.  In that case, I'd

14    have to subpoena.

15    BY MR. PYSER:

16        Q.    You're one diversion

17    investigator when you were working at DEA,

18    correct?

19        A.    Yes.

20        Q.    Do you know one way or the

21    other whether the diversion investigators who

22    visited Cardinal Health's facilities ever

23    told them about this indefinite record

24    retention policy that you're putting forward

25    in your expert report?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  Objection.  And
 2         remind you of your Touhy obligation.
 3         Anything that is internal policy at
 4         DEA or communicated while you were on
 5         the job is outside the scope of what
 6         you're authorized to testify to.
 7         A.    I'm not aware.
 8    BY MR. PYSER:
 9         Q.    So on page 50 of your report,
10    you have a chart that talks about suspicious
11    orders reported in the CT1 jurisdictions,
12    right?
13         A.    Yes.
14         Q.    Okay.  And there's two columns,
15    pre-shipment reporting and then -- on the
16    left, and on the right, post-shipment
17    reporting, right?
18         A.    Right.  Yes, sir.
19         Q.    Okay.  On the right side, the
20    post-shipment reporting, it's blank until
21    2005, correct?
22         A.    Yes, sir.
23         Q.    And that's blank there because
24    you know from testimony that Cardinal Health
25    was submitting ingredient limit reports to
```

1    DEA, but we just no longer have those

2    records; is that right?

3         A.    Sir, I believe my report says

4    that I could not find those -- I could not

5    find -- those weren't provided to me and I

6    did not find those reports.

7         Q.    You also reviewed the testimony

8    of Steve Reardon we talked about earlier

9    today, and he said Cardinal Health was

10   sending ingredient limit reports to the DEA

11   beginning in the early '90s, correct?

12        A.    I don't have a recollection of

13   that exact statement in his deposition.

14        Q.    Did you have any reason to

15   believe Mr. Reardon wasn't telling the truth

16   if that is, in fact, what he said?

17        A.    No, I don't have any

18   independent knowledge of not -- whether to

19   believe him or not to believe him.

20        Q.    So on page 50 we have blanks

21   under post-shipment report, where it's

22   unknown, but you filled in zeros on the left

23   side for pre-shipment reports all the way

24   from 1996 to 2012, correct?

25        A.    Yes.

1    Q.    We talked earlier about these

2  agency contact forms for phone calls to DEA?

3    A.    Yes, sir.

4    Q.    Is it possible that at some

5  point from 1996 through 2012 employees from

6  Cardinal Health may have called DEA before

7  shipping an order that was destined for

8  Cuyahoga or Summit County?

9    A.    If that occurred, I would have

10  an expectation to see one of the agency

11  contact forms.

12    Q.    But knowing that we don't have

13  any agency contact forms from Wheeling, West

14  Virginia, is it possible that people spoke on

15  the phone, but today, from 1996, it's

16  23 years later, so 23 years later, is it

17  possible a phone call was made but we don't

18  have a record of it?

19        MR. FULLER:  Objection,

20      misstates evidence.

21    A.    So I can only comment on the

22  facts of which I know and what records exist.

23  I don't make comments on hypothetical

24  situations of whether it could have occurred

25  and there was no documentation or it's lost

Highly Confidential - Subject to Further Confidentiality Review

1    diligence, but that wasn't the program, and

2    it was just one occurrence, then I don't

3    think it's really faulty.

4              I think it requires that the

5    company acted -- actually had to have some

6    procedure in place to actually do due

7    diligence investigations, not just one

8    instance.

9         Q.    But in your report you assume

10   that there was no due diligence and that

11   Dr. McCann then relied on that assumption,

12   correct?

13             And so my question is very

14   specific:  If McKesson conducted sufficient

15   due diligence on that first flagged order

16   under its LDMP program, its CSMP program, its

17   Section 55 program, you would agree sitting

18   here today that the results that we see from

19   Dr. McCann's analysis, they would be

20   different?

21             MR. FULLER:  Object to form,

22        misstates the fact.  The witness

23        didn't make the assumption there was

24        no due diligence.  He's testified

25        based on his opinion there's not

Highly Confidential - Subject to Further Confidentiality Review

1          adequate due diligence.

2          A.     That's hypothetical.  I

3    wouldn't say one -- one due diligence would

4    reset it if the company's conduct continued

5    along the same, the same level, so -- and

6    my -- and my requirement to Dr. McCann was

7    that during the entire time period, I did not

8    see a sufficient due diligence to satisfy the

9    regulatory requirements, so that's why it was

10   ran during the whole time frame.

11   BY MR. EPPICH:

12         Q.     How many due diligence

13   investigations or analyses would be enough to

14   be sufficient due diligence?

15         A.     Every one of the suspicious

16   orders.

17         Q.     Did you review any of the

18   flagged orders from Dr. McCann's analysis of

19   McKesson?

20         A.     No, sir.

21         Q.     Do you intend to offer any

22   opinions on whether the orders flagged by

23   Dr. McCann are legitimate or suspicious?

24         A.     If that requirement is required

25   of me by the attorneys in the case, I would

1    complete that analysis.  I don't have any

2    independent intentions of doing that.

3         Q.    Sitting here today, you have no

4    opinions about the legitimacy of the flagged

5    orders from Dr. McCann's analysis, correct?

6              MR. FULLER:  That misstates his

7         report.

8         A.    It's -- Dr. McCann's report

9    doesn't report orders, it just reports dosage

10   units.  It doesn't say how many orders.  It

11   doesn't say there was an analysis of each

12   individual order.

13             It looked at them whether or

14   not they violated the trigger that was

15   provided for each one of them, and if it --

16   and then it moved forward without the --

17   because already knowing that there was

18   insufficient due diligence.

19   BY MR. EPPICH:

20        Q.    And you reviewed -- let me

21   strike that.

22             Let's turn to page 74 of your

23   report.  On page 74, I'm looking at

24   Section 6, the second paragraph in

25   particular.  The first sentence there says:

Highly Confidential - Subject to Further Confidentiality Review

1    There is no more effective control to prevent

2    diversion than blocking a suspicious order

3    before it is shipped.

4              Did I read that correctly?

5    A.      You did, sir.

6    Q.      And that's because a blocked

7    order of opioids remains safely in the vault

8    of the distributor's warehouse, correct?

9    A.      I guess you could make that

10   assumption.  It doesn't leave the control of

11   the distributor and have the potential to be

12   diverted, so I think that's probably the same

13   statement, yes, sir.

14   Q.      You'd agree that reporting the

15   blocked order to DEA in a suspicious order

16   report does not prevent the blocked order

17   from being diverted, correct?

18   A.      Well, that hypothetical

19   wouldn't occur because if you block an order

20   and report it, that doesn't -- unless you're

21   saying that that causes a distribution, and

22   if that causes the distribution without the

23   effective due diligence, then no, that would

24   not be true.

25              I would say that it would

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8
 9                    __ __ __
10             Tuesday, May 14, 2019

                      __ __ __
11
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, VOLUME 2, held at Weitz &
17   Luxenburg PC, 3011 West Grand Avenue, Suite
     2150, Detroit, Michigan, commencing at
18   8:25 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21
22
23                    __ __ __
24           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    there were questions related to the summary

2    data, I think I could answer any questions

3    related to that data because it's obviously

4    posted on the DEA website.

5         Q.    All right.  I'd like you to

6    turn to page 37 of your report, which I

7    believe you have in front of you.

8         A.    It is.

9         Q.    And I understand it's

10   Exhibit 16.

11        A.    It is.

12        Q.    Pages 37 through 40 of your

13   report are within a section that starts on

14   page 36.

15             Do you see that?

16        A.    Yes, ma'am, titled Maintenance

17   of Effective Controls Against Diversion of

18   Controlled Substances.

19        Q.    Yeah.  And at the top of

20   page 37, just before the bullet list starts,

21   you wrote:  Included below are some key

22   components that one would expect to see an

23   operational system designed to maintain

24   effective controls against diversion.

25             Did I read that correctly?

```
1              A.      You did, ma'am.

2              Q.      Okay.  Then following that

3    statement at the top of page 37 of your

4    report, you've included a list, a

5    bullet-pointed list, several levels of bullet

6    points, that carries all the way over to

7    page 40.

8                      Would you agree with that?

9              A.      Yes, ma'am.

10             Q.      Is that list of bullet points

11   on pages 37 to 40, is it your opinion that

12   those are requirements to be included in a

13   distributor's suspicious order monitoring

14   system?

15             A.      No, I wouldn't say they're

16   requirements.  As the initial statement said,

17   they would -- I would expect to see those as

18   components of an operational system, but it's

19   not a -- not dictating or saying that they're

20   a requirement by the government.

21             Q.      You're not saying that any of

22   those bullet points on pages 37 through 40

23   are requirements, not a single one of them?

