# EXHIBIT 75

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL REQUIREMENTS OF DISTRIBUTORS ...............................................1

III.   THE LEGACY DIVERSION CONTROL PROGRAM ........................................2

     A.    Policies and Procedures .........................................................................2

     B.    Training and Education ...........................................................................2

     C.    New Customer Due Diligence ................................................................2

     D.    Order Monitoring Program .....................................................................3

     E.    Resources and Oversight ........................................................................4

     F.    Ongoing Monitoring ..............................................................................5

     G.    External Review .....................................................................................5

IV.   THE CURRENT DIVERSION CONTROL PROGRAM .....................................7

     A.    Background .............................................................................................7

          1.    Formation of Project Management Office to Review and Recommend Enhancements to the Legacy Diversion Control Program ...........7

          2.    Implementation of the OMP Enhancements ....................................8

     B.    Policies and Procedures .........................................................................8

     C.    Training and Education ...........................................................................8

     D.    New Customer Due Diligence ................................................................9

     E.    Order Monitoring Program ...................................................................10

          1.    The New Threshold System: Cumulative Volume and Order Size Parameters ...............................................................................11

               a)    Cumulative Volume Parameter .......................................11

               b)    Order Size Parameter ......................................................12

               c)    Identification of Orders and Customers for Review .............12

          2.    Calculation of Parameters ..............................................................13

     F.    Annual Review and Refresh .................................................................15

     G.    Resources and Oversight ......................................................................15

          1.    Diversion Control Internal and External Resources.......................15

          2.    The Diversion Control Advisory Committee ..................................17

     H.    Investigation, Evaluation and Reporting of Orders.............................18

     I.    Ongoing Monitoring ............................................................................19

     J.    On-Site Customer Investigation ..........................................................19

     K.    Annual External Review ......................................................................20

-i-

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004578

**TABLE OF CONTENTS**
(continued)

Page

V.      CONCLUSION ................................................................................................................23

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0349

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004579

## I.     INTRODUCTION

AmerisourceBergen Drug Corporation ("ABDC" or the "Company") is committed to the safe and efficient delivery of medications to meet legitimate patient needs across the United States.  As a wholesale distributor registered with the United States Drug Enforcement Administration ("DEA"), ABDC is equally committed to complying with all regulatory requirements while carrying out this important work.  ABDC's Diversion Control Program is the means by which the Company monitors for suspicious orders and customers suspected of diverting (or tolerating others' diversion of) controlled substances and listed chemicals.   This program is a multi-faceted approach to awareness, monitoring, investigation, and reporting overseen by ABDC Corporate Security and Regulatory Affairs ("CSRA").

ABDC has had a program in place to monitor and report suspicious orders since at least the 1980s.  Then, in 2007, an improved diversion control program (the "Legacy Diversion Control Program") was created in consultation with the DEA.[1]  The Legacy Diversion Control Program consisted of policies and procedures dedicated to diversion control; a team of full-time diversion control employees; Know Your Customer Due Diligence; an Order Monitoring Program; ongoing monitoring and investigations; and training.  As part of this Legacy Diversion Control Program, certain criteria were established that would help in the identification of orders that varied in some significant way from the typical orders made by the customers of ABDC or received by the Company.

Although it had been reviewed and amended many times since its inception, beginning in 2014, ABDC undertook a comprehensive review of the Legacy Diversion Control Program.  The goal was to identify and implement improvements, while taking advantage of significant advancements in the use and efficacy of data-driven analytical tools.  This culminated in the roll-out of an enhanced diversion control and order monitoring program (the "Current Diversion Control Program") beginning in August 2015.

These enhancements were devised by a multi-functional team with a wide variety of experience and skill sets.  AmerisourceBergen Corporation's ("ABC") Board of Directors and executive team were kept fully informed of these efforts, and the full resources of the Company were brought to bear.  Based on the work that was done, the Company believes that the improvements created innovative new tools to assist in the partnership between industry and government in the fight against prescription drug diversion.

The details of both the Legacy Diversion Control Program and the Current Diversion Control Program are set forth below.

## II.     FEDERAL LEGAL REQUIREMENTS OF DISTRIBUTORS

The requirements that the Controlled Substances Act ("CSA") impose on distributors within the closed system of authorization, manufacture, distribution, and dispensing of controlled substances are

---

[1] On June 22, 2007 ABDC and the DEA entered into a Settlement and Release Agreement pursuant to which ABDC agreed to implement certain controls and reporting structures designed to prevent the diversion of controlled substances.  The Settlement and Release Agreement stemmed from the DEA's investigation of controls in place at ABDC's Orlando Distribution Center to prevent diversion of controlled substances by customers using various Internet websites.  The key facets of the Legacy Diversion Control Program were negotiated and a structure for the Legacy Diversion Control Program was agreed upon at that time.  As part of the Settlement and Release Agreement, ABDC expressly denied the DEA's allegations and paid no fine or penalty.

1

relatively circumscribed.  Distributors must obtain a DEA registration number, and the DEA imposes on them certain requirements as a condition of registration.

