IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF OHIO EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Cases*[1] | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK 1B RETAIL PHARMACY DEFENDANTS' OBJECTION TO DISCOVERY RULING REGARDING PHARMACY DATA PRODUCTION (DKT. 3106)**

The Track 1B Retail Pharmacy Defendants ("Pharmacy Defendants")[2] object to certain aspects of the Special Master's Discovery Ruling Regarding Pharmacy Data Production, issued on January 27, 2020 (the "Ruling") (Dkt. No. 3106).[3] Special Master Cohen's Ruling requires the Pharmacy Defendants to produce data not only for the relevant opioids but also for additional non-opioid products in connection with an expansive definition of "cocktails" related to

---

[1] The Track One-B Cases are: *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 18-op-45090 (N.D. Ohio); and *The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 17-op-45004 (N.D. Ohio).

[2] CVS Pharmacy, Inc. and Ohio CVS, L.L.C. ("CVS"), Rite Aid of Maryland, Inc. d/b/a Mid-Atlantic Customer Support Center, Rite Aid of Ohio, Inc. and Rite Aid Hdqtrs. Corp. ("Rite Aid"), Walgreen Co. and Walgreen Eastern Co. ("Walgreens"), HBC Service Company, an unincorporated operating division of Giant Eagle, Inc. ("Giant Eagle"), Discount Drug Mart Inc. ("DDM"), and Walmart Inc. ("Walmart").

[3] The Pharmacy Defendants preserve all objections previously asserted and now pending before the Sixth Circuit Court of Appeals, including but not limited to the amended claims asserted in Track 1B, scope of discovery ordered in connection with the Track 1B cases, and production of private patient prescription information. *See* Writ of Mandamus, *In re CVS*, 20-3075 (6th Cir. Jan. 17, 2020). Further, it is the Pharmacy Defendants' position that Plaintiffs never should have been permitted to amend to add dispensing claims. *See id.*

Plaintiffs' combination-prescription "red flag" theory. The Ruling also sets forth an untenable timeframe for production of (a) the ordered dispensing data (by March 2) and (b) "any additional data fields which [Pharmacy Defendants] or their experts intend to rely on in defending against Plaintiffs' claims" after Plaintiffs have identified "the prescriptions they (and their experts) conclude should have been 'Red Flagged' as suspicious, and investigated or not filled" (14 days). Finally, the Ruling requires the production of additional sensitive patient identifying information in the form of patient's year of birth ("Birth Year") or age, which, when considered against the totality of the other information that the Pharmacy Defendants were ordered to produce (including, among other things, Zip Code, Diagnostic Code, and Physician Specialty), further increases the risk that the identity of individual patients could be revealed.

To cure these errors concerning the scope, type, and timetable for the Pharmacy Defendants' production of dispensing data, the Pharmacy Defendants respectfully request that the Court modify the Ruling as follows: (a) additional non-opioid drugs to be included in the dispensing data to be produced should be limited as set forth below; (b) Birth Year shall be removed from the data set ordered for production; and (c) the deadlines for production of dispensing data should be extended as follows: (i) if the additional non-opioid drugs are not limited as the Pharmacy Defendants propose, then the March 2 deadline shall be stricken and re-evaluated after the Pharmacy Defendants have had sufficient time to determine how long it will take to implement the Special Master's ruling; and (ii) the 14-day deadline for the Pharmacy Defendants to identify additional data fields after receipt of Plaintiffs' red flag analysis and identified prescriptions shall be stricken and re-evaluated based on the nature and volume of prescriptions and analyses identified by Plaintiffs.

I.       INTRODUCTION AND BACKGROUND

At issue here is the type and scope of dispensing data that the Pharmacy Defendants will be required to produce in connection with the Track 1B cases. Plaintiffs argue they will use the dispensing data in part to identify specific prescriptions containing purported "red flags" that Plaintiffs claim the Pharmacy Defendants should have further investigated prior to filling (Plaintiffs' "Red Flag Prescriptions").

