UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL 2804** |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) ) | |
| | ) | **Judge Dan Aaron Polster** |
| *Cleveland Bakers and Teamsters Health* | ) ) | |
| *and Welfare Fund, et al. v. Purdue Pharma,* | ) | |
| *L.P., et al., Case No. 1:18-op-45432-DAP* | ) ) | **OPINION AND ORDER** |

On June 18, 2018, Plaintiffs, Cleveland Bakers and Teamsters Health and Welfare Fund

("Cleveland Bakers") and Pipe Fitters Local Union No. 120 Insurance Fund ("Pipe Fitters")

(collectively "Plaintiffs" or "Funds"), filed their First Amended Complaint (Doc. #: 635).  On

December 20, 2019, Plaintiffs filed their Corrected Unredacted Amended Complaint (Doc. #:

3031) (the "Complaint").[1]  The Complaint identifies two categories of defendants: Marketing

---

[1] Other than changes regarding the identities of several defendants, Plaintiffs' Corrected
Unredacted Amended Complaint is substantively identical to Plaintiffs' First Amended Complaint.
Thus, although the motions to dismiss, response, and replies reference the First Amended
Complaint, the Court will refer to Plaintiffs' Corrected Unredacted Complaint (Doc. #: 3031) in
this Opinion and Order.

Defendants[2] and Distributor Defendants.[3] The Marketing Defendants are generally described by Plaintiffs as having "packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs." Doc. #: 3031 at ¶ 35. The Distributor Defendants are described by Plaintiffs as wholesale pharmaceutical distributors who distributed, supplied, sold, and placed prescription opioids into the stream of commerce without fulfilling their alleged duty to detect and warn of the diversion of these drugs for non-medical purposes. *See id*. at ¶ 79. Four of the Distributor Defendants—CVS, Rite Aid, Walgreens, and Walmart—are also National Retail Pharmacies (the "Pharmacies" or "Pharmacy Defendants"). *See id*. ¶ 93. Plaintiffs refer to the Marketing Defendants and the Distributor Defendants collectively as "Defendants." *See id*. at ¶ 14. The Court will do the same.

---

[2] The named "Marketing Defendants" are: Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company (collectively "Purdue"); Allergan, plc (f/k//a Actavis plc f/k/a Allergan, Inc.), Allergan Finance LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.), Allergan Sales, LLC, Allergan USA, Inc., Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City Utah), Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) (collectively "Actavis"); Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals, USA, Inc., and Cephalon, Inc. (collectively "Cephalon"); Johnson & Johnson, Janssen Pharmaceuticals, Inc., Noramco, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica n/k/a Jansen Pharmaceuticals, Inc. (collectively "Janssen"); Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. (collectively "Endo"); Insys Therapeutics, Inc. ("Insys"); Mallinckrodt plc, Mallinckrodt LLC, and SpecGX LLC (collectively "Mallinckrodt").

[3] The named "Distributor Defendants" are: AmerisourceBergen Drug Corporation; Anda, Inc.; Cardinal Health, Inc.; CVS Indiana, L.L.C., CVS Rx Services, Inc., CVS TN Distribution, L.L.C., CVS Pharmacy, Inc. (collectively "CVS"); Discount Drug Mart, Inc.; H.D. Smith Wholesale Drug Company; McKesson Corporation; Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc.; Walgreen Co. and Walgreen Eastern Co., Inc. (collectively "Walgreens"); and Walmart, Inc. f/k/a/ Wal-Mart Stores, Inc.

The Complaint describes the following eleven causes of action:

### Federal Law Claims

| | |
|---|---|
| Count 1 | Violation of RICO, 18 U.S.C. §1961, *et seq.* – Opioid Marketing Enterprise (against Purdue, Cephalon, Janssen, Endo and Mallinckrodt); |
| Count 2 | Violation of RICO, 18 U.S.C. §1961, *et seq.* – Opioid Supply Chain Enterprise (against Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen); |

### State Law Claims

| | |
|---|---|
| Count 3 | Violation of the Ohio Corrupt Practices Act Ohio Revised Code § 2923.31, *et seq.* – Opioid Marketing Enterprise (against Purdue, Cephalon, Janssen, Endo, and Mallinckrodt); |
| Count 4 | Violation of the Ohio Corrupt Practices Act Ohio Revised Code § 2923.31, *et seq.* – Opioid Supply Chain Enterprise (against Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen); |
| Count 5 | Statutory Public Nuisance (against all Defendants); |
| Count 6 | Common Law Absolute Public Nuisance (against all Defendants); |
| Count 7 | Negligence (against all Defendants); |
| Count 8 | Common Law Fraud (against the Marketing Defendants); |
| Count 9 | Injury Through Criminal Acts–Ohio Revised Code § 2307.60 (against all Defendants); |
| Count 10 | Unjust Enrichment (against all Defendants); and |
| Count 11 | Civil Conspiracy (against all Defendants). |

On July 23, 2018, two groups of defendants—Manufacturer Defendants[4] and Distributor

---

[4] *See* Manufacturer Defendants' Joint Motion to Dismiss the Amended Complaint (Doc. #: 777-1).  The "Manufacturer Defendants" consist of the same entities as the Marketing Defendants. However, Noramco, Inc., Teva Pharmaceutical Industries, Inc., Allegan, plc, and Mallinckrodt, plc, did not directly join the motion.  For ease of reference, parties to the Manufacturers' motion will be referred to as "Marketing Defendants."

Defendants[5]—filed motions to dismiss the First Amended Complaint.  On July 24, 2018, the Pharmacies filed a motion to dismiss.[6]  On August 20, 2018, Plaintiffs filed an omnibus response in opposition to the motions to dismiss.  *See* Doc. #: 893.  On September 10, 2018, Defendants filed reply briefs.  *See* Doc. ##: 867, 868, 869.  This order addresses all three motions.[7]

## I. Legal Standards

### A.    The 12(b)(6) Standard.

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court is "required to 'accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff.'"  *Dinwiddie v. Beshear*, 2019 WL 4009835, at *2 (6th Cir. April 24, 2019) (quoting *Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Federal courts require only 'notice pleadings' containing "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Accordingly, "a complaint need not contain 'detailed factual allegations,' however, it requires more than 'labels and conclusions' or 'a formulaic

---

[5] *See* Defendants' AmerisourceBergen Drug Corp., Cardinal Health, Inc, and McKesson Corp.'s Motion to Dismiss (Fed. R. Civ. P. 12(b)(6)) (Doc. #: 774-1).  Although Anda, Inc., Discount Drug Mart, Inc., HBC Service Company, and H.D. Smith Wholesale Drug Company are named as defendants, they are not parties to the Distributors' Motion.

[6] *See* Motion to Dismiss Complaint by Defendants Walmart, Inc., CVS Health Corp., Rite Aid of Maryland, Inc., and Walgreens Boots Alliance, Inc. (Doc. #: 773-1).  The parties agreed the Pharmacies' motion would apply to the new Walgreen and CVS defendants as if they had been parties when the motion was filed.

[7] Case Management Order One ("CMO-1") requires coordination and consolidation of motion to dismiss briefing, including incorporating similar arguments by reference.  *See* CMO-1 (Doc. #: 232) at 4, ¶ g.  Pursuant to CMO-1, the parties refer to and incorporate portions of the memoranda of law filed in *County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.,* No. 18-op-45090 and *West Boca Med. Ctr., Inc. v. AmerisourceBergen Drug* Corp. *et al*, No. 18-op-45530 into their respective memoranda.  For ease of reference, *County of Summit v. Purdue, et al.* will be referred to as "*Summit County*."

4

recitation of the elements of a cause of action.'" *Dinwiddie*, 2019 WL 4009835, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Deciding if a complaint states a plausible claim for relief is context-specific and a court must draw on its judicial experience and common sense. *See id.* at 679. A district court may dismiss a complaint for failure to state a claim 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Trollinger v. Tyson Foods, Inc*., 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Swierzkiewickz v. Sorema N.A*., 534 U.S. 506, 514 (2002); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## B.    The 12(b)(1) Standard.

In addition to seeking dismissal for failure to state a claim, the Pharmacy Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Doc. #: 773-1 at 2-4. Rule 12(b)(1) allows dismissal if there is a "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). If it does not have subject matter jurisdiction, a court must dismiss the action. *See* Fed. R. Civ. P. 12(h)(3); *see also Thornton v. S.W. Detroit Hosp*., 895 F.2d 1131, 1133 (6th Cir. 1990). The Rule 12(b)(1) standard of review depends on whether the defendant makes a facial or factual challenge to subject matter jurisdiction. *See Wayside Church v. Van Buren County*, 847

F.3d 812, 816-17 (6th Cir. 2017).  A facial attack questions only the sufficiency of the pleadings. *See Gentek Bldg Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).  A factual attack requires a district court to weigh conflicting factual evidence to determine if subject-matter exists.  *See id*.

Here, the Pharmacies have made a facial attack on the Complaint; therefore, as with a Rule 12(b)(6) motion, the Ccourt must accept the allegations in the complaint as true, drawing all inferences in favor of the plaintiff, and determine whether Plaintiffs have stated a plausible claim. *Gaylor v. Hamilton Crossing CMBS*, 582 Fed. Appx. 576, 579 (6th Cir. 2014) (citations omitted). Although Plaintiffs have the burden when subject matter jurisdiction is challenged, this is not an onerous burden.  *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).  "'[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice' because in considering a motion to dismiss, 'we presume that general allegations embrace those specific facts that are necessary to support the claim.'"  *Gaylor*, 582 Fed. Appx. at 579 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

## II. The Complaint's Factual Allegations

Much of the 341-page Complaint filed by the Funds is copied verbatim or otherwise derived from the complaints filed in *Summit County* and in *The County of Cuyahoga, Ohio v. Purdue Pharma L.P.,* 17-md-2804 ("*Cuyahoga County*").  The Court summarized relevant factual allegations of these complaints previously and will not re-state them here.  *See* Doc. #: 1025, Doc. #: 1203.[8]  Factual allegations in the Complaint that differ materially from those previously

---

[8] The Court will cite to its prior decisions by docket number as follows: Doc. #: 1203 is the Opinion and Order relating to motions to dismiss filed in *Summit County*; Doc. #: 1025 is the Report and Recommendation ("R&R") relating to motions to dismiss filed in *Summit County*; Doc. #: 1680 is the Opinion and Order relating to motions to dismiss filed in *Muscogee (Creek) Nation v. Purdue*

summarized are addressed below.

## A.    The Plaintiffs.

Similar to insurance companies, the two Plaintiff Funds provide health and welfare benefits to members of their respective unions. *See* Doc. #: 3031 at ¶¶ 28-29. Both Plaintiffs are headquartered in Cuyahoga County, Ohio. *See id.* at ¶ 638. Unlike the plaintiffs in *Summit County* and *Cuyahoga County*, neither Plaintiff is a governmental entity. Instead, Plaintiffs are private third-party payors ("TPPs") who indirectly purchased, paid for, and/or reimbursed others for the costs of opioids intended for consumption by their covered participants and their dependents.[9] *See id*. at ¶¶ 28-29.

To qualify for payment or reimbursement by Plaintiffs, a prescription opioid had to be listed on a Plaintiff's formulary. A formulary is a "list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits." https://www.healthcare.gov/glossary/formulary. In essence, "[a]ccess to the formulary is the 'ticket' that ensures that TPPs will pay" for prescriptions. *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 159 F. Supp. 3d 898, 914 (N.D. Ill. 2016). Plaintiffs also paid for hospital stays, emergency department visits, and medications associated with opioid misuse, addiction, and overdose. *See, e.g.,* Doc. #: 3031 at ¶ 960.

## B.    Plaintiffs' Third-Party Administrators and their Pharmacy Benefits Managers.

To assist with providing prescription benefits to their members, Plaintiffs contracted with

---

*Pharma L.P., et al.*, Case No. 1:18-op-45459 ("Muscogee Nation") and *The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corporation, et al.*, Case No. 1:18-op-45749 ("Blackfeet Tribe"); Doc. #: 1499 is the R&R relating to motions to dismiss the Muscogee Nation complaint (Doc. #: 731); Doc. #: 1500 is the R&R relating to motions to dismiss the Blackfeet Tribe complaint (Doc. #6).

[9] Plaintiffs' lawsuit was designated as a representative TPP case by the Plaintiffs' Executive Committee. *See* CMO-1 (Doc. #: 232) at 4, ¶ (e).

third-party administrators ("TPAs").  *See id.* at ¶ 682.  TPAs evaluate a drug's "coverage status" based on a its efficacy, safety, and cost.  *See id.* at ¶ 683.  They also perform "formulary status" reviews to determine if a drug should be added to, remain on, or be removed from a TPA's formulary.  *See id.*  In addition, TPAs determine whether a prescription medication should be designated as a "preferred" or "non-preferred" product, or should be subject to conditions such as pre-authorization prior to dispensing, or step therapy requirements.[10]  *See id.*  According to Plaintiffs, their TPAs acted as their agents for purposes of administering Plaintiffs' prescription drug benefit programs.  *See id.* at ¶¶ 682, 689.  Medical Mutual of Ohio ("MMO") was Cleveland Bakers' TPA from at least 2008 until 2014, when it switched to OptumRx, Inc..  At all relevant times, Pipe Fitters' TPA  was MMO.  *See id.* at ¶ 682.

To make its formulary decisions, MMO relied on a Pharmacy and Therapeutics committee to oversee and direct its pharmacy programs.  *See id.* at ¶¶ 686-87.  This committee comprised pharmacists, physicians, and representatives of Express Scripts, MMO's Pharmacy Benefits Manager ("PBM").  *See id.* at ¶¶ 684-85.[11]  The information on which MMO and its Pharmacy and Therapeutics committee relied in making formulary decisions was derived from FDA data and other information, including Defendant-sponsored material.  *See id*. at ¶ 686.  MMO received some of this information directly.  Other information was received by Express Scripts which, according to Plaintiffs, acted as a "conduit," regularly providing information to MMO for use in making formulary decisions.  *Id*. at ¶ 687.  Once it made its formulary decisions, MMO provided formulary options to Plaintiffs.  *See id*.

---

[10] Step therapy requires patients to be treated with less expensive medication before moving on to a more expensive approach.  *See* Doc. #: 1031 at ⁋ 742 & n.216.

[11] Medco was MMO's PBM until 2013, when it merged with Express Scripts.  For ease of reference, Medco and Express Scripts will be referred to as "Express Scripts."

C.     **Defendants' Alleged Wrongful Acts.**

Plaintiffs contend Defendants sought to increase their opioid sales and profits by selling more of their opioid products to broader groups of users.  *See id*. at ¶ 11.  In contrast, Plaintiffs assert TPAs sought to limit the opioids listed on their formularies and control opioid costs.  *See id*. at ¶ 695.  Plaintiffs contend that, to advance their goals and circumvent barriers to formulary inclusion, the Marketing Defendants made numerous misrepresentations concerning prescription opioids, targeting Plaintiffs "through the agents that established their formularies—their TPAs, such as MMO and OptumRx, and the PBMs that assisted them." *Id*. at ¶ 689.  Plaintiffs further contend their TPAs and PBMs relied on Defendants' misrepresentations when making formulary decisions for Plaintiffs.  *See, e.g., id.* at ¶¶ 691-92.

