

**National Association of Attorneys General**

PRESIDENT
**Tim Fox**
Montana Attorney General

PRESIDENT-ELECT
**Karl A. Racine**
District of Columbia Attorney General

VICE PRESIDENT
**Tom Miller**
Iowa Attorney General

IMMEDIATE PAST PRESIDENT
**Jeff Landry**
Louisiana Attorney General

EXECUTIVE DIRECTOR
**Chris Toth**

1850 M Street, NW
Twelfth Floor
Washington, DC 20036
Phone: (202) 326-6000
https://www.naag.org/

February 24, 2020

Honorable Dan Aaron Polster
Carl B. Stokes United States Courthouse
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113-1837

RE:  Plaintiffs' Executive Committee Amended Motion for Entry of Order Establishing Common Benefit Fund and Proposed Order, Doc ## 3112, 3112-1.

Dear Judge Polster:

In response to your February 4, 2020 order, the 37 undersigned Attorneys General write as *amici curiae* to oppose the motion filed by the Plaintiffs' Executive Committee ("PEC") on January 28, 2020, seeking to establish a common benefit fund to award attorneys' fees and litigation costs to private counsel in the Opioid MDL.  Through the motion, the PEC seeks to obtain additional attorneys' fees not only from their own local government clients, but also from other public entities – seemingly including States – over which the Court does not have jurisdiction.  This would redirect funds recovered from defendants that States otherwise could use to abate the ongoing harms inflicted by the opioid epidemic.

The PEC's proposed order to establish a common benefit fund goes well beyond what is necessary to ensure fair compensation for private counsel. The proposed order violates state sovereignty, including by purporting to apply to some aspects of State Attorney General settlements and to other state court actions over which this Court lacks jurisdiction.  Moreover, if entered, the proposed order will disrupt – perhaps irreparably so – the substantial progress that has been made to negotiate a large national settlement with several defendants.  Finally, the proposed order is improper, insofar as it would require local governments to pay more in attorneys' fees rather than simply reallocate fees among attorneys with cases in the MDL, as common benefit fees are typically intended to do.

Members of the PEC and other lawyers retained by local government plaintiffs in this MDL, have engaged in valuable work pursuing the litigation. At the same time, State Attorneys General have conducted independent opioid-related investigations and litigation outside the MDL.[1]  These investigations and litigation involve strong legal claims brought on behalf of States and their citizens, based on searching, nonpublic investigation, and they

---

[1] Two State Attorneys General, of Idaho and South Carolina, have lawsuits pending in the MDL. Both Attorneys General also filed separate lawsuits in state court that are still pending there.

do not suffer from many of the legal questions that surround claims brought by other entities.

Work done by the State Attorneys General has inured to the benefit of plaintiffs in this MDL. For example, MDL plaintiffs have obtained orders from this Court requiring defendants to produce voluminous documents previous produced to the State Attorneys General. *See, e.g.*, Doc # 232 ¶ 9(k)(ii); Doc # 2712, at 3. Additionally, the State Attorneys General's investigation brought to light a failure to file tens of thousands of suspicious order reports, a failure cited by this Court in a summary judgment ruling. Doc #3143 at 28 n.56 ("The evidence shows that CAH discovered the issue, not during a 2015 audit, but in the course of a 2018 document collection for the Multistate AG group."); Doc #2483 at 28-29.

The work of the Attorneys General has also brought critical pressure to bear on the MDL defendants – State Attorneys General with state court trials this year include Alabama, Arkansas, Louisiana, Mississippi, New York, Ohio, and Washington – and made invaluable contributions to the public's understanding of the crisis. Examples include the work of the Massachusetts Attorney General's Office regarding Sackler family misconduct and the work of the Tennessee Attorney General's Office related to pharmaceutical distributors' lack of controls in their dealings with pharmacies, including those in East Tennessee where extraordinary quantities of opioids were delivered.[2]

## I. MDL Courts Lack Jurisdiction to Impose Common Benefit Assessments on State Attorneys General and Other Plaintiffs Not Litigating in Federal Court.

