# EXHIBIT 3

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

CASE NO. 1:17-MD-2804
**Judge Dan A. Polster**

### DECLARATION OF HANNAH HAMBURGER CONCERNING INADVERTANT PRODUCTION OF DISPENSING DATA PRIOR TO 1/1/2006

I, HANNAH HAMBURGER, hereby certify and say under penalty of perjury that:

1. I am a Senior Director at FTI Consulting Inc. ("FTI"), 227 West Monroe, Chicago, IL 60606. FTI was engaged by Bartlit Beck LLP ("Counsel"), in connection with its representation of Walgreen Co. and Walgreen Eastern Co. ("Walgreens" or the "Company") in the above-captioned cases. FTI was engaged to provide data analytic consulting services to Counsel. I make this declaration based on my work as a consultant on behalf of Walgreens.

2. I have over 12 years of experience working with complex datasets and transactional databases in complex litigation, government and regulatory investigations, antitrust investigations, financial and accounting investigations, and bankruptcies. I have significant expertise in the areas of database management, claims management, and complex data analytics.

3. I was asked by Counsel to assist the Company with its collection and production of historical dispensing data in Cuyahoga and Summit Counties, Ohio, back to 1/1/2006, pursuant to the Court's Order regarding the production of this information, Dkt. 3106.

4.     I was asked to simultaneously assist the Company with its collection and production of historical dispensing data in the Nassau and Suffolk Counties, New York, back to 10/23/2015.

5.     My team worked for several weeks to collect this subset of Walgreens' dispensing data, including many multi-day, in-person meetings with company personnel. I was on-site with a team of Walgreen's employees troubleshooting the best and most efficient way to collect the data from a live production database, while maintaining the security of the data.

6.     Because of the sheer volume of dispensing transactions nationwide we wrote targeted queries to collect subsets of the data for limited geographic areas, which still required lengthy processing times. Walgreens uses a relational database in a Hadoop framework, which is standard practice for a dataset of this size and configuration.  Walgreens' dispensing data is stored in many tables, each of which had to be queried, to collect the data. As data grows and changes over time (*i.e.*, a customer moves, a doctor changes hospitals, a manufacturer divests a product) a relational database will capture these changes, and the number of transactions being stored can increase rapidly. The volume and scope of historical transactional data collected here required the writing of complicated computer code; with the increased complexity, that code, in turn, takes longer to run and compute.

7.     It is my understanding that regular maintenance of the database and the company's retention policy dictates that historical dispensing activity is only maintained for 11 years.  Initially, the team was unable to identify dispensing data dating prior to 2013.  I worked with the Walgreens team to search additional database tables, and to write additional queries, and ultimately identified earlier data.  However, given the retention policy, as well as the record

counts of earlier years (*e.g.,* one record in 2002, 17 records in 2003, 326 in 2004, *etc.*), I believe data prior to 2008 is incomplete.

8.   The process of identifying and verifying the correct data for production was a lengthy, involved, and iterative process. Several steps of the data collection required revision and additional pulls to ensure data completeness. When the team was unable to identify dispensing data dating prior to 2013, we had to identify the cause of the missing data; historical NDC codes were not consistently being pulled. We identified additional tables with historical NDC information and rewrote the queries to pull from both historical and current NDC sources. The contemporaneous fields related to each prescription (*i.e.* prescriber information, pharmacist information, store locations, patient location) were initially pulled with only current information. We worked with the team to rewrite the queries to accurately pull the contemporaneous fields associated with the correct time period based on the prescription sold date.

9.   I also took numerous steps to ensure that the proper data was collected, to protect that data once it was collected, and to ensure that it was complete and accurate. To protect the data temporally I wrote queries restricting the data to the Court-ordered timeframe, 1/1/2006 to present.

10.   To ensure that the data collected was for the appropriate stores in the counties at issue, I reviewed DEA Number to NABP mappings, and DEA to Store Number mappings.  I reviewed store numbers, addresses, open/close date information, and relocation information. I reviewed the ARCOS data for all store numbers/DEA numbers attributed to the relevant counties. And I compared open/close dates with transaction activity in ARCOS (i.e., minimum and maximum dates). I referenced ARCOS, active database Location information, and Store listings from the Walgreens Tax department.  I reviewed acquisition information to identify

3

stores Walgreens had purchased, to ensure that data for those stores was included in the production.

11. To ensure that the data collected was for the drugs at issue, including the correct NDC codes, I confirmed all drugs dispensed during the ARCOS time period had a record of distribution into the store using ARCOS. I confirmed that all records for the eight agreed upon pharmaceutical opioids were included in the production. I cross-referenced NDC codes in ARCOS and I-STOP. I also confirmed all fourteen benzodiazepines and four muscle relaxers on the Defendants' agreed list of NDCs were included in the production. I wrote SQL code, and reviewed the output to make sure benzodiazepines and muscle relaxers were only produced if they were within 14 days of an opioid prescription for the same patient.

12. To ensure the correct data fields were included in the production, I mapped the 34 data fields from the Court's Order regarding the production of this information, Dkt. 3106, to more than ten tables in the Company's systems, and ensured dispensing data for Cuyahoga and Summit Counties, Ohio included only birth year, not birth day or month information.

13. To ensure Protected Health Information was secure, I assigned a masked ID to de-identify each unique Patient ID for patient identifiers.

14. To ensure the dispensing data was protected, and to prevent inadvertent disclosure to unauthorized users, I sent the data to Plaintiffs by encrypted hard drive, the password was provided separately by counsel, and chain of custody forms were requested from all parties handling the protected data. I also asked that the hard drives be returned to FTI after plaintiffs' counsel uploaded the data. As soon as those hard drives were returned, I notified counsel for Walgreens, and I have taken steps to secure the hard drives. The drives will be destroyed in

accordance with the National Institute of Standards and Technology (NIST) 800-88 publication, including physical data destruction.

15. It was not my intention to produce dispensing data prior to the ordered time period (*i.e.*, pre-1/1/2006) and the inclusion of this information was inadvertent.

16. It is standard industry practice to reconcile large data sets to other contemporaneous reports or datasets to ensure data completeness, as part of the quality control process. If data sets that should reconcile have unexplained inconsistencies, that is a sign that one set of data may be incomplete. Identifying two completely comparable reports or datasets is unlikely, and typically national reporting, productions, or publicly available comparison points are used.

17. As part of the process to ensure data completeness here, I compared the Walgreens dispensing data to the nationally produced ARCOS data, as well as the NY PMP I-STOP data ("I-STOP") produced by the New York Attorney General. The ARCOS data spans the period 1/1/2006 to 12/31/2014 while I-STOP includes data from 1/1/2010 to 12/31/2019. I used the ARCOS data to cross reference information such as store location and NDC values. However, because the ARCOS data only covers 2006-2014, in order to use it as a comparison point, I had to remove the temporal restriction on the date a prescription was sold in one of my queries. That temporal restriction should have been added back to the query for the production but was inadvertently excluded.

18. As soon as I became aware the production contained data prior to 1/1/2006, I undertook a comprehensive root cause analysis and backtracked to the source of the problem (i.e., as described above, that a WHERE clause criteria was removed in a reconciliation and not added back). I immediately provided Counsel with the SQL code and instructions necessary to

truncate the data to the appropriate time period (i.e., 1/1/2006 forward), so that Counsel could provide this information to Plaintiffs, and Plaintiffs could delete the 2,065 prescription records dated prior to 1/1/2006.

Under penalty of perjury, I hereby certify and declare that the foregoing statements made by me are true and accurate.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 17, 2020                                                                  */s/ Hannah Hamburger*