# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) | **MDL 2804** |
| | ) | |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | **Judge Dan Aaron Polster** |
| *West Boca Medical Center, Inc. v.* | ) | |
| *AmerisourceBergen Drug Corporation, et al.* | ) | <u>**OPINION AND ORDER**</u> |
| 1:18-op-45530 | ) | |
| | ) | |

Before the Court are three separate motions to dismiss plaintiff West Boca Medical

Center, Inc.'s ("West Boca," or the "Hospital") Complaint. Doc. #: 385.[1] Distributors,[2]

Pharmacies,[3] and Manufacturers[4] each filed a group motion, seeking dismissal of West Boca's

claims against them.[5] Doc. #: 684-1 (Distributors); Doc. #: 686 (Pharmacies); Doc. #: 691

(Manufacturers). West Boca filed an omnibus response in opposition that addressed all three

---

1 Unless otherwise indicated, all document numbers refer to the master MDL docket, Case No. 17-md-2804. Page numbers, when necessary, refer to the documents' native format pagination. West Boca's Complaint was refiled unredacted at Doc. #: 2985 and although the Court refers to the sealed complaint, Doc. #: 385, paragraph numbers in the unredacted version should be the same.

2 The Distributors' motion was filed collectively by defendants AmerisourceBergen Drug Corporation ("ABDC"); Cardinal Health, Inc. ("Cardinal"); and McKesson Corporation ("McKesson") (collectively, "Distributors" or "Distributor Defendants").

3 The Pharmacies' motion was filed collectively by defendants CVS Health Corporation ("CVS"); The Kroger Co. ("Kroger"); Walgreens Boots Alliance, Inc. ("Walgreens"); and Walmart Inc. ("Walmart") (collectively "Pharmacies" or "Pharmacy Defendants").

4 The Manufacturers' motion was filed collectively by defendants Purdue Pharma LP, Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue"); Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan"); Watson Laboratories, Inc., Actavis Pharma, Inc.; Actavis LLC; Teva Pharmaceuticals, USA, Inc.; and Cephalon, Inc. ("Teva"); Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Insys Therapeutics, Inc. ("Insys"); Mallinckrodt LLC ("Mallinckrodt"); and Noramco, Inc. ("Noramco") (collectively "Manufacturers" or "Manufacturer Defendants").

5 The Court recognizes that some Defendants have or are contemplating filing for bankruptcy protection, and litigation against those Defendants has or may be stayed pending those proceedings. For the sake of simplicity, the Court addresses these motions as they were filed by the parties.

motions. Doc. #: 806. Distributors and Pharmacies filed replies in support of their respective motions. Doc. #: 887 (Distributors); Doc. #: 890 (Pharmacies). Manufacturers also filed a reply in support of their motion. Case No. 18-op-45530, Doc. #: 55.[6]

West Boca later filed a notice of supplemental authority, Doc. #: 911, and then (purportedly on behalf of all hospitals whose cases have been transferred into this MDL) filed another notice of supplemental authority ("Second Notice"), Doc. #: 2618. Distributors filed a response to West Boca's second notice. Doc. #: 2681. West Boca filed a reply to Distributors' response, again on behalf of all hospitals in the MDL. Doc. #: 2705. West Boca then filed a third notice of supplemental authority. Case No. 1:18-op-45530, Doc. #: 65.[7]

The Court has reviewed all of the parties' submissions.  For the reasons stated below, the Court now rules as follows: Defendants' Motions to Dismiss are **GRANTED** with respect to Count II (RICO § 1962(a)); Count V (Breach of Implied Warranty); Count VIII (Negligence Per Se); Count IX (Negligent Marketing); and Count X (Negligent Distribution).  The motions are otherwise **DENIED**.

## I. Legal Standard for a Motion to Dismiss

The principles governing review of a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) are well-settled, as this Court has previously articulated. *See, e.g.*, *Report and Recommendation ("R&R") on Motions to Dismiss Muscogee (Creek) Nation Claims*, Doc. #: 1499 at 2-3; *R&R on Motion to Dismiss Summit County Claims*, Doc. #: 1025 at 2-3. A court is "required to 'accept all well-pleaded factual allegations of the complaint as true and

---

6 The Manufacturers' Reply was not filed on the master MDL docket.

7 Additionally, on April 5, 2019, various hospital plaintiffs, including West Boca, filed a tangentially-related Brief in Response to Defendants' Briefing on the Viability of Public Nuisance Nationwide. Doc. #: 1523.

construe the complaint in the light most favorable to the plaintiff.'" *Dinwiddie v. Beshear*, 2019 WL 4009835, at *2 (6th Cir. Apr. 24, 2019) (quoting *Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Federal courts require only "notice pleadings" containing "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, "a complaint need not contain 'detailed factual allegations,' however, it requires more than 'labels and conclusion' or 'a formulaic recitation of the elements of a cause of action.'" *Dinwiddie*, 2019 WL 4009835, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rule 8 "demands more than an unadorned, the-defendant-harmed-me accusation," and a complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Deciding if a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A district court may dismiss a complaint for failure to state a claim "only if it's clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Swierzkiewickz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## II. Factual Allegations

In its Complaint, West Boca asserts the following claims:

- Count I, Violation Of RICO,[8] 18 U.S.C. 1961, *et seq.* – Opioid False Narrative Enterprise (Against All Defendants);

- Count II, Violation Of RICO, 18 U.S.C. § 1962(a)&(d) (Against All Defendants);

- Count III, Violation Of Florida's Deceptive And Unfair Trade Practices Act (Fla. Stat. Ann. § 501.201, *et seq.*) (Against All Defendants);

- Count IV, Fraudulent Practices – Misleading Advertising, Florida Statutes Title XLVI, Crimes § 817.41 (Against Marketing Defendants);[9]

- Count V, Breach of Implied Warranty of Fitness For a Particular Purpose (Fla. Stat. Ann. §§ 672.315 and 672.11, *et seq.*) (Against All Defendants);

- Count VI, Negligence (Against All Defendants);

- Count VII, Wanton Negligence (Against All Defendants);

- Count VIII, Negligence Per Se (Against All Defendants);

- Count IX, Negligent Marketing (Against Marketing Defendants);

- Count X, Negligent Distribution (Against All Defendants);

- Count XI, Nuisance (Against All Defendants); and

- Count XII, Unjust Enrichment (Against All Defendants).

Many of the factual allegations that pertain to the Defendants' alleged behavior are the same as those alleged in the complaints filed in the (i) *Summit County*, (ii) *Muscogee (Creek)*

---

8 Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.*

9 In its Complaint, West Boca uses the following definitions:

- "Collectively, Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt are referred to as 'Marketing Defendants.'" *See* Doc. #: 385 at ¶131. West Boca's definition of Janssen includes J&J and Noramco, thus the "Marketing Defendants" are the same as the Manufacturers defined in footnote 4 by their joint participation in the Manufacturers' Motion to Dismiss.

- "Cardinal, McKesson, and AmerisourceBergen are collectively referred to as the 'Distributor Defendants.'" Doc. #: 385 at ¶148.

- "Collectively, Defendants CVS, Kroger, Rite Aid, Walgreens, and Wal-Mart are referred to as 'National Retail Pharmacies.'" Doc. #: 385 at ¶154. Although incorporated in this definition, Rite-Aid of Maryland, Inc. was voluntarily dismissed on May 29, 2018. *See* Case No. 18-op-45530, Doc. #: 5; *see also* Doc. #: 760 (redacted complaint filed with Rite Aid removed).

- "Additionally, the Distributor Defendants and the National Retail Pharmacies are collectively referred to as the 'Supply Chain Defendants.'" Doc. #: 385 ¶154.

*Nation*, and (iii) *Blackfeet Tribe* cases.[10] *See* Doc. ##: 514; 731; 6.[11] The Magistrate Judge and this Court have addressed those factual allegations at length. *See Summit County R&R,* Doc. #: 1025; *Muscogee Nation R&R,* Doc. #: 1499; *Blackfeet Tribe R&R*, Doc. #: 1500; *Opinion and Order on Summit County*, Doc. #: 1203; *Opinion and Order on Tribe Cases*, Doc. #: 1680. Thus, the Court only provides below a brief overview of the factual allegations specific to West Boca, and incorporates by reference the general factual circumstances surrounding the opioid crisis and the allegations of Defendants' behavior that are common to the cases addressed in the aforementioned R&Rs and Orders.

## A. Factual Allegations Against Defendants

Plaintiff, West Boca Medical Center, is a 195-bed, acute-care hospital located in Palm Beach County, Florida, which includes a pharmacy, emergency room ("ER"), and a 35-bed Neonatal Intensive Care Unit ("NICU"). West Boca also operates a separate ER facility in Broward County, Florida. Doc. #: 385 at ¶20.

West Boca alleges that the Manufacturer Defendants, also referred to as "Marketing Defendants," manufacture, sell, and market prescription opioid painkillers and fueled the opioid crisis "through a massive marketing campaign premised on false and incomplete information," which engineered a "dramatic shift in how and when opioids are prescribed by the medical community and used by patients." Doc. #: 385 at ¶15. West Boca alleges the Marketing Defendants dramatically increased sales of prescription opioids despite their knowledge "that

---

[10] Those cases are *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*, 18-op-45090; *The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*, 18-op-45459; and *The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al.*, 18-op-45749.

[11] The Magistrate Judge's R&R and the Court's Opinion and Order addressed the then-operative *Summit County* Complaint, Doc. #: 514. This complaint has since been amended. *See* Doc. ##: 2943; 3020. The *Blackfeet Tribe* Complaint was not filed on the master MDL docket. The referenced Doc. #: 6 corresponds to case no. 18-op-45749.

opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded." Doc. #: 385 at ¶16.

West Boca also alleges that the Distributor and Pharmacy Defendants, also referred to as "Supply Chain Defendants," "participated in the conspiracy by ignoring their legal responsibilities under the Controlled Substance Act, and flooded affected areas with opioids well knowing they were contributing to, but profiting from, widespread addiction and human misery." Doc. #: 385 at ¶17. West Boca further alleges that Marketing and Supply Chain Defendants "extract billions of dollars of revenue from the addicted American public while tens of millions of dollars of injury are caused to hospitals as the reasonably foreseeable consequences of the prescription opioid epidemic." Doc. #: 385 at ¶19.

West Boca further alleges that hospitals in Southern Florida, where it is located, have been hit especially hard by the opioid crisis. West Boca alleges that, prior to 2009, Florida's medical laws allowed physicians to prescribe and dispense opioids from their offices, with no prescription-monitoring system in place. Doc. #: 385 at ¶30. West Boca cites to statistics showing that "[b]y 2009, of the top oxycodone-prescribing counties in American, nine were in Florida. . . Broward County had four pain clinics in 2007 and 115 two years later." Doc. #: 385 at ¶30. West Boca also provides statistics showing that "[i]n 2009, 25% of nationwide shipments of oxycodone were sent to the state of Florida. By 2010, 98 of the 100 doctors in the country who dispensed the highest quantities of oxycodone from their offices were located in Florida." Doc. #: 385 at ¶31. West Boca further provides statistics regarding the costs of this epidemic, showing that in 2015, "health care costs related to opioid abuse in Florida reached $1,246,526,068.00." Doc. #: 385 at ¶38.

**B. Facts Specific to Hospitals**

In its Complaint, West Boca alleges that hospitals, such as itself, and especially those in south Florida, have been negatively impacted by the opioid crisis in at least three ways. First, West Boca alleges that hospitals must provide un- or under-compensated medical treatment to victims of the opioid crisis, at great expense to hospitals. Under various state and federal laws, hospitals are required to provide care to all patients who come in with any medical condition, including opioid addiction, regardless of whether the patient has the ability to pay for treatment. Further, it is often the case that patients who arrive at West Boca with opioid dependency issues will require extra or especially-complicated care compared with patients who do not have opioid-use issues. Exacerbating this situation, these "opioid patients" frequently do not have health insurance coverage or the ability to pay otherwise; and even when they do have insurance, hospitals are not compensated fully for the special care that may be required. *See* Doc. #: 385 at ¶¶53; 55; 57.

Second, West Boca alleges that hospitals have been forced to incur additional operational costs associated with the opioid crisis. Because healthcare providers, such as those employed by West Boca, are themselves a potential source of opioid medication, hospitals frequently must utilize additional capital and human resources to identify and handle individuals who attempt to obtain opioids by deception—so-called "pill-seekers." Hospital staffs require additional training and diagnostic tools to distinguish pill-seekers from legitimate patients, and hospitals need to hire additional personnel to help them keep their opioids secure. *See* Doc. #: 385 at ¶58.

Finally, West Boca alleges hospitals are also direct consumers of opioid pills. *See* Doc. #: 385 at ¶¶52; 62. Hospitals often run their own pharmacies, which purchase pills from distributors to be dispensed to hospital patients. Hospitals, of course, also have doctors and nurses on staff who were direct targets of the Defendants' alleged misrepresentations. West Boca

asserts these alleged misrepresentations caused their physicians to write more prescriptions than they otherwise would have, in turn causing them to have to purchase, stock, and fill more prescriptions for opioid medications than were warranted.  *See* Doc. #: 385 at ¶52; 63.[12]

### III. Causation under Florida Law

The Pharmacies assert that Florida's "sole proximate cause" doctrine, and also the learned intermediary rule, each preclude a finding of proximate cause as a matter of law.[13] *See* Doc. #: 686-1 at 2. They refer the Court to their briefing in *Broward County, Florida v. Purdue Pharma L.P., et al.*, Case No. 18-op-45332, MDL Doc. #: 582-1. As set forth below, the Court concludes neither of these doctrines compel dismissal of West Boca's claims. As a general principle under Florida law, "[i]ssues of causation are problematic and, under most circumstances, should be left to the jury." *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1316 (11th Cir. 1990).

