1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION

3               - - - - -

4

5  IN RE:  NATIONAL PRESCRIPTION   )
                         ) Case No. 1:17MD2804
6  OPIATE LITIGATION          )
                         )
7  Track 1B Cases            )

8               - - - - -

9

10    TRANSCRIPT OF PROCEEDINGS VIA TELECONFERENCE

11  BEFORE THE HONORABLE JUDGE DAN A. POLSTER, JUDGE

12   OF SAID COURT, ON TUESDAY, APRIL 28TH, 2020,

13      COMMENCING AT 2:30 O'CLOCK P.M.

14             - - - - -

15

16

17

18  Court Reporter:         GEORGE J. STAIDUHAR
                      801 W. SUPERIOR AVE.,
19                     SUITE 7-184
                      CLEVELAND, OHIO 44113
20                     (216) 357-7128

21

22

23

24

25

1              P R O C E E D I N G S

2              MS. RUCKI:  Hi Everyone.  This is Molly.

3              I am going to start checking folks in using

4    first names if that's easier.

5              Starting with the Plaintiff and for Cuyahoga

6    County, we do have Hunter?

7              (No response.)

8              MS. RUCKI:  Salvatore?

9              MR. BADALA:  Yes.  Good afternoon.

10             MS. RUCKI:  Frank?

11             MR. GALLUCCI:  Yes.  Yes, good afternoon.

12             MS. RUCKI:  Brendan.

13             (No response.)

14             MS. RUCKI:  Greg?  Do we have Deborah from

15    Summit?  Or Linda?

16             MS. SINGER:  Linda is here.

17             MS. RUCKI:  Donald?  Do we have Mark?  All

18    right.

19             For Defendants, Walgreens first.

20             MR. SHKOLNIK:  I'm sorry, Hunter Shkolnik is

21    here.  I didn't hear.

22             MS. RUCKI:  Okay.  Thanks.

23             MR. WEINBERGER:  And Pete Weinberger is on.

24             MR. MIGLIORI:  And Don Migliori for Summit.

25             MR. RICE:  And Joe Rice is on.

1          MS. RUCKI:  Okay.

2          MR. FARRELL:  And Paul Farrell.

3          MR. LANIER:  And Mark Lanier and Paul

4     Stanley.

5          MR. RAFFERTY:  And Troy Rafferty.

6          MS. RUCKI:  All right.  Back to Defendants.

7     Kaspar.

8          MR. STOFFELMAYR:  Yes, I am on.

9          MS. RUCKI:  Michael Freeman?

10         MR. FREEMAN:  Here.

11         MS. SWIFT:  And Kate Swift is on as well.  I

12    didn't hear you call my name.  Apologies.

13         MS. RUCKI:  For CVS, we have Eric?

14         MR. DELINSKY:  Yes, I'm here.  Sasha.

15         MS. MILLER:  Yes, I'm here.

16         MS. RUCKI:  Graeme.

17         MR. BUSH:  Here.

18         THE COURT:  All right.  Dan Polster calling

19    in.

20         MS. RUCKI:  Hi, Judge.  I am just checking

21    everyone in to make sure everyone is here.

22         From CVS, we have Elizabeth?

23         MS. FERGUSON:  Yes, I'm sorry.

24         MS. RUCKI:  Giant Eagle, Robert?

25         MR. BARNES:  Here.

1          MS. RUCKI:  Josh?

2              (No response).

3          MS. RUCKI:  Do we have David Ross.

4          MR. ROSS:  Yes, I'm here.

5          MS. RUCKI:  Drug Mart, Tim and Tom?

6          MR. McCONNELL:  Tom is here.

7          MR. JOHNSON:  I'm here.

8          MS. RUCKI:  For Rite Aid, we have Kelly.

9          MS. MOORE:  Yes.

10         MS. RUCKI:  John Lavelle.

11         MR. LaVELLE:  John Lavelle is here, yes.

12         MS. RUCKI:  Greg.

13         MR. FOUTS:  Yes, here.

14         MS. RUCKI:  Ron.

15         MR. CHIMA:  Yes, here.

16         MS. RUCKI:  Okay.  For Wal-Mart, we have

17    Tina.

18         MS. TABACCHI:  Yes.

19         MS. RUCKI:  Tara.

20         MS. FUMERTON:  Yes.

21         MS. RUCKI:  And Kerri.

22         MS. RUTTENBERG:  Yes.

23         MS. RUCKI:  Do we have the court reporter?

24         COURT REPORTER:  Yes, I'm here.  George.

25         MS. RUCKI:  Okay.

1                 MS. MATZ:  Deb Matz.

2                 MS. RUCKI:  Thank you.

3                 MR. KORBIN:  Josh Korbin.

4                 MS. RUCKI:  David Cohen, are you there?

5                 (Pause.)

6                 SPECIAL MASTER COHEN:  Hi, Molly.  Sorry, I

7     am here.

8                 MS. RUCKI:  Great.  All right, Judge, seems

9     like we have everyone.

