# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) | **MDL 2804** |
|  | ) | |
|  | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) | |
|  | ) | **Judge Dan Aaron Polster** |
| *County of Monroe, Michigan v. Purdue Pharma L.P., et al.,* | ) ) | |
|  | ) | **OPINION AND ORDER REGARDING** |
| Case No. 1:18-op-45158 | ) | **DEFENDANTS' MOTIONS TO** |
|  | ) | **DISMISS** |
|  | ) | |

Before the Court are three separate motions to dismiss the Complaint (Doc. #: 3032) filed

by plaintiff Monroe County, Michigan.[1]  Distributors,[2] Pharmacies,[3] and Manufacturers[4] each filed

a group motion, seeking dismissal of Monroe's claims against them.[5]  Doc. #: 572 (Distributors);

---

[1] Unless otherwise indicated, all document numbers refer to the master MDL docket, Case No. 17-md-2804.  Page numbers, when necessary, refer to the documents' native format pagination.

[2] The Distributors' motion was filed collectively by defendants AmerisourceBergen Drug Corporation ("ABDC"); Cardinal Health, Inc. ("Cardinal"); and McKesson Corporation ("McKesson") (collectively, "Distributors" or "Distributor Defendants").

[3] The Pharmacies' motion was filed collectively by defendants CVS Health Corporation ("CVS"); The Kroger Co. ("Kroger"); Rite Aid Corporation, Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center ("Rite Aid"); Walgreens Boots Alliance, Inc. ("Walgreens"); and Walmart Inc. ("Walmart") (collectively "Pharmacies" or "Pharmacy Defendants").

[4] The Manufacturers' motion was filed collectively by defendants Purdue Pharma LP, Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue"); Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan"); Watson Laboratories, Inc., Actavis Pharma, Inc.; Actavis LLC; Teva Pharmaceuticals, USA, Inc.; and Cephalon, Inc. ("Teva"); Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Insys Therapeutics, Inc. ("Insys"); Mallinckrodt LLC ("Mallinckrodt"); and Noramco, Inc. ("Noramco") (collectively "Manufacturers" or "Manufacturer Defendants").

[5] The Court recognizes that some Defendants have filed or are contemplating filing for bankruptcy protection, and litigation against those Defendants has been or may be stayed pending those proceedings.  For the sake of simplicity, the Court addresses these motions as they were filed by the parties.

Doc. #: 592 (Pharmacies); Doc. #: 595 (Manufacturers).  Monroe filed an omnibus opposition that addressed all three motions.  Doc. #: 729.  The three Defendant groups each filed replies in support of their respective motions.  Doc. #: 820 (Distributors); Doc. #: 815 (Pharmacies); Doc. #: 821 (Manufacturers).

The Court has reviewed all of the parties' submissions.  For the reasons stated below, the Court now rules as follows:

- Defendants' Motions to Dismiss are **GRANTED** with respect to Count III (MCPA) and Count V (Negligence).

- In addition, the Manufacturers' Motion to Dismiss is **GRANTED** with respect to Count VI (Unjust Enrichment), Count VII (Fraud and Fraudulent Concealment), and Count VIII (Civil Conspiracy), to the extent those claims: (1) seek recovery for monetary losses, and (2) are based on fraudulent marketing of prescription opioids that are not "combination products."

- The motions are otherwise **DENIED**.

## I.      12(b)(6) Legal Standard.

The Court incorporates by reference the applicable legal standards set forth in its Opinion and Order in *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp.,* Case No. 1:18-op-45530, MDL Doc. #: 3253 at 2-3.

## II.     Factual Allegations.

In its Complaint, Monroe asserts the following claims:

2

- Count I, Violation of RICO,[6] 18 U.S.C. § 1961 *et seq.* − Opioid Marketing Enterprise (Against RICO Marketing Defendants);[7]

- Count II, Violation of RICO, 18 U.S.C. § 1961 *et seq.* − Opioid Supply Chain Enterprise (Against RICO Supply Chain Defendants);

- Count III, Violation of the Michigan Consumer Protection Act ("MCPA"), MCL § 445.901, *et seq.* (Against All Defendants);

- Count IV, Public Nuisance (Against All Defendants);

- Count V, Negligence (Against All Defendants);

- Count VI, Unjust Enrichment (Against All Defendants);

- Count VII, Fraud and Fraudulent Concealment (Against All Defendants);

- Count VIII, Civil Conspiracy (Against All Defendants);

Most of Monroe's allegations of Defendants' conduct are similar to those alleged in the complaints filed in the following actions: (i) *Summit County* ( Doc. #: 513); (ii) *Muscogee  Nation* (Doc. #: 731); (iii) *Blackfeet Tribe* (Doc. #: 6);[8] (iv) *Cleveland Bakers* (Doc. #: 3031); (v) *West*

---

[6] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

[7] In its Complaint, Monroe uses the following definitions:

- "Marketing Defendants" refers to Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt, collectively.  Doc. #: 3032, ¶ 76.
- "RICO Marketing Defendants" refers to Purdue, Cephalon, Janssen, Endo, and Mallinckrodt, collectively. *Id.* at 26 n.14.
- "National Retail Pharmacies" refers to CVS, Kroger, Rite Aid, Walgreens, and Walmart, collectively.  *Id.*, ¶ 87.
- "Distributor Defendants" refers to Cardinal, McKesson, AmerisourceBergen, and the National Retail Pharmacies, collectively.  *Id.*, ¶ 88.
- "RICO Supply Chain Defendants" refers to Purdue, Actavis, Cephalon, Endo, Mallinckrodt, Cardinal, McKesson, and AmerisourceBergen, collectively.  *Id.* at 29 n.15.

[8] The *Blackfeet Tribe* Complaint is referred to as Doc.#: 6 in the individual docket for case no. 1:18-op-45749-DAP. Other record citations herein cite to numbers in the MDL docket, 17-md-2804-DAP.

*Boca* (Doc. #: 2985); and (vi) *Broward County (Doc. #:* 525).[9]  The Magistrate Judge and this Court have addressed those factual allegations at length.  *See Summit County* Report and Recommendation ("R&R") (Doc. #: 1025); *Summit County* Opinion and Order (Doc. #: 1203); *Muscogee Nation* R&R (Doc. #: 1499); *Blackfeet Tribe* R&R (Doc. #: 1500); *Muscogee Nation and Blackfeet Tribe* Opinion and Order (Doc. #: 1680); *Cleveland Bakers* Opinion and Order (Doc. #: 3177); *West Boca* Opinion and Order (Doc. #: 3253); *Broward County* Opinion and Order (Doc. #: 3274).  Thus, the Court provides below only a brief overview of the factual allegations specific to Monroe County, and incorporates by reference the general factual circumstances surrounding the opioid crisis and the allegations of Defendants' behavior that are common to all of these cases.

### A.    Factual Allegations Against Defendants.

Monroe alleges the Manufacturer Defendants, also referred to as "Marketing Defendants," manufacture, sell, and market prescription opioids.  Monroe asserts the Marketing Defendants fueled the opioid crisis "through a massive marketing campaign premised on false and incomplete information," which "engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients."  Doc. #: 3032, ¶ 10.  Monroe alleges the Marketing Defendants dramatically increased sales of prescription opioids, despite their knowledge "that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits,

---

[9] These actions are: (i) *County of Summit, Ohio v. Purdue Pharma L.P., et al.*, 18-op-45090 ("*Summit County"*); (ii) *The Muscogee (Creek) Nation v. Purdue Pharma L.P.*, 18-op-45459 ("*Muscogee Nation*"); (iii) *The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp.*, 18-op-45749 ("*Blackfeet Tribe*"); (iv) *Cleveland Bakers and Teamsters Health and Welfare Fund, et al. v. Purdue Pharma, L.P.*, 18-op-45432 ("*Cleveland Bakers*"); (v) *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp.*, 18-op-45530 ("*West Boca*"); and (vi) *Broward County, Florida v. Purdue Pharma L.P.*, 18-op-45332 ("*Broward County*").

and superiority of opioids for long-term use were untrue and unfounded." *Id.*, ¶ 11.  Monroe alleges Defendants reaped billions of dollars of profit as a result of opioid sales. *Id.*, ¶¶ 12-13.

Further, Monroe alleges all Defendants "failed to maintain effective controls over the distribution of prescription opioids" and instead "actively sought to evade such controls." Doc. #: 3032, ¶ 14.  Monroe asserts Defendants fueled and sustained the opioid crisis by "selling and distributing far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses," while failing to report and take steps to halt suspicious orders, "thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market." *Id.*, ¶¶ 14, 641, 648-650.


### B.    Facts Specific to Monroe County, Michigan.

In its Complaint, Monroe alleges the following facts:  Monroe County "sits squarely in the crosshairs" of the opioid-fueled epidemic.  Doc. #: 3032, ¶ 656.  Over the course of extended periods of time, Monroe had opioid prescription rates far exceeding its population, which provided notice to Defendants that diversion was likely occurring in the County.  Doc. #: 3032, ¶¶ 635-636.  For instance, according to Automation of Reports and Consolidated Orders System ("ARCOS") data disclosed to date, from 2006 to 2014, approximately 71 million units of various opioids were shipped into Monroe County − amounting to approximately 53 pills for every man, woman, and child in the County each year. *Id.*, ¶ 639.  Although Monroe's population was only about 150,000 people, in 2016, patients in the County received 154,426 opioid prescriptions, amounting to 10,935,495 units of opiates. *Id.*, ¶ 657.  These figures indicate a far greater distribution of opioids than could be justified by legitimate medical needs. *Id.*, ¶ 641.

This oversupply of opioids and increased opioid use has had "severe and far-reaching public health, social services, and criminal justice consequences in the County, including the "fueling of addiction, overdose, and death from illicit drugs." *Id.*, ¶ 19.  From 2013 to 2016, the number of opioid-related deaths in the County skyrocketed from 485 to 817 per year, *i.e.* over 32 deaths for every 100,000 residents. *Id.*, ¶ 657.

The necessary and extraordinary costs of responding to these consequences are borne by Monroe County and other governmental entities. *Id.*, ¶¶ 19-20.  These costs include "the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, treating opioid-addicted newborns in neonatal intensive care units, and burying the dead." *Id.*, ¶ 19.  More specifically, the opioid crisis caused by Defendants' conduct has forced the County to make large, unplanned-for expenditures in order to protect the health and welfare of its community, "costing millions [in] treatment services, emergency visits, medical care, treatment for related illnesses and accidents, lost productivity to Monroe County's workforce, increased law enforcement and judicial expenditures, increased prison and public works expenditures, increased substance abuse treatment and diversion plan expenditures, lost economic activity, and lost reputation and good will." *Id.*, ¶ 858.

## III.    Legal Issues Relevant to Multiple Claims.

### A.    Authority to Sue.

The Pharmacies and Manufacturers assert Monroe lacks standing to bring its claims.  The Pharmacies base their arguments on Article III of the United States Constitution, while the Manufacturers rely on the Michigan Constitution.  The Court rejects these arguments and denies both motions to dismiss as they relate to standing.

6

### 1.    Article III Standing.

The Pharmacies assert Monroe lacks Article III standing to assert its claims in this case. *See* Doc. #: 592-1 at 2 (incorporating by reference the same arguments made in *Summit County*). The Court rejects this argument for the reasons stated in *Summit County*, *i.e.* because Monroe has plausibly pleaded an injury-in-fact that is fairly traceable to the Defendants' alleged actions and is likely to be redressed by the requested relief.  Doc. #: 1025 at 100-102, *adopted by* Doc #: 1203 at 2 n.2.  Accordingly, the Court denies the Pharmacy Defendants' motion to dismiss on this ground.

### 2.    Authority to Sue Under Michigan Law – The Statewide Concern Doctrine.

The Manufacturers contend that, under Michigan law, the power of a county to sue is limited to actions concerning "local interests" and, because this lawsuit involves a "statewide interest," it infringes on the Attorney General's power to sue on behalf of the State of Michigan. Doc. #: 595-1 at 3-5.

Michigan law provides each county with the power to sue and be sued.  MCL § 45.3.  The statutory provision granting this power is to be "liberally construed" in favor of the counties.  Mich. Cons. 1963, art. 7, § 34.  At the same time, the Michigan Attorney General has broad discretion to determine what constitutes a "state interest," and also has broad authority to bring actions and settle claims on behalf of the state and its people.  *In re Certified Question from U.S. Dist. Ct. for E.D. Mich.*, 638 N.W.2d 409, 413-14 (Mich. 2002).

