UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>Track One Cases | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**MOTION TO PRECLUDE EVIDENCE
CONCERNING DISPENSING PRACTICES AT SELECT RETAIL STORES[1]**

Plaintiffs respectfully move this Court for an order precluding Defendants from introducing evidence at trial of dispensing practices at select retail stores to show they have discharged their obligations to prevent diversion. For two years, Defendants insisted that evidence concerning dispensing practices at their retail stores was not relevant to the claims or defenses in a distribution only case and thus did not need to be produced. Based on these representations, the Special Master held that, with certain specific exceptions, Defendants need not produce their dispensing information unless it was explicitly considered by the distributor in its suspicious order monitoring. Defendants, thus, did not produce the bulk of this information until after Plaintiffs asserted

---

[1] Plaintiffs appreciate that, in an effort to determine whether the claw back of the dispensing-related discovery produced after amendment of Plaintiffs' complaint is appropriate, the Court seeks to determine what evidence the parties intend to adduce at trial. In light of Defendants' notices regarding pharmacists' witnesses, Plaintiffs submit this Rule 37 motion in response and to address the Court's April 29, 2020 Order. *See* Dkt. # 3280 (Order); CVS Notice (Exh. A); DDM Notice (Exh. B); Giant Eagle/HBC Service Company Notice (Exh. C); Rite-Aid Notice (Exh. D); Walgreens Notice (Exh. E); Walmart Notice (Exh. F). Plaintiffs contend the scope of discovery is not based on what the parties might do at trial; but the scope of what the parties may do *at trial* may be limited by what they did during discovery. Given Defendants' past successful effort to prevent Plaintiffs from obtaining dispensing related evidence, they may not now use that evidence at trial.

dispensing-related claims in their amended complaints, and now following the Sixth Circuit's recent ruling striking those amendments, Defendants seek to claw black the dispensing information produced after November 2019.

Defendants know that the evidence they seek to claw back would enable Plaintiffs to respond to and rebut any claim by Defendants that the actions of the testifying pharmacists would demonstrate the sufficiency and accuracy of Defendants' suspicious order monitoring ("SOM") systems and anti-diversion controls.[2] Defendants CVS, Walgreens, and Giant Eagle have stated that they intend to introduce testimony of individual pharmacists who work at their stores. The testimony will likely attempt to demonstrate the extent to which anti-diversion efforts at the pharmacy level justified the orders that were placed with, and filled by, Defendants' own distribution centers, and supported Defendants' anti-diversion efforts. Although Rite-Aid, Walmart, and Discount Drug Mart, Inc. have not stated an intention to call store-level pharmacists at trial,[3] none of the Defendants should be permitted to introduce evidence in any form about their dispensing practices to justify their distribution conduct.

Throughout discovery, Defendants insisted that dispensing and distribution were separate

---

[2] The Controlled Substances Act ("CSA") requires Defendants to provide effective controls against diversion. "Section 1301.71 plainly requires [CSA] registrants to provide effective controls and procedures to guard against the diversion of controlled substances . . . ." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at *8 (N.D. Ohio Aug. 19, 2019). Further, "as a matter of law, Section 1301.74 [of the CSA's implementing regulations] imposes a legal duty on [CSA] registrants to: (1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrant." *Id.* at *7.

[3] Defendants object to the term "pharmacists," claiming the term is vague, and assert it should not include "non-practicing" pharmacists at the management or corporate level. It is clear from the transcript of the April 28, 2020 telephonic hearing that the Court is referring to store-level pharmacists who worked at the retail locations during the relevant time period. *See* Dkt. # 3283 ("I am talking about pharmacists who worked at Rite Aid, CVS, Walgreens, Walmart during the period . . . ."). It is Plaintiffs' understanding that Defendants' notices addressed their intent to call store-level pharmacists at trial. However, Plaintiffs seek a subject matter restriction on any witnesses being called to testify regarding Defendants' dispensing practices, regardless of how they are characterized.

activities. They persuaded the Court this was true. They may not now offer evidence at trial to show that the dispensing practices at their stores played any role in the controls they were required, as distributors, to maintain against diversion. This evidence (whether in the form of testimony from pharmacists or otherwise) should be precluded under Rule 37 and as a matter of judicial estoppel.

