<pre>
 1                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3    -----------------------------------X
      IN RE: NATIONAL PRESCRIPTION      :  Case No. 1:17-md-2804
 4    OPIATE LITIGATION                 :  Cleveland, Ohio
                                        :
 5                                      :
      THIS DOCUMENT RELATES TO:         :  Thursday, May 28, 2020
 6                                      :  1:03 p.m.
      County of Summit, Ohio, et al.    :
 7    v. Purdue Pharma L.P., et al.,    :
      Case No. 18-op-45090              :
 8                                      :
                                        :
 9    The County of Cuyahoga, Ohio, et  :
      al. v. Purdue Pharma L.P., et al., :
10    Case No. 17-op-45004              :
                                        :
11                                      :
      Track 1B Cases                    :
12                                      :
      -----------------------------------X
13

14                         ** SEALED **

15         TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
               BEFORE THE HONORABLE DAN AARON POLSTER
16                 UNITED STATES DISTRICT JUDGE
                           - AND -
17            BEFORE THE HONORABLE DAVID A. RUIZ
                 UNITED STATES MAGISTRATE JUDGE
18

19    SPECIAL MASTER:         DAVID R. COHEN

20
      Court Reporter:         Donnalee Cotone, RMR, CRR, CRC
21                            United States District Court
                              801 West Superior Avenue
22                            Court Reporters 7-189
                              Cleveland, Ohio 44113
23                            donnalee_cotone@ohnd.uscourts.gov

24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
</pre>

1    APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

2

3         On behalf of Plaintiffs:

4              **PETER H. WEINBERGER, ESQ.**
               Spangenberg, Shibley & Liber
5              1001 Lakeside Avenue, Suite 1700
               1900 East Ninth Street
6              Cleveland, Ohio 44114
               216-696-3232
7              pweinberger@spanglaw.com

8

9              **W. MARK LANIER, ESQ.**
               The Lanier Law Firm
               6810 FM 1960 West
10             Houston, Texas 77069
               813-659-5200
11             wml@lanierlawfirm.com

12

13             **HUNTER J. SHKOLNIK, ESQ.**
               400 Broadhollow Road, Suite 305
               Melville, New York 11747
14             212-397-1000
               hunter@napolilaw.com

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

2

3          On behalf of Plaintiffs:

4

5                    **DONALD MIGLIORI, ESQ.**
                     **LINDA SINGER, ESQ.**
6                    **JOSEPH F. RICE, ESQ.**
                     Motley Rice LLC
7                    28 Bridgeside Boulevard
                     Mount Pleasant, South Carolina 29465
8                    843-216-9140
                     dmigliori@motleyrice.com
9                    lsinger@motleyrice.com
                     jrice@motleyrice.com

10

11                   **PAUL T. FARRELL, JR., ESQ.**
                     Greene, Ketchum, Farrell, Bailey & Tweel LLP
12                   419 Eleventh Street
                     Huntington, West Virginia 25701
13                   304-525-9115
                     paul@greeneketchum.co

14

15

16

17

18

19

20

21

22

23

24

25

```
1     APPEARANCES (ALL PARTICIPANTS APPEARING TELEPHONICALLY):

2

3          On behalf of Defendants Walgreen Co. and Walgreen
           Eastern Co.:
4
                  KASPAR J. STOFFELMAYR, ESQ.
5                 (CHAIN PHARMACY LIAISON COUNSEL)
                      - and -
6                 KATHERINE M. SWIFT, ESQ.
                  Bartlit Beck LLP
7                 54 West Hubbard Street, Suite 300
                  Chicago, Illinois  60654
8                 312-494-4400
                  kaspar.stoffelmayr@bartlitbeck.com
9                 kate.swift@bartlitbeck.com

10
           On behalf of Defendants CVS Pharmacy, Inc. and Ohio
11         CVS, L.L.C. ("CVS"):

12                ERIC R. DELINSKY, ESQ.
                  SASHA MILLER, ESQ.
13                GRAEME W. BUSH, ESQ.
                  Zuckerman Spaeder
14                1800 M Street, NW
                  Washington, DC 20036
15                202-778-1831
                  edelinsky@zuckerman.com
16                smiller@ zuckerman.com
                  gbush@zuckerman.com
17

18         On behalf of Defendants HBC Service Company, an
           unincorporated operating division of Giant Eagle,
19         Inc. ("HBC/Giant Eagle"):

20                ROBERT M. BARNES, ESQ.
                  JOSH A. KOBRIN, ESQ.
21                Marcus & Shapira
                  35th Floor
22                One Oxford Centre
                  301 Grant Street
23                Pittsburgh, PA 15219
                  412-471-3490
24                rbarnes@marcus-shapira.com
                  kobrin@marcus-shapira.com
25
```

1    APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

2

3         On behalf of Defendant Discount Drug Mart, Inc.:

4              **TIMOTHY D. JOHNSON, ESQ.**
               Cavitch Familo & Durkin
5              20th Floor
               1300 East Ninth Street
6              Cleveland, OH 44114
               216-621-7860
7              tjohnson@cavitch.com

8

         On behalf of Defendants Rite Aid of Maryland, Inc.
9        d/b/a Mid-Atlantic Customer Support Center, Rite Aid
         of Ohio,Inc. and Rite Aid Hdqtrs. Corp. ("Rite Aid"):
10

11             **KELLY A. MOORE ESQ.**
               Morgan, Lewis & Bockius
12             101 Park Avenue
               New York, NY 10178
13             212-309-6612
               kelly.moore@morganlewis.com
14
                 - and -
15
               **JOHN P. LAVELLE, JR., ESQ.**
16             Morgan, Lewis & Bockius LLP
               1701 Market St.
17             Philadelphia, PA 19103-2921
               215-963-5000
18             john.lavelle@morganlewis.com

19               - and -

20             **GREGORY T. FOUTS, ESQ.**
               Morgan, Lewis & Bockius LLP
21             77 West Wacker Dr.
               Chicago, IL 60601-5094
22             312-324- 1776
               gregory.fouts@morganlewis.com
23

24

25

1    APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

2

3          On behalf of Defendant Walmart, Inc.:

4               **TINA M. TABACCHI, ESQ.**
                **TARA A. FUMERTON, ESQ.**
5               **JOHN M. MAJORAS, ESQ.**
                Jones Day
6               77 West Wacker
                Suite 3500
7               Chicago, Illinois 60601
                312-782-3939
8               ttabacchi@jonesday.com
                tfumerton@jonesday.com
9               jmajoras@jonesday.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              AFTERNOON SESSION, THURSDAY, MAY 28, 2020

 2                   (Proceedings commenced at 1:03 p.m. p.m.)

 3                             - - -

 4              JUDICIAL ASSISTANT:  Before Judge Polster

 5    starts, I would like to remind everyone that there is a

 6    court reporter on your line -- on the line.

 7         I would ask that you mute your phones if you're not

 8    speaking.  I would ask that you identify yourself every

 9    single time you speak.

