# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 1:17-md-2804 |
| *County of Monroe, Michigan v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-45158 | Hon. Dan Aaron Polster |

**MEMORANDUM IN SUPPORT OF DISTRIBUTORS' MOTION TO CERTIFY UNDER 28 U.S.C. § 1292(b) THE COURT'S APRIL 30, 2020 ORDER DENYING IN PART THEIR MOTION TO DISMISS MONROE COUNTY'S CLAIMS, FOR PURPOSES OF SEEKING IMMEDIATE APPEAL OF THE <u>COURT'S RULINGS THAT DENIED DISMISSAL OF THE COUNTY'S CLAIMS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

CERTIFICATION FOR IMMEDIATE INTERLOCUTORY APPEAL OF THE RICO AND MPLA RULINGS IS WARRANTED ................................................................................. 5

I.  THE COURT'S DENIAL OF DISTRIBUTORS' MOTION TO DISMISS THE COUNTY'S RICO AND STATE-LAW CLAIMS INVOLVED CONTROLLING QUESTIONS OF LAW. ....................................... 5

II.  THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION ON THE RICO AND MPLA RULINGS. ................................................................................. 6

    A.  Jurists Could Reasonably Disagree Regarding Whether the County's RICO Claims Meet RICO's Proximate Causation and Injury To "Business or Property" Requirements .......... 6

        1.  There are substantial grounds for difference of opinion with the Court's conclusion that the County satisfied RICO's proximate causation pleading requirement............. 6

        2.  There are substantial grounds for difference of opinion with the Court's conclusion that the County alleged an injury to its "business or property." ................................ 13

    B.  Jurists Could Reasonably Disagree Regarding Whether the Michigan Product Liability Act Requires Dismissal of the County's State-Law Claims. ............................................. 16

        1.  There are substantial grounds for difference of opinion with the Court's conclusion that the claims against Distributors do not seek to hold them liable as "sellers" of prescription opioids within the meaning of the MPLA. ............................................. 18

        2.  Reasonable jurists could likewise disagree with the Court's conclusion that the County's claims are not all product liability claims. ................................................. 22

III.  IMMEDIATE APPEAL COULD MATERIALLY ADVANCE THE TERMINATION OF THE LITIGATION. 24

CONCLUSION ................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Bradshaw*,
  2010 WL 816532 (N.D. Ohio Mar. 4, 2010) ...........................................................................1

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
  228 F.3d 429 (3d Cir. 2000)...................................................................................................11

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)..................................................................................................................7

*Ashley County v. Pfizer, Inc.*,
  552 F.3d 659 (8th Cir. 2009) ...........................................................................................12, 16

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
  241 F.3d 696 (9th Cir. 2001) .................................................................................................11

*Attorney Gen. v. Merck Sharp & Dohme Corp.*,
  807 N.W.2d 343 (Mich. Ct. App. 2011) ...........................................................................20, 21

*In re Baker & Getty Fin. Servs., Inc.*,
  954 F.2d 1169 (6th Cir. 1992) ...........................................................................................6, 24

*Baye v. HBI Branded Apparel Enters.*,
  2013 WL 6546815 (E.D. Mich. Dec. 13, 2013) ....................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................10

*Berrington v. Wal-Mart Stores, Inc.*,
  696 F.3d 604 (6th Cir. 2012) .................................................................................................17

*In re Braden*,
  344 F. Supp. 3d 83, 91 (D.D.C. 2018) ..................................................................................26

*Brown v. Ajax Paving Indus., Inc.*,
  752 F.3d 656 (6th Cir. 2014) .................................................................................................14

*Canyon County v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008) ................................................................................3, 14, 15, 16

*In re Certified Question from U.S. Court of Appeals for Sixth Circuit*,
  659 N.W.2d 597 (Mich. 2003)...............................................................................................17

*In re Certified Question from U.S. Dist. Court for W. Mich.*
   825 N.W.2d 566 (Mich. 2012) .................................................................17

*In re Certified Question from United States Court of Appeals for Ninth Circuit*
   *(Deacon v. Pandora Media, Inc.)*,
   885 N.W.2d 628 (Mich. 2016) .................................................................17

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
   863 F.3d 474 (6th Cir. 2017) .............................................................10, 11

*City of Cleveland v. Ameriquest Mortgage Securities*,
   615 F.3d 496 (6th Cir. 2010) ...............................................9, 10, 11, 16

*In re City of Memphis*,
   293 F.3d 345 (6th Cir. 2002) .................................................................26

*City of New Haven v. Purdue Pharma, L.P.*,
   2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019)..................................8

*City of Philadelphia v. Beretta U.S.A. Corp.*,
   277 F.3d 415 (3d Cir. 2002)...................................................................12

*In re Depakote*,
   2017 WL 11438790 (S.D. Ill. June 13, 2017)........................................26

*Duronio v. Merck & Co.*,
   2006 WL 1628516 (Mich. Ct. App. June 13, 2006) .................18, 21, 23

*Fox v. Amazon.com, Inc.*,
   930 F.3d 415 (6th Cir. 2019) .................................................................19

*Garcia v. Wyeth-Ayerst Labs.*,
   385 F.3d 961 (6th Cir. 2004) .................................................................20

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2019 WL 6827277 (S.D.N.Y. Dec. 12, 2019) ........................................25

*Griffus v. Novartis Pharm. Corp.*,
   2006 WL 2583129 (E.D. Mich. Sept. 6, 2006)........................................21

*Gucwa v. Lawley*,
   731 F. App'x 408 (6th Cir. 2018) ..........................................................13

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010)............................................................................. *passim*

*Hill v. Henderson*,
   195 F.3d 671 (D.C. Cir. 1999) ...............................................................25

*Holloway v. Clackamas River Water*,
    739 F. App'x 868 (9th Cir. 2018) ..............................................................14

*Holmes v. Secs. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)..............................................................6, 8, 9, 16

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    196 F.3d 818 (7th Cir. 1999) ..............................................................11

*Jackson v. Sedgwick Claims Management Services, Inc.*,
    731 F.3d 556 (6th Cir. 2013) ..............................................................2, 13, 14, 16

*Johnson v. Jones*,
    515 U.S. 304 (1995)..............................................................2

*Katz v. Carte Blanche Corp.*,
    496 F.2d 747 (3d Cir. 1974)..............................................................24

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999)..............................................................11, 12, 24

*Lyons v. Philip Morris Inc.*,
    225 F.3d 909 (8th Cir. 2000) ..............................................................11

*McElhaney v. Harper-Hutzel Hosp.*,
    711 N.W.2d 795 (Mich. Ct. App. 2006) ..............................................................18

*In re Microsoft Corp. Antitrust Litig.*,
    274 F. Supp. 2d 741 (D. Md. 2003) ..............................................................26

*In re Microsoft Corp. Antitrust Litig.*,
    355 F.3d 322 (4th Cir. 2004) ..............................................................26

*In re Miedzianowski*,
    735 F.3d 383 (6th Cir. 2013) ..............................................................16

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009)..............................................................16

*In re Nat'l Prescription Opiate Litig.*,
    2018 WL 6628898 ..............................................................14

*Newsome v. Young Supply Co.*,
    873 F. Supp. 2d 872 (E.D. Mich. 2012)..............................................................5

*Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ..............................................................9

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
    694 F.3d 783 (6th Cir. 2012) ...................................................................................25

