IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>*All Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**AMERISOURCEBERGEN DRUG CORPORATION'S OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL AND FOR SANCTIONS**

AmerisourceBergen Drug Corporation ("ABDC") respectfully files this Response in Opposition to Plaintiffs' Motion to Compel Defendant AmerisourceBergen to Produce Discovery Improperly Withheld and to Show Cause Why It Should Not Be Sanctioned For Its Discovery Misconduct ("Plaintiffs' Motion") (ECF No. 3300). Plaintiffs' Motion should be denied in its entirety.

**I.    INTRODUCTION**

Plaintiffs' Motion seeks to compel the production of documents and the imposition of sanctions. There is no legal or factual basis for either request.

As for the first request, while the Motion's title says that Plaintiffs are seeking to compel ABDC to "produce discovery improperly withheld," the Motion itself reveals that Plaintiffs do not actually seek to compel production of any documents. The reason for this is plain: Plaintiffs already have the documents at issue—and Plaintiffs do not, and cannot, contend otherwise.

As for the second request, Plaintiffs have obscured the relevant inquiry and do not even try to meet their burden to establish that sanctions are warranted. While Plaintiffs spill much ink describing (most often wrongly) the ten cherry-picked documents they allege were produced late

(including their exaggerated portrayal of the headline-grabbing "pillbilly" parody), they do not devote a single paragraph, sentence, or even a word to the law.  An examination of the legal standard governing the imposition of sanctions explains why:  Plaintiffs cannot meet it.

ABDC has not improperly withheld or delayed production of any documents.  Instead, ABDC complied with the Special Master's discovery rulings, including Discovery Ruling Nos. 2, 3, and 22.  The first two rulings, issued early in the litigation, carefully delineated the scope of Track One discovery—discovery expressly designed to target under a very compressed schedule those documents "absolutely necessary" for the first bellwether trial.  That discovery also was, in certain key respects, geographically limited—with the express understanding (stated on the record by the Special Master) that this limitation could result in potentially relevant documents not being produced during Track One.

Since the Track One settlement on the eve of trial, discovery in state court litigation across the country has progressed at an extremely rapid pace and the scope of that discovery has expanded to cover additional jurisdictions and topics—as all parties knew it would.  Discovery Ruling No. 22 afforded Plaintiffs in the MDL the benefit of that discovery—requiring defendants to reproduce state court productions into the MDL.  ABDC has complied with this directive, and that compliance resulted in the production in the MDL of the ten documents that are the subject of Plaintiffs' Motion.

At its core, Plaintiffs' Motion is an effort to take advantage of the benefits provided to them by Discovery Ruling No. 22 while at the same time to use ABDC's *compliance* with the Special Master's regime against it.  That effort should be rejected.  A careful review of the documents Plaintiffs flag as allegedly "late produced" tells a very different story about ABDC's discovery conduct than the one Plaintiffs try to tell in their Motion.  For instance, some of these documents

are plainly outside the scope of the geographic limits of Track One discovery. And other documents did not even hit on the agreed-upon Track One search terms. The facts, in short, show that ABDC has not engaged in any discovery misconduct.

Moreover, even if this Court were to agree with Plaintiffs' position on these ten individual documents, the law does not support the imposition of sanctions. A court should not impose sanctions unless they can be justified under a four-factor test that looks at (1) whether the party failed to cooperate in discovery due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the party's failure to cooperate in discovery; (3) whether the party was warned that failure to cooperate could lead to the sanction; and (4) if dismissal as a sanction is sought, whether less drastic sanctions were first imposed or considered. *Doe v. Lexington-Fayette Urban Cnty. Gov.*, 407 F.3d 755, 765-66 (6th Cir. 2005).

None of these factors supports imposition of sanctions here. There is no evidence whatsoever that ABDC engaged in willful misconduct (or any misconduct at all). The record is similarly devoid of any evidence that Plaintiffs have been prejudiced by the supposed misconduct. Plaintiffs have all the documents, and have had them for more than six months. While they complain vaguely of a "truncat[ed]" record on remand, discovery is still open in all three remanded cases (and not even started in one case), and the trial date for the next federal case listed for trial (in West Virginia) is still more than four months away. As to the third and fourth factors, no warnings were given and no prior sanctions were imposed—something that is not surprising given that ABDC did not fail to produce documents and was not subject to, for instance, a motion to compel.

