# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 17-md-2804 |
| *County of Harris v. Purdue Pharma, et al.*, Case No. 1:18-op-45677-DAP | Judge Dan Aaron Polster |

# NEGOTIATION CLASS OPT OUT RESPONSE TO PROFESSOR RUBENSTEIN'S REPORT AND RECOMMENDATION ADDRESSING MOTION FOR COMMON BENEFIT FUND

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION AND SUMMARY ................................................................................. 1

QUESTIONS PRESENTED ................................................................................................. 6

    Q1(a): How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order? ........................................................................................................................ 6

    Q1(b): Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?..................................................................................................................................... 8

    A.  The Participation Agreement. ..................................................................... 8

    B.  There are a Number of Current Settlements with Fee Fund Inputs. ........................... 8

        1.  There is a $2–3 billion Fees and Expenses Fund. ................................................. 8

        2.  The Purdue Fee Issue and the PEC's Overreaching Attempt to Capture it Via Common Benefit in the MDL. ..................................................................... 10

        3.  The Mallinckrodt PEC-Negotiated Fund Addresses PEC Fees. ........................... 11

    C.  Intra-State Agreements Have Been and Continue to be Negotiated........................... 12

    Q2: (a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution? (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved. ................................................................................................................................ 12

    Q3(a): How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution? ..................................................................................... 13

    Q3(b): If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.......................................................................................................................... 14

    A.  This Type of Lien is Not Recognized Under the Law. ............................................... 14

    B.  Certain State's Laws Will Not Recognize This Type of Lien. ................................... 15

    C.  Quantum Meruit Would be the Only Viable Option for This Type of Recovery but Would Result in Additional Litigation. ................................................................. 16

    D.  The Lien Approach Proposed Earlier Is Distinguishable. .......................................... 16

Q4(a): How should a common benefit assessment account for the potential size of the taxed settlements, if at all?..................................................................................................... 17

Q4(b): Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter? If so, explain how. If not, explain how it should be adjusted to do so. ............................................................................................... 19

Q5(a): How should a common benefit assessment account for the size of the underlying IRPA's (Individually Retained Plaintiff's Attorney) contingent fee, if at all?...................... 20

Q5(b): Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPA's contingent fee contracts? If so, explain how. If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence. ............................................................................................................................... 21

**REQUEST FOR HEARING** ................................................................................................ **25**

**CONCLUSION** .................................................................................................................... **25**

# TABLE OF AUTHORITIES

**Cases**

*Bruton v. Carnival Corp.*,
    916 F. Supp. 2d 1262 (S.D. Fla. 2012) .................................................................. 16

*Chesley v. Union Carbide Corp.*,
    927 F.2d 60 (2d Cir. 1991) ................................................................................. 15

*Clarion Corp. v. Am. Home Prods. Corp.*,
    464 F.2d 444 (7th Cir. 1972) .............................................................................. 15

*Collins v. Thuringer*,
    21 P.2d 709 (Colo. 1933) ................................................................................... 14

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*,
    941 F.2d 1217 (D.C. Cir. 1991) .......................................................................... 15

*Finkelstein v. Roberts*,
    220 S.W. 401 (Tex. Civ. App.–Ft. Worth 1920, writ dism'd) ................................. 16

*Fire Protection Resources, Inc. v. Johnson Fire Protection Co.*,
    594 N.E.2d 146 (Ohio 6th Dist. Lucas County 1991) ........................................... 14

*George v. Sandor M. Gelman, P.C.*,
    506 N.W.2d 583 (Mich. Ct. App. 1993) .............................................................. 14

*Hale v. Tyson*,
    79 So. 499 (Ala. 1918) ...................................................................................... 14

*Hillside Enters., Inc. v. Cont'l Carlisle, Inc.*,
    147 F.3d 732 (8th Cir. 1998) .............................................................................. 15

*Hinton v. Fed. Nat. Mortg. Ass'n*,
    957 F. Supp. 101 (S.D. Tex. 1997) ................................................................ 15, 16

*In re Air Crash Disaster at Florida Everglades*,
    594 F.2d 1006 (5th Cir. 1977) ............................................................................ 10

*In re Cooper*,
    52 N.E.2d 421 (N.Y. 1943) ................................................................................ 14

*In re Genetically Modified Rice Litig.*,
    764 F.3d 864 (8th Cir. 2014) ................................................................................ 4

*In re Nat'l Prescription Opiate Litig.*,
    956 F.3d 838 (6th Cir. 2020) ................................................................................ 4

*In re Pacific Far East Line, Inc.*, 654 F.2d 664 (9th Cir. 1981) .................................................... 15

*Jaye v. Royal Saxon, Inc.*,
    687 So.2d 978 (Fla. Ct. App. 1997)......................................................................... 16

*New York Univ. v. Ariel Fund Ltd., et al.*,
    No. 603803/08 (N.Y. Sup. Ct. Mar. 1, 2010), NYSCEF No. 139 ............................ 17

*Purdue Pharma L.P. v. Commonwealth of Massachusetts* (*In re Purdue Pharma L.P.*),
    Adv. Pro. No. 19-08289-RDD, (Bankr. S.D.N.Y. Feb. 17, 2020), ECF No. 139 (Sixth
    Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary
    Injunction)........................................................................................................................ 11

*Royal Ins. Co. v. Simon*,
    174 A. 444 (Del. 1934) ................................................................................................ 14

*State ex rel. Oklahoma Bar Ass'n v. Cummings*,
    863 P.2d 1164 (Okla. 1993)......................................................................................... 14

*Thomson v. Findlater Hardware Co.*,
    156 S.W. 301 (Tex. Civ. App.–Austin 1913, no writ)................................................. 16

*Tri City Equipment Co. v. Modern Real Estate Invs., Ltd.*,
    460 N.W.2d 464 (Iowa 1990) ...................................................................................... 14

**Statutes**

28 U.S.C. § 1334.......................................................................................................................... 11

28 U.S.C. § 157............................................................................................................................ 11

Tex. Gov't Code Ann. § 2254.1038 ............................................................................................ 15

**Other Authorities**

5 Newberg on Class Actions § 15:81 (5th ed.) ..................................................................... 18, 19

BLACK'S LAW DICTIONARY (10th ed. 2014) ............................................................................... 14

Bolch Judicial Institute of Duke Law School, *Guidelines and Best Practices for Large
    and Mass-Tort MDLs* (2nd ed. Sept. 2018) .............................................................. 24

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee
    Awards*, 7 J. Empirical Legal Stud. 811 (2010)......................................................... 18

Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*,
    74 La. L. Rev. 371 (2014)............................................................................... passim

MANUAL COMPLEX LITIG. § 14.121 (4th ed.) ...................................................................... 19, 20

Negotiation Clase Website, https://www.opioidsnegotiationclass.info/Home/FAQ#faq32 ......... 11

Sara Randazzo, *Drug Distributors in Talks to Settle Opioid Litigation for $18 Billion*,
THE WALL STREET JOURNAL (Oct. 15, 2019, 6:58 pm ET),
https://www.wsj.com/articles/drug-distributors-in-talks-to-settle-opioid-litigation-for-
18-billion-11571170730 ........................................................................................................... 9

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action
Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248 (2010) ...................................... 18, 19

William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3
Class Action Att'y Fee Dig. 87 (2009) ............................................................................. 20, 22

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................. 1, 3, 5, 6

**Constitutional Provisions**

U.S. Constitution, Article III ......................................................................................................... 3

## INTRODUCTION AND SUMMARY

Without waiving challenges and objections to jurisdiction, the below-identified political subdivisions proceeding in state-filed cases, or who have been improvidently removed, who have entered into statewide allocation agreements for any future settlements with their State's Attorney General and/or State Government, or have opted out of the Negotiation Class (hereinafter, the "Opt Out Group"), file this Supplemental Opposition to the Amended Motion for Entry of Order Establishing Common Benefit Fund ("the Motion") [Doc. #3112], incorporated herein by reference, to address Professor Rubenstein's Recommendations [Doc. #3319].

