# EXHIBIT A

# ONE OHIO MEMORANDUM OF UNDERSTANDING

Whereas, the people of the State of Ohio and its communities have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and,

Whereas, the State of Ohio, though its Attorney General, and certain Local Governments, through their elected representatives and counsel, are separately engaged in litigation seeking to hold Pharmaceutical Supply Chain Participants accountable for the damage caused by their misfeasance, nonfeasance and malfeasance; and,

Whereas, the State of Ohio, through its Governor and Attorney General, and its Local Governments share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance and malfeasance throughout the State of Ohio;

Now therefore, the State and its Local Governments, subject to completing formal documents effectuating the Parties' agreements, enter into this Memorandum of Understanding ("MOU") relating to the allocation and use of the proceeds of Settlements described.

**A.    Definitions**

As used in this MOU:

1. "The State" shall mean the State of Ohio acting through its Governor and Attorney General.

2. "Local Government(s)" shall mean all counties, townships, cities and villages within the geographic boundaries of the State of Ohio.

3. "The Parties" shall mean the State of Ohio, the Local Governments and the Plaintiffs' Executive Committee of the National Prescription Opiate Multidistrict Litigation.

4. "Negotiating Committee" shall mean a three-member group comprising one representative for each of (1) the State; (2) the Plaintiffs' Executive Committee of the National Prescription Opiate Multidistrict Litigation ("PEC"); and (3) Ohio Local Governments (collectively, "Members").  The State shall be represented by the Ohio Attorney General or his designee. The PEC shall be represented by attorney Joe Rice or his designee. Ohio Local Governments shall be represented by attorney Frank Gallucci, or attorney Russell Budd or their designee.

5. "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the State, PEC and the Local Governments.

6. "Opioid Funds" shall mean monetary amounts obtained through a Settlement as defined in this Memorandum of Understanding.

7. "Approved Purpose(s)" shall mean evidence-based forward-looking strategies, programming and services used to (i) expand the availability of treatment for individuals affected by substance use disorders, (ii) develop, promote and provide evidence-based substance use prevention strategies, (iii) provide substance use avoidance and awareness education, (iv) decrease the oversupply of licit and illicit opioids, and (v) support recovery from addiction services performed by qualified and appropriately licensed providers, as is further set forth in the agreed Opioid Abatement Strategies attached as Exhibit A. For purposes of the Local Government Share, "Approved Purpose(s)" will also include past expenditures.

8. "Pharmaceutical Supply Chain" shall mean the process and channels through which Controlled Substances are manufactured, marketed, promoted, distributed or dispensed.

9. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic.

B. **Allocation of Settlement Proceeds**

1. All Opioid Funds shall be divided with 30% going to Local Governments ("LG Share"), 55% to the Foundation (structure described below) ("Foundation Share"), and 15% to the Office of the Ohio Attorney General as Counsel for the State of Ohio ("State Share").

2. All Opioid Funds, regardless of allocation, shall be utilized in a manner consistent with the Approved Purposes definition. The LG Share may also be used for past expenditures so long as the expenditures were made for purposes consistent with the remaining provisions of the Approved Purposes definition. Prior to using any portion of the LG Share as restitution for past expenditures, a Local Government shall pass a resolution or take equivalent governmental action that explains its determination that its prior expenditures for Approved Purposes are greater than or equal to the amount of the LG Share that the Local Government seeks to use for restitution.

3. The division of Opioid Funds paid to Local Governments participating in an individual settlement shall be based on the allocation created and agreed to by the Local Governments which assigns each Local Government a percentage share of Opioid Funds. The allocations are set forth in Exhibit B. With respect to Opioid Funds, the allocation shall be static.

4. In the event a Local Government merges, dissolves, or ceases to exist, the allocation percentage for that Local Government shall be redistributed equitably based on the

composition of the successor Local Government. If a Local Government for any reason is excluded from a specific settlement, the allocation percentage for that Local Government shall be redistributed equitably among the participating Local Governments.

5. If the LG Share is less than $500, then that amount will instead be distributed to the county in which the Local Government lies to allow practical application of the abatement remedy.

6. Funds obtained from parties unrelated to the Litigation, via grant, bequest, gift or the like, separate and distinct from the Litigation, may be directed to the Foundation and disbursed as set forth below.

7. The LG Share shall be paid in cash and directly to Local Governments under a settlement or judgment, or through an administrator designated in the settlement documents who shall hold the funds in trust in a segregated account to benefit the Local Governments to be promptly distributed as set forth herein.

