**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL NO. 2804 |
| | Case No. 17-MD-2804 |
| THIS DOCUMENT RELATES TO: | Judge Dan Aaron Polster |
| *Salmons v. Purdue Pharma L.P., et al.* MDL Case #1:18-OP-45268; | |
| *Doyle v. Purdue Pharma L.P., et al.* MDL Case No. #1:18-op-46327 | |
| *Artz v. Purdue Pharma, L.P., et al.* MDL Case No. #1:19-op-45459 | |

**NAS GUARDIANS' ADDITIONAL BRIEFING IN OPPOSITION TO AMENDED
MOTION FOR ENTRY OF ORDER ESTABLISHING COMMON BENEFIT FUND**

The NAS Guardians respond to the topics identified by Special Master Rubenstein regarding the PEC's *Amended* Motion for Entry of Order Establishing Common Benefit Fund (Doc. 3112).

The NAS Guardians are legal guardians of children born addicted to opioids and medically diagnosed with opioid-related Neonatal Abstinence Syndrome ("NAS"). The NAS Guardians moved for class certification of their medical monitoring and surveillance claims.[1] With its recent amended motion and proposed order, the PEC asks this Court to impose an assessment on *any* recovery for opioid-related claims, whether by settlement or through judgment, that will be used to fund a Common Benefit Fund established by this Court.[2] The NAS Guardians have opposed imposition of a Common Benefit Fund at this early stage and at the rate proposed by the PEC because the PEC's work has not conferred a substantial benefit to the unique claims advanced by

---

[1] *See* NAS Guardians' Motion for Class Certification, Doc. 3066.
[2] *See* PEC's Proposed Order, Doc. 3112-1, p. 5 (Section 2(a)).

the NAS Guardians. Indeed, as has been shown by the NAS Guardians, the PEC has often worked at cross-purposes and in conflict with this putative class which has advanced unique claims, pleadings, discovery, and expert work.

In fact, the conflict between public and private litigants is so serious that in the Purdue Pharmacy Bankruptcy, Judge Drain entered an order on March 4, 2020 appointing mediators to:

> … mediate the dispute(s) between the Non-Federal Public Claimants, on the one hand, and the Private Claimants,[] on the other, as to the allocation of value/proceeds available from the Debtor's estates, including, without limitations, from any settlements, to such claimants, in each case on an aggregate basis as between them.

The public claimants include all of the members of the PEC. The private claimants include the guardians of children born with NAS.[3]

Special Master Rubenstein recognizes significant potential flaws in the merits of the PEC's Motion, especially as concerns its attempt to assess plaintiffs and cases outside the MDL and claiming unearned fees for cases within the MDL for which the PEC has done nothing of benefit. The questions posed by Special Master further illustrate the complexity and uncertainty of the case, and counsel against imposing such a broad, across-the-board tax at this early stage of the litigation, including unique satellite claims such as those brought by the NAS Guardians against whom the PEC stands in conflict. The NAS Guardians respond only to the specific Questions raised by the Special Master that are relevant to their claims.

## **BRIEFING ON QUESTIONS POSED BY SPECIAL MASTER**

**Q3:      (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution? (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative?**

---

[3] In Re Purdue Bankruptcy SDNY 19-23649 (Doc 895) Filed 3/4/20 Attached hereto as Exhibit 1

The NAS Guardians and PEC are unlikely to reach an agreement to a common benefit fund assessment at the 7% taxation proposed by PEC because the PEC's work product has not provided a benefit of that value, given the unique litigation and evidentiary issues involved in the NAS Guardian cases.

"The [common benefit] doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Geier v. Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004) (citing *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)). As Special Master Rubenstein noted, "[t]he proper amount of such compensation will likely vary by circumstance. Relevant factors may include (i) the usefulness of the MDL attorney's work to the prosecution of a state court case, (ii) state court counsel's own costs and time spent prosecuting the case, and (iii) the total amount of attorney's fees made available in that jurisdiction." (Report and Recommendation at 8). While Special Master Rubenstein did not seize on the equitable nature of the common benefit recovery sought by the PEC, there should have been an added relevant factor that is specific to the NAS Guardians—(iv) is the PEC otherwise disqualified from seeking equitable relief by virtue of having unclean hands? The answer to (iv) is that the PEC has disqualified itself because of its opposition to the work of the NAS Guardians within the MDL and because it is advocating directly against the NAS Guardians (and in favor of its own governmental clients) in the bankruptcy proceedings.

