# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | **Case No. 1:17-md-02804** |
| **THIS DOCUMENT RELATES TO:** | Judge Dan Aaron Polster |
| *"All Cases"* |  |

## PLAINTIFFS' RESPONSE TO THE REPORT AND RECOMMENDATION ADDRESSING MOTION FOR COMMON BENEFIT FUND

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................... 1

II.     MDL COMMON BENEFIT ASSESSMENTS: THE STATE OF THE ART AND ITS APPLICATION TO MDL NO. 2804 ....................................................... 2

III.    RESPONSES TO THE R&R QUESTIONS ................................................ 12

1.      Response to Question 1 .................................................................................... 12

     (a)    How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order? ...................................... 12

     (b)    Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not? ................................................ 13

2.      Response to Question 2 .................................................................................... 14

     (a)    How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution? .................... 14

     (b)    If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved. ........................................ 14

3.      Response to Question 3 .................................................................................... 15

     (a)    How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution? ...................................... 15

     (b)    If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative. .................................. 17

4.      Response to Question 4 .................................................................................... 19

     (a)    How should a common benefit assessment account for the potential size of the taxed settlements, if at all? Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter?  If so, explain how. If not, explain how it should be adjusted to do so. ........................................................................... 19

5.      Response to Question 5 .................................................................................... 21

     (a)    How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all? ........................................ 21

     (b)    Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPAs' contingent fee contracts?  If so, explain how. If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence. ........................................ 24

IV.     CONCLUSION ................................................................................................... 25

CERTIFICATE OF SERVICE .......................................................................................... 27

OPIOIDS CASE CENSUS ................................................................................................. 1

    A.     Cases by Filing Date ............................................................................... 1

    B.     Cases by Venue/Status ........................................................................... 4

    C.     Cases by Plaintiff Type .......................................................................... 4

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Central Railroad Banking Co. of Georgia v. Pettus*,
113 U.S. 116 (1885)..........................................................................................2

*In re Air Disaster at Fla. Everglades on Dec. 29, 1972*,
549 F.2d 1006 (5th Cir. 1977) .........................................................................3

*In re Diet Drugs Prod. Liab. Litig.*,
582 F. 3d 524 (3d Cir. 2009).......................................................................3, 21

*In re Genetically Modified Rice Litig.*,
No. 4:06 MD 1811 CDP, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010),
*aff'd*, 764 F.3d 864 (8th Cir. 2014).................................................................4

*In re MGM Grand Hotel Fire Litigation*,
660 F. Supp. 522 (D. Nev. 1987)....................................................................20

*In re National Prescription Opiate Litigation*,
290 F. Supp. 3d 1375 (J.P.M.L. 2017).............................................................12

*In re Vioxx Prod. Liab. Litig.*,
650 F. Supp. 2d 549 (E.D. La. 2009)...............................................................20

*In re Vioxx Prod. Liab. Litig.*,
760 F. Supp. 2d 640 (E.D. La. 2010)...............................................................20

*In re: E.I. DuPont De Nemours & Co. Personal Injury Litigation*
(MDL No. 2433), 2018 WL 4771524
(S.D. Ohio 2018).............................................................................................4

*Mills v. Electric Auto-Lite Co.*,
396 U.S. 375 (1970).........................................................................................2

*Sprague v. Ticonic Nat. Bank*,
307 U.S. 161 (1939)........................................................................2, 7, 16, 18

*Trustees v. Greenough*,
105 U.S. 527 (1881).........................................................................................2

**Statutes**

28 U.S.C. § 1407...............................................................................................2

**Other Authorities**

Eldon E. Fallon
"Common Benefit Fees in Multidistrict Litigation", 74 La. L. Rev. 371 (2014) ......................2

Fallon, Grabill & Wynn,
"Bellwether Trials in Multidistrict Litigation," 82 Tul. L. Rev. 2323 (2008) .........................25

William B. Rubenstein,
5 *Newberg on Class Actions* §§15:112-15:117 (5th ed.) ...................................................passim

I.      **<u>INTRODUCTION</u>**

Plaintiffs, through the undersigned Plaintiffs' Co-Lead Counsel and Plaintiffs' Liaison

Counsel, and on behalf of the Plaintiffs' Executive Committee (collectively, "Plaintiffs'

Leadership" or "PEC"), respectfully submit this Response to the June 3, 2020 *Report and*

*Recommendation Addressing Motion for Common Benefit Fund* (Doc. #3319) (hereinafter "*R*

*and R*") pursuant to this Court's June 3, 2020 Order Regarding Professor Rubenstein's Report

and Recommendation (Doc. #3320).

The PEC appreciates the observations and insights of Professor Rubenstein's *R and R*,

and the opportunity to clarify the intent and operation of its March 6, 2020

*(Revised)(Proposed)(Corrected) Order Establishing Common Benefit Fund* (Doc. #3212-1)

(hereinafter, "*Proposed Order*"). This PEC Response provides both a general context and

specific rationale for its *Proposed Order*. It then addresses each of the five questions posed in the

*R and R*. The Response ends with a renewed request for entry of the *Proposed Order*, clarified as

the Court deems appropriate.

The *Proposed Order*: 1) reflects this Court's authority and discretion to impose the

requested 7% assessment on settlements and judgments in individual cases (including

bellwethers and inventories of cases) that are part of this MDL and in cases represented by

lawyers participating in this MDL, as MDL common benefit orders have long done; 2) does *not*

assess the State Attorneys General Cases or bankruptcies; 3) does not supersede or disrupt any

settlement discussions that include fair and reasonable alternative fees and costs structures;

4) does not add any additional assessment on top of such structures; and 5) enables the parties to

reach future fair and reasonable alternative fee structures to reflect the particular circumstances

of future aggregate or global settlements.

The flexibility built into the *Proposed Order* responds to the *R and R* inquiry, and

acknowledges and implements what Justice Frankfurter called the federal courts' "recognized power of equity" "in doing justice as between a party and the beneficiaries of his litigation." *Sprague*, 307 U.S. at 167.[1]  This long-established power to prevent unjust involvement by taxing the beneficiaries of another's efforts, whether or not the beneficiaries are parties in cases before the court and without the requisite of a pre-existing fund finds contemporary expression in the common benefit order issued as a matter of course in 21st Century MDLs.

