UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION,<br><br>THIS DOCUMENT RELATES TO:<br><br>*All Cases* | MDL 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

## **DECLARATION OF PETER H. WEINBERGER**

I, Peter H. Weinberger, provide this declaration on behalf of the Plaintiffs' Executive Committee ("PEC") in the National Prescription Opiate Litigation, MDL 2804.

1. I was appointed by the Court as Plaintiffs' Co-Liaison Counsel. I am also a member of the PEC. My role in this litigation has been extensive and varied. As is traditional for MDL liaison counsel, I have devoted the last nearly 2½ years on a full-time basis (to the exclusion of any other significant legal work) acting as one of the principal spokespersons on behalf of the PEC with counsel for the more than 20 defendants, the defendants' liaison counsel, and with the Court and the Court's personnel, including its three appointed special masters. I have made significant presentations before the Court in a variety of different hearings on a myriad of substantive, discovery related, evidentiary, and procedural issues. I was appointed as a member of the trial team for the first bellwether trial involving Cuyahoga and Summit Counties. I also supervise and manage the PEC Opioid Capital Litigation Fund, which is described more fully below.

2. In this role, I have had the unique opportunity to fully understand the breadth and scope of the work performed by the PEC lawyers in this litigation. I have reviewed nearly every pleading prepared by the PEC's Law and Briefing Committee. I have reviewed every discovery request propounded to each of the defendants. I have reviewed their responses. I have reviewed nearly every one of our discovery responses. I have reviewed every expert report submitted by the PEC and the defendants. I have reviewed and/or digested many of the discovery depositions that have been taken. I have reviewed and analyzed every Order issued by the Court and its Discovery Special Master. I have interacted with nearly every PEC lawyer in this case. I have participated and strategized with all of the PEC teams including but not limited to the law and briefing committee, the offensive discovery committee, the defensive discovery committee, the trial teams, and the settlement negotiating team. As a result, I believe that I have the knowledge and experience to be able to attest to the following:

3. There are 21 law firms represented on the PEC. At least one member of each firm makes up the PEC. 981 lawyers from those 21 law firms have performed work on this litigation in this MDL. Pursuant to the Court's Case Management Order No. 5 (Doc. 636), each of these firms have submitted the time devoted by their lawyers to this case to the PEC Co-Leads. The time has been audited and continues to be audited by an auditor employed by the PEC. The hours accumulated to date exceed 1.3 million. These lawyers collectively have:

   a. drafted 14 detailed bellwether complaints and amended complaints;
   b. prepared motions or responded to over 240 motions (over 100 of which were dispositive), position statements, or objections to formal discovery rulings,

which are detailed on the public docket in the MDL, and Case Tracks One and Three, which resulted in 2 emergency motions and 9 writs of mandamus;

c. prepared arguments and responded an additional over 260 informal motions related to discovery issues in CT1, some of which resulted in formal Discovery Rulings on the public docket but the vast majority of which resulted in non-public decisions by the Discovery Special Master;

d. taken more than 490 discovery depositions in CT1;

e. received and reviewed the defendants' production of 28,484,880 documents which totaled 153,977,822 pages.  We also reviewed 729,529 third party documents.

f. received and analyzed 400,000+ defense privilege claims, and drafted extensive challenges to same – uncovering 1 million+ pages of documents;

g. retained 23 experts who submitted expert reports and whose depositions were defended in CT1;

h. reviewed 84 expert reports submitted by the defendants and deposed each one in CT1;

i. reviewed and challenged defendants' confidentiality designations, resulting in the unsealing (and public availability) of pleadings, briefs, expert reports, thousands of documents, and more than 300 depositions;

j. prepared for the CT1 bellwether trial including submitting and/or responding to over 100 *motions in limine*;

k. engaged in jury selection for the CT1 bellwether trial;

l. prepared on an ongoing basis for the CT1B trial scheduled for November 9, 2020, and;

m. engaged in extensive settlement discussions with the defendants, the states' Attorneys General, and the Settlement Special Master.

4. The Court and the litigants realize that the PEC's litigation strategy that resulted in an Order to the DEA to produce its ARCOS data base from 2006-2014 was probably the transformative event in this case. It was produced to the PEC as raw data. The PEC retained a firm who specialized in extracting and analyzing the data into a usable and understandable format. Ultimately, this analysis provided information that tracked every opioid pill from the manufacturer to the distributor to the pharmacy for every pharmacy in every community in the United States. This analysis was converted to an interactive map which allowed every political subdivision to discover how many pills were delivered to their community and which defendants were responsible. The data demonstrated the significant increases in pill quantities and dosages that fed the opioid epidemic over this time frame. The vendor cost, incurred by the PEC, for this project exceeded $1 million. The data analysis was shared, at no cost, with the states' attorneys general. It was also shared with non-PEC members representing political subdivisions. The data analysis has been used to determine the defendants' relative culpability, and has driven the settlement negotiations. The data analysis was at the heart of the CT1 trial and will serve the basis for liability determinations in the upcoming federal and state trials.

