# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** ) ) ) ) | |
| This document relates to all Actions, including: ) ) | **MDL No. 2804** |
| *Lovelace Health System, Inc. v. Purdue Pharma L.P, et al.*, Case No. 19-op-45458 ) ) ) | **Case No. 17-MD-2804** |
| *Danville Regional Medical Center, LLC v. Purdue Pharma L.P, et al.*, Case No. 19-op-45788 ) ) ) | **Judge Dan Aaron Polster** |
| *Southwest Mississippi Regional Medical Center, et al. v. AmerisourceBergen Drug Corporation, et al.*, Case No. 5:17-cv-00145 ) ) ) ) | |
| *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corporation, et al.*, MDL No. 1:17-md-2804 ) ) ) ) | |
| *Rosary Hall and St. Vincent Charity Hospital v. AmerisourceBergen Drug Corporation, et al.*; MDL No. 1:17-md-2804 ) ) ) ) | |
| *Baptist Healthcare System, Inc., et al. v. AmerisourceBergen Drug Corporation, et al.*, Case No. 3:18-cv-00558 ) ) ) ) | |
| *Saint Elizabeth Medical Center, Inc., et al. v. AmerisourceBergen Drug Corporation, et al.*, Case No. 2:18-cv-00146 ) ) ) ) | |
| *Takoma Regional Hospital, Inc., et al. v. Purdue Pharma, L.P., et al.*, Case No. CC19CV295BB ) ) ) ) | |
| *Bowling Green-Warren County Community Hospital Corporation, et al. v. Purdue Pharma, L.P., et al.*, Case No. 19-CI-01146 ) ) ) ) | |
| *Singing River Health System, et al. v. Nathan C. Grace, et al.*, Case No. 1:19-cv-01879 ) ) | |

**RESPONSE OF CERTAIN HOSPITALS ADDRESSING
THE SPECIAL MASTER'S REPORT AND RECOMMENDATION**

Come now, certain interested hospitals and hospital systems[1] represented by the firms Sherrard Roe Voigt & Harbison, PLC and Barrett Law Group, P.A.[2] (collectively, the "Hospitals"), pursuant to this Court's June 3, 2020 Order [ECF No. 3320], and respectfully jointly file this supplemental briefing in response to and in light of the questions posed in the Special Master's Report and Recommendation Addressing Motion for Common Benefit Fund [ECF No. 3319].[3]

**INTRODUCTION**

The Hospitals are in positions different than many of the other, governmental entity plaintiffs in this MDL, including those represented by the members of the PEC. The PEC is dominated by lawyers for governmental entities; sometimes those entities' positions are congruent with hospital interests; other times they are irrelevant to hospital interests; in other situations, they are in direct conflict with hospital interests. Hospitals have opted to pursue recovery for their damages caused by Defendants' actions creating and contributing to the opioid crisis in a variety of ways, including through federal and state lawsuits, bankruptcy proceedings, or private negotiations.

The unique obligations and organization of the Hospitals required individualized and tailored representation of their specific interests—interests which are not always entirely aligned, and sometimes conflict, with those of the plaintiffs represented by the members of the PEC. Further, all of the Hospitals have necessarily relied on their own counsel to advise them, research the law, analyze the facts, submit their own briefings, represent them on multiple bankruptcy

---

[1] Including the hospital plaintiffs in each of the cases identified in the above case style.
[2] Don Barrett serves as a member of the PEC pursuant to this Court's Order [*see* ECF Nos. 34, 37].
[3] Undersigned counsel represents numerous hospitals and hospital systems, both nonprofit and for profit, having a presence in a majority of U.S. states. Each of the Hospitals is an interested party.

2

committees, and retain their own experts to evaluate all aspects of trial preparation from causation to individualized damages to specific abatement measures needed for their communities.

Before turning to the Special Master's five questions and their subparts, the Hospitals reiterate that an award of attorneys' fees from a common benefit fund is appropriate only if it is necessary and reasonable to compensate counsel for work that benefitted parties other than their clients, *see, e.g.*, *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *Shimman v. Int'l Union of Operating Engineers, Local 18*, 744 F.2d 1226, 1234-35 (6th Cir. 1984), and when that work can be shown to have "substantial[ly] benefit[ted]" the case to be taxed, *see In re Genetically Modified Rice Litig.*, 835 F.3d 822, 830 (8th Cir. 2016). Thus, before fees from the Hospitals' cases are allocated to a common benefit fund, the PEC, as the proponents of the fund, should show that the Hospitals have substantially benefitted from their work.

