# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**

THIS DOCUMENT RELATES TO:

*County of Lake, Ohio v. Purdue Pharma, L.P., et al.*,
Case No. 18-op-45032

*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,
Case No. 18-op-45079

"Track Three Cases"

**MDL No. 2804**

**Case No. 17-md-2804**

**Hon. Dan Aaron Polster**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PHARMACY DEFENDANTS' MOTION TO DISMISS <u>SECOND AMENDED COMPLAINTS</u>

2004950.7

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

INTRODUCTION AND SUMMARY OF ARGUMENT..........................................................1

LEGAL STANDARD ....................................................................................................4

ARGUMENT ................................................................................................................5

I.      Plaintiffs' Common Law Public Nuisance Actions Have Not Been Abrogated...............5

II.     The Counties Properly Allege that Defendants' Dispensing Practices Were Unlawful ...............................................................................................................10

        A.     The CSA Imposes Duties on Pharmacists, Pharmacies, and Their Corporate Parents.....................................................................................10

        B.     The CSA Requires All Registrants to Maintain Effective Controls against Diversion ....................................................................................11

        C.     The CSA Requires Defendants to Ensure that Only Legitimate Prescriptions Are Dispensed...............................................................15

        D.     The Counties Allege Defendants Violated Their Duties under the CSA.............20

III.    Plaintiffs Sufficiently Allege that Defendants Created an Absolute Public Nuisance Through their Unlawful and Intentional Conduct. ..........................................26

IV.    Plaintiffs Have Adequately Pled Proximate Causation .................................................31

V.     Defendants Offer No Reason for this Court to Depart from its Prior Rulings.................36

CONCLUSION.....................................................................................................................37

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alotech, Ltd. v. Huntington Nat'l Bank,*
No. 1:13-CV-01971-DAP, 2014 WL 281973 (N.D. Ohio Jan. 24, 2014) ............................8, 9

*Amzee Corp. v. Comerica Bank-Midwest,*
No. 01AP–465, 2002 WL 1012998 (Ohio Ct. App. 10 Dist. May  21, 2002)..........................9

*Appalachian Reg'l Healthcare, Inc.,*
246 F. Supp. 3d 1184 (E.D. Ky. Mar. 30, 2017) ....................................................17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................4

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................4

*Berdyck v. Shinde,*
613 N.E.2d 1014 (1993) ...................................................................36

*Bob's Pharmacy and Diabetic Supplies; Revocation of Registration,*
74 FR 19599-03 ((DEA Apr. 29, 2009) .................................................18

*Bolles v. Toledo Trust Co.,*
58 N.E.2d 381 (Ohio 1944) .................................................................8

*Brondes Ford, Inc. v. Habitec Sec.,*
38 N.E.3d 1056 (Ohio Ct. App. 2015) .............................................32, 37

*Carrel v. Allied Products Corp.,*
78 Ohio St.3d 284, 1997-Ohio-12, 677 N.E.2d 795 (1997) ..................................2, 6

*ChipRx L.L.C d/b/a City Center Pharm.,*
82 Fed Reg. 51433 (DEA Nov. 6, 2017)..........................................13, 15

*Cincinnati v. Beretta U.S.A. Corp.,*
768 N.E.2d 1136 (Ohio 2002) .............................................................29

*Delaware v. Purdue Pharma L.P.,*
No. N18C-01-223, 2019 WL 446382 (Del. Sup. Ct. Feb. 4, 2019)........................................10

*Dunbar v. State,*
136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111 (2013) .............................7

*East Main Street Pharmacy; Affirmance of Suspension Order,*
75 FR 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010).............................16, 23

*Edge Pharmacy; Decision and Order,*
81 FR 72092-03 (DEA Oct. 19, 2016).....................................................18

*Erickson v. Pardus,*
551 U.S. 89 (2007)........................................................................4

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Frantz v. Maher*,
106 Ohio App. 465, 155 N.E.2d 471 (2nd Dist. 1957) .............................................................6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011); *accord United States v. Springer*,
262 F. App'x 703 (6th Cir. 2008) ..........................................................................................22

*Gonzales v. Raich*,
545 U.S. 1 (2005)....................................................................................................................19

*Grider Drug 1 & Grider Drug 2*;
77 FR 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012)...................................16

*Harris v. Purdue Pharma, L.P.*,
218 F.R.D. 590 (S.D. Ohio 2003) ..........................................................................................35

*Harris v. St. Vincent Med. Ctr.*,
205 F.3d 1340 (6th Cir. 2000) ................................................................................................32

*Hishon v. King & Spalding*,
467 U.S. 69 (1984).....................................................................................................................4

*Holiday CVS, L.L.C. v. Holder*,
839 F. Supp. 2d 145 (D.D.C.), *vacated and remanded on other grounds*, 493 F. App'x 108
(D.C. Cir. 2012) ......................................................................................................................14

*Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*,
77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) .................................................18

*In re Asbestos Sch. Litig.*,
46 F.3d 1284 (3d 1994) ...........................................................................................................31

*In re Nat'l Prescription Opiate Litig. ("Blackfeet")*,
No. 1:17-CV-02804, 2019 WL 2477416 (N.D. Ohio Apr. 1, 2019),
*report and recommendation adopted in relevant part*, No. 1:17-MD-2804, No. 1:17-md-2804,
2019 WL 3737023 (N.D. Ohio June 13, 2019) ........................................................................1

*In re Nat'l Prescription Opiate Litig. ("Broward")*,
No. 1:17-MD-2804, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020).........................................1

*In re Nat'l Prescription Opiate Litig. ("Summit Cuyahoga")*,
No. 1:17-MD-2804, 2019 WL 4261460 (N.D. Ohio Sept. 09, 2019)........................................1

*In re Nat'l Prescription Opiate Litig. ("West Boca")*,
No. 1:17-MD-2804, 2020 WL 1669655 (N.D. Ohio Apr. 3, 2020)........................... 1, 2, 34, 36

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-md-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019)............................. 2, 34, 36

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-md-2804, 2019 WL 3917575 (N.D. Ohio Aug. 19, 2019) ........................... 13, 15, 27

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-md-2804, 2019 WL 6628898 (N.D. Ohio Dec. 19, 2018).......................................33

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-md-2804, 2019 WL 871539 (N.D. Ohio Feb. 21, 2020) ............................... 2, 32, 34

*In re Nat'l Prescription Opiate Litig.*,
    406 F. Supp. 3d 672 (N.D. Ohio 2019) ..................................................................................28

*In re Nicole Gas Prod., Ltd.*,
    581 B.R. 843 (B.A.P. 6th Cir. 2018)........................................................................................5

*In re Opioid Litig.*,
    No. 400000/2017 (N.Y. Sup. Ct., Suffolk Cty. Apr. 9, 2020).................................................20

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*,
    14 C 1748, 2018 WL 305503 (N.D. Ill. Jan. 6, 2018).............................................................32

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*,
    181 F. Supp. 3d 278 (E.D. Pa. 2016) .....................................................................................32

*In re Welding Fume Prod. Liab. Litig.*,
    1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) .............................................31

*Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*,
    881 F.3d 823 (11th Cir. 2018) ........................................................................................17, 23

*Leibreich v. A.J. Refrigeration, Inc.*,
    617 N.E.2d 1068 (1993) ..........................................................................................................35

*Little v. Purdue Pharma, L.P.*,
    227 F. Supp. 2d 838 (S.D. Ohio 2002)...................................................................................35

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
    211 F. Supp. 2d 567 (E.D. Pa. 2002) .....................................................................................23

*Mann v. Northgate Investors, L.L.C.*,
    138 Ohio St.3d 175, 5 N.E.3d 594 (2014)................................................................................6

*Medic-Aid Pharmacy*,
    55 Fed. Reg. 30,043, 1990 WL 328750 (Dep't of Justice July 24, 1990).........................16, 23

*Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*,
    300 F. App'x 409 (6th Cir. 2008) ..........................................................................................16

*Moroccanoil, Inc. v. Groupon, Inc.*,
    278 F. Supp. 3d 1157 (C.D. Cal. 2017)..................................................................................23

*Nottke v. Norfolk S. Ry. Co.*,
    264 F. Supp. 3d 859 (N.D. Ohio 2017) ..................................................................................28

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Peters Family Farm, Inc. v. Sav. Bank*,
 No. 10CA2, 2011 WL 497476 (Ohio Ct. App. 4 Dist.  Jan. 28, 2011) .................................... 9

*Ralph J. Bertolino Pharmacy, Inc.*,
 55 Fed. Reg. 4,729, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990) ............................ 16, 23

*S & S Pharmacy, Inc.; Denial of Registration*,
 46 FR 13051-03 (Dept. of Justice, Feb. 13, 1981) .................................................................. 18

*Seley v. G. D. Searle & Co.*,
 423 N.E.2d 831 (1981) ..................................................................................................... 34, 35

*State ex rel. Morris v. Sullivan*,
 81 Ohio St. 79, 90 N.E. 146 (1909) ........................................................................................ 6

*State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.*,
 619 N.E.2d 2 (Ohio App. 1st Dist. 1992), *cause dismissed*,
 613 N.E.2d 648 (Ohio 1993) ................................................................................................ 28

*Streater v. Cox*,
 336 Fed. App'x 470 (6th Cir. 2009) ........................................................................................ 4

*Strother v. Hutchinson*,
 423 N.E.2d 467 (1981) ........................................................................................................ 32

*Superior Pharmacy*,
 81 Fed. Reg. 31310-01, 2016 WL 2866659 (D.E.A. May 18, 2016) .................................... 23

*Swierzkiewickz v. Sorema N.A.*,
 534 U.S. 506 (2002) ............................................................................................................... 4

*Taylor v. City of Cincinnati*,
 55 N.E.2d 724 (Ohio 1944) ............................................................................................. 27, 28

*Taylor v. Webster*,
 231 N.E.2d 870 (1967) ........................................................................................................ 35

*The Medicine Dropper*;
 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011) ........................... 16

*Thompson v. Ford*,
 128 N.E.2d 111 (1955) ........................................................................................................... 8

*Townwood Pharmacy*;
 63 Fed. Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998) ................................. 16

*Tracy v. Merrell Dow Pharm., Inc.*,
 569 N.E.2d 875 (1991) ........................................................................................................ 35

*Trollinger v. Tyson Foods, Inc.*,
 370 F.3d 602 (6th Cir. 2004) .................................................................................................. 4

**TABLE OF AUTHORITIES**

(continued)

