# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-d-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**WALGREENS' MOTIONS *IN LIMINE***

Walgreen Co. and Walgreen Eastern Co. ("Walgreens") hereby submit the following

three motions *in limine*.[1]

## I.     Motion No. W-1: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen

Walgreens moves *in limine* to preclude plaintiffs from offering evidence or argument

about Walgreens' equity ownership interest in AmerisourceBergen (ABDC).

Plaintiffs bring claims against Walgreens based solely on allegedly improper distribution

of prescription opioid medications.  Walgreens has not distributed prescription opioid

medications into the Track One counties since 2014.  More recently, Walgreens has relied on

ABDC as its distributor for controlled substances.

In summary judgment briefing, plaintiffs argued for the first time that Walgreens'

"malfeasance" continued beyond 2014 through a "partnership" with ABDC because Walgreens

owns "more than 26%" of ABDC's stock and is considered "a related party" under SEC rules.

Dkt. No. 2190/2205 at 12-13.  Walgreens anticipates that plaintiffs will suggest at trial that

Walgreens exerts control or influence over ABDC, and is therefore responsible for ABDC's

distribution conduct, by virtue of that ownership interest.  Any such suggestion would not be

merely misleading; it would be demonstrably false.  It would also be unduly prejudicial and

confusing to the jury, and would necessarily lead to a time-consuming side show on collateral

issues.  The Court should exclude it under Rules 402 and 403.

---

[1] To distinguish its motions from those filed by other defendants, Walgreens has numbered its motions W-1, W-2, and W-3.  Walgreens also joins the following MILs submitted by the distributor defendants: D-2, D-3, D-4, D-5, D-6, and D-8.

*First*, evidence of ownership is irrelevant and misleading because under the terms of the agreements pursuant to which Walgreens acquired its interest in ABDC, Walgreens is prohibited from exercising any control over ABDC. The Framework Agreement executed between Walgreens and ABDC expressly states that ABDC is ***not*** an "affiliate" of Walgreens—defined as a "person . . . that directly or indirectly . . . Controls, is Controlled by, or is under common Control with" another person. **Exhibit A** at 33. Control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of securities, by contract, management control, or otherwise." *Id.* at 34. Likewise, the AmerisourceBergen Shareholders Agreement, which resulted in Walgreens acquiring an equity stake in ABDC, contains strict Standstill Provisions that provide that Walgreens "shall not, directly or indirectly, . . . act, alone or in concert with others, to seek to Control or influence the management or the policies of the Company (for the avoidance of doubt, excluding any such act to the extent in its capacity as a commercial counterparty, customer, supplier, industry participant or the like)." **Exhibit B** at 12-14.

*Second,* evidence of ownership is irrelevant because the ***only*** claims against Walgreens are based on Walgreens' role as a distributor and ***not*** in any other capacity. In ruling on defendants' motions to dismiss, this Court noted that "Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids" and held that "the Retail Pharmacies may only be held liable as distributors." Dkt. No. 1203 at 2. Since Walgreens transitioned distribution of controlled substances to ABDC as its third-party vendor, any alleged "malfeasance" arising out of Walgreens' equity ownership in ABDC would go solely to distribution claims against ABDC and cannot possibly give rise to any claim against Walgreens. The Court should preclude any effort by Plaintiffs to confuse the jury on this issue. *See Sanco, Inc. v. Ford Motor Co.*, 771 F.2d 1081, 1087 (7th Cir. 1985) (affirming exclusion of

evidence that only supported a theory plaintiffs did not assert at trial); *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1217 (D. Kan. 2008), *aff'd*, 402 F. App'x 337 (10th Cir. 2010) (admissibility requires showing that evidence relates "to the plaintiff's circumstances and theory of the case").

        *Third*, allowing plaintiffs to offer evidence and argument about Walgreens' ownership interest in ABDC would be unfairly prejudicial to Walgreens and will lead to jury confusion by suggesting that Walgreens somehow bears (or shares) responsibility for the distribution conduct of another defendant. This would warrant exclusion even if Walgreens *did* control ABDC. *See U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."). The risk of prejudice and confusion is far greater where Walgreens' ownership does not involve any control.

        *Finally*, if such evidence and argument is not excluded, Walgreens will be forced to rebut any inference of control or influence by presenting evidence and testimony about the Framework Agreement, Shareholders Agreement, and Standstill Provisions. Such a distraction from the actual issues in these cases would be a manifest waste of the jury's limited time to consider and absorb an enormous evidentiary record in a matter of virtually unprecedented complexity. In addition, the Court has allotted defendants only 100 hours—just 12.5 hours to each of the remaining eight defendant families—for their *entire* defense, Dkt. No. 2594 at 1-2, leaving no time to waste on collateral issues like ABDC's corporate governance measures with respect to Walgreens' equity interest.

        For all of these reasons, the Court should exclude any reference to Walgreens' equity ownership interest in ABDC.

## II.     Motion No. W-2: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement

Walgreens moves *in limine* to preclude plaintiffs from offering evidence or argument

about a DEA enforcement action and administrative settlement agreement involving a single

Walgreens distribution center in Florida that last shipped controlled substances to Ohio in 2007.

Walgreens also moves to exclude reference to the $80 million Walgreens paid to the DEA to

settle the DEA's allegations while litigation was pending and before any adjudication of the

allegations by a court or other factfinder.

Plaintiffs allege that Walgreens improperly distributed prescription opioid medication to

its retail pharmacy stores in Cuyahoga and Summit Counties and thereby contributed to an

oversupply of opioids that caused them harm.  Given their near-exclusive reliance in their

complaint and summary judgment papers on allegations specific to Florida, it is apparent that

plaintiffs intend to argue that the unproven (and disputed) allegations in an Order to Show

Cause/Immediate Suspension Order issued to a Walgreens distribution center in Jupiter, Florida

("Florida OTSC") somehow show that Walgreens improperly distributed prescription opioid

medications in Ohio.[2]  Walgreens further anticipates that plaintiffs will suggest—and the jury

may infer—that Walgreens' settlement of DEA's allegations is an admission of fault.  Any such

evidence or argument would be irrelevant and improper.  Allowing plaintiffs to inject it into the

trial would be unfairly prejudicial to Walgreens and confusing to the jury.  It will lead to a

---

[2] Walgreens also moves to exclude evidence or argument about (1) Orders to Show Cause issued by DEA to six Walgreens pharmacies in Florida for alleged dispensing violations and (2) a 2011 settlement agreement involving alleged dispensing violations at a Walgreens pharmacy in California.  In addition to the other arguments set forth in this motion, plaintiffs do not assert any ***dispensing*** claims against Walgreens in Track One, further eliminating any relevance and dramatically increasing the risk of unfair prejudice and confusion.

lengthy trial-within-a-trial about issues that have nothing to do with plaintiffs' Ohio distribution claims. The Court should exclude it under Rules 402, 403, and 408.

**First**, this is exactly the kind of evidence that courts routinely reject under Rules 408 and 403. Rule 408 directly "bars the admission of settlement agreements when offered 'to prove or disprove the validity . . . of a disputed claim.'" *United States v. Tevis*, 593 F. App'x 473, 476 (6th Cir. 2014) (quoting Fed. R. Evid. 408). Under Rule 408, evidence of both the existence and content of prior settlement agreements is inadmissible to prove liability on a later civil claim. In *Hobart Corp. v. Dayton Power & Light Co.*, the court rejected plaintiffs' attempt to establish that the defendant had assumed certain liabilities because its corporate predecessor had made "admission[s]" in a settlement agreement resolving a separate case involving a different site. 2017 WL 5956911, *19-20 (S.D. Ohio Nov. 29, 2017). Because plaintiffs were "attempting to use evidence of a prior settlement agreement to establish . . . liability and prove the validity of a disputed . . . claim," the evidence was "inadmissible under Rule 408." *Id.* at *21. As the court explained, "making the content of prior settlement agreements available for use in related litigation contravenes the very purpose of Rule 408." *Id.*[3]

Evidence about settlement agreements is likewise inadmissible under Rule 403 as unduly prejudicial. As the Sixth Circuit has recognized, "the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800 (6th Cir. 2007). The same is true here. Were evidence of Walgreens' settlement with DEA admitted, the jury would likely conclude that

---

[3] Rule 408's clear bar on settlement evidence also serves to prevent the introduction of irrelevant evidence under Rule 402, since "disputes are often settled for reasons having nothing to do with the merits of a claim." *Korn, Womack, Stern & Assocs., Inc. v. Fireman's Fund Ins. Co.*, 27 F.3d 566, 1994 WL 264263, at *6 (6th Cir. 1994); *see also Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 480 (6th Cir. 2007) ("[A] settlement offer or the fact of settlement negotiations is not direct evidence regarding the factual issues in a case.").

Walgreens must have acted improperly if it paid a significant sum of money to resolve DEA's allegations, without ever determining whether plaintiffs have proved their actual claims in this case. No limiting instruction is sufficient to cure the resulting prejudice. *Id.* at 805 (rejecting the proposition "that any amount of evidence supporting liability, . . . coupled with a limiting instruction . . . is sufficient to cure the wrongful admission" of settlement evidence).

The Florida OTSC is similarly inadmissible. The document contains preliminary unproven allegations and improper legal conclusions, about a single distribution center in Florida, that were never tested in adversarial proceedings before an administrative law judge. These very same characteristics have led courts to reject the suggestion that government "investigation[s]" or "sanctions" against one member of a corporate family are "indicative of [wrongdoing] on a company-wide scale," *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014), and to hold that "an SEC enforcement action" is "not evidence of fraud, or even negligence or mistake," *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at \*11 (M.D. Pa. Dec. 7, 2016). The Florida OTSC "do[es] not prove that any of the conduct described therein actually occurred or, if it did occur, the conduct was [unlawful]." *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 923 (N.D. Ill. 2004). As for the Florida OTSC's legal opinions, "questions of law are not a proper subject for evidentiary proof." *Id.*; *see also* Dkt. No. 2494 (granting in part defendants' motion to exclude opinions of James Rafalski as legal conclusions).

***Second,*** the Florida OTSC and settlement agreement are irrelevant and misleading for a separate reason: plaintiffs have not established any evidentiary nexus, through expert testimony or otherwise, between distribution activity in Florida and either of the Track One counties. It is not disputed that the distribution center in Florida that was the subject of the Florida OTSC did not distribute any controlled substances to Ohio after January 2007—years before any of the

events in Florida that led to the Florida OTSC.  Unsurprisingly, Plaintiffs and their experts do not identify a single allegedly "suspicious order" shipped from Florida into either Cuyahoga or Summit County.  Even if they had, Plaintiffs have never identified any even remotely similar issues involving Walgreens stores in Cuyahoga or Summit County, much less in the relevant time period.  Any hypothetical connection is attenuated beyond the point of speculation.

Whether the policies and procedures at the distribution center in Florida were the same as at other Walgreens distribution centers does not change the analysis.  Plaintiffs will have to prove at trial what the systems were at the relevant distribution centers that shipped prescription opioid medications to Walgreens pharmacies in Track One during the relevant time period.  They will also have to demonstrate that the systems at the relevant distribution centers did not comply with the law.  The DEA's disputed opinions about whether the systems at a Florida distribution center violated the law—at a time when that distribution center was not shipping to the Track One counties—are neither relevant nor proper.  *See Chen*, 315 F. Supp. 2d at 923.

***Finally***, if the Court were to permit evidence and argument regarding the Florida OTSC and subsequent settlement, Walgreens would be forced to introduce the evidence necessary to rebut the DEA's allegations, requiring a whole trial in itself.  In fact, prior to settlement, the allegations in the Florida OTSC were set to be tried ***for 18 days*** in a hearing before an administrative law judge in agency proceedings with hundreds of exhibits and dozens of fact and expert witnesses specific to the circumstances in Florida.  *See* **Exhibit C** (Notice of Hearing in DEA ALJ Proceedings); *see also* **Exhibit D** (Government Prehearing Statement); **Exhibit E** (Walgreens Prehearing Statement).  To litigate these factual disputes now, years later, would be a massive distraction and misuse of the jury's time.  Moreover, with eight defendants remaining in the Track One trial, and only 100 hours for all defendants to put on their defense, Dkt. No. 2594 at 1-2, there is simply no time for evidence related to collateral issues in other states.

The Court should exclude all evidence and argument relating to DEA's OTSC and Walgreens' subsequent settlement agreement.

**III.**     **Motion No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man"**

Walgreens moves *in limine* to preclude evidence or argument suggesting that former DEA Deputy Administrator Joseph Rannazzisi's credibility or character is bolstered by the fact of his appearance on 60 Minutes, in articles published by the Washington Post, or in reporting by any other news organization. At deposition, plaintiffs' counsel repeatedly referred to Mr. Rannazzisi as the "60 Minute Man," going so far as to create a hand-drawn demonstrative "Roadmap" that started on "60 Minute Man Road," and continued from there to focus extensively on Mr. Rannazzisi's appearance on the television news program, as well as his interviews in the Washington Post. *E.g.*, **Exhibit F**, Rannazzisi Dep. 376:19-377:9; 396:11-399:6.

Walgreens anticipates that plaintiffs may seek to paint Mr. Rannazzisi as an honest whistleblower by virtue of these news appearances, including in opening statement. Such references would trade on the credibility of respected news organizations—and those organizations' purported commitment to finding and reporting the truth—to suggest that Mr. Rannazzisi is also credible by virtue of the fact that these organizations reported what he said. (By the same token, the fact that 60 Minutes or any news article criticized a company or individual should not be used to impeach that person.) That improperly invades the jury's role as factfinder to weigh the strength of the evidence. It also threatens to mislead and confuse the jury in a way that is prejudicial to Walgreens and other defendants. Any such evidence or argument should be excluded under Rule 403.

Dated:      September 25, 2019

Respectfully Submitted,

_/s/ Kaspar Stoffelmayr_____
Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

_Counsel for Walgreen Co. and Walgreen_
_Eastern Co._

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 25th day of September, 2019, the foregoing has been served

via CM/ECF to all counsel of record.

<u>*/s/ Kaspar J. Stoffelmayr*</u>
Kaspar J. Stoffelmayr

*Counsel for Walgreen Co. and Walgreen
Eastern Co.*

# EXHIBIT A

EXECUTION COPY

**FRAMEWORK AGREEMENT**
Dated March 18, 2013
by and among
**AMERISOURCEBERGEN CORPORATION,**
**WALGREEN CO.**
and
**ALLIANCE BOOTS GMBH**

[[3397517]]

# TABLE OF CONTENTS

**Page**

Article I

Warrants Issuance; Closing

1.1     Warrants Issuance ..................................................................................2
1.2     Closing ..................................................................................................2
1.3     Interpretation ........................................................................................3

Article II

Representations and Warranties

2.1     Disclosure .............................................................................................4
2.2     Representations and Warranties of the Company ...............................6
2.3     Representations and Warranties of Walgreens and Alliance Boots......11

Article III

Covenants

3.1     Efforts ................................................................................................13
3.2     Public Announcements ......................................................................17
3.3     Expenses .............................................................................................17
3.4     Sufficiency of Authorized Common Stock ......................................18
3.5     Pursuit of Other Opportunities .........................................................18
3.6     Non-Solicit .........................................................................................18
3.7     Financing Cooperation ......................................................................19

Article IV

Additional Agreements

4.1     Additional Equity Purchases .............................................................21
4.2     Acquisition for Investment ...............................................................24
4.3     Legend .................................................................................................24
4.4     Anti-takeover Provisions and Rights Plan .......................................25

Article V

Miscellaneous

5.1     Termination of This Agreement; Other Triggers ..............................25
5.2     Amendment ........................................................................................30

[[3397517]]

| | | |
|---|---|---|
| 5.3 | Waiver of Conditions | 30 |
| 5.4 | Counterparts and Facsimile | 31 |
| **5.5** | **Governing Law; Submission to Jurisdiction; WAIVER OF JURY TRIAL** | 31 |
| 5.6 | Notices | 31 |
| 5.7 | Entire Agreement, Etc | 33 |
| 5.8 | Definitions of "subsidiary" and "Affiliate" | 33 |
| 5.9 | Assignment | 34 |
| 5.10 | Severability | 34 |
| 5.11 | No Third Party Beneficiaries | 34 |
| 5.12 | Specific Performance | 34 |

## LIST OF ANNEXES

ANNEX A:        Shareholders Agreement

ANNEX B-1:      Form of Warrant 1

ANNEX B-2:      Form of Warrant 2

[[3397517]]

# INDEX OF DEFINED TERMS

| Term | Page |
|---|---|
| Additional Open Market Shares | 21 |
| Additional Opportunity | 18 |
| Affiliate | 31 |
| Aggregate Additional Open Market Shares | 21 |
| Agreement | 1 |
| Alliance Boots | 1 |
| AmerisourceBergen Drug | 1 |
| Anti-takeover Provisions | 10 |
| Antitrust Laws | 8 |
| Bankruptcy Exceptions | 8 |
| Beneficial Owner | 13 |
| Beneficial Ownership | 12 |
| Beneficially Own | 13 |
| Business Day | 4 |
| Closing | 2 |
| Commission | 5 |
| Common Stock | 1 |
| Company | 1 |
| Company Benefit Plan | 11 |
| Company Disclosure Letter | 6 |
| Company Stock Plans | 6 |
| Confidentiality Agreements | 30 |
| Control | 31 |
| Controlled | 31 |
| Controlling | 31 |
| conversion | 22 |
| convertible securities | 22 |
| Debt Financing | 20 |
| Designees | 21 |
| Effect | 4 |
| Exchange Act | 5 |
| FW JV | 1 |
| GAAP | 4 |
| Generic Pharmaceuticals Purchasing Services Agreement | 1 |
| Governmental Entity | 8 |
| HSR Act | 8 |
| HSR Filing Date | 13, 14 |
| Initial Antitrust Clearance | 15 |
| Initial Antitrust Filings | 14 |
| Initial Communications Materials | 17 |
| Initial Equity Transaction | 4 |
| Initial Filing Transaction | 14 |
| Initial Number | 22 |
| Initial Open Market Shares | 21 |

[[3397517]]

Investors ............................................................................................................. 4
IOMS Rights Holder ........................................................................................... 21
Key Company Employee ..................................................................................... 18
Key Walgreens/Alliance Boots Employee .......................................................... 19
Material Adverse Effect ........................................................................................ 4
Other Antitrust Clearance ................................................................................... 15
Other Antitrust Filings ....................................................................................... 14
Other Equity Transactions .................................................................................. 14
Permitted Transactions ....................................................................................... 22
Post-Issuance Adjustment ................................................................................... 22
Potential Repurchase Increase of Equity Percentage ............................................ 4
Preferred Stock ..................................................................................................... 6
Previously Disclosed ............................................................................................. 5
Purchase Approvals ............................................................................................. 12
Rx Distribution Agreement .................................................................................... 1
SEC Reports .......................................................................................................... 5
Second Equity Transaction ................................................................................... 4
Securities Act ........................................................................................................ 6
Shareholders Agreement ....................................................................................... 1
SOX ..................................................................................................................... 10
Subject Issuance ................................................................................................. 22
subsidiary ............................................................................................................ 30
Threshold Notice ................................................................................................. 23
Threshold Period ................................................................................................. 23
Transaction Documents ......................................................................................... 5
Transaction Litigation ......................................................................................... 16
Transaction Rights Agreement .............................................................................. 1
Ultimate Standstill Level ....................................................................................... 4
Walgreens .............................................................................................................. 1
Walgreens/Alliance Boots Material Adverse Effect ............................................ 12
Warrant 1 .............................................................................................................. 2
Warrant 1 Shares .................................................................................................. 2
Warrant 2 .............................................................................................................. 2
Warrant 2 Shares .................................................................................................. 2
Warrant 2 Transferability Event ......................................................................... 26
Warrant 2 Transferable Portion .......................................................................... 26
Warrant Shares ..................................................................................................... 2
Warrants ............................................................................................................... 2
Warrants Issuance ................................................................................................. 2
WBAD ................................................................................................................... 1

-iv-

**FRAMEWORK AGREEMENT**, dated March 18, 2013 (this "Agreement"), by and among AmerisourceBergen Corporation, a Delaware corporation (the "Company"), Walgreen Co., an Illinois corporation ("Walgreens"), and Alliance Boots GmbH, a private limited liability company incorporated under the laws of Switzerland, having its registered office at Baarerstrasse 94, CH 6300 Zug, Switzerland and registered in the Register of Commerce and Companies of the Canton of Zug under No.CH-170.4.007.953.1 ("Alliance Boots").

<div align="center">

**RECITALS:**

</div>

**WHEREAS**, subject to the terms and conditions hereof, each of the Company, Walgreens and Alliance Boots have determined it to be advisable and in the best interests of their respective companies and stockholders to enter into certain commercial and collaboration arrangements as further set forth herein, including by entering into, at the Closing, that certain (a) Pharmaceutical Purchase and Distribution Agreement, by and between AmerisourceBergen Drug Corporation, a Delaware corporation and wholly owned subsidiary of the Company ("AmerisourceBergen Drug") and Walgreens, in the form previously agreed by the Company and Walgreens (the "Rx Distribution Agreement"), and (b) Generic Pharmaceuticals Purchasing Services Agreement, by and between AmerisourceBergen Drug and Walgreens Boots Alliance Development GmbH, a private limited liability company incorporated under the laws of Switzerland, having its registered office at Untermattweg 8, CH3027 Bern, Switzerland and registered in the Register of Commerce and Companies of the Canton of Bern under No CH-036.4.054.841-8, jointly owned by Walgreens and Alliance Boots ("WBAD"), in the form previously agreed by the parties thereto (the "Generic Pharmaceuticals Purchasing Services Agreement").

**WHEREAS**, the respective boards of directors of each of the parties hereto has unanimously approved this Agreement, each of the other Transaction Documents and the transactions contemplated hereby and thereby.

**WHEREAS**, in connection with the transactions contemplated hereby, and subject to the terms and conditions hereof, (a) the Company desires to issue to Permitted Transferees (as defined in the Shareholders Agreement) of Walgreens and Alliance Boots, and such Permitted Transferees desire to acquire from the Company, at the Closing, certain warrants to purchase shares of the Company's common stock, $0.01 par value per share (the "Common Stock"), and (b) the parties desire to agree upon certain rights of Walgreens and/or Alliance Boots to acquire additional shares of Common Stock.

**WHEREAS**, the parties hereto will, at the Closing, enter into a shareholders agreement, in the form attached hereto as Annex A (the "Shareholders Agreement"), providing for certain corporate governance and other matters with respect to the Company and certain other agreements between the Company, Walgreens and Alliance Boots.

**WHEREAS**, on the date hereof, Walgreens, Alliance Boots, Walgreens Pharmacy Strategies, LLC, an Illinois limited liability company and wholly owned Subsidiary of Walgreens, Alliance Boots Luxembourg S.à r.l., a private limited liability company (société à responsabilité limitée) incorporated under the laws of the Grand Duchy of Luxembourg and wholly owned Subsidiary of Alliance Boots, and WAB Holdings LLC, a Delaware limited liability company, jointly owned, directly or indirectly, by Walgreens and Alliance Boots (the

"FW JV"), entered into that certain Transaction Rights Agreement (the "Transaction Rights Agreement"), providing for certain rights and obligations of each of Walgreens and Alliance Boots with respect to the transactions contemplated herein and in the other Transaction Documents.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

## Article I
### WARRANTS ISSUANCE; CLOSING

1.1 <u>Warrants Issuance</u>. On the terms and subject to the conditions set forth in this Agreement, the Company shall issue to such Permitted Transferee(s) (as defined in the Shareholders Agreement) of Walgreens or Alliance Boots as Walgreens and Alliance Boots shall jointly designate, and such designated Permitted Transferee(s) shall acquire from the Company, at the Closing, (a) a warrant to purchase 22,696,912 shares, subject to adjustment in accordance with its terms (the "Warrant 1 Shares"), of Common Stock in the form attached hereto as Annex B-1 ("Warrant 1"), and (b) a warrant to purchase 22,696,912 shares, subject to adjustment in accordance with its terms (the "Warrant 2 Shares" and, together with the Warrant 1 Shares, the "Warrant Shares")), of Common Stock in the form attached hereto as Annex B-2 ("Warrant 2" and, together with Warrant 1, the "Warrants")) (the issuance of the Warrants by the Company and the acquisition of the Warrants by Walgreens (or such designated Permitted Transferee(s)), the "Warrants Issuance"); provided, that 50% of each of Warrant 1 and Warrant 2 will be issued to and acquired by Alliance Boots Luxembourg S.à r.l., a wholly-owned subsidiary of Alliance Boots, and 50% of each of Warrant 1 and Warrant 2 will be issued to and acquired by Walgreens Pharmacy Strategies, LLC , a wholly-owned subsidiary of Walgreens.

1.2 <u>Closing</u>.

(a) The closing of the Warrants Issuance (the "Closing") will take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, immediately following the execution and delivery of this Agreement.

(b) At the Closing, the Company shall deliver:

(i) to Walgreens (or such Permitted Transferee(s) of Walgreens or Alliance Boots as Walgreens and Alliance Boots shall jointly designate), Warrant 1 and Warrant 2, in each case as evidenced by a duly and validly executed warrant certificate dated as of the date hereof and bearing appropriate legends as hereinafter provided for;

(ii) to Walgreens, the Rx Distribution Agreement, duly executed by the Company;

(iii) to WBAD, the Generic Pharmaceuticals Purchasing Services Agreement, duly executed by AmerisourceBergen Drug; and

(iv) to Walgreens and Alliance Boots, the Shareholders Agreement, duly executed by the Company.

-2-

(c)     At the Closing, Walgreens shall deliver:

(i)     to the Company, the Rx Distribution Agreement, duly executed by Walgreens; and

(ii)     to the Company and Alliance Boots, the Shareholders Agreement, duly executed by Walgreens.

(d)     At the Closing, Alliance Boots shall deliver to the Company and Walgreens the Shareholders Agreement, duly executed by Alliance Boots.

(e)     At the Closing, Walgreens and Alliance Boots shall cause WBAD to deliver to AmerisourceBergen Drug the Generic Pharmaceuticals Purchasing Services Agreement, duly executed by WBAD.

1.3     <u>Interpretation</u>.  When a reference is made in this Agreement to "Recitals," "Articles," "Sections," "Annexes," "Schedules" or "Exhibits" such reference shall be to a Recital, Article or Section of, or Annex, Schedule or Exhibit to, this Agreement unless otherwise indicated.  The terms defined in the singular have a comparable meaning when used in the plural, and vice versa.  References to "herein," "hereof," "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise.  The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation."  Except as otherwise set forth therein, any references to the transactions contemplated by or in this Agreement and/or any of the other Transaction Documents, or similar references, shall be deemed to include, among other things, the Equity Transactions and the Potential Repurchase Increase of Equity Percentage; *provided* that the reference to the Potential Repurchase Increase of Equity Percentage shall not include or refer to any particular action(s) by the Company, that cause the Potential Repurchase Increase of Equity Percentage to occur and neither the foregoing nor any other provision of this Agreement or any of the other Transaction Documents shall be interpreted to require the Company, to engage in any repurchase (whether through self-tender, open market transactions or otherwise) of any shares of Common Stock or other securities, the decision with respect to which will be made by the Company in its sole discretion at the time of any such repurchase and, in any event, may require further board of director approvals or authorizations on the part of the Company; and *provided further* that nothing in this Agreement or any of the other Transaction Documents shall be interpreted to require either Walgreens or Alliance Boots, or any of their respective Affiliates, to exercise any Warrants or to purchase any Initial Open Market Shares, Additional Open Market Shares or any other shares of Common Stock or other securities, the decision with respect to which will be made by each of Walgreens and/or Alliance Boots, as applicable, in its sole discretion at the time of any such exercise, purchase or other acquisition and, in any event, may require further board of director approvals or authorizations on the part of Walgreens and/or Alliance Boots, as applicable.  No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel.  Any reference to a wholly-owned subsidiary of a person shall mean such subsidiary is directly or indirectly wholly-owned by such

person. All references to "$" or "dollars" mean the lawful currency of the United States of America. Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section. The term (a) "Initial Equity Transaction" means, with respect to the Investors (as defined in the Shareholder Agreement), the acquisition in full (in one or more transactions) of the Initial Open Market Shares and the exercise in full (in one or more transactions) of Warrant 1 (as adjusted, if applicable, for the purchase of any Additional Open Market Shares pursuant to the terms of Warrant 1) and, relatedly, the issuance in full (in one or more transactions) of the Warrant 1 Shares (as adjusted, if applicable, for the purchase of any Additional Open Market Shares pursuant to the terms of Warrant 1), and/or the purchase of any and/or all (in one or more transactions) Additional Open Market Shares, (b) "Second Equity Transaction" means, with respect to the Investors, the exercise in full (in one or more transactions) of Warrant 2 and, relatedly, the issuance in full of the Warrant 2 Shares, (c) the "Equity Transactions" mean the Initial Equity Transaction and Second Equity Transaction, and (d) "Business Day" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close. The term "Potential Repurchase Increase of Equity Percentage"means the increase in the aggregate Beneficial Ownership of the Investors up to the Ultimate Standstill Level (as defined in the Shareholders Agreement) as a result of share repurchases (whether through self-tender, open market transactions or otherwise) by the Company or any of its Affiliates.

## Article II
### REPRESENTATIONS AND WARRANTIES

2.1     Disclosure.

(a)     "Material Adverse Effect" means any change, effect, event, development, circumstance or occurrence (each, an "Effect") that, taken individually or when taken together with all other applicable Effects, has been, is or would reasonably be expected to be materially adverse to (i) the business, financial condition or results of operations of the Company and its subsidiaries, taken as a whole, or (ii) the ability of the Company to complete the transactions contemplated the Transaction Documents or to perform its obligations under the Transaction Documents; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, is or would be, a Material Adverse Effect: (A) any change in general economic, market or political conditions; (B) conditions generally affecting the industry in which the Company operates; (C) any change in generally accepted accounting principles in the United States ("GAAP") or applicable law; (D) any act of war (whether or not declared), armed hostilities, sabotage or terrorism, or any material escalation or worsening of any such events, national disaster or any national or international calamity; (E) any failure, in and of itself, to meet internal or published projections, forecasts, targets or revenue or earnings predictions for any period, as well as any change, in and of itself, by the Company in any projections, forecasts, targets or revenue or earnings predictions for any period (provided that the underlying causes of such failures (to the extent not otherwise falling within one of the other exceptions in this proviso)

-4-

may constitute or be taken into account in determining whether there has been, is, or would be, a Material Adverse Effect); (F) any change in the price or trading volume of the Common Stock (provided that the underlying causes of such change (to the extent not otherwise falling within one of the other exceptions in this proviso) may constitute or be taken into account in determining whether there has been, is or would be, a Material Adverse Effect); or (G) the announcement of this Agreement or the other Transaction Documents, including, to the extent attributable to such announcement, any loss of or adverse change in the relationship, contractual or otherwise, of the Company and its subsidiaries with their respective employees, customers, distributors, licensors, licensees, vendors, lenders, investors, partners or suppliers; provided, further, however, that any Effect referred to in clauses (A) through (D) may be taken into account in determining whether or not there has been a Material Adverse Effect to the extent such Effect has a disproportionate adverse effect on the Company and its subsidiaries, taken as a whole, as compared to other participants in the industry in which the Company and its subsidiaries operate (in which case any adverse effect(s) to the extent disproportionate may be taken into account in determining whether or not there has been, is or would be a Material Adverse Effect).

(b)     "Previously Disclosed" means information set forth or incorporated in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2012 or its other reports, statements and forms (including exhibits and other information incorporated therein) filed with or furnished to the Securities and Exchange Commission (the "Commission") under Sections 13(a), 14(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or under the Securities Act, in each case on or after September 30, 2012 (the "SEC Reports") (in each case excluding any disclosures set forth in any risk factor section and in any section relating to forward-looking or safe harbor statements), to the extent such SEC Reports are filed or furnished prior to the execution and delivery of this Agreement.

Each party acknowledges that it is not relying upon any representation or warranty, express or implied, not set forth in the Transaction Documents. Each of Walgreens and Alliance Boots acknowledges, on behalf of itself and not the other, that it has had an opportunity to conduct such review and analysis of the business, assets, condition, operations and prospects of the Company and its subsidiaries, including an opportunity to ask such questions of management and to review such information maintained by the Company and its subsidiaries, in each case as it considers sufficient for the purpose of consummating the Equity Transactions and the other transactions contemplated by the Transaction Documents. Each of Walgreens and Alliance Boots further acknowledges, on behalf of itself and not the other, that it has had such an opportunity to consult with its own counsel, financial and tax advisers and other professional advisers as it believes is sufficient for purposes of the Equity Transactions and the other transactions contemplated by the other Transaction Documents. For purposes of this Agreement, the term "Transaction Documents" refers collectively to this Agreement, the Rx Distribution Agreement, the Generic Pharmaceuticals Purchasing Services Agreement, the Shareholders Agreement, Warrant 1, Warrant 2, and any other agreement entered into by and among the parties and/or their Affiliates on the date hereof in connection with the transactions contemplated hereby or thereby (but expressly excluding the Transaction Rights Agreement, the Limited Liability Company Agreement of the FW JV, and any other agreement solely by and among Alliance Boots, Walgreens and their respective Affiliates), in each case, as amended, modified or supplemented from time to time in accordance with their respective terms.

-5-

2.2    Representations and Warranties of the Company.  Except as Previously Disclosed or as disclosed in the disclosure letter (the "Company Disclosure Letter") delivered by the Company to Walgreens and Alliance Boots prior to the execution of this Agreement, the Company represents and warrants as of the date of this Agreement to each of Walgreens and Alliance Boots that:

(a)    Organization, Authority and Significant Subsidiaries.  The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware, with the corporate power and authority to own its properties and conduct its business in all material respects as currently conducted, and, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, has been duly qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties, or conducts any business so as to require such qualification.  Each subsidiary of the Company that is a "significant subsidiary" within the meaning of Rule 1-02(w) of Regulation S-X under the Securities Act of 1933, as amended (the "Securities Act"), and each subsidiary of the Company that is not such a "significant subsidiary" but is a party to any other Transaction Document, has been duly organized and is validly existing in good standing under the laws of its jurisdiction of organization, with the corporate or analogous power and authority to own its properties and conduct its business in all material respects as currently conducted, and, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, has been duly qualified as a foreign corporation, limited liability company or partnership, as applicable, for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties, or conducts any business so as to require such qualification.

(b)    Capitalization.  The authorized capital stock of the Company consists of 600,000,000 shares of Common Stock of which, as of the close of business on March 15, 2013, 265,830,219 shares were issued and outstanding (including, for the avoidance of doubt, shares held in treasury and shares of restricted stock issued pursuant to compensatory equity plans of the Company or a subsidiary of the Company in effect as of the date hereof and set forth in Section 2.2(b) of the Company Disclosure Letter (the "Company Stock Plans")), and 10,000,000 shares of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), of which, as of the date hereof, no shares are either designated or issued and outstanding.  As of the close of business on March 15, 2013, the Company held 34,193,830 shares of Common Stock in its treasury.  As of the close of business on March 15, 2013, no shares of Common Stock or Preferred Stock were reserved for issuance, except for 49,246,234 shares of Common Stock reserved for issuance under the Company Stock Plans (including (i) 17,350,679 shares of Common Stock reserved for issuance upon the exercise of stock options outstanding as of such date and granted under the Company Stock Plans, with a weighted average exercise price of $31.28 per share, (ii) 433,161 shares of Common Stock reserved for issuance upon the settlement of restricted stock units and performance awards outstanding as of such date and granted under the Company Stock Plans (assuming, in the case of performance awards, that applicable goals are attained at maximum level), and (iii) 4,000,000 shares of Common Stock reserved and available for issuance under the Company 2011 Employee Stock Purchase Plan).  The outstanding shares of Common Stock have been duly authorized and are validly issued and outstanding, fully paid and nonassessable, and subject to no preemptive rights (and were not

issued in violation of any preemptive rights, the Company's certificate of incorporation or by-laws, or any applicable laws).  Except as set forth above or pursuant to the Transaction Documents, there are no (A) shares of capital stock or other equity interests or voting securities of the Company authorized, reserved for issuance, issued or outstanding, (B) options, warrants, calls, preemptive rights, subscription or other rights, instruments, agreements, arrangements or commitments of any character, obligating the Company or any of its subsidiaries to issue, transfer or sell or cause to be issued, transferred or sold any shares of capital stock or other equity interest or voting security in the Company or any securities or instruments convertible into or exchangeable for such shares of capital stock or other equity interests or voting securities, or obligating the Company or any of its subsidiaries to grant, extend or enter into any such option, warrant, call, preemptive right, subscription or other right, instrument, agreement, arrangement or commitment, (C) outstanding contractual obligations of the Company or any of its subsidiaries to repurchase, redeem or otherwise acquire any capital stock or other equity interest or voting securities of the Company or (D) issued or outstanding performance awards, units, rights to receive any capital stock or other equity interest or voting securities of the Company on a deferred basis, or rights to purchase or receive any capital stock or equity interest or voting securities issued or granted by the Company to any current or former director, officer, employee or consultant of the Company.  No subsidiary of the Company owns any shares of capital stock or other equity interest or voting securities of the Company.  There are no voting trusts or other agreements or understandings to which the Company or any of its subsidiaries is a party with respect to the voting of the capital stock or other equity interest or voting securities of the Company.

(c)     The Warrants and Warrant Shares.  Each Warrant has been duly authorized by the Company and constitutes a valid and legally binding obligation of the Company in accordance with its terms, except as the same may be limited by the Bankruptcy Exceptions, and the Warrant Shares have been duly authorized and reserved for issuance upon exercise of the applicable Warrant and when so issued will be validly issued, fully paid and non-assessable, and free and clear of any liens or encumbrances, other than liens or encumbrances created by the Transaction Documents, arising as a matter of applicable law or created by or at the direction of Walgreens, Alliance Boots or any of their respective Affiliates.

(d)     Authorization, Enforceability.

(i)     Each of the Company, and each subsidiary of the Company that is a party to any other Transaction Document, has the power and authority to execute and deliver this Agreement and the other Transaction Documents, as applicable, to consummate the transactions contemplated hereby and thereby, and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance by the Company, and by each subsidiary of the Company that is a party to any other Transaction Document, of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate (or analogous) action on the part of the Company and its stockholders, or such subsidiary and its equityholders, as applicable, and no further approval or authorization is required on the part of the Company or its stockholders, or such subsidiary or its equityholders, as applicable.  This Agreement and the other Transaction Documents, assuming the due authorization, execution and delivery by the other parties hereto and thereto, are valid and binding obligations of the Company and each such

-7-

subsidiary, as applicable, enforceable against the Company and such subsidiary, respectively, in accordance with their respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity ("Bankruptcy Exceptions").

(ii)     The execution, delivery and performance by the Company, and each subsidiary of the Company that is a party to any other Transaction Document, of this Agreement and the other Transaction Documents, as applicable, and the consummation of the transactions contemplated hereby and thereby and compliance by the Company or such subsidiary, as applicable, with any of the provisions hereof and thereof, will not (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company or any of its subsidiaries under any of the terms, conditions or provisions of (x) its certificate of incorporation or by-laws (or analogous organizational documents), or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries may be bound, or to which the Company or any of its subsidiaries or any of the properties or assets of the Company or any of its subsidiaries is subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Company or any of its subsidiaries or any of their respective properties or assets except, in the case of clauses (A)(y) and (B), for those occurrences that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(iii)     Other than (A) such notices, filings, exemptions, reviews, authorizations, consents or approvals as have been made or obtained as of the date hereof, and (B) notices, filings, exemptions, reviews, authorizations, consents or approvals as may be required under, and other applicable requirements of (1) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (2) any other Antitrust Laws, (3) the Exchange Act, (4) the Securities Act and (5) listing applications with the New York Stock Exchange, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any federal, state, local, domestic, foreign or supranational court, administrative or regulatory agency or commission or other federal, state, local, domestic, foreign or supranational governmental authority or instrumentality (each, a "Governmental Entity") is required to be made or obtained by the Company or any of its subsidiaries in connection with the consummation by the Company or any of its subsidiaries of the Warrants Issuance and the other transactions contemplated hereby and by the other Transaction Documents, except for any such notices, filings, exemptions, reviews, authorizations, consents and approvals the failure of which to make or obtain have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For purposes of this Agreement, "Antitrust Laws" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the German Act against Restraints of Competition (Gesetz gegen Wettbewerbsbeschränkungen), as amended, and any other federal, state, local, domestic, foreign

or supranational laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or that provide for review of foreign investment.

(e)     Company Financial Statements; Internal Controls.

(i)     Each of the consolidated financial statements included in the SEC Reports (A) complied as to form, as of their respective dates of filing with the Commission, in all material respects with the applicable accounting requirements and with the rules and regulations of the Commission, (B) were prepared in accordance with GAAP, in all material respects, applied on a consistent basis during the periods involved (except as may be indicated in such financial statements or in the notes thereto and subject, in the case of unaudited statements, to normal year-end audit adjustments and the absence of footnote disclosure), and (C) fairly presents, in all material respects, the consolidated financial position and the consolidated results of operations and cash flows (and changes in financial position, if any) of the Company and its subsidiaries as of the date and for the periods referred to in such financial statements.

(ii)     Neither the Company nor any of the Company's subsidiaries is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar agreement or arrangement, where the result, purpose or effect of such agreement or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its subsidiaries in the SEC Reports (including the financial statements contained therein).

(iii)     The Company has designed and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting. The Company (A) has designed and maintains disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits with the Commission is recorded, processed, summarized and reported within the time periods specified in the Commission's rules, regulations and forms, and is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure, and (B) has disclosed, based on its most recent evaluation of internal control over financial reporting, to the Company's outside auditors and the Audit Committee of the Company's Board of Directors (x) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that would reasonably be expected to adversely affect the Company's ability to record, process, summarize and report financial information and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting, all of which information described in clauses (x) and (y) above has been disclosed by the Company to Walgreens prior to the date hereof.  Any material change in internal control over financial reporting required to be disclosed in any SEC Report has been so disclosed.

(iv)     Since September 30, 2010, to the knowledge of the Company, neither the Company nor any of its subsidiaries has received any complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any of its subsidiaries or their respective internal accounting controls relating to

-9-

periods after September 30, 2010, except for any complaints, allegations, assertions or claims that have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(v)     Each of the principal executive officer of the Company and the principal financial officer of the Company (or each former principal executive officer of the Company and each former principal financial officer of the Company, as applicable) has made all certifications required by Rules 13a-14 and 15d-14 under the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, as amended ("SOX"), with respect to the SEC Reports, and the statements contained in such certifications were true and complete on the date such certifications were made.  For purposes of this Agreement, "principal executive officer" and "principal financial officer" shall have the meanings given to such terms in SOX.

(f)     No Material Adverse Effect.  Since September 30, 2012, no Effect has occurred that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(g)     Reports.

(i)     Since September 30, 2010, the Company has complied in all material respects with the filing requirements of Sections 13(a), 14(a) and 15(d) of the Exchange Act, and of the Securities Act.

(ii)     The SEC Reports, when they became effective or were filed with the Commission, as the case may be, complied in all material respects with the requirements of the Securities Act, the Exchange Act and SOX, as applicable, and none of such documents, when they became effective or were filed with the Commission, as the case may be, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

(h)     Anti-takeover Provisions and No Rights Plan.

(i)     The actions taken by the Board of Directors of the Company to approve this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby, assuming the accuracy of the representations and warranties of Walgreens and Alliance Boots set forth in Section 2.3(c), constitute all the action necessary to render inapplicable to this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby the provisions of any potentially applicable anti-takeover, control share, fair price, moratorium, interested shareholder or similar law (including, for the avoidance of doubt, Section 203 of the Delaware General Corporation Law) and any potentially applicable provision of the Company's certificate of incorporation or bylaws (collectively, the "Anti-takeover Provisions").

(ii)     The Company does not have any "poison pill" or similar shareholder rights plan or agreement in effect.

(i)     No Change in Control.  Except as set forth in Section 2.2(i) of the Company Disclosure Letter, neither the execution and delivery of this Agreement or any of the other

-10-

Transaction Documents, nor the consummation of the transactions contemplated hereby and thereby will (i) result in any payment (including severance, unemployment compensation, forgiveness of indebtedness or otherwise) becoming due to any director or any employee of the Company or any of its subsidiaries under any employment, compensation or benefit plan, program, policy, agreement or arrangement that is sponsored, maintained or contributed to by the Company or any of its subsidiaries (each, a "Company Benefit Plan") or otherwise; (ii) increase any benefits otherwise payable under any Company Benefit Plan; (iii) result in any acceleration of the time of payment or vesting of any such benefits; (iv) require the funding or acceleration of funding of any trust or other funding vehicle; or (v) constitute a "change in control," "change of control" or other similar term under any Company Benefit Plan.

(j)     Brokers; Fees and Expenses.  No broker, investment banker, financial advisor or other person, other than Morgan Stanley (the fees and expenses of which will be paid by the Company), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of the Company.

2.3     Representations and Warranties of Walgreens and Alliance Boots.  Each of Walgreens and Alliance Boots, severally, on behalf of itself, and not jointly, hereby represents and warrants as of the date of this Agreement to the Company that:

(a)     Status.  It and WBAD have been duly organized and are validly existing under the laws of their respective jurisdiction of incorporation or organization, as applicable.

(b)     Authorization, Enforceability.

(i)     It, each of its subsidiaries that is a party to any other Transaction Document and WBAD have the corporate or analogous power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to consummate the transactions contemplated hereby and thereby, and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance by it, by each of its subsidiaries that is a party to any other Transaction Document and WBAD, as applicable, of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or analogous action on its, such subsidiary's or WBAD's part, as applicable, and no further approval or authorization is required on its, such subsidiary's or WBAD's part, as applicable.  This Agreement and the other Transaction Documents, assuming the due authorization, execution and delivery by the other parties hereto and thereto, are valid and binding obligations of it, such subsidiary and WBAD, as applicable, enforceable against it, such subsidiary and WBAD, as applicable, in accordance with their respective terms, except as the same may be limited by Bankruptcy Exceptions.  Notwithstanding anything to the contrary contained herein, the exercise of the Warrants and/or the purchase of any Initial Open Market Shares, Additional Open Market Shares and/or any other shares of Common Stock, as applicable, may require further board of director (or analogous) approvals or authorizations on the part of Alliance Boots and/or Walgreens (the "Purchase Approvals").

-11-

(ii)      The execution, delivery and performance by it, any such subsidiary or WBAD, as applicable, of this Agreement and the other Transaction Documents to which it, any such subsidiary or WBAD is a party and the consummation of the transactions contemplated hereby and thereby and compliance by it, such subsidiary and WBAD, as applicable, with any of the provisions hereof and thereof, will not (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of its properties or assets under any of the terms, conditions or provisions of (x) subject to Purchase Approvals, its, such subsidiary's or WBAD's, as applicable, organizational documents or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which it, such subsidiary or WBAD, as applicable, is a party or by which it, such subsidiary or WBAD, as applicable, may be bound, or to which it, such subsidiary or WBAD, as applicable, or any of its, such subsidiary's or WBAD's, as applicable, properties or assets is subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to it, such subsidiary or WBAD, as applicable, or any of its, such subsidiary's or WBAD's, as applicable, properties or assets except, in the case of clauses (A)(y) and (B), for those occurrences that, individually or in the aggregate, have not had and would not reasonably be expected to have, with respect to it, a Walgreens/Alliance Boots Material Adverse Effect.  "Walgreens/Alliance Boots Material Adverse Effect" means a material adverse effect on the ability of Walgreens, Alliance Boots or WBAD, as applicable, to complete the transactions contemplated by the Transaction Documents or to perform its obligations under the Transaction Documents.

(iii)      Other than (A) such notices, filings, exemptions, reviews, authorizations, consents or approvals as have been made or obtained as of the date hereof, and (B) notices, filings, exemptions, reviews, authorizations, consents or approvals as may be required under, and other applicable requirements of (1) the HSR Act, (2) any other Antitrust Laws, (3) the Exchange Act and (4) the Securities Act, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Entity is required to be made or obtained by it or any of its subsidiaries in connection with the consummation by it or any of its subsidiaries of the Warrants Issuance and the other transactions contemplated hereby and by the other Transaction Documents, except for any such notices, filings, exemptions, reviews, authorizations, consent and approvals the failure of which to make or obtain have not had and would not reasonably be expected to have, individually or in the aggregate, a Walgreens/Alliance Boots Material Adverse Effect.

(c)      Ownership.  Other than pursuant to this Agreement and the other Transaction Documents, it is not the Beneficial Owner of (i) any Common Stock or (ii) any securities or other instruments representing the right to acquire Common Stock.  Other than with Alliance Boots and its Affiliates (in the case of Walgreens) or with Walgreens and its Affiliates (in the case of Alliance Boots), including the Transaction Rights Agreement, it does not have an agreement, arrangement or understanding with any person (other than the Company and its Affiliates) to acquire, dispose of or vote any securities of the Company.  "Beneficial Ownership" shall have the meaning assigned to such term in the Shareholders Agreement.  "Beneficial Owner" and "Beneficially Own" shall have conforming definitions.

-12-

(d)     Brokers; Fees and Expenses.  With respect to Walgreens, no broker, investment banker, financial advisor or other person, other than Goldman, Sachs & Co. (the fees and expenses of which will be paid by Walgreens), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of Walgreens or WBAD.  With respect to Alliance Boots, no broker, investment banker, financial advisor or other person, other than Centerview Partners (the fees and expenses of which will be paid by Alliance Boots), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of Alliance Boots or WBAD.

## Article III
### COVENANTS

3.1     Efforts.

(a)     Subject to the terms and conditions hereof (including the remainder of this Section 3.1) and the other Transaction Documents, each party hereto will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or desirable under applicable law to carry out the provisions hereof and thereof and give effect to the transactions contemplated hereby and thereby.  In furtherance and not in limitation of the foregoing, the parties hereto will (i) subject to the provisions of this Section 3.1, including Section 3.1(b) and Section 3.1(d), use their reasonable best efforts to obtain as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)) all exemptions, authorizations, consents or approvals from, and to make all filings with and to give all notices to, all third parties, including any Governmental Entities, required in connection with the transactions contemplated by this Agreement and the other Transaction Documents, which, for the avoidance of doubt, shall include providing, as promptly as practicable and advisable, such information to any Governmental Entity as such Governmental Entity may request in connection therewith, and (ii) cooperate fully with the other parties hereto in promptly seeking to obtain all such exemptions, authorizations, consents or approvals and to make all such filings and give such notices.

(b)     Without limiting the generality of the foregoing, (1) as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d), but in any event within ten (10) Business Days of the date of this Agreement, unless a later date is mutually agreed between the parties), the parties will file the Notification and Report Forms required under the HSR Act with the Federal Trade Commission and the United States Department of Justice (the date on which all such Notification and Report Forms required under the HSR Act have been initially filed, the "HSR Filing Date") and (2) as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)), file, make or give, as applicable, all other filings, requests and/or notices required under any other Antitrust Laws, in each case with respect to the Equity Transactions (the "Initial Filing Transaction") (the filings, requests and notices described in the foregoing clauses (1) and (2), collectively, the "Initial Antitrust Filings").  In addition, if, on or

-13-

prior to the one-year anniversary of the date on which the Initial Antitrust Clearance was obtained, the IOMS Rights Holder and its Designees (for the avoidance of doubt, expressly including for this purpose any Warrantholder (as defined in Warrant 1) pursuant to the exercise in-part of Warrant 1 pursuant to the terms thereof during the Warrant 1 Special Exercise Period) have not exceeded the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h), as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d), but in any event within ten (10) Business Days of such one-year anniversary, unless a later date is mutually agreed between the parties), the parties will file the Notification and Report Forms required under the HSR Act with the Federal Trade Commission and the United States Department of Justice with respect to the Equity Transactions in order to exceed the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h) (but not, for purposes of such filing, any greater notification threshold) (the "Second HSR Filing", and the date on which all such Notification and Report Forms comprising the Second HSR Filing shall have been initially filed, the "Second HSR Filing Date").  In addition, following the receipt of the Initial Antitrust Clearance, to the extent required by applicable law (including, for the avoidance of doubt any Antitrust Law) in connection with any acquisition of shares of Common Stock comprising all or any portion of the Equity Transactions (in each case, whether in full or in part), the parties shall file, make or give, as applicable, as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)), any further required filings, requests and/or notices required under any Antitrust Laws, including the HSR Act (collectively, the "Other Antitrust Filings" and any such acquisitions, "Other Equity Transactions", *provided* that "Other Antitrust Filings" shall not include the Second HSR Filing).  Without limiting the generality of the foregoing, each party agrees to supply as promptly as reasonably practicable and advisable to the appropriate Governmental Entities any information and documentary material that may be requested pursuant to the HSR Act or any other Antitrust Laws.

(c)     Subject to the terms and conditions hereof (including the remainder of this Section 3.1) and the other Transaction Documents, each of the parties hereto agrees to use its reasonable best efforts to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Governmental Entity, so as to enable the parties hereto to give effect to the transactions contemplated hereby and by the other Transaction Documents in accordance with the terms hereof and thereof; provided, that notwithstanding anything to the contrary contained herein or in any of the other Transaction Documents, nothing in this Section 3.1 shall require, or be construed to require, any party hereto or any of its Affiliates to agree to (and no party hereto (other than Walgreens with respect to its and/or its Affiliates own assets, businesses or interests, in each case other than WBAD or any of its subsidiaries) or any of its Affiliates will agree to, without the prior written consent of the other parties): (i) sell, hold separate, divest, discontinue or limit (or any conditions relating to, or changes or restrictions in, the operation of) any assets, businesses or interests of it or its Affiliates (irrespective of whether or not such assets, businesses or interests are related to, are the subject matter of or could be affected by the transactions contemplated by the Transaction Documents); (ii) without limiting clause (i) in any respect, any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests that would reasonably be expected to adversely impact (x) the business of, or the financial, business or strategic benefits of the transactions contemplated hereby or by any of the other Transaction Documents to it or its Affiliates, or (y)

any other assets, businesses or interests of it or its Affiliates; or (iii) without limiting clause (i) in any respect, any modification or waiver of the terms and conditions of this Agreement or any of the other Transaction Documents that would reasonably be expected to adversely impact (x) the business of, or financial, business or strategic benefits of the transactions contemplated hereby or by any of the other Transaction Documents to it or its Affiliates, or (y) any other assets, businesses or interests of it or its Affiliates.  For purposes of the foregoing proviso, it is expressly acknowledged and agreed that the mere fact, in and of itself, that an approval or consent of a Governmental Entity required in connection with all or any portion of the Equity Transactions does not also expressly include or expressly constitute an affirmative approval or consent for the Investors' Beneficial Ownership of shares of Common Stock to exceed the Ultimate Standstill Level shall not be considered to adversely impact the Investors or their Affiliates in any way, including any of their respective assets, businesses or interests or their respective financial, business or strategic benefits from the transactions contemplated hereby or by any of the other Transaction Documents.  For purposes of this Agreement, the term (x) "Initial Antitrust Clearance" as of any time means (a) prior to such time, the expiration or termination of the waiting period under the HSR Act and the receipt of all exemptions, authorizations, consents or approvals, the making of all filings and the giving of all notices, and the expiration of all waiting periods, pursuant to any other Antitrust Laws, in each case to the extent required with respect to the Initial Filing Transaction, and (b) the absence at such time of any applicable law or temporary restraining order, preliminary or permanent injunction or other judgment, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation, decision or decree issued by any court of competent jurisdiction or other legal restraint or prohibition under any Antitrust Law, in each case that has the effect of preventing the consummation of the Initial Filing Transaction, (y) "Second HSR Clearance" as of any time following the Initial Antitrust Clearance means, with respect to the Equity Transactions (to the extent set forth in the Second HSR Filing), prior to such time, the expiration or termination of the waiting period under the HSR Act, and (z)  "Other Antitrust Clearance" as of any time following the Initial Antitrust Clearance means, with respect to any Other Equity Transaction, (a) prior to such time, the expiration or termination of the waiting period under the HSR Act and the receipt of all exemptions, authorizations, consents or approvals, the making of all filings and the giving of all notices, and the expiration of all waiting periods, pursuant to any other Antitrust Laws, in each case to the extent required with respect to such Other Equity Transaction, and (b) the absence at such time of any applicable law or temporary restraining order, preliminary or permanent injunction or other judgment, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation, decision or decree issued by any court of competent jurisdiction or other legal restraint or prohibition under any Antitrust Law, in each case that has the effect of preventing the consummation of such Other Equity Transaction.

(d)     Walgreens shall have the principal responsibility for devising and implementing the strategy (including with respect to the timing of filings) for obtaining any exemptions, authorizations, consents or approvals required under the HSR Act or any other Antitrust Laws in connection with the transactions contemplated hereby and by the other Transaction Documents; provided, however, that Walgreens shall consult in advance with each other party hereto and in good faith take each such other party's views into account regarding the overall antitrust strategy.  Each of the parties hereto will promptly notify the other parties of, and if in writing furnish the others with copies of (or, in the case of oral communications, advise the others of), any substantive communication that it or any of its Affiliates receives from any Governmental

-15-

Entity, whether written or oral, relating to the matters that are the subject of this Agreement or any of the other Transaction Documents and, to the extent reasonably practicable, permit the other parties to review in advance any proposed substantive written communication by such party to any Governmental Entity and consider in good faith the other parties' reasonable comments on any such proposed substantive written communications prior to their submission. No party hereto shall, and each party hereto shall cause its Affiliates not to, participate or agree to participate in any substantive meeting or communication with any Governmental Entity in respect of the subject matter of the Transaction Documents, including on a "no names" or hypothetical basis, unless (to the extent practicable) it or they consult with the other parties hereto in advance and, to the extent practicable and permitted by such Governmental Entity, gives the other parties hereto the opportunity to jointly prepare for, attend and participate in such meeting or communication.  The parties hereto will (and will cause their Affiliates to) coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the matters described in this Section 3.1, including (x) furnishing to each other all information required for any filing or submission under any Antitrust Law and (y) keeping each other reasonably informed with respect to the status of each exemption, authorization, consent, approval, filing and notice under any Antitrust Law, in each case, in connection with the matters that are the subject of this Agreement or any of the other Transaction Documents.  The parties hereto will provide each other with copies of all substantive correspondence, filings or communications between them or any of their Affiliates or representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, relating to the matters that are the subject of this Agreement or any of the other Transaction Documents; provided that such material may be redacted as necessary to (1) comply with contractual arrangements, (2) address good faith legal privilege or confidentiality concerns and (3) comply with applicable law.

(e)     Subject to the other provisions of this Agreement, including in this Section 3.1, in the event that any arbitral, administrative, judicial or analogous action, claim or proceeding is instituted (or threatened to be instituted) by a Governmental Entity or any other party challenging the transactions contemplated hereby or by any of the other Transaction Documents ("Transaction Litigation"), each party hereto shall use its reasonable best efforts to contest and resist any such Transaction Litigation and to have vacated, lifted, reversed or overturned any judgment, ruling, order, writ, injunction or decree, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation or implementation of the transactions contemplated hereby or by any of the other Transaction Documents.  Each party hereto shall keep each other party hereto reasonably informed unless doing so would reasonably be likely to jeopardize any privilege of such party regarding any such Transaction Litigation (subject to such party using reasonable best efforts to, and cooperating in good faith with the other parties in, developing and implementing reasonable alternative arrangements to provide such other parties with such information).  Subject to the immediately preceding sentence, each party hereto shall promptly advise each other party hereto orally and in writing and shall cooperate fully in connection with, and shall consult with each other with respect to, any Transaction Litigation and shall in good faith give consideration to each other's advice with respect to such Transaction Litigation.

(f)     As promptly as practicable following the date hereof, the Company shall adopt such amendments and take such further actions and do or cause to be done all things necessary,

proper or advisable under applicable law, to prevent the execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby from constituting a "change in control," "change of control" or other similar term under any Company Benefit Plan (whether or not relating to matters set forth on Section 2.2(i) of the Company Disclosure Letter).

(g)     Notwithstanding anything herein to the contrary, from and after the earlier of (i) the completion in full of the Equity Transactions, (ii) the expiration, termination or cancellation of Warrant 2 without Warrant 2 having been exercised in full or (iii) the Warrant 2 Transferability Event, no party will have any further obligations under this Section 3.1; *provided*, that this Section 3.1(g) shall in no way relieve any party with respect to any breach by such party of this Section 3.1 prior to such time.

3.2     Public Announcements.  The parties acknowledge that the communication plan (including the initial press release of each party) regarding the initial announcement of the transactions contemplated by this Agreement and the other Transaction Documents to customers, suppliers, investors and employees and otherwise (the "Initial Communications Materials") has been agreed by the parties.  During the initial announcement period, no party shall originate any publicity, news release or other public announcement, written or oral, relating to this Agreement, the other Transaction Documents, the transactions contemplated hereby or thereby or the existence of any arrangement between the parties or make any other communication, in each case which is inconsistent with the Initial Communications Materials.  Thereafter, except as required by applicable law or by the rules or requirements of any stock exchange on which the securities of a party hereto are listed, no party hereto shall make, or cause to be made, or permit any of its Affiliates to make, any press release or public announcement or other similar communications in respect of the Transaction Documents or the transactions contemplated thereby without prior written consent (not to be unreasonably withheld, conditioned or delayed) of each other party hereto, to the extent such release, announcement or communication relates to the transactions contemplated hereby or by any of the other Transaction Documents; provided that no party shall have the right to consent to any release, announcement or communication of any other party (including, in the case of the Company and Walgreens, any filing required to be made under the Exchange Act) made in the ordinary course of business unless and to the extent such release, announcement or communication (x) relates specifically to the signing or completion of the transactions contemplated hereby or by any of the other Transaction Documents or (y) includes information with respect to the transactions contemplated hereby or by any of the other Transaction Documents that is inconsistent with the Initial Communications Materials; provided, further, that the immediately foregoing clauses (x) and (y) shall not apply to any release, announcement or other communication to the extent containing information that is consistent with releases, announcements or other communications previously consented to by the other parties in accordance with this Section 3.2.

3.3     Expenses.  Unless otherwise provided in any Transaction Document, each of the parties hereto will bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated under the Transaction Documents, including fees and expenses of its own financial or other consultants, investment bankers, accountants and counsel.

-17-

3.4    Sufficiency of Authorized Common Stock.  From and after the date hereof and until the date on which each of the Warrants has been fully exercised (or expires unexercised or is canceled in accordance with the terms hereof and thereof), the Company shall at all times have reserved for issuance, free of preemptive or similar rights, a sufficient number of shares of authorized and unissued Warrant Shares to effectuate such exercise in full (for the avoidance of doubt, without giving effect to any "cashless" or "net" exercise provisions therein).  Nothing in this Section 3.4 shall preclude the Company from satisfying its obligations in respect of the exercise of either Warrant by delivery of shares of Common Stock which are held in the treasury of the Company.

3.5    Pursuit of Other Opportunities.  From and after the date hereof to the date that is six (6) months after the date of this Agreement, each of the parties hereto agrees to cooperate and negotiate in good faith to explore the opportunities set forth on Section 3.5 of the Company Disclosure Letter (each such opportunity, an "Additional Opportunity").  Section 3.5 of the Company Disclosure Letter does not contain all the essential terms with respect to the Additional Opportunities, and the parties acknowledge that they must complete negotiations on the points set forth in Section 3.5 of the Company Disclosure Letter as well as on points beyond the scope of Section 3.5 of the Company Disclosure Letter in a mutually satisfactory manner, before definitive documents can be executed and any transactions with respect to the Additional Opportunities can be consummated.  Neither this Section 3.5 nor the provisions of Section 3.5 of the Company Disclosure Letter shall create or constitute any legally binding obligations between the parties, and none of the parties shall have any liability to the other parties with respect to, based on, arising from or relating to this Section 3.5 or the Additional Opportunities.  This Section 3.5 and the provisions of Section 3.5 of the Company Disclosure Letter do not express an agreement of the parties or an offer to enter into an agreement and are not intended to and do not create any legal or equitable obligations with respect to the Additional Opportunities.  Each of the parties hereto shall be free to withdraw from discussions and not continue to pursue any Additional Opportunity, without obligation or liability to the other parties or to any other person, if such party determines in its sole discretion, but after consultation with the other parties, that it is not in the best interests of such party to continue to pursue such Additional Opportunity.

3.6    Non-Solicit.

(a)    From and after the date hereof (x) to the date that is one (1) year after the later of (i) the termination of the Rx Distribution Agreement and (ii) the termination of the Generic Pharmaceuticals Purchasing Services Agreement, each of Walgreens and Alliance Boots covenants and agrees, individually on behalf of itself and not jointly, with the Company that it will not, nor will it permit its Affiliates to, directly or indirectly, solicit for employment any individual set forth on Section 3.6(a) of the Company Disclosure Letter (each, a "Key Company Employee"); and (y) to the date that is three (3) years after the date of this Agreement, each of Walgreens and Alliance Boots covenants and agrees that it will not, nor will it permit its Affiliates to, hire any Key Company Employee; provided, however, that the foregoing shall not preclude it or its Affiliates from (A) placing general solicitations not targeted at such Key Company Employees (so long as it and its Affiliates do not hire any such Key Company Employee) or (B) soliciting in any manner or hiring any such Key Company Employee whose employment with the Company and its Affiliates has terminated at least one (1) year prior to the date of such solicitation or hire, as applicable, so long as neither it nor its Affiliates solicited such

-18-

Key Company Employee in violation of this Section 3.6(a) prior to such one (1) year anniversary.

(b)     From and after the date hereof (x) to the date that is one (1) year after the later of (i) the termination of the Rx Distribution Agreement and (ii) the termination of the Generic Pharmaceuticals Purchasing Services Agreement, the Company covenants and agrees with each of Walgreens and Alliance Boots that the Company will not, nor will the Company permit its Affiliates to, directly or indirectly, solicit for employment any individual set forth on Section 3.6(b) of the Company Disclosure Letter (each, a "Key Walgreens/Alliance Boots Employee"); and (y) to the date that is three (3) years after the date of this Agreement, the Company covenants and agrees that it will not, nor will it permit its Affiliates to, hire any Key Walgreens/Alliance Boots Employee; provided, however, that the foregoing shall not preclude the Company or its Affiliates from (x) placing general solicitations not targeted at such Key Walgreens/Alliance Boots Employees (so long as the Company and its Affiliates do not hire any such Key Walgreens/Alliance Boots Employee) or (y) soliciting in any manner or hiring any such Key Walgreens/Alliance Boots Employee whose employment with Walgreens, Alliance Boots and their Affiliates has terminated at least one (1) year prior to the date of such solicitation or hire, as applicable, so long as neither the Company nor its Affiliates solicited such Key Walgreens/Alliance Boots Employee in violation of this Section 3.6(b) prior to such one (1) year anniversary.

3.7     Financing Cooperation.

(a)     From and after the date hereof, the Company shall, and shall cause its subsidiaries to, and shall use its reasonable best efforts to cause its and its subsidiaries' representatives to, cooperate with Walgreens and Alliance Boots in connection with any Debt Financing in the following manner (in each case to the extent reasonably required in connection with any such Debt Financing):

(i)     furnish the report(s) of the auditors with respect to the audited financial statements of the Company and its subsidiaries, and use reasonable best efforts to obtain the consent of such auditors to the use of such report(s) in accordance with normal custom and practice with respect to any such Debt Financing, and use reasonable best efforts to cause such auditors to provide customary comfort letters to the underwriters, initial purchasers or placement agents, as applicable, in connection with any such Debt Financing;

(ii)     furnish Walgreens and Alliance Boots (and their respective representatives) with additional financial statements, schedules or other financial data relating to the Company and its subsidiaries and assist Walgreens and Alliance Boots (and their respective representatives) with preparing pro forma financial statements, in each case, as reasonably requested in connection with any such Debt Financing (it being understood that none of Walgreens, Alliance Boots or any of their Affiliates (or any of their respective representatives) shall be permitted to disclose (whether by including such information in, or reflecting such information on, their financial statements or otherwise) any financial information provided by the Company pursuant to this clause (ii) prior to the

-19-

Company first publicly disclosing such information in its ordinary course of business);

(iii)     reasonably cooperate with the due diligence of the proposed lenders, underwriters, initial purchasers, ratings agencies or placement agents, as applicable, and/or Walgreens, Alliance Boots and their respective representatives in connection with any such Debt Financing, to the extent customary and reasonable and to the extent not unreasonably interfering with the business of the Company (and in the case of the provision of information, to the extent already existing or that can be prepared without excessive cost or management time), and only as long as any person involved in such due diligence enters into a confidentiality agreement with the Company in customary form and substance reasonably acceptable to the Company; *provided, however,* that none of the Company, its subsidiaries or their respective representatives shall be required to deliver any opinions, 10b-5 statements or officer's certificates in connection with any such due diligence efforts; *provided, further* that none of the Company, its subsidiaries or their respective representatives shall be required to provide any cooperation or information to the extent that (x) such information is competitively sensitive, (y) providing such cooperation or information (A) would reasonably be expected to jeopardize attorney-client privilege or loss of attorney work product protection, (B) would violate a confidentiality obligation to any person or (C) would violate any applicable law; *provided,* that with respect to clauses (x) and (y), the Company uses reasonable efforts, and cooperates in good faith with Walgreens and/or Alliance Boots, as applicable, to develop and implement reasonable alternative arrangements to provide Walgreens and Alliance Boots (and their respective representatives) with the intended benefits of this Section 3.7; and

(iv)     reasonably assist in the review or preparation of applicable portions (i.e., to the extent relating to the Company) of one or more confidential information memoranda, prospectuses, offering memoranda and other marketing and syndication materials in connection with such Debt Financing.

(b)     Notwithstanding anything in this Section 3.7 to the contrary, in fulfilling obligations of the Company pursuant to this Section 3.7, neither the Company nor any of its subsidiaries shall be required to pay any commitment or other fee, provide any security or incur any other liability or execute or enter into any agreement in connection with any such Debt Financing.  Walgreens and Alliance Boots shall promptly, upon request by the Company, reimburse the Company for all reasonable out of pocket costs and expenses incurred by the Company or any of its subsidiaries in connection with the cooperation of the Company and its subsidiaries contemplated by this Section 3.7.  For purposes of this Agreement, "Debt Financing" means any debt financing incurred by Walgreens or Alliance Boots, as applicable, for purposes of exercising the Warrants and/or acquiring Initial Open Market Shares, Additional Open Market Shares or any New Securities or Replacement Pre-emptive Shares (each as defined in the Shareholders Agreement), including, for the avoidance of doubt, any refinancings or "take-out" financings with respect thereto.  The obligations of the Company and its subsidiaries under this Section 3.7 shall automatically terminate upon the date that the Beneficial Ownership (as

-20-

defined in the Shareholders Agreement) of the Investors, in the aggregate, of Common Stock is less than five percent (5%).

## Article IV
### ADDITIONAL AGREEMENTS

4.1    Additional Equity Purchases.

(a)    The parties hereto acknowledge and agree that, from and after the date hereof, Walgreens (or any of its wholly-owned subsidiaries, or Alliance Boots or any of its wholly-owned subsidiaries, or the FW JV, in each case to the extent designated by Walgreens in writing) (Walgreens, in its capacity as the holder of the right to acquire (and/or to designate any such person(s) (the "Designees") to acquire) Initial Open Market Shares, the "IOMS Rights Holder") shall have the right to acquire, from time to time (but subject to Section 2.2 of the Shareholders Agreement), in one or more open market transactions, a number of shares of Common Stock not exceeding, in the aggregate, 19,859,795 shares of Common Stock, subject to adjustment pursuant to Section 4.1(c) (the "Initial Open Market Shares").

(b)    In addition (without limitation to Section 4.1(a)), in the event that, on any day during the Exercise Period (as defined in Warrant 1), the Market Price (as defined in Warrant 1) is less than the then-applicable Exercise Price (as defined in Warrant 1), the parties hereto acknowledge and agree that, from and after such day through the date which is five (5) days after the last day of the Exercise Period, any Warrantholder (as defined in Warrant 1) shall have the right to acquire (either directly or through Walgreens or any of its wholly-owned subsidiaries, or through Alliance Boots or any of its wholly-owned subsidiaries, or the FW JV, as designated by such Warrantholder in writing), from time to time (but subject to Section 2.2 of the Shareholders Agreement), in one or more open market transactions, a number of shares of Common Stock not exceeding, in the aggregate, the product of (i) (A) 14,185,570 shares of Common Stock (the "Aggregate Additional Open Market Shares"), subject to adjustment pursuant to Section 4.1(c), minus (B) the sum of (I) the greater of (x) zero and (y) (1) the number of Warrant 1 Shares previously issued upon exercise of Warrant 1 minus (2) 37.5% of the total number of Warrant 1 Shares, whether already issued upon exercise of Warrant 1 or remaining unexercised and underlying Warrant 1 and (II) the number of Required Shares, if any, actually purchased by the IOMS Rights Holder and its Designees during the Threshold Period pursuant to Section 4.1(c)(iii), and (ii) a fraction, the numerator of which is the sum of (A) the number of Warrant 1 Shares previously issued upon exercise of Warrant 1 in respect of the portion of Warrant 1 held by such Warrantholder and (B) the number of unexercised Warrant 1 Shares underlying the portion of Warrant 1 held by such Warrantholder, and the denominator of which is the total number of Warrant 1 Shares, whether already issued upon exercise of Warrant 1 or remaining unexercised and underlying Warrant 1 (the "Additional Open Market Shares").

(c)    Notwithstanding anything to the contrary in Section 4.1(a) or Section 4.1(b), each of (x) the number of Initial Open Market Shares (to the extent not already acquired by the IOMS Rights Holder or its Designees prior to the adjustment(s) provided for in this Section 4.1(c)) and (y) the number of Aggregate Additional Open Market Shares (to the extent not already acquired by the Warrantholder(s) or their permitted designees(s) prior to the adjustment(s) provided for in this Section 4.1(c)), shall be subject to adjustment from time to time from and after the execution

-21-

and delivery hereof as follows; *provided*, that if more than one subsection of this Section 4.1(c) is applicable to a single event, the subsection shall be applied that produces the largest adjustment and no single event shall cause an adjustment under more than one subsection of this Section 4.1(c) so as to result in duplication:

(i)     If the Company shall from and after the execution and delivery hereof (a) declare and pay a dividend or make a distribution on its Common Stock in shares of Common Stock, (b) split, subdivide or reclassify the outstanding shares of Common Stock into a greater number of shares, or (c) combine or reclassify the outstanding shares of Common Stock into a smaller number of shares, the number of Initial Open Market Shares and Aggregate Additional Open Market Shares at the time of the record date for such dividend or distribution or the effective date of such split, subdivision, combination or reclassification shall be proportionately adjusted to equal, immediately upon such record date or effective date, as the case may be, the number of shares of Common Stock that the Initial Open Market Shares and Aggregate Additional Open Market Shares, respectively, would have represented (including entitlements to receive shares of Common Stock) had the Initial Open Market Shares and Aggregate Additional Open Market Shares been acquired in full prior to such record date or effective date, as the case may be.

(ii)     If the Company shall from and after the execution and delivery hereof issue shares of Common Stock (or rights or warrants or any other securities or rights exercisable or convertible into or exchangeable (collectively, a "conversion") for shares of Common Stock) (collectively, "convertible securities") (other than in Permitted Transactions) (a "Subject Issuance"), then, in such event, the number of Initial Open Market Shares and Aggregate Additional Open Market Shares immediately prior to the Subject Issuance (each, an "Initial Number") shall be increased to the number obtained by multiplying the applicable Initial Number by a fraction (1) the numerator of which shall be the sum of (x) the number of shares of Common Stock outstanding immediately prior to the Subject Issuance and (y) the number of additional shares of Common Stock issued (or into which such issued convertible securities may be converted) and (2) the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to the Subject Issuance. For purposes of the foregoing, (I) "Permitted Transactions" shall include (a) issuances pursuant to which the adjustment set forth in Section 4.1(c)(i) is applicable, (b) issuances of shares of Common Stock (including upon exercise of options) to directors, advisors, employees or consultants of the Company pursuant to a stock option plan, employee stock purchase plan, restricted stock plan, other employee benefit plan or other similar compensatory agreement or arrangement approved by the Board of Directors of the Company, (c) conversions of convertible securities outstanding as of the date of this Agreement and disclosed in Section 2.2(b) of this Agreement in accordance with the terms of such convertible securities and (d) the exercise of the Warrants, (II) on any increase in the number of shares of Common Stock deliverable upon conversion of any convertible securities issued in the Subject Issuance (each, a "Post-Issuance Adjustment"), then, to the extent that, in respect of the same facts and events, the adjustment provisions set forth in this Section 4.1(c) (excluding this clause (II)) do not result in a proportionate increase in the number of Initial Open Market Shares and/or the number of Aggregate Additional Open Market Shares, in each case equal to or greater than the proportionate increase in respect of such convertible securities, then the number of Initial Open Market Shares and/or the number of Aggregate Open Market Shares, as applicable, then in effect, shall forthwith be readjusted to such number of Initial Open Market

-22-

Shares and/or the number of Aggregate Additional Open Market Shares, respectively, as would have been obtained had the Post-Issuance Adjustment been effective in respect of such convertible securities as of immediately prior to the Subject Issuance and (III) if the number of Initial Open Market Shares and Aggregate Additional Open Market Shares shall have been adjusted upon any Subject Issuance of convertible securities in accordance with this Section 4.1(c), subject to clause (II) above, no further adjustment of the number of Initial Open Market Shares and Aggregate Additional Open Market Shares shall be made for the actual issuance of shares of Common Stock upon the actual conversion of such convertible securities in accordance with their terms. Any adjustment made pursuant to this Section 4.1(c)(ii) shall become effective immediately upon the Subject Issuance.

(iii)     During the period beginning on the later of (a) the acquisition in full by the IOMS Rights Holder and its Designees of all Initial Open Market Shares (before giving effect to the adjustment set forth pursuant to this Section 4.1(c)(iii)) and (b) the date on which the Initial Antitrust Clearance shall have been obtained, and ending immediately following the one-year anniversary of the date on which the Initial Antitrust Clearance shall have been obtained (such period, the "Threshold Period"), subject to the proviso to this Section 4.1(c)(iii), the number of Initial Open Market Shares shall be increased by such number of shares of Common Stock as is equal to the lesser of: (I) such number of shares of Common Stock as is applicable to enable the IOMS Rights Holder and its Designees to exceed the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h) prior to the expiration of the Threshold Period and (II) 2,837,114 shares of Common Stock (as adjusted to appropriately reflect any of the events referred to in this Section 4.1(c)) (such number of shares as determined by clauses (I) and (II), the "Required Shares"); provided, that (A) this Section 4.1(c)(iii) shall only be applicable following (1) the delivery of a written notice from Walgreens to the Company during the Threshold Period requesting that either this Section 4.1(c)(iii) or the Warrant 1 Special Exercise Period (as defined in Warrant 1) take effect (such notice, the "Threshold Notice") and (2) the earlier of (x) the fifth (5th) Business Day following such Threshold Notice, if the Company shall not have responded with a written notice to Walgreens specifying that it has elected for the Warrant 1 Special Exercise Period to take effect in lieu of this Section 4.1(c)(iii), and (y) the delivery by the Company to Walgreens of a written notice specifying that it has elected for this Section 4.1(c)(iii) to take effect in lieu of the Warrant 1 Special Exercise Period.

(iv)     All calculations under this Section 4.1(c) shall be made to round up to the nearest whole share of Common Stock. Any adjustments pursuant to this Section 4.1(c) shall be made successively whenever an event referred to herein shall occur.

(v)     In the event that the Company shall propose to (1) take any action of the type described in this Section 4.1(c) (but only if the action of the type described in this Section 4.1(c) would result in an adjustment in the Initial Open Market Shares or Aggregate Additional Open Market Shares), or (2) declare any dividend or distribution (or to set any record date in respect of any such dividend or distribution) on shares of Common Stock payable, in whole or in part, in Other Voting Securities (as defined in Warrant 1), the Company shall provide written notice to each of Walgreens and Alliance Boots, which notice shall specify the record date, if any, with respect to any such action and the approximate date on which such action is to take place. In the case of the foregoing clause (1) of this Section 4.1(c)(v), such notice shall also set

-23-

forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Initial Open Market Shares and Additional Open Market Shares.  In the case of any action described in this Section 4.1(c)(v) which would require the fixing of a record date, such notice shall be given at least ten (10) days prior to the date so fixed.  In case of all other action, such notice shall be given at least ten (10) days prior to the taking of such proposed action unless the Company reasonably determines in good faith that, given the nature of such action, the provision of such notice at least ten (10) days in advance is not reasonably practicable from a timing perspective, in which case such notice shall be given as far in advance prior to the taking of such proposed action as is reasonably practicable from a timing perspective.

(d)  The parties agree to the matters set forth in Section 4.1(d) of the Company Disclosure Letter.

4.2  <u>Acquisition for Investment</u>.  Each of Walgreens and Alliance Boots acknowledges that the issuance of the Warrants and Warrant Shares has not been registered under the Securities Act or under any state securities laws.  (i) Each of Walgreens and Alliance Boots acknowledges that Walgreens is acquiring the Warrants and the Warrant Shares pursuant to an exemption from registration under the Securities Act solely for investment with no present intention to distribute them to any person in violation of the Securities Act or any other applicable securities laws, (ii) each of Walgreens and Alliance Boots agrees, individually on behalf of itself and not jointly, that it will not (and will not permit its Affiliates to) sell or otherwise dispose of the Warrants or the Warrant Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any applicable securities laws, (iii) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the Warrants Issuance and of making an informed investment decision, and has conducted a review of the business and affairs of the Company that it considers sufficient and reasonable for purposes of consummating the Warrants Issuance, (iv) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it is able to bear the economic risk of the Warrants Issuance and is able to afford a complete loss of such investment and (v) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it is an "accredited investor" (as that term is defined by Rule 501 under the Securities Act).

4.3  <u>Legend</u>.  Each of Walgreens and Alliance Boots agrees that all certificates or other instruments representing the Warrants and the Warrant Shares will bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.  THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER

-24-

PROVISIONS OF (1) A FRAMEWORK AGREEMENT, DATED AS OF
MARCH 18, 2013, BY AND AMONG THE ISSUER OF THESE SECURITIES,
WALGREEN CO., AN ILLINOIS CORPORATION, AND ALLIANCE BOOTS
GMBH, A PRIVATE LIMITED LIABILITY COMPANY INCORPORATED
UNDER THE LAWS OF SWITZERLAND, A COPY OF WHICH IS ON FILE
WITH THE ISSUER AND (2) A SHAREHOLDERS AGREEMENT, DATED
AS OF MARCH 18, 2013, BY AND AMONG THE ISSUER OF THESE
SECURITIES, WALGREEN CO. AND ALLIANCE BOOTS GMBH.  THE
SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD
OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID
AGREEMENTS.  ANY SALE OR OTHER TRANSFER NOT IN
COMPLIANCE WITH SAID AGREEMENTS WILL BE VOID."

In the event that any Warrant Shares become registered under the Securities Act or the Company
is presented with an opinion of counsel reasonably satisfactory, in form and substance, to the
Company that the Warrant Shares are eligible to be transferred without restriction in accordance
with Rule 144 under the Securities Act, the Company shall issue new certificates or other
instruments representing such Warrant Shares which shall not contain such portion of the above
legend that is no longer applicable; provided that the holder of such Warrant Shares surrenders to
the Company the previously issued certificates or other instruments.

4.4     Anti-takeover Provisions and Rights Plan.  The Company shall not take any
action that would cause this Agreement or any of the other Transaction Documents, or any of the
transactions contemplated hereby or thereby, to be subject to any requirements imposed by any
Anti-takeover Provision, or subject in any manner to any "poison pill" or similar shareholder
rights plan or agreement, and shall take all necessary steps within its control to exempt (or ensure
the continued exemption of) the Transaction Documents and such transactions from, or if
necessary challenge the validity or applicability of, any applicable Anti-takeover Provisions, as
now or hereafter in effect.

<div align="center">

**Article V**
**MISCELLANEOUS**

</div>

5.1     Termination of This Agreement; Other Triggers.

(a)     This Agreement may be terminated at any time:

(i)     with the prior written consent of each of Walgreens, Alliance Boots and
the Company; or

(ii)     by any of Walgreens, Alliance Boots or the Company, upon the
termination of the Shareholders Agreement in accordance with its terms.

(b)     If (x) the Initial Antitrust Clearance shall not have been obtained on or prior to the
one-year anniversary of the HSR Filing Date, (y) to the extent applicable, the Second HSR
Clearance shall not have been obtained on or prior to the one-year anniversary of the Second
HSR Filing Date or (z) (1) any Other Antitrust Clearance in respect of an Other Antitrust Filing
seeking to allow the Investors to acquire (in the aggregate, taking into account the Investors'

existing ownership) up to a number of shares of Common Stock equal to 24.99% or less of the then-issued and outstanding shares of Common Stock shall not have been obtained on or prior to the one-year anniversary of the initial filing, making or giving, as applicable, of such Other Antitrust Filing and (2) the party or parties, as applicable, proposing to consummate the applicable Other Equity Transaction have not, on or prior to such one-year anniversary, delivered a written notice to the other parties hereto specifying that it or they, as applicable, are no longer proposing to consummate such Other Equity Transaction at such time, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents:

(i)     the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens, cancel the Warrants (to the extent not already exercised or expired), in whole but not in part;

(ii)     the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens, terminate Section 4.1 and/or Section 4.4 of this Agreement, in each case in whole but not in part; and

(iii)     (1) at the election of Walgreens (in its sole discretion), the Rx Distribution Agreement (to the extent then still in effect) shall be immediately modified such that the defined term "Initial Term" set forth in the Rx Distribution Agreement shall mean the later of "August 31, 2017" and the date which is two (2) years after the date on which Walgreens elects to modify the Rx Distribution Agreement pursuant to this Section 5.1(b)(iii) and/or (2) at the election of the Company (in its sole discretion), on the one hand, or WBAD (in its sole discretion and by joint action of Walgreens and Alliance Boots), on the other hand, the Generic Pharmaceuticals Purchasing Services Agreement shall be immediately terminated;

*provided* that a party may not exercise any cancelation, termination or modification right pursuant to this Section 5.1(b) if the breach by such party of any obligation, representation or warranty under this Agreement has been the cause of, or resulted in, the failure of the Initial Antitrust Clearance to have been obtained on or prior to the one-year anniversary of the HSR Filing Date.

(c)     If any Other Antitrust Clearance necessary to allow the Investors to acquire (in the aggregate, taking into the account the Investors' existing ownership) up to a number of shares of Common Stock that is equal to or greater than 25% of the then-issued and outstanding shares of Common Stock shall not have been obtained on or prior to the one-year anniversary of the initial filing, making or giving, as applicable, of the related Other Antitrust Filing, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents, for all purposes under this Agreement and the other Transaction Documents, a "Warrant 2 Transferability Event" shall be deemed to have occurred with respect to such Warrant 2 Shares as would have caused the Investors to exceed the applicable threshold if the remaining portion of Warrant 2 was then exercised in full (such excess portion of Warrant 2, the "Warrant 2 Transferable Portion").

(d)     If, at any time, the Generic Pharmaceuticals Purchasing Services Agreement has been terminated (x) by the Company in accordance with its terms pursuant to Sections 5.B(ii)(a)

-26-

or 5.B.(ii)(b) thereof or (y) by mutual agreement of the Company and WBAD or pursuant to Sections 5.B(i)(c) or 5.B(ii)(c) thereof, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents:

(i)      the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens delivered no later than on the third (3rd) Business Day following the effective date of such termination, cancel the Warrants (to the extent not already exercised or expired), in whole but not in part;

(ii)      the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens delivered no later than on the third (3rd) Business Day following the effective date of such termination, terminate Section 4.1 and/or Section 4.4 of this Agreement, in each case in whole but not in part; and

(iii)      in the case of clause (y), if the Company shall have exercised its rights pursuant to either Section 5.1(d)(i) or (ii), then, at the election of Walgreens (in its sole discretion), the Rx Distribution Agreement (to the extent then still in effect) shall be immediately modified such that the defined term "Initial Term" set forth in the Rx Distribution Agreement shall mean the later of "August 31, 2017" and the date which is two (2) years after the date on which Walgreens elects to modify the Rx Distribution Agreement pursuant to this Section 5.1(d)(iii).

(e)      The parties expressly acknowledge and agree that, notwithstanding anything in the Transaction Documents to the contrary, if, at any time the Rx Distribution Agreement is ter-minated by Walgreens in accordance with its terms pursuant to Section 15.A thereof, then:

(i)      at the election of the Company (in its sole discretion), on the one hand, or WBAD (in its sole discretion and by joint action of Walgreens and Alliance Boots), on the other hand, pursuant to written notice (the "Cross Termination Notice") delivered to the other (the date of the delivery of such Cross Termination Notice, the "Notice Delivery Date"), the Generics Pharmaceuticals Purchasing Services Agreement (to the extent then still in effect) shall terminate, effective on the twelve-month anniversary of the Notice Delivery Date (or such earlier date as the Company may specify at any time during such twelve-month period upon at least 30 days written notice, provided that any such earlier date shall be a month end);

(ii)      if the Notice Delivery Date shall have occurred, to the extent a Walgreens Investor Rights Termination Event (as defined in the Shareholders Agreement) shall not have previously occurred, a Walgreens Investor Rights Termination Event shall be deemed to have occurred immediately upon the Notice Delivery Date, for all purposes under the Shareholders Agreement other than Sections 1.3(b) and (c) (with respect to which the Walgreens Investor Rights Termination Event shall occur pursuant to such defined term without giving effect to this clause (ii));

(iii)      if the Notice Delivery Date shall have occurred, Section 4.1 and, subject to clause (v) below, Section 4.4 of this Agreement, and Section 2.3 of the Shareholders Agreement shall be terminated, in each case in whole but not in part;

(iv) if the Notice Delivery Date shall have occurred, each Restricted Period (as defined in the Shareholders Agreement), to the extent then still in effect, shall be deemed to have expired for all purposes immediately as of the Notice Delivery Date;

(v) with respect to any Warrant, (1) if the Notice Delivery Date shall have occurred earlier than the date that is six months prior to the Exercise Start Date (as defined in such Warrant) of such Warrant (without application of this clause (v)), then such Warrant shall be immediately canceled, (2) if the Notice Delivery Date shall have occurred on or after the date that is six months prior to the Exercise Start Date and prior to the Exercise Start Date (in each case without application of this clause (v)), then such Exercise Start Date shall be deemed to be the Notice Delivery Date and the Expiration Date (as defined in such Warrant) of such Warrant shall be deemed to be at 5:00 p.m., New York City time, on the six-month anniversary of the Notice Delivery Date, and (3) if the Notice Delivery Date shall have occurred after the Exercise Start Date for such Warrant (without application of this clause (v)), no adjustment shall be made to the Exercise Start Date or the Expiration Date of such Warrant (except in such case where the Exercise Start Date for such Warrant shall have been accelerated as a result of the occurrence of a Preliminary Control Date or an Other Voting Security Event (each as defined in such Warrant), in which case the Expiration Date (as defined in such Warrant) of such Warrant shall be deemed to be the earlier of (x) such Expiration Date without application of this clause (v) and (y) 5:00 p.m., New York City time, on the six-month anniversary of the Notice Delivery Date); provided that any exercise of any Warrant after the Notice Delivery Date and prior to the Expiration Time (as modified by this clause (v)) for such Warrant shall be only effected as a Cashless Exercise (as defined in such Warrant) (the Expiration Time determined by the immediately foregoing clauses (1), (2) and (3), the "Modified Expiration Time");

(vi) if the Notice Delivery Date shall have occurred, to the extent not previously expired, from and after the Notice Delivery Date, the Standstill Period (as defined in the Shareholders Agreement) and the SP Standstill Period (as defined in the Shareholders Agreement), if then in effect, shall be deemed for all purposes to be the period beginning on the date of this Agreement and ending upon the later of (1) the 18 month anniversary of the Notice Delivery Date and (y) the date that the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, equals one share less than 10%;

(vii) if the Notice Delivery Date shall have occurred, for the avoidance of doubt giving effect to the eighth and tenth sentences of Section 5.2 of the Shareholders Agreement, from and after the date of the later of (1) the Notice Delivery Date and (2) the latest to occur of the Modified Expiration Time in respect of each Warrant (the date determined pursuant to clause (1) and clause (2), the "Sell-down Date"), each Investor shall be required to Transfer (as defined in the Shareholders Agreement) to Persons other than Walgreens, Alliance Boots or any of their respective Permitted Transferees or Affiliates, in each case in accordance with the terms of the Shareholders Agreement (as modified pursuant to this Section 5.1(e)), by no later than the two-year anniversary of the Sell-down Date (such two-year period, the "Sell-Down Period"), a number of shares of Common Stock, if any, as is necessary so that the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, is less than 15% (such shares, the "Required Sell-Down Shares" and such required Transfers, the "Required Sell-

-28-

Down Transfers"), it being understood that subject to the obligation of the Investors to complete the Required Sell-Down Transfers prior to the expiration of the Sell-Down Period, and subject to compliance with the Shareholders Agreement (as modified pursuant to Section 5.1(e)(iv)), the manner, timing, volumes, prices and transferees applicable to any Required Sell-Down Transfers shall be in the Investors' respective sole discretion; provided, that, if at any time during the Sell-Down Period, (A) the Investors have not yet completed the Required Sell-Down Transfers and (B) the Company delivers to each of Walgreens and Alliance Boots a notice (the date of delivery of such notice, the "Repurchase Election Date") affirmatively and irrevocably electing to repurchase in full from the Investors a number of shares equal to (and not less than) the remaining Required Sell-Down Shares with respect to which Required Sell-Down Transfers have not yet occurred, the Investors shall Transfer to the Company, and the Company shall purchase from the Investors, all such remaining Required Sell-Down Shares at a per share purchase price, payable by the Company to the Investors in immediately available funds, equal to the greater of (x) Applicable Market Price on the trading day immediately prior to the Repurchase Closing Date and (y) the Weighted Average Price as of the Repurchase Closing Date. The closing of such repurchase by the Company shall occur on a Business Day (the "Repurchase Closing Date") selected by the Investors, but in any event no later than on the tenth (10th) Business Day immediately following the Repurchase Election Date. For purposes of this Section 5.1(e), (1) the "Applicable Market Price" means, as of any date of determination, the closing price (regular way) of the Common Stock on such date on the principal stock exchange on which the Company Common Stock is then listed and (2) the "Weighted Average Price" means, as of any date of determination, the weighted-average per share price (including the applicable Exercise Prices (as defined in the applicable Warrants) in respect of all exercises of the Warrants (whether pursuant to a Cash Exercise or Cashless Exercise)) paid by the Investors in respect of all acquisitions of Common Stock from and after the date hereof and on or prior to such date of determination;

(viii)    if the Notice Delivery Date shall have occurred, for the avoidance of doubt giving effect to the eighth and tenth sentences of Section 5.2 of the Shareholders Agreement, from and after the Notice Delivery Date, the Ultimate Standstill Level (as defined in the Shareholders Agreement) shall be deemed to mean "(1) prior to the two-year anniversary of the Sell-down Date, thirty percent (30%) and (2) from and after the two-year anniversary of the Sell-down Date, ten percent (10)%"; provided, that, from and after the two-year anniversary of the Sell-down Date and with respect to shares of Common Stock that represent collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group of less than 15% and more than 10%, if at any time during the Standstill Period (as modified by this Section 5.1(e)), the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, equals or exceeds the Ultimate Standstill Level, the Investors shall, in accordance with the Shareholders Agreement (as modified by this Section 5.1(e)), within a commercially reasonable and practicable time thereafter, taking into account market conditions, effect the Transfer of such number of shares of Common Stock as is necessary so that such collective Beneficial Ownership of Common Stock is no longer equal to or in excess of the Ultimate Standstill Level; provided, further, that, notwithstanding anything to the contrary (and, for the avoidance of doubt, without any implication of expanding the Investors' obligations pursuant to the immediately preceding proviso), and with respect to shares of Common Stock that represent collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group of less than 15% and more than 10%, in no event shall the Investors be required to

-29-

Transfer any shares of Common Stock (or be deemed to be in breach or default by virtue of not Transferring any shares of Common Stock) pursuant to this Section 5.1(e)(viii) to the extent that the then-current Applicable Market Price is less than the then-current Weighted Average Price; provided further, that, notwithstanding anything to the contrary, any shares that reflect collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group in excess of 15% remain subject to the obligations of clause (vii); and

(ix)     if the Notice Delivery Date shall have occurred, each of the parties hereto agrees to act in good faith and execute and deliver, and/or cause the execution and delivery of, all such future amendment and modification agreements and such other instruments, in each case with respect to any Transaction Document (and, in the case Alliance Boots and Walgreens, the Transaction Rights Agreement and the limited liability company agreement of the FW JV), and to take, and/or cause the taking of, such other and further action as may be reasonably necessary or appropriate to carry out the provisions of, and the intention of the parties as expressed in, this Section 5.1(e).

(f)     In the event of termination of this Agreement as provided in this Section 5.1, this Agreement (other than Section 1.3, Section 3.2, Section 3.3, Section 3.6, Section 4.2 (to the extent of any Initial Open Market Shares and Additional Open Market Shares that have been acquired prior to termination) and Section 4.3 (to the extent of any Initial Open Market Shares and Additional Open Market Shares that have been acquired prior to termination) and this Article V, each of which shall survive any termination of this Agreement, and other than the Confidentiality Agreements and the Transaction Rights Agreement, each of which shall survive in accordance with the terms thereof) shall forthwith become void and there shall be no liability on the part of any party hereto, except that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination.

(g)     Without affecting in any manner any prior exercise of the canceled Warrant(s), in the event that the either Warrant 1 and/or Warrant 2 are canceled in accordance with this Section 5.1, such canceled Warrant(s) shall be canceled and terminated and shall forthwith become void and the Company shall have no subsequent obligation to issue, and the Warrantholder (as defined in the Warrants) shall have no subsequent right to acquire, any Warrant 1 Shares (if Warrant 1 is canceled) or any Warrant 2 Shares (if Warrant 2 is canceled).

(h)     Without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents, in the event that either Section 4.1 and/or Section 4.4 are terminated in accordance with this Section 5.1, such terminated Section(s) shall forthwith become void and there shall be no liability on the part of any party hereto with respect to such terminated Section(s), except that nothing herein shall relieve any party from liability for any breach of such terminated Section(s) prior to such termination.

5.2     Amendment.  No amendment of any provision of this Agreement will be effective unless made in writing and signed by an officer of a duly authorized representative of each party.

5.3     Waiver of Conditions.  The conditions to any party's obligation to consummate any transaction contemplated herein are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law.  No waiver will be

effective unless it is in writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

5.4     Counterparts and Facsimile.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.  Executed signature pages to this Agreement may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

**5.5     Governing Law; Submission to Jurisdiction; WAIVER OF JURY TRIAL.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In addition, each of the parties hereto (a) submits to the personal jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such dispute, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such dispute, any Delaware State court sitting in New Castle County, in the event any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the transactions contemplated hereby, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any claim, action or proceeding relating to this Agreement or the transactions contemplated hereby in any court other than the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such claim, action or proceeding, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such claim, action or proceeding, any Delaware State court sitting in New Castle County.  Each party agrees that service of process upon such party in any such claim, action or proceeding shall be effective if notice is given in accordance with the provisions of this Agreement.  EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.5.**

5.6     Notices.  Any notice, request, instruction or other document to be given hereunder by any party to the others will be in writing and will be deemed to have been duly given (a) on

-31-

the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

### If to the Company, to:

| | |
|---|---|
| Name: | AmerisourceBergen Corporation |
| Address: | 1300 Morris Drive |
| | Chesterbrook, PA 19087 |
| Country: | United States |
| Fax: | 610 727 3612 |
| Attn: | General Counsel |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Cravath, Swaine & Moore LLP |
| Address: | Worldwide Plaza |
| | 825 Eighth Avenue |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 474-3700 |
| Attention: | Damien R. Zoubek, Esq. |
| | Robert I. Townsend III, Esq. |

### if to Walgreens, to:

| | |
|---|---|
| Name: | Walgreen Co. |
| Address: | 108 Wilmot Road |
| | Deerfield, Illinois 60015 |
| Country: | United States |
| Fax: | (847) 315-3652 |
| Attention: | Thomas J. Sabatino, Executive Vice President, |
| | General Counsel and Corporate Secretary |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Wachtell, Lipton, Rosen & Katz |
| Address: | 51 West 52nd Street |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 403-2000 |
| Attention: | Andrew R. Brownstein, Esq. |
| | Benjamin M. Roth, Esq. |

*if to Alliance Boots, to:*

| | |
|---|---|
| Name: | Alliance Boots GmbH |
| Address: | 94 Baarerstrasse |
| | 6300 Zug |
| Country: | Switzerland |
| Attention: | Marco Pagni, Group Legal Counsel & |
| | Chief Administrative Officer |
| Email: | Marco.Pagni@allianceboots.com |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Darrois Villey Maillot Brochier |
| Address: | 69 avenue Victor Hugo |
| | 75116 Paris |
| Country: | France |
| Fax: | +33 1 45 02 49 59 |
| Attention: | Me. Alain Maillot |
| | Benjamin S. J. Burman, Esq. |

5.7    Entire Agreement, Etc.  This Agreement (including the Annexes hereto), the other Transaction Documents, the Confidentiality Agreements and, in the case of Walgreens and Alliance Boots, the Transaction Rights Agreement, constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof.  No party hereto shall take, or cause to be taken, including by entering into agreements or other arrangements with provisions or obligations that conflict, or purport to conflict, with the terms of the Transaction Documents or any of the transactions contemplated thereby, any action with either an intent or effect of impairing any such other persons' rights under any of the Transaction Documents. "Confidentiality Agreements" has the meaning ascribed to such terms in the Shareholders Agreement.

5.8    Definitions of "subsidiary" and "Affiliate".

(a)    When a reference is made in this Agreement to a subsidiary of a person, the term "subsidiary" means, with respect to such person, any foreign or domestic entity, whether incorporated or unincorporated, of which (a) such person or any other subsidiary of such person is a general partner or (b) at least a majority of the voting power to elect a majority of the directors or others performing similar functions with respect to such other entity is directly or indirectly owned or controlled by such person or by any one or more of such party's subsidiaries, or by such party and one or more of its subsidiaries.

(b)    The term "Affiliate" means, with respect to any person, any other person (for all purposes hereunder, including any entities or individuals) that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first person.  It is expressly agreed that, for purposes of this definition, (i) none of the Company or any of its subsidiaries is an Affiliate of Walgreens, Alliance Boots or WBAD (or any of their

-33-

respective subsidiaries) (and *vice versa*), and (ii) each of WBAD and the FW JV is an Affiliate of each of Walgreens and Alliance Boots (and *vice versa*). "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of securities, by contract, management control, or otherwise. "Controlled" and "Controlling" shall be construed accordingly. Notwithstanding the foregoing, for all purposes of any Transaction Document or any other agreement that expressly incorporates this definition by reference hereto, in no event shall (i) Walgreens (or any of its subsidiaries) be deemed an Affiliate of Alliance Boots (or any of its subsidiaries) (and *vice versa*), unless and until Alliance Boots shall have become a subsidiary of Walgreens, and in no event shall either Walgreens (or any of its subsidiaries) or Alliance Boots (or any of its subsidiaries) be deemed an Affiliate of the Company (or any of its subsidiaries) (and *vice versa*) or (ii) Alliance Boots (or any of its subsidiaries) or Walgreens (or any of its subsidiaries) be deemed an Affiliate of Kohlberg Kravis Roberts & Co. L.P., a Delaware limited partnership, or of any of its Affiliates (including its investment funds) or of any of its or its Affiliates' (including its investment funds') "portfolio companies" (as such term is customarily used among institutional investors) (and *vice versa*).

       5.9     <u>Assignment</u>.  Neither this Agreement nor any right, remedy, obligation nor liability arising hereunder or by reason hereof shall be assignable by any party hereto without the prior written consent of the other parties, and any attempt to assign any right, remedy, obligation or liability hereunder without such consent shall be void, except that each of Walgreens and Alliance Boots may transfer or assign, in whole or from time to time in part, to one or more of its respective direct or indirect wholly-owned subsidiaries, or to the FW JV, its rights and/or obligations under this Agreement, but any such transfer or assignment will not relieve Walgreens or Alliance Boots, as applicable, of its obligations hereunder.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

       5.10    <u>Severability</u>.  If any provision of this Agreement or a Transaction Document, or the application thereof to any person or circumstance, is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby or thereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

       5.11    <u>No Third Party Beneficiaries</u>.  Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person other than parties hereto (and (a) any wholly-owned subsidiary of either Walgreens or Alliance Boots, or the FW JV, as applicable, to which an assignment is made in accordance with this Agreement and (b) any Warrantholder (as defined in Warrant 1) with respect to Section 4.1 and Additional Open Market Shares), any benefits, rights, or remedies.

       5.12    <u>Specific Performance</u>.  The parties hereto agree that failure of any party to perform its agreements and covenants hereunder, including a party's failure to take all actions as

[[3397517]]

are necessary on such party's part in accordance with the terms and conditions of this Agreement to consummate the transactions contemplated hereby, will cause irreparable injury to the other parties, for which monetary damages, even if available, will not be an adequate remedy. It is agreed that the parties shall be entitled to equitable relief including injunctive relief and specific performance of the terms hereof, without the requirement of posting a bond or other security, and each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of a party's obligations and to the granting by any court of the remedy of specific performance of such party's obligations hereunder, this being in addition to any other remedies to which the parties are entitled at law or equity.

\* \* \*

[[3397517]]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

AMERISOURCEBERGEN CORPORATION

By: _____

    Name:

    Title:


WALGREEN CO.

By: _____

    Name:

    Title:


ALLIANCE BOOTS GMBH

By: _____

    Name:

    Title

[[3397517]]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

AMERISOURCEBERGEN CORPORATION

By: _____

Name: Steven H. Collis
Title: President and CEO

WALGREEN CO.

By: _____

Name: Greg Wasson

Title: Chief Executive Officer

*[Signature Page to Framework Agreement]*

ALLIANCE BOOTS GMBH

By: _____

Name: Stefano Pessina

Title: Executive Chairman

*[Signature Page to Framework Agreement]*

# EXHIBIT B

EXECUTION COPY

---

AMERISOURCEBERGEN SHAREHOLDERS AGREEMENT

Dated as of March 18, 2013

---

# TABLE OF CONTENTS

**Page**

ARTICLE I

GOVERNANCE .................................................................................................................2

1.1    Composition of the Board of Directors........................................................................2
1.2    Objection to Investor Designee....................................................................................3
1.3    No Adverse Action; Voting Agreement .......................................................................4
1.4    Board Committees .......................................................................................................5
1.5    Termination of Board Designation Rights ..................................................................5
1.6    Information Rights .......................................................................................................6

ARTICLE II
TRANSFERS; STANDSTILL PROVISIONS; PREEMPTIVE RIGHTS ....................................9

2.1    Transfer Restrictions....................................................................................................9
2.2    Standstill Provisions...................................................................................................12
2.3    Preemptive Rights ......................................................................................................17
2.4    Outside Activities.......................................................................................................20

ARTICLE III

REPRESENTATIONS AND WARRANTIES.....................................................................21

3.1    Representations and Warranties of the Investors.......................................................21
3.2    Representations and Warranties of the Company ......................................................22
3.3    Representations and Warranties of Alliance Boots ...................................................22

ARTICLE IV

REGISTRATION ...............................................................................................................23

4.1     Demand Registrations.................................................................................................23
4.2     Piggyback Registrations.............................................................................................25
4.3     Shelf Registration Statement......................................................................................27
4.4     Withdrawal Rights .....................................................................................................29
4.5     Holdback Agreements................................................................................................29
4.6     Registration Procedures.............................................................................................30
4.7     Registration Expenses................................................................................................35
4.8     Miscellaneous. ...........................................................................................................36
4.9     Registration Indemnification. ....................................................................................36
4.10   Free Writing Prospectuses ........................................................................................39

**Page**

ARTICLE V

DEFINITIONS ........................................................................................................................39

5.1     Defined Terms ................................................................................................................39
5.2     Interpretation ..................................................................................................................54

ARTICLE VI

MISCELLANEOUS ...............................................................................................................55

6.1     Term ..............................................................................................................................55
6.2     Notices ..........................................................................................................................55
6.3     Investor Actions ............................................................................................................57
6.4     Amendments and Waivers ............................................................................................57
6.5     Successors and Assigns .................................................................................................57
6.6     Severability ...................................................................................................................58
6.7     Counterparts ..................................................................................................................58
6.8     Entire Agreement ..........................................................................................................58
6.9     Governing Law; Jurisdiction ........................................................................................58
6.10   WAIVER OF JURY TRIAL .........................................................................................58
6.11   Specific Performance ....................................................................................................59
6.12   No Third Party Beneficiaries .......................................................................................59
6.13   Obligation to Update Annex A .....................................................................................59

Annex A     Ownership Schedule

SHAREHOLDERS AGREEMENT, dated as of March 18, 2013 (this "Agreement"), among (i) AmerisourceBergen Corporation, a Delaware corporation (the "Company"), (ii) Walgreen Co., an Illinois corporation ("Walgreens"), and (iii) Alliance Boots GmbH, a private limited liability company incorporated under the laws of Switzerland ("Alliance Boots").

<u>W I T N E S S E T H</u>:

WHEREAS, on the date hereof, the Company, Walgreens and Alliance Boots entered into a Framework Agreement (as it may be amended from time to time, the "Framework Agreement") pursuant to which, among other things, the Company (i) issued on the date hereof Warrant 1 and Warrant 2 (together, the "Warrants") to Permitted Transferees of Walgreens and Alliance Boots and (ii) agreed with Walgreens and Alliance Boots with respect to certain rights of Walgreens and/or Alliance Boots, and/or their respective permitted designees, as applicable, to acquire the Initial Open Market Shares and the Additional Open Market Shares, subject to the terms and conditions herein and therein;

WHEREAS, each of the parties hereto wishes to set forth in this Agreement certain terms and conditions regarding, among other things, the Investors' ownership of the Warrants, Warrant Shares, Initial Open Market Shares and/or Additional Open Market Shares, as applicable (the Warrant Shares, Initial Open Market Shares and Additional Open Market Shares, collectively, the "Shares");

WHEREAS, on the date hereof, Walgreens, Alliance Boots, Walgreens Pharmacy Strategies, LLC, an Illinois limited liability company and wholly owned Subsidiary of Walgreens, Alliance Boots Luxembourg S.à r.l., a *societé à responsabilité limitée* organized under the laws of the Grand Duchy of Luxembourg and wholly owned Subsidiary of Alliance Boots, and WAB Holdings, LLC, a Delaware limited liability company, jointly owned, directly or indirectly, by Walgreens and Alliance Boots (the "FW JV"), entered into that certain Transaction Rights Agreement (the "Transaction Rights Agreement"), providing for certain rights and obligations of each of Walgreens and Alliance Boots with respect to the transactions contemplated herein and in the other Transaction Documents; and

WHEREAS, the respective boards of directors of each of the parties hereto has unanimously approved this Agreement, each of the other Transaction Documents and the transactions contemplated hereby and thereby.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

# ARTICLE I

# GOVERNANCE

1.1    Composition of the Board of Directors.

(a)    Upon the occurrence of a Walgreens Investor Rights Initiation Event, the Company's board of directors (the "Board") shall promptly (and in any case within ten (10) Business Days) after receiving a Walgreens Investor Rights Initiation Event Notice take all action necessary (including by amending the organizational documents of the Company, if necessary) to cause one (1) Walgreens Designee to be appointed to the Board.

(b)    Upon the occurrence of a Walgreens Investor Rights Step-Up Event, the Board shall promptly (and in any case within ten (10) Business Days) after receiving a Walgreens Investor Rights Step-Up Event Notice take all action necessary (including by amending the organizational documents of the Company, if necessary) to cause one (1) additional Walgreens Designee to be appointed to the Board, such that the Board shall have two (2) Walgreens Directors.

(c)    During the Walgreens Investor Rights Period, subject to the other provisions of this Section 1.1, including Section 1.1(d), and Section 1.2, at each annual or special meeting of the stockholders of the Company at which directors are to be elected to the Board, the Company will nominate and use its reasonable best efforts (which shall, subject to Applicable Law, include including in any proxy statement used by the Company to solicit the vote of its stockholders in connection with any such meeting the recommendation of the Board that stockholders of the Company vote in favor of the slate of directors) to cause the election to the Board of a slate of directors that includes (i) during the Walgreens Enhanced Investor Rights Period, two (2) Walgreens Designees or (ii) otherwise, one (1) Walgreens Designee.

(d)    Walgreens shall notify the Company of the identity of any proposed Walgreens Designee, in writing, on or before the time such information is reasonably requested by the Board or the Governance and Nominating Committee for inclusion in a proxy statement for a meeting of stockholders, together with all information about such proposed Walgreens Designee as shall be reasonably requested by the Board or the Governance and Nominating Committee (including, at a minimum, any information regarding such proposed Walgreens Designee to the extent required by applicable securities laws or for any other person nominated for election to the Board).

(e)    Subject to Section 1.1(d) and Section 1.2, so long as no Walgreens Investor Rights Termination Event has occurred, in the event of (i) the death, disability, removal or resignation of a Walgreens Director, the Board will promptly appoint as a replacement Walgreens Director the Walgreens Designee designated by Walgreens to fill the resulting vacancy, or (ii) the failure of a Walgreens Designee to be elected to the Board at any annual or special meeting of the stockholders of the Company at which such Walgreens Designee stood for election but was nevertheless not elected (such Walgreens Designee, a "Walgreens Specified Designee"), the Board will promptly appoint another Walgreens Designee designated by Walgreens to serve in lieu of such Walgreens Specified Designee as a Walgreens Director during the term that such Walgreens Specified Designee would have served had such Walgreens Specified Designee been

elected at such meeting of the stockholders of the Company, and, in each case of clause (i) and clause (ii), such individual shall then be deemed a Walgreens Director for all purposes hereunder. Neither the Company nor the Board will remove any Walgreens Director without the prior written consent of Walgreens, unless such Walgreens Director is no longer eligible for designation as a member of the Board pursuant to Section 1.2 or if to the extent necessary to remedy a breach of Section 1.5.

(f)     The Company will at all times provide each Walgreens Director (in his or her capacity as a member of the Board) with the same rights to indemnification and exculpation that it provides to the other members of the Board.  The Company acknowledges and agrees that any such indemnification obligations to indemnify or advance expenses to each Walgreens Director, in his or her capacity as such, for the matters covered by such indemnification obligations, shall be the primary source of indemnification and advancement of such Walgreens Director in connection therewith, and any obligation on the part of any Investor Indemnitor under any Investor Indemnification Agreement to indemnify or advance expenses to such Walgreens Director shall be secondary to the Company's obligation and shall be reduced by any amount that such Walgreens Director may collect as indemnification or advancement from the Company. In the event that the Company fails to indemnify or advance expenses to each Walgreens Director as required by such indemnification obligations and this Agreement (such unpaid amounts, the "Unpaid Indemnitee Amounts"), and any Investor Indemnitor makes any payment to such Walgreens Director in respect of indemnification or advancement of expenses under any Investor Indemnification Agreement on account of such Unpaid Indemnitee Amounts, such Investor Indemnitor shall be subrogated to the rights of such Walgreens Director under this Agreement in respect of such Unpaid Indemnitee Amounts.

1.2     Objection to Investor Designee.

(a)     Notwithstanding the provisions of this Article I, Walgreens will not be entitled to designate a particular Walgreens Designee (or, for the avoidance of doubt, any Walgreens Director) to the Board pursuant to this Article I in the event that the Board reasonably determines that (i) the election of such Walgreens Designee to the Board would cause the Company to not be in compliance with Applicable Law, (ii) such Walgreens Designee has been involved in any of the events enumerated in Item 2(d) or (e) of Schedule 13D under the Exchange Act or Item 401(f) of Regulation S-K under the Securities Act or is subject to any order, decree or judgment of any Governmental Authority prohibiting service as a director of any public company, (iii) such Walgreens Designee does not satisfy the director eligibility requirements applicable to the other members of the Board (e.g., mandatory retirement age) or (iv) such Walgreens Designee is not reasonably acceptable to the Board or Governance and Nominating Committee; provided, that for the purposes of this clause (iv), each of the Persons set forth on Section S-1.2 of the Company Disclosure Letter shall be deemed to be acceptable to the Board and Governance and Nominating Committee for so long as this Agreement remains in effect and none of the circumstances set forth in clauses (i), (ii) or (iii) of this sentence shall be applicable with respect to such Person.  In any such case described in clauses (i) through (iv) of the immediately preceding sentence, Walgreens will withdraw the designation of such proposed Walgreens Designee and, so long as no Walgreens Investor Rights Termination Event has occurred, be permitted to designate a replacement therefor (which replacement Walgreens  Designee will also be subject to the requirements of this Section 1.2).

-3-

(b)　　　Notwithstanding the provisions of Section 1.2(a) and the Persons set forth on Section S-1.2 of the Company Disclosure Letter, Walgreens shall not be entitled to designate SP as a Walgreens Designee (or, for the avoidance of doubt, a Walgreens Director) to the Board pursuant to this Article I, and SP shall have no right to be appointed to the Board, unless and until SP shall have first executed a customary joinder agreement, in form and substance reasonably satisfactory to the Company and Walgreens, pursuant to which SP shall agree during any time the SP Standstill Period is in effect to be bound by, and to cause any SP Investor to comply with, Section 2.2, and, to the extent applicable, Article VI, of this Agreement *mutatis mutandis* as if SP and each SP Investor were a "Alliance Boots Investor" hereunder.

1.3　　　No Adverse Action; Voting Agreement.

(a)　　　Until the occurrence of the Walgreens Investor Rights Termination Event, without the prior consent of Walgreens, except as required by Applicable Law, neither the Company nor the Board shall (i) increase the size of the Board such that the number of directors on the Board is greater than the sum of (A) nine (9) and (B) the number of Walgreens Designees to which Walgreens is entitled pursuant to Section 1.1 (such sum, the "Maximum Board Size") or (ii) take any action to cause the amendment of its charter, bylaws or other organizational documents (including, for the avoidance of doubt, any documents giving rise to the eligibility requirements described in clause (iii) of Section 1.2(a)) such that Walgreens's rights under this Article I would not be given effect; provided, that the Maximum Board Size can be increased by a maximum of one (1) additional director for a period of up to one year (or such shorter period ending upon the effectiveness of the retirement described in this proviso) to accommodate the pending retirement of a director that will occur during such one-year period.

(b)　　　During any time in which the Standstill Period is in effect, each Investor agrees to cause each Voting Security owned by it or any of its respective Permitted Transferees or over which it or any of its respective Permitted Transferees has voting control to be voted (including, if applicable, through the execution of one or more written consents if stockholders of the Company are requested to vote through the execution of an action by written consent in lieu of any such annual or special meeting of stockholders of the Company): (x) in favor of all those persons nominated to serve as directors of the Company by the Board or its Governance and Nominating Committee and (y) with respect to any other action, proposal or other matter to be voted upon by the stockholders of the Company (including through action by written consent), in accordance with the recommendation of the Board; provided, however, that no Investor or any of its Affiliates shall be under any obligation whatsoever to vote in accordance with the recommendation of the Board or in any other manner, other than in its sole discretion, with respect to the approval (or non-approval) or adoption (or non-adoption) of, or other proposal directly related to, any Acquisition Proposal or Acquisition Transaction.

(c)　　　For so long as it is subject to the voting requirements of Section 1.3(b), each Investor hereby appoints the Chairman of the Board and any designee thereof, and each of them individually, its proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote or act by written consent during the term of this Agreement with respect to shares of Company Common Stock owned by such Investor or any of its Permitted Transferees or over which such Investor or any of its Permitted Transferees has voting control to be voted in accordance with Section 1.3(b). This proxy and power of attorney is given to secure the

-4-

performance of the duties of such Investor under this Agreement. Each Investor hereby agrees that it shall take such further action or execute such other instruments as may be necessary to effectuate the intent of this proxy; this proxy and power of attorney granted by such Investor shall be irrevocable during the term of this Agreement (but subject to Section 1.3(b)), shall be deemed to be coupled with an interest sufficient under Applicable Law to support an irrevocable proxy and shall revoke any and all prior proxies granted by such Investor with respect to shares of Company Common Stock. The power of attorney granted by each Investor herein is a durable power of attorney and shall survive the dissolution or bankruptcy of such Investor.

      1.4    <u>Board Committees</u>

      (a)    At any time when at least one (1) Walgreens Director is a member of the Board, each committee of the Board shall include (to the extent that a Walgreens Director elects to serve on such committee), as a full member with the same voting and other privileges as other members of such committee, at least one (1) Walgreens Director, subject to such Walgreens Director meeting the applicable eligibility requirements for such committee mandated by Applicable Law or the charter of such committee; <u>provided</u>, that to the extent more than one (1) Walgreens Director shall meet such eligibility requirements, Walgreens shall determine which such one (1) Walgreens Director shall be entitled to be included as a member of such committee.

      (b)    Until no Walgreens Director serves as a director on the Board (and Walgreens either no longer has any rights under this Article I to designate any Walgreens Designee to serve on the Board or irrevocably waives any such rights), the Company shall not amend the charter, bylaws or any other organizational documents of the Company, or the charter or other governing documents of any committee of the Board, in any manner that, either directly or indirectly through impact or effect, adversely and disparately affects the ability of any Walgreens Director to be a member of any such committee.

      (c)    Notwithstanding anything to the contrary in this Section 1.4, no Walgreens Director shall be entitled to serve on any *ad hoc*, special or similar committee established by the Board to consider a matter with respect to which the Board has determined in good faith, following consultation with outside counsel to the Company, that Walgreens, Alliance Boots or their respective Affiliates (expressly including Walgreens Boots Alliance Development GmbH), or such particular Walgreens Director, as applicable, has a conflict with respect to such matter.

      1.5    <u>Termination of Board Designation Rights.</u> Promptly upon the occurrence of the Walgreens Investor Rights Termination Event, all obligations of the Company with respect to the Investors and any Walgreens Director or Walgreens Designee pursuant to this Article I shall terminate and unless otherwise consented to by a majority of the members of the Board (in each case, excluding Walgreens Directors, if any) the Investors shall cause any Walgreens Directors to immediately resign from the Board. Promptly upon the occurrence of the Walgreens Investor Rights Step-Down Event, to the extent there is more than one (1) Walgreens Director, unless otherwise consented to by a majority of the members of the Board (in each case, excluding Walgreens Directors, if any), the Investors shall cause one (1) Walgreens Director to immediately resign from the Board.

1.6    Information Rights.

(a)    For the avoidance of doubt, subject to Applicable Law, prior to a Walgreens Investor Rights Termination Event, the Company and its Subsidiaries will prepare and provide, or cause to be prepared and provided, to each Walgreens Director (in his or her capacity as such) any materials or other information prepared for or given to any other member of the Board (excluding any such materials or other information prepared for and given to solely the Chief Executive Officer and no other member of the Board), as and when prepared for or given to any such other member, or any other materials or other information relating to the management, operations and finances of the Company and its Subsidiaries as and when generally provided to directors of the Company or as and when reasonably requested by such Walgreens Director (in his or her capacity as such). Each Walgreens Director shall be bound by and subject to the same confidentiality obligations as each other director of the Company.

(b)    During the Walgreens Investor Rights Period:

(i)    The Company and its Subsidiaries will prepare and provide, or cause to be prepared and provided, to Walgreens and/or Alliance Boots:

(A)    within the time periods applicable to the Company under Section 13(a) or 15(d) of the Exchange Act (or if the Company is at any time not subject to Section 13(a) or 15(d) under the Exchange Act, the time periods that would be applicable to the Company if it were so subject) all quarterly and annual financial statements required to be contained in a filing with the Commission on Forms 10-Q and 10-K; and

(B)    within thirty (30) days after the end of each monthly accounting period in each fiscal quarter, the unaudited consolidated balance sheet of the Company and its Subsidiaries as at the end of each such monthly period, and the unaudited consolidated statements of operations of the Company and its Subsidiaries for each such monthly period and for the current fiscal year to date.

(ii)    The Company will consider and respond in good faith to reasonable requests for information, to the extent already existing or that can be prepared without excessive cost or management time, regarding the Company and its Subsidiaries from Walgreens and/or Alliance Boots (to the extent such requests are made in its respective capacity as a stockholder of the Company and to the extent such requests are made by the Chief Executive Officer (or in the case of Alliance Boots, its Executive Chairman), Chief Financial Officer or Controller of Walgreens or Alliance Boots, as applicable), it being understood that the Company shall have discretion as to (1) whether or not to provide, in whole or in part, any such requested information and (2) whether or not to impose restrictions on Walgreens or Alliance Boots, as applicable, with respect to the types or categories of Representatives to whom such information may be disclosed (including, for example, requiring that any such information only be disclosed to corporate staff of Walgreens or Alliance Boots, as applicable, and not to employees with operational responsibility), in each case in light of the nature of the request and the facts and circumstances at the time. Without limiting the generality of the foregoing, the Company and its

Subsidiaries will not be required to provide any such information if (i) the Company determines that such information is competitively sensitive, (ii) the Company determines in good faith that providing such information would adversely affect the Company (taking into account the nature of the request and the facts and circumstances at such time) or (iii) providing such information (A) would reasonably be expected to jeopardize an attorney-client privilege or cause a loss of attorney work product protection, (B) would violate a confidentiality obligation to any person or (C) would violate any Applicable Law; provided, that, with respect to clauses (i)-(iii), the Company uses reasonable efforts, and cooperates in good faith with Walgreens and/or Alliance Boots, as applicable, to develop and implement reasonable alternative arrangements to provide Walgreens and Alliance Boots (and their respective representatives) with the intended benefits of this Section 1.6.

(c)      In furtherance and not in limitation of the foregoing, during the Walgreens Investor Rights Period, the Company and its Subsidiaries will use its commercially reasonable efforts to prepare and provide, or to cause to be prepared and provided, including, if requested and reasonably available, in electronic data format, to Walgreens and/or Alliance Boots, as applicable, or to assist Walgreens and/or Alliance Boots with preparing (at the expense of Walgreens and/or Alliance Boots, as applicable), in a reasonably timely fashion upon reasonable prior request by Walgreens or Alliance Boots, as the case may be, any (A) financial information (including those described in clauses (A)-(B) of Section 1.6(b)(i)) or other data relating to the Company and its Subsidiaries and (B) any other relevant information or data, in each case to the extent necessary, as reasonably determined in good faith by Walgreens or Alliance Boots, as the case may be, for Walgreens or Alliance Boots, as the case may be, to (x) comply with GAAP or IFRS, as applicable, or to comply with its reporting, filing, tax, accounting or other obligations under Applicable Law or (y) apply the equity method of accounting, in the event Walgreens and/or Alliance Boots, is required to account for its investment in the Company under the equity method of accounting under GAAP or IFRS, as applicable, and agrees to use its reasonable best efforts to cause its and its Subsidiaries' Representatives to cooperate in good faith with such Investor in connection with the foregoing; provided, however, that notwithstanding anything in this Agreement to the contrary, in no event will Walgreens or Alliance Boots or their respective Affiliates disclose (including by reflecting such information on their financial statements) any financial information or other financial data provided to Walgreens or Alliance Boots pursuant to this Section 1.6 prior to the Company first publicly disclosing such information in its ordinary course of business, other than pursuant to the terms of Section 1.6(d)(i) or Section 1.6(d)(iv) (solely to the extent required by subpoena, order or other compulsory legal process).  Walgreens and Alliance Boots shall promptly, upon request by the Company, reimburse the Company for all reasonable out of pocket costs and expenses incurred by the Company or any of its Subsidiaries in connection with any actions taken by the Company or any of its Subsidiaries pursuant to this Section 1.6(c).

(d)      In furtherance of and not in limitation of any other similar agreement such party or any of its Representatives may have with the Company or its Subsidiaries, each of the Investors hereby agrees that all Confidential Information with respect to the Company shall be kept confidential by it and shall not be disclosed (including by reflecting such information on their financial statements) by it in any manner whatsoever, except as permitted by this Section 1.6(d). Any Confidential Information may be disclosed:

(i)       by an Investor (x) to each other Investor, (y) to any of its Affiliates and (z) to such Investor's or such Affiliate's respective directors, managers, officers, employees and authorized representatives (including attorneys, accountants, consultants, bankers and financial advisors thereof) (each of the Persons described in clauses (y) and (z)), collectively, for purposes of this Section 1.6(d) and the definition of Confidential Information, "Representatives" of such Investor), in the case of clause (y) and clause (z), solely if and to the extent any such Person needs to be provided such Confidential Information to assist such Investor or its Affiliates in evaluating or reviewing its existing or prospective direct or indirect investment in the Company, including in connection with the disposition thereof.  Each Representative of an Investor shall be deemed to be bound by the provisions of this Section 1.6(d) and such Investor shall be responsible for any breach of this Section 1.6(d) (or such other agreement or obligation, as applicable) by any of its Representatives;

(ii)      by an Investor or any of its Representatives to the extent the Company consents in writing;

(iii)     by an Investor or any of its Representatives to a potential Transferee (so long as such Transfer is permitted hereunder); provided, that such Transferee agrees to be bound by the provisions of this Section 1.6(d) (or a confidentiality agreement having restrictions substantially similar to this Section 1.6(d)) and such Investor shall be responsible for any breach of this Section 1.6(d) (or such confidentiality agreement) by any such Transferee; and

(iv)     by any Investor or any of its Representatives to the extent that such Investor or Representative has been advised by its outside counsel that such disclosure is required to be made by such Investor or Representative under Applicable Law or by a Governmental Authority, including as (and to the extent) may be required by Applicable Law or by a Governmental Authority in furtherance of any action taken by such Person not in contravention of the terms of Section 2.2(b)(ii), and in any case such Investor or Representative is not otherwise in material breach of Section 2.2 of this Agreement; provided, that prior to making such disclosure, such Person uses commercially reasonable efforts to preserve the confidentiality of the Confidential Information to the extent permitted by Applicable Law, including, to the extent practicable and permitted by Applicable Law, consulting with the Company regarding such disclosure and, if reasonably requested by the Company, assisting the Company, at the Company's expense, in seeking a protective order to prevent the requested disclosure; provided, further, that such disclosing Investor or Representative, as the case may be, uses reasonable best efforts to disclose only that portion of the Confidential Information as is requested by the applicable Governmental Authority or as is, based on the advice of its outside counsel, legally required or compelled; and provided, further, that the parties hereto expressly agree that notwithstanding anything in the Alliance Boots Confidentiality Agreement, the Walgreens Confidentiality Agreement, or any other confidentiality agreement between or among the Company, the Investors or their Respective Affiliates or Representatives, to the contrary, any Confidential Information that is permitted to be disclosed or used in any manner pursuant to this Agreement can be so disclosed or used.

## ARTICLE II

### TRANSFERS; STANDSTILL PROVISIONS; PREEMPTIVE RIGHTS

2.1    <u>Transfer Restrictions</u>.

(a)    Other than solely in the case of a Permitted Transfer, no Investor shall Transfer:

(i)    the Warrants at any time;

(ii)    any Initial Open Market Shares until the Expiration Time (as defined in Warrant 1) (such period, the "<u>Initial Open Market Shares Restricted Period</u>");

(iii)    any Additional Open Market Shares until the earlier of (A) the later of the two (2) year anniversary of (I) the exercise in full of the then-remaining portion of Warrant 1, (II) the Expiration Time (as defined in Warrant 1), if Warrant 1 expires with Warrant 1 Shares remaining un-exercised, and (III) the last purchase of Additional Open Market Shares by the Investors and (B) the delivery to the Company of a written, irrevocable commitment by each of Walgreens and Alliance Boots not to (and to cause each of its respective Permitted Transferees not to) exercise Warrant 2 (such period, the "<u>Additional Open Market Shares Restricted Period</u>");

(iv)    any Warrant 1 Shares until the earlier of (A) the later of the two (2) year anniversary of (I) the exercise in full of the then-remaining portion of Warrant 1, (II) the Expiration Time (as defined in Warrant 1), if Warrant 1 expires with Warrant 1 Shares remaining un-exercised, and (III) the last purchase of Additional Open Market Shares by the Investors and (B) the delivery to the Company of a written, irrevocable commitment by each of Walgreens and Alliance Boots not to (and to cause each of its respective Permitted Transferees not to) exercise Warrant 2 (such period, the "<u>Warrant 1 Shares Restricted Period</u>"); or

(v)    any Warrant 2 Shares until the later of the one (1) year anniversary of (A) the exercise in full of the then-remaining portion of Warrant 2 and (B) the Expiration Time (as defined in Warrant 2), if Warrant 2 expires with Warrant 2 Shares remaining un-exercised (such period, the "<u>Warrant 2 Shares Restricted Period,</u>" and, together with the Initial Open Market Shares Restricted Period, the Additional Open Market Shares Restricted Period and the Warrant 1 Shares Restricted Period, the "<u>Restricted Periods</u>").

(b)    "<u>Permitted Transfers</u>" means, in each case so long as such Transfer is in accordance with Applicable Law and, solely in the case of sub-clauses (i) and (ii) below, so long as any such Transfer would not result, immediately after giving effect to such Transfer, in the Walgreens Investors, directly or indirectly (including on a look-through basis), (x) Beneficially Owning less than fifty percent (50%) of the shares of common stock, par value $0.01 per share, of the Company (the "<u>Company Common Stock</u>") Beneficially Owned by the Investors in the aggregate or (y) owning of record less than fifty percent (50%) of the shares of Company Common Stock owned of record by the Investors in the aggregate; <u>provided</u>, that, notwithstanding anything to the contrary, for purposes of sub-clauses (x) and (y) above, any shares of Company Common

Stock Beneficially Owned or owned of record by the FW JV shall instead be deemed to be Beneficially Owned or owned of record, respectively (1) 50% by the Walgreens Investors and (2) 50% by the Alliance Boots Investors for so long as the Walgreens Investors Beneficially Own at least 50% of the voting and economic rights of the FW JV (the calculation of ownership pursuant to this proviso, the "<u>FW JV Ownership Calculation</u>"):

(i)     a Transfer of Warrants or Shares to a Permitted Transferee of the applicable Investor, so long as such Permitted Transferee, to the extent it has not already done so, executes a customary joinder to this Agreement, in form and substance reasonably acceptable to the Company, in which such Permitted Transferee agrees to be a "Walgreens Investor," in the case of (A) a Transfer by a Walgreens Investor or (B) a Transfer to the FW JV, or a "Alliance Boots Investor," in the case of a Transfer by a Alliance Boots Investor (other than a Transfer to the FW JV), in each case for all purposes of this Agreement;

(ii)     a Transfer of Warrants or Shares solely between Walgreens and/or any of its Permitted Transferees, on the one hand, and Alliance Boots and/or any of its Permitted Transferees, on the other hand, so long as the Transferee(s), to the extent it has not already done so or is not already a party to this Agreement, executes a customary joinder to this Agreement, in form and substance reasonably acceptable to the Company, in which such Transferee agrees to be a "Walgreens Investor," if such Transferee is a Permitted Transferee of Walgreens, or a "Alliance Boots Investor," if such Transferee is a Permitted Transferee of Alliance Boots (other than the FW JV), in each case for all purposes of this Agreement;

(iii)     a Transfer of Shares in connection with an Acquisition Transaction approved by the Board (including if the Board (A) recommends that its stockholders tender in response to a tender or exchange offer that, if consummated, would constitute an Acquisition Transaction, or (B) does not recommend that its stockholders reject any such tender or exchange offer within the ten (10) Business Day period specified in Rule 14e-2(a) under the Exchange Act);

(iv)     a Transfer of Shares that constitutes a tender into a tender or exchange offer commenced by the Company or any of its Affiliates, or a Transfer in accordance with Section 2.2(e); and

(v)     a Transfer of the Warrant 2 Transferable Portion (as defined in the Framework Agreement) from and after the Warrant 2 Transferability Event (as defined in the Framework Agreement) in accordance with Section 2.1(e).

(c)     Notwithstanding anything to the contrary contained herein, including Article IV and the expiration or inapplicability of any of the Restricted Periods (but subject in all cases to the other provisions of this Section 2.1), no Investor shall Transfer any Shares, other Voting Securities or Warrant 2 Transferable Portion:

(i)     other than in accordance with all Applicable Laws and the other terms and conditions of this Agreement;

-10-

(ii)        except in a Permitted Transfer (other than clause (v) of the definition thereof), (A) in one or more transactions in which any Person or Group, to such Investor's knowledge, acquires Shares representing Beneficial Ownership of Company Common Stock equal to or in excess of five percent (5%) or more of the Total Voting Power or the Total Economic Interest or (B) (x) to any Person or Group (other than any Person who, to such Investor's knowledge, is an Activist or Group that, to such Investor's knowledge, includes an Activist) whose Beneficial Ownership of Company Common Stock, to such Investor's knowledge, after giving effect to such Transfer, would equal or exceed ten percent (10%) or who would Beneficially Own ten percent (10%) or more of the Total Voting Power or Total Economic Interest or (y) to any Person who, to such Investor's knowledge, is an Activist or Group that, to such Investor's knowledge, includes an Activist, whose Beneficial Ownership of Company Common Stock, to such Investor's knowledge, after giving effect to such Transfer, would equal or exceed five percent (5%) or who would Beneficially Own five percent (5%) or more of the Total Voting Power or Total Economic Interest; or

(iii)        except in a Permitted Transfer (other than clause (v) of the definition thereof), on any given day in an amount (calculated in the aggregate together with all other transfers of all other Investors) greater than ten percent (10%) of the average daily trading volume of Company Common Stock for the twenty (20) trading day period immediately preceding the date of such Transfer; or

(iv)        except in a Permitted Transfer (other than clause (v) of the definition thereof), to any Prohibited Transferee;

provided, however, that the restrictions of sub-clauses (ii)-(iv) of this Section 2.1(c) shall not apply to Transfers effected through a bona fide Underwritten Offering pursuant to an exercise of the registration rights provided in Article IV of this Agreement so long as the Investors effecting any such Transfers shall instruct the managing underwriter(s) of any such Underwritten Offering to exclude (as a Transferee) Prohibited Transferees from such Underwritten Offering.

(d)        Any Transfer or attempted Transfer of Warrants or Shares or other Voting Securities in violation of this Section 2.1 shall, to the fullest extent permitted by law, be null and void ab initio, and the Company shall not, and shall instruct its transfer agent and other third parties not to, record or recognize any such purported transaction on the share register or other books and records of the Company.

(e)        From and after the Warrant 2 Transferability Event, any Investor may, at any time prior to the Expiration Time (as defined in Warrant 2), provide a written notice to the Company specifying that it intends to Transfer (other than pursuant to Section 2.1(b)(i)-(ii)) the portion of the Warrant 2 Transferable Portion then held by such Investor (the date of such notice, the "Warrant Transfer Notice Date"); provided, that, if on the trading day immediately prior to the Warrant Transfer Notice Date, the closing price (regular way) of the Company Common Stock on the principal stock exchange on which the Company Common Stock is then listed (the "Applicable Trading Price") is less than the Exercise Price (as defined in Warrant 2) as of the Warrant Transfer Notice Date (a "Below Money Event"), such written notice shall include such Investor's proposed

"Black-Scholes" valuation prepared in accordance with customary corporate finance standards in respect of such portion of the Warrant 2 Transferable Portion (the "<u>Below Money Valuation</u>"). Upon such written notice from such Investor, the Company shall have five (5) Business Days to notify such Investor in writing whether or not the Company affirmatively and irrevocably elects to repurchase such portion of the Warrant 2 Transferable Portion (in full) from such Investor. Without limiting in any respect Section 2.1(b)(i)-(ii), if the Company shall not provide such written notice affirmatively and irrevocably electing to repurchase such portion of the Warrant 2 Transferable Portion (in full) within such five (5) Business Day period, such Investor shall be free to Transfer such portion of the Warrant 2 Transferable Portion in accordance with the other provisions of this Section 2.1 and Warrant 2; <u>provided</u>, that in the case of a Below Money Event, any such Transfer shall not be permitted unless at a price equal to or greater than the applicable Below Money Valuation. If the Company shall provide such written notice affirmatively and irrevocably electing to repurchase such portion of the Warrant 2 Transferable Portion (in full) within such five (5) Business Day period, such Investor shall Transfer to the Company, and the Company shall purchase from such Investor, such portion of the Warrant 2 Transferable Portion (in full) at a purchase price, payable by the Company to such Investor in immediately available funds, equal to (x) in the case of a Below Money Event, the applicable Below Money Valuation, and (y) in all other cases, the product of (A) the excess of the Applicable Trading Price over the Exercise Price as of the Warrant Transfer Notice Date and (B) the number of Warrant 2 Shares underlying such portion of the Warrant 2 Transferable Portion (in full). The closing of such repurchase by the Company shall occur on a Business Day selected by such Investor, but in any event no later than on the fifth (5th) Business Day immediately following the Warrant Transfer Notice Date.

2.2    <u>Standstill Provisions</u>.

(a)    During any time in which the Standstill Period is in effect, each of the Investors shall not, directly or indirectly, and shall not permit any of their Controlled Affiliates, directly or indirectly, to, without the prior written consent of, or waiver by, the Company:

(i)    acquire, agree to acquire, propose or offer to acquire, or facilitate the acquisition (including through the acquisition of Beneficial Ownership) of, Equity Securities or Derivative Instruments of the Company, other than:

(A) Warrant Shares acquired by the Investors;

(B) Initial Open Market Shares acquired by the Investors;

(C) Additional Open Market Shares acquired by the Investors;

(D) as a result of any stock split, stock dividend or distribution, other subdivision, reorganization, reclassification or similar capital transaction involving Equity Securities of the Company;

(E) acquisitions by an Investor in connection with the reinvestment of dividends or distributions (regular or otherwise) paid on any Equity Securities of the Company Beneficially Owned by such Investor (any Equity Securities of the Company acquired pursuant

-12-

to any such reinvestment, the "Dividend Reinvestment Shares");and

(F) pursuant to and in accordance with Section 2.1(b)(i), Section 2.1(b)(ii) or Section 2.3;

in the case of each of sub-clauses (B), (C), (E) and (F) above, solely to the extent that such acquisition would not, based on the most recently (as of the time of such acquisition) publicly available outstanding share count of Company Common Stock disclosed by the Company in an Annual Report on Form 10-K, Quarterly Report on Form 10-Q or Current Report on Form 8-K (and, for the avoidance of doubt, taking into account, but without duplication, the definition of "Beneficial Ownership"), cause the collective Beneficial Ownership of Company Common Stock of the Investors, SP and the SP Investors, as a group, to exceed the Ultimate Standstill Level;

(ii) deposit any Voting Securities in a voting trust or similar Contract or agreement or subject any Voting Securities to any voting agreement, pooling arrangement or similar arrangement, or grant any proxy with respect to any Voting Securities (in each case, other than (A) pursuant to Section 1.3(b) and Section 1.3(c), (B) otherwise to the Company or a Person specified by the Company in a proxy card (paper or electronic) provided to stockholders of the Company by or on behalf of the Company or (C) solely between or among, or to, as applicable, the Walgreens Investors, the Alliance Boots Investors and/or any of their respective Controlled Affiliates);

(iii) enter, agree to enter, propose or offer to enter into or facilitate any merger, business combination, recapitalization, restructuring, change in control transaction or other similar extraordinary transaction involving the Company or any of its Subsidiaries (unless (1) such transaction is affirmatively publicly recommended or otherwise approved by the Board and there has otherwise been no breach of this Section 2.2 in connection with or relating to such transaction or (2) such action is permitted by Section 2.1(b)(iii) or Section 2.1(b)(iv));

(iv) make, or in any way participate or engage in, any "solicitation" of "proxies" (as such terms are used in the proxy rules of the Commission) to vote, or advise or knowingly influence any Person (other than any other Investor or any of its Controlled Affiliates) with respect to the voting of, any Voting Securities;

(v) call, or seek to call, a meeting of the stockholders of the Company or initiate any stockholder proposal for action by stockholders of the Company;

(vi) form, join or in any way participate in a Group (other than with its Permitted Transferee that is bound by the restrictions of this Section 2.2(a) or a Group that consists solely of the Investors and/or any of their respective Controlled Affiliates), with respect to any Voting Securities;

(vii)   otherwise act, alone or in concert with others, to seek to Control or influence the management or the policies of the Company (for the avoidance of doubt, excluding any such act to the extent in its capacity as a commercial counterparty, customer, supplier, industry participant or the like);

(viii)   advise or knowingly assist or encourage or enter into any discussions, negotiations, agreements or arrangements with any other Persons in connection with the foregoing; or

(ix)   make any proposal or statement of inquiry or disclose any intention, plan or arrangement inconsistent with any of the foregoing;

it being understood and agreed that neither this Section 2.2 nor Section 1.4(c) shall in any way limit (A) the activities of any Walgreens Director taken in good faith in his or her capacity as a director of the Company or (B) the full participation of any Walgreens Director in any Board (or Board committee, as applicable) discussions, deliberations, negotiations or determinations, or other actions or matters with respect to which any other members of the Board participate, regarding any Acquisition Proposal or any Acquisition Transaction; provided, that, with respect to this clause (B), in the case of any Walgreens Director that is a director, officer, employee or Affiliate of Walgreens, Alliance Boots or any of their respective Affiliates (1) such Acquisition Proposal or the Acquisition Proposal, if any, in respect of such Acquisition Transaction, respectively, is not made or submitted by Alliance Boots, Walgreens or any of their respective Affiliates and (2) each of Walgreens and Alliance Boots shall have committed to the Company in writing not to make (directly or through its Affiliates) a Qualifying Public Acquisition Proposal with respect to such Acquisition Proposal or Acquisition Transaction.  In addition, each of the Investors shall not, directly or indirectly, and shall not permit any of their Controlled Affiliates, directly or indirectly, to, (x) contest the validity of this Section 2.2 or, subject to, and without limiting in any respect, Section 2.2(b), seek a waiver, amendment or release of any provisions of this Section 2.2 (including this sentence) (whether by legal action or otherwise) or (y) take any action that would reasonably be expected to require the Company to make a public announcement regarding the possibility of a business combination, merger or other type of transaction or matter described in this Section 2.2.

(b)   Notwithstanding anything to the contrary contained herein or in any of the other Transaction Documents, including Section 2.2(a) hereof and Section 3.2 of the Framework Agreement, no Investor shall be prohibited or restricted from making and submitting, (i) to the Company and/or the Board, at any time, any Acquisition Proposal that is intended by such Investor, as applicable, to be made and submitted on a non-publicly disclosed or announced basis (which such Acquisition Proposal may, for the avoidance of doubt, include requests for the Company and/or the Board to waive, amend or provide a release of any provision of this Section 2.2) and (ii) to the Company, the Board, and/or the Company's stockholders, following any Acquisition Proposal received (or entered into) by the Company, the Board or the Company's stockholders by any Person or Group other than any Alliance Boots Investor or any of its Affiliates, in the case of any Alliance Boots Investor, or any Walgreens Investor or any of its Affiliates, in the case of any Walgreens Investor, respectively, that is, was or becomes, publicly disclosed or announced (including as a result of being approved by the Board or otherwise the subject of any agreement, Contract or understanding with the Company) (the "Original Public Acquisition Proposal"), a

-14-

Qualifying Public Acquisition Proposal on a publicly disclosed and announced basis (which such Qualifying Public Acquisition Proposal may, for the avoidance of doubt, include requests for the Company and/or the Board to waive, amend or provide a release of any provision of this Section 2.2), or from taking any other action, whether or not otherwise restricted by Section 2.2(a), in connection with evaluating, making, submitting, negotiating, effectuating or implementing any such Qualifying Public Acquisition Proposal (or any amendment, supplement or modification thereto); provided, that, in the case of this sub-clause (ii), the right of such Investor to evaluate, make, submit, negotiate, effectuate or implement a Qualifying Public Acquisition Proposal on a publicly disclosed and announced basis shall terminate with respect to the Original Public Acquisition Proposal if such Original Public Acquisition Proposal is publicly withdrawn (or terminated) (for the avoidance of doubt, an amendment, supplement or modification to, or replacement Acquisition Proposal in respect of, such Original Public Acquisition Proposal, shall not be deemed to be a withdrawal (or termination)) before such Investor initially publicly discloses or announces such Qualifying Public Acquisition Proposal; provided, further, that the immediately preceding proviso shall not prohibit or restrict such Investor from continuing, amending, supplementing or modifying, publicly or otherwise, any such Qualifying Public Acquisition Proposal that was initially publicly disclosed or announced prior to the public withdrawal (or termination) of the Original Public Acquisition Proposal, or limit in any respect the rights of such Investor with respect to any subsequent Original Public Acquisition Proposal (whether or not made by the same Person or Group, and whether or not related in any manner to any previously withdrawn (or terminated) Original Public Acquisition Proposal).

(c)     "Standstill Period" shall mean the period beginning on the date hereof and ending upon the later of (x) two (2) years from the date of this Agreement and (y) the date that is eighty-nine (89) days (or one day less than such lesser period as may be applicable under the Company's advance notice bylaws as in effect from time to time) after no Walgreens Director serves as a director on the Board (and Walgreens either no longer has any rights under Article I to designate any Walgreens Designee to serve on the Board or irrevocably waives any such rights).

(d)     As promptly as practicable (but in no event more than 48 hours) following receipt of any Acquisition Proposal or any request for nonpublic information or inquiry that could reasonably be expected to lead to any Acquisition Proposal, the Company shall advise each of Walgreens and Alliance Boots in writing of the receipt of such Acquisition Proposal, request or inquiry and the terms and conditions of such Acquisition Proposal, request or inquiry, and provide to each of Walgreens and Alliance Boots a written summary of the material terms of such Acquisition Proposal, request or inquiry (including the identity of the Person or Group making such Acquisition Proposal, request or inquiry) and a copy of all substantive (or otherwise material) documentation and correspondence relating thereto. Thereafter, the Company shall keep each of Walgreens and Alliance Boots apprised of any related substantive (or otherwise material) developments, discussions and negotiations (including providing each of Walgreens and Alliance Boots with a copy of all substantive (or otherwise material) documentation and correspondence relating thereto) on a reasonably current basis. The Company agrees that it shall promptly provide to each of Walgreens and Alliance Boots any substantive (or otherwise material) non-public information concerning the Company that may be provided to any other Person or Group in connection with any such Acquisition Proposal, request or inquiry which has not previously been provided to each of Walgreens and Alliance Boots and Walgreens and Alliance Boots agree that they will keep any such information confidential in accordance with the terms of Section 1.6.

-15-

(e)     If (i) the Company engages in any share repurchases or series of related share repurchases (whether through self-tender, open market transactions or otherwise) that have the effect of causing the collective Beneficial Ownership of Company Common Stock of the Investors, SP and the SP Investors, as a group, to exceed the Ultimate Standstill Level (a "Share Repurchase Ownership Event") or (ii) following exercise of either of the Warrants (in whole or in part) the collective Beneficial Ownership of Company Common Stock of the Investors, SP and the SP Investors, as a group, exceeds the Ultimate Standstill Level (a "Warrant Exercise Ownership Event"), then, subject to Applicable Law, following receipt by each of Walgreens and Alliance Boots of a written notice from the Company delivered no later than on the tenth (10th) Business Day following such Share Repurchase Ownership Event or Warrant Exercise Ownership Event, as applicable, (x) notifying each of Walgreens and Alliance Boots of such Share Repurchase Ownership Event or Warrant Exercise Ownership Event, as applicable (and including, in the case of a Share Repurchase Ownership Event, current and reasonably detailed information with respect to such share repurchase(s) and, in all cases, the number of shares of Company Common Stock then outstanding in order to permit each of Walgreens and Alliance Boots to verify such Share Repurchase Ownership Event or Warrant Exercise Ownership Event, as applicable, and the calculations set forth in this Section 2.2(e)), (y) requesting that each of Walgreens and Alliance Boots engage in the transactions contemplated by this Section 2.2(e) and (z) irrevocably offering to Walgreens and Alliance Boots to consummate the transactions contemplated by this Section 2.2(e) (a "Sell Down Request"), each of (i) the Walgreens Investors and (ii) the Alliance Boots Investors shall, on a Business Day determined by Walgreens, in the case the Walgreens Investors, and on a Business Day determined by Alliance Boots, in the case of the Alliance Boots Investors, respectively, but in no event later than on the tenth (10th) Business Day following Walgreens's and Alliance Boots's respective receipt of the Sell Down Request, sell to the Company, at a purchase price per share (payable by the Company in cash) equal to the Thirty Day VWAP of Company Common Stock as of the closing of trading on such Business Day, such number of outstanding shares of Company Common Stock (to the extent actually owned by the Walgreens Investors, on the one hand, or the Alliance Boots Investors, on the other hand, as applicable) as shall be necessary to cause, in the case of clause (i), the Walgreens Investors' collective Beneficial Ownership of Company Common Stock not to exceed the Walgreens Investors' pro rata portion (measured based upon the Walgreens Investors' collective Beneficial Ownership of Company Common Stock relative to the Alliance Boots Investors' collective aggregate Beneficial Ownership of Company Common Stock) of the Ultimate Standstill Level, and, in the case of clause (ii), the Alliance Boots Investors', SP's and the SP Investors' collective Beneficial Ownership of Company Common Stock not to exceed the Alliance Boots Investors' pro rata portion (measured based upon the Walgreens Investors' collective Beneficial Ownership of Company Common Stock relative to the Alliance Boots Investors' collective aggregate Beneficial Ownership of Company Common Stock) of the Ultimate Standstill Level; provided, that the Beneficial Ownership of any shares of Company Common Stock Beneficially Owned by the FW JV shall be determined in accordance with the FW JV Ownership Calculation.

(f)     During the Standstill Period, solely with respect to the Company, Walgreens (i) shall not amend, modify, waive or terminate or agree to any amendment, modification, waiver or termination of Sections 3.1(a)(i), 3.1(b) and 3.1(c) of the Walgreens Shareholders Agreement (the "Relevant Sections") (including any amendment or modification of the definition of any defined term used in such Sections) and (ii) shall, including in the event of a breach thereof by SP or an SP Investor, take all actions reasonably within its control to seek to

enforce the Relevant Sections to the fullest extent permissible under Applicable Law.  Walgreens represents and warrants to the Company that (A) it has made available to the Company a complete and correct copy of the Walgreens Shareholders Agreement, including all amendments thereto, (B) the Walgreens Shareholders Agreement is in full force and effect, (C) Walgreens has not waived or failed to enforce any rights or benefits under the Relevant Sections with respect to the Company and (D) to the knowledge of Walgreens, neither SP nor the SP Investors is in breach or default under the Relevant Sections with respect to the Company.  To the knowledge of Walgreens, there has occurred no event giving (with or without notice or lapse of time or both) to any person any right of termination, amendment or cancellation of the Relevant Sections with respect to the Company.  Upon knowledge of any breach or default by SP or the SP Investors, or expiration or termination by its terms or otherwise, of the Relevant Sections with respect to the Company, Walgreens shall, as promptly as practicable (but in any event within 48 hours), notify the Company.

(g)     Notwithstanding anything to the contrary, nothing in this Agreement or any other Transaction Document shall prevent or restrict the ability of any Investor to acquire or Transfer among Investors subject to compliance with Section 2.2(b) Derivative Instruments for the purpose of engaging in "hedging" or other similar transactions in connection with acquiring (x) the Initial Open Market Shares or, (y) during any period that Additional Open Market Shares could otherwise be purchased, the Additional Open Market Shares.  In no event will the notional amount of shares underlying any such Derivative Instruments exceed, at any time (1) in the case of Derivative Instruments used for the purpose of engaging in "hedging" or other similar transactions in connection with acquiring the Initial Open Market Shares, the total number of Initial Open Market Shares which the IOMS Rights Holder could purchase at such time or (2) in the case of Derivative Instruments used for the purpose of engaging in "hedging" or other similar transactions in connection with acquiring the Additional Open Market Shares, the total number of Additional Open Market Shares which the Investors could purchase at such time.

2.3     Preemptive Rights.

(a)     The Company hereby grants to each of Walgreens and Alliance Boots (each, a "Pre-Emptive Stockholder") the right, subject to Applicable Law, to purchase (and/or to designate Alliance Boots or Walgreens or any Permitted Transferees of Walgreens or Alliance Boots to purchase (subject to Section 2.1(b) and so long as any such Permitted Transferee, to the extent it has not already done so, executes a customary joinder to this Agreement, in form and substance reasonably acceptable to the Company, in which such Permitted Transferee, agrees to be a "Walgreens Investor," in the case of a Subsidiary of Walgreens or the FW JV, or a "Alliance Boots Investor," in the case of a Subsidiary of Alliance Boots, in each case for all purposes of this Agreement)) such Pre-Emptive Stockholder's Pro Rata Portion of any Equity Securities (collectively, the "New Securities") that the Company may from time to time propose to issue (other than in Permitted Transactions); provided, that, for the avoidance of doubt, (i) such Pro Rata Portions of any New Securities shall not increase the total number of New Securities issued or proposed to be issued and (ii) no Proposed Issuance (including any issuance of New Securities to the Pre-Emptive Stockholders (and/or their designees)) completed in  compliance with this Section 2.3 shall be applied in  a circular manner to this Section 2.3 so as to result in duplicative or iterative pre-emptive rights.

(b)     The Company shall give written notice (an "Issuance Notice") of any proposed issuance described in subsection (a) above ("Proposed Issuance") to each of Walgreens and Alliance Boots no later than five (5) Business Days prior to such issuance (or if such notice period is not reasonably possible under the circumstances, such prior written notice as is reasonably possible). The Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including:

(i)     the number and description of the New Securities to be issued and the percentage of the Company's outstanding Equity Securities such issuance would represent;

(ii)     the proposed issuance date; and

(iii)     the cash purchase price per New Security (and/or, if applicable, reasonably detailed information with respect to any non-cash consideration proposed to be received by the Company in respect of such proposed issuance, in order to permit the Pre-emptive Stockholders to evaluate the Market Price (in the case of securities) and/or Fair Market Value (as defined in Warrant 1) (in the case of any other property) of any such non-cash consideration).

(c)     Each Pre-emptive Stockholder shall for a period of five (5) Business Days (or such shorter period if the Issuance Notice was sent by the Company in accordance with the first sentence of subsection (b) above less than five (5) Business Days prior to the proposed issuance date, but in no event less than one (1) Business Day) following the receipt of an Issuance Notice (the "Exercise Period") have the right to elect to purchase (and/or to designate Alliance Boots or Walgreens or any Permitted Transferee of Walgreens or Alliance Boots to purchase, as described in subsection (a) above) its Pro Rata Portion of the New Securities, at an all-cash purchase price per New Security (the "Per Security Offering Price") equal to: (1) in the case of all-cash consideration proposed to be received by the Company in respect of the Proposed Issuance, the cash purchase price per New Security set forth in the Issuance Notice or (2) in the case of consideration other than all-cash consideration proposed to be received by the Company in respect of the Proposed Issuance, the per New Security price derived from the aggregate Market Price of all consideration proposed to be received by the Company that is securities and the aggregate Fair Market Value of all consideration (including cash) proposed to be received by the Company other than securities, in each case as of the date of receipt of such Issuance Notice.  Each Pre-emptive Stockholder may exercise its election by delivering a written notice to the Company during the Exercise Period.  Such notice must indicate the specific amount of New Securities that such Pre-emptive Stockholder desires to purchase (and/or designate others to purchase, as described above) and may not be conditioned in any manner not also available to other potential purchasers of the Proposed Issuance.  Each Pre-emptive Stockholder, if so exercising its election (an "Exercising Stockholder"), shall be entitled and obligated to purchase, or to cause such other persons it may have designated in accordance with this Section 2.3 to purchase, that portion of the New Securities so offered to such Pre-emptive Stockholder specified in such Pre-emptive Stockholder's notice on the terms and conditions set forth in the Issuance Notice.  The failure of any Pre-emptive Stockholder to exercise its election during the Exercise Period shall be deemed a waiver by such Pre-emptive Stockholder of its rights under this Section 2.3 with respect to such Proposed Issuance.  The closing of any purchase by a Pre-emptive Stockholder (and/or any of its

-18-

designees) shall be consummated concurrently with the consummation of the Proposed Issuance; provided, however, that the closing of any purchase by any such Pre-emptive Stockholder (and/or any of its designees) may be extended beyond the closing of the consummation of the Proposed Issuance to the extent necessary to obtain required Governmental Approvals, but for the avoidance of doubt the Company shall not be required to delay or extend the closing of the other portion of the Proposed Issuance to the extent not subject to such Governmental Approval requirement (and, subject to Section 3.1 of the Framework Agreement, the Company and the Investors shall use their respective reasonable best efforts to obtain such Governmental Approvals) and/or to finally determine any required calculations of Market Price and/or Fair Market Value in accordance with the terms of such definitions.

(d)     Subject to Section 2.3(g), if any Pre-emptive Stockholder (directly or through its designees) fails to purchase its allotment of the New Securities within the time period described in Section 2.3(c), the Company shall be free to complete the Proposed Issuance to the extent and with respect to which such Pre-emptive Stockholder failed to exercise the option set forth in this Section 2.3 on terms no less favorable to the Company (including with respect to consideration) than those set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced); provided, that such Proposed Issuance is closed within sixty (60) Business Days after the expiration of the Exercise Period (subject to the extension of such sixty (60) Business Day period for a reasonable time not to exceed an additional sixty (60) Business Days to the extent reasonably necessary to obtain any Government Approvals).  In the event the Company has not completed (in whole or in part) such Proposed Issuance within such time period, the Company shall not thereafter issue or sell any such New Securities without first again offering such securities to the Pre-Emptive Stockholder in accordance with the procedures set forth in this Section 2.3.

(e)     Upon the issuance of any New Securities in accordance with this Section 2.3, the Company shall deliver to the Exercising Stockholders (and/or any of their respective designees) certificates evidencing the New Securities, which New Securities shall be issued free and clear of any liens, other than liens or encumbrances created by the Transaction Documents, arising as a matter of Applicable Law or created by or at the direction of any of the Investors or any of their respective Affiliates, and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Securities shall be, upon issuance thereof to such purchasers and after payment of the Per Security Offering Price therefor, duly authorized, validly issued, fully paid and non-assessable.  Each Exercising Stockholder shall deliver or cause to be delivered to the Company the aggregate Per Security Offering Price for the New Securities purchased by it (and/or such designees) by certified or bank check or wire transfer of immediately available funds.  In the event that a Proposed Issuance shall be terminated or abandoned by the Company without the issuance of any New Securities, then each Pre-emptive Stockholder's rights pursuant to this Section 2.3 shall also terminate as to such Proposed Issuance.

(f)     For the avoidance of doubt, the aggregate New Securities issued to the Exercising Stockholders and their designees hereunder may equal but shall not exceed the aggregate Pro Rata Portion of the New Securities of all the Investors.

(g)     In the event that the Company has been advised by its outside counsel that the issuance of New Securities in full to the Pre-emptive Stockholders pursuant to this Section 2.3 would require the approval of the Company's stockholders under Applicable Law, including the rules of the New York Stock Exchange, (i) the excess amount of such New Securities to the extent otherwise triggering such stockholder approval requirement will be excluded from the total number of New Securities that the Pre-emptive Stockholders would otherwise have a right to purchase pursuant to this Section 2.3 (such excess amount of New Securities, the "Excluded New Securities") and (ii) each such Pre-emptive Stockholder shall instead be permitted (in its sole discretion) to acquire (and/or to designate Alliance Boots or Walgreens or any Permitted Transferee of Walgreens or Alliance Boots to purchase, as described in subsection (a) above), in one or more open market transactions, up to a number of shares of Company Common Stock, that would, in the aggregate, result, after giving effect to such open market transactions (and ignoring other intervening events), in such Pre-emptive Stockholder's (and/or such designee(s)'), as applicable, Beneficial Ownership of Company Common Stock being equal to what such Pre-emptive Stockholder's (and/or such designee(s)'), as applicable, Beneficial Ownership of Company Common Stock would have been had New Securities been issued in full pursuant to this Section 2.3 to such Pre-emptive Stockholder (and/or such designee(s)) in the absence of such stockholder approval requirement (such shares of Company Common Stock purchasable pursuant to this Section 2.3(g)(ii), the "Replacement Pre-emptive Shares").

2.4     Outside Activities.

(a)     Subject to the provisions of Section 1.6 of this Agreement and Section 3.6 of the Framework Agreement, any Investor and any of its Affiliates may engage in or possess any interest in other investments, business ventures or Persons of any nature or description, independently or with others, similar or dissimilar to, or that competes with, the investments or business of the Company, and may provide advice and other assistance to any such investment, business venture or Person.

(b)     The Company shall have no rights by virtue of this Agreement in and to such investments, business ventures or Persons or the income or profits derived therefrom.

(c)     The pursuit of any such investment or venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper and shall not constitute a conflict of interest or breach of fiduciary or other duty in respect of the Company, its Subsidiaries or the Investors.  None of the Investors or any of its Affiliates shall be obligated to present any particular investment or business opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be pursued by the Company, and any Investor and any of its Affiliates shall have the right to pursue for its own account (individually or as a partner or a fiduciary) or to recommend to any other Person any such investment opportunity; provided, that a Walgreens Director who is offered an investment or business opportunity in his or her capacity as a member of the Board shall be obligated to communicate such opportunity to the Company, in which case such Walgreens Director, the Investors and their respective Affiliates (expressly including WBAD), respectively, shall not be permitted to pursue such opportunity unless (i) the Board determines not to do so or (ii) such Walgreens Director, the Investors or any of their respective Affiliates (expressly including WBAD) learn of such opportunity other than as a result of such Walgreens Director being offered such opportunity in his or her capacity as a

member of the Board.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties of the Investors</u>.  Each Investor, on behalf of itself and not any other Investor, hereby represents and warrants to the Company as follows as of the date hereof (or, if applicable, as of the date the joinder agreement pursuant to which such Investor shall have become a party to this Agreement):

(a)    Such Investor Beneficially Owns and owns of record the number of shares of Company Common Stock as listed on Annex A (or, in the case of a joinder agreement, as listed on an annex to such joinder agreement) opposite such Investor's name and such shares constitute all of the Equity Securities and Derivative Instruments of the Company Beneficially Owned or owned of record by such Investor.

(b)    Such Investor has been duly formed, is validly existing and, where such concept is applicable, is in good standing under the laws of its jurisdiction of organization.  Such Investor has all requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

(c)    The execution and delivery by such Investor of this Agreement and the performance by such Investor of its obligations under this Agreement do not and will not conflict with or violate any provision of, or require the consent or approval of any Person (except for any such consents or approvals which have been obtained) under, (x) Applicable Law, (y) the organizational documents of such Investor or (z) any contract or agreement to which such Investor is a party.

(d)    The execution and delivery by such Investor of this Agreement and the performance by such Investor of its obligations under this Agreement have been duly authorized by all necessary corporate or other analogous action on the part of such Investor.  This Agreement has been duly executed and delivered by such Investor and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms, subject to bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general principles of equity.

(e)    Such Investor: (i) is acquiring the Warrants and the Shares, as applicable, for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such Warrants or Shares, as applicable, in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the Warrants and the Shares, as applicable, and of making an informed investment decision and (iii) is an

-21-

"accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act. Such Investor understands that the Company is relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the Warrants and the Warrant Shares are not registered under the Securities Act or any other Applicable Law and that such Warrants and Warrant Shares may not be Transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other Applicable Law) or pursuant to an applicable exemption therefrom.

3.2     <u>Representations and Warranties of the Company</u>.  The Company hereby represents and warrants to the Investors as follows:

(a)     The Company is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  The Company has all requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

(b)     Except as set forth in the Framework Agreement, the execution and delivery by the Company of this Agreement and the performance of the obligations of the Company under this Agreement do not and will not conflict with or violate any provision of, or require the consent or approval of any Person (except for any such consents or approvals which have been obtained) under, (x) Applicable Law, (y) the organizational documents of the Company (following any actions taken pursuant to Section 1.1(a), Section 1.1(b) or Section 1.1(c)) or (z) any contract or agreement to which the Company is a party.

(c)     The execution and delivery by the Company of this Agreement and the performance of the obligations of the Company under this Agreement have been duly authorized by all necessary corporate action on the part of the Company.  This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general principles of equity.

3.3     <u>Representations and Warranties of Alliance Boots</u>.  Alliance Boots hereby represents and warrants to the Company and Walgreens that neither SP nor any SP Investor nor any Person Controlled by SP or any SP Investor (other than Investors whose Beneficial Ownership is the subject of Section 3.1(a)) Beneficially Owns any shares of Company Common Stock or any Derivative Instruments of the Company.

# ARTICLE IV

# REGISTRATION

4.1    <u>Demand Registrations</u>.

(a)    From and after the expiration of the Initial Open Market Shares Restricted Period, the Additional Open Market Shares Restricted Period, the Warrant 1 Shares Restricted Period, and/or the Warrant 2 Shares Restricted Period, as applicable, subject to the terms and conditions hereof (x) solely during any period that the Company is then-ineligible under Applicable Law to register Registrable Securities on Form S-3 or, if the Company is so eligible but has failed to comply with its obligations under Section 4.3 or (y) following the expiration of the Company's obligation to keep the Shelf Registration Statement continuously effective pursuant to Section 4.3(c), but only if there is no Shelf Registration Statement then in effect, any Demand Shareholders ("<u>Requesting Shareholders</u>") shall be entitled to make an unlimited number of written requests of the Company (each, a "<u>Demand</u>") for registration under the Securities Act of an amount of Registrable Securities then held by such Requesting Shareholders that equals or is greater than the Registrable Amount (a "<u>Demand Registration</u>" and such registration statement, a "<u>Demand Registration Statement</u>").  Thereupon, the Company will, subject to the terms of this Agreement, use its commercially reasonable efforts to effect the registration as promptly as practicable under the Securities Act of:

(i)    the Registrable Securities which the Company has been so requested to register by the Requesting Shareholders for disposition in accordance with the intended method of disposition stated in such Demand;

(ii)    all other Registrable Securities which the Company has been requested to register pursuant to Section 4.1(b), but subject to Section 4.1(g); and

(iii)    all shares of Company Common Stock which the Company may elect to register in connection with any offering of Registrable Securities pursuant to this Section 4.1, but subject to Section 4.1(g);

all to the extent necessary to permit the disposition (in accordance with the intended methods thereof) of the Registrable Securities and the additional shares of Company Common Stock, if any, to be so registered.

(b)    A Demand shall specify:  (i) the aggregate number of Registrable Securities requested to be registered in such Demand Registration, (ii) the intended method of disposition in connection with such Demand Registration, to the extent then known, and (iii) the identity of the Requesting Shareholder(s).  Within ten (10) days after receipt of a Demand, the Company shall give written notice of such Demand to all other holders of Registrable Securities.  The Company shall include in the Demand Registration covered by such Demand all Registrable Securities with respect to which the Company has received a written request for inclusion therein within ten (10) days after the Company's notice required by this paragraph has been given, subject to Section 4.1(g).  Each such written request shall comply with the requirements of a Demand as set forth in this Section 4.1(b).

(c)     A Demand Registration shall not be deemed to have been effected and shall not count as a Demand Registration (i) unless the Demand Registration Statement with respect thereto has become effective and has remained effective for a period of at least one hundred eighty (180) days or such shorter period in which all Registrable Securities included in such Demand Registration have actually been sold or otherwise disposed of thereunder (provided, that such period shall be extended for a period of time equal to the period the holders of Registrable Securities refrain from selling any securities included in such registration statement at the request of the Company or the lead managing underwriter(s) pursuant to the provisions of this Agreement) or (ii) if, after it has become effective, such Demand Registration becomes subject, prior to one hundred eighty (180) days after effectiveness, to any stop order, injunction or other order or requirement of the Commission or other Governmental Authority, other than by reason of any act or omission by the applicable Selling Shareholders.

(d)     Demand Registrations shall be on such appropriate registration form of the Commission as shall be selected by the Company and reasonably acceptable to the Requesting Shareholders.

(e)     The Company shall not be obligated to (i) subject to Section 4.1(c), maintain the effectiveness of a registration statement under the Securities Act filed pursuant to a Demand Registration for a period longer than one hundred eighty (180) days or (ii) effect any Demand Registration (A) within six (6) months of a "firm commitment" Underwritten Offering in which all Demand Shareholders were offered "piggyback" rights pursuant to Section 4.2 (subject to Section 4.2(b)) and at least fifty percent (50%) of the number of Registrable Securities requested by such Demand Shareholders to be included in such Demand Registration were included, (B) within six (6) months of the completion of any other Demand Registration (including, for the avoidance of doubt, any Underwritten Offering pursuant to any Shelf Registration Statement) or (C) if, in the Company's reasonable judgment, it is not feasible for the Company to proceed with the Demand Registration because of the unavailability of audited or other required financial statements of the Company or any other Person; provided, that the Company shall use its commercially reasonable efforts to obtain such financial statements as promptly as practicable.

(f)     The Company shall be entitled to (1) postpone (upon written notice to the Demand Shareholders) the filing or the effectiveness of a registration statement for any Demand Registration, (2) cause any Demand Registration Statement to be withdrawn and its effectiveness terminated and (3) suspend the use of the prospectus forming the part of any registration statement, in each case in the event of a Blackout Period until the expiration of the applicable Blackout Period.  In the event of a Blackout Period under clause (ii) of the definition thereof, the Company shall deliver to the Demand Shareholders requesting registration a certificate signed by either the chief executive officer or the chief financial officer of the Company certifying that, in the good faith judgment of the Company, the conditions described in clause (ii) of the definition of Blackout Period are met.  Such certificate shall contain an approximation of the anticipated delay.  Upon notice by the Company to the Demand Shareholders of any such determination, each Demand Shareholder covenants that, subject to Applicable Law, it shall keep the fact of any such notice strictly confidential, and, in the case of a Blackout Period pursuant to clause (ii)(y) of the definition of Blackout Period, promptly halt any offer, sale, trading or other Transfer by it or any of its Affiliates of any Registrable Securities for the duration of the Blackout Period set forth in such notice (or until such Blackout Period shall be earlier terminated in writing by the Company) and

promptly halt any use, publication, dissemination or distribution of the Demand Registration Statement, each prospectus included therein, and any amendment or supplement thereto by it and any of its Affiliates for the duration of the Blackout Period set forth in such notice (or until such Blackout Period shall be earlier terminated in writing by the Company) and, if so directed in writing by the Company, will deliver to the Company any copies then in the Demand Shareholder's possession of the prospectus covering such Registrable Securities that was in effect at the time of receipt of such notice.

(g)     If, in connection with a Demand Registration that involves an Underwritten Offering, the lead managing underwriter(s) advise(s) the Company that, in its (their) opinion, the inclusion of all of the securities sought to be registered in connection with such Demand Registration would adversely affect the success thereof, then the Company shall include in such registration statement only such securities as the Company is advised by such lead managing underwriter(s) can be sold without such adverse effect as follows and in the following order of priority:  (i) first, up to the number of Registrable Securities requested to be included in such Demand Registration by the Demand Shareholders, which, in the opinion of the lead managing underwriter(s), can be sold without adversely affecting the success thereof, pro rata among such Demand Shareholders on the basis of the number of such Registrable Securities requested to be included by such Demand Shareholders; (ii) second, securities the Company proposes to sell; and (iii) third, all other securities of the Company duly requested to be included in such registration statement, pro rata on the basis of the amount of such other securities requested to be included or such other allocation method determined by the Company.

(h)     Any time that a Demand Registration involves an Underwritten Offering, the Requesting Shareholder(s) shall select the investment banker(s) and manager(s) that will serve as managing underwriters (including which such managing underwriters will serve as lead or co-lead) and underwriters with respect to the offering of such Registrable Securities; provided, that such investment banker(s) and manager(s) shall be reasonably acceptable to the Company (such acceptance not to be unreasonably withheld, conditioned or delayed).

4.2     Piggyback Registrations.

(a)     From and after the expiration of the Initial Open Market Shares Restricted Period, the Additional Open Market Shares Restricted Period, the Warrant 1 Shares Restricted Period, and/or the Warrant 2 Shares Restricted Period, as applicable, subject to the terms and conditions hereof, whenever the Company proposes to register any Company Common Stock (or any other securities that are of the same class or series as any Registrable Securities that are not shares of Company Common Stock) under the Securities Act (other than a registration by the Company (i) on Form S-4 or any successor form thereto, (ii) on Form S-8 or any successor form thereto, (iii) on a Shelf Registration Statement or (iv) pursuant to Section 4.1) (a "Piggyback Registration"), whether for its own account or for the account of others, the Company shall give all Demand Shareholders prompt written notice thereof (but not less than ten (10) Business Days prior to the filing by the Company with the Commission of any registration statement with respect thereto).  Such notice (a "Piggyback Notice") shall specify the number of shares of Company Common Stock (or other securities, as applicable) proposed to be registered, the proposed date of filing of such registration statement with the Commission, the proposed means of distribution and the proposed managing underwriter(s) (if any) and a good faith estimate by the Company of the

proposed minimum offering price of such shares of Company Common Stock (or other securities, as applicable), in each case to the extent then known. Subject to Section 4.2(b), the Company shall include in each such Piggyback Registration all Registrable Securities held by Demand Shareholders (a "Piggyback Seller") with respect to which the Company has received written requests (which written requests shall specify the number of Registrable Securities requested to be disposed of by such Piggyback Seller) for inclusion therein within ten (10) days after such Piggyback Notice is received by such Piggyback Seller.

(b)     If, in connection with a Piggyback Registration that involves an Underwritten Offering, the lead managing underwriter(s) advise(s) the Company that, in its opinion, the inclusion of all the securities sought to be included in such Piggyback Registration by (i) the Company, (ii) other Persons who have sought to have shares of Company Common Stock registered in such Piggyback Registration pursuant to rights to demand (other than pursuant to so-called "piggyback" or other incidental or participation registration rights) such registration (such Persons being "Other Demanding Sellers"), (iii) the Piggyback Sellers and (iv) any other proposed sellers of shares of Company Common Stock (such Persons being "Other Proposed Sellers"), as the case may be, would adversely affect the success thereof, then the Company shall include in the registration statement applicable to such Piggyback Registration only such securities as the Company is so advised by such lead managing underwriter(s) can be sold without such an effect, as follows and in the following order of priority:

(i)     if the Piggyback Registration relates to an offering for the Company's own account, then (A) first, such number of shares of Company Common Stock (or other securities, as applicable) to be sold by the Company as the Company, in its reasonable judgment, shall have determined, (B) second, Registrable Securities of Piggyback Sellers, pro rata on the basis of the number of Registrable Securities proposed to be sold by such Piggyback Sellers, (C) third, shares of Company Common Stock sought to be registered by Other Demanding Sellers, pro rata on the basis of the number of shares of Company Common Stock proposed to be sold by such Other Demanding Sellers and (D) fourth, other shares of Company Common Stock proposed to be sold by any Other Proposed Sellers; or

(ii)     if the Piggyback Registration relates to an offering other than for the Company's own account, then (A) first, such number of shares of Company Common Stock (or other securities, as applicable) sought to be registered by each Other Demanding Seller pro rata in proportion to the number of securities sought to be registered by all such Other Demanding Sellers, (B) second, Registrable Securities of Piggyback Sellers, pro rata on the basis of the number of Registrable Securities proposed to be sold by such Piggyback Sellers, (C) third, shares of Company Common Stock to be sold by the Company and (D) fourth, other shares of Company Common Stock proposed to be sold by any Other Proposed Sellers.

(c)     For clarity, in connection with any Underwritten Offering under this Section 4.2 for the Company's account, the Company shall not be required to include the Registrable Securities of a Piggyback Seller in the Underwritten Offering unless such Piggyback Seller accepts the terms of the underwriting as agreed upon between the Company and the lead managing underwriter(s), which shall be selected by the Company.

(d)     If, at any time after giving written notice of its intention to register any shares of Company Common Stock (or other securities, as applicable) as set forth in this Section 4.2 and prior to the time the registration statement filed in connection with such Piggyback Registration is declared effective, the Company shall determine for any reason not to register such shares of Company Common Stock (or other securities, as applicable), the Company may, at its election, give written notice of such determination to the Piggyback Sellers within five (5) Business Days thereof and thereupon shall be relieved of its obligation to register any Registrable Securities in connection with such particular withdrawn or abandoned Piggyback Registration; provided, that, if permitted pursuant to Section 4.1, the Demand Shareholders may continue the registration as a Demand Registration pursuant to the terms of Section 4.1.

4.3     Shelf Registration Statement.

(a)     From and after the expiration of the Initial Open Market Shares Restricted Period, the Additional Open Market Shares Restricted Period, the Warrant 1 Shares Restricted Period, and/or the Warrant 2 Shares Restricted Period, as applicable, subject to the terms and conditions hereof, and further subject to the availability of a registration statement on Form S-3 or any successor form thereto ("Form S-3") to the Company, any of the Demand Shareholders may by written notice delivered to the Company (the "Shelf Notice") require the Company to file as soon as reasonably practicable, and to use commercially reasonable efforts to cause to be declared effective by the Commission as soon as reasonably practicable after such filing date, a Form S-3 providing for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act relating to the offer and sale, from time to time, of an amount of Registrable Securities then held by such Demand Shareholders that equals or is greater than the Registrable Amount (the "Shelf Registration Statement").  To the extent the Company is a well-known seasoned issuer (as defined in Rule 405 under the Securities Act), the Company shall file the Shelf Registration Statement in the form of an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) or any successor form thereto.

(b)     Within ten (10) days after receipt of a Shelf Notice pursuant to Section 4.3(a), the Company will deliver written notice thereof to all other holders of Registrable Securities.  Each other holder of Registrable Securities may elect to participate with respect to its Registrable Securities in the Shelf Registration Statement in accordance with the plan and method of distribution set forth, or to be set forth, in such Shelf Registration Statement by delivering to the Company a written request to so participate within ten (10) days after the Shelf Notice is received by any such holder of Registrable Securities.

(c)     Subject to Section 4.3(d), the Company will use its commercially reasonable efforts to keep the Shelf Registration Statement continuously effective until the earlier of (i) three (3) years after the Shelf Registration Statement has been declared effective; (ii) the date on which all Registrable Securities covered by the Shelf Registration Statement have been sold thereunder in accordance with the plan and method of distribution disclosed in the prospectus included in the Shelf Registration Statement, or otherwise cease to be Registrable Securities; and (iii) the date on which the Investors' collective Beneficial Ownership of Company Common Stock falls below five percent (5.0%); provided, that the Company's obligations under this Section 4.3(c) shall cease after completion of the fifth (5th) Shelf Offering by the Investors (taking into account the time periods described in Section 4.1(c) as if such Shelf Offering were a Demand Registration).

-27-

(d)     Notwithstanding anything to the contrary contained in this Agreement, the Company shall be entitled, from time to time, by providing written notice to the holders of Registrable Securities who elected to participate in the Shelf Registration Statement, to require such holders of Registrable Securities to suspend the use of the prospectus for sales of Registrable Securities under the Shelf Registration Statement during any Blackout Period.  In the event of a Blackout Period under clause (ii) of the definition thereof, the Company shall deliver to the Demand Shareholders requesting registration a certificate signed by either the chief executive officer or the chief financial officer of the Company certifying that, in the good faith judgment of the Company, the conditions described in clause (ii) of the definition of Blackout Period are met. Such certificate shall contain an approximation of the anticipated delay.  Upon notice by the Company to the Demand Shareholders of any such determination, each Demand Shareholder covenants that it shall, subject to Applicable Law, keep the fact of any such notice strictly confidential, and, in the case of a Blackout Period pursuant to clause (ii)(y) of the definition of Blackout Period, promptly halt any offer, sale, trading or other Transfer by it or any of its Affiliates of any Registrable Securities for the duration of the Blackout Period set forth in such notice (or until such Blackout Period shall be earlier terminated in writing by the Company) and promptly halt any use, publication, dissemination or distribution of the Shelf Registration Statement, each prospectus included therein, and any amendment or supplement thereto by it and any of its Affiliates for the duration of the Blackout Period set forth in such notice (or until such Blackout Period shall be earlier terminated in writing by the Company) and, if so directed in writing by the Company, will deliver to the Company any copies then in the Demand Shareholder's possession of the prospectus covering such Registrable Securities that was in effect at the time of receipt of such notice.

(e)     After the expiration of any Blackout Period and without any further request from a holder of Registrable Securities, the Company, to the extent necessary, shall as promptly as reasonably practicable prepare a post-effective amendment or supplement to the Shelf Registration Statement or the prospectus, or any document incorporated therein by reference, or file any other required document so that, as thereafter delivered to purchasers of the Registrable Securities included therein, the prospectus will not include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f)     At any time that a Shelf Registration Statement is effective, if any Demand Shareholder delivers a notice to the Company (a "Take-Down Notice") stating that it intends to sell all of part of its Registrable Securities included by it on the Shelf Registration Statement (a "Shelf Offering"), then the Company shall amend or supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Shelf Offering (taking into account, solely in connection with a Marketed Underwritten Shelf Offering, the inclusion of Registrable Securities by any other holders pursuant to this Section 4.3).  In connection with any Shelf Offering that is an Underwritten Offering and where the plan of distribution set forth in the applicable Take-Down Notice includes a customary "road show" (including an "electronic road show") or other substantial marketing effort by the Company and the underwriters (a "Marketed Underwritten Shelf Offering"):

(i)     such proposing Demand Shareholder(s) shall also deliver the Take-Down Notice to all other Demand Shareholders included on the Shelf Registration

Statement and permit each such holder to include its Registrable Securities included on the Shelf Registration Statement in the Marketed Underwritten Shelf Offering if such holder notifies the proposing Demand Shareholder(s) and the Company within five (5) days after delivery of the Take-Down Notice to such holder; and

(ii)     if the lead managing underwriter(s) advises the Company and the proposing Demand Shareholder(s) that, in its opinion, the inclusion of all of the securities sought to be sold in connection with such Marketed Underwritten Shelf Offering would adversely affect the success thereof, then there shall be included in such Marketed Underwritten Shelf Offering only such securities as the proposing Demand Shareholder(s) is advised by such lead managing underwriter(s) can be sold without such adverse effect, and such number of Registrable Securities shall be allocated in the same manner as described in Section 4.1(g).  Except as otherwise expressly specified in this Section 4.3, any Marketed Underwritten Shelf Offering shall be subject to the same requirements, limitations and other provisions of this Article IV as would be applicable to a Demand Registration (*i.e.*, as if such Marketed Underwritten Shelf Offering were a Demand Registration), including Section 4.1(e)(ii) and Section 4.1(g).

4.4     Withdrawal Rights.  Any holder of Registrable Securities having notified or directed the Company to include any or all of its Registrable Securities in a registration statement under the Securities Act shall have the right to withdraw any such notice or direction with respect to any or all of the Registrable Securities designated by it for registration by giving written notice to such effect to the Company prior to the effective date of such registration statement.  In the event of any such withdrawal, the Company shall not include such Registrable Securities in the applicable registration and such Registrable Securities shall continue to be Registrable Securities for all purposes of this Agreement (subject to the other terms and conditions of this Agreement). No such withdrawal shall affect the obligations of the Company with respect to the Registrable Securities not so withdrawn; provided, however, that in the case of a Demand Registration, if such withdrawal shall reduce the number of Registrable Securities sought to be included in such registration below the Registrable Amount, then the Company shall as promptly as practicable give each Demand Shareholder seeking to register Registrable Securities notice to such effect and, within ten (10) days following the mailing of such notice, such Demand Shareholder still seeking registration shall, by written notice to the Company, elect to register additional Registrable Securities to satisfy the Registrable Amount or elect that such registration statement not be filed or, if theretofore filed, be withdrawn.  During such ten (10) day period, the Company shall not file such registration statement if not theretofore filed or, if such registration statement has been theretofore filed, the Company shall not seek, and shall use reasonable best efforts to prevent, the effectiveness thereof.

4.5     Holdback Agreements.

(a)     Each Investor agrees to enter into customary agreements restricting the sale or distribution of Equity Securities of the Company (including sales pursuant to Rule 144 under the Securities Act) to the extent required in writing by the lead managing underwriter(s) with respect to an applicable Underwritten Offering during the period commencing on the date of the request (which shall be no earlier than fourteen (14) days prior to the expected "pricing" of such Underwritten Offering) and continuing for not more than ninety (90) days after the date of the

-29-

"final" prospectus (or "final" prospectus supplement if the Underwritten Offering is made pursuant to a Shelf Registration Statement), pursuant to which such Underwritten Offering shall be made, plus an extension period, as may be proposed by the lead managing underwriter(s) to address FINRA regulations regarding the publishing of research, or such lesser period as is required by the lead managing underwriter(s).

(b)     If any Demand Registration or Shelf Offering involves an Underwritten Offering, the Company will not effect any sale or distribution of Company Common Stock (or securities convertible into or exchangeable or exercisable for Company Common Stock) (other than a registration statement on Form S-4, Form S-8 or any successor forms thereto) for its own account, within sixty (60) days (plus an extension period as may be proposed by the lead managing underwriter(s) for such Underwritten Offering to address FINRA regulations regarding the publication of research, or such shorter periods as the lead managing underwriter(s) may agree with the Company), after the effective date of such registration except as may otherwise be agreed between the Company and the lead managing underwriter(s) of such Underwritten Offering.

4.6     Registration Procedures.

(a)     If and whenever the Company is required to use commercially reasonable efforts to effect the registration of any Registrable Securities under the Securities Act as provided in Section 4.1, Section 4.2 or Section 4.3, the Company shall as expeditiously as reasonably practicable:

(i)     prepare and file with the Commission a registration statement to effect such registration in accordance with the intended method or methods of distribution of such securities and thereafter use commercially reasonable efforts to cause such registration statement to become and remain effective pursuant to the terms of this Article IV; provided, however, that the Company may discontinue any registration of its securities which are not Registrable Securities at any time prior to the effective date of the registration statement relating thereto; provided, further, that before filing such registration statement or any amendments thereto, the Company will furnish to the Demand Shareholders which are including Registrable Securities in such registration ("Selling Shareholders"), their counsel and the lead managing underwriter(s), if any, copies of all such documents proposed to be filed, which documents will be subject to the review and reasonable comment of such counsel, and other documents reasonably requested by such counsel, including any comment letter from the Commission, and, if requested by such counsel, provide such counsel reasonable opportunity to participate in the preparation of such registration statement and each prospectus included therein and such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Company's books and records, officers, accountants and other advisors.  The Company shall not file any such registration statement or prospectus or any amendments or supplements thereto with respect to a Demand Registration to which the holders of a majority of Registrable Securities held by the Requesting Shareholder(s), their counsel or the lead managing underwriter(s), if any, shall reasonably object, in writing, on a timely basis, unless, in the opinion of the Company, such filing is necessary to comply with Applicable Law;

-30-

(ii)     prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective pursuant to the terms of this Article IV, and comply in all material respects with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(iii)     if requested by the lead managing underwriter(s), if any, or the holders of a majority of the then outstanding Registrable Securities being sold in connection with an Underwritten Offering, promptly include in a prospectus supplement or post-effective amendment such information as the lead managing underwriter(s), if any, and such holders may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received such request; provided, however, that the Company shall not be required to take any actions under this Section 4.6(a)(iii) that are not, in the opinion of counsel for the Company, in compliance with Applicable Law;

(iv)     furnish to the Selling Shareholders and each underwriter, if any, of the securities being sold by such Selling Shareholders such number of conformed copies of such registration statement and of each amendment and supplement thereto, such number of copies of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and each free writing prospectus (as defined in Rule 405 of the Securities Act) (a "Free Writing Prospectus") utilized in connection therewith and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Shareholders and underwriter, if any, may reasonably request in order to facilitate the public sale or other disposition of the Registrable Securities owned by such Selling Shareholders;

(v)     use commercially reasonable efforts to register or qualify or cooperate with the Selling Shareholders, the underwriters, if any, and their respective counsel in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities covered by such registration statement under such other securities laws or "blue sky" laws of such jurisdictions as the Selling Shareholders and any underwriter of the securities being sold by such Selling Shareholders shall reasonably request, and to keep each such registration or qualification (or exemption therefrom) effective during the period such registration statement is required to be kept effective and take any other action which may be necessary or reasonably advisable to enable such Selling Shareholders and underwriters to consummate the disposition in such jurisdictions of the Registrable Securities owned by such Selling Shareholders, except that the Company shall not for any such purpose be required to (A) qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this clause (v) be obligated to be so qualified, (B) subject itself to taxation in any such jurisdiction or (C) file a general consent to service of process in any such jurisdiction;

(vi) use commercially reasonable efforts to cause such Registrable Securities (if such Registrable Securities are shares of Company Common Stock) to be listed on each securities exchange on which shares of Company Common Stock are then listed;

(vii) use commercially reasonable efforts to provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by such registration statement from and after a date not later than the effective date of such registration statement;

(viii) enter into such agreements (including an underwriting agreement) in form, scope and substance as is customary in underwritten offerings of Company Common Stock by the Company and use its commercially reasonable efforts to take all such other actions reasonably requested by the holders of a majority of the Registrable Securities being sold in connection therewith (including those reasonably requested by the lead managing underwriter(s), if any) to expedite or facilitate the disposition of such Registrable Securities, and in such connection, whether or not an underwriting agreement is entered into and whether or not the registration is an Underwritten Offering (A) make such representations and warranties to the holders of such Registrable Securities and the underwriters, if any, with respect to the business of the Company and its Subsidiaries, and the registration statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by issuers in underwritten offerings, and, if true, confirm the same if and when requested, (B) if any underwriting agreement has been entered into, the same shall contain customary indemnification provisions and procedures with respect to all parties to be indemnified pursuant to Section 4.9, except as otherwise agreed by the holders of a majority of the Registrable Securities being sold and (C) deliver such documents and certificates as reasonably requested by the holders of a majority of the Registrable Securities being sold, their counsel and the lead managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to sub-clause (A) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder;

(ix) in connection with an Underwritten Offering, use commercially reasonable efforts to obtain for the underwriter(s) (A) opinions of counsel for the Company, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such underwriters and (B) "comfort" letters and updates thereof (or, in the case of any such Person which does not satisfy the conditions for receipt of a "comfort" letter specified in Statement on Auditing Standards No. 72, an "agreed upon procedures" letter) signed by the independent public accountants who have certified the Company's financial statements included in such registration statement, covering the matters customarily covered in "comfort" letters in connection with underwritten offerings;

      (x)     make available for inspection by the Selling Shareholders, any underwriter participating in any disposition pursuant to any registration statement, and any attorney, accountant or other agent or representative retained in connection with such offering by such Selling Shareholders or underwriter (collectively, the "Inspectors"), financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be reasonably necessary, or as shall otherwise be reasonably requested, to enable them to exercise their due diligence responsibility, and cause the officers, directors and employees of the Company and its Subsidiaries to supply all information in each case reasonably requested by any such representative, underwriter, attorney, agent or accountant in connection with such registration statement; provided, however, that the Company shall not be required to provide any information under this Section 4.6(a)(x) if (A) the Company believes, after consultation with counsel for the Company, that to do so would cause the Company to forfeit an attorney-client privilege that was applicable to such information or (B) either (1) the Company has requested and been granted from the Commission confidential treatment of such information contained in any filing with the Commission or documents provided supplementally or otherwise or (2) the Company reasonably determines in good faith that such Records are confidential and so notifies the Inspectors in writing; unless prior to furnishing any such information with respect to clause (1) or (2) such Selling Shareholder requesting such information enters into, and causes each of its Inspectors to enter into, a confidentiality agreement on terms and conditions reasonably acceptable to the Company; provided, further, that each Selling Shareholder agrees that it will, upon learning that disclosure of such Records is sought in a court of competent jurisdiction or by another Governmental Authority, give notice to the Company and allow the Company, at its expense, to undertake appropriate action seeking to prevent disclosure of the Records deemed confidential;

      (xi)     as promptly as practicable notify in writing the Selling Shareholders and the underwriters, if any, of the following events:  (A) the filing of the registration statement, any amendment thereto, the prospectus or any prospectus supplement related thereto or post-effective amendment to the registration statement or any Free Writing Prospectus utilized in connection therewith, and, with respect to the registration statement or any post-effective amendment thereto, when the same has become effective; (B) any request by the Commission or any other U.S. or state governmental authority for amendments or supplements to the registration statement or the prospectus or for additional information; (C) the issuance by the Commission of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings by any Person for that purpose; (D) the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction or the initiation or threat of any proceeding for such purpose; (E) if at any time the representations and warranties of the Company contained in any mutual agreement (including any underwriting agreement) contemplated by Section 4.6(a)(viii) cease to be true and correct in any material respect; and (F) upon the happening of any event that makes any statement made in such registration statement or related prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires the making of any changes in such registration statement, prospectus or documents so that, in the case of the registration statement, it will not contain any untrue statement of a material fact or omit to state any

material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and, at the request of any Selling Shareholder, promptly prepare and furnish to such Selling Shareholder a reasonable number of copies of a supplement to or an amendment of such registration statement or prospectus as may be necessary so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

              (xii)    use commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of such registration statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction at the earliest reasonable practicable date, except that, subject to the requirements of Section 4.6(a)(v), the Company shall not for any such purpose be required to (A) qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this clause (xii) be obligated to be so qualified, (B) subject itself to taxation in any such jurisdiction or (C) file a general consent to service of process in any such jurisdiction;

              (xiii)    cooperate with the Selling Shareholders and the lead managing underwriter(s) to facilitate the timely preparation and delivery of certificates (which shall not bear any restrictive legends unless required under Applicable Law) representing securities sold under any registration statement, and enable such securities to be in such denominations and registered in such names as the lead managing underwriter(s) or such Selling Shareholders may request and keep available and make available to the Company's transfer agent prior to the effectiveness of such registration statement a supply of such certificates;

              (xiv)    cooperate with each seller of Registrable Securities and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA; and

              (xv)    have appropriate officers of the Company prepare and make presentations at a reasonable number of "road shows" and before analysts and rating agencies, as the case may be, and other information meetings reasonably organized by the underwriters, take other actions to obtain ratings for any Registrable Securities (if they are eligible to be rated) and otherwise use its commercially reasonable efforts to cooperate as reasonably requested by the Selling Shareholders and the underwriters in the offering, marketing or selling of the Registrable Securities; provided, however, that the scheduling of any such "road shows" and other meetings shall not unduly interfere with the normal operations of the business of the Company.

        (b)    The Company may require each Selling Shareholder and each underwriter, if any, to furnish the Company in writing such information regarding each Selling Shareholder or

underwriter and the distribution of such Registrable Securities as the Company may from time to time reasonably request in writing to complete or amend the information required by such registration statement.

(c)　　Each Selling Shareholder agrees that upon receipt of any notice from the Company of the happening of any event of the kind described in clauses (B), (C), (D), (E) and (F) of Section 4.6(a)(xi), such Selling Shareholder shall forthwith discontinue such Selling Shareholder's disposition of Registrable Securities pursuant to the applicable registration statement and prospectus relating thereto until such Selling Shareholder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4.6(a)(x), or until it is advised in writing by the Company that the use of the applicable prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such prospectus; provided, however, that the Company shall extend the time periods under Section 4.1(c) with respect to the length of time that the effectiveness of a registration statement must be maintained by the amount of time the holder is required to discontinue disposition of such securities.

(d)　　With a view to making available to the holders of Registrable Securities the benefits of Rule 144 under the Securities Act and any other rule or regulation of the Commission that may at any time permit a holder to sell securities of the Company to the public without registration, the Company shall:

(i)　　use commercially reasonable efforts to make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act;

(ii)　　use commercially reasonable efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act, at any time when the Company is subject to such reporting requirements; and

(iii)　　furnish to any holder of Registrable Securities, promptly upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act and of the Exchange Act, a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed or furnished by the Company with the Commission as such holder may reasonably request in connection with the sale of Registrable Securities without registration (in each case to the extent not readily publicly available).

4.7　　Registration Expenses.　All fees and expenses incident to the Company's performance of its obligations under this Article IV, including (a) all registration and filing fees, including all fees and expenses of compliance with securities and "blue sky" laws (including the reasonable and documented fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities pursuant to Section 4.6(a)(v)) and all fees and expenses associated with filings required to be made with FINRA (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in FINRA Rule 5121, except in the event that Requesting Shareholders select the

underwriters)  (b) all printing (including expenses of printing certificates for the Registrable Securities in a form eligible for deposit with the Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by an Investor) and copying expenses, (c) all messenger, telephone and delivery expenses, (d) all fees and expenses of the Company's independent certified public accountants and counsel (including with respect to "comfort" letters and opinions), (e) expenses of the Company incurred in connection with any "road show", other than any expense paid or payable by the underwriters and (f) reasonable and documented fees and disbursements of one counsel for all holders of Registrable Securities whose Registrable Securities are included in a registration statement, which counsel shall be selected by, in the case of a Demand Registration, the Requesting Shareholders, in the case of a Shelf Offering, the Demand Shareholder(s) requesting such offering, or in the case of any other registration, the holders of a majority of the Registrable Securities being sold in connection therewith, shall be borne solely by the Company whether or not any registration statement is filed or becomes effective.  In connection with the Company's performance of its obligations under this Article IV, the Company will pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties and the expense of any annual audit) and the expenses and fees for listing the securities to be registered on the primary securities exchange or over-the-counter market on which similar securities issued by the Company are then listed or traded.  Each Selling Shareholder shall pay its portion of all underwriting discounts and commissions and transfer taxes, if any, relating to the sale of such Selling Shareholder's Registrable Securities pursuant to any registration.

   4.8 <u>Miscellaneous</u>.  (a) Not less than ten (10) Business Days before the expected filing date of each registration statement pursuant to this Agreement, the Company shall notify each holder of Registrable Securities who has timely provided the requisite notice hereunder entitling such holder  to register Registrable Securities in such registration statement of the information, documents and instruments from such holder that the Company or any underwriter reasonably requests in connection with such registration statement, including a questionnaire, custody agreement, power of attorney, lock-up letter and underwriting agreement (the "<u>Requested Information</u>").  If the Company has not received, on or before the second Business Day before the expected filing date, the Requested Information from such holder, the Company may file the registration statement without including Registrable Securities of such holder.  The failure to so include in any registration statement the Registrable Securities of a holder of Registrable Securities (with regard to that registration statement) shall not result in any liability on the part of the Company to such holder.

   (b) The Company shall not grant any demand, piggyback or shelf registration rights the terms of which are senior to or conflict with the rights granted to the Investors hereunder to any Person without the prior written consent of Investors Beneficially Owning a majority of the Company Common Stock then Beneficially Owned by all Investors.

   4.9 <u>Registration Indemnification</u>.

   (a) The Company agrees, without limitation as to time, to indemnify and hold harmless, to the fullest extent permitted by law, each Selling Shareholder and its Affiliates and their respective officers, directors, members, stockholders, employees, managers and partners and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20

of the Exchange Act) such Selling Shareholder or such other indemnified Person and the officers, directors, members, stockholders, employees, managers and partners of each such controlling Person, each underwriter, if any, and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) such underwriter, from and against all losses, claims, damages, liabilities, costs, expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses), judgments, fines, penalties, charges and amounts paid in settlement (collectively, the "Losses"), as incurred, arising out of, caused by, resulting from or relating to any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto or any omission (or alleged omission) of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and (without limitation of the preceding portions of this Section 4.9(a)) will reimburse each such Selling Shareholder, each of its Affiliates, and each of their respective officers, directors, members, stockholders, employees, managers and partners and each such Person who controls each such Selling Shareholder and the officers, directors, members, stockholders, employees, managers, partners, accountants, attorneys and agents of each such controlling Person, each such underwriter and each such Person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending any such claim, Loss, damage, liability or action, except insofar as the same are caused by any information furnished in writing to the Company by any other party expressly for use therein.

(b)     In connection with any registration statement in which a Selling Shareholder is participating, without limitation as to time, each such Selling Shareholder shall, severally and not jointly, indemnify the Company, its directors, officers and employees, and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) the Company, from and against all Losses, as incurred, arising out of, caused by, resulting from or relating to any untrue statement (or alleged untrue statement) of material fact contained in the registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto or any omission (or alleged omission) of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (without limitation of the preceding portions of this Section 4.9(b)) will reimburse the Company, its directors, officers and employees and each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) for any legal and any other expenses reasonably incurred in connection with investigating and defending any such claim, Loss, damage, liability or action, in each case solely to the extent, but only to the extent, that such untrue statement or omission is made in such registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto in reliance upon and in conformity with written information furnished to the Company by such Selling Shareholder for inclusion in such registration statement, prospectus or preliminary prospectus or Free Writing Prospectus or any amendment or supplement thereto.  Notwithstanding the foregoing, no Selling Shareholder shall be liable under this Section 4.9(b) for amounts in excess of the net proceeds received by such holder in the offering giving rise to such liability.

(c)     Any Person entitled to indemnification hereunder shall give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification;

provided, however, the failure to give such notice shall not release the indemnifying party from its obligation, except to the extent that the indemnifying party has been actually and materially prejudiced by such failure to provide such notice on a timely basis.

(d)     In any case in which any such action is brought against any indemnified party, and it notifies an indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein, and, to the extent that it may wish, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof and acknowledging the obligations of the indemnifying party with respect to such proceeding, the indemnifying party will not (so long as it shall continue to have the right to defend, contest, litigate and settle the matter in question in accordance with this paragraph) be liable to such indemnified party hereunder for any legal or other expense subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation, supervision and monitoring (unless (i) such indemnified party reasonably objects to such assumption on the grounds that there may be defenses available to it which are different from or in addition to the defenses available to such indemnifying party and, as a result, a conflict of interest exists or (ii) the indemnifying party shall have failed within a reasonable period of time to assume such defense and the indemnified party is or would reasonably be expected to be materially prejudiced by such delay, in either event the indemnified party shall be promptly reimbursed by the indemnifying party for the expenses incurred in connection with retaining one separate legal counsel (for the avoidance of doubt, for all indemnified parties in connection therewith)).  For the avoidance of doubt, notwithstanding any such assumption by an indemnifying party, the indemnified party shall have the right to employ separate counsel in any such matter and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such indemnified party except as provided in the previous sentence.  An indemnifying party shall not be liable for any settlement of an action or claim effected without its consent (which consent shall not be unreasonably withheld, conditioned or delayed).  No matter shall be settled by an indemnifying party without the consent of the indemnified party (which consent shall not be unreasonably withheld, conditioned or delayed), unless such settlement (x) includes as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation, (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified party and (z) is settled solely for cash for which the indemnified party would be entitled to indemnification hereunder.

(e)     The indemnification provided for under this Agreement shall survive the Transfer of the Registrable Securities and the termination of this Agreement.

(f)     If recovery is not available under the foregoing indemnification provisions for any reason or reasons other than as specified therein, any Person who would otherwise be entitled to indemnification by the terms thereof shall nevertheless be entitled to contribution with respect to any Losses with respect to which such Person would be entitled to such indemnification but for such reason or reasons, in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and such indemnified party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue

statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party, the Persons' relative knowledge and access to information concerning the matter with respect to which the claim was asserted, the opportunity to correct and prevent any statement or omission, and other equitable considerations appropriate under the circumstances.  It is hereby agreed that it would not necessarily be equitable if the amount of such contribution were determined by pro rata or per capita allocation.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not found guilty of such fraudulent misrepresentation.  Notwithstanding the foregoing, no Selling Shareholder shall be required to make a contribution in excess of the amount received by such Selling Shareholder from its sale of Registrable Securities in connection with the offering that gave rise to the contribution obligation.

4.10   <u>Free Writing Prospectuses</u>.  No Investors shall use any "free writing prospectus" (as defined in Rule 405 under the Securities Act) in connection with the sale of Registrable Securities pursuant to this Article IV without the prior written consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, the Investors may use any free writing prospectus prepared and distributed by the Company.

<div style="text-align:center">

ARTICLE V

DEFINITIONS

</div>

5.1   <u>Defined Terms</u>.  Capitalized terms when used in this Agreement have the following meanings:

"<u>Acquisition Proposal</u>" means any proposal, offer, inquiry, indication of interest or expression of intent (whether binding or non-binding, and whether communicated to the Company, the Board or publicly announced to the Company's stockholders or otherwise) by any Person or Group relating to an Acquisition Transaction.

"<u>Acquisition Transaction</u>" means any transaction or series of related transactions involving: (i) (a)any acquisition (whether direct or indirect, including by way of merger, share exchange, consolidation, business combination or other similar transaction) or purchase from the Company or any of its Subsidiaries that would result in any Person or Group Beneficially Owning thirty percent (30%) or more in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or (b) any tender offer, exchange offer or other secondary acquisition that would result in any Person or Group Beneficially Owning thirty percent (30%) or more in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or (c) any merger, consolidation, share exchange, business combination or similar transaction involving the Company or any of its Subsidiaries that would result in the stockholders of the Company immediately preceding such transaction (the "<u>Pre-Transaction Stockholders</u>") Beneficially Owning less than seventy percent (70%) in interest of the total outstanding Equity Securities in the surviving or resulting entity of such transaction (measured by voting power or economic interest); provided, that this clause (c) shall not apply if (1) such transaction or series of related transactions is an acquisition by the Company effected, in whole or in part, through the issuance of Equity Securities

<div style="text-align:center">-39-</div>

of the Company, (2) such acquisition does not result in a Person Group Beneficially Owning, directly or indirectly, a greater percentage of the outstanding Equity Securities (measured by either voting power or economic interest) of the Company than the Investors, as a group, and (3) the Pre-Transaction Stockholders continue to Beneficially Own, directly or indirectly, at least 60% of the outstanding Equity Securities (measured by voting power and economic interest); (ii) any sale or lease or exchange, transfer, license or disposition of a business, deposits or assets that constitute thirty percent (30%) or more of the consolidated assets, business, revenues, net income, assets or deposits of the Company; or (iii) any liquidation or dissolution of the Company.

"Activist" means, as of any date of determination, a Person (other than an Investor) that has, directly or indirectly through its Affiliates, whether individually or as a member of a Group, within the five-year period immediately preceding such date of determination, (i) made, engaged in or been a participant in any "solicitation" of "proxies" (as such terms are used in the proxy rules of the Commission) to vote, or advise or knowingly influence any Person with respect to the voting of, any equity securities of any issuer, including in connection with a proposed change of Control or other extraordinary or fundamental transaction, or a proposal for the election or replacement of directors, not approved (at the time of the first such proposal) by the board of directors of such issuer, (ii) called, or publicly sought to call, a meeting of the shareholders of any issuer or initiated any shareholder proposal for action by shareholders of any issuer, in each case not approved (at the time of the first such action) by the board of directors of such issuer, (iii) otherwise publicly acted, alone or in concert with others, to seek to Control or influence the management or the policies of any issuer (provided, that this clause (iii) is not intended to include the activities of any member of the board of directors of an issuer, with respect to such issuer, taken in good faith solely in his or her capacity as a director of such issuer), (iv) commenced a "tender offer" (as such term is used in Regulation 14D under the Exchange Act) to acquire the equity securities of an issuer that was not approved (at the time of commencement) by the board of directors of such issuer in a Schedule 14D-9 filed under Regulation 14D under the Exchange Act, or (v) publicly disclosed any intention, plan, arrangement or other Contract to do any of the foregoing.

"Additional Open Market Shares" has the meaning set forth in the Framework Agreement.

"Additional Open Market Shares Restricted Period" has the meaning set forth in Section 2.1(a)(iii).

"Affiliate" has the meaning set forth in the Framework Agreement.

"Agreement" has the meaning set forth in the preamble.

"Alliance Boots" has the meaning set forth in the preamble.

"Alliance Boots Confidentiality Agreement" means the letter agreement, dated as of June 27, 2012, between AB Acquisitions Holdings Limited and the Company, as amended on January 23, 2013 and as further amended on March 10, 2013.

"Alliance Boots Investors" means (i) the Initial Alliance Boots Investors, (ii) any Permitted Transferee of any Initial Alliance Boots Investor that is Transferred Shares by such Initial Alliance Boots Investor in compliance with the terms of this Agreement, (iii) any Permitted Transferee of

any of the Persons included in clause (ii) of this definition that is Transferred Shares by such Person in compliance with the terms of this Agreement, (iv) any Permitted Transferee of Walgreens that is a Transferee of Shares pursuant to Section 2.1(b)(ii), and (v) any Permitted Transferee of Alliance Boots that acquires New Securities or Replacement Pre-emptive Shares pursuant to Section 2.3; provided, that, for the avoidance of doubt, the FW JV shall be deemed to be a "Walgreens Investor" rather than a "Alliance Boots Investor."

"Applicable Law" means, with respect to any Person, any federal, national, state, local, cantonal, municipal, international, multinational or SRO statute, law, ordinance, secondary and subordinate legislation, directives, rule (including rules of common law), regulation, ordinance, treaty, Order, permit, authorization or other requirement applicable to such Person, its assets, properties, operations or business.

"Applicable Trading Price" has the meaning set forth in Section 2.1(e).

"Below Money Event" has the meaning set forth in Section 2.1(e).

"Below Money Valuation" has the meaning set forth in Section 2.1(e).

"Beneficial Owner", "Beneficially Own" or "Beneficial Ownership" has the meaning assigned to such term in Rule 13d-3 under the Exchange Act, and a Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule (in each case, irrespective of whether or not such Rule is actually applicable in such circumstance); provided, that, except as otherwise expressly specified herein, such calculations shall be made with respect to any Person's beneficial ownership of securities hereunder assuming that the holder(s) (whether or not such Person) of each of Warrant 1 and Warrant 2 (in each case, if the applicable Expiration Time shall not have occurred with respect to such Warrant) have exercised the remaining portion(s) of each such Warrant, if any, in full, and the holder(s) (whether or not such Person) of the right to acquire any un-acquired Initial Open Market Shares have acquired all such Initial Open Market Shares, if any, in full; provided, further, that such calculations shall be made with respect to any Person's beneficial ownership of securities hereunder without giving effect to the Call Option (as such term is defined in the Purchase and Option Agreement) unless and until the Second Step Closing (as such term is defined in the Purchase and Option Agreement) shall have occurred; provided, further, that, for the avoidance of doubt, neither SP nor any SP Investor shall be deemed to have, or to have acquired, Beneficial Ownership of any Equity Securities of the Company that are held by any investment fund or other Person in which SP or such SP Investor holds any interest or participation, provided that (x) neither SP nor any SP Investor exercises any influence over the investment decisions of such investment fund or Person, (y) such Equity Securities are held for passive investment purposes only and (z) such Equity Securities do not constitute more than 2% of the outstanding securities of any class of securities issued by the Company.

"Blackout Period" means (i) any regular quarterly period during which directors and executive officers of the Company are not permitted to trade under the insider trading policy of the Company then in effect and (ii) in the event that the Company determines in good faith that the registration would (x) reasonably be expected to materially adversely affect or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or (y) would require disclosure of information that has not been, and is not otherwise

required to be, disclosed to the public, the premature disclosure of which would adversely affect the Company in any material respect, a period of up to seventy-five (75) days; provided, that a Blackout Period described in this clause (ii) may not occur more than twice in any period of eighteen (18) consecutive months.

"Board" has the meaning set forth in Section 1.1(a).

"Business Day" means a day on which banks are generally open for normal business in New York, New York, which day is not a Saturday or a Sunday.

"Commission" means the Securities and Exchange Commission or any other federal agency administering the Securities Act.

"Company" has the meaning set forth in the preamble.

"Company Common Stock" has the meaning set forth in Section 2.1(b).

"Company Disclosure Letter" has the meaning set forth in the Framework Agreement.

"Confidential Information" means all information (irrespective of the form of communication, and irrespective of whether obtained prior to or after the date hereof) obtained by or on behalf of an Investor or its Representatives from the Company, its Affiliates or their respective Representatives, through the Beneficial Ownership of Equity Securities or through the rights granted pursuant hereto, other than information which (i) was or becomes generally available to the public other than as a result of a breach of this Agreement by such Investor, its Affiliates (expressly including WBAD) or their respective Representatives, (ii) was or becomes available to such Investor, its Affiliates (expressly including WBAD) or their respective Representatives on a non-confidential basis from a source other than the Company, its Affiliates or their respective Representatives, or any other Investor or its Representatives, as the case may be, provided, that the source thereof is not known by such Investor or such of its Affiliates (expressly including WBAD) or their respective Representatives to be bound by an obligation of confidentiality, or (iii) is independently developed by such Investor, its Affiliates (expressly including WBAD) or their respective Representatives without the use of any such information that would otherwise be Confidential Information hereunder.  Subject to clauses (i)-(iii) above, Confidential Information also includes (a) all non-public information previously provided by the Company, its Affiliates or their respective Representatives under the provisions of any confidentiality agreement between the Company, the Investors or their respective Affiliates or Representatives, including the Confidentiality Agreements, including all information, documents and reports referred to thereunder, (b) subject to any disclosures permitted by Section 3.2 of the Framework Agreement, all non-public understandings, agreements and other arrangements between and among the Company and the Investors, and (c) all other non-public information received from, or otherwise relating to, the Company or its Subsidiaries.

"Confidentiality Agreements" means the Alliance Boots Confidentiality Agreement and the Walgreens Confidentiality Agreement.

"Contract" means any contract, lease, license, indenture, loan, note, agreement or other legally binding commitment, arrangement or undertaking (whether written or oral and whether express or implied).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Controlled Affiliate" means any Affiliate of the specified Person that is, directly or indirectly, Controlled by the specified Person.

"conversion" has the meaning set forth in the definition of Equity Securities.

"convertible securities" has the meaning set forth in the definition of Equity Securities.

"Demand" has the meaning set forth in Section 4.1(a).

"Demand Registration" has the meaning set forth in Section 4.1(a).

"Demand Registration Statement" has the meaning set forth in Section 4.1(a).

"Demand Shareholder" means any Walgreens Investor or any Alliance Boots Investor, in either case that holds Registrable Securities.

"Derivative Instruments" means any and all derivative securities (as defined under Rule 16a-1 under the Exchange Act) that increase in value as the value of any Equity Securities of the Company increases, including a long convertible security, a long call option and a short put option position, in each case, regardless of whether (x) such interest conveys any voting rights in such security, (y) such interest is required to be, or is capable of being, settled through delivery of such security or (z) other transactions hedge the economic effect of such interest.

"Dividend Reinvestment Shares" has the meaning set forth in Section 2.2(a)(i).

"Equity Securities" means any and all (i) shares, interests, participations or other equivalents (however designated) of capital stock or other voting securities of a corporation, any and all equivalent or analogous ownership (or profit) or voting interests in a Person (other than a corporation), (ii) securities convertible into or exchangeable for shares, interests, participations or other equivalents (however designated) of capital stock or voting securities of (or other ownership or profit or voting interests in) such Person, and (iii) any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and, in each case, whether or not such shares, interests, participations, equivalents, securities, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination (clauses (ii) and (iii), collectively "convertible securities" and any conversion, exchange or exercise of any convertible securities, a "conversion").

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

-43-

"Excluded New Security" has the meaning set forth in Section 2.3(g).

"Exercise Period" has the meaning set forth in Section 2.3(c).

"Exercising Stockholder" has the meaning set forth in Section 2.3(c).

"Fair Market Value" has the meaning set forth in Warrant 1.

"FINRA" means the Financial Industry Regulatory Authority, Inc.

"Form S-3" has the meaning set forth in Section 4.3(a).

"Framework Agreement" has the meaning set forth in the recitals.

"Free Writing Prospectus" has the meaning set forth in Section 4.6(a)(iv).

"FW JV" has the meaning set forth in the recitals.

"FW JV Ownership Calculation" has the meaning set forth in Section 2.1(b).

"GAAP" has the meaning set forth in the Framework Agreement.

"Governance and Nominating Committee" means the Governance and Nominating Committee of the Company or any such successor committee.

"Governmental Approval" means any authorization, consent, approval, waiver, exception, variance, order, exemption, publication, filing, declaration, concession, grant, franchise, agreement, permission, permit, or license of, from or with any Governmental Authority, the giving of notice to or registration with any Governmental Authority or any other action in respect of any Governmental Authority.

"Governmental Authority" means any federal, national, state, local, cantonal, municipal, international or multinational government or political subdivision thereof, governmental department, commission, board, bureau, agency, taxing or regulatory authority, instrumentality or judicial or administrative body, or arbitrator or SRO, having jurisdiction over the matter or matters in question.

"Group" has the meaning assigned to such term in Section 13(d)(3) of the Exchange Act.

"IFRS" means the standards and interpretations adopted by the International Accounting Standards Board, including (i) the International Financial Reporting Standards issued by the International Accounting Standards Board, (ii) the International Accounting Standards originally issued by the International Accounting Standards Committee, in the form adopted by the International Accounting Standards Board, (iii) the final interpretations issued by the International Financial Reporting Interpretations Committee and (iv) the final interpretations issued by the Standing Interpretations Committee, consistently applied, as in effect at the date of such financial statements or information to which it refers.

"Initial Alliance Boots Investors" means Alliance Boots and any Permitted Transferee of Alliance

Boots that initially acquires any Warrant Shares, Initial Open Market Shares or Additional Open Market Shares; provided, that, for the avoidance of doubt, the FW JV shall be deemed to be an "Initial Walgreens Investor" rather than an "Initial Alliance Boots Investor."

"Initial Open Market Shares" has the meaning set forth in the Framework Agreement.

"Initial Open Market Shares Restricted Period" has the meaning set forth in Section 2.1(a)(ii).

"Initial Walgreens Investors" means Walgreens and any Permitted Transferee of Walgreens that initially acquires any Warrant Shares, Initial Open Market Shares or Additional Initial Open Market Shares.

"Inspectors" has the meaning set forth in Section 4.6(a)(x).

"Investor Indemnification Agreements" means each and every certificate, memorandum or articles of incorporation or association, bylaws, limited liability company operating agreement, limited partnership agreement and any other organizational document of, and each and every insurance policy maintained by any Investor or its Affiliates, as applicable, providing for, among other things, indemnification of and advancement of expenses for a Walgreens Director for, among other things, the same matters that are subject to indemnification and advancement of expenses under this Agreement.

"Investor Indemnitors" means any Investor or its Affiliates in their capacity as indemnitors to a Walgreens Director under the applicable Investor Indemnification Agreements.

"Investors" means the Walgreens Investors and the Alliance Boots Investors.

"Issuance Notice" has the meaning set forth in Section 2.3(b).

"Losses" has the meaning set forth in Section 4.9(a).

"Majority Acquisition Proposal" means any proposal, offer, inquiry or indication of interest (whether binding or non-binding, and whether communicated to the Company, the Board or publicly announced to the Company's stockholders or otherwise) by any Person or Group relating to any transaction or series of related transactions involving: (i) any acquisition (whether direct or indirect, including by way of merger, share exchange, consolidation, business combination or other similar transaction) or purchase from the Company or any of its Subsidiaries that would result in any Person or Group Beneficially Owning more than fifty percent (50%) in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or any tender offer, exchange offer or other secondary acquisition that would result in any Person or Group Beneficially Owning more than fifty percent (50%) in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or any merger, consolidation, share exchange, business combination or similar transaction involving the Company or any of its Subsidiaries that would result in the stockholders of the Company immediately preceding such transaction Beneficially Owning less than fifty percent (50%) in interest of the total outstanding Equity Securities in the surviving or resulting entity of such transaction (measured by voting power or economic interest); or (ii) any sale or lease or exchange, transfer, license or disposition of a

-45-

business, deposits or assets that constitute more than fifty percent (50%) of the consolidated assets, business, revenues, net income, assets or deposits of the Company.

"Market Price" has the meaning set forth in Warrant 1.

"Marketed Underwritten Shelf Offering" has the meaning set forth in Section 4.3(f).

"Maximum Board Size" has the meaning set forth in Section 1.3(a).

"Minority Acquisition Proposal" means any proposal, offer, inquiry or indication of interest (whether binding or non-binding, and whether communicated to the Company, the Board or publicly announced to the Company's stockholders or otherwise) by any Person or Group relating to any transaction or series of related transactions involving: (i) any acquisition (whether direct or indirect, including by way of merger, share exchange, consolidation, business combination or other similar transaction) or purchase from the Company or any of its Subsidiaries that would result in any Person or Group Beneficially Owning between thirty percent (30%) and fifty percent (50%) in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or any tender offer, exchange offer or other secondary acquisition that would result in any Person or Group Beneficially Owning between thirty percent (30%) and fifty percent (50%) in interest of the total outstanding Equity Securities of the Company or any of its Subsidiaries (measured by voting power or economic interest), or any merger, consolidation, share exchange, business combination or similar transaction involving the Company or any of its Subsidiaries that would result in the stockholders of the Company immediately preceding such transaction Beneficially Owning less than seventy percent (70%) but more than fifty percent (50%) in interest of the total outstanding Equity Securities in the surviving or resulting entity of such transaction (measured by voting power or economic interest); or (ii) any sale or lease or exchange, transfer, license or disposition of a business, deposits or assets that constitute between thirty percent (30%) and fifty percent (50%) of the consolidated assets, business, revenues, net income, assets or deposits of the Company.

"New Securities" has the meaning set forth in Section 2.3(a).

"Order" means any judgment, decision, decree, order, settlement, injunction, writ, stipulation, determination or award issued by any Governmental Authority.

"Original Public Acquisition Proposal" has the meaning set forth in Section 2.2(b).

"Other Demanding Sellers" has the meaning set forth in Section 4.2(b).

"Other Proposed Sellers" has the meaning set forth in Section 4.2(b).

"Per Security Offering Price" has the meaning set forth in Section 2.3(c).

"Permitted Transactions" shall include (a) issuances by the Company as a Company Common Stock dividend payable in shares of Company Common Stock or other Equity Securities of the Company, or upon any subdivision or split-up of the outstanding Equity Interests, (b) issuances of shares of Company Common Stock (including upon exercise of options) to directors, advisors, employees or consultants of the Company pursuant to a stock option plan, employee stock

-46-

purchase plan, restricted stock plan, other employee benefit plan or other similar compensatory agreement or arrangement approved by the Board of Directors, (c) conversions of convertible securities outstanding as of the date of the Framework Agreement and disclosed in Section 2.2(b) of the Framework Agreement in accordance with the terms of such convertible securities and (d) the exercise of the Warrants.

"Permitted Transferee" means, with respect to (x) any Walgreens Investor, Walgreens and any wholly owned Subsidiary of Walgreens, and the FW JV or (y) any Alliance Boots Investor, Alliance Boots and any wholly owned Subsidiary of Alliance Boots, and the FW JV, respectively; provided, that the FW JV may be a Permitted Transferee pursuant to clause (x) and clause (y) only if it is 100% Controlled by Walgreens and/or Alliance Boots; provided, further, that such Transferee would continue to qualify as a Permitted Transferee of the applicable Transferor if such Transfer were to take place as of any time of determination (and, in the event that such Transferee would no longer so qualify, such Transferee shall immediately Transfer back the Transferred securities to such Transferor and such Transfer shall, to the fullest extent permitted by law, be null and void ab initio, and the Company shall no longer, and shall instruct its transfer agent and other third parties to no longer, record or recognize such Transfer on the share register of the Company).

"Permitted Transfers" has the meaning set forth in Section 2.1(b).

"Person" means an individual, company, corporation, partnership, limited liability company, trust, body corporate (wherever located) or other entity, organization or unincorporated association, including any Governmental Authority.

"Piggyback Notice" has the meaning set forth in Section 4.2(a).

"Piggyback Registration" has the meaning set forth in Section 4.2(a).

"Piggyback Seller" has the meaning set forth in Section 4.2(a).

"Pre-emptive Stockholder" has the meaning set forth in Section 2.3(a).

"Pro Rata Portion" means, with respect to any Pre-emptive Stockholder, on any issuance date for New Securities, the number of New Securities equal to the product of (i) the total number of New Securities to be issued by the Company on such date and (ii) the fraction determined by dividing (x) the number of shares of Company Common Stock Beneficially Owned, in aggregate, by such Pre-emptive Stockholder and its Permitted Transferees immediately prior to such issuance (excluding, for this purpose, any then un-acquired Initial Open Market Shares) by (y) the total number of shares of Company Common Stock outstanding immediately prior to such issuance; provided, that, in the case of clause (y), such calculation shall be made assuming that the holder(s) of each of Warrant 1 and Warrant 2 (in each case, if the applicable Expiration Time shall not have occurred with respect to such Warrant) have exercised the remaining portion(s) of each such Warrant, if any, in full.

"Prohibited Transferee" means any Person set forth on Section S-5.1 of the Company Disclosure Letter.

"Proposed Issuance" has the meaning set forth in Section 2.3(b).

"Purchase and Option Agreement" means the Purchase and Option Agreement, dated as of June 18, 2012, by and among Alliance Boots, AB Acquisitions Holdings Limited and Walgreens.

"Qualifying Public Acquisition Proposal" means as it relates to any Original Public Acquisition Proposal under Section 2.2(b), any proposal, offer, inquiry or indication of interest (whether binding or non-binding, and whether communicated to the Company, the Board or publicly announced to the Company's stockholders or otherwise) by any Investor relating to (x) if the applicable Original Public Acquisition Proposal is a Minority Acquisition Proposal, (A) (i) any acquisition (whether direct or indirect, including by way of merger, share exchange, consolidation, business combination or other similar transaction) or purchase from the Company or any of its Subsidiaries that would result in any Person or Group Beneficially Owning one hundred percent (100%) in interest of the total outstanding shares of Company Common Stock (measured by voting power or economic interest), or any tender offer, exchange offer or other secondary acquisition that would result in any Person or Group Beneficially Owning one hundred percent (100%) in interest of the total outstanding shares of Company Common Stock (measured by voting power or economic interest), or any merger, consolidation, share exchange, business combination or similar transaction involving the Company or any of its Subsidiaries that would result in the stockholders of the Company immediately preceding such transaction Beneficially Owning less than fifty percent (50%) in interest of the total outstanding Equity Securities in the surviving or resulting entity of such transaction (measured by voting power or economic interest); or (ii) any sale or lease or exchange, transfer, license or disposition of a business, deposits or assets that constitute all or substantially all of the consolidated assets, business, revenues, net income, assets or deposits of the Company or (B) a Minority Acquisition Proposal submitted or made by an Investor in response to any such Original Public Acquisition Proposal as a result of which, after giving effect to such Minority Acquisition Proposal, the collective Beneficial Ownership of Company Common Stock of the Investors, as a group, would be less than or equal to forty-nine percent (49%) of the total outstanding Company Common Stock, and (y) if the applicable Original Public Acquisition Proposal is a Majority Acquisition Proposal, an alternative Acquisition Proposal.

"Records" has the meaning set forth in Section 4.6(a)(x).

"Registrable Amount" means an amount of Registrable Securities having an aggregate value of at least $250 million (based on the anticipated offering price (as reasonably determined in good faith by the Company)), without regard to any underwriting discount or commission, or such lesser amount of Registrable Securities as would result in the disposition of all of the Registrable Securities Beneficially Owned by the applicable Requesting Shareholder(s); provided, that such lesser amount shall have an aggregate value of at least $100 million (based on the anticipated offering price (as reasonably determined in good faith by the Company)), without regard to any underwriting discount or commission.

"Registrable Securities" means, with respect to the Walgreens Investors or the Alliance Boots Investors, respectively, as of any date of determination, (a) from and after the expiration of the Initial Open Market Shares Restricted Period, (i) a number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate number of Initial Open Market Shares theretofore acquired by the Walgreens Investors or Alliance Boots Investors, respectively, plus (ii) an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the sum of (A)

the aggregate number of New Securities that are shares of Company Common Stock issued to the Pre-Emptive Stockholder (or its designees) pursuant to Section 2.3 and theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, and (B) the aggregate number of Replacement Pre-emptive Shares theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, pursuant to Section 2.3(g), and plus (iii) an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate number of Dividend Reinvestment Shares theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, (b) from and after the expiration of the Additional Open Market Shares Restricted Period, a number of shares of Company Common Stock equal to the sum of the number of shares calculated in the foregoing sub-clause (a) plus an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate Additional Open Market Shares theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, (c) from and after the expiration of the Warrant 1 Shares Restricted Period, a number of shares of Company Common Stock equal to the sum of the number of shares calculated in the foregoing sub-clause (b) plus an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate number of Warrant 1 Shares theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, and (d) from and after the expiration of the Warrant 2 Shares Restricted Period, a number of shares of Company Common Stock equal to the sum of the number of shares calculated in the foregoing sub-clause (c) plus (i) an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate number of Warrants 2 Shares theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively, and plus (ii) an additional number of shares of Company Common Stock held by the Walgreens Investors or Alliance Boots Investors, respectively, equal to the aggregate number of shares of Company Common Stock then held by the Walgreens Investors or the Alliance Boots Investors, respectively, and not covered by the foregoing sub-clauses (a)-(c) or (d)(i). In addition, from and after the expiration of the Initial Open Market Shares Restricted Period, "Registrable Securities" shall also include any and all New Securities that are not shares of Company Common Stock issued to the Pre-Emptive Stockholder (or its designees) pursuant to Section 2.3 and theretofore acquired by the Walgreens Investors or the Alliance Boots Investors, respectively. In furtherance of establishing the appropriate number of Registrable Securities held by the Walgreens Investors and Alliance Boots Investors, respectively, in the event of any Transfer between Walgreens and/or any of its Permitted Transferees, on the one hand, and Alliance Boots and/or any of its Permitted Transferees, on the other hand, of any shares of Company Common Stock, Walgreens and Alliance Boots shall, in connection with any such Transfer, jointly designate such shares being Transferred (and therefore being acquired by the Transferee) as Initial Open Market Shares, New Securities issued to the Pre-Emptive Stockholder (or its designees) pursuant to Section 2.3, Replacement Pre-emptive Shares purchased pursuant to Section 2.3(g), Dividend Reinvestment Shares, Additional Open Market Shares, Warrant 1 Shares, Warrant 2 Shares or other shares of Company Common Stock, or any combination of the foregoing.

As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities if (i) a registration statement with respect to the sale of such securities has become effective under the Securities Act and such securities have been disposed of pursuant to such effective registration statement, (ii) such securities have been distributed pursuant to

Rule 144 (or any similar provision then in force) under the Securities Act, (iii) such securities have been otherwise transferred to any Person other than an Investor or its Permitted Transferees, if new certificates or other evidences of ownership for them not bearing a legend restricting further transfer and not subject to any stop-transfer order or other restrictions on transfer have been delivered by the Company and subsequent disposition of such securities does not require registration or qualification of such securities under the Securities Act or any other securities laws then applicable or (iv) such securities shall cease to be outstanding.

"<u>Relevant Sections</u>" has the meaning set forth in Section 2.2(f).

"<u>Replacement Pre-emptive Shares</u>" has the meaning set forth in Section 2.3(g).

"<u>Representatives</u>" has the meaning set forth in Section 1.6(d).

"<u>Requested Information</u>" has the meaning set forth in Section 4.8(a).

"<u>Requesting Shareholders</u>" has the meaning set forth in Section 4.1(a).

"<u>Restricted Periods</u>" has the meaning set forth in Section 2.1(a)(v).

"<u>Second Step Failure Event</u>" shall be deemed to occur upon the termination of the Purchase and Option Agreement without the Second Step Closing (as defined in the Purchase and Option Agreement) having occurred.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Sell Down Request</u>" has the meaning set forth in Section 2.2(e).

"<u>Selling Shareholders</u>" has the meaning set forth in Section 4.6(a)(i).

"<u>Share Repurchase Ownership Event</u>" has the meaning set forth in Section 2.2(e).

"<u>Shares</u>" has the meaning set forth in the recitals.

"<u>Shelf Notice</u>" has the meaning set forth in Section 4.3(a).

"<u>Shelf Offering</u>" has the meaning set forth in Section 4.3(f).

"<u>Shelf Registration Statement</u>" has the meaning set forth in Section 4.3(a).

"<u>SP</u>" means Stefano Pessina.

"<u>SP Investor</u>" has the meaning set forth in the Walgreens Shareholders Agreement and also includes (i) any Permitted Transferee (as defined in the Walgreens Shareholders Agreement) of any SP Investor that is transferred Equity Securities of the Company by any SP Investor and (ii) any Permitted Transferee (as defined in the Walgreens Shareholders Agreement) of any of the persons included in clause (i) of this definition that is transferred Equity Securities of the Company by such person.

"SP Standstill Period" means the period beginning on the date on which SP is appointed to the Board and ending on the date that is eighty-nine (89) days (or one day less than such lesser period as may be applicable under the Company's advance notice bylaws as in effect from time to time) after SP ceases to serve as a director on the Board.

"SRO" means (i) any "self-regulatory organization" as defined in Section 3(a)(26) of the Exchange Act, (ii) any other United States or foreign securities exchange, futures exchange, commodities exchange or contract market or (iii) any other securities exchange.

"Standstill Period" has the meaning set forth in Section 2.2(c).

"Subsidiary" has the meaning set forth in the Framework Agreement.

"Take-Down Notice" has the meaning set forth in Section 4.3(f).

"Thirty Day VWAP" means, with respect to any security, as of any day, the volume weighted average price of such security for the thirty trading days ending on (and including) the trading day immediately prior to such day, as obtained from Bloomberg L.P. using the "Bloomberg definition" for calculation of "all day VWAP".

"Total Economic Interest" means, as of any date of determination, the total economic interests of all Voting Securities then outstanding. The percentage of the Total Economic Interest Beneficially Owned by any Person as of any date of determination is the percentage of the Total Economic Interest of the Company that is represented by the total economic interests of all Voting Securities then Beneficially Owned by such Person, including pursuant to any Derivative Instruments and any swaps or any other agreements, transactions or series of transactions, whether any such swap, agreement, transaction or series of transaction is to be settled by delivery of securities, in cash or otherwise.

"Total Voting Power" means, as of any date of determination, the total number of votes that may be cast in the election of directors of the Company if all Voting Securities then outstanding were present and voted at a meeting held for such purpose. The percentage of the Total Voting Power Beneficially Owned by any Person as of any date of determination is the percentage of the Total Voting Power of the Company that is represented by the total number of votes that may be cast in the election of directors of the Company by Voting Securities then Beneficially Owned by such Person.

"Transaction Documents" has the meaning set forth in the Framework Agreement.

"Transaction Rights Agreement" has the meaning set forth in the recitals.

"Transfer" means (i) any direct or indirect offer, sale, lease, assignment, encumbrance, pledge, grant of a security interest, hypothecation, disposition or other transfer (by operation of law or otherwise), either voluntary or involuntary, or entry into any contract, option or other arrangement or understanding with respect to any offer, sale, lease, assignment, encumbrance, pledge, hy-pothecation, disposition or other transfer (by operation of law or otherwise), of any capital stock or interest in any capital stock or (ii) in respect of any capital stock or interest in any capital stock, to enter into any swap or any other agreement, transaction or series of transactions that hedges or

transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of such capital stock or interest in capital stock, whether any such swap, agreement, transaction or series of transaction is to be settled by delivery of securities, in cash or otherwise. "Transferor" means a Person that Transfers or proposes to Transfer; and "Transferee" means a Person to whom a Transfer is made or is proposed to be made. Notwithstanding the foregoing, any direct or indirect, voluntary or involuntary act contemplated by clause (i) or clause (ii) of the first sentence of this definition, by (a) any shareholder of Alliance Boots to any other Person of, or with respect to, as applicable, any Equity Securities of Alliance Boots, or (b) any stockholder of Walgreens to any other Person of, or with respect to, as applicable, any Equity Securities of Walgreens, shall not be deemed to constitute a "Transfer" subject to the restrictions on Transfer contained or referenced herein.

"Ultimate Standstill Level" means thirty percent (30%).

"Underwritten Offering" means a sale of securities of the Company to an underwriter or underwriters for reoffering to the public.

"Unpaid Indemnitee Amounts" has the meaning set forth in Section 1.1(f).

"Voting Securities" means shares of Company Common Stock and any other securities of the Company entitled to vote generally in the election of directors of the Company.

"Warrant 1" has the meaning set forth in the Framework Agreement.

"Warrant 1 Shares" has the meaning set forth in the Framework Agreement.

"Warrant 1 Shares Restricted Period" has the meaning set forth in Section 2.1(a)(iv).

"Warrant 2" has the meaning set forth in the Framework Agreement.

"Warrant 2 Shares" has the meaning set forth in the Framework Agreement.

"Warrant 2 Shares Restricted Period" has the meaning set forth in Section 2.1(a)(v).

"Warrant Exercise Ownership Event" has the meaning set forth in Section 2.2(e).

"Warrant Shares" means the Warrant 1 Shares and the Warrant 2 Shares.

"Warrant Transfer Notice Date" has the meaning set forth in Section 2.1(e).

"Warrants" has the meaning set forth in the recitals.

"WBAD" means Walgreens Boots Alliance Development GmbH.

"Walgreens" has the meaning set forth in the preamble.

"Walgreens Confidentiality Agreement" means the letter agreement, dated as of July 6, 2012, between Walgreens and the Company, as amended on March 10, 2013.

"Walgreens Designee" means an individual designated in writing by Walgreens for election or appointment to the Board; provided, that the initial Walgreens Designee shall be an executive officer of Walgreens and any subsequent Walgreens Designee may be an executive officer of Walgreens and/or Alliance Boots or any other individual.

"Walgreens Director" means a Walgreens Designee who has been elected or appointed to the Board.

"Walgreens Enhanced Investor Rights Period" shall mean the period beginning upon the occurrence of the Walgreens Investor Rights Step-Up Event and ending upon the occurrence of the Walgreens Investor Rights Step-Down Event.

"Walgreens Investor Rights Initiation Event" shall be deemed to occur upon the Investors collectively owning (directly or through any of their respective Permitted Transferees) five percent (5%) or more of the shares of Company Common Stock then issued and outstanding.

"Walgreens Investor Rights Initiation Event Notice" means a notice in writing from Walgreens to the Company (i) certifying that a Walgreens Investor Rights Initiation Event has occurred together with (ii) reasonable evidence that a Walgreens Investor Rights Initiation Event has occurred, including evidence of the Investors' ownership of Company Common Stock.

"Walgreens Investor Rights Period" shall mean the period beginning upon the occurrence of the Walgreens Investor Rights Initiation Event and ending upon the occurrence of the Walgreens Investor Rights Termination Event.

"Walgreens Investor Rights Step-Down Event" shall be deemed to occur if, as of the end of any Business Day following the Walgreens Investor Rights Step-Up Event, the Investors collectively own (directly or through any of their respective Permitted Transferees) less than fourteen percent (14%) of the shares of Company Common Stock then issued and outstanding; provided, however, that the effect of any issuance of Equity Securities of Company shall be disregarded for all purposes of the calculation set forth in this definition unless and until the Investors (or any of their respective Permitted Transferees) Transfers to a third party un-Affiliated with any Investor any shares of Company Common Stock subsequent to such issuance in question.

"Walgreens Investor Rights Step-Up Event" shall be deemed to occur upon the later to occur of (i) the exercise in full of Warrant 1 (as the number of Warrant 1 Shares may be reduced as a result of the acquisition of Additional Open Market Shares) and (ii) the acquisition in full by the Investors of the Initial Open Market Shares.

"Walgreens Investor Rights Step-Up Event Notice" means a notice in writing from Walgreens to the Company (i) certifying that a Walgreens Investor Rights Step-Up Event has occurred together with (ii) reasonable evidence that a Walgreens Investor Rights Step-Up Event Notice has occurred, including evidence of the Investors' ownership of Company Common Stock.

"Walgreens Investor Rights Termination Event" shall be deemed to occur if, as of the end of any Business Day following the occurrence of the Walgreens Investor Rights Initiation Event, the Investors collectively own (directly or through any of their respective Permitted Transferees) less

than five percent (5%) of the shares of Company Common Stock then issued and outstanding; provided, however, that the effect of any issuance of Equity Securities of the Company shall be disregarded for all purposes of the calculation set forth in this definition unless and until the Investors (or any of their respective Permitted Transferees) Transfers to a third party un-Affiliated with any Investor any shares of Company Common Stock subsequent to such issuance in question.

"Walgreens Investors" means (i) the Initial Walgreens Investors, (ii) any Permitted Transferee of any Initial Walgreens Investor that is Transferred Shares by such Initial Walgreens Investor in compliance with the terms of this Agreement, (iii) any Permitted Transferee of any of the Persons included in clause (ii) of this definition that is Transferred Shares by such Person in compliance with the terms of this Agreement, (iv) any Permitted Transferee of Alliance Boots that is a Transferee of Shares pursuant to Section 2.1(b)(ii) and (v) any Permitted Transferee of Walgreens that acquires New Securities pursuant to Section 2.3.

"Walgreens Shareholders Agreement" means the Walgreen Co. Shareholders Agreement, dated as of August 2, 2012, among Walgreens, SP, KKR Sprint (Europe II) Limited, KKR Spring (2006) Limited, KKR Sprint (KPE) Limited, Alliance Santé Participations S.A. and Kohlberg Kravis Roberts & Co. L.P.

"Walgreens Specified Designee" has the meaning set forth in Section 1.1(e).

      5.2    Interpretation. Whenever used: the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and the words "hereof" and "herein" and similar words shall be construed as references to this Agreement as a whole and not limited to the particular Article, Section, Annex, Exhibit or Schedule in which the reference appears. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Annexes, Exhibits and Schedules mean the Articles, Sections and Annexes of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. References to "$" or "dollars" means United States dollars. Any reference in this Agreement to any gender shall include all genders. Any reference to a wholly-owned Subsidiary of a Person shall mean such Subsidiary is directly or indirectly wholly owned by such Person. The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. The Annexes, Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. The headings of the Articles and Sections are for convenience of reference only and do not affect the interpretation of any of the provisions hereof. If, and as often as, there is any change in the outstanding shares of Company Common Stock or other Equity Interests of the Company by reason of stock or security dividends, splits, reverse splits, spin-offs, split-ups, mergers, reclassifications, reorganizations, recapitalizations, combinations or exchanges of securities and the like, appropriate anti-dilution adjustments consistent with the anti-dilution provisions otherwise set forth in the Transaction Documents shall be made in the provisions of this Agreement. No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel. With respect to each of the Warrant

Shares, Initial Open Market Shares and Additional Open Market Shares, such terms shall include, in each case, any shares of Company Common Stock or other securities of the Company received by the Investors as a result of any stock split, stock dividend or distribution, other subdivision, reorganization, reclassification or similar capital transaction. For purposes of all Transactions Documents (including the Warrants), whenever an assumption is made that the Warrants have been exercised (whether or not in full), unless otherwise expressly specified, such assumption will be based on a Cash Exercise (as defined in the Warrants) basis.


## ARTICLE VI

## MISCELLANEOUS

6.1     <u>Term</u>.  This Agreement will be effective as of the date hereof and shall automatically terminate upon the date that the Beneficial Ownership of the Investors, in the aggregate, of the Company Common Stock is less than five percent (5%), so long as, as of such date, all of the then-remaining Registrable Securities Beneficially Owned by the Investors, in each case, may be sold in a single transaction without limitation under Rule 144 under the Securities Act; <u>provided</u>, <u>however</u>, that, unless otherwise agreed to by the parties hereto, this Agreement shall in no event terminate prior to the occurrence of a Walgreens Investor Rights Termination Event .  If this Agreement is terminated pursuant to this Section 6.1, this Agreement shall become void and of no further force and effect, except for the provisions set forth in Section 1.6(d) (which shall survive termination of this Agreement for a period of five (5) years), Section 4.9, Section 5.2 and this Article VI, and except that no termination hereof shall have the effect of shortening the Standstill Period or the SP Standstill Period, to the extent that the Standstill Period or the SP Standstill Period, as applicable, would continue in effect in the absence of such termination.

6.2     <u>Notices</u>.

(a)     Notices and other statements in connection with this Agreement shall be in writing in the English language and shall be delivered by hand, facsimile or overnight courier to the recipient's facsimile number or address as set forth below or to such other facsimile number or address as a party hereto may notify to the other parties hereto from time to time and shall be given:

(i)     if to the Company, to:

| | |
|---|---|
| Name: | AmerisourceBergen Corporation |
| Address: | 1300 Morris Drive |
| | Chesterbrook, PA 19087 |
| Country: | United States |
| Fax: | 610 727 3612 |
| Attn: | General Counsel |

with a copy to (which shall not be considered notice):

| | |
|---|---|
| Name: | Cravath, Swaine & Moore LLP |
| Address: | Worldwide Plaza |
| | 825 Eighth Avenue |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 474-3700 |
| Attention: | Damien R. Zoubek, Esq. |
| | Robert I. Townsend III, Esq. |

(ii)    if to Walgreens or any other Walgreens Investor, to:

| | |
|---|---|
| Name: | Walgreen Co. |
| Address: | 108 Wilmot Road |
| | Deerfield, Illinois 60015 |
| Country: | United States |
| Fax: | (847) 315-3652 |
| Attention: | Thomas J. Sabatino, Executive Vice President, |
| | General Counsel and Corporate Secretary |

with a copy to (which shall not be considered notice):

| | |
|---|---|
| Name: | Wachtell, Lipton, Rosen & Katz |
| Address: | 51 West 52nd Street |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 403-2000 |
| Attention: | Andrew R. Brownstein, Esq. |
| | Benjamin M. Roth, Esq. |

(iii)    if to Alliance Boots or any other Alliance Boots Investor, to:

| | |
|---|---|
| Name: | Alliance Boots GmbH |
| Address: | 94 Baarerstrasse |
| | 6300 Zug |
| Country: | Switzerland |
| Attention: | Marco Pagni, Group Legal Counsel & |
| | Chief Administrative Officer |
| Email: | Marco.Pagni@allianceboots.com |

with a copy to (which shall not be considered notice):

Name:          Darrois Villey Maillot Brochier
Address:       69 avenue Victor Hugo
               75116 Paris
Country:       France
Fax:           +33 1 45 02 49 59
Attention:     Me. Alain Maillot
               Benjamin S. J. Burman, Esq.

(b)     A notice shall be effective upon receipt and shall be deemed to have been received:

    (i)     at the time of delivery, if delivered by hand, or overnight courier; or

    (ii)     at the time of transmission in legible form if received prior to 5:00 p.m. local time on such date or at the beginning of the recipient's next Business Day if received after 5:00 p.m. local time on such date or such date is not a Business Day, if delivered by fax.

6.3     <u>Investor Actions</u>.  Any determination, consent or approval of, or notice or request delivered by, or any similar action of, the Walgreens Investors, the Alliance Boots Investors or the Investors, as applicable, shall be made by, and shall be valid and binding upon, all Walgreens Investors, all Alliance Boots Investors or all Investors, respectively, if made by (i) in the case of the Walgreens Investors, the Walgreens Investors Beneficially Owning a majority of the Total Voting Power then Beneficially Owned by all Walgreens Investors, (ii) in the case of the Alliance Boots Investors, the Alliance Boots Investors Beneficially Owning a majority of the Total Voting Power then Beneficially Owned by all Alliance Boots Investors and (iii) in the case of all Investors, a majority of the Total Voting Power then Beneficially Owned by all Investors; <u>provided</u>, that, notwithstanding anything to the contrary, for purposes of this Section 6.3, the Beneficial Ownership of any shares of Company Common Stock Beneficially Owned by the FW JV shall be determined in accordance with the FW JV Ownership Calculation.

6.4     <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended or modified unless such amendment or modification is in writing and signed by (i) the Company, (ii) the Walgreens Investors Beneficially Owning a majority of the Company Common Stock then Beneficially Owned by all Walgreens Investors, and (iii) the Alliance Boots Investors Beneficially Owning a majority of the Company Common Stock then Beneficially Owned by all Alliance Boots Investors; <u>provided</u>, that, notwithstanding anything to the contrary, for purposes of this Section 6.4, the Beneficial Ownership of any shares of Company Common Stock Beneficially Owned by the FW JV shall be determined in accordance with the FW JV Ownership Calculation. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

6.5     <u>Successors and Assigns</u>.  Neither this Agreement nor any of the rights or obligations hereunder shall be assigned by any of the parties hereto without the prior written

consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns. Any attempted assignment in violation of this Section 6.5 shall be void.

6.6    Severability. It is the intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under Applicable Law and public policies applied in each jurisdiction in which enforcement is sought. If any particular provision or portion of this Agreement shall be adjudicated to be invalid or unenforceable, such provision or portion thereof shall be deemed amended to the minimum extent necessary to render such provision or portion valid and enforceable, and such amendment will apply only with respect to the operation of such provision or portion in the particular jurisdiction in which such adjudication is made.

6.7    Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that each party need not sign the same counterpart.

6.8    Entire Agreement. This Agreement (including the documents and the instruments referred to in this Agreement), together with the other Transaction Documents, the Transaction Rights Agreement, the Alliance Boots Confidentiality Agreement and the Walgreens Confidentiality Agreement, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter of this Agreement.

6.9    Governing Law; Jurisdiction. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In addition, each of the parties hereto (a) submits to the personal jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such dispute, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such dispute, any Delaware State court sitting in New Castle County, in the event any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the transactions contemplated hereby, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any claim, action or proceeding relating to this Agreement or the transactions contemplated hereby in any court other than the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such claim, action or proceeding the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such claim, action or proceeding, any Delaware State court sitting in New Castle County. Each party agrees that service of process upon such party in any such claim, action or proceeding shall be effective if notice is given in accordance with the provisions of this Agreement.

6.10    WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES TO THE

FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.10.

6.11    _Specific Performance_.  The parties hereto agree that failure of any party to perform its agreements and covenants hereunder, including a party's failure to take all actions as are necessary on such party's part in accordance with the terms and conditions of this Agreement to consummate the transactions contemplated hereby, will cause irreparable injury to the other parties, for which monetary damages, even if available, will not be an adequate remedy.  It is agreed that the parties shall be entitled to equitable relief including injunctive relief and specific performance of the terms hereof, without the requirement of posting a bond or other security, and each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of a party's obligations and to the granting by any court of the remedy of specific performance of such party's obligations hereunder, this being in addition to any other remedies to which the parties are entitled at law or equity.

6.12    _No Third Party Beneficiaries_.  Nothing in this Agreement shall confer any rights upon any Person other than the parties hereto and each such party's respective heirs, successors and permitted assigns; _provided_, that the Persons indemnified under Section 4.9 are intended third party beneficiaries of Section 4.9.

6.13    _Obligation to Update Annex A_.  Each of the parties hereto agrees that in connection with any acquisitions or Transfers of Equity Securities of the Company in accordance with the terms of the Transaction Documents, the parties hereto will, as promptly as practicable following the completion of such acquisition or Transfer, modify Annex A to reflect the effect of such acquisition or Transfer.

*[The remainder of this page left intentionally blank.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement by their authorized representatives as of the date first above written.

**AMERISOURCEBERGEN CORPORATION**

By: _____

Name: Steven H. Collis

Title: President and CEO

*[Signature Page to AmerisourceBergen Shareholders Agreement]*

WALGREEN CO.

By: _____

Name: Grey Wasson

Title: Chief Executive Officer

*[Signature Page to AmerisourceBergen Shareholders Agreement]*

ALLIANCE BOOTS GMBH

By: _____
Name:   Stefano Pessina
Title:   Executive Chairman

<u>ANNEX A</u>

<u>OWNERSHIP SCHEDULE</u>

| INVESTOR | NUMBER OF SHARES OF COMPANY COMMON STOCK BENEFICIALLY OWNED | NUMBER OF SHARES OF COMPANY COMMON STOCK OWNED OF RECORD |
|---|---|---|
| WALGREEN CO. | 32,626,810 | 0 |
| WALGREEN PHARMACY STRATEGIES, LLC | 22,696,912 | 0 |
| ALLIANCE BOOTS GMBH | 32,626,810 | 0 |
| ALLIANCE BOOTS LUXEMBOURG S.À R.L. | 22,696,912 | 0 |

# EXHIBIT C



**U.S. Department of Justice**
Drug Enforcement Administration
Office of Administrative Law Judges
8701 Morrissette Drive
Springfield, VA 22152
Tel. (202) 307-8188 Fax (202) 307-8198

# FAX TRANSMISSION

Date:       April 16, 2013

To:         Scott Lawson, Esq.
            Frank Mann, Esq.
            Jonathan Novak, Esq.
            Michelle F. Gillice, Esq.
            Robert Walker, Esq.
            Paul Soeffing, Esq.
            (202) 307-4946

            Philip J. Perry, Esq.
            Nathan H. Selzer, Esq.
            Allen M. Gardner, Esq.
            (202) 637-2201

Re:         *Walgreen Co.* Docket No. 13-1
            *Walgreen Co. d/b/a Walgreens #03629* Docket No. 13-9
            *Walgreen Co. d/b/a Walgreens #04727* Docket No. 13-10
            *Walgreen Co. d/b/a Walgreens #06997* Docket No. 13-11
            *Walgreen Co. d/b/a Walgreens #03836* Docket No. 13-16
            *Walgreen Co. d/b/a Walgreens #04391* Docket No. 13-18
            *Walgreen Co. d/b/a Walgreens #03099* Docket No. 13-20
            Notice of Hearing

Sender:     Ikea Pickett
            Secretary
            Office of Administrative Law Judges

YOU SHOULD RECEIVE 3 PAGES, INCLUDING THIS COVER SHEET. IF YOU DO NOT
RECEIVE ALL THE PAGES, PLEASE CALL (202) 307-8188.

## UNITED STATES DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

| | |
|---|---|
| In the Matter of | |
| **Walgreen Co.;**<br>**(Jupiter Distribution Facility)** | **Docket No. 13-1** |
| **Walgreen Co.**<br>**d/b/a Walgreens #03629;**<br>**(Hudson Pharmacy)** | **Docket No. 13-9** |
| **Walgreen Co.**<br>**d/b/a Walgreens #04727;**<br>**(Fort Pierce Pharmacy)** | **Docket No. 13-10** |
| **Walgreen Co.**<br>**d/b/a Walgreens #06997;**<br>**(Oviedo Pharmacy)** | **Docket No. 13-11** |
| **Walgreen Co.**<br>**d/b/a Walgreens #03836;**<br>**(Port Richey Pharmacy)** | **Docket No. 13-16** |
| **Walgreen Co.**<br>**d/b/a Walgreens #04391**<br>**(Fort Pierce 2 Pharmacy)** | **Docket No. 13-18** |
| **Walgreen Co.**<br>**d/b/a Walgreens #03099**<br>**(Fort Myers Pharmacy)** | **Docket No. 13-20** |

## NOTICE OF HEARING

Please take notice that the hearing in the above-captioned matters is scheduled to take

place on the following dates in Arlington, Virginia:

| | |
|---|---|
| April 23, 2013-April 26, 2013 | May 13, 2013-May 16, 2013 |
| April 29, 2013-May 2, 2013 | May 20, 2013-May 23, 2013 |
| May 6, 2013-May 7, 2013 | |

The hearing is scheduled to begin at **9:00 a.m. local time** on April 23, 2013 and will be held at the DEA Hearing Facility (DEAHF), 1550 Crystal Drive, Arlington, Virginia 22202. The parties are instructed to arrive at the courthouse in sufficient time to complete security screening and meet Law Clerk Laura Sambataro, Esq., in Courtroom A at **8:45 a.m. local time** to provide original exhibits. The hearing will commence shortly thereafter.

The parties have noticed a significant number of witnesses to be heard via videoteleconference (VTC). At the outset of each hearing day, counsel for each side will provide Ms. Sambataro with an updated, daily list of any witness(es) it intends to call via VTC.

The copy of proposed exhibits previously received by the OALJ from each party will serve as the Administrative Law Judge's (ALJ) copy for the hearing. The record copy should conform to the same specifications as the ALJ copy. Each party should ensure that it brings a copy of all exhibits for its own use during the hearing.

In accordance with 21 C.F.R. § 1316.44, I have determined that this notice will constitute sufficient notice to the parties without further publication as set forth in 21 C.F.R. § 1316.53.

Dated: April 16, 2013

JOHN J. MULROONEY, II
Chief Administrative Law Judge

## Certificate of Service

This is to certify that the undersigned on April 16, 2013, caused a copy of the foregoing to be delivered via interoffice mail and facsimile to counsel for the Government, Scott Lawson, Esq., Office of Chief Counsel, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152, and a copy of the foregoing was transmitted via First Class Mail and facsimile, to counsel for the Respondent Philip J. Perry, Esq., Nathan H. Selzer, Esq., and Allen M. Gardner, Esq., Latham & Watkins, LLP, 555 Eleventh Street, NW, Suite 1000, Washington, DC 20004.

Ikea Pickett
Secretary to Judge Mulrooney

2

# EXHIBIT D

# APPENDIX B

CONFIDENTIAL



**U.S. Department of Justice**
Drug Enforcement Administration

---

*Office of the Administrator*                                    *Springfield, VA 22152*

                                                September 13, 2012

**IN THE MATTER OF**

Walgreen Co.
15998 Walgreens Drive
Jupiter, Florida 33478

## ORDER TO SHOW CAUSE AND
## IMMEDIATE SUSPENSION OF REGISTRATION

      **PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21,
United States Code, Sections 823 and 824,

      **NOTICE** is hereby given to inform Walgreen Corporation ("Walgreens" or
"Respondent") of the immediate suspension of Drug Enforcement Administration
("DEA") Certificate of Registration RW0277752, pursuant to 21 U.S.C. § 824(d),
because such registration constitutes an imminent danger to the public health and safety.
Notice is also given to afford Walgreens an opportunity to show cause before DEA in
Arlington, Virginia, or a location designated by the Administrative Law Judge, on
November 13, 2012 (if Walgreens requests such a hearing), as to why DEA should not
revoke Walgreens's DEA Certificate of Registration RW0277752, pursuant to 21 U.S.C.
§ 824(a)(4), deny any pending applications for renewal or modification of such
registration, and deny any applications for additional registration, pursuant to 21 U.S.C.
§ 823(b) & (e), because Walgreens' continued registration is inconsistent with the public
interest, as that term is defined in 21 U.S.C. § 823(b) & (e). The basis for this Order to
Show Cause and Immediate Suspension of Registration is set forth in the following
nonexhaustive summary of facts and law (*see* 21 C.F.R. §§ 1301.36(e) and 1301.37(c),
which DEA construes *in pari materia* in this context.)

1.   Walgreens' Jupiter Florida Distribution Center is registered with DEA as a distributor
   in Schedules II-V pursuant to DEA Certificate of Registration RW0277752 at
   15998 Walgreens Drive, Jupiter, Florida 33478. DEA Certificate of Registration
   RW0277752 expires by its terms on May 31, 2013. The Jupiter Distribution Center is
   one of 12 Distribution Centers owned and operated by the Walgreen Corporation,

CONFIDENTIAL                                                WAGMDL00387654

headquartered in Deerfield, Illinois. Walgreens also operates more than 7800 Walgreens retail pharmacies in the United States.

2. Since at least 2009, the State of Florida has been the epicenter of a notorious, well-documented epidemic of prescription drug abuse. In July 2011, the Florida Surgeon General declared a Public Health Emergency based on the prescription pill epidemic which results in an average of seven overdose deaths per day in Florida. The drugs most commonly associated with this epidemic are typically prescribed at unscrupulous pain clinics by physicians acting outside the usual course of professional practice and include Schedule II pain relievers, such as oxycodone; Schedule IV benzodiazepines such as alprazolam, and Schedule IV muscle relaxers, such as carisoprodol. Frequently, these drugs are prescribed in large amounts and in combination with each other as "cocktails" popular with drug seeking individuals. *See East Main Street Pharmacy*, 75 Fed. Reg, 66149, 66153, (2010); *Paul H. Volkman*, 73 FR 30630, 30633-34, 30639 (2008), *pet. for rev. denied, Volkman v. DEA*, 567 F.3d 1215 (6th Cir. 2009).

3. Oxycodone is a dangerously addictive Schedule II controlled substance which is known to be highly abused and diverted in the State of Florida. According to the 2010 Florida Medical Examiner's Commission Drug Report, the drug that caused the most deaths in the state of Florida for 2010 was oxycodone (1,516 deaths), followed by benzodiazepines (1,304 deaths of which 981 were caused by alprazolam.)

4. Since 2009, Walgreens' Jupiter, Florida Distribution Center has been the single largest distributor of oxycodone products in Florida. At about the same time as the abuse of prescription drugs became an epidemic in Florida, Walgreens' Florida retail pharmacies, supplied by Respondent, commanded an increasingly large percentage of the state's growing oxycodone business. In 2010, only 3 Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida. In 2011, 38 Walgreens pharmacies made the top 100 and 6 were in the top 10. Through May 2012, 44 Walgreens pharmacies are in the top 100 oxycodone purchasers, all of them supplied by Respondent.

5. According to DEA records, in 2011, Walgreens operated 7,862 retail pharmacies in the United States. Sixteen of the top 25 largest Walgreens retail oxycodone purchasers, including the top 6 purchasers, were in Florida and supplied by Respondent. The following table shows these 6 stores and their yearly oxycodone purchases for 2009 through 2011:

2

CONFIDENTIAL

| Store # Location | Oxycodone Purchases by Dosage Unit | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 |
| 1. 03629 Hudson, FL | 388,100 | 913,900 | 2,211,700 |
| 2. 03099 Ft. Myers, FL | 95,800 | 496,100 | 2,165,900 |
| 3. 06997 Oviedo, FL | 80,900 | 223,500 | 1,684,900 |
| 4. 03836 Port Richey, FL | 344,000 | 849,000 | 1,406,000 |
| 5. 04391 Ft. Pierce, FL | 250,000 | 881,400 | 1,329,600 |
| 6. 04727 Ft. Pierce, FL | 153,500 | 507,100 | 1,192,000 |

6. An ongoing DEA investigation of Respondent's distribution practices and policies, combined with both a general examination of dispensing at Walgreens Florida pharmacies as well as a detailed investigation of the dispensing practices at the six pharmacies identified above, demonstrates that Respondent has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1). Respondent failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those controlled substances pursuant to prescriptions written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice. *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487 (2007) (revocation based in part on the respondent's recurring distributions of extraordinary quantities of controlled substances to entities that likely diverted the controlled substances by filling unlawful prescriptions, as well as the respondent's failure to conduct due diligence sufficient to protect against the diversion of the controlled substances it distributed).

7. DEA's investigation of Respondent also revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. §1301.74(b). 21 C.F.R. § 1301.74(b) (distributors are required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances . . . suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."); *see also Southwood Pharm., Inc.*, 72 Fed. Reg. at 36,502 (finding that the respondent repeatedly violated federal regulations by failing to report suspicious orders). Walgreens knew or should have known about their obligations to report suspicious orders, as such obligations were spelled out in detail in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Respondent, on September 27, 2006, February 7, 2007, and December 27, 2007. The purpose and proper implementation of suspicious order reporting programs was further discussed in the industry's own trade association, the

3

CONFIDENTIAL
WAGMDL00387656

Healthcare Distribution Management Association (HDMA), in "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" published in 2008.[1]

8. Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at Respondent's customer pharmacies. *See* 21 C.F.R. § 1301.74(b); *see also Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487 (2007).

9. Respondent's practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled "Suspicious Control Drug Orders." Two reports were provided, one for suspicious orders of Schedule II drugs, another for suspicious orders of drugs in Schedules III through V. These reports were transmitted on Respondent's behalf from Walgreens Corporate headquarters in Deerfield, Illinois. Respondent's suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for just suspicious orders of Schedule II drugs is 1712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico. The reports are based on a formula that assigns an average monthly order for a particular drug, which is then multiplied by a "DEA factor" (which is always 3, regardless of the drug or the average order amount), resulting in a "Trigger" amount, above which orders for the month are reported as suspicious, along with a listing of all orders placed for the particular drug by the reported pharmacy for the month in which the "Trigger" amount was exceeded. This report from the Jupiter Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area.

10. As made clear in 21 CFR §1301.74(b), *Southwood*, and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported *as discovered*, not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place *before* the order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded. As such, Respondent's reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title Respondent attached to these reports.

---

[1] See http://www.healthcaredistribution.org/gov_affairs/pdf_controlled/20081113_icg.pdf.

4

WAGMDL00387657

11. A review of the documents Respondent provided as evidence of its "due diligence" on the above listed six pharmacies, demonstrates that Respondent failed to conduct any meaningful investigation or analysis to ensure that the massive amounts of commonly abused, highly addictive controlled substances being ordered by these pharmacies were not being diverted into other than legitimate channels. In response to DEA requests, Respondent has been unable to provide any files related to any effort to adequately verify the legitimacy of any particular order it shipped to its customer stores.

12. Respondent's employee with overall responsibility for Schedule II drug operations (the "CII Function Manager"), raised questions within the corporation about what she correctly identified as unusually large orders for Schedule II narcotics placed regularly by several customer pharmacies. Based on the evidence available to DEA, none of these orders were reported to DEA as suspicious and all appear to have been shipped, without any further due diligence to verify their legitimacy. For example:

    a. In January 2011, Jupiter's CII Function Manager expressed concern about the enormous volume of 30 mg oxycodone being ordered by three stores, Walgreens #'s 7298, 3836, and 5018, concluding in an email to the "Manager, Rx Inventory Drug Stores" at Walgreens' Corporate Headquarters in Deerfield, Illinois, that she felt the stores needed "to justify the large quantity." With regard to store # 3836 in Port Richey, Florida, she noted that Respondent had shipped this store 3271 bottles of 100 count 30 mg oxycodone (i.e., 327,100 dosage units) in the 40 day period from 12/1/10 to 1/10/11, causing her to question *"how they can even house this many bottle[s]."* She then inquired of the same corporate manager: *"How do we go about checking the validity of these orders?"*

    b. Despite having raised these concerns from the distributor to a supervisor at corporate headquarters, none of these orders were reported as suspicious and there appears to have been no other inquiry conducted into the circumstances of the enormous amount of narcotics being shipped to store # 3836 in Port Richey, a town of less than 3000 people in a county with a population of only approximately 475,000. Despite the fact that a distribution center manager had raised questions about this store's ordering volume to a corporate manager in January 2011, the very next month, Respondent filled and shipped orders totaling another 285,800 dosage units of 30 milligram oxycodone to the same pharmacy. Again, there is no evidence of any due diligence conducted by Respondent or anyone else within the corporation to verify the legitimacy of these orders in order to fulfill their obligation to maintain effective controls against diversion.

13. According to documents received from Walgreens Corporate Headquarters, on April 2, 2012, Walgreens revised its suspicious order policy, but made the policy retroactively effective to January 1, 2012. The policy states, in pertinent part, that "Effective calendar year 2012, the Controlled Substance Order Monitoring and Prevention System prevents suspicious control drugs from being shipped to the stores. In calendar year 2012, because of the program mentioned, suspicious control drug reports are no longer generated as their shipment is prevented by the system."

5

CONFIDENTIAL
WAGMDL00387658

14. This policy ignores the fact that the reporting requirement of 21 CFR § 1301.74(b) applies to *orders*, not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement, which, as I stated in *Southwood*, is "to provide investigators in the field with information regarding potential illegal activity in an expeditious manner." 72 FR at 36501.

15. Respondent's local DEA field office within the Miami Field Division has not received a suspicious order report for any orders placed in 2012, despite the fact that Respondent has received and shipped multiple orders this year that, using the criteria Walgreens employed in 2011, would have exceeded the trigger amount previously used to report these sales.

16. The available evidence suggests that Respondent's abdication of its responsibilities as an individual registrant was at least facilitated by a push from Walgreens Corporate headquarters to increase oxycodone sales at its Florida retail pharmacies, all of which received their Schedule II controlled substances from Respondent. I also note that during the relevant time herein, Walgreens had in effect compensation programs for pharmacy employees in which bonuses were based on the number of prescriptions filled at the pharmacy. This bonus program, combined with a concerted, corporate directed effort to increase oxycodone sales, served as an incentive for pharmacists and pharmacy technicians to ignore the "red flags" of diversion presented by these prescriptions, many of which, in the proper exercise of the pharmacist's corresponding responsibility under 21 CFR §1306.04(a), should have resulted in a refusal to fill.

   a. In July 2010, Walgreens' corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies and produced an 11 page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June. The spreadsheet was sent to Walgreens' market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "*look at stores on the bottom end .... We need to make sure we aren't turning legitimate scripts away. Please reinforce.*" A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "*busiest store in Florida*" was filling almost 18 oxycodone prescriptions per day, yet "*We also have stores doing about 1 a day. Are we turning away good customers?*"

   b. At roughly the same time as Walgreens' supervisors were urging its Florida pharmacies to increase their oxycodone sales, Florida enacted new laws to combat the prescription drug abuse problem, particularly the devastating effects of oxycodone and other abused drugs dispensed directly from rogue pain clinics, commonly known as "pill mills." These new laws went into effect on October 1, 2010 and severely restricted the ability of pain clinics and physicians to dispense controlled substances directly from the clinics. The purpose of these legislative changes was to stem the overwhelming tide of controlled substances being

6

CONFIDENTIAL

diverted from pill mills and into illicit channels for sale and recreational abuse. As a result, Florida pharmacies and the distributors who served them knew or should have known that starting in late 2010, there would be a significant increase in requests to dispense pursuant to prescriptions issued by physicians associated with the pain clinics.

c. Walgreens store # 06997 in Oviedo, Florida, was ranked 444th on the above-referenced Walgreens' ranking of oxycodone sales generated at its Florida retail pharmacies, filling on average only 4 oxycodone prescriptions per day in June 2010. DEA tracks pharmacy activity not by prescriptions but by dosage units of a particular drug purchased by the pharmacy for retail sales. In 2010, the national average for oxycodone sales to retail pharmacies was 70,395 dosage units per year, or about 5,866 dosage units per month. This store's oxycodone sales began to increase drastically, as shown by the fact that in June 2010, Walgreens store #06997 purchased just 6,600 dosage units of oxycodone products. One year later, in June 2011, this same pharmacy purchased 169,700 dosage units of oxycodone.

d. Oviedo is a town of about 34,000 people and is home to two Walgreens retail pharmacies. Beginning in late 2010, these two pharmacies became the site of multiple arrests by the local police for drug offenses. The local Chief of Police began writing letters to the pharmacies after each arrest stemming from prescriptions they filled. These letters informed the pharmacy of the circumstances of the arrest and that the dispensed drugs were not being used for treatment. They further provided the pharmacy with the name and date of birth not only of the person whose prescription they filled, but also of others associated with the illegal distribution of the dispensed drugs. These letters then concluded with a request for the pharmacy's help in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.

e. The Oviedo Police Chief's concerns reached the highest levels of Walgreens' Loss Prevention Operations, with the Director of Divisional Loss Prevention noting in an email on January 28, 2011 that "*[e]vidently the Chief of Police is concerned that we are filling too many C2 prescriptions.... From what I've been told, he is referencing 100 plus incidents/arrests in his jurisdiction.*" Walgreens' response was to "*take a look at this market . . . and see if we have an increase in dispensing.*"

f. The Oviedo Police Chief convened a meeting with Walgreens Loss Prevention officials on February 10, 2011, in an effort to further bring awareness of the problems he was seeing at their stores and to brief them on the number of arrests at each location. On March 15, 2011, he sent identical letters to both the Chairman and CEO of Walgreens, asking them for their support and assistance in combating the prescription drug epidemic, informing them that Oviedo "*has seen the parking lots of your stores become a bastion of illegal drug sales and drug use*" where once the prescriptions are filled, "*the drugs are sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies.*"

7

CONFIDENTIAL

g. Despite being informed at the highest levels of ongoing diversion and drug-related criminal activity directly stemming from dispensing at these pharmacies, and bearing in mind that the average U.S. retail pharmacy in 2011 purchased only 73,000 dosage units of *all formulations* of oxycodone *for the entire year*, the Walgreens corporation, through Respondent, responded to this information about one of its stores by shipping the following quantities of 30 milligram formulation oxycodone to Oviedo store 06997:

|      |               |                     |
|------|---------------|---------------------|
| (i)  | February 2011 | 75,300 dosage units |
| (ii) | March 2011    | 72,900 dosage units |
| (iii)| April 2011    | 101,700 dosage units|
| (iv) | May 2011      | 133,900 dosage units|
| (v)  | June 2011     | 115,200 dosage units|
| (vi) | July 2011     | 145,300 dosage units|

h. Perhaps even more significant than the enormous amount of oxycodone Respondent shipped to this store despite the information provided by the Chief of Police to its pharmacists and most senior leaders, is the fact that the dispensing records for both Oviedo Walgreens pharmacies show that on multiple occasions, they each dispensed additional prescriptions of commonly diverted narcotics to the same individuals who they knew had been previously arrested for drug offenses at their pharmacies. I find this to be a staggering disregard of Walgreens' obligations under the Controlled Substances Act.

17. While the detailed information provided by the Chief of Police put Respondent and its parent company on notice of actual diversion occurring at the two Oviedo pharmacies, Respondent had ample other indications that its pharmacies were direct and significant contributors to the epidemic of prescription drug abuse and diversion in Florida, yet it largely ignored these indicators, at all levels of the corporate structure. An inexhaustive description of some of these indicators are the following:

a. On September 27, 2010, a pharmacist working at Walgreens # 04727 in Ft. Pierce reported to law enforcement that he mistakenly provided an extra 120 dosage units of 15 milligram oxycodone to a customer. When the pharmacist tried to call the customer to request he return the mistakenly dispensed oxycodone, he was told by the customer's girlfriend that the customer was an addict who sells his pills and views the extra oxycodone as a "pot of gold" which he would not return. Despite this incident, Walgreens # 04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011.

8

WAGMDL00387661

b. On November 4, 2010, a Walgreens # 04727 pharmacist reported to police that she dispensed a prescription for 60 dosage units of oxycodone 15mg to a twenty-four year old male who she then witnessed transfer the drugs to a female in the store. The female entered the pharmacy restroom, leaving behind evidence indicating she had smoked the oxycodone. Despite this incident, Walgreens # 04727 continued to fill the same customer's oxycodone and alprazolam prescriptions on several occasions in November and December 2010 and January 2011.

c. On December 21, 2010, a pharmacist employed by Walgreens Pharmacy # 3629 in Hudson, Florida reported to the Pasco County (Florida) Sheriff's Office that an individual had attempted to fill a prescription for 270 dosage units of thirty milligram oxycodone, but ran from the pharmacy after learning the pharmacy had contacted law enforcement, suspecting the prescription was a forgery. Despite this incident, the same pharmacy that reported this customer to the Sheriff's Office in December continued to fill the same customer's oxycodone prescriptions in February, March, April, May and October of 2011.

18. On or about March 2011, corporate officials at Walgreens headquarters in Illinois initiated a Florida pharmacy store review initially entitled "Focus on Profit" and later changed to "Focus on Compliance." The purpose of this review was to address the "significant increase in the number of [Schedule II controlled substance] prescriptions we are filling in [Florida]" after the October 2010 change in Florida law regarding pain clinics. The initial pilot survey asked the following questions, amongst others: "Do pain management clinic patients come all at once or in a steady stream?" and "Do you see an increase in pain management prescriptions on the day the warehouse order is received?" On May 17, 2011, in an email with the subject heading "Florida Focus on Profit," a Walgreen Co. corporate attorney reviewed the survey and regarding these two questions, stated "*If these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance.*" The surveys that ultimately were used in the Focus on Compliance initiative did not contain those questions. By omitting these questions in order to avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion, the Walgreens Corporation and Respondent as a corporate subsidiary, ignored its statutory and regulatory obligation to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. *See* 21 U.S.C. § 823(b) and (e).

19. Apparently as part of this "Focus On Compliance," Walgreens sought to develop and implement "Oxycodone Action Plans" within its districts in Florida in an attempt to reduce the volume of oxycodone dispensing on behalf of pain clinics. For store # 3629 in Hudson, the plan devised by District Pharmacy and Loss Prevention supervisors in a memo dated August 23, 2011 included "*contacting the Jupiter warehouse and designating order limits for Oxycodone.*" The plan, effective immediately, was to "limit" the Hudson store to orders of no more than 100 bottles of 100 count 30 milligram oxycodone. Notwithstanding the memo and the plan to limit store #3629's purchases to no more than 100 bottles, Respondent subsequently

9

CONFIDENTIAL

shipped the following orders to store 3629:

| Date | Bottles | Dosage Units |
|------|---------|--------------|
| 09/26/11 | 331 | 33,100 |
| 10/10/11 | 371 | 37,100 |
| 11/29/11 | 200 | 20,000 |
| 12/06/11 | 113 | 11,300 |
| 12/13/11 | 150 | 15,000 |

Respondent's inability to enforce a very simple, modest limitation on this one pharmacy is further evidence of its failure to maintain effective controls against diversion, even in the rare instance when it tried to do so.

20. In mid to late 2011 and continuing into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing at its high-volume pharmacies and in some cases, did, in fact, achieve a relatively significant reduction in Schedule II dispensing at these stores. Additionally, in late May, 2012, approximately seven weeks after Administrative Inspection Warrants were served on six Walgreens retail pharmacies and Respondent, Walgreens suspended dispensing of Schedule II drugs as well as Alprazolam and Carisoprodol at these six pharmacies and two others. In my assessment of the imminent danger posed by Respondent's continued registration, I have considered these remedial measures, as well as Walgreens' claims that it continues to revise its suspicious order reporting system to prevent the excesses that occurred in 2010 and 2011. In my judgment, and in the exercise of the discretion afforded me by 21 U.S.C. § 824(d), the danger posed by Respondent's continued registration is only slightly mitigated by the dispensing restrictions enacted at these eight pharmacies.

21. To reiterate, my concerns with Respondent's distribution practices are not limited to the six Walgreens pharmacies discussed herein. Respondent distributes to over 800 other retail pharmacies in Florida alone, many of which dispense oxycodone in amounts far in excess of the U.S. and Florida averages and which also experienced dramatic increases in their distribution of oxycodone from at least 2009 to the present. No fewer than 43 Walgreens pharmacies in Florida purchased in excess of 500,000 dosage units of oxycodone in 2011, despite a national average of approximately 74,000 dosage units for all U.S. pharmacies and an average of approximately 110,00 dosage units for all Florida Walgreens pharmacies. Florida remains the epicenter of this country's prescription drug abuse problem and notwithstanding the cessation of Schedule II dispensing at eight of its retail customers, Respondent remains the top distributor of the most dangerous prescription drugs in Florida, and still has not made a single suspicious order report in calendar year 2012.

10

WAGMDL00387663

22. Through May of this year, Respondent's customers included 44 Walgreens retail pharmacies on the list of the 100 top oxycodone purchasing pharmacies in Florida.[2] Respondent continues to distribute large amounts of oxycodone while it appears to continue to misunderstand or ignore its obligation to maintain effective controls against diversion by reporting suspicious orders and conducting due diligence on its customer stores to verify the legitimacy of their orders. Thus, the fact that Walgreens stopped selling Schedule II controlled substances to a handful of retail pharmacies – virtually all of which Walgreens also knew were themselves under DEA investigation at the time Walgreens stopped distributing to these pharmacies – does little to mollify my concerns about the danger posed by Respondent's continued operation. The nature and significance of the problems revealed by DEA's investigation indicate that Respondent's anti-diversion measures are inadequate generally; the problems do not appear to be limited to the pharmacies discussed herein. Consequently, I believe that Respondent's continued operation poses an imminent danger to public health and safety.

23. Voluntary dispensing restrictions enacted either in anticipation of, or in reaction to regulatory action, do not indicate to me that Respondent and its parent company have recognized and adequately reformed the systemic shortcomings discussed herein. On the contrary, when a company undertakes to survey its stores for regulatory compliance, then selectively edits that survey for the explicit purpose of avoiding evidence of its own non-compliance, as Walgreens apparently did in May 2011, claims of effective remedial measures have less credibility. I gave significant weight to the fact that Walgreens appears to have deliberately structured certain of its anti-diversion measures to avoid learning about and/or documenting evidence consistent with diversion. At best, I regard this as deliberate indifference on Walgreens' part as to its obligations as a DEA registrant.

24. My confidence in Walgreens' remedial measures is lessened further by the fact that this manipulation of the compliance survey occurred just one month after Walgreens entered into a nationwide Memorandum of Agreement (MOA) with DEA to resolve an Order to Show Cause issued to a San Diego Walgreens pharmacy based on allegations of unlawful dispensing. Walgreens pledged in this MOA to enact a compliance program at all of its retail pharmacies to detect and prevent diversion of controlled substances and to implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations. Walgreens' effort to enact such a program in Florida appears to have been, in part, intentionally skewed to avoid actually detecting certain evidence of possible diversion. That Walgreens would actively seek to avoid documenting evidence of possible diversion in its "Focus on Compliance" in Florida immediately after entering this MOA, further contributes to my preliminary finding that Respondent's continued registration during

---

[2] By way of comparison, only two other national or regional chain pharmacies have stores on this list, one of which has four stores in the top 100, while the other has three.

11

CONFIDENTIAL

the pendency of this proceeding constitutes an imminent danger to the public health and safety.

IN view of the foregoing, and based on information before the Agency as of the issuance of this notice, it is my preliminary finding pursuant to 21 U.S.C. §§ 823(f) and 824(a)(4), that Walgreens' continued registration is inconsistent with the public interest. Under the summarized facts and circumstances described herein, it is also my preliminary finding, significantly in light of the rampant and deadly problem of prescription controlled substance abuse in Florida, that Respondent's continued registration while these proceedings are pending constitutes an imminent danger to the public health and safety. *See* 21 U.S.C. § 824(d). Accordingly, pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. § 1301.36(e), and the authority granted me under 28 C.F.R. § 0.100, DEA Certificate of Registration RW0277752 is hereby suspended, effective immediately. Such suspension shall remain in effect until a final determination is reached in these proceedings.[3]

PURSUANT to 21 U.S.C. § 824(f) and 21 C.F.R. § 1301.36(f), the Special Agents and Diversion Investigators of the DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal or to remove for safekeeping all controlled substances that Walgreens possesses pursuant to the registration which I have herein suspended. The said Agents and Investigators are also directed to take into their possession Walgreens's DEA Certificate of Registration RW0277752 and any unused order forms.

THE following procedures are available to you in this matter:

1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Walgreens may file with the DEA a written request for a hearing in the form set forth in 21 C.F.R. § 1316.47. *See* 21 C.F.R. § 1301.43(a). If Walgreens fails to file such a request, the hearing shall be cancelled in accordance with paragraph 3, below.

2. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Walgreens may file with the DEA a waiver of hearing together with a written statement regarding its respective positions on the matters of fact and law involved. *See* 21 C.F.R. § 1301.43(c).

3. Should Walgreens decline to file a request for a hearing or, should Walgreens request a hearing and then fail to appear at the designated hearing, Walgreens shall be deemed to have waived the right to a hearing and the DEA may cancel

---

[3] I have primarily addressed Schedule II controlled substances based on Walgreens' representations that Respondent no longer distributes controlled substances other than Schedule II. This should not be construed as an indication that DEA has concluded that Respondent's distribution practices relating to non-schedule II controlled substances conform to all applicable requirements and obligations. To the contrary, many of the problematic distribution practices noted herein would raise imminent danger concerns with respect to non-Schedule II controlled substances if Respondent were to continue to distribute them.

12

CONFIDENTIAL

such hearing, and I may enter my final order in this matter without a hearing based upon the evidence presented to me. *See* 21 C.F.R. §§ 1301.43(d) and 1301.43(e).

Correspondence concerning this matter, including requests referenced in paragraphs 1 and 2 above, should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152. Matters are deemed filed upon receipt by the Hearing Clerk. *See* 21 C.F.R. § 1316.45. A copy of the same shall also be served on the Government counsel listed below and be addressed to the Office of Chief Counsel, Diversion and Regulatory Litigation, 8701 Morrissette Drive, Springfield, VA 22152.

Michele M. Leonhart
Administrator
Drug Enforcement Administration

cc: Hearing Clerk, Office of Administrative Law Judges
    Scott Lawson, Counsel for the Government
    Jonathan Novak, Counsel for the Government

13

CONFIDENTIAL

WAGMDL00387666

# REQUEST FOR HEARING

Any person desiring a hearing with regard to an Order to Show Cause must, within thirty (30) days from receipt of the Order to Show Cause, file a request for a hearing in the following format:

[DATE]

DEA Headquarters
Office of the Administrative Law Judges
Hearing Clerk
8701 Morrissette Drive
Springfield, Virginia 22152

Dear Madam:

The undersigned, [Name of person], hereby requests a hearing in the matter of [Identification of the proceeding].

    (A) [State with particularity the interest of the person in the proceeding.]

    (B) [State with particularity of the objections or issues, if any concerning which the person desires to be heard.]

    (C) [State briefly the position of the person with regard to the particular objections or issues.]

    (D) [Name (either registrant, applicant, or attorney), address (including street address, city, state, and zip code), and telephone number (including area code) of person to whom all subsequent notices or mailings in this proceeding should be sent.]

                   Respectfully yours,

                   [Signature of registrant, applicant or attorney]

Note:  Pursuant to 21 CFR 1316.47(b), the Administrative Law Judge, upon request and showing of good cause, may grant a reasonable extension of time allowing for response to an Order to Show Cause.

CONFIDENTIAL

WAGMDL00387667



[Page intentionally left blank]

CONFIDENTIAL

WAGMDL00387668

# United States Department of Justice

## Drug Enforcement Administration

| | |
|---|---|
| In the Matter of<br><br>Walgreen, Co. | Docket No. 13-01<br><br>Administrative Law Judge<br>John J. Mulrooney, II |

# Government's Prehearing Statement

Scott Lawson
Jonathan Novak
Attorneys
Diversion & Regulatory Litigation
Office of Chief Counsel
8701 Morrissette Drive
Springfield, VA 22152
Tel: 202.307.8038
Fax: 202.307.4946

Date: October 31, 2012

CONFIDENTIAL

WAGMDL00387669

Pursuant to the October 15, 2012 Order for Prehearing Statements, as modified by the October 18, 2012 Order Granting the Respondent's Motion For a Continuance and Amending the Order for Prehearing Statements, the United States Department of Justice, Drug Enforcement Administration (DEA or Government), hereby submits its Prehearing Statement.[1]

## I. ISSUE

Whether DEA should revoke DEA Certificate of Registration RW0277752 issued to Walgreen Co. ("Respondent"), pursuant to 21 U.S.C. §§ 824(a)(4) and 823(b) and (e) and deny any pending applications for renewal or modification of such registration, pursuant to 21 U.S.C. § 823(b) and (e).

## II. REQUESTED RELIEF

The Government requests revocation of Respondent's DEA Certificate of Registration RW0277752.

## III. PROPOSED STIPULATIONS OF FACT[2]

1. Respondent is registered with DEA as a distributor in Schedules II-V under DEA Registration RW0277752 at 15998 Walgreens Drive, Jupiter, Florida 33478.

2. DEA Registration Number RW0277752 expires by its terms on May 31, 2013.

## IV. PROPOSED WITNESSES[3]

1. Joseph Rannazzisi
   Deputy Assistant Administrator for Diversion Control
   DEA Headquarters
   8701 Morrissette Drive

---

[1] The Government is filing separately a Motion For an Extension of Time to file this Prehearing Statement, which was originally due on October 29, 2012. The Government was unable to file by this date due to Hurricane Sandy and the resulting closure of the federal government on October 29 and 30, 2012.

[2] The Government anticipates discussing additional stipulations with Respondent.

[3] At this time the Government has not noticed an expert witness. The Government requests the opportunity to supplement its intended witnesses and testimony if it determines that such an expert is necessary in the presentation of its case, and particularly, if Respondent intends to utilize an expert witness.

2

CONFIDENTIAL

WAGMDL00387670

Springfield, Virginia  22152

2.  Susan Langston
    Diversion Program Manager
    DEA Miami Field Division
    2100 North Commerce Parkway
    Weston, Florida  33326

3.  Kyle Wright
    Chief, Targeting and Analysis Unit
    DEA Headquarters
    8701 Morrissette Drive
    Springfield, Virginia  22152

4.  Donna Richards
    Acting Diversion Group Supervisor
    DEA Miami Field Division
    2100 North Commerce Parkway
    Weston, Florida  33326

5.  Phyllis Garrett
    Diversion Investigator
    DEA Miami Field Division
    2100 North Commerce Parkway
    Weston, Florida  33326

6.  Chief Jeffrey Chudnow
    Oviedo Police Department
    300 Alexandria Boulevard
    Oviedo, Florida 32766

7.  Robert Varno
    Walgreen Co.
    15998 Walgreens Drive
    Jupiter, Florida 33478

8.  Christine Atwell
    Walgreen Co.
    15998 Walgreens Drive
    Jupiter, Florida 33478

9.  Kathy L. Federico
    Diversion Group Supervisor
    Milwaukee District Office
    4725 West Electric Avenue
    West Milwaukee, Wisconsin  53219

3

CONFIDENTIAL

WAGMDL00387671

10. George Corripio
    Pharmacist
    Walgreen Co. Store # 5079
    2423 Orange Ave.
    Ft. Pierce, Florida

11. Edward J. Lanzetti
    Walgreen Co. Market Loss Prevention Director
    7003 Presidents Dr., #250
    Orlando, Florida 32809

## V. SUMMARY OF TESTIMONY

### 1. Deputy Assistant Administrator Joseph Rannazzisi

Deputy Assistant Administrator Rannazzisi will describe his background, education and training as a DEA Deputy Assistant Administrator, a law enforcement officer, and a licensed pharmacist. He will further testify substantially as follows:

Prescription drug abuse occurs in the United States at an alarming rate. The 2010 National Survey on Drug Use and Health reveals that approximately 7 million Americans abuse controlled substance pharmaceuticals for non-medical purposes. Second only to marijuana, controlled substance prescription drugs are abused by more people than cocaine, heroin, hallucinogens and inhalants combined. Of all prescription drugs, narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently. Each year, roughly 5.1 million people abuse narcotic pain relievers in the United States.

Beginning in late 2008 and continuing to the present, there has been a significant rise in the number of rogue pain clinics whose complicit doctors were initially permitted to dispense millions of dosage units of oxycodone and other abused drugs directly from the clinics. Florida is the epicenter for these illegal pain clinics. DEA, State and local law enforcement investigations reveal that thousands of drug seekers flock to these Florida-based pain clinics to obtain their supply of oxycodone, and other controlled substances such as alprazolam, which is

4

CONFIDENTIAL

in turn illegally redistributed in states along the entire east coast and Midwest.

The illicit pain clinics, the pharmacies that fill their scripts, and the wholesale distributors who supply pharmacies without appropriate due diligence (including Respondent), have caused, and continue to cause, millions of dosage units of oxycodone and other controlled substances to be diverted, posing a serious threat to the public health and safety. According to the Florida Medical Examiner's Office, they have seen a 345.9% increase in the number of overdose deaths associated with oxycodone between 2005 and 2010. For 2010, their data showed that approximately 4,091 persons died in Florida alone from an overdose caused by just five drugs: methadone, oxycodone, hydrocodone, benzodiazepines, or morphine.

Furthermore, the abuse of prescription drugs is not isolated to just one drug. Abusers and addicts routinely abuse prescription drugs in combination with one another to enhance the effects. This activity significantly increases the risk of potential harm to the individual. This combination is often referred to as a "cocktail" of hydrocodone or oxycodone used in combination with alprazolam (a benzodiazepine) and carisoprodol. According to the Florida Medical Examiner's Office, they have seen a 127% increase in the number of deaths associated with benzodiazepines in the State of Florida between 2005 and 2010.

On July 1, 2011, the State Health Officer and Surgeon General, Dr. Frank Farmer issued a statewide public health emergency declaration in response to the ongoing problem of prescription drug abuse and diversion in Florida. The press release accompanying this emergency declaration noted more oxycodone is dispensed in the state of Florida than in all remaining states combined. It further stated that in 2010, "98 of the top 100 doctors dispensing Oxycodone nationally were in Florida"; and that "126 million oxycodone pills were dispensed through the top 100 dispensing pharmacies in Florida".

5

CONFIDENTIAL

Following changes in Florida law aimed at curbing the problematic dispensing direct from the pain clinics, drug abusers have found other ways to obtain oxycodone and other "cocktail" drugs. Rather than dispensing the drugs directly to "patients," pain clinics and complicit doctors are now forced to write prescriptions for oxycodone and other abused drugs. Drug abusers wanting their prescriptions filled must take their prescriptions to a retail pharmacy. The result was that law enforcement saw immediate and significant increases in the volume of oxycodone dispensed from retail pharmacies across the state of Florida. Retail pharmacies are generally supplied by a DEA-registered wholesale distributor. The doctors and clinics that prescribe oxycodone inappropriately, the pharmacies that dispense their prescriptions, and the wholesale distributors who supply them have caused, and continue to cause, millions of dosage units of oxycodone to be diverted for unlawful use thereby creating an imminent threat to the public health and safety.

Deputy Assistant Administrator Rannazzisi will authenticate and describe the purpose behind three letters sent by DEA to all distributors and manufacturers, including Respondent, on September 27, 2006, February 7, 2007, and December 27, 2007. These letters explained to distributor registrants their obligations to maintain effective controls against diversion and report suspicious orders as part of their duties within the closed system established by the Controlled Substances Act (CSA). He will describe the purpose of the suspicious order requirement of 21 C.F.R. §1301.74(b) and its relationship to the statutory obligation of all distributors to maintain effective controls against diversion of controlled substances pursuant to 21 U.S.C. §§ 823(b)(1) & 823(d)(1). Consistent with the guidance of these letters, he will describe a distributor's obligation to devise and implement an effective system to identify suspicious orders and the obligation to report suspicious orders to DEA as they are discovered. He will further testify that

6

CONFIDENTIAL

WAGMDL00387674

a distributor has an obligation under the statutory and regulatory scheme to determine the legitimacy of any order it identifies as suspicious prior to fulfilling that order.

He will further testify that distributors have a statutory obligation to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific and industrial channels and that the exercise of this obligation requires a distributor to confirm the legitimacy of all orders prior to filling. He will describe the general ways in which distributors commonly perform and document this due diligence and will describe common indicators of diversion that all distributors should be alert to at their customer pharmacies. He will testify that these obligations apply equally to distributor registrants regardless of whether their customers are independent or chain pharmacies and regardless of whether the distributor and its customers are under common ownership.

Based on the evidence of its' suspicious order program provided by Respondent, he will testify that the Walgreen Co.'s suspicious order program fails to comply with Respondent's obligations under 21 C.F.R. §1301.74(b). He will testify that the "Suspicious Control Drug Orders" report provided to DEA on Respondent's behalf monthly by Walgreen Co. corporate headquarters constitutes nothing more than a monthly report of completed transactions and therefore does not meet the regulatory requirement to report suspicious orders as discovered, as is spelled out in his December 27, 2007 letter to Respondent. In other words, despite the title attached to these compilations of completed transactions, he will testify that they are not suspicious order reports under the regulation. Furthermore, he will testify that based on the documents provided by Walgreen Co., Respondent appears to have conducted little to no investigation or analysis of the orders it reported as suspicious prior to completing the sale of these orders, despite the fact that on a single day, many of these orders greatly exceeded the

7

CONFIDENTIAL

WAGMDL00387675

monthly threshold established by Respondent for reporting orders of a particular controlled substance as suspicious.

Moreover, he will testify that the monthly reports of completed "suspicious" transactions reported by Respondent were misleading in that they did not report each order received and shipped by Respondent, but instead aggregated the orders shipped on any given day. Further, he will testify that the reports made by Respondent are flawed in that they include all orders for a particular controlled substance shipped to a particular pharmacy in a given month and do not indicate which of these orders are being reported as suspicious. He will testify that based on the foregoing, Respondent did not make a single proper suspicious order report, despite a history of supplying its customers, particularly but not limited to its Florida retail pharmacies, incredibly large amounts of the most commonly abused and diverted controlled substances.

He will testify regarding the Walgreen Co.'s current suspicious order policy, applicable to all of its distribution centers, including Respondent, which indicates that as of January 1, 2012, the company will no longer make suspicious order reports as a result of a system that supposedly prevents shipment of any suspicious orders. He will testify that such a policy evidences a misunderstanding of the suspicious order reporting requirement, which is triggered by suspicious orders for controlled substances, not only when such an order is actually shipped. He will testify that this operating statement on behalf of Respondent is further evidence of the lack of an appropriate system under 21 C.F.R. § 1301.74(b) and is indicative of ineffective controls against the diversion of controlled substances.

Finally, he will discuss the additional requirements imposed upon the Walgreen Co's operation of its retail pharmacies by the Memorandum of Agreement entered into between DEA and Walgreen Co. in April, 2011.

8

CONFIDENTIAL

## 2. Susan Langston, Diversion Program Manager ("DPM"), Miami Field Division (MFD)

DPM Langston will testify to her background, education and training as a DEA Diversion Investigator, Diversion Group Supervisor, and Diversion Program Manager. She will testify substantially as follows:

Since at least 2009, the State of Florida has been the epicenter of a notorious, well-documented epidemic of prescription drug abuse. In July 2011, the Florida Surgeon General declared a Public Health Emergency based on the prescription pill epidemic which results in an average of seven overdose deaths per day in Florida. The controlled substances most commonly associated with this epidemic are typically prescribed at unscrupulous pain clinics by physicians acting outside the usual course of professional practice and include Schedule II pain relievers, such as oxycodone (which is highly addictive and known to be highly abused an diverted in the State of Florida); Schedule IV benzodiazepines, such as alprazolam; and Schedule IV muscle relaxers, such as carisoprodol. Frequently, these controlled substances are prescribed in large amounts and in combination with each other as "cocktails" popular with drug seeking individuals. According to the 2010 Florida Medical Examiner's Commission Drug Report, the drug that caused the most deaths in the State of Florida for 2010 was oxycodone (1,516 deaths), followed by benzodiazepines (1,304 deaths of which 981 were caused by alprazolam). DPM Langston will testify regarding changes to Florida law aimed at curbing this problem that restricted the ability of practitioners to dispense controlled substances to patients and how the epidemic of controlled substance drug abuse and diversion has now shifted to pharmacies.

DPM Langston will explain why Respondent and 6 of its retail pharmacy customers were targeted for investigation. She will testify about statistical information compiled by DEA's

9

CONFIDENTIAL

WAGMDL00387677

ARCOS ("Automation of Reports and Consolidated Orders System") unit, identifying the largest distributors of oxycodone and related controlled substances in Florida, as well as the largest retail pharmacy purchasers of these substances in Florida from 2008 to the present. She will introduce charts showing these pharmacies' oxycodone purchases from at least 2008 to the present and describe why the size and frequency of these purchases should have created suspicion within Walgreen Co. and Respondent that these pharmacies were diverting controlled substances.

She will testify that on August 19, 2011, DEA met with Walgreens personnel at the DEA MFD offices in Weston, Florida to apprise them of relevant ARCOS information about Walgreens' sales of oxycodone in Florida. Present from Walgreens were Dwayne Pinon (corporate in-house counsel), Ed Forbes (Market Loss Prevention Director), Wesley Rohn (Pharmacy District Supervisor), Joan Bustelo (Pharmacy District Supervisor), Anne-Marie Aldrich (Pharmacy District Supervisor), Cesar Cedeno (Pharmacy District Supervisor), Georgia Lehoczky (Market Pharmacy Director), Robert Espinosa (Pharmacy Supervisor), Lakeisha Axem (Pharmacy Supervisor), Sandra Vazquez (Pharmacy Supervisor) and Susan Thompson, Loss Prevention Manager. She will testify that the Walgreens officials at this meeting were told, amongst other things, that 20 Florida Walgreens pharmacies were in the top 300 of oxycodone purchasers in the United States for the first half of 2011 and within the State of Florida over the same time frame, 100 of the top 300 pharmacy oxycodone purchasers were Walgreens retail pharmacies. Moreover, Florida Walgreens pharmacies purchased more than double the average amount of oxycodone purchased by Florida pharmacies.

DPM Langston will discuss the "Suspicious Control Drug Order" reports received by DEA from Walgreens. She will testify that these reports were sent to DEA from Walgreens Loss

10

WAGMDL00387678

Prevention officials at corporate headquarters in Illinois on behalf of the Jupiter Distribution Center. She will discuss the contents of these reports, how frequently they were submitted, and what DEA was able to glean from an examination of these reports. DPM Langston will testify that the reports were not in compliance with DEA's clear edict regarding what should and should not be contained in a suspicious order report. She will also testify that in 2012, DEA has not received a single suspicious order report from either Walgreens Corporate Headquarters or from the Jupiter distribution center.

DPM Langston will discuss the execution of Administrative Inspection Warrants (AIW), on April 4, 2012 at six Walgreens pharmacies and Respondent, along with the service of an administrative subpoena for additional records from Respondent, the six pharmacies, and their corporate headquarters. She will testify regarding the meaning of the subpoena's request for "due diligence" files and her efforts to communicate this concept to Respondent. Further, she will testify to the types of information traditionally found within such files maintained by distributor registrants and the traditional steps distributors undertake to monitor their customers and assess whether or not they are involved in diversion.

She will also introduce emails produced by Walgreens in response to the subpoena, in which the corporation urges its Florida pharmacy supervisors to increase their oxycodone sales and she will discuss other emails indicating that Walgreens' officials were aware of excessive dispensing at some of these 6 pharmacies, all of whom received their Schedule II controlled substances from Respondent. She will discuss Walgreen Co.'s dispensing guidelines for its Florida pharmacies and the development and results of a survey entitled "Focus on Compliance", the purpose of which was to assess the scope of the diversion problem at Walgreen's Florida pharmacies.

11

CONFIDENTIAL

WAGMDL00387679

DPM Langston will testify about multiple specific suspicious orders placed by the six related Walgreens pharmacies during 2011, which were filled despite their suspicious nature and without Respondent conducting any due diligence to ensure these orders were not being diverted. DPM Langston will discuss the specific order dates, the objective suspicious factors related to the orders, such as size and quantity, as well as the subjective factors creating a situation in which Walgreens knew or should have known that the orders were suspicious and that these pharmacies' dispensing practices posed an unreasonable risk of diversion. DPM Langston will discuss due diligence steps that could have and should have been taken before the distribution center shipped the orders. She will also describe numerous "red flags" of diversion evident from a review of the records available to Respondent from the individual pharmacies it served.

### 3. Office of Diversion Control, Unit Chief Kyle Wright

Mr. Wright will testify to his background, education and training as the Targeting and Analysis Unit Chief in the Office of Diversion Control. He will further testify as follows:

Mr. Wright will testify regarding the Automation of Reports and Consolidated Orders System ("ARCOS") data regarding Respondent's sales of controlled substances. He will testify to the background of ARCOS, its purpose, the information ARCOS contains, and how the information is used by DEA to identify potential diversion of controlled substances. He will testify that he used ARCOS information to conduct an analysis of Respondent's sales of controlled substances. Specifically, he will testify with respect to the ARCOS information for Respondent's top six retail pharmacy customers. Wright will further authenticate charts showing comparative levels of controlled substance purchases among Respondent's various retail chain customers from 2008 to the present, to include the average oxycodone purchasing by all of Respondent's customers; its Florida customers; and the six targeted Walgreens pharmacies.

12

CONFIDENTIAL

Wright will further testify to the importance of accurate and complete reporting to ARCOS and will testify that a distributor who reports in a manner that consolidates multiple orders under separate DEA Forms 222 into a single Form 222 is not making a complete and accurate report. Wright will authenticate documents showing Respondent's ARCOS reporting on a number of occasions and compare this reporting to the actual sales information from the source documents.

### 4. Acting Group Supervisor ("A/GS") Donna Richards

A/GS Donna Richards will testify to her background, education and training as a DEA Diversion Investigator and Group Supervisor. She will testify substantially as follows:

A/GS Richards conducted a thorough review of the materials provided by Walgreens in response to the administrative subpoena issued by DEA. She will testify that her review of these documents produced no actual showing of any due diligence exercised by Respondent to verify the legitimacy of their increasingly frequent and large orders for highly abused controlled substances. The one exception A/GS Richards will note are several emails from the Jupiter distribution center CII Function Manager, Christine Atwell, questioning the size and frequency of orders from particular pharmacies. Richards will testify that despite Respondent's apparent concern about the orders it was fulfilling on behalf of these pharmacies, Respondent continued to ship suspiciously large quantities of controlled substances to these pharmacies and did not properly report any of the orders that Atwell questioned, or that were subsequently shipped to these pharmacies as suspicious. Richards will testify that based on the Walgreen Co.'s response to DEA's request for due diligence files, Respondent filled these orders without adequately resolving Atwell's concerns or otherwise conducting any investigation of these orders to determine that they were not being diverted.

13

CONFIDENTIAL

WAGMDL00387681

Richards will further testify about several particular incidents occurring at Respondent's customer pharmacies that should have increased Respondent's scrutiny of these customers, all of whom were already purchasing unusually large quantities of the most commonly abused and diverted controlled substances. One of these incidents occurred in December 2010, at Walgreens store 03629 in Hudson, Florida. An individual attempted to fill a prescription for 270 thirty milligram oxycodone tablets but abruptly left the pharmacy without the narcotics he was seeking after apparently learning that pharmacy personnel, who had reviewed the prescription and suspected it was a forgery, had contacted law enforcement. Despite being put on notice that this customer was likely diverting, Walgreens 03629 continued filling prescriptions for the customer through October 2011. All of the prescriptions were for oxycodone, hydromorphone and/or alprazolam, were paid for in cash and issued by physicians located a significant distance from Walgreens 03629. She will further testify that efforts by Walgreens to impose order limits on this particular store in light of its problematic dispensing did not succeed.

Similarly, Richards will testify that on September 27, 2010, a pharmacist at Walgreens store 04727 in Ft. Pierce, Florida, reported to local law enforcement that he mistakenly provided an extra 120 dosage units of oxycodone 15mg to a customer. The pharmacist stated that when he spoke to the customer's girlfriend to request the return of the oxycodone, the girlfriend said that the customer was an addict who sold his pills and viewed the extra prescription as a "pot of gold." Despite this incident, Walgreens 04727 continued to fill this customer's prescriptions for oxycodone 15mg and oxycodone 30mg on December 30, 2010 and January 26, 2011.

On November 4, 2010, a Walgreens 04727 pharmacist reported to local law enforcement that she dispensed a prescription for 60 dosage units of oxycodone 15mg to a customer. The pharmacist witnessed the customer hand the prescription to a female in the store. The female

14

CONFIDENTIAL

WAGMDL00387682

entered the restroom with the prescription and upon leaving the restroom, left evidence (aluminum foil with burn marks and pill residue) indicating that she had used the oxycodone in an illicit manner. Despite this incident, Walgreens 04727 continued to fill the customer's oxycodone and alprazolam prescriptions on November 30, 2010, December 13, 2010, December 27, 2010, and January 24, 2011. Additionally, on two of these occasions, the pharmacist noted on the prescription that the customer did not have identification and/or a passport.

On October 28, 2011, the Sheriff of St. Lucie County notified Walgreens 04727 by letter that it needed to take action to stem the tide of prescription drug diversion. St. Lucie County Sheriff Ken Mascara requested Walgreens 04727's "help in dealing the with prescription painkiller epidemic" in St. Lucie County and Florida by "closely scrutinizing" prescriptions for Schedule II narcotics, written by out-of-town physicians and/or written for out-of town individuals. Nevertheless, Walgreens 04727 continued its practice of filling numerous opiate/opioid prescriptions issued by out-of-town physicians through early 2012. Several of these out-of town physicians subsequently surrendered their registrations for cause and/or were subject to state action for their conduct involving controlled substances prescriptions.

She will also provide additional examples of orders for controlled substances received by Respondent that, given the information available to the Walgreen Co., including the above-related police incidents and the below-summarized testimony of Oviedo Police Chief Chudnow, should have been considered suspicious. She will provide testimony that despite clear "red flags" of diversion at some of its customer pharmacies, the distribution center shipped suspicious orders to these pharmacies without executing any due diligence to resolve the potential for diversion.

15

CONFIDENTIAL

**5. Diversion Investigator ("DI") Phyllis Garrett**

DI Phyllis Garrett will testify to her background, education and training as a DEA Diversion Investigator. She will testify as follows:

A review of the ARCOS information reported by the Jupiter distribution center to DEA revealed failures to report complete and accurate information to ARCOS. Specifically, DI Garrett will point to examples where Walgreens reported a single ordered quantity of Schedule II controlled substances, while the actual amounts were ordered over several DEA 222 forms, amounting to several separate transactions instead of one. DI Garrett's testimony, along with that of Kyle Wright, will be used to admit documents showing these failures to report completely and accurately.

She will introduce evidence of particular shipments of 30mg oxycodone to the six pharmacies named in the Order to Show Cause and will describe the characteristics of these orders that should have triggered both a suspicious order report and additional investigation from Respondent prior to shipping.

**6. Oviedo Chief of Police Jeffrey Chudnow**

Chief Chudnow will testify about his background, training and experience as a police officer and as the Chief of Police for Oveido, Florida. Chief Chudnow will testify about the very tangible effects that the diversion of controlled substances has had on the city of Oveido, as evidenced by increases in, among other things, crime rates and overdoses. Chief Chudnow will testify about his department's knowledge of Walgreens 06997, as well as another Walgreens within the city limits, as centers for illicit controlled substance sales and use.

The Oveido Police Department (OPD) made numerous arrests for illegal distribution of

16

CONFIDENTIAL

controlled substances in 2010 and 2011 related to controlled substances dispensed at the two

Walgreens pharmacies, with many of the illicit transactions preceding these arrests occurring in

the parking lots of the stores. Chief Chudnow will testify that it was his practice following one

of these arrests to send a letter to the pharmacy which dispensed the controlled substance being

diverted, notifying them of the details and asking for the pharmacy's assistance in preventing

future diversion. Chief Chudnow sent dozens of these letters, at least five of which will be

offered into evidence because, as noted in the ISO, Walgreens Store 06997 continued to dispense

to some of these individuals even after being notified of their arrest.[4]

On February 10, 2011, Chief Chudnow met with Ed Lanzetti, Walgreens Market Loss

Prevention Director, and another Walgreens official. At the meeting, Chief Chudnow presented

Mr. Lanzetti with numerous statistics and facts regarding controlled substance arrests related to

Walgreens' two Oveido pharmacies. These statistics included numbers and types of drug-related

arrests, types of controlled substances seized per arrest, and statistics showing the names of

doctors whose prescriptions were related to diversion arrests. Despite being given this

information, Walgreens 06997 continued to fill prescriptions for these associated doctors

subsequent to the February meeting with Chief Chudnow.

On March 15, 2011, Chief Chudnow sent letters to Alan G. McNally, Chairman of

Walgreens Corporation and to Gregory D. Wasson, President and CEO of Walgreens

Corporation, informing them about the numerous controlled substance arrests taking place at the

Oveido Walgreens pharmacies and the effects on the community of Oveido, and asking for their

assistance in stopping these problems. Chief Chudnow never received any response to his

request for assistance from anyone at Walgreens Corporation.

---

[4] DEA will offer the evidence of subsequent dispensing to the subjects of Chudnow's letters through a Diversion Investigator and will specify these individuals and supporting documents in a Supplemental Prehearing Statement, after moving for a protective order concerning the personal information to be disclosed in these exhibits.

CONFIDENTIAL

WAGMDL00387685

### 7. Robert Varno

Varno will be asked to testify about his experience as Respondent's Distribution Center Manager in Jupiter, Florida from June 2001 until June 2012. Varno will testify about his responsibilities as the manager of the distribution center, including the filling of orders for all of the Walgreens retail pharmacies serviced by the Jupiter distribution center. Varno will be asked to explain the distribution of controlled substances to the Walgreens retail pharmacies, including the use of DEA Form 222 for filling orders for Schedule II controlled substances. Varno will testify regarding his knowledge and use of shipping information reported to ARCOS, as well as Suspicious Order Reports, his understanding of their creation and his use of these reports in managing the distribution center. He will discuss how these reports were received and stored at the distribution center, his utilization of these reports, and how these reports impacted shipping operations at the distribution center. Varno will testify about his training in anti-diversion measures by Walgreen's Headquarters and/or Loss Prevention officials, particularly those portions of his training focusing on Florida's well-known epidemic of prescription drug abuse. He will also testify about his own knowledge of the prescription drug problem in Florida and how that awareness impacted operations at Respondent, particularly with regard to identifying and verifying suspicious orders of commonly abused painkillers.

### 8. Christine Atwell

Christine Atwell will be asked to testify about her more than six years of experience as the CII Function Manager at the Walgreens distribution center in Jupiter, Florida. Atwell will explain the role of the CII Function Manager as part of the distribution center operations, including her functions while serving in that role. She will explain the system for filling orders for Schedule II controlled substances in place in 2010 and 2011, including the filling of standard

18

CONFIDENTIAL

WAGMDL00387686

orders, the filling of "PDQ[5]" orders and the filling of orders for a quantity beyond the stock on hand at the distribution center. Atwell will discuss how the Distribution Center handled orders placed directly by pharmacy employees in addition to the automated system. She will testify about the process of reviewing orders for controlled substances received at the distribution center, as well as about the guidance and training she received from Walgreen Co. on how to evaluate special orders. Atwell is expected to testify that she had full approval authority on all special orders placed by pharmacies. She will testify about how the automated system handled DEA Form 222 documentation of orders filled by the distribution center, as well as any controlled substances ordered but not filled by the distribution center.

Atwell will testify regarding her knowledge and use of information reported to ARCOS, as well as Suspicious Order Reports, to include her understanding of their creation and her use of these reports in managing the distribution center's CII functions. She will testify about her training in anti-diversion measures by Walgreen's Headquarters and/or Loss Prevention officials, particularly those portions of this training focusing on Florida's well-known epidemic of prescription drug abuse. She will also testify about her own knowledge of the prescription drug problem in Florida and how that awareness impacted operations at Respondent, particularly with regard to identifying and verifying suspicious orders of commonly abused painkillers.

As the CII Function Manager, Atwell will testify regarding emails she sent to Walgreens corporate personnel, including Barbara Martin and Distribution Center Manager Rob Varno, voicing concerns about the unusual size and frequency of orders being placed by several pharmacies. She will testify about Walgreens response to those concerns and her awareness of any efforts by Walgreens to address the prescription drug problem both nationally and within

---

[5] PDQ is internal vernacular used by Walgreens for "Pretty Darn Quick," or for orders received daily at the distribution center for fast turnaround outside the regular weekly orders.

19

CONFIDENTIAL

WAGMDL00387687

Florida.

Atwell will discuss changes to the automated filling systems implemented at the Jupiter Distribution Center in 2012. She will also discuss her understanding of the suspicious order reports produced by Walgreens, including that she has no input into the creation of these reports and she never utilized these reports as part of her role as CII Function Manager at the distribution center. She will testify that during her tenure as the CII Function Manager at the Jupiter distribution center, she has never stopped an order from being filled and distributed.[6]

### 9. Group Supervisor ("GS") Kathy Federico

GS Federico will testify to her background, education and training as a DEA Group Supervisor. She will testify as follows:

On June 14, 2012, GS Federico, of the DEA Milwaukee District Office, spoke with Dwayne Pinon, in-house corporate counsel for Walgreen, Co., in a telephone interview. During the interview, Pinon stated that Walgreens' prior suspicious order reporting system was based on a formula for Pseudoephedrine reporting in the DEA Chemical Handlers Handbook. Pinon stated that the old system automatically reported any orders for quantities above the algorithm's threshold limit. He stated that DEA had informed Walgreens that this algorithm reporting system was outdated and that Walgreens needed to establish their own system for reporting suspicious orders. Pinon stated that the old reports were not suspicious orders, but were in fact just orders that "bounced off" the old reporting system. Pinon informed Federico that Walgreens had implemented a new system which they hoped to present to DEA at some point. The new system set limits on a pharmacy ordering controlled substances based on their sales history, and

---

[6] Both Ms. Atwell and Mr. Varno were interviewed by DEA in August, 2012, with counsel for Respondent present. The Government reserves the right to present evidence of their statements through the testimony of DI's Richards and/or Garrett, particularly if either or both do not testify at the hearing.

20

CONFIDENTIAL

WAGMDL00387688

any order over the set limit would trigger an alert to Walgreens Loss Prevention. Loss Prevention would then resolve the order. Pinon stated that any orders that Loss Prevention could not resolve would be reported to DEA. However, he stated that initial implementation of this new version of the Suspicious Order Monitoring System had produced "thousands" of allegedly suspicious orders, and was thus still being adjusted to produce different results.

### 10. George Corripio

George Corripio will testify about his thirty-one (31) years of experience as a pharmacist, and his current position as a Walgreen's Staff Pharmacist at Walgreens #5079 at 2423 Orange Avenue, Ft. Pierce, Florida 34950. Corripio will testify about a brief period in 2011 when he worked at Walgreens #4727, also located in Ft. Pierce, Florida. Corripio will testify as follows:

Unlike the customers at The clientele at Walgreens #4727 was "heavy CII traffic," and that "80% of the clientele was oxy[codone]." In his professional opinion, the diagnoses did not match the customers, as most of the clientele were young people and most of the diagnoses were for back pain. He felt that most of the customers were not telling the truth. The customers were young, they seemed to all now each other, and they often appeared to be under the influence. Often the clientele would present "cocktail prescriptions." On one occasion, a female customer presented a prescription for ten opiates, which is the type of prescription dispensed to a patient suffering from terminal illness.

Corripio will testify about his general discomfort at filling oxycodone prescriptions at Walgreens #4727, and about how supervising pharmacist did not seem bothered by the clientele and offered to fill prescriptions for Corripio that he felt uncomfortable filling. She suggested that as long as the pharmacy had a diagnosis code for the prescription, they were fine to fill. When Corripio refused to fill a prescription, the customer would often ask when the female pharmacist

21

WAGMDL00387689

was coming back.

Corripio will testify that in his professional opinion, any reasonable pharmacist and technician would know that something was not right with the situation going on at the pharmacy. Corripio brought the situation to the attention of the local police department to seek help with the problems. Corripio will further testify that he believed his District pharmacy supervisor knew about the dispensing practices at Store # 4727. [7]

### 11. Edward J. Lanzetti

Mr.Lanzetti will testify about his employment and duties at Walgreens as a Market Loss Prevention Director. He will be asked to describe his knowledge of the prescription drug abuse problem in Florida and about Walgreens' efforts to combat these issues. He will be asked to describe the Loss Prevention program as it pertains to anti-diversion measures and the methods used by Walgreens' Loss Prevention program to detect and prevent diversion at its pharmacies. Lanzetti will be asked about the increases in oxycodone sales at Walgreens pharmacies in 2010. He will also be questioned about his meeting with Chief Jeffrey Chudnow of the Oviedo Police Department, and about any actions taken in response by the Walgreen Corporation.

### VI. PROPOSED DOCUMENTS

| Exhibit | Description | Approx. # Pages |
|---------|-------------|-----------------|
| 1. | DEA Certificate of Registration RW0277752 (attached hereto) | 1 |
| 2. | Sep 27, 2006 Letter from Deputy Asst. Administrator to Respondent | 4 |
| 3. | Feb 7, 2007 Letter from Deputy Asst. Administrator to Respondent | 2 |

---

[7] Mr. Corripio was also interviewed by DEA in August, 2012, with counsel for Respondent present. The Government reserves the right to present evidence his statements through the testimony of DI's Richards and/or Garrett, particularly if Corripio does not testify at the hearing.

22

CONFIDENTIAL

| Exhibit | Description | Approx. # Pages |
|---|---|---|
| 4. | Dec 27, 2007 Letter from Deputy Asst. Administrator to Respondent | 4 |
| 5. | 2011 Memorandum of Agreement between DEA and Walgreen Co. | 7 |
| 6. | Florida Declaration of Public Health Emergency | 3 |
| 7. | HDMA Guidance on Suspicious Order Reporting | 16 |
| 8. | Walgreen Policy: Handling Suspicious Drug Orders, Revised 2/15/05 | 1 |
| 9. | Walgreen Policy: Handling Suspicious Orders and Loss of Controlled Drugs, Revised 2/15/05 | 1 |
| 10. | Walgreen: Handwritten Revisions to Suspicious Order Policies, undated | 2 |
| 11. | Walgreen Policy: Handling Suspicious Drug Orders, Revised 04/02/202 (sic) | 1 |
| 12. | Walgreen Policy: Handling Suspicious Orders and Loss of Controlled Drugs, Revised 04/02/2012 | 1 |
| 13. | "Controlled Substance Threshold" Project P09002, Feb. 2009 | 18 |
| 14. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated Dec. 30, 2011 | 1500+ * |
| 15. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated Nov. 30, 2011 | 1500+ * |
| 16. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated Oct. 31, 2011 | 1500+ * |
| 17. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated Sep. 30, 2011 | 1500+ * |
| 18. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated July 31, 2011 | 1500+ * |
| 19. | Jupiter CII Suspicious Control Drug Orders Report with cover letter dated May 5, 2011 | 1500+ * |
| 20. | Chart of Top Oxycodone Dispensing Florida Pharmacies, 2008-2012. | 5 |
| 21. | Chart of Oxycodone Sales to Selected Walgreens Pharmacies, 2006-2012 | 7 |
| 22. | Chart of Oxycodone Average Sales: US average, Florida average, Walgreens Nationwide Average, Walgreens Florida Average. | 2 |
| 23. | Chart of Oxycodone 30 mg Orders Shipped to Selected Pharmacies | 5 |

23

CONFIDENTIAL

WAGMDL00387691

| Exhibit | Description | Approx. # Pages |
|---------|-------------|-----------------|
| 24. | 2011 MOA between Walgreens and DEA | 7 |
| 25. | Chart and Supporting Documents – Inaccurate ARCOS Reporting | 10 |
| 26. | Excerpts from DEA Pharmacist Manual | 5 |
| 27. | Chart:  Oxycodone Sales Comparisons of Selected Walgreens Pharmacies | 4 |
| 28. | Oviedo Police Department Letters to Walgreens | 10 |
| 29. | Walgreen Emails Re:  Oxycodone Sales ** | 2 |
| 30. | Walgreens Emails re:  pharmacy orders ** | 15 |
| 31. | Walgreens Emails re:  Ft. Pierce Pharmacies 4727 & 4391  ** | 8 |
| 32. | Walgreens Email about Oviedo Police Chief ** | 2 |
| 33. | Walgreens Emails re:  Focus on Compliance ** | 25 |
| 34. | Walgreens Emails re: Oxycodone Action Plans ** | 8 |
| 35. | Walgreens Emails re:  Dispensing Guidelines ** | 10 |
| 36. | Selected DEA Forms 222 From Respondent | 25 |
| 37. | ARCOS Information Submitted by Respondent for the transactions in Exhibit 33. | 5 |
| 38. | Police Reports re:  individual incidents at selected pharmacies | 15 |

\* The Government will seek to only use excerpts from these reports in order to limit the size of each exhibit well below the number of pages contained within the original report.

\*\* Respondent has informed the Government that it will be providing a Bates-stamped replica of the material it originally provided in response to a subpoena without any numeration.  Once received, the Government will use these materials to specify exactly which documents are being used and provide a more detailed exhibit list in subsequent filings.

### VII. OTHER MATTERS

As this and related matters not currently before the Court are part of an ongoing investigation, the Government requests the opportunity to supplement this Prehearing Statement as necessary with additional witnesses and documentary evidence.   There may also be a need to supplement or revise in response to ongoing litigation brought by Respondent in both the Eastern District of Virginia and the Court of Appeals for the District of Columbia.

24

CONFIDENTIAL

WAGMDL00387692

Pursuant to the Court's Amended Order for Prehearing Statements, the Government's position at this time is that paragraph 20 of the OTSC/ISO is the only portion of the charging document that is *solely* relevant to the Administrator's findings of an imminent danger to the public health and safety. While other portions of the OTSC/ISO also support this finding, they are also relevant to the issues to be determined herein, particularly at this stage of the proceeding, where the Government is not yet aware of the particular defenses to be raised by Respondent.

## VIII. POSITION REGARDING HEARING SITUS

At this time, the Government does not request a change of location for the hearing, though this position is subject to clarification of the means and method of securing the presentation of testimony by civilian witnesses located more than 500 miles from the site of the hearing. *See* 21 U.S.C. § 876. This concern would be substantially alleviated should Respondent agree to produce in person any current employee requested in this Prehearing Statement or supplements thereto.

## IX. BEST ESTIMATE AS TO TIME REQUIRED TO PRESENT CASE

The Government anticipates requiring no more than four (4) days to present its case-in-chief, exclusive of cross-examination and rebuttal.

Respectfully submitted,

SCOTT LAWSON
JONATHAN P. NOVAK
Attorneys
Diversion & Regulatory Litigation
Office of Chief Counsel

Date: October 31, 2012

25

CONFIDENTIAL

WAGMDL00387693

## CERTIFICATE OF SERVICE

I hereby certify that on the date signed below, I caused the original and two copies of the foregoing GOVERNMENT'S PREHEARING STATEMENT, to be hand delivered and faxed to the DEA Office of the Administrative Law Judges, and I caused a copy of the same to be sent, *via e-mail* to counsel for Respondent at the following addresses:

> Phil Perry
> Allen M. Gardner
> Nathan H. Seltzer
> Latham & Watkins LLP
> 555 Eleventh Street, NW
> Suite 1000
> Washington, DC 20004-2232
> Fax: 202.637.2201
> Email: Phil.Perry@lw.com
> Allen.Gardener@lw.com
> Nathan.Seltzer@lw.com
>
> David S. Weinstein
> Clarke Silverglate P.A.
> 799 Brickell Plaza
> Suite 900
> Miami, Florida 33131
> Fax: 305-377-3001
> Email: DWeinstein@cspalaw.com

_3(0(12_
Date

Signature

CONFIDENTIAL

WAGMDL00387694



[Page intentionally left blank]

CONFIDENTIAL

WAGMDL00387695

# UNITED STATES DEPARTMENT OF JUSTICE

## DRUG ENFORCEMENT ADMINISTRATION

| | |
|---|---|
| IN THE MATTER OF | DOCKET NO. 13-01 |
| WALGREEN, CO. | ADMINISTRATIVE LAW JUDGE<br>JOHN J. MULROONEY, II |

# GOVERNMENT'S SUPPLEMENTAL PREHEARING STATEMENT

Scott Lawson
Jonathan Novak
Attorneys
Diversion & Regulatory Litigation
Office of Chief Counsel
8701 Morrissette Drive
Springfield, VA 22152
Tel: 202.307.8038
Fax: 202.307.4946

Date:  December 7, 2012

CONFIDENTIAL

WAGMDL00387696

Pursuant to the November 20, 2012 Prehearing Ruling, the Government hereby submits its Supplemental Prehearing Statement.

The Government supplements the proposed testimony of its previously disclosed witnesses as follows:

**1. Deputy Assistant Administrator Joseph Rannazzisi**

Both the ISO and the Government's Prehearing Statement refer to three letters issued by Deputy Administrator Rannazzissi. The second of these two letters, dated February 7, 2007, is identical to the first, dated September 27, 2006. The Government therefore will not be referencing the February 7, 2007 letter in its proposed testimony and has removed this document from its exhibit list.

Deputy Administrator Rannazzissi will further testify in response to Respondent's contention in its Prehearing Statement that its suspicious orders program was modeled on guidance from DEA's website. He will testify that Respondent's reliance on this website is misplaced, as it applies to DEA's Chemical Program only and is designed to implement separate statutes and regulations than those involving suspicious orders for controlled substances.

**2. DPM Langston:**

Ms. Langston will further testify to her review of the materials provided by Respondent in response to a subpoena request for the distributor's due diligence and customer files. Utilizing her training and experience in investigating manufacturers and distributors of controlled substances, she will testify that she found little to no evidence that Respondent or any part of its vertically integrated corporate structure undertook any efforts to assess the reasonableness or legitimacy of the orders it was shipping to Walgreens stores, despite the fact that it routinely identified these orders as suspicious. (To the extent this testimony is duplicative of that

2

CONFIDENTIAL

proffered for A/GS Richards, Ms. Langston's testimony on these matters will be in place of Ms. Richards.) Correcting her proffered testimony in the government's Prehearing Statement, Ms. Langston will testify that the last suspicious control drug orders report received by DEA on behalf of Respondent was in February 2012, covering orders through January 2012.

### 3. Diversion Investigator ("DI") Phyllis Garrett:

DI Garrett (or, in the alternative, GS Richards) will additionally testify that Respondent's Suspicious Order Reports frequently failed to fully report all orders that, pursuant to their own criteria, should have been reported as suspicious. She will identify and describe a chart with supporting documentation, showing examples of these failures, some of which also include failures to report orders of Schedule II drugs to ARCOS. She will similarly identify and describe a summary of orders shipped by Respondent in early 2012, after it adopted a policy of no longer making suspicious order reports on the basis that it would not ship them, that exceeded its 2011 and January 2012 criteria for reporting those orders as suspicious.

DI Garrett (or, in the alternative GS Richards) will identify Walgreens "Oxycodone Action Plan" Memo for District 227 and compare the plan's intent to impose immediate order limits on three stores with the actual orders shipped by Respondent subsequent to this plan.

### 4. George Corripio

Pharmacist George Corripio will testify that he was temporarily transferred from Fort Pierce Walgreens 5079 to Walgreens Store # 4727, Fort Pierce, Florida, for a brief period in late 2010 (vice 2011 as stated in the Government's Prehearing Statement.) He will testify to the sharp contrast in clientele and dispensing practices between 4727 and 5079, despite their relative close proximity. He will testify that much of Store #4727's oxycodone customers appeared to be young, healthy individuals, whose appearance did not correspond with the medication they were

3

CONFIDENTIAL

WAGMDL00387698

seeking or the diagnosis codes he obtained from the offices of the clinics issuing the prescriptions. Many times, the customers seeking the pain medications would arrive in groups who all seemed to know each other and they often appeared to be under the influence of something, which was suspicious to him based on his years of experience as a pharmacist. He will testify that the pharmacy supervisor, Andrea Cohen, told him that all he had to do to in order to fill a prescription was to get a diagnosis code from the issuing office. Because of his own discomfort in filling these prescriptions which he readily identified as suspicious, Andrea Cohen offered to fill them for him. He will testify that the offices whose customers presented pain prescriptions at 4727 generally provided the same diagnosis, usually low back pain, and that he observed that if 4727 filled one of these questionable prescriptions, they would soon see several more customers presenting similarly questionable prescriptions. He will testify that many times when he refused to fill these prescriptions, the customers would get angry and ask when the female pharmacist was coming back. He will testify that the majority of these customers paid cash and were encouraged to return to the pharmacy by Supervisor Andrea Cohen, who would offer these customers Walgreens discount cards. He will testify that he told law enforcement officers that the situation at 4727 with regards to the pill-seeking customers was out of control and that he needed help.

He will testify about an incident he reported to the police after he mistakenly provided extra oxycodone to customer Richard Hanson. Upon trying to call Hanson to tell him to return the oxycodone, Hanson's girlfriend told him that Hanson was an addict who sells his pills. He will be asked about whether there is anything in Walgreens dispensing system to note such an incident in order to flag a customer such as Hanson should he present prescriptions in the future for similar substances.

4

CONFIDENTIAL

**Proposed Exhibits:**

Pursuant to the Court's Prehearing Ruling, the Government produced the following

proposed exhibits to Respondent on November 30, 2012:

| Exhibit | Description | # Pages |
|---|---|---|
| 1. | DEA Certificate of Registration RW0277752 | 1 |
| 2. | September 27, 2006 Guidance Letter From DEA Deputy Assistant Administrator Joseph T. Rannazzisi to Walgreen Co. | 8 |
| 3. | December 27, 2007 Guidance Letter From DEA Deputy Assistant Administrator Joseph T. Rannazzisi to Walgreen Co. | 4 |
| 4. | April 2011 Memorandum of Agreement Between Walgreen Co. and DEA | 7 |
| 5. | July 1, 2011 Florida State Department of Health Declaration of Public Health Emergency Regarding Prescription Drug Abuse Epidemic | 5 |
| 6. | October 17, 2008 Healthcare Distribution Management Association Guidance with Attached Letter for DEA Chief Counsel Wendy Goggin | 17 |
| 7. | February 15, 2005 Walgreens Policy: "Handling Suspicious Drug Orders" | 2 |
| 8. | Notes on Walgreens Proposed Suspicious Order Policy | 2 |
| 9. | April 4, 2012 Walgreens Policy: "Handling Suspicious Orders and Loss of Controlled Drugs" | 1 |
| 10. | April 4, 2012 Walgreens Policy: "Handling Suspicious Drug Orders" | 1 |
| 11. | Walgreens "Controlled Substance Threshold" Project P09002, February 2009 | 18 |
| 12. | December 2011 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 1626 |
| 13. | December 2011 Walgreens Jupiter Distribution Center C3-5 Suspicious Order Report | 384 |

5

CONFIDENTIAL

WAGMDL00387700

| 14. | Excerpt of December 2011 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 25 |
|---|---|---|
| 15. | Excerpt of August 2011 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 46 |
| 16. | Excerpt of July 2011 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 46 |
| 17. | Excerpt of June 2011 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 46 |
| 18. | Excerpt of December 2010 Walgreens Jupiter Distribution Center C2 Suspicious Order Report | 36 |
| 19. | Excerpt of Suspicious Orders for Walgreens #3099 | 14 |
| 20. | Excerpt of Suspicious Orders for Walgreens #3629 | 64 |
| 21. | Excerpt of Suspicious Orders for Walgreens #3836 | 49 |
| 22. | Excerpt of Suspicious Orders for Walgreens #4391 | 34 |
| 23. | Excerpt of Suspicious Orders for Walgreens #4727 | 19 |
| 24. | Excerpt of Suspicious Orders for Walgreens #6997 | 15 |
| 25. | Walgreens Ft. Pierce Comparison of ARCOS Data and Chart | 1 |
| 26. | Walgreens Oviedo Comparison of ARCOS Data and Chart | 1 |
| 27. | Walgreens Port Richey and Hudson Comparison of ARCOS Data and Chart | 1 |
| 28. | Walgreens Ft. Myers Comparison of ARCOS Data and Chart | 1 |
| 29. | Top 100 Walgreens Purchasers of Oxycodone from Jupiter Distribution Center | 3 |
| 30. | Yearly Sales of Oxycodone to Select Walgreens Pharmacies from All Sources, 209-2011 | 1 |
| 31. | Orders for 30mg Oxycodone (100 count bottles) in 2012 Exceeding Walgreens 2011 "Trigger Amount" for Reporting Suspicious Transactions, with Attached DEA Forms 222 | 23 |
| 32. | Walgreens Ft. Pierce (#4391) ARCOS Reporting Discrepancies | 28 |
| 33. | Walgreens Ft. Pierce (#4727) ARCOS Reporting Discrepancies | 21 |
| 34. | Walgreens Ft. Meyers (#3099) ARCOS Reporting Discrepancies | 25 |
| 35. | Walgreens Hudson (#3629) ARCOS Reporting Discrepancies | 41 |

CONFIDENTIAL

WAGMDL00387701

| 36. | Walgreens Oviedo (#6997) ARCOS Reporting Discrepancies | 22 |
|-----|---------------------------------------------------------|-----|
| 37. | Walgreens Port Richey (#3836) ARCOS Reporting Discrepancies | 30 |
| 38. | Suspicious Order Report Discrepancies | 39 |
| 39. | DEA Guidance "A Pharmacist's Guide to Prescription Fraud" | 2 |
| 40. | September 27, 2010 Ft. Pierce Police Incident Report for Richard Frederick Hanson | 5 |
| 41. | Copies of Prescriptions Filled for Richard Frederick Hanson by Walgreens #4727 | 10 |
| 42. | November 4, 2011 Ft. Pierce Police Incident Report from Walgreens #4727 | 6 |
| 43. | Copies of Prescriptions Filled for Carlo Pastor by Walgreens #4727 | 18 |
| 44. | December 24, 2010 Police Incident Report Regarding James McCune and Accompanying Prescriptions | 18 |
| 45. | Dispensing Log of Prescriptions Filled by Walgreens #3629 for James McCune | 1 |
| 46. | Letters sent from Oviedo Police Department to Walgreens | 16 |
| 47. | Summary of Arrests Made at Walgreens Pharmacies in Oviedo, Florida | 1 |
| 48. | Summary of Surveillance Conducted at Walgreens Oviedo Pharmacies and Law Enforcement Results | 2 |
| 49. | Oviedo Clinton and Valerie Brekke Exhibit | 30 |
| 50. | Oviedo Staci Starling Exhibit | 17 |
| 51. | March 19, 2012 Administrative Subpoena for Walgreens Due Diligence Files | 2 |
| 52. | Letters from Walgreens Legal Counsel to DPM Susan Langston Outlining Walgreens' Response to DEA Due Diligence Subpoena | 6 |
| 53. | Email: FW: The Two Minute Oxy-Refusal [WAG00000368] | 2 |
| 54. | Email: re_oxycodone 30 mg [WAG00000460] | 2 |
| 55. | Email: Re_Please advise on Pain Manag [WAG00000462] | 2 |
| 56. | Email: Standards of Practice for the Disp [WAG00000464] | 2 |
| 57. | Email: Re_Handling Pain Management RX [WAG00000660] | 2 |

CONFIDENTIAL

WAGMDL00387702

| 58. | Email: 0969_001a [WAG00000742] | 22 |
|-----|-------------------------------|-----|
| 59. | Email: 0969_001a [WAG00000742] | 22 |
| 60. | Email: Fw_DEA issue at 6094 with attachment [WAG00000813]**** | 8 |
| 61. | Email: _ Oxycodone sales with attachment  [WAG00000829] | 12 |
| 62. | Email: District Notes and Focus Points [WAG00000845] | 1 |
| 63. | Email: Margate FL Schedule II limitations (Svihra) [WAG00000846] | 4 |
| 64. | Email: Re: High Quantity Stores 682971 [WAG00000869] | 11 |
| 65. | Email: Ft Pierce.msg 2 [WAG0000889] | 13 |
| 66. | Email: Rx Numbers – Oviedo FL (Svihra) [WAG00000902] | 2 |
| 67. | Email: Oviedo FL (Stahmann) [WAG00000904] | 3 |
| 68. | Email: Re Fw 682971 - OXYCODONE HCL 30MG TAB [WAG0000908] | 11 |
| 69. | Email: Fw_3099 Oxycodone Issue [WAG00000919] | 2 |
| 70. | Email: Re Store #3836 [WAG00000921] | 4 |
| 71. | Email: Re Fw INC000002834005 Store #3836 WIC#682971 order qty 148 [WAG00000925] | 4 |
| 72. | Email: 1412 - CII Dispensing Action Plan [WAG00000929] | 1 |
| 73. | Email: 3525 - CII Dispensing Action Plan [WAG00000930] | 1 |
| 74. | Email: Fw_Stores with many adjustments [WAG00000948] | 2 |
| 75. | Email: STORE 3099 – RxS Due Diligence [WAG00001042] | 3 |
| 76. | Email: Re Store #06997 [WAG00001057] | 2 |
| 77. | Email: Re Fw Oxycontin question [WAG00001064] | 8 |
| 78. | Email: Re Fw CII Order [WAG00001087] | 17 |
| 79. | Email: Florida Focus on Profit (Svihra) [WAG00001107]  **** | 7 |
| 80. | Email: Store 4706 [WAG00001125] | 7 |
| 81. | Email: Dist #227 Oxycodone Memo August 2011 [WAG00001212] | 2 |

CONFIDENTIAL

WAGMDL00387703

| 82. | Email: Store 3099 [WAG00001256] | 1 |
| 83. | Email: Re_3099 [WAG00001260] | 2 |
| 84. | Email: 1009_001 [WAG00001326] | 40 |
| 85. | Email: REQUEST REVIEW Florida Pain Management Visits (Merten) [WAG00001638] | 1 |

**** Government Exhibits 60 and 79 are subject to the ongoing litigation involving Respondent's privilege claims. They are produced here as redacted by Respondent pending a resolution of the privilege issue.

### Proposed Supplemental Exhibits:

86. Email: Actions Taken in District 21 about CII Dispensing WAG0001740 – 2 pages

87. Email: New Florida Prescribing Law – 3 pages

88. Email: Focus on Compliance Survey – 6 pages

89. Focus on Compliance Survey Results – Excel Spreadsheet – 48 pages

90. List of items produced in response to Administrative Subpoena – 13 pages

### OTHER MATTERS

**1. Testimony by VTC:**

The Government has moved to exclude the proffered testimony of DEA employees and/or Task Force Officers Amber Baginski, Roberta Goralczyk, William Schwartz and Roger Kernicky, witnesses 19-22 in Respondent's Prehearing Statement. Should the Court deny the Government's motion as to any of these witnesses, we request that they be allowed to testify by VTC. It is the Government's intention to have Oviedo Police Chief Jeffrey Chudnow testify in

9

CONFIDENTIAL

person, however, given his position, we request the opportunity to present his testimony by VTC only if some currently unforeseen circumstance requires that he remain in Florida. We similarly request the opportunity to present the testimony of George Corripio by VTC if necessary to accommodate his employment schedule.

**2. Notice of Additional Basis For Revocation:**

The ISO and Prehearing Statement allege that Respondent violated federal statutes and regulations by failing to implement a system to properly identify and investigate suspicious orders. The failure to conduct adequate due diligence as part of a distributor's obligation to maintain effective controls against diversion is further alleged as conduct that would render Respondent's registration inconsistent with the public interest under 21 U.S.C. § 824(a)(4). Florida law imposes similar requirements on wholesale distributors to conduct due diligence and develop a program to identify suspicious orders and prevent suspicious transactions. Florida Statutes (FS) 499.0121 (15). In particular, a wholesale distributor must assess the reasonableness of orders in excess of 5,000 unit doses of any one controlled substance in any one month. FS 499.0121 (15)(b). The Government hereby notifies Respondent that the same evidence and testimony already disclosed may therefore also demonstrate that Respondent has failed to comply with applicable State law under 21 U.S.C. §§ 823(b)(2) & § 823(e)(2).

3. **Courtroom presence of Government Expert Witness:**

The Government requests that its noticed expert, Prof. Paul Doering be permitted to observe all aspects of the hearing in the event he is called in rebuttal.

4. **Respondent's Witnesses:**

Similar to Respondent's notice at fn 1 of its Prehearing Statement, the Government reserves the right to call any of Respondent's Witnesses on the matters listed in their proposed testimony.

10

CONFIDENTIAL

Respectfully submitted,

SCOTT LAWSON
JONATHAN P. NOVAK
Attorneys
Diversion & Regulatory Litigation
Office of Chief Counsel

Date:  December 7, 2012

11

CONFIDENTIAL

WAGMDL00387706

## CERTIFICATE OF SERVICE

I hereby certify that on the date signed below, I caused the original and two copies of the foregoing GOVERNMENT'S SUPPLEMENTAL PREHEARING STATEMENT, to be hand delivered and faxed to the DEA Office of the Administrative Law Judges, and I caused a copy of the same to be sent, *via e-mail* to counsel for Respondent at the following addresses:

> Phil Perry
> Allen M. Gardner
> Nathan H. Seltzer
> Latham & Watkins LLP
> 555 Eleventh Street, NW
> Suite 1000
> Washington, DC 20004-2232
> Fax: 202.637.2201
> Email: Phil.Perry@lw.com
>        Allen.Gardener@lw.com
>        Nathan.Seltzer@lw.com

12/7/12
Date

Signature

12

CONFIDENTIAL

# EXHIBIT E

## UNITED STATES DEPARTMENT OF JUSTICE
### Drug Enforcement Administration

In the matters of

Walgreen Co.

Docket Nos. 13-1, 13-9, 13-10, 13-11
(Consolidated)

ADMINISTRATIVE LAW JUDGE
JOHN J. MULROONEY, II

## RESPONDENTS' CONSOLIDATED PREHEARING STATEMENT IN THE PHARMACY MATTERS

WAGMDL_T1_TX00002682

Pursuant to the Court's December 31, 2012 Order for Prehearing Statements and January 10, 2013 Ruling On Respondents' Motion To Consolidate, Walgreen Co. ("Walgreens," "Respondent," or "the Company"), hereby submits its Consolidated Prehearing Statement for dockets 13-9, 13-10, and 13-11 (the "Pharmacy Matters"). Walgreens previously submitted a Prehearing Statement and Supplemental Statement for docket 13-1 regarding Walgreens' Jupiter Distribution Center (the "Jupiter Facility Matter").

**I. ISSUE**

Whether the Drug Enforcement Administration ("DEA") can prove that it would be inconsistent with the public interest for each of the following three Walgreens pharmacies to retain their registrations pursuant to 21 U.S.C. § 824(a)(4): (1) Walgreen pharmacy #06997 in Oviedo, FL, registration BW8487438 ("Walgreens #06997"); (2) Walgreens pharmacy #04727 in Ft. Pierce, FL, registration BW6561270 ("Walgreens #04727"); and (3) Walgreen pharmacy #03629 in Hudson, FL, registration BW4713992 ("Walgreens #03629") (collectively, the "Pharmacies").

**II. REQUESTED RELIEF**

Walgreens requests that this Court recommend denial of DEA's request that the Pharmacies' registrations be revoked.

**III. PROPOSED STIPULATIONS OF FACT**

A. Quotations of Prior DEA Statements

1. When evaluating the validity of a prescription for a controlled substances, rather than focusing on any particular factor, it is critical to bear in mind that (i) the entirety of circumstances must be considered, (ii) the cases in which physicians have been found to have prescribed controlled substances improperly typically involve facts that demonstrate blatant

1

criminal conduct, and (iii) the percentage of physicians who prescribe controlled substances improperly (or are investigated for doing so) is extremely small.[1]

**2.** There is a lack of consensus among physicians as to all the circumstances that warrant the use of opioids to treat pain.[2]

**3.** What constitutes an inordinately large quantity of controlled substances … can vary greatly from patient to patient.[3]

**4.** DEA does not apply a greater level of scrutiny to the prescribing of controlled substances to treat pain as compared to other ailments. Regardless of the ailment, DEA applies evenhandedly the requirement that a controlled substance be prescribed for a legitimate medical purpose in the usual course of professional practice. The idea that prescribing opioids to treat pain will trigger special scrutiny by DEA is false.[4]

**5.** One cannot provide an exhaustive and foolproof list of "dos and don'ts" when it comes to prescribing controlled substances for pain or any other medical purpose.[5]

**6.** There are no definitive criteria laying out precisely what is legally permissible, as each patient's medical situation is unique and must be evaluated based on the entirety of the circumstances.[6]

---

[1] Dispensing Controlled Substances for Treatment of Pain, 71 Fed. Reg. 52716, 52720 (Sept. 6, 2006) (verbatim DEA quote).
[2] *Id*. at 52718 (verbatim DEA quote).
[3] *Id*. at 52720 (verbatim DEA quote).
[4] *Id*. (verbatim DEA quote).
[5] *Id*. at 52719 (verbatim DEA quote).
[6] *Id*. (verbatim DEA quote).

2

**7.** The types of cases in which physicians have been found to have dispensed controlled substances improperly under Federal law generally involve facts where the physician's conduct is not merely of questionable legality, but instead is a glaring example of illegal activity.[7]

**8.** It is not possible to expand on the phrase "legitimate medical purpose in the usual course of professional practice," in a way that will provide definitive guidelines that address all the varied situations physicians might encounter.[8]

**9.** DEA presumes … that most physicians provide appropriate amounts of pain medication.[9]

**10.** It is not DEA's role to issue medical guidelines specifying patient characteristics that warrant the selection of a particular opioid or other medication or regimen for the treatment of pain.[10]

**11.** DEA's authority under the CSA is not equivalent to that of a State medical board. DEA does not regulate the general practice of medicine. The responsibility for educating and training physicians so that they make sound medical decisions in treating pain (or any other ailment) lies primarily with medical schools, post-graduate training facilities, State accrediting bodies, and other organizations with medical expertise.[11]

**12.** DEA … has neither the legal authority nor the expertise to provide medical training to physicians or issue guidelines that constitute advice on the general practice of

---

[7] *Id.* at 52717 (verbatim DEA quote).

[8] *Id.* (verbatim DEA quote).

[9] *Id.* at 52718 (verbatim DEA quote).

[10] *Id.* (verbatim DEA quote).

[11] *Id.* at 52719 (verbatim DEA quote).

3

medicine.[12]

**13.** The amount of dosage units per prescription will never be a basis for investigation of the overwhelming majority of physicians.[13]

**14.** Some physicians who treat patients having a history of drug abuse require each patient to a contract agreeing to certain terms designed to prevent diversion and abuse, such as periodic urinalysis. While such measures are not mandated by the CSA and DEA regulations, they can be very useful.[14]

**15.** DEA recognizes that the overwhelming majority of American physicians who prescribe controlled substances do so for legitimate medical purposes. In fact, the overwhelming majority of physicians who prescribe controlled substances do so in a legitimate manner that will never warrant scrutiny by Federal or State law enforcement officials.[15]

**16.** DEA establishes manufacturing and procurement quotas each year for schedule I and II controlled substances in order to avoid the overproduction of these substances, for the purposes of reducing the risk of diversion to illicit traffic. Accordingly, the quota system serves the vital purpose of reducing the risk of diversion.[16] DEA's aggregate production quota for oxycodone (for sale) has more than doubled over the last seven years, from 56,000,000 grams in 2006, to a currently established production quota of 131,500,000 grams for 2013.[17]

---

[12] *Id.* (verbatim DEA quote).

[13] *Id.* at 52723 (verbatim DEA quote).

[14] *Id.* (verbatim DEA quote).

[15] *Id.* at 52719 (verbatim DEA quote).

[16] *Warning: The Growing Danger of Prescription Drug Diversion: Hearing Before the Subomm. on Commerce, Manufacturing, and Trade of the H. Comm. on Energy & Commerce*, 111th Cong. 3-4 (2011) (statement of Michele M. Leonhart, Administrator, Drug Enforcement Administration) (verbatim quote).

[17] *See* DEA Notice, Controlled Substances: Final Revised Aggregate Production Quotas for 2006, 71 Fed. Reg. 61803 (Oct. 19, 2006); DEA Notice, Controlled Substances: Final Revised Aggregate Production Quotas for 2007, 72 Fed. Reg. 48686 (Aug. 24, 2007); DEA Notice,

4

17.     Until 2010, Fla. Stat. § 465.0276 allowed a practitioner to dispense drugs in the usual course of professional practice so long as s/he was registered as such and paid a $100 fee. In 2010, the Florida legislature amended Fla. Stat. § 476.0276 to prohibit a registered practitioner from dispensing more than a 72-hour supply of any controlled substance for any patient who paid for the medication with cash, check or credit card. The law became effective October 1, 2010. Finally, in 2011, the Florida legislature amended the statute a second time to prohibit a practitioner, except in very limited circumstances, from dispensing any controlled substances in Schedules II and III. The law became effective July 1, 2011.[18]

18.     In October 2010, Florida passed legislation severely restricting the ability of pain clinics to dispense controlled substances. The purpose of this legislation was to combat the severe abuse of prescription drugs dispensed directly from [pain] clinics. After the law was enacted, pharmacies in Florida experienced a substantial increase in requests to dispense controlled substances.[19]

19.     Just as illicit drug traffickers and organizations adapt to law enforcement methods, pharmaceutical traffickers adapt to and circumvent laws that attempt to stop the flow of

---

Controlled Substances: Final Revised Aggregate Production Quotas for 2008, 73 Fed. Reg. 66939 (Nov. 12, 2008); DEA Notice, Controlled Substances: Final Revised Aggregate Production Quotas for 2009, 74 Fed. Reg. 54077 (Oct. 21, 2009); DEA Notice, Controlled Substances: Final Revised Aggregate Production Quotas for 2010, 75 Fed. Reg. 55828 (Sept. 14, 2010); DEA Notice, Controlled Substances: Final Adjusted Aggregate Production Quotas for 2011, 76 Fed. Reg. 77016 (Dec. 9, 2011); DEA Notice, Controlled Substances: Final Adjusted Aggregate Production Quotas for 2012, 77 Fed. Reg. 55500 (Sept. 10, 2012); DEA Notice, Established Aggregate Production Quotas for Schedule I and II Controlled Substances and Established Assessment of Annual Needs for the List I Chemicals Ephedrine, Pseudoephedrine, and Phenylpropanolamine for 2013, 77 Fed. Reg. 59980 (Oct. 1, 2012).

[18] Declaration of DEA Counsel Scott Lawson, *In Re: Administrative Subpoena*, 1:12-mc-43 (E.D. Va.), Dkt. No. 34-2, ¶ 21.

[19] *Id.* at ¶10 (verbatim quote).

5

WAGMDL_T1_TX00002587

controlled substance pharmaceuticals into the illicit market.[20]

20.     In mid to late 2011 and continuing into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing at its high-volume pharmacies and in some cases, did, in fact, achieve a relatively significant reduction in Schedule II dispensing at these stores.[21]

**B.**     Proposed Stipulations Regarding 2011 Memorandum of Agreement

21.     In April 2011, DEA and Walgreens entered into a Memorandum of Agreement ("2011 MOA"). The 2011 MOA became effective on April 7, 2011.

22.     Respondents' Exhibit 289 is an authentic copy of the 2011 MOA.

23.     The 2011 MOA is applicable "to all current and future Walgreens walk-in, retail pharmacy locations registered with the DEA to dispense controlled substances."[22]

24.     In the 2011 MOA, DEA "release[d] and agree[d] to refrain from filing any administrative actions against Walgreens' DEA registrations based on the Covered Conduct or similar conduct at any other Walgreens pharmacy on or before the effective date of this agreement, within DEA's enforcement authority under 21 U.S.C. §§ 823 and 824."[23]

25.     Among the conduct described in the 2011 MOA as "Covered Conduct" are allegations regarding:  (1) dispensing controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed; (2) dispensing controlled substances based on prescriptions issued by physicians for other than a legitimate medical purpose; (3) dispensing controlled substances to individuals that Walgreens knew or should have known were diverting controlled substances; (4) refilling prescriptions for controlled substances too early;

---

[20]  *Responding to the Prescription Drug Abuse Epidemic: Hearing Before the S. Caucus on Int'l Narcotics Control*, 112th Cong. (2012) (statement of Joseph T. Rannazzisi, Deputy Assistant Administrator, Drug Enforcement Administration) (verbatim quote)

[21]  Order to Show Cause and Immediate Suspension of Registration, Jupiter Matter, Sept. 13, 2012,¶ 20 (verbatim DEA quote).

[22]  2011 MOA, Part I.

[23]  2011 MOA § 5.

6

WAGMDL_T1_TX00002688

and (5) filling prescriptions that were issued using expired DEA registrations number.[24]

26. The conduct described by DEA in its OSCs and Prehearing Statements in the

Pharmacy Matters is the basis on which DEA seeks to revoke the Pharmacies' registrations.

27. The following allegations in DEA's Prehearing Statement for Walgreens #04727

involve conduct that pre-dates April 7, 2011:

> a. "[B]etween January 1, 2010 and March 21, 2012, Respondent filled 723 controlled substance prescriptions issued by Dr. Kenneth Pearlberg, an ophthalmologist, located approximately 69 miles from Respondent in Boca Raton." Gov.'s Walgreens #04727 PHS at 11 (proposed testimony of Gayle Lane; footnote omitted).
>
> b. "[B]etween January 1, 2010 and April 2012, Respondent dispensed at least 657 controlled substance prescriptions issued by Dr. Alexandra Taylor, certified in obstetrics and gynecology, located in Del Ray Beach, Florida." *Id.* (proposed testimony of Gayle Lane; footnote omitted).
>
> c. "[B]etween January 1, 2010 and April 2012, Respondent dispensed at least 745 controlled substance prescriptions issued by Dr. Ralph Miniet, a pediatrics specialist, located approximately 90 miles from Respondent in Fort Lauderdale, of which 73% of the prescriptions were for oxycodone and alprazolam cocktails." *Id.* (proposed testimony of Gayle Lane; footnote omitted).
>
> d. "20 prescriptions for oxycodone dispensed by Respondent between March 2011 and December of 2011 despite its own pharmacists' warnings or noted 'red flags' concerning the physicians." *Id.* at 12 (proposed testimony of Gayle Lane; footnote omitted).
>
> e. Conduct at Walgreens #04727 occurring "for a period of about six months in 2010/2011." *Id.* at 14; *id.* at 18-19 (proposed testimony of George Corripio).
>
> f. Walgreens' Orlando central fill facility and prescriptions from "between January 2010 and April 2012." *Id.* at 15-16 (proposed testimony of Linda Stocum); *see also id.* at 17-18 (proposed testimony of Dianne Williams).

---

[24] 2011 MOA Part II and Part III(3).

7

WAGMDL_T1_TX00002689

g.   Guidance Andrea Cohen "received with respect to the growth of oxycodone customers in 2010 and 2011 and dispensing guidance from her supervisor" and "guidance she provided to other pharmacy staff on how to resolve red flags pertaining to controlled substance prescriptions." *Id.* at 20 (proposed testimony of Andrea Cohen).

h.   "[O]xycodone customer traffic at Respondent's location between 2010 through 2011" and an email to Wesley Rohn dated January 5, 2011. *Id.* at 20-21 (proposed testimony of Joseph Berdie).

i.   Alleged conduct by Mr. Rohn occurring in "December 2010" and on "November 23, 2010." *Id.* at 21. (proposed testimony of Wesley Rohn).

j.   Concerns that Edward Svihra, "Doug Lemmons and Ken Amos discussed in January 2011 regarding Respondent's oxycodone dispensing" and a "pharmacist's hotline complaint received in 2011" *Id.* at 21-22 (proposed testimony of Edward Svihra).

k.   Mr. Lemmons's "concerns identified in January 2011 and discussed with Mr. Svihra and Ken Amos regarding Respondent's oxycodone dispensing." *Id.* at 22 (proposed testimony of Doug Lemmons).

l.   Professor Doering's "analysis of Respondent's controlled substance dispensing between January 1, 2010 and April 4, 2012." *Id.* at 26. (proposed testimony of Paul Doering).

m.   A chart "illustrat[ing] the increase in Respondent's average daily dispensing of controlled substances. In the first six months of 2010, Respondent dispensed on average 35.3 controlled substance prescriptions per day. In the first six months of 2011, that number rose to an average of 72.5 prescriptions dispensed per day." *Id.* at 26 (proposed testimony of Paul Doering).

**28.**   The following allegations in DEA's Prehearing Statement for Walgreens #06997

involve conduct that pre-dates April 7, 2011:

a.   "Walgreens #06997 significantly increased its oxycodone purchases between 2009 and 2011." Gov.'s Walgreens #06997 PHS at 4 (proposed testimony of Susan Langston).

b.   "Walgreens representatives were told that the average US pharmacy purchased 69,500 dosage units of oxycodone in 2010, whereas the average Florida pharmacy purchased 134,000 dosage units of oxycodone in 2010. DPM Langston will testify that the summary chart entitled '2010 Top 100 Florida Walgreens Pharmacy Buyers of Oxycodone' was discussed at the meeting and provided to Walgreens official Dwayne Piñon." *Id.* at 6 (proposed testimony of Susan Langston).

8

WAGMDL_T1_TX00002690

c. "[T]wo hundred sixty eight (268) prescriptions for controlled substances filled for Dr. Anthony Wicks under registration BW7987184 between December 2010 and July 2011." *Id.* at 7 (proposed testimony of Susan Slyker).

d. Individuals allegedly arrested and supplied with controlled substances including "Sean Reynolds, arrested November 11, 2010 for illegal distribution of Xanax; Frederick J. Goepel, arrested January 12, 2011 for illegal distribution of oxycodone; Clinton Brekke, arrested January 20, 2011 for possession with intent to sell oxycodone; Valerie Brekke, involved in the arrest of Clinton Brekke for possession with intent to sell oxycodone; Matthew S. Miller and Timothy Kemp Dawson, arrested January 21, 2011 for illegal distribution of oxycodone; Brian Lee Kemm, arrested on January 26, 2011 for illegal distribution of oxycodone; and, Staci Lynn Starling and Anna Marie Girst, involved in the arrest of Kemm as the customers purchasing illegal controlled substances." *Id.* at 9 (proposed testimony of Deborah George).

e. "Walgreens #06997 filled controlled substance prescriptions for some of the arrested customers subsequent to these arrests and notifications to Walgreens #06997. Clinton Brekke was arrested on January 20, 2011 and Chief Chudnow notified Walgreens in a letter dated January 21, 2011. Subsequently, Walgreens #06997 filled prescriptions for Mr. Brekke on March 13, April 7 and April 11, 2011. In the same letter regarding the arrest of Clinton Brekke, Valerie Brekke was identified as involved in the oxycodone-related arrest. Nonetheless, Walgreens #06997 filled prescriptions for Valerie Brekke for oxycodone on March 16 and April 25, 2011. In Chief Chudnow's January 27, 2011 letter, Staci Lynn Starling was noticed as a party purchasing oxycodone from Brian Lee Klemm. Nonetheless, Walgreen's #06997 dispensed alprazolam, hydromorphone and oxycodone to Ms. Starling on February 15, March 14 and April 13, 2011." *Id.* (proposed testimony of Deborah George).

f. Walgreens' Orlando central fill facility and prescriptions from "between January 2010 and April 2012." *Id.* at 10 (proposed testimony of Linda Stocum).

g. "The Oveido Police Department (OPD) made numerous arrests for illegal distribution of controlled substances in 2010 and 2011 related to controlled substances dispensed at the two Walgreens pharmacies, Walgreens #06997 and Walgreens #04251, with many of the illicit transactions preceding these arrests occurring in the parking lots of the stores." *Id.* at 12 (proposed testimony of Jeffrey Chudnow).

9

WAGMDL_T1_TX00002691

h.   "On February 10, 2011, Chief Chudnow met with Ed Lanzetti, Walgreens Market Loss Prevention Director, and another Walgreens official," statistics presented at that meeting, and subsequent filling of prescriptions. *Id.* at 12-13 (proposed testimony of Jeffrey Chudnow).

i.   "On March 15, 2011, Chief Chudnow sent letters to Alan G. McNally, Chairman of Walgreens Corporation and to Gregory D. Wasson, President and CEO of Walgreens Corporation." *Id.* at 13 (proposed testimony of Jeffrey Chudnow).

j.   Professor Doering's "analysis of Walgreens #06997's controlled substance dispensing between January 1, 2010 and April 4, 2012." *Id.* at 17 (proposed testimony of Paul Doering).

**29.**   The following allegations in DEA's Prehearing Statement for Walgreens #03629

involve conduct that pre-dates April 7, 2011:

a.   Analysis related to "an electronic dispensing log for all Schedule II-IV controlled substances dispensed by Walgreens #03629 between January 1, 2010 and April 4, 2012." Gov.'s #03629 PHS at 8 (proposed testimony of Gayle Lane).

b.   "[O]n December 21, 2010, the PCSO received a call from Walgreens #03629 pharmacist Caren Cohalla (Ms. Cohalla) regarding an individual who attempted fill a fraudulent oxycodone prescription." *Id.* at 9 (proposed testimony of Janet Pascalli); *see also id.* at 14-15 (proposed testimony of Caren Cohalla).

c.   Analysis related to "inventory records, copies of all Schedule II prescriptions, and dispensing records for Schedule II-IV controlled substances dispensed between January 1, 2010 and April 4, 2012." *Id.* at 11 (proposed testimony of Peter Flagg).

d.   "From June 5, 2010 through August 11, 2010, Walgreens #03629 filled eight prescriptions for the aforementioned drug cocktail (oxycodone, alprazolam and Soma) issued by John T. Legowik, M.D. (Dr. Legowik) of Fort Myers, Florida." *Id.*

e.   "From September 3, 2010 through February 5, 2011, Walgreens #03629 filled 40 prescriptions for the aforementioned drug cocktail issued by Paul J. Glusman, D.O. of Deerfield Beach, Florida." *Id.*

f.   "From January 9, 2010 through November 7, 2011, Walgreens #03629 filled 1,550 controlled substance prescriptions issued by Robert R. Reppy, D.O. (Dr. Reppy) of Tampa, Florida." *Id.*

10

        g.     Analysis related to Investigator Flagg's "review of Walgreens #03629's purchases of oxycodone from January 1, 2010 through April 4, 2012, and his comparison of the pharmacy's purchases of oxycodone with 14 pharmacies within the same zip code area (zip code 34667)." *Id.* at 12-13.

        h.     Professor Doering's "analysis of Walgreens #03629's controlled substance dispensing between January 1, 2010 and April 4, 2012." *Id.* at 20 (proposed testimony of Paul Doering).

**C.**  Other Proposed Stipulations

**30.**   In May 2012, Walgreens voluntarily discontinued dispensing all Schedule II drugs as well as alprazolam and carisoprodol at the Pharmacies, and at five additional Florida pharmacies.

**31.**   The Pharmacies did not utilize a central fill pharmacy in connection with dispensing Schedule II drugs.

**32.**   In November 2012, prior to DEA issuing the OSCs, Walgreens informed DEA that it had voluntarily discontinued utilizing the Orlando central fill pharmacy in connection with dispensing controlled substances.

**33.**   Florida became the epicenter of prescription drug diversion because—until recently—Florida had weak regulatory oversight of pain management practices, limited oversight of physician dispensing habits, and a non-operational statewide Prescription Drug Monitoring Program (PDMP).[25]

---

[25] Pamela Jo Bondi, Florida Attorney General, "Florida's Roadmap to End its Prescription Drug Abuse Epidemic," Testimony to House Energy and Commerce Committee, Subcommittee on Commerce, Manufacturing & Trade (Mar. 1, 2012) (verbatim quote of Florida Attorney General's testimony before U.S. Congress).

11

## IV.   AGREED STIPULATIONS OF FACT

**1.**    Walgreens agrees with all stipulations of fact proposed by DEA in its Prehearing Statement regarding Walgreens #06997 ("Gov.'s Walgreens #06997 PHS").

**2.**    Walgreens agrees with the following stipulations of fact proposed by DEA in its Prehearing Statement regarding Walgreens #04727 ("Gov.'s Walgreens #04727 PHS"): stipulation 1, 3, 4, and 6.

**3.**    Walgreens agrees with the following stipulations of fact proposed by DEA in its Prehearing Statement regarding Walgreens #03629 ("Gov.'s Walgreens #04727 PHS"): stipulation 1, 9, 10, 11, and 12.

## V.   STATEMENT OF THE CASE

Walgreens #06997 is located in Oviedo, FL, Walgreens #04727 is located in Ft. Pierce, FL, and Walgreens #03629 is located in Hudson, FL. These pharmacies, like pharmacies across Florida, experienced increased demand for oxycodone and other prescriptions following Florida legislation that channeled demand for millions of oxycodone dosage units per month into the retail pharmacy market. This was a challenging time for Walgreens and other pharmacies statewide. But Walgreens pharmacists and district and market leaders recognized the challenges caused by the increased demand soon thereafter and began implementing additional controls to assist pharmacists with identifying problematic prescriptions and prevent patients and doctors from unlawfully diverting controlled substances. Walgreens did not turn a blind eye to the problem or wait for DEA to force it to act; it identified and addressed the issue many months before DEA intervened. And by the time DEA executed its Administrative Inspection Warrants at the Pharmacies, Walgreens' efforts had already substantially reduced the volume of oxycodone dispensed. Walgreens' actions demonstrate that it successfully worked to reduce levels of oxycodone dispensing and prevent diversion.    Accordingly, revocation of these

12

pharmacy registrations is not in the public interest.

*First*, as the Attorney General of Florida stated before Congress, "Florida became the epicenter of prescription drug diversion because—until recently—[Florida] had weak regulatory oversight of pain management practices, limited oversight of physician dispensing habits, and a non-operational statewide Prescription Drug Monitoring Program (PDMP)." In October 2010, Florida passed legislation that restricted the ability of physicians to dispense directly to their patients. According to DEA's own data, this had the result of channeling the approximately 8 million dosage units of oxycodone previously dispensed by physicians into the retail pharmacy market—a market of which Walgreens has an approximate 30% market share. Not surprisingly, as DEA itself acknowledges, pharmacies across the state experienced "a substantial increase in requests to dispense controlled substances." These requests, in many cases, came from patients and doctors who previously had no relationship with Walgreens. As demand continued to increase, and as patterns developed and red flags emerged, the pharmacies implemented controls and limitations intended to prevent improperly dispensing prescriptions. Some of these controls worked quickly. Some took longer. As DEA has stated, "just as illicit drug traffickers and organizations adapt to law enforcement methods, pharmaceutical traffickers adapt to and circumvent laws that attempt to stop the flow of controlled substance pharmaceuticals into the illicit market." But Walgreens continued to implement controls and turn away questionable prescriptions—often in partnership with local law enforcement or local DEA agents who praised Walgreens for its commitment to ferreting out diversion—and today continues to work at improving and refining its systems for ensuring compliance with the law and ethical practice of pharmacy.

*Second*, Walgreens' efforts worked. Well before DEA executed warrants in the

13

Pharmacy Matters, Walgreens' controls had the effect of reducing the volume of oxycodone dispensed substantially. DEA agrees. The Order to Show Cause in the Jupiter Matter states: "In mid to late 2011 and continuing into 2012, Walgreens undertook to reduce the volume of oxycodone dispensing at its high-volume pharmacies and in some cases, did, in fact, achieve a relatively significant reduction in Schedule II dispensing at these stores."

*Third*, revocation is not in the public interest and is too broad a remedy in this matter. These were unprecedented circumstances. Walgreens recognizes that its efforts were not always perfect, and that its remedial actions at certain pharmacies required a longer period of time to achieve their full effects. But perfection is not the standard for revocation, and the public interest is served by pharmacies operated by companies that proactively respond to the challenges they face, as occurred here. Walgreens firmly believes that the public is better served by the continued registration of these pharmacies, with pharmacists, District Supervisors, Market Supervisors, and corporate leaders committed to fighting prescription drug abuse and diversion, in partnership with DEA.

## VI. PROPOSED WITNESSES

Walgreens incorporates by reference the witness list contained in Respondents' Consolidated Witness and Exhibit List, filed concurrently with this Prehearing Statement per this Court's January 10, 2013 Ruling On Respondents' Motion To Consolidate. In addition, Walgreens reserves the right to call any witnesses listed by DEA on the matters identified by DEA.

14

WAGMDL_T1_TX00002696

## VII.   SUMMARY OF TESTIMONY[26]

### A.   Witnesses Whose Testimony Is Applicable To Multiple Pharmacies

#### 1.   Rex Swords, Divisional Vice President, Centralized Pharmacy and Operations Support Services

Rex Swords will describe the Walgreens corporate structure and the responsibilities of the Company's different departments, the steps the Company took in response to pain clinic issues in Florida (including describing the anti-diversion controls that were already in place and the controls that were developed in response to the new challenges the Company faced), how those steps (prior to DEA's administrative warrants) had the effect of drastically reducing the volume of oxycodone dispensed from the Pharmacies and the Company's other Florida pharmacies, and how the Company improved its systems to ensure that, today, the Company is able to quickly identify problems at its pharmacies.

Specifically, Mr. Swords will describe his role as Divisional Vice President, Centralized Pharmacy and Operations Support Services, and his background, education, and training.  He will describe the scope and organization of Walgreens' operations across the United States and Florida specifically.  Mr. Swords will describe his responsibility within the Company to lead a team to assess and improve Walgreens' controlled substances compliance, with a specific focus on ensuring that Walgreens' vertically integrated business units work effectively toward this end. He will explain that Walgreens has multiple overlapping business structures and policies that should, among other things, serve as cross-checks to ensure proper training, handling and oversight regarding controlled substances within the Company, including at its pharmacies.

---

[26]   Walgreens has identified witnesses it may call to ensure compliance with this Court's December 31, 2012 Order.  In addition to the testimony set forth herein, such witnesses will be prepared to address specific testimony from DEA's case in chief.  To the extent the testimony described herein is cumulative or otherwise unnecessary to address DEA's actual case, Walgreens will reduce the number of witnesses and the scope of their testimony at trial.

15

WAGMDL_T1_TX00002697

Mr. Swords will testify that following changes in Florida law that occurred in 2010 and 2011, many retail pharmacies across the state, including the Pharmacies, saw an increase in the number of prescriptions presented for oxycodone and other drugs. He will testify that Walgreens pharmacists were expected to use their professional judgment when deciding whether to fill these prescriptions.

Mr. Swords will testify that Walgreens anticipated that the 2010 change in Florida's pain clinic law would increase the number of legitimate prescriptions for oxycodone prescriptions at Walgreens pharmacies, but that Walgreens could not predict how much those numbers would increase, or at what volume diversion was likely.

Mr. Swords will testify that even at the height of the dispensing volume associated with the Pharmacies, the pharmacists at those stores were simultaneously refusing to fill a substantial number of prescriptions. Mr. Swords will testify that in 2010-2011—long before the first DEA administrative subpoenas were served—Walgreens more fully appreciated the unique problems Florida's legislative policies caused and it began to take aggressive steps to ensure that prescriptions for oxycodone were being dispensed appropriately. Walgreens personnel worked diligently to address these issues, but found them very difficult to resolve quickly. Mr. Swords will testify that by mid-2011, through a combination of these proactive steps, the level of oxycodone being dispensed from the Pharmacies decreased substantially. Mr. Swords will testify that Walgreens and its pharmacists have been threatened or sued by a number of physicians for failing to fill oxycodone prescriptions.

Mr. Swords will explain Walgreens' voluntary decision to discontinue all Schedule II dispensing at the Pharmacies and five other Florida pharmacies. Mr. Swords will testify that, with the support of the Company's most senior management, Walgreens' created a new

16

WAGMDL_T1_TX00002698

department—the Department of Pharmaceutical Integrity—with broad authority to coordinate and supervise the Company's compliance efforts. Mr. Swords will testify that Walgreens has continued to make enhancements to its policies, procedures and technology systems to help prepare it to deal with the next diversion threat.

Mr. Swords will explain how, pursuant to DEA regulations, some Walgreens pharmacies make use of a "central fill pharmacy" for filling certain prescriptions. He will explain the process by which a prescription comes into a retail pharmacy, how a determination is made whether that prescription should be centrally filled, and how a central fill order is processed and ultimately dispensed to a patient. He will testify that under paragraph 4(f) of the 2011 MOA, Walgreens agreed to maintain dispensing records electronically and to make them available "within a reasonable time" of any DEA request, and will explain how Walgreens complies with that requirement. Mr. Swords will testify that each prescription that is centrally filled is tracked electronically, that the label and exterior packaging of all centrally filled drugs contain unique identifiers indicating that the drug was centrally filled, and that Walgreens' computer system enables pharmacists to easily identify whether any given prescription was centrally filled. Mr. Swords will testify that Walgreens' corporate office can, within a matter of hours, make available for inspection a complete list of prescriptions that have been centrally filled for any given retail pharmacy. Mr. Swords will testify that physically marking a hard copy prescription with the notation "CENTRAL FILL" could potentially result in pharmacies maintaining inaccurate records in violation of DEA regulations and state laws, because refills based on that prescription may not be centrally filled. He will testify that the Company's central fill pharmacy in Orlando, FL voluntarily stopped filling prescriptions for controlled substances on November 1, 2012, and that the Company has never used central fill pharmacies for filling Schedule II drug

17

prescriptions presented to retail pharmacies.

Mr. Swords will describe how paragraph 4(b) of the 2011 MOA requires Walgreens to utilize data provided by NTIS to verify that prescribers of controlled substances have active, valid DEA registration numbers, and how that system operates. Mr. Swords will explain how Walgreens uses data from NTIS and other sources and will rebut DEA's allegations that its verification system was inadequate. Mr. Swords will testify about other technological enhancements Walgreens is implementing to assist its pharmacists in consistently exercising their professional judgment.

## 2. Tasha Polster, Director of Pharmaceutical Integrity

Tasha Polster will describe her new role as Director of Pharmaceutical Integrity at Walgreens, her department's responsibility for oversight of controlled substances handling at pharmacies and distribution centers, and will describe the state-of-the-art technological tools and policy changes that Walgreens has implemented to make sure that Walgreens is at the forefront of preventing diversion of controlled substances.

Specifically, Ms. Polster will explain the initiatives she has pursued and implemented since she assumed her role along with other ongoing anti-diversion activities. She will testify about enhancements to the Good Faith Dispensing procedures that she spearheaded to help pharmacists exercise their professional judgment, and will describe new specialized policies and procedures she developed and implemented for pharmacists filling certain drugs with a higher than normal risk of diversion (such as the Target Drug Good Faith Dispensing Checklist, *see* Exhibit 244).

Ms. Polster will also explain the technological enhancements that Walgreens has implemented to prevent the events of 2010 and 2011 from recurring, including functionality added to Walgreens' computerized systems to perform advanced statistical analyses on

18

pharmacy orders and detect potential diversion problems. She will testify that such systems utilize quantity ceilings and thresholds to prevent the distribution centers from shipping greater quantities of controlled substances to pharmacies. She will testify that Company procedures will not permit Walgreens pharmacies to receive shipments above particular ceiling levels until an appropriate review of the order occurs. She will testify that Walgreens has implemented state-of-the-art reporting and monitoring tools that allow her team and other key personnel in the Company to monitor for new trends potentially indicative of diversion, and how she intends to use those tools. She will testify that the Company uses these tools to verify that its pharmacists are properly exercising their professional judgment and satisfying their corresponding responsibility. Ms. Polster may perform a demonstration of these technological tools for the Court using a laptop with sample data. Ms. Polster will describe additional tools Walgreens is implementing in its next generation pharmacy computer systems. Ms. Polster will also testify about how Walgreens integrates NTIS into its computer systems to help pharmacists verify the status of DEA registration numbers.

Finally, based on her decades of experience as a pharmacist, Ms. Polster will describe how DEA's new approach to regulating controlled substances is changing the traditional relationship between pharmacists and physicians, and how Walgreens has restructured its organization and rewritten its policies to address those changes.

### 3. Joanna Shepherd-Bailey, Ph.D., Associate Professor of Law at the Emory University School of Law

Dr. Shepherd-Bailey will testify about her education, training, experience and responsibilities, and will offer her expert opinions based on her analysis of prescription dispensing data about, among other things, the flaws in DEA's analyses and contentions relating to: (1) DEA's comparison of oxycodone dispensed at certain Walgreens pharmacies with the

19

WAGMDL_T1_TX00002701

oxycodone dispensed at other retail pharmacies, including the average U.S. retail pharmacy, the average Florida retail pharmacy, the average Florida Walgreens pharmacy, the average Walgreens pharmacy in particular counties, top oxycodone purchasers in Florida and in the U.S., and the top Walgreens pharmacy purchasers of oxycodone; (2) DEA's evaluation of volume increases in oxycodone dispensing, including increases following the change in Florida Law in mid-2010, *see, e.g.,* Gov.'s Walgreens #04727 PHS at 7 (Proposed Testimony of DPM Susan Langston); Gov.'s Walgreens #06997 PHS at 4-5 (same); (3) DEA's assessment of the extent to which oxycodone volume redirected as a result of Florida policy changes was illegitimate; (4) DEA's discussion of customer and prescriber red flags in the context of the dispensing data, including, among other red flags identified by DEA, prescriber patterns, patient and prescriber distance, and method of payment; (5) DEA's analysis of oxycodone dispensing patterns to out-of-state customers; (6) DEA's analysis of the dispensing patterns for oxycodone prescriptions written by prescribers without valid DEA registrations; (7) the applicability of the chi squared methodology proffered by DEA's witness, Mary E. Chmielewski, Ph.D., Senior Personnel Psychologist, Research & Analysis (HRN), Human Resources Division; and (7) the efficacy of the controls implemented by Walgreens by reference to prescriber and dispensing patterns.

Dr. Shepherd-Bailey will also testify about the legitimate reasons that volumes of oxycodone dispensed from a given pharmacy could increase over time, why such volumes could be substantially higher for some pharmacies than for the average pharmacy and would not necessarily raise a red flag. Dr. Shepherd-Bailey may also provide testimony in rebuttal to any additional quantitative or statistical analyses introduced by DEA and its witnesses.

### 4. Sunil J. Panchal, M.D.

Dr. Panchal will testify to his background, education and training, including, but not limited to, that he received his medical degree from Albany Medical College of Union

20

University in Albany, New York, performed a residency in anesthesiology at Northwestern University, and then completed a fellowship in pain management at the University of Illinois in Chicago. Dr. Panchal previously served as the Co-Director of the Chronic Pain Service as well as the Director of the Multidisciplinary Pain Fellowship Training Program at Johns Hopkins University, and subsequently as Director, Division of Pain Medicine at the Joan and Sanford I. Weill Medical College of Cornell University. More recently, Dr. Panchal was an Associate Professor in the Departments of Oncology and Anesthesiology and Director of Intervention Pain Medicine at the H. Lee Moffitt Cancer Center and Research Institute of the University of South Florida College of Medicine in Tampa, Florida. Dr. Panchal has also held leadership positions in many professional societies, including the Committee for Pain Medicine for the American Society of Anesthesiologists, and on the Board of Directors for the American Academy of Pain Medicine. Dr. Panchal is currently the President of the National Institute of Pain, a private, nonprofit corporation with offices in Lutz, Florida, where he treats patients who are suffering from acute or chronic debilitating pain.

Dr. Panchal will offer his expert opinion about acute and chronic pain conditions and treatment that is within the usual course of professional practice, address DEA's mistaken allegations that specific prescriptions or prescribing patterns should have raised "red flags." He will rebut Prof. Doering's proposed expert testimony and explain the appropriate medical treatment of pain and the role of opioids in pain management in this context. He will testify that oxycodone is a legitimate choice for treating pain when opioid therapy is indicated. He will also describe the training and education that doctors receive regarding the use of opioids and the development of pain medicine as a specialty, and thus why certain types of prescriptions DEA alleges are problematic should not necessarily raise red flags. Dr. Panchal will testify about the

21

WAGMDL_T1_TX00002703

range of training and expertise in pain management among doctors and that legitimate well-intentioned doctors will disagree on the proper treatment for pain, including about what medication, if any, should be prescribed and what dosage. He will testify that physicians who have a more limited knowledge base with respect to alternative treatments for pain management, are still within the scope of their medical practice to rely entirely on medication and medication management for pain, including the use of opioids.

Dr. Panchal will testify that volumes of oxycodone alone, either prescribed by a physician or dispensed by a pharmacy are an insufficient basis for concluding that diversion is occurring. He will explain how a prescription for a legitimate medical purpose within the usual course of professional practice may be for the same number of dosage units as an illegitimate prescription, and that the number of dosage units should not necessarily be a red flag to a pharmacist. Dr. Panchal will explain that it is commonplace for physicians who manage pain primarily with medications to increase the dose in response to the development of tolerance, so the number of dosage units per patient filling prescriptions at a pharmacy may increase, in some cases quite dramatically, over time. Dr. Panchal will further testify that other alleged red flags cited by DEA are not reliable indicators of diversion or treatment outside the usual course of professional practice.

Dr. Panchal will explain that although pharmacists have a corresponding responsibility under the regulations, in many cases pharmacists are not well equipped to review and assess physicians' diagnoses and treatment decisions. In a number of circumstances, pharmacists lack sufficient knowledge, training or background to identify certain prescribing decisions as "red flags" or to second-guess the prescribing decisions of physicians, and may have significant difficulty determining whether narcotics, including oxycodone, are being diverted into other than

22

WAGMDL_T1_TX00002704

legitimate medical channels by patients. As DEA has previously acknowledged in its public statements, pharmacists and law enforcement officers may not be qualified to evaluate the prescriptions for the purpose of determining whether the number of dosage units, dosage strength and active ingredients are appropriate, and do not have the expertise to contravene the treating physician's decision to prescribe a particular drug regimen. Dr. Panchal will testify that a pharmacist cannot apply a one-size-fits-all rule to refuse to fill prescriptions, and that DEA's attempt to categorize and label certain circumstances as red flags could end up preventing legitimate patients from obtaining needed therapy.

Dr. Panchal will testify that, following DEA's effort to crack down on opioids, many of his legitimate patients have had difficulty filling prescriptions for opioids, including at Walgreens pharmacies. Dr. Panchal will testify that his patients have been told by pharmacists at local pharmacies near his office that they will have to wait a week to fill their prescriptions because the store is out of stock. Waiting a week is simply not an option for patients suffering from severe pain. Therefore, pharmacies that are able to secure adequate provisions of opioids have seen increasing demand from legitimate patients to fill opioid prescriptions.

**5. David Brushwood, R.PH, J.D., University of Florida College of Pharmacy**

David Brushwood is a professor of Pharmaceutical Outcomes and Policy at the University of Florida College of Pharmacy. He is a graduate of the schools of pharmacy and law at the University of Kansas and has practiced as both a pharmacist and as an attorney. Professor Brushwood will describe his background, education and training as a pharmacist, attorney and professor of pharmacy.

Professor Brushwood will offer his expert opinion about the scope of professional responsibilities of a pharmacist, the Florida state law obligations of a pharmacist, and a pharmacist's corresponding responsibility under the regulations. He will describe how

WAGMDL_T1_TX00002705

pharmacists are educated about their responsibilities and the historic means by which pharmacists exercised their corresponding responsibility, particularly efforts to identify forged or stolen prescriptions.

Professor Brushwood will describe the additional burdens placed on pharmacists following the Florida pain clinic legislation in 2010. He will testify that Florida pharmacies were faced with an influx of new patients (often coming from new doctors) for whom they had no prior patient history or experience. He will testify that although some red flags may be immediately apparent to a pharmacist (*i.e.*, evidence that a prescription is forged) patterns of prescribing indicative of diversion, or other factors that may indicate that a prescription is outside the usual course of medical treatment, take time to become apparent. Professor Brushwood will testify that in Florida generally, and at the Pharmacies specifically, the number of dosage units dispensed increased following the legislation and then declined as patterns developed, pharmacists identified potential diversion, and controls were implemented that prevented improper prescriptions from being filled. Professor Brushwood will also testify that following the pain clinic legislation, the traditional paradigm of doctors and pharmacists as partners was altered, and pharmacists for the first time needed to more rigorously question the treatment decisions of physicians.

Professor Brushwood will testify that the evidence of the Pharmacies refusing to fill prescriptions shows that the pharmacists were wrestling with the difficult circumstances and exercising their professional judgment. Professor Brushwood will describe the difficult judgments and considerations that may factor in to a pharmacist's decision whether or not to fill a prescription for pain medication. Professor Brushwood will also testify about the reasonableness of the controls Walgreens and the Pharmacies implemented to help uncover

24

illegitimate prescriptions. Professor Brushwood will testify about Walgreens' Good Faith Dispensing Policy and that it provides Walgreens pharmacists with further guidance to help them exercise professional judgment in a matter that will detect and prevent potential diversion.

Dr. Brushwood will also respond to testimony offered by Professor Doering. He will respond to Professor Doering's testimony regarding so-called "red flags" and the steps a pharmacist may take in response to identifying such red flags. Professor Brushwood will explain what may or may not be a red flag, and moreover, that the presence of one or more red flags does not necessarily mean that a pharmacist cannot ethically and within the reasonable range of professional judgment dispense medication to the patient.

**6.    Cheryl Creek, Director, Operations Optimization - Health and Wellness Initiatives**

Cheryl Creek is the Director, Operations Optimization – Health and Wellness Initiatives (formerly titled the Manager of Pharmacy Training) at Walgreens' Corporate Headquarters. Ms. Creek will describe the enhancements that were made to Walgreens Good Faith Dispensing Policy and other measures following Florida's legislative changes in 2010.

Ms. Creek will testify that she is the liaison between the Learning & Development Team and the Operations Team at Corporate Headquarters. In this capacity, Ms. Creek works closely with the Walgreens policy team to develop and modify pharmacy policies and procedures, and to assist in implementing these policies within the Company. Ms. Creek will also describe the role that Pharmacy Supervisors and District Managers are expected to play in monitoring local conditions, establishing best practices and seeing that pharmacists receive appropriate training.

Ms. Creek will describe Walgreens' Good Faith Dispensing Policy and how it has developed over time to help pharmacists properly exercise their professional judgment. Ms. Creek will describe updates to the Good Faith Dispensing Policy in June 2011 and June 2012,

25

how these updates improved the policy, and why those improvements were made. Ms. Creek
will further testify how pharmacists are trained on good faith dispensing, including, but not
limited to, describing training for pharmacists on the updates to Good Faith Dispensing Policy
that occurred in October 2011 and July 2012.

## 7. Terry Gubbins, Market Pharmacy Director, Markets 3 and 28

Terry Gubbins will explain his role as the Market Pharmacy Director for Markets 3 and
28, which include Hudson, FL and Oviedo, FL. Mr. Gubbins will describe the issues his
pharmacies began facing in 2010, the proactive steps that were taken to address the challenges
brought by an increase in patients seeking oxycodone, specific controls that were implemented at
Walgreens #03629 and #06997, and the lack of guidance from DEA.

Specifically, Mr. Gubbins will testify to his background, education, training, and his
participation in professional associations, specifically as the president-elect of the Florida
Pharmacy Association. He will testify about his 30 years of experience at Walgreens as a
pharmacist, store Pharmacy Manager, District Pharmacy Supervisor, Divisional Director, and his
current role as Market Pharmacy Director for Walgreens Market 3 in Florida. Mr. Gubbins will
testify about the role of market and district supervision of Walgreens stores in Florida, and in
particular the role of supervisors in training store pharmacists and technicians, monitoring store
dispensing activities, and ensuring compliance with applicable state and federal laws and
regulations.

Mr. Gubbins will testify that in late 2010, following changes in Florida law, stores in his
market began to see an increase in patients presenting prescriptions for oxycodone. He will
testify about competitors in the marketplace who determined that it would be easier to refuse to
dispense any oxycodone rather than trying to determine which patients were presenting
legitimate prescriptions. This trend caused more patients to present prescriptions at Walgreens

26

stores where pharmacists were looking for potential "red flags" and were attempting to exercise their judgment properly by filling certain prescriptions while regularly refusing to fill others. Mr. Gubbins will also testify that store pharmacists routinely faced threats and complaints from both patients and doctors as a result of their questioning of—and refusals to fill—prescriptions for oxycodone, and he will testify that Walgreens received daily telephone complaints based on the stores' refusals to fill oxycodone.

Mr. Gubbins will testify about the steps taken, from mid-2010 through 2012, at the market and district levels to assist the pharmacists and stores in identifying suspicious prescriptions and preventing diversion. These measures included reinforcing Walgreens' Good Faith Dispensing Policy, the use of professional judgment, and the pharmacist's "corresponding responsibility"; re-training pharmacists; devising detailed, localized action plans and best practices for the dispensing of oxycodone; assessing dispensing data and feedback from individual stores; conducting supervisory visits to stores to observe dispensing practices and meet with store personnel; and holding regular meetings with store personnel, store Pharmacy Managers and Loss Prevention personnel to discuss ongoing dispensing issues. Mr. Gubbins will discuss an external Continuing Education program that he implemented in his markets that addressed issues regarding how pharmacists should exercise their professional judgment. He will testify that he instructed pharmacists within his market to visit newly opened pain clinics to assess their legitimacy. He will testify that he instructed his pharmacy supervisors to stress the importance of the corresponding responsibility to the pharmacists, to monitor oxycodone dispensing levels, and to take additional basic security measures such as keeping the parking lots clear of loiterers. Mr. Gubbins will testify that the pharmacies were concerned about red flags and thus were refusing to fill many prescriptions; indeed, Pharmacy Supervisors would spend

27

hours a day just responding to complaints filed through Walgreens' corporate complaint system.

**8.    Doug Lemmons, Divisional Loss Prevention Operations Director**

Mr. Lemmons will explain his current role as the Divisional Loss Prevention Operations Director for Walgreens and how his department assists with compliance and investigating theft and losses. Mr. Lemmons will describe the steps Loss Prevention took beginning in 2010 and continuing through the present to help equip pharmacies to properly respond to increased demand for oxycodone and reduce oxycodone volume to where it is today.

Specifically, Mr. Lemmons will testify that in 2010 when the oxycodone dispensing numbers initially began to increase, Walgreens responded at the district and market level. Mr. Lemmons will describe efforts made by Loss Prevention, including meeting with pharmacists and Pharmacy Supervisors to assess the problem, providing assistance to Pharmacy Supervisors to help put together Action Plans to assist pharmacists in exercising their professional judgment, and meeting with law enforcement groups to discuss solutions. Mr. Lemmons will describe the role of Walgreens' corporate headquarters in addressing the higher oxycodone dispensing numbers in Florida, including the timing of when corporate headquarters first became aware of the problem and the assistance that Loss Prevention provided to Pharmacy Supervisors in implementing measures to respond to the issues. Mr. Lemmons will describe the nature and evolution of the Focus on Profit program and the development of the Focus on Compliance.

Mr. Lemmons will describe fact-finding visits he made with Walgreens' Director of HealthCare Loss Prevention to high dispensing stores in Florida. He will testify that during these visits, he met with the pharmacists and Pharmacy Supervisors, and will describe the discussions about the best practices that they were implementing, and how he took that information back to corporate headquarters for analysis.

Mr. Lemmons will testify about a meeting he and a District Loss Prevention Manager had

28

with a DEA investigator during which they discussed Walgreens' practices for submitting information to DEA. Mr. Lemmons will testify that the investigator told them to stop faxing copies of the prescriptions Walgreens was refusing to fill because the stores were overloading DEA. (The fact that Walgreens' pharmacies were refusing to fill so many oxycodone prescriptions is relevant to whether such pharmacies were exercising their responsibility to carefully review such prescriptions.) He will further testify that the investigator was asked whether there was anything additional that Walgreens should be doing, and the investigator stated there was not.

### 9. John Rossing, Manager, Results Financial Planning and Analytics

John Rossing is the Manager of Results Financial Planning and Analytics at Walgreens' Corporate Headquarters. In paragraph 8 of its Prehearing Statement for Walgreens #04727, DEA indicates that it intends to have Andrea Cohen testify about any bonuses that she may have received while working at Walgreens #04727. Mr. Rossing is prepared to testify in rebuttal, specifically that prescription volume is one of several factors in determining bonuses, and a new prescription may contribute only a few cents to a pharmacist's bonus—if DEA intends and is permitted to introduce testimony on this point.

### 10. Kevin Pepkowski, Store Manager, Walgreens #03933

Mr. Pepkowski is the store manager of Walgreens #03933 in Coral Springs, FL. He will testify that on January 11, 2013, Susan Langston (Diversion Program Manager, DEA Miami) informed him, after reviewing Walgreens' Target Good Faith Dispensing Checklist, that Walgreens should not rely on checklists to prevent diversion and should instead rely on pharmacists exercising their professional judgment. Mr. Pepkowski will testify how this instruction is yet another instance of the "mixed messages" given to Walgreens by DEA: after complaining in 2012 that pharmacists exercising their professional judgment had allowed

29

oxycodone dispensing to increase improperly, Walgreens implemented new requirements further limiting the types of oxycodone prescriptions that could be filled by a pharmacist exercising his/her professional judgment. But Ms. Langston has now apparently come full circle and is instructing Walgreens now to eliminate these measures and return to same system of oversight on dispensing that she previously criticized.

### 11. Jennifer Strickland, PharmD, BCPS

Dr. Jennifer Strickland will testify to her background, education and training, including, but not limited to, that she received a doctor of pharmacy degree with the highest honors from the University of Florida College of Pharmacy; that she is board certified in pharmacotherapy ("BCPS) by the Board of Pharmaceutical Sciences; and that she was the pharmacist for the Pain and Palliative Care Service at the H. Lee Moffitt Cancer Center for six years and has co-managed pain, psychiatry, and addiction clinics in the past.

Dr. Strickland will offer her expert opinion about the role of medications in palliative medicine and chronic pain management. Dr. Strickland will describe the physician's role in prescribing pain medication and the pharmacist's corresponding responsibility under DEA regulations. She will testify that prior to the pain clinic issue, in all but the most exceptional cases, physicians and pharmacists were allies in the fight against diversion and worked together to combat diversion, most frequently from stolen, forged or altered prescriptions. Dr. Strickland will explain how the abuse of prescription pain medications by individuals, facilitated in some cases by unscrupulous doctors and pain clinics, particularly in Florida, has altered the traditional partnership between doctor and pharmacist and led to a re-assessment of the proper role of the pharmacist. Dr. Strickland will discuss this changing paradigm in the context of the changes in Florida law and the impact on pharmacists. Dr. Strickland will explain that there is limited guidance from DEA or any other organization in this area and that pharmacists across the State

30

were struggling to properly address the issues that resulted from Florida's legislative changes. She will note that the challenges faced by certain pharmacies attempting to make these difficult judgments were compounded by other Florida pharmacies' decisions to discontinue dispensing certain oxycodone medications altogether, which had the effect of concentrating a larger percentage of oxycodone patients at Florida pharmacies (including the Pharmacies) that were willing to wrestle with the increasingly difficult task of making professional judgments about the legitimacy of prescriptions issued by physicians with valid DEA registrations. Dr. Strickland will testify about Walgreens' Good Faith Dispensing Policy, specifically that it provides Walgreens pharmacists with appropriate guidance to prevent and detect potential diversion.

Dr. Strickland will also respond to testimony offered by Professor Doering and describe the steps a pharmacist may take in response to identifying such red flags. Dr. Strickland will also describe how a pharmacist should exercise his or her professional judgment when confronted with so-called red flags.

**12.    Kristie Provost, Director, Strategic Planning & Analytics, Loss Prevention**

Kristie Provost will explain her role as Director of Loss Prevention Strategic Planning & Analytics at Walgreens and will describe the historical efforts of Walgreens' Loss Prevention department to help detect and investigate potential diversion, how that role has expanded over time to respond to new threats, and the new technological tools that are now in place to ensure that the Company proactively detects and responds to potential diversion.

Ms. Provost will explain the data trends that emerged in 2010 through 2012 regarding the quantity of oxycodone and other controlled substances dispensed from the Pharmacies. With respect to oxycodone, she will describe the increase that began in 2010 and the rapid subsequent decline in 2011. She will describe the analytical tools that were formerly and are currently

31

available to Loss Prevention and other Walgreens departments to collect the data and monitor trends.

Ms. Provost will testify that she has acted as a technical consultant during the development of the software and reporting tools used in Walgreens' anti-diversion efforts, including Walgreens' suspicious order monitoring systems, data monitoring tools, and new dashboard monitoring systems. If necessary, Ms. Provost can describe formulas used in, and other technical specifications of, the software and tools. She will also authenticate charts and other data as necessary.

### 13. William Schwartz, DEA Diversion Investigator

Mr. Schwartz will be asked to testify about his experience as a DEA Diversion Investigator and his role with respect to Walgreens stores in Florida. He will be asked to testify about meetings, interactions, and communications he had with Walgreens personnel. In particular, he will be asked to testify about a meeting that occurred on or about August 19, 2011 during which he, Susan Langston (Diversion Program Manager, DEA Miami), and Roger Kernicky (Diversion Investigator) met with Georgia Lehoczky and other Walgreens personnel at DEA's office in Weston, Florida. He will be asked to testify about the discussions that took place at that meeting regarding Walgreens' dispensing practices at its Florida stores. He is expected to testify that he made statements that Walgreens was making good-faith efforts at its stores to prevent the diversion of oxycodone and to comply with DEA regulations and that he did not have concerns about Walgreens' dispensing practices. He will also be asked whether Walgreens personnel requested from DEA information regarding suspicious prescribing doctors, and he is expected to testify that DEA refused to provide such information.

32

**14.    Roger Kernicky, DEA Diversion Investigator**

In the event that William Schwartz is unavailable to testify, Walgreens will ask Mr. Kernicky to testify in the alternative. Mr. Kernicky's testimony is expected to be substantially similar to that of Mr. Schwartz.

**15.    John Mudri, Mudri Associations Inc.**

John Mudri will testify to his background, education and training, including, but not limited to, his experience as a Chief, U.S. Drug Enforcement Administration; DEA Supervisory Investigator; DEA Instructor for Diversion (National, Ohio, Michigan and Florida); Instructor for U.S. Drug Enforcement Administration national domestic drug policy conferences; Instructor at United States Attorney Conferences; Instructor for pharmaceutical industry management conferences; Instructor for medical, pharmaceutical and wholesaler continuing education conferences; Instructor for law enforcement agencies including FBI, Michigan State Police and Maryland State Police; and as a board member of the Florida Board of Pharmacy.

Mr. Mudri will offer his expert opinion regarding Walgreens' due diligence and controls designed to prevent diversion and improper dispensing relative to the kinds of diligence undertaken in the industry. Mr. Mudri will testify about Walgreens' response to the red flags that its pharmacies began identifying in late 2010, at the district and market levels and ultimately by Walgreens' corporate headquarters, including limiting dispensing to defined geographic boundaries, verifying prescriptions, identifying troubling prescription patterns, attempting to reduce volume at its stores, cooperating with local law enforcement, seeking guidance from DEA, providing additional training to pharmacists, and developing and implementing best practices for good faith dispensing. This testimony will rebut evidence from DEA regarding what Walgreens could have and should have done to prevent diversion.

33

**B.** Witnesses Whose Testimony Is Applicable Only To Walgreens #03629

### 16. Caren Cohalla, Pharmacy Manager, Walgreens #03629

Caren Cohalla will testify about her over 15 years of experience at Walgreens, including as the Pharmacy Manager at Walgreens #03629 in Hudson, Florida. Ms. Cohalla will testify that although her store dispensed what DEA identifies as a significant volume of oxycodone, she and her pharmacy technicians worked extremely hard every day under very difficult circumstances to ensure the pharmacists exercised their professional judgment on every prescription, and that many of the controls that were implemented at Walgreens #03629 to prevent diversion formed the foundation of Walgreens' Good Faith Dispensing Policy.

Specifically, Ms. Cohalla will testify that the number of dosage units dispensed from Walgreens #03629 does not tell the complete story. She will testify that in addition to the influx of patients following the legislative changes, numerous surrounding pharmacies refused to dispense oxycodone at all, driving significant numbers of patients to Walgreens #03629. She will testify that before Florida's PDMP became operational, she required new patients to submit prescription histories and existing patients to explain excessive time gaps between prescriptions. She will testify that her store developed a number of additional protocols and guidelines to prevent diversion, including: not filling for customers with a Naples address; not filling for patients with addresses in a county that did not abut Pasco County; reducing the volume of dosage units per prescription; and not filling certain combinations of drugs or prescriptions without an extended release formulation. She will testify that every time Walgreens #03629 implemented a new control, the doctors and patients would come up with another scheme to circumvent it.

Ms. Cohalla will testify about the significant volume of oxycodone prescriptions her pharmacy refused to fill each day. She will testify that they received many complaints every day

34

based on those refusals to fill. She will testify that she and her pharmacy technicians worked hard to do the right thing, consistent with limited guidance from DEA. She will testify that she worked closely with local police to patrol the parking lots and to help prevent diversion. Despite help from local law enforcement, Ms. Cohalla will testify that she repeatedly sought guidance from DEA and the State of Florida and received no assistance at all.

Ms. Cohalla will also testify regarding her understanding of the facts related to DEA's allegation that Walgreens #03629 continued to fill oxycodone prescriptions for a customer about whom the store had at one time called the police because they suspected a fraudulent prescription. She will also testify regarding her understanding of the facts related to DEA's allegation that Walgreens #03629 filled a prescription issued by Dr. Pritchard using an incorrect label. She will also testify that, contrary to the allegations implied in DEA's proposed testimony (*see* Gov.'s Walgreens #03629 PHS at 13 (proposed testimony of Investigator Flagg); *id.* at 6-7 (proposed testimony of Susan Langston)), Walgreens #03629 did not fill an unusual number of oxycodone prescriptions for out-of-state patients.

## 17.    Terry Collins, District Pharmacy Supervisor, District 227 (Tampa North)

Terry Collins will describe his experience as the District Pharmacy Supervisor, including his oversight of Walgreens #03629. Mr. Collins will describe the steps that his pharmacies took to prevent and detect diversion and the policies and procedures that were implemented. He will testify that specifically with respect to Walgreens #03629, although there was a high volume of oxycodone dispensing, he is confident that the store was working diligently to prevent diversion and was adhering to the good faith dispensing guidelines and exercising professional judgment in the face of extremely difficult circumstances.

Specifically, Mr. Collins will testify that in late 2010 he started seeing increases in oxycodone dispensing and started seeing new clientele in his pharmacies. This caused him to

35

begin to work with his pharmacies to develop guidelines on proper dispensing of controlled substances. He will testify that the guidelines began as oral advice and ultimately became written guidelines. Mr. Collins will discuss disciplinary action taken against a pharmacist that he did not feel was adequately exercising his professional judgment after these additional measures were put in place.

Mr. Collins will testify that the initial anti-diversion controls included limiting the quantity of dosage units that could be dispensed per prescription and prohibiting dispensing based on certain geographic distances or variables. Mr. Collins will testify that patients and doctors quickly adapted and found ways to circumvent those guidelines, including obtaining ID cards for vacant or empty houses and changing the quantities or drug combinations, making it difficult for pharmacists to identify illegitimate prescriptions. Mr. Collins will describe the arguments, confrontations and complaints that his pharmacists and pharmacies received based on their refusals to dispense to certain customers. Mr. Collins will testify that nearly all of his pharmacists have felt threatened by customers and that many attempted to avoid dispensing controlled substances at all, or would carry limited quantities in stock.

Finally, Mr. Collins will testify regarding how some prescriptions at his stores are centrally filled at Walgreens' Orlando central fill pharmacy, and how Walgreens' system tracks which prescriptions were filled there.

36

WAGMDL_T1_TX00002718

**18. Amy Spiehs-Hicks, District Loss Prevention Manager, District 198 (Tampa West)**

Amy Spiehs-Hicks will testify about her role as a Loss Prevention Manager, including her direct involvement with Walgreens #03629. Specifically, Ms. Spiehs-Hicks will testify that Walgreens #03629 was extremely diligent in its efforts to prevent diversion. She will testify about neighboring stores that closed or stopped dispensing oxycodone, and the impact on Walgreens #03629. Ms. Spiehs-Hicks will testify that she had a cooperative relationship with Pasco County law enforcement and will describe the cooperative efforts at Walgreens #03629, including efforts that resulted in numerous arrests. Ms. Spiehs-Hicks will also describe other district-wide efforts to combat oxycodone diversion, including the dispensing guidelines and action plans that she helped create to guide stores. She will testify that the PDMP system has helped Walgreens pharmacies prevent diversion of controlled substances.

**19. Bryon Wheeldon, Market Loss Prevention Director, Market 3**

Bryon Wheeldon will testify about his current role as the Market Loss Prevention Director for Walgreens Market 3, which includes Tampa, Sarasota, and Naples, Florida and their surrounding areas. Mr. Wheeldon will describe the nature of Loss Prevention at Walgreens; the historic cooperative relationship between the pharmacies in his market and the local DEA; the challenges that pharmacies in his market faced beginning in mid-2010; and the steps his department took to help prevent the diversion of controlled substances and reduce the volume of oxycodone shipments from the Jupiter Facility.

Specifically, Mr. Wheeldon will testify that in late 2010, following changes in Florida law, pharmacies in Market 3 began to see an increase in patients with prescriptions for oxycodone. Mr. Wheeldon will testify that the Loss Prevention team in Market 3 supported the Pharmacy Supervisors and pharmacists in identifying issues that were occurring in the

37

pharmacies and taking steps to ensure good faith dispensing practices were being utilized. He will also testify about requests for guidance from DEA and DEA's response that they could not provide guidance about what prescriptions to fill. He will testify about the work he undertook with his counterparts in Loss Prevention and with Pharmacy Directors to prepare a Florida-specific Focus on Compliance.

Mr. Wheeldon will describe the evolution of the Focus on Compliance and will testify that Walgreens surveyed top dispensing stores in Florida in June 2012. He will testify that the District Loss Prevention Managers and Pharmacy Supervisors were required to visit stores in their district which had seen the greatest increase in pharmacy sales to review proper pain medication dispensing policies, procedures and compliance.

Mr. Wheeldon will further testify that competitors in the marketplace began refusing to dispense any oxycodone at all, which caused dispensing to increase at Walgreens pharmacies, including Walgreens #03629, even though pharmacists were enforcing the Good Faith Dispensing Policy and regularly turning prescriptions away. Mr. Wheeldon will describe how he visited stores who were dispensing high volumes of oxycodone, and will describe specific instances he observed where pharmacists refused to fill prescriptions they were uncomfortable with.

Mr. Wheeldon will also testify to his market's relationship and historic partnership with DEA. He will testify that in approximately 2003 or 2004, he proposed to DEA that it, other law enforcement agencies and loss prevention personnel for retail pharmacies have quarterly meetings to share information and discuss current issues and challenges in the industry. Mr. Wheeldon told DEA that Walgreens would provide the location and handle the logistics, but that

38

WAGMDL_T1_TX00002720

the invitations should be on DEA letterhead, so that it did not appear to Walgreens' competitors to be a "Walgreens meeting."

Mr. Wheeldon will testify that Kenneth Boggess of DEA took the lead on these meetings, and they have been very successful. Mr. Wheeldon will testify that these meetings gave DEA the opportunity to raise issues with registrants, and that until DEA executed administrative warrants at Walgreens facilities, Walgreens participated in those meetings.

Mr. Wheeldon will also testify that in March 2012, he contacted Mr. Boggess and asked if DEA wanted to conduct any training with pharmacists (Walgreens and other retailers) to better address the oxycodone issues in Florida. Mr. Wheeldon again offered to provide meeting space. Mr. Wheeldon will testify that Mr. Boggess told him that he did not have concerns about Walgreens, that he was aware of Walgreens' efforts and partnership and that Walgreens had initiated the DEA/industry meetings. Mr. Wheeldon will testify that he asked whether there was anything else Walgreens should be doing to help prevent diversion, and Mr. Boggess said that he had no concerns about Walgreens and declined to conduct the training proposed by Mr. Wheeldon.

Mr. Wheeldon will testify that Walgreens made a presentation to Central Florida law enforcement officials in May 2011 at a meeting supported by the Central Florida Drug Enforcement Strike Force. Mr. Wheeldon will testify that he made a presentation focused on issues in the dispensing of pain medication.

C. Witnesses Whose Testimony Is Applicable Only To Walgreens #04727

### 20. Georgia Lehoczky, Market Pharmacy Director, Market 6

Georgia Lehoczky will explain her role as the Market Pharmacy Director for Market 6, which includes Ft. Pierce and Palm Beach. Ms. Lehoczky will describe the issues her pharmacies began facing in 2010, the proactive steps that were taken to address the challenges

39

brought by an increase in patients seeking oxycodone, specific controls that were implemented at Walgreens #04727 and the lack of guidance from DEA.

Specifically, Ms. Lehoczky will testify to her background, education, and training, as well as her 25 years of experience at Walgreens as a pharmacist, store Pharmacy Manager, District Pharmacy Supervisor and her current role as Market Pharmacy Director for Walgreens Market 6 in Florida. Ms. Lehoczky will testify about the role of market and district supervision of Walgreens stores in Florida, and in particular the role of supervisors in training store pharmacists and technicians, monitoring store dispensing activities, and ensuring compliance with applicable state and federal laws and regulations.

Ms. Lehoczky will testify that in late 2010, following changes in Florida law, stores in her market began to see an increase in patients presenting prescriptions for oxycodone. She will testify about competitors in the marketplace who were refusing to dispense any oxycodone, which caused dispensing to increase at Walgreens stores where pharmacists were enforcing the Good Faith Dispensing Policy and regularly turning prescriptions away. Ms. Lehoczky will also testify that store pharmacists routinely faced threats and complaints from both patients and doctors as a result of their questioning of—and refusals to fill—prescriptions for oxycodone, and she will testify that Walgreens received daily telephone complaints based on her stores' refusals to fill oxycodone.

Ms. Lehoczky will testify about the steps taken, from late 2010 through 2012, at the market and district levels to assist the pharmacists and stores in identifying possible red flags and suspicious prescriptions and preventing diversion. These measures included reinforcing Walgreens' Good Faith Dispensing Policy, the use of professional judgment, and the pharmacist's "corresponding responsibility"; re-training pharmacists; devising detailed, localized

40

action plans and best practices for the dispensing of oxycodone (including an October 2011 "Market Action Plan/Guidelines for CII Dispensing" document she prepared); assessing dispensing data and feedback from individual stores; conducting supervisory visits to stores to observe dispensing practices and meet with store personnel; and holding regular meetings with store personnel, store Pharmacy Managers and Loss Prevention personnel to discuss ongoing dispensing issues. Ms. Lehoczky will further testify about how Market and District Supervisors partnered with their Loss Prevention counterparts to evaluate oxycodone dispensing by stores and implement these various responsive measures. She will testify that, as a result of these measures, oxycodone dispensing volumes declined for stores in her market in late 2011 and early 2012.

Ms. Lehoczky will testify specifically about Walgreens #04727 located in Ft. Pierce, Florida, and that she and her District staff took a number of proactive steps to reduce oxycodone dispensing and to prevent diversion. Ms. Lehoczky will also testify about her interactions with local law enforcement and DEA personnel. In particular, she will testify that on or about August 19, 2011, she and other Walgreens personnel met with Susan Langston (Diversion Program Manager, DEA Miami), William Schwartz (DEA Diversion Investigator) and Roger Kernicky (Diversion Investigator) at DEA's office in Weston, Florida. She will testify as to discussions at that meeting regarding Walgreens' dispensing practices, DEA's own best practices recommendations (which she and Walgreens personnel subsequently distributed to stores), and DEA's refusal at that meeting to give Walgreens any information regarding suspicious prescribing doctors. Ms. Lehoczky will further testify that at that meeting, the two DEA Diversion Investigators indicated that they were supportive of the anti-diversion efforts Walgreens was making at its stores in confronting the oxycodone issue and did not have

41

WAGMDL_T1_TX00002723

concerns about Walgreens' dispensing practices. She will also testify as to additional discussions she had with Ms. Langston pertaining to Walgreens, including, among other topics, DEA registrations for stores in Florida. And she will testify that she invited Ms. Langston and other DEA personnel to attend multiple internal Walgreens meetings with pharmacists, and DEA declined to attend.

**21.    Ed Forbes, Market Loss Prevention Director, Market 6**

Ed Forbes will explain his role as the Market Loss Prevention Director for Walgreens Market 6, which includes the West Palm Beach, Florida area. Mr. Forbes will describe the steps taken by Loss Prevention in Market 6 to address the influx of oxycodone prescriptions, including store visits, training and implementation of the Market 6 Action Plan. He will describe how doctors and patients attempted to evade the controls that were implemented, and how the controls ultimately reduced the volume of shipments from the Jupiter Facility.

Mr. Forbes will testify that in late 2010, following changes in Florida law, pharmacies in Market 6 began to see an increase in patients with prescriptions for oxycodone. Mr. Forbes will testify about the historic focus of anti-diversion efforts on fraudulent and forged prescriptions, and how the Florida law changed the focus of anti-diversion efforts. He will testify to the remedial measures the Loss Prevention team in Market 6 took to reduce the high dispensing numbers, including developing an Action Plan for addressing Schedule II dispensing, requiring District Loss Prevention Managers to train the Pharmacy Supervisors and Managers, reviewing dispensing data to assess the issue and conducting investigations into specific stores' dispensing. He will testify that he took specific efforts to reduce the volumes at high-dispensing stores in Market 6, including conducting random visits with the Market Pharmacy Director and auditing the high-dispensing stores, instructing the pharmacists to scrutinize the prescriptions and to aggressively reduce the number of oxycodone prescriptions filled and mandating that the

42

pharmacists at these stores attach the PDMP profile to all new oxycodone prescriptions.

Mr. Forbes will testify that initial efforts by stores in his market at reducing oxycodone dispensing were successful, but that unscrupulous doctors and patients adapted to circumvent the controls. For example, he will testify that some stores started refusing to fill prescriptions for out-of-state patients and then out of county patients, and that the pain clinics would shift their operations to within the county. Mr. Forbes will testify that pharmacists' refusal to fill oxycodone prescriptions that they believed to be illegitimate caused some customers to become hostile, and that as a result, Walgreens had to hire off-duty police officers to provide safety and security for the employees and customers.

Mr. Forbes will testify to Walgreens' efforts to work with law enforcement to prevent diversion. He will testify that the Florida Department of Law Enforcement singled Walgreens out as being an aggressive and supportive partner in fighting drug diversion. He will further testify to a meeting he, the Market Pharmacy Supervisor and the Pharmacy Supervisors from Market 6 had with DEA in August 2011 during which they discussed best practices and means of identifying fraudulent patients more effectively. He will testify that DEA refused to give out specific information about specific doctors.

## 22. Wesley Rohn, District Pharmacy Supervisor, District 112 (Palm Beach North)

Wesley Rohn will testify about this current role as the District Pharmacy Supervisor for District 112, including his oversight of Walgreens #04727. He will testify about the increase of oxycodone prescriptions at Walgreens #04727, and efforts made to reduce the numbers and detect and prevent diversion of controlled substances.

Mr. Rohn will testify tbat in late 2010, Walgreens #04727 began seeing an increase in customers with oxycodone prescriptions. He will explain that it took time for them to adjust to

43

the new patient population, the new doctors writing the prescriptions, and to identify indications of potential diversion. He will testify that he reinforced that pharmacists needed to exercise their professional judgment and take steps to ensure that prescriptions were valid. Mr. Rohn will testify that over time he realized that the dispensing numbers were continuing to increase and that additional steps needed to be taken, and that as a result, he began implementing new controls to try to decrease the number of oxycodone prescriptions being filled. He will further testify that he and the District Loss Prevention Manager visited the store to review the prescriptions that had been filled and to verify that the pharmacists were following the implemented controls. He will describe meetings he had with the pharmacists and pharmacy manager during these visits. He will testify that throughout 2011 he continued to implement additional controls to try to curb the dispensing but that fraudulent patients and doctors would adapt to the new controls and find ways to circumvent them. Mr. Rohn will testify about the effectiveness of controls Walgreens implemented and the significant number of prescriptions that his pharmacists refused to fill, and the resulting complaints from customers.

Mr. Rohn will testify about a meeting he and other members of Walgreens management had with DEA in August 2011. He will testify that he took the information he learned at the meeting and conveyed it to the pharmacists in his district, including at Walgreens #04727, and will further testify that he subsequently scheduled sessions for DEA investigators to train his pharmacists on red flags and how to identify diversion.

Mr. Rohn will describe the events of April 4, 2012 when DEA executed an inspection warrant at Walgreens #04727. He will testify about conversations he had with Susan Langston and Gayle Lane from DEA and Robert Difiore from the Florida Department of Health.

44

Finally, Mr. Rohn will testify regarding how some prescriptions at his stores are centrally filled at Walgreens' Orlando central fill pharmacy, and how Walgreens' system tracks which prescriptions were filled there.

**D.** Witnesses Whose Testimony Is Applicable Only To Walgreens #06997

### 23. Daniel Heinis, Pharmacy Manager, Walgreens #06997

Daniel Heinis will testify to his current role as the pharmacy manager at Walgreens #06997 in Oviedo, FL. He will testify that in late 2010, following changes in Florida law, his store began to see an increase in patients with prescriptions for oxycodone, including some from the Miami area or out-of-state. In response, his store established a number of limits on oxycodone dispensing, including a geographical service area limited to patients or doctors in Seminole County or Orange County, and other limits on dispensing prescriptions.

Mr. Heinis will also testify regarding the letters received from Chief Chudnow at the Oviedo Police Department. He will explain what was done with the information and the steps that were taken to avoid dispensing prescriptions, as well as his cooperative working relationship with the Oviedo Police Department, which led to the arrest of a number of individuals engaged in doctor shopping and other unlawful activity.

### 24. Melissa Rakauskas, District Pharmacy Supervisor, District 163 (Orlando East)

Melissa Rakauskas will describe her current role as the Pharmacy Supervisor for District 163, which includes Walgreens #06997 in Oviedo, FL. Ms. Rakauskas will then describe the steps that stores in her district took beginning in late 2010 to address the increase of patients with oxycodone prescriptions.

She will further testify that in late 2010, following changes in Florida law, pharmacies in her district began to see an increase in patients with prescriptions for oxycodone. She will testify

45

that the pharmacists in her district expressed concerns regarding the increased numbers, that they were instructed to use their professional judgment as to whether to fill a prescription, and that her pharmacists refused to fill numerous prescriptions. At this time, she began receiving dozens of calls and emails with complaints about refusals to fill, and her pharmacists began reporting concerns for their own safety from patients whose prescriptions they refused to fill.

She will testify to the remedial measures her district took to reduce the high dispensing numbers at her stores, including geographic, quantity and drug combination limitations, how customers and doctors adapted to evade these controls, and how she held monthly meetings with pharmacy managers to evaluate dispensing protocols.

Ms. Rakauskas will note that the challenges faced by certain pharmacies attempting to make these difficult judgments were compounded by other nearby Florida pharmacies' decisions to discontinue dispensing certain oxycodone medications altogether, which had the effect of concentrating a larger percentage of oxycodone patients at Walgreens #06997.

Ms. Rakauskas will also describe a February 2011 meeting with the Chief of the Oviedo Police Department during which they discussed steps the pharmacists could take to assist with preventing diversion. These anti-diversion efforts were focused on identifying patients that posed a diversion risk. She will further describe subsequent efforts the pharmacists in her district made to work with the Oviedo Police Department and not fill prescriptions for known abusers, such as adding information received from the Police Department to the comments section of patients' profile. Ms. Rakauskas will testify that the steps Walgreens has taken to address oxycodone diversion has reduced the dispensing numbers are her stores to pre-2010 levels.

46

Finally, Ms. Rakauskas will testify regarding how some prescriptions at her stores are centrally filled at Walgreens' Orlando central fill pharmacy, and how Walgreens' system tracks which prescriptions were filled there.

### 25. Ed Lanzetti, Market Loss Prevention Director, Market 28

Ed Lanzetti will describe his current role as the Market Loss Prevention Director for Walgreens Market 28, which includes Walgreens #06997 in Oviedo, FL. Mr. Lanzetti will describe the steps that Market 28 Loss Prevention took beginning in late 2010 to address the increase of patients with oxycodone prescriptions.

Mr. Lanzetti will testify that in late 2010, following changes in Florida law, pharmacies in Market 28 began to see an increase in patients with prescriptions for oxycodone. He will testify that the pharmacists in his market expressed concerns regarding the increased numbers, including concerns for their own safety. He will testify to the remedial measures the Loss Prevention team in Market 28 took to reduce the high dispensing numbers, including development of the Focus on Compliance initiative. Mr. Lanzetti will discuss meetings he and the Market Pharmacy Director of Market 28 had with the Pharmacy Managers to discuss the pharmacists' dispensing practices. He will also describe how he tasked the District Loss Prevention Managers and Pharmacy Supervisors in his market with performing additional visits to high-dispensing stores and reviewing dispensing protocols. Mr. Lanzetti will further testify that the initial efforts made to handle the increased dispensing were at the district and market level. He will describe efforts he later made in conjunction with the corporate headquarters to implement standard protocols to ensure consistency across the different markets and districts.

Mr. Lanzetti will describe a February 2011 meeting with the Deputy Chief of the Oviedo Police Department during which they discussed steps the pharmacists could take to assist with preventing diversion. He will further describe subsequent efforts the pharmacists in his market

47

made to work with the Oviedo Police Department and not fill prescriptions for suspected abusers.

## VIII.  PROPOSED DOCUMENTS

Walgreens incorporates by reference the exhibit list contained in Respondents' Consolidated Witness and Exhibit List, filed concurrently with this Prehearing Statement per this Court's January 10, 2013 Ruling On Respondents' Motion To Consolidate.

## IX.  OTHER MATTERS

**1.**     Walgreens anticipates filing multiple motions *in limine* in advance of trial. Walgreens respectfully requests that the Court set a briefing schedule for filing any such motions.

**2.**     Walgreens has not yet been provided with the documents that form the basis for DEA's cases.  Walgreens anticipates that the Court will set a date for DEA to provide relevant materials and that the parties can work cooperatively to voluntarily produce much of those materials.  Until that time, Respondent cannot be certain of the extent to which a subpoena will be required.  Respondent therefore asks that the Court set a date following the exchange of documents for filing such motions.

## X.  POSITION REGARDING HEARING LOCATION

Walgreens does not request a change of location for the hearing, so long as DEA agrees to make its witnesses and the DEA witnesses identified by Walgreens in this Prehearing Statement available for trial in Virginia.

## XI.  BEST ESTIMATE AS TO TIME REQUIRED TO PRESENT CASE

Walgreens anticipates requiring approximately six days to present its case-in-chief in the Pharmacy Matters, exclusive of cross-examination and rebuttal.

48

WAGMDL_T1_TX00002730

Dated: January 18, 2013

Philip J. Perry
Allen M. Gardner
Nathan H. Seltzer
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
*Attorneys for Respondent Walgreen Co.*

49

WAGMDL_T1_TX00002731

## CERTIFICATE OF SERVICE

I certify that on the 18th day of January 2013, I served true and accurate copies of the

foregoing by sending the same via United States mail, first-class certified postage prepaid, and

via email to the following:

Scott Lawson
Diversion and Regulatory
Litigation Section
Office of the Chief Counsel
Drug Enforcement
Administration
8701 Morrissette Drive
Springfield, VA 22152
Scott.Lawson@usdoj.gov

Jonathan Novak
Diversion and Regulatory
Litigation Section
Office of the Chief Counsel
Drug Enforcement
Administration
8701 Morrissette Drive
Springfield, VA 22152
Jonathan.P.Novak@usdoj.gov

Michelle Gillice
Diversion and Regulatory
Litigation Section
Office of Chief Counsel
Drug Enforcement
Administration
8701 Morrissette Drive
Springfield, VA 22152
Michelle.F.Gillice@usdoj.gov

Robert Walker
Diversion and Regulatory
Litigation Section
Office of Chief Counsel
Drug Enforcement
Administration
8701 Morrissette Drive
Springfield, VA 22152
Robert.Walker@usdoj.gov

David S. Weinstein
Clarke Silverglate P.A.
799 Brickell Plaza
Suite 900
Miami, FL 33131
Dweinstein@cspalaw.com

Philip J. Perry
Allen M. Gardner
Nathan H. Seltzer
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
*Attorneys for Respondent Walgreen Co.*

# EXHIBIT F

Page 364

1     IN THE UNITED STATES DISTRICT COURT

     FOR THE NORTHERN DISTRICT OF OHIO

2        EASTERN DIVISION

3

   _____

4

   IN RE: NATIONAL PRESCRIPTION  MDL No. 2804

5   OPIATE LITIGATION     Case No. 17-md-2804

6

   This document relates to:  Judge Dan

7               Aaron Polster

8   The County of Cuyahoga v. Purdue

   Pharma, L.P., et al.

9   Case No. 17-OP-45005

10   City of Cleveland, Ohio vs. Purdue

   Pharma, L.P., et al.

11   Case No. 18-OP-45132

12   The County of Summit, Ohio,

   et al. v. Purdue Pharma, L.P.,

13   et al.

   Case No. 18-OP-45090

14   _____

15

16

17        VOLUME II

18   Videotaped Deposition of Joseph Rannazzisi

19       Washington, D.C.

20       May 15, 2019

21        8:43 a.m.

22

23

24   Reported by:  Bonnie L. Russo

25   Job No. 3301884

Page 375

 1                    P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on

 4     the record.  My name is Dan Lawlor, I'm a

 5     videographer with Golkow Litigation Services.

 6     Today's date is May 15, 2019, and the time is

 7     8:43 a.m.

 8              This video deposition is being held

 9     in Washington, D.C., in the matter of In RE:

10     National Prescription Opioid Litigation, MDL

11     No. 2804.  The deponent is Joseph Rannazzisi.

12              Counsel will be noted on the

13     stenographic record.  The court reporter is

14     Bonnie Russo and will now swear in the witness.

15

16              JOSEPH RANNAZZISI,

17      being first duly sworn, to tell the truth, the

18        whole truth and nothing but the truth,

19              testified as follows:

20        EXAMINATION BY COUNSEL FOR PLAINTIFFS

21              BY MR. LANIER:

22        Q.    Mr. Rannazzisi, thank you for your

23     time today.  My name is Mark Lanier.  You and I

24     have not met before you sat down here just a

25     few minutes ago; is that right?

Page 376

1      A.    That's correct.

2      Q.    You understand, though, that I

3   represent the claimants that are bringing this

4   lawsuit against the various opioid defendants

5   that are present in court today.

6           Do you understand?

7      A.    Yes.

8      Q.    All right.  I have got a picture

9   with some notes that I will make as we go

10  along.  That's you.

11          Did I spell your name right?

12     A.    Yes, sir.

13     Q.    Would you pronounce it for me so

14  that I can pronounce it right?

15     A.    Rannazzisi.

16     Q.    Rannazzisi.  All right.  And that

17  picture looks pretty much like you.  I don't

18  see much difference there.

19          Let me tell you where we would like

20  to go today and what all I need to ask you

21  about.  I have done a little roadmap for you

22  and for the jury so that we can follow along.

23  The roadmap, I am calling you the 60 Minute

24  Man.  You have been on 60 Minutes; is that

25  right?

Page 377

1          A.     Yes, sir.

2          Q.     All right.  So on 60 Minute Man

3     Road, I want to make a stop to talk about your

4     background, I want to make a stop to talk about

5     the 60 Minutes episode and then I want to ask

6     some follow-up questions and we will deal with

7     some roadblocks or some questions about your

8     testimony along the way.  Okay?

9          A.     Yes, sir.

10         Q.     So with that, if you have got any

11    questions as we go along, let me know but we're

12    going to begin with stopping at your background

13    and I will start a clean sheet on your

14    background so that we can look at it together.

15    All right?

16         A.     Yes, sir.

17         Q.     Would you please tell the jury a

18    little bit about where you are from, where you

19    grew up, just so they've got a feel for you.

20         A.      I grew up in a town on Long Island,

21    New York, Freeport, New York.  It's a smaller

22    town on the south shore of Long Island.  Went

23    to Freeport High School, from Freeport High

24    School, I went to Butler University.

25         Q.     And Butler university is in

Page 378

1    Indianapolis?

2         A.    Yes, sir.

3         Q.    What's their mascot, the Butler --

4         A.    Bulldogs.

5         Q.    -- bulldogs.

6         A.    Yes, sir.

7         Q.    All right.  So you were a bulldog

8    and when did you get out of college, out of

9    Butler?

10        A.    1984.

11        Q.    And what was your major?

12        A.    Pharmacy.

13        Q.    Are you actually a licensed

14   pharmacist or have you been at some point in

15   your life?

16        A.    Yes, sir.  I maintain my pharmacy

17   license, State of Indiana.

18        Q.    Okay.  So you are a licensed

19   pharmacist in Indiana.  What does that enable

20   you to do?

21        A.    It enables me to dispense medication

22   pursuant to physicians' prescriptions.

23        Q.    I assume that is if you are in

24   Indiana?

25        A.    If I am in Indiana, yes, sir.

Page 395

1      Q.    Sometimes you get paid to give
2  speeches?
3      A.    Yes, sir.
4      Q.    Sometimes you give speeches for
5  free?
6      A.    Yes, sir.  It's groups where
7  families have lost children or lost loved ones.
8  Those are free.  I generally just ask them to
9  pay for my way out and back.  Law enforcement,
10 free, except again, if they pay my way out and
11 back.
12         Pharmacy -- some pharmacy groups,
13 especially if it is, like, a state, they are
14 doing -- if they are doing continuing
15 education, I will do those for free as well.
16     Q.    What do you speak about?
17     A.    Generally my speeches are tailored
18 to what the audience, what they are interested
19 in.  Sometimes I will speak about the overall
20 opioid crisis where we will just talk about,
21 you know, how it occurred, historically what
22 happened.
23         For pharmacists, I generally stay
24 towards corresponding responsibility, helping
25 the states and the pharmacists understand what

1    corresponding responsibility is and what is

2    required of a pharmacist with prescriptions and

3    what they are supposed to do, how they are

4    supposed to resolve red flags.

5            A lot of times, I go and speak and

6    then just help the parents, talk to parents,

7    you know, who have lost kids, talk to parents

8    who just want to tell their story which, you

9    know, is definitely -- it's tragic, all those

10   kids and all those people.  Very tragic.

11       Q.   All right.  That's going to do our

12   first stop on the road.  So we have got your

13   background information here.

14           It is going to be relevant as we go

15   along, but I want to move to the next stop on

16   the road, which is what I call the 60 Minute

17   stop.  Okay?

18       A.   Yes, sir.

19           MR. STEPHENS:  Object to form.

20           BY MR. LANIER:

21       Q.   All right.  Let's move to the 60

22   Minute stop and we will get a sheet set up for

23   that stop and talk to you about that.  Okay?

24       A.   Yes, sir.

25       Q.   First set of questions here, how on

Case: 1:17-md-02804-DAP Doc #: 4124-8 Filed: 08/14/20 245 of 396. PageID #: 498607
Case: 1:17-md-02804-DAP Doc #: 2648-6 Filed: 09/28/19 45 of 133. PageID #: 416309

1    earth -- by the way, this 60 Minutes, that the

2    TV show, right?

3         A.    Yes, sir.

4         Q.    That's the one that's got on those

5    ads, the ticking clock, tick, tick, tick, tick,

6    tick?

7         A.    Yes, sir.

8         Q.    All right.  What -- how did you even

9    get involved to get on 60 Minutes?  How did

10   that come about?

11              MS. McCLURE:  Objection.

12              THE WITNESS:  I -- it basically

13   didn't start with 60 Minutes.  It started with

14   reporters calling asking certain things about

15   the opioid crisis and I never -- if a reporter

16   called and asked questions, I felt obligated to

17   answer them.

18              As more reporters called, reporters

19   obviously read other reports and they started

20   -- Washington Post called and they were looking

21   at a story and they asked several questions and

22   I explained how things happened and how things

23   occurred in the opioid crisis, and they were

24   very interested in the Insurance Patient Access

25   Act and one thing led to another and they

```
 1        started writing about different things and the

 2        interplay between, you know, Congress and other

 3        entities.

 4                    From there, 60 Minutes started

 5        working with the Washington Post and we ended

 6        up on 60 Minutes.

 7                    BY MR. LANIER:

 8        Q.    Was not something you sought out?

 9        A.    No, sir.

10                    MR. STEPHENS:  Object to form.

11                    BY MR. LANIER:

12        Q.    Why you?  Do you know?

13                    MR. STEPHENS:  Object to form.

14                    BY MR. LANIER:

15        Q.    Let me ask it this way.  Let me

16        re-ask the question.

17                    In your mind, what made you

18        particularly important or useful for a 60

19        Minutes story?

20                    MS. MAINIGI:  Objection.

21                    MR. EPPICH:  Objection.

22                    THE WITNESS:  I think because I was

23        -- I was there during that time period.  I was

24        there during the time period where the deaths

25        increased or the overdoses increased, and quite
```

1    frankly, they saw -- they saw my testimony
2    before Congress and it wasn't difficult to see
3    in my testimony before Congress, you know, it
4    was -- there was a lot of -- there was quite a
5    bit of tension between what DEA was doing and
6    what Congress wanted us to do.
7              BY MR. LANIER:
8         Q.   All right.  If we -- I don't want to
9    go back necessarily to your background, but one
10   of the things that you did when you worked for
11   the DEA that we have left out is your testimony
12   to Congress.
13             You testified to Congress; is that
14   right?
15        A.   Yes, sir.
16        Q.   Do you recall how many times you got
17   called on to come give testimony to the United
18   States Congress?
19        A.   I believe it's right around 33,
20   maybe a little more.
21        Q.   So 33 times you were selected I
22   assume, or were you invited or how does that
23   work?
24             MR. STEPHENS:  Objection.
25             THE WITNESS:  Sometimes I was

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION *This document relates to:* Track One Cases | MDL 2804 Case No. 17-md-2804 Hon. Dan Aaron Polster |

### PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ VII

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ..................................................................................................................... 4

    A.    PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661). ................................................................................................................ 4

        1.    Defendants' Omnibus MIL No. 1: The Court should not permit Plaintiffs to present evidence or argument to the jury concerning "future damages." .......................................................................................... 4

                *i.*    *Plaintiffs long ago disclosed that they are seeking future damages.* ....................... 4

                *ii.*    *Defendants offer no argument to support the exclusion of future damages evidence other than the McGuire and Liebman Supplemental Tables.* ............... 6

                *iii.*    *Plaintiffs properly supplemented the expert reports of Profs. Liebman and McGuire to separate future damages from abatement costs.* ............................... 8

        2.    Defendants' Omnibus MIL No. 2: The Court should preclude Plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant." ........................................................... 12

        3.    Defendants' Omnibus MIL No. 3: The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others. ........................................................................... 15

        4.    Defendants' Omnibus MIL No. 4: The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use. ............................................................................................. 17

        5.    Defendants' Omnibus MIL No. 5: The Court should preclude evidence concerning lobbying and other protected petitioning activity. ......................... 21

        6.    Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions. ......................................................................... 31

7.      Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations. ...........................................................................34

8.      Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony. .....................41

9.      Defendants' Omnibus MIL No. 9: The Court should not allow use of certain charts presenting misleading and irrelevant data. ................................43

10.     Defendants' Omnibus MIL No. 10: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct. ........................................................................................44

11.     Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability. .........................................................................................................47

12.     Defendants' Omnibus MIL No. 12: The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis .........48

13.     Defendants' Omnibus MIL No. 13: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers. ...............................................................................51

14.     Defendants' Omnibus MIL No. 14: The Court should preclude any comment regarding the absence of a corporate representative at trial. ..........51

B.      PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666). .............................53

1.      Distributors' MIL No. D-1: The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia. .............................................................................53

2.      Distributors' MIL No. D-2: The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge. ..............................................................................................59

3.      Distributors' MIL No. D-3: The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction. .........................................................................62

4.      Distributors' MIL No. D-4: The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found. .................................63

5.      Distributors' MIL No. D-5: The Court should prohibit Plaintiffs from
        presenting evidence or making arguments suggesting Distributors
        committed a "fraud on the DEA." ........................................................................65

6.      Distributors' MIL No. D-6:  The Court should prohibit counsel and
        witnesses from making references broadly and generally to
        "Defendants" when the statement, argument, or testimony relates only
        to certain specific Defendants or groups of Defendants. ...............................67

7.      Distributors' MIL No. D-7: The Court should preclude Plaintiffs from
        offering evidence of, and arguments about RICO predicates that
        Plaintiffs did not identify in their discovery responses....................................68

8.      Distributors' MIL No. D-8: The Court should issue an order excluding
        any evidence of, or reference to, Distributor-run programs that allowed
        Manufacturers to communicate product information to Pharmacies or
        other parties. ..........................................................................................................70

C.      PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE
        (DKT. #2645). .........................................................................................................72

1.      Henry Schein MIL No. HS-1: References to the Henry Schein
        Defendants having engaged in any alleged activities with respect to
        Cuyahoga County...................................................................................................72

2.      Henry Schein MIL No. HS-2: References to Henry Schein Medical
        Systems, Inc. as having distributed any opioid medications into Summit
        County or otherwise caused or contributed to any alleged opioid
        epidemic. ..................................................................................................................73

3.      Henry Schein MIL No. HS-3: References to sales or distribution of
        opioid medications to retail, chain, Internet pharmacies, or "pill mills." .......74

4.      Henry Schein MIL No. HS-4: References to opioid medications
        distributed by Henry Schein, Inc. to Dr. Brian Heim.......................................74

5.      Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should
        not have shipped opioid medications following Dr. Heim's May 2012
        indictment. ...............................................................................................................75

6.      Henry Schein MIL No. HS-6: References to opioid medications
        distributed by Henry Schein, Inc. to Dr. Adolph Harper. ...............................77

7.      Henry Schein MIL No. HS-7: References to purported inadequacies
        regarding Henry Schein, Inc.'s Suspicious Order Monitoring System

without first identifying whether any orders that HIS sold into Summit County were diverted. ....................................................................77

8.     Henry Schein MIL No. HS-8: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.........78

9.     Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County. ............................................79

10.     Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.......................................................................................79

11.     Henry Schein MIL No. HS-11: References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014. ..........................................................................80

12.     Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiff's lawsuit.......................81

D.    PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648)...........82

1.     Walgreens' MIL No. W-1: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen.......................................82

2.     Walgreens' MIL No. W-2: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement............84

3.     Walgreens' MIL No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man."........86

E.    PLAINTIFFS' RESPONSE TO CARDINAL HEALTH INC'S MOTIONS *IN LIMINE* (DKT. #2653). ....................................................................87

1.     Cardinal MIL No. 1: 14,000 Orders Not Shipped. ............................................87

2.     Cardinal MIL No. 2: "Interesting Gossip" Email.............................................90

3.     Cardinal MIL No. 3: Misleading Data Comparisons (McCann Data Analysis). ..........................................................................91

F.    PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663)................................92

1.     McKesson MIL No. MCK-1: The Court should prohibit any reference to baseless accusations. ..........................................................92

2.      McKesson MIL No. MCK-2: The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation. ..........................................93

      *i.      The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.*........................................................................93

      *ii.     The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.*........................................................................95

      *iii.    Testimony Provided to the Committee is Also Admissible.* ............................96

      *iv.    Letters from members of Congress to McKesson Are Admissible.* ..................96

3.      McKesson MIL No. MCK-3: The Court should prohibit the introduction of nationwide trends in drug deaths.............................................97

4.      McKesson MIL No. MCK-4: The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ. ..........................................................98

5.      McKesson MIL No. MCK-5: The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct. ..........................................................98

6.      McKesson MIL No. MCK-6: The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance. ......................................................... 102

G.     PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE (DKT. #2668).................................... 104

1.      Teva MIL No. TAD-1: The Court should exclude reference to the Cephalon misdemeanor plea. .......................................................... 104

2.      Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion. .......................................................... 105

3.      Teva MIL No. TAD-3: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government. ..... 106

4.      Teva MIL No. TAD-4: The Court should exclude evidence of opioid-related harm that occurred outside of the counties. ...................................... 106

5.      Teva MIL No. TAD-5: The Court should exclude evidence of
        marketing-related statements or opioid shipments outside of the
        counties.................................................................................................................. 108

6.      Teva MIL No. TAD-6: The Court should exclude evidence regarding
        Teva Defendants' financial support of third-party groups. ........................... 109

7.      Teva MIL No. TAD-7: The Court should exclude testimony from
        Russell Portenoy about any improper conduct by Moving Defendants...... 112

8.      Teva MIL No. TAD-8: Plaintiffs should be precluded from arguing that
        the Actavis Generic Defendants should have made additional warnings
        regarding their generic medicines or should have stopped selling them. .... 114

9.      Teva MIL No. TAD-9: The Court should exclude reference to the
        purchase price paid by Teva Pharmaceutical Industries Ltd. for the
        Actavis Generic Defendants........................................................................... 115

10.     Teva MIL No. TAD-10: The Court should exclude reference to the
        settlement agreement between Teva Ltd. and Allergan. ................................ 116

CONCLUSION ............................................................................................................... 117

# TABLE OF AUTHORITIES

*Page*

**CASES**

*Adams v. U.S.,*
03-0049-E-BLW, 2009 WL 1259019 (D. Idaho May 3, 2009) ........................................24, 25, 67

*Alexander v. Natl. Farmers Org.,*
687 F.2d 1173 (8th Cir. 1982) ...........................................................................................23

*Almanza v. United Airlines, Inc.,*
851 F.3d 1060 (11th Cir. 2017) .......................................................................................113

*Anderson v. Westinghouse Savannah River Co.,*
406 F.3d 248 (4th Cir. 2005)...............................................................................................95

*Andler v. Clear Channel Broadcasting, Inc.,*
670 F.3d 717 (6th Cir. 2012)..........................................................................................42, 43

*Anthony v. DeWitt,*
295 F.3d 554 (6th Cir. 2002)...............................................................................................97

*Antioch Co. Litig. Tr. v. Morgan,*
No. 3:10CV156, 2014 WL 2117450 (S.D. Ohio May 21, 2014) ...................................68

*Atanus v. S&C Elec. Co.,*
454 F. Supp. 2d 753 (N.D. Ill. 2006)..................................................................................40

*Baker v. Elcona Homes Corp.,*
588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979)....................................94

*Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.,*
959 F.2d 606 (6th Cir. 1992)................................................................................................94

*Bankers Trust Co. v. Rhoades,*
859 F.2d 1096 (2d Cir. 1988) ...............................................................................................6

*Beech Aircraft Corp. v. Rainey,*
488 U.S. 153 (1988) ..............................................................................................................94

*Bell v. Consol. Rail Corp.,*
299 F. Supp. 2d 795 (N.D. Ohio 2004)..............................................................................57

*Brazos River Auth. v. GE Ionics, Inc.,*
469 F.3d 416 (5th Cir. 2006)...........................................................................................60, 61

*Bridgeport Music, Inc. v. WM Music Corp.,*
   508 F.3d 394 (6th Cir. 2007) ...................................................................................70

*Brooks v. Caterpillar Glob. Mining Am. LLC,*
   No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017)...........................116, 117

*Buckman Co. v. Plaintiffs' Leg. Comm.,*
   531 U.S. 341 (2001) .........................................................................................66, 67

*Cadence Educ., LLC v. Vore,*
   No. 17-CV-2092-JTM-TJJ, 2018 WL 690993 (D. Kan. Feb. 2, 2018) ..........................84

*Cal. Motor Transport Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) ...........................................................................................22

*Campbell v. PMI Food Equip. Group, Inc.,*
   509 F.3d 776 (6th Cir. 2007) .................................................................................22

*Chambers v. St. Mary's Sch.,*
   697 N.E.2d 198 (Ohio 1998) ..................................................................................40

*Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.,*
   No. 10-CV-02349-WJM-KMT, 2014 WL 1583993 (D. Colo. Apr. 21, 2014) ...................62

*Chism v. CNH Am., LLC,*
   638 F.3d 637 (8th Cir. 2011) ..................................................................................104

*Christopher Seri v. Crosscountry Mortg., Inc.,*
   No. 1:16-CV-01214-DAP, 2016 WL 5405257 (N.D. Ohio Sept. 28, 2016) ......................68

*Cincinnati Ins. Co. v. Omega Flex, Inc.,*
   No. 3:10-CV-00670-H, 2013 WL 1403493 (W.D. Ky. Apr. 5, 2013) ............................45

*Cincinnati v. Beretta U.S.A. Corp.,*
   768 N.E.2d 1136 (Ohio 2002) .................................................................................39

*Cipollone v. Liggett Group, Inc.,*
   668 F. Supp. 408 (D.N.J. 1987) ............................................................................23, 24

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
   538 F. Supp. 1257 (N.D. Ohio 1980) ......................................................26, 27, 28, 29

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
   734 F.2d 1157 (6th Cir. 1984) ................................................................26, 27, 28, 29

*City of Cleveland v. Peter Kiewit Sons' Co.,*
   624 F.2d 749 (6th Cir. 1980) ..................................................................................117

*Community Action League v. City of Palmdale*,
   CV 11-4817 ODW VBKX, 2012 WL 10647285 (C.D. Cal. Feb. 1, 2012) ...................24

*Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*,
   CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5, 2003) .........................................24

*Cooley v. Lincoln Elec. Co.*,
   693 F.Supp.2d 767 (N.D. Ohio 2010) ......................................................................63

*Croskey v. BMW of North America, Inc.*,
   532 F.3d 511 (6th Cir. 2008) ..................................................................................56

*CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*,
   401 F. Supp. 2d 813 (N.D. Ohio 2005) ...............................................................56, 57

*Daniels v. Northcoast Anesthesia Providers, Inc.*,
   2018-Ohio-3562 (Ct. App. 2018) .........................................................................6, 8

*Davis v. Clark Cty. Bd. of Commrs.*,
   994 N.E.2d 905 (Ohio App. 2d Dist. 2013) ..............................................................40

*DeLoach v. Philip Morris Companies, Inc.*,
   1:00CV01235, 2001 WL 1301221 (M.D.N.C. July 24, 2001) ....................................22

*DIRECTV, Inc. v. Cavanaugh*,
   321 F. Supp. 2d 825 (E.D. Mich. 2003) ..................................................................22

*Doe v. United States*,
   253 F.3d 256 (6th Cir. 2001) ...............................................................................48

*Dortch v. Fowler*,
   588 F.3d 396 (6th Cir. 2009) ..............................................................................2, 35

*Feinstein v. Resolution Tr. Corp.*,
   942 F.2d 34 (1st Cir. 1991) ..................................................................................70

*Feminist Women's Health Ctr., Inc. v. Mohammad*,
   586 F.2d 530 (5th Cir. 1978) ............................................................................30, 31

*Flir Sys., Inc. v. Fluke Corp.*,
   No. 3:10-CV-00971-HU, 2012 WL 13054267 (D. Or. Nov. 29, 2012) .......................69

*Galayda v. Lake Hosp. Sys., Inc.*,
   1994-Ohio-64, 71 Ohio St. 3d 421 ...........................................................................6

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
   458 U.S. 375 (1982) ....................................................................................111, 112

*Gillis v. Murphy-Brown, LLC,*
    7:14-CV-185-BR, 2018 WL 5928010 (E.D.N.C. Nov. 13, 2018) ................................................23

*Gjokaj v. United States Steel Corp.,*
    700 F. App'x 494 (6th Cir. 2017) .................................................................................................55

*Globetti v. Sandoz Pharm. Corp.,*
    CV98-TMP-2649-S, 2001 WL 419160 (N.D. Ala. Mar. 5, 2001) ...............................................67

*Goldman v. Healthcare Mgmt. Sys., Inc.,*
    559 F. Supp. 2d 853 (W.D. Mich. 2008) ...............................................................................45, 93

*Gomez v. Rivera,*
    344 F.3d 103 (1st Cir. 2003) .................................................................................................19, 20

*Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.,*
    No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015) ..........................................117

*Harris v. Goins,*
    No. 6: 15-151-DCR, 2017 WL 4080692 (E.D. Ky. Sep. 14, 2017)............................................102

*Hilton Hotels Corp. v. Dunnet,*
    No. 00–2852–GV, 2002 WL 1482543 (W.D.Tenn. Mar. 15, 2002) ..........................................101

*Hobson v. Wilson,*
    556 F. Supp. 1157 (D.D.C. 1982), *aff'd in part, rev'd in part,* 757 F.2d 1 (D.C. Cir. 1985) ..............95

*Hochstein v. Microsoft Corp.,*
    04-73071, 2009 WL 2022815 (E.D. Mich. July 7, 2009) ...........................................................83

*Homoki v. Rivers Edge Tree Stands,*
    No. 1:12-CV-2926, 2012 WL 6631043 (N.D. Ohio Dec. 19, 2012)............................................55

*Howe v. City of Akron,*
    801 F.3d 718 (6th Cir. 2015)........................................................................................................11

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,*
    538 U.S. 600 (2003) .....................................................................................................................22

*In re Air Crash at Lexington, KY,*
    No. 5:06-CV-316-KSF, 2008 WL 2782827 (E.D. Ky. July 8, 2008)..........................................91

*In re Air Crash Disaster,*
    86 F.3d 498 (6th Cir. 1996).....................................................................................................91, 92

*In re Asbestos Sch. Litig.,*
    46 F.3d 1284 (3d Cir. 1994) .......................................................................................................113

*In re Cathode Ray Tube Antitrust Litig.,*
MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891 (N.D. Cal. 2016) ..............................82

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.,*
295 F. Supp. 3d 927, 973 ........................................................................................24

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.,*
888 F.3d 753 (5th Cir. 2018) ............................................................................46, 47

*In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings,*
14 C 1748, 2018 WL 305503 (N.D. Ill. Jan. 6, 2018) ........................................23, 24

*In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.,*
181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) ..............................................24, 66, 67

*In re Vioxx Products Liab. Litig.,*
MDL 1657, 2005 WL 3164254 (E.D. La. Nov. 21, 2005) ......................................67

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.,*
MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) .................23, 24

*In re Welding Fume Products Liab. Litig.,*
1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) ............................23, 24

*In re Welding Fume Products Liab. Litig.,*
526 F. Supp. 2d 775 (N.D. Ohio 2007) ..........................................................110, 112

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.,*
No. 3:09-CV-10012-DRH, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ......................passim

*In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.,*
No. 2:13-CV-170, 2016 WL 659112 (S.D. Ohio Feb. 17, 2016) ..........................55, 56

*In re: Gen. Motors LLC Ignition Switch Litig.,*
14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) .........................24, 25

*Indiana Ins. Co. v. Gen. Elec. Co.,*
326 F. Supp. 2d 844 (N.D. Ohio 2004) ..........................................................passim

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
451 U.S. 557 (1981) ...................................................................................................8

*Jackson v. O'Reilly Auto. Stores, Inc.,*
131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ..............................................49

*Jacobs v. Tricam Industries, Inc.,*
10-11469, 2013 WL 950969 (E.D. Mich. Mar. 12, 2013) ....................................16, 17

*Jones v. Pramstaller*,
No. 1:09-CV-392, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013) ...........................................19

*Jordan v. John Soliday Fin. Group, LLC*,
1:09CV0707, 2010 WL 4281807 (N.D. Ohio Oct. 20, 2010)........................................2, 3, 4, 32

*KCH Services, Inc. v. Vanaire, Inc.*,
CIV.A. 05-777-C, 2010 WL 3245243 (W.D. Ky. June 2, 2010) ...........................................16, 17

*King v. Pratt & Whitney, a Div. of United Technologies Corp.*,
161 F.R.D. 475 (S.D. Fla. 1995)........................................................................................102

*Koloda v. General Motors Parts Div., General Motors Corp.*,
716 F.2d 373 (6th Cir. 1983)................................................................................................91

*Kottle v. N.W. Kidney Centers*,
146 F.3d 1056 (9th Cir. 1998)..............................................................................................22

*Lloyd v. Midland Funding, LLC*,
No. 15-5132, 639 Fed. Appx. 301 (6th Cir. Jan. 22, 2016) ...................................................60, 61

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013)...........................................................................................3, 35

*Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*,
835 F. Supp. 2d 299 (W.D. Ky. 2011) ...............................................................................66, 67

*Marcilis v. Twp. of Redford*,
693 F.3d 589 (6th Cir. 2012)................................................................................................68

*Martin v. Thrifty Rent A Car*,
145 F.3d 1332 (6th Cir. 1998)..............................................................................................57

*Mascarenas v. Cooper Tire & Rubber Co.*,
CV208-009, 2010 WL 11534359 (S.D. Ga. Jan. 11, 2010) .......................................................52

*McAuliffe v. United States*,
514 F. App'x 542 (6th Cir. 2013) ....................................................................................55, 56

*McConnell v. Fed. Election Commn.*,
540 U.S. 93 (2003), *overruled by Citizens United v. Fed. Election Commn.*, 558 U.S. 310 (2010)........110

*McFarlane v. Ben–Menashe*,
No. 93–1304, 1995 WL 129073 (D.D.C. March 16, 1995), *reconsideration granted,* 1995 WL
799503 (D.D.C. June 13, 1995) ............................................................................................95

*McLean v. 988011 Ontario*,
224 F.3d 797 (6th Cir. 2000)................................................................................................42

*McWilliams v. S.E., Inc.*,
    581 F. Supp. 2d 885 (N.D. Ohio 2008)....................................................................112

*Miles v. Scutt*,
    No. 07-15068, 2008 WL 2949240 (E.D. Mich. July 29, 2008) ....................................21

*Mitchell v. City of Tukwila*,
    C12-238RSL, 2013 WL 6631791 (W.D. Wash. Dec. 17, 2013)....................................52

*Morningstar v. Circleville Fire & EMS Dept.*,
    2:15-CV-3077, 2018 WL 3721077 (S.D. Ohio Aug. 6, 2018)...........................2, 3, 35

*Nat.-Immunogenics Corp. v. Newport Tr. Group*,
    SACV1502034JVSJCGX, 2018 WL 6137597 (C.D. Cal. May 16, 2018) ......................24

*Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ..................................................................................................112

*O'Dell v. Hercules, Inc.*,
    904 F. 2d 1194 (8th Cir. 1990) ...................................................................................94

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ....................................................................................................25

*Okuda v. Wyeth*,
    1:04-CV-80 DN, 2012 WL 12337860 (D. Utah July 24, 2012) ..................................52

*Pearce v. E.F. Hutton Group, Inc.*,
    653 F. Supp. 810 (D.D.C. 1987) ................................................................................95

*Pfahler v. Nat'l Latex Prod. Co.*,
    517 F.3d 816 (6th Cir. 2007).........................................................................................7

*Potters Med. Ctr. v. City Hosp. Ass'n*,
    800 F.2d 568 (6th Cir. 1986).......................................................................................22

*PPM Finance, Inc. v. Norandal USA, Inc.*,
    392 F.3d 889 (7th Cir. 2004).......................................................................................61

*Pugh v. City of Attica, Ind.*,
    259 F.3d 619 (7th Cir. 2001).................................................................................61, 62

*Quillen v. Safety-Kleen Sys., Inc.*,
    No. CIV.A. 07-67-EBA, 2010 WL 8357353 (E.D. Ky. May 27, 2010) ........................45

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*,
    2:13-CV-213-JRG-RSP, 2015 WL 627430 (E.D. Tex. Jan. 31, 2015) .........................52

*Reo v. Caribbean Cruise Line, Inc.*,
No. 1:14 CV 1374, 2016 WL 1109042 (N.D. Ohio Mar. 18, 2016) ...........................................68

*Rheinfrank v. Abbott Labs., Inc.*,
No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015) ...............................................115

*Robinson v. Runyon*,
149 F.3d 507 (6th Cir. 1998)......................................................................................................2

*Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*,
2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018).........108

*Rui He v. Rom*,
No. 1:15-CV-1869, 2017 WL 1054814 (N.D. Ohio Mar. 21, 2017).........................................68

*Sara Lee Corp. v. Kraft Foods, Inc.*,
276 F.R.D. 500 (N.D. Ill. 2011) .................................................................................61, 62, 63

*Securities and Exch. Commn. v. Jacobs*,
1:13 CV 1289, 2014 WL 12597832 (N.D. Ohio Feb. 25, 2014) ...................................................3

*Shahid v. City of Detroit*,
889 F.2d 1543 (6th Cir. 1989)..................................................................................................43

*Snyder v. Phelps*,
562 U.S. 443 (2011) .........................................................................................................25, 26

*Sperberg v. Goodyear Tire & Rubber Co.*,
519 F.2d 708 (6th Cir. 1975).................................................................................................2, 49

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
537 U.S. 51 (2002) .........................................................................................................38, 39

*St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*,
1:06CV2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)...............................................2, 3

*Stanton v. Vashinder*,
No. 06-10432, 2009 WL 996955 (E.D. Mich. Apr. 13, 2009) ...................................................21

*State ex rel. Morrison v. Wiener*,
83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) ...............................................................40

*State v. Craig*,
110 Ohio St. 3d 306, 853 N.E.2d 621 (2006) ........................................................................21

*State v. Toudle*,
2013-Ohio-1548.......................................................................................................................21

*Stewart v. Hooters of Am., Inc.,*
No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873 (M.D. Fla. June 18, 2007)...............................69

*Stringer v. N.F.L.,*
749 F. Supp. 2d 680 (S.D. Ohio 2010) ........................................................................17, 73, 83

*Taylor v. AirCo, Inc.,*
CV 02-30014-MAP, 2003 WL 27382684 (D. Mass. Aug. 4, 2003), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003)...................26, 110, 111

*Taylor v. Checkrite, Ltd.,*
627 F. Supp. 415 (S.D. Ohio 1986) ............................................................................. 112, 113

*Taylor v. City of Cincinnati,*
55 N.E.2d 724 (Ohio 1944) .........................................................................................................39

*Telecor Commun., Inc. v. S.W. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) .................................................................................................23

*TJX Companies, Inc. v. Hall,*
2009-Ohio-3372, 183 Ohio App. 3d 236 ................................................................................7, 8

*Tovey v. Nike, Inc.,*
1:12CV446, 2014 WL 3510636 (N.D. Ohio 2014) ....................................................................43

*Tucker v. Union of Needletrades, Indus., & Textile Emps.,*
407 F.3d 784 (6th Cir. 2005).....................................................................................................70

*U.S. Football League v. Natl. Football League,*
634 F. Supp. 1155 (S.D.N.Y. 1986) ...............................................................................29, 30, 31

*U.S. Football League v. Natl. Football League,*
842 F.2d 1335 (2d Cir. 1988) ....................................................................................................30

*U.S. v. Alghazouli,*
517 F.3d 1179 (9th Cir. 2008) ...................................................................................................37

*U.S. v. Boyd,*
640 F.3d 657 (6th Cir. 2011).....................................................................................................97

*U.S. v. Daniel,*
329 F.3d 480 (6th Cir. 2003)......................................................................................................37

*U.S. v. Kerley,*
784 F.3d 327 (6th Cir. 2015)......................................................................................................50

*U.S. v. Lopez-Ortiz,*
736 F. Supp. 2d 469 (D.P.R. 2010) ...........................................................................................88

*U.S. v. Moore*,
  651 F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom.*, *Smith v. U.S.*, 568 U.S. 106 (2013) ................53

*U.S. v. Nixon*,
  694 F.3d 623 (6th Cir. 2012) .........................................................................................53

*U.S. v. Pits*,
  85 F.3d 629, 1996 WL 254655 (6th Cir. 1996) ..........................................................53

*U.S. v. Signer*,
  482 F.2d 394 (6th Cir. 1973) .........................................................................................53

*U.S. v. Smith*,
  70 Fed. Appx. 804 (6th Cir. 2003) ..........................................................................41, 42

*U.S. v. Turning Bear*,
  357 F.3d 730 (8th Cir. 2004) .........................................................................................88

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*,
  111 F.3d 1284 (6th Cir. 1997) .......................................................................................54

*Union Pump Co. v. Centrifugal Tech. Inc.*,
  Nos. 10–30040, 10–30072, 2010 WL 5186616 (5th Cir. Dec. 16, 2010) ....................63

*United Mine Workers of Am. v. Pennington*,
  381 U.S. 657 (1965) .......................................................................................23, 26, 29

*United States v. Amr*,
  132 F. Appx. 632 (6th Cir. 2005) ..................................................................................48

*United States v. Asher*,
  910 F.3d 854 (6th Cir. 2018) .........................................................................................59

*United States v. Fleming*,
  902 F.2d 1570 (6th Cir. 1990) ..................................................................................72, 73

*United States v. Foster*,
  376 F.3d 577 (6th Cir. 2004) ..................................................................................113, 114

*United States v. Fowler*,
  932 F.2d 306 (4th Cir. 1991) .........................................................................................51

*United States v. Gupta*,
  747 F.3d 111 (2d Cir. 2014) .........................................................................................84

*United States v. Midwest Fireworks Mfg. Co.*,
  248 F. 3d 563 (6th Cir. 2001) .......................................................................................94

*United States v. Mohammad*,
    No. 1:10CR389, 2012 WL 4483544 (N.D. Ohio, Sept. 27, 2012) ...............................................73

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ...................................................................................................51

*United States v. Robinson*,
    763 F.2d 778 (6th Cir. 1985) ....................................................................................................84

*United States v. Schrock*,
    855 F.2d 327 (6th Cir. 1988) ....................................................................................................59

*United States v. Smith*,
    550 F.2d 277 (5th Cir. 1977) ....................................................................................................51

*United States v. Valdez-Reyes*,
    No. 03-3737, 2006 WL 126733 (6th Cir. Jan. 18, 2006) ..........................................................50

*Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*,
    68 F. Supp. 3d 917 (N.D. Ill. 2014) .........................................................................................61

*Vystrcil v. Mercy Health*,
    No. 17CV781, 2019 WL 2076035 (N.D. Ohio May 10, 2019) ..................................................70

*Watson Carpet & Floor v. Mohawk Indus.*,
    648 F. 3d 452 (6th Cir. 2011) ...................................................................................................82

*Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*,
    641 F.2d 457 (7th Cir. 1981) ....................................................................................................31

*Widmer v. Warden, Corr. Reception Ctr.*,
    2017 WL 447237 (S.D. Ohio Feb. 2, 2017) ...........................................................................104

*William F. Shea, LLC v. Bonutti Research, Inc.*,
    No. 2:10-CV-615, 2012 WL 5077701 (S.D. Ohio Oct. 18, 2012) .............................................55

*Wise v. Zwicker & Associates, P.C.*,
    780 F.3d 710 (6th Cir. 2015) ....................................................................................................22

*Wolfe v. McNeil-PPC, Inc.*,
    CIV.A. 07-348, 2012 WL 38694 (E.D. Pa. Jan. 9, 2012) ..................................................24, 25

## STATUTES

5 U.S.C. § 551 ...........................................................................................................................22

5 U.S.C. § 552 ...........................................................................................................................22

5 U.S.C. § 553 .................................................................................................................22

5 U.S.C. § 554 .................................................................................................................22

5 U.S.C. § 555 .................................................................................................................22

5 U.S.C. § 556 .................................................................................................................22

5 U.S.C. § 557 .................................................................................................................22

5 U.S.C. § 558 .................................................................................................................22

5 U.S.C. § 559 .................................................................................................................22

18 U.S.C. § 545 ..............................................................................................................37

18 U.S.C. § 1343 ............................................................................................................37

18 U.S.C. § 1961 ............................................................................................................36

21 U.S.C. § 801 .........................................................................................................39, 40

21 U.S.C. § 821 ..............................................................................................................38

21 U.S.C. § 826 ..............................................................................................................22

21 U.S.C. § 843 .................................................................................................36, 37, 39

21 U.S.C. § 871 ..............................................................................................................38

21 U.S.C. § 877 ..............................................................................................................22

OHIO REV. CODE § 313.10 ..............................................................................................21

OHIO REV. CODE § 4729.35 ........................................................................................37, 38

**OTHER AUTHORITIES**

1 CV Ohio Jury Instructions 443.01 ..............................................................................40

1 CV Ohio Jury Instructions 621.05 ..............................................................................39

21 C.F.R. § 1303.11 ........................................................................................................22

21 C.F.R. § 1303.12 ........................................................................................................22

21 C.F.R. § 1303.13 ........................................................................................................22

21 C.F.R. § 1303.31 ........................................................................................................22

21 C.F.R. § 1303.32 ................................................................................................................22

21 C.F.R. § 1303.33 ................................................................................................................22

21 C.F.R. § 1303.34 ................................................................................................................22

21 C.F.R. § 1303.35 ................................................................................................................22

21 C.F.R. § 1303.36 ................................................................................................................22

21 C.F.R. § 1303.37 ................................................................................................................22

21 C.F.R. § 1316.41 ................................................................................................................22

21 C.F.R. § 1316.42 ................................................................................................................22

21 C.F.R. § 1316.43 ................................................................................................................22

21 C.F.R. § 1316.44 ................................................................................................................22

21 C.F.R. § 1316.45 ................................................................................................................22

21 C.F.R. § 1316.46 ................................................................................................................22

21 C.F.R. § 1316.47 ................................................................................................................22

21 C.F.R. § 1316.48 ................................................................................................................22

21 C.F.R. § 1316.49 ................................................................................................................22

21 C.F.R. § 1316.50 ................................................................................................................22

21 C.F.R. § 1316.51 ................................................................................................................22

21 C.F.R. § 1316.52 ................................................................................................................22

21 C.F.R. § 1316.53 ................................................................................................................22

21 C.F.R. § 1316.54 ................................................................................................................22

21 C.F.R. § 1316.55 ................................................................................................................22

21 C.F.R. § 1316.56 ................................................................................................................22

21 C.F.R. § 1316.57 ................................................................................................................22

21 C.F.R. § 1316.58 ................................................................................................................22

21 C.F.R. § 1316.59 ................................................................................................................20

21 C.F.R. § 1316.60 ................................................................................................................22

21 C.F.R. § 1316.61 ................................................................................................................22

21 C.F.R. § 1316.62 ................................................................................................................22

21 C.F.R. § 1316.63 ................................................................................................................22

21 C.F.R. § 1316.64 ................................................................................................................22

21 C.F.R. § 1316.65 ................................................................................................................22

21 C.F.R. § 1316.66 ................................................................................................................22

21 C.F.R. § 1316.67 ................................................................................................................22

21 C.F.R. § 1316.68 ................................................................................................................22

2 MCCORMICK ON EVIDENCE § 214 (7th ed.) ........................................................................46

FED. R. CIV. P. 1 ....................................................................................................................42

FED. R. CIV. P. 26 ................................................................................................10, 11, 19, 20

FED. R. CIV. P. 30 ........................................................................................................... passim

FED. R. CIV. P. 37 ..................................................................................................................11

FED. R. CIV. P. 56 ..................................................................................................................61

FED. R. EVID. 401 ...............................................................................................................2, 58

FED. R. EVID. 402 ........................................................................................................... passim

FED. R. EVID. 403 ........................................................................................................... passim

FED. R. EVID. 404 ................................................................................................................106

FED. R. EVID. 406 ......................................................................................................56, 57, 58

FED. R. EVID. 408 ........................................................................................................... passim

FED. R. EVID. 602 ......................................................................................................60, 61, 75, 79

FED. R. EVID. 613 ................................................................................................................113

FED. R. EVID. 701 ............................................................................................................50, 51

FED. R. EVID. 702 ................................................................................................................50

FED. R. EVID. 704 ................................................................................................................51

FED. R. EVID. 801 ................................................................................................................97

FED. R. EVID. 803 ................................................................................................ 21, 62, 93, 94

https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-
    distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-
    fb56c5522e1c_story.html ..................................................................................... 63, 64

https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-
    federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-
    d7f0e60391e9_story.html ..........................................................................................85

*In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*,
    N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final
    Assessment, pp. 7-8) ..................................................................................................47

RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) ........................................................39

# INTRODUCTION

Plaintiffs submit this omnibus response to the following motions *in limine* filed by Defendants: Omnibus Memorandum of Law in Support of All Track One Bellwether Trial Defendants' Motion in Limine (Dkt. #2661); Omnibus Memorandum of Law in Support of Distributor Defendants' Motions in Limine (Dkt. #2666); Henry Schein Defendants' Motions in Limine (Dkt. #2645); Walgreens' Motions *in Limine* (Dkt. #2648); Cardinal Health Inc.'s Motions *in Limine* (Dkt. #2653); McKesson Corporation's Motion in Limine to Exclude Certain Evidence and Argument (Dkt. #2663); and Teva Defendants' and Actavis Generic Defendants' Omnibus Motion in Limine (Dkt. #2668).[1]  This omnibus response is designed to reduce the documents on this Court's docket and promote brevity.

The MILs proposed by Defendants should be denied.[2]  As a preliminary matter, Plaintiffs are unclear if Defendants have not read this Court's summary judgment rulings, or have simply chosen to ignore them, but many of their MILs seek to re-litigate issues on which they have already lost.  This is not an appropriate use of a motion *in limine*.  Additionally, Defendants' legal and factual arguments in support of exclusion are without merit.  Many of the cases Defendants cite do not even address motions *in limine* or evidentiary issues, and those that do are easily distinguishable.  Defendants do not come close to satisfying their burden to demonstrate that the evidence sought to be excluded is clearly inadmissible on all grounds.  And most of their MILs are overly broad and vague.  Accordingly, Defendants' MILs should be denied and any evidentiary ruling should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context.

---

[1]  All Exhibits referenced herein as are attached to the Appendix in Support of Plaintiffs' Omnibus Response to Defendants' Motions *in Limine*, filed contemporaneously herewith.

[2]  There are two exceptions.  Plaintiffs will agree to the Teva/Actavis Defendants' MIL No. TAD-10.  *Infra* at § G.10.  Additionally, the parties have agreed to stipulate to a modified version of Defendants' Omnibus MIL No. 13 (*infra* at § A.13) and informed Special Master Cohen of this agreement by e-mail on September 30, 2019.

Case: 1:17-md-02804-DAP Doc #: 2815 Filed: 10/14/19 24 of 146. PageID #: 424203

**LEGAL STANDARD**

The Sixth Circuit states: "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).[3] Thus, the Court "has the power to exclude evidence in limine only when evidence is *clearly inadmissible* on all potential grounds." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (emphasis added).[4] Relevant evidence is generally admissible. FED. R. EVID. 402. "Evidence is relevant if: (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401 (emphasis added). This is an " 'extremely liberal' " standard. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)(citation omitted). Courts may exclude relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. To be excluded on prejudice grounds, the evidence cannot just be prejudicial; it must be *unfairly* prejudicial. *Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998). " 'Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.' " *Id.* at 515 (citation omitted). Even when the evidence is "shaky," " 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking' such evidence, not exclusion." *Id.* (citation omitted).

The moving party bears the burden of demonstrating that the evidence sought to be excluded is clearly inadmissible. *See Jordan*, 2010 WL 4281807, at *1 (" 'A court will generally not grant a motion in limine unless the moving party meets its burden of showing that the evidence in

---

[3]    *See also Morningstar v. Circleville Fire & EMS Dept.*, 2:15-CV-3077, 2018 WL 3721077, at *1 (S.D. Ohio Aug. 6, 2018) (same).

[4]    *See also Jordan v. John Soliday Fin. Group, LLC*, 1:09CV0707, 2010 WL 4281807, at *1 (N.D. Ohio Oct. 20, 2010) (same); *St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*, 1:06CV2781, 2009 WL 10689369, at *1 (N.D. Ohio Oct. 23, 2009).

question is clearly inadmissible.' ") (citation omitted). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins.*, 326 F. Supp. 2d at 846.[5] The Court has broad discretion in determining whether to grant or deny a motion *in limine*. *St.-Gobain*, 2009 WL 10689369, at *1 ("Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court.").

Moreover, motions *in limine* are meant to address evidentiary issues; they should not be used to resolve non-evidentiary factual or legal disputes. As the Sixth Circuit explained:

> [A] mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion. Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment.

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). Thus, when a motion *in limine* "is no more than a rephrased summary-judgment motion, the motion should not be considered. *Id.* at 563. *See also Morningstar*, 2018 WL 3721077, at *7 (same).

The fact that the Court denies a motion *in limine* "does not necessarily mean that all evidence contemplated by the motion will be admitted at trial." *Indiana Ins.*, 326 F. Supp. 2d at 846.[6] It simply means that "without the context of trial, the [C]ourt is unable to determine whether the evidence in question should be excluded." *Indiana Ins.*, 326 F. Supp. 2d at 846.[7] The movant may still raise objections to the introduction of the evidence during the trial.[8]

---

[5]  *See also Jordan*, 2010 WL 4281807, at *1 ("If this burden is not met, evidentiary rulings should be deferred and resolved in the context of the trial."); *St.-Gobain*, 2009 WL 10689369, at *1 ("If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in the proper context.").

[6]  *See also Securities and Exch. Commn. v. Jacobs*, 1:13 CV 1289, 2014 WL 12597832, at *2 (N.D. Ohio Feb. 25, 2014); *Jordan*, 2010 WL 4281807, at *1.

[7]  *See also Securities*, 2014 WL 12597832, at *2 ("Where a court denies a motion *in limine*, it is, in essence, a finding that the court cannot determine whether it can exclude the evidence without the context of trial."); *Jordan*, 2010 WL 4281807, at *1.

[8]  *Indiana Ins.*, 326 F. Supp. 2d at 846 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine."); *Jordan*, 2010

# ARGUMENT

**A.    PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661).**

**1.    Defendants' Omnibus MIL No. 1: The Court should not permit Plaintiffs to present evidence or argument to the jury concerning "future damages."**

Defendants seek to exclude evidence of Plaintiffs' future damages on the ground that Plaintiffs failed timely to disclose that they were seeking these damages.  The record shows otherwise:  Plaintiffs specifically identified future damages in their interrogatory responses as a category of damages they were seeking and specifically noted the overlap between their claims for future damages and their claim for abatement.  When Plaintiffs learned that the two remedies would not be tried together, they promptly provided supplemental tables from their previously-disclosed experts, Prof. Jeffrey Liebman and Prof. Thomas McGuire, to separate the two forms of relief, and offered the experts who provided the supplemental tables for additional deposition time.  Under these circumstances, Defendants cannot fairly claim surprise or prejudice to justify exclusion of this evidence.

*i.    Plaintiffs long ago disclosed that they are seeking future damages.*

On November 30, 2018, Plaintiffs served their Second Supplemental Response and Objections to Distributor Defendants' Interrogatory No. 18.  In those responses, Summit County and Cuyahoga County each stated:  "Plaintiff seeks, *inter alia*, damages in the amounts as set forth below, which reflect both past damages from at least 2006 to present, *and future damages for at least 10 years*.  Plaintiff's investigation of both its past and future costs, expenditures, damages, losses or harms caused by Defendants is ongoing. . . ."  *See* **Ex. 1** [Summit Rog Resp.] at p. 6; **Ex. 2** [Cuyahoga Rog Resp]. at p. 7 (emphasis added).  Each response further disclosed:

> To the extent Plaintiff is seeking future damages as set forth above, various components and subparts may either overlap, be a component part of, or be incidental to the equitable remedy sought as part of a comprehensive abatement plan

---

WL 4281807, at *1 (same).

should the Court enter such a plan, including the provision of funds necessary to implement the abatement plan.

**Ex. 1** [Summit Rog Resp.] at p. 8; **Ex. 2** [Cuyahoga Rog Resp.]. at p. 9.  Finally, each response identified by name "the following persons with knowledge of such damages. . . ." *Id.*  Thus, Defendants were informed 11 months before the start of the trial both that Plaintiffs were seeking future damages and that the components of future damages would overlap with the components of any comprehensive abatement plan.  They were also provided with the names of fact witnesses concerning Plaintiffs' damages.

Plaintiffs also timely disclosed expert witnesses concerning damages.  In March 2019, Plaintiffs disclosed their expert reports, including reports from Prof. Jeffrey Liebman and Prof. Thomas McGuire.  Prof. Liebman's report set forth a detailed abatement plan to address the opioid crisis in Summit and Cuyahoga Counties over the period 2020-2034.  Prof. Liebman quantified the cost of the abatement plan, offering the opinion that

> In Cuyahoga, the 15-year costs for the elements of the Abatement Plan evaluated to date range from $3.5 billion to $4.5 billion. In Summit, the 15-year costs range from $1.5 billion to $2.0 billion.

Dkt. #2000-11 (Liebman Expert Rep.) at p. 30.  There was, of course, no doubt that all of this money would be expended in the future.  In the meantime, Prof. Thomas McGuire quantified the past costs of the opioid epidemic, offering the opinion that "[i]n total for both Bellwether governments, damages from 2006 through 2018 range from to $194.4 - $223.4 million." Dkt. #2000-17 (McGuire Expert Report) at p. 7.  Prof. McGuire noted, as well that, "[t]o the extent any Bellwether government seeks damages at trial beyond 2018 attributable to defendants' misconduct, the same methodology set forth herein would be extended to those future years, subject to the assumption that there would be no material changes in the scope and extent of harms."  *Id.* at p. 7 n.12.

Although Defendants focus on the McGuire and Liebman supplemental tables, their motion sweeps more broadly and asks the Court to exclude *all* evidence of future damages.  To the extent that Plaintiffs rely on previously disclosed material, including previously disclosed fact witnesses and

previously disclosed expert testimony, to prove their future damages, there can be no possible claim of surprise or prejudice and no basis to complain about a "trial by ambush." None of this evidence of future damages should be excluded.

       ii.    *Defendants offer no argument to support the exclusion of future damages evidence other than the McGuire and Liebman Supplemental Tables.*

Defendants' entire argument for the exclusion of all evidence pertaining to future damages is based on the purported untimeliness of the McGuire and Liebman supplemental tables. But Plaintiffs have other evidence of future damages, including testimony of fact witnesses and testimony of expert witnesses as disclosed in March 2019. Defendants offer no basis to exclude any of that evidence.

Under Ohio state law (applicable to Plaintiffs' conspiracy and OCPA claims) or federal law (applicable to Plaintiffs' RICO claims), "a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future." *Galayda v. Lake Hosp. Sys., Inc.*, 1994-Ohio-64, 71 Ohio St. 3d 421, 425; *see also Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562, ¶ 57 (Ct. App. 2018); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (future damages recoverable under RICO unless the fact of their accrual is speculative or their amount and nature unprovable). Significantly, however, expert testimony is not required to prove future damages. *See Daniels*, 2018-Ohio-3562, ¶ 56 (*citing Sahrbacker v. Lucerne Prods., Inc.*, 52 Ohio St.3d 179, 179 (1990)). The authorities cited by Defendants do not show otherwise, under Ohio law or federal law; they merely provide illustrations of the potential use of expert testimony to establish the certainty of future damages in particular cases. So long as a jury can find and quantify future damages with the requisite level of certainty, there is no specific requirement of expert testimony.

In this case, Plaintiffs have sufficient evidence, besides the supplemental tables, so that the existence of future damages cannot be found, as a matter of law, to be speculative, nor the amounts unprovable. The testimony of Plaintiffs' addiction experts and of fact witnesses regarding the opioid epidemic in Ohio will sufficiently establish that, in the absence of treatment, opioid abuse problems persist. In light of this testimony, it hardly requires speculation to conclude that the Counties will

continue to incur losses in the future arising from the opioid epidemic. (Indeed, the entire predicate of Plaintiffs' abatement claim is that the nuisance will continue to inflict harm until it is abated.) As for the amount of future damages, that information, too, may be provided by fact witnesses from the Counties with knowledge of how much it costs to provide the services needed address the opioid abuse problem in the Counties. This is especially true because Plaintiffs' claims for future damages are in the alternative, not in addition, to their claim for an abatement remedy.[9] For this reason, the premise of this claim is that there is no abatement plan in place, so the amount of future damages need not account for the kinds of improvements one would expect an abatement plan to produce. And even without their supplemental charts, the expert testimony of Profs. Liebman and McGuire provides sufficient information about the services required to address the opioid crisis, the ongoing need for such services, and the cost of providing them that a jury could with reasonable certainty award future damages based on this information.[10] The McGuire report provides sufficient information for the jury to determine the ongoing damages to be incurred in the future, and the Liebman report provides sufficient information for the jury to identify the overlap between Plaintiffs' future damages and their abatement plan. No more is required. *See Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) ("Damages cannot be speculative, but this only means that the fact of damages, not their amount, cannot be uncertain."); *TJX Companies, Inc. v. Hall*, 2009-Ohio-3372, ¶ 32, 183 Ohio App. 3d 236, 245 ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."). Indeed, "[a] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as

---

[9]   To the extent they are awarded both, Plaintiffs have already recognized a set-off will be necessary to avoid double recovery. *See* Dkt. #2660 (Plaintiffs' Trial Brief) at p. 4.

[10]   The Court has already found that the testimony of Profs. Liebman and McGuire is reliable and admissible. *See* Dkt. #2577 (denying motion to exclude testimony of Prof. McGuire); Dkt. #2519 (denying motion to exclude expert testimony regarding abatement costs).

would otherwise be possible." *TJX Companies*, 2009-Ohio-3372, ¶ 33, 183 Ohio App. 3d at 245; *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (citation and internal quotation marks omitted).

In *Daniels*, the Ohio Court of Appeals held that, although the plaintiff's future damages had to be reduced to present value, the plaintiff was not required to offer expert testimony on that issue. 2018-Ohio-3562, ¶ 57. If a jury can make its own present value computation without expert guidance, so, too, a jury can determine the Counties' future damages from the testimony of the County's employees, the evidence of the ongoing nature of addiction and opioid misuse, the evidence of the costs of addressing the crisis in the past, and the evidence of what it would take to abate the problem going forward. Defendants cannot show that no jury could find the fact of future damages to be reasonably certain or make a reasonable estimate of what those damages will be.

In any event, the issue on this motion is not the sufficiency of Plaintiffs' future damages evidence, but its admissibility. As discussed above, no arguments of prejudice or surprise apply to evidence of future damages as presented by Plaintiffs' fact witnesses or as presented in expert reports that were disclosed in March 2019. Not only were Defendants informed that Plaintiffs would be seeking future damages, they were provided the names of Plaintiffs' fact witnesses with respect to damages and they were provided with the original Liebman and McGuire reports, which included, as noted above, the methodology that would be used to calculate future damages. Plaintiffs may properly rely on this evidence to prove their future damages at trial.

   iii.  *Plaintiffs properly supplemented the expert reports of Profs. Liebman and McGuire to separate future damages from abatement costs.*

Although Plaintiffs believe their fact and original expert evidence is sufficient to establish their future damages, the Counties should also be permitted to present testimony based on the supplemental tables prepared by Profs. Liebman and McGuire. Because Plaintiffs expected to try their legal claims together with their equitable abatement claim, Plaintiffs did not separately quantify their future damages. Rather, Plaintiffs believed that the jury would hear all of the evidence

concerning past damages and abatement, and could then determine all elements of damages based on that evidence. On September 16, 2019, however, the Court suggested that it might bifurcate the trial and hear evidence pertaining to nuisance abatement in a separate proceeding from the trial in which Plaintiffs will present their damages evidence. On September 24, 2019, the Court ordered such bifurcation. *See* Dkt. #2629. Prior to September 16, Plaintiffs had no notice that the Court intended to hear evidence pertaining to legal remedies separately from evidence pertaining to equitable abatement and had not planned to separate the evidence pertaining to those remedies.

At the September 16 conference the Court explained its concerns about allowing Plaintiffs to present their nuisance abatement evidence in same proceeding with the rest of their evidence:

> It seems to me what I am proposing is that a jury decide whether or not any of the Defendants are liable for public nuisance. And that's all the jury will decide with respect to public nuisance. There is not going to be any evidence or testimony about what any relief or abatement would be in the event there is nuisance, how much it would cost, who would do what, whatever.

> We are not going to take the time in the trial for that because the jury isn't going to decide it, and my concern is, it may confuse them, and they may jumble things up and conflate that with past damages.

**Ex. 3** [9/16/19 transcript]. Thus, the Court made clear that the jury could not use the abatement plan to compute future damages or to offset future damages from abatement, because, in order to prevent confusion and prejudice to the Defendants, the full abatement plan would not be presented to the jury.

This change in the trial plan required Plaintiffs to adapt the presentation of their evidence.[11] In order to present their legal damages in a separate proceeding from their equitable abatement plan,

---

[11] Defendants' suggestion that Plaintiffs sought to introduce evidence of future damages only when they learned that the Court, rather than the jury, would be the fact-finder with respect to the amount of the abatement remedy, *see* Dkt. #2661 at pp. 2-3, is entirely unfounded and contradicted by the record. First, as discussed above, Plaintiffs had identified future damages as a component of their damages on their legal claims in November, 2018. Second, Plaintiffs had always assumed that the Court would be the fact-finder with respect to the cost of the abatement remedy. Indeed, in Plaintiffs' Position Statement Regarding a Jury Trial on the Public Nuisance Claim (Dkt. #2598) (a well as in the corrected version of that document, *see* Dkt. #2601), Plaintiffs took the position that "there is no right to a jury trial on a public nuisance claim for abatement." Dkt. #2601 at p. 1. Plaintiffs also stated that they "take no position and defer to the Court's decision as to whether to use an advisory jury regarding that claim." *Id.* Thus, Plaintiffs neither expected nor sought a jury with respect to their nuisance abatement claim. What

on September 30, Plaintiffs provided three supplemental tables to Prof. Liebman's expert report and one supplemental table to the Prof. McGuire's report. *See* **Ex. 4** [supplemental tables]. The supplemental table to the McGuire report presents a computation of damages since the time of his original report as well as future damages,[12] while the supplemental tables to the Liebman report assess the overlap between future damages and abatement. Plaintiffs have offered to provide Profs. Liebman and McGuire for deposition to answer questions about the computations in these tables. Plaintiffs do not seek to introduce new experts or new reports – rather, their "new" evidence consists solely of a single table that projects Plaintiffs' past damages into the future (as Prof. McGuire explained in his March, 2019 report could be done) and three tables that show how future damages can be subtracted from the amount needed for abatement. These tables simply extend the methodologies already found by this Court to be reliable.

Defendants seek specifically to exclude testimony based on these supplemental tables, but their arguments are unpersuasive and should be rejected. Plaintiffs had no advance knowledge that the trial would be bifurcated and thus had no reason to separate their future damages from their abatement plan. Once they learned of the bifurcation plan, they promptly supplemented their experts' reports. Rule 26(e) requires that a party supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . ." FED. R. CIV. P. 26. Here, Plaintiffs learned that their disclosures were incomplete when they learned that, because of the bifurcated structure of the trial, Prof. Liebman's abatement plan could not be presented to the jury for its consideration in assessing future damages. They provided the supplemental tables less than one week after the Court ruled that it would, in fact, bifurcate the trial. This constitutes a timely supplement.

Even if the Court concludes that the supplemental tables were not timely under Rule 26(e), the tables should still not be struck or excluded because any delay was both "substantially justified"

---

Plaintiffs did expect was that all of their damages evidence would be submitted in a single proceeding.

[12] The computations in Prof. McGuire's supplemental table are based on the corrected numbers from his errata, rather than the numbers in his original report.

and also is harmless. *See* FED. R. CIV. P. 37(c)(1). Untimely disclosure does not automatically warrant preclusion. Rather, Rule 37 provides that a party may be precluded from using material that was not timely disclosed "unless the failure was substantially justified or is harmless." Either ground is sufficient, under Rule 37, to preclude the sanction of exclusion Defendants seek, but in this instance, both factors are present.

In assessing whether a late disclosure is substantially justified or harmless, the Sixth Circuit uses a five-factor test: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). All of these factors weigh in favor of admitting the supplemental tables.

First, as discussed above, the surprise to the Defendants is limited because Defendants have known for eleven months that Plaintiffs are seeking future damages and have had other disclosures, including the testimony of fact witnesses and the original disclosures of Profs. Liebman and McGuire on that subject. Second, to the extent Defendants were surprised by the supplemental tables, that surprise can be readily cured by brief pretrial examination of each of the witnesses, limited to questioning about the supplemental tables. Third, the evidence will not disrupt the trial because Prof. McGuire, who provides the future damages information, will testify to the Counties' past damages in any event. The only question is whether he will also be permitted to explain how his past damage numbers may be extrapolated to calculate future damages. Moreover, the supplemental tables do not alter Defendants' overall exposure at trial. The future damages shown on Prof. McGuire's supplemental table are less than the cost of the abatement plan covering the same period and there would be an offset to prevent double recovery. Thus, although the supplemental table permits a jury to identify future damages separate and apart from the cost of abatement, it does not affect the total amount Plaintiffs are seeking to recover. Fourth, the evidence is important because with information from the Liebman abatement plan, the jury may lack sufficient guidance about the nature of future expenditures. Finally, as discussed above, Plaintiffs

have explained the reason for the late disclosure of these supplemental tables. For these reasons, the disclosure of the supplemental tables on September 30 was both substantially justified and, in light of Plaintiffs' offer to provide the witnesses for additional deposition, harmless. Defendants' motion to exclude them should be denied.

> **2.    Defendants' Omnibus MIL No. 2: The Court should preclude Plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

Defendants' Omnibus MIL No. 2 is an improper attempt to sanitize the record of all evidence of individual prescriptions, shipments, or use of prescription opioids. This request sweeps far too broadly by conflating the disputed relevancy of individual prescriptions or shipments to *causation* with the relevancy of the very existence of these prescriptions or shipments. The Court's rulings only limited the former, while also *requiring* Plaintiffs, at Defendants' demand, to either identify individual prescriptions and individuals or to forego presentation of evidence at trial. Plaintiffs identified the prescriptions and produced associated claims data, and this Court confirmed the propriety of Plaintiffs' responses in Discovery Rulings 13 and 18. Defendants cannot now categorically exclude this evidence that they demanded be produced.

The Court's discovery rulings that Defendants rely upon for this request did not prohibit all use of individualized evidence or declare it *per se* irrelevant. Just the opposite, in what Defendants call the "seminal" ruling on this subject, *see* Dkt. #2661 at p. 6, the Special Master ruled that:

> Plaintiffs must now produce all available statistical and aggregate evidence, *and enough supporting particulars* to allow the Court and Defendants and the parties' experts to understand the fundamental bases for those statistics and aggregated data; but Plaintiffs need not produce *all* discovery regarding *every* patient or *every* opioid prescription.
>
> <div align="center">***</div>
>
> Plaintiffs . . . must produce to defendants all relevant aggregated data and statistics. Plaintiffs must also undertake a good faith effort to produce sufficient supporting particularized evidence to allow Defendants and their experts to understand the fundamental bases for these statistics and aggregated data. . . . When Plaintiffs later

> seek *to prove causation or damages at trial . . . Plaintiffs may not rely affirmatively or defensively on any evidence or data they did not produce during discovery.*

Dkt. #606 (Discovery Ruling No. 1) at pp. 4-5 (first and last emphases added; middle emphases in original). This discovery ruling thus both required Plaintiffs to produce some (though not all) individual prescription and shipment evidence and then limited their use of individualized evidence at trial only by holding that they cannot prove causation or damages with evidence not produced during discovery. This ruling is far narrower than the blanket exclusion of individual prescription or shipment evidence Defendants now seek.

And Defendants' request seemingly ignores Plaintiffs' interrogatory responses served during discovery, which were presented to the Special Master at least three times for rulings. In the first ruling, the Special Master ordered Plaintiffs to identify certain medically unnecessary prescriptions and individuals harmed by prescriptions, ruling:

> The plaintiffs' objections are upheld in part, to the extent that plaintiffs do not have to identify **all** prescriptions and **every** person, as requested in the Interrogatories. Rather, the Special Master rules that plaintiffs must respond to the five Interrogatories at issue **as rewritten below**.

Dkt. #1027 (Discovery Ruling No. 5) at pp. 1-2 (emphasis in original). The ruling rewrote the interrogatories to replace the phrase "all prescriptions" with "500 prescriptions," and included other criteria (*e.g.*, 10 prescriptions per manufacturer, etc.). *Id.* at pp. 2-3. Plaintiffs objected to this ruling, and the Court modified it as follows:

> Instead of answering the disputed interrogatories as required by the Discovery Ruling, Plaintiffs may instead elect not to answer them **on the condition** that Plaintiffs instead categorically and affirmatively respond to the disputed interrogatories by stating that: (1) they will not assert, either in expert opinions or factual presentations at trial, that any specific prescriptions 'were unauthorized, medically unnecessary, ineffective, or harmful' or that 'the filling of [any specific prescriptions] caused or led to harm for which [Plaintiffs] seek to recover,' and (2) Plaintiffs instead will rely, at trial and in expert opinions, solely on a theory of aggregate proof.

Dkt. #1047 at pp. 1-2 (emphasis in original) (internal footnote omitted).

Plaintiffs in fact did produce individual prescription evidence pursuant to the Court's Orders and at Defendants' demand, as follows:

1845586.1   13

- Manufacturer Interrogatory No. 6 (*identify 500 prescriptions written in reliance on alleged wrongdoing*): Plaintiffs answered that *all* prescriptions in their respective jurisdictions were influenced by Defendants' deceptive marketing, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 7 (*identify 300 persons who became addicted or were harmed as a result of any opioid prescription*): Plaintiffs identified 300 such persons, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 10 (*identify 500 prescriptions that were unauthorized, medically unnecessary, ineffective, or harmful*): Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 2 (*identify 500 prescriptions alleged to support claims*): Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 3 (*identify 500 prescriptions which caused or led to harm*): Plaintiffs identified 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms.

Dkt. #1058 (Bellwether Plaintiffs' Submission in Response to Discovery Ruling No. 5) at pp. 2-6.[13]

Defendants, having demanded and obtained individual-level prescription evidence from Plaintiffs, cannot now turn tail and preclude all use of such evidence at trial.[14] Nor may Defendants preclude Plaintiffs' use of this evidence on the ground that it is "cherry-picked." Dkt. #2661 at

---

[13]  In late October and mid-November of 2018, Plaintiffs served interrogatory responses that identified prescriptions in response to some, but not all of the interrogatories. Defendants challenged Plaintiffs' responses. On December 22, 2018, the Special Master ordered Plaintiffs to choose between answering all five of the interrogatories fully, or electing not to answer them at all. Dkt. #1215 (Discovery Ruling No. 13) at p. 6. In that same ruling, the Special Master rejected Defendants' complaint that Plaintiffs had not sufficiently identified the alleged misstatements that led to the prescription. *Id.* at p. 7. On December 31, 2018, Plaintiffs amended their responses to identify prescriptions and individuals in response to *all five* interrogatories, in compliance with the Special Master's order. Defendants once again challenged Plaintiffs' response, and the Special Master rejected their challenge in his Discovery Ruling No. 18. Dkt. #1476.

[14]  Plaintiffs also have produced millions of lines of information associated with individual prescriptions. For example, pursuant to the Order Regarding Production of Medical and Pharmacy Claims Data in Track One Cases (Dkt. #1421), Plaintiffs produced claims data for: (i) all individuals who received prescriptions Plaintiffs' identified as "medically unnecessary" in response to the interrogatories; and (ii) all individuals insured through the bellwethers who received an opioid prescription.

pp. 8-9 ("This bar should apply to *all* individualized evidence plaintiffs might offer in these categories, including the limited samples they cherry-picked for disclosure in discovery . . . .") (emphasis in original). The Court specifically ruled in Discovery Ruling No. 5 that Plaintiffs did *not* have to produce *all* prescriptions and identify *every* person in response to Defendants' interrogatories. Moreover, Defendants have subpoenaed insurers seeking production of claims data for all residents of Summit and Cuyahoga counties. Defendants thus already have the information they need.

Similarly, Plaintiffs identified suspicious orders or shipments throughout discovery. Discovery Ruling No. 7 directed Plaintiffs to identify suspicious orders, and Plaintiffs did so. In Discovery Ruling No. 12, the Court rejected Defendants' attempt to compel further answers, but directed Plaintiffs to identify additional suspicious orders, which Plaintiffs did. Further, the expert reports of James Rafalski, Craig McCann, and Lacey Keller all identified suspicious orders and the methodology used to identify the orders. The Court denied Defendants' motions to exclude these expert opinions, and those decisions are dispositive of this issue. Dkt. #2492; Dkt. #2494.

In sum, the Court limited but did not prohibit use of individual-level opioid prescription, shipment, and use evidence and since Plaintiffs produced substantial amounts of this evidence at Defendants' demand, Defendants' Omnibus MIL No. 2 for a categorical exclusion of this type of evidence at trial should be rejected.

**3.    Defendants' Omnibus MIL No. 3: The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.**

Defendants' Omnibus MIL No. 3 is another improper attempt to sanitize the record of evidence of individual-level harms from opioid abuse. Defendants repeat through incorporation their incorrect arguments from MIL No. 2 for exclusion of all individual-level opioid prescription, shipment, and use evidence. Dkt. #2661 at p. 9. The Court should reject these arguments for the same reasons set forth above (*supra* at § A.2), *i.e.*, that the Court's prior rulings did not prohibit all use of individual level opioid prescription, shipment, and use evidence and that Plaintiffs produced

substantial amounts of this evidence at Defendants' demand, thus making categorical exclusion at trial impermissible.

The Court also should reject Defendants' argument that Plaintiffs' attempts to prohibit questioning on certain deponents' or their family members' private medical treatment information prohibits *all* testimony about opioid abuse. Dkt. #2661 at p. 9. The examples Defendants cite where Plaintiffs' counsel instructed witnesses not to answer involved questions about the witnesses' own medical treatment. Dkt. #2661-4 at 260:1-9; Dkt. #2661-5 at 346:24-347:1-2; Dkt. #2661-6 at 181:7-182:5. Defendants acknowledge, however, that they also obtained testimony about some individuals' use of opioids. Dkt. #2661 at p. 9 n.7. Defendants again therefore cannot categorically preclude all use of this type of evidence at trial.

Nor may Defendants obtain a blanket preclusion on "foundational and hearsay grounds." Dkt. #2661 at p. 10. These are context-specific objections that should be raised and ruled upon not in a vacuum, but with respect to particular evidence if and when it is introduced. *See, e.g., Jacobs v. Tricam Industries, Inc.*, 10-11469, 2013 WL 950969, at *2 (E.D. Mich. Mar. 12, 2013) ("[I]t is premature to rule on Plaintiffs' motion prior to Plaintiffs establishing their proofs at trial and before the Court can consider and resolve any evidentiary issues regarding foundation, relevancy, jury confusion, and potential prejudice."); *KCH Services, Inc. v. Vanaire, Inc.*, CIV.A. 05-777-C, 2010 WL 3245243, at *1 (W.D. Ky. June 2, 2010) ("[T]he defendants' motion in limine to exclude documents or require authentication and foundation prior to admission (R. 340) is DENIED as premature.").

Finally, the Court also should reject Defendants' argument that this testimony should be categorically excluded because the witnesses are not parties. Dkt. #2661 at p. 10. A non-party witness may be a source of relevant evidence. *See, e.g., Stringer v. N.F.L.*, 749 F. Supp. 2d 680, 704 (S.D. Ohio 2010) ("[W]here an employee is injured while using a product at work, Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim."). Whether a particular non-party witness's testimony is founded, relevant, and/or fairly or unfairly prejudicial should, again, be raised and decided not in a vacuum, but with

respect to particular evidence if and when it is introduced at trial. *See, e.g., Jacobs*, 2013 WL 950969, at *2; *KCH Services*, 2010 WL 3245243, at *1.[15]

For all of these reasons, the Court should deny Defendants' Omnibus MIL No. 3 as both substantively incorrect and procedurally premature.

### 4. **Defendants' Omnibus MIL No. 4**: The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Defendants, having failed in their attempt to exclude expert testimony about the Gateway Effect, now attempt to exclude the particularly important testimony on that subject from Thomas Gilson, the Cuyahoga County Medical Examiner.[16] However, Defendants' MIL No. 4 completely omits reference to Dr. Gilson's extensive and ground-breaking demonstration of the Gateway Effect with actual data that he reviewed in his official capacity as Medical Examiner. Defendants' arguments, which do not address this important factual evidence, are insufficient to exclude it.

The Gateway Effect, which refers to the transition from prescription opioids to illicit drugs such as heroin/fentanyl, is a widely acknowledged phenomenon in both scientific literature and common understanding. *See, e.g.,* Dkt. #2197 (Plaintiffs' Opp. to Defendants' Gateway *Daubert* Motion). While the Gateway Effect has been a proper subject of scientific literature and may be addressed by expert testimony, as the Court found in denying the Defendants' *Daubert* motion (Dkt. #2518), the admissibility of expert testimony does not render factual testimony on the issue

---

[15] Notably, during discovery, Plaintiffs argued that individual prescription records should not be produced because those individuals were not parties and had not put their treatment at issue or consented to disclosure. Defendants vehemently opposed Plaintiffs' position, and each Defendant sought interrogatory responses, for example, on individuals harmed by opioid prescriptions, which Plaintiffs provided. *Supra* at § A.2. Defendants cannot have it both ways by now seeking to categorically preclude as irrelevant evidence they previously and successfully argued was relevant.

[16] Plaintiffs do not plan to call Jerry Craig, Executive Director of Summit County's Alcohol and Mental Health Board, or Keith Martin, Assistant Special-Agent-in-Charge of the DEA's Cleveland Field Office, to testify in the upcoming trial. Accordingly, Defendants' Omnibus MIL No. 4 is moot as to these witnesses. Plaintiffs note, however, that both of these witnesses appear on Defendants' witness lists. To the extent Defendants call them at trial, these witnesses are certainly permitted to testify as to their factual knowledge arising from their personal experiences and any objections should be assessed in the context of their overall testimony.

irrelevant or inadmissible. Instead, Dr. Gilson's testimony complements and reinforces the opinions of Plaintiffs' experts concerning the pathway from prescription opioids to heroin/fentanyl and provides direct and specific experience of this effect in Cuyahoga County.

On January 14, 2019, Dr. Gilson testified at a deposition in this case. His testimony established that, in his capacity as Medical Examiner, he reviewed Cuyahoga County records that identified heroin/fentanyl as cause of death, and then investigated the Ohio Automated Rx Reporting System (OARRS), a State-wide prescription monitoring database, to determine which of these heroin/fentanyl decedents had prior opioid pain reliever prescriptions. Dr. Gilson "cross-check[ed] our heroin overdoses against the OARRS database," due to a "spike in heroin mortality, and the function of going back to look at that was to firm up, to our satisfaction, that this was in fact, the relationship." Dkt. #2163-2 (1/14/19 Gilson Dep.) at 176:7-177:10. Dr. Gilson testified: "We identified, through our Poison Death Review Committee, through our task forces, that there was a role for the prescription opiates in the subsequent evolution into heroin and fentanyl addiction…" *Id.* at 163:9-164:18. Dr. Gilson and his staff "collected good data to make that association," and, as a result, "We were one of the first counties to recognize is [sic] that *people are going from OPRs [opioid pain relievers] to heroin.*" *Id.* at 170:1-171:12; 173:2-174:3 (emphasis added). At Dr. Gilson's second deposition session on January 22, 2019, defense counsel inquired at length about the OARRS program, and Dr. Gilson reiterated that the OARRS data was used to verify the sequence of prior prescription opioids and subsequent fatal overdoses on heroin or fentanyl.[17] These facts are relevant, admissible, and supportive of the opinions of Plaintiffs' experts, previously found to meet *Daubert* standards by this Court.

Defendants raise a red herring as to whether Dr. Gilson's testimony constitutes "expert" opinion, and further misrepresent his qualifications. Plaintiffs maintain that the testimony referenced above constitutes reliable, relevant *factual* evidence of the transition from OPRs to

---

[17] Dkt. #1977-16 (1/22/19 Gilson Dep.) at 127:5 – 146:8; *see especially*, 132:8-133:4 and 135:1-15 which affirm the use of OARRS data to confirm the factual sequence of opioid pain relievers followed by heroin/fentanyl overdose.

heroin/fentanyl in Cuyahoga County. However, to the extent that qualifications are at issue, Dr. Gilson testified in response to a direct question at his deposition that he is an expert on "the opioid crisis."[18] The fact that he is an expert on this subject in no way impairs the admissibility of his testimony regarding the facts regarding the prior use of opioid prescriptions by heroin/fentanyl decedents. Under Federal Rule of Civil Procedure 26, "[t]he relevant inquiry is the nature of the testimony rather than the status of the witness." FED. R. CIV. P. 26, Commentary; *Jones v. Pramstaller*, No. 1:09-CV-392, 2013 WL 12249827, at *1 (W.D. Mich. Jan. 14, 2013) (holding that where witnesses had both factual and expert knowledge, expert disclosure rules would not apply if the witness would "present eyewitness testimony" rather than expert testimony). Accordingly, "[t]he fact that an individual has expertise does not require him to be disclosed as an expert so long as his testimony is going to be limited to that of a fact witness." *Id.*; *see also Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003) (overturning exclusion of testimony of "fact witness" with specialized knowledge, finding the definition of an expert under Rule 26 "does not encompass a percipient witness who happens to be an expert"). There was no need for an expert report to testify as to factual evidence regarding heroin/fentanyl deaths among OPR users in Cuyahoga County. Nor can Defendants claim unfair surprise, since their own counsel asked whether Dr. Gilson held himself out as an expert on opioids and inquired at length on the very topic they now seek to exclude.

Defendants' changing position as to Dr. Gilson's testimony is particularly ironic. As the Court may recall, Defendants affirmatively cited and relied on an outdated version of Dr. Gilson's views on the Gateway Effect in their misleading reference to his 2014 article stating that "there is a dearth of firm evidence establishing the role of OPR [opioid pain relievers] as a gateway to heroin."

---

[18]  Dkt. #2163-2 (1/14/19 Gilson Dep.) at 103:12-20. Defendants' reference to Dr. Gilson's testimony at his January 22, 2019 deposition is misleading, in that Dr. Gilson was asked only about opioids and their pharmacologic properties, rather than about the "opioid crisis." As to the latter, Dr. Gilson has published articles in scientific journals, and his employment on the opioid crisis would qualify him as an expert. Such expertise is not necessary to admissibility of the factual testimony about the OARRS database/death certificate evidence of prescription opioid use before heroin/fentanyl overdose; nevertheless, it is worth noting that Defendants' motion misstates Dr. Gilson's qualifications and testimony.

Dkt. #1857-1, at pp. 5-6. However, as pointed out in Plaintiffs' Opposition to the *Daubert* motion, Defendants had failed to inform the Court that Dr. Gilson published a follow-up article in 2017, which stated: "While this crisis appears to have its *roots in the overprescribing of opioid pain relievers (OPR)*, more recent years have seen *a transition to illicit drugs*, primarily heroin and fentanyl."[19]  Having cited Dr. Gilson's statements on the Gateway Effect when they believed them to support their position, Defendants are in a poor position to seek to exclude his testimony when it turns out that their earlier reliance was misplaced.

Dr. Gilson's 2017 article also states, "The Cuyahoga County Medical Examiner's Office (CCMEO) has a *statutory responsibility* to investigate all deaths that are unnatural, suspicious, or involve the sudden, unexpected death of a person in apparent good health."[20]  Dr. Gilson's review pursuant to statute confers the status of public records upon the work product of his office. Dr. Gilson also reviewed the official records found in the OARRS, and those records provided data summarized in his article (*id.*), as well as those described in his deposition testimony, above. These reports are official records, and testimony about them is admissible under FED. R. EVID. 803(6) (Records of Regularly Conducted Activity) and/or 803(8) (Official Records).[21]  Dr. Gilson may

---

[19]  Dkt. #2197-29 (T. Gilson, *et al. The Evolution of the Opiate/Opioid Crisis in Cuyahoga County.* Acad. Forensic Pathology) 7:41-49, at p. 42 (2017) (emphasis added); Dkt. #2197 (Plaintiffs' Gateway *Daubert* Opposition Brief) at pp. 20-21.

[20]  Dkt. #2197-29 at p. 42 (emphasis added). "All DRD in our jurisdiction underwent intensive case review and from 2011 through the third quarter of 2016 (with full-year projections where appropriate), cases were analyzed for basic demographic information (i.e., age, gender, race) and residency status (i.e., urban vs. suburban). More recent years (2015 and 2016) were also analyzed for education level and occupation based on death certificate entries for these variables. The more recent DRD were further stratified by lethal intoxicant represented by heroin, fentanyl, cocaine, OPR, and all others. In our earlier study, we used oxycodone data as a surrogate for OPR, as this has been the major driver of OPR trends in our region [citation omitted]. *Id.*

[21]  *See State v. Toudle*, 2013-Ohio-1548, ¶ 20 ("[W]e find that an OARRS report is an official record of the state pharmacy board and is admissible under Evid.R. 803(8)."); OHIO REV. CODE ANN. § 313.10 (designating records of coroners, including medical examiners, as public records, with some exceptions); *Stanton v. Vasbinder*, No. 06-10432, 2009 WL 996955, at *10 (E.D. Mich. Apr. 13, 2009) ("[T]he factual observations in a medical examiner's autopsy report have sufficient 'indicia of reliability' to be admitted as a business record regardless of whether or not the examining pathologist testifies at trial."); *Miles v. Scutt*, No. 07-15068, 2008 WL 2949240, at *4 (E.D. Mich. July 29, 2008) (noting that "autopsy reports are business records" and are therefore admissible); *State v. Craig*, 110 Ohio St. 3d 306, 322, 853 N.E.2d 621, 639 (2006) (same).

testify to the evolution of these reports during the course of his tenure, showing the transition from prescription opioids to illicit heroin/fentanyl, as stated in the records kept pursuant to statute. Supplementing his deposition testimony, Dr. Gilson's article shows that prescription opioid mortality peaked in 2011, and that there was an inflection point from that year forward, in which heroin deaths rose and surpassed the declining numbers of prescription opioid deaths in Cuyahoga County, followed by a fentanyl spike beginning in 2014. Dkt. #2197-29 at p. 43, Figure 1. Dr. Gilson's article cites a trend toward lower numbers of death cases of patients with an opioid prescription within the preceding year, suggesting the possibility that "addicts may be circumventing the previously *well-established progression route from OPR to illicit drugs like heroin and fentanyl*." *Id.* at p. 48 (emphasis added). This progression was "well-established" by the factual data evaluated by Dr. Gilson, as summarized above.

For these reasons, Defendants' Omnibus MIL No. 4 should be denied as to Dr. Gilson, and denied as moot as to Mr. Craig and Mr. Martin.

5. **Defendants' Omnibus MIL No. 5: The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

As a preliminary matter, Plaintiffs dispute the underlying premise of Defendants' argument in support of this MIL (*i.e.*, that the lobbying and petitioning activities at issue in this case are constitutionally protected). It is well-established that neither the First Amendment nor the *Noerr-Pennington* doctrine immunizes fraud.[22] Regardless, Plaintiffs have clearly stated that they are not

---

[22] *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 606, 612 (2003); *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513-15 (1972); *Wise v. Zwicker & Associates, P.C.*, 780 F.3d 710, 719 n.5 (6th Cir. 2015); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986). Defendants claim the fraud exception to *Noerr-Pennington* applies only in the context of an adjudicatory proceeding (Dkt. #2661 at p. 14 n.13). But at least some of Defendants' fraudulent communications with the government were made in an adjudicatory context, such as during enforcement-related proceedings or rulemakings. Additionally, the DEA's quota-setting process is unquestionably adjudicatory in nature, as it conducts public hearings, accepts evidence and argument from interested parties, makes findings of fact and conclusions of law, and its actions are guided by enforceable standards subject to review (21 C.F.R. §§ 1303.11 – 1303.13, 1303.31 – 1303.37, 1316.41 – 1316.68; 5 U.S.C. §§ 551-559; 21 U.S.C. §§ 826, 877). *Cf. Kottle v. N.W. Kidney Centers*, 146 F.3d 1056, 1062 (9th Cir. 1998) ("The CON determination by the Department [of Health] bears many indicia of a true adjudicatory proceeding. The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses. The Department must

attempting "to impose liability upon the Defendants for their lobbying or petitioning activities, nor do [they] argue that these activities were unlawful conduct." Dkt. #2090-1 at p. 3; Dkt. #2562 at p. 6 n.7. Thus, the question of whether or not these activities are constitutionally protected need not be decided here.[23]

Even assuming, *arguendo*, that Defendants' lobbying and petitioning conduct is constitutionally protected such that those activities could not directly give rise to liability, this does not mean evidence of that conduct is inadmissible at trial. Far from it. Rather, the United States Supreme Court, and courts throughout the country, have recognized that such evidence is still relevant and admissible to show the purpose and character of Defendants' wrongful activities. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."); *In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010) ("*Welding Fume II*") (noting that it previously declined to

---

issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case."); *DeLoach v. Philip Morris Companies, Inc.*, 1:00CV01235, 2001 WL 1301221, at *12 (M.D.N.C. July 24, 2001) (no *Noerr-Pennington* immunity for defendants who intentionally submitted false purchase intentions to the USDA that resulted in lower annual tobacco quotas).

[23]   Although Plaintiffs are not seeking to impose liability on Defendants for their petitioning conduct, Plaintiffs do not waive any argument they may have at trial that certain petitioning conduct of Defendants is not constitutionally protected under the First Amendment or the *Noerr-Pennington* doctrine. Plaintiffs also do not concede that the *Noerr-Pennington* doctrine applies outside the antitrust context. Although the Sixth Circuit recognizes that other federal courts have applied the doctrine to common law claims, it has not yet definitively resolved the issue. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (acknowledging other federal courts have applied *Noerr-Pennington* to common law claims, but stating that it "need not decide that issue here because the Workers failed to state such a claim"); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) ("Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine.").

issue a pretrial, blanket ruling excluding all evidence of the defendants' lobbying activities, and in fact had "admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contain[ed] statements directly relevant to issues central to every *Welding Fume* case").[24]  For example, such evidence demonstrates

---

[24]  *See also Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136-39 (10th Cir. 2002) (district court did not abuse its discretion admitting evidence of defendant's misleading statements to Oklahoma Corporation Commission where offered "for the proper purpose of supporting the claim that [the defendant] acted for an improper monopolistic purpose"); *Alexander v. Natl. Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982) ("Exempt conduct may be considered, however, to the extent it tends to show the 'purpose or character' of other, nonexempt activity.  Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative.  While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.") (internal citations omitted); *Cipollone v. Liggett Group, Inc.*, 668 F. Supp. 408, 410-11 (D.N.J. 1987); *Gillis v. Murphy-Brown, LLC*, 7:14-CV-185-BR, 2018 WL 5928010, at *1 (E.D.N.C. Nov. 13, 2018) (noting that the *Noerr-Pennington* doctrine does not operate "in the manner in which defendant seeks to do here—[to] bar otherwise admissible evidence in a state law private nuisance lawsuit"); *In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) ("The Court disagrees that the *Noerr–Pennington* doctrine is applicable.  Nolte does not seek to hold AbbVie *liable* for its alleged petitioning activity; he intends to offer evidence of that activity to demonstrate AbbVie's motive or intent.  There is no general rule that evidence of activity that is protected by the First Amendment—speech, for example—is inadmissible.") (internal citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *15 n.4 (N.D. Cal. Oct. 30, 2017) ("The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. . . .  Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful.  Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2015 WL 8130449, at *1-2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Community Action League v. City of Palmdale*, CV 11-4817 ODW VBKX, 2012 WL 10647285, at *8 (C.D. Cal. Feb. 1, 2012); *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled the exclusion of evidence of two citizen's petitions one defendant submitted to the FDA and noting that the petitions were "relevant to defendants' knowledge regarding the safety of ibuprofen and the adequacy of its labeling"); *Adams v. U.S.*, 03-0049-E-BLW, 2009 WL 1259019, at *2 (D. Idaho May 3, 2009) (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington* because, among other things, such evidence was "relevant to plaintiffs' claims of misbranding and failure to warn, and shows the state of [the defendant's] knowledge which is relevant to many claims"); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, CV 00-1693-PA, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) ("[E]ven if the state lands transaction could not itself have been a basis for liability [under *Noerr-Pennington*], evidence regarding that transaction would likely have been admissible for other purposes, such as showing market share, the extent of any log sources available to competitors, the scope of the relevant market or markets, the manner in which Weyerhaeuser allegedly obtained and maintained its monopoly, the company's motives and intent, and to impeach credibility").

Defendants' knowledge and intent to participate in a RICO enterprise.[25]  For these reasons, courts regularly deny motions *in limine* seeking to preclude evidence of lobbying and petitioning activities.[26]

Moreover, evidence of Defendants' lobbying activities will be particularly probative in this case since Defendants, as they have already indicated, plan to argue that the DEA did not do enough to enforce the law.  Plaintiffs are entitled to rebut this argument with evidence that, for example, Defendants and their trade association (i) lobbied to limit the DEA's enforcement authority, and (ii) influenced their Congressional allies to criticize the DEA in order to undermine the agency's authority and effectiveness.

Defendants' cases do not support granting their *limine* request.  First, they cite *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), for the proposition that "[a]llowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right."  Dkt. #2661 at p. 13.  In *Octane*, which involved the appropriateness of an attorney's fee

---

[25]  *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) ("Plaintiffs are not asserting that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*."); *Nat.-Immunogenics Corp. v. Newport Tr. Group*, SACV1502034JVSJCGX, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) ("While the evidence may ultimately be inadmissible under the Noerr-Pennington doctrine as a basis for liability, it may be admissible for some other purpose such as to show intent to participate in a RICO enterprise, in which case Noerr-Pennington would not be a bar to admissibility.").

[26]  *See, e.g., Welding Fume II*, 2010 WL 7699456, at *93; *In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (denying defendants' motion *in limine* to exclude lobbying evidence; "[T]he plaintiff seeks to offer evidence about how the defendants attempted to influence, petition, or communicate with Congress and/or the FDA to show their knowledge, state of mind, or intent.  It would be a stretch to say that Noerr-Pennington bars any use of any evidence of the defendants' petitioning of the government, and its agencies, or evidence of any communications with the FDA."); *Cipollone*, 668 F. Supp. at 410-11 (denying defendants' motion *in limine* to exclude evidence that defendants provided false and misleading information to Congress; court deferred decision of "whether the specific evidence to be offered is probative of a continuing course of conduct that corroborates plaintiff's direct allegations" until trial so that it could be "decided in context"); *Testosterone*, 2018 WL 305503, at *10 (denying defendant's motion *in limine* to exclude all evidence of defendant's lobbying efforts with the FDA); *Gen. Motors*, 2015 WL 8130449, at *1-2 (denying defendants' motion *in limine* to exclude evidence that it intentionally misled or concealed information from, or tried to influence, NHTSA); *Wolfe*, 2012 WL 38694, at *6 (denying defendants' motion *in limine* to exclude citizen's petitions submitted to the FDA); *Adams*, 2009 WL 1259019, at *2 (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington*).

award in a patent litigation case, the Supreme Court briefly discussed the *Noerr-Pennington* doctrine because the plaintiff had attempted (unsuccessfully) to analogize the standard for baseless litigation under that doctrine with the standard applicable under the Patent Act. 572 U.S. at 548, 555-56. The Court noted that it had "crafted the *Noerr-Pennington* doctrine . . . to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Id.* at 556. The case has absolutely nothing to do with the admissibility of petitioning-related evidence.

Defendants then cite *Snyder v. Phelps*, 562 U.S. 443 (2011), to support their argument that "plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy." Dkt. #2661 at pp. 14-15. But *Snyder* is entirely distinguishable. In that case, the plaintiff asserted various tort claims, including civil conspiracy, against the Westboro Baptist Church and some of its members based on their picketing of a military funeral. 562 U.S. at 447. At trial, the jury found in favor of the plaintiff. *Id.* The Supreme Court affirmed the reversal of the jury's verdict, holding that "the First Amendment shield[ed] the church members from tort liability for their speech in th[at] case." *Id.* at 447, 451-60.[27] Significantly, the defendants' picketing formed the *entire basis* for the plaintiff's tort claims in that case. *Id.* at 447.[28] Because the underlying torts upon which the alleged conspiracy was based failed, the civil conspiracy claim also failed. *Id.* at 460. This case does not address the admissibility of lobbying or petitioning evidence.[29]

---

[27] Notably, the Supreme Court noted that none of the defendants' statements were "provably false[.]" *Id.* at 451. And it also emphasized that its holding was "narrow." *Id.* at 460 ("We are required in First Amendment cases to carefully review the record, and *the reach of our opinion here is limited by the particular facts before us.*") (emphasis added).

[28] In the present case, to the contrary, Plaintiffs' claims are based on Defendants' (i) unlawful marketing and distribution of opioids through fraud and misrepresentation, and (ii) unlawful failure to prevent diversion and failure to monitor for, report, and prevent shipment of suspicious orders of opioids. It is the entirety of that wrongful conduct that forms the basis of Plaintiffs' civil conspiracy claims. *See, e.g., Taylor v. AirCo, Inc.*, CV 02-30014-MAP, 2003 WL 27382684, at *16 n.8 (D. Mass. Aug. 4, 2003) (rejecting defendants' argument that they were immune from liability based on their lobbying efforts under *Noerr-Pennington*; "Plaintiffs do not seek to have liability imposed solely on the basis of lobbying efforts. Rather, Plaintiffs allege 'a continuing course of deceptive conduct of which this activity was just one small part.'"), *report and recommendation adopted*, CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003).

[29] Nor does this case address the *Noerr-Pennington* doctrine at all.

Defendants also claim "the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct[,]" citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157 (6th Cir. 1984) ("*Cleveland II*") and *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257 (N.D. Ohio 1980) ("*Cleveland I*"). Dkt. #2661 at p. 15. Of course neither of these opinions, which arise from the same *antitrust* case,[30] addresses the admissibility of petitioning evidence in cases involving nuisance, RICO, OPCA, or common-law conspiracy claims. Moreover, neither case even stands for the proposition that such evidence is *per se* inadmissible in antitrust cases.

In *Cleveland I*, the City of Cleveland brought an antitrust suit against an electric utility. 538 F. Supp. 1257. There were two trials, the first of which ended in a hung jury. *Cleveland II*, 734 F.2d at 1160. Prior to the second trial, the defendant sought to preclude the plaintiff from "enter[ing] upon a [specific] course of inquiry" in its examination of the "defendant's general attorney, the *sole purpose* of which [wa]s to elicit testimony" that would trigger the introduction of certain *Noerr-Pennington*-protected evidence that the court had *already determined* should be excluded based on the first trial. *Cleveland I*, 538 F. Supp. at 1278 (emphasis added). After noting that the protected conduct of which the plaintiff was seeking to introduce evidence was not relevant to the plaintiff's claims,[31] the court precluded the plaintiff from initiating that course of inquiry unless the defendant opened the door.[32] In other words, the court analyzed specific pieces of evidence of the defendant's *Noerr-Pennington*

---

[30] It is well established that, subject to certain exceptions, petitioning conduct, even if undertaken for anti-competitive purposes, is not sanctionable *under the Sherman Act*. *See Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

[31] *Id.* at 1279 ("In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit *which, the City concedes, did not actually affect the construction of the 69KV intertie*, the plaintiff may not inquire as to activity undertaken by CEI which was merely 'designed' to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection.") (emphasis added).

[32] *Id.* at 1279 ("Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of Noerr-Pennington conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may 'open the door' for the introduction of such conduct, as occurred during the first trial.").

protected conduct, determined that this evidence should be excluded, and then prohibited the plaintiff from questioning a witness in its case-in-chief with the sole purpose of triggering the introduction of the previously-excluded evidence. Contrary to Defendants' assertions otherwise, *Cleveland I* does not support granting Defendants' overly-broad MIL No. 5. In fact, that court explicitly stated that determinations as to the admissibility of petitioning-related evidence *should be deferred until trial*:

> [T]he weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the Noerr-Pennington doctrine, are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

*Id.* at 1265 (internal citations omitted).[33]

Defendants cite *Cleveland II* as affirming the *Cleveland I* decision (Dkt. #2661 at p. 15), but in actuality *Cleveland II* affirmed the district court's judgment on the jury's defense verdict from the second trial. 734 F.2d at 1160, 1169.[34] The plaintiff appealed, arguing, among other things, that the trial judge erred by refusing to admit into evidence information regarding the defendant's secret sponsorship of a lawsuit challenging an order by the Federal Power Commission requiring the defendant to interconnect with the plaintiff's utility company. *Id.* at 1161-62. The plaintiff claimed the evidence demonstrated the defendant's "anticompetitive intent to exclude [the plaintiff's utility

---

[33] The court also recognized that courts are "vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine." *Id.* at 1277.

[34] Defendants also purport to quote certain language from *Cleveland II* in their motion, implying that this was a direct quote by the Sixth Circuit's majority opinion. Dkt. #2661 at p. 15 ("Allowing such questioning would 'gut the constitutional protection afforded under the Noerr-Pennington doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.' *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171."). In fact, this is a direct quote from the district court in *Cleveland I* (538 F. Supp. at 1279), which is then re-quoted in a parenthetical to a citation to *Cleveland I* in the *dissent* to *Cleveland II*. 734 F.2d at 1171.

company] from the retail electric power market." *Id.* at 1161. The district court ruled that the evidence was "inadmissible on the basis of the *Noerr-Pennington* Doctrine." *Id.* at 1161-62. The Sixth Circuit held that the district court had not abused its discretion in excluding the evidence because the conduct was "not the kind of antitrust activity that is admissible to prove a Sherman Act violation" and the plaintiff's purpose in introducing the evidence "was to show the anticompetitive character and nature of [the defendant's] conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers[,]" which was "not an admissible basis for its introduction[.]" *Id.* at 1162-63. The court further noted that the evidence was cumulative because the defendant had already admitted at trial that its objective was "to reduce and *eliminate* competition with its competitor" and the plaintiff had introduced considerable other evidence of the defendant's anti-competitive conduct. *Id.* at 1164. Thus, *Cleveland II,* similar to *Cleveland I*, simply reiterates that the balancing test for whether a particular piece of petitioning-related evidence is admissible requires a fact-specific inquiry that should be deferred until trial.

Defendants' Rule 403 arguments are also without merit. They claim that "evidence of lobbying activity is considered presumptively prejudicial." Dkt. #2661 at p. 15. But the cases they cite for this proposition—all of which, not surprisingly, arise in the antitrust context—are entirely distinguishable. In *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986) ("*U.S. Football I*"), the plaintiffs brought various antitrust claims against the NFL. *Id.* at 1158. The NFL sought summary judgment on certain of these claims that related to the NFL's actions "directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities." *Id.* at 1176. The NFL argued that the stadium-related claims were barred under the *Noerr-Pennington* doctrine because the conduct at issue almost entirely consisted of the NFL's lobbying of state and local governments on issues related to stadium lease approvals. *Id.* at 1177-78. The court held that such conduct could not "give rise to liability under the federal antitrust laws." *Id.* at 1180. It recognized, however, that evidence of stadium-related conduct could potentially be "probative of the 'purpose and character' of the transactions" that formed the basis of some of the

plaintiffs' other claims. *Id.* at 1180 (quoting *Pennington*, 381 U.S. at 670 n.3). And it expressly acknowledged that the admissibility of this evidence should be determined *during the trial*: "Since the admissibility or exclusion of such 'purpose or character' evidence will be within this Court's discretion at trial, *it would be premature to rule on such matters at this time*." *Id.* (internal citation omitted) (emphasis added). Despite this acknowledgement, the court proceeded *in dicta* to make some "preliminary observations" regarding the potential admissibility of such evidence at trial. *Id.* The court emphasized the need to weigh the probative value of the evidence against the risk of undue prejudice. *Id.* at 1180-81. The court noted that the evidence was largely irrelevant to the plaintiffs' remaining claims and had significant evidentiary problems, including that most of it was hearsay. *Id.* at 1181 & n.13. It was during this *dicta* analysis that the court stated: "Given such risks, the exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception *in an antitrust case*." *Id.* at 1181 (emphasis added).[35] But even if the present case was an antitrust case (which it is not), and even if the 33-year-old *dicta* of a district court outside this circuit was binding on this Court (which it is not), *U.S. Football I* does not support granting Defendants' *limine* request. To the contrary, it *reaffirms* Plaintiffs' argument that such determinations should be deferred until trial, where the Court will have the benefit of a developed record in order to analyze whether a specific piece of lobbying-related evidence is admissible. 634 F. Supp. at 1180.

---

[35] In their motion, Defendants cite *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988) ("*U.S. Football II*") as affirming the district court's *U.S. Football I* opinion. Dkt. #2661 at p. 15. In actuality, the Second Circuit's opinion affirmed the district court's denial of the plaintiffs' *post-trial* motions which dealt with issues that arose *during* the trial. *Id.* at 1340-41. In fact, the appellate court noted that the district court's summary judgment ruling "in favor of the NFL on the USFL's stadium-related claims on *Noerr-Pennington* grounds" had "not been appealed." *Id.* at 1350 n.13. The Second Circuit acknowledged that the district judge actually admitted some lobbying evidence at trial, but also held that he had not abused his discretion in excluding certain other lobbying evidence during the trial based on the specific circumstances of that case. *Id.* at 1373-75. Notably, the appellate court did not state that such evidence was "presumptively prejudicial"; rather, it acknowledged that lobbying evidence "may be admitted . . . 'if it tends reasonably to show the purpose and character of the particular transactions under scrutiny,' and that evidence is more probative than prejudicial." *Id.* at 1374 (internal citation omitted); *see also id.* ("Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence.").

In *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), which is also an antitrust case, the court never said lobbying/petitioning evidence is "presumptively prejudicial." Rather, in determining whether the district court properly granted summary judgment on one of the plaintiff's antitrust claims, the Fifth Circuit acknowledged that "[e]vidence of activity that is protected by the Noerr doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defendants." *Id.* at 543 n.7. The court determined that a specific piece of petitioning evidence was inadmissible in that case because "[i]ts evidentiary value to the plaintiff [wa]s far outweighed by the defendants' first amendment interests." *Id.* Specifically, the court found that "the probative value of this evidence [wa]s low" because "[a]s evidence of the alleged conspiracy it [wa]s cumulative" and "[a]s evidence of [the defendant's] state of mind it [wa]s exceedingly weak[.]" *Id.* As with *U.S. Football I*, this case does not support the granting of Defendants' broad *limine* request; rather, it reaffirms that the admissibility of lobbying evidence is a fact-specific inquiry that is best reserved for trial.

Finally, *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) is yet another antitrust case in which the appellate court analyzed whether the district court erroneously declined to consider evidence of the defendants' lobbying activities when deciding whether to grant the defendants' summary judgment motion. *Id.* at 458, 466-67. In *Weit*, the plaintiffs alleged that the defendant banks "conspired to fix the interest rate paid by consumer credit cardholders on extended payments[.]" *Id.* at 548. After *eight years* of discovery, the plaintiffs "failed to produce any significant probative evidence to support the[ir] complaint[,]" leading the district court to grant summary judgment in favor of the defendants. *Id.* On appeal, the plaintiffs argued, among other things, that the district court erred by not considering evidence of the defendants' lobbying efforts to influence the passage of a bill in the legislature that would allow the banks to charge an increased interest rate. *Id.* at 461, 466-67. The district court did not exclude that evidence because the conduct was immunized from antitrust liability under *Noerr-Pennington*, but rather because "the prejudicial quality of this evidence outweighed its probative value." *Id.* at 466. The Seventh Circuit held that the district court "correctly excluded this evidence from consideration on

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id. See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

In fact, there is abundant evidence in the record that the opioids Defendants shipped migrated beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.[37] The Ohio Department of Mental Health and Addiction Services was aware of the migration of opioids into Ohio.[38] Defendants were regularly alerted to the migration phenomenon by the DEA,[39] and their personnel acknowledged the reality of diversion and migration in their depositions.[40] With respect to Walgreens, Plaintiffs' expert James Rafalski opined that Walgreens was familiar with the Florida phenomenon in part because its pharmacy managers alerted their supervisors to the high volume of prescriptions coming from out of state:

> Walgreens's also knew opioids it distributed in Florida were migrating into Ohio. Because Walgreens failed to maintain many pre-2012 documents outside of those produced to the DEA during the Jupiter DC investigation, many of the pre-2012 documents Walgreens produced relate to Walgreens distribution in Florida. This information is highly relevant to CT1, however, because not only does the evidence show that Walgreens's distribution failures were "systemic", as noted by the DEA in the 2013 MOA, but the evidence further shows that Walgreens knew and/or should have known that the high-volume Florida prescriptions were traveling out of state, including to Ohio. For example, Pharmacy managers in Florida alerted their supervisors and the distribution center that they were ordering 55+ bottles a week (where 30 bottles was an admitted red flag) and that many of the prescriptions were coming from out of state. Walgreens was well familiar with the "Florida migration"

---

[37] See, e.g., **Ex. 5** [CAH_MDL_2804_031944472] at p. 118 (vast majority of Florida pain clinic patients came from out-of-state, including Ohio); **Ex. 6** [FTIMDL00039536] (most drug customers travel to Florida from Ohio and elsewhere); **Ex. 7** [HDS_MDL_00455124] (travelers seeking opioids come "by the thousands" to Florida from Ohio and elsewhere); **Ex. 8** [ABDCMDL00360134] at Slide 7(2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to Ohio and other states); **Ex. 9** [MCKMDL00407451] at 465(McKesson presentation depicting "Drug Diversion Migration Out of Florida" to Ohio and elsewhere); **Ex. 10** [WAGMDL00441398—1431] (describing case studies of diverted opioids migrating to Ohio); **Ex. 11** [WAGMDL00049752] at 759 ("this is not just a Florida problem").

[38] See **Ex. 12** [*Ohio Substance Abuse Monitoring Network Surveillance of Drug Abuse Trends in the State of Ohio*, CUYAH_001656831] at 834, 840, 913, 924 (Cleveland region law enforcement and others note influx of prescription opioids from outside Ohio).

[39] See, e.g., **Ex. 13** [CAH_MDL_02448227] at 378—80; **Ex. 14** [US-DEA 00000001 – 141]; **Ex. 15** [WAGMDL00289068] at 153.

[40] See, e.g., Dkt. #1962-24 (8/1/18 Hartle Dep.) at 318:24 – 321:2.

phenomenon, in which prescription opioids were being dispensed in Florida and transported north to states include Ohio, and knew that "Interstate 95 has been renamed the Oxycodone Express because of the brisk travel of people from Kentucky, Tennessee, [and] Ohio to South Florida to obtain medications." When the DEA issued Orders to Show Cause to Walgreens's Jupiter Distribution Center and six Florida Walgreens pharmacies, the DEA specifically noted likely migration to Ohio."

Dkt. #1895-19 (Rafalski Expert Rep.) at p. 121; *see also* Dkt. #1969-19 (5/14/19 Rafalski Dep.) at 552:13-554:6 (testifying as to the basis for his opinion and observing that "by this time period, everybody knew there was a problem in Florida").

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped tens of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them. Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Dkt. #1895-19 (Rafalski Expert Rep.) at pp. 46-186. Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. *See id.* at p. 62 (noting that DEA enforcement actions against Cardinal in Maryland and Florida involved increasing thresholds despite evidence indicating potential diversion, and that these actions identified a systematic problem in Cardinal's nationwide distribution operations); *id.* at p. 79 (observing that the DOJ recognized that there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective

controls against diversion); *id.* at p. 85 (ABDC's settlement with the DOJ arose from failures in its SOM program, which were systematic because ABDC maintained national SOM policies and procedures); *see also, e.g.,* Dkt. #1971-2 (10/16/18 Stahmann Dep.) at 94-96. Because the SOM programs were implemented nationally, not regionally, each suspicious order filled by Defendants is also evidence of the flaws in Defendants' SOM programs, wherever it shipped to. For this reason, as well, Defendants' efforts to exclude this highly probative evidence must be denied.

7. **Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.**

In their Omnibus MIL No. 7, Defendants argue that evidence of their CSA violations is irrelevant because it does not establish certain elements of Plaintiffs' claims. First, that is not true, as discussed in greater detail below.[41] Moreover, Defendants are attempting to use this MIL to re-litigate issues decided on summary judgment, which the Sixth Circuit has held is improper. *See Louzon*, 718 F.3d at 558, 563 (defendant moved *in limine* to exclude plaintiff's "evidence of comparable employees on the basis that none were similarly situated as a matter of law[,]" arguing this evidence was irrelevant to plaintiff's discrimination claims; court held this was an improper motion *in limine*: "[T]his argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings. Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant. Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.").

This Court has determined that whether Defendants violated their duties under the CSA or its implementing regulations must be resolved by the jury in the upcoming trial:

---

[41] And, regardless, "a piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dortch*, 588 F.3d at 401. *See also Morningstar*, 2018 WL 3721077, at *1 (same).

> The Court . . . finds the record is replete with disputes of material fact as to whether each Defendant complied with its obligations under the CSA, which preclude summary judgment. In these circumstances, it is a jury that must determine the credibility of the evidence, the weight to be given to the evidence, and any inferences to be drawn from the facts presented. Put simply, while the Defendants had a duty not to ship suspicious orders, there are disputes of fact as to whether, and when, each Defendant's SOMS was adequate, whether orders were suspicious, and whether each Defendant did actually ship suspicious orders (or instead, identified it as suspicious but then, through due diligence, dispelled that suspicion.

Dkt. #2483 at pp. 20-21 (internal citations omitted). *See also id.* at p. 32 ("[T]he Court finds the record is replete with material factual disputes regarding whether Defendants furnished false information or omitted material information, and, if so, whether they did so knowingly or intentionally."). By arguing that Plaintiffs cannot submit evidence of Defendants' CSA violations at trial, Defendants are effectively seeking to invalidate this Court's summary judgment rulings. This they cannot do.

Additionally, Defendants are simply wrong when they argue that their CSA violations are not relevant to Plaintiffs' claims. They largely reiterate the same erroneous arguments they made on summary judgment. These arguments were refuted in Plaintiffs' summary judgment briefing, which is incorporated by reference as if fully set forth herein. Dkt. #2545 at pp. 68-81; Dkt. #1924 at pp. 20-25. However, a number of their arguments bear some additional discussion here.

For example, Defendants claim that a violation of 21 U.S.C. § 843(a)(4)(A) "based on failure to comply with 'suspicious' order duties" cannot serve as a racketeering predicate act in this case. Dkt. #2661 at pp. 18-19. The Court has rejected this argument numerous times. Dkt. #2580 at p. 3 ("[T]he Court reaffirms its legal conclusion that a violation of 21 U.S.C. § 843(A)(4)(a) can constitute a predicate act under 18 U.S.C. § 1961(1)(D); and the Court further concludes that, at a minimum, Distributors have failed to demonstrate there is no genuine dispute of material fact regarding whether they violated § 842, § 843."); Dkt. #1025 at pp. 45-47; Dkt. 1203.[42]

---

[42] Additionally, Defendants' CSA violations are clearly felonious pursuant to § 841(a) and § 843(a)(4)(A). *See, e,g,* Dkt. #2545 at pp. 73-76.

Defendants also, yet again, argue that a violation of CSA *regulations* is not a violation of law punishable as a crime for purposes of 18 U.S.C. § 1961(1)(D).[43]  But this Court has flatly rejected the argument that the relevant CSA regulations do not have force of law.  Dkt. #2483 at p. 15 ("As a regulation promulgated pursuant to Congressional authority, Section 1301.74 is legislative in nature and has the full force and effect of law.") (citing cases).  Defendants cite *U.S. v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), in support of their argument, but that case is distinguishable.  In *Alghazouli*, which did not involve RICO at all, the court decided whether a regulatory violation satisfied the "contrary to law" requirement in 18 U.S.C. § 545, a statute prohibiting the fraudulent or knowing importation of merchandise "contrary to law[.]"  *Id.* at 1182-83.  After analyzing the statutory history, the court determined "that Congress intended 'law', *as used in § 545*, to include a regulation only if a statute specifies that the violation of that regulation is a crime."  *Id.* at 1187 (emphasis added).  Unlike the statutes at issue in *Alghazouli*, CSA §§ 841 and 843 do not criminalize conduct that is "contrary to law," but rather conduct that violates "this subchapter" (*i.e.*, Subchapter I of the CSA and regulations promulgated thereunder).

Next, Defendants claim that evidence of their CSA violations "does not establish intent to defraud a victim of money or property, as required for mail and wire fraud[,]" citing *U.S. v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003).  The cited portion of *Daniel* simply provides the elements of a wire fraud claim; that case does not involve or discuss violations of the CSA.  329 F.3d at 485.  Defendants' CSA violations are certainly relevant to the issue of intent to defraud.  Defendants intended to induce the medical community and individual patients to purchase more opioids than they otherwise would have purchased "by means of false or fraudulent pretenses, representations, or promises[.]"  18 U.S.C. § 1343; *Daniel*, 329 F.3d at 488 ("It is sufficient that the defendant by material misrepresentations intend the victim to accept a substantial risk that otherwise would not have been taken").  In order to serve that purpose, Defendants violated the CSA and made

---

[43]  They further argue that because these violations are not relevant to establishing RICO predicates, they are not relevant to establishing "corrupt activities" for purposes of OCPA.  Because the violations *are* relevant to establishing RICO predicates, Defendants' OCPA-related arguments also fail.

misrepresentations regarding same. Thus, evidence of Defendants' violations is relevant to Plaintiffs' wire and mail fraud allegations. Of course, even if Defendants' CSA violations were not relevant to their intent to defraud, they are relevant to various elements of Plaintiffs' other claims, as described herein.

Moving on to Plaintiffs' statutory public nuisance claim, Defendants reiterate their argument that CSA regulations do not constitute "laws . . . of the United States of America . . . controlling the distribution of a drug of abuse" for purposes of OHIO REV. CODE § 4729.35. Dkt. #2661 at p. 20. Again, this argument has already been rejected by this Court. *See* Dkt. #2483 at p. 15; Dkt. #2578 at p. 8 ("[T]he Court recently determined that the record demonstrates material issues of fact as to whether each Defendant complied with CSA obligations, and that conclusion applies here. Manufacturers' contention that no violation supporting the statutory nuisance claim has been identified in this litigation is without merit and does not warrant summary judgment.") (internal citation omitted). Defendants now try to argue that the fact that § 4729.35 separately lists "any rule of the board of pharmacy controlling the distribution of a drug of abuse" means that its reference to "laws" cannot be interpreted to include regulations. But "rules" are not the same thing as "regulations." Even the Controlled Substances Act differentiates between the two. *See, e.g.,* 21 U.S.C. § 821 ("The Attorney General is authorized to promulgate rules *and* regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances . . .") (emphasis added); 21 U.S.C. § 871(b) ("The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his function under this subchapter."). Under Defendants' interpretation, violating a "rule of the board of pharmacy controlling the distribution of a drug of abuse" is sufficiently "inimical, harmful, and adverse to the public welfare of the citizens of Ohio . . . to constitute a public nuisance[,]" but violating federal regulations controlling the distribution of a drug of abuse is not.[44] This makes no sense and is not consistent with the purpose of the statute, which is

---

[44] Presumably, if the Ohio legislature intended this interpretation, it could have easily used the word "statutes" instead of "laws."

to penalize "unlawful" distribution of "drug[s] of abuse," such as opioids. OHIO REV. CODE § 4729.35.

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51 (2002), is inapposite. In that case, the Supreme Court was determining whether an express preemption clause in the Federal Boat Safety Act of 1971, which states that it applies to "a [state or local] law or regulation[,]" encompassed common-law claims. *Id.* at 63. The Court determined it did not, reasoning:

> [B]ecause "a word is known by the company it keeps," the terms "law" and "regulation" *used together* in the pre-emption clause indicate that Congress pre-empted only positive enactments. If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render *the express reference to "regulation" in the pre-emption clause* superfluous.

*Id.* (internal citation omitted) (emphasis added).

Defendants next claim that their CSA violations are irrelevant to Plaintiffs' common law absolute public nuisance claims because Plaintiffs are required to prove that Defendants "violated a 'safety statute' " in order to recover on those claims. To begin with, that is not true. Defendants may also be held liable for intentional and unreasonable conduct causing the public nuisance. *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 n.4 (Ohio 2002) ("With an absolute nuisance, the wrongful act is either intentional *or* unlawful . . .") (emphasis added); CV 621.05 Absolute nuisance–intentional acts [Rev. 3-18-02], 1 CV Ohio Jury Instructions 621.05 ("Ohio has recognized that an intentional act can form the basis for an absolute nuisance.").[45] Moreover, the Ohio Supreme Court has clearly stated that violations of statutes *or regulations* involving public health or safety can establish a public nuisance: "[A] 'public nuisance' is 'an unreasonable interference with a right common to the general public.' 'Unreasonable interference' includes . . . conduct that is contrary to a statute, *ordinance or regulation* . . ." *Beretta*, 768 N.E.2d at 1142 (internal citations omitted) (emphasis added); *see also id.* (noting it has "often applied public nuisance laws to actions

---

[45] In *Taylor v. City of Cincinnati*, 55 N.E.2d 724 (Ohio 1944), the Ohio Supreme Court merely stated that the violation of a safety statute is one way to establish an absolute nuisance. *Id.* at 728. But the court also noted that an absolute nuisance can be established when "the actor commits and intentional act involving a culpable wrong." *Id.* at 727.

connected . . . to statutory *or regulatory* violations involving public health or safety") (emphasis added)).[46]  Regardless, Plaintiffs have alleged violations of the CSA itself (*e.g.*, § 841, § 843) in Defendants' failure to maintain effective controls against diversion.  The CSA is clearly a statute setting forth specific legal requirements for the protection of others.  *See* 21 U.S.C. § 801 (in the introductory provisions to the CSA, Congress finds and declares that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people").  Finally, *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198 (Ohio 1998), is entirely inapposite as it addressed negligence *per se* claims, not nuisance claims.  *Id.* at 200-03 (holding "the violation of an administrative rule does not constitute negligence *per se*").

Defendants' CSA violations also are relevant to Plaintiffs' civil conspiracy claims.  In its order denying Defendants' summary judgment motion as to those claims, this Court explained that the "unlawful act" element of civil conspiracy "requires existence of an underlying unlawful act that is actionable in the absence of a conspiracy"[47] and that the unlawful act of any one member of the conspiracy is sufficient to satisfy this element.  Dkt. #2562 at p. 4.  The Court noted that Plaintiffs had alleged "unlawful acts of fraudulent marketing and Defendants' 'near uniform CSA noncompliance[,]' " and held that these issues "present[ed] factual disputes that must be evaluated by a jury."  *Id.*  Defendants' CSA violations are some of the unlawful activities on which Plaintiffs' underlying tort claims are based.  Specifically, these violations form the basis of Plaintiffs' nuisance, RICO, and OPCA claims, all of which are torts separate from the conspiracy itself that Plaintiffs are pursuing against each Defendant.  For that reason, Defendants' cases are inapposite.[48]

---

[46]  *See also* RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) (unreasonable interference with a public right may be shown by "conduct [that] is proscribed by a statute, ordinance, *or administrative regulation*") (emphasis added).

[47]  *See also* CV 443.01 Civil conspiracy [Rev. 12-1-07], 1 CV Ohio Jury Instructions 443.01 ("The unlawful act must be an unlawful act 'independent' of the existence of the conspiracy.  In other words, there must be an underlying unlawful act actionable in the absence of the conspiracy.").

[48]  *See State ex rel. Morrison v. Wiener*, 83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) (granting summary judgment on plaintiffs' civil conspiracy claim because plaintiffs failed to allege any underlying torts

As Defendants' CSA violations are relevant to all of Plaintiffs' claims, Defendants' request for an instruction to the jury as to the limited relevance of this evidence to particular causes of action should be denied. Dkt. #2661 at p. 22. Plaintiffs have no objection to the jury being instructed as to the definition of "suspicious orders" under CSA regulations. *Id.* However there is no basis, and Defendants fail to offer any justification, for "instructing the jury that 'suspicious' orders are not evidence of diversion or likely diversion." *Id.* The very purpose of monitoring for suspicious orders is to prevent diversion. Certainly evidence of an order that was, or should have been, flagged as suspicious is *some* evidence of likely diversion. If Defendants have proof that a particular suspicious order was not diverted, they are certainly able to make such an argument at trial. Defendants' requested instruction seeks to prevent the jury from weighing such evidence and is therefore improper and unwarranted.

Finally, Defendants ask the Court to preclude any testimony "that purports to set out, or opine on, the content of the law, whether on 'suspicious' order duties or any other subject." Dkt. #2661 at p. 22. Presumably, since Defendants request this relief, they will have no objection to Plaintiffs' *limine* request #13, which seeks to preclude "[a]ny argument or suggestion that the [CSA] and its implementing regulations do not impose, or have not always imposed, on registrants an identification duty, reporting duty, and no-shipping duty with respect to suspicious orders[,]" since such argument or suggestion would not only address the content of the law but directly contradict this Court's prior summary judgment rulings. Dkt. #2652 at pp. 10-11. Of course, Plaintiffs' *limine* request identified specific statements regarding the law that should be excluded because they would conflict with the Court's prior rulings. Defendants' request, on the other hand,

---

supporting the conspiracy claim in their complaint and noting that even if the plaintiffs had pled the underlying torts they raised for the first time in their summary judgment response, they failed to meet their burden of pointing to any triable issues of material fact with respect to civil conspiracy based on those underlying torts); *Davis v. Clark Cty. Bd. of Commrs.*, 994 N.E.2d 905, 909-11 (Ohio App. 2d Dist. 2013) (dismissing plaintiff's civil conspiracy claim because the underlying torts on which he based that claim were barred by the statute of limitations); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) (noting that, in that case, the "success of [the plaintiff's tort] claims d[id] not depend upon a determination of whether defendants violated the regulation").

is overly broad, vague, and would encompass all legal conclusions (regardless of whether they conflicted with the law as determined by the Court). Dkt. #2661 at p. 22 ("The Court should therefore exclude any evidence on the meaning of law."). Whether certain testimony or evidence offers an inadmissible legal conclusion depends on the content of such testimony or evidence, and the context in which it is offered. As the Sixth Circuit noted in *U.S. v. Smith*, 70 Fed. Appx. 804 (6th Cir. 2003) (unpublished), when deciding whether testimony containing a legal conclusion should be allowed, " '[t]he best resolution . . . is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' " *Id.* at 809 (citation omitted).[49] Thus, Defendants' blanket *limine* request should be denied.

### 8. Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.

Defendants' request for a hearing prior to the presentation of any expert's testimony should be denied. While a party must establish the necessary foundation for their experts' testimony, pre-testimony hearings are neither required by the Federal Rules of Evidence nor necessary in this case, particularly given the significant resources this Court has already expended ruling on dozens of *Daubert* and summary judgment motions. *Cf.* FED. R. CIV. P. 1 (mandating that the parties and Court refrain from wasting resources).[50] Defendants' proposal would serve only to interrupt the trial and allow Defendants to re-litigate issues which they previously lost.

---

[49] In that case, for example, the court held that a witness's opinion that the firearm at issue "belonged" to the defendant based on its location was admissible in an unlawful possession case. *Id.* ("Though Kurowski twice stated that he believed that the gun belonged to Smith, the term 'belong' does not have a meaning identical to the legal term 'possession' contained in the statute. Moreover, even if Kurowski had used the term "possession," in the present context, there is no distinction between the legal term of art and the common vernacular usage that would render the testimony inadmissible under [Federal] Rule [of Evidence] 704.").

[50] Plaintiffs proposed to stipulate to Defendants' language that: "The Parties shall be required to establish the necessary foundation for their experts' testimony." Defendants declined, instead indicating that for their motion to be mooted, an additional sentence would be required: "Before any expert is called to testify, the opposing side may request a hearing outside the presence of the jury to address whether the requirement has been satisfied." Such an additional mechanism not contemplated by the Federal Rules is not necessary to address Defendants' concerns in this case.

Defendants' cases do not support a different conclusion. Most instead emphasize that expert testimony is liberally admitted before a jury. *See McLean v. 988011 Ontario*, 224 F.3d 797, 806 (6th Cir. 2000) (reviewing a grant of summary judgment finding that the lower court had erred by prohibiting the expert testimony which was "sufficiently rooted in the available evidence to make out a reasonable theory . . . and [] plaintiffs should have been allowed to take their negligence theory to a jury"); *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (applying the *Daubert* standards to the "district court's initial decision to exclude [Plaintiffs expert's] testimony was an abuse of discretion"); *Torey v. Nike, Inc.*, 1:12CV446, 2014 WL 3510636, at *14 (N.D. Ohio 2014) (applying the *Daubert* standards to expert testimony). Given that this Court has already evaluated these experts' qualifications and opinions under the *Daubert* standard, there is no need to predetermine there is a need for a hearing in each case. To the extent such a need arises, if it arises, the Court is more than capable of making that determination during trial.

Another of Defendants' cases, *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989), also supports permitting the court to make this determination at trial and discusses the proper method for objections to testimony based on assumptions not in evidence. The Sixth Circuit found that the district court did not err in excluding prior expert testimony via *videotape* "based on assumptions not in evidence, but rather assumptions based on plaintiff's version of events." *Id.* In doing so, the district court reasoned: "If you were asking these questions at this time there would be objections in terms of foundation or assumes a fact not in evidence, and I would have to sustain that objection, so we have a problem with this testimony." *Id.* Here, Plaintiff's experts will be testifying live and Defendants will have every opportunity to make such objections should Plaintiffs not lay the proper foundation for their expert's testimony.

Defendants also assert a variety of hypothetical arguments that Plaintiffs will ultimately be unable to demonstrate at trial that certain of their expert's assumptions are valid. Setting aside that Defendants are incorrect, what matters for present purposes is the point made above: Plaintiffs either will or will not lay a proper foundation for their experts, just as Defendants either will or will not lay a proper foundation for theirs. Additional hearings are wasteful. Indeed, the Court has

already ruled that any purported assumptions will be properly tested at trial, not that another *Daubert* hearing be held before the expert can testify. *See, e.g.*, Dkt. #2558 at p. 14 (Op. & Order Granting in Part and Denying in Part Mot. to Exclude Kessler and Perri) ("If this is a faulty assumption, as Defendants allege, they will have the opportunity for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack Perri's opinions." (citing *Burgett v. Troy–Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014)); Dkt. #2492, at p. 18 (Op. & Order Denying Mot. to Exclude Keller) ("If the party positing the hypothetical fails to independently prove the facts assumed, the jury is free to disregard the conclusion of the witness." (citing *United States v. McCafferty*, 801 F. Supp. 2d 605, 621 (N.D. Ohio 2011)); Dkt. #2495, at p. 13 (Op. & Order Denying Mot. to Exclude Rosenthal) ("Of course, Defendants are free to challenge Rosenthal's assumption – and Defendants may well convince a jury it is not true that all of defendants' detailing was fraudulent and tainted by misrepresentations – but her central assumption does not render her opinion inadmissible." (citing *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002)).

As noted, in the event Defendants later continue to disagree with a particular expert's testimony, they are able to address it by *inter alia* (i) cross-examination, (ii) their own case-in-chief, (iii) a Rule 50 motion, or (iv) another motion made at trial. The Court is perfectly capable of addressing any issues that may arise at trial without the need for further evidentiary hearings to ensure proper foundation. Defendants' Omnibus MIL No. 8 should be denied.

9.    **Defendants' Omnibus MIL No. 9**: The Court should not allow use of certain charts presenting misleading and irrelevant data.

Defendants seek to exclude certain charts that are attached to Plaintiffs' expert Dr. Craig McCann's report[51] on the basis that they are potentially misleading. But Defendants identify nothing that is actually or inherently misleading about these charts. Each of the points raised by Defendants, that the charts include data relating to shipments outside the CT-1 jurisdictions and/or by non-

---

51    Dkt. #2661 at p. 25 n. 19 (listing the charts Defendants seek to exclude).

defendants, and that charts do not identify specific pharmacies or specific diverted orders, is a matter that Defendants can readily address through objections to any direct examination of Dr. McCann that they believe is misleading and through their own cross-examination. Indeed, Defendants' challenges regarding the purported methodological flaws regarding Dr. McCann's processing of the ARCOS data and Defendants' own transactional data have already been rejected at the *Daubert* phase, with the Court specifically recognizing that Dr. McCann's methodological choices go to weight rather than admissibility, and permitting Defendants to cross-examine Dr. McCann on the choices he made. Dkt. #2494 at pp. 15-21.

The subject charts provide valuable background information in support of Dr. McCann's opinions, including information that Plaintiffs will use to show what orders – based on non-controversial data from ARCOS and Defendants' own production – should have been flagged as suspicious and therefore ultimately caused the harm Defendants are responsible for. Defendants' generalized concerns regarding how this data was analyzed or whether they are an appropriate methodological fit do not warrant their exclusion. *See, e.g., Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008) ("Factual questions should not be resolved through motions in limine."); *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No. 3:10-CV-00670-H, 2013 WL 1403493, at *1 (W.D. Ky. Apr. 5, 2013) (denying motion *in limine* where cross examination would be sufficient to address deficiencies in expert testimony or opinions); *Quillen v. Safety-Kleen Sys., Inc.*, No. CIV.A. 07-67-EBA, 2010 WL 8357353, at *1 (E.D. Ky. May 27, 2010) (denying motion *in limine* where alleged errors in expert opinion could be the subject of cross examination).

**10.** **Defendants' Omnibus MIL No. 10: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.**

As the Court has repeatedly noted, the parties in this litigation are represented by some of the most experienced and accomplished trial attorneys in the country. They all know how to try cases. Defendants' Omnibus MIL No. 10 is an attempt to improperly curtail proper, and long-standing, trial advocacy. Defendants' MIL seeks to preclude, among other things, "ad hoc drawings

or other visual aids during examination of witnesses," alleging that such tactics "belittle" witnesses or "mischaracterize" testimony. This assertion is wrong, and the MIL should be denied.

In the first place, the motion is overly broad and vague, making it practically unenforceable. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) ("The Court finds that the request is too broad and will handle any individual objections at trial."). In *Yasmin*, the court denied two requested motions *in limine* because they were overly broad – one seeking to exclude "all evidence regarding unrelated corporate controversies," and one seeking to exclude "media reports." The court correctly concluded that those matters were better addressed during trial, when the relevance and admissibility of particular items could be more appropriately evaluated.

The same is true here. Lawyers have used visual aids in trial for decades – flip charts, white boards, and presumably chalk boards before those. The "ELMO" document projector is merely the latest iteration of the chalk board. There is nothing inappropriate or unusual about using such visual aids during witness examination. In fact, such aids are very useful in assisting the jury who are trying to follow complex testimony covering subject areas about which they likely have no prior experience. As one authoritative evidence treatise notes,

> It is today increasingly common to encounter the use of demonstrative aids throughout a trial. These aids are offered to illustrate or explain the testimony of witnesses, including experts, or to present a summary or chronology of complex or voluminous documents. Counsel also rely on such aids during opening and closing statements. Demonstrative aids take many forms; the types discussed in this Section are duplicates, models, hand drawn maps, charts, drawings, diagrams, and computer-generated pedagogic aids. *Unlike real evidence, the availability of which will frequently depend upon circumstances beyond counsel's control, opportunities for the use of demonstrative aids are limited only by counsel's ingenuity and ability to generate them. The potential of these aids for giving clarity and adding interest to spoken statements has brought about their widespread use, which will undoubtedly continue in the future.*

§ 214.Demonstrative aids, 2 MCCORMICK ON EVIDENCE § 214 (7th ed.). Defendants should be required to make specific and timely objections during trial, where the Court can rule on them in context rather than based on non-specific hypotheticals.

This MIL also attempts to impugn Mr. Lanier regarding evidence that a long-serving and well-regarded federal district judge determined was admissible to rebut misleading evidence adduced by the defendants in the trial. The court of appeals disagreed with the district court's evidentiary rulings, but that is no reflection on Mr. Lanier. The opinion omits the fact that the challenged evidence was only introduced after a series of lengthy sidebar discussions with the district court about whether the evidence should be admitted. As the court of appeals' opinion observes, "[t]he *district court* admitted several pieces of inflammatory character evidence against defendants— including claims of race discrimination and bribes to Saddam Hussein's Iraqi 'regime'—reasoning the defendants had 'opened the door' by repeatedly presenting themselves as 'wonderful people doing wonderful things.'" *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 764 (5th Cir. 2018) (emphasis added).

This portion of Defendants' Omnibus MIL is also too vague to be enforced. Every trial is unique. Even in the Pinnacle Hip Implant MDL, where the MDL court tried four lengthy bellwether trials (and started a fifth), each trial was different and the evidence that was admitted varied depending on the circumstances. Significantly, that court also explicitly recognized the high caliber of the plaintiffs' counsel's legal representation in that MDL. *See In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*, N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final Assessment, pp. 7-8) ("The skill requisite to perform the legal services properly was exceptional. Defendants were ably represented by multi-national law firms. At one point, Defendants asserted they had 50 lawyers working on this case. To fight Defendants to a draw—or, in reality, better—Plaintiffs' legal skill was readily apparent to even a casual observer."). Defendants' Omnibus MIL effectively could be read as requesting that Plaintiffs be precluded from doing anything at trial that could constitute reversible error. That is not the purpose of a motion *in limine*.

Next, the portion of this MIL regarding "references to unrelated bad acts" should be denied for the same reasons expressed by the court in *Yasmin*:

> Bayer asks that the Court prohibit any and all evidence regarding unrelated corporate controversies. Plaintiff counters, arguing that while most of the disputed controversies are likely irrelevant, the request is overbroad, vague, and not capable of enforcement.
>
> The Court could just as easily grant this motion because the request incorporates the language "unrelated." Thus, it would presume that the Court is only precluding that which is irrelevant. However, relevance is in the eye of the beholder. So while the Eli Lily example provided by the plaintiff in her response is in her view relevant, Bayer undoubtedly would disagree. The Court finds that the request is too broad and will handle any individual objections at trial.

*Yasmin*, 2011 WL 6740391, at *12.

With regard to "Golden Rule" arguments, Plaintiffs have no intention of making such arguments, and in fact agreed to a more specifically worded MIL proposed by Defendants that precludes "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers." *See infra* at § A.13.

In sum, Defendants' Omnibus MIL No. 10 should be denied because it is overly broad and vague, and the items which it seeks to exclude can only be properly considered in the context of the trial.

**11.    Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability.**

Defendants seek to exclude evidence about "defendants' overall financial condition, assets, revenues, or profitability." This motion is overbroad. Plaintiffs agree that they will not seek to introduce evidence of Defendants' overall financial condition or assets, as they are not seeking punitive damages, and neither RICO trebling nor OCPA trebling, which Plaintiffs do seek, depends on the defendant's ability to pay. But the request to exclude evidence of revenues and profitability stands on a different footing. Plaintiffs should be permitted to introduce and refer to evidence of the revenues and profits Defendants earned *from their opioid sales.* Evidence of profits earned from the conduct at issue is admissible to show the defendants' motive for engaging in that conduct. *See United States v. Amr*, 132 F. App'x 632, 635 (6th Cir. 2005); *Doe v. United States*, 253 F.3d 256, 269 (6th Cir. 2001). The evidence is probative of Defendants' willingness to engage in illegal conduct, and

thus of the likelihood that they did. Neither the jury nor the Court can properly assess whether, or understand how, Defendants could engage in the callous conduct at issue, involving indiscriminate dissemination of addictive drugs, without understanding the profits that were at stake. This evidence also shows the extent to which Defendants had the resources from their opioid business to design and maintain appropriate suspicious order monitoring and due diligence systems. It is thus probative of the extent to which their failure to do so was a deliberate choice, rather than reflecting, for example, a lack of resources. Because evidence of Defendants' opioid profits is highly relevant to both motive and intent, it should be not excluded.

12. **Defendants' Omnibus MIL No. 12**: The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.

Defendants seek to preclude witness testimony concerning "personal feelings of personal responsibility or guilt relating to the opioid epidemic or their opinions about whether they or their employers violated legal requirements." Dkt. #2661 at p. 34. This request should be denied because it is vague, overbroad, and devoid of any specific context.

Defendants complain that "counsel for plaintiffs often asked" witnesses about their personal beliefs in depositions, yet fail to identify any examples of testimony they claim should be excluded. In the absence of specifically identified testimony, the Court cannot properly assess the potential relevance or prejudice of the evidence. *See Jackson v. O'Reilly Auto. Stores, Inc.*, 131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ("[W]e are unable to resolve Plaintiff's motion because he has not identified any particular piece of evidence that should be excluded. As a result, we cannot assess the likely relevancy or prejudice of the challenged evidence.").

Defendants' motion is also vague and overbroad. Terms such as "personal feelings" and "responsibility" could conceivably encompass a vast array of testimony, and Defendants' broad reference to those terms does little to provide the Court with any specific context upon which to base its rulings. *See Sperberg*, 519 F.2d at 712 ("Orders in limine which exclude broad categories of evidence should rarely be employed."). Without providing some minimal context for their motion

to exclude this broad category of testimony, Defendants are asking this Court to blindly exclude such evidence.

Further, the Court "has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.* Defendants cannot satisfy that standard here.

To the extent Plaintiffs can offer a response to Defendants' motion as it is presented, "testimony from individual witnesses affiliated with defendants" concerning their personal perception of their own or their employers' "responsibilities" is not inherently irrelevant or prejudicial. Such testimony would certainly be probative and relevant to central issues in this case, such as notice, standard of care, and causation. Defendants cite no case law supporting exclusion of the testimony under Rule 403, and they have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice.

Additionally, Defendants cannot show that such testimony is "clearly inadmissible" under Rule 701. *See Indiana Ins.*, 326 F. Supp. 2d at 846. Rule 701 permits lay witness testimony if it is rationally based on the witness's perception, helps the factfinder to understand the witness's testimony or to determine a fact in issue, and does not depend on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. 701. In applying Rule 701, "the modern trend among courts favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *United States v. Valdez-Reyes*, No. 03-3737, 2006 WL 126733, *4 (6th Cir. Jan. 18, 2006) (internal quotation marks and citation omitted). The Sixth Circuit has established that lay opinion testimony is proper where it is drawn from the witness's personal knowledge and experience gained through employment. *See U.S. v. Kerley*, 784 F.3d 327, 337-39 (6th Cir. 2015). Such testimony includes a witness's personal knowledge of his or her employer's policies and procedures, as well as the witness's experience in applying those procedures. *See id.* at 338.

Here, there can be no doubt that testimony regarding "personal feelings" is susceptible of firsthand knowledge. Witnesses affiliated with Defendants possess particularized knowledge about their own or their employers' policies and procedures by virtue of their employment. *See* FED. R. EVID. 701 adv. comm. note ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."). Because those procedures and policies are a central issue in this case, such testimony would facilitate understanding of a factual issue. Indeed, lay opinion testimony is particularly helpful "when the inference of knowledge is based on . . . such factors as the defendant's history or job experience." *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). *See also, e.g.*, *United States v. Fowler*, 932 F.2d 306, 312 (4th Cir. 1991) (permitting Department of Defense officials to opine that a person with defendant's experience in the department would know rules forbidding giving certain documents to contractors); *United States v. Smith*, 550 F.2d 277, 281 (5th Cir. 1977) (allowing witness to testify to her belief that defendant who ran federally funded program understood certain federal regulations).

Finally, Defendants argue that such testimony impermissibly amounts to a legal conclusion and addresses an ultimate issue. Again, the absence of specifically identified testimony precludes a proper assessment of the testimony. Nevertheless, lay witnesses may testify as to their personal perception about certain responsibilities and procedures. Rather than constituting a legal conclusion, such testimony will provide factual information that will aid the factfinder in determining the ultimate legal issues in this case. Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704.[52]

In sum, determinations regarding the admissibility of particular testimony are best left for trial, once such testimony has been identified and the purpose for which it is offered has been explained. If Defendants have an objection to specific deposition testimony that Plaintiffs have

---

[52] Defendants cite several cases for the general proposition that lay opinion on an ultimate issue must be helpful to the trier of fact. As explained above, the testimony Defendants challenge would facilitate understanding of a factual issue and is admissible under Rule 701.

designated for trial, it is appropriate for Defendants to object to that testimony in accordance with the Court's instructions. That would provide the appropriate context for the Court to make a specific evidentiary ruling.

> 13. **Defendants' Omnibus MIL No. 13**: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.

The parties conferred regarding this MIL and agreed to stipulate to a modified version. Specifically, both sides have agreed not to make "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers" in the presence of the jury.

> 14. **Defendants' Omnibus MIL No. 14**: The Court should preclude any comment regarding the absence of a corporate representative at trial.

Defendants' Omnibus MIL No. 14 should be denied because it is overbroad and premature. Whether or not a particular witness's absence is relevant depends on who the witness is and the relevant circumstances. This analysis should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context. For this reason, courts regularly deny similar motions *in limine*. *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 2:13-CV-213-JRG-RSP, 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying defendant's motion to exclude reference to the absence of any its witnesses at trial); *Yasmin*, 2011 WL 6740391, at *11 ("The Court concludes, if no corporate representative is present at counsel table, said absence is fodder for comment by plaintiff since it is customary for such a person to be present. Certainly, if plaintiff was never present in the court room Bayer would feel compelled to comment. There are circumstances when a missing witness instruction is appropriate and that will not be precluded prior to trial.").[53]

---

[53] *See also Mitchell v. City of Tukwila*, C12-238RSL, 2013 WL 6631791, at *4 (W.D. Wash. Dec. 17, 2013) (denying plaintiff's motion *in limine* to preclude arguments "regarding the absence of specific witness testimony"; "[T]he parties will be allowed to present arguments regarding the absence of evidence. Whether the parties will be permitted to argue why certain witnesses have not testified cannot be determined in the absence of information regarding particular witnesses and the evidence presented at trial."); *Okuda v. Wyeth*, 1:04-CV-80 DN, 2012 WL 12337860, at *3 (D. Utah July 24, 2012) (denying defendants' motion *in limine* to preclude plaintiff "from making any reference to the absence of a corporate representative for [d]efendants at trial"; "The presence or absence of a corporate representative (or a fact witness) is not evidence but is a fact of the procedure of trial. It may

Significantly, not one of the cases cited by Defendants involved references to the absence of corporate representatives, or even motions *in limine*. *See U.S. v. Nixon*, 694 F.3d 623, 635-36 (6th Cir. 2012) (district court did not err in excluding the testimony of a witness in a criminal trial because that testimony was irrelevant); *U.S. v. Signer*, 482 F.2d 394, 398-400 (6th Cir. 1973) (in criminal trial for attempted income tax evasion and for making and signing false income tax returns, prosecutor's opening and closing arguments suggesting defendant committed a crime for which he was not on trial constituted reversible error); *U.S. v. Pits*, 85 F.3d 629, 1996 WL 254655, at *1 (6th Cir. 1996) (district court did not abuse its discretion in sustaining objections to statements made by defense counsel in his opening statement about the defendant regarding irrelevant matters, including that she is the mother of two small children, lived with her mother, had never before been arrested, and only recently learned the identity of her father); *U.S. v. Moore*, 651 F.3d 30, 51-55 (D.C. Cir. 2011) (addressing whether prosecutor committed prosecutorial misconduct during his opening and closing arguments in a criminal trial; although prosecutor crossed the line on several occasions, "the misconduct did not impermissibly and prejudicially interfere with the jury's ability to assess the evidence"), *aff'd in part sub nom. on other grounds*, *Smith v. U.S.*, 568 U.S. 106 (2013).

Because the factual circumstances of the absence of the specific witness should be considered, this category is not appropriate for a motion *in limine* and should be handled by individual objections during trial.[54] Defendants' Omnibus MIL No. 14 should be denied.

---

be argued, and counter-argument may be made."); *Mascarenas v. Cooper Tire & Rubber Co.*, CV208-009, 2010 WL 11534359, at *10 (S.D. Ga. Jan. 11, 2010) (denying defendant's motion to exclude "any reference to the fact that it may not have a representative at trial at any particular time or to [the defendant's] choice of its corporate representative not being the appropriate person to respond to Plaintiffs' allegations").

[54] The risk of unfair prejudice is particularly low with respect to any such references made by Plaintiffs' counsel. What an attorney says is not evidence and the jury will be instructed accordingly. *Moore*, 651 F.3d at 54. If Defendants believe any additional instruction is necessary with respect to a particular reference made at trial, they should request it at that time, so the Court will have the full context necessary to decide their request.

**B.** **PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666).**

1. <u>**Distributors' MIL No. D-1**</u>: **The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia.**

Defendants have filed several motions *in limine* that seek to exclude evidence regarding their resolution of various enforcement actions taken by federal and state governments. The arguments asserted by Defendants in these MILs are very similar, so rather than repeat them in response to each MIL, Plaintiffs will address the legal standards and argument regarding these topics once, and will refer back to this argument on the specific points. If any specific additional information is necessary in response to a particular MIL, that will be addressed separately.

The argument and legal standards addressed here are applicable to the following MILs:

- Dkt. #2666 –Distributors' MIL No. D-1: Distributor settlements with the DEA and West Virginia.

- Dkt. #2645 – Henry Schein MIL Nos. HS-9 and HS-10: DEA fines, investigations, and Ohio Board of Pharmacy cease and desist letter (*infra* at § C.9-10).

- Dkt. #2648 – Walgreens' MIL No. W-2: DEA enforcement action and related settlement with Walgreens (*infra* at § D.2).

- Dkt. #2663-1 – McKesson MIL No. MCK-4: Allegations contained in letters from the DEA and DOJ to McKesson (*infra* at § F.4).

- Dkt. #2668-1 – Teva MIL No. TAD-1: Cephalon misdemeanor off-label promotion plea agreement (*infra* at § G.1).

- Dkt. #2668-1 – Teva MIL No. TAD-3: Cephalon settlement with DOJ (*infra* at § G.3).

<u>**The agreements are not precluded by Rule 408.**</u> Federal Rule of Evidence 408 generally prohibits the use of evidence of statements or conduct to compromise a claim "to prove or disprove the validity or amount of a disputed claim." However, "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, *not some other claim.*" *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (citing Wright, et al., FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5314, 5308 (1st ed. 1980)

(internal citations omitted, emphasis added); *see also Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 501 (6th Cir. 2017).  So Rule 408 does not even apply to the evidence Defendants seek to exclude, since that evidence does not involve the specific claims asserted by Cuyahoga and Summit Counties in this case.[55]

Moreover, even when Rule 408 applies, evidence of settlements *is* admissible where it is offered for "another purpose," such as "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R. EVID. 408(b).  The burden of establishing the application of Rule 408 is on the party invoking its protection. *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-CV-615, 2012 WL 5077701, at *5 (S.D. Ohio Oct. 18, 2012).

Rule 408 is therefore "not a blanket rule that wholly precludes the consideration of settlement discussions." *Homoki v. Rivers Edge Tree Stands*, No. 1:12-CV-2926, 2012 WL 6631043, at *2 (N.D. Ohio Dec. 19, 2012).  Instead, "evidence of such discussions may be admitted for any purpose not specifically excluded by the Rule." *Id.*  As the rule makes clear, a settlement may be admissible where "it is offered for a purpose other than to prove liability or disprove a claim." *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *54 (S.D. Ohio Feb. 17, 2016).  Accordingly, "the principal inquiry that determines whether Rule 408 bars introduction of evidence of [this evidence] must be toward the purpose for which the evidence is being offered." *McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013).

The Sixth Circuit and Ohio district courts have recognized several purposes allowing for the admission of settlement evidence.  One such purpose is establishing a party's knowledge or notice of potential harm.  *See E.I Du Pont*, 2016 WL 659112, at *54 (consent decree was properly admitted when it was offered "as evidence of [Defendant] DuPont's knowledge and/or notice of C-8's

---

[55]  This is also plain from the language of the rule, which repeatedly references "prov[ing] or disprov[ing] the validity or amount of **a** disputed claim" by offering evidence of conduct that occurred while attempting to resolve "**the** claim."  *See* FED. R. EVID. 408(a)(1) and (2) (emphasis added).

potential for harm, not as evidence that DuPont acted negligently"). In this case, the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate and were likely to cause harm – not just in the specific locations where the enforcement actions focused, but throughout the country. That is particularly true in this case, where Defendants have claimed that they lacked understanding of their legal duties.

Another permissible purpose is to prove a party's state of mind. *See Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 519 (6th Cir. 2008) ("settlement evidence was not offered as a defense to plaintiff's negligence claims against BMW, but instead was offered to show the state of mind of the witnesses"); *McAuliffe*, 514 F. App'x at 549-50 ("It is plain from the record that the contents of the conversation were not offered in McAuliffe's criminal trial to prove the liability of either one in the civil dispute or the amount of those claims. Instead, the evidence was offered for the other purpose of showing McAuliffe's knowledge of and participation in illegal acts—in other words, his state of mind, which Rule 408 allows.").

With regard to Plaintiffs' nuisance claims, the Court identified as disputed issues of fact for trial in its rulings on the parties' motions for summary judgment: (1) whether a public nuisance exists (Dkt. #2572 at p. 4); (2) whether the opioid epidemic interferes with public health and public safety rights (Dkt. #2578 at p. 4); (3) whether Defendants' conduct substantially contributed to Plaintiffs' injuries (*id.* at p. 5); and (4) whether Defendants' conduct was intentional or unlawful (*id.* at pp. 5-7). The enforcement actions demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time, which goes to the heart of Plaintiffs' claims.

**The agreements are admissible under Rule 406.** Evidence of "an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice" is admissible. FED. R. EVID. 406; *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*, 401 F. Supp. 2d 813, 818 (N.D. Ohio 2005) (finding the evidence of performing inspections and "observations made during the inspections, [are] admissible under Fed. R. Evid. 406 as proof of habit or routine practice"). "Rule 406 evidence must rest on an analysis of instances numerous

enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation." *Bell v. Consol. Rail Corp.*, 299 F. Supp. 2d 795, 800 (N.D. Ohio 2004) (internal citations and quotations omitted). Courts may consider three elements to determine whether the organization's routine practice is admissible under Rule 406: (1) whether "it is unlikely that the individual instance can be recalled or the person who performed it can be located," (2) whether the "specific conduct … is engaged in frequently by the group," and (3) whether "the number of instances of such behavior [is] large enough that doubt about a single instance does not destroy the inference that the practice existed." *Martin v. Thrifty Rent A Car*, 145 F.3d 1332 (6th Cir. 1998).

Defendants' conduct that forms the bases of the DEA/DOJ agreements occurred "with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Bell*, 299 F. Supp. 2d at 800. The agreements and related documents establish that Defendants engaged in "systematic, particularized, and repetitive conduct" by selling prescription opioids without proper, effective controls to prevent diversion and to identify, report, and stop shipment of suspicious orders. As the agreements describe, the temporal and geographic scope of this systematic conduct (covering millions of transactions) was so extensive that it cannot be evaluated by a singular instance, nor can a single instance destroy the inference that this was a routine practice.

Both Cardinal Health and McKesson agreed to pay significant fines in 2008 relating to their failure to comply with their obligations under the Controlled Substances Act. Despite agreeing to comply with those obligations, both companies continued to ignore them and were the subject of later enforcement actions by the federal government roughly a decade later, reflecting their persistent failure to conform their conduct to the law. In connection with those later enforcement actions, Cardinal and McKesson acknowledged that they had not lived up to their prior agreements. This history of repeated violations of their legal duties shows that Defendants' violations were not the result of mere oversight, but reflected Defendants' intentional and ongoing business practices.

As a result, the agreements are admissible under Rule 406 because they prove Defendants acted in accordance with their routine practice.

**The agreements are relevant.**  Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  FED. R. EVID. 401.  Generally, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible."  FED. R. EVID. 402.

Defendants' meritless relevance arguments are wholly divorced from an analysis of the substantive law governing the claims and defenses at issue.  The DEA/DOJ agreements are relevant evidence for several claims at issue.  For instance, as part of Plaintiffs' RICO and Ohio Corrupt Practices Act (OCPA) claims against McKesson, Cardinal, and AmerisourceBergen, Plaintiffs seek to establish that these Defendants formed and operated an opioid supply chain to expand their sales of prescription opioids through repeated violations of the CSA.  Defendants failed to maintain effective controls to prevent diversion and filled suspicious orders for opioids.  The DEA/DOJ agreements describe investigations and findings by the DEA and the DOJ concerning the same violations alleged here.  The agreements also describe the multiple suspension orders and ISOs which provided notice to Defendants that their suspicious order systems were ineffective and were being abused.

Evidence regarding Defendants' repeated violations of their duties under the CSA demonstrates that Defendants continued the conduct in the face of confirmed proof that such conduct was contributing to the opioid epidemic.  These agreements are therefore relevant to establish Defendants' RICO and OCPA violations.

Distributor Defendants argue that the settlement agreements are not relevant because some of them "disclaim any admission or concession of liability," and even those that contain "narrow admissions" do not implicate the distribution of opioids into Summit and Cuyahoga Counties.  Dkt. # 2666 at p. 5.  Defendants therefore attempt to cabin the relevance of the agreements to the distribution centers at issue there.  Yet, the agreements make it clear that they apply to all (or at least most) distribution centers.  The McKesson 2017 Agreement, for example, expressly states that

"[t]his Agreement shall be applicable to McKesson and any facility owned or operated by McKesson US Pharmaceutical registered, or who may become registered, with DEA to distribute, or otherwise handle controlled substances." Dkt. #2212-29; Dkt. #2557-3. AmerisourceBergen's obligations are similarly not limited to any particular Distribution Centers.

These arguments also fail to acknowledge that the conduct about which Plaintiffs complain is not limited to conduct that occurred in Cuyahoga and Summit Counties. Instead, Plaintiffs' allege that the harm they suffered was caused by conduct that occurred all across the nation, over many years, which was a substantial factor in causing the nuisance condition that persists in those counties and also gives rise to Plaintiffs' other claims. This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

**The agreements are not unfairly prejudicial.** Although relevant evidence is generally admissible, "Rule 403 carves out a narrow exception to this broad rule of admissibility." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*; FED. R. EVID. 403. As the permissive language of the rule makes clear, a court may admit evidence even where there is potential prejudice, and "[this] decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court." *Id.* "When the district court admits evidence over a party's undue-prejudice objection, [the 6th Circuit] review[s] the admitted evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (citation omitted).

Here, any danger of unfair prejudice or confusion is quite limited because the practices described in the DEA/DOJ agreements pertain directly to Defendants' controls to prevent diversion and the filling of suspicious orders for opioids. Thus, this evidence will not confuse the

issue nor inject extraneous factual matters into the trial. Nor would a jury be likely to take this evidence as a concession of liability – although the evidence is factually on point, the *legal* context of the agreements is so distinct that a jury is not likely to believe that an agreement with the government to settle what are in effect charges for CSA violations amount to an admission of liability to the alleged RICO, OCPA, and public nuisance claims. And, to the extent that the jury credits the factual statements in the agreements, this does not constitute "unfair" prejudice. Even if that were the case, the Court can ensure, through trial rulings and jury instructions, that the context in which the facts were developed does not overwhelm the import of the evidence itself.

For these reasons, Distributor Defendants' arguments that their distributor settlements with the DEA and West Virginia are irrelevant, prejudicial, or inadmissible under Rule 408, are without merit. Distributor Defendants' MIL No. D-1 should be denied.

2. **<u>Distributors' MIL No. D-2</u>: The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge.**

Distributor Defendants broadly seek to preclude the admission of non-party 30(b)(6) witness testimony "on matters outside the witness' personal knowledge," arguing such evidence is inadmissible hearsay and lacks foundation. For the following reasons, Distributor Defendants' MIL No. D-2 should be denied.

Contrary to Distributor Defendants' assertion, Rule 602's personal knowledge requirement does not preclude the introduction of 30(b)(6) testimony at trial that is beyond the witness' direct personal knowledge. It is well established that a corporate designee testifying pursuant to Rule 30(b)(6) "does not testify as to his personal knowledge or perceptions [but rather] testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). *See also Lloyd v. Midland Funding, LLC*, No. 15-5132, 639 Fed. Appx. 301, 305 (6th Cir. Jan. 22, 2016) (citing *Brazos*). As such, Rule 30(b)(6) provides a recognized exception to the personal knowledge requirement set forth in Rule 602.

Although Rule 30(b)(6) refers by its terms to depositions, courts have recognized that a 30(b)(6) witness may testify at trial despite a lack of personal knowledge about the matters described.

*See Brazos*, 469 F.3d at 434 (permitting 30(b)(6) trial testimony concerning "the collective knowledge or subjective belief of [the corporation] . . . even if it is not within his direct personal knowledge"); *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("[A] Rule 30(b)(6) witness may testify both in a deposition and at trial to matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602."). Relatedly, numerous courts, including the Sixth Circuit, have permitted 30(b)(6) witness testimony addressing corporate matters outside of the witness' personal knowledge in summary judgment proceedings. *See, e.g., Lloyd*, 639 F. App'x at 305 (finding corporate representative's testimony based on his review of corporate records satisfied personal knowledge requirement under Federal Rule of Civil Procedure 56); *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894 (7th Cir. 2004) (holding non-party 30(b)(6) witness "was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric").

With respect to *non-party* 30(b)(6) witness testimony, the court in *Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500 (N.D. Ill. 2011) specifically rejected the argument that a non-party 30(b)(6) witness could not testify at trial regarding matters outside his or her personal knowledge. *See id.* at 503 ("This Court . . . will not limit . . . testimony strictly to matters within [his] personal knowledge"). The court reasoned that to rule otherwise "would only recreate the problems that Rule 30(b)(6) was created to solve." *Id.* "For example, a party might force a corporation to 'take a position' on multiple issues through a Rule 30(b)(6) deposition, only to be left with the daunting task of identifying which individual employees and former employees will have to be called at trial to establish the same facts." *Id.* The court concluded that proper areas of testimony for non-party Rule 30(b)(6) witnesses include "topics . . . about which the corporation's official position is relevant . . . ." *Id.* at 503.

Second, 30(b)(6) testimony that is beyond personal knowledge is not inherently inadmissible hearsay. *See, e.g., Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 n.7 (7th Cir. 2001) (finding, in the summary judgment context, that City Attorney O'Conner's "answers to the interrogatories were not hearsay because the City had designated O'Connor to testify to matters known or reasonably

available to the City."). While the *Sara Lee* court acknowledged the risks of admitting non-party 30(b)(6) testimony based on hearsay, it reasoned that limiting such testimony to matters "particularly suitable for Rule 30(b)(6) testimony" sufficiently mitigated the risk. 276 F.R.D. at 503.

Here, Distributor Defendants' motion is overbroad and completely devoid of context. They seek a blanket evidentiary ruling based on hearsay and lack of foundation and mistakenly assume that if Plaintiffs offer non-party 30(b)(6) testimony beyond a witness' direct personal knowledge, then such evidence must be offered for the truth of the matter. Determinations regarding the admissibility of a particular third-party statement are best left for trial, once such statement has been identified and the purpose for which it is offered has been explained. *See Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-CV-02349-WJM-KMT, 2014 WL 1583993, at *3 (D. Colo. Apr. 21, 2014) ("Defendant's Motion identifies no specific evidence it seeks to exclude from Plaintiffs' Rule 30(b)(6) designees. Instead, Defendant makes general reference to evidence that may be inadmissible hearsay, and asks the Court to restrict the testimony of Plaintiffs' witnesses without any indication of what such evidence will show, or for what purpose it will be offered. The Court will not issue such a blanket evidentiary ruling, particularly where a fact-intensive evaluation of hearsay exceptions may be necessary.") (internal citation omitted).

Distributor Defendants offer two examples of testimony they claim should be excluded from the 30(b)(6) deposition of DEA employee, Thomas Prevoznik, in which he identified a DEA report and DEA presentation.[56] However, such testimony addresses "matters about which the corporation's official position is relevant" and therefore falls squarely within the realm of permissible trial testimony for non-party 30(b)(6) witnesses. *See Sara Lee*, 276 F.R.D. at 503.

---

[56] These DEA documents could be admitted for a number of non-hearsay reasons, such as to prove (i) that the statement was made, (ii) the falsity of the matter asserted, (iii) the knowledge of the declarant, (iv) notice to, or knowledge of, the recipient of the statement, (v) motive, intent, bias, or state of mind, or (vi) association among persons or entities. And *if* Plaintiffs offered the evidence for the truth of the matter, the documents could fall within a hearsay exception in Rule 803, such as: a record of regularly conducted activity under Rule 803(6); a public record or report under Rule 803(8); or, a statement in an ancient document under Rule 803(16).

Further, the official DEA report and presentation Mr. Prevoznik identified sharply contrast with the type of evidence excluded in the cases Distributor Defendants cite. For instance, in *Cooley v. Lincoln Elec. Co.*, 693 F.Supp.2d 767, 791 (N.D. Ohio 2010), the defendant's 30(b)(6) witness sought to explain the company's position at trial using a recent conversation he had with the CEO. The court barred the proposed explanatory testimony on the basis of hearsay. *Id.* at 791-92. Significantly, the hearsay at issue in *Cooley* was of questionable reliability. Stephen J. O'Neil, *Rule 30(b)(6) Witnesses at Trial*, 60 Fed. Law. 70, 73 (September 2013) ("[T]he result in *Cooley* might be different if the Rule 30(b)(6) witness had learned of additional information in the discovery record as opposed to the undiscoverable water-cooler conversation with the CEO, or if the Rule 30(b)(6) witness had learned of new information at trial that was not in the discovery record but was verifiable and reliable."). Similarly, the testimony found to be improper in *Union Pump Co. v. Centrifugal Tech. Inc.*, Nos. 10–30040, 10–30072, 2010 WL 5186616, at *6-7 (5th Cir. Dec. 16, 2010) involved facts the 30(b)(6) witness learned "solely through conversations with others" and of which there were no written reports. *Cf. Sara Lee*, 276 F.R.D. at 503-04 (considering "whether the underlying corporate knowledge is *sufficiently reliable* to substitute for personal knowledge") (emphasis added).

For all these reasons, the Court should deny Distributor Defendants' MIL No. D-2 in its entirety and defer ruling on issues regarding the foundation for admitting Mr. Prevoznik's and other 30(b)(6) witness' testimony until trial.

3.   **Distributors' MIL No. D-3**: **The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction.**

In March of 2019, David Gustin, the former compliance officer for McKesson's warehouse in southern central Ohio, was indicted on one count of conspiracy for allegedly violating the Controlled Substances Act.[57] Mr. Gustin's lawyer described the charge as follows: "The United

---

[57]   *See* "Feds probe manager of McKesson narcotics distribution warehouse in Ohio," *The Washington Post*, Sept. 18, 2019, available at https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-

States' theory seems to be that Mr. Gustin was so woefully negligent in overseeing his compliance responsibilities that his conduct was criminal." The article reports that McKesson has received subpoenas from the federal government and is cooperating with the government's investigation, and that "documents [filed in the criminal case] also show that Gustin and McKesson have an agreement to work together on the legal case." So McKesson is obviously fully aware of the circumstances and conduct giving rise to Mr. Gustin's indictment.

Although the indictment and related documents are included on Plaintiffs' exhibit list, Plaintiffs do not intend to introduce these documents unless necessary for some other purpose, such as impeachment. However, Plaintiffs are not precluded from inquiring about the *conduct* at issue in the indictments. Whether the former director of regulatory affairs for McKesson's warehouse in Ohio engaged in conduct that violated the Controlled Substances Act involving the distribution of prescription opiates is certainly relevant to Plaintiffs' claims.

4. <u>**Distributors' MIL No. D-4**</u>: **The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found.**

Distributor Defendants' MIL No. D-4 seeks to preclude Plaintiffs, or any of their experts, from "suggesting" that the "fact that suspicious order reports and due diligence files from five, ten, or twenty years ago cannot be located today does not mean they never existed." Dkt. #2666 at p. 13. Their purported basis is that there is no "requirement to maintain such records for any period of time," and Plaintiffs have failed to satisfy the Sixth Circuit's adverse inference test. *Id.*

This argument is virtually identical to the argument Defendants raised in their *Daubert* motion against Mr. Rafalski, which has already been rejected by this Court:

> Defendants reply that, if the law does not require them to maintain due diligence records, Rafalski has no basis to conclude they did not conduct due diligence based on the absence of those records. Based on his experience as a DEA Diversion Investigator, however, Rafalski may opine as to what the absence of due diligence records indicates to him. *Moreover, it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it.*

fb56c5522e1c_story.html (accessed on 10/6/19).

Dkt. #2494 (Opinion and Order Regarding Defendants' Motion to Exclude Opinions of James Rafalski and Craig McCann) at p. 13 (emphasis added).

Moreover, in bringing this motion, Distributor Defendants once again incorrectly argue that the absence of documents is the "sole" basis for Mr. Rafalski's conclusion that they failed to perform due diligence. But as pointed out in Plaintiffs' *Daubert* opposition brief (Dkt. #2253 at pp. 13-14), the bases for Mr. Rafalski's conclusions are his detailed review of Defendants' SOM program, Defendants identification of an absurdly trivial number of suspicious orders, and policies and practices that allowed certain Defendants to ship orders before any due diligence could be carried out. In light of this evidence, it falls to Defendants to establish that their purported due diligence nonetheless took place. As Mr. Rafalski found, Defendants' files are devoid of any such evidence, and as the Court itself emphasized, "it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it." Dkt. #2494 at p. 13.

Distributor Defendants' reliance on the Sixth Circuit's adverse inference test is also inapposite. There is a difference between asking the fact-finder to draw inferences adverse to a party from the evidence presented (which presumably both parties intend to do at trial) and asking the Court to issue an adverse inference instruction. Distributor Defendants' test applies in the latter case, and at this time, Plaintiffs are not seeking such an instruction. In fact, Plaintiffs are not arguing that documents were necessarily destroyed, as opposed to never existing in the first place because Defendants failed to perform any due diligence. One can infer from the absence of due diligence materials that no due diligence was performed, or that if due diligence was performed, but not documented, this is an indication of an inadequate due diligence program. There is nothing improper about Plaintiffs, or their experts, advocating for such an inference. In rejecting Defendants' *Daubert* argument, the Court has already ruled that Mr. Rafalski can offer this as an expert opinion:

> As a former Diversion Investigator, Rafalski clearly has experience and expertise regarding the components and characteristics he would expect to be included in an

effective SOMS and due diligence program. Indeed, Defendants do not challenge his credentials in this regard . . .

Defendants ask the Court to preclude Rafalski from stating that the law requires registrants to document and retain forever suspicious order reports and due diligence records. It is Rafalski's position that, while the regulations do not require a registrant to retain these documents for any specific length of time, in his opinion, permanent retention is important to maintaining effective control and preventing diversion. See Rafalski Depo. at 125:11 to 126:3. *For the reasons stated above, Rafalski may opine as to the need for documentation to maintain effective control; however he may not state what the law requires in this regard.*

Dkt. #2494 at pp. 8, 10 (emphasis added).

For these reasons, Distributor Defendants' MIL No. D-4 should be denied.

5. **Distributors' MIL No. D-5**: The Court should prohibit Plaintiffs from presenting evidence or making arguments suggesting Distributors committed a "fraud on the DEA."

Through their MIL No. D-5, Distributor Defendants attempt to re-litigate their preemption argument in the guise of a motion *in limine*. Indeed, the vast majority of their argument is that Plaintiffs' due-diligence based claims are preempted under *Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341 (2001). But as this Court has held several times, Plaintiffs are not asserting claims for fraud on the DEA (or FDA), and thus, their claims are not preempted under *Buckman*. Dkt. #2565 at pp. 9-10, 22; Dkt. #1025 at pp. 50-51; Dkt. #1203 at p. 2.

However, this does not render evidence regarding their interactions with the DEA irrelevant or inadmissible.[58] To the contrary, this evidence is highly relevant to a wide range of issues, including Defendants' knowledge, motive, intent, and state of mind, as well as their violations of the CSA, fraudulent misstatements to the public and the medical community, and their conspiratorial conduct and objectives. *See, e.g., Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 318 (W.D. Ky. 2011) ("[T]he fact that Plaintiff intends to introduce evidence that NPC violated FDA regulations does not automatically implicate the holdings of *Buckman* and *Kemp*. State-law

---

[58] *See Tylenol*, 181 F. Supp. 3d at 289 n.9 (noting that "whether the evidence related to the defendants' interactions with the FDA is admissible for purposes other than establishing liability or breach of duty" is "a different inquiry than whether the plaintiff's claims are preempted").

causes of action that track federal regulatory regimes have not been preempted by these decisions . . . . Evidence of violations of the FDA's regulations that are introduced to support the state-law torts is admissible."), *order vacated in part on other grounds on reconsideration sub nom. Mahaney on behalf of estate of Kyle v. Novartis Pharm. Corp.*, 1:06-CV-00035-R, 2012 WL 12996015 (W.D. Ky. Jan. 4, 2012); *Tylenol*, 181 F. Supp. 3d at 289–90 (denying defendants' motion *in limine* to exclude evidence or argument relating to fraud on the FDA because "evidence that the defendants attempted to manipulate the regulatory process, failed to comply with regulatory duties, or adhere to guidance provided by the FDA can be used to show other elements of the plaintiff's claims[,]" including "the defendants' state of mind, motive, or knowledge of a defect"; "It also would be relevant to the plaintiff's fraud claims if the information the defendants sent to or received from the FDA was different from what the defendants were communicating to consumers[.]").[59]  Moreover, as Defendants have indicated that they intend to argue that the DEA failed to vigorously enforce the law, their misstatements regarding their SOMS programs, reporting of suspicious orders, and efforts to prevent diversion are directly relevant to facts that Defendants themselves are putting at issue.

Distributor Defendants' sole argument against the admissibility of this evidence is their conclusory statement, citing nothing but Rule 402 and 403, that "testimony, evidence, or argument that Distributor Defendants have misled the DEA by failing to report suspicious orders, or

---

[59]   *See also Yasmin*, 2011 WL 6740391, at *2 (denying similar motion *in limine* implicating fraud-on-the-FDA; "In a case such as this, the jury must be fully informed of any information withheld from the FDA that could have effected decisions regarding the label."); *Adams*, 2009 WL 1259019, at *1 ("The Court has ruled in a prior decision . . . that evidence of communications between DuPont and the agencies is not excludable simply because the Court dismissed the fraud-on-the-agency claim.  The evidence of such communications is relevant for other purposes, such as proving the claims of misbranding or failure to warn."); *In re Vioxx Products Liab. Litig.*, MDL 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (denying defendant's motion *in limine* to exclude evidence or argument preempted by federal regulations, including that the defendant "committed 'fraud' on the FDA, misled the FDA, did not cooperate with the FDA, or otherwise violated the Food, Drug, and Cosmetic Act and its implementing regulations[,]" noting that "[t]his is an issue of proof and will have to be dealt with at time of trial"); *Globetti v. Sandoz Pharm. Corp.*, CV98-TMP-2649-S, 2001 WL 419160, at *3 (N.D. Ala. Mar. 5, 2001) (denying defendant's motion *in limine* based on *Buckman*; "While plaintiff may not offer evidence simply to show misrepresentations to or concealment from the FDA, such evidence may be relevant to showing the defendant's knowledge relating to the adequacy of the warning or the truth of information represented to or concealed from plaintiff or her physician.").

otherwise failing to submit the required information" is "irrelevant, prejudicial, and would risk confusing the jury." Dkt. #2666 at p. 15. This does not come close to satisfying their high burden of demonstrating such evidence is clearly inadmissible on all potential grounds. *Supra* at pp. 2-3. Distributor Defendants' MIL No. D-5 should be denied.

6.   **Distributors' MIL No. D-6**: The Court should prohibit counsel and witnesses from making references broadly and generally to "Defendants" when the statement, argument, or testimony relates only to certain specific Defendants or groups of Defendants.

Distributor Defendants seek to prohibit Plaintiffs' counsel and witnesses from referring to "defendants" generally at trial, contending it will violate Federal Rule of Evidence 403. Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403. "Exclusion under Rule 403 is an extraordinary measure that should be exercised sparingly." *Antioch Co. Litig. Tr. v. Morgan*, No. 3:10CV156, 2014 WL 2117450, at *1 (S.D. Ohio May 21, 2014) (citing *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996)).

None of the cases Defendants cite demonstrate that categorical references to defendants are improper in the context of a motion *in limine* or under Rule 403. Instead, they discuss concerns related to "lumping" defendants in a jury charge or complaint.[60] Of course, those concerns are not implicated at this stage of the litigation, and Plaintiffs have no intention of "lumping" Defendants together in the jury charge.

Distributor Defendants' motion is also overbroad and highly impractical, and its enforcement would unduly police the speech of Plaintiffs' counsel and witnesses at trial. Requiring

---

[60]   *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (noting damage claims against government officials arising from constitutional rights violations must allege particular facts against each defendant); *Rui He v. Rom*, No. 1:15-CV-1869, 2017 WL 1054814, at *4-5 (N.D. Ohio Mar. 21, 2017) (finding lumping of defendants on jury form was proper); *Christopher Seri v. Crosscountry Mortg., Inc.*, No. 1:16-CV-01214-DAP, 2016 WL 5405257, at *4 (N.D. Ohio Sept. 28, 2016) (dismissing complaint); *Reo v. Caribbean Cruise Line, Inc.*, No. 1:14 CV 1374, 2016 WL 1109042, at *1 (N.D. Ohio Mar. 18, 2016) (holding that lumping defendants in complaint did not require dismissal).

Plaintiffs' counsel to approach the bench before using the word "defendants" would inevitably impede the flow of trial and interfere with the presentation of evidence. And given the breadth of the restriction, it would necessitate numerous side bars addressing whether various statements, arguments, or testimony relate to certain Defendants. Plaintiffs' counsel and witnesses should be permitted in their discretion to reference certain subsets of defendants or defendants generally at trial. *See Flir Sys., Inc. v. Fluke Corp.*, No. 3:10-CV-00971-HU, 2012 WL 13054267, at *5 (D. Or. Nov. 29, 2012) ("It would be highly impractical to enforce this motion at trial. Absent a legitimate basis to preclude the use of a particular term . . . it is for counsel to choose the words they prefer to describe it.").

Further, any potential prejudice or confusion will be minimized through cross-examination and clarifying jury instructions. Distributor Defendants have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice. Distributor Defendants' MIL is an inappropriate method of addressing the word choice of Plaintiffs' counsel and witnesses, and should be handled by individual objections at trial. *See Stewart v. Hooters of Am., Inc.*, No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007) ("Motions In Limine are disfavored; admissibility questions should be ruled upon as they arise at trial.").

7. **Distributors' MIL No. D-7: The Court should preclude Plaintiffs from offering evidence of, and arguments about RICO predicates that Plaintiffs did not identify in their discovery responses.**

Distributor Defendants' MIL No. D-7 must be denied because it rests on a misapplication of the law and misstatements of the facts. Specifically, Distributor Defendants argue that the Court should exclude evidence of any racketeering activities not disclosed in Plaintiffs' discovery responses. But their cited authority does not support exclusion. Instead of addressing exclusion of evidence at trial after a purported failure to identify racketeering activities, Distributor Defendants' cases involve exclusion of evidence about legal claims alleged in a complaint or amended

complaint.[61]  *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("Bridgeport's first amended complaint alleges liability on the part of Universal based solely on the inclusion of *Change Gone Come* in 'Well Connected' and 'Dead Man Walkin.'  To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal"); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787 (6th Cir. 2005) ("Tucker contends that the district court erred when it refused to consider her promissory estoppel claim.  The court took this action after determining that she had neglected to include such a claim in her complaint"); *Vystril v. Mercy Health*, No. 17CV781, 2019 WL 2076035, at *4 (N.D. Ohio May 10, 2019) ("Plaintiffs argue that the April 7, 2017 telephone calls also violated 15 U.S.C. § 1692c(a)(2).  Plaintiffs did not allege any violations of that subsection in the Amended Complaint.  Plaintiffs may not expand the scope of their claims in an opposition to a summary judgment motion").

Here, setting aside the lack of authority regarding Distributor Defendants' position, their request for exclusion also fails because Plaintiffs identified the racketeering activities (and corrupt activities)[62] upon which they intend to rely at trial in their Complaints including:  (1) mail fraud, (2) wire fraud; and (3) the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance.  *See, e.g.,* Dkt. #1466 (Summit Third Amended Complaint) at ¶ 914.  Indeed, Defendants made this same argument in the motion to dismiss phase of the case and the Court rejected it, confirming that each of the racketeering activities was sufficiently alleged.  Dkt. #1025 at pp. 39-48; Dkt. #1203 at pp. 38-39.  Plaintiffs did not identify any new racketeering activities in their opposition to Defendants' summary judgment motions.

---

[61]  *Feinstein v. Resolution Tr. Corp.*, is different than the above cases and even further afield because in *Feinstein*, the plaintiff failed to adequately plead the details of mail and wire fraud to overcome a Rule 9(b) argument.  942 F.2d 34, 42 (1st Cir. 1991) ("It is well settled in this circuit that Fed. R. Civ. P 9(b) . . . extends to pleading predicate acts of mail and wire fraud under RICO.  . . . Neither in this part of the complaint nor in count 1 proper did the plaintiffs supply any additional details as to when the communications occurred, where they took place, or what they contained").

[62]  Plaintiffs also identified telecommunications fraud as a corrupt activity in support of their OCPA claim.  As this claim is not addressed in Distributor Defendants' motion, any ruling arising from it should not be applied to that aspect of Plaintiffs' OCPA claims.

Finally, Distributor Defendants' motion also fails because they mischaracterize Plaintiffs responses to their discovery requests. When asked to identify the racketeering activity at issue, Plaintiffs not only identified mail and wire fraud and violations of the CSA, including a broad range of misrepresentations and omissions that form the basis of those violations, they cited to documents supporting their claims. *See* **Ex. 16** [Plaintiffs' 12/14/18 Supplemental Objections and Responses to Distributor Defendants' Interrogatory Nos. 24, 25, 26, and 27]. In sum, Plaintiffs provided ample information to Defendants regarding the racketeering activity at issue and Defendants fail to provide any authority showing that more is required.

8. **Distributors' MIL No. D-8**: **The Court should issue an order excluding any evidence of, or reference to, Distributor-run programs that allowed Manufacturers to communicate product information to Pharmacies or other parties.**

Distributor Defendants seek to exclude evidence that Manufacturers use Distributors as a conduit to convey marketing information based on a misplaced argument under Rules 402 and 403. Dkt. #2666 at pp. 18-20. The evidence that Manufacturers used Distributors to market opioids is *not* being offered to support marketing-based claims against Distributors, but rather to demonstrate their overall motive and knowledge. Distributors profited from these marketing services and were aware of Manufacturers' marketing efforts and claims. This evidence is particularly relevant given Distributors' intent to blame Manufacturers, doctors, and patients as potentially superseding causes of Plaintiffs' injuries. The evidence further supports Plaintiffs' marketing RICO and conspiracy claims *against the Manufacturers*, as it is relevant to show how Manufacturers used their relationships with Distributors in order to further disseminate the Manufacturers' marketing messages.

In support of their erroneous arguments, Distributors misrepresent both statements made by Plaintiffs and the testimony of Plaintiffs' expert, Dr. Perri.[63] First, though Plaintiffs' conspiracy claims "*against the Pharmacy and Distributor Defendants* are not based on opioid marketing," Plaintiffs'

---

[63]  Plaintiffs have not listed Dr. Perri as a testifying witness on their witness list, but mention him herein simply to correct Distributor Defendants' mischaracterization of his testimony in their motion.

RICO and Conspiracy claims against Manufacturers expressly *are*.[64]  As discussed in Plaintiffs'

summary judgment briefing, different coconspirators may have different roles in the conspiracy.

Dkt. #2182 at p. 114-115.  The evidence of Manufacturers' agreements with Distributors to use the

Distributors to facilitate distribution of the Manufacturers' advertisements and marketing materials

are directly relevant to Plaintiffs' claims *against the Manufacturers* who created the advertisements and

who were well versed in the flaws in the marketing materials.  Second, the testimony of Plaintiffs'

expert Dr. Perri confirms that the Manufacturers' use of Distributors to convey the Manufacturers'

marketing messages is an important fact in support of Plaintiffs' marketing claims, contrary to

Defendants' inaccurate summary of Dr. Perri's testimony.[65]

Not only are these facts relevant to Distributors' motive and knowledge, as well as Plaintiffs'

marketing claims against Manufacturers, such that exclusion under Rule 402 is not warranted, but

they are hardly so prejudicial that they warrant exclusion under Rule 403.  Any purported "spill over

prejudice" may be resolved through jury instructions and does not warrant exclusion of this

evidence.  *See United States v. Fleming*, 902 F.2d 1570 (6th Cir. 1990) (evidence properly admitted

where alleged "jury confusion and spill over prejudice were made less likely by the trial court's jury

instructions."); *United States v. Mohammad*, No. 1:10CR389, 2012 WL 4483544, at *5 (N.D. Ohio,

Sept. 27, 2012) (rejecting defendant's "spill-over prejudice argument" where "instructions to the jury

directing them to consider the evidence and charges against each defendant separately" could

"eliminate any possible prejudice").  Distributor Defendants' ill-founded MIL to exclude this

evidence is due to be denied.

---

[64]  Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' Civil Conspiracy, RICO, and OCPA Claims) at p. 114 (emphasis added).  *See also id.* at p. 114 ("the conspiracy began with the Manufacturer Defendants' false marketing efforts . . . ), and pp. 7-27 (discussing the Manufacturers' marketing conspiracy).

[65]  Dkt. #1969-7/#1983-4 (4/23/19 Perri Dep.) at 217-222 (testifying that distributors were "integral" to manufacturers' functioning in the supply chain, that, in addition to conveying information on "price and availability" for the manufacturers, the distributors also conveyed marketing messages "beyond that" including "unbranded marketing messages," that "marketing behaviors … are interrelated" such that "the overall marketing and all the things [the defendants] did contributed to the marketing success," and that "the marketing of opioids was inappropriate" with the distributors being "part of that process").

C. **PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE (DKT. #2645).**

    1.    <u>Henry Schein MIL No. HS-1</u>: **References to the Henry Schein Defendants having engaged in any alleged activities with respect to Cuyahoga County.**

Through MIL No. HS-1, the Henry Schein Defendants ("Henry Schein") seek a blanket prohibition of references to any Henry Schein entities or to "Defendants" or "Distributor Defendants" when referencing Plaintiff Cuyahoga County's claims because Cuyahoga did not sue the Henry Schein companies. Dkt. #2645 at p. 2. The Court should reject this request as both unwarranted and unworkable.

It is unwarranted because the mere fact that Cuyahoga did not sue Henry Schein does not mean *either* that Henry Schein's conduct in neighboring Cuyahoga County cannot be relevant to Plaintiff Summit County's claims against it *or* that Henry Schein's conduct as a non-party is irrelevant to Cuyahoga's claims. *See, e.g., Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim."). For example, there is evidence that Henry Schein engaged in the "alleged activities" in Cuyahoga County since as early at 2010. A November 12, 2012 letter from HSI to the Ohio State Board of Pharmacy informs the Board that, with the exception of products containing two non-opioid substances, HSI failed to report sales of controlled substances as required by the state's Prescription Monitoring Program since as early as 2010. *See* Dkt. #2302-31/#2307-2 (Ex. 32 to Plaintiffs' Opp. to Non-Rico Small Distributors' MSJ). Defendants explain in the letter that HSI "operates six (6) distribution centers licensed to sell prescription drugs in Ohio. The primary customers for [their] distribution services are office based dental and medical practitioners." *Id.* Based on this language a reasonable juror could conclude that Henry Schein did distribute and fail to report the distribution of opioid products throughout the entire state of Ohio including Cuyahoga County from at least 2010-2012.

This MIL is also unworkable because this blanket requirement that any party not refer to "Defendants" or "Distributor Defendants" when discussing Cuyahoga's claims could not be enforced without an endless series of objections raised every time these words are spoken and

ensuing colloquies over whether the claims of Cuyahoga-only, Summit-only, or both were being discussed when the verboten word or words were spoken. Finally, a party's reference to "Defendants" or "Distributor Defendants" would not be prejudicial to Henry Schein under FED. R. EVID. 403 in any event because the jury may be instructed that Cuyahoga has no claims against Henry Schein and therefore it could not find Henry Schein liable to Cuyahoga. Henry Schein's MIL No. HS-1 therefore should be denied.

2. <u>**Henry Schein MIL No. HS-2**</u>**: References to Henry Schein Medical Systems, Inc. as having distributed any opioid medications into Summit County or otherwise caused or contributed to any alleged opioid epidemic.**

Henry Schein's MIL No. HS-2 addresses Defendant Henry Schein Medical Systems, Inc. ("HSMS") and seeks to prohibit Plaintiffs "from referencing HSMS as having distributed opioids generally or to Summit County specifically causing or contributing to any alleged opioid epidemic." Dkt. #2645 at p. 2. This request is contrary to Plaintiff Summit County's claims, *see* Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 117 (HSMS's "symbiotic" arrangement with Defendant Cardinal Health generated hundreds of millions of dollars in sales), and to the Court's Order denying summary judgment for HSMS. Dkt. #2559 (Order Denying Small Distr. MSJ) at p. 5 ("[T]he Court is unable to conclude that no reasonable jury could find that Schein's market activities were *de minimus*."). Since sufficient evidence supports Summit's claims against HSMS, the Court should deny Henry Schein's MIL No. H-2 to preclude Plaintiffs from referencing Defendant HSMS as having caused harms to Summit County.

**3.**   **Henry Schein MIL No. HS-3**: **References to sales or distribution of opioid medications to retail, chain, Internet pharmacies, or "pill mills."**

Neither Plaintiffs nor their counsel have any intention of making or eliciting factual misrepresentations at trial. Thus, if Defendant Henry Schein, Inc. ("HSI") truly did not distribute opioids to chain, retail, or internet pharmacies,[66] Plaintiffs and their counsel will not claim they did. To the extent Henry Schein believes that Plaintiffs have offered at trial specific evidence or argument on this issue that is factually inaccurate or lacks foundation, they should raise their objections at that time so that the Court can resolve the matter in context. A blanket motion *in limine* is not appropriate.

Henry Schein also inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that the "probative value of such references is contrary to the evidence, lacks foundation, and would otherwise confuse the jury and unfairly prejudice Henry Schein, Inc." Dkt. #2645 at p. 3. Rule 602 states:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

FED. R. EVID. 602. It is not clear how this rule is relevant to MIL No. H-3, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-3 should be denied.

**4.**   **Henry Schein MIL No. HS-4**: **References to opioid medications distributed by Henry Schein, Inc. to Dr. Brian Heim.**

Henry Schein's MIL No. H-4 seeks to prohibit Plaintiffs from referencing HSI's distribution of prescription opioids to Dr. Brian Heim after he pled guilty and lost his medical license for felony

---

[66]   Although Henry Schein claims that the "undisputed evidence shows that [HSI's] distribution of opioids in Summit County was limited to individual prescribers (*i.e.*, doctor and dentists)[,]" they failed to cite to, or attach, any such evidence to their motion *in limine*.

drug theft and again after he was indicted for drug trafficking, unless Plaintiffs show that the drugs sold were diverted. Dkt. #2645 at pp. 3-4.

The Court should reject this request as contrary to its recent Order denying summary judgment on causation. In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9. So it is here. Plaintiffs may introduce evidence of Henry Schein's sales to Dr. Heim after his guilty plea, loss of licensure, and later drug trafficking indictment as evidence of its complete failure to maintain effective controls *whether or not* those sales are shown to have been diverted. Henry Schein's MIL No. H-4 concerning Dr. Heim therefore should be denied.

### 5. Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should not have shipped opioid medications following Dr. Heim's May 2012 indictment.

Henry Schein also seeks to exclude evidence regarding HSI's continued shipments of opioid medications to Dr. Heim after he was indicted in May 2012 for destroying business records and trafficking in the stimulant drug Adderall. Henry Schein argues that such evidence is inadmissible unless Plaintiffs can show HSI knew or should have known of the indictment.

As a distributor of dangerous drugs with a known risk of diversion, HSI had a duty to know and monitor their customers. For new customers seeking to purchase opioids, HSI should have exercised due diligence to determine whether there were any potential "red flags" with that new customer. HSI failed to adequately inquire about Dr. Heim's background when it approved him to purchase opioid medications. A simple verification of Dr. Heim's medical license in Ohio would have revealed that in 1998, Dr. Heim entered a guilty plea to twenty-four felony counts of theft of drugs and twenty-one felony counts of illegal processing of drug documents, which resulted in his

license being revoked. A reasonable distributor, knowing this information, would have realized that any sales to Dr. Heim would result in a likelihood of diversion and would have not sold opioid medications to him. From January 2010 to December 2011, Dr. Heim was listed as the 11th top prescriber of Oxycodone/APAP in the Akron, Ohio area, yet HSI's due diligence file for Dr. Heim does not reflect a single visit to his office.

Henry Schein designed and operated a grossly inadequate screening system for customers that allowed customers, including Dr. Heim, to place and receive large orders of opioids despite warning signs. HSI's witnesses repeatedly testified that their due diligence inquiry for opioid customers has never included either criminal background checks or medical license disciplinary checks. In this particular case, based on a license check HSI conducted in June of 2011, Henry Schein knew Dr. Heim had previously faced disciplinary actions. **Ex. 17** [HSI-MDL-00001198-HSI-MDL-00001210] at 1210. Despite this red flag, HSI made no additional effort beyond the license check and a simple questionnaire to determine whether Dr. Heim should be allowed to order and receive large quantities of opioids. In addition, Dr. Heim identified his areas of medical practice as Family Practice and Obstetrics & Gynecology. This should have been another red flag.

Instead, HSI shipped approximately 11,500 hydrocodone pills to Dr. Heim over fourteen transactions between August 17, 2011, and June 5, 2012. *See* Dkt. #2200 (Plaintiffs' Opp. to Non-RICO Small Distributors' De Minimis MSJ) at p. 10. Two thousand of those pills were shipped on May 21, 2012 and June 5, 2012, after Dr. Heim was indicted on May 18, 2012 for drug trafficking. Whether Henry Schein knew about the indictment at the time of the May and June shipments is irrelevant - they already had plenty of warning signs about Dr. Heim by that time. In addition, the orders Henry Schein filled for Dr. Heim were during the timeframe and of materials that were not reported to the Ohio Prescription Monitoring Program as previously discussed in above (*supra* at § C.1). Dkt. #2200 at p. 10. All of this information is relevant the question of Henry Schein's liability.

Had HSI performed the due diligence the law requires, it would have known about Dr. Heim's history of criminal activity. Consequently, HSI cannot claim ignorance of his indictment when minimal effort would have disclosed it. Henry Schein's MIL No. H-5 should be denied.

6.    **Henry Schein MIL No. HS-6**: References to opioid medications distributed by Henry Schein, Inc. to Dr. Adolph Harper.

Henry Schein's MIL No. H-6 seeks to prohibit Plaintiffs from referencing HSI's distribution of opioids to Dr. Adolph Harper—who was convicted of drug trafficking, health care fraud, and conspiracy to distribute oxycodone, in effect operating a pill mill, and eight of whose patients died of overdose-related deaths—unless Plaintiffs show that the pills HSI sold to Dr. Harper were diverted. Dkt. #2645 at pp. 4-5.

The Court should reject this request, too, as contrary to its recent Order denying summary judgment on causation. In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9. So it is here. Plaintiffs may introduce evidence of HSI's sales to Dr. Harper as evidence of its complete failure to maintain effective controls. Although these sales pre-dated Dr. Harper's criminal conviction, the frequency and strength of the opioid prescriptions he wrote support Summit County's claim that Schein should have flagged his orders as suspicious. Dkt. #1999-7/#2000-7 (Keller Rep.) at ¶¶ 104-105. Henry Schein's MIL No. H-6 concerning Dr. Harper therefore should be denied.

7.    **Henry Schein MIL No. HS-7**: References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System without first identifying whether any orders that HIS sold into Summit County were diverted.

It is not entirely clear whether Henry Schein is arguing that evidence of HSI's insufficient

SOMS is itself irrelevant and unfairly prejudicial, or whether it is only irrelevant and unfairly prejudicial if Plaintiffs do not first demonstrate "that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County." Regardless, both arguments are without merit. First, evidence of HSI's insufficient SOMS is highly probative to Plaintiffs' claims and is not unfairly prejudicial for the reasons discussed above as to Defendants' Omnibus MIL No. 7. *Supra* at § A.7. Additionally, Plaintiffs have already made an initial showing that Henry Schein's conduct substantially contributed to the public nuisance, which the Court considered sufficient to withstand summary judgment. Dkt. #2561 at p. 9 ("As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."); Dkt. #2559 (order denying small distributors' summary judgment motion). Plaintiffs understand that they will have to establish causation at trial, and fully intend to do so. Whether Plaintiffs have laid an adequate foundation for a particular piece of evidence or testimony is a determination that should be made at trial so that it can be resolved in context. *See Indiana Ins.*, 326 F. Supp. 2d at 846.

Finally, Henry Schein again inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that this evidence "lacks foundation and is otherwise irrelevant and unfairly prejudicial." Dkt. #2645 at p. 5. It is not clear how this rule, which requires witnesses to have personal knowledge of matters on which they testify (FED. R. EVID. 602), is relevant to MIL No. H-7, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-7 should be denied.

8. **Henry Schein MIL No. HS-8**: **References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.**

Henry Schein's MIL No. HS-8 should be denied for the same reasons discussed above with

respect to Defendants' Omnibus MIL No. 6.  *Supra* at § A.6.

9.  **Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

Henry Schein argues that evidence regarding fines imposed by other states is not relevant in this case because those fines did not involve HSI's distribution of opioids in Ohio.  As discussed in § A.6, *supra*, however, Henry Schein's argument improperly seeks to limit the scope of Plaintiffs' proof.  The opioid crisis and harm experienced by Cuyahoga and Summit Counties did not result solely from conduct by Defendants that specifically occurred in those counties or in Ohio.  Rather, the problem caused in these counties by Defendants' oversupply, inadequate monitoring, and diversion resulted from conduct by Defendants that occurred all over the country.  This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

10.  **Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

Henry Schein seeks to exclude evidence regarding a "purported" letter "supposedly" sent in 1998 from the Ohio Board of Pharmacy to HSI.  The MIL specifically references meeting minutes of the Ohio Board of Pharmacy from November 1998 that reference the letter.  Henry Schein argues "[a]s an initial matter, there is no evidence that any such letter was actually sent to or received by HSI."  Dkt. #2645 at p. 6.

Henry Schein is wrong.  Its own documents reflect receipt of the very same letter referenced in the meeting minutes.  In a PowerPoint presentation discussing HSI's due diligence requirements, there is a slide summarizing various "penalties" imposed by governmental entities on distributors, including HSI.  The first item on the slide references a "Warning Letter" sent by the "Ohio State BOP" in 1998 to HSI regarding the "Sale of dangerous drugs to persons/entities not

licensed/authorized to possess them." **Ex. 18** [HSI-MDL-00176719] at p. 4. This could not be clearer. As has been discussed previously, this evidence is relevant and admissible to show that Henry Schein was aware that there were deficiencies in its oversight of sales of dangerous opioid medications, which is probative of its intent in causing the nuisance condition in Cuyahoga and Summit Counties.

11.   **Henry Schein MIL No. HS-11: References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014.**

Henry Schein requests that Plaintiffs be prohibited from referencing, or introducing evidence of, Henry Schein's pre-May 18, 2014 conduct to support their conspiracy claim. In support, Defendants argue "Plaintiff has acknowledged that its conspiracy claim against the Henry Schein Defendants…is governed by a four (4) year statute of limitations." Dkt. #2645 at p. 7. This argument is not only unsupported in the motion, it is simply not true. Henry Schein's MIL No. HS-11 should be denied for multiple reasons.

First, as Plaintiffs argued and the Court has held, there is no statute of limitations for Plaintiffs' RICO claims for equitable relief and they "are exempt from the operations of a limitations period." Dkt. #2568 at p. 11. Second, to the extent Defendants contend that a four year statute of limitations is applicable to Plaintiffs' public nuisance claim, Plaintiffs have consistently argued there is no limitations period applicable to public nuisance claims. More importantly, this Court also held there is no limitations period for absolute nuisance claims. *Id.* at p. 5. Third, since "the applicable statute of limitations for filing a civil conspiracy cause of action is the relevant limitations statues for the underlying cause of action," *id.* at p. 12 (citation omitted), and the underlying cause of action is public nuisance there is likewise no conspiracy statute of limitations at issue here. Fourth, as set forth in Plaintiffs' prior arguments submitted in opposition to the Defendants' motion for partial summary judgment on statute of limitations grounds, pre-May 18, 2014 conduct remains relevant and admissible as it relates to post-May 18, 2014 damages and liability. Dkt. #2212 at pp. 55-56. Indeed, unless Henry Schein demonstrates that it has *affirmatively withdrawn* from a conspiracy, it remains exposed to liability for post-May 18, 2014 damages for the acts of its co-conspirators. To

the extent Henry Schein seek to temporally limit the scope of its participation in the conspiracy, it has not pointed to any action taken to affirmatively withdraw from the conspiracy.[67]

Finally, this Court held that there are "material fact questions concerning the claim's accrual dates, whether Plaintiffs exercised reasonable diligence to discover facts necessary to bring suit, and the applicability of tolling doctrines." Dkt. #2568 at p. 1; *see also* Dkt. #2212. The Court further ruled that questions about "the dates these [civil conspiracy] claims accrued or the periods they were tolled," can only be answered after a presentation of all the evidence at trial. Dkt. #2568 at p. 3.

There are multiple factual disputes involving Henry Schein the jury will need to consider. For example there is evidence that, despite recommendations to the contrary, Henry Schein willfully failed to design a system that would detect suspicious orders until at least October 2009.[68] In addition, there is evidence that Henry Schein failed to report suspicious orders to the DEA when discovered until at least 2017 and that, in the meantime, Henry Schein was aware it lacked due diligence files for 27,000 customers.[69] Whether and the extent to which these actions impact the statute of limitations and/or the date(s) Plaintiffs' claims accrued must be determined at trial.[70]

Henry Schein's MIL No. HS-11 should be denied for these reasons.

### 12. Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiffs lawsuit.

Henry Schein's MIL No. HS-12 seeks to prohibit any reference to or evidence concerning Henry Schein Animal Health ("HSAH"), which is not a named defendant. Dkt. #2645 at pp. 7-8.

---

[67] "[O]nce a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." *Watson Carpet & Floor v. Mohawk Indus.*, 648 F. 3d 452 (6th Cir. 2011). "At a minimum, 'affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." *In re Cathode Ray Tube Antitrust Litig.*, MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891, *3 (N.D. Cal. 2016) (citing *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 464-5 (1978)).

[68] *See* Dkt. #1956-2 (12/13/18 Abreu Dep.) at 237:21-239:1, 259:17-261:19, 454:12-456:24.

[69] *Id.* at 261:9-19, 294:21-295:7, 308:10-310:24.

[70] Dkt. #2568 at p. 3.

Henry Schein asserts that any reference or evidence about HSAH "is irrelevant as to whether HSI or HSMS substantially caused or contributed to the alleged public nuisance in Summit County. *Id.* at p. 7. This is incorrect. An entity's status as a non-party is not determinative of whether its conduct is relevant to a claim. *See*, *e.g.*, *Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").

Here, Plaintiffs allege that HSAH was investigated for distribution of wholesale dangerous drugs to an unlicensed entity in Ohio in 2014. Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 590. Although Defendant HSI asserts that it "no longer holds an interest" in HSAH, Dkt. #2645 at p. 7, it does not dispute that it did when the conduct at issue took place. Henry Schein's request concerning HSAH therefore is either baseless or else premature. *See*, *e.g.*, *Hochstein v. Microsoft Corp.*, 04-73071, 2009 WL 2022815, at *6 (E.D. Mich. July 7, 2009) (denying motion *in limine* to exclude "any reference to third party games for which discovery was not sought" as "premature," to which the parties agreed). In either event, Henry Schein's MIL No. H-12 should be denied.

## D. PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648).

### 1. <u>Walgreens' MIL No. W-1</u>: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen.

Walgreens's argument that evidence of its ownership interest in AmerisourceBergen should be excluded under Rules 402 and 403 is based on a misconstruction of the purpose for which Plaintiffs propose to rely on the evidence. Plaintiffs do not seek to hold Walgreens liable for the actions of AmerisourceBergen as a legal control person or parent entity. Rather, Plaintiffs seek to enter evidence of Walgreens' ownership interest in AmerisourceBergen as being relevant to Plaintiffs' conspiracy claims.

The financial relationships between Defendants, including Walgreens's ownership interest in AmerisourceBergen, are relevant to show the continuing conspiracy among the Defendants and should not be excluded under Rule 402. Plaintiffs' summary judgment briefing concerning Plaintiffs' RICO and conspiracy claims set out the significant financial interests implicit in the

relationships among and between the Defendant coconspirators. *See, e.g.,* Dkt. #2182 at pp. 63-68. This evidence of Defendants' financial interests and connections is relevant to Plaintiffs' conspiracy claims. *See United States v. Robinson*, 763 F.2d 778, 783 n.8 (6th Cir. 1985) ("evidence tending to establish. . . . an ownership interest . . . would be relevant as tending to show . . . a motive for entering into the conspiracy"); *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (evidence establishing ownership were relevant to establish "financial stake in the profitability" of an entity in context of alleged conspiracy); *Cadence Educ., LLC v. Vore*, No. 17-CV-2092-JTM-TJJ, 2018 WL 690993, at *7 (D. Kan. Feb. 2, 2018) (defendants ordered to produce documents concerning ownership interest in corporate entities and relationships between corporate entities as being relevant to conspiracy claims).

Walgreens has repeatedly taken the position that its liability ended when it ceased self-distribution. However, as set out in Plaintiffs' summary judgment briefing regarding Plaintiffs' conspiracy claims, Walgreens did not withdraw from the Conspiracy at that time – or ever – and has continued to work with other Defendants, including AmerisourceBergen, to continue to support the conspiracy's objectives. Dkt. #2182 at pp. 116-117. Walgreens remains liable for the actions of its coconspirators in furtherance of the conspiracy, regardless of its cessation of distribution. The jury should be permitted to consider Walgreens' near simultaneous decision to stop self-distribution, entry of an exclusive distribution relationship with coconspirator AmerisourceBergen, its corporate involvement in the AmerisourceBergen SOM review of Walgreens orders, and the beginning of Walgreens acquisition of significant amounts of AmerisourceBergen stock, which also provided Walgreens with a seat on AmerisourceBergen's Board.

Walgreens's continued participation in the conspiracy and financial relationships to conspirators are relevant to show Walgreens's continued corporate involvement in and support of the conspiracy, including Walgreens's involvement in the SOM procedures applied by AmerisourceBergen to orders for prescription opioids placed by Walgreens's pharmacies, and do not transform Plaintiffs distribution and conspiracy based claims into claims based on Walgreens pharmacy level dispensing. Walgreens' MIL No. W-1 should be denied.

2. **Walgreens' MIL No. W-2**: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement.

The arguments asserted by Walgreens regarding admissibility under Rule 408 and 403 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

With regard to Walgreens' argument that evidence concerning the Florida DEA enforcement action should be excluded because it occurred in Florida, rather than Ohio, this argument ignores the well-known problem of opioid "migration" from one location to another. As the Washington Post recently reported,

> During the past two decades, *Florida became ground zero for pill mills* — pain management clinics that served as fronts for corrupt doctors and drug dealers. They became so brazen that some clinics set up storefronts along I-75 and I-95, advertising their products on billboards by interstate exit ramps. So many people traveled to Florida to stock up on oxycodone and hydrocodone, they were sometimes referred to as "prescription tourists."
>
> *The route from Florida to Georgia, Kentucky, West Virginia and Ohio became known as the "Blue Highway."* It was named after the color of one of the most popular pills on the street — 30 mg oxycodone tablets made by Mallinckrodt, which shipped more than 500 million of the pills to Florida between 2008 and 2012.
>
> When state troopers began pulling over and arresting out-of-state drivers for transporting narcotics, drug dealers took to the air. *One airline offered nonstop flights to Florida from Ohio and other Appalachian states, and the route became known as the Oxy Express.*

"76 billion opioid pills: Newly released federal data unmasks the epidemic," The Washington Post, July 16, 2019 (emphasis added).[71]

There is abundant evidence in the record – including in Walgreens' own internal documents – that the opioids the Defendants shipped migrated far beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon. *Supra* at fn.37. Defendants were regularly alerted to the migration phenomenon

---

[71] *Available at* https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html (accessed on 10/3/19).

by the DEA, and their personnel acknowledged the reality of diversion and migration in their depositions. *Supra* at fns.39-40.

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Walgreens' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped hundreds of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come long distances from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every diverted pill posed a risk to localities throughout the nation was not only foreseeable to Walgreens, it was observed and known by them. Each shipment Walgreens made in disregard of the potential for diversion is evidence of damages caused by Walgreens to localities throughout the nation, including Cuyahoga and Summit Counties.

Because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a SOM program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Each Defendant's SOM was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. Because of the uniform national character of Defendants' SOMs, each wrongful order filled by Defendants is further evidence of the flaws in Defendants' SOMs, and of the consequences of those flaws. Defendants' efforts to exclude this highly probative evidence, including by Walgreens' MIL No. W-2, should be denied.

3.      <u>Walgreens' MIL No. W-3</u>: **To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man."**

Walgreens' motion to preclude evidence or argument that former DEA Deputy Administrator Joseph Rannazzisi's credibility is bolstered by his appearance on "60 Minutes," or by reporting by other news outlets, has no merit. Walgreens specifically seeks to preclude such references – and in particular, reference to Mr. Rannazzisi as the "60 Minute Man" – on the grounds that such references would invade the jury's role as factfinder, as well as mislead and confuse the jury. These purported concerns cannot be taken seriously.

First, Walgreens' objection to the specific phrase "60 Minute Man" – to reference a man who appeared on "60 Minutes" – has no legal basis. The parties have listed hundreds of names to appear as potential witnesses at trial, and each witness called by the parties will testify in varying levels of detail as to their backgrounds, educational history, employment history, as well as their involvement and interactions with the opioid epidemic. Brief, accurate references to a relevant and undisputed part of a witness's history are thus necessary at trial. Instead of reciting a witness's full name, full job title, and dates of employment, counsel routinely instead refers to "the Walgreens' CEO," "the ABDC Consultant," or "the Mallinckrodt Investigator." "The 60 Minute Man" is no different, and this phrase includes no commentary or argument as to Mr. Rannazzisi's credibility. It simply references a critical part of one witness's relevant history in a neutral, shorthand phrase. Forbidding such references at trial would result in bizarre affirmative rules mandating the use of each witness's full name and title each time counsel references that witness. Walgreens' request here is unreasonable and untenable, and must be denied.

Second, actual references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, do nothing to invade the jury's role as a factfinder to weigh the strength of the evidence. In fact, such references affirmatively provide additional evidence for the jury to weigh. With this evidence – and any admissible impeachment evidence offered by Defendants – the jury is free to determine whether it finds Mr. Rannazzisi to be a

credible witness.[72]  Indeed, a reputable news outlet's use and reliance on Mr. Rannazzisi's comments in a national broadcast or publication constitutes valid and admissible evidence of his credibility. And Walgreens cites no authority that such evidence is typically excluded.

Finally, references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, also do nothing to mislead or confuse the jury.  The decision of various news outlets to broadcast and publish Mr. Rannazzisi's statements is useful information the jury should consider in weighing the strength of his testimony.  This inference does not mislead the jury as to any facts (and Walgreens identifies none), nor does it confuse the jury as to any facts (and Walgreens identifies none).  Walgreens' MIL No. W-3 should accordingly be denied.

## E. Plaintiffs' Response to Cardinal Health Inc's Motions *in Limine* (Dkt. #2653).

### 1. Cardinal MIL No. 1: 14,000 Orders Not Shipped.

Cardinal erroneously seeks to exclude evidence that it failed to report more than 14,000 suspicious orders nationwide under Rule 402 and pursuant to a misplaced and repeatedly rejected preemption argument.  Dkt. #2653-1 at pp. 1-4.  Cardinal's MIL is due to be denied on both grounds.

Cardinal's admitted failure to report suspicious orders is relevant to Plaintiffs' claims that Cardinal failed to maintain effective controls against the diversion of opioids.  This evidence presents another example of Cardinal's failures both in CT1 counties specifically and nationally. Even after the DEA took action against Cardinal in 2008 and 2012, Cardinal continued to fail to establish an effective SOM program.  Over at least six years[73] Cardinal was failing to report

---

[72]  *See U.S. v. Turning Bear*, 357 F.3d 730 (8th Cir. 2004) (admitting evidence of witness's character for truthfulness over Rule 403 objection, that was neither substantially outweighed by unfair prejudice nor needlessly cumulative, where credibility of the testimony was at issue); *U.S. v. Lopez-Ortiz*, 736 F. Supp. 2d 469, 471 (D.P.R. 2010) ("Allowing defense counsel to introduce admissible testimony or other evidence bearing on the government witnesses's character would not result in unfair prejudice to the government's case or unfairly influence the jury.").

[73]  Cardinal told the DEA that the "vast majority" of the unreported suspicious orders were placed during the time period of 2012-2015, but that 23 have occurred since January 1, 2017. **Ex. 19** [CAH_MDL2804_02101803].

suspicious orders of the most highly abused opioids and only disclosed their failures in 2018 because of pending litigation with an attorney general.

The seriousness of Cardinal's failure to report these suspicious orders is underscored by the fact that, according to Cardinal, the "vast majority" of the suspicious orders were for formulations of opioids most likely to be diverted and abused.[74] Cardinal sets sub-base code thresholds only for the most highly abused strengths of certain opioids. These formulations, according to Cardinal, "are more susceptible to diversion and abuse," including in particular 15 and 30 milligram doses of oxycodone and 10 milligram doses of hydrocodone.[75] If it was not egregious enough that Cardinal failed to report thousands of suspicious orders over the course of at least six years, the fact that most of those orders were for the most dangerous versions of opioids is astounding given the company's history with DEA administrative actions. The unreported suspicious orders are directly relevant to whether Cardinal was able to maintain effective controls against diversion after 2012.

While Cardinal contends that four of the more than 14,000 unreported suspicious orders originated from Summit and/or Cuyahoga Counties, Cardinal advised the DEA that 887 of the orders were placed by customers in the Wheeling, West Virginia Distribution Center's service area, which includes Summit and Cuyahoga Counties.[76] Even if the orders were not shipped, it is undisputed that pharmacies in this region placed nearly 900 suspicious orders, the vast majority of which were for the most abused and diverted opioids.[77] Cardinal's failure to report allows these bad pharmacies to continue to operate without further investigation.

Cardinal attempts to downplay the number of suspicious orders it failed to report by stating that it was reporting "tens of thousands of orders a year" from 2012 to 2015. However, in his 2012 Annual Quality and Regulatory Report to the Cardinal Board of Directors' Audit Committee, Chief

---

[74] *Id.*

[75] **Ex. 20** [CAH_MDL2804_00069435] at 48.

[76] **Ex. 19** [CAH_MDL2804_02101803] at 4.

[77] Dkt. #1959-14 (9/26/18 Cameron Dep.) at 269:12-270:13 (produced at CAH_MDL2804_02953369); **Ex. 20** [CAH_MDL2804_00069435] at 48.

Legal and Compliance Office Craig Morford reported that Cardinal had reported only 3,020 suspicious orders to the DEA nationwide in fiscal year 2012.[78] The ratio of unreported suspicious orders versus reported suspicious orders is much larger than Cardinal presents.

Finally, Cardinal recycles again here the preemption arguments this Court has repeatedly rejected.[79] Those arguments are made no more persuasive in their third iteration. Cardinal's MIL No. 1 should be denied.

---

[78] **Ex. 21** [CAH_MDL2804_03262274] at 438.

[79] Dkt. #1025 (Report and Recommendation) at pp. 48-54 (rejecting preemption arguments); Dkt. #1203 (Opinion and Order) at p. 2 (adopting R&R decision on preemption); Dkt. # 2565 (Opinion and Order re: Preemption) (rejecting all preemption arguments).

2.    **Cardinal MIL No. 2: "Interesting Gossip" Email.**[80]

Cardinal bases its argument that MCKMDL00545341 should be excluded under Rules 402
and 403 (Dkt. #2653-1 at p. 4) on a misconstruction of the purpose for which Plaintiffs propose to
use the email at trial.  The email, and the notes attached thereto, contain the report from Cardinal's
Director of Regulatory Affairs of a "Huddle" meeting among Cardinal, McKesson,
AmerisourceBergen, and HD Smith (the self-styled "Big Four") and the issues discussed therein,
including those related to CSA compliance.  Plaintiffs do not intend to cite the email as evidence
that Cardinal failed to report suspicious orders, but rather as evidence of the nature of the
relationships between these Defendants and the types of CSA compliance related issues they
discussed and coordinated together.[81]

The evidence is relevant and should not be excluded under Rule 402.  The email Cardinal
moves to exclude contains notes from a Big Four "Huddle" meeting that occurred during and after
an HDA conference.  During this Huddle, these Defendants all discussed CSA compliance issues,
including intentional failure to comply.  This document (among others) shows that Big Four
Huddles in conjunction with HDA conferences occurred and further shows the kinds of discussions
that occurred at the meetings.  This evidence is particularly relevant to Plaintiffs' RICO and
conspiracy claims because it shows, as Plaintiffs' alleged in their TAC,[82] that Defendants used the
HDA as a forum in which to form agreements, to discuss issues related to suspicious order
compliance, and to coordinate their activities.  The document is also relevant to show Defendants'
knowledge of – and failure to report - the noncompliance of direct competitors.  Moreover, the

---

[80]    Though Cardinal's motion refers to MCKMDL0054341, based on the first page of the email, which
Cardinal attaches to the motion, and the context of the argument, Plaintiffs believe Cardinal made a
typographical error and respond regarding MCKMDL00545341.  Further, Cardinal only includes the
cover page of MCKMDL00545341 as an exhibit to its motion, depriving the Court of the full context of
the document.  Plaintiffs attach the complete document – including the attached notes – here.  *See* **Ex. 22**
[MCKMDL00545341-347].

[81]    The purpose for which Plaintiffs intend to offer the email is confirmed in Plaintiffs' omnibus summary
judgment opposition briefing regarding Plaintiffs' Conspiracy, RICO, and OCPA claims (Dkt. #2182 at
pp. 37 and Exhibit 291).

[82]    *See* Dkt. #1466 (Summit Third Amended Complaint) at ¶¶ 540-546, 763-767, 854, 910.

"interesting gossip" section of the Huddle notes is also relevant to show that the relationships between these Defendants were so secure that Cardinal felt comfortable disclosing intentional regulatory violations.

Rule 403 does not justify exclusion of the Big Four Huddle document. While all evidence is prejudicial, Rule 403 requires that the probative value of the document be outweighed by the prejudice. *See Koloda v. General Motors Parts Div., General Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'"). Exclusion under Rule 403 is an "extraordinary remedy and carries a strong presumption in favor of admissibility." *In re Air Crash at Lexington, KY*, No. 5:06-CV-316-KSF, 2008 WL 2782827, at *1 (E.D. Ky. July 8, 2008) (citing *U.S. v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). *See also In re Air Crash Disaster*, 86 F.3d 498, 538 (6th Cir. 1996) ("Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant—the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or inappropriate. The truth may hurt, but Rule 403 does not make it inadmissible on that account."). Here, there are multiple reasons why this Big Four Huddle document has probative value regarding the defenses and claims at issue in this case, as discussed above. Cardinal's only argument about prejudice is their presumption (without supporting evidence) that the document contains an allegedly inaccurate statement that would require rebuttal and take time. Cardinal's position is simply not enough to overcome the significant probative value of the Big Four Huddle document. Cardinal's MIL No. 2 should be denied.

### 3.   <u>Cardinal MIL No. 3</u>: Misleading Data Comparisons (McCann Data Analysis).

Cardinal seeks to prohibit Plaintiffs' expert Dr. Craig McCann from testifying based upon data produced by Cardinal for the years 1996-2005. Cardinal argues that because it retained and produced data for several years prior to the period covered by other Distributor Defendants' productions, the jury may be confused when comparing Dr. McCann's opinions regarding Cardinal to his opinions regarding the other Distributor Defendants. Plaintiffs dispute Cardinal's contentions

regarding the potential for juror confusion and do not believe any limiting instruction is necessary. Should the need arise for any clarification, Defendants can make a request for a properly worded instruction at the time the evidence is offered and a determination as to the appropriateness of said instruction can be made at that time.

**F.  PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663).**

**1.  <u>McKesson MIL No. MCK-1</u>: The Court should prohibit any reference to baseless accusations.**

McKesson asks the Court to prohibit Plaintiffs from making "baseless accusations." Dkt. #2663-1 at p. 1.  This request is one part specific, and one part general.  As to the general, of course, Plaintiffs do not believe their allegations of McKesson's widespread and rampant misconduct are baseless, and indeed, the parties' disagreement on this score is the reason for the trial.  Thus, McKesson's vague request that Plaintiffs be precluded from referencing "unfounded accusations" in "opening, closing, or during examination of witnesses" should be rejected. Dkt. #2663-1 at p. 2.

As to the specific, McKesson complains about certain deposition questions regarding former Attorney General Eric Holder.  Plaintiffs dispute that the questions were baseless, but this testimony was not designated by Plaintiffs for trial, and so the request to strike reference to them is now moot. McKesson also complains about deposition questions pertaining to whether McKesson Chief Executive Officer John Hammergren knowingly provided false information during Congressional testimony when he stated that McKesson did not market opioids to, among others, pharmacists.  *Id.* This is an entirely appropriate area of inquiry in light of McKesson's marketing agreements with other Defendants, including Teva, Purdue, and Actavis.  *See, e.g.,* Dkt. #2169-32/#2173-50 (7/19/18 Oriente Dep.) at 278-287, 305-313.  McKesson has every right to argue that Hammergen's testimony was the whole truth, but Plaintiffs have the equal right to present witnesses with evidence that suggests otherwise and question the bases of McKesson's public statements.  *See, e.g., Goldman,* 559 F. Supp. 2d at 871 ("Factual questions should not be resolved through motions in limine.").

For these reasons, McKesson's MIL No. MCK-1 should be denied.

**2.** **McKesson MIL No. MCK-2:** **The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation.**

McKesson's MIL No. MCK-2 seeks to preclude Plaintiffs from offering evidence or argument regarding the U.S. House of Representatives Energy and Commerce Committee's Investigation. Dkt. #2663-1 at p. 2. This MIL should be denied for the following reasons.

> i.  *The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.*

The U.S. House of Representatives, Committee on Energy and Commerce Report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (the "House Report") (**Ex. 23**) clearly is admissible under Rule 803(8) of the Federal Rules of Evidence. Rule 803(8) provides, in relevant part:

> A record or statement of a public office [is not excluded by the rule against hearsay] if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED. R. EVID. 803(8). Rule 803(8) is intended to encompass investigative or "evaluative reports" generated in the course of a public agency's duties. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 166 (1988). Examples of the types of agency investigative reports admissible under Rule 803(8) include accident reports prepared by specialized agencies, consumer safety studies, and diagnostic studies relating to issues of public health.[83] Conclusions and opinions, as well as facts, are admissible under Rule 803(8) as long as they are based on a factual investigation and satisfy the Rule's trustworthiness requirement. *Beech Aircraft*, 488 U.S. at 170.

---

[83]  *See, e.g., id.* at 170 (Air Force accident report on cause of plane crash in training exercise); *United States v. Midwest Fireworks Mfg. Co.*, 248 F. 3d 563, 566-67 (6th Cir. 2001) (reports of Consumer Product Safety Commission); *O'Dell v. Hercules, Inc.*, 904 F. 2d 1194, 1204-06 (8th Cir. 1990) (CDC report on health risks from environmental exposure to dioxin).

In light of this presumption of admissibility, the party opposing the admission of the report must prove that the report is not trustworthy. *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979). To determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems. *Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.*, 959 F.2d 606, 616–17 (6th Cir. 1992). McKesson has failed to show that the House Report lacks trustworthiness under any of these factors.

The House Report was the result of an in-depth, bipartisan investigation into the distribution of prescription opioids by wholesale distributors, which was undertaken as part of the Committee's legislative responsibilities. The report itself contains factual findings. The Subcommittee on Oversight and Investigations held hearings and received sworn testimony from, and posed questions to, representatives of each of the wholesale drug distributors involved in the investigation. The Subcommittee examined the role that each company may have played in contributing to the opioid epidemic. In addition, the five distributors (Cardinal Health, AmerisourceBergen, McKesson, Miami-Luken and H.D. Smith) provided thousands of pages of documents to the Committee, including due diligence files, suspicious order reports and policy manuals. **Ex. 23** [House Report] at p. 40. In all, the Committee, through its members and staff, sent twelve letters requesting documents and information, reviewed more than 20,000 pages of material obtained from the DEA and wholesale distributors, participated in numerous briefings with the DEA and wholesale distributors, and held two hearings. *Id.* at pp. 43-44.

McKesson bases its challenge on possible motivational problems, arguing that the investigation was "highly charged" and involved matters already a subject of litigation (and thus subject to influence by the litigants). Dkt. #2663-1 at p. 2. The cases McKesson cites for its proposition mostly involve draft reports and partisan investigations.[84] In contrast, here the House

---

[84] *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005) (affirming exclusion on the grounds that "the Department of Energy's assessment was only a draft report"); *Pearce v. E.F. Hutton*

Report is a final report which resulted from a bipartisan investigation. Where, as here, members of both parties joined in the report, courts have been more likely to reject challenges to the admissibility of Congressional reports.[85] McKesson has not pointed to anything in either the House Report or the hearings that would indicate that the report was prepared primarily or even partially to assist in ongoing opioid-related litigation. McKesson alleges that Plaintiffs' counsel in this litigation played an active role in the investigation process, including by briefing congressional staff and providing them with "factsheets" about the opioid epidemic. Dkt. #2663-1 at p. 2 n.4. McKesson fails to state that Defendants also had input into the investigation, including briefing congressional staff and providing documents and testimony. **Ex. 24** [MCKMDL00373829]; **Ex. 25** [ABDCMDL00320377]; **Ex. 26** [CAH_MDL_PRIORPROD_HOUSE_0004057]; **Ex. 27** [CAH_MDL_PRIORPROD_HOUSE_0004068]; **Ex. 28** [ABDCMDL00321879]; **Ex. 29** [MCKMDL00373814].

      ii. *The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.*

The investigation that led to the House Report sought to "evaluate the extent that distributors implemented controls to prevent diversion of opioids." **Ex. 23** [House Report] at p. 4. Further, while the House Report "focused on a narrow part of West Virginia, the report raises grave concerns about practices by the distributors and the DEA nationwide." *Id.* at p. 9. The House Report notes that its findings "raise questions about the effectiveness of distributors' anti-diversion efforts outside West Virginia, as the same policies were implemented across the country." *Id.* at p. 105. Thus, the House Report's probative value is not limited to conduct that occurred in West

---

*Group, Inc.*, 653 F. Supp. 810, 813–15 (D.D.C. 1987) (excluding House committee report that was "dissented to directly along party lines" and that failed "to isolate or distinguish any factual findings from its subjective criticisms and conclusions").

[85] *See McFarlane v. Ben–Menashe,* No. 93–1304, 1995 WL 129073, at *4–*5 (D.D.C. March 16, 1995) (admitting the report of a joint Congressional task force in which members of both parties joined), *reconsideration granted on other grounds,* 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson,* 556 F. Supp. 1157, 1181 (D.D.C. 1982) (admitting committee report that "reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness"), *aff'd in part, rev'd in part on other grounds,* 757 F.2d 1 (D.C. Cir. 1985).

Virginia. The House Report is directly relevant to the litigation, going to Defendants' due diligence, suspicious order monitoring and reporting practices. Further, Defendants' own experts relied on the House Report and it was included on at least one Defendant exhibit list.[86]

Thus, there is no doubt that this evidence is highly probative on a number of issues and Defendants have not met their burden to demonstrate a risk of prejudice, much less a risk that is so substantial that outweighs their probative value.

### iii. Testimony Provided to the Committee is Also Admissible.

McKesson also challenges the admissibility of testimony given by McKesson Chairman, President and CEO John Hammergren to the Subcommittee on Oversight and Investigations Committee on Energy and Commerce United States House of Representatives. The statements made by Mr. Hammergren were made while he was the McKesson Chairman, President and CEO of McKesson and related to McKesson's role in the supply chain and its SOM system, unquestionably matters within the scope of his employment. These statements are therefore admissible as party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Additionally, to the extent that Defendants' experts relied on this testimony it is relevant to challenge their opinions.[87]

### iv. Letters from members of Congress to McKesson Are Admissible.

McKesson argues that the February 15, 2018 letter sent from members of Congress to McKesson is inadmissible hearsay. However, the letter to McKesson is not offered to prove the truth of the matters asserted in the letter, but rather as background for the House investigation and to show McKesson's awareness of the investigation and that the statements in the letter were

---

[86] *See* Dkt. #2174-2/#2172-2 (Bell Expert Rep.) at p. 70 and n.329; Dkt. #2544-1/#2546-1 (Cantor Expert Rep.) at pp. 95-96 and Attachment 3 – Materials Considered at p. 8; **Ex. 30** [Purdue Exhibit list of September 10, 2019].

[87] John Dombrowski, MD, and expert for distributor defendants McKesson Corporation, AmerisourceBergen Drug Corporation, and Cardinal Health included Mr. Hammergren's testimony in his report as material he considered in forming his opinions. *See* **Ex. 31** [Expert Report of John Dombrowski, MD, Exhibit C P. 3].

1845586.1 96

made. Evidence is not hearsay when it is not offered to prove the truth of the matter asserted. *See Anthony v. DeWitt,* 295 F.3d 554, 563 (6th Cir. 2002). "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." FED. R. EVID. 801, Advisory Committee Note to Subdivision (c), 1972 Proposed Rules. Further, "[s]tatements to prove the listener's knowledge are not hearsay." *U.S. v. Boyd,* 640 F.3d 657, 664 (6th Cir. 2011).

3. **McKesson MIL No. MCK-3**: **The Court should prohibit the introduction of nationwide trends in drug deaths.**

McKesson seeks to exclude certain Centers for Disease Control ("CDC") maps on the basis that Plaintiffs may inaccurately characterize the data depicted on the maps. But McKesson's expressed concerns do not warrant the remedy of exclusion of this evidence. If in fact McKesson believes that an inaccurate or misleading suggestion is made by Plaintiffs at trial regarding these maps, McKesson can object at the time and/or address the matter through cross-examination.

No more availing is McKesson's argument that the maps should be excluded as irrelevant because, in McKesson's view, Plaintiffs lack evidence that McKesson caused any death, and Plaintiffs may not "seek damages beyond their borders." Dkt. #2663-1 at p. 4. But these maps are relevant to numerous other issues, including by providing useful background with respect to the scope and nature of the opioid crisis, and showing (with appropriate qualification) the relationship between increased prescription opioid shipment and harms, including mortality—a subject of extensive expert testimony. As Plaintiffs' causation and damage experts make clear, increased shipments led to increased harms, and Plaintiffs' experts use mortality as the primary proxy for these harms – an analysis this Court has already blessed in rejecting Defendants prior complaints about the purported irrelevance of mortality in their *Daubert* motions. Indeed, as explained in Prof. Cutler's expert report, the field of health economics routinely studies how the use of substances—including addictive ones such as tobacco, alcohol, and more recently, opioids—are related to personal harms such as mortality. Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶ 14. The use of mortality trends and statistics is hardly controversial, and in fact is of fundamental

relevance in measuring the magnitude of the harms caused by defendants' misconduct. Information of this type will greatly assist the jury in understanding the issues presented at trial.

Accordingly, McKesson's MIL No. MCK-3 should be denied.

4. **McKesson MIL No. MCK-4: The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ.**

McKesson argues that allegations contained in enforcement letters from the DEA and DOJ should be excluded "[f]or substantially the same reasons that the Court should exclude settlement agreements." Dkt. #2663-1 at pp. 4-5. For the same reasons discussed in § B.1, *supra*, that evidence is not precluded by Rule 408 or any other rule of evidence. That evidence is relevant, among other reasons, to prove that McKesson engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs, and that they were on notice of the ways in which its conduct violated the law.

5. **McKesson MIL No. MCK-5: The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct.**

McKesson improperly seeks to exclude the entirety of the 30(b)(6) testimony[88] from its designated witness Nathan Hartle based only on a couple of areas of questioning undertaken by Plaintiffs, which covered a small portion of a day long deposition that spanned nearly 400 pages of testimony. Dkt. #2663-1 at pp. 6-7. In reality, Plaintiffs' questioning of Mr. Hartle in his capacity as a 30(b)(6) witness was reasonable and tailored to the broad range of topics Mr. Hartle was designated to discuss. Mr. Hartle directly answered these questions and McKesson's belated

---

[88] Mr. Hartle was deposed in two different capacities in this case. On July 31, 2018, he testified as a 30(b)(6) designee. On August 1, 2018, he provided fact witness testimony as well. Given that McKesson's arguments in its motion *in limine* focus solely on Mr. Hartle's 30(b)(6) testimony, Plaintiffs respond only to the baseless accusations made as to that testimony. While there is equally no basis to exclude Mr. Hartle's fact testimony, Plaintiffs reserve the right to separately oppose exclusion of that testimony should that remedy be sought by McKesson in the future.

attempts to unpack that credible and admissible testimony should not be rewarded.  Thus, McKesson's MIL should be denied in its entirety.[89]

First, McKesson's complete failure to seek assistance from the Special Master or the Court at or following Mr. Hartle's deposition demonstrates that Plaintiffs did not act in a "wasteful" and "abusive" manner as McKesson now contends.  Dkt. #2663-1 at p. 6.  Rather, McKesson's motion is nothing more than an improper attempt to exclude admissible testimony that is simply contrary to the liability picture it now intends to portray to the Court and the jury.  Routinely throughout the discovery phase of this case Special Master Cohen was heavily involved in the conduct of depositions, and in fact, actually attending some of the depositions that were taken.  Despite the Special Master's active involvement in the deposition process, McKesson never once asked for relief from the Special Master related to Mr. Hartle's deposition.  This is telling, given that Mr. Hartle's 30(b)(6) deposition was only the third of twenty depositions taken of current or former McKesson employees during the discovery phase.  If McKesson truly believed Plaintiffs acted in an abusive and wasteful fashion during Mr. Hartle's 30(b)(6) deposition it surely would have sought relief from the Special Master and/or the Court before Plaintiffs continued with seventeen additional depositions of McKesson witnesses, including the fact witness deposition of Mr. Hartle himself.

Second, the questioning addressed by McKesson was completely legitimate and consistent with the subject matter areas for which McKesson designated Mr. Hartle.   McKesson designated Mr. Hartle on ten different topics that spanned broad areas concerning McKesson's duties under the CSA, the company's efforts to comply with the CSA, data concerning opioid orders supplied to CT1 pharmacies, and information concerning suspicious orders identified for CT1 pharmacies.[90]

---

[89]   Although its criticisms of Mr. Hartle's deposition have no merit, McKesson could easily avoid having his deposition played at trial by simply making him available to testify live.

[90]   Specifically, Mr. Hartle was designated to cover the entirety of Plaintiffs' first 30(b)(6) notice and topics 9, 14, and 16-22 of Plaintiffs' second 30(b)(6) notice.  *See* Dkt. #2663-4 (Amended First Notice of Deposition); Dkt. #2663-5 (Amended Second Notice of Deposition).

The testimony cited by McKesson concerning opioids being a gateway to heroin use certainly relates to McKesson's duties under the CSA and why those duties are important. McKesson concedes the relatedness of this inquiry, but instead complains that answering this question requires "specialized medical and public health knowledge." Dkt. #2663-1 at p. 6. As an expert in controlled substances generally, and opioids specifically, McKesson should have such specialized knowledge to be able to answer questions on this topic. Thus, McKesson alone had the ability and responsibility to select the appropriate person to address this inquiry. Moreover, Mr. Hartle had no problem answering the question posed of him on this subject because, in fact, he does possess such specialized knowledge himself.[91] Mr. Hartle has presented data on opioids being a gateway to heroin use to various McKesson pharmacy customers and to McKesson employees in his capacity as Senior Regulatory Affairs Director at McKesson.[92] The fact that McKesson trusted Mr. Hartle's expertise to discuss opioids being a gateway to heroin use in presentations to its own customers and its own employees alone completely undercuts the validity of McKesson's argument that Mr. Hartle lacks the requisite knowledge on this subject now.

Similarly, Mr. Hartle readily acknowledged, as the company's 30(b)(6) designee, McKesson's role in contributing to the opioid epidemic.[93] Given that Mr. Hartle was designated by McKesson to broadly speak to the company's compliance, or lack thereof, with its regulatory and societal responsibilities concerning opioid distribution, this testimony is well within the scope of topics Mr. Hartle could reasonably be expected to discuss. Moreover, McKesson is undoubtedly in an excellent position to judge its own culpability in contributing to the opioid epidemic, and as the company's designated spokesperson on those topics, Mr. Hartle is precisely the person that should be expected to answer this central question. *See* e.g., *Hilton Hotels Corp. v. Dunnet*, No. 00–2852–GV, 2002 WL 1482543, *2 (W.D.Tenn. Mar. 15, 2002) (30(b)(6) deponents are expected to speak as to

---

[91] Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 320:14-321:13.

[92] *See* **Ex. 32** [MCKMDL00430424] at 425; **Ex. 33** [MCKMDL00448596] at 611; Dkt. #1962-24/#1978-4 (8/1/18 Hartle Dep.) at 34:16 – 40:3.

[93] Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 285:6-286:15.

"the knowledge of the corporation and the corporation's subjective beliefs and opinions and interpretation of documents and events"). While McKesson no doubt dislikes the testimony Mr. Hartle offered on this point, that distaste does not justify the exclusion of this vitally important testimony.

Third, despite the fact that Plaintiffs' examination was tailored to the confines of the 30(b)(6) notices, Plaintiffs were not necessarily limited to questioning Mr. Hartle on matters specifically included in those notices. As outlined in *King v. Pratt & Whitney, a Div. of United Technologies Corp.,* 161 F.R.D. 475, 476 (S.D. Fla. 1995):

> Rule 30(b)(6) should not be read to confer some special privilege on a corporate deponent responding to this type of notice. ... Rather, the Rule is best read as follows:
>
> 1) Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice.
>
> 2) If the designated deponent cannot answer those questions, then the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions, etc. The corporation has an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are "known or reasonably available" to the corporation. Rule 30(b)(6) delineates this affirmative duty.
>
> 3) If the examining party asks questions outside the scope of the matters described in the notice, the general deposition rules govern (i.e. Fed.R.Civ.P. 26(b)(1)), so that relevant questions may be asked and no special protection is conferred on a deponent by virtue of the fact that the deposition was noticed under 30(b)(6).
>
> 4) However, if the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem.

This interpretation of the scope of examinations under Rule 30(b)(6) has been explicitly followed by courts in the Sixth Circuit. *See e.g., Harris v. Goins,* No. 6: 15-151-DCR, 2017 WL 4080692, *2 (E.D. Ky. Sep. 14, 2017) (citing *King,* 161 F.R.D. 475) ("Rule 30(b)(6) does not limit what can be asked at a deposition"). Thus, McKesson's contention that Plaintiffs somehow strayed from the 30(b)(6) topics is immaterial, as the notices themselves did not serve to limit the topical areas that could be addressed with Mr. Hartle.

Finally, even assuming the portions of the examination pinpointed by McKesson were improper – which they were not – McKesson has offered no justification or authority for excluding the entirety of Mr. Hartle's 30(b)(6) testimony based on the narrow set of issues it has identified. The glaring lack of authoritative support for this remedy speaks volumes to the futility of the motion itself. In fact, the more appropriate approach would be to deal with these issues through the process already in place to deal with objections to deposition designations. Wholesale exclusion of the entirety of Mr. Hartle's 30(b)(6) testimony is simply not the appropriate answer under any circumstances. McKesson's MIL No. MCK-5 should be denied.

6. **McKesson MIL No. MCK-6:** The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance.

McKesson asks the Court to prohibit introduction of documents related to McKesson's relationship with CVS and Rite Aid because CVS and Rite Aid were severed from the Track I Trial. The Court should deny this MIL because: (1) evidence about McKesson's "relationship" with CVS and Rite Aid is central to Plaintiffs' civil conspiracy claim, so that evidence poses no danger of a "trial within a trial" – it is the trial itself; and (2) severance of defendants is not a basis for excluding any evidence about those defendants in a conspiracy case.

A critical component of Plaintiffs' conspiracy claim is the many actions and inactions by Distributor Defendants, including McKesson, to ensure that they and their pharmacy customers, including CVS and Rite Aid, could avoid having to report suspicious orders.[94] Far from creating a "trial within a trial," evidence about McKesson's relationship with CVS (McKesson's largest customer from 2008-2018) and Rite Aid goes directly to Plaintiffs' allegations that Distributor and Pharmacy Defendants conspired to protect and grow the opioids market by, inter alia, avoiding their reporting obligations to the DEA. One of the key provisions of McKesson's Controlled Substance Monitoring Program was creation of appropriate thresholds for opioid sales to pharmacy

---

[94] *See, e.g.,* Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment of Plaintiffs' Civil Conspiracy, RICO and OCPA Claims) at pp. 68-70.

customers.[95]  Yet, McKesson repeatedly and automatically increased thresholds for both CVS and Rite Aid, without adequate due diligence, and failed to investigate or report suspicious orders by these chain pharmacies in order to advance their common purpose to avoid suspicious order reporting.[96]  Such evidence does not pose any risk of a "trial within a trial" – it is evidence that will support Plaintiffs' conspiracy claim.[97]  This evidence will not cause McKesson to defend CVS and Rite Aid's internal SOM processes, but its role in abdicating its own duties,[98] which again is evidence going directly to Plaintiffs' claims.

Second, McKesson cites no authority for the proposition that a defendant's severance precludes introduction of evidence regarding the relationship between that defendant and a non-severed defendant.  Even assuming such a rule exists (which it does not), its application here would improperly hamstring Plaintiffs in presenting their conspiracy claim.  Granting this motion would unduly prejudice Plaintiffs by preventing them from presenting direct evidence of McKesson's role in the conspiracy.  Indeed, McKesson acknowledged that evidence regarding the relationship between Distributor Defendants and Pharmacy Defendants would be central to Plaintiffs' conspiracy claims when opposing severance.  Dkt. #2143 at pp. 6-7.  Under these circumstances McKesson's MIL No. MCK-6 should be denied.

---

[95]   Dkt. #1959-4 (1/17/19 Boggs Dep.) at 88:19–89:18.

[96]   *See, e.g.*, Dkt. #1971-19 (1/10/19 D. Walker Dep.) at 279:4-24, 288:6–291:1; Dkt. #2261-10 (MCKMDL00632825); Dkt. #2261-26 (MCKMDL00627723); Dkt. #2261-25 (MCKMDL00629858); Dkt. #2261-28/#2371-86 (MCKMDL00632923); Dkt. #2261-27 (MCKMDL00646634).

[97]   The cases McKesson cites do not support exclusion of evidence in this trial of McKesson's involvement with other actors as part of a conspiracy.  *Chism v. CNH Am., LLC*, 638 F.3d 637, 642 (8th Cir. 2011) (in personal injury case against manufacturer of hay baler, excluding evidence of other accidents involving hay balers because of lack of substantial similarity); *Widmer v. Warden, Corr. Reception Ctr.*, 2017 WL 447237, at *49 (S.D. Ohio Feb. 2, 2017) (in habeas corpus action seeking relief from murder conviction, refusing to allow inmate to cross-examine investigator based on alleged prior instance of untruthful conduct where authenticity of document on which request was based was questionable).  In both instances, evidence was excluded for other reasons besides the "trial within a trial" rationale.  More importantly, in neither instance was the evidence sought to be excluded directly relevant to the plaintiff's claim, like the evidence McKesson seeks to exclude here.

[98]   Dkt. #2169-32/#2713-50 (7/19/18 Oriente Dep.) at 548:22-550:1.

G.   **PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE (DKT. #2668).**

1.   **Teva MIL No. TAD-1**: The Court should exclude reference to the Cephalon misdemeanor plea.

Moving Defendants[99] seek to exclude evidence regarding a criminal plea agreement entered into by one of their related companies, Cephalon.  The motion attempts to minimize the severity of the criminal activity, describing it as "a single misdemeanor count of off-label promotion of three medicines, only one of which was an opioid) limited to an eight-month period in 2001." Dkt. #2668-1 at p. 1.  The reality is far more serious.  The opioid drug in question was Actiq, which was approved by the FDA in 1998 solely for the management of "breakthrough pain" in opioid-tolerant cancer patients.  The FDA restricted its use because Actiq was a powerful narcotic – fentanyl – in the form of a fast-dissolving lollipop, also known as a Transmucosal Immediate-Release Fentanyl product (TIRF).

In 2000, Actiq generated a relatively modest $16 million in revenue for its then-owner Anesta.  That same year Cephalon purchased Anesta.  Cephalon set extremely high sales goals for Actiq, pressuring employees to generate volume sales. The pressure tactics worked spectacularly well. By 2006, Cephalon's Actiq sales were $590.7 million, more than 36 times the amount sold in 2000.  The massive increase in sales was driven largely by fraudulent marketing – criminal acts that were later admitted by Cephalon.  The "single misdemeanor count of off-label promotion" resulted in $425 million in fines and settlements.  Cephalon and its successors were also required to adhere to a five-year "Corporate Integrity Agreement" governing marketing practices.  The evidence supporting these facts was included in Plaintiffs' Opposition to Teva/Actavis' Motion for Summary Judgment.  Dkt. #2220 at pp. 5-6.

For the same reasons discussed in § B.1, *supra*, this evidence is relevant and admissible, and not properly excluded under Rule 403.  It is relevant, among other reasons, to prove that Moving

---

[99]   "Moving Defendants" are the Teva Defendants and the Actavis Generic Defendants, as defined in their motion *in limine*. Dkt. #2668-1 at p. 1 & n.1.

Defendants engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs.

Moving Defendants argue the Cephalon plea is inadmissible character evidence, but they are wrong. If they were being prosecuted for off-label promotion of a different drug, or at a later time, and the government sought to prove their guilt by introducing evidence of this prior conviction, that evidence would likely be barred by Rule 404. But that is not the purpose for which the evidence will be offered here. Rather, as Rule 404(b) notes, character evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). In this case, these Defendants' intent is an element of Plaintiffs' claims, and their ongoing and repetitive conduct improperly and falsely promoting the use of dangerous opioid medications is central to those claims. Accordingly, Moving Defendants MIL No. TAD-1 should be denied.

2. **Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion.**

Moving Defendants' MIL No. TAD-2 seeks to preclude Plaintiffs from offering any testimony, evidence, or argument that Cephalon, Teva USA, or any other Moving Defendant's conduct constituted off-label promotion. Dkt. #2668-1 at pp. 4-6. Moving Defendants assert that any reference to off-label promotion is irrelevant and would confuse the jury. Both of these arguments should be rejected as red herrings.

Moving Defendants argue that evidence and testimony about off-label promotion is irrelevant be-cause promoting the off-label use of drugs is not inherently false or misleading. *Id.* at p. 4. But even if misleading messaging were not part of Moving Defendants' off-label promotion, false marketing is not the only basis for Plaintiffs' claims. Evidence regarding off-label promotion is relevant to Plaintiffs' argument that the massive overpromotion of opioid use led to the creation of the public health crisis confronting their communities. Evidence or testimony that Actiq and Fentora, for example, were promoted for noncancer pain caused by migraines and injuries when they were only approved for cancer pain in opioid-tolerant patients is relevant to the argument that

excessive promotion of opioids created a public health crisis. Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful. Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case. *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4. But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic. Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6. The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs. Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations. Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

3. **Teva MIL No. TAD-3**: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

4. **Teva MIL No. TAD-4**: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred. As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

evidence Moving Defendants are seeking to exclude. To the degree that Moving Defendants have specific evidence in mind, and that they are simply choosing not to identify it at this time, the appropriate course is for them to object when that evidence is offered at trial, as opposed to seeking an unspecified adjudication in a vacuum.

But more importantly, the fact that Plaintiffs cannot recover for harm incurred outside Ohio does not mean that the impact of Defendants misconduct outside of Ohio is irrelevant or should be ignored. Moving Defendants reference, by way of example, national studies on opioid abuse relied on by Plaintiffs' experts. Dkt. #2668-1 at p. 9. These studies are relevant to numerous issues, including providing the context and background with respect to the scope and nature of the opioid crisis. This is a crisis which many Defendants are disputing actually exists. Further, evidence of the national scope and nature of the crisis will be pertinent to any attempt by Defendants to blame the Plaintiffs for the harms by suggesting bellwether-specific failures are the cause of the harms. Indeed, the Court has already rejected Defendants' arguments seeking to exclude Plaintiffs' causation and damage experts who analyze national and aggregate trends to create their models. As Plaintiffs' expert reports make clear, and explained by Plaintiffs in their opposition briefs to Defendants' *Daubert* motions, national trends and statistics make Plaintiffs' analyses more reliable and relevant, and strengthen the reliability of the relationship between increased shipments of prescription opioids and increased harms. *See, e.g.,* Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶¶ 81-100 (explaining the most appropriate way to assess the relationship between shipments and mortality is based on regression-based comparisons across a robust sample of counties across the nation, not just one or two counties viewed in isolation); *see also* Dkt. #2000-6/#1999-6 (Gruber Expert Rep.) at ¶ 84, Fig. 1.18 (showing that in counties with the highest per capita shipments between 1997 and 2010, the prescription opioid mortality rate increased over 3.75 times more than it did in the counties with the lowest per capita shipments); *see also Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2017 WL 4748054, at *3 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018) ("[I]t seems axiomatic that the more data points that are available, the more reliable the ultimate damage calculation"). As such, information on the opioid crisis and its national scope is directly relevant to

both claims and defenses at issue in the litigation, and will greatly assist the jury in understanding the issues presented at trial. *See also supra* at § A.6.

5.    **Teva MIL No. TAD-5: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties.**

Moving Defendants also seek to exclude "evidence of marketing activity" where there is no showing that the marketing materials were distributed, published, or read in either County, as well as any evidence of shipments of opioids manufactured by Defendants that have no connection to Ohio.   Moving Defendants' arguments regarding shipments outside of Ohio are addressed in Plaintiffs' response to Defendants' Omnibus MIL No. 6.  *Supra* at § A.6.  With respect to Moving Defendants' marketing arguments, the factual premise underpinning these arguments is false.  The evidence in the record demonstrates that both Teva and Actavis engaged in nationwide marketing.  There was no state-specific marketing, including state-specific marketing in Ohio, and any national marketing would have been used in all 50 states.  *See, e.g.,* Dkt. #1962-26/#1978-06 (11/16/18 Hassler Dep.) at 275:12 – 276:17 (confirming that for Teva, Cephalon and Actavis, marketing, sales and advertising pieces were national in scope, in that "they are able to be used all over America," and that these materials were not tracked, such that defendants have no way showing that such materials were not used in Ohio); **Ex. 34** [Hassler Dep. Vol II] at 621:10-19 (testifying that Teva and Cephalon did not release materials that were specific to geographic areas for their marketing or educational messages, and that "[t]he messages were approved nationwide, and they would have been available and used in Ohio, just as they would have been in any other state in the country."); Dkt. #2177-5 (11/2/18 Snyder Dep.) at 271:5 – 272:3 (testifying that Kadian marketing materials were national in that the same marketing materials were provided and used by sales reps across the country).

Finally, Moving Defendants' constitutional argument—that it is unconstitutional to "project Ohio's regulatory regime into another state"—is simply misplaced.  Dkt. #2668-1 at pp. 10-11. Plaintiffs are not seeking to project Ohio's regulatory regime into another state, nor are they seeking to "penalize" Moving Defendants for conduct outside of Ohio.  Defendants' misconduct violated

not only Ohio law, but also federal law and the local laws of any non-Ohio jurisdiction within which the conduct occurred. As Plaintiffs will demonstrate at trial, the evidence in the record establishes that Moving Defendants have engaged in misconduct, and caused significant injury, within Plaintiffs' jurisdictions. But Plaintiffs are also entitled to introduce evidence showing the systemic nature of Moving Defendants' misconduct, and the degree to which this conduct caused a national opioid crisis that impacted the bellwether jurisdictions.

6. **<u>Teva MIL No. TAD-6</u>: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups.**

Moving Defendants claim Plaintiffs should be precluded from offering evidence or argument of their funding of third-party trade groups because such conduct is protected by the First Amendment's right to freedom of association.[100] Not so. Plaintiffs are not arguing that Moving Defendants' mere participation in, and funding of, various trade and advocacy organizations, in and of themselves, subject them to liability. Rather, Plaintiffs allege, and will demonstrate at trial, that Moving Defendants worked together, through their trade associations and otherwise, (i) to unlawfully deceive and mislead the public, the medical community, and the government regarding the risks of their opioids and their purported efforts to prevent diversion, and (ii) to unlawfully avoid their legal duties to monitor for, report, and prevent shipment of suspicious orders of opioids. Evidence of Moving Defendants' participation and funding of these trade associations is relevant to demonstrate that they participated in this conspiracy with the intention of furthering this wrongful conduct. *See In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775, 803 (N.D. Ohio 2007)

---

[100] In their motion, Moving Defendants quote the following language from the Supreme Court: " 'The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.' " Dkt. #2668-1 at pp. 11-12 (quoting *McConnell v. Fed. Election Commn.*, 540 U.S. 93, 255 (2003), *overruled on other grounds by Citizens United v. Fed. Election Commn.*, 558 U.S. 310 (2010)). They fail to mention this language was taken from Justice Scalia's *dissent* in that case. *McConnell*, 540 U.S. at 247-48, 255. (In *McConnell*, Justice Scalia concurred in part and dissented in part, but the quoted language is in a section of his opinion in which he is criticizing the majority opinion. *Id.* at 250, 255-56.).

("*Welding Fume I*") (recognizing that there are circumstances in which "joint activity undertaken through a trade association" can be "evidence of a conspiracy").[101]

Moving Defendants also claim that Plaintiffs should be precluded from arguing that they are responsible for statements made by these third-party groups because Plaintiffs have not and cannot demonstrate that any third-party group was acting as their agent. Dkt. #2668-1 at p. 12. This Court already rejected this argument in its opinion denying the Teva Defendants' summary judgment motion:

> The Court rejects the Teva Defendants' argument that Plaintiffs cannot show an agency relationship existed between the Teva Defendants and the third parties they "partially" funded. In the "Pain Matters" presentation, Gudin told the audience: "this program was developed by Teva Pharmaceuticals, . . . the three of us are presenting on behalf of Teva, and . . . we've been compensated by Teva to give this presentation." Clearly, material fact issues exist in this regard.

Dkt. #2564 at pp. 3-4 n.5 (internal citations omitted). *See also* Dkt. #2565 at p. 19 ("Whether groups like APF were truly independent third parties or merely front groups, remains an issue of fact for the jury. Though Teva contends that funding to these third-party organizations was conditional on their independence, it is the jury's province to decide whether third-party agreements requiring independent were actually followed; and this, to large extent, may depend on the credibility of the witnesses called. . . . A reasonable finder of fact could conclude . . . that the Teva entities directly, as well as through front groups and CME programs, falsely represented the risk of opioid addiction, and that these representations were not tied to specific brand names, but applied to opioids generally.") (internal citation omitted).[102]

---

[101] *See also AirCo, Inc.*, 2003 WL 27382684, at *16 (rejecting defendants' argument that dismissal of plaintiff's civil conspiracy claim was warranted because members of a trade association cannot be held liable "for simply exercising their first amendment rights by attending meetings[,]" because the complaint did "not seek to hold Defendants responsible merely for attending trade association or scientific meetings[,]" but rather "allege[d], beyond mere membership, that they . . . took specific affirmative acts at meetings in which specifically-named entities agreed to perpetrate a series of frauds").

[102] Thus, Plaintiffs have already made an evidentiary proffer that the Court considered sufficient to withstand summary judgment.

The cases cited by Moving Defendants, none of which involved motions *in limine*, are factually inapposite. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 395 (1982) (in a § 1981 racial discrimination action, defendants could not be held vicariously liable, under *respondeat superior*, for the discriminatory conduct of third party where there was no evidence in the record that the third party was acting as the defendants' agent; "That the employers fund the activities of the JATC does not render the JATC the employers' servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. The employers must also enjoy a right to control the activities of the JATC, and there is no record basis for believing that to be the case."); *Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451 (1958) (addressing whether the state of Alabama could compel the NAACP "to reveal to the State's Attorney General the names and addresses of all its Alabama members and agents, without regard to their positions or functions in the Association"); *McWilliams v. S.E., Inc.*, 581 F. Supp. 2d 885, 893 (N.D. Ohio 2008) (plaintiff failed to allege "any agency relationship between the pilot and the aircraft owner[,]" and therefore could "not impute [the pilot's] alleged negligence to [the owner]"; bare allegation in complaint that "[a]ll acts of [the aircraft owner] were done by its agents" was "insufficient to establish agency");[103] *Welding Fume I*, 526 F. Supp. 2d at 803 ("There is no evidence that would allow a jury to conclude that Caterpillar actually joined any conspiracy by agreeing to cooperate with other defendants, intending to help them achieve the objective of hiding the hazards of manganese in welding fume. This is so because, from the beginning, Caterpillar's actions and statements reveal that, in most regards, it was actually working at cross-purposes from the supposed objectives of the conspiracy."); *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416-18 (S.D. Ohio 1986) (holding franchisor had sufficient right of control over

---

[103]   In their motion, Moving Defendants describe *McWilliams* as holding a "defendant not liable for third-party statements because [there was] no evidence that [the] third party acted as defendant's agent with respect to the challenged statements[.]"  Dkt. #2668-1 at p. 13 n.11.  But that case does not address liability for third-party statements.  Rather, the issue was whether the owner of a skydiving plane owed a duty to the skydiver "to inspect the harness or ensure its safety" based on the owner's relationship with the pilot.  581 F. Supp.2d at 893.  The court held that the pilot's negligence could not be imputed to the owner because the plaintiff had failed to allege an agency relationship between the two.  *Id.*

franchisee check collection company under their contract to make franchisee its "agent" in regard to franchisee's acts giving rise to check drawer's action against franchisor for liability under the Fair Credit Reporting Act and the Fair Debt Collection Practices Act); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1072 (11th Cir. 2017) ("Of course, *alone*, membership in a trade organization like CANAERO does not make Defendants part of an enterprise.") (emphasis added); *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1290-94 (3d Cir. 1994) (former manufacturer of asbestos products could not be held civilly liable for any wrongful conduct committed by [the trade association] SBA or its members in the years after SBA's formation unless it can be shown that [the manufacturer's] actions taken in relation to the SBA were specifically intended to further such wrongful conduct" and "[h]ere, there is simply no evidence that [the manufacturer] had such an intent"; critically, the court noted that there was no evidence that the manufacturer "had 'tacitly or overtly agreed' with the other defendants to continue selling its product without warnings or had been a party to 'written agreements, meetings, and other communications among asbestos defendants to conceal their knowledge of the dangers of asbestos from the public' ").

For these reasons, Moving Defendants' MIL No. TAD-6 should be denied.

7.      **Teva MIL No. TAD-7: The Court should exclude testimony from Russell Portenoy about any improper conduct by Moving Defendants.**

Moving Defendants' MIL No. TAD-7 is an improper attempt to evade possibly adverse relevant testimony by a witness whom the Court expressly permitted Teva to depose, but Teva declined to do so. Moving Defendants argue that Plaintiffs should be precluded from eliciting testimony from witness Dr. Russell Portenoy about any improper conduct by Teva because he allegedly testified in the State of Oklahoma prescription opioid litigation that he was unaware of any such conduct. Dkt. #2668-1 at 13-14. The Court should reject this argument as procedurally improper.

Moving Defendants have not demonstrated that Dr. Portenoy's trial testimony here would contradict his prior testimony in the Oklahoma case. Even assuming it did, the remedy would not be exclusion under FED. R. EVID. 402, as Moving Defendants aver, *see* Dkt. #2668-1, but

impeachment under FED. R. EVID. 613(b).  *See, e.g., United States v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004) ("Glover's prior inconsistent statement is admissible under Federal Rule of Evidence 613(b), which permits the impeachment of a witness . . . ").  Since Moving Defendants may try to impeach Dr. Portenoy using any allegedly contrary prior testimony, the Court should reject this motion to preemptively limit his trial testimony here.

An *in limine* ruling would be particularly inappropriate here because the Court issued an Order expressly permitting Teva and all Defendants to depose Dr. Portenoy.  Dkt. #1577 (Order re Discovery Order No. 19) at p. 8 ("[T]he Court concludes that a more appropriate sanction is to allow Defendants to take Dr. Portenoy's deposition at Plaintiffs' counsel's expense.  Further, should Defendants deem it necessary, the Court will consider, on a motion by Defendants, allowing a small amount of supplemental discovery and deposition testimony from additional fact witnesses that Defendants sincerely believe could 'challenge Dr. Portenoy's specific claims about Defendants' supposedly misleading marketing. . . .").  The Court placed no substantive limits on Defendants' deposition of Dr. Portenoy, thus permitting Moving Defendants to probe the full range of his factual knowledge and also to obtain additional rebuttal evidence as needed.

Moving Defendants chose not to do so.  At one point, Defendants expressed an intent to exercise their right to depose Dr. Portenoy.  A dispute then arose concerning the scope of his deposition, particularly over whether questioning would or would not be limited to the scope of his Oklahoma testimony and over whether Plaintiffs, too, would be permitted to question him.  Special Master Cohen ruled in a telephonic hearing that questioning of Dr. Portenoy *would not* be limited to the scope of his Oklahoma testimony, which he found to be "incomplete," and that *all parties* including Plaintiffs would be permitted to question him.  *See* **Ex. 35** [Transcript of July 18, 2019 Teleconference with Special Master Cohen re Dr. Portenoy Deposition].  After the Special Master so ruled, Teva and its co-Defendants backpedaled and chose to decline the Court's invitation to depose Dr. Portenoy.  Having done so, Moving Defendants may not now obtain an order precluding allegedly inconsistent testimony that they could have fully probed and rebutted through discovery and may still try to impeach at trial.

For all of these reasons, the Court should deny Moving Defendants' MIL No. TAD-7 concerning Dr. Portenoy.

**8.**      **Teva MIL No. TAD-8**: Plaintiffs should be precluded from arguing that the Actavis Generic Defendants should have made additional warnings regarding their generic medicines or should have stopped selling them.

Moving Defendants' joint motion to preclude argument that the Actavis Generic Defendants should have made additional warnings regarding generic opioids is an improper attempt to re-litigate the preemption theory Defendants already lost. Dkt. #2565 (Opinion and Order Re: Preemption) ("Preemption Order"). In the Preemption Order, the Court summarized Plaintiffs' theory that "*all* manufacturers engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12 (emphasis in original). "[A]ny distinction . . . between those defendants who manufactured brand name opioids, those who manufactured generic opioids, or, as appears to be most common, those who manufactured both, would be rendered largely immaterial." *Id.* As the Court found, because "Plaintiffs' state law claims are *not* predicated upon violations of the FDA or CSA, nor are they accurately characterized as 'fraud on the FDA' or 'fraud on the DEA' claims," preemption simply does not apply. Dkt. #2565 at p. 10 (emphasis in original).

Moving Defendants' reliance on *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015), is inapt. Dkt. #2668-1 at p. 15. In *Rheinfrank*, the Court granted a motion *in limine* on plaintiff's failure to warn claim because the FDA had affirmatively found the warning at issue "'should not be incorporated'" into defendant's drug label. 2015 WL 5258858 at *2 (citation omitted). No parallel exists here.

Moving Defendants also argue they had no duty to "correct[] alleged impressions *by others* about opioids." Dkt. #2668-1 at p. 15 (emphasis added). But that straw man does not address Plaintiffs' claim; Plaintiffs allege that Teva/Actavis engaged in affirmative misrepresentations in their branded and unbranded marketing, and failed to correct their *own* representations, not others'.

Second, Actavis Generic Defendants' employees, including some that designated to testify at trial here, were active participants on the boards that conducted non-branded marketing.[104] As such, Plaintiffs have put forward evidence sufficient to show that the Actavis Generic Defendants themselves "engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12. Such promotional activities are not preempted. *Id.* at p. 10; *see also* Dkt. #1499, *The Muscogee (Creek) Nation v. Purdue Pharma L.P.*, Report and Recommendation re: Motion to Dismiss, at p. 35 n.29 (denying motion to dismiss marketing claims because "some of the Generic Manufacturers or their corporate affiliates are also alleged to sell name-brand prescription opioids"). Plaintiffs have never advanced any argument that Moving Defendants needed to "stop selling" opioids (Dkt. #2668-1 at p. 15), just that they could not do so with false and misleading marketing.

For these reasons, Moving Defendants' MIL No. TAD-8 should be denied.

9. **Teva MIL No. TAD-9: The Court should exclude reference to the purchase price paid by Teva Pharmaceutical Industries Ltd. for the Actavis Generic Defendants.**

Moving Defendants move to exclude reference to the purchase price Teva Pharmaceutical Industries Ltd. paid for the Actavis Generic Defendants in 2016 on grounds that the price is irrelevant and unduly prejudicial. It is neither. The purchase price is relevant because it indicates that, as of 2016, the acquisition of the Actavis Generic Defendants and their portfolio of generic opioids was worth approximately $40.5 billion. Opioids were massively profitable for Defendants, due in substantial part to extensive marketing based on misrepresentations and the failure to comply with the CSA's SOM requirements. Teva's willingness to pay tens of billions dollars in order to acquire the rights to sell a large number of generic opioids, including oxycodone, oxymorphone, morphine sulfate, and fentanyl, is relevant to the jury's understanding of the value of and expectations for sales of generic opioids.

---

[104] Dkt. #2383-1/#2290-1 at 391:22-393:5 (Michael Perfetto on NACDS planning board); Dkt. #2380-20/#2287-20 at 431:3-14 (Douglas Boothe on GPhRMA board).

Moving Defendants' reliance on *Brooks v. Caterpillar Glob. Mining Am. LLC*, No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017), is inapt. Dkt. #2668-1 at p. 16. The claim in that case concerned a design defect claim concerning a single accident sustained by a coal miner; as such, defendant's financial condition was properly found irrelevant. 2017 WL 3401476, at *1. This case, concerning decades of misrepresentations and failures to meet regulatory requirements, could not be more different. *Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.*, No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015), is more informative. There, the court denied in part defendant's motion *in limine* to exclude the financial condition of defendant because it determined that such evidence "pertain[ed] to [defendant's] knowledge and potential motives for [defendant's] actions." *Id.* at *11. Similarly, the amount paid by Teva to acquire the Actavis Generic Defendants is relevant and probative of how valuable generic opioids were viewed by a pharmaceutical company.

Nor is the purchase price unduly prejudicial. Moving Defendants posit a strawman fallacy, contending that Plaintiffs will use the purchase price to communicate Teva's "current financial health" to the jury. Dkt. #2668-1 at p. 17. Not so. In fact, the Teva entity that purchased the Actavis Generic Defendants – Teva Pharmaceutical Industries Ltd. – is not a defendant at the trial for which Moving Defendants seek exclusion of the sale price. Dkt. #2673. Contrary to *City of Cleveland v. Peter Kiewit Sons' Co.*, on which Moving Defendants rely (Dkt. #2668-1 at p.), references to the purchase price will *not* be "'clearly calculated to direct the jury's attention to . . . compensation rather than the real issues in the case.'" 624 F.2d 749, 756-57 (6th Cir. 1980). Rather, as set forth above, the purchase price is probative of the market value of a portfolio including generic opioids in 2016 – even after the role of prescription opioids in creating the opioid crisis was a matter of national discussion. The purchase price is, therefore, indicative of "the real issues in the case." It is not unduly prejudicial.

10. <u>**Teva MIL No. TAD-10**</u>**: The Court should exclude reference to the settlement agreement between Teva Ltd. and Allergan.**

Plaintiffs have no objection to Moving Defendants' MIL No. TAD-10.

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny each of Defendants' joint and individual MILs, except as otherwise indicated above.

Dated: October 7, 2019

Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232

(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX 77069-3804
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Lead Trial Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

**CERTIFICATE OF SERVICE**

I certify that the foregoing instrument was served via email to defense counsel and to Special

Master Cohen on October 7, 2019.

<div style="margin-left:40%">

s/Peter H. Weinberger
Peter H. Weinberger

</div>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## WALGREENS' REPLIES IN SUPPORT OF ITS MOTIONS *IN LIMINE*

Walgreens submits these replies in support of its motions *in limine*.  Dkt. 2648 ("MIL").

## I.      W-1: To exclude Walgreens' ownership interest in ABDC

Walgreens moved to preclude evidence or argument about its equity ownership interest in

ABDC because it is irrelevant to plaintiffs' claims under Rule 402; and unfairly prejudicial,

misleading, and confusing (as well as a waste of precious time) under Rule 403.  In response,

plaintiffs do not contest any of Walgreens' arguments for exclusion under Rule 403.  And

plaintiffs' arguments about relevance do not apply to the actual evidence at issue.

***First***, plaintiffs' response does not change the fact that an alleged conspiracy between

ABDC (as a distributor) and Walgreens (as ABDC's customer) has no bearing on plaintiffs'

actual claims in these lawsuits, which they have expressly limited to claims regarding

Walgreens' alleged conduct as a distributor itself.  Plaintiffs cannot deny that they have

repeatedly disclaimed causes of action based on Walgreens' conduct as a pharmacy, or that this

Court has held that Walgreens can "only be held liable ***as [a] distributor[]***."  Dkt. 1203 at 2

(emphasis added).  Nor do plaintiffs dispute that the first time they even *suggested* that

Walgreens' liability might extend beyond 2014—when Walgreens stopped distributing

prescription opioid medications—was in their summary judgment briefing.

There is no basis for an argument, months after the close of discovery and on the eve of

trial, that plaintiffs' election to limit their claims to Walgreens' distribution conduct silently

carved out an exemption for their civil conspiracy claim.  Once Walgreens stopped distributing,

by definition it ceased any conduct that could be relevant to plaintiffs' claims.  In fact, plaintiffs

admit that the "relevance" of the evidence at issue relates to ABDC's SOM procedures for

"orders for prescription opioids placed by Walgreens's pharmacies," Opp. at 83—in short, ***to***

***Walgreens' conduct as a pharmacy***.  It is far too late in the day for plaintiffs to walk away from

their prior concessions and expand the scope of their claims, an expansion that would entitle

Walgreens to take additional discovery relevant to an alleged post-2014 "conspiracy" and to

submit supplemental expert reports to address such new claims.

  ***Second***, even assuming that Walgreens' post-distribution conduct had some relevance to

plaintiffs' civil conspiracy claim, plaintiffs do not explain why the evidence Walgreens seeks to

exclude—regarding its equity ownership interest in ABDC—would be relevant.  Plaintiffs argue

in the most general terms that "financial interests and connections" can be relevant to conspiracy

claims.  Opp. at 83.  And so, Walgreens does not seek to exclude evidence that its pharmacies

sell prescription opioid medications, that ABDC has acted as a distributor to Walgreens, or that

Walgreens communicated with ABDC about SOM.  But it is also undisputed that the relevant

agreements expressly forbid Walgreens from exercising any control or influence over ABDC,

thus depriving evidence of stock ownership or a board seat of any probative value.  MIL at 2.

  ***Third***, at the same time, the risk of unfair prejudice, along with the risk that jurors will be

confused or misled, is substantial and warrants exclusion under Rule 403.  Not only would such

evidence misleadingly suggest control, influence, or responsibility for ABDC's conduct, it could

also inflame juror bias towards large corporations.  Plaintiffs do not dispute any of this.  But

these risks are precisely why other courts routinely exclude evidence of this sort.  *See, e.g.*, *Jay*

*Cashman, Inc. v. Portland Pipe Line, Inc.*, 573 F. Supp. 2d 335, 336 (D. Me. 2008) (ownership

evidence irrelevant and "runs a significant risk of unfair prejudice"); *Brian v. Advanced Bionics,*

*LLC*, 2013 WL 12234530, at *2 (W.D. Ky. March 22, 2013) (evidence could "prejudice the

jury" by "cast[ing] Defendant as a corporate giant that can absorb a large adverse verdict").

  ***Finally***, plaintiffs do not dispute that the efforts Walgreens would be forced to undertake

to rebut the false inferences from this evidence would be a time-consuming distraction from the

core issues of this case.  *See* MIL at 3.  That waste of limited time is reason enough exclude the

evidence of Walgreens' equity ownership interest in ABDC under Rule 403.

## II.   W-2: To exclude Walgreens' Florida DEA action and related settlement[1]

Plaintiffs' response to Walgreens' second motion *in limine* fails for several reasons.

***First***, Rule 408 directly bars use of Walgreens' Florida settlement with DEA to prove plaintiffs' claims.  MIL at 5-6.  Plaintiffs attempt to avoid Rule 408 by suggesting that the DEA settlement involved "some other claim."  Opp. at 53-54.  But plaintiffs do not deny that they intend to use the settlement to prove liability ***in this case***.  In fact, they admit it just a few pages later in an effort to show that the settlement is relevant.  Opp. at 57 (arguing that the settlement "concern[s] the same violations alleged here"); *id.* at 85 (arguing that Walgreens' shipments to Florida caused harm in Ohio).  Plaintiffs are wrong about relevance, but there is no question that the ***purpose*** for which they seek to use this evidence is impermissible under Rule 408.

***Second***, Plaintiffs cannot save their intended misuse of Florida settlement evidence by appealing to Rule 406.  Fundamentally, a rule about ***relevance*** cannot supersede a policy-based bar on ***admissibility***.  The Federal Rules plainly contemplate the exclusion of relevant evidence. *See, e.g.*, FED. R. EVID. 403 ("The court may exclude relevant evidence if . . . .").  In any event, a ***single*** settlement in ***Florida*** could never amount to a "routine practice" in Ohio.  For the same reason, plaintiffs' attempt to suggest that the settlement shows that Walgreens' conduct "was intentional and persisted over a lengthy period of time" falls flat.  *See* Opp. at 54-57.  Unlike other distributors, Walgreens did not enter multiple settlements over any length of time.[2]

---

[1] Walgreens also moved to exclude six Orders to Show Cause issued to Florida pharmacies and a 2011 settlement involving a California pharmacy—each of which involved ***dispensing*** allegations only.  MIL at 4 n.2.  Plaintiffs have not opposed that request.  That aspect of Walgreens' motion should be granted regardless of the Court's ruling on the settlement and Order to Show Cause relating to Walgreens' Florida distribution center.

[2] Plaintiffs incorporate by reference their arguments in § B.1 of their omnibus response.  Opp. at 84.  Walgreens likewise incorporates the distributors' reply in support of Dkt. 2666, MIL D-1.

*Third*, the Florida settlement and OTSC are, in fact, *irrelevant*. The fact of settlement says nothing about the merits of the underlying allegations. MIL at 5 n.3 (collecting authority). Courts have rejected the suggestion that government investigations or even sanctions are evidence of wrongdoing. *Id.* at 6 (collecting authority). And that is on top of the fact that the allegations about conduct in Florida have no connection to plaintiffs' Ohio claims. Plaintiffs' response involves generalized assertions about pill "migration," Opp. at 84-85, and a truly remarkable notion that *any* evidence that Walgreens' improperly shipped a suspicious order *anywhere* is evidence of damages *everywhere*, *id.* at 85. But plaintiffs do not (and cannot) dispute that neither they nor their experts have established any evidentiary nexus between distribution in Florida and either of the Track One counties. MIL at 6-7.

*Fourth*, plaintiffs' answer to Walgreens' arguments about prejudice under Rule 403 is to baldly assert that jurors are unlikely to conclude that Walgreens' settlement of alleged "CSA violations" is an admission of liability for plaintiffs' claims *based on alleged CSA violations*. *See* Opp. at 59. Plaintiffs' argument makes no sense, and flies directly in the face of the Sixth Circuit's view that the impact of settlement evidence is "profound" and no amount of evidence of liability, even with a "limiting instruction," is "sufficient to cure [its] wrongful admission." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007).

*Finally*, plaintiffs offer no response at all to the unfair prejudice of introducing the Florida OTSC's preliminary, unproven allegations and improper legal conclusions. MIL at 6. Nor do they dispute that the introduction of evidence about the OTSC or subsequent settlement would require a whole trial in itself, wasting valuable time and confusing the jury. *Id.* at 7.

## III.   W-3: To exclude references to Joseph Rannazzisi as the "60 Minute Man"

In response to Walgreens' motion to exclude evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man," plaintiffs admit that they plan to use such

references for exactly the impermissible purpose that Walgreens raised as a basis for exclusion—

to bolster Mr. Rannazzisi's credibility. "Indeed," plaintiffs state, "a reputable news outlet's use

and reliance on Mr. Rannazzisi's comments in a national broadcast or publication constitutes

valid and admissible evidence of his credibility." Opp. at 87. But Mr. Rannazzisi's credibility is

for the jury to determine on its own, based on their evaluation of his testimony and demeanor,

not based on hearsay evidence that cannot be tested in court. Evidence of Mr. Rannazzisi's

credibility is therefore prohibited under Rule 404. FED. R. EVID. 404(a) ("Evidence of a person's

character or character trait is not admissible to prove that on a particular occasion the person

acted in accordance with the character trait."). Moreover, the parties have stipulated that neither

side shall offer evidence or argument "that bolsters the unchallenged character (e.g., honest) or

traits (e.g., generous) of any party's . . . witnesses." Dkt. 2647 at 2 ¶ 3. Plaintiffs' planned use

of the "60 Minute Man" references flies in the face of this stipulation and Rule 404(a).

Walgreens' motion to exclude these references should be granted.

Dated:     October 14, 2019                          Respectfully Submitted,

                                                      _/s/ Kaspar J. Stoffelmayr_____
                                                      Kaspar J. Stoffelmayr
                                                      Brian C. Swanson
                                                      Katherine M. Swift
                                                      Matthew W. Brewer
                                                      **BARTLIT BECK LLP**
                                                      54 West Hubbard Street
                                                      Chicago, IL 60654
                                                      Tel: (312) 494-4400
                                                      Fax: (312) 494-4440
                                                      kaspar.stoffelmayr@bartlitbeck.com
                                                      brian.swanson@bartlitbeck.com
                                                      kate.swift@bartlitbeck.com
                                                      matthew.brewer@bartlitbeck.com

                                                      Alex J. Harris
                                                      **BARTLIT BECK LLP**
                                                      1801 Wewatta Street, Suite 1200
                                                      Denver, CO 80202
                                                      Tel: (303) 592-3100
                                                      Fax: (303) 592-3140
                                                      alex.harris@bartlitbeck.com

                                                      *Counsel for Walgreen Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2019, the foregoing has been served via

CM/ECF to all counsel of record.

/s/ Kaspar J. Stoffelmayr
Kaspar J. Stoffelmayr

*Counsel for Walgreen Co.*