# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

**BELLWETHER TRIAL DEFENDANTS' MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTIONS IN LIMINE**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   RESPONSES TO PLAINTIFFS' MOTIONS .................................................. 1

    1.   Plaintiffs' counsel should not be permitted to imply to the jury that they
         are handling these cases for altruistic reasons. ....................................... 1

    2.   Defendants are entitled to question witnesses on matters relevant to their
         statute of limitations defense. ................................................................. 2

    3.   MOOTED BY STIPULATION ................................................................. 3

    4.   MOOTED BY STIPULATION ................................................................. 3

    5.   The spending of plaintiffs' counsel on private aircraft and
         accommodations is properly excluded, but defendants are entitled to
         question plaintiffs' experts on luxuries and other gratuities that
         supplement their compensation................................................................. 4

    6.   Plaintiffs' request to bar references to philanthropy or good deeds or acts
         carried out by the parties or their employees is overbroad. .................... 6

    7.   Plaintiffs' request to bar references to any alleged malpractice claims
         involving designated experts is too abstract, and admissibility should be
         dealt with on a case-by-case basis. ......................................................... 6

    8.   Plaintiffs have failed to justify their request to preclude any reference to
         experts not testifying in this litigation or to subjects on which no expert
         testimony is offered.................................................................................. 7

    9.   Plaintiffs have failed to justify their request to prevent defendants from
         using ordinary means to display exhibits while presenting deposition
         testimony.................................................................................................. 9

    10.  MOOTED BY STIPULATION ............................................................... 11

    11.  Restrictions on references to motions *in limine* should include evidentiary
         objections made during trial.................................................................... 11

    12.  MOOTED BY STIPULATION................................................................. 12

    13.  Plaintiffs have failed to justify their request to preclude arguments
         concerning the varying and evolving duties defendants faced with respect
         to monitoring of suspicious orders.......................................................... 13

14.   Plaintiffs' attempt to preclude defendants from presenting evidence
      bearing on their preemption defenses should be rejected. ..................................... 14

15.   Plaintiffs have failed to justify their request to preclude any reference to
      the DEA "approving" or "endorsing" a particular defendant's SOM
      program. ..................................................................................................... 16

16.   Plaintiffs have failed to justify their request to preclude references to the
      DEA's failure to initiate enforcement actions against a particular
      defendant. ..................................................................................................... 21

17.   Plaintiffs have failed to justify their request to preclude references to the
      FDA's failure to sanction or initiate enforcement actions against a
      particular defendant. ..................................................................................... 24

18.   Plaintiffs' request to preclude any "reference" to the possibility that an
      award of damages will adversely affect the availability or cost of
      medications is overbroad. ............................................................................ 25

19.   Plaintiffs' request to preclude any "suggestion" or "indication" that a
      judgment in this case will have adverse economic effects is overbroad .............. 27

20.   Plaintiffs' vague request for a bar on "any reference that a verdict for
      Plaintiffs will adversely impact pharmaceutical manufacturers' incentive
      or ability to develop new drugs" is overbroad. ..................................................... 28

21.   Plaintiffs' request to exclude evidence of the impact of litigation on costs
      is overbroad. ..................................................................................................... 28

22.   Plaintiffs have failed to justify their request to preclude references to
      deposition or trial testimony from witnesses produced in litigation in
      which plaintiffs did not participate. ..................................................................... 29

23.   Plaintiffs have failed to justify their request to preclude any argument
      regarding the effect of the "learned intermediary" doctrine on liability .............. 31

24.   Plaintiffs have failed to justify their request to preclude any reference to
      plaintiffs' failure to mitigate their damages. ........................................................ 33

25.   Measures to protect the identities of children are appropriate but should be
      reasonable. ..................................................................................................... 36

26.   Plaintiffs' request to bar "any reference" to individual health information
      is premature and should be addressed, if necessary, on a case-by-case
      basis ..................................................................................................... 37

27.   Plaintiffs have made no meaningful effort to carry their burden of justifying the procedural and substantive restrictions they seek to impose on testimony from allegedly "undercover" law enforcement personnel. ............. 39

28.   Plaintiffs have failed to justify their request to preclude relevant evidence concerning the deaths of individuals in the Cuyahoga County Jail and related matters. ......................................................................................... 42

29.   Plaintiffs have failed to justify their request to preclude "any reference" to government corruption in Cuyahoga County. ........................................... 43

30.   Although specific references to indictments, grand jury proceedings, and criminal investigations are properly excluded, the underlying facts remain properly admissible. ................................................................................. 43

31.   Plaintiffs' request to preclude any "reference" to recent investigations or subpoenas involving Cuyahoga County should not operate to exclude relevant underlying facts. ....................................................................... 44

32.   Plaintiffs' request to preclude any "reference" to the indictment of Ken Mills should not operate to exclude relevant underlying facts. ........................... 44

33.   Plaintiffs have failed to justify their request to preclude any reference to investigations of former Cuyahoga County Sheriff Pinkney or the Cuyahoga County Sheriff's Office. ................................................................ 44

34.   Plaintiffs' request to preclude any "reference" to any podcast or other media coverage regarding Cuyahoga County courts should be denied as overbroad. .......................................................................................... 44

35.   Plaintiffs have failed to justify their request to preclude any "reference" to investigations regarding the death of Aniya Day Garrett, which are relevant to plaintiffs' damages claims. ............................................... 45

36.   Plaintiffs have failed to justify a blanket order precluding any "reference" to government corruption in Summit County. ...................................... 47

37.   Plaintiffs have failed to justify a blanket order precluding any "reference" to deaths of individuals while in the Summit County Jail or in the custody of the Summit County Sheriff's Office. ................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*455 Companies, LLC v. Landmark Am. Ins. Co.*,
    2018 WL 3159552 (E.D. Mich. June 28, 2018)......................................................19, 20

*Abroms v. Synergy Bldg. Sys.*,
    2011 WL 1734081 (Ohio Ct. App. 2d Dist. 2011) .................................................34

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
    2013 WL 5533696 (W.D. La. Oct. 2, 2013) .........................................................28

*Allied Erecting & Dismantling Co., Inc. v. U.S. Steel Corp.*,
    2015 WL 1843236 (N.D. Ohio Apr. 22, 2015)......................................................15

*Andrews v. Weatherproofing Techs., Inc.*,
    277 F. Supp. 3d 141, 146 (D. Mass. 2017) .........................................................31

*Ausa Life Ins. Co. v. Dwyer*,
    899 F. Supp. 1200 (S.D.N.Y. 1995)....................................................................29

*Ayala v. Speckard*,
    131 F.3d 62 (2d Cir. 1997)...................................................................................40

*Baird v. Crop Prod. Servs., Inc.*,
    2012 WL 3815314 (Ohio Ct. App. 12th Dist. 2012) ...........................................34

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) (Breyer, J., concurring) .....................................................26

*BP Exploration & Oil Co. v. Maint. Servs., Inc.*,
    313 F.3d 936 (6th Cir. 2002) ..............................................................................33

*Brantley v. Sears Roebuck & Co.*,
    959 S.W.2d 927 (Mo. Ct. App. 1998)...................................................................5

*Brown v. Williamson Tobacco Corp. v. F.T.C.*,
    710 F.2d 1165 (6th Cir. 1983) ............................................................................40

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)......................................................................................15, 24

*In re Campbell*,
    625 S.E.2d 233 (S.C. Ct. App. 2006), *aff'd as modified*, 666 S.E.2d 908
    (2008) ...................................................................................................................5

*Cascade P. Intern. v. United States*,
    773 F.2d 287 (Fed. Cir. 1985).................................................................35

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    915 F.3d 1 (1st Cir. 2019)......................................................................17

*Chicago Title Ins. Co. v. Huntington Nat'l Bank*,
    719 N.E.2d 955 (Ohio 1999)..................................................................34

*Chicago Title Ins. Corp. v. Magnuson*,
    2009 WL 3321372 (S.D. Ohio Oct. 9, 2009).........................................35

*Clay v. Johns-Manville Sales Corp.*,
    722 F.2d 1289 (6th Cir. 1983) ..............................................................31

*In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*,
    2018 WL 6617375 (S.D. Ind. Dec. 18, 2018)................................22, 24

*Cummins v. BIC USA, Inc.*,
    727 F.3d 506 (6th Cir. 2013) ..........................................................22, 24

*In re Depuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*
    888 F.3d 753 (5th Cir. 2018) .....................................................4, 5, 10

*Dist. Attorney of New York Cty. v. Republic of Philippines*,
    307 F. Supp. 3d 171, 209 (S.D.N.Y. 2018).........................................30

*Dunn v. Maxey*,
    693 N.E.2d 1138 (Ohio Ct. App. 9th Dist. 1997) ................................33

*United States ex rel. Dye v. ATK Launch Sys., Inc.*,
    2008 WL 4642164 (D. Utah Oct. 16, 2008) ........................................35

*Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*,
    2014 WL 3744976 (N.D. Tex. July 30, 2014) ...............................22, 24

*Fisher v. Peters*,
    249 F.3d 433 (6th Cir. 2001) ...............................................................23

*Georges v. Novartis Pharm. Corp.*,
    2013 WL 5217198 (C.D. Cal. Apr. 4, 2013) .......................................23

*Harris v. Purdue Pharma, L.P.*,
    218 F.R.D. 590 (S.D. Ohio 2003) ........................................................32

*House v. Combined Ins. Co. of Am.*,
    168 F.R.D. 236 (N.D. Iowa 1996) .........................................................9

*S.E.C. v. Koenig*,
    557 F.3d 736 (7th Cir. 2009) ....................................................................9

*Indiana Ins. Co. v. Gen. Elec. Co.*,
    326 F. Supp. 2d 844 (N.D. Ohio 2004)...................................................34

*Kerns v. Pro-Foam of S. Ala., Inc.*,
    572 F. Supp. 2d 1303 (S.D. Ala. 2007)....................................................9

*Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*,
    789 F. Supp. 2d 777 (E.D. Mich. 2011) ...................................................9

*Louzon v. Ford Motor Co.*,
    718 F.3d 556 (6th Cir. 2013) ..................................................................18

*Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*,
    835 F. Supp. 2d 299 (W.D. Ky. 2011) ...................................................25

*Masters Pharm., Inc. v. DEA*,
    861 F.3d 206 (D.C. Cir. 2017) ...............................................................23

*McNeil v. Cmty. Prob. Servs., LLC*,
    2019 WL 298474 (M.D. Tenn. Jan. 7, 2019) ....................................19, 20

*Medical Mutual of Ohio v. Air Evac EMS, Inc.*,
    2019 WL 4573700 (N.D. Ohio Sept. 20, 2019).................................14, 17

*New Jersey Tpk. Auth. v. PPG Indus., Inc.*,
    197 F.3d 96 (3d Cir. 1999) .....................................................................30

*New Mexico v. Gen. Elec. Co.*,
    335 F. Supp. 2d 1185 (D.N.M. 2004) ....................................................35

*Picture Me Press, LLC v. CPI Images, LLC*,
    2009 WL 2448545 (N.D. Ohio Aug. 6, 2009) ...........................19, 20, 50

*Provident Life and Acc. Ins. Co. v. United States*,
    772 F. Supp. 1016 (E.D. Tenn. 1991) ....................................................35

*Ray v. Draeger*,
    353 P.3d 806 (Alaska 2015).....................................................................5

*Rodriguez v. Miller*,
    537 F.3d 102 (2d Cir. 2008).....................................................................40

*S.S. v. Leatt Corp.*,
    2014 WL 356938 (N.D. Ohio Jan. 31, 2014).............................................7

*Schlegel v. Li Chen Song*,
    547 F. Supp. 2d 792 (N.D. Ohio 2008)........................................................................7

*Sears v. Rutishauser*,
    466 N.E.2d 210 (Ill. 1984) ...........................................................................................5

*Settlemyre Industries, Inc. v. E-Biofuels, LLC*,
    2010 WL 11538068 (S.D. Ohio Mar. 22, 2010) ........................................................34

*Sperberg v. Goodyear Tire & Rubber Co.*,
    519 F.2d 708 (6th Cir. 1975) ...........................................................................14, 17, 42

*State ex rel. Stacy v. Batavia Loc. Sch. Dist. Bd. of Edn.*,
    829 N.E.2d 298 (Ohio 2005).....................................................................................34, 35

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)......................................................................................................26

*Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*,
    909 F.2d 862 (6th Cir. 1990) ......................................................................................34

*Surface v. Conklin*,
    2018 WL 6257984 (S.D. Ohio Nov. 30, 2018)........................................................16, 26, 28

*Tobin v. Astra Pharm. Prod., Inc.*,
    993 F.2d 528 (6th Cir. 1993) ......................................................................................17

*Tracy v. Merrell Dow Pharm., Inc.*,
    569 N.E.2d 875 (Ohio 1991)......................................................................................32

*In re: Tylenol (Acetaminophen) Mktg.*,
    2016 WL 3125428 (E.D. Pa. June 3, 2016) ..............................................................26

*United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, an Article
of Device*,
    799 F. Supp. 1275 (D.P.R. 1992) ..............................................................................23

*United States v. City of Menominee*,
    727 F. Supp. 1110 (W.D. Mich. 1989) ......................................................................23

*United States v. City of Toledo*,
    867 F. Supp. 603 (N.D. Ohio 1994)...........................................................................23

*United States v. Fuller*,
    162 F.3d 256 (4th Cir. 1998) ......................................................................................21

*United States v. Gibbs*,
    506 F.3d 479 (6th Cir. 2007) ......................................................................................47

*United States v. Hoyt*,
   2014 WL 5023093 (W.D. Va. Oct. 8, 2014)......................................................23, 24, 25

*United States v. Maso*,
   2007 WL 3121986 (11th Cir. Oct. 26, 2007) (per curiam).....................................40

*United States v. Mitrow*,
   2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015).........................................................5

*United States v. Odeh*,
   815 F.3d 968 (6th Cir. 2016) ...............................................................................21

*United States v. Pope*,
   561 F.2d 663 (6th Cir. 1977) ...............................................................................21

*United States v. Soto*,
   794 F.3d 635 (6th Cir. 2015) ...............................................................................21

*United States v. Tobin*,
   676 F.3d 1264 (11th Cir. 2012) ...........................................................................21

*Waller v. Georgia*,
   467 U.S. 39 (1984)...............................................................................................40

*Washington Tour Guides Ass'n v. Natl. Park Serv.*,
   808 F. Supp. 877 (D.D.C. 1992) .........................................................................23

*In re Welding Fume Prods. Liab. Litig.*,
   2010 WL 76995456 (N.D. Ohio 2010) ................................................................5

*William F. Shea, LLC v. Bonutti Research, Inc.*,
   2013 WL 2424382 (S.D. Ohio June 4, 2013) ......................................................29

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab.
Litig.*,
   2011 WL 6740391 (S.D. Ill. Dec. 22, 2011)........................................................28

**Statutes**

21 U.S.C. § 832...............................................................................................................17

21 U.S.C. § 841(a) .....................................................................................................20, 21

21 U.S.C. § 871(a) ..........................................................................................................17

31 U.S.C. § 3729 *et seq.*.................................................................................................35

**Other Authorities**

21 C.F.R. § 1301.74 ...................................................................................................17

28 C.F.R. § 0.100 .......................................................................................................17

Fed. R. Civ. P. 32(a)(8) .....................................................................................29, 30, 31

Fed. R. Evid. 401(a) ...................................................................................................24

Fed. R. Evid. 402 .......................................................................................................43

Fed. R. Evid. 403 ...................................................................................................18, 47

Fed. R. Evid. 611(a)(1)-(2) .........................................................................................10

Fed. R. Evid. 801(d)(2) .............................................................................................9, 45

Fed. R. Evid. 804 ...................................................................................................29, 31

## I. INTRODUCTION

Plaintiffs' 37 motions *in limine* fall into three general categories.

First, many of plaintiffs' motions purport to address seemingly straightforward questions, while disguising the true nature of the parties' disagreements. Several of those motions have now been mooted by stipulation, as set forth below. On others, defendants' responses in this brief focus on the issues that are actually in dispute and, where appropriate, propose alternative rulings that would both resolve those issues and address any legitimate concerns that may exist.

Second, several of plaintiffs' motions discuss evidentiary questions in purely abstract terms, without identifying any particular evidence to which the motions are addressed. Plaintiffs' arguments simply *assume* that all evidence in a particular category is inadmissible – *e.g.*, on relevance grounds. Even if this assumption is correct for *some* evidence hypothetically covered by the motion, it is plainly *not* correct for other items. The Court should deny such purely abstract motions without prejudice to plaintiffs' ability to state corresponding objections to specific evidence.

Finally, a few of plaintiffs' motions address more substantial disputes. For the reasons set forth below, those motions should also be denied. Even if the Court is inclined to conclude that *some* evidence addressed by those motions should be excluded, such rulings should be made on a case-by-case basis as specific evidence is offered at trial, taking into account the foundation laid and other pertinent contextual factors.

## II. RESPONSES TO PLAINTIFFS' MOTIONS

### 1. Plaintiffs' counsel should not be permitted to imply to the jury that they are handling these cases for altruistic reasons.

Plaintiffs' discussion of their Motion No. 1 is a classic example of misdirection. Plaintiffs describe this motion as seeking a bar on "[a]ny reference to the parties' attorneys' fee

arrangements or how litigation expenses are paid, or how much those expenses are, in connection with this or any similar litigation." Dkt. 2652 ("Pl. MIL Br.") at 1. Defendants have been trying to achieve a stipulation with plaintiffs on this subject for weeks. Defendants agree that the parties' attorneys' fee arrangements have no place in this trial. The only sticking point is plaintiffs' unwillingness to agree that it is also impermissible for their counsel to suggest to the jury that they are handling the litigation for altruistic reasons. Plaintiffs' transparent tactic here is to leave themselves free to make such improper suggestions, with no risk of the jury understanding that plaintiffs' counsel actually hope to make hundreds of millions of dollars, if not more, from these cases. The motives of plaintiffs' counsel in this litigation, whether financial *or otherwise*, are simply irrelevant.

As defendants set out in their own Motion in Limine No. 10, it is improper for counsel to make comments to the jury that imply their personal opinions of the case. *See* Omnibus Mem. of Law in Support of All Track One Bellwether Trial Defendants' Motions in Limine (Dkt. 2661) at 28-31. Allowing plaintiffs' counsel to claim altruistic or other personal reasons for handling these cases would be improper even if it were true.

