# EXHIBIT B

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

# REPLY IN SUPPORT OF PLAINTIFFS' OMNIBUS MOTION *IN LIMINE* (DKT. #2652) AND MEMORANDUM IN SUPPORT

October 14, 2019

4.     **Any reference suggesting or in any way reflecting the financial status or resources of any of the attorneys representing the parties, or those attorneys' law firms, or any of those attorneys' other businesses or cases.**

This MIL has been mooted by an agreed stipulation between the parties, as noted in Defendants' response.  Dkt. #2725 at p. 3.

5.     **Any references to the accommodations of, or the use of private aircraft for transportation by, any witnesses, parties, or counsel.**

Defendants argue that the type of transportation and accommodations used by an expert during his or her work in this case is a proper subject of cross-examination because it constitutes supplemental compensation to the expert with "luxuries."  Dkt. #2725 at p. 5.  But they provide no legal authority that actually supports this argument.

As a preliminary matter, Defendants clearly cite *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753 (5th Cir. 2018) in an effort to impugn the character of Plaintiffs' counsel and not because that case has any relevance to the matter at issue here.  In *Depuy*, the issue was whether certain payments to experts and contributions to an expert's preferred charity were appropriately disclosed to the opposing party.  *Id.* at 788.  That case had nothing to do with the admissibility of an expert's hotel accommodations or private air travel.

Defendants claim that they "are entitled to cross-examine plaintiffs' experts about *all* of the compensation or reimbursement they receive for their work in these cases, not just the payments received on their invoices."  Dkt. #2725 at pp. 4-5.  In support, they cite *DePuy*, which as previously noted is not relevant here.  The remaining cases cited by Defendants for this point, all of which are non-Ohio state court cases, are similarly inapposite as they all address the relevance of an expert's substantial monetary ties to a particular industry, or to one side of the bar, in order to demonstrate bias.  *See Ray v. Draeger*, 353 P.3d 806, 814-16 (Alaska 2015) (evidence that an expert witness hired by the defense had a substantial connection to the insurance industry was relevant to the issue of bias); *Sears v. Rutishauser*, 466 N.E.2d 210, 211 (Ill. 1984) (trial court erred by not allowing defense counsel to cross-examine plaintiff's medical expert concerning the number and frequency of referrals the expert had received from plaintiff's attorney); *Brantley v. Sears Roebuck & Co.*, 959 S.W.2d 927, 929

(Mo. App. E. Dist. 1998) (evidence that expert "was regularly hired by Insurer," "had worked on over one-hundred fifty cases for Insurer[,]" and was testifying in that case "so that Insurer might receive $154,000 of its money back" was admissible to show bias).

Evidence regarding an expert's hotel accommodations and private air travel in this case is too attenuated to show bias, as Judge O'Malley has explained:

> Various fact and expert witnesses have used plaintiffs' counsel's private airplanes to attend depositions, hearings, medical appointments, and so on. Ruth seeks to preclude defendants from bringing out this information at trial, while defendants argue it is legitimate evidence of bias, in the same way as is evidence of an expert's hourly rates. *The Court concludes the "private airplane" evidence is too attenuated to show bias, so the motion is GRANTED.* Any impeachment on the basis of bias due to financial interests may be undertaken sufficiently by adducing evidence of how much a witness got paid, how often they have worked for a particular party (or type of party), and the extent to which their expenses were covered or reimbursed. *Federal Rules of Evidence 403 and 611 counsel against delving into greater detail regarding which hotels experts use, in what restaurants they ate, whether they fly first class, and so on.* This limitation will be applied equally to all parties.

*Ruth v. A.O. Smith Corp.*, 1:04-CV-18912, 2006 WL 530388, at *6 (N.D. Ohio Feb. 27, 2006) (emphasis added). Presumably, Defendants can make the point that an expert's travel expenses related to this case have been covered by Plaintiffs or their counsel without mentioning the use of a private plane or the name of the hotel in which the expert stayed.

The only cases Defendants cite that even mention private air travel provide no support for their argument and are factually inapposite.[3] *In re Campbell*, 625 S.E.2d 233 (S.C. App. 2006), *aff'd as modified,* 666 S.E.2d 908 (S.C. 2008), involved a probate action in which a daughter sought to have herself appointed as conservator of her mother's assets. *Id.* at 234. The probate court appointed two doctors to examine the mother's capacity to handle her own affairs. *Id.* These doctors had long-standing relationships with the mother and had been previously designated by the mother as her expert witnesses for the conservatorship proceedings.[4] After they testified that the mother was

---

[3]   Defendants cite no cases discussing the hotel accommodations of experts.

