# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE**

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or

evidence regarding defendants' lobbying activities.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful

shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint

offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West

Virginia without identifying a connection between such shipments and the Track One

jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One

jurisdictions might be relevant because some of the pills in those shipments could have

"migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that

theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had

any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other

evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is

no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence

of allegedly wrongful shipments to other locations would constitute classic "other bad acts"

evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited

allowable purposes for such evidence, none are applicable here.  The allowable purposes

recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid.

404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy." *Id.*

whether the factor identified to justify admission is material to the claims, (2) whether the evidence is probative on that factor, and (3) whether prejudice substantially outweighs that probative value. *See United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996).

Most of the Rule 404(b)'s permitted uses are clearly not available here because they are immaterial to the plaintiffs' claims. *See Jobson*, 102 F.3d at 220-21 (6th Cir. 1996) (exception applies when evidence of prior misconduct tends logically to prove an element of offense charged). The defendants' identity is not at issue. No defendant contests that it has the opportunity to distribute opioids or knows that it does so. Not have defendants alleged that they distributed opioids by mistake or accident, so there is no basis to present evidence of shipments elsewhere to prove *absence of* mistake or *lack of* accident. *See United States v. Semak*, 536 F.2d 1142, 1144 (6th Cir. 1976).

While scienter is a required element of plaintiffs' RICO claims, outside shipments are not probative on that issue. First, the fact that a defendant may have purportedly shipped suspicious orders at another time or place does not make it more likely that it intended to commit similar acts as alleged in the instant case. *See United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) (prior threatening letters inadmissible to prove intent behind threatening phone calls). Second, unproven allegations of misconduct have a lower probative value generally – plaintiffs would need to prove not just that a shipment occurred, but that it was wrongful – a contention defendants would be entitled to rebut. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir. 1992). Thus, opening the door to evidence of shipments to other locations would require an inordinate amount of trial time to be expended on what is *at best* a collateral issue.

Finally, any limited probative value of such evidence is clearly outweighed by the unfair prejudice it would create. *See Ring*, 513 F.2d at 1007 (evidence of prior bad acts may not be introduced as a pretext for placing highly prejudicial evidence before the jury). Evidence of

17

other unproven allegations may put a party "on trial for . . . other bad acts" in a way that
prejudices the right to a fair trial. *United States v. McFadyen-Snider*, 552 F.2d 1178, 1184 (6th
Cir. 1977). Plaintiffs should not be permitted to cherry-pick purportedly wrongful shipments
elsewhere rather than focusing on shipments that actually could have affected them. *See id.* at
1182 (improper to introduce evidence of prior prostitution that "served only to cater to the
passions of the jury").

### 7.    The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

The Court should exclude as irrelevant evidence purporting to demonstrate that
defendants' conduct violated duties this Court has ruled arise under the Controlled Substances
Act or its regulations – namely, to identify, inform DEA of, and not ship, "suspicious" orders.
*See* Dkt. 2483.[16] Even if plaintiffs are permitted to introduce any type of evidence of an
allegedly inadequate monitoring system, or not reporting, or not halting shipment of "suspicious
orders," plaintiffs should not be permitted to introduce evidence or argument, or to suggest in
cross-examination, that such conduct violated "suspicious" order duties, the CSA, or
implementing regulations. Any such noncompliance or violation is irrelevant to the causes of
action to be tried.

**Federal RICO.** To prove a "[p]attern of racketeering activity," a plaintiff must prove at
least two acts of "racketeering activity." 18 U.S.C. § 1961(5). RICO limits "racketeering
activity" to the criminal offenses listed in 18 U.S.C. § 1961(1)(A)–(G).

Even if a violation of 21 U.S.C. § 843(a)(4)(A) "can," in theory, constitute a predicate
racketeering act under RICO, 18 U.S.C. § 1961(1)(D), as this Court held, *see* Dkt. 2580 at 3, a §
843(a)(4)(A) violation based on failure to comply with "suspicious" order duties is not the same

---

[16] Defendants maintain that the Court's rulings on alleged "suspicious" order duties and on a violation of 21 U.S.C.
§ 843(a)(4) as a possible RICO predicate are erroneous as a matter of law for reasons previously set forth. However,
these motions assume their validity for the sake of argument here.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id. See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

1845586.1 31

In fact, there is abundant evidence in the record that the opioids Defendants shipped migrated beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.[37] The Ohio Department of Mental Health and Addiction Services was aware of the migration of opioids into Ohio.[38] Defendants were regularly alerted to the migration phenomenon by the DEA,[39] and their personnel acknowledged the reality of diversion and migration in their depositions.[40] With respect to Walgreens, Plaintiffs' expert James Rafalski opined that Walgreens was familiar with the Florida phenomenon in part because its pharmacy managers alerted their supervisors to the high volume of prescriptions coming from out of state:

