# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE**

from offering lay opinion testimony about the alleged gateway from prescription opioids to illicit opioids.

### 5. The Court should preclude evidence concerning lobbying and other protected petitioning activity.

The First Amendment protects the right of citizens to petition the government. Allowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). And permitting jurors to hear such evidence makes it more likely that jurors will be confused and inappropriately conflate the defendants' constitutionally protected behavior with illegal actions. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403.

Lobbying and other efforts to influence government action are protected by the First Amendment. The *Noerr–Pennington* doctrine protects persons from liability for their speech and conduct in exercising their First Amendment right to petition the government. *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition"). The doctrine likewise extends to "publicity campaign[s] to influence governmental action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961), as well as to concerted action designed to influence the government, *see id.* at 135-36 (doctrine applies to "associating together in an attempt to persuade the legislature or executive to take particular action"); *Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment). The Sixth Circuit has explained that "[a]lthough the *Noerr-Pennington* doctrine

was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims . . . ." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007).

The "intent . . . of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*." *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012). That is true for both legislative and administrative lobbying. As to legislative lobbying, the First Amendment permits liability *only* where lobbying is "'not genuinely aimed at procuring favorable government action' at all." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (*quoting Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988)). This "sham exception" has nothing to do with whether the communication contains untruths or otherwise employed "improper means." *Id.* at 380. Rather, it applies only if the defendant does not genuinely seek the *result* it advocates. *See VIBO*, 669 F.3d at 686 (defendant files frivolous objections to the license application of a competitor solely to delay). The same general principles that immunize legislative lobbying apply to administrative lobbying. *See BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524-25 (2002).[13]

Plaintiffs do not contest that the defendants intended to procure favorable government action through their petitioning efforts. Evidence of such activity is accordingly inadmissible under *Noerr-Pennington*.

In accordance with Supreme Court precedent, plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy. *See Snyder v. Phelps*, 562 U.S. 443, 460 (2011) (holding that where allegedly tortious conduct is protected by the First Amendment, a

---

[13] Some courts have recognized a fraud exception to the *Noerr-Pennington* doctrine where knowing and willful misrepresentations are made to an agency, but only in the context of an *adjudicatory* proceeding. *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

plaintiff "cannot recover for civil conspiracy based on those torts").[14]  And the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984). A party may not circumvent *Noerr-Pennington* by asking questions "solely designed to create an inference which may be dispelled by disclosure of the protected activity."  *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257, 1278 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984).  Allowing such questioning would "gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a 'chilling effect' upon the exercise of First Amendment rights."  *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171.

The Court should therefore exclude evidence of lobbying activity under Rule 403, given that the likelihood of unfair prejudice and confusion substantially outweighs any probative value of the evidence.  Fed. R. Evid. 403; *Weit*, 641 F.2d at 467. Indeed, because of its inherent chilling effect and its likelihood to confuse jurors, evidence of lobbying activity is considered presumptively prejudicial.  *United States Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("[E]xclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case."); *see also Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978).  Cautionary instructions are insufficient to forestall confusion and unfair prejudice, as the *Noerr-Pennington* doctrine is complicated and difficult for lay jurors to fully comprehend in the context of complex litigation.  *Weit*, 641 F.2d at

---

[14] *See, e.g.*, Dkt. 2182 (Pls.' Consolidated Mem. in Opp. to Mot. for Summ. Judgment on Pls. Civil Conspiracy, RICO, and OCPA Claims) at 83, 86-87 (pointing to protected lobbying as evidence of existence of unlawful enterprise).

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or

evidence regarding defendants' lobbying activities.

> **6.**  **The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful

shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint

offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West

Virginia without identifying a connection between such shipments and the Track One

jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One

jurisdictions might be relevant because some of the pills in those shipments could have

"migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that

theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had

any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other

evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is

no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence

of allegedly wrongful shipments to other locations would constitute classic "other bad acts"

evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited

allowable purposes for such evidence, none are applicable here.  The allowable purposes

recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid.

