UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) | No. 1:17-md-2804 |
| | | Judge Dan A. Polster |
| This Document Relates To: *ALL CASES* | ) ) ) ) ) | |

**PLAINTIFFS' MOTION FOR SANCTIONS
AGAINST THE ALLERGAN AND TEVA DEFENDANTS**

4811-5623-1881.v2

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | FACTUAL AND PROCEDURAL BACKGROUND | | 2 |
| III. | ARGUMENT | | 7 |
|  | A. | The Newly Produced Cegedim Audit Report Supports that Multiple Allergan Entities Knowingly Maintained Insufficient SOM Protocols | 7 |
|  | B. | Despite Plaintiffs' Repeated Requests, and Numerous Discovery Rulings Requiring the Production of Audit Reports, the Audit Report Was Never Produced in CT1 | 9 |
|  | C. | Defendants Made Arguments Contradicting the Report's Findings at Summary Judgment, Settled CT1 Without Producing It, and Now Refuse to Produce Additional Documents in New Case Tracks | 10 |
|  | D. | Sanctions Should Be Issued | 12 |
| IV. | CONCLUSION | | 13 |

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Doe v. Lexington-Fayette Urban Cnty. Gov't*,
 407 F.3d 755 (6th Cir. 2005) ....................................................................................... 6, 12

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982) ........................................................................................................ 7

**STATUTES, RULES AND REGULATIONS**

21 U.S.C. §801 *et seq.* .............................................................................................................. 5, 7

Federal Rules of Civil Procedure
 Rule 37 .......................................................................................................................... 1, 6
 Rule 37(b)(2)(A) .............................................................................................................. 6

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 37, Plaintiffs hereby move this Court for an order of sanctions against the Allergan[1] and Teva[2] Defendants for willful suppression of evidence in violation of their discovery obligations. In Case Track One ("CT1"), Allergan completely failed to produce a critical audit report issued to Watson Pharmaceuticals, Inc. ("Watson," now Allergan Finance, LLC) by Cegedim (formerly known as Cegidim Dendrite and now known as IQVIA), assessing and finding wholly inadequate Watson's Suspicious Order Monitoring ("SOM") system. Ex. 1.[3] Teva, too, failed to produce the document in CT1 despite the fact that, according to Allergan, "most of [the] documents" relating to the business "were transferred to Teva" at the time Teva purchased Allergan's generic business. *See* ECF No. 989 (Discovery Ruling No. 4) ("DR 4"). Plaintiffs received the report for the first time on August 21, 2020, from IQVIA. Allergan's and Teva's combined failure to produce the Cegedim audit report, in the face of explicit Court rulings to produce such SOM system audits, constitutes a clear violation of their discovery obligations.

---

[1] The current Allergan Defendants are Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Allergan plc f/k/a Actavis plc f/k/a Allergan, Inc.; Allergan Sales, LLC; and Allergan USA, Inc.

[2] The Teva Defendants are Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Watson Laboratories, Inc.; Warner Chilcott Company, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City; and Actavis Laboratories FL, Inc. f/k/a Watson Laboratories, Inc.-Florida.

[3] References to "Ex." are to the exhibits attached to the Declaration of Evan M. Janush in Support of Plaintiffs' Motion for Sanctions Against the Allergan and Teva Defendants, filed concurrently herewith.

4811-5623-1881.v2

The report at issue is obviously critically relevant to the question of whether Watson had a legally compliant SOM system during the relevant time period.[4] But it is significant for another reason as well. As this Court is aware, Allergan has repeatedly taken the position that it has no generic opioid liability in this case due to the fact that it sold certain of its generic drug businesses to Teva in 2016.[5] As established by the newly produced document, Allergan's SOM program (for all its brand name and generic opioids) was managed by Watson at a top corporate level, not by the Watson subsidiaries that manufactured opioids. The Watson entity (now known as Allergan Finance, LLC) is one of the Allergan Defendants and was never sold to Teva. Allergan Finance, LLC remains within the Allergan family, remains a Defendant in this action, and remains liable for the SOM deficiencies identified in this document produced for the first time by IQVIA just days ago.

