# EXHIBIT 3

Highly Confidential - Subject to Further Confidentiality Review

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

------------------------------X

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION, MDL No. 2804

Case No. 17-MD-2804

This document relates to:

All Cases

Hon. Dan A. Polster

------------------------------X

* * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

* * CONFIDENTIALITY REVIEW * *

VIDEOTAPED DEPOSITION

OF

THOMAS P. NAPOLI

New York, New York

Thursday, January 17, 2019

Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

January 17, 2019

9:06 a.m.

Videotaped deposition of PURDUE PHARMA, through its representative, THOMAS P. NAPOLI, held at the offices of LIEFF CABRASER HEIMANN & BERNSTEIN LLP, 250 Hudson Street, New York, New York, pursuant to Notice, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Realtime Systems Administrator, a Certified Realtime Reporter, and a Notary Public of the State of New York and New Jersey.

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD LLP
Attorneys for Plaintiffs
655 West Broadway - Suite 1900
San Diego, California 92101
BY: THOMAS E. EGLER, ESQ.
Tegler@rgrdlaw.com
BY: KELLI BLACK, ESQ.
Kblack@rgrdlaw.com

MORGAN, LEWIS & BOCKIUS LLP
Attorneys for Teva Pharmaceuticals
1111 Pennsylvania Avenue NW
Washington, D.C. 20004-2541
BY: STEVEN A. LUXTON, ESQ.
steven.luxton@morganlewis.com
BY: MARYANN B. ZAKI, ESQ.
Maryann.zaki@morganlewis.com
(Teleconferenced)
BY: ARCANGELO CELLA, ESQ.
Arcangelo.cella@morganlewis.com
(Teleconferenced)

A P P E A R A N C E S(CONT'D.):

JONES DAY
Attorneys for Walmart
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
BY: ADAM HOLLINGSWORTH, ESQ.
Ahollingsworth@jonesday.com

KIRKLAND & ELLIS LLP
Attorneys for Allergan Finance LLC
300 North LaSalle
Chicago, Illinois 60654
BY: TIMOTHY KNAPP, ESQ.
Timothy.knapp@kirkland.com

FARRELL FRITZ P.C.
Attorneys for Cardinal Health
400 RXR Plaza
Uniondale, New York 11556
BY: KEVIN P. MULRY, ESQ.
Kmulry@farrellfritz.com

A P P E A R A N C E S(CONT'D.):

ARNOLD & PORTER KAYE SCHOLER, LLP
Attorneys for Endo Pharmaceuticals, Inc.
and Endo Health Solutions, Inc.
601 Massachusetts Ave., NW
Washington, D.C., 20001-3743
BY: SEAN HENNESSY, ESQ.
Sean.Hennessy@arnoldporter.com
(Teleconferenced/Internet realtime))

GIBBONS, P.C.
Attorneys for AmerisourceBergen Drug Corporation
One Pennsylvania Plaza - 37th Floor
New York, NY 10119-3701
BY: PAUL E. ASFENDIS, ESQ.
Pasfendis@gibbonslaw.com
(Teleconferenced/Internet realtime)

A P P E A R A N C E S(CONT'D.):

O'MELVENY & MYERS LLP
Attorneys for Janssen Pharmaceuticals
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
BY: TRISHA PARIKH, ESQ.
Tparikh@omm.com
(Teleconferenced/internet realtime)

ROPES & GRAY LLP
Attorneys for Mallinckrodt
1211 Avenue of the Americas
New York, New York 10036-8704
BY: JUSTIN MANN, Law Clerk
Justin.Mann@ropesgray.com
(Via internet realtime)

ALSO PRESENT:

ERIK DAVIDSON, Videographer

required to release a pended order that is under review, affecting customer service/fill rate levels."

Do you see that there?

A. I do.

Q. Did you write that?

A. Yes, I did.

Q. At the time that you wrote it, did you believe what you wrote there?

MR. LUXTON: Objection to form.

A. Yup, I do believe that those facts are accurate. We did have -- we did have a compliance system, but we wanted to enhance our compliance to ensure that we were always continually evolving it on the high ground.

Q. So above there you write, under background, "The SOM" -- "The SOM automation project initially commenced in 2011 with the primary goal of replacing our, quote, threshold, unquote, based system with the CFR compliant model developed by Cegedim. This project was initiated in an effort to ensure compliance with the Code of Federal Regulations, SOM requirements, controlled substances, 21 CFR

1301.74 b, as well as December 2007, DEA memory."

Do you see that?

A. I did.

Q. When you wrote that in February 2015, did you believe that to be true?

A. I did believe that Buzzeo had a system that they were proposing that was compliant with the CFR

We also had one as well, but we wanted to move up to a more enhanced sophisticated system.

Q. So other parts of the -- this memo talk about a suspicious order monitor -- suspicious order monitor statistical model that will be hosted, quote, in the cloud and based on Actavis's order data.

A. Yes.

Q. Do you remember whether this cloud-based SOM statistical model was ever adopted at Actavis?

A. This system was created. We used it in a test environment. We're happy with it. We were subsequently acquired by Teva and it was

put on hold and I don't believe that Teva chose to utilize it.

Q. All right. So with regard to the -- this is -- so with regard to your understanding -- well, with regard to your understanding, Actavis never implemented the cloud-based system that's discussed in this memo; is that right?

A. That's correct. When Teva acquired Actavis around this time frame they already had their own program in place for Suspicious Order Monitoring.

Q. So this goes to the number of corporate transactions that took place --

A. Right, right.

Q. You're describing the company as being bought by Teva. Part of what was Actavis, was purchased and closed on by Allergan.

Do you have an understanding of that as well or some type of transaction occurred between Allergan and Actavis; is that right?

A. Right.

Q. Either Actavis bought Allergan or Allergan bought Actavis?

A. Actavis bought Allergan.

Q. All right. And as far as you're concerned -- well, during that process, when did you leave?

A. I left around maybe October of 2016. Sometime in the early fall of 2016.

Q. So I'm going to hand you what we will mark as Exhibit 26.

A. Okay.

(Napoli Exhibit 26, Email chain beginning with email dated 1/11/16 from Baran to Russo with attachment, Bates-stamped ALLERGAN_MDL_ 03431731 through 1739, marked for identification, as of this date.)

BY MR. EGLER:

Q. Before we get to Exhibit 26, why did you leave?

A. I was laid off.

Q. All right.

A. Because Teva already had a DEA compliance staff and program. I helped them orient them with -- with our side of the business and was part of a reduction in force.

Q. All right. So looking at what I marked as Exhibit 26, can you page through it. I'll read into the record. It's ALLERGAN_MDL_03431731 through 1739.

If you look through this generally, but I'm just going to ask you a few questions about this.

(Document review.)

Q. Now I'll note for the record that the last email that you're on the page appears on the third page of this document, as I read it.

A. Um-hmm.

(Document review.)

A. Okay.

Q. All right. Based on the emails that are here, do you remember around August 2015 Actavis deciding to sell to Bell Medical again?

MR. KNAPP: Objection to form.

A. I do recall this series of emails and this situation.

Q. All right. Did you have any input in the decision whether to start selling controlled substances to Bell Medical around this time?

A. My input would have been from a DEA