EXHIBIT 5

## KIRKLAND & ELLIS LLP
#### AND AFFILIATED PARTNERSHIPS

Donna M. Welch, P.C.
To Call Writer Directly:
+1 312 862 2425
donna.welch@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

February 19, 2019

*Via Electronic Mail*

Peter H. Weinberger
Spangenberg Shibley & Liber LLP
1001 Lakeside Avenue East, Suite 1700
Cleveland, Ohio 44114
pweinberger@spanglaw.com

Evan M. Janush
Tower 56
126 East 56th Street, 6th Floor
New York, NY 10022
evan.janush@lanierlawfirm.com

Re:   *In re National Prescription Opiate Litigation*, MDL No. 2804: SOM
      Discovery Concerning IQVIA and/or BuzzeoPDMA-Related Entities

Dear Peter and Evan:

I am writing to provide Plaintiffs with the information identified in Discovery Ruling No. 15 regarding IQVIA Discovery. Allergan's responses to each of the topics identified by the Special Master in Discovery Ruling No. 15 are below.

***1. Evidence of whether, how, and when the defendant: (1) requested production from IQVIA of <u>contracts and/or scope of work documents</u>; (2) received that production from IQVIA; and (3) produced to plaintiffs that production from IQVIA.***

On February 5, 2019, Allergan sent a letter to counsel for IQVIA and requested contracts and scope of work documents that Allergan has been unable to find in its own files. (*See* Exhibit A.) In response to this letter, IQVIA's counsel informed Allergan that IQVIA expected to provide Allergan with any contracts and scope of work documents IQVIA identified related to SOM Consulting services by February 22. (*See* Exhibit B.) Allergan has not received any of the

# KIRKLAND & ELLIS LLP

Peter H. Weinberger; Evan M. Janush
February 19, 2019
Page 2

requested documents yet, but will promptly provide Plaintiffs with any responsive, non-privileged, non-duplicative documents provided by IQVIA once Allergan receives such documents.

**2. Evidence of whether, how, and when the defendant: (1) requested production from IQVIA of _SOMS data and reports_ (including audit reports); (2) received that production from IQVIA; and (3) produced to plaintiffs that production from IQVIA.**

On February 5, 2019, Allergan sent a letter to counsel for IQVIA and requested SOMs data and reports Allergan has been unable to find in its own files. (*See* Exhibit A.) In response to this letter, IQVIA's counsel informed Allergan that IQVIA expected to provide Allergan with any SOMs data and reports IQVIA identified related to SOM Consulting services by February 22. (*See* Exhibit B.) Allergan has not received any of the requested documents yet, but will promptly provide Plaintiffs with any responsive, non-privileged, non-duplicative documents provided by IQVIA once Allergan receives such documents.

**3. Evidence of whether, how, and when the defendant: (1) requested production from IQVIA of all _communications between IQVIA and defendant concerning SOMS_, including system audits and design; (2) received that production from IQVIA; and (3) produced to plaintiffs that production from IQVIA.**

On February 5, 2019, Allergan sent a letter to counsel for IQVIA and requested communications regarding SOM between IQVIA or related entities and Allergan that Allergan had been unable to find in its own files. (*See* Exhibit A.) In response to this letter, IQVIA's counsel informed Allergan that IQVIA does not intend to provide Allergan with communications regarding SOM between IQVIA or related entities and Allergan that Allergan had been unable to find in its own files.. (*See* Exhibit B.) Nonetheless, in the event that IQVIA does provide any such communications to Allergan on or before February 22, Allergan will promptly provide Plaintiffs with any responsive, non-privileged, non-duplicative documents.

**4. As to each of the three topics numbered immediately above (highlighted in bold), evidence of whether, how, and when the defendant produced those materials over which it retained control.**

On February 7, 2019, Allergan identified for Plaintiffs the Bates numbers of contracts and scope of work documents, SOM data and reports, and communications between Allergan and IQVIA or related entities regarding SOM that were identified in Allergan's possession. (*See* Exhibit C.)

**5. As to each of the three bullet-point topics above (highlighted in bold), an explanation of whether and on what bases defendant is asserting privilege, if applicable.**

# KIRKLAND & ELLIS LLP

Peter H. Weinberger; Evan M. Janush
February 19, 2019
Page 3

As explained in Allergan's February 7, 2019 letter, Allergan is not claiming a blanket attorney-client or attorney work product privilege for any of the following categories:

(i)    SOM-related scope of work documents

(ii)   SOM-related contracts

(iii)  Communications concerning SOM system audits, SOM design, and Suspicious Order Monitoring that were had between the Buzzeo-related entities and/or IQVIA and Allergan, or

(iv)   Reports and other data concerning the monitoring of the SOM processes provided by, or in consultation with, the Buzzeo-related entities and/or IQVIA.

Allergan has only withheld documents that relate to SOM if they contain legal advice, requests for legal advice, or attorney work product.

Please let us know if you have any further questions.

Sincerely,

*Donna M. Welch, P.C.*

Donna M. Welch, P.C.

# EXHIBIT A

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

Catie Ventura
To Call Writer Directly:
+1 202 879 5907
catie.ventura@kirkland.com

+1 202 879 5000

Facsimile:
+1 202 879 5200

www.kirkland.com

February 5, 2019

**By E-mail**

Patrick L. Oot
1155 F Street, N.W., Suite 200
Washington, DC 20004
oot@shb.com

Re:    *In re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Patrick:

In your January 29, 2019 letter to Evan Janush, you identified Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. as a client potentially having suspicious order monitoring work product from their engagement with BuzzeoPDMA and related entities. In response, plaintiffs have asked us to produce all contracts, statements of work, data, reports, audits, and communications related to the suspicious order monitoring consulting work or other services performed.

We have reviewed our files and we believe we have produced most responsive information. However, we have identified a few gaps and would appreciate if you could provide us with copies of the following documents to the extent you have them in your possession:

**1. Contracts and/or scope of work documents related to SOM consulting services provided.**

We have attached a copy of the June 4, 2014 Master Services Agreement between Actavis Pharma, Inc. and BuzzeoPDMA (ALLERGAN_MDL_02160689), and we have located Statements of Work Nos. 2, 3, 5, 6, 9, and 11. However, Statements of Work Nos. 2, 5, and 9 are either unsigned or only partially signed versions, and we are missing Statements of Work Nos. 1, 4, 7, and 8 entirely. Please provide these Statements of Work and any others that may be connected to the June 4, 2014 Master Services Agreement if IQVIA has them in its possession.

Additionally, we have attached a copy of Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, related to an April 7, 2011 agreement. (ALLERGAN_MDL_02467194). We are missing an executed version of Statement of Work No. 3; please provide this document if IQVIA has it in its possession.

Beijing   Boston   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

# KIRKLAND & ELLIS LLP

Patrick L. Oot
February 4, 2019
Page 2

Finally, we have attached a June 30, 2011 Services Agreement between Actavis Inc. and BuzzeoPDMA (ALLERGAN_MDL_00369927). We have located Statement of Work No. 2, but we are missing No. 1. Please provide it, and any others that may exist, if IQVIA has copies of these documents.

## 2. SOM data and reports related to SOM consulting services provided

We do not believe that we purchased or obtained any SOM data from BuzzeoPDMA or related entities, but we believe that BuzzeoPDMA may have created audits, reports, or other evaluations of Watson's or Actavis's suspicious order monitoring systems. For example, in Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, BuzzeoPDMA agreed to "provide Customer an onsite review and assessment of its current SOM system." Please provide copies of any such audits, reports, evaluations, assessments, or other work product for Actavis Inc., Actavis Pharma, Inc., and Watson Pharma, Inc.

## 3. Other communications with Watson or Actavis

Finally, please provide copies of any other communications in your possession between BuzzeoPDMA or related entities and Actavis Inc., Actavis Pharma, Inc., and Watson Pharma, Inc., specifically related to suspicious order monitoring design, system audits, assessments, or requirements. We believe most relevant communications would have been with Nancy Baran and/or Tom Napoli.

Thank you for your help, and please let us know if you have any questions.

Sincerely,

*/s/ Catie Ventura*

Catie Ventura

# SERVICES AGREEMENT

This Services Agreement ("Agreement") effective as of the 30th day of June, 2011 (the "Effective Date") by and between Actavis Inc., for itself and on behalf of its subsidiaries, a Delaware company, with a place of business at: 60 Columbia Road, Building B, Morristown, NJ 07960 (hereinafter referred to as "Actavis"), and BuzzeoPDMA LLC, a Delaware limited liability company, with its principal office at: 1025 Boulders Parkway, Suite 405, Richmond, Virginia 23225 (hereinafter referred to as "BuzzeoPDMA"), who together may hereinafter be referred to collectively as "Parties" or individually as "Party."

## WITNESSETH:

1.     Services and Payment.

(a)     Services.  BuzzeoPDMA agrees to undertake and complete the services that are more fully set forth on the statement of work appended hereto as Exhibit A (the "Services") in accordance with the terms and conditions hereof.  Any additional services, or other changes to the Services, shall be incorporated into this Agreement by adding additional Exhibits upon the agreement of the Parties on such changes.

(b)     Responsibilities of BuzzeoPDMA.  BuzzeoPDMA shall use commercially reasonable efforts: (i) provide the Services in accordance with the terms hereof; (ii) keep Actavis advised of the status of the Services; (iii) permit any Actavis representative to review and observe from time to time the provision of the Services; and (iv) provide Actavis with reports, descriptions, outline procedures and the like, as are appropriate to the nature of the Services, and which are described in Exhibit A.

(c)     BuzzeoPDMA Personnel.  BuzzeoPDMA may delegate to a Contractor its obligations to perform any of the Services with prior written consent of Actavis.  Such delegation shall not release BuzzeoPDMA of its responsibility to Actavis regarding the timely and proper performance of such Services.  BuzzeoPDMA will comply with Actavis' requests for information that Actavis deems necessary to comply with its record keeping protocols. In the event information is required to comply with federal or state law reporting requirements, or any other requirements, BuzzeoPDMA shall promptly provide such information to Actavis. BuzzeoPDMA will undertake background checks on individuals assigned to provide the Services if Actavis in its sole discretion determines such checks to be necessary. Actavis, in its sole discretion, reserves the right to reject for any legal reason any BuzzeoPDMA personnel and BuzzeoPDMA shall provide Actavis with a suitable replacement promptly.

(d)     Payment.   As the only consideration due to BuzzeoPDMA, Actavis will pay BuzzeoPDMA for the Services at the rate listed on Exhibit A.  Unless otherwise stated in this Agreement, BuzzeoPDMA shall invoice Actavis monthly for all approved and documented expenses incurred during the previous period.  All Services which are one-time services will be invoiced as incurred.  All Services which are to be charged in a per diem, per incident or per user basis will be invoiced on a monthly basis. All invoices sent to Actavis by BuzzeoPDMA are due and payable within thirty (30) days of the date of receipt of the invoice from BuzzeoPDMA.  All unpaid and undisputed amounts due to BuzzeoPDMA hereunder shall bear interest at the rate of one and a half percent (1.5%) per month or at the highest rate permitted by New Jersey law, whichever is less.  All amounts due to BuzzeoPDMA hereunder are net of any and all taxes (including withholding taxes), assessments, charges and levies of any governmental authority, all of which shall be the sole obligation of Actavis, except for taxes payable on the income of BuzzeoPDMA.

