# EXHIBIT 16

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654

Donna M. Welch
To Call Writer Directly:
(312) 862-2425
Donna.welch@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2000

May 31, 2019

*Via Electronic Mail*

Thomas E. Egler
Robbins Geller Rudman & Dowd LLP
655 West Broadway
San Diego, CA 92101
tome@rgrdlaw.com

Re:  *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)

Dear Tom:

I am writing on behalf of Allergan plc and Allergan Finance, LLC ("Allergan") in response to your May 22, 2019 letter regarding various outstanding issues. Please find Allergan's responses to each below.

**A. Lisa Pehlke Deposition**

Your letter requests a date for the deposition of Lisa Pehlke. We propose July 9th and 10th. Please let us know if these dates work for you.

**B. Cegedim-Dendrite (Buzzeo) Audits and Reports**

Your letter requests copies of the "Cegedim-Dendrite (Buzzeo) written report" referred to in Napoli Deposition, Ex. 15. Allergan has conducted extensive searches to attempt to locate this or any similar report but has not located such a report.

In addition, on February 5, 2019, Allergan wrote to Patrick L. Oot, at Shook, Hardy & Bacon, LLP, counsel for IQVIA, requesting any missing documents related to SOM audits or reports. Specifically, Allergan stated:

"[W]e believe that BuzzeoPDMA may have created audits, reports, or other evaluations of Watson's or Actavis's suspicious order monitoring systems. For example, in Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, BuzzeoPDMA agreed to 'provide Customer an onsite review and assessment of its current SOM system.' Please

Beijing   Boston   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

## KIRKLAND & ELLIS LLP

Tom Egler
May 31, 2019
Page 2

   provide copies of any such audits, reports, evaluations, assessments, or other work product for Actavis Inc., Actavis Pharma, Inc., and Watson Pharma, Inc."

(Feb. 5, 2019 Ltr. from C. Ventura to P. Oot). Mr. Oot responded by letter on February 15, 2019 confirming that IQVIA would provide readily-accessible deliverables with Buzzeo-related entities by February 22, 2019. (Feb. 15, 2019 Ltr. from P. Oot to C. Ventura). To date, Allergan has not received any such deliverables. On May 29, 2019, Allergan followed up with yet another letter to Mr. Oot to obtain confirmation that IQVIA does not have any deliverables to provide, and again specifically requested the written report at issue. Allergan awaits a response and will let you know if IQVIA locates any such reports.

   Finally, Allergan has searched its privilege logs to ensure that we were not withholding any SOM audit-related documents on the basis of privilege, and we have not identified any such documents being withheld.

   Thus, Allergan has undertaken a good faith search and taken every reasonable step to attempt to locate any written SOM audit or report. Allergan has not located any such document. We have no reason to believe that the document was deleted or destroyed, but we have been unable to find it despite our diligent efforts.

### C. Data Offloaded to Teva

   Your letter requests that Teva produce various databases that Teva affirmed it has possession of, including: direct sales data for legacy Actavis's generic opioids from QAD and SAP databases; ZVSUS reports with information about orders that were held and ultimately released to the customer; and sales reports with information about pended orders and reason codes for generic opioids. This issue is applicable to Teva, not Allergan, because Teva is in possession of those databases.

### D. Incomplete Databases

   Your letter requests the textual information that corresponds with numeric codes within various sales and transactional datasets produced by Teva. This issue is applicable to Teva, not Allergan, because Teva is in possession of those datasets.

### E. DEA Reports

   You ask for clarity regarding reports made to the DEA about customers and orders that Allergan (or its prior subsidiaries) deemed suspicious. Because Allergan is unaware of any written record of all suspicious orders reported to the DEA, Allergan cannot confirm that the list below contains all suspicious orders that were ever reported to the DEA by Allergan (or any of

# KIRKLAND & ELLIS LLP

Tom Egler
May 31, 2019
Page 3

its prior subsidiaries), or whether additional orders were reported verbally, electronically, or in writing. Allergan reserves the right to supplement this list with information about additional suspicious order reports to the extent that information becomes available.

Allergan has supplemented its response to Plaintiffs' Fourth Set of Interrogatories (Interrogatory No. 35) to contain the information set forth below.

