**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | **CASE NO. 1:17-MD-2804** |
| OPIATE LITIGATION | ) | |
| | ) | **SPECIAL MASTER COHEN** |
| THIS DOCUMENT RELATES TO: | ) | |
| *"Track Three Cases"* | ) | |
| | ) | **RULING REGARDING** |
| | ) | **JURISDICTIONAL DISCOVERY** |
| | ) | **OF RITE AID CORP.** |

This *Ruling* addresses discovery disputes presented to the Special Master by way of letter briefs[1] regarding Plaintiffs' attempts to obtain jurisdictional discovery from Rite Aid Corporation ("RAC") and its related company, Rite Aid Hdqtrs. Corp. ("RAHC") (collectively, "Defendants").[2]

Plaintiffs served jurisdictional discovery on RAC in the *Track 1-B* cases, and then served additional jurisdictional discovery on RAC and RAHC in the *Track 3* cases. Plaintiffs assert RAC's *Track 1-B* responses were insufficient and seek an order compelling RAC to provide information it was earlier ordered to produce.[3] Defendants, on the other hand, seek an order relieving them of

---

[1] All of the letter briefs cited in this Ruling are exhibits to Discovery Agenda Items 267 and 268.

[2] In addition to RAC and RAHC, the Rite Aid-related defendants in *Track 3* include: (i) Rite Aid of Maryland; (ii) Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center; and (iii) Rite Aid of Ohio, Inc. *See* docket nos. 3326, ¶¶40-45; 3327, ¶¶39-44. Only RAC has contested personal jurisdiction. *See* docket no. 3339.

[3] *See* Weinberger's 07/29/20 letter (motion to compel); Fouts' 08/12/20 letter (RAC's response).

any obligation to provide responses to the *Track 3* discovery.[4] Each side has objected to the other's positions. For the reasons and to the extent explained below, Plaintiffs' motion to compel and Defendants' motion for protective order are both granted in part.

## I.     Background.

The parties' discovery disputes center on Plaintiffs' attempts to obtain information relating to the jurisdictional defenses raised by RAC in its Rule 12(b)(2) motion to dismiss claims in *Track 3*. *See* docket no. 3339. In its motion, RAC asserts the Court lacks personal jurisdiction over it because RAC is merely a holding company with no employees and no business operations in Ohio. *See* docket no. 3339-1 at 2-4. To support these assertions, RAC submits a declaration by RAHC Vice President Ron Chima averring, *inter alia*, that RAC maintains separate corporate formalities with its subsidiaries and "does not have any involvement in directing, managing, or supervising the operations or the employees of any of its subsidiary companies, including any of its subsidiaries that ever have engaged in the distribution or dispensing of prescription opioids." Docket no. 3339-2, ¶6.

Previously, in *Track 1-B,* RAC filed a similar motion to dismiss, asserting similar jurisdictional arguments and relying on the same Chima declaration. *See* docket no. 3042. The *Track 1-B* motion became moot, however, as a result of the Sixth Circuit's mandamus ruling disallowing the *Track 1-B* plaintiffs' amendments by interlineation. *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838 (6th Cir. 2020). Thus, the Court did not issue a ruling on RAC's motion

---

[4] *See* Fouts' 07/23/20 letter (motion for protective order); Pifko's 08/06/20 letter (Plaintiffs' response); Fouts' 08/13/20 letter (Defendants' reply).

to dismiss in *Track 1-B*.[5]

While RAC's *Track 1-B* motion to dismiss was pending (that is, before the Sixth Circuit issued its mandamus ruling), the undersigned ruled that Plaintiffs could take jurisdictional discovery before responding.[6]  *See* Fouts' 07/23/20 letter, Ex. 2 (Special Master's 02/12/20 email).  At that time, the *Track 1-B* plaintiffs focused their jurisdictional discovery on whether RAC had established national corporate policies for its subsidiaries or engaged in global oversight and risk management with regard to opioid dispensing.  *See* Weinberger's 07/29/20 letter at 3; Fouts' 07/23/20 letter at 3.  Plaintiffs did not at that time seek jurisdictional discovery related to an alter ego theory.

On February 24, 2020, the Court resolved ongoing disputes over jurisdictional discovery by ordering RAC to produce certain documents, including: (1) corporate organizational charts; (2) policies regarding branding, marketing, sales, promotion, distribution, dispensing, regulatory affairs, and pharmacovigilance (to the extent such policies apply to opioids); (3) policies regarding corporate management (to the extent such policies bear on opioid-related subsidiaries); and (4) annual reports.  *See* docket no. 3180 at 2-3.  The Court also ordered RAC to respond to certain requests for production regarding its 2018 Report to Stockholders.  *Id.* at 3; *see* Fouts' 07/23/20 letter, Ex. 3 (Weinberger's 02/14/20 email).

On March 2, 2020, the Special Master clarified that the latter requests required production of the following information:

---

[5]  *See* Order (June 4, 2020 ) (non-document) (denying RAC's *Track 1-B* motion as moot).

[6]  In so ruling, the Special Master asked the parties to confer and propose a plan for jurisdictional discovery, stating: "I imagine that the necessary discovery need not exceed a small handful of [depositions] and interrogatories.  The Court will accept any reasonable plan."  Special Master's 02/12/20 email to the parties, Ex. 2 to Fouts' 07/23/20 letter.

3

a.   Documents sent to or received by RAC's Board of Directors, and/or any of
the Board's Committees, during the relevant period, regarding: (1) opioid
dispensing policies, (2) opioid distribution policies, (3) risk assessment and
management related to distribution/dispensing of opioids; and (4) compliance
with laws and regulations, and policies and procedures, governing opioids.
[Note that all four of these categories are limited to **opioid** subject matter.]
These documents include (but are not limited to) opioid-related documents
sent to the Board and/or its Committees by (a) internal subject matter experts,
(b) external advisors, (c) Rite Aid's head of compliance and Rite Aid's
Group Vice President of Privacy, Compliance and Internal Assurance; and
(d) Rite Aid's General Counsel, to the extent those documents are not
privileged.

b.   The names and titles of all of the individuals who, during the relevant period,
comprise: (1) RAC's Board of Directors and/or any of the Board's
Committees and sub-committees who sent or received the above described
documents; and (2) the experts, advisors, and others who sent the
above-described documents.

c.   The case captions, including jurisdiction and case number, of any case in
which RAC was a named defendant and argued the court had no personal
jurisdiction over RAC.

