# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

# BELLWETHER TRIAL DEFENDANTS' MEMORANDUM
# IN OPPOSITION TO PLAINTIFFS' MOTIONS IN LIMINE

6. **Plaintiffs' request to bar references to philanthropy or good deeds or acts carried out by the parties or their employees is overbroad.**

Plaintiffs' motion to exclude any suggestion at trial that defendants are "good" or "benevolent" companies – including that defendants "employ a lot of people" and provide "life-saving drugs or products that improve people's lives" – is wildly overbroad. *See* Pl. MIL Br. at 4. That is true even taking into account the limited exception that plaintiffs carve out for evidence of defendants' work related to opioid addiction prevention.

Plaintiffs allege that defendants are essentially drug dealers who intentionally flooded the market with opioids to turn a profit, without regard for the safety of the communities they serve. In defense, each defendant company is entitled to introduce itself to the jury, describe itself accurately, and explain who and how many people really work there and the work those employees do to ensure the safe manufacture and delivery of necessary medication to the people living in Cuyahoga and Summit Counties. Yet as written, plaintiffs' motion would prohibit even that basic introduction. Indeed, the motion would also exclude evidence of the good work defendants have done to prevent diversion – evidence that is different from "opioid addiction prevention" but nonetheless centrally relevant to the case.

Plaintiffs have not identified any specific "philanthropy or good deeds or acts" they seek to keep out. The Court should deny this motion without prejudice to renewal of the objection if any irrelevant evidence of defendants' good deeds or acts is offered at trial.

7. **Plaintiffs' request to bar references to any alleged malpractice claims involving designated experts is too abstract, and admissibility should be dealt with on a case-by-case basis.**

Plaintiffs' motion to exclude "[a]ny reference to any alleged malpractice claims" against experts (Pl. MIL Br. at 5) fails to identify any *specific* malpractice claims they are seeking to exclude. Plaintiffs' abstract arguments simply *assume* that any malpractice claim would be

irrelevant. It is certainly possible to imagine hypothetical malpractice claims that would be irrelevant to an expert's testimony. For example, if a physician is presented as an expert on substance abuse treatment, an old malpractice claim accusing her of botching an appendix operation would probably be irrelevant. On the other hand, if this same doctor had committed malpractice by employing substance abuse treatment methods that were inconsistent with accepted medical practice, that would be an appropriate subject of questioning.

Because the Court has no way of knowing exactly what plaintiffs are challenging here, it should deny this motion without prejudice to renewal of the objection when and if any such evidence is offered. *See Schlegel v. Li Chen Song*, 547 F. Supp. 2d 792, 796 (N.D. Ohio 2008) ("The Court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds"); *see also S.S. v. Leatt Corp.*, 2014 WL 356938, at *9 (N.D. Ohio Jan. 31, 2014) (denying motion to exclude evidence of "crash sequence" that failed to identify any specific crashes the plaintiff was seeking to exclude).

**8. Plaintiffs have failed to justify their request to preclude any reference to experts not testifying in this litigation or to subjects on which no expert testimony is offered.**

In their Motion No. 8, plaintiffs seek an order precluding defendants from making "[a]ny reference to experts not testifying in this litigation," including (1) the failure to offer at trial "an expert in a particular … discipline" or (2) "experts that were de-designated in this case." Pl. MIL Br. at 6.[4] This motion is at best overbroad and lacks legal foundation.

Plaintiffs' principal ground for this motion is relevance. *Id.* But there are situations in which the absence of expert evidence on a topic could be highly relevant. For example, plaintiffs

---

[4] Defendants understand the term "de-designated" witnesses, as used in plaintiffs' motion, to refer to witnesses who provided expert reports in this matter but whom plaintiffs will not call at trial.

purport to prove causation by reference to "aggregate proof" – a theory that necessarily requires expert testimony. If plaintiffs were to fail to call at trial any expert supporting their aggregate proof theory, then defendants would be entitled to comment on plaintiffs' failure to present an expert on that subject. Likewise, if plaintiffs make arguments to the jury concerning a medical question that on its face requires expert testimony – such as the neuropharmacological effect of opioids – defendants would be entitled to point out the absence of such supporting testimony.

Moreover, if a testifying expert relies on the opinions of another expert whom plaintiffs elect not to call at trial, defendants would be entitled to comment on the absence of supporting testimony from the other expert. For example, plaintiffs' expert David Cutler calculates the percentages of harm that allegedly flow from allegedly wrongful manufacturer marketing based on opinions described in the report of Meredith Rosenthal. Given that Rosenthal's opinions are a necessary predicate for Cutler's opinions, Cutler should not be permitted to testify *at all* on those subjects if Rosenthal's predicate opinions have not been presented. *See* Dkt. 2661 at 24-25. But if his testimony were permitted under such circumstances, defendants would surely be entitled to point to plaintiffs' failure to offer the predicate testimony from Rosenthal in questioning Cutler and in offering argument about the reliability of his opinions.

One can imagine circumstances in which it would be improper for a party to ask the jury to draw inferences based upon the absence of expert testimony on a given subject. The Court, however, can and should deal with any such objections on a case-by-case basis. Because plaintiffs' motion sweeps far too broadly and would preclude plainly relevant argument and evidence, it should be denied.

The Court should also reject plaintiffs' challenge to defendants' right to offer into evidence and make argument based upon the reports and/or testimony of "de-designated"

experts. Federal Rule of Evidence 801(d)(2)(B) permits "a third party's out-of-court statement

[to] be offered against a party if 'the party has manifested an adoption or belief in its truth.'"

*Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp. 2d 777, 781 (E.D. Mich.

2011). Here, plaintiffs have manifested adoption of their experts' reports, *inter alia*, by

disclosing them to defendants and relying on them in summary judgment and *Daubert* briefing.

Accordingly, defendants are entitled to offer into evidence, and otherwise refer to, the relevant

opinions of "de-designated" plaintiff experts at trial. *See, e.g.*, *S.E.C. v. Koenig*, 557 F.3d 736,

744 (7th Cir. 2009) (affirming use of experts' video deposition at trial by non-sponsoring party

on the ground that a "witness identified as a testimonial expert is available to either side");

*House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245 (N.D. Iowa 1996) ("once an expert is

designated, the expert is recognized as presenting part of the common body of discoverable, and

generally admissible, information and testimony available to all parties"); *Kerns v. Pro-Foam of

S. Ala., Inc.*, 572 F. Supp. 2d 1303, 1311 (S.D. Ala. 2007) ("[C]ourts have repeatedly observed

that once a party has given testimony through deposition or expert reports, those opinions do not

'belong' to one party or another, but rather are available for all parties to use at trial.").

9. **Plaintiffs have failed to justify their request to prevent defendants from using ordinary means to display exhibits while presenting deposition testimony.**

Plaintiffs' Motion No. 9 represents another disguised attempt by plaintiffs to gain an

unfair advantage to which they are not entitled.[5] No rule prevents attorneys from highlighting,

enlarging, or emphasizing documents during trial – a practice employed in thousands of

courtrooms every day, including during the presentation of recorded depositions. Indeed, this

---

[5] In this motion, plaintiffs seek to preclude "[u]se of any deposition video or associated technology that alters the appearance of what was displayed at the deposition, including but not limited to, the use of 'highlighting,' enlarging, or otherwise emphasizing documents or portions of documents, unless the emphasis was done during the deposition and is part of the deposition video record." Pl. MIL Br. at 6.

has for years been the standard practice in publishing exhibits to a jury. The only evidentiary rule on which plaintiffs rely affords the Court control over the mode of examining witnesses "so as to make those procedures effective for determining the truth [and to] avoid wasting time." Fed. R. Evid. 611(a)(1)-(2). Using standard technology to enlarge documents and show which portions are being discussed in real time helps jurors to visually process and assess the documents relative to the witness's testimony. It also avoids wasting time by focusing the jury's attention on the pertinent information in documents.

The fact that a deposition recording is being played for the jury does not change this conclusion. There is no requirement, as plaintiffs try to argue, to give "the witness and opposing counsel advance notice of how the jury will perceive the witness' testimony." Pl. MIL Br. at 7. That would require prescience beyond any party's abilities. Neither is there any rule requiring witnesses to "testify according to counsel's emphasis" rather than the substance of the questions and exhibits themselves. *See id.* All parties have fair warning of each deponent's testimony and each exhibit on which the deponent was examined. And putting that same exhibit up on a screen or highlighting a sentence from a document that is quoted or discussed during the deposition does not alter the substance of the testimony. It is merely a practical tool to help the jury see and analyze the document that the deponent is discussing.

Plaintiffs fail to cite any compelling authority that would support a deviation from, much less a bar to, this standard practice. The only case authority that plaintiffs cite is an unpublished *in limine* ruling in the *Depuy* case. Notably, the Fifth Circuit later ordered a retrial of an early *Depuy* bellwether trial due to critical errors in the management of the trial. *See In re Depuy Orthopaedics, Inc.*, 888 F.3d at 784-92.

Plaintiffs' ulterior motive for this request is clear. Defendants' counsel took the traditional approach in conducting depositions, questioning witnesses on a single video feed and handing them the documents to which they would be referring. By contrast, plaintiffs' counsel took the unusual approach of employing three separate simultaneous cameras, hand-drawn illustrations, and tech media personnel to manipulate documents.[6] Plaintiffs' motion would not prevent them from using the output of this elaborate exercise, since it was recorded at the time. The practical effect of the ruling that plaintiffs now seek, therefore, would limit *only* defendants, who did not carefully stage and record the projection of exhibits while taking depositions.

This Court should not preclude defendants for using standard and well accepted trial presentation techniques merely because they conducted depositions in the ordinary manner, particularly where no rule or published authority supports plaintiffs' position.

### 10.  MOOTED BY STIPULATION

The parties have resolved plaintiffs' Motion No. 10 with a stipulation prohibiting:

> [a]ny reference to personal matters of an expert or the expert's family, such as divorce proceedings, that have no bearing on the witness's qualifications, opinions, or credibility.

### 11.  Restrictions on references to motions *in limine* should include evidentiary objections made during trial.

Plaintiffs' Motion No. 11, which purports to seek a straightforward ruling that would bar reference to motions *in limine* before the jury, presents another topic on which plaintiffs' brief fails to address the only genuine areas of disagreement.[7] Those arise from plaintiffs'

---

[6] Much of plaintiffs' harassment of witnesses, discussed in Defendants' Joint Motion in Limine No. 10, occurred in the context of this elaborate effort to simulate trial performance.

[7] The motion seeks to bar "[a]ny reference to the filing of the parties' motions *in limine*, the contents thereof, or other such motions to exclude evidence and their contents, and any agreements or proceedings in connection with this motion or reference to any such matter." Pl. MIL Br. at 8.

trial. If plaintiffs do attempt to prove their claims by reference to allegedly fraudulent statements made by defendants to the DEA, then defendants will be entitled to respond appropriately to establish that plaintiffs cannot satisfy their burden merely by demonstrating a fraud on the DEA.[11] Thus, at a minimum, the Court should deny plaintiffs' motion and determine the admissibility of the targeted evidence at trial with the benefit of the context in which it is offered. *See Surface v. Conklin*, 2018 WL 6257984, at *1 (S.D. Ohio Nov. 30, 2018) ("If the evidence is not plainly inadmissible on all potential grounds, the court's evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.") (internal quotation omitted).

