# EXHIBIT 2

```
 1           IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4     ----------------------------X

       IN RE: NATIONAL PRESCRIPTION    MDL No. 2804

 5     OPIATE LITIGATION,

                                       Case No. 17-MD-2804

 6     This document relates to:

 7     All Cases                       Hon. Dan A. Polster

 8     ----------------------------X

 9

10      * * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

11              * * CONFIDENTIALITY REVIEW * *

12                 VIDEOTAPED DEPOSITION

13                         OF

14              THOMAS P. NAPOLI

15              New York, New York

16            Thursday, January 17, 2019

17

18

19

20

21

22

       Reported by:

23     ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And then at the very bottom it

 3    states, "Complete evaluation of current system V

 4    DEA requirements and prepare executive summary

 5    by 4/30, 2011.  Develop action plan and present

 6    to management by 6/1, and implement system with

 7    automated business system test environment by

 8    end of fourth quarter."

 9              Do you remember who set that schedule

10    for the Phase II of the upgrade of Watson's

11    Suspicious Order Monitoring program?

12          A.    It's likely myself, my manager.

13          Q.    Again, who was your manager?

14          A.    Scott Soltis.

15          Q.    All right.  So let's set this

16    document aside.

17              (Witness complies.)

18              (Napoli Exhibit 11, Customer Services

19          Agreement - Statement of Work No. 1,

20          Bates-stamped ALLERGAN_MDL_03535028 through

21          5030, marked for identification, as of this

22          date.)

23    BY MR. EGLER:

24          Q.    I'll hand you what we will mark as
```

1      Exhibit 11.

2                  (Handing.)

3          A.     Thank you.

4          Q.     Mr. Napoli, can you look at what I've

5      marked as Exhibit 11?  While you're looking at

6      it, I'll read into the record it's

7      ALLERGAN_MDL_03535028 through 5030.

8                  When you're ready, when you're ready,

9      can you tell me what this appears to you to be?

10                 (Document review.)

11         A.     Yes.  It's a Statement of Work from

12     Buzzeo PDMA, also known as Cegedim.  And it's to

13     conduct what we discussed in my, my goals and my

14     performance review to do an analysis of our SOM

15     program and discuss our approach, meet with IT

16     and compliance teams, discuss data, and the, the

17     current model and any improvements that can be

18     made.

19         Q.     So with regard to this Statement of

20     Work No. 1, do you know who would have -- who

21     would have, at Watson, negotiated this statement

22     of work with Buzzeo?

23         A.     Likely myself and Scott Soltis.

24         Q.     All right.  And what makes you think

Highly Confidential - Subject to Further Confidentiality Review

1      that?

2             A.    It was our, our project.

3             Q.    And so speaking generally about the

4      Buzzeo entity, I think you had said today that

5      you had worked with them previously in the

6      course of your work at Watson; is that right?

7             A.    Correct.

8             Q.    And as you think of it, did you work

9      with consultants other than Buzzeo that provided

10     similar services while you were at Watson?

11            A.    I mean primarily from a consulting

12     standpoint, we would utilize Buzzeo.  I'm trying

13     to think if there are any other...

14            There may have been another firm, but

15     I'm just drawing a blank right now.

16            Q.    Do you remember whether with regards

17     to the Phase II that you talked about in your

18     annual review for the Suspicious Order

19     Monitoring program at Watson, whether you

20     entertained bids or proposals from anyone other

21     than Buzzeo PDMA?

22            A.    Perhaps ValueCentric, but I can't be

23     100 percent sure.

24            Q.    So what do you know about

Highly Confidential - Subject to Further Confidentiality Review

 1    ValueCentric?

 2         A.    ValueCentric is another organization

 3    that is in the business of providing data to the

 4    pharmaceutical industry.

 5         Q.    Can you think of a particular person

 6    that you recognize as a contact at ValueCentric?

 7         A.    No.

 8         Q.    Do you know whether you were -- when

 9    you were at Watson or Actavis, your group ever

10    contracted with the ValueCentric entity?

