# Exhibit 3

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

-----------------------------X

IN RE: NATIONAL PRESCRIPTION     MDL No. 2804

OPIATE LITIGATION,

                                 Case No. 17-MD-2804

This document relates to:

All Cases                        Hon. Dan A. Polster

-----------------------------X


  * * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

        * * CONFIDENTIALITY REVIEW * *

            VIDEOTAPED DEPOSITION

                   OF

            THOMAS P. NAPOLI

            New York, New York

         Thursday, January 17, 2019


Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

Page 238

1      inquiring about that?

2              A.    I don't recall.

3              Q.    As you made the reduced quota demand

4      for the --

5              A.    Well, I mean, obviously if we're

6      making a quota request or if we're not due for a

7      quota request is because of diminished sales.

8              Q.    Do you remember what the reason for

9      the diminished sales were?

10             A.    That, I don't know.

11             Q.    All right.

12                   MR. LUXTON:  Before we go to the next

13             document, can we take a quick bathroom

14             break?

15                   MR. EGLER:  Sure.

16                   THE VIDEOGRAPHER:  The time is

17             2:37 p.m.  We are going off the record.

18                   (Recess is taken.)

19                   THE VIDEOGRAPHER:  We are back on the

20             record at approximately 3:05 p.m.

21                   (Napoli Exhibit 15, Watson document

22             entitled SOMS Project Evolution IT

23             Governance Meeting, Bates-stamped

24             ALLERGAN_MDL_02468983 through 68994, marked

Page 239

1          for identification, as of this date.)

2      BY MR. EGLER:

3          Q.    Mr. Napoli, you understand you are

4      still under oath?

5          A.    Yes.

6          Q.    Could you look at what I've just

7      marked as Exhibit 15?

8              And as with other documents I've

9      handed you today, the first page has no Bates

10     number, but starting on the second page, the

11     Bates numbers are ALLERGAN_MDL_02468983 through

12     68994.

13             Can you take a look at this document,

14     and when you're ready, tell me if you recognize

15     it.

16             (Document review.)

17         A.    I do.

18         Q.    What is this document?

19         A.    It's a document I guess detailing the

20     anatomy of our SOMS project.

21         Q.    So as you think about this document,

22     that is Exhibit 15, were you responsible for it

23     or somebody in your group responsible for

24     creating it?

Page 240

1          A.     For this document itself?

2          Q.     This particular document.

3          A.     I don't have an exact recollection.

4     I could have contributed to this.

5          Q.     All right.  So as you look at this

6     document, do you have an understanding of who

7     this presentation was made to?

8          A.     Based on the fact that it's an IT

9     governance meeting, I'm thinking perhaps some --

10    our IT folks.

11         Q.     Have you ever heard that term "IT

12    governance" in the course of your work at

13    Watson?

14         A.     I have.

15         Q.     What does that term mean to you?

16         A.     Well, from a governance perspective,

17    I would think, and it's IT, I would think that

18    ensuring that any systems or IT-related programs

19    that we're utilizing within the organization

20    meet the requirements in compliance with our

21    standard operating procedures.

22         Q.     When you think of an IT department at

23    Watson while you were there around this time,

24    April 2012, do you think of one or a couple of

Page 241

1    particular people that stand out in your mind?

2           A.    Not really.

3           Q.    So going into this document, on the

4    fourth page, it's 8984.  At the top of the page

5    it states, "Regulatory Requirement.

6           A.    Um-hmm.

7           Q.    And it states -- it has the language

8    of that 21 CFR 1301.74 (B), right?

9           A.    Yes.

10          Q.    And you see that?

11                So I'll just read it in the record.

12                "The registrant shall design and

13   operate a system to disclose to the registrant

14   suspicious orders of controlled substances.  The

15   registrant shall inform the field division of

16   the administration in his area of suspicious

17   orders when discovered by the registrant.

18   Suspicious orders include orders of unusual

19   size, orders deviating substantially from a

20   normal pattern, and orders of unusual

21   frequency."

22                Do you see that?

23          A.    Yes, sir.

24          Q.    And then the next one says, "Further

Page 242

1    guidance, December letter of 2000."  It states,

2    "Registrants that rely on rigid formulas to

3    define whether an order is suspicious may be

4    failing to detect suspicious orders.  For

5    example, a system that identifies orders as

6    suspicious only if the total number exceeds the

7    previous month by a certain percentage or more

8    is insufficient."

