# Exhibit 5

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Donna M. Welch
To Call Writer Directly:
(312) 862-2425
donna.welch@kirkland.com

300 North LaSalle
Chicago, IL 60654

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

June 14, 2019

*Via Electronic Mail*

Thomas E. Egler
Robbins Geller Rudman & Dowd LLP
655 West Broadway
San Diego, CA 92101
tome@rgrdlaw.com

      Re: *In re National Prescription Opiate Litigation*, MDL No. 2804: Discovery Issues

Dear Tom:

  I write in response to your June 12, 2019 letter regarding jurisdictional discovery and other discovery matters.

## I. ALLERGAN PLC JURISDICTIONAL DISCOVERY

  At the outset, I note that this is now at least the third time we've responded on many of the issues discussed below. You continue to follow-up on issues based on your mischaracterization of testimony or documents and in ways that simply ignore the responses we've provided, many of which explain that the documents or information you are repeatedly requesting simply do not exist. Further, many of the issues you continue to raise have no relevance to the sole question at hand: whether Allergan plc has sufficient contacts with Ohio related to the marketing and distribution of FDA-approved prescription opioids to warrant the exercise of personal jurisdiction. Your continued letter-writing campaign on these irrelevant and/or settled factual issues suggests you are more interested in harassing Allergan plc or obtaining far-too-late merits discovery than litigating the discrete issue of whether the Court has personal jurisdiction over Allergan plc

  It's also important at the outset to correct your May 24 misrepresentation that "Allergan plc improperly resisted participating in straightforward discovery served on it…" That claim is contradicted by Allergan plc's consistent participation in discovery (despite its well-founded objections) dating back to last fall. In Julie Snyder's Verified 30(b)(6) Supplemental Responses, we clarified that the responses contained "all responsive documents and information reasonably

# KIRKLAND & ELLIS LLP

June 14, 2019
Page 2

accessible to <u>all</u> of its current affiliates, including Allergan plc…" *See* J. Snyder Verified 30(b)(6) Supplemental Responses 2019-2-25.  We also clarified that all of our interrogatory and documents responses to date include information available to Allergan plc.  *See* Allergan 3rd Amended Responses and Objections 2018-12-06 (responses "include[] all responsive documents and information reasonably accessible to <u>all</u> of its current affiliates, including Allergan plc."); Allergan 2nd Amended Responses and Objections to Third Set of Interrogatories 2019-03-20 (production "include[s] all responsive documents and information reasonably accessible to <u>all</u> of its current affiliates, including Allergan plc…").  With that important background in mind, I turn now to the issues in the order raised in your letter.

    **A.**    **General Ledgers**

As my colleague Tim Knapp noted in his email yesterday, we produced Allergan plc's general ledger for 2016-2019 on June 13, 2019.  We continue to work as quickly as possible to collect the ledger from 2013 (inception of Allergan plc) to 2015, although that process has been cumbersome and time-consuming due to the 2016 Teva transaction and the fact that the relevant underlying files are stored in archives.  We will produce the additional files on a rolling basis as soon as we receive them and anticipate production by middle of next week.

    **B.**    **Category 4 Document Request: Allergan plc "Policies Regarding Accounting"**

Special Master Cohen's April 3, 2019 order required the production of Allergan plc's accounting policies.  We have collected and produced all such policies located after multiple good faith searches.  Your contention that Allergan plc is required to produce all such policies for "one year prior to the launch of each relevant Opioid Product through the date of Your response" is not reflected in Special Master Cohen's order.  Further, Allergan plc was incorporated in 2013, years after the launch of the relevant opioid products and after its subsidiaries had ceased any marketing of opioids, so that time period makes no sense in this context.  Nonetheless, in order to avoid a dispute on this issue, we are searching for and will produce any prior versions of Allergan plc accounting policies as quickly as we can on a rolling basis.

