# Exhibit 1

EXECUTION VERSION

**SERVICE PROVIDER MASTER AGREEMENT**

THIS MASTER AGREEMENT, effective as of April 7, 2011 (hereinafter "Effective Date"), by and between Watson Pharma, Inc., with offices at 360 Mt. Kemble Ave., Morristown, New Jersey 07962-1953 (hereinafter called "Watson") and BuzzeoPDMA LLC, having an address at 1025 Boulders Park way, Suite 405, Richmond, VA 23225 (hereinafter called "Service Provider"). Each of Watson and Service Provider are sometimes hereinafter referred to as a "Party" or collectively the "Parties":

WHEREAS, Service Provider provides compliance and sample management solutions to the life sciences industry; and

WHEREAS, Watson and or its affiliates ("Affiliates") may require various services from time to time in support of various projects (individually, a "Project", and collectively "Projects"). Documents referring to such services shall be attached hereto and incorporated herein as Project Documents to this Master Agreement.

In consideration of the mutual promises contained herein, the parties hereby mutually agree as follows:

1. **Appointment**

   **1.1** The specific responsibilities and obligations to be performed by Service Provider with respect to a Project (the "Services"), a description of the Scope of Work including performance schedules, and the budget shall be set forth in Project Documents attached to this Master Agreement as exhibits, which shall be incorporated by reference herein (collectively, for each Project these documents shall be referred to as "Project Documents". Service Provider shall provide the Services hereunder and in completing each Project according to the schedule set forth in the Project Documents.

   **1.2** "Affiliate" shall mean and refer to a Watson entity which directly or indirectly through one or more intermediaries owns or controls, is owned or controlled by or is under common ownership or control with Watson. For the purposes of this definition, the term "owns" (including, with correlative meanings, the terms "owned by" and "under common ownership with") as used with respect to any party, shall mean the possession (directly or indirectly) of more than 50% of the outstanding voting securities or other equity or voting interest of an entity.

   1.3 "Contractor" shall mean any vendor, consultant or contractor utilized by Service Provider to accomplish defined tasks in the Services.

   1.4 "Governmental Authority" shall mean any Federal, state, local or foreign governmental authority, agency, court, regulatory commission or other governmental body.

2. **Payment**
   **2.1** The estimated costs and payment schedule for each Project shall be set forth in the Project Documents. Watson shall pay to Service Provider all amounts, exclusive of Pass–Through Expenses (as hereinafter defined), due to Service Provider for the Services (hereinafter "Service Fees"). Payment of all invoices shall be made by Watson within 45 days of the date of the receipt of the applicable invoice by Watson. All unpaid amounts due to Service Provider hereunder shall bear interest at the rate of ▮▮▮▮▮▮▮ per month or at the highest rate permitted by New Jersey law, whichever is less; provided however, that in the event of a "good faith" controversy regarding the invoice, Watson shall have the right to withhold the amount in controversy (without such payment being subject to such interest) while the parties resolve the issue.

   **2.2** (a) Watson shall be responsible to reimburse Service Provider for all reasonable travel, meals and lodging expenses which are incurred by Service Provider in connection with Service Provider's performance hereunder and which are approved in writing by Watson's prior to their incurrence (hereinafter "Pass-Through Expenses"). All Pass-Through Expenses shall be paid to Service Provider net forty-five (45) days from the date of receipt of invoice therefor.

   (b) Watson will reimburse Service Provider for all amounts payable to third parties by Service Provider on Watson's behalf (which such third party services have been previously authorized in writing by Watson) when such payments are due and payable to such third parties provided, that Service Provider provide original receipts therefore and provides at least fifteen (15) days' prior notice of such payment obligations. Watson will not advance any monies for payments to such third parties and will not be liable for reimbursement or payment to any third parties for services for which Watson had not previously issued its approval in writing. If Watson does not make such payment to Service Provider in accordance with the above, then, in addition to Watson's reimbursement of such payment to Service Provider upon demand, Watson will incur default interest charges at the rate of five percent (5%) on any such payments to third parties properly due and owing in accordance with the terms hereof.

   **2.3** In the event that a Project requires more time than allotted in the Project Documents, and the

Highly Confidential – Subject to Protective Order
Highly Confidential

TEVA_MDL_A_13647407

EXECUTION VERSION

parties agree to continue such Services beyond the expected conclusion date, Service Provider shall advise Watson, in writing, of any additional Service Fees (to be determined at the contractual rates set forth in the Project Documents) to be incurred in connection therewith, and upon written approval by Watson, the Services shall be completed and Watson shall pay the additional Service Fees incurred in order to complete the Project.

