# Exhibit 3

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

-----------------------------X

IN RE: NATIONAL PRESCRIPTION      MDL No. 2804
OPIATE LITIGATION,

                                  Case No. 17-MD-2804

This document relates to:

All Cases                         Hon. Dan A. Polster

-----------------------------X


 * * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

         * * CONFIDENTIALITY REVIEW * *

             VIDEOTAPED DEPOSITION

                     OF

             THOMAS P. NAPOLI

             New York, New York

          Thursday, January 17, 2019




Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    inquiring about that?

2         A.    I don't recall.

3         Q.    As you made the reduced quota demand

4    for the --

5         A.    Well, I mean, obviously if we're

6    making a quota request or if we're not due for a

7    quota request is because of diminished sales.

8         Q.    Do you remember what the reason for

9    the diminished sales were?

10        A.    That, I don't know.

11        Q.    All right.

12             MR. LUXTON:  Before we go to the next

13        document, can we take a quick bathroom

14        break?

15             MR. EGLER:  Sure.

16             THE VIDEOGRAPHER:  The time is

17        2:37 p.m.  We are going off the record.

18             (Recess is taken.)

19             THE VIDEOGRAPHER:  We are back on the

20        record at approximately 3:05 p.m.

21             (Napoli Exhibit 15, Watson document

22        entitled SOMS Project Evolution IT

23        Governance Meeting, Bates-stamped

24        ALLERGAN_MDL_02468983 through 68994, marked

Highly Confidential - Subject to Further Confidentiality Review

Page 239

1         for identification, as of this date.)

2    BY MR. EGLER:

3         Q.    Mr. Napoli, you understand you are

4    still under oath?

5         A.    Yes.

6         Q.    Could you look at what I've just

7    marked as Exhibit 15?

8              And as with other documents I've

9    handed you today, the first page has no Bates

10   number, but starting on the second page, the

11   Bates numbers are ALLERGAN_MDL_02468983 through

12   68994.

13             Can you take a look at this document,

14   and when you're ready, tell me if you recognize

15   it.

16             (Document review.)

17        A.    I do.

18        Q.    What is this document?

19        A.    It's a document I guess detailing the

20   anatomy of our SOMS project.

21        Q.    So as you think about this document,

22   that is Exhibit 15, were you responsible for it

23   or somebody in your group responsible for

24   creating it?

Page 240

1        A.      For this document itself?

2        Q.      This particular document.

3        A.      I don't have an exact recollection.

4    I could have contributed to this.

5        Q.      All right.  So as you look at this

6    document, do you have an understanding of who

7    this presentation was made to?

8        A.      Based on the fact that it's an IT

9    governance meeting, I'm thinking perhaps some --

10   our IT folks.

11       Q.      Have you ever heard that term "IT

12   governance" in the course of your work at

13   Watson?

14       A.      I have.

15       Q.      What does that term mean to you?

16       A.      Well, from a governance perspective,

17   I would think, and it's IT, I would think that

18   ensuring that any systems or IT-related programs

19   that we're utilizing within the organization

20   meet the requirements in compliance with our

21   standard operating procedures.

22       Q.      When you think of an IT department at

23   Watson while you were there around this time,

24   April 2012, do you think of one or a couple of

Highly Confidential - Subject to Further Confidentiality Review

Page 241

1      particular people that stand out in your mind?

2           A.    Not really.

3           Q.    So going into this document, on the

4      fourth page, it's 8984.  At the top of the page

5      it states, "Regulatory Requirement.

6           A.    Um-hmm.

7           Q.    And it states -- it has the language

8      of that 21 CFR 1301.74 (B), right?

9           A.    Yes.

10          Q.    And you see that?

11                So I'll just read it in the record.

12                "The registrant shall design and

13     operate a system to disclose to the registrant

14     suspicious orders of controlled substances.  The

15     registrant shall inform the field division of

16     the administration in his area of suspicious

17     orders when discovered by the registrant.

18     Suspicious orders include orders of unusual

19     size, orders deviating substantially from a

20     normal pattern, and orders of unusual

21     frequency."

22                Do you see that?

23          A.    Yes, sir.

24          Q.    And then the next one says, "Further

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  guidance, December letter of 2000."  It states,

2  "Registrants that rely on rigid formulas to

3  define whether an order is suspicious may be

4  failing to detect suspicious orders.  For

5  example, a system that identifies orders as

6  suspicious only if the total number exceeds the

7  previous month by a certain percentage or more

8  is insufficient."

