UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| In re NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This Document Relates To:<br><br>    *ALL CASES*. | )   No. 1:17-md-2804<br>)<br>)   Judge Dan A. Polster<br>)<br>)<br>)<br>)<br>) |

PLAINTIFFS' REPLY IN SUPPORT OF THE MOTION FOR SANCTIONS
AGAINST THE ALLERGAN AND TEVA DEFENDANTS

4822-2843-6939.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT .........................................................................................................................4

    A. Allergan's and Teva's Responses Make Clear that They Failed in Their Affirmative Duty to Search for and Produce the Audit Report ..............................4

        1. Allergan's "Exhaustive Search" Was Plainly Insufficient .........................4

        2. Allergan's Attempt to Shift Its Burden, and the Blame, Should Not Be Countenanced ....................................................................................7

        3. Teva Relied on Allergan, Knowing It Did Not Have a Full Set of Relevant Custodial Documents ................................................................8

    B. Defendants' Summary Judgment Opposition Demonstrates that Plaintiffs Were Significantly Prejudiced by Defendants' Failures .......................................10

    C. Allergan Finance Maintained the Broken System ................................................11

    D. The Requested Sanctions Are Appropriate ...........................................................12

III. Conclusion ..........................................................................................................................13

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Doe v. Lexington-Fayette Urban Cnty. Gov't*,
    407 F.3d 755 (6th Cir. 2005) .............................................................................. 7, 9, 11, 13

**I.**     **INTRODUCTION**

In 2011, outside auditors found that Watson Pharmaceuticals, Inc. ("Watson"), now known as Allergan Finance, LLC ("Allergan Finance"), had used an outdated and inadequate Suspicious Order Monitoring ("SOM") system for more than a decade.  Despite that finding, the outdated and inadequate system remained in place for at least another five years, as Watson renamed itself Actavis, Inc., and as Actavis, Inc. renamed itself Allergan Finance.  Among other findings, the 2011 audit detailed that Watson closed its eyes and thereby failed to identify suspicious orders from its two biggest customers and instead shipped those orders.  ECF No. 3443-1 at 9. Other findings made clear the system was "contributing to drug abuse" in communities throughout the United States.  *Id*.

Neither Allergan nor Teva produced the audit report.[1]  The only plausible explanation for their failure to do so is that they sought to hide its damning conclusions from Plaintiffs, including the CT1 Plaintiffs, whose case proceeded and ultimately settled against both Allergan and Teva without the benefit of the audit report. In doing so, they hid the report also from the Court.  Allergan and Teva should no longer be able to assert that the SOM system evaluated by the 2011 audit report complied with applicable law or that they had a reasonable or good faith basis for believing that it did.  The audit report makes clear that Watson was specifically informed its SOM system was not in compliance with the CSA.

Allergan's and Teva's responses make clear that fact discovery in CT1 was significantly limited by Allergan's and Teva's failures and misrepresentations to Plaintiffs and the Court.  These errors were prejudicial and willful, in bad faith, and/or certainly the fault of Allergan and Teva, such that they warrant the reopening of fact discovery into the "missing" report and Defendants' knowledge thereof.  It is notable that Allergan has taken the position in other litigation, including, but not limited to, proceedings in cases remanded from this MDL, that their CT1 production suffices

---

[1]     The Allergan and Teva Defendants are the same as defined in Plaintiffs' Motion for Sanctions Against the Allergan and Teva Defendants (ECF No. 3443) ("Motion").

- 1 -

4822-2843-6939.v1

to meet their discovery obligations in those cases. That position is not tenable in light of the discovery of this highly material document that they failed to produce. ECF No. 3443-12.

Allergan's and Teva's joint obligations to produce this document have been outstanding for more than a year. In 2018 and 2019, Allergan and Teva were compelled multiple times to produce the document themselves or to obtain it from Cegedim/IQVIA, yet both failed to do so. Only after Plaintiffs sought the report themselves from Cegedim/IQVIA was it produced, just over a week after Plaintiffs raised the issue directly with Cegedim/IQVIA.

