**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*The Track Three Cases* | **MDL No. 2804**<br><br>**Case No. 17-md-2804**<br><br>**Judge Dan Aaron Polster** |

**OBJECTIONS TO ORDER REGARDING
PERSONAL JURISDICTION DISCOVERY OVER RITE AID CORPORATION**

Pursuant to the Appointment Order (Doc. 69) and Federal Rule of Civil Procedure 53(f)(2), Rite Aid Corporation ("RAC") and Rite Aid Hdqtrs. Corp. ("RAHC") (collectively, "Rite Aid") respectfully file these objections to Special Master Cohen's September 8 Ruling Regarding Jurisdictional Discovery of Rite Aid Corp. (the "Order") (Doc. 3457).

Special Master Cohen's Order permits Track 3 Plaintiffs to engage in intrusive and exceptionally burdensome discovery regarding a theory of personal jurisdiction that is both unpleaded and impossible for Plaintiffs to satisfy; dramatically expands the scope of this Court's previous rulings regarding jurisdictional discovery; requires Rite Aid to produce far more jurisdictional discovery than has been produced by any other defendant; and orders Rite Aid to respond to ambiguous requests that are vastly disproportionate to the needs of the case.

It is no accident that Plaintiffs have not pleaded an alter ego theory.  They could not plausibly plead such a theory in good faith.  As Rite Aid has repeatedly reiterated, Rite Aid Corporation is a holding company, nothing more.  Rite Aid Corporation has no bank accounts, no employees, and no money with which it could have paid employees.  These are objective, indisputable facts.  Rite Aid Corporation (1) has a Board of Directors and (2) owns subsidiaries. That is all.

Because Rite Aid Corporation is a holding company, the alter ego factors are facially inapplicable.  For example, Rite Aid Corporation could not possibly have "siphoned corporate funds" from Rite Aid Hdqtrs. Corp. because Rite Aid Corporation has no funds.  Because Rite Aid Corporation's only assets are the ownership of the subsidiaries, there is no suggestion that Rite Aid Hdqtrs. was undercapitalized or insolvent.

Given these facts, Plaintiffs cannot plead an alter ego theory in good faith, and they should not be permitted to take discovery on this unpleaded and meritless theory.  Plaintiffs have identified no case—ever—in which a pure holding company was held to be an alter ego of a subsidiary based on oversight engaged in by its Board of Directors.  There is no serious possibility that Plaintiffs can satisfy the high bar required to pierce the corporate veil.  This Court should reverse the Special Master's Order regarding jurisdictional discovery, dismiss Rite Aid Corporation for lack of personal jurisdiction, and allow counsel to focus on the upcoming Track 1-B trial.

## Background

Rite Aid Corporation is a corporation "organized under the laws of Delaware" with "its principal place of business in Pennsylvania."  Doc. 3042-2 ¶3.  "RAC is a holding company with no operations other than those related to its status as a holding company."  Doc. 3042-2 ¶4.  "RAC has no offices, facilities, assets, income, employees, or operations in Ohio, and RAC does not manufacture, distribute, or dispense opioids in Ohio or elsewhere."  Doc. 3042-2 ¶4.

More than six months ago, this Court defined the scope of jurisdictional discovery regarding RAC as part of the Track 1 proceedings.  RAC was first named as a defendant in the Track 1 Amended Complaints in May 2018.  RAC then filed a motion to dismiss for lack of personal jurisdiction, and without responding, the Track 1 Plaintiffs voluntarily dismissed RAC.  Doc. 622.

RAC was named as a defendant again in the Track 1-B amendments by interlineation on November 20, 2019.  Docs. 2493-94.  RAC again filed a motion to dismiss for lack of personal jurisdiction.  Doc. 3042.  The motion to dismiss was supported by the declaration of Ronald S. Chima.  Doc. 3042-2.

Plaintiffs did not respond to RAC's motion to dismiss.  Instead, they sought jurisdictional discovery.  In an email to counsel for RAC and in a teleconference with the Special Master on February 20, 2020, Plaintiffs pointed to a RAC Board of Directors report on opioid oversight and argued that RAC could be subject to personal jurisdiction in Ohio because RAC's Board of Directors (acting out-of-state) created corporate policies concerning opioid dispensing and risk oversight that allegedly caused an impact in Ohio.  Ex. 1. As Rite Aid explained (and Plaintiffs' counsel now apparently concede), this "policies" theory of personal jurisdiction is meritless—the Supreme Court has expressly rejected the proposition that out-of-state acts can give rise to specific personal jurisdiction merely because they have an in-state effect.  *Walden v. Fiore*, 571 U.S. 277 (2014).  Nor is it factually accurate—any policies were created by RAHC, not RAC.

