# EXHIBIT 6

**SHIRLEY WERNER KORNREICH**
**J.S.C.**
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 54

-------------------------------------------------------------------X

SUNG HWAN CO., LTD.,

                              Plaintiff,

              -against-                                    Index No. 112444/2001

                                                          DECISION & ORDER

RITE AID CORPORATION,

                              Defendant.

-------------------------------------------------------------------X

SHIRLEY WERNER KORNREICH, J.:

    This is a 2001 action brought by plaintiff, Sung Hwan Co., Ltd. (Plaintiff), to enforce,

pursuant to CPLR Article 53, a February 9, 2001 default judgment entered against defendant Rite

Aid Corporation (RAC) in the Seoul District Court in South Korea (Judgment). Exs 215 & 216.[1]

The Korean action was filed in Korea in 1998 (Ha Tr, 73), and years of litigation has transpired

as to whether the Judgment should be recognized in New York pursuant to CPLR 5304(a)(2).

CPLR 5304(a)(2) provides that New York will not recognize a foreign judgment if the foreign

court did not have personal jurisdiction over the judgment debtor. After a tortured history, the

case was transferred to and tried by this court on the issue of the Korean Court's jurisdiction over

RAC pursuant to CPLR 302(a)(3). *Sung Hwan Co., Ltd. v Rite Aid Corp.*, 7 NY3d 78 (2006)(Ct

of App Dec).[2]

---

[1] References to "Ex or Exs" followed by a number refer to Plaintiff's exhibits. References to "Ex or Exs" followed by a letter refer to RAC's exhibits. References to "Ct Ex" refer to court exhibits. References to "Tr followed by a name and number, refer to transcripts of witnesses and the page numbers of their deposition or trial testimony (with respect to Kenneth C. Black, his deposition testimony will be denoted as either "Dep Tr" for deposition testimony or "Trial Tr").

[2] The procedural history of the action, involving three appeals to the Appellate Division and one to the Court of Appeals, is set forth in detail in a prior decision of this court. *Sung Hwan Co., Ltd. v Rite Aid Corp.*, 40 Misc3d 1227(A) (Sup Ct NY Co Aug. 14, 2013).

Printed: 1/22/2015

The non-jury trial was held before me on March 31, April 1, April 3, July 22, July 23 and July 24, 2014. Plaintiff chose to present its direct case solely through cross-designated portions of deposition transcripts contained in an exhibit binder entered into evidence. Ct Ex 1, Tr 261-264. The deposition witnesses on plaintiff's direct case were Lawrence M. Crosby, Elliot S. Gerson, Jong Sun Ha, Sung Hyun Yoon, Ronald Simmer, Robert Dwyer, Stephen Kindler and Kenneth C. Black.[3] An index of the documents offered by plaintiff on its direct case was entered in evidence. Ct Ex 2; Tr 265. The index reflects which documents were excluded from evidence by the court in rulings made prior to trial. At trial, when plaintiff offered the books of evidence wholesale, the court cautioned that if there was no deposition testimony to explain an exhibit, or the court did not understand what the exhibit was, it would not be considered. Tr 335-336.[4] Nonetheless, the plaintiff chose to put the books into evidence without any index relating the trial evidence to the deposition testimony and without any live witness testimony. RAC presented two live witnesses, Kenneth C. Black and an expert, David Feldman.

The Judgment was based upon a Korean tort claim arising from the sale to Plaintiff of listeria-tainted, Thrifty brand ice cream, which resulted in financial damage to Plaintiff. No personal injury was claimed. The Korean court found the ice cream was manufactured by RAC and imported by Plaintiff to Korea. Ex 215 & 216. It determined that Plaintiff lost sales and inventory due to reports of the listeria detected by the Korean government in the ice cream.

At the start of trial, Plaintiff asserted that RAC was subject to personal jurisdiction on three theories: 1) that the manufacturer of the ice cream delivered to Korea was an agent of

---

[3] Plaintiff read in the testimony of Lawrence Crosby. The remainder of the deposition testimony was entered into evidence without reading it into the record.

[4] Despite the warning, the court went out of its way to understand the documentary evidence addressed in the depositions, spending nearly a month deciphering the record, pairing the appropriate evidence to the EBT testimony and writing this decision.

RAC; 2) that RAC owned the Plant that manufactured the ice cream; and 3) that the manufacturer was the alter ego or a mere department of RAC. The trial proceeded on all three theories.[5]

Nonetheless, Plaintiff's position at trial was that "ownership" did not turn on who owned the Plant, but on who controlled the manufacture, testing, inspection and distribution of the defective ice cream and put it into the stream of commerce. Plaintiff's 3/20/13 Trial Memorandum of Law, pp 2-4. According to Plaintiff, while ownership of the Plant itself "may shed light on who was in fact involved in the manufacturing and distribution of the defective product, mere ownership of land on which a product is manufactured can never be a basis for imposition of products liability." *Id*, p 3. Plaintiff framed the issues to be tried as follows:

> WAS THERE SUFFICIENT INVOLVEMENT BY RITE AID [RAC], DIRECTLY OR THROUGH A "MERE DEPARTMENT" OR AGENT, IN THE PRODUCTION AND DISTRIBUTION OF DEFECTIVE ICE CREAM FROM THE THRIFTY ICE CREAM PLANT IN 1997 TO PERMIT THE KOREAN COURT, WITHOUT OFFENDING NEW YORK JURIDICTIONAL PRINCEPLES, TO EXERCISE JURISDICTION OVER RITE AID?

*Id*. In its Post Trial Brief, Plaintiff maintained that while the Appellate Division remanded the action for trial on the "triable issue of fact [of] whether defendant owned the ice cream plant that manufactured and sold listeria-tainted ice cream to the plaintiff, which would provide a basis for Korea's exercise of personal jurisdiction over defendant," the Appellate Division could not have meant that title to the land and improvements was the issue, as opposed to RAC's operation or control of the Plant, i.e., manufacture and distribution. Plaintiff's 9/19/14 Post Trial Brief, pp 17-18.

---

[5] The specific issue of whether RAC owned the Plant was remanded for trial by the Appellate Division. *Sung Hwan Co., Ltd. v Rite Aid Corp.*, 94 AD3d 524, 525 (1st Dept 2012).

3

The parties agree that the ice cream was shipped from a California ice cream plant in El Monte, California (Plant) to Korea in 1997, the last shipment having been sent on September 19, 1997. Thus, 1997 is the critical end-date for the tort, i.e., when the ice cream was placed in the stream of commerce.

RAC's position essentially was that Plaintiff sued the wrong corporate entity. RAC contends: that in 1997 to 1998, it was a holding company with no assets, employees or earnings; that one of its subsidiaries, Thrifty Realty Company (Thrifty Realty), owned the Plant; and that another of its subsidiaries, Thrifty Payless, Inc. (TPI), operated the Plant and manufactured the ice cream. RAC contended that the employees who dealt with Plaintiff and the Plant during the relevant time period, 1997 to 1998, were employed by either TPI or Rite Aid Headquarters Corp., Inc. (HQ), another wholly-owned subsidiary of RAC. RAC disputed that the subsidiary that manufactured and sold the ice cream was its agent or a mere department/alter ego of RAC for jurisdictional purposes.

## I. Findings of Fact

### A. Contracts Relating to Sale of Ice Cream

Based upon the credible evidence, the court makes the following findings of fact.

There was no contract by RAC to sell ice cream to Plaintiff. In 1995, Dong Woo Kim, President of Sangshin Trading Co. (Sangshin), agreed to purchase ice cream from TPI to be delivered at the Plant. Ex 165 (TPI/Sangshin Contract). TPI granted Sangshin a one-year license to sell Thrifty ice cream products in Korea, which was renewable for successive years under certain conditions. *Id.* TPI's address on the TPI/Sangshin Contract is Wilsonville, Oregon (Thrifty Main Office). It was signed on behalf of TPI by Lawrence M. Crosby (Crosby), as Vice President, Manufacturing, as well as by Robert A Dwyer (Dwyer), as Director. In addition to

4

Dong Woo Kim as President of Sangshin, Dong Young Kim signed the contract for the buyer as

Director, U.S.A.  The address for notices to be sent to TPI was ***Thrifty Payless, Inc., Ice Cream***

***Division***, 9200 Telstar Avenue, El Monte, California (Plant Address).  *Id*, ¶10.  The Thrifty Main

Office address was the corporate headquarters of Thrifty Payless Holdings, Inc. (Thrifty

Holdings), TPI's parent corporation.  As will be explained below, until December of 1996,

Thrifty Holdings owned TPI, the seller named in the TPI/Sangshin Contract.

On August 26, 1996, an agreement was made among Plaintiff's Chairman, Sung Doo

Hwan; Sangshin's Chairman, Kim Dong Woo; and I.F.M.'s Chairman, Kim Dong Young

(possibly the same individual who signed the TPI/Sangshin Contract as Director U.S.A. of

Sangshin).  Ex 94 (Sung Hwan Contract).  The Sung Hwan Contract obligated Plaintiff to pay a

fee to Sangshin in return for its assistance in importing and a fee to I.F.M. for carrying out the

operation in the United States with Thrifty.  The fees were based on half gallons, presumably of

ice cream, a word not mentioned in the Sung Hwan Contract.  I.F.M. agreed to keep the price

from Thrifty as low as possible, to notify the other parties if problems arose with Thrifty and to

cooperate with Sangshin as much as possible "if related to Thrifty."  Thrifty is simply referred to

as "Thrifty".  The Sung Hwan Contract was effective immediately.

### B.  *Corporate Structure & Tax Returns of Relevant Entities*

RAC is incorporated in Delaware and has its principal offices at 30 Hunter Lane, Camp

Hill, Pennsylvania (RAC Main Office).  Black Trial Tr, 347.  RAC's Main Office also is where

the office of HQ and TPI are located.  *Id*, 476-477.

RAC's live witness on the issue of corporate structure, Kenneth C. Black (Black), was a

certified public accountant.  *Id*, 336.  From 1982-1999, Black worked for Peet Marwick, the

predecessor of KPMG, where he earned his CPA, following which he worked as tax manager

and then director of income tax and legislation for Union Pacific Corporation, and, subsequently, as director of tax administration for NBC. *Id*, 337. From 1999 to 2003, he worked for Deloitte, in which capacity he audited RAC and its subsidiaries. *Id*, 337-339. In 2003, he joined RAC and its subsidiaries as Vice President of Tax; in 2005, he became their Vice President of Tax and Payroll; and in 2010, he became RAC's Group Vice President of Compensation, Benefits and Shared Services, which was his position at the time of trial. *Id*, 337 & 339-340. Black said that he was President and Vice President of both HQ and TPI. *Id*, 340-341. However, he said that he was an employee of HQ, not TPI. *Id*, 341.

While at Deloitte, Black became familiar with the income tax returns of RAC and its subsidiaries going back to 1993, including their corporate structure for the years prior to 2003. *Id*, 337-338. It was important for him to understand corporate structure because it had tax implications. *Id*, 338.

Black described RAC as a holding company that owns investments in its subsidiaries and delegates to HQ the responsibility for supporting those subsidiaries. Black Trial Tr, 346. RAC's status as a holding company did not change from 1996 to the time of trial. Black Trial Tr, 405. Black testified that RAC does not conduct any daily business operations and never operated the Plant. *Id*, 404. He further testified that to maintain holding company status and avoid Delaware taxes, more than 90% of RAC's assets had to be in the form of investments, such as stock of subsidiaries, and its operations could not be more than de minimus with regard to other income. *Id*, 348. Black stated that if RAC owned assets, such as drug stores or an ice cream plant, it could not be designated a holding company in Delaware. *Id*, 349. He said that in Pennsylvania, as a foreign Delaware corporation, RAC would have to pay franchise taxes if it were not a holding company, which is defined in Pennsylvania as having more than 90% of

assets in the form of investments in subsidiaries. *Id*. The court agrees that Black's analysis accords with Delaware and Pennsylvania statutes during the years 1997 and 1998 regarding holding company status for tax purposes. 1997 & 1998 72 PA Stat § 7602(e); 1997 & 1998 30 Del C §1902(b) (8).

Since 1996, RAC has owned 100% of HQ's stock. Black Dep Tr, 135. Black testified that RAC's officers delegated their responsibilities to HQ, which provided services to RAC and its subsidiaries. Black Trial Tr, 341-346 & 425-427. HQ furnished support functions for the subsidiaries, such as accounting, legal, tax, HR (human resources), category management and distribution services, the latter of which he described as oversight of moving goods between facilities and delivering goods to the stores. *Id*, 341-342. He explained that HQ serviced RAC by analyzing investments, tax and SEC (Security and Exchange Commission) filings, and providing oversight and recommendations as to corporate structure and capital and operating budgets. *Id*, 342. Black denied that RAC provided any support services to its subsidiaries. *Id*, 346 & 368. There was no written contract between TPI and HQ that required HQ to perform functions, but it did bill TPI for its services. *Id*, 425-426. HQ did not, and does not, own TPI. *Id*.

Following RAC's merger with Thrifty Holdings, Black said that *for purposes of HQ's accounting systems*, the Plant was designated "Rite Aid Distribution Center 61" (DC 61). *Id*, 506. Notably, Black did not testify, either on direct or cross-examination, that HQ provided services related to manufacturing, selling, testing, or distributing ice cream other than to warehouses or stores of RAC's subsidiaries.

RAC's 10-K registration statement (10K), for the year ending May 29, 1997 (RAC 97 10K), stated that on December 12, 1996, Thrifty Holdings was merged into RAC. Ex 178, ,

7

Bates RAC 00065. The name of the registrant on the first page of the RAC 97 10K is RAC. Ex 178. Black testified that in a 10K filed with the SEC, the registrant must report the operations of the subsidiaries it owns so that the public understands what assets they are investing in, including key assets owned by subsidiaries of the registrant. Black Trial Tr, 358-359. He said that a 10K must be a consolidated filing. *Id*, 356.

Black was correct. In a 10K, a parent should consolidate subsidiaries when it owns a majority of a subsidiary's stock. 17 CFR 210.3A-02 ("Generally, registrants shall consolidate entities that are majority owned…."). This accords with generally accepted accounting principles for financial statements:

> The rules regarding the consolidation of subsidiaries are controlled by generally accepted accounting principles, which require parent corporations to consolidate subsidiaries if the parent owns more than 50 percent of the subsidiary's stock.

*Volkswagenwerk Aktiengesellschaft v Beech Aircraft Corp.*, 751 F2d 117 (2d Cir 1984), citing American Institute of Certified Public Accountants, *Consolidating Financial Statements*, *Accounting Research Bulletin No. 51*, ¶ 2 (1959).

Black testified that RAC's 10K's for the years 1996 through 1999 were publicly available from the SEC. *Id*, 402. In addition, the court takes judicial notice that 10Ks are publicly available documents. *Kramer v Time Warner, Inc.*, 937 F2d 767, 774 (2d Cir 1991).

With respect to the merger, the RAC 97 10K disclosed that in connection with the merger, RAC acquired TPI, "the largest drugstore retailer in the Western United States with over 1,000 stores in 10 states." Ex 178, Bates RAC 000090. According to a Prospectus Supplement issued by RAC to supplement a Prospectus dated December 3, 1996 (RAC 1996 Pro Supp), prior to the merger, RAC "operated" 2,788 drugstores located in 20 states and the District of

8

Columbia. Ex 177, Bates 00071170.  The merger with Thrifty Holdings enabled RAC to expand

its store base, which had been on the east coast.  Ex 178, Bates 000093.

The publicly filed RAC 97 10K and RAC's 1998 10K, for the fiscal year ending February

28, 1998 (RAC 98 10K), disclosed that TPI was a subsidiary of RAC.  The RAC 97 and 1998

10Ks listed more than 20 subsidiaries of RAC in more than 20 states with names beginning with

the words "Rite Aid".  Ex 178, Bates RAC 000139 & Ex 180, Bates 000059.  Among the listed

subsidiaries are TPI, HQ, Thrifty Corporation (Thrifty Corp), and Thrifty Realty.  *Id*.  Black

explained that "Rite Aid" is a brand name that the subsidiaries license.  Black Trial Tr, 356.  The

RAC 97 and 98 10Ks reported that the registrant owned the Plant.  Ex 178, RAC Bates 000071

& Ex 180, RAC Bates 000004.  Black said that this statement meant that the Plant was owned by

either RAC or one of its subsidiaries.  Black Trial Tr, 358-359.

The organization of Thrifty Holdings and its subsidiaries before the merger with RAC

was reflected on a chart identified by Black.  *Id*, 351-353 & Ex JJ.  The chart showed that TPI

was a wholly-owned subsidiary of Thrifty Holdings; TPI wholly-owned Thrifty Corp., which

wholly-owned Thrifty Realty.  *Id*.  The same exhibit contained a second chart showing that after

the merger, RAC was substituted for Thrifty Holdings, but the corporate structure below the

holding company level remained the same -- TPI was wholly-owned by RAC and TPI's

subsidiaries did not change.  *Id*.  Black testified that both charts reflected his understanding of

the corporate structure in 1997 based upon his research.  *Id*.  On the date of the merger, RAC was

issued all of the outstanding shares of TPI's stock.  Black Trial Tr, 354 & Ex NN.

An excerpt from TPI's 10K for the period ending September 30, 1996 (TPI 96 10K), a

few months prior to the merger, was entered into evidence.  Black Trial Tr, pp , 359-360, Ex C.

The 1996 TPI 10K said that TPI owned the Plant.  Ex C, p 16.  According to Black, this meant

9

that either TPI or one of its subsidiaries owned the Plant. Black Trial Tr, p 361. The TPI 96 10K
was filed on December 24, 1996. Ex C, p 1.

Black testified that, by virtue of his review of accounting and tax records, he had
determined that prior to and after the merger, TPI operated the Plant. *Id*, 361-362. He stated that
the Plant was the only manufacturing entity in Rite Aid's business and that it did not fit into the
business model of RAC and its subsidiaries' stores. Black Dep Tr, 86. Plaintiff's counsel,
however, admitted during pre-trial proceedings that before the merger, TPI owned 300 drug
stores and the Plant. Tr 12/20/12, 14.[6]

Following the merger, RAC elected the board of TPI by unanimous written consent,
without a meeting. Ex S, Black Trial Tr, 376-377. The directors appointed by RAC to TPI's
board were Frank M. Bergonzi, Elliot S. Gerson and James E. Krahulec. Ex S. After the
merger, RAC & TPI had the following officers in common:

|  | **RAC** | **TPI** |
|---|---|---|
| Frank M Bergonzi | Exec VP | Exec VP & CFO[7] |
| Franklin C. Brown | Exec VP | Exec VP |
| I. Lawrence Gelman | Secretary | Secretary |
| Eliott S. Gerson | Sr VP | Sr VP & Asst Secretary |
| Charles R. Kibler | President | President |
| Joseph S. Speaker | Sr VP | Sr VP & Treasurer |

Compare Ex C, 23-25; Ex 178, Bates RAC 000073-000074; Ex S & Ex T. Two of TPI's
directors, Gerson and Bergonzi, were officers and directors of both RAC & TPI. Ex S, T & Ex

---

[6] Despite this testimony, plaintiff's counsel contended that after the merger, TPI continued to
exist and own 300 drug stores, but RAC operated the Plant, which was an "anomaly" because it
was the only manufacturing business. Pre-Trial Tr 12/20/12, 12-15.

[7] The following abbreviations for officers' titles will be used in this opinion. Assistant
(Asst), Executive (Exec), Senior (Sr), Vice President (VP), Chief Executive Officer (CEO),
and Chief Financial Officer (CFO).

178, Bates RAC 000074. The following year, on the RAC 98 10K, it reported that four of TPI's executive officers, Bergonzi, Gerson, Kibler and Speaker, were RAC executive officers. Ex 180, Bates RAC 000006.

TPI observed corporate formalities. Gerson, Tr, 35-37. Minutes or unanimous consent resolutions of the TPI board meetings were kept. Gerson, *Id*. TPI board meetings were held in Gerson's office. Gerson Tr, 34. With respect to Gerson, the 96 TPI 10K publicly disclosed the following:

> Elliot S. Gerson was appointed Senior Vice President and Assistant Secretary on December 12, 1996. Mr. Gerson is an executive officer of Rite Aid and joined Rite Aid as Senior Vice President and Assistant Chief Legal Counsel in November 1995 ....

Ex C, 26-27.

Black testified that in December 1996 through September 1997, RAC had no employees. Black Trial Tr, p 347. A portion of the consolidated tax return for RAC and its subsidiaries for the year ending March 4, 1997 (96 Return) was entered into evidence without objection. *Id*, 380-382 & Ex PP-1. By law, a consolidated tax return must report the income of each subsidiary. *Id*. A portion of the 96 Return is labeled "STATEMENT 1 – LIST OF CORPORATIONS IN THIS RETURN REFERENCED BY CODE NAME." Ex PP-1. Each corporation named on the list has a business code number and an employer identification number. Ex PP-1. Black testified that the business codes reflect "the type of industry that somebody is in." *Id*, 384. Black noted that the business code for RAC and TPI, 5912, stands for retail business. *Id* & Ex PP-1 Bates RAC 006546 & Bates RAC 006556. HQ's business code was listed on the 96 Return as "INACTIVE." Ex PP-1, Bates RAC 006548. Thrifty Realty's business code, 6511, signified real estate holdings. Ex PP-1, Bates RAC 006557; Black Trial Tr, 385. Also listed as a subsidiary was Thrifty Corporation (Thrifty Corp), whose business code was 5912, retail

11

business. Ex PP-1, Bates RAC 006559. He said that because the ice cream business was a division of and was operated within TPI, the Plant's results were included in TPI's results on the 96 Return. *Id*, 384-385.

The 96 Return showed that RAC had no sales, paid no salaries or wages to employees or officers, and had no expenses relating to cost of goods sold. Ex PP-1, Bates RAC 006559; Black Trial Tr, 385-387. Nor did RAC report expenses for advertising, or employees' benefit programs. *Id*. On the same return, RAC reported that HQ had no income from sales of goods and no expenses for cost of goods sold, but it did have expenses for compensation of officers, salaries and wages, advertising and employee benefit programs. Ex PP-1, Bates RAC 006564; Black Trial Tr, 387-388. Black testified that this is because HQ sells nothing and only provides services. *Id*. The "Other Income" of HQ on the 96 Return reflected intercompany charges for services HQ provided to other RAC subsidiaries. *Id*. Black said that HQ did not charge RAC for its services. *Id*. On the 96 Return, RAC reported that TPI had sales of $1.6 billion, spent $1.3 billion on cost of goods sold, had no expenses for compensation of officers, paid salaries and wages of over $100 million and had expenses for advertising, employee benefit plans and pensions. Ex PP-1, Bates, RAC 006572. This return was filed approximately two months after the merger, so TPI's activity was for a small portion of 1996.

As the merger occurred on December 12, 1996, RAC's first consolidated federal tax return reflecting TPI's sales for a full year was the return for the year ending February 28, 1998, i.e., March 1, 1997 through February 28, 1998 (97 Return, with 96 Return, Returns). Black Trial Tr, 388-389 & Ex PP-1. On the 97 Return, RAC, HQ and TPI all had the business code 5912 for retail business, while Thrifty Realty's business code was 6511, which signified real estate holdings. Ex PP-1, Bates RAC 005784, 005786, 005792 & 005798, Black Trial Tr, 384-385.

12

The 97 Return reported that RAC and HQ had no sales and no costs for goods sold, while TPI had sales of about $7.2 billion and spent $5.8 billion for cost of goods sold. Ex PP-1, Bates RAC 005799 & 005803. TPI had expenses for salaries and wages, advertising, and employee benefit and pension plans. *Id*, Bates RAC 005811. TPI did not have expenses for compensation of officers. *Id*. Black testified that TPI's sales were predominantly sales from stores operated by TPI on the west coast, including the Plant's sales, which averaged about $10 million a year, a "de minimus" portion of its total sales. Black Trial Tr, 389-391. RAC reported no expenses for advertising, compensation of officers, wages, salaries and employee benefit plans. Ex PP-1, Bates RAC 005784. RAC reported that HQ had no sales or expenses for cost of goods sold, but did report that HQ had expenses for compensation of officers, wages and salaries, and advertising, as well as other income. Ex PP-1, Bates RAC 005803.

At trial, Black explained that sales of Thrifty ice cream from the Plant to Thrifty stores on the west coast owned by TPI was a "zero-based operation", meaning that it was sold at cost without a profit. *Id*, 390-391. The reason was that sales within one legal entity, i.e., within TPI, have to be eliminated when reporting financial results in accounting records and tax returns. *Id*. However, at his deposition, Black said he could not "specifically state" that there was a zero cost basis, but it would be TPI selling to itself. Black Dep Tr, 70.

Black admitted that his knowledge of the operations of RAC and its subsidiaries in 1996 through 1998 was derived from the review of accounting and tax records and that he had no personal knowledge of how the Plant was operated in in 1996 and 1997, although he stated that RAC never operated it. Black Trial Tr, 361, 404 & 406. He had never spoken to Crosby at all and had not spoken to Gerson about how the Plant operated in 1996 and 1997. *Id*, 406-407. He also said that HQ did not take over providing services for TPI the day after the merger because

13

"typically" there is a transition period. *Id*, 367-368. He did not know what the transition time was in the case of TPI, but stated that the transition of the payroll system was not completed until 1999. *Id*.

Black's testimony about corporate structure, earnings, and income taxes was credible, and much of his testimony was corroborated by the tax statutes and confirmed by documentary evidence. Somewhat confusing, however, was his own employment status. He testified that he was employed by HQ and its subsidiaries, but his employment contract was with RAC, a corporation he insisted had no employees. He continued to claim that he was employed by HQ, explaining:

> it also requires me to – you know, it has delegation rights. I have to be available to all of the subsidiaries. I'm an employee of Rite Aid Corporation – not employee. I'm an officer of Rite Aid Corporation, employee of Rite Aid Hdqtrs. Corp.

Black Trial Tr, 475-476, Ex 231. Black admitted that his business card did not say "Rite Aid Headquarters", asserting that it said only "Rite Aid", the licensed logo used by all RAC subsidiaries. *Id*, 476.

### C. Operation of the Plant at the Time of Manufacture

Excerpts of the depositions of three witnesses, Crosby, Robert Dwyer and Ronald Simmer, all of whom worked at the plant in 1997and 1998, were put in evidence. Court Ex 1. Crosby first worked at the Plant in 1973. Ct Ex 1, Crosby Tr, 11. In 1976, the Plant moved to its current location in El Monte, CA. *Id*, 12. From 1976 until 1987, Crosby was general manager of the Plant and held that title at the time of his 2009 deposition. *Id*, 12-13. Simmer was the Plant's operations manager from 1987 through 2008, when he was deposed. Simmer Tr, 5.

Much of Crosby's testimony referred to "Rite Aid" and "Thrifty Payless" without specifying particular corporate entity names. Crosby said that in 1996 "Thrifty Payless" owned

14

the Plant.  Crosby Tr, 61.  He testified that "Thrifty Payless" was acquired in late '96 or early '97

by "Rite Aid", but was uncertain who owned the Plant after the merger and in 1998; he said that

"Rite Aid" owned it at the time of his deposition, again without further designation of the entity.

*Id*, 13 & 62-63.  He testified that "Thrifty" was a trade mark and a trade name, but did not know

if after the merger it was registered to RAC.  *Id*, 90.  In 1996, Crosby reported to Murray Todd, a

VP employed by "Thrifty Payless", who worked in the Thrifty Main Office in Oregon.  *Id*, 63-

64.  When asked whether Mr. Todd was VP of ice cream or something else, Crosby replied, "[i]t

was a fairly large umbrella.  And I don't know all of the different areas of his responsibility."  *Id*.

After the merger, Crosby reported to Ron Miller, whose title Crosby thought was, "Sr VP Supply

Chain" of "Rite Aid"; again he named no particular Rite Aid entity, although later he said that

Miller was a VP of HQ.  *Id*, 15-16 & 94.

Crosby's failure to identify "Rite Aid" more particularly was understandable because he

simply did not know much about the corporate structure.  For example, when asked who the

officers of "Thrifty Payless" were in 1996 and 1998, Crosby answered that he believed Chuck

Kibler was president but "[b]eyond him I do not know."  *Id*, 17.  Crosby did not know "for

certain" whether "Thrifty Payless" had a board of directors, but he said that, "[i]n my mind it

would be the same, Chuck Kibler."  *Id*, 17-18.  In addition, many of the questions propounded to

him by Plaintiff referred to "Rite Aid" and failed to identify the corporate entities.  Thus, when

asked if Mr. Kibler was "a Rite Aid executive," he replied, "I know he's employed by Rite Aid"

and "based in Camp Hill," which, as previously noted, is the location of the RAC Main Office,

as well as the offices of TPI and HQ.  *Id*, 18.  He said that, beginning sometime in 1997, his

individual paychecks (as well as the paychecks of the other Plant managers) were issued by "Rite

Aid" and that his 1997 W-2 was issued by "Thrifty Payless".  *Id*, 20-21.  Crosby said that "Rite

15

Aid" was the carrier for his health insurance benefits and that the co-pays were deducted by "Rite Aid" from his salary. *Id*, 22. Similarly, he said that after the merger, "Rite Aid" determined his vacation time. *Id*, 23.

The court finds that Crosby was incorrect about the entity that issued his paychecks and paid his benefits. RAC established by a preponderance of the credible evidence that in 1996 and 1997, neither RAC nor HQ, issued Crosby's W-2s. Crosby's W-2s for the years 1999 through 2001 were admitted into evidence and no earlier ones were offered by either party. Ex YY. They show that TPI "DBA Rite Aid" issued Crosby's W-2 in those years. As previously noted by Black, the transition of payroll operations following the merger was not completed until 1999.[8] Black Trial Tr, 367-368. It would be unreasonable to infer that, after the merger, RAC changed the entity that paid Crosby back to TPI. If anything, after the merger, RAC or one of its subsidiaries might have been substituted as the entity paying him, in place of TPI. In addition, according to the 1996 TPI 10K, TPI or one of its subsidiaries owned the Plant where Crosby worked prior to the merger. Ex C. Hence, the most likely inference is that neither RAC nor HQ paid Crosby before 1999. Similarly, the W-2s for Simmer for the years 1999 and 2000 were issued by TPI "DBA Rite Aid". Ex ZZ. Finally, the Returns demonstrate that RAC paid no wages, salaries or benefits. Ex PP-1.

The court does not credit Crosby's testimony relating to corporate structure. Crosby's testimony on this subject was undermined because he disavowed understanding that RAC and HQ were specific corporate entities during the relevant period:

Q: *When you say "Rite Aid Headquarters," are you talking about any specific corporate entity or its* [sic] *just headquarters to you?*

---

[8] As noted earlier, the end-date of the tort which is the subject of this action was 1997.

16

A: *Just headquarters to me*.

...

Q: Do you, sir, in your own mind – back in 1997, did you make a distinction between Rite Aid Headquarters and Rite Aid Corporation as being two different entities?

A: Rite Aid Headquarters Corporation was who I dealt with.

Q: Did you make a distinction between that and Rite Aid Corporation?

A: *I didn't know who Rite Aid Corporation was*.

Q: Who was Rite Aid Headquarters Corporation to your knowledge, back in 1997 and 1998?

A: The people that provided me with services.

...

Q: Do you happen to know whether Rite Aid Headquarters was a corporation that was owned by Rite Aid Corporation?

A: That's my understanding.

Q: ... I've talked about the logistics department. Do you understand that to be a department of Rite Aid Corporation or Rite Aid Headquarters Corporation? Which?

A: Rite Aid Headquarters Corporation.

Q: And what is that understanding based upon?

A: That I had no interaction whatsoever with Rite Aid Corporation.

Q: Well, how do you know you had an interaction with Rite Aid Headquarters Corporation, that particular entity?

A: Because all of the people I dealt with are employed by that corporation.

Q: ... What is the source of that information?

A: It's just my understanding.

Q: Is it your understanding based on review of records?

A: No review of records, no.

Q: Is it based on any personal conversation with any of the individuals we mentioned today? Mr. Miller, Mr. Osborne?

A: I don't recall.

Q: Was it based on … materials that Rite Aid provided to you? …

A: I don't think so.

Q: Did you have that understanding back in … 1997, 1998, or was that an understanding that you recently acquired?

Q: Probably more recently acquired.

Q: So what was your understanding back in the 1977 through 2000 period?

MR. SCHMUTZ: '77?

MR. EDINBURGH: I'm sorry 1997 through 2000 period.

Q: Or did you have an understanding of which Rite Aid it was?

A: *I had very little contact with anyone in those days, so I couldn't say that I knew there was a distinction.*

Similarly, Crosby's testimony was not credible on the issue of the corporate affiliations of the officers he dealt with. His testimony proved that he was in the dark, mistaken or unsure about the officers of TPI, HQ and RAC:

Q: Did you know back in the period between 1997 and 2000 the identity of any officers of Rite Aid Headquarters Corporation?

18

A: I dealt with Ron Miller infrequently, but he was, as far as I knew, a senior vice president with Rite Aid Headquarters.

Q: How about Mr. Gerson, … what was your understanding of his title back in the period of 1997, 2001?

A: Chief general counsel, headquarters corporation.

Q: Do you know whether he had that same title for Rite Aid Corporation?

A: No, I do not.

Q: Do you know whether he was also an officer of Thrifty Payless, Inc. in that same time period?

A: No, I do not.

Q: Did you ever address any correspondence to Mr. Miller or Mr. Gerson addressed to Rite Aid Headquarters Corporation, using that specific title?

A: No. Only to their name.

Q: What name?

A: To their individual name.  It wasn't necessary for me to add any qualifier.

…

Q: You sent faxes to them?

A: I may.

Q: Do you know the fax number you sent to was a number unique to Rite Aid Headquarters Corp. or was it the same fax number to Rite Aid Corporation as well?

A: I would not know the distinction.

Q: Did they have the same address, Rite Aid Headquarters Corp. and Rite Aid Corporation?

19

A: I don't know that.

Q: Did they have offices in the same building?

A: I don't know that.

Q: Were they both based in Camp Hill, Pennsylvania?

A: I don't know that.

Crosby Tr, 71-71, 89 & 90-97.

      Other, more credible evidence establishes that Crosby was incorrect that Gerson was General Counsel of HQ. According to Gerson's deposition testimony, he was Deputy or Assistant General Counsel[9] and Sr VP of RAC in 1995, and was General Counsel of RAC in 1997 or 1998, until he retired in 2002. Gerson Tr, 8-11. His November 2000 employment contract for the position of Exec VP and General Counsel was with RAC, not HQ. Ex 218. Although the contract is dated after the relevant period for this lawsuit, Gerson's offices did not change materially from 1997 or 1998 through 2002. Gerson Tr, 8-11. Gerson's W-2s were issued by HQ in 2000 and 2001, which signifies that HQ paid his salary, but he had an employment contract as an officer of RAC. Ex 218 & Ex BBB. This comports with Black's and Gerson's testimony that they were employees of RAC, which delegated its officers to HQ in order to provide services to RAC's subsidiaries. Black Trial Tr, 341-346 & 425-427; Gerson Tr, 14-16 & 23. It also comports with the Returns, which reported that HQ, not RAC, paid compensation to officers. Ex PP-1. Further, contrary to Crosby's belief, there is no evidence in the record that HQ had its own counsel. Gerson testified that at the time of the merger, he was not an officer of HQ. Gerson Tr, 23 & 15-16. Nor could he recall being a director of HQ. *Id*, 15-16. Gerson and Black testified that HQ provided legal services to TPI and RAC's other

---

[9] The record reflects that he was Assistant Chief Legal Counsel, Ex C, 26-27.

subsidiaries. Black Trial Tr, 341-342; Gerson Tr, 52-53. Contrary to Crosby's understanding, following the merger, Gerson was an officer and director of both TPI and RAC. Ex S, T & Ex 178, Bates 000074. Consequently, Crosby erred when he said that Gerson was General Counsel of HQ; Crosby was unaware that Gerson was a director and officer of RAC and TPI. Finally, Crosby did not know that Gerson's office was at the RAC Main Office in Camp Hill, Pennsylvania, where HQ and TPI had offices as well. Black Tr, 476-477; Gerson Tr, 51-52.

Crosby also lacked precise knowledge of the corporate affiliations of Kibler and Miller. Although not mentioned by Crosby, Kibler was an officer of TPI and RAC. Exs 178, Bates RAC 000073-000074, & Ex T. Gerson testified that Miller was an officer of RAC, employed by HQ, was in charge of the warehouse, and had an office at RAC's Main Office. Gerson Tr, 51-52. Black said that, in 1996 to 1998, Miller was an officer of RAC and of HQ, an employee of HQ, and responsible for the distribution center network. Black Trial Tr, p 498 & Black Dep Tr, 110-112. In 1999, Miller had an employment contract with RAC, but his W-2s for 2000 and 2001 were issued by HQ. Exs 226, AAA & BBB. RAC's 10Ks for the relevant years stated that Miller was Sr VP of RAC. Ex 178, Bates & Ex 180, Bates RAC 000006.

While Crosby, as well as Gerson and Black, did say that HQ performed certain functions after the merger, they did not include manufacturing, distributing and selling ice cream. Crosby said that in 1997 and thereafter, HQ advertised the Thrifty ice cream and determined his salary and bonus. Crosby Tr, 20-21 & 43. As previously noted, Gerson and Black testified that HQ provided legal services to TPI, which did not have its own legal department. Crosby requested funds for equipment, a second hardener, from "Thrifty Payless" before the merger, and after the merger from "Rite Aid Headquarters." Crosby Tr, 28-29. Crosby said "Rite Aid Headquarters" handled the Plant's insurance and that the Plant was designated Rite Aid's DC 61. *Id*, 32-33 &

39.  Crosby also said that "through the years" after the merger, the Plant's computer software was changed to Rite Aid proprietary systems for payroll, accounts receivable, accounts payable and inventory management, i.e., accounting systems.  *Id*, 31-32.  Lastly, Crosby said that after the merger, HQ assigned two men, Simon Osborne and Doug Donley, from logistics and accounting of "Rite Aid Headquarters", to evaluate whether the Plant should be sold.  *Id*, 71-74.  Crosby and Simmer had 30 meetings at the Plant with Osborne in the first half of 1997.  *Id*, 39 & 71-74.  Simmer confirmed that just after the merger, he had conversations with Osborne and Donley from "Rite Aid" regarding Plant operations.  Simmer Tr, 13-15.  However, Simmer denied that Osborne gave him any advice on improving Plant operations.  *Id*.  The Plant was not sold.

As previously noted, Black testified that for accounting purposes, HQ used the designation DC 61.  Black Trial Tr, 506.  According to Black, accounting services were run by HQ for TPI and all RAC subsidiaries.  Black Trial Tr, 341, 367-368.  Stephen Kindler also confirmed that HQ provided accounting services to RAC's subsidiaries and that the Plant was "in a [TPI] subsidiary."  Kindler Tr, 20-21.  Kindler was employed by RAC from 1990 through 2010, when he retired.  *Id*, 7-9.  He was an officer of RAC and provided services through HQ to a number of subsidiaries, including TPI; in 1996 to 1997, he served as RAC's VP and Controller.  *Id*, 7-9, 14, 16, & 20-21.  He was paid and his W-2 was issued by HQ.  *Id*.  The shared services HQ provided to TPI, including accounting and information systems and services, which ***tracked*** all TPI sales, including the Plant's.  *Id*.  He did not say that HQ made the sales.

On the other hand, Crosby was quite clear that, after the merger, he operated the Plant with little or no input from "Rite Aid".  As previously noted, he testified that he had "very little

contact with anyone" in 1997 through 2000. Crosby Tr, 92. Crosby described his duties as
follows:

> I oversee the entire operation of the ice cream manufacturing and distribution
> of ice cream products through Rite Aid drugstores, as well as a number of
> independent accounts.

*Id*, 13. His duties had not changed materially since 1987. *Id*. He said he was the highest
ranking manager at the Plant in 1997. *Id*, 21. In 1997 and thereafter, Miller made annual written
evaluations of Crosby's performance. *Id*, 45. However, when asked if he reported to Miller, he
said:

> No. All day-to-day operations were conducted at the ice cream plant. The only
> time we would reach out to Ron Miller is if there was something that involved
> support from headquarters.

*Id*, 155.

Simmer described his responsibilities as Plant operations manager as "[r]esponsible for
all the production, engineering, distribution." Simmer Tr, 5. He said that he reported to his
"boss", Crosby, the Plant's General Manager and its highest level manager or executive. *Id*, 8-9.

Crosby testified that after the merger, no "Rite Aid" executives or officers visited the
Plant and he spoke to Miller of the logistics department "on occasion". Crosby Tr, 43-44. After
the merger, "Rite Aid" did not establish goals for the Plant's sales, revenue or income. *Id*, 44-45.
Crosby determined the annual Plant budgets. *Id*, 28. Risk management was handled by Simmer.
*Id*, 39. Prior to 2005, nobody at HQ assigned management or business consultants to make the
Plant more profitable or efficient. *Id*, 76. He and Simmer negotiated the labor agreements on
behalf of management. *Id*, 26-27. When asked whether the collective bargaining agreements
had to be approved by RAC, Crosby answered, "I have no connection with Rite Aid
Corporation." *Id*. Beginning in 1997, the Plant did not report daily ice cream sales to "Rite

Aid", although in the first quarter of 1997, the Plant sent daily intra-company communications to "Rite Aid Headquarters". *Id*, 47.

Although Ron Simmer negotiated labor contracts with "some help from the "Rite Aid" Labor Relations Department, Crosby did not know whether that was a separate corporation or a department of RAC. *Id*. The man who assisted Simmer, both before and after the merger, was based in Wilsonville, Oregon, not the RAC Main Office. *Id*.

Crosby testified that the Plant was profitable in 1997 and 1998. *Id*, 41-42. He said that in March of 1997, the Plant had three types of accounts: license, contract and wholesale. *Id*, 79. However, he said that sales of ice cream to the drug stores were considered a "zero-based" operation, meaning the drug stores paid for the ice cream and any profits from sales of ice cream were transferred to "Rite Aid Headquarters". *Id*. With respect to the sales to the stores, he said, "we weren't losing money, we weren't making money." *Id*. With respect to wholesale sales, which did not include sales to the stores, Crosby said that the monies went to Rite Aid Headquarters. *Id*, 41-42 & 78. However, Crosby's testimony directly contradicted the RAC consolidated Returns, which showed that HQ did not have sales revenue in those years. Ex PP-1, Bates RAC 006564 & 005803; Black Trial Tr, 387-388. Further, Crosby contradicted himself on this point. A page earlier in his deposition, he said that he did not know whether there were transfers of funds from the Plant to HQ in 1997, including corporate funds, dividends, loan payments or anything of that nature. *Id*, 40. Further, Black gave a cogent explanation as to why sales from the Plant to the TPI stores were zero-based: they were sales within TPI, i.e., from its Plant to its drug stores. Black Trial Tr, 390-391.

The court does not credit Crosby's testimony that the Plant's profits were transferred to HQ for several reasons. He did not know what HQ was, it was "just headquarters" to him.

Crosby said the Plant did not transfer funds to HQ. Finally, and most importantly, the Returns did not report that HQ had income from sales in 1996 and 1997. Ex PP-1. Black and Kindler, an accountant and controller, testified credibly that HQ provided accounting and sales tracking functions for TPI, so that profits would have been recorded by HQ. Perhaps, Crosby confused the recording of profits by HQ with transferring them to HQ, as he did with many other facts surrounding the interrelation of RAC and its subsidiaries.

There was no credible evidence that the Plant transferred its profits to RAC. Even if Crosby were correct that the Plant's profits went to HQ, HQ is a separate entity from RAC. The document that Plaintiff relies on to prove that the Plant's profits went to RAC does not support its argument. Ex 115; P's Brief, p 19. The exhibit is a flow chart that was not authenticated by any witness. Ex 115. Kindler testified about it, but said that he did not prepare it, did not know who had prepared it, and that it appeared to be a proposal relating to setting up accounting systems. Kibler Tr, 27-30, 36-37, 43-45 & 65-68. Significantly, he did not say that it was a proposal about transferring money or profits. *Id*. Nor does the exhibit itself say anything about money from sales going from the Plant to RAC, which showed no income on its Returns. The flow chart has arrows going to and from boxes labeled "Ice Cream" and "Rite Aid", **not** "Rite Aid Corporation". Ex 115. There also are arrows going to and from a box labeled "Ice Cream" to a box labeled "Third Party". *Id*. Kibler said he did not know what the arrows signified. *Id*, 31-32. At most Kibler's testimony established that someone made a proposal that some Rite Aid entity was going to track sales from the Plant to third parties for accounting purposes, but Kibler was unable to so testify from personal knowledge. Ex 115; Kibler Tr, 43-49. As a result, there is no credible proof that the Plant's profits from the sale of ice cream to Korea, or any third

25

party, were transferred to RAC. However, there is proof that they were not, i.e., the Returns, which reflected that RAC had no income from sales. Ex PP-1.

In early 1997 or the first quarter of 1998, Crosby stated that he came to believe that the Plant was a division of "Rite Aid":

Q: When did you come to the belief that the Thrifty Ice Cream plant was a division of Rite Aid?

A: That was something I came up with in early '97 or '98.

Q: And what was the basis for that belief or understanding at that time?

A: I was merely trying to connect the dots between Rite Aid, the retail Rite Aid stores and Thrifty Ice Cream.

Q: Did you share that belief or understanding with any of your managers at the ice cream plant?

A: I don't recall.

Q: Did you share that belief or understanding with any Rite Aid managers or executives?

A: I don't recall.

Crosby Tr, 47-48.

Plaintiff relied heavily at trial on a letterhead that Crosby used for the Plant's stationery and faxes, both of which bore the legend, "Thrifty Ice Cream a Division of Rite Aid Corporation" (Letterhead). At the time, Crosby did not know the difference between a division and a subsidiary. Crosby Tr, 199. He said that he began using the Letterhead between the first and second quarter of 1997. *Id*, 48. In 1997 and 1998, he had stationery professionally printed with the Letterhead on it and the Plant printed the fax cover sheets that contained it. *Id*, 50-52.

26

The reason he created it was "to try to make the connection for our customers between Thrifty Ice Cream and that it was available for sale at a Rite Aid drugstore." *Id*, 200.[10]

Crosby used the Letterhead for seven years, from 1997 through 2004. *Id*. He stopped using it because he came to realize that it was "his own creation," that he had "not received … anyone's approval or authorization," and that the Plant "was not a division of Rite Aid Corporation," with which he had "no interaction." *Id*, 52. In 1997, he did send the Letterhead to "Rite Aid" executives, officers or managers, including Miller and, maybe, Gerson. *Id*, 53.

The record contains a number of communications in 1997 from the Plant to Plaintiff with the Letterhead on it. Exs 2-8, 11, 13, 14, 20 & 22. Four of these were sent before the Plant's last shipment of tainted ice cream on September 19, 1997 (Final Shipment). There also are four exhibits with the Letterhead on it that were sent to Miller in November 1997 and to Gerson in February of 1998, all after the Final Shipment. Exs 66 & 73-75. Other exhibits sent to Miller or Gerson from the Plant in 1997, before and after the Final Shipment, do not have the Letterhead on it; they have a different letterhead that says "Thrifty Ice Cream Division." Exs 46, 56, 64 and 60. Crosby kept the correspondence in a file in the Plant office. Crosby Tr, 50. Two exhibits with the Letterhead on them bear a "cc" to "File." Exs 14 & 22. There are other communications with Letterhead on them from the Plant to I.F.M., Plaintiff's contract counterparty, and the Korean Department of Food and Agriculture (Korean FDA), that indicate a copy was placed in the file. Exs 1, 9 & 20. The court notes again that Gerson and Miller were officers of RAC in 1997 and 1998. Gerson Tr, 8-11, 51-52, 218 & 498.

---

[10] Similarly, after the merger, Simmer made a decision, after consulting Crosby, to put signs on the tractor trailer fleet that identified the Plant as a division of RAC to make sure that customers knew they could buy Thrifty Ice Cream in Rite Aid stores. Simmer Tr, 15-16.

Plaintiff further relied on the following evidence of communications to TPI employees in order to prove that RAC controlled the Plant following the merger: 1) RAC sent letters terminating TPI employees because their positions had been eliminated; and 2) RAC published a newsletter to TPI employees, which explained how they would be affected by the merger (Newsletter). Exs 45 & 110 & Black Dep Tr 168. Specifically, the Newsletter said: "Rite Aid will continue to operate the ice cream business as it is today under the Thrifty name." Ex 110.

Neither the Termination Letters nor the Newsletter are persuasive evidence of who controlled or operated the Plant in 1997. With respect to the Termination Letters, there was no evidence that the employees were employed at the Plant. Ex 45. The exhibit does not say what positions the eliminated employees held and no witness testified on that point. With respect to the Newsletter, a reference to "Rite Aid" operating the ice cream business under the name "Thrifty" appears to be a casual reference appropriate for communications with staff. Ex 110. Moreover, Black testified that Rite Aid is a brand name licensed to all subsidiaries. Black Trial Tr, 356. The court does not view the Newsletter or the Termination Letters as so compelling that they can override formal corporate structure and actual corporate operations, as reflected on the Returns or in the testimony of knowledgeable corporate officers.

Additionally, Plaintiff introduced a statement of undisputed material facts and an affidavit, which RAC filed in lawsuits in 2005 and 2008 (Judicial Statements). Plaintiff offered the Judicial Statements to prove that RAC employed an HR director, employed pharmacists and operated stores. Exs 168 & 169. Black testified the Judicial Admissions were erroneous because RAC is a holding company that does not operate stores. Black Dep Tr, 210-211 & 217. The court does not find these documents persuasive due to the Returns, which showed that RAC had no expenses for salaries and no income from sales. Ex PP-1. Moreover, the Judicial Statements

28

do not relate to the relevant time period, 1997 and 1998. Finally, they do not prove that RAC operated the Plant, or sold or distributed ice cream. At most, they would prove that RAC had employees and operated stores years after the tainted ice cream was placed in the stream of commerce.

### D. *Plaintiff's Listeria Claim*

On October 22, 1997, Crosby sent a letter to the Korean FDA and Plaintiff saying that he had recently learned that the Korean government alleged that two flavors of Thrifty Ice Cream, Pistachio Nut and Medieval Madness, were listeria-tainted. Ex 20. The letter had the Letterhead on it and was copied to "File." *Id*. The next day, Plaintiff faxed a letter to "Department of Food and Agriculture, U.S. Embassy," stating that Sangshin had heard the allegation on the news, but not from the Korean government, and that the two flavors had been manufactured in April and July, 1997. Ex 26.

The court finds that Gerson saw the Letterhead on November 5, 1997. On November 4 and 5, 1997, Crosby sent memos, with a letterhead that said only "Thrifty Ice Cream" to Miller and Gerson, respectively. Exs 56 & 60. The memo to Miller said, "[u]nder separate cover I am sending to Elliot Gershon [sic] (with a copy to you) copies of pertinent correspondence and documents we have with Korea dating back to day one." The memo to Gerson was introduced, but the body was redacted on the ground of privilege. Ex 60. Crosby did not recall what he sent to Miller or Gerson, but he assumed that he sent what he said he had sent. Crosby Tr, 159-161. The court credits his testimony on this point, as there was no contradictory evidence.

The record established that the labels on the tainted ice cream said that it was manufactured by **TPI**. On November 6, 1997, the Pacific Regional Office of the Food and Drug Administration (CA FDA) sent a fax to Simmer at the Plant, attaching a fax from "Agricultural

29

Affairs US Embassy/Seoul," dated November 5, 1997, concerning Thrifty Payless Ice Cream (Embassy Fax). Ex 65. The Embassy Fax attached two pages, one titled "<u>INFORMATION ON THE PRODUCTS THAT FAILED INSPECTION</u>" and the other titled "<u>LIST OF INFORMATION OBTAINED FROM LABELS.</u>" *Id* [emphasis in original]. The first attachment said that Pistachio Nut and Medieval Madness ice cream manufactured by TPI and imported by Plaintiff had failed inspection, and that the Korean DFA had announced in the press that four other flavors manufactured by TPI had failed too. *Id.* The second attachment said that *the labels on all six flavors listed the manufacturer as TPI and the importer as Plaintiff. Id.* The Embassy Fax was offered in evidence by Plaintiff. Ct Ex 1. Another, earlier, fax from the CA FDA, dated October 23, 1997, reported that "the Koreans analyzed Pistachio Nut Ice Cream and Medieval Madness Ice Cream (no date codes reported) manufactured by Thrifty Ice Cream, A Division of Rite Aid Corporation, El Monte, CA ... and found L. mono". Ex 21. The October 21 CA FDA fax did not mention packaging or labels. *Id.* It annexed correspondence from Plaintiff and a newspaper article. *Id.*

On November 14, 1997, Plaintiff's President, Doo Hwan Seong (Doo), wrote to "Thrifty Ice Cream" to the attention of Crosby, President, stating that six Thrifty flavors had tested positive for listeria. Ex 28. Doo requested a discussion with "Thrifty" and asked Crosby to come to Korea. *Id.* On November 20 and 25, 1997, Doo wrote two more letters, addressed in the same manner, noting his disappointment that Crosby had not responded. Exs 29 & 30. On December 24, 1997, Doo wrote to Crosby, again addressing him as President of Thrifty, and demanded payment of $6,000,000 in damages. Ex 31. On February 9, 1998, Jason Ha (Ha), Plaintiff's attorney, wrote a letter reiterating the demand for settlement and threatening suit (Demand Letter). Ex 32. Ha addressed his letter to Crosby, President, Thrifty Ice Cream. *Id.*

In response, on February 10, 1998, Ha got an email from Gerson from the address esgerson@riteaid.com, which said, "Thrifty does not acknowledge any liability to your client," but that Gerson would be available to discuss the matter. Ex 33. Gerson's salutation identified his title as "Senior Vice President and General Counsel". *Id*. The email did not indicate in which entity he held those offices. *Id*. Ha responded with a letter, dated February 11, 1998, on the letterhead of Chin, Ann, Ha & Seo (Ha Firm). Ex 34. Ha's correspondence was addressed to Gerson as "Senior Vice President and General Counsel" of "Thrifty Ice Cream" at the Plant's address. *Id*. Ha suggested a meeting in Korea. *Id*. When Gerson did not reply, Ha sent another letter, addressed the same way. Ex 35. On February 16, Gerson responded using the same riteaid.com email address, and offering to meet Ha at the RAC Main Office. Ex 36. This email was signed with Gerson's name, without indication of the corporate office he held or the entity for which he was acting. *Id*. Ha sent two more letters, addressing Gerson the same way, i.e., as Sr VP and Gen Counsel of Thrifty Ice Cream. Exs 37 & 38. Gerson testified that he never advised Ha that he was not Sr VP and General Counsel of Thrifty Ice Cream, although it was incorrect because there was no such entity as Thrifty Ice Cream. *Id*, 82-83.

One of Ha's letters said that if Gerson did not agree to meet, "we will not hesitate to file a lawsuit against **Thrifty** in Seoul, Korea." Ex 37 [emphasis supplied]. On February 26, Gerson wrote back using his Rite Aid email address, signing the letter with his name only, and offering to meet in San Francisco. Ex 39. Gerson wrote, "I do not want you to take my willingness to meet as any assurance or promise that we will acknowledge any obligation to your client or that we will compensate your client in any way or any amount." *Id*. When asked what he meant by "we," Gerson said, "[i]t's the imperial we" ... "meaning [m]e and me." Gerson Tr, 86-87. As previously noted, in 1998, Gerson was an officer and director of both RAC and TPI, as well as

General Counsel of RAC, whose officers delegated to HQ the duty to provide legal services to TPI.

At the time that Ha filed the Korean action against RAC, he was an experienced products liability lawyer. Ha earned his law degree in Korea and an LLM in real estate from UCLA (University of California at Los Angeles) in 1982. Ha Tr, 12-14. He also attended the Judicial Training Institute of the Supreme Court of Korea. *Id.* At the time of his deposition in 2009, his license to practice law in California was inactive, but he was licensed in Korea. *Id*, 13. Ha served as general counsel to Hyundai Motor Company for a decade. *Id*, 14. In that capacity, his major areas of focus were products liability and international trade. *Id.* After that he opened his own practice in products liability litigation for nine years, first in the Ha Firm, which had six lawyers, where he apparently worked when he corresponded with Gerson about Plaintiff's claim. Ha Tr, 14-16; Exs 34-35 & 37-38. In 2001, he was with another firm, with twenty lawyers. *Id.* In 2004, he became President of Hyundai Marine and Fire Insurance Company, then he became an advisor to that company, and finally he became President of Hyundai Group. *Id*, 16-17.

Ha and Gerson met in San Francisco on March 5, 1998 (SF Meeting). *Id*, 54. Sung Hung Yoon (Yoon), a managing director and twenty-five percent stockholder of Plaintiff, also attended, but as he spoke no English, Ha translated what transpired. Yoon Tr, 9-12, 20-21; Ha Tr, 27-28. Ha testified that his client had informed him that he had been importing "Thrifty brand ice cream into Korea." Ha Tr, 30. Thus, when he got to the SF meeting, Ha was "surprised" that Gerson's business card said General Counsel of RAC. *Id*, 54. Ha said that as a result he said to Gerson, "oh, you are the general counsel of Rite Aid Corporation; because Thrifty Ice Cream is a division, you came to this meeting." *Id*, 54-55. Ha testified that, "[u]pon my remark, Mr. Gerson kind of nodded." *Id.* Ha said that, throughout the meeting, he referred

32

several times to Thrifty Ice Cream as "your ice cream division" and Gerson did not deny it. *Id*.

Ha, however, admitted that Gerson did not say that Thrifty Ice Cream was a division of RAC.

*Id*, 72.

Gerson said he attended the SF Meeting instead of Miller or Crosby because "that fell

within my bailiwick." Gerson Tr, 95. He did not know what he reviewed in preparation, but

said he was sure he reviewed whatever had been sent to him. *Id*, 58. He did not recall Ha saying

that he believed Thrifty Ice Cream was a division of RAC. *Id*, 63. Gerson testified that at the SF

Meeting, he told Ha that, without documentation that there was listeria in the ice cream, "we"

would not pay any money and that "our own testing" and testing of the CA FDA had found no

unacceptable levels of listeria in the Plant. Gerson Tr, 57-58 & 63-64. Gerson said that after the

SF Meeting, Ha never presented anything further. *Id*.

Gerson testified that he would not have nodded in assent to the statement that Thrifty Ice

Cream was a division of RAC because it would have been against his interest to admit liability

for "the whole entity, the imperial we" and it would have been "a lie." *Id*, 134-135. A week

after the SF Meeting, Gerson sent Ha an email that said "we do not believe we have any

responsibility to your client and will not pay anything to it." Ex 42; Gerson Tr 40-41. Gerson

signed the email with his name without any indication of his title or corporate affiliation. Ex 42.

At the time of his 2010 deposition, Gerson was receiving an annual pension from RAC of more

than $300,000. Gerson Tr, 8.

Ha claimed he determined that Thrifty Ice Cream was a division of RAC from four

things: 1) the Letterhead; 2) correspondence in which Crosby referred to himself as a general

manager and director; 3) what Ha believed was Gerson's acknowledgement at the SF Meeting;

and 4) he checked the Rite Aid website to find out who RAC's CEO was. *Id*, 49-55 & 73-74.

1124442001 DECISION AND ORDER

Ha testified that he did no further investigation and that he did not know that "Thrifty Payless" was a separate corporation. *Id*, 60 & 73-74.

Yoon also is an attorney. Yoon Tr, 8. He said that he believed that Crosby was the general managing director of the Thrifty Ice Cream factory based upon faxes and letters. *Id*, 22-23. At the SF Meeting, Yoon told Gerson that he wanted to meet with Crosby, but Gerson told him "he had power to represent RAC because he is the chief of the legal section of the company." *Id*, 24. Yoon thought Gerson was representing "Thrifty" and RAC. *Id*, 27. At that time, Yoon's understanding was that the Thrifty Ice Cream department was one of the branches of Rite Aid Corporation, a belief founded on the Letterhead and hearsay (a conversation between Dwyer, who worked at the Plant, and an employee of Plaintiff named Lee). *Id*, 24-27 & 41-42. Yoon did not discuss the corporate structure of "Rite Aid" at the SF Meeting. *Id*, 35. Before filing the Korean suit, Plaintiff did not check SEC filings to determine the corporate structure of Rite Aid; did not check with Sangshin or IFM with regard to RAC's corporate structure; and did not call anyone at RAC. *Id*, 33-34. Yoon testified that he was aware that a subsidiary is a separate legal entity, and believed a division is "part of the company." *Id*, 40-41. Yoon thought that someone from Thrifty had said to someone at Plaintiff that Thrifty was a wholly owned subsidiary of RAC. *Id*, 40. Plaintiff left the decision as to whom to sue to Ha because he "is an American attorney." *Id*. The court will not consider Yoon's testimony as to conversations his employees relayed to him because they are hearsay.[11]

Ha and Yoon both admitted that they have a financial interest in the outcome of this action. Ha said that he had a written agreement to receive 20% of anything collected, including

---

[11] Dwyer, the alleged source of some of the hearsay, testified that he was suffering from memory problems. Dwyer Tr, 5-8. The record does not contain any testimony by him about the alleged conversation with Lee.

Printed: 1/22/2015

interest. *Id*, 86-90. If this case is unsuccessful, Ha will receive nothing. *Id*, 90. Yoon testified

that if Plaintiff prevails, he will be paid "some money," presumably because he owns 25% of

Plaintiff. Yoon Tr, 18.

 The court does not find credible the testimony that, at the SF Meeting, Gerson kind of

nodded to the statement "oh, you are the general counsel of Rite Aid Corporation; because

Thrifty Ice Cream is a division, you came to this meeting." It is more likely to the court that Ha

made the statement and Gerson remained silent. Gerson could not recall whether Ha said it.

Gerson Tr, 63. However, Gerson testified that he never advised Ha that he was not Sr VP and

General Counsel of Thrifty Ice Cream, and Ha said that Gerson did not say that Thrifty Ice

Cream was a division of RAC. *Id*, 82-83; Ha Tr, 72. Ha and Yoon have a financial interest to

say that Gerson acknowledged that Thrifty Ice Cream was a division of RAC because they stand

to recover from enforcement of the Judgment. Gerson was retired when he testified. Further, as

Gerson said, it would have been a lie to agree to Ha's statement and, more importantly, it would

have been against RAC's interest to admit liability.

 *D. Ownership of the Plant*

 The court finds that the Plant was owned by Thrifty Realty, a TPI subsidiary. RAC

presented a live expert witness, David Feldman (Feldman), who was an expert in title insurance,

having been in the field for approximately 30 years. He graduated from Boston College Law

School in1983, following which he was a real estate attorney until 1983, and an underwriting

counsel and managing partner of a title agency, Settler's Abstract until 1997, which was sold to

First American Title Insurance, where he was working at the time of trial. Feldman Tr, 295-404.

Feldman testified that based upon his review of the title for 9200 Telstar Avenue in Los Angeles

County, California, the Plant's address, the land and the Plant had been owned since 1974 by

Printed: 1/22/2015

Thrifty Realty. *Id*, 305-309.  Feldman testified credibly and without opposition that, unless the public record of title notes that improvements to land are severed, one who receives a deed owns all the improvements on the property, which in this case would be the Plant. *Id*, 305-306.  A copy of a recorded deed conveying 6200 Telstar Avenue, El Monte, CA, Los Angeles County, to Thrifty Realty was entered into evidence.  Ex II.  As previously noted, Black testified that Thrifty Realty is a TPI subsidiary.  Black Tr, 351-353 & Ex JJ.

*II.  Discussion*

      In reversing a prior dismissal of this action, the Court of Appeals held that in order to find that RAC was subject to personal jurisdiction in Korea, it must be found: that it committed a tortious act outside of Korea; that the cause of action arose from that act; that the act caused injury to a person or property within Korea; that RAC expected or should reasonably have expected the act to have consequences in Korea; and that RAC derived substantial revenue from interstate or international commerce. *Sung Hwan Co., Ltd. v Rite Aid Corp.*, 7 NY3d 78 (2006)(Ct of App Dec), 83-84.  Further, the Court of Appeals held that the inquiry turns on whether exercise of jurisdiction by the foreign [Korean] court comports with New York's concept of personal jurisdiction. *Id*, 83. Based on this ruling, this court will apply New York law on personal jurisdiction, not California law, as urged by RAC.[12]

      To determine whether a non-domiciliary is subject to personal jurisdiction under New York law, the court first must determine whether New York's long arm statute is satisfied, and then whether the exercise of jurisdiction comports with due process.

---

[12] RAC argues that under California law, there is no concept of personal jurisdiction based on the fact that a subsidiary is a mere department of the parent corporation. 8/3/13 RAC Trial Brief, p 2, fn 1. In all other respects, RAC submits the laws of both jurisdictions is the same with respect to the issues presented. *Id passim*.

*LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d 210, 214 (2000). The plaintiff bears the burden of establishing the fact of jurisdiction. *Derso v Volkswagen of America, Inc.*, 159 AD2d 937, 938 (4th Dept 1990). CPLR 302, New York's long arm jurisdiction statute provides, in pertinent part, as follows:

> (a) Acts which are the basis of jurisdiction.
>
> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ..., who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or ...
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ....

*A. Ownership*

Personal jurisdiction over RAC cannot be based on ownership of the Plant. The court has found as a fact that RAC did not own the Plant. It was owned by Thrifty Realty, a subsidiary of TPI. There was no countervailing proof to rebut Feldman's testimony and the court accepts it as true. In addition, Plaintiff itself disavowed the theory that personal jurisdiction over RAC turned on ownership of the Plant. Plaintiff's 9/19/14 Post Trial Brief (P's Brief), 17-18.

*B. Agency & Operational Control of the Plant*

In order to establish personal jurisdiction over RAC due to the acts of an agent, Plaintiff must prove that RAC's agent committed a tortious act and that Plaintiff's cause of action arose from the agent's act. See Ct of App Dec. Product liability cannot be imposed on a party that is outside the manufacturing, selling, or distribution chain. *Porter v LSB Indus.*, 192 AD2d 205

(4th Dept 1993).  Hence, Plaintiff must prove that in 1997, the Plaint was RAC's agent for manufacturing, selling and distributing ice cream (Tortious Act).

For purposes of personal jurisdiction, the actions of an agent will be imputed to the principal if: 1) the agent engages in purposeful activities in the State in relation to the transaction; 2) for the benefit of and with the knowledge and consent of the defendant/principal; and 3) the principal exercised some control over the agent in the matter. *Kreutter v McFadden Oil Corp.*, 71 NY2d 460, 467 (1988).  A formal agency relationship need not be established.  *Id.*  Although *Kreutter* involved transaction of business in the State, CPLR 302(a)(1), the same analysis has been used for agency status under CPLR 302(a)(3).  *Zito v Leasecomm Corp.*, 2003 U.S. Dist. LEXIS 17236, 66-67 (SDNY 9/30/03) (nor).  In accord with the Court of Appeals ruling in this case, the State should be read to mean Korea.  Ct of App Dec,7 NY3d 78.

Here, the record demonstrates that RAC did not exercise "some control" over the Tortious Act underlying the Judgment.  Crosby testified that he rarely spoke to anyone at Rite Aid or HQ and that he was in complete control of the Plant and its operations.  The court credits his testimony on this point.  Simmer, the Plant operations manager, testified that he reported to Crosby.  Crosby denied that he reported to Miller.  Although Crosby spoke to Miller on occasions when he needed support from headquarters, "any corporation that owns the stock of another necessarily exercises a considerable degree of control over the subsidiary corporation"; "supervision alone is not enough to subject the parent to New York jurisdiction," unless the parent shows disregard for the subsidiary's separate corporate existence.  *Volkswagenwerk Aktiengesellschaft v Beech Aircraft Corp.*, 751 F2d 117, 120 (2d Cir 1984).  The evidence demonstrated that Miller provided no more than supervision and even that was unrelated to the Tortious Act.

38

Plaintiff argues, based on the Letterhead, that the Plant held itself out as a division of RAC to Plaintiff and others and that no RAC official corrected the statement, which was misleading conduct on the part of RAC, or amounted to an acquiescence by silence. Plaintiff also urges that the following actions by RAC are evidence that the Plant was RAC's agent in the manufacture and distribution of ice cream: RAC analyzed the Plant and solicited bids to sell it; RAC sold the ice cream at cost to RAC's west coast drug stores; profits from the Plant's outside sales (sales not to the drugstores) were given to RAC; and RAC would have had to supply ice cream to the west coast stores if there had been no Plant. P's Brief, 29-30.

The notion that RAC held itself out as a division of RAC is an argument based upon apparent authority. Apparent authority exists when the agent has not been delegated actual authority, but verbal or other manifestations of the principal support a reasonable inference of the principal's intent to grant authority to the agent to conduct the transaction. *Greene v Hellman*, 51 NY2d 197 (1980). An agent cannot clothe himself with apparent authority by his own actions. *Hallock v State*, 64 NY2d 224, 231 (1984). In addition, reliance by the third party on an appearance of authority must be reasonable under the surrounding circumstances. *Id.*; *Ernst Iron Works, Inc. v Duralith Corp.*, 270 NY 165, 170 (1936)("There can be no reliance on apparent authority unless the circumstances are such that the plaintiff is entitled to rely upon it.").

Applying these principles here, the Letterhead did not imbue Crosby with apparent authority to act for RAC in committing the Tortious Acts. Crosby admitted that it was his own act, not the act of RAC, and he created the Letterhead without authorization or approval from anyone. To the extent that the Letterhead was sent to others, it was not a basis for Plaintiff to rely on it.

Moreover, reliance on the Letterhead by Plaintiff was not reasonable, even if Gerson failed to deny that Thrifty Ice Cream was a division of RAC. There was no contract with RAC to sell ice cream. The seller was identified as TPI in the Sangshin/TPI Contract, and the contract required notices to be sent to "Thrifty Payless, Inc., Ice Cream Division," at the Plant's address in El Monte, CA. Ex 165. The labels on the ice cream said it was manufactured by TPI. Publicly filed documents showed that TPI owned the Plant and that TPI was a wholly-owned subsidiary of RAC, a holding company with many subsidiaries. The publicly filed TPI 96 10K, filed before the SF Meeting, showed that, after the merger, Gerson was an officer and director of TPI. Ex C, p 26. RAC's 97 and 98 10Ks identified Gerson as an officer and director of RAC as well. Ex 178 & 180. It was not reasonable for Ha and Yoon, both attorneys and the former a sophisticated corporate attorney schooled in products liability and international trade, to rely on the Letterhead without checking public filings, especially when the TPI/Sangshin Contract and ice cream labels should have put them on notice that TPI, a corporate entity, was the seller and manufacturer.[13] Ha admitted that he did not check any public filings before suing RAC, and Yoon testified that he relied on Ha. The public filings would have revealed that TPI owned the Plant and that Gerson was an officer of both TPI and RAC.[14] Further, in some correspondence with Plaintiff, Crosby did not use the Letterhead. Given the different stationery, reliance on one and not the other was not reasonable without further inquiry.

---

[13] Although not argued by Plaintiff, the court does not find that Crosby had implied authority. Implied authority differs from apparent authority in that the principal imbues a reasonable belief in the agent that he has authority. *Green v Hellman, supra.* With respect to the Letterhead, the record establishes that Crosby acted on his own, without authorization or approval from anyone.

[14] To the extent that Plaintiff relies on consolidated returns to show that RAC said it owned the Plant, that reliance is unreasonable. Black correctly testified that applicable law requires holding companies to file consolidated returns listing the assets of its subsidiaries. *Beech, supra.*

Moreover, at the SF Meeting, Ha had reason not to rely on Gerson. Gerson and Ha were there as adversaries negotiating a settlement for their respective clients. Ha had no reason to expect that he could rely on Gerson's silence, or even an ephemeral nod. Gerson had no duty to explain to Ha, a seasoned products liability attorney with both Korean and California degrees and licenses, the correct entity against which he should file suit. As set forth above, the court believes that Gerson did not assent to Ha's statement at the SF Meeting and, if he was silent when Ha made the statement, Ha's reliance on silence alone was not reasonable in light of other facts at his disposal. The statement that Gerson did not contradict was, allegedly, that " you are the general counsel of Rite Aid Corporation; because Thrifty Ice Cream is a division, you came to this meeting." Assent to that statement could indicate that Gerson had authority as counsel to negotiate Plaintiff's claim, not that Thrifty Ice Cream, which Ha should have known was a non-existent entity with whom Sangshin did not contract, was RAC's agent when it committed the Tortious Act. Moreover, even if the court believed that Gerson "kind of nodded", that would not establish reasonable reliance. A kind of nod is not a definitive response. Certainly, before commencing suit, lawyers investigate the appropriate defendant, knowing full well that entities are incorporated to shield principals from liability. Here, available public records, the TPI/Sangshin Contract and the ice cream labels would have revealed the true entity to sue, or at least prompted further inquiry.

Turning to Plaintiff's claim that RAC officers acquiesced in the use of the Letterhead, even if that is true, it does not eliminate the element of reasonable reliance. Although the court has found that prior to the SF Meeting, Crosby sent all of his correspondence from Korea to Gerson, it nevertheless was unreasonable for Ha and Plaintiff to rely on this in light of the other surrounding circumstances.

41

None of the other alleged acts of RAC proved that it controlled the manufacture, sale and distribution of ice cream. Trying to sell the Plant is not manufacture, sale or distribution. It is a common act of a parent corporation or principal. There was proof that RAC did not manufacture or sell anything, let alone ice cream. The Returns evidenced no income or expenses relating to goods sold. Ex PP-1. The fact that TPI sold the ice cream at cost to the west coast drug stores proved nothing because both the Plant and the west coast drug stores were owned by TPI so that it was selling to itself at cost. Crosby testified that profits from the Plant went to HQ. However, the court does not credit his testimony on that point for the reasons stated above, especially the fact that he also said the opposite -- that there was no transfer of funds from the Plant to HQ. In addition, HQ is not RAC.

The last argument is Plaintiff's claim that RAC would have had to supply ice cream to the west coast stores if there had been no Plant. This is not borne out by the record. The Plant was a tiny fraction of TPI's core business, which was the operation of drug stores. The Plant's sales were a miniscule amount of TPI's sales. The fact that HQ or RAC considered selling the Plant shows that TPI would not have had to supply ice cream to the stores if the Plant did not exist. Further, the recent United States Supreme Court decision in *Daimler* rejected the idea that a subsidiary could be an agent for purposes of general jurisdiction, if the function performed by the subsidiary was so important to the parent that it would perform it itself if the subsidiary did not exist. *Daimler AG v Bauman,* 134 S Ct 746, 760 (2014) (nor). The court's reasoning was that "the inquiry into importance stacks the deck, for it will always yield a pro-jurisdiction answer." *Id.* That statement is true whether applied to general jurisdiction, which was the issue in *Daimler*, or specific jurisdiction, the issue here.

 *C. Mere Department or Alter Ego*

42

Under New York law, jurisdiction over a parent corporation based on actions of its subsidiary is appropriate where the subsidiary is so controlled by the parent that it is a "mere department" of the parent. *Volkswagenwerk Aktiengesellschaft v Beech Aircraft Corp.*, 751 F2d 117, 120 (2d Cir 1984). To exercise jurisdiction on this theory, the parent's control over the subsidiary's activities must be complete and the parent corporation must show a disregard for the separate corporate existence of its subsidiary. *Delagi v Volkswagenwerk AG of Wolfsburg*, 29 NY2d 426, 432 (1972); *Beech*, 120. Mere department is related to equitably piercing the corporate veil for purposes of imposing liability. *D. Klein & Son, Inc. v Good Decision, Inc.*, 147 Fed Appx 195, 196-199 (2d Cir 2005). Where it is used in equity, veil piercing requires a showing that the corporate form was used to commit a wrong or fraud against the plaintiff. *Id*; *Billy v Consolidated Machine Tool Corp.*, 51 NY2d 152, 163 (1980). However, for jurisdictional purposes, it is not necessary to show that the corporate form was abused to commit a fraud or wrong. *D. Klein*, *supra*.

The factors that must be considered by the court to find that a subsidiary is a mere department are: 1) common ownership: 2) financial dependency of the subsidiary on the parent; 3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and 4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. *Id*, 120-122. The first factor, common ownership, is essential. *Id*. Supervision of the subsidiary by the parent standing alone is not enough because a corporation that owns the stock of another necessarily exercises a considerable degree of control over the subsidiary. *Id*, 120. Nor is consolidation of tax returns dispositive. *Id*, 120, fn 3.

43

The issue here is whether TPI is a mere department of RAC, not whether the Plant was. The Plant was not a subsidiary. It was a division of, and was owned by TPI in 1997 and 1998. Plaintiff admits that TPI owned the Plant.

The first *Beech* factor, common ownership, is established. Since the merger, RAC has owned all of TPI's stock. Following the merger, RAC elected TPI's board of directors and officers of RAC comprised most of the officers of TPI. Although RAC had many other officers, who were not TPI officers, there was overlap.

Turning to factor two, there is no evidence that TPI was financially dependent on RAC, but rather the reverse was true. RAC's consolidated 97 Return, for the first full year after the merger, reported that RAC had no income, while TPI had more than $7 billion in sales. Ex PP-1. TPI was an ongoing business that operated a chain of drugstores on the west coast when RAC acquired it in the end of 1996. TPI continued to do that after the merger, even though it used the brand name Rite Aid.

The third factor is the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities. There was no evidence that TPI did not observe corporate formalities. After the merger, RAC elected the TPI board of directors, which in turn selected TPI's officers. Gerson testified that there were corporate meeting with minutes, which were kept in his office. The evidence on the assignment and selection of TPI's other executive personnel was sparse. RAC issued the Termination Letters to TPI employees following the merger, but the record does not establish that they were executive personnel. Other than the officers of TPI, which were selected by its RAC-appointed board following the merger, there was no evidence on the process of selection and assignment of TPI's executives, except that the Plant executive personnel remained

unchanged from the 1980s. Crosby and Simmer continued to run the Plant, as they had before the merger.

The fourth factor, the degree of marketing and operational control weighs against finding complete control by RAC. Advertising of ice cream was done by HQ, not RAC. As far as operational control of TPI, there was no evidence beyond use of the brand name Rite Aid that supports the notion that RAC operated stores in 1997 and 1998. Black Trial Tr, 356. Moreover, the Returns evidenced that RAC had no income from sales, or expenses from salaries or cost of goods sold. Ex PP-1. With respect to the Plant, the record was clear that it was operated by Crosby and Simmer, who were employed by TPI. They were paid by TPI, as evidenced by their W-2s. The only RAC executive who was shown to have performed a function for TPI was Gerson, who appeared to be wearing two hats at the SF Meeting: officer of TPI and Gen Counsel to RAC.

Most importantly, the record established that RAC was a holding company that owned investments in subsidiaries. There was evidence that HQ provided accounting, legal, inventory, payroll, insurance and other computer services to all of RAC's subsidiaries and that HQ provided services to RAC, for which HQ earned income. But there was no evidence that RAC itself performed services. While there was evidence that RAC executive officers had contracts with RAC, a holding company must have officers. All corporations have officers because a corporation is a fictitious entity that can only act through its officers and directors. The fact that RAC had officers did not vitiate holding company status.

Under very similar facts, in another product liability case, the Appellate Division, Fourth Department, ruled that a subsidiary was not a mere department of its parent for purposes of personal jurisdiction:

> It does not appear that the subsidiary is financially dependent on the parent. On the contrary, it appears that the parent, as a holding company in the business of acquiring other entities for investment purposes, is financially dependent on its subsidiaries. Moreover, although LSB [the parent] provides Summit [the subsidiary] with certain legal, accounting, banking and insurance services, it charges market rates for those services. There is no evidence that LSB fails to observe corporate formalities in its relationship with its subsidiaries, and indeed the record shows that it does not interfere in the recruitment and assignment of Summit's employees .... Finally, defendant established that it does not control the subsidiary's policies and day-to-day operations.

*Porter v LSB Indus.*, 192 AD2d 205, 214 (4th Dept 1993). *Cf, Schubert v Marwell*, 218 AD2d 693 (2d Dept 1995)(mere department found where parent wholly owned subsidiary, exerted considerable control over executive personnel, marketing, and operational policies of subsidiary, and subsidairy was financially dependent on parent). As in *Porter*, here RAC is a holding company financially dependent on its subsidiaries; certain services are provided to its subsidiaries through another subsidiary, HQ, which is paid for the services; corporate formalities were observed; there is no evidence of interference by RAC in the recruitment and assignment of TPI's employees; and there is no evidence that RAC controlled TPI's policies and day-to-day operations.

In sum, the four factors do not yield a finding that RAC had complete control over its subsidiary, TPI. In fact, the factors show the opposite, that in 1997 and 1998, TPI had a separate corporate existence that was respected by RAC. Accordingly it is

ORDERED that the complaint of Sung Hwan Company, LTD, against Rite Aid Corporation is dismissed with prejudice, and the Clerk is directed to enter judgment accordingly.

Dated: January 5, 2015

ENTER:

**SHIRLEY WERNER KORNREICH**
**J.S.C**

FILED

JAN 05 2015

COUNTY CLERK'S OFFICE
NEW YORK

46