# EXHIBIT 5

Page 1

1            UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF OHIO

2                  EASTERN DIVISION

_____

3   IN RE: NATIONAL PRESCRIPTION   |

4   OPIATE LITIGATION              | MDL No. 2804

5   This document relates to:      | Case No. 17-md-2804

6   Jennifer Artz v. Endo Health   | Judge Dan Aaron Polster

7   Solutions Inc., et al.         |

8   Case No. 1:19-OP-45459         |

9   Darren and Elena Flanagan v.   |

10  McKesson Corporation, et al.   |

11  Case No. 1:18-OP-45405         |

12  Michelle Frost, et al., v.     |

13  Endo Health Solutions Inc.,    |

14  et al.                         |

15  Case No. 1:18-OP-46327         |

16  Walter and Virginia Salmons,   |

17  et al., v. McKesson            |

18  Corporation, et al.            |

19  Case No. 1:18-OP-45268         |

20

21            VIDEOTAPED DEPOSITION OF

22            DR. CHARLES VYVYAN HOWARD

23                 January 27, 2020

24                 Chicago, Illinois

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        THOMPSON BARNEY LAW FIRM

 5        2030 Kanawha Boulevard, East

 6        Charleston, West Virginia 25311

 7        304.343.4401

 8   BY:  KEVIN W. THOMPSON, ESQ.

 9        kwthompson@gmail.com

10   - also -

11   THE BILEK LAW FIRM, L.L.P.

12        700 Louisiana, Suite 3950

13        Houston, Texas 77002

14        713.227.7720

15   BY:  THOMAS E. BILEK, ESQ.

16        tbilek@bileklaw.com

17   - also -

18   MARTZELL, BICKFORD & CENTOLA

19        338 Lafayette Street

20        New Orleans, Louisiana 70130

21        504.581.9065

22   BY:  SCOTT R. BICKFORD, ESQ.

23        srb@mbfirm.com

24
```

Page 3

1   A P P E A R A N C E S:   (Continued)

2

3   - also -

4        COOPER LAW FIRM, L.L.C.

5        1525 Religious Street

6        New Orleans, Louisiana 70130

7        504.399.0009

8   BY:   STUART H. SMITH, ESQ.

9        (Telephonic appearance)

10       info@sch-llc.com

11

12  ON BEHALF OF DEFENDANT McKESSON CORPORATION:

13       SHOOK, HARDY & BACON L.L.P.

14       Jamboree Center

15       5 Park Plaza, Suite 1600

16       Irvine, California 02614-8502

17       949.475.1500

18  BY:   MICHELLE M. FUJIMOTO, ESQ.

19       mjfujimoto@shb.com

20  - also -

21

22

23

24

Page 4

1  A  P  P  E  A  R  A  N  C  E  S:  (Continued)

2

3        COVINGTON & BURLING LLP

4        One CityCenter

5        850 Tenth Street, NW

6        Washington, DC 20001-4956

7        202.662.6000

8  BY:  EMILY S. ULLMAN, ESQ.

9        eullman@cov.com

10       COLLEEN SMITH, ESQ.

11       csmith@cov.com

12

13  ON BEHALF OF DEFENDANT H.D. SMITH:

14       BARNES & THORNBURG LLP

15       11 South Meridian Street

16       Indianapolis, Indiana46204-3535

17       317.236.1313

18  BY:  KATHLEEN L. MATSOUKAS, ESQ.

19       kmatsoukas@btlaw.com

20

21

22

23

24

Page 5

1    A P P E A R A N C E S:   (Continued)

2

3    ON BEHALF OF DEFENDANT ALLERGAN:

4         KIRKLAND & ELLIS LLP

5         300 North LaSalle

6         Chicago, Illinois 60654

7         312.862.2000

8    BY:  MARIA PELLEGRINO RIVERA, ESQ.

9         mrivera@kirkland.com

10

11   ON BEHALF OF DEFENDANTS MALLINCKRODT LLP and

12   SPECGX LLC:

13        ROPES & GRAY LLP

14        Prudential Tower

15        800 Boylston Street

16        Boston, Massachusetts 0219903600

17        617.951.7000

18   BY:  JENNIFER PANTINA, ESQ.

19        jennifer.pantina@ropesgray.com

20

21

22

23

24

```
                                               Page 6
 1   A P P E A R A N C E S:   (Continued)

 2

 3   ON BEHALF OF DEFENDANT TEVA PHARMACEUTICALS USA

 4   and RELATED ENTITIES:

 5        BLANK ROME

 6        One Logan Square

 7        130 North 18th Street

 8        Philadelphia, Pennsylvania 19103

 9        215.569.5500

10   BY:  MELANIE S. CARTER, ESQ.

11        mcarter@blankrome.com

12   - also -

13        JUSTINA L. BYERS, ESQ.

14        (Telephonic appearance)

15        byers@blankrome.com

16

17   ON BEHALF OF DEFENDANT CARDINAL HEALTH:

18        WILLIAMS & CONNOLLY LLP

19        725 Twelfth Street NW

20        Washington, DC 20005

21        202.434.5000

22   BY:  J. ANDREW KEYES, ESQ.

23        akeyes@wc.com

24
```

```
                                              Page 7
 1   A  P  P  E  A  R  A  N  C  E  S:   (Continued)

 2

 3   ON  BEHALF  OF  DEFENDANT  WALGREENS:

 4        BARTLIT  BECK  LLP

 5        Courthouse  Place

 6        54  West  Hubbard  Street,  Suite  300

 7        Chicago,  IL  60654

 8        312.494.4400

 9   BY:   SHARON  DESH,  ESQ.

10        sharon.desh@bartlitbeck.com

11

12   ON  BEHALF  OF  ENDO  and  PARR  DEFENDANTS:

13        ARNOLD  &  PORTER  KAYE  SCHOLER  LLP

14        250  West  55th  Street

15        New  York,  New  York  10019-9710

16        212.836.8000

17   BY:   ANGELA  R.  VICARI,  ESQ.

18        angela.vicari@arnoldporter.com

19

20

21

22

23

24
```

```
                                                    Page 8
 1    A  P  P  E  A  R  A  N  C  E  S:  (Continued)

 2

 3    ON  BEHALF  OF  DEFENDANT  AMERISOURCEBERGEN:

 4         REED  SMITH  LLP

 5         Three  Logan  Square

 6         1717  Arch  Street,  Suite  3100

 7         Philadelphia,  Pennsylvania  19103

 8         215.851.8100

 9    BY:   JENNIFER  B.  JORDAN,  ESQ.

10         jennifer.jordan@reedsmith.com

11    - also -

12         KRISTEN  ASHE,  ESQ.

13         (Telephonic  appearance)

14         kashe@reedsmith.com

15

16    ON  BEHALF  OF  DEFENDANT  WALMART:

17         JONES  DAY

18         77  West  Wacker,  Suite  3500

19         Chicago,  Illinois  60601-1692

20         312.782.3939

21    BY:   NICOLE  C.  HENNING,  ESQ.

22         nhenning@jonesday.com

23

24
```

1   A P P E A R A N C E S: (Continued)

2

3   ON BEHALF OF THE RITE AID DEFENDANTS:

4        MORGAN LEWIS & BOCKIUS LLP

5        77 West Wacker Drive

6        Chicago, Illinois 60601-5094

7        312.324.1000

8   BY:  GREGORY T. FOUTS, ESQ.

9        gregory.fouts@morganlewis.com

10

11  ON BEHALF OF DEFENDANTS GIANT EAGLE and HBC:

12       MARCUS & SHAPIRA LLP

13       301 Grant Street, 35th Floor

14       One Oxford Centre

15       Pittsburgh, Pennsylvania 15219-6401

16       412.471.3490

17  BY:  MATTHEW MAZGAJ, ESQ.

18       (Telephonic appearance)

19       mazgaj@marcus-shapira.com

20

21

22

23

24

Page 10

1    A P P E A R A N C E S: (Continued)

2

3    ON BEHALF OF DEFENDANT PRESCRIPTION SUPPLY, INC.

4         FOX ROTHSCHILD LLP

5         2700 Kelly Road, Suite 300

6         Warrington, Pennsylvania 18976

7         215.345.7500

8    BY:  STEPHANIE B. FINEMAN, ESQ.

9         (Telephonic appearance)

10        sfineman@foxrothschild.com

11

12   ON BEHALF OF DEFENDANT JANSSEN:

13        O'MELVENY & MYERS LLP

14        400 South Hope Street, 18th Floor

15        Los Angeles, California 90071-2899

16        213.430.6000

17   BY:  ROBERT WINSON, ESQ.

18        (Telephonic appearance)

19        rwinson@omm.com

20

21   ALSO PRESENT:

22        Mr. Kevin Duncan, Videographer

23

24

*     *     *

Page 44

1   windows of vulnerability, so the timing here is
2   extremely important.
3        Q.    And we'll get into the details of
4   that during the course of the day, but let me
5   just -- I think where you're going with this is
6   am I correct that when you're looking at things
7   that might affect the development of a fetus,
8   timing of when the fetus is exposed to a
9   substance is important?
10       A.    Yes.
11       Q.    Is it also the nature or type of
12  substance that they're exposed to matters,
13  right?
14       A.    Clearly.
15       Q.    Okay.  And am I right that the
16  duration of exposure will affect a fetus
17  differently, short- versus long-term exposure
18  during the pregnancy?
19       A.    Again, it depends which windows of
20  vulnerability it's moving through, but in the
21  nervous system, for apoptosis, that's quite a
22  protracted period.
23       Q.    Okay.  And so it can then, the
24  duration can, not always, but can have an

Page 45

```
 1   impact on the fetus?
 2        A.    True.
 3        Q.    Okay.  So we got timing, duration,
 4   nature -- you know, the type of substance --
 5        A.    Dose.
 6        Q.    We'll go through it, but -- I assume
 7   then that anything that the fetus is exposed to
 8   could potentially impact that fetus?
 9        A.    That's a very general statement.
10        Q.    Right.  But so anything the mom
11   takes, whether it's drugs, what she eats,
12   whether she's exposed to environmental hazards,
13   maybe depending upon where she lives or works,
14   all of those things could potentially impact
15   the fetus, right?
16        A.    Things -- yeah, things have a
17   potential to impact the fetus, of course.
18        Q.    Okay.  Genetics would affect the
19   fetus, right?
20        A.    Genetics can have an effect, yes,
21   all part of the mix.
22        Q.    Do you consider yourself a leading
23   world expert on how prescription opioid use
24   impacts fetus's neurological development?
```

*     *     *

Page 101

1                          woman and determine what

2                          else she was exposed to,

3                          when, the dose, the

4                          duration, the timing of a

5                          lot of other exposures, that

6                          by the scientific literature

7                          we know, could actually have

8                          an impact on the neurologic

9                          and structural development

10                         of fetuses."

11   BY MS. FUJIMOTO:

12        Q.    Is that accurate, Doctor, to your

13   knowledge?

14        A.    The other factors could be

15   contributory to the known exposure to opioids.

16        Q.    Right.

17        A.    Correct.

18        Q.    Okay.  Thank you.

19             Five minutes, let me see if we can

20   get through this exhibit, and then we'll take a

21   break, okay?

22        A.    Yes.

23        Q.    Going back to Exhibit 6, which is

24   the e-mail traffic, let's see, the

*    *    *

Page 179

1  effect is large, you know.

2      Q.    This is another paper that you cited

3  to.  I'll mark as Exhibit 10 to the

4  deposition --

5                   (Exhibit 10 marked for

6                    identification.)

7  BY MS. FUJIMOTO:

8      Q.    -- by Gilardi:  Will Widespread

9  Synthetic Opioid Consumption Induce Epigenetic

10  Consequences in Future Generations?

11           You recognize that?

12      A.    I do.

13      Q.    Okay.  And it talks right upfront

14  there in the first -- second sentence of the

15  abstract.  It says:

16           Both maternal and paternal

17  transmission of phenotype across generations

18  has been proved, demonstrating that parental

19  drug history may have significant implications

20  for subsequent generations.

21           Do you see that?

22      A.    I do.

23      Q.    All right.  And so I take it you

24  agree with me that a woman's genetics will

Page 180

1   influence how the fetus is impacted by

2   different exposures, whether it's opioids or

3   not?

4        A.    And I presume, also, if the father

5   had been exposed that it might come from him as

6   well.  I mean, you know, that's a possibility.

7   This is well-known.

8        Q.    And so that was my second question.

9             Not only the genetics of the mother,

10  but the genetics of the baby's father is

11  important in whatever effects opioid exposure

12  might have on that fetus, right?

13       A.    In the epigenetic influences, yeah.

14       Q.    And so epigenetic inheritance that

15  each baby gets from their parents, that can

16  include not just prenatal exposure, but

17  parental exposure too, right?

18       A.    As illustrated in Figure 1.

19       Q.    Yes.

20            Like it says here on page 2, under

21  Molecular Mechanisms Underlying the Impact of

22  Drugs, it says:

23            A family history of drug abuse

24  correlates with increased risk of drug use in

Page 181

1    offspring.

2           Correct?

3      A.    Yes.

4      Q.    Okay.  So --

5      A.    Can you just show me exactly

6    where --

7      Q.    Right here.

8      A.    There, yeah.

9      Q.    But we know that to be true, right?

10     A.    Yes.

11     Q.    And so if you're looking at women

12   who have used prescription opioids, the use of

13   a prescription opioid during pregnancy is not

14   the only thing that is important, but her

15   history of drug use would be important too,

16   right, in terms of the impact on the fetus?

17     A.    It would -- I suspect that that is

18   what a clinician would want to collect.

19     Q.    And every pregnant woman has

20   different genetics and a different history as

21   to whether that lot they used had a drug abuse

22   history or never used a drug at all, right --

23     A.    Yes.

24     Q.    -- true?

Page 182

1           And then for each of those babies,

2    the genetics and the drug history of the father

3    comes into play as well because of this idea of

4    epigenetic modifications in the role of sperm

5    RNA.

6         A.    Yes, but it is important not to lose

7    site of the fact that the genome of the fetus

8    is also being exposed, and that can cause these

9    effects as well.

10        Q.    And so we have the genetics and drug

11   history use of the father, the genetics and

12   drug history use of the mother and the genetics

13   of the baby, right?

14        A.    Correct.

15        Q.    That are all important to whatever

16   impact might happen as a result of opioid

17   exposure?

18        A.    That's correct.

19        Q.    Okay.

20            MS. FUJIMOTO:  Okay.  We need to

21       take a break.  We have to change tapes.

22            THE WITNESS:  Oh, right.

23            THE VIDEOGRAPHER:  Going off the

24       video at 12:30 p.m.

1               (Recess taken.)

2          A F T E R N O O N   S E S S I O N

3               THE VIDEOGRAPHER:  We are going back

4      on the video record at 1:13 p.m.  You may

5      proceed.

6  BY MS. FUJIMOTO:

7      Q.    Welcome back, Dr. Howard.

8            I want to stick with -- we ran out

9  of time -- before we finished with exhibit, I

10  think it would be 10.  That's the Gilardi

11  paper.

12      A.    I have that.

13      Q.    Okay.  Great.  Thank you.

14            If you would go to page 4 of that

15  paper, and the section I want to ask you about

16  is Consequences of Opioid Prenatal Exposure.

17            Do you see that?

18      A.    Can you direct me to it?

19      Q.    Right here.

20      A.    There.  Page 4.  Oh, yes, sorry.

21  It's in the big writing.

22      Q.    The big, bold, black writing.  Okay.

23            The last sentence of the first

24  paragraph of that section says:

Page 184

1            Prenatal opioid exposure can induce

2      neonatal abstinence syndrome (NAS) in newborn

3      infants, but knowledge about its long-term

4      effects is limited.

5            Do you agree with that?

6      A.    We are going to find out more as

7      these children get older, so this is really one

8      of the reasons why we need to have a monitoring

9      committee to -- to study that, and learn more,

10     so that we can really understand the spectrum

11     of disease and the nature of disease.

12           MS. FUJIMOTO:  Move to strike,

13        nonresponsive.

14     BY MS. FUJIMOTO:

15     Q.    Doctor, my question is do you agree

16     with the statement that:

17           Knowledge about long-term effects of

18     opioid exposure, prenatal opioid exposure is

19     limited.

20           Do you agree with that?

21     A.    It isn't full -- I mean we don't

22     have full information, so --

23     Q.    Okay.

24     A.    -- from that point of view, it is

Page 185

1  limited, yes.

2      Q.    Okay.  And if you go down then to

3  probably three quarters of the way down that

4  next paragraph, the words "Indeed," the

5  sentence starts with "Indeed."

6          Do you have that?

7      A.    I do.

8      Q.    Indeed, despite multiple efforts

9  aiming at modeling the contributions of

10  maternal opioid dose and of the concurrent

11  exposure to other medications or illicit drugs,

12  the results remain so far inconclusive.

13          Do you agree with that statement?

14      A.    That is inconclusive with respect to

15  knowledge of long-term effects.

16      Q.    Um-hmm.

17      A.    Well, I'm going to defer this to

18  Dr. Anand anyway.  This is more -- the clinical

19  picture is definitely his specialty.  I am

20  trying to give the Court an understanding of

21  the process, the mechanism.

22      Q.    So does that mean you don't agree or

23  disagree with the statement that the

24  contributions of maternal opioid dose and of

1   the concurrent exposure to other medications or

2   illicit drugs remain inconclusive?

3        A.    I think they remain incomplete and

4   that that information is still being collected,

5   particularly as these cohorts get older.

6            The information we do have at the

7   minute is that as they get older, the

8   discrepancy between the exposed and nonexposed

9   controls is increasing.

10       Q.    If you go to the right-hand column,

11  first full paragraph, they write:

12            Regarding the long-term consequences

13  of in utero opioid exposure, clinical studies

14  in humans are extremely complicated by the huge

15  amount of variables, in paren, (i.e., doses and

16  length of treatment) and of concurring risk

17  factors that are often present, such as

18  polysubstance use, stability, mother-child

19  interaction, et cetera.

20            Do you agree with that statement?

21       A.    I agree that it is complicated, yes.

22       Q.    And if you go down to the bottom of

23  that column, last sentence of the second to the

24  last paragraph, they say:

Page 187

1          Collectively, however, these data

2    must be taken with caution due to the

3    heterogeneity of prenatal drug exposure and the

4    difficulty to disassociate opioid effects from

5    other risk factors to which they are often

6    associated.

7          Do you agree with that statement?

8    A.     Yeah, well, scientists always take

9    data with caution in complex cases, but I don't

10   think that the author is trying to argue that

11   we shouldn't collect it.

12   Q.     I'm not suggesting that's what

13   they're trying to say.

14          Do you agree that there is profound

15   heterogeneity between prenatal drug exposure

16   and that it is difficult to parcel out the

17   effects of the opioids from all the other

18   substances and risk factors that are often

19   present?

20   A.     As I've already stated on the

21   record, these can be contributory factors, but,

22   in these cases, what we do know is that there

23   has been exposure to opioids and these children

24   get withdrawal symptoms, which, if they're

Page 188

1   treated postnatally with opioids, respond.  So

2   that's proof that it is the opioids that's

3   causing their problem at that time, and we have

4   a diagnosis.

5           So it's complicated because there

6   are many factors, but what we do know in these

7   cases is that opioids are implicated, and there

8   may be other contributory factors.

9       Q.    You do understand that the term

10  "neonatal abstinence syndrome" can be used and

11  diagnosed with relation to exposure to drugs

12  other than opioids, don't you?

13      A.    Yes, I do.

14      Q.    Okay.  And so you agree that the

15  data show significant variability in the use of

16  a variety of different substances, opioids,

17  benzodiazepines, alcohol, tobacco, all kinds of

18  things --

19      A.    Yeah.

20      Q.    -- that it's difficult to parcel out

21  the effect of the opioid from the effect of

22  other substances that can cause NAS --

23      A.    But --

24      Q.    -- or other substances that can

1   cause other cognitive problems down the road?

2        A.    But, if the child responds to opiate

3   therapy to reduce its symptoms, withdrawal

4   symptoms, then that simplifies the question

5   quite a lot.  Clearly, the opiates will have

6   been -- because if the child was addicted to

7   something else, it wouldn't respond necessarily

8   to opioid therapy.

9        Q.    Including benzos and other

10  substances?

11       A.    That might help.

12       Q.    Are you sure?

13       A.    Hmm?

14       Q.    I mean, are you sure that --

15       A.    That is -- I am not involved in

16  treating children, but if they respond

17  specifically to opioids, that would indicate

18  that there has been opioid exposure.

19             But, again, this is something I

20  think that Dr. Anand will address and --

21       Q.    Right.  So you don't have expertise

22  in the area of NAS treatment?

23       A.    I do not.

24       Q.    Okay.  Do you have any knowledge as

Page 190

1    to whether NAS symptoms can resolve without

2    opioid treatment?

3         A.    They can.  Not all children are

4    treated with opioids --

5         Q.    Right.

6         A.    -- postnatally.

7         Q.    So for those NAS babies who are

8    diagnosed with NAS but aren't treated with

9    opioids, how do you know -- how can you then

10   confirm that their symptoms were attributed

11   only to opioids, and not something else like

12   benzodiazepines?

13        A.    Well, we have the prescription

14   history that they have been taking opioids, so

15   they will be having an effect.  And the other

16   thing is they can be contributory effects, but,

17   as I understand it, there has to be inadequate

18   dose given to precipitate NAS in these

19   children.

20        Q.    Okay.  First question is:

21              You agree, though, then it's

22   difficult to parcel out the other contributory

23   effects that you've acknowledged?

24        A.    To actually quantify them.

Page 191

1      Q.    Right, to parcel the amount and
2  understand whether or not they could have a
3  role and to what extent?
4      A.    Well, you would be able to take a
5  history presumably.
6      Q.    Right.
7      A.    But that's, again, a clinical
8  question.  I think I've not been involved in
9  trying to elucidate those problems.  Dr. Anand
10 presumably has.
11     Q.    Okay.  So you don't have an opinion
12 with respect to women who have both a
13 prescription for opioids during pregnancy but
14 also have reported history in the medical
15 records of using benzodiazepine or other
16 substances?
17     A.    I think that -- my opinion is that
18 these children have been diagnosed by clinical
19 attendants to have NAS, and that they have a
20 history of opioids, and that's what I'm trying
21 to inform the Court about is how
22 that damage -- any damage could have been
23 caused.
24     Q.    But you're acknowledging that other

Page 192

1    things can cause damage?

2         A.    It's complicated, yes.

3         Q.    Yes, okay.

4               And you mention -- you've mentioned

5    a few times that the fact that a baby is

6    diagnosed with NAS confirms for you that they

7    had adequate exposure to opioids.

8         A.    That is the -- that is the effect

9    that I'm basing my opinion on, that any damage

10   for -- or a proportion, say, of the damage they

11   have suffered could be through a mechanism

12   which affects apoptosis.

13        Q.    And so what dose is an adequate dose

14   in your view?

15        A.    One enough to produce NAS.

16        Q.    And so if the baby is not diagnosed

17   with NAS, they didn't have an adequate dose?

18        A.    I think that opioid exposure without

19   NAS does occur -- well, we know it occurs, and

20   I think that they could be damaged as well.  I

21   don't think you have to have NAS to have

22   affected apoptosis.

23              You know, as I told you before the

24   break, this is of massive doses, massive doses.

1    I can give you -- I can give you an example of

2    the susceptibility of the fetus to -- and the

3    exquisite sensitivity that Professor Soto had

4    down in Tufts.  She's exposed pregnant rats to

5    Bisphenol A and estrogen.

6           Q.    Right, and so --

7           A.    Can I just finish?

8           Q.    Sure.

9           A.    And this was at 1/250 thousandaths

10   of the dose you're required to produce an

11   effect in an adult, and it produced a massive

12   obvious change, naked-eye in the microscope

13   change, to the breast tissue which was

14   subsequently concerned to be malignant, so --

15   premalignant.

16              So that's an example is that the

17   fetus is working with cell-signaling molecules

18   at parts per trillion, and they are

19   physiologically active at that level, and we're

20   putting in massive boluses of cell-signalling

21   molecules, which in evolution, they've -- you

22   know, they don't know how to cope with them

23   basically.  That's the problem.

24              It is this exquisite sensitivity to

Page 194

1    the cell-signalling environment in the fetus,

2    produces completely different effects than it

3    would in an adult.

4         Q.    Okay.  So the question is:

5              Given this profound or this massive

6    exposure, nonetheless, there are babies born

7    who are not diagnosed with NAS, babies born

8    that -- to mothers who have used opioids,

9    right?

10        A.    Yes.

11        Q.    And is it your testimony, then, that

12   even those babies that haven't been diagnosed

13   have been harmed by the opioid exposure?

14        A.    So this case here is dealing with

15   babies that have had NAS diagnosed, and that's

16   what I'm addressing.

17             Now, all the things we have been

18   talking about for the last hour or two,

19   polymorphisms, the genetics of the mother and

20   the father, the complexity of cell signaling,

21   dimerization, all these things mean that there

22   will be a variable response --

23        Q.    Right.

24        A.    -- accepted.

Page 195

1      Q.    Right.

2      A.    But we are dealing with very high

3   doses of cell-signalling molecules which are

4   known to be able to induce apoptosis.

5           So I don't -- I would not rule out

6   damage with opioid exposure which doesn't

7   produce NAS.

8      Q.    Because given the high variability

9   of, if not -- even more than variable, but

10  individual fetal response to drug exposure,

11  there can be harm in the setting of no

12  diagnosis is your point?

13     A.    Of NAS.

14     Q.    Yeah.  Right.

15     A.    Absolutely.

16     Q.    Okay.  And there can be harm to

17  fetuses that don't have NAS -- or have not been

18  diagnosed with NAS, there can be harm caused to

19  them developmentally or otherwise by the use of

20  other drugs and substances by the mother,

21  right?

22     A.    Certainly that could happen.

23     Q.    Okay.  And, then, so for the mothers

24  that used both opioids and other substances,

1  there will be individual and variable effects

2  of each of those substances in different ways

3  on each fetus, right?

4      A.    Yes, unpredictably and different.

5            But with massive doses, some of

6  these processes, such as cell migration and

7  apoptosis, are very, as I've tried to explain,

8  susceptible to high-dose effects because they

9  are relying on a balance of very low dose cell

10  signalling in the physiological state.  So that

11  is why I think that harm could occur at doses

12  that don't produce FAS [sic].

13                    (Exhibit 11 marked for

14                     identification.)

15            MS. FUJIMOTO:  I will mark as

16       Exhibit 11 to the deposition the paper that

17       you cited and relied upon by Susan

18       Robinson, 2002, about the Effects of

19       Perinatal Buprenorphine in Methadone

20       Exposures on Striatal Cholinergic Ontogeny.

21            You see that, Doctor?

22       A.    Yes.

23       Q.    Okay.  And this is a study that was

24  done on buprenorphine and methadone, both of

*     *     *

...
Page 232

1        Q.    Okay.

2        A.    I don't think I actually edited that

3    chapter, by the way.

4        Q.    Okay.  Let's see about the next

5    chapter.

6             So if you go toward the end of

7    Exhibit 12, page through a few, and there is a

8    chapter on Clinical Teratology.

9        A.    Yes.

10        Q.    Do you have it?

11        A.    I do.

12        Q.    Okay.  That -- it would be page 147

13    of this book chapter and the second paragraph.

14        A.    Yes.

15        Q.    It says:

16             Susceptibility to teratogenic agents

17    depends on the combination of several factors

18    including the genotype of the mother and/or of

19    the fetus, dosage, the gestational period at

20    exposure, pharmacokinetics and pharmacodynamics

21    of the substance.

22             Do you agree with that?

23        A.    Well, we discussed most of that

24    already, and yes, that's a statement of fact.



Page 254

1    various exposures, whether it's multiple drug

2    exposure, maternal incarceration, complex or

3    violent family situations, nutritional

4    deficiencies, and other transmission of

5    infections, do you have an understanding that

6    all of these factors can impact the post-birth

7    development cognitive function and academic

8    performance in babies that had been diagnosed

9    with NAS when they were born?

10              MR. THOMPSON:  Object to form,

11         continuing objection, beyond scope.

12              THE WITNESS:  I -- certainly from my

13         medical knowledge, all of those could

14         potentially impact on a child.

15              MR. THOMPSON:  Could I borrow a

16         Post-it Note?

17              MS. FUJIMOTO:  Sure.

18              MR. THOMPSON:  Maybe a couple.

19         Thank you very much.

20                    (Exhibit 14 marked for

21                     identification.)

22    BY MS. FUJIMOTO:

23         Q.    Mark as Exhibit 14 to the deposition

24    another paper you cited by Cheryl Broussard,

*     *     *

```
                                        Page 261
 1   to a specific reason, opioids were most
 2   commonly reported within surgical procedures,
 3   infections, chronic diseases, and injury
 4   sections of the questionnaire.
 5               Do you see that?
 6       A.    Yes.
 7       Q.    And so this tells us that there's a
 8   large percentage of women who use opioids
 9   during pregnancy, who are prescribed opioids
10   for reasons other than being addicted, right?
11       A.    Yes.
12       Q.    Okay.  Let's see.
13               Okay.  If you go to page 314.e6, or,
14   you know, before you do this, let me just ask
15   you this question:
16               When we talk about the percentage of
17   women who are prescribed opioids for a reason
18   other than addiction, are you familiar with
19   ACOG guidelines as to the recommended practice
20   of prescribing opioids in these non-addiction
21   settings?
22               MR. THOMPSON:  Objection, beyond
23          scope.
24               THE WITNESS:  I think I have read
```

*    *    *

Page 287

1    A.    Yes.

2    Q.    Well, then why wouldn't there be

3  high variability?

4    A.    The normal physiological condition

5  in the developing fetus is very low doses which

6  control cell signaling and, therefore, the

7  likelihood of apoptosis in a particular cell or

8  not.  And this is a high-dose toxicology to the

9  fetus when the mother takes therapy --

10    Q.    Can you show me any paper that takes

11  animal data and then confirms it in human

12  epidemiologic studies that show a substance can

13  cause birth defects and later cognitive

14  neurodevelopmental effects, irrespective of

15  timing of exposure?

16    A.    Irrespective of timing of exposure?

17    Q.    Irrespective of timing of exposure.

18    A.    So we have talked about -- the first

19  three weeks of human existence in the womb are

20  refractory.

21    Q.    Right.

22    A.    Nothing much is going to happen.

23  Then you move into another period up to week 12

24  to week 16 where organogenesis is going on, and

*   *   *

Page 301

```
 1   investigation.  I have acknowledged that they

 2   can be contributory, and it is my opinion that

 3   the therapy that these ladies have been on, the

 4   maintenance therapy with opioids is sufficient

 5   to cause damage and lead to FAS -- NAS.

 6        Q.    And then let me ask you the bookend

 7   to that question, then:

 8             We've talked about, and maybe we

 9   don't have to go through all of them, and there

10   are a number of studies, that talk about

11   post-birth factors that can affect NAS babies'

12   development, cognitive abilities, academic

13   performance, all of that, right?  We have their

14   environment, both family, geographic,

15   socioeconomic, their education, their exposure

16   to other bad substances after birth, all of

17   which will impact how they perform on testing

18   later on, right?

19        A.    Yeah.

20        Q.    Okay.  And you -- I take it you've

21   seen -- you cited to a number of those studies.

22   You've cited to Desai, you've cited to Patrick,

23   Conradt, Gee and Wolff and Yazdy.

24             Those are some of the papers that
```

Page 302

1  you cited to that list a whole host of

2  environmental variables after birth that impact

3  a child's cognitive and neurobiologic

4  development over time, right?  Yes?

5       A.   Yes.

6       Q.   So the question is:

7            Have you done anything in your work

8  to somehow quantify or assess the differential

9  contribution of all of these post-birth factors

10  that you acknowledge can impact the cognitive

11  and neural performance of these NAS babies?

12       A.   Of course, there's a large

13  proportion of these babies who were removed

14  from their birth mother and fostered.

15       Q.   Yeah.

16       A.   And there's quite an interesting

17  paper that's come out by Niga recently which

18  assesses the progress of children who are still

19  with their birth mother, while you might assume

20  that conditions are not ideal with foster

21  children, and they find no difference in

22  outcome.

23       Q.   Um-hmm.

24       A.   So -- and then the other thing is

*   *   *

```
                                        Page 319
 1   to fetal life, right?

 2        A.    Yes, it has vulnerability which the

 3   adult doesn't have.

 4        Q.    And you agree that the brain has

 5   vulnerabilities in infancy as well?

 6        A.    Oh, yes.  It's still in a very big

 7   state of flux.

 8        Q.    There you go.

 9              And this is where it says:

10              For instance, early separation from

11   caregivers, abuse, neglect or social

12   deprivation in infancy or early childhood can

13   produce enduring behavioral and neurocognitive

14   deficits.

15              You agree with that, right?

16        A.    Let me just read it again.

17        Q.    For instance, early separation from

18   caregivers, abuse, negligent or social

19   deprivation in infancy or early childhood can

20   produce enduring, behavioral and neurocognitive

21   deficits.

22              And they cite to Carpenter and

23   Stacks 2009 and Kreppner 2007.

24              MR. THOMPSON:  Objection, beyond the
```

Page 320

1      scope of his testimony.

2    BY MS. FUJIMOTO:

3      Q.    Do you agree with that?

4      A.    I think Dr. Anand will be able to

5    address that.

6      Q.    I assume you don't have any basis to

7    disagree with it, though?

8      A.    It's been published, and I don't

9    disagree with it, but it's not in my scope.

10     Q.    All right.  Okay.  Last one on this

11   paper, 161 Conclusions and Future Directions.

12           Do you have it?

13     A.    Yes, I do.

14     Q.    It says:

15           Evolving experimental approaches

16   have afforded us an increasingly nuanced view

17   of the development of the brain's circuits as a

18   protracted and even lifelong series of

19   interrelated and partially overlapping

20   iterative, biological processes that follow

21   their own time courses across different brain

22   regions.

23           That's accurate, isn't it?

24     A.    Yes.



Page 396

1    reject the fact that there was a risk of

2    teratogenic effect?

3              MS. FUJIMOTO:  Object to form,

4         foundation, documents speak for themselves,

5         outside the scope of his review, and

6         opinions based on prior testimony.

7              THE WITNESS:  They didn't.  By

8         omission, they didn't mention any of this.

9              MR. THOMPSON:  No further questions.

10        Your witness.

11                  Mr. Duncan, how much time do we

12        have left?

13             THE VIDEOGRAPHER:  Total elapsed

14        time is 7 hours and 8 minutes.

15             MS. FUJIMOTO:  I still had, what,

16        32 minutes left?

17             THE VIDEOGRAPHER:  25 minutes.

18                  FURTHER EXAMINATION

19   BY MS. FUJIMOTO:

20        Q.   Okay.  Doctor, just following up on

21   your most recent testimony on a common mode of

22   action, you were talking about the mu receptor

23   and all that.  I'm not going to go through it

24   all; we have already been through it today, but

Page 397

1   my question to you is when you reference a

2   common mode of action, we have already

3   discussed and you've confirmed that there would

4   be no such effect before, say, three weeks,

5   right, because mu opioid receptors and the

6   other opioid receptors are not expressed in the

7   fetal brain, right?

8       A.    That's right, and that's the period

9   of refractory.

10      Q.    Exactly.  So they can't have any

11  teratogenic effects then, right?

12      A.    I suppose they could have lethal

13  effects, but they would not have teratogenic

14  effects.

15      Q.    Okay.  And we have already discussed

16  about the variability of impact depending upon

17  timing of exposure, right?

18      A.    Yes.

19      Q.    Okay.  Going back to the questions

20  Mr. -- plaintiffs' counsel asked you regarding

21  Olney and Creeley, do you remember those?

22      A.    Vaguely.

23      Q.    Okay.  The two papers -- two of the

24  several papers you and I talked about regarding

*     *     *

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted
to access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.