# EXHIBIT 41

1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

   _____

3  IN RE: NATIONAL PRESCRIPTION   |

4  OPIATE LITIGATION              | MDL No. 2804

5  This document relates to:      | Case No. 17-md-2804

6  Jennifer Artz v. Endo Health   | Judge Dan Aaron Polster

7  Solutions Inc., et al.         |

8  Case No. 1:19-OP-45459         |

9  Darren and Elena Flanagan v.   |

10 McKesson Corporation, et al.   |

11 Case No. 1:18-OP-45405         |

12 Michelle Frost, et al., v.     |

13 Endo Health Solutions Inc.,    |

14 et al.                         |

15 Case No. 1:18-OP-46327         |

16 Walter and Virginia Salmons,   |

17 et al., v. McKesson            |

18 Corporation, et al.            |

19 Case No. 1:18-OP-45268         |

20

21            VIDEOTAPED DEPOSITION OF

22           DR. KANWALJEET ANAND, M.D.

23                January 28, 2020

24                Chicago, Illinois

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   ON BEHALF OF PLAINTIFFS:

 4   THOMPSON BARNEY LAW FIRM

 5        2030 Kanawha Boulevard, East

 6        Charleston, West Virginia 25311

 7        304.343.4401

 8   BY:  KEVIN W. THOMPSON, ESQ.

 9        kwthompson@gmail.com

10   - also -

11        THE BILEK LAW FIRM, L.L.P.

12        700 Louisiana, Suite 3950

13        Houston, Texas 77002

14        713.227.7720

15   BY:  THOMAS E. BILEK, ESQ.

16        tbilek@bileklaw.com

17   - also -

18   MARTZELL, BICKFORD & CENTOLA

19        338 Lafayette Street

20        New Orleans, Louisiana 70130

21        504.581.9065

22   BY:  SCOTT R. BICKFORD, ESQ.

23        srb@mbfirm.com

24
```

Page 3

1    A P P E A R A N C E S:   (Continued)

2

3    ON BEHALF OF DEFENDANT McKESSON CORPORATION:

4         SHOOK, HARDY & BACON L.L.P.

5         Jamboree Center

6         5 Park Plaza, Suite 1600

7         Irvine, California 02614-8502

8         949.475.1500

9    BY:  MICHELLE M. FUJIMOTO, ESQ.

10        mjfujimoto@shb.com

11   - also -

12        COVINGTON & BURLING LLP

13        One CityCenter

14        850 Tenth Street, NW

15        Washington, DC 20001-4956

16        202.662.6000

17   BY:  EMILY S. ULLMAN, ESQ.

18        eullman@cov.com

19

20

21

22

23

24

1    A P P E A R A N C E S:   (Continued)

2

3    ON BEHALF OF DEFENDANT H.D. SMITH:

4         BARNES & THORNBURG LLP

5         11 South Meridian Street

6         Indianapolis, Indiana46204-3535

7         317.236.1313

8    BY:  KATHLEEN L. MATSOUKAS, ESQ.

9         kmatsoukas@btlaw.com

10

11   ON BEHALF OF DEFENDANT ALLERGAN:

12        KIRKLAND & ELLIS LLP

13        300 North LaSalle

14        Chicago, Illinois 60654

15        312.862.2000

16   BY:  MARIA PELLEGRINO RIVERA, ESQ.

17        mrivera@kirkland.com

18

19

20

21

22

23

24

```
                                                    Page 5
 1    A P P E A R A N C E S: (Continued)

 2

 3    ON BEHALF OF DEFENDANTS MALLINCKRODT LLP and

 4    SPECGX LLC:

 5          ROPES & GRAY LLP

 6          Prudential Tower

 7          800 Boylston Street

 8          Boston, Massachusetts 0219903600

 9          617.951.7000

10    BY:   JENNIFER PANTINA, ESQ.

11          jennifer.pantina@ropesgray.com

12

13    ON BEHALF OF DEFENDANT TEVA PHARMACEUTICALS USA

14    and RELATED ENTITIES:

15          BLANK ROME

16          One Logan Square

17          130 North 18th Street

18          Philadelphia, Pennsylvania 19103

19          215.569.5500

20    BY:   TERRY M. HENRY, ESQ.

21          thenry@blankrome.com

22          LAUREN O'DONNELL, ESQ.

23          (Telephonic appearance)

24          odonnell@blankrome.com
```

Page 6

1  A P P E A R A N C E S:   (Continued)

2

3  ON BEHALF OF DEFENDANT CARDINAL HEALTH:

4        WILLIAMS & CONNOLLY LLP

5        725 Twelfth Street NW

6        Washington, DC 20005

7        202.434.5000

8  BY:  MICHAEL R. FISHMAN, ESQ.

9        mfishman@wc.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 7

1    A P P E A R A N C E S:   (Continued)

2

3    ON BEHALF OF DEFENDANT WALGREENS:

4         BARTLIT BECK LLP

5         Courthouse Place

6         54 West Hubbard Street, Suite 300

7         Chicago, IL 60654

8         312.494.4400

9    BY:  SHARON DESH, ESQ.

10        sharon.desh@bartlitbeck.com

11

12   ON BEHALF OF ENDO and PARR DEFENDANTS:

13        ARNOLD & PORTER KAYE SCHOLER LLP

14        250 West 55th Street

15        New York, New York 10019-9710

16        212.836.8000

17   BY:  ANGELA R. VICARI, ESQ.

18        angela.vicari@arnoldporter.com

19

20

21

22

23

24

Page 8

```
 1   A  P  P  E  A  R  A  N  C  E  S:  (Continued)

 2

 3   ON  BEHALF  OF  DEFENDANT  AMERISOURCEBERGEN:

 4       REED  SMITH  LLP

 5       Three  Logan  Square

 6       1717  Arch  Street,  Suite  3100

 7       Philadelphia,  Pennsylvania  19103

 8       215.851.8100

 9   BY:   JENNIFER  B.  JORDAN,  ESQ.

10       jennifer.jordan@reedsmith.com

11       KRISTEN  ASHE,  ESQ.

12       kashe@reedsmith.com

13

14   ON  BEHALF  OF  DEFENDANT  WALMART:

15       JONES  DAY

16       77  West  Wacker,  Suite  3500

17       Chicago,  Illinois  60601-1692

18       312.782.3939

19   BY:   NICOLE  C.  HENNING,  ESQ.

20       nhenning@jonesday.com

21

22

23

24
```

Page 9

```
 1   A P P E A R A N C E S:   (Continued)

 2

 3   ON BEHALF OF THE RITE AID DEFENDANTS:

 4        MORGAN LEWIS & BOCKIUS LLP

 5        77 West Wacker Drive

 6        Chicago, Illinois 60601-5094

 7        312.324.1000

 8   BY:  GREGORY T. FOUTS, ESQ.

 9        (Telephonic appearance)

10        gregory.fouts@morganlewis.com

11

12   ON BEHALF OF DEFENDANTS GIANT EAGLE and HBC:

13        MARCUS & SHAPIRA LLP

14        301 Grant Street, 35th Floor

15        One Oxford Centre

16        Pittsburgh, Pennsylvania 15219-6401

17        412.471.3490

18   BY:  MATTHEW MAZGAJ, ESQ.

19        (Telephonic appearance)

20        mazgaj@marcus-shapira.com

21

22

23

24
```

\*     \*     \*

Page 130

1    balance a system that needs to maintain

2    homeostasis, correct?

3        A.    Exactly, yes.

4        Q.    And then you go on to say:

5            The data on opioid exposure are

6    somewhat muddied because many of those data

7    were obtained from children of heroin abusers

8    and had an overlay of several social and other

9    factors that call those findings into question,

10   period.

11           Do you see that?

12       A.    Did I -- yes.

13       Q.    Now, would you -- do you stand by

14   that statement as you made it in 2016?

15       A.    Yes, I did.

16       Q.    And was that a recognition that,

17   going from the science we are talking to the

18   kind of patients on the clinical level, that

19   many women who give birth to NAS children are

20   not simply taking an opioid as prescribed,

21   correct?

22       A.    That is part of the contributing

23   factor, yes.

24       Q.    And if you're going to be looking at

*    *    *

1    registries established for NAS, and then,

2    lastly, a toxicology screen.

3         Q.    So all of those things together

4    allow you to diagnose a person who's currently

5    18 --

6         A.    Yes.

7         Q.    -- with NAS, obviously when they

8    were born.

9         A.    Yes.

10        Q.    But NAS itself as a disease

11   condition is a disease condition of birth?

12        A.    Yes.

13        Q.    Or about the perinatal period,

14   right?

15        A.    That is correct.

16        Q.    Now, looking at what's been marked

17   as Exhibit 11 and is in front of you, if you go

18   to, I think, the middle of that paragraph?

19        A.    Um-hmm.

20        Q.    It says -- starts with the word

21   "published."

22              Do you see that?

23        A.    Yes.

24        Q.    It says:

```
                                          Page 160

 1            Published follow-up studies of NAS
 2    babies, however -- comma, however, comma, show
 3    minimal long-term effects related to prenatal
 4    opioid exposure.
 5                 Do you see that?
 6        A.    Yes, I do.
 7        Q.    And then you go on to talk in the
 8    next sentence about Baldacchino; is that
 9    correct?
10        A.    Yes.
11        Q.    So at least as of your August 2018
12    report, it was your understanding of the
13    literature that published follow-up studies of
14    NAS babies showed minimum long-term effects
15    related to prenatal opioid exposure, correct?
16        A.    That is correct.
17        Q.    And then when you -- if you go to
18    what has been marked as Exhibit 8, which is
19    your December report.
20        A.    Um-hmm.
21        Q.    You say in the middle of that
22    paragraph starting with the word "thus," in
23    paragraph 7, my apologies.  You see it says:
24                 Thus, prenatal opioid exposures have
```

*     *     *

Page 213

1      A.    All I'm saying is that this case

2   that we're preparing for is to address children

3   who had opioid exposure and were diagnosed with

4   NAS at birth.  We're not really, in this

5   situation, not focusing on children who had

6   fetal alcohol syndrome.

7      Q.    And this monitoring program doesn't

8   do anything to address poverty, correct?

9      A.    No, it doesn't.

10     Q.    It doesn't address parental abuse of

11  children, correct?

12     A.    Absolutely.

13     Q.    It doesn't address negligence by

14  parents, correct?

15     A.    Yes, correct.  Although it makes it

16  much more difficult, because when you look at

17  the monitoring surveillance program, it

18  requires, you know, quarterly or biweekly

19  evaluations in the first year after birth, and

20  it requires regular evaluation including home

21  visits during this -- this child's sort of

22  preschool years.

23          So if there is abuse, if there is

24  negligence, then it will be picked up much

1    earlier before it has the ability to escalate

2    and make this child's brain damage worse; the

3    brain damage, meaning, what occurred from

4    opioid exposure during the prenatal period.

5         Q.    And what happens if the mother

6    doesn't bring the child in for those

7    evaluations?

8         A.    Again, I think the protocol includes

9    a paragraph, if you look at it, there are

10   certain barriers for overcoming those.  It's

11   paragraph number 4 on the page just before my

12   signature page and it says:

13            Barriers for implementing these

14   monitoring protocols must be anticipated and

15   addressed.  These may include providing funding

16   for transportation to scheduled assessments or

17   making the transport arrangements, providing

18   token compensation to participants facilitating

19   access by offering home visits or assessments

20   at a location convenient for the

21   parent/caregiver, consideration for living

22   situation and other barriers.

23            So I think it is important that we

24   anticipate those barriers and see why there is

Page 215

1    no compliance, that the mother is -- why the

2    mother is not bringing this child in for

3    evaluations, and trying to overcome those.

4          Q.    Now, one of the ways you suggest we

5    may overcome that is by offering some financial

6    incentives to the parents for bringing their

7    kids in?

8          A.    Yes.

9                MR. EHSAN:  I'm going to mark --

10                     (Exhibit 14 marked for

11                      identification.)

12   BY MR. EHSAN:

13         Q.    Doctor, you've been handed what's

14   been marked as Exhibit 14.  This is an article

15   titled Measuring Socioeconomic Adversity in

16   Early Life; is that correct?

17         A.    That is correct.

18         Q.    And are you the first author on that

19   article?

20         A.    Yes, I am.

21         Q.    And this was published in?

22         A.    2019.

23         Q.    2019.

24                So after your first declaration,

Page 216

1   before your second declaration, correct?

2        A.     That is correct.

3        Q.     Are you familiar with the content of

4   the article?

5        A.     Yes, I am.

6        Q.     What was the aim of your study?

7        A.     The aim of this study was to develop

8   a way of assessing socioeconomic adversity.

9               For decades, socioeconomic status

10  had been assigned after looking at simply

11  economic factors without taking account of the

12  social factors that the -- the child or -- and

13  the mother and the child may be experiencing.

14              And so this was one attempt at

15  creating an index that will account for social

16  as well as economic factors to assign

17  socioeconomics or to estimate the socioeconomic

18  adversity.

19        Q.     So to the extent that socioeconomic

20  status was perhaps not a refined concept, it

21  could have made studies who were trying to

22  control for socioeconomic status potentially

23  less reliable because they were not taking a

24  fine-grain approach to it, as you suggest in

Page 217

1    your article, correct?

2         A.    That is correct.

3         Q.    In the -- on the bottom of the first

4    page, there's a colored box that has a title:

5    Key notes.

6                Do you see that?

7         A.    Yes, I do.

8         Q.    And could you read the second note,

9    the second bullet?

10        A.    Sure.

11               Social and familial factors

12   significantly contribute to early life

13   adversity which leads to worse long-term

14   physical/mental health outcomes.

15        Q.    And you agree with that statement?

16        A.    Yes.

17        Q.    And the next bullet states:

18               Factors predicting socioeconomic

19   adversity in early life include:  Marital

20   status, household structure, annual income,

21   education, and health insurance.

22               Did I read that correctly?

23        A.    That is correct.

24        Q.    So all of these factors would be

Page 218

1  relevant to how the child does in terms of

2  their physical and overall health outcomes,

3  correct?

4       A.    That's correct.

5       Q.    And if you go to -- my vision

6  here -- if you go to page 2 of the article.

7       A.    Okay.

8       Q.    You state, the left paragraph, that

9  first indented -- left column, first indented

10 paragraph starting "instead."

11            Do you see that?

12       A.    Starting where?

13       Q.    So the second page of the article --

14       A.    Yeah.

15       Q.    -- left-hand column, the first

16 indented the paragraph --

17       A.    Yeah, okay.

18       Q.    -- that starts with "instead."

19       A.    "Instead of focusing."

20       Q.    And it states:

21            Instead of focusing -- or you state:

22            Instead of focusing on poverty, we

23 call for considering socioeconomic adversity

24 more broadly as that resulting from social,

\* \* \*

1   from conferences or colleagues that you think

2   is reliable, correct?

3          A.     Yes.

4          Q.     And in terms of the individualized

5   aspect, I assume that you treat each of your

6   kids or your patients as individuals.

7          A.     Um-hmm.

8          Q.     Yes?

9          A.     That's true.

10         Q.     And so what that means is that when

11  you make clinical decisions about their care,

12  you weight risks and benefits and exercise your

13  clinical judgment in a way that is specific to

14  each child; is that fair?

15         A.     That is correct.

16         Q.     Okay.  And so when we think about

17  this population of NAS children that we have

18  been talking about, would you agree with me

19  that each NAS child is unique in his or her

20  genetic makeup?

21         A.     Yes, absolutely.

22         Q.     They have their own unique genome --

23         A.     Yes.

24         Q.     -- that is made up of the unique and

1   individual genetic makeup of each parent,

2   right?

3          A.    That is right.

4          Q.    Okay.  And each parent that is

5   contributing to this child's genetic makeup

6   have their own unique and individual epigenetic

7   influences through their life, right?

8          A.    That is correct.

9          Q.    And are you one that believes that

10  that could be transgenerational effects that we

11  see down the road from epigenetic influences?

12         A.    Yes, there is fairly good evidence.

13  It's still pretty shaky, but there's fairly

14  good evidence accumulating for that.

15         Q.    And so to the extent the parents,

16  and particularly the mother who we are looking

17  at who has used opioids at some point during

18  her pregnancy for different reasons, each of

19  their genetic makeup and their epigenetic

20  influences get passed on to their NAS child,

21  right?

22         A.    That is correct.

23         Q.    Okay.  And would you agree with me

24  that each NAS child has very individual and

*     *     *

Page 280

1  with their diagnosis.  Their -- I see no reason
2  to question their diagnosis.
3       Q.    Understood.  And so we know, then,
4  for this population of NAS children that each
5  child is going to be different in terms of what
6  NAS scale was used, which kind of health care
7  provider filled it out, whether it was a nurse,
8  doctor, PA, and there will be differences in
9  how they're treated based on how they're
10 scored, right?
11      A.    That is correct.
12      Q.    And each child, each NAS child would
13 also therefore differ in terms of their
14 immediate neonatal and post birth care?
15      A.    There will be differences,
16 absolutely, however, there's at least two
17 studies that have shown that when charts were
18 reviewed, where the diagnosis had been
19 documented in the chart, they went back and
20 reassessed those kids, and they showed that
21 those diagnoses were -- were accurate.  So
22 there is some reproducibility and -- and there
23 are quality improvement initiatives going on
24 in, you know, different hospitals at different

1  times, which have tended to reduce the

2  inter-rator sort of variations so that there

3  is -- there's, you know, a uniform way of

4  assessing the child.

5      Q.    And is there -- am I correct that

6  each NAS child will differ in terms of the

7  severity of the NAS and particularly depending

8  upon whether or not the mother was exposed to

9  other substances?

10     A.    That is true.

11     Q.    Right?

12     A.    Yeah.

13     Q.    And each NAS child is going to be

14  different in terms of their performance or how

15  do I say it, health assessment at one year of

16  age, right?

17     A.    Absolutely.

18     Q.    I take it you're familiar with the

19  data and studies on how important that first

20  year of life is to the overall lifetime

21  performance or development of the child?

22     A.    Yes, there -- there is a lot of data

23  to support the developmental origins of, you

24  know, subsequent disease patterns and things

*     *     *

1  substance abuse, et cetera, they're still

2  talking about children born from mothers

3  exposed to opioids.  So that still shows that

4  it's the opioid exposure that is a primary

5  factor.  This is, you know, in 1998.

6        Q.    Agreed.

7              So let me ask you, then, about --

8  you had mentioned the Patrick study --

9        A.    Yes.

10       Q.    -- earlier in your testimony too, so

11  I know you've seen it.

12             Do you agree that the predictability

13  of the impact of NAS on a child will vary

14  depending upon drug type, cumulative opioid

15  exposure, and other substances like cigarette

16  smoke?

17       A.    Yes, I agree.

18       Q.    Okay.

19       A.    But the opioid exposure is

20  contributory and a major player.

21       Q.    And -- but you're acknowledging

22  there are a lot of other potential

23  contributors?

24       A.    Sure.

*     *     *

Page 309

1   and D may not be there.  Information may be

2   missing on that, but if there is a toxicology

3   screen that is positive, I would include that

4   child within the class so that we can start the

5   monitoring and the surveillance and at least

6   rule out the -- the long-term effects of the

7   opioid exposure.

8        Q.    Well, there are NAS children who

9   have been diagnosed with NAS based on symptoms,

10  where the blood and cord blood and meconium

11  tests are not positive, right?

12       A.    That is right.

13       Q.    And there are NAS children -- or

14  strike that.

15            There are children exposed to

16  opioids in utero, who have positive cord blood

17  or positive meconium and yet don't fulfill the

18  NAS criteria and, therefore, are not diagnosed

19  with NAS, right?

20       A.    True, NAS --

21       Q.    So you're going to include in your

22  class babies who have not been diagnosed with

23  NAS, if they have positive cord blood or

24  positive meconium?

\*     \*     \*

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.