24             A.      Oh, to meet the maintenance of

25   effective controls, I think they're all
```

Highly Confidential - Subject to Further Confidentiality Review

1    requirements, but I understood your question

2    to say is this something that would be a

3    regulatory requirement, that something would

4    be in a regulation, these specific things.

5         Q.    Let me --

6         A.    Based on my experience, these

7    are all the things that I believe should be

8    present in a functioning operational

9    suspicious order system.

10        Q.    Let me see if I understand your

11   testimony.

12             You're saying that the list of

13   components on pages 37 to 40 are not

14   requirements under the DEA's suspicious order

15   monitoring regulation; is that correct?

16   That's part one.

17        A.    Well, the word "requirement" is

18   kind of the word that I'm thinking about.  So

19   if you're trying to say that it's a mandate,

20   I would say in order for me to say that it's

21   an operational system, then these things

22   would need to be present.  If they weren't

23   present, it wouldn't be an operational

24   system.

25             So if you were to say that you

1    could take this and say the DEA said you must

2    have these things in your system, there's a

3    possibility that maybe one of them wouldn't

4    be there and it still could function.

5              So I wouldn't say -- I don't

6    want to say that this is dictating exactly

7    what has to be in a system, but in my

8    experience in reviewing a lot of systems,

9    these would be the key components I would

10   expect to see.

11        Q.    All right.  Now I'm more

12   confused than I was before.

13        A.    Okay.

14        Q.    If I understand what you're

15   saying, it seems like you're saying the

16   bullet list at pages 37 to 40 are not

17   required by the DEA's suspicious order

18   monitoring regulation, but they are required

19   by the maintenance of effective controls

20   against diversion?

21        A.    Let me start over.  So --

22        Q.    Just -- can you just say yes or

23   no?  I really want to just know if I'm

24   following you.

25              MR. FULLER:  No, he can explain

Highly Confidential - Subject to Further Confidentiality Review

1          clarify.

2                    MS. SWIFT:  All right.  Let me

3          see if I can clean this up.

4                    MR. FULLER:  Sure.

5     BY MS. SWIFT:

6          Q.     There was a pronoun in the

7     question that I thought Mike was correcting.

8                    When you say -- let's see.  The

9     maintenance of effective controls is in the

10    large regulation which is above, or the

11    hierarchy, did you mean 1301.74(a)?

12         A.     Well, that is the regulation.

13    I'm also aware that the laws in 823, USC 823.

14         Q.     As your counsel just reminded

15    you?

16         A.     Well, I've always known that

17    whether counsel reminded me or not.

18         Q.     Understood.  Understood.

19         A.     So that's the regulation, it's

20    both the law regulation and the law.  Only --

21    1301.74(b) is only a regulation, which is

22    part of the security program, which is part

23    of maintenance of effective controls.

24                    So it's kind of bulleted so

25    that the top regulation is maintenance of

1    effective controls.  Falling under that is

2    suspicious order system.

3         Q.    So the list on 37 to 40, these

4    are not requirements under 1301.74(b), the

5    suspicious order monitoring regulation,

6    correct?

7         A.    So I'd like to answer that by

8    saying I believe these are all components,

9    which would be necessary to have an effective

10   suspicious monitoring -- a suspicious order

11   monitoring system.

12        Q.    And with respect, sir, that's

13   not what I asked you.

14              Are the bullet list components

15   on pages 37 to 40 of your report required

16   under 1301.74(b), the suspicious order

17   monitoring --

18        A.    Yes, they are.

19        Q.    Okay.  All of them?

20        A.    Yes.

21        Q.    Okay.  Great.  Thanks.

22              Is it possible to have a

23   compliant suspicious order monitoring system

24   without all of these components?

25        A.    Yes, I think it would be

1    possible.

2         Q.    But they are all requirements?

3         A.    Based on -- depending on the

4    scope of the business that's the customer and

5    based on the scope of activity of the

6    distributor, I would say that some of

7    these -- there could be some of these that

8    would not be necessary.  But I'd also say

9    that there may be some that aren't identified

10   on this list.  And also, based on the fact

11   that the distribution activity is not static

12   and it changes.

13        Q.    So if I'm following you, all of

14   the bullet-listed components on pages 37 to

15   40 are, in fact, required under 1301.74(b),

16   but you could have a compliant suspicious

17   order monitoring system without all of these

18   compliant -- components, and, in fact, there

19   may be other components that are required

20   under 1301.74(b) that are not included in

21   this list.

22              Do I have all that, correct,

23   sir?

24        A.    I believe that's correct, yes.

25        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I'm not saying this is an

2    exclusive list and there might not be other

3    things that I have not considered or might

4    come up based on the type of business

5    activities that are involved.

6      Q.      On page 39, if you would take a

7    look, please.  You say, the top bullet, that:

8    A robust and well-documented due diligence

9    program is key.

10           And then it goes on from there

11   and provides components that you say you

12   would like to see in a due diligence

13   compliance program for suspicious orders,

14   correct, sir?

15     A.      Yes, ma'am.

16     Q.      Is it your opinion that a

17   distributor has to do all of the diligence

18   steps listed here in order to comply with the

19   law?

20     A.      Yes, ma'am.

21     Q.      All right.  I want you to hold

22   on to these pages of your report for a

23   minute, please.  And I'm going to hand you a

24   document.  This will be Exhibit 19.

25           (Whereupon, Deposition Exhibit

 1          Rafalski-19, 5/17/06 Corso Letter,

 2          WAGMDL00753477 - WAGMDL00753479, was

 3          marked for identification.)

 4                  MR. FULLER:  Are they all the

 5          same?

 6                  MS. SWIFT:  They're all the

 7          same.

 8                  MR. FULLER:  Okay.

 9     BY MS. SWIFT:

10          Q.    Okay.  Exhibit 19 is a

11     May 17th, 2006 letter from the DEA to Todd

12     Polarolo at Walgreens in Perrysburg, Ohio,

13     correct, sir?

14          A.    Yes.

15          Q.    Do you recognize this as a

16     letter the DEA sent to Walgreens after an

17     audit of Walgreens' Perrysburg, Ohio

18     distribution center in 2006?

19          A.    I recognize it only based on my

20     review of documents for preparation of this

21     is the first time I've seen this, from my

22     report.

23          Q.    You're mentioned in the first

24     paragraph of the May 17th, 2006 letter,

25     correct, sir?

1      A.     I was there, yes, ma'am.

2      Q.     When you were at the Detroit

3  field office, you were involved in this audit

4  of Walgreens' Perrysburg, Ohio distribution

5  center, correct, sir?

6      A.     Yes, ma'am.

7      Q.     This was a routine audit before

8  Walgreens' Perrysburg distribution center

9  started distributing Schedule II controlled

10 substances in early 2007, correct, sir?

11     A.     No, that's not correct.

12     Q.     What is the basis of your

13 statement that that's not correct?

14     A.     It's a regulatory audit, but it

15 was just scheduled as part of the work plan

16 program.  It wasn't in response to the second

17 part of your question, Schedule II controlled

18 substance authorization.

19     Q.     Are you offering that testimony

20 based on your personal involvement with an

21 investigation of Walgreens while you were at

22 the DEA?

23         MR. FULLER:  Again, I remind

24     you, Mr. Rafalski, that your

25     authorization does not and

1          specifically addresses the fact that

2          Walgreens was an investigation that

3          you conducted that you're not

4          authorized to talk about it based on

5          your personal knowledge.  Just from

6          what information you gained in this

7          litigation.

8     BY MS. SWIFT:

9          Q.     Do you want to retract the

10    testimony that you gave a moment ago?

11         A.     Yes, thank you.

12         Q.     This 2006 letter that I marked

13    as Exhibit 19 that the DEA sent to Walgreens

14    does not include the three pages of guidance

15    on what Walgreens' suspicious order

16    monitoring system should look like that you

17    included in your report at pages 37 to 40,

18    does it, sir?

19         A.     It does not.

20         Q.     This 2006 letter the DEA sent

21    Walgreens, it says what DEA thought Walgreens

22    was doing wrong.  It doesn't provide an

23    explanation of what we should do to do it

24    right, correct, sir?

25         A.     That's an accurate description

1    of what the letter says, yes, ma'am.

2        Q.      You did not provide to

3    Walgreens the three pages of requirements

4    that are included in your report.  You didn't

5    give those to Walgreens in 2006, correct,

6    sir?

7            MR. FULLER:  Object to form.

8        Don't answer that, that would be based

9        on your own investigation, not

10       knowledge of this case.

11   BY MS. SWIFT:

12       Q.      You're not going to come to

13   trial and say you provided these three pages

14   of guidance to Walgreens in 2006, correct,

15   sir?

16       A.      If the Touhy is still in place,

17   I would say that I would not be able to

18   testify to that.

19       Q.      You worked with the folks at

20   Walgreens' Ohio distribution center for

21   several years, correct, sir?

22       A.      I'll respond to that question

23   by saying as part of my assignments as a

24   diversion investigator, I went on-site to

25   that facility several times.  I'm not sure I

1    would agree that I worked with them, but I

2    was present at the registered location.

3          Q.    You worked with Steve Kneller a

4    fair amount?  He works at the Perrysburg

5    distribution center.

6          A.    I know the name Mr. Kneller.  I

7    think it's K-N-E-L-L-E-R?

8          Q.    Correct.

9          A.    I recognize that he was the

10   person that if I was on-site, that he would

11   be the person that I would have contact with,

12   yes, ma'am.

13         Q.    Did you know Justin Joseph as

14   well?

15         A.    There was another -- there was

16   one other person with him, and I don't know

17   that that was Mr. Joseph.  I do remember who

18   Mr. Polarolo was, but I'm not sure.

19         Q.    You never told Steve or Justin

20   or Todd Polarolo or anybody else at the

21   Perrysburg distribution center, here's a list

22   of things your suspicious order monitoring

23   system is supposed to have, did you, sir?

24               MR. FULLER:  Object to form.

25         I'd remind you of your Touhy

1              authorization.

2                   THE WITNESS:  Based on the

3              Touhy, I'm not going to answer.

4    BY MS. SWIFT:

5         Q.    You don't say anything like

6    that -- strike that.

7                   The DEA doesn't say anything

8    like that in this 2006 letter, correct, sir?

9         A.    None of the things that are in

10   the pages we've discussed is present in this

11   letter.

12        Q.    You also don't say in your

13   report that you told Walgreens at any point

14   in time, here's what your suspicious order

15   monitoring system is supposed to look like?

16        A.    My report does not indicate

17   that I told them that, that's a correct

18   statement.

19        Q.    Did anything prevent you from

20   providing these pages of guidance on

21   suspicious order monitoring to Walgreens in

22   2006 or at any other point in time?

23                  MR. FULLER:  Object to form.

24             If it would deal with internal DEA

25             policies and what agents were and were

Highly Confidential - Subject to Further Confidentiality Review

1          not allowed to do, you're not

2          authorized to answer that.

3                    THE WITNESS:  I think based on

4          the Touhy, I'm not going to answer

5          that question.

6     BY MS. SWIFT:

7          Q.    Your position today, 13 years

8     after this 2006 letter from the DEA to

9     Walgreens, your position today after you've

10    been hired by the plaintiffs' lawyers and

11    paid to offer opinions in this case is that

12    these pages of your report, these three pages

13    listing these requirements, are all obligated

14    by law; is that right, sir?

15         A.    I think I've always believed

16    they were obligated by the law.  I would

17    probably say in 2006, the environment in

18    regards to the opioid crisis and diversion,

19    probably the environments changed.

20                    So I'm not sure that all of

21    these would have been something that I would

22    have used or been aware of at that time.

23                    I think this is fluid and it's

24    changed over a period of years, but

25    generally, the answer to your question...

1      Q.     My question is simply:  Do you

2   agree with me that the formula in

3   Appendix E(3) that Walgreens used to report

4   suspicious orders from 2007 to 2012 is not

5   the same as the customer grouping formula

6   Walgreens was using in 2006?

7      A.     Well, this statement just goes

8   to say that they used the same multiplier, so

9   the three multiplier is the same as the E(3)

10   as it is in the area referenced in the prior

11   time period.

12      Q.     The two formulas are not the

13   same, correct, sir?

14      A.     The formulas are not, but the

15   multiplier is.

16      Q.     Okay.  That's all I'm trying to

17   get an understanding from you is whether the

18   customer grouping formula that Walgreens was

19   using when it received the 2006 letter from

20   the DEA is the same or different from the

21   formula it changed to use afterwards?

22      A.     There's no customer grouping in

23   the subsequent years --

24      Q.     Thank you.

25      A.     -- starting in 2007.

1     Q.     You didn't do -- well, strike

2  that.

3            You don't say in your report

4  that you or anyone else at the DEA ever told

5  Walgreens not to use the formula found in

6  Appendix E(3) of the Chemical Handler's

7  Manual, correct, sir?

8     A.     Appendix E(3) was never

9  discussed in my presence with Walgreens.

10    Q.     The DEA's 2006 letter to

11 Walgreens doesn't say not to use the E(3)

12 formula, correct?

13    A.     I still stand by my previous

14 statement.  The E(3) appendix was never

15 discussed by me or anyone in my presence the

16 whole time I was at Walgreens.

17    Q.     And it's not mentioned in this

18 letter either?

19    A.     It is not mentioned in that

20 letter.

21    Q.     All right.  I'd like you to

22 turn to page 40 of your report, please.  Is

23 that 40?

24    A.     I'm sorry.

25    Q.     I believe you testified

1    yesterday that you did not review any of the

2    flagged orders from Dr. McCann's analysis; is

3    that correct?

4         A.    I think my testimony in that

5    area was any specific orders.  That would be

6    correct of what my testimony was, yes.

7         Q.    You did not do any analysis to

8    see whether any specific suspicious order

9    caused the diversion of any specific pills

10   for nonmedical use, correct?

11        A.    In regards to Dr. McCann's --

12        Q.    Correct.

13        A.    That would be a correct

14   statement.  I didn't do a specific order of a

15   specific drug, if I understand your question

16   properly.

17        Q.    Well, you asked for a

18   clarification of whether I was speaking about

19   Dr. McCann's analysis.

20             You didn't do any analysis to

21   see whether any specific suspicious order

22   caused the diversion of any specific pills,

23   correct?

24             MR. FULLER:  Object to form.

25        A.    I think that's an accurate

1   statement.

2   BY MS. SWIFT:

3       Q.    You testified yesterday that

4   you endorsed Flagging Method A, which you can

5   see at the top of page 41 of your report.

6   Because it -- is that correct?

7       A.    I think that's an accurate

8   statement.  It was -- I endorsed it because

9   it was utilized by the Masters

10  Pharmaceutical.

11      Q.    Is that the only reason you

12  endorsed Flagging Method A?

13      A.    No, that wouldn't be the only

14  reason, no, ma'am.

15      Q.    Did any of the plaintiffs'

16  lawyers instruct or suggest to you that you

17  use Flagging Method A?

18      A.    No.

19      Q.    What other reasons did you

20  endorse Flagging Method A?

21      A.    One, it was part of one of the

22  investigations I conducted, so I was familiar

23  with it.  I believe it was discussed at an

24  administrative hearing with the DEA,

25  subsequently reviewed by the D.C. Court, and

1    there was a ruling on it from the D.C. Court

2    and also the one ruling that it was part of

3    this litigation, I think...

4         Q.    Discovery Ruling 12?

5         A.    Yes, Discovery Ruling 12.  So I

6    think it's had some scrutiny.  I think it

7    would be the proper one.  And that's...

8         Q.    What analysis, if any, did you

9    undertake to test each of the five flagging

10   methodologies and their ability to identify

11   suspicious orders?

12        A.    Could you say that one more

13   time, please?

14        Q.    Sure.

15             What analysis, if any, did you

16   do to test the five flagging methodologies in

17   your report and their ability to identify

18   suspicious orders?

19        A.    I didn't personally do any

20   tests.  I'm aware that they could have been

21   done by Dr. McCann, but I didn't personally

22   do them.

23        Q.    Do you know whether Dr. McCann

24   conducted any analysis at all to test the

25   five flagging methodologies and their ability

1    to identify suspicious orders?

2                 MR. FULLER:  Object to form.

3          A.    He had an extensive report.

4    I'm not sure on that.  I believe he did, but

5    I'm not sure.

6    BY MS. SWIFT:

7          Q.    Why do you believe Dr. McCann

8    did any analysis at all to test the five

9    flagging methodologies and their ability to

10   identify suspicious orders?

11                MR. FULLER:  Object to form.

12         A.    Well, I think that's what this

13   does.

14   BY MS. SWIFT:

15         Q.    You think that's what what

16   does?

17         A.    I think the methodology of A

18   identifies suspicious orders based on that

19   methodology, and then it provides them in

20   dosage units.  So I think ultimately, for

21   these dosage units to appear on this page,

22   there had to be flagged suspicious orders.

23         Q.    You're pointing to a page of

24   your report, not Dr. McCann's report,

25   correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1         A.     Right.  But -- yes.  But for me

2    to see this --

3              MR. FULLER:  Form.

4         A.     -- I would have to know that

5    this methodology had flagged suspicious

6    orders because that's the only way the dosage

7    units could appear on this chart.

8    BY MS. SWIFT:

9         Q.     Did you read Dr. McCann's

10   report?

11        A.     I did.

12        Q.     When did you read Dr. McCann's

13   report?

14        A.     Sometime after he had submitted

15   it and reviewed his charts resulting from his

16   analysis.

17        Q.     Did you read Dr. McCann's

18   report before you put together this section

19   of your report that appears at page 41?

20        A.     No.

21        Q.     Flagging Methodology A -- I'm

22   still at page 41 of your report.  I'm going

23   to focus on the rows of these tables that

24   we've got here that relate to my client,

25   which is Walgreens, okay?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Sure.  Yes, ma'am.

2    Q.    Flagging Methodology A flagged

3    95% of all Walgreens orders by dosage unit of

4    oxycodone and hydrocodone, correct, sir?

5    A.    Yes, ma'am.

6    Q.    Is it your professional opinion

7    to a reasonable degree of certainty that 95%

8    of Walgreens orders should not have been

9    shipped?

10   A.    Based on the conduct of

11   Walgreens and the failure to do due diligence

12   on suspicious orders, yes, ma'am.

13   Q.    Is it your opinion to a

14   reasonable degree of certainty that only 5%

15   of orders from Walgreens stores should have

16   been shipped and available to fill

17   prescriptions for Walgreens patients?

18   A.    Well, that would be the

19   converse of this statement, but based on

20   their conduct -- I'll go back again, based on

21   their conduct and their failure to do

22   diligence after identification of suspicious

23   orders, the only conclusion I can draw is

24   that subsequent to that act, all of the

25   controlled substances were diverted.

 1          Q.     So that's a yes, your opinion

 2    is that only 5% of orders from Walgreens

 3    stores should have been shipped and available

 4    to fill prescriptions for Walgreens patients?

 5                 MR. FULLER:  Object to form.

 6          A.     I really don't know because

 7    Walgreens didn't conduct the proper due

 8    diligence.  But based on the methodology and

 9    how I applied it, that's the results of the

10    methodology.

11    BY MS. SWIFT:

12          Q.     You don't know whether it's

13    true that only 5% of orders from Walgreens

14    stores should have been shipped and available

15    for prescriptions to be filled for Walgreens

16    patients?

17          A.     I guess you would draw that

18    conclusion based on 95.3% based on the

19    conduct of Walgreens, yes, ma'am.

20          Q.     You would draw the

21    conclusion --

22          A.     I would draw the conclusion

23    based on --

24          Q.     Let me ask the question so the

25    record is clear.

1          You would draw the conclusion

2    that only 5% of Walgreens orders should have

3    been shipped so that prescriptions could be

4    filled for Walgreens patients?

5          MR. FULLER:  Object to form,

6       asked and answered.  You've asked it

7       twice now or three times, probably.

8          A.     Same as my previous statement.

9    Based on Walgreens' conduct in regards to

10   applying this methodology, that would be a

11   correct statement, yes, ma'am.

12   BY MS. SWIFT:

13         Q.     You didn't do any analysis of

14   how many people would not have gotten their

15   medication if 95% of Walgreens orders had not

16   shipped, correct, sir?

17         A.     I did not.

18         Q.     You didn't do any analysis of

19   how many legitimate prescriptions would have

20   gone unfilled if 95% of Walgreens orders had

21   not been shipped, correct, sir?

22         A.     I did not do that analysis, no,

23   ma'am.

24         Q.     In your report, you don't offer

25   an opinion on the legitimacy of any of the

1    other flagging methods you talk about,

2    correct?

3         A.    That's correct.

4         Q.    You didn't offer any criticisms

5    of any of the five flagging methods in your

6    report, correct, sir?

7         A.    Oh, I think I did.

8         Q.    Where did you offer criticisms

9    of any of the five flagging methods in your

10   report?

11        A.    You're saying the

12   methodology --

13        Q.    Correct.

14        A.    -- for example, the three

15   times?

16        Q.    There are five methodologies --

17             MR. FULLER:  Go ahead and

18        finish your answer, Raf.

19             MS. SWIFT:  Yes, I was

20        answering his question.  There was no

21        pending question.

22        A.    Yes.  Throughout my report, I

23   think there's reviews of these methodologies,

24   and I think I'm critical of each of the

25   methodologies, with the exception of

Highly Confidential - Subject to Further Confidentiality Review

1    data that it would have to indicate specific

2    orders which would identify those pharmacies.

3              Now, whether he looked at them

4    specifically to that pharmacy, but based on

5    your question, just the analysis of the ARCOS

6    data, that -- that actually would occur

7    because each order would be specific to a

8    pharmacy.

9              He didn't -- if I understand

10   your question, he didn't look at them in

11   terms of each specific pharmacy, but the

12   nature of the analysis, it is by the pharmacy

13   by the orders.

14        Q.    You did not perform an analysis

15   to see whether Walgreens performed diligence

16   on any of the actual orders that flagged on

17   any of your five methodologies in

18   Mr. McCann's analysis, correct?

19        A.    Well, my investigation and

20   opinion of Walgreens does state that in

21   regards to the due diligence topic.

22        Q.    Listen to my question.  That's

23   not what I'm asking about.

24        A.    Okay.

25        Q.    We'll get to the stuff you say

Highly Confidential - Subject to Further Confidentiality Review

1    in your report about the due diligence that

2    Walgreens did.

3              You didn't perform an analysis

4    to see whether Walgreens performed diligence

5    on any of the specific orders that flagged on

6    any of these five methodologies, correct,

7    sir?

8         A.    I'm not aware of any due

9    diligence for those orders, that's correct.

10        Q.    That's not what I asked.

11        A.    I didn't -- I didn't

12   specifically go to McCann's report and look

13   at each order of Dr. McCann's and try to find

14   due diligence.  I just looked at the scope of

15   the due diligence by Walgreens.

16        Q.    You didn't go to Dr. McCann's

17   report and look at any order of -- that

18   flagged on any of the analyses.

19        A.    That's a correct statement.

20        Q.    For any of the five flagging

21   methods that you talk about, did you consider

22   the impact of stocking a new store's shelves?

23        A.    I did not take that specific

24   incident into consideration, but in my review

25   of due diligence records, I didn't find

1    anything that would indicate that that had

2    occurred.

3         Q.    Did you consider whether any of

4    the five flagging methods that you talk about

5    could flag an order for a store before the

6    store even opened for business, just based on

7    the stocking of the store's shelves?  Do you

8    know whether that happened?

9         A.    I'm not aware that that had

10   happened.

11        Q.    Did you read Dr. McCann's

12   testimony from this past Friday that using at

13   least some of these five flagging methods, an

14   order to stock a new store's shelves could be

15   flagged?

16        A.    I don't recall reading that in

17   his testimony, no, ma'am.

18        Q.    Did you read his testimony yet?

19   I know it was just the other day.

20        A.    I've read so many.  I don't

21   believe so.

22        Q.    I will represent to you, and

23   you can check the transcript, that Dr. McCann

24   testified that for low-volume stores, the

25   store might never have another order as big

Highly Confidential - Subject to Further Confidentiality Review

1    an economist or I've never talked to anyone

2    with the purpose of giving these things to an

3    economist.  So I don't want to imply my

4    testimony is I've never talked to an

5    economist.  I'm not aware of it, but I'm just

6    kind of protecting the fact that if I did, I

7    wasn't even aware of it.

8            Q.    You never explained the data in

9    your report to anyone for the purpose of them

10   taking that data and using it to calculate

11   damages in this litigation?

12           A.    I have never done that.

13           Q.    You testified yesterday that

14   you provided the five flagging methods

15   discussed in your report -- you provided

16   those to plaintiffs' counsel by phone I

17   believe, you said to -- provided them to

18   Mr. Farrell.

19                 Do you remember that testimony?

20           A.    I think that question was the

21   first time that I talked to somebody about

22   it.  So --

23           Q.    I'm trying to get at how the --

24                 MR. FULLER:  Object to the form

25           of the last question.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. SWIFT:
 2         Q.    I'm trying to get at how the
 3    five flagging methods made their way from you
 4    to Dr. McCann.
 5              Do you have any idea how that
 6    happened?
 7         A.    There was a couple of different
 8    discussions with the plaintiff attorneys.
 9    I'm not sure who relayed it to Dr. McCann.  I
10    discussed it with Paul Farrell, Mr. Farrell a
11    couple of times; also with Mr. Fuller.  I'm
12    not sure who relayed it to him, but I
13    discussed the methodologies and how I wanted
14    them applied.
15         Q.    All of those conversations were
16    verbal, is that correct, not in writing?
17         A.    There was nothing in writing,
18    and they were verbal, either in person or on
19    a telephone.
20         Q.    I'm going to hand you what I'll
21    mark as Exhibit 20.
22              MS. SWIFT:  And, Counsel, I
23         apologize, I only have one extra copy.
24         Blame the hotel.  I'm not even going
25         to have a copy for myself.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit

 2            Rafalski-20, Plaintiffs' Responses to

 3            the Amended and Clarified Discovery

 4            Ruling 12 Supplemental Interrogatory

 5            Issued to Plaintiffs, was marked for

 6            identification.)

 7     BY MS. SWIFT:

 8            Q.     Do you have that in front of

 9     you, sir?

10            A.     I do.

11                   THE WITNESS:  Trade you.

12            Sorry.

13     BY MS. SWIFT:

14            Q.     Well, first of all, have you

15     ever seen the document that I've marked as

16     Exhibit 20?

17            A.     I have, yes, ma'am.

18            Q.     The document I marked as

19     Exhibit 20 is a set of interrogatory

20     responses served by the plaintiffs on

21     January 25th, 2019, and if you go to -- I

22     believe it's the sixth page -- there's a list

23     of flagging methodologies prepared at the

24     very end of the written interrogatory

25     response.  Keep going.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  It's not page

 2       numbered.

 3              MS. SWIFT:  I noticed that,

 4       Mike.

 5              MR. FULLER:  We'll blame

 6       Mr. Moody or Mr. Farrell.

 7  BY MS. SWIFT:

 8       Q.    Do you have a list in front of

 9  you, Mr. Rafalski, that lists five flagging

10  methodologies in the plaintiffs'

11  interrogatory response from January 25th?

12       A.    I do.

13       Q.    Are these your five flagging

14  methodologies?

15       A.    Yes, ma'am.

16       Q.    Which one is based on the

17  Masters case?

18       A.    4.

19       Q.    Am I correct based on your

20  testimony today and yesterday that you're not

21  planning to come to trial and offer testimony

22  about any of the flagging methods except the

23  Masters method?

24       A.    No, I don't think that's my

25  testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  All right.  Turning back

 2     to your report -- you can set that aside,

 3     we're done with it -- page 42, I'd like to

 4     take a look at, please.

 5                 MR. FULLER:  I'm sorry,

 6          Counsel, what page?

 7                 MS. SWIFT:  42.

 8     BY MS. SWIFT:

 9          Q.     If you had picked Flagging

10     Method B that's identified at the top of

11     page 42, instead of Method A, the Masters

12     method, what data would you have presented

13     for Walgreens?

14                 MR. FULLER:  Object to form.

15          A.     I don't understand that

16     question.

17     BY MS. SWIFT:

18          Q.     Fair enough.

19          A.     I think I did pick

20     Methodology B, but so I don't understand.

21          Q.     Well, you said you endorsed

22     Method A and that's the only method you

23     endorsed, correct, because of the Masters

24     case and some other reasons?

25          A.     Well, I think I make that
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You didn't --

2    A.    -- trigger.

3    Q.    You can't vouch for the

4    accuracy of any of the numbers that appear in

5    these tables at pages 41 to 45 of your

6    report, correct, sir?

7    A.    Mr. McCann would have to

8    testify to the accuracy.  He did the

9    analysis.

10    Q.    You just relied on what

11    Mr. McCann provided, correct, sir?

12    A.    Yes, I did.

13    Q.    You were -- strike that.

14    You don't have an opinion about

15    whether any particular order that you

16    identified or that Dr. McCann identified as

17    suspicious was diverted to an illicit

18    channel, correct, sir?

19    A.    Well, I think based on the

20    methodologies and the lack of due diligence,

21    I think my -- these say that those were

22    diverted.

23    Q.    My question was a little bit

24    different.

25    A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     You don't have an opinion about
 2     whether any particular order -- you didn't
 3     look at any particular order to see whether
 4     it was diverted to an illicit channel?
 5            A.     I did not --
 6            Q.     Okay.
 7            A.     -- analyze all the orders and
 8     try to find one or locate one that was
 9     diverted.
10            Q.     You didn't analyze any of the
11     orders, correct, sir?
12            A.     That's correct.
13            Q.     You have no opinion about
14     whether any particular order that was flagged
15     as suspicious led to someone's addiction,
16     overdose or death, correct, sir?
17            A.     As of today, I have no opinion
18     on that matter.
19            Q.     Do you plan on coming up with
20     that opinion at some point after today?
21            A.     I can't rule that out if I'm
22     asked to look at that or I'm provided some
23     information I could review that would -- that
24     would indicate that.  So I can't rule out
25     that that would occur.
```

1          Q.     If a prescription was

2     legitimate, the pharmacist was obligated to

3     fill it, correct, sir?

4                 MR. FULLER:  Form.

5          A.     I don't think the DEA speaks to

6     that, whether they're obligated to fill a

7     prescription.

8     BY MS. SWIFT:

9          Q.     Do you know one way or the

10    other whether --

11         A.     If the DEA speaks to that

12    topic?

13         Q.     No, sorry.

14                Do you know whether pharmacists

15    are obligated by their professional

16    responsibilities to fill prescriptions that

17    they have determined are legitimate?  Maybe

18    you don't know one way or the other.

19         A.     Let me think.  I don't know

20    that, the answer to that question.

21         Q.     All right.  Turn, if you would,

22    please, to page 114 of your report.

23         A.     Can I qualify my last answer,

24    quickly?

25         Q.     Sure.

1      Q.      Is that the page 856 that you

2    cite in your report at page 114?

3      A.      Yes, ma'am.

4      Q.      Okay.  This Appendix 10 from

5    McCann's report is what you relied on to

6    determine total volume of oxycodone and

7    hydrocodone that Walgreens shipped into

8    Cuyahoga and Summit Counties; is that right?

9      A.      Yes, ma'am.

10      Q.      You only talk about oxycodone

11    and hydrocodone in your report, correct?

12      A.      Yes, ma'am.

13      Q.      Am I right that you don't have

14    any opinions about any other opioid pain

15    medications besides oxy and hydro?

16      A.      As of today I do not because I

17    was not requested to do any analysis on those

18    other drugs.

19      Q.      After -- turn back to page 1 of

20    Exhibit 21.  The page 1 of Exhibit 21 is a

21    table that shows overall numbers, Total

22    Shipments to Cuyahoga identified by

23    Methodology, Common Sense Method, Maximum

24    Monthly Trailing Six-Month Pharmacy Specific

25    Threshold, Walgreens to All Buyers, 1996 to

1    2018, correct?

2          A.      Yes.

3          Q.      And it's a table that shows

4    numbers broken out by drug and by

5    transaction, dosage units, MME, and base

6    weight, correct?

7          A.      Yes.

8          Q.      After the table on page 1 of

9    Appendix 10, there's a series of bar graphs

10   showing, in the aggregate, Walgreens

11   shipments of oxy and hydro to its pharmacies

12   in the aggregate, correct?

13         A.      Yes, ma'am.

14         Q.      None of these charts shows any

15   data for any individual Walgreens pharmacy,

16   correct?

17               MR. FULLER:  Object to form.

18         A.      That's an accurate statement,

19   but they're all built upon individual orders.

20   BY MS. SWIFT:

21         Q.      I understand.

22         A.      Okay.

23         Q.      I'm just saying, when you're

24   flipping through Dr. McCann's charts that

25   display the results of his flagging

1    methodologies, you can't tell anything about

2    any individual pharmacy, correct?

3         A.    I cannot by looking at these

4    charts.

5         Q.    Do you know how many Walgreens

6    stores there are in Cuyahoga County?

7         A.    I do not.

8         Q.    How about Summit County?

9         A.    I do not.

10        Q.    Do you know anything about the

11   geographic locations of any of Walgreens'

12   pharmacies in Summit or Cuyahoga County,

13   other than the fact that they're in those

14   counties?

15        A.    It doesn't appear in my

16   opinion, but during my review of data, I did

17   at one point take a look by just using the

18   Internet, Googling and looking at some of the

19   locations, but I didn't formulate a report on

20   that.

21             So I won't say that I never did

22   that, but I don't have any records or

23   documents that would record exactly the

24   distances and the locations.

25        Q.    You also didn't include in your

Highly Confidential - Subject to Further Confidentiality Review

1    report anything about the specific customer

2    base for any individual Walgreens pharmacy,

3    correct, sir?

4         A.    I did not.

5         Q.    Do you know how many of the

6    Walgreens pharmacies in Cuyahoga and Summit

7    County are on corner lots?

8         A.    I do not.

9         Q.    Do you know how many of the

10   Walgreens pharmacy in Summit and Cuyahoga

11   Counties are freestanding locations with

12   their own dedicated parking and a

13   drive-through window?

14        A.    I do not.

15        Q.    Do you know how much oxycodone

16   or hydrocodone Walgreens distribution centers

17   shipped to any one of those Walgreens

18   pharmacies?

19        A.    I do not.  I had not done that

20   analysis up to today.

21        Q.    You can't tell any of that from

22   the charts that are in Appendix 10, correct,

23   sir?

24        A.    That's correct.

25        Q.    All right.  You can set that

1    one aside.

2              Turn, if you would, please,

3    sir, to page 117 of your report.  This is a

4    section within the Walgreens section about

5    the due diligence that you believe Walgreens

6    conducted, correct?

7         A.    Yes, ma'am.

8         Q.    Now, as I understand it, it's

9    your opinion that because you only saw a

10   limited number of e-mails about due diligence

11   that Walgreens performed 10, 12, 13 years

12   ago, that that means Walgreens performed no

13   other due diligence; is that correct?

14        A.    Not that was brought to my

15   attention in trying to formulate my opinion.

16        Q.    And in formulating your

17   opinion, you determined that Walgreens had

18   only conducted limited due diligence because

19   you only saw documentation of limited due

20   diligence, correct?

21        A.    That's the only basis I could

22   use to form my opinion.

23        Q.    You based your -- well, let me

24   ask you this.

25              Did you read any of the

Highly Confidential - Subject to Further Confidentiality Review

1      this one?

2              MS. SWIFT:  Yep.

3              (Comments off the stenographic

4      record.)

5  BY MS. SWIFT:

6      Q.     I'm marking as Exhibit 25 an

7  excerpt of McCann's Appendix 11, and like

8  with the others today, what we've done is

9  pulled out the pages that relate to

10 Walgreens, okay?

11     A.     Okay.

12     Q.     Have you ever seen the charts

13 that appear in Exhibit 25?

14     A.     I believe I looked at these

15 because they were part of the methodology

16 analysis.

17     Q.     Who shared them with you?

18     A.     I believe Mr. Elkins would have

19 provided them to me.

20     Q.     The plaintiffs' lawyer,

21 Mr. Elkins?

22     A.     Yes.

23     Q.     When did Mr. Elkins share the

24 charts in Exhibit 25 with you?

25     A.     I don't recall.

1          Q.      You didn't cite or attach any

2    of these charts to your report, correct, sir?

3          A.      No, I don't believe I did.

4          Q.      You've never talked to

5    Dr. McCann about any of the charts in his

6    report; am I right about that?

7          A.      That's correct.

8          Q.      Okay.  All right.  You can set

9    those aside.  That's all I was going to do

10   with that one.

11              Turn, if you would, please, to

12   page 115 of your report.  Page 115 is within

13   the Walgreens section and talks about an

14   investigation of the Jupiter distribution

15   center in Florida, correct, sir?

16         A.      It does at the bottom of the

17   page.

18         Q.      You didn't have any personal

19   involvement in the Jupiter, Florida

20   investigation of Walgreens, correct?

21         A.      No, ma'am, I don't believe so.

22         Q.      To the extent that you have

23   opinions about the Jupiter, Florida

24   investigation, you're relying entirely on the

25   Order to Show Cause and related documents

1    attached to Walgreens' 2013 settlement

2    agreement with the DEA -- is that right --

3    cited in note 493?

4           A.     Yes, ma'am.

5           Q.     Okay.  Did you -- in preparing

6    for your -- to write your report, did you

7    review any of the documents showing

8    Walgreens' efforts to cooperate with Florida

9    DEA and local law enforcement in 2010 and

10   2011?

11                 Do you remember anything like

12   that?

13          A.     I don't remember reviewing any

14   records or communications in regards to that,

15   no, ma'am.

16          Q.     In preparing your report, did

17   you review any of the documents produced by

18   the plaintiffs, Cuyahoga and Summit County,

19   showing Walgreens' pharmacists notifying

20   local law enforcement when they suspected

21   diversion?

22          A.     No, ma'am.

23          Q.     Turn, if you would, please, to

24   page 118.  I'll direct your attention to the

25   last paragraph on the page that starts

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      But if you look at the CVS line

3   for Cuyahoga County on page 41, you've got

4   95.7% of the total dosage units are flagged

5   using the trailing six-month threshold?

6        A.      I do.

7        Q.      And you have 94% of the total

8   dosage units in Summit County that are

9   flagging, right?

10       A.      I do.

11       Q.      And if you remove the

12  assumption that everything after one failed

13  due diligence effort flags, do you know what

14  those numbers go down to?

15       A.      I do not.

16       Q.      You have no clue?

17       A.      I have no clue.

18       Q.      If I told you that in Summit

19  County they go down to 4.3% rather than 94%,

20  and they go down to 4.6% rather than 95% in

21  Cuyahoga, would that surprise you?

22       A.      I wouldn't have a comment on

23  those figures.

24       Q.      Now, you also have testified

25  already a little bit about whether or not you

1  reviewed any particular orders, and I think

2  your answer in substance is no, you didn't

3  review any particular orders that might or

4  might not have been suspicious.

5           Is that generally true?

6      A.    That's generally true, that's

7  my recollection is I answered that way

8  previously, too, yes, sir.

9      Q.    And with respect to any of the

10  orders that are flagged by these

11  methodologies under your and Mr. McCann's

12  analysis, you don't know what happened to any

13  of the drugs that were actually shipped and

14  delivered to CVS Pharmacies?

15      A.    I don't have any direct

16  knowledge of what happened to any of the

17  drugs that were distributed to each of the

18  pharmacies.  I didn't conduct any analysis as

19  of today that would give me that knowledge.

20      Q.    And you don't know whether -- I

21  understand that your opinion is that the due

22  diligence was insufficient by CVS, and we'll

23  get to that in a minute.

24           But you don't know whether any

25  of these orders would have cleared a due

1    diligence investigation that does meet your

2    exacting standards, do you?

3          A.    Could you say that one more

4    time, I'm sorry?

5          Q.    I'm just saying you don't know

6    whether any of the orders that are flagged

7    using your and Mr. McCann's methodologies for

8    CVS would have been cleared using what you

9    would say is an adequate due diligence

10   process.  You haven't done that analysis.

11         A.    So I think what you're asking,

12   is it a hypothetical question?

13         Q.    Yes.

14         A.    Okay.

15         Q.    Well, no, actually it's not.

16   You don't know.  I'm asking you.  You don't

17   know?

18         A.    Well, I guess you're asking me

19   to assume that if CVS had an adequate due

20   diligence system in place and they conducted

21   it?  Is that the question?  Maybe I don't

22   understand the question.

23         Q.    Let's -- if you took your

24   standards for a due diligence system --

25         A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1   that.  It's just that I wasn't tasked to

2   provide that methodology in regards to

3   manufacturers at this time.

4        Q.     I understand.  But your report

5   doesn't identify any suspicious orders that

6   were submitted by distributors to

7   manufacturers.

8        A.     My report would only identify

9   those orders that the manufacturers have

10  identified.  I don't make any independent

11  calculations or apply any algorithms to

12  identify it outside of what's in my report

13  stated as I've discovered as part of this

14  discovery.

15       Q.     Okay.  So other than the

16  reports that the manufacturers themselves

17  reported to DEA, you have not identified any

18  suspicious orders submitted by distributors

19  to manufacturers, correct?

20       A.     Can I ask a clarification?  Are

21  you talking about an individual order or are

22  you talking about conduct?

23       Q.     I'm talking about individual

24  orders.

25       A.     I have not done that as we sit

Highly Confidential - Subject to Further Confidentiality Review

1    here today, no, sir.

2         Q.    Okay.  So your report does not

3    identify any shipments by manufacturers to

4    distributors that you claim should have been

5    reported as suspicious?

6         A.    My opinion goes to whether or

7    not there were effective -- or suspicious

8    orders, effective suspicious order systems in

9    place and/or the maintenance of effective

10   controls, the due diligence.  I do not do any

11   calculations that would identify any specific

12   orders.

13        Q.    Okay.  So just to be clear, in

14   response to my question, your report does not

15   identify any shipments by manufacturers to

16   distributors that you claim should have been

17   reported as suspicious, correct?

18        A.    I think there's some instances

19   in my report, there was -- there may be a

20   description of a relationship or some

21   transactions between a -- let me think a

22   second.

23        Q.    Uh-huh.

24        A.    Because I have all of the

25   different companies.

1          (Document review.)

2      A.     I don't believe so, no, sir.

3  BY MR. O'CONNOR:

4      Q.     Okay.  And at trial, do you

5  intend to offer any opinion regarding whether

6  any particular order submitted to a

7  manufacturer was suspicious?

8      A.     If I'm requested to do that

9  analysis by counsel, I guess that would be a

10 possibility.  I haven't done the analysis as

11 today, so I couldn't offer that opinion.

12     Q.     So as you sit here today, you

13 do not have an opinion on whether any

14 particular order that was shipped by a

15 manufacturer was suspicious?

16     A.     I think I have an opinion.

17     Q.     But you haven't identified any

18 order, correct?

19     A.     I have not identified a

20 specific order, but I have an opinion on the

21 conduct.

22     Q.     And are you offering any

23 opinion in this litigation that any

24 particular order that was shipped into Summit

25 or Cuyahoga Counties was suspicious?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      Okay.  And are you offering any

 3      opinion in this litigation that any

 4      particular order shipped by a manufacturer

 5      into Summit or Cuyahoga County was

 6      suspicious?

 7              A.      I'm sorry, shipped by a

 8      manufacturer --

 9              Q.      Correct.

10              A.      -- to a distributor?

11              Q.      That's right.  To -- to someone

12      in Cuyahoga or Summit County.

13              A.      No, sir.

14              Q.      Okay.  With respect to a

15      manufacturer, what is a suspicious order?

16              A.      Well, if a manufacturer has

17      conducted a sufficient due diligence or

18      onboarding process and they've evaluated the

19      scope of their customers' business and the

20      needs, they would establish a pattern, and

21      that pattern would give them an idea of

22      initially the volume of drugs they need to

23      purchase.

24                      Now, if it's brand-new

25      customer -- yours is kind of a hypothetical.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    If it's a brand-new customer, there's not a
 2    pattern or a frequency, but they would start
 3    out with what they assess as a legitimate
 4    volume, and they would monitor that volume,
 5    and if a customer exceeded that, that should
 6    trigger as an unusual size.
 7              But to give you just a general
 8    definition, it's kind of a broad topic
 9    because it depends on the scope of business
10    of the manufacturer, of the customer, the
11    type of products, the needs, so the -- prior
12    to ever shipping an order, the importance is
13    to understand what the legitimate needs is of
14    a customer.
15        Q.    Yesterday you testified that it
16    was important to understand what a usual
17    order was so that you could determine what a
18    suspicious order was.
19              Do you generally recall that
20    testimony?
21        A.    I think that's a general
22    description.  I think we were discussing the
23    size, so I think before you would know an
24    unusual size, you would need to know the
25    usual size.
```

1            Q.      What does that term mean?

2                    MR. FULLER:   Form.

3            A.      Well, manufacturers are in a

4     unique position at the top of the

5     distribution chain, that their products pass

6     through distributors down to pharmacies.

7                    So there's a couple concepts

8     within that know your customer's customer.

9     There's, of course, if you have the

10    information that you already have the ability

11    to know, things like chargebacks and IQVIA,

12    that's an example of information, know

13    your -- you know, you know your customer's

14    customer.

15                   Secondly, a manufacturer would

16    have the responsibility under the maintenance

17    of effective controls to do an analysis of

18    who their customers are, which would be the

19    distributors.

20                   So it would be incomplete to go

21    do an analysis on them when they don't have

22    an understanding of where their products

23    would ultimately go.

24    BY MR. O'CONNOR:

25           Q.      If a manufacturer wanted to

Highly Confidential - Subject to Further Confidentiality Review

1    understand what this idea of know your

2    customer's customer meant, it couldn't look

3    in the regulations, could it, because it's

4    not there?

5                MR. FULLER:  Form.

6        A.    I think it's encompassed in the

7    maintenance of effective controls.

8    BY MR. O'CONNOR:

9        Q.    But to be clear, the

10   maintenance of effective controls regulation

11   does not mention anything about knowing your

12   customer's customer, does it?

13       A.    It doesn't give any specific

14   guidance, but I think what it does is it puts

15   a manufacturer or any registrant on notice

16   that their continued use of a DEA

17   registration requires them to take steps to

18   prevent diversion, and I believe that getting

19   that information is one of those steps.

20            But so just -- just so it --

21   but I guess if your question is does it

22   specifically say that term?  It does not.

23       Q.    And DEA never issued any

24   guidance to manufacturers informing them of

25   their supposed obligation to monitor -- or to

Highly Confidential - Subject to Further Confidentiality Review

1    know their customer's customers, correct?

2                 MR. FULLER:  Form.

3         A.    I know I've reviewed where it

4    was presented at some training, but I'm not

5    sure if that was by an industry or a

6    consultant.

7    BY MR. O'CONNOR:

8         Q.    DEA --

9         A.    So I'll say no.

10        Q.    DEA --

11        A.    I'm not aware of it.  At least

12   I'm not aware they've done it.  I'm not

13   saying they have not done it.

14        Q.    DEA never published guidance in

15   the Federal Register saying anything about

16   knowing your customer's customer, did it?

17        A.    They have not done that.

18        Q.    Okay.  And they never sent a

19   letter to all manufacturers, for example,

20   saying they were to know their customer's

21   customer, did they?

22        A.    I'd like to look at the 2007

23   letter.  I think it may say all relevant

24   transaction information, and I would consider

25   that relevant transaction information.

Highly Confidential - Subject to Further Confidentiality Review

1    prescribed in the MOA can be greater than the

2    duties imposed by statute, fair?

3         A.    No, I don't agree with that.  I

4    think under maintenance of effective

5    controls, that's a broad regulation, and I

6    think all of these things fit under there.

7              I think I could -- I could hold

8    another manufacturer, if I was still a DEA

9    diversion investigator.  I think the

10   statements entered because it kind of affirms

11   that that is a -- to me, that they

12   acknowledge that that is their

13   responsibility, because I wouldn't expect

14   them to do it if they didn't think it was.

15        Q.    Just to be clear, are you

16   saying that every duty that's imposed on any

17   registrant through a memorandum of agreement

18   is by definition also required by the law?

19             MR. FULLER:  Form.

20        A.    Yes.

21   BY MR. O'CONNOR:

22        Q.    Are you aware of any DEA

23   guidance that's ever been issued that

24   supports the statement you just made?

25        A.    In regards to the -- whether

Highly Confidential - Subject to Further Confidentiality Review

1    the MOAs are all legal requirements?  No,

2    sir.

3            Q.    Okay.  In connection with your

4    opinion, you examined the suspicious order

5    monitoring programs of seven manufacturers,

6    correct?

7            A.    Yes, sir.

8            Q.    And each of those programs or

9    systems was different from one another,

10   correct?

11           A.    Yes, sir.

12           Q.    And you believe they all fell

13   short of the regulatory responsibilities

14   imposed by the CSA and CFR, correct?

15           A.    Yes, sir.  Just to add the

16   caveat that some of them didn't have systems,

17   but, yes, sir.

18           Q.    Fair to say of the seven you

19   saw, you weren't satisfied with any of them?

20           A.    That's correct.

21           Q.    Have you ever come across a

22   manufacturer's suspicious order monitoring

23   program that you did think satisfied

24   regulatory requirements?

25                 MR. FULLER:  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I can think of one.
 2    BY MR. O'CONNOR:
 3              Q.      What was that?
 4              A.      I'm not sure I can discuss that
 5    with the Touhy letter.
 6                    MR. FULLER:  Not if it was
 7              based on an investigation that you did
 8              while an agent.
 9                    MR. O'CONNOR:  Sorry, are you
10              not answering that question?
11                    THE WITNESS:  That's what I
12              stated, sir.
13                    MR. O'CONNOR:  Okay.
14                    THE WITNESS:  Because it's not
15              publicly readily available that
16              someone would know that.
17    BY MR. O'CONNOR:
18              Q.      While we're talking about
19    Touhy, you have said and your counsel has
20    stated on a number of occasions yesterday and
21    today that you're not permitted to speak
22    about any particular investigation you were
23    involved in while at the DEA; is that fair?
24              A.      That's not publicly or readily
25    available.
```

1    Q.    Okay.  And with respect to

2    Mallinckrodt in particular, given those

3    restrictions, is it fair to say that all of

4    the opinions you express in your report are

5    based on materials that you reviewed in

6    connection with this litigation?

7    A.    Yes, sir.

8    Q.    And your opinions are not based

9    on any other information outside of what

10   you've relayed and referred to in your

11   report?

12   A.    Well, it's difficult to --

13   since I worked the case for a period of

14   years, obviously, that there may be things I

15   know that aren't part of the discovery, but

16   the opinion I wrote is only based on the

17   information contained in my report.

18   Q.    Okay.  And do you intend at

19   trial to offer any information or opinions

20   that are based on something other than what

21   you've cited here in this report?

22          MR. FULLER:  Object to form,

23       based on the same basis earlier.

24   A.    If the Touhy letter is in place

25   and it's restricted by the government, then I

Highly Confidential - Subject to Further Confidentiality Review

1    likely than not, but it occurs more

2    frequently now than it ever has.

3         Q.    How much oxycodone would a

4    pharmacy have to purchase for you to conclude

5    that it's diverting oxycodone?

6         A.    I'd have to see their customer

7    file and what their scope of business, who

8    they're supplying to be able to make that

9    determination.  There's not just a --

10        Q.    And that's because you cannot

11   determine whether diversion is occurring

12   simply by looking at the volume, correct?

13        A.    That's not correct.  So if we

14   look at a pharmacy with a population of 1,000

15   people and there's a million pills go

16   there -- and that's an extreme case, but I

17   think I could clearly say there's something

18   occurring, diversion's occurring there.

19             If it's an amount that's not

20   consumable by that geographic area, I would

21   say it's very likely that there's diversion

22   occurring.

23        Q.    Outside of this extreme case

24   that you mention where there's a population

25   of 1,000 getting a million pills, fair to say

1    that a manufacturer can't tell if the

2    diversion is occurring simply by looking at

3    the volume of a purchase?

4        A.    Are you saying that if they saw

5    that situation, they would say that diversion

6    is occurring and then outside of that

7    situation?  I think generally speaking, just

8    looking at volume of a pharmacy, I think they

9    would have sufficient data.

10            So let's say, for example,

11   Mallinckrodt, they distribute to many

12   distributors who then distribute to many

13   pharmacies, so I think they have established

14   a pretty good baseline of what a usual order

15   is.  So I think they would identify some

16   pharmacies by volume that would rise to a

17   level of suspicion.

18            I would agree -- generally

19   agree that in most cases the amount of the

20   drug alone wouldn't immediately make them

21   suspicious -- say that that is a suspicious

22   order, but I think there is a point or a

23   volume where it's very likely that is going

24   to occur.  Florida would be an example of

25   that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    With respect to your review of

2    manufacturers' suspicious order monitoring

3    programs, what methodology did you apply in

4    coming to your opinions?

5    A.    The one that was identified or

6    the lack of one that was identified by each

7    manufacturer.

8    Q.    But what methodology did you

9    apply when assessing the suspicious order

10    monitoring programs?

11    A.    Well, I would apply my

12    training, experience, knowledge in doing

13    these kinds of cases, in regards to what I --

14    was provided to me to make judgment and form

15    an opinion.

16    Q.    And when you say "provided to,"

17    you mean by plaintiffs' counsel?

18    A.    No, by -- in discovery.

19    Q.    And you received that

20    discovery -- those discovery materials

21    through plaintiffs' counsel, correct?

22    A.    Yes, but at my direction of

23    what documents I wanted to see.  I know we'll

24    get back to the --

25    Q.    So you --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      -- the, you know, whether

 2     everything was provided to me, but my opinion

 3     is based on -- which I believe is everything

 4     that was available and the topics I

 5     requested.

 6              Q.      Okay.  So your opinion is based

 7     solely on your review of the documents that

 8     you received and that -- and your experience;

 9     is that fair?

10              A.      Experience and training, yes,

11     sir.

12              Q.      Okay.

13              A.      And legal guidance.

14              Q.      From plaintiffs' counsel?

15              A.      No, from my employment with the

16     DEA.

17              Q.      So your own legal opinions?

18              A.      No, receiving legal guidance

19     from lawyers.

20              Q.      Okay.  At DEA?

21              A.      Yes, sir.

22              Q.      Okay.  Are you familiar with

23     Scott Higham?

24              A.      The Washington Post reporter?

25              Q.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes, sir.

2      Q.      Have you ever had a

3   conversation with Scott Higham?

4      A.      Yes, sir.

5      Q.      How many times?

6      A.      I don't know, four or five.

7      Q.      What was the substance of those

8   communications?

9      A.      Initial were he was writing an

10  article about the DEA and the new -- I think

11  it was a regulation or change in the law --

12  change in regulation or law which was in

13  regards to when a registrant sees some

14  adverse or administrative action, they get to

15  do a correction plan.  And I think he wanted

16  me to make some comments on that, so I

17  provided some comments I believe that he

18  published in an article.

19     Q.      Did you ever discuss

20  Mallinckrodt with Scott Higham?

21     A.      I believe I probably did,

22  postsettlement.

23     Q.      When was your first

24  conversation with Mr. Higham?

25     A.      I don't recall.

1    investigation, whether you would raise those

2    with the registrant?

3                    MR. FULLER:  Same objection and

4           instruction.  Point out to counsel

5           that we have a 30(b) of the DEA on

6           Friday and you can ask the question.

7                    THE WITNESS:  I'm not going to

8           answer the question because of the

9           Touhy.

10   BY MS. LUCAS:

11        Q.    Well, are you aware that

12   Mr. Prevoznik has testified that if the DEA

13   has concerns about a registrant's suspicious

14   order monitoring written policies, it would

15   raise those concerns with the registrant?

16        A.    I would -- I would either not

17   be surprised or not surprised that he raised

18   those concerns, but I believe he would be, in

19   his position, in a better position to be able

20   to know whether to release that information

21   and the public availability.  I don't.  Or

22   whether he has a Touhy authorization to speak

23   to that or not.

24        Q.    Well, you're not telling me

25   that if a DEA diversion inspector came to

Highly Confidential - Subject to Further Confidentiality Review

1    Janssen and inspected the system, the

2    suspicious order monitoring system, and had

3    concerns about that program, you're not

4    telling me that they would just do nothing,

5    right?

6                    MR. FULLER:  Object to form.

7                    Same Touhy issue.

8        A.      I can't answer that because of

9    the Touhy issue but I'm not making a comment

10   one way or the other on that statement.

11                   Taking the Touhy doesn't mean

12   that I'm not answering affirmatively or

13   negatively.

14   BY MS. LUCAS:

15       Q.      Whether a suspicious order

16   monitoring program is compliant with the CSA

17   depends on the type of company and the scope

18   of the business model and customers you said

19   earlier, correct?

20       A.      Some of the things, yes, ma'am.

21       Q.      Would it also depend on the

22   medications at issue?  Yes or no?

23       A.      That could have a bearing also.

24       Q.      The abuse rates of those

25   medications?

1        A.      Yes, or the nonabuse rates.

2        Q.      The geographic location or

3   where they're being sold?

4        A.      Yes.

5        Q.      The sales volume in that

6   geography?

7        A.      That could be another factor,

8   yes, ma'am.

9        Q.      All right.  I'm going to ask

10  you some quick yes or nos and then I need to

11  pass the witness while reserving my rights

12  since I have many, many more questions for

13  you.

14              Do you know how many customers

15  Janssen had during the time it sold

16  Duragesic?

17       A.      No, I do not.

18       Q.      Do you know how many customers

19  Janssen had during the time it sold Nucynta?

20       A.      I have not evaluated that

21  information as far as the ARCOS, so, no, I do

22  not at this time.

23       Q.      Do you know how many orders per

24  month Janssen received from its customers for

25  Duragesic?

1          A.      No, I do not at this time.

2          Q.      Do you know how many orders per

3    month Janssen received from its customers for

4    Nucynta?

5          A.      No, I do not, not at this time.

6          Q.      Do you know Janssen's market

7    share for its opioid medications sold in the

8    Track 1 jurisdictions?

9          A.      No, I do not at this time.

10          Q.      Do you know the rates of

11    diversion for Duragesic or Nucynta in the

12    Track 1 jurisdictions?

13          A.      I'm not sure there's any

14    analysis or information available to give any

15    concise rate of diversion of any drug.

16          Q.      So is that a no?

17          A.      I think that's a no.

18          Q.      Do you know how many shipments

19    of Duragesic Janssen flagged through its

20    algorithm and investigated as potentially

21    suspicious?

22          A.      Janssen's never reported a

23    suspicious order to the DEA.

24          Q.      My question was different.

25          A.      Oh, I'm sorry.  Misunderstood

Highly Confidential - Subject to Further Confidentiality Review

1    it then.

2        Q.    Do you know how many shipments

3    of Duragesic Janssen's algorithm flagged and

4    Janssen subsequently investigated before

5    releasing?

6        A.    I do not.

7        Q.    Do you know how many shipments

8    of Nucynta Janssen flagged as potentially

9    suspicious and investigated before releasing?

10        A.    I didn't do that type of

11    analysis up to today on that, on the data in

12    regards to those products and that

13    registrant.

14        Q.    Yes or no, did you know that

15    Janssen has reported a physician to the DEA

16    based on a sales representative's tip?

17        A.    I have not reviewed a document

18    that had indicated that to me, no, ma'am.

19        Q.    Do you know of any instance in

20    the Track 1 jurisdictions of Duragesic being

21    diverted?

22        A.    At this time, no, ma'am.

23        Q.    Do you know of any instance in

24    the Track 1 jurisdictions of Nucynta being

25    diverted?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     At this time, no, ma'am.
 2              Q.     Do you know how many
 3      inspection -- or strike that.
 4                     Do you know how many regulatory
 5      investigations Janssen -- strike that again.
 6                     Do you know how many DEA
 7      regulatory investigations of Janssen
 8      distribution centers were conducted during
 9      the relevant time period in this case?
10              A.     I do not because that
11      information would not be available to me.
12              Q.     Are you aware, yes or no, that
13      the DEA conducted multiple regulatory
14      investigations of Janssen using at least 14
15      different DEA diversion investigators since
16      2008?
17              A.     Were those regulatory
18      investigations that -- I'm sorry, with your
19      question --
20              Q.     Were you aware of --
21              A.     Could you answer --
22              Q.     Well, let me --
23              A.     Could you restate that for me?
24      Just whether it was inspections or regulatory
25      investigations, I just need clarification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      Were you aware that the DEA
 2   conducted multiple regulatory investigations
 3   of Janssen using at least 14 different DEA
 4   diversion investigators since 2008?
 5            A.      No, I'm not aware of that, but
 6   just for clarification purposes, I've been at
 7   manufacturers where there were groups of
 8   people, so the number, multiple, I would
 9   acknowledge is more than one.
10            But when you say 14 people, to
11   go to a manufacturer, sometimes there are
12   large groups of people that go, so...
13            Q.      Is that a no?
14            A.      It's -- so I would answer that
15   with the information you provided me, I
16   wouldn't comment.  I don't know one way or
17   the other.
18            Q.      Were you aware of any
19   regulatory investigations of Janssen by the
20   DEA since 2008?
21            A.      I don't have any direct
22   knowledge of any investigations, ma'am.
23            Q.      Did you ask to see any
24   documents reflecting DEA regulatory
25   investigations of Janssen?
```

```
 1              A.     I believe he did make that

 2     comment, yes.  He didn't say that it was

 3     sufficient to be compliant, but he did say it

 4     was an improvement.

 5              Q.     But again, he didn't say that

 6     it wasn't compliant with DEA regulations?

 7              A.     No, I didn't say that.

 8              Q.     My question to you is:  He

 9     didn't say that it wasn't compliant with DEA

10     regulations?

11              A.     He never made that exact

12     statement.

13              Q.     Teva also had an internal audit

14     of its own suspicious order monitoring

15     program?

16              A.     I believe so, yes.

17              Q.     And that program was rated

18     overall as effective, correct?

19              A.     Yes, but it's an internal

20     audit.

21              Q.     The DEA regulations don't

22     require that companies actively audit their

23     own programs, correct?

24              A.     No, that's true.  But I only

25     make that statement because sometimes the
```

1    person that does the audit, without knowing

2    the full information on the audit, is the

3    person in charge of the system, so they don't

4    typically give a bad audit to themselves.

5              So, I mean, I'm not totally

6    discounting it, but I'm always concerned

7    about internal audits.

8         Q.    Mr. Rafalski, in your report

9    you don't identify any suspicious order that

10   Teva shipped to Summit County or Cuyahoga;

11   isn't that correct?

12        A.    I do not identify any single

13   suspicious order -- any order specifically

14   that was suspicious.

15        Q.    And that goes for Cephalon and

16   the Actavis entities as well, correct?

17        A.    As I sit here today, that's an

18   accurate statement.

19        Q.    And you don't identify any

20   order that Teva failed to flag as suspicious?

21        A.    Is that question a specific

22   order?

23        Q.    Any order that Teva failed to

24   flag as suspicious, you don't have an example

25   of any specific order?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      No, I think my examples in here

2   are more -- go more to the conduct of the due

3   diligence and it doesn't specifically say

4   that there was a specific order, but I think

5   the totality of the incident that I describe

6   on page 183 I think would include that, but

7   to answer your question, there's no specific

8   order where I state that.

9       Q.      And I want to ask you quickly

10  about that order.

11          You're speaking of the Publix

12  Supermarket pharmacies incident or scenario

13  that we discussed -- that's in your report on

14  page 183?

15      A.      Yes, I am.

16      Q.      The orders involving the Publix

17  Supermarket pharmacies were not orders placed

18  from Publix to Teva, were they?

19      A.      No, they were placed to a

20  distributor, an in-between so --

21      Q.      Right.  They were orders placed

22  from Publix to Anda, correct?

23      A.      Yes.  But so the first concern

24  that I would have with this is that Teva

25  would need a means of effective controls to

1    go to Anda and see why this situation

2    occurred.

3           Q.     And it did do that, correct?

4           A.     I don't recall that occurring.

5           Q.     Well, so you read the

6    deposition of Joe Tomkiewicz, didn't you?

7           A.     Yes.

8           Q.     And sitting here today, you

9    don't know whether any of Teva's product was

10   ultimately shipped to one of those Publix

11   Supermarkets that Joe Tomkiewicz identified

12   as entities he wanted to look into, correct?

13          A.     Based on my review, he was

14   looking at the chargebacks, and I believe

15   they were Teva products.

16          Q.     But you would agree with me

17   that Joe Tomkiewicz testified he didn't see

18   any specific orders of Teva's products,

19   correct?

20          A.     Yes, but if they weren't Teva's

21   products, I'm not sure that he would have

22   taken all this action unless he was

23   indicating it was someone else's product that

24   he was going to go investigate.

25          Q.     Well, he could have been

1    Q.    And so I'd like you, if you

2    could, to just open your report to page 7.

3    You know that Anda, Inc. is one of the

4    defendants in this action, right?

5    A.    I believe so, yes, sir.

6    Q.    Okay.  Looking at page 7 of

7    your report, in the second full paragraph,

8    you wrote:  I am of the opinion to a

9    reasonable degree of professional certainty

10   that there was a systematic, prolonged

11   failure over many years by the defendant

12   manufacturers and distributors to maintain

13   effective controls against diversion of

14   legitimate opioid prescriptions into the

15   illicit market.

16          Did I read that correctly?

17   A.    You did.

18   Q.    So Anda is a defendant, right?

19   A.    Yes, sir.

20   Q.    And that opinion as described

21   on page 7 does not apply to Anda, right?

22   A.    As I sit here today, no, I have

23   not reviewed any records related to Anda.

24   Q.    Okay.  I want to ask one more

25   question following up on your testimony.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    During the course of the

 2      deposition, you've said on several occasions

 3      that your method for assessing the

 4      defendants' suspicious order monitoring

 5      systems is based in part on your experience,

 6      training and guidance from lawyers at DEA; is

 7      that correct?

 8                    Do you remember that testimony?

 9          A.      Yes, sir.

10          Q.      Okay.  This is just a yes-or-no

11      answer:  Does the Touhy authorization that

12      you received for today's testimony prevent

13      you from disclosing the legal guidance from

14      DEA lawyers that supports your opinions?

15          A.      So just so I understand the

16      question.  Does the Touhy letter prevent me

17      from answering that question?

18          Q.      Right.

19          A.      I believe it does, yes.

20                  MR. MATTHEWS:  Thank you.  I

21          have no further questions.

22                  THE VIDEOGRAPHER:  Going off

23          the record, 5:18 p.m.

24                  (Proceedings recessed at

25          5:18 p.m.)
```