The only non-physical security requirements relevant to distributors are contained in § 1301.74 of the CSA.  This section provides, in part, that "the registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances."  Further, "[t]he registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  Suspicious orders are defined to "include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  § 1301.74(b).  Neither the CSA nor the implementing regulations prescribe any particular form or content of the system identified in § 1301.74(b).  The DEA leaves the design of the system to the distributor's sole discretion.  Similarly, neither the regulations nor the CSA provide any definition of "unusual" or "substantially" in the context of determining what constitutes a suspicious order.

## III.    THE LEGACY DIVERSION CONTROL PROGRAM (2007-2015)

### A.    Policies and Procedures

The Legacy Diversion Control Program consisted of numerous policies and procedures dedicated to diversion control, which were updated and revised over time.  The policies and procedures addressed the following: (1) New Customer Due Diligence (New Retail Pharmacy Account Due Diligence; New Customer Account Due Diligence; and Customer DEA Registration Verification); (2) the OMP (Order Monitoring Program Policy; Excessive/Suspicious Order Investigation Program; Order Monitoring Verification/Investigation Program; Controlled Substance and Listed Chemical Order Monitoring Program; and DEA Daily Reporting); (3) Ongoing Customer Monitoring Activities (Retail Pharmacy Targeted Visits; and Distribution Center Audits); and (4) Training (Compliance Training Program).

### B.    Training and Education

As part of the implementation of the Legacy Diversion Control Program, ABDC compliance employees were trained on the intricacies of the program over a 6-hour session in ABDC's "Compliance Critical" training program.  Additionally, associates responsible for handling and/or record-keeping of controlled substances, or in a related position which had an impact on the handling or record-keeping of controlled substances, were required to take annual compliance training.  Further, employees within the Distribution Centers were given annual training to assist in the company's compliance obligations through education on identifying orders that diverged from established patterns or were otherwise out of the ordinary.  OMP training was also provided to the sales personnel, Customer CARE and Business Transformation team.

### C.    New Customer Due Diligence

ABDC's New Customer Due Diligence is the process by which new customers are assessed for suitability to purchase controlled substances and listed chemicals from ABDC.

Beginning in 2007, ABDC's New Customer Due Diligence of newly onboarded independent retail pharmacies generally required completion of ABDC's Retail Customer Questionnaire CSRA Form 590 ("Retail Customer Questionnaire").  The information requested on the questionnaire was the basis for ABDC's due diligence investigation and provided a baseline to measure the pharmacy's ordering habits

2

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0351

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004581

and to determine any deviation from expected purchasing practices.   The questionnaire provided significant information to ABDC regarding anticipated ordering practices, including, among other things, the amount of controlled substances ordered, the anticipated ratio of controlled substances purchased vs. total purchases, key prescribing doctors in the area utilizing the pharmacy, and the payment practices of the pharmacy's customers (*i.e.* cash, credit, insurance, etc.).  The questions on the questionnaire were based on guidance from the DEA.

After ABDC received the completed Retail Customer Questionnaire, it verified that the prospective account was not listed on ABDC's "Do Not Ship List."  That list provides a comprehensive record of all customers prohibited from purchasing controlled substances and listed chemicals from ABDC.  ABDC also verified that the pharmacy had a valid DEA registration and state licensure. ABDC's due diligence investigation on potential retail pharmacy customers generally also included site visits, a review of the information provided by the pharmacy, and online investigation (including internet licensing and disciplinary searches) for identified pharmacy, owner, pharmacist-in-charge, and any identified physicians.

D.      Order Monitoring Program

The OMP is the system designed by ABDC to meet its regulatory requirement to design and operate a system to disclose to the registrant suspicious orders of controlled substances.  It is one component of ABDC's broader diversion control program.

The Legacy Diversion Control Program established a system to compare the purchases by pharmacies and hospitals against those of their peers to identify orders that—based on the particular metrics established—appeared to be of unusual size, orders deviating substantially from a normal pattern, or orders of unusual frequency.

First, each customer was grouped by their DEA classification (hospital/clinic, retail pharmacy, practitioner, distributor, etc.).  Then within each group, the customer was classified according to its size (small, medium, large, or extra-large).  The size of the retail pharmacies was determined by the total dollar value of prescription sales, which included both controlled and non-controlled substances.  By grouping and comparing pharmacies with other like-sized pharmacies, the OMP was designed to ensure that a pharmacy could not avoid detection by increasing its purchases gradually, but significantly, over time.

For each category of customers, a threshold was established for each class of drug (as determined by the active ingredient).  For each drug family, ABC calculated a yearly average of the order volume. This average was multiplied by a factor to determine a threshold, which represented the amount of a drug family that a particular customer could order over the course of 30 days without orders being reviewed.

Orders that exceeded the 30-day threshold for that pharmacy's size grouping were placed on hold by ABDC's computer systems ("Orders of Interest").  A trained OMP reviewer at the Distribution Center that would fill the order initially reviewed the Order of Interest consistent with the "know your customer guidelines" established by the DEA.  "Know your customer" means knowing the customer type, whether it has a known legitimate and well-established need for high volumes of controlled substances and listed chemicals, and the typical ordering patterns for that customer.  There were three options for the OMP reviewer: 1) release the order and allow it to be filled; 2) cancel the order; and 3) escalate the order for CSRA review.

3

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004582

Generally, the OMP reviewers released Orders of Interest for hospitals and the Department of Defense. Those orders could be released by the OMP reviewers unless there were other factors that rendered those orders suspicious, in which case they were referred to CSRA for additional investigation. The OMP reviewer could cancel an Order of Interest if the review indicated that it was not suspicious but should be cancelled because, for example, the order quantity was obviously not correct based on prior purchases or the customer reported the order as mistakenly submitted. Orders by retail pharmacies that exceeded threshold and required further review were passed on to CSRA team's dedicated team of reviewers for a final determination.

When an Order of Interest was sent to CSRA for review, the CSRA representative for the particular customer's region undertook an analysis to determine if the order was suspicious. The CSRA representative could use the customer's sales history and purchase data as well as due diligence and investigative files. Among the factors that could be considered were: the size of the pharmacy; the ordering practices, purchase history, dollar volume and product mix; the percentage of controlled substance purchases; follow-up interviews with customer employees; rationale for order; and the time of the order within the month. At the conclusion of the CSRA analysis, the CSRA representative would make a determination of whether the order should be reported as suspicious to the DEA, rejected as placed in error, or released for shipment to the customer. ABDC's OMP, from 2007 to today, was designed such that orders reported as suspicious to the DEA were not shipped to the customer.

These controls were put in place to deter the possible diversion of controlled substances and listed chemicals. The CSRA team determined what further corrective action to take, if any, as a result any investigation. Available remedies included reduction of thresholds, withdrawal of ability to purchase particular controlled substances from ABDC, or withdrawal of ability to purchase all controlled substances from ABDC.

ABDC's Legacy Diversion Control Program was an evolving program that changed as new trends or information became available. For example, in May 2012, CSRA created a new drug family for oxycodone 30 mg immediate release formula, a formulation of the product that had been identified as particularly susceptible to abuse. The rationale was to rein in customers who primarily purchased the one strength of oxycodone while not punishing customers who had a more typical product mix.

E.    Resources and Oversight

In 2007, ABDC hired Edward Hazewski as part of its effort to bolster the Legacy Diversion Control Program. Mr. Hazewski had previously been a police officer for 20 years with the Wilmington, Delaware Police Department and a Special Investigator for five years with the Delaware State Attorney General's Office. Mr. Hazewski worked with Bruce Gundy, whom ABDC hired in December 2005 as Manager of Investigations. Prior to joining ABDC, Mr. Gundy was a police officer for Berks County, Pennsylvania for more than 25 years. In 2007, Mr. Gundy and Mr. Hazewski helped develop the guidelines for the Legacy Diversion Control Program and the diversion control team within CSRA.

The enhancements which populated the Legacy Diversion Control Program were reviewed with the DEA, including Michael Mapes, Chief, Regulatory Section, Office of Diversion Control, DEA, during negotiations leading to ABDC's June 22, 2007 Settlement and Release Agreement with the DEA. Following his retirement from the DEA, ABDC retained Mr. Mapes as a consultant under an exclusive retainer from approximately January 2008 through 2013, as discussed below.

4

F.    Ongoing Monitoring

In addition to the review of Orders of Interest, CSRA performed analyses of purchase data to identify orders and customers that diverged from customary purchasing.  CSRA personnel met on a monthly basis to discuss trends in ordering habits and other pertinent information to the compliance program.

One of the criteria measured by CSRA was a pharmacy's current ratio of controlled substances purchases as compared to total purchases from ABDC.  Customers with a particularly high percentage of controlled purchases attracted the attention of CSRA.  CSRA could then follow up with questions for the account manager, the Distribution Center, or the pharmacy itself to determine the reasoning behind this mix of products.  CSRA could review the files and purchase history for these customers for signals of possible diversion.  In addition to the product mix, CSRA performed a statistical analysis to identify customers who had significantly increased their volume of purchases of controlled substances. Significant increases in volume during the period being reviewed could trigger an inquiry into the reason for such increases.  CSRA also evaluated the top purchasers in certain controlled substances families on an individual pharmacy basis.

In addition to statistical analyses and due diligence inquiries, CSRA performed targeted visits of certain retail pharmacy customers that were generally identified through review of Orders of Interest or other on-going monitoring.  These visits enabled CSRA to ensure that retail pharmacy customers had implemented their own policies and procedures to help prevent diversion of controlled substances.  CSRA could observe first hand and better appreciate the customer's size and volume of business as well as note any potential red flags suggesting the possibility of diversion.

G.    External Review

At the request of ABDC's in-house legal counsel, Mr. Mapes performed periodic audits of ABDC's OMP.  The audits were performed to ensure that the OMP was providing ABDC with an appropriate system to monitor orders for controlled substances to comply with the requirements of 21 CFR § 1301.74 (b) and ABDC's policies and procedures.  The audits generally included review of the default thresholds for each drug family and customer size, ABDC's "Do Not Ship List," several individual customer and drug reports, CSRA 590 forms, and completed CSRA files for 20-25 customers. He chose files for some new customers, customers he may have heard about or investigated, and the rest at random based on geography to ensure diversity.  Mr. Mapes submitted reports of his findings to ABDC's counsel.

5

EXHIBITS:

A. Sample diversion control policies and procedures

B. AmerisourceBergen, Security and Regulatory Compliance Program 2008-2009, Six Hour Compliance Training

C. Sample CSRA Form 590

D. Sample Trend Reports

6

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004585

## IV.     THE CURRENT DIVERSION CONTROL PROGRAM

A.      <u>Background</u>

As discussed above, beginning in 2014, the Company undertook a critical review and enhancement of the Legacy Diversion Control Program.  As a result, the Current Diversion Control Program was rolled out beginning in August 2015.

The Current Diversion Control Program is more specifically tailored to identify individual suspicious orders.  This increased precision was accomplished through the use of historical data, widely-accepted statistical data analysis methodology, and better-defined peer groups.  The Current Diversion Control Program also acknowledges that not all customers and not all products present the same risk of diversion, and attempts to focus the Company's attention and efforts on the particular orders that present the greatest risk of diversion.

Additionally, the Current Diversion Control Program uses a variety of other monitoring tools – including user-friendly analytical dashboards and targeted customer visits – to monitor ABDC's customers' overall purchasing patterns, in addition to the review for individual suspicious orders. Therefore, in addition to satisfying the regulatory requirement to identify and report suspicious orders, ABDC is regularly monitoring for customers that otherwise raise red flags.  When such customers are identified, appropriate steps are taken, including more restrictive ordering parameters, increased monitoring, on-site visits, placement on the "Do-Not-Ship List," and, if appropriate, termination of the customer relationship.

### 1.     Formation of Project Management Office to Review and Recommend Enhancements to the Legacy Diversion Control Program

The first step in assessing potential areas for improvement of the Legacy Diversion Control Program was the formation of a Project Management Office ("PMO"), a cross-functional team of employees assigned to help devise and implement enhancements.[2]  In February 2014, at the recommendation of the PMO, ABDC retained FTI Consulting, Inc. ("FTI") to assist with the design and implementation of technological improvements to the OMP component of the Legacy Diversion Control Program.  FTI is a global consulting firm with expertise in data-driven technology solutions.

The PMO worked in conjunction with FTI to analyze and test eighteen months of historical data from the legacy OMP in order to evaluate potential enhancements.  The PMO and FTI applied a number of different statistical models to ABDC's data, and evaluated hundreds of outputs from those models, in order to simulate and test different approaches to enhancing the OMP before deciding on the use of the Interquartile Range ("IQR"), a recognized statistical technique for identifying outliers in a data set.  As part of this analysis, the PMO assessed the efficacy of the product-ordering thresholds that had been calculated under the legacy OMP.  As a general matter, a threshold was the maximum amount of a

---

[2] The PMO was comprised of twenty-three individuals from the following departments within ABDC: Health Systems, Customer Solutions, Distribution Services, Corporate Security and Regulatory Affairs, Legal, IT Services Management, Integrity and Deployment Management, Finance, Service Portfolio Owner, Customer Operations, Sales, and Operations.  Among the members were the President of ABDC and General Counsel for ABC.  It held regularly scheduled meetings, and also communicated informally throughout the process.

7

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

product that a customer could order in a ███████████████ before an order would be held until individually reviewed and analyzed by a Diversion Control Team member, who would decide whether to release the order or block it and report it to the DEA as suspicious. The PMO engaged in a full review of the components of the legacy OMP, including the way product families were treated, the way thresholds were defined and calculated, and the way in which customers were placed into peer groups. Every part of the process was revised and improved. As part of their work, the PMO developed a computer simulation model to mirror the way in which the enhanced OMP would function. Historical ordering data was tested through this computer simulation. The goal of the testing was to ensure that the OMP's use of the enhanced methodology would capture orders that in fact warranted further review. Included in this simulation testing was the comparison of identification of Orders of Interest between the legacy OMP and the proposed revised system using actual historical data.

### 2. Implementation of the OMP Enhancements

ABDC implemented the enhancements to the OMP across its distribution centers over the course of five months. The roll-out was phased, first to a single distribution center, and then to several at a time. The PMO adopted this phased approach to ensure that the required communication and training was in place for each distribution center so as to assure a smooth operational transition. The phased roll-out also afforded ABDC the ability to make adjustments to the enhancements as the implementation proceeded. For example, during implementation the PMO made an adjustment that prohibited customers from being told when they could place their next order. Each phase of the roll-out involved the preparation of files that were loaded onto SAP (ABDC's computer order management platform) followed by a period of monitoring and evaluation by FTI and the PMO before the deployment proceeded to the next phase.

### B. Policies and Procedures

The PMO also recommended the preparation of an updated set of diversion control policies and procedures. Those updates included incorporation of the significant enhancements to the Diversion Control Program resulting from the work of the PMO. The updated policies and procedures address the following: (1) New Customer Due Diligence and Communications (Know Your Customer Policy; New Customer Due Diligence; New Customer Communications); (2) the OMP (Order Monitoring Program Policy; OMP Methodology; Product Risk Assessment; Customer Peer Group Maintenance; Identifying and Reporting Suspicious Orders; Consumption Reviews; OMP Annual Reviews; OMP Annual Audits); and (3) Ongoing Customer Monitoring Activities (Ongoing Monitoring Policy; Ongoing Monitoring Activities; Targeted Pharmacy Visits; Due Diligence Documentation). Copies of these policies have been produced at ABDC-SC Req.0034 – ABDC-SC Req.0096.

### C. Training and Education

ABDC also revamped diversion control training at all levels of the Company. ABC's CSRA has formed a training committee tasked with overseeing training, as well as the ongoing review and updating of all regulatory- and compliance-related training materials.

Under the enhanced process, two levels of training are completed annually within ABDC's 26 distribution centers. First, the Compliance Manager trains the distribution center personnel responsible

---

[3] ████████████████████████████████████████████████████████
████████████████████████████████████████████████

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0357

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004587

for assessing Orders of Interest at the distribution center level (called "Responsible Persons in Charge" or "RPICs") on the order review and adjudication process. At the completion of that training session, participants must achieve a passing score or be retrained. Second, the Compliance Manager trains all distribution center personnel on diversion control. Completion of the training is documented, and those records are retained. If any changes to the Diversion Control Program are made between trainings, CSRA communicates those changes in writing to the distribution center personnel.

ABDC sales associates also have defined responsibilities in the diversion control process. These responsibilities include facilitating a customer's completion of the new customer due diligence form (the CSRA Form 590); coordinating logistics of targeted ABDC diversion control on-site investigations; and notifying CSRA of suspicious activity they observe in the field.[4] On the other hand, sales associates are expressly not involved in the determination of a customer's eligibility to purchase controlled substances or listed chemicals, establishment of the amount of controlled substances a customer may purchase, adjudication of Orders of Interest, or reporting of suspicious orders.

In furtherance of the sales team fulfilling their diversion control responsibilities, ABDC requires all new sales associates to attend drug diversion awareness training. The Company provides this training through an eLearning module, which allows it to track employee attendance and completion. In addition, ABDC is in the process of re-training all existing sales associates on drug diversion awareness. Furthermore, at the annual meeting of its sales force and customers (called "ThoughtSpot"), CSRA and in-house legal counsel presented to and trained the sales force on the changes to the Diversion Control Program.

The Company also offers training to its pharmacy customers. This training covers the pharmacist's and pharmacy's responsibilities to guard against diversion, and how they can best identify red flags for potential diversion. ABDC personnel have also presented to two regional retail pharmacy chains on the topic of identifying potential diversion, and ABDC is willing to provide this or similar training to any of its customers who request such training.

D.     New Customer Due Diligence

ABDC revisited and improved its Know Your Customer Retail Pharmacy Questionnaire (CSRA Form 590).[5] It includes inquiries on topics such as high risk drugs and high prescribing physicians. The forms can be completed digitally, and are retained in ABDC's central matter management system. No new customer can be opened unless the form is completed in full and CSRA has completed its due diligence review and communicated its approval to the Customer Maintenance group. The Customer

---

[4] The incentive structure for sales associates is designed to foster their taking ownership of the Company's diversion control responsibilities. Every sales associate has an annual revenue goal, the achievement of which is one factor that may entitle the sales associate to additional compensation. If the Diversion Control Team takes action against a customer, such as reducing the amount or types of products the customer can purchase, the sales associate's annual revenue goal will be adjusted downward accordingly to avoid any disincentive on the part of the sales force to report potentially problematic customers. Furthermore, if the Company takes action against a customer and determines that a sales associate did not report observed signs of diversion, the sales associate's revenue goal will not be reduced, and the associate may be subject to disciplinary action.

[5] There are other versions of the Form 590 for other customer types. Those other versions of the Form 590 are not discussed in detail. For purposes of new customer due diligence, ABDC treats chain retail pharmacies differently from non-chain retail pharmacy customers.

9

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Maintenance group is responsible for confirming that the form has been completed in full. Once complete, CSRA then uses the form as part of its due diligence investigation of potential new customers.

CSRA has also put in place new procedures with respect to the due diligence investigation performed on potential new customers. All customer files are now opened, stored, and saved electronically. Each time a CSRA Form 590 is received, a new customer matter is opened in the matter management system. All documents related to the review are uploaded into that file. This generally includes the customer's licensure, the CSRA Form 590, photographs of the pharmacy, data voluntarily provided by the customer (such as dispensing data or consumption data), records of internet searches conducted, public documents accessed, disciplinary records (if any) for identified pharmacists and physicians, and any other documents reviewed during the due diligence investigation. The customer's due diligence files are then maintained in the matter management system. Thus, there is a centralized system containing both the completed new customer forms and the communications and materials generated from the due diligence review. In addition to providing a historical record of the due diligence completed, these files can be accessed to assist with further investigation should any questions arise about the customer later, either internally or as a result of inquiries received.

As part of the enhancements to the Diversion Control Program, the Company contracted with Thomson Reuters to develop a new computer system to maintain its customer due diligence files (as well as other documents related to the Diversion Control Program). The new system will have significantly improved search capabilities allowing for easier access to and retrieval of historical information. It will also auto-generate email reminders to the team member responsible for conducting a review of, or approving a decision on, a particular customer.

Additionally, completion of an updated standard checklist (CSRA Form 595) by each due diligence investigator is required when performing new customer due diligence. The list helps ensure that the necessary review steps are completed, and documents compliance with those steps. Once the CSRA Form 590 has been reviewed and investigated, the CSRA Form 595 completed, and the decision on whether to approve the pharmacy for purchase of controlled substances made, the file is sent to the Director of Diversion Control for final review. The Director of Diversion Control then assesses the file for completeness and determines whether he agrees with the decision that was made by the Diversion Control Team investigator.[6] This helps ensure consistent and well-documented decision-making.

E.     Order Monitoring Program

The enhanced OMP allows ABDC to better identify orders that warrant further review and refines ABDC's process for evaluating and adjudicating such orders. These enhancements also improve ABDC's ability to identify potentially problematic customers that might never have come to the attention of the Diversion Control Team under the legacy program.

---

[6] Potential new customers not approved to purchase controlled substances or listed chemicals are added to ABDC's "Do Not Ship List." That list provides a comprehensive record of all customers prohibited from purchasing such products from ABDC. This list is regularly updated and always available to the Diversion Control Team.

10

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0359

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004589











G.      Resources and Oversight

1.      **Diversion Control Internal and External Resources**

ABC has added significant diversion control resources in a variety of areas as part of these enhancements.  Several new diversion control positions have been created within CSRA, the organization

15

within the Company with primary, but not exclusive, Diversion Control Program responsibility. In 2014, ABC added the position of Senior Director of Diversion Control & Federal Investigations, and hired David May to fill that role. Prior to joining ABC, Mr. May had a nearly 30-year career with DEA as a Special Agent. Mr. May spent the last ten months of his DEA career as the Assistant Special Agent in Charge of the Atlanta Field Office, during which time he supervised a tactical diversion squad responsible for investigating all DEA registrants. In his position with ABDC, Mr. May is responsible for day-to-day oversight and management of all aspects of the Diversion Control Program. He also serves as the primary point of contact for all interactions with DEA and other regulatory agencies on diversion control issues. Final decision-making authority rests with Mr. May on all significant decisions within the Diversion Control Program.

Also in 2014, ABC added the position of Director of Pharmacy Compliance and hired Sharon Hartman to fill that position. Ms. Hartman has been a licensed pharmacist for over 35 years, serving the last 17 years in various pharmacy compliance roles. One of her primary responsibilities is to help manage the process of reviewing retail pharmacies that exhibit potential red flags for diversion. In that role, she coordinates in-person pharmacy site visits and either participates personally in the on-site reviews or consults with the review team on their findings. Many of these reviews involve acquiring dispensing data from the pharmacy, which Ms. Hartman analyzes. She also brings a pharmacist's clinical expertise to assist in the review of orders held for further analysis.

In 2016, ABC added the position of Diversion Control Analyst, and hired Marcelino Guerreiro, who brings more than ten years of diversion control experience to that role. This position is modeled after that of a DEA Analyst. Similar to a DEA Analyst, ABDC's Diversion Control Analyst has primary responsibility for managing and reviewing all of the new analytical tools in the enhanced OMP program to identify patterns and customers for additional review. Mr. Guerreiro is also responsible for recognizing trends, including, for example, trends in terms of high risk drug products and customers, which are shared with the Diversion Control Team for consideration in its daily decision-making. He likewise participates with the Diversion Control Team in daily order monitoring and customer analysis.

The Diversion Control Team includes sixteen employees at the corporate headquarters level. Of those sixteen employees, six have day-to-day responsibility for review of Orders of Interest, as well as overall customer monitoring; those six report to the Director of Diversion Control.[13]

The Diversion Control Team holds weekly conferences in which they review orders of heightened interest, customers recently flagged for additional review, and general diversion control trends. This is in addition to ongoing and regular communications among the team regarding customers of concern. There are also in-person meetings two times per year for the Diversion Control Team. Those meetings are designed to ensure that CSRA employees are kept up-to-date on diversion trends and coordinated in their approach to customer and order review.

---

[13] As part of their efforts to remain current on diversion trends and diversion control efforts, the Diversion Control Team regularly attends DEA conferences and participates in industry working groups. Among the working groups in which ABDC has recently participated is the Anti-Diversion Industry Working Group (ADIWG). ADIWG is comprised of representatives from manufacturers and distributors, and seeks to work in collaboration with state and federal governments and regulatory agencies, law enforcement, the medical community, the pharmaceutical industry, and the public.

16

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

In addition, there are over 100 ABDC employees across the 26 distribution centers who have diversion control responsibilities.  Each distribution center has three to four RPICs who have primary responsibility for reviewing Orders of Interest for customers serviced by that center.  Each center also has a Compliance Manager, an employee dedicated to overseeing regulatory compliance activities at the center and who reports to CSRA.  The Compliance Managers have auditing and oversight responsibility for the RPICs.  Each distribution center also has anywhere from one to three Compliance Clerks who provide additional diversion control support as needed.  The group shares information on drug diversion trends and diversion control best practices.

These internal resources are also supplemented with external experts.  For example, the Company has retained Brian Reise, a recently retired DEA Diversion Group Supervisor, who participates in ABDC's Diversion Control Program reviews and assists with training.  Mr. Reise also conducted the first annual external audit of ABDC's Diversion Control Program in early 2017. This was a comprehensive audit, analyzing documentation covering the identification and assessment of Orders of Interest, new customer due diligence, targeted customer visits, reporting of suspicious orders, and the Company's new policies and procedures.  It also included interviews of key members of the Diversion Control Team.

In addition, the Company has engaged The Pharma Compliance Group to assist with on-site retail pharmacy visits.  The Pharma Compliance Group is comprised of former career DEA Special Agents and Diversion Investigators.[14]  This engagement allows for additional on-site visits to customers.  The Pharma Compliance Group follows a comprehensive procedure in conducting the on-site customer reviews and provides a detailed written report of its findings to ABDC's Diversion Control Team.

## 2.    The Diversion Control Advisory Committee

The Company has created a Diversion Control Advisory Committee to ensure visibility to the Diversion Control Program at the highest levels within the Company, as well as to facilitate management input and buy-in with regard to diversion control.  The Committee is thus a cross-functional team of senior executives to whom the Senior Director of Diversion Control presents on at least a quarterly basis and with which he can consult at any time on an as-needed basis.  The Committee provides an additional level of support and oversight to the Diversion Control Program.  It also helps ensure commitment and execution from all levels of management to the diversion control activities and initiatives.  The current members of the Diversion Control Advisory Committee are:

- Senior VP – Distribution Services, NC Region

- Senior VP – Distribution Services, West Region

- Vice President – IT Service Management

- Vice President – Operations AmerisourceBergen Specialty Group

- Vice President – Field Sales, West Region

- Senior Director – IT Relationship Management

---

[14] A full description of the capabilities and background of The Pharma Compliance Group is available at its website: www.pharmacompliancegroup.com.

17

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004596

- Assistant General Counsel – Legal

- Senior Director – Regulatory Compliance

H.      Investigation, Evaluation, and Reporting of Orders

Customer orders that exceed either (1) the Cumulative Volume Parameter and the Order Size Parameter or (2) the Fail-Safe Parameter, are not processed for shipment, but instead are held for review. The hold is electronic and, therefore, automatically blocks shipment until the review is complete and a decision is made as to whether to release the product for shipment.[15]

These held Orders of Interest are first reviewed by trained personnel at the distribution center – the RPICs. The RPICs determine whether the order should be processed and shipped, rejected as a keying error, or escalated to the Diversion Control Team for review and determination as to whether it is suspicious. In so doing, they consider multiple factors including, but not limited to, the following:



If the order is determined by the RPIC to present a risk of diversion, it continues to be blocked and the matter is elevated to the Diversion Control Team for further analysis. When a keying error is confirmed, the RPIC rejects the order due to an administrative error, and the order is not reported. When the totality of the circumstances suggests no or low risk of diversion, the RPIC releases the order for processing. The RPICs are trained to document in the SAP system their decision rationale through the use of standardized reason codes and in free text notes fields, which allow the RPIC to document information specific to the review of the particular order. Example reason codes include: "Approval based on knowledge specific to the customer" and "Confirmed administrative issue, keying error or duplicate order."

There are six Diversion Control Team members assigned to review the orders escalated to the Diversion Control Team for further analysis. Those team members have access to additional tools that the RPICs do not, including analytical dashboards and other reports that provide a broader perspective on customer ordering patterns, trends, and behaviors. They also have access to the customer's due diligence file, including the CSRA Form 590. Following its review, the Diversion Control Team can make one of three possible decisions: (1) reject and report to DEA as a suspicious order, (2) reject due to an administrative error, or (3) release and process for shipment. The Diversion Control Team members document their decision rationale using standardized reason codes and notes fields in SAP.

---

[15] The SAP system used for the enhanced Diversion Control Program retains a history of all controlled substance and listed chemical orders, including the order size, running 30-day dosage unit consumption, and applicable parameters. The SAP history provides a record for future reference as to why an order was held for review.

18

CSRA personnel at both the distribution centers and corporate headquarters monitor the evaluation of Orders of Interest for policy compliance, consistency, trends, and red flags.  Specifically, the Compliance Managers review daily activity reports consisting of the prior day's evaluations of Orders of Interest to monitor and track decisions of the RPICs at their respective distribution centers.  At the corporate level, on a weekly basis, the Director of Diversion Control reviews the evaluations of Orders of Interest from all distribution centers to ensure consistency and policy compliance across all distribution centers.  On a monthly basis, the Director of Diversion Control reviews monthly activity reports to validate the decisions made by the Diversion Control Team members on Orders of Interest.  Should the reports be deemed unsatisfactory, the Director of Diversion Control or the Compliance Manager re-educates the reviewer.

I.     Ongoing Monitoring

The Diversion Control Team conducts ongoing monitoring and oversight of ABDC customers subject to the Diversion Control Program.  Based on this monitoring, the Diversion Control Team may determine that a customer should be subject to an on-site investigation, cut off from the purchase of controlled substances and put on the "Do Not Ship List," or that it is appropriate to put in place an override that decreases a customer's Cumulative Volume or Order Size Parameters.[16]  As with the other tasks performed under the Diversion Control Program, all relevant investigation and correspondence regarding such decisions is documented in the customer's file in the matter management system.



J.     On-Site Customer Investigation

On-site customer investigations are triggered when specific issues or concerns come to the attention of the Diversion Control Team through ongoing monitoring activities, the OMP, notifications from distribution center personnel, or inquiries from external bodies, including DEA or other enforcement agencies.  ABDC employees perform detailed visits of some customers.  As discussed above, ABDC has

---

[16] During 2017, ABDC terminated the ability to purchase controlled substances for the following South Carolina customers because of concerns about possible diversion: Herold's Pharmacy North and Sunset Pharmacy.

19

also partnered with The Pharma Compliance Group to conduct customer visits, alone or in conjunction with ABDC.  These visits consist of observing, reviewing, and documenting:[17]



The investigators then prepare comprehensive reports for use by the Diversion Control Team in determining what, if any, action to take as a result of the visit.  The reports by Pharma Compliance Group are reviewed in conjunction with the other information available to the Diversion Control Team in reaching its recommendation on the action to be taken, if any.  Frequently, the Diversion Control Team conducts additional investigation of the customer, such as requesting dispensing data, before deciding whether and what action to take.

K.     Annual External Review

Annually, and more often if deemed necessary, ABDC will engage an experienced outside consultant with specific expertise in diversion control to conduct a comprehensive audit of ABDC's Division Control Program.  As noted above, ABDC engaged Brian Reise, a retired DEA Diversion Group Supervisor, for the inaugural external review.  Mr. Reise assessed the effectiveness of ABDC's program to identify Orders of Interest, to report suspicious orders, and to otherwise deter diversion.  He conducted a comprehensive audit, analyzing documentation covering the identification and assessment of Orders of Interest, new customer due diligence, targeted customer visits, reporting of suspicious orders, and the Company's new policies and procedures.  This review also included interviews of key members

---

[17] As in all instances in which it requests information from its customers, ABDC is necessarily constrained by its customers' willingness to provide accurate and complete information.  While ABDC has no reason to believe its customers do not provide accurate and complete information, ABDC lacks any regulatory or legal authority to compel cooperation or to collect information that would allow it to verify all that its customers report.  ABDC can and does take action when a customer refuses to cooperate, such as reducing or terminating that customer's ability to purchase controlled substances from ABDC.  Additionally, if ABDC were to learn that a customer was intentionally misleading ABDC, it would take the appropriate steps within its power.

20

of the Diversion Control Team.  Any changes that are implemented as a result of any annual audit will be incorporated into all diversion control policy, procedure, and training materials.

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0370

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004600

**EXHIBITS:**

A.  2015 Presentation to the Board Audit Committee regarding modifications to the Diversion Control Program

B.  General awareness training for distribution center employees from 2016

C.  RPIC training and testing material from 2016

D.  CSRA Form 590 – Retail Pharmacy Questionnaire

E.  CSRA Form 595 – Standard Review Checklist

F.  Product Family Risk Assessment for 2017

G.  Consumption Review Form

H.  Analytical Dashboards and Reports utilized by the Diversion Control Team

I.  Targeted Pharmacy Visit Checklist

J.  OMP Annual Refresher Checklist

K.  CSRA and Diversion Control Team Work Charts

L.  Agenda from twice-yearly diversion control meeting held in December 2016

M.  Decision Flow Chart for Order Review

N.  Reason Code Listing

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0371

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004601

## V.     CONCLUSION

ABDC's Diversion Control Program aspires to meet or exceed all regulatory requirements and to maintain a dynamic approach to the ever-evolving challenges of protecting against diversion, while assuring the safe and secure delivery of needed medication for legitimate uses.  As such, the program will continue to evolve and change to meet new challenges, and to benefit from internal and external experience.

23

Business Confidential
SC FOIA Exempt

ABDC -SC Req.0372

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

ABDCMDL00004602