Plaintiffs' requests for dispensing data have expanded and changed during the course of Track 1B discovery. Plaintiffs initially requested Pharmacy Defendants' dispensing data for approximately 20 data fields and specified that each "[p]atient's name and address shall be de-identified." Ex. A, Track 1B Combined Discovery Requests at n.2. Setting aside the Pharmacy Defendants' overarching objection to producing dispensing data, the Pharmacy Defendants were willing, subject to appropriate safeguards, to produce these fields for three years for the two Plaintiff counties, to the extent available. Within weeks of the initial Case Management Conference for Track 1B on December 4, 2019, each Defendant participated in a meet-and-confer with Plaintiffs and Special Master Cohen to finalize the fields and production logistics, including production timelines. The Pharmacy Defendants believed they could produce the 20 data fields that Plaintiffs were requesting as of that point for Cuyahoga and Summit Counties within six weeks of the date Plaintiffs confirmed that the list of fields was complete. *See* Dkt. No. 3029, Pharmacy Defendants' Motion for Reconsideration of the Court's Order Regarding Scope of Track One-B and Supporting Memorandum, dated January 28, 2020, at 14.

After that progress, however, Plaintiffs changed course and significantly expanded the scope of dispensing discovery that they requested. On January 3, 2020, Plaintiffs sent the Pharmacy Defendants a request for approximately 160 data fields, requiring additional review and consideration by the Pharmacy Defendants and conferences with the parties and Special

3

Master to evaluate positions and attempt compromise. Ex. B, excerpt of Plaintiffs' January 3, 2020 data field request listing the 160 fields requested). During an in-person conference with the Special Master on January 22, 2020, Plaintiffs changed course again, dropping the vast majority of the 160 data fields they had most recently requested, but insisting on the production of 34 data fields.

At the January 22 conference, the parties ultimately reached agreement on certain dispensing data fields that the Pharmacy Defendants would be willing to produce,[4] and the Special Master ordered that other fields be produced over the Pharmacy Defendants' Objections.[5] The parties also agreed upon a phased discovery approach whereby the Pharmacy Defendants could identify additional data fields they might rely on after Plaintiffs had identified the specific prescriptions that they allege contained "red flags" and should not have been filled absent further investigation. The specific time frame in which the Pharmacy Defendants would have to produce that additional data was not discussed, although the Pharmacy Defendants made clear that their previous estimates of being able to produce the requested data in six weeks was in jeopardy in light of the expanded scope of data fields that they were being ordered to produce.

On January 23, 2020, the parties held yet another discovery conference with the Special Master to discuss Plaintiffs' request that, in addition to producing dispensing data for opioids, the Pharmacy Defendants produce dispensing data for numerous other drugs that Plaintiffs claim present a "red flag" when prescribed in combination with an opioid (so-called "cocktail"

---

[4] The Pharmacy Defendants had expressed a willingness, pending the outcome of the decision of the Sixth Circuit, to proceed with the collection and production of these 34 fields of data for Summit County and Cuyahoga County stores for the relevant opioids, going back 3 years.

[5] Specifically, the data fields that the Pharmacy Defendants were ordered to produce over their objection were: Dispensing Pharmacist, Patient Age, Rejection Indicator, Patient DOB, and DEA Override.

4

prescriptions). The Pharmacy Defendants objected to Plaintiffs' expansive request and stated that if Plaintiffs are permitted to seek such discovery it should be limited to the so-called "Trinity" or "Holy Trinity" combination consisting of (1) alprazolam (anti-anxiety medication); (2) carisoprodol (muscle relaxant); and (3) either hydrocodone or oxycodone, all filled for the same patient on the same day, at the same pharmacy and prescribed by the same prescriber. *See* Ex. C, Retail Pharmacy Defendants' Submission re "Trinity" Cocktails, dated January 27, 2020, at 2-4.[6] The Pharmacy Defendants further maintained that this additional data be limited to those prescriptions filled 2013 and later, a few months after 2012 DEA industry guidance identified such a combination as a potential "red flag" and more than two years before the Ohio Board of Pharmacy in 2015 issued similar guidance. *See id.* at n.3.

All of these discovery conferences culminated in the Special Master issuing his Ruling Regarding Pharmacy Data Production (Dkt. No. 3106), which directs the Pharmacy Defendants as follows:

- Dispensing data relating to the 34 fields must be produced by the Pharmacy Defendants by March 2, 2020.

- Any additional data fields that the Pharmacy Defendants intend to use to defend against Plaintiffs' claims must be produced by the Pharmacy Defendants within fourteen days of Plaintiffs' identification of the Red Flag Prescriptions.

- Data for 14 benzodiazepines and 4 muscle relaxants that Plaintiffs identified as non-opioids relevant to their analysis of potential "red flag" combinations must be

---

[6] Exhibits to the January 27, 2020 Pharmacy Defendants' submission are omitted here due to size.

produced by the Pharmacy Defendants, to the extent prescriptions for those drugs were filled within 14 days (either before or after) any opioid.

There is no basis for the timing and substance of these broad rulings. Far outside the confines of the Federal Rules, the Ruling serves only to further Plaintiffs' quest to fish through the Pharmacy Defendants' dispensing data without connection to Plaintiffs' Track 1B claims. Indeed, the addition of eighteen non-opioids, which, according to Plaintiffs, translates to thousands of additional individual drug products ("NDCs")[7] that may have to be searched, presents not only an additional burden on the Pharmacy Defendants but an additional intrusion into patient privacy. And the timetable set forth in the Ruling is simply untenable. The Pharmacy Defendants therefore request that the Ruling be reversed and amended as explained below.

## II. ARGUMENT

Federal Rule of Civil Procedure 26 requires the Special Master not only to limit discovery to what is relevant, but also to consider whether the discovery sought is proportional to the needs of the case. *See, e.g.*, *In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 236 (2016) ("[A] plaintiff [cannot] be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive."). By ordering discovery that is overbroad, unduly burdensome, and neither relevant nor proportional to Plaintiffs' claims in the

---

[7] On February 1, 2020, Plaintiffs provided a list of over 15,000 NDCs and 4,000 NDCs, respectively, for the 14 benzodiazepines and 4 muscle relaxants for which they request additional dispensing data, and which we are not attaching here due to its size. The Pharmacy Defendants are still investigating which NDCs may be implicated for the 18 new drugs for which they were ordered to produce dispensing data.

6

Track 1B litigation, and on an impractical, unduly burdensome timeline, the Special Master abused his discretion in entering the Ruling.[8]

> **A.  The Expansive Definition Of "Cocktail" Prescriptions Is Unsupported, Overly Burdensome, Not Proportional To The Needs Of The Case, And Untenable In Light Of The March 2 Production Deadline.**

The Ruling largely adopts Plaintiffs' position and orders the Pharmacy Defendants to produce data for 18 non-opioid drugs (translating to thousands of additional NDCs, according to Plaintiffs ) so that Plaintiffs can attempt to identify purported "red flag" "cocktail" combinations in prescriptions that Pharmacy Defendants' pharmacists filled.  That ruling goes against the typical guidance concerning opioid "cocktails," as well as the discovery rules, and thus must be reversed.

> **1.  An opioid "cocktail" has been defined by DEA as a three-drug combination of oxycodone or hydrocodone + alprazolam + carisoprodol.**

Plaintiffs claim certain drug combinations, or "cocktails," should have constituted "red flags" to the Track 1B Defendants' pharmacists, who should have further investigated the prescriptions and, possibly, refused to fill them.  Plaintiffs argued such a "cocktail" consists of

---

[8] The Ruling is styled as one governing discovery only, and the Pharmacy Defendants understand it as such.  Plaintiffs, of course, bear the ultimate burden of proof on all of their claims, including those related to dispensing.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4194272, at *1-*2 (N.D. Ohio Sept. 4, 2019) (citing *Cincinnati v. Beretta U.S.A.*, 768 N.E.2d 1136, 1141-44 (Ohio 2002)); *see also City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 621 F. Supp. 2d 513, 528, 531 (N.D. Ohio 2009) (defendants cannot be held liable in a public nuisance action challenging conduct that is subject to regulation unless the plaintiff pleads and shows that defendants did not comply with the applicable regulation), *aff'd*, 615 F.3d 496 (6th Cir. 2010); *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003) (plaintiff bears the burden of proof on public nuisance claim).  Pharmacy Defendants do not understand the production obligations identified on pages 6-7 of the Ruling to shift the burden of proof in any respect.  Any such burden-shifting would obviously be improper and would deprive the Pharmacy Defendants of due process.  *See Addington v. Texas*, 441 U.S. 418, 423 (1979); *Voigt v. Chicago & N.W. Ry. Co.*, 380 F.2d 1000, 1004 (8th Cir. 1967) ("It has long been generally recognized that it is reversible error to place the burden of proof on the wrong party or to place an unwarranted burden of proof on one party.").

certain opioids or opioid treatments taken in combination with one or more benzodiazepine, muscle relaxant, or sleep aid—regardless of whether prescriptions for those drugs were presented at the same pharmacy, presented on the same day, or written by the same prescriber.

Plaintiffs are wrong.  The concept of "red flags" is not referenced in the Controlled Substances Act ("CSA") or its implementing regulations.  Nor does the CSA or its regulations define a "cocktail."  In the context of CSA enforcement, the DEA has used the concept of "red flags" to describe circumstances about which a reasonable pharmacist—in keeping with his or her "corresponding responsibility"—may want to be aware.

Further, there is no blanket regulatory prohibition of *any* opioid combination.  Opioid combinations, including those implicated by the Ruling, can be common treatment for patients, for example, in active cancer treatment, experiencing acute sickle cell crises, or experiencing post-surgical pain.  Ex. D, CDC Clarification of Opioid Guidelines; *see also* Ex. E, DEA Letter to NACDS, dated November 4, 2019 (responding to inquiry for position on "Trinity" prescriptions by advising that "[f]ederal regulations do not define the term legitimate medical purpose nor do they set forth the standards of medical practice.  It is up to each DEA-registered practitioner to treat a patient according to his or her professional medical judgment . . . .").  Beginning in approximately 2012, industry guidance from the DEA and Ohio Board of Pharmacy has instructed that a very specific three-drug combination, commonly referred to as the "Trinity" or "Holy Trinity," is the "cocktail" most commonly abused:  oxycodone or hydrocodone + alprazolam + carisoprodol.  *See* Ex. F, Aug. 3 & 4, 2013 DEA presentation on DEA Perspective: Pharmaceutical Use & Abuse, during the Baton Rouge Pharmacy Diversion Awareness Conference, at 18, 20; Ex. G, Aug. 24, 2015 DEA presentation on Current Trends in DEA Compliance, to NACDS, at 3, 9; Ex. H, Mar. 19 & 20, 2016 DEA presentation on DEA

8

Trends and Update, to Delaware Pharmacy Diversion Awareness Conference, at 33-35; Ex. I, 2017 DEA presentation on DEA Trends and Update, to San Juan, Puerto Rico Pharmacy Diversion Awareness Conference, at 12, 17, 18; June 2015 Ohio Board of Pharmacy website video at 5:55-6:20.[9]  Importantly, these agencies do not argue that such a "cocktail" is per se invalid or can never be prescribed or dispensed.  Additionally, several authorities that take a broader position still define a "cocktail" as a three-drug combination of an opioid, benzodiazepine, and muscle relaxant.  *See, e.g.*, *Trinity Pharmacy II*, 84 Fed. Reg. 7304 (2018); *see also* Ruling at 3.

> **2.   The Ruling is overbroad and unduly burdensome because it requires production of data for fourteen benzodiazepines and four muscle relaxants, which are neither relevant nor proportional to Plaintiffs' claims.**

Despite this context, the Ruling largely follows Plaintiffs' position and requires the Pharmacy Defendants to produce data for fourteen benzodiazepines and four muscle relaxants (which, according to Plaintiffs, includes over 19,000 individual NDCs) that Plaintiffs argued may constitute combination or "cocktail" prescriptions that should have been further investigated.[10]  This is too broad.  These drugs are not appropriate for an analysis of "red flag" combinations—in fact, many are not even controlled substances (let alone Schedule II drugs).

The Ruling's broad definition of "cocktail" is also unnecessary.  The Pharmacy Defendants had agreed to provide Plaintiffs with additional data for two non-opioid products (alprazolam and carisoprodol) in connection with DEA guidance pertaining to "Trinity" combinations.  The Special Master's Ruling rejects the Pharmacy Defendants' position and

---

[9] The video can be found at https://www.pharmacy.ohio.gov/ or on the Ohio Board of Pharmacy YouTube account at https://www.youtube.com/channel/UCidYeMX_wTBJsAVgafF076g.

[10] The Ruling does not require production of data for the sleep aids that Plaintiffs requested.

9

vastly expands the scope of discovery, associated burden on the Pharmacy Defendants, and intrusion into patient privacy by requiring production of data for 18 additional non-opioid drugs, which, according to Plaintiffs, translates to thousands of additional individual products, all to be included in the upcoming March 2 production.[11]

The Ruling does not, however, justify its breadth. At most, the Ruling reasons "it is known that patients receiving any combination of these categories of drugs (including only just two-drug combinations) are very often also drug-seeking." Ruling at 4. But this is not true—many patients that are prescribed opioids in combination with other drugs (particularly two-drug combinations) need those drugs for legitimate treatment. Indeed, it is for this reason that the DEA has declined to assert a blanket position that such combination prescriptions are improper, instead deferring "to each DEA-registered practitioner to treat a patient according to his or her professional medical judgment." Ex. E, DEA Letter to NACDS, dated November 4, 2019. Further, as DEA has advised, "DEA regulations do not impose a specific quantitative minimum or maximum limit on the amount of medication that may be prescribed on a single prescription, or the duration of treatment intended with the prescribed controlled substance." *Id.*

Nor does the Ruling provide support for the breadth of the non-opioid drugs it orders produced, since it relies heavily on authorities holding that the most commonly abused combination is the "Trinity" or "Holy Trinity." In fact, the Ruling does not cite any specific authorities to support that Pharmacy Defendants should produce data for all of the possible combinations of only two drugs provided in the Ruling. In contrast, the Pharmacy Defendants have shown that limiting an analysis of potential "red flag" combinations to three-drug "Trinity"

---

[11] *See* Dkt. No. 3029 & supporting affidavits.

combinations aligns with recent guidance from relevant agencies. Ex. C, Retail Pharmacy Defendants' Submission re "Trinity" Cocktails, dated January 27, 2020.

Any potential relevance that the additional non-opioid data may have must be balanced with the significant discovery burden required for producing it. This burden has since been underscored by Plaintiffs' identification of *over 19,000* separate medications identified by individual NDC codes for the newly-added non-opioid drugs that Plaintiffs argue are implicated by the Ruling and must be included in the Pharmacy Defendants' productions of dispensing data.[12] The data corresponding to those NDC codes is far too voluminous to be necessary for the "red flag" analysis for which Plaintiffs claim they need the data.[13] Production of this data not only requires significant Pharmacy Defendant resources, but it also implicates private patient information for a massive volume of prescriptions that have nothing to do with opioids. *See* Ruling at 4 ("Defendants also note correctly that every addition to their data production increases their discovery cost and to some extent the invasion of their customers' privacy.").

> **3. The 28-day rolling time window for purported "cocktail" combinations is unsupported and overly burdensome; the alternative option of producing all prescription data for all listed benzodiazepines and muscle relaxants is an intrusion on patient privacy.**

The Ruling leaves the Pharmacy Defendants in an untenable situation (*see* Ruling at n.8):

> In other words, each Defendant has two choices. First, it may simply produce data for ***all*** of its prescriptions for the listed benzodiazepines and muscle relaxers, and let Plaintiffs figure out which were given to patients who also received recent prescriptions for opioids. Second, a Defendant may instead filter its data and produce only its prescriptions for the listed benzodiazepines and muscle relaxers that it dispensed to a patient who ***also*** received from it a prescription for opioids within a 14-

---

[12] Plaintiffs provided the NDC codes by email dated February 1, 2020. We are not including that list as an exhibit hereto due to its significant volume.

[13] This is true even if all of the improperly added non-Schedule II opioids are removed from Plaintiffs' list of NDCs.

> day plus-or-minus window. This gives each Pharmacy Defendant options to tailor, in part, its own discovery burden. That said, the deadlines discussed below may limit a Defendant's choice, if applying the data filter causes data production to take longer. The Special Master adds that giving Defendants the option of a more complicated filter, such as producing non-opioid prescriptions only when the patient received **both** a benzodiazepine **and** a muscle relaxer within a 14-day plus-or-minus window of an opioid prescription, is not warranted and possibly unworkable. Last, as stated earlier, all prescription data shall date back to 2006. *See* Dkt. No. 3055.

The Ruling's option to limit production of data for the benzodiazepines or muscle relaxants to the 14-day period before or after a prescription for an opioid was dispensed (or a 28-day window) only creates an additional burden—not to mention that it is overbroad and impractical. The option poses a logistical nightmare, requiring complex algorithms to implement, all of which is exacerbated by the March 2 production deadline. The alternative option of producing all prescription data for patients prescribed only a muscle relaxant or only an anti-anxiety medication at any time after 2006—by definition sweeping into this opioid litigation the private patient information of individuals who have never been prescribed an opioid—is no better.

The 14-day window before and after an opioid is dispensed (28 days) is both overly broad and without justification. That period is far too extensive to target the "red flags" Plaintiffs say they seek for their claims. It is also impractical, as it suggests pharmacists might be expected to identify purported "red flag" prescriptions presented up to 28 days apart. In practice, unless the combination is presented to the pharmacist at the same time, it might not be apparent to the pharmacist that there might be a red flag to resolve. The Pharmacy Defendants submit they should be able to limit their production of "cocktail" data to combination prescriptions presented to the same pharmacy on the same day.

Accordingly, the Pharmacy Defendants respectfully request that the Court modify the Ruling to require Pharmacy Defendants to produce data for only the drugs commonly identified as a "Trinity" that were prescribed on the same day to the same patient and filled at the same pharmacy.

### B. The Ruling Is Unfair And Unduly Burdensome Because It Limits The Time Available For Pharmacy Defendants To Defend The Purported Red Flag Prescriptions Identified By Plaintiffs To 14 Days.

The Ruling states that, "no later than 14 days from the date of Plaintiffs' 'Red Flag' identification, Defendants shall produce, for all earlier-supplied prescriptions, any additional data fields upon which they or their experts intend to rely in defending against Plaintiffs' claims." Ruling at 7.  This period is too short.  Depending on the volume of purported Red Flag Prescriptions that Plaintiffs identify (which based on Plaintiffs' past analyses will likely be voluminous), the time period will likely be impossible for Pharmacy Defendants to meet.  Before even assessing what additional data fields they may need to produce, the Pharmacy Defendants will have to analyze the prescriptions identified by Plaintiffs and try to understand Plaintiffs' methodology.  Only after that is accomplished, can the Pharmacy Defendants determine what additional data fields they need and begin the process for extracting that data.  And depending on the type of data that needs to be extracted, that process could be quite complicated, which is what prompted the parties to agree to a phased-discovery approach with the production of data in the first place.  Accordingly, the Pharmacy Defendants respectfully request that the Court amend the Ruling to remove the 14-day deadline and allow for considered evaluation of the appropriate timetable following Plaintiffs' identification of Red Flag Prescriptions and related analyses, and the volume of prescriptions identified.

13

### C. The Ruling Further Puts Patient Privacy At Risk By Requiring The Production Of Patient Birth Year Or Age.

As the Pharmacy Defendants have previously explained, certain required data constitutes an unwarranted invasion into patient privacy. *See* Writ of Mandamus, *In re CVS*, 20-3075 (6th Cir. Jan. 17, 2020) at 26-27*; see also* Dkt. No. 3029, Pharmacy Defendants' Motion for Reconsideration of the Court's Order Regarding Scope of Track One-B and Supporting Memorandum, at 12-13. The Ruling overrules Pharmacy Defendants' objections that the production of a patient's Birth Year (or Age) constitutes an improper privacy invasion and further increases the risk that particular patients could be identified based on the totality of the information being produced. As previously explained, and acknowledged by Special Master Cohen in the Ruling, the more data that is produced about a particular patient, the greater the invasion of privacy, and the greater the risk that a patient's identify will be exposed. *See, e.g*, Dkt. No. 3029 at 12-13; Reply in Support of Petitioners' Emergency Motion to Stay Certain Discovery at 9, *In re CVS*, 20-3075 (6th Cir. Jan. 31, 2020); Ruling at 4. In the interests of judicial economy, rather than repeating arguments here that have been amply set forth in prior filings, the Pharmacy Defendants incorporate them by reference and object to the production of the additional data fields on privacy grounds.[14]

### III. CONCLUSION

Special Master Cohen's Ruling would require the Pharmacy Defendants to produce expansive dispensing data with strict time constraints, without any justification for either. As it

---

[14] The Pharmacy Defendants had objected to providing patient name, address, and other private patient information but had agreed that each Pharmacy Defendant would provide a unique identifier linked to each Patient ID number to protect patient privacy. To the extent that the "new, unique identifying number" referenced in the Ruling is consistent with this agreement, the Pharmacy Defendants do not object to each Pharmacy Defendant providing such an identifier in their data. To the extent that this issue requires further clarification, the Pharmacy Defendants request an opportunity to brief and be heard on the issue.

14

is unduly burdensome, overly broad, and not proportional to the Track 1B claims, the Ruling Regarding Pharmacy Data Production should be modified as discussed herein.

Dated:  February 3, 2020                    Respectfully submitted,

/s/   *Tara A. Fumerton*
Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

/s/   *Eric R. Delinsky (consent)*
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC  20036
Phone: (202) 778-1800
Fax: (202) 822-8106
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com

*Attorneys for CVS Pharmacy, Inc. and Ohio CVS Stores, L.L.C.*

/s/   *Kelly A. Moore (consent)*
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Phone: (212) 309-6612
Fax: (212) 309-6001
E-mail: kelly.moore@morganlewis.com

Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5917
Fax: (215) 963-5001
E-mail: elisa.mcenroe@morganlewis.com

16

*Attorneys for Rite Aid of Maryland, Inc., d/b/a Mid-Atlantic Customer Support Center, Rite Aid of Ohio, Inc., and Rite Aid Hdqtrs. Corp.*

/s/ Kaspar Stoffelmayr (consent)
Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
E-mail: kaspar.stoffelmayr@bartlit-beck.com

*Attorney for Walgreen Co. and Walgreen Eastern Co.*

/s/ Timothy D. Johnson (consent)
Timothy D. Johnson
Gregory E. O'Brien
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, OH 44114
Phone: (216) 621-7860
Fax: (216) 621-3415
Email: tjohnson@cavitch.com
Email: gobrien@cavitch.com

*Attorneys for Discount Drug Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for HBC Service Company*

17

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record on February 3, 2020.

/s/ *Tara A. Fumerton*
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*