According to Plaintiffs, the Marketing Defendants' misinformation campaign took many forms.  *See id*. at 208-216.  Plaintiffs complain the Marketing Defendants developed dedicated "managed care" sales groups tasked with calling on pharmacy directors and Pharmacy and Therapeutics committees to present false and misleading information.  *See, e.g., id*. at ¶¶ 225, 712, 720, 731-32, 735-36, 739-40, 759-760.  Plaintiffs also maintain that, in an effort to influence placement of their drugs on Plaintiffs' formularies, Marketing Defendants met purposely with MMO to provide false and misleading information, downplay the risks of opioid use for chronic non-cancer pain, minimize the risks of addiction and abuse, and misstate cost savings associated with extended release formulations.  *See id*. at ¶¶ 695, 697-98.  Plaintiffs also assert the Marketing Defendants attended managed-care industry conferences where they distributed misleading publications, submitted misleading abstracts, and made misleading presentations directed to TPPs, TPAs, and PBMs.  *See id.* at ¶¶ 700-09.  Plaintiffs further allege MMO personnel regularly received an assortment of managed care periodicals containing false and misleading statements

about the safety and efficacy of the Marketing Defendants' opioid products.  *See id.* at ¶ 710.

According to Plaintiffs, this misleading information was provided not only by the Marketing Defendants themselves, but also by their Key Opinion Leaders ("KOLs") and Front Groups—that is, physicians and trade organizations who appeared independent, but were actually used by Defendants to promote deceptive, pro-opioid information.  *See id*. at ¶¶ 317, 691, 767-770.

In addition to alleged misrepresentations by the Marketing Defendants, Plaintiffs allege all Defendants acted to suppress evidence of opioid diversion, despite their knowledge that TPAs (such as MMO) sought to prevent opioid diversion.  *See, e.g., id.* at ¶¶ 464-83.  In this regard, Plaintiffs contend Defendants did not comply with their obligations to monitor and report suspicious activity under the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* ("CSA").  *See id*. at ¶¶ 469-6.  It is Plaintiffs' position that, absent Defendants' failure to comply with their obligations to prevent opioid diversion and their concealment of these failures, TPPs, on their own or through their TPAs and PBMs, would have: (i) made different decisions with respect to opioid coverage and formulary placement; (ii) been on notice that a significant number of the opioids for which they paid were being diverted; (iii) taken steps to stop opioid diversion; and (iv) informed MMO that representations about the non-addictive nature of opioids were not true.  *See, e.g., id.* at ¶¶ 761-62.

## D.    Plaintiffs' Alleged Harm.

Plaintiffs advance claims against the Marketing Defendants for participating in a false marketing campaign designed to expand the opioid market and, in turn, garner higher profits from selling more opioids.  They advance claims against all Defendants based on their roles in the opioid supply chain, complaining each Defendant profited by failing to monitor and restrict improper opioid distribution.  *See id.* at ¶ 1.

Plaintiff Funds' alleged injuries are their economic losses, which Plaintiffs explain occurred in two ways: (i) opioid pill payments and (ii) addiction treatment payments. Specifically, Plaintiffs first assert Defendants' misrepresentations and failures to comply with their anti-diversion obligations induced Plaintiffs to make hundreds of thousands of dollars of payments for opioids which Plaintiffs would not have otherwise made. Second, Plaintiffs seek reimbursement for amounts paid for opioid-related medical treatment for their members, including reimbursement for increased payments for hospital and emergency department visits associated with opioid misuse, addiction, and overdose, and increased payments for medications used to treat illness and disease related to opioid misuse, addiction and overdose. *See id*. at ¶¶ 960, 974, 998. It is Plaintiffs' position that they would not have incurred these costs absent Defendants' wrongful conduct.

### III. Analysis

The Court first examines several overarching defenses Defendants assert in their motions to dismiss, and then examines Defendants' separate grounds for dismissal related to individual causes of action.

**A.  Analysis of defenses common to multiple claims.**

**1.  Limitations.**

Motions to dismiss based on statute-of-limitation grounds should only be granted where undisputed facts "'conclusively establish the defense as a matter of law.'" *Estate of Barney v. PNC Bank,* 714 F.3d 920, 926 (6th Cir. 2013). The defense is more appropriately addressed in the context of a summary judgment motion or at trial if disputed issues of fact exist relating, for example, to accrual dates, fraudulent concealment, continuing unlawful conduct, or whether information possessed by a plaintiff sufficed to provide notice of the claim. *See, e.g., Am. Premier*

*Underwriters, Inc. v. Nat'l R.R. Passenger Corp.,* 839 F.3d 458, 464 (6th Cir. 2016); Doc #: 1025 at 54-56.

Marketing Defendants posit the longest statute of limitations applicable to Plaintiffs' claims is the five-year period governing claims under the Ohio Corrupt Practices Act ("OCPA"). Marketing Defendants reason the Plaintiffs' claims are barred to the extent they rely on conduct occurring more than five years prior to April 13, 2018, the date the suit was commenced.[12] *See* Doc. #: 777-1 at 20-22. The Marketing Defendants further argue that no tolling doctrine applies to extend the limitations periods. *Id.* Plaintiffs respond that the applicable limitations periods are tolled by the continuing violations doctrine and by equitable estoppel based on Defendants' alleged fraudulent concealment of their unlawful conduct. *See* Doc. #: 893 at 57-61. The parties' positions rely on arguments raised in the *Summit County* motions to dismiss. As noted above, allegations and theories of recovery asserted in the instant Complaint are virtually identical to those in the *Summit County* pleading.

Addressing those arguments, the Court concluded the *Summit County* Complaint demonstrated Plaintiffs were "inarguably aware" of Manufacturer Defendants' marketing practices "at least since 2007;" therefore, Plaintiffs could not rely on fraudulent concealment of that conduct to toll limitations periods. Doc. #: 1203 at 3-4. But the Court also determined that disputed factual questions arose from allegations that "Defendants concealed their lack of cooperation with law enforcement and that they affirmatively misrepresented that they had satisfied their duty to report suspicious orders, concealing the fact that they had not done so." *Id.* As to the continuing violations doctrine, the Court found factual questions existed with respect to the alleged "longstanding and demonstrable policy of misrepresentations and omissions" and

---

[12] Plaintiffs filed an amended complaint naming additional Defendants on June 28, 2018. *Id.*

Defendants' ability to have avoided further injury by ceasing the complained-of conduct.[13]  *Id.* at 5.

The Court's conclusion in *Summit County* – that is, that the facts alleged suffice to raise a plausible inference that applicable limitations periods were subject to tolling under either fraudulent concealment or continuing violations theories -- applies to the Funds' pleading for the same reasons.  The Court does not dismiss any claim as barred in part by statutes of limitations at this early stage of the proceedings.

    **2.**      **Preemption.**

The Marketing Defendants challenge Plaintiffs' state law claims on grounds of federal preemption, relying upon and incorporating arguments asserted in Manufacturer Defendants' *Summit County* Rule 12(b)(6) motion.  Doc. #: 777-1 at 13-14.  There, Manufacturers maintained the Ohio state law causes of action were preempted because they would require a drug manufacturer to make statements regarding drug safety or efficacy that differ from DEA requirements.  The *Summit County* R&R concluded: "Plaintiffs claims are not premised upon inappropriate labeling or a fraud on the FDA, but rather fraudulent marketing in the promotion and sale of their opioids."  Doc. #: 1025 at 48-50.  Manufacturers further contended the state law claims were preempted by the statutory and regulatory scheme of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §1 *et seq.* ("FDCA"), which governs off-label promotion and does not provide a private right of action.  The *Summit County* R&R rejected this argument too, explaining:

---

[13] Claim-accrual date issues regarding when plaintiffs knew or should have discovered their claims also raise disputed issues of material fact not appropriate for resolution at this stage of the proceedings.  *See, e.g., Schmitz v. Nat'l Collegiate Athletic Ass'n*, 122 N.E.3d 80, 85 (Ohio 2018) ("Application of a statute of limitations presents a mixed question of law and fact, when a cause of action accrues is a question of fact, but in the absence of a factual issue, application of the limitations period is a question of law.") (citation omitted).

> Plaintiffs do not seek to enforce the provisions of the FDCA, instead they allege that Defendants fraudulently and misleadingly promoted their opioids. These allegations are of the type that would traditionally be brought as state law claims and, therefore, are not preempted.

*Id.* at 51-52, citing *Loreto v. Procter & Gamble Co.*, 515 Fed. App'x 576, 580 (6th Cir. 2013) (a claim based on conduct traditionally giving rise to liability under state law "even if the FDCA had never been enacted" is not preempted, but if the conduct at issue is not of that type, the claim is preempted).  The Court adheres to its reasoning in Summit County.

*Summit County* Manufacturers also contended plaintiffs' diversion monitoring theory, framed as a duty not to sell defendants' opioid products due to diversion concerns, would present an obstacle to the purposes and objectives of the FDCA by undermining the DEA's decision to make prescription opioids available to the public.  The *Summit County* R&R found Manufacturers misconstrued the Complaint as alleging Defendants should have stopped selling opioids altogether, while the pleading was more accurately construed to allege defendants are liable for failing to fulfill a duty of due care in selling their opioid drugs—"a claim that is not inconsistent with the purposes of the FDCA."  Doc. #: 1025 at 54.

No objection challenged the *Summit County* R&R's conclusion that the claims were not preempted.  *See* Doc. #: 1203 at 2.  Accordingly, the Marketing Defendants' motion to dismiss the Funds' state law claims as preempted by federal law is denied based on the reasoning of the *Summit County* R&R.  Doc. #: 1025 at 50-54.

**3.    Causation.**

Defendants contend Plaintiffs failed to adequately plead proximate cause and, as a result, their claims should be dismissed.  Based on its analysis below of relevant proximate cause standards, the Court disagrees.

**a.    The federal RICO proximate cause standard.**

14

Plaintiffs' only federal claim is for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO").  As a preliminary matter, and as this Court has previously observed, "'RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause . . . [a]nd as a matter of RICO law, the two concepts overlap."  Doc. #: 1203 at 6 (quoting *Trollinger*, 370 F.3d at 613).  Because proximate cause is a component of RICO standing, as it has before, the Court will begin by addressing proximate cause.  *See id.* at 7.

RICO allows recovery by "[a]ny person injured in his business or property *by reason of* a violation" of the Act.  18 U.S.C. § 1964(c) (emphasis added).  The phrase "by reason of" requires the alleged wrongful act to be a proximate cause of the plaintiff's alleged injury which, in turn, requires a direct relation between the injury asserted and the injurious conduct alleged.  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Trollinger*, 370 F.3d at 612-13.  A direct relation exists if there is a "link between the scheme and the type of injury [plaintiff] suffered …."  *Wallace v. Midwest Fin. & Mortg.* Servs., Inc., 714 F.3d 414, 420 (6th Cir. 2013); *see also* Doc. #: 1203 at 7; Doc. #: 1025 at 28-30.  A RICO plaintiff need not allege a defendant's conduct was the sole cause of the plaintiff's alleged harm as long as it was a substantial cause.  *See Trollinger*, 370 F.3d at 620; *Wallace*, 714 F.3d. at 422.  RICO also requires an injury be foreseeable and the basis of recovery be neither speculative nor based on surmise.  *See Trollinger*, 370 F.3d at 614-15; *Wallace*, 714 F.3d. at 419.

However, RICO's directness requirement is more stringent than most state-law requirements.  *See Trollinger*, 370 F.3d at 614 (citing *Desiano v. Warner–Lambert Co*., 326 F.3d 339, at 348 (2d Cir. 2003)).  Even if a RICO plaintiff and defendant have a direct relationship, the causal link between plaintiff's injury and defendant's conduct "may still be too weak to constitute

proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *See id.* at 614-15 (citing *Perry v. Am. Tobacco Co., Inc.,* 324 F.3d 845, 850 (6th Cir. 2003). At the pleading stage, it is not unusual for these types of "fact driven" questions to preclude dismissal. *See id.* at 619.

Seven Circuits applying RICO's proximate cause analysis to TPP claims against pharmaceutical companies have reached varying conclusions concerning the viability of these claims. In all seven cases, plaintiffs sought damages based on their payments for various prescription pharmaceuticals (and not for medical expenses they paid as a result of pharmaceutical use). Four cases allowed the TPP claims to proceed, and Plaintiffs rely on three of these cases to support their position.[14] *See, e.g.,* Doc. #: 892 at 2, 23, 25. Three cases rejected TPP claims against drug companies, and Defendants rely on these decisions to support their position. *See, e.g.,* Doc. ##: 777-1 at 4-8; Doc. 774-1 at 19.

The Court finds more persuasive the analysis of the Circuits that have allowed TPP claims against pharmaceutical companies to proceed. Not only are these cases more factually analogous to this one, but the reasoning applied by these courts is more compelling. For example, as in the case at bar, the cases allowing TPP claims against pharmaceutical companies involve allegations of direct misrepresentations to the TPP; seek damages based, in part, on payments made for prescription drugs; and do not involve class certification issues. A discussion of both sides of this debate is warranted.

Most recently, in *Painters and Allied Trades District Council 82 Health Care Fund,* 943 F.3d 1243, 1260 (9th Cir. 2019), the Ninth Circuit reversed a 12(b)(6) dismissal of plaintiffs' RICO

---

[14] The fourth case, *Painters and Allied Trades District Council 82 Health Care Fund,* 943 F.3d 1243, 1260 (9th Cir. 2019), was decided after the motions to dismiss in this action were fully briefed.

claims.[15] In *Painters*, plaintiffs alleged anti-diabetes drug Actos increased the risk of developing bladder cancer but, in a scheme to increase sales and profits, defendants intentionally misled the FDA, prescribing physicians, consumers, and TPPs that Actos was safe. *See id*. at 1246. The Ninth Circuit noted there was a "central dispute" between the circuit courts concerning whether decisions of third-parties, such a doctors and PBMs, "constitute intervening causes that sever the chain of proximate cause between the drug manufacturer and TPP." *Id*. at 1257. In concluding these actors do not constitute intervening causes, the *Painters* court stated:

> In this case, although prescribing physicians serve as intermediaries between Defendants' fraudulent omission of Actos's risk of causing bladder cancer and Plaintiffs' payments for Actos, prescribing physicians do not constitute an intervening cause to cut off the chain of proximate cause. An intervening cause is "a later cause of independent origin that was not foreseeable." Here, since Actos was a prescription drug, it was required to be prescribed by physicians. Hence, it was perfectly foreseeable that physicians who prescribed Actos would play a causative role in Defendants' alleged fraudulent scheme to increase Actos's revenues. Further, because of the structure of the American health care system, Defendants have always known that physicians would not be the ones paying for the drugs they prescribed. Rather, they are well aware that TPPs and individual patients pay for the drugs.

*Id*. (citations and quotations omitted). This analysis applies equally here.

In *In re Neurontin Mktg. & Sales Practices Litig*., 712 F.3d 21 (1st Cir. 2013), after a five-week trial, the jury found plaintiff TPP had incurred damages as a result of defendant's violation of RICO with respect to its off-label promotion of Neurontin, an epilepsy medication. *See id.* at 26. Defendant's alleged fraudulent scheme included: direct marketing to doctors; sponsoring misleading informational supplements and continuing medical education programs; suppressing

---

[15] The *Painters* opinion is unclear whether the district court dismissed the plaintiff's' RICO claim based on failure to establish proximate cause or lack of standing. *See id*. at 1247-48. Given the overlap between RICO's proximate cause and standing requirements, the Court discusses the case here. *See* Doc. #: 1203 at 6.

negative information about Neurontin while publishing articles in medical journals that reported positive information about its off-label effectiveness; employing physicians associated with TPPs to serve on speakers' bureaus and publish misleading articles about Neurontin; and targeting TPPs to influence formulary and prescribing decisions. *Id*. at 28. In sum, the allegations in the *Neurontin* MDL are virtually the same as the allegations in this *Opioid* MDL.

Seeking reversal, the *Neurontin* defendants argued there were too many steps in the causal chain connecting its misrepresentations to plaintiffs, "particularly because that injury rests on the actions of independent actors—the prescribing doctors." *Id*. at 34. The First Circuit rejected this argument, emphasizing that the defendant's scheme

> was designed to fraudulently inflate the number of Neurontin prescriptions for which TPPs paid. The evidence that [defendant] had specifically targeted [plaintiff] for Neurontin sales in general supports the conclusion that [plaintiff's] injury was a natural consequence of [defendant's] fraudulent scheme, but such evidence was not required, given the mechanisms by which [defendant's] marketing plan operated.

*Id*. at 37. The court also found the causal chain was "anything but attenuated" because the defendant always knew

> that, because of the structure of the American health care system, physicians would not be the ones paying for the drugs they prescribed. [Defendant's] fraudulent marketing plan, meant to increase its revenues and profits, only became successful once [defendant] received payments for the additional Neurontin prescriptions it induced. Those payments came from [plaintiff] and other TPPs.

*Id*. at 38-39; *see also In re Celexa & Lexapro Mktg. and Sales Practices Litig*., Nos. 18-1146, 18-1147, 2019 WL 364019, at *8 (1st Cir. Jan. 30, 2019) (citing *In re Neurontin* to reach the same

conclusion concerning proximate cause).[16]

In *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015), the TPP plaintiffs alleged they included the anti-diabetes drug Avandia on their formularies in reliance on material misrepresentations made by the defendant pharmaceutical company.  *See id.* at 636.  Plaintiffs sought return of high prices they paid for Avandia as a result of defendants' alleged failure to disclose known health risks.  In affirming the district court's denial of a 12(b)(6) motion, the *Avandia* appellate court explained:

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused TPPs and PBMs to place Avandia in the formulary.  The injury alleged by the TPPs is an economic injury independent of any physical injury suffered by Avandia users.  And, as far as we can tell, prescribing physicians did not suffer RICO injury from [the] marketing of Avandia.[17]

---

[16]  The Court cites *Neurontin* favorably in connection with its threshold analysis of the viability of Plaintiffs' claims.  *Neurontin* is also noteworthy for its acceptance of aggregate evidence to prove RICO causation. This Court has stated it will likewise allow Plaintiffs to use aggregate evidence to attempt to prove causation in the RICO context.

It is worth noting, however, that there are important differences between *Neurontin* and the opioid cases. For example, in *Neurontin*, plaintiff Kaiser used aggregate data to link marketing activity of a *single* manufacturer's *single* drug to a *single* alleged injury (payment for off-label prescriptions) by a *single* plaintiff.  The First Circuit concluded that Kaiser's regression analysis, in conjunction with other non-aggregate-data evidence, was sufficient to prove causation and not just correlation.  *See Neurontin*, 712 F.3d at 46.  In contrast, in the opioid litigation there are *many* manufacturers that marketed *many* different opiate drugs to *many* plaintiffs, who seek *many* types of damage.  For example, opioid cases include non-marketing theories of liability against Distributors and Pharmacies, and many categories of injury that were not at issue in *Neurontin*. Ultimately, the causation analysis accepted by the First Circuit in *Neurontin* may be of limited application in the opioid litigation context, due to the more complex nature of the MDL cases.

[17] The issue before the Second Circuit in *Avandia* was whether plaintiffs had standing to bring their claims.  See *Avandia*, 804 F.3d at 638.  As noted *supra* at n.15, in light of the overlap between RICO's proximate cause and standing requirements, this case is addressed here.

*Id.* at 644.[18]

In *Desiano v. Warner–Lambert Co*., 326 F.3d 339 (2d Cir. 2003), the TPP plaintiffs alleged defendant and its affiliates made misrepresentations to them about the safety of anti-diabetes drug Rezulin.  Plaintiffs argued that, had they known the manufacturer's statements were untrue, they would not have purchased Rezulin.  *See Desiano*, 326 F.3d at 349 & n.9.  The Second Circuit found defendants' alleged misrepresentation regarding Rezulin's safety "directly caused economic loss to [plaintiffs] as purchasers, since they would not have bought defendants' product, rather than available cheaper alternatives, had they not been misled by [defendant's] misrepresentations." *Id*. at 349.  The *Desiano* court premised its findings on the conclusion that

> in dismissing Plaintiffs' claims on a 12(b)(6) motion, the district court erred by treating Plaintiffs' complaint as one analogous to the insurance companies' claims in *Laborers Local 17*.  Instead, the court should have considered the complaint as it was presented.  Under this characterization, the insurance companies were the direct victims of Defendants' fraudulent marketing.  As such, their complaint must surely survive a 12(b)(6) motion.

*Id*. at 351 (vacating dismissal).  The allegations in *Avandia* and *Desiano* are also akin to those currently before the Court.

In contrast, three Circuits (including the Second Circuit, which decided *Desiano*) have denied recovery in cases brought by TPPs against pharmaceutical manufacturers.  In *Sidney*

---

[18] Three years before *Avandia*, the Third Circuit in *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3rd Cir. 2012), addressed whether a TPP had standing to bring a claim against a pharmaceutical company for economic damages resulting from promotion to physicians for off-label uses of certain drugs.  The district court dismissed the TPP's claims, concluding it failed to allege an injury to business or property because the complaint did not contain sufficient allegations that the TPP paid for prescriptions of drugs that were actually ineffective or otherwise worth less than what they paid.  *See id*. at 246.  The Third Circuit found plaintiff had not established that its alleged injury was fairly traceable to Schering's alleged wrongful conduct and upheld dismissal based on its determination that plaintiff did not have *Article III* standing -- not because plaintiff lacked standing to bring a RICO claim.  *See id*.  Because *Schering* did not apply the *Holmes* analysis, and the facts are significantly dissimilar to those currently before the Court, the Court finds *Schering* inapposite.  *See* Doc. ##: 777-1 at 6; 967 at 6.

20

*Hillman Health Ctr. v. Abbott Labs.*, 873 F.3d 574 (7th Cir. 2017), plaintiffs sought class certification of RICO claims against Abbott, the manufacturer of the drug Depakote, for concealing its role in promoting off-label uses to intermediaries, such as prescribing physicians.  *Id.* at 575.  In affirming dismissal, the court relied on plaintiff's temporal proximity to the alleged injury.  *See id.* at 576 (quoting *Holmes*, 112 S.Ct. 1311 ("[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.").  Although the *Sidney Hillman* court noted an injury caused by wrongs against another may satisfy RICO's proximate cause requirement, it nevertheless found plaintiffs too far removed from the alleged RICO violation, holding that "improper representations made *to physicians* do not support a RICO claim by Payors, several levels removed in the causal sequence."  *Id*. at 378 (emphasis added).  In that regard, *Sidney Hillman* differs materially from Plaintiffs' allegations here that misrepresentations were communicated directly to them, and not just to physicians.

In *Southeast Laborers Health & Welfare Fund v. Bayer Corp.,* 444 Fed. Appx. 401 (11th Cir. 2011), a TPP seeking class certification alleged the defendant misrepresented information about the risks of Trasylol, a drug used to reduce the need for transfusions during cardiac bypass surgery.  Plaintiff alleged defendant hired numerous KOLs to promote Trasylol to the medical community and to mislead decisionmakers into believing Trasylol's safety and efficacy justified its price of more than $1,000 per dose.  *Id*. at 403.  After allowing plaintiffs to replead twice, the district court dismissed the case pursuant to Rule 12(b)(6), finding plaintiff "failed to explain how or why it made the choice to pay for Trasylol and how or why [defendant's] alleged concealment of the dangers of Trasylol led [plaintiff] to pay for Trasylol.  *Id*. at 410.  The Eleventh Circuit affirmed, concluding plaintiff failed to allege facts plausibly demonstrating it would have determined Trasylol was not "medically necessary" if defendant had disclosed the suppressed

information and, absent this allegation, the court could not reasonably infer defendant's fraudulent conduct led directly to plaintiff's decision to pay for Trasylol. *Id*. In contrast to the Trasylol plaintiffs, the Funds clearly and explicitly allege they and their agents would have determined some opioid prescriptions were not medically necessary if the defendants had not engaged in misrepresentation. [20]

Several years after *Desiano*, the Second Circuit decided *UFCW Local 1776 v. Eli Lilly & Co*., 620 F.3d 121 (2d Cir. 2010). In *Local 1776,* TPPs and patients brought a putative class action against the manufacturer of Zyprexa, alleging the defendant misrepresented Zyprexa's efficacy and side effects to physicians. The TPPs sought damages based on: (i) their overpayment for the drug; and (ii) payment for prescriptions they would not have authorized absent the misrepresentations. *See id.* at 123. The district court certified a TPP class based on the overpayment theory and denied defendants' motion for summary judgment. *See id.* at 130. The Second Circuit reversed, finding plaintiffs' overpayment theory too attenuated to meet RICO's direct relation requirement. *See id.* at 134. Significantly, however, the court acknowledged that "the only reliance that might show proximate causation with respect to price is reliance by the TPPs, not reliance by the doctors." *Id*. at 134. And, when considering whether defendant's misrepresentations caused plaintiffs to pay for prescriptions they would not have paid for otherwise, the court noted that, although this theory would not support class certification, "it is not

---

[20] The Eleventh Circuit also affirmed dismissal of a TPP claim against a pharmaceutical company for fraudulent marketing for off-label uses in *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals*, LP, 634 F.3d 1352 (11th Cir. 2011). The court concluded plaintiff had not sufficiently pleaded it suffered economic injury caused by defendant's misrepresentations. The court focused on the TPP's system of determining premium payments and determined it was the TPPs themselves, not the drug companies, that were responsible for decisions related to premiums. *See id*. at 1368-69. Subsequent courts rejected this premium-centric analysis. *See, e.g*., *In re Avandia*, 804 F.3d at 641; *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *22 n.32 (collecting cases in which courts disagreed with the reasoning in *Ironworkers*).

clear that the theory is not viable with respect to individual claims by some TPPs or other purchasers." *Id*. at 135-36.[21]

In sum, the Court finds *Sidney Hillman* and the *Trasylol* case factually dissimilar; and *Local 1776* is supportive of the Court's conclusions.

### b. The Ohio proximate cause standard.

Ohio courts have adopted the *Holmes* "direct relation" analysis in cases involving state-RICO claims and have made similar observations about the legal foundation necessary to establish proximate cause. *See, e.g., City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148 (Ohio 2002) (acknowledging the *Holmes* direct relationship test and adopting the *Holmes* analysis for remoteness and proximate cause); *Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145, at *5 (8th Dist. Ohio Nov. 10, 2005) ("Because [OCPA] is patterned after the federal RICO law, we adopt the same position as that in *Holmes* … which requires proof of proximate cause in an OCPA claim. … In essence, it is the common law meaning of proximate cause.").

Ohio courts also have described proximate cause as the "natural and continuous sequence [that] produces a result which would not have taken place without the act…." *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981); *see also Bier v. City of New Philadelphia*, 464 N.E.2d 147, 148 (Ohio 1984). An injury is the natural and probable consequence of an act if it could have been foreseen or reasonably anticipated from the alleged negligent act. *Strother*, 423 N.E.2d at 471. It is not necessary that a defendant anticipate a plaintiff's particular injury. Instead, it is sufficient that the defendant's act is likely to result in injury to someone. *Id.* (quoting *Neff Lumber Co. v. First Nat'l Bank*, 171 N.E. 327, 330 (Ohio 1930). Like federal courts, Ohio courts

---

[21] Although the court vacated the denial of summary judgment and remanded for further proceedings, the case settled before the trial court addressed the viability of individual TPP claims. *See UFCW Local 1776 v. Eli Lilly and Co*., 1:05-cv-04115 (Doc. #: 283).

recognize "there can be more than one proximate cause of a particular injury." *Taylor v. Webster*, 231 N.E.2d 870, 873 (Ohio 1967); *see also State v. Theuring*, 546 N.E.2d 436, 438 (Ohio1988) ("Intervening acts, even negligent acts, do not *per se* eliminate the possibility that a prior act may be the proximate cause of a resulting injury."). Ordinarily, the existence of proximate cause is a question of fact to be determined by the trier of fact. *Strother*, 423 N.E.2d at 471. Thus, the state court proximate cause standards will be equal to, if not broader than, the federal RICO standard.

### c. Plaintiffs have pleaded facts sufficient to survive the motions to dismiss on proximate cause grounds.

#### i. The parties' positions.

Incorporating motion to dismiss briefing filed in *Summit County*, Defendants argue Plaintiffs have pleaded facts too attenuated and remote to establish a "direct relation" between the Plaintiffs' alleged injury and the misconduct attributed to Defendants, so proximate cause is lacking.[22] *See, e.g.,* Doc. ##: 777-1 at 8, 11-12, 14, 16-18; 774-1 at 7-8, 18-20; 773-1 at 3-9. Defendants contend the causal chain between their allegedly wrongful acts and Plaintiffs' alleged injuries was broken by: (i) the involvement of sophisticated TPAs and PBMs; (ii) the independent medical judgment of prescribing physicians acting as learned intermediaries; (iii) the actions and inactions of other defendants; (iv) third-party criminal acts; and (v) actions of Plaintiffs' members. *See, e.g.,* Doc. ##: 777-1 at 8-9, 18; 774-1 at 7, 18-20; 773-1 at 5-7.

The Marketing Defendants also argue Plaintiffs' claims are speculative and too attenuated to support proximate cause because Plaintiffs failed to plead that any violation of the CSA resulted in: (i) a prescription being filled by any of Plaintiffs' members; (ii) increases in opioid shipments

---

[22] All Defendants seek dismissal pursuant to Rule 12(b)(6). The Pharmacy Defendants also assert Plaintiffs' failure to sufficiently plead causation requires dismissal pursuant to Rule 12(b)(1). *See* Doc. #: 773-1 at 2-4. Acknowledging the distinctions between the two bases for dismissal, the court will nevertheless address them together.

to Ohio; (iii) a missed opportunity for a Drug Enforcement Administration ("DEA") enforcement action; (iv) failure of the DEA to reduce opioid production quotas; or (v) harm to any of Plaintiffs' members by the diversion of a suspicious order. *See* Doc. #: 777-1 at 11-12. And, the Distributors allege Plaintiffs fail to plead the required direct causal connection because Plaintiffs' opioid-related payments were contingent on Plaintiffs' members' injuries. Doc. #: 774-1 at 7.

In response, the Funds rely on the arguments made by the *Summit County* plaintiffs in response to motions to dismiss, and also cite *Painters*, *Desiano*, *In re Neurontin*, and *In re Avandia* as support for their position. *See* Doc. #: 893 at 2-25. Plaintiffs also describe the ways the Complaint alleges recoverable direct injuries, focusing on allegations that Marketing Defendants intentionally made misrepresentations directly to Plaintiffs and that all Defendants suppressed evidence of diversion to insure formulary status for their opioid products. *See* Doc. #: 893 at 23-25. Plaintiffs argue they pleaded a direct injury because they allege that, absent Defendants' wrongful acts and omissions:

> (1) the opioids would not have been approved on Plaintiffs' formularies or would have been subject to additional controls and guidance; (2) Plaintiffs would have had more control over preexisting controls, such as preauthorization requirements; (3) doctors would not have prescribed opioid medications at the same rate; and (4) Plaintiffs would have been on notice that medications were being diverted to a secondary market. Second, Plaintiffs adequately allege injury in the form of payments for opioid-related treatments, hospitalizations, and illnesses that were a direct and foreseeable result of the crisis Defendants engineered, which went far beyond the provision of payments that third-party payors would ordinarily and customarily incur in paying for insureds' medical expenses.

Doc. #: 893 at 3-4.

Plaintiffs also contend they sufficiently allege proximate cause because, unlike the cases on which Defendants rely, misrepresentations were directly targeted to Plaintiffs and their agents:

> Defendants misled Plaintiffs and their TPAs, PBMs, and other

> agents in order to enrich themselves. ¶¶696, 771-791. Plaintiffs were subjected to false and misleading information directed at third-party payors. ¶¶693-710 (describing conferences and publications directed at third-party payors and their agents); ¶¶711-770 (specific false and misleading statements by Marketing Defendants). Plaintiffs relied to their detriment on Defendants' statements; as a result, opioids secured preferred status on Plaintiffs' formularies. ¶¶689-691, 762.

*Id*. at 13-14. Concerning the Pharmacies, Plaintiffs further assert their "actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids," leading to the opioid epidemic. *Id*. at 14; *see also* Doc. #: 3031 at ¶¶ 570-90.

In response, the Marketing Defendants criticize Plaintiffs' failure to allege they paid an inflated price for any opioid medication, contend Plaintiffs would have included the Marketing Defendants' products on their formularies absent the Marketing Defendants' alleged misrepresentations, and note that physicians were simply writing prescriptions for FDA-approved uses. *See* Doc. #: 967 at 5-9. The Distributor and Pharmacy Defendants add that the alleged misrepresentations upon which Plaintiffs rely were made only by the Marketing Defendants and, therefore, Plaintiffs have failed to plead a direct claim as to them that would meet the applicable proximate cause requirements. *See* Doc. #: 968 at 12; Doc. #: 969 at 2-3.

### ii.    The Court's conclusions.

To repeat: at the pleading stage, a complaint need only set forth a plausible claim for relief and should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. In this light, the Court finds the *Painters*, *In re Neurontin, Avandia*, and *Desiano* cases persuasive. The Court concludes the Complaint sufficiently pleads a connection between Defendants' alleged misconduct and Plaintiffs' alleged

injuries that is sufficiently direct and foreseeable to cross the plausibility threshold under Rule 12(b)(6) and Rule 12(b)(1).

The Court's conclusion rests in large part on two overarching factual theories in the Complaint.  First, the Complaint describes a scheme whereby, in an effort to sell more opioids and increase revenues, Marketing Defendants misrepresented the safety and risks of their products to Plaintiffs and their agents, so that the Funds would include the Marketing Defendants' products on their formularies.  Plaintiffs contend that, absent these misrepresentations, they would not have included the Marketing Defendants' products on their formularies, or would have included them with greater restrictions, thereby paying for fewer opioid prescriptions and less opioid-related care.

Second, the Complaint alleges that, by illegally failing to report and prevent suspicious opioid orders and opioid diversion, all Defendants not only precluded Plaintiffs from discovering and attempting to stop diversion (by removing or limiting opioid formulary status), but also caused Plaintiffs to incur the costs of (a) excessive opioid prescriptions and (b) treatment for widespread opioid addiction, abuse, and overdose.  The Funds assert they would not have incurred these costs absent Defendants' wrongful conduct.

The Plaintiffs' first theory is consistent with *Painters*, *In re Neurontin*, *Avandia*, and *Desiano,* to the extent this theory is premised on recovery of damages for the purchase of opioids. The second theory is not addressed in these four cases, inasmuch as the cases do not involve (i) controlled substances and a corresponding anti-diversion regulatory scheme under the CSA and (ii) damage claims for medical costs.[23]  Ultimately, if the Court accepts the facts alleged by

---

[23] Defendants argue Plaintiffs' claims for medical costs are analogous to tobacco cases, most of which were dismissed prior to trial.  *See, e.g*., Doc. #s: 773 at 2, 6-7; 774 at 4-6.  Plaintiffs attempt to distinguish the tobacco cases arguing that: (1) they are inapposite because no TPP ever paid for cigarettes, but the Funds did pay for opioids (Doc. #: 893 at 6); (2) the health effects of opioids are

Plaintiffs to be true, as it must, Defendants' misdeeds resulted in payments by Plaintiffs for which they would not otherwise be responsible, thereby putting them directly in the crosshairs of the Defendants' alleged scheme and pleading a direct injury.  *See, e.g.,* Doc. #: 3031 at ¶¶ 761-762.

The Distributors and Pharmacies argue that Plaintiffs do not allege they made misrepresentations to Plaintiffs about opioid safety and efficacy, so Plaintiffs' claims against them should be dismissed.  This argument ignores that Plaintiffs pleaded not only that the Marketing Defendants' misrepresentations were a proximate cause of their damages, but also that the actions and inactions of the Distributor and Pharmacy Defendants contributed to their damages.  For example, Plaintiffs allege:

> All Defendants undertook concerted efforts to illegally suppress evidence of drug diversion, which they were obligated to report.  Absent this concealment, payers like Plaintiffs, on their own and through their TPAs and PBMs, would have been on notice that a significant amount of the opioid drugs for which they had paid were not prescribed for legitimate medical need but rather made their way to the black market. This would have led MMO, among others, to employ various fraud fighting tools to thwart "market prescribing" and would also have affected MMO's formulary access and status decisions regarding opioid drugs. In addition, disclosure of the extent of opioid diversion would have informed MMO that representations regarding the non-addictive properties of opioid drugs were almost certainly false.

> Absent this concealment, TPAs, including specifically MMO, would not have made the coverage and formulary placement decisions they did with respect to opioid drugs, and Plaintiffs would have spent far less on the reimbursement of opioid drugs.

Doc. #: 3031 at ¶¶ 761-762.

Plaintiffs assert they were the intended targets of Defendants' misrepresentations and were victims of the scheme alleged; therefore, Plaintiffs have pleaded that Defendants' wrongful acts

---

closer in time and more obvious than tobacco-related illness, making causation "less complex" (*id*. at 7); and (3) because Defendants' misrepresentations specifically targeted them, Plaintiffs' alleged harm was not derivative of their members' injuries (*id*. at 15).

have a direct relationship to Plaintiffs' harm.  The Court adopts the reasoning of the Circuits that have allowed TPP claims against drug manufacturers to proceed and rejects Defendants' arguments that the involvement of physicians and other third-parties breaks the causal link between Defendants' alleged misdeeds and Plaintiffs' alleged injury.  The Court also concludes Plaintiffs have plausibly pleaded proximate cause even though the Distributor and Pharmacy Defendants are not accused of making direct misrepresentations to Plaintiffs.[24]  The Court stresses that it will be incumbent upon Plaintiffs to establish why their analysis of the claims based on medical care related to opioid use and abuse are not derivative of their members' personal injuries and, therefore, analogous to the tobacco cases.

Having determined there is a sufficiently direct connection between Defendants' alleged misconduct and Plaintiffs' alleged injuries, the Court also considered whether the three *Holmes* factors counsel against this finding.[25]  The Court finds they do not.  Plaintiffs allege, as a result of Defendants' misrepresentations and failures to address diversion, they suffered economic loss because they paid for members' opioid prescriptions and for medical care for which they would not otherwise have paid.  At this stage of the proceedings, accepting all the facts in the Complaint as true and viewing them in the light most favorable to the Plaintiffs, the Court finds Plaintiffs have met the first *Holmes* factor because they pleaded a claim that could plausibly allow for a

---

[24] The Marketing Defendants also contend Plaintiffs cannot establish causation because they continued to cover opioid costs after their safety risks were publicly exposed.  This argument assumes Plaintiffs knew the full extent of the alleged fraud and, if so, they did not change their coverage decisions.  At this stage of these proceedings, the Court cannot assume that to be true, because it must interpret all facts in the light most favorable to Plaintiffs.  *See Avandia*, 804 F.3d at 644.

[25] This Court previously summarized the *Holmes* court's three-factor analysis.  *See* Doc. #: 1203 at 8 ("[I]t is important to first carefully consider the relationship between the injury asserted by Plaintiffs and the alleged injurious conduct of Defendants and then further consider whether that relationship implicates any of the concerns highlighted by the *Holmes* Court."); *see also* Doc. #: 1025 at 27-36.

determination of damages to Plaintiffs attributable to Defendants' alleged conduct, as opposed to other factors.  The Court also finds the risk of multiple recoveries by other plaintiffs asserting different levels of injury unlikely, because the only parties that incurred the costs sought by Plaintiffs are Plaintiffs.  Plaintiffs' members might have claims for deductibles, co-pays, or personal injuries; however, they do not have claims for reimbursement of funds paid by Plaintiffs. Accordingly, the Court finds the second *Holmes* factor satisfied.  And finally, the Court does not believe that, to deter the injurious conduct alleged, justice would be better served by having Plaintiffs' insureds bring suit directly.  Even if viable, this option would result in a plethora of lawsuits involving disputes over money that, if recoverable, ultimately would belong to Plaintiffs, to the extent they paid their insureds' costs.  *See* Doc. ##: 1203 at 7-9; 1025 at 32-36.

The Court also finds Plaintiffs' damage allegations are not so speculative as to require dismissal at the pleadings stage of these proceedings.  Plaintiffs seek re-payment of funds allegedly expended for their insureds' prescription opioids and for care and treatment caused by Defendants' alleged misconduct relating to these opioids.  Like the *Berretta* plaintiffs who sought damages, in part, as a result of defendants' conduct alleged to have created an illegal firearms market, the TPP Plaintiffs here allege Defendants' wrongful conduct contributed to the illegal opioid market.  *See* Doc. #: 893 at 14-15.  As did the *Beretta* court, this Court finds Plaintiffs have sufficiently alleged Defendants' role in the opioid crisis exposed Plaintiffs to damages and it was foreseeable these damages would have occurred.

**B.    Analysis of Plaintiffs' Specific Claims.**

Having examined the overarching arguments by Defendants of limitations, preemption, and causation, the Court now turns to the Defendants' claim-specific arguments.

**1.    Counts One and Two: Federal RICO Claims.**

30

### a.    The Opioid Marketing Enterprise.

The Complaint alleges RICO Marketing Defendants[26] formed an association-in-fact (the "Opioid Marketing Enterprise") with Front Groups and KOLs for the purpose of "unlawfully increas[ing] their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the RICO Marketing Defendants' drugs."  Doc. #: 3031 at ¶¶ 840, 842. The Complaint alleges Marketing Defendants communicated misinformation directly to their agent TPAs and PBMs, "with the intent that Plaintiffs would be the intended victims of [the] scheme."  *Id.* at ¶ 682.  Those communications allegedly influenced decisions regarding opioid drug placement and coverage status on Plaintiffs' formularies and assured payment for prescription opioids, even unnecessary ones.  *Id.* at ¶¶ 682-791.

Plaintiffs allege RICO Marketing Defendants' scheme to circumvent coverage restrictions included: falsely modifying prior medical histories and diagnosis codes (*id.* at ¶¶ 745, 758); providing free "reimbursement" support, including pre-populated cancer and non-cancer pre-approval forms to physicians with "all relevant data and studies it identified supporting the use and reimbursement" of products "for unsafe and inappropriate use" (*id.* at ¶ 729); assisting physicians with the prior authorization process to evade TPP drug formulary restrictions (*id.* at ¶ 733); lying about patients' previous prescription drugs to avoid step therapy limitations (*id.* at ¶ 747); and changing listed diagnoses to "cancer" (*id.* at ¶¶ 745-747).

Plaintiffs contend this fraudulent conduct resulted in Plaintiffs' payments for opioid prescriptions that otherwise would not have been approved or would have been subject to limitations to guard against improper or harmful use.  The misconduct also allegedly led to

---

[26] The RICO Marketing Defendants are Purdue, Cephalon, Janssen, Endo, and Mallinckrodt.  Doc. #: 3031 at ¶839 & n.245.

31

increased health care payments necessitated by plan beneficiaries' opioid abuse and addiction.  *Id.*
at ¶¶ 972-975.

> b.    **The Opioid Supply Chain Enterprise.**

In Count II, Plaintiffs assert a civil RICO violation against certain Marketing and
Distributor Defendants that allegedly joined in an "illicit enterprise" (the "Opioid Supply Chain
Enterprise") for the purpose of "vastly increasing their respective profits and revenues by
exponentially expanding a market that the law intended to restrict."[27]  *Id.* at ₱ 875.  Each RICO
Defendant allegedly disregarded its own CSA anti-diversion obligations, agreed not to expose
conduct by co-conspirators in order to maximize sales and profits, and fraudulently increased DEA
quotas in order to "collectively benefit from a greater pool of prescription opioids to manufacture
and distribute."  *Id.* at ¶¶ 464-556, 875-903.  According to the Complaint, Defendants concealed
their illegal conduct while falsely representing they had complied with their duties imposed by the
CSA and its regulations, thereby depriving Plaintiffs of the ability to discover the wrongful conduct
and address its consequences.  *Id.* at ¶¶ 557-569, 795-802, 892.

Plaintiffs claim economic loss resulting from RICO Supply Chain Defendants' conduct
based on the costs of covering plan beneficiaries' opioid-related medical treatment and medication
(*id.* at  ¶ 960) and the costs of paying for opioid drugs that were "not prescribed for legitimate
medical need but rather made their way to the black market," causing Plaintiffs to unwittingly fuel
the opioid addiction crisis (*id.* at ¶¶ 761-762).[28]  The Complaint states RICO Defendants' failure

---

[27] The Supply Chain Defendants are Purdue, Cephalon, Endo, Mallinckrodt, Activis, McKesson,
Cardinal, and AmerisourceBergen.  Doc. #: 3031 at ₱ 875.  The Pharmacy Defendants are not
parties to any of Plaintiffs' RICO claims.

[28] Count Two also seeks injunctive relief.  *See* Doc. #: 3031 at ₱ 964.

to comply with anti-diversion obligations created or contributed to an oversupply of opioids and an illicit market.  ¶¶ 804-805, 880-881, 946.  It further alleges:

> All Defendants were also aware that the growing evidence of prescription opioid diversion could lead TPAs to make formulary decisions that would drastically reduce the access to opioids and to implement controls to prevent drug diversion. Defendants suppressed evidence of diversion so as to maintain formulary access and status for opioids.

*Id.* ¶ 696.  Plaintiffs claim that an awareness of the truth regarding diversion would have led them to adopt fraud-prevention measures and change formulary access and status decisions to exclude inappropriate or harmful use of prescription opioids.  Had such steps been implemented, they aver, "Plaintiffs would have spent far less on the reimbursement of opioid drugs."  *Id.* ¶¶ 761-762.

### c.    Standing.

At a minimum, standing requires a plaintiff to prove (i) it suffered an injury in fact (ii) that is fairly traceable to the challenged conduct of the defendant and (iii) is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560).  To establish an injury in fact, a plaintiff must show it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way."  *Id.* (citations omitted).  An injury is "concrete" if it actually exists.  *Id.*[29]  To have

---

[29] Pharmacy Defendants raise Article III standing arguments identical to those raised by pharmacy defendants in *Summit County*.  *See* Doc. ##: 773-1 at 3-5, 968 at 2-3.  The Court denies dismissal of the Complaint for the reasons stated in *Summit County*: "Pharmacy Defendants, in their objections, mention Article III standing only briefly in a section dedicated to the RICO claims. *See* Doc. #: 1078 at 2-3.  They mischaracterize the *Summit County* R&R's analysis of the Article III standing directness requirement, rehash arguments already made in their motion to dismiss, and then move on to address their RICO analysis concerns.  The Court finds this objection without merit, and therefore it is overruled."  Doc. #: 1203 at 2 n.1; *see also* Doc. #: 1025 at 100-102.

standing to bring a RICO claim, a plaintiff must also have suffered an economic injury. *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor.").

### i.    The "by reason of" requirement.

As it pertains to standing, RICO's "by reason of" limitation "is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was 'derivative or passed on' to the plaintiff by some intermediate party." Doc. #: 1203  at 11 (quoting *Trollinger* 370 F.3d. at 614).  Here, as in *Summit County*, Defendants repeatedly argue that, at their core, Plaintiffs' claims are dependent on injuries to Plaintiffs' opioid-using members and not on a direct injury to Plaintiffs.   Therefore, Defendants contend, Plaintiffs' alleged damages are derivative of their insureds' injuries and Plaintiffs have not suffered a cognizable injury. *See, e.g.,* Doc. ##: 777-1 at 7-8, 10-11, 16; 774-1 at 3-6, 8; 773-1 at 8-9.  As in *Summit County*, Defendants also rely on the Sixth Circuit's decision in *Perry*, and other tobacco cases, as support for that argument. *See, e.g.,* Doc. ##: 774-1 at 1, 4, 6; 773-1 at 2, 4, 6; 967 at 3-4, 968 at 4; 969 at 4-5.

In response, Plaintiffs argue the Marketing Defendants engaged in a scheme designed to misrepresent the dangers of using opioids, including the risks of addiction and abuse, and concealed from Plaintiffs their failures to comply with diversion control requirements.  Plaintiffs further contend these acts and omissions: (i) caused Plaintiffs to include the Marketing Defendants' products on their formularies; (ii) precluded Plaintiffs from understanding and reacting to the diversion of opioid products; and (iii) resulted in an increase in the number of opioid prescriptions paid for by Plaintiffs and increased payments for their members' medical bills secondary to use and abuse of opioids.  Plaintiffs also argue these misrepresentations and failures to disclose,

34

*targeting Plaintiffs*, distinguish them from TPP plaintiffs in cases in which courts have declined to find standing. *See, e.g.,* Doc. #: 893 at 3-4, 8-9, 19-21. *See also supra* at Point III.A.3.a.

The Court finds Plaintiffs' arguments more persuasive. Plaintiffs have alleged a plausible claim that their injuries are the direct result of the RICO Marketing Defendants' misrepresentations to them and their agents, and have also alleged a plausible claim that the RICO Defendants' participation in the creation of an illicit opioid market resulted in Plaintiffs' damages. Although Defendants identify third parties within the causal chain, Plaintiffs' economic injuries were incurred by Plaintiffs and not passed on by any intermediate party that was "closer" to Defendants' actions. *See* Doc. #: 1203 at 11-12. In *Summit County*, the Court analyzed *Jackson v. Sedgwick Claims Mgmt. Serv., Inc*., 731 F.3d 556, 565-66 (6th Cir. 2013), and other decisions that considered whether a pecuniary harm arises directly from a personal injury. Those cases, the Court explained, involve economic losses arising directly from a personal injury and "the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him-or herself." Doc. #: 1203 at 14. That is not the case here. Plaintiffs seek damages for payments they made and these claims are theirs and theirs alone.

In its *Summit County* opinion and order, the Court expressed reservations about whether a RICO plaintiff can recoup actual monetary costs paid as a result of treatment provided to or medical expenses incurred by third-party individuals for whom the RICO plaintiff had some obligation to provide or pay for care. *Cf.* Doc. #: 1203 at 15 (implying that the Court's analysis regarding compensation for personal injuries might be overly broad and contemplating categories of damages that might or might not flow from personal injuries, even under a narrower construction of *Jackson)*. However, even if *Jackson* precludes a RICO claim where the asserted economic harm

is created by personal injury to a third-party, the Funds also allege other categories of injury: claims paid for reimbursement for opioids premised on misrepresentations made to them or their agents, and payments unknowingly made for opioids destined for diversion into the secondary black market created by the RICO Supply Chain Defendants. These claims do not arise from third-party personal injuries. *See id* at 15-17. Because some of Plaintiffs' claims are not dependent on medical costs and expenses, the Court will not, at the motion to dismiss stage, deny Plaintiffs the opportunity to proceed with their claims.

### ii. The "business or property" requirement.

As discussed above, Plaintiffs allege injuries arising from inappropriate payments for opioid prescriptionss and for members' opioid abuse treatments. *See* Doc. #: 3031 at ¶¶ 960-62. Defendants insist none of these costs are the type of property injury permitted under RICO, particularly those that arise as a result of personal injuries to Plaintiffs' members. *See Jackson*, 731 F.3d at 565-66 (holding that courts interpreting RICO exclude "damages 'arising directly out of' a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury").

As in *Summit County*, the Court finds, taken as a whole, Plaintiffs' allegations describe an economic loss sufficient to meet RICO's "business or property" requirement. There can be no real dispute that "money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). And, it is beyond debate that "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906)). As the Court previously noted, the fact that some of the categories of recovery sought by Plaintiffs arise as a result of personal injuries is not sufficient, at

this stage of the proceedings, to warrant dismissal of Plaintiffs' RICO claim.  *See* Doc. #: 1203 at 16-17.  This is true even though the Court harbors some doubt regarding some categories of damages that Plaintiffs claim.

The Manufacturing Defendants also argue that, for economic injury to exist, the purchased drugs must have been ineffective for their prescribed use and Plaintiffs have failed to sufficiently plead this requirement.  *See* Doc. #s: 777-1 at 5; 967 at 5.  But the Complaint includes allegations that the Marketing Defendants' opioids were ineffective for certain uses.  For example, Plaintiffs contend they were told, contrary to fact, that addiction was rare among patients taking opioids for pain, addiction risk could be effectively managed, addiction symptoms were actually symptoms of "pseudo-addiction," withdrawal was easily managed, increased dosing presented no significant risks, long-term opioid use improves function, risks of alternative forms of pain treatment were greater than the adverse effects of opioids, and use of time-released dosing prevents addiction.  *See* Doc. #: 3031 at ¶ 841.  Plaintiffs also contend that, along with these misrepresentations, Defendants engaged in a "scheme of deception" to increase sales of their opioid products by refusing to identify or report suspicious orders of prescription opioids they knew were highly addictive, subject to abuse, and were actually being diverted into the illegal market.  *See id*. at ¶ 958.  Thus, Plaintiffs allege, on the one hand, they were told Defendants' products were safe and effective for the uses promoted by Defendants when, on the other hand, Defendants knew their products were neither safe nor effective for these uses.  These allegations are sufficient to invoke economic injury.

### d.    Previously addressed arguments.

RICO Defendants also charge that Counts I and II fail because Plaintiffs do not adequately plead the existence of an enterprise and actionable racketeering activity.  They further argue the

Complaint fails to satisfy the particularity requirements of Fed. R. Civ. P. 9(b).[30]  These arguments were addressed and rejected in the context of the *Summit County* motions to dismiss.  *See* Doc. #: 1025 at 36-39 (existence of an enterprise), 39-48 (predicate acts), 39-40 (Rule 9(b)).  The *Summit County* defendants either did not object to these recommendations or their objections were overruled.  Doc. #: 1203.

Upon review of Defendants' briefs and replies in this action, the Court finds no materially new arguments for dismissal.  The alleged facts and statements of the RICO claims in the Complaint track the *Summit County* Complaint.  Accordingly, the Court does not reiterate the reasons for rejecting the RICO Defendants' contentions that dismissal is mandated by inadequate pleading of an enterprise, predicate acts, or Rule (9) particularity in this action.

Based on the foregoing, the Court concludes dismissal is not appropriate at this stage of the litigation.[31]  The Court notes, however, that none of the TPP cases on which the Court relies address whether a TPP is entitled to compensation for payments it made for the medical care and treatment of an injured member or insured.  *See supra* at III.A.3.a, c(ii).  At this stage of the proceedings, there is no evidence before the Court concerning whether, or to what extent, a governmental plaintiff's legal obligation to pay for its citizens' medical care differs from a TPP's contractual obligation to pay for its member's medical care.  As Defendants note, claims seeking payment for medical care to TPP members were often dismissed in tobacco litigation.

---

[30] *See* Doc. ##: 777-1 at 9-10, 12-13; 774 at 1 9-12; 969 at 6-7.

[31]  The Court notes that Plaintiffs' recitation of the Count One and Count Two elements (Doc. #: 3031 at ¶¶ 904-964) specify only healthcare costs as injuries.  Nevertheless, the Complaint incorporates all preceding allegations into each Count.  *Id.* at ¶¶ 904, 932.  Construing the Complaint in the light most favorable to Plaintiffs, and acknowledging that throughout the Complaint Plaintiffs pleaded injuries measured by prescription payments allegedly induced by RICO Defendants' misconduct, the Court finds those allegations to be sufficient to provide Defendants with notice under Fed. R. Civ. P. 8.

However, as in *Summit County*, Plaintiffs here have alleged categories of injury (economic loss) based on payments for prescription opioids which cannot be said to arise from a third-party member's personal injuries.  *See* Doc. #: 1203 at 15.  Accordingly, Plaintiffs have stated a claim that survives dismissal and, as in *Summit County*, the Court declines, at this phase, to dismiss Plaintiffs' other claims.  This determination does not mean Plaintiffs will ultimately prevail or that the Court agrees with all the theories advanced by Plaintiffs.  Rather, the Court finds only that Plaintiffs have alleged the facts necessary to withstand a motion to dismiss and will now have the opportunity to pursue, and the burden to prove, their claims.

### 2.    Count Three and Four: Ohio RICO Statute Claims.

Plaintiffs allege RICO Marketing Defendants (Count Three) and Supply Chain Defendants (Count Four) violated Ohio's Corrupt Practices Act ("OCPA"), O.R.C. § 2923.31 *et seq*.  *See* Doc. #: 3031 at ¶¶ 965-975, 976-999.  Defendants challenge the OCPA claims' viability.  *See* Doc. ##: 777-1 at 14-15; 774-1 at 6-12; 969 at 2-7.

The OCPA statute is patterned after the federal RICO statute; therefore, courts apply federal case law to analyze claims under OCPA.  *See, e.g., Aaron v. Durrani*, 2014 WL 996471, at *8 (S.D. Ohio Mar. 13, 2014) (*citing U.S. Demolition & Contracting v. O'Rourke*, 640 N.E.2d 235, 240 (Ohio Ct. App. 1994)).  Because the Court found Plaintiffs sufficiently pleaded their RICO claims (Point III.B.1 *supra*), that determination applies to Counts Three and Four.

Furthermore, the Complaint alleges OCPA liability arises from Defendants' "telecommunications fraud" and felony violations of Section 843(a)(4)(A) of the CSA, based on furnishing and omitting false material information in documents required under CSA Sections 801 or 843.  *See, e.g.,* Doc. #: 635 at ¶¶ 969, 970, 987, 989.  As determined in *Summit County*, those allegations fulfill the OCPA requirement to plead "at least one incident other than a violation of"

federal mail, wire, or security fraud statutes.  *See* O.R.C. § 2923.34(A); Doc. #: 1025 at 56-57. Accordingly, the Court denies Defendants' motions for dismissal of Plaintiffs' OCPA claims.

### 3.  Abrogation of Common Law Claims Under the Ohio Products Liability Act.

Defendants contend Plaintiffs' public nuisance claims (Counts Five and Six) and their negligence claim (Count Seven) are abrogated by the Ohio Products Liability Act ("OCPA"). They rely entirely on arguments raised in the *Summit County* motions to dismiss.  *See* Doc. ##: 777-1 at 12-15, 967 at 1; 774-1 at 12-15, 967 at 7-8; 773-1 at 5, 968 at 4.  Following a lengthy analysis, the Court concluded that the OCPA did not abrogate the plaintiffs' public nuisance or negligence claims.  *See* Doc. #: 1203 at 22-33.  That conclusion applies here for the same reasons.

### 4.  Count Five: Statutory Public Nuisance.

Count Five alleges statutory nuisance liability based on Defendants' violations of federal and state laws and regulations controlling the distribution of a "drug of abuse," which conduct is declared by the Ohio legislature to "constitute a public nuisance." O.R.C. § 4729.35.  Doc. #: 3031 at ¶¶ 1000-1019.  Defendants contend Plaintiffs lack standing to maintain the cause of action asserted under Ohio nuisance statutes O.R.C. Sections 3767 and 4729.35.  *See* Doc. #: 774-1 at 12-13; Doc. #: 774-1 at 12; 773-1 at 8.  The Court agrees.

Analyzing standing under these provisions, the Court in *Summit County* previously concluded that Section 4729.35, as the special or local provision concerning authority to sue to abate a nuisance resulting from a violation of applicable drug laws, prevailed over the more general provisions of Section 3767.  *See* Doc. ##: 1025 at 66-70; 1203 at 28-31.  Section 3767 includes a significantly broader list of parties authorized to bring a public nuisance claim than Section 4729.35; the latter vests authority to maintain a nuisance action to enjoin violations of drug control laws only in "the attorney general, the prosecuting attorney of any county in which the offence

was committed or in which the person committing the offense resides; or the state board of pharmacy."  O.R.C. § 4729.35

Accordingly, Plaintiffs in this action – private TPPs – are excluded from maintaining Ohio statutory nuisance claims for the drug law violations they allege.  Count Five is dismissed.

### 5.    Count Six: Common Law Absolute Public Nuisance.

Plaintiffs plead an absolute public nuisance claim under Ohio common law against all Defendants.  *See* Doc. #: 3031 at ¶¶ 1020-1060.  Ohio follows the Restatement (Second) of Torts ("Restatement"), which states:

> (1)    A public nuisance is an unreasonable interference with a right common to the general public.
>
> (2)    Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
> > (a)    whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> >
> > (b)    whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> >
> > (c)    whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B (1965); *see Beretta*, 768 N.E.2d at 1142; *JP Morgan Chase Bank,* 2013 WL 1183332, at *3.  The Complaint asserts all three of the Restatement's potential bases for nuisance liability, alleging Defendants' conduct was: (i) an unreasonable interference with public health, welfare, and safety (*e.g.*, Doc. #: 3031 at ¶¶ 634-681, 1023, 1028); (ii) fraudulent and/or proscribed by federal and Ohio laws governing the manufacture, distribution, and dispensing of prescription opioids (*e.g., id.* at ¶¶ 140-622, 574-622, 1030-1032); and (iii) of a "continuing, ongoing, persistent" nature (*e.g., id.* at ¶¶ 792-793, 805, 852, 860, 1052).

41

Many of Defendants' arguments for dismissal were raised and ruled upon in other actions in this MDL.  Those actions, *Summit County*, *Muscogee Nation*, and *Blackfeet Tribe*, were brought by government entities.  Certain aspects of public nuisance law, including standing to bring a claim, differ when claims are asserted by private parties such as Plaintiffs.

> a.       **Standing.**

As a general rule, a private party "lacks standing to pursue a public nuisance claim" except when "able to show that [the party] suffered an injury or damage that was not incurred by the general public."  *Cleveland Hous. Renewal Project, Inc. v. Wells Fargo Bank, N.A.*, 934 N.E.2d 372, 380 (Ohio 2010).  "[T]he harm suffered by the plaintiff must be different in kind, rather than different in degree, from that suffered by other members of the public exercising the public right."  *Kramer*, 882 N.E.2d at 52 (citation omitted).  Accordingly, to state a claim, the Funds are required to plead harm that is distinct from that suffered by the general public.

Defendants contend Plaintiffs lack standing to maintain the public nuisance claim for failure to allege such harm, arguing the claimed injuries derive from enrollees' personal injuries and are, therefore, indistinct from those suffered by the public at large.  *See* Doc. ##: 777-1 at 15-16; 967 at 11-12; 774 at 12-13; 969 at 7-8.  Responding, Plaintiffs argue the injuries they suffered are actual pecuniary losses, specific to them, measured by payments they would not have made absent Defendants' fraudulent and unlawful conduct.  *See* Doc. #: 893 at 34; *see also* Point III.B.1, *supra*.

The Complaint alleges the Funds, as third-party payors, were specifically targeted by the Marketing Defendants' fraudulent and directly communicated misinformation, undertaken for the purpose of obtaining favorable formulary placement and coverage status, and to "secure a stream, of payments from Plaintiffs."  Doc. #: 3031 at ¶¶ 307, 682-791, 797, 1036.  The Complaint pleads

specific instances in which false information was communicated directly to them, and to their agent TPAs and PBMs, by Defendants' sales representatives and via professional publications and presentations.  *Id.* ¶¶ 693-760; *see supra*, Point III.B.3.a (reviewing decisions concluding directly-communicated misrepresentations satisfied causation).

All Defendants are alleged to have "illegally suppressed evidence of drug diversion, which they were obligated to report," thus depriving Plaintiffs of: (i) notice they were paying for opioids that were being diverted to the illicit market; and (ii) the opportunity to employ "fraud fighting tools" to prevent that outcome.  Doc. #: 3031 at ¶¶ 761-762; *see also* ¶¶ 20, 28-29, 639, 692-699, 1046-1047, 1051.  Consequently, according to Plaintiffs, they paid for prescriptions where coverage would otherwise have been denied or subjected to restrictions, such as advance approval or step therapy (*e.g., id.* at ¶¶ 683, 761, 766); unwittingly paid for opioids destined for unlawful use rather than medical necessity (*e.g., id.* at ¶ 761); and covered increased costs to treat members' opioid misuse, addiction, and/or overdose (*e.g., id.* at ¶ 20).  *See* Doc. #: 893 at 34-35.

Plaintiffs have plausibly pleaded they sustained concrete economic losses differing in kind from the generalized injury to public health, safety, and wellness suffered by the general public as a consequence of the multi-faceted opioid crisis.

**b.    Prior rulings.**

Previously, the Court analyzed and rejected arguments substantially similar to those raised by Defendants here.  Plaintiffs' nuisance pleading tracks the *Summit County* Complaint. Doc. #: 513.  It also shares common facts and theories of liability that are virtually identical to those alleged in the *Blackfeet Tribe* Complaint (Doc. #: 1089) and substantially similar to the *Muscogee Nation* pleading (Doc. #: 731).  Specifically, defendants in other cases in this MDL have challenged public nuisance claims in motions for dismissal under Fed. R. Civ. P. 12(b)(6) based on a failure to

sufficiently plead causation and a public right.  Defendants in those actions also argued they were entitled to immunity from nuisance liability for regulated business activities.  The Court's prior reasoning and conclusions apply to Defendants' arguments now before it, as follows.

### i.    Causation.

Marketing Defendants contend their conduct is too remote and attenuated to establish proximate causation under the fraudulent marketing theory.  *See* Doc. ##: 777-1 at 15; 774-1 at 18-20; 773-1 at 8;  968 at 8; 967 at 5.  Distributors and Marketing Defendants join in challenging causation under Plaintiffs' diversion control theory and argue intervening acts break the causal chain.  *See id*.  Responding, Plaintiffs assert they have, at a minimum, raised a reasonable inference that their economic injuries arose from Defendants' alleged wrongful conduct.  *See* Doc. #: 893 at 36; *see Beretta*, 768 N.E.2d at 1147-1149 (reasoning that, where a plaintiff's claims are not based on the rights of others, but rather their own right to sue for harm and economic loss allegedly caused by a defendant's misconduct, "the alleged harms are direct injuries" and "are not so remote or indirect as to preclude recovery … as a matter of law") (internal quotation marks and citation omitted).

The Complaint alleges the claimed injuries were not only foreseeable, but also that Defendants intended for Plaintiffs to bear the costs of an increasing demand for prescription opioids resulting from their fraudulent and unlawful conduct.  *E.g*., Doc. #: 3031 at ¶¶ 31, 682, 1040, 1042, 1153.  As discussed in Point III.A.3, *supra*, the Complaint pleads a plausible connection between Defendants' alleged misconduct and Plaintiffs' claimed injuries sufficient to satisfy proximate cause, and raises factual issues concerning intervening acts and foreseeability not appropriately resolved on a motion to dismiss.  *See* Doc. #: 2578 (Order Denying Summary Judgement on Public Nuisance Claims) at 6-7 ("factfinders could reasonably infer that …

44

fraudulent marketing and failures to maintain anti-diversion controls were substantial factors in producing the alleged harm suffered by Plaintiffs," and the alleged unlawful conduct supporting the nuisance claim raised "disputes of material fact as to whether each Defendant complied with its obligations under the CSA"); *see also* Doc. ##: 1499 at 61-62; 1500 at 31-32; 1680 at 7-10.

### ii. Public right.

Like the *Summit County*, *Muscogee Nation*, and *Blackfeet Tribe* plaintiffs, the Funds base their nuisance claim on alleged interference with rights commonly held by the general public, *i.e.*, public health, welfare, safety, peace, comfort, convenience, and freedom from "conduct that creates a disturbance and reasonable apprehension of danger to person and property." Doc. ##: 3031 at ¶¶ 1023, 1000, 453, 918. Defendants here challenge the viability of those allegations arguing, as did defendants in the above-referenced actions, that the nuisance claims are based on a collection of individual rights and "public health" and "public right" are not synonymous. *See* Doc. ##: 777-1 at 16; 774-1 at 12-13; 773-1 at 2. The Court previously found those objections unpersuasive, concurring with the *Summit County* R&R's analysis, which need not be reiterated here. *See* Doc. #: 1680 at 18-19 ("'public health' has traditionally been considered a 'public right'"), adopting 1499 at 59-61 and 1500 at 28-30. The Funds sufficiently allege interference with a right common to the general public.

### iii. Immunity for authorized activities.

The Distributor Defendants, referring to arguments raised in the *Summit County* motions to dismiss, contend they are not subject to nuisance liability because their business activities are authorized and extensively regulated by state and federal law. *See* Doc. ##: 774-1 at 12; 773-1 at 8. Distributor Defendants argue that absolute public nuisance is a theory that does not fit Plaintiffs' case, because the cause of action ordinarily involves inherently dangerous activity "that cannot be

maintained without injury to property, no matter what precautions are taken." *See* Doc. #: 744-1 at 12 (quoting *Kramer*, 882 N.E.2d at 52). The Funds, however, do not (and need not) allege that Defendants undertook inherently dangerous activity giving rise to strict liability. Rather, as discussed above, the Complaint alleges "[t]he public nuisance is an absolute nuisance because the Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others." Doc. #: 3031 at ¶ 1024. (emphasis in original). *See* Point III.B.5, *supra*.

Noting distribution of controlled substances is authorized and extensively regulated by federal and state law, Distributor Defendants further argue such conduct is not an actionable nuisance tort. *See Brown v. Cty Comm'rs of Scioto Cty*, 622 N.E.2d 1153, 1159 (Ohio 1993) ("conduct which is fully authorized by statute or administrative regulation is not an actionable tort"); 39 Am. Jur. Nuisances, § 8 (Public nuisances always arise out of unlawful acts, and that which is lawful, or is authorized by a valid statute, or which the public convenience imperatively demands, cannot be a public nuisance).

Responding, Plaintiffs argue the complained-of conduct is not sheltered under *Brown,* which makes clear that protection against public nuisance liability is available to those who operate "*subject to the limitations imposed* under … a comprehensive and vigilant regulatory scheme," 622 N.E.2d at 1158 (emphasis added); *see also Beretta*, 768 N.E.2d at 1140, 1143 (rejecting defendants' assertion that they were not subject to liability since they engaged in "legislatively authorized conduct;" the court concluded that, "even though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and distribution of firearms, … the law does not regulate the distribution practices alleged in the complaint," *i.e.*, practices that "fostered the criminal misuse of firearms and help[ed] sustain the illegal firearms market in [Plaintiff

municipality]") (internal citations omitted).  *See* Doc. 893 at 36.

As these cases demonstrate, 'safe harbor' immunity from absolute nuisance liability is available only to those who perform in accordance with their applicable licensing regulatory obligations.  The Complaint alleges Defendants did not comply with the regulatory scheme, but rather violated it.

Previously, the Court addressed substantially similar arguments challenging allegations identical to those cited above.  *See* Doc. #: 1680 at 17-18.  Applying legal principles common to both Montana and Ohio law, the Court concluded the *Blackfeet* Complaint sufficiently pleaded conduct exceeding defendants' statutory authority, making the nuisance claim viable.  *Id.* (concurring with the analysis of the *Blackfeet* R&R, Doc. #: 1500 at 26-28).  The conclusion is the same under Ohio law.

### 6.    Count Seven: Negligence

The Complaint alleges a negligence claim against all Defendants.  *See* Doc. #: 3031 at 311. It is Plaintiffs' position that Defendants breached their duties by distributing and selling opioids (i) in ways that facilitated or encouraged their flow into the illegal, secondary market; (ii) without maintaining effective controls against their diversion; (iii) without effectively monitoring for, investigating, reporting, or stopping suspicious orders; and (iv) prescribed by "pill mills."  *See id.* at ¶ 1067.  Plaintiffs further assert the Marketing Defendants breached their duties to Plaintiffs by deceptively marketing opioids, including minimizing the risk of addition and overdose and exaggerating the benefits of long-term opioid use for treatment of chronic pain.  *See id.* at  ¶ 1068. Plaintiffs also contend their injuries were foreseeable to Defendants to the extent reasonably prudent manufactures and distributors of opioids should have anticipated injury to Plaintiffs as a probable result of their marketing, distributing, and selling opioids.  *See, e.g.*, *id.* at ¶¶ 1071, 1073-

74, 1080-81.  And Plaintiffs allege they were damaged as a result of Defendants' acts and omissions.  *See, e.g., id.* at  ¶¶ 1090-91.

The elements of a claim for negligence are: (i) a duty owed by the defendant to the plaintiff to conform to a certain standard of conduct; (ii) the defendant breached that duty, and (iii) the breach of the duty proximately caused plaintiff's injury.  *See Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 928-929 (Ohio 2015); s*ee also Rieger v. Giant Eagle, Inc.*,  2019 WL 4492503 at, *3 (Ohio Sept. 19, 2019) (citing *Strother v. Hutchinson*, 423 N.E.2d. 467 (Ohio 1981) ("In order to establish an actionable claim of negligence, a plaintiff must show the existence of a duty, a breach of that duty, and an injury that was proximately caused by the breach").  Unlike the *Summit County* motions to dismiss which only challenge elements one and three, Defendants here challenge the Complaint's sufficiency with respect to all three elements.  *See*  Doc. #: 893 at 36.

### a.    Duty to Defendants.

The Complaint alleges Defendants had legal duties: (i) not to expose Plaintiffs to an unreasonable risk of harm; (ii) to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in manufacturing, advertising, marketing, selling and distributing opioids; and (iii) not to breach the standard of care established by federal and state laws for reporting suspicious prescribing, and maintaining systems to detect and report such activity. *See* Doc. #: 3031 at ¶¶ 1062-64.  Relying in large part on the *Summit County* briefing and arguments raised there, Defendants contend they owed no duty of care to Plaintiffs.  *See* Doc. #: 777-1 at 17; Doc. #: 774-1 at 14; Doc. #: 773-1 at 5.  The Court rejected the *Summit County* defendants' arguments and concluded the duty of care "depends on the foreseeability of the injury, and an injury is 'foreseeable' if the defendant knew or should have known that his act was likely

to result in harm to someone." *See* Doc. #: 1203 at 33 (quoting 70 Ohio Jur. 3d Negligence § 11).

However, the current facts alleged are different than those in *Summit County*. Plaintiffs are not municipal entities; they are TPPs. Thus, the Court must determine whether Plaintiffs have sufficiently pleaded that it was foreseeable that Defendants' alleged misconduct was likely to result in harm. For the reasons set forth below, the Court finds it was reasonably foreseeable that TPPs, like Plaintiffs, would seek to hold Defendants responsible for costs incurred as a result of Defendants' role facilitating the opioid crisis, including facilitating the flow of opioids into the illegal, secondary market, failing to maintain effective controls against opioid diversion, failing to effectively monitor, investigate, report, or stop suspicious opioid orders, and deceptively marketing opioids.

As an initial matter, Plaintiffs allege Defendants purposefully and specifically targeted them as the intended victims of Defendants' scheme to increase the sale of opioids. *See* Doc. #: 3031 at ¶ 682. These allegations include:

> That the Marketing Defendants "implemented false and misleading marketing campaigns to target Plaintiffs and other TPPs through their TPAs to ensure formulary access for chronic non-cancer pain and other conditions, notwithstanding the lack of evidence of opioids' safety or efficacy for those conditions." *Id*. at ¶ 695.

> That all Defendants "were also aware that the growing evidence of prescription opioid diversion could lead TPAs to make formulary decisions that would drastically reduce the access to opioids and to implement controls to prevent drug diversion. Defendants suppressed evidence of diversion so as to maintain formulary access and status for opioids. *Id*. at ¶ 696.

> That the "Marketing Defendants were fully aware of TPP concerns over rising healthcare costs and aimed to secure formulary coverage and status for ADFs [abuse-deterrent formulations] by misrepresenting the formulations' effectiveness at deterring abuse and addiction and by presenting misleading information on the healthcare cost savings with abuse deterrent and extended-release formulations to TPAs, including MMO." *Id*. at ¶ 698.

That Marketing Defendants regularly attended trade organization events, exhibiting information about their opioid products and giving or sponsoring presentations to managed care and PBM representatives with the "explicit aim … to influence opioid drug formulary access." *Id*. at ¶ 705.

That in connection with obtaining information about opioids for use in formulary decision making, MMO's pharmacy and medical personnel regularly received periodicals that they reviewed and believed to be reputable when, in fact, these periodicals regularly contained false and misleading statements about the Marketing Defendants' prescription opioids and omitted information required to make other statements concerning prescription opioids not misleading. *See id*. at ¶ 710.

Second, as noted above in the Court's causation analysis, Defendants' alleged scheme to increase opioid sales and, in turn, increase profits, would only succeed if they were paid for prescriptions. Defendants do not argue that TPPs and individual patients were not ultimately responsible for these payments. *See In re Neurontin*, 712 F.3d at 38-39; *Painters and Allied Trades,* 943 F.3d at 1257. Based on these allegations in the Complaint, the Court finds Plaintiffs have sufficiently pleaded that Defendants owed them a duty of care.

### b. Breach of Duty

The Distributors are the only Defendants to argue the Complaint is deficient because it fails to allege they breached their purported duties to report and halt suspicious opioid orders. *See* Doc. #: 774-1 at 17. They specifically contend the Complaint fails to identify any specific pharmacy that placed excessive orders or any specific order that the Distributors should have reviewed or refused to fill. *See id*. This argument ignores that the Complaint contains numerous allegations that Distributors breached their duty of care, including that:

The opioid crisis described by Plaintiffs was "fueled and sustained by those involved in the supply chain of opioids, including…distributors…who failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls." *See* Doc. #: 3031 at ¶ 14.

Defendants, including Distributors, "contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription

50

opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market." *See id.*

Distributors "[f]ailed to fulfill the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal and/or state law and were a substantial cause for the volume of prescription opioids plaguing Plaintiffs' communities." *See id.* at ¶ 79.

The DEA began "a major push" to remind the Distributors of their obligations to prevent the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers. *Id.* at ¶491.

Additionally, as this Court has previously noted, the Distributors' argument fails to appreciate that, in a case of massive proportions like this one, there is nothing gained by requiring a Complaint to identify a handful of orders or pharmacy order-recipients the Distributors should have reviewed or refused to fill. *See* Doc. #: 1025 at 25 & n.20.

The Court finds the Complaint adequately alleges the Distributor Defendants breached their alleged duties to Plaintiffs for purposes of the Court's limited 12(b)(6) analysis. The Distributers, as well as the Marketing Defendants and Pharmacies, will have the opportunity to request the identity of specific pharmacies during discovery. If Plaintiffs cannot support their theories with evidence, the Distributor Defendants will have the opportunity to file appropriate motions later in these proceedings seeking judgment on these claims.

### c.    Proximate Cause

Plaintiffs argue Defendants' negligent sales practices, including failing to comply with obligations to monitor and report suspicious orders, halt suspicious orders, and implement effective diversion controls, led to the creation of a population of addicted patients and enhanced an illegal secondary market, both of which lie at the root of the opioid crisis. As a result, Plaintiffs contend they have incurred costs they would not have otherwise incurred. *See supra* Point II.C-

D.  As indicated in the Court's proximate cause analysis, for purposes of Defendants' motions to dismiss, Plaintiffs have sufficiently pleaded proximate cause.

> ### d.  Negligence *per se*.

As noted above, one of the elements of a negligence claim is the existence of a duty.  Duty may be established by, *inter alia*, legislative enactment.  *Chambers v. St. Mary's School*, 697 N.E. 198, 201 (Ohio 1998) (citing *Eisenhuth v. Moneyhon*, 119 N.E. 2d 440, paragraph one of the syllabus (Ohio 1954)).  If a legislative enactment imposes a specific duty for the safety of others, failure to perform that duty is negligence *per se*.  *See Chambers*, 697 N.E. at 201 (citing *Eisenhuth* syllabus ¶2).  To determine whether a statute provides a "specific duty of safety to others," the terms of the statute are key.  *Mussivand v. David*, 544 N.E.2d 265, 271 (Ohio 1989).  If a statute only "'makes provision to secure the safety or welfare of the public,' the statute does not mandate the use of a negligence *per se* standard.  *Moreland v. Oak Creek OB/GYN, Inc.*, 970 N.E.2d 455, 461 (2nd Dist. Ohio 2005) (quoting *Eisenhuth*, 119 N.E.2d 440, syllabus ¶3.)  Thus, as a preliminary matter, a plaintiff must demonstrate "the duty set forth in the statute was imposed for the plaintiff's benefit to prevent the harm that ultimately resulted," and the plaintiff "fall[s] within the class of individuals that statute was designed to protect."  *Smrtka v. Boote*, 88 N.E. 465, 474 (9th Dist. 2017) (citations omitted).

In the current case, Plaintiffs allege Defendants violated federal and state law, including provisions of the CSA and Ohio Pharmacy Board regulations pertaining to controlled substances.  *See* Doc. #: 3031 at  ¶¶ 1082-83.  It is Plaintiffs' position that these statutes and regulations were intended to prevent "the widespread diversion of illicit drugs which … has a substantial and detrimental effect on the health and general welfare of the American people."  Doc. #: 893 at 42.  While that may be true, the Court disagrees that Plaintiffs were the intended beneficiaries of these

provisions. As this Court previously found, "[t]he CSA was intended to protect individual members of the public from falling victim to drug misuse and abuse." Doc. #: 1680 at 24. Plaintiff Funds are not individual members of the public who could fall victim to drug misuse and abuse and are not the intended beneficiaries of these statutes.

Neither are Plaintiffs the intended beneficiaries of the state-law provisions cited in the Complaint. The statutory citations identified by Plaintiffs consist of a definition provision; a provision making it a crime to knowingly administer, furnish, induce, or cause another to use a controlled substance causing serious physical harm to the other person; and administrative provisions relating to pharmacists. *See* Doc. #: 3031 at ¶¶ 1082-83. TPPs are clearly not the intended beneficiaries of these regulations.

Because none of the statutes cited by Plaintiffs are intended to protect Plaintiffs or other TPPs from the harms alleged, to the extent Plaintiffs' Negligence Claim (Count Seven) asserts a claim for negligence *per se*, Plaintiffs have failed to state a claim and this portion of Plaintiffs' negligence claim is dismissed. This dismissal is not intended to impact Plaintiffs' remaining claim for negligence.

### e. The Pharmacies as retailers.

The Pharmacies point to several paragraphs of the Complaint they contend may purport to state a claim against them as retail dispensing pharmacies rather than wholesale distributors. *See* Doc. #: 773-1 at 4; *see also* Doc. #: 3031 at ¶¶ 574-89. Arguing these allegations are too vague, general, and conclusory to support a claim against them, the Pharmacies seek dismissal of any claim against them as retail dispensing pharmacies. *See* Doc. #: 773 at 4-5. Plaintiffs' Response did not address or otherwise clarify whether they intended to sue the Pharmacy Defendants as retailers.

The Court assumes, without deciding, Plaintiffs' intended to bring suit against the

Pharmacies as retailers. Based on this assumption, the Court finds the portions of the Compliant referenced by the Pharmacies satisfy the requirement of Fed. R. Civ. P. 8(a)(2). For example, the Compliant describes pharmacies' and pharmacists' duties to prevent diversion as CSA registrants. *See* 21 C.F.R. §§ 1301.11, 1301.71(a), 1306.04(a); Doc. #: 3031 at ¶ 575. It alleges the Pharmacies, in contravention of these duties, failed to: (i) adequately train pharmacists and technicians to undertake proper inquiries regarding prescriptions; (ii) adequately employ data to identify doctors who overprescribe; (iii) conduct audits of opioid sales to identify patterns of improperly filled prescriptions and adopt preventative policies; and (iv) respond to employees' concerns regarding inadequate opioid dispensing policies and procedures. *See id.* at ¶¶ 584-588. Plaintiffs also allege the Pharmacy Defendants were, or should have been, aware that the quantity of opioids they dispensed "was untenable, and in many areas patently absurd," yet failed to take meaningful measures to investigate and ensure compliance with anti-diversion controls. *See id.* ¶ 589, *see also id.* at ¶¶ 590-622 (referencing government investigations and enforcement actions involving the Pharmacies). These allegations provide the necessary "short and plain statement of the claim showing that the pleader is entitled to relief," so the Plaintiffs' dispensing claims against the Pharmacy Defendants do not warrant dismissal. *Twombly*, 550 U.S. at 547; *see also Iqbal*, 556 U.S. at 678.

### 7. The Economic Loss Rule.

Defendants next assert the economic loss doctrine bars Plaintiffs' claims for negligence and common law absolute public nuisance. The Court disagrees. In its review of the *Summit County* motions to dismiss plaintiffs' negligence claims, the Court explained:

> The economic loss rule recognizes that the risk of consequential economic loss is something that the parties can allocate by agreement when they enter into a contract. This allocation of risk is not possible where, as here, the harm alleged is caused by involuntary interactions between a tortfeasor and

a plaintiff.  Thus, courts have noted that in cases involving only economic loss, the rule "will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011).  By contrast, "the economic loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Id.*; *see also Corporex*, 835 N.E.2d. at 705 ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."); *Ineos USA LLC v. Furmanite Am., Inc*., 2014 WL 5803042, at *6 (Ohio Ct. App. Nov. 10, 2014) ("[W]here a tort claim alleges that a duty was breached independent of the contract, the economic loss rule does not apply.").

*See* Doc. #: 1203 at 35-36 (quoting Doc. #: 1025 at 84 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701 (Ohio 2005)).

### a.  Negligence.

Plaintiffs' allegations of Defendants' negligence liability are virtually identical to those pleaded in the *Summit County* Complaint.  *See* Doc. ##: 3031 at ¶¶ 1061-1093; 514 at ¶¶ 1039-1071).  Defendants and Plaintiffs refer to arguments in support of and in opposition to dismissal of the *Summit County* negligence claim as barred by the economic loss doctrine.  No new or different points are raised here.  In *Summit County*, the Court held the doctrine did not preclude plaintiffs' negligence claim because the claim arose from a duty independent of any contract.  See Doc. #: 1203 at 35-36, quoting and affirming Doc. #: 1025 at 84-85.  That ruling applies to the Funds' negligence claim, Count Seven, for the same reasons.

### b.  Common law absolute public nuisance.

Defendants contend the economic loss doctrine also bars Plaintiffs' common law public nuisance claim.  Initially, the Court notes Defendants rely primarily upon a decision construing the economic loss doctrine as barring any tort claim that fails to allege a non-economic injury.  *See RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, 2006 WL 2777159, at *3 (Ohio Ct. App. Sept.

28, 2006).  That construction is at odds with the conclusion of this and other courts that the rule does not deny recovery for purely economic damages in tort, where claims are alleged to arise from a duty independent of a contract.  *See* Doc. #: 1203 at 35-36.  As discussed below, the Court finds *RWP* and its progeny apply to bar only qualified (negligence-based) public nuisance claims.  Accordingly, neither *RWP* nor the cases applying its reasoning alter this Court's analysis of Plaintiffs' negligence claim.  *See supra,* Point III.B.7.a.  And, even under the view of the economic loss doctrine adopted by the *RWP* court, Defendants' motion fails for the reasons discussed below.

Responding to Defendants' arguments for application of the doctrine, Plaintiffs state that precedent applying the rule, including caselaw relied upon by Defendants, does not mandate dismissal of the absolute nuisance claim, because the claim alleges intentional misconduct by Defendants.  *See* Doc.#: 893 at 44-45.  The Court agrees with that conclusion, which is based on an analysis that includes some aspects of Ohio nuisance law not addressed in prior rulings in this MDL.

Ohio law recognizes several varieties of public nuisance claims, including "absolute" and "qualified" claims, which require different elements for pleading and proof.  The law further distinguishes two sub-categories of  "absolute" nuisance, the first premised on intentional conduct "(akin to an intentional tort);" the second, "(akin to a strict liability tort)," is premised on an "abnormally dangerous condition that cannot be maintained without injury to property no matter what care is taken."  *Cincinnati v. Deutsche Bank Nat. Trust Co*., 863 F.3d 474, 477 (6th Cir. 2017); *Kramer v. Angel's Path, L.L.C*., 882 N.E.2d 46, 53 (Ohio Ct. App. 2007).  A "qualified" nuisance claim is based on negligent conduct and, therefore, requires the additional elements of a duty of care and breach thereof.  *Deutsche Bank*, 863 F.3d at 477 ("a qualified public nuisance mirrors a negligence tort"); *Kramer*, 882 N.E.2d at 52-53 (qualified nuisance "relies upon a finding

of negligence").  Distinctions among the categories and sub-categories, which are based on the nature of the conduct alleged, are relevant to assessing the sufficiency of the pleadings and arguments for dismissal.

Plaintiffs' absolute public nuisance claim alleges injuries resulting from Defendants' intentional and unlawful conduct—not from negligent acts.  *See, e.g.,* Doc. #: 3031 at ¶¶ 1026-1039.  Nor do Plaintiffs assert injuries arising from an abnormally dangerous condition triggering strict liability, a theory based on negligence concepts.[33]

Defendants nevertheless argue that, as an "absolute" variety of nuisance, Plaintiffs' claim for recovery of purely economic loss is barred by the doctrine, citing *RWP*.  The *RWP* court first dismissed plaintiffs' negligence-based nuisance claim as precluded by the doctrine, reasoning that plaintiffs, who did not own the damaged property at issue, failed to show non-economic injury. *Id*.  The court then explained in *dicta*, "plaintiffs correctly note that a claim of nuisance may be predicated upon an alleged 'absolute nuisance' which is not dependent upon a showing of negligence….[b]ut nonetheless requires that the plaintiff sustain an injury to property," which the RWP plaintiffs did not establish.[34]  *Id*.  *RWP's* commentary on "absolute nuisance" liability does not persuade the Court to dismiss Plaintiffs' claim.

---

[33] *See* Baldwin's Oh. Prac. Tort L.(2d ed.) § 22:39 Theories—Strict liability in tort ("Strict liability in tort presumes a duty is automatically assumed by the defendant, and that if a plaintiff is injured by some failure to perform that duty, the defendant is strictly liable."); *Bowling v. Heil Co.*, 511 N.E.2d 373, 384 (Ohio 1987) ("Strict products liability not only arose, in part, from negligence theory, but it remains tied to and based upon negligence theory concepts.").

[34] As authority, *RWP* cites a regulatory takings case addressing a strict liability question of whether coal mining can be maintained without injury to property.  *Id.* at *4 (citing *R.T.G., Inc. v. State*, 780 N.E.2d 998, 1009-1010 (Ohio 2002)).  *R.T.G.* is inapposite: as Plaintiffs point out, the decision describes conditions that may result in strict liability but does not address or support a proposition that an absolute nuisance claim based on intentional conduct must establish a tangible injury to person or property, or else be precluded by the economic loss rule.  *See* Doc. #: 893 at 45 n.32.

Defendants argue that other courts cite *RWP* as authority for applying the economic loss doctrine to bar public nuisance causes of action.  But those decisions address *qualified* nuisance claims and, therefore, do not provide a basis to dismiss Plaintiffs' intent-based absolute nuisance cause of action.  *See Deutche Bank*, 863 F.3d at 477-478 ("The economic-loss doctrine forecloses the City's claim for damages for a qualified public nuisance under Ohio law.") (emphasis in original); *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332 (Ohio Ct. App. March 21, 2013) ("[A] previous decision of this court clearly indicates the economic loss rule applies to qualified public nuisance claims.  *Fabriz*i at ¶ 24–26.") (emphasis supplied); City *of Cleveland v. Ameriquest Mortg. Sec., Inc*., 621 F. Supp. 2d 513, 521-522 (N.D. Ohio 2009) ("Defendants argue that the economic loss rule applies in qualified public nuisance actions like this one, and bars the City from its desired recovery.") (emphasis supplied), *aff'd on other grounds*, 615 F.3d 496 (6th Cir. 2010); *Ashtabula River Corp. Grp. II v. Conrail, Inc*., 549 F. Supp. 2d 981, 987 (N.D. Ohio 2008) (dismissing common law and statutory nuisance claims and stating, "in the absence of physical harm to persons and tangible things, there can be no recovery in negligence.") (emphasis supplied).

The Marketing Defendants argue that Plaintiffs fail to cite a single case declining to apply the economic loss rule to intent-based public nuisance claims.  *See* Doc.#: 967 at 11.  Defendants, however, are the moving parties bearing the burden to demonstrate Plaintiffs' claim is barred, and they do not cite any decision applying the doctrine to preclude such a claim, which the Sixth Circuit has described as "akin to an intentional tort."  *See Deutsche Bank Nat. Trust Co*., 863 F.3d at 477. Numerous courts addressing operation of the economic loss doctrine in other contexts refuse to apply it to bar intentional torts.  *See, e.g., Eysoldt v. Proscan Imaging*, 957 N.E.2d 780, 785 (Ohio Ct. App. 2011) (Ohio's economic loss doctrine "applies only in negligence cases, not in cases

involving intentional torts."); *ODW Logistics, Inc. v. Karmaloop*, Inc., 2014 WL 293816, at *4 (S.D. Ohio Jan. 27, 2014) (the proposition that the doctrine applies only to negligence and not intentional torts "is replete in the case law; courts have repeatedly rejected application of the doctrine to intentional torts").[35]

Based on the foregoing, the Court holds that Defendants fail to satisfy their burden to demonstrate the economic loss doctrine bars recovery under Count Six, Plaintiffs' common law absolute public nuisance claim.

### 8.    Count Eight:  Common Law Fraud.

Relying on *Summit County* briefing of motions to dismiss, the Marketing Defendants argue Plaintiffs' common law fraud claim should be dismissed because Plaintiffs failed to: (i) plead proximate cause; (ii) comply with Rule 9(b); (iii) plead reliance; and (iv) identify a physician exposed to deceptive marketing or who wrote a prescription based on this marketing.  *See* Doc. #: 777-1 at 18-19.  These arguments have been rejected elsewhere in this opinion and in *Summit County.  See, e.g.,* Doc. #: 1025 at 25 at n. 19, 30-31, 85-88; *supra* at Point III.B.1.d.  The Marketing Defendants' argument also ignores the references in the Complaint to Plaintiffs' reliance on statements made to them and/or their alleged agents.  *See, e.g.,* Doc. #: 3031 at ¶¶ 693, 719, 802, 854, 1103-04.

---

[35] *ODW Logistics* cites the following decisions:  *Medpace, Inc. v. Biothera, Inc .,* 2013 WL 1386298, at *4 (S.D. Ohio Apr.4, 2013) (holding that Ohio's doctrine did not bar conversion claim); *Pride of Hills Mfg. Inc. v. Range Resources–Appalachia, LLC,* 2011 WL 2116455, at *6–7 (N.D. Ohio May 27, 2011) (declining to apply the doctrine to intentional torts claims); *Hodell–Natco Indus., Inc. v. SAP America, Inc.,* 2010 WL 6765522, at * 11 (N.D. Ohio Sept.2, 2010) ("It does not appear that Ohio courts intended to extend the economic loss rule beyond negligence actions to bar intentional torts as well."); *Reengineering Consultants, Ltd. v. EMC Corp.,* 2009 WL 113058, at *6 (S.D. Ohio Jan.14, 2009) ("The economic loss rule prevents recovery in negligence of purely economic loss, not recovery under an intentional tort theory for economic loss.").

That some of these representations were allegedly made to Plaintiffs' agents, rather than Plaintiffs, is a distinction without a difference at this stage of the proceedings. "'The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.'" *See* Doc. #: 1025 at 88 (quoting Restatement of the Law (Torts) § 533 (2018); *see also Nernberg v. Pearce*, 35 F.3d 247, 250–51 (6th Cir. 1994) ("It is generally accepted that a plaintiff is not required to prove direct reliance on a fraudulent misrepresentation to state a claim for fraud.").

The Funds sufficiently allege a claim for common law fraud and the Marketing Defendants' motion to dismiss this claim is denied.

### 9. Count Nine:  Injury Through Criminal Acts.

The Marketing and Pharmacy Defendants, again incorporating the *Summit County* motion to dismiss briefing, ask the Court to dismiss the Funds' claim brought pursuant to Ohio Rev. Code § 2307.60, which allows the recovery of damages, costs of suit, attorneys' fees, and, potentially, punitive damages by "[a]nyone injured in person or property by a criminal act…".  R.C. § 2307.60(A)(1).  *See* Doc. #: 777-1 at 9; Doc. #: 773-1 at 9.  As did the *Summit County* defendants, Defendants here assert dismissal is proper because Plaintiffs do not allege a predicate criminal conviction and they fail to plead a substantive violation of any of the predicate statutes.  *See* Doc. #: 777-1 at 9; Doc. #: 773-1 at 9.

Plaintiffs respond by adopting the *Summit County* plaintiffs' arguments and also based on this Court's decision in *Buddenberg v. Weisdack*, 2018 WL 3159052 (N.D. Ohio June 28, 2018).

*See* Doc. #: 893 at 47-48.  In *Buddenburg*, this Court denied defendants' motion to dismiss a similar claim, ordering plaintiffs to "'renew their challenge in the form of a motion for summary judgment after discovery and further research.'"  Doc. #: 1203 at 36 (quoting *Buddenberg*, 2018 WL 3159052, at *6).  The Court also certified to the Ohio Supreme Court the question of whether Ohio Rev. Code § 2307.60(A)(1) requires an underlying criminal conviction.  The Ohio Supreme Court accepted the certified question but has yet to rule.

The parties have not identified, and the Court has not found, new authority that would lead to a different result from *Summit County* with respect to whether Plaintiffs' Section 2307.60 claim should be dismissed. Therefore, the Court finds Plaintiffs have pleaded facts sufficient to survive Defendants' challenge to their claim brought pursuant to Ohio Rev. Code § 2307.60.

### 10.    Count 10:  Unjust Enrichment.

The following elements comprise a valid unjust enrichment cause of action: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  *Hambleton v. R.G. Barry Corp*., 465 N.E.2d 1298 (Ohio 1984) (internal quotations omitted).

Plaintiffs plead two theories of liability under Count Ten.  Doc. ##: 3031 at ¶¶ 1130-43; 893 at 48-52.  The first is a negative externalities theory – that is, Plaintiffs allegedly conferred a benefit upon Defendants by paying for prescriptions and for union members' opioid related healthcare costs, thereby "allow[ing] them to continue providing customers with a high volume of opioid products." *Id.* at ¶¶ 1132-1138.  In that regard, the Complaint alleges Plaintiffs "expended significant amounts of money to mitigate the societal harms caused by Defendants' conduct," incurred expenditures for special programs over and above Plaintiffs' ordinary expenses" that are

not "part of the normal and expected costs of a local government's existence." *Id.* at ¶¶ 1133, 1141-1142.  While such allegations may be relevant to claims brought by government entities, they do not support claims by the Plaintiff Funds.  *See, e.g.,* Doc. #: 1025 at 92-94, adopted by Doc. #: 1203 at 37-38.[36]

The Complaint, however, also alleges Defendants are unjustly enriched by Plaintiffs' wrongfully-induced payments for prescription opioids that were either unsafe, ineffective and/or not medically unnecessary.  *See* Doc. #: 3031 at ¶¶ 1130-1143.  As discussed above, Plaintiffs allege those prescriptions were listed, approved, and placed on formularies based on false promotional assurances to the contrary and Defendants' deliberate role in creating the illicit opioid market.  They also aver the purpose of the misinformation scheme was to increase sales and that Defendants violated anti-diversion duties because compliance would have decreased sales and profits.  Plaintiffs allege their expenditures contributed to the success of that goal and "helped sustain Defendants' businesses." *See, e.g., id.* at ¶¶ 9, 11-12, 465, 568, 692, 771, 785, 803-808, 1135.

Defendants argue Count Ten should be dismissed because the Complaint fails to allege a direct transaction between Defendants and Plaintiffs, citing *Johnson v. Microsoft Corp.,* 834 N.E.2d 791 (Ohio 2005).  They further contend dismissal is appropriate because they were not enriched by costs covered by TPPs and because the unjust enrichment claim derives from Plaintiffs' other causes of action, which Defendants contend should be dismissed.  *See* Doc. ##: 777-1 at 19-20; 774-1 at 21-23; 773-1 at 8-9; 976 at 13; 968 at 16-19; 769 at 48-52.

---

[36] Plaintiffs repeatedly invoke "cut-and'paste" allegations pertaining to local governments or political subdivisions.  *See, e.g.,* Doc. #: 3031 at ¶¶ 21, 1050-1051, 1016, 1088-1089, 1107-1108, 1126-27, 1133, 1141-1142, 1156-56.  These assertions clearly do not apply to union health and welfare Funds or other TPPs.  Inclusion of these allegations by Plaintiffs is careless and an irksome distraction to the Court.

For the reasons stated in *Summit County,* these arguments do not persuade the Court to dismiss Plaintiffs' unjust enrichment claim.  *See* Doc. ##: 1025 at 91-95; 1203 at 36-38.  The Complaint pleads a facially plausible unjust enrichment cause of action on the theory that Defendants allegedly gained significant profits at Plaintiffs' expense and did so through fraudulent and illegal means.  *See* 18 Ohio Jur. 3d Contracts § 279  ("one is unjustly enriched if the retention of a benefit would be unjust, and one should  not be allowed to profit or enrich himself or herself inequitably at another's expense").

### 11.    Count 11:  Civil Conspiracy

The tort of civil conspiracy requires there be "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Finance Co*., 700 N.E. 859, 868 (Ohio 1998).  In Ohio, this concept requires the following elements: "(i) a malicious combination; (ii) two or more persons; (iii) injury to person or property; and (iv) existence of an unlawful act independent from the actual conspiracy" *Hale v. Enerco Grp., Inc*., 2011 WL 49545, at *5 (N.D. Ohio Jan. 5, 2011) (citation and internal quotation marks omitted).

Relying entirely on *Summit County* briefing, Defendants allege Plaintiffs failed to plead a malicious combination, the existence of an express agreement between the Defendants, or underlying criminal acts.  *See* Doc. #: 774 at 23; Doc. #:777 at 20; Doc. #:773 at 9.  Each of these arguments was addressed and rejected by the Court in *Summit County*.  *See* Doc. #: 1203 at 20-22; Doc. #: 1025 at 97-98.  Given the similarity between the pleadings, motions, and responses in this case and *Summit County*, and because defendants do not offer newargument or authority that would call for a different conclusion, the Court denies Defendants' motions to dismiss as it relates to Plaintiffs' conspiracy claims for the reasons set forth in *Summit County*.

**VI.    Conclusion.**

In sum, for the foregoing reasons, Defendants' Motions to Dismiss, Doc. ##: 773, 774, 777, are

**DENIED** with the following exceptions: (i) Plaintiffs Statutory Nuisance Claim (Count Five) is

dismissed for lack of standing; and (ii) to the extent Plaintiffs' Negligence Claim (Count Seven)

asserts a claim for negligence *per se*, Plaintiffs have failed to state a claim and this portion of

Plaintiffs' negligence claim is dismissed.

        **IT IS SO ORDERED.**


                                      **/s/ Dan Aaron Polster  2/21/20**
                                        **DAN AARON POLSTER**
                                        **UNITED STATES DISTRICT JUDGE**