The proposed order would exceed this Court's jurisdiction by appearing to impose a common benefit assessment on State Attorneys General and other plaintiffs with cases pending in state courts[3] as well as parties who have not filed a lawsuit in any court.

Multiple federal courts of appeal have held that MDL courts lack the power to impose a common benefit assessment on state court plaintiffs. One of the leading cases on this jurisdictional issue is *In re Showa Denko K.K. L.-Tryptophan Products Liability Litigation-II*, 953 F.2d 162 (4th Cir. 1992). In that case, the MDL court ordered a common benefit fee set-aside that applied not only to the cases transferred to the MDL court, but also to state cases and claims that had yet to be litigated. The Fourth Circuit granted interlocutory review and reversed

---

[2] *See* Barry Meier, *Sackler Scion's Email Reveals Push for High-Dose OxyContin New Lawsuit Disclosures Claim*, N.Y. Times (Feb. 1, 2019); Jamie Satterfield, Tennessee AG Zeroes in on Opioid Distribution Chain, Knoxville News-Sentinel (Jan. 26, 2020) ("An analysis of AmerisourceBergen internal records – contained in a racketeering lawsuit filed against the distributor by the Tennessee Attorney General's office – reveals a push by the state's pharmacies for millions of opiates at a time when thousands of citizens were dying from them.").

[3] The significant number of lawsuits improperly removed from state courts and transferred here with pending remand motions should be treated as akin to cases pending in state court. Although this Court made a reasonable decision in allocating its resources to hold in abeyance these remand motions, those local government plaintiffs should not be put in a worse position than local government plaintiffs that obtained remand before the MDL panel transferred the case.

the MDL district court, holding that the district court could not impose such a fee because it did not have jurisdiction over the state court cases that were not before it. *Id*. at 166.

The court explained that such an order was impermissible because "claimants who have not sued and plaintiffs in state and untransferred federal cases have not voluntarily entered the litigation before the district court nor have they been brought in by process. The district court simply has no power to extend the obligations of its order to them." *Id.*; *see also id.* at 165 (stating that the procedural authority to consolidate federal cases before one MDL judge was "merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred").

The Eight and Ninth Circuits have similarly rejected a MDL court imposing a common benefit assessment on plaintiffs not before the MDL. *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 874 (8th Cir. 2014) (holding that a federal MDL court lacks jurisdiction to order a defendant to hold back common benefit funds from state court plaintiff settlements and stating that "state-court cases, related or not, are not before the MDL district court"); *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir. 1976) (reversing district court on the grounds that it "had not even a semblance of jurisdiction" to order non-parties to contribute to a common benefit fund). The leading treatise on federal practice likewise concludes that "although a transferee judge has the authority to appoint a committee of attorneys to conduct consolidated discovery and can require parties in the MDL cases to make payments into a common discovery fund, that authority does not extend to parties or attorneys involved in related state court proceedings, un-transferred federal cases, or unfiled claims." Wright & Miller, 15 Fed. Prac. & Proc. Juris. § 3866 (4th ed.).

The same logic applies here, where the PEC has asked this MDL court to hold back common benefit funds from settlements with state court plaintiffs and other governments that are not parties to this MDL.

### a. Application to State Attorneys General

The PEC's apparent request that the Court apply a common benefit assessment to certain aspects of relief secured by State Attorneys General raises heightened concerns implicating not only this Court's jurisdiction but also the States' unique place in our constitutional structure. The proposed order states that an assessment is due from all entities "who have relied upon, used, accepted, or have had access to MDL generated work product." Doc # 3112-1 § 1(4), at 4. It later provides that "no assessment is due from a Defendant on any portion of a judgment or settlement in a State Attorney General action that resolves or satisfies that State's own *damages claims*." *Id*. § 2(c), at 6 (emphasis altered). This language appears intended to exclude – and therefore potentially to sweep into the purview of a common benefit assessment – relief resulting from States' claims that may not strictly be considered "damages." For example, abatement relief obtained based on nuisance claims, or civil penalties, might fall outside a strict definition of "damages." *See, e.g.*, Doc #2572 at 5 (ruling "abatement relief" is not a form of "compensatory damages" covered by the Ohio apportionment statute).

For reasons of federalism and state sovereignty, an attempt by a federal MDL court, in cases involving political subdivisions of States, to assert jurisdiction to impose a common benefit assessment on a State Attorney General who is bringing claims on behalf of the State as a whole, raises even more profound concerns than an attempt to assert jurisdiction over another type of party in state court. *See, e.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 54 (1982). Such federalism concerns also extend to State Attorneys General who are litigating in this MDL.[4]

This Court has already recognized that imposing a common benefit fee against Attorneys General would be inappropriate. A February 27, 2018 order stated that "pursuant to a request by certain AGs, the Court makes clear that, if a global settlement is achieved under the auspices of the MDL, this Court has no intention of imposing upon the States any common benefit fees." Doc # 146 at 2. More generally, consistent with the constitutional principles discussed above, this Court has acknowledged numerous times, from the outset of the MDL, that it does not have jurisdiction over the State Attorneys General and their cases. *See, e.g.*, Doc #94 at 1 ("[T]he Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations . . . ."); Doc #111 (reiterating that "the Attorneys General are not subject to the jurisdiction of this court" and that their participation in settlement discussions is voluntary); Doc # 232 (noting that "[t]he Court acknowledges it has no jurisdiction over related State court proceedings" but that the Court would "coordinate with State courts presiding over related cases to the greatest extent possible, in order to avoid unnecessary duplication").[5]

Furthermore, the PEC cannot claim that sharing discovery with the Attorneys General supports a common benefit assessment on State recoveries. The States have been clear with both this Court and with the PEC, from the beginning of the MDL process, that they would not consent to this Court's exercise of jurisdiction over them or to contribute to the payment of the MDL plaintiffs' attorneys' fees.[6] Although some States accepted the PEC's invitation to share

---

[4] Absent agreement from a State, the common benefit assessment should not be imposed against State Attorney General actions that are in the MDL. When a State elects to litigate on behalf of its citizens, principles of sovereignty vest the state with exclusive authority to direct its own litigation. The PEC's proposed tax would infringe on that sovereign authority. Further, if imposed, the tax would essentially treat States like absent class members, which they cannot be compelled to be. Notions of "equity" do not give the PEC a workaround of state sovereignty when it comes to compensation. These principles apply regardless of whether a State Attorney General action is pending in the MDL.

[5] In asserting jurisdiction over State Attorneys General to assess common benefit fees for the work of contingency fee private counsel, this Court would also be ignoring limits imposed by many state legislatures on the terms under which such counsel can be paid to recover for state claims. *See, e.g.*, N.C. Gen. Stat § 114-9.5 (limiting contingency fees to five percent for recoveries on State claims of over $25 million and specifying no contingency fees can be applied to civil penalty recoveries).

[6] *See, e.g.*, Letter from the Tennessee Office of the Attorney General, on behalf of the Attorneys General (Jan. 25, 2018) (attached as Exhibit 1) (accepting invitation to participate in global

discovery, they did this based on the express acknowledgements from both this Court, in May 15 and June 11, 2018 Protective Orders, and from the PEC, in its "Sharing Agreement with States Attorneys General" filed on July 19, 2019, that these actions would not result in a common benefit assessment or in the exercise of federal court jurisdiction.[7]

It would be profoundly inequitable for this Court to now reverse course and order an assessment on State case recoveries to fund a common benefit fund. The States sought and received assurances that this would not happen, from both the PEC and the Court, and they relied upon those assurances in coordinating to the extent that they did with the MDL.

### b. Application to Other Plaintiffs Not Litigating in Federal Court

Similar to its treatment of the recoveries of State Attorneys General, the PEC's proposed order also runs afoul of the authorities discussed above in seeking to impose a common benefit assessment on all recoveries by local governments that are litigating in state courts or otherwise not litigating in the MDL. Specifically, the proposed order would cover all monies received by each of the approximately 34,458 local government entities across the nation that were sent notice of the Negotiation Class last fall. *See* Doc # 3112-1 §§ 1, 2(c), at 4-5 ("This Order . . . applies to . . . all cases, claims and classes . . . as to which a settlement is entered into, or a settlement or judge was or is paid . . . that provides or purports to provide for the satisfaction, release, dismissal or compromise of the Opioids-related claims . . . .of any or all potential members of the Negotiation Class defined in the September 11, 2019 Order Certifying Negotiation Class and Approving Notice (Doc # 2591) . . . ."); *see also* Doc # 2590, at 16

---

settlement discussions and setting out parameters of the States' participation, including making clear that they did not consent to the Court's jurisdiction); Letter from New Jersey Office of the Attorney General (Feb. 8, 2018) (attached as Exhibit 2) (noting the Court's acknowledgement that voluntary attendance in settlement meetings would not be construed as conferring jurisdiction over State cases and the Court's reassurance that it would not assess any common benefit costs or obligations against States); Letter from Mississippi Office of the Attorney General (Feb. 9, 2018) (attached as Exhibit 3) (same); Letter from Ohio Office of the Attorney General (Feb. 8, 2018) (attached as Exhibit 4) (same).

[7] *See* Doc # 1856 (documenting PEC's agreement to share the ARCOS platform and other MDL discovery and work product, and that sharing these materials "will **not** result in a common benefit assessment by the PEC upon any recovery by the States" (emphasis in original)); Doc #602-1 ("Notwithstanding anything in this Order, under no circumstances is a State . . . by signing this Acknowledgement [to received ARCOS data], subjecting itself in any way to the jurisdiction of this Court for any purpose other than enforcement of the confidentiality provisions of the Protective Order."); Doc # 441 ¶¶ 33(*l*), 34(j) ("Neither the receipt of [MDL discovery] . . . nor the provision of the certification [to be bound by the Protective Order] shall in any way be deemed a submission, by the claimant represented by counsel in such outside litigation, to the jurisdiction of this Court or any other federal court or a waiver of any jurisdictional arguments available to such claimant, provided, however, that any such recipient of documents or information produced under this Order shall submit to the jurisdiction of this Court for any violations of this Order.").

(explaining the class's potential members are local government entities listed on an Excel spreadsheet with 34,458 rows).

Nor is there any jurisdictional basis to attach common benefit fees based on the counsel that a state court litigant has chosen to hire, as the proposed order seeks to do. *See In re Genetically Modified Rice Litig.*, 764 F.3d at 874 ("The state-court plaintiffs at issue neither agreed to be part of the federal MDL nor participated in the MDL Settlement Agreement. Even if the state plaintiffs' attorneys participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court plaintiffs and Bayer.").

To the extent that the PEC's filing implies that this Court's previously entered negotiation class certification order is a basis to distinguish the above-cited case law and supports a common benefit assessment against parties who have not filed individual actions in the MDL, it is wrong even if the certification order is affirmed. This Court's certification order emphasized the limited and optional purpose of the certification, with no mention of creating jurisdiction for a common benefit fund order. *See, e.g.*, Doc #2591 ¶ 13, at 6 ("The Order does not certify the Negotiation Class for any purpose other than to negotiate for the class members with the thirteen (13) sets of national Defendants identified above."); Doc # 2590, at 3-4 ("[T]here is nothing coercive about this process . . . . There is nothing exclusive about this process . . . . And there is nothing intrusive about this process . . . ."). Additionally, the proposed common benefit fund order cannot rely on the Negotiation Class to create jurisdiction because the assessment would cover local governments that *opted out* of the negotiation class. Doc # 3112-1 §§ 1, 2(c), at 4-5 (covering all "potential members" of the Negotiation Class).[8]

For the foregoing reasons, any attempt by the PEC to seek a common benefit assessment on any settlement obtained by a State – and any other non-consenting party that is not part of the MDL[9] – gives rise to serious jurisdictional problems.

## II. The Proposed Order Would Harm Efforts to Achieve a Global Settlement.

In addition to its jurisdictional flaws, the proposed order would be detrimental to obtaining settlements from defendants in this MDL. As the Court is aware, State Attorneys

---

[8] Should the negotiation class withstand appellate review and the PEC negotiate a settlement for the certified class, it is entitled to obtain fees from the fund its efforts have created. However, it is inappropriate for the PEC to obtain compensation for a class settlement from litigants who are not part of the class. For instance, the District of Columbia Office of the Attorney General has filed its opioid litigation as the Chief Legal Officer of the jurisdiction, and is therefore operating as a state. However, the negotiating class proposed by the PEC listed the District as a subdivision. Although the District opted out of the negotiating class, and has never accessed the MDL database, it would be subject to a 7% common benefit surcharge under the PEC's motion.

[9] Whether the PEC may obtain a common benefit assessment from non-parties to this MDL that have expressly and knowingly consented to such an assessment is a different question on which we take no position.

General have been attempting to work collaboratively for more than two years with the PEC to develop a settlement framework that would allow for maximum relief and global peace. Significant progress has been made on developing a settlement structure that achieves global peace, provides significant resources to address the crisis nationwide, and changes the rules of opioid distribution to help prevent the crisis from recurring.

In working to develop a framework, the States have strived to adhere to this Court's direction that recoveries in opioid litigation should be directed to remediate the crisis and expand services to people who are suffering. Accordingly, within the emerging settlement framework, the States have proposed to assign the bulk of the settlement proceeds to an "abatement fund" that would allow state and local public health officials to provide services to victims of the opioid crisis.

The PEC's attempt impose a common benefit assessment against *all* proceeds put into such a fund is exceptionally counterproductive, given all the work that has gone into developing this payment structure, and the urgent need for constructive interaction between state and local actors to address the crisis effectively.[10]

As explained above, the proposed order exempts only States' "damages claims" from the common benefit assessment. Doc # 3112-1 § 2(c), at 6 (emphasis omitted). Money assigned to the type of abatement fund that has been under discussion as part of a settlement structure is a type of relief that might fall outside a strict definition of "damages." Moreover, under the abatement fund model envisioned in the settlement framework, it is not clear how settlement proceeds would be identified as being attributable specifically to State claims, whether based on "damages" or otherwise.

In essence, the PEC's proposed order would impose a seven percent tax on recoveries that were made possible by the strength of States' legal claims,[11] which are not within the

---

[10] In addition to the destructive timing with respect to settlement negotiations, the motion may also be legally premature. *See In re Terrorist Attacks on September 11, 2001*, 2019 U.S. Dist. LEXIS 169698, at *294-295 (S.D.N.Y. Sept. 30, 2019) (rejecting certain aspects of a common benefit motion as premature).

[11] State law often makes the States' claims quite valuable compared to the claims of local governments. *See, e.g.*, N.C. Gen. Stat. §§ 75-14 to -15.2 (giving the Attorney General unique powers to prosecute civil actions and obtain recoveries under North Carolina's Unfair or Deceptive Practices Act); N.C. Gen. Stat. §§ 75D-5, -8(b) (similar under North Carolina's Racketeer Influence and Corrupt Organizations Act); Tex. Bus. & Com. Code § 17.47 (giving the Attorney General broad authority to bring Deceptive Trade Practices Act claims and seek up to $10,000 in penalties per violation); Tex. Bus. & Com. Code § 17.48 (providing Texas counties may only seek injunctive relief under the Deceptive Trade Practices Act); *see also City of New Haven v. Purdue Pharma, L.P.*, 2019 Conn. Super. LEXIS 55, at *2 (Conn. Super. Ct. Jan. 8, 2019) ("Specific statutes grant the state and federal government authority to bring these kind of suits without meeting the ordinary burdens of individual civil plaintiffs. But the cities who have

jurisdiction of this Court. Under the proposed order, that money would be given to private attorneys retained by subdivisions in the MDL rather than used to help victims of the opioid crisis. That is unacceptable, and contravenes the Court's stated goal of directing funds towards remediation.

The proposed order is also troubling because it could scuttle valuable settlement options with cash-poor companies that, despite their limited cash, are able to use their production capacity to manufacture and provide free addiction treatment medication (MAT). The proposed order's requirement that a manufacturer come up with cash to pay the common benefit assessment for each MAT pill it provides would likely limit a manufacturer's willingness to provide free MAT drugs. *See* Doc # 3112-1 § 2(d)(3), at 6 ("The value of non-cash products or services provided by a Defendant shall be included, with the value subject to negotiation for purposes of this assessment."). Thus, the proposed order dramatically hampers the efforts to negotiate a global settlement.

### III. A Common Benefit Assessment Should Not Simply Increase the Attorneys' Fees But Instead Should Reallocate Attorneys' Fees Among Attorneys in the MDL.

The common benefit assessment proposed by the PEC would add a new attorney fee percentage to be applied to any MDL recovery, on top of other attorneys' fees that would have to be paid via contingency fee contracts. The PEC proposes keeping intact the fee agreements that give them significant fees from their MDL clients while at the same time receiving additional fees. *See* Doc # 3112-1 § 3(g), at 9 ("Nothing in this Order shall be deemed to modify, alter, or change the terms of any fee contracts between plaintiffs' counsel and their individual clients."). In other words, it would simply increase the amount of attorneys' fees paid by their government clients.

The general purpose of a common benefit fund, however, is to use the Court's equitable power to address the so-called "free-rider" problem in MDL litigation. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 769-70 (E.D. La. 2011) ("The theoretical bases for the application of this [common fund] concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit."). As Professor Rubenstein has stated in an article cited by the PEC in its proposed order, Doc # 3112-1, at 3, a common benefit fee taxes other attorneys in an MDL who benefitted from the work done by the common benefit attorneys and is supposed to be "essentially an intra-attorney allocation mechanism." William B. Rubenstein, *On What A 'Common Benefit Fee' Is, Is Not, and Should Be*, Class Action Attorney Fee Digest 87, 89 (Mar. 2009).

A common benefit fee is intended to spread the fees between individually retained plaintiffs' attorneys doing individual client work and PEC attorneys doing common benefit work at the aggregate level. *Id.* It is not a means to add a new attorney fee percentage on top of already contracted-for attorneys' fees and increase the overall amount of attorneys' fees that are coming out of the settlement for the clients in an MDL. As Professor Rubenstein notes, a

---

brought the lawsuits this court is considering, by contrast, have been granted no such authority.").

properly designed common benefit fee typically taxes the other attorneys in the MDL who benefitted from the work done by the common benefit attorneys; if the common benefit fee did not work this way and instead simply worked to be an additional amount of attorney fees that the clients had to pay, clients would be theoretically charged twice, once by their individually retained attorney and then again by the PEC.  *Id.*

Other authorities describe the purpose underlying the common benefit fee the same way. "[T]he judge should be aware that the [common benefit fee] is drawn from the contingency fees of the individual, originating attorneys."  Bolch Judicial Institute of Duke Law School, Guidelines and Best Practices for Large and Mass-Tort MDLs 73 (2d ed. 2018).  "[I]n MDLs, the common benefit fee is extracted from the fee of the primary attorney and not the claimant, as is the case with class actions.  Thus, in MDLs, the claimant does not pay the common benefit fee; the primary attorney who is the beneficiary of the common benefit work pays it."  Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 376 (2014); s*ee also In Re Nat'l Football League Players' Concussion Injury Litig.*, 2018 U.S. Dist. LEXIS 57792, at \*6-7 (E.D. Pa. Apr. 5, 2018) (holding that, in connection with deciding the total amount for the common benefit fund in an MDL, it was necessary to adjust and reduce the fees of some attorneys in order to "prevent a 'free-rider problem'").  In sum, the issue usually underlying the application of a common benefit fee in an MDL is that the substantial work done to develop and litigate bellwether cases will inure to the benefit of all MDL plaintiffs, allowing the attorneys who represent the non-bellwether plaintiffs to get the benefit of their attorneys' fees contracts without having to expend much effort to obtain the recovery.

A common benefit assessment, when done appropriately, might be a sensible way to deal with any free-rider issues in the Opioid MDL.  But in order to do so, the common benefit assessment must reallocate the attorneys' fees for MDL parties in some way to hold the clients harmless and ensure that they are not paying additional fees.  In other words, in order for the PEC's proposed order's seven percent assessment to fulfill the equitable role that forms the theoretical basis of such assessments, other MDL attorney fees would need to be adjusted, as is done in other MDLs, so as to not create a situation where attorneys' fees are simply being increased and the MDL parties' recoveries are being reduced accordingly.[12]  *See, e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457 (E.D. Pa. 2008) ("If a Class Member is represented by individual counsel, the 'Common Benefit Percentage Amount' is deducted from the individual counsel's fee."); *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS 25435, at \*1353 (S.D. W. Va. Jan. 30, 2019) (specifying that a common benefit fund was created pursuant to an order that provided "[n]othing in th[e] Agreed Order is intended to increase the attorneys' fee paid by a client").

Under the circumstances of this MDL, it would be especially inequitable for this Court to enter a common benefit fund order that simply increased the attorneys' fees for MDL parties.  For one thing, the MDL parties have often entered into contingency fee contracts that provide

---

[12] For the reasons set forth above, the MDL court would not have jurisdiction to adjust the contingency fees agreed to by non-parties to the MDL.  The need to ensure that the common benefit fund does not simply increase attorneys' fees further demonstrates why the Court cannot impose the common benefit assessment on non-parties to the MDL.

substantial percentages of any recovery to their attorneys. *See* Randy Ludlow, *Merged Opioid Deal for Ohio a Possibility*, Columbus Dispatch (Feb. 9, 2020) ("Lawyers for the local governments would be paid around $325 million from a $1 billion Ohio settlement, with a 30% share the most common figure in legal contingency fee agreements obtained by The Dispatch."). But more fundamentally, such a common benefit fund order would result in less relief for communities that have been harmed by the devastating opioid crisis.

*  *  *

In light of the above concerns, we respectfully request that this Court not enter the common benefit fund order as proposed. We stand ready to continue to work with the PEC and this Court to find a reasonable and equitable way that the private attorneys who have devoted substantial time and resources to this MDL and state court litigation, as well as Attorneys General Offices that have devoted their own finite resources, are fairly compensated. But that must be done in a way that is fair to all parties, does not risk disrupting a nationwide settlement, and does not divert vital resources from going to address the opioid crisis effectively.

Respectfully submitted,

Josh Stein
North Carolina Attorney General

Ken Paxton
Texas Attorney General

Kevin G. Clarkson
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Leslie Rutledge
Arkansas Attorney General

Xavier Becerra
California Attorney General

Phil Weiser
Colorado Attorney General

Karl A. Racine
District of Columbia Attorney General

Leevin Taitano Camacho
Guam Attorney General

Clare E. Connors
Hawaii Attorney General

Lawrence Wasden
Idaho Attorney General

Kwame Raoul
Illinois Attorney General

Curtis T. Hill, Jr.
Indiana Attorney General

Tom Miller
Iowa Attorney General

Derek Schmidt
Kansas Attorney General

Jeff Landry
Louisiana Attorney General

Aaron M. Frey
Maine Attorney General

Brian Frosh
Maryland Attorney General

Dana Nessel
Michigan Attorney General

Keith Ellison
Minnesota Attorney General

Lynn Fitch
Mississippi Attorney General

Eric S. Schmitt
Missouri Attorney General

Edward Manibusan
Northern Mariana Islands Attorney General

Douglas Peterson
Nebraska Attorney General

Aaron D. Ford
Nevada Attorney General

Gordon MacDonald
New Hampshire Attorney General

Gurbir S. Grewal
New Jersey Attorney General

Hector Balderas
New Mexico Attorney General

Letitia James
New York Attorney General

Wayne Stenehjem
North Dakota Attorney General

Mike Hunter
Oklahoma Attorney General

Ellen F. Rosenblum
Oregon Attorney General

Josh Shapiro
Pennsylvania Attorney General

Herbert H. Slatery III
Tennessee Attorney General

T.J. Donovan
Vermont Attorney General

Mark R. Herring
Virginia Attorney General

Joshua L. Kaul
Wisconsin Attorney General

Cc:
Helen Norton, Judicial Assistant
Katherine King, Deputy Clerk
*Via Electronic Mail*