### A. Sole Proximate Cause Doctrine

In their motion to dismiss Broward County's claims, the Pharmacies assert that, "under Florida's 'sole proximate cause' doctrine, the intentional misuse of a product such as a prescription opioid is, as a matter of law, the only legally relevant proximate cause of resulting injuries." Doc. #: 582-1 at 3. The Pharmacies assert that "[a]ny injuries that [West Boca] might try to connect to the Moving Defendants' conduct necessarily stem from the intentional misuse of diverted prescription opioids" and must, therefore, be dismissed. Doc. #: 582-1 at 3. Put simply, the Pharmacies assert the harms identified by West Boca were caused by the patients

---

12 It seems this third category of damages might be offset entirely by the profit West Boca made on the sale of the opioid medications to patients.  At this stage of the litigation, however, the Court accepts that this third category of damages does exist.

13 The Court has previously addressed these legal concepts under Ohio and Oklahoma law. *See* Doc. ##: 1025 at 29-32, 79-82; 1680 at 6-10. Although not dispositive, the analysis remains instructive and is incorporated herein by reference.

who consumed the opioid drugs.  The Pharmacies cite three product liability cases to support this assertion: *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346, 1356 (S.D. Fla. 2003); *Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1361 (S.D. Fla. 2001); and *Clark v. Boeing Co.*, 395 So. 2d 1226, 1229 (Fla. Dist. Ct. App. 1981).

All three cases are distinguishable. The Florida Supreme Court has concluded that, under Florida law, a plaintiff's knowing misuse of a product ***does not*** bar recovery, as a matter of law, on a products liability claim sounding in negligence, even if that misuse was done in an unforeseeable manner. *Standard Havens Prod., Inc. v. Benitez*, 648 So. 2d 1192, 1193 (Fla. 1994). Product misuse, under Florida law, is "a form of comparative negligence." *Id.* at 1197. "Of course, if a court determines as a matter of law, or a jury determines as a matter of fact . . . that a claimant's negligence was the ***sole*** legal cause of her injury, then, in such event, the claimant could not recover." *Id.* (emphasis added).

As a threshold matter, West Boca does not assert a products liability claim, so it is not clear that the sole proximate cause doctrine even applies in the present case. Regardless, *Clark* is a Florida Appellate Court decision that was issued before *Standard Havens*, so to the extent the two cases conflict, *Standard Havens* is controlling.[14] Similarly, *Bruner* and *Labzda* are cases decided by the Southern District of Florida; but the Supreme Court of Florida remains the ultimate arbiter of Florida law. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488 (1976) ("We are, of course, bound to accept the interpretation of [state] law by

---

14 It is worth noting as well that in *Benitez v. Standard Havens Prod., Inc.*, 7 F.3d 1561, 1565 (11th Cir. 1993), the case from which the Eleventh Circuit certified the question of whether knowing product misuse was a complete bar to recover on a products liability claim to the Florida Supreme Court, the Eleventh Circuit distinguished *Clark* as being "based on the particular facts of the case and the lack of causation between any alleged defect and the plaintiff's injuries, not on an absolute bar to recovery for knowing misuse." *Benitez*, 7 F.3d at 1565, *certified question answered*, 648 So. 2d 1192 (Fla. 1994).

the highest court of the State."). Thus, *Standard Havens* controls to the extent *Bruner* and *Labzda* conflict. In sum, *Standard Havens* trumps all three cases that defendants cite.

Moreover, the three cited cases are distinguishable and do not demand dismissal by their holdings. In *Clark*, the court clearly articulated the test for finding strict product liability: "The test is whether or not the product was reasonably safe for its intended use as manufactured and designed when it left the plant of the manufacturer." 395 So. 2d at 1229. Here, West Boca has alleged that opioids are not reasonably safe for at least some of their advertised intended uses, and Defendants' misrepresentations caused doctors to prescribe them for other than their safe uses. *See* Doc. #: 385 at ¶131 ("Defendants, however, have manufactured, promoted, marketed, and distributed opioids for the management of chronic pain by misleading consumers and medical providers."). In *Labzda*, the court held that "foreseeable ***voluntary*** abuse of a non-defective product, such as alcohol, results in the legal conclusion that the proximate cause of the injury to the consumer was his ***voluntary*** abuse."[15] 292 F. Supp. 2d at 1356 (emphasis added). Similarly, in *Bruner*, the court concluded that, although there are dangers associated with the use of alcohol, "beer is not considered an 'unreasonably dangerous' product . . . because of the ***common knowledge of these dangers***." 153 F. Supp. 2d at 1360–61 (emphasis added). Here, West Boca has alleged that the "abuse" by many patients was ***not*** voluntary because patients became addicted even when taking opioids as directed and prescribed by a doctor, and as advertised by Defendants; and both the doctors and patients were intentionally misled by Defendants about the dangers of opioids that were legally and "properly" prescribed for large doses over long periods of time. *See, e.g.,* Doc. #: 385 at ¶131 (quoted above); ¶188.

---

[15] Additionally, as Broward County points out in its own opposition brief (incorporated by West Boca), *Labzda* was decided on a full record at summary judgment. Doc. #: 730 at 23 n.16. If the sole proximate cause doctrine did not preclude Labzda's claims on a motion to dismiss, there is no reason to believe dismissal is appropriate here. Causation questions are best left to a jury. *Simon*, 895 F.2d at 1316.

Accordingly, Florida's sole proximate cause doctrine does not demand dismissal of West Boca's claims.

## B. Learned Intermediary Rule

The Pharmacies also assert, in their motion to dismiss Broward County's case, that a "doctor's independent prescribing decision supersedes and breaks any causal link back to a distributor's prior shipment of the medication to a pharmacy where the patient happened to fill it." Doc. #: 582-1 at 4. The cases cited by the Pharmacies to support this assertion conclude that "[a] manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an ***adequate*** warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs." *Buckner v. Allergan Pharm., Inc.*, 400 So. 2d 820, 822 (Fla. Dist. Ct. App. 1981) (citing *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974)) (emphasis added).

Again, the Defendants' argument fails.  First, the *Buckner* court's analysis expressly turns on whether a drug manufacturer ***adequately*** warns a medical professional—precisely what West Boca alleges manufacturers did ***not*** do. Second, the same argument was expressly considered and rejected by Magistrate Judge Ruiz in the *Summit County Report and Recommendation*, and that analysis and conclusion remain applicable here. *See* Doc. #: 1025 at 29-30 ("the complaint alleges that prescribing physicians were also targets of the misrepresentations. Given these allegations, the court declines to find that the physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result.") This Court adopted this part of the *Summit County* R&R, *see* Doc. #: 1203.

The cases relied on by the Pharmacies do not purport to relieve a pharmacist—also a medical expert—from all responsibility stemming from the filling of prescriptions written by doctors. In fact, the court in *Buckner* expressly states that "Chapters 458, 465 and 500, Florida Statutes, evidences legislated public policy to rely on physicians ***and pharmacists*** to protect the consuming public from injury by product use when the product is a prescription drug." *Buckner*, 400 So. 2d at 822 n.3 (citing Fla. Stat. Ann. (1979) at §§ 500.02(1) and 500.151 (repealed)) (emphasis added). Nowhere in its opinion does the *Buckner* court extend the learned intermediary rule under Florida law to pharmacies, which was the case under Oklahoma law in the *Muscogee* case. And even in *Muscogee*, this Court concluded that the Tribes' claims against the Pharmacies, as both dispensers and distributors, would be allowed to proceed to fact discovery. *See* Doc. #: 1680 at 7-10. The same result is compelled here.

## IV. RICO

West Boca's allegations of RICO violations are similar to those alleged by other plaintiffs in this MDL. Specifically, West Boca alleges that all Defendants conducted and participated—through various acts of mail and wire fraud and violations of the Controlled Substances Act ("CSA")—in the conduct of a False Narrative Enterprise that created the opioid epidemic and injured West Boca, in violation of 18 U.S.C. § 1962(c). *See* Doc. #: 385 at ¶¶812-884. West Boca further alleges each Defendant derived income and invested the proceeds in an enterprise that injured West Boca, in violation of § 1962(a), and that each Defendant conspired with one another to do so in violation of § 1962(c). *See* Doc. #: 385 at ¶¶885-894.

Nothing in the parties' briefs convinces the Court to revisit any of its prior analysis of the applicable RICO standard. *See* Doc. ##: 1025; 1203. The question is whether and to what extent that standard should apply differently to a different type of plaintiff (a Hospital) alleging different types of injuries. In its previous orders, the Court explained that the RICO statute

should be liberally construed and should apply broadly in civil cases. *See* Doc. #: 1025 at 12 (citing *Boyle v. United States*, 556 U.S. 938, 944 (2009)); Doc. #: 1203 at 6 (citing *Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985)). The Court also explained that "RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004). RICO law has also been "interpreted to require that a private plaintiff show proximate cause in order to have standing to sue." *Id.* at 612. Thus, as before, the Court will address the Defendants' proximate cause arguments and then address their standing arguments; this time, however, the analysis involves claims by a Hospital, not a municipal entity, Indian Tribe, or third-party-payor.

**A. Proximate Cause**

Under RICO, proximate cause consists of two distinct elements: foreseeability and directness. *See Perry v. Am. Tobacco Co.*, 6914 F.3d 845, 850 (6th Cir. 2003) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992)) ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury."). Directness, in the proximate cause context, requires ***both*** an analysis of the closeness of the relationship between the asserted injury and the alleged injurious conduct, ***and*** an evaluation of public policy considerations that reflect "'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)).

As stated previously, the alleged injurious conduct of these Defendants is substantially similar to that which was alleged by Summit and Cuyahoga Counties in Track One, the first

Opiate MDL bellwether trial. West Boca's asserted injuries, however, are different. Where Summit County alleged thirteen categories of injuries,[16] West Boca asserts only three:

1. Unreimbursed charges for treatment of patients with opioid conditions. Doc. #: 385 at ¶55.

2. Increased operational costs for: (a) providing more and more-complicated care to opioid addicts, and (b) dealing with "pill seekers." Doc. #: 385 at ¶55-58.

3. Increased costs as a purchaser of opiates from Defendants. Doc. #: #: 385 at ¶¶62-63.

The Court concludes that West Boca has presented sufficient factual allegations that at least some of their asserted injuries are a foreseeable result of the Defendants' purported failures that allegedly created the opioid crisis. However, even when a causal connection is foreseeable, it is well-settled that a disconnected and efficient intervening cause may break the causal chain. *See Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193, 195 (6th Cir. 1933); *see also Tardif v. P.E.T.A.*, 829 F. Supp. 2d 1219, 1234 (M.D. Fla. 2011) ("[A] Defendant is not liable when a separate force or action is the active and efficient intervening cause, the sole proximate cause or an independent cause of the plaintiff's damages."). On the other hand, "when an intervening cause is foreseeable to the defendant, he may still be held liable." *Tardif*, 829 F. Supp. 2d at 1234.

The Manufacturer Defendants attempt to rely on the fact that West Boca is legally obligated to treat patients to conclude that, but for this purported intervening obligation, West Boca might not have been damaged at all. They assert that "applicable federal and state law defeats causation because any alleged harm to West Boca stems from these legislative public-policy decisions." Doc. #: 691-1 at 5. Thus, according to the Manufacturers, an intervening legislative public-policy decision breaks the causal chain. The Manufacturers cite no case law to

---

16 The injuries asserted by *Summit County* are listed in Doc. #: 1203 at 15-16.

support this assertion. West Boca, on the other hand, asserts that its legal obligation to treat patients actually makes it *more* foreseeable that it would be harmed by the opioid crisis. *See* Doc. #: 806 at 17-18. The Court finds West Boca's argument more persuasive. The Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, was enacted by congress in 1986 and requires hospitals to provide, at a minimum, medical screening and stabilization of every patient's medical condition prior to transfer. Doc. #: 385 at ¶41. EMTALA and related state statutes requiring hospitals to treat all patients make West Boca's injuries, if anything, a more foreseeable consequence of the Defendants' actions related to the opioid crisis. Thus, the Court concludes at least some of West Boca's asserted injuries are a foreseeable result of Defendants' alleged conduct.[17]

That the creation of an opioid crisis foreseeably led to increased costs for hospitals, however, does not end the inquiry. Under RICO law, the injury must also be a direct consequence of a Defendant's injurious conduct. No Defendant meaningfully develops any argument that either the second or third categories of West Boca's alleged damages are too tenuous to support proximate cause. The Defendants' arguments for dismissal of West Boca's RICO claims only address the first category of damages – the cost of unreimbursed medical treatment.[18]

---

[17] The foreseeability element is evaluated further in the Court's analysis of West Boca's negligence claims in Section IX below.

[18] Distributors, for example, assert that "[t]he Hospital's claimed injuries consist entirely of 'unreimbursed charges for its treatment of patients.'" Doc. #: 684-1 at 4 (citing Doc. #: 385 at ¶55) (emphasis added). This assertion is plainly inaccurate, as it identifies only the first of the three categories of alleged damages. The Defendants' failure to argue that the second and third categories of alleged damages are not a direct consequence of their conduct leaves the Court with no choice but to conclude its prior analyses in its opinions in *Summit County* and *Cleveland Bakers and Teamsters Health and Welfare Fund, et al.,* Case No. 1:18-op-45432 ("*Cleveland Bakers*"), remains valid and applicable to West Boca's claims. *See* Doc. #: 1203; *Opinion and Order Regarding Motions to Dismiss Cleveland Bakers Claims*, Doc. #: 3177. The Court concludes now, as it has before, that the Defendants' alleged behavior—false marketing and/or failure to prevent diversion—led to the opioid crisis, and the opioid crisis led to West Boca's

Regarding this first category of damages, closer scrutiny under *Holmes* is warranted. Some of the Defendants' arguments regarding the first category of damages are persuasive, and the Court has some reservations about the viability of this category of claimed damages under the applicable RICO standard.[19]

Defendants rely primarily on two cases, in which hospitals brought claims seeking damages for unreimbursed medical expenses related to tobacco use: *Association of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 702 (9th Cir. 2001), and *Allegheny Gen. Hosp. v. Philip Morris, Inc.* 228 F.3d 429, 435 (3d Cir. 2000). In both cases, the plaintiffs' claims were dismissed. However, the circuit courts analogized the plaintiffs' claims to the claims of third-party payors. After carefully reviewing and comparing the complaints of West Boca and Cleveland Bakers, Doc. #: 3031, the Court is not convinced that the claims are, in fact, similar. Thus, the third-party payor cases cited by West Boca and the Defendants may be of limited value.[20]

---

injuries. Thus, West Boca has alleged a foreseeable and sufficiently direct chain of causation to cross the plausibility threshold. *See* Doc. #: 1203 at 7-10; Doc. #: 3177 at 24-27.

The motion to dismiss standard precludes dismissal if there is any set of facts upon which relief may be available. Because West Boca has alleged a set of facts upon which relief can be granted (relief being compensation for the second and third categories of asserted injuries, for example), the Court will allow West Boca's RICO claim to survive Defendants' motions to dismiss with respect to unreimbursed medical expenses as well. But the Court expects its concerns regarding these different categories of damages, described further below, will be addressed on a more fulsome factual record at summary judgment.

19 As mentioned below, the Court's concern regarding the viability of the first category of alleged damages attaches to all of West Boca's claims, not just its RICO claims.

20 Distributors rely heavily on *International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999). *See* Doc. #: 684 at 5-6. *Brotherhood of Teamsters* is even less instructive. Where *Allegheny* and *Washington Public* are hospital cases, *Brotherhood of Teamsters* is a third-party payor case. Furthermore, all three cases arise out of the tobacco litigation. In *Brotherhood of Teamsters*, the Seventh Circuit concluded that "[t]he problem for [the third-party payor plaintiffs] is . . . that they do not deal with tobacco producers, the supposed wrongdoers." *Id.* at 827. Here, West Boca asserts that it does deal directly with "supposed-wrongdoer" opioid manufacturers.  And given the litany of other legal and factual distinctions that, in this Court's view, were not adequately briefed or were overlooked entirely, it is not clear whether or to what extent *Brotherhood of Teamsters* is applicable at all, let alone to the Distributors.

16

The factual and legal distinctions between third-party payors and hospitals are manifest. As a general matter, when West Boca provides care to a patient, West Boca becomes a creditor to that patient, who in turn owes a debt to West Boca for services rendered. It is not uncommon, therefore, for hospitals to sell patient debt to a collection agency or to bring a creditor lawsuit against the patient. It is, thus, also not surprising that courts have found medical debt is consumer debt under various statutes. *See, e.g., Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016) (Telephone Consumer Protection Act ("TCPA")); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) (Fair Debt Collection Practices Act ("FDCPA")).

This creditor-debtor relationship is factually distinct from the legal relationship that exists between a third-party payor and its members. While a hospital provides a service and then seeks compensation from the patient (regardless of whether the patient has a right to recover from a third-party tortfeasor or not), a third-party payor generally has a subrogation right to recover medical expenses from a third-party tortfeasor on its member's behalf. A hospital, so far as the Court is aware, has no analogous right; and West Boca does not argue that it does.[21] On this point, Defendants assert there is long-standing, common-law precedent that hospitals ***do not*** have

---

West Boca, on the other hand, relies heavily on *In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013). *See* Doc. #: 806 at 6-7; 12; 16; 18. Unlike the tobacco cases mentioned above, *Neurontin* is a pharmaceutical case and is noteworthy for its acceptance of aggregate evidence to prove RICO causation. While this Court has stated it will allow Plaintiffs to use aggregate evidence to attempt to prove causation in the RICO context, it is also worth noting there are important differences between *Neurontin* and the opioid cases. For example, in *Neurontin,* plaintiff Kaiser used aggregate data to link marketing activity of a *single* manufacturer's *single* drug to a *single* alleged injury (payment for off-label prescriptions) by a *single* plaintiff. The First Circuit concluded that Kaiser's regression analysis, in conjunction with other non-aggregate-data evidence, was sufficient to prove causation and not just correlation. *See Neurontin,* 712 F.3d at 46. In contrast, in the opioid litigation there are *many* manufacturers that marketed *many* different opiate drugs to *many* plaintiffs, who seek *many* types of damage. For example, opioid cases include non-marketing theories of liability against Distributors and Pharmacies, and many categories of injury that were not at issue in *Neurontin.* Ultimately, due to the more complex nature of the MDL cases, the causation analysis accepted by the First Circuit in *Neurontin* may have no application in opioid litigation.

21 West Boca does, however, argue that many states have enacted hospital lien laws, which allow hospitals to claim a portion of a legal award that an uninsured patient might receive for their accident if West Boca attaches the lien within a specified time period. Doc. #: 385 at ¶61. If anything, this heightens the Court's concern that allowing West Boca to pursue the first category of damages would lead to double recovery against the Defendants.

a direct cause of action in tort against a tortfeasor who allegedly injures the patient, even if it imposes increased costs on the hospital. Doc. #: 684-1 at 4 (citing *United Food & Commercial Workers Unions, Employers Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000)). Thus, it appears that, while a third-party payor may pursue a claim against a third-party tortfeasor who injures a patient-insured, a hospital's only claim is against the patient. Unfortunately, this distinction is not briefed by the parties or carefully drawn in the tobacco cases cited by Defendants.[22]

At least with respect to unreimbursed charges for medical treatment, this distinction places West Boca's injury at least one step further removed from the injurious conduct of the Defendants. The *Holmes* factors are thus implicated regarding the first category of West Boca's alleged damages in a way that West Boca's other alleged categories of injuries are not. In *Holmes*, the Supreme Court articulated three policy concerns that arise when an injury is not a sufficiently direct result of a defendants' conduct:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269–70 (internal citations omitted).

---

22 The Ninth Circuit, in *Washington Public*, in the factually-distinct context of tobacco litigation, acknowledges the difference between third-party payors and healthcare providers, but concludes it is immaterial. 241 F.3d at 702 ("The fact that Plaintiff Districts are health care providers rather than third party health care payers like the union trusts in *Oregon Laborers* is immaterial for purposes of RICO and antitrust standing."). The Third Circuit, in *Allegheny*, does not even draw the distinction. 228 F.3d at 435 ("Plaintiffs raise antitrust and RICO claims that are essentially identical to those the union funds raised in Steamfitters. Therefore, Steamfitters controls.").

The first *Holmes* factor is applicable to the present analysis.[23] West Boca alleges its unreimbursed costs have increased due to an increase in both: (1) hospitalizations for opioid-related injuries (e.g. overdoses) and (2) the cost of providing care for "normal" conditions exacerbated by opioid use (e.g. child-birth). West Boca asserts that instances like the latter are made more complicated and expensive when the patient has an opioid use disorder. While it is likely relatively easy to ascertain damages in the former situation—that the care provided for an opioid overdose is easily attributable to the opioid crisis—the latter situation is more complicated.

Child birth presents a good illustration of the potential difficulty. If a woman is considered a high-risk pregnancy due to advanced age or a preexisting medical condition, but is also addicted to opioids, it is not clear to the Court how it will be possible to distinguish what portion of West Boca's increased costs for those pregnancy services will be attributable to one complicating factor over any other. Nevertheless, such apportionment is rightfully the subject of expert discovery, and the Court will allow that discovery to occur.

Despite these reservations, the situation in this case is not that meaningfully different from *Summit County* and *Cleveland Bakers*. In those cases, the Court also expressed its reservations about the viability of certain categories of damages.  In each case, however, where the plaintiff had alleged at least one category of damages that set forth a plausible claim for relief, the Court declined to dismiss the entire claim. *See* Doc. #: 1203 at 15-16; Doc. #: 3177 at 35-36. The same conclusion is equally appropriate here. Therefore, the Court concludes West

---

23 Because of the overlap between proximate cause and standing with respect to RICO, the second and third *Holmes* factors are addressed in Section IV.B below.

Boca has sufficiently alleged at least one plausibly direct and foreseeable chain of causation from injurious conduct to alleged injury to survive a motion to dismiss for lack of proximate cause.

**B. Standing**

Having determined that West Boca's injures are not too far removed from Defendants' conduct, the Court turns to the standing analysis—that is, whether hospitals are the appropriate plaintiffs to bring these claims. As the Court has previously articulated:

> Title 18 of the U.S. Code, section 1964(c), has been deemed the standing provision of RICO. It provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee." 18 U.S.C. § 1964(c). The two operative portions of this section are the "business or property" limitation and the "by reason of" limitation.
>
> "The 'by reason of' limitation . . . bundles together a variety of 'judicial tools,' some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions." *Trollinger*, 370 F.3d at 613 (citing *Holmes*, 503 U.S. at 268.). As it pertains to standing, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was "derivative or passed-on" to the plaintiff by some intermediate party. *See id.* at 614.
>
> * * *
>
> Even if Plaintiffs' asserted injuries were proximately and directly caused "by reason of" Defendants' alleged injurious conduct, Plaintiffs still may not bring a RICO claim if the injuries asserted were not to their "business or property." 18 U.S.C. § 1964(c). As a general principal, "money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). It is also true that, "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906)).

Doc. #: 1203 at 10-11; 12-13.

Defendants rely heavily on *Jackson v. Sedgwick Claims Mgmt. Services*, 731 F.3d 556 (6th Cir. 2013), to argue that West Boca has not alleged any injury to any business or property, but has instead only alleged injuries that flow from the personal injuries of its patients. *See*

Doc. ##: 684-1 at 9; 691-1 at 2. However, as articulated in its *Summit County* Opinion, the Court believes *Jackson* is factually distinct from these opioid cases generally, and also disagrees with Defendants' characterization of the law as set forth by the Sixth Circuit in *Jackson*. Doc. #: 1203 at 13. It is true that *Jackson* stands for the proposition that "personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson* at 565-66. However, after carefully reviewing the facts of *Jackson* and the several cases cited therein, the Court concluded that a pecuniary loss "flows from" a personal injury "when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself." Doc. #: 1203 at 14.

Here, West Boca is in the business of providing a service. Its asserted injuries stem from (1) not being adequately compensated for the services provided, (2) the increased operational costs of providing those services, and (3) the increased cost of purchasing supplies necessary for the provision of those services, respectively. These categories of injuries are injuries to business or property. That West Boca is in the business of providing ***healthcare*** services, does not make its injuries "derivative" of personal injuries, because "[i]f any claim merely derivative of a personal injury barred RICO liability, then . . . doctors, hospitals, and any number of nonprofits directly injured in their business dealings ***involving*** personal injuries would as well. This is not how the Court interprets the holding in *Jackson*." *State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-CV-10266, 2014 WL 5427170, at *8 (E.D. Mich. Oct. 24, 2014) (emphasis added).

Furthermore, operational costs such as "capital improvement costs," "additional security costs," and "additional training and educational costs for hospital personnel," Doc. #: 806 at 34-35. (citing Doc. #: 385 at ¶¶51-58), as well as costs associated with being falsely induced to

purchase and prescribe more opioid pills than were appropriate, are direct costs to hospitals that allegedly were borne as a result of the opioid crisis itself, not simply as a result of treating injured patients. Doc. #: 806 at 7-8. As alleged, these are classic business costs.

Again, however, the Court must draw what it views as an important distinction between unreimbursed medical expenses and the other two asserted categories of injury. In the case of unpaid medical bills, it is not entirely clear that the medical expenses injury does not belong, in whole or in part, to the patients. That is, in terms of RICO law, it is not immediately apparent that West Boca's alleged injury from the provision of unreimbursed medical services was caused "by reason of" a substantive RICO violation, or instead that this particular category of injury was "passed-on" by the injured patients (specifically those patients' inability to pay for the services rendered).

As stated in the proximate cause section above, the Defendants maintain that a hospital does not have a direct cause of action in tort against a tortfeasor who allegedly injures the patient. Doc. #: 684-1 at 4 (citing *United Food*, 223 F.3d at 1274). The Third Circuit in *Allegheny Gen. Hosp.* articulated the slippery slope that forms the policy rationale behind this argument. *See Allegheny Gen. Hosp.*, 228 F.3d at 445 ("The Hospitals are dangerously close to asserting that they have standing to sue any company that causes a nonpaying patient's disease or illness."). As a general matter, the Court is concerned, as was the Third Circuit, about the precedent of allowing healthcare providers to recover the increased costs of providing care to their allegedly wrongfully-injured patients. While the opioid crisis is inarguably unlike any mass tort this country has ever faced, the Court is skeptical that it should attempt to engage in the type of line-drawing necessary to determine what type of crises a defendant would need to create in

order to give hospitals standing to sue that defendant for the unreimbursed costs of treating such a crisis, especially where individual plaintiffs are also attempting to vindicate their own rights.

In this MDL alone, there are scores of cases brought by individual parties seeking compensation for various damages, including their medical bills. If hospitals are damaged by patients not paying their medical bills, their remedy—as discussed above—should be to seek compensation from the patients who are not paying those bills. To the extent the Defendants are liable to the patients for the costs of medical bills, it ought to be the patients' responsibility to hold the Defendants liable as "private attorneys general."[24] *See Holmes*, 503 U.S. at 269-70. The Court is concerned it might be forced to establish a complicated remedial scheme to adequately apportion damages between patients and hospitals, so that Defendants will not be subject to duplicative recoveries from each. This is the exact problem about which the second and third *Holmes* factors caution, *see id.*, and, as Defendants point out, something courts in the tobacco cases nearly unanimously declined to do.

Nevertheless, West Boca asserts that reliance on prior tobacco cases as precedent for the opioid crisis is misplaced and articulates nine paragraphs of factual distinctions between their opioid case and the tobacco cases. *See* Doc. #: 806 at 19-21. While the Court is hesitant to find that hospitals have standing to bring a RICO claim for their unreimbursed medical expenses, the Court will allow the RICO claim with respect to this injury to proceed for two reasons. First, in the municipality cases, the Tribe cases, and the third-party payor case, the Court concluded it would not (***at the motion to dismiss stage***) draw distinctions between the various alleged categories of injuries. Such distinctions regarding damages are better drawn after discovery has

---

24 Interestingly, it is Defendants who assert that those patients cannot, in fact, seek compensation for their medical expenses and thus vindicate the law as private attorneys general in the interest of deterring injurious conduct. *See, e.g.*, Doc. #: 684-1 at 1 ("[T]hese victims brought claims against the prescription-opioid manufacturers . . . seeking recovery of personal-injury damages. As far as Distributors are aware, those claims all failed.").

fleshed out the factual record. Second, as West Boca carefully points out, there are a large number of factual distinctions between opioid cases and tobacco cases generally, and some of those factual distinctions may reasonably require further development. Thus, because the RICO claim is plausible on at least one theory of damages and because West Boca raises significant factual issues not suitable for resolution on a motion to dismiss, discovery will proceed as to the entire claim.

As a final thought, neither the tobacco cases cited by the parties, nor the parties' briefs, adequately draw any meaningful distinctions between hospitals' asserted injuries and those of third-party payors. The parties should have an opportunity to address the factual distinctions between hospitals, third-party payors, and municipalities with respect to the injuries alleged and with respect to the legal standard articulated by the Court. Thus, the Court concludes that West Boca has standing to bring its RICO claims against these Defendants.

## C. Other RICO Arguments

### 1. Previously Addressed RICO Arguments

Defendants make several arguments that the Court has addressed in prior orders. The Defendants assert that reporting-based violations of the CSA cannot constitute predicate acts under RICO;[25] that West Boca did not adequately plead the existence of a RICO enterprise;[26] and that West Boca failed to adequately plead an agreement sufficient to support a RICO conspiracy claim under § 1962(d).[27] The Defendants also argue that West Boca's allegations of mail and

---

[25] *See* Doc. #: 961-1 at 5.

[26] *See* Doc. #: 961-1 at 4; Doc. #: 684-1 at 11-12.

[27] *See* Doc. #: 961-1 at 7-8; Doc. #: 684-1 at 13.

wire fraud do not meet the heightened pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedures, and constitutes impermissible "group pleading."[28]

The Court has addressed the merits of each of these arguments before. *See* Doc. #: 1025 at 36-39 (existence of an enterprise), 39-48 (predicate acts), 39-42 (Rule 9(b)), 37-44 (conspiracy generally), 97-98 (conspiratorial agreement);[29] Doc. #: 1680 at 2-4 (Rule 9(b)), 4-5 (group pleading); *see also Opinion and Order Regarding Conspiracy claims*, Doc. #: 2562 (setting out an analysis of the alleged agreement between many of the same Defendants on substantially similar factual allegations); *Opinion and Order Regarding RICO claims*, Doc. #: 2580 at 2-3 (CSA violations as predicate acts), 3-6 (existence of an enterprise); *Evidentiary Order Regarding Track One Pretrial Motions*, Doc. #: 3058 at 24 (CSA violations as predicate acts).

Upon careful review of the parties' briefs, the Court concludes its prior analyses apply with equal force to the facts alleged in West Boca's complaint. Accordingly, the Court incorporates its legal analyses from the aforementioned orders and rejects the Defendants' contentions that dismissal is mandated in this action by inadequate pleading of (1) the existence of an enterprise, (2) predicate acts, (3) conspiratorial agreement,[30] or (4) Fed. R. Civ. P. 9(b)'s particularity requirement.

---

28 *See* Doc. #: 961-1 at 5; Doc. #: 684-1 at 10; Doc. #: 686-1 at 3-4. Federal Rule 9(b) is also analyzed in section VI.C below regarding West Boca's FDUTPA claims.

29 The R&R of the Magistrate Judge with respect to the analysis of these sections was adopted by the Court. *See* Doc. #: 1203.

30 It is not clear from West Boca's complaint or from briefing by the parties whether West Boca's RICO conspiracy claim under 18 U.S.C. § 1962(d) is premised solely upon its § 1962(a) claim, or whether West Boca also intended to allege a conspiracy to commit a substantive violation of § 1962(c). By the express language of paragraph 893 of the Complaint, West Boca's second cause of action appears to be premised on the § 1962(a) claim alone, which as discussed below, must be dismissed. Doc. #: 385 at ¶893 ("In violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendants, with full knowledge and purpose, conspired to violate Section 1962(a) of RICO."). However, given that (1) all parties briefed the issue as though the conspiracy claim applied to both §§ 1962(a) and (c), and (2) there appear to be sufficient allegations within the complaint addressing § 1962(c) to support a claim for conspiracy to violate that section, the Court assumes West Boca's conspiracy claim is premised upon both §1962(a) and (c). *See, e.g.,* Doc. #: 385 at ¶773.

## 2. Pharmacy Liability Under RICO

The Pharmacy Defendants assert that:

[i]f anything, Plaintiff's RICO claims against [the Pharmacies] are even more implausible than RICO claims against the other defendants. Whatever the other bellwether plaintiffs may have believed to be the merits of a RICO claim against the manufacturer or major distributor defendants, they have uniformly recognized that no such claim is feasible against the Moving Defendants. Alone among the bellwether plaintiffs, Plaintiff here asserts RICO claims against the Moving Defendants as well.

Doc. #: 686-1 at 3. The Pharmacies' argument appears to be that, since no other plaintiffs alleged RICO claims against them, West Boca's claims against them should be dismissed. This is, of course, not the legal standard for a motion to dismiss. The Court is not persuaded by what claims may or may not have been filed by other types of plaintiffs in other cases (e.g., municipal entities or Tribes), but instead must look at the plausibility of what the Plaintiff in this case actually alleged in its complaint.

The Pharmacy Defendants also assert, conclusorily, that "to whatever extent Plaintiff intended to assert claims against the Moving Defendants as pharmacies rather than as distributors, its pleading does not pass muster under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." Doc. #: 686-1 at 2. This assertion is plainly inaccurate.[31]

In its response, West Boca asserts that the Pharmacy Defendants "participated in the False Narrative conspiracy through their intentional acts designed (among other things) to conceal conspicuous anomalies in the distribution patterns of opioids, and reaped tremendous

---

31 *See, e.g.,* Doc. #: 385 at ¶155 (noting the defendants are being sued "to the extent that they are engaged in the manufacture, promotion, distribution, sale **and/or dispensing** of opioids") (emphasis added); Doc. #: 385 at ¶¶663-717 (describing in detail that the National Retail Pharmacies "business includes the distribution ***and dispensing*** of prescription opioids.").

profits in the process." Doc. #: 806 at 22-23; (citing Doc. #: 385 at ¶¶870 (alleging a common purpose); 509-514, 519-569 (alleging breach of duty to prevent diversion by Distributors); 663-707 (alleging breach of duty to prevent diversion by National Retail Pharmacies). These allegations are sufficient to state plausible claims against and provide notice to the Pharmacies as distributors and dispensers of opioids generally, and also with respect to West Boca's RICO claim as described above.

**D. Investment Injury Under 18 U.S.C. § 1962(a)**

Defendants assert that West Boca's Section 1962(a) claim fails because West Boca does not allege an injury specifically caused by any of the Defendants' investment of income obtained through racketeering activity. *See* Doc. #: 684-1 at 12-13; Doc. #: 961-1 at 67. For the reasons that follow, the Court agrees.

Section 1962(a) of RICO provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

A majority of Circuits, including the Sixth, have concluded that, "in order to state a claim under § 1962(a), a plaintiff must plead a specific injury to the plaintiff caused by the investment of income into the racketeering enterprise, distinct from any injuries caused by the predicate acts of racketeering." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994) (citing *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 494 (6th Cir.1990)); *see also Beck v. Prupis*, 529 U.S. 494, 506 n.9 (2000) (while expressing no view on the issue, noting that "most courts of appeals have adopted the so-called investment injury rule, which requires that a plaintiff suing for a

27

violation of § 1962(a) allege injury from the defendant's 'use or invest[ment]' of income derived from racketeering activity") (citing *Vemco*, 23 F.3d at 132).

When an enterprise receives the proceeds of its racketeering activity against a plaintiff, and then merely reinvests the proceeds of its racketeering activity in itself so that it can continue to operate (and presumably further injure the plaintiff via continued racketeering activity), such investment does not give rise to a § 1962(a) claim under the majority rule. This is because,

> [o]ver the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 305 (3d Cir. 1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d Cir. 1995). Thus, under the majority rule, a plaintiff may have standing under § 1962(a) in one of two ways. A plaintiff can allege that a defendant either: (1) used or invested its ill-gotten racketeering income in a separate enterprise that injured the plaintiff;[32] or (2) used for itself or invested in itself ill-gotten racketeering income from prior separate racketeering activity, thus allowing it to injure the plaintiff.[33]

---

32 *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir.2011) (reversing dismissal of § 1962(a) claim upon conclusion that defendant, Anza, defrauded the State of New York (a prior victim) out of tax revenue and subsequently invested the ill-gotten racketeering income into a new enterprise, Easton Corporation, in order to purchase property for a competing store that directly injured plaintiff, Ideal Steel).

33 *See Vemco*, 23 F.3d at 131 (distinguishing *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir.1989)). In *Newmyer*, the Sixth Circuit reversed dismissal of plaintiffs' § 1962(a) claim where "*Newmyer* plaintiffs could have been injured by the investment itself if the investment plan into which they put their money (i.e., the enterprise) was itself funded with monies from **prior** racketeering against **prior** victims" concluding that "an injury resulting from the investment of racketeering proceeds itself was possible." *Id.* (emphasis added).

The question at issue here, then, is whether any of West Boca's asserted injuries stem from some investment of the Defendants allegedly ill-gotten income. The Court concludes that, as alleged in West Boca's Complaint, they do not. West Boca expressly alleges that "Defendants, having income derived, directly or indirectly, from a pattern of racketeering, in which it participated as a principal within the meaning of l8 U.S.C. § 2, **used or invested, directly or indirectly, part of such income in itself**, an enterprise." and that West Boca "was injured . . . through the above-referenced acts of racketeering" Doc. #: 385 at ¶¶892; 894 (emphasis added). Thus, West Boca expressly asserts that the Defendants merely reinvested their allegedly ill-gotten racketeering income in themselves as enterprises and used that reinvestment to further propagate their alleged pattern of racketeering activity (false marketing and failure to prevent diversion). Under controlling Sixth Circuit precedent, these allegations are insufficient to confer standing on West Boca to assert a §1962(a) claim.  West Boca's Second Claim for Relief must be dismissed.[34]

## V. Nuisance

West Boca alleges the opioid epidemic is a public nuisance. Doc. #: 385 at ¶153. Specifically, West Boca asserts "[t]he nuisance is the over-saturation of opioids in the patient population of [West Boca] and in the geographic area served by [West Boca] . . . , as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use." Doc. #: 385 at ¶991. West Boca alleges that Defendants "substantially participated in

---

[34] West Boca attempts to rely on *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990), to support its assertion that it need not plead a distinct investment injury to bring a claim under § 1962(a).  *Busby* cannot help West Boca. The Fourth Circuit is one of the few circuits not following the majority rule, and this Court is bound to follow controlling Sixth Circuit precedent. *See Vemco*, 23 F.3d at 132.

nuisance-causing activities" through facilitating the sale of prescription opioids and failing to maintain effective controls to prevent diversion to the general public. Doc. #: 385 at ¶¶992-994.

As with RICO, many of Defendants' arguments for dismissal were raised and ruled upon in other actions in this MDL. Although most of those actions, *Summit County*, *Muscogee (Creek) Nation*, and *Blackfeet Tribe*, involve governmental entities, at least one action, *Cleveland Bakers*, was brought by a private plaintiff. Florida, like Ohio, follows the Restatement (Second) of Torts, so in order for West Boca to have standing to assert a public nuisance claim, it must assert a "special or peculiar injury to an individual different in kind and not merely in degree from the injury to the public at large." *Brown v. Fla. Chautauqua Ass'n*, 59 Fla. 447, 451 (1910); *see also Fla. Wildlife Fed'n v. State Dep't of Envtl. Regulation*, 390 So. 2d 64, 67 (Fla. 1980).

Defendants assert West Boca has not alleged any injury that is different from that suffered by the general public. In addition, Defendants also assert: (1) they lacked control over the instrumentality of the nuisance; (2) West Boca's injuries are not connected to the use and enjoyment of property; and (3) West Boca has not alleged an interference with a public right. Finally, Defendants assert their actions are protected by a Florida "Safe Harbor" law.[35]  The Court addresses each assertion below.

First, Defendants assert "West Boca's injuries are merely derivative, and, for that reason, they are not different or special, but the same as the alleged 'public' injury." Doc. #: 684-1 at 15. As described in Section IV.B. above, however—at least with respect to increased operational costs and direct purchase of excess opioid pills—West Boca has alleged concrete economic costs, unique to hospital entities, that are different than the alleged interference with human

---

[35] Defendants also assert West Boca has not sufficiently alleged the Defendants proximately caused the alleged injuries. Causation is addressed in multiple locations throughout this opinion and the Court found it was alleged sufficiently in each instance. *See, e.g.,* Sections III. IV.A; and VI.C.2. For the same reasons, it is alleged sufficiently here.

health outcomes suffered by the general public as a result of the opioid crisis. Therefore, as in *Cleveland Bakers*, and subject to the Court's prior analysis that the unreimbursed costs of medical care may not be West Boca's injury to assert, the Court concludes that "Plaintiffs have plausibly pled they sustained concrete economic losses differing in kind from the generalized injury to public health, safety, and wellness suffered by the general public as a consequence of the multi-faceted opioid crisis." Doc. #: 3177 at 43.

Next, with respect to Defendants' arguments regarding control over the instrumentality of the nuisance and interference with a public right, the Court has carefully addressed each of these arguments in prior orders and nothing in the parties' briefs here convinces the Court to revisit that analysis. *See, e.g.,* Doc. #: 1680 at 19 (concluding that "Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, or dispensing practices.") (adopting Doc. #: 1499 at 57; Doc. #: 1500 at 31); Doc. #: 1680 at 18-19 (reviewing the Restatement (Second) of Torts § 821B and concluding that "'public health' has traditionally been considered a 'public right.'") (adopting Doc. #: 1499 at 59-61 and Doc. #: 1500 at 28-30); *see also* Doc. #: 3177 at 45 (same).

Distributor Defendants also assert that nuisance law in Florida requires an interference with the use and enjoyment of property. In support of this conclusion, Distributors cite an unreported Florida circuit court decision concluding that "[p]ublic nuisance does not apply to the design, manufacture, and distribution of a lawful product." Doc. #: 591-1 at 9 (citing *Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353, at *4 (Fla. Cir. Ct. Dec. 13, 1999), aff'd, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001)). Even if the Court found this Florida trial court decision persuasive (much less precedential), the case still does not require a nuisance claim to allege interference with the use and enjoyment of land.

In response to this argument, West Boca refers the Court to *Estep v. State ex rel. Caro*, where the Florida Supreme Court concluded that "the practice of medicine by one without a license and also without learning and skill in treating the sick is a nuisance *per se*."[36] 156 Fla. 433, 434 (1945). While also not directly on point, this opinion from the state's highest court suggests that Florida allows for at least some non-property-related nuisance claims. As dictated by the Court's prior application of the *Erie* doctrine to nuisance law, West Boca's argument is better taken. *See* Doc. #: 1680 at 11-13; 16-17 (adopting and expanding on the analysis from Doc. ##: 1499; 1500). The Court concludes that Florida nuisance law does not require an interference with the use and enjoyment of property.

Finally, regarding Florida's "safe harbor," the parties implicitly agree that, to whatever extent Florida law incorporates a safe harbor provision for the manufacture, distribution, or sale of lawful products, the Court's prior analysis under Ohio law is controlling. *See* Doc. ##: 684-1 at 14-17; 686-1 at 4;[37] 691-1 at 15-17; 806 at 31-39 (each Party expressly incorporating *Summit County* briefs by reference). The Court has previously concluded under Ohio and Montana law that "'safe harbor' immunity from absolute nuisance liability is available only to those who perform in accord with their applicable licensing regulatory obligations. The Complaint alleges Defendants did not comply with the regulatory scheme, but rather violated it." Doc. #: 3177 at 47. The Court concluded in those cases, as it does here, that West Boca's complaint sufficiently

---

36 West Boca refers the Court to *Broward County's Opposition Response to the Defendants' Motions to Dismiss*. Doc. #: 703 at 17-18. Broward County cites *Estep*.

37 Pharmacy Defendants give short shrift to their own motion to dismiss West Boca's public nuisance claim. The entirety of their briefing on the issue consists of the following sentence: "The Moving Defendants' brief in *Broward County* explains why Florida law does not allow Plaintiff's nuisance claim. *See* Moving Defs. Broward County Br. 9-10." The Pharmacies' *Broward County* brief subsequently incorporates the *Summit County* brief by reference. *See* Doc. #: 582-1 at 9. Overlooking the differences in types of plaintiffs and the law of the different states at issue in these cases, the Court can only assume that the Pharmacies accept the Court's analysis in *Summit County* as applicable to its motion to dismiss West Boca's claims.

pleads conduct that is incompatible with defendants' statutory authority and that the nuisance claim is therefore viable.[38] *See* Doc. #: 3177 at 46-47 (citing Doc. #: 1680 at 17-18, concurring with the analysis of Doc. #: 1500 at 26-28). Accordingly, the Court concludes West Boca has sufficiently alleged an actionable public nuisance claim.

## VI. Florida's Deceptive and Unfair Trade Practices Act

### A. Plaintiff's FDUTPA Claims Against All Defendants

West Boca's Third Claim for Relief alleges each Defendant engaged in "unfair or deceptive acts or practices" in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, *et seq*. (2007). Doc. #: 385 at ¶¶895-913. Specifically, West Boca alleges:

> [e]ach of the Defendants have engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances ("SOMS"), as well as by failing to actually disclose such suspicious orders, as required of 'registrants' by the federal CSA, 21 C.F.R. § 1301.74(b), which is incorporated into Florida law by the FLDCA [Drug and Cosmetic Act], including Fla. Stat. § 499.0121.

Doc. #: 385 at ¶902. West Boca further asserts that Defendants' violations of the FDUTPA "offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will," thereby causing substantial injury to West Boca, and that "[b]y reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff, physicians, patients, and/or others suffered actual pecuniary damage." Doc. #: 385 at ¶903; ¶911.

Finally, West Boca alleges "the Marketing Defendants have each engaged in unfair and deceptive acts or practices in commerce in violation of the FDUTPA by actively promoting and

---

38 This conclusion is on all fours with the Court's analysis of the FDUTPA safe harbor provision in Section VI.C.a below.

marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning opioids' safety and efficacy, and downplaying or omitting the risk of addiction arising from their use." Doc. #: 385 at ¶901.

## B. FDUTPA Legal Standards

The FDUTPA is Florida's consumer-protection law. It is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §§ 501.202(2) and 501.204. A successful claim for damages under FDUTPA contains three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. *See Carriuolo v. Gen. Motors Co.,* 823 F.3d 977, 983-84 (11th Cir. 2016). The Florida legislature specifically provided that the FDUTPA "shall be construed liberally." Fla. Stat. § 501.202(2); *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC,* 315 F.Supp.3d 1291, 1307 (S.D. Fla. 2018) ("when considering whether a defendant's actions support a finding of 'unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce,' courts have regarded the concept as 'extremely broad'").

## C. FDUTPA Analysis

### 1. Pleading Requirements

Defendants assert West Boca's FDUTPA claim should be dismissed because West Boca has not pled sufficient factual allegations to support the claim. Distributors and Pharmacies assert West Boca's FDUTPA claim must meet the heightened pleading requirements under Rule 9(b)

of the Federal Rules.[39] *See* Doc. #: 684-1 at 23-25; Doc. #: 686-1 at 5. Courts in Florida are split on whether Rule 9(b) applies to FDUTPA claims. *See State Farm,* 278 F.Supp.3d at 1327-28 (S.D. Fla. 2017) (comparing cases finding that Rule 9(b) does not apply to FDUTPA claims with cases finding it does); *see also Weiss v. General Motors LLC*, 2019 WL 5394621 (S.D. Fla. Oct. 22, 2019) (following prior court decisions and holding that the requirements of Rule 9(b) do not apply to a claim under FDUTPA "[b]ecause 'FDUTPA claims seek a remedy for conduct distinct from traditional common law torts such as fraud[,]'") (citing *Harris v. Nordyne, LLC*, No. 14-cv-21884, 2014 WL 12516067, at *4 (S.D. Fla. Nov. 13, 2014)).

The Court need not analyze whether Rule 9(b) applies to West Boca's FDUTPA claims, however, because in any event the allegations within the Complaint are "sufficiently detailed to meet the requirements of Rule 9(b)." *Marty v. Anheuser-Busch Cos., LLC*, 43 F.Supp.3d 1333, 1338 (S.D. Fla. 2014). The Court has addressed similar Rule 9 arguments in its prior opinions and the same analysis applies to the allegations—and the sufficiency thereof—in West Boca's Complaint. *See, e.g.,* Doc. #: 1680 at 2-4 (finding similarly detailed allegations sufficient to meet the pleadings standard under Rule 9 because "the circumstances of the fraud [are] pled with enough specificity to put defendants on notice as to the nature of the claim.").

### 2. Standing Under the FDUTPA

West Boca alleges it is a "person" within the meaning of Section 501.203(6) of the FDUTPA. Doc. #: 385 at ¶899. Manufacturer Defendants argue that West Boca "is not a 'consumer' of any medicine sold by Manufacturer Defendants" and "does not allege facts showing that it was involved in a consumer transaction." Doc. #: 691-1 at 9; Case No. 18-op-

---

39 Rule 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

45530, Doc. #: 55 at 12.  Distributor Defendants argue West Boca doesn't allege they were involved in "trade or commerce," Doc. #: 684-1 at 24, and Pharmacy Defendants argue West Boca hasn't identified whether it purchased an opioid from any Defendant. Doc. #: 686-1 at 8. Having carefully considered each of Defendants' arguments, the Court finds that West Boca has sufficiently established it is a proper party to bring this FDUTPA action.

Prior to 2001, the FDUTPA limited the class of plaintiffs who could file suit to "consumers who have suffered a loss as a result of [the Act]." *See* Fla. Stat. § 501.211(2); *Bailey v. St Louis*, 196 So. 3d 375, 382 (Fla. 2d DCA 2016). In 2001, the Florida legislature amended the statute to replace the word "consumer" with the term "person," thereby giving non-consumers standing to sue. *See id*. A Florida appellate court has confirmed that "[t]his change indicates that the legislature no longer intended the FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.,* 169 So.3d 164, 169 (Fla. 4th DCA 2015).

This Court chooses to follow the majority of recent opinions from Florida's District Courts of Appeal concluding that, "in amending the Act, the legislature intended to give non-consumers standing." *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL 277733, at *11 (M.D. Fla., Jan. 22, 2019) (citing *Bailey*, 196 So. 3d at 383); *see also Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 869 n. 2 (Fla. 3d DCA 2016) (same); *Caribbean Cruise Line,* 169 So. 3d at 169; *Wallace v. Southern Cable Sys., LLC,* 2016 WL 9308535, at *2 (N.D. Fla. Nov. 4, 2016) (collecting cases) (the FDUTPA "is not limited to consumers, but, rather, it applies to all individuals and entities that are able to prove the three elements on a FDUTPA claim") (citations omitted); *Stewart Agency Inc., v. Arrigo Enterprises, Inc.,* 266 So.3d 207, 212 (Fla. 4th DCA 2019) ("an entity does not have to be a consumer to bring

a FDUTPA claim, but it still must prove the elements on the claim, including an injury to a consumer).

Furthermore, West Boca itself need not be involved in a "consumer transaction," because the FDUTPA is not limited to purely consumer transactions. Instead, it applies to "any act or practice occurring 'in the conduct of any . . . commerce.'" *Beacon v. Property Mgt., Inc. v. PNR, Inc.*, 890 So.2d 274, 278 (Fla. Dist. Ct. App. 2004) (citation omitted). A plaintiff need not be party to any consumer transaction to bring a FDUTPA claim. *See, e.g., BPI Sports, LLC v. Labdoor, Inc.*, 2016 WL 739652, at *5 (S.D. Fla. Feb. 25, 2016) (even though the plaintiff admitted it was not a party to any consumer transaction, the case survived a motion to dismiss and the court analyzed the remaining elements of the FDUTPA claim). Because the FDUTPA is intended to be construed liberally, applies to non-consumers, and does not require a consumer transaction between West Boca and the Defendants, the Court concludes West Boca has standing to assert its FDUTPA claim.

### 3. Allegations of Unfair and Deceptive Acts

Federal Courts in the Southern District of Florida have held that a "deceptive act" is one where a "representation, omission, or practice occurred that was likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment;" and an "unfair practice" is one that "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cox v. Porsche Fin. Serv., Inc.*, 342 F.Supp.3d 1271, 1286 (S.D. Fla. 2018) (internal citations omitted). Courts have defined "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing . . . any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Nazario v. Prof'l Account Servs., Inc.,* No. 2:16-cv-772, 2017 WL 1179917, at *4 (M.D. Fla., Mar. 30, 2017).

37

West Boca alleges that "each of the Defendants have engaged in unfair and/or deceptive trade practices" in commerce, in violation of the FDUTPA, by omitting the material fact of its failure to design and operate a SOMS, as well as by failing to actually disclose suspicious orders. Doc. #: 385 at ¶902. West Boca also alleges that "Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made material misrepresentations and omissions of facts to Plaintiff to induce it to purchase, administer, and consume opioids," and such false or misleading statements violate the FDUTPA. Doc. #: 385 at ¶¶905-06. Each Defendant argues that West Boca cannot meet the first element of proving an FDUTPA claim because it failed to properly plead a "deceptive act."

### A. Marketing Defendants

West Boca alleges the Marketing Defendants have each engaged in unfair and deceptive acts or practices in commerce by actively promoting and marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning opioids' safety and efficacy, and downplaying or omitting the risk of addiction arising from their use. Doc. #: 385 at ¶901.

Marketing Defendants argue that Florida law provides a "safe harbor" from FDUTPA claims, which they fall within: FDUTPA does not apply to any "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). Manufacturer Defendants bear the burden of establishing the applicability of the safe-harbor provision in a FDUTPA claim, and must show that a specific federal or state law affirmatively authorized it to engage in the conduct alleged. *Anheuser-Busch Cos.*, 43 F.Supp.3d at 1343 (citing *Florida v. Tenet Healthcare Corp.*, 420 F.Supp.2d 1288, 1310 (S.D. Fla. 2005)). Manufacturer Defendants argue that, since "the FDA has approved most of the ER/LA [extended release / long-acting] opioid medications at issue here for the treatment of chronic pain and Florida law authorizes such use of

38

opioids," the safe-harbor provisions of the FDUTPA apply and West Boca's claim must fail. Doc. #: 691-1 at 9.

West Boca alleges Manufacturer Defendants' misrepresentations and omissions regarding the risk of opioid use fall into nine "categories of falsehoods," which include misrepresentations regarding: (i) addiction risk; (ii) ease of withdrawal; and (iii) improved patient functionality with long-term use. *See* Doc. #: 385 at ¶¶146–317. West Boca argues these misrepresentations and omissions are not based on any of the Manufacturer Defendants' proffered "FDA determinations about opioid safety and effectiveness," and thus are not "specifically permitted by federal or state law." Doc. #: 806 at 65-66. West Boca concludes therefore, that the safe-harbor provision does not apply.

The Court finds that the Manufacturer Defendants' have not met their burden. The Manufacturers do not provide unambiguous evidence showing that their methods of promoting and marketing opioids remained within the parameters specifically authorized by state or federal law. *See* Case No. 18-op-45530, Doc. #: 55 at 17.[40] The Manufacturer Defendants have not established that the safe-harbor provision of the FDUTPA applies to their challenged conduct as a matter of law, and the FDUTPA claim will not be dismissed on this ground. *See Prohias v. AstraZeneca Pharmaceuticals, L.P.*, 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (the moving party in an FDUTPA case must "demonstrate that a specific federal or state law affirmatively authorized it to engage in the conduct alleged in the Complaints").

---

40 For instance, Manufacturer Defendants fail to address the myriad factual allegations set forth by Plaintiff regarding false and misleading statements made in marketing the use of opioids for indications not approved. *See* Doc. #: 806 at 77-78.

### B. Supply Chain Defendants

West Boca alleges that Distributor and Pharmacy Defendants "knowingly made material misrepresentations and omissions of facts to Plaintiff to induce it to purchase, administer, and consume opioids," and "engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a SOMS, and by failing to actually disclose such suspicious orders," as required under the CSA. Doc. #: 385 at ¶¶902; 905; 906.

### i. Deceiving Customers

Distributor Defendants argue the Complaint is "entirely devoid" of any allegation that West Boca, "let alone any consumer – was likely to be deceived by Distributors' alleged omission and reporting failures." Doc. #: 684-1 at 25. West Boca's Complaint, however, specifically contains allegations that "Defendants recklessly disregarded the falsity of their representations and omissions," intending that West Boca and others would rely upon them, and "[b]y reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff, physicians, patients, and/or others suffered actual pecuniary damage." Doc. #: 385 at ¶¶908-911. More specifically, West Boca alleges "Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under federal law [to report and halt suspicious orders of opioids] and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties." Doc. #: 385 at ¶649. At this stage, it is sufficient that West Boca plausibly alleges the public was misled; whether West Boca, regulators, or the public was actually deceived by the alleged false statements is a factual question not properly resolved in a motion to dismiss. *See Schojan v. Papa John's Int'l., Inc.,* 2014 WL 6886041, at *6 (M.D. Fla., Dec. 8, 2014) (denying defendant's motion to dismiss because "[w]hether particular conduct constitutes an unfair or deceptive trade practice is a question of fact"). Therefore, West Boca has properly

40

pled that the Distributors' failure to report suspicious orders could plausibly have deceived it and/or the public.[41]

### ii. CSA Violations: Actionable under the FDUTPA

Distributor Defendants assert that violations of the CSA cannot serve as a predicate for an FDUTPA claim because the CSA does not proscribe "unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," and any CSA violation did not occur in the conduct of "trade or commerce." Doc. #: 684-1 at 24-25.[42] Distributor and Pharmacy Defendants argue for dismissal, claiming "the only deceptive or unfair act or practice asserted against [Pharmacy Defendants] is a supposed failure to disclose alleged noncompliance with [CSA] regulatory reporting requirements." *See e.g.* Doc. #: 825 at 13.

West Boca incorporates by reference arguments made by Broward County in its opposition to Defendants' motions to dismiss its FDUTPA Claim – that is, the CSA is considered a consumer protection law. In its opposition, Broward County asserts that "[t]he FDCA, which incorporates the CSA, proscribes deceptive and unfair practices, as its purpose is 'to protect the public health, safety, and welfare' [of consumers]."[43] Doc. #: 730 at 47. Broward County further asserts that the Defendants' failure to operate a system to disclose suspicious orders of controlled substances "offends established public policy," and is therefore actionable under the FDUTPA. Doc. #: 730 at 47-48.

---

41 As it relates to reporting requirements, Pharmacy Defendants argue that Plaintiff is asking the Court to "read FDUTPA to impose a duty on every business in Florida to inform all government entities of noncompliance with any regulation … even when the regulation creates no duty to that government entity ***and no consumer has been misled***." (Emphasis added.) Of course, that is not what Plaintiff actually argues.

42 Distributor Defendants also argue these CSA allegations do not meet the Rule 9(b) heightened pleading requirement, see Doc. #: 684 at 24, but for the reasons discussed above, the Court finds Plaintiff's allegations are sufficient under Rule 9(b).

43 "FDCA" is the Florida Drug and Cosmetic Act, Florida Statutes, Title XXXIII, Chapter 499, *et seq.*

Whether violations of the CSA serve as an appropriate predicate is not dispositive of West Boca's FDUTPA claim.[44] The Court finds that West Boca has plausibly alleged "unconscionable, deceptive, or unfair acts or practices" by Distributor Defendants other than those acts that allegedly violate the CSA. Fla. Stat. §§ 501.202(2) and 501.204. One such allegation reads: "members of the supply chain joined and conspired in the false and deceptive marketing of prescription opioids, which was designed dramatically to increase the demand for and sale of opioids and opioid prescriptions." Doc. #: 385 at ¶14; *see also* Doc. #: 385 at Section XV (alleging facts pertaining to substantive RICO violations, including mail and wire fraud). West Boca also alleges that, while conducting these activities, "[a]ll Defendants engaged in '[t]rade or commerce' within the meaning of Fla. Stat. § 501.203(8)." Doc. #: 385 at ¶900. The Court finds that West Boca has sufficiently alleged unfair or deceptive acts against each of the Defendants.

### C. Causation

Section 501.211(2) of the FDUTPA provides that a "person who has suffered a loss as a result of a violation [of the statute] may recover actual damages." To prove the causation element of a consumer claim under the FDUTPA, West Boca must show that "the practice was likely to

---

44 Although the Court declines to decide whether violations of the CSA constitute predicate acts under the FDUTPA, the Court makes the following observations.  When the CSA was amended in 2008 to prohibit the distribution of controlled substances over the internet, the amendment was titled the "Ryan Haight Online Pharmacy Consumer Protection Act of 2008," presumably indicating its consumer protection goals. *See* 21 U.S.C.A. §§ 829(e)(1), 841(h). Furthermore, this Court has previously ruled on the significance of Defendants' duties under the CSA. In Track One, this Court articulated that Section 1301.74 of the CSA is a regulation promulgated pursuant to Congressional authority and has the full force and effect of law. *See* Doc. #: 2483 at 15. The Court also observed that one goal of the CSA is to protect the "public interest" by regulating the "manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. §§ 821 and 823. Still further, Section 1301.74 imposes a legal duty on registrants to design and operate a SOMS, and to inform the DEA of suspicious orders when discovered by the registrants. Doc. #: 2483 at 15. Finally, the Court ruled that, as part of their duty to maintain effective controls against diversion, registrants under the CSA have a duty not to ship suspicious orders. Doc. #: 2483 at 18. That is, the CSA creates a duty not to put a suspicious order into the stream of commerce where the opioids will be used *by consumers*, absent due diligence.

deceive a consumer acting reasonably in the same circumstances." *Office of Attorney Gen. v. Bilotti*, 267 So.3d 1, 3 (Fla. 4th DCA 2019) (citation omitted). West Boca "need not prove reliance on the allegedly false statement . . . but rather a plaintiff must simply prove that an objectively reasonable person would have been deceived." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 3691 F.App'x 565, 567 (11th Cir. 2009); *see Lombardo v. Johnson & Johnson Consumer Cos. Inc.,* 124 F.Supp.3d 1283, 1290 (citation omitted). Nonetheless, "causation must be direct, rather than remote or speculative." *Lombardo*, 124 F.Supp.3d at 1290 (citation omitted).

Defendants each argue that West Boca has not sufficiently pled the existence of an actionable misrepresentation or omission which would establish causation. (*See* Doc. #: 691-1 at 16; Doc. #: 684-1 at 12-13; Doc. #: 686-1 at 8 (incorporating Doc. #: 582-1 at 3-5). In response, West Boca asserts that Defendants deceived not only regulators, but also the general public. West Boca alleges that "[p]ublic statements by the [Manufacturer and Distributor] Defendants and their associates created the false and misleading impression to regulators, prescribers, ***and the public*** that the Defendants rigorously carried out their legal duties . . . and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact." Doc. #: 385 at ¶616 (emphasis added). Furthermore, West Boca alleges that, "[i]n addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook ***to fraudulently convince the public*** that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic." Doc. #: 385 at ¶655 (emphasis added). Lastly, West Boca alleges that Supply Chain

Defendants, which include the Pharmacies, had unlawful "policies and practices [which] remained in place even as the [opioid] epidemic raged," Doc. #: 385 at ¶676, and that "members of the supply chain joined and conspired in the false and deceptive marketing of prescription opioids, which was designed dramatically to increase the demand for and sale of opioids and opioid prescriptions" to the medical community and the public. Doc. #: 385 at ¶14.

The Court concludes West Boca has plausibly alleged that deceptive practices undertaken by all Defendants worked to deceive both regulators and the public, including West Boca, in a manner specifically designed to increase the Defendants' ability to manufacture, distribute, and sell more prescription opioids. The resultant increase in Defendants' commercial transactions were allegedly legitimized by Defendants' deceptive practices, and created the opioid epidemic which injured West Boca. This causal chain is consistent with that described elsewhere in this opinion and the Court's prior opinions. *See* Sec. IV.A., *infra*; Doc. ##: 1203; 3177. Therefore, West Boca has plausibly alleged that actions taken by each Defendant were objectively likely to deceive a reasonable person and caused West Boca's asserted injuries. Defendants' Motions to Dismiss on this ground are denied.[45]

### 4. Actual Damages

The FDUTPA provides that, "[i]n any action brought by a person who has suffered a loss as a result of a violation of [the Act], such person may recover actual damages, plus attorney's fees and court costs." § 501.211(2). Actual damages are limited to compensatory damages; consequential damages are not available under the Act. *Dorestin v. Hollywood Imports, Inc.,* 45 So.3d 819 (Fla. 4th DCA 2010). In addition, the FDUTPA affords civil private causes of action

---

45 Of course, the Court's determination does not mean Plaintiff will ultimately prevail or that the Court agrees with any or all of the theories advanced by Plaintiff. Rather, the court finds only that Plaintiff has alleged facts necessary to withstand a motion to dismiss and will now have the opportunity to pursue, and the burden to prove, its claims.

for equitable relief in the form of a declaratory judgment or an injunction. *See Nazario,* 2017 WL 1179917, at *4.

First, Defendants insists West Boca hasn't alleged "actual damages" cognizable under Section 501.207(1) of the FDUTPA, arguing damages are defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *See, e.g.,* Doc. #: 582-1 at 14 (incorporated by reference). While this is true, "the inclusion of diminished value as an actual damage under the FDUTPA is ***an addition*** to those damages that are already easily recognized as actual damages," that is, the "amounts necessary to compensate adequately an injured party for losses sustained as the result of a defendant's wrongful or negligent actions." *See Diamond v. Porsche Cars N. Am., Inc.,* 2012 WL 6837916, at *4-5 (Cir. Ct. Fla. Sept. 28, 2012) (citation omitted).  West Boca has alleged adequately these other types of compensatory damages.

Defendants also argue West Boca has not alleged a cognizable damages claim because "its purported damages arise from personal injuries." *See, e.g.* Doc. #: 684-1 at 26. The Court concluded above, in Section IV.B., that West Boca's being in the business of providing healthcare services, does not make its injuries "derivative" of personal injuries.

Defendants make additional arguments, but the Court need not undertake an itemized evaluation of the validity of each type of claimed damages on a motion to dismiss, so long as some alleged damages are sufficient to support West Boca's claim. It remains West Boca's burden to prove at trial that the damages presented are actual, quantifiable damages. *See State Farm,* 315 F.Supp.3d at 1311 ("[a]ll questions regarding the reasonableness and quantification of damages are generally issues of fact…[and] should be left to the jury") (citation omitted). But

West Boca's pleading of alleged damages is sufficient. Defendants' Motions to Dismiss are denied on these grounds.

### 5. Equitable Relief

Regardless of whether a plaintiff can recover "actual damages" under Section 501.211(2), it may obtain injunctive relief under Section 501.211(1). *See Ahearn v. Mayo Clinic*, 180 So.3d 165, 172 (1st DCA Fla. 2015) (citation omitted). To state a claim for equitable relief, West Boca "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." Fla. Stat. § 501.211(1); *Stewart Agency, Inc,* 266 So.3d at 214. The equitable relief available under FDUTPA is limited to a declaratory judgment or an injunction. Fla. Stat. § 501.211.

West Boca has asked the Court for "equitable relief, including injunctive relief," alleging specific examples of how West Boca "continues to suffer from the unlawful actions by the Defendants." *See* Doc. #: 385 at ¶¶10; 748; 769. Defendants do not specifically address West Boca's requests for equitable relief. Absent briefing to the contrary, the Court concludes West Boca has shown "a sufficient likelihood that [it] will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.,* 733 F.3d 1323, 1328-29 (11th Cir. 2013). West Boca may seek equitable relief under the FDUTPA.

### VII. Misleading Advertising

In its Fourth Claim for Relief, West Boca alleges the Marketing Defendants "engaged in misleading advertising in the conduct of a business, trade or commerce" in Florida, "deceiving the public about the efficacy and safety of opioid pharmaceuticals" in violation of Fla. Stat. § 817.41. Doc. #: 385 at ¶¶915, 917-18. "Misleading advertising" is defined by Section 817.40(5) as:

any statements made, or in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or thorough the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, or selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

Fla. Stat. § 817.40(5).

To prove misleading advertising under Florida law, a plaintiff must "prove reliance on the alleged misleading advertising, as well as each of the other elements of the common law tort of fraud in the inducement." *Koens v. Royal Caribbean Cruises, Ltd.*, 774 F.Supp.2d 1215, 1220 (S.D. Fla. 2011) (citation omitted).

West Boca alleges Marketing Defendants' advertising was misleading in the following ways:

  a. Misrepresenting the truth about how opioids lead to addiction;

  b. Misrepresenting that opioids improve function;

  c. Misrepresenting that addiction risk can be managed;

  d. Misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

  e. Falsely claiming that withdrawal is simply managed;

  f. Misrepresenting that increased doses pose no significant additional risks;

  g. Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

Doc. #: 385 at ¶919.

Marketing Defendants argue West Boca has failed to allege any false or misleading statement and failed to allege it was exposed to, and relied upon, any alleged misrepresentation

by Marketing Defendants.[46] Doc. #: 691-1 at 11. But this is plainly incorrect.  West Boca identifies specific examples of allegedly-misleading statements made by Marketing Defendants, setting forth nine "falsehoods" Marketing Defendants promoted to increase the market for opioids. *See* Doc. #: 385 at ¶¶155-327. West Boca also identifies the "multiple channels" Marketing Defendants used to disseminate these allegedly misleading statements. *See* Doc. #: 385 at ¶¶328-480. In fact, West Boca dedicates over 300 paragraphs of its Complaint to specifically identifying documents or statements it believes were misleading, the source of the statements, the various methods used to disseminate the statements, and when and to whom the statements were made. *See* Doc. #: 385 at ¶¶155-480.[47] *See also Doria v. Royal Caribbean Cruises, Ltd.,* 393 F.Supp.3d 1141, 1145 (S.D. Fla. 2019) (finding plaintiff's allegations met the heightened pleading standard of Rule 9(b), as it provided the statements alleged to be misleading or false, the sources of the misleading materials, and identified when the misleading statements were made.) The Court has previously concluded that, "where multiple defendants are alleged to have engaged in the same pattern of conduct," a plaintiff need not "reiterate its allegations against each defendant individually." Doc. #: 1499 at 25-26 (adopted by Doc. #: 1680 at 5). "Such a finding would exponentially increase the length of pleadings while adding no substantive value." Doc. #: 1499 at 26. West Boca's allegations are sufficient, even under the heightened pleading standard of Rule 9.

---

46 Marketing Defendants also argue Plaintiff's allegations do not meet the heightened pleading requirement of Rule 9(b). Doc. #: 691-1 at 11.

47 For example, in paragraph 192, Plaintiff identifies a 2009 patient education publication entitled "*Pain: Opioid Therapy*," funded by Endo and posted online, that omitted the term "addiction" from the list of "common risks" of opioid use. This allegation identifies the document, the source of the statement, the methods used to disseminate the statement, and the date and intended audience of the statement.

West Boca has also sufficiently alleged throughout its Complaint that it relied upon Marketing Defendants' allegedly misleading advertisements. Accordingly, this Court finds that West Boca has stated a claim for Misleading Advertising, and Marketing Defendants' Motion to Dismiss is denied on this ground.

### VIII. Breach of Implied Warranty of Fitness For a Particular Purpose

West Boca alleges each Defendant breached implied warranties of fitness for a particular purpose, in violation of Fla. Stat. Ann. §§ 672.315 (the "Florida UCC").[48] Doc. #: 385 at ¶¶922-928. West Boca alleges Defendants knew or had reason to know that: (i) West Boca was purchasing opioids "for a particular purpose, namely to provide pain relief in an appropriate way that did not unnecessarily endanger its patients if the opioids were used as sold and marketed by Defendants,;" and (ii) "[t]he opioids that Plaintiff purchased were not suitable for the particular purpose for which Plaintiff purchased them." West Boca claims it suffered damages as a result of justifiably relying upon Defendants' "skill, judgment and narrative to provide opioids that were suitable." Doc. #: 385 at ¶¶924-28.

However, West Boca's opposition brief is entirely devoid of any factual statements or legal arguments regarding a breach of warranty. Doc. #: 806. As Defendants correctly argue, a plaintiff abandons its claims by failing to raise them in its brief opposing a defendant's motion to dismiss. *See, e.g.* Doc. #: 55 at 14 (citing *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007)). Therefore, the Court finds that West Boca has abandoned its breach of implied warranty claim. Defendants' Motions to Dismiss Count V are granted.[49]

---

[48] Plaintiff purportedly also brought this claim under "Section 672.11," but there is no such section within the Florida UCC.

[49] Confusingly, in *Plaintiff's Reply in Support of its Second Notice*, Doc. #: 2705, West Boca states it "had also asserted a claim for breach of implied warranty of *merchantability*, but that claim was withdrawn." Case No. 1:18-op-45530, Doc. #: 62 at n.3 (emphasis added). Although Florida law does recognize a separate claim for breach of

## IX. Negligence

West Boca asserts five variations of negligence claims: Negligence (Count VI); Wanton Negligence (Count VII); Negligence Per Se (Count VIII); Negligent Marketing (Count IX); and, Negligent Distribution (Count X). The Court examines each claim separately.

### A. Common-Law Negligence

There are four elements to a common-law negligence claim under Florida law: (1) a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risk; (2) breach of that duty; (3) a reasonably close causal connection between the conduct and the resulting injury, or "proximate cause;" and (4) damages. *See Clay Elec. Co-op., Inc. v. Johns*on, 873 So. 2d 1182, 1185 (Fla. 2003). In its Sixth Claim for Relief, West Boca alleges each Defendant breached "its duty to exercise reasonable care in the manufacturing, marketing, selling, and distributing of highly dangerous opioid drugs." Doc. #: 385 at ¶¶930-931. West Boca further alleges that, "[a]s a proximate result, Defendants have caused Plaintiff's injury related to the treatment of opioid-related conditions." Doc. #: 385 at ¶¶933. Defendants only challenge the sufficiency of the allegations with respect to the duty of care.[50] *See* Doc. #: 691-1 at 14-15; Doc. #: 684-1[51] at 19-20; Doc. #: 686-1 at 4.

---

implied warranty of merchantability, Fla. Stat. § 672.314, the Court is not aware that Plaintiff ever alleged that cause of action. Further, West Boca does not cite to any document purporting to withdraw this (or any) claim. Thus, for clarification, the Court hereby dismisses West Boca's claim for Breach of Implied Warranty of Fitness For a Particular Purpose *and*, to the extent it was ever alleged and not properly withdrawn, dismisses West Boca's Breach of Implied Warranty of Merchantability as well.

50 Defendants also challenge proximate causation generally, and those challenges are addressed elsewhere in this opinion.

51 Distributor Defendants assert they did not breach any duty of care. Breach is addressed in the Negligent Distribution section (IX.E.) below.

In Florida, "[t]he touchstone for determining whether a duty exists is 'foreseeability.' '[W]here a person's conduct is such that it creates a "foreseeable zone of risk" posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably.'" *Sewell v. Racetrac Petroleum, Inc.*, 245 So. 3d 822, 825 (Fla. Dist. Ct. App. 2017) (citing *McCain v. Florida Power Corp.*, 593 So.2d 500, 503 (Fla. 1992); *Williams v. Davis*, 974 So.2d 1052, 1056 (Fla. 2007)); *see also U.S. v. Stevens*, 994 So.2d 1062, 1066-67 (Fla. 2008). In order to determine whether a duty arises, the Florida Supreme Court has identified four sources that provide such a duty: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Clay Elec.*, 873 So. 2d at 1185 (quoting *McCain*, 593 So.2d at 503 n.2).

West Boca relies upon the general facts of this case as the source of Defendants' common-law duty. *See* Doc. #: 806 at 41-42. West Boca asserts its injuries were within the "foreseeable zone of risk" created by Defendants' manufacturing, distributing, and dispensing activities, because: (a) if not conducted with a requisite level of care, these activities could (and, in fact, did) foreseeably allow opioids to be diverted in large quantities into West Boca's service area; (b) this diversion could (and, in fact, did) foreseeably lead to widespread injury to people's health, creating a public health crisis; and (c) hospitals are necessarily and foreseeably on the "front lines" of any and all health crises. *See* Doc. #: 806 at 41 (citing Doc. #: 385 at ¶¶16-17; 47; 58; 60). West Boca alleges that, not only could the Defendants have reasonably foreseen that hospitals would bear the responsibility for treating individuals with opioid addiction, but the Defendants may have even counted on it -- West Boca alleges "defendants knew that but for West Boca's providing at least some aspect of a safety net, the number of overdose deaths and

other related health consequences arising from opioid addictions would have even been far greater than actually occurred." Doc. #: 385 at ¶19. Although this allegation will need to be proved, it is taken as true at the motion to dismiss stage.

The Court concludes West Boca's asserted injuries plausibly fall within the foreseeable zone of risk created by Defendants' manufacturing, distributing, and dispensing activities related to opioid drugs. In other words, Defendants' activities regarding these potentially dangerous and highly addictive opioid drugs create a "general threat of harm to others," and it is therefore appropriate, under Florida law, to recognize a legal duty "to ensure that the underlying threatening conduct is carried out reasonably." *Sewell*, 245 So. 3d at 825. At this stage in the case, a complaint need only set forth a plausible claim for relief and should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Trollinger.*, 370 F.3d at 615; *Krehling v. Baron*, 900 F.Supp. 1574, 1577 (M.D. Fla. 1995). Thus, the Court finds West Boca has sufficiently pled that Defendants owe it a duty of care. Defendants Motion to Dismiss Count VI is denied.

## B. Wanton Negligence Allegations Against All Defendants

In the Seventh Claim for Relief, West Boca alleges Wanton Negligence. West Boca alleges:

> Defendants conducted themselves with reckless indifference to the consequences of their acts and omissions, in that they were conscious of their conduct and were aware, from their knowledge of existing circumstances and conditions, that their conduct would inevitably result in injury to others, specifically hospitals such as Plaintiff, which would be subject to providing unreimbursed healthcare treatment to patients with opioid conditions.

Doc. #: 385 at ¶938.

Distributor Defendants argue that willful and wanton negligence is considered a "more culpable" form of misconduct than ordinary negligence, as it relates to "conduct which is more in

the nature of an intentional wrong." Distributor Defendants assert West Boca's allegations do not even support a simple negligence claim, and therefore cannot support a claim for wanton negligence. Doc. #: 684-1 at 30. Manufacturer Defendants argue that West Boca did not properly plead its negligence claim to allege Manufacturer Defendants owed it a duty of care. Doc. #: 691-1 at 14.[52]

Under Florida law, conduct rises to the level of willful and wanton misconduct when the actor has "knowledge, actual or constructive, of the likelihood that his conduct will cause injury to other persons" and this conduct "indicate[s] a reckless indifference to the rights of others." *Bell v. Circle K Stores Inc.,* No. 8:18-cv-1296, 2019 WL 5190907, at *4 (M.D. Fla. Oct. 15, 2019) (citing *Boyce v. Pi Kappa Alpha Holding Corp.,* 476 F.2d 447, 452 (5th Cir. 1973). Reckless misconduct differs from negligence in that "reckless misconduct requires a conscious choice of a course of action . . . with knowledge of the serious dangers to others involved in it or with knowledge of facts which would disclose the danger to any reasonable man." *Id.* (citing Restatement (Second) of Torts § 500).

As outlined in the RICO section of this Order, the Complaint details the alleged manner in which Defendants knowingly promoted and distributed misleading and false information in order to increase the market for prescription opioids, and willfully failed to monitor, report, or halt shipments of suspicious orders of opioids. West Boca's Complaint sets forth alarming statistics related to the opioid epidemic, further alleging each Defendant was aware of, yet

---

[52] Manufacturer Defendants also argue Plaintiff's request for punitive damages based on false advertising and wanton negligence should be stricken because "the Complaint contains only conclusory allegations plainly insufficient to justify such extraordinary relief." Doc. #: 691-1 at 20. This Court will not Strike Plaintiff's request for punitive damages, as motions to strike are disfavored and rarely granted, and the argument raised by Manufacturer Defendants is more appropriately raised at a later phase of this litigation. *See, e.g., Berene v. Nationstar Mortg. LLC,* 2016 WL 3944742, at *5 (S.D. Fla. Feb. 5, 2016), *rev'd and remanded on other grounds,* 686 F.App'x 714 (11th Cir. 2017).

ignored, these statistics. *See* Doc. #: 385 at ¶¶1-50. West Boca also alleges the Defendants' conduct "continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies," and that "Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes." Doc. #: 385 at ¶783.

The Court concludes these factual allegations, taken as true, rise to the level of reckless indifference. West Boca has adequately pled allegations against Defendants which reflect intentional misconduct and could ultimately, if proved, support a finding of wanton negligence against Defendants. Therefore, Defendants' Motion to Dismiss the wanton negligence claim is denied.

### C. Negligence Per Se Allegations Against All Defendants

In the Eighth Claim for Relief, West Boca alleges negligence per se, claiming Defendants violated their duties under the CSA by "knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the DEA." Doc. #: 385 at ¶942. West Boca also alleges "Defendants failed to comply with the FDCA" in failing "to provide effective controls and procedures to guard against diversion of controlled substances in contravention of Florida and federal law." Doc. #: 385 at ¶¶944; 948.

The Defendants argue that neither the CSA nor the FDCA establish a private right of action, so West Boca cannot pursue a negligence per se claim premised on these statutes. *See* Doc. #: 684-1 at 27-28; Doc. #: 691-1 at 14-15. The Court agrees with Defendants.

As this Court has ruled previously, "[t]he CSA was intended to protect individual members of the public from falling victim to drug misuse and abuse." *See* Doc. #: 1680 at 24; Doc. #: 3177 at 53. West Boca, a hospital system, is not an "individual member of the public" that could fall victim to drug misuse and abuse. West Boca is not an intended beneficiary of the

CSA. *See* Doc. #: 3177 at 53. Nor is West Boca the intended beneficiary of the FDCA, which was enacted to "[s]afeguard the public health and promote the public welfare by protecting the public from injury" caused by using products relating to drugs, devices and cosmetics. *See* § 499.002(1), Fla. Stat. (1993); *Fields v. Mylan Pharm's Inc.,* 751, F.Supp.2d 1257, 1259 (N.D. Fla. 2009). Furthermore, under Florida law, negligence per se cannot be premised upon a violation of the CSA or the FDCA, as there is no "evidence of a legislative intent to create a private cause of action." *Rowe v. Mentor Worldwide, LLC,* 297 F.Supp.3d 1288 (M.D. Fla. 2018).

For these reasons, West Boca has failed to state a claim for negligence per se. Defendants' Motion to Dismiss is granted, and Count VIII is dismissed.

### D. Negligent Marketing Allegations Against Marketing Defendants

In the Ninth Claim for Relief, West Boca alleges "negligent marketing" against Marketing Defendants, claiming they "marketed opioids in an improper manner" by overstating the benefits of chronic opioid therapy and opioids' superiority compared with other treatments. Doc. #: 385 at ¶973(a) and (c). West Boca alleges Marketing Defendants also mischaracterized the serious risks and adverse outcomes of opioid use, including the "serious risk of addiction, overdose and death," the difficulty of withdrawal from opioids, and West Boca contends that opioids were marketed for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence. Doc. #: 385 at ¶973(b), (d)-(e). West Boca also alleges the Marketing Defendants "knew or should have known that opioids were unreasonably dangerous and cause addiction" when used to treat chronic pain. Doc. #: 385 at ¶977.

Manufacturing Defendants argue that a claim for "negligent marketing" does not exist under Florida law and cannot serve as an independent cause of action. Doc. #: 691-1 at 14. West Boca responds that several courts in Florida have recognized negligent marketing claims.

55

However, the case law cited by West Boca does not support this argument. *See* Doc. #: 806 at 45.[53] While there is Florida case law to support "fraudulent marketing" or "negligent misrepresentation" claims against drug manufacturers, *see, e.g., Hamblen v. Davol, Inc.,* 2017 WL 6406888, at *3 (M.D. Fla. Dec. 15, 2017) (denying motion to dismiss plaintiff's negligent misrepresentation claim alleging manufacturer of hernia patch omitted information about the risks of its product), Florida courts have not yet deemed "negligent marketing" a separate cause of action.[54]

For these reasons, West Boca has failed to state a viable claim for negligent marketing. Marketing Defendants' Motion to Dismiss is granted with respect to Count IX.

**E. Negligent Distribution Allegations Against All Defendants**

In the Tenth Claim for Relief, West Boca alleges "Negligent Distribution" against all Defendants, alleging they "distributed opioids in an improper manner" when they failed to maintain effective controls against diversion of opioids, (i.e. failed to monitor, report, or stop or suspend shipments of suspicious orders).  West Boca alleges Defendants distributed and sold "opioids in a way that facilitated and encouraged their flow into the illegal, secondary market" (i.e. "knew or should have known they were distributing and selling opioids prescribed by 'pill mills.'").  Doc. #: 385 at ¶986.

---

53 For instance, West Boca's reliance on *Godelia v. Doe I*, 881 F.3d 1309 (11th Cir. 2018) is misplaced, as that Court upheld plaintiff's claim for negligent misrepresentation, and did not address whether "negligent marketing" claims exist under Florida law.

54 Further, Plaintiff indicated that it pled negligent marketing out of "an abundance of caution" and "[w]hether considered (in aggregate) as components of a single negligence count or as separate claims, there is ample authority confirming that allegations of negligence in marketing and distribution are actionable." *See* Doc. #: 806 at 44. Thus, the Court considers Count IX as essentially pleading in the alternative.  Given that Plaintiffs' other negligence claims (Counts VI and VII) survive the motions to dismiss, Count IX is unnecessary and redundant.  As noted below, the same is true for Count X.

Similar to Count IX, Manufacturing and Pharmacy Defendants argue that "negligent distribution" claims do not exist in Florida law, Doc. #: 691-1 at 14; Doc. #: 686-1 at 4. Distributor Defendants argue West Boca's negligent distribution claim "is entirely duplicative of its negligence claim," and therefore, fails. Doc. #: 684-1 at 21-22.

As with West Boca's negligent marketing claim, there is no specific case law holding that a negligent distribution claim against a pharmaceutical distributor exists under Florida law. Thus, for the same reasons as with Count IX, West Boca has failed to state a viable claim for negligent distribution.  Defendants' Motion to Dismiss is granted with respect to Count X.

## X. Unjust Enrichment

In the Twelfth Claim for Relief, West Boca alleges unjust enrichment against all Defendants, claiming "Plaintiff provided unreimbursed healthcare treatment to patients with opioid conditions that Defendants are responsible for creating," and West Boca thereby conferred a benefit on Defendants. Doc. #: 385 at ¶1006. West Boca also argues it was a "purchaser and dispenser of opioids which conferred pecuniary benefits upon the Defendants." Doc. #: 806 at 51-52; 58. West Boca alleges it would be "inequitable for Defendants to retain the benefit without payment of its value" and Defendants must disgorge their unjustly acquired profits by providing restitution to West Boca. Doc. #: 385 at ¶¶1008-11.

In Florida, the elements of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff. *See Duty Free World, Inc. v. Miami Perfume Junction, Inc*., 253 So.3d 689, 693 (Fla. 3d DCA 2018). The basis of the remedy for unjust enrichment is to provide restitution where one person has been unjustly enriched at the expense of another. *See id.* Disgorgement is an equitable remedy in

unjust enrichment actions, and is measured by the defendant's ill-gotten gains rather than the plaintiff's losses. *See, e.g., S.E.C. v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).

Defendants argue that West Boca does not plausibly allege any benefit it conferred upon the Defendants, arguing West Boca only conferred benefits upon its patients. *See* Doc. #: 691-1 at 17; Doc. #: 684-1 at 22-23. Distributors further argue that: (1) West Boca fails to allege the Distributors were aware of the benefit conferred upon them; (2) the unjust enrichment claim fails because it is duplicative, as it is based on the same alleged conduct underlying its other claims; and (3) because West Boca is obligated under both state and federal law to provide emergency medical care to indigent patients, West Boca's garnering of unreimbursed medical expenses is not unjust. *See* Doc. #: 684-1 at 22-23.

For the reasons stated in *Summit County*, *see* Doc. ##: 1025 at 91-95; 1203 at 36-38, and repeated by this Court in *Cleveland Bakers*, *see* Doc. #: 3177 at 61-63, these arguments do not persuade the Court to dismiss West Boca's unjust enrichment claim. The Ohio law of unjust enrichment parallels Florida law; accordingly, the Court's prior rulings apply here. *See City of Miami v. Bank of America Corp.*, 800 F.3d 1262, 1288 (11th Cir. 2015).

First, as in the *Summit County* case, West Boca's Complaint pleads a facially plausible unjust enrichment cause of action "on the theory that [the plaintiff] conferred a benefit upon all Defendants by alleging that they paid for the cost of harm caused by the defendant's conduct, *i.e.*, the defendants' externalities." Doc. #: 1025 at 95.[55] Furthermore, Defendants' argument that there was no direct transaction between the parties, and therefore no direct benefit conferred, does not warrant dismissal of the unjust enrichment claim under Florida law. *See, e.g., Wilson v.*

---

[55] *See also* Doc. #: 1499 at 67-68 (citing to the *Summit County* holding and denying the motion to dismiss plaintiff's unjust enrichment claim, where plaintiff paid for the costs of the harm caused by Defendants' conduct).

*EverBank, N.A.,* 77 F. Supp. 3d 1202, 1236–37 (S.D. Fla. 2015) (citing cases in the Southern District of Florida that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary); *see also Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC,* 650 F.Supp.2d 1213, 1229 (S.D.Fla. 2009) ("Whether [Defendants] did or did not receive a direct benefit from Plaintiff is a question of fact that cannot be resolved at the motion to dismiss stage.").

The Court has also addressed and rejected in its *Summit County* ruling each of the Distributor Defendants' remaining arguments. First, the Court previously ruled that allegations similar to West Boca's allegations herein—that "Defendants appreciated and knew of this benefit"—adequately supports the unjust enrichment element of knowledge in the pleading stage. *See* Doc. #: 1025 at 94. Second, the argument that West Boca's unjust enrichment claim should be dismissed as "duplicative" was rejected in *Summit County* and is expressly rejected by courts in the Southern District of Florida. *See* Doc. #: 1025 at 94-95; *In re Monat Hair Care Prods. Marketing, Sales Practices, and Prods. Liab. Litig.*, MDL No. 2841, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019) ("The general rule that 'equitable remedies are not available under Florida law when adequate legal remedies exist'…does not apply to unjust enrichment claims.") (citations omitted); *Martorella v. Deutsche Bank Nat. Trust Co.,* 931 F.Supp.2d 1218, 1227 (S.D. Fla. 2013) (finding plaintiff could "maintain an equitable unjust enrichment claim in the alternative to her legal claims against Defendants").

Finally, Distributor Defendants' argument that "there is nothing unjust" about the costs incurred by West Boca, because it was obligated to provide care to patients adversely affected by opioids, was also rejected in *Summit County. See* Doc. #: 1025 at 94 ("the complaint pleads that the costs Plaintiffs assumed 'are not part of the normal and expected costs' and that 'Defendants'

alleged wrongful acts' were not the sort to be reasonably expected"); *but see City of Miami v. Bank of America Corp.*, 800 F.3d 1262 (11th Cir. 2015) (upholding dismissal of City's unjust enrichment claim, finding it was not clear that the municipal expenditures at issue are "among the types of benefits that can be recovered by unjust enrichment under Florida law").

For these reasons, Defendants' Motion to Dismiss West Boca's unjust enrichment claim is denied.

### XI. Conclusion

Accordingly, Defendants' Motions to Dismiss are **DENIED** with respect to Counts I (RICO § 1962(c)); II (RICO § 1962(d)); III (FDUTPA); IV (Misleading Advertising); VI (Negligence); VII (Wanton Negligence); XI (Nuisance); and XII (Unjust Enrichment).

Defendants' Motions to Dismiss are **GRANTED** with respect to Counts II (RICO § 1962(a)); V (Breach of Implied Warranty); VIII (Negligence Per Se); IX (Negligent Marketing); and X (Negligent Distribution).

**IT IS SO ORDERED.**

 /s/ Dan Aaron Polster  April 3, 2020
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**