10                THE COURT:  All right.  Is Judge Ruiz on?

11                MS. RUCKI:  Yes, he is here.

12                MAGISTRATE JUDGE RUIZ:  Yes, I am.

13                THE COURT:  All right.  This is MDL 2804,

14    the opioid MDL, particularly the case against the

15    pharmacies, Track 1B.

16                The Court has reviewed the various filings

17    that have come in over the last few days.  I want to say

18    this at the outset:  It was my plan and intent to have

19    one pharmacy bellwether trial.

20                It makes sense to the MDL Judge to be the

21    one who conducts the first bellwether trial.  I had set

22    one for the pharmacies, Track 1B, Summit and Cuyahoga

23    County as the Plaintiffs.

24                I knew it was somewhat unusual to allow

25    complaints to be amended to add dispensing claims, but I

1    thought it was far more efficient for the Plaintiffs,

2    certainly the Defendants, and the Court to have one

3    bellwether case against the pharmacies, having all of the

4    claims, distributing claims and dispensing claims.

5              Pharmacies filed a Mandamus action that the

6    Court of Appeals ruled that it was wrong for me to allow

7    the belated -- amending the claims to add -- amending the

8    complaints to add the dispensing claims.

9              But the pharmacies should have realized that

10   what they were doing was giving that decision to the

11   Plaintiffs, whether or not to go forward with Track 1B

12   with the distribution claims alone or to just drop the

13   distribution claims and ask the Court to set a bellwether

14   trial with everything.  Plaintiff opted to go forward

15   with the distribution claims alone.

16             So that's what we are going to try in

17   November, but the pharmacies should have realized that I

18   was going to set a bellwether case involving the

19   dispensing claims, and I can only set a bellwether case

20   in the Northern District of Ohio.

21             So that's why I suggested that the parties

22   confer and see if they could come up with one.

23             The Plaintiff had suggested Lake County and

24   Trumbull County, counties.  They seemed as good as any to

25   me, but I don't really care.  If the Defendants thought

1    that some other counties in the Northern District would

2    be better, I would certainly listen to them.

3              The Defendants had suggested a county in

4    Georgia, and they are not waiving Lexicon, so obviously,

5    I couldn't do that.  I can't try a case in Georgia

6    without the parties' consent.  I can only try a case in

7    the Northern District of Ohio.

8              So we will just try Trumbull County and Lake

9    County, and the Defendants objected to my structuring the

10   case.  I didn't structure the case.  The case was already

11   structured against the pharmacies and public nuisance

12   alone.

13             So I said, well, we will do the same thing.

14   So that's what we will do.  We will end up with two

15   bellwether trials.  November of 2020 will be the

16   distribution claims alone, Plaintiff Summit County,

17   Cuyahoga County, and in May of 2021, we will have

18   Lake County and Trumbull counties against the same

19   pharmacies, and we will have distribution claims and

20   dispensing claims.

21             So I am going to direct the parties to meet

22   and confer and come up with a litigating schedule.  You

23   can use the model of Track 1B, which I had given people a

24   year in advance to do, so you can pretty much plug in the

25   dates.  We will have a four-week trial in May of 2021

1   unless, of course, the parties use the opportunity

2   between now and then to work out some settlement, which I

3   have encouraged, and while we are on that subject, have

4   you had any conversation with the private mediator that

5   you selected?  I am not asking for any details.  I just

6   want to know whether you met with him virtually.

7           MR. STOFFELMAYR:  Judge, it is Kaspar

8   Stoffelmayr for the Defendants, and the parties have met

9   with Judge Gandhi, both together and independently at

10  this point a number of times.

11          THE COURT:  Okay, good.  Again, I just want

12  to make sure you were underway.  Judge Gandhi has an

13  excellent reputation.  I think if all sides really

14  want to reach a settlement, you can do it under his

15  direction.

16          Okay.  Now, we have to figure out Track 1B,

17  and I have read the parties' filings.  It is not -- the

18  Court isn't going to decide how the Plaintiffs try their

19  case or the Defendants try their case, but how you

20  respectively try your case will influence what documents

21  are admissible.

22          Let me start out with the Plaintiffs.  All

23  right.  This is distribution claims only.  How will you

24  -- how are you trying your case?  What's your evidence

25  going to be?

1              MR. WEINBERGER:  Your Honor, this is Pete

2    Weinberger for the Plaintiffs.

3              The distribution case will be tried

4    principally on whether or not the Defendants had adequate

5    SOM systems in place, and with respect to the SOM systems

6    they did have in place, whether or not they correctly

7    used them or in total whether or not they violated the

8    Controlled Substances Act by failing to properly use

9    systems that should have identified suspicious orders and

10   halt that shipment.

11             Now, unlike the Big Three distribution case,

12   these pharmacy Defendants as both distributors and retail

13   dispensers had -- were able to see from the dispensing

14   side how a particular store or in what quantities or in

15   what -- and what methodology they were dispensing these

16   opioids, what we have commonly now referred to as a

17   red-flag system.

18             And so in order to make decisions about the

19   quantities of opioids to distribute to their own stores,

20   we believe that they had an obligation, indeed, a duty to

21   look at what were the dispensing practices or levels of

22   opioids being dispensed at the store level.

23             And so it was our belief and going back to a

24   year-and-a-half ago that dispensing policies and

25   potentially dispensing data, that they would have had

1      available to look at at the time they were making

2      decisions to distribute to themselves, was important, and

3      it is important to this case.

4                     Now, having said that, as you know, your

5      Honor, we took -- we have taken the position that if the

6      Defendants' position is that dispensing information and

7      policies are not relevant to their obligations as

8      distributors and are prepared not to utilize dispensing

9      policies or data to defend themselves, then we are

10     prepared to try the case as if they were simply a

11     distributors case and not a pharmacy distributor, who

12     also had obligations as dispensers.  So let me just stop

13     there.

14                     THE COURT:  All right.

15                     MR. WEINBERGER:  And before I conclude, if

16     any member of my team, our team who is on this call,

17     wants to add anything, I am happy to stop and let them

18     add.

19                     MR. SHKOLNIK:  Nothing from Cuyahoga.

20                     MR. MIGLIORI:  It was well said.

21                     MR. FARRELL:  This is Paul Farrell.  The

22     only thing I would add is the actual data from the

23     pharmacies that CVS, for instance, was distributing, the

24     data that is available theoretically could be a component

25     of the due diligence file.

1          And so Pete's point is an emphasis for us

2     that if we are going to draw a line, then what's good for

3     the goose is good for the gander.

4          THE COURT:  Well, obviously.  But Paul, that

5     data was produced last year in 2019 as part of an issue

6     of discovery for Track 1B when it was just distribution

7     claims against the pharmacies, correct?

8          MR. WEINBERGER:  Your Honor, this is Pete.

9     No, not completely.

10          There were dispensing policies that were

11    produced, and there were reports of due diligence that

12    were produced.  So what I am saying is compilations, but

13    the data itself, we never had the data, the prescription

14    data, dispensing data until it was produced about six

15    weeks ago.

16          THE COURT:  All right.  And we only had that

17    because we were at that time proceeding as Track 1B

18    having distribution and dispensing claims.

19          MR. WEINBERGER:  That is true, your Honor.

20          And I believe in a discovery order from

21    Special Master Cohen, which is discovery order 8, he made

22    a decision on portionality and was looking also at the

23    timing of the discovery schedule and ruled that at that

24    time, that we could not get -- we could get the policies,

25    and we could get due diligence files, but we couldn't get

1     the dispensing data, but that the Defendants had an

2     obligation to preserve the data, and that the data might

3     become available to us in discovery post CT 1A.

4              THE COURT:  All right.  How are

5     the Defendants planning to defend this case in

6     November?

7              MR. DELINSKY:  Good afternoon, your Honor.

8     It is Eric Delinsky on behalf of CVS, and I will speak

9     for the pharmacy Defendants on this issue.

10             The short answer to your question is that we

11    are going to defend our respective clients at trial based

12    on the discovery record as it existed at the time we were

13    severed.  That may require a little explanation, your

14    Honor, but I think the parties were generally severed.

15             Most of us were severed in and around August

16    of 2019 prior to the Track 1A trial in October, and

17    Walgreens, of course, was severed right after the

18    settlement was reached after jury was selected before

19    opening statements.

20             And we are going to use the discovery record

21    as it existed at the time of the severance to defend our

22    clients.  That will include witnesses on the distribution

23    side of our respective businesses, expert witnesses,

24    third-party witnesses, of course, witnesses Plaintiff --

25    representatives of the Plaintiffs.

1          And to a degree, your Honor, it also will

2    include some what we can call dispensing-related

3    information.

4          And just to step back, as Pete referenced a

5    year-and-a-half ago in October of 2018, we have been at

6    this that long, Special Master Cohen addressed the

7    question about what degree of dispensing information is

8    appropriate for a distribution only case, specifically in

9    the context of Track 1A.

10          And Special Master Cohen determined that it

11   was appropriate, indeed, necessary that the pharmacy

12   Defendants produce several buckets of dispensing

13   information.

14          So for instance, we were ordered to produce,

15   and we did produce dispensing data contained in our SOM

16   due diligence file.  That was produced.  We were ordered

17   to produce, and we did produce our dispensing policies

18   and procedures.

19          We were ordered to produce, and we did

20   produce 30(b)(6) witnesses able to testify on dispensing

21   policies and procedures.

22          We were ordered to produce, and we did

23   produce compensation policies for our pharmacists.  We,

24   of course, produced all the orders that our pharmacists

25   placed to our distribution center.

1          Your Honor, we call that distribution data,

2    but what that distribution data encapsulates are our

3    orders placed by our pharmacies that the distribution

4    centers fulfill.  That was produced in the case.

5          And as we went down this course in Track 1A

6    in the distribution case and in the wake of discovery

7    ruling No. 8 entered by Special Master Cohen, many of us

8    also disclosed witnesses who could testify about the

9    policies and procedures and pharmacists who could testify

10   about relevant issues.

11         All that discovery, your Honor, was provided

12   long ago, twelve months ago, eighteen months ago, all in

13   the context of Track 1A, all in service of Special Master

14   Cohen's order, all in service of the Track 1A

15   distribution trial.

16         And had we gone to trial, had we not been

17   severed, that evidence would be available to Plaintiff.

18   It would be available to us.  And our position is that's

19   where we are today, just as we were at the time of

20   severance, and that that same status quo should pertain.

21         To the extent Plaintiffs object or the

22   concern that we may use an entirely new bucket of

23   discovery that was produced since the amendments by

24   interlineation since Track 1B commenced over the course

25   of the last several months, we are not going to use that

1    information.

2              We agree with Plaintiff that that

3    information, which includes prescription-by-prescription

4    dispensing data, is not available for use in this case.

5    But we do -- our position is that all the discovery

6    material and disclosures made in the course of the

7    Track 1A distribution case should be available to us, is

8    available to Plaintiff.  Plaintiffs state in their

9    position paper that they believe it is available to them,

10   and certainly, if it is available to them, it is

11   available to us, too.

12             THE COURT:  All right.  Well, I think

13   everyone agrees with that, Mr. Delinsky.  If it was

14   produced last year and would have been used in the trial,

15   1A, it is available for 1B.

16             MR. WEINBERGER:  Your Honor, this is Pete.

17   Can I respond for a moment?

18             THE COURT:  Yes.

19             MR. WEINBERGER:  So in the leadup to the

20   trial, Walgreens for one identified a number of

21   pharmacists who they indicated they were going to call as

22   witnesses, who had not been deposed.

23             So the context in which Mr. Delinsky talks

24   about orders by the pharmacists that they are going to

25   put into evidence orders by a pharmacist from a

1    particular store to the CVS distribution center using CVS

2    as an example, presumably per their policies -- and

3    frankly, per the testimony of witnesses that were

4    deposed -- that pharmacist had an obligation to look at

5    the dispensing data to identify whether or not there were

6    prescriptions that potentially raised red flags in order

7    to properly place the orders for drugs to be distributed

8    to the local pharmacy.

9            So you can't separate what Mr. Delinsky

10   describes as distribution data, which he described as the

11   order by the pharmacist as distribution data, and

12   separate out the fact that what the pharmacist had to be

13   relying on or should have been relying on was information

14   at the store level in terms of how and to what extent

15   these opioids were being dispensed.

16           And you know clearly we did not have the

17   data; we had what they describe as due diligence files

18   looking at the data.

19           Well, until we got the data, we were unable

20   to test whether or not the due diligence files were

21   complete.  So they can -- what I'm hearing Mr. Delinsky

22   say is, well, we produced the due diligence files, which

23   is a compilation of the data that a pharmacist may have

24   looked at to justify an order of distribution to that

25   store, but we are unable to test whether or not that due

1    diligence was done appropriately, and that's, frankly,

2    your Honor, where the rubber meets the road here.

3                  THE COURT:  All right.  Look, Mr. Delinsky,

4    are you planning to call individual pharmacists to

5    testify, and if so, what are they going to say?  What is

6    the purpose of their testimony?

7                  MR. DELINSKY:  We may call pharmacists, your

8    Honor, and their testimony would be limited to the

9    material that has been the subject of discovery in

10   Track 1A.  It would be about ordering, placing orders to

11   wholesale pharmacies.  It would be about the policies

12   that have been produced, all of which were produced long

13   ago in Track 1A.

14                 THE COURT:  Well, what about -- I mean, is a

15   given pharmacist really going to say that he didn't look

16   at his own dispensing data and records in deciding how

17   much to order?

18                 MR. DELINSKY:  Your Honor, what

19   Mr. Weinberger has raised frankly is, you know, are

20   fact accusations that aren't supported.  There isn't a

21   problem --

22                 THE COURT:  I would like -- can you answer

23   my question?

24                 All right.  You call a pharmacist to testify

25   about wholesale orders, orders, policies, et cetera.  Is

1     he going to say that he placed -- he or she --

2     placed orders without examining his own dispensing

3     records?

4                    MR. DELINSKY:  Your Honor, in the context of

5     dispensing records, it can really be broken down in two

6     ways:  There is inventory and what is an appropriate

7     till, appropriate quantity of a particular medicine to

8     maintain on the shelf, so it is available to fill

9     prescriptions for patients who need them.  That's one way

10    of looking at the data.

11                   The other is what is posited by

12    Mr. Weinberger, that pharmacists in Plaintiffs' view

13    would undertake some, quote unquote, red flag review of

14    the prescriptions in the course of placing their orders.

15    We do not plan to present evidence of the latter nor do

16    we think, frankly, that's a legal requirement in any

17    respect.

18                   THE COURT:  All right.

19                   MR. WEINBERGER:  Your Honor, I can't just

20    sit silently.

21                   I mean, this is splitting hairs,

22    inappropriately splitting hairs when, in fact, we have --

23    we should have the right to -- I mean, the crux of the

24    retail pharmacy distribution case is whether or not the

25    orders that were placed and then tilled was done

1      appropriately and in accordance with suspicious order

2      monitoring, and the only way to test that is frankly to

3      test whether or not the ordering employee exercised due

4      diligence at the dispensing level.

5              Very frankly, it is not that different than

6      our case against the Big Three because the Big Three also

7      produced information that they were -- and questionnaires

8      -- that they were issuing to a retail pharmacy like CVS

9      when one of them was distributing an opioid to them,

10     because they wanted to know what was the reason for the

11     additional, let's say, thousand-pill quantity than the

12     month before.  And so CVS had to produce information as

13     to why it was that they ordered more.

14              MR. DELINSKY:  Your Honor, if I can --

15              THE COURT:  This is exactly why I only

16     wanted one trial because it has always been clear to me

17     that for a pharmacy -- that their distribution policies

18     are inextricably intertwined with your dispensing

19     policies and practices, because you are only distributing

20     to yourself, all right, as opposed to the Big Three

21     distributors who distribute to -- they are not

22     distributing to themselves; they are distributing to

23     other entities.

24              You are only distributing to yourself.  I am

25     talking of the pharmacy.  So I always questioned what was

1    the real difference between the dispensing claim and a

2    distribution claim, and that ultimately when we had this

3    combined trial, I really thought it would focus on the

4    dispensing claim.

5            The red flags would be red flags that come

6    up in dispensing from, you know, say a given patient, a

7    given customer gets four prescriptions for opioids from

8    four different CVS stores in the same month.

9            And candidly, I don't know how we are going

10    to try the distribution claim only case.  I can't tell

11    the Plaintiffs how to do it; I can't tell the Defendants

12    not to call pharmacists, but guess what?

13            You call the pharmacist at 55th and Euclid,

14    I don't see how I can allow that without ordering you to

15    produce the dispensing records for the 55th and Euclid

16    pharmacy, so the Plaintiff can test the credibility of

17    the statements the pharmacist is making.

18            Now, if we don't have any pharmacists

19    testifying, maybe not, but I don't -- you know, I don't

20    -- unless someone can clearly tell me how a distribution

21    claim against a pharmacy is separate and distinct from a

22    dispensing claim -- we are talking about whether or not

23    they caused a public nuisance -- I don't see how we break

24    -- how we have a distribution practice case only.

25            MR. DELINSKY:  Your Honor, the solution to

1   your dilemma would be to put Track 1B back in the MDL --

2   back in the bucket of state cases and to proceed with

3   another bellwether that has bells.  That is the solution,

4   the dilemma you outlined.

5          But if we are not going to do that, I do

6   think it is important to direct your attention to a few

7   of the facts we are dealing with and some of the

8   ramifications.  We began disclosing pharmacists as

9   potential witnesses with relevant information in Track 1A

10  going back two years, June of 2018 as a category.

11         And we progressively got more granular

12  providing names.  This is all in Track 1A.  Never were

13  these issues raised with the exception of the litigation

14  before Special Master Cohen where he ruled on the issues.

15  Now well on the case, he struck the balance.  That's the

16  balance that we have to live with in this case now.  It

17  is the balance that does not fall to sensing data.

18         THE COURT:  Look, I don't see how we try

19  this case in November on distribution only without it

20  morphing into dispensing on both sides.  And I am not

21  going to tie -- I am going to have the same ground rules

22  for both, but can someone tell me -- how can a pharmacy

23  -- can you have a suspicious order monitoring system that

24  doesn't look at dispensing data?  Is that possible when

25  all you are doing is distributing to yourself?

1                    That's my question.

2                    MR. DELINSKY:  Absolutely, your Honor.

3                    THE COURT:  How?  All right.  How can your

4       SOM -- how can your SOM not require someone to look at

5       the dispensing practices of your pharmacies.

6                    MR. DELINSKY:  The answer is provided in the

7       regulation.  The SOM regulation calls upon the

8       registrant, in this instance the distributor, to put in

9       place a system to identify suspicious orders defined to

10      be orders of unusual size, orders of unusual frequency or

11      orders of an unusual pattern.

12                   It is an order-based analysis.  That's what

13      the statute calls for, and that's how a SOM system can be

14      run without reference to dispensing data, and indeed,

15      that's often how it is run when you are not dealing with

16      self-distributors; you are dealing with wholesale

17      distributors; don't have their own pharmacies; shipping

18      to other pharmacies, and they don't always and frequently

19      don't have the dispensing data.

20                   That's not to say it is not used.  It hasn't

21      been used where it is in the due diligence file.  We have

22      all produced it, but that's the answer to your question.

23      It is an order-based analysis.

24                   The regulations require an evaluation based

25      on the size, pattern, frequency of the order.  It does

1    not call on the registrant to go to the dispensing

2    data.

3              THE COURT:  Well, let me follow up on that.

4              Okay.  If the SOM is supposed to -- what we

5    will call red flags of orders, unusual size, frequency,

6    or pattern, so if you get an order that seems of unusual

7    size, frequency, or pattern -- again, this is from one of

8    your own stores -- then, you would be required to

9    exercise due diligence, go to the store, talk to the

10   people, ask them questions, and.

11             The questions and follow-up and due

12   diligence would almost certainly require probing the

13   dispensing practices of that store, right?

14             MR. DELINSKY:  Possibly.  But we have

15   produced the due diligence materials from our files.  So

16   to the extent that there was a resort to dispensing

17   information into the files, it has been produced.

18             MR. WEINBERGER:  Your Honor, unless you have

19   another question --

20             THE COURT:  Well, let me keep going with

21   this.

22             MR. WEINBERGER:  Okay.

23             THE COURT:  Then why -- are the Plaintiffs

24   planning to call any pharmacists in your case in chief?

25   What I am saying, pharmacist employees of the Defendant.

1          MR. LANIER:  Your Honor, Mark Lanier.  No,

2    we are not.

3          THE COURT:  Okay.

4          MR. DELINSKY:  But your Honor, Plaintiffs

5    are calling experts who single out particular pharmacies

6    as suspicious.

7          THE COURT:  Understood.  But I am talking

8    about pharmacists who worked at Rite Aid, CVS, Walgreens,

9    Wal-Mart during the period, so the answer is no.  All

10   right.

11         Then Mr. Delinsky, what are you planning to

12   have your pharmacists testify about?

13         MR. DELINSKY:  Our pharmacists will testify

14   about particular circumstances relating to their pharmacy

15   that could explain large orders, for instance, if it is

16   next to a hospital.

17         Pharmacists can testify about why and how

18   they place orders.  Pharmacists could testify about

19   policies and procedures produced in the case.

20   Pharmacists will not testify about the particular

21   prescription.

22         So everything we would have our pharmacists

23   testify fit squarely within the four corners of the

24   discovery that was taken and completed in the Track 1A

25   distribution case.

1            And your Honor, if I could say one more word

2     about that, it would not be appropriate -- it would not

3     be permissible if Plaintiff were able to seek severance

4     on their own initiative.  We didn't ask for it.  They

5     sought it.

6            They discontinued the trial from last

7     October to this November, and it would not be permissible

8     that the consequence of their voluntary act in seeking

9     severance had the effect of reformulating and reforming

10    discovery records.

11           All that is going to trial is the

12    distribution case.  The record in the distribution case

13    is closed.  And that's where we are.  And there is no

14    basis because of the failed amendment and their own

15    decision to amend or their own decision to severe off

16    for them to go back in time and re-do things that

17    they --

18           THE COURT:  Well, back in time, I don't have

19    a problem with individual pharmacists talking about how

20    they placed orders, policies, and procedures.  All right.

21    But if they are getting into the circumstances of

22    particular orders and why they placed certain orders and

23    what they did and didn't do, I don't see how I can allow

24    that without permitting the Plaintiff to get to

25    dispensing data at the same time, during the same period

1     that is the subject of the testimony.

2                 Again, I am not -- I'm not -- you are the

3     one who said this is what you want these pharmacists to

4     testify about, and I think -- the first thing, the first

5     element you mentioned, I think, goes beyond prior

6     discovery, opens the door to requiring the production of

7     dispensing data.

8                 And I don't want to go down that road.  If

9     we can clearly make this a SOM distribution claim case,

10    we will try it in November.  That's fine.

11                MR. DELINSKY:  But your Honor, pharmacists

12    don't consult dispensing data in placing orders, and they

13    are not going to testify to that effect.  They consult

14    inventory data, but they don't do red flag analysis and

15    consult dispensing data as it has become known in this

16    case.  It's just not how it works, and that's not what

17    their testimony is going to be.

18                And Plaintiff, their core allegation from

19    the time they amended us into the complaint in April of

20    2018 has been that pharmacists placed suspicious orders.

21    It has always been an accusation against pharmacists, the

22    core.  It has always been in the case.

23                It has never been a mystery that pharmacists

24    are witnesses about whether -- you know, why they placed

25    orders and how.  We are not going to delve into the

1  particulars of any orders.  No pharmacist remembers that,

2  Judge.  Remember we stopped --

3           THE COURT:  No.  You said that particular

4  circumstances relating to a specific order like --

5           MR. DELINSKY:  No, I'm sorry.  I am sorry,

6  your Honor.  Let me -- I confused that.  Let me restate

7  that.

8           Certain pharmacies are criticized for an

9  aggregate high volume, not one order or another.  Okay.

10 But Plaintiffs' experts say pharmacy A is a high volume

11 pharmacy, and therefore, it is suspicious.

12          Well, if that pharmacy -- you know, we may

13 call a pharmacist to say "yeah, we have a high volume.

14 We are near four hospitals."

15          It is a matter of geography, not a matter

16 of specific orders.  That's certainly fair game,

17 especially if Plaintiffs' experts are making the

18 accusations.

19          THE COURT:  All right.

20          MR. LANIER:  Your Honor, Mark Lanier.  If I

21 could respond, please?

22          THE COURT:  Yes.

23          MR. LANIER:  This idea could only be brought

24 forward by the Defendants as Mr. Delinsky is suggesting

25 if it is part of the due diligence file.  In other words,

1    the distributor has the responsibility of due diligence
2    once a suspicious order has been identified.

3                So if they have got evidence that the
4    distributor went to the pharmacy, did the due diligence,
5    got the, quote unquote, testimony of the pharmacy that is
6    going to be offered to the jury, that's one situation,
7    but I think Mr. Delinsky is going to tell you that, as
8    part of the due diligence, there is nothing in the file
9    that indicates that there were records made of going to
10   the pharmacy or doing the necessary research and finding
11   out from the pharmacists this type of material.

12               So for him to put the witness on belies his
13   entire argument of us being limited to suspicious order
14   monitoring because he just stepped out of the due
15   diligence rank and said I am not allowed to cross the guy
16   on due diligence.

17               I am not allowed to say, "Okay.  Maybe you
18   are in the middle of four hospitals, but by the same
19   token, these are prescriptions that were all being
20   written by a gynecologist for men."

21               I mean, this isn't the kind of thing where
22   he can have his cake and eat it, too.

23               THE COURT:  Yeah, I agree with that,
24   Mr. Delinsky.  Let me just put it this way:

25               I will do this distribution-only claim

1    trial, but I don't see how -- I don't see how it is

2    relevant or should be admissible that you put on

3    pharmacists.

4            The only way you put on a pharmacist is if

5    somehow that pharmacist's testimony is relevant to the

6    due diligence.

7            Now, if you want to corroborate that the

8    corporation did call the pharmacist at 55th and Euclid,

9    you can put him on and say "yes, they did contact me, and

10    this is what I said," but to put in new testimony, I

11    think you are merging into, you know, turning this into a

12    dispensing case.

13            MR. DELINSKY:  That is not true, your Honor.

14    That is not true.  And what the Plaintiffs are doing,

15    your Honor, is they are walking the Court into error

16    again.

17            What they are saying is that everything

18    about the case has to be evaluated by reference to their

19    liability case, and that there is no other elements to

20    the offense.  There is not a causation element that is

21    eligible for proof.

22            They are saying that they are allowed the

23    present testimony singling out particular pharmacies, but

24    we can't present counter evidence about those pharmacies.

25    Okay.

1          They are saying that, no --

2          THE COURT:  You want to put on evidence from

3     your pharmacies, fine, but then you have got to give them

4     the record of those pharmacies.

5          MR. DELINSKY:  But your Honor -- and that is

6     -- they are asking for this data in complete and total

7     violation of the mandate of the Sixth Circuit.

8          Your Honor, we were prepared to go to trial

9     in October.  Plaintiff had raised none of these issues,

10    not a one, other than as decided by Special Master Cohen

11    in discovery ruling No. 8.  This is using -- what they

12    are doing now, your Honor, is they are using their

13    request for a severance in which they pledged to us that

14    severance would not prejudice us.

15         THE COURT:  Let me ask you:  Have all the

16    pharmacists that you designated as potential witnesses

17    been deposed?

18         MR. DELINSKY:  No.  Plaintiffs elected not

19    to try to depose them.

20         THE COURT:  Well, they will be deposed now.

21    That's the only way I can determine what testimony I am

22    going to allow in the case.

23         MR. DELINSKY:  Well, your Honor, that's just

24    giving them a re-do.  That's reopening what has been

25    closed.  They had the opportunity to take that position

1   of the pharmacists.

2                   We, as a matter of fact, put in a discovery

3   response two months ago in discovery where we for a

4   third time identified pharmacists as a category of

5   witnesses, and we told them, if you want a sampling of

6   names, tell us, and we will get them to you, and they

7   didn't respond.

8                   THE COURT:  How many pharmacists are you

9   planning to call?  You have got four weeks.  How many

10  pharmacists -- I mean, you may have designated, I don't

11  know, 50.  How many are you really planning to call?

12                  MR. DELINSKY:  I believe we designated ten,

13  your Honor.

14                  THE COURT:  And designated --

15                  SPECIAL MASTER COHEN:  I'm sorry, your

16  Honor.  This is David.

17                  Is that just your client or ten as amongst

18  all the pharmacy Defendants?

19                  MR. DELINSKY:  It is CVS, Special Master.

20                  SPECIAL MASTER COHEN:  So how many -- do you

21  know how many total?

22                  MR. DELINSKY:  I don't, I'm sorry.

23                  THE COURT:  That could be 60 pharmacists.

24  Obviously, Mr. Delinsky, we are not going to have 60

25  pharmacists testify.  It is inconceivable.  All right.

1    It's the testimony by individual pharmacists that trouble

2    the Court as to how we draw a line between a distribution

3    case and a dispensing case.  All right.  And I --

4                    (At this point, Judge Polster's phone

5    connection was lost, and the following discussion was

6    held out of the presence of the Court:)

7                    MR. FARRELL:   Judge Polster, this is Paul

8    Farrell.  Can I say one thing for the record?

9                    MS. HUGHES:  Sounds like he is not on, Paul.

10                   MR. FARRELL:  Well, it was going to be very

11   important.

12                   MS. HUGHES:  Well, fine.  Just a minute, and

13   we will try to get him back.

14                   (Long pause.)

15                   SPECIAL MASTER COHEN:  Mary, this is David.

16   Can you hear me?

17                   Thank you for taking the lead during this

18   telecon.  I just wanted to ask you because I don't

19   remember when it was that the pharmacy Defendants were

20   severed in Track 1A.

21                   MR. DELINSKY:  I think there were -- the

22   five of us were severed -- I don't know the exact

23   date --

24                   THE COURT:  All right.  This is Judge

25   Polster.  I don't know what happened.  Suddenly, I was

1     off.  All right.

2                My question was:  How long do the

3     pharmacists want to identify -- the pharmacist witnesses

4     you are really going to call and what they are going to

5     say, can it be done in two weeks?

6                MS. HUGHES:  Can everybody hear the Judge

7     since he was disconnected?

8                THE COURT:  Can you hear me?  This isn't

9     working.  What's going on?

10                SPECIAL MASTER COHEN:  Your connection I am

11    sorry to say is not very clear, Judge.

12                THE COURT:  Then, I guess we will have to do

13    this in person.  I don't know.  What --

14                MS. HUGHES:  Judge, why don't you hang up --

15                THE COURT:  I did, I did.  I called back in.

16    I will do it one more time.

17                (Discussion continues out of the presence of

18    the Court as follows:)

19                SPECIAL MASTER COHEN:  I will take up where

20    I left off, Eric.  I didn't catch your answer.

21                MR. DELINSKY:  Five of us were in August,

22    Special Master.  I can pull up the exact date.  I can say

23    it was around August 15th, 16th.

24                VOICE:  I don't know if this helps, the

25    order was issued on August 15th granting the severance.

1             SPECIAL MASTER COHEN:  Yeah, that's fine.  I

2 was just trying to remember where we were in discovery on

3 the question of pharmacists because I know they had been

4 named, but -- and it doesn't make sense to me to have

5 depositions either before or during trial.  And I think

6 that it was headed towards something like that with the

7 pharmacists.

8             THE COURT:  All right.  I am back on one

9 more time.  Can people hear me now?

10             MS. HUGHES:  Perfect Judge.

11             THE COURT:  We are going to have to get this

12 ending quickly because the technology is no good.

13             How long do the pharmacists want to do what

14 I just said?

15             MR. DELINSKY:  Can we please have 30 days,

16 your Honor?

17             THE COURT:  All right.  That's -- so

18 that's --

19             MS. HUGHES:  Judge are you still on?

20             SPECIAL MASTER COHEN:  He must have a bad

21 connection.

22             (Judge Polster again was disconnected, and

23 the following discussion was held:)

24             MR. FARRELL:  David, this is Paul Farrell.

25 I need to make a proffer for the record to correct the

1    record on something that my good friend Mr. Delinsky

2    said.

3                SPECIAL MASTER COHEN:  Are you sure you need

4    to do that, Paul?

5                MR. FARRELL:  Given he has made reference to

6    a waiver issue of the Plaintiffs taking the depositions

7    of the pharmacists, I want to preserve somewhere on the

8    record that we disagree with that position.

9                SPECIAL MASTER COHEN:  Okay.  All right.

10               MS. HUGHES:  Can we do that now, David?

11               SPECIAL MASTER COHEN:  Well, I think we just

12   did.

13               Is there anything more you need to say other

14   than what you just did, Paul?

15               MR. FARRELL:  I always have more to say, but

16   as long as the record is clear that we have a strong

17   position that's inconsistent with that waiver argument,

18   that's all I need.

19               SPECIAL MASTER COHEN:  Okay.  This really

20   was the Judge's teleconference, and I am not going to

21   take it over.  I assume that he has gotten answers to

22   questions that he needed to have answered, and if he

23   didn't, we will follow up in e-mail.

24               So I appreciate everybody getting on the

25   phone together.  I hope you are all staying safe and

1    healthy.  Be careful.  Thank you very much.

2                    (Teleconference concluded 3:45 p.m.)

3                         - - - - -

4                    C E R T I F I C A T E

5              I, George J. Staiduhar, Official Court

6    Reporter in and for the United States District Court,

7    for the Northern District of Ohio, Eastern Division,

8    do hereby certify that the foregoing is a true

9    and correct transcript of the proceedings herein.

10

11

12

13                    s/George J. Staiduhar
                      George J. Staiduhar,
14                    Official Court Reporter

15                    U.S. District Court
                      801 W. Superior Ave., Suite 7-184
16                    Cleveland, Ohio 44113
                      (216) 357-7128
17

18

19

20

21

22

23

24

25