Arguing the opioid crisis is a statewide (indeed, national) concern, the Manufacturers contend Monroe's claims necessarily seek to vindicate the state's interest, thereby infringing on the Attorney General's exclusive powers.  Doc. #: 595-1 at 4.  But the Manufacturers are mistaken

7

in at least two respects.  First, Monroe clearly seeks recovery for its own harms, and not on behalf of the state as a whole.  Second, in *Certified Question,* the Michigan Supreme Court held: "where the Attorney General **has acted** to limit the power of the counties to sue*"* on a matter involving the state's interest, "the county may not act to defeat the state's clear intentions."  *Id.* at 415 (emphasis added).  The Manufacturers have not brought to the Court's attention any indication that the Michigan Attorney General has acted to limit the power of Monroe County, or any other county, to bring suit for damages stemming from the opioid crisis.[10]   Accordingly, the Manufacturers have not established, as a matter of law, that Monroe lacks authority to maintain this action.[11]

### B.      Federal Preemption.

Relying exclusively on briefing in *Summit County*, the Manufacturers assert Monroe's state law claims are preempted by federal law because they conflict with the Federal Drug Administration's ("FDA's") enforcement authority regarding the labeling and promotion of the Manufacturers' opioid products.  Doc. #: 595-1 at 9.  Because the Manufacturers raise no new arguments with respect to federal preemption, the Court concludes, as it did in *Summit County*,

---

[10] The Manufacturers contend the Michigan Attorney General has exercised his exclusive authority to sue by initiating an investigation involving the defendants in this case.  Doc. #: 595-1 at 5.  Contrary to the Manufacturers' contention, the fact that the Michigan Attorney General may have initiated an investigation into Defendants' conduct does not conclusively show the Attorney General has clearly "acted to limit the power of the counties to sue" to recover damages they incurred as a result of the opioid crisis. *Certified Question,* 638 N.W.2d at 415.  Unlike in *Certified Question*, the Michigan Attorney General here has not filed suit or entered into a settlement agreement involving Monroe's claims.

[11] The Court overruled similar arguments in *Summit County*.  There, the Magistrate Judge found, under Ohio law, that Defendants had not shown "the statewide concern doctrine bars locally-originated municipal or county lawsuits seeking to remedy alleged injuries within their borders."  Doc. #: 1025 at 99-100, *adopted without objection by* Doc. #: 1203 at 2.

that none of Monroe's state law claims is preempted by federal law.  Doc. #: 1025 at 48-54, *adopted without objection by* Doc. #: 1203 at 2.


### C.     Immunity under the Michigan Product Liability Act ("MPLA").

Monroe asserts common law claims for public nuisance, negligence, unjust enrichment, fraud, and civil conspiracy.  Each claim is based on two theories of recovery: (1) fraudulent marketing against the Manufacturers; and (2) failure to maintain effective controls to prevent diversion against all Defendants.  Defendants contend they are immune from liability on all of these claims under MPLA § 600.2946(5), which provides manufacturers and sellers "an absolute defense" from **product liability** suits involving FDA-approved drugs.[12]  Doc. #: 572-1 at 2-6 (quoting *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 131 (Mich. 2003)).  To prevail on this argument, Defendants must establish that, as a matter of law, their common law claims constitute a "product liability action" within the meaning of the MPLA.[13]  *See, e.g., Duronio v. Merck & Co., Inc.*, 2006 WL 1628516, at *3 (examining the substance of plaintiff's factual

---

[12] MPLA § 600.2946(5) states, in part:

> In a product liability action against a manufacturer or seller, a product that is a drug is not defective or unreasonably dangerous, and the manufacturer or seller is not liable, if the drug was approved for safety and efficacy by the United States food and drug administration, and the drug and its labeling were in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller.

MCL § 600.2946(5); *see also* MCL § 600.2946(5)(a) and (b) (providing exceptions for situations involving fraud or bribery in obtaining FDA approval).  "Michigan appears to be the only state that provides immunity in this fashion." *Miller v. Mylan Inc.*, 741 F.3d 674, 678 (6th Cir. 2014).

[13] The Manufacturers summarily assert MPLA § 600.2946(5) precludes *all* of Monroe's state law claims, including the MCPA claims.  Doc. #: 595-1 at 5-9; *but see* Doc. #: 572-1 at 2-6; Doc. #: 592-1 at 4-6 (Distributors and Pharmacies' briefs conclusively asserting only the common law claims are barred).  Defendants do not separately analyze whether MPLA § 600.2946(5) immunity applies to the MCPA claims.  However, the Michigan Court of Appeals has ruled the MPLA does not bar an otherwise valid MCPA claim.  *Duronio v. Merck & Co., Inc.*, 2006 WL 1628516, at *6 (Mich. Ct. App. June 13, 2006).  In light of this ruling and the parties' failure to present any contrary analysis or authority, the Court concludes MPLA § 600.2946(5) does not preclude the MCPA claims.

allegations to determine whether a common law fraud claim constituted a "product liability action" under the MPLA).

The MPLA defines "product liability action" to mean "an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product."  MCL § 600.2945(h).  Under the plain language of this section, a claim constitutes a "product liability action" if the claim: (1) is based on a legal or equitable theory of liability; (2) is "brought for the death of a person or for injury to a person or damage to property;" and (3) is caused by or resulting from the "production of a product."  *Attorney Gen. v. Merck Sharp & Dohme Corp.*, 807 N.W.2d 343, 344 (Mich. Ct. App. 2011) (quoting MCL § 600.2945(h)), *leave to appeal denied*, 803 N.W.2d 696 (Mich. 2011).

Here, the common law claims clearly meet the first element of a "product liability action," as they are based on a legal or equitable theory.  Defendants contend the claims also meet the second and third elements, because the claims seek recovery for "damage to property" that resulted from the "production of a product."  Below, the Court examines whether each theory of recovery satisfies these last two elements.

### 1.      Fraudulent Marketing Claims.

Against the Manufacturers, Monroe asserts common law claims based on the Manufacturers' allegedly false and misleading marketing campaign that misrepresented the risks and benefits of opioids.  Doc. #: 3032 at 39-146.  The Manufacturers argue these claims constitute a "product liability action" under MPLA § 600.2945(h) because the claims seek recovery for monetary loss stemming from the "production of a product."  Doc. #: 595-1 at 6-7.  The Court first examines whether the fraudulent marketing claims result from the "production of a product."

a)      **"Production of a Product."**

The MPLA defines the "production" of a product as the "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, *marketing,* selling, *advertising,* packaging, or labeling" of a product.[15]   MCL § 600.2945(i) (emphasis added); *see also White v. SmithKline Beecham Corp.*, 538 F. Supp. 2d 1023, 1027 (W.D. Mich. 2008) ("a suit against a drug manufacturer . . . is a product liability suit when the plaintiff alleges fault in the standards, testing, warning, instruction, *marketing*, selling, *advertising* or labeling of the drug") (emphasis added).

As highlighted in the MPLA definition above, the "production" of a product includes the "marketing" and "advertising" of a product.  MCL § 600.2945(i).  Clearly, Monroe's fraudulent marketing allegations fall within this definition, and, therefore, result from the "production of a product," as defined by the MPLA.  Indeed, by not responding to Defendants' argument on this point, Monroe implicitly concedes that its fraudulent marketing claims fall within the definition of "production of a product."

b)      **"Damage to Property."**

To constitute a "product liability action," the fraudulent marketing claims must also meet the second element of the MPLA definition, *i.e.* they must be "brought for the death of a person or for injury to a person or damage to property."  MCL § 600.2945(h).  Defendants assert the fraudulent marketing claims meet this requirement because "damage to property" includes claims

---

[15] The term "product" includes "any and all component parts to a product."  MCL § 600.2945(g).

for monetary loss.  Doc. ##: 572-1 at 2-4; 592-1 at 5-6; 595-1 at 6-9.  Monroe does not respond to this argument.  Doc. #: 729 at 11-16.

At least two decisions by the Michigan Court of Appeals[16] support the Manufacturers' assertion that claims for monetary loss are claims for "damage to property" under the MPLA: *Duronio*, 2006 WL 1628516, at *2-5; and *Merck Sharp*, 807 N.W.2d at 348-350.  In *Duronio*, plaintiff claimed the defendant drug manufacturer fraudulently misled the public and prescribing physicians about the safety of Vioxx, an FDA-approved prescription drug found to increase the risk of heart attacks.  Asserting putative class action claims for fraud and consumer protection, plaintiff sought to recover the purchase cost of Vioxx and expenses related to an FDA-recommended medical consultation.  The Michigan Court of Appeals affirmed the trial court's conclusion that MPLA § 600.2946(5) immunity applied to the fraud claim.  In so ruling, the court rejected plaintiff's argument that "damage to property" encompassed only *physical* damage to property.  *Duronio*, 2006 WL 1628516, at *4.  Instead, the appellate court found the plain meaning of "damage to property" is "broad enough to include both physical damage to an object and injury or harm to rights or interests associated with an object, so long as the damage is caused by or results from the production of the product."  *Id.* at *4 (noting that "[m]oney itself is a form of property").  The appellate court thus concluded the alleged monetary loss was "damage to property" within the meaning of MPLA § 600.2945(h); therefore, the common law fraud claim

---

[16] It appears the Michigan Supreme Court has not addressed whether "damage to property" under the MPLA includes claims for monetary loss.  In predicting how the highest state court would rule, the Court looks to "all the available data."  *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607-08 (6th Cir. 2012) (quotation and citation omitted).  In so doing, the Court views intermediate state appellate decisions as persuasive "unless it is shown that the state's highest court would decide the issue differently." *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 334 (6th Cir. 2018) (citation omitted); *see also Berrington*, 696 F.3d at 607-08 (decisions of the Michigan Court of Appeals are binding authority absent a Michigan Supreme Court decision on point).

was, in substance, a "product liability action" subject to immunity under MPLA § 600.2946(5). *Id.* at *5.

In *Merck Sharp*, a case also involving Vioxx fraudulent marketing claims, the Michigan Court of Appeals again found a claim for monetary loss constituted "damage to property" under MPLA § 600.2945(h). *Merck Sharp,* 807 N.W.2d at 350. Suing under Michigan's Medicaid False Claims Act and for unjust enrichment, the Michigan Attorney General sought to recover the state's payments to providers who prescribed or dispensed Vioxx to Medicaid beneficiaries. The trial court disagreed with *Duronio's* interpretation of "product liability action" and ruled MPLA § 600.2946(5) immunity did not apply to the Attorney General's claims. *Id.* at 346. The Michigan Court of Appeals reversed, finding claims for "monetary loss based on alleged misrepresentations regarding the safety and efficacy of Vioxx" were claims for "damage to property" under MPLA § 600.2945(h). *Id.* at 348-50. The court therefore concluded MPLA § 600.2946(5) immunity applied. *Id.* at 350.

Based on *Duronio* and *Merck Sharp*, this Court determines the Michigan Supreme Court would find that, to the extent Monroe's common law claims based on fraudulent marketing seek to recover monetary loss, they are claims for "damage to property" within the meaning of MPLA § 600.2945(h).[18] Accordingly, the Court concludes that, absent an exception, MPLA § 600.2946(5) immunity applies to Monroe's negligence, fraud, unjust enrichment, and civil conspiracy claims, to the extent these claims seek to recover monetary loss based on fraudulent marketing.[19] *See,*

---

[18] This conclusion is buttressed by the fact that the Michigan Supreme Court refused to review *Merck Sharp*. *See, e.g., West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237-38 (1940) (it is especially true that, where the highest court has refused to review the lower court's decision (rendered in an earlier phase of the same litigation), a federal court should not disregard a considered judgment of an intermediary appellate state court decision unless it is convinced by other persuasive data that the highest state court would decide otherwise).

[19] Monroe seeks to recover for monetary loss on its negligence, fraud, unjust enrichment, and civil conspiracy claims. *See* Doc. #: 3032, ¶¶ 879 (asserting pecuniary losses and damages for negligence); 885 (seeking disgorgement for

*e.g., Duronio*, 2006 WL 1628516, at *4-5 (MPLA § 600.2946(5) immunity applied to fraud claim

for monetary loss); *Merck Sharp*, 807 N.W.2d at 350 (MPLA § 600.2946(5) immunity applied to

unjust enrichment claim for monetary loss); *see also Cotton v. Johnson & Johnson*, 2016 WL

9776137, at *2-3 (E.D. Mich. Dec. 1, 2016) (MPLA § 600.2946(5) barred a negligence claim); *In

re Risperdal Litig.*, 175 A.3d 1023, 1026-1033 (MPLA § 600.2946(5) barred common law claims,

including conspiracy).

In addition to monetary loss, however, Monroe also seeks injunctive and non-monetary

relief on these claims.  *See* Doc. #: 3032, ¶ 896 (seeking injunctive relief for fraud); *id.* at 295

(prayer for relief on all claims, seeking "equitable and injunctive relief in the form of Court-ordered

enforced correction action, programs, and communications").  The parties' briefs do not address

whether MPLA § 600.2946(5) immunity applies to these non-monetary forms of relief.  Doc. ##

572-1 at 2-6; 592-1 at 4-6; 595-1 at 5-9; 729 at 11-14; 815 at 3-6; 820 at 1-2; 821 at 2-5.  On this

record, the Manufacturers have not shown MPLA § 600.2946(5) immunity applies to Monroe's

common law claims seeking injunctive and non-monetary relief.

Along similar lines, the Manufacturers offer no analysis or authority to show Monroe's

public nuisance claims are "brought for the death of a person or for injury to a person or damage

to property."  MCL § 600.2945(h).  A public nuisance claim arises from the *unreasonable

interference with a public right*[20] - not from "the death of a person or for injury to a person."  MCL

§ 600.2945(h).  Moreover, the nuisance claims seek relief in the form of *abatement*[21] − not for

---

unjust enrichment); 895 (seeking economic losses for fraud); 913 (alleging the County sustained damages as a result
of civil conspiracy).

[20] *Adkins v. Thomas Solvent Co.,* 487 N.W.2d 715, 720 n.8 (Mich. 1992).

[21] *See* Doc. #: 3032, ¶ 871 (seeking monetary *and injunctive relief* on nuisance claims to halt the threat of future harm);
*id.* at 295 (prayer for relief, seeking abatement); *see also* Doc. #: 2519 at 2 (Track One *Daubert* Order re: Abatement)

"damage to property."  For these reasons, the Manufacturers have not shown the nuisance claims meet the MPLA's definition of "product liability action" and, therefore, have not shown MPLA § 600.2946(5) immunity applies to Monroe's public nuisance claims.

Based on the foregoing analysis, the Court concludes that, to the extent Monroe's common law claims for negligence, fraud, unjust enrichment, and civil conspiracy are: (1) based on fraudulent marketing; and (2) seek to recover monetary loss, they constitute a "product liability action" as defined under MPLA § 600.2945(h).[22]  Thus, absent an exception (discussed in subsection 3, below), the Manufacturers are immune from liability for Monroe's alleged monetary losses on these claims.

### 2.        Anti-Diversion Claims.

In addition to fraudulent marketing, Monroe's common law claims are also based on alleged failures by *all* Defendants to maintain effective controls against diversion, *i.e.* the failure to identify, report, investigate, and not ship suspicious orders.[23]  Defendants contend these anti-diversion claims constitute a "product liability action" because the claims seek monetary loss

---

(abatement is a forward-looking equitable remedy intended to compensate the plaintiff for the costs of rectifying the nuisance going forward).

[22] The Court's conclusion here differs from the *Track One* cases where the Court found, under **Ohio** law, the definition of "product liability claim" did not include claims for only monetary loss.  Doc. ##: 1025 at 58-60; 1203 at 22-28.  Unlike the Michigan product liability statute, the Ohio statute specifically defines a "product liability claim" to mean an action seeking "compensatory damages . . . for . . . *physical* damage to property other than the product in question." Ohio Rev. Code § 2307.71(13) (emphasis added).  The Michigan statutory language, however, does not limit "damage to property" to "*physical* damage to property."  Moreover, as noted, Michigan courts have interpreted "damage to property" under the MPLA to include claims seeking only monetary loss.  *Duronio,* 2006 WL 1628516, at *4-5; *Merck Sharp*, 807 N.W.2d at 348-50.  The Court therefore reaches a different result under Michigan law.

[23] This Court has previously found that, as a matter of law, the CSA and its implementing regulations require registrants to: (1) design and operate a system to disclose to the registrant suspicious orders; (2) inform the DEA of suspicious orders when discovered by the registrant; and (3) not ship a suspicious order unless due diligence reasonably dispels the suspicion.  Doc. #: 2483 at 15, 18-19 (*Track One* MSJ Order re: CSA).

resulting from the "production of a product."  As noted, the MPLA defines the "production of a product" to include the "selling" of a product.  MCL § 600.2945(i).  Defendants assert the anti-diversion claims meet this definition because the anti-diversion theory implicates the "selling" of FDA-approved drugs.  The Court disagrees.

Unlike the fraudulent marketing claims, the anti-diversion claims do not fall squarely within the definition of "production of a product."  Specifically, the anti-diversion claims are not derived from the mere "selling" of opioids.  *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/selling (last checked 04/28/2020) (to "sell" means "to give up (property) to another for something of value (such as money)").[24]  Rather, the claims are based on Defendants' alleged conduct in ***disregarding their legal duties*** to prevent diversion, which created an oversupply of opioids that fueled an illicit secondary market and caused Monroe's alleged injuries. *See, e.g.,* Doc. #: 3032, ¶ 14 (Defendants actively sought to evade anti-diversion controls, distributing far greater quantities of prescription opioids than could be necessary for legitimate medical uses, thereby fueling an illegal secondary market); *id.* ¶ 515 (Defendants ignored red flags of suspicious orders and funneled far more opioids into communities than could have been expected to serve legitimate medical uses).  These claims do not depend on a defective product[25] or otherwise implicate the FDA's approval of the safety and efficacy of prescription opioids.[26]  *See*

---

[24] *See also Duronio*, 2006 WL 1628516, at *4 (looking to the dictionary meaning of "damage" where the phrase "damage to property" was not defined under the MPLA).

[25] *See, e.g.,* 20 Mich. Civ. Jur. Prod. Liab. Summary (the general law of products liability involves "the liability of manufacturers or sellers for injuries caused to a person as a result of a defective product"); *Ghrist v. Chrysler Corp.*, 547 N.W.2d 272, 275 (Mich. 1996) ("A product is defective if it is not reasonably safe for its foreseeable uses.").

[26] *Cf. Merck Sharp*, 807 N.W.2d at 350 (MPLA § 600.2946(5) barred claims that were "indisputably based" on alleged misrepresentations about the safety and efficacy of the drug); *Duronio*, 2006 WL 1628516, at *5 (MPLA § 600.2946(5) immunity applied where it was "clear" that the safety and efficacy of the drug were "essential" to plaintiff's claim of monetary loss).

16

MPLA § 600.2946(5) (if the FDA has approved a drug for safety and efficacy, the drug "is not defective or unreasonably dangerous" in a "product liability action").  Instead, the claims depend on whether Defendants failed to adequately implement required controls, to ensure their otherwise safe and non-defective drugs were not diverted to the black market.

Accordingly, on this record, the Court finds Defendants have not shown that, as a matter of law, Monroe's anti-diversion claims derive from the "production of a product"[27] or otherwise constitute a "product liability action" under MPLA § 600.2946(5).[28]  Defendants' motions to dismiss are therefore overruled as to Monroe's common law claims based on Defendants' alleged failure to fulfill anti-diversion duties.

### 3. Exceptions to Immunity.

Monroe asserts that, even if its common law claims are otherwise abrogated by MPLA § 600.2946(5), the immunity does not apply because: (1) the fraudulent marketing claims involve unregulated, non-branded, and off-label promotional efforts; (2) the Manufacturers made misrepresentations to the FDA; (3) its claims involve "combination products;" and (4) the

---

[27] Because the Court concludes the anti-diversion claims are not based on the "production of a product," it need not address whether they are "brought for the death of a person or for injury to a person or damage to property."  MPLA § 600.2945(h).

[28] This ruling is consistent with the Court's previous findings in this MDL that similar or identical claims did not sound in products liability.  *See* Doc. ##: 1203 at 32 (Summit County's negligence claim does not assert Defendants' opioids were defective but rather that Defendants negligently permitted or encouraged diversion of those products) (Ohio law); 1499 at 65 (Muskogee Nation does not seek to hold the Distributors liable for distributing a defective product) (Oklahoma law); 1500 at 21-22 (Defendants' arguments do not support a conclusion that the Blackfeet Tribe's nuisance claims are essentially product liability claims) (Montana law); 1680 at 11 (Muscogee Nation "has sufficiently alleged a non-product liability negligence theory") (Oklahoma law); 3253 at 9 ("West Boca does not assert a products liability claim") (Florida law).  The same reasoning applies here: Monroe's anti-diversion claims are not based on Defendants' *selling* of opioids, but, rather, on Defendants' alleged diversion-related misconduct that created an oversupply of opioids that fueled an illicit secondary market, causing the County's alleged injuries.

County's alleged loss resulted from the "reasonably foreseeable misuse" of opioids under MPLA § 600.2947(2). Doc. #: 729 at 13-16. The Court examines below each potential exception.

### a) Non-Branded and Off-Label Promotional Efforts.

Monroe argues MPLA § 600.2946(5) immunity does not apply to claims involving non-branded and off-label promotional efforts that were not regulated by any governmental entity. Doc. #: 729 at 14. Federal courts in Michigan, however, have squarely rejected similar arguments. *See, e.g., Short v. Janssen Pharm., Inc.*, 2015 WL 2201713, at *6 (W.D. Mich. May 11, 2015) ("courts have repeatedly rejected" plaintiffs' argument that MPLA § 600.2946(5) immunity applies only if the drug is promoted and marketed within the scope of the FDA's approval).[29] Monroe points to no Michigan authority reaching a contrary result. The Court therefore follows the courts that have rejected Monroe's argument on this ground.

### b) Misrepresentations to the FDA.

MPLA § 600.2946(5)(a) provides an exception to immunity where the defendant intentionally withheld or misrepresented information material to the FDA's approval of a drug. MCL § 600.2946(5)(a).[30] Monroe asserts this exception applies because the Manufacturers

---

[29] *See also, e.g., Short*, 2015 WL 2201713, at *6 (MPLA § 600.2946(5) provides an "absolute defense" regardless of whether the defendant engaged in an unlawful marketing scheme to promote off-label use of the drug); *White*, 538 F. Supp. 2d at 1029-30 (MPLA § 600.2946(5) provides an "absolute defense" even if the defendant fraudulently misled the medical profession and public about the dangers of the drug's side effects); *Griffus v. Novartis Pharm. Corp.*, 2006 WL 2583129, at *1-2 (E.D. Mich. Sept. 6, 2006) (MPLA § 600.2946(5) provides an "absolute defense;" and the Michigan legislature was certainly aware that drugs will be used for purposes beyond that which the FDA approved).

[30] Specifically, MPLA § 600.2946(5)(a) provides an exception to immunity if, "before the event that allegedly caused the injury," the defendant:

Intentionally withholds from or misrepresents to the United States food and drug administration information concerning the drug that is required to be submitted under the federal food, drug, and cosmetic act . . . and the drug would not have been approved, or the United States food and drug

18

intentionally withheld or misrepresented information that would have led the FDA to deny or withdraw approval for their prescription opioids.  Doc. #: 729 at 13.  Under federal preemption principles, however, the Sixth Circuit has found this exception to be unavailable where a state law claim would require the court to make a determination of fraud on the FDA.  *Garcia v. Wyeth-Ayerst Labs*, 385 F.3d 961, 966 (6th Cir. 2004) (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001)).[31]  As a practical matter, this means Monroe may not invoke this exception to MPLA immunity based on *its own* proof of fraud, but must instead show evidence of *federal findings* of fraud on the FDA.  *White*, 538 F. Supp. 2d at 1027-29; *Ammend v. BioPort, Inc.*, 2006 WL 1050509, at *3 (W.D. Mich. April 19, 2006).

Here, Monroe contends it has alleged "multiple instances in which the FDA itself has admonished Defendants" for misrepresentations and omissions regarding their marketing and promotion of opioid medications.[32]  Doc. #: 729 at 13.  Monroe further asserts the Complaint is "replete with examples of Defendants' misrepresentations regarding their dangerous products" and

---

administration would have withdrawn approval for the drug if the information were accurately submitted.

MCL § 600.2946(5)(a).

[31] In *Garcia*, the Sixth Circuit found, under federal preemption principles, the exceptions to immunity under MPLA § 600.2946(5)(a) and (b) are invalid in some settings (*e.g.* when a plaintiff asks a state court to make a determination of bribery or fraud on the FDA), but not in others (*e.g.* where the state law claims are based on *federal findings* of bribery or fraud on the FDA).  *Garcia*, 385 F.3d at 966; *see also Marsh v. Genentech, Inc.*, 693 F.3d 546, 553-54 (6th Cir. 2012) (federal law preempted the MPLA § 600.2946(5)(a) immunity exception where plaintiff did not allege the FDA, itself, found the defendant committed fraud).

[32] Specifically, Monroe points to allegations that the FDA: (1) requested Endo to remove Opana-ER from the market and communicated concerns that Endo omitted material facts in promotional materials; (2) sent warning letters to Janssen regarding its misleading promotion of the Duragesic patch; (3) sent a warning letter to Purdue regarding omissions in its campaign promoting OxyContin; (4) issued guidance to Purdue regarding omissions in its OxyContin label; (5) sent a warning letter to Cephalon regarding its misleading advertising of Fentora; and (6) sent warning letters to various manufacturers regarding "the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life."  Doc. #: 729 at 13 (citing Doc. #: 3032, ¶¶ 64, 130, 159-163, 232, 242, 282-304, 421, 701, 706-708).  Notably, even these admonishments by the FDA do not suggest the opioid drugs at issue "would not have been approved."

"[d]iscovery is almost certain to uncover additional instances of misrepresentations and omissions made directly to the FDA." *Id.* Even accepting Monroe's assertions as true, they stop well short of alleging the FDA or any other federal entity has actually determined that Defendants committed a fraud on the FDA, *i.e.* that they intentionally withheld or misrepresented information regarding the FDA's approval of the drugs at issue. *See, e.g., White*, 538 F. Supp. 2d at 1029 (as a functional matter, to maintain a product liability suit against a drug manufacturer under Michigan law, a plaintiff must allege "the federal government has established that the drug manufacturer either committed fraud against the FDA or bribed an FDA official"). In sum, Michigan law and federal preemption principles set a very high bar for the "fraud on the FDA" exception to MPLA immunity, and Monroe has not alleged facts sufficient to clear it.

### c)    "Combination Products."

Monroe next asserts MPLA § 600.2946(5) immunity does not apply because many of the opioid products at issue are "combination products," *i.e.* products that include both a drug and a delivery mechanism. Doc. #: 729 at 14. In *Miller v. Mylan Inc.*, 741 F.3d 674 (6th Cir. 2014), the Sixth Circuit found Michigan law ambiguous as to whether MPLA § 600.2946(5) immunity applies to claims against the manufacturer of a combination product. *Id.* at 675-78. In light of this ambiguity, the Sixth Circuit ruled MPLA § 600.2946(5) should *not* be construed to exempt those manufacturers from suit. *Id.* at 678.

*Miller* involved a claim for wrongful death allegedly caused by a generic version of the Duragesic (fentanyl) patch – one of the opioid products involved in this case. *Id.* at 675; Doc. #: 3032, ¶ 130. The district court dismissed the claim, finding the fentanyl patch was a "drug" falling within the purview of MPLA § 600.2946(5). *Miller*, 741 F.3d at 676-77. The Sixth Circuit

reversed, finding the district court failed to take full account of the statutory scheme governing federal regulations, which leaves to the FDA's discretion the determination whether a combination product is regulated as (i) a drug or (ii) a device.  *Id.* at 677.  More specifically, the Sixth Circuit noted the fentanyl patch essentially has two parts: (1) fentanyl (the active ingredient or drug); and (2) a "transdermal system," *i.e.* the patch that delivers the drug.  The Sixth Circuit found a question of fact existed as to whether the fentanyl patch was a "combination product," and remanded the case for determination of whether the fentanyl patch should be designated only as a "drug" for purposes of MPLA § 600.2946(5).  *Id.* at 675-78.

Monroe argues many of the opioid products at issue here are "combination products" that offer new delivery systems for opioids, such as "patches, lollipops, and oral delivery systems with extended-release mechanisms."  Doc. #: 729 at 14.  In their reply briefs, Defendants argue Monroe has not adequately alleged claims based on combination products.  Doc. ##: 815 at 5; 820 at 4; 821 at 4.  The Court, however, declines to address arguments raised for the first time in a reply brief.  *Ross v. Choice Hotels Int'l, Inc.*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012).

In light of the Sixth Circuit's ruling in *Miller*, Defendants have not shown that, as a matter of law, Monroe has failed to allege fraudulent marketing claims involving combination products as to which there is no immunity under MPLA § 600.2946(5).  *See, e.g.,* Doc. #: 3032, ¶ 67 (describing single-dose spray device intended for oral, under-the-tongue administration); *id.*, ¶ 130 (marketing allegations regarding Duragesic (fentanyl patch); *id.*, ¶ 450 (referencing the sales of a narcotic lollipop).  Accordingly, the Court declines to dismiss any common law fraudulent marketing claim to the extent it involves a combination product.

### d)     Reasonably Foreseeable Misuse.

Finally, Monroe asserts MPLA § 600.2946(5) does not apply because the misuse of opioids was "reasonably foreseeable."  Doc. #: 729 at 15-16.  Monroe's argument is problematic because it conflates two separate provisions of the MPLA.  As discussed above, MPLA § 600.2946(5) provides manufacturers and sellers with broad immunity in a particular type of "product liability action," *i.e.* those cases involving FDA-approved drugs.  Nothing in MPLA § 600.2946(5) provides an exception to this brand of immunity based on the "reasonably foreseeable" misuse of these drugs.  The only exceptions provided under this provision are for bribery and fraud on the FDA, as discussed above.

Monroe nevertheless argues MPLA § 600.2946(5) immunity for FDA-approved drugs is foreclosed by a *separate* provision of the MPLA − § 600.2947(2)[33] − which provides an "absolute defense" in *any type* of product liability case if a plaintiff's harm was caused by the *misuse* of a product.  *See Belleville v. Rockford Mfg. Group, Inc*, 172 F. Supp. 2d 913, 918 (E.D. Mich. 2001) (determining whether MPLA § 600.2947(2) barred liability based on plaintiff's alleged misuse of a wire draw machine).  A plaintiff can overcome this "misuse of a product" defense, however, by showing the misuse was "reasonably foreseeable" to the defendant.  *Id.* (denying the manufacturer's motion for summary judgment, finding plaintiff's misuse of the machine was reasonably foreseeable).

Here, Monroe provides no authority to show that the "reasonably foreseeable" exception to the "misuse of a product" defense in MPLA § 600.2947(2) can be applied to circumvent the broad immunity that MPLA § 600.2946(5) provides to manufacturers and sellers of FDA-approved

---

[33] MPLA § 600.2947(2) states: "A manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product *unless the misuse was reasonably foreseeable*.  MCL § 600.2947(2) (emphasis added).

drugs. Moreover, the many provisions, immunities, and exceptions within the MPLA are carefully crafted, suggesting the exception set out in one statutory section should *not* be applied to the immunity set out in another section. Accordingly, the Court declines to deny MPLA § 600.2946(5) immunity on this ground.

In sum, based on the foregoing analysis, the Court concludes that − to the extent the common law claims for negligence, unjust enrichment, fraud, and civil conspiracy seek to recover monetary losses for fraudulent marketing involving FDA-approved drugs that are not "combination products" − the Manufacturers are immune from liability under MPLA § 600.2946(5). Defendants have not shown, however, that the immunity provision applies to Monroe's anti-diversion or nuisance claims, or to any fraudulent marketing claims that seek non-monetary loss or involve "combination products."


### D. Free Public Services Doctrine.

Defendants next assert the free public services doctrine, also known as the municipal cost recovery rule, precludes Monroe from recovering the costs of providing public services. Doc. ##: 572-1 at 14; 595-1 at 16-17. Like other plaintiffs in this MDL, Monroe alleges damages resulting from Defendants' alleged long-term and continuing misconduct including, *inter alia,* the costs of providing emergency, law enforcement, criminal justice, and foster care services. *E.g.,* Doc. #: 3032, ¶¶ 9-21, 136-664. Regarding these allegations, this Court previously declined to apply the free public services doctrine to bar recovery under RICO and state law claims, concluding:

> the costs of Plaintiff's governmental services are recoverable to the extent that they exceed the ordinary costs of providing those services and evidence establishes that they were incurred due to the Defendants' violation of [RICO or] state law.

Doc. ##: 1680 at 13-14, *adopting* 1499 at 15-17 *and* 1500 at 8; *see also* Doc. ##: 1203 at 19,

*adopting* 1025 at 17-22.

Acknowledging the absence of any published Michigan decision expressly adopting or rejecting the free public services doctrine, Defendants posit the Michigan Supreme Court "would adopt" the doctrine, and follow the reasoning in *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), to dismiss Monroe's claims. Doc. #: 595-1 at 16-17. Defendants do not, however, cite any authority to support the proposition that Michigan would adopt *Berretta*. Nor does *Beretta* contradict this Court's prior rulings. Although *Beretta* dismissed plaintiff's damages claim, it found the public resources at issue there were merely "ordinary," involving the "normal provision of police, fire, and emergency services," and therefore not recoverable. 821 N.E.2d at 1145-1147 (quoting *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co,* 719 F.2d 322, 324 (9th Cir. 1983)). By contrast, this Court has found the opioid crisis, allegedly created by Defendants, resulted in new and additional costs for protecting the public welfare that went "far beyond what a government entity might ordinarily be expected to pay." Doc. #: 1203 at 19. These increased costs are recoverable even under *Beretta*.

Accordingly, the Court declines to apply the free public services doctrine to dismiss Monroe's claims.

### E. Statute of Limitations.

The Manufacturers assert Monroe's claims are time-barred to the extent they rely on conduct occurring more than six years prior to the filing of the operative Complaints.[36]

---

[36] The limitations periods and the dates applicable to them vary by claim and by the dates each Defendant was sued. The original Complaint was filed February 7, 2012 and amended April 25, 2012. Subsequent amendments adding defendants were filed on May 30, 2018 and December 20, 2019.

Manufacturers base the look-back on a six-year limitation period, which they describe as the longest period applicable to Monroe's causes of action.  Doc. #: 595-1 at 21-22; 821 at 1 n.2. Responding, Monroe argues the Complaint alleges facts sufficient to toll the limitation periods, based on fraudulent concealment and equitable estoppel.[37]  Doc. #: 729 at 8-11 (citing Doc. #: 3032, ¶¶ 687-695, 552-559).

The Manufacturers rely on arguments raised in the *Summit County* motions to dismiss.  The allegations and tolling theories advanced by Monroe are virtually identical to those asserted by the *Summit County* plaintiffs.  Doc. ##: 513, ¶¶ 599-606, 769-777; 3032, ¶¶ 552-559, 687-695.  The Court concluded the *Summit County* complaint alleged facts supporting a plausible inference that applicable limitations periods were subject to tolling.  The Court's reasoning and conclusion apply with equal force here; therefore, the Court declines to dismiss any of Monroe's causes of action as time-barred.

### F.      Failure to Provide Notice and Affidavit Under MCL § 600.219d.

Citing several paragraphs of the Complaint describing the Pharmacies' activities as retail dispensers rather than wholesale distributors, the Pharmacy Defendants argue that, if these allegations are intended to state claims against the Pharmacies as retail dispensers, any such claims are vague and conclusory and should be dismissed.  Doc. #: 592-1 at 2; *see also* Doc. #: 3032, ¶¶ 560-623.  The Pharmacies made similar arguments in *Cleveland Bakers,* addressing allegations

---

[37] Michigan statutory law expressly provides an exception to limitations periods as follows:  "If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations."  MCL § 600.5855.

almost identical to those cited here.  Doc. #: 773-1 at 4-5.  And, like the plaintiffs' response in *Cleveland Bakers*, Monroe's opposition brief does not entirely clarify the scope of its claims against the Pharmacies.  Doc. #: 729 at 4-5.

Nevertheless, the factual allegations in the Complaint make clear Monroe intends to hold the Pharmacies liable for their dispensing practices, and has alleged facts sufficient to do so.  *See* Doc. #: 1332, ¶ 574 ("Pharmacies' fail[ed] to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers"); *id.*, ¶ 575 ("Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids") *id.*, ¶ 576 ("Pharmacies failed to analyze . . . the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community."); *id.*, ¶ 579 ("Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd.").  Thus, the Court concludes Monroe's claims, to the extent Monroe intends to pursue them against the Pharmacies as retail dispensers of opioid drugs, are not vague or conclusory and may proceed.

As further grounds to dismiss any "dispenser" claims against them, the Pharmacies argue these claims are barred because Monroe failed to file the pre-suit "affidavit of merit" required by Michigan's malpractice statute.  Doc. #: 592-1 at 2-3.  This argument fails. A pre-suit affidavit of merit is only required in a medical malpractice claim, MCL § 600.2912d, and Monroe disavows making a medical malpractice claim.  Doc. #: 729 at 6.[38]

---

[38] Even if the County were asserting a medical malpractice claim against the Pharmacies, pharmacies are not health care providers under Michigan's malpractice statute, so a pre-suit affidavit is not required.  *See Kuznar v. Raksha Corp.*, 750 N.W.2d 121, 129 (Mich. 2008) ("A pharmacy is neither a licensed health facility or agency nor a licensed health-care professional. Hence, under the law [a pharmacy is] incapable of committing medical malpractice.").

Finally, the Pharmacies allege Michigan law precludes pharmacist liability for correctly filling prescriptions written by licensed physicians. Doc. #: 592-1 at 3. The cases cited by the Pharmacies to support this argument address only whether pharmacies owe duties to their customers, and are inapposite to the current facts. *See Adkins v. Mong*, 425 N.W.2d 151, 152 (Mich. Ct. App. 1988) (no duty to warn plaintiff of potential side effects of narcotics dispensed in accord with valid prescriptions); *Kintigh v. Abbott Pharmacy*, 503 N.W.2d 657, 658 (Mich. Ct. App. 1993) (no duty to discover a customer's addiction to nonprescription cough syrup and no duty to refuse to sell medication to the customer); *Hooper v. Perry Drug Stores, Inc.,* 1996 WL 33359076, at *2 (Mich. Ct. App., Sept. 20, 1996) (no duty to warn a customer of the side effects of concurrent use of multiple medications when the medications were supplied in accordance with a valid prescription). Accordingly, the Court denies the Pharmacy Defendants' motion to dismiss Monroe's claims against them in their capacity as "retailers."

## IV.     Failure to State A Claim.

As to all claims, Defendants assert Monroe has failed to state a claim upon which relief may be granted. The Court evaluates each claim below.

### A.     Racketeer Influenced and Corrupt Practices Organizations Act ("RICO") (Counts I and II).

Monroe asserts civil RICO claims against the RICO Marketing Defendants and the RICO Supply Chain Defendants. Doc. #: 3032, ¶¶ 792-851. These claims are virtually identical to the RICO claims in *Summit County*. The Manufacturers' and Distributors' briefing refers almost exclusively to defense theories advanced in *Summit County*. Specifically, Defendants contend Monroe fails to sufficiently plead: (1) standing; (2) causation; (3) the existence of an enterprise;

27

and (4) predicate acts.  Defendants further contend the Complaint fails to satisfy the particularity requirement of Rule 9(b), Fed. R. Civ. P.  Doc. ##: 572-1 at 6; 595-1 at 20-21; 820 at 5-6; 821 at 1 & n.2.

In *Summit County*, the Court thoroughly analyzed Defendants' arguments, concluding dismissal of the RICO claims was inappropriate at the pleading stage.  Doc. #: 1203 at 6-20, *adopting* Doc. #: 1025 at 11-48.  The outcome is the same here for the same reasons.  The Court addresses the parties' Michigan-specific arguments below.

Michigan statutory and case law cited by the Manufacturers does not alter the Court's conclusion that dismissal of Monroe's RICO claims at the pleading stage is unwarranted.  The Manufacturers argue the Complaint fails to allege causation because Monroe's theories depend on alleged intervening unlawful acts, or decisions of patients, doctors, and pharmacies.  Doc. #: 595-1 at 20.  In *Summit County*, the Court found the 'intervening cause' defense raised "significant factual issues not suitable for resolution on a motion to dismiss."  Doc. #: 1025 at 82, *adopted by* Doc. #: 1203 at 20.  That conclusion applies equally here, unchanged by Manufacturers' citation to additional Michigan legal authority.

The Manufacturers also contend the Complaint's allegations that they misrepresented compliance with state anti-diversion laws are insufficient to support RICO's predicate act element.  Specifically, the Manufacturers argue Michigan law imposes no independent statutory or common law duty to monitor, report, and halt suspicious orders.  Doc. #: 595-1 at 20-21.  Without further analysis, the Manufacturers cite a Michigan Supreme Court decision that states: "Generally, an individual has no duty to protect another who is endangered by a third person's conduct."  *Murdock v. Higgins,* 559 N.W.2d 639, 643 (Mich. 1997).  As Monroe points out, however, the Complaint alleges the RICO Marketing Defendants acted to perpetuate the Opioid Marketing Enterprise, not

merely that they misrepresented compliance with state law duties.  Doc. #: 729 at 54-55 (citing Doc. #: 3032, ¶¶ 757, 804, 806, 826, 830).  Monroe further alleges the RICO Marketing Defendants' predicate acts of racketeering included mail and wire fraud as well as violations of federal anti-diversion obligations.  *Id., ¶¶* 803-815, 826-843.  The Court previously analyzed these allegations and found them sufficient to plead predicate racketeering acts.  Doc. #: 1025 at 39-48, *adopted by* Doc. #: 1203 at 6-20.  Again, Manufacturers' citation to additional Michigan legal authority does not alter this conclusion.

Finally, the Manufacturers assert Monroe's predicate act pleading based on third parties' allegedly false statements fails to satisfy Michigan agency law, which requires proof that a principal controls an agent's acts.  *See* Doc. #: 595-1 at 21 (*citing Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992)).  Addressing the same argument in *Summit County*, the Court acknowledged plaintiff's allegations of direct misrepresentations by the RICO Marketing Defendants, and their sponsorship and control of front groups, and stated: "although the veracity of these allegations may be in dispute, they cannot be challenged in a 12(b)(6) motion."  Doc. #: 1025 at 43, *adopted by* Doc. #: 1203 at 20.  Because the Complaint is based on identical allegations, the Manufacturers' argument does not provide a reason to dismiss the RICO claims.  Doc. ##: 513, ¶¶ 442-451; 3032, ¶¶ 403-412.

Based on the foregoing analysis and the Court's decision in *Summit County*, Defendants' motions to dismiss Monroe's RICO claims are denied.

###### B.     Michigan Consumer Protection Act ("MCPA") (Count III).

The MCPA provides an extensive list of "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  MCL § 445.903(1).  Among these proscribed acts are:

(a)   Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services. * * *

(c)   Representing that goods or services have sponsorship, approval, characteristics . . . uses, and benefits . . . that they do not have. * * *

(s)   Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. * * *

(bb)  Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

(cc)  Failing to reveal facts that are material to the transaction in light of representations of facts made in a positive manner. * * *

MCL § 445.903(a).

Monroe asserts each Defendant violated the MCPA because each one "engaged in unfair and/or deceptive acts or practices by omitting the material fact of [their] failure to monitor, report, and stop the filing of suspicious orders of controlled substances."  Doc. #: 3032, ¶ 857.  Monroe alleges additional violations of the MCPA by the Manufacturers, stemming from their unbranded marketing[39] through the use of "trade associations, front groups, and key opinion leaders to actively promote the use of opioids for indications not federally approved, to circulate false and misleading information concerning opioids' risks, benefits, and superiority, and to downplay or

---

[39] The County describes "unbranded" promotional materials as "materials that promote the use of a type of drug but do not identify any particular drug by name."  Doc. #: 729 at 27.

omit the risk of addiction arising from their use." *Id.,* ¶ 856.  Monroe further asserts the Manufacturers, by engaging in improper unbranded marketing, "circumvented and acted outside the bounds of their federal regulatory obligations and FDA oversight." *Id.*

Defendants seek the dismissal of Monroe's MCPA claims, arguing: (1) Defendants are shielded from liability under the MCPA's exemption for transactions authorized by law; (2) the claims do not "relate to a consumer transaction" as required by the MCPA; and (3) Monroe has not pleaded its claims with the required specificity.  The Distributors and Pharmacies also argue Monroe has not alleged a misrepresentation material to any relevant transaction as required under certain provisions of the MCPA.  Finally, the Manufacturers argue Monroe cannot show causation or damages.  Doc. ##: 572-1 at 15-20; 592-1 at 6-9; 595-1 at 9-14.

The MCPA does not allow for liability related to a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States."  MCL § 445.904(1)(a) (the "authorized transaction" exemption).  Defendants argue the Drug Enforcement Agency ("DEA") and FDA licensing and regulatory regimes to which they are subject bring them within this exemption.  Doc. ##: 572-1 at 15-18; 592-1 at 8-9; 595-1 at 9-11.

In *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28 (Mich. 1999), the Michigan Supreme Court adopted a broad reading of the exemption provided by MCPA § 445.904(1)(a):

> we conclude here that, when the Legislature said that transactions or conduct "specifically authorized" by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute.  Contrary to the "common-sense reading" of this provision by the Court of Appeals, we conclude that *the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is "specifically authorized."  Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.*

*Id.* at 38 (emphasis added); *see also Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 519 (Mich. 2007) ("[T]he relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.").

As noted, Monroe alleges diversion-based violations of the MCPA as well as violations based on unbranded marketing.[40]  Monroe argues the authorized transaction exemption does not apply to either claim.  The Court does not agree.  The exemption clearly applies to the diversion-related claims, as Monroe itself asserts the sale and distribution of prescription opioids are regulated by the DEA and FDA.  Doc. #: 3032, ¶¶ 463-487, 156-164.  Defendants' allegedly deceptive non-disclosure of their "failure to monitor, report, and stop the filling of suspicious orders" of prescription opioids, even if in violation of DEA regulations, nevertheless concerns transactions within the regulatory purview of the DEA.  Doc. #: 3032, ¶ 857.  Therefore, under *Smith* and *Liss*, because the "general transactions" of distributing and selling prescription opioids are "specifically authorized by law," the authorized transaction exemption applies to Monroe's diversion-related MCPA claims against all Defendants.  *Smith*, 597 N.W.2d 28; *Liss*, 732 N.W.2d 514.

The MCPA claim based on the Manufacturers' marketing activities presents a closer question.  Monroe asserts, with scant authority,[41] that the "unbranded marketing" activities it

---

[40] Monroe does not base its MCPA claim against the Marketing Defendants on "branded" marketing, *i.e.* marketing by individual defendants to promote their own named products.  Doc. #: 729 at 27.  As the County concedes, branded marketing is regulated by the FDA and would, therefore, fall within the scope of the MCPA's "transactions authorized by law" exemption.  *Id.* at 24.

[41] The two cases Monroe cites to support the proposition that unbranded marketing is not regulated by the FDA are both opioid cases that merely repeat, in sections setting out the factual background, *plaintiffs' own allegations* that unbranded marketing is not regulated by the FDA.  The actual holdings in those cases do not support Monroe's proposition.  *See City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1063 & n.6 (N.D. Ill. 2016); *City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423, at *2 (N.D. Ill. May 8, 2015).

alleges are not regulated by the FDA, and thus evade the reach of the authorized transaction exemption. Doc. #: 729 at 26-29. In support of this argument, Monroe cites cases in which Michigan courts found the exemption inapplicable to regulated defendants engaging in unregulated activity. For example, in *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727 (Mich. Ct. App. 1996), the plaintiff sued a pharmacy for violating the MCPA, alleging the defendant deceptively advertised a computer software system that harmed the plaintiff by failing to flag a harmful drug interaction. In finding the exemption did not apply, the *Baker* court reasoned that, even though the pharmacy itself was regulated by the state Board of Pharmacy, "[a]dvertising is not within the purview of the Pharmacy Board's regulatory power." *Id.* at 732. *See also Attorney Gen. v. Diamond Mortg. Co.*, 327 N.W.2d 805 (Mich. 1982) (MCPA exemption did not apply to licensed real estate broker's writing of a mortgage loan because the broker's real estate license did not authorize the writing of loans).

*Baker* and *Diamond Mortgage* do not support the conclusion that Monroe's marketing allegations are not subject to the authorized transaction exemption of MCPA § 445.904(1)(a). First, both cases were decided before the Michigan Supreme Court in *Smith* announced its current expansive view of the exemption.[42] Second, those cases are factually distinguishable – the deceptive practices alleged in *Baker* and *Smith* were fundamentally different than the regulated conduct in which the defendants normally engaged. The real estate agent in *Diamond Mortgage* was not selling houses, but issuing loans. The pharmacy in *Baker* was not selling prescription medications, but touting its point-of-sale software. Here, the unbranded marketing in question was

---

[42] *See* Scott Thomas O'Neal, *Exempting the Protection Out of Michigan's Consumer Protection Act: A Call for Returning Consumer Protection to the Act*, 84, U. Det. Mercy L. Rev 237, 247 (2007) (comparing Michigan MCPA jurisprudence before and after *Smith* and observing that, after *Smith,* "if the business is generally regulated, it will be exempt from liability under the MCPA through [§ 445.904(1)(a)].").

intimately connected to the highly-regulated business of marketing and selling prescription opioids.[43]  In light of the Michigan Supreme Court's clear pronouncement in *Smith*, the Court is not persuaded that the distinction between branded and unbranded marketing is sufficient to push Monroe's allegations beyond the reach of MCPA § 445.904(1)(a).

Monroe argues it is premature to dismiss any MCPA claims on exemption grounds because the authorized transaction exemption is an affirmative defense that cannot be granted at the motion to dismiss stage.  Doc. #: 729 at 28 (citing *Pfeil v. State Street Bank & Trust Co.*, 671 F.3d 585, 599 (6th Cir. 2012) ("Courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings.")).  But in *Marsh v. Genentech, Inc.*, 693 F.3d 546 (6th Cir. 2012), the Sixth Circuit, while acknowledging the general rule against basing a motion to dismiss on an affirmative defense, noted that a "motion to dismiss can be premised on an affirmative defense, however, if 'the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief.'"  *Id.* at 554-55 (quoting 5B Charles Alan Wright, Arthur Miller, Mary Kay Kane & Richard Marcus, Federal Practice & Procedure § 1357 at 713 (3d ed. 2004)).

Because Monroe's own allegations of violations of DEA and FDA regulations indicate the authorized transaction exemption applies, the Court concludes, under *Marsh,* it is not premature to grant Defendants' motions to dismiss Monroe's MCPA claims.  Accordingly, Monroe's MCPA claims against all Defendants are dismissed.

---

[43] The Complaint itself reveals the FDA exercises some regulatory authority over unbranded marketing.  *See* Doc. #: 3032, ¶ 164 ("A representative from the FDA's Division of Drug Marketing, Advertising and Communications . . . call[ed] for an extensive educational effort to consumers and health care practitioners to correct a misconception that [OxyContin] is different than morphine.") (internal quotation marks omitted).

## C.      Public Nuisance (Count IV).

Like Ohio, Florida, Montana, and Oklahoma, Michigan defines public nuisance as an unreasonable interference with a right common to the general public.    *See Adkins v. Thomas Solvent Co.,* 487 N.W.2d 715, 720 n.8 (Mich. 1992) (citing the Restatement (Second) of Torts § 821B).  Monroe's nuisance pleading is virtually identical to the *Summit County* and *Blackfeet Tribe* complaints, Doc. ##: 513, 6, and also alleges facts and theories of nuisance liability substantially similar to those asserted in *Muscogee Nation*, *Cleveland Bakers*, *West Boca*, and *Broward County*. Doc. ##: 731, 3031, 2985, 525.[44]

Defendants raise arguments for dismissal that echo those asserted in the foregoing actions. Specifically, Defendants assert the nuisance claim is insufficiently pleaded because it: (1) relies on individual rights rather than those commonly held by the general public; (2) alleges a causal link broken by the acts of intervening third parties; (3) does not concern the use and condition of property; (4) is based on a defective product or a product over which they had no control following its sale, distribution, or dispensing; and (5) cannot be maintained because "safe harbor" protection shelters their regulated conduct from liability.  Doc. ##: 572-1 at 6-9; 592-1 at 9; 595-1 at 14-16; 815 at 8-11; 820 at 6-8; 821 at 6-8.

The Court has analyzed each of these arguments previously in this MDL and concluded the pleadings were sufficient.  Doc. ## 1680 at 16-20, *adopting* 1499 at 50-62 *and* 1500 at 17-34; 3177 at 41-47; 3253 at 29-33; *see also* 2578 at 1-4 (*Summit County* MSJ Order re: Public

---

[44] The *Cleveland Bakers* and *West Boca* plaintiffs are private parties, and in some respects their public nuisance claims differ from those asserted by Summit County, Muscogee Nation, and Blackfeet Tribe, which are government entities. Citations to the *Cleveland Bakers* MTD Order (Doc. #: 3177) and the *West Boca* MTD Order (Doc. #: 3253) pertain to elements and holdings common to government and private public nuisance claims.

Nuisance).  For the same reasons, the Court concludes Monroe's nuisance pleading is sufficient to withstand Defendants' motions to dismiss.


### D.     Negligence (Count V).

In Michigan, a negligence claim requires a duty, breach of that duty, and damages proximately caused by the breach.  *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 688 (Mich. 2005); *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).  The "duty" element addresses "whether the defendant is under any obligation to the plaintiff to avoid negligent conduct."  *Moning v. Alfono*, 254 N.W.2d 759, 764 (Mich. 1977).  The proximate cause element requires foreseeability and a determination of whether defendant should be held legally responsible for its actions.  *Ray v. Swagger*, 903 N.W.2d 366, 371 (Mich. 2017).  In Michigan,

> [i]t is well established that placing a product on the market creates the requisite relationship between a manufacturer, wholesaler and retailer and persons affected by use of the product giving rise to a legal obligation or duty to the persons so affected.  A manufacturer owes the consumer an obligation to avoid negligent conduct.  The obligation extends to persons within the foreseeable scope of the risk.

*Moning*, 254 N.W.2d at 765.  Michigan common law also recognizes a general relationship "which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unnecessarily endanger the person or property of others." *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967); *see also Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 809 N.W.2d 553, 560 (Mich. 2011).

Relying on *Summit County* briefing, all Defendants argue Monroe's negligence claim should be dismissed because Defendants owed no duty to Monroe.  Doc. ##: 572-1 at 11-12; 592-1 at 9-13; 595-1 at 17.  Also, the Manufacturers and Pharmacies assert Monroe has failed to sufficiently plead proximate cause.  Doc. ##: 572-1 at 13; 595-1 at 16-17.

36

In *Summit County*, the Court rejected the same duty and proximate cause arguments made here, concluding plaintiffs had pled facts sufficient to plausibly set forth a negligence claim.  Doc. #: 1203 at 33-34, *adopting* Doc. #: 1025 at 74-82.  Given the similarities between the elements of negligence in Ohio and Michigan, the Court finds, at this stage of the proceedings, that Monroe has pled facts sufficient to satisfy the duty and proximate cause elements of its negligence claim.[45]

The Distributor Defendants also seek dismissal of Monroe's negligence claim based on Michigan's "present physical injury" rule.  Doc. #: 572-1 at 13.  Specifically, the Distributors argue: "Because the County has not alleged any present injuries to its person or property, its negligence claim fails as a matter of Michigan law."  *Id*.  Monroe responds that it "is asserting present injury to its property and to its population" and, pursuant to Michigan law, money is considered to be property.  Doc. #: 729 at 49 & n.47.  To support this position, Monroe cites to its allegation that it:

> suffered and continues to suffer both injuries and pecuniary losses and damages proximately caused by the Defendants' breaches.  Among other things, and as discussed further herein, Monroe County has experienced an unprecedented opioid addiction and overdose epidemic costing millions, including, but not limited to, treatment services, emergency visits, medical care, treatment for related illnesses and accidents, lost productivity to Monroe County's workforce, increased law enforcement and judicial expenditures, increased prison and public works

---

[45] The Complaint contains a single, generic reference to negligence *per se*.  *See* Doc. #: 3032, ¶ 874 ("Negligence *per se* is established where the defendant violates a statutory duty and where the statute is intended to protect against the result of the violation, the plaintiff is within the class intended to be protected by the statute and the statutory violation is a proximate cause of the plaintiff's injury.").  The Court has addressed motions seeking dismissal of other claims for *negligence per se*.  *See* Doc. ##: 1680 at 23-24 (dismissing Oklahoma negligence *per se* claims because statutes cited by plaintiffs were not intended to protect plaintiffs from the harms alleged); 3177 at 52-53 (same under Ohio law).  In Michigan, however, a negligence *per se* claim is not an independent cause of action separate from negligence.  *See Zeni v. Anderson*, 243 N.W.2d 270, 280-82 (1976) ("Michigan does not subscribe to the doctrine of negligence *per se*."); *Guldenstein v. Merit Energy Co*., 2017 WL 3225960, at *3 & n.3 (6th Cir. July 31, 2017) ("Michigan does not adhere to the doctrine of negligence per se.").  Instead, "violation of a statute creates a rebuttable presumption of negligence, and the violation of an administrative regulation constitutes evidence of negligence."  *Kennedy v. Great Atl. & Pac. Tea Co*., 737 N.W.2d 179, 186 (Mich. Ct. App. 2007).  Consequently, the concept of negligence *per se* based on statutory and regulatory violations is subsumed within Monroe's negligence claim.  In light of the Court's dismissal of the negligence claim, it need not address the question of negligence *per se*.

37

> expenditures, increased substance abuse treatment and diversion plan expenditures,
> lost economic activity, and lost reputation and good will.  * * *

Doc. #: 3032, ¶ 879

A Michigan plaintiff seeking damages for negligence must establish present physical injury to person or property.  "It has simply always been the case in [Michigan] jurisprudence that plaintiffs alleging negligence claims have also shown that their claims arise from present physical injuries." *Henry*, 701 N.W.2d at 690.  In *Henry*, plaintiffs sought damages only for the costs of medical monitoring and not for physical injury or for the enhanced risk of physical injury. *Henry*, 701 N.W.2d at 689 & n.4.  The court dismissed plaintiffs' negligence claim and "reaffirm[ed] the principle that a plaintiff must demonstrate a present physical injury to person or property *in addition* to economic losses that result from that injury in order to recover under a negligence theory." *Id.* at 690 (emphasis in original); *see also Means v. U.S. Conf. of Catholic Bishops*, 836 F.3d 643, 654 (6ᵗʰ Cir. 2016) (quoting *Henry* and emphasizing the need for "present physical injury to person or property," in addition to economic loss, to support a Michigan negligence claim).[46]

As a result of the alleged acts and omissions of Defendants, Monroe asserts it was required to provide various services to its residents and also suffered lost productivity to its workforce, increased county expenditures, lost economic activity, and lost reputation and good will.  Doc. #: 3032, ¶ 879.  These injuries have already occurred and, therefore, are "present" injuries.  However, based on its review of Michigan jurisprudence, the Court believes Michigan courts would reject Monroe's negligence claim on the grounds that the County's alleged injuries are not the type of

---

[46] The *Henry* court also distinguished tort damages from tort injuries, noting tort *damages* include damages naturally flowing from the subject *injury;* because the economic damages sought by the *Henry* plaintiffs were based only on a possible, future injury rather than an actual, present injury, plaintiffs could not state a claim for negligence. *See Henry*, 701 N.W.2d at 691 ("While the courts of this state may not have always clearly articulated this injury requirement, nor finely delineated the distinction between an 'injury' and the 'damages' flowing therefrom, the injury requirement has always been present in our negligence analysis.").

"physical injury to person or property," as opposed to "economic" injury, required by Michigan law. While money may be considered property, that does not convert an economic injury into a physical injury to person or property.[47]  *See Henry*, 701 N.W.2d at 690 ("We are not aware of any Michigan cases in which a plaintiff has recovered on a negligence theory without demonstrating some present physical injury."); *id.* at 691 ("A financial 'injury' simply is not a present physical injury, and thus not cognizable under our tort system.").

Accordingly, the Court grants Defendants' motions to dismiss the negligence claim.


### E.      Unjust Enrichment (Count VI).

Monroe asserts claims for unjust enrichment against all Defendants. Under Michigan law, the elements of an unjust enrichment claim are: "(1) receipt of a benefit by the defendant from the plaintiff . . . (2) which benefit it is inequitable that the defendant retain." *Meisner Law Group PC v. Weston Downs Condo. Ass'n*, 909 N.W.2d 890, 900 (Mich. Ct. App. 2017) (citation omitted). Unjust enrichment extends to the unjust retention of "money or benefits which in justice and equity belong to another." *Wright v. Genesee County*, 934 N.W.2d 805, 809 (Mich. 2019) (citations omitted); *see also Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010).

Monroe contends it provided benefits to Defendants; the benefits were known to and accepted by Defendants; and, in light of the ensuing opioid epidemic allegedly caused by

---

[47] This conclusion is consistent with Michigan case law addressing MPLA claims, where courts have found the term "damage to property," standing alone, includes more than "physical damage" and was "broad enough to include both *physical damage to an object* and injury or harm to rights or interests associated with an object, so long as the damage is caused by or results from the production of the product." *Duronio*, 2006 WL 1628516, at *4 (emphasis added); *see also supra*, Part III.C.1.b (interpreting the MPLA's definition of "damage to property"). Michigan's "present physical injury rule," as articulated in *Henry*, expressly includes the term "physical injury." *See Henry*, 701 N.W.2d at 690 ("a plaintiff must demonstrate a present physical injury to person or property *in addition* to economic losses"). Thus, based on its inclusion of this term of limitation, the common law "present physical injury" rule appears to embrace a narrower application than that adopted in connection with MPLA claims.

Defendants' conduct, it would be inequitable for Defendants to retain the benefits.  Doc. #: 3032, ¶¶ 882-885.  In response, relying on Michigan law and *Summit County* briefing, Defendants argue they received no benefit from Monroe.  Defendants further contend the law requires a direct benefit from Monroe to each Defendant, which the County has not sufficiently pleaded.  Doc. ##: 572-1 at 24-25; 592-1 at 15-16; 595-1 at 18.

Monroe disputes Defendants' assessment of Michigan law,[48] and also argues it need only plead that its detriment and Defendants' benefit flow relatedly from the alleged wrongful conduct. Doc. #: 729 at 50-52.  And Monroe argues it has met this pleading requirement by alleging it conferred a benefit to Defendants by paying the costs associated with the opioid epidemic, including "medical care and treatment services, emergency visits, medical care, treatment for related illnesses and accidents, law enforcement and lost productivity to Monroe County's workforce."  *Id.*, ¶ 884.  Monroe describes these benefits as negative externalities:

> [B]y using Plaintiff to pay for Defendants' negative externalities − the cost of the harms caused by the wrongful practices − the Defendants knowingly saved costs and expenses that allowed them to sell and distribute more opioids, and make more money, than if they had internalized the actual cost of their activities.

Doc. #: 729 at 52.[49]  For the reasons discussed below, the Court agrees with Monroe.

The Court has addressed the "negative externalities" theory of unjust enrichment in other cases in this MDL.  *See* Doc. #: 1025 at 95 ("Plaintiffs state a facially plausible unjust enrichment claim on the theory that they conferred a benefit upon all Defendants by alleging that they paid for

---

[48] "Courts have split on whether Michigan unjust enrichment law requires that a plaintiff confer a direct benefit on a defendant, or whether a benefit may be unjustly obtained by a defendant through an intermediary." *In re 100% Grated Parmesan Cheese Mktg. & Sales Pract. Litig.*, 348 F. Supp. 3d. 797, 817 (N.D. Ill. 2018).  The Court need not address this issue because it finds Monroe has sufficiently pleaded a direct benefit.

[49] Monroe also identifies its payments for opioids marketed and distributed by Defendants as another benefit to Defendants.  Doc. #: 3032, ¶¶ 882-883; *see also* Doc. #: 729 at 51.  In this connection, Monroe alleges it is "self-insured for certain of its employees' health benefits."  Doc. #: 3032, ¶ 28.

the cost of harm caused by the defendant's conduct, *i.e.*, the defendant's externalities."), *adopted by* Doc. #: 1203 at 36-38; *see also* Doc. ## 1499 at 67-68, *adopted by* 1680 at 14-16; 3177 at 61-63; 3253 at 57-60; 3274 at 19-22.  The parties have not identified, and the Court has not found, any authority indicating Michigan courts would reject the negative externality theory as a basis for an unjust enrichment claim.  Indeed, to the contrary, the Michigan Supreme Court recently highlighted the adaptable nature of unjust enrichment:

> Unjust enrichment has evolved from a category of restitutionary claims with components in law and equity into a unified independent doctrine that serves a unique legal purpose: it corrects for a benefit received by the defendant rather than compensating for the defendant's wrongful behavior.

*Genesee County*, 934 N.W.2d at 811; *see also Thachik*, 790 N.W.2d at 265 (noting equitable rights derive "from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate.").

Consequently, the Court believes a negative externalities analysis is compatible with Michigan's unjust enrichment jurisprudence.  Here, the Complaint alleges Defendants received direct benefits from the County in the form of County's payments of the costs of Defendants' negative externalities.  The Complaint also alleges it would be unjust to allow these benefits to go uncompensated.  These allegations suffice to state an unjust enrichment claim.

The Manufacturer and Distributor Defendants add another argument, asserting the conduct underlying Monroe's unjust enrichment claim is the same conduct that forms the basis of the County's other claims and, thus, there are no grounds for an unjust enrichment claim.  Doc. ##: 572-1 at 24-25; 595-1 at 17.  But as the Court noted in *Summit County*, at the pleading stage, multiple overlapping and conflicting claims may be asserted alternatively without requiring dismissal.  Doc. #: 1025 at 94-95; *see also Miller v. MSX-IBS Holding, Inc*., 2016 WL 4138238,

at *7 (E.D. Mich. Aug. 4, 2016) ("At this pleadings stage, however, plaintiffs are entitled to plead in the alternative and the fact that plaintiff seeks to recover under both theories [breach of contract and unjust enrichment] is of no moment at this early juncture.").

Finally, the Distributors contend that, if Monroe purchased opioids from them, then necessarily a contract governed the parties' relationship; and, in light of that contract, the equitable remedy of unjust enrichment is inapplicable. Doc. #: 572-1 at 25. This argument is unavailing. The Court here does not base its conclusion solely on Monroe's alleged payments for opioids, but also on its payment of the costs associated with the opioid crisis – the costs of doing business that, absent recovery in this action, Defendants would never have to bear. These costs are extra-contractual. Accordingly, Defendants' motions to dismiss Monroe's unjust enrichment claims are denied, except to the extent Defendants are immune from liability under the MPLA (as set out in Part III.C).

### F. Fraud and Fraudulent Concealment (Count VII).

Monroe asserts common law claims for fraud against all Defendants based on alleged misrepresentations and omissions related to their anti-diversion duties under federal and state law. Doc. #: 3032, ¶¶ 890-896. Additionally, as to the Manufacturers, Monroe asserts claims based on fraudulent marketing. *Id.*, ¶¶ 888-889. Defendants contend these allegations fail to state a claim upon which relief may be granted.

To state a fraud claim under Michigan law, a plaintiff must allege: (1) the defendant made a material misrepresentation; (2) the representation was false; (3) the defendant knew the representation was false at the time it was made (or was reckless as to its truth); (4) the defendant made the representation with the intention that plaintiff would act upon it; (5) plaintiff reasonably

relied on the misrepresentation; and (6) plaintiff thereby suffered injury.[50]  *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976); *Cummins v. Robinson Twp.*, 770 N.W.2d 421, 435-38, (Mich. Ct. App. 2009).  Under Rule 9(b), Monroe must plead the circumstances of the alleged fraud, including detrimental reliance, with particularity.  *See Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 852-53 (6th Cir. 2006) (conclusory allegations of reliance are insufficient); *Bachi-Reffitt v. Reffitt*, 2020 WL 548265, at *2 n.2 (6th Cir. Feb. 4, 2020) (in Michigan, a plaintiff must plead reasonable reliance with particularity).

The Court has previously set forth its analysis of the application of Rule 9(b) to allegations of fraud in this MDL:

> "The sufficiency of a fraud pleading tends to vary with the complexity of the transaction in question in the litigation. When the issues are complicated or the transactions cover a long period of time, a number of federal courts have required less of the pleader." Charles Alan Wright *et al*, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.); *see also, cf., United States v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) (describing that "'particular' allegations of fraud may demand different things in different contexts."). The Sixth Circuit has relaxed pleading standards in certain contexts to aid in judicial efficiency. *See, e.g., U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007) (describing how "pleading every instance of fraud would be extremely ungainly, if not impossible" in situations where allegations are "complex and far-reaching.")

> "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006)). That is, when considering Rule 9's particularity requirement, "a court must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8." *Id.* Thus, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Intern., Inc.*, 681

---

[50] The Michigan elements of fraud are similar to those under Ohio law.  *See* Doc. #: 1025 at 85 (stating the elements of fraud under Ohio law).

F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

Doc. #: 1680 at 3-4.[51]

### 1.    Manufacturers.

As noted, Monroe asserts fraud claims against the Manufacturers based on alleged misrepresentations and omissions regarding their marketing and anti-diversion duties.  These claims are essentially the same as those asserted against these same defendants in *Summit County*. Doc. ##: 513, ¶¶ 1073-1076; 3032, ¶¶ 887-889.  The Manufacturers seek to dismiss these claims for the same reasons they asserted in *Summit County*.  Doc. #: 595-1 at 18.  Additionally, the Manufacturers argue the claims fail under Michigan law because: (1) Monroe has not sufficiently alleged reliance; and (2) the FDA-approved labels carried prominent warnings that disclosed the risks of opioids to prescribing physicians.  Doc. #: 595-1 at 18-19.

In *Summit County*, the Court denied the Manufacturers' motion to dismiss, finding plaintiffs had sufficiently stated claims for common law fraud under Ohio law.  Doc. #: 1025 at 86-88, *adopted without objection by* Doc. #: 1203 at 2.  The Court adopts and incorporates the *Summit County* reasoning here, as supplemented by the discussion below regarding the Manufacturers' specific arguments under Michigan law.

---

[51] *See also* Doc. #: 1025 at 39-42 ("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.") (quoting *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988)), *adopted by* Doc. #: 1203.

a)      **Reliance.**

The Manufacturers assert Monroe's allegations of reliance are merely conclusory and therefore insufficient.  Doc. #: 595-1 at 18.  The Court disagrees.  Monroe alleges the Manufacturers made numerous material misrepresentations and omissions with the intent to deceive the medical community, patients, government regulators, and the public (including the County).  Doc. #: 3032, ¶¶ 139-447, 665-677, 687-695, 888-894.  Monroe alleges these misrepresentations and omissions misled the public (including the County) into believing the opioid crisis was caused not by the Manufacturers' conduct, but rather, by the unlawful abuse and inappropriate prescribing behavior of others.[52]  Monroe further asserts that, as a result of this deception, it did not (and could not) discover the facts underlying its claims, including the full nature, scope, and magnitude of the Defendants' misconduct and its full impact on the County, which caused the County to incur exorbitant costs in responding to the opioid crisis.  *Id.*, ¶¶ 19, 664, 689-693.[53]

Defendants are correct that some of Monroe's fraud allegations are generic and its proofs at trial will certainly require more individualized precision.  Nonetheless, as in *Summit County*, the Court finds Monroe's allegations are sufficient to fairly apprise the Manufacturers of the nature

---

[52] *See, e.g.,* Doc. #: 3032, ¶ 687 (Defendants fraudulently assured the public they were working to curb the opioid epidemic); 689 (Marketing Defendants "denied blame for the epidemic attributing it instead solely to abuse and inappropriate prescribing"); 690 (Defendants misled regulators, prescribers, and the public (including the County) by hiding their lack of cooperation with law enforcement and publicly portraying themselves as working to prevent diversion); 692 (the Marketing Defendants' conduct deceived the medical community and the public).

[53] *See also* Doc. #: 1203 at 4 ("Without access to the ARCOS data, Plaintiffs were forced to take Defendants at their word that they were complying with their obligations under consent decrees, statutes, and regulations.").

of Monroe's fraud claims against them, including the element of detrimental reliance.[55]  Doc. #: 1025 at 86-88.

### b)     FDA-Labels.

The Manufacturers assert the warnings on FDA-approved opioid labeling relieve them from liability because, based on these labels, prescribing physicians could adequately take into account the "propensities of the drugs."  Doc. #: 595-1 at 18-19.  Given Monroe's allegations that prescribing physicians were also targets of the misrepresentations, the Court declines to find "the physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result."  Doc. #: 1025 at 29-30 (rejecting Defendants' arguments concerning intervening causes and the learned intermediary doctrine).  Accordingly, the Court declines to dismiss the fraud claims against the Manufacturers on these grounds.

### 2.     Distributors and Pharmacies.

Against the Distributors and Pharmacies, Monroe asserts common law fraud claims based on alleged misrepresentations and omissions regarding their anti-diversion duties.  Defendants

---

[55] The Manufacturers argue briefly that representations made to a third party cannot establish a valid fraud claim under Michigan law.  Doc. #: 595-1 at 18.  Contrary to this assertion, like Ohio, Michigan *does* recognize a fraud claim based on "misrepresentations to a third party with the intent to induce reliance by the claimant."  *Arrowood Indem. Co. v. City of Warren*, 2015 WL 58679, at *6 (E.D. Mich. Jan. 5, 2015 (quoting *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F. Supp. 1019, 1028 (W.D. Mich. 1989)).  As in *Summit County*, Monroe's allegations here are sufficient to state a claim that the Manufacturers intended to induce others, including Monroe, to rely on their allegedly false assurances and omissions.  Doc. #: 1025 at 85-88; *see also* Doc. #: 1680 (finding the Magistrate Judge's analysis of pleading under Rule 9 in *Muscogee Nation* and *Blackfeet Tribe* "strikes the appropriate balance between simplicity and particularity").  The Manufacturers also argue Monroe has not sufficiently alleged it relied on any third-party misrepresentations.  Doc. #: 595-1 at 18.  The Court notes, however, that Monroe has alleged first-party misrepresentations, *i.e.* to the public, including Monroe County.  Moreover, to the extent Monroe alleges third-party representations, for the reasons stated, these allegations sufficiently allege detrimental reliance by Monroe.

argue these claims fail because Monroe has not sufficiently alleged: (1) the Distributors and Pharmacies made affirmative misrepresentations; (2) the County relied on any such misrepresentations; or (3) the Distributors and Pharmacies owed a legal duty to the County sufficient to support a claim of fraud by omission.  Doc. #: 572-1 at 20-24; Doc. #: 592-1 at 13-15.

### a)    Fraud by Affirmative Statements.

The Distributors and Pharmacies assert Monroe has failed to sufficiently allege they made *any* affirmative misrepresentations.  Doc. #: 572-1 at 21-22; Doc. #: 592-1 at 13-15.  To the contrary, however, Monroe alleges that, "[a]fter being caught failing to comply with particular obligations at particular facilities, Distributor Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens."[56] Doc. #: 3032, ¶ 548.  Monroe further alleges: "Distributor Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs."  *Id.*, ¶ 549.  Monroe also specifically alleges that Defendants "continued to violate the laws in contrast to [their] written agreement[s] not to do so."[57]  *Id.*, ¶¶ 548, 715 (concerning McKesson, specifically).  As in *Broward County*, the Court finds these allegations sufficient to put the Distributors and Pharmacies on notice of the common law fraud claims against them for affirmative statements they made to the public, which includes Monroe County.  Doc. #: 3274 at 24-25.

---

[56] Monroe's definition of Distributor Defendants includes the Pharmacy Defendants.  Doc. #: 3032, ¶ 88.

[57] Monroe offers specific allegations of these types of false and fraudulent statements made to the public, which includes the County itself, against most of the Defendants individually.  *See, e.g.,* Doc. #: 3032, ¶¶ 583 n.235, 587 (CVS); ¶ 595 n.245 (Walgreens) ¶ 604 n.251 (Rite Aid); *see also id.*, ¶¶ 549, 551 (alleging public statements by Cardinal and AmerisourceBergen regarding their commitment to anti-diversion measures).

### b)    Reliance.

The Distributors and Pharmacies next argue Monroe has not sufficiently alleged reasonable reliance.  Doc. #: 572-1 at 23-24; Doc. #: 592-1 at 15.  For the reasons stated above with respect to the Manufacturers, the Court finds Monroe has sufficiently alleged detrimental reliance, inasmuch as the Complaint alleges the deception of the Distributors and Pharmacies prevented Monroe from discovering the facts underlying its claims.  Doc. #: 3032, ¶¶ 19, 664, 689-693.

### c)    Fraud by Omission.

Finally, the Distributors and Pharmacies contend Monroe has not alleged they owed a legal duty to the County sufficient to support a silent fraud claim.  Doc. ##: 572-1 at 22-23; 592-1 at 14 n.6.  In *Broward County*, the Court observed that Florida law recognizes a claim for fraud by omission (which Michigan calls silent fraud), where a duty to disclose arises because a fiduciary or other relationship of trust or confidence exists between the parties.  Doc. #: 3274 at 25-26.  The Court further found that, in light of the CSA's purpose of consumer protection and public interest, and the DEA's mission of cooperation, collaboration, and sharing information with local enforcement officials, "it is not unreasonable to assume that the omission of material facts in statements made to the DEA would be passed on to [the County] specifically, so that it could engage in the very drug enforcement efforts from which it allegedly abstained in reliance on those omissions." *Id.* at 26-27.  The Court concludes the same conclusion is appropriate under Michigan law:

> Here, Michigan law also recognizes a claim for silent fraud, or fraudulent concealment, where a party suppresses, with intent to defraud, a material fact that it "in good faith is duty-bound to disclose." *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (citation omitted). Silent fraud has also long

> been recognized in Michigan. This doctrine holds that when there is a legal or equitable duty of disclosure, "[a] fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud." *Tompkins v. Hollister*, 60 Mich. 470, 483, 27 N.W. 651 (1886) (citations omitted)[.]

*Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 569 (Mich. 2012). To constitute an actionable claim, the silence must have "occurred under circumstances where there was a legal duty of disclosure." *Id.* (citation omitted). Michigan law imposes such a duty to disclose in circumstances involving fiduciary or other special relationships involving significant trust or a substantial imbalance of knowledge or power. *See Brownell v. Garber*, 503 N.W.2d 81, 85 (Mich. Ct. App. 1993) ("there is an affirmative duty to disclose when the parties are in a fiduciary relationship") (citation omitted); *St. Paul Fire & Marine Ins. Co. v. CEI Florida, Inc.*, 864 F. Supp. 656, 674 (E.D. Mich. 1994) (Michigan law recognizes a duty to advise where a special relationship exists between the parties).[58]

Like Broward County, Monroe County alleges that, as CSA registrants, "Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a first line of defense." Doc. ##: 525, ¶ 142; 3032, ¶ 135. Monroe further alleges that, under the CSA's "closed" system, which is "intended to control the supply and reduce the diversion" of opioids, the Distributors and Pharmacies were "uniquely positioned, based on their knowledge of their customers and orders − as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the

---

[58] *See also In re Estate of White*, 2013 WL 4006534, at *7 (Mich. Ct. App. Aug. 6, 2013) ("A 'fiduciary relationship' is one of inequality where a person places complete trust in another person regarding the subject matter, and the trusted person controls the subject of the relationship by reason of knowledge, resources, power, or moral authority.") (quotation and citation omitted).

illicit market." *Id.*, ¶ 481.  As in *Broward County*, the allegations here are sufficient to demonstrate that Monroe relied on these Defendants to inform it – either via the DEA or directly – that opioids were being diverted into the County.  Based on these allegations, it appears Monroe has adequately pleaded a special relationship sufficient under Michigan law to indicate a duty of disclosure.

On this record, Monroe has sufficiently alleged facts demonstrating Defendants owed a legal duty to the County to support a silent fraud claim.  *See, e.g., Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*, 2004 WL 2106638, at *11 (W.D. Mich. Mar. 30, 2004) (refusing to dismiss claims for breach of fiduciary duty where plaintiffs alleged a substantial imbalance of knowledge, power, and capability, and extraordinary trust in and reliance on defendant in their business dealings); *St. Paul Fire*, 864 F. Supp. at 674  (whether a special relationship existed between an insurance agent and its client that created a duty to disclose was a fact question for the jury).

Based on the foregoing analysis, and for the reasons more fully stated in *Broward County*, the Court concludes Monroe has provided sufficient particularity in its pleading to support its allegations of fraud by omission, and has sufficiently put each Defendant on notice as to the nature of the claim against it.  Accordingly, the Court denies Defendants' motions to dismiss the fraud claims, except to the extent Defendants are immune from liability under the MPLA (as set out in Part III.C).

### G.    Civil Conspiracy (Count VIII).

Monroe alleges all Defendants "engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids into and around Monroe County."  Doc. #: 3032, ¶¶ 897-913.  Under Michigan law, "A civil conspiracy is

a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 670 N.W.2d 569, 580 (2003), *aff'd*, 693 N.W.2d 358 (Mich. 2005) (quotation and citation omitted).  The claim requires proof of a separate, actionable tort, which may be satisfied by proof of an unlawful act by any one of the conspirators resulting in damages.  *Roche v. Blair*, 9 N.W.2d 861, 864 (Mich. 1943).

Relying on their briefing in *Summit County,* Defendants assert Monroe fails to allege sufficient facts to demonstrate an underlying act or a conspiratorial agreement under the particularity requirements of Rule (9)(b).  Doc. ## 572-1 at 25-26; 592-1 at 16; 595-1 at 19-20; 729 at; 815 at 16; 820 at 16; 821 at 1 n.2.  In *Summit County*, the Court analyzed and rejected similar arguments, and it does so here again for the same reasons.

As to Defendants' contention that no claims asserting actionable underlying acts survive dismissal, as addressed above in this Order, the Court has denied Defendants' motions to dismiss Monroe's diversion-based fraud claims.  Thus, as in *Summit County,* Monroe has sufficiently alleged an underlying illegal act or tort.  Doc. #: 1203 at 21, *adopting* Doc. #: 1025 at 96.

Further, Defendants' assertion that Monroe fails to plead a conspiratorial agreement is not well-taken.  Michigan law does not require direct proof of a formal agreement, and it recognizes the element may be "established by circumstantial evidence based on inference."  *Temborius v. Slatkin*, 403 N.W.2d 821, 828 (Mich. Ct. App. 1986).  Here, Monroe alleges Defendants undertook concerted action to achieve the conspiratorial goal of expanding the opioid market.  *E.g.,* Doc.#: 3032, ¶¶ 509-13, 565-72, 678-84.  As the Court has concluded in its prior decisions, these allegations satisfy the conspiratorial agreement element under the pleading requirements of Rule

9(b).  Doc. #: 1203 at 20-22, *adopting* 1025 at 95-98; 1680 at 25, *adopting* 1499 at 69-70 and 1500 at 41-42; 3177 at 63-64; and Doc. #: 3274 at 30-31.

Accordingly, Defendants' motions to dismiss Monroe's civil conspiracy claims are denied, except to the extent Defendants are immune from liability under the MPLA (as set out in Part III.C).

## V.    Conclusion.

In sum, the Court rules as follows:

- Defendants' Motions to Dismiss are **GRANTED** with respect to Count III (MCPA) and Count V (Negligence).

- In addition, the Manufacturers' Motion to Dismiss is **GRANTED** with respect to Count VI (Unjust Enrichment), Count VII (Fraud and Fraudulent Concealment), and Count VIII (Civil Conspiracy), to the extent those claims: (1) seek recovery for monetary losses, and (2) are based on fraudulent marketing of prescription opioids that are not "combination products."

- The motions are otherwise **DENIED**.

**IT IS SO ORDERED.**

        **/s/ Dan Aaron Polster 4/30/20**
        **DAN AARON POLSTER**
        **UNITED STATES DISTRICT JUDGE**