## BACKGROUND

Defendants Walgreens, Rite-Aid, CVS, Walmart, Giant Eagle, and Discount Drug, Inc. act (or at relevant times acted) as both distributors and dispensers of prescription opioids. As dispensers, Defendants sold prescription opioids to consumers at their retail stores. As distributors, they supplied their stores with these drugs, acting as wholesale middlemen between the manufacturers and the stores. In their distributor role, Defendants were required by the federal Controlled Substances Act ("CSA") to maintain effective controls against diversion, to identify and report suspicious orders they received from their stores, and to halt shipment of suspicious orders unless and until they were able to determine that the orders were not likely to be diverted. *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at *8 (N.D. Ohio Aug. 19, 2019). Plaintiffs contend, and intend to prove at trial, that Defendants failed to implement appropriate SOM systems, failed to identify suspicious orders, and failed to perform due diligence on orders that were, or should have been, identified as suspicious. Plaintiffs thus intend to show that Defendants' distribution of prescription opioids was in violation of the CSA and that this unlawful conduct created a public nuisance under Ohio law.

Since the earliest days of discovery in this litigation, the Parties have disagreed about the relationship between Defendants' distributor activities and what went on at Defendants' retail stores. As dispensers, Defendants are in possession of detailed data about each and every prescription they fill at their stores ("dispensing data"). Plaintiffs asserted that what actually happened in the stores with respect to dispensing would shed light on the effectiveness of Defendants' SOM programs.

Defendants, however, insisted that this detailed information was not relevant to their maintenance of effective controls against diversion as *distributors*.

Plaintiffs brought this issue before the Special Master in the fall of 2018 when they sought to compel Defendants to produce evidence pertaining to their dispensing practices, including prescription-level dispensing data. *See* Pls.' Letter (Oct. 8, 2018) (Exh. G)  In opposing the motion, Defendants argued that most of the dispensing information Plaintiffs sought was irrelevant because Plaintiffs were not asserting claims based on dispensing activities.  In particular, Walmart argued that its production should be limited to "documents explaining its order monitoring procedures with respect to its pharmacies[,]. . . the investigation of flagged orders from the CT1 jurisdictions [and] information regarding proactive measures taken by Walmart to address concerns arising from opioid misuse."  Walmart Letter, at 2 (Oct. 12, 2018) (Exh. H).  Rite-Aid similarly argued that its production should be limited to "dispensing information directly related to suspicious order monitoring – such as a due diligence report in connection with a request to increase a distribution threshold for a particular pharmacy that included a review of dispensing information . . . ." Rite-Aid Letter, at 1-2 (Oct. 12, 2018) (Exh. I).  Rite-Aid resisted producing due diligence documents related to prescriptions filled in its stores, claiming there was no duty under the CSA to do so and, even if there was, Rite-Aid has never flagged a suspicious order that required due diligence.  Walgreens argued that it was sufficient for it to produce its dispensing policies and documents, and only dispensing data "regarding its evaluation of Opioids orders from its pharmacies," but that otherwise dispensing data was non-responsive.  Walgreens Email (Oct. 12, 2018) (Exh. J).  CVS similarly proposed limiting its production to "dispensing-related documents contained in suspicious order monitoring files;" "relevant policies and procedures related to dispensing controlled substances;" and "compensation policies for pharmacists."  CVS Letter, at 2 (Oct. 12, 2018) (Exh. K).  In short, Defendants' position was that they should only be required to produce narrowly defined dispensing

-4-

1993319.13

information to the extent it was actually in the distribution entity's SOM files.

Considering Defendants' positions collectively, Special Master Cohen ruled on the motion to compel dispensing data in Discovery Ruling 8. Dkt. # 1055. The Special Master accepted Defendants' representations about the relevance of dispensing information and limited the scope of production along the lines they suggested because such restrictions were proportional, particularly "in light of the press of imminent Track One deadlines." Dkt. # 1055, at 3. Rather than require production of all of Defendants' dispensing information including all raw dispensing data, he enumerated six categories of dispensing information that Defendants would be required to produce. Dkt. # 1055, at 3-4. These categories included:

- Policies and produces related to dispensing controlled substances. This includes documents related to (a) procedures, policies, protocols, internal controls, or instructions to (b) identify, prevent, investigate, evaluate, report, or halt (c) the actual or potential inappropriate or unlawful dispensing of opioids.

- Dispensing-related documents contained in suspicious order monitoring files related to Track One jurisdictions. This includes, for example, due diligence reports made in connection with particular orders, or in connection with requests to increase a distribution threshold for a particular pharmacy.

- Documents regarding evaluation [by the Defendant-distributor] of opioid orders from a particular retail pharmacy in Track One jurisdictions, whether before or after those orders are placed. To the extent such an evaluation includes dispensing data, that data must also be produced.

- Compensation policies for pharmacists in Track One jurisdictions.

- Transaction data showing the volume of opioid products received by each retail pharmacy location in the Track One jurisdictions, on an order-by-order basis.

- Memoranda of Settlement Agreements with the DEA involving dispensing violations.

In other words, to the extent Defendants used their dispensing data as part of their SOM systems, they were required to produce it. But if the information was not actually considered by the distributor with respect to suspicious order monitoring, Defendants were not required to produce it.

-5-

Special Master Cohen's order did not consider, at the time, the extent to which dispensing data might be required by the Plaintiffs to rebut or impeach Defendants' evidence that their SOM programs adequately performed due diligence on their orders.

Following DR 8, Defendants produced some dispensing information, such as policies and procedures relating to dispensing controlled substances, training material documents relating to dispensing controlled substances, compensation policies for pharmacists, and due diligence files, but withheld certain information. In particular, none of the Defendants produced meaningful dispensing data (whether or not it was a component of their SOM systems) until this year.

After they convinced the Court that the majority of the dispensing information was irrelevant, Defendants changed tact. Instead of focusing on information that they considered *as distributors* in receiving orders from their stores, at least some of the Defendants now contend that what their pharmacists and stores did or knew is also relevant, regardless if connected to their distribution conduct at the time they shipped the orders to their pharmacies. Indeed, Defendants suggest that it was not necessary for them, in their role as distributors, to consider the information they collected from their stores because they relied on the *stores* (and the pharmacists who work in them) to use that information to protect against diversion. Defendants also now suggest that information about dispensing is relevant to whether the orders they shipped were in fact later diverted.[4]

None of this can be squared with the position Defendants took in discovery. Rather, Defendants' current plan to rely on testimony of pharmacists and/or other anecdotal evidence about dispensing practices at their stores reflects an understanding that the legitimacy of the orders the

---

[4] CVS suggests as much in its letter to the Court "[t]he order asks us to address 'why the pharmacist's testimony is appropriate if that pharmacist was not involved in suspicious order due diligence or SOMs review when it occurred.' …such testimony is appropriate because it relates to *other* issues in the trial." *See* CVS Notice at 8 (Exh. A).

pharmacies placed to the Defendants' distribution centers is intertwined with the dispensing activity at the stores. *See* Dkt. # 3283, Tr. 19:16-20 (Apr. 28, 2020) (recognizing it has "always been clear" that pharmacy "distribution policies are inextricably intertwined with [their] dispensing policies and practices, because [they] are only distributing to [themselves]"). Having refused to allow Plaintiffs to utilize the recently produced data showing their total dispensing activity such that Plaintiffs could refute Defendants' arguments by reference to aggregate dispensing patterns, Defendants may not now cherry-pick dispensing practices at particular stores, or connected with particular orders, in order to establish that their distribution was proper.

This is particularly prejudicial because, as the Court and the Parties know, Plaintiffs' claims turn on an analysis of Defendants' conduct and knowledge in the aggregate (i.e. a pattern and practice of repeated violations of the CSA on a broad scale that lead to the crisis), not what occurred at a particular store with a particular pharmacist and particular prescription.[5] Defendants' intention to call individual pharmacists, which in no way will refute Plaintiffs' aggregate proof arguments, is of marginal, if any, relevance and will only lead to juror confusion. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Nor may Defendants rely on their own dispensing policies—even those that were produced in discovery— when they refused to provide the information necessary for Plaintiffs to test whether those policies were in fact followed

---

[5] As repeatedly argued, this case is not about prescription-by-prescription analysis, but analysis of the data in the aggregate. *See* Betses, M., *Abusive Prescribing of Controlled Substances—A Pharmacy View*, N. Engl. J. Med. 369:11 (Sept. 12, 2013) (recognizing "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances" and that chain pharmacies are better situated to detect diversion because they have the "advantage of aggregated information on all prescriptions filled at the chain.") (Exh. P). *See also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3934470, at *2 (N.D. Ohio Aug. 20, 2019) (denying Defendants' motion to exclude Plaintiffs' expert relying on aggregate data).

or whether they were adequate or effective.

It was not until March 2020 that the Defendants turned over raw dispensing data, which as the Court knows, Plaintiffs have analyzed in conjunction with objective red flag criteria to identify millions of prescriptions that should not have been dispensed. That is precisely the kind of analysis that common sense would dictate should have been done before an order for distribution was placed under a properly constructed SOM system. The Defendants cannot have it both ways. In other words, they cannot argue that at the distribution level, they filled orders because they believed their pharmacies were using good faith dispensing policies and at the same time prevent Plaintiffs from demonstrating, through the data, that this was not the case.

Defendants argued dispensing activity was irrelevant; they must now live with that decision.

## ARGUMENT

### I. Judicial estoppel prevents Defendants from introducing evidence concerning dispensing practices.

It is well-settled that the doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Yatsko v. Graziolli*, No. 1:18 CV 1675, 2019 WL 2497794, at *3 (N.D. Ohio June 17, 2019) (Polster, J.) (quoting *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 424 (6th Cir. 2005) (unpublished)). The doctrine "preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Id.* (quoting *Browning v. Levy,* 283 F.3d 761, 776 (6th Cir.2002)). "Although there is no set formula for assessing when judicial estoppel should apply, it is well-established that at a minimum, a party's later position must be clearly inconsistent with its earlier position for judicial estoppel to apply." *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) (internal citations omitted). The Sixth Circuit has enumerated three flexible considerations relevant in determining whether judicial estoppel should apply:

> (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceedings would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Lewis*, 141 F. App'x at 425 (internal citations omitted). A district court's application of judicial estoppel is reviewed under a *de novo* standard of review. *Lorillard*, 546 F.3d at 757.

As explained above, Defendants' new position that store level dispensing practices are relevant to defend against the distribution claims is clearly inconsistent with their earlier position. The Court and the Plaintiffs relied on Defendants' position that because the bulk of Defendants' dispensing practices were irrelevant, they did not intend to use it in their defense at trial. The Special Master limited discovery based on these representations, including representations about the marginal relevance of dispensing activity to Plaintiffs' distribution claims. *See* Dkt. # 1055 (DR 8); Dkt. # 1476 (DR 18). Plaintiffs did not take depositions, relying on Defendants' representations regarding the relevance of pharmacists' practices and testimony and, in any event, lacking impeachment material to examine them. Allowing Defendants to introduce evidence at trial regarding the dispensing practices in their retail stores after years of asserting it had nothing to do with their SOM systems or potential diversion on the distribution level would be unfairly prejudicial to Plaintiffs.

Defendants cannot "hav[e] [their] cake and eat it too." *Lewis*, 141 F. App'x at 424.

## II. Defendants' intended evidence should be precluded under Fed. R. Civ. P. 37.

### a. Preclusion is proper pursuant to Rule 37(c).

A party who fails to provide information in discovery is not allowed to then use that information at trial, unless the failure to disclose was substantially justified or harmless. Fed. R. Civ. P. 37(c). Indeed, "[t]he purpose of discovery is to provide a mechanism for making relevant

-9-

information available to the litigants. 'Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'" Fed. R. Civ. P. 26 (advisory committee note to 1983 amendment (citing *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)); *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) (noting "the basic purpose of Rule 37(c)(1): preventing surprise and prejudice to the opposing party"). Defendants' failure to disclose all the dispensing information and repeated assurance that it was not relevant was neither justified nor harmless.

Defendants contend that there was no failure to disclose because, they argue, the testimony they now propose to offer will not directly discuss dispensing data or particular suspicious orders (unless identified by Plaintiffs) and thus was not required to be produced under DR 8. They claim that the due diligence files that were produced, which is a compilation of data, are sufficient to justify an order of distribution to a particular store. *See* Dkt. # 3283, Tr. 26:3-17. But this ignores the fact that the dispensing data is needed to confirm the accuracy of those due diligence files and show that the dispensing activity at the pharmacies, including use of the potentially inaccurate due diligence files, were insufficient and failed to control against potential diversion. *See* Plaintiffs' April 27, 2020 Position Statement; *see also* Dkt. # 3283, Tr. 16:4-8 (noting the "pharmacist had an obligation to look at the dispensing data to identify whether or not there were prescriptions that potentially raised red flags in order to properly place the orders for drugs to be distributed to the local pharmacy."). Defendants cannot withhold certain information during the course of discovery arguing it is irrelevant (i.e. dispensing data, among other information) and then offer evidence at trial that can only be rebutted by the withheld information. *See* Fed. R. Civ. P. 37(c).

The "Sixth Circuit has adopted a five-factor test to determine whether a parties' failure to disclose is substantially justified or harmless: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing

the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *In re Nat'l Prescription Opiate Litig.,* No. 1:17-MD-2804, 2019 WL 1872908, at *2 (N.D. Ohio Apr. 26, 2019) (internal citations omitted). All factors here weigh in favor of precluding the testimony regarding dispensing practices.

Plaintiffs are surprised to learn that Defendants plan to introduce dispensing evidence after they insisted for so long that this evidence is irrelevant. Defendants' new position is deeply prejudicial. With the limitations imposed in discovery due to Defendants' old position, Plaintiffs are not able to effectively respond, and rebut, the accuracy of any evidence about dispensing practices. In particular, Plaintiffs would be prejudiced if they cannot use the aggregate data that would allow them to show that Defendants' select examples of dispensing practices are not representative of what actually occurred at Defendants' stores.[6] Plaintiffs asked for the data in discovery and Defendants persuaded the Court it was not sufficiently relevant to warrant production based on a misrepresentation of the import of that information to the distribution process. Plaintiffs are surely prejudiced by Defendants failure to produce full dispensing information.

Defendants' claim that it is not surprising that they would call store-level pharmacists to testify about dispensing practices within the retail pharmacies is not well-taken. Prior to DR 8, Defendants did not meaningfully identify pharmacist witnesses. For example, CVS tucked a generic category of "pharmacists who ordered or dispensed Schedule II Opioids at issue in Track One cases" into a laundry list of other non-specific witnesses in response to Plaintiffs' discovery requests. *See* CVS Interrogatory Response No. 15 (June 18, 2018) (Exh. L). CVS did not disclose specific pharmacists' names until the last day of discovery—after the deadline for the close of written

---

[6] For this reason, it would be especially unhelpful— indeed, prejudicial—for Defendants to be permitted, belatedly, to produce dispensing information from the specific stores at which their proposed witnesses worked. Such limited data would not permit Plaintiffs to test whether the stores selected by the Defendants were in any way representative of dispensing activity within the CT1 jurisdictions, or to select stores that paint a different picture.

discovery had passed—when it disclosed two of the six witnesses it intends to call at trial. *See* CVS Amended Interrogatory Response No. 15 (Jan. 25, 2019) (Exh. M). The remaining four witnesses were first disclosed on March 4, 2019. Importantly, Defendants also did not disclose the scope of the witnesses' knowledge, or the scope of the intended testimony, until their recent position statements. *See* 26(a)(1)(A)(i) (requiring the parties to identify the subjects of discoverable information within the knowledge of named witnesses). Thus, Plaintiffs did not seek the depositions of these store-level pharmacists because (1) Plaintiffs operated on the representation that Defendants would not offer evidence related to dispensing practices at trial because it was allegedly irrelevant to the claims or defenses of the distribution case; and (2) Defendants did not produce all the dispensing information, including dispensing data, required to cross-exam the witnesses.

Only now have Defendants made clear that they intend to offer testimony about the work of local pharmacists, including their role in the delivery of healthcare/patient care and their incentives to fill prescriptions; store-level ordering and dispensing systems, including how and why orders were placed by pharmacists in the distribution system/warehouse and whether the orders were suspicious; handling of controlled substances at the pharmacy level; or otherwise pharmacists' role in the claimed public nuisance.[7] *See* Walgreens Notice at 4-5 (Exh. E); CVS Notice at 6-8 (Exh. A); Giant Eagle Notice at 8 (Exh. C). Thus, Plaintiffs did not know that Defendants planned to offer precisely the kind of dispensing testimony Defendants had said would not be relevant. This is especially true because Defendants *had* been required to produce dispensing evidence actually considered by the

---

[7] Defendants also intend to introduce store-level pharmacists to testify as to Defendants' the role of pharmaceutical distribution systems in the practice of pharmacy; pharmacy compliance with applicable regulations including placement of orders for controlled substances and company controls against diversion; local efforts to address the opioids crisis and the criminal diversion of prescription opioids; licensing and regulation by state and federal regulatory agencies. Non-pharmacist witnesses, however, can supply this testimony and Defendants did not state otherwise, as required by the Court's April 29 Order.

distribution centers in filling orders from the pharmacies. Defendants could have (but did not) identify pharmacist witnesses with knowledge about the distribution analysis they conducted. Indeed, CVS failed to identify a single pharmacist that participated in its due diligence analysis.

To be clear, the issue is not whether Plaintiffs were surprised by the names of the specific witnesses Defendants have now identified, but whether Plaintiffs were surprised that Defendants would offer *any* evidence about dispensing practices at their stores. If pharmacist witnesses are permitted to testify at all, the scope of their testimony should be limited to their participation with the distribution center in due diligence investigations of suspicious opioid distribution orders.[8] Any discussion of dispensing-related testimony, including whether and to what extent pharmacists were responsible for dispensing due diligence, should be prohibited as Defendants consistently argued it is irrelevant since the opening of fact discovery.

At this late date, it is not possible for Defendants to cure the surprise created by their faulty disclosures and changes of position. As Defendants have argued repeatedly, discovery has been closed for quite some time.

In any event, Defendants' intended testimony is of marginal, if any, relevance to the distribution claims that remain in this case track. As the Court well knows, Plaintiffs intend to prove Defendants' failure to maintain effective control against diversion through aggregate proof, demonstrating a widespread and pervasive pattern of suspicious orders. Given Plaintiffs' contention that defendants shipped thousands of suspicious orders, testimony from a few pharmacists explaining the basis for placing a single one of those orders, and the due diligence that purportedly underlay the placement of the order, or the filling of the prescriptions, simply does not address

---

[8] This type of testimony would be parallel to the type of testimony introduced at the trial with the non-dispensing Distributor Defendants. CVS previously acknowledge same stating dispensing discovery is relevant only to the "extent it was considered by CVS's distribution operations in monitoring orders placed by CVS pharmacies and putting in place systems and processes for such monitoring." *See* CVS Letter to Special Master (Aug. 31, 2019) (Exh. O).

Plaintiffs' evidence showing that each of the Defendants shipped large numbers of suspicious orders into the CT1 jurisdictions. And Defendants cannot offer testimony about each and every one of those orders. Because the value of the evidence is marginal to Defendants' defense, precluding them from offering it is entirely proper.

Finally, Defendants' "explanation" for their failure to disclose does not provide a basis to deny preclusion. On the contrary, it is precisely the explanation for that failure that justifies preclusion here. Defendants obtained an order relieving them of the obligation to disclose dispensing information by representing that such information was not relevant to their liability as distributors. They cannot now benefit from the misrepresentation by being permitted to present a one-sided view of the story. Defendants should not be allowed to put forth evidence about how their pharmacy-level practices are adequate to identify suspicious orders and safeguard against diversion, having refused to produce the information needed to refute that evidence under the pretense that it is irrelevant.

### b.  Preclusion is proper pursuant to Rule 37(b).

Separate and apart from the Rules requiring disclosure under Rule 26(a) and (e), Rule 37(b) permits the Court to "issue further just orders" when a party "fails to obey an order to provide or permit discovery . . . ." DR 8 required Defendants to produce dispensing data if it was a component of their SOM systems. If Defendants maintain their representations that they have indeed produced all dispensing information tied to distribution, and did not produce the dispensing data because it was not a component of their SOM programs, then Defendants need to admit same. And if Defendants' dispensing data was in fact a component of their SOM systems and they did not produce it in light of DR 8, then precluding evidence concerning dispensing activity is likewise appropriate under Rule 37(b). Indeed, Special Master Cohen previously warned Defendants that withholding dispensing information relevant to the distribution claims, including the dispensing data,

-14-

was at their own peril.  *See* Email from Cohen to Counsel (Jan. 10, 2019) (Exh. N).  If it was later discovered that the dispensing data was used in the SOM process or due diligence process, Defendants "risk a sanction, up to and including judgment as a matter of law, for failure to produce dispensing data or dispensing information that is used in SOMS/due diligence decisions." *Id.*

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court re-affirm Special Master Cohen's prior orders, as sought by Defendants, and preclude the introduction of evidence at trial related to Defendants' dispensing practices at select retail stores.  To allow Defendants now to present evidence related to their dispensing practices is unfairly prejudicial to Plaintiffs.  As Plaintiffs informed the Court, we do not intend to introduce dispensing-related evidence during the November trial, including store-level pharmacists' testimony consistent with the Court's prior orders.  Precluding evidence related to dispensing practices places the Parties on equal footing during the trial.

If the Court, however, allows Defendants to permit the pharmacists identified to testify and to offer pharmacy dispensing information, Plaintiffs require production of statewide dispensing data, those witnesses full custodial files and seek depositions of the identified witnesses on the enumerated topics in Defendants' recent position statements, as well as the extent to which they were involved in Defendants' SOM systems.  Plaintiffs will be able to conduct these depositions by June 15, 2020, with the caveat that Defendants agree that these depositions can be conducted by remote audiovisual means in light of the various governmental directives aimed to facilitate social distancing and to protect the health and safety of the public in light of the COVID-19 pandemic.

1993319.13

Dated: May 26, 2020

Respectfully submitted,

*/s/ Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL LAW
422 Ninth Street
Huntington, WV 25701
(304) 654-8281
paul@farrell.law

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Trial Counsel*

1993319.13

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger

1993319.13