10         I would also ask that because this is a teleconference

11    and not an in-person conference, we can lose a little

12    something in translation.  It's very hard for her to hear,

13    and she works very hard to get everything correctly.

14         So please speak a little slow, speak a little loud,

15    pronounce your words clearly.

16              Okay.  Judge, you're on.  Go ahead.

17              THE COURT:  All right.  Good afternoon,

18    everyone.  This is a status conference in the opioid MDL,

19    primarily the Track 1B and Track 3.

20         There's sort of a clicking on the background.  If

21    everyone could mute their phones when you're not speaking, I

22    would appreciate it.  I don't know if everyone else is

23    hearing that.

24              MR. WEINBERGER:  Yes, Judge.  I think we all

25    are.
```

1          THE COURT:  There it goes again.

2          Okay.  All right.  We've been getting filings back and

3     forth.  There's volleys back and forth.  And I'm trying to

4     sort them out, and I want to get both of these cases on

13:05:32 5     track.  One is set for November.  One is going to be May

6     of 2021.

7          I didn't want to have two trials with pharmacies.  All

8     right?  That wasn't my intent.  My intent was to have one.

9     It was set for November.  It was to cover everything that

13:05:54 10    pharmacies do.  Pharmacies primarily dispense drugs.  They

11    also distribute to themselves, but distribution is to

12    themselves.

13         So I've been, you know, struggling for two years to

14    understand how you separate a pharmacy's responsibility as a

13:06:18 15    distributor from its responsibilities as a dispenser.  And

16    I'm still struggling with it.  So I wanted one trial, and

17    that's why I did what I did, committed the plaintiffs to

18    amend their complaints to add dispensing claims.

19         The pharmacies filed their mandamus action.  The Sixth

13:06:42 20    Circuit ruled the way they did, so we now have -- we are

21    where we are.

22         But I'm curious.  You know, the pharmacies, in your

23    filings, you seem to complain that either the plaintiffs are

24    doing something wrong or the Court is doing something wrong

13:06:59 25    in creating Track 3 trial.

1          But had you given any thought to what would happen if

2     you prevailed in your mandamus action what I would do?  I'm

3     just curious.

4          I mean, had you given any thought as to what I was

13:07:19  5     likely to do?

6                    MR. STOFFELMAYR:  All right.  Judge, it's

7     Kaspar Stoffelmayr.

8          Maybe I can address that as current liaison counsel.

9     I don't want to, you know, overstep my bounds speaking on

13:07:31 10     behalf of anybody.  But I think -- I mean the short answer

11     is yes.  The longer answer, you know, probably involves work

12     product and privilege discussions.

13          But at least to deal to with our --

14                    THE COURT:  I'm not --

13:07:47 15                    MR. STOFFELMAYR:  -- with our --

16                    THE COURT:  I'm not looking to pervade work

17     product, obviously.

18                    MR. STOFFELMAYR:  I understand.  I wouldn't --

19     I didn't . . .

13:07:53 20          But I think you know what our position is, and I don't

21     know that it's useful to reargue it on the phone today.

22          But our position going back many, many months has been

23     that there is a -- you know, a full slate of bellwether

24     trials before the federal courts and a lot of cases in front

13:08:15 25     of state courts as well, including multiple cases involving

1    dispensing claims, and that's where we -- you know, that's

2    where we believe it would make most sense to focus --

3              THE COURT:  Well, I know --

4              MR. STOFFELMAYR:  -- our efforts, and --

13:08:27    5              THE COURT:  -- I know, Mr. Stoffelmayr, that

6    has been your position, but what have you -- what have --

7    you all must have given some thought to what you thought I

8    would likely do.  I'm the MDL judge.

9         Well, you know, I'm not going to waste time on this.

13:08:46    10   I think if you had all given some -- any thought at all, you

11   would have guessed that I did what I have done.  It's my job

12   as the MDL judge to do most of the -- most of the MDL work.

13   That's how it goes.

14        So I'm the one who is supposed to oversee the

13:09:09    15   discovery, deal with all the motions, get at least one case

16   ready for trial.  If it goes to trial, try it.  So that all

17   of my colleagues around the country, state court, federal

18   court, don't have to reinvent the wheel.  If they want to,

19   of course, they can.  They're not bound to follow any of my

13:09:32    20   rulings.  It's not binding.  But typically judges do it.

21        And since, you know, if -- pharmacies should have

22   figured that if they prevailed in their argument to the

23   Sixth Circuit that it wasn't proper for the Court to permit

24   the plaintiffs to add dispensing claims to Track 1B, then I

13:09:55    25   would just come up with another case in the Northern

1    District of Ohio to include those claims so we could have

2    the discovery and the motions and a trial, if necessary.  So

3    I would have the first trial.

4        I mean, that's what I did with the manufacturers and

13:10:12 5    the distributors.  We went all the way up to the night

6    before the trial and then that settled.  But that wasn't my

7    doing.  I wasn't involved in that settlement.  I was ready

8    to try the case.

9        So I've done what everyone should have expected me to

13:10:29 10    do and what I think the MDL court would expect me to do and

11    that's what I've done.

12        So we now have a trial set for next May with

13    everything the pharmacies do, distributing and dispensing.

14        And I know everyone is working on the schedule.  You

13:10:50 15    know, I'll go pretty much with whatever schedule you all

16    come up with so long as it leaves me enough time to address

17    all the motions, which I'm sure I'll get.

18        One change is the Sixth Circuit conference is in mid

19    to late June of 2021.  It was supposed to be June of this

13:11:10 20    year, but because of COVID-19, it was cancelled.

21        So I need the trial to start May the 10th, two weeks

22    before what you proposed, so if you just factor that in.

23        Now, we have the Track 1B, which is dispensing claims

24    only.  And I am still struggling, as I have been for two

13:11:40 25    years, to figure out how to separate the two halves of what

1     a pharmacy does into an intelligible trial.

2         All right.  There's one claim, the public nuisance.

3     And I'm going to go back to Track 3.  The idea of Track 3

4     was to recreate what Track 1B was going to be.  We just had

13:12:07  5     two different counties.  Everything else was going to be the

6     same.

7         So that's why we're only going to try the claim of

8     public nuisance, and as I made clear with Track 1B, there

9     will be no further trial against the pharmacy -- pharmacies

13:12:26  10    in Track 3 of any claim other than public nuisance.  That

11    isn't going to happen.  So they're going to trial, Lake

12    County, Trumbull County, public nuisance only.  All right?

13    So you don't have to worry about the other claims.

14        And all these different entities the plaintiffs have

13:12:46  15    added, my intent was to have the same entities that we had

16    in Track 1B unless some additional entities are needed for

17    the dispensing claims.  I'm not quite sure why they would

18    be.  And we had -- everyone had agreed that for purposes of

19    trial, everyone could just refer to a corporate entity.

13:13:07  20        So we have six corporate entities; Walmart, Discount

21    Drug Mart, Rite Aid, Giant Eagle, Walgreens, and CVS.  With

22    the exception of CVS -- and I understand the statute of

23    limitations argument, and that for one period there was one

24    CVS entity that was a distributor, and then for another

13:13:27  25    period there was another entity.  So for CVS we'll have two.

1          But it's my intent that for Track 3, again, we'll just

2     be referring to Walmart, Rite Aid, Giant Eagle, et cetera.

3     So the parties are to work that out.  I don't -- and the one

4     name on the jury form, jury verdict forms is for the jury.

13:13:51  5     So you all can work that out.  We're doing it -- basically

6     it's a re-creation.

7          All right.  I'm going to ask some questions.  I'm

8     not -- these aren't rhetorical.  I'm really struggling with

9     the answers.

13:14:09  10          I sent out today the jury instructions, the final jury

11     instructions that I plan to give.  My staff and I have been

12     working on this for months.  We got a lot of comments from

13     both sides.  We have factored those in.  My objective was to

14     craft instructions that are legally correct and readily

13:14:33  15     understandable for a lay jury, and I think I've got it.

16          Everyone agrees that, you know, the plaintiffs have to

17     prove that the defendants committed, each of them, some

18     either intentional conduct or unlawful conduct that caused

19     the significant interference to the public right to health

13:15:00  20     or safety.  Here's it's the opioid epidemic.  All right?

21          But that isn't enough.  That isn't enough.  There's

22     also a causation element, and we defined that pretty

23     clearly, that the plaintiff would have to prove that each of

24     the defendants, whatever they did or didn't do, was a

13:15:19  25     substantial factor in creating the public nuisance.

1        Now, am I correct that the public nuisance is the

2   pills getting out into the community, not just sitting in

3   the pharmacies, locked up in the pharmacies, but getting out

4   into the community?

13:15:48  5        And do both sides agree with that?

6             MR. WEINBERGER:  On behalf of plaintiff, we

7   agree.  This is Pete Weinberger.

8             THE COURT:  Okay.  What about the defendant?

9             MR. STOFFELMAYR:  Again, Kaspar Stoffelmayr.

13:16:04 10        I think I can say on behalf of everybody, the pills

11   are not in the community as they're sitting in a locked

12   cabinet.  As far as I can see, nobody would assert that

13   they're doing any harm to anybody.

14             THE COURT:  Okay.  Well, that's what I

13:16:19 15   thought.  I mean, but, you know, there's been disagreement

16   on a whole lot of things.

17        All right.  So and, of course, pharmacies, you know,

18   that's what they do.  They dispense drugs.  Everyone knows

19   that.  That's where you get your prescriptions filled.

13:16:39 20        The next question is for the plaintiffs.  I guess,

21   Peter, you were responding.

22        It's my understanding that you will -- you are going

23   to attempt to prove for each of the corporate defendants one

24   of -- one, two, or three of the following:

13:17:01 25        One, for all or most of the period that the

1    corporation didn't have a SOMS, a suspicious order monitored

2    system, or two, even if they had one, it wasn't a robust

3    one, and/or three, even if they had one and it was robust,

4    they really didn't use it.  They had this policy, but they

13:17:27  5    didn't use it.

6          Am I right that your proof is going to be for each of

7    the defendants, one, two, and/or three?

8                    MR. WEINBERGER:  Yes, Your Honor.

9          This is Pete Weinberger again.

13:17:40 10          Yes.  The answer is yes.

11                    THE COURT:  Okay.  All right.

12          Now, the next question is:  What are your witnesses

13    going to say that a distributor is legally obligated to do

14    if they receive a suspicious order from one of their, in

13:18:10 15    this case, one of their pharmacies?  They're distributing to

16    themselves.  All right?

17          So what is a prudent corporate pharmacy supposed to do

18    if they receive a suspicious order?

19                    MR. WEINBERGER:  They are to perform due

13:18:26 20    diligence and --

21                    THE COURT:  Okay.

22                    MR. WEINBERGER:  -- I'm happy to expand on

23    that.

24                    THE COURT:  Yeah, what --  all right.  Yeah.

13:18:33 25                    MR. WEINBERGER:  Sure.

1                THE COURT:  I'd like you to expand on what are

2     they to do to exhibit or perform due diligence.

3                MR. WEINBERGER:  So they are to required to

4     look at that order and compare it to prior orders that came

13:18:52  5     from that pharmacy that resulted in distribution of pills to

6     that pharmacy.

7        They are to look at similar -- similarly situated

8     pharmacies and determine whether or not the particular order

9     that is flagged as suspicious meets certain criteria that

13:19:20  10     the -- that the distribution side should be looking at, and

11     then they are to utilize information that they have with

12     respect to the pharmacy's dispensing -- prior dispensing

13     practices and also current dispensing practices to determine

14     whether at the store level there is information that

13:19:57  15     suggests that prescriptions that were dispensed resulted in

16     or triggered red flags.

17        So it's utilizing the unique position that pharmacies

18     as distributors are in in that they have knowledge and

19     control and visibility not only at the distribution level,

13:20:34  20     but they also have evidence from the pharmacy side in terms

21     of knowledge, control, and visibility.

22        All of -- and if you combine all of this information,

23     it is information that they are required to utilize to

24     discharge their distribution responsibilities under the CSA

13:21:03  25     1301.74(b).

    1          THE COURT:  Okay.  All right.  I think that

    2    was a very clear description.

    3          Do the pharmacies agree that that's -- that that's

    4    what they're required to do to exercise due diligence?

13:21:25  5          MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

    6    again.

    7          I don't think anybody would agree with the way

    8    Mr. Weinberger put it, and there's a couple of different

    9    levels of disagreement probably.

13:21:39 10          THE COURT:  All right.

   11          MR. STOFFELMAYR:  One is from the plaintiffs'

   12    perspective, 80 to 90 percent of orders were suspicious.

   13          The way it works in the real world, obviously, that's

   14    not the case.

13:21:56 15          THE COURT:  Well, all right.  I'm not -- I'm

   16    not asking you whether you would agree with whether a given

   17    order is suspicious or not.  I'm just -- I asked

   18    Mr. Weinberger to go through the steps of what a pharmacy

   19    should do if they received an order that they deem

13:22:15 20    suspicious.  All right?  The steps they should take.  And I

   21    want to know if you have -- if you have any serious quarrel

   22    with, All right, this is what we as a prudent pharmacy

   23    should do if we get an order from one of our stores that we

   24    deem suspicious.

13:22:37 25          MR. STOFFELMAYR:  Yeah.  The answer is going

1    to -- there isn't a one-size-fits-all answer is the -- you

2    know, the short version.

3         Different chains are going to have done different

4    things at different points in time, and they were all in the

13:22:55  5    view -- or certainly in the view of DEA and others, you

6    know, we were appropriate at the time.

7         In some cases, the required step may be as simple as a

8    phone call to the pharmacy.  In some cases, it may be a

9    simple glance at the pharmacy's ordering history that shows

13:23:15 10    you, for example, that they received no shipment the prior

11    week because it was Independence Day, and so unsurprisingly

12    they are receiving a -- they have placed a larger order and

13    they're receiving a larger order.

14              THE COURT:  All right.  I'm --

13:23:31 15              MR. STOFFELMAYR:  This is -- might require --

16              THE COURT:  I'm not -- I understand that the

17    level of inquiry is simply, you know, equivalent to the

18    suspicion.  Okay, obviously.  There's a big order, and you

19    determined they got none the prior week, you're satisfied.

13:23:46 20         But Mr. Weinberger outlined some steps that said at

21    sometime -- sometimes a corporate pharmacy might need to

22    look at the dispensing practices of that particular store in

23    exercising its due diligence.  And I'm just asking, does

24    anyone's pharmacies quarrel with that; that at times your

13:24:18 25    due diligence could extend to looking at dispensing

1    practices of that pharmacy?

2              MR. STOFFELMAYR:  I am aware of no authority

3    to support that position, that the due diligence for a

4    suspicious order would require a consideration of dispensing

13:24:34  5    data, detailed dispensing information at a particular store.

6         Some of the experts talk about a very general

7    know-your-customer requirement.  But the requirements are

8    exactly the same.

9              COURT REPORTER:  Mr. Stoffelmayr.

10         Mr. Stoffelmayr, this is the court reporter.

11              MR. STOFFELMAYR:  Yes.

12              COURT REPORTER.  Can you -- we're getting some

13    feedback.  Can you please make sure you take it off speaker

14    or . . .

13:25:03  15              MR. STOFFELMAYR:  Let me try something

16    different.  I don't know if this is any better.  There was a

17    headphone involved before.

18         Is this better?

19              COURT REPORTER:  Yes.

13:25:16  20              MR. STOFFELMAYR:  What I said is, I'm not

21    aware of any -- there is authority.  Some of the experts

22    talk about a very general idea that you need to know your

23    customer.  And the requirements on a distributor are not

24    going to -- the requirements for a -- the requirements on a

13:25:32  25    distributor is to know your customer.  That may mean

1    something different if you are a Cardinal or a McKesson

2    distributing to unaffiliated pharmacies than it does to a

3    pharmacy inside your own, you know, corporate family

4    college.

13:25:51  5         But I'm aware of no authority that ever says the

6    evaluation of a red flag means to pull patient level

7    dispensing data at the individual source.  I've never heard

8    anyone say that.  I've never seen anything that says that.

9              THE COURT:  Well, you mean you would

13:26:10  10   never -- I'm not saying you necessarily would go to the

11   point of identifying -- of looking at each and every

12   prescription.

13        But are you saying that your due diligence as a

14   distributor would never entail checking to see if in a given

13:26:31  15   month the pharmacy had -- actually had received the -- the

16   number of prescriptions that would have justified that

17   order?

18              MR. STOFFELMAYR:  Well, if the question is --

19   if the question is whether the pharmacy actually had

13:26:55  20   prescriptions, that's different than this -- what I

21   understood Mr. Weinberger to say.  That would be a theft

22   issue.  And there are all sorts of controls, you know,

23   inventory controls to identify pills that go missing, so to

24   speak, that are not dispensed to a prescription.  I don't

13:27:16  25   know -- even know if -- again, this might depend by the

1    company at the point in time, but that's not typically

2    considered a suspicious order monitoring problem; that's a

3    theft prevention -- a pilferage prevention issue.

4                    THE COURT:  Could the --

5                    MR. STOFFELMAYR:  There's all sorts of layers

6    of control.

7                    THE COURT:  It could be a lot of things.  All

8    right?  Going out the back door, in other words, you know,

9    as a catchall.  Out the front door, you're filling

10   prescriptions.  Out the back door is theft, pilferage, black

11   market, whatever.

12                   MR. STOFFELMAYR:  And if the computer system

13   shows, you know, inventory coming in that's not reflected by

14   prescriptions being filled, I think just about everywhere,

15   that is a big issue covered by, you know, asset prescription

16   and compliance programs.  That's not a suspicious order

17   monitoring function.

18        Although, I suppose if a pharmacy's orders were large

19   only because the pharmacy technician was a thief and, you

20   know, stealing large volumes, you know, you could make an

21   argument if they overlap.

22        But that's not the purpose of this suspicious order

23   monitoring system.  They're not there to address theft.

24   There are many layers of control to address theft, but

25   that's a different issue from the regulatory perspective.

1      THE COURT:  Well, all right.  Maybe I wasn't

2  aware that you separated the two.

3      But you have to have those -- you have to have those

4  controls or else you don't have a good -- you don't have a

13:28:50  5  good system.

6      MR. STOFFELMAYR:  The -- and, in fact, the

7  regulations are -- if you, you know, pull out the

8  regulations, you know -- is for more attention paid to

9  physical security measures than this sort of order

13:29:10  10  monitoring that we're talking about.

11      COURT REPORTER:  Can you repeat that,

12  Mr. Stoffelmayr.  There is static coming on --

13      MR. STOFFELMAYR:  Certainly.

14      I said the regulations are, in some senses, in some

13:29:15  15  ways very focused on physical security measures designed to

16  address exactly this issue, pilferage, whether it is a bad

17  employee, or somebody who has found a way to break in,

18  things fall off trucks, whatever it is that can happen out

19  in the world is, of course, something that is of, you know,

13:29:36  20  intense interest to the people who own the pills.  You know,

21  obviously it's a loss to the pharmacy and it's of great

22  interest to law enforcement.

23      THE COURT:  Well, what I'm -- what I'm trying

24  to determine -- you know, I had asked the pharmacies

13:30:03  25  individually whether they anticipated calling

1    pharmacies -- pharmacists as witnesses, not just someone who

2    has a pharmacist license, but active pharmacists from their

3    stores to testify in trial.  And several of them said they

4    would and they outlined the testimony, and candidly, I -- it

13:30:26   5    looked to me like dispensing testimony, at least in part.

6        And, you know, the pharmacists were very successful in

7    getting that cut out of the case, and I'm certainly not

8    going to let it back in.

9        So it seems to me that -- I mean, the plaintiffs'

13:30:45   10    proof really -- the plaintiffs' proof requires few, if any,

11    witnesses.  It's all documents.  And the defendants -- the

12    defendants should require few, if any, witnesses, just

13    documents.

14        The issue is, look at the records.  Were there

13:31:02   15    suspicious orders, and if so, what did the defendants do to

16    show due diligence?  And that's what we've got.

17        And so we don't need testimony from -- on the

18    plaintiffs' side from pharmacists as to what happened in

19    individual pharmacies and we don't need it from the

13:31:27   20    defendants either because whatever happened and whatever was

21    done was done years ago, and it's in the records.

22        So this is a historic case.

23        Now, but the problem -- the problem I'm still

24    struggling with is, how do the plaintiffs prove and how do

13:31:52   25    the defendants defend on the causation element without

1    getting into dispensing practices or testimony to the trial

2    as to how pills got out into the community?

3        Because we agree that there's -- if the pills stay in

4    the pharmacists [sic], there's no public nuisance.  It's

13:32:21    5    only -- if they get out in the community and people get

6    addicted and die, and that's the -- that's the health harm,

7    and the issue is, did anything the pharmacist did or didn't

8    do substantially cause that?

9        But there's got to be testimony that the drugs got out

13:32:41    10    into the community.  But how are the plaintiffs going to

11    produce that evidence?

12        How are you going to produce that in a trial?

13                MR. WEINBERGER:  So, Your Honor, we have from

14    the ARCOS data on the distribution side, what number of

13:33:07    15    pills were distributed to the pharmacy -- to their own

16    pharmacies, and how many of those pills ended up getting

17    dispensed.  So we're --

18                COURT REPORTER:  This is the court reporter.

19    I'm assume this is Mr. Weinberger?

13:33:26    20                MR. WEINBERGER:  I'm sorry.  I'm sorry.  Yes.

21    This is Pete Weinberger.

22        And as it states in our expert reports, we have done

23    an analysis of that -- of those quantities, and we're using

24    that analysis then to establish our causation case.

13:33:55    25        And what -- to add on to that -- and, of course, we

1    have experts to testify as to which of those orders

2    from -- that were filled by their own distribution centers

3    were suspicious.

4                THE COURT:  All right.  Have you identified to

13:34:14  5    the defendants which orders you're going to be relying on

6    you're claiming are suspicious?

7                MR. WEINBERGER:  Yes, we have.

8                THE COURT:  Okay.  And ballpark we -- you

9    know, per defendant -- and like per defendant per year, are

13:34:37  10    we talking about hundreds?  Thousands?

11        I mean, I just want to get a sense of what your

12    experts are going to be saying.

13                MR. WEINBERGER:  Pete Weinberger again.

14        I don't have the numbers, I'm sorry, in front of me

13:34:53  15    right now.  But I know that over the relevant time frame,

16    which would be from 2000- -- where we have data, from 2006

17    to 2014, which is when these defendants stopped distributing

18    to themselves, you know, it's certainly into the millions

19    per defendant.

13:35:18  20                MR. STOFFELMAYR:  Judge, it's

21    Kaspar Stoffelmayr.

22        I can say for Walgreens that plaintiffs' expert

23    believes that 95 percent of the orders were suspicious.

24                THE COURT:  95 percent of the orders were

13:35:29  25    suspicious?

```
 1              MR. STOFFELMAYR:  95 percent, yes.

 2              THE COURT:  Okay.

 3              MR. STOFFELMAYR:  So it's tens of thousands of

 4     orders easily -- or not millions as Mr. Weinberger says.

 5              THE COURT:  Okay.  All right.  So you've got

 6     the ARCOS data, so you know how many were -- you know, that

 7     they were dispensed, they were distributed.

 8         Well, then -- I mean, I -- as I said, we're -- the

 9     only way to conduct the Track 1B is if -- is to really --

10     merely separate distributing from dispensing and have no

11     testimony about dispensing, because if we have testimony

12     about dispensing, we're going to have to have discovery on

13     it, and that's what the defendants clearly argued was not

14     proper and the Sixth Circuit agreed.

15         So the plaintiffs are not putting in any evidence

16     about dispensing; is that right?

17              MR. STOFFELMAYR:  Judge, may I?  -- sorry.

18     It's Kaspar.  May I be heard for one moment on the first --

19              THE COURT:  All right.

20              MR. STOFFELMAYR:  It is, I think, incorrect.

21     We will be responding in due course to plaintiffs' Rule 37

22     motion filed yesterday or the day before.

23         It is not correct that over the course of Track 1 the

24     defendants collectively or individually ever said that all

25     dispensing discovery was inappropriate.  They never said
```

1    that to the Sixth Circuit.  We have -- and it is unfair to

2    group defendants on this issue, I think, because different

3    defendants will take different positions for all sorts of

4    reasons.

13:37:24  5    But through -- it's a misunderstanding -- and we will

6    clear this up when we respond to their motion -- but it is a

7    misunderstanding that we ever took the position that

8    dispensing, per se, was irrelevant to the Track 1

9    distribution case and resisted all discovery.

13:37:45 10    Now, I can hear -- you know, my friends are going to

11    tell me that I'm wrong, but I think that we're entitled to

12    present that to the Court.

13            THE COURT:  Well, you can present it, but

14    candidly, it's not going to get -- it's not going to get

13:37:59 15    very far, Mr. Stoffelmayr.  You were the ones -- I didn't

16    want to do the separation, because I didn't think -- I

17    thought it was intellectually very difficult, practically

18    very difficult.  It's going to get the Court involved

19    in -- there will be millions of objections to this trial

13:38:23 20    about whether we're getting into dispensing or not.  All

21    right?

22    The pharmacists chose to ask -- chose to raise this

23    when you knew very well why I had allowed the plaintiffs to

24    amend their complaints, and so we had one trial.  One trial.

13:38:41 25    And the jury can examine the totality of what each of these

1   corporations did and whether they contributed to a public

2   nuisance or not.  We don't need to do it over two trials.

3   But now we've got it split.

4        But I'm not going to let the pharmacies defend with

13:39:01   5   documents or testimony on dispensing.  If we can -- if we

6   can do a trial on pure distribution, that's what we're going

7   to have.  All right?  Because that's what the -- that's what

8   the defendants wanted apparently.  You'll get what you

9   wanted.

13:39:22  10        So it seems to me we won't have any pharmacists

11   testifying from either side, because what any pharmacy did

12   or didn't do on filling prescriptions isn't part of this

13   case.  And the defendants at least believe that their due

14   diligence, you know -- that's not part of their due

13:39:47  15   diligence.

16        So the problem is if the plaintiffs think it is -- if

17   the plaintiffs think it is, then we're getting into

18   dispensing.  Because if the plaintiffs think it is, then

19   defendants are going to say we want the defend the case the

13:40:01  20   plaintiffs are bringing.

21        And then we get into testimony about dispensing

22   practices at given pharmacies and the defendants will need

23   to call the pharmacists who were there, and then the

24   plaintiffs are going to say, Well, we want to have the

13:40:21  25   dispensing records of at least those pharmacies -- or those

1      pharmacists for the time that they were pharmacists at those

2      stores so we can cross-examine them, and there we go going

3      right back into, you know, the mess we -- the mess that

4      we've got.  And then the Track 1B goes back into a

13:40:47  5      dispensing trial.

6           So I'm -- I -- you know, you all have sort of created

7      this mess.  I mean, again, the plaintiffs chose to separate,

8      you know, distribution claims from dispensing claims way

9      back with the pharmacies, and I never really

13:41:08  10      understood -- and I understand the words, but I was

11      concerned whether it could be done, and I am no more

12      comfortable with it now two years down the road.

13           And so I'm not really interested in dealing with a lot

14      of motions on it, and I'm certainly -- this trial can't

13:41:31  15      function if every question is subject to an objection, and

16      now you're getting into dispensing.

17           So, again, it seems to me we could have a trial purely

18      on the historic record, and we literally need no witnesses.

19      You know, the documents are what they are, and the

13:41:56  20      plaintiffs can say, all right, these orders were suspicious.

21      Then the defendants should have done X, Y, and Z.

22           And the defendants can attack on a number of bases.

23      They can say, Well, guess what?  Most of these weren't

24      suspicious at all, you know, so there was nothing we needed

13:42:14  25      to do, or if it was suspicious, here's what we did, and this

1    was reasonable, and here are the documents to show what we

2    did, and then you'd make your arguments.

3         So I -- we could -- we could -- we could have a trial

4    like that, and then no one is going to call the pharmacists

13:42:32  5    from individual stores to testify what -- you know, what did

6    or didn't happen at those pharmacies, because it's not those

7    pharmacists who were doing the due diligence.

8         So how does that sound for a trial?  The plaintiffs'

9    side and the defendants' side?

13:42:58 10              MR. WEINBERGER:  Your Honor, this is

11    Pete Weinberger.

12         We are prepared to try the case using those

13    parameters.

14              MR. STOFFELMAYR:  I'm sorry.

13:43:09 15    Kaspar Stoffelmayr speaking through the defendants.

16         It is so for me personally impossible to understand

17    how the plaintiffs can prove their case with those

18    parameters.  Maybe I'm not imaginative enough or I just

19    don't understand how they connect the dots.

13:43:31 20         But it sounds to me that if plaintiffs (inaudible)

21    actually put their case in that way, the case is over

22    before --

23              COURT REPORTER:  Mr. Stoffelmayr.

24    Mr. Stoffelmayr, can you say that again.  We're getting

13:43:52 25    really bad static here.

1          MR. STOFFELMAYR:  Yeah.  I can hear the

2    clicking, too.  I'm not sure -- I'm not sure what that is.

3    I apologize if it's something at our end.

4          Well, what I was trying to say is, I don't understand

13:44:04 5    how plaintiffs can prove their case that way, and what we

6    would want to do for a defense case, and what we would want

7    to do -- see what the Court really allows us to do -- would

8    obviously depend on what the plaintiffs' case actually looks

9    like.  If their case is actually a stack of documents and

13:44:25 10   that's it, our case would look very different than if -- if

11   it's something else -- if it's something beyond that.

12          THE COURT:  They've got a stack of documents

13   and a bunch of experts.

14          MR. STOFFELMAYR:  If what you're asking me,

13:44:41 15   Judge, is do we consent to a trial without any live

16   witnesses who work in -- at pharmacies in Cuyahoga and

17   Summit Counties?  The answer is obviously no.  We don't

18   consent to that.  But I don't think that's what you were

19   asking for.

13:44:56 20          THE COURT:  Well, I'm not going to -- I'm --

21   the point is, I'm not going to let any of those people

22   discuss any dispensing practices they did, and the point is,

23   their testimony may -- as I see it, I don't know what

24   relevant testimony they have unless there's -- I mean, if

13:45:17 25   there's a document that says, all right, you know, on

1    March 3rd, 2012, someone from Walmart corporate called

2    Walmart pharmacy on 55th and Euclid, all right, and there's

3    an issue as to whether that really happened, well, the

4    person who got the call can certainly testify, Yeah, they

13:45:45   5    did call me.  All right?  Okay?  Fine.

6         But to talk about -- other than that, there would be

7    no -- nothing relevant for that pharmacist to say.  The

8    pharmacist isn't doing the due diligence.  Someone at

9    corporate.  And it would not be at all relevant or proper

13:46:05  10    for the pharmacist to talk about any dispensing practices at

11    that pharmacy.  I wouldn't -- I wouldn't permit it, because

12    the pharmacies have gotten the Sixth Circuit to truncate the

13    case.  So you can't put it back in.

14              MR. DELINSKY:  Your Honor, this is

13:46:26  15    Eric Delinsky on behalf of CVS.

16              THE COURT:  Yes.

17              MR. DELINSKY:  There's -- there are other

18    issues that pharmacists should be able to testify on.  The

19    plaintiffs' case is that pharmacies place suspicious orders

13:46:49  20    to distribution centers.  The pharmacies are part of the

21    transaction, the ordering transaction, that comprises

22    plaintiffs' case.  It --

23              THE COURT:  All right.  Mr. Delinsky, what

24    is -- all right.  You call a pharmacist, describe -- say,

13:47:13  25    all right, to explain how he or she places orders?

1          MR. DELINSKY:  Correct.

2          THE COURT:  Well, what are they going to say?

3      How does a pharmacist place an order?

4          MR. DELINSKY:  They are going to -- they -- a

13:47:33  5  pharmacist could talk about what they take into account in

6  the course of placing an order or approving an order or

7  adjusting an order.

8          THE COURT:  Yeah.  Well, that's my concern.  I

9  don't -- the pharmacist is going to say, Well, I take into

13:47:55 10  account the number of prescriptions I expect to receive.

11      Isn't that one of the main things they take into

12  account?

13      Hello?

14          MR. DELINSKY:  Your Honor, I don't think the

13:48:11 15  testimony necessarily would come in that way.  They -- a lot

16  of what they take into account is what's on the shelves and

17  what's not on the shelves, what they think they may need.

18          THE COURT:  Well, but how --

19          MR. DELINSKY:  And that's more --

13:48:31 20          THE COURT:  The only thing that -- the only

21  reason they would need it, Mr. Delinsky, is if they

22  anticipated demand, and the demand certainly isn't black

23  market or theft, the demand would be people coming in with

24  prescriptions for that drug, right?

13:48:53 25          MR. DELINSKY:  Even if the testimony went that

1    far, Your Honor, much of this could be controlled in terms

2    of what questions are allowed and what questions are not

3    allowed.

4                    THE COURT:  Yeah.  Well, I'm not -- that's

13:49:05  5    what we're not going to have.  We're not going to have.  You

6    all got the Sixth Circuit to truncate this case, and so be

7    it.  It will be truncated.

8        Plaintiffs aren't going to put in any testimony about

9    the dispensing practices at all and I'm not going to allow

13:49:21 10    any testimony about dispensing or reference to dispensing,

11    because the moment that pharmacist says, you know, I've got

12    to fill the shelves, I anticipate I -- you know, got a

13    thousand prescriptions in February, I'm anticipating at

14    least a thousand in March, well, that begs the question of

13:49:43 15    whether, you know, they were lawful, suspicious, whatever,

16    and the plaintiffs are going to want to have their records

17    to cross-examine that pharmacist.  And then we're back into

18    the dispensing practices of particular pharmacists, and I'm

19    not --

13:50:01 20                    MR. DELINSKY:  Your Honor -- I apologize,

21    Your Honor.

22                    THE COURT:  So --

23                    MR. DELINSKY:  I fear there's an apples and

24    oranges problem.

13:50:09 25        The Sixth Circuit litigation pertains to substantive

1    causes of action and claims seeking to impose.

2                    COURT REPORTER:  Can you repeat that?  It is

3    hard to hear.

4                    MR. DELINSKY:  The Sixth Circuit litigation

13:50:26  5    was focused on requests for relief based on dispensing, and

6    the Sixth Circuit determined, as we know, that those claims

7    can't lie in Track 1.

8         That is a different question of admissibility in a

9    distribution case.  That is not an issue that the

13:50:53  10   Sixth Circuit was asked to rule on or that the Sixth Circuit

11   did rule on, and the effect of the ruling -- the evidence

12   limitation that you are proposing, Your Honor, would be to

13   go back in time -- to go back to Track 1A and find out of

14   the Track 1A distribution records, the dispensing evidence

13:51:24  15   that was permitted, and, in fact, that was ordered.

16        And our position is is that the Track 1 trial could

17   proceed with the record established in the Track 1A case.

18   It has a certain component of dispensing in it, and we do

19   not believe it would be appropriate to go back and excise

13:51:57  20   that from the case.

21                    THE COURT:  All right.  Look.  All right.

22   Look.  This is what I'm going to rule.  I'm going to make it

23   very simple.

24        I'm not going to tell the pharmacists [sic] they can't

13:52:07  25   call pharmacists to testify.  But I am ruling this way.

1        If you call a pharmacist, you must have produced well

2    in advance of trial the dispensing records of that pharmacy

3    of prescription opioids for the period that that pharmacist

4    was the pharmacist.  All right?

13:52:32  5        So if you've got a pharmacist who is there since 2010,

6    you've got to produce the dispensing records of that

7    pharmacy from 2010 to 2014.  All right?  So you know who you

8    want to call.  They've been identified and you produce those

9    records so the plaintiff has them for cross-examination.

13:53:00  10   And then they may or may not need them for cross-examination

11    depending on what the witness says.

12        But they'll be ready if they need to.

13        So I think that's the simplest way to do it.

14               SPECIAL MASTER COHEN:  Judge, this is David.

13:53:19  15  May I ask --

16               THE COURT:  Everyone is clear on that?

17    Everyone is clear on that?

18        Yes, who had a question?

19               SPECIAL MASTER COHEN:  I'm sorry, Judge.  This

13:53:25  20  is David.  I just had a clarification question.

21        I believe that three of the defendants stated that

22    they would -- that they did intend to call pharmacists, and

23    many of those pharmacists, of course, were listed in witness

24    lists, but they were not deposed.

13:53:44  25        And so my question simply is, do you have a ruling now

1    or do you want to think about it with regard to whether

2    those pharmacists, if the defendants still want to call them

3    and after the data is produced, you would allow deposition

4    or not?

13:54:00    5            THE COURT:  We'll cross that bridge when I

6    come to it.  If someone feels they need to depose someone

7    that was previously identified and not deposed, they'll have

8    to make a case for it.

9            SPECIAL MASTER COHEN:  Thank you, Judge.

13:54:16   10            THE COURT:  So any pharmacist --

11            COURT REPORTER:  I'm sorry.  Who was --

12            THE COURT:  -- any pharmacist who is

13    testifying, you've got to produce those dispensing records

14    for the period that pharmacist was at that store.

13:54:29   15            SPECIAL MASTER COHEN:  And I just want to say,

16    this is David Cohen for the court reporter.  Excuse me for

17    not identifying myself earlier.

18            THE COURT:  So it may be this trial will go a

19    lot faster than four weeks.

13:54:47   20        Okay.  And, again, I think that -- I think that, you

21    know, it's -- again, I didn't want to have two trials, but

22    that's what we've got.  So that will be the November trial,

23    and the May trial will be everything.

24        There were one or two questions I had on the status

13:55:41   25    report.  I didn't see any reference to West Virginia -- the

1   case that was remanded to the federal court in West Virginia

2   involving the distributors, and that case is there.  I know

3   it's moving forward.

4                 MR. WEINBERGER:  Your Honor, this is

13:55:59 5   Pete Weinberger.  I'm going to -- I think Paul Farrell is on

6   the phone.  He can address where things stand on CT2 with

7   respect to the distributor case.

8        The reason that we didn't include it in the status

9   report is that generally the status report relates to, you

13:56:21 10   know, the Track 1B and now the three cases, and I don't

11   believe -- well, it's quite possible there are attendees

12   from the three distributors on this call.

13                 THE COURT:  Oh, I see.

14                 MR. WEINBERGER:  But perhaps not.  But if you

13:56:44 15   want Paul Farrell to address where we are before --

16                 THE COURT:  No.  I see you only -- it's number

17   5.  It updates on remanded cases, including any Track 1B

18   defendants, and that case only involves a distributor.  So,

19   okay.  I see why it was omitted.

13:57:04 20        Everyone should know it's still there.  It's still

21   active.  That's all.  I don't want anyone to think that it

22   wasn't.

23                 MR. FARRELL:  Judge, this is Paul Farrell.

24        It is still there and it is still active.

13:57:18 25                 THE COURT:  Oh, I know that.  I just didn't

1    want anyone to think that it wasn't because it's not on the

2    report and I see why it's not.

3        All right.  Well, I think there was -- I guess there

4    was some issue we were holding off issuing the final

13:57:47  5    schedule for the Track 1B in November.

6        I can't -- I don't recall what -- there's some issue

7    between the parties who were still -- they were still

8    disagreeing over.  I can't -- we had held off doing it.

9        Does anyone recall what --

13:58:09  10            MS. SWIFT:  Judge, this is Kate Swift on

11    behalf of Walgreens.

12        We -- and when I say we, I mean, both defendants and

13    plaintiffs -- submitted to Special Master Cohen on May 20th

14    a proposed list of dates that we have agreed upon for the

13:58:28  15    remainder of the Track 1B schedule.  I think that is where

16    that stands.

17            THE COURT:  All right.  Well, we'll get one

18    out.  Now that we've clarified things, we'll get that order

19    out.

13:58:48  20        Now, of course, our federal court, and to my

21    knowledge, you know, every federal court in the country, no

22    one has had any jury trial since the middle of March.

23        We have -- our court meets every few weeks to take

24    pulse of things.  We've determined we will not resume jury

13:59:15  25    trials before August.  We haven't said we'll definitely do

1    them in August.  They won't be before August.  We're meeting

2    Friday the June the 12th to assess things and to supplement

3    our orders.

4        I looked at the schedule for Track 1A, and I believe

13:59:35  5    that's about three months before that trial.  So sometime in

6    the mid to late August, which was several months before the

7    trial, we sent out an inquiry to several hundred jurors

8    inquiring whether they would be able to sit for a one-month

9    trial.

14:00:01  10   And then we got -- the ones who said they could, then

11   we sent them the detailed questionnaire.  Then we went

12   through that process.  I would do the same process.  It

13   worked very well.  The point is, that's -- for a November

14   trial, that would mean sending those inquiries out in

14:00:24  15   August.

16       You know, no one knows how people are going to feel

17   about sitting on a jury, and we can take all the precautions

18   we want in court to try and keep people safe, but if jurors

19   don't feel they'll be safe, they'll ask to be excused or

14:00:45  20   they won't come or really won't want to come.

21       No one is contemplating arresting people to be jurors.

22   I'm not being facetious.  No one would do that.  But no one

23   wants a jury composed of people who are so fearful that they

24   can't concentrate on the testimony.

14:01:06  25       So it remains to be seen what we can do.  I'm

1    guardedly optimistic, but no one knows exactly how -- you

2    know, the course of this pandemic or how people are going to

3    feel.  So that's the reality.  But we'll keep going as we

4    can.

14:01:30    5    So we'll get the schedule out and then everyone should

6    work on getting the Track 3 schedule back with the one

7    revision.  I want the trial to start on -- opening

8    statements on May the 10th.  So that's when it will begin.

9    All right.  Was there anything that anyone else wanted

14:01:57    10    to bring up?  I think I've covered the things I wanted to

11    cover, and I've done most -- I have asked my questions and

12    done most of the talking, but there may be some other things

13    that I've left out.

14    MR. STOFFELMAYR:  Judge, it's

14:02:10    15    Kaspar Stoffelmayr again, if I could just ask one question.

16    THE COURT:  Sure.

17    MR. STOFFELMAYR:  You asked us maybe a month

18    ago now to meet and confer with the Ohio Board of

19    Pharmacy --

14:02:19    20    THE COURT:  Oh, right.

21    MR. STOFFELMAYR:  -- about writing something

22    to the Sixth Circuit.  We have discussed this with their

23    outside counsel.  But I just want to let you know we have

24    been pursuing, discussed it with their outside counsel,

14:02:36    25    explained the situation and also what's going on between the

1    Track 2 cases -- sorry -- Track 1B cases --

2              THE COURT:  Right.

3              MR. STOFFELMAYR:  -- Track 3 cases.

4         They told us they needed to confer with their client.

14:02:47  5    That was a couple of weeks ago.  We haven't heard back.  I

6    just wanted to make sure you were aware that, A, that has

7    not happened yet.

8              THE COURT:  All right.

9              MR. STOFFELMAYR:  But not that we have been

14:02:57 10    ignoring your request.

11              THE COURT:  Well, I'm making a suggestion that

12    it is -- the specific issue that is -- that is the subject

13    of the mandamus doesn't exist anymore the way it was set up

14    because that has been mooted by the earlier order.

14:03:23 15         But the same -- the same issue is going to arise very

16    shortly in Track 3 because the defendants will want the

17    exact same records from the Ohio Board of Pharmacy that they

18    would have wanted for Track 2 when it included dispensing

19    claims.

14:03:45 20         Am I correct?

21              MR. STOFFELMAYR:  Yes.  We agree.

22              THE COURT:  All right.  So -- but because

23    judges are very careful and they don't want to decide things

24    that are moot, they need to -- someone has to advise the

14:03:59 25    Court of that, okay, that those records are not -- not

1    needed for the November trial, but they are going to be --

2    they are going to be needed for the May 2021 trial.  And the

3    issue is the same.  They're the same records.  And

4    presumably the Ohio Board of Pharmacy will have exactly the

14:04:25  5    same objections.

6         But I think you need -- you've got to -- I mean, the

7    parties won't do it.  You know, I -- someone should do that.

8         Now, I haven't received any inquiry from the

9    Sixth Circuit anything about that.  I haven't seen that

14:04:45  10    they've set a briefing schedule.  They haven't asked me to

11    make a response if I wish.  And I haven't -- I've received

12    no notification.

13         So I'm just strongly suggesting you meet with the --

14    you know, and tell them this is what -- this is what I think

14:05:06  15    should be done.  And maybe the Court will just say, Okay.

16    We'll address it in this way, or we've got to wait until,

17    you know, there's a new objection and you've got to

18    promulgate the same -- the same third-party subpoena,

19    whatever, in Track 3.  I don't know.  They'll tell

14:05:26  20    you -- you'll get some directive.

21         But whatever ruling would be the same.  It's the same

22    document for the same purpose.

23         All right.  Or maybe that -- maybe the simplest thing

24    is for me to do it.  I don't know.  I mean, I didn't

14:05:45  25    initiate the mandate.

44

1          I mean, certainly if they ask me -- if they ask me for

2     a response, that's what I would include.  But I think it's

3     more appropriate for the parties to advise the Court.

4          Okay.  Was there anything else?

14:06:08  5               MR. RICE:  Judge.

6               THE COURT:  Yes.

7               MR. RICE:  This is Joe Rice.  This is

8     Joe Rice.

9          We've got some -- in the status report it talks about

14:06:13 10     some motions that have been pending for quite a while of a

11     general nature.  I'm just trying to get some insight.

12               THE COURT:  Well, all right.

13          Well, the oldest is that common benefits fund.  I have

14     not forgotten about that, Joe, and I -- that's still on the

14:06:43 15     Court's attention.  I have not at all forgotten about that

16     and I'll be turning to that.

17          I think the other things I've pretty much dealt with

18     other than the --

19               MR. RICE:  Joe Rice again.

14:07:03 20          It was the common benefit thing that I was addressing.

21               THE COURT:  All right.  Thank you.

22          That's the oldest one on the status report.  The Court

23     has not forgotten about it.  I'll be turning to that

24     shortly.

14:07:17 25          The one that is -- that I'll need to rule on is

1    probably the last one.  May 24th the plaintiffs filed a

2    motion to propound nationwide dispensing data.  So the

3    defendants will be responding to that.

4         I think the other things, you know, are the other

14:07:42  5    things I dealt with through my rulings today.

6         Okay.  Anything else?

7         The last thing, I guess, I do want to -- I think it's

8    a good idea to have one of these conferences once a month,

9    and I think I'm suggesting maybe Thursday, June 25th, the

14:08:16 10   last Thursday in June.  I guess we could do it at -- we

11   could do it at 1:00 on Thursday, June 25th.

12        And we can have the same call instructions.  And then,

13   I guess, if I get a status report two days before, which

14   would be, say, noon on Tuesday the 23rd.  I think these are

14:08:58 15   useful to keep both of these cases on track and deal with

16   things that come up.

17        So we'll keep that practice going, and at some point

18   we may be able to meet in person, but candidly, given that

19   everyone is all over the country, we save a whole lot of

14:09:16 20   time and money by doing it this way, and I'm comfortable

21   doing it by phone, except this -- someone has this very bad

22   clicking that made it hard for all of us, particularly our

23   court reporter.  So hopefully we can figure out what that

24   was.

14:09:32 25        Okay.  Thank you, everyone, and I hope you and your

1       families continue to stay safe.

2              And with that, we're adjourned.

3                    COUNSEL EN MASSE:  Thank you, Judge.

4                              - - -

5              (Proceedings concluded at 2:09 p.m.)

6

7                       **C E R T I F I C A T E**

8

9         I certify that the foregoing is a correct transcript

10      from the record of proceedings in the above-entitled matter.

11

12      */s/ Donnalee Cotone _____28th of May, 2020*
        DONNALEE COTONE, RMR, CRR, CRC                DATE
13      Realtime Systems Administrator

14

15

16

17

18

19

20

21

22

23

24

25