*Perry v. American Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ..............................................................................11, 12

*Planned Parenthood of Cincinnati Region v. Strickland*,
    531 F.3d 406 (6th Cir. 2008) ...................................................................................3

*Popular Leasing U.S.A., Inc. v. Forman*,
    2009 WL 2969519 (D.N.J. Sept. 14, 2009) .............................................................25

*Regence Blueshield v. Philip Morris Inc.*,
    5 F. App'x 651 (9th Cir. 2001) ...............................................................................11

*Serv. Emp. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) ..............................................................................11

*In re Spiech Farms, LLC*,
    592 B.R. 152 (Bankr. W.D. Mich. 2018) ................................................................19

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999) ...................................................................................11

*Taylor v. Smithkline Beecham Corp.*,
    658 N.W.2d 127 (Mich. 2003) ...........................................................................17, 20

*Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*,
    199 F.3d 788 (5th Cir. 2000) ..................................................................................11

*Trees v. Pfizer, Inc.*,
    2018 WL 6710594 (Mich. Ct. App. Dec. 20, 2018) ................................................17

*Trollinger v. Tyson Foods, Inc.*,
    370 F.3d 602 (6th Cir. 2004) .............................................................................10, 11

*In re Trump*,
    874 F.3d 948 (6th Cir. 2017) ...........................................................................2, 5, 6

*United States v. Philip Morris USA Inc.*,
    2004 WL 1514215 (D.D.C. June 25, 2004) ............................................................25

*W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*,
    138 F. Supp. 2d 1015 (W.D. Tenn. 2000) ..........................................................24, 25

*Welborn v. Bank of N.Y. Mellon Corp.*,
    557 F. App'x 383 (5th Cir. 2014) (per curiam) .............................................14, 15, 16

*White v. SmithKline Beecham Corp.*,
    538 F. Supp. 2d 1023 (W.D. Mich. 2008) ..............................................................................20

**Statutes**

18 U.S.C. § 1962(c) ..............................................................................................................25

28 U.S.C. § 1292(b) ......................................................................................... *passim*

28 U.S.C. § 1964(c) ..............................................................................................................13

Michigan Product Liability Act, Mich. Comp. Laws Ann. §§ 600.2945 *et seq.* ................... *passim*

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ............... *passim*

**Other Authorities**

Wright & Miller, *Federal Practice & Procedure* § 3929 ...........................................................25

Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation ("Distributors") move this Court to certify under 28 U.S.C. § 1292(b) the Court's April 30, 2020 Opinion and Order, Dkt. 3285 ("Order") denying in part their motion to dismiss claims asserted by Monroe County, Michigan (the "County"), for purposes of an immediate appeal. Specifically, Distributors seek certification of the Order so they may request an interlocutory appeal of the following two issues:[1]

1. Whether the County's allegations meet RICO's proximate causation and injury to "business or property" requirements.

2. Whether the County's remaining claims must be dismissed because they are state-law claims that constitute a "product liability action" within the meaning of the Michigan Product Liability Act ("MPLA"), which bars such actions.

Certification of an interlocutory appeal would permit the Sixth Circuit to resolve the RICO question and, in its discretion, either resolve or certify the MPLA issue to the Michigan Supreme Court under Mich. Ct. R. 7.308(A)(2).

## PRELIMINARY STATEMENT

Recognizing that the "Court is not averse to certifying for interlocutory appeal questions that satisfy the standard set by § 1292(b)," Dkt. 3289 at 4, Distributors request certification to seek interlocutory appellate review of the rulings that are the basis for this Court's Order denying their motion to dismiss the County's RICO and Michigan-law claims.[2] The Court's rulings on RICO

---

[1] A "district court may grant certain issues for interlocutory appeal while denying others." *Adams v. Bradshaw*, 2010 WL 816532, at *2 (N.D. Ohio Mar. 4, 2010) (citing *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 472–73 (6th Cir. 2008)).

[2] This Court granted dismissal of the County's Michigan Consumer Protection Act and negligence claims. Order at 2. The Court declined to dismiss the County's common-law claims for public nuisance, fraud, unjust enrichment, and civil conspiracy claims. *Id.*

and the MPLA meet the requirements for Section 1292(b) certification because (1) they present controlling questions of law; (2) there is "substantial ground for difference of opinion" on the questions; and (3) an immediate appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *In re Trump*, 874 F.3d 948, 951 (6th Cir. 2017).

The considerations for interlocutory appeal readily are met here.  The RICO and MPLA rulings plainly involve "questions of law"—and they are "controlling" because appellate resolution of those questions would "simplify, or more appropriately direct, the future course of litigation," thereby "reduc[ing] the burdens of future proceedings."  *Johnson v. Jones*, 515 U.S. 304, 309 (1995).  Indeed, reversal of the Court's rulings on these two issues would be case-dispositive. Because a ruling on the immunity provisions of the MPLA in Distributors' favor would bar the County's state-law claims, and because resolution of the RICO question in Distributors' favor would lead to a dismissal of the only federal claim asserted by the County, there would be nothing left of the case should the Sixth Circuit disagree with this Court's analysis on these two issues.

In addition, there is substantial ground for difference of opinion regarding the RICO and MPLA issues.  In light of decisions of the Supreme Court and Sixth Circuit dismissing RICO claims by local governments on causation grounds because they failed to allege a ***direct*** relationship between the government's alleged injury and the defendants' alleged wrongdoing, a jurist reasonably could conclude that the County's allegations against Distributors similarly do not survive RICO's stringent proximate causation standard.  Equally, a jurist reasonably could find that the County's allegations do not survive RICO's requirement that alleged injury be to the plaintiff's "business or property" in light of (1) the Sixth Circuit's holding that RICO liability does not extend to claims for "personal injuries" or claims for "pecuniary losses flowing from those personal injuries," *Jackson v. Sedgwick Claims Management Services, Inc.*, 731 F.3d 556, 565 (6th

- 2 -

Cir. 2013) (en banc); and (2) the weight of appellate authority holding that "the government does not possess a property interest in the law enforcement or health care services that it provides to the public" and thus "is not 'injured in its property' when greater demand causes it to provide additional public services of this type." *Canyon County v. Syngenta Seeds, Inc*., 519 F.3d 969, 977 (9th Cir. 2008) (barring county's claims under RICO for "increased expenditures for law enforcement and health care services").

There also is substantial ground for difference of opinion regarding the second issue on which Distributors request interlocutory appeal—whether the County's remaining claims should be dismissed because they are state-law claims that amount to a "product liability action" that is barred under the MPLA.  Interlocutory review of this issue would allow for appellate consideration in the Sixth Circuit, the federal court of appeals with supervisory authority over federal trial courts in Michigan.  The Sixth Circuit would then have the option to adjudicate the issue or, if it so chose, to certify the question to the Michigan Supreme Court under Mich. Ct. R. 7.308(A)(2).  *See generally Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 410 (6th Cir. 2008) ("Submitting uncertain questions of state law to the state's highest court by way of certification acknowledges that court's status as the final arbiter on matters of state law and avoids the potential for 'friction-generating error' which exists whenever a federal court construes a state law in the absence of any direction from the state courts.").[3]

Certification of the RICO and MPLA rulings for immediate appellate review also "may materially advance the ultimate termination of the litigation."  Indeed, resolution of these two issues in Distributors' favor would terminate the lawsuit in its entirety, as all of the remaining

---

[3] Alternatively, this Court could bifurcate the two issues, certifying the RICO issues to the Sixth Circuit and the MPLA issue to the Michigan Supreme Court.

common-law claims would be barred under the MPLA, and the RICO claim would be dismissed pursuant to that statute's proximate causation or "business or property" requirements.  Moreover, because the County asserts only a *federal* RICO claim, with no equivalent state-law claim, even appellate reversal as to the RICO issue alone would eliminate the need to collect and present significant evidence.  Resolution of the RICO issues also would likely provide guidance for the more than *2,000* other cases asserting similar RICO claims currently pending in this MDL.

This Court's earlier denial of the motion to certify an interlocutory appeal in the *Cleveland Bakers* case, Dkt. 3289, does not undermine this request for certification.  There, the Court determined that the issues proposed for certification were not controlling and would not materially advance the litigation because the plaintiff's state-law claims, including a claim under Ohio's RICO statute, would proceed regardless of the Sixth Circuit's decision.  Here, by contrast, the issues upon which Distributors seek an interlocutory appeal would be case-dispositive because the only claims in this case are a federal RICO claim that, in Distributors' view, fails on proximate cause or "business or property" grounds and state-law claims that, in Distributors' view, are barred under the MPLA.  Accordingly, if Distributors prevail on these two issues on appeal, all claims would be required to be dismissed.  Equally, the Court's earlier denial in the *Summit County* case, Dkt. 1283, does not undermine this request for an interlocutory appeal, as there is no imminent trial scheduled in this case.[4]

---

[4] This case currently is stayed, and discovery has not yet begun.  Distributors respectfully submit that the existing stay should remain in place.  Distributors, however, do not intend to seek a stay from the Sixth Circuit if this Court certifies an interlocutory appeal but decides to lift the existing stay.  *See* 28 U.S.C. § 1292(b) ("application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order").

**CERTIFICATION FOR IMMEDIATE INTERLOCUTORY APPEAL OF THE
RICO AND MPLA RULINGS IS WARRANTED**

**I.      The Court's Denial of Distributors' Motion To Dismiss the County's RICO and
         State-Law Claims Involved Controlling Questions of Law.**

The "sufficiency of a complaint is a question of law" for purposes of 28 U.S.C. § 1292(b),

and the RICO and MPLA issues on which Distributors seek certification are purely legal questions.

*See, e.g.*, *In re Trump*, 874 F.3d at 951 (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*,

648 F.3d 365, 369 (6th Cir. 2011)); *see also* Dkt. 3289 at 2 ("It is undisputed, and the Court agrees,

that the issues for appeal are questions of law.").

The RICO and MPLA questions of law are controlling because their resolution could

"materially affect the outcome of the case."  *In re Trump*, 874 F.3d at 951 (quoting *In re City of

Memphis*, 293 F.3d 345, 351 (6th Cir. 2002)).  The "Sixth Circuit has … set a low bar for a

determination that a question of law is 'controlling' in the context of a motion for certification

under § 1292(b)."  *Newsome v. Young Supply Co.*, 873 F. Supp. 2d 872, 875–76 (E.D. Mich. 2012).

Although this Court has stated that "an issue that may result in dismissal of some claims does not

materially affect the outcome of the case if a number of claims or theories providing additional

grounds for recovery will remain after dismissal," Dkt. 3289 at 2, there are no such claims or

theories here.  Appellate reversal of the RICO and MPLA rulings would result in dismissal of the

entire action, as all remaining state-law claims would be barred under the MPLA and the sole

federal claim (RICO) would be dismissed on either proximate causation or "business or property"

grounds.[5]  Accordingly, the issues on which Distributors seek certification indisputably present

controlling questions of law.

---

[5] The RICO questions also are "controlling" as their resolution may "have precedential value for
a number of pending cases," *i.e.*, some of the thousands of cases pending in this MDL that contain

II.     **There Is Substantial Ground for Difference of Opinion on the RICO and MPLA Rulings.**

A "substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution." *In re Trump*, 874 F.3d at 952 (quoting *Reese v. BP Exploration, Inc.*, 643 F.3d 681, 688 (9th Cir. 2011)). As demonstrated below, jurists might reasonably disagree on the legal sufficiency of the County's RICO and state-law claims against Distributors.

A.     **Jurists Reasonably Could Disagree Regarding Whether the County's RICO Claims Meet RICO's Proximate Causation and Injury To "Business or Property" Requirements.**

This Court allowed the County's RICO claim to proceed to discovery. Reasonable jurists could disagree with that decision for either of two independent reasons. First, jurists reasonably could conclude that the County's allegations could not establish that Distributors directly and proximately caused the County's asserted injury. Second, jurists reasonably could conclude that the County failed to allege an injury to its "business or property." Each ground for difference of opinion, independently and in combination, warrant interlocutory appellate review of this Court's denial of Distributors' motion to dismiss the RICO claim.

1.     **There is substantial ground for difference of opinion with the Court's conclusion that the County satisfied RICO's proximate causation pleading requirement.**

Supreme Court precedent is clear that a RICO plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). An alleged link between a predicate RICO violation and an injury that is "too remote" or "purely contingent" will not suffice. *Id.* at 268, 271; *accord Hemi Grp., LLC v.*

_____

federal RICO claims. *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992) (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990)).

*City of New York*, 559 U.S. 1, 10 (2010) (theories of causation are inadequate if they "go beyond the first step").[6]

A jurist reasonably could conclude that, as in *Hemi* (where "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," *id*. at 11), the conduct directly responsible for the County's alleged harm was conduct by others, *i.e.*, the illicit use and abuse of opioids by County residents.  And, just as in *Hemi* (where "the conduct constituting the alleged fraud was [the defendant]'s failure to file Jenkins Act reports" with the government), the conduct constituting Distributors' alleged wrongdoing, *i.e.*, Distributors' alleged failure to inform DEA of suspicious orders, was directed at the federal government rather than the plaintiff.  *Id.*  On this reasoning, the City fails to plead RICO causation for the same reasons that the plaintiffs in *Hemi* and *Anza* failed to state a claim.  *See Hemi*, 559 U.S. at 11 ("The City's claim suffers from the same defect as the claim in *Anza*.").

"Indeed, the disconnect between the asserted injury and the alleged fraud in this case is even sharper than in *Anza*":

> The [County's] theory … requires that [the Court] extend RICO liability to situations where the [Distributors' alleged] fraud on the third party (the [DEA]) has made it easier for a fourth party ([a County resident]) to cause harm to the plaintiff (the [County]).  Indeed, the fourth-party [residents] here only caused harm to the [County] in the first place if they decided [to illicitly consume opioids].  Put simply, [Distributors' alleged] obligation was to file the [suspicious order] reports with the [DEA], not the [County], and the [County's] harm was directly caused by the [illicit opioid use of its residents], not [Distributors].

---

[6] RICO imposes liability based *only* on the commission by defendants of enumerated "predicate acts."  *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) ("the compensable injury flowing from a violation of [RICO] 'necessarily is the harm caused by predicate acts'").  The principal predicate acts alleged in the Second Amended Complaint ("Complaint" or "Compl.") consist of Distributors' alleged failure to report "suspicious orders" to federal regulators (which Distributors have elsewhere argued, and continue to maintain, do not constitute RICO predicate acts in any event, *see, e.g.*, Dkt. 491-1 at Part I, *incorporated by reference*, Dkt. 572-1 at 6).

*Hemi*, 559 U.S. at 11; *see id.* at 10 (rejecting this causation theory as moving "beyond the first step").

Notably, another court applying the *Holmes* direct injury test relied precisely on these considerations to dismiss opioid-related claims brought against Distributors by various Connecticut municipalities. *See City of New Haven v. Purdue Pharma, L.P.*, 2019 WL 423990 at *3 (Conn. Super. Ct. Jan. 8, 2019) (Connecticut "adopts the approach of … *Holmes*" to "decide what's too indirect to sue over"). Noting the "many links" in the "causation chain" separating the defendants' alleged conduct from the cities' claimed injury, the court held that the cities' allegations were "too attenuated to support a claim." *Id.* at *3–4 (identifying multiple links in the causal chain separating Distributors' conduct from any "black market" for prescription opioids). This decision—which addressed virtually identical claims and reached an opposite conclusion— demonstrates that reasonable jurists might disagree with this Court's application of *Holmes* and the RICO direct injury requirement.

This conclusion is bolstered by the fact that the superseding criminal misconduct of actors outside Distributors' control necessarily stands between Distributors' alleged conduct and the County's alleged injury. In its Order, this Court embraced a causal theory premised on the diversion of opioid medications "into an illicit, black market"—conduct that occurs only after the medicines are delivered by Distributors to DEA-registered pharmacies. *See* Dkt. 1203 at 9–10, *incorporated by reference*, Order at 28. Thus, in every case, the County cannot suffer harm from the diversion of prescription opioids unless—sometime after a Distributor delivers the medicines to the pharmacy—a doctor writes a prescription, a pharmacist fills the prescription, the patient (illegally) sells or gives the pills away or a thief (illegally) steals them, an end-user (illegally) ingests the pills, and the County incurs expense as a result of the end-users addiction or overdose.

The intervening, criminal conduct of these third and fourth parties further demonstrates the **indirect** nature of the City's alleged injuries.  *See, e.g.*, *Hemi*, 559 U.S. at 11 (directness requirement not satisfied where alleged injury was contingent on intervening third-parties' decisions "not to pay taxes they were legally obligated to pay"); *Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 965 (9th Cir. 1999) ("the direct injury test … wisely limit[s] standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties" (quoting *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 233–34 (2d Cir. 1999)).

The Sixth Circuit's decision in *City of Cleveland v. Ameriquest Mortgage Securities*, 615 F.3d 496 (6th Cir. 2010), underscores this conclusion.  There, the City of Cleveland alleged that the defendants' financing of subprime loans led to a foreclosure crisis, which caused homes in the City to become "eyesores, fire hazards, and easy prey for looters and drug dealers," thereby leading to "increased expenditures for fire and police protection and maintenance and demolition costs" on the part of the City.  615 F.3d at 499.  Faced with those allegations, the Sixth Circuit held that the City's allegations failed the *Holmes* direct injury test because numerous "independent actors" stood between the defendants' alleged misconduct and the City's asserted injury.  *Id.* at 505.

Like the defendants in *Ameriquest*—who "did not directly make subprime loans to the homeowners of Cleveland" but rather reviewed the loans for sale to investors, *id.*—Distributors do not directly make opioid medications available to County residents.  Distributors ship only to licensed retailers, who dispense to patients pursuant to a doctor's prescription and through a licensed pharmacist.  Without both a doctor who prescribed the medications and a pharmacist who dispensed them, the medications supplied to pharmacies by Distributors would have remained on the shelf, reaching no one.  Moreover, like the City in *Ameriquest*—whose harm was directly

- 9 -

caused not by the defendants but by the subsequent actions of homeowners, lenders and the "[d]rug dealers and looters [who] made independent decisions to engage in … criminal conduct," *id.*—the County's alleged harm, to the extent it can be traced to any party, was more closely caused by (i) manufacturers whose allegedly deceptive marketing changed the standard of care for prescribing opioids, (ii) doctors and pharmacists who prescribed and dispensed the medicines to patients, (iii) the patients or third parties who diverted lawfully obtained controlled substances to illegal use, and (iv) the County residents who used the medicines unlawfully.  Thus, even more so than in *Ameriquest*, "the connection between the [County's] alleged harm and [Distributors'] alleged misconduct is too indirect to warrant recovery."  *Id.* at 506; *see also City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (similar).

In the course of reaching a contrary conclusion, this Court opined that "Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause," Dkt. 1203 at 10 (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004)), *incorporated by reference*, Order at 28.  But a jurist reasonably might disagree with the conclusion that the alleged harm in this case is "less remote" than in *Trollinger*.  There, the employee-plaintiffs alleged that their employer engaged in a scheme to deflate their wages by hiring illegal alien workers.  The Sixth Circuit declined to dismiss the complaint at the pleading stage, noting that the defendant allegedly "***directly*** employed the four plaintiffs, … ***directly*** paid them and … ***directly*** injured [them] by paying them less than they otherwise would have paid" but for the illegal hiring scheme. *Id.* at 615.[7]  Moreover, as the Sixth Circuit recognized in *Ameriquest*, the Supreme Court subsequently abrogated the relaxed pleading standard relied on in *Trollinger*.  *See* 615 F.3d at 503– 04 (citing *Anza*, 547 U.S. at 453); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

---

[7]  Unless otherwise noted, all emphases are added and citations omitted.

Accordingly, jurists reasonably might disagree with this Court's reliance on *Trollinger* as opposed to the more recent Sixth Circuit decisions in *Ameriquest* and *Deutsche Bank*.

Reasonable jurists also could disagree with this Court's decision to distinguish *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003). In the tobacco context, the courts of appeals unanimously rejected RICO claims seeking to recover monies that governments and other third-party payors expended on smoking-related healthcare costs of their residents, members, and insureds.[8] In *Perry*, the Sixth Circuit "agree[d] with the essential holdings of [those] circuits." *Id.* at 849 (collecting cases). As the court explained, because the claims of third-party payors were "inherently contingent on injury to third-party smokers," they were "too remote" to state a claim as a matter of law. *Id.*[9]

This Court distinguished the tobacco cases on the ground that the defendants' conduct in those cases did not allegedly create an "illicit market." Dkt. 1203 at 12, *incorporated by reference*, Order at 28. But there is no suggestion in *Perry* that such a distinction matters, and a jurist

---

[8] *See, e.g.*, *Serv. Emp. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1069, 1073 (D.C. Cir. 2001) (dismissing RICO claim); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701–05 (9th Cir. 2001) (same); *Regence Blueshield v. Philip Morris Inc.*, 5 F. App'x 651, 652–53 (9th Cir. 2001) (same); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 443–45 (3d Cir. 2000) (same); *Lyons v. Philip Morris Inc.*, 225 F.3d 909, 914–15 (8th Cir. 2000) (same); *Tex. Carpenters Health Benefit Fund v. Philip Morris Inc.*, 199 F.3d 788, 789–90 (5th Cir. 2000) (same); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 825–27 (7th Cir. 1999) (same); *Or. Laborers*, 185 F.3d at 963–66 (same); *Laborers Local 17*, 191 F.3d at 239 (same); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932 34 (3d Cir. 1999) (same).

[9] The claims in *Perry* were even more remote than those brought by third-party payors in the other tobacco cases because they were brought by individual subscribers of a health insurance plan. 324 F.3d at 847. The Sixth Circuit, however, unequivocally endorsed the holdings of eight other Circuits barring claims brought directly by the third-party payors. *Id.* at 849. Because the plaintiffs in each of those eight cases were the parties that directly paid the increased costs allegedly caused by the tobacco companies' wrongdoing, reasonable jurists could disagree with the Court's attempt to distinguish *Perry* as hinging on the "passed-on" nature of the plaintiffs' alleged injury. Dkt. 1203 at 11–12, *incorporated by reference*, Order at 28.

reasonably might conclude that it does not.  *Perry*'s holding did not turn on the precise nature of the defendants' alleged conduct but instead on the derivative and contingent nature of the plaintiff's alleged injury.  *See* 324 F.3d at 849.  And, just like the third-party payors in the tobacco cases, "[w]ithout injury to the individual [opioid users], the [County] would not have incurred any increased costs."  *Laborers Local 17*, 191 F.3d at 239.

This Court's reliance on the "illicit market" allegations as determinative, moreover, conflicts with persuasive authority from other Circuits.  *See, e.g.*, *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 662–63 (8th Cir. 2009); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 424 (3d Cir. 2002) (dismissing on remoteness grounds a claim by a municipality that the negligent distribution of firearms fueled an "illegal market" for handguns).  In *Ashley County*, numerous counties brought claims against the manufacturers and distributors of products containing ephedrine or pseudoephedrine, seeking "to recoup the costs expended by the counties in dealing with the societal effects of the methamphetamine epidemic."  552 F.3d at 662–63.  The counties alleged that the defendant manufacturers and distributors "knew that their products were being used illegally" to cook methamphetamine and that "they were selling far more than the legitimate market for their products."  *Id*. at 663–64.  Despite the defendants' alleged fueling of an illicit market for their products, the Eighth Circuit concluded that the counties failed to plead proximate causation.  *See id*. at 666 (citing *Anza*, 547 U.S. at 456–57).  As the court explained, "it is inadvisable as a matter of public policy to deem the [distributor] defendants' actions a legal cause" where they do not "sell the medications directly to the public," but rather sell their products to "independent retailers" from whom illegal methamphetamine cooks obtain the products.  *Id*. at 663, 671–72 & n.5.  Likewise here, a reasonable jurist could disagree with this Court's conclusion that the County's allegations could establish that Distributors are the legal cause of the County's

- 12 -

alleged injury, where Distributors sold opioids only to DEA-registered retailers and any diversion to an illicit market that occurred was the result of the subsequent, criminal conduct of third parties over whom Distributors had no control.

> **2. There is substantial ground for difference of opinion with the Court's conclusion that the County alleged an injury to its "business or property."**

A jurist also reasonably might conclude that the RICO claim fails because the County did not allege that Distributors injured the County's "business or property," as required by 28 U.S.C. § 1964(c).

*First*, reasonable jurists could disagree with the Court's conclusion that the County's claim for medical treatment and other costs does not "flow from" the personal injury of County residents, and thus is not barred by the Sixth Circuit's decision in *Jackson v. Sedgwick Claims Management Services, Inc.*, 731 F.3d 556 (6th Cir. 2013) (en banc). *See also Gucwa v. Lawley*, 731 F. App'x 408, 412 (6th Cir. 2018) ("personal injuries and their associated pecuniary losses—*including medical expenses*—do not confer relief under [RICO]"). *Jackson* held that Section 1964(c)'s requirement that injury be to "business or property" forecloses attempts to base RICO claims on "personal injuries" or "pecuniary losses flowing from those personal injuries." *Id.* at 565–66. Here, the County's alleged "losses" all arguably "flow[] from" personal injuries: but for the opioid addiction and overdoses of County residents, there would be no "opioid epidemic" for the County to allegedly spend money combatting.

This Court concluded that the Sixth Circuit's decision in *Jackson* applies only when "the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself." Dkt. 1203 at 14, *incorporated by reference*, Order at 28. But there are reasonable grounds to disagree with that conclusion because it is contrary to Sixth Circuit authority holding that it is the "nature of the

- 13 -

*injury*" that determines whether *Jackson* applies, not the identity of the parties.  *Brown v. Ajax Paving Indus., Inc.*, 752 F.3d 656, 658 (6th Cir. 2014) (emphasis in original).  In any event, if an individual suffered personal injury as a result of Distributors' alleged conduct, then the individual could sue in tort for that personal injury.[10]

    *Second*, reasonable jurists could disagree with this Court's conclusion—contrary to the decisions of other appellate courts addressing the issue—that local governments may recover under RICO for expenses incurred to provide quintessential governmental services to their residents.

    The decisions of two other Circuits strongly suggest that a local government may not recover under RICO for governmental expenses undertaken in its governmental capacity.  *See Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383, 387 (5th Cir. 2014) (per curiam) (local governments may not recover under RICO for injuries to "the government's ability to carry out governmental functions"); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979 (9th Cir. 2008) (barring county's claims for "increased expenditures for law enforcement and health care services" under RICO).  In light of *Welborn* and *Canyon County*, jurists reasonably might disagree with the Court's novel conclusion that local governments may recover for the costs of providing

---

[10] This Court also has read *Jackson* narrowly to conclude that "perhaps" only "pecuniary losses [that] arise *directly* out of a personal injury" are non-recoverable.  *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *7; *see* Order at 36–37 (incorporating prior opinion).  But a reasonable jurist could conclude that does not square with *Jackson*'s unqualified holding.  *See also Brown v. Ajax Paving Indus., Inc.*, 752 F.3d 656, 658 (6th Cir. 2014) ("*Jackson* explained that expected workers' compensation benefits stand outside the Act's perimeter because they flow from personal injuries.").  Moreover, to the extent that the County's injury only flows *indirectly* from the use or abuse of opioids by its residents, a reasonable jurist could conclude that the County failed to plead a direct connection between its alleged injury and Defendants' predicate acts.  *See, e.g.*, *Holloway v. Clackamas River Water*, 739 F. App'x 868, 869 (9th Cir. 2018) (affirming dismissal of RICO claims where alleged injuries "either do[] not constitute a 'harm to a specific business or property interest' or lack[] the requisite [causal] connection to alleged racketeering activity").

- 14 -

healthcare, law enforcement, and other core government services to residents "to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services."  Dkt. 1203 at 20, *incorporated by reference*, Order at 28.

In reaching that conclusion, this Court did not address or distinguish *Welborn*.  As for *Canyon County*, the Court "declined to follow" that decision, and further quoted the Ninth Circuit's statement that a local government may not recover "based ***solely*** on the fact that it has spent money in order to act governmentally" as "impl[ying]" that public services expenditures ***are*** recoverable so long as something more is alleged, such as the "scope and magnitude of the opioid crisis" having led a political subdivision to dedicate more of its resources than "what a government entity might ordinarily be expected to."  Dkt. 1203 at 18–19, *incorporated by reference*, Order at 28.  That interpretation, however, is undermined by the Ninth Circuit's later and unequivocal holding "that the government does not possess a property interest in the law enforcement or health care services that it provides to the public" and, therefore, "is not 'injured in its property' when greater demand causes it to provide additional public services of this type."  *Canyon County*, 519 F.3d at 977.  At a minimum, reasonable jurists could disagree with the Court's reading of *Canyon County*.

Reasonable jurists likewise could disagree with this Court's conclusion that the County has alleged damages associated with its "participation in the marketplace."  Dkt. 1203 at 20, *incorporated by reference*, Order at 28.  No authority supports the suggestion that the County may recover from Distributors for the costs of providing medical treatment—including the administration of naloxone—to County residents merely because the County allegedly had to first purchase the naloxone and other supplies.  *See id.* ("[a]ll government actions require the expenditure of money").  Because the County does not allege that it was injured as a result of a

- 15 -

commercial transaction with Distributors, a reasonable jurist easily could conclude that the County's claims are not predicated upon its "participation in the marketplace."

* * *

In short, ample appellate authority—including *Holmes*, *Hemi*, *Ameriquest*, *Ashley County*, *Jackson*, *Welborn*, and *Canyon County*—demonstrates that a reasonable jurist could conclude that the County's RICO claim against Distributors fails as a matter of law.  At the very least, the absence of Circuit-level authority directly supporting this Court's decision refusing to dismiss the County's RICO claim against non-marketing Distributors weighs heavily in favor of certification of the RICO issue for interlocutory appeal.  *See* Dkt. 1203 at 17, 39 ("there has never been a case with facts analogous to those alleged by Plaintiffs here" and "the[] allegations do not fit neatly into the legal theories"); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) ("district courts should not hesitate to certify an interlocutory appeal" under Section 1292(b) for cases that "involve[] a new legal question"); *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) ("substantial ground for difference of opinion exists" when "the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions").

### B.  Jurists Reasonably Could Disagree Regarding Whether the Michigan Product Liability Act Requires Dismissal of the County's State-Law Claims.

There also is substantial ground for difference of opinion as to whether the Michigan Product Liability Act ("MPLA")[11] requires the dismissal of the County's remaining state-law claims because that statute provides immunity from suit for claims arising out of distributions and

---

[11] Although not officially titled the "Michigan Product Liability Act," courts routinely refer to these statutes as such.  *See, e.g., Baye v. HBI Branded Apparel Enters.*, 2013 WL 6546815, at *2 (E.D. Mich. Dec. 13, 2013) ("[P]laintiff's claims in this case are governed by the Michigan Product Liability Act ("MPLA"), Mich. Comp. Laws Ann. §§ 600.2945 *et seq.*").

sales of FDA-approved pharmaceutical products in the manner alleged in the Second Amended Complaint.  This factor weighs heavily in favor of certifying an immediate appeal of this question to the Sixth Circuit—which may, in turn, elect to certify the question to the Michigan Supreme Court.  *See In re Certified Question from U.S. Court of Appeals for Sixth Circuit*, 659 N.W.2d 597, 598 (Mich. 2003) (granting certification on a legal question regarding the "plain language" of a state statute).[12]

As explained by the Michigan Supreme Court, a "seller of a drug that has been approved by the FDA has an absolute defense to a products liability claim if the drug and its labeling were in compliance with the FDA's approval at the time the drug left control of the manufacturer or seller."  *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 131 (Mich. 2003).  The statute reflects a determination by the Michigan legislature "that compliance with federal governmental standards (established by the FDA) is conclusive on the issue of due care for drugs; therefore, with exceptions not relevant to this action, "the Legislature has determined that a drug manufacturer or seller that has properly obtained FDA approval of a drug product has acted sufficiently prudently so that no tort liability may lie."  *Id.* at 130–31; *see also Trees v. Pfizer, Inc.*, 2018 WL 6710594,

---

[12] On interlocutory appeal, the Sixth Circuit has "discretion to certify unsettled questions of state law to a state supreme court."  *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 610 (6th Cir. 2012); *see also* Mich. Ct. R. 7.308(A)(2) ("When a federal court … considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may … certify the question to the [Michigan Supreme] Court"); *In re Certified Question from U.S. Dist. Court for W. Mich.* 825 N.W.2d 566, 567 (Mich. 2012) (accepting certification from federal court on important question of statute statutory law); *In re Certified Question from United States Court of Appeals for Ninth Circuit (Deacon v. Pandora Media, Inc.)*, 885 N.W.2d 628, 634 (Mich. 2016) (Young, C.J., concurring) (acceptance of certified questions appropriate where "the Michigan legal issue … is determinative to the federal case" and where the question "is a debatable one actively contested by the parties").  If certification to seek an interlocutory appeal under 1292(b) is granted, Distributors intend to propose that course of action in the Sixth Circuit as a possible route to adjudication of this important state-law issue.

at *2 (Mich. Ct. App. Dec. 20, 2018) ("Michigan law provides broad immunity to manufacturers and sellers of products in product liability actions.").

Under the MPLA, a product liability action is defined as "an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product."  MCL 600.2945(h).  The word "product" is defined separately as "any and all component parts to a product," MCL 600.2945(g), while "production" is defined as "manufacture … warning, instructing, marketing, *selling*, advertising, packaging, or labeling," MCL 600.2945(i).  Against this statutory backdrop and the case law of Michigan courts interpreting the statute, the two central factors are whether (1) Distributors are "sellers" of FDA-approved opioid medications, and (2) the County's claims are brought for "the death of a person or for injury to a person or damage to property" caused by such sale of FDA-approved opioid products.

**1.      There is substantial ground for difference of opinion with the Court's conclusion that the claims against Distributors do not seek to hold them liable as "sellers" of prescription opioids within the meaning of the MPLA.**

Under Michigan law, "[t]he primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature.  It is presumed that the Legislature intended the plain and obvious meaning it expressed."  *Duronio v. Merck & Co.*, 2006 WL 1628516, at *2 (Mich. Ct. App. June 13, 2006); *see also McElhaney v. Harper-Hutzel Hosp.*, 711 N.W.2d 795, 798 (Mich. Ct. App. 2006) ("The Legislature is presumed to have intended the meaning it plainly expressed.  If the statutory language is clear and unambiguous, appellate courts presume that the Legislature intended the meaning plainly expressed, and further judicial construction is not permitted.").  Consistent with ordinary everyday usage, as observed by the Sixth Circuit in evaluating Tennessee's products liability law, "to 'sell' generally means to dispose of property 'by

sale,'" while "[a] 'sale' is generally a transfer of title to or possession of property for an agreed upon price, or the agreement by which such a transfer takes place." *Fox v. Amazon.com*, *Inc.*, 930 F.3d 415, 422 (6th Cir. 2019) (quoting Sell, Black's Law Dictionary (4th ed. 1968); Sell, Black's Law Dictionary (10th ed. 2014)); *see also In re Spiech Farms, LLC*, 592 B.R. 152, 162 (Bankr. W.D. Mich. 2018) (a "'seller' is defined as, among other things, a person who sells or contracts to sell goods; the party who transfers property in the contract of sale."), *aff'd*, 613 B.R. 522 (W.D. Mich. 2019).

As alleged in the Complaint, Distributors ship prescription drugs to pharmacies upon receipt of an order and in exchange for payment: in other words, Distributors "sell" FDA-approved opioid medications.  *See* Compl. ¶ 77 ("At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce ... prescription opioids"); *id.* ¶ 79 ("McKesson, through its various DEA registered subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country."); *id.* ¶ 81 (similar description of ABDC as a "wholesaler").

The Court nonetheless concluded that the County's suit does not seek to impose liability on Distributors as sellers, but instead based on their alleged failure to comply with DEA regulations relating to the maintenance of effective controls against diversion.[13]  In other words, the Court concluded that the County's alleged injury (increased municipal costs associated with the opioid crisis) was caused not by Distributor's sale of "products" (*i.e.*, FDA-approved opioid medicines) to pharmacies, but by their purported regulatory failures, and thus that the County did not assert a

---

[13] Distributors maintain that the DEA registration factors do not give rise to duties enforceable by local governments in tort.  *See generally* Dkt. 2159 (Defendants' Track One CSA Duties Brief). Additionally, defendants maintain that if the plaintiff's claim is construed as enforcing the federal CSA registration scheme, it would be preempted, and respectfully repeat their previous objections regarding the Court's contrary ruling in the *Summit County* case.

- 19 -

"products liability" action against Distributors within the meaning of the statute.  A jurist reasonably could disagree with that conclusion.

The Michigan courts have interpreted the MPLA's immunity provisions broadly, consistent with the legislative intent "that a drug manufacturer or seller that has properly obtained FDA approval of a drug product has acted sufficiently prudently so that ***no*** tort liability may lie." *Taylor*, 658 N.W.2d at 131; *see also White v. SmithKline Beecham Corp.*, 538 F. Supp. 2d 1023, 1030 (W.D. Mich. 2008) ("Through the definition of 'production,' the statute extends the protection from suits broadly to a myriad of activities a manufacturer might perform related to the product.  The statute does not limit the protection to situations when the drug is used for its approved purposes.").[14]  Indeed, the immunity provisions of the statute have been held to extend beyond "traditional products-liability actions" and to include cases of alleged misrepresentations made by drug companies in the course of selling FDA-approved drugs.  *Attorney General v. Merck Sharp & Dohme Corp.*, 807 N.W.2d 343, 344 (Mich. Ct. App. 2011).

*Merck* is instructive.  There, the State of Michigan sought to recoup from Merck payments it made to provide Medicaid recipients with Vioxx, alleging that Merck misrepresented the safety and efficacy of the drug.  807 N.W.2d at 345.  The State alleged that had Merck not made such misrepresentations, Michigan would not have incurred the expenses it did.  Similar to the County here, the Attorney General argued that its claim for unjust enrichment was not predicated on a defective or unsafe product, and thus did not fall within the conventional understanding of a "products liability" action under the MPLA.  The Court of Appeals rejected this argument, finding that even though the claim was not directly linked to personal injury resulting from the use of a

---

[14] *See Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 968 (6th Cir. 2004) ("[T]he Michigan legislature … granted immunity from liability to drug sellers and manufacturers who market their products after obtaining approval from the FDA.").

drug and instead sounded in economic intentional torts, the Attorney General had "asserted legal and equitable theories of liability for damage to property resulting from the production of a product" and that the "claim of monetary loss based on alleged misrepresentations regarding the safety and efficacy of Vioxx constitutes a claim for 'damage to property.'" *Merck*, 807 N.W.2d at 350.  In so holding, the court noted that, whatever the wisdom of the statute, "it is for the Legislature, not this Court, to narrow the application of the statute by amending or redrafting its terms." *Id.* at 350.

A jurist could reasonably find that the same principle applies here.  The County's allegation is that, had Distributors behaved differently vis-à-vis government regulators, it would not have incurred the additional costs associated with the use of the FDA-approved medications that Distributors sold and shipped to pharmacies.  Like the Attorney General in *Merck*, reasonable jurists could certainly find that the County here has asserted equitable and legal claims arising from the sale of opioids, and the County "cannot avoid dismissal of a cause of action by artful pleading."  *Id.* at 347; *see also Griffus v. Novartis Pharm. Corp.*, 2006 WL 2583129, at *2 (E.D. Mich. Sept. 6, 2006) (applying MPLA and concluding that "Plaintiff's negligence and warranty claims are simply disguised product liability claims"); *Duronio v. Merck & Co.*, 2006 WL 1628516, at *3 (Mich. Ct. App. June 13, 2006) ("Although we must accept the factual allegations in plaintiff's second amended complaint as true for purposes of deciding this issue, we are not bound by a party's choice of labels for its action because this would put form over substance. Plaintiff's mere allegation that he is not pursuing a product liability action is not controlling.").

More fundamentally, there is room for reasonable disagreement with the Court's conclusion that the gravamen of the County's claim does not relate to the sale of opioids.  The injury alleged by the County—increased medical and other expenses—would not have occurred

but for the use and abuse of opioids by County residents.  And that injury occurs not as a result of Distributors' purported regulatory failings, but (according to the County) as a result of Distributors' sale of opioid medicines to County pharmacies (and the subsequent diversion of those medicines by County residents).  *See, e.g.*, Compl. ¶ 464 ("[U]nder the common law, the Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances.  By flooding Michigan with more opioids than could be used for legitimate medical purposes and by filling … orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.").[15]  Accordingly, a reasonable jurist could conclude that the County's asserted injury was allegedly caused by Distributor's "flooding" of Michigan with too many opioids—in other words, by "selling" opioids to Michigan pharmacies in an amount that the County deems excessive.

> ## 2. Reasonable jurists likewise could disagree with the Court's conclusion that the County's claims are not all product liability claims.

In considering the County's claims against Manufacturers, the Court correctly concluded that the County's negligence, fraud, unjust enrichment and civil conspiracy claims were "product liability" claims within the meaning of the MPLA "to the extent these claims seek to recover monetary loss."  Order at 13.  The Court, however, concluded that (1) the County's claims survived to the extent that they sought "equitable and injunctive relief in the form of Court-enforced correction action" and (2) the County's public nuisance claim was not a product liability claim

---

[15]  Indeed, the County's claims against Distributors are based on the (incorrect) assertion that Distributors failed to comply with a purported legal duty to maintain effective controls against diversion that could support tort liability and that their sales of opioid medicines to County pharmacies were therefore unlawful in their entirety.  *See* Compl. ¶¶ 466, 865, 866, 890.

because it did not seek to recover "for injury to a person or damage to property." *Id.* at 14.  There is reasonable ground for disagreement with these conclusions as well.[16]

First, insofar as the County seeks monetary relief (*i.e.*, the payment of money to mitigate the future impact of opioid use and abuse by County residents) under the guise of equitable abatement, a jurist reasonably could conclude that such relief is precluded by the MPLA.  Under Michigan law, the term "damage to property" is interpreted "broad[ly]," and the cases recognize that "[m]oney itself is a form of property."  *Duronio*, 2006 WL 1628516, at *4.  Accordingly, a jurist reasonably might conclude that a claim seeking the payment of money to ameliorate the future effects of a defendant's alleged wrongdoing is a claim that seeks to recover for "monetary loss"—and thus, as this Court has recognized, is barred by the MPLA.[17]

A jurist likewise could reasonably conclude that the County's nuisance claims are "brought for the death of a person or for injury to a person or damage to property."  MPLA § 600.2945(h).  The Court disagreed, noting that a "public nuisance claim arises from the *unreasonable interference with a public right*—not from 'the death of a person or for injury to a person.'"  Order at 14 (emphasis in original) (quoting MCL § 600.2945(h)).  But the purported "public right" with which Distributors allegedly interfered is the right to "public health"—*i.e.*, the right to be free from bodily injury and death.  Moreover, the costs claimed by the County are entirely derivative of personal injuries suffered by County residents:  but for the injuries of those individuals, the County would not have incurred treatment, emergency response, burial or other costs it seeks to recover.

---

[16] Because the Court concluded that Distributors were not "sellers" within the meaning of the MPLA, it did not reach these issues as to Distributors.

[17] Even assuming that any claims for a restraining injunction might remain under the MPLA, interlocutory review is warranted because it would substantially narrow the issues in the case and materially advance its termination if the Sixth Circuit clarified that the County's available recovery is limited to true injunctive relief.

*See, e.g.*, *Laborers Local 17*, 191 F.3d at 239 ("Without injury to the individual smokers, the [plaintiffs] would not have incurred any increased costs…."). Accordingly, there is substantial ground for difference of opinion with the Court's conclusion that the public nuisance claim alleged in the Complaint is not a product liability action.[18]

### III.     Immediate Appeal Could Materially Advance the Termination of the Litigation.

Immediate appeal to the Sixth Circuit of the RICO and MPLA rulings "may materially advance the ultimate termination of the litigation." Indeed, an immediate appeal could result in dismissal of the entire action—the RICO claim being dismissed under that statute's proximate causation or "business or property" requirements, and all remaining state-law claims being dismissed pursuant to the MPLA—and thereby "avoid protracted and expensive litigation." *In re Baker*, 954 F.2d at 1172; *see also, e.g.*, *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000) ("an interlocutory decision could have a major impact on the time and expense involved at trial," particularly in a case where "the financial and legal stakes are high").

The potential for a Sixth Circuit ruling on the RICO and MPLA issues leading to the dismissal of every claim in this case that would obviate discovery and trial ***altogether*** amply justifies immediate appellate review. *See, e.g.*, *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974) (noting that "the potential length of a possibly avoidable trial" is a relevant factor for 1292(b) certification). There can be no question that immediate review of this Court's RICO

---

[18] Defendants in their brief in support of the motion to dismiss argued that the MPLA "provides Distributors with an absolute defense to all of the County's common-law claims," Dkt. 572-1 at 2, including public nuisance, because the County's common-law claims "all attempt to impose liability on Distributors for harms resulting from their sales of FDA-approved opioid medications." *Id.* These arguments apply with equal force to the County's claims for monetary relief in support of an abatement remedy.

and MPLA rulings "will *potentially* save substantial judicial resources and litigant expense." *City of Memphis*, 138 F. Supp. 2d at 1026.

Even if this Court's order were affirmed in part, immediate appellate review would streamline the case and clarify the nature of the remaining claims. Either way, an appellate ruling would assist in decreasing disputes over the scope of discovery and trial preparation. This is particularly true as the County asserts only a *federal* RICO claim, with no equivalent state-law racketeering claim. Accordingly, even if the Sixth Circuit's ruling were to result only in the dismissal of the County's RICO claim, that would wholly obviate the need to collect and present evidence regarding (1) whether there was a RICO "enterprise," (2) whether each defendant played a role in directing the affairs of the alleged criminal enterprise, and (3) whether each defendant committed two or more RICO "predicate acts" in service of a purported enterprise. *See* 18 U.S.C. § 1962(c); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791–96 (6th Cir. 2012) (discussing RICO elements). This possibility alone justifies Section 1292(b) certification. *See, e.g.*, *Popular Leasing U.S.A., Inc. v. Forman*, 2009 WL 2969519, at *3 (D.N.J. Sept. 14, 2009) (Section 1292(b) satisfied where immediate appeal had potential for "eliminating complex issues and thereby simplifying discovery"); *United States v. Philip Morris USA Inc.*, 2004 WL 1514215, at *3 (D.D.C. June 25, 2004) (certifying RICO issue under Section 1292(b); "[t]here is no question that an interlocutory appeal of this discrete and central legal issue would conserve the resources of the Court and the parties").

In addition, certification under Section 1292(b) is "favored" in the MDL context. *Hill v. Henderson*, 195 F.3d 671, 677 (D.C. Cir. 1999); *see also, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2019 WL 6827277, at *14 (S.D.N.Y. Dec. 12, 2019) (similar); Wright & Miller, *Federal Practice & Procedure* § 3929 ("interlocutory appeal is [more often] appropriate … in

'big' cases").[19]  Accordingly, numerous courts have recognized that the fact that a case is part of an MDL proceeding is relevant to the 1292(b) analysis.  *See, e.g.*, *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741, 743 (D. Md. 2003) ("Delaying [interlocutory] review would burden not only the parties, but the judicial system itself."), *interlocutory appeal accepted*, 355 F.3d 322, 325 (4th Cir. 2004) (noting potential "effect in the cases encompassed in this MDL proceeding").

## CONCLUSION

Distributors respectfully request that the Court enter the attached Proposed Order certifying under 28 U.S.C. § 1292(b) the Court's April 30, 2020 Order denying in part their motion to dismiss claims asserted by the County, for purposes of an immediate appeal of the Court's rulings that (1) denied dismissal of the RICO claims on the RICO proximate causation and injury to "business or property" requirements, and (2) denied dismissal of the County's state-law claims notwithstanding the MPLA's bar on actions arising from the "selling" of FDA-approved medications.

---

[19] Although, outside the MDL context, Section 1292(b) certification for is warranted "sparingly and only in exceptional cases," *In re City of Memphis*, 293 F.3d at 350, "the MDL status of the underlying litigation is surely an 'exceptional circumstance.'"  *In re Braden*, 344 F. Supp. 3d 83, 91 (D.D.C. 2018) (quoting *In re Disposable Contact Lens Antitrust Litig.*, 306 F. Supp. 3d 372, 377 (D.D.C. 2017)); *see also, e.g.*, *In re Depakote*, 2017 WL 11438790, at *1 (S.D. Ill. June 13, 2017) ("the role of this trial as a bellwether for an entire MDL makes this the type of 'exceptional' case where entry of final judgment pursuant to Rule 54(b) is appropriate" (quoting *In re MTBE Prods. Liab. Litig.*, 2010 WL 1328249, at *4 (S.D.N.Y. Apr. 5, 2010))).

Dated: _____                                   Respectfully submitted,


_____                                  _____
Geoffrey E. Hobart                                 Robert A. Nicholas
Mark H. Lynch                                       Shannon E. McClure
Christian J. Pistilli                              REED SMITH LLP
COVINGTON & BURLING LLP                             Three Logan Square
One CityCenter                                      1717 Arch Street, Suite 3100
850 Tenth Street N.W.                               Philadelphia, PA 19103
Washington, DC 20001                                Tel.:  (215) 851-8100
Tel:  (202) 662-5281                                Fax:  (215) 851-1420
ghobart@cov.com                                     rnicholas@reedsmith.com
mlynch@cov.com                                      smcclure@reedsmith.com
cpistilli@cov.com


*Counsel for McKesson Corporation*                 *Counsel for AmerisourceBergen*
                                                   *Drug Corporation*


_____
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
EMainigi@wc.com
lheard@wc.com
ahardin@wc.com


*Counsel for Cardinal Health, Inc.*

**LOCAL RULE 7.1(F) CERTIFICATION**

This memorandum adheres to the page limits established by Case Management Order No.

1 (Dkt. 232) and 4 (Dkt. 485), and Local Rule 7.1(f).

/s/ *Geoffrey E. Hobart*
Geoffrey E. Hobart