Finally, while this Court need not even engage in the particulars of the sanctions requested because there has been no discovery misconduct (and certainly no sanctionable conduct), it also is worthy of mention that the specific sanctions Plaintiffs seek are inappropriate and wholly

impractical.  Moreover, Plaintiffs ask this Court to take actions that the Court itself already has acknowledged are outside its jurisdiction.

In sum, Plaintiffs' Motion is factually and legally unfounded and should be denied in its entirety.

## II.   RELEVANT PROCEDURAL BACKGROUND

While this Court is well familiar with the procedural history of this MDL, a review of certain key events in this and other related litigation provides the needed context for adjudication of Plaintiffs' Motion.  Indeed, the procedural history, standing alone, shows that Plaintiffs' contentions are unfounded and the relief they seek is not warranted or appropriate.

### A.   The Geographic Scope of Track One Discovery

This MDL exists in the context of opioid-related litigation filed in federal and state courts around the country.  Track One of the MDL, which ultimately involved only the cases filed by Summit County and Cuyahoga County in Ohio, was among the first cases to proceed to discovery, including document production and depositions.

The proper scope of Track One discovery was the subject of detailed attention and consideration by the Court and the Parties.  The discussion and ultimate decision regarding the geographic scope of Track One discovery is most relevant to Plaintiff's Motion.  Geographic scope was an early issue in Track One because both Track One Plaintiffs were located in Northern Ohio, but many aspects of Defendants' operations are nationwide. (For example, many Defendants have certain policies and procedures of nationwide applicability, instead of being specific to any particular region.)

Special Master David Cohen ruled on the geographic scope of Track One discovery (among other things) in Discovery Ruling Nos. 2 and 3.  In Discovery Ruling No. 2, Special Master Cohen distinguished between "Category One" discovery, related to various high-level topics including,

among other things, distribution monitoring, diversion, and suspicious order reports, and "Category Two" discovery, related to decentralized, customer-specific materials.  Discovery Ruling No. 2 at 4-5 (ECF No. 693).  Special Master Cohen ordered that the scope of Category One discovery should be nationwide.  *Id.* at 4.  In response to Plaintiffs' argument about their "pill migration" theory, the Special Master ordered that Defendants produce Category Two discovery for seven states:  Ohio, Pennsylvania, West Virginia, Kentucky, Illinois, Georgia, and Florida.  *Id.* at 4-5.

While the Special Master had expanded discovery to cover these additional states in Discovery Ruling No. 2, Ohio was still paramount and the Special Master's intended priority.  As he explained at a July 10, 2018 discovery conference:  "[I]t should certainly be the case that ***as far as the geographics go, all Defendants concentrate on Ohio***, that Ohio comes out first.  We need to get Ohio -- all the discovery that is Ohio-related produced."  July 10, 2018 Discovery Conf. Tr. at 36:12-16 (emphasis added) (excerpts attached hereto as Exhibit A).  Then—and critically—Special Master Cohen formalized that directive when he revised the geographic scope for Category Two discovery in Discovery Ruling No. 3.  In limiting the scope of Category Two discovery to ***Summit and Cuyahoga Counties only***, the Special Master explained that:

> ***the seven-State geographic scope set out in Discovery Ruling No. 2 is not "proportional to the needs of the case***, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Discovery Ruling No. 3 at 3 (citing Fed. R. Civ. P. 26(b)(1)) (emphasis added) (ECF No. 762).

The Special Master's decision to revise the scope of discovery was not technical or minor and, as all understood, it would have an impact of the volume and scope of documents produced.  Indeed, the revision embodied in Discovery Ruling No. 3 was "designed to produce a ***substantial reduction*** in discovery burden on the defendants."  *Id.* at 4 (emphasis added).  This was a pragmatic

- 5 -

decision that acknowledged that some potentially relevant discovery would not be produced in Track One.  *Id.* at 3 & n.1.  Indeed, even though the Special Master noted that "all of the evidence defendants would produce within the seven named States ***would have some relevance*** to the bellwether trial," he still concluded that the limitation was necessary for proportionality and "especially in light of the Court's tight trial schedule."  *Id.* at 3-4 (emphasis added).  He further emphasized that the revised scope "reflects a much-sharper focus on pursuing ***only the discovery that is absolutely necessary and appropriate for the bellwether trial cases***."  *Id.* at 3 n.1 (emphasis added).  To the extent the ruling would "hamper[] plaintiffs' ability to prove their theory that opioids 'migrate' between States," Special Master Cohen stated that Plaintiffs could rely on "other discovery, such as ARCOS data, [that] touches on the same theory."  *Id.*

**B.     Progression of the Opioid Litigation Following Track One Discovery**

On October 21, 2019, just prior to the start of trial, the Court announced a settlement of the Track One case against ABDC and certain other remaining defendants.  The Track One case against these defendants, including ABDC, was then dismissed with prejudice.  (ECF No. 2868.)

Thereafter, as relevant to ABDC, the Court implemented a "hub and spoke" strategic remand process.  The Court set forth its remand strategy in its Suggestions of Remand filed on November 19, 2019 and January 6, 2020.  (ECF Nos. 2941 & 3059.)  There now are active remanded cases proceeding against ABDC (and other defendants) it in the Southern District of West Virginia (the "Track Two" cases filed by Cabell County and the City of Huntington), the Northern District of California (San Francisco), and the Eastern District of Oklahoma (the Cherokee Nation).[1]  Discovery has started or may soon begin in all of these cases.  As this Court

---

[1]   ABDC is not a party in the active litigation in Track One-B, having settled and been dismissed with prejudice from Track One, or in the recently created Track Three, pursuant to the Court's ruling on Plaintiffs' Motion to Bifurcate.  (ECF Nos. 3297 & 3315.)

has properly acknowledged, it does not have jurisdiction over discovery matters that pertain to these remanded cases. *See* Response to Motion for Clarification (ECF No. 3263) ("[T]he undersigned is quick to add that discovery disputes in the West Virginia remanded cases are no longer within this Court's jurisdiction. Any further resolution of discovery disputes is within the purview of the transferor court.").

In the meantime, opioid litigation quickly ramped up in state courts around the country, not only in terms of the number of jurisdictions and cases, but also with regard to the progress of discovery in those cases. ABDC has produced or reproduced documents in **20 states**: Alabama, Alaska, Arizona, Delaware, Florida, Georgia, Indiana, Maryland, Massachusetts, Nevada, New Mexico, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, Washington, and West Virginia. And ABDC has upcoming trials scheduled in state courts in New York and Ohio, to name just a few.

The desire not to "reinvent the wheel" in discovery is a common theme in the MDL, the remanded cases, and the state court litigation. Toward this end, discovery produced in the MDL has been reproduced or deemed produced in cases around the country. And pursuant to Special Master Cohen's Discovery Ruling No. 22, discovery *from* state court litigation is reproduced *into* the MDL:

> Defendants shall produce in discovery in this MDL copies of all sworn statements, testimony, video-taped testimony, written responses and discovery, expert reports, and other documents and discovery that they produce in any court case, government investigation, or government hearing, regarding the marketing, sales, distribution, or dispensing of Opioids or Opioid Products, including any exhibits referred to in that testimony, on an ongoing basis, for the Track Two cases . . .

Discovery Ruling No. 22 at 3 (ECF No. 2712) (amending ECF No. 2576).

To put a fine point on it: Special Master Cohen expressly limited the scope of Track One discovery in a manner that would exclude production of potentially relevant documents; all parties

were aware that discovery was ongoing in state court litigation; and all parties were aware that additional documents from that state court litigation (that had not been produced in Track One consistent with Track One discovery scope rulings) would be reproduced into the MDL.

      **C.**      **ABDC's Approach to Discovery Appropriately Evolved as the Litigation Progressed**

As the litigation has progressed and evolved, ABDC's approach to review and production of responsive documents has evolved accordingly. During Track One discovery, no other cases were in active discovery. As a consequence, ABDC was focused solely on responding to Track One discovery, and reviewed and produced documents in accordance with Track One's scope. Consistent with standard practice, ABDC applied the agreed-upon Track One search terms to the files of the agreed-upon Track One custodians. Importantly, the mere fact that a document from a Track One custodian hit on the Track One search terms did not render it *per se* responsive. Instead, as is the standard practice, all documents were reviewed for responsiveness based on Plaintiffs' requests and the scope of discovery as set forth in the Special Master's rulings.

Following the conclusion of Track One, as the scope of the litigation and, in turn, discovery expanded, ABDC revised its approach accordingly. ABDC voluntarily pursued a ***global*** approach to discovery, whereby documents would be searched and reviewed on a national basis, instead of on a case-by-case basis. This included use of a broader set of search terms than those negotiated in Track One. In addition, ABDC reviewed the documents that hit on those search terms with a broader, global view of responsiveness—*i.e.*, without reference to geographic limiters. This change in approach responded to not only the increasing number of active cases and jurisdictions, but also to the ever-increasing scope of the discovery requests served by plaintiffs' counsel in those cases. Unsurprisingly, this process resulted in the production of many additional documents,

including from individuals previously identified as Track One custodians.  Indeed, production of additional and broader documents was the entire point of the new approach.

This approach was neither a secret nor a surprise.  To the contrary, ABDC proposed and negotiated this approach with plaintiffs' counsel around the country.  Notably, ABDC proposed and negotiated global search terms in the New York litigation beginning in May 2019, in the Pennsylvania litigation in August 2019, and in the remanded West Virginia litigation (Cabell and Huntington) in December 2019.  During these negotiations, ABDC made clear that these global search terms would be run against certain individuals who were Track One custodians and that additional documents would be produced from these custodians' files in the state court litigation (which would later result in production into the MDL pursuant to Discovery Ruling No. 22).  Plaintiffs' counsel in all three of these cases include members of the PEC in the MDL—the same group of lawyers who filed this Motion.[2]

## III. ARGUMENT

Plaintiffs' Motion seeks extreme sanctions on a threadbare factual record and without any discussion of the relevant legal principles.  When the entire factual record and the law is taken into account, it is readily apparent that Plaintiffs' Motion should be denied for three reasons.  First, ABDC did not commit any discovery violations.  Second, even if it had, none of the conduct warrants sanctions.  And third, the specific relief Plaintiffs seek is inappropriate and, to some extent, outside this Court's jurisdiction.

### A. ABDC Has Complied With All Relevant Discovery Orders and Standards

ABDC's review and production of documents in Track One was consistent with the Special Master's rulings and in keeping with standard discovery practice.  As explained above, the Special

---

[2]   This includes lawyers from Simmons Hanley, Baron & Budd, Motley Rice, and Farrell Law.

Master expressly limited the geographic scope for Category Two discovery to Cuyahoga and Summit Counties.  The Special Master acknowledged that in doing so, some arguably responsive documents would not be produced in Track One.

The search terms used in Track One were negotiated and agreed upon by the Parties.  ABDC reviewed documents based on those search terms and produced responsive documents.  Thereafter, as discovery expanded in related litigation, additional documents were reviewed and produced.  This includes state court productions that were then reproduced wholesale in the MDL pursuant to Discovery Ruling No. 22.  The fact that additional documents would be produced in the MDL, including from Track One custodians, was not a surprise to anyone.

For these reasons, Plaintiffs' Motion fails ***in concept*** because it is built on a flawed premise.  On ABDC's discovery conduct, Plaintiffs have pointed to nothing other than conduct consistent with prior discovery rulings and agreed-upon and understood practices.  ABDC complied with its discovery obligations in Track One, it then expanded discovery efforts in other litigation, and subsequently reproduced documents into the MDL (as ordered to do by Discovery Ruling No. 22).  In other words, Plaintiffs simply describe a process that functioned as designed.

Plaintiffs' Motion also fails ***in practice***.  A review of Plaintiffs' ten cherry-picked documents shows that Plaintiffs' claims of discovery misconduct are baseless.[3]  For two of the documents, ABDC initially withheld on privilege grounds a close version or duplicate of the document, but then subsequently produced those documents in Track One.[4]  Two other documents relate specifically to Florida and therefore are ***outside the geographic scope*** of Track One

---

[3] Plaintiffs have requested that ABDC de-designate the nine of these ten documents that are currently marked confidential.  ABDC has agreed to de-designate five of them, but maintains the confidentiality designation for four of them.  The issue of confidentiality is being handled through separate motion practice before Special Master Cohen.

[4] Plaintiffs' Motion Doc. Nos. 4 (ABDCMDL00551507) and 10 (ABDCMDL00566109).

discovery.[5] This includes the headline-grabbing "pillbilly" parody email that is the primary focus of, and apparent impetus for, Plaintiffs' Motion.[6] Additionally, two other documents ***did not even hit on the Track One search terms***.[7] The four remaining documents were deemed non-responsive during initial review and then subsequently deemed responsive when ABDC moved to broader global discovery.[8] Significantly, all ten documents were produced to Plaintiffs in the MDL in December 2019. *See* Plaintiffs' Motion at 3 n.3.

Despite Plaintiffs' dramatic tone and apparent desire for media attention,[9] ABDC acknowledges that Plaintiffs may legitimately believe that some or all of these documents were responsive under the Track One discovery regime. But, as explained, that provides no basis for imposing sanctions.

In discovery, reasonable minds can—and often do—differ as to whether certain documents are responsive. This is especially likely, if not inevitable, in litigation as complex and sweeping as the opioid litigation. Indeed, the Special Master and the Parties have acknowledged that

---

[5] *Id.* Doc. Nos. 1 (ABDCMDL00569571) and 3 (ABDCMDL00569575). These documents are clearly related to Florida, and not related to ABDC's overall diversion control program that is the subject of national Category One discovery.

[6] Plaintiffs' sensationalized portrayal of the "pillbilly" parody email is evidence of their true motives here. This document is simply an example of someone sharing something they found on the internet with coworkers. Moreover, the document is closely tied to Florida (and not Ohio). At the time this parody was shared, ABDC was heavily involved in working with Florida Legislators on the Florida state pill-mill legislation that passed in May 2011 and was signed into law by then-Florida Governor Rick Scott in June 2011.

[7] *Id.* Doc. Nos. 6 (ABDCMDL00573788) and 8 (ABDCMDL00571804).

[8] *Id.* Doc. Nos. 2 (ABDCMDL00571243), 5 (ABDCMDL00568921) 7 (ABDCMDL00570832), and 10 (ABDCMDL00566109).

[9] Plaintiffs were quick to seek de-designation of the Pillbilly parody email and equally quick to provide misleading comments to the media about that document. For example, in giving a comment to the Washington Post, Mr. Farrell incorrectly described the document as "withheld" and implied that without the efforts of Plaintiffs' counsel, the document "may not have ever seen the light of day"—all despite the fact that ABDC ***produced the document itself***. *See* "Drug distributor employees emailed a parody song about 'pillbillies,' documents show," Wash. Post (May 23, 2020), *available at* https://www.washingtonpost.com/national/drug-distributor-employees-emailed-a-parody-song-about-pillbillies-documents-show/2020/05/23/823f148e-9cf4-11ea-a2b3-5c3f2d1586df_story.html.

"perfection" is not the standard for discovery in this litigation. Plaintiffs' counsel stated it well during a November 15, 2018 discovery conference:

> But look, in a litigation as large in scope and as complex as this one, ***it's inevitable that, from time to time, there is going to be documents that are found at a later date***, or discovered to be non-privileged at a later date, ***and by no means is perfection the standard***.

Nov. 15, 2018 Discovery Conf. Tr. at 24:6-16 (emphasis added) (excerpts attached hereto as Exhibit B). Special Master Cohen too has emphasized this point. *See* Oct. 8, 2018 Discovery Conf. Tr. At 24:21-25 ("I understand that it ain't going to be perfect, but if you know that someone has not been there -- you know, began working there in 2012, then it's unlikely that their custodial file is going to retrieve anything earlier than that date.") (excerpts attached hereto as Exhibit C).

Plaintiffs' contentions about alleged discovery failings amount—if anything and at most—to their disagreement with certain of ABDC's decisions as to responsiveness. That, as a threshold matter, does not prove discovery misconduct—and it surely does not prove sanctionable conduct. There is nothing remarkable about the apparent disagreement about whether the subject documents should have been produced in Track One—nor is it an issue unique to ABDC's productions. For example, Defendants could no doubt dispute certain of Plaintiffs' responsiveness decisions if the same Track One Plaintiffs were in a similar situation and had to continue to produce documents in dozens of other cases after Track One settled. But the existence of disagreements like these, standing alone, does not establish any wholesale failure to comply with discovery obligations of the sort complained about in Plaintiffs' Motion.

### B. Sanctions Are Not Appropriate

ABDC has not engaged in any discovery violations. But even if this Court concludes, for example, that certain individual documents were responsive to Track One discovery responses (which they are not), sanctions are not warranted.

- 12 -

While Plaintiffs' Motion does include some factual allegations—they have at least identified the ten complained-about documents—Plaintiffs do not even bother to cite the legal standards. That is not surprising because Plaintiffs' request for sanctions is not supported by the governing law. Courts in the Sixth Circuit apply a four-factor test in assessing whether sanctions are warranted and appropriate:

> The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered.

*Doe v. Lexington-Fayette Urban Cnty. Gov.*, 407 F.3d 755, 765-66 (6th Cir. 2005).[10]  Not one of the factors warrants imposition of sanctions here.

***First***, there is no evidence whatsoever that ABDC's alleged discovery failure is due to "willfulness, bad faith, or fault." To the contrary, ABDC's conduct is, at the very most, the result of a **good-faith** disagreement about the proper scope of discovery in the context of a massive, sprawling, and extremely burdensome discovery effort. Positions taken as part of good faith discovery disputes are not sanctionable. *Cf. Doe*, 407 F.3d at 765 (explaining that a party should not be ordered to pay the attorneys' fees associated with an unsuccessful motion to compel, as permitted by Rule 37, where the motion "raises an issue about which 'there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'"). Moreover, there is no evidence that ABDC tried to hide or refused to produce these documents. It simply concluded that they were not subject to production pursuant to Discovery Ruling Nos. 2 and 3 and then produced them at a later date in accordance with Discovery Ruling No. 22.

---

[10] S*ee also* Conditional Sanction Order at 4 n.2 (ECF. No. 1574) (citing the *Doe* factors).

*Second*, Plaintiffs have not been prejudiced by the subsequent production of this handful of documents.  In the first instance, Plaintiffs *have all of the documents* and the litigation is still very much ongoing.  Plaintiffs will have, and will no doubt avail themselves of, many opportunities to use these documents.  Indeed, while Plaintiffs' Motion includes a passing accusation that ABDC has "truncat[ed] the record upon remand," the all of the remanded cases are ongoing.  Document discovery is not yet complete in the Cabell / Huntington case and that trial is set to commence in October.  Discovery has just started in the San Francisco case and has not yet even begun for the Cherokee Nation case.  Moreover, all ten of these documents were produced in the MDL on December 12, 2019, but the Cabell / Huntington case was not even remanded until January 14, 2020, with San Francisco and the Cherokee Nation following a few weeks later on February 5, 2020.  (JMPL No. 2804 ECF Nos. 6751 & 7033.)  Thus, contrary to what Plaintiffs say, the record on remand has not been truncated at all.

Additionally, even as for Track One itself (which settled before trial), the topics covered by these documents (other than those that are irrelevant for geographic reasons) already had been the subject of discovery.  For example, Plaintiffs contend that the "pillbilly" parody email is "important" because it shows "actual knowledge of interstate diversion of prescription opioids into the illicit market" and is a "tacit admission of Plaintiffs' 'pill migration' theory."  But this is hardly the only document that has been produced related to this general topic.  For example, countless documents that have been produced list "red flags" of diversion, which include pharmacy customers with out-of-state license plates.  And Plaintiffs did ask ABDC deponents, including fact and 30(b)(6) witness Chris Zimmerman, about their migration theory.  Moreover, Special Master Cohen acknowledged that this specific topic would *not* be fully developed through Track One document production.

Plaintiffs' other flagged documents are similarly redundant of other documents produced in prior discovery. The topics they cover—generic awareness of diversion issues, ABDC's views on DEA guidance, the role of HDMA/HDA—have been the subject of extensive document productions and deposition testimony. For example, Plaintiffs contend that Document 5 is critical because it shows that "as of mid-2007, ABDC was aware . . . that the DEA believed it was illegal for distributors to continue selling controlled substances to customers who had placed suspicious orders." Plaintiffs' Motion at 7. Plaintiffs hardly need this email chain—a second- or third-hand report of information routed through HDMA—to establish that ABDC had become aware that, starting in mid-2007, DEA wanted distributors to cease the industrywide practice of reporting suspicious orders after shipment. Indeed, as ample discovery has shown, DEA itself told this to ABDC earlier in 2007 and it was one of the terms of ABDC's 2007 settlement negotiations with DEA.

***Third***, ABDC has not been warned that it could be subject to the severe sanctions Plaintiffs seek. To the contrary, ABDC always has believed it has been compliant with the relevant discovery orders and standards. Special Master Cohen made clear that Track One discovery would be limited. All parties knew discovery would continue and additional documents would be produced. ABDC has complied with the obligation to reproduce state court productions into the MDL. It has never been suggested that disagreement over responsiveness decisions could lead to ABDC's affirmative defenses being stricken, for example.

***Fourth***, ABDC has never been sanctioned in this litigation. This is not the case where a recalcitrant litigant has ignored a prior sanction and further sanctions are needed to ensure future compliance.

Relatedly, courts also have applied another test in the sanctions context—one that considers whether late disclosure of evidence by a party seeking to use that evidence at trial is "harmless."

The factors considered are: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015).[11]

No sanctions are warranted under that test either. And while the test does not neatly fit the circumstances here because ABDC is not seeking to use late-disclosed evidence at trial, the test nevertheless is instructive because it shows that the alleged late disclosure is "harmless." First, Plaintiffs' counsel was on notice that additional documents would be produced, including from Track One custodians. Second, Plaintiffs have ample opportunity to cure this alleged prejudice by seeking to use these documents in the future—indeed, no one has said that they cannot. Third, there are no concerns of trial disruption implicated here. Track One was settled prior to trial more than seven months ago. Fourth, a fair reading of the documents—and not Plaintiffs' sensationalized and exaggerated descriptions apparently designed to grab headlines—shows that these documents are of marginal importance, at best, and redundant of many other documents. And fifth, as explained, ABDC has a concrete and legitimate explanation for the alleged failure to disclose: the good-faith application of discovery principles and the court's guidance in a massive, multi-jurisdictional litigation.

### C. Plaintiffs' Requested Relief Is Inappropriate

As shown above, Plaintiffs' Motion is built on—at most—disputed responsiveness calls on a very small number of Plaintiff-selected documents. Sanctions are not warranted at all, and there certainly is no basis to impose the extreme sanctions Plaintiffs request in their Motion.

---

[11] *See also* Opinion & Order re: Discovery Ruling no. 19 at 3 (ECF No. 1577) (citing *Howe*).

Plaintiffs' first and second proposed items of relief request that ABDC be required to certify under oath that all "Category One Discovery documents responsive to Plaintiffs' Rule 34 requests" and "all documents from custodial files and document repositories that are responsive to search terms" "have now been produced in the MDL proceedings." Plaintiffs Motion at 10 (Requests A and B). This request is circular, vague, and would be impossible to effectuate—in both these circumstances and others that might surely follow.

Plaintiffs' request for a certification of compliance begs the question: under whose standard? Granting such relief will amount to an unacceptably vague directive and inevitably will lead to more motion practice related to the various parties' productions because the entire point here is that Plaintiffs disagree with ABDC as to the proper scope of Track One discovery. ABDC *does* believe it has produced all responsive documents; Plaintiffs *do not*. But Plaintiffs' view on what is responsive is hardly elucidated by the ten documents that form the basis for their Motion. Indeed, some of the documents do not hit the Track One search terms, others are outside the geographic scope of Track One, and so forth. What Plaintiffs really are asking for is a document-by-document rehash of the scope of Track One discovery, unmoored to any objective standard. Plaintiffs' request is too vague to allow for compliance with any reasonable degree of certainty, and should be denied on that basis alone.[12]

---

[12] This is analogous to the well-established rule in the context of injunctive relief that an order "should clearly let [a] defendant know what he is ordered to do or not to do" in order to "avoid the possible founding of a contempt citation on a decree too vague to be understood." *SKG Int'l, Inc. v. SKG Italia, S.p.A.*, No. 16-14510, 2017 WL 405935, at *8 (E.D. Mich. Jan. 31, 2017) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) and *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Plaintiffs' request is akin to the widely disfavored "obey the law" injunction. *See Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 410-12 (6th Cir. 2016) ("The prohibition on overbroad or vague injunctions is deeply rooted in equity."); *see also, e.g.*, *Midland Funding LLC v. Brent*, No. 08-1434, 2009 WL 3086560, at *3 (N.D. Ohio. Sept. 23, 3009) (concluding that an injunction that prohibited use of "false affidavits" was impermissibly vague).

This Court should not allow Plaintiffs to, in essence, weaponize Discovery Ruling No. 22, by using timely state-court productions as an on-demand source of potential sanctions rulings in the already-settled Track One of the MDL. The purpose of Discovery Ruling No. 22 is to provide the MDL plaintiffs with documents—by definition, documents produced later in state court litigation—that may be of some relevance to them. It defies logic that Plaintiffs should then be able to turnaround and claim that those documents should have been produced sooner and obtain sanctions on that basis. To endorse this request would be to open the floodgates to never-ending, frivolous sanctions motions.

Next, Plaintiffs demand that ABDC "identify each 'new' document" and provide a litany of information about each document under oath, including whether it falls under Category One discovery, whether it relates to a witness deposed in Track One, the date it was created and produced, the reason the document was not previously produced, and the date and location the document was produced in other proceedings. Plaintiffs' Motion at 10 (Request C). This requested relief, too, is circular and compliance with it would be impossible.

Moreover, as Plaintiffs acknowledge, ABDC has produced over 400,000 documents since the resolution of Track One—and is continuing to produce documents across the country. Providing Plaintiffs with the under-oath document-by-document analysis they request—unnecessary in any event—would be extremely burdensome and would have the obvious and perverse effect of *slowing down* all future Discovery Ruling No. 22 productions, something that surely will engender complaints from Plaintiffs. This make-work sanction also would needlessly divert already strained resources needed for discovery to progress in remanded and state court litigation.

Finally, Plaintiffs seek a hearing on the matter and further relief including reopening depositions, waiver of affirmative defenses, stripping of confidentiality designations, and

- 18 -

monetary sanctions. *Id.* (Request D). As set forth above, none of these sanctions are warranted under the relevant legal principles. But this Court also should be wary of what is, in effect, Plaintiffs' invitation to this Court to overstep jurisdictional boundaries. This Court properly has acknowledged that it does not have jurisdiction over the remanded litigation, including the Cabell and Huntington cases in West Virginia. To the extent the sanctions Plaintiffs seek relate to active litigation in other jurisdictions, they are inappropriate. For example, depositions do not happen in a vacuum—they happen during discovery for a specific case. Likewise, a defendant pleads affirmative defenses in its answer to a complaint in a specific case. There are no "blanket" affirmative defenses for the MDL writ large. To the extent Plaintiffs seek these sorts of sanctions, they must do so in the active case in which they want the sanction to be applied.

## IV.    CONCLUSION

The vagueness of Plaintiffs' requested relief, the meagerness of their submission, and their total avoidance of the legal standard all shine a light on their true purpose. They seek to exert undue pressure and garner media attention. This exercise is counterproductive and a waste of the Court's time. Plaintiffs' Motion lacks any factual basis or legal merit. This Court, accordingly, should deny the Motion in its entirety.

Dated:  June 4, 2020

Respectfully submitted,

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 4, 2020, AmerisourceBergen Drug Corporation's Opposition to Plaintiffs' Motion to Compel and for Sanctions was served on all counsel of record via the CM/ECF system.

/s/ *Robert A. Nicholas*

Robert A. Nicholas