The undersigned agree with Prof. Rubenstein that it is unclear at this stage what structure any aggregate settlement may take, which defendants may settle, what role (if any) Judge Polster's court would or should play in such context and whether the structure of any future hypothetical deal would warrant a common benefit approach at all. It is for these reasons that the Opt Out Group argued in its original Opposition to the PEC motion [Doc. #3189] that the contemplated assessment is premature. The Opt Out Group maintains that position now. The undersigned agree that "the Court is being asked to act on novel legal issues in a state of factual uncertainty," [*See* Doc. #3319 at 6] and is being asked to do so without established precedent. The Negotiation Class has already put the Court in the tenuous position of certifying a novel class without grounded precedential authority under Fed. R. Civ. P. 23. A cautionary approach would avoid stacking new and novel legal issues upon each other, lest the rule of law rest on an unstable foundation. Indeed, the only use of the purported Negotiation Class to date has not been for negotiation or settlement purposes, but by the PEC as the basis for equity jurisdiction for the requested 7% tax.[1]

---

[1] Rule 23 and an MDL are not jurisdictional grants for all purposes to a court. [See Doc. #3186 at 5-9]. No negotiations or settlements have run through the Negotiation Class to date. In addition, the Negotiation class contained

The Opt Out Group also agrees with Prof. Rubenstein's observations regarding the variety of plaintiffs and defendants involved in these cases and that there are a "staggering" number of possible permutations for resolution. A single assessment, as contemplated, most certainly risks "being too crude an approach." [Doc. #3319 at 5]. It is for that reason the Opt Out Group argued in its original Opposition that the contemplated assessment lacked the necessary specificity as to defendant groups and lacked a necessary factual basis. [*e.g.*, Doc. #3189 at 1-2, 5]. Prof. Rubenstein appears to have taken these particular critiques to heart. [*See* Doc. #3319. at 4 n.2 ("Some opponents point out that the moving papers, at present, proffer no factual support for any of [the PEC] statements. To the extent that the movants aim to demonstrate factually that their efforts have substantially benefitted the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents." (citation omitted))]. Such proof should be neither cursory nor conclusory. This is particularly true as to the Opt Out Group, who will only receive a recovery through litigating their own cases or negotiating their own settlements.[2]

The Opt Out Group further agrees with Prof. Rubenstein that its clients' status as governmental entities present "another unique factor that may pose difficult legal questions." *Id.* at 5. It is for that reason the undersigned noted in its original Opposition that none of the PEC's proffered authorities involved political subdivisions, like the undersigned, who additionally (1) opted out of a class (here, the Negotiation Class, which no defendant group has elected to utilize

---

metrics on how monies would be allocated to governmental entities, which were not used by the State of Ohio and its local governments, or the State of Texas and its local governments in separate agreements determining how future opioid settlement monies would be allocated to the states and local governments in those jurisdictions. Members of the PEC are both primary signatories and negotiating parties in the Ohio Agreement and could have used these metrics. These Agreements are attached hereto at Exs. A and B.

[2] This argument is more fully briefed by the City of Baltimore in its Opposition and is incorporated herein by reference. [Doc. #3191 at § I.b].

and is under significant appellate challenge); (2) declined to sign participation agreements; and (3) continued to press for remands in response to what they view as improvident removals in the first instance. [Doc. #3189 at 16-17].

And, the Opt Out Group agrees with other entities, including the State Attorneys General, that imposition of the proposed assessment at this time will be genuinely disruptive to meaningful progress that has been made on the (non-Negotiation Class) settlement negotiation front over an extended period by a diverse number of interested parties including the undersigned, State Attorneys General, and other litigants.

It will surprise no one that, in light of the foregoing, the undersigned further agree with Prof. Rubenstein's recommendation that the Court "proceed cautiously with respect to [the PEC's] request." [Doc. #3319 at 5]. Caution is particularly warranted when evaluating the application of an unprecedented common benefit tax on cases over which this Honorable Court lacks jurisdiction.[3] It is axiomatic that jurisdiction is the *sine qua* non of authority to levy a tax on the undersigned's cases.  This Court's lack of jurisdiction and movants' lack of citation to applicable authority for the proposition that the claims described herein are subject to this Court's jurisdiction present the first- and dispositive – problems with answering each of the questions posed; the questions appear to *assume* jurisdiction where none has been established. For instance, Prof. Rubenstein notes that that the PEC must show its work "substantially benefited" the causes to be

---

[3] Notably, Prof. Rubenstein's R&R contained no jurisdictional analysis. This notwithstanding that each of the filed oppositions noted the lack of this Court's jurisdiction over cases it has been asked to assess against. [*See, e.g.,* Docs. #3186, #3189, #3181, and #3191]. These jurisdictional challenges are incorporated herein by reference. It is, in fact, unclear whether Prof. Rubenstein was assigned the task of addressing jurisdictional issues in the referral. The Court's Order of referral did not set out the specific questions to be considered. [*See* Doc. #3218]. The Opt Out Group's original Opposition raised jurisdictional concerns for the undersigned as well as absent members of the class—here, more than approximately 34,000 cities and municipalities. It also addressed the inability of the Court to bootstrap jurisdiction for a common benefit fee *via* Rule 23, certifying a new and novel Negotiation Class that never referenced the assessment, as well as the established precedent that Rule 23's requirements must be interpreted in keeping with Article III constraints. [*See* Doc. #3186 at 7].

taxed [*Id.* at 2], but even the case cited supports the undersigned's jurisdictional point that, *to wit*, even if substantial benefit is shown, the Court must have jurisdiction over the causes to be taxed. *See, e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 866 (8th Cir. 2014) (rejecting common benefit proposal for lack of jurisdiction over out-of-court settling parties even where such plaintiffs "benefited substantially" from the work of Lead Counsel).

Caution is also advisable given the absence of *any* legal precedent supporting a common benefit assessment under circumstances such as here. No such precedent was supplied by Prof. Rubenstein, and not one of the PEC's authorities involved improvidently-removed state cases filed by political subdivisions that resisted federal jurisdiction, affirmatively opted out of a class, declined to sign participation agreements, and are endeavoring to protect an abatement fund designed to address an ongoing national health epidemic. [*See* discussion of PEC authorities, Doc. #3319 at 16-17]. While the undersigned note that no such precedential authority was presented in Prof. Rubenstein's recommendations, ample contrary authority was provided in the opposition briefing. The fact that the body of caselaw and treatises presented do not capture or bless the scope of the present motion speaks volumes on its viability. The complex and novel issues raised in the PEC's motion still require that the Court provide a legal foundation in managing this MDL, including a common benefit fee. Naturally, every MDL court must adhere to the rule of law. *See In re Nat'l Prescription Opiate Litig.,* 956 F.3d 838, 841 (6th Cir. 2020) (stating an MDL court may not distort or disregard the rule of law, which is applicable to each of its cases).

Caution is further appropriate given the significant transparency issues raised in the Opt Out Group's initial Opposition. [*See* Doc. #3189 at 26-28]. Therein, the undersigned recounted the ways in which this MDL has effectively proceeded *in pais* by, among other things, holding un-noticed hearings in private, sealing all transcripts therefrom, sealing pleadings, blocking the

undersigned from participation in critical committees (after promising inclusion), and imposing a moratorium on remands of improvidently removed cases unless counsel agrees to terms of the Participation Agreement (presumably to help justify the common benefit tax). The questions raised by Prof. Rubenstein—including the seminal question of whether the Court can "simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks"—would be significantly better informed by unsealing these chambers proceedings, which are uncommon in federal MDL litigation. Among other unfortunate consequences of this lack of transparently conducted argument and deliberation is the perception (enhanced by the instant overreaching motion) that the PEC is more interested in rewarding itself than maximizing coordinated pressure on defendants in a manner consistent with our clients' priorities to address this epidemic. [*See Id.* at § VI].

To this end, a Motion to Unseal the relevant sealed transcripts that could better inform all parties as to the intent of the PEC's Motion is being filed contemporaneously herewith and incorporated herein. Of particular import is the 63-page sealed transcript of a status conference held on January 29, 2020, the day after the PEC's instant Motion. [Doc. #3113].

As noted above, and further complicating matters is the fact that no national settlement has occurred in this MDL; no defendant is currently negotiating a national settlement by or through this MDL; the national Negotiation Class (certified by this Court and currently on appeal in the U.S. Court of Appeals for the Sixth Circuit) is self-described as a novel approach to Rule 23 class actions; sovereign entities do not agree to this Court's jurisdiction; issues of federalism predominate; companion state-filed MDLs/cases are actively proceeding; two defendants are severed and proceeding in bankruptcy under the jurisdiction of the bankruptcy courts; hundreds of improvidently removed cases are before this Court under a moratorium on remand hearings or

motion; at least two States and their counties and municipalities—Texas and Ohio—have entered into agreements on the allocation of settlements within their States, including fees and expenses; and current negotiations with Distributor Defendants and Johnson & Johnson are premised upon an allocation to the States, which then results in an allocation to the cities and counties within each State. As pointed out by the Defendants in their Opposition, this Court expressly promised that no allocation to a State would be assessed an MDL fee. [Doc. #3186 at 6].

Here, because there has been no national settlement in the MDL (and none contemplated), no defendant operating through the negotiating class, and significant movement outside the parameters of this MDL toward settlements, transparency is the only way to ensure there are no subversive agendas aimed at halting global settlement negotiations, including by ordering a holdback on every opioid case, filed or unfiled, state or federal. Indeed, the PEC's burden is to demonstrate both that the Court has jurisdiction over the cases it seeks to assess *and* that the PEC has done work to "substantially benefit" all of the cases they ask the Court to assess—a burden it has not met. *See supra* note 2.

For these reasons and the reasons set forth below, caution warrants that the Court decline to enter the PEC's Proposed Order. Specifically, this Court lacks both jurisdiction and authority supported by decisional law and Rule 23 to enter an order taxing all cases proceeding in state venues or state MDLs; unfiled cases; cases that were removed and transferred to this Court but are languishing *sin die* under the Court's remand moratorium orders (when they would otherwise be remanded); cases in bankruptcy; cases where the plaintiffs or the State have not voluntarily agreed to contract with the PEC to be assessed under the MDL; and cases where future settlements is to be paid to the State to distribute through agreements with its political subdivisions.

**QUESTIONS PRESENTED**

**Q1(a): How likely is it that a global settlement will have specific funds to compensate**

**all attorneys in these matters such that the Court will not need to render a common benefit order?**

It is highly likely that any truly global settlement "will encompass a separate pot of money dedicated solely to attorney's fees." [Doc. #3319 at 6]. That is exactly the construct contemplated in the Distributor and Johnson & Johnson negotiations, as has been reported widely in the public record. That is similarly the construct likely in the Purdue bankruptcy. More specifically, in the Distributor and Johnson & Johnson negotiations, the public record reveals that approximately $2–3 billion in fees and expenses are being negotiated on top of the client recoveries, in order to form a separate pool to compensate counsel. The PEC is apparently unsatisfied with whatever its fair share of that separate fee and expense pot will be. On no meaningful record, it seeks—through this motion—to levy an additional $3.3 billion tax on the proposed Distributor and Johnson & Johnson settlement. [*Id.* at 8]. The PEC would also seek to recover 7% on additional settlements and through PEC-aligned and state-litigant contingency fee contracts already negotiated at below-market rates.[4]

Such an extraordinary level of assessment, unsupported by law or fact, creates the appearance that that the Motion is punitive toward defendants, Attorneys General, and state-filed litigants or having engaged in settlement negotiations outside the MDL.

Any impropriety attached to granting the Motion at this stage can be avoided simply by waiting for the settlement discussions and data points to mature without interference of this Court. It may well be that an assessment, in the end, is wholly unnecessary.

Respectfully, the Court can and should simply deny the Motion without prejudice.

---

[4] Even if one assumes the PEC's approximately 1.5 million hours are related to these three defendant groups, a blind payment of $1,000 per hour would only reach $1.5 billion, or $1.6 billion with claimed expenses. In addition, there is some $20 million as a holdback on the Track 1 settlement and future exemplary trials and potential settlements in the works that will carry legal fees and expenses. The PEC would also seek to recover additional fees under contingency fee contracts and outside counsel contracts with some 20 PEC-aligned Attorneys General.

**Q1(b): Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?**

Yes, and a measured stay of the Court's hand is, in fact, advisable given the instant record and the lack of any legal precedent whatsoever to support the premature and improper overreach that is contemplated by the instant Motion.

Three data sets are important to this question: (A) whether the exemplary cases already have a Participation Agreement with the PEC such that no court ordered common benefit assessment is necessary; (B) the status of current settlement negotiations, bankruptcies, and potential fee and expense funds therefrom; and (C) the existence of and likelihood that most states will have an intra-state agreement.

**A.      The Participation Agreement.**

Prof. Rubenstein observes that "court-ordered common benefit assessments are necessary only when the lawyers cannot voluntarily reach agreement among themselves." [Doc. #3319 at 7]. In so stating, he references the initial bellwether and upcoming MDL exemplary trials. The initial bellwether settlement resulted in a voluntary holdback of some $20 million. [Doc. #2980]. All of the trial track cases are PEC-aligned selections by the Court, and, like the initial PEC-aligned case, will have a signed Participation Agreement. Thus, no common benefit holdback order is needed on these cases, which will result in similar or substantially higher contributions to the sought-after common benefit fund. Since the Court has all other cases on moratorium, even from remand, there is presently no path for any of those non-exemplary, non-PEC cases to move forward in litigation.

**B.      There are a Number of Current Settlements with Fee Fund Inputs.**

Presently, in addition to the potential for exemplary cases to contribute substantial funds to any common benefit fund in the MDL, there are ongoing settlement discussions.

**1.      There is a $2–3 billion Fees and Expenses Fund.**

8

**Contemplated in Distributor J&J/AG Negotiations.**

The current settlement structure discussions reported with the Distributor Defendants and Johnson & Johnson would fund attorney's fees and expenses sufficient to include Attorneys General and their counsel as well as counsel for state-filed governmental entity cases (including lodestar and/or contingency fees), and it would add to the PEC's common benefit pot.[5] That settlement would not happen in a vacuum, but would include Attorneys General, State Coalition Counsel, and the PEC. It would result in a public announcement and a Master Settlement Agreement that would carry with it relevant terms including, without limitation, whether the parties agree to submit the settlement under the jurisdiction of MDL 2804 or in conjunction with it; whether the settlement is to be implemented as a class action or is derived from settlements between the States and that States' local governments; whether all, some, or none of the proposed Opioid Abatement strategies will flow through MDL 2804; where and how fees and expenses are to be administered; releases; and final jurisdiction over the settlement and any disputes. The fact that the reported imminent nature of this global settlement immediately stalled with the filing of the PEC's Motion raises the specter of whether the PEC intended that these negotiations be stalled by the Motion and, if so, why? A Motion to Unseal the transcripts from status conferences that address these issues is being filed contemporaneously herewith, which would inform all parties as to circumstances under which the fee Motion was filed.  The sealed transcript at issue remains *sub judice*.

The fact that settlement negotiations include parties outside of this Court's jurisdiction—who are proceeding in state-filed cases or multi-district litigation—is not a basis to implement a

---

[5] *See* Sara Randazzo, *Drug Distributors in Talks to Settle Opioid Litigation for $18 Billion*, THE WALL STREET JOURNAL (Oct. 15, 2019, 6:58 pm ET), https://www.wsj.com/articles/drug-distributors-in-talks-to-settle-opioid-litigation-for-18-billion-11571170730

fee assessment Order. The PEC casts aspersions at the diligent work of the Opt Out Group—calling counsel "free riders." In truth, the undersigned have collectively survived dozens of motions to dismiss in their respective state courts (including against entities not worked up during the bellwethers), are actively engaged in all aspects of discovery and have state court trial dates set throughout 2021. These litigants and their counsel have *expressly rejected* involvement in the MDL, as well as the "help" of the PEC. This is hardly the behavior of free riders. And it is well settled that an alleged "free-rider" is not riding free when she is also contributing to the outcome.[6] *See In re Air Crash Disaster at Florida Everglades*, 594 F.2d 1006, 1019 (5th Cir. 1977) (recognizing an attorney who is a contributor to the final result is not a free rider). Moreover, any argument that the PEC filed a motion requesting a holdback because lawyers proceeding outside this Court's jurisdiction were negotiating settlements the PEC did not like is no basis for a common benefit order. If it were, no settlement could ever happen outside of a federal MDL.

> **2.  The Purdue Fee Issue and the PEC's Overreaching Attempt to Capture it Via Common Benefit in the MDL.**

Defendant Purdue entered bankruptcy in 2019, having made an agreement with the PEC and certain State Attorneys General as to a proposed settlement value, but having failed to reach a contractual agreement with the PEC on fees and expenses. As pointed out in the undersigned's

---

[6] The free-rider argument is utterly absurd. The State of Texas has its own multi-district litigation in Harris County, Texas and has bellwether cases set for trial against the defendants at issue. Texas has reached its own intra-state allocation agreement including fees and expenses. [Ex. B]. In more than 1,100 other cases representing the majority of litigants and localities in many states such as Virginia, South Carolina, Texas, Nevada, Missouri, Arkansas, Tennessee, Oklahoma, West Virginia, South Dakota, Kentucky, Maryland, New Mexico, Pennsylvania, Arizona, Kansas, and more, this consolidated group, as well as many others, have spent tens of thousands of hours on state court actions, bellwether cases and trial settings, have formed formal and informal committees, created document repositories independent of the PEC, retained working experts, been involved in hundreds of depositions, and much more. In the Purdue Bankruptcy, the Multi-State Group of Governmental Entities, formed from our group, is an active mediation party, and Cameron County, Texas, an opt-out plaintiff in this Court's Negotiation Class, sits *ex officio* on the UCC. The group has also been actively involved in discussions with the Attorneys General and certain defendants toward finding a reasonable resolution to this epidemic.

initial Opposition, it is likely that a substantial portion of the hours and expenses incurred by the PEC relates to work on the Purdue case and is not attributable to the Distributor/J&J settlement or any others down the road. The hours and expenses referenced by the PEC were not recorded in a manner sufficient to address how many of those hours related to Purdue or the other debtors. Regardless, this Court relinquished jurisdiction over those fees and expenses when the Purdue case was filed in the bankruptcy court. 28 U.S.C. §§ 157(a)-(b) and 1334(b).[7] Further, the proceedings against Purdue in this Court are currently enjoined[8] [Doc. #3251] and Purdue severed from the trial track [Doc. #2612]. Additionally, Purdue has filed its own Notice requesting clarification and exclusion from the common benefit order. [Doc. #3214]. Neither can the Negotiation Class—the proposed primary hook for the PEC's Motion—be used to assess fees and expenses that would cover Purdue. Specifically, the Negotiation Class website expressly provides, "Whether you remain in or opt out of the Negotiation Class will have *no effect* on your rights or obligations as a Creditor in the Purdue Bankruptcy, including any right to receive a distribution or recovery in the bankruptcy. The Negotiation Class (and any decision about whether to remain in or opt out) is not at this point connected *in any way* to the Purdue Chapter 11 Cases."[9] In addition, as set forth in the undersigned's Opposition, the PEC reached an agreement with the Purdue debtors that the common benefit order did not apply to Purdue or its proceeds and creditors. [*See* Doc. #3189 at 7-8 & n.6].

### 3.     The Mallinckrodt PEC-Negotiated Fund Addresses PEC Fees.

The Mallinckrodt Defendant entities agreed to a term sheet with the PEC that would allow

---

[7] Section § 157(b) grants the bankruptcy court jurisdiction "to hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title."

[8] *See also* Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction at 6-8, *Purdue Pharma L.P. v. Commonwealth of Massachusetts* (*In re Purdue Pharma L.P.*), Adv. Pro. No. 19-08289-RDD, (Bankr. S.D.N.Y. Feb. 17, 2020), ECF No. 139.

[9] https://www.opioidsnegotiationclass.info/Home/FAQ#faq32 (last visited June 22, 2020) (emphasis added).

Mallinckrodt to go into bankruptcy with a separate fee fund of some $350 million. [*See* Ex. C, Securities Filing]. If (or when) Mallinckrodt goes into bankruptcy, this fee fund would be approved, administered, and distributed under the supervision of the bankruptcy court and pursuant to bankruptcy law. The PEC has made no showing of whether or how the instant motion would relate to that resolution. Indeed, this concern is shared by Purdue (currently in bankruptcy court). [*See* Doc #3214]. Surely a record is required to ensure that counsel are being paid once and only once for their time. A proper accounting, at a minimum, should be required to evaluate the PEC's hours across Mallinckrodt, Insys, Purdue, the Distributors, Johnson & Johnson, and the other defendants from whom the PEC seeks the Court's authority to assess a common benefit holdback.

### C.     Intra-State Agreements Have Been and Continue to be Negotiated.

States and their local governments are determining among themselves the proper allocation of settlement funds, intra-state, including fees and expenses. Where the PEC represents entities (or where one or more of PEC-counsel or PEC-associated counsel represents both the entities and the State), the agreements account for whether there is a contractual basis for voluntary participation in the federal MDL or a PEC common benefit fund. [*See e.g.,* Exs. A and B, One Ohio Agreement and Texas Term Sheet, respectively]. Many other States are currently negotiating similar agreements, and the Court should allow this process to mature and the parties to voluntarily reach agreement, in contract, if that participation is warranted, rather than force the issue and substantially deviate from existing legal authority.

For each of these reasons, the appropriate approach at this juncture would be to recognize the premature nature and likely overreach of the fee Motion as it presently sits.

**Q2: (a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution? (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved.**

The parties and lawyers to the referenced upcoming exemplary cases (*i.e.* those "scheduled for trial in federal courts throughout the country," *see* Doc. #3319 at 7) have already reached agreement on a common benefit contribution. Every one of them has signed a Participation Agreement with the PEC providing for a PEC assessment in those cases. The assessment sought by the instant motion concerns cases outside that universe: it represents an impermissible effort to tax state law claims filed by local governments over which this Court has no jurisdiction—claims which are actively proceeding in state courts nationwide and are being prosecuted by able counsel who neither desire, seek, nor require PEC assistance in any regard.

### Q3(a): How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?

The only obstacle to agreement with the PEC on appropriate common benefit contributions is the PEC's own behavior. The examples extend even beyond the interference sought by this motion, the infirmities of the negotiation class, and the lack of transparency described throughout this and the Opt Out Group's initial Opposition. Most remarkably, the PEC has coopted ordinary procedure and guiding principles by supporting remands *if and only if* state-filed counsel signed its Participation Agreement, thus preventing political subdivisions with improvidently removed cases from obtaining a remand and litigating their own cases, unless they agree to pay the PEC for work from which these cases did not benefit.

With transparency and a commitment to the ordinary professional courtesies attendant with large-scale litigation such as this—where there are literally thousands of counsel nationwide working towards the same objective (abatement of a public health crisis)—the parties would be able to reasonably discuss their respective efforts and contributions in the context of any particular resolution with any particular defendant or defendant group. This proposition is hardly controversial. As the undersigned's initial Opposition laid bare, it is customary for MDLs to be

conducted in daylight because with such daylight comes fairness and efficiencies. [*See* Doc. #3189 at 26-29]. The PEC's unusual choices in the context of this proceeding have led to exactly the opposite—a proposed common benefit order utterly detached from any reality and causing genuine distraction from what should be everyone's larger purpose: abating this epidemic and providing desperately needed relief to our clients.

> **Q3(b): If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

The obstacles to resolution are discussed throughout our initial Opposition and herein. With a transparent and inclusive process, resolution would be likely.

A lien is not an appropriate and viable alternative to agreement, particularly here, where agreement can be reached if the PEC elects to conduct itself in a manner consistent with legal precedent and customary practice.

A lien is "a legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures it satisfied." *Lien*, BLACK'S LAW DICTIONARY (10th ed. 2014). The PEC is not a creditor in any case wherein counsel has not signed a Participation Agreement. Thus, it has no legal right to fees absent an agreement to the contrary.

> **A.     This Type of Lien is Not Recognized Under the Law.**

A lien is a legal right. Attorneys' liens are divided, according to their nature, into two types or classes: (1) general, possessory, or retaining liens; and (2) charging or special liens.[10] A charging or special lien is closest in kind to the lien that Prof. Rubenstein has requested the parties to brief.

---

[10] *Hale v. Tyson*, 79 So. 499 (Ala. 1918); *Collins v. Thuringer*, 21 P.2d 709 (Colo. 1933); *Royal Ins. Co. v. Simon*, 174 A. 444 (Del. 1934); *Tri City Equipment Co. v. Modern Real Estate Invs., Ltd*., 460 N.W.2d 464 (Iowa 1990); *George v. Sandor M. Gelman, P.C.*, 506 N.W.2d 583 (Mich. Ct. App. 1993); *In re Cooper*, 52 N.E.2d 421 (N.Y. 1943); *Fire Protection Resources, Inc. v. Johnson Fire Protection Co*., 594 N.E.2d 146 (Ohio 6th Dist. Lucas County 1991); *State ex rel. Oklahoma Bar Ass'n v. Cummings*, 863 P.2d 1164 (Okla. 1993).

Liens of this nature in federal courts with diversity jurisdiction are governed by the applicable substantive law. *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 941 F.2d 1217, 1219 (D.C. Cir. 1991) ("The existence and effect of an attorney's lien is governed by the law of the place in which the contract between the attorney and the client is to be performed."). In federal diversity cases, such as this MDL, federal courts apply state law to attorney lien issues.[11] Similarly, if a lien is filed in a state court action, that state's law will indeed govern. This issue alone renders the lien approach both inappropriate, and in contravention of state law.[12]

Indeed, a lien approach would only be appropriate for parties where there is an absolute right to a portion of the fees—such as voluntary subscription to a Participation Agreement that has been dishonored. In those situations, not only would the aggrieved party (the PEC) have the ability to attach a lien to funds, but it would also have a viable cause of action for breach of contract. But that is the limited circumstance under which a lien approach should be employed, if at all.

**B.     Certain State's Laws Will Not Recognize This Type of Lien.**

Under certain state laws, an attorney's lien for fees would likely be invalid. Indeed, in Texas for example, "an attorney's lien for fees is valid only (a) if the person over whom the lien is asserted is the attorney's client, and (b) the attorney has collected and possesses a judgment or a settlement on the client's behalf." *Hinton v. Fed. Nat. Mortg. Ass'n*, 957 F. Supp. 101, 102 (S.D.

---

[11] *See Hillside Enters., Inc. v. Cont'l Carlisle, Inc.*, 147 F.3d 732 (8th Cir. 1998) (applying Missouri law to attorney lien issue); *Chesley v. Union Carbide Corp.*, 927 F.2d 60 (2d Cir. 1991) (New York lien statute is enforceable in federal court as interpreted by New York courts); *In re Pacific Far East Line, Inc.*, 654 F.2d 664 (9th Cir. 1981) (applying California lien law in accordance with bankruptcy law); *Clarion Corp. v. Am. Home Prods. Corp.*, 464 F.2d 444 (7th Cir. 1972) (applying Illinois lien statute in diversity case).

[12] *See, e.g.*, Tex. Gov't Code Ann. § 2254.1038. Enacted on September 1, 2019, under Texas law, a contingent fee contract for legal services with a political subdivision must receive "attorney general approval of the contract." *Id.* ("Before a contingent fee contract for legal services approved under Section 2254.1036 is effective and enforceable, the political subdivision must receive attorney general approval of the contract.").

Tex. 1997) (citing *Finkelstein v. Roberts*, 220 S.W. 401, 405 (Tex. Civ. App.–Ft. Worth 1920, writ dism'd); *Thomson v. Findlater Hardware Co.*, 156 S.W. 301, 303 (Tex. Civ. App.–Austin 1913, no writ)). Notwithstanding issues of federalism, the lien that would purportedly be asserted under these facts and enforced in state courts would likely not meet the legal requirements and would be void. *See Hinton*, 957 F. Supp. at 103.[13]

### C.    Quantum Meruit Would be the Only Viable Option for This Type of Recovery but Would Result in Additional Litigation.

If the PEC feels that it possesses a valid *quantum meruit* claim against a particular party, it can proceed with bringing that claim in state court against the party in a separate proceeding that does not interfere with the underlying litigation. This approach has been recognized as an alternative to asserting a lien that cannot attach under state law. *See Bruton*, 916 F. Supp. 2d at 1269 ("Here, Fox's charging lien cannot attach to property that was not involved in a lawsuit that he or his firm filed. Although his work may have indirectly benefitted the recovery here, sufficient to give rise to a quantum meruit claim (a proposition we assume but do not find), that work does not give rise to an equitable charging lien in an action foreign to him. His claim, to the extent it has any legs at all, must be filed in the ordinary course of a contract action in state court. In other words, his equitable lien never attached to the recovery in this case, because he never filed, worked on, or settled this case.")

### D.    The Lien Approach Proposed Earlier Is Distinguishable.

The "attorneys' lien" exemplar cited in the PEC's briefing is distinguishable from the

---

[13] *See also Bruton v. Carnival Corp.*, 916 F. Supp. 2d 1262, 1268 (S.D. Fla. 2012). ("To impose a charging lien, a court in equity must find: (1) an express or implied contract between the attorney and client; (2) an express or implied understanding that payment is either contingent upon recovery or will be paid from the recovery; (3) an attempt by the client to avoid paying or a dispute as to the amount of the fee; and, most relevant here, (4) a timely notice of a request for a lien."); *Jaye v. Royal Saxon, Inc.,* 687 So.2d 978, 981 (Fla. Ct. App. 1997) ("Fees and charges incurred outside of a suit are not, absent special circumstances, covered by a charging lien.").

instant case. [Docs. #3319 at 8; #3192 at 11]. In that case, an early TRO was secured to prevent the dissipation of assets that was the corpus of the monies that was the recovery. Order, *New York Univ. v. Ariel Fund Ltd., et al*., No. 603803/08, at *9 (N.Y. Sup. Ct. Mar. 1, 2010), NYSCEF No. 139. Indeed, the court reasoned the TRO was the only action taken to prevent dissipation of the corpus of money upon which recovery was largely based.[14] *Id.* at *6-8. In this matter, concurrent litigation in state courts is currently proceeding with different defendants and legal theories—the New York matter was and is solely based in one Court in New York, all stemming from the Bernard Madoff scandal. Conversely, the Opt Out Group's cases are replete with broad-ranging facts and legal theories founded in many jurisdictions.

A lien approach is not an appropriate or viable alternative in this scenario. Only an agreement between the PEC and state litigants will produce a global resolution of this issue.

### Q4(a): How should a common benefit assessment account for the potential size of the taxed settlements, if at all?

Any common benefit assessment should first and foremost be reasonable under the particular circumstances of the MDL in which it operates, and it should not amount to a windfall for the relatively small number of attorneys who stand to gain from the assessment. *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 381 (2014) ("The total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data.").

As in the class action context, a fundamental principle of percentage-based common benefit

---

[14] The court reasoned: "NYU's primary concern when initiating these proceedings was preserving Ariel's assets after the Madoff fraud was revealed and after Merkin announced that a substantial portion of Ariel's assets had been invested with Madoff." *Id.* at *6. No one, other than NYU, took any step to preserve the fund after the announcements were made, including Ariel's board of directors." *Id.* at *6-7. Further, "[t]he actions taken by NYU [and counsel] in this proceeding led to a substantial benefit to the investors. The opposition cannot argue that the TRO obtained by NYU…were not necessary actions because the AG took the identical steps when it finally filed its own case. Without question, the preservation of Ariel's assets during the five months that the AG took to bring its action conferred a substantial benefit on Ariel." *Id.* at *8.

assessments should be that as the amount of recovery increases, the percentage needed for any assessment decreases. *See id.* at 379 (stating "MDLs are quasi-class actions"); *id.* at 385 ("A number of courts have reviewed data compiled in empirical studies of attorneys' fees in class actions to determine what has been awarded in similar cases to assist them in computing the appropriate percentage fee in the case before them. The studies reveal that the higher the settlement, the lower the percentage of the fee."); *Applying the percentage method— Reasonableness of percentage—Mega-fund approach*, 5 Newberg on Class Actions § 15:81 (5th ed.) (noting "empirical data on class action fee awards do demonstrate that the percentage awarded to counsel decreases as the size of the fund increases"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 837 (2010) (finding "fee percentages are strongly and inversely associated with the size of the settlement").

If this principle is ignored, "as funds reach gargantuan proportions, normal fee percentages would generate fees of such a high magnitude that they would provide a windfall to class counsel." 5 Newberg on Class Actions § 15:81 (5th ed.). Accordingly, "[t]he existence of a scaling effect— the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions" and MDLs. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248, 263 (2010).

As Prof. Rubenstein recognized, "[p]otential settlements in this matter could be enormous." [Doc. #3319 at 8]. Already, an October 2019 proposed global settlement involving only a handful of opioid defendants has been valued at around $48 billion. [*See id.* (citing Doc. #3186 at 2)]. In contrast, only 1.65% of federal class action settlements for the years 2006 and 2007 were valued at over $500 million. *See* Fitzpatrick, 7 J. Empirical Legal Stud. at 828 tbl.5; *see also id.* at 828 tbl.6 (stating the average class action settlement for 2006-07 was $54.7 million); *id.* at 830 (stating

the *total* amount of federal class action settlements for 2006-07 was around $16 billion per year); Eisenberg & Miller, 7 J. Empirical Legal Stud. 248, 262 (stating the average class action recovery for the years 1993 to 2008 was $116 million, in 2008 dollars). Consequently, because the recovery in this MDL is likely to be much larger than that of nearly any other litigation to date, any common benefit assessment should be equally and inversely proportional. *See Percentage-Fee Awards*, Manual Complex Litig. § 14.121 (4th ed.) (noting "in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate"). In other words, any percentage-based common benefit assessment in this litigation should be on the lower end—if not actually setting the lower limit—of any known range of possibilities.

**Q4(b): Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter? If so, explain how. If not, explain how it should be adjusted to do so.**

In the Motion, the PEC seeks an assessment of 7%: 6% for fees and 1% for costs. [*See* Doc. #3112 at 3]. The PEC describes this assessment as "midrange" and "ordinary." [*Id.* at 4]. Prof. Rubenstein also noted "[t]he PEC's request . . . [is] just below the mean and just above the median" of other common benefit assessments. [Doc. #3319 at 8]. Thus, it appears the PEC has made little to no effort to account for the enormity of the potential recovery in this litigation or the proper impact that such a recovery, as described above, should have on its assessment request.[15] In other words, the PEC is asking for an average percentage of an exceptional potential recovery, which would be grossly disproportionate to the purpose of the common benefit fund and likely result in

---

[15] Undersigned counsel further suggest that a common benefit assessment is premature until the total opioid recovery can be determined, or at a minimum, better estimated. *See Applying the percentage method—Generally*, 5 Newberg on Class Actions § 15:68 (5th ed.) (stating the first step in determining an appropriate percentage-based common benefit assessment is to "ascertain the size of the fund against which the percentage will be taxed"). The PEC did not attempt to guide the Court with this critical first step in its Motion, and the undersigned believe the PEC should be required to do so before seeking a common benefit assessment.

a windfall to fund participants. *See* William B. Rubenstein*, On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 89 (2009) (stating a common benefit fund is a "tax" on individual attorneys who benefit from the work performed by an MDL plaintiffs' steering committee); *Percentage-Fee Awards*, MANUAL COMPLEX LITIG. § 14.121 (4th ed.) ("The application of a benchmark percentage for unusually large funds may result in a windfall.").

For example, in its proposed Corrected Order Establishing Common Benefit Fund, the PEC purports to "have invested more than one million hours and tens of millions of dollars" in furtherance of the opioid litigation. [(Doc. #3112-1 at 1]. While this is certainly commendable and appreciated by all plaintiffs' counsel, this investment is substantially dwarfed by the amount the PEC would have assessed just from the October 2019 proposed settlement: $3.3 billion. [Doc. #3319 at 8 (citing Doc. #3186 at 2)]. The PEC's proposed assessment should be significantly reduced to account for this disparity and arrive at a more reasonable result that, while compensating those who have performed common benefit work, does not disproportionately "tax" all other plaintiffs' counsel. *See* Fallon, 74 La. L. Rev. at 381 ("The total amount of the common benefit fund should be reasonable under the circumstances . . . .").

### Q5(a): How should a common benefit assessment account for the size of the underlying IRPA's (Individually Retained Plaintiff's Attorney) contingent fee, if at all?

Prof. Rubenstein recognized from the opposition papers that many governmental claimants may already have negotiated below market rates for their contingency fees. [Doc. #3319 at 9]. This fact is critical to the inquiry because any common benefit assessment must account for the underlying individually-retained plaintiffs' attorneys' ("IRPAs") contingent fees since every dollar added to a federal common benefit fund is taken from the contingent fees of such counsel. *See* Fallon, 74 La. L. Rev.at 379 ("[T]here is a symbiotic relationship between the fee for common benefit work and the fee of the primary attorney. . . . [T]he common benefit fee comes out of the

fee of the primary attorney - a slice out of that pie, so to speak."). Certain factors complicate the analysis of the data set: (1) there is no standard contingent fee for governmental entities; and (2) there is no average or mean assessment percentage that can be fettered out of cases involving governmental entities.

For the common benefit assessment to be fair and efficient, the assessment must consider that a one-size-fits-all assessment would reduce the IRPAs' fees to a fraction of what any competent attorney performing this level of complex work should expect to be paid for their years-long efforts—efforts that drive settlement outside of the MDL just as much, if not more, than through the PEC. Governmental entity fees, often controlled by statute, range from strictly hourly to percentages well below the 30–33% cited by Prof. Rubenstein. Here, a global assessment of 7% against all cases means that a lawyer with a 12.5% contingency fee in a state-filed case, where the client has opted out of the Negotiation Class and has litigated outside the federal MDL, would be unable to recover under the PEC's common benefit fee and expense guidelines and would be reduced to a 5.5% contingency fee. This factor alone militates in favor of the Court waiting for proper data sets to make a determination on the appropriateness of any common assessment on the cases over which the Court has jurisdiction.

Given the diversity and volume of plaintiffs in this litigation, it would be impractical, if not impossible, to present the Court with each and every contingency fee contract for the approximately 2,500 local governments and each of the States, Tribes, and Territories. Nor would it be appropriate to require such information from entities over which this Court has no jurisdiction. However, the PEC could undertake that exercise on the cases subject to an executed Participation Agreement with any voluntary party.

**Q5(b): Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPA's contingent fee contracts? If so, explain how. If not,**

**identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

The percentage method in common fund cases "should not be completely arbitrary, devoid of all reality or inconsistent with usual fees for the type of case involved." Fallon, 74 La. L. Rev. at 384-85. As Prof. Rubenstein notes, "the problem of setting a common benefit fee too high is that it unfairly taxes the local lawyer and makes the litigation infeasible for him to pursue." Rubenstein, 3 Class Action Att'y Fee Dig. At 90. In other words, if the common benefit fee is too high, the IRPA has "little return and nowhere near enough to fund the amount of individual work he is doing in the case." *Id*. This loss is especially problematic to the extent that (as here) local lawyers "help publicize harms and inform clients of their rights." *Id*. Here, the PEC's proposed 7% common benefit assessment *is* entirely arbitrary, untethered to any factual justification, and inconsistent with the already-reduced contingent fees charged by the IRPA.

Given the number and diversity of the thousands of IRPA contingency fee contracts, there is no comprehensive evidence of the levels of each and every IRPA contingent fee, but as the PEC and the Court know, many (if not most) of the IRPAs represent public entities, which typically require negotiating fees well below prevailing market rates. Moreover, several IRPAs stated in their Oppositions to the PEC's Motion that they accepted below market rates in their contingency fee contracts.

For instance, in their Opposition, the Governmental Plaintiffs assert that charging the proposed assessment to IRPA contingent fees will "dramatically and unfairly reduce their contracted for contingency rates," many of which are "far less than what [the IRPAs] would charge private clients." [Doc. #3192 at 9]. The Governmental Plaintiffs also note (as Prof. Rubenstein suggests can happen with an excessive assessment) that as a result of the 7% proposed assessment in a mega fund case such as this, "the continued prosecution of enormously expensive cases

becomes untenable." [*Id.*]. The NAS Guardians contend that the proposed assessment would impose an excessive tax on IRPA contingent fee structures by breaking down the result of the tax on the percentage recoverable by the IRPAs. [*See* Doc #3193]. They say the 7% assessment would result in IRPAs losing 23% of a 30% contingency fee (i.e., 7/30). [*See id.* at 6]. By way of explanation, the 7% tax would be based on the IRPAs' clients' recovery but taken out of the IRPAs' attorneys' fees. For example, if an IRPA has a contingency fee contract at a 20% rate, and a client recovers $1,000,000, the IRPA would be entitled to receive $200,000 for her efforts. However, if the proposed common benefit assessment were to apply, the PEC would get 7% of the IRPA's client's recovery, or $70,000. But that $70,000 would come out of the IRPA's $200,000 contingency fee, leaving the IRPA with just $130,000, and effectively reducing the IRPA's contingent fee to 13%—a figure the IRPA would never have contracted for when taking on these tremendously complex and hard-fought cases. This also means that the Opt-Out Group's IRPAs, which are not in the MDL and who have exclusively litigated their cases outside of the MDL, must give up 35% of their rightly-earned attorneys' fees to the PEC without any showing that the IRPAs' results were in any way based on the PEC's work. Given that many of the IRPAs have even lower contingency fee agreements with public entities, the assessment would result in those IRPAs losing an even higher percentage of their already low contingent fees.

The unfairness of an excessive tax on the IRPAs' already low contingent fees is highlighted when contrasted with what the PEC proposes for itself via the proposed assessment—a double recovery (significant fees from their contingent fee contracts with MDL clients plus additional fees from the common assessment). [*See* Doc. #3112-1 §3(g) at 9]. That the IRPAs would be compelled to continue to zealously prosecute cases while left with ever-diminishing returns while the PEC is rewarded by many multiples under the proposed assessment destroys any pretense of fairness or

23

reasonableness as to the proposed assessment. Consequently, any assessment is premature.

The PEC's proposed excessive tax on already low contingent fees is particularly alarming and unmerited when it comes to the Opt-Out Group's recoveries. The benefits conferred on the Opt-Out Group from the PEC are difficult to identify, impossible to measure, and, at best, incidental. They do not, by any stretch of the imagination, justify so heavily taxing these IRPAs. The plaintiffs in the Opt Out Group are not "beneficiaries" of the common benefit work to justify a 7% assessment. *See* Fallon, 74 La. L. Rev. at 376 ("The theoretical bases for the application of the common fund concept to MDLs are the same as for class actions -- namely, equity, and her blood brother, quantum meruit.") The common benefit fund's function is to "compensate plaintiffs' counsel for their work based on their relative contributions to the outcome of the case." Bolch Judicial Institute of Duke Law School, *Guidelines and Best Practices for Large and Mass-Tort MDLs* (2nd ed. Sept. 2018) at 65. The PEC cannot reasonably show its work relieved the plaintiffs in the Opt-Out Group of 7% of their efforts, justifying a 35% or higher reduction in fees to the counsel actually litigating these cases (in the case of a 20% contingency fee), and therefore reducing their contingent fees to the point where it is barely worth it to litigate these important cases.

As Prof. Rubenstein notes, in this litigation "there are numerous different types of plaintiffs (cities, counties, tribes, hospitals, third-party payors, and so on) and dozens and dozens of different defendants involved in distinct aspects of the pharmaceutical chain (manufacture, distribution, retail sale, etc.)." [Doc. #3319 at 5]. Of course, Professor Rubenstein is right. For example, while some major defendants are commonly named in nearly all cases (e.g., AmerisourceBergen), great variation among local defendants are found in the Opt-Out Group's cases, including local doctors and local pharmacies. The PEC has done nothing at all to advance the cases against those

defendants, and to reward them with a "cut" of any fund obtained from these defendants would be patently unfair. The PEC has abandoned many aspects of the case against the Distributor Defendants and Johnson & Johnson for the sake of speedy exemplary trials. The PEC made a conscious choice not to bring dispenser claims against the retail pharmacies. These choices, and the PEC's exclusion of state litigants from the process, color but do not destroy the ability of the parties to reach agreement amongst themselves. Forcing a global 7% assessment destroys that ability. As Prof. Rubenstein recognizes, "[i]deally, the lawyers in a case of this structure work out the common benefit tax among themselves; if contracting is a viable option, then resort to court-imposed measures if unnecessary." [*Id*. at 2].

The impossibility of accounting for all of the levels in the underlying IRPA contingent fee contracts and inability to measure what, if any, benefit the PEC conferred on the Opt-Out Group in particular, does not support an assessment. States and their subdivisions have multiple ways to address contingency and common benefit fund fees, as evidenced by two executed agreements in Ohio and Texas, where fees funds were worked out at 11.05% and 9.3925%, respectively. More states are in discussion with their local governments about similar agreements, and any premature assessment by the Court would interfere with these ongoing negotiations.

## REQUEST FOR HEARING

The undersigned respectfully request that this Honorable Court conduct a hearing and grant an opportunity to be heard on their objection to the imposition of any common benefit assessment on their cases or claims.

## CONCLUSION

For all the foregoing reasons, and those set forth in the undersigned's initial Opposition [Doc. #3189], the PEC's request for a common benefit assessment should be denied.

Dated June 23, 2020                Respectfully Submitted,

/s/ Mikal C. Watts
Mikal C. Watts
TX Bar No. 20981821
Shelly A. Sanford
TX Bar No. 00784904
Meredith Drukker Stratigopoulos
TX Bar No. 24110416
**WATTS GUERRA LLP**
811 Barton Springs Rd., Suite 725
Austin, TX 78704
Tel: (512) 479-0500
mcwatts@wattsguerra.com
ssanford@wattsguerra.com
mdrukker@wattsguerra.com

*State-Federal Liaison Counsel to the PSC for In Re: Texas Opioid Litigation*

/s/ Michael T. Gallagher
Michael T. Gallagher
TX Bar No. 07586000
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, TX 77098
Tel: (713) 222-8080
Fax: (713) 222-0066
mike@gld-law.com

*Counsel for Certain Opt-Out Entities within the State of Texas*

/s/ Kevin Sharp
Kevin Sharp
TN Bar No. 016287
Andrew Miller
MA Bar No. 682496
R. Johan Conrod, Jr.
VA Bar No. 46764
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Tel: (615) 434-7000
Fax: (615) 434-7020

ksharp@sanfordheisler.com
amiller@sanfordheisler.com
jconrod@sanfordheisler.com

*Counsel for Certain Opt-Out Entities within the Commonwealth of Virginia*

/s/ W. Edgar Spivey
W. Edgar Spivey
VA. Bar No. 29125
**KAUFMAN & CANOLES, P.C.**
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Tel: (757) 624-3196
Fax: (888) 360-9092
wespivey@kaufcan.com

*Counsel for Certain Opt-Out Entities within the Commonwealth of Virginia*

/s/ Joanne Cicala
Joanne Cicala
TX Bar No. 24052632
Joshua Wackerly
TX Bar No. 24093311
R. Johan Conrod, Jr.
VA Bar No. 46764
**THE CICALA LAW FIRM PLLC**
101 College Street
Dripping Springs, TX 78620
Tel: (512) 275-6550
Fax: (512) 858-1801
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

*Counsel for Certain Opt-Out Entities within the Commonwealth of Virginia*

/s/ Robert T. Eglet
Robert T. Eglet
NV Bar No. 3402
Robert M. Adams
NV Bar No. 6551
Erica D. Entsminger
NV Bar No. 7432

27

**EGLET ADAMS**
400 S. 7th Street, 4th Floor
Las Vegas, NV 89101
Tel: (702) 450-5400
reglet@egletlaw.com
badams@egletlaw.com
eentsminger@egletlaw.com

*Counsel for Certain Opt-Out Entities within the State of Nevada (except Clark County)*

/s/ Marc J. Bern
Marc J. Bern
NY Bar No. 1859271
Joseph Cappelli
PA Bar No. 55166
**MARC J. BERN & PARTNERS LLP**
One Grand Central Place
60 E. 42nd Street, Suite 950
New York, NY 10165
Tel: (212) 702-5000
mbern@bernllp.com
jcappelli@bernllp.com

*Counsel for Opt-Out Entities within the States of Delaware, Ohio, Pennsylvania, South Carolina, and West Virginia*

/s/ John B. White, Jr.
John B. White, Jr.
SC Bar No. 5996
Marghretta H. Shisko
SC Bar No. 100106
**HARRISON WHITE, P.C.**
178 W. Main Street (29306)
P.O. Box 3547
Spartanburg, SC 29304
Tel: (864) 585-5100
jwhite@spartanlaw.com
mshisko@spartanlaw.com

*Counsel for Opt-Out Entities within the State of South Carolina*

28

/s/ Jeff Reeves
Jeff Reeves
CA Bar No. 156648
Cheryl Priest Ainsworth
CA Bar No. 255824
Kevin N. Royer
CA Bar No. 312185
**THEODORA ORINGHER PC**
535 Anton Boulevard, 9th Floor
Costa Mesa, CA 92626
Tel: (714) 549-6200
Fax: (714) 549-6201
jreeves@tocounsel.com
cainsworth@tocounsel.com
kroyer@tocounsel.com

*Counsel for Opt-Out Entities within the States of*
*Arizona, Missouri, Kansas, and Maryland*

/s/ Jennifer K. Scifo
Jennifer K. Scifo
IL Bar No. 6300817
Jeffrey Li
IL Bar No. 6330031
**KRALOVEC JAMBOIS & SCHWARTZ**
60 W. Randolph, 4th Floor
Chicago, IL 60601
Tel: (312) 782-2525
Fax: (312) 855-0068
jscifo@kjs-law.com
jli@kjs-law.com

*Counsel for Opt-Out Entities within the State of*
*Illinois*

/s/ Matthew R. McCarley
Matthew R. McCarley
Texas Bar No. 24041426
Bryan Fears
Texas Bar No. 2400886
Majed Nachawati
Texas Bar No. 24038319
S. Ann Saucer
Texas Bar No. 00797885
**FEARS NACHAWATI, PLLC**
5473 Blair Rd.

29

Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712
mccarley@fnlawfirm.com
fears@fnlawfirm.com
mn@fnlawfirm.com
asaucer@fnlawfirm.com

/s/ Scotty MacLean
Scotty MacLean
Texas Bar No. 00787942
**MACLEAN LAW FIRM, P.C.**
4916 Camp Bowie Blvd.
Fort Worth, TX 76107
Tel. (817) 900-3897
Fax (817) 698-9401
smaclcan@macleanfirm.com

/s/ Matthew S. Daniel
Matthew S. Daniel
Texas Bar No. 24047575
**FERRER POIROT** & **WANSBROUGH**
2603 Oak Lawn Ave. Ste. 300
Dallas, TX 75219
Tel. (214) 521-4412
Fax (866) 513-0115
mdaniel@lawyerworks.com

*Counsel for Certain Opt-Out Entities within the State of Texas*

*/s/* Jeffrey B. Simon
Jeffrey B. Simon
TX Bar No. 00788420
**SIMON GREENSTONE PANATIER BARTLETT, P.C.**
3232 McKinney Avenue, Suite 610
Dallas, TX 75204
Tel: 214-276-7680
Fax: 214-276-7699
jsimon@sgpblaw.com

*Counsel for Texas Opt-Out Counties Dallas and Kendall*

## LOCAL RULE 7.1(f) CERTIFICATION

The Court's June 3, 2020 Order Regarding Professor Rubenstein's Report and Recommendation [Doc. #3320] stated that reply briefs may not exceed twenty-five (25) pages.

I, Josh Wackerly, hereby certify that this document complies with the Court's June 3, 2020 Order and the page limitations set forth therein.

Respectfully submitted,

/s/ Josh Wackerly

Josh Wackerly
**THE CICALA LAW FIRM PLLC**
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801
josh@cicalapllc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record at their e-mail addresses on file with the Court.

/s/ Josh Wackerly
Josh Wackerly

31