8. Nothing in this MOU should alter or change any Local Government's rights to pursue its own claim. Rather, the intent of this MOU is to join all parties to seek and negotiate binding settlement or settlements with one or more defendants for all parties within Ohio.

9. Opioid Funds directed to the Foundation shall be used to benefit the local community consistent with the by-laws of the Foundation documents and disbursed as set forth below.

10. The State of Ohio and the Local Governments understand and acknowledge that additional steps should be undertaken to assist the Foundation in its mission, at a predictable level of funding, regardless of external factors.

11. The Parties will take the necessary steps to ensure there is the ability of a direct right of action under the expedited docket rules to the Ohio Supreme Court relative to any alleged abuse of discretion by the Foundation.

C. **Payment of Counsel and Litigation Expenses**

1. The Parties agree to establish a Local Government Fee Fund ("LGFF") to compensate counsel for Local Governments if the Parties cannot secure the separate payment of fees and associated litigation expenses for their counsel from a settling entity.

2. The LGFF shall be calculated by taking 11.05% of the total monetary component of any settlement accepted ("LGFF Amount"). Fees related to product or other items of value shall be addressed case by case.

3. The first 45% of the LGFF amount shall be drawn from the LG Share. The remaining 55% shall be drawn from the Foundation Share. No portion of the LGFF Amount may be assessed against or drawn from the State Share.

4. To the extent the Parties can secure the separate payment of fees and associated litigation expenses from a settling entity, the amount to be drawn for the LGFF will be proportionally reduced.

5. This LGFF Amount will be deposited into the LGFF and shall be divided with 60% being allocated to the National Prescription Opiate MDL ("M.D.L.") Common Benefit fund for fees and expenses and 40% to contingency fees.

6. Local Government contingent fee contracts shall be capped at 25% or the actual contract rate whichever is less. Eligible contingent fee contracts shall be executed as of March 6, 2020 and subject to review by the committee designated to oversee the Local Government Fee Fund.

7. Common Benefit awards will be coordinated as set forth in the M.D.L. Common Benefit Fee Order. Expenses will be addressed consistent with the manner utilized in the M.D.L.

8. Any balance left in the LGFF following the payment of fees shall revert to the Foundation.

9. Any attorney fees related to representation of the State of Ohio shall not be paid from the LGFF but paid directly from the State Share or through other sources.

D. **The Foundation**

1. The State of Ohio will be divided into 19 Regions (See attached Exhibit C). Eight of the regions will be single or two county metropolitan regions. Eleven of the regions will be multi-county, non-metropolitan regions.

2. Each Region shall create their own governance structure so it ensures all Local Governments have input and equitable representation regarding regional decisions including representation on the board and selection of projects to be funded from the region's Regional Share. The Expert Panel (defined below) may consult with and may make recommendations to Regions on projects to be funded. Regions shall have the responsibility to make decisions that will allocate funds to projects that will equitably serve the needs of the entire Region.

3. The Parties shall create a private 501(c)(3) foundation ("Foundation") with a governing board ("Board"), a panel of experts ("Expert Panel"), and such other regional entities as may be necessary for the purpose of receiving and disbursing Opioid Funds and other purposes as set forth both herein and in the documents establishing the Foundation. The Foundation will allow Local Governments to take

    advantage of economies of scale and will partner with the State of Ohio to increase revenue streams.

4.    Board Composition

    a.    The Board will consist of 29 members comprising representation from four classes:

- Six members selected by the State (five selected by the Governor and one selected by the Attorney General);
- Four members drawn from the Legislature
    - One representative selected by the President of the Ohio Senate;
    - One representative selected by the Ohio Senate Minority Leader;
    - One representative selected by the Speaker of the Ohio House of Representatives; and,
    - One representative selected by the Ohio House Minority Leader
- Eleven members with one member selected from each non-metropolitan Regions; and
- Eight members, with one member selected from each metropolitan Regions.

    b.    All board members shall serve as fiduciaries of the Foundation as required by Ohio Revised Code § 1702.30(B) governing directors of nonprofit corporations.

5.    Board terms will be staggered.  Five members, (one from each of the first three classes above, and two from the metropolitan class) will be appointed for an initial three-year term, eight members of the Board (two from the first class, including the Attorney General's representative, one from the second class, four from the third class, and one from the fourth class) will be appointed for an initial term of one year.  The remaining members will be appointed for a two-year term.  Board members may be reappointed.  All subsequent terms will be for two years.

6.    Eighteen members of the Board shall constitute a quorum.  Members of the Board may participate in meetings by telephone or video conference or may select a

       designee to attend and vote if the Board member is unavailable to attend a board meeting.

7. In all votes of the Board, a measure shall pass if a quorum is present, the measure receives the affirmative votes from a majority of those board members voting, and at least one member from each of the four classes of Board members votes in the affirmative.

8. The Foundation shall have an Executive Director appointed by the Governor.

   a. The Governor shall appoint the Executive Director at his or her discretion from a list of three candidates provided to the Governor by the Board. If the Governor finds all three candidates to be unsatisfactory, the Governor may reject all three candidates and request the Board to provide three new persons to select from.

   b. In choosing candidates to be submitted to the Governor, the Board shall seek candidates with at least six (6) years of experience in addiction, mental health and/or public health and who shall have management experience in those fields.

   c. No funds derived from the Foundation Share shall be used to pay the Executive Director or any of the foundation staff in excess of the maximum range (range 42) of the Department of Administrative Services Exempt Schedule E2 or that schedule's successor.

   d. The Executive Director shall serve as an ex officio, non-voting member of both the Board and the Expert Panel.

9. The Board shall appoint the Expert Panel. The Expert Panel shall consist of six members submitted by the Board Members representing the Local Governments, two members submitted by the Governor and one member submitted by the Attorney General. Expert Panel members may be members of Local Governments or the State. The Expert Panel will utilize experts in addiction, pain management, public health and other opioid related fields to make recommendations that will seek to ensure that all 19 regions can address the opioid epidemic both locally and statewide. Expert Panel members may also be members of the Foundation Board, but need not be.

10. The Foundation Board and the Regions shall be guided by the recognition that expenditures should ensure both the efficient and effective abatement of the opioid epidemic and the prevention of future addiction and substance misuse. In recognition of these core principles, the Board and the Regions shall endeavor to assure there are funds disbursed each year to support evidence-based substance abuse/misuse prevention efforts.

11.     Disbursement of Foundation Funds by the Board

    a.     The Foundation Board shall develop and approve procedures for the disbursement of Opioid Funds of the Foundation consistent with this Memorandum of Understanding.

    b.     Funds for statewide programs, innovation, research, and education may also be expended by the Foundation. Any statewide programs funded from the Foundation Share would be only as directed by an affirmative vote of the Board as set forth in paragraph D(7) above. Expenditures for these purposes may also be funded by the Foundation with funds received from either the State Share (as directed by the State) or from sources other than Opioid Funds as provided in paragraph 14 below.

    c.     Funds approved for disbursement to the nineteen Regions shall be allocated based on each Region's share of Opioid Funds ("Regional Share"). Each Regional Share shall be calculated by summing the individual percentage shares of the Local Governments within that Region as set forth in Exhibit B. The Regional Shares for each Region are set forth in Exhibit D.

    d.     Regions may collaborate with other Regions to submit joint proposals to be paid for from the Regional Shares of two or more Regions for the use of those Regions.

    e.     The Foundation's procedures shall set forth the role of the Expert Panel and the Board in advising, determining, and/or approving disbursements of Opioid Funds for Approved Purposes by either the Board or the Regions. Proposed disbursements to Regions of Regional Shares shall be reviewed only to determine whether the proposed disbursement meets the criteria for Approved Purposes.

    f.     Within 90 days of the first receipt of any Opioid Funds and annually thereafter, the Board, assisted by its investment advisors and Expert Panel, shall determine the amount and timing of Foundation funds to be distributed as Regional Shares. In making this determination, the Board shall consider: (a) Pending requests for Opioid Funds from Regions; (b) the total Opioid Funds available; (c) the timing of anticipated receipts of future Opioid Funds; (d) non-Opioid Funds received by the Foundation; and (e) investment income. The Foundation may disburse its principal and interest with the aim towards an efficient, expeditious abatement of the Opioid crisis considering long term and short term strategies.

    g.     Votes of the Board on the disbursement and expenditure of funds shall, as with all board votes, be subject to the voting procedures in Section D(7) above. The proposed procedures should provide for the Board to hear appeals by Local Governments from any denials of requested use of funds.

12. The Foundation, Expert Panel, and any other entities under the supervision of the Foundation shall operate in a transparent manner. Meetings shall be open, and documents shall be public to the same extent they would be if the Foundation was a public entity. All operations of the Foundation and all Foundation supervised entities shall be subject to audit. The bylaws of the Foundation Board regarding governance of the Board as adopted by the Board, may clarify any other provisions in this MOU except this subsection. This substantive portion of this subsection shall be restated in the bylaws.

13. The Foundation shall consult with a professional investment advisor to adopt a Foundation investment policy that will seek to assure that the Foundation's investments are appropriate, prudent, and consistent with best practices for investments of public funds. The investment policy shall be be designed to meet the Foundation's long and short-term goals.

14. The Foundation and any Foundation supervised entity may receive funds including stocks, bonds, real property and cash in addition to the proceeds of the Litigation. These additional funds shall be subject only to the limitations, if any, contained in the individual award, grant, donation, gift, bequest or deposit consistent with the mission of the foundation.

E. **Settlement Negotiations**

1. All Members of the Negotiating Committee, and their respective representatives, shall be notified of and provided the opportunity to participate in all negotiations relating to any Ohio-specific Settlement with a Pharmaceutical Supply Chain Participant.

2. No Settlement Proposal can be accepted for presentation to Local Governments or the State under this MOU over the objection of any of the three Members of the Negotiating Committee. The Chair shall poll the Committee Members at the conclusion of discussions of any potential settlement proposal to determine whether such objections exist. Although multiple individuals may be present on a Member's behalf, for polling purposes each Member is a single entity with a single voice.

3. Any Settlement Proposal accepted by the Negotiating Committee shall be subject to appoval by Local Governments and the State.

4. As this is an "All Ohio" effort, the Committee shall be Chaired by the Attorney General. However, no one member of the Negotiating Committee is authorized to speak publicly on behalf of the Negotiating Committee without consent from the other Committee Members.

5. The State of Ohio, the PEC or the Local Governments may withdraw from coordinated Settlement discussions detailed in this Section upon 5 days' written

       notice to the remaining Committee Members and counsel for any affected Pharmaceutical Supply Chain Participant. The withdrawal of any Member releases the remaining Committee Members from the restrictions and obligations in this Section.

6.        The obligations in this Section shall not affect any Party's right to proceed with trial or, within 30 days of the date upon which a trial involving that Party's claims against a specific Pharmaceutical Supply Chain Participant is scheduled to begin, reach a case specific resolution with that particular Pharmaceutical Supply Chain Participant.

### Acknowledgment of Agreement

We the undersigned have participated in the drafting of the above Memorandum of Understanding including consideration based on comments solicited from Local Governments. This document has been collaboratively drafted to maintain all individual claims while allowing the State and Local Governments to cooperate in exploring all possible means of resolution. Nothing in this agreement binds any party to a specific outcome. Any resolution under this document will require acceptance by the State of Ohio and the Local Governments.

FOR THE STATE OF OHIO:

_____         _____

**Mike DeWine, Governor**                      **Dave Yost, Attorney General**

FOR THE LOCAL GOVERNMENTS AND
PLAINTIFFS' EXECUTIVE COMMITTEE:

**Frank L Gallucci III**
Plevin & Gallucci Co., LPA

**Anthony J. Majestro**
Powell & Majestro PLLC

**Michelle Kranz**
Zoll & Kranz, LLC

**Donald W. Davis, Jr.**
Brennan, Manna & Diamond, LLC

**Joe Rice**
Motley Rice, LLC

**Russell Budd**
Baron & Budd, PC

**Robert R. Miller**
Oths, Heiser, Miller, Waigland
& Clagg, LLC

**D. Dale Seif, Jr.**
Seif & McNamee, LLC

**James Lowe**
Lowe, Eklund & Wakefield Co., LPA

**Peter H. Weinberger**
Dustin Herman
Spangenberg, Shibley & Liber LLP

**Kevin M. Butler**
Law Offices of Kevin M. Butler

We the undersigned ACCEPT / REJECT (Circle One) the One Ohio Memorandum of Understanding ("MOU"). We understand that the purpose of this MOU is to permit collaboration between the State of Ohio and Local Governments to explore and potentially effectuating earlier resolution of the Opioid Litigation against Pharmaceutical Supply Chain Participants. We also understand that an additional purpose is to create an effective means of distributing any potential settlement funds obtained under this MOU between the State of Ohio and Local Governments in a manner and means that would promote an effective and meaningful use of the funds in abating the opioid epidemic throughout Ohio.