The PEC has taken positions directly adverse to the interests of the NAS Guardians and other non-public entities in the Purdue bankruptcy proceedings. To be clear, the PEC acting on behalf of its governmental clients has sought to maximize the limited recovery of the bankruptcy estate on behalf of the public litigants and to the detriment of the private litigants, such as the NAS Guardians. The split between the public/private litigants is highly contentious and the PEC stands

in clear conflict with the NAS Guardians. The PEC simply cannot take a legal position adverse to a litigant in favor of its own clients and then expect to extract fees from the litigants in which it stands in adversity, whether in that same or other related proceeding. Any *de minimis* benefit that the PEC might have conferred to the NAS Guardians is certainly outweighed by the attacks it makes on their right to recover in the Purdue bankruptcy proceeding. And, because the PEC's attempted common benefit assessment arises in equity, it cannot take in equity with unclean hands.

Here, the NAS Guardians and PEC are unlikely to reach an agreement on a common benefit contribution because PEC has not conferred a substantial benefit on the NAS Guardians, nor have NAS Guardians been unjustly enriched by the PEC's legal efforts to date. While the PEC is pursuing primarily a public nuisance theory on behalf of government entities, the NAS Guardians pursue a medical monitoring and surveillance remedy. These claims are very different, and to the extent that the PEC argues it asserts overlapping interests, this poses a conflict of interest with the NAS Guardians, who owe an unlimited, and non-delegable duty of care to the children in their custody. The NAS Guardians' unique claims have not been advanced, much less championed, by the PEC. The governmental entities represented by the PEC do not have standing, similar interests, or ongoing care duties for the NAS Children that will be addressed by the medical monitoring and assessment relief requested by the Guardians. This is precisely why the PEC has not advanced these interests.

Consequently, PEC's attorney work product has been of very limited value to the NAS Guardian's claims, while the PEC has itself substantially benefited from the litigation work of the NAS Guardians. Given the nature of the NAS Guardians' claims, which address the unique effects and challenges presented to persons who were bathed in opioids while their nervous systems, organ

systems, and bodies were forming *in utero*,[4] as well as the urgent relief sought to monitor and address those challenges,[5] they have had to draft their own comprehensive complaints,[6] conduct their own discovery, depose their own witnesses, and hire and provide reports of their own experts, which includes experts addressing NAS and the causal link to serious latent diseases, the necessity and structure for the design and implementation of a medical monitoring program for NAS children, and the implementation costs for such monitoring program.[7] Moreover, ESI search terms developed and applied by the NAS Guardians have demonstrated that there are "areas of discovery pertinent to the NAS Baby claims [that] were not taken."[8] Consequently, the PEC's discovery has provided only limited value to the NAS Guardians' cases. Counsel for Guardians only had access to the document database late in the litigation. PEC members asked a few, limited questions about Neonatal Abstinence Syndrome of only a few of their deponents and failed to follow up on evasive or inadequate answers. As a result, it has been necessary for the NAS Guardians to conduct their own discovery related to the unique claims in their cases, taking on this necessary legal work and cost without assistance from the PEC. *An entirely separate briefing and discovery plan covers the*

---

[4] *See, e.g.*, NAS Guardians' Consolidated Memorandum in Support of their Class Certification Motion, Doc. 3066-1, at 7-13, 20-21 (Plaintiffs' expert detailing extensively the mechanism of opioid exposure on brain development and bring growth).

[5] *Id.* at 12-13 ("The weight of medical opinion is that when a child has been diagnosed with NAS, he or she absolutely requires medically-necessary surveillance and monitoring for both the existing effects of NAS, as well as the heightened risk of additional disease and disorders that may manifest in the future as a result of NAS."), 19-20 ("The host of problems after birth that these children and their caregivers face are overwhelming and include delayed and impaired cognitive development and long-term behavioral problems. The resultant increased care burden faced by the NAS Guardians is nondelegable, immense, and cannot be met without the intervention of this Court and an order of declaratory and injunctive relief that requires financing by the Defendant responsible parties. Regarding the timing of these efforts, 'the best possible outcomes can only be achieved with proper management of NAS before hospital discharge, couple with increased monitoring and surveillance, as well as active multi-disciplinary interventions that are initiated just after birth and continued for the child's entire childhood and adolescence (up to 18 years of age).'"); 21-29.

[6] *See* Docs. 2745, 2746, 2747, 2748.

[7] *See* NAS Guardians' Notice of Experts, Doc. 2814.

[8] *See* NAS Guardians' Status Report, Doc. 2489, at 3, n.1. *See also*, NAS Guardians' Motion for Leave to Extend Time to File Class Action Complaints, Doc. 2605-1, at 3(¶ 8), 4(¶ 10) ("… NAS Baby counsel's independent research has identified many documents not produced that are critical to NAS Babies[.]").

*NAS Guardian litigation*, such that dozens of plaintiff, expert, and fact witness depositions have been noticed, hundreds of pages of briefing filed, thousands of pages of discovery provided, and hundreds of pages of expert reports exchanged. The PEC has played absolutely no role in any of this. Instead, it is the PEC which has substantially benefited from the NAS Guardians' efforts, including expert reports prepared and funded by the NAS Guardians, and has demanded that NAS Guardians release one of their expert witnesses to consult with the PEC. The NAS Guardians provided copies of all expert reports that Guardian's counsel paid for to the PEC.[9]

Moreover, the PEC's attorney work has at times been at cross-purposes with that of the NAS Guardians, as the PEC has thus far opposed participation of the NAS Guardians in a negotiating class or bellwether trials while simultaneously suggesting that the relief it seeks would benefit NAS Guardians. *See, e.g.*, Plaintiffs Statement of Interest in Response to Proposed Class Counsels' Amended Joint Proposed Scheduling Order and Positions on Scheduling, Doc. #27120, filed October 3, 2019 (arguing that members of the putative Negotiating Class have *in loco parentis* standing with an obligation "to keep them [the NAS Children] safe and healthy as they grow.").

These positions pose a direct conflict of interest with NAS Guardians and have made the work of NAS Guardians more difficult, not less. It is certainly true that a governmental entity, paradigmatically a state, acting as *parens patriae* can "represent the interests of their citizens in enjoining public nuisances." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 603, 102 S. Ct. 3260, 3266, 73 L. Ed. 2d 995 (1982). But it is also true that, [i]n order to maintain [a *parens patriae*] action, the State must articulate an interest apart from the interests of particular private parties," that is, a sovereign or quasi-sovereign interest. *Id*. at 607. Because the "[i]nterests of private parties are obviously not in themselves sovereign interests" of any type, *id*.

---

[9] See Declaration of Kevin Thompson one of the counsel for the NAS Guardians attached hereto as Exhibit 2

at 602, the governmental entities that belong to the existing negotiation class lack standing to assert them. Consequently, they can neither sue on behalf of the guardians or the NAS children nor release their private claims.

The Tenth Circuit reached exactly this conclusion in *Satsky v. Paramount Commc'ns, Inc*., 7 F.3d 1464 (10th Cir. 1993). There, the question was whether a consent decree entered into by the State of Colorado prevented private individuals who subsequently asserted claims for personal injuries, property damage, and economic losses from suing. Even though the consent decree contained a broad release, the Tenth Circuit allowed the individuals to sue. The consent decree did not release the individuals' claims because "a state may not sue to assert the rights of private individuals." *Id*. at 1469 (citing *Snapp*, 458 U.S. at 600; *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976); *New York by Abrams v. Seneci,* 817 F.2d 1015, 1017 (2nd Cir. 1987)*; Illinois v. Life of Mid-America Ins. Co*., 805 F.2d 763, 766 (7th Cir. 1986), and 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2d § 3531.11 at 19 (1984)).[10] Lacking power to assert private claims, Colorado could not release them either. The Sixth Circuit has also recognized that a governmental entity lacks standing to assert a claim held by a private individual. In *Chapman v. Tristar Prod., Inc*., 940 F.3d 299, 306 (6th Cir. 2019), it held that Arizona lacked standing to appeal the fairness of a class action settlement because "the only objections that Arizona can make are indistinguishable from the objections which individual Arizonans might raise."

---

[10] *See also State of Ga. v. Pennsylvania R. Co.,* 324 U.S. 439, 473, 65 S. Ct. 716, 733, 89 L. Ed. 1051 (1945) (dissenting opinion) ("[T]he inhabitants of the State who have suffered injury or who are threatened with injury by the unlawful practices alleged in the amended complaint are alone entitled to seek a legal remedy for their injury, and are the proper parties plaintiff in any suit to enforce their rights which are alleged to have been infringed. It has long been settled by the decisions of this Court that a State is without standing to maintain suit for injuries sustained by its citizens and inhabitants for which they may sue in their own behalf.").

In sum, an agreement between the NAS Guardians and PEC to a common benefit contribution is unlikely as this satellite litigation is very different from the PEC claims and has therefore been of limited utility to the NAS Guardians' case. And, as stated earlier, because the PEC has acted and continues to act in direct conflict with the NAS Guardians, the PEC's equitable "unjust enrichment" claim for common benefit work will not stand.

**Q5:**     **(a) How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all? (b) Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPA's contingent fee contracts? If so, explain how. If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

The common benefit assessment proposed by the PEC is even more disproportionately large and inappropriate when considering the potential fee outcomes in the case, particularly as applied to the medical monitoring claims advanced by NAS Guardians. Even if the PEC's assessment was not barred by the doctrine of unclean hands and even if the PEC had actually done something of substantial benefit to the NAS Guardians, this still would not be the correct basis to determine an assessment. Rather than a percentage of the case (which is a taking from the client), a percentage of the approved fee would be a preferable approach. And, indeed, it is axiomatic that the same scrutiny and demonstration of proof that the NAS Guardians' own counsel would have to satisfy to be awarded a fee should also apply to the alleged efforts of the PEC.

The underlying fee amount in a class action case will be ultimately be based upon the factors recognized by the Sixth Circuit:

    (1) the value of the benefit rendered to the plaintiff class ...;
    (2) the value of the services on an hourly basis;
    (3) whether the services were undertaken on a contingent fee basis;
    (4) society's stake in rewarding attorneys who produce such benefits in order to
        maintain an incentive to others;
    (5) the complexity of the litigation; and
    (6) the professional skill and standing of counsel involved on both sides.

*Bowling v. Pfizer*, 102 F.3d 777, 780 (6th Cir. 1996); *Rawlings v. Prudential-Bache Properties, Inc.,* 9 F. 3d 513, 516-17 (6th Cir. 1993). Consequently, the fee percentage may ultimately be higher or lower depending on these factors and the outcome of the litigation. By applying the up-front, across-the-board 7% *of the case* common benefit fee as proposed by the PEC, the PEC might extract a larger and likely disproportionate assessment that in no way satisfies the Sixth Circuit criteria for such an award. *This potential is particularly high for claims involving a large medical monitoring fund and every unearned dollar extracted by the PEC would mean one less dollar for monitoring and surveillance of the NAS Children.* If a settlement resulted in more resources for the class and a lower rate of attorney fees, the PEC would unjustly receive an even larger percentage of the fees than the attorneys who prosecuted the case. While a better approach would be to wait to assess any fee on satellite litigation until the conclusion of the case, to the extent that any common benefit fee is assessed up front, a percentage of the fee would be a better approach than a percentage of the case.

## CONCLUSION

For the reasons set forth above, NAS Guardians respectfully request that the PEC's *Amended* Motion for Entry of Order Establishing Common Benefit Fund (Doc. 3112) be denied. The NAS Guardians reserve the right to further object to any additional arguments made by the PEC in its own responses to Special Master Rubenstein's queries.

**WHEREFORE**, for the reasons set forth above, NAS Guardians respectfully request that the PEC's *Amended* Motion for Entry of Order Establishing Common Benefit Fund (Doc. 3112) be denied.

Respectfully submitted,

*/s/ Marc E. Dann*
Marc E. Dann (0039425)
Emily C. White (0085662)
DANN LAW
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas E. Bilek
Kelly Cox Bilek
THE BILEK LAW FIRM, L.L.P.
700 Louisiana, Suite 3950
Houston, TX 77002
Telephone: (713) 227-7720
tbilek@bileklaw.com
kbilek@bileklaw.com

Celeste Brustowicz
Stephen Wussow
COOPER LAW FIRM
1525 Religious Street
New Orleans, LA 70130
Telephone: 504-399-0009
Facsimile: 504-309-6989
cbrustowicz@sch-llc.com

Scott R. Bickford
Spencer R. Doody
MARTZELL, BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
srb@mbfirm.com

*Counsel for NAS Guardians and
Proposed Liaison and Class Counsel*

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed via the Court's electronic filing system on June 24, 2020.

Notice of this filing will be sent by email through the Court's electronic case-filing system to all

counsel of record.

                                        */s/ Marc E. Dann*
                                        Marc E. Dann (0039425)