The *Proposed Order* itself is well-adapted to the particular circumstances of Opioid litigation. It enables and promotes the goal of global resolution of Opioid litigation this Court has envisioned from the outset, such as the potential revised Distributors settlement now under confidential discussion among the MDL plaintiffs (specifically, Cities and Counties and Tribes), the State Attorneys General, and the major Distributor defendants, and puts in place a long-deferred common benefit order to address more routine bellwether and individual settlements.

## II.  MDL COMMON BENEFIT ASSESSMENTS: THE STATE OF THE ART AND ITS APPLICATION TO MDL NO. 2804

Judicial recognition of the need to appoint plaintiffs' leadership to coordinate and conduct pretrial proceedings in the cases centralized in an MDL under 28 U.S.C. § 1407, and the need to compensate the common benefit work of that appointed leadership from the recoveries in such cases, is coextensive with the rise of mass tort MDLs. Eldon E. Fallon's "Common Benefit Fees in Multidistrict Litigation", 74 La. L. Rev. 371, 372-74 (2014), describes how the seminal *Florida Everglades* MDL litigation, and the resulting landmark appellate decision *Florida Everglades* 1) acknowledged the unjust enrichment problem, and 2) confirmed the district court's authority to solve it by taxing recoveries. *In re Air Disaster at Fla. Everglades on Dec.*

---

[1] *See also, Trustees v. Greenough*, 105 U.S. 527 (1881); *Central Railroad Banking Co. of Georgia v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970).

*29, 1972*, 549 F.2d 1006 (5th Cir. 1977) (endorsing common benefit assessments from individual fees as permissible and appropriate). As Judge Fallon noted, "The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work." *Fallon*, 74 La. L. Rev. at 317, citing *Florida Everglades*, 549 F.2d 1004-16.

America may run on Dunkin Donuts, but MDLs definitively run on common benefit: MDL courts must, as a matter of operational necessity, "designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide." *Everglades*, 547 F.2d at 1014. "Naturally, the authority would be illusory if it is dependent upon lead counsels' performing the duties desired of them for no additional compensation." *Fallon*, 74 La. L. Rev. at 377, quoting *Everglades*, 549 F.2d at 1018.

The *R and R* describes the common benefit assessment as a "tax". As such, like any tax, while well-established at law, and, more saliently, founded in equity (as *Everglades*' tracing of common benefit to a series of Supreme Court decisions going back to the late 1800s - and pre-dating that other oft-complained of tax, the federal income tax - demonstrates) common benefit assessments are inevitably subject to dispute. Common benefit assessments can be unpopular, but they are necessary, indeed therapeutic. The *R and R* essentially asks: what is the effective percentage dose, how is it administered, and does it apply to all settlements of any size?

A host of district and circuit decisions, many citing *Everglades*, have reaffirmed the propriety and necessity of common benefit assessments, *see, e.g., In re Diet Drugs Prod. Liab. Litig.*, 582 F. 3d 524, 546-50 (3d Cir. 2009), anchoring the MDL judges' authority to do so in the district court's equitable powers under the common fund doctrine, as articulated and reaffirmed in *Trustees*, *Pettus*, and *Sprague. See, e.g., In re Genetically Modified Rice Litig.*, No. 4:06 MD

1811 CDP, 2010 WL 716190, at*4 (E.D. Mo. Feb. 24, 2010), *aff'd*, 764 F.3d 864 (8th Cir. 2014); *In re: E.I. DuPont De Nemours & Co. Personal Injury Litigation* (MDL No. 2433), 2018 WL 4771524 (S.D. Ohio 2018) (collecting cases); *see generally* William B. Rubenstein, 5 *Newberg on Class Actions* §§15:112-15:117 (5th ed. 2015) ("*Newberg*"). The doctrine itself is unassailable, and its application to MDLs has long been routine, generating scores of examples of specific assessment orders, as surveyed in *Newberg*, and readily available to MDL transferee courts for adaptation to specific MDLs. Exhibit B to this Response, a chart and analysis of common benefit orders entered in 25 mass tort MDLs from 2002-2020. These common benefit orders include those entered in the largest and most high-profile MDLs, including the 6% assessment in *Vioxx*, imposed on a $4.85 billion global settlement, the 6.5% assessment in the $1.143 billion *Baycol* settlement, the 9% (later reduced to 6%) federal assessment in the $6.44 billion *Diet Drugs* settlement, and, as a comparison with large mass tort class action settlements, the 11% aggregate fee-award in the uncapped, $1 billion+ *NFL Concussion* settlement.

Comparative analysis of 20 years' worth of such orders has enabled commentators to ascertain the range and determine the mean and median of such assessments. Professor Rubenstein's survey of a larger sample of 35 fee assessments and 26 cost assessments in cases (including but not limited to mass tort MDLs) reveals both a general range, and average and median assessments. "[T]he tax is generally calculated in the range of 5% for fees and 2.5% for costs." *R and R* at 2, citing 5 *Newberg on Class Actions* §15:117. "My empirical data… show that the average assessment is 4.99% for fees and 2.49% for costs (about 7.5% altogether)…The PEC's request of 6% for fees and 1% for costs (7% altogether) is therefore, in total, just below the mean and just above the median." *Id.* at 8.  Against this backdrop, the PEC's proposed assessment of 6% fees/1% costs is unremarkable and predictable. It is thus unsurprising that this

assessment is also essentially consensual, among the PEC members, and the other counsel who not only have incurred the bulk of the costs and done most of the work, but also represent the vast majority of actively litigating plaintiffs in the Opioid litigation.[2]

This agreement, which the *R and R* recognizes as an ideal ("Ideally, the lawyers in a case of this structure work out the common benefit tax among themselves[.]"  *R and R* at 2), was reached among lawyers with substantial individual and collective experience in prior mass tort MDLs, across the entire range of outcomes, from dismissal to multi-billion dollar settlements, including experiences in many of the MDLs mentioned above and listed on the Exhibit A chart.

The requested assessment is intended to govern what the *R and R* terms "satellite" settlements, and the typical individual federal and state court settlements, including bellwether case settlements; routine subjects of the assessment orders surveyed in Exhibit A and *Newberg*, as well as what the *R and R* predicts may be "enormous" settlements. *R and R* at 8. This is also not unusual: both *Vioxx* and *Diet Drugs* applied common benefit assessments in the range requested here to multi-billion-dollar "enormous" settlements, in which private contingent fees were also paid. There is an important caveat, however, provided for in the operative *Proposed Order*, and absent from the *R and R* discussion: a savings clause. The *Proposed Order* provides room to tailor a common benefit award to the nature and size of any resolution.

The 6%/1% assessment is established as the "off the rack" assessment for the routine settlements in individual MDL and "satellite" cases; leaving other bespoke fees/costs structures to be made to suit. The *Proposed Order* specifies a "system of assessment on some (but not all)

---

[2] In terms of filed cases, the Opioid litigation universe consists of 88 AG actions (most filed post-*ARCOS Orders*, which have received access to the ARCOS data **without** charge, and which would **not** be subject to the *Proposed Order*), approximately 2,849 federal MDL actions (on whose behalf the PEC has been directly working for over 2.5 years), and approximately 371 non-AG state court actions (most post-*ARCOS Orders*, which have and can share in the MDL work product and are beneficiaries of MDL common benefit work).  *See* Exhibit A, the Opioids Case Census.

of the settlements and recoveries to which this substantial effort has contributed, commensurate with common benefits assessments ordered in recent MDLs." (Doc# 3212-1 at 3). The assessment applies to "certain types of cases."  (*Id.* at 3). It excludes AG actions (*Id.* at Section 2.c., p. 7). Importantly, Section 4 of the *Proposed Order* provides:

> a.      This Order is without prejudice to such other assessments of or awards of  fees and costs as may be ordered by this Court under Rule 23(h), the common benefit doctrine,  a Court-approved agreement among the parties to any global or comprehensive settlement with any defendant, or that may be provided by contract between attorneys and clients. The intent of  this Order is to establish, secure, and supervise a fund to promote the purposes and policies of  the common benefit doctrine and provide a source for equitable payment of services rendered  and costs incurred for the benefit of Opioids plaintiffs.
>
> b.      **Nothing in this Order precludes the parties from negotiating, agreeing on,  and proposing a different fee structure in a global settlement of claims against any defendant  that provides a different fund or mechanism for fairly compensating common benefit work and   costs.** [emphasis supplied]
>
> c.      Common benefit fees and costs requested or agree(d) to be paid from assets  in any bankruptcy proceeding would be approved and awarded as determined by the bankruptcy  court in the exercise of its jurisdiction.
>
> d.      If a settlement includes funding for abatement that is shared among  parties, including state Attorneys General, not subject to this Order, the parties participating in  directing the fund shall agree on a method for determining what part of that fund will be subject  to common benefit fees and costs. To the extent that no agreement can be reached, this Court  will determine a fair assessment subject to this Order, pursuant to notice and an opportunity for  the parties to be heard.
>
> e.      If all parties to a future settlement agree that exceptional circumstances  warrant a departure from the holdback obligations, or other provisions of this Order, they shall   submit affidavits thereon and request appropriate relief from this Court.
>
> f.      Any disputes or requests for relief from or modification of

> this Order will be decided by this Court in the exercise of its
> continuing jurisdiction over the parties, and its authority and
> discretion under the common benefit doctrine.

(Revised) (Proposed) *Corrected* Order Establishing Common Benefit Fund, March 6, 2020,

Doc# 3212-1 (emphasis added). [3]

Thus, the same circumstances identified by the *R and R* as calling for potential

modification of the assessment, such as an extraordinarily large ("enormous") settlement, an

aggregate settlement, or a settlement that may call for a different fee/cost structure due to

participation by the AGs (to name but three of the most likely scenarios) are already provided for

in the *Proposed Order*, which enables the parties to such a settlement to agree on an alternative

structure, different percentage, or other modification as necessary to make that settlement work.

There are no "double" or "extra" assessments. For example, as Section 4.d. provides, there

would be no assessment in a settlement with AGs that includes an alternative agreed-on

structure.  The Section 4 provisions are fully consistent with this Court's "power of equity in

doing justice as between a party (here, the MDL itself and the PEC and the others who labor for

the common benefit) and the beneficiaries of his litigation." *Sprague*, 307 U.S. at 167. Inherent

in the flexibility to design a fee structure to reflect the circumstances of enormous or unusual

deals is the overarching principle that fees, however structured, must be reasonable, to avoid the

unjust enrichment of either lawyers or the beneficiaries of the lawyers' work. Given this Court's

consistent efforts and constant encouragement of the MDL parties (and others, including the

AGs) to reach fair, equitable, and innovative settlements, this inherent flexibility in the *Proposed*

*Order* is also fully consistent with the particular circumstances and goals of MDL No. 2804.

As Professor Rubenstein observes, this MDL is extraordinary, and unusually, perhaps

---

[3] The PEC suggests clarifications to Section 4.e. so that it reads "*any* parties" to a future settlement; and 4.f. to read
"…its continuing jurisdiction over the parties *subject to this Order*."

uniquely, complex. The plaintiffs assert both tort and (federal and state) statutory claims, for abatement relief and economic damages. Most MDL No. 2084 plaintiffs are not individuals: they are governmental entities, or institutional plaintiff/third party payors, such as union health and welfare funds and hospitals. *See* Exhibit B. These plaintiffs are not arrayed against a single defendant, or even a single category of defendant: multiple manufacturers, distributors, and pharmacies are named. Finally, Attorneys General have also filed or investigated their own actions, in other forums, against the same categories of defendants. Thus, the common benefit work that has been performed (and the unprecedented costs that have been incurred) in both the litigation and settlement tracks of MDL No. 2084, and in remanded bellwethers, as itemized in the accompanying *Declaration of Peter H. Weinberger*, have also been used by and benefited plaintiffs both within the MDL and elsewhere.[4]

The settlement track of this MDL, as supervised and facilitated by this Court, has likewise focused not on an MDL settlement alone. This Court recognized from the start the inescapable fact that, from the perspective of the MDL defendants, no aggregate settlement of the "enormous" magnitude necessary here is feasible unless it includes AG cases and other state court litigation. *See, e.g. Second Order Regarding ARCOS* data (Doc. #397). That is precisely why the *Proposed Order* already provides what Professor Rubenstein recommends: the ability of the parties to craft and agree on other fees structures specifically designed for particular settlements. In this litigation, the PEC has recognized that one settlement structure, and one size or type of fees/costs assessment or fund, may not fit all. The *Proposed Order* acknowledges and expressly provides for this Court's ongoing ability to consider and approve different fee

---

[4] For example, the PEC members are actively participating in the New York state court coordinated litigation that includes the New York AG's action and city and county cases. There, symbiotic cooperation between the AG's office and the PEC in the essential work of discovery, motions practice, and trial preparation have advanced these cases to trial-readiness. Only Covid-19 has prevented the New York trial from already commencing. There are now trial dates in other PEC bellwethers, including Ohio, West Virginia, and San Francisco.

structures for settlements that include the claims and cases of the MDL plaintiffs over which it has jurisdiction.

Appointment to any MDL plaintiffs' leadership structure- and especially appointment to the Opioids PEC- is neither a mere honorific nor a financial sinecure. It is an enforceable obligation to fund the costs and do the work of the MDL, on a contingent basis, for the common benefit of plaintiffs and their respective counsel. This commitment relieves most plaintiffs and counsel of much of the time and costs that would otherwise be required in the underlying cases, and delivers to the court and all parties (plaintiffs and defendants as well) the economies of scale and efficiencies of centralization that are the goals of the MDL statute.

Most Plaintiffs' counsel are aware of the uniquely large costs the PEC has incurred (over $68 million in assessments alone, paid by the PEC, with another $24 million in PEC members' held costs) and the unprecedented magnitude of the work performed (over 1.3 million hours, increasing daily). *See Weinberger Declaration.* This assertion is not mere argument. The Court knows directly of the scope, necessity, and benefit provided by this investment, because it is visible on the docket, in court proceedings, and in the bellwether tracks' pretrial motions, expert motions, discovery motions, and trial preparation. For those outside the litigation, who unlike the Court do not experience it daily or directly, the accompanying *Weinberger Declaration* demonstrates it for the record, providing the count of documents produced and analyzed, motions briefed, fact witnesses and experts deposed, and trials prepared. *See R and R* at 4. No other lawyers in this litigation anywhere, individually or collectively, public or private, have, to the PEC's knowledge, invested anywhere near this amount of time and money, or produced the level of beneficial work product, to advance the Opioid litigation for all.

While waiting for entry of a common benefit assessment order, the PEC could not wait to

assess its members to pay for MDL costs. As of July, 2020, each member will have paid in at least $3.25 million, with more assessments forthcoming. These are front end, non-contingent assessments that none of the MDL or other plaintiffs, or their counsel, have had to pay in their individual actions. But all have already benefitted from them (whether they would acknowledge it or not) in the tangible and indispensable form of the ARCOS data, and of the millions of documents, hundreds of depositions, scores of experts, and many key motions, of which this Court is directly aware. The eve-of-trial settlements in the Summit and Cuyahoga bellwether actions are exemplars both of this benefit, and its recognition by the beneficiaries themselves. These bellwether plaintiffs agreed to the requested assessment and this entry of the Order Regarding Track One Settlement Funds (Doc. #2980), placing into escrow 7.5% of their settlements.  The record in this MDL thus reflects agreement to and imposition of a 7% assessment on gross monetary recoveries (not an assessment on underlying contingent fees only) on quite substantial settlements.

The MDL assessment orders surveyed in Exhibit B, and those surveyed by Professor Rubenstein, typically do <u>not</u> include sliding scales that decrease assessments as individual settlements, or settlements in the aggregate, increase in size. Rather, they do what the *Proposed Order* does: they provide for adjustment, in the court's discretion, as actual circumstances warrant. Thus, the *Diet Drugs* MDL's 9%/6% assessments were later reduced, after a multi-billion-dollar aggregate settlement was reached, to avoid windfall. Such reductions may rarely occur, as Professor Rubenstein observes, but this is most likely because assessments in the range requested here are usually adequate but not excessive when applied to even very large settlements, whether individual, as in the case of Summit/Cuyahoga (intensively litigated up to trial, including completion of jury selection), or in the aggregate, as in *Vioxx*.

As a matter of economic reality, the argument can be made that, as the process of MDL centralization of underlying litigation has become more efficient, MDL assessment orders have failed to keep pace: the percentages assessed have not increased to keep pace with the percentage of work performed/services rendered by the common benefit attorneys. The problem is thus not windfall, but the reverse. The Opioid litigation illustrates this trend. In prior decades, before electronic filing and instantaneous communication, mass tort litigation took many months, or even years, to reach the point of MDL centralization. This meant extensive work was required by individual counsel (or "IRPAs") in individual cases preceding the MDL, and it meant that becoming a passive part of an MDL actually litigated by others was not the prevailing expectation. Private contingent fees reflected these conditions. MDL transferee courts were understandably reluctant to impose more than single digit assessments, and, as Exhibit A demonstrates, many imposed the assessments not upon lawyers' fees only, but upon "gross monetary recoveries": the plaintiffs and their counsel thus incurred these assessments ratably.

In very recent years, MDL petitions have been filed within weeks-sometimes days- of breaking news of a mass tort, rather than months or years after the underlying cases have commenced. This acceleration of MDL centralization has occurred as communications have improved and as plaintiffs and defendants alike have learned of the strategic advantages (or at least practical necessities) of MDL treatment. In the case of the Opioid litigation, while a few cities and counties (e.g., City of Chicago and Santa Clara County) had been actively prosecuting opioids cases prior to the motion to create the Opioids MDL, the vast majority of MDL plaintiffs retained counsel and filed their cases *after* the MDL was created. As the Response to Question 5(a) and the Exhibit A Case Census show, out of 3,232 Opioids-related cases of all types (AGs, federal, state, individual, class action, municipalities, third party payor, and NAS), only 48 were

filed prior to the December 5, 2017 *Transfer Order. In re Nat'l Prescription Opiate Litigation*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017). Because common benefit assessment orders are a routine MDL staple (omission of an assessment order is the exception, not the rule), these counsel and clients in the nearly 3,200 cases filed <u>after</u> the MDL knew they could depend on the PEC, appointed in early 2018, to front most of the cost and do most of the work. Thus, private contingency fees could be low. As Exhibit A shows, plaintiffs in the vast majority of Opioids cases on file are government or service-providing institutions. These government entities and other sophisticated institutions could—and many did—use a competitive bidding process, such as Requests for Proposals ("RFPs") to create a market that drove fees down. Lawyers competing for these clients knew that the MDL, once established, would include a common benefit asssement order, likely one imposed against gross monetary recoveries rather than on contingent fees alone, and could negotiate with clients and plan accordingly.

## III.    **RESPONSES TO THE R&R QUESTIONS**

The following responses are informed by and incorporate the foregoing general discussion.

### 1.    **Response to Question 1**

**(a)    How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order?**

It is likely that a global settlement will provide a separate fund and/or other mechanisms for payment of both common benefit and private contractual fees and costs. This is so precisely because the parties and their counsel are operating under the knowledge and anticipation that this Court may and should enter a common benefit order, if and to the extent that the parties do not bring their own agreement for such to this court for its approval. In other words, whether happily or not, the parties are already operating under a presumption supplied by the principles of the

equitable common benefit doctrine, the jurisprudence that has reaffirmed and refined it, and the many common benefit orders in specific MDLs. The rational expectation is that this Court will enter a common benefit order that will operate as a default levy on recoveries, unless the parties agree on an alternative structure. The *Proposed Order* ensures the parties are free to do so. It also incentivizes them to do so, by putting in place a known default assessment if they do not. Of course, this Court must be advised of, and approve, any such alternative to the extent it resolves claims that are part of the MDL; again, the *Proposed Order* provides this mechanism.

**(b)    Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?**

The Court should not wait to enter a common benefit order. A "wait and see" approach does not create any proactive incentive. The *Proposed Order* is not "an intrusive holdback"; it is neither unexpected, unfair, nor disruptive to any ongoing discussions. Rather, the *Proposed Order* reflects the standard (and necessary) operating procedure in an MDL. It provides useful information and predictability on the form of advance notice of a uniform assessment that will occur, unless and until a different arrangement is proposed. As noted above, in this MDL, the Cuyahoga/Summit bellwether settlement was reached, on the literal eve of opening arguments at trial. That settlement emerged from a process that attempted, but failed, to produce a global settlement. It was the occurrence of this individual settlement of an MDL bellwether action- the paradigm context for operation of a common benefit assessment-that prompted the original request for, and entry of, the *Order Regarding Track One Settlement Funds* (Doc. #2980).

Since then, as the Court knows, efforts to reach a global settlement have continued, with the prospect of at least hoped-for success at an undetermined future date. Without violating the settlement confidentiality orders of this Court, it may be said that a comprehensive structure for payment of common benefit and other fees and costs is a part of these discussions. Because of

the savings clause provisions of the *Proposed Order* quoted above, the entry of a common benefit order should not, and is not intended by the PEC to, disrupt these or any other global settlement discussions. The parties to such discussions know or should know that the issue of how fees and costs should be addressed follows from the settlement structure they choose, whether that be a resolution flowing through AGs, a class action, or some other structure. The common benefit order in the circumstances of this MDL is essentially a default provision that operates in the absence of another arrangement. Therein lies the importance of entering it now. While global discussions continue, individual settlements may continue to be reached in bellwether and other individual settlements, whether with major Defendants who might ideally desire a global settlement, or with regional or local Defendants who might be named in one or a few cases. A common benefit order that assesses a standard and predictable 7% overall percentage on these cases should be in place for predictability and guidance, to avoid the need for a series of individual holdback orders such as the Cuyahoga/Summit 7.5% holdback.

2. **Response to Question 2**

**(a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution?**

With respect to those cases remanded from MDL No. 2804 to serve as exemplary or bellwether cases, the counsel prosecuting them (many of whom are members of PEC firms) are doing so with an understanding that their work is, at least in large part, common benefit work, and mindful of and in agreement with the request for a common benefit assessment in this case. Nonetheless, entry of the Proposed Order is preferable to deferring it further, for the reasons stated throughout this Response.

**(b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved.**

While agreement exists among the lawyers principally charged with prosecuting the

MDL and the remanded bellwether ("exemplary") cases, entry of the *Proposed Order* is essential to finalize and enforce this agreement, and to provide predictability and security for all members of the teams actually litigating these cases, including PEC, other common benefit lawyers, and local counsel, as well as the bellwether plaintiffs themselves.

3.    **Response to Question 3**

(a)    **How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?**

No one voluntarily agrees to a common benefit tax absent the prospect- now universally expected, if not welcomed- that the MDL court serving as the hub for common discovery and pre-trial work will impose one. Informal discussion and negotiation among MDL and state court lawyers typically precedes the request for a specific percentage assessment, as it did here. It is no accident that the requested 7% is in the mainstream of the assessment range and that the PEC, and most other lawyers not tasked with active prosecution of the litigation, support it. Unfortunately, some lawyers' opposition to the Proposed Order arises from an incomplete understanding of the common benefit work done by the PEC and the impact it has had in their own cases. For example, in resisting an assessment order, the County of Harris, Texas, argues that: 1) this Court has no subject matter jurisdiction over it, 2) that the PEC has conferred no benefit upon it; and 3) that if anything the PEC impeded the recent settlement of the Texas cases in which Harris County would be included.[5] First, the Harris County case is currently pending in this MDL. There has been no remand. Second, Harris County is incorrect that the PEC has conferred no benefit upon it or the Texas litigation, given that PEC member Mark Lanier is lead trial counsel in the Dallas County bellwether case (set for trial in Spring 2021). Given that Mr.

---

[5] Footnote: There is no Texas settlement, yet, with any defendant, to interfere with. Harris County refers not to a settlement at all, but to an apportionment agreement that would be applicable if the settlement that the PEC has been diligently working towards comes to fruition. If that settlement DOES occur, the apportionment agreement, would relate to an agreed fees structure that would supersede the 7% assessment.

Lanier was fully set to try the initial MDL bellwether case which settled (after all pretrial and *in limine* motions were decided, and the jury selected) in October 2019, counsel would be hard pressed to argue that the Texas litigation incurs no benefit from the MDL. Dallas co-counsel, Jeffrey Simon, captured and is utilizing much of the PEC work product obtained during trial preparation for CT1 and has requested that the PEC assist with experts (from the MDL) and discovery (from the MDL). And one of the leaders of the Texas litigation, Mikal Watts, has been in constant contact with PEC Co-Lead Joe Rice and benefitted from advice regarding various negotiations. Beyond the PEC's direct involvement in the Texas litigation and Texas counsel's utilization of the PEC work product, it is beyond cavil that the vast resources and expertise the PEC has shared for the last 2.5 years, the successes in MDL motion practice, and the constant efforts toward settlement, have advanced and bolstered all cases, including the Texas cases. By contrast, the Texas cases have neither been as active as the MDL, nor have they produced a benefit to themselves or anyone else that could factually or equitably support exemption from assessment.

It is also known (if not always graciously acknowledged) that no Opioids case in any court, whether federal or state, can make its case at trial or survive the onslaught of case-specific pretrial motions, without access to the quintessential Opioids MDL common benefit work product: the ARCOS data and analyses. *See Weinberger Declaration*, ¶ 4.

Under these circumstances, a lien on state court recoveries would be consistent with the goal of the common benefit doctrine: the avoidance of unjust enrichment. The early Supreme Court cases did invoke the lien concept to tax the recoveries of out-of-court beneficiaries, *See Sprague, supra*, and a successful lien procedure could arguably tax recoveries at much higher percentages than 7%. It is also predictable that such piecemeal collateral litigation would be

needlessly wasteful of judicial and party resources. Recourse to a piecemeal lien process assumes what MDL courts (and the plaintiffs' counsel who are seasoned mass tort litigators) have long rejected: that every action in a given mass tort is unique. Not so: they share important common fact questions, legal elements, and dependence on key documents and depositions. A standard assessment, imposed (and modifiable for good cause) by a court, is a fairer, more efficient, and less expensive system.

As to state court lawyers who wish to access MDL No. 2804 work product, a Participation Agreement that pre-dates the *Proposed Order* is in existence, negotiated by the MDL federal/state liaison with state counsel at an earlier stage of the MDL, and signed by at least 45 firms. A sample of this Participation Agreement is attached as Exhibit C. It can be updated and adjusted to be attached to the *Proposed Order*. Similar agreements are features of many common benefit orders. Such Participation Agreements routinely provide for access to MDL work product, conditioned on application of the MDL common benefit assessment to state cases and unfiled claims. Moreover, state court lawyers who wish their state court work to be considered for common benefit payment as well, are able to do so, under the Participation Agreements, as well as Section 3.b. of the *Proposed Order*. Again, this is a provision common in modern MDL assessment orders.

**(b)     If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

The obstacles to agreement to a common benefit contribution are no different here than in any other case. These obstacles and objections recur routinely in every MDL. Everyone wants to reap the benefit of the MDL work, but no one wants to volunteer to pay for it. No one will be the first to step forward to say "Here is what I think I should pay on my cases." MDL common benefit orders are hence commonplace, out of necessity. The request for them is proceeded by a

survey of the field, a search for comparables, and an analysis of the amount and cost of common benefit work that will be necessary to advance the cases- all of which occurred here. The request for a specific assessment was not made early in this case, when many such orders are entered. It was preceded by the direct experience of the PEC and other common benefit providers of the scope and quantum of work and cost actually necessary to advance the CT 1 bellwether track cases to trial. While the requested 7% is "just below the mean and just above the median" (*R and R* at 8) it was not selected merely because it is average, much less picked out of a hat. It reflects an informed assessment informed by actual experience in <u>this</u> litigation, of what Opioids cases cost to meaningfully litigate, and the common benefit level at which such cost can be equitably spread among beneficiaries. A lien process cannot replicate that ratable and equitable assessment, and lien process imposes unnecessary costs on proponents, opponents, and courts alike.

What matters is not individual negotiation of and agreement to a case-specific assessment, but that it is within a reasonable range. Both the empirical research, and over two and a half years of intensive experience in this MDL, demonstrate that 7% is reasonable here. The provision of flexibility and recourse to modification if, in a particular instance, the standard contribution would be unreasonable, also matters, as a matter of equity and due process. Accordingly, the *Proposed Order* provides these mechanisms.

The equity power of the district courts to remedy unjust enrichment by taxing the beneficaries of another's litigation does not depend upon the existence of a fund in court, the filing by beneficiaries of suits there, or other "formalities" of litigation, as the Supreme Court has made clear, *Sprague*, 307 U.S. at 167. In this Opioids MDL, however, there *is* the functional equivalent of a fund in court: the Rosetta Stone of the Opioid litigation produced at and accessed

under the direction of the Court, subject to its Protective Order, is indisputably of more value and

utlity to all litigants everywhere than almost any monetary fund could be. It is indisputably under

the jurisdiction and protection of this Court. It is indisputably the product of the PEC's initiative

in seeking, obtaining, analyzing it, and making it available. *See Order Regarding ARCOS Data*

(Doc. #233) (4/11/2018). Every Opioids case in every court depends on this data, produced

nationwide over 2 years ago, for its viability. *See Second Order Regarding ARCOS Data* (Doc.

#397). The AGs have ARCOS access for free, in the spirit of cooperation. But a free ride on the

ARCOS data is not the entitlement of every litigant. Even if the PEC had done no other work,

access to the ARCOS data and analysis alone would be sufficient to justify the requested 7%

investment.

       4.    **<u>Response to Question 4</u>**

      **(a)**      **How should a common benefit assessment account for the potential size of
the taxed settlements, if at all? Does the PEC's proposed 7% common benefit assessment
properly account for the potential size of settlements in this matter?  If so, explain how. If
not, explain how it should be adjusted to do so.**

      See the response to Q2 and Section II of this Response as to why: 1) the requested 7%

reflects a reasonable, mid-range assessment that state court litigants have agreed to in prior

MDLs; 2) which is reasonable and should be agreed to for individual and inventory settlements

in this MDL; and 3) which should serve as a default in the absence of alternative fees/costs

provisions in a global settlement. While it is generally true that "percentage-based attorney's fees

decrease as settlement values increase" (*R and R* at 8, citing *Newberg on Class Actions* Section

15:81), this observation (and the body of empirical data that informs it) relates directly to large,

"mega fund" class action settlements. An "enormous" aggregate settlement in this MDL would

correlate, although imperfectly, to the rare class settlements known as "super-megafund"

settlements: those exceeding $1 billion. At this rarefied level, fee percentages vary widely, but

even at this level, as the chart attached as Exhibit B shows, the requested 6%/1% amount would not be an outlier.

More to the point, and as Professor Rubenstein notes in *Newberg on Class Actions* Sections 15:113-115, common benefit assessments in MDLs are different. There is no empirical evidence that directly correlates a reduction in fee percentage with an increase in the dollar value of either individual or aggregate MDL non-class settlements. Common benefit assessments cluster in the same range, whether resolution occurs through a series of individual settlements, a handful of major "inventory" settlements, or, as in *Vioxx*, a global non-class mass settlement. *See In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 661-62 (E.D. La. 2010) (6.5% common benefit fee and 1% costs assessment imposed in $4.85 billion global non-class settlement); *In re Vioxx Prod. Liab. Litig.*, 650 F. Supp. 2d 549, 564 (E.D. La. 2009) (capping private contingency fees at 32%). Rather, as Exhibit A shows, percentages at the high and low ends occur regardless of settlement size. This may reflect different degrees of litigation difficulty, novelty, expense, duration, and intensity. These multiple complex, and interacting case-specific variables are reflected in the chosen percentages.

One indication is that MDL assessments do *not* decrease as settlement size increases is the phenomenon noted in *Newberg*:  low assessments are adjusted *upward* at the time of global settlement. *Newberg on Class Action*, § 15:115 & n. 16. Percentages may increase if entered at a stage when the parties and court have more experience with the demands of the litigation, as occurred in *MGM Grand* and *Bextra/Celebrex*.[6] A lower percentage may be more politically

---

[6] *In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 529 (D. Nev. 1987) (awarding common benefit fees of 7% of a global settlement, after the initial common benefit was set at 5%). In *Bextra/Celebrex,* the assessment began, by dint of hard bargaining at the outset of the case by state court lawyers, at 4% (2% fees/2% costs). As that litigation progressed toward the eve of the first MDL bellwether trial (at which point inventory settlements began) it became clear that the time and costs invested in the MDL necessitated a doubling of the assessment, to 8% for later participants. In Opioids the vast majority of filed cases (not to mention unfiled claims) would fit in such a "later" category, as Exhibit A demonstrates.

popular, but it fails to account for the cost and work required, and it will need to be adjusted. In MDL No. 2804, there is enough information to set a reasonable percentage now.

While class action fee awards are retrospective, common benefit assessments are meant to provide *ex parte* predictability to the litigants. It is not that MDL common benefit orders are without a mechanism to insure against windfall; they are well equipped, by provisions that allow the court to amend the assessment. The percentage may be adjusted upward or downward, if and when it appears that a percentage assessment is inadequate to compensate common benefit work, or when it appears (far less frequently), that a reduction in percentage is warranted. The latter is what happened in the *Diet Drugs* MDL. *See In re Diet Drugs*, 553 F. Supp. 2d 442, 457-58, 490-91 (E.D. Pa. 2008) (9% federal and 6% state assessment, later reduced to 6% and 4%, respectively), *aff'd*, 582 F. 3d 824 (3d Cir. 2009). Assessment reduction, which results in a partial refund to contributors from a common benefit fund, may be rare, as *Newberg* notes in Section 15:117. But it is provided for in the *Proposed Order* (in Section 3. F).

Here, we are at the point of sufficient maturity to know that 7% is an appropriate level for Opioids case assessments, at least outside of a global settlement with its own governing fees/costs structure. Again, the need for a unique fees/costs structure in a uniquely designed, or uniquely "enormous" settlement does not obviate the need for entry of a common benefit Order as the PEC requests.

5.    **<u>Response to Question 5</u>**

(a)    **How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all?**

The *Proposed Order* accounts for the size of the underlying IRPAs' contingent fee through the routine mechanism of applying the 7% to the "gross monetary recovery" of the plaintiff, rather than directly and solely to the attorneys' contingent fees. *See* Doc. #3212-1 at

Section 2, defining "gross monetary recovery." Thus, the plaintiff and its attorney ratably bear the assessment in a proportional manner. For example, under the gross monetary recovery approach contemplated by the PEC's *Proposed Order*, a total of $7,000 would be assessed on $100,000, $93,000 would be directed to the plaintiff, and the contingency fee attorney (IRPA) would apply the contract percentage provided for in the agreement with the client to that $93,000. This is the more usual, indeed the preferred approach, in MDLs where (as here) there is a range of underlying fee contracts, rather than one or a few "standard" or traditional percentage fees. Of the 24 cases included in Exhibit A – a comprehensive set of 21st Century mass tort MDLs, most utilize the gross monetary recovery approach. *Newberg* notes both the "gross recovery" and "fees only" approaches, observing "Most commonly, the common benefit fee is an assessment on the gross settlement value." *Newberg on Class Actions*, § 15:165 at 427-428. This "most common" approach is the one taken here. This norm of assessing the gross monetary recovery contrasts with the approach ultimately taken by Judge Fallon in the *Vioxx* litigation, in which imposition of the common benefit assessment solely on the IRPAs' private fees was coupled with a cap on those same fees, to ensure that the plaintiffs did not bear an unreasonably high fee burden. In *Vioxx*, the fee cap that preceded the 6.5% assessment was 32%. *See In re Vioxx Prod. Liab. Litig.*, 650 F. Supp. 2d at 564.

Here, by contrast, the market has acted, through the mechanism of competition among lawyers for retention by sophisticated clients, to produce a wide variation of fee percentages, that for the most part range below the traditional personal injury 30-40% fees. Indeed, competition for Opioids clients among counsel, including among the firms who are now part of the MDL PEC, was fierce. The terms of contingent fee agreements, including fee percentages, were subject to competitive bidding and, at times, statutory constraints. In entering into such

agreements, the highly sophisticated clients made a free and informed decision and anticipated an organized approach to the opioid litigation in which cases would not necessarily be litigated individually. In the end, hundreds of local entities and many State Attorneys General entered into contingent fee arrangements with outside counsel which, as a general matter, contained substantially discounted fee percentages. These contracts were publicly available, making the terms, including contingency percentages, well-known to lawyers and clients alike.

Most of the clients signing these agreements are not active litigants, and they have incurred few costs. For example, of the over 30,000 Cities and Counties who are potential litigants only 2,435, less than 10%, have filed suit. Only a double handful of City, County and Tribe cases are being actively litigated. The settlement value of these cases and claims comes from their sheer number, which creates enormous settlement pressure on defendants, and their status as components (and beneficiaries) of the aggregate MDL litigation. Many IRPAs have large "inventories" of claims, each with a percentage contingent fee, many of which are neither active cases nor even filed cases, but unfiled claims. This is not a criticism. It is true that some IRPAs have incurred substantive time representing their clients, including time spent preparing the complaints, completing fact sheets, communicating with clients regarding case developments, preparing for defensive discovery, and evaluating settlements. Moreover, the decision not to actively litigate is a rational one for several reasons. This Court has stated that not all Cities, Counties and Tribes need file cases to participate in any global settlement. The fact that the many are dependent on the work of the few reflects the goals of the MDL:  It avoids duplication of cost and effort while delivering economies of scale. The assessment of a reasonable tax on the benefits to many, to defray the costs of the few, ensures that the rational choice made by the inactive majority comports with fairness and equity as well.

In any event, virtually all IRPAs knew of the existence of the MDL, knew of the work of the PEC, knew of the intensive dual track litigation (simultaneous trial and settlement tracks) in the MDL, knew of the *ARCOS Orders*, and knew of the bellwether trial process (now an established fixture in MDLs) before their clients retained them and before they filed their individual suits. The attached census of Opioids filings demonstrates this point. As Exhibit A demonstrates, the vast majority of Opioids filings of all types, in all courts, occurred after the creation and adjudication of MDL No. 2084. Only 48 cases were on file before the Judicial Panel's December 5, 2017 *Transfer Order*. In the immediate aftermath of the MDL's creation, from December 6-29, 2017, an additional 198 cases were filed. The MDL PEC was appointed on January 14, 2018 (Doc #37). The Common Benefit funding and costs order was issued on May 1, 2018 (Doc #358). The *ARCOS Data Orders* were issued on April 4, 2018 (for six bellwether states) and May 8. 2018 (extended nationwide). The 2018 monthly filing rates correspond to these developments. *See* Exhibit B. Of all 3,232 cases on file, for example, 2,557 (over 79%) were filed after the *ARCOS Orders*. The timing of cases filed demonstrates that most litigants were not only aware of, but made their decisions with the existence of and actuality of MDL No. 2804 in mind, and mindful of the benefits being produced in that litigation. They could thus factor in their expected level of case-specific time and cost commitment, as well as the expected level of common benefit assessment coming from the MDL Court, in setting their fees. In the reality of this litigation, most IRPA contingency fee contracts post-dated the establishment of the MDL; for these, there were fewer than usual contingencies, and no surprises. The requested 6%/1% assessment conforms and is proportional to these circumstances.

      **(b)**      **Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPAs' contingent fee contracts?  If so, explain how. If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

Yes. Here, 7% is not being assessed directly against a contingent fee, which may be in the low double digits, or even single digits. Rather, it is being assessed against the entire recovery. The client and its IRPA are assessed ratably, with the total fees (IRPA contingent fee and common benefit assessment) combining to reflect a reasonable and proportional charge on recoveries. This charge is not only ratably shared, but is proportional to a recovery that both plaintiffs and their lawyers expected to be produced, not from work in the individual case alone, but from the added value of being part of a whole. As explained above, the 7% assessment properly accounts for a range of contingent fees, most of which are or should be below the "traditional" percentage range of 30-40% in personal injury tort cases, and most of which exist with clients that do not expect to be fully litigated as individual cases.[7]

## IV.  __CONCLUSION__

The *Proposed Order* itself, and the information and answers provided in this Response underscore the propriety and efficacy of entering the *Proposed Order* now, without prejudice to or interference with the development of an alternate fee and cost structure in the settlement discussions now underway, or with respect to others that may be discussed in the future. Meanwhile, entry of the *Proposed Order* will provide the predictability and security of a source of default funding for common benefit work. Here, in this most complex, intensive, and demanding of modern MDLs, such an order is both fair and necessary to reimburse the costs incurred and work performed for the common benefit, by the PEC and others, from day one of this MDL, through bellwether trial dates this year and next, and the foreseeable future.

---

[7] The MDL bellwether system that focuses on the trial of selected "exemplary cases," as the *R and R* notes, takes the place of such individual litigation of thousands of cases, in a more cost-effective, organized, and informative way. *See* Fallon, Grabill & Wynn, Bellwether Trials in Multidistrict Litigation, 82 Tul. L. Rev. 2323 (2008) (discussing the approaches to bellwether selection and trials employed throughout the *Vioxx* litigation).

Dated:  June 24, 2020                    Respectfully submitted,

*/s/ Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
*phanly*@simmonsfirm.com


Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com


Paul T. Farrell, Jr.
FARRELL LAW
422 Ninth St., 3rd Floor
Huntington, WV  25701
(304) 654-8281
paul@farrell.law
  paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*



*/s/Peter H. Weinberger*
Peter H. Weinberger
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2020, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may

be  obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*_____

Peter H. Weinberger

*Plaintiffs' Liaison Counsel*