The April 11, 2018 Order Regarding ARCOS Data (Doc 233) ordered the DEA to produce that data for the six bellwether states (Ohio, West Virginia, Illinois, Alabama,

4

Michigan, and Florida). The May 8, 2018 Second Order Regarding ARCOS Data (Doc 397) "extended the reach of the first ARCOS Data Order" to "the entire United States, for the period of January 1, 2006 through December 31, 2014." (Doc 397 at 2). These Orders could not have been obtained without the centralization of Opioids litigation in this Court through the MDL mechanism, and the PEC's battle for nationwide ARCOS data in a Court with jurisdiction to order it.  As the Orders recite, the ARCOS data allowed plaintiffs across the country "to identify previously-unknown entities involved in the manufacturing and distribution of opioids", enabling them to file or amend their complaints. (Doc 397 at 1). This Court recognized the PEC's position that "the detailed transactional ARCOS data, which shows the precise number of pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy, will prove essential in settlement discussions regarding apportionment of any obligation amongst defendants, and allocation of any settlement funds to plaintiffs." (Doc 397 at 2; Doc 233 at 15 n.8). "…it is certain that all of the detailed information in the [ARCOS] database is necessary for litigation, as the defendants recognized. Discovery of precisely which manufacturers sent which drugs to which distributors, and which distributors sent which drugs to which pharmacies and doctors, is critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation." (Doc 3233 at 7-8). These Orders articulate the Court's determination that the ARCOS data is key both to the global Opioids litigation, and the ongoing efforts toward global Opioids settlements.  (Doc 233 at 7-8; Doc 397 at 2-3).

5. The PEC is also in active litigation before Judge Polster in CT3 – Trumbull and Lake Counties, Ohio.  These cases focus on the national pharmacies and involve

5

both distribution and dispensing claims. While discovery on the distribution claims against these defendants occurred in CT1B, significant discovery is ongoing on both the distribution and dispensing aspects of the case. This trial is to begin on May 10, 2021. Jury selection begins on May 5, 2021.

6. The PEC is intimately involved in the remanded cases in CT2 – West Virginia, CT4 – City and County of San Francisco, CT5 – The Cherokee Nation, and CT6 – the City of Chicago. CT2 is in the trial preparation stage with a trial date set in October, 2020. The latter three cases are all at initial stages (an additional 17 motions to dismiss were recently fully briefed) and will no doubt require the same level of lawyering as occurred in CT1, though each will benefit from the extensive work done in the MDL to date. CT4 is set for trial before Judge Charles Breyer on June 28, 2021.

7. As of June 2020, there were pending in the MDL court a total of 169 tribal cases on behalf of 413 federally recognized Tribes and 17 inter-tribal organizations (over 70% of all federally recognized Tribes, but an estimated 85% of all tribal citizens, as this includes many of the largest Tribes). The PEC's direct work with and sharing of common benefit work product in both the Blackfeet and Muscogee Tribe cases which were subject to dispositive motions and in the ongoing CT5 has greatly assisted the Tribes. The Tribal Leadership Committee has been working with the PEC since the PEC's Appointment.

8. In New York state court, the PEC is working in collaboration with the two PEC firms who represent Nassau and Suffolk Counties as well as the New York Attorney General, in their consolidated cases against the defendant manufacturers, distributors, and retail pharmacies. (The PEC does not represent the NY entities.) A trial is expected in the Fall 2020. On plaintiffs' request, the PEC provided substantial assistance in

opposing 20 dispositive motions and 9 Frye motions, in submitting 7 reports by experts who had previously submitted reports in the MDL, as well as assisting in the review of the 59 defense expert reports submitted, many of whom had been reviewed and deposed in the MDL.

9. The PEC has shared its work product including document production and discovery depositions with non-PEC members and state court lawyers for their cases representing political subdivisions, Native American Tribes, hospitals, and third-party payers throughout the nation. The PEC has also shared this same work product, at no charge, with the states' attorneys general.

10. One notable example of the PEC sharing the MDL common benefit work product with state court litigants is in the context of the Texas multidistrict litigation. There, one of the bellwether counties set for trial in 2021, Dallas County, has coordinated directly with PEC counsel, one of which will serve as lead trial counsel in the case. In that case, co-counsel sought and received deposition transcripts, expert reports and work product preparation of the experts, jury research, and other substantive trial preparation materials for its state court case. Another Texas county's case, Harris County, is actually pending in the MDL and its counsel had significant contact with the MDL Settlement Special Master before his tragic and untimely death in February 2020, and with PEC Co-lead Joe Rice and in that context was provided a plethora of information regarding MDL litigation materials in the context of settlement negotiations.

11. Each of the PEC members has committed to fund the MDL litigation. As such, each PEC firm agreed to pay assessments to fund the PEC Opioid Litigation Capital Fund. This is the Litigation Fund created to pay "shared expenses" as defined by CMO

5, Section IV subsection 1. As of July 1, 2020, each of the firms will have paid $3.25 Million in total assessments.  A significant portion of that $68.25 Million has been utilized to defray the shared expense litigation costs.  Additional periodic assessments are contemplated.

12. Each of the PEC firms has also committed to pay for certain "non-shared" expenses as defined by CMO 5, Section IV, subsection 2.  The total non-shared expenses, subject to audit, total more than $24 million to date.


Dated:  June 24, 2020  */s/Peter H. Weinberger*
Peter H. Weinberger
Plaintiffs' Liaison Counsel