At this point, however, it remains to be seen whether or which Hospitals have benefitted or will benefit from work done by those members of the PEC, who have been almost exclusively representing governmental entities.[4] The Hospitals acknowledge that they could potentially benefit from a portion of this work, but there is also a distinct possibility that hospitals are disadvantaged as a result of the PEC's efforts because limited recoveries that may compensate the Hospitals are, instead, being steered toward the governmental entities represented by members of the PEC at the behest of the PEC.[5]

---

[4] The Hospitals do not intend either to diminish the PEC's efforts or to question whether any counsel should be appropriately compensated by those who benefit from members of the PEC's work and take no position on the propriety of the fee request as to the local governments or the negotiating class represented by members of the PEC.

[5] To illustrate this issue, consider two examples from this case. First, in the Insys bankruptcy, monies were allocated among various claimant groups through an approved and agreed upon bankruptcy plan. The distributions were not evenly divided, and it was understood that the PEC did not represent the interests of the Hospitals. Given those dynamics, one could not now, nor did anyone suggest then, that the Hospitals benefitted from the PEC's work efforts in that particular matter and, in fact, it seems possible that the PEC's efforts there actually caused the Hospitals to receive less, rather than benefit from the PEC's work. Second, consider the proposed settlement between Mallinckrodt and various governmental entities, publicly announced on February 25, 2020, in which the PEC appeared to neither

Because the Record has not yet made clear whether, and to what extent, private entity plaintiffs, such as the Hospitals, will benefit from the PEC's work and because the PEC members have largely been operating independently of—and generally divergent from—the Hospitals' interests, it does not seem reasonable for the Hospitals, and similarly situated private entity plaintiffs, to be indiscriminately subjected to a substantial reimbursement to governmental entities and their counsel for *their* costs in obtaining recoveries. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03MDL01570GBDSN, 2019 WL 4744268, at *3-4 (S.D.N.Y. Sept. 30, 2019) (noting that the original request for a common benefit fund was denied as premature where it was not clear how much work counsel would perform on behalf of all plaintiffs and the amounts that ultimately would be recovered were uncertain).

## DISCUSSION

Turning to the Special Master's five specific questions and their subparts on which the Court solicited supplemental briefing, the Hospitals state as follows.

**I. The Hospitals cannot reasonably predict the likelihood of a global settlement specifically compensating all attorneys, such that the Court would not need to render a common benefit order, but the Hospitals urge the Court to defer entry of any order imposing common-benefit holdbacks until such a settlement structure emerges.**

Q1 of the Special Master's Report and Recommendation asks (a) that the Hospitals gauge the likelihood "that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order" and (b) whether the Court can "simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks . . . ." For subpart (a) of Q1, the Hospitals would expect that a global settlement structure would have specific provisions for a full release of all parties'

---

involve nor allocate recoveries to any single private party. Thus, if private parties such as the Hospitals do ultimately recover from Mallinckrodt, it would appear to be in spite of the PEC's efforts, rather than because of them.

4

claims and funds to compensate the parties' attorneys. Nevertheless, the Hospitals are not in a position to provide an accurate prediction about the likelihood of this occurring because the PEC has not included the Hospitals or their counsel in the PEC's discussions regarding such a global settlement. Consequently, the exclusion of Hospitals from such discussions causes the Hospitals to predict that any "global" settlement at this point would not adequately address the Hospitals' claims.

Turning to subpart (b), however, the Hospitals respectfully suggest that the Court not only can but most definitely should opt to wait and see if a settlement structure that accounts for attorneys' fees emerges before taking the more heavy-handed and intrusive step of requiring common benefit holdbacks. This wait-and-see approach not only provides for the more preferable outcome of the parties reaching agreements among themselves, *see generally* Rest. (3d) of Restitution and Unjust Enrichment § 29, but also allows further opportunity for facts to develop as to whether and to what extent the PEC members' work has benefitted classes of plaintiffs such as the Hospitals and thus what, if any, common benefit fee holdback would be appropriate for those parties, *see, e.g.*, *In re Diet Drugs*, 582 F.3d 524, 546 (3d Cir. 2009).

## II. It would seem likely that the parties and lawyers in the exemplary cases should be able to agree on a common benefit contribution.

In Q2, the Special Master and Court have asked the Hospitals (a) to predict the likelihood "that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution" and (b) to identify and discuss obstacles and potential resolutions to these obstacles, if this sort of agreement seems unlikely. Respectfully, the Hospitals suggest that it should be highly likely that the parties and lawyers in the upcoming exemplary cases are able to agree on a common benefit fee contribution because the PEC members sought to put their own clients into the exemplary cases. In light of that, the exemplary case parties and lawyers ought to

5

be able to reach an agreement without needing to obtain fees from the Hospitals' own, separate efforts.

**III. Although an agreement between the PEC and state court litigants is possible, any such agreement would need to recognize and account for the fact that the PEC and the Hospitals litigating in state court have been working at cross purposes.**

In Q3, the Special Master and Court have asked the Hospitals (a) to predict the likelihood that "the PEC and state court litigants can reach an agreement on a common benefit contribution" and (b) if an agreement seems unlikely, to "identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative." For their part, the Hospitals with cases proceeding in state courts are open to discussion and willing to reach an agreement with the PEC. As a practical matter, any such agreement would need to acknowledge that the PEC has, in fact, been working at cross-purposes to the Hospitals and that the Hospitals have not yet received material and tangible benefits from the PEC's work. A most recent example of this reality occurred within the context of a very mundane request for access to the MDL dataset. Despite Hospital counsel having signed and submitted (several months ago) the requisite authorization for access, the Hospitals' counsel were challenged and, as of this filing, still were not given access to the data.  Nevertheless, counsel for the Hospitals can engage in discussions concerning an agreement as to common benefit and are confident that such discussions can be productive.  With an acknowledgement of past misgivings, the Hospitals are hopeful that an agreement between the PEC and state and federal court litigants would be likely. Failing to recognize the reality of no genuine benefit having been conferred to date, however, could present a substantial impediment to an agreement on a common benefit contribution.

Turning to subpart (b), in the event that the PEC and state court litigants do reach an impasse on this question of common benefit contributions, the Hospitals respectfully suggest that

6

state courts can address any attempts by the members of the PEC to assert attorneys' liens in the various state court cases. As the Special Master and others have noted, having the Court here impose a sweeping common-benefit holdback extending to state court lawsuits would raise serious federalism concerns that a lien approach would not. Moreover, deferring to state courts' consideration of any prospective attorneys' lien, namely, the determination of any contribution that should be taxed for the PEC's work, would permit a more just result. That is, the state court would have a more detailed Record to review, in an individual case, of the ways in which the PEC may claim its work benefitted a specific Hospital case relative to the work of the state court attorneys in those cases. In light of that Record, a state court can more justly allocate any appropriate percentage for any potential common benefit contribution. This exercise of judicial discretion is better suited for the Hospital cases, rather than adopting the one-size-fits-all approach advocated by the PEC here.

**IV. In the event a common benefit assessment is imposed, it should account for the potential size of the taxed settlements, should be less than the 7% proposed by the PEC, and should be adjusted to reflect the fees that the PEC members obtained from their own cases.**

The fourth question posed by the Special Master asks the Hospitals (a) how, if at all, a common benefit assessment—assuming one is imposed—should account for the potential size of the taxed settlements and (b) whether the PEC's proposed 7% common benefit assessment properly accounts for the size of the settlements in this matter. Although the Hospitals maintain that a common benefit assessment is not appropriate at this time, assuming *in arguendo*, one was imposed, the percentage should be substantially less than the 7% proposed by the PEC.

Although the PEC's 7% common benefit holdback may not, at first blush, appear too high, this percentage is exceptionally and disproportionately high when considered in light of the potential pool of gross settlement funds in this litigation. *See, e.g.*, 5 *Newberg on Class Actions*

7

§ 15:81 (analyzing empirical data to note that percentage-based attorneys' fees strongly tend to decrease as settlement values increase); *see also id*. at §15:117 (analyzing 35 common benefit fee assessments and 26 cost assessments to reach a 6% combined median and a 7.5% combined mean). As an example, and as other parties have noted, applying this proposed 7% tax to the October 2019 settlement framework would lead to a common benefit fee that exceeds $3,300,000,000—an amount that does not even account for the other cases both covered by this MDL and in state courts.

Given this extremely high potential settlement value, the Court should decrease any common benefit assessment imposed to be substantially less the 7% advocated by the PEC, but must especially do so in the Hospital cases, where the Record does not reflect, to date, any substantial benefit to the Hospitals. Additionally, the PEC's proposed 7% common benefit fee is not the only recovery that the PEC's members stand to reap in this litigation. To the extent that a percentage-based common benefit assessment is taxed to every case, the value of this assessment should be considered in light of, and offset by, the recovery that members of the PEC stand to earn as a result of their own individual percentage-based fee agreements with their individual clients.

Moreover, any fee should be altogether eliminated to the extent the PEC's efforts inured to the detriment, rather than the benefit, of the Hospitals. Perhaps unlike other plaintiffs that stand to benefit from a global resolution of this litigation, the Hospital Plaintiffs have not sat idly while the PEC developed the Hospital cases. To the contrary, not only have counsel for the Hospitals had to affirmatively develop the theories and evidence in their own cases, but they have also had to guard against efforts to potentially devalue the Hospital cases. In this litigation, a "one size fits all" approach is particularly unjust when attorneys and their respective clients have different, divergent and even, at times, conflicting interests. Indeed, in a privileged setting, counsel for the Hospital Plaintiffs can inform the Court of several instances in which the PEC has, at times, overlooked or

8

exhibited indifference to the interests of the Hospital Plaintiffs or has advanced the interests of the governmental plaintiffs to the detriment of Hospital Plaintiffs. The Court should not presume common benefit amongst all plaintiffs.

**V.** **To the extent a common benefit assessment is imposed, it should consider the percentage of the individually retained plaintiffs' attorneys' ("IRPA") contingent fees and reflect a discount in cases that have a contingent fee agreement that is less than the typical range of a "one-third" contingent fee.**

The final question on which the Court has solicited briefing asks (a) how, if at all, a common benefit assessment should account for the underlying contingent fees of the individually retained plaintiffs' attorneys ("IRPA") and (b) whether the PEC's proposed 7% common benefit assignment properly accounts for the IRPA's contingent fee levels and, if not, what evidence there is of the contingent fee levels in the underlying contracts.

Fairness concerns are especially acute in the context of the Hospitals. Were the Court to impose a common benefit assessment, this tax would be carved out of a contingent fee arrangement that was entered into between the Hospitals and their counsel without considering such a tax; in this way, the Hospitals and their counsel are like a number of other entities and their IRPA. But, unlike other entities and their IRPA who have tangibly benefitted from the PEC members' work, the Hospitals and other private parties have yet to realize any demonstrable benefits from the PEC's efforts. Rather, this common benefit tax—were it imposed on the Hospitals—would essentially require Hospitals to pay a material portion of the contingent fee that they had arranged with their own counsel to compensate the PEC for work that has not benefitted the Hospitals and their counsel and which instead has been contrary to the very interest of the Hospitals.

## CONCLUSION

In sum, the Hospitals respectfully submit that a common benefit assessment is, at a minimum, premature. The Court should defer ruling on a uniform tax. Instead, the Court should

9

direct the parties to engage in discussions for the purpose of reaching agreement amongst themselves—whether through a global settlement, through the upcoming exemplary case(s), and/or through agreements between the PEC and counsel representing parties in state court. Additionally, for the Hospitals in particular, this wait-and-see approach will permit further development of the Record, to determine whether and to what extent the Hospitals have substantially benefitted from the PEC's efforts. Given that PEC's efforts to date have not sought to advance the Hospitals' interests, a clear and developed Record will allow this Court, and any state court, to fairly determine whether a common benefit allocation would be appropriate and, if so, at what rate.

If, despite the Hospitals' position, the Court opts to impose a common benefit tax, the Hospitals respectfully submit that it should be limited to the federal litigation on behalf of governmental entities, and not imposed on Hospitals. Further, the Hospitals respectfully suggest that if any such order included Hospitals, that for all of the reasons stated, herein, any common benefit tax applied to Hospitals should be substantially less than the 7% requested, perhaps 1%.

Respectfully submitted by:

*/s/ Lauren Z. Curry*
Phillip F. Cramer (No. 20697)
Lauren Z. Curry (No. 30123)
Christina R.B. López (No. 37282)
SHERRARD ROE VOIGT & HARBISON, PLC
150 Third Avenue South, Suite 1100
Nashville, Tennessee 37201
Phone: (615) 742-4200
pcramer@srvhlaw.com
lcurry@srvhlaw.com
clopez@srvhlaw.com

/s/ *Don Barrett*
John W. Barrett
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Phone: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was filed via the Court's electronic filing system on June 24, 2020. Notice of this filing will be sent by e-mail through the Court's electronic case-filing system to all counsel of record.

                                                */s/ Lauren Z. Curry*
                                               Lauren Z. Curry