**Page**

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965) ............................................................................................... 31

*United Prescription Services, Inc. Revocation of Registration*,
   72 FR 50397-01 (DEA Aug. 31, 2007) ........................................................... 17, 20

*United States v. Ahmad*,
   No. 4:15CV-181-JM, 2016 WL 11645908 (E.D. Ark. May 2, 2016),
   *aff'd sub nom. United States v. United Pain Care, Ltd.*,
   747 F. App'x 439 (8th Cir. 2019) .................................................................... 18

*United States v. Cap Quality Care, Inc.*,
   486 F. Supp. 2d 47 (D. Maine 2007) ............................................................. 17

*United States v. City Pharmacy, LLC*,
   No. 3:16-cv-24, 2016 WL 9045859 (N.D. W.Va. Dec. 19, 2016) ................. 17

*United States v. Clinical Leasing Serv., Inc.*,
   925 F.2d 120 (5th Cir. 1991) ........................................................................... 17

*United States v. Holloway*,
   731 F.2d 378 (6th Cir. 1984) ........................................................................... 22

*United States v. Mahmud*,
   541 F. App'x 630 (6th Cir. 2013) .................................................................... 23

*United States v. Moore*,
   423 U.S. 122 (1975) ......................................................................................... 19

*United States v. Poulin*,
   926 F. Supp. 246 (D. Mass. 1996) .................................................................. 17

*United States v. Prince*,
   214 F.3d 740 (6th Cir. 2000) ........................................................................... 23

*United States v. Ramos-Atondo*,
   732 F.3d 1113 (9th Cir. 2013) ......................................................................... 23

*United States v. Reichert*,
   747 F.3d 445 (6th Cir. 2014) ........................................................................... 22

*United States v. Robinson*,
   No. 12-20319-CIV, 2012 WL 3984786 (S.D. Fla. Sept. 11, 2012) ............... 18

*United States v. Salman*,
   618 Fed. App'x. 886 (9th Cir. 2015) ............................................................... 23

*United States v. Stidham*,
   938 F. Supp. 808 (S.D. Ala. 1996) ................................................................. 18

*United States v. Yi*,
   704 F.3d 800 (9th Cir. 2013) ........................................................................... 23

## TABLE OF AUTHORITIES
(continued)

**Page**

**Statutes**

21 C.F.R. § 1301.71(a) .................................................................................................. passim

21 C.F.R. § 1301.72 ............................................................................................................. 14

21 C.F.R. § 1301.75 ............................................................................................................. 14

21 C.F.R. § 1306.03 ...................................................................................................... 3, 12, 16

21 C.F.R. § 1306.04 ................................................................................................. 3, 12, 16, 21

21 C.F.R. § 1306.04(a) ......................................................................................................... 16

21 U.S.C. § 802(21) ............................................................................................................. 14

21 U.S.C. § 812(b)(2) ........................................................................................................... 29

21 U.S.C. § 822 ................................................................................................................... 12

21 U.S.C. § 823 ................................................................................................................... 12

21 U.S.C. § 829 ................................................................................................................... 12

21 U.S.C. § 841 ................................................................................................................... 12

21 U.S.C.A. § 824(d) ........................................................................................................... 13

82 Fed. Reg. at *51438 .......................................................................................................... 15

Ohio Rev. Code § 4729.35 ................................................................................................... 2, 6

Ohio Rev. Code § 4731.341 ..................................................................................................... 9

Ohio Rev. Code § 4734.49 ...................................................................................................... 9

Ohio Rev. Code §§ 4729.07-4729.24 ......................................................................................... 9

Ohio Rev. Code Ann. § 2307.76(C) .......................................................................................... 34

**Rules**

Fed. R. Civ. P. 8(a) ............................................................................................................. 37

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ..................................................................................... 9

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Lake and Trumbull County, Ohio [hereinafter Plaintiffs], file this memorandum in opposition to the Pharmacy Defendants' Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6).[1]

As this Court is well aware, these joined cases are bellwether actions in this MDL which will test Plaintiffs' claims against the Pharmacy Defendants arising from their distribution and dispensing practices, and in particular these Defendants' potential liability for absolute public nuisance under Ohio law for that conduct.  This Court has previously upheld nearly identical public nuisance claims based on the Pharmacies' distribution practices in the face of both motions to dismiss and motions for summary judgment.[2]  Defendants do not seek to relitigate those rulings at this time.[3]  For that reason, the present motion primarily, though not exclusively, raises issues concerning the viability of Plaintiffs' claims based on the Pharmacy Defendants' dispensing practices.  This Court has also already three times upheld similar dispensing claims against motions

---

[1] Defendants refer to Plaintiffs' complaints as the "Second Amended Complaints": the complaints are Plaintiffs' "Supplemental and Amended Allegations to be Added to 'Short Form for Supplementing Complaint and Amending Defendants and Jury Demand'."  *See* Dkt. # 3326 (Trumbull County); Dkt. # 3327 (Lake County). Because the two bellwether complaints filed by the Counties contain nearly identical allegations, for convenience, Defendants elected to cite to Lake only.  Pharm. Memo. at 1, and Plaintiffs here follow suit [hereinafter "FAC"].

[2] *See, e.g.*, *In re Nat'l Prescription Opiate Litig. ("Broward")*, No. 1:17-MD-2804, 2020 WL 1986589, at *6-8 (N.D. Ohio Apr. 27, 2020); *In re Nat'l Prescription Opiate Litig. ("West Boca")*, No. 1:17-MD-2804, 2020 WL 1669655, at *17-18 (N.D. Ohio Apr. 3, 2020); *In re Nat'l Prescription Opiate Litig. ("Blackfeet")*, No. 1:17-CV-02804, 2019 WL 2477416, at *9-18 (N.D. Ohio Apr. 1, 2019), *report and recommendation adopted in relevant part,* No. 1:17-MD-2804, No. 1:17-md-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019); *In re Nat'l Prescription Opiate Litig. ("Summit Cuyahoga")*, No. 1:17-MD-2804, 2019 WL 4261460 (N.D. Ohio Sept. 09, 2019).

[3] The Pharmacy Defendants do include a section in their memorandum incorporating by reference their briefing from the prior Track One motions solely for the purpose of preserving those arguments for appellate review.  Pharmacy Defendants' Brief at 30-31 [hereinafter Pharm. Memo]. Plaintiffs correspondingly include a section below, *see infra* Part V, incorporating their prior briefs for the same purpose.

to dismiss, including once under Ohio law, *see In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3737023, at *6 (N.D. Ohio June 13, 2019) (*Muscogee*); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 871539, at *28 (N.D. Ohio Feb. 21, 2020) (*Cleveland Bakers*; Ohio law); *In re Nat'l Prescription Opiate Litig.* ("*West Boca*"), No. 1:17-md-2804, 2019 WL 1669655, at *7 (N.D. Ohio Apr. 3, 2020)  (*West Boca Med. Center*); and should do the same here.[4]

In their motion, the Pharmacy Defendants assert four distinct arguments for dismissing these claims.  None has merit.

First, Defendants argue that the Plaintiff Counties may not pursue a public nuisance claim for abatement or damages at common law based on their "failure to detect and prevent the diversion of drugs of abuse," because the Ohio legislature implicitly repealed that cause of action through its enactment of Ohio Rev. Code § 4729.35.  Section 4729.35 creates a statutory public nuisance claim in such circumstances, the remedy for which is limited to injunctive relief.  But nothing in the text or legislative history of Ohio Rev. Code § 4729.35 suggests a legislative intent to do away with other equitable and common law claims for public nuisance or their corresponding forms of relief.  And it is a fundamental principle of statutory construction in Ohio that "the General Assembly will not be presumed to have intended to abrogate a common-law rule unless the language used in the statute clearly shows that intent."  *Carrel v. Allied Products Corp.,* 78 Ohio St.3d 284, 1997-Ohio-12, 677 N.E.2d 795 (1997).

Second, the Pharmacy Defendants argue that, unlike with respect to their distribution activities involving opioids, the federal Controlled Substances Act imposes no duties whatsoever

---

[4] As the Court is aware, many of these same Defendants were the litigants in these listed cases with the same ability and incentive to raise arguments there as they have here.

on them—as opposed to the pharmacists they employ—with respect to their dispensing of drugs. But that is incorrect, as both the courts and the Drug Enforcement Administration ("DEA") have repeatedly made clear.  The CSA imposes two sets of dispensing duties on Defendants.  21 C.F.R. § 1301.71(a) requires all registrants under the Act, including most of the Defendant entities, to "provide effective controls and procedures to guard against theft *and diversion* of controlled substances; contrary to Pharmacy Defendants' argument, this requirement is in no way limited to in-store physical security against theft.  In addition, 21 C.F.R. §§ 1306.03 and 1306.04 require that controlled substances be dispensed only pursuant to a legitimate prescription, which the DEA has construed to require that prescriptions not be filled unless and until "red flags" indicative of diversion have been resolved.  Both courts and the DEA have repeatedly held that this requirement applies to corporate entities as well as the licensed pharmacists in their employ.  *See infra,* § II. Plaintiffs expressly allege that the Pharmacy Defendants violated these CSA duties.

This same authority provides half of the answer to Defendants' third argument, that Plaintiffs have failed to allege any unlawful or intentional culpable conduct, a requirement for absolute public nuisance liability under Ohio law.  As just explained, Plaintiffs have most certainly alleged unlawful conduct in violation of the CSA.  Moreover, as explained below, Plaintiffs also sufficiently allege that the Pharmacy Defendants' conduct was intentional.  Allegations concerning investigations and enforcement actions to which the Pharmacy Defendants were subjected, further establishes their knowledge that that conduct was unlawful, rendering their noncompliance intentional.

Finally, as this Court has previously held, Plaintiffs sufficiently allege that Defendants' conduct was a proximate cause of the public nuisance in Lake and Trumbull Counties.  The Pharmacy Defendants nevertheless advance a meritless argument that Ohio's "learned

intermediary" doctrine somehow breaks the chain of causation.  This cannot be so for at least two reasons.  First, the learned intermediary doctrine is a principle of products liability law that holds that a drug manufacturer satisfies its duty to warn by warning the plaintiff's prescribing physician; the doctrine has no application to the Counties' public nuisance claims.  Equally important, the Pharmacy Defendants offer no explanation—nor, logically, could they—for how a physician's decision to write a prescription, which necessarily precedes the pharmacy's actions in filling it, could possibly break the causal link between the pharmacies' conduct and the harm to the Counties.

Because none of the Pharmacy Defendants' arguments for dismissing Plaintiffs' claims have any merit, the motion to dismiss should be denied.

## LEGAL STANDARD

When ruling upon a motion to dismiss filed under Rule 12(b)(6), a court must accept as true all the factual allegations contained in the complaint, but need not accept conclusions of law as true.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *accord Streater v. Cox*, 336 Fed. App'x 470, 474 (6th Cir. 2009).  Under Rule 8(a)(2), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court "may dismiss a complaint for failure to state a claim 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Swierzkiewickz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## ARGUMENT

I.  **Plaintiffs' Common Law Public Nuisance Actions Have Not Been Abrogated**

This Court has previously upheld Plaintiffs' public nuisance claims seeking abatement and/or damages for economic loss against the Manufacturer, Distributer, and Pharmacy Defendants based on its analysis of Ohio law on multiple motions to dismiss and summary judgment, including those previously asserted by these Pharmacy Defendants.  *See, e.g.,* Dkt. # 1203, at 26-28.

Nevertheless, the Pharmacy Defendants now argue, for the first time in this MDL, that Plaintiffs' public nuisance claims are—in their entirety—"*precluded by Ohio Rev. Code § 4729.35, which permits only injunctive relief*[.]"  Pharm. Memo at 3.  But nothing in the text or purpose of R.C. § 4729.35 suggests the Ohio legislature also intended to eliminate all other equitable and common law public nuisance causes of action and all other forms of relief (e.g., abatement, restitution, damages), when it created this new statutory cause of action.  Nor has any Ohio court ever interpreted R.C. § 4729.35 or any other statute in R.C. Chapter 4729 to have abolished any common law or equitable causes of action.  Defendants' position is untenable and does not comport with fundamental principles of statutory construction or Ohio case law.

***First***, R.C. § 4729.35 does not expressly abrogate any common law or equitable causes of action or forms of relief, nor does any other statute in R.C. Chapter 4729.  This is fatal to Defendants' position.

The well-established rule of statutory construction is that: "A court construing a statute should not presume that a legislature intended to repeal settled rules of common law unless the statutory language clearly expresses or imports such intention.  Instead, '***statutes are presumed to embrace the common law extant at their enactment***.'"  *In re Nicole Gas Prod., Ltd.*, 581 B.R. 843, 850 (B.A.P. 6th Cir. 2018) (quoting *Mann v. Northgate Investors, L.L.C.,* 138 Ohio St.3d 175,

5 N.E.3d 594, 598–99 (2014) (emphasis added)); *see also State ex rel. Morris v. Sullivan*, 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus (1909) ("Statutes are to be read and construed in the light of and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the Legislature will not be presumed or held to have intended a repeal of the settled rules of the common law, unless the language employed by it clearly expresses or imports such intention."); *Frantz v. Maher*, 106 Ohio App. 465, 471–72, 155 N.E.2d 471, 476 (2nd Dist. 1957) ("An intention of the General Assembly to abrogate common-law rules must be manifested by express language.  There is no repeal of the common law by mere implication.").[5]

Here, R.C. § 4729.35 is three sentences long.[6] In the first sentence it declares any violation of any law or regulation controlling the distribution of drugs of abuse to be a *per se* public nuisance.

---

[5] The Court is already familiar with this rule of construction based on its prior consideration of whether the Ohio Products Liability Act superseded common law product liability claims.  In *Carrel*, the Ohio Supreme Court stated "According to principles of statutory construction, the General Assembly will not be presumed to have intended to abrogate a common-law rule unless the language used in the statute clearly shows that intent.  Thus, in the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force."  *Carrel v. Allied Products Corp.,* 78 Ohio St.3d 284, 277, 1997-Ohio-12, 677 N.E.2d 795, 798 (1997) (citing *State ex rel. Morris v. Sullivan*, 81 Ohio St. 79, 90 N.E. 146 (1909).  Thus, as this Court recognized, the court in *Carrel* held that without an express abrogation provision, "the common-law action of negligent design survives the enactment of the Ohio Products Liability Act."  Dkt. # 1203, at 23 (quoting *Carrel*, at 799).  Of course, the Ohio legislature later amended the OPLA to add an express abrogation provision.  In interpreting the scope of the abrogation provision, this Court held: "The subsequent amendments make clear that any civil action concerning liability for a product due to a defect in design, warning, or conformity—including any common law public nuisance or common law negligence claim, regardless of how styled—that 1) seeks to recover compensatory damages 2) for 'harm' is abrogated by the OPLA.  Conversely, a claim *not* seeking to recover compensatory damages or seeking to recover solely for 'economic loss' (i.e. *not* 'harm') does not meet the definition of a product liability claim and is not abrogated by the OPLA."  Dkt. # 1203, at 25.

[6] The full text of R.C. § 4729.35 reads: "The violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code or the commission of any act set forth in division (A) of section 4729.16 of the Revised Code, is hereby

In the second, it grants authority to the Attorney General, county prosecutors, and the Board of Pharmacy to bring an action under the statute to immediately stop such conduct.  In the third, it specifies the proper venue for such an action.

The language of the statute is plain and unambiguous.[7] As such, any extra-textual "inquiry into legislative intent, legislative history, public policy, the consequences of an interpretation, or any other factors identified in R.C. 1.49 is inappropriate[.]"  *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16 (2013).  There is simply no language in the statute that suggests (no less "clearly expresses") a legislative intent to abolish any part of the common law.

Furthermore, there is no conflict between R.C. § 4729.35 and Plaintiffs' public nuisance actions.  There is nothing inconsistent between, on the one hand, a statute that grants authority to certain governmental entities to enjoin violations (even technical ones) of the controlled drug laws, and, on the other hand, equitable and common law public nuisance actions that allow for abatement and recovery of economic damages if violations of the controlled drug laws create a significant and unreasonable interference with a public right.

Thus, because it does not contain an express abrogation provision, R.C. § 4729.35 does not abrogate Plaintiffs' public nuisance causes of action.

---

declared to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance.  The attorney general, the prosecuting attorney of any county in which the offense was committed or in which the person committing the offense resides, or the state board of pharmacy may maintain an action in the name of the state to enjoin such person from engaging in such violation.  Any action under this section shall be brought in the common pleas court of the county where the offense occurred or the county where the alleged offender resides."

[7] Ambiguity is not determined in light of "the facts and circumstances" of each case, but rather "ambiguity in a statute exists only if *its language* is susceptible of more than one reasonable interpretation."  *Dunbar v. State*, 136 Ohio St.3d 181, 2013-Ohio-2163, 992 N.E.2d 1111, ¶ 16 (2013) (emphasis in original).

**Second**, the cases cited by Defendants are inapposite.  The rule of *Thompson v. Ford* is that if a statute gets specific enough in prescribing a course of conduct, it indicates a legislative intent that the statutory standard of care is to replace the common law standard of care.  128 N.E.2d 111, 116 (1955).  In *Thompson*, the statute at issue provided specific and detailed requirements for what kind of lights a person must have on their car if they park on the street at night.[8] The court noted that not all statutes which set forth a statutory standard of care will replace the common law standard of care.  *Id.* at 115 ("In Ohio, driving faster than certain speeds constitutes prima facie evidence of an unlawful rate of speed, but one driving under such rate could still be guilty of negligence in driving at an unreasonable speed because of the conditions surrounding him at the time of the driving.").  However, the court held that the statute regarding lights on parked cars at nighttime was sufficiently detailed that it replaced the common law reasonable person standard of care, such that a "violation of the statute makes the violator guilty of negligence per se[,]" and compliance with the statute, "absolves one from liability for claimed negligence in failing to display lights."  *Id.* at 116.  But this holding did not *abolish* any common law causes of action or remedies.  Thus, *Thompson* in no way supports the Defendants' claims that R.C. § 4729.35 abolished Plaintiffs' claims by implication.

Defendants also cite a string of cases involving the "codification" of the common law.[9] The rule in those cases is that when the legislature intends to codify the common law, "the codification

---

[8] "[T]he General Assembly has said that if you park at night you must have a white light visible from a distance of 500 feet to the front and a red light visible from a distance of 500 feet to the rear, but you need display no light upon your vehicle if you park within a municipality where there is sufficient light to reveal any person or substantial object within a distance of 500 feet upon the highway."  *Thompson*, 128 N.E.2d 111, 115.

[9] *See, e.g., Bolles v. Toledo Trust Co.*, 58 N.E.2d 381, 392 (Ohio 1944); *Alotech, Ltd. v. Huntington Nat'l Bank*, No. 1:13-CV-01971-DAP, 2014 WL 281973, at *3 (N.D. Ohio Jan. 24, 2014); *Amzee Corp. v. Comerica Bank-Midwest,* No. 01AP–465, 2002 WL 1012998, at *9 (Ohio Ct. App. 10

of law typically displaces and precludes the common-law that precedes it." *Alotech, Ltd. v. Huntington Nat'l Bank*, No. 1:13-CV-01971-DAP, 2014 WL 281973, at *3 (N.D. Ohio Jan. 24, 2014). But R.C. Chapter 4729 is not a "codification" of prior existing common law.[10] Indeed, almost all the statutes contained in R.C. Chapter 4729 have no counterpart in the common law. Instead, they deal with the formation and organization of the Board of Pharmacy and the procedures for regulating and licensing professional pharmacists and pharmacies. *See, e.g.*, R.C. §§ 4729.07-4729.24 (relating to the registration of pharmacists with the State Board of Pharmacy).

There are 66 other chapters in Title 47 ("Occupations—Professions"), which establish similar regulations and/or regulatory boards for other occupations and professions.[11] Some of those chapters even contain a statute almost identical to R.C. § 4729.35, which declares certain violations of law to be a *per se* public nuisance, and authorizes the attorney general, the country prosecutor, or the relevant board to enjoin the conduct. *See, e.g.*, R.C. § 4731.341 (physicians); R.C. § 4734.49 (chiropractors). It would be absurd to claim the Ohio legislature has codified the common law and *impliedly* abolished common law causes of action related to the conduct of all of these occupations and professions (e.g., medical malpractice actions).

---

Dist. May 21, 2002); *Peters Family Farm, Inc. v. Sav. Bank*, No. 10CA2, 2011 WL 497476, at *3 (Ohio Ct. App. 4 Dist. Jan. 28, 2011).

[10] "Codification" means "The process of compiling, arranging, and systematizing the laws of a given jurisdiction, or of a discrete branch of the law, into an ordered code." CODIFICATION, Black's Law Dictionary (11th ed. 2019).

[11] Including but not limited to: Accountants (Ch. 4701); Architects (Ch. 4703); Attorneys (Ch. 4705); Auctioneers (Ch. 4707); Barbers (Ch. 4709); Debt Adjusting (Ch. 4710); Commission Merchants (Ch. 4711); Cosmetologists (Ch. 4713); Dentists, Dental Hygienists (Ch. 4715); Embalmers, Funeral Directors, and Crematory Facility Operators (Ch. 4717); Telephone Solicitors (Ch. 4719); Innkeepers (Ch. 4721); Home Construction Service Law (Ch. 4722); Nurses (Ch. 4723); Optometrists, Dispensing Opticians (Ch. 4725); Pawnbrokers (Ch. 4727); Precious Metal Dealers (Ch. 4728); etc.

Furthermore, Defendants conspicuously avoid trying to explain which portion of the common law was codified by R.C. Chapter 4729 or the exact scope of the common law which they argue has been displaced by the "codification" (e.g., are they claiming all common law causes of action related to the dispensing of dangerous drugs are abrogated or just public nuisance claims?; are they claiming only corporate pharmacies are immune from Plaintiffs' causes of action or are others immune as well?). Defendants cannot do so because R.C. Chapter 4729 is not a codification of existing common law, and thus does not displace the common law at all.[12]

## II. The Counties Properly Allege that Defendants' Dispensing Practices Were Unlawful

Defendants next argue that their dispensing practices were not unlawful because, they contend, the CSA imposes no dispensing duties on them and because Plaintiffs have not alleged particular instances of pharmacists filling illegitimate prescriptions for which they may be held liable. Defendants are wrong on both counts: the CSA imposes duties not only on pharmacists and pharmacies, but on their corporate parents as well, and Plaintiffs need not identify particular illegitimate prescriptions in order to allege, and prove, that Defendants' dispensing practices failed to comply with those duties.

### A. The CSA Imposes Duties on Pharmacists, Pharmacies, and Their Corporate Parents

Defendants argue that the CSA imposes duties only on pharmacists, not on pharmacies or their parent companies. Pharm. Memo at 16. This is not the case, as the DEA and various courts

---

[12] To the extent Defendants rely on the out-of-state trial court opinion in *Delaware v. Purdue Pharma L.P.*, No. N18C-01-223, 2019 WL 446382, *11 (Del. Sup. Ct. Feb. 4, 2019) for support of an obstacle preemption argument, the Court should reject such argument. First, the court in *Delaware v. Purdue Pharma L.P.*, held that the plaintiffs' *negligence* claims were1 preempted by state and federal regulation, but did not hold plaintiffs' public nuisance claims were preempted (dismissing those claims on other grounds). Second, this Court "has previously rejected this obstacle preemption argument" with respect to the FDA and the DEA, *see* Dkt. # 2565, at 22, and should reject an obstacle preemption argument based on Ohio state law.

have repeatedly made clear in sanctioning pharmacies and pharmacy parent corporations because of improper dispensing practices at their stores.  Indeed, Defendants' argument cannot be right.  If it were, corporate pharmacy parents could knowingly conspire with drug dealers and/or rogue doctors to fill prescriptions they know to be illegitimate *and simply conceal from their pharmacists the facts necessary to determine that the prescriptions or prescribers are illegitimate.*  Under Defendants' construction of the CSA, no one would be liable in that situation—not the unwitting pharmacist, duped by his or her own employer, and not a corporate parent that intentionally facilitated diversion, who, according to Defendants, has no obligations under the CSA whatsoever. As demonstrated below, however, the CSA does not permit the owner-operator of a pharmacy to ignore or conceal information in its possession indicative of diversion thereby preventing its own pharmacists from using that information in making their dispensing decisions.  Rather, because Defendants collect and use this information in their own marketing practices to increase sales, they are obliged, under the CSA, to use the information to detect illegitimate prescriptions and maintain effective controls against diversion.  They are, at a minimum, precluded from willfully turning a blind eye to rampant diversion occurring through their pharmacy stores.

### B.    The CSA Requires All Registrants to Maintain Effective Controls against Diversion

The CSA is a comprehensive statutory scheme enacted in 1970 to combat drug abuse.  It was designed to create a "closed system" for the supply of dangerous drugs to the public and to control against the diversion of those drugs for non-medical use.  In order to ensure that controlled substances are handled, throughout the supply chain, by those accountable for preventing diversion, the CSA requires anyone who manufactures, distributes, or dispenses controlled substances to register with the DEA, the agency charged with enforcement of the CSA.  21 U.S.C. § 822.  The DEA is required to grant registration only where it is able to conclude that such

registration is consistent with the public interest.  21 U.S.C. § 823.  It is unlawful for *any* person knowingly to manufacture, distribute, or dispense controlled substances other than in accordance with the requirements of the CSA and its implementing regulations.  21 U.S.C. § 841.  Thus, in exchange for the privilege of trading in these dangerous substances, registrants must comply with the statutory and regulatory regime designed to protect individuals and communities from the predictable consequences of uncontrolled supply of these drugs.  Moreover, even entities that are not registered may not dispense (or manufacture or distribute) other than in accordance with the requirements of the statute, because the prohibitions of the CSA apply to "any person."

Pursuant to the CSA, the DEA has adopted regulations that govern the behavior of those who manufacture, distribute or dispense controlled substances.  These regulations include the requirement, applicable to all registrants, to provide effective controls against diversion, 21 C.F.R. § 1301.71(a), as well as the requirement, applicable in the dispensing context to all dispensers, whether registrants or not, to ensure that only legitimate prescriptions are filled, 21 C.F.R. §§ 1306.03, 1306.04; *see also* 21 U.S.C. § 829 (requiring a prescription); § 822 (specifying that a valid controlled substance prescription may only be issued by an individual who is authorized to prescribe and is registered with the DEA).

Defendants argue that the requirement to maintain effective controls against diversion does not apply to pharmacies because 21 U.S.C. § 823 does not expressly require the DEA to consider the maintenance of effective controls in deciding whether or not to grant registration to a pharmacy.  This argument is wrong for two reasons.  First, regardless of whether § 823 requires the DEA to consider this factor, the DEA, in adopting § 1301.71(a) clearly and unequivocally has required *all* registrants to maintain such controls.  As this Court has previously recognized, Defendants must comply not only with the statute, but with the regulations promulgated under it.  *See In re Nat'l*

*Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3917575, at *7-8 (N.D. Ohio Aug. 19, 2019).[13]  Second, Defendants ignore that the CSA itself specifically provides that the "failure of [a] registrant to maintain effective controls against diversion or otherwise comply with the obligations of a registrant" is a ground for immediate suspension of *any* registration when that failure means that "there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension. . . ." 21 U.S.C.A. § 824(d);[14] *see also ChipRx L.L.C d/b/a City Center Pharm.*, 82 Fed Reg. 51,433, 51438 (DEA Nov. 6, 2017) (upholding immediate suspension of pharmacy's registration and noting "Registrant's failure to maintain effective controls against diversion or otherwise comply with the obligations of a registrant under the CSA").  Because § 824 permits the DEA to immediately suspend a pharmacy's registration for failure to maintain effective controls against diversion, Defendants' argument based on the absence of language in § 823 should be rejected.

Defendants recognize, albeit in a footnote, that DEA regulations require all registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances," *see* Pharm. Memo at 16-17 n.6 (*quoting* 21 C.F.R. § 1301.71(a)), but argue that "with respect to pharmacies, this regulation only imposes requirements for in-store physical security

---

[13] The Court may recall that certain defendants, including Walgreens, previously argued that § 823 is not the source of duties for anyone under the CSA, but rather simply a directive to the DEA. *See* Dkt. # 2159 at 1-2.  Their current position, that they owe no duties because § 823 *does* create such duties, but not for them, would seem to be at odds with their previous argument, while nonetheless disregarding the Court's prior ruling on this point.

[14] Although the clarifying definition of "imminent danger" needed to support immediate suspension was added in 2016, it is clear that the "failure of the registrant to maintain effective controls against diversion" in that definition refers to a pre-existing, not a new, duty, *see* § 824(d), and ratifies the DEA regulation that imposes that duty.  (The clause in § 824 that follows the language about the failure to maintain effective controls, "or *otherwise* comply with the obligations of a registrant" (emphasis added), removes all doubt that the maintenance of effective controls was understood by Congress to be among those obligations.)

controls. . . ."  *Id.* But § 1301.71 contains no such limitation.  The first sentence of the regulation is unequivocal:  "*All* applicants and registrants *shall provide effective controls and procedures to guard against* theft and *diversion of controlled substances*."  § 1301.71(a) (emphasis added); *see also Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 151 (D.D.C.), *vacated and remanded on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012) ("registered pharmacies must 'provide effective controls and procedures to guard against theft *and diversion* of controlled substances.'" (emphasis added)).  Had the DEA meant to say that *some* registrants must guard against both theft and diversion, while other registrants need only guard against in-store theft, it would have said so. Indeed, in other contexts, the DEA has differentiated among registrants, imposing certain requirements on manufacturers and wholesalers, on the one hand, and others on dispensers.  *See, e.g.*, 21 C.F.R. § 1301.72 ("Physical security requirements for non-practitioners"); 21 C.F.R. § 1301.75 ("Physical security controls for practitioners").[15]  It did not do so in § 1301.71(a).  Nor does the *ChipRx* case, cited above and by Defendants, support their position.  There, the DEA upheld the immediate suspension of a pharmacy's registration on multiple grounds.  Significantly, the Acting Administrator specifically cited § 824(d) and the "Registrant's *failure to maintain effective controls against diversion or otherwise comply* with the obligations of a registrant under the CSA" in affirming the immediate suspension. 82 Fed. Reg. at *51438 (emphasis added).  That much of the decision focuses on that particular pharmacy's failures relating to theft and record-keeping in no way suggests that a pharmacy's *only* obligations relate to in-store physical security.

Moreover, it is the essence of effective controls against diversion that a pharmacy have in place procedures to prevent the filling of suspicious prescriptions without proper investigation.

---

[15] The term "practitioner" includes physicians and pharmacies, *see* 21 U.S.C. § 802(21), but not manufacturers or wholesale distributors.

This Court has already held that the requirement to provide effective controls against diversion precludes distributors from shipping suspicious wholesale orders unless and until they have determined that such orders are not likely to be diverted. *See In re Nat'l Prescription Opiate Litig.*, No. 17-md-2084, 2019 WL 3917575 at *7 (N.D. Ohio, Aug. 19, 2019) (citing *Masters Pharm., Inc. v. DEA* ("*Masters II*"), 861 F.3d 206, 212 (D.C. Cir. 2017)). Indeed, the court was "hard-pressed to think of a more basic requirement." *Id.* The same is true for dispensing: just as distributors may not ship suspicious wholesale orders without performing due diligence, so too dispensers may not fill suspicious prescription orders without investigating and clearing red flags. Practically speaking, no "controls and procedures to guard against . . . diversion," 21 C.F.R. § 1301.71(a), can be effective if registrants are free to dispense prescriptions that are likely to be diverted in contravention of the CSA. For this reason, the Court can readily conclude that, as registrants,[16] Defendants had an obligation to put in place policies to ensure proper due diligence is conducted *before* filling prescriptions with indicia of diversion.[17]

## C.    The CSA Requires Defendants to Ensure that Only Legitimate Prescriptions Are Dispensed

Nor are Defendants correct that the specific dispensing duties found in the CSA are applicable only to doctors and pharmacists, but not to them. As noted above, 21 C.F.R. §§ 1306.03 and 1306.04 require that controlled substances be dispensed only pursuant to a legitimate prescription. The DEA has construed these regulations to include the requirement not to fill

---

[16] Plaintiffs recognize that not all of the Defendant entities are registrants. The duty to maintain effective controls applies to those that are. Those Defendants who are not registrants are, however, subject to the dispensing requirements discussed in II.C below.

[17] Defendants' discussion of § 1301.74(a)–(b) does not demonstrate otherwise. As this Court has already recognized in the context of the Distributors, the requirement of due diligence in the face of known red flags arises directly from the requirement of effective controls; it does not depend on a separate, more specific regulation.

prescriptions until "red flags" indicative of illegitimacy and diversion have been resolved.  *See, e.g.*, *Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008); *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (Dep't of Justice July 24, 1990) ("a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."); *East Main Street Pharmacy; Affirmance of Suspension Order*, 75 FR 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010) ("[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions.").[18]

Although the regulations place the initial responsibility for ensuring appropriate prescribing on physicians, they also recognize that pharmacists have a "corresponding obligation" to ensure that only legitimate prescriptions are filled.  21 C.F.R. § 1306.04(a).  Defendants recognize this "corresponding obligation," but argue that it applies to individual pharmacists alone. Courts and the DEA, however, have repeatedly rejected this argument.  "[W]hen § 1306.04(a) states that the person knowingly filling the prescription is subject to penalties, it contemplates liability for corporate entities as well."  *Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189 (E.D. Ky. Mar. 30, 2017).  Indeed, the *Appalachian Reg'l Healthcare* court found, "there is nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their

---

[18] *See also Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990); *Townwood Pharmacy*; 63 Fed. Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998); *Grider Drug 1 & Grider Drug 2*; 77 FR 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012); *The Medicine Dropper*; 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011); *Medicine Shoppe-Jonesborough*; 73 FR 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008).

role in issuing and filling invalid prescriptions." *Id.* at 1189-90. In *United Prescription Services, Inc. Revocation of Registration*, 72 FR 50397-01 (DEA Aug. 31, 2007), moreover, the DEA found that the Respondent, expressly defined as the pharmacy corporate entity, "repeatedly violated 21 CFR 1306.04(a) by filling numerous prescriptions that *it* had reason to know were issued by physicians who had not established valid doctor-patient relationships under the laws of various States." *Id.* at 50408 (emphasis added). This clear holding that the entity (and not a pharmacist) had violated the CSA based on knowledge available to the entity, refutes Defendants' argument that only a pharmacist can violate the dispensing provisions of the CSA.[19] A wealth of other authority demonstrates that pharmacies and corporate owners have been found responsible by courts and the DEA for violations of various provisions of the CSA.[20] Defendants offer no counterarguments to this authority, choosing instead to simply ignore it.

---

[19] It is significant that, in *United Prescription Services,* the DEA did not merely revoke the pharmacy entity's registration, but expressly stated that it had violated the CSA.

[20] *See Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 823 (11th Cir. 2018); *United States v. City Pharmacy, LLC*, No. 3:16-cv-24, 2016 WL 9045859, at *4 (N.D. W.Va. Dec. 19, 2016) ("[I]t is not a defense to liability in this case for [the pharmacy owner] to assert that he is shielded by the corporate form."); *United States v. Clinical Leasing Serv., Inc*., 925 F.2d 120, 122-23 (5th Cir. 1991) (affirming liability for corporate operator of clinic that illegally distributed controlled substances); *United States v. Poulin*, 926 F. Supp. 246, 249 (D. Mass. 1996) (owner and operator of pharmacy liable for filling illegitimate prescriptions); *United States v. Cap Quality Care, Inc*., 486 F. Supp. 2d 47, 54 (D. Maine 2007) (penalizing clinic for violation of methadone dispensing regulations); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786 (S.D. Fla. Sept. 11, 2012) (in enforcing record-keeping requirements of CSA, "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under [21 U.S.C. § 842(a)(5)], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (finding a shareholder of a pharmacy incorporated as a Subchapter S corporation to be an "owner" liable for record-keeping violations of the CSA); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996) (owner of clinic liable for CSA violations); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*, 77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) (upholding revocation of store registrations based in part on questions about how seriously the CVS entity that operates the retail stores "takes its responsibility to comply with federal law"); *S & S Pharmacy, Inc.; Denial*

The cases cited by Defendants for their contrary position do not support their argument.  In *Bob's Pharmacy and Diabetic Supplies; Revocation of Registration*, 74 FR 19599-03 ((DEA Apr. 29, 2009), the DEA revoked the registration of the *pharmacy entity* because of its repeated dispensing of prescriptions it knew or should have known were not legitimate.  Tellingly, the Deputy Administrator explained that "an *entity* which voluntary engages in commerce by shipping controlled substances to persons located in other States is properly charged with knowledge of the laws. . . ."  and that the respondent—that is, the pharmacy entity —"had ample reason to know that the prescriptions were unlawful under both the CSA and the laws of numerous States."  74 FR 19599-03, *19601.  Indeed, the case is devoid of any reference to the actions of any particular pharmacist.  *Edge Pharmacy; Decision and Order*, 81 FR 72092-03 (DEA Oct. 19, 2016), is similarly unhelpful to Defendants.  There, the Government proceeded against *a pharmacy* based on the actions of its pharmacists.  Nothing in the decision addresses the question whether the pharmacists were the only ones who could have violated the CSA.  The Acting Administrator's reference to the Government's burden with respect to the case it chose to put on, based on pharmacist conduct, in no way supports Defendants' assertion that neither pharmacies nor their owners may be found to have violated the CSA.

Defendants' argument that they have no dispensing duties is not only contrary to law, but illogical as well.  In suggesting that they have no duties under the CSA, Defendants ask this Court to find that the "closed system" carefully crafted by Congress is not closed at all, and that multi-billion dollar businesses that reap massive profits by dispensing opioids bear no responsibility for their dispensing activity.  This Court should reject such a radical and illogical view of the law.  *See*

---

*of Registration*, 46 FR 13051-03 (Dept. of Justice, Feb. 13, 1981) ("Congress did not intend to exempt pharmacies from the reach of the law merely because they may be organized along corporate lines as opposed to being sole proprietorships.").

*Gonzales v. Raich*, 545 U.S. 1, 12–13 (2005) ("The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. . . ."). As the United States Supreme Court has explained, when enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels." *United States v. Moore*, 423 U.S. 122, 135 (1975). This is especially true because, as alleged in the Complaints, it is Defendants, and not any individual pharmacists, that have the data needed to detect patterns of diversion, *see, e.g.*, FAC at ¶¶ 77, 149-55,  and it is Defendants that set the policies that determine whether and how prescriptions are dispensed, *see, e.g.*, *id.* at ¶¶ 77, 83-85, 205-12, 260-72, 316-28, 362-89, 405-33. It makes no sense to say that these Defendant dispensers, who control nearly half of the national, and more than two-thirds within the Plaintiffs' jurisdictions, market share for the dispensing of opioids, have no obligations with respect to dispensing at their stores, when it is Defendants that run the stores, set the policies, and have the ability to ensure compliance.

In this respect, the *United Pharmacy* case is especially instructive. In his decision, the Deputy Administrator describes an elaborate scheme in which doctors employed by a related entity would issue prescriptions for the Respondent pharmacy entity to fill, often without ever seeing the patient, while representatives of the Respondent also actively arranged with operators of websites that offered prescriptions based on telephonic consultations to have those prescriptions sent to Respondent to be filled. 72 FR 50397-01, *50398. The ALJ found that Respondent entity "knew the prescriptions were invalid and violated 21 CFR 1306.04(a) when it filled them." *Id.* Defendants propose that such a scheme is entirely lawful, and does not violate the CSA, so long as the entity that hires the conspiring doctors and contracts with the website is careful to hire unwitting pharmacists who do not know the origins of the prescriptions or have the information

needed to question their validity.  This Court can and should reject such an absurd construction of the CSA.[21]

### D.    The Counties Allege Defendants Violated Their Duties under the CSA

Defendants argue that, even if they have duties under the CSA, Plaintiffs have not alleged a violation of those duties because Plaintiffs have not identified a particular prescription filled by a pharmacist with knowledge that the prescription was illegitimate.  As the above discussion makes clear, however, that is not the test.

First, with respect to registrant Defendants, who are obligated under 21 C.F.R. § 1301.71(a) to maintain effective controls against diversion, there is no requirement of "knowledge" of any kind.  The failure of a registrant Defendant to maintain effective controls against diversion is, in and of itself, a violation of the statutory and regulatory scheme.  The requirement to maintain effective controls required Defendants, at a minimum, to make use of the information they already had in their possession in order to prevent illegitimate prescriptions from being filled.  In order to accomplish this, Defendants were required to adopt policies for analyzing and transmitting the information they had about red flags to those in the pharmacy stores who could use that information

---

[21] Elsewhere, Defendants have cited a New York decision that they contend insulates a corporate pharmacy parent from liability, but that case is of no help to them.  In *In re Opioid Litig*., No. 400000/2017 (N.Y. Sup. Ct., Suffolk Cty. Apr. 9, 2020), the New York trial court judge expressly declined to decide whether the CSA imposes obligations on companies that, like Defendants, own and operate chain pharmacies.  Instead, the court held that the New York plaintiffs had failed to demonstrate a basis, under New York law, on which to pierce the corporate veil between these entities and the retail stores they operate.  The Counties' claims here, however, do not turn on piercing the corporate veil between the Defendants and their stores.  Rather, the Counties allege that the Defendants breached their *own* duties under the CSA and that, under Ohio law, those breaches are sufficient to demonstrate unlawful conduct with respect to the creation of a public nuisance and to provide evidence that these defendants breached their duty of reasonable care. That the New York judge did not see the relevance, under New York law, of the Defendants' own violations of the CSA in no way demonstrates either that these defendants are free to ignore the strictures of the CSA or that that their violations are insufficient to support the Counties' claims under Ohio law.

to perform due diligence and make dispensing decisions based on the results of that due diligence. Defendants failed to adopt such policies, failed to make use of the information they had, failed to convey this information to those in their stores, and, indeed, adopted policies intended to impede their pharmacists from performing due diligence in the face of red flag prescriptions.  *See, e.g.*, FAC at ¶¶ 156-447.  Because no controls against diversion could be effective without due diligence, Defendants' failure to implement appropriate policies that would ensure that such diligence occurred constitutes a violation of the CSA.  It is not necessary for the Counties to identify particular prescriptions that were improperly filled:  the violation of § 1301.71(a) was complete when the registrant Defendants failed to set policies that would provide effective controls against diversion.

Section 1306.04, in contrast, does require that illegitimate prescriptions be "knowingly" filled.  But, because § 1306.04 imposes duties on Defendants—as discussed above—it is *Defendants'* knowledge, based on the information in their possession, not just that of their pharmacists, that is relevant here, and the Counties have sufficiently pled that knowledge.  Indeed, as discussed above, looking only to the knowledge of the pharmacist would simply encourage pharmacies and their owner to keep their pharmacists in the dark about suspicious prescriptions. Moreover, because Defendants have dispensing data from all of their stores, their knowledge is aggregate in nature.  Thus, the Counties' claim does not turn on improper dispensing of individual prescriptions by individual pharmacists, but rather on Defendants' willful failure to identify aggregate groups and patterns of dispensing indicative of diversion.  *See* FAC at ¶¶ 77, 104-107, 149-55.  By failing to put adequate policies and procedures in place to determine which prescriptions carried indicia of illegitimacy and diversion and to adopt policies to guard against

the filling of such prescriptions until the suspicions could be resolved, Defendants themselves run afoul of the CSA.[22]

Defendants acknowledge that "actual knowledge" is not required and that "willful blindness" is sufficient to establish that illegitimate prescriptions were "knowingly" filled, but they mischaracterize that standard.  Dkt. # 3340-1, at 20-21.  "Willful blindness" (also referred to as "deliberate ignorance") requires only that the defendant (1) subjectively believes that there is a "high probability that a fact exists" and (2) takes "deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011); *accord United States v. Springer*, 262 F. App'x 703, 706 (6th Cir. 2008) (willful blindness or deliberate ignorance where "the defendant was subjectively aware of a high probability of the existence of illegal conduct, and he purposely contrived to avoid learning of the illegal conduct"); *see also United States v. Reichert*, 747 F.3d 445, 450 (6th Cir. 2014) (affirming instruction explaining that "[n]o one can avoid responsibility for a crime by deliberately ignoring the obvious. . . ."); *United States v. Holloway*, 731 F.2d 378, 380 (6th Cir. 1984) (knowledge may be inferred from "proof that the defendant deliberately closed his eyes or her eyes to what would otherwise have been obvious to him or her"); Sixth Circuit Pattern Jury Instruction 2.09.

A defendant may be willfully blind when it fails to make further inquiry once suspicions are aroused, *United States v. Prince*, 214 F.3d 740, 760 (6th Cir. 2000), or to investigate "under circumstances where a reasonable person would make further inquiries."  *United States v. Salman*, 618 Fed. App'x. 886, 890 (9th Cir. 2015) (citing *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013); *United States v. Yi*, 704 F.3d 800, 804-05 (9th Cir. 2013); *see also United*

---

[22] Because the Counties do not seek to hold Defendants liable for the torts of their pharmacists, but rather for their own violations of the CSA, Defendants' discussion of vicarious liability is entirely inapposite.

*States v. Mahmud*, 541 F. App'x 630, 635 (6th Cir. 2013) (evidence supported finding of willful blindness where defendant avoided scrutinizing the files in order to avoid learning about underlying fraud). Willful blindness is also inferred where the defendant has been notified of its violations but continues unlawful activities. *See Moroccanoil, Inc. v. Groupon, Inc.*, 278 F. Supp. 3d 1157, 1164-65 (C.D. Cal. 2017); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002).

More specifically, in the context of the CSA, pharmacists and pharmacies have been deemed willfully blind and, therefore, liable, when—as Defendants did here—they ignore high volumes of red-flag orders or other dispensing irregularities plainly present in their data. *See, e.g., Medic-Aid Pharmacy*, 55 Fed. Reg. 30043-01, 30043-44 1990 WL 328750 (July 24, 1990); *Ralph J. Bertolino*, 55 Fed. Reg. 4729-01 1990 WL 352775; *Jones Total Health Care Pharm., LLC*, 881 F.3d 823, 832; *E. Main St. Pharmacy*, 75 Fed. Reg. 66149-01, 2010 WL 4218766 (D.E.A. Oct. 27, 2010). *Superior Pharmacy*, 81 Fed. Reg. 31310-01, 2016 WL 2866659 (D.E.A. May 18, 2016), on which Defendants rely, is not to the contrary. There, the Acting Administrator found that merely filling isolated "red flag" prescriptions might not be sufficient to establish the scienter requirement, but, critically, he also held that "where there are multiple red flags, none of which alone would establish the requisite scienter, the combination of red flags may well create a subjective belief that there is a high probability that a prescription lacks a legitimate medical purpose," *id*. at n. 54,  which would support an inference of "willful blindness" sufficient to establish scienter. He also recognized that failure to identify red flags and conduct due diligence were appropriate bases for revocation. *Id*.

The Plaintiff Counties have sufficiently pled that Defendants were willfully blind to the filling of illegitimate prescriptions at their stores. Indeed, the gravamen of Plaintiffs' complaints

is that Defendants had extensive data in their possession that would have revealed patterns of illegitimate prescribing, but refused to use that data in order to detect such prescribing, or to permit their pharmacists to use it, even as they themselves used the very same information to evaluate productivity and increase sales. *See* FAC at ¶ 77 (Defendants "had direct knowledge of patterns and instances of improper distribution, prescribing, sale, and use of prescription opioids in communities throughout the country, and in the County in particular"; Defendants failed to use their data to stop diversion, but used it for their own purposes); ¶ 81 ("Defendants systemically ignored red flags that they were fueling a black market"); ¶ 106 (chain pharmacies are in a position to use aggregated information on all prescriptions filled at the chain in order to examine "patterns" of opioids and other high-risk drugs and target "inappropriate prescribing), ¶ 153(describing detailed information in the possession of each of the Defendants); ¶ 199 ("CVS failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs."); ¶ 202 ("CVS knew, or deliberately turned a blind eye, to its pharmacies' role in diversion of dangerous drugs" and describing information available to it); ¶ 204 ("CVS has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but CVS chose not to utilize this information . . ."); ¶ 213 ("Although Walgreens had visibility into red flags of diversion due to its vertically integrated distribution and dispensing practices, it failed to take these factors into account. . . ."); ¶ 264 (Walgreens corporate attorney suggested, in reviewing the legitimacy of prescriptions coming from Florida, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance"); ¶ 285 ("Walgreens knew the flood of pills being supplied into Florida were being diverted into Ohio."); ¶ 287 ("Walgreens

had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in Ohio. . . .  Such data are a valuable resource that Walgreens could have used to help stop diversion, but it did not."); ¶ 288 ("Walgreens, by virtue of its data analytics, was actually aware of indicia of diversion . . . [but] Walgreens ignored these obvious red flags"); ¶ 310 ("Rite Aid funneled far more opioids into Ohio and the County than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders"); ¶ 311 ("Rite Aid, by virtue of the data available to it, was actually aware of indicia of diversion. . . . [but] Rite Aid ignored these obvious red flags"); ¶ 333 ("Rite Aid has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but Rite Aid failed to utilize this information to effectively prevent diversion"); ¶¶ 370-377 (describing information to which Walmart had access, but that it declined to use to prevent diversion); ¶ 384 ("Walmart's national corporate office not only failed to insist that Walmart implement adequate controls against diversion, they ignored concerns raised by Walmart pharmacists"); ¶¶ 400-404 (despite possession of detailed data, Giant Eagle failed to analyze or make use of that data to prevent diversion); ¶ 408 ("Giant Eagle . . . conspired with McKesson to circumvent any meaningful limit on distribution to its pharmacies"); ¶ 631 ("Defendants intentionally and unreasonably distributed, dispensed, and sold opioids that Defendants knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes").

That is the essence of willful blindness.  But Plaintiffs' allegations go further.  Plaintiffs also allege that Defendants were put on notice of the diversion occurring at their stores, and still failed to take steps to stop that diversion.  *See id.* at ¶ 145 ("DEA took Walgreens 'to the woodshed' over its dispensing cocktail drugs and opioids to questionable out of state customers, customers with the duplicate diagnoses, young people, and customers only paying cash.  Many of these same

red flags were highlighted in the 2009 Walgreens Order to Show Cause and resulting 2011 Memorandum of Agreement ("MOA").");  ¶ 497 ("CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ").  It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.");  ¶¶ 498-512 (describing enforcement actions against CVS that put it on notice);  ¶¶ 514-528 (describing enforcement against Walgreens that put it on notice);  ¶¶ 530-534 (describing enforcement against Rite-Aid that put it on notice);  ¶¶ 378-387 535-537 (describing enforcement actions that put Walmart on notice). And Plaintiffs also allege that Defendants actually took steps to make it *harder* for their own pharmacists to detect and stop diversion.  *See id.* at ¶¶ 413-433.

Together, these allegations are more than sufficient to plead the requisite level of knowledge to establish violations of DEA's dispensing regulations.

## III.    **Plaintiffs Sufficiently Allege that Defendants Created an Absolute Public Nuisance Through their Unlawful and Intentional Conduct.**

Defendants next contend that the "Counties have failed to adequately allege any unlawful or intentional culpable conduct, as required to state a claim for absolute public nuisance under Ohio law[,]" and that their claims "fundamentally sound in negligence and—as a result—are antithetical to the absolute nuisance doctrine."  Pharm. Memo at 2, 23.  These arguments are without merit.

First, as just discussed, Plaintiffs sufficiently allege that Defendants' conduct was unlawful.  "Where conduct involves the violation of law resulting in a civil wrong or harm, strict or absolute liability is applied."  *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 728 (Ohio 1944).

Defendants do not dispute that, in their role as distributors of controlled substances, they are required by law to maintain "effective controls against diversion[,]" and "design and operate" systems to identify "suspicious orders of controlled substances."  Pharm. Memo at. 16.  Indeed, this Court has previously held that the CSA requires registrants, including distributors, to: (i) "design and operate a system to disclose to the registrant suspicious orders;" (ii) "inform the DEA of suspicious orders when discovered by the registrant[;]" and (iii) decline to ship suspicious orders "unless due diligence reasonably dispels the suspicion." *In re Natl. Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3917575, at *7, 9 (N.D. Ohio Aug. 19, 2019).  Moreover, as explained above, in their role as dispensers of controlled substances, Defendants are required by law to provide effective controls against diversion and not to dispense illegitimate prescriptions.  *See supra*, at § II.  The Complaints are replete with allegations that Defendants, through their distribution and dispensing conduct, violated these statutory and regulatory obligations.  *See, e.g.*, FAC at ¶¶ 74-433, 495-544, 556-562, 620, 626, 629-630, 632.  Thus, Plaintiffs have sufficiently alleged unlawful conduct to support their absolute public nuisance claims.

Plaintiffs also sufficiently allege that Defendants' conduct was intentional.  As this Court previously noted, in the context of an absolute public nuisance, "intentional" conduct "'means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance.'" *In re Nat'l. Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 675 (N.D. Ohio 2019) (quoting *Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 863 (N.D. Ohio 2017)).  In other words, "'[w]here the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies." *Id.* (quoting *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944)).  Here, as detailed below, Plaintiffs

allege that: (i) in order to increase their Schedule II controlled substances business and maximize profits, Defendants deliberately facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market; and (ii) the opioid epidemic was a necessary consequence of their intentional conduct.  *See, e.g.*, FAC at ¶¶ 1-3, 9-15, 74, 78, 81, 96, 572, 620-622, 630-637.[23]

Defendants knew that the opioids they were distributing and/or dispensing had "a high potential for abuse" that could lead to severe psychological or physical dependence" (21 U.S.C. § 812(b)(2); FAC at ¶¶ 63, 67, 96, 119, 633), and thus knew that the diversion of opioids would create a public health hazard.  *See, e.g.*, FAC at ¶¶ 73, 79-80, 90-96, 115-20, 126, 129, 134-35, 150, 222, 293, 524, 542, 622, 634.  Despite this knowledge, Defendants were determined to increase their opioid sales as much as possible.  *See, e.g.*, *id.* at ¶¶ 3, 74, 78, 81, 85, 210, 240, 264, 316, 322, 325, 380, 432, 454, 459-60, 470, 478, 496, 522, 569, 600, 602, 606.  Implementing effective controls against diversion and ensuring that illegitimate prescriptions were not filled was antithetical to that goal.  So Defendants took steps to ensure the flow of opioids would continue unimpeded.

---

[23] Defendants cite *State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.*, 619 N.E.2d 2 (Ohio App. 1st Dist. 1992), *cause dismissed*, 613 N.E.2d 648 (Ohio 1993), for the proposition that an absolute public nuisance claim cannot be based on lawful, regulated, and licensed conduct.  Pharm. Memo at 24 n.11 & 25.  Of course, as previously mentioned, the Counties allege that Defendants' conduct was unlawful.  Moreover, *Schoener* is factually distinguishable as it was decided in the specific context of nuisance claims against solid waste disposal facilities.  619 N.E.2d at 6 ("[W]e hold that in order for a duly licensed and regulated sanitary landfill to be found liable for maintaining a nuisance, negligence must be established.").  In a case more factually analogous to this one, however, the Ohio Supreme Court held that the fact that the distribution of firearms is highly regulated and legislatively authorized does not preclude a public nuisance claim against handgun manufacturers and distributors related to their alleged conduct in marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal market.  *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 (Ohio 2002) (refusing to dismiss plaintiff's absolute and qualified public nuisance claims).

For example, some Defendants chose not to have any SOM system during much of the relevant time period. *See, e.g.*, *id.* at ¶¶ 159-67, 178-80, 237, 301, 334-36, 346-47, 391. Others designed and implemented their SOM systems in such a way that they would not identify all, or even most, suspicious orders. *See, e.g.*, *id.* at ¶¶ 168-74, 215-18, 226, 232-35, 239-42, 295-300, 307, 310, 312, 337-41, 348-49, 358, 392-95. Even when suspicious orders were identified, Defendants often chose not to report them to regulators. *See, e.g.*, *id.* at ¶¶ 10, 184, 194, 198, 221-31, 236, 243, 248-49, 252-53, 274, 281, 283, 296-99, 304-06, 308, 310, 312, 342-43, 352, 354, 356, 358, 397, 399, 401, 518, 630. They also distributed suspicious orders to their retail stores without first conducting sufficient due diligence to determine whether those orders were likely to be diverted. *See, e.g.*, *id.* at ¶¶ 176-79, 182-83, 185, 194, 198-200, 219-20, 223, 225, 235-36, 238, 242-49, 252, 254-57, 281, 295-99, 308, 312, 342-45, 347, 354, 356, 358, 394, 396-97, 401, 630. At the retail pharmacy level, they deliberately implemented dispensing and compensation policies that discouraged or hindered their pharmacists from performing due diligence on suspicious prescriptions. *See, e.g.*, *id.* at ¶¶ 82-85, 209210, 260-64, 316, 322-27, 377-79, 385-87, 413-33, 471, 522, 630. And they refused to provide their pharmacists with the training, resources, or feedback necessary to ensure dispensing compliance. *See, e.g.*, *id.* at ¶¶ 82-85, 209, 260-65, 269-72, 316-19, 321-22, 326, 377-79, 384-87, 389, 423, 432, 486.

Defendants also knew diversion was occurring but deliberately chose to do nothing to prevent it. They were selling, distributing, and dispensing far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses. *See, e.g.*, *id.* at ¶¶ 10, 77, 86, 88, 188, 192-93, 195-97, 202-03, 279-80, 282-83, 292, 309-10, 328-32, 351-52, 355-56, 365-369, 398-99, 409-12, 497, 565-67. They had extensive distribution and dispensing data demonstrating patterns and instances of improper distribution, prescribing, and use of opioids.

*See, e.g.*, *id.* at ¶¶ 74, 77, 103-04, 106-07, 109, 149-55, 174, 201-04, 213-14, 286-88, 310-11, 320-21, 329, 332-33, 345, 355-57, 361, 364, 368-76, 378-90, 399-400, 555.  They eagerly utilized such data to improve their marketing efforts and boost sales, but refused to utilize that same data to prevent diversion.  *See, e.g.*, *id.* at ¶¶ 74, 77, 199, 202-04, 211, 213-14, 240, 245, 287-91, 310-13, 321, 333, 345, 352, 357-61, 388-90, 399-404.  Instead, they deliberately ignored red flags and other dispensing and distribution irregularities plainly present in such data and continued to fill suspicious orders and prescriptions.  *See, e.g.*, *id.* at ¶¶ 74, 81, 156, 196-97, 201-04, 210, 261, 264, 270-72, 278, 283-85, 288-92, 306, 310-16, 332, 352-53, 357-58, 360-61, 367, 369, 380-82, 386-87, 390, 399-407, 410, 531-32, 535, 569, 630.

Defendants were also subject to investigations and enforcement actions, or parties to settlements, in which they were informed of diversion or sanctioned for their failures to prevent diversion; so they knew that their conduct was unlawful.  *See, e.g.*, *id.* at ¶¶ 145-46, 164, 178, 181, 222-23, 247-49, 264-66, 380-83, 406, 414, 419, 481, 495-544.  Despite these repeated warnings and sanctions, Defendants continued to facilitate and encourage the oversupply and diversion of their opioids.  *See, e.g.*, *id.* at ¶¶ 17, 188-91, 177,[24] 217-18, 224-25, 251-58, 261-62, 267-68, 270-72, 383-87, 419, 486, 488, 490, 497-511, 528, 530, 534, 539-43.  Indeed, knowing they would all benefit from the increased sales and impeded regulation of opioids, Defendants actively worked together and with others, through contractual agreements, meetings, and trade associations, to achieve those goals.  *See, e.g.*, *id.* at ¶¶ 121-27, 185-87, 273-77, 303-07, 408, 434-78, 600-06.  They intentionally misled regulators and the public regarding their purported efforts to prevent diversion and actively sought to undermine and evade the regulation of opioids so they could keep

---

[24] On p. 53 of the FAC, there is a paragraph between ¶ 191 and ¶ 192 that has mistakenly been numbered ¶ 177.

pumping their opioids into communities across the country.  *See, e.g.*, *id.* at ¶¶ 3, 185, 396, 434-47, 479-94, 603-05.

Contrary to Defendants' assertions (Pharm. Memo at p. 26), the Counties do not seek to hold them liable based on their lobbying activity.[25]  However, as this Court has previously recognized (Dkt. # 3058 (*Nunc Pro Tunc* Evidentiary Order) at 51-52), Defendants' lobbying activities are still relevant to demonstrate their intent, motive, and/or knowledge.  *See, e.g.*, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965); *In re Welding Fume Prod. Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) (citing *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016)).

Accordingly, the allegations in the Complaints sufficiently plead that Defendants created an absolute public nuisance through their unlawful and intentional culpable conduct.

## IV.    <u>Plaintiffs Have Adequately Pled Proximate Causation</u>

Finally, Defendants argue that Ohio's "learned intermediary" doctrine bars any finding of proximate cause as a matter of law.  This argument too is without merit.

Ohio courts define proximate cause as the "natural and continuous sequence [that] produces a result which would not have taken place without the act. . . ."  *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (1981).  As this Court has previously observed, "[a]n injury is the natural and probable consequence of an act if it could have been foreseen or reasonably anticipated from the

---

[25] For this reason, *In re Asbestos Sch. Litig.*, 46 F.3d 1284 (3d 1994), is inapposite.  *Id.* at 1290-94 (former manufacturer of asbestos products could not be held civilly liable for wrongful conduct committed by trade association or its members where there was no evidence manufacturer's actions taken in relation to the trade association were specifically intended to further such wrongful conduct).

alleged negligent act . . . It is not necessary that a defendant anticipate a plaintiff's particular injury. Instead, it is sufficient that the defendant's act is likely to result in injury to someone." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 871539, at *13 (N.D. Ohio Feb. 21, 2020) (applying Ohio law) (internal citations and quotations omitted).  Intervening acts, including criminal acts, do not constitute superseding causes if they were foreseeable.  *See Harris v. St. Vincent Med. Ctr.*, 205 F.3d 1340 (6th Cir. 2000) (applying Ohio law).  Ultimately, however, questions of proximate cause are typically left to the trier of fact, except in the rare case where no facts alleged justify "any reasonable inference" of causation.  *See Brondes Ford, Inc. v. Habitec Sec.*, 38 N.E.3d 1056, 1086 (Ohio Ct. App. 2015).

Plaintiffs' Complaints more than adequately meet this standard.  Plaintiffs' 200-plus page Complaints detail how Defendants "contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and take steps to halt suspicious orders and sales . . ."  FAC at ¶ 10.  Defendants "failed to put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market," instead "put[ting] in place policies that required and rewarded speed and volume over safety . . ."  *Id.* at ¶¶ 83-85. Pharmacies were aware that the quantity of opioids they distributed and dispensed "was untenable, and in many areas patently absurd," yet failed to take meaningful measures to investigate and ensure compliance with anti-diversion controls.  *Id.* at ¶ 86.

Plaintiffs further allege how such conduct directly, predictably, and foreseeably "caused prescriptions and sales of opioids to skyrocket in Plaintiff's community, flooded Plaintiff's community with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and the residents of

Plaintiff's community." *Id.* at ¶¶ 621 13, 88, 114, 636.  Such "conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public," and has "produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's community." *Id.* at ¶¶ 622-23.  It has also directly caused Plaintiffs to incur significant costs relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.  *See id.* at ¶ 625.

This Court has, again and again, found substantially similar allegations sufficient to overcome a motion to dismiss on proximate cause grounds.  As Defendants themselves observe, in CT1-A, this Court applied Ohio law in finding that Summit County had adequately pled proximate causation against Manufacturers and Distributors (including Chain Pharmacies).  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 6628898 (N.D. Ohio Dec. 19, 2018).  In the Tribal Case Track, the Court once again rejected similar causation arguments, finding that Muscogee had adequately pled its distribution and ***dispensing*** claims against Chain Pharmacies.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3737023, at *6 (N.D. Ohio June 13, 2019).  This year, this Court again applied Ohio law to reject Pharmacy Defendants' motions to dismiss third party payer ***dispensing*** and distribution claims.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 871539, at *28 (N.D. Ohio Feb. 21, 2020).  Most recently, the Court rejected Pharmacy Defendants' arguments to dismiss Plaintiff West Boca Medical Center, Inc.'s distribution and ***dispensing*** claims on proximate cause grounds.  *See In re Nat'l Prescription Opiate Litig.* (*"West Boca"*), No. 1:17-md-2804, 2019 WL 1669655, at *7 (N.D. Ohio Apr. 3, 2020).  Here, Plaintiffs' theory of proximate causation is equally plausible, and there is no compelling reason for this Court to depart from its previous rulings.

Despite this Court's clear proximate cause rulings, Defendants invoke the "learned intermediary doctrine," arguing that under that doctrine, "the intervening conduct of prescribing medical professionals breaks the causal chain as a matter of law." *See* Pharm. Memo at 26.  In Ohio, the "learned intermediary" doctrine, both at common law and in statute, is a doctrine of products liability law that establishes that a "manufacturer satisfies his duty to warn of dangers associated with use of the product by providing adequate warnings to the medical profession, and not the ultimate user." *Seley v. G. D. Searle & Co.*, 423 N.E.2d 831, 839 (1981); *see also* Ohio Rev. Code Ann. § 2307.76(C).  Cobbling together a patchwork of cherry-picked excerpts from four cases, Defendants brazenly contend that such protection extends to public nuisance claims against Defendants' dispensing conduct here.  In so doing, Defendants argue that a prescriber's alleged unlawful conduct is—as a matter of law—a superseding cause sufficient to insulate Pharmacies from their own reckless and unlawful dispensing related conduct.

Defendants' arguments are misguided and unavailing.  As an initial matter, the learned intermediary doctrine is limited to personal injury, failure-to-warn cases against drug manufacturers and ***has never been applied by an Ohio court outside this context***.  The rule "has its origins in Comment k to § 402A of the Second Restatement, which itself concerns strict product liability." *Little v. Purdue Pharma, L.P.*, 227 F. Supp. 2d 838, 850 (S.D. Ohio 2002); *see also Seley*, 423 N.E.2d 831 (Ohio 1981) (adopting learned intermediary rule in strict liability, products liability context).  But even in the personal injury, failure-to-warn context, courts in Ohio have declined to extend learned intermediary protection to pharmacies.  *See, e.g.*, *Little*, 227 F. Supp. 2d at 850.  Here, Plaintiffs do not pursue failure-to-warn or personal injury claims, and Defendants are not drug manufacturers; the doctrine simply has no conceivable bearing on this case.  All of

Defendants' cited cases involve personal injury, failure-to-warn claims against manufacturers, and are therefore inapplicable.[26]

But even more fundamentally, Defendants' have failed to articulate (nor could they) how third-party conduct (a physician writing a prescription) which necessarily ***preceded*** Defendants' dispensing-related conduct could act as a superseding cause sufficient to cut off Defendants' liability for that conduct.  The Ohio Supreme Court has explained that "[t]he causal connection of the ***first act*** of negligence is broken and superseded by the ***second***, *only if the intervening negligent act is both **new and independent***."  *Leibreich v. A.J. Refrigeration, Inc.*, 617 N.E.2d 1068, 1071 (1993) (emphasis added).  The Ohio Supreme Court has also clearly explained that an "intervening event" is "where the original negligence of the defendant is ***followed by*** the independent act of a third person."  *Taylor v. Webster*, 231 N.E.2d 870, 872–73 (1967) (emphasis added); *see also Berdyck v. Shinde*, 613 N.E.2d 1014, 1024–25 (1993) ("A break will occur when there intervenes ***between*** an agency creating hazard and an injury resulting therefrom . . .") (emphasis added).  Here, by contrast, any misconduct by physicians in writing opioid prescriptions occurred before Defendants' conduct in filling those prescriptions and thus could not interrupt the causal chain.  Defendants' argument concerning superseding causes is nonsensical, has no basis in Ohio law, and should be rejected.

Most importantly, ***this Court has, on at least two separate occasions, rejected the same dispensing-related, learned intermediary arguments Defendants advance here***.  In the *Muscogee* case, this Court rejected Defendants' arguments—and its reliance on arguably more supportive

---

[26] *See, e.g.*, *Seley*, 423 N.E.2d 831 (Ohio 1981) (learned intermediary doctrine applied in personal injury, failure to warn context); *Tracy v. Merrell Dow Pharm., Inc.*, 569 N.E.2d 875 (1991) (same); *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590 (S.D. Ohio 2003) (class action, medical monitoring claims against manufacturers).

case law[27]—that the learned intermediary doctrine precluded dispensing claims. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at *5. The Court also rejected Defendants' efforts to limit its proximate cause ruling in *Summit* (relating to distribution and manufacturing conduct), reasoning that "the extent to which Pharmacies knew about and took advantage of Manufacturers' alleged scheme to deceive doctors is a question of fact . . ." *Id.* Here, Plaintiffs not only allege that Defendants took advantage of false and misleading messages, but also that they ***worked in concert*** with marketing Defendants to disseminate these messages. *See, e.g.*, FAC at ¶¶ 454-78. Most recently, in the *West Boca* case, this Court again rejected learned intermediary arguments made by dispensers, finding that doctrine's application was even less warranted than in *Muscogee*. *In re Nat'l Prescription Opiate Litig.* ("*West Boca*"), No. 1:17-md-2804, 2019 WL 1669655, at *7 (N.D. Ohio Apr. 3, 2020).

It is clear that Plaintiffs have adequately pled a "short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to overcome a motion to dismiss based on proximate causation. *See* Fed. R. Civ. P. 8(a). "[P]roximate cause is a question of fact for the jury," *Brondes Ford, Inc.*, 38 N.E.3d at 1086, and this case is no exception. Defendants' strained and convoluted arguments to the contrary are baseless, have never been accepted by an Ohio Court, and have already been rejected by this Court.

## V.     Defendants Offer No Reason for this Court to Depart from its Prior Rulings.

Defendants close their brief by incorporating by reference arguments in prior briefings that this Court has previously rejected in Case Track One. *See* Pharm. Memo at 30-31. Defendants do not reargue any of these issues, nor offer the Court any reason to revisit its prior rulings; they

---

[27] There is a single Oklahoma case which has extended the learned intermediary doctrine to Pharmacies. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at *6.

simply "incorporate the Track One briefing to preserve those arguments for appellate review." *Id.*
at 30.  Therefore, to ensure a complete record for appeal, Plaintiffs Lake and Trumbull Counties
here incorporate by reference Track One plaintiffs' prior briefing on these same issues.  *See* Dkt.
# 654 (Opp. to Defs.' Motion to Dismiss); Dkt. # 2171 (Opp. to Defs.' Motion for Summary
Judgment on Preemption); Dkt. # 2179 (Opp. to Defs.' Motion for Summary Judge on Statute of
Limitations); Dkt. # 2203 (Opp. to Defs.' Motion for Summary Judgment on Causation).

## CONCLUSION

Defendants have offered no valid reasons for dismissing the Counties' Amended
Complaints.  For the foregoing reasons, their motion to dismiss the complaints should be denied.

Dated: July 2, 2020                   Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

/s/ Joseph F. Rice
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

/s/ Paul T. Farrell, Jr.
Paul T. Farrell, Jr., Esq.
FARRELL LAW
422 Ninth Street, 3rd Floor
Huntington, WV 25701
(304) 654-8281
paul@farrell.law

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &
LIBER 1001 Lakeside Avenue
East, Suite 1700 Cleveland, OH
44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank Gallucci
Plevin & Gallucci Company, L.P.A.
55 Public Square
Suite 2222
Cleveland, Ohio 44113
(216) 861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and Trumbull County, Ohio*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of July, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF System.

*/s/Peter H. Weinberger*
Peter H. Weinberger

*Plaintiffs' Liaison Counsel*