Defendants accordingly ask that the Court enter an order that addresses this question in the appropriately reciprocal manner that plaintiffs have refused to accept, precluding:

> Any references to how (or how much) the parties' counsel will be
> paid, counsel's fee contracts, or the litigation costs expended by
> any party in this or any similar litigation. Counsel may not suggest
> that they are handling the case for personal or altruistic reasons.

**2.      Defendants are entitled to question witnesses on matters relevant to their statute of limitations defense.**

Plaintiffs' brief also fails to disclose the true dispute that precluded a stipulation on their Motion No. 2, which seeks to preclude "[a]ny reference to how, when, or under what circumstances, the parties selected or hired their attorneys, or to any referral arrangements or

other counsel the parties may have retained or consulted beyond their current counsel." Pl. MIL Br. at 2. Defendants have no interest in inquiring into the details of any labyrinthine referral arrangements that may exist among plaintiffs' counsel or commenting on the fact that the lawyers who appear for plaintiffs at trial are not the same ones they originally hired. But plaintiffs' proposed motion sweeps much broader, seeking to preclude defendants from inquiring about "when" and "under what circumstances" plaintiffs sought to hire attorneys to assist with these claims. These questions are plainly pertinent to defendants' statute of limitations defense, as when plaintiffs consulted or sought to hire counsel is one indication of when they knew they had a claim. The Court has found there are disputed facts about the statute of limitations defense requiring trial. Dkt. 2568.

Plaintiffs' motion makes no effort to address the genuine dispute on this subject. None of the cases they cite (*see* Pl. MIL Br. at 2) involved bars on evidence bearing on a statute of limitations defense. This motion should simply be denied.[1]

## 3. MOOTED BY STIPULATION

The parties have resolved plaintiffs' Motion No. 3, along with plaintiffs' Motion No. 4, with a stipulation prohibiting:

> [a]ny references to any counsel's other current or former (a) clients (by name or by type) or how they obtained them or may obtain future clients, (b) legal and other work, (c) specialization or practice experience, or (d) financial status or resources. This includes counsel's law firms and staff members.

## 4. MOOTED BY STIPULATION

*See* Response to Motion No. 3 above.

---

[1] As stated with respect to Motion No. 1 above, defendants agree – and are amenable to the Court ordering, with appropriate clarification – that the details of a party's financial arrangements with its counsel are not an appropriate subject for discussion before the jury.

5.  **The spending of plaintiffs' counsel on private aircraft and accommodations is properly excluded, but defendants are entitled to question plaintiffs' experts on luxuries and other gratuities that supplement their compensation.**

Plaintiffs' Motion No. 5 addresses another topic on which plaintiffs' brief fails to identify the genuine dispute between the parties, which was discussed extensively before and then again after motions *in limine* were filed.  This motion seeks to exclude "[a]ny references  to the accommodations of, or the use of private aircraft for the transportation by, any witnesses, parties, or counsel."  Pl. MIL Br. at 3.  The parties agree that the use of private airplanes by plaintiffs' counsel for themselves and their clients should not be mentioned before the jury.  Defendants also agree that the hotels counsel choose to stay at are not an appropriate subject of comment before the jury.  Defendants were even willing to accede to plaintiffs' desire to extend this to cover lay witnesses as well as counsel.  But experts are another matter.

The relevance and admissibility of the compensation provided to an expert are beyond dispute.  And plaintiffs' counsel here has a documented history of compensating experts in non-traditional ways.  In *In re Depuy Orthopaedics, Inc.*, 888 F.3d 753 (5th Cir. 2018), the Fifth Circuit ordered a new trial in part because plaintiffs' counsel, Mr. Lanier, had concealed from defendants and the jury the fact that he had compensated two of the plaintiffs' experts through a charitable donation to one of the expert's favored causes, followed later by large post-trial checks to "thank" the experts for their testimony.  *Id.* at 788-92.  The Fifth Circuit held that the concealment of these facts (coupled, in that case, by a misrepresentation by Mr. Lanier to the jury that the experts had testified *pro bono*) "prevented the defendants from 'fully and fairly' defending themselves," because it prevented them from seeking to impeach the experts with the compensation.  *Id.* at 792 (citation omitted).

Defendants are entitled to cross-examine plaintiffs' experts about *all* of the compensation or reimbursement they receive for their work in these cases, not just the payments received on

their invoices.[2]  It is well accepted that private jet travel, at least to a location that is easily

reachable by ordinary means, is a luxury of no small value.  *See In re Campbell*, 625 S.E.2d 233,

235-36 (S.C. Ct. App. 2006), *aff'd as modified*, 666 S.E.2d 908 (2008) (physicians who took

private jet supplied by a party were not truly "disinterested" and so probate court erred in

appointing them as expert examiners); *see also United States v. Mitrow*, 2015 WL 5245281, at

*6 (S.D.N.Y. Sept. 8, 2015) (discussing "the extraordinary cost of chartering private jets, relative

to flying, say, business or even first-class on commercial flights").[3]  If plaintiffs choose to

supplement the compensation of their experts with luxuries, it is an appropriate subject for cross-

examination.

Accordingly, the Court should exclude experts from any order on this subject, prohibiting

only:

> [a]ny references to accommodations or the use of private aircraft
> for transportation of any party, lay witness, or counsel.

If the Court is instead inclined to grant this motion as proposed by plaintiffs, it should

similarly restrict *all* bias cross of experts.  It would be unfair to preclude a form of bias cross

unique to plaintiffs – flying private jets – and allow full bias cross of defense experts.

---

[2] *See In re Depuy Orthopaedics*, 888 F.3d at 792; *see also Sears v. Rutishauser*, 466 N.E.2d 210, 215 (Ill. 1984) (trial court abused its discretion in preventing cross-examination of medical expert concerning the number and frequency of patient referrals from the plaintiff's attorney); *Brantley v. Sears Roebuck & Co.*, 959 S.W.2d 927, 929 (Mo. Ct. App. 1998) (inquiry allowed on fact that expert worked on over 150 cases for insurer party and was offering testimony so that insurer "might receive $154,000 of its money back"); *Ray v. Draeger*, 353 P.3d 806, 815 (Alaska 2015) (trial court abused discretion in not admitting evidence of the large percentage of expert's annual income received from annual insurance reviews for party).

[3] Judge O'Malley did exclude "evidence of flying on private airplanes" in her "trial template" order in the *Welding Fume MDL.  See In re Welding Fume Prods. Liab. Litig.*, 2010 WL 76995456, at *70-71 (N.D. Ohio 2010).  However, that motion was unopposed. *Id.* at *71.

6.  **Plaintiffs' request to bar references to philanthropy or good deeds or acts carried out by the parties or their employees is overbroad.**

Plaintiffs' motion to exclude any suggestion at trial that defendants are "good" or "benevolent" companies – including that defendants "employ a lot of people" and provide "life-saving drugs or products that improve people's lives" – is wildly overbroad.  *See* Pl. MIL Br. at 4.  That is true even taking into account the limited exception that plaintiffs carve out for evidence of defendants' work related to opioid addiction prevention.

Plaintiffs allege that defendants are essentially drug dealers who intentionally flooded the market with opioids to turn a profit, without regard for the safety of the communities they serve. In defense, each defendant company is entitled to introduce itself to the jury, describe itself accurately, and explain who and how many people really work there and the work those employees do to ensure the safe manufacture and delivery of necessary medication to the people living in Cuyahoga and Summit Counties.  Yet as written, plaintiffs' motion would prohibit even that basic introduction.  Indeed, the motion would also exclude evidence of the good work defendants have done to prevent diversion – evidence that is different from "opioid addiction prevention" but nonetheless centrally relevant to the case.

Plaintiffs have not identified any specific "philanthropy or good deeds or acts" they seek to keep out.  The Court should deny this motion without prejudice to renewal of the objection if any irrelevant evidence of defendants' good deeds or acts is offered at trial.

7.  **Plaintiffs' request to bar references to any alleged malpractice claims involving designated experts is too abstract, and admissibility should be dealt with on a case-by-case basis.**

Plaintiffs' motion to exclude "[a]ny reference to any alleged malpractice claims" against experts (Pl. MIL Br. at 5) fails to identify any *specific* malpractice claims they are seeking to exclude.  Plaintiffs' abstract arguments simply *assume* that any malpractice claim would be

irrelevant. It is certainly possible to imagine hypothetical malpractice claims that would be irrelevant to an expert's testimony. For example, if a physician is presented as an expert on substance abuse treatment, an old malpractice claim accusing her of botching an appendix operation would probably be irrelevant. On the other hand, if this same doctor had committed malpractice by employing substance abuse treatment methods that were inconsistent with accepted medical practice, that would be an appropriate subject of questioning.

Because the Court has no way of knowing exactly what plaintiffs are challenging here, it should deny this motion without prejudice to renewal of the objection when and if any such evidence is offered. *See Schlegel v. Li Chen Song*, 547 F. Supp. 2d 792, 796 (N.D. Ohio 2008) ("The Court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds"); *see also S.S. v. Leatt Corp.*, 2014 WL 356938, at *9 (N.D. Ohio Jan. 31, 2014) (denying motion to exclude evidence of "crash sequence" that failed to identify any specific crashes the plaintiff was seeking to exclude).

### 8. Plaintiffs have failed to justify their request to preclude any reference to experts not testifying in this litigation or to subjects on which no expert testimony is offered.

In their Motion No. 8, plaintiffs seek an order precluding defendants from making "[a]ny reference to experts not testifying in this litigation," including (1) the failure to offer at trial "an expert in a particular … discipline" or (2) "experts that were de-designated in this case." Pl. MIL Br. at 6.[4] This motion is at best overbroad and lacks legal foundation.

Plaintiffs' principal ground for this motion is relevance. *Id.* But there are situations in which the absence of expert evidence on a topic could be highly relevant. For example, plaintiffs

---

[4] Defendants understand the term "de-designated" witnesses, as used in plaintiffs' motion, to refer to witnesses who provided expert reports in this matter but whom plaintiffs will not call at trial.

purport to prove causation by reference to "aggregate proof" – a theory that necessarily requires expert testimony. If plaintiffs were to fail to call at trial any expert supporting their aggregate proof theory, then defendants would be entitled to comment on plaintiffs' failure to present an expert on that subject. Likewise, if plaintiffs make arguments to the jury concerning a medical question that on its face requires expert testimony – such as the neuropharmacological effect of opioids – defendants would be entitled to point out the absence of such supporting testimony.

Moreover, if a testifying expert relies on the opinions of another expert whom plaintiffs elect not to call at trial, defendants would be entitled to comment on the absence of supporting testimony from the other expert. For example, plaintiffs' expert David Cutler calculates the percentages of harm that allegedly flow from allegedly wrongful manufacturer marketing based on opinions described in the report of Meredith Rosenthal. Given that Rosenthal's opinions are a necessary predicate for Cutler's opinions, Cutler should not be permitted to testify *at all* on those subjects if Rosenthal's predicate opinions have not been presented. *See* Dkt. 2661 at 24-25. But if his testimony were permitted under such circumstances, defendants would surely be entitled to point to plaintiffs' failure to offer the predicate testimony from Rosenthal in questioning Cutler and in offering argument about the reliability of his opinions.

One can imagine circumstances in which it would be improper for a party to ask the jury to draw inferences based upon the absence of expert testimony on a given subject. The Court, however, can and should deal with any such objections on a case-by-case basis. Because plaintiffs' motion sweeps far too broadly and would preclude plainly relevant argument and evidence, it should be denied.

The Court should also reject plaintiffs' challenge to defendants' right to offer into evidence and make argument based upon the reports and/or testimony of "de-designated"

experts. Federal Rule of Evidence 801(d)(2)(B) permits "a third party's out-of-court statement [to] be offered against a party if 'the party has manifested an adoption or belief in its truth.'" *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp. 2d 777, 781 (E.D. Mich. 2011). Here, plaintiffs have manifested adoption of their experts' reports, *inter alia*, by disclosing them to defendants and relying on them in summary judgment and *Daubert* briefing. Accordingly, defendants are entitled to offer into evidence, and otherwise refer to, the relevant opinions of "de-designated" plaintiff experts at trial. *See, e.g.*, *S.E.C. v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009) (affirming use of experts' video deposition at trial by non-sponsoring party on the ground that a "witness identified as a testimonial expert is available to either side"); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245 (N.D. Iowa 1996) ("once an expert is designated, the expert is recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony available to all parties"); *Kerns v. Pro-Foam of S. Ala., Inc.*, 572 F. Supp. 2d 1303, 1311 (S.D. Ala. 2007) ("[C]ourts have repeatedly observed that once a party has given testimony through deposition or expert reports, those opinions do not 'belong' to one party or another, but rather are available for all parties to use at trial.").

**9.  Plaintiffs have failed to justify their request to prevent defendants from using ordinary means to display exhibits while presenting deposition testimony.**

Plaintiffs' Motion No. 9 represents another disguised attempt by plaintiffs to gain an unfair advantage to which they are not entitled.[5] No rule prevents attorneys from highlighting, enlarging, or emphasizing documents during trial – a practice employed in thousands of courtrooms every day, including during the presentation of recorded depositions. Indeed, this

---

[5] In this motion, plaintiffs seek to preclude "[u]se of any deposition video or associated technology that alters the appearance of what was displayed at the deposition, including but not limited to, the use of 'highlighting,' enlarging, or otherwise emphasizing documents or portions of documents, unless the emphasis was done during the deposition and is part of the deposition video record." Pl. MIL Br. at 6.

has for years been the standard practice in publishing exhibits to a jury. The only evidentiary rule on which plaintiffs rely affords the Court control over the mode of examining witnesses "so as to make those procedures effective for determining the truth [and to] avoid wasting time." Fed. R. Evid. 611(a)(1)-(2). Using standard technology to enlarge documents and show which portions are being discussed in real time helps jurors to visually process and assess the documents relative to the witness's testimony. It also avoids wasting time by focusing the jury's attention on the pertinent information in documents.

The fact that a deposition recording is being played for the jury does not change this conclusion. There is no requirement, as plaintiffs try to argue, to give "the witness and opposing counsel advance notice of how the jury will perceive the witness' testimony." Pl. MIL Br. at 7. That would require prescience beyond any party's abilities. Neither is there any rule requiring witnesses to "testify according to counsel's emphasis" rather than the substance of the questions and exhibits themselves. *See id.* All parties have fair warning of each deponent's testimony and each exhibit on which the deponent was examined. And putting that same exhibit up on a screen or highlighting a sentence from a document that is quoted or discussed during the deposition does not alter the substance of the testimony. It is merely a practical tool to help the jury see and analyze the document that the deponent is discussing.

Plaintiffs fail to cite any compelling authority that would support a deviation from, much less a bar to, this standard practice. The only case authority that plaintiffs cite is an unpublished *in limine* ruling in the *Depuy* case. Notably, the Fifth Circuit later ordered a retrial of an early *Depuy* bellwether trial due to critical errors in the management of the trial. *See In re Depuy Orthopaedics, Inc.*, 888 F.3d at 784-92.

Plaintiffs' ulterior motive for this request is clear. Defendants' counsel took the traditional approach in conducting depositions, questioning witnesses on a single video feed and handing them the documents to which they would be referring. By contrast, plaintiffs' counsel took the unusual approach of employing three separate simultaneous cameras, hand-drawn illustrations, and tech media personnel to manipulate documents.[6] Plaintiffs' motion would not prevent them from using the output of this elaborate exercise, since it was recorded at the time. The practical effect of the ruling that plaintiffs now seek, therefore, would limit *only* defendants, who did not carefully stage and record the projection of exhibits while taking depositions.

This Court should not preclude defendants for using standard and well accepted trial presentation techniques merely because they conducted depositions in the ordinary manner, particularly where no rule or published authority supports plaintiffs' position.

### 10. MOOTED BY STIPULATION

The parties have resolved plaintiffs' Motion No. 10 with a stipulation prohibiting:

> [a]ny reference to personal matters of an expert or the expert's family, such as divorce proceedings, that have no bearing on the witness's qualifications, opinions, or credibility.

### 11. Restrictions on references to motions *in limine* should include evidentiary objections made during trial.

Plaintiffs' Motion No. 11, which purports to seek a straightforward ruling that would bar reference to motions *in limine* before the jury, presents another topic on which plaintiffs' brief fails to address the only genuine areas of disagreement.[7] Those arise from plaintiffs'

---

[6] Much of plaintiffs' harassment of witnesses, discussed in Defendants' Joint Motion in Limine No. 10, occurred in the context of this elaborate effort to simulate trial performance.

[7] The motion seeks to bar "[a]ny reference to the filing of the parties' motions *in limine*, the contents thereof, or other such motions to exclude evidence and their contents, and any agreements or proceedings in connection with this motion or reference to any such matter." Pl. MIL Br. at 8.

unwillingness to agree that (a) the same principles that properly bar reference to motions *in limine* should also prohibit comment on objections made during trial or resolved by stipulation,[8] and (b) there needs to be a neutral way for the parties to incorporate an *in limine* ruling into objections made during trial.  The language defendants proposed – and plaintiffs rejected – was:

> Any reference to evidentiary motions or other requests made by any party for evidentiary rulings from the Court or to any stipulation concerning trial conduct or the exclusion of evidence, except that, in making an objection, a party may base its objection, without further comment, on "the Court's prior ruling."

Defendants agree that it is improper for the parties and their counsel to refer to motions *in limine* in the presence of the jury.  But the same is true of commentary about objections made during trial.  And if an objection is made during trial that relies upon an *in limine* ruling, the parties need some way to flag that for the Court in a way that will be neutral before the jury.

### 12.    MOOTED BY STIPULATION

The parties have resolved plaintiffs' Motion No. 12 with a stipulation prohibiting:

> [a]ny suggestion or reference that an award of punitive damages is unconstitutional or illegal.

Motion No. 12 is also moot because plaintiffs have now conceded that they are not seeking punitive damages.  *See* Ex. 1 (Email from Louis Bograd to Kim Watterson et al.); *see also* Dkt. 2715-3 at 55 n.11.  Accordingly, there should be no discussion *of any kind* at this trial concerning punitive damages.

---

[8] Stipulations that affirmatively *establish* facts are appropriately presented to the jury.  But stipulations that preclude evidence or arguments are not.

**13.   Plaintiffs have failed to justify their request to preclude arguments concerning the varying and evolving duties defendants faced with respect to monitoring of suspicious orders.**

Plaintiffs' Motion No. 13 seeks to block "[a]ny argument or suggestion that the Controlled Substances Act and its implementing regulations do not impose, or have not always imposed, on registrants an identification duty, reporting duty, and no-shipping duty with respect to suspicious orders." Pl. MIL Br. at 10. This motion is overbroad, and the restriction it seeks to impose would be highly prejudicial to defendants. It should be denied.

First, this Court has already ruled that the issue of whether the CSA and regulations have "always imposed" such duties presents "material facts in dispute that must be resolved by a jury." Dkt. 2483 at 28; *see also id.* at 29 (whether "DEA did not impose a no-ship requirement" prior to 2008 is a question that "present[s] issues for a jury determination"). Thus, defendants are fully entitled to argue and present evidence that any such duties have *not* always existed; that requirements have changed over the years; and that DEA's guidance has been inconsistent and has shifted over time. *See, e.g.*, Dkt. 1887-4 at 2; 1887-5 at 2.

Second, plaintiffs' motion should be denied because their vague use of the term "duties" actually highlights the importance of permitting defendants to clarify for the jury *which* section of the CSA or its regulations is at issue with respect to a particular context in which plaintiffs accuse defendants of violating "duties." There is no general "violation of the CSA" that has uniform legal force, including with respect to plaintiffs' claims. Defendants are therefore entitled to help the jury in its evaluation of the evidence distinguish among "duties" under specific provisions of the statute and regulations, each of which has *different* significance in this case. Any bar on such argument or evidence would impose a severe risk of juror confusion about the alleged violation at issue (and its significance) and impose unfair prejudice on defendants. To offer just one example, such clarification is critical to helping the jury

13

understand whether a particular "duty" that was allegedly violated constitutes a felony (one of the preconditions to establish a RICO predicate). Motion No. 13 should be denied.

### 14. Plaintiffs' attempt to preclude defendants from presenting evidence bearing on their preemption defenses should be rejected.

Plaintiffs' Motion No. 14, which appears to be largely designed to prevent defendants from presenting evidence bearing on their preemption defenses, should be denied.[9] This motion, which once again seeks to exclude an entire category of evidence without reference to any *particular* evidence that plaintiffs seek to exclude, is impermissibly vague. *See Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). It is also overbroad, as the category it purports to address includes highly relevant evidence. *See Medical Mutual of Ohio v. Air Evac EMS, Inc.*, 2019 WL 4573700, at *3 (N.D. Ohio Sept. 20, 2019) (denying as "inappropriate and premature" motion *in limine* that would have excluded some evidence that "may be admissible for certain purposes").

Plaintiffs argue that all evidence they seek to exclude is irrelevant and would "conflict with this Court's prior rulings on preemption." Pl. MIL Br. at 11. That is incorrect. The Court denied defendants' dispositive motions based on certain preemption arguments because it "declined to read Plaintiffs' allegations so narrowly" as to fall entirely within a ground for preemption. Dkt. 2565 at 3; *see also id.* at 8. But declining to grant summary judgment is not the same as precluding evidence. The Court's ruling does not eliminate defendants' ability to present evidence at trial about FDA or DEA regulatory policies, which are critical to show that defendants did not violate the law or cause the alleged harm at issue.[10] And the Court's ruling

---

[9] This motion seeks to exclude "[a]ny reference that tort laws frustrate the FDA's or DEA's regulatory policies, or to the potential impact on pharmaceutical companies, the FDA, or the DEA, if any, or permitting tort claims to be asserted or of allowing a plaintiff to prevail." Pl. MIL Br. at 11.

[10] *See* pp. 16-25 below (discussing Plaintiffs' Motion Nos. 15-17).

certainly does not preclude defendants from raising a preemption defense, depending on the evidence that plaintiffs seek to present at trial. *See Allied Erecting & Dismantling Co., Inc. v. U.S. Steel Corp.*, 2015 WL 1843236, at *2 (N.D. Ohio Apr. 22, 2015) (summary judgment order did not "limit [the court] in advance of the trial with respect to evidentiary rulings").

Further, contrary to plaintiffs' argument, the Court has held that certain legal theories *are* preempted due to conflict with the FDA or DEA policies. For example, the Court held

> that representations made in [Manufacturers'] marketing materials must be consistent with specific pre-approved labels submitted to the FDA [and] state law claims seeking to impose liability on Manufacturers for failing to include statements on their marketing materials regarding the correct dosage and duration of treatments were preempted . . . .

Dkt. 2565 at 5. Likewise, the Court held that plaintiffs' claims against generic manufacturers conflict with the "duty of sameness" imposed by federal law (and the FDA) to the extent they are based upon evidence that generic manufacturers failed to disclose certain risks or should have sent additional communications to doctors. *Id.* The Court also recognized that any claims based on evidence that defendants misled the FDA are preempted because they would conflict with FDA enforcement authority. *Id.* at 9. Plaintiffs' overbroad and vague Motion No. 14 seeks to circumvent these rulings by banning any reference to "tort laws frustrat[ing] the FDA's … regulatory policies." Pl. MIL Br. at 11-12.

Similar principles apply with respect to claims involving allegations of fraud on the DEA. This Court has not disputed that any claim premised upon alleged misrepresentations to DEA would be preempted. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) ("state-law fraud-on-the-[federal government] claims conflict with, and are therefore impliedly pre-empted by federal law"). Instead, the Court accepted plaintiffs' repeated disavowal of any such claims. It is unclear, however, what evidence and arguments plaintiffs plan to present at

trial.  If plaintiffs do attempt to prove their claims by reference to allegedly fraudulent statements made by defendants to the DEA, then defendants will be entitled to respond appropriately to establish that plaintiffs cannot satisfy their burden merely by demonstrating a fraud on the DEA.[11]  Thus, at a minimum, the Court should deny plaintiffs' motion and determine the admissibility of the targeted evidence at trial with the benefit of the context in which it is offered. *See Surface v. Conklin*, 2018 WL 6257984, at *1 (S.D. Ohio Nov. 30, 2018) ("If the evidence is not plainly inadmissible on all potential grounds, the court's evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.") (internal quotation omitted).

### 15.  Plaintiffs have failed to justify their request to preclude any reference to the DEA "approving" or "endorsing" a particular defendant's SOM program.

The Court should deny Plaintiffs' Motion No. 15, which seeks exclusion of "[a]ny reference to the DEA 'approving' or 'endorsing' a particular Defendant's SOM program."  Pl. MIL Br. at 12.  Such evidence is admissible to assist the jury in determining whether defendants complied with their legal obligations and whether they acted with the purpose of engaging in unlawful conduct.  The Court already has determined that "there are disputes of fact as to whether, and when, each Defendant's SOMS was adequate," Dkt. 2483 at 21, and evidence that DEA approved or endorsed defendants' SOM systems is highly relevant to that determination.[12]

---

[11] For example, plaintiffs allege as RICO predicate acts that defendants committed mail or wire fraud. Because any claim that defendants "defrauded" DEA by failing to inform it of "suspicious orders" would be preempted, defendants are entitled to explain to the jury that plaintiffs' mail and wire fraud claims must be proven by reference to something other than fraud on the DEA.

[12] Evidence of DEA approvals and endorsements of defendants' SOM systems is especially relevant and critical to Defendants' ability to defend themselves if the Court denies Defendants' Motion in Limine No. 7, which seeks to have this Court exclude all evidence that defendants violated alleged duties under the CSA or its regulations as irrelevant.  Dkt. 2661 at 18-22.  But even if the Court were to grant defendants' Motion in Limine No. 7 – as it should – evidence of DEA approvals and endorsements of defendants' SOM systems is nonetheless probative of the ultimate liability questions that the jury must answer at trial.

***Evidence of DEA approvals and endorsements are relevant.*** Plaintiffs have not identified which "approvals" and "endorsements" they seek to exclude – or even which evidence they would characterize as reflecting "approvals" or "endorsements." Instead, they seek to have this Court exclude a broad category of evidence in the abstract. Such abstract categorical motions that give a court no concrete guidance as to the evidence that is actually at issue are disfavored. *Sperberg*, 519 F.2d at 712; *Medical Mutual of Ohio*, 2019 WL 4573700, at *3.

That at least *some* evidence in this category is highly relevant cannot be seriously disputed. Defendants' compliance with their SOM obligations is an integral part of plaintiffs' case. As plaintiffs themselves put it, "Plaintiffs allege that Defendants violated the CSA and that these violations form a basis of their public nuisance and RICO/OCPA claims." Pl. MIL Br. at 12. DEA administers and enforces the provisions governing SOM systems. *See* 21 U.S.C. § 871(a); 28 C.F.R. § 0.100; 21 U.S.C. § 832; 21 C.F.R. § 1301.74. Accordingly, DEA's approval or endorsement of a SOM system is relevant to whether the system complies with those provisions – and thus whether defendants can be held liable under plaintiffs' tort theories as plaintiffs have framed them. *See Tobin v. Astra Pharm. Prod., Inc.*, 993 F.2d 528, 538 (6th Cir. 1993) (holding that drug approval by federal agency "is evidence which the jury may consider in reaching its verdict" in tort action against the drug's manufacturer); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 10 (1st Cir. 2019) ("The common law has long recognized that agency approval of this type is relevant in tort suits.").

An examination of just one DEA approval shows the clear relevance of such evidence. On July 23, 1998, after AmerisourceBergen's predecessor, Bergen Brunswig, spent two years consulting with DEA and developing a new SOM system, DEA's then-Chief of the Liaison and Policy Section, Patricia Goode, issued a letter to Bergen Brunswig stating:

> This is to **grant approval** of your request to implement on a
> nationwide basis your newly developed system to identify and
> report suspicious orders for controlled substances and regulated
> chemicals, **as required by Federal regulation**. DEA managers
> who have been involved with the testing of the system have
> relayed their **positive opinions** regarding its ability to provide
> information in a fashion which is not only useful overall, but is
> also responsive to the needs of individual DEA offices.
>
> We appreciate the efforts you have undertaken to develop this
> improved system and apologize for the lengthy **approval process**.
> It did not seem appropriate to **grant this approval** prior to the
> conclusion of the Suspicious Order Task Force formed as a result
> of the Methamphetamine Control Act. Thank you for your
> patience in this matter.

Dkt. 2379-7 at ABDCMDL00315783 (emphasis added). Plaintiffs are free to put their own spin on the weight a jury should give such evidence, but the *relevance* of this DEA approval is undeniable.

> ***Admitting evidence of DEA approvals and endorsements results in no unfair prejudice.***

There is no plausible way for evidence of DEA approvals to result in any *unfair* prejudice to plaintiffs, let alone unfair prejudice that substantially outweighs probative value. *See* Fed. R. Evid. 403. To the contrary, if the Court were to preclude defendants from offering evidence showing that DEA approved defendants' SOM systems, that would unfairly restrict defendants' ability to defend themselves. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561–62 (6th Cir. 2013) (reversing *in limine* ruling that excluded evidence because a court must "allow for full development of the evidence" and cannot "'depriv[e] [the defendant] of an opportunity to present all pertinent material to defend'") (citation omitted).

> ***Plaintiffs' remaining arguments also lack merit.*** Plaintiffs suggest that the Court should

preclude defendants from introducing DEA statements of approval because they would "contradict this Court's prior legal determinations." Pl. MIL Br. at 12. But nothing about a DEA approval or endorsement of a defendant's SOM system would contradict any of this

Court's prior legal determinations. This Court *denied* plaintiffs' summary judgment motion on

defendants' compliance with their SOM duties because "there are disputes of fact as to *whether,*

*and when, each Defendant's SOMS was adequate*, whether orders were suspicious, and whether

each Defendant did actually ship suspicious orders (or instead, identified it as suspicious but

then, through due diligence, dispelled that suspicion)." Dkt. 2483 at 21 (emphasis added).

Evidence of a DEA approval is plainly probative of whether a "Defendant's SOMS was

adequate" – and thus goes directly to what the Court has said is a disputed issue of fact. *See id.*

Plaintiffs next argue that "the statements of an *individual* DEA agent purporting to

'approve' or 'endorse' a particular defendant's SOM program are irrelevant . . . ." Pl. MIL Br. at

12. But plaintiffs do not identify which DEA approvals or endorsements they consider to be

merely the statements of "individual DEA agents"; nor do they offer any authority for the

proposition that a statement by a DEA officer or agent acting in his or her official government

capacity is meaningless. To the extent plaintiffs believe that a particular approval or endorsement

came from a DEA officer or agent who was not acting in his or her official capacity, plaintiffs

are free to pursue that point on cross-examination. Where a party's objection goes to the weight

of evidence rather than its relevance, a motion *in limine* is properly denied.[13]

Plaintiffs further contend that no evidence of DEA approvals or endorsements should be

admitted because DEA stated recently that it "does not approve or otherwise endorse any specific

---

[13] *See Picture Me Press, LLC v. CPI Images, LLC*, 2009 WL 2448545, at *1 (N.D. Ohio Aug. 6, 2009)
(denying motion *in limine* because "[defendant] appears to attack the weight that should be given to the
testimony …. [Defendant] is free to demonstrate this fact to the jury through cross-examination.");
*McNeil v. Cmty. Prob. Servs., LLC*, 2019 WL 298474, at *1 (M.D. Tenn. Jan. 7, 2019) (denying motion
*in limine* because "Defendants are free to explore, on cross examination and in argument, issues relating
to the weight the Court should give such testimony"); *455 Companies, LLC v. Landmark Am. Ins. Co.*,
2018 WL 3159552, at *2 (E.D. Mich. June 28, 2018) (holding that counsel has an "ability to argue to the
jury the probative weight it should attach to the evidence presented" and thus "[t]hese matters are ripe for
cross examination and closing argument, not a motion in limine").

system for reporting suspicious orders" and DEA sent a letter to registrants in December 2007 stating that any "[p]ast communications with DEA … should *no longer* be taken to mean that DEA approves a specific system." Pl. MIL Br. at 12–13 & n.4 (emphasis added). The implication of the December 2007 letter is clear: DEA did issue statements *before* December 2007 and knew that registrants understood such statements to be approvals. And to the extent DEA approved or endorsed specific SOM systems *after* December 2007, plaintiffs are free to inquire into the merits of those approvals and endorsements through cross-examination. *See Picture Me Press, LLC*, 2009 WL 2448545, at *1; *McNeil*, 2019 WL 298474, at *1; *455 Companies, LLC*, 2018 WL 3159552, at *2. This, too, goes to weight, not admissibility.

Plaintiffs spend a considerable portion of their argument suggesting that "Defendants may try to argue that this evidence is relevant to an equitable estoppel defense to their CSA violations." Pl. MIL Br. at 13–17. This is a red herring. DEA is not a party, and defendants do not seek to estop it or any other agency of the federal government. The law of equitable estoppel as it applies to government enforcement actions is simply irrelevant here.[14]

Finally, evidence of DEA approvals and endorsements is highly relevant to the *intent* elements of plaintiffs' nuisance, RICO, and OCPA claims. For example, plaintiffs accuse defendants of violating a CSA provision prohibiting the "knowing[] or intentional[]" distribution of controlled substances in a manner that is not authorized by subchapter I of the CSA, 21 U.S.C. § 841(a), and seek to impose RICO and OCPA liability on that basis.[15] Evidence showing that

---

[14] This subject is discussed further at pp. 21-23 below, in response to plaintiffs' similar argument with respect to their Motion No. 16.

[15] As defendants explain elsewhere, plaintiffs (1) have not identified any conduct by defendants – who are each expressly authorized under the CSA to distribute controlled substances – that violated subchapter I of the CSA, and (2) should be precluded from relying on section 841 as a predicate act because they failed timely to disclose it in response to an on-point interrogatory.

DEA approved a particular type of SOM system is probative of whether defendants knowingly or intentionally distributed controlled substances in a manner that was not authorized under the CSA.[16]

**16.    Plaintiffs have failed to justify their request to preclude references to the DEA's failure to initiate enforcement actions against a particular defendant.**

In their Motion No. 16, plaintiffs ask that the Court preclude defendants from offering any evidence or argument regarding DEA's failure to "sanction or initiate enforcement actions" against them.  Pl. MIL Br. at 20.  As this Court has already recognized, this evidence is highly relevant to disputed issues of fact.  Plaintiffs' motion should therefore be denied.

DEA, as the principal regulator of the entire distribution chain for prescription opioids, is the federal agency charged with determining, among other things, whether manufacturers, distributors, pharmacies, and other registrants maintain effective controls against diversion.  And it is vested with authority to take action against registrants – including by suspending their registration to distribute controlled substances – if they do not comply with their obligations. Tellingly, no defendant has ever been subject to an enforcement action by DEA relating to (1) a

---

[16] Plaintiffs' assertion that the scienter requirement of section 841 is satisfied so long as defendants distributed opioids "deliberately and not by accident" (Pl. MIL Br. at 17) is incorrect.  First, the Sixth Circuit has held that section 841 is a specific intent crime, *see United States v. Soto*, 794 F.3d 635, 659 (6th Cir. 2015); *United States v. Pope*, 561 F.2d 663, 670 (6th Cir. 1977) (same).  "A specific intent crime … requires that a defendant act with the additional 'purpose of violating the law.'"  *United States v. Odeh*, 815 F.3d 968, 976 n.3 (6th Cir. 2016) (quoting *United States v. Gonyea*, 140 F.3d 649, 653 (6th Cir. 1998)).  Second, even if section 841 were not a specific intent crime, as the very cases relied on by plaintiffs make clear, "[t]o act 'knowingly' is to act with 'knowledge of the facts that constitute the offense.'"  *E.g.*, *United States v. Fuller*, 162 F.3d 256, 260 (4th Cir. 1998).  Here, the "fact" that would constitute the offense is the distribution of opioids in a manner that was not "authorized by" subchapter I of the CSA.  21 U.S.C. § 841(a).  Third, unlike the CSA's prohibition of cultivating marijuana, the provisions that defendants are accused of violating are highly technical, and thus plaintiffs must prove that defendants were aware of the specific "duties" they allegedly violated.  *United States v. Tobin*, 676 F.3d 1264, 1282 (11th Cir. 2012).  Evidence regarding DEA approval of certain SOM systems is thus relevant to whether defendants knowingly engaged in the *unauthorized* distribution of controlled substances.

customer in either Summit or Cuyahoga County or (2) a distribution facility servicing either Summit or Cuyahoga County.

The weight of authority holds that the absence of a pertinent regulatory enforcement action is admissible. *See, e.g.*, *In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*, 2018 WL 6617375, at *2 (S.D. Ind. Dec. 18, 2018) (admitting evidence of the government's failure to initiate an enforcement action); *Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 3744976, at *12 (N.D. Tex. July 30, 2014) (same); *see also Cummins v. BIC USA, Inc*., 727 F.3d 506, 514 (6th Cir. 2013) (holding in product liability action that district court did not abuse its discretion in admitting evidence that Consumer Product Safety Commission did not "take any enforcement action" against defendant).

*In re Cook Medical* is instructive.  In that product liability case, the defendant sought to "offer evidence that the [medical device at issue] was never recalled by the FDA, that the FDA never observed any violations of Cook's quality system during its inspections between 2000 and 2014, and that the FDA never used any enforcement action against Cook."  2018 WL 6617375, at *2.  The court denied the plaintiffs' motion to exclude, holding that the "evidence is relevant to Cook's defense."  *Id.*

Similarly, in *Eagle Oil*, the defendant insurer bore the burden of proving that the plaintiff oil-well operators acted unreasonably.  2014 WL 3744976, at *1–2. The insurer moved to exclude expert testimony from the former executive director of the plaintiffs' regulator, arguing that "it is improper to conclude that a party did not violate a [regulation] simply because there was no … enforcement action."  *Id.* at *11.  The court, however, denied the motion and permitted testimony "regarding whether an enforcement action was brought."  *Id.* at *12.

Here, the absence of any regulatory enforcement actions against defendants relating to customers and distribution facilities in Summit and Cuyahoga Counties is plainly relevant. Indeed, this Court has recognized that DEA's past endorsement of defendants' conduct "present[s] issues for a jury determination." *E.g.*, Dkt. 2483 at 29 (question whether McKesson's "manner of reporting" suspicious orders was accepted by DEA as "compliant" presents a fact issue precluding summary judgment). Defendants should therefore be permitted to introduce evidence and argument regarding DEA's failure to sanction or take enforcement actions against them.

None of the cases cited by plaintiffs is to the contrary. Rather, the vast majority of those cases address the inapposite question of whether the federal government may be estopped from bringing suit by its prior failure to initiate an enforcement action.[17] Here, of course, the federal government is not a party and defendants do not seek to estop anybody. Cases that rely on the strong public policy against estopping the federal government from exercising its statutory obligations thus present no basis on which to exclude relevant evidence.[18]

---

[17] *United States v. City of Toledo*, 867 F. Supp. 603, 607–08 (N.D. Ohio 1994) (government's failure to bring an enforcement action did not equitably estop government's lawsuit); *United States v. City of Menominee*, 727 F. Supp. 1110, 1121–22 (W.D. Mich. 1989) (same); *United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, an Article of Device*, 799 F. Supp. 1275, 1297 (D.P.R. 1992); *Washington Tour Guides Ass'n v. Natl. Park Serv.*, 808 F. Supp. 877, 882 (D.D.C. 1992) (same); *see also Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 224–25 (D.C. Cir. 2017) (same); *Fisher v. Peters*, 249 F.3d 433, 444–45 (6th Cir. 2001) (plaintiff could not equitably estop Secretary of the Air Force from asserting that plaintiff's claims were non-justiciable).

[18] The *only* on-point case cited by plaintiffs – *Georges v. Novartis Pharm. Corp.*, 2013 WL 5217198, at *6 (C.D. Cal. Apr. 4, 2013) – is an outlier that is entirely devoid of analysis. *United States v. Hoyt*, 2014 WL 5023093, at *7 (W.D. Va. Oct. 8, 2014), is inapposite for the reason described below in the response to Motion No. 17.

17. **Plaintiffs have failed to justify their request to preclude references to the FDA's failure to sanction or initiate enforcement actions against a particular defendant.**

There is no dispute that the pharmaceutical manufacturers' marketing activities are carefully regulated by the FDA, which has the authority to enforce compliance with the Federal Food, Drug, and Cosmetic Act ("FDCA") and its own regulations. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 (2001). The heart of plaintiffs' case against the Teva and Actavis Generic Defendants is that they supposedly engaged in a "scheme involving the false and deceptive marketing of prescription opioids" in Summit and Cuyahoga Counties, thereby allegedly causing local doctors to write medically unnecessary or excess opioid prescriptions that caused harm to plaintiffs. *See* Dkt. 1466 ¶¶ 9, 903. Thus, the fact that the FDA has never brought an enforcement action against these particular manufacturer defendants for the false or misleading marketing of opioids in the counties is relevant to rebut this claim. *See In re Cook Med., Inc.*, 2018 WL 6617375, at *2; *Eagle Oil*, 2014 WL 3744976, at *12; *Cummins*, 727 F.3d at 514.

Plaintiffs argue that "[t]he fact that a Defendant has not been sanctioned or the subject of an enforcement action does not mean that Defendant did not violate the CSA, the FDCA, and/or related regulations." Pl. MIL Br. at 20–21. But evidence need not be *dispositive* of a fact of consequence to be admissible, it must only make that fact "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Evidence of the FDA's decision not to take enforcement against a particular defendant for false or misleading marketing in the Counties makes it less probable that Manufacturer Defendants did so.

Plaintiffs' reliance on *United States v. Hoyt*, 2014 WL 5023093, at *7 (W.D. Va. Oct. 8, 2014), is misplaced. *Hoyt* was a criminal conspiracy case in which the Government moved to preclude the defendants from introducing evidence that they did not know that the substances

they allegedly sold were controlled substance analogues and to exclude evidence of the

Government's failure to notify defendants that they were violating the law. *Id.* at *6. The Court

granted the motion because an ignorance-of-the-law defense was "not a valid defense to the

charges the defendants face." *Id.* at *7. That decision has no applicability here. Defendants are

not attempting to raise an ignorance-of-the-law defense, and the evidence would not be offered

in furtherance of such a defense. In cases that *are* on point, courts have rejected plaintiffs'

argument, reasoning that "[i]t is unjust to allow plaintiff to allege violations of the FDA's

regulatory framework, while at the same time prohibiting [Defendant] from explaining the

absence of formal violations." *Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 835 F.

Supp. 2d 299, 320 (W.D. Ky. 2011).[19]

### 18. Plaintiffs' request to preclude any "reference" to the possibility that an award of damages will adversely affect the availability or cost of medications is overbroad.

Defendants do not intend to personalize their arguments to members of the jury. Neither

side should do that, and to the extent that plaintiffs' Motion No. 18 is limited to barring reference

that an award of damages will adversely affect the availability or increase the costs of

medications *for members of the jury*, defendants have no intention of making any such argument

unless plaintiffs open the door.

However, the remainder of Motion No. 18 should be denied, for three reasons.[20] First, as

explained in Defendants' Joint Motion In Limine No. 11, plaintiffs cannot seek punitive damages

---

[19] As discussed above, plaintiffs' secondary argument that defendants may not invoke an equitable estoppel defense based on government inaction is a red herring. Defendants assert no such defense.

[20] This motion seeks to exclude: "[a]ny reference that any award of damages will adversely affect the ability of any member of the jury to purchase, or have available medications in the future, or affect the cost thereof, or have an adverse effect on the drugs or health products available to individuals or industries in the United States or elsewhere (*e.g., argument or testimony that in Plaintiffs are awarded*

as a matter of law. Dkt. 2661 at 32–33. And, in fact, plaintiffs have since conceded that they no longer seek punitive damages. *See.* Ex. 1; Dkt. 2715-3 at 55 n.11. However, in the event that plaintiffs reverse course yet again and the Court permits punitive damages to be tried – over defendants' objections – this evidence would be relevant to that issue.[21]

Second, this motion is so broad that it appears to sweep in evidence that is relevant to liability. For instance, evidence of the availability of "drugs … to individuals," including whether legitimate pain patients are being denied legitimate opioid prescriptions by doctors, is relevant to whether there is a public nuisance. Such evidence is also relevant to the efficacy of any marketing by manufacturers and to rebutting plaintiffs' theory of causation.

Finally, it is unclear what plaintiffs will argue at trial. At a minimum, the Court should defer ruling on this motion until the evidence plaintiffs seek to exclude can be evaluated in the context in which it is offered. *See Surface*, 2018 WL 6257984, at *1 ("If the evidence is not plainly inadmissible on all potential grounds, the court's evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.") (internal quotation omitted).

---

damages, the cost of medicines or medical care will increase, or that medications will no longer be available.)." Pl. MIL Br. at 22.

[21] As the Supreme Court has recognized, punitive damages must be calibrated to avoid over-deterring socially beneficial conduct, such as the development and marketing of pharmaceuticals. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff . . . ."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 593 (1996) (Breyer, J., concurring) (noting that excessive awards can result in over deterrence of socially useful activity). To rebut plaintiffs' claim for punitive damages, defendants would be entitled to offer evidence establishing how a punitive damages award would affect defendants' businesses, including the effect on the availability and price of their medications. *See In re: Tylenol (Acetaminophen) Mktg.*, 2016 WL 3125428, at *5 (E.D. Pa. June 3, 2016) (denying motion *in limine* to exclude nearly identical evidence because, in part, "the context of this evidence is important").

**19. Plaintiffs' request to preclude any "suggestion" or "indication" that a judgment in this case will have adverse economic effects is overbroad.**

The scope of what plaintiffs intend by their Motion No. 19 is unclear.[22] Defendants do not intend to argue to the jury that a verdict against them will affect their ability to compete in the marketplace or will adversely affect the economy or lead to layoffs. However, to the extent plaintiffs seek to preclude defendants from describing the nature of their businesses, where they operate, how many persons they employ, and the like, any such request should be denied for the reasons set forth in defendants' response to Motion No. 6. (*See* p. 6 above.) Such information is as basic as plaintiffs' own description of the nature and scope of their governmental services.

Plaintiffs' brief asserts that "evidence of net worth or financial status of Defendants is admissible with respect to the issue of punitive damages." Pl. MDL Br. at 24. This assertion is not only incorrect but also moot, as plaintiffs have now disclaimed punitive damages. *See* Ex. 1; Dkt. 2715-3 at 55 n.11. Should plaintiffs reverse course on that yet again – and should the Court permit punitive damages to be tried over defendants' objections – evidence addressed by this motion would clearly be relevant on that issue.

---

[22] Motion No. 19 seeks to preclude "[a]ny suggestion or indication that a judgment in this case will have an adverse effect on the finances or ability of Defendants to compete in the marketplace, or that it may negatively affect the economy or lead to layoffs (*e.g., any argument or testimony that a judgment in this or any other case might force the company to lay off employees, or cut back on its business, or affect the local or other economy*)." Pl. MIL Br. at 23.

**20.    Plaintiffs' vague request for a bar on "any reference that a verdict for Plaintiffs will adversely impact pharmaceutical manufacturers' incentive or ability to develop new drugs" is overbroad.**

Plaintiffs' Motion No. 20 should be denied, at least provisionally, for the same three reasons as their Motion No. 18.  First, as discussed above, if punitive damages make their way back into this trial – and they should not – this evidence would be relevant on that issue.[23]

Second, Motion No. 20 is vague.  As drafted, it may cover evidence that is relevant to liability, such as evidence that the regulatory and litigation environment has stymied manufacturers' ability to develop new drugs that would benefit legitimate pain patients.  This, in turn, has decreased the availability of prescription opioid medications to such patients.  At a minimum, such evidence is relevant to whether the manufacturers have caused a public nuisance.

Finally, it is unclear what plaintiffs will argue at trial that may have a bearing on this subject.  At a minimum, therefore, the Court should defer ruling on this motion until the evidence Motion No. 20 seeks to exclude can be evaluated in the context in which it is offered. *See Surface*, 2018 WL 6257984, at *1.

**21.    Plaintiffs' request to exclude evidence of the impact of litigation on costs is overbroad.**

In Motion No. 21, plaintiffs argue that defendants "should also be precluded from offering evidence or argument that lawsuits impact the cost of their products," claiming such evidence or argument "encourages the jury to decide the case based on impermissible factors." Pl. MIL Br. at 25.  Although defendants currently have no plans to offer evidence about the

---

[23] To rebut plaintiffs' claim for punitive damages, defendants would be entitled to offer evidence establishing how a punitive damages award would affect defendants' businesses, including their incentive and ability to develop new medications. For this very reason, courts have denied motions *in limine* to exclude the same evidence plaintiffs seek to exclude. *See, e.g.*, *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 2013 WL 5533696, at *2 (W.D. La. Oct. 2, 2013); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, 2011 WL 6740391, at *16 (S.D. Ill. Dec. 22, 2011).

impact that lawsuits have on the pricing of pharmaceuticals, excluding such evidence in the abstract is premature. Neither defendants nor the Court can anticipate how plaintiffs will attempt to prove their case, but should plaintiffs make arguments at trial that implicate this question – *e.g.*, by arguing that this litigation will make medical care more affordable or accessible – defendants must be permitted to respond. This motion should accordingly be denied as premature, as it is more appropriately raised if and when the issue arises. *See William F. Shea, LLC v. Bonutti Research, Inc*., 2013 WL 2424382, at *2 (S.D. Ohio June 4, 2013) (denying motion *in limine* in absence of sufficient information about what evidence would be offered); *Ausa Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1202 (S.D.N.Y. 1995) (same).

### 22. Plaintiffs have failed to justify their request to preclude references to deposition or trial testimony from witnesses produced in litigation in which plaintiffs did not participate.

The Court should deny plaintiffs' request to exclude deposition testimony from any "parallel litigation in which Plaintiffs did not participate." Pl. MIL Br. at 25. Although plaintiffs insist that they can use such (unidentified) testimony "for impeachment purposes," they assert that it cannot be used affirmatively. *See id*. at 26.

Defendants and the Court are left to guess what testimony plaintiffs are actually talking about – once again plaintiffs' motion identifies no specific evidence, making opaque reference only to testimony taken in "parallel litigation." *Id.* at 25. But assuming that this motion refers to depositions taken in the Oklahoma state-court opioid litigation, that testimony was subject to cross-examination by a party with interests identical to plaintiffs' interests, and Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 804 authorize its admission.

Certain defendants have designated testimony depositions in the Oklahoma litigation of individuals, such as "Key Opinion Leaders" ("KOLs") and pain advocacy groups, with whom plaintiffs allege certain defendants conspired and formed a RICO enterprise to illegally market

prescription opioids. *See, e.g.*, Dkt. 1466 (Summit Cty. TAC) ¶¶ 391–423, 879–906; *see also*

Dkt. 2000-8 (Kessler Rep.) ¶ 471.4. Testimony from these alleged co-conspirators could not be

more relevant: In the designated testimony, the KOLs and alleged "front groups" repudiate

plaintiffs' conspiracy theories and maintain that, rather than conspiring with defendants, they

simply expressed their independent medical opinions.[24] Plaintiffs do not (and could not) dispute

the relevance of this testimony.

This evidence is admissible under the very Federal Rules that plaintiffs cite. Plaintiffs

invoke Federal Rule of Civil Procedure 32, but that Rule allows use of state-court depositions "in

a later action" that: (1) "involv[es] the same subject matter" and (2) is "between the same parties,

*or their … successors in interest.*" Fed. R. Civ. P. 32(a)(8) (emphasis added). Both of these

requirements, which must be "construed liberally," *District Attorney of New York County v.*

*Republic of Philippines*, 307 F. Supp. 3d 171, 209 (S.D.N.Y. 2018), are satisfied here. First, this

case undeniably "involve[es] the same subject matter" as the Oklahoma opioids litigation: the

plaintiffs in both cases sued the same pharmaceutical manufacturers under the same theory that

pharmaceutical marketing caused the opioid abuse crisis. *Compare generally* Petition,

*Oklahoma v. Purdue Pharma*, CJ-2017-816 (Okla. Dist. Ct. June 30, 2017) *with* Dkt. 1466

(Summit Cty. TAC). Second, plaintiffs here are a "successor in interest" with the state of

Oklahoma for purposes of Rule 32, which requires only a party with a "shared interest in the

material facts and outcome of the case." *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96,

110 n.21 (3d Cir. 1999). Neither privity nor a common property interest is required. *Id.* "The

---

[24] This includes the highly relevant testimony of Lynn Webster and Scott Fishman, who directly
contradict Plaintiffs' accusations that they were part of some marketing conspiracy and that
manufacturers influenced their statements about opioids. *See* Dkt. 1985-15 (Webster Dep.) at 299:15–
300:10; 375:7–17; 223:4–7; Dkt. 1977-6 (Fishman Dep.) at 293:8–294:2.

key is whether an adversary with the same motive to cross-examine the deponent was present when the deposition was taken in the earlier action." *Andrews v. Weatherproofing Techs., Inc.*, 277 F. Supp. 3d 141, 146 (D. Mass. 2017). The State of Oklahoma pursued virtually identical theories of liability and had precisely the same motive as the Counties to cross-examine these witnesses. Their depositions accordingly can be used at trial "to the same extent as if [they were] taken in the [present] action." Fed. R. Civ. P. 32(a)(8).

Similarly, plaintiffs invoke the hearsay rule, but Rule 804(b)(1) recognizes a hearsay exception for deposition testimony from unavailable witnesses if a "predecessor in interest" had "an opportunity and similar motive" to examine the witness. Fed. R. Evid. 804(b)(1). Because the State of Oklahoma "ha[d] a like motive to cross-examine about the same matters as the present party would have … the testimony may be received against" plaintiffs. *Clay v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983).

Put simply, the Federal Rules authorize the admission of this undeniably relevant evidence, and keeping it from the jury would be prejudicial error.

### 23. Plaintiffs have failed to justify their request to preclude any argument regarding the effect of the "learned intermediary" doctrine on liability.

Plaintiffs' Motion No. 23, which seeks to preclude "[a]ny argument or suggestion that the 'learned intermediary' doctrine limits the liability of any Defendant or absolves any Defendant from liability" (Pl. MIL Br. at 27), should be denied for several reasons. First, plaintiffs improperly seek to narrow the "learned intermediary" doctrine. Plaintiffs are correct that the doctrine modifies liability for prescription drugs, so that "a manufacturer is . . . required to provide warnings only to physicians, who assess the risks and benefits of their patient using the drug" rather than to the end user of the medication. Pl. MIL Br. at 28. However, the doctrine goes further. Indeed, "[t]he rationale behind the [doctrine] is that the physician stands between

31

the manufacturer and the patient as a learned intermediary. The physician has the duty to know the patient's condition as well as the qualities and characteristics of the drugs or products to be prescribed for the patient's use. The physician is in the best position, therefore, to balance the needs of patients against the risks and benefits of a particular drug or therapy, and then to supervise its use." *Tracy v. Merrell Dow Pharm., Inc.*, 569 N.E.2d 875, 878 (Ohio 1991). Thus, the physician, as the learned intermediary, must examine and consider the "patient's condition as well as the qualities and characteristics of the drugs or products to be prescribed for the patient's use" and serves as the gatekeeper between the prescription of a drug (both for appropriate and inappropriate purposes) and the consumption by the patient. *Id.*

The learned intermediary doctrine is therefore broad, and its principles apply here. Plaintiffs assert that certain manufacturer defendants failed to warn of and misrepresented the risks associated with their opioid medications. The "learned intermediary" doctrine, and its underlying principles, are highly relevant to defend against this theory. By way of example, evidence that a physician is a "learned intermediary" – one who must make an independent medical judgment as to what medicine to prescribe to a patient after familiarizing herself with the risks and labels of those medicines – helps negate causation. A jury could find that because a physician is obligated to know the risks of the medicines she prescribed as a learned intermediary, her actions – not any misrepresentations by defendants – caused plaintiffs' alleged harms. At a minimum, defendants must be allowed to present evidence of this well-settled legal principle and all evidence consistent with it. *See, e.g.*, *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590, 596 (S.D. Ohio 2003) (recognizing broad scope of doctrine and finding that independent and individualized decision-making of "Learned Intermediaries" defeated any "common marketing issues").

Finally, none of the arguments plaintiffs make in support of this motion purport to undermine the ability of the distributor defendants to point to the intervening actions of physicians as breaking the chain of causation between their actions and plaintiffs' alleged injuries. Indeed, plaintiffs' motion itself makes clear that it does *not* seek to preclude evidence suggesting that "the actions of doctors break the causal chain between Defendants' fraud and Plaintiffs' injuries." Pl. MIL Br. at 28. Regardless of whether this causation evidence is or is not affixed with the label of the "learned intermediary doctrine," distributors are plainly entitled to present it, and plaintiffs' motion does not offer a basis for concluding otherwise.

### 24. Plaintiffs have failed to justify their request to preclude any reference to plaintiffs' failure to mitigate their damages.

Plaintiffs' Motion No. 24 seeks an order precluding defendants from offering "any evidence or argument" that plaintiffs failed to mitigate damages. Pl. MIL Br. at 29. In Ohio, as elsewhere, an injured party may not "recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort." *BP Exploration & Oil Co. v. Maint. Servs., Inc.*, 313 F.3d 936, 943–44 (6th Cir. 2002) (citing *Johnson v. Univ. Hosps.*, 540 N.E.2d 1370, 1377 (Ohio 1989)). This principle – known as the "mitigation doctrine" – reflects a policy that encourages loss avoidance, placing an obligation on tort plaintiffs to take "reasonable measures" to reduce their "damages and to prevent an aggravation of [their] injuries." *Dunn v. Maxey*, 693 N.E.2d 1138, 1140 (Ohio Ct. App. 9th Dist. 1997). Notwithstanding this well-established principle, plaintiffs seek to exclude "any evidence or argument" that they failed to mitigate their damages, asserting that the doctrine does not apply for four reasons. Pl. MIL Br. at 29. None has merit.

*First*, plaintiffs assert that they were under no duty to mitigate "any damages they are claiming in this case" because a mitigating party is not required to incur "extraordinary expense

and risk" and plaintiffs "incurred significant costs and expense … in their efforts to address the opioid crisis."  Pl. MIL Br. at 29 (quoting *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 961 (Ohio 1999)).  But even if plaintiffs were not required to undertake "extraordinary" measures to mitigate their damages, they would still have a duty to undertake *reasonable* measures.  *See, e.g.*, *Baird v. Crop Prod. Servs., Inc.*, 2012 WL 3815314, at *8 (Ohio Ct. App. 12th Dist. 2012); *Abroms v. Synergy Bldg. Sys.*, 2011 WL 1734081, at *10 (Ohio Ct. App. 2d Dist. 2011).  Moreover, whether expenses are "extraordinary" and whether damages could have been avoided are questions of fact for the jury.  *See, e.g.*, *Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990) ("[T]he adequacy of mitigation is a question of fact"); *Settlemyre Industries, Inc. v. E-Biofuels, LLC*, 2010 WL 11538068, at *3 (S.D. Ohio Mar. 22, 2010).  Accordingly, plaintiffs' request for a blanket prohibition on "any evidence or argument" regarding mitigation is inappropriate.  *See Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds.").

*Second*, plaintiffs assert that "when both parties have the same opportunity to reduce damages, a defendant cannot later contend that the plaintiff failed to mitigate."  Pl. MIL Br. at 29 (quoting *Chicago Title*, 719 N.E.2d at 962).  However, as the Ohio Supreme Court has explained, this theory applies only in "circumstances in which the breaching party could have minimized damages *by performing the same act as the other party*."  *State ex rel. Stacy v. Batavia Loc. Sch. Dist. Bd. of Edn.*, 829 N.E.2d 298, 311 (Ohio 2005) (emphasis added).  Here, plaintiffs do not – and cannot – claim that defendants "had an equal opportunity" to provide the governmental services that form the basis of plaintiffs' damages claims.  *Contra Chicago Title*,

719 N.E.2d at 962 ("[A] mortgagee is not obligated to mitigate its damages by bidding on the secured property in foreclosure" if the insurer "had an equal opportunity to do so.").[25]

*Third*, plaintiffs argue that the mitigation doctrine does not apply because their harms "were caused by defendants' intentional conduct." Pl. MIL Br. at 30. But as plaintiffs concede, *id.*, they cannot identify a single Ohio case – state or federal – that follows this "limiting view." *Chicago Title Ins. Corp. v. Magnuson*, 2009 WL 3321372, at *6 (S.D. Ohio Oct. 9, 2009) (describing the "unqualified application of the duty to mitigate in intentional tort cases [which] presents a clear statement of Ohio law"). Ohio courts have roundly rejected this approach and require plaintiffs to make reasonable efforts to mitigate damages regardless of the type of tort that caused the harm. *See id.* (collecting cases).

*Fourth*, without citing any authority, plaintiffs argue that the mitigation doctrine does not apply because the federal government has no duty to mitigate damages in cases brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* This argument is without merit. Even with regard to the federal government, courts have narrowly limited this exception to the mitigation doctrine to claims brought under the FCA, which is not at issue here.[26] Nor have courts extended this exception to other governmental entities; to the contrary, state and local government plaintiffs are regularly required to mitigate damages, just like any other plaintiff. *See, e.g.*, *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185, 1231 (D.N.M. 2004).

---

[25] Plaintiffs further argue that "Defendants should be precluded from arguing the counties should have done more when it was the defendants' conduct that caused the problem in the first place." Pl. MIL Br. at 30. This argument is "inaccurate and illogical," as "it would relieve every plaintiff of the duty to mitigate because the defendant could have mitigated by not breaching [its duties] in the first place." *Batavia*, 829 N.E.2d at 311 (quotations and alterations omitted).

[26] *See, e.g.*, *Cascade P. Intern. v. United States*, 773 F.2d 287, 294 (Fed. Cir. 1985) (federal government has duty to mitigate damages for common law claims); *United States ex rel. Dye v. ATK Launch Sys., Inc.*, 2008 WL 4642164, at *4 (D. Utah Oct. 16, 2008) (same); *Provident Life and Acc. Ins. Co. v. United States*, 772 F. Supp. 1016, 1023 (E.D. Tenn. 1991) (same).

### 25. Measures to protect the identities of children are appropriate but should be reasonable.

In their Motion No. 25, plaintiffs seek an order precluding "[a]ny reference to, or evidence of, the identities of any children, including but not limited to children in child protective custody." Pl. MIL Br. at 31. Once again, plaintiffs' brief fails to identify the actual scope of the parties' dispute. Defendants naturally agree that the names of children should ordinarily not be mentioned during the trial, but have pointed out to plaintiffs that any bar should exclude situations in which the name is a matter of public record. Plaintiffs' own publicly filed brief on these motions – which mentions a child's name prominently and repeatedly– illustrates this point. *See* Pl. MIL Br. at 39 (discussing Aniya Day Garrett).

Further, plaintiffs' request for a broad bar on any "evidence of" the identities of children is excessively vague and likely to lead to unnecessary disputes. If and to the extent there is discussion during trial of individual cases,[27] virtually *any* information about a particular case will be "evidence of" the subject's identity. It does not necessarily follow that the admission of the evidence will *reveal* that identity. And the record must, at a minimum, reflect sufficient information to allow the opposing party to know *what* case is under discussion, so that effective cross-examination is possible and a proper record maintained for appellate purposes.

Defendants accordingly suggest that any general order on this subject entered before trial be limited to the actual *names* of children. If there is other evidence concerning a specific case that, if disclosed, would pose an unnecessary risk of allowing the child to be identified, defendants will work with plaintiffs to address the issue and, if no agreement can be reached, an

---

[27] Defendants have moved *in limine* for an order barring plaintiffs from presenting evidence of such cases, given plaintiffs' success in avoiding discovery concerning them. *See* Dkt. 2661 at 5-9.

objection may be stated at that time. Defendants accordingly suggest that the Court simply order

the parties to refrain from:

> [a]ny reference to the names of any children, including but not
> limited to children in child protective custody, unless their
> identities are matters of public record.

**26.  Plaintiffs' request to bar "any reference" to individual health information is premature and should be addressed, if necessary, on a case-by-case basis.**

Although the parties are in agreement that the parties should attempt to avoid

unnecessary mention during trial of genuinely private health information of individual patients,

plaintiffs' Motion No. 26 sweeps too broadly and should be denied.[28]

The importance of this question will be much diminished if the Court grants, as it should,

Defendants' Joint Motions in Limine Nos. 2 and 3, which would preclude plaintiffs from

offering *any* evidence regarding specific patients, not merely their individually identifiable health

information. *See* Dkt. 2661 at 5–11. For the reasons set forth in defendants' brief on those

motions, plaintiffs should be estopped from introducing evidence concerning specific patients

after they successfully resisted discovery of such individualized evidence by taking the position

that only "aggregate" evidence was relevant.

In any event, plaintiffs' Motion No. 26 suffers from the same problem of impracticality

and overbreadth as their Motion No. 25. By seeking to preclude "any evidence" of individual

health information or records, it arguably sweeps in virtually everything that might be said about

a particular patient, preventing the parties and the jury from even knowing what is being

---

[28] Motion No. 26 seeks to exclude "[a]ny reference to, or evidence of, any individually identifiable health information or medical records related to any individual patients, including but not limited to information or records that identifies babies with neonatal abstinence syndrome or persons with opioid use disorder." Pl. MIL Br. at 31.

discussed or being able to correlate one piece of evidence about a particular individual with another piece of evidence about that same individual.

For example, plaintiffs state that they "anticipate offering evidence regarding the nature of treatment and other services they have had to provide to their respective communities." *Id*. at 31-32. As a matter of due process, therefore, defendants cannot be precluded from rebutting whatever evidence plaintiffs may offer on this subject with medical or other individualized records related to any individuals who allegedly received such services. Such medical records are clearly relevant to defend against plaintiffs' theory of causation and damages, regardless of how plaintiffs seek to prove their case. For instance, individualized records may help show that a patient's opioid use disorder or neonatal abstinence syndrome has nothing to do with the prescription opioid medicines marketed or shipped by the remaining Track 1 Defendants; thus, plaintiffs cannot recover for such harm. Likewise, individualized records may help establish that relevant cases of opioid use disorder or neonatal abstinence syndrome were caused by factors *distinct* from any unlawful marketing or distribution of prescription opioids by the remaining Track 1 Defendants, such as the illegal conduct of third parties. Plaintiffs acknowledge that "Defendants may seek to introduce such information in the course of their defense" and that "facts [regarding] treatment are relevant and admissible." *Id*. at 32. A broad *in limine* ruling that interfered with defendants' practical ability to present such evidence would be inappropriate.

To the extent any information about individual patients is offered at trial, the parties should naturally take appropriate steps to ensure that the privacy of those individuals is protected, taking into account the needs of the case and the parties' due process rights. The measures that are appropriate in any given instance will vary according to, among other things, the particular evidence that is at issue, what that evidence is offered to show, how much need

there is to correlate that evidence with other evidence, and what information can appropriately be redacted for privacy reasons without unfair prejudice to any party. If the Court wishes to direct the parties to meet and confer about such issues before any testimony or exhibits are offered that refer to potentially sensitive health information, defendants will naturally comply. However, plaintiffs' Motion No. 26, as presented, is not useful to such efforts and should be denied.

**27.  Plaintiffs have made no meaningful effort to carry their burden of justifying the procedural and substantive restrictions they seek to impose on testimony from allegedly "undercover" law enforcement personnel.**

Plaintiffs' Motion No. 27 seeks an elaborate assortment of restrictions on the use at trial of deposition and/or live testimony from witnesses they refer to in vague and general terms as "undercover law enforcement personnel." Pl. MIL Br. at 34.[29] None of these restrictions are supported by the case law, which mandates public access to trial testimony absent *concrete proof* of an important countervailing interest. And while protections may be afforded to preserve the identities of law enforcement personnel who face genuine danger, plaintiffs have made no effort to satisfy this burden with respect to any of the officers whose names appear on the parties' witness lists. In fact, plaintiffs have not identified any specific witness to whom their proposed restrictions would apply, and the record that does exist is inconsistent with the need for any special measures.

The default presumption is against plaintiffs' request. The case law they cite affirms the default rule that "open trials are strongly favored," so the party seeking to restrict evidence must offer "persuasive evidence of serious risk to an important interest in ordering *any* closure."

---

[29] Most of the discussion in plaintiffs' brief addresses proposed restrictions on the presentation of testimony via deposition. As far as defendants are aware, all of the witnesses as to whom this motion might be addressed – once again, plaintiffs have failed to say which witnesses they are actually talking about – are within the subpoena power of the court and would be expected to testify live. If so, their depositions would presumably be used only for impeachment purposes.

*Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir. 1997) (emphasis added). The public right to access evidence in judicial proceedings applies also to civil trials. *See Brown v. Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983). To implement a restriction based on an "overriding interest based on findings that closure is essential to preserve higher values," the Court must both make those findings on the record and ensure that the restriction is "narrowly tailored to serve that interest." *Waller v. Georgia*, 467 U.S. 39, 45 (1984) (quoting *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 464 U.S. 501, 510 (1986)).

As the case law plaintiffs cite makes clear, this requirement of individualized, evidence-based balancing applies with full force to testimony from undercover officers. *See, e.g.*, *United States v. Maso*, 2007 WL 3121986, at *3 (11th Cir. Oct. 26, 2007) (per curiam) (allowing the use of a pseudonym only after extensive *in camera* review revealing that officer had suffered personal threats from defendant's father and had previously been targeted by a hit-man); *Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) (restricting defendant's family from attending officer's testimony only after assessing that officer had been threatened before and would continue to operate in neighborhood where family lived). Plaintiffs have cited no case in which access to a witness's testimony has been restricted based on a party's blanket request that unspecified officers be categorically protected, with no proof of genuine need.

Plaintiffs have failed to provide any individualized justification — let alone proof of an "overriding interest" — for why the restrictions they propose should be categorically applied to the testimony of what they refer to as "undercover law enforcement officers." Pl. MIL Br. at 34. In addition to leaving defendants (and the Court) to guess which officers they are talking about, plaintiffs have supplied no evidence of threats or other indicia of danger. Plaintiffs do not dispute that each of these individuals has, like most police officers, testified in open court in

multiple criminal proceedings – situations that on their face would pose considerably greater risk of retaliation than any public testimony in this case.

Moreover, the identities and other information about at least some of the individuals plaintiffs appear to be referring to have been made public through press interviews and other voluntary disclosures. For example, Detective Scott Moran – the witness as to whom plaintiffs sought special protections in discovery based on similar arguments – has given multiple press interviews, where he has been quoted – by name.[30] Should Detective Moran (or someone similar) testify at trial, it would be bizarre, to say the least, for his identity to be withheld from the jury, as plaintiffs request, when his name and the nature of his work are easily available online. Nor, if excerpts from a witness's recorded deposition are used in lieu of live testimony, is there any reason to deprive the jury of the ability to hear his voice.[31]

Plaintiffs' motion ignores the unfair prejudice to defendants that would arise if their proposed restrictions were adopted without a showing of compelling need. Singling out these witnesses for special treatment could be interpreted by the jury as conveying special gravity or significance to their testimony, which is not warranted. It would also impose unnecessary and improper practical burdens on defendants' ability to examine these witnesses, including using their deposition testimony for impeachment purposes. And the suggestion that the witnesses not

---

[30] *See, e.g.*, Adam Ferrise, *Cleveland police's specialized opioid unit now a national model*, cleveland.com (Updated Jan. 30, 2018; Posted May 21, 2018) (*available at* https://www.cleveland.com/metro/2018/05/specialized_cleveland_police_u.html).

[31] At plaintiffs' request, Special Master Cohen ordered that Detective Moran's deposition could be recorded only by audio, and not by video, apparently accepting plaintiffs' concern that a video could somehow receive public distribution notwithstanding the protective order. (It was later confirmed during his deposition that Detective Moran's Facebook page – complete with photographs – was publicly available without restrictions.) There is obviously no basis for concern here about the unauthorized disclosure of a video of any witness's trial testimony, as no such video will be created.

be referred to by name – a restriction plaintiffs do not attempt to establish as having ever been used for the testimony of these same witnesses in other cases – would create burdensome and unnecessary challenges in questioning them about exhibits on which their names appear.[32]

If there is a particular witness as to whom there is a concrete need for a specific, appropriately tailored protection, defendants will gladly discuss that situation with plaintiffs, and if the parties are unable to agree, plaintiffs can raise the issue with the Court when the witness is called to testify, either live or by deposition.  But plaintiffs' Motion No. 27 falls far short of carrying their burden.

### 28.    Plaintiffs have failed to justify their request to preclude relevant evidence concerning the deaths of individuals in the Cuyahoga County Jail and related matters.

Plaintiffs' bid in their Motion Nos. 28, 29, and 33 for blanket exclusions of whole categories of evidence regarding the plaintiff Cuyahoga County government should be denied. Plaintiffs seek to exclude evidence of or references to: (1) deaths of individuals while in the Cuyahoga County Jail or in the custody of the Cuyahoga County Sheriff's Office; (2) the U.S. Marshal Service's review of the Cuyahoga County Correctional Center; (3) corruption in the Cuyahoga County government; and (4) investigations of former Cuyahoga County Sheriff Clifford Pinkney or the Cuyahoga County Sheriff's Office.  Pl. MIL Br. at 36-39.  As discussed above, "[o]rders in limine which exclude broad categories of evidence should rarely be employed" – especially where, as here, it is beyond reasonable question that at least *some* evidence in the category is relevant and admissible.  *Sperberg*, 519 F.2d at 712.

---

[32] There is no conceivable reason why one of these witnesses, if testifying live at trial, should not be impeached with the recording of his testimony rather than by reading the transcript, if that is defendants' choice.  *See* Pl. MIL Br. at 34.  Those in the courtroom will hear the sound of the witness's voice as he testifies; there is no reason they should not hear it also from the recording.  Equally irrational and without purpose is plaintiffs' suggestion that defendants be barred from asking a witness "how long he or she has been with any particular law enforcement agency."  *Id.*

Defendants do not intend to offer evidence about any of these topics that is unrelated to the issues in these cases. But at least some evidence in these categories is highly relevant. *See* Fed. R. Evid. 402. Plaintiffs claim that defendants caused the opioid abuse crisis in Cuyahoga County and resulting increases in costs to the County Jail, Sheriff's Office, and law enforcement generally that plaintiffs seek as damages. Evidence showing that the County itself caused or contributed to the damages it claims to have suffered is clearly relevant. For example, defendants may present evidence of the County's failure to provide adequate care or screening for opioid addiction in the jail and to prevent County-employed guards from smuggling opioids to inmates, and how such failures resulted in inmate fatalities and medical mistreatment. Defendants are also entitled to introduce evidence showing how corruption of County officials led to failures to address the opioid crisis, as well as evidence showing that the County Sheriff's Department did not adequately address opioid-related harms and criminal activities that had nothing to do with defendants, including illicit opioid dealing by the County's own employees. This evidence bears directly on, among other things, whether defendants caused or contributed to the alleged damages that are sought and whether the County took sufficient action to mitigate its damages. This Court should therefore deny Plaintiffs' Motions Nos. 28, 29, and 33.

**29. Plaintiffs have failed to justify their request to preclude "any reference" to government corruption in Cuyahoga County.**

*See* Response to Motion No. 28 above.

**30. Although specific references to indictments, grand jury proceedings, and criminal investigations are properly excluded, the underlying facts remain properly admissible.**

Plaintiffs' Motion Nos. 30, 31, and 32 mirror the Distributor Defendants' Motion No. D-3. The law is clear that the *fact* of an indictment, of grand jury proceedings, or of a criminal investigation is ordinarily not admissible absent proof of a criminal *conviction*. The only

problem with plaintiffs' motions on these points is that they seek rulings only as to indictments and other criminal proceedings "involving Cuyahoga County." Plaintiffs offer no argument or authority suggesting that the law on this subject is unique to evidence concerning Cuyahoga County and its employees. It is not. The Court should simply grant the Distributor Defendants' Motion in Limine No. D-3, which would establish an appropriate general rule, excluding "any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction." Dkt. 2666 at 8.

To be clear, defendants do not mean to suggest that *facts* about events that are otherwise relevant to the claims and defenses in this case are inadmissible merely because they are the subject of criminal proceedings. Plaintiffs cite no authority for such a rule, and defendants are aware of none. As discussed at pp. 42-43 above, many of the *facts* that led to the criminal investigations and indictments of Cuyahoga County personnel are highly relevant here.

**31.    Plaintiffs' request to preclude any "reference" to recent investigations or subpoenas involving Cuyahoga County should not operate to exclude relevant underlying facts.**

*See* Response to Motion No. 30 above.

**32.    Plaintiffs' request to preclude any "reference" to the indictment of Ken Mills should not operate to exclude relevant underlying facts.**

*See* Response to Motion No. 30 above.

**33.    Plaintiffs have failed to justify their request to preclude any reference to investigations of former Cuyahoga County Sheriff Pinkney or the Cuyahoga County Sheriff's Office.**

*See* Response to Motion No. 28 above.

**34.    Plaintiffs' request to preclude any "reference" to any podcast or other media coverage regarding Cuyahoga County courts should be denied as overbroad.**

Plaintiffs' Motion No. 34, seeking to exclude evidence or reference to any podcast or media coverage on the Cuyahoga County courts (Pl. MIL Br. at 38), is overbroad. Plaintiffs

have not identified any specific statement they seek to exclude. Cuyahoga County alleges that defendants' conduct has increased drug-related offenses affecting its court system. Any statement in a podcast or media coverage that was made, authorized, or adopted by the County's agents or employees, suggesting other causes of increased drug offenses in the County's court system, is a relevant party admission. *See* Fed. R. Evid. 801(d)(2). The same is true of podcasts and media coverage that include statements by the County or its employees on *any* issue in this case. Although defendants do not presently intend to introduce any evidence from the *Serial* podcast referenced in plaintiffs' motion, defendants reserve the right to do so based on the evidence presented at trial or any new information that would make new or existing podcasts relevant. This motion should be denied.

**35.    Plaintiffs have failed to justify their request to preclude any "reference" to investigations regarding the death of Aniya Day Garrett, which are relevant to plaintiffs' damages claims.**

In their Motion No. 35, plaintiffs make a perfunctory one-paragraph argument that this Court should exclude any reference to the widely-publicized investigation regarding the death of Aniya Day Garrett, a four-year-old who was murdered by her biological mother and her mother's boyfriend in March 2018 after multiple reports of abuse were made to Cuyahoga County Children and Family Services ("CFS"). Plaintiffs' motion asserts that this child's case did not involve opioids. Pl. MIL Br. at 39. But that is why it is relevant, as that well-publicized incident provides an alternative explanation for increases in CFS costs that contradicts plaintiffs' damages experts, who simply attribute all such increases to the opioid crisis.

Several of plaintiffs' experts opine that increased CFS and related costs borne by plaintiffs in recent years are a result of the opioid crisis, and that those costs stem from "increases in the number of children in their foster care programs due to the opioid epidemic." *See* Dkt. 1899-16 ¶ 43 (McGuire Rep.); *see also* Dkt. 1899-4 ¶ 43 (Cutler Rep.) ("The opioid

crisis has resulted in increased demand for the provision of services to children and families."); Dkt. 1899-24 at 16-22 (Young Rep.) (discussing placement rates in out-of-home care). These reports suggest that all increased costs to CFS in recent years are due to the opioid crisis – full stop – without any consideration of other potential causes.

The evidence is to the contrary. Cynthia Weiskittel, Director of Cuyahoga County CFS, has acknowledged that highly-publicized child deaths generated substantial media attention directed at CFS. Ex. 2 (Weiskittel Dep.) at 68:23-69:4; 111:15-25.[33] Ms. Weiskittel described an increase in the number of children entering CFS custody in recent years that flowed from that publicity. As she explained, the increase resulted at least in part because "any time [CFS] has had huge attention from the media … we will see [the number of] calls [reporting potential abuse] go up." Ex. 2 at 111:15-19. Ms. Weiskittel also acknowledged another effect: "The other thing our data will tell you is that when the agency receives a lot of attention due to a child welfare death, not only will our custody numbers go up, but some of that reason the custody numbers go up is because kids aren't going out of the system." *Id.* at 349:19-25. In those circumstances, "kids that should be going home aren't going home.… Fear of sending another kid home … will cause staff to stop." *Id.* at 350:4-7.

In short, there is evidence that media attention on child deaths associated with CFS leads to an increased call for services, which leads to increased costs – and none of that has to do with prescription opioids. *Id.* at 255:23-256:20, 257:15-258:23, 372:5-373:4 (recognizing that recommended changes in policy were not aimed at cases involving opioid use). Thus, by the CFS

---

[33] *See also* Cassie Nist and Sia Nyorkor, *Through the Cracks: At least 4 children died who Cuyahoga County Children and Family Services knew about*, 19 News (Mar. 23, 2018 at 5:14 p.m. EDT) (*available at* https://www.cleveland19.com/story/37795862/through-the-cracks-at-least-4-children-died-who-cuyahoga-county-children-and-family-services-knew-about/).

director's own admission, opioids are "not the only reason" for an increase in need for custody services in recent years.  *Id.* at 339:10-17.  Indeed, after Aniya's death, County Administrator Armond Budish commissioned a panel of child welfare professionals to investigate whether CFS followed policies, procedures, and laws in handling Aniya's case.  Ex. 2 at 366:10-367:13; Ex. 3.  The panel issued a report detailing its findings in June 2018.  Ex. 2 at 366:10-18.  That report recommended policy changes and additional programming that have also increased CFS's expenditures, yet have nothing to do with opioids.  *Id.* at 372:5-373:4.

Given these facts, the tragic deaths of Aniya and others provide an alternate explanation for the costs associated with more calls coming in to CFS and more children receiving services for longer periods.  These facts rebut plaintiffs' experts' blanket assumptions that the increase in costs for CFS is due only to the opioid crisis.

For their part, plaintiffs offer no basis for excluding this evidence beyond the conclusory statement that "[a]ny probative value this evidence might have is substantially outweighed by the danger of unfair prejudice, confusing the issues and misleading or inflaming the jury."  MIL at 39.  This rote recitation of Rule 403, without more, is not enough to exclude evidence plaintiffs find objectionable, particularly where they have identified no *unfair* prejudice stemming from its admission.  *See United States v. Gibbs*, 506 F.3d 479, 485 (6th Cir. 2007).

### 36.    Plaintiffs have failed to justify a blanket order precluding any "reference" to government corruption in Summit County.

Plaintiffs' Motion No. 36 does not identify any specific evidence of "government corruption" in Summit County that they fear defendants will offer.  Their brief merely argues the general tautology that *irrelevant* evidence of government corruption is inadmissible.  Pl. MIL Br. at 39.  But they offer no concrete reason – beyond a vague general reference to Rule 403 – for why *relevant* evidence of such corruption would be inadmissible.

Defendants will naturally expect to carry the burden of showing that any evidence they may offer on this subject is relevant and admissible. Viewing the question in merely hypothetical terms – which is all that is possible given the absence of any concrete examples in plaintiffs' brief – it is easy to envision hypothetical corruption that would *not* be relevant (*e.g.*, embezzlement from a high school sports fund) and other kinds of corruption (such as misappropriation of funds that plaintiffs claim as damages) that could be very relevant indeed. The Court should accordingly deny this motion without prejudice to plaintiffs' right to re-assert it if and when *specific* evidence of corruption is offered.

37. **Plaintiffs have failed to justify a blanket order precluding any "reference" to deaths of individuals while in the Summit County Jail or in the custody of the Summit County Sheriff's Office.**

Once again, plaintiffs' Motion No. 37 identifies no concrete evidence to which plaintiffs' exclusion request is directed. As discussed at pp. 42-43 above, the deaths of individuals while in the custody of the Cuyahoga County Jail or the Sheriff's Office will, in at least some circumstances, be highly relevant to plaintiffs' damages claims. The same would be true if and to the extent such evidence is presented concerning Summit County. Plaintiffs' bare assertion that such evidence is "unrelated to the claims or defenses at issue in this case," Pl. MIL Br. at 40, is thus overbroad at best and insufficient to support an *in limine* ruling. If and when *specific evidence* on this subject is offered, plaintiffs will have ample opportunity to interpose any relevance or other objections that may apply to that particular evidence.

48

Dated:     October 7, 2019

Respectfully Submitted,

 _/s/ Geoffrey E. Hobart_

Geoffrey E. Hobart
Mark H. Lynch
Sonya D. Winner
Paul W. Schmidt
Phyllis A. Jones
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com
pschmidt@cov.com
pajones @cov.com

*Counsel for McKesson Corporation*

 _/s/ Enu Mainigi_

Enu Mainigi
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Cardinal Health, Inc.*

 _/s/ Robert A. Nicholas_

Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation and*
*AmerisourceBergen Corporation*

 _/s/ John P. McDonald_

John P. McDonald
C. Scott Jones
Lauren M. Fincher
Brandan J. Montminy
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Tel: (214) 740-8000
Fax: (214) 756-8758
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc. and*
*Henry Schein Medical Systems, Inc.*

  /s/ Steven A. Reed
Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
Harvey Bartle
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
harvey.bartle@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
Fax: (412) 560-7001

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida, and appearing specially for Teva Pharmaceutical Industries Ltd.[34]*

---

[34] Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is an Israeli corporation that is not subject to and contests personal jurisdiction for the reasons explained in its motions to dismiss for lack of personal jurisdiction; Teva Ltd. is specially appearing to join this motion as a result of the Court's deadline to file motions *in limine*, and, thus, they do not waive and expressly preserve their pending personal jurisdiction challenges.

  */s/ Kaspar Stoffelmayr*
Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreen Co. and Walgreen Eastern Co.*

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

# EXHIBIT 1

| From: | Bograd, Louis |
|---|---|
| To: | Watterson, Kim M.; Pistilli, Christian; Saltzburg, Lisa M.; Quirk, Michael; Mark Pifko; Sterling Cluff |
| Cc: | Gaffney, Mike |
| Subject: | RE: EXTERNAL-FW: jury instructions |
| Date: | Thursday, October 3, 2019 1:10:41 PM |
| Attachments: | image001.jpg |
| | Draft Joint Submission on Jury Instructions LMB 100319 incorporating introductory language and agreed-upon instructions.DOCX |

**[EXTERNAL]**

Kim and company –

Attached please find an updated version with some proposed introductory language (short and sweet), along with a filled-in section for instructions on which the parties have agreed. (Please note the modest edit we made to what had been Defendants' proposed 17 concerning Compensatory Damages; please advise if that is a problem).

I did not attempt any reformatting of this document. Nevertheless, please note that my introduction identifies the three sections (agreed instructions; plaintiffs' instructions with defendants' objections; and defendants' instructions with plaintiffs' objections) as Exhibits to the main document, which would then be just the introduction. I trust that you all can handle that conversion.

In answer to Kim's questions:

We agree to drop all instructions concerning punitive damages. I have been assured that Plaintiffs are not seeking them at trial, although I can't seem to get anyone to say that out loud in a formal communication.

Yes, please feel free to renumber our exhibits, with one caveat: We proposed to drop numbers 1-14, 16, and 44-50, the general form instructions, but not number 15. That is one where I still feel plaintiffs and defendants should be able to reach agreement. Until we do, however, it should be kept in. (I haven't yet had a chance to review Chris's edit to see where we stand on that.)

I am concerned about multiple versions flying around and things getting lost. It would be great if you could break this into 4 pieces (submission with introductory language plus the three Exhibits) and then we should make sure that every version has a time or other control number in its title and that we know who is working on each at any given time.

Please know that part of my team will be unavailable for at least a few hours this evening because of a social obligation with the firm.

Lou

**Louis Bograd** | Attorney at Law | Motley Rice LLC
401 9th St. NW, Suite 1001 | Washington, DC 20004 | lbograd@motleyrice.com
o. 202.386.9623 x5623 | c. 434.242.2473 | f. 202.232.5513

Case: 1:17-md-02804-DAP Doc #: 2725-2 Filed: 10/04/19 6 of 12. PageID #: 419693

# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4

                ~~~~~~~~~~~~~~~~~~~~
5

6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
      OPIATE LITIGATION
7                                  Case No. 17-md-2804
8                                  Judge Dan Aaron
      This document relates to:       Polster
9

      The County of Cuyahoga v. Purdue
10    Pharma L.P., et al.
      Case No. 18-OP-45090
11

12             ~~~~~~~~~~~~~~~~~~~~
13          Videotaped deposition of
              CYNTHIA G. WEISKITTEL
14

15             November 13, 2018
16                  8:59 a.m.
17

18

19                  Taken at:
20        Climaco, Wilcox, Peca & Garofoli
21         55 Public Square, Suite 1950
22              Cleveland, Ohio
23

24

25        Renee L. Pellegrino, RPR, CLR

Page 66

1 that were involved in looking at this issue
2 collectively before 2014?
3          MR. GALLUCCI:  Object to form.
4     A.   I don't have that information.
5     Q.   So you mentioned START, right?
6 START was started in 1997?
7     A.   Correct.
8     Q.   And that it generated data on a
9 statewide basis, correct?
10    A.   It was agency data.  SACWIS didn't
11 exist in '97.
12    Q.   Are you aware of any analyses of
13 START data before 2014 to look at trends in drug
14 usage overall and the impact on family services?
15    A.   As I said, START produced data
16 reports for many years.
17    Q.   Do you remember any discussion that
18 went on before 2014 looking at START data to
19 look for trends or issues over time related to
20 drug use?
21          MR. GALLUCCI:  Object to form.
22    A.   I don't remember a specific
23 conversation.
24    Q.   Do you remember that in general?  Do
25 you remember that being something that went on

Page 67

1 before 2014?
2          MR. GALLUCI:  Object to form.
3     A.   The discussion of drugs was always
4 going on.
5     Q.   I just want to distinguish because
6 you said in individual cases, for an individual
7 case file with an individual family or client,
8 part of what the caseworkers are always supposed
9 to pay attention to is the impact of drug use on
10 the situation they are in, the needs of the
11 child; is that fair?
12    A.   Correct.
13    Q.   And that is your goal is to protect
14 the child, correct?
15    A.   Our goal it to ensure the safety of
16 children.
17    Q.   And part of that analysis, at least
18 as long as you've been with the department, has
19 been to pay attention to drug use on an
20 individual or family-by-family basis, correct?
21    A.   One of the factors we look at.
22    Q.   And you said that over time there's
23 also been attention to trends in drug use or the
24 collective impact of drugs on the overall
25 caseload or the ability of the department to

Page 68

1 fulfill its function, correct?
2          MR. GALLUCCI:  Object to form.
3     A.   I'm sorry.  Say it again.  I
4 apologize.
5     Q.   Maybe I should break that up.
6          I mean, one of the things that you
7 know happens as a director is you look at
8 whether essentially your group is doing a good
9 job, correct?
10    A.   A good job?  We're ensuring the
11 safety of children?
12    Q.   Yes.
13    A.   Yes.
14    Q.   And you try to improve the function
15 of your group through seeking additional funding
16 or additional staffing or changing procedures,
17 among other things, correct?
18    A.   Yes.
19    Q.   And that's part of what your focus
20 has been as director over the last two and a
21 half years, correct?
22    A.   Yes.
23    Q.   And we'll get to it, but obviously
24 there have been well publicized issues with
25 deaths of children in 2018 that have led to a

Page 69

1 lot of attention and public statements and
2 changes in policies, correct?
3          MR. GALLUCCI:  Object to form.
4     A.   Yes.
5     Q.   Going back before that, even before
6 the deaths that have been so widely publicized
7 of kids within the system, if you will, your
8 intention as director, and I assume as deputy
9 director, was looking at whether how well the
10 department did in protecting the safety of
11 children could be improved by additional funding
12 or staffing or changes in policies or practices;
13 is that right?
14          MR. GALLUCCI:  Object to form.
15    A.   We use available data to hit the
16 three points that we're to hit, safety, child
17 well-being and permanency.
18    Q.   And so as long as you've been there,
19 you've been tracking through data essentially
20 performance?
21    A.   Outcomes for families.
22    Q.   Fair enough.
23          Okay.  So over time you have used
24 data to track outcomes for families, which is a
25 measure of whether the department is fulfilling

18 (Pages 66 - 69)

Page 110

1 opiate abuse, heroin abuse, or do you attribute
2 that to various things?
3    A.   I believe opiates are playing a
4 major role, but other things are certainly
5 impacting that.
6    Q.   What else is impacting it?
7    A.   I think just the overall number of
8 calls being screened in has gone up, which has
9 given us more situations to look at.  I think
10 that those things are also impacting kids coming
11 into care.
12    Q.   By "those things," you just mean
13 that there are more calls being screened in?
14    A.   The percentage of calls being
15 screened in hasn't gone up.  It's the sheer
16 number of calls coming in that has caused the
17 increase in calls being screened in.
18    Q.   And why do you think the number of
19 calls coming in has gone up?
20    A.   I think it's impacted by multiple
21 things, certainly by the times we're living in.
22 Certainly by some of the attention the agency is
23 getting will cause that to happen.  Our data
24 will reflect that.
25    Q.   I don't know what you mean by "the

Page 111

1 times we're living in."  Can you just be a
2 little more specific?
3    A.   Certainly the use of drugs,
4 specifically opiates in our community, has had
5 an impact on the times that we're living in, the
6 availability of other options for families other
7 than custody of their children.
8    Q.   So are there factors, other than the
9 use of heroin and other opiates, that you think
10 leads to an increased number of calls to your
11 department?
12    A.   We have not -- we have not done an
13 analysis, but I suspect there could be, yes.
14    Q.   Like what?
15    A.   Again, some of the attention the
16 agency has received will cause -- our data will
17 reflect that any time the agency has had huge
18 attention from the media, that we will see calls
19 go up.
20    Q.   And the attention from the media is,
21 what we were talking about a little bit before,
22 some of the deaths and high-profile cases over
23 the last year or so?  Is that what you're
24 talking about?
25    A.   Yes.

Page 112

1    Q.   Can you identify any other factors
2 that you think lead to an increase in the number
3 of calls or increase in the number of children
4 being brought into custody?
5    A.   Not at this time.
6    Q.   And you said there's not been an
7 analysis done of the reasons for increased
8 calls, correct?
9    A.   We've looked at the overall
10 increase.  We are starting to look at what kind
11 of calls and that kind of thing, but no analysis
12 has been done.
13    Q.   Is there any analysis that's been
14 done of the impact of opioid or opiate abuse by
15 parents on the number of children being brought
16 into custody?
17    A.   A specific analysis?
18    Q.   Yes.
19    A.   No.
20    Q.   So we've identified two impressions
21 that you have from reviewing case files as they
22 relate to opiates, heroin and other opiates, one
23 being the number of children being brought into
24 custody, and then another one being your
25 impression that sometimes people start with a

Page 113

1 prescription opioid and then they go on to use
2 heroin and other street drugs.
3        Are there other impressions that you
4 have from reviewing case files that you would
5 testify about at trial potentially?
6    A.   Not at this time.
7    Q.   Now, you said that there's this
8 SACWIS database where data has been entered, and
9 you weren't sure when the data entry started,
10 correct?
11    A.   Which data entry?
12    Q.   Well, any data entry that your group
13 does.
14    A.   We started using SACWIS in December
15 of 2008, if that's what you're asking me.
16    Q.   What did you use before SACWIS?
17    A.   It was called FACTS.  It was a
18 homegrown system we used in Cuyahoga County.
19    Q.   Is there something called FACWIS?
20    A.   FACWIS is about the forms and the
21 process we use.  I don't know much about FACWIS,
22 to be honest with you.
23    Q.   And what sort of data analyses are
24 done with the data planted into SACWIS?
25    A.   There are state reports that can be

29 (Pages 110 - 113)

Page 254

1    A.   I don't know.
2    Q.   I'm sorry?
3    A.   I don't know.
4    Q.   You don't know if it was helpful?
5    A.   I'm not sure that I found it
6 helpful.
7    Q.   So you don't know if it would have
8 been helpful to you to have had that white paper
9 in hand maybe with, like, the Cuyahoga County
10 Opiate Task Force report that we went over right
11 before it to try to advocate for policy and
12 practice changes or increased funding and
13 staffing for your division over the last four
14 plus years?
15    A.   I'm not sure.
16    Q.   Do you think it's possible that
17 having those might have helped the division
18 perform its job better, including addressing
19 issues relating to heroin addiction and opiate
20 abuse?
21        MR. CIACCIO:  Objection to form.
22    A.   It might have.
23    Q.   I'm sorry.  I didn't hear your
24 answer.
25    A.   I was waiting for him to speak.  I'm

Page 255

1 sorry.
2        It may have helped.  I don't know.
3    Q.   In what areas do you think it may
4 have helped?
5    A.   Possibly in the argument of why we
6 would be returning the advocates to the START
7 department.
8    Q.   And are you still advocating in
9 budget discussions and internal dealings within
10 the department and the county to get that
11 funding to add the advocates back?
12    A.   Yes.
13    Q.   That's not something you've
14 abandoned hope for, correct?
15    A.   Correct.
16    Q.   Are there other changes that you
17 want to have made, too?
18    A.   As related to opiates?
19    Q.   Yes.
20    A.   Certainly.  I would like to see more
21 programming where kids could stay with their
22 parents.  Absolutely.
23    Q.   And I will set aside for now -- I
24 mean, we'll probably have time, but there have
25 been changes to policies implemented in 2018 as

Page 256

1 a result of the publicized deaths of the child
2 Garrett and Rodriguez, correct?
3    A.   I'm not allowed to talk about the
4 cases.  The prosecutor has asked us to not speak
5 on the cases specifically.
6    Q.   I didn't ask you about the cases.  I
7 asked about the policies and practices.  They've
8 been produced in the litigation.  There are
9 changes that you're on that changed some
10 policies and practices in the last couple of
11 months, correct?
12    A.   There are panel recommendations that
13 are being implemented, if that's what you're
14 referring to.
15    Q.   Yes.
16    A.   Yes, there are panel recommendations
17 being implemented.
18    Q.   And does any of that have to do with
19 opioids or opiates?
20    A.   No.
21    Q.   So that's why I was setting it
22 aside.  Does that make sense?  I'm asking you
23 about, have there been any recommended changes
24 to policies or practices at all as a result of
25 any of these task force or white papers or

Page 257

1 analyses of the impact of heroin abuse or opioid
2 abuse on child welfare and the department of
3 child and family services?
4    A.   Policy changes?
5    Q.   Yes.
6    A.   Not that I'm aware of.
7    Q.   Or changes in practices at all?
8    A.   Not that I'm aware of.
9    Q.   Any written guidances that you're
10 aware of, any written documents you're aware of
11 that advocate any kind of change to how the
12 division does its business as a result of any of
13 these documents?
14    A.   Not that I'm aware.
15    Q.   Just so it's clear, I'm not asking
16 you about what actually happened in the cases
17 that are in criminal prosecution, I guess, or
18 have other legal proceedings with the deaths in
19 2018, but none of those had to do with opiates
20 or prescription opioids, correct?
21        MR. CIACCIO:  Again, I think she
22 answered before that she can't speak to anything
23 that has anything to do with the specific cases.
24        MR. ALEXANDER:  I think she can
25 answer that question because I'm not asking what

65 (Pages 254 - 257)

Page 258

1  they actually involved.  Just so it's clear --
2  and maybe you can enter a stipulation for
3  Plaintiffs.  We're not going to hear something
4  like at trial where somebody says, oh, yeah,
5  those cases involved, you know, prescription
6  opioids and that was part of the case.  Either
7  we get to ask questions about it or we get some
8  sort of stipulation that it won't be raised
9  later.  You can't have a sword and a shield.
10        MR. CIACCIO:  I'm not stipulating to
11  anything.  I understand your position.
12     Q.   Go ahead and answer the question,
13  please, ma'am.
14        MR. CIACCIO:  Okay.  Go ahead.
15     A.   As far as I know, the prosecutions
16  do not involve that piece of the work.
17     Q.   I'm sorry.  You said "the
18  prosecutions"?
19     A.   The cases that are being prosecuted,
20  as far as I know, do not include a discussion
21  about opiates.  I don't have all the details of
22  the cases so I don't have any way of giving you
23  a hundred percent guarantee on that.
24     Q.   And you're not aware of cases where
25  there was a death of a child who was already

Page 259

1  part of the system for your case -- I'm not
2  asking about those two -- I'm asking in
3  general -- who was already part of your
4  division's clients where there was a death that
5  has been attributed to the use of a prescription
6  opioid?
7        MR. CIACCIO:  You're just asking
8  generally if she's aware?
9        MR. ALEXANDER:  Yes.
10        MR. CIACCIO:  Just without the names
11  of any individuals, you can answer the question.
12     A.   We have had cases where children
13  have died from drug overdoses, but I am not
14  aware if it was prescription or illegal drugs.
15     Q.   Is that documented somewhere in
16  writing?
17     A.   Is it documented somewhere in
18  writing, the overdose?
19     Q.   The way that you're aware of it,
20  that they died as a result of some overdose, the
21  children who are clients of your division, yes.
22        MR. CIACCIO:  Objection to form.
23     A.   Do I believe we have it in writing?
24     Q.   Yes.
25     A.   Yes.

Page 260

1     Q.   Would that just be in the individual
2  case files?
3     A.   Yes.
4     Q.   Would it be anywhere else?
5     A.   I don't think so.
6     Q.   So like -- first of all, do you know
7  how many deaths there are like this for any time
8  period?
9     A.   I don't.
10        MR. CIACCIO:  Objection to form.
11     Q.   And if we wanted to figure out for
12  any of these individual cases if the death was
13  attributable to overdose or accidental use,
14  presumably not intentional use but accidental
15  use, of any particular drug, that detail might
16  be in the individual case file, correct?
17     A.   Yes.
18     Q.   And so, like, if a child encountered
19  fentanyl or the child somehow swallowed heroin
20  as opposed to taking a prescription opioid that
21  was prescribed to their parent, let's say, we
22  could look and see if that information is in the
23  case file, correct?
24     A.   Yes.
25     Q.   There would be no other way to get

Page 261

1  that, correct?
2     A.   As far as I know, there is no other
3  way to get that information.
4     Q.   Is there some way to identify those
5  case files?
6     A.   I don't have names, if that's what
7  you're asking me.
8     Q.   I wasn't asking for anybody's name.
9     A.   I know you're not asking me to name
10  somebody, but I don't know the names of the
11  children so I wouldn't know how to find the case
12  file.
13     Q.   Okay.  All right.
14        So other than your recollection that
15  there have been some deaths and they may have
16  had to do with some drug, which may or may not
17  have been a prescription opioid, there's no way
18  that you're aware of to find these files, to
19  kind of do a little bit of fact checking to
20  figure out what the circumstances were, what
21  information exists on what drug was involved or
22  drugs were involved; is that correct?
23        MR. CIACCIO:  Objection to form.
24     A.   As far as -- as far as I know, we --
25  I do not -- I wouldn't know how to go about

66 (Pages 258 - 261)

Page 338

1      THE WITNESS:  928 is my end.
2      Q.  Can you go back to 20, please?  I
3  think on 20 you had a combined exhibit.
4      A.  Oh, okay.  Sure.
5      MR. CIACCIO:  683 you're asking
6  about now?
7      MR. ALEXANDER:  Yes.  My apologies.
8      THE WITNESS:  683?
9      MR. CIACCIO:  Yes.  It's like the
10  second to last page.
11      THE WITNESS:  I gotcha.
12      Q.  We get these e-mails that kind of
13  interject and diverge, if you will, these
14  chains.  And so this is a response back to Mary
15  Louise Madigan after Deonna and you spoke
16  apparently.
17      Do you remember that discussion?
18      A.  Yes.
19      Q.  Was that an in-person discussion or
20  an e-mail exchange?
21      A.  She sits right next door.  I suspect
22  in person.
23      Q.  Okay.  So we saw that she sent you
24  an e-mail, at some point you spoke, and then you
25  had her send a response, correct?

Page 339

1      A.  Typically we talk and then she sends
2  an e-mail, correct.
3      Q.  And was the expectation that
4  eventually this information would be relayed to
5  the media?  Remember this started with the
6  Cleveland.com inquiry from Karen Farkas.
7      A.  Yes.  This would have been what we
8  would have prepared to send out after -- back to
9  the media.
10      Q.  It includes some of the same stuff
11  we talked about.  It says, "Seeing an increase
12  in opiate cases and custodies but not to the
13  same degree as other counties.  Opiates are part
14  of the reason but not the only reason."
15      You stand by both of those
16  statements, correct?
17      A.  I do.
18      Q.  And it says in parentheses there,
19  "This is what Cindy has said on Sound of Ideas
20  yesterday."
21      Do you recall what that is?
22      A.  The Ideas is the program I told you
23  about on public television.
24      Q.  Sound of Ideas?
25      A.  They must call it the Sound of

Page 340

1  Ideas.
2      Q.  Is that one where you, like, gave a
3  recorded statement or a written statement?
4      A.  No.  I was interviewed.  I didn't
5  give a recorded statement.
6      Q.  The next bullet says, "We are not
7  asking for additional money."
8      Do you know what's up with that
9  statement?  You were asking for additional money
10  throughout this period of time.
11      A.  Well, in May of '17 specifically, we
12  weren't asking for additional money due to the
13  increase in custodies; we were trying to watch
14  our numbers and caseloads, as it says, and
15  dealing with staff and budget resources as we
16  have.
17      Q.  But we saw back in January of 2017
18  you were asking for additional funding.
19      A.  There was a memo Tammy wrote asking
20  for additional money.  It not necessarily went
21  all the way downtown.  It was us putting
22  documentation together as budget requests came
23  up.
24      Q.  Did somebody put the brakes on that
25  request?

Page 341

1      A.  No.  We often write memos in
2  preparation to request money.  We're in the
3  process of doing that now.
4      Q.  It says, "We're in need of more
5  foster homes due to the increased need."  I
6  assume that's need for various reasons, not just
7  because of drug use, correct?
8      A.  Right.  And as it says, not only for
9  our county, but other counties.  So we're
10  competing with other counties for available
11  resources.  Franklin County pays almost twice
12  what we pay for foster care.  So if you're a
13  Franklin County foster parent, you wait for a
14  Franklin County kid because you make more -- you
15  get more compensation.  So we're competing with
16  other counties who also are seeing an increase
17  in opiate use in their counties.
18      Q.  Okay.  And have you gotten more
19  foster homes since this time period?
20      A.  We continue to work to increase our
21  foster homes.  We are very limited on foster
22  care placements.  We are actually putting more
23  kids in kin placement.
24      Q.  So that's with a relative?
25      A.  I'm sorry.  Yes.  The law is very

86 (Pages 338 - 341)

Page 346

1  grown over the last five or ten years.
2        Do you see that?
3    A.   Yes.
4    Q.   And that's kind of right up your
5  alley about a topic, right, foster care costs?
6    A.   Yep.
7    Q.   And Maggie Keenan, what was her
8  position in March of 2018?
9    A.   Office of business management.
10   Q.   She responded, "No, we haven't seen
11 an increase. We have had an increase in
12 out-of-home placements, but based on drug test
13 results, it's not necessarily attributed to
14 opiates."
15       Do you see that?
16   A.   Yes.
17   Q.   Do you agree with that?
18   A.   Well, I agree with my statement
19 where I say to Walter I don't know how she knows
20 the answer to that question.
21   Q.   It says, "Despite the increase in
22 placements, costs have been flat or gone down."
23       Do you agree with the statement
24 about costs?
25   A.   Yes, because we've increased kinship

Page 347

1  placements.
2    Q.   So you said how would she know this,
3  because she would need drug test results to know
4  if there's an increase related to opiates,
5  correct?
6    A.   Yes.
7    Q.   And it says, "The costs on top of
8  our board and care would give us a different
9  picture of the total costs of placements. We
10 have seen an increase in opiates. Can I
11 attribute that as to why kids are coming into
12 care? No."
13       Did I read that right, the first
14 sentence of the fifth paragraph in the first
15 e-mail?
16   A.   Yes. And then it goes on to say all
17 the clients in drug courts are opiate clients.
18   Q.   What do you mean by "We have seen an
19 increase in opiates. Can I attribute that as to
20 why kids are coming into care, no"?
21   A.   So I think what I'm saying -- we
22 have seen an increase in opiates, can I
23 attribute this to why kids are coming into care
24 -- I can tell you all of our clients, this is a
25 complete turnaround -- I'm sorry. I -- so if

Page 348

1  you read the paragraph above it, I am talking
2  about there is an increase in board and care
3  dollars, they're being offset by kin placements,
4  and that we should look at those costs on top of
5  board and care costs. The costs on top will
6  give us a different picture of placement costs.
7  I think what this should say is we have seen an
8  increase in opiates. Can I attribute it totally
9  to that, the reason kids are coming into care,
10 no. So I don't think it's well written.
11   Q.   Okay. So when you say, "Can I
12 attribute that as to why kids are coming into
13 care, no," you mean to say --
14   A.   Can I totally attribute it to
15 opiates, no, is what I'm saying.
16   Q.   And can you -- are you in a position
17 to attribute some portion of that to opiates in
18 some sort of reasonable way, it's 5 percent
19 related, 8 percent related, 10 percent related?
20   A.   I can't give you a specific.
21   Q.   Is there any analysis that looks at
22 that issue that you're aware of?
23   A.   As I told you, we're starting to dig
24 into the drug of choice conversation from
25 earlier this year.

Page 349

1    Q.   Right. That's where we're going to
2  go. The next paragraph here says, "I would love
3  to be able to dig into more things like LOS
4  comparisons - are we running out of homes
5  because kids are staying longer because they
6  can't return to their drug-involved parent?"
7  And a series of questions.
8        Have you done anything since March
9  of this year, since this e-mail to Walter P, to
10 have analyses like that done?
11   A.   We have started to look at length of
12 stay for children -- that's what LOS refers
13 to -- and are trying to figure out what is
14 impacting length of stay, is that why the -- is
15 that why we have more kids in care.
16       So one of the things I would also
17 say to you, although this would have been early
18 on for this discussion -- actually, this is
19 right before the fatality. The other thing our
20 data will tell you is that when the agency
21 receives a lot of attention due to a child
22 welfare death, not only will our custody numbers
23 go up, but some of that reason the custody
24 numbers go up is because kids aren't going out
25 of the system.

88 (Pages 346 - 349)

Page 350

1    Do you understand what I'm saying?
2    Q.  No.
3    A.  So it's not just kids coming in.
4  The kids that should be going home aren't going
5  home.  The county will stop.  The system will
6  stop.  Fear of sending another kid home
7  impacting will cause staff to stop.  This
8  happened prior to that happening.  I'm just
9  putting it out there, that our current length of
10  stay may have something to do with that.  We
11  have started looking at length of stay numbers,
12  yes, we have.  We are -- why are PPLAs going up.
13  It's a type of custody.  Yes, we've started to
14  dig into that.
15    Q.  Are there any reports or analyses
16  that have been finalized yet that look at the
17  impact --
18    A.  No.
19    Q.  -- of opiates or opioids on length
20  of stay or other metrics that might show the
21  burden on the child protective services?
22    A.  Not as of yet.
23    MR. ALEXANDER:  Do you want to break
24  now or do you want to do one more document?
25    THE WITNESS:  No.  We can take a

Page 351

1  break.
2    THE VIDEOGRAPHER:  Off the record,
3  3:50.
4    (Recess had.)
5    THE VIDEOGRAPHER:  On the record,
6  4:08.
7  BY MR. ALEXANDER:
8    Q.  Ms. Weiskittel, is there any of your
9  testimony thus far you need to change or
10  supplement in any way?
11    A.  I don't believe so.
12    MR. ALEXANDER:  That may have been
13  our last break before we're done today, so I'm
14  just going to state for the record a reservation
15  that we have in case we're rushing to be running
16  to airports or whatever or have some issue at
17  the end.
18    I think it's been apparent that
19  there are a number of documents that have been
20  identified, specific and categories of
21  documents, that have not been produced, or there
22  are improper claims of withholding on the basis
23  of privilege.  We'll have to follow up on that
24  later, in addition to other issues that may be
25  brought up in the transcript.  So I just want to

Page 352

1  state our reservation on behalf of my client to
2  seek additional documents and continue the
3  deposition upon the production of additional
4  documents.  We obviously are going to use up our
5  time and do the most we can subject to that
6  reservation.
7    And I don't know if any of the other
8  Defendants want to join in at this time,
9  but I did want to state that now before we kind
10  of have the final push to finish up.
11    MR. SAROKHANIAN:  We join in the
12  same reservation.
13    MS. FRANKLIN:  We join in the same
14  reservation.
15    MR. HAWKINS:  We join in the same
16  reservation.
17    MR. ZIPP:  We join in the same
18  reservation.
19    MR. CIACCIO:  I'll just say whatever
20  discovery you believe is outstanding, just
21  follow up in writing.  I'm not specifically
22  aware of anything that we've failed to produce,
23  but, you know, we can take it up after the
24  deposition, like you said.
25    MR. ALEXANDER:  Yeah.  And, you

Page 353

1  know, there also was during the first hour when
2  I don't think you were in the room, so obviously
3  we will follow up by letter, and with the
4  transcript and all of that, following the
5  appropriate procedures that the Court has
6  outlined, but I do want to make sure that we
7  have this reservation on the record here.
8  BY MR. ALEXANDER:
9    Q.  With that, back to the exciting
10  questioning, the final push, Ms. Weiskittel.
11    The analyses that we talked about in
12  the last document that are -- were begun
13  sometime this spring, do you have an idea of
14  when those might be concluded?
15    A.  No.
16    Q.  Are there any ongoing analyses that
17  you're aware of or evaluations that you're aware
18  of to try to figure out the financial impact on
19  your division of anything relating to heroin,
20  opiates or specifically prescription opioid use?
21    A.  Well, as I've shared, we are looking
22  at certain data not specifically for those
23  reasons, so I don't know if those will be some
24  of the contributing reasons.
25    Q.  And let me just be clear.  We talked

89 (Pages 350 - 353)

Page 362

1  make sure that the information in the system was
2  as accurate as possible.
3      Q.   Have you done some sort of check to
4  see if the additional data that got entered as
5  part of the caseworker blitz was biased in some
6  way, in any direction?  It could have
7  underestimated opiates or overestimated opiates.
8      A.   No, we did not.
9      Q.   Would that be concerning to you if
10 there was some sort of bias in either direction?
11     A.   Well, for me, at the time we were
12 doing the blitz, there was no lawsuit, so no
13 staff would have been motivated by a lawsuit to
14 biasly report overuse as part of a lawsuit.
15 Many staff with the agency still don't know
16 there's a lawsuit going on.  So I think it's a
17 huge jump to say people are biased because they
18 think it's a good thing that we report opiates,
19 from my opinion.
20     Q.   I didn't ask you about bias because
21 of the lawsuit.  I just asked about bias that
22 leads to the data being skewed in one direction
23 or another.  Is there some reason why you think
24 that the bias could have related to the lawsuit
25 or pending litigation?

Page 363

1      A.   I would say I would totally think it
2  doesn't relate to the lawsuit.
3      Q.   All right.  So if we wanted to see
4  if the additional data that got added to the
5  SACWIS because of the caseworker blitz was
6  accurate or skewed in any direction, to do that
7  kind of analysis we would need to have access to
8  the case files, to look at them, to look at the
9  data in them?
10     A.   We -- that is one way.  I mean, I
11 think the other thing is our PEI people could
12 randomly pull some and look at them, if that's
13 what -- I'm not sure we'd give you access to
14 personal information of families.  We would have
15 to redact all the information.
16     Q.   And what would the PEI people
17 evaluate?
18     A.   Exactly what you're asking.  They
19 could look at the record and see if it matched
20 what was in SACWIS.
21     Q.   Have you ordered an analysis like
22 that?
23     A.   I have not.
24     Q.   Are you aware of any information
25 about prescription opioids that was inaccurately

Page 364

1  relayed by any manufacturer or distributor or
2  pharmacy in Cuyahoga County at any time?
3      A.   I don't understand the question.
4      Q.   So we talked about how you thought
5  that this was a case against drug manufacturers,
6  and I asked you about other people, like
7  pharmacies and distributors of pharmaceuticals.
8  Do you remember that question up front?
9      A.   Yes.
10     Q.   Now, are you aware of anything that
11 any of those entities ever said about a
12 prescription opioid that was inaccurate in any
13 way, about risks, benefits, addiction potential,
14 efficacy, anything?
15     A.   I have no idea.
16     Q.   And are you aware of any practices
17 from any of the distributors in particular that
18 were insufficient in any way and played any role
19 in contributing to any of the problems that you
20 saw in your patient population?
21     A.   I have no idea.
22     Q.   For SACWIS, do you know if it's
23 overwritten or if there's sequential -- if it's,
24 like, sequentially saved so you can see what
25 edits somebody made at any point in time?

Page 365

1      A.   It is sequentially saved.  You know
2  when notes are put in the system.  So the note
3  is dated, but it also tells you the date it was
4  put in.
5      Q.   So for, like, the caseworker blitz,
6  of updating the drug information, drug of choice
7  information, we could see who added that and
8  when if we had access to SACWIS?
9      A.   Yes.
10          - - - - -
11         (Thereupon, Deposition Exhibit 23,
12         E-Mail String with Attachment
13         Beginning Bates Number
14         CUYAH_002466134, was marked for
15         purposes of identification.)
16          - - - - -
17     Q.   Exhibit -- Exhibit 23,
18 Ms. Weiskittel, is a document starting with
19 Bates number CUYAH_002466134, and that goes
20 until 139, and then there's a document attached
21 to that, which is the natively -- native file
22 document that doesn't have a Bates number on it,
23 if that makes sense, so all of this together is
24 Exhibit 23.
25          So, to orient, you mentioned earlier

92 (Pages 362 - 365)

Page 366

1 that there was a panel that produced
2 recommendations this year --
3     A.  Yes.
4     Q.  -- for your division, correct?
5     A.  Yes.
6     Q.  And what was the name of the panel?
7     A.  I'm sorry.  I'm not trying to be
8 funny.  I think we just call it the panel
9 recommendations.
10    Q.  If you look at the attachment,
11 there's something called "Cuyahoga County
12 Independent Child Welfare Panel Report, June
13 28th, 2018," and then it lists the panel
14 members.
15    A.  Yes, it does.
16    Q.  Are we talking about the same thing;
17 that's the panel?
18    A.  Yes, we are.  Sorry.
19    Q.  And the mandate of the panel as
20 listed on -- it's numbered page 2, but it's
21 actually page 3 of the attachment, because it
22 starts on page number zero for some reason,
23 says -- their mandate was "All child deaths in
24 Cuyahoga County are reviewed by the Cuyahoga
25 County Child Fatality Review Board.  There are

Page 367

1 internal reviews within Cuyahoga County DCFS for
2 all child deaths with involvement by DCFS.  The
3 State Department of Jobs and Family Services
4 conducts independent reviews of certain child
5 fatalities with involvement by DCFS, and are
6 reviewed by -- and are reviewing this case."
7 Then it goes on to talk about essentially what
8 the panel did, how it relates to prior deaths in
9 the system, the findings relating to the
10 individual deaths, and then a series of
11 recommendations.
12        Is that a fair summary of that?
13    A.  Yes.
14    Q.  And in the e-mails that we have
15 before that, there's essentially a response
16 from, I guess, a day later relating to
17 individual recommendations, correct?
18    A.  Yes.
19    Q.  And the proposed response starts
20 with Jennifer Croessmann of the special -- who
21 is a special projects coordinator, office of the
22 director, within the department of health and
23 human services?
24    A.  Yes.
25    Q.  And how does that position relate to

Page 368

1 your job?
2     A.  So Jennifer works directly for
3 Walter, and so she does work in different
4 departments based on what Walter is looking for.
5     Q.  And so she sent a proposed response
6 to you within a day of when they issued their
7 report?
8     A.  Are you referring to the child --
9 the response list?  That didn't come from Jen.
10    Q.  So the attachment of child welfare
11 panel recommendations response list, who
12 generated that document?
13    A.  I'm sorry.  Which document are you
14 looking at?  I apologize.  I'm getting confused.
15    Q.  The start of Exhibit 23 is an e-mail
16 where Jennifer Croessmann e-mailed you and then
17 you forwarded it to Tamara Chapman-Wagner, Chris
18 Cabot --
19    A.  I apologize.  I was wrong.  Jen was
20 the -- Jen did send this information.  I
21 apologize.
22    Q.  Okay.  So a day after the report,
23 this special projects coordinator from the
24 office of the director sends back a response
25 list to you and you forward it to essentially

Page 369

1 three of your staff to help respond, correct?
2     A.  Yes.
3     Q.  The caseload projections on the
4 first part of this list, FTE projections, the
5 first one says, "ES."  What is that?
6     A.  Extended services.
7     Q.  And it says caseloads of 9.5.  Is
8 that the actual current calculation?
9     A.  No.  Those are caseloads we're
10 attempting to get to.
11    Q.  And that's the one where you said
12 it's currently 17?
13    A.  14.
14    Q.  Okay.  And the one below that, STS,
15 what is that?
16    A.  Short-term services.
17    Q.  And what's the current caseload?
18    A.  They're 17-ish.
19    Q.  And they want it to get down to 14?
20    A.  No.  We would like to get them to
21 12.
22    Q.  Why does it say caseloads of 14 here
23 then?
24    A.  Caseloads of 14 new assignments
25 based on their 1,250 investigations.  What that

93 (Pages 366 - 369)

Page 370

1  is saying to you is that's their new
2  assignments.  Those are investigations.
3  Short-term services also carry a few family
4  cases, which makes up the other three or so
5  cases per worker.  Short-term services is not
6  just investigations.
7      Q.   Okay.  So these projections on
8  caseloads and the targets that you've talked
9  about, this is a general functioning of the
10  department, not specific to opioids or opiates
11  and not specific to these panel recommendations,
12  correct?
13      A.   Yes.
14      Q.   At the end of this there's a part
15  where it says, "Restore START model."  Do you
16  see that?  And it says there's going to be a
17  2018-19 budget request.  This is with the Bates
18  ending in 37.  Do you see that?
19      A.   Yes.
20      Q.   And is that the plan, as far as you
21  know, is that the next budget request will ask
22  you -- ask to finally get the money you've been
23  asking for all along to restart the START
24  staffing at the levels that you wanted?
25          MR. CIACCIO:  Objection to form.

Page 371

1      A.   The panel recommendations included
2  restoring the advocates.  We were told that all
3  of the panel recommendations would be followed,
4  so yes, we believe that we will receive our
5  advocates.
6      Q.   And, in fact, more than you asked
7  for before.  Now you're going to ask for 26
8  advocates.  Do you see that on the next page?
9      A.   Yeah.  So then we would be back to a
10  one-to-one ratio.
11      Q.   And so this discussion in the
12  section about the effect of opiates and the
13  increase in drug-exposed infants over the past
14  four years, that's not part of why you're
15  actually going to get the increased funding,
16  though, is it?
17      A.   I'm sorry.  Say it again.
18      Q.   The increased funding for START
19  that's finally going to come through isn't
20  because of anything about opiate increases, it's
21  because of the attention paid to the deaths,
22  correct?
23          MR. CIACCIO:  Objection to form.
24      A.   The panel recommendations looked
25  at -- they looked at the death, but also the

Page 372

1  function of the agency.  I would say that it
2  wasn't strictly the deaths that would bring the
3  advocates back.  The deaths had to nothing do
4  with the lack of advocates.
5      Q.   There was nothing in the panel's
6  analysis that said that this is needed to
7  address the opioid crisis, correct?
8      A.   The panel recommendation I believe
9  says that they believe -- if you look at it --
10  we'll read what it says.  It says on page 20,
11  number 7, "The DCFS system will benefit from
12  other programs and supports, fully restore the
13  START model for substance abuse cases by adding
14  advocate positions."  So these are other
15  recommendations the panel made that did not have
16  specifically to do with the death of the child.
17      Q.   Is there anything in here that says
18  this is because of some trend with opioid or
19  opiate use?
20      A.   They don't address the specifics of
21  opiate use.
22      Q.   Have you had any interaction with
23  the panel or anybody over these last couple of
24  months since this was going on that the funding
25  is finally going to come in to increase the

Page 373

1  START staffing because of anything about opiates
2  as opposed to the general attention?
3      A.   I've had no conversation of that
4  kind.
5      Q.   And what's your take, that this is
6  because of increased attention and negative
7  press that you're finally going to get the
8  budget to increase the staffing to what you
9  wanted, or do you think this has to do somehow
10  with opioids or opiates?
11      A.   I don't know what the panel was
12  thinking.
13      Q.   So the discussion on the e-mail,
14  going back to the very beginning of this, from
15  Tammy Chapman-Wagner -- this is just a little
16  over four months ago -- says, starting with the
17  second part -- second paragraph, "We really
18  struggled with the staffing recommendations.  As
19  you will see we have scaled them way back.  We
20  would like to say that our 2018 asks with an
21  opportunity to revisit staffing levels end of
22  year.  This will give us a better measurement of
23  volume and impact with the staff we do hire.
24  Knowing how long it would take to" -- to
25  higher -- h-i-g-h-e-r it says -- "knowing even

94 (Pages 370 - 373)

# EXHIBIT 3

# Cuyahoga County Independent Child Welfare Panel Report

## June 28, 2018

**Panel Members**

Jan Flory, MSW, Child Welfare Consultant, former Deputy Commissioner for Child Protection, Administration for Children's Services, New York City, Panel Chair

David Crampton, MSW, Ph.D. Associate Professor of Social Work, Jack, Joseph and Morton Mandel School of Applied Social Sciences, Case Western Reserve University

LaJean Ray, Director, Fatima Family Center, long time community advocate

Lolita McDavid, MD MPA, Medical Director, Child Advocacy & Protection UH Cleveland Medical Center; Professor, Pediatrics, CWRU School of Medicine

Marsha Wickliffe, J.D., Child Welfare Professional

0

# Origin of Panel Review

- On March 11, 2018 4 year old Aniya Day-Garrett died.

- An active DCFS investigation was underway with allegations of physical abuse by her mother.

- The DCFS Hotline call, received 3/6/18 began with a call to Aniya's mother who asked that the worker not visit until the following week. This was the 4th report to DCFS over a 14 month period.

- Aniya's mother and the mother's boyfriend were arrested and have been charged.

- Aniya's tragic death has raised questions about the role of DCFS during their involvement with this family.

# Mandate of panel

- All child deaths in Cuyahoga County are reviewed by the Cuyahoga County Child Fatality Review Board. There are internal reviews within Cuyahoga County DCFS for all child deaths with involvement by DCFS. The State Department of Jobs and Family Services conducts independent reviews of certain child fatalities with involvement by DCFS, and are reviewing this case.

- In this instance , County Administrator Armond Budish convened a panel of local and national child welfare experts and requested that they conduct an independent review with mandates to:

  -Review the case and assess whether staff followed DCFS policies and procedures

  -Compare the time line or responses and services to the state guidelines for response times

  -Assess whether the investigation and case work reflect solid child welfare practice

2