[4]   *Id.* at 235 (one doctor "admitted to being a friend of Mother's for over sixty years, attending her husband's most recent birthday party, and having supper with Mother four months prior to examining (footnote continues on next page)

4

competent to handle her own financial affairs, the probate court denied the daughter's request for conservatorship. *Id.* at 234. The appellate court reversed, finding these doctors were not disinterested *because the mother had previously designated them as experts*. *Id.* at 236 ("Here, Mother had previously designated Drs. Cathcat and Edwards as experts. Thus, it was a foregone conclusion those doctors would opine Mother was capable of handling her own financial affairs."). Although the court mentioned in the factual background of the opinion that the doctors had flown by private jet to the mother's home in order to conduct their examination (*id.* at 235), there is absolutely no indication that this was the basis of, or even relevant to, the appellate court's determination that the doctors were disinterested.

*U.S. v. Mitrow*, S3 13 CR. 633 PAE, 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015), is also inapposite. In that case, a criminal defendant pled guilty to conspiracy to commit wire fraud and tax evasion related to his fraudulent use of company funds to pay for his personal expenses, which included "travel by [the defendant] to resorts with his paramour, continuing an approximately nine-year (2001-2009) practice in which [the defendant] caused [the company] to pay for roughly monthly private jet trips with the paramour to hotels in Mexico, Hawaii, Aspen, Jackson Hole, Manila, and elsewhere." *Id.* at *2. The language quoted by Defendants in their response related to the court's discussion of the reasonableness of the company's policy against "pay[ing] for business travel on private jets." *Id.* at *6.

Finally, Defendants request that if the Court grants this MIL, it should also prohibit Plaintiffs from cross-examining defense experts on *all* issues related to bias. They provide no legal authority to support this ridiculous request. As discussed above, evidence regarding an expert's hotel accommodations and private air travel is irrelevant because it is too attenuated to show bias. But evidence that actually is relevant to an expert's bias should be fair game for cross-examination.

---

her"; second doctor "had also eaten supper with Mother four months prior to examining her and before that, she had occasionally consulted him from 1950 to 1995 if she was having medical problems").

In sum, the Court should prohibit Defendants from introducing prior witness testimony that they did not produce until after the close of discovery because this is both inadmissible hearsay and unfairly prejudicial to Plaintiffs.

**23.    Any argument or suggestion that the "learned intermediary" doctrine limits the liability of any Defendant or absolves any Defendant from liability.**

Defendants offer the following justification to invoke the "learned intermediary" doctrine: "A jury could find that because a physician is obligated to know the risks of the medicines she prescribed as a learned intermediary – not any misrepresentations by defendants – caused plaintiffs alleged harms."  Dkt. #2725 at p. 32.  In other words, by using the term "learned intermediary," Defendants hope to conjure in the minds of the jury an obligation on the part of medical professionals to see through Defendants' false and misleading marketing practices and protect society from Defendants' misdeeds.  If Defendants wish to assert such a causation defense, however, they must find some other doctrine to support it.  The "learned intermediary" doctrine does not require prescribers to ferret out a drug manufacturer's lies.

Instead, the learned intermediary doctrine applies in a personal injury or product defect case against a drug manufacturer which has given adequate information about the drug to the prescribing medical professional.    *See* OHIO REV. CODE. ANN. §2307.76(C)*; Seley v. G.D. Searle & Co.*, 423 N.E.2d 831 (Ohio 1981).  "The learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user for an inadequate or misleading warning; it only provides that the warning reaches the ultimate user through the learned intermediary."  *Vaccariello v. Smith & Nephew Richards, Inc.,* 763 N.E. 2d 160, 164 (Ohio 2002).

Therefore, the learned intermediary doctrine is inapplicable here because Plaintiffs are *not* the ultimate users of the drugs; the claims are *not* for personal injury; and the claims are *not* based on a failure to warn the drugs' ultimate users directly.  Defendants cite no authority applying the doctrine in a case such as this.  The sole authority they do cite, *Harris. v. Purdue Pharma, L.P.,* 218 F.R.D. 590 (S.D. Ohio 2003), has no bearing here.  The claims in *Harris* were for personal injury, brought as a class action.  The *Harris* court considered the learned intermediary doctrine only as part of its

analysis of the individualized matters the personal injury plaintiffs would be required to prove and their implications for the commonality requirement for class certification.  *Id.* at 596.  Here Plaintiffs' claims do not require proof of the individualized matters identified in *Harris,* nor is the commonality analysis applicable to this non-class action.

The "learned intermediary" doctrine has no application to this litigation, and any suggestion or argument otherwise can only serve to confuse or mislead the jury.

**24.    Any reference to, or evidence of, any alleged "failure to mitigate" by Plaintiffs.**

There are at least four grounds for the Court to exclude reference to or evidence of any alleged "failure to mitigate" by Plaintiffs, none of which Defendants refute.

*First*, as Defendants recognize, the duty to mitigate does not require Plaintiffs to incur extraordinary or unreasonable expenses.  *See, e.g., Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 961-62 (Ohio 1999).  Defendants argue that whether expenses are reasonable or extraordinary is itself a question of fact for the jury.  Dkt. #2725 at p. 34.  That generally is the rule under Ohio law.  *See, e.g., Telecom Acquistion Corp. I, Inc. v. Lucic Enterprises, Inc.*, 62 N.E.3d 1034, 1050 (Ohio Ct. App. 2016).  However, Ohio courts also recognize that "whether a party . . . used 'reasonable efforts' . . . becomes a question of law when reasonable minds can come to but one conclusion."  *Interstate Gas Supply, Inc. v. Calex Corp.*, No. 04AP-980, 2006 WL 328679, at *5 (Ohio Ct. App. Feb. 14, 2006).  That is the case here.  Plaintiffs' evidence shows that they have suffered hundreds of millions of dollars in damages (and face far greater-still abatement costs going forward).  Dkt. #2577 (Op. and Order Denying Motion to Exclude McGuire) at p. 2.  No reasonable mind could conclude that Plaintiffs should have expended these enormous sums to mitigate the harms Defendants created.  For this reason alone, the Court should exclude any reference to mitigation.

*Second*, there also is no duty to mitigate where the defendant had the same opportunity to minimize damages that the plaintiff did.  *See Chicago Title*, 719 N.E.2d at 962.  Defendants answer that this rule applies only where a defendant could have minimized damages by performing the same act that the plaintiff could have.  Dkt. #2725 at p. 34 (citing *State ex rel. Stacy v. Batavia Loc. Sch. Dist.*

*Bd. of Educ.*, 829 N.E.2d 298, 311 (Ohio 2005)).  Even if so, Defendants' blanket assertion that they cannot be said to have had an equal opportunity "to provide the governmental services that form the basis of [P]laintiffs' damages claims," Dkt. #2725 at p. 34, sweeps too broadly.  One of the primary services at issue is treatment for the widespread drug addiction caused by Defendants' unlawful promotion and distribution conduct.  Dkt. #2577 (Op. and Order Denying Motion to Exclude McGuire) at p. 5 n.4-5.  Defendants, prescription drug manufacturers or distributors all, may well have been able to provide or else fund these types of services just as the Plaintiff Counties do.

*Third*, there also is no duty to mitigate harms caused by intentional misconduct.  Defendants cite a single case in concluding that "Ohio courts have roundly rejected this approach . . . ." Dkt. #2725 at p. 35 (citing *Chicago Title Ins. Corp. v. Magnuson*, 2009 WL 3321372 (S.D. Ohio Oct. 9, 2009)).  The Court should reject this sweeping conclusion both because the authority cited is not controlling, and because courts elsewhere that apply the rule governing intentional misconduct do so for reasons that are consistent with principles of Ohio law.  In *Warner/Elektra/Atlantic Corp. v. County of DuPage*, 991 F.2d 1280 (7th Cir. 1993), the court addressed an inverse condemnation claim based on flooding damage, held that a duty to mitigate applied because the claim was grounded in negligence, but recognized with respect to the plaintiff's alleged failure to mitigate that, under applicable Illinois law, "such contributory or comparative negligence would not be a defense, in whole or in part, to an intentional tort."  *Id.* at 1287 (citing *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522 (Ill. 1992)).  Ohio law is exactly the same on this point.  *See, e.g., Lambert v. Shearer*, 616 N.E.2d 965, 970 (Ohio Ct. App. 1992) ("[C]ontributory negligence and comparative negligence are no defense to a reckless or intentional tort.").  Thus, to the extent that an alleged failure to mitigate harm is deemed a species of contributory negligence, it has no application here to Plaintiffs' claims based upon Defendants' intentional wrongdoing.

*Fourth*, the Plaintiff County Governments have no duty to mitigate for Defendants' fraudulent conduct.  Defendants recognize this rule's application in federal False Claims Act cases. Dkt. #2725 at p. 35; *see also United States v. United Techs. Corp.*, 950 F. Supp. 2d 949, 954 (S.D. Ohio

31

2013) ("'The Government has no duty to mitigate damages in fraud actions, including those under the FCA.'") (quoting *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, 2009 WL 4576097, at *8 (D.N.J. Dec. 1, 2009)).  Defendants err, however, in seeking to limit this rule to a single statute and to the U.S. Government alone.  Dkt. #2725 at p. 35 ("Nor have courts extended this exception to other governmental entities . . . .").  In *City of New York v. FedEx Ground Package System, Inc.*, 314 F.R.D. 348 (S.D.N.Y. 2016), the court held that no duty to mitigate applied to claims under the federal Contraband Cigarette Trafficking Act ("CCTA") that were brought by the State and City of New York because the State and City's "fundamental role as discretionary enforcer of the public interest when suing under the CCTA precludes application of a duty to mitigate damages." *Id.* at 358.  Although the court also left open whether any duty to mitigate would apply to the State and City's RICO claims, it recognized that "the fact that Plaintiffs rely on CCTA violations as their RICO predicate suggests the very same problems as requiring mitigation of damages for the CCTA claim itself." *Id.* at 359.  The same conclusion should apply here to the Plaintiff Counties' RICO and OCPA claims predicated upon Defendants' violations of the federal Drug Abuse Prevention and Control Act.

Defendants are wrong to claim that an isolated decision in *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185 (D.N.M. 2004), stands for the rule that "government plaintiffs are regularly required to mitigate damages[.]"  Dkt. #2725 at p. 35.  First, Defendants do not suggest that the State in that case raised any of the arguments made here, and the circumstances were quite different. There, the court applied New Mexico state law and held that where the State plaintiff indicated no intent to mitigate hazardous waste contamination of groundwater and had not proven that most or all of the groundwater source was affected, the State "may *not* recover monetary damages for present and future value of the use of groundwater that in fact has not been or need not be lost."  335 F. Supp. 2d at 1231 (emphasis in original).  This decision thus addressed a lack of proof of damage that was separate and distinct from any mitigation issue, and which is not presented here.  Finally, Defendants' mitigation argument here is, effectively, an attempt to call into question local governments' allocation of resources or efforts on behalf of the public to address harm created by

others (here, namely, Defendants). Courts have repeatedly rejected such arguments, whether as the basis for liability claims, or raised under the guise of mitigation. As the Ohio Supreme Court has explained:

> It is most often asserted that because the available public resources are limited by the resources possessed by the community, the deployment of them must remain in the realm of policy decision. Obviously, there are insufficient police resources to meet every need, particularly in high crime areas and during times of higher crime rates. Police departments must be able to prioritize and create responses without the benefit of hindsight.

*Sawicki v. Village of Ottawa Hills*, 525 N.E.2d 468, 476–79 (Ohio 1988) (applying the "public duty doctrine" to claims negligence claims against a local government and explaining that "[o]ne of the basic policy considerations has been that of finance"); *see also Est. of Graves v. Circleville*, 902 N.E.2d 535, 541–44 (Ohio App. 4th Dist. 2008) (explaining that the doctrine remains in force following statutory changes impacting sovereign immunity), *aff'd and remanded,* 922 N.E.2d 201 (Ohio 2010); *see also Resolution Tr. Corp. v. Gibson*, 829 F. Supp. 1103, 1107-08 (W.D. Mo. 1993) (striking mitigation defense from answer and stating that the "court is persuaded . . . that public policy weighs in favor of the public not bearing the risk for errors in judgment made by the RTC").

For any or all of the reasons set forth, the Court should prohibit Defendants from referencing or introducing evidence of any alleged "failure to mitigate" by Plaintiffs.

## PLAINTIFF-SPECIFIC LIMINE REQUESTS

**25. Any reference to, or evidence of, the identities of any children, including but not limited to children in child protective custody.**

While Defendants appear to recognize the appropriateness of protecting the identities of children, their suggestion that the Court's order *in limine* be restricted to the actual names of children not otherwise in the public record is inadequate. Obviously there are numerous other specific identifiers (*e.g.*, social security numbers, addresses, names of parents or guardians), that could divulge a child's identity. Moreover, simply because a child's name or identifying information is in some public record does not mean it is appropriate to place that child's information in the record of a

33

Cir. 2008). The principal relief sought here, substituting a pseudonym when the officer's testimony is read, provides no meaningful concerns regarding either the confrontation clause nor the public's right to attend the trial. Defendants know the true names of the witnesses and have had the opportunity to take their depositions. The public will continue to have access to the trial, the only information it was not receive is the identity of the undercover law enforcement officer, a matter as to which there is an obvious and important interest in preserving confidentiality.

Nor will Defendants be prejudiced by this relief. Contrary to Defendants' assertion, the substitution of pseudonyms will not constitute special treatment of these witnesses that may cause the jury to accord their testimony added weight. Rather, the jury will have no reason to know the substitution occurred. To the extent documents that contain an officer's name are to be used, the pseudonym can be substituted in those documents as well. Any inconvenience resulting from this is far outweighed by the benefit of continuing the ability of these law enforcement officers to function undercover.

**28. Any reference to deaths of individuals while in the Cuyahoga County Jail or in the custody of the Cuyahoga County Sheriff's Office, and any reference to the U.S. Marshalls Service report on jails.**

Plaintiffs will address Defendants' responses to Plaintiffs' MIL Nos. 28-33 collectively below. *Infra* at § 33.

**29. Any reference to or allegation of current or former government corruption in Cuyahoga County.**

Plaintiffs will address Defendants' responses to Plaintiffs' MIL Nos. 28-33 collectively below. *Infra* at § 33.

**30. Any reference to grand jury testimony or proceedings involving Cuyahoga County.**

Plaintiffs will address Defendants' responses to Plaintiffs' MIL Nos. 28-33 collectively below. *Infra* at § 33.

31. **Any reference to recent investigations or subpoenas involving Cuyahoga County.**

Plaintiffs will address Defendants' responses to Plaintiffs' MIL Nos. 28-33 collectively below. *Infra* at § 33.

32. **Any reference to the indictment of Ken Mills, former director of Cuyahoga County jails.**

Plaintiffs will address Defendants' responses to Plaintiffs' MIL Nos. 28-33 collectively below. *Infra* at § 33.

33. **Any reference to any investigations of former Cuyahoga County Sheriff Pinkney or the Cuyahoga County Sheriff's Office.**

Defendants' opposition to Plaintiffs' MIL Nos. 28-33 demonstrates how Defendants hope to have it both ways—by being allowed to introduce evidence that is wholly irrelevant while preventing Plaintiffs from using evidence of Defendants' *relevant* bad acts. Defendants argue that Plaintiffs' MIL Nos. 28, 29 and 33 should be denied as overly broad, while MIL Nos. 30, 31 and 32 are somehow equivalent to Distributor Defendants' Motion No. D-3, which seeks to exclude evidence of the indictment of David Gustin, the former compliance officer for McKesson's warehouse in southern central Ohio. The Court should grant Plaintiffs' MIL Nos. 28-33 and prevent Defendants from prejudicing the jury by introducing irrelevant information on alleged problems within the Cuyahoga County government.

These MILs are not overly broad, making Defendants' citation to *Sperberg v. Goodyear Tire*, 519 F.2d 708, 712 (6th 1975), inapposite. Instead, MIL Nos. 28- 33 seek to prevent potential jury confusion and the waste of trial time on evidence that is clearly irrelevant. For example, the U.S. Marshalls Service report does not discuss opioids or substance abuse issues at the jail. *See* Plaintiffs' MIL No. 28, Dkt. #2652 at p. 36. Similarly, the indictment of Ken Mills (Plaintiffs' MIL No. 32), and the facts underlying it, which are wholly unrelated to opioids or substance abuse at the jail, are irrelevant and will only serve to waste valuable trial time and possibly distract the jury from focusing on the issues they need to determine. Dkt. #2652 at p. 38. Allegations of current or former

government corruption in Cuyahoga County (Plaintiffs' MIL No. 29) also bear no relationship to opioids or drug abuse. Dkt. #2652 at pp. 36-37.

Defendants advocate for a general rule that would exclude evidence of criminal indictments and investigations if there is no final judgement, while allowing the facts related to those indictments and investigations to be admitted whether they are relevant or not. (*See* Dkt. #2725 at pp. 43-44, arguing that the court should grant Distributor Defendants' Motion No. D-3). This would serve their purpose of excluding evidence of relevant conduct while allowing them to prejudice the jury with information on issues in the Cuyahoga County government that have nothing to do with opioids or the damages that the County is claiming. Mr. Gustin's conduct is clearly relevant to the issues at the heart of this case, including whether McKesson complied with its duties under the CSA. In contrast, Plaintiffs' MILs seek to exclude conduct that is plainly unrelated to any relevant issues. Defendants' opposition is devoid of any facts related to government corruption (Plaintiffs' MIL No. 29), grand jury proceedings (Plaintiffs' MIL No. 30), recent investigations or subpoenas involving Cuyahoga County (Plaintiffs' MIL No. 31), the indictment of Ken Mills (Plaintiffs' MIL No. 32) and investigations of evidence of or reference to any investigations of former Cuyahoga County Sheriff Pinkney or the Cuyahoga County Sheriff's Office (Plaintiffs' MIL No. 33) that involve opioids or drug abuse. Nor have they specified how any of these issues demonstrate that the County caused or contributed to its damages.

Defendants' untimely addition to Defendants' Joint Witness List illustrates their purpose to distract the jury with irrelevant nonsense. Defendants identified Gary Brack as a fact witnesses who "is expected to testify concerning his duties and responsibilities as Interim Director of Ambulatory Care at Cuyahoga County Jail and related to his previous relevant employment." Dkt. #2742 at p. 10, ¶ 4.[16] Mr. Brack recently filed a whistleblower lawsuit against Cuyahoga County Executive

---

[16] Plaintiffs have objected to testimony from Mr. Brack as a witness Defendants failed to disclose during the discovery period. *See* Plaintiffs' Objections to Defendants' Witness List, Dkt. #2749 at p. 2. Because Mr. Brack was not disclosed during the discovery period, and because his testimony is irrelevant as indicated here, the Court should bar his testimony and strike him from the witness list. Plaintiffs did not include Mr. Brack in their initial Motions *in Limine* because they had no indication that he could be called (footnote continues on next page)

Armond Budish alleging that Mr. Brack was terminated for speaking out about conditions, unrelated to the opioid epidemic, at the Cuyahoga County Jail. Mr. Brack has not participated as a witness in this case either via written interrogatory responses or through a deposition. Defendants seek to introduce his testimony solely to try to prejudice the jury against Cuyahoga County for reasons unrelated to the claims or defenses in this litigation. As with MIL Nos. 28-33, Mr. Brack's testimony should be excluded in its entirety under Rules 401, 402, and 403 because it is irrelevant to the jury questions on liability and damages, has no probative value, and would create a significant danger of unfair prejudice, confusing the issues, and misleading the jury. Permitting Mr. Brack's testimony likely would force Plaintiffs to have to introduce evidence rebutting his allegations, thereby distracting the jury from the issues that need to be resolved now and wasting valuable time in what is already going to be a complex and lengthy trial.

Similarly, permitting evidence of non-opioid related issues, whether they have resulted in a conviction of anyone associated with the Cuyahoga County government or not, will waste time and distract the jury. The basis for Plaintiffs' MIL Nos. 28-33 is to avoid that by seeking to exclude non-opioid and non-drug related information about the Cuyahoga County government as irrelevant and prejudicial under Rules 401, 402 and 403. The Court should grant these MILs and order that any evidence about the Cuyahoga County government, and the specific issues raised in MIL Nos. 28-33, is excluded from trial as irrelevant and likely to unfairly prejudice Plaintiffs and sidetrack the jury and waste time at trial.

**34.    Any reference to any "podcast" or other media coverage regarding Cuyahoga County courts.**

Defendants argue that Plaintiffs' MIL No. 34 should fail because Plaintiffs have not identified any specific statement that should be excluded. Their opposition misses the point, which is to ensure the exclusion of evidence of any podcasts or media coverage of the Cuyahoga County

---

as a witness.

courts that are unrelated to the issues in this case. Media coverage of alleged issues with the Cuyahoga County courts, such as the *Serial* podcast, is completely separate from whether Defendants' conduct caused Cuyahoga County's damages. These stories may also be sensationalized and lack indicia of reliability. For these reasons, they should be excluded under Rules 401, 402 and 403. These statements are also inadmissible hearsay under Rule 802. *See Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010) ("Newspaper articles are 'rank hearsay.'") (quoting *Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 147 (8th Cir. 1991).

Moreover, in their response, Defendants reveal their plan to attempt to introduce statements made by the County's employees or agents that "suggest" other causes of increased drug offenses in the County's court system, or on any issue in this case, as a party admission, regardless of their reliability or relevance. Notably, Defendants fail to identify these alleged County employees or agents, the alleged statements and in what specific fora the statements were made. Defendants cannot introduce random statements made in response to questions outside the context of this litigation and deem them party admissions. Rule 801(d)(2) includes a scope requirement that only allows statements to be non-hearsay admissions if they were "made by the party's agent or employee *on a matter within the scope of that relationship and while it existed*." FED. R. EVID. 801(d)(2)(D) (emphasis added). Courts routinely reject statements made by employees or alleged agents that were outside the scope of that relationship or without proof that the employee or agent could bind the party. *See, e.g.*, *Cary v. Cordish Co.*, 731 F. App'x 401, 406 (6th Cir. 2018); *Huffman v. Speedway LLC*, 621 F. App'x 792, 799 (6th Cir. 2015); *United States v. Wiedyk*, 71 F.3d 602, 605–06 (6th Cir. 1995). Moreover, the term "suggest" is so broad and vague that it allows virtually any statement to qualify. The Court should grant Plaintiffs' MIL No. 34 and exclude evidence of or reference to any podcast or other media coverage regarding the Cuyahoga County courts that is not relevant to any issue to be decided in this case or if made by a person unauthorized to speak for the County. This includes statements

made by the County's alleged employees or agents that "suggest" other causes of increased drug offenses in the County's court system or comment on this litigation.[17]

## 35.   Any reference to any investigation regarding the death of Aniya Day Garrett.

Defendants seek to introduce evidence regarding Aniya Day Garrett's death even though Defendants concede her death "did not involve opioids."  Dkt. #2725 at p. 45.[18]  Although Defendants concoct a theory that such evidence is relevant because it "contradicts [P]laintiffs' damages experts, who simply attribute all . . .  increases [in costs to Cuyahoga County Children and Family Services (CFS)] to the opioid crisis" (Dkt. #2725 at p. 45), this theory is simply incorrect. Plaintiffs' experts carefully detailed the complex models that they used to identify the increased costs to CFS that are attributable to Defendants' misconduct.  While it is certainly true that "[s]everal of [P]laintiffs' experts opine that increased CFS and related costs borne by [P]laintiffs in recent years are the result of the opioid crisis" (*id.*), neither Plaintiffs nor their experts claim, as Defendants assert, "that *all* increased costs to CFS in recent years are due to the opioid crisis – full stop – without any consideration of other potential causes."  *Id.* at p. 46 (emphasis added).  For instance, the report of Professor McGuire, a Professor of Health Economics in the Department of Health Care Policy at Harvard Medical School,[19] makes clear that his analysis has been careful to identify

---

[17]   At a minimum, if Defendants seek to introduce this evidence, the Court should order that Defendants must identify the statements and witnesses outside the presence of the jury so that the Court can determine if the witness was authorized to speak for the County, if the statements were within the scope of the witness's relationship with the County, and evaluate the relevance and potential prejudice of any such statements.  If admitted, the person would have to be called as a witness and given a chance to explain the statements and context.

[18]   Defendants initially listed Mickhal Garrett, Aniya's father, as a trial witness (Dkt. #2642 at pp. 13-14), but they then removed him from their Amended Witness List.  Dkt. #2742.  Garrett's lawyer stated that his client's inclusion on Defendants' witness list was "puzzling," and declared, "There's no evidence that opioids played any role in any way shape or form [f]or what happened to 4-year-old Aniya." *See* https://www.cleveland.com/court-justice/2019/10/drug-companies-may-probe-cuyahoga-county-jail-problems-mothers-murder-of-4-year-old-daughter-at-october-opioid-trial.html (last visited Oct. 7, 2019). It is unclear, then, which witness Defendants intend to use to introduce evidence about Aniya Day-Garrett's death, but in any event, such evidence should be excluded.

[19]   Dkt. #1899-16 at ¶ 1.

those increased costs to CFS (and other divisions in Cuyahoga and Summit Counties) *that are attributable to Defendants' misconduct.*[20] Similarly, Professor Cutler, a Professor of Applied Economics at Harvard,[21] focused his analysis on assessing the share of various harms imposed on county divisions that is attributable to Defendants' misconduct.[22] Given that Plaintiffs and their experts have *not* purported to claim that *all* increased costs for CFS are directly attributable to the opioid crisis or to Defendants' misconduct, it is unremarkable that Cynthia Weiskittel, Director of Cuyahoga County CFS, testified that other matters have also resulted in additional costs to CFS. Contrary to Defendants' assertion, Ms. Weiskittel's testimony in no way contradicts the opinions of Plaintiffs' experts.

Under these circumstances, the tragic death of Aniya Day Garrett, which Defendants concede had nothing to do with opioids or any other drug, is irrelevant to the issues in this case and should be excluded for that reason alone. FED. R. EVID. 401. Alternatively, what little probative value such evidence may have is far outweighed by the prejudice to Cuyahoga County that such evidence would pose. FED. R. EVID. 403.

**36.** **Any reference to or allegation of current or former government corruption in Summit County.**

Defendants' objection makes clear that any evidence of or reference to allegations of current or former government corruption in Summit County is not relevant to any issue to be decided in

---

[20] *E.g.*, *id.* at ¶¶ 16-18 (explaining model for determination of increased costs to Bellwether divisions "that is attributable to defendants' misconduct"); ¶ 72 (describing methodology for attribution of share of harms due to defendants' misconduct and showing percentages for CFS ranging from 1.0% in 2006 to 7.5% in 2018).

[21] Dkt. #1899-4 at ¶ 1.

[22] *Id.* at ¶ 9 ("My analysis yields annual estimates of the share of various harms imposed on selected departments in each Bellwether government . . . that is attributable to defendants' misconduct."); ¶¶ 118-119 (expressing share of harms attributable to defendants' misconduct in formulaic terms); ¶ 120 (for Cuyahoga Sheriff Division, identifying "share of crime attributable to opioids" as 5.5%, but showing "share of crime attributable to defendants' misconduct" as either 1.2% or 2.0%, depending on which of two approaches is utilized); ¶ 123 (percentages of harm to CFS due to defendants' misconduct for each year between 2006 and 2018, ranging from low of 1.0% to high of 7.6%).

this case. They suggest they might conceive of a hypothetical in which such evidence could be relevant, but do not actually contend that their hypothetical could apply. Moreover, the only conceivable evidence they might introduce would be precisely the kind that they concede "would *not* be relevant." Dkt. #2725 at p. 48 (emphasis in original) (citing embezzlement from a high school sports fund). Here, the only potential evidence of which the County is aware concerns a dispute over $2,300 in spending on newsletters that had nothing to do with opioids and purportedly did not have a public benefit, a matter which is currently under dispute, as the County contends that the expenditure was valid, and which has nothing to do with opioids or any issues in this case. Further, Defendants offer nothing to counter the County's Rule 403 arguments; rather, they ask the court to ignore them as too "vague." Dkt. #2725 at p. 48. Thus, there is no meaningful dispute that any probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See Doe v. Claiborne County,* 103 F.3d 495, 515 (6th Cir. 1996) (unfair prejudice is "the undue tendency to suggest a decision based on improper considerations").

**37.    Any reference to deaths of individuals while in the Summit County Jail or in the custody of the Summit County Sheriff's Office.**

Here too, Defendants' objection makes clear that any evidence of or reference to jail issues in Summit County unrelated to the substance/opioid abuse, including any reference to deaths or other incidents involving individuals while in the Summit County Jail or in the custody of the Summit County Sheriff's Office is not relevant to any issue to be decided in this case. Attempting to manufacture a theory of relevance, Defendants argue that they may seek to introduce "evidence of the County's failure to provide adequate care or screening for opioid addiction in the jail and to prevent County-employed guards from smuggling opioids to inmates." Dkt. #2725 at p. 43.[23] They do not, however, suggest that such evidence actually exists. Likewise, they fail to explain how or why they would need to take the further step of introducing evidence of the deaths sought to be

---

[23]    As explained in Plaintiffs' separate reply regarding mitigation, this is not a valid defense, and any evidence offered to dispute mitigation is inadmissible in any event.

excluded. In this regard, they effectively concede that evidence of deaths unrelated to opioids should be excluded. Defendants' opposition confirms that their sole purpose in trying to elicit such information would be to attempt to prejudice the jury against Summit County for reasons that are unrelated to the matters at issue in this case, as well as that, assuming *arguendo* any relevance, any probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues and misleading or inflaming the jury. This evidence must be excluded under Rules 401, 402, and 403. Further, Defendants' opposition confirms that they may seek to use such evidence to cast aspersions on the County's character generally, which is also inadmissible under Rule 404.

Dated: October 14, 2019

Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*