> Walgreens's also knew opioids it distributed in Florida were migrating into Ohio. Because Walgreens failed to maintain many pre-2012 documents outside of those produced to the DEA during the Jupiter DC investigation, many of the pre-2012 documents Walgreens produced relate to Walgreens distribution in Florida. This information is highly relevant to CT1, however, because not only does the evidence show that Walgreens's distribution failures were "systemic", as noted by the DEA in the 2013 MOA, but the evidence further shows that Walgreens knew and/or should have known that the high-volume Florida prescriptions were traveling out of state, including to Ohio. For example, Pharmacy managers in Florida alerted their supervisors and the distribution center that they were ordering 55+ bottles a week (where 30 bottles was an admitted red flag) and that many of the prescriptions were coming from out of state. Walgreens was well familiar with the "Florida migration"

---

[37] See, e.g., **Ex. 5** [CAH_MDL_2804_031944472] at p. 118 (vast majority of Florida pain clinic patients came from out-of-state, including Ohio); **Ex. 6** [FTIMDL00039536] (most drug customers travel to Florida from Ohio and elsewhere); **Ex. 7** [HDS_MDL_00455124] (travelers seeking opioids come "by the thousands" to Florida from Ohio and elsewhere); **Ex. 8** [ABDCMDL00360134] at Slide 7(2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to Ohio and other states); **Ex. 9** [MCKMDL00407451] at 465(McKesson presentation depicting "Drug Diversion Migration Out of Florida" to Ohio and elsewhere); **Ex. 10** [WAGMDL00441398—1431] (describing case studies of diverted opioids migrating to Ohio); **Ex. 11** [WAGMDL00049752] at 759 ("this is not just a Florida problem").

[38] See **Ex. 12** [*Ohio Substance Abuse Monitoring Network Surveillance of Drug Abuse Trends in the State of Ohio*, CUYAH_001656831] at 834, 840, 913, 924 (Cleveland region law enforcement and others note influx of prescription opioids from outside Ohio).

[39] See, e.g., **Ex. 13** [CAH_MDL_02448227] at 378—80; **Ex. 14** [US-DEA 00000001 – 141]; **Ex. 15** [WAGMDL00289068] at 153.

[40] See, e.g., Dkt. #1962-24 (8/1/18 Hartle Dep.) at 318:24 – 321:2.

phenomenon, in which prescription opioids were being dispensed in Florida and transported north to states include Ohio, and knew that "Interstate 95 has been renamed the Oxycodone Express because of the brisk travel of people from Kentucky, Tennessee, [and] Ohio to South Florida to obtain medications." When the DEA issued Orders to Show Cause to Walgreens's Jupiter Distribution Center and six Florida Walgreens pharmacies, the DEA specifically noted likely migration to Ohio."

Dkt. #1895-19 (Rafalski Expert Rep.) at p. 121; *see also* Dkt. #1969-19 (5/14/19 Rafalski Dep.) at 552:13-554:6 (testifying as to the basis for his opinion and observing that "by this time period, everybody knew there was a problem in Florida").

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped tens of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them. Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Dkt. #1895-19 (Rafalski Expert Rep.) at pp. 46-186. Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. *See id.* at p. 62 (noting that DEA enforcement actions against Cardinal in Maryland and Florida involved increasing thresholds despite evidence indicating potential diversion, and that these actions identified a systematic problem in Cardinal's nationwide distribution operations); *id.* at p. 79 (observing that the DOJ recognized that there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective

controls against diversion); *id.* at p. 85 (ABDC's settlement with the DOJ arose from failures in its SOM program, which were systematic because ABDC maintained national SOM policies and procedures); *see also, e.g.,* Dkt. #1971-2 (10/16/18 Stahmann Dep.) at 94-96. Because the SOM programs were implemented nationally, not regionally, each suspicious order filled by Defendants is also evidence of the flaws in Defendants' SOM programs, wherever it shipped to. For this reason, as well, Defendants' efforts to exclude this highly probative evidence must be denied.

7. **Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.**

In their Omnibus MIL No. 7, Defendants argue that evidence of their CSA violations is irrelevant because it does not establish certain elements of Plaintiffs' claims. First, that is not true, as discussed in greater detail below.[41] Moreover, Defendants are attempting to use this MIL to re-litigate issues decided on summary judgment, which the Sixth Circuit has held is improper. *See Louzon*, 718 F.3d at 558, 563 (defendant moved *in limine* to exclude plaintiff's "evidence of comparable employees on the basis that none were similarly situated as a matter of law[,]" arguing this evidence was irrelevant to plaintiff's discrimination claims; court held this was an improper motion *in limine*: "[T]his argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings. Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant. Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.").

This Court has determined that whether Defendants violated their duties under the CSA or its implementing regulations must be resolved by the jury in the upcoming trial:

---

[41] And, regardless, "a piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dorch*, 588 F.3d at 401. *See also Morningstar*, 2018 WL 3721077, at *1 (same).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct. Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67. The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties. Shipments made elsewhere, even if wrongful, are otherwise irrelevant. Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17. Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24. Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence. Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal." *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).

and found its way into either county.  The most they offer are a couple of sources suggesting the possibility of "migration" of prescription opioids from Florida "into Ohio" and various other states.  Pl. Opp. at 32-33.  They identify no evidence that even suggests the existence of "migration" into Cuyahoga or Summit Counties (as opposed, for example, to Southern Ohio).

Moreover, the only specific defendant plaintiffs' Opposition attempts to connect to migration of any kind is Walgreens; plaintiffs identify no evidence whatsoever as to any other defendant.  And plaintiffs have provided no basis to deny this motion even as to Walgreens.  Plaintiffs quote a paragraph from the expert report of James Rafalski, who relies almost exclusively on a settlement agreement (which is itself the subject of a separate motion *in limine*) that in turn cites unproven and untested allegations of a handful of instances (fewer than five) of Walgreens pharmacies in Florida *dispensing* opioid medications to Ohio residents.  Even if these allegations had identified prescriptions dispensed to residents of Cuyahoga or Summit Counties – and they did not – they would be irrelevant.  As the Court has found, "Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids."  Dkt. 1203 at 2.  Plaintiffs' claims are limited to alleged harm from *distribution* into Cuyahoga and Summit Counties.  Plaintiffs have no evidence, and their experts do not opine, that opioids distributed elsewhere – by Walgreens or anyone else – caused injury to plaintiffs.

Plaintiffs' only other argument on this point – that they should be allowed to offer evidence of wrongful shipments elsewhere because defendants' SOM programs were national in scope – is precisely the kind of argument for admissibility that Rule 404(b) rejects.  If a defendant made a wrongful shipment to a pharmacy in Utah, that is *not* admissible evidence of whether that defendant made wrongful shipments to Cuyahoga or Summit Counties that caused

injury to plaintiffs, any more than evidence of a prior automobile accident would be admissible in a personal injury case merely because the prior accident involved the same car and driver.

### 7. The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

Plaintiffs' primary argument in opposition to defendants' Motion No. 7 is that this Court has already ruled against defendants on the evidentiary question this motion presents. That is incorrect. The order plaintiffs cite, Dkt. 2483, was a ruling on general "duties" and specified that it did *not* "address the scope of possible liability [to plaintiffs] for breach of those duties," *id.* at 14. At the time of that order, plaintiffs were pressing a negligence claim and asserted that such general duties and "breach of those duties" were relevant to that claim, but they have since elected to drop the negligence claim. As defendants have demonstrated, any breach of the "duties" that the Court addressed in that order are not relevant to the remaining claims.

Plaintiffs' substantive arguments are also without merit. Once again, plaintiffs seek to rely on allegations of vague, undefined "CSA violations." *See* Pl. Opp. at 35. But there is no general "CSA violation" that has uniform legal force, including with respect to plaintiffs' claims. Plaintiffs must establish the relevance of any alleged failure to abide by a statutory or regulatory section by identifying that section and its relevance to an element of a claim to be tried. Plaintiffs' Opposition fails entirely to satisfy this burden.

**RICO and OCPA.** Defendants' motion demonstrated that plaintiffs cannot rely on any failure to abide by provisions of 21 U.S.C. §§ 823, 841, or 842 to establish a RICO or OCPA predicate act. Plaintiffs offer no substantive refutation of that point. This is unsurprising, as plaintiffs did not identify these sections in their interrogatory response listing the predicate acts on which their RICO and OCPA claims are based. *See* Dkt. 2666 at 18.

18

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

<u>**HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE**</u>

Defendants Henry Schein, Inc. and Henry Schein Medical Systems, Inc. (together, "Henry Schein Defendants") hereby move the Court, prior to the commencement of trial, for an order directing that Plaintiffs Summit County and Cuyahoga County, and their attorneys and witnesses, not mention or bring before the jury panel or the jury, either directly or indirectly, upon voir dire, opening or closing statements, interrogation of any witnesses, the offer or reading of any exhibit, deposition, or other discovery response in the case, arguments or objections before the jury, or by any other manner or means inform the jury or bring to the jury's attention any of the matters set forth below, unless and until such matters have first been called to the Court's attention outside the presence and hearing of the jury, and a favorable ruling received as to the admissibility thereof.

The Henry Schein Defendants further move the Court to order attorneys for Plaintiffs to inform and counsel their clients and witnesses not to volunteer, inject, disclose, state or mention to the jury any of the matters set forth below until specifically questioned thereon after a prior ruling by the Court.[1]

---

[1] The Omnibus Memorandum of Law In Support Of All Track One Bellwether Trial Defendants' Motions In Limine, and the Memorandum of Law In Support Of Distributor Defendants' Motions in Limine set forth the applicable and

sentenced to ten years in prison. Again, these events took place after HSI had discontinued distributing medications to Dr. Harper. Because Plaintiff cannot show that Dr. Harper diverted any of the opioid pills distributed to him by HSI, or furnished such pills to the referenced deceased patients, and because the conduct for which Dr. Harper was indicted and convicted involved the unlawful dissemination of prescriptions (not pills), Plaintiff should be prohibited from referencing HSI's distribution of opioid medications to Dr. Harper. Such evidence is irrelevant, misleading, and unfairly prejudicial. *See* Fed. R. Evid. 401, 403. Such evidence also lacks foundation. *See* Fed. R. Evid. 602.

AGREED: _____ GRANTED: _____ DENIED: ____

## 7. [HS-7] References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System without first identifying whether any orders that HSI sold into Summit County were diverted.

Plaintiff intends to offer evidence regarding purported deficiencies with respect to HSI's Suspicious Order Monitoring System. Plaintiff should be prohibited from offering such evidence absent an initial showing that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County. Such evidence lacks foundation and is otherwise irrelevant and unfairly prejudicial. *See* Fed. R. Evid. 401, 403, 602.

AGREED: _____ GRANTED: _____ DENIED: ____

## 8. [HS-8] References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.

Plaintiff should be prohibited from making references or otherwise eliciting witness testimony that opioid medications that HSI may have distributed to locations outside of Summit County "migrated" or otherwise found their way into Summit County. Plaintiff possesses no

evidence that any single pill that HSI distributed or otherwise delivered to a customer outside of Summit County was later re-shipped to and diverted within Summit County. Permitting Plaintiff (or any of its witnesses) to make such reference lacks foundation and is otherwise unfairly prejudicial to HSI. *See* Fed. R. Evid. 401, 403, 602.

AGREED: _____     GRANTED: _____          DENIED: _____

**9.      [HS-9] References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

From Plaintiff's exhibit list it is apparent that it intends to offer testimony or otherwise reference in front of the jury certain fines imposed by other states regarding HSI's distribution of opioid medications *in those states*. Notably, any such isolated incidents did not involve in any way HSI's distribution of opioids into Ohio generally, or Summit County specifically. Accordingly, any such evidence or references are irrelevant to whether or not HSI's conduct was a substantial factor in creating, or maintaining a public nuisance in Summit County, and is otherwise unfairly prejudicial to HSI. *See* Fed. R. Evid. 401, 403.

AGREED: _____     GRANTED: _____          DENIED: _____

**10.     [HS-10] References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

According to Plaintiff's exhibits, it intends to offer into evidence a set of Ohio Board of Pharmacy meeting minutes from November 1998 whereby mention was made regarding the issuance of a cease and desist letter to Henry Schein, Inc. regarding the "sale of dangerous drugs to persons and/or facilities which are not licensed by the Board nor otherwise authorized to possess dangerous drugs." As an initial matter, there is no evidence that any such letter was actually sent to or received by HSI. Furthermore, the minutes reference "dangerous drugs" and make no mention of whether the subject drugs consisted of or included opioids, let alone to whom the drugs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

SOMS is itself irrelevant and unfairly prejudicial, or whether it is only irrelevant and unfairly prejudicial if Plaintiffs do not first demonstrate "that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County." Regardless, both arguments are without merit. First, evidence of HSI's insufficient SOMS is highly probative to Plaintiffs' claims and is not unfairly prejudicial for the reasons discussed above as to Defendants' Omnibus MIL No. 7. *Supra* at § A.7. Additionally, Plaintiffs have already made an initial showing that Henry Schein's conduct substantially contributed to the public nuisance, which the Court considered sufficient to withstand summary judgment. Dkt. #2561 at p. 9 ("As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."); Dkt. #2559 (order denying small distributors' summary judgment motion). Plaintiffs understand that they will have to establish causation at trial, and fully intend to do so. Whether Plaintiffs have laid an adequate foundation for a particular piece of evidence or testimony is a determination that should be made at trial so that it can be resolved in context. *See Indiana Ins.*, 326 F. Supp. 2d at 846.

Finally, Henry Schein again inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that this evidence "lacks foundation and is otherwise irrelevant and unfairly prejudicial." Dkt. #2645 at p. 5. It is not clear how this rule, which requires witnesses to have personal knowledge of matters on which they testify (FED. R. EVID. 602), is relevant to MIL No. H-7, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-7 should be denied.

8.   **Henry Schein MIL No. HS-8**: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.

Henry Schein's MIL No. HS-8 should be denied for the same reasons discussed above with

respect to Defendants' Omnibus MIL No. 6. *Supra* at § A.6.

**9.    Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

Henry Schein argues that evidence regarding fines imposed by other states is not relevant in this case because those fines did not involve HSI's distribution of opioids in Ohio.  As discussed in § A.6, *supra*, however, Henry Schein's argument improperly seeks to limit the scope of Plaintiffs' proof.  The opioid crisis and harm experienced by Cuyahoga and Summit Counties did not result solely from conduct by Defendants that specifically occurred in those counties or in Ohio.  Rather, the problem caused in these counties by Defendants' oversupply, inadequate monitoring, and diversion resulted from conduct by Defendants that occurred all over the country.  This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

**10.    Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

Henry Schein seeks to exclude evidence regarding a "purported" letter "supposedly" sent in 1998 from the Ohio Board of Pharmacy to HSI.  The MIL specifically references meeting minutes of the Ohio Board of Pharmacy from November 1998 that reference the letter.  Henry Schein argues "[a]s an initial matter, there is no evidence that any such letter was actually sent to or received by HSI."  Dkt. #2645 at p. 6.

Henry Schein is wrong.  Its own documents reflect receipt of the very same letter referenced in the meeting minutes.  In a PowerPoint presentation discussing HSI's due diligence requirements, there is a slide summarizing various "penalties" imposed by governmental entities on distributors, including HSI.  The first item on the slide references a "Warning Letter" sent by the "Ohio State BOP" in 1998 to HSI regarding the "Sale of dangerous drugs to persons/entities not

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) ) ) |
| This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | ) ) ) ) MDL No. 2804<br>) Hon. Judge Dan A. Polster |
| and | ) ) |
| *The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:17-op-45004 | ) ) ) ) ) ) |

## TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE

Pursuant to Federal Rules of Evidence 402, 403, 404, and 408, and for the reasons set forth in the Teva Defendants' and Actavis Generic Defendants' (collectively, "Moving Defendants") attached Memorandum of Law, Moving Defendants move for the following to be excluded at trial:

- TAD-1: reference to the Cephalon misdemeanor plea;

- TAD-2: reference to "off-label" promotion;

- TAD-3: reference to the 2008 civil settlement between Cephalon and the Office of Inspector General (along with the settlement of the opioid action brought by the Oklahoma Attorney General);

- TAD-4: evidence of any opioid-related harm that occurred outside of the Counties;

- TAD-5: evidence of marketing-related statements or opioid shipments outside of the Counties;

(holding settlement evidence inadmissible under Rule 403 in addition to Rule 408); *see also Goodyear*, 332 F.3d at 982–83 ("the statement [made in furtherance of settlement] would likely be inadmissible under Rules 403 and 408"). Rule 403 permits the Court to exclude even "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403.

That is precisely the case here. If evidence of the Cephalon Settlement were admitted, the jury is likely to conclude—wrongly—that Cephalon acted improperly because it paid significant sums of money to resolve civil actions regarding marketing practices, without ever determining whether the plaintiffs proved their ***specific*** claims ***in this case***. This unwarranted conclusion also may be extended to the other Moving Defendants by affiliation. Indeed, a jury may believe— wrongly—that if Cephalon did nothing wrong, it would not have settled. This risk of unfair prejudice is "profound." *See United States v. Hays*, 872 F.2d 582, 589 (5th Cir. 1989) ("[T]he potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound. It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back."), *cited with approval in Stockman*, 480 F.3d at 800. The Cephalon Settlement (as well as the Oklahoma Settlement) should be excluded.

### D. The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

This Court should prohibit any evidence regarding any harm that occurred outside of Ohio. As a matter of law, the Counties can only recover for any harm that ***they*** incurred.[5] As a result,

---

[5] 18 U.S.C. § 1962(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages

any opioid-related harm experienced by other counties in Ohio, or that occurred elsewhere in the United States, is entirely irrelevant.  For instance, Plaintiffs seek to utilize expert testimony and documents relating to opioid-related harms, including studies and instances of opioid-related addiction, outside of the Counties.  *See, e.g.*, Mark Schumacher Expert Report ¶¶ 53-56, ECF No. 2000-24 (discussing studies about a "national" epidemic but none that examine the Counties); Anna Lembke Expert Report, at 81-85, ECF No. 2000-10 (citing national studies and studies on opioid abuse in "Los Angeles . . . San Diego, Seattle, and New York" but none examining the Counties).  But that says nothing about any harm that has occurred in the Counties.  To the extent Plaintiffs seek to introduce such evidence, it should be precluded as irrelevant under Rule 402.

Moreover, even if such evidence were relevant, it is unduly prejudicial and Rule 403 precludes its admission.  The case is brought by two Counties in Ohio, based upon alleged false marketing made to doctors in the Counties and alleged excessive shipments of opioids into the Counties.  If the jury is allowed to hear testimony about opioid-related harm in other parts of the United States, it will unduly influence its decision-making.  Jurors may wrongly believe that because other areas of the country have experienced significant opioid-related harm, so must have Summit and Cuyahoga, without the Counties having to prove their legally cognizable injuries and damages.  The prejudice clearly outweighs the risk.

## E.    The Court Should Exclude Evidence Of Marketing-Related Statements Or Opioid Shipments Outside Of The Counties (TAD-5).

Plaintiffs' false marketing claims rest upon the theory that the Teva and Actavis Generic Defendants misled doctors in the Counties into writing prescriptions that were harmful to residents

---

from the underlying unlawful act, there can be no successful civil conspiracy action") (citation and quotation omitted); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (common law public nuisance claim requires injury to plaintiff).

of the Counties. *See Summit* TAC, ¶¶ 10-11, 15, 71, 674-79, 715, 722. As a result, evidence of marketing activity, either branded or unbranded, should be excluded where there is no showing that the marketing materials were distributed, published, or read in either County. For example, Plaintiffs seek to use a "Pain Matters" program sponsored by Teva USA in support of their claims (Opp., at 14-15), but there is no evidence that this program was viewed by any doctor, patient, or person in Cuyahoga or Summit County. Nor have any of Plaintiffs' causation experts even considered it. Thus, even if certain statements in that video were false, they have no relevance to the claims brought by Plaintiffs. Fed. R. Evid. 402. At a minimum, any such relevance is substantially outweighed by the prejudice of allowing marketing statements with no nexus to the Counties. Fed. R. Evid. 403.

Likewise, as explained in greater detail in the Joint Brief, any evidence of shipments of opioids manufactured or sold by the Teva or Actavis Generic Defendants should be excluded where those shipments have no connection to Ohio. For instance, Plaintiffs have argued that Teva USA purportedly released a suspicious order placed by a Publix store in Florida. (Opp., at 18). Putting aside that Plaintiffs are wrong, this order has no connection to the Counties; it was never shipped into the Counties, thus, it has no bearing on any of the claims brought by Plaintiffs for harm in the Counties. *See Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, No. 2:00-CV-1439, 2003 WL 21750835, at *5 (S.D. Ohio July 11, 2003) (excluding evidence relating to non-party that suffered harm). It is entirely irrelevant.[6]

In fact, allowing Plaintiffs to base liability on this evidence would be a constitutional violation. Under the Commerce Clause, the Counties cannot project Ohio's regulatory regime into

---

[6]     As explained in the Joint Brief, evidence of opioid shipments outside of the Counties is also inadmissible under Fed. R. Evid. 404(b). *See* Joint Brief at Section II(6).

another state—even if the Counties can point to some downstream effect they want to prevent. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).[7] This means that the Counties cannot rely upon Moving Defendants' out-of-state conduct to satisfy the elements of Ohio state-law claims; indeed, the Supreme Court has held that the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State*." *Id.* (citations omitted) (emphasis added). Nor can the Counties rely upon out-of-state conduct to try to impose punitive damages (which, as described in the Joint Brief, are unavailable here anyway). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003). The Counties' attempt to penalize Moving Defendants under Ohio law, based on conduct outside of Ohio, is unconstitutional.[8]

## F. The Court Should Exclude Evidence Regarding Teva Defendants' Financial Support Of Third-Party Groups (TAD-6).

Plaintiffs seek to hold Moving Defendants liable for the conduct of trade organizations that they funded, such as the American Pain Foundation. (Opp., at 13-14).[9] But the First Amendment shields Moving Defendants' right to associate with trade and advocacy organizations. U.S. Const. amend. I (protecting "the right of the people peaceably to assemble"). That protection extends across a broad range of activities, including funding: "The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial

---

[7]     *See also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986).

[8]     Likewise, the Supreme Court has made clear that the application of state law to out-of-state conduct violates the Due Process Clause unless the out-of-state conduct has significant contacts with the state and implicates significant state interests. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985). Here, the Counties cannot meet their burden to establish that that Moving Defendants' marketing conduct outside of Ohio has any pertinent contact with Ohio or implicates any state interest, much less a significant one.

[9]     *See, e.g.*, Summit TAC, ¶¶ 360-71 (seeking to hold Defendants responsible for statements made by the American Academy of Pain Medicine and the American Pain Society in their consensus statements about and guidelines for the use of opioids).

11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

excessive promotion of opioids created a public health crisis. Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful. Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case. *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4. But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic. Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6. The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs. Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations. Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

3.      **Teva MIL No. TAD-3**: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

4.      **Teva MIL No. TAD-4**: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred. As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

evidence Moving Defendants are seeking to exclude.  To the degree that Moving Defendants have specific evidence in mind, and that they are simply choosing not to identify it at this time, the appropriate course is for them to object when that evidence is offered at trial, as opposed to seeking an unspecified adjudication in a vacuum.

But more importantly, the fact that Plaintiffs cannot recover for harm incurred outside Ohio does not mean that the impact of Defendants misconduct outside of Ohio is irrelevant or should be ignored.  Moving Defendants reference, by way of example, national studies on opioid abuse relied on by Plaintiffs' experts.  Dkt. #2668-1 at p. 9.  These studies are relevant to numerous issues, including providing the context and background with respect to the scope and nature of the opioid crisis.  This is a crisis which many Defendants are disputing actually exists.  Further, evidence of the national scope and nature of the crisis will be pertinent to any attempt by Defendants to blame the Plaintiffs for the harms by suggesting bellwether-specific failures are the cause of the harms.  Indeed, the Court has already rejected Defendants' arguments seeking to exclude Plaintiffs' causation and damage experts who analyze national and aggregate trends to create their models.  As Plaintiffs' expert reports make clear, and explained by Plaintiffs in their opposition briefs to Defendants' *Daubert* motions, national trends and statistics make Plaintiffs' analyses more reliable and relevant, and strengthen the reliability of the relationship between increased shipments of prescription opioids and increased harms. *See, e.g.,* Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶¶ 81-100 (explaining the most appropriate way to assess the relationship between shipments and mortality is based on regression-based comparisons across a robust sample of counties across the nation, not just one or two counties viewed in isolation); *see also* Dkt. #2000-6/#1999-6 (Gruber Expert Rep.) at ¶ 84, Fig. 1.18 (showing that in counties with the highest per capita shipments between 1997 and 2010, the prescription opioid mortality rate increased over 3.75 times more than it did in the counties with the lowest per capita shipments); *see also Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2017 WL 4748054, at *3 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018) ("[I]t seems axiomatic that the more data points that are available, the more reliable the ultimate damage calculation").  As such, information on the opioid crisis and its national scope is directly relevant to

1845586.1  107

both claims and defenses at issue in the litigation, and will greatly assist the jury in understanding the issues presented at trial. *See also supra* at § A.6.

> **5.** **Teva MIL No. TAD-5**: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties.

Moving Defendants also seek to exclude "evidence of marketing activity" where there is no showing that the marketing materials were distributed, published, or read in either County, as well as any evidence of shipments of opioids manufactured by Defendants that have no connection to Ohio. Moving Defendants' arguments regarding shipments outside of Ohio are addressed in Plaintiffs' response to Defendants' Omnibus MIL No. 6. *Supra* at § A.6. With respect to Moving Defendants' marketing arguments, the factual premise underpinning these arguments is false. The evidence in the record demonstrates that both Teva and Actavis engaged in nationwide marketing. There was no state-specific marketing, including state-specific marketing in Ohio, and any national marketing would have been used in all 50 states. *See, e.g.,* Dkt. #1962-26/#1978-06 (11/16/18 Hassler Dep.) at 275:12 – 276:17 (confirming that for Teva, Cephalon and Actavis, marketing, sales and advertising pieces were national in scope, in that "they are able to be used all over America," and that these materials were not tracked, such that defendants have no way showing that such materials were not used in Ohio); **Ex. 34** [Hassler Dep. Vol II] at 621:10-19 (testifying that Teva and Cephalon did not release materials that were specific to geographic areas for their marketing or educational messages, and that "[t]he messages were approved nationwide, and they would have been available and used in Ohio, just as they would have been in any other state in the country."); Dkt. #2177-5 (11/2/18 Snyder Dep.) at 271:5 – 272:3 (testifying that Kadian marketing materials were national in that the same marketing materials were provided and used by sales reps across the country).

Finally, Moving Defendants' constitutional argument—that it is unconstitutional to "project Ohio's regulatory regime into another state"—is simply misplaced. Dkt. #2668-1 at pp. 10-11. Plaintiffs are not seeking to project Ohio's regulatory regime into another state, nor are they seeking to "penalize" Moving Defendants for conduct outside of Ohio. Defendants' misconduct violated

not only Ohio law, but also federal law and the local laws of any non-Ohio jurisdiction within which the conduct occurred. As Plaintiffs will demonstrate at trial, the evidence in the record establishes that Moving Defendants have engaged in misconduct, and caused significant injury, within Plaintiffs' jurisdictions. But Plaintiffs are also entitled to introduce evidence showing the systemic nature of Moving Defendants' misconduct, and the degree to which this conduct caused a national opioid crisis that impacted the bellwether jurisdictions.

6.   <u>Teva MIL No. TAD-6</u>: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups.

Moving Defendants claim Plaintiffs should be precluded from offering evidence or argument of their funding of third-party trade groups because such conduct is protected by the First Amendment's right to freedom of association.[100] Not so. Plaintiffs are not arguing that Moving Defendants' mere participation in, and funding of, various trade and advocacy organizations, in and of themselves, subject them to liability. Rather, Plaintiffs allege, and will demonstrate at trial, that Moving Defendants worked together, through their trade associations and otherwise, (i) to unlawfully deceive and mislead the public, the medical community, and the government regarding the risks of their opioids and their purported efforts to prevent diversion, and (ii) to unlawfully avoid their legal duties to monitor for, report, and prevent shipment of suspicious orders of opioids. Evidence of Moving Defendants' participation and funding of these trade associations is relevant to demonstrate that they participated in this conspiracy with the intention of furthering this wrongful conduct. *See In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775, 803 (N.D. Ohio 2007)

---

[100] In their motion, Moving Defendants quote the following language from the Supreme Court: " 'The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.' " Dkt. #2668-1 at pp. 11-12 (quoting *McConnell v. Fed. Election Comm.*, 540 U.S. 93, 255 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm.*, 558 U.S. 310 (2010)). They fail to mention this language was taken from Justice Scalia's *dissent* in that case. *McConnell*, 540 U.S. at 247-48, 255. (In *McConnell*, Justice Scalia concurred in part and dissented in part, but the quoted language is in a section of his opinion in which he is criticizing the majority opinion. *Id.* at 250, 255-56.).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *Track One Cases* | Hon. Dan Aaron Polster |

**TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' REPLY IN
<u>SUPPORT OF THEIR OMNIBUS MOTION IN LIMINE</u>**

Plaintiffs intend to introduce the Cephalon Settlement to prove their clams, in violation of Rule 408.

### D. The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

Plaintiffs do not dispute that their experts do not cite to any studies regarding opioid-related harms that occurred *in* the Counties and instead rely on documents and studies examining *other* municipalities and states, or national studies with generalized conclusions that cannot be extrapolated to the Counties. Opp. at 107; *see also* Mot. at 8–9. Nor do Plaintiffs dispute that they plan to rely at trial on documents, statistics, and studies demonstrating harms that are *entirely outside* of Cuyahoga and Summit Counties as evidence of the "national scope and nature of the crisis" in order to prove their alleged injuries. *Id*. Instead, Plaintiffs appear to argue that they should be allowed to introduce such evidence because '[t]his is a crisis which many Defendants are disputing actually exists" and "Defendants [may] blame the Plaintiffs for the harms." *Id*.[4] But Plaintiffs do not cite to anything on the record to support those assertions. Moreover, those arguments make little sense and are simply a red herring.

At trial, the Counties can only recover for any harm that ***they*** incurred.[5] The Court has made abundantly clear that only harm to the Counties is at issue. Dkt. No. 2561, at 4-6 (denying summary judgment based upon alleged "increase in the supply of prescription opioids in the *Track One* Counties"). And Plaintiffs even concede in their Opposition that they "cannot recover for

---

[4] Plaintiffs rely on *Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14CIV2590VMJCF, 2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), but that case is neither controlling nor is it applicable as the issue there was valuation of a bank's assets for damages and did not consider whether damages of non-party banks should be included.

[5] 18 U.S.C. § 1964(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages from the underlying unlawful act, there can be no successful civil conspiracy action") (citation and quotation omitted); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (common law public nuisance claim requires injury to plaintiff).

harm incurred outside of Ohio." Opp. at 107. Accordingly, under Rules 402 and 403, only evidence of harm that Cuyahoga and Summit Counties experienced should be admitted in order for the Counties to prove their legally cognizable injuries and damages.

Plaintiffs do not and cannot dispute that the only alleged "crisis" at issue is what exists in the Counties. As a result, any opioid-related harm experienced by other counties in Ohio, or that occurred elsewhere in the United States, is irrelevant, would confuse the jury into associating harms outside of the Counties as harms to the Counties, and would be highly prejudicial to the Moving Defendants—indeed, the jury may wrongly believe that because other areas of the country have experienced significant opioid-related harm, so too must have Summit and Cuyahoga. Under Rules 402 and 403, this evidence should be excluded.

### E. The Court Should Exclude Evidence Of Marketing-Related Statements Or Opioid Shipments Outside Of The Counties (TAD-5).

Plaintiffs do not dispute that, as part of their false marketing claims, they must prove that the Moving Defendants made false marketing statements to physicians *in the Counties*, thereby causing those physicians to improperly write a medically inappropriate prescription that caused harm in the Counties.[6] Opp. at 108. Nor do Plaintiffs cite to any authority contrary to the common-sense argument that evidence of marketing activity by the Moving Defendants should be excluded where there is no showing those marketing materials were actually *distributed, published, or read in either County*. *Id*. The motion should be granted based upon these concessions alone.

Ignoring these points, Plaintiffs argue that because "[t]here was no state-specific marketing" and marketing materials might have been "approved nationwide" or were "able to be

---

[6]     Plaintiffs do not address the Moving Defendants' arguments regarding the inadmissibility of evidence of shipments outside of the Counties and instead refer to Plaintiffs' opposition to the Joint Motion in Limine. Opp. at 108. As explained in the Joint Reply, evidence of opioid shipments outside of the Counties is also inadmissible under Fed. R. Evid. 404(b). *See* Joint Reply at Section II(6).

used all over America," they should be introduced even if they were *never actually used in Cuyahoga or Summit counties*. *Id.* But marketing statements or materials (whether Ohio-specific or national) that were never actually disseminated to physicians in either of the Counties are irrelevant to proving the Counties' claims. Someone in the Counties must have actually received and been misled by those marketing materials. Introducing evidence of marketing materials where there is no showing they were ever used in the Counties would serve no other purpose than to mislead the jury into assuming that any allegedly false marketing material used elsewhere must have reached physicians in the Counties.

In addition, the Counties' attempt to penalize Moving Defendants under Ohio law, based on conduct outside of Ohio, is unconstitutional. Mot. at 9–11. Although Plaintiffs state they are not "seeking to 'penalize' Moving Defendants for conduct outside of Ohio," they fail to address how introducing evidence of marketing used elsewhere that has no ties to either of the Counties would not constitute an impermissible reliance on out-of-state conduct to satisfy Ohio state-law claims. Liability based on such evidence is unconstitutional and should be excluded. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Under Rules 402 and 403, such evidence is irrelevant, misleading, and prejudicial and should be excluded.

**F.** **The Court Should Exclude Evidence Regarding Moving Defendants' Financial Support of Third-Party Groups (TAD-6).**

Allowing Plaintiffs to introduce evidence of Moving Defendants' financial support of third-party groups would violate Moving Defendants' First Amendment rights. Plaintiffs' argument on this issue is unavailing.

Plaintiffs do not dispute that the First Amendment protects the activity of funding trade organizations. Opp. at 109. Even so, Plaintiffs argue that such evidence is relevant because they