404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy."  *Id.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

### PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

testify to the evolution of these reports during the course of his tenure, showing the transition from prescription opioids to illicit heroin/fentanyl, as stated in the records kept pursuant to statute. Supplementing his deposition testimony, Dr. Gilson's article shows that prescription opioid mortality peaked in 2011, and that there was an inflection point from that year forward, in which heroin deaths rose and surpassed the declining numbers of prescription opioid deaths in Cuyahoga County, followed by a fentanyl spike beginning in 2014. Dkt. #2197-29 at p. 43, Figure 1. Dr. Gilson's article cites a trend toward lower numbers of death cases of patients with an opioid prescription within the preceding year, suggesting the possibility that "addicts may be circumventing the previously *well-established progression route from OPR to illicit drugs like heroin and fentanyl*." *Id.* at p. 48 (emphasis added). This progression was "well-established" by the factual data evaluated by Dr. Gilson, as summarized above.

For these reasons, Defendants' Omnibus MIL No. 4 should be denied as to Dr. Gilson, and denied as moot as to Mr. Craig and Mr. Martin.

5. **Defendants' Omnibus MIL No. 5:** **The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

As a preliminary matter, Plaintiffs dispute the underlying premise of Defendants' argument in support of this MIL (*i.e.*, that the lobbying and petitioning activities at issue in this case are constitutionally protected). It is well-established that neither the First Amendment nor the *Noerr-Pennington* doctrine immunizes fraud.[22] Regardless, Plaintiffs have clearly stated that they are not

---

[22] *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 606, 612 (2003); *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513-15 (1972); *Wise v. Zwicker & Associates, P.C.*, 780 F.3d 710, 719 n.5 (6th Cir. 2015); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986). Defendants claim the fraud exception to *Noerr-Pennington* applies only in the context of an adjudicatory proceeding (Dkt. #2661 at p. 14 n.13). But at least some of Defendants' fraudulent communications with the government were made in an adjudicatory context, such as during enforcement-related proceedings or rulemakings. Additionally, the DEA's quota-setting process is unquestionably adjudicatory in nature, as it conducts public hearings, accepts evidence and argument from interested parties, makes findings of fact and conclusions of law, and its actions are guided by enforceable standards subject to review (21 C.F.R. §§ 1303.11 – 1303.13, 1303.31 – 1303.37, 1316.41 – 1316.68; 5 U.S.C. §§ 551-559; 21 U.S.C. §§ 826, 877). *Cf. Kottle v. N.W. Kidney Centers*, 146 F.3d 1056, 1062 (9th Cir. 1998) ("The CON determination by the Department [of Health] bears many indicia of a true adjudicatory proceeding. The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses. The Department must

attempting "to impose liability upon the Defendants for their lobbying or petitioning activities, nor do [they] argue that these activities were unlawful conduct." Dkt. #2090-1 at p. 3; Dkt. #2562 at p. 6 n.7. Thus, the question of whether or not these activities are constitutionally protected need not be decided here.[23]

Even assuming, *arguendo*, that Defendants' lobbying and petitioning conduct is constitutionally protected such that those activities could not directly give rise to liability, this does not mean evidence of that conduct is inadmissible at trial. Far from it. Rather, the United States Supreme Court, and courts throughout the country, have recognized that such evidence is still relevant and admissible to show the purpose and character of Defendants' wrongful activities. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."); *In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010) ("*Welding Fume II*") (noting that it previously declined to

---

issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case."); *DeLoach v. Philip Morris Companies, Inc.*, 1:00CV01235, 2001 WL 1301221, at *12 (M.D.N.C. July 24, 2001) (no *Noerr-Pennington* immunity for defendants who intentionally submitted false purchase intentions to the USDA that resulted in lower annual tobacco quotas).

[23] Although Plaintiffs are not seeking to impose liability on Defendants for their petitioning conduct, Plaintiffs do not waive any argument they may have at trial that certain petitioning conduct of Defendants is not constitutionally protected under the First Amendment or the *Noerr-Pennington* doctrine. Plaintiffs also do not concede that the *Noerr-Pennington* doctrine applies outside the antitrust context. Although the Sixth Circuit recognizes that other federal courts have applied the doctrine to common law claims, it has not yet definitively resolved the issue. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (acknowledging other federal courts have applied *Noerr-Pennington* to common law claims, but stating that it "need not decide that issue here because the Workers failed to state such a claim"); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) ("Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine.").

issue a pretrial, blanket ruling excluding all evidence of the defendants' lobbying activities, and in fact had "admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contain[ed] statements directly relevant to issues central to every *Welding Fume* case").[24]  For example, such evidence demonstrates

---

[24] *See also Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136-39 (10th Cir. 2002) (district court did not abuse its discretion admitting evidence of defendant's misleading statements to Oklahoma Corporation Commission where offered "for the proper purpose of supporting the claim that [the defendant] acted for an improper monopolistic purpose"); *Alexander v. Natl. Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982) ("Exempt conduct may be considered, however, to the extent it tends to show the 'purpose or character' of other, nonexempt activity.  Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative.  While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.") (internal citations omitted); *Cipollone v. Liggett Group, Inc.*, 668 F. Supp. 408, 410-11 (D.N.J. 1987); *Gillis v. Murphy-Brown, LLC*, 7:14-CV-185-BR, 2018 WL 5928010, at *1 (E.D.N.C. Nov. 13, 2018) (noting that the *Noerr-Pennington* doctrine does not operate "in the manner in which defendant seeks to do here—[to] bar otherwise admissible evidence in a state law private nuisance lawsuit"); *In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) ("The Court disagrees that the *Noerr-Pennington* doctrine is applicable.  Nolte does not seek to hold AbbVie *liable* for its alleged petitioning activity; he intends to offer evidence of that activity to demonstrate AbbVie's motive or intent.  There is no general rule that evidence of activity that is protected by the First Amendment—speech, for example—is inadmissible.") (internal citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *15 n.4 (N.D. Cal. Oct. 30, 2017) ("The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. . . .  Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful.  Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2015 WL 8130449, at *1-2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Community Action League v. City of Palmdale*, CV 11-4817 ODW VBKX, 2012 WL 10647285, at *8 (C.D. Cal. Feb. 1, 2012); *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled the exclusion of evidence of two citizen's petitions one defendant submitted to the FDA and noting that the petitions were "relevant to defendants' knowledge regarding the safety of ibuprofen and the adequacy of its labeling"); *Adams v. U.S.*, 03-0049-E-BLW, 2009 WL 1259019, at *2 (D. Idaho May 3, 2009) (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington* because, among other things, such evidence was "relevant to plaintiffs' claims of misbranding and failure to warn, and shows the state of [the defendant's] knowledge which is relevant to many claims"); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, CV 00-1693-PA, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) ("[E]ven if the state lands transaction could not itself have been a basis for liability [under *Noerr-Pennington*], evidence regarding that transaction would likely have been admissible for other purposes, such as showing market share, the extent of any log sources available to competitors, the scope of the relevant market or markets, the manner in which Weyerhaeuser allegedly obtained and maintained its monopoly, the company's motives and intent, and to impeach credibility").

Defendants' knowledge and intent to participate in a RICO enterprise.[25]  For these reasons, courts regularly deny motions *in limine* seeking to preclude evidence of lobbying and petitioning activities.[26]

Moreover, evidence of Defendants' lobbying activities will be particularly probative in this case since Defendants, as they have already indicated, plan to argue that the DEA did not do enough to enforce the law.  Plaintiffs are entitled to rebut this argument with evidence that, for example, Defendants and their trade association (i) lobbied to limit the DEA's enforcement authority, and (ii) influenced their Congressional allies to criticize the DEA in order to undermine the agency's authority and effectiveness.

Defendants' cases do not support granting their *limine* request.  First, they cite *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), for the proposition that "[a]llowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right."  Dkt. #2661 at p. 13.  In *Octane*, which involved the appropriateness of an attorney's fee

---

[25]  *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) ("Plaintiffs are not asserting that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*."); *Nat.-Immunogenics Corp. v. Newport Tr. Group*, SACV1502034JVSJCGX, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) ("While the evidence may ultimately be inadmissible under the Noerr-Pennington doctrine as a basis for liability, it may be admissible for some other purpose such as to show intent to participate in a RICO enterprise, in which case Noerr-Pennington would not be a bar to admissibility.").

[26]  *See, e.g., Welding Fume II*, 2010 WL 7699456, at *93; *In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (denying defendants' motion *in limine* to exclude lobbying evidence; "[T]he plaintiff seeks to offer evidence about how the defendants attempted to influence, petition, or communicate with Congress and/or the FDA to show their knowledge, state of mind, or intent.  It would be a stretch to say that Noerr-Pennington bars any use of any evidence of the defendants' petitioning of the government, and its agencies, or evidence of any communications with the FDA."); *Cipollone*, 668 F. Supp. at 410-11 (denying defendants' motion *in limine* to exclude evidence that defendants provided false and misleading information to Congress; court deferred decision of "whether the specific evidence to be offered is probative of a continuing course of conduct that corroborates plaintiff's direct allegations" until trial so that it could be "decided in context"); *Testosterone*, 2018 WL 305503, at *10 (denying defendant's motion *in limine* to exclude all evidence of defendant's lobbying efforts with the FDA); *Gen. Motors*, 2015 WL 8130449, at *1-2 (denying defendants' motion *in limine* to exclude evidence that it intentionally misled or concealed information from, or tried to influence, NHTSA); *Wolfe*, 2012 WL 38694, at *6 (denying defendants' motion *in limine* to exclude citizen's petitions submitted to the FDA); *Adams*, 2009 WL 1259019, at *2 (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington*).

award in a patent litigation case, the Supreme Court briefly discussed the *Noerr-Pennington* doctrine because the plaintiff had attempted (unsuccessfully) to analogize the standard for baseless litigation under that doctrine with the standard applicable under the Patent Act. 572 U.S. at 548, 555-56. The Court noted that it had "crafted the *Noerr-Pennington* doctrine . . . to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Id.* at 556. The case has absolutely nothing to do with the admissibility of petitioning-related evidence.

Defendants then cite *Snyder v. Phelps*, 562 U.S. 443 (2011), to support their argument that "plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy." Dkt. #2661 at pp. 14-15. But *Snyder* is entirely distinguishable. In that case, the plaintiff asserted various tort claims, including civil conspiracy, against the Westboro Baptist Church and some of its members based on their picketing of a military funeral. 562 U.S. at 447. At trial, the jury found in favor of the plaintiff. *Id.* The Supreme Court affirmed the reversal of the jury's verdict, holding that "the First Amendment shield[ed] the church members from tort liability for their speech in th[at] case." *Id.* at 447, 451-60.[27] Significantly, the defendants' picketing formed the *entire basis* for the plaintiff's tort claims in that case. *Id.* at 447.[28] Because the underlying torts upon which the alleged conspiracy was based failed, the civil conspiracy claim also failed. *Id.* at 460. This case does not address the admissibility of lobbying or petitioning evidence.[29]

---

[27] Notably, the Supreme Court noted that none of the defendants' statements were "provably false[.]" *Id.* at 451. And it also emphasized that its holding was "narrow." *Id.* at 460 ("We are required in First Amendment cases to carefully review the record, and *the reach of our opinion here is limited by the particular facts before us*.") (emphasis added).

[28] In the present case, to the contrary, Plaintiffs' claims are based on Defendants' (i) unlawful marketing and distribution of opioids through fraud and misrepresentation, and (ii) unlawful failure to prevent diversion and failure to monitor for, report, and prevent shipment of suspicious orders of opioids. It is the entirety of that wrongful conduct that forms the basis of Plaintiffs' civil conspiracy claims. *See, e.g., Taylor v. AirCo, Inc.*, CV 02-30014-MAP, 2003 WL 27382684, at *16 n.8 (D. Mass. Aug. 4, 2003) (rejecting defendants' argument that they were immune from liability based on their lobbying efforts under *Noerr-Pennington*; "Plaintiffs do not seek to have liability imposed solely on the basis of lobbying efforts. Rather, Plaintiffs allege 'a continuing course of deceptive conduct of which this activity was just one small part.' "), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003).

[29] Nor does this case address the *Noerr-Pennington* doctrine at all.

Defendants also claim "the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct[,]" citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157 (6th Cir. 1984) ("*Cleveland II*") and *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257 (N.D. Ohio 1980) ("*Cleveland I*"). Dkt. #2661 at p. 15. Of course neither of these opinions, which arise from the same *antitrust* case,[30] addresses the admissibility of petitioning evidence in cases involving nuisance, RICO, OPCA, or common-law conspiracy claims. Moreover, neither case even stands for the proposition that such evidence is *per se* inadmissible in antitrust cases.

In *Cleveland I*, the City of Cleveland brought an antitrust suit against an electric utility. 538 F. Supp. 1257. There were two trials, the first of which ended in a hung jury. *Cleveland II*, 734 F.2d at 1160. Prior to the second trial, the defendant sought to preclude the plaintiff from "enter[ing] upon a [specific] course of inquiry" in its examination of the "defendant's general attorney, the *sole purpose* of which [wa]s to elicit testimony" that would trigger the introduction of certain *Noerr-Pennington*-protected evidence that the court had *already determined* should be excluded based on the first trial. *Cleveland I*, 538 F. Supp. at 1278 (emphasis added). After noting that the protected conduct of which the plaintiff was seeking to introduce evidence was not relevant to the plaintiff's claims,[31] the court precluded the plaintiff from initiating that course of inquiry unless the defendant opened the door.[32] In other words, the court analyzed specific pieces of evidence of the defendant's *Noerr-Pennington*

---

[30]    It is well established that, subject to certain exceptions, petitioning conduct, even if undertaken for anti-competitive purposes, is not sanctionable *under the Sherman Act*. *See Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

[31]    *Id.* at 1279 ("In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit *which, the City concedes, did not actually affect the construction of the 69KV intertie*, the plaintiff may not inquire as to activity undertaken by CEI which was merely 'designed' to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection.") (emphasis added).

[32]    *Id.* at 1279 ("Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of Noerr-Pennington conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may 'open the door' for the introduction of such conduct, as occurred during the first trial.").

protected conduct, determined that this evidence should be excluded, and then prohibited the plaintiff from questioning a witness in its case-in-chief with the sole purpose of triggering the introduction of the previously-excluded evidence. Contrary to Defendants' assertions otherwise, *Cleveland I* does not support granting Defendants' overly-broad MIL No. 5. In fact, that court explicitly stated that determinations as to the admissibility of petitioning-related evidence *should be deferred until trial*:

> [T]he weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the Noerr-Pennington doctrine, are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

*Id.* at 1265 (internal citations omitted).[33]

Defendants cite *Cleveland II* as affirming the *Cleveland I* decision (Dkt. #2661 at p. 15), but in actuality *Cleveland II* affirmed the district court's judgment on the jury's defense verdict from the second trial. 734 F.2d at 1160, 1169.[34] The plaintiff appealed, arguing, among other things, that the trial judge erred by refusing to admit into evidence information regarding the defendant's secret sponsorship of a lawsuit challenging an order by the Federal Power Commission requiring the defendant to interconnect with the plaintiff's utility company. *Id.* at 1161-62. The plaintiff claimed the evidence demonstrated the defendant's "anticompetitive intent to exclude [the plaintiff's utility

---

[33] The court also recognized that courts are "vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine." *Id.* at 1277.

[34] Defendants also purport to quote certain language from *Cleveland II* in their motion, implying that this was a direct quote by the Sixth Circuit's majority opinion. Dkt. #2661 at p. 15 ("Allowing such questioning would 'gut the constitutional protection afforded under the Noerr-Pennington doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.' *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171."). In fact, this is a direct quote from the district court in *Cleveland I* (538 F. Supp. at 1279), which is then re-quoted in a parenthetical to a citation to *Cleveland I* in the *dissent* to *Cleveland II*. 734 F.2d at 1171.

company] from the retail electric power market." *Id.* at 1161. The district court ruled that the evidence was "inadmissible on the basis of the *Noerr-Pennington* Doctrine." *Id.* at 1161-62. The Sixth Circuit held that the district court had not abused its discretion in excluding the evidence because the conduct was "not the kind of antitrust activity that is admissible to prove a Sherman Act violation" and the plaintiff's purpose in introducing the evidence "was to show the anticompetitive character and nature of [the defendant's] conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers[,]" which was "not an admissible basis for its introduction[.]" *Id.* at 1162-63. The court further noted that the evidence was cumulative because the defendant had already admitted at trial that its objective was "to reduce and *eliminate* competition with its competitor" and the plaintiff had introduced considerable other evidence of the defendant's anti-competitive conduct. *Id.* at 1164. Thus, *Cleveland II,* similar to *Cleveland I,* simply reiterates that the balancing test for whether a particular piece of petitioning-related evidence is admissible requires a fact-specific inquiry that should be deferred until trial.

Defendants' Rule 403 arguments are also without merit. They claim that "evidence of lobbying activity is considered presumptively prejudicial." Dkt. #2661 at p. 15. But the cases they cite for this proposition—all of which, not surprisingly, arise in the antitrust context—are entirely distinguishable. In *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986) ("*U.S. Football I*"), the plaintiffs brought various antitrust claims against the NFL. *Id.* at 1158. The NFL sought summary judgment on certain of these claims that related to the NFL's actions "directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities." *Id.* at 1176. The NFL argued that the stadium-related claims were barred under the *Noerr-Pennington* doctrine because the conduct at issue almost entirely consisted of the NFL's lobbying of state and local governments on issues related to stadium lease approvals. *Id.* at 1177-78. The court held that such conduct could not "give rise to liability under the federal antitrust laws." *Id.* at 1180. It recognized, however, that evidence of stadium-related conduct could potentially be "probative of the 'purpose and character' of the transactions" that formed the basis of some of the

plaintiffs' other claims. *Id.* at 1180 (quoting *Pennington*, 381 U.S. at 670 n.3). And it expressly acknowledged that the admissibility of this evidence should be determined *during the trial*: "Since the admissibility or exclusion of such 'purpose or character' evidence will be within this Court's discretion at trial, *it would be premature to rule on such matters at this time*." *Id.* (internal citation omitted) (emphasis added). Despite this acknowledgement, the court proceeded *in dicta* to make some "preliminary observations" regarding the potential admissibility of such evidence at trial. *Id.* The court emphasized the need to weigh the probative value of the evidence against the risk of undue prejudice. *Id.* at 1180-81. The court noted that the evidence was largely irrelevant to the plaintiffs' remaining claims and had significant evidentiary problems, including that most of it was hearsay. *Id.* at 1181 & n.13. It was during this *dicta* analysis that the court stated: "Given such risks, the exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception *in an antitrust case*." *Id.* at 1181 (emphasis added).[35] But even if the present case was an antitrust case (which it is not), and even if the 33-year-old *dicta* of a district court outside this circuit was binding on this Court (which it is not), *U.S. Football I* does not support granting Defendants' *limine* request. To the contrary, it *reaffirms* Plaintiffs' argument that such determinations should be deferred until trial, where the Court will have the benefit of a developed record in order to analyze whether a specific piece of lobbying-related evidence is admissible. 634 F. Supp. at 1180.

---

[35]   In their motion, Defendants cite *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988) ("*U.S. Football II*") as affirming the district court's *U.S. Football I* opinion. Dkt. #2661 at p. 15. In actuality, the Second Circuit's opinion affirmed the district court's denial of the plaintiffs' *post-trial* motions which dealt with issues that arose *during* the trial. *Id.* at 1340-41. In fact, the appellate court noted that the district court's summary judgment ruling "in favor of the NFL on the USFL's stadium-related claims on *Noerr-Pennington* grounds" had "not been appealed." *Id.* at 1350 n.13. The Second Circuit acknowledged that the district judge actually admitted some lobbying evidence at trial, but also held that he had not abused his discretion in excluding certain other lobbying evidence during the trial based on the specific circumstances of that case. *Id.* at 1373-75. Notably, the appellate court did not state that such evidence was "presumptively prejudicial"; rather, it acknowledged that lobbying evidence "may be admitted . . . 'if it tends reasonably to show the purpose and character of the particular transactions under scrutiny,' and that evidence is more probative than prejudicial." *Id.* at 1374 (internal citation omitted); *see also id.* ("Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence.").

In *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), which is also an antitrust case, the court never said lobbying/petitioning evidence is "presumptively prejudicial." Rather, in determining whether the district court properly granted summary judgment on one of the plaintiff's antitrust claims, the Fifth Circuit acknowledged that "[e]vidence of activity that is protected by the Noerr doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defendants." *Id.* at 543 n.7. The court determined that a specific piece of petitioning evidence was inadmissible in that case because "[i]ts evidentiary value to the plaintiff [wa]s far outweighed by the defendants' first amendment interests." *Id.* Specifically, the court found that "the probative value of this evidence [wa]s low" because "[a]s evidence of the alleged conspiracy it [wa]s cumulative" and "[a]s evidence of [the defendant's] state of mind it [wa]s exceedingly weak[.]" *Id.* As with *U.S. Football I*, this case does not support the granting of Defendants' broad *limine* request; rather, it reaffirms that the admissibility of lobbying evidence is a fact-specific inquiry that is best reserved for trial.

Finally, *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) is yet another antitrust case in which the appellate court analyzed whether the district court erroneously declined to consider evidence of the defendants' lobbying activities when deciding whether to grant the defendants' summary judgment motion. *Id.* at 458, 466-67. In *Weit*, the plaintiffs alleged that the defendant banks "conspired to fix the interest rate paid by consumer credit cardholders on extended payments[.]" *Id.* at 548. After *eight years* of discovery, the plaintiffs "failed to produce any significant probative evidence to support the[ir] complaint[,]" leading the district court to grant summary judgment in favor of the defendants. *Id.* On appeal, the plaintiffs argued, among other things, that the district court erred by not considering evidence of the defendants' lobbying efforts to influence the passage of a bill in the legislature that would allow the banks to charge an increased interest rate. *Id.* at 461, 466-67. The district court did not exclude that evidence because the conduct was immunized from antitrust liability under *Noerr-Pennington*, but rather because "the prejudicial quality of this evidence outweighed its probative value." *Id.* at 466. The Seventh Circuit held that the district court "correctly excluded this evidence from consideration on

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id.* *See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil … Rules."  Those standards are not satisfied here, either substantively or procedurally.

If plaintiffs had disclosed Dr. Gilson as an expert, full disclosure would have been required of his analysis and all supporting data.  Defendants would have had the opportunity to conduct an expert deposition, produce a responsive expert, and challenge Gilson's conclusions under *Daubert*.[14]  Plaintiffs cannot "evade the expert witness disclosure requirements … by simply calling an expert witness in the guise of a layperson."  Rule 701 Notes of the Advisory Committee.  Dr. Gilson's testimony about the "gateway theory," like those of plaintiffs' other lay witnesses who purport to have opinions on that subject, should be excluded.

### 5.    The Court should preclude evidence concerning lobbying and other protected petitioning activity.

Allowing plaintiffs to introduce evidence of defendants' lobbying efforts or other petitioning activity would violate defendants' First Amendment rights.  None of plaintiffs' arguments on this issue have merit.

*First*, plaintiffs are wrong to suggest that the *Noerr-Pennington* doctrine is limited to the antitrust context.  Pl. Opp. at 22 n.23.  As decisions of both the Sixth Circuit and numerous other courts of appeals make clear, *Noerr-Pennington* broadly applies "to claims brought under both state and federal laws, including common law claims."  *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (holding that the First Amendment bars suits seeking to impose liability on petitioning

---

[14] To survive *Daubert*, plaintiffs would have had the burden of defending, among other things, Gilson's admitted lack of expertise on the kind of statistical analysis he purported to perform, as well as his highly skewed sample, the limitations of the OARRS database, and his failure to consider control or other variables.  The OARRS data set that Gilson used, which was critical to his conclusions, was not even produced, and no expert has had an opportunity to evaluate its reliability or limitations.

in the civil rights context).[15]  Accordingly, the *Noerr-Pennington* doctrine precludes plaintiffs

from introducing evidence of such petitioning activity to establish liability.

     *Second*, plaintiffs' invocation of *Noerr-Pennington*'s "sham" exception, and their

assertion that the *Noerr-Pennington* doctrine does not "immunize[] fraud," are unavailing.

While defendants dispute plaintiffs' allegation that their petitioning activity was fraudulent, that

is not relevant under the *Noerr-Pennington* doctrine, which applies irrespective of a party's

motive or intent in petitioning the government.  *See City of Columbia v. Omni Outdoor Advert.,*

*Inc.*, 499 U.S. 365, 380 (1991) (holding that even if defendants lobbied for improper motives or

used "improper means" in seeking "favorable government action," the First Amendment protects

that petitioning); *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012) (The "intent … of

private actors seeking government action is irrelevant to the application of *Noerr-Pennington*.").

Rather, the "sham" exception applies only where a defendants' petitioning activity was not

actually intended to achieve favorable government action, but was instead a pretext for achieving

some other improper end – for example, blocking a competitor's access to the courts.  *See, e.g.,*

*Cal. Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972) (*Noerr-Pennington* "sham"

exception applied where judicial and administrative proceedings were brought to "harass and

deter" the plaintiffs so as to deny them "'free and unlimited access' to those tribunals," rather

---

[15] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("[T]he *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr–Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.")

than to influence government action in favor of defendants).[16]  The First Amendment protects evidence of the petitioning activity that plaintiffs seek to introduce here.

*Third*, plaintiffs' Opposition makes clear that they intend to use evidence of defendants' protected lobbying and other petitioning activities to establish liability – a result the First Amendment forbids.  Plaintiffs suggest that evidence of defendants' petitioning activity may be "relevant and admissible to show the purpose and character of defendants' wrongful activities." Pl. Opp. at 21-22 (citing *Pennington*).  As an initial matter, this argument makes no sense; the "purpose and character" of defendants' marketing or suspicious order monitoring programs can be assessed without reference to any lobbying conduct.

Plaintiffs' suggestion that evidence of lobbying can be used to show "knowledge and intent to participate in a RICO enterprise," Pl. Opp. at 23-24, only proves that they want to use protected activity to prove an essential element of their claim – a result the Constitution forbids. *See Cal. Motor Transport Co.*, 404 U.S. at 510–11 ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a -vis their competitors.").[17]  In *Pennington*, the Supreme Court noted that evidence

---

[16]  As defendants pointed out in their initial Motion, Dkt. 2661 at 14 n.13, some courts have recognized a narrow fraud exception to the *Noerr-Pennington* doctrine where a defendant makes knowing and willful misrepresentations to an agency, but *only* in the context of an *adjudicatory* proceeding.  *See Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

[17]  To the extent plaintiffs suggest that evidence of lobbying can be used to show the "purpose" or "character" of that lobbying, evidence of protected petitioning activity may be introduced only to show the "purpose" or "character" of conduct *that is not itself protected by the First Amendment*. *See, e.g.*, *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984) (rejecting plaintiff's argument that it could introduce petitioning-related evidence to show

of petitioning activity might be admissible *if otherwise* "probative and not unduly prejudicial" on a disputed issue *other* than liability purportedly arising from the protected activity. But *Pennington* is clear that First Amendment petitioning activity may not be used, as plaintiffs seek to do here, as a basis for imposing liability. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 671 n.3 (1965) (petitioning activity is "barred from forming the basis for a suit").[18]

*In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 (N.D. Ohio June 4, 2010), which plaintiffs cite, illustrates the point. There, the defendants' lobbying materials were admitted, not to show that lobbying was evidence of any wrongdoing, but instead because the materials contained admissions showing the defendants knew of adverse medical effects of their products. *Id.* at *93. Indeed, the court admonished the plaintiffs that they "may not suggest to the jury that defendants were engaged in any improper activity by lobbying." *Id.*; *see also Pennington*, 381 U.S. at 671 (reversing trial court instruction that lobbying activity could be considered for "whatever bearing it may have on the overall picture"). The other cases cited by plaintiffs are no different.[19] In short, plaintiffs' attempt to rely on protected petitioning activity

---

the "'purpose' or the 'character' of [defendant's] action" because the underlying conduct itself was shielded).

[18] The two district court decisions cited by plaintiffs – *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) and *Nat.-Immunogenics Corp. v. Newport Tr. Group*, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) – do not call into question either the Supreme Court's clear directive that protected activity cannot form the basis for liability or the multiple appellate decisions affirming dismissal of RICO claims based on the *Noerr-Pennington* doctrine. *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d at 942 (affirming dismissal of RICO claim that relied on evidence protected by *Noerr-Pennington*); *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135 (same); *see also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund*, 196 F.3d at 826 (protected lobbying activity "cannot be a source of [RICO] liability directly under the *Noerr–Pennington* doctrine").

[19] *See, e.g.*, *Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136–37 (10th Cir. 2002) (evidence held admissible because it was not offered for the "improper purpose of showing that [defendant] violated antitrust laws"); *Alexander v. Nat'l Farmers Org.*, 687 F.2d

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct. Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67. The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties. Shipments made elsewhere, even if wrongful, are otherwise irrelevant. Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17. Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24. Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence. Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal." *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).