Defendants' failure to produce the report meant it was not available for use during the discovery process, including during fact and expert depositions intended to be taken for all the MDL cases. The report also was not available for the "CT1" motions for summary judgment and other pretrial motions and for settlement. Accordingly, Plaintiffs request that the Court impose and issue discovery sanctions against Defendants for their failure to produce this essential report.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Cegedim report at issue concerns the Allergan Defendants' SOM protocols in place in 2011. At that time, the parent Defendant entity was known as Watson Pharmaceuticals, Inc., a large U.S.-domiciled producer of generic prescription opioid drugs and the brand-name opioid Norco, a widely abused hydrocodone product. A subsequent merger frenzy in the pharmaceuticals industry

---

[4] As Special Master Cohen recognized, similar reports contained "a thorough analysis of [defendants'] Suspicious Order Monitoring System and recommendations on 'corrective actions' that can make [defendants] more 'compliant' with government requirements." ECF No. 1498 at 1 (Discovery Ruling 14, Part 5) ("DR 14-5").

[5] *See, e.g.*, ECF No. 1901-1 at 5 (arguing that Allergan "cannot be held liable for the alleged actions" of the entities it sold to Teva).

saw Watson purchase multiple other companies, change its name twice, adopt an Irish "plc" holding company as a parent, and sell off its vast generic opioid prescription drug lines to Teva.[6] The Watson Pharmaceuticals, Inc. entity is now known as Allergan Finance, LLC, and its parent company is Allergan plc.

In September 2011, Watson hired Cegedim to review its SOM system. The resulting audit report was a damning account of Watson's SOM system. Among other things, it detailed how and why the system utterly failed to meet specific DEA standards, did not integrate available "downstream data," and regularly allowed orders from Watson's largest customers, including distributors McKesson and AmerisourceBergen, to bypass review altogether. Ex. 1. Cegedim not only found the system was "inconsistent with the specific requirements noted in the regulations and with written guidance provided by the DEA to all registrants," it found specific failures made the system "'self-gaming'" and potentially "contributing to drug abuse." *Id*. at 877, 879, 891.

Numerous Watson employees were aware of the audit. As discussed below, 13 Watson employees met with Cegedim in connection with the audit. Cegedim sent the completed audit report to at least two Watson employees and had numerous follow-on discussions with them. After receiving the report, Watson engaged Cegedim to replace its failed SOM system, stating it would use the audit report as the "[f]oundation" for the new system. Ex. 2 at 988. This planned upgrade was later canceled, however, leaving the non-compliant system in place. Ex. 3 at 323:5-324:22. The

---

[6] In 2012, Watson purchased the privately held Swiss company Actavis Group, which also made generic prescription opioid drugs and the brand-name opioid Kadian. The combined company, then among the largest generic opioid makers on the planet, called itself Actavis, Inc. but adopted the Watson SOM system. Actavis, Inc. acquired an Irish company, Warner Chilcott plc, and created an Irish company named Actavis plc to effectuate the merger and to reduce its U.S. corporate tax liability. Actavis, Inc. became known as Allergan Finance, LLC. In simpler terms, and as acknowledged in Allergan counsel's signature blocks, Allergan Finance, LLC is formerly known as Actavis, Inc. and Watson Pharmaceuticals, Inc.; the three names all relate to only one entity, the same entity that commissioned the 2011 Cegedim audit report.

system remained in place through Watson's mergers with Actavis and Allergan and was only shut down when the Allergan conglomerate offloaded its generic opioids to Teva in 2016.

As detailed below, after learning of the audit report's existence, Plaintiffs repeatedly and specifically asked Allergan's counsel, Kirkland & Ellis LLP, to produce it.  The audit report was never produced.  In connection with DR 14-5, which required the production of a similar SOM report pertaining to Cardinal Health, Special Master Cohen made very clear that ***all Defendants*** (not just Cardinal) were required to produce such reports:

> It is not sufficient for a defendant to state "we are not Cardinal and our documents are not the Dendrite Audit document discussed in DR 14-5." Even if the question of privilege is a fact-intensive inquiry, I have made clear which facts are relevant and how I view them; and the Court has adopted and approved that analysis.  Each defendant must apply fully the precepts set out in DR 14-5 to their own circumstances and to their own documents.  If it later proves that defendants drew "too fine" distinctions as a basis not to follow the spirit and direction set out in DR 14-5 (and the Court's earlier statements on the issue), or not to produce substantially similar documents, I assure you that the Court will be even less patient than I.  Put differently: all defendants were looking to my analysis of the Cardinal Dendrite Audit as a ***bellwether evidentiary ruling***, and they must now apply it and adhere to it accordingly.

Ex. 4 at 1 (emphasis in original).

Further, in Discovery Ruling No. 15 Regarding IQVIA Discovery (ECF No. 1375) ("DR 15"), issued on February 15, 2019, Special Master Cohen directed all defendants that were clients of IQVIA (including both Allergan and Teva) to collect and produce audit reports and related documents from IQVIA.  Allergan neither produced the report from its own files nor collected and produced it from Cegedim's files, but rather stated it didn't have the file.  Ex. 5.  Allergan's counsel also represented that "Allergan has also asked IQVIA if it maintained a copy of [the audit] report; they did not."  Ex. 6 at 1.

Because Allergan repeatedly stated in discovery that all documents relevant to its generic opioid business had been transferred to Teva at the time of the Actavis acquisition, Plaintiffs also sought the report from Teva, which similarly denied being able to locate it.  Ex. 7 at 1 (stating Teva

- 4 -

has "performed extensive searches for documents related to your requests and have not located any responsive documents or information").

After denying that any copies of the Cegedim audit report continued to exist, Allergan opposed Plaintiffs' motion for summary judgment (which sought a finding that Allergan had violated the Controlled Substances Act of 1970 ("CSA")), arguing facts and conclusions the report affirmatively contradicted. ECF No. 2181 at 45. The CT1 Plaintiffs settled their claims with the Allergan and Teva Defendants before resolution of the summary judgment motion. Yet, earlier this year, as Plaintiffs investigated other documents produced by IQVIA after the CT1 matter settled, they discovered evidence that IQVIA did in fact possess the report. In response to a direct inquiry by Plaintiffs, IQVIA advised Plaintiffs on August 6, 2020, that it had "located the document and provided it to [Teva's] counsel to follow the process that [IQVIA] used in the original production." Ex. 8 at 1. The document was produced only after IQVIA sought permission from Allergan and Teva to produce it. Beginning on August 6, 2020, Plaintiffs' counsel followed up repeatedly with counsel for Teva, Jonathan Maier, to determine whether, and, if so, when, Teva would produce the SOM audit report. Ex. 9. On August 14, 2020, counsel advised that the report would be produced, and the report was finally produced on August 21, 2020.[7]

There was no plausible argument that the report was privileged and it was never included on an Allergan or Teva privilege log. Instead, as noted above, Teva and Allergan maintained they did not have the report, despite transparently incomplete or non-existent efforts to obtain and locate it. The in-person component of Cegedim's audit was conducted in the presence of 13 Watson employees, none of whom was an attorney, and the audit was requested by, and transmitted to, non-

---

[7] Although it relates to a current Allergan entity, the audit report has been produced through Teva's counsel and bears a Teva Bates number ("Teva_IQVIA_0020874"). This violates DR 4, which made clear that "[b]oth Allergan and Teva have separate and independent responsibilities to produce responsive discovery." DR 4 at 4. DR 4 allowed Allergan and Teva could produce "one set of documents jointly" if they chose. *Id*. Here, however, they chose to disregard the Court's order.

attorney employees of Watson. Ex. 10. In short, this should have been an easy call to produce. It wasn't. Moreover, just before the document was produced, Teva's counsel advised Plaintiffs that there was a "problem" with how Teva received the document; therefore, the metadata that would otherwise accompany the production and show details concerning to whom the document was sent was purportedly not able to be produced. ECF No. 2181 at 45.

It is incomprehensible that Allergan does not possess any copy of the adverse report that was so damning an assessment of its existing SOM system and that was going to be used as the "foundation" for its new and improved system. Cegedim sent the report to at least two Watson employees in September 2011; given its gravamen, the report was very likely shared with other Watson employees. Moreover, Allergan had access to the report through IQVIA and had a ***duty to seek and produce it*** under DRs 14 and 15. Allergan nevertheless failed to do so and instead chose to make arguments blatantly contradicting the report in its opposition to summary judgment. ECF No. 2181 at 45-48. This is yet another instance of Allergan's continued efforts at obfuscation and delay in discovery in these cases, first refusing to produce any documents related to generic opioids, then refusing to produce any documents for any entities other than Allergan Finance, LLC, and even then, failing to produce this document, which was sent directly to Watson, the predecessor company of Allergan Finance, LLC. Now it refuses to produce any additional documents in the new case tracks. *See, e.g.*, Ex. 11. The Court should not countenance these obstructive tactics.

Plaintiffs respectfully request that the Court sanction Allergan and Teva under Fed. R. Civ. P. 37(b)(2)(A) for "not obeying Discovery Order[s]" by reopening relevant document and deposition discovery in all MDL cases as set forth below and by additionally ordering an evidentiary presumption/preclusion related to the failure to produce evidence. *See Doe v. Lexington-Fayette Urban Cnty. Gov't*, 407 F.3d 755, 766 (6th Cir. 2005) (listing four factors that should guide a court's discretion when imposing sanctions under Rule 37). Such sanctions are appropriate here because

they "flow from and specifically relate to the discovery at issue." *See* ECF No. 1574 at 3-4 (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).

**III.   ARGUMENT**

    **A.   The Newly Produced Cegedim Audit Report Supports that Multiple Allergan Entities Knowingly Maintained Insufficient SOM Protocols**

As with all companies that manufactured and sold Drug Enforcement Administration ("DEA") Schedule II drugs, the CSA required Watson to maintain CSA-compliant SOM protocols. While Watson maintained subsidiaries to manufacture its opioids, the SOM protocols were created and applied at the corporate parent level under the purview of a small group of individuals, including Tom Napoli, Manager of Security and DEA Affairs at Watson, and Scott Soltis, Watson's Senior Director of Global Corporate Security.[8]

At the urging of Napoli, Watson hired Cegedim to audit its SOM protocols in mid-2011. The consultancy had been founded by Ron Buzzeo, a former DEA agent who had specialized in SOM issues.[9] Thirteen Watson employees met with Cegedim representatives for an entire day on September 8, 2011. Ex. 10.[10] Two weeks later, Cegedim delivered to Napoli and Soltis an eight-page audit report reflecting its findings:

- Watson's "SOM system [was] ***inconsistent with the specific requirements*** noted in the regulations and with written guidance provided by the DEA to all registrants."

---

[8] *See, e.g.*, Ex. 12 (document showing "Corporate Standard Operating Procedure" of "Watson Pharmaceuticals, Inc." regarding "Suspicious Orders of Controlled Drugs," dated April 7, 2009); Ex. 13 (same, dated July 19, 2011).

[9] Buzzeo was retained as an expert by the Mallinckrodt Defendants during CT1 litigation and provided an expert report touting its SOM system. *See* ECF No. 3125.

[10] The Watson employees that attended the meeting were Tom Napoli, Scott Soltis, Mary Woods, Larry Schaffer, Justin Park, Laura Pinti, Sandra Simmons, Lisa Scott, Lynn DaCunha, Jaydeep Shukla, Rick Robbins, and Napoleon Clarke.

- Orders from distributors McKesson and AmerisourceBergen were "*frequently approved by staff simply because [the customer's] inventory is low*," causing even the SOM system to be "'self gaming'" and useless.

- The Company sent sales representatives to visit new customers only at the "corporate level" and never made "*actual warehouse visits*" or had investigations performed to confirm their customers' statements about the legitimacy of their program.

- The Company possessed but ignored data showing "to whom their customers are selling," thereby "*unwittingly contributing to drug abuse* in a locality or through a method of sales and distribution" it could not otherwise see.

Ex. 1 at 877, 879-881.[11]  The report concluded that "Watson should re-visit their entire approach to SOM to fully address the specific regulatory requirements and other guidance documents provided by the DEA." *Id*. at 878.

After receiving the report, Napoli subsequently paraphrased some of the report's findings in an April 2012 PowerPoint presentation, but left out many of the key details and specific negative findings. Ex. 2 at 988-993.  Napoli's PowerPoint further indicated that Watson planned to replace its system "[b]ased on compliance concerns" and that a new system was "[b]udgeted for 2012 Implementation." *Id*. at 987-991.

But the planned replacement never happened.  Instead, the non-compliant Watson system remained in place up until late 2016, when the Company sold its generic opioid lines to Teva. Ex. 3 at 323:5-324:22 (Napoli stating that the replacement system was "put on hold" when the Teva sale was announced). Napoli, who had sought to upgrade Defendants' SOM systems repeatedly after the failed early 2012 effort, was laid off during the Teva sale. *Id.* at 325:2-6. Soltis followed the generic opioid prescription drugs to Teva and worked there until 2017. Allergan's sale of its generic lines to Teva included a number of corporate subsidiaries involved in manufacturing opioids. Allergan Finance LLC, however, Defendants' top domestic corporate entity, the entity that ran the SOM system and commissioned the audit report, remains with Allergan still.

---

[11]  Emphasis is added and citations are omitted, unless otherwise noted.

### B. Despite Plaintiffs' Repeated Requests, and Numerous Discovery Rulings Requiring the Production of Audit Reports, the Audit Report Was Never Produced in CT1

As set forth above under DR 14-5, Special Master Cohen expressly ordered Defendants to produce these types of audit reports. On February 15, 2019, Special Master Cohen issued DR 15, which directed Defendants such as the Allergan and Teva Defendants to work with IQVIA to "facilitate the production from IQVIA of any such information and documents over which they did not have control." ECF No. 1375 at 2. As the ruling notes, the Special Master had previously also "ordered defendants to . . . produce to plaintiffs information and documents over which they had control related to the consulting work IQVIA performed." *Id*. at 1-2.

In response to the ruling, counsel for the Allergan Defendants reported that they had "sent a letter to counsel for IQVIA" with a description of people involved in their SOM process, and further reported that "IQVIA expected to provide Allergan with any SOMs data and reports" by February 22. Ex. 5 at 1-2. Teva provided similar communications. Ex. 20. Yet no reports were delivered.

Plaintiffs also had specifically requested that Allergan produce the Cegedim report because it was referenced in the PowerPoint created by Napoli, the Manager of Allergan's DEA Affairs unit. *See, e.g.*, Ex. 14. Yet Allergan did not produce it. When Plaintiffs asked Allergan again to seek it from IQVIA, its counsel represented that it had "**also asked IQVIA if it maintained a copy of [the audit] report; they did not**." Ex. 6.

In May 2019, Plaintiffs again sought production from both the Teva and Allergan Defendants to ensure that the important document was not available to either set of Defendants. Ex. 15. Plaintiffs requested that Defendants find and track the reports or, to the extent they were deleted, provide "a statement from the companies regarding the circumstances surrounding their deletion or destruction." *Id*. at 2. Both sets of counsel purported to have "conducted extensive searches" for the document and confirmed it was not being withheld as privileged. Exs. 16 at 1, 17 at 1. Neither,

however, would provide details of the search they purportedly conducted or tell Plaintiffs when such documents were deleted.  Ex. 18 at 5.

> C.  **Defendants Made Arguments Contradicting the Report's Findings at Summary Judgment, Settled CT1 Without Producing It, and Now Refuse to Produce Additional Documents in New Case Tracks**

The absence of the report allowed the Allergan Defendants to make false and misleading statements in opposition to summary judgment.  In their joint opposition to Plaintiffs' motion for summary judgment concerning Defendants' SOM obligations, the Allergan Defendants mischaracterized the Cegedim report, stating that it merely reflected "'an effort to enhance our *already* compliant [SOM] system.'"  ECF No. 2181 at 45 (emphasis in original).  They further accused Plaintiffs of "ignoring evidence" about "downstream customer" data and ignoring that the system "frequently flagged orders . . . that were only 25% or 50% above the customer's historical average."  *Id.* at 46.  They argued that having a manually set threshold based on a fixed multiplier and allowing "orders to be shipped based on internal justification" were "immaterial to whether the systems were legally compliant."  *Id.* at 48.

Had the Cegedim audit report been available to the parties and the Court, these Defendants would not have been able to make these statements.  The report first makes clear the SOM system was not "compliant" with the law, detailing how the SOM protocols were "inconsistent with the specific requirements noted in the regulations and with written guidance provided by the DEA to all registrants."  Ex. 1 at 877.  It even lists the regulations and guidance with which the protocols failed to comply.  *Id.* at 877-878.  Contrary to the statements made to the Court, the report emphasizes the Allergan Defendants' failure to "develop[] and incorporate[]" downstream data into the system as a hazard that may "contribut[e] to drug abuse."  *Id.* at 881.  The report makes clear that the "multiplier[s]" Defendants touted were the exact "'rigid formula[]'" that the DEA had found to be "'insufficient.'"  *Id.* at 877.  Finally, it identifies purportedly immaterial internal justifications as

loopholes that made the SOM protocols "'self gaming'" because they permitted employees to approve and ship orders from McKesson and AmerisourceBergen "simply because inventory [was] low" and they had a "managed inventor[y agreement]." *Id.* at 879.  The prejudice associated with the failure to produce the report is obvious because, without the report, Plaintiffs were unable to bring these direct contradictions to Defendants' positions to the Court's attention.

On August 14, 2019, the CT1 Plaintiffs and the Allergan Defendants reached an agreement in principle to settle claims against it.  As with the summary judgment briefing, the settlement negotiations were uninformed by the Cegedim report, which remained unproduced.  Subsequently, in new case tracks, Allergan has brazenly taken the position it is not required to produce any additional documents not already produced in CT1.  *See, e.g.*, Ex. 11 at 4 (stating that "Allergan confirms that it does not presently intend to produce additional responsive documents (beyond those included in any future Discover Ruling No. 22 productions")).

In late August 2019, Teva produced some documents from IQVIA pursuant to Plaintiffs' subpoena on that third party (allowing Teva to perform a review of the documents for privilege before their production).  One of the documents is a three e-mail chain from September 22, 2011, and the first e-mail in time indicates the transmission of the Cegedim report to Napoli, cc-ing Soltis. Ex. 19.  The report itself, however, was not attached to the email chain or included in the August 2019 production.  No part of the email chain was produced by the Allergan and Teva Defendants despite that the report containing numerous search terms agreed to among the parties and that DR 15 specifically ordered production of these types of e-mails.  Based on the e-mail chain produced by IQVIA, Plaintiffs eventually requested the document directly from IQVIA, which finally produced the Cegedim report on August 21, 2020.

- 11 -

### D. Sanctions Should Be Issued

Eighteen months after the Allergan and Teva Defendants were ordered to produce any Cegedim audits of their SOM protocols, Plaintiffs finally received a copy, but it did not come from Allergan or Teva. Instead, Plaintiffs were required to conduct a separate investigation of documents produced by Cegedim in a separate case track, only to find that the report had been e-mailed to Napoli and Soltis and could have been found in their custodial files with a simple targeted search.

Plaintiffs respectfully request that the Court sanction Allergan and Teva by:

- Reopening fact discovery against Allergan and Teva for purposes of use in *all MDL cases*, including first the production of all related documents and information from employees who were made aware of it (irrespective as to whether they were previously designated as custodians) and allowing the (re)depositions of those involved, including, but not limited to, Napoli, Soltis, IQVIA employees with knowledge, and any other witnesses that may be uncovered by any newly produced documents;

- Directing as an established fact *in all MDL cases* that the SOM system subject to the September 2011 Cegedim audit report did not comply with applicable law as set forth in the report and prohibiting Allergan and Teva from asserting *in any MDL case* that they had a reasonable and/or good faith basis to believe otherwise; and

- Ordering any additional monetary or other relief the Court deems appropriate.

These remedies are appropriate under the four-prong test as outlined by the Sixth Circuit. *Doe*, 407 F.3d at 766. Under *Doe*, the Court must examine:

- "'whether the [Allergan and Teva's] failure to cooperate in discovery is due to willfulness, bad faith, or fault'";

- "'whether [Plaintiffs were] prejudiced by [Allergan and Teva's] failure to cooperate in discovery'";

- "'whether [Allergan and Teva were] warned that failure to cooperate could lead to the sanction'"; and

- "'whether less drastic sanctions were first imposed or considered.'"

*Id.* Here, there is no question that Allergan and Teva are at fault for failing to produce, or seeking the production of, the audit report. Defendants knew the report had been written, knew at least that

- 12 -

Napoli had received it, and knew when it was received thanks to the PowerPoint Napoli produced. Pursuant to Special Master Cohen's Discovery Rulings 14 and 15 not only were both parties under a duty to produce the document, they were under a duty to work with non-party IQVIA to seek such production. Moreover, there is no question as to whether the audit is of critical importance to proving Plaintiffs' case and to negating the defenses raised. As Special Master Cohen noted, these audits were issued "to determine the extent to which [defendants'] Suspicious Order Monitoring System met existing DEA regulatory requirements, and to identify and execute modifications necessary to improve compliance." DR 14-5 at 7. The audit reports were important, and every Defendant was ordered to produce them or seek them from the subpoenaed party. DR 15 at 3. Plaintiffs clearly suffered prejudice through Defendants' failure to produce the audit report as they did not have it for purposes of summary judgment, trial preparation, or settlement discussions.[12]

### IV. CONCLUSION

For the above-stated reasons, Plaintiffs seek sanctions as described herein.

Dated: August 31, 2020           Respectfully submitted,

/s/ Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY LLC
112 Madison Avenue, Seventh Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

---

[12] It is further noted that Special Master Cohen and this Court have repeatedly granted motions to compel against Allergan and Teva on issues relating to generic opioid prescription drugs and their SOM systems, as well as the various jurisdictional documents they refused to produce. *See, e.g.*, ECF No. 1512 ("Ruling Regarding Jurisdictional Discovery on Defendants Allergan, Teva, and Mallinckrodt"). These Defendants should be uniquely aware of consequences from failing to provide relevant discovery.

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL LAW
422 Ninth Street
Huntington, WV 25701
(304) 654-8281
paul@farrell.law

*Plaintiffs' Co-Lead Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

*On the Brief:*

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
(561) 750-3000
(561) 750-3364 (Fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com

- 14 -

- 15 -

Aelish M. Baig
Matthew S. Melamed
Hadiya K. Deshmukh
ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
(415) 288-4545
(415) 288-4534 (Fax)
aelishb@rgrdlaw.com
mmelamed@rgrdlaw.com

Thomas E. Egler
Carissa J. Dolan
ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (Fax)
tome@rgrdlaw.com
cdolan@rgrdlaw.com

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 31, 2020, the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF System, and will be served via the Court's CM/ECF filing system on all attorneys of record.

*/s/Peter H. Weinberger*
PETER H. WEINBERGER

4811-5623-1881.v2