*CONFIDENTIAL*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ALLERGAN_MDL_03402063

(i)     _Travel expenses._     Actavis must approve all travel plans in advance. BuzzeoPDMA's expenses must comply with Actavis' Travel Policy, attached as Exhibit B, and as modified from time to time by Actavis.

(ii)     _No mark-up._     BuzzeoPDMA will bill to Actavis all itemized, documented, reasonable, out-of-pocket expenses at net cost. All reimbursable expenses shall be paid to BuzzeoPDMA net thirty (30) days from the date of receipt of invoice therefor. No mark-ups will be permitted on pass-through or out-of-pocket expenses. All discounts received by BuzzeoPDMA will be passed onto Actavis.

2.     _Restrictive Covenants._

(a)     _Ownership._ Subject to and except as provided in this Section 2(a)(i), Actavis shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, sui generis database rights and all other intellectual and industrial property rights) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information prepared exclusively for Actavis (each a "Work") and made and fixed in a tangible form, or conceived or reduced to practice to the extent that such rights are within a Work, which intellectual property in such Work either (i) uses or incorporates Confidential Information belonging to Actavis or (ii) consists of deliverables prepared exclusively for Actavis in performance of the Services hereunder, in whole or in part, by BuzzeoPDMA in connection with performance of the Services (collectively, the "Work Product") and BuzzeoPDMA will promptly disclose and provide all Work Product to Actavis. All Work Product shall be deemed work made for hire to the extent allowed by law and BuzzeoPDMA hereby makes all assignments necessary to accomplish the foregoing establishment of ownership as if BuzzeoPDMA was an employee of Actavis. BuzzeoPDMA shall further assist Actavis, at Actavis' expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights assigned. BuzzeoPDMA hereby irrevocably designates and appoints Actavis as its agent and attorney-in-fact to act for and in BuzzeoPDMA's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Provider. In addition, Actavis hereby grants to the BuzzeoPDMA a non-exclusive, non-transferable limited license to use the Work Product and any other intellectual property Actavis has authorized it to use in connection with the Services.

(i) Notwithstanding the foregoing, BuzzeoPDMA's IP shall be and remain the property of BuzzeoPDMA and there shall be no condition, restriction, or limitation on BuzzeoPDMA's free and unfettered use, disclosure, or assignment of BuzzeoPDMA's IP, BuzzeoPDMA possessing all right, title and interest therein and thereto free and clear of any right, title, interest or other encumbrance of Actavis. If BuzzeoPDMA's IP is used in connection with the Services, BuzzeoPDMA shall grant Actavis a non-exclusive license to use the BuzzeoPDMA's IP solely in connection with the product of the Services, as is necessary. Nothing contained in this Agreement shall be construed as restricting BuzzeoPDMA from using or disclosing any general learning, skills or know-how discovered or developed by its personnel under this Agreement or otherwise, except to the extent that same is derived from Actavis' Confidential and Proprietary Information, trade secrets, and/or intellectual property.

(ii) Trade secrets, inventions, processes, know-how, technical expertise, knowledge, concepts, analyses, tools, frameworks, models, templates, formats, industry perspectives, data, software and other intellectual property that have been or are independently invented, discovered, developed or obtained (without reference to or use of any Confidential Information or other intellectual property of Actavis disclosed or made available to BuzzeoPDMA under this Agreement) by or for BuzzeoPDMA, including, without limitation, any information invented, discovered, developed or obtained by BuzzeoPDMA during

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ALLERGAN_MDL_03402064

the performance of this Agreement and all intellectual property rights associated therewith, shall be known as "Buzzeo PDMA's IP".

(b)    Confidential and Proprietary Information.  Subject to this Section 2(b), each Party ("Receiving Party") agrees that all Work Product, and all other business, technical and financial data and information (including, without limitation, the identity of and information relating to products, pricing, rebates, equipment, strategy, customers or employees) that is disclosed to it by the other party ("Disclosing Party") constitutes "Confidential and Proprietary Information." The Receiving Party will hold in confidence and not disclose or, except in performing the Services or otherwise upon receipt of the Disclosing Party's prior written consent, use any of the Confidential and Proprietary Information. Notwithstanding the foregoing, the Receiving Party may disclose Confidential and Proprietary Information (1) to its affiliates and those of its and its affiliates' directors, officers, employees, independent contractors, accountants and attorneys (collectively "Representatives") who need such information in order to assist or advise such party in the performance of its obligations hereunder and (2) regarding the terms and conditions of this Agreement to the extent required by applicable law.  The restrictions on use or disclosure of Confidential and Proprietary Information do not extend to information which: (i) at the time of disclosure is already within the public domain; (ii) subsequent to disclosure becomes part of the public domain through no fault or breach of this Agreement by the Receiving Party; (iii) the Receiving Party can demonstrate by written evidence was in its possession prior to disclosure by the Disclosing Party; (d) subsequent to disclosure by the Disclosing Party, becomes known to the Receiving Party through a third party unless the Receiving Party knew or reasonably should have known such party did not have a right to make such disclosure; or (iv) the Receiving Party can demonstrate by written evidence it was discovered or developed by the Receiving Party independently of any disclosure by the Disclosing Party.

In the event Receiving Party is required by a governmental authority or by order of a court of competent jurisdiction to disclose any Confidential and Proprietary Information, the Receiving Party will give the Disclosing Party prompt notice thereof so that the Disclosing Party may seek an appropriate protective order prior to such required disclosure.  The Receiving Party will reasonably cooperate with the Disclosing Party in its efforts to seek such protective order.  If Disclosing Party takes no action within the time permitted for the Receiving Party to respond or if Disclosing Party's actions do not result in a judicial order preventing the Receiving Party from testifying, the Receiving Party may comply with the request.  The Disclosing Party shall reimburse and pay the Receiving Party for all costs and expenses incurred by the Receiving Party in connection with any such summons or subpoenas, including reasonable attorney's fees and time spent by the Receiving Party's personnel, billed at their regular rates.

(c)    Non-Solicitation.  As additional protection for Confidential and Proprietary Information, the Parties agree that during the period over which Services are provided, and for one (1) year thereafter, the Parties will not encourage or solicit any employee or consultant of the other Party to leave the other Party or to alter or terminate its relationship with such Party or any of its affiliates for any reason.

(d)    Equitable Relief.  In the event of a breach or threatened breach of any provision of this Section 2, the non-breaching party shall have the right to seek to have such obligation specifically enforced by a court of competent jurisdiction, including without limitation, the right to entry of restraining orders and injunctions (whether preliminary, mandatory, temporary or permanent) against a violation, threatened or actual, and whether or not continuing, of such obligation, without the necessity of showing any particular injury or damage. It is hereby acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to the non-breaching party and that money damages may not provide adequate remedy.  The non-breaching party may pursue any such remedy available to it concurrently or consecutively in any order as to any such breach or violation and the pursuit of one of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_03402065

such remedies at any time will not be deemed an election of remedies or waiver of the right to pursue any other of such remedies as to such breach or violation or as to any other breach, violation or threatened breach or violation.

(e)     Except as required by law, neither Party will use the name of the other Party, nor of any employee of the other Party in connection with any publicity without the prior written approval of the other Party. The Parties recognize that it may be of mutual interest of the Parties to publish in journals or present at professional meetings material related to the Services. Neither Party will publish or present material related to these Services without the prior review and approval of the other Party, such approval not to be unreasonably withheld. BuzzeoPDMA will not include any information from or related to the Services that would reveal Actavis' identity or specific details of the Services without Actavis' review and written approval, such approval not to be unreasonably withheld.

3.     <u>Warranties and Representations</u>. BuzzeoPDMA hereby warrants and represents, that:

(a)     the Services will be performed in a professional and workmanlike manner in accordance with the customary industry standards applicable to such Services and that none of such Services or any part of this Agreement is or will be inconsistent with any obligation, which BuzzeoPDMA or any of its employees may have to others;

(b)     BuzzeoPDMA has all rights, title and interests in and to all of BuzzeoPDMA's IP needed to perform the Services sufficient to enable the BuzzeoPDMA to use them in performing the Services;

(c)     all Works under this Agreement shall be BuzzeoPDMA's original work and none of the Services or Work Product or any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity (including, without limitation, BuzzeoPDMA); and,

(d)     BuzzeoPDMA is authorized to enter into this Agreement and provide the Services to Actavis and has the full right to provide Actavis with the assignments and rights provided for herein.

(e)     THE REPRESENATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES AND BUZZEOPDMA HEREBY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR USE AND/OR A PARTICULAR PURPOSE.

4.     <u>Compliance with the Law.</u> (a) Each Party will comply with all international, federal, state and local laws and regulations to the extent specifically applicable to the Services, including but not limited to,

(i)     all terms of 48 C.F.R. § 52.244-6 (Subcontracts for Commercial Items and Commercial Components) (including the requirement of including this provision in subcontracts awarded under this contract), 15 U.S.C. § 637 (d) (2) and (3) (Utilization of Small Business Concerns), and such provision is hereby incorporated into this Agreement as if fully set forth herein; and

(ii)     pursuant to 48 C.F.R. § 52.209-6, neither BuzzeoPDMA nor its principals was or is debarred, suspended, proposed for debarment or otherwise determined to be ineligible to participate in federal health care programs (as that term is defined in 42 U.S.C. 1320a-7b(f)) or convicted of a criminal offence related to the provision of health care items or services, but has not yet been debarred, suspended,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER         ALLERGAN_MDL_03402066

proposed for debarment or otherwise determined to be ineligible to participate in federal health care programs. In the event that BuzzeoPDMA, is debarred, suspended, proposed for debarment or otherwise determined to be ineligible to participate in federal health care programs or convicted of a criminal offence related to the provision of health care items or services, BuzzeoPDMA will notify Actavis immediately.

(b) BuzzeoPDMA further represents that:

(i) any compensation paid by Actavis to BuzzeoPDMA is for legitimate, bona-fide services, and that no portion of compensation, if any, paid by Actavis to BuzzeoPDMA has been, or will be paid or pass through to any other person or entity, if such payment or pass through either does or could be construed as violating in any way the applicable provisions of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1. et seq. including any administrative interpretations thereof; and

(ii) it will not make any payments, in cash or in kind, to or for the benefit of a representative of any customer to obtain business for Actavis or to obtain governmental concessions or favorable rulings for Actavis, or for any other improper purpose.

Any breach by BuzzeoPDMA or any of its directors, officers, or employees of the aforesaid representations and warranties shall be deemed a material breach of this Agreement and shall not prejudice any claims which Actavis may have against BuzzeoPDMA for damages which may arise as a result of said breach, pursuant to the terms of this Agreement.

5.   Indemnification; Limitation of Liability.   (a) Each Party shall indemnify, defend and hold harmless the other, its respective officers, employees, affiliates or subcontractors for any and all damages, costs, expenses and other liabilities, including reasonable attorneys' fees and court costs, incurred in connection with any third-party claim, action or proceeding arising from any breach of such Party of a material obligation hereunder or any of the representations made by it herein; provided, however, that the indemnifying Party hereunder shall have no obligation with regard to any claim, action to proceeding to the extent that it arises from the negligence or willful misconduct of the other Party.

(b) IN NO EVENT SHALL EACH PARTY BE LIABLE UNDER ANY CIRCUMSTANCES FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER (WHETHER ARISING OUT OF CONTRACT, STRICT LIABILITY, OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, ANY LOST REVENUES OR PROFITS OF THE OTHER PARTY, RESULTING FROM OR ARISING OUT OF A BREACH OF ANY WARRANTY TO THE OTHER PARTY, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c) NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE PARTIES AGREE THAT BUZZEOPDMA'S AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED, UNDER ANY CIRCUMSTANCES, TWO (2) TIMES THE AGGREGATE AMOUNT OF FEES PAID PURSUANT TO THE APPLICABLE STATEMENT OF WORK OR WORK ORDER DURING THE SIX MONTH PERIOD IMMEDIATELY PRECEDING THE DATE UPON WHICH THE EVENT GIVING RISE TO SUCH CLAIM OCCURRED.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_03402067

6.    Insurance.  The BuzzeoPDMA shall, at its own cost and expense, obtain and maintain in full force and effect all necessary insurance in accordance with the industry standards in BuzzeoPDMA's industry during the term of this Agreement. The BuzzeoPDMA shall, within seven (7) days of execution of this Agreement, furnish to Actavis, a Certificate of Insurance as evidence of the foregoing insurance. Should any of the above described policies be cancelled before the expiration date thereof, notice will be delivered to Actavis in accordance with the policy provisions.

7.    Term and Termination.  (a)  The term of this Agreement will commence on the Effective Date, and continue for Two (2) year thereafter ("Initial Term"), unless terminated earlier without cause by a Party by giving the other Party thirty (30) days written notice after one (1) year of Maintenance Support Services (Project #2). This Agreement may be extended by mutual written agreement between the Parties (each a "Renewal Term").

(b) If either Party materially breaches a material provision of this Agreement, the other Party may terminate this Agreement upon thirty (30) days' written notice unless the breach is cured within the notice period  Sections 2 (subject to the limitations on Section 2(d) stated therein) through 10 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration.

8.    Relationship of the Parties.  Notwithstanding any provision hereof, for all purposes of this Agreement each Party shall be and act as an independent contractor and not as partner, joint venturer, or agent of the other and shall not bind nor attempt to bind the other to any contract. BuzzeoPDMA is an independent contractor and is solely responsible for all taxes, withholdings, and other statutory or contractual obligations attributable to its personnel, including, but not limited to, Workers' Compensation Insurance and BuzzeoPDMA agrees to defend, indemnify and hold Actavis harmless from any and all claims, damages, liability, reasonable attorneys' fees and court costs incurred by Actavis in connection with a claim brought by a third party to the extent caused by (i) failure by BuzzeoPDMA to satisfy any such obligations, or (ii) any other action or inaction of BuzzeoPDMA with respect thereto.

9.    Assignment.  This Agreement may not be assigned (by operation of law or otherwise) or transferred, in whole or in part, by either Party without the prior written consent of the other Party; provided, however, that either Party shall be entitled to assign this Agreement, without the prior written consent of the other Party, to an affiliate or subsidiary of such Party or to any successor corporation which succeeds as a going concern to the business presently conducted by such Party pursuant to a merger, consolidation or sale of all or substantially all of its assets, if such successor corporation assumes such Party's obligations hereunder. Any attempt to do so in violation of this Section 9 shall be void.

10.    Notice. All notices under this Agreement shall be in writing, and shall be deemed given when personally delivered, or upon receipt when sent by a reputable overnight courier or by prepaid certified or registered U.S. mail return receipt requested to the address of the Party to be noticed as set forth herein and an additional copy shall be sent to:

If to Actavis,

     Actavis Inc., 60 Columbia Road, Building B, Morristown, New Jersey 07960, Attn:  Legal Department or USLegal@actavis.com.

If to BuzzeoPDMA,

     Cegedim Inc., 1425 US Highway 206, Bedminster, New Jersey 07921, Attn:  General Counsel, Americas.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                          ALLERGAN_MDL_03402068

11. <u>Audit</u>. The BuzzeoPDMA agrees to maintain accurate and complete records of all contracts, papers, correspondence, copybooks, accounts, invoices, and/or other information in the BuzzeoPDMA's possession relating to this Agreement (collectively, "Records"). The Records shall be maintained in accordance with the applicable laws and recognized commercial accounting practices and retained during the term of this Agreement and thereafter for a period of three (3) years after the term of this Agreement. The BuzzeoPDMA agrees to permit Actavis or its representatives to examine and audit the Records at no charge to Actavis, with prior written notification and during normal business hours.

12. <u>Force Majeure</u>. Neither Party will be liable for any failure to perform as required by this Agreement, to the extent such failure to perform is due to circumstances reasonably beyond either Party's control, (Force Majeure). If any such Force Majeure event and resulting inability to perform continues for more than ninety (90) days, then the Party not in breach of contract as a result of the event, or either Party if both are in breach of the Agreement as a result of the event, may terminate this Agreement upon written notice to the other.

13. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or electronic means also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, or binding effect hereof.

14. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of New Jersey, excluding any provisions of law that would lead to the application of any law other than the laws of the State of New Jersey. In the event of a dispute or difference arising under or in connection with this Agreement (including a dispute or difference as to the validity of this Agreement), such dispute or difference shall be referred to and resolved according to the judgment of the New Jersey Courts and the Parties submit to the exclusive jurisdiction of the New Jersey Courts. Notwithstanding the foregoing, the Parties agree that either Party has the right to seek, to the extent permitted under the laws of any relevant jurisdiction, temporary or permanent injunctive or other similar relief in any other court or other authority of competent jurisdiction in respect of any claims of breach of confidentiality or for an order of specific performance or other injunctive relief.

15. <u>Miscellaneous</u>. The failure of either Party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both Parties. In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement and the Exhibits appended hereto constitute the entire agreement of the Parties and supersedes any and all prior negotiations, correspondence, understandings, and agreements between the Parties respecting the subject matter hereof. In the event of any conflict between the terms and conditions set forth in this Agreement and the terms and conditions set forth in any Exhibit annexed hereto, the terms and conditions of this Agreement shall govern. Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement.

16. <u>Acknowledgements</u>. (a) With respect to any consulting services performed as part of the Services which involve compliance with regulatory requirements, the sole duty of BuzzeoPDMA shall be to examine or review existing practices, policies or procedures (as set forth in its engagement), report to the Actavis and makes appropriate recommendations within the scope of the Services; BuzzeoPDMA shall have no liability or obligation (i) with respect to any prior violations of such requirements by the Actavis; or (ii) to insure that any analysis or recommendations are adopted or implemented by the Actavis; responsibility for implementing any recommendations and monitoring, overseeing and insuring

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER         ALLERGAN_MDL_03402069

compliance shall be the sole responsibility of the Actavis. Without limiting the generality of the foregoing, Actavis agrees and acknowledges that the ultimate regulatory burden of compliance is and shall remain with the Actavis, and nothing herein contained is intended to shift such burden to BuzzeoPDMA.

(b) Any analysis by BuzzeoPDMA as part of the Services is based solely on information and individuals made available to BuzzeoPDMA by Actavis during its performance of the Services. Recommendations and analysis provided by BuzzeoPDMA as part of the Services represent BuzzeoPDMA's professional judgment based on its knowledge of and experience with the DEA, CSA, FDA and PDMA and comparable state laws. Actavis acknowledges, however, that BuzzeoPDMA's performance of Services does not include providing legal, accounting, actuarial, financial, real estate, insurance or any other advice which is legally required to be provided by a licensed or certified professional and Actavis should at all times rely on its own employees, personnel or agents for the provision of same. Certain requirements of federal and state regulations thereunder are subject to interpretation and such interpretations may contain subjective components; implementation of any recommendations does not guarantee that federal, state, or other governmental authority would not find any violations.

(c) The Services provided to Actavis by BuzzeoPDMA are advisory in nature and BuzzeoPDMA's entitlement to payment hereunder is neither, directly or indirectly, tied to nor a function of any specific results or the outcome of any efforts BuzzeoPDMA may undertake.

(d) BuzzeoPDMA has expended considerable time and effort to develop and maintain its goodwill and credibility in the pharmaceutical and regulatory community. To avoid diminution in this regard, Actavis agrees to disclose fully, completely and accurately any and all material information regarding its business and services to BuzzeoPDMA in order to permit BuzzeoPDMA to perform the Services hereunder.

(e) BuzzeoPDMA performs services to other clients which may have, directly or indirectly, common, similar or competing interests to the interests of Actavis. Without reducing from BuzzeoPDMA's confidentiality obligations expressly provided under this Agreement, nothing herein shall be construed or interpreted to limit or restrict in any way the nature or type of services which may, during the Initial Term or the Renewal Term of this Agreement or thereafter, be performed or undertaken by BuzzeoPDMA for other parties.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the day and year first above written.

**BuzzeoPDMA LLC**

By: _____
Name: William Buzzeo
Title: General Manager and Vice President
Date: June 30, 2011

**Actavis Inc.**

By: _____
Name: Nancy Baran
Title: Director, Customer Service
Date: June 30, 2011

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      ALLERGAN_MDL_03402070

## EXHIBIT A

## SERVICES

BuzzeoPDMA is being engaged to provide Actavis with statistical model development and consulting services, among other things, as detailed below (collectively, "Services").

### Project #1: SOM Statistical Model Development & Consulting Support

BuzzeoPDMA will develop a customized suspicious order monitor (SOM) statistical model using consulting team so that it can be implemented into Actavis' existing order management system. The SOM modeling is a complex project that will result in a statistically sound SOM model for Actavis. The two primary activities for this project will be 1) extensive data review and analysis of Actavis' order history data and existing SOM system (if applicable) and 2) modeling and development of a statistically viable and supportable SOM model based on this data. BuzzeoPDMA consulting team will work with Customer to obtain the initial data sets that will provide the foundation for the SOM project.

**This SOM project includes:**
- o Teleconference Discovery/Kickoff Meeting(s) - BuzzeoPDMA will meet via teleconference with Actavis for a discussion and assessment of the items that will be needed to develop a defensible SOM program. This discovery meeting will include a thorough discussion and review of current process, Actavis' customer and product profiles, current IT systems, and order history and Actavis insight.
- o Development of a customized statistical SOM model for Actavis.
- o Interaction with your IT team during model development and model integration into your system.
- o Development of supporting documentation and justification for the SOM model.
- o Support during the first 3 months upon launch of the new SOM model process (as required).

### SOM Consulting Support – SOPs, Processes, Best Practices

BuzzeoPDMA will assist with the review, comment and recommendations for building the best practices pertaining to the Actavis' SOM process and procedures including SOPs, order pending process, account investigation and customer qualification program to strengthen its SOM order analysis, evaluation and disposition process.

*Project Fee:* **$48,500.00 plus business expenses, for the development of SOM Statistical Model and SOM Consulting Support.**

**Assumptions:**
- o As part of BuzzeoPDMA support for this project, our consultants will support modifying the recommended SOM model, if necessary, during the first 3 months after the model is delivered to Actavis. If appropriate, BuzzeoPDMA recommends that Actavis run a dual (old vs. new) SOM process during the initial launch of this new SOM process for data backup and continuity purposes.
- o Actavis' IT group is responsible for the actual programming and integration of the recommended SOM model into its inventory order system.
- o Onsite time for this project is limited to one to two face to face visits with our consulting team – typically at model turnover or shortly thereafter to review initial "pends" generated by the enhanced system. All off-site discussions are supported within the project fees.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       ALLERGAN_MDL_03402071

o  BuzzeoPDMA owns the intellectual property of its model and will provide Actavis a perpetual license to the use this SOM model as part of our project fees. BuzzeoPDMA does not own Actavis' data used in the SOM modeling project.

**Outside the Scope:**
o  BuzzeoPDMA can provide a maintenance agreement for the SOM model which provides unlimited yearly phone support for the model and its implementation after the initial 3 months of support ends, as well as a once a year full "retunement" of the model by our statisticians based on potentially changing Actavis' customer ordering behavior.
o  Follow-up walk through prior to DEA inspection or on-site during the DEA inspection or discussion with the DEA regarding the SOM model.

**Project #2:  Ongoing Maintenance Support Services - SOM System**

Once a year, it is recommended that the model be fully retuned so that the model coefficients can be adjusted, if necessary, to assure optimal sensitivity.  The reason for this is that the model is developed using historical data that is provided at the start of the design.  When the model is implemented, a rolling history is used to calculate the model attributes.  In this way the SOM model is a dynamic system. However, the model coefficients are fixed – relating back to the original (supplied) data.  BuzzeoPDMA proposes that the model coefficients be verified and annually adjusted against a more current sample of data.  The yearly annual adjustment also affords an opportunity for the attributes to be reconfirmed to ensure that the necessary information is collected in the best possible way.  The yearly adjustment is primarily a data analysis exercise – reviewing the most recent 6 – 12 months of order history and confirming and/or adjusting the model as necessary to ensure optimum sensitivity.

The yearly adjustment can be accomplished in the background while your order system continues to function and typically requires only a minor software update by Actavis' IT resources to implement the revised coefficients and/or formulas.

Yearly Ongoing Maintenance Support Service:
- Access to Consulting Team Resources:
  - DEA Project Consultant
  - Ph.D. Statistician
- Ongoing modifications to the attributes and parameters through the year.
- One annual full retunement so that the model coefficients can be adjusted, if necessary, to assure optimal sensitivity.
- Ongoing phone support with DEA Project Consultant/Statistician regarding changes to Actavis customers and/or false positives issues etc.

**Professional Fees: $23,500.00 based on a two (2) year support agreement.**

Assumptions:  Ongoing Maintenance Support Service is based on offsite support. If onsite work is required, additional billable time may be required utilizing the rates under our current ongoing consulting agreement, plus business expenses.

*The following are reimbursable expenses:*
*Business expenses will include hotels, meals, rental car, airfare, mileage, parking, taxi and postage etc.*

**Project #3:  Customer Site Reviews**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ALLERGAN_MDL_03402072

BuzzeoPDMA will provide independent customer site reviews for select Actavis' customers and potential new customers (pharmacies and/or physician clinics) to support Actavis due diligence program. These on-site reviews will assist Actavis with making regulatory and business decisions on the validity of each site and its regulatory operations. This project includes:

- Site Review Questionnaire: BuzzeoPDMA will use and complete our proven site review questionnaire for this project.
- BuzzeoPDMA will perform site reviews using our Field Specialists or our Consultants/Associates resources depending on Actavis' request/business needs (see descriptions of each role below). The reviewer will complete the site questionnaire.
- BuzzeoPDMA will provide Actavis a completed, post visit questionnaire (checklist) along with digital pictures and a description of the operations after each visit is completed. This report will be reviewed by our BuzzeoPDMA consultant before submitting to Actavis.
- Project Coordinator: A project coordinator will be assigned to this project and will assist with general coordination for each site review assignment, make sure site review questionnaires are properly competed and reviewed by our BuzzeoPDMA consultant, and provide the final site review report to Actavis.

*Professional Fees: There will be a one-time project setup fee of $3,500 (waived with project #1) for the initial setup of our site review program, which covers Actavis specific business rules and our standard site review questionnaire. The project fee chart below will be used to charge for each assigned site review. Our Project Coordinator and BuzzeoPDMA Consultant's document review time is included within the rates below.*

|  | Resource Type | |
| | Consultant | Field Specialist |
| Site Reviews | Cost per Visit | Cost per Visit |
| Per Site Review | $ 1,295.00 | $ 495.00 |

Assumptions:
- *Business travel expenses: No business travel expenses will be charged when our Field Specialists perform assignments; however, our consultants are regionally based and will require BuzzeoPDMA to invoice for their travel related expenses. All business travel expenses will be paid in accordance with Actavis' Travel Policy attached as Exhibit B.*
- *Each review is estimated to take 2 to 4 hours onsite, plus travel time and finalizing the questionnaire.*
- *BuzzeoPDMA will provide Actavis with our standard site review questionnaire. If the Actavis requests that we make revisions to our standard questionnaire, we reserve the right to invoice for the extra development time under this Agreement. We would require consent from Actavis if this is required.*

*Two levels of Personnel (Resource Type):*

*Field Specialist: Recommended for more routine reviews and inspections.*
*Our field specialists are well trained on our site review program, typically have life sciences or pharmaceutical related experience, possess at least a bachelor degree, and are under a contractor's agreement with our organization which includes confidentiality terms. Site reviews using our field specialists are locally based with no travel expenses to Actavis.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER　　　　　　　　　　　ALLERGAN_MDL_03402073

*Consultant: Recommended for reviews and inspections of higher risk or large purchasing volume accounts.*
*Review using former DEA experienced Associates or Consultant/Associate level personnel with investigative backgrounds and include employees and/or contractors in which we have professional agreements which includes confidentiality terms. BuzzeoPDMA Associate/Consultants are regionally based and in most cases, business travel expenses would be required.*

*The following are reimbursable expenses:*
*Business expenses will include hotels, meals, rental car, airfare, mileage, parking, taxi and postage etc.*

*For Project #1, Actavis will be invoiced an initial retainer of 50% of the $48,500.00 with the remaining 50% balance invoiced at SOM model turnover to Actavis.*

*Project #2, Actavis will be invoiced annually at the start of the maintenance support services the amount set forth in this Schedule A.*

*For Project #3, BuzzeoPDMA will invoice the project set fee initially (unless waived with Project #1), then each site review will be invoiced monthly.*

In accordance with BuzzeoPDMA Personnel Section 1 (c) of the Agreement, for the support of Projects #1, 2 and 3, BuzzeoPDMA will be using both its employees and Contractors including PhD Statisticians & resources used for the site reviews).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        ALLERGAN_MDL_03402074

**EXHIBIT B**
**Travel Policy**

BuzzeoPDMA shall be reimbursed for reasonable expenses actually incurred in connection with the performance of the Services under this Agreement (provided, however, that all travel plans shall be pre-approved by Actavis).

BuzzeoPDMA shall submit to Actavis an itemized statement of reimbursable expenses (with receipts attached) within thirty (30) days of the last day of each month in which the expense(s) was incurred. All expenses require a receipt with the exception of tips (however, tips must be detailed, i.e., bellboy in lobby, parking attendant at hotel, etc.). Each statement shall contain reference to this Agreement.

The following shall apply to expenses incurred under this Agreement:

I.      Airfares:  At the lowest rate available not to exceed coach.  Reservations shall be made as early as possible.

II.     Ground Transportation:

    (i)      Automobile, Mileage:  If using own car, a per mile rate that corresponds to the current quoted rate per the Internal Revenue Service for actual miles traveled in the performance of Services.

    (ii)     Automobile, Rental:
        (a)    where necessary in the performance of the Services, subcompact or compact shall be used unless more than four people share the same car.
        (b)    where two or more BuzzeoPDMA personnel are at the same site in connection with this Agreement, one car shall be shared by up to four individuals.

    (iii)    Use hotel shuttle services when available.

    (iv)     Taxi receipt must be obtained and tip amount needs to be on receipt.

    (v)      Parking and tolls should be accompanied by receipts.  Bulk listing of tolls will not be accepted.

III.    Meals:    Breakfast – Up to $10
           Lunch – Up to $15
           Dinner – Up to $35

Meals may be added to the hotel bill, but must be listed separately in expense statement to Actavis.

IV.     Lodging:    Safe, clean and cost-effective hotels (i.e., Marriott, Marriott Courtyard, Hilton, Embassy Suites, Days Inn, Best Western, Quality Inns or Sheraton.).  Pre-approval by Actavis is required if BuzzeoPDMA needs to stay at a hotel that is "over-budget."  The following shall also apply:

    (i)      Allowable expenses include room and tax, high-speed internet connection fees and reasonable meal expenses.

    (ii)     Personal entertainment or recreation (in-room movies, mini-bar, health club fees, etc.) is not reimbursable.

    (iii)    All expenses must be categorized and itemized appropriately on the expense statement (separate meals, lodging, internet, etc.).

V.      Telephone Calls:   Those necessary for the performance of the Services.  Personal calls are not reimbursable.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ALLERGAN_MDL_03402075

# SERVICE PROVIDER MASTER AGREEMENT

**THIS MASTER AGREEMENT,** effective as of June 4, 2014 (hereinafter "Effective Date"), by and between Actavis Pharma, Inc., with offices at 360 Mt. Kemble Ave., Morristown, New Jersey 07962-1953 (hereinafter called 'Actavis") and BuzzeoPDMA LLC, having an address at 1025 Boulders Park'way, Suite 301, Richmond, VA 23225 (hereinafter called "Service Provider"). Each of Actavis and Service Provider are sometimes hereinafter referred to as a "Party" or collectively as the "Parties":

**WHEREAS,** Service Provider provides compliance and sample management solutions for the life sciences industry; and

**WHEREAS,** Actavis and or its affiliates ("Affiliates") may require various services from time to time in support of various projects (individually, a "Project", and collectively "Projects"). Documents referring to such services shall be attached hereto and incorporated herein as Project Documents to this Master Agreement.

**In consideration** of the mutual promises contained herein, the parties hereby mutually agree as follows:

## 1. Appointment

1.1 The specific responsibilities and obligations to be performed by Service Provider with respect to a Project (the "Services"), a description of the Scope of Work including performance schedules, and the budget shall be set forth in Project Documents attached to this Master Agreement as exhibits, which shall be incorporated by reference herein (collectively, for each Project these documents shall be referred to as "Project Documents". Service Provider shall provide the Services hereunder and in completing each Project according to the schedule set forth in the Project Documents.

1.2 "Affiliate" shall mean and refer to a Actavis entity which directly or indirectly through one or more intermediaries owns or controls, is owned or controlled by or is under common ownership or control with Actavis. For the purposes of this definition, the term "owns" (including, with correlative meanings, the terms "owned by" and "under common ownership with") as used with respect to any party, shall mean the possession (directly or indirectly) of more than 50% of the outstanding voting securities or other equity or voting interest of an entity.

1.3 "Contractor" shall mean any vendor, consultant or contractor utilized by Service Provider to accomplish defined tasks in the Services.

1.4 "Governmental Authority" shall mean any Federal, state, local or foreign governmental authority, agency, court, regulatory commission or other governmental body.

## 2. Payment

2.1 The estimated costs and payment schedule for each Project shall be set forth in the Project Documents. Actavis shall pay to Service Provider all amounts, exclusive of Pass—Through Expenses (as hereinafter defined), due to Service Provider for the Services (hereinafter "Service Fees"). Payment of all invoices shall be made by Actavis within 45 days of the date of the receipt of the applicable invoice by Actavis. All unpaid amounts due to Service Provider hereunder shall bear interest at the rate of one and a half percent (1.5%) per month or at the highest rate permitted by New Jersey law, whichever is less; provided however, that in the event of a "good faith" controversy regarding the invoice, Actavis shall have the right to withhold the amount in controversy (without such payment being subject to such interest) while the parties resolve the issue.

2.2 (a) Actavis shall be responsible to reimburse Service Provider for all reasonable travel, meals and lodging expenses which are incurred by Service Provider in connection with Service Provider's performance hereunder and which are approved in writing by Actavis's prior to their incurrence (hereinafter "Pass-Through Expenses"). All Pass-Through Expenses shall be paid to Service Provider net forty-five (45) days from the date of receipt of invoice therefor.

(b) Actavis will reimburse Service Provider for all amounts payable to third parties by Service Provider on Actavis's behalf (which such third party services have been previously authorized in writing by Actavis) when such payments are due and payable to such third parties provided, that Service Provider provide original receipts therefore and provides at least fifteen (15) days' prior notice of such payment obligations. Actavis will not advance any monies for payments to such third parties and will not be liable for reimbursement or payment to any third parties for services for which Actavis had not previously issued its approval in writing. If Actavis does not make such payment to Service Provider in accordance with the above, then, in addition to Actavis's reimbursement of such payment to Service Provider upon demand, Actavis will incur default interest charges at the rate of five percent (5%) on any such payments to third parties properly due and owing in accordance with the terms hereof..

2.3 In the event that a Project requires more time than allotted in the Project Documents, and the

parties agree to continue such Services beyond the expected conclusion date, Service Provider shall advise Actavis, in writing, of any additional Service Fees (to be determined at the contractual rates set forth in the Project Documents) to be incurred in connection therewith, and upon written approval by Actavis, the Services shall be completed and Actavis shall pay the additional Service Fees incurred in order to complete the Project.

**2.4** All invoices for Pass-Through Expenses shall be accompanied by documentation. Because the difficulty in substantiating the validity of claims for payment increases with time, in no event shall Actavis pay on invoices submitted more than one hundred twenty (120) days after an expense has been incurred.

**2.5** Any expenses for which Actavis is liable to Service Provider pursuant to this Section 2.2 shall be "Reimbursable Expenses." During the term of this Master Agreement and for a period of two (2) years after its expiration or termination, but not more than once in any calendar year, Actavis may, at its own expense and upon reasonable advance written notice and during regular business hours, (i) audit Service Provider's records concerning Reimbursable Expenses for which it received reimbursement from Actavis hereunder during normal business hours for the sole purpose of verifying the accuracy of the invoices submitted by Service Provider and the amounts paid or payable by Actavis hereunder and (ii) .only in the event that services will be provided by Service Provider hereunder on a time and materials basis, audit any financial records of Service Provider associated with this Master Agreement and such Project Document (and fees associated therewith) attached thereto (including, without limitation, invoice records, invoices from third parties, contracts with third parties, and payments relating to this Master Agreement and/or such Project Document(s))..

**2.6** The parties acknowledge and agree that the compensation set forth in a Project Document represents the fair market value of the services provided by Service Provider to Actavis negotiated in an arms-length transaction and has not been determined in a manner which takes into account the volume or value of any referrals or business otherwise generated between Actavis and Service Provider. The parties further agree that this Master Agreement, and any related Project Documents, do not involve the counseling or promotion of a business arrangement that violates state or federal law.

**3.** **Confidentiality**

"Confidential Information" shall, for the purpose of this Master Agreement, mean any and all business and technical information in any form, tangible or intangible, of a Party which may be disclosed by to the other in writing, orally or by observation, which is either nonpublic, proprietary, a trade secret, or confidential in nature. Each Party agrees to hold in trust and confidence all of the information obtained from the other or otherwise generated pursuant to this Agreement. Neither Party shall disclose all or any part of such Confidential Information to any third party or make use thereof (except to perform its obligations pursuant to the provisions of this Master Agreement), or publish or present any work, which in whole or in part uses Confidential Information, without the prior written consent of the other Party. Each Party agrees to restrict access to all such information within its company to only such limited group of authorized employees, who (i) require such information in connection with its activities pursuant to this Master Agreement and (ii) have signed a Confidentiality Agreement having substantially similar terms to the confidentiality provisions set out in this Section. It is understood, however, that Confidential Information does not include any information which (1) is or becomes generally available to the public through no breach of this Agreement or violation of this Agreement by the receiving party, (2) as can be demonstrated by the written records of the receiving party, was independently developed by the receiving party without use of or reliance upon the disclosing party's Confidential Information or (3) as can be demonstrated by the written records of the receiving party, becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party; provided that such source is not prohibited from transferring the information to the receiving party by a contractual, legal or fiduciary obligation. Service Provider shall return all such information in tangible form (including all copies, extracts or derivatives thereof) to Actavis within sixty (60) days after the termination or expiration of the term of this Master Agreement, or upon request by Actavis, whichever comes first. For the avoidance of doubt, retention of electronic copies of Confidential Information maintained pursuant to regular data archiving and record retention policies and practices shall not be deemed to be a violation of this Section 3. Notwithstanding the foregoing, each Party may disclose Confidential Information (1) to its Affiliates and those of its and its Affiliates' directors, officers, employees, independent contractors, accountants and attorneys (collectively "Representatives") who need such information in order to assist or advise such Party in the performance of its obligations hereunder provided that (A) such Representatives are subject to written obligations of confidentiality and non-use no less restrictive than those set forth herein, (B) disclosure to independent contractors may not be made without the other Party's prior written consent, which consent shall not be unreasonably withheld and (2) regarding the terms and conditions of this Agreement to the extent required by applicable law. Each Party shall be liable for any breach of this Section 3 by any of its Representatives. Each Party shall promptly notify the other Party if it discovers any unauthorized use, copying or disclosure of the other Party's Confidential Information.

## 4.    Intellectual Property

### 4.1.    Work for Hire

Subject to and except as provided in Section 4.4 below, the parties expressly agree that to the extent that the work performed under this Master Agreement or a Project Document is fixed in tangible form and prepared exclusively for Actavis, such work shall be deemed a work made for hire as defined under 17 USC Section 101 (the "Works"). All such Works which are or have been made or written by Service Provider or its employees (and which are based upon Services performed by Service Provider for Actavis hereunder) shall belong exclusively to Actavis, including rights to obtain copyrights in such Works regardless of whether such materials, concepts and plans have been produced and employed by Actavis in their marketing and communications efforts. In cases where a Work or a copy of a Work cannot be owned, Actavis shall be notified by Service Provider and Actavis shall have only those rights of use granted by the owner of such Work. All communications materials and artwork developed or provided by Actavis shall also remain the property of Actavis, including the right to obtain copyrights.

### 4.2.    Assignment of Intellectual Property

Service Provider agrees to assign to Actavis all intellectual property in the Works, including but not limited to copyrights, whether patentable or not, and inventions conceived or reduced to practice by Service Provider's employees alone or jointly with others during the term of this Master Agreement or any Project Document attached hereto to the extent that such rights are within a Work, which intellectual property in such Work either (i) uses or incorporates Confidential Information belonging to Actavis or (ii) consists of deliverables prepared exclusively for Actavis in performance of the Services hereunder. Service Provider agrees to disclose promptly and fully all intellectual property belonging to Actavis under this Master Agreement and to assist Actavis in every reasonable way, at Actavis's expense, to protect the rights of Actavis or any affiliate in the intellectual property in such Works, including obtaining patents and copyrights thereon in any and all countries.

### 4.3.    Presumption of Ownership

Service Provider further agrees that it shall be conclusively presumed that any patent and copyright applications related to information introduced by or originating with Actavis consisting of Actavis's commercial, developmental or experimental products or Actavis's trade secrets Confidential Information, which Service Provider or any of its employees may file within one year after termination or expiration of the term of this Master Agreement, shall belong to Actavis and Service

Provider further agrees to assign same to Actavis as having been conceived or reduced to practice during the term of this Master Agreement and to assist Actavis in every reasonable way, at Actavis's expense, to obtain patents and copyrights thereon in any and all countries.

### 4.4.    Service    Provider    Independent Information

Notwithstanding anything to the contrary in this Agreement, including, without limitation, notwithstanding anything set forth in Sections 4.1 through 4.3 herein, Service Provider Independent Information (defined below) shall be and remain the property of Service Provider and there shall be no condition, restriction, or limitation on Service Provider's free and unfettered use, disclosure, or assignment of Service Provider Independent Information, Service Provider possessing all right, title and interest therein and thereto free and clear of any right, title, interest or other encumbrance of Actavis. Service Provider hereby grants Actavis a non-exclusive, perpetual, fully paid-up (provided that Actavis fulfills its payment obligations in accordance with the terms herewith), irrevocable (except in the event of Service Provider's termination of this Agreement due to Actavis's material breach hereunder) worldwide license, subject to Actavis' obligations under Section 3, to use, copy, distribute, and display, and to authorize others to use, copy, distribute, and display for Actavis's business purposes any Service Provider Independent Information provided to Actavis under this Agreement. Nothing contained in this Agreement shall be construed as restricting Service Provider from using or disclosing any general learning, skills or know-how discovered or developed by its personnel under this Agreement or otherwise, except to the extent that same is derived from Actavis's Confidential Information and/or trade secrets..

(c) Trade secrets, inventions, processes, know-how, technical expertise, knowledge, concepts, analyses, tools, frameworks, models, templates, formats, industry perspectives, data, software and other intellectual property that have been or are independently invented, discovered, developed or obtained (without reference to or use of any Confidential Information or other intellectual property of Actavis disclosed or made available to Service Provider under this Agreement) by or for Service Provider, including, without limitation, any information invented, discovered, developed or obtained by Service Provider during the performance of this Agreement and all intellectual property rights associated therewith, shall be known as "Service Provider Independent Information".

ALLERGAN_MDL_02160691

## 5 Term

4.1 The term of this Master Agreement shall be for the period beginning with the Effective Date hereof and ending on the third anniversary thereof, unless terminated earlier in accordance with the terms set forth hereinA Project Document may be terminated upon completion of all ongoing Services.

4.2.   Termination for Cause. Either party may terminate this Agreement at any time in the event the other party commits a material default of any of its obligations, which such defaulting party fails to cure within thirty (30) days after receiving written notice of such default from the other party.

4.3.   Termination in the Event of Bankruptcy. Either party may terminate this Agreement upon thirty (30) days written notice following (1) the filing of a voluntary or involuntary petition in bankruptcy by or against the other party or (2) the liquidation of the other party.

4.4    This Agreement may be terminated upon the mutual written consent of the Parties.

Termination or expiration of the term hereof shall not relieve either party of the obligations imposed upon Service Provider by the provisions of Section 3 and 4 aboveand 7 and 12 below , said provisions shall survive for a period of five (5) years from expiration or termination of this Master Agreement. In the event of termination of a Project by Actavis for any reason other than Service Provider's breach of the terms of this Master Agreement, Service Provider shall be reimbursed for costs incurred to the date of termination, and for all reasonable non-cancelable commitments outstanding as of that date, such reimbursement in no event to exceed the approved budget set forth in the respective Project Document, and any additional sums approved by Actavis, in advance, in writing. Said request for reimbursement shall be accompanied by supporting documentation.

## 5. Independent Contractor

The relationship of Service Provider to Actavis is that of an independent contractor and nothing herein shall be construed as creating any other relationship.        Service Provider may adopt such arrangements as it may desire with regard to the details of the Services performed hereunder, the hours during which the Services are to be provided, and the place or places where the Services are to be furnished, provided that such details, hours and places shall be consistent with the proper accomplishment of the Services, and provided further that the Services shall be performed in a manner calculated to attain the most satisfactory results for Actavis. Service Provider may delegate to a Contractor its obligations to perform any of the Services without prior written consent of Actavis. In such event Service Provider shall cause such Contractor to comply with the terms and provisions hereof applicable to such delegation and shall be liable for Contractor's failure to comply with same. Furthermore, such delegation shall not release Service

Provider of its responsibility to Actavis regarding the timely and proper performance of such Services.

## 6.   Compliance

### 6.1    Safety Compliance

In the event Service Provider is to perform any of the Services on Actavis's premises, Service Provider agrees that it shall comply with the applicable safety rules and regulations of the particular location where the Services are to be performed, and Actavis agrees that said safety rules and regulations shall be made available to Service Provider before the commencement of performance of any such Services.

### 6.2    Compliance with Pertinent Standards.

If applicable to the Services, in performing its obligations under this Agreement, Service Provider and Actavis agree to abide by all applicable laws, rules and regulations, including without limitations, the (i) U.S. Food and Drug Administration's "Guidance for Industry-Supported Scientific and Educational Activities"; (ii) "Guidelines for Gifts to Physicians", issued by the American Medical Association; (iii) PhRMA Code on Interaction with Healthcare Professionals; and (iv) any other governing accrediting body standards applicable to the Services described herein.

## 7.    Indemnification; Limitation of Liability

7.1    Service Provider agrees to indemnify, defend and save Actavis harmless from and against any and all claims, injuries, disabilities, losses, fines, penalties, costs, expenses (including reasonable attorneys' fees), damages or liabilities incurred by a Actavis in connection with claims asserted by a third party to the extent caused by any material breach of this Agreement by Service Provider, violation by Service Provider of any law applicable to the Services, and/or negligent or grossly negligent act or willful misconduct of Service Provider or its Representatives and/or Contractors in the performance of the Services .

7.2    NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, OR CONSEQUENTIAL, DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, LOST REVENUES, LOST PROFITS, OR LOST BUSINESS, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE AND, EXCEPT WITH RESPECT TO DAMAGES ARISING FROM A PARTY'S BREACH OF ITS OBLIGATIONS UNDER SECTION 3, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS MASTER AGREEMENT FOR MORE THAN THE AMOUNT PAYABLE TO SERVICE PROVIDER BY

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ACTAVIS UNDER ANY PROJECT DOCUMENT DURING THE PRECEDING TWELVE (12) MONTH PERIOD.

## 8. Equal Opportunity

Service Provider acknowledges that it understands that Actavis is an Equal Opportunity Employer and Service Provider warrants that Service Provider complies with the Fair Labor Standard Act of 1938, as amended. Service Provider agrees that, if this Master Agreement is construed to be a subcontract within the meaning of the Rules and Regulations approved by the United States Secretary of Labor pursuant to Executive Order 11246, as amended, the Vietnam Era Veterans Readjustment Act of 1974, as amended, or the Rehabilitation Act of 1973, as amended, or of the regulations issued pursuant to Executive Order 11625, the provisions of those regulations as well as the Equal Opportunity and Nondiscrimination provision of Section 202 of Executive Order 11246 shall be incorporated herein by reference and shall be binding upon Service Provider as part of this Master Agreement.

## 9. Insurance; Parental Guaranty

9.1     Commencing with the performance of Services hereunder, Service Provider shall, during the term hereof, maintain insurance of the type and minimum coverages indicated below, with insurance carriers reasonably satisfactory to Actavis. The terms of coverage shall be evidenced by certificates of insurance to be furnished to Actavis. Such General Liability and Automobile Liability policies shall name Actavis as an additional insured, as its interests may appear, and the Service Provider shall provide prompt written notice of cancellation material modification or expiration thereof.

| Type | Minimum Limits |
|------|----------------|
| Worker's Compensation | Statutory |
| Employer's Liability | $100,000 |
| General Liability (Including contractual coverage) | $1,000,000 Limit |
| Automobile - any auto | $1,000,000 (Limit) |

9.2

(a)     Cegedim Inc. ("Guarantor") will, upon the demand of Actavis, without deduction for any claim of setoff or any counterclaim or defense, subject to any notice required to be provided to Service Provider or applicable grace period, perform and satisfy those obligations and liabilities of Service Provider set forth hereunder in accordance with its terms. It shall not be necessary to the enforcement of any of the obligations of the Guarantor hereunder that any rights or remedies of Actavis first be pursued against the Service Provider.

(b)     The obligations of the Guarantor under this Guaranty: (i) shall be absolute, irrevocable and unconditional under any and all circumstances without regard to the genuineness, validity, legality or enforceability

of any term hereof, and, irrespective of any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, which discharge and defenses are hereby waived by Guarantor; (ii) are in no way conditioned upon any attempt to enforce performance of or compliance with this Agreement by or against the Service Provider; (iii) shall remain in full force and effect until performance by the Service Provider of all of its performance and payment obligations which Guarantor guarantees performance of pursuant to this Section 9.3; and (iv) shall not be affected or impaired by any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Service Provider or any defense which the Service Provider may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(c)     Guarantor hereby represents and warrants to Actavis that: (i) Guarantor is a corporation duly organized and existing in good standing under the laws of the State of New Jersey and has full power and authority to make and deliver this Guaranty; (ii) the execution, delivery and performance of this Guaranty by Guarantor have been duly authorized by all necessary corporate action; and (iii) this Guaranty has been duly executed and delivered by the authorized officers of the Guarantor and constitutes a lawful, binding and legally enforceable obligation enforceable in accordance with its terms.

(d)     This Guaranty shall be binding upon the successors and assigns of the Guarantor and its successors, and shall inure to Actavis's benefit and to the benefit of Actavis's successors and assigns. This Guaranty may not be modified, amended, terminated or revoked, in whole or in part, except by an agreement in writing signed by Guarantor and Actavis.

## 10.     Service Provider's Warranties; Conflicts of Interest

10.1.     Service Provider represents and warrants that: (i) it has no obligations to any third party which will in any way limit or restrict its ability to perform Services for Actavis hereunder, (ii) it shall not disclose to Actavis, nor make any use in the performance of services hereunder of the trade secrets or proprietary information of any third party without Actavis's prior written consent,     (iii) it possesses the necessary expertise to perform the Services hereunder consistent with the customary standards of the industry; and (iv) it shall perform the Services in a professional and workmanlike manner as agreed to by the parties..

## 10.2.     Requirement to Advise of Future Conflicts

Service Provider further warrants and affirms that it shall advise Actavis of any such relationships that might arise during the term of this

Master Agreement. In such event, Actavis shall have the option to terminate this Master Agreement without further liability to Service Provider other than the obligations to pay for Services actually rendered through the date of such termination.

### 10.3. Limitations On Warranties.

THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE 10 HEREOF ARE IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES AND SERVICE PROVIDER HEREBY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR USE AND/OR A PARTICULAR PURPOSE.

### 11. Undertaking by Employees and Contractors of Service Provider

Service Provider agrees that it is a condition precedent to the obligations of this Master Agreement that it have each employee and/or Contractor who will be performing work hereunder agree to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof. Service Provider shall not assign any employee or Contractor to the performance of Services hereunder unless such person agrees to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof. In the event Service Provider shall assign an employee or Contractor to the performance of work hereunder after the date of execution of this Master Agreement, Service Provider shall ensure such employee or Contractor agrees to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof.

### 12. Tax Reporting and Payment

All amounts due to Service Provider hereunder are net of any and all taxes (including withholding taxes), assessments, charges and levies of any Governmental Authority, all of which shall be the sole obligation of Actavis, except for taxes payable on the income of Service Provider.

### 13. Miscellaneous Provisions

#### 13.1. Assignability

This Agreement may not be assigned (by operation of law or otherwise) or transferred, in whole or in part, by either party without the prior consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed);; provided, however, that either party shall be entitled to assign this Agreement, without the prior written consent of the other party, to an Affiliate of such party, if such Affiliate assumes such party's obligations hereunder. Except as specifically provided herein, this Agreement is not intended to and does not create any rights in favor of any Person not a party hereto.

#### 13.2. Extraordinary Relief

In the event of the actual or threatened breach by Service Provider of any of the terms of Section 3 hereof, Actavis shall have the right to seek specific performance and injunctive relief. The rights granted by this Section are in addition to all other remedies and rights available at law or in equity.

### 13.3. Complete Agreement

This Master Agreement, Exhibits and all Project Documents executed pursuant to it constitute the entire agreement between the parties hereto with respect to the subject matter hereof, and there are no other agreements or understandings, written or oral, between the parties relating to the subject matter of this Master Agreement. No amendments or modifications of the terms of this Agreement, including any conflicting or additional terms contained in any sales order, acknowledgment form, or other written document submitted by either party hereto, shall be binding on either party hereto unless reduced to writing and signed by a duly authorized representative of each party hereto.

#### 13.4. Amendments

This Master Agreement may not be altered, changed or amended except by a writing signed by each of the parties hereto.

#### 13.5. Severability

In the event that any provision of this Master Agreement is held illegal or invalid for any reason, such provision shall not affect the remaining parts of this Agreement, but this Master Agreement shall be construed and enforced as if that illegal and invalid provision had never been inserted herein.

#### 13.6. Captions and Headings

The captions and headings in this Master Agreement are for convenience and reference only, and they shall in no way be held to explain, modify, or construe the meaning of the terms of this Master Agreement.

#### 13.7. Counterpart Originals

This Master Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall constitute one and the same document.

#### 13.8 Choice of Law; Jurisdiction

This Master Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey without giving effect to the choice of law principles thereof. The parties agree to accept service of process and to be bound by the decision of a State or Federal court of competent jurisdiction in the State of New Jersey.

**13.9    Notices.**

All notices, requests and other communications shall be in writing and shall be validly given or served when (a) hand delivered, (b) delivered by recognized commercial overnight courier services, or (c) given by registered or certified first class mail, postage prepaid, return receipt requested, to the individual named on the signature page hereof, at the address set forth herein, or to such other address as shall have been specified by such Party.

**13.10 Conflict**

In case of conflict between this Master Agreement, an applicable Project Document and any other document, the terms of the Project Document shall prevail in all business matters and this Master Agreement shall prevail in all administrative matters unless the applicable Project Document expressly states otherwise.

**13.11.** With respect to any consulting services performed as part of the Services which involve compliance with regulatory requirements, the sole duty of Service Provider shall be to examine or review existing practices, policies or procedures (as set forth in its engagement), report to Actavis and make appropriate recommendations within the scope of the Services; Service Provider shall have no liability or obligation (i) with respect to any prior violations of such requirements by Actavis; or (ii) to insure that any analysis or recommendations are adopted or implemented by Actavis; responsibility for implementing any recommendations and monitoring, overseeing and insuring compliance shall be the sole responsibility of Actavis. Without limiting the generality of the foregoing, Actavis agrees and acknowledges that the ultimate regulatory burden of compliance is and shall remain with Actavis, and nothing herein contained is intended to shift such burden to Service Provider.

**13.12** Any analysis by Service Provider as part of the Services is based solely on information and individuals made available to Service Provider by Actavis during its performance of the Services. Recommendations and analysis provided by Service Provider as part of the Services represent

Service Provider's professional judgment based on its knowledge of and experience with the DEA, CSA, FDA and PDMA and comparable state laws. Certain requirements of federal and state regulations thereunder are subject to interpretation and such interpretations may contain subjective components; implementation of any recommendations does not guarantee that federal, state, or other governmental authority would not find any violations.

**13.13** The Services provided to Actavis by Service Provider are advisory in nature and Service Provider's entitlement to payment hereunder is neither, directly or indirectly, tied to nor a function of any specific results or the outcome of any efforts Service Provider may undertake.

**13.14** Actavis agrees to disclose fully, completely and accurately any and all material information regarding its business and services to Service Provider in order to permit Service Provider to perform the Services hereunder.

**13.15** Service Provider performs services to other clients which may have, directly or indirectly, common, similar or competing interests to the interests of Actavis. Without derogating from Service Provider's confidentiality obligations expressly provided under this Agreement, nothing herein shall be construed or interpreted to limit or restrict in any way the nature or type of services which may, during the Term of this Agreement or thereafter, be performed or undertaken by Service Provider for other parties.

**13.16** During the term of this Agreement, and for a period of one (1) year thereafter, each party will not directly or indirectly, and it will cause its Affiliates not to directly or indirectly, (a) solicit for employment any Person who is an employee or consultant of the other party or any of its Affiliates or who was an employee or consultant of such party or its Affiliates at any time during the term of this Agreement; provided; however that nothing contained herein shall be construed as a restriction on any such persons answering a party's general solicitation for employment. .

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized representatives to sign this Master Agreement upon the date first set forth above.

BuzzeoPDMA LLC.

By: _____

Its: SVP, Business Development

Dated 10/4/14

Actavis Pharma, Inc.

By: _____

Its: _____

Dated _____

**Tom Griffin**
**VP Business Operations**
**Actavis Pharma**

**Customer Services Agreement**
**Statement of Work No. 1**

This Statement of Work No. 1 is entered into by and between Watson Pharma, Inc. (the "**Customer**") having an address at 360 Mt. Kemble Ave., Morristown, New Jersey 07962-1953 and **BuzzeoPDMA LLC** ("**BuzzeoPDMA**"), having its office at 1025 Boulders Parkway, Suite 405, Richmond, VA 23225.

Customer and BuzzeoPDMA LLC are parties to the Customer Services Agreement dated April 7, 2011 (the "Agreement").

This Statement of Work is amended to the Agreement and shall be governed by the terms and conditions of the Agreement as if set forth in full herein.

The parties agree to the following:

**1.  Scope of Services**

**Suspicious Order Monitoring (SOM) – Onsite System Review**

BuzzeoPDMA will provide Customer an onsite review and assessment of its current SOM system.  We will meet with Customer's SOM team to conduct a thorough discussion and review of the SOM system. The assessment will involve an onsite meeting at Customer's New Jersey office.

During this assessment, BuzzeoPDMA consulting team will review, discuss, and evaluate the following elements of Customer's SOM system*:

- o  We will review and analyze Customer's SOM system.
- o  We will discuss and review Customer's approach used to design its SOM system.
- o  We will meet with Customer's IT and compliance teams to gain an understanding of the available data tables, schemas, fields, etc. in your current orders tracking system and how these items have been integrated into Customer's approach to SOM.
- o  We will discuss the data that is available and what is the appropriate sampling of the actual data needed to "train" a set of statistically based and supportable index modeling formulas, if appropriate.
- o  We will discuss those parameters and data points that are inherently unique to each account type and the requirements for developing a statistically justifiable SOM model specific to each account type.
- o  We will discuss the systems validation of the SOM system if applicable.

*While BuzzeoPDMA will provide regulatory guidance and high level insight to model review, we will not share BuzzeoPDMA specific Intellectual Property, trade secrets, model details, etc.

The deliverable for this onsite review will be a report that identifies any gaps or other recommended changes to assist Customer in enhancing their SOM system to comply with DEA regulations and associated memorandum regarding SOM.

Our two person consulting team will consist of a Ph.D. statistician and an individual with former DEA experience, both of whom are well versed in SOM regulations and systems.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_02467194

***Professional Fee:*** **$12,750 for the one to two day review, report preparation, and delivery, plus business expenses.**

***The following are reimbursable expenses:***

    ***Business Expenses:***

| | |
|---|---|
| Hotel: | Equivalent to Marriott Courtyard |
| Meals | Not to exceed $85.00 per day |
| Rental Car: | Mid-size |
| Airfare: | Obtain lowest coach fares available |
| Misc: | UPS/Federal Express/Postage/Printing/Mileage/Parking/Taxi |

**Invoices shall be sent to:**

*Thomas Napoli, Manager Security: DEA - Affairs*

Name, Title

*MORRIS CORPORATE CENTER III*
*400 Interpace Parkway*

Address

*Parsippany, NJ, 07054*

*862-261-7193*

Phone Number

*862-261-7927*

Fax Number

*TOM.NAPOLI @ WATSON.Com*

Email address

***Please check one of the following:***

\_\_\_\_ **Purchase order #** _____**required (please attach copy)**

    Please remit payment as noted below:

| | |
|---|---|
| Mail Checks to: | Wire Transfer to: |
| BuzzeoPDMA LLC | BuzzeoPDMA LLC |
| P.O. Box 281414 | c/o Bank of America |
| Atlanta, GA 30384-1414 | ABA No. 0260-0959-3 (EFT) |
| | ABA No. 0212-0033-9 (ACH) |
| | Account No: 381026605690 |

\_\_\_\_**Purchase order not required for payment**

*Please answer the following question:*

Does your company allow for invoices to be received electronically?  **Yes**   **No**
If the answer is "yes", to what e-mail address should the invoices be sent? _____
(BuzzeoPDMA understands that certain invoices have supporting documentation; therefore, these invoices will be mailed with the backup, in addition to the invoice being sent electronically.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                  

The undersigned have caused this Statement of Work No. 1 to be accepted as of the Signature Date below.

Watson Pharma, Inc.

By: _~~~~~_

Name: _Sen ic Saldis_

Title: _bree Director_

Date: _7/28/11_

BuzzeoPDMA LLC

By: _William Buzzeo_

Name: William E. Buzzeo

Title: General Manager and Vice President

Date: _8/3/11_

ALLERGAN_MDL_02467196

# EXHIBIT B



February 15, 2019

Patrick L. Oot

1155 F Street, N. W., Suite 200
Washington, D.C. 20004
**t** 202.783.8400
**dd** 202.639.5645
**f** 202.783.4211
oot@shb.com

VIA ELECTRONIC MAIL

Catie Ventura
Associate
Kirkland & Ellis
655 Fifteenth Street, N.W.
Washington, D.C. 20005
T: 202.879.5907
E: catie.ventura@kirkland.com

Re:   IQVIA's clients affected by the *In re National Prescription Opiate Litigation*, MDL No. 2804 in the Northern District of Ohio

Dear Catie:

We write you to confirm that on behalf of IQVIA, Shook, Hardy & Bacon, LLP has received requests from certain Defendant manufacturers, distributors, retailers, and others ("Clients") seeking that IQVIA provide Clients with documents regarding their Suspicious Order Monitoring ("SOM") engagement with BuzzeoPDMA, LLC, Cegedim, Dendrite, and Cegedim Dendrite ("Buzzeo-related entities"). We understand that Clients' requests seek documents in response to Plaintiffs' demands in the *In re National Prescription Opiate Litigation, MDL No. 2804* litigation in the Northern District of Ohio.

On September 14, 2018, IQVIA properly objected to Plaintiffs' Rule 45 subpoena but agreed to work with Clients to assist them in fulfilling their discovery obligations if such requests did not present an undue hardship or burden on IQVIA, which is not a party in this litigation. Over the last few months, IQVIA assisted Clients in fulfilling their productions related to sales and prescription data, and it is our understanding that the PEC has conveyed to the Court that Plaintiffs are satisfied with Clients' sales and prescription data productions. Now, all that is left are the SOM-related requests. This letter addresses those requests.

Since August 2018, Shook has worked diligently with IQVIA to identify Defendants' SOM-related engagements.  In that regard, efforts to locate SOM-related engagements have been a significant burden as no single employee, data source or location exists that contains SOM-related engagement materials. The search for SOM-related information for multiple Clients has required, among other things, hundreds of hours of IQVIA employee and outside counsel time that has included, but is not limited to, disruptive



employee interviews, document collection, and significant manual line-by-line, page-by-page analysis for necessary redactions in order to protect IQVIA's confidential commercial information. As Clients have reviewed their own repositories and found gaps or deficiencies, Clients have requested IQVIA to fill those gaps, and IQVIA diligently has endeavoured to do so, to the extent the documents are readily accessible and still exist.

February 15, 2019
Page 2

In our January 29, 2019 letter to the PEC, we summarized the results of IQVIA's efforts. IQVIA continues to provide Clients with information, upon request, to the extent that it still exists, on a first-in-first-out basis:

- On January 7, 2019, IQVIA began providing Clients with readily accessible agreements and statements of work ("SOWs") with Buzzeo-related entities via a secure download link and password.

- On February 11, 2019, IQVIA began providing Clients with readily-accessible deliverables with Buzzeo-related entities via a secure download link and password.

- By February 22, 2019, barring any unforeseen circumstances, IQVIA will provide Clients with the final set of readily-accessible deliverables with Buzzeo-related entities via a secure download link and password.

Recently, in addition to requests for contracts, SOWs and deliverables, IQVIA has received requests for *all* existing communications between Buzzeo-related entities and Defendants. On September 14, 2018, in IQVIA's Responses and Objections to Plaintiffs' Rule 45 Subpoena, IQVIA objected to this request, as it is overly broad, not proportional to the needs of the case, and seeks to impose undue burden and expense on a non-party for what is likely duplicative information. Instead, we agreed to cooperate with Clients on a cohesive and targeted approach to identify information within the scope of discovery and provide Clients with what is proportional to the needs of a case from a non-party. IQVIA's cohesive and targeted approach included contracts, SOWs, and deliverables and asked Clients to tell IQVIA what they believe might be missing.

As we have previously conveyed, parties must search their own document repositories, including e-mail sources before burdening a non-party. *See* Fed. R. Civ. P. 45(d)(1); *see also Waite, Schneider, Bayless & Chesley Co. v. Davis*, No.1:11-cv-0851, 2013 WL 146362, at *4-5 (D.D. Ohio Jan. 14, 2013); *In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253-54 (S.D. Ohio Jan. 3 2013) (quashing non-party subpoena because "[Plaintiff] must first establish that it cannot obtain the discoverable information from its party-opponent before subpoenaing those documents from a non-party"); *Musarra v. Digital Dash, Inc.*, No. 2:05-cv545, 2008 WL 4758699, at *3-4 (S.D. Ohio Oct. 30, 2008) (refusing to require non-party to produce documents when they were available



from a party to the litigation); *Recycled Paper Greetings v. Davis*, No. 1:08—mc—13, 2008 WL 440458, at *4-5 (N.D. Ohio Feb. 13, 2008) (granting a motion to quash subpoena, in part, because "the vast majority of the relevant documents" could have or had been produced by a party to the litigation).

February 15, 2019
Page 3

Parties in the litigation, not IQVIA, are the best source for this information. *See* Fed. R. Civ. P. 26(B)(2)(C)(i) (the court must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that "discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"); *see also* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").

IQVIA has objected and continues to object to the production of likely duplicative e-mail correspondence.  The unreasonable burden and expense of searching for, collecting, processing, reviewing and producing e-mail messages for multiple SOM Clients will only inflict costs of exponential magnitude on IQVIA, a non-party, when it is far more efficient, less burdensome and proportional for each individual Client to first search its own e-mail repositories. Forcing this undue burden on IQVIA violates the Rules and common sense.

In addition, IQVIA did not participate in the development of the ESI Protocol, negotiate the Protective Order, or negotiate the search terms to be applied in this litigation. *See United States v. Columbia Broad. Sys., Inc.,* 666 F.2d 364, 371 (9th Cir. 1982) (because "[n]onparty witnesses are powerless to control the scope of litigation and discovery, [they] should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party."). To embark upon a duplicative e-mail fishing expedition beyond the cohesive and targeted approach that IQVIA has undertaken would cost hundreds of thousands of dollars, if not millions, and the expenditure of significant internal resources, that a non-party should not be forced to bear.

It is our understanding that the PEC has asked Defendants if they have produced all existing communications in their possession concerning SOM between any of the Buzzeo-related entities and Clients. IQVIA understands that Defendants are in the process of confirming the completeness of their productions to the PEC.  At this time, Defendants have not identified to IQVIA any lost, missing or deficient e-mail productions from Defendants to the PEC and IQVIA does not believe that inflicting duplicative discovery of exponential effort is warranted for a non-party to this litigation. Accordingly, prior to requesting IQVIA to produce all e-mail communications, Defendants should first turn to their own internal resources to identify and produce relevant e-mails. If they have not done so already, Defendants should identify their own



custodians, and search criteria to locate SOM-related communications before propounding IQVIA with burdensome discovery.

*** 

February 15, 2019
Page 4

IQVIA has undertaken significant discovery efforts to assist Clients in satisfying their discovery obligations in response to Plaintiffs' requests. IQVIA will continue to do so, as appropriate and consistent with its reasonable objections. We believe the approach taken by IQVIA in producing to Clients any contracts and deliverables, upon request, is consistent with the Special Master's instructions and undoubtedly has been working.

IQVIA will continue to update our Clients on the status of the efforts described above in the coming days, and I am happy to address any questions or concerns.

Best regards,

Patrick L. Oot
Partner

EXHIBIT C

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

Jennifer Levy, P.C.
To Call Writer Directly:
+1 202 879 5211
jennifer.levy@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

February 7, 2019

*Via Electronic Mail*

Peter H. Weinberger
Spangenberg Shibley & Liber LLP
1001 Lakeside Avenue East, Suite 1700
Cleveland, Ohio 44114
pweinberger@spanglaw.com

Evan M. Janush
Tower 56
126 East 56th Street, 6th Floor
New York, NY 10022
evan.janush@lanierlawfirm.com

Re: *In re National Prescription Opiate Litigation*, MDL No. 2804: SOM Discovery Concerning IQVIA and/or BuzzeoPDMA-Related Entities

Dear Peter and Evan:

I write in response to your January 31, 2019 email regarding discovery issues related to consulting performed by Cegedim, Dendrite, Cegedim Dendrite, BuzzeoPDMA (collectively, the "Buzzeo-related entities") and/or IQVIA.

Consistent with the description in Patrick Oot's January 29, 2019 letter, the scope of Allergan's and its affiliates' relationship with IQVIA and/or the Buzzeo-related entities related to SOM was limited to consulting services and development of an SOM statistical model that could be built into Allergan's order management system for the purpose of identifying orders of interest. Allergan did not purchase SOM data from these entities; any data that was used for the development of this model was provided by Allergan and its affiliates.

# KIRKLAND & ELLIS LLP

February 7, 2019
Page 2

## Scope of Work & Contracts

Allergan has produced all contracts and/or scope of work documents related to SOM consulting services from the Buzzeo-related entities and/or IQVIA that Allergan has identified in its searches for such documents. These documents can be found at the following Bates numbers, which were provided in our letter dated January 7, 2019 on the same issue:

- For Watson Pharma, Inc.: ALLERGAN_MDL_02467194; ALLERGAN_MDL_03826315; ALLERGAN_MDL_02940660; ALLERGAN_MDL_02467521

- For Actavis Inc.: ALLERGAN_MDL_03402123

- For Actavis Pharma, Inc.: ALLERGAN_MDL_02160689; Acquired_Actavis_01675178; ALLERGAN_MDL_03740633; ALLERGAN_MDL_02146782; ALLERGAN_MDL_03734611; Acquired_Actavis_01380024; ALLERGAN_MDL_02160685.

## SOM Data / Reports

Allergan did not purchase, and does not have, SOM data from IQVIA and/or the Buzzeo-related entities.

In light of Allergan's limited relationship with these entities related to SOM, Allergan has nothing further to request or produce regarding SOM data. Allergan has separately produced IMS/IQVIA data that it obtained, separate and apart from any SOM data, at ALLERGAN_MDL_02485011 and ALLERGAN_MDL_03281086.

## Communications between Allergan and Buzzeo-related entities or IQVIA

Allergan has produced all communications with any of the Buzzeo-related entities and/or IQVIA in its possession that Allergan has identified to-date, concerning SOM system audits, SOM design, and suspicious order monitoring generally. These documents can be found at the following Bates numbers, among others:

ALLERGAN_MDL_03535336
ALLERGAN_MDL_03535333
ALLERGAN_MDL_02176488
ALLERGAN_MDL_02187149
ALLERGAN_MDL_03824254
ALLERGAN_MDL_02940675
ALLERGAN_MDL_02940682

ALLERGAN_MDL_03740163
ALLERGAN_MDL_02146564
ALLERGAN_MDL_02146565
ALLERGAN_MDL_03774718
ALLERGAN_MDL_03429626
ALLERGAN_MDL_03429483

# KIRKLAND & ELLIS LLP

February 7, 2019
Page 3

ALLERGAN_MDL_03429954
ALLERGAN_MDL_03429485
ALLERGAN_MDL_03429487
ALLERGAN_MDL_02128359
ALLERGAN_MDL_02128361
ALLERGAN_MDL_02939384
ALLERGAN_MDL_02939385
ALLERGAN_MDL_02150403
ALLERGAN_MDL_02872122
ALLERGAN_MDL_03429872
ALLERGAN_MDL_03429874
ALLERGAN_MDL_03429851
ALLERGAN_MDL_03401196
ALLERGAN_MDL_03401198
ALLERGAN_MDL_03401199
ALLERGAN_MDL_03401210
ALLERGAN_MDL_03401706
ALLERGAN_MDL_03401708
ALLERGAN_MDL_03401859
ALLERGAN_MDL_03401860
ALLERGAN_MDL_03401229
ALLERGAN_MDL_03401236
ALLERGAN_MDL_03401241
ALLERGAN_MDL_03401248
ALLERGAN_MDL_00675261
ALLERGAN_MDL_02128078
ALLERGAN_MDL_03401821
ALLERGAN_MDL_02128814
ALLERGAN_MDL_03401404
ALLERGAN_MDL_03401976
ALLERGAN_MDL_03401977

ALLERGAN_MDL_02150382
ALLERGAN_MDL_02150384
ALLERGAN_MDL_03401836
ALLERGAN_MDL_03401838
ALLERGAN_MDL_03402121
ALLERGAN_MDL_01720006
Acquired_Actavis_00795992
Acquired_Actavis_01509230
Acquired_Actavis_01117590
ALLERGAN_MDL_03380979
ALLERGAN_MDL_03380981
ALLERGAN_MDL_03382730
ALLERGAN_MDL_04333352
ALLERGAN_MDL_02146537
ALLERGAN_MDL_02146681
ALLERGAN_MDL_02146549
ALLERGAN_MDL_02146555
ALLERGAN_MDL_02146683
ALLERGAN_MDL_02146686
ALLERGAN_MDL_02146618
ALLERGAN_MDL_03739426
ALLERGAN_MDL_03819353
ALLERGAN_MDL_03745641
ALLERGAN_MDL_03735769
ALLERGAN_MDL_03755066
ALLERGAN_MDL_03750813
ALLERGAN_MDL_03763165
ALLERGAN_MDL_03774710
ALLERGAN_MDL_03534531
ALLERGAN_MDL_03763146
ALLERGAN_MDL_03763182

Allergan has also produced presentations and other materials created by the Buzzeo-related entities and/or IQVIA related to suspicious order monitoring, such as those found at the following Bates numbers:

ALLERGAN_MDL_03535007
ALLERGAN_MDL_02468242
Acquired_Actavis_02476237
ALLERGAN_MDL_02054715

ALLERGAN_MDL_02467477
ALLERGAN_MDL_02467968
ALLERGAN_MDL_02468356
ALLERGAN_MDL_03535258

# KIRKLAND & ELLIS LLP

February 7, 2019
Page 4

ALLERGAN_MDL_03275797           ALLERGAN_MDL_02467198
ALLERGAN_MDL_02467898           ALLERGAN_MDL_02467523
ALLERGAN_MDL_03466024           ALLERGAN_MDL_02468028
ALLERGAN_MDL_02147138           ALLERGAN_MDL_03752689

## Requests for Documents from IQVIA

Allergan has asked IQVIA if it has any additional contracts, scope of work documents, reports, or communications. To the extent any such documents are provided, Allergan will produce any non-duplicative, responsive documents to Plaintiffs.

## Privilege Assertions

Allergan has produced all information responsive to SOM discovery requests, subject to its objections, that Allergan has identified to-date. Allergan is not claiming a blanket attorney-client or attorney work product privilege for any of the following categories:

a) SOM-related scope of work documents
b) SOM-related contracts
c) Communications concerning SOM system audits, SOM design, and Suspicious Order Monitoring that were had between the Buzzeo-related entities and/or IQVIA and Allergan, or
d) Reports and other data concerning the monitoring of the SOM processes provided by, or in consultation with, the Buzzeo-related entities and/or IQVIA.

Allergan has only withheld documents that relate to suspicious order monitoring if they contain legal advice, requests for legal advice, or attorney work product.

Please let us know if you have any further questions.

Sincerely,

*/s/ Jennifer Levy, P.C.*

Jennifer Levy, P.C