### 1. TopRx, Inc.

Investigation reports detailing the suspicious order investigations and subsequent actions related to TopRX, Inc. can be found at ALLERGAN_MDL_02187198, ALLERGAN_MDL_02187201, and ALLERGAN_MDL_02467197. These documents discuss nine orders that were cancelled over a five-month period, and they indicate that the Watson DEA Affairs team "determined TOP RX's orders to be suspicious and in accordance with federal regulation, must report these suspicious orders to the DEA."[1] Additionally, the DEA Affairs team "canceled pending orders" and Watson "agreed to discontinue all sales of controlled substances to TopRX."[2] The investigation summaries also contain Watson's investigative findings about Dr. Christopher J. Fisher, MD and Buena Vista Pharmacy.[3] Tom Napoli testified that he personally remembers reporting TopRX to the DEA and "providing all this information [from the investigation summary] to the DEA" -- specifically, to Tim Lenzi in the Chicago Field Office.[4]

### 2. Capital Wholesale Drug Co.

Investigation reports detailing the suspicious order investigations and subsequent actions related to Capital Wholesale Drug Co. can be found at ALLERGAN_MDL_02187195 and ALLERGAN_MDL_03765743. These documents indicate that the order at issue was an October 24, 2012 order for 48 units of Hydrocodone/APAP 10/650 mg (NDC 00591050301; Order # 580581).[5] DEA Affairs "determined Capital's order to be suspicious and in accordance with

---

[1]    ALLERGAN_MDL_02187198

[2]    ALLERGAN_MDL_02467197

[3]    ALLERGAN_MDL_02187198

[4]    *See* Napoli Dep. 260:3-261:19; 340:15-21.

[5]    ALLERGAN_MDL_02187195

## KIRKLAND & ELLIS LLP

Tom Egler
May 31, 2019
Page 4

federal regulation, must report suspicious orders to the DEA."[6] Further, DEA Affairs
recommended "discontinuing sales of controlled substances to Capital."[7] Tom Napoli testified
that he personally remembers reporting Capital Wholesale Drug Co. to the DEA-- specifically,
Tim Lenzi in the Chicago Field Office.[8]

### 3. R & S Northeast / Dixon Shane Drug Company

Investigation reports detailing the suspicious order investigations and subsequent actions
related to R & S Northeast, LLC (ship-to party Dixon-Shane Drug Company) can be found at
ALLERGAN_MDL_02176521, ALLERGAN_MDL_02176522,
ALLERGAN_MDL_03356576, and ALLERGAN_MDL_03912159. The order at issue was a
July 20, 2010 order for thirty-six 100-count bottles of Hydrocodone/Apap 10/325 mg and
twenty-four 100-count bottles of Hydrocodone/APAP 5/325 mg.[9] When Watson requested
justification for the order, R & S Northeast stated that "a new customer came on board -- Palm
Beach Pain & Rejuvenation."[10] Upon researching Palm Beach Pain & Rejuvenation, the DEA
Affairs team at Watson "concluded that the order was suspicious and agreed to cancel R & S
Northeast's July 20th Hydrocodone order."[11] The order was reported to the DEA, as indicated
within subsequent meeting minutes stating that Watson reported a suspicious order from Dixon
Shane to the Chicago Field Office.[12]

### 4. Quality King Healthcare, Inc.

Documents reflecting some of the correspondence related to the investigation of Quality
King Healthcare, Inc. include Acquired_Actavis_01675041 and ALLERGAN_MDL_03407212.
Tom Napoli testified that after the acquisition of Actavis Inc., he personally remembers

---

[6]   *Id.*

[7]   *Id.*

[8]   *See* Napoli Dep. 339:3-14; 340:22-341:5.

[9]   ALLERGAN_MDL_02176521;  ALLERGAN_MDL_03356576;  ALLERGAN_MDL_03912159

[10]  ALLERGAN_MDL_02176521

[11]  ALLERGAN_MDL_02176521

[12]  ALLERGAN_MDL_02176488 at -6490

## KIRKLAND & ELLIS LLP

Tom Egler
May 31, 2019
Page 5

preemptively reporting Quality King to Richard Springer of the Long Island DEA office  -- i.e. before taking them on as a customer.[13]

### F. IQVIA Manufacturer Codes for Pre-2018 Transactions

Your letter requested clarifying information on "Manufacturer Codes" listed in the IQVIA data. Your question refers to Allergan's production of data that Allergan purchased from IQVIA for use in this litigation. IQVIA did not provide a data key or dictionary for the "manufacturer code" column, and so we cannot produce one. Nor have we conducted the analysis to determine "which of these manufacturer codes relate to which prior owners of the various prescription opioid drugs."

Please let us know if you have any further questions.

Sincerely,

*/s/ Donna M. Welch, P.C.*

Donna M. Welch, P.C.

---

[13]    *See* Napoli deposition 339:18-340:14