Fouts' 07/23/20 letter, Ex. 4 (Special Master's 03/02/2020 email) (brackets and emphasis in original,

footnotes omitted).

On April 3, 2020, RAC provided its discovery responses,[7] which Plaintiffs then contended

were deficient.  *See* Weinberger's 07/29/20 letter.  The parties exchanged correspondence regarding

the alleged deficiencies and planned to meet and confer.  *Id.* at 5.  Before the scheduled meeting,

however, the Sixth Circuit issued its mandamus ruling and RAC cancelled the meeting.

Following the Sixth Circuit's mandamus ruling, the following events occurred.  On June 5,

2020, Plaintiffs named RAC as a defendant in the *Track 3* cases.  *See* docket nos. 3326, 3327.  On

---

[7] RAC notes that, due to COVID-19, some of its discovery responses were delayed until July
23, 2020.  *See* Fouts' 04/03/20 and 07/23/20 letters, Exs. D and E, respectively, to Weinberger's
07/29/20 letter.

the same day, the Court entered its *Track 3* Case Management Order ("CMO"), which provides:

> All discovery propounded or produced in *Track 1* shall be deemed propounded and/or produced in *Track 3*. Additional discovery served in *Track 3* will be tailored to *Track 3* as appropriate. New discovery propounded in *Track 3* will not be duplicative of discovery previously propounded.

Docket no. 3325 at 1 (emphasis added).[8] The parties agree the effect of this provision is that the *Track 1-B* jurisdictional discovery was "revived" and deemed propounded in *Track 3*. Additionally, with respect to motions to dismiss on jurisdictional grounds, the Court stated:

> The parties shall meet and confer as soon as possible to discuss whether and the extent to which jurisdictional discovery may be necessary, and shall incorporate the reasoning set out in the Court's [February 24] Order [docket no. 3180].

*Id.* at 2.

On June 16, 2020, RAC filed its motion to dismiss the *Track 3* claims for lack of personal jurisdiction. Docket no. 3339. Eleven days later, on June 23, 2020, Plaintiffs served additional document production requests on RAC and RAHC ("June 2020 Requests"). *See* Exs. 5 and 6 to Fouts' 07/23/20 letter.

On June 30 and July 13, 2020, the parties held meet-and-confer conferences regarding: (1) alleged deficiencies in RAC's *Track 1-B* jurisdictional discovery responses; and (2) Defendants' objections to the newer June 2020 Requests. *See* Weinberger's 07/29/20 letter at 5; Fouts' 07/23/20 letter at 1. The parties were unable to reach agreement and sent letters to the Special Master regarding their impasse. *See* Weinberger's 07/17/20 letter; Fouts' 07/24/20 letter.

Plaintiffs now seek an order compelling RAC to provide the jurisdictional discovery it was ordered to produce in *Track 1-B*. *See* Weinberger's 07/29/20 letter. Defendants object and also seek

---

[8] *See* discovery hearing transcript at 47 (July 7, 2020) (clarifying the use and meaning of the terms "propounded" and "produced" in this provision).

an order of protection with respect to the June 2020 Requests.  *See* Fouts' 07/23/20 and 08/13/20 letters.  The Special Master examines these motions below.


II.     **Plaintiffs' Motion to Compel.**

Plaintiffs contend RAC's *Track 1-B* jurisdictional discovery responses are deficient because RAC: (1) has produced documents that are incomplete and almost entirely redacted; (2) has over-designated documents as protected by the attorney-client privilege; (3) did not produce documents responsive to the categories set forth in the Court's February 24 Order (docket no. 3180); (4) did not produce all relevant documents sent to or received by its Board of Directors and Committees; and (5) did not identify internal subject matter experts, external advisors, or others who sent relevant documents to the Board of Directors or its Committees, as required by the Special Master's March 2 email.  Each of these contentions is addressed below.


A.     **Incomplete and Redacted Documents.**

Plaintiffs first assert the documents that RAC *did* produce were incomplete and almost

entirely redacted.  *See* Weinberger's 07/29/20 letter at 6-7 and Exs. B, C, F, and G thereto.[9]  RAC responds that the Special Master required it to produce jurisdictional discovery *only* with respect to "**opioid** subject matter."  Fouts' 08/12/20 letter at 6 (quoting Special Master's 03/02/20 email, emphasis in original).  RAC asserts it satisfied this directive by producing non-privileged information relating to opioids, and redacting or omitting any unrelated material.  *See* Fouts' 08/12/20 letter at 6.  In other words, RAC unilaterally redacted or omitted any information it determined was unrelated to the subject matter of opioids.

Plaintiffs correctly point out, however, that RAC was ordered to produce *documents* – not *information*.  *See* docket no. 3180; Special Master's 03/02/20 email.  The Federal Rules make clear that, "[u]nless otherwise stipulated or ordered by the court, ... [a] party must produce documents as they are kept in the usual course of business."  Fed. R. Civ. P. 34(b)(2)(E)(i).  Neither Rule 34(b) – nor any other rule – authorizes a party to unilaterally redact information it believes to be irrelevant or non-responsive.  *See, e.g.*, *Skky, Inc. v. Manwin USA, Inc.*, 2014 WL 12527215, at *11-12 (D. Minn. Oct. 29, 2014) ("[r]edaction is an inappropriate tool for excluding alleged irrelevant

_____

[9] Plaintiffs provide Exhibits B, C, F, and G as examples of the redacted and incomplete documents that RAC produced.  Exhibit B is an unidentifiable, 90-page document, the vast majority of which is redacted.  *See* Ex. B.  The first non-redacted material falls on the 52nd page, which is a title page regarding: "Regulatory Update – 'What's Hot,'" for a Rite Aid Board of Directors Meeting in June of 2014.  *Id.* at Bates number 0062984.  Only five other pages of Exhibit B are not redacted.  *See id.* at Bates numbers 0062993-94, 0063005-06, 0061311.  Exhibit C is comprised of three pages that appear to have been selected from a larger, undisclosed document.  Exhibit F appears to be 79-pages of Board-meeting minutes, the vast majority of which are redacted.  Exhibit G is an unidentifiable, 49-page document, of which only selected portions of three pages are not redacted.  *See* Ex. G at Bates numbers 0063511, 0063532, 0063536.  All of the exhibits are marked "highly confidential – subject to protective order."  Although these exhibits are marked "highly confidential," RAC does ***not*** assert it redacted or omitted material on this ground.  *See* Fouts' 08/12/20 letter at 6-7 (stating RAC undertook "redaction on relevance grounds of material not related to opioids," and noting this redaction was also "consistent with" cases allowing redaction of confidential and sensitive information).

information from documents that are otherwise responsive to a discovery request") (citations omitted); *Melchior v. Hilite Int'l, Inc.*, 2013 WL 2238754, at *3 (E.D. Mich. May 21, 2013) (same); *Pavillion Bank v. OneBeacon Am. Ins. Co.*, 2013 WL 12126258, at *3 (N.D. Tex. Nov. 13, 2013) (adopting "persuasive and well-reasoned" rationale that unilateral redactions are: (i) not authorized under the rules; (ii) generally unwise because they breed suspicion and deprive the reader of context; and (iii) procedurally unfavored) (citations omitted).

RAC insists the redactions are proper because the Special Master's order "specifically limits RAC's production to '**opioid** subject matter.'" Fouts' 08/12/20 letter at 6 (quoting Special Master's 03/02/20 email, emphasis in original).  The language RAC quotes, however, is merely a parenthetical that points out that the preceding four categories of documents are expressly limited to the subject matter of opioids.  *See* Special Master's 03/02/20 email (requiring RAC to produce documents that address: "(1) opioid dispensing policies, (2) opioid distribution policies, (3) risk assessment and management related to distribution/dispensing of opioids; and (4) compliance with laws and regulations, and policies and procedures, governing opioids").  Contrary to RAC's assertion, the Special Master's order did not authorize RAC to unilaterally redact irrelevant material from otherwise responsive documents.[10]

RAC contends the Special Master's order is "consistent with cases recognizing that board materials are extremely sensitive, warranting relevance redactions." *Id.* (citations omitted).  In this case, however, RAC does ***not*** assert the redactions are warranted because the material is highly

---

[10] RAC contends: "Material unrelated to opioids is irrelevant to Plaintiffs' inquiry, as the Special Master recognized in his March 2, 2020 order." Fouts' 08/12/20 letter at 6.  The Special Master disagrees that this order somehow relieved RAC from ordinary discovery rules requiring parties to produce responsive documents without redaction.

8

confidential or sensitive. Rather, RAC merely contends the redacted material is *irrelevant* to the subject of opioids. *See id.*

The Court's CMO No. 2 (Protective Order) permits the parties to redact: (1) personal identifying information; (2) privileged information; (3) third-party confidential information; and (4) "segregated, non-responsive Confidential or Highly Confidential Information concerning a Producing Party's non-opioid products [subject to certain limitations stated therein]." Docket no. 441, ¶¶29-30. Here, RAC does not contend the redacted material falls under any of these expressly permitted categories (including category 4). Rather, RAC states it is "aware" the CMO "generally does not permit redactions for relevancy," but RAC nevertheless contends the Special Master's March 2 email relieves it from that limitation. Fouts' 08/12/20 letter at 6. Nonetheless, the Special Master acknowledges the possibility that some responsive documents, such as Board Minutes, are likely to include "segregated, non-responsive Confidential or Highly Confidential Information concerning a Producing Party's non-opioid products."

Accordingly, the Special Master orders that, on or before September 18, 2020, RAC must produce responsive documents that are *not* redacted based only on relevance; RAC may, however, redact information that fits squarely within the categories listed in the CMO No. 2 above.

### B. Attorney-Client Privilege.

Plaintiffs contend RAC has over-designated documents as protected by the attorney-client privilege. To support this contention, Plaintiffs observe RAC has withheld as privileged almost twice as many documents (235 documents) as it has produced (119 documents). *See* Weinberger's 07/29/20 letter at 7. Plaintiffs contend such wide-sweeping privilege designations contradict the

9

Court's previous directives that attorney-client privilege should be narrowly construed.[11] *See id.* at 7 n.10.

RAC responds that many of the documents it withheld relate to RAHC's Compliance Committee and Pharmacy Compliance Sub-Committee.[12] RAC asserts RAHC's in-house counsel sit on these Committees and "regularly attend their meetings for the purpose of providing legal advice." Fouts' 08/12/20 letter at 5. RAC contends that – with the assistance of RAHC's counsel – these Committees evaluated RAHC's compliance with laws and regulations, which involved a *legal* function, regardless whether it *also* served a *business* function. *See id.* at 3-4. RAC concludes the withheld materials "necessarily concern Rite Aid's interpretation of, and adherence with, federal and state laws and regulations that apply to Rite Aid's business (and to controlled substances in particular)." *Id.* at 5.[13]

The Special Master has previously set forth the legal standards that apply to attorney-client privilege, which are adopted by reference and incorporated herein. *See, e.g.,* docket nos. 2979 at

---

[11] Specifically, Plaintiffs point to the Court's statement at a status conference: "Again, I again want to emphasize I don't want to see any over-designation of privilege documents because if I – if I see that, I'm going to have to impose sanctions. Special Master Cohen has power to impose them. And if he doesn't, I'll have to. And I don't want to do that." Docket no. 1244 at 5:20-24. Plaintiffs further cite the transcript of a discovery conference in which the Special Master stated the parties should "construe [the] attorney-client privilege extremely narrowly if it has anything to do with suspicious order reports, suspicious order monitoring, or due diligence." Weinberger's 07/29/20 letter at 7 n.10 (quoting 12/06/18 Discovery Conf. Tr. at 22:5-10).

[12] RAC asserts the Compliance Committee "focuses on compliance with laws and regulations relating to RAHC's overall business (including laws and regulations concerning controlled substances)," and the Pharmacy Compliance Sub-Committee focuses on "regulatory, policy and operational compliance efforts with respect to pharmacy operations specifically." Fouts' 08/12/20 letter at 5.

[13] The vast majority of Fouts' 08/12/20 letter refers specifically to RAC and/or RAHC. The letter does not define what "Rite Aid" refers to. *See id.*

1-2; 1321 at 2-3.  In short, the party claiming the privilege bears the burden of proving it applies and has not been waived.  *Davis v. Drake*, 2014 WL 5795554, at 3-4 (N.D. Ohio Nov. 6, 2014).  To fall within the privilege, a communication must involve more than the mere presence of an attorney; rather, it "must have the *primary* purpose of soliciting legal, rather than business, advice."  *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607, at *1 (N.D. Ohio April 9, 2007) (internal quotations and citations omitted, emphasis in original).  *See Fed. Trade Comm'n v. Abbvie, Inc.*, 2015 WL 8623076 at *9 (E.D. Pa. Dec. 14, 2015) ("attorney-client privilege does not apply . . . if the client seeks regulatory advice for a business purpose").  Ultimately, the Court narrowly construes claims of attorney-client privilege; it applies "only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice."  *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986) (citation omitted).

Here, RAC has provided a privilege log, *see* Plaintiffs' Exs. H-1 and H-2, and asserts the withheld materials: (1) "reflect privileged analyses and discussions concerning legal and regulatory matters;" and (2) contain "counsel's advice concerning ongoing legal matters, and requirements under federal and state laws."  Fouts' 08/12/20 letter at 5. The privilege log and briefing alone, however, do not provide a sufficient basis to determine whether the attorney-client privilege properly applies to the withheld documents.  Accordingly, the Special Master will conduct an *in camera* review of up to 20 sample documents selected by Plaintiffs.  *See* Weinberger's 07/17/20 letter at 4 (requesting a sampling for *in camera* review).

On or before on or before September 15, 2020, Plaintiffs shall provide RAC with their selection of documents for *in camera* review.  On or before on or before September 18, 2020, RAC

11

shall submit these documents to the Special Master.[14]

### C.    Discovery Allowed by the Court's February 24 Order (docket no. 3180).

Plaintiffs next assert RAC did not produce any documents responsive to certain categories set forth in the Court's February 24 Order (docket no. 3180).  Specifically, Plaintiffs assert RAC has not produced: "(1) corporate organizational charts; (2) policies regarding branding, marketing, sales, promotion, distribution, dispensing, regulatory affairs, and pharmacovigilance, to the extent they apply to opioids; (3) policies regarding corporate management to the extent such policies bear on opioid related subsidiaries; or (4) annual reports."  Weinberger's 07/29/20 letter at 7.

RAC responds that it and its related companies have produced this information.  Specifically, as to the first category (organizational charts), RAC provides the Bates numbers of documents that RAHC produced in *Track I-A* and *Track I-B* discovery.  *See* Fouts' 08/12/20 letter at 2.  As to the second and third categories (opioid policies), RAC asserts that RAC, RAHC, and other Rite Aid entities previously provided responsive documents regarding corporate management, distribution, dispensing, regulatory affairs, and pharmacovigilance, and that they do not have any policies or procedures regarding the branding, marketing, sales, or promotion of opioids.  *See id.* (citing RAC's

---

[14] Before conducting this review, the Special Master expects RAC to carefully review the principles contained in the Court's prior rulings, including the following, and reassess whether its privilege claims are appropriate: (a) docket nos. 1321 at 5-6 (attorney-client privilege does not apply to documents that simply set out information of a business nature regarding a defendant's SOMS); (b) 1380 at 7 (the attorney-client privilege does not protect the underlying facts within communications between a client and attorney); (c) 1678 at 1-2 (the Special Master's decisions are most prominently based on applying the principle that "compliance with regulations is usually a business matter, not a legal one"); and (d) 2968 at 3 (the attorney-client privilege does not protect attorneys' recommendations for improving due diligence regarding pharmacy accounts and the criteria for when to terminate a customer's account, because the essence of such advice concerns compliance with **regulatory** obligations, which is primarily business-related, not legal).

Ex. E and F, Rite Aid's cover letters dated 02/21/20 and 02/27/20, respectively; and Rite Aid of Maryland's interrogatory responses).  As to the fourth category (annual reports), RAC asserts it produced this information on July 31, 2020.  *See id.* at 3 (citing RAC's Ex. B, cover letter dated 07/31/20).

On this record, in light of RAC's representations that the requested information has been produced, the Special Master declines to issue an order compelling the production of these documents.  If Plaintiffs still contend RAC has not fully responded to these document requests, Plaintiffs shall promptly notify RAC and the Special Master and explain with detail the bases for this contention.  RAC shall then have an opportunity to cure and respond.

### D.  Documents Sent to or Received by the Board of Directors and Committees.

Plaintiffs contend RAC failed to comply with the Special Master's order to produce all documents (to the extent not privileged) sent to or received by its Board of Directors or Committees, including opioid-related documents sent by (a) internal subject matter experts, (b) external advisors, (c) Rite Aid's head of compliance and Rite Aid's Group Vice President of Privacy, Compliance and Internal Assurance; and (d) Rite Aid's General Counsel.  Weinberger's 07/29/20 letter at 7-8 (citing Special Master's 03/02/20 email).  Specifically, Plaintiffs assert RAC's production of these documents consists almost entirely of PowerPoint presentations and does not include any documents "authored by internal subject matter experts or external advisors" or discussing the policies enumerated in the Special Master's March 2 email.  Weinberger's 07/29/20 letter at 8.

RAC responds that it "performed an appropriate search for responsive materials, and is not withholding any responsive, non-privileged documents."  Fouts' 08/12/20 letter at 3.  On this record,

in light of RAC's representations that the requested information has been produced, the Special Master declines to issue an order compelling the production of these documents.[15]  Once again, if Plaintiffs still contend RAC has not fully responded to these document requests, Plaintiffs shall promptly notify RAC and the Special Master and explain with detail the bases for this contention. RAC shall then have an opportunity to cure and respond.

### E.  Identification of Individuals Who Sent Documents to the Board or Committees.

Last, Plaintiffs contend RAC has not identified the internal subject matter experts, external advisors, or others who sent relevant documents to the Board of Directors or its Committees.  As noted, the Special Master's March 2 email clarified that RAC was required to produce, *inter alia*: "[t]he names and titles of all of the individuals who, during the relevant period comprise ... the experts, advisors, and others who sent [certain documents regarding opioid-related topics to the Board of Directors or its Committees]."  Special Master's 03/02/20 email.

RAC asserts it complied with this order by producing "all opioid-related updates that were provided to RAC's Board of Directors."  Fouts' 08/12/20 letter at 7.  RAC explains the Board receives all materials through a centralized process under which materials are uploaded though an application called "Boardbooks" by a company point-person based on information received from internal and external subject matter experts.  *Id.*  RAC asserts that, since Board members do not actually receive the information directly from these experts, RAC is not required to identify who provided the materials to the company point-person who uploaded the information to the Board.  *Id.*

---

[15]  The Special Master notes, however, that the conclusion in subsection E (immediately below) may affect RAC's contention regarding whether it has produced all relevant documents sent by internal subject matter experts or external advisors.

RAC further asserts: "[i]dentifying every person who may have provided relevant information in advance of a Board or Audit Committee meeting would ... go far beyond the scope of the Court's and Special Master's orders."  Fouts' 08/12/20 letter at 7.

The Special Master disagrees – RAC has not accurately characterized the ruling of the undersigned.  RAC cannot avoid its obligations by simply claiming it funneled everything through one person and then providing only that one person's name.  Accordingly, on or before September 18, 2020, RAC shall provide this information to Plaintiffs.


**III.    Defendants' Motion for Protective Order.**

Defendants ask to be relieved from any obligation to respond to the June 2020 Requests, arguing these Requests are both unauthorized and overly burdensome.  *See* Fouts' 07/23/20 and 08/13/20 letters.  The Court exercises broad discretion in deciding whether to permit Plaintiffs to conduct further discovery to investigate jurisdictional facts. *Theunissen v. Matthews,* 935 F.2d 1454, 1465 (6th Cir. 1991).  In so doing, the Court may "limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 854 (6th Cir. 2017) (quotations and citations omitted).  Plaintiffs "should have access to information necessary to establish [their] claim," yet should not be allowed to "go fishing." *Id.*


**A.    Whether the June 2020 Requests are Unauthorized.**

Defendants assert the June 2020 Requests are unauthorized because they exceed the scope of discovery previously permitted in *Track 1-B*.  In other words, Defendants argue the scope of

15

jurisdictional discovery in *Track 3* should be limited to what the Court and Special Master ordered RAC to produce in *Track 1-B*.

Defendants' argument is unavailing for a number of reasons.  First, the *Track 3* plaintiffs are different entities than the *Track 1-B* plaintiffs.  Defendants provide no legal analysis or authority suggesting that, as a matter of law or appropriate discretion, the *Track 3* plaintiffs should be limited to the jurisdictional arguments asserted by *Track 1-B* plaintiffs, even if represented by the same counsel.[16]

Second, jurisdictional discovery in *Track 1-B* was abruptly discontinued as a result of the Sixth Circuit's mandamus ruling.  After mandamus issued, the parties stopped their meet-and-confer process and did not fully develop or present any jurisdictional discovery disputes to the Court for a final ruling.

Third, the *Track 3* plaintiffs reasonably contend their theory of personal jurisdiction has evolved from what was asserted by the *Track 1-B* plaintiffs.  As noted, the *Track 1-B* plaintiffs initially sought jurisdictional discovery based on RAC's alleged direct involvement in policy-making – and not based on an alter ego theory.  *See* Fouts' 07/23/20 letter at 4.  But the *Track 3* plaintiffs contend they have since learned (or come to understand) additional information suggesting

---

[16] Defendants cite the *Track 3* CMO, which directed the parties to meet and confer regarding "whether and the extent to which jurisdictional discovery may be necessary," and to "incorporate the reasoning" set out in the Court's February 24 Order (docket no. 3180).  Docket no. 3325 at 2; *see* Fouts' 07/23/20 letter at 6.  Nothing in this language, however, limited Plaintiffs' ability to propound additional jurisdictional discovery; to the contrary, this wording suggests some modifications or amendments may be appropriate.  The Special Master agrees Plaintiffs should have met-and-conferred with RAC before issuing additional jurisdictional discovery requests (as directed), but that failure does not extinguish Plaintiffs' right to obtain appropriate discovery.

RAC has been operating as an alter ego of RAHC.[17]  *See* Pifko's 08/06/20 letter at 6-8.

Defendants respond that these facts and "nearly every" document that Plaintiffs cite were previously known and should have been raised in *Track 1-B*.  Fouts' 08/13/20 letter at 4-6.  Defendants admit, however, that at least two critical documents were produced *after* Plaintiffs formulated their jurisdictional discovery in *Track I-B*.  *See, e.g.,* Fouts' 08/13/20 letter at 5 (stating that, of the documents Plaintiffs cite, only Exhibits K and L had not been produced in February of 2020); *see also* Ex. K to Pifko's 08/06/20 letter (2006 Store Bonus Summary, stating: "the bonus program is subject to terms and conditions that are controlled by Rite Aid Corporation" and is not a "guarantee of employment or job security with Rite Aid Corporation"); Ex. L to Pifko's 08/06/20 letter (2009 Store Bonus Summary stating: "[t]his bonus program is a unilaterally adopted, voluntary incentive plan created by Rite Aid Corporation and its Subsidiaries ('Rite Aid')").  Given these recently-surfaced documents, it seems likely Plaintiffs would have raised the alter ego theory in *Track 1-B* if discovery regarding personal jurisdiction had not been suspended by mandamus.

The Special Master will not engage in a lengthy fact-finding exercise to determine what the *Track 1-B* plaintiffs should have known and when they should have known it (which is not fully developed on this record, and would be a poor use of the Court's time in any event), and then perform a complicated analysis of whether the *Track 3* plaintiffs should be bound by the jurisdictional theories asserted in *Track 1-B* (which has not been briefed by the parties).  Instead, the Special Master simply concludes the balance of equities weighs in favor of allowing the *Track 3*

---

[17] Plaintiffs also point out that RAC's *Track 3* motion contains a new footnote that was not present in the *Track 1-B* motion, stating: "Although some Rite Aid Hdqtrs[.] Corp. documents were mislabeled as RAC documents, because RAC has no employees, there is no question that these policies were truly prepared by [RAHC's] employees."  Docket no. 3339:1 at 5 n.5.  Plaintiffs challenge Defendants' characterization of the documents as merely "mislabeled."  Pifko's 08/06/20 letter at 8.

plaintiffs to conduct circumscribed jurisdictional discovery with respect to their alter ego theory.

Plaintiffs have provided a colorable basis for pursuing this discovery.  *See* Pifko's 08/06/20 letter

at 6-9 (detailing documents and issues indicating a possible alter-ego relationship between RAC and

RAHC.  This conclusion is further buttressed by "the well-established preference for allowing

claims to be decided on the merits where possible."  *Burkeen v. A.R.E. Accessories, LLC*, 758 Fed.

Appx. 412, 416 (6th Cir. 2018) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

This leaves the question of the proper extent of such discovery, which is addressed next.


**B.       Whether the June 2020 Requests are Overly Burdensome.**

Plaintiffs will be allowed to pursue limited jurisdictional discovery reasonably calculated to

obtain information relevant to their alter ego theory.  Defendants assert the June 2020 Requests are

overly broad and burdensome.  *See* Fouts' 07/23/20 letter at 9-10 and Fouts' 08/13/20 letter at 8-10.

The Special Master therefore examines whether the June 2020 Requests are reasonably tailored to

obtain information necessary for Plaintiffs to establish whether RAC is subject to the Court's

personal jurisdiction because it operated as an alter ego to RAHC.

"In determining whether a subsidiary is an alter ego of the parent corporation, Ohio courts

consider factors such as whether: (1) corporate formalities are observed, (2) corporate records are

kept, and (3) the corporation is financially independent."  *Estate of Thomson v. Toyota Motor Corp.*,

545 F.3d 357, 362-63 (6th Circuit 2008) (citation omitted).  The Sixth Circuit considers additional

factors, including:

> (1) sharing the same employees and corporate officers;
> (2) engaging in the same business enterprise;
> (3) having the same address and phone lines;
> (4) using the same assets;

(5) completing the same jobs;
(6) not maintaining separate books, tax returns and financial statements; and
(7) exerting control over the daily affairs of another corporation.

*Id.; Anwar*, 876 F.3d at 849. Ultimately, to satisfy the alter-ego test, Plaintiffs "must demonstrate 'unity of interest and ownership' that goes beyond mere ownership and shared management personnel." *Anwar*, 876 F.3d at 849 (citation omitted).

Before granting jurisdictional discovery, the Court must find Plaintiffs have presented a prima facie basis for asserting jurisdiction. *Beightler v. Produkte Fur Die Medizin AG*, 2007 WL 2713907, at *4 (N.D. Ohio Sept. 17, 2007); *see also Swagelok Co. v. Dansk Ventil & Fittings ApS*, 2006 WL 8454625, at *2 (N.D. Ohio March 9, 2006) ("the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted") (quotation and citation omitted). To establish personal jurisdiction over RAC in *Track 3*, the alleged alter-ego company must itself be subject to the Court's personal jurisdiction.[18]

Here, Plaintiffs have served nearly identical document requests on RAC and RAHC. *See* Exs. 5 and 6 to Fouts' 07/23/20 letter ("RAC Requests" and "RAHC Requests," respectively). Plaintiffs assert the requests are proper because: "RAC and RAHC or other Rite Aid subsidiaries are alter egos such that RAC is subject to personal jurisdiction in Ohio based on the forum's jurisdiction over RAHC or another one of its subsidiaries named as Defendants in the *Track 3* Complaints." Pifko's 08/06/12 letter at 1 (emphasis added). In support of this assertion, Plaintiffs state they have uncovered evidence that contradicts RAC's contention that it is "a holding company,

_____

[18] *See Estate of Thomson*, 545 F.3d at 362 (applying the "alter-ego theory of jurisdiction," under which courts exercise personal jurisdiction over "a corporation that would not ordinarily be subject to personal jurisdiction in that court when ... the corporation is an alter ego ... of a corporation that would be subject to personal jurisdiction in that court") (quotations and citations omitted).

with no employees or business operations, and has no involvement in the distribution or dispensing of opioids in Ohio." *Id.* at 1.  The principal thrust of Plaintiffs' argument focuses on the theory that RAC and RAHC operate as alter egos.  *See id.* at 4-9 (asserting Rite Aid's documents suggest RAC and RAHC: (1) share employees; (2) engage in the same business; and (3) fail to maintain separate records).  However, Plaintiffs also point to documents and suggest they show RAC exerts control over and engages in the same business enterprise as its subsidiaries generally, including other Rite Aid *Track 3* defendants and individual Rite Aid stores and pharmacies.  *See id.* at 7-8 (citing documents produced by McKesson suggesting: (1) RAC requested threshold increases from opioid distributors on behalf of Rite Aid stores, Pls. Exs. E, H, and I; (2) RAC "has a DEA monitoring program at the corporate level that includes their loss prevention department," Pls. Ex. J ("Rite Aid Corporation and McKesson agreed to increase all CII base codes by 50%"); and (3) RAC "is involved in supply operations at its distribution centers," Pls. Ex. M).

At best, however, the evidence cited by Plaintiffs suggests RAC may have operated as an alter ego only to RAHC.  Plaintiffs have not made out a prima facie case that RAC operated as an alter ego to any other subsidiary or related company.[19]  Accordingly, the Special Master will limit the scope of alter-ego jurisdictional discovery to RAC's relationship with RAHC, and not to any

---

[19]  While Plaintiffs' documentary exhibits do not serve to make out a prima facie case of alter-ego general jurisdiction with respect to Rite Aid entities other than RAHC, some of these documents are still relevant to Plaintiffs' alternate theory of specific jurisdiction based on RAC's having promulgated opioid policies and global oversight and risk management with regard to opioid dispensing for its subsidiaries.

other related company or subsidiary.[20]

The June 2020 Requests seek ten categories of documents, as listed and discussed below.

### 1.    Nature and Extent of Relationships with Other Rite Aid Defendants.

The first request seeks all documents "relating to the nature and extent of RAC's relationship with RAHC" and the other *Track 3* Rite Aid Defendants (Rite Aid of Maryland, Eckerd, and Rite Aid of Ohio).  RAC Requests at 3.  Similarly, Plaintiffs seek documents regarding the nature and extent of RAHC's relationship with RAC and the other *Track 3* Rite Aid Defendants.  *See* RAHC Requests at 3.

These requests become reasonably tailored to the permissible scope of alter-ego jurisdictional discovery by limiting them only to the relationship between RAC and RAHC, and not the relationships of these two entities with any other Rite Aid entities.  Rite Aid's motion for a protective order is granted in part accordingly.[21]

### 2.    Organizational Structure.

The second request seeks all documents "relating to the organizational structure of RAC" including: (a) the composition and roles of its board of directors, officers, committees, and

---

[20] As noted earlier, the other *Track 3* Rite Aid defendants are: Rite Aid of Maryland; Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center ("Eckerd"); and Rite Aid of Ohio, Inc. *See* docket nos. 3326, ¶¶39-44; 3327, ¶¶40-45.  According to the Complaints: (1) Rite Aid of Maryland and Eckert are subsidiaries of RAC; and (2) "Rite Aid entities also owned and operated pharmacies in the Count[ies]" through Defendant Rite Aid of Ohio, Inc."  Docket nos. 3326, ¶¶41-43; 3327, ¶¶42-44.

[21]  Except as noted, this limitation also applies to all of the other nine discovery sub-categories discussed below.

subcommittees, and how RAC is organized as a legal entity; (b) the "organizational responsibilities of RAC, including ... the business enterprise(s) in which it is engaged;" (c) the nature and status of RAC's employees, including "documents showing the number of employees, identity of different departments, locations of employees, and their job responsibilities;" and (d) the "location and ownership of any physical locations such as its headquarters office, including whether any location is shared with any RAC subsidiary, including ... shared office space, facilities, and phone numbers." RAC Requests at 3-4.  Plaintiffs also seek similar documents from RAHC.  *See* RAHC Requests at 3-4.

These requests address relevant alter-ego factors, including whether the companies share the same employees, business enterprise, and office facilities.  *See Anwar*, 876 F.3d at 849 (factors 1-3). RAC must answer these requests, except "any RAC subsidiary" is limited to RAHC.  RAHC must also answer these requests, except it need not answer questions about its own subsidiaries.

### 3.      Identities, Formation, and Role of RAC's Subsidiaries.

The third request seeks all documents "relating to the identities, formation, and role of RAC's subsidiaries" including: (a) the identity of any RAC subsidiaries; (b) RAC's relationships with its subsidiaries; (c) the "extent that RAC exerts control over its subsidiaries;" and (d) "[t]he extent of RAC's operational role in human resources for any of its subsidiaries, including employee payroll operations, performance evaluations, and compensation, and information relating to the sharing/overlap of employees or corporate officers with any of its subsidiaries or parent corporations." RAC Requests at 4.  Plaintiffs also seek similar documents from RAHC.  *See* RAHC Requests at 4.

22

These requests address relevant alter-ego factors, including the sharing of employees and corporate officers and exertion of control over the daily affairs of another corporation. *See Anwar*, 876 F.3d at 849 (factors 1, 7).  Accordingly, the request is appropriate to the extent it seeks information regarding the relationship between RAC and RAHC.  Thus, RAC must produce the requested information with respect to its relationship with RAHC, but need not respond as to any other subsidiaries or other related companies.  Similarly, RAHC must produce the requested information as to its relationship with RAC, but need not respond with respect to its subsidiaries or related companies.

### 4.       Involvement in Ensuring Regulatory and Legal Compliance.

The fourth request seeks all documents "relating to the extent of RAC's involvement in ensuring regulatory and legal compliance for itself, RAHC, ... or any of its other subsidiaries," including:

(a)       RAC's efforts to comply with the [CSA], including ... how RAC ensures that its efforts are enforced or implemented at its subsidiaries;

(b)       RAC's efforts to prevent and report diversion of controlled substances including ... how RAC ensures that its efforts are enforced or implemented at its subsidiaries; and

(c)       [i]nteractions or communications relating to controlled substances between RAC and federal, state, or local governmental entities or agencies, such as DEA, including ... settlement agreements and investigations or audits into RAC or any of its subsidiaries.

RAC Requests at 4-5.  Similarly, Plaintiffs seek the same documents as to RAHC.  *See* RAHC Requests at 4-5.

These requests target information relevant to the alter-ego analysis, namely RAC's exertion

23

of control over its related companies.  *See Anwar*, 876 F.3d at 849 (factor 7).  Again, as to RAC, the request is appropriate to the extent it seeks information relating to RAHC.  Similarly, RAHC must produce the requested information as it relates to RAC.  However, the companies need not respond as to any other subsidiaries or related companies.

### 5.     Finances.

The fifth request seeks all documents related to RAC's finances, including the amount of RAC's income derived from: (a) its subsidiaries; (b) business conducted in Ohio, including business conducted by any of its subsidiaries; (c) its pharmacies; and (d) sales of controlled substances.  *See* RAC Requests at 5.  In addition, the request seeks documents regarding RAC's assets and liabilities and financial filings, including its SEC financial filings and tax returns.  *See id.*  Plaintiffs also seek similar documents from RAHC.  *See* RAHC Requests at 5.

As to RAC, this request seeks information relevant to the alter-ego analysis including whether it and RAHC: (1) are financially independent; (2) use the same assets; and (3) maintain separate books, tax returns, and financial statements.  *See Estate of Thompson*, 545 F.3d at 362-63 (factor 3); *Anwar*, 876 F.3d at 849 (factors 4, 6).  However, for the reasons stated, the scope of subcategories (a) and (b) must be limited to RAHC and not other Rite Aid entities.

As to RAHC, however, it is not apparent how the sources of income described in subcategories (a)-(d) – *i.e.* from *RAHC's* subsidiaries and *RAHC's* business in Ohio – are relevant to the alter-ego analysis concerning the Court's jurisdiction over *RAC*.  Accordingly, RAHC need not respond to the requests contained in subcategories (a), (b), (c), and (d).  However, the remaining information – documents regarding RAHC's assets and liabilities and financial filings, including its

24

SEC financial filings, and tax returns – is relevant to alter-ego factors, including whether RAC and RAHC: (1) are financially independent; (2) use the same assets; and (3) maintain separate books, tax returns, and financial statements.  *See Estate of Thompson*, 545 F.3d at 362-63 (factor 3); *Anwar*, 876 F.3d at 849 (factors 4, 6).  RAHC must respond accordingly.

### 6.      Retention of Corporate Records.

The sixth request seeks all documents "relating to RAC's retention of corporate records, including retention policies and storage locations."  RAC Requests at 5.  Similarly, Plaintiffs seek the same documents as to RAHC.  *See* RAHC Requests at 5.

This information appears relevant to alter-ego factors including whether the companies maintain separate records.  *See Estate of Thompson*, 545 F.3d at 362-63 (factor 2); *Anwar*, 876 F.3d at 849 (factor 6).  Accordingly, the Special Master declines to enter a protective order as to these requests.

### 7.      Relationship with Rite Aid Pharmacies.

The seventh request seeks all documents "relating to RAC's relationship with Rite Aid pharmacies," including RAC's role in: (a) conducting audits of Rite Aid pharmacies or distribution centers; (b) maintaining pharmacy or distribution center records or data; (c) pharmacy or distribution center licensing or accreditation; (d) training employees of its subsidiaries' pharmacies or distribution centers; and (e) developing, formulating, implementing, and enforcing policies and/or procedures for pharmacy operation, including ... controlled substance dispensing policies."  RAC Requests at 5.  Plaintiffs also seek the same documents as to RAHC.  *See* RAHC Requests at 5-6.

25

The information sought in these requests is relevant to the issue of control exerted by RAC over the pharmacies' operations, including Chima's declaration that RAC has no direct involvement in such operations.  *See* Chima Declaration, ¶ 6 (Doc. #: 3339-2); *Anwar*, 876 F.3d at 849 (factor 7).  Additionally, this information appears relevant to alter-ego factors regarding whether RAC and RAHC engaged in the same business enterprise or completed the same jobs.  *See Anwar*, 876 F.3d at 849 (factors 2, 5).  Accordingly, the Special Master declines to enter a protective order as to these requests.  (Note that footnote 21 does not apply to this request.)

8.      **Response to Address the Opioid Crisis.**

The eighth request seeks all documents "relating to RAC's role in the Rite Aid entities' response to address the opioid crisis, including ... [RAC's] Board Report to Stockholders On Oversight of Risk Related to Opioids and how RAC ensures that its decisions are enforced or implemented at its subsidiaries."  RAC Requests at 6.  Similarly, Plaintiffs seek the same documents as to RAHC (except Plaintiffs do not specifically ask RAHC for a stockholders report).  *See* RAHC Requests at 6.

These requests seek information relevant to the alter-ego analysis, namely the extent of control exerted by RAC over RAHC and whether the companies engaged in the same business enterprise or completed the same jobs.  *See Anwar*, 876 F.3d at 849 (factors 2, 5, 7).  RAC and RAHC must answer these requests.  (Note that footnote 21 does not apply to this request.)

9.      **Risk Management.**

The ninth request seeks all documents "relating to RAC's risk management, including

26

compliance risks, including ... how RAC insured that its efforts and decisions were enforced or implemented at its subsidiaries." RAC Requests at 6. Plaintiffs also seek the same documents as to RAHC.  *See* RAHC Requests at 6.

Similar to the eighth request, this information is relevant to the extent of control exerted by RAC over RAHC and whether the companies engaged in the same business enterprise or completed the same jobs.  *See Anwar*, 876 F.3d at 849 (factors 2, 5, 7).  The ruling regarding the eighth request applies to this ninth request as well.

### 10.    Contacts with the State of Ohio.

The tenth request seeks all documents "relating to the nature and extent of RAC's contacts with the State of Ohio, including ... documents related to business transacted in Ohio."  RAC Requests at 6, Ex. 5 to Fouts' 07/23/20 letter.  Plaintiffs also seek similar documents from RAHC. *See* RAHC Requests at 6.

As to RAC, this request seeks basic information relevant to the parties' jurisdictional dispute, *see Estate of Thomson*, 545 F.3d at 361, and must be produced.  However, because RAHC does not contest personal jurisdiction, it need not respond to this request.

## IV.    Objections.

Given the substantial letter briefing already submitted on the topics addressed herein, if any party chooses to object to any aspect of this *Ruling*, it must do so on or before Monday, September 14, 2020.

**RESPECTFULLY SUBMITTED,**

/s/ *David R. Cohen*

**David R. Cohen**
**Special Master**

**Dated: September 8, 2020**