### 15. Plaintiffs have failed to justify their request to preclude any reference to the DEA "approving" or "endorsing" a particular defendant's SOM program.

The Court should deny Plaintiffs' Motion No. 15, which seeks exclusion of "[a]ny reference to the DEA 'approving' or 'endorsing' a particular Defendant's SOM program." Pl. MIL Br. at 12. Such evidence is admissible to assist the jury in determining whether defendants complied with their legal obligations and whether they acted with the purpose of engaging in unlawful conduct. The Court already has determined that "there are disputes of fact as to whether, and when, each Defendant's SOMS was adequate," Dkt. 2483 at 21, and evidence that DEA approved or endorsed defendants' SOM systems is highly relevant to that determination.[12]

---

[11] For example, plaintiffs allege as RICO predicate acts that defendants committed mail or wire fraud. Because any claim that defendants "defrauded" DEA by failing to inform it of "suspicious orders" would be preempted, defendants are entitled to explain to the jury that plaintiffs' mail and wire fraud claims must be proven by reference to something other than fraud on the DEA.

[12] Evidence of DEA approvals and endorsements of defendants' SOM systems is especially relevant and critical to Defendants' ability to defend themselves if the Court denies Defendants' Motion in Limine No. 7, which seeks to have this Court exclude all evidence that defendants violated alleged duties under the CSA or its regulations as irrelevant. Dkt. 2661 at 18-22. But even if the Court were to grant defendants' Motion in Limine No. 7 – as it should – evidence of DEA approvals and endorsements of defendants' SOM systems is nonetheless probative of the ultimate liability questions that the jury must answer at trial.

*Evidence of DEA approvals and endorsements are relevant.* Plaintiffs have not

identified which "approvals" and "endorsements" they seek to exclude – or even which evidence

they would characterize as reflecting "approvals" or "endorsements." Instead, they seek to have

this Court exclude a broad category of evidence in the abstract. Such abstract categorical

motions that give a court no concrete guidance as to the evidence that is actually at issue are

disfavored. *Sperberg*, 519 F.2d at 712; *Medical Mutual of Ohio*, 2019 WL 4573700, at *3.

That at least *some* evidence in this category is highly relevant cannot be seriously

disputed. Defendants' compliance with their SOM obligations is an integral part of plaintiffs'

case. As plaintiffs themselves put it, "Plaintiffs allege that Defendants violated the CSA and that

these violations form a basis of their public nuisance and RICO/OCPA claims." Pl. MIL Br. at

12. DEA administers and enforces the provisions governing SOM systems. *See* 21 U.S.C.

§ 871(a); 28 C.F.R. § 0.100; 21 U.S.C. § 832; 21 C.F.R. § 1301.74. Accordingly, DEA's

approval or endorsement of a SOM system is relevant to whether the system complies with those

provisions – and thus whether defendants can be held liable under plaintiffs' tort theories as

plaintiffs have framed them. *See Tobin v. Astra Pharm. Prod., Inc.*, 993 F.2d 528, 538 (6th Cir.

1993) (holding that drug approval by federal agency "is evidence which the jury may consider in

reaching its verdict" in tort action against the drug's manufacturer); *In re Celexa & Lexapro

Mktg. & Sales Practices Litig.*, 915 F.3d 1, 10 (1st Cir. 2019) ("The common law has long

recognized that agency approval of this type is relevant in tort suits.").

An examination of just one DEA approval shows the clear relevance of such evidence.

On July 23, 1998, after AmerisourceBergen's predecessor, Bergen Brunswig, spent two years

consulting with DEA and developing a new SOM system, DEA's then-Chief of the Liaison and

Policy Section, Patricia Goode, issued a letter to Bergen Brunswig stating:

> This is to **grant approval** of your request to implement on a nationwide basis your newly developed system to identify and report suspicious orders for controlled substances and regulated chemicals, **as required by Federal regulation**. DEA managers who have been involved with the testing of the system have relayed their **positive opinions** regarding its ability to provide information in a fashion which is not only useful overall, but is also responsive to the needs of individual DEA offices.
>
> We appreciate the efforts you have undertaken to develop this improved system and apologize for the lengthy **approval process**. It did not seem appropriate to **grant this approval** prior to the conclusion of the Suspicious Order Task Force formed as a result of the Methamphetamine Control Act. Thank you for your patience in this matter.

Dkt. 2379-7 at ABDCMDL00315783 (emphasis added). Plaintiffs are free to put their own spin on the weight a jury should give such evidence, but the *relevance* of this DEA approval is undeniable.

### Admitting evidence of DEA approvals and endorsements results in no unfair prejudice.

There is no plausible way for evidence of DEA approvals to result in any *unfair* prejudice to plaintiffs, let alone unfair prejudice that substantially outweighs probative value. *See* Fed. R. Evid. 403. To the contrary, if the Court were to preclude defendants from offering evidence showing that DEA approved defendants' SOM systems, that would unfairly restrict defendants' ability to defend themselves. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561–62 (6th Cir. 2013) (reversing *in limine* ruling that excluded evidence because a court must "allow for full development of the evidence" and cannot "'depriv[e] [the defendant] of an opportunity to present all pertinent material to defend'") (citation omitted).

### Plaintiffs' remaining arguments also lack merit.

Plaintiffs suggest that the Court should preclude defendants from introducing DEA statements of approval because they would "contradict this Court's prior legal determinations." Pl. MIL Br. at 12. But nothing about a DEA approval or endorsement of a defendant's SOM system would contradict any of this

Court's prior legal determinations. This Court *denied* plaintiffs' summary judgment motion on defendants' compliance with their SOM duties because "there are disputes of fact as to *whether, and when, each Defendant's SOMS was adequate*, whether orders were suspicious, and whether each Defendant did actually ship suspicious orders (or instead, identified it as suspicious but then, through due diligence, dispelled that suspicion)." Dkt. 2483 at 21 (emphasis added). Evidence of a DEA approval is plainly probative of whether a "Defendant's SOMS was adequate" – and thus goes directly to what the Court has said is a disputed issue of fact. *See id.*

Plaintiffs next argue that "the statements of an *individual* DEA agent purporting to 'approve' or 'endorse' a particular defendant's SOM program are irrelevant . . . ." Pl. MIL Br. at 12. But plaintiffs do not identify which DEA approvals or endorsements they consider to be merely the statements of "individual DEA agents"; nor do they offer any authority for the proposition that a statement by a DEA officer or agent acting in his or her official government capacity is meaningless. To the extent plaintiffs believe that a particular approval or endorsement came from a DEA officer or agent who was not acting in his or her official capacity, plaintiffs are free to pursue that point on cross-examination. Where a party's objection goes to the weight of evidence rather than its relevance, a motion *in limine* is properly denied.[13]

Plaintiffs further contend that no evidence of DEA approvals or endorsements should be admitted because DEA stated recently that it "does not approve or otherwise endorse any specific

---

[13] *See Picture Me Press, LLC v. CPI Images, LLC*, 2009 WL 2448545, at *1 (N.D. Ohio Aug. 6, 2009) (denying motion *in limine* because "[defendant] appears to attack the weight that should be given to the testimony …. [Defendant] is free to demonstrate this fact to the jury through cross-examination."); *McNeil v. Cmty. Prob. Servs., LLC*, 2019 WL 298474, at *1 (M.D. Tenn. Jan. 7, 2019) (denying motion *in limine* because "Defendants are free to explore, on cross examination and in argument, issues relating to the weight the Court should give such testimony"); *455 Companies, LLC v. Landmark Am. Ins. Co.*, 2018 WL 3159552, at *2 (E.D. Mich. June 28, 2018) (holding that counsel has an "ability to argue to the jury the probative weight it should attach to the evidence presented" and thus "[t]hese matters are ripe for cross examination and closing argument, not a motion in limine").

system for reporting suspicious orders" and DEA sent a letter to registrants in December 2007 stating that any "[p]ast communications with DEA … should *no longer* be taken to mean that DEA approves a specific system." Pl. MIL Br. at 12–13 & n.4 (emphasis added). The implication of the December 2007 letter is clear: DEA did issue statements *before* December 2007 and knew that registrants understood such statements to be approvals. And to the extent DEA approved or endorsed specific SOM systems *after* December 2007, plaintiffs are free to inquire into the merits of those approvals and endorsements through cross-examination. *See Picture Me Press, LLC*, 2009 WL 2448545, at *1; *McNeil*, 2019 WL 298474, at *1; *455 Companies, LLC*, 2018 WL 3159552, at *2. This, too, goes to weight, not admissibility.

Plaintiffs spend a considerable portion of their argument suggesting that "Defendants may try to argue that this evidence is relevant to an equitable estoppel defense to their CSA violations." Pl. MIL Br. at 13–17. This is a red herring. DEA is not a party, and defendants do not seek to estop it or any other agency of the federal government. The law of equitable estoppel as it applies to government enforcement actions is simply irrelevant here.[14]

Finally, evidence of DEA approvals and endorsements is highly relevant to the *intent* elements of plaintiffs' nuisance, RICO, and OCPA claims. For example, plaintiffs accuse defendants of violating a CSA provision prohibiting the "knowing[] or intentional[]" distribution of controlled substances in a manner that is not authorized by subchapter I of the CSA, 21 U.S.C. § 841(a), and seek to impose RICO and OCPA liability on that basis.[15] Evidence showing that

---

[14] This subject is discussed further at pp. 21-23 below, in response to plaintiffs' similar argument with respect to their Motion No. 16.

[15] As defendants explain elsewhere, plaintiffs (1) have not identified any conduct by defendants – who are each expressly authorized under the CSA to distribute controlled substances – that violated subchapter I of the CSA, and (2) should be precluded from relying on section 841 as a predicate act because they failed timely to disclose it in response to an on-point interrogatory.

DEA approved a particular type of SOM system is probative of whether defendants knowingly or intentionally distributed controlled substances in a manner that was not authorized under the CSA.[16]

### 16. Plaintiffs have failed to justify their request to preclude references to the DEA's failure to initiate enforcement actions against a particular defendant.

In their Motion No. 16, plaintiffs ask that the Court preclude defendants from offering any evidence or argument regarding DEA's failure to "sanction or initiate enforcement actions" against them. Pl. MIL Br. at 20. As this Court has already recognized, this evidence is highly relevant to disputed issues of fact. Plaintiffs' motion should therefore be denied.

DEA, as the principal regulator of the entire distribution chain for prescription opioids, is the federal agency charged with determining, among other things, whether manufacturers, distributors, pharmacies, and other registrants maintain effective controls against diversion. And it is vested with authority to take action against registrants – including by suspending their registration to distribute controlled substances – if they do not comply with their obligations. Tellingly, no defendant has ever been subject to an enforcement action by DEA relating to (1) a

---

[16] Plaintiffs' assertion that the scienter requirement of section 841 is satisfied so long as defendants distributed opioids "deliberately and not by accident" (Pl. MIL Br. at 17) is incorrect. First, the Sixth Circuit has held that section 841 is a specific intent crime, *see United States v. Soto*, 794 F.3d 635, 659 (6th Cir. 2015); *United States v. Pope*, 561 F.2d 663, 670 (6th Cir. 1977) (same). "A specific intent crime … requires that a defendant act with the additional 'purpose of violating the law.'" *United States v. Odeh*, 815 F.3d 968, 976 n.3 (6th Cir. 2016) (quoting *United States v. Gonyea*, 140 F.3d 649, 653 (6th Cir. 1998)). Second, even if section 841 were not a specific intent crime, as the very cases relied on by plaintiffs make clear, "[t]o act 'knowingly' is to act with 'knowledge of the facts that constitute the offense.'" *E.g.*, *United States v. Fuller*, 162 F.3d 256, 260 (4th Cir. 1998). Here, the "fact" that would constitute the offense is the distribution of opioids in a manner that was not "authorized by" subchapter I of the CSA. 21 U.S.C. § 841(a). Third, unlike the CSA's prohibition of cultivating marijuana, the provisions that defendants are accused of violating are highly technical, and thus plaintiffs must prove that defendants were aware of the specific "duties" they allegedly violated. *United States v. Tobin*, 676 F.3d 1264, 1282 (11th Cir. 2012). Evidence regarding DEA approval of certain SOM systems is thus relevant to whether defendants knowingly engaged in the *unauthorized* distribution of controlled substances.

customer in either Summit or Cuyahoga County or (2) a distribution facility servicing either Summit or Cuyahoga County.

The weight of authority holds that the absence of a pertinent regulatory enforcement action is admissible.  *See, e.g.*, *In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*, 2018 WL 6617375, at *2 (S.D. Ind. Dec. 18, 2018) (admitting evidence of the government's failure to initiate an enforcement action); *Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 3744976, at *12 (N.D. Tex. July 30, 2014) (same); *see also Cummins v. BIC USA, Inc*., 727 F.3d 506, 514 (6th Cir. 2013) (holding in product liability action that district court did not abuse its discretion in admitting evidence that Consumer Product Safety Commission did not "take any enforcement action" against defendant).

*In re Cook Medical* is instructive.  In that product liability case, the defendant sought to "offer evidence that the [medical device at issue] was never recalled by the FDA, that the FDA never observed any violations of Cook's quality system during its inspections between 2000 and 2014, and that the FDA never used any enforcement action against Cook."  2018 WL 6617375, at *2.  The court denied the plaintiffs' motion to exclude, holding that the "evidence is relevant to Cook's defense."  *Id.*

Similarly, in *Eagle Oil*, the defendant insurer bore the burden of proving that the plaintiff oil-well operators acted unreasonably.  2014 WL 3744976, at *1–2. The insurer moved to exclude expert testimony from the former executive director of the plaintiffs' regulator, arguing that "it is improper to conclude that a party did not violate a [regulation] simply because there was no … enforcement action."  *Id.* at *11.  The court, however, denied the motion and permitted testimony "regarding whether an enforcement action was brought."  *Id.* at *12.

Here, the absence of any regulatory enforcement actions against defendants relating to customers and distribution facilities in Summit and Cuyahoga Counties is plainly relevant. Indeed, this Court has recognized that DEA's past endorsement of defendants' conduct "present[s] issues for a jury determination." *E.g.*, Dkt. 2483 at 29 (question whether McKesson's "manner of reporting" suspicious orders was accepted by DEA as "compliant" presents a fact issue precluding summary judgment). Defendants should therefore be permitted to introduce evidence and argument regarding DEA's failure to sanction or take enforcement actions against them.

None of the cases cited by plaintiffs is to the contrary. Rather, the vast majority of those cases address the inapposite question of whether the federal government may be estopped from bringing suit by its prior failure to initiate an enforcement action.[17] Here, of course, the federal government is not a party and defendants do not seek to estop anybody. Cases that rely on the strong public policy against estopping the federal government from exercising its statutory obligations thus present no basis on which to exclude relevant evidence.[18]

---

[17] *United States v. City of Toledo*, 867 F. Supp. 603, 607–08 (N.D. Ohio 1994) (government's failure to bring an enforcement action did not equitably estop government's lawsuit); *United States v. City of Menominee*, 727 F. Supp. 1110, 1121–22 (W.D. Mich. 1989) (same); *United States v. 789 Cases, More or Less, of Latex Surgeons' Gloves, an Article of Device*, 799 F. Supp. 1275, 1297 (D.P.R. 1992); *Washington Tour Guides Ass'n v. Natl. Park Serv.*, 808 F. Supp. 877, 882 (D.D.C. 1992) (same); *see also Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 224–25 (D.C. Cir. 2017) (same); *Fisher v. Peters*, 249 F.3d 433, 444–45 (6th Cir. 2001) (plaintiff could not equitably estop Secretary of the Air Force from asserting that plaintiff's claims were non-justiciable).

[18] The *only* on-point case cited by plaintiffs – *Georges v. Novartis Pharm. Corp.*, 2013 WL 5217198, at *6 (C.D. Cal. Apr. 4, 2013) – is an outlier that is entirely devoid of analysis. *United States v. Hoyt*, 2014 WL 5023093, at *7 (W.D. Va. Oct. 8, 2014), is inapposite for the reason described below in the response to Motion No. 17.

17.    **Plaintiffs have failed to justify their request to preclude references to the FDA's failure to sanction or initiate enforcement actions against a particular defendant.**

There is no dispute that the pharmaceutical manufacturers' marketing activities are carefully regulated by the FDA, which has the authority to enforce compliance with the Federal Food, Drug, and Cosmetic Act ("FDCA") and its own regulations. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 (2001). The heart of plaintiffs' case against the Teva and Actavis Generic Defendants is that they supposedly engaged in a "scheme involving the false and deceptive marketing of prescription opioids" in Summit and Cuyahoga Counties, thereby allegedly causing local doctors to write medically unnecessary or excess opioid prescriptions that caused harm to plaintiffs. *See* Dkt. 1466 ¶¶ 9, 903. Thus, the fact that the FDA has never brought an enforcement action against these particular manufacturer defendants for the false or misleading marketing of opioids in the counties is relevant to rebut this claim. *See In re Cook Med., Inc.*, 2018 WL 6617375, at *2; *Eagle Oil*, 2014 WL 3744976, at *12; *Cummins*, 727 F.3d at 514.

Plaintiffs argue that "[t]he fact that a Defendant has not been sanctioned or the subject of an enforcement action does not mean that Defendant did not violate the CSA, the FDCA, and/or related regulations." Pl. MIL Br. at 20–21. But evidence need not be *dispositive* of a fact of consequence to be admissible, it must only make that fact "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Evidence of the FDA's decision not to take enforcement against a particular defendant for false or misleading marketing in the Counties makes it less probable that Manufacturer Defendants did so.

Plaintiffs' reliance on *United States v. Hoyt*, 2014 WL 5023093, at *7 (W.D. Va. Oct. 8, 2014), is misplaced. *Hoyt* was a criminal conspiracy case in which the Government moved to preclude the defendants from introducing evidence that they did not know that the substances

they allegedly sold were controlled substance analogues and to exclude evidence of the
Government's failure to notify defendants that they were violating the law. *Id.* at *6. The Court
granted the motion because an ignorance-of-the-law defense was "not a valid defense to the
charges the defendants face." *Id.* at *7. That decision has no applicability here. Defendants are
not attempting to raise an ignorance-of-the-law defense, and the evidence would not be offered
in furtherance of such a defense. In cases that *are* on point, courts have rejected plaintiffs'
argument, reasoning that "[i]t is unjust to allow plaintiff to allege violations of the FDA's
regulatory framework, while at the same time prohibiting [Defendant] from explaining the
absence of formal violations." *Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 835 F.
Supp. 2d 299, 320 (W.D. Ky. 2011).[19]

> ### 18. Plaintiffs' request to preclude any "reference" to the possibility that an award of damages will adversely affect the availability or cost of medications is overbroad.

Defendants do not intend to personalize their arguments to members of the jury. Neither
side should do that, and to the extent that plaintiffs' Motion No. 18 is limited to barring reference
that an award of damages will adversely affect the availability or increase the costs of
medications *for members of the jury*, defendants have no intention of making any such argument
unless plaintiffs open the door.

However, the remainder of Motion No. 18 should be denied, for three reasons.[20] First, as
explained in Defendants' Joint Motion In Limine No. 11, plaintiffs cannot seek punitive damages

---

[19] As discussed above, plaintiffs' secondary argument that defendants may not invoke an equitable
estoppel defense based on government inaction is a red herring. Defendants assert no such defense.

[20] This motion seeks to exclude: "[a]ny reference that any award of damages will adversely affect the
ability of any member of the jury to purchase, or have available medications in the future, or affect the
cost thereof, or have an adverse effect on the drugs or health products available to individuals or
industries in the United States or elsewhere (*e.g., argument or testimony that in Plaintiffs are awarded*

impact that lawsuits have on the pricing of pharmaceuticals, excluding such evidence in the abstract is premature. Neither defendants nor the Court can anticipate how plaintiffs will attempt to prove their case, but should plaintiffs make arguments at trial that implicate this question – *e.g.*, by arguing that this litigation will make medical care more affordable or accessible – defendants must be permitted to respond. This motion should accordingly be denied as premature, as it is more appropriately raised if and when the issue arises. *See William F. Shea, LLC v. Bonutti Research, Inc.*, 2013 WL 2424382, at *2 (S.D. Ohio June 4, 2013) (denying motion *in limine* in absence of sufficient information about what evidence would be offered); *Ausa Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200, 1202 (S.D.N.Y. 1995) (same).

### 22. Plaintiffs have failed to justify their request to preclude references to deposition or trial testimony from witnesses produced in litigation in which plaintiffs did not participate.

The Court should deny plaintiffs' request to exclude deposition testimony from any "parallel litigation in which Plaintiffs did not participate." Pl. MIL Br. at 25. Although plaintiffs insist that they can use such (unidentified) testimony "for impeachment purposes," they assert that it cannot be used affirmatively. *See id.* at 26.

Defendants and the Court are left to guess what testimony plaintiffs are actually talking about – once again plaintiffs' motion identifies no specific evidence, making opaque reference only to testimony taken in "parallel litigation." *Id.* at 25. But assuming that this motion refers to depositions taken in the Oklahoma state-court opioid litigation, that testimony was subject to cross-examination by a party with interests identical to plaintiffs' interests, and Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 804 authorize its admission.

Certain defendants have designated testimony depositions in the Oklahoma litigation of individuals, such as "Key Opinion Leaders" ("KOLs") and pain advocacy groups, with whom plaintiffs allege certain defendants conspired and formed a RICO enterprise to illegally market

prescription opioids. *See, e.g.*, Dkt. 1466 (Summit Cty. TAC) ¶¶ 391–423, 879–906; *see also*

Dkt. 2000-8 (Kessler Rep.) ¶ 471.4. Testimony from these alleged co-conspirators could not be

more relevant: In the designated testimony, the KOLs and alleged "front groups" repudiate

plaintiffs' conspiracy theories and maintain that, rather than conspiring with defendants, they

simply expressed their independent medical opinions.[24] Plaintiffs do not (and could not) dispute

the relevance of this testimony.

This evidence is admissible under the very Federal Rules that plaintiffs cite. Plaintiffs

invoke Federal Rule of Civil Procedure 32, but that Rule allows use of state-court depositions "in

a later action" that: (1) "involv[es] the same subject matter" and (2) is "between the same parties,

*or their … successors in interest.*" Fed. R. Civ. P. 32(a)(8) (emphasis added). Both of these

requirements, which must be "construed liberally," *District Attorney of New York County v.*

*Republic of Philippines*, 307 F. Supp. 3d 171, 209 (S.D.N.Y. 2018), are satisfied here. First, this

case undeniably "involve[es] the same subject matter" as the Oklahoma opioids litigation: the

plaintiffs in both cases sued the same pharmaceutical manufacturers under the same theory that

pharmaceutical marketing caused the opioid abuse crisis. *Compare generally* Petition,

*Oklahoma v. Purdue Pharma*, CJ-2017-816 (Okla. Dist. Ct. June 30, 2017) *with* Dkt. 1466

(Summit Cty. TAC). Second, plaintiffs here are a "successor in interest" with the state of

Oklahoma for purposes of Rule 32, which requires only a party with a "shared interest in the

material facts and outcome of the case." *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96,

110 n.21 (3d Cir. 1999). Neither privity nor a common property interest is required. *Id.* "The

---

[24] This includes the highly relevant testimony of Lynn Webster and Scott Fishman, who directly
contradict Plaintiffs' accusations that they were part of some marketing conspiracy and that
manufacturers influenced their statements about opioids. *See* Dkt. 1985-15 (Webster Dep.) at 299:15–
300:10; 375:7–17; 223:4–7; Dkt. 1977-6 (Fishman Dep.) at 293:8–294:2.

key is whether an adversary with the same motive to cross-examine the deponent was present when the deposition was taken in the earlier action." *Andrews v. Weatherproofing Techs., Inc.*, 277 F. Supp. 3d 141, 146 (D. Mass. 2017). The State of Oklahoma pursued virtually identical theories of liability and had precisely the same motive as the Counties to cross-examine these witnesses. Their depositions accordingly can be used at trial "to the same extent as if [they were] taken in the [present] action." Fed. R. Civ. P. 32(a)(8).

Similarly, plaintiffs invoke the hearsay rule, but Rule 804(b)(1) recognizes a hearsay exception for deposition testimony from unavailable witnesses if a "predecessor in interest" had "an opportunity and similar motive" to examine the witness. Fed. R. Evid. 804(b)(1). Because the State of Oklahoma "ha[d] a like motive to cross-examine about the same matters as the present party would have … the testimony may be received against" plaintiffs. *Clay v. Johns-Manville Sales Corp.*, 722 F.2d 1289, 1295 (6th Cir. 1983).

Put simply, the Federal Rules authorize the admission of this undeniably relevant evidence, and keeping it from the jury would be prejudicial error.

### 23. Plaintiffs have failed to justify their request to preclude any argument regarding the effect of the "learned intermediary" doctrine on liability.

Plaintiffs' Motion No. 23, which seeks to preclude "[a]ny argument or suggestion that the 'learned intermediary' doctrine limits the liability of any Defendant or absolves any Defendant from liability" (Pl. MIL Br. at 27), should be denied for several reasons. First, plaintiffs improperly seek to narrow the "learned intermediary" doctrine. Plaintiffs are correct that the doctrine modifies liability for prescription drugs, so that "a manufacturer is . . . required to provide warnings only to physicians, who assess the risks and benefits of their patient using the drug" rather than to the end user of the medication. Pl. MIL Br. at 28. However, the doctrine goes further. Indeed, "[t]he rationale behind the [doctrine] is that the physician stands between

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

<table>
<tr><td>

**IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**

THIS DOCUMENT RELATES TO:
*Track One Cases*

</td><td>

MDL NO. 2804

Civ. No. 1:17-md-02804-DAP

HON. JUDGE DAN A. POLSTER

</td></tr>
</table>

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE**

As this Court has observed on multiple occasions, these are important cases that have garnered unprecedented public attention. The stakes are high, and all parties deserve a neutral forum. Yet plaintiffs and their counsel may be tempted to divert the jury's attention away from the core facts and evidence with irrelevant and prejudicial spectacle. Prudence dictates taking steps at the outset to ensure the integrity of the trial by precluding inadmissible evidence and improper argument.

This brief (and other *in limine* briefs filed by industry groups and individual defendants) reflects a good-faith effort to identify important evidentiary issues that merit resolution pre-trial. Where appropriate, this brief identifies specific examples of evidence that plaintiffs may offer. In most instances, however, defendants still have no meaningful notice of the *specific* evidence plaintiffs intend to offer at trial. Plaintiffs served several hundred hours of deposition designations, an exhibit list with more than 150,000 documents, and a witness list with hundreds of names. Although some reductions have since been made, these lists still massively exceed what plaintiffs can possibly present at trial. Defendants reserve all objections to all evidence and arguments plaintiffs actually seek to present.

## II.     IN LIMINE RULINGS REQUESTED

### 1.     The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

In a telephonic conference with the Court on September 16, 2019, plaintiffs suggested for the first time that they would pursue "future" damages at trial on their RICO, OCPA, and conspiracy claims – separate and apart from their proposed "abatement" remedy. That sudden announcement came after many months of expert disclosures, depositions, and motions, during which plaintiffs had every opportunity to develop their damages theories but failed to put forward any evidence supporting a future damages claim. It is no coincidence that plaintiffs raised this issue only after the Court stated that it, not the jury, would determine the

appropriateness, structure, and amount of any "abatement" remedy.  The belated assertion that plaintiffs are seeking future damages is a transparent attempt to make an end-run around that decision.  It is too late to inject intricate, underdeveloped issues into an extraordinarily complex trial now less than one month away.  Doing so would violate federal discovery rules and unfairly prejudice defendants.  It would also create a risk of double recovery between a jury award and the prospective compensation plaintiffs have said they intend to seek under the mantle of nuisance "abatement."[2]  This Court should therefore bar plaintiffs from presenting future damages evidence in connection with any of their claims.

As a threshold matter, neither of plaintiffs' operative Complaints mention or seek future damages.  (Dkt. 1465 at ¶ 1138; Dkt. 1630 at ¶ 1179).  Indeed, plaintiffs expressly say that they brought these actions to "prevent future harm and redress past wrongs" – not to obtain future damages.

Plaintiffs also failed to provide any expert disclosures addressing future damages.  Because damages must be "reasonably certain to follow the injury complained of," *Marzullo v. J.D. Pavement Maintenance*, 975 N.E.2d 1, 10 (Ohio Ct. App. 2011), Ohio law typically requires future damages to be proved using expert evidence, *see, e.g.*, *Scott v. Condo*, 2002 WL 832210, at *2 (Ohio Ct. App. May 3, 2002) ("[W]ithout expert evidence on the future course of medical treatment, a jury is not permitted to simply infer from the expense of past treatment an amount of damages for future treatment."); *cf. also*, *e.g.*, *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 383 (E.D.N.Y. 2000) (rejecting speculative future damages under RICO).  But the report of plaintiffs' damages expert, Thomas McGuire, calculated only *past* damages for 2006-2018.[3]  Nor can plaintiffs claim that their abatement experts (Alexander

---

[2] Defendants maintain their position that the prospective compensation plaintiffs seek for public nuisance is not recoverable as "abatement."

[3] McGuire's only references to future damages were in footnotes, one of which stated that his methodology could theoretically be used to calculate future damages "[t]o the extent any bellwether government seeks damages at trial

and Liebman) provide what is needed on future compensatory damages because both experts stated unequivocally that they offer no such opinion. Dkt. 1979-20 (Liebman Dep.) at 63:7-64:2; Dkt. 1974-04 (Alexander Dep.) at 64:8-16.

Plaintiffs' failure to satisfy basic expert disclosure obligations requires such evidence to be excluded from trial. Allowing plaintiffs to advance a future compensatory damages theory would unfairly prejudice defendants. With no expert analysis on plaintiffs' purported claim for future damages, defendants would have to go into trial blind on a potentially massive damages demand – precisely the kind of "trial by ambush" that federal discovery rules are designed to avoid. *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010). The Court should not allow that profoundly prejudicial result. *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or harmless."); *see also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Trans.*, 596 F.3d 357, 366-69 (6th Cir. 2010) (affirming exclusion of future damages evidence for violation of discovery obligations); *Flying J, Inc. v. Central CA Kenworth*, 45 Fed. App'x 763, 767 (9th Cir. 2002) ("The court prohibited evidence of future damages . . . because Flying J's damages expert failed to include calculations of future damages in his expert report and concluded that the failure operated to the prejudice of defendants.").

Plaintiffs' eleventh-hour request to present evidence to the jury regarding "future damages" should also be rejected because it would impermissibly duplicate the relief plaintiffs claim they are entitled to collect for public nuisance "abatement." Plaintiffs' "future damages" presumably consist of increased governmental expenditures, *i.e.*, money that they will need to

---

beyond 2018." Dkt. 1911-5 at 7 n. 12. *See also id.* at 44 n.90 ("Note that the fact that my calculation of damages is limited to 2006 through 2018 should not be interpreted as a conclusion that damages to the Bellwether governments ended in 2018, as these costs likely will continue in the future.").

spend in the future to deal with the problem of opioid use and abuse. But that is precisely the relief that plaintiffs seek under the guise of the "abatement" remedy. Permitting plaintiffs to seek both "future damages" and "abatement" poses an incurable risk of double recovery. *See Myles v. Meineke*, 82 Ohio App. 126, 129 (Ohio Ct. App. 1948) ("It is elementary that plaintiff is entitled to but one satisfaction of his wrong. Recovery if allowed the plaintiff here would amount to an additional satisfaction for the one wrong.").[4]

Plaintiffs made a strategic litigation decision to produce an expert damages report focused exclusively on past damages, and then allowed *Daubert* and summary judgment motions to go by without hinting at a claim for future damages. Because of these choices, the parties have not had an opportunity to litigate the adequacy of any future damages evidence plaintiffs might offer. This Court should exclude any future damages evidence from the trial of plaintiffs' RICO, OCPA, and conspiracy claims.

> 2. **The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

From the beginning of this litigation, plaintiffs have insisted that they intend to prove their claims through "aggregate" proof. They successfully resisted defendants' efforts to obtain discovery that would look behind plaintiffs' generalized allegations to determine, for example, *which orders* shipped by *which distributors* plaintiffs contend were "suspicious" and might have been diverted to improper use, *which prescriptions* plaintiffs contend were improperly written because of the manufacturers' marketing activities, and *which incidents* of misuse of prescription opioids plaintiffs contend actually caused them harm.

---

[4] Allowing plaintiffs to seek future damages from the jury also would impede the Court's adjudication of plaintiffs' proposed "abatement" remedy. If the jury were to award future damages, this Court would have no way of knowing what future expenses the jury included in its award (such that "abatement" compensation would be duplicative) or what expenses it rejected (such that "abatement" compensation would violate the Seventh Amendment). *See In re Lewis*, 845 F.2d 624, 629 (6th Cir. 1988) ("[T]he judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."(internal citation omitted)).

The probative value of such evidence is "substantially outweighed" by its potential for "unfair prejudice." Fed. R. Evid. 403.

> **4.** **The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.**

Plaintiffs intend to present evidence to the jury of a supposed causal connection, or "gateway," between prescription opioids and illicit opioid use. In addition to the three experts plaintiffs have disclosed to opine on this so-called "gateway" theory, plaintiffs have identified several lay witnesses who may testify concerning the theory, including Dr. Thomas Gilson, Cuyahoga's Medical Examiner, who has formed opinions on the theory but does not claim to be – and was not identified in plaintiffs' expert disclosures as – an expert on the subject. The Court should prohibit plaintiffs from introducing lay opinion testimony about their gateway theory that is (1) inconsistent with the narrow scope of lay opinion testimony authorized under Rule 701 and (2) based on unbridled speculation, inadmissible hearsay, or both.

First, Rule 701 permits opinion testimony from lay witnesses only when it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This rule "is designed to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in … [Rule 26]." *United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015); *see* Fed. R. Evid. 701, Advisory Committee Note (explaining that 701(c) was added in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing"). Therefore, "if the opinion testimony draws on scientific, technical, or other specialized knowledge, then its admissibility should be assessed under Rule 702, not Rule 701." *Kilpatrick*, 798 F.3d at 381.

Opinions suggesting that there is a "gateway" from prescription to illicit opioids necessarily require "specialized knowledge within the scope of Rule 702." Plaintiffs do not dispute this; they disclosed *three* experts to address this theory – Anna Lembke, M.D., Katherine Keyes, Ph.D, and Jonathan Gruber, Ph.D. As the Court found in denying defendants' *Daubert* challenge to these experts, they based their opinions upon "epidemiological studies and [their] own published literature and clinical experience." Dkt. 2518 at 14. Because opinions suggesting the existence of a gateway from prescription to illicit opioids are based on "specialized knowledge within the scope of Rule 702," lay witnesses, including Dr. Gilson, may not offer such opinions.[10]

Second, to the extent the lay testimony of these witnesses is based on anything other than rank speculation, it relies on inadmissible hearsay. Lay witnesses who were able to identify any basis at all for their "gateway" opinions could cite only to "conversations" or "discussions" they had had with unidentified individuals. For example, Jerry Craig, Executive Director of Summit County's Alcohol, Drug and Mental Health Board, identified the basis for his conclusions about the gateway theory as: "discussions . . . with individuals who've been affected by this and people who study this."[11] Keith Martin, the Assistant Special-Agent-in-Charge of the DEA's Cleveland Field office, testified that his conclusions about the gateway theory were based on his conversations with parents.[12]

In light of the scientific, specialized nature of the theory and the tendency of lay witnesses to adopt the theory based on inadmissible hearsay, the Court should preclude plaintiffs

---

[10] Although Dr. Gilson is a physician, he is a lay witness on this topic. As he admitted at his deposition, he is not an expert in either opioids or addiction. Dkt. 1977-16 (Gilson Dep.) at 25:3–11; 30:18–22. If plaintiffs contend that Dr. Gilson, or any other lay witness, is in fact an expert, their testimony should have been disclosed pursuant to Rule 26(a)(2)(C), and the absence of such a disclosure would be independent grounds for excluding the testimony.

[11] Dkt. 1976-7 (Craig Dep.) at 383:10–18.

[12] Ex. 7 (Martin Dep.) at 189:18–190:8.

from offering lay opinion testimony about the alleged gateway from prescription opioids to illicit opioids.

### 5. The Court should preclude evidence concerning lobbying and other protected petitioning activity.

The First Amendment protects the right of citizens to petition the government. Allowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). And permitting jurors to hear such evidence makes it more likely that jurors will be confused and inappropriately conflate the defendants' constitutionally protected behavior with illegal actions. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403.

Lobbying and other efforts to influence government action are protected by the First Amendment. The *Noerr–Pennington* doctrine protects persons from liability for their speech and conduct in exercising their First Amendment right to petition the government. *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition"). The doctrine likewise extends to "publicity campaign[s] to influence governmental action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961), as well as to concerted action designed to influence the government, *see id.* at 135-36 (doctrine applies to "associating together in an attempt to persuade the legislature or executive to take particular action"); *Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment). The Sixth Circuit has explained that "[a]lthough the *Noerr-Pennington* doctrine

taxpayers, or that jurors as taxpayers would benefit from ordering defendants to pay money to plaintiffs.

"Remarks involving the individual pecuniary interests of jurors as taxpayers are universally viewed as improper." *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2008) (citing cases). After all, given that "pecuniary interests would necessarily disqualify a prospective juror from service," it is "patently improper to make an appeal to that interest." *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991) (marks and citation omitted); *see also Gomez v. Schoenbeck*, 2019 WL 3887128, at *3 (S.D. Ill. Aug. 19, 2019) (granting motion *in limine* to bar "arguments to jurors relating to their status as taxpayers").

In this case, any reference to taxpayers' role in funding government services would be legally irrelevant and calculated to inflame the jury, and thus in clear violation of Rules 401 and 403. Plaintiffs complain of "extraordinary costs and losses" that are allegedly "related directly to Defendants' illegal actions," and plaintiffs charge that these costs were "borne by Plaintiffs and other governmental entities." Dkt. 1465 at ¶¶ 20-21. Because the plaintiffs have sued based on their own alleged injuries and not based on any injury allegedly sustained by the taxpaying public, any suggestion that these costs were ultimately paid by taxpayers would be legally irrelevant. Worse, such remarks would carry a high risk of unfair prejudice, as they would suggest that a portion of these costs was ultimately paid by the very jurors sitting to decide this case, and implicitly encourage them to decide the case based on their own pecuniary interests instead of based on the evidence and instructions presented at trial.

### 14. The Court should preclude any comment regarding the absence of a corporate representative at trial.

The Court should preclude counsel for plaintiffs from advancing argument, comment, or innuendo to the jury, or soliciting testimony regarding, the fact that a defendant's corporate representative might not attend all or part of the trial. Comments concerning the absence of

defendants' corporate representatives at trial are irrelevant and thus inadmissible.  Fed. R. Evid. 401, 402; *United States v. Nixon*, 694 F.3d 623, 636 (6th Cir. 2012).  The trial judge has full authority to "exclude irrelevant matters," *United States v. Pits*, 85 F.3d 629, *1 (6th Cir. 1996) (table), and the presence of corporate representatives has no bearing on any of the claims or issues in this action.  Moreover, such comments are unfairly prejudicial to the defendants, Fed. R. Evid. 403, because they improperly imply to the jury that the defendants do not take the proceedings seriously or may otherwise exploit potential jury bias against large corporations.  Accordingly, counsel's statements (including opening and closing statements), as well as the testimony counsel solicits from witnesses, must focus on the issues and admissible evidence, not recite irrelevant and prejudicial observations to "poison the minds of the jury," *United States v. Signer*, 482 F.2d 394, 398 (6th Cir. 1973); *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011).  The Court should accordingly prohibit counsel from making any comments or arguments, or soliciting testimony, at trial regarding the absence of any defendant's corporate representatives.

Case: 1:17-md-02804-DAP Doc #: 3465-1 Filed: 09/14/20 32 of 56. PageID #: 506466

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

## I.    INTRODUCTION

Plaintiffs' Opposition to defendants' motions *in limine* is long on pages but short on substance.  This brief offers short replies on the joint motions presented by all defendants remaining in the Track One trial.[1]  For all or portions of some motions, plaintiffs' Opposition offers no substantive response.  Those motions should be granted to the extent conceded.  The remaining motions should also be granted, as plaintiffs' arguments are without merit.

## II.    REPLIES IN SUPPORT OF MOTIONS IN LIMINE

### 1.    The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

After plaintiffs filed their Opposition and before this Reply was due, the Special Master entered an order stating the "Plaintiffs may not pursue future damages at trial."  Ex. 1 (October 10, 2019, Email from David R. Cohen).  That order renders this motion moot.  However, because the formalization of this ruling has not yet occurred as of this writing, *see id.*, the following discussion is provided for the record:

**Plaintiffs failed timely to disclose their future damages claim.**  Plaintiffs' claim that they adequately disclosed their claim for future damages during discovery is simply untrue.

First, plaintiffs' fact witnesses do not disclose a basis for their future damages claim.  As plaintiffs admit, they are required to prove their entitlement to future damages with "reasonable certainty."  *See* Dkt. 2727 (Plaintiffs' Omnibus Response to Defendants' Motions in Limine) at 7 ("Pl. Opp.").  While in certain circumstances (*e.g.*, a case involving lost wages) future damages may be proved without expert evidence, *see Sahrbacker v. Lucerne Products, Inc.*, 52 Ohio St.

---

[1] The distributor defendants are submitting a separate short reply on their joint motions, as provided in the Special Master's order on briefing of pretrial motions.  *See* Dkt. 1709 at 6.  Each defendant is submitting a reply addressing its individual motion as authorized by that same order.

3d 179, 179 (1990), that is not the case here, where even plaintiffs' claims for past damages are founded upon expert evidence. *See generally* Dkt. 1911-5 (McGuire Report).[2] In any event, plaintiffs cannot point to any non-expert testimony supporting their claim for future damages. Indeed, plaintiffs' fact witnesses were extensively deposed concerning plaintiffs' damages as reflected in their interrogatory responses (*see, e.g.*, Dkt. 2727-2, Ex. 2), and not a single one had an inkling as to how they were derived or calculated, pointing instead to expert reports that they claimed would later address that issue.[3]

Second, plaintiffs' interrogatory responses did *not* properly disclose a claim for future damages. While those responses generically referenced "future damages," they also stated that plaintiffs' "investigation" regarding "future costs" was "ongoing" and objected on the ground that the interrogatory "call[ed] for an expert opinion that will be the subject of a fully-supported and detailed expert opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure." Dkt. 2727-1 at 6; Dkt. 2727-2 at 7. The interrogatory responses did not disclose the basis for any future damages claim or how any future damages would be calculated; nor were the responses later supplemented to provide that information.

---

[2] Plaintiffs' claim for future damages is premised entirely on an extrapolation from their experts' calculation of past damages. *See* Dkt. 2727-4 at 1.

[3] *See, e.g.*, Dkt. 1982-14 (Nelsen 30(b)(6) Dep. Tr.) at 177-78, 185; Dkt. 2173-35 (Kearns Dep. Tr.) at 24-25; Dkt. 1979-5 (Keenan Dep. Tr.) at 431-33 ("Q. If you turn to the next to last page, there's a spreadsheet that attempts to estimate damages based on various categories. Have you ever seen this before? A. No, I have not. Q. Are you able to determine how this is computed? A. This document doesn't even detail what these numbers are? Q. What do you mean? A. I don't know what's being reported here. Is this total expenses? Is this revenue? Is this expenses related to opiates? There's no real detailing on the spreadsheet. . . . Q. Ms. Keenan, are you able to determine how these numbers were computed? A. I am not able to determine that, no. Q. Would you have any ability, based on the spreadsheet, to go and fact check this? A. No."); Dkt. 1979-4 (Keenan 30(b)(6) Dep. Tr.) at 101-02, 104, 107-08; Dkt. 1977-21 (Gutierrez Dep. Tr.) at 260-61.

Third, despite plaintiffs' promises in their interrogatory responses, they also did not disclose the basis for their future damages claim in their expert reports. Plaintiffs' damages expert, McGuire, did not disclose any future damages in his report. Rather, McGuire merely noted in a footnote that he *could* calculate future damages if asked to do so. *See* Dkt. 1911-5 at 7 n.12. While plaintiffs point to the report and testimony of their "abatement expert," Liebman, his report also did not purport to quantify future damages. Rather, he purported to quantify the amount of money that would be required to "abate the opioid crisis." Dkt. 2000-12 ¶ 14; *see also id.* at 2 n.3 (distinguishing McGuire's estimates of "the costs faced by Bellwether governments due to the opioid crisis"). These are legally distinct remedies. Tellingly, the amounts that McGuire now identifies as "future damages" are not set forth in, or broken out as a subset of, Liebman's "abatement" figures. *See id.* at 28–29 Tbls. 1–2.

Contrary to plaintiffs' suggestion, the mere fact that the money needed to implement the abatement plan "would be expended in the future," Pl. Opp. at 5, does not convert Liebman's abatement opinion into a quantification of future damages. While (as plaintiffs appear to acknowledge) any future damages would be duplicative of the so-called abatement remedy, *see id.* at 7 n.9, the two remedies are analytically distinct and not co-extensive.[4] The disclosure of an abatement opinion is no substitute for the timely disclosure of a future damages opinion.

**Defendants would be prejudiced if plaintiffs are permitted to add a claim for future damages on the eve of trial.** Plaintiffs' assertion that their belated attempt to inject an $800-million future damages claim into the impending trial would not prejudice defendants is absurd.

---

[4] Because McGuire now calculates "future damages" for 2019 – a year not covered by Liebman's abatement estimates – plaintiffs' future damages increase the total amounts plaintiffs are seeking by $42 million. For this reason, plaintiffs' assertion that their last-minute expert submissions "do not alter Defendants' overall exposure at trial," Pl. Opp. at 11, is wrong.

As a threshold matter, plaintiffs' failure to offer timely expert opinions on their claim for future damages was not substantially justified. Plaintiffs do not argue that their experts were unable to offer their future damages opinions in accordance with the expert disclosure schedule in this case – nor could they. Indeed, McGuire's expert report affirmatively acknowledged that he could have calculated future damages, but he did not do so. *See* Dkt. 1911-5 at 7 n.12.

For this reason, plaintiffs' assertion that defendants have "known for eleven months that Plaintiffs are seeking future damages" ignores reality. Plaintiffs' interrogatory responses stated that any claim for future damages would be set forth in "detailed expert opinion(s)." Dkt. 2727-1 at 6; Dkt. 2727-2 at 7. When the March 25, 2019, expert disclosure deadline came and went without any disclosure by plaintiffs of future damages, defendants reasonably concluded that plaintiffs were not moving forward with a future damages theory.

Plaintiffs' suggestion that their failure to timely produce expert evidence regarding future damages is "harmless," Pl. Opp. at 10–11, also strains credulity. Just days before trial, they seek to assert a brand new, $880 million damages theory based on new expert opinions. In order to respond, defendants would need to re-open both fact and expert discovery – a process that would likely take many months. First, because plaintiffs' "future damages" estimate is based on a projection from purported 2018 costs, defendants would need to obtain document and deposition discovery regarding plaintiffs' actual 2018 costs.[5] Second, defendants would need to re-depose not only McGuire and Liebman (as plaintiffs themselves concede, *see* Pl. Opp. at 10), but also

---

[5] Cuyahoga County has not produced *any* data regarding its 2018 expenditures, and the limited data produced by Summit County is woefully incomplete.

4

other experts – including Rosenthal, McCann and Cutler – regarding plaintiffs' future damages estimate.[6] Third, defendants' experts would need to formulate their own opinions.

Without an opportunity to interrogate the basis for plaintiffs' eleventh-hour future damages claim and to develop a responsive expert case, defendants will be substantially prejudiced at trial. With jury selection set to commence this week, there is insufficient time for the requisite fact and expert discovery. The Court should strike plaintiffs' last-minute expert submissions on future damages and preclude them from offering evidence of such damages.[7]

> **2.     The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

Defendants' Motion No. 2 seeks to bar plaintiffs from offering certain individualized evidence, not because it is irrelevant, but because plaintiffs successfully argued that it was and thereby avoided producing it in discovery. Plaintiffs have asserted throughout this case that they would be proving their claims through aggregate proof, and that the individualized evidence

---

[6] For example, McGuire's new "future damages" estimate is premised on the implicit assumption that harm to the plaintiff counties will remain steady over the next decade. *See* Dkt. 2727-4 at 1. But McGuire has never explained or justified this assumption. Nor has he ever opined on the extent of plaintiffs' harm; rather, he relies on the opinions of Cutler for that. *See* Dkt. 1911-5 ¶ 11 ("[D]amages are estimated by applying the estimates of the percent of harms attributable to defendants' misconduct presented in the Cutler Report … to the identified affected costs in each division…."). Defendants thus would be entitled to depose Cutler on questions such as whether – notwithstanding the *decrease* in opioid mortality in the plaintiff counties – it is appropriate to project into the future based upon estimated 2018 harms. Cutler in turn purports to rely on information he received from counsel and other experts. *See* Dkt. 2000-4 (Cutler Report) at 60–62 & App'x III.J. Defendants would need discovery on that information as well.

[7] *See, e.g.*, *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 914 (N.D. Ohio 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) (rejecting declaration filed after due date for disclosure of expert reports); *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 2010 WL 8334226, at *1 (N.D. Ohio Dec. 6, 2010), *aff'd sub nom. Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) (striking portion of supplemental report not based on new information); *Pluck v. BP Oil Pipeline Co.*, 2009 WL 10679665, at *7 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir. 2011) (striking new expert testimony submitted months after the deadline); *Shannon v. State Farm Ins.*, 2016 WL 3031383, at *3 (E.D. Mich. May 27, 2016) (listing Sixth Circuit decisions upholding orders striking experts).

Plaintiffs tacitly admit this, for they do not explain why Mr. Bornstein's story, or any other, is relevant. Nor do plaintiffs refute any of defendants' other arguments.[12] Without defending the admissibility of any particular evidence, they simply assert that this type of evidence cannot be categorically excluded. But given plaintiffs' failure to identify any respect in which such evidence *is* relevant and admissible, this argument necessarily fails.

Mr. Bornstein is a parent who lost his son. His story is heartbreaking, as is that of any parent who has endured the death of a child, no matter the cause. Any juror listening to his story – or others like it – is sure to be moved and may be motivated to "do something" to prevent other parents from suffering as he did, feeling the need to blame someone for what happened. Plaintiffs are banking on those types of purely emotional reactions motivating the jury to find in their favor. That purpose is patently improper and unfairly prejudicial to defendants. Permitting this type of evidence also will give plaintiffs all the benefits of these individual stories without putting them to the burden of proving up the required connections – if any – to any defendant's conduct. The Court should exclude these anecdotal personal stories about opioid abuse and related harms from the Track One trial.

### 4. The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Under Federal Rule of Evidence 701(c), "*if a witness is not testifying as an expert*, testimony in the form of an opinion is limited to one that is … *not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702" (emphasis added). Whether there

---

[12] Plaintiffs do not deny, for example, that they routinely instructed witnesses not to answer questions concerning personal use of opioids, instead pointing only to the fact that there were a few instances in which they chose not to do so. Pl. Opp. at 16. But a party cannot preserve its right to present evidence at trial on a subject merely by providing the limited discovery it finds convenient, while blocking the opposing party from obtaining related evidence that might undermine or contradict it.

is a causal connection between prescription and illicit opioid use is plainly within the scope of Rule 702.  Indeed, plaintiffs designated *three* experts to opine on the alleged connection.  The time to designate any additional experts on this subject expired months ago.

Plaintiffs concentrate their opposition to this motion on the proposed testimony of Dr. Thomas Gilson, the Cuyahoga County Medical Examiner.  They suggest that the motion is otherwise moot because two witnesses discussed as examples in defendants' motion, Jerry Craig and Keith Martin, are no longer on plaintiffs' witness list.  Pl. Opp. at 17 n.16.  But this does not moot defendants' motion to exclude lay witness testimony about the gateway theory from *any* witness.  Defendants cited Craig and Martin merely as illustrative examples; other witnesses who purported to testify on this subject in their depositions remain on plaintiffs' list.[13]

As for Dr. Gilson, who has not been designated as an expert and so will be testifying only as a fact witness, plaintiffs have offered no justification for permitting him to testify about an alleged causal connection between prescription and illicit opioid abuse.  Dr. Gilson's opinions are based on a "study" he allegedly performed in which he reviewed autopsy reports from a non-representative sample of Cuyahoga County residents, cross-referenced their identities with a database containing opioid prescription information (OARRS), and then drew conclusions about the relationship between prescription and illicit opioids.  That is precisely the sort of analytical exercise that expert witnesses perform and that is subject to challenge under *Daubert*.

Gilson's testimony about the gateway theory is not factual, lay testimony merely because he reached his conclusions while acting "in his capacity as Medical Examiner."  Pl. Opp. at 17.

---

[13] *See, e.g.*, Dkt. 1978-18 (Johnson Dep. Tr.) at 73:12-74:5 (testifying that "we know that 80 percent of our heroin users start with prescription opioids,"  based on "articles that I've read that talk about when folks self-report, in talking with Donna Skoda, in being at Opiate Task Force meetings … [and] presentations done by Dr. Doug Smith,"); Ex. 3 (Weiskittel Dep. Tr. at 50:4-52:15) (opinions about gateway connection based on discussions with her direct reports).

Medical examiners, including Dr. Gilson, routinely testify in an expert capacity; they cannot circumvent the expert disclosure requirements by testifying as percipient fact witnesses about scientific, technical, and specialized matters. Indeed, such a result would be especially troubling here, given that Dr. Gilson's statistical analysis strayed far beyond his own area of expertise. Dkt. 1977-16 (Gilson Dep. Tr.) at 68:24-69:3 ("I know some statistics. I -- I don't hold a degree in statistics. And I would not say that I would be somebody consulted as an expert in statistics.").

There can be circumstances in which an individual with specialized knowledge is also a percipient fact witness. *See, e.g.*, *Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003); *Jones v. Pramstaller*, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013). Whether Rule 26 applies depends on "the essence of the proffered testimony." *Gomez*, 344 F.3d at 113. For example, the witness in *Gomez* was a lawyer who participated in a meeting with the defendant in which he explained the defendant's legal obligations. The Court held that the witness's testimony "was not admissible for the purpose of proving what obligations the law imposed upon the [defendant]," only "to show the [defendant's] understanding at the time and his ensuing state of mind." *Id.* at 115. In other words, the witness's opinions were not themselves admissible; the witness could testify only as to information about those opinions that had been conveyed to the defendant for purposes of establishing the defendant's state of mind.

Here, in contrast, it is Dr. Gilson's conclusions themselves that are being offered. Nothing prevents plaintiffs from eliciting testimony from Dr. Gilson about *facts* on which he is a percipient witness, such as his personal observations in autopsies he conducted. But as the Advisory Committee Notes to Rule 701 explain, "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is

governed by the standards of Rule 702 and the corresponding disclosure requirements of the

Civil … Rules." Those standards are not satisfied here, either substantively or procedurally.

If plaintiffs had disclosed Dr. Gilson as an expert, full disclosure would have been

required of his analysis and all supporting data. Defendants would have had the opportunity to

conduct an expert deposition, produce a responsive expert, and challenge Gilson's conclusions

under *Daubert*.[14] Plaintiffs cannot "evade the expert witness disclosure requirements … by

simply calling an expert witness in the guise of a layperson." Rule 701 Notes of the Advisory

Committee. Dr. Gilson's testimony about the "gateway theory," like those of plaintiffs' other lay

witnesses who purport to have opinions on that subject, should be excluded.

### 5. The Court should preclude evidence concerning lobbying and other protected petitioning activity.

Allowing plaintiffs to introduce evidence of defendants' lobbying efforts or other

petitioning activity would violate defendants' First Amendment rights. None of plaintiffs'

arguments on this issue have merit.

*First*, plaintiffs are wrong to suggest that the *Noerr-Pennington* doctrine is limited to the

antitrust context. Pl. Opp. at 22 n.23. As decisions of both the Sixth Circuit and numerous other

courts of appeals make clear, *Noerr-Pennington* broadly applies "to claims brought under both

state and federal laws, including common law claims." *Campbell v. PMI Food Equip. Grp., Inc.*,

509 F.3d 776, 790 (6th Cir. 2007); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th

Cir. 1992) (holding that the First Amendment bars suits seeking to impose liability on petitioning

---

[14] To survive *Daubert*, plaintiffs would have had the burden of defending, among other things, Gilson's admitted lack of expertise on the kind of statistical analysis he purported to perform, as well as his highly skewed sample, the limitations of the OARRS database, and his failure to consider control or other variables. The OARRS data set that Gilson used, which was critical to his conclusions, was not even produced, and no expert has had an opportunity to evaluate its reliability or limitations.

designed to intimidate and harass the witness, are inadmissible under Rule 403. Plaintiffs do not cite a single case to the contrary.

Such testimony is also inadmissible as improper lay opinion testimony under Rule 701. Plaintiffs themselves have identified the subject of causation as one properly addressed by expert opinion under Rule 702. The opinion of lay witnesses on this subject is inadmissible under Federal Rule of Evidence 701(c). And to the extent plaintiffs seek to offer such testimony as evidence of "fault," "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Plaintiffs argue that defendants' witnesses' "particularized knowledge about their own or their employers' policies and procedures" is relevant. Pl. Opp. at 50. But that is beside the point; this motion does not address such testimony. There is no basis to question defendants' employees about whether they feel responsible for overdose deaths, whether they feel their employers are responsible for overdose deaths, or whether they feel guilt about their conduct or their employers' conduct, as plaintiffs regularly did in depositions. *United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) ("Seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact. …" (internal marks omitted)).

### 13. The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.

This motion has been mooted by stipulation. *See* Dkt. 2724 at 1.

### 14. The Court should preclude any comment regarding the absence of a corporate representative at trial.

Although plaintiffs ask the Court to defer ruling on the questions of relevance and potential prejudice raised by Motion No. 14, they do not (and cannot) seriously maintain that any argument, comment, or innuendo about the presence or absence of defendant corporate

representatives would ever be relevant to findings of fact in this case, or that any such comment would be anything but improperly prejudicial.

The handful of cases that plaintiffs cite on this point are out-of-circuit, unpublished, and conclusory, and most are off-point. The court in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, for instance, offered no reasoned basis for its order that the plaintiff was permitted to make reference to a corporate representative who was "customar[ily]" present at a trial. *See* 2011 WL 6740391, at *11 (S.D. Ill. Dec. 22, 2011). Other cases refer to witnesses, not corporate representatives. *See, e.g.*, *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying motion to exclude "reference to … the absence of any Samsung witnesses at trial"). The presence or absence of corporate representatives has no bearing on the issues to be tried.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF**
**DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE**

*Lincoln Elec. Co.*, 693 F.Supp.2d 767, 791 (N.D. Ohio 2010).  The prohibition on using 30(b)(6)

witnesses as conduits for hearsay is especially important when the proponent does not offer any

"independent evidentiary basis that might otherwise prove the truth of the hearsay." *Id.* at 792.

Although Rule 30(b)(6) gives broad latitude for the representative to speak about

corporate knowledge at a deposition, that right is significantly narrowed by the hearsay rule that

applies *at trial*.  "[A] corporate representative may not testify to matters outside his own personal

knowledge 'to the extent that information [is] hearsay not falling within one of the authorized

exceptions.'"  *Union Pump Co. v. Centrifugal Technology Inc.*, 404 F. App'x 899, 907-08 (5th

Cir. 2010) (quoting *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 435 (5th Cir. 2006))).

Therefore, while plaintiffs may offer otherwise admissible testimony from Mr. Prevoznik

or other third-party 30(b)(6) designees that reflects their own personal knowledge, testimony that

is not based on personal knowledge is hearsay and lacks foundation and is therefore

inadmissible.

### 3. [D-3] The Court Should Exclude Any Evidence Of Criminal Indictments And Investigations Without Corresponding Proof Of A Final Judgment Of Conviction

Plaintiffs' proposed exhibit list includes indictments (as well as press releases

announcing indictments) that allege misconduct in the distribution, prescription, and dispensing

of opioid medications.  The fact that someone has been indicted amounts to "no more than an

accusation, *i.e.*, alleging that the defendant committed the crime."  3 Fishman & McKenna, *Jones*

*on Evidence* § 17:34 (7th ed.); *see also, e.g.*, *Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins.*

*Co.*, 243 F.2d 949, 953 (2d Cir. 1957) ("The indictment, since it was only hearsay, was clearly

inadmissible for any purpose."); *United States v. Olivieri*, 740 F. Supp. 2d 414, 419 (S.D.N.Y.

2010) ("Charging Instruments are hearsay."). The Court should therefore exclude these exhibits, related testimony and press releases, and any other evidence concerning criminal indictments.[6]

To be sure, an indictment may be introduced "under Rule 803(22), which excepts judgments of previous *convictions* from the general ban against hearsay." *Mike's Train House, Inc. v. Lionel, LLC,* 472 F.3d 398, 412 (6th Cir. 2006) (emphasis added). But to satisfy this exception, plaintiffs would need to present a corresponding *judgment of conviction* that meets the strictures of Rule 803(22), including that the judgment be final and entered after a trial or guilty plea. *See id.* The point remains that a mere indictment will not suffice. *Cf. Munsey v. Tactical Armor Prods., Inc.*, No. 07-CV-445, 2008 WL 4500130, at *1 (E.D. Tenn. Sept. 30, 2008) ("The Court agrees with defendants that the Superseding Indictment is hearsay that does not fall within any hearsay exception."). Indeed, the fact that an indictment might satisfy a hearsay exception *when accompanied by a corresponding conviction* only underscores the default rule that an indictment standing alone is inadmissible. *See Gritton*, 2007 WL 3407459, at *10 ("Absent a conviction, it follows that these indictments do not come within the scope of Rule 803(22) and remain inadmissible hearsay."). And even such a conviction is admissible only if admitted to prove a fact "essential to the judgment." Fed. R. Evid. 803(22)(C).

Even if plaintiffs purport to offer an indictment for reasons other than the truth of its underlying allegations, the indictment would be inadmissible under Rule 402. The mere fact that the government has indicted someone has no relevance independent of the truth of the underlying allegations, given that "an indictment is not *any* evidence of guilt." *United States v. Chance*,

---

[6] The general bar against admitting criminal indictments carries special force because "indictments may be issued where the entire basis of evidence against the criminal defendant is hearsay." *Gritton v. Disponett*, No. 3:05-cv-75-JMH, 2007 WL 3407459, at *10 n.12 (E.D. Ky. Nov. 14, 2007). In other words, not only are indictments themselves hearsay, they may rest on nothing but hearsay—further compounding their unreliability. Given those shaky foundations, "there are no circumstantial guarantees of trustworthiness which would render [criminal indictments] admissible under the residual exception." *Levinson v. Westport Nat. Bank*, Nos. 09cv269(VLB), 09–cv–1955(VLB), 10cv261(VLB), 2013 WL 2181042, at *1 (D. Conn. May 20, 2013).

306 F.3d 356, 385 (6th Cir. 2002) (emphasis added); *see also In re Knerr*, 361 B.R. 858, 862 (Bankr. N.D. Ohio 2007) (striking state court indictment "[b]ecause an indictment is not evidence of any kind against a defendant and does not create any presumption or permit any inference of guilt" (internal quotation marks and citation omitted)). The only relevance of an indictment depends on the truth of its allegations. And because "indictments do not prove that any of the conduct described therein actually occurred," they should be excluded as irrelevant. *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 923 (N.D. Ill. 2004).[7] Despite the lack of any probative value, introduction of indictments would also create a substantial risk of unfair prejudice, as an "indictment's official nature" lends an undeserving imprimatur of credibility to its allegations that risks misleading and confusing the jury. *Baxter Health Care Corp. v. Spectramed Inc.*, No. SA CV 89-131, 1992 WL 340763, at *3 (C.D. Cal. Aug. 27, 1992).

The grounds for excluding evidence of ongoing criminal investigations are equally compelling. Like an indictment, the mere existence of a criminal investigation is not evidence admissible against a defendant. Even if an ongoing criminal investigation could be deemed to have some minimal probative value, that probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury—and thus should be excluded under Rule 403. *See Spencer v. McDonald*, 705 F. App'x 386, 390 (6th Cir. 2017) (affirming decision to exclude evidence of a criminal investigation because "[e]ven if the investigation were relevant" to the issues in the civil case, the district court did not abuse its discretion in excluding it under Rule 403); *Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*, Nos. 08–cv–12247, 2:08–cv–12274, 2010 WL 848689, at *1 (E.D. Mich. Mar. 8, 2010) (excluding evidence of an FBI investigation under Rule 403 because "'[t]he probative value of

---

[7] Many of the indictments on Plaintiffs' list are also irrelevant because they relate only to allegations occurring outside of the Plaintiff counties.

an ongoing criminal investigation is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury'") (quoting *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.,* Nos. 00 C 5658, 00 C 7086, 2003 WL 2005233, at *10 (N.D. Ill. Apr. 30, 2003)). Rule 403 applies not only to documents and testimony on direct examination, but also to questions on cross-examination. *See United States v. Newsom*, 452 F.3d 593, 602-04 (6th Cir. 2006) (agreeing that "the district court erred in allowing the government to cross-examine his other witnesses . . . because the resulting evidence violated Rule 403"); *Spencer*, 705 F. App'x at 392 (affirming the disallowance under Rule 403 of an impeachment question on cross-examination regarding a criminal investigation).

For these reasons, the Court should exclude any evidence of criminal investigations or indictments without corresponding proof of a final judgment of a conviction.

### 4.  [D-4] The Court Should Prohibit Plaintiffs From Stating Expressly Or Suggesting That The Jury May Infer That An Older Document Never Existed Just Because It Cannot Be Found

At his deposition, Plaintiffs' DEA expert James Rafalski offered his opinion that customer due diligence records and suspicious order reports "should be kept forever."[8] Then, in forming his opinions about alleged violations of the Controlled Substances Act, he assumed that if a distributor is unable to locate a due diligence file, this means the due diligence was not performed, even if the file would have been created in 1996, more than twenty years ago.[9] This assumption is the sole basis for Rafalski's conclusion that there was a "complete failure" by

---

[8] Rafalski Tr. (Dkt. No. 1983-15) at 125:5–126:3;

[9] *Id*. at 289:10-17.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

# OMNIBUS REPLY IN SUPPORT OF
# DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE

Plaintiffs' effort to discount the examples from the Prevoznik deposition cited in Distributors' motion are no more successful. Prevoznik testified at deposition about a document that he had "never seen." Distrib. MIL at 7. Rather than offering any basis on which Prevoznik's testimony about this document could possibly be admissible, Plaintiffs respond by listing a number of potential bases on which the underlying document might itself be admissible. Opp. 61 n.56. But none of those bases, even if correct, would render admissible *Prevoznik's testimony* about the document, which he admitted he had never seen and about which he had no personal knowledge.

In the end, Plaintiffs' opposition does not identify even a single example of any non-party Rule 30(b)(6) testimony they seek to offer that is admissible in the absence of personal knowledge of the witness. Plaintiffs' speculation that such an example *might* be found to exist (Opp. 61) is insufficient to warrant denial of this motion.[8] Because such testimony is barred by Rule 602 and the overwhelming weight of authority, and because Plaintiffs' vague hypothesis about admissible exceptions is unsupported, Distributors' motion should be granted.

3.    **[D-3] The Court Should Exclude any Evidence of Criminal Indictments and Investigations without Corresponding Proof of a Final Judgment of Conviction.**

Distributors' motion seeks exclusion of evidence of criminal indictments and investigation without proof of a conviction. It is beyond question—and the parties appear to be in full agreement—that the *fact* of an indictment, of grand jury proceedings, or of a criminal investigation is not admissible absent proof of a criminal *conviction*. *See* Distrib. MIL at 8; Opp. 63; *see also* Dkt. No. 2652 at 49–50; Dkt. No. 2725 at 53–54. Perhaps in recognition of this

---

[8] For this point, Plaintiffs cite a case in which no examples of testimony sought to be excluded were provided, which contrasts with the instant motion in which examples have been provided and discussed at length. *Compare Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, 2014 WL 1583993, at *3 (D. Colo. Apr. 21, 2014) ("Defendant's Motion identifies no specific evidence it seeks to exclude . . . "), *with* Distrib. MIL at 7, *and* Dkt. No. 2756 at 1–4.

principle, Plaintiffs suggest that they "do not intend to introduce" indictments and related documents, "unless necessary for some other purpose, such as impeachment." Opp. 63. Contrary to the Plaintiffs' assertion, however, it is well-established that "[i]nquiry into the mere existence of an arrest or indictment is not admissible to impeach [a witness's] credibility." *United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir. 1989); *U.S. v. Maynard*, 476 F.2d 1170, 1174 (D.C. Cir. 1973) ("As a general rule, it is improper to impeach a witness by showing an outstanding indictment without a conviction").

Moreover, while there is no blanket rule precluding the admissibility of *facts* underlying a criminal indictment or investigation, such facts must be relevant to the issues in the case, and their probative value must outweigh the danger of unfair prejudice. *See* Fed. R. Evid. 402, 403. Plaintiffs reflexively suggest that whether Dave Gustin violated the CSA is "certainly relevant" to their claims. Opp. 63. Not so. Mr. Gustin's McKesson territory did *not* include Cuyahoga or Summit Counties.[9] Moreover, the allegation that Mr. Gustin violated the CSA is not an "underlying fact"—it is an unproven legal conclusion. Finally, Mr. Gustin's counsel has already informed the Court that, if called to testify, Mr. Gustin would invoke his Fifth Amendment right, *see* Dkt. No. 2795—which would have no probative value yet would be highly prejudicial to McKesson.[10]

---

[9] Mr. Gustin was not responsible for "compliance" (or anything else) at the New Castle Distribution Center, which accounted for more than 99 percent of McKesson's opioid shipments into Cuyahoga and Summit Counties, and which is part of McKesson' Northeast region. Mr. Gustin served as a director for a different region (North Central) that did not include Cuyahoga or Summit Counties.

[10] *See, e.g.*, *Akinyemi v. Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009) (upholding refusal to instruct jury on adverse inference against employer based on employee's invocation of Fifth Amendment); *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1465 (5th Cir. 1992) ("The potential prejudice in revealing the invocation of the Fifth Amendment is high, because the jury may attach undue weight to it, or may misunderstand [the witness's] decision to invoke his constitutional privilege."); *Coquina Investments v. Rothstein*, 2011 WL 13096509, at *1 (S.D. Fla. Oct. 19, 2011) (granting motion in limine excluding former employee's invocation of the Fifth Amendment; inference drawn from invocation of privilege "would not be trustworthy, and should be excluded under Rule 403 of the Federal Rules of Evidence").

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-d-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## WALGREENS' MOTIONS *IN LIMINE*

The Court should exclude all evidence and argument relating to DEA's OTSC and Walgreens' subsequent settlement agreement.

## III. Motion No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man"

Walgreens moves *in limine* to preclude evidence or argument suggesting that former DEA Deputy Administrator Joseph Rannazzisi's credibility or character is bolstered by the fact of his appearance on 60 Minutes, in articles published by the Washington Post, or in reporting by any other news organization. At deposition, plaintiffs' counsel repeatedly referred to Mr. Rannazzisi as the "60 Minute Man," going so far as to create a hand-drawn demonstrative "Roadmap" that started on "60 Minute Man Road," and continued from there to focus extensively on Mr. Rannazzisi's appearance on the television news program, as well as his interviews in the Washington Post. *E.g.*, **Exhibit F**, Rannazzisi Dep. 376:19-377:9; 396:11-399:6.

Walgreens anticipates that plaintiffs may seek to paint Mr. Rannazzisi as an honest whistleblower by virtue of these news appearances, including in opening statement. Such references would trade on the credibility of respected news organizations—and those organizations' purported commitment to finding and reporting the truth—to suggest that Mr. Rannazzisi is also credible by virtue of the fact that these organizations reported what he said. (By the same token, the fact that 60 Minutes or any news article criticized a company or individual should not be used to impeach that person.) That improperly invades the jury's role as factfinder to weigh the strength of the evidence. It also threatens to mislead and confuse the jury in a way that is prejudicial to Walgreens and other defendants. Any such evidence or argument should be excluded under Rule 403.

Case: 1:17-md-02804-DAP Doc #: 2801 Filed: 10/14/19 54 of 56. PageID #: 423730

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## WALGREENS' REPLIES IN SUPPORT OF ITS MOTIONS *IN LIMINE*

**Third**, the Florida settlement and OTSC are, in fact, **irrelevant**.  The fact of settlement says nothing about the merits of the underlying allegations.  MIL at 5 n.3 (collecting authority).  Courts have rejected the suggestion that government investigations or even sanctions are evidence of wrongdoing.  *Id.* at 6 (collecting authority).  And that is on top of the fact that the allegations about conduct in Florida have no connection to plaintiffs' Ohio claims.  Plaintiffs' response involves generalized assertions about pill "migration," Opp. at 84-85, and a truly remarkable notion that *any* evidence that Walgreens' improperly shipped a suspicious order *anywhere* is evidence of damages *everywhere*, *id.* at 85.  But plaintiffs do not (and cannot) dispute that neither they nor their experts have established any evidentiary nexus between distribution in Florida and either of the Track One counties.  MIL at 6-7.

**Fourth**, plaintiffs' answer to Walgreens' arguments about prejudice under Rule 403 is to baldly assert that jurors are unlikely to conclude that Walgreens' settlement of alleged "CSA violations" is an admission of liability for plaintiffs' claims **based on alleged CSA violations**.  *See* Opp. at 59.  Plaintiffs' argument makes no sense, and flies directly in the face of the Sixth Circuit's view that the impact of settlement evidence is "profound" and no amount of evidence of liability, even with a "limiting instruction," is "sufficient to cure [its] wrongful admission." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007).

**Finally**, plaintiffs offer no response at all to the unfair prejudice of introducing the Florida OTSC's preliminary, unproven allegations and improper legal conclusions.  MIL at 6.  Nor do they dispute that the introduction of evidence about the OTSC or subsequent settlement would require a whole trial in itself, wasting valuable time and confusing the jury.  *Id.* at 7.

## III.    W-3: To exclude references to Joseph Rannazzisi as the "60 Minute Man"

In response to Walgreens' motion to exclude evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man," plaintiffs admit that they plan to use such

references for exactly the impermissible purpose that Walgreens raised as a basis for exclusion—to bolster Mr. Rannazzisi's credibility. "Indeed," plaintiffs state, "a reputable news outlet's use and reliance on Mr. Rannazzisi's comments in a national broadcast or publication constitutes valid and admissible evidence of his credibility." Opp. at 87. But Mr. Rannazzisi's credibility is for the jury to determine on its own, based on their evaluation of his testimony and demeanor, not based on hearsay evidence that cannot be tested in court. Evidence of Mr. Rannazzisi's credibility is therefore prohibited under Rule 404. FED. R. EVID. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character trait."). Moreover, the parties have stipulated that neither side shall offer evidence or argument "that bolsters the unchallenged character (e.g., honest) or traits (e.g., generous) of any party's . . . witnesses." Dkt. 2647 at 2 ¶ 3. Plaintiffs' planned use of the "60 Minute Man" references flies in the face of this stipulation and Rule 404(a). Walgreens' motion to exclude these references should be granted.