11         A.    My group did not.

12         Q.    Do you know if anyone at Watson

13    contracted with the ValueCentric entity?

14              MR. KNAPP:  Foundation.

15         A.    I believe sales and marketing may

16    have utilized their services.

17         Q.    Okay.  Anybody else that you know of?

18         A.    No, I don't.

19         Q.    All right.  So with regard to this

20    Statement of Work No. 1, it's marked as

21    Exhibit 11, who in particular, if anyone, at the

22    Buzzeo PDMA group did you negotiate with?

23         A.    Now when you say "negotiate," can you

24    expand on that, on that term?

```
1          Q.    Okay.  So this document appears to me

2    to be signed by Mr. Soltis, I think, is it

3    July 28th, 2011?

4          A.    Um-hmm.

5                (Document review.)

6          A.    Yes.

7          Q.    So before that time, as the agreement

8    was coming together, is there anyone in

9    particular at Buzzeo PDMA that you worked with

10   to get a mutual understanding of the scope of

11   the project and the cost?

12         A.    Yeah.  Likely it was an individual

13   named Paul Hamby, H-a-m-b-y, and Bob Williamson,

14   common spelling.

15         Q.    And Mr. Hamby I think we mentioned

16   earlier today.

17                When did you first meet Mr. Hamby?

18         A.    Likely in the mid-2000s at a Buzzeo

19   conference.

20         Q.    How about Mr. Williamson?

21         A.    Same.  Mr. Caverly we talked about

22   earlier now.  This is the first introduction to

23   Paul, I believe.

24         Q.    All right.  All right.  You can set
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     this document aside for now.

 2               (Witness complies.)

 3     BY MR. EGLER:

 4          Q.   I'll hand you what we will mark as

 5     Exhibit 12.

 6               (Napoli Exhibit 12, Meeting Minutes

 7          dated 9/8/11 ALLERGAN_MDL_02176488 through

 8          6492, marked for identification, as of this

 9          date.)

10     BY MR. EGLER:

11          Q.   And Mr. Napoli, can you look at what

12     I've marked as Exhibit 12?

13               And while you're looking at it, I'll

14     note for the record that it's numbered

15     ALLERGAN_MDL_02176488 through 6492.

16               When you're ready, can you tell me if

17     you recognize this document?

18          A.   I do recognize it.

19          Q.   What is it?

20          A.   It looks like a meeting minutes from

21     an initial meeting that we had with Cegedim

22     regarding the SOMS assessment.

23          Q.   So in the subject, on the first page,

24     page 88 states, "SOMS meeting system evaluation,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cegedim Dendrite," and it states "Thursday,

2    September 8th, 2011."

3         Do you remember this particular

4    meeting?

5         A.    I don't.

6         Q.    Can you, can you tell from the

7    context of this where this meeting would have

8    been held?

9         A.    Likely in our Parsippany office.

10        Q.    Do you remember having a meeting like

11   this with people from Cegedim Dendrite in

12   September 2011?

13        A.    Yes.

14        Q.    And there's a person there under

15   attendees, Robert C. Williamson.

16        Is that Bob Williamson -- Bob

17   Williamson that you were talking about before?

18        A.    Bob Williamson, yes.

19        Q.    And there's -- the name underneath

20   there Jonathan Kuhn, Ph.D.

21        Do you know Mr. Kuhn or Dr. Kuhn?

22        A.    Yes.  He's a statistician who worked

23   for Cegedim.

24        Q.    And then there are various people

Highly Confidential - Subject to Further Confidentiality Review

```
 1    listed beyond there; Scott Soltis, Mary Woods,

 2    Larry Schaffer, Justin Park, Laura Pinti, Sandra

 3    Simmons, Lisa Scott, Lynn DaCunha, Jaydeep

 4    Shukla, Rick Robbins, and Napoleon Clarke.

 5              Did all those people that I just read

 6    their names, did all those people work at

 7    Watson?

 8         A.    Yes.

 9         Q.    All right.  I don't think we have

10    seen the name Jaydeep Shukla earlier today.  Who

11    is -- is it Mr. or Ms. Shukla?

12         A.    Jaydeep eventually joined our DEA

13    affairs team as an associate or a DEA compliance

14    specialist.

15         Q.    All right.  And then Rick Robbins,

16    who is Rick Robbins?

17         A.    Rick Robbins and Napoleon were both

18    in sales and marketing.

19         Q.    All right.  So -- and the front seems

20    to be a discussion of what is going on at the

21    meeting.

22              And the third entry down there, it

23    say, "Agenda," and then in parentheses, "Tom."

24         A.    Um-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    As you read this, do you know who

 2      would have typed the text in there that appears

 3      there?

 4            A.    No.

 5            Q.    Do you think it was you?

 6            A.    No.

 7            Q.    So it states, "Overview of

 8      organization," and it says, "Anda not included

 9      in the scope of this project."

10                  What is Anda, as you understand it in

11      the context of Watson?

12            A.    Anda is a pharmaceutical distributor

13      that, when we acquired Andrx, they were a part

14      of that organization.  But they were treated as

15      a separate entity.  They weren't part of our --

16      when it came to compliance or anything, they

17      were a separate entity.

18            Q.    And then the next line down there, it

19      states, "Enable and sustain growth of our

20      business" and, dash, "$498 million of C/S

21      products sold in 2010 with top 5 products,

22      hydrocodone, oxycodone, fentanyl and

23      methylphenidate."

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And then in parentheses, "Concerta

 2     P&G," close parentheses.

 3               So there are, I think, four things

 4     listed there.

 5               But do you remember having a

 6     discussion of Watson having $498 million of CS

 7     products sold in 2010 and the top four products

 8     being hydrocodone, oxycodone, fentanyl and

 9     methylphenidate?

10          A.    It's entirely possible.

11          Q.    All right.  And then the next entry

12     is, "Enable and sustain growth of business," and

13     then dash "security and compliance."

14               Do you have an understanding of

15     whether you said something like this at the

16     meeting and what you meant by it?

17          A.    What I would have meant by that is

18     to, you know, from a business perspective, to

19     support the business and -- but to make sure

20     that we do it in a secure and compliant manner.

21          Q.    All right.  And then the next

22     statement is, "Systemic upgrade" and then it

23     says, "Take labor and subjectivity out of the

24     department."
```

1          Do you remember whether you said

2     something like that at this meeting and what you

3     meant by it?

4          A.    It's possible.

5          Q.    What would you have meant by it?

6          A.    It meant that although we had a

7     compliant system, it was very labor intensive,

8     and we were looking to make enhancements to the

9     program that would sharpen the tool for us.

10    Maybe have we have a statistician there where --

11    to look at algorithms that were currently

12    developing with the, the advance of technology

13    itself, or to take a look at is there a way that

14    we could do this more efficiently to take some

15    of the labor intensivity out of it and to have

16    it autocalibrate.

17         Q.    So when you say "labor intensivity,"

18    as you think about the labor intensive part of

19    the Suspicious Order Monitoring System and

20    Watson around this time, mid to late 2011, what

21    was labor intensive about it?

22         A.    We pended a lot of orders in the

23    system that need to be reviewed.

24         Q.    And so as you think about it, what

1    was your proposed means of reducing the labor

2    intensiveness of the system?

3         A.    Automation.

4         Q.    Would the automation replace -- let

5    me start over.

6              As I think of the system, there are

7    three basic parts; the SAP system, and then the

8    initial order management team consideration, and

9    the potential DEA team consideration.

10             So as you think about taking the

11   labor intensive part out of it, if those are the

12   correct stages of the system, which part are you

13   thinking of?

14        A.    Well, just to back up and clarify,

15   when I think of our SOM system, I don't think

16   just of SAP.  I think of a holistic approach

17   that begins with the Know Your Customer

18   initiative and vetting.

19             And then we have the systemic

20   approach to it, which we're talking about, then

21   also the evaluation investigative aspect as

22   well, too, and the monitoring.

23             But in this aspect, we were talking

24   strictly about the automated aspect of the

```
 1    system, where although we had a compliant

 2    system, it -- we wanted to, again, sharpen the,

 3    you know, the sensitivity.  So by -- and I'm

 4    just putting this out there.  If we looked at

 5    six parameters, we wanted to -- maybe Buzzeo had

 6    a statistical algorithm of like 12.  Maybe we

 7    could reduce the number, because we had an awful

 8    lot of false positives in our system, so we

 9    wanted to be more accurate and take -- and by

10    less labor, it means less false positives, less

11    time spent on reviewing orders that we didn't

12    need to have to.  Because that was one of the

13    issues.  We reviewed a lot of orders because we

14    erred on the side of being conservative.  We

15    rather look at too many orders than not look at

16    enough.

17         Q.    So with regard to that issue and

18    trying to make the automated part of the

19    Suspicious Order Monitoring System more

20    accurate, is that a good word or --

21         A.    No, because it was accurate, but we

22    just wanted to make it more efficient.

23         Q.    More efficient.

24               Was there ever any consideration that
```

Highly Confidential - Subject to Further Confidentiality Review

1    the system wasn't pulling up enough suspicious

2    orders?

3            MR. LUXTON:  Objection to form.

4        A.    The system wasn't pulling up

5    suspicious orders.  The system was pulling up

6    orders of interest that were pending and it -- I

7    would not say it didn't pull up enough.  I think

8    we pulled up a lot of orders that were, I would

9    say, false positives that we had to -- had to

10   work through.

11       Q.    Was there ever any consideration that

12   the Suspicious Order Monitoring System at Watson

13   around this time in 2011 was not pulling up or

14   not pending orders that were suspicious or would

15   be suspicious if examined?

16       A.    No.

17           MR. KNAPP:  Objection to form.

18   BY MR. EGLER:

19       Q.    Was there ever any discussion of the,

20   for example, the Norco diversion issue and

21   whether the Suspicious Order Monitoring System

22   could be tuned to better examine issues raised

23   to the diversion of Norco?

24           MR. KNAPP:  Form and foundation.

1          A.      Not specifically.  I mean, we already

2     looked at hydrocodone as a molecule, which would

3     include Norco.

4          Q.      Was there any discussion of whether

5     to add more variables or data to examine the

6     known diversion issues with the hydrocodone

7     molecule?

8          A.      Again, known diversion issues -- what

9     known diversion issues are you talking about?

10         Q.      So we are talking about the Exhibit,

11    I think, 8 before, the email...

12             (Document review.)

13    BY MR. EGLER:

14         Q.      What we marked as Exhibit 8, there is

15    a statement from Mr. Herrera that says, "The

16    agents were" -- "that were interested were from

17    the San Diego field office, and there was a

18    presentation by SD County prosecutor that keyed

19    on the diversion wave in SD, especially Watson

20    hydro and Norco really hard."

21             Do you remember, and this is

22    April 2010, do you remember in 2011 when

23    recalibrating the Suspicious Order Monitoring

24    System at Watson, whether there was ever any

```
 1    discussion of finding data or variables that
 2    would help to track diversion in, say, San Diego
 3    County, California?
 4         A.    No.  Our system designed for our SOMS
 5    program was in accordance with the DEA
 6    regulations for us to identify or that deviated
 7    in size, pattern or frequency with, with our
 8    trading partners, with our partners.  That's
 9    what it was geared towards.
10         Q.    The DEA didn't instruct registrants
11    on the formulas or algorithms they were to use
12    in constructing their Suspicious Order
13    Monitoring systems; is that right?
14         A.    That's correct.
15         Q.    And was there any consideration at
16    Watson at this time after having been told by
17    the San Diego field office of the DEA that there
18    was a diversion wave in San Diego that there
19    should be some analysis of how to account for
20    that wave or analyze it or anything?
21              MR. KNAPP:  Objection to form.  Asked
22         and answered multiple times.
23         A.    And I'll state that, you know, you're
24    basing this premise on someone's version of what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     was, I don't know if it was completely shut down

 2     or if there is was a temporary order.  I'm not

 3     sure.

 4          Q.   And I guess "shut down" isn't the

 5     right way to say it.

 6               They were unable to sell controlled

 7     substances; is that right?

 8          A.   Correct.

 9          Q.   Okay.  So the next bullet point down

10     states, "Expectation that we know our customers'

11     customers."

12               Do you see that there?

13          A.   Um-hmm.

14          Q.   Do you remember where that language

15     came from, "expectation that we know our," that

16     we, quote, "know our customers' customers,"

17     unquote?

18          A.   I don't.

19          Q.   It states, "Cross-functional team

20     established in 2010."

21               And I think we talked about that

22     before, right?

23          A.   Right.

24          Q.   And as you understand it, the
```

1    cross-functional team that's referred to there

2    is the group from customer service and the group

3    from the DEA affairs; is that right?

4         A.    That's correct.

5         Q.    Oh, and below, it says, "Security and

6    DEA affairs, IT and customer relations."

7              And the IT component is programming

8    the automated system into the SAP process; is

9    that right?

10        A.    Right.  Or from a project management

11   standpoint of implementing a new -- if we went

12   with a new algorithm into the system.

13        Q.    And then "Establish goals, compliance

14   and efficiency."

15             And, again, do you remember there

16   being a discussion about compliance around this

17   time frame?

18        A.    No, I do not.

19        Q.    All right.  And then the next one is,

20   "Budgeted for third-party evaluation in 2011."

21        A.    Right.

22        Q.    And then turning to the next page,

23   "Automated System Evaluation," it starts talking

24   about Cegedim-Dendrite; is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And is that the evaluation that we

 3   were talking about in the exhibit before we took

 4   the break?

 5        A.    Correct.

 6        Q.    So the next page is "Findings."

 7              Do you see that there?

 8              (Document review.)

 9        A.    Yes.

10        Q.    So it states -- as you see that word

11   "Findings," can you -- do you have an

12   understanding what that means in the context of

13   this document?

14        A.    These would be observations that were

15   made by the consultant.

16        Q.    And the consultant was Buzzeo?

17        A.    Yes.

18        Q.    And it says, "Use of multiplier to

19   create monthly threshold."

20              And it says, "Not consistent with

21   specific requirements noted within regulations

22   and guidance, and current system will detect a

23   certain percentage of suspicious orders but not

24   all."
```

1                    Do you see that there?

2          A.    I do.

3          Q.    Do you remember that being a finding

4     that the Buzzeo group made about the Watson

5     system in early 2012?

6          A.    I don't have a specific recollection.

7          Q.    Do you remember -- and, you know, I

8     put a date limitation on that.

9                    Is your lack of specific recollection

10    based on the date or something else?

11         A.    It's just... it's been a while.

12         Q.    And then it states, "Current model

13    evaluates at SKU level."

14                   Is that pronounced typically "skew"?

15         A.    Yes.

16         Q.    All right.  What is a SKU?

17         A.    A SKU is just one, one product.  So

18    it can be oxycodone 10325, 100 fill count, SKU.

19         Q.    Do you recognize the difference

20    between a SKU and an NDC code?

21         A.    The SKU could be -- yeah, there,

22    there is a difference between the two.  I don't

23    know the exact -- SKU is more of a -- we're kind

24    of exceeding my, probably my area of expertise,

```
 1      but they're both unique identifiers.

 2                  I think what this is saying here is

 3      that by looking at it at the SKU level, we're

 4      not looking at the total molecule.  And that was

 5      an enhancement.  So that's something where we

 6      could have enhanced.

 7          Q.    All right.  So it states, "Current

 8      model evaluates at SKU level.  Possibility of

 9      distributing orders across multiple SKUs without

10      detection."

11                  So that's where you're talking about

12      it can be the same, as you refer to it, molecule

13      but with different SKUs?

14          A.    Right.

15          Q.    And then the next one is, "System

16      does not evaluate listed chemicals"?

17          A.    Right.

18          Q.    I think we talked about that earlier

19      as well?

20          A.    Right.

21          Q.    Those are the precursor chemicals

22      that you talked about?

23          A.    Right.

24          Q.    And then on the next page, 990, it
```

Highly Confidential - Subject to Further Confidentiality Review

1    states, "Revisit approach to SOM to fully

2    address specific regulatory requirements."

3         And then it states, "Develop SOM that

4    is a 'non-threshold-based adaptive' -- I'm

5    sorry, let me read it.

6         "Develop SOM that is a,

7    'non-threshold-based adaptive,' system trained

8    to identify suspicious orders by utilizing a set

9    of historic markers to include," and then

10   another bullet point, "statistical scoring of

11   active ingredient order volume versus history,

12   active ingredient order versus short and

13   long-term trend, identification of high/low

14   frequency ordering behavior."

15        And then the next bullet point is

16   "Base system on milligram strength rather than

17   SKU."

18        A.   Um-hmm.

19        Q.   And then, "Include list of chemical

20   within system."

21        And then, "Based on recommendations,

22   GS and DEAA requested a proposal and quote."

23        In the context of this document, do

24   you know what GS and DEAA would be?

1          A.     Global security and DEA affairs.

2          Q.     And your group was DEA affairs; is

3     that right?

4          A.     Yes.

5          Q.     And then the next dash is "Establish

6     meeting with IT and consultant."

7          A.     Um-hmm.

8          Q.     "Understand scope, confirm that

9     solution was appropriate and achievable."  And

10    then the next one is "Budgeted for 2012

11    implementation."

12               Do you see that there?

13         A.     Yes.

14         Q.     Do you remember the -- do you

15    remember whether there was a decision around

16    this time, April 2012, to implement the Buzzeo

17    system at Watson?

18         A.     Yes, I believe there was.

19         Q.     All right.  Do you remember who made

20    that decision?

21         A.     It would have been my management.

22         Q.     Did you support the conclusion to

23    implement the Buzzeo system?

24         A.     I definitely supported enhancing our

Highly Confidential - Subject to Further Confidentiality Review

```
 1    system.  You know, the automated system that

 2    we're talking about is -- we are talking about

 3    just one component within the system, that's

 4    what I want to make clear.  So we're not relying

 5    on one component of a system as our Suspicious

 6    Order Monitoring program.

 7         Q.    And as you had been talking about

 8    earlier, in addition to this process, there is

 9    the onboarding process and reviews; is that

10    right?

11         A.    The Know Your Customer due diligence.

12         Q.    And Know Your Customer due diligence.

13              And then beyond the automated system,

14    there is a process of customer service clearing

15    and then, if necessary, DEA affairs clearing of

16    orders; is that right?

17         A.    Yes, sir.

18         Q.    And if none of those processes work,

19    the order will be reported to the DEA as

20    suspicious; is that right?

21         A.    Correct.

22         Q.    All right.

23              All right.  You can set this aside.

24         A.    Okay.
```

```
 1                    (Witness complies.)

 2                    (Napoli Exhibit 16, Watson document

 3            entitled SOMS Project Evolution IT

 4            Governance Meeting, Bates-stamped

 5            ALLERGAN_MDL_02187196 through 87199, marked

 6            for identification, as of this date.)

 7     BY MR. EGLER:

 8            Q.   Mr. Napoli, I'm handing you what I

 9     marked as Exhibit 16.

10                    Mr. Napoli, can you look at that

11     exhibit?  And while you're looking through it,

12     I'll read it into the record.  It's

13     ALLERGAN_MDL_02187196 through 87199.

14                    And I'll tell you for the record,

15     there -- as I read it, there are two emails in

16     this exhibit, plus an attachment.  And the last

17     email in time, the first one on the page, the

18     first page of Exhibit 16, you're not included in

19     that email.

20            A.   Okay.

21            Q.   So you can read it, but I'm not going

22     to ask you questions about it.

23            A.   Okay.

24            Q.   The one below, Tuesday, October 4th,
```

```
1    then Actavis, each year about how many new

2    customers, on average, do you think came in to

3    the company?

4         A.    Zero.

5         Q.    All right.  And did they have any new

6    customers at any point?

7         A.    There may have been one or two.  We

8    had a long-standing customer base and we -- it

9    was a very rare occasion if we took on a new

10   customer for controlled substances.

11        Q.    When you talk about the onboarding

12   process for the time that you were the head of

13   DEA affairs at Watson from 2009 through whenever

14   you left, about how many times was there an

15   onboarding process?

16        A.    I don't have a direct recollection.

17        Q.    Fewer than a dozen?

18        A.    Yes.

19        Q.    Fewer than five?

20        A.    I don't know.

21        Q.    All right.  And then with regard to

22   the Know Your Customer processes that you talked

23   about on this panel, do you remember what you

24   presented on?
```

```
 1           A.    Presented on our process for reaching

 2     out, establishing strong relationships with our

 3     partners, identifying compliance colleagues at

 4     the other organizations, understanding who their

 5     customers are and how their business relates to

 6     our product, an overview of what their security

 7     programs and compliance programs are, ensuring

 8     that they were compliant with -- their -- with

 9     the CFR, as well as ensuring that we also had a

10     compliance agreement that we would ask our

11     customers to acknowledge as well too.  So.

12           Q.    And around this same time, October of

13     2012, Watson had planned on implementing the

14     Buzzeo automation part of the Suspicious Order

15     Monitoring System; is that right?

16           A.    Correct.

17           Q.    And also around the same time, late

18     2012, is this when Watson and Actavis announced

19     their combination?

20           A.    Yes.

21           Q.    So do you remember whether Watson

22     implemented the Buzzeo process that it had

23     planned on implementing?

24           A.    They did not.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Do you remember what it did instead?

2        A.    We continued with our -- our current

3    system.  The reason why we didn't implement it,

4    with the acquisition of Actavis, there was a

5    freeze-out period within SAP because of this --

6    without getting too into detail, the process of

7    lifting an entire company and moving all their

8    products into the business system, there was a

9    quite extensive freeze-out period where you

10   couldn't make any changes to the business

11   system.  So that would have held us back from

12   implementing our system.

13       Q.    And that freeze out and

14   implementation took place in the years 2012 and

15   2013; is that right?

16       A.    We had at Watson/Actavis there was a

17   period where there was a series of, what I would

18   call, multiple M&A activities in successive

19   years.

20       Q.    Okay.  Let let's leave it at that for

21   now.

22       A.    Okay.

23       Q.    All right.  Let's move on.  You can

24   set that document aside and we'll move on to 19.

```
 1                 (Napoli Exhibit 19, Email chain

 2                 beginning with email dated 9/27/12 from

 3                 Napoli to Lepore and others, Bates-stamped

 4                 ALLERGAN_MDL_04173111 through 113, marked

 5                 for identification, as of this date.)

 6      BY MR. EGLER:

 7           Q.    Received what's marked as Exhibit 19,

 8      can you look through it.  As you're looking

 9      through it generally, I'll read on the record,

10      it's ALLERGAN_MDL_04173111 through 113.

11                 And as you look at this document, can

12      you tell me what it appears to you to be?

13                 (Document review.)

14           A.    This appears to be an email that is

15      in regards to our Suspicious Order Monitoring

16      folks, the customer service side, pending an

17      order for further review for an increase, and us

18      asking for additional information and

19      subsequently releasing the order.

20           Q.    On the second page of Exhibit 19, the

21      first email in time, Victoria Lepore writes to a

22      person named Jared Green and Robert Gettus about

23      an order that's being held; is that right?

24           A.    Um-hmm.
```

1    order management system within SAP.  Due to

2    successive acquisition activities since product

3    initiation the implementation has been placed on

4    hold at several junctures based on business

5    integration needs.  During the past several

6    years, DEA has become more aggressive in its

7    approach related to SOM/Know Your Customer

8    taking against" -- "taking action against a

9    growing number of companies for having

10    non-compliant SOM programs.  In an effort to

11    ensure compliance with the regulations, both the

12    C/S compliance, order management teams, have

13    collaborated making efforts to enhance

14    compliance from customer vetting, order

15    review/evaluation through

16    investigation/disposition.

17              "This manual effort is very labor

18    intensive, as the current system was not

19    configured with any analytical tools to support

20    timely and accurate decision making.  This

21    approach also introduces the element of human

22    interaction into the order evaluation process.

23              "Additionally, the current process

24    can have an impact on the amount of time

```
 1    required to release a pended order that is under

 2    review, affecting customer service/fill rate

 3    levels."

 4              Do you see that there?

 5    A.    I do.

 6    Q.    Did you write that?

 7    A.    Yes, I did.

 8    Q.    At the time that you wrote it, did

 9    you believe what you wrote there?

10              MR. LUXTON:  Objection to form.

11    A.    Yup, I do believe that those facts

12    are accurate.  We did have -- we did have a

13    compliance system, but we wanted to enhance our

14    compliance to ensure that we were always

15    continually evolving it on the high ground.

16    Q.    So above there you write, under

17    background, "The SOM" -- "The SOM automation

18    project initially commenced in 2011 with the

19    primary goal of replacing our, quote, threshold,

20    unquote, based system with the CFR compliant

21    model developed by Cegedim.  This project was

22    initiated in an effort to ensure compliance with

23    the Code of Federal Regulations, SOM

24    requirements, controlled substances, 21 CFR
```

```
1     1301.74 b, as well as December 2007, DEA

2     memory."

3               Do you see that?

4          A.    I did.

5          Q.    When you wrote that in February 2015,

6     did you believe that to be true?

7          A.    I did believe that Buzzeo had a

8     system that they were proposing that was

9     compliant with the CFR

10              We also had one as well, but we

11    wanted to move up to a more enhanced

12    sophisticated system.

13         Q.    So other parts of the -- this memo

14    talk about a suspicious order monitor --

15    suspicious order monitor statistical model that

16    will be hosted, quote, in the cloud and based on

17    Actavis's order data.

18         A.    Yes.

19         Q.    Do you remember whether this

20    cloud-based SOM statistical model was ever

21    adopted at Actavis?

22         A.    This system was created.  We used it

23    in a test environment.  We're happy with it.  We

24    were subsequently acquired by Teva and it was
```

```
 1      put on hold and I don't believe that Teva chose

 2      to utilize it.

 3          Q.    All right.  So with regard to the --

 4      this is -- so with regard to your

 5      understanding -- well, with regard to your

 6      understanding, Actavis never implemented the

 7      cloud-based system that's discussed in this

 8      memo; is that right?

 9          A.    That's correct.  When Teva acquired

10      Actavis around this time frame they already had

11      their own program in place for Suspicious Order

12      Monitoring.

13          Q.    So this goes to the number of

14      corporate transactions that took place --

15          A.    Right, right.

16          Q.    You're describing the company as

17      being bought by Teva.  Part of what was Actavis,

18      was purchased and closed on by Allergan.

19              Do you have an understanding of that

20      as well or some type of transaction occurred

21      between Allergan and Actavis; is that right?

22          A.    Right.

23          Q.    Either Actavis bought Allergan or

24      Allergan bought Actavis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3     STATE OF NEW YORK        )

 4                            : ss.

 5     COUNTY OF WESTCHESTER    )

 6

 7              I, ANNETTE ARLEQUIN, a Notary Public

 8          within and for the State of New York, do

 9          hereby certify:

10             That THOMAS P. NAPOLI, whose deposition

11          is hereinbefore set forth, was duly sworn

12          by me, and that the transcript of such

13          depositions is a true record of the

14          testimony given by such witness.

15             I further certify that I am not related

16          to any of the parties to this action by

17          blood or marriage; and that I am in no way

18          interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto set

20          my hand this 17th day of January 2019.

21

22          _____

23             ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

24
```