9              Do you see that there?

10    A.    Yes.

11    Q.    That second group of, or that second

12    paragraph that I read, do you recognize that as

13    being from the letter authorized by

14    Mr. Rannazzisi?

15    A.    Yes.

16    Q.    And do you remember whether, in that

17    same letter, Mr. Rannazzisi highlighted the term

18    "include" in the 21 CFR 1301.74 (B) language

19    above, that suspicious orders "include" orders

20    of unusual size, orders deviating substantially

21    from a normal pattern, and orders of unusual

22    frequency?

23    A.    I don't recall if that was within the

24    letter.

Page 243

1        Q.    And that there may be more than those

2    three requirements or conditions for something

3    to be a suspicious order?

4        A.    I don't recall if it was in the

5    letter.

6        Q.    All right.  So moving down into this,

7    on the next page, page 8985, it states, "Current

8    automated model," and it has various texts

9    there.

10            Can you read that text to yourself

11    and tell me what, in your opinion, it describes?

12            As you're reading it to yourself,

13    I'll read it into the record.

14            "Current automated model designed and

15    implemented within SAP, primary user is customer

16    relations," then, dash, "order intake process."

17            And then it states, "Based on a

18    'threshold,'" and then, dash, "customer

19    groupings," and then a bullet point, "class of

20    trade," and then three dashes underneath there,

21    "wholesaler, retail chain, distributor,

22    mail-order, et cetera," then another dash,

23    "monthly average based on 12" -- "based on

24    rolling 12-month period," and then "multiplied

Page 244

1      by static multiplier equals monthly allowable."

2              So as you think about that whole page

3      together, does that describe the Watson

4      Suspicious Order Monitoring System around this

5      time April of 2012?

6              MR. KNAPP:  Objection to form.

7        A.    It describes a component of the

8      system.

9        Q.    Okay.  Then it has that term that we

10     talked about earlier, "class of trade."

11             Do you see that there?

12        A.    Yes.

13        Q.    Class of trade, it then says,

14     "wholesaler, retail chain, distributor, mail

15     order, et cetera."

16             Is that what you understand a class

17     of trade to be?

18        A.    Yes.

19        Q.    All right.  How about the next

20     language that's down there, "monthly average

21     based on rolling 12-month period," is that class

22     of trade?

23        A.    No.

24        Q.    Okay.  Why would that be listed there

Page 245

1      under "class of trade"?

2                   Could it be just a mistake --

3           A.    Yes.

4           Q.    All right.  And if you were tabbing

5      it today, putting it under a bullet point or a

6      dash, where would you put it?  Would you put it

7      as the same as based on a threshold, customer

8      groupings, or somewhere else?

9           A.    I may put it under a bullet of

10     formula.

11          Q.    Okay.  And then the next one,

12     "multiplied by static multiplier equal monthly

13     allowable," would you put that under the same

14     formula bullet?

15          A.    Yes.

16          Q.    So if you can turn to that next page,

17     8986, it states "Customer groupings."

18                   Do you see that there?

19          A.    Yes.

20          Q.    And it states, "Individual customer

21     ship to location monthly average based on 12" --

22     no, "monthly average based on rolling 12-month

23     period," and then "multiplied by static

24     multiplier equal monthly allowable."

Page 246

1               It seems to be similar language to
2     the prior one?
3          A.    Yes.
4          Q.    What does that "customer groupings"
5     mean?
6          A.    Not having authored this document, I
7     don't know.  I don't want to speculate.
8          Q.    And then it states, "Order pending."
9     And then the next bullet point is, "Multiplier
10    table is populated manually based on
11    estimation."
12              Do you have an understanding of what
13    that sentence means?
14         A.    I believe it indicates that the
15    multiplier is set manually based on a review of
16    the -- what the normal behavior could be
17    estimated to be with a customer.
18         Q.    Now as you think about your time at
19    Watson and Actavis, do you remember about this
20    time, April 2012, who would have set the
21    multiplier that's referred to in this page 8986?
22         A.    Setting the multiplier was the
23    responsibility of my group.
24         Q.    Do you remember if there was one

Highly Confidential - Subject to Further Confidentiality Review

Page 247

1    person in particular who would have set the

2    multiplier?

3         A.    I would have authorized it.

4         Q.    So with regard to setting the

5    multiplier, as you think about it, would the

6    multiplier be the same for every order by a

7    particular customer or would they differ with

8    regard to different orders by customers or

9    something else?

10        A.    It would be the same for each

11   customer.

12        Q.    So, say, McKesson was one of the

13   customers, every multiplier -- let me start

14   over.

15              Say McKesson was one of the

16   customers, the multiplier for every order by

17   McKesson would be the same; is that right?

18        A.    Right.

19        Q.    So going down further into the

20   document, "Current Automated System Evaluation"

21   down below, it says "Based on compliance

22   concerns."

23              Do you remember there being concerns

24   about whether Watson's Suspicious Order

Highly Confidential - Subject to Further Confidentiality Review

Page 248

1      Monitoring System complied with the DEA

2      regulations and laws in April 2012?

3            A.    I don't recall any specific

4      compliance concerns, but only our desire to

5      enhance the system.

6            Q.    Okay.  Do you remember ever -- anyone

7      ever telling you that they had concerns about

8      Watson's Suspicious Order Monitoring System

9      complying with the DEA regulations and laws

10     around this time?

11           A.    Not that I recall.

12           Q.    All right.  And then it says below,

13     "Increased enforcement action by DEA in the area

14     of SOM audits."

15                 And then, "Most recently Cardinal and

16     CVS failing to maintain systems to detect

17     diversion."

18                 Do you see that there?

19           A.    Yes.

20           Q.    Do you remember that around this time

21     that Cardinal Lakeland Distribution Center being

22     shut down?

23           A.    I don't have a specific memory, but I

24     do know that they had a distribution center that

Page 249

1     was, I don't know if it was completely shut down

2     or if there is was a temporary order.  I'm not

3     sure.

4          Q.    And I guess "shut down" isn't the

5     right way to say it.

6               They were unable to sell controlled

7     substances; is that right?

8          A.    Correct.

9          Q.    Okay.  So the next bullet point down

10    states, "Expectation that we know our customers'

11    customers."

12              Do you see that there?

13         A.    Um-hmm.

14         Q.    Do you remember where that language

15    came from, "expectation that we know our," that

16    we, quote, "know our customers' customers,"

17    unquote?

18         A.    I don't.

19         Q.    It states, "Cross-functional team

20    established in 2010."

21              And I think we talked about that

22    before, right?

23         A.    Right.

24         Q.    And as you understand it, the

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    cross-functional team that's referred to there

2    is the group from customer service and the group

3    from the DEA affairs; is that right?

4         A.    That's correct.

5         Q.    Oh, and below, it says, "Security and

6    DEA affairs, IT and customer relations."

7              And the IT component is programming

8    the automated system into the SAP process; is

9    that right?

10        A.    Right.  Or from a project management

11   standpoint of implementing a new -- if we went

12   with a new algorithm into the system.

13        Q.    And then "Establish goals, compliance

14   and efficiency."

15              And, again, do you remember there

16   being a discussion about compliance around this

17   time frame?

18        A.    No, I do not.

19        Q.    All right.  And then the next one is,

20   "Budgeted for third-party evaluation in 2011."

21        A.    Right.

22        Q.    And then turning to the next page,

23   "Automated System Evaluation," it starts talking

24   about Cegedim-Dendrite; is that right?

Page 251

1          A.     Yes.

2          Q.     And is that the evaluation that we

3    were talking about in the exhibit before we took

4    the break?

5          A.     Correct.

6          Q.     So the next page is "Findings."

7                 Do you see that there?

8                 (Document review.)

9          A.     Yes.

10         Q.     So it states -- as you see that word

11   "Findings," can you -- do you have an

12   understanding what that means in the context of

13   this document?

14         A.     These would be observations that were

15   made by the consultant.

16         Q.     And the consultant was Buzzeo?

17         A.     Yes.

18         Q.     And it says, "Use of multiplier to

19   create monthly threshold."

20                And it says, "Not consistent with

21   specific requirements noted within regulations

22   and guidance, and current system will detect a

23   certain percentage of suspicious orders but not

24   all."

Highly Confidential - Subject to Further Confidentiality Review

Page 252

1                      Do you see that there?

2          A.     I do.

3          Q.     Do you remember that being a finding

4     that the Buzzeo group made about the Watson

5     system in early 2012?

6          A.     I don't have a specific recollection.

7          Q.     Do you remember -- and, you know, I

8     put a date limitation on that.

9                      Is your lack of specific recollection

10    based on the date or something else?

11         A.     It's just... it's been a while.

12         Q.     And then it states, "Current model

13    evaluates at SKU level."

14                     Is that pronounced typically "skew"?

15         A.     Yes.

16         Q.     All right.  What is a SKU?

17         A.     A SKU is just one, one product.  So

18    it can be oxycodone 10325, 100 fill count, SKU.

19         Q.     Do you recognize the difference

20    between a SKU and an NDC code?

21         A.     The SKU could be -- yeah, there,

22    there is a difference between the two.  I don't

23    know the exact -- SKU is more of a -- we're kind

24    of exceeding my, probably my area of expertise,

Page 253

1    but they're both unique identifiers.

2              I think what this is saying here is

3    that by looking at it at the SKU level, we're

4    not looking at the total molecule.  And that was

5    an enhancement.  So that's something where we

6    could have enhanced.

7         Q.    All right.  So it states, "Current

8    model evaluates at SKU level.  Possibility of

9    distributing orders across multiple SKUs without

10   detection."

11             So that's where you're talking about

12   it can be the same, as you refer to it, molecule

13   but with different SKUs?

14        A.    Right.

15        Q.    And then the next one is, "System

16   does not evaluate listed chemicals"?

17        A.    Right.

18        Q.    I think we talked about that earlier

19   as well?

20        A.    Right.

21        Q.    Those are the precursor chemicals

22   that you talked about?

23        A.    Right.

24        Q.    And then on the next page, 990, it

Page 254

1     states, "Revisit approach to SOM to fully

2     address specific regulatory requirements."

3             And then it states, "Develop SOM that

4     is a 'non-threshold-based adaptive' -- I'm

5     sorry, let me read it.

6             "Develop SOM that is a,

7     'non-threshold-based adaptive,' system trained

8     to identify suspicious orders by utilizing a set

9     of historic markers to include," and then

10    another bullet point, "statistical scoring of

11    active ingredient order volume versus history,

12    active ingredient order versus short and

13    long-term trend, identification of high/low

14    frequency ordering behavior."

15            And then the next bullet point is

16    "Base system on milligram strength rather than

17    SKU."

18        A.    Um-hmm.

19        Q.    And then, "Include list of chemical

20    within system."

21            And then, "Based on recommendations,

22    GS and DEAA requested a proposal and quote."

23            In the context of this document, do

24    you know what GS and DEAA would be?

Highly Confidential - Subject to Further Confidentiality Review

Page 255

1          A.     Global security and DEA affairs.

2          Q.     And your group was DEA affairs; is

3     that right?

4          A.     Yes.

5          Q.     And then the next dash is "Establish

6     meeting with IT and consultant."

7          A.     Um-hmm.

8          Q.     "Understand scope, confirm that

9     solution was appropriate and achievable."  And

10    then the next one is "Budgeted for 2012

11    implementation."

12                 Do you see that there?

13         A.     Yes.

14         Q.     Do you remember the -- do you

15    remember whether there was a decision around

16    this time, April 2012, to implement the Buzzeo

17    system at Watson?

18         A.     Yes, I believe there was.

19         Q.     All right.  Do you remember who made

20    that decision?

21         A.     It would have been my management.

22         Q.     Did you support the conclusion to

23    implement the Buzzeo system?

24         A.     I definitely supported enhancing our

Highly Confidential - Subject to Further Confidentiality Review

Page 256

1    system.  You know, the automated system that

2    we're talking about is -- we are talking about

3    just one component within the system, that's

4    what I want to make clear.  So we're not relying

5    on one component of a system as our Suspicious

6    Order Monitoring program.

7         Q.    And as you had been talking about

8    earlier, in addition to this process, there is

9    the onboarding process and reviews; is that

10   right?

11        A.    The Know Your Customer due diligence.

12        Q.    And Know Your Customer due diligence.

13              And then beyond the automated system,

14   there is a process of customer service clearing

15   and then, if necessary, DEA affairs clearing of

16   orders; is that right?

17        A.    Yes, sir.

18        Q.    And if none of those processes work,

19   the order will be reported to the DEA as

20   suspicious; is that right?

21        A.    Correct.

22        Q.    All right.

23              All right.  You can set this aside.

24        A.    Okay.