To date, we have produced over 300 pages of accounting policies.  You assertion that "the policies cover Internal Controls over Financial Reporting ('ICFR'), Inter-Company Loans, and Inter-Company Accounting and Settlement, are plainly not the only three relevant policies the Company maintains" is true, but simply ignores the 276-page US GAAP Allergan plc Accounting Policies we produced.  That file includes dozens of policies that are expressly identified as "the Company's critical accounting policies."  Your letter references policies described in the "Critical Accounting Estimate" on Allergan plc's 10K.  There are various Accounting Standards Updates referenced in that section.  *See* Allergan plc 2018 10K p. 75 ("[W]e adopted ASU No. 2014-09, 'Revenue from Contracts with Customers' ('Topic 606')").  These Accounting Standards Updates

## KIRKLAND & ELLIS LLP

June 14, 2019
Page 3

are drafted by the Financial Accounting Standards Board, not by Allergan, and are publicly available. We have not located any other Allergan plc "policies regarding accounting."

    **C.**    **Category 5 Document Request: Allergan plc "Policies Regarding Corporate Management to the Extent Such Policies Bear on Opioid Related Subsidiaries"**

As we have now stated four times, we did not locate any policies regarding corporate management to the extent such policies bear on opioid related subsidiaries after a good faith search.

    **D.**    **Interrogatory No. 2**

Interrogatory 2 requested information regarding Allergan plc's "subsidiaries (including direct and indirect subsidiaries) involved" with opioid products. We have provided the requested information about Allergan's current subsidiaries. You are now asking a separate question—not included in Interrogatory No. 2—about entities that are now owned by Teva. As you are well aware, Allergan plc already provided this information to Plaintiffs many months ago, long before you even served this interrogatory. Further, your demand that Allergan plc adopt Steve Kaufhold's statements and submitted documents is superfluous. The 30(b)(6) Deposition Notice Plaintiffs served stated that Mr. Kaufhold's deposition was on behalf of Allergan plc, among other named defendants. *See* 2018-10-22 Second Amended 30(b)(6) Deposition Notice (Exhibit 1 at S. Kaufhold Deposition). At Mr. Kaufhold's deposition, Plaintiffs asked Mr. Kaufhold:

> 7 Q. What is the name of the entity
> 8 that designated you to testify on its behalf?
> 9 A. It would be Allergan plc.

S. Kaufhold Dep. T. p. 12. And, as I noted in my May 31, 2019 letter, Mr. Kaufhold provided Plaintiffs with detailed charts outlining which entities sold to Teva were involved with opioids and which entities currently owned by Allergan plc were involved with opioids. I attached those charts to my May 31, 2019 letter. Further, Allergan has also produced numerous organizational charts that showed the corporate relationship of these entities at different points in time:

> ALLERGAN_MDL_03367307; ALLERGAN_MDL_03367302;
> ALLERGAN_MDL_03367301; ALLERGAN_MDL_02761472;
> ALLERGAN_MDL_03367304; ALLERGAN_MDL_02758853;
> ALLERGAN_MDL_02931208; ALLERGAN_MDL_01098786;
> ALLERGAN_MDL_01384578; ALLERGAN_MDL_03295845;
> ALLERGAN_MDL_02177059; ALLERGAN_MDL_02079795;
> ALLERGAN_MDL_01471538; ALLERGAN_MDL_02147315;
> ALLERGAN_MDL_01373731; ALLERGAN_MDL_02147111;

## KIRKLAND & ELLIS LLP

June 14, 2019
Page 4

> ALLERGAN_MDL_03295865; ALLERGAN_MDL_03295869;
> ALLERGAN_MDL_00000006; ALLERGAN_MDL_00000001;
> ALLERGAN_MDL_03295860; ALLERGAN_MDL_04450023.

There is no basis (or need) for your request that Allergan plc "adopt" the testimony of its 30(b)(6) representative. Your insistence on this issue once again reveals that Plaintiffs are more interested in imposing burdens on the Defendants than on procuring information relevant to the question of personal jurisdiction. Nevertheless, despite the fact that this Interrogatory did not ask about former subsidiaries, in order to avoid a dispute, we are supplementing our response to this Interrogatory to incorporate the exhibits to Mr. Kaufhold's deposition.

### E.    Interrogatory No. 5

You continue to press for information that does not exist, ignoring the explanation we have provided to you on three prior occasions that Allergan plc had no employees and that Allergan plc's subsidiaries employed any and all of the individuals who provided services to Allergan plc pursuant to intercompany agreements. You also blatantly mischaracterize Allergan plc's response when you say "[i]t is not enough to respond that Allergan plc did not have employees." To be clear, Allergan plc responded that it is "not aware of any employees hired and terminated in the United States as a result of decisions by Allergan plc." *See* Allergan plc Responses and Objections to First Set of Interrogatories, 2019-05-11.

To reiterate, Allergan plc is a holding company that does not have and has never had any employees. By its nature, Allergan plc has not made hiring or termination decisions with respect to personnel in the United States. In regards to your reference to Mr. Kaufhold, he, like members of Allergan plc's Executive Leadership Team, is paid and employed by Allergan Sales, LLC. As noted in the response to this Interrogatory, "the direct and indirect subsidiaries that were operating companies were responsible for the hiring and firing of their own employees."

Although Mr. Kaufhold is an officer (Treasurer) of Allergan plc, he is not an employee of Allergan plc. He, like the other individuals that provide services to Allergan plc, provides services to Allergan plc pursuant to an agreement known as the Management Services Agreement. *See* ALLERGAN_MDL_04451501. Pursuant to this Agreement, Allergan plc's subsidiaries provide management services, which include but are not limited to "executive management services that provide strategic direction in terms of business operations, financial goals and long-term growth." *See id.*, Exhibit A of Management Services Agreement. While these employees provide services to Allergan plc, the hiring and termination decisions of employees remains with the employer. Allergan plc does provide corporate oversight consistent with its fiduciary and legal obligations. However, based on its investigation, Allergan plc is not aware of any "employees hired and terminated in the United States as a result of decisions by" Allergan plc. Thus, as we've stated on

## KIRKLAND & ELLIS LLP

June 14, 2019
Page 5

multiple occasions, there simply is no additional information available with which to supplement our prior responses to this Interrogatory.

### F.  Interrogatory No. 8

We continue to stand by our prior responses and objections to this Interrogatory. Nevertheless, reserving all objections and despite the utter irrelevance of your reframing of this request to the personal jurisdiction inquiry, we have amended our response to this request with information about the individuals and entities most significantly involved with due diligence related to the Warner Chilcott transaction.  As I noted previously, it would be incredibly burdensome to identify every single person involved in due diligence with the transaction.  And it is wholly irrelevant to the question at hand as none of those individuals were employed by Allergan plc given that Allergan plc was created just three days before the deal was signed.  You appear to be pursuing this irrelevant, burdensome information in an effort to conduct far-too-late follow-up merits discovery.

Finally, your contention that we did not previously object to this Interrogatory on burden grounds is incorrect.  *See* Allergan plc Responses and Objections 5-11-2019, at p. 4 ("Allergan plc objects to the Interrogatories to the extent they seek information for which the burden or expense of the proposed discovery outweighs any likely benefit in resolving the issues in these actions."); *id.* at 1 ("Allergan plc objects to engaging in costly and burdensome discovery prior to the Court's ruling on Allergan plc's motion to dismiss."); *id.* at 7 ("Allergan plc objects to the definition of 'Identity' and 'Identify' with respect to persons as overly broad, unduly burdensome . . .").

## II. OTHER DISCOVERY ISSUES

### A. Lisa Pehlke Deposition

Thank you for confirming the July 10, 2019 deposition of Lisa Pehlke.

### B. Cegedim-Dendrite (Buzzeo) Audits and Reports

We vigorously dispute your insinuation that the allegedly missing Buzzeo report—which (to the extent it ever existed) would now be approximately 8 years old—was "destroyed" through spoliation.  Allergan has produced all information in its possession related to SOM assessments or audits that may have been performed by Buzzeo, which is completely inconsistent with your allegations of spoliation.  For example, Allergan produced the August 2011 Statement of Work between Watson Pharma, Inc. and BuzzeoPDMA which sets out the relevant assessment and purported deliverable (ALLERGAN_MDL_02467194). Allergan also produced subsequent documents discussing that assessment, including September 2011 meeting minutes with Cegedim (ALLERGAN_MDL_02176488) and an internal April 2012 presentation summarizing the

## KIRKLAND & ELLIS LLP

June 14, 2019
Page 6

findings (ALLERGAN_MDL_02468982). Further, Allergan has repeatedly contacted IQVIA to attempt to track down any copy of a written report—if one was in fact created—since such report has not been found in Allergan's files. None of these efforts are consistent with any attempt to destroy evidence or withhold relevant information. Consequently, your request for discovery on discovery is wholly inappropriate. It is also inconsistent with Plaintiffs' emails to the Special Master about the inappropriateness of discovery on discovery, *see*, *e.g.*, 12/3/18 email from M. Pifko to D. Cohen. Nevertheless, to the extent you pursue such discovery, we reserve our right to conduct similar follow-up discovery with respect to Plaintiffs' retention, collection, and production efforts.

As you requested, we have enclosed a copy of our communications with IQVIA concerning the written report that we have been seeking. As you know, we followed up with IQVIA yet again on June 13, 2019 to request confirmation whether or not they have a copy of the report at issue or related deliverables (if any exist). We will keep you copied on related correspondence going forward and will certainly update you upon any delivery of this or related documents.

### C. Data Offloaded to Teva

For the reasons set forth in our May 31, 2019 letter, this issue is for Teva, not Allergan.

### D. Incomplete Databases

For the reasons set forth in our May 31, 2019 letter, this issue is for Teva, not Allergan.

### E. DEA Reports

We reiterate that because Allergan is unaware of any written record of all suspicious orders that were reported to the DEA by its prior subsidiaries or affiliates, we cannot confirm that the orders detailed in our May 31, 2019 letter represent a comprehensive list of all suspicious orders that were ever reported. However, we confirm that to the extent Allergan becomes aware of further documentation related to suspicious orders reported to the DEA, Allergan will promptly provide you with the details.

### F. IQVIA Manufacturer Codes for Pre-2018 Transactions

Your letter asks us to tell you which of "six manufacturer codes that previously were assigned to Allergan, Actavis and Watson (and Teva) [that] have now been assigned to 'Teva' . . . denotes Allergan, Actavis and/or Watson." Your request refers to data that was not housed at Allergan/Actavis but rather was purchased by Allergan from IQVIA for use in this litigation. As you know, IQVIA did not provide a data key or dictionary for the manufacturer code column. Nor has Allergan performed the complex analysis necessary to decode the data. We are aware of no

## KIRKLAND & ELLIS LLP

June 14, 2019
Page 7

requirement that we perform such an analysis for Plaintiffs pursuant to Plaintiffs' informal request nor that we provide the work product results of any such analysis to Plaintiffs. If you believe there is any such requirement, please provide authority, if any, that you believe supports it.

    Sincerely,

    /s/ Donna M. Welch
    Donna M. Welch, P.C.

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Catie Ventura
To Call Writer Directly:
+1 202 879 5907
catie.ventura@kirkland.com

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

February 5, 2019

**By E-mail**

Patrick L. Oot
1155 F Street, N.W., Suite 200
Washington, DC 20004
oot@shb.com

Re:   *In re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Patrick:

In your January 29, 2019 letter to Evan Janush, you identified Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. as a client potentially having suspicious order monitoring work product from their engagement with BuzzeoPDMA and related entities. In response, plaintiffs have asked us to produce all contracts, statements of work, data, reports, audits, and communications related to the suspicious order monitoring consulting work or other services performed.

We have reviewed our files and we believe we have produced most responsive information. However, we have identified a few gaps and would appreciate if you could provide us with copies of the following documents to the extent you have them in your possession:

**1. Contracts and/or scope of work documents related to SOM consulting services provided.**

We have attached a copy of the June 4, 2014 Master Services Agreement between Actavis Pharma, Inc. and BuzzeoPDMA (ALLERGAN_MDL_02160689), and we have located Statements of Work Nos. 2, 3, 5, 6, 9, and 11. However, Statements of Work Nos. 2, 5, and 9 are either unsigned or only partially signed versions, and we are missing Statements of Work Nos. 1, 4, 7, and 8 entirely. Please provide these Statements of Work and any others that may be connected to the June 4, 2014 Master Services Agreement if IQVIA has them in its possession.

Additionally, we have attached a copy of Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, related to an April 7, 2011 agreement. (ALLERGAN_MDL_02467194). We are missing an executed version of Statement of Work No. 3; please provide this document if IQVIA has it in its possession.

KIRKLAND & ELLIS LLP

Patrick L. Oot
February 4, 2019
Page 2

Finally, we have attached a June 30, 2011 Services Agreement between Actavis Inc. and BuzzeoPDMA (ALLERGAN_MDL_00369927). We have located Statement of Work No. 2, but we are missing No. 1. Please provide it, and any others that may exist, if IQVIA has copies of these documents.

**2. SOM data and reports related to SOM consulting services provided**

We do not believe that we purchased or obtained any SOM data from BuzzeoPDMA or related entities, but we believe that BuzzeoPDMA may have created audits, reports, or other evaluations of Watson's or Actavis's suspicious order monitoring systems. For example, in Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, BuzzeoPDMA agreed to "provide Customer an onsite review and assessment of its current SOM system." Please provide copies of any such audits, reports, evaluations, assessments, or other work product for Actavis Inc., Actavis Pharma, Inc., and Watson Pharma, Inc.

**3. Other communications with Watson or Actavis**

Finally, please provide copies of any other communications in your possession between BuzzeoPDMA or related entities and Actavis Inc., Actavis Pharma, Inc., and Watson Pharma, Inc., specifically related to suspicious order monitoring design, system audits, assessments, or requirements. We believe most relevant communications would have been with Nancy Baran and/or Tom Napoli.

Thank you for your help, and please let us know if you have any questions.

Sincerely,

*/s/ Catie Ventura*

Catie Ventura



February 15, 2019

                                              Patrick L. Oot

VIA ELECTRONIC MAIL

          1155 F Street, N. W., Suite 200
                       Washington, D.C. 20004
                               **t** 202.783.8400

Catie Ventura                               **dd** 202.639.5645
Associate                                      **f** 202.783.4211
Kirkland & Ellis                             oot@shb.com
655 Fifteenth Street, N.W.
Washington, D.C. 20005
T: 202.879.5907
E: catie.ventura@kirkland.com

Re:   IQVIA's clients affected by the *In re National Prescription Opiate Litigation*, MDL No. 2804 in the Northern District of Ohio

Dear Catie:

We write you to confirm that on behalf of IQVIA, Shook, Hardy & Bacon, LLP has received requests from certain Defendant manufacturers, distributors, retailers, and others ("Clients") seeking that IQVIA provide Clients with documents regarding their Suspicious Order Monitoring ("SOM") engagement with BuzzeoPDMA, LLC, Cegedim, Dendrite, and Cegedim Dendrite ("Buzzeo-related entities"). We understand that Clients' requests seek documents in response to Plaintiffs' demands in the *In re National Prescription Opiate Litigation, MDL No. 2804* litigation in the Northern District of Ohio.

On September 14, 2018, IQVIA properly objected to Plaintiffs' Rule 45 subpoena but agreed to work with Clients to assist them in fulfilling their discovery obligations if such requests did not present an undue hardship or burden on IQVIA, which is not a party in this litigation. Over the last few months, IQVIA assisted Clients in fulfilling their productions related to sales and prescription data, and it is our understanding that the PEC has conveyed to the Court that Plaintiffs are satisfied with Clients' sales and prescription data productions. Now, all that is left are the SOM-related requests. This letter addresses those requests.

Since August 2018, Shook has worked diligently with IQVIA to identify Defendants' SOM-related engagements. In that regard, efforts to locate SOM-related engagements have been a significant burden as no single employee, data source or location exists that contains SOM-related engagement materials. The search for SOM-related information for multiple Clients has required, among other things, hundreds of hours of IQVIA employee and outside counsel time that has included, but is not limited to, disruptive



February 15, 2019
Page 2

employee interviews, document collection, and significant manual line-by-line, page-by-page analysis for necessary redactions in order to protect IQVIA's confidential commercial information. As Clients have reviewed their own repositories and found gaps or deficiencies, Clients have requested IQVIA to fill those gaps, and IQVIA diligently has endeavoured to do so, to the extent the documents are readily accessible and still exist.

In our January 29, 2019 letter to the PEC, we summarized the results of IQVIA's efforts. IQVIA continues to provide Clients with information, upon request, to the extent that it still exists, on a first-in-first-out basis:

- On January 7, 2019, IQVIA began providing Clients with readily accessible agreements and statements of work ("SOWs") with Buzzeo-related entities via a secure download link and password.

- On February 11, 2019, IQVIA began providing Clients with readily-accessible deliverables with Buzzeo-related entities via a secure download link and password.

- By February 22, 2019, barring any unforeseen circumstances, IQVIA will provide Clients with the final set of readily-accessible deliverables with Buzzeo-related entities via a secure download link and password.

Recently, in addition to requests for contracts, SOWs and deliverables, IQVIA has received requests for *all* existing communications between Buzzeo-related entities and Defendants. On September 14, 2018, in IQVIA's Responses and Objections to Plaintiffs' Rule 45 Subpoena, IQVIA objected to this request, as it is overly broad, not proportional to the needs of the case, and seeks to impose undue burden and expense on a non-party for what is likely duplicative information. Instead, we agreed to cooperate with Clients on a cohesive and targeted approach to identify information within the scope of discovery and provide Clients with what is proportional to the needs of a case from a non-party. IQVIA's cohesive and targeted approach included contracts, SOWs, and deliverables and asked Clients to tell IQVIA what they believe might be missing.

As we have previously conveyed, parties must search their own document repositories, including e-mail sources before burdening a non-party. *See* Fed. R. Civ. P. 45(d)(1); *see also Waite, Schneider, Bayless & Chesley Co. v. Davis*, No.1:11-cv-0851, 2013 WL 146362, at *4-5 (D.D. Ohio Jan. 14, 2013); *In re CareSource Mgmt. Grp. Co.*, 289 F.R.D. 251, 253-54 (S.D. Ohio Jan. 3 2013) (quashing non-party subpoena because "[Plaintiff] must first establish that it cannot obtain the discoverable information from its party-opponent before subpoenaing those documents from a non-party"); *Musarra v. Digital Dash, Inc.*, No. 2:05-cv545, 2008 WL 4758699, at *3-4 (S.D. Ohio Oct. 30, 2008) (refusing to require non-party to produce documents when they were available



February 15, 2019
Page 3

from a party to the litigation); *Recycled Paper Greetings v. Davis*, No. 1:08—mc—13, 2008 WL 440458, at *4-5 (N.D. Ohio Feb. 13, 2008) (granting a motion to quash subpoena, in part, because "the vast majority of the relevant documents" could have or had been produced by a party to the litigation).

Parties in the litigation, not IQVIA, are the best source for this information. *See* Fed. R. Civ. P. 26(B)(2)(C)(i) (the court must limit the frequency or extent of discovery allowed by these rules or by local rule if it determines that "discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"); *see also* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").

IQVIA has objected and continues to object to the production of likely duplicative e-mail correspondence. The unreasonable burden and expense of searching for, collecting, processing, reviewing and producing e-mail messages for multiple SOM Clients will only inflict costs of exponential magnitude on IQVIA, a non-party, when it is far more efficient, less burdensome and proportional for each individual Client to first search its own e-mail repositories. Forcing this undue burden on IQVIA violates the Rules and common sense.

In addition, IQVIA did not participate in the development of the ESI Protocol, negotiate the Protective Order, or negotiate the search terms to be applied in this litigation. *See United States v. Columbia Broad. Sys., Inc.,* 666 F.2d 364, 371 (9th Cir. 1982) (because "[n]onparty witnesses are powerless to control the scope of litigation and discovery, [they] should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party."). To embark upon a duplicative e-mail fishing expedition beyond the cohesive and targeted approach that IQVIA has undertaken would cost hundreds of thousands of dollars, if not millions, and the expenditure of significant internal resources, that a non-party should not be forced to bear.

It is our understanding that the PEC has asked Defendants if they have produced all existing communications in their possession concerning SOM between any of the Buzzeo-related entities and Clients. IQVIA understands that Defendants are in the process of confirming the completeness of their productions to the PEC. At this time, Defendants have not identified to IQVIA any lost, missing or deficient e-mail productions from Defendants to the PEC and IQVIA does not believe that inflicting duplicative discovery of exponential effort is warranted for a non-party to this litigation. Accordingly, prior to requesting IQVIA to produce all e-mail communications, Defendants should first turn to their own internal resources to identify and produce relevant e-mails. If they have not done so already, Defendants should identify their own



custodians, and search criteria to locate SOM-related communications before propounding IQVIA with burdensome discovery.

***

February 15, 2019
Page 4

IQVIA has undertaken significant discovery efforts to assist Clients in satisfying their discovery obligations in response to Plaintiffs' requests. IQVIA will continue to do so, as appropriate and consistent with its reasonable objections. We believe the approach taken by IQVIA in producing to Clients any contracts and deliverables, upon request, is consistent with the Special Master's instructions and undoubtedly has been working.

IQVIA will continue to update our Clients on the status of the efforts described above in the coming days, and I am happy to address any questions or concerns.

Best regards,

*Patrick Oot*

Patrick L. Oot
Partner

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Catie Ventura
To Call Writer Directly:
+1 202 879 5907
catie.ventura@kirkland.com

1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
United States

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

May 29, 2019

**By E-mail**

Patrick L. Oot
1155 F Street, N.W., Suite 200
Washington, DC 20004
oot@shb.com

    Re: *In re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Patrick:

  I write to follow up on our correspondence requesting suspicious order monitoring-related deliverables between BuzzeoPDMA (and related entities) and Actavis Pharma, Inc. or Watson Pharma, Inc.

  In your January 29, 2019 letter to Evan Janush, you identified Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. as a client potentially having suspicious order monitoring work product from their engagement with BuzzeoPDMA and related entities. In response, plaintiffs asked us to produce all contracts, statements of work, data, reports, audits, and communications related to the suspicious order monitoring consulting work or other services performed.

  On February 5, 2019, we wrote to you requesting your help finding certain missing items. Specifically, we are in search of one particular document: in Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA, dated August 3, 2011, BuzzeoPDMA agreed to "provide Customer an onsite review and assessment of its current SOM system." The Statement of Work indicates that "[t]he deliverable for this onsite review will be a report that identifies any gaps or other recommended changes to assist Customer in enhancing their SOM system to comply with DEA regulations and associated memorandum regarding SOM." We requested from you "copies of any such audits, reports, evaluations, assessments, or other work product for any of the Watson or Actavis companies."

  On February 15, 2019, you responded and indicated that "By February 22, 2019, barring any unforeseen circumstances, IQVIA will provide Clients with the final set of readily-accessible deliverables with Buzzeo-related entities via a secure download link and password."

## KIRKLAND & ELLIS LLP

Patrick L. Oot
May 29, 2019
Page 2

    To date, we have not received any deliverables. Please confirm that you do not have any such documents to provide, including the deliverable referenced in Statement of Work #1 described above.

    Thank you for your help, and please let us know if you have any questions.

    Sincerely,

    */s/ Catie Ventura*

    Catie Ventura

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Catie Ventura
To Call Writer Directly:
+1 202 879 5907
catie.ventura@kirkland.com

1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
United States

+1 202 879 5000

www.kirkland.com

Facsimile:
+1 202 879 5200

June 13, 2019

**By E-mail**

Patrick L. Oot
1155 F Street, N.W., Suite 200
Washington, DC 20004
oot@shb.com

Re:   *In re: National Prescription Opiate Litigation*, MDL No. 2804

Dear Patrick:

I write to follow up again on our correspondence requesting suspicious order monitoring-related deliverables between BuzzeoPDMA (and related entities) and Actavis Pharma, Inc. or Watson Pharma, Inc.

On February 5, 2019, we requested your help finding certain documents, including the deliverable (if any was actually created) referenced in the August 3, 2011 Statement of Work #1 between Watson Pharma, Inc. and BuzzeoPDMA. That Statement of Work indicates that BuzzeoPDMA would "provide Customer an onsite review and assessment of its current SOM system" and "[t]he deliverable for this onsite review will be a report that identifies any gaps or other recommended changes to assist Customer in enhancing their SOM system…" We requested copies of any such audits, assessments, or other work product for any of the Watson or Actavis companies.

On February 15, 2019, you responded and indicated that "By February 22, 2019, barring any unforeseen circumstances, IQVIA will provide Clients with the final set of readily-accessible deliverables with Buzzeo-related entities via a secure download link and password."

Having received no deliverables, we wrote to you on May 29, 2019 to confirm that you do not have the report referenced in Statement of Work #1 described above, or any related documents to provide. We still have not received a response.

Plaintiffs have asked us to confirm by June 14, 2019 whether we have this report, so we ask you to please confirm whether or not you have a copy of it (or related documents) as soon as possible.

Beijing   Boston   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai

# KIRKLAND & ELLIS LLP

Patrick L. Oot
June 13, 2019
Page 2

                              Sincerely,

                              */s/ Catie Ventura*

                              Catie Ventura

KIRKLAND & ELLIS LLP