**2.4** All invoices for Pass-Through Expenses shall be accompanied by documentation. Because the difficulty in substantiating the validity of claims for payment increases with time, in no event shall Watson pay on invoices submitted more than one hundred twenty (120) days after an expense has been incurred.

**2.5** Any expenses for which Watson is liable to Service Provider pursuant to this Section 2.2 shall be "Reimbursable Expenses." During the term of this Master Agreement and for a period of two (2) years after its expiration or termination, but not more than once in any calendar year, Watson may, at its own expense and upon reasonable advance written notice and during regular business hours, (i) audit Service Provider's records concerning Reimbursable Expenses for which it received reimbursement from Watson hereunder during normal business hours for the sole purpose of verifying the accuracy of the invoices submitted by Service Provider and the amounts paid or payable by Watson hereunder and (ii) .only in the event that services will be provided by Service Provider hereunder on a time and materials basis, audit any financial records of Service Provider associated with this Master Agreement and such Project Document (and fees associated therewith) attached thereto (including, without limitation, invoice records, invoices from third parties, contracts with third parties, and payments relating to this Master Agreement and/or such Project Document(s))..

**2.6** The parties acknowledge and agree that the compensation set forth in a Project Document represents the fair market value of the services provided by Service Provider to Watson negotiated in an arms-length transaction and has not been determined in a manner which takes into account the volume or value of any referrals or business otherwise generated between Watson and Service Provider. The parties further agree that this Master Agreement, and any related Project Documents, do not involve the counseling or promotion of a business arrangement that violates state or federal law.

**3.** **Confidentiality**

"Confidential Information" shall, for the purpose of this Master Agreement, mean any and all business and technical information in any form, tangible or intangible, of a Party which may be disclosed by to the other in writing, orally or by observation, which is either nonpublic, proprietary, a trade secret, or confidential in nature. Each Party agrees to hold in trust and confidence all of the information obtained from the other or otherwise generated pursuant to this Agreement. Neither Party shall disclose all or any part of such Confidential Information to any third party or make use thereof (except to perform its obligations pursuant to the provisions of this Master Agreement), or publish or present any work, which in whole or in part uses Confidential Information, without the prior written consent of the other Party. Each Party agrees to restrict access to all such information within its company to only such limited group of authorized employees, who (i) require such information in connection with its activities pursuant to this Master Agreement and (ii) have signed a Confidentiality Agreement having substantially similar terms to the confidentiality provisions set out in this Section. It is understood, however, that Confidential Information does not include any information which (1) is or becomes generally available to the public through no breach of this Agreement or violation of this Agreement by the receiving party, (2) as can be demonstrated by the written records of the receiving party, was independently developed by the receiving party without use of or reliance upon the disclosing party's Confidential Information or (3) as can be demonstrated by the written records of the receiving party, becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party; provided that such source is not prohibited from transferring the information to the receiving party by a contractual, legal or fiduciary obligation. Service Provider shall return all such information in tangible form (including all copies, extracts or derivatives thereof) to Watson within sixty (60) days after the termination or expiration of the term of this Master Agreement, or upon request by Watson, whichever comes first. For the avoidance of doubt, retention of electronic copies of Confidential Information maintained pursuant to regular data archiving and record retention policies and practices shall not be deemed to be a violation of this Section 3. Notwithstanding the foregoing, each Party may disclose Confidential Information (1) to its Affiliates and those of its and its Affiliates' directors, officers, employees, independent contractors, accountants and attorneys (collectively "Representatives") who need such information in order to assist or advise such Party in the performance of its obligations hereunder provided that (A) such Representatives are subject to written obligations of confidentiality and non-use no less restrictive than those set forth herein, (B) disclosure to independent contractors may not be made without the other Party's prior written consent, which consent shall not be unreasonably withheld and (2) regarding the terms and conditions of this Agreement to the extent required by applicable law. Each Party shall be liable for any breach of this Section 3 by any of its Representatives. Each Party shall promptly notify the other Party if it discovers any unauthorized use, copying or disclosure of the other Party's Confidential Information.

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**TEVA_MDL_A_13647408**

EXECUTION VERSION

4.  **Intellectual Property**

**4.1.    Work for Hire**

Subject to and except as provided in Section 4.4 below, the parties expressly agree that to the extent that the work performed under this Master Agreement or a Project Document is fixed in tangible form and prepared exclusively for Watson, such work shall be deemed a work made for hire as defined under 17 USC Section 101 (the "Works"). All such Works which are or have been made or written by Service Provider or its employees (and which are based upon Services performed by Service Provider for Watson hereunder) shall belong exclusively to Watson, including rights to obtain copyrights in such Works regardless of whether such materials, concepts and plans have been produced and employed by Watson in their marketing and communications efforts. In cases where a Work or a copy of a Work cannot be owned, Watson shall be notified by Service Provider and Watson shall have only those rights of use granted by the owner of such Work. All communications materials and artwork developed or provided by Watson shall also remain the property of Watson, including the right to obtain copyrights.

**4.2.    Assignment of Intellectual Property**

Service Provider agrees to assign to Watson all intellectual property in the Works, including but not limited to copyrights, whether patentable or not, and inventions conceived or reduced to practice by Service Provider's employees alone or jointly with others during the term of this Master Agreement or any Project Document attached hereto to the extent that such rights are within a Work, which intellectual property in such Work either (i) uses or incorporates Confidential Information belonging to Watson or (ii) consists of deliverables prepared exclusively for Watson in performance of the Services hereunder. Service Provider agrees to disclose promptly and fully all intellectual property belonging to Watson under this Master Agreement and to assist Watson in every reasonable way, at Watson's expense, to protect the rights of Watson or any affiliate in the intellectual property in such Works, including obtaining patents and copyrights thereon in any and all countries.

**4.3.    Presumption of Ownership**

Service Provider further agrees that it shall be conclusively presumed that any patent and copyright applications related to information introduced by or originating with Watson consisting of Watson's commercial, developmental or experimental products or Watson's trade secrets Confidential Information, which Service Provider or any of its employees may file within one year after termination or expiration of the term of this Master Agreement, shall belong to Watson and Service

Provider further agrees to assign same to Watson as having been conceived or reduced to practice during the term of this Master Agreement and to assist Watson in every reasonable way, at Watson's expense, to obtain patents and copyrights thereon in any and all countries.

**4.4.    Service    Provider    Independent Information**

Notwithstanding anything to the contrary in this Agreement, including, without limitation, notwithstanding anything set forth in Sections 4.1 through 4.3 herein, Service Provider Independent Information (defined below) shall be and remain the property of Service Provider and there shall be no condition, restriction, or limitation on Service Provider's free and unfettered use, disclosure, or assignment of Service Provider Independent Information, Service Provider possessing all right, title and interest therein and thereto free and clear of any right, title, interest or other encumbrance of Watson. Service Provider hereby grants Watson a non-exclusive, perpetual, fully paid-up (provided that Watson fulfills its payment obligations in accordance with the terms herewith), irrevocable (except in the event of Service Provider's termination of this Agreement due to Watson's material breach hereunder) worldwide license, subject to Watson' obligations under Section 3, to use, copy, distribute, and display and to authorize others to use, copy, distribute, and display for Watson's business purposes any Service Provider Independent Information provided to Watson under this Agreement. Nothing contained in this Agreement shall be construed as restricting Service Provider from using or disclosing any general learning, skills or know-how discovered or developed by its personnel under this Agreement or otherwise, except to the extent that same is derived from Watson's Confidential Information and/or trade secrets..

(c) Trade secrets, inventions, processes, know-how, technical expertise, knowledge, concepts, analyses, tools, frameworks, models, templates, formats, industry perspectives, data, software and other intellectual property that have been or are independently invented, discovered, developed or obtained (without reference to or use of any Confidential Information or other intellectual property of Watson disclosed or made available to Service Provider under this Agreement) by or for Service Provider, including, without limitation, any information invented, discovered, developed or obtained by Service Provider during the performance of this Agreement and all intellectual property rights associated therewith, shall be known as "Service Provider Independent Information".

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**5 Term**

4.1  The term of this Master Agreement shall be for the period beginning with the Effective Date hereof and ending on the third anniversary thereof, unless terminated earlier in accordance with the terms set forth herein. A Project Document may be terminated upon completion of all ongoing Services.

4.2.  Termination for Cause.  Either party may terminate this Agreement at any time in the event the other party commits a material breach of any of its obligations, which such defaulting party fails to cure within thirty (30) days after receiving written notice of such default from the other party.

4.3.  Termination in the Event of Bankruptcy.  Either party may terminate this Agreement upon thirty (30) days written notice following (1) the filing of a voluntary or involuntary petition in bankruptcy by or against the other party or (2) the liquidation of the other party.

4.4  This Agreement may be terminated upon the mutual written consent of the Parties.

Termination or expiration of the term hereof shall not relieve either party of the obligations imposed upon Service Provider by the provisions of Section 3 and 4 above and 7 and 12 below , said provisions shall survive for a period of five (5) years from expiration or termination of this Master Agreement.  In the event of termination of a Project by Watson for any reason other than Service Provider's breach of the terms of this Master Agreement, Service Provider shall be reimbursed for costs incurred to the date of termination, and for all reasonable non-cancelable commitments outstanding as of that date, such reimbursement in no event to exceed the approved budget set forth in the respective Project Document, and any additional sums approved by Watson, in advance, in writing.  Said request for reimbursement shall be accompanied by supporting documentation.

**5.  Independent Contractor**

The relationship of Service Provider to Watson is that of an independent contractor and nothing herein shall be construed as creating any other relationship.  Service Provider may adopt such arrangements as it may desire with regard to the details of the Services performed hereunder, the hours during which the Services are to be provided, and the place or places where the Services are to be furnished, provided that such details, hours and places shall be consistent with the proper accomplishment of the Services, and provided further that the Services shall be performed in a manner calculated to attain the most satisfactory results for Watson.  Service Provider may delegate to a Contractor its obligations to perform any of the Services without prior written consent of Watson.  In such event Service Provider shall cause such Contractor to comply with the terms and provisions hereof applicable to such delegation and shall be liable for Contractor's failure to comply with same.  Furthermore, such delegation shall not release Service

Provider of its responsibility to Watson regarding the timely and proper performance of such Services.

**6.  Compliance**

**6.1  Safety Compliance**

In the event Service Provider is to perform any of the Services on Watson's premises, Service Provider agrees that it shall comply with the applicable safety rules and regulations of the particular location where the Services are to be performed, and Watson agrees that said safety rules and regulations shall be made available to Service Provider before the commencement of performance of any such Services.

**6.2  Compliance with Pertinent Standards.**

If applicable to the Services, in performing its obligations under this Agreement, Service Provider and Watson agree to abide by all applicable laws, rules and regulations, including without limitations, the (i) U.S. Food and Drug Administration's "Guidance for Industry-Supported Scientific and Educational Activities"; (ii) "Guidelines for Gifts to Physicians", issued by the American Medical Association; (iii) PhRMA Code on Interaction with Healthcare Professionals; and (iv) any other governing accrediting body standards applicable to the Services described herein.

**7.  Indemnification;  Limitation of Liability**

7.1  Service Provider agrees to indemnify, defend and save Watson harmless from and against any and all claims, injuries, disabilities, losses, fines, penalties, costs, expenses (including reasonable attorneys' fees), damages or liabilities incurred by a Watson in connection with claims asserted by a third party to the extent caused by any material breach of this Agreement by Service Provider, violation by Service Provider of any law applicable to the Services, and/or negligent or grossly negligent act or willful misconduct of Service Provider or its Representatives and/or Contractors in the performance of the Services .

7.2  NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, OR CONSEQUENTIAL, DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, LOST REVENUES, LOST PROFITS, OR LOST BUSINESS, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE AND, EXCEPT WITH RESPECT TO DAMAGES ARISING FROM A PARTY'S BREACH OF ITS OBLIGATIONS UNDER SECTION 3, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS MASTER AGREEMENT FOR MORE THAN THE AMOUNT PAYABLE TO SERVICE PROVIDER BY

Highly Confidential – Subject to Protective Order
Highly Confidential

WATSON UNDER ANY PROJECT DOCUMENT DURING THE PRECEDING TWELVE (12) MONTH PERIOD.

**8. Equal Opportunity**

Service Provider acknowledges that it understands that Watson is an Equal Opportunity Employer and Service Provider warrants that Service Provider complies with the Fair Labor Standard Act of 1938, as amended. Service Provider agrees that, if this Master Agreement is construed to be a subcontract within the meaning of the Rules and Regulations approved by the United States Secretary of Labor pursuant to Executive Order 11246, as amended, the Vietnam Era Veterans Readjustment Act of 1974, as amended, or the Rehabilitation Act of 1973, as amended, or of the regulations issued pursuant to Executive Order 11625, the provisions of those regulations as well as the Equal Opportunity and Nondiscrimination provision of Section 202 of Executive Order 11246 shall be incorporated herein by reference and shall be binding upon Service Provider as part of this Master Agreement.

**9. Insurance; Parental Guaranty**

9.1    Commencing with the performance of Services hereunder, Service Provider shall, during the term hereof, maintain insurance of the type and minimum coverages indicated below, with insurance carriers reasonably satisfactory to Watson. The terms of coverage shall be evidenced by certificates of insurance to be furnished to Watson. Such General Liability and Automobile Liability policies shall name Watson as an additional insured, as its interests may appear, and the Service Provider shall provide prompt written notice of cancellation material modification or expiration thereof .

| Type | Minimum Limits |
|------|----------------|
| Worker's Compensation | |
| Employer's Liability | |
| General Liability (Including contractual coverage) | |
| Automobile - any auto | |

9.2

(a)    Cegedim Inc. ("Guarantor") will, upon the demand of Watson, without deduction for any claim of set-off or any counterclaim or defense, subject to any notice required to be provided to Service Provider or applicable grace period, perform and satisfy those obligations and liabilities of Service Provider set forth hereunder in accordance with its terms. It shall not be necessary to the enforcement of any of the obligations of the Guarantor hereunder that any rights or remedies of Watson first be pursued against the Service Provider.

(b)    The obligations of the Guarantor under this Guaranty: (i) shall be absolute, irrevocable and unconditional under any and all circumstances without regard to the genuineness, validity, legality or enforceability

of any term hereof, and, irrespective of any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, which discharge and defenses are hereby waived by Guarantor; (ii) are in no way conditioned upon any attempt to enforce performance of or compliance with this Agreement by or against the Service Provider; (iii) shall remain in full force and effect until performance by the Service Provider of all of its performance and payment obligations which Guarantor guarantees performance of pursuant to this Section 9.3; and (iv) shall not be affected or impaired by any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Service Provider or any defense which the Service Provider may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(c)    Guarantor hereby represents and warrants to Watson that: (i) Guarantor is a corporation duly organized and existing in good standing under the laws of the State of New Jersey and has full power and authority to make and deliver this Guaranty; (ii) the execution, delivery and performance of this Guaranty by Guarantor have been duly authorized by all necessary corporate action; and (iii) this Guaranty has been duly executed and delivered by the authorized officers of the Guarantor and constitutes a lawful, binding and legally enforceable obligation enforceable in accordance with its terms.

(d)    This Guaranty shall be binding upon the successors and assigns of the Guarantor and its successors, and shall inure to Watson's benefit and to the benefit of Watson's successors and assigns. This Guaranty may not be modified, amended, terminated or revoked, in whole or in part, except by an agreement in writing signed by Guarantor and Watson.

**10.    Service Provider's Warranties; Conflicts of Interest**

10.1.    Service Provider represents and warrants that: (i) it has no obligations to any third party which will in any way limit or restrict its ability to perform Services for Watson hereunder, (ii) it shall not disclose to Watson, nor make any use in the performance of services hereunder of the trade secrets or proprietary information of any third party without Watson's prior written consent,  (iii) it possesses the necessary expertise to perform the Services hereunder consistent with the customary standards of the industry; and (iv) it shall perform the Services in a professional and workmanlike manner as agreed to by the parties..

**10.2.    Requirement to Advise of Future Conflicts**

Service Provider further warrants and affirms that it shall advise Watson of any such relationships that might arise during the term of this

Master Agreement. In such event, Watson shall have the option to terminate this Master Agreement without further liability to Service Provider other than the obligations to pay for Services actually rendered through the date of such termination.

**10.3. Limitations On Warranties.** THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE 10 HEREOF ARE IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES AND SERVICE PROVIDER HEREBY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR USE AND/OR A PARTICULAR PURPOSE.

**11. Undertaking by Employees and Contractors of Service Provider**

Service Provider agrees that it is a condition precedent to the obligations of this Master Agreement that it have each employee and/or Contractor who will be performing work hereunder agree to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof. Service Provider shall not assign any employee or Contractor to the performance of Services hereunder unless such person agrees to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof. In the event Service Provider shall assign an employee or Contractor to the performance of work hereunder after the date of execution of this Master Agreement, Service Provider shall ensure such employee or Contractor agrees to comply with confidentiality and non-use restrictions substantially similar to those set forth in Section 3 hereof.

**12. Tax Reporting and Payment**

All amounts due to Service Provider hereunder are net of any and all taxes (including withholding taxes), assessments, charges and levies of any Governmental Authority, all of which shall be the sole obligation of Watson, except for taxes payable on the income of Service Provider.

**13. Miscellaneous Provisions**

**13.1. Assignability**

This Agreement may not be assigned (by operation of law or otherwise) or transferred, in whole or in part, by either party without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed);; provided, however, that either party shall be entitled to assign this Agreement, without the prior written consent of the other party, to an Affiliate of such party, if such Affiliate assumes such party's obligations hereunder. Except as specifically provided herein, this Agreement is not intended to and does not create any rights in favor of any Person not a party hereto.

**13.2. Extraordinary Relief**

In the event of the actual or threatened breach by Service Provider of any of the terms of Section 3 hereof, Watson shall have the right to seek specific performance and injunctive relief. The rights granted by this Section are in addition to all other remedies and rights available at law or in equity.

**13.3. Complete Agreement**

This Master Agreement, Exhibits and all Project Documents executed pursuant to it constitute the entire agreement between the parties hereto with respect to the subject matter hereof, and there are no other agreements or understandings, written or oral, between the parties relating to the subject matter of this Master Agreement. No amendments or modifications of the terms of this Agreement, including any conflicting or additional terms contained in any sales order, acknowledgment form, or other written document submitted by either party hereto, shall be binding on either party hereto unless reduced to writing and signed by a duly authorized representative of each party hereto.

**13.4. Amendments**

This Master Agreement may not be altered, changed or amended except by a writing signed by each of the parties hereto.

**13.5. Severability**

In the event that any provision of this Master Agreement is held illegal or invalid for any reason, such provision shall not affect the remaining parts of this Agreement, but this Master Agreement shall be construed and enforced as if that illegal and invalid provision had never been inserted herein.

**13.6. Captions and Headings**

The captions and headings in this Master Agreement are for convenience and reference only, and they shall in no way be held to explain, modify, or construe the meaning of the terms of this Master Agreement.

**13.7. Counterpart Originals**

This Master Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall constitute one and the same document.

**13.8 Choice of Law; Jurisdiction**

This Master Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey without giving effect to the choice of law principles thereof. The parties agree to accept service of process and to be bound by the decision of a State or Federal court of competent jurisdiction in the State of New Jersey.

**13.9 Notices.**

All notices, requests and other communications shall be in writing and shall be validly given or served when (a) hand delivered, (b) delivered by recognized commercial overnight courier services, or (c) given by registered or certified first class mail, postage prepaid, return receipt requested, to the individual named on the signature page hereof, at the address set forth herein, or to such other address as shall have been specified by such Party.

**13.10 Conflict**

In case of conflict between this Master Agreement, an applicable Project Document and any other document, the terms of the Project Document shall prevail in all business matters and this Master Agreement shall prevail in all administrative matters unless the applicable Project Document expressly states otherwise.

**13.11.** With respect to any consulting services performed as part of the Services which involve compliance with regulatory requirements, the sole duty of Service Provider shall be to examine or review existing practices, policies or procedures (as set forth in its engagement), report to Watson and make appropriate recommendations within the scope of the Services; Service Provider shall have no liability or obligation (i) with respect to any prior violations of such requirements by Watson; or (ii) to insure that any analysis or recommendations are adopted or implemented by Watson; responsibility for implementing any recommendations and monitoring, overseeing and insuring compliance shall be the sole responsibility of Watson. Without limiting the generality of the foregoing, Watson agrees and acknowledges that the ultimate regulatory burden of compliance is and shall remain with Watson, and nothing herein contained is intended to shift such burden to Service Provider.

**13.12** Any analysis by Service Provider as part of the Services is based solely on information and individuals made available to Service Provider by Watson during its performance of the Services. Recommendations and analysis provided by Service Provider as part of the Services represent Service Provider's professional judgment based on its knowledge of and experience with the DEA, CSA, FDA and PDMA and comparable state laws. Certain requirements of federal and state regulations thereunder are subject to interpretation and such interpretations may contain subjective components; implementation of any recommendations does not guarantee that federal, state, or other governmental authority would not find any violations.

**13.13** The Services provided to Watson by Service Provider are advisory in nature and Service Provider's entitlement to payment hereunder is neither, directly or indirectly, tied to nor a function of any specific results or the outcome of any efforts Service Provider may undertake.

**13.14** Watson agrees to disclose fully, completely and accurately any and all material information regarding its business and services to Service Provider in order to permit Service Provider to perform the Services hereunder.

**13.15** Service Provider performs services to other clients which may have, directly or indirectly, common, similar or competing interests to the interests of Watson. Without derogating from Service Provider's confidentiality obligations expressly provided under this Agreement, nothing herein shall be construed or interpreted to limit or restrict in any way the nature or type of services which may, during the Term of this Agreement or thereafter, be performed or undertaken by Service Provider for other parties.

**13.16** During the term of this Agreement, and for a period of one (1) year thereafter, each party will not directly or indirectly, and it will cause its Affiliates not to directly or indirectly, (a) solicit for employment any Person who is an employee or consultant of the other party or any of its Affiliates or who was an employee or consultant of such party or its Affiliates at any time during the term of this Agreement; provided; however that nothing contained herein shall be construed as a restriction on any such persons answering a party's general solicitation for employment. .

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized representatives to sign this Master Agreement upon the date first set forth above.

BuzzeoPDMA LLC

By: _____

Name:  William E. Buzzeo

Title:  General Manager and Vice President_

WATSON PHARMA, INC.

By: _____

Name:  ~~Thomas~~ Griffin

Title:  VP Sales

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**TEVA_MDL_A_13647413**

**EXECUTION VERSION**

**PROJECT DOCUMENT #1**

This Project Document is effective September, 2010 by and between BuzzeoPDMA LLC ("Service Provider") and Watson Pharma, Inc. ("Watson").

      A.      Watson and Service Provider have entered into a Master Services Agreement effective January 1, 2011 (the "Master Agreement").

      B.      Watson and Service Provider desire to enter into this Project Document.

      C.      The parties confirm that the Master Agreement governs the relationship between the parties. Unless otherwise specifically set forth herein, in the event of a conflict or inconsistency between the terms and conditions set forth in the Master Agreement and the terms and conditions set forth in this Project Document, the terms and conditions set forth in the Master Agreement shall take precedence, govern and control.

      D.      The Parties hereby acknowledge that the terms set forth in the Master Agreement are incorporated herein by reference, as if fully set forth at length therein.

**I.**      *SERVICES:*

      1.      Provide compliance and sample management solutions as more specifically set forth in Schedule 1.

      2.      Any other related tasks that may be required by Watson.

**II.**      *COMPENSATION:*

Watson shall compensate Service Provider for Services performed as follows:

      1.      As set forth in the attached pricing schedule set forth on Schedule 1.



      4.      Services performed by Service Provider and described above shall be completed on time and fulfilled to Watson's satisfaction.

**III.**      *BILLING:*

      1.      For the expenses referred to above, Service Provider shall submit an invoice to Watson, which shall include, but not be limited to, adequate time report documentation for Services performed during the applicable time period. Invoices shall be addressed to the attention of Michael Murphy, Watson Pharma, Inc., Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

      2.      Payments will be made payable to: BuzzeoPDMA LLC., 1025 Boulders Parkway, Suite 405, Richmond, VA 23225, TAX ID: 27-3779713

      3.      Invoices will be paid by Watson within 45 days of receipt.

Highly Confidential – Subject to Protective Order
Highly Confidential

**IN WITNESS WHEREOF**, the parties hereto have caused their duly authorized representatives to sign this Project Document upon the date first set forth above.

Buzzeo PDMA LLC

By: _____

Name: William E. Buzzeo

Title:   General Manager and Vice President_

WATSON PHARMA, INC.

By: _____

Name:   ~~Lynne Amato~~  Thomas. R. Griffin

Title:   Vice President, ~~Global Brand Marketing~~ SALES

Highly Confidential – Subject to Protective Order

Highly Confidential

# Schedule 1

**Project #1: Annual Inventories**

Service Provider's Field Inventory Specialists will conduct the annual inventories of Watson's sales representatives.

Annual Inventories include:
- Discussion with Watson regarding annual inventory cycle
- Discussion with Watson regarding the method and type of communication to each sales representative to be audited
- Development of a format for collection and reporting of data to meet the requirements of the PDMA
- On-site physical inventory of samples at storage location and home
- Listing of storage locations and conditions, checking for outdated or damaged drugs
- Listing of home storage locations and conditions, checking for outdated or damaged drugs
- Tracking completed audits via our proprietary web-based tracking system
- Preparation of the required forms and / or entry into Watson's SFA system

**Program Set-Up**

Watson-specific program development with Director and Project Manager of Field Inventory Services and Watson designee, which includes but is not limited to:
- Review of Watson's SOPs to ensure consistency
- Review and comment on current forms or development of new forms
- Development of Watson-specific work directives for Field Inventory Specialists
- Development and initiation of Watson-specific training content for Field Inventory Specialists

**Dependencies/Contingencies**



**Project #2: For Cause Audits**

Watson will make the determination as to when "For Cause" Audits occur, with input and guidance from Service Provider. Service Provider's For-Cause auditors are former state and federal regulatory investigators and senior industry professionals experienced in for-cause audits and are regionally based. Regional travel may be required.

For Cause Audits may include:
- Interviews with Sales Representatives
  - Watson will determine the number of on-the sales representative interviews based on reconciled inventories that exceed a significant loss threshold, potential drug sample diversion, and/or potential falsification of required PDMA documents.

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**TEVA_MDL_A_13647416**

**EXECUTION VERSION**

- Review of accountability reconciliation documents, explanations for discrepancies, and other appropriate records for those sales representatives intended to be interviewed
- On-site inventory and reconciliation
- Timely discussions with Watson on findings and preparation of formal reports so that Watson will meet FDA's thirty (30) day reporting requirement
- On-site discussions with practitioners, if required
    - o Review of sample request forms with practitioners

Service Provider shall provide Watson with a dedicated contact point to initiate and facilitate For-Cause audits. Watson is required to designate a contact point to responsible for notifying Service Provider to initiate a For-Cause audit and to receive For-Cause audit reports. This program can be adjusted or modified based on Watson's recommendations.

**Project #3: Sales Representative Closeouts**

Service Provider's Field Inventory Specialists shall provide this Service to Watson as follows:

- If drug samples are in the possession of a sales representative, the Field Inventory Specialist will take an inventory on a paper form. The drug samples will be sent to Watson's designee by Watson's choice of delivery service or will be left in the storage unit with a new lock. Watson will provide a shipping account number for shipping of all property and paperwork
- Promotional materials and literature will be shipped to Watson's designee or left in the storage unit with a new lock
- If necessary, Service Provider will relocate sales representative's samples, automobile, or any other assets to a pre-arranged pre-paid commercial storage unit.
- The Field Inventory Specialist will inspect the sales representative's automobile and transfer or store the automobile as directed by Watson within a 15-mile radius of the Sales Representative's location. If the automobile must be moved outside the 15-mile radius, mileage and additional time charges will apply. The *keys* to the automobile will be forwarded to Watson's designee
- The Field Inventory Specialist will pack and ship the sales representative's computer and associated items to Watson's designee
- The Field Inventory Specialist will retrieve other assets from the sales representative, including but not limited to company credit card, cellular phones, pagers, etc. and will pack and ship to Watson or its designee

**Closeout Pricing:**



**Program Set-Up**

A program specific to Watson will be developed with Director and Project Manager of Field Inventory Services and Watson designee which shall include but not be limited to:

- Review of Watson's SOPs to ensure consistency
- Review and comment on current forms or development of new forms
- Development of Watson-specific work directives for Field Inventory Specialists
- Development and initiation of Watson-specific training content for Field Inventory Specialists

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**EXECUTION VERSION**

<u>Project #4:  State Monitor Survey</u>

**Mid-Level Practitioner Sampling Requirements** - Provides an in-depth review of the state laws, regulations, and board opinions surrounding the sampling, prescriptive, and dispensing authority of physician assistants and nurses with advanced practice status.

Highly Confidential – Subject to Protective Order
**Highly Confidential**

**EXECUTION VERSION**

**Pricing Schedule**

Highly Confidential – Subject to Protective Order
**Highly Confidential**



Highly Confidential – Subject to Protective Order
**Highly Confidential**