9          Do you see that there?

10  A.    Yes.

11  Q.    That second group of, or that second

12  paragraph that I read, do you recognize that as

13  being from the letter authorized by

14  Mr. Rannazzisi?

15  A.    Yes.

16  Q.    And do you remember whether, in that

17  same letter, Mr. Rannazzisi highlighted the term

18  "include" in the 21 CFR 1301.74 (B) language

19  above, that suspicious orders "include" orders

20  of unusual size, orders deviating substantially

21  from a normal pattern, and orders of unusual

22  frequency?

23  A.    I don't recall if that was within the

24  letter.

Page 243

1    Q.    And that there may be more than those

2    three requirements or conditions for something

3    to be a suspicious order?

4    A.    I don't recall if it was in the

5    letter.

6    Q.    All right.  So moving down into this,

7    on the next page, page 8985, it states, "Current

8    automated model," and it has various texts

9    there.

10         Can you read that text to yourself

11   and tell me what, in your opinion, it describes?

12         As you're reading it to yourself,

13   I'll read it into the record.

14         "Current automated model designed and

15   implemented within SAP, primary user is customer

16   relations," then, dash, "order intake process."

17         And then it states, "Based on a

18   'threshold,'" and then, dash, "customer

19   groupings," and then a bullet point, "class of

20   trade," and then three dashes underneath there,

21   "wholesaler, retail chain, distributor,

22   mail-order, et cetera," then another dash,

23   "monthly average based on 12" -- "based on

24   rolling 12-month period," and then "multiplied

Highly Confidential - Subject to Further Confidentiality Review

Page 244

1    by static multiplier equals monthly allowable."

2           So as you think about that whole page

3    together, does that describe the Watson

4    Suspicious Order Monitoring System around this

5    time April of 2012?

6           MR. KNAPP:  Objection to form.

7       A.    It describes a component of the

8    system.

9       Q.    Okay.  Then it has that term that we

10   talked about earlier, "class of trade."

11          Do you see that there?

12      A.    Yes.

13      Q.    Class of trade, it then says,

14   "wholesaler, retail chain, distributor, mail

15   order, et cetera."

16          Is that what you understand a class

17   of trade to be?

18      A.    Yes.

19      Q.    All right.  How about the next

20   language that's down there, "monthly average

21   based on rolling 12-month period," is that class

22   of trade?

23      A.    No.

24      Q.    Okay.  Why would that be listed there

Highly Confidential - Subject to Further Confidentiality Review

Page 245

1    under "class of trade"?

2            Could it be just a mistake --

3        A.    Yes.

4        Q.    All right.  And if you were tabbing

5    it today, putting it under a bullet point or a

6    dash, where would you put it?  Would you put it

7    as the same as based on a threshold, customer

8    groupings, or somewhere else?

9        A.    I may put it under a bullet of

10   formula.

11       Q.    Okay.  And then the next one,

12   "multiplied by static multiplier equal monthly

13   allowable," would you put that under the same

14   formula bullet?

15       A.    Yes.

16       Q.    So if you can turn to that next page,

17   8986, it states "Customer groupings."

18            Do you see that there?

19       A.    Yes.

20       Q.    And it states, "Individual customer

21   ship to location monthly average based on 12" --

22   no, "monthly average based on rolling 12-month

23   period," and then "multiplied by static

24   multiplier equal monthly allowable."

Page 246

1          It seems to be similar language to
2     the prior one?
3          A.    Yes.
4          Q.    What does that "customer groupings"
5     mean?
6          A.    Not having authored this document, I
7     don't know.  I don't want to speculate.
8          Q.    And then it states, "Order pending."
9     And then the next bullet point is, "Multiplier
10    table is populated manually based on
11    estimation."
12         Do you have an understanding of what
13    that sentence means?
14         A.    I believe it indicates that the
15    multiplier is set manually based on a review of
16    the -- what the normal behavior could be
17    estimated to be with a customer.
18         Q.    Now as you think about your time at
19    Watson and Actavis, do you remember about this
20    time, April 2012, who would have set the
21    multiplier that's referred to in this page 8986?
22         A.    Setting the multiplier was the
23    responsibility of my group.
24         Q.    Do you remember if there was one

Page 247

1     person in particular who would have set the
2     multiplier?
3           A.    I would have authorized it.
4           Q.    So with regard to setting the
5     multiplier, as you think about it, would the
6     multiplier be the same for every order by a
7     particular customer or would they differ with
8     regard to different orders by customers or
9     something else?
10          A.    It would be the same for each
11    customer.
12          Q.    So, say, McKesson was one of the
13    customers, every multiplier -- let me start
14    over.
15                Say McKesson was one of the
16    customers, the multiplier for every order by
17    McKesson would be the same; is that right?
18          A.    Right.
19          Q.    So going down further into the
20    document, "Current Automated System Evaluation"
21    down below, it says "Based on compliance
22    concerns."
23                Do you remember there being concerns
24    about whether Watson's Suspicious Order

Highly Confidential - Subject to Further Confidentiality Review

Page 248

1    Monitoring System complied with the DEA

2    regulations and laws in April 2012?

3         A.    I don't recall any specific

4    compliance concerns, but only our desire to

5    enhance the system.

6         Q.    Okay.  Do you remember ever -- anyone

7    ever telling you that they had concerns about

8    Watson's Suspicious Order Monitoring System

9    complying with the DEA regulations and laws

10   around this time?

11        A.    Not that I recall.

12        Q.    All right.  And then it says below,

13   "Increased enforcement action by DEA in the area

14   of SOM audits."

15             And then, "Most recently Cardinal and

16   CVS failing to maintain systems to detect

17   diversion."

18             Do you see that there?

19        A.    Yes.

20        Q.    Do you remember that around this time

21   that Cardinal Lakeland Distribution Center being

22   shut down?

23        A.    I don't have a specific memory, but I

24   do know that they had a distribution center that

Highly Confidential - Subject to Further Confidentiality Review

Page 249

1    was, I don't know if it was completely shut down
2    or if there is was a temporary order.  I'm not
3    sure.
4         Q.   And I guess "shut down" isn't the
5    right way to say it.
6              They were unable to sell controlled
7    substances; is that right?
8         A.   Correct.
9         Q.   Okay.  So the next bullet point down
10   states, "Expectation that we know our customers'
11   customers."
12             Do you see that there?
13        A.   Um-hmm.
14        Q.   Do you remember where that language
15   came from, "expectation that we know our," that
16   we, quote, "know our customers' customers,"
17   unquote?
18        A.   I don't.
19        Q.   It states, "Cross-functional team
20   established in 2010."
21             And I think we talked about that
22   before, right?
23        A.   Right.
24        Q.   And as you understand it, the

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1      cross-functional team that's referred to there

2      is the group from customer service and the group

3      from the DEA affairs; is that right?

4            A.    That's correct.

5            Q.    Oh, and below, it says, "Security and

6      DEA affairs, IT and customer relations."

7                  And the IT component is programming

8      the automated system into the SAP process; is

9      that right?

10           A.    Right.  Or from a project management

11     standpoint of implementing a new -- if we went

12     with a new algorithm into the system.

13           Q.    And then "Establish goals, compliance

14     and efficiency."

15                 And, again, do you remember there

16     being a discussion about compliance around this

17     time frame?

18           A.    No, I do not.

19           Q.    All right.  And then the next one is,

20     "Budgeted for third-party evaluation in 2011."

21           A.    Right.

22           Q.    And then turning to the next page,

23     "Automated System Evaluation," it starts talking

24     about Cegedim-Dendrite; is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 251

1        A.    Yes.

2        Q.    And is that the evaluation that we

3   were talking about in the exhibit before we took

4   the break?

5        A.    Correct.

6        Q.    So the next page is "Findings."

7              Do you see that there?

8              (Document review.)

9        A.    Yes.

10       Q.    So it states -- as you see that word

11   "Findings," can you -- do you have an

12   understanding what that means in the context of

13   this document?

14       A.    These would be observations that were

15   made by the consultant.

16       Q.    And the consultant was Buzzeo?

17       A.    Yes.

18       Q.    And it says, "Use of multiplier to

19   create monthly threshold."

20              And it says, "Not consistent with

21   specific requirements noted within regulations

22   and guidance, and current system will detect a

23   certain percentage of suspicious orders but not

24   all."

Highly Confidential - Subject to Further Confidentiality Review

Page 252

1                    Do you see that there?

2          A.    I do.

3          Q.    Do you remember that being a finding

4    that the Buzzeo group made about the Watson

5    system in early 2012?

6          A.    I don't have a specific recollection.

7          Q.    Do you remember -- and, you know, I

8    put a date limitation on that.

9                    Is your lack of specific recollection

10   based on the date or something else?

11         A.    It's just... it's been a while.

12         Q.    And then it states, "Current model

13   evaluates at SKU level."

14                   Is that pronounced typically "skew"?

15         A.    Yes.

16         Q.    All right.  What is a SKU?

17         A.    A SKU is just one, one product.  So

18   it can be oxycodone 10325, 100 fill count, SKU.

19         Q.    Do you recognize the difference

20   between a SKU and an NDC code?

21         A.    The SKU could be -- yeah, there,

22   there is a difference between the two.  I don't

23   know the exact -- SKU is more of a -- we're kind

24   of exceeding my, probably my area of expertise,

Highly Confidential - Subject to Further Confidentiality Review

Page 253

1    but they're both unique identifiers.

2            I think what this is saying here is

3    that by looking at it at the SKU level, we're

4    not looking at the total molecule.  And that was

5    an enhancement.  So that's something where we

6    could have enhanced.

7        Q.   All right.  So it states, "Current

8    model evaluates at SKU level.  Possibility of

9    distributing orders across multiple SKUs without

10   detection."

11           So that's where you're talking about

12   it can be the same, as you refer to it, molecule

13   but with different SKUs?

14       A.   Right.

15       Q.   And then the next one is, "System

16   does not evaluate listed chemicals"?

17       A.   Right.

18       Q.   I think we talked about that earlier

19   as well?

20       A.   Right.

21       Q.   Those are the precursor chemicals

22   that you talked about?

23       A.   Right.

24       Q.   And then on the next page, 990, it

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    states, "Revisit approach to SOM to fully

2    address specific regulatory requirements."

3            And then it states, "Develop SOM that

4    is a 'non-threshold-based adaptive' -- I'm

5    sorry, let me read it.

6            "Develop SOM that is a,

7    'non-threshold-based adaptive,' system trained

8    to identify suspicious orders by utilizing a set

9    of historic markers to include," and then

10   another bullet point, "statistical scoring of

11   active ingredient order volume versus history,

12   active ingredient order versus short and

13   long-term trend, identification of high/low

14   frequency ordering behavior."

15           And then the next bullet point is

16   "Base system on milligram strength rather than

17   SKU."

18           A.    Um-hmm.

19           Q.    And then, "Include list of chemical

20   within system."

21           And then, "Based on recommendations,

22   GS and DEAA requested a proposal and quote."

23           In the context of this document, do

24   you know what GS and DEAA would be?

Highly Confidential - Subject to Further Confidentiality Review

Page 255

1    A.    Global security and DEA affairs.

2    Q.    And your group was DEA affairs; is
3    that right?

4    A.    Yes.

5    Q.    And then the next dash is "Establish
6    meeting with IT and consultant."

7    A.    Um-hmm.

8    Q.    "Understand scope, confirm that
9    solution was appropriate and achievable."  And
10   then the next one is "Budgeted for 2012
11   implementation."

12         Do you see that there?

13   A.    Yes.

14   Q.    Do you remember the -- do you
15   remember whether there was a decision around
16   this time, April 2012, to implement the Buzzeo
17   system at Watson?

18   A.    Yes, I believe there was.

19   Q.    All right.  Do you remember who made
20   that decision?

21   A.    It would have been my management.

22   Q.    Did you support the conclusion to
23   implement the Buzzeo system?

24   A.    I definitely supported enhancing our

Page 256

```
1    system.  You know, the automated system that
2    we're talking about is -- we are talking about
3    just one component within the system, that's
4    what I want to make clear.  So we're not relying
5    on one component of a system as our Suspicious
6    Order Monitoring program.
7         Q.    And as you had been talking about
8    earlier, in addition to this process, there is
9    the onboarding process and reviews; is that
10   right?
11        A.    The Know Your Customer due diligence.
12        Q.    And Know Your Customer due diligence.
13              And then beyond the automated system,
14   there is a process of customer service clearing
15   and then, if necessary, DEA affairs clearing of
16   orders; is that right?
17        A.    Yes, sir.
18        Q.    And if none of those processes work,
19   the order will be reported to the DEA as
20   suspicious; is that right?
21        A.    Correct.
22        Q.    All right.
23              All right.  You can set this aside.
24        A.    Okay.
```