Defendants made numerous statements in opposition to Plaintiffs' summary judgment motion that directly contradicted the audit report's findings, and the CT1 Plaintiffs settled without the benefit of the audit report's findings. The audit report shows that Defendants made misrepresentations to the Court and to Plaintiffs at summary judgment. And the gravity of the report's findings make it difficult to believe that only one person at Teva and Allergan received the document and that person never circulated the report to others, as Allergan's brief implies.

In light of their inability to counter the audit report's damning conclusions, Allergan's and Teva's responses to Plaintiffs' motion seek to rewrite history by describing it as merely a benign assessment of the SOM system. Allergan seeks to mitigate it's non-production by describing the report as merely an "'assessment' of Watson Pharma, Inc.'s SOM system by an outside vendor … pitching its services to perform additional consulting work." ECF 3469 at 1. Teva describes it as carrying "little to no weight" and characterizing it as "just one document" that "merely contains the view of one outside company that had a commercial interest in obtaining a contract with Watson Pharma to create a new SOM system as a paid consultant." ECF No. 3443 at 13. But in 2019, Special Master Cohen described the Cegedim/IQVIA audit reports at issue as "a thorough analysis of [defendants'] Suspicious Order Monitoring System and recommendations on 'corrective actions' that can make [defendants] more 'compliant' with government requirements." ECF No. 1498 at 1 (Discovery Ruling 14, Part 5) ("DR 14-5"). Defendants cannot change history. Further:

4822-2843-6939.v1

- In his orders compelling production of the audits, Special Master Cohen never limited the scope of Defendants' required search to previously-retrieved sets of documents, and in response to Discovery Ruling No. 15 Regarding IQVIA Discovery (ECF No. 1375) ("DR 15"), Allergan told Plaintiffs that it "conducted an exhaustive search" for the audit and could not find it. ECF No. 3443-7. Now Allergan has admitted its "exhaustive search" consisted of running nine search terms and an e-mail address over the same set of documents previously collected and searched, and asking one person "for her views on where to search for" the report. ECF Nos. 3469 at 2, 4-5; 3443-7 at 1. Notably, Allergan does not state it searched the files of Scott Soltis ("Soltis"), who received the report, or of the nine other people who attended the meeting with Buzzeo. Teva avers that it searched in numerous places, but it makes clear *for the first time* in over two years of discovery in this MDL that it has never had full access to the files of the key person at issue: Thomas Napoli ("Napoli"), who received the report via e-mail. In 2019, Allergan represented to Plaintiffs that it had "asked IQVIA if it maintained a copy of this report; *they did not*." ECF No. 3443-7.[2] But several weeks ago, Plaintiffs sought the document directly from IQVIA, and notwithstanding Allergan's representations that the report no longer existed, IQVIA produced the report in just over a week. ECF No. 3443 at 5.

- Allergan contends it should not be responsible for the report's non-production or the conclusions made in the report because the SOM system belonged to a subsidiary that it sold to Teva in 2016. ECF No. 3469 at 1. Yet, Allergan ignores that its own document shows the "Corporate Standard Operating Procedure" was issued by Watson – an Allergan defendant group member now known as Allergan Finance, which was never sold to Teva. *See* ECF No. 3443-12. Teva is silent on this issue.

The inculpatory nature of the report that was so damning of Watson's SOM system no doubt explains why both Allergan and Teva would not want the Plaintiffs and the Court to see it. For it not to have been produced must be because either one or both Defendants' destroyed it or intentionally failed to produce it while in their possession. Cegedim sent the report to at least two Watson employees in September 2011; and, after the report was issued, Watson retained Cegedim to assist it in designing a new, compliant SOM system that was ultimately not implemented. Allergan says it can't find the document in one of their custodian's files and has still not searched the files of the other. Regardless, it is illogical to conclude that such an important and damning report was never shared with other employees.

---

[2]   Emphasis is added and internal citations omitted, unless otherwise noted.

- 3 -

Further, Allergan and Teva had access to the report, through IQVIA, and had a duty to seek and produce it under DRs 14-5 and 15. Even after DR 14-5 and DR 15 were issued, Defendants were directed by the Court on multiple occasions to either produce their SOM audits directly to Plaintiffs or to provide them to Special Master Cohen for in camera review (if privilege was being claimed). *See e.g.*, Exs. 1 at 56:11-15; 2 at 29-30.[3] Yet, these Defendants failed to do so while making arguments directly contradicted by the report in opposition to summary judgment. ECF No. 2181 at 45-48. This is yet another instance of these Defendants' continued efforts at obfuscation and delay in discovery in this case.[4] The Court should not countenance these obstructive tactics.

## II.    ARGUMENT

### A. Allergan's and Teva's Responses Make Clear that They Failed in Their Affirmative Duty to Search for and Produce the Audit Report

Allergan and Teva both ignore in their responses that they were under a specific duty to "produce to plaintiffs information and documents over which they had control related to the consulting work IQVIA performed." *See* ECF No. 3443 at 9-10 (quoting DR 15). While both previously represented that they had searched "exhaustively" for the document, their briefs demonstrate those representations were false.

#### 1.    Allergan's "Exhaustive Search" Was Plainly Insufficient

Recognizing the importance of these reports, Special Master Cohen compelled Defendants to "produce to plaintiffs ***information and documents over which they had control*** related to the

---

[3]    References to "Ex." are to the exhibits attached to the Declaration of Evan M. Janush in Support of Plaintiffs' Reply in Support of the Motion for Sanctions Against the Allergan and Teva Defendants, filed concurrently herewith.

[4]    Allergan refused to produce any documents relating to generic opioids until this Court compelled it to repeatedly. *See e.g.* ECF No. 762 (Discovery Ruling No. 3); ECF No. 989 (Discovery Ruling No. 4) ("DR 4"). Similarly, Allergan to produce documents for any entities other than Allergan Finance, LLC and refused to identify its current and former subsidiaries that were involved in the manufacture, sale, or marketing of opioids, prompting another order compelling it to participate in such discovery. ECF No. 1377 at 2. The Court also was forced to compel Allergan and Teva to produce documents on jurisdictional discovery. *See, e.g.*, ECF No. 1512 ("Ruling Regarding Jurisdictional Discovery on Defendants Allergan, Teva, and Mallinckrodt").

4822-2843-6939.v1

consulting work IQVIA performed." DR 15.  Special Master Cohen never limited the scope of Defendants' required search to previously-established custodians or locations, and never said the search could be limited to previously-used search terms.

In April 2019, Allergan's counsel told Plaintiffs that the Company had "conducted an exhaustive search" for the audit but did not find it. ECF No. 3443-7. They further stated, "Allergan has also asked IQVIA if it maintained a copy of this report; ***they did not***." *Id*.  In fact, IQVIA did. When Plaintiffs asked for details of the "exhaustive search," Allergan refused to provide them, denying that the "allegedly missing Buzzeo report – which (to the extent it ever existed) would now be approximately 8 years old – was 'destroyed'" and calling any inquiry into the search for it "wholly inappropriate."  ECF No. 3469-9 (Declaration of Karl Stampfl in Support of Allergan Defendants' Opposition to Plaintiffs' Motion for Sanctions ("Stampfl Decl."), Ex. 5 at 5-6). It could only be "wholly inappropriate" because it was so highly relevant to Plaintiffs' case.

Allergan now states that its "exhaustive search" consisted of simply running nine search terms over previously collected and searched document groups. ECF Nos. 3469 at 5; 3443-7 at 1.[5] Yet, one pair of the terms that Allergan required to appear in every document ("suspicious" and/or "SOM") were already part of the "Teva" generic terms that Special Master Cohen ordered Allergan to run as part of DR 4 at 3; *See* Ex. 3 at 12 (listing "suspicious" and "SOM" as search terms).[6]  As those two terms were already required to appear in every search result for documents previously delivered to Plaintiffs, few new documents could have been retrieved pursuant to this purportedly

---

[5]  The brief's recitation does not state when the searches took place or who undertook them, and the assertions it does make are unsupported by any evidence. *Id.*

[6]  Discovery Ruling Four required that "[t]he search terms Allergan must use related to discovery of generic opioids shall be the same as those negotiated between counsel for Plaintiffs and Teva; there will be no separate negotiation of search terms between different counsel for Plaintiffs and Allergan." DR 4 at 3.

"exhaustive" search – and Allergan knew it.[7]  Allergan also states that it searched for documents containing the Cegedim representative's e-mail address (robert.williamson@cegedim.com).  ECF No. 3469 at 5.  Yet, as Allergan notes, that address does not appear in the audit report itself; it is only on the "cover email."  *Id*.  So, if the audit report were attached to a new e-mail and sent internally at Allergan, the e-mail address search would find nothing.  Allergan also asserts that it asked only ***one*** person – current employee Mary Woods ("Woods"), who worked on SOM issues and was a 30(b)(6) witness – "for her views on where to search for" the audit report.  ECF No. 3469 at 2, 4-5.[8]  Woods suggested they look in Napoli's files.  *Id*.  When nobody found it in Napoli's files, Allergan stopped looking.

Allergan's narrative shows that nobody ever asked Napoli, who received the report, where a copy would be.  Although Allergan laid off Napoli when it sold its generic lines to Teva, Allergan's counsel represented him during his deposition in this action and his testimony demonstrates he was willing to cooperate with his former employer, having participated in a "call with counsel and Mary Woods" to provide "procedural clarifications from when we administered the SOMS program" before Woods' 30(b)(6) deposition in January 2019.  Ex. 5 at 90-91.  Allergan's failure to ask the report's recipient – a key witness for Allergan in CT1 – where a copy of the Cegedim report was

---

[7]  Allergan states that the three searches it ran included: "('Buzzeo' or 'BuzzeoPDMA' or 'Cegedim' or 'Dendrite' or 'IQVIA') and ('SOM' or 'SOMS' or 'suspicious')"; "'Buzzeo*,' 'Cegedim*,' 'SOM*' and 'suspicious'"; and "(Cegedim OR Buzzeo OR BuzzeoPDMA OR Dendrite) AND (audit OR assessment OR review) AND (SOM OR SOMS OR Suspicious)."  ECF No. 3469 at 5.  Under those Boolean phrases, the words "SOM" and/or "suspicious," will appear in every document in the results.  The resulting documents would be limited to those that included as well as one or more of the other terms, so those documents would already have been produced.  Allergan has never previously shared these search terms with Plaintiffs.

[8]  In its year-end 2014 Annual Report, Allergan stated, "[a]s of December 31, 2014, we had approximately 21,600 employees.  Of our employees, approximately 2,070 were engaged in R&D, 7,600 in manufacturing, 2,400 in quality assurance and quality control, 8,580 in sales, marketing and distribution, and 950 in administration."  Ex. 4 at 24.

4822-2843-6939.v1

located refutes any claim that Allergan's counsel was diligent or responded to discovery in good faith compliance with the Civil Rules.

Further, Allergan notes that it produced "meeting minutes" from the September 8, 2011 audit meeting that led to the report. ECF No. 3469 at 4 n.6 (citing ECF No. 3443-11). These minutes demonstrate the insufficiency of Allergan's search: aside from Napoli and Woods, Allergan apparently did not ask any other of the ten identified meeting attendees if they received a copy of the audit report.[9] Like Woods, a number of the attendees continue to work at Allergan or transferred to Teva with the generic opioids business. Among others, the minutes identify Soltis, who Napoli said "executive director of securit[y] and DEA affairs." Ex. 5 at 140. We now know that Soltis, too, received a copy of the audit report directly from Cegedim. It is stunning that Soltis's files were apparently not searched by either Allergan, where he was employed when he received the audit report, or Teva, where he was employed after he left Allergan in 2017.

Given Allergan's anemic search, it is unsurprising that it failed to find the report. This more than meets the requirement of a "'failure to cooperate in discovery is due to willfulness, bad faith, or fault'" under *Doe v. Lexington-Fayette Urban Cnty. Gov't*, 407 F.3d 755, 766 (6th Cir. 2005).

### 2. Allergan's Attempt to Shift Its Burden, and the Blame, Should Not Be Countenanced

Having failed to perform its duty, Allergan blames others, arguing that "IQVIA's delay in locating and producing the report had nothing to do with Allergan." ECF No. 3469 at 3. Allergan's counsel claims to be "startled" that Plaintiffs did not discuss an IQVIA "error" that initially delayed production of the document discussed in an August 25, 2020 letter. *Id.* This is another prevarication. It was Plaintiffs that identified the "error" to IQVIA in the first place. Plaintiffs' counsel Evan Janush wrote to IQVIA seeking the 2011 audit report and noting the possibility that,

---

[9] The listed attendees beyond Napoli and Woods include "Scott Soltis, . . . Larry Schaffer, Justin Park, Laura Pinti, Sandra Simmons, Lisa Scott, Lynn DaCunha, Jaydeep Shukla, Rick Robbins [and] Napoleon Clarke." ECF No. 3443-10.

4822-2843-6939.v1

"during a de-duplication process or due to some other production issue, IQVIA's DR-15 production may have inadvertently removed or otherwise failed to capture the initial email in this string, together with the attached SOM report."  ECF No. 3466-1.

This is what IQVIA now says occurred, and IQVIA's declaration makes clear that Plaintiffs, not Allergan or Teva, raised the issue.  Although the Court had compelled Allergan and Teva to seek the document, they sat on their hands and did nothing to cure the problem in IQVIA's production.  Absent Plaintiffs' diligence in working with a third party for a document Allergan and Teva were required to produce, the audit report would have remained hidden, and Allergan and Teva would still be benefiting from its absence.

IQVIA's "error" does not absolve Allergan from failing to undertake adequate internal searches for the document, nor does it not absolve Allergan from failing to follow up adequately with IQVIA per the Court's order.  Defendants should have run the issue to ground with IQVIA.  They didn't.

### 3. Teva Relied on Allergan, Knowing It Did Not Have a Full Set of Relevant Custodial Documents

Teva's brief makes clear that it did very little to find the document itself.  Teva asserts that: (1) Allergan controlled Napoli's custodial documents; (2) Teva's lawyers were only allowed to review Allergan-controlled custodial documents that hit on agreed search terms; and (3) Teva's review of such documents occurred only after Allergan removed documents for privilege.  ECF No. 3466 at 4.  Teva further explains its counsel looked for the audit report in the documents that Allergan provided but did not find the report.  *Id.*

This is concerning.  Throughout the course of the CT1 litigation – and now in other bellwether cases – Allergan's counsel has repeatedly represented that "non-custodial data for generics, and most relevant custodial data for generics, was transferred to Teva in connection with

the [2016 acquisition]." *See* Ex. 6 at 3; *see also* DR 4 at 2 ("most of these documents" relating to Allergan's generics business "were transferred to Teva").[10]

Teva's assertion that plaintiffs "inappropriate[ly] attempt to seek sanctions" against entities that were "not even named as defendants or required to produce anything in Track One" (ECF No. 3466 at 1 n.2) is equally concerning because it is wrong. These entities Teva is referencing – Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc., f/k/a Watson Laboratories, Inc.-Salt Lake City; and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida – were named as defendants in CT1 (ECF No. 1466) after Allergan finally identified them for Plaintiffs pursuant to a Court order (ECF No. 1377 at 2). Ex. 7 at 2. Allergan's counsel further represented to Plaintiffs that "none of these entities were excluded from the discovery process." *Id.* In other words, Allergan said that the generic entities transferred to Teva participated fully in discovery, but Teva now says they did not. These statements cannot be reconciled and are further support for reopening fact discovery.

Last, Teva contends that, in addition to searching document sources agreed to by the parties, it searched additional sources available to it "in which one could reasonably expect to locate the SOM Assessment." It vaguely references various custodial files and folders it searched; but, like Allergan, nowhere does it state that it searched the custodial files of the audit meeting attendees.

Given its incomplete searches in cherry-picked custodial files, Teva, like Allergan, failed to meet its obligation to produce the audit report. This "willfullness" is sanctionable under *Doe*, 407 F.3d at 766.

---

[10]   Clearly, this raises concerns not only regarding the scope of Teva's search, but regarding the veracity of Allergan's representations.

### B. Defendants' Summary Judgment Opposition Demonstrates that Plaintiffs Were Significantly Prejudiced by Defendants' Failures

Allergan asserts that it should not be held responsible for its actions because even if the audit report was withheld from production, Plaintiffs "had documents summarizing the report's key findings and conducted discovery about them." ECF No. 3469 at 4. Teva similarly asserts that there can be no prejudice because Plaintiffs "obtained deposition testimony about the SOM Assessment and presentations and materials describing the document." ECF No. 3466 at 10. These assertions are false.

As Plaintiffs explained in their opening brief, the "summaries" Allergan wants to substitute for the original, unproduced audit report omit some of the most damning findings including that:

- The "***SOM system [was] inconsistent with the specific requirements noted in the regulations and with written guidance provided by the DEA*** to all registrants."

- Orders from distributors McKesson and AmerisourceBergen were "***frequently approved by staff simply because [the customer's] inventory is low***," making the SOM system "'***self gaming***'" and useless.

- The Company ***never made "actual warehouse visits"*** or had investigations performed to confirm their new customers' statements about the legitimacy and security of their programs.

- The Company disregarded data showing "to whom their customers are selling," thereby "unwittingly ***contributing to drug abuse*** in a locality or through a method of sales and distribution" it could not otherwise see.

ECF No. 3443 at 7-8.

Since Plaintiffs did not know about these specific findings, they were hamstrung in their ability to question Napoli "about the report and its findings," as Allergan contends they should have done. ECF No. 3469 at 1. Moreover, Allergan opposed Plaintiffs' motion for summary judgment by making arguments inconsistent with the specific findings of which Plaintiffs were unaware. Allergan boasted that its SOM system "frequently flagged orders . . . that were only 25% or 50% above the customer's historical average" and accused Plaintiffs of "ignor[ing] evidence" about the

4822-2843-6939.v1

system's use of "downstream customer" data.  ECF No. 2181 at 46.[11]  Allergan asserts that proposed replacement was just "'an effort to enhance our already compliant [SOM] system'" and that the antiquated process of allowing "orders to be shipped based on internal justification" was "immaterial to whether the systems were legally compliant."  *Id*. at 45-48.  Those assertions are directly contradicted by the audit report.

Now, both Allergan and Teva are silent as to the manner in which the audit report directly contradicts their earlier representations.  That is because the audit report details how dramatically false or misleading these assertions were.  ECF No. 3443 at 8.  Instead, both Allergan's and Teva's briefs ignore the statements made in their summary judgment briefs.  Plaintiffs in CT1 reached a settlement with Allergan before the Court ruled on the motion for summary judgment, and absent the additional certainty Plaintiffs would have had regarding the insufficiency of Allergan's SOM system had the audit report been timely produced.  Plaintiffs were clearly "'prejudiced by [Allergan and Teva's] failure to cooperate in discovery,'" meeting *Doe* factor two.  *Doe*, 407 F.3d at 766.

        **C.**    **Allergan Finance Maintained the Broken System**

Finally, and crucially, Allergan wrongly asserts that it cannot be held responsible for the disastrous SOM system it kept in place for more than a decade because the contract with the SOM auditors was nominally between the auditors and a subsidiary Allergan later sold to Teva.  ECF No. 3469 at 1 n.1.  Allergan cites no law to support this assertion, and the evidence demonstrates the contrary is true: present-day Allergan is itself liable for SOM system liabilities for the time period before it sold its generic opioids portfolio to Teva.  Indeed, Allergan represented that it transferred to

---

[11] The opposition to Plaintiffs' motion for summary judgment was filed on behalf of the Allergan Defendants, the Teva Defendants, and numerous other defendants.  *Id.*

- 11 -

Teva "most relevant custodial data for generics"; apparently, Napoli's custodial file was not sufficiently relevant to be transferred. *See supra* at §II.A.3.[12]

As set forth above, Watson is now known as Allergan Finance. Long before Allergan sold its generic opioid business to Teva, Watson created a single, uniform SOM system across its entire operation that was developed, and it operated that system at the enterprise level. Woods, Allergan's corporate designee, made clear that the Procedure "is filed with the entire corporation. It is a high-level procedure regarding suspicious orders of controlled drugs." Ex. 8 at 117:3-14. Allergan's response wholly ignores that "Watson Pharmaceuticals, Inc." – *i.e.*, Allergan Finance – maintained the "Corporate Standard Operating Procedure" regarding "Suspicious Orders of Controlled Drugs" that is at issue in this motion. *See* ECF No. 3443 (quoting ECF No. 3443-12). The unrebutted evidence undermines Allergan's attempt to slough off liability for its deficient SOM system.

### D. The Requested Sanctions Are Appropriate

The Court has repeatedly had to prod Allergan and Teva into cooperating with discovery in this action. From the inappropriate and artificial "generics vs. brand" separation the Court had to untangle in DR 4 to Allergan and Teva's refusal to participate in discovery relating to their purported jurisdictional defenses (ECF No. 1377) and the various episodes in between, the Court has repeatedly needed to force the companies to comply with properly served discovery. Now, it is clear that even after being compelled to produce and/or seek out documents from others, (*See* ECF No. 3443 at 9-10) these Defendants did less than the absolute minimum to comply. Only when Plaintiffs, themselves, went around Defendants and sought the document was it produced. *See* ECF No. 3443 at 10-12. And it was produced in just over a week after it was sought. *Id.*

---

[12] Teva now avers it never even took custody of the full Napoli custodial file, instead receiving portions that Allergan decided were relevant and non-privileged. ECF 3466 at 3-4 ("After performing an initial review to identify and remove privileged documents, Allergan sent the remainder of the documents that contained search terms and their family members – and only those documents – to the Teva Defendants for review and production.").

These repeated failures and their failures to cooperate in discovery were not by chance. And Plaintiffs suffered harm because of them. ECF No. 3443 at 12. The Court should not countenance activities like these, and the sanctions sought, all of which are non-monetary, will correct the inappropriate actions taken. *Doe*, 407 F.3d at 766. It remains to be seen, subsequent to a hearing, whether non-monetary sanctions are also warranted.

### III. Conclusion

For the above-stated reasons, and the reasons stated in their opening brief, Plaintiffs seek sanctions as described in the Motion. Plaintiffs respectfully request the Court schedule a hearing on these matters at the Court's first convenience.

Dated: September 21, 2020      Respectfully submitted,

*/s/ Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY LLC
112 Madison Avenue, Seventh Floor
New York, NY  10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

*/s/ Joseph F. Rice*
Joseph F. Rice
MOTLEY RICE
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL LAW
422 Ninth Street
Huntington, WV  25701
(304) 654-8281
paul@farrell.law

*Plaintiffs' Co-Lead Counsel*

- 13 -

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

- 14 -

4822-2843-6939.v1

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of September, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF System.

    *s/ Peter H. Weinberger*
    PETER H. WEINBERGER
    *Plaintiffs' Liaison Counsel*

4822-2843-6939.v1