This Court and the Special Master permitted jurisdictional discovery over RAC (and set the scope of the discovery) in rulings in February and March 2020.  On February 12, 2020, the Special Master stated in an email that "Plaintiffs will be allowed to take jurisdictional discovery" but suggested that "the necessary discovery need not exceed a small handful of depos and interrogatories."  Ex. 2.

Far from the "small handful of depos and interrogatories" envisioned by the Special Master, counsel requested broad discovery, including the custodial files of every member of RAC's Board and the files of numerous RAC and RAHC committees and subcommittees from

3

2006-2020, Ex. 1, but Plaintiffs' counsel did not seek any discovery based on an alter ego theory or seek any discovery purportedly based on the Chima declaration.

When the parties met and conferred, and when they presented their positions to Special Master Cohen, Plaintiffs' counsel continued to seek discovery based only on (the meritless) theory regarding RAC's purported development of policies.

Over RAC's objections, this Court ordered jurisdictional discovery.  *See* Order Regarding Jurisdictional Discovery of Rite Aid Corp., Doc. 3180.  This Court "adopted and incorporated" the earlier order regarding jurisdictional discovery of Teva and other manufacturer defendants. Doc. 3180, at 2.  With respect to document production, this Court ordered RAC to produce essentially the same categories of documents it required the manufacturers to produce: (i) corporate organizational charts; (ii) policies regarding branding, marketing, sales, promotion, distribution, dispensing, regulatory affairs, and pharmacovigilance, to the extent they apply to opioids; (iii) policies regarding corporate management to the extent such policies bear on opioid-related subsidiaries; and (iv) annual reports.  *Id.* at 2-3.  Additionally, the Court ordered RAC to produce documents in response to "the requests for productions made in Mr. Weinberger's [February 14] e-mail." *Id.* at 3.

RAC responded to the discovery ordered by the Court on April 3, 2020.  The parties scheduled a meet and confer to discuss RAC's responses for April 14, but before counsel could meet and confer the amendments that had added RAC to Track 1-B were struck and the personal jurisdiction issues in Track 1 became moot.

Personal jurisdiction arose again in Track 3, when RAC was named as a defendant in the amended complaints filed on May 15, 2020.  The Track 3 complaints make no allegations at all regarding the conduct of RAC, other than the conclusory allegations that Rite Aid's "practices and

procedures" for distributing and dispensing opioids were "established by Rite Aid Corporation" and that Rite Aid of Ohio, Inc. operated pharmacies in the Track 3 jurisdictions "on behalf of its parent company Rite Aid Corporation."  *See* Lake County Am. Compl. ¶ 44.

On June 5, 2020, the Court entered the Track 3 Case Management Order.  Doc. 3325.  The CMO directed the parties to meet and confer "to discuss whether and the extent to which jurisdictional discovery may be necessary" and mandated that jurisdictional discovery "shall incorporate the reasoning set out in the Court's order [] at docket no. 3180," *id.* at 2, the previous Track 1-B order regarding jurisdictional discovery of RAC.

On June 16, 2020, RAC moved to dismiss the Track 3 complaints for lack of personal jurisdiction.  Doc. 3339.  The motion was supported by the same declaration submitted in support of the motion to dismiss in Track 1-B.  Doc. 3339-2.

After the Track 3 complaints were filed, RAC and Plaintiffs' counsel[1] resumed meeting and conferring on issues related to RAC's responses to the previously-ordered jurisdictional discovery.  Track 3 Plaintiffs (despite not being the parties that sought the discovery) filed a motion to compel, to which Rite Aid responded.

On June 23, without leave of this Court or the Special Master—and without meeting and conferring as the CMO requires—Plaintiffs' counsel served new jurisdictional discovery on RAC and RAHC.  Ex. 3; Ex. 4.  In the cover email Plaintiffs' counsel claimed the requests were justified because in a footnote to its motion to dismiss, RAC noted that some RAHC documents were

---

[1] Because the Track 1 and Track 3 plaintiffs are represented by the same counsel and because the cases are consolidated in this MDL for pre-trial proceedings, neither Rite Aid nor Plaintiffs' counsel distinguished between discovery served on behalf of different plaintiffs.  As detailed below, the Special Master's approach—which permits Plaintiffs' counsel to assert different jurisdictional theories and seek different discovery on behalf of different plaintiffs—is inconsistent with the parties' approach and the consolidation of matters in the MDL for pre-trial discovery.

mislabeled as RAC documents (an issue long known to Plaintiffs' counsel), see Doc. 3339-1 at 5 n.5, so Plaintiffs demanded "discovery to explore whether Rite Aid Headquarters Corp is really the alter ego of RAC."  Ex. 5, P. Weinberger Email to Rite Aid, 6/23/20.

These requests exceeded the scope of jurisdictional discovery previously allowed by the Court and the Special Master—as to RAC or any other defendant—and are untethered to any issue involving misidentification of documents.  The broad requests sought a broad but ill-defined scope of documents, including, for example, "All documents relating to the nature and extent of RAC's relationship with" RAHC and numerous other Rite Aid entities (RFP No. 1);  "All Documents relating to the identities, formation, and role of RAC's subsidiaries" (RFP No. 3); "All Documents relating to RAC's finances" (RFP No. 5); and "all documents relating to RAC's relationship with Rite Aid pharmacies."  (RFP No. 7).  The requests to RAHC mirrored the requests to RAC and are equally sweeping.  Rite Aid filed a motion for a protective order.

On September 8, Special Master Cohen issued a combined Ruling Regarding Jurisdictional Discovery of Rite Aid Corp., addressing both the motion to compel and motion for a protective order.  Doc. 3457.  The Special Master ordered RAC and RAHC to answer these broad requests, including requests for documents containing highly confidential corporate materials—such as documents of RAC's Board of Directors—without redactions of confidential (and irrelevant) materials unrelated to opioids.  *Id*.

This facially overbroad, excessively burdensome fishing expedition into a company's highly sensitive corporate documents and finances cannot be justified, particularly on an unpleaded and facially meritless theory of personal jurisdiction.  Rite Aid respectfully objects to this Court.

## Argument and Analysis

**I.**     **The Special Master Erred by Ordering Discovery That Exceeds the Jurisdictional Discovery Permitted Against Any Other Defendant and That Is Inconsistent with this Court's Previous Orders.**

This Court has already determined the scope of jurisdictional discovery of RAC.  Doc. 3180.  This Court reaffirmed that the initial Track 1 rulings applied to all personal jurisdiction disputes when it "adopted and incorporated" the legal standards "for allowing jurisdictional discovery and determining its appropriate scope" set out in the Special Master's order on jurisdictional discovery of Allergan, Teva, and Mallinckrodt.  Doc. 3180, at 2-3 (adopting Doc. 1512).  Based on those standards, when this Court first considered the issue in Track 1-B, it ordered RAC to produce the same categories of documents it previously required the manufacturer defendants to produce (except that the Court did not order RAC to produce tax returns or policies regarding accounting).  *Id.*  The Court found this discovery was "consistent with" the jurisdictional discovery factors a court should consider when determining whether a parent company is subject to jurisdiction.  *Id.* at 3 n.1 (citing *Anwar v. Dow Chem. Corp.*, 876 F.3d 841 (6th Cir. 2017)).  In the Track 3 Case Management Order, this Court directed parties to "incorporate the reasoning set out in the Court's order [Doc. 3180]" when discussing any Track 3 jurisdictional discovery.[2]  Doc. 3325, at 2.

The Special Master erred by disregarding the earlier ruling and permitting Plaintiffs to serve broad requests for additional discovery.  The only analysis of the Track 3 CMO and this Court's earlier ruling is in a footnote, stating that "[n]othing in this language . . . limited Plaintiffs' ability to propound additional jurisdictional discovery."  Order at 16 n.16.  It is true that the CMO did not expressly bar Plaintiffs from seeking additional discovery, but in its previous ruling, this

---

[2] As the Special Master acknowledged (at 16 n.16), Plaintiffs violated the Track 3 CMO by failing to meet and confer before seeking additional jurisdictional discovery.

Court determined the appropriate scope of jurisdictional discovery (based on the still earlier ruling regarding the Allergan, Teva, and Mallinckrodt).  Disturbing these settled rulings—which this Court directed the parties to follow in Track 3 jurisdictional discovery—and dramatically expanding the scope of jurisdictional discovery required far more than noting that these rulings did not expressly bar additional requests.

The Special Master's primary justification for ordering expansive new discovery was that that Track 3 Plaintiffs' "theory of personal jurisdiction has evolved" from what the same counsel argued in Track 1-B.  Order at 16.  Thus, the Special Master determined, Plaintiffs' counsel can, after asserting and receiving discovery on legally meritless "corporate policies" theory of personal jurisdiction, now change tack and seek jurisdictional discovery on an entirely different (albeit equally meritless) theory of "alter ego" personal jurisdiction.  *Id*.  In effect, the Special Master's approach creates a one-way-ratchet, where defendants are bound by earlier discovery rulings but each plaintiff can receive everything that previous plaintiffs received *and* make additional requests under new theories.

This approach is inconsistent with discovery in multi-district litigation.  28 U.S.C. § 1407(a).  Cases are consolidated for efficiencies in pretrial proceedings, like discovery.  It is difficult to imagine a less efficient procedure than permitting Plaintiffs' counsel to develop a new theory of personal jurisdiction over RAC (and demand new discovery) only after its case is selected as a bellwether.  Under the Special Master's approach, once Plaintiffs' counsel realize that their "alter ego" theory of personal jurisdiction is as meritless as their "policies" theory, the very same lawyers could then "evolve" their theory of personal jurisdiction again and seek new jurisdictional discovery.  This approach would destroy any efficiencies created by the MDL process.

Moreover the Track 1-B allegations against RAC (which were struck) and the allegations against RAC in Track 3 are essentially identical, and neither recites an "alter ego" theory.  Nothing has changed since this Court's previous discovery ruling,[3] and there is no reason for this Court to depart from its prior ruling on the appropriate scope of jurisdictional discovery.  The failure of the "policies" theory of personal jurisdiction is a reason for RAC to be dismissed, not a reason to allow Plaintiffs' counsel to change theories and seek sweeping new discovery.

## II.    The Track 3 Plaintiffs Failed to Establish a Prima Facie Case of "Alter Ego."

Even if the Special Master could expand the scope of jurisdictional discovery previously ordered by this Court, it erred by allowing Plaintiffs to take discovery regarding their "alter ego" theory because they have not pleaded it.

Alter ego is a theory that must be pleaded.  *See, e.g.*,  *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 323 (6th Cir. 2014) ("Plaintiffs have not pled an alter ego or piercing the corporate veil claim in their Fourth Amended Complaint and cannot now, when faced with summary judgment, assert this new theory of liability." (quoting the district court's decision being affirmed); *Trustees of Detroit Carpenters Fringe Benefit Funds v. Patrie Const. Co.*, 618 F. App'x 246, 252 (6th Cir. 2015) ("[T]he allegations in the amended complaint do not adequately plead the existence of an alter-ego operation."); *Kendall v. Phoenix Home Health Care Servs. Ltd.*, No. 2:15-CV-3009, 2016 WL 5871506, at *4 (S.D. Ohio Oct. 7, 2016) (concluding that "no alter-ego or agency relationship is adequately pled").  A motion to dismiss for lack of personal jurisdiction should be

---

[3] The Special Master's refusal (at 16-17) to consider what the Track 3 Plaintiffs "knew" is refuted by basic principles of agency.  It is axiomatic that a lawyer is the agent of the client.  *See, e.g.*, *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (internal quotation marks omitted)).  The Track 3 Plaintiffs "knew" everything that the their lawyers learned in Track 1-B—they cannot plead ignorance of the Track 1-B proceedings as an excuse to seek additional discovery.

granted when a plaintiff "has not pled sufficient information to support an alter-ego finding." *Kraemer v. WhizCut Am. Inc.*, No. 1:16-CV-2364, 2017 WL 2119342, at *5 (N.D. Ohio May 16, 2017).  Standing alone, Track 3 Plaintiffs' failure to plead alter ego against RAC requires the discovery request to be denied and the motion to dismiss to be granted.

There is a good reason that Plaintiffs did not plead an alter ego theory—they cannot plausibly plead the theory in good faith, and in their briefing, they did not make out a prima facie case of alter ego that could justify discovery on the theory (even had they pleaded it).  Plaintiffs' counsel, untethered from the pleadings, now argues that RAC is an alter ego of RAHC.  This unpled theory is not legally viable and is not grounds for additional discovery.[4]

Because RAC is incorporated in Delaware, Delaware law governs Plaintiffs' alter ego theory.  *See MA Equip. Leasing I LLC v. Tilton*, No. 2:09-CV-880, 2010 WL 11538520, at *8 (S.D. Ohio Aug. 19, 2010) (holding that "the law of the state of incorporation" governs alter ego issues, collecting cases and noting the consensus among courts).[5]

There is no serious argument that Plaintiffs can satisfy the strict standard for alter ego.  As an Ohio district court recognized, "[p]ersuading a Delaware Court to disregard the corporate entity is a difficult task."  *Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-CV-01575, 2010 WL 816344, at *6 (N.D. Ohio Mar. 4, 2010) (quoting *Plaskon Elec. Materials v. Allied Signal*, 904 F. Supp.

---

[4] Rite Aid does not contest personal jurisdiction with respect to RAHC in Ohio, only with respect to RAC.

[5] More formally, this Court, sitting in diversity, must "loo[k] to the choice of law provisions of the forum state (Ohio)."  *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 604 (6th Cir. 2005).  Ohio has "adopted the Restatement [(Second) of Conflicts of Laws] to govern choice-of-law analysis."  *Am. Interstate Ins. Co. v. G & H Serv. Ctr., Inc.*, 2007-Ohio-608, ¶ 7, 112 Ohio St. 3d 521, 522, 861 N.E.2d 524, 526.  And under the Restatement, "the law of the state of incorporation governs veil piercing claims."  *Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259-TCK-FHM, 2009 WL 2601940, at *2 (N.D. Okla. Aug. 21, 2009) (citing cases discussing Restatement (Second) of Conflict of Laws § 307).  Ohio law generally appears to be consistent.

10

644, 656 (N.D. Ohio 1995)).  Delaware will disregard the corporate form "only in the 'exceptional case.'"  *Winner Acceptance Corp. v. Return on Capital Corp.*, No. CIV.A. 3088-VP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008) (quoting *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at * 11 (Del. Ch. July 14, 2008)).

Delaware courts consider several factors in determining whether to pierce the corporate veil, including:

(1) whether the company was adequately capitalized for the undertaking;

(2) whether the company was solvent;

(3) whether corporate formalities were observed;

(4) whether the dominant shareholder siphoned company funds; and

(5) whether, in general, the company simply functioned as a facade for the dominant shareholder.

*EBG Holdings LLC v. Vredezicht's Gravenhage* 109 B.V., No. CIV.A. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) (citing *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)).  Critically, "no single factor c[an] justify a decision to disregard the corporate entity"—"some combination of them [is] required."  *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) , *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989) (citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976) ("The conclusion to disregard the corporate entity may not, however, rest on a single factor[.]")).[6]

---

[6] *See also Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-CV-01575, 2010 WL 816344, at *6 (N.D. Ohio Mar. 4, 2010) (noting that in *Harco*, the Delaware courts "adopt[ed] the test set forth in" *Golden Acres*).

In addition to these factors, "[p]iercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'" *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (quoting *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.*, Del. Supr., 685 A.2d 724, 729 (1996)).  In effect, "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.*  "The underlying cause of action does not supply the necessary fraud or injustice" because "hold[ing] otherwise would render the fraud or injustice element meaningless" *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *accord Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996).[7]

Merely stating this standard makes clear that it is impossible for Plaintiffs to satisfy. Plaintiffs have not alleged—let alone plausibly alleged—anything regarding the first four factors. There is no plausible allegation that RAHC was undercapitalized for its undertaking or insolvent, no plausible allegation that RAC and RAHC failed to observe corporate formalities, and no plausible allegation that RAC siphoned funds from RAHC.  RAC does not even have a bank account—there is nowhere to which it could have "siphoned" any funds.[8]

To the extent Plaintiffs have made any relevant allegations, they are limited to whether RAC "controlled" RAHC.  Plaintiffs' evidence consists largely of documents where Rite Aid

---

[7] Ohio applies a similar rule: "[T]he plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act.  Courts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Dombroski v. WellPoint, Inc.*, 2008-Ohio-4827, ¶ 29, 119 Ohio St. 3d 506, 513, 895 N.E.2d 538, 545.

[8] As other courts have recognized, the nature of a holding company means that it will not be the alter ego of its subsidiaries.  Subsidiaries are not dependent on a holding company for income.  If anything, the reverse is true.  *See Porter v. LSB Indus., Inc.*, 192 A.D.2d 205, 214 (N.Y. App. 1993) ("It does not appear that the subsidiary is financially dependent on the parent. On the contrary, it appears that the parent, as a holding company . . . is financially dependent on its subsidiaries.").

employees referred to "Rite Aid Corporation" in e-mail signature blocks (Resp. Exs. A, D, E, H, I, M), or in Congressional testimony or correspondence with third parties (*id.* Exs. F, G).  But this "evidence" is irrelevant and insufficient to make out a prima facie case of any factor—a parent corporation may "hold itself out to the public" without "distinguish[ing] services it offers through its subsidiaries" without creating an alter ego relationship.  *Garlock v. Ohio Bell Tel. Co.*, 2014 WL 2006781, at *1 (N.D. Ohio May 15, 2014); *Ohio Edison Co. v. Frontier North, Inc.*, 2014 WL 6389564, at *11 ("the fact that [parent company] does not distinguish services which it offers through [subsidiaries] is insufficient to establish alter ego liability").[9]  For the same reason, the fact that a third party, McKesson, referred to "Rite Aid Corporation" as its customer is not prima facie evidence of an alter ego relationship.

Not only do these references fall far short of demonstrating that RAHC "simply functioned as a facade for [RAC]," *EBG Holdings*, 2008 WL 4057745 at *12, but even if Plaintiffs had made out of a prima facie case regarding this one element of the multi-element test, Delaware law is clear that a single factor is insufficient for an alter ego finding.

Nor do Plaintiffs make out a prima facie case of the additional requirement that the "corporate structure cause fraud or similar injustice" independent of the underlying cause of action. There is no prima facie case that RAHC is "a sham" that "exist[s] for no other purpose than as a vehicle for fraud."

---

[9] Any number of cases could be cited for this proposition.  *See also, e.g.*, *Miami Products & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 185 (W.D.N.Y. 2020) ("Moreover, regarding the submissions from Shintech's website, 'the Court is not persuaded that a failure to distinguish between parent and subsidiary on a web page is sufficient to show that the parent controls the subsidiary's marketing and operational policies. An advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities.'" (quoting J.*L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001))).

The Special Master failed to engage in any serious analysis regarding whether Plaintiffs established a prima facie case for alter ego jurisdiction over RAC.  After reciting the standard (at 18-19), the Special Master acknowledged the rule: "Before granting jurisdictional discovery, the Court must find Plaintiffs have presented a prima facie basis for asserting jurisdiction."  Order at 19 (quoting *Beightler v. Produkte Fur Die Medizin AG*, 2007 WL 2713907, at *4 (N.D. Ohio Sept. 17, 2007)).  But far from rigorously analyzing the factors that go into an alter ego analysis and concluding that Plaintiffs had a made a prima facie showing that this was the rare and exceptional case in which alter ego might be proven, the Special Master merely recited that "Plaintiffs have provided a colorable basis for pursuing this discovery."  Order at 18.

Particularly given the unusually broad and sensitive scope of potential alter ego discovery and the extremely high bar necessary to disregard the corporate form, far more was required.  Alter ego cases are rare and unusual, appropriate only when the corporate form is used as a vehicle to conduct fraud.  The notion that a large, sophisticated corporate entity such as Rite Aid could be an alter ego of one of its subsidiaries is facially incorrect, and such a holding would be unprecedented.

Indeed, a New York court exhaustively analyzed allegations that RAC was an alter ego of one of its subsidiaries, Thrifty Payless, Inc., and readily concluded—based on the same objective and uncontroverted evidence in this case—that the holding company was not an alter ego.  *See* Ex. 6, Decision and Order, *Sung Hwan Co., Ltd. v. Rite Aid Corp.*, Index No. 112444/2001 (N.Y. Sup. Ct. Jan. 5, 2015), *aff'd*, 52 N.Y.S. 3d 627 (App. Div. 2017) at 44 ("[T]here is no evidence that [the subsidiary] was financially dependent on RAC, but rather the reverse was true. RAC's consolidated 97 Return, for the first full year after the merger, reported that RAC had no income, while [the subsidiary] had more than $7 billion in sales."); *id.* ("There was no evidence that [the subsidiary] did not observe corporate formalities."); *id.* at 45 (concluding that RAC did not have

any "operational control" because, *inter alia*, "the [tax] Returns evidenced that RAC had no income from sales, or expenses from salaries or cost of goods sold").  The facts recited in that opinion are uncontroverted by Plaintiffs and are equally controlling here:

> . . . RAC was a holding company that owned investments in subsidiaries.  There was evidence that [RAHC]provided accounting, legal, inventory, payroll, insurance and other computer services to all of RAC's subsidiaries and that [RAHC]provided services to RAC, for which [RAHC] earned income.  But there was no evidence that RAC itself performed services.

*Id.* The evidence demonstrated that the subsidiary "had a separate corporate existence that was respected by RAC."  *Id.*

Plaintiffs' failure to plead that RAC was an alter ego of RAHC was no accident.  Plaintiffs cannot plausibly allege the extraordinary suggestion that RAC is alter ego of RAHC and cannot make out a prima facie case of jurisdiction.  As the Special Master recognized, without a prima facie case, jurisdictional discovery must be denied, particularly on this unpleaded theory.

## III.    The Discovery Allowed by the Special Master Is Overbroad and Excessively Burdensome.

Even if Plaintiffs amended their complaints and plausibly alleged an alter ego theory against RAC, the discovery requested by Plaintiffs and ordered by the Special Master vastly exceeds the scope of what would be appropriate.  The Rules limit discovery to material that is relevant and proportional, considering "whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  "Discovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims."  *Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97-ART-EBA, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016).  This Court must "limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce."  *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 854 (6th Cir. 2017).  The proponent of discovery bears the burden

15

of demonstrating relevance.  *Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010).

The Special Master's Order fails to consider the relevance or the burden of much of the discovery that it orders.  For example, the Order requires Rite Aid Corporation to "identif[y] the internal subject matter experts, external advisors, or others who sent relevant documents to the Board of Directors or its Committees."  Order at 14.  As Rite Aid explained, materials were sent to the Board through a centralized process (an application called "Boardbooks") controlled by a single person.  No "subject matter expert, external advisor, or other" sent relevant materials to the Board.  The Special Master reinterpreted the discovery to require RAC to (apparently) identify all persons who indirectly generated or contributed to materials that were incorporated into documents sent to the Board over a 14-year period.  Order at 15.  Not only is this discovery practically impossible[10] (and thus disproportionate to any need by Plaintiffs), but more significantly, the Special Master failed to identify any conceivable relevance of the information.  The identities of individuals who contributed to reports to RAC's Board is unrelated to any alter ego factor and unrelated to jurisdictional discovery.

With much of the rest of the discovery, the Special Master failed to consider its proportionality.  The fact that material might, hypothetically, be relevant, does not establish that a discovery request is proportionate.

Indeed,  were Plaintiffs permitted to amend their complaints to include an alter ego theory, virtually all of the information that might be relevant to such an alter ego theory could be sought

---

[10]    The difference between the two requests is enormous.  For example, a law firm could readily identify all motions filed by a particular attorney, but ordering it to identify all attorneys who "contributed" (without signing) motions filed by a particular attorney over a multi-year period would be practically impossible.

far more easily (and be received far more quickly) through simple interrogatories rather than burdensome requests for production.  Consider, for example, the demand for massive amounts of financial information from RAC and RAHC, including virtually all of their financial information for more than a decade.  On its face, the request demands massive amounts of information with no relevance whatsoever to any "alter ego" inquiry.  To the extent that any portion of the financial information in this massive request for production could be relevant to an alter ego analysis, Plaintiffs could receive it through simple interrogatories:

- List all instances in which money was transferred from a RAHC bank account to a RAC bank account.  *(None.)*

- Please list all assets owned by RAC.  *(None, other than stock in its subsidiaries.)*

- Do RAC and RAHC maintain separate corporate books and financial records?  *(Yes.)*

With answers to these interrogatories, Plaintiffs will have all of the information that they need that could be relevant to their alter ego theory (and the evidence confirming that the theory is meritless).  And to the extent that Plaintiffs desired documents to confirm these simple facts, a small set of financial documents (such as tax returns or the publicly-filed 10ks) would confirm the corporate separateness.

In contrast, producing documents in response to a sweeping request for sensitive financial data is a grossly disproportionate method of learning the basic information that might be relevant to an alter ego analysis.  *Cf. Rasch v. Tyson Fresh Meats, Inc.*, 16-CV-3006-LTS, 2017 WL 3091458, at *5 (N.D. Iowa Feb. 27, 2017) (recognizing that "[e]ven if this interrogatory is somehow relevant . . . , ordering any additional production of documents for this interrogatory would not be proportionate to the cost of such production.").

The Special Master makes this error throughout the Order, conflating the relevance of information with the proportionality of a request for producing all documents relating to that

information.  For example, the Special Master notes that information regarding "whether the companies share the same employees, business enterprise, and office facilities" is relevant to alter ego. Order at 22.  But, rather than basic interrogatories to determine this simple information (the answer to each is, "No, nothing is shared.  RAC has no employees, business enterprise, or office facilities."), Plaintiffs demanded production of all documents relating to the organizational structure of RAC and RAHC, including all documents regarding "the nature and status of RAC's [and RAHC's] employees, including 'documents showing the number of employees, identity of different departments, locations of employees, and their job responsibilities.'"  Order at 22. Demanding documents regarding every employee is burdensome and disproportionate method of conducting discovery into these basic facts.

For example, imagine that the number of employees that a defendant had in a particular jurisdiction was relevant.  One way to determine that number would be an interrogatory, "How many employees do you have?"  Or a plaintiff might request a single document showing the current headcount.  But demanding that the defendant produce all documents reflecting all hiring, firing, and resignations that has ever occurred in the jurisdiction—even if these documents would, theoretically, be relevant to the number of persons employed by the defendant—would be a disproportionate and burdensome means of learning the number of employees.  The same is true here.  Plaintiffs' demands for production of enormous quantities of documents is a burdensome and disproportionate means of seeking discovery into the simple and basic facts that might be relevant to their unpleaded alter ego theory.

Put another way, the only relevant evidence concerns whether there are any ***common*** employees of RAC and RAHC.  Documents (or other evidence) regarding RAHC employees who are not also employees of RAC are irrelevant.  The Special Master erred by permitting Plaintiffs'

18

to take discovery regarding irrelevant documents and facts.  The same is true of all discovery that Plaintiffs seek regarding the organizational structure of RAHC and RAC (Order at 21)—it is relevant to alter ego only to the extent that it overlaps and is common to both entities.  Information about RAC and RAHC's physical locations that are not shared could not be relevant to any alter ego theory.

Other requests are hopelessly vague.  RAC has no way to understand what is meant by the request for all documents relating to "the extent that RAC exerts control over [RAHC]."  Order at 22.  In theory, every single document in the possession of RAHC might be responsive to this request.  A document that said nothing about RAC would, after all, demonstrate that RAC did not exert control over RAHC with respect to the document.  Given that the Special Master failed to define the scope of this request to any degree that it could be understood, he necessary failed to consider whether the requested materials are relevant, excessively burdensome, or disproportionate.

The Special Master further erred by ordering RAC to produce documents—such as Board Minutes—without redacting materials that are unrelated to opioids and thus irrelevant to Plaintiffs' claims.  Order at 6–9.  The Special Master's analysis appears to conflict with this Court's Case Management Order, which expressly permits defendants to redact "segregated, non-responsive, Confidential or Highly Confidential information" from documents, materials, or other things produced.  Doc. 441 at 9.  Board materials, on their face, fall within the definition of Highly Confidential Information: "information which, if disclosed, disseminated, or used by or to a Competitor of the Producing Party or any other person . . . could reasonably result in possible antitrust violations or commercial, financial, or business harm."  Doc. 441 at 4.

As Rite Aid explained in opposing the motion to compel, courts regularly recognize that the highly confidential and sensitive nature of board materials warrants redaction. *See, e g.*, *Georgandellis v. Holzer Clinic, Inc.*, No. 2:08-cv-626, 2010 WL 1839027, at *1 (board minutes were appropriately redacted to remove "information unrelated to the claims and defenses asserted in this action"); *Ajuba Int'l, LLC v. Saharia*, No. 11-cv-12936, 2014 WL 4793846, at *3 (E.D. Mich. Sept. 25, 2014) (permitting redaction of non-responsive information from board minutes); *In re Oil Spill by the "Deepwater Horizon*," No. MDL 2179, 2011 WL 12663484, at *1 (E.D. La. July 1, 2011) (approving redaction of board meeting minutes because "confidential" and "highly confidential" designations are "inadequate to describe the level of confidentiality required for Board Minutes"); *Beauchem v. Rockford Prods. Corp., Inc.*, No. 01-cv-50314, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002) (finding that good cause existed to redact for relevance because portion of board minutes relating to matters at issue was "small" and "large portions of the Board Minutes relate to other aspects of the company's operation and administration"). Rite Aid explained in its response to the motion to compel that board materials warrant redaction because they are "extremely sensitive." Fouts Letter, 8/12/2020. Rite Aid redacted this information from its production not merely because it was irrelevant but because it was highly sensitive and could result in business harm. CMO No. 2 expressly permitted this.

To the extent that the Special Master correctly interpreted CMO No. 2 as requiring Rite Aid to produce irrelevant and highly sensitive board minutes to Plaintiffs without redaction, it should be modified. The "good cause" standard of Rule 26(c) is "highly flexible" and allows courts "to accommodate all relevant interests as they arise." *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008). In issuing a protective order, courts balance the need for the discovery against the hardship to the party against whom discovery is sought. *E.g.*, *Cazorla v. Koch Foods*

*of Mississippi, L.L.C.*, 838 F.3d 540, 555 (5th Cir. 2016) ("Under the balancing standard, the district judge must compare the hardship to the party against whom discovery is sought against the probative value of the information to the other party.").  Here, there is no probative value and no need for the discovery—the redacted materials are irrelevant to opioids—and the hardship to RAC of disclosing sensitive materials concerning the deliberations of and materials presented to its board is high.  Even if the Special Master were correct that CMO No. 2 requires RAC to produce these documents without redactions, this Court should modify the protective order to allow RAC to redact highly sensitive information that has no relevance to Plaintiffs' claims.

## Conclusion

The Special Master erred in reversing this Court's earlier order setting the scope of permissible jurisdictional discovery and by allowing Plaintiffs to take discovery regarding an unpleaded theory of alter ego, for which they failed to make out a prima facie case.  And even if Plaintiffs amended their complaints and alter ego discovery were permissible, the discovery ordered by the Special Master is exceptionally burdensome and far disproportionate to what Plaintiffs would need to show to support an alter ego theory.

The Order should be reversed; no additional discovery regarding alter ego should be permitted; and this Court should dismiss Rite Aid Corporation for lack of personal jurisdiction. Even if Plaintiffs were permitted to amend their complaints and succeeded in pleading a plausible alter ego theory, then any related discovery should be strictly restricted to proportionate means of learning the basic information that might be relevant to an alter ego theory, such as interrogatories. This Court should clarify that the previously-ordered discovery does not include the irrelevant (and burdensome) requirement of identification of every person who indirectly contributed to board

materials for more than a decade, and Rite Aid should be permitted to redact the highly-sensitive

and irrelevant information from its board minutes that is unrelated to opioids..

Dated:  September 29, 2020        Respectfully submitted,

/s/ *Kelly A. Moore*
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Phone: (212) 309-6612
Fax: (212) 309-6001
E-mail: kelly.moore@morganlewis.com

John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Phone: (215) 963-4824
Fax: (215) 963-5001
E-mail: john.lavelle@morganlewis.com

*Attorneys for Rite Aid Corporation and Rite Aid Hdqtrs. Corp.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system to all counsel of record on September 29, 2020.

/s/ *Kelly A. Moore*
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Phone: (212) 309-6612
Fax: (212) 309-6001
E-mail: kelly.moore@morganlewis.com

*Attorneys for Rite Aid Corporation and Rite Aid Hdtqrs. Corp.*

23