# **<u>EXHIBIT 48</u>**

# The Birth of the Crack Baby and the History that "Myths" Make

Jason E. Glenn
Institute for the Medical Humanities
University of Texas Medical Branch
301 University Blvd
Galveston, TX 77555-1311
jeglenn@utmb.edu
(409) 772-9332

*Article manuscript submitted to the* Journal of Health Politics, Policy, and Law, *October, 2006.*

**ABSTRACT**  This essay explores the creation of the crack baby "myth" in the midst of the hysteria surrounding crack cocaine use in the late 1980s and early 1990s.  The analysis ties the crack baby narrative to the manufacture of public support for the legislation enacted in the anti-drug "crusade" responsible for the mass imprisonment trends of the last two decades.  I then explain why the narrative had such resonance in American culture, tying it to the conservative reformation movement of the Reagan-Bush Presidencies.

# The Birth of the Crack Baby and the History that "Myths" Make

**ABSTRACT**   This essay explores the creation of the crack baby "myth" in the midst of the hysteria surrounding crack cocaine use in the late 1980s and early 1990s.  The analysis ties the crack baby narrative to the manufacture of public support for the legislation enacted in the anti-drug "crusade" responsible for the mass imprisonment trends of the last two decades.  I then explain why the narrative had such resonance in American culture, tying it to the conservative reformation movement of the Reagan-Bush Presidencies.

> When the Puritans organized their New England communities, they wrote covenants that made two sharply different pledges.  They would hold one another in mutual love and they would drive away the "contrary minded."  All social policy ultimately rests on that neat division of the world – us and them.
>
> *- James A. Morone, 1997*[1]

Though recent medical research has discredited the concept of the crack baby,[2] it has nevertheless had a tremendous effect on determining public policy and through policy, recent U.S. history.  The revelation that there was no empirical evidence supporting the crack baby narrative is now over five years old, yet we continue living the history this narrative helped create in terms of the continued cultural demonization of crack cocaine users, the disparities in crack cocaine sentencing and, more broadly, the continued public support for a criminal approach to the War on Drugs that by all accounts has failed miserably to achieve its goals. [3]  Why is it that the myth remains a more forceful motivator of behavior than fact?  I argue that the narrative of the crack baby had such a high cultural resonance with Americans because it functioned as a new, post-Civil Rights-era discourse of otherness.  This analysis will affirm that human behavior can never be analyzed outside of symbolic systems of meaning.  Symbolic systems of meanings frame our perception of the material world, thereby structuring our consciousness of that world, and as a result orient our behaviors.

1

*The Birth of the Crack Baby and the History that Myths Make*

In a pioneering essay, "The History that Literature Makes,"[4] and more recently in the text, *The Founding Legend of Western Civilization,*[5] Richard Waswo argues that literary narratives, re-read and retold over generations, eventually become legends that act as templates for organizing future behaviors.  Waswo analyzes the narrative of Western descent from Troy – with the resultant classificatory system of what constitutes "civilized" and, analogously, "uncivilized" – as a story metaphorically organized around a discourse of otherness.  It is this discourse, Waswo argues, that has framed the entire history of Western colonial expansion and its concordant displacement, enslavement, and/or elimination of the "uncivilized."  Waswo makes this point as one example of the power of fictional literature to cause real events: "that by determining perception, it can determine behavior."[6]

It is our Euro-Western cultural narrative – which frames our understanding of ourselves as a modern society that organizes itself according to scientific reason, in contrast to "primitive" societies that believe in myths – that makes Waswo's argument so groundbreaking and quite heretical.  As Bruno Latour explains, "[w]hen the word 'modern', 'modernization', or 'modernity' appears, we are defining, by contrast, an archaic and stable past.  Furthermore, the word is always being thrown into the middle of a fight, in a quarrel where there are winners and losers, Ancients and Moderns.  'Modern' is thus doubly asymmetrical: it designates a break in the regular passage of time, and it designates a combat in which there are victors and vanquished."[7]  As a result, Latour further explains, those who consider themselves 'modern' remain "unable to conceptualize themselves in continuity with premoderns," and have "to think of themselves as absolutely different."[8]  But what, Latour proposes, "if we had never been

modern?"  What if there is no real dichotomy between those "premoderns" who believe in myths and us "moderns" whose behaviors are grounded in historical facts?

Waswo insists that "[i]t is necessary not to scorn this function [of literature] as a 'regress' to some unenlightened prior practice of either individuals or societies.  We are still, in other words, acting out stories; there is no regress, for the simple reason that there has been no progress.  The very idea of progress is [*the*] issue… how the West comes to see itself as 'advanced' with respect to other cultures."[9]

As Allen Greenberger argues, "[t]he relationship between literature and history is clearly an intimate one.  Literature is particularly important in spreading ideas and images about things which are unfamiliar to the general reading public, thus helping to shape opinion and through it policy."[10]  This essay will do exactly that – examine the relationship between the narrative representation of the crack baby "epidemic" as it appeared in American media in the late 1980s and U.S. drug policy.

Even if the crack baby narrative had empirical grounding, the manner in which it motivated political action would nevertheless deserve academic attention.  For example, compare the campaign to stop expectant women from smoking or drinking while pregnant to the laws targeting pregnant women using crack cocaine.  Though the medical community now universally agrees that alcohol and tobacco abuse do considerable harm to the healthy development of an embryo, there has been no public crusade to criminalize smoking and drinking while pregnant, despite the fact that a generation ago smoking and drinking during pregnancy were much more prevalent than cocaine use has ever been.  What was special about the crack baby narrative that made it resonate so strongly with the American people?

3

*The Birth of the Crack Baby and the History that Myths Make*

### The "Myth" of the Crack Baby

> This, therefore, will be our first task: to show how the emergence of new meanings in the sphere of language generates an emergence of new images.
>
> *- Paul Ricoeur, 1979[11]*

A story becomes a "myth" when a critical mass of subjects within a society acts on that story as if it were true. The analysis presented here suggests that we should actually forego the use of the term "myth" because it only has meaning within the pretext of modernity. That is to say, the pretext that as moderns, our actions are organized according to our accurate perception of some veridical truth. To get beyond this modern=fact/premodern=myth ideological trap of our Euro-Western "local culture,"[12] rather than see ourselves as believing in truths or myths, it is imperative that we understand the role of cultural narratives in producing facts for consciousness. Facts for consciousness need not be grounded in empirical evidence – all that matters is that they are collectively shared. In being collectively shared, facts for consciousness facilitate a shared perception of the world, i.e., that "'general horizon of understanding'… by means of which alone each human order can be dynamically integrated, and stably replicated."[13] As a society our cultural behaviors unfold from our shared "general horizon of understanding."

The 'fact for consciousness' of the crack baby is situated within the broader cultural pre-occupation with crack cocaine use from the mid 1980s through the early 1990s. This cultural pre-occupation carried with it the perception that crack cocaine was the most addictive drug ever introduced in the United States (it was not), that its use was concentrated among inner-city Black Americans (it was not), and that its sale and distribution was responsible for an

explosion of gang violence and the deterioration of American cities (a correlation, yes, but not the cause).[14]   Together, these perceptions created the idea that the nation was facing a crack epidemic.[15]   The wide perception that the country was in the midst of a crack epidemic set the conditions for the narrative of the crack baby to be created, passed on, and endure.   A brief introduction to the roots of that perception will help ground an analysis of the crack baby phenomenon.

*The Crack "Epidemic"*

On June 17, 1986, University of Maryland college basketball phenom, Len Bias, died of heart complications reportedly related to cocaine use.  Highly touted by basketball aficionados, Bias was drafted by the Boston Celtics who had just won a NBA-record sixteenth franchise title.  With such high hopes and media attention, Bias' death was a story that captured national attention and remained in the news cycle for months.  From sports writers to notable politicians, many Americans were shocked by the sudden death of a young man with such a promising career.  Speaker of the House Tip O'Neill, a representative from Massachusetts, eagerly tried to pre-empt the Reagan administration and score political points for the Democrats in an area where Republicans held a commanding lead in opinion polls.  Upon returning from the 4th of July recess, O'Neill immediately called an emergency meeting for all the crime-related committee chairs.  His goal was to write and sponsor some Democratic-led anti-drug legislation tougher than anything the Reagan administration had put forth.[16]

Not to be outdone, in a speech from the residential quarters of the White House later that year in September, Ronald Reagan, joined by wife Nancy, informed the nation that "Drugs are menacing our society. They're threatening our values and undercutting

our institutions. They're killing our children."[17]  Despite the progress that had been made in decreasing the number of drug users since Reagan took office, he explained that "[t]oday there's a new epidemic: smokable cocaine, otherwise known as crack. It is an explosively destructive and often lethal substance which is crushing its users. It is an uncontrolled fire."  Shortly after the president's opening warning Mrs. Reagan chimed in, exclaiming "[t]oday there's a drug and alcohol abuse epidemic in this country, and no one is safe from it—not you, not me, and certainly not our children, because this epidemic has their names written on it."  For all the hard work they had done in their first five years in office, the First Lady pointed out that there were "dark" forces working against the future of America's children: "Our job is never easy because drug criminals are ingenious. They work everyday to plot a new and better way to steal our children's lives, just as they've done by developing this new drug, crack. For every door that we close, they open a new door to death. They prosper on our unwillingness to act."

Reagan made a special request near the end of this speech directed at those "in the newsrooms and production rooms of our media centers – you have a special opportunity with your enormous influence to send alarm signals across the Nation."  It was a call to media organizations to help his administration fight the War on Drugs by covering the war effort from a perspective sympathetic to the Reagan White House.  Along those lines, the White House instructed the DEA to allow ABC News to accompany them on "crack house" raids.  As the head of the New York office of the DEA reported back to his superiors, "Crack is the hottest combat-reporting story to come along since the end of the Vietnam War."[18]  Hot indeed.  In 1986 alone, more than one thousand crack stories appeared in the press, with over 400 crack cocaine reports on NBC alone.  The crack

epidemic was five times each the cover story for *Time* and *Newsweek*.[19] Such coverage was instrumental in producing in the public consciousness the perception that crack cocaine use was in an epidemic state.

On Halloween shortly after his prime time address, Reagan declared October national Crack Cocaine Awareness Month, alluding to the death of Len Bias as an example of how cocaine, "long masquerading as glamorous and relatively harmless," was indeed "a killer."[20]  Reagan even offered a medical opinion on how crack cocaine worked in the body: "crack is smoked, producing immediate effects in the user.  It is relatively inexpensive but it is so powerfully addictive that the user, even a first-time user, feels an overwhelming compulsion for more."  To drive home the dire nature of the threat, Reagan continued: "tragically, it is sold to and used by even 11 and 12-year olds.  To mothers and fathers, boys and girls at this age are children.  To a cocaine dealer, they are just another market."[21]

Only two years earlier, an epidemiological study conducted for the Alcohol, Drug Abuse and Mental Health Administration (ADAMHA) to ascertain recent drug use patterns barely mentioned crack cocaine as a problem.  The purpose of the study was to determine whether the increasing number of recreational drug users and addicts in the 26-and-over age range were a result of younger users getting older or completely different users starting anew.[22]  One of the study's conclusions was that cocaine users in the 26-and-over population were new to their drug use.  As the study put it, in addition to the cohort effect, there was an "equally large net increase in users within the older adult group."[23]

*The Birth of the Crack Baby and the History that Myths Make*

Appended to this epidemiological study was a second set of research findings called "Report of Coca Paste Smoking Field Investigation in South Florida." The report concluded with a warning about the emergence of "rock cocaine" as a serious problem.[24] "This is a form of freebase," the report explained, "in which cocaine hydrochloride is combined with bicarbonate of soda and heated producing crystals or rocks which are then smoked."[25] As the study further pointed out, snorting cocaine powder (hydrochloride) continued to be the primary form and route of cocaine use, but that "freebase smoking appears to be rapidly gaining popularity among cocaine users from the lower economic strata." To this point, the report mentioned the emergence of crack houses in Fort Lauderdale and Miami, "located primarily in black inner-city communities." Read together, the epidemiological study and the coca paste smoking report left administrators in the ADAMHA with the perception that there was a growing number of cocaine users, and those new users were primarily Black, 26 and older, from the inner city. It was the first time that crack cocaine was flagged as a possible item for concern in upper-level policy circles.

A little over a year later, at the December 11, 1985 meeting of the Oversight Working Group on Drug Abuse Health Issues in 1985, Carlton Turner, White House Senior Policy Advisor for Drug Policy, reported to the committee that "many cocaine users are switching from cocaine hydrochloride to 'rock' cocaine, or 'crack.'"[26] Turner explained to the group that crack "is cheaper (3-4 rocks for $20), induces a quicker high than snorting, and is perceived safer than injection because of the AIDS scare." Turner further informed the group that crack was "very powerful and difficult to treat," and its users "deteriorate quickly and usually need treatment in 6 to 9 months." At this point, the

use of crack cocaine was just a cautionary blip on the radar—nothing compared to the manner in which the nation became possessed with the crack story six months later with the sudden death of Len Bias.  And if the frenzy surrounding Bias's death was extreme, it paled in comparison to the doomsday discourse that accompanied the narrative of the crack baby.

*The Birth of the Crack Baby*

In a July 30, 1989 op/ed article for the *Washington Post,* Charles Krauthammer warned that "[t]he inner-city crack epidemic is now giving birth to the newest horror: a bio-underclass, a generation of physically damaged cocaine babies whose biological inferiority is stamped at birth."[27]  Krauthammer, quoting the former director for the National Center on Child Abuse and the American Enterprise Institute's Douglas Besharov,[28] further explained that "[t]his is not stuff that Head Start can fix… This is permanent brain damage.  Whether it is 5 percent or 15 percent of the black community, it is there." Krauthammer likened cocaine-exposed children to "a race of (sub)human drones" as in those described in Aldous Huxley's *Brave New World*.  He stated matter-of-factly that their "future is closed to them from day one.  Theirs will be a life of certain suffering, of probable deviance, of permanent inferiority.  At best, a menial life of severe deprivations," that would exhaust the resources of our educational system, fill the prisons to overflowing, and completely drain the coffers of social welfare.  The horror of the situation led him to conclude that "the dead babies may be the lucky ones."[29]

Krauthammer was by no means the only one to weigh in on the alleged crisis.  By 1987, roughly three years after crack was introduced in the U.S., many of the over one thousand media stories about this drug focused on the "epidemic" of crack babies.[30]  Dr.

Ira Chasnoff in the *New England Journal of Medicine* gave birth to the frenzy in September of 1985 with an article in which he suggested that "prenatal cocaine exposure could have a devastating effect on infants."[31]  In this article, Chasnoff explained that his sample size was only 23 women and that much more research was needed before any conclusions could be reached.[32]  In December 1986 the *New England Journal of Medicine* published a special report on the medical complications of cocaine abuse.[33] The report argued that the use of crack, described as "almost pure cocaine" (an egregious mistake in pharmacological analysis) could contribute to "spontaneous abortions."  It further warned that infants exposed to crack were "at risk for higher rates of congenital malformations, perinatal mortality, and neurobehavioral impairments."[34]

By 1987 the topic had generated so much interest that the journal *Neurotoxicology and Teratology* published a special edition focusing on the developmental effects of drug addiction, particularly cocaine.  Among the findings, researchers reported that an infant born to a woman using cocaine typically had a lower birth weight, length, head circumference and Apgar score,[35] and an abnormal heart rate accompanied by tremors and hypertonicity.[36]  In addition to these biological factors, another study in the series found that drug-using mothers were also much more likely to abuse or neglect their infants, and that the children stood an increased chance of being placed in foster care.[37]

Popular news sources ran with this information.  A few days after Chasnoff's first article, CBS news aired a story of a social worker treating an 18 month-old crack-exposed infant explained that the baby would grow up to have "an IQ of perhaps 50" and be "barely able to dress herself."[38]  In the September 15, 1986 issue of *Time*, whose cover read "Drugs—The Enemy Within," crack was called the "issue of the year."[39]  The night

before the release of the *Time* issue was when the Reagans' joint prime time nationally televised press conference took place, where Nancy Reagan implored her fellow citizens to "[l]isten to this news account from a hospital in Florida of a child born to a mother with a cocaine habit: 'Nearby, a baby named Paul lies motionless in an incubator, feeding tubes riddling his tiny body. He needs a respirator to breathe and a daily spinal tap to relieve fluid buildup on his brain. Only 1 month old, he's already suffered 2 strokes.'"[40] An article in *Sober Times* proclaimed that "cocaine ingested by a pregnant woman can cause premature birth, or cerebral strokes in the unborn child.  It is unsafe at any dosage," the authors warned, quoting Dr. Henry Wasiewski of Penn State's Hershey Medical Center, "even just one hit of cocaine may be enough to cause defects or death."[41]  By the November elections of 1986, this media frenzy detailing the horrors of the crack epidemic made being "tough on drugs" a top priority with voters.[42]

When George H. W. Bush assumed the office of the president he, like Reagan, also held a prime time press conference – the first of his presidency – to press upon the American public the continued threat posed by illegal drugs.  Bush directly asserted "[o]ur most serious problem today is cocaine, and in particular, crack."[43]  No one was safe, Bush further admonished in his hyperbolic description of the crack baby epidemic, "when hundreds of thousands of babies are born each year to mothers who use drugs -- premature babies born desperately sick -- then even the most defenseless among us are at risk."[44]  Bush reinforced this dire warning with a crack baby photo-op the day after his State of the Union Address the following January.  After explaining the previous evening how his administration was stepping up the war on drugs, Bush visited a hospital room

for babies abandoned by drug-addicted mothers, and scooped up four-month-old "Little Edward," to give Americans a glimpse of an "authentic" crack baby.[45]

A 1989 *Washington Post* article by Marcia Greene, at the height of the crack scare, painted an alarming scenario of the mothers of crack babies. As she described, "[p]arents seeking the next crack fix have abandoned their young children in the streets and in hospitals. They have sold food stamps and their children's clothes for drug money. A few even have sold their children as prostitutes."[46] Lending further credence to the crack baby narrative, a 1990 front-page *New York Times* article proclaimed:

> Parents and researchers say a majority of children exposed to significant amounts of drugs in the womb appear to have suffered brain damage that cuts into their ability to make friends, know right from wrong, understand cause and effect, control their impulses, gain insight, concentrate on tasks, and feel and return love… As adults, they may never be able to hold jobs or control anger.[47]

By 1991, John Silber, president of Boston University, went so far as to lament the expenditure of so many health care dollars on "crack babies who won't ever achieve the intellectual development to have consciousness of God."[48] And Judy Howard, a pediatrician at the University of California, Los Angeles, regularly gave interviews warning of the horrors of crack babies, once telling *Newsweek* that in crack babies, the part of their brains that "makes us human beings, capable of discussion or reflection" had been "wiped out."[49]

Even more drastic language was applied to the supposed havoc that crack babies would wreak upon the world as they grew older. A September 17, 1989 article in the *Washington Post* warned of "A Time Bomb in Cocaine Babies," while a September 15, 1990 article in the St. Louis Post-Dispatch declared a "Disaster In Making: Crack Babies Start to Grow Up."[50] As columnist Ellen Goodman pointed out, after early indications that the crack baby narrative may have been blown out of proportion, "perhaps the worst

*The Birth of the Crack Baby and the History that Myths Make*

effect of this distortion is the sense of hopelessness dispensed with the title 'crack kid.'

Hopelessness on the part of mothers, teachers, and even the children themselves. As [Dr.

Claire Coles of Emory University] warns, 'if a child comes to kindergarten with that

label, they're dead.'"[51]

Most pertinent about this narrative of the crack baby is that its structure

specifically frames the behavior of the mothers and the biological condition of the infants

as antithetical to what we think of as basic human nature.  Crack-addicted mothers were

inhuman because of their neglect in caring for their unborn babies – a supposed violation

of the most basic of human instincts.  Crack babies were inhuman by outcome of that

neglect – their hypothesized deficiencies in mental, emotional, and developmental

capacity were physical evidence of their phylogenetic degeneration on the evolutionary

scale.

### The Revelation of the "Myth"

> Our task, consequently, would be to extend the concept of fiction beyond language and
> the plastic arts, and to acknowledge the work of the analogies, models, and paradigms in
> the conceptual field of scientific knowledge.
>
> *Raul Ricoeur, 1979*[52]

What is striking about these assertions is not only the horrific picture they paint

but – and perhaps more importantly – that there seems to have been no sound or verified

scientific studies to support such claims.  As explained in a March 28, 2001 article in

*JAMA,* the studies' authors—performing a "meta-analysis" of three dozen earlier studies

of the impact of cocaine use during pregnancy on infants and young children—conclude

that the very idea of a "crack baby" has no ground.  According to the authors, "among

children aged 6 years or younger, there is no convincing evidence that prenatal cocaine

exposure is associated with developmental toxic effects that are different in severity,

scope, or kind from the sequelae of multiple other risk factors. Many findings once thought to be specific effects of *in utero* cocaine exposure are correlated with other factors, including prenatal exposure to tobacco, marijuana, or alcohol, and the quality of the child's environment."[53]

Given the preponderance of reporting on the subject, the idea that the very existence of the crack baby is a "myth" seems difficult to accept.  Throughout the late 1980s and early 1990s, while over a thousand news articles in both national and local publications detailed the devastating effects of infants born to crack-addicted mothers, television news outlets lent footage of the phenomenon in daily news programs as well as on network news magazine shows such as *Prime Time, 48 Hours,* and *60 Minutes*.[54] Such stories helped garner public support for harsher, war-oriented drug legislation by shaping public perception that crack cocaine use represented a threatening crisis that needed to be dealt with harshly.  Short of a grand conspiracy, it seems impossible that so many reporters and news editors could have independently found images and wrote stories to verify something that did not exist.  So, how does one explain such a turn of events, and how do we understand how something that does not exist become such a powerful determinate of U.S. public policy and of U.S. history?

The authors of the *JAMA* article cite serious methodological flaws in the bulk of research conducted to study the impact of prenatal cocaine exposure, such as the failure to distinguish cocaine exposure from exposure to other drugs, a lack of control groups to consider basic factors such as malnourishment and a lack of prenatal health care, and a general lack of understanding of normal infant behavior. It would be a mistake, however, to explain this phenomenon simply as a matter of the *naïveté* of lay reporters unable to

distinguish between sound and unsound scientific practice.  For example, as Gideon

Koren et. al. explain in a 1989 study, editors of major science journals systematically

rejected articles submitted for publication whose results tended to nullify the crack baby

hypothesis, even when such articles employed more sound research methods.[55]

According to the authors,

> Our analysis revealed that the likelihood of a negative study [one nullifying the crack-baby hypothesis] being selected for presentation was negligible, whereas a positive study was likely to be accepted in 57% of cases.  It is generally assumed that studies are selected for presentation or publication based on objective scientific criteria.  In selecting criteria for this assessment we tried to identify those elements in an abstract that reviewers are likely to use.  The data indicated that negative abstracts were similar to or better than positive abstracts.  In particular negative abstracts tended to verify cocaine use more frequently, which is probably the most important independent variable in such studies.[56]

As this study illustrates, stories verifying the existence of crack babies had

something of an irresistible radiance with both medically trained and lay audiences.  The

crack baby phenomenon led to the enactment of a number of laws that resulted in

numerous criminal convictions for prenatal drug use.  As columnist Mariah Blake

explains, "hospitals began secretly testing pregnant women for cocaine, and jailing them

or taking their children.  Tens of thousands of kids were swept into foster care, where

many languish to this day."[57]  By 1995, thirteen states required doctors to report drug use

in pregnancy or positive drug tests in newborns to law enforcement authorities.  There

were also nine states that specifically defined drug use during pregnancy as child abuse or

neglect, addressed by any means from mandatory treatment for the mother to a criminal

investigation and the possible removal of the child.  By 1995, Grieder estimates that

"between 200 and 300 women [had] been prosecuted, often under existing child abuse

and neglect statutes, and mostly for cocaine."[58]  In a throwback to the American eugenics

movement of the early twentieth century, programs started offering so-called crack

*The Birth of the Crack Baby and the History that Myths Make*

mothers money to buy more drugs in exchange for being sterilized.[59]  The bulk of these policies were enacted between 1988 and 1991, when articles citing the horrors of prenatal cocaine exposure peaked.

The persistence of the crack baby narrative despite nullifying evidence and the zeal with which policymakers latched onto the issue suggest that there was something enthralling about the crack baby narrative that fed the American psyche.  Here, the interface between media representations, science practitioners and policy makers combined to create the phenomenon of the crack baby that resulted in a chain of events in which mostly Black and Latina lower-class women who consumed crack cocaine during pregnancy were demonized and singled out for special prosecution from the courts.[60] Despite having no empirical grounding, the narrative of the crack baby nevertheless had the power to influence historical events.

### The White House Response

Seizing on the horrific crack baby reports, Donald Ian MacDonald – director of the White House Office of National Drug Control Strategy, i.e., the "Drug Czar" – alerted U.S. Attorney General, Edwin Meese to the crisis of illegal drug use during pregnancy on June 17, 1988.  This inspired the Attorney General's office to usher in the new laws targeting drug addicted expectant mothers for tougher penal sanction.  MacDonald cited two examples of hospitals in Miami and Philadelphia where 20% of pregnant women had tested positive for illegal drugs.  MacDonald further referenced the oft-cited crack baby symptoms of premature birth weight and both physical and behavioral abnormalities "that have been reported as a result of cocaine use by the mother.  Among the most distressing," MacDonald warned, "are the effects on the baby's brain," and supplied for

16

Meese a photocopy of one such study citing such birth defects.[61]  The article, "Brain Lesions in Cocaine and Methamphetamine Exposed Neonates,"[62] like the ones mentioned earlier, controlled for cocaine use as opposed to methamphetamine but did not control for other factors, such as alcohol and tobacco use, malnutrition and access to neonatal care. However, the picture painted was particularly dire, finding that neonatal strokes— including "hemorrhagic infraction in the deep brain particularly around the internal capsule/basal ganglion," cystic lesions, large posterior fossa hemorrhage, absent septum pellucidum with atrophy, and brain edema—were common in 35% of the infants born to drug addicted mothers.[63]

MacDonald also sent a memo to Reagan's communications director on the necessity of the President maintaining a high profile on the drug war.  He advised Reagan do so by making regular appearances at select drug awareness events.  "Recent poll numbers," he pointed out, "show that our best issue, as far as Presidential approval and Republican/Democrat differential, is the drug issue.  We have about a 20 point spread, while our other issues on peace, economy, etc., have only a two to three point difference. With that in mind," MacDonald concluded, "our efforts should be focused on building the foundation that has already been laid by the President and First Lady."[64]

Implementing MacDonald's suggestion involved increasing awareness around an issue that was actually in decline.  By the mid-to-late 1980s, violent crime and the nation's overall drug use were in significant overall decline.  The percentage of drug users among the 12-25-age group (the majority of illegal drug users fall into this category) had considerably decreased from its high in 1978-79.  However, the number of drug-related hospital visits and deaths was on the rise from its low during 1978-79.  This

inconsistency is accounted for in the fact that addiction among persons 26 and older was on the rise as treatment facilities opened during the 1960s and 1970s were closed during the Reagan years.[65]  The patterns of drug use among older persons is qualitatively different than that of teenagers and young adults, and what these numbers suggest is that recreational drug use among teens and college-age adults was in great decline but that there were slightly more older addicts using heroin and cocaine whose consumption was increasing.  Other factors were exacerbating drug addiction in this older age group, such as federal funding for treatment drying up, higher potency, more dangerous routes of administration, and an increased use of drug combinations among addicts.  However, as MacDonald's memo demonstrates, continued Republican electoral success depended on maintaining the public impression that drug use in the US continued to represent a crisis. In suggesting that Reagan continue making routine anti-drug event appearances, this would feed the crack reporting frenzy that had already begun to self-replicate in the press.

Along these lines, MacDonald advised Frederick J. Ryan, Reagan's assistant, "to establish the groundwork for carrying the President's and Mrs. Reagan's crusade for a drug-free America into the next decade."[66]  MacDonald requested Reagan's presence at a March 7, 1988, White House luncheon scheduled for media chief executives.  The presidential luncheon, MacDonald explained, would be to thank the major media organizations for their "extraordinary" coverage of the drug abuse problem in the wake of Reagan's September 14, 1986, call to action for media organizations to address this issue, as they "have a special opportunity with their enormous influence to send alarm signals across the nation."[67]  He cited the Media Partnership for a Drug-Free America, CBS's "Stop the Madness," NBC's "Don't Be a Dope," the National Association of

Broadcasters "On-Air Initiatives," "and countless others."  MacDonald concluded that "the drug issue has been the subject of in-depth specials on the nightly news, in daily newspapers, and in weekly magazines.  Together these initiatives represent hundreds of millions of dollars [in favor of Reagan administration policies] in expertise and coverage."[68]  This cooperation from the major media outlets helped keep the issue of drug abuse salient in the public consciousness.  It thereby helped maintain a general fear and anxiety about the lurking specter of illegal drugs and, most importantly, those Black, inner-city, criminalized segments of the population associated with them in the American consciousness.

### The "Focus on the User" Crusade

To lay the intellectual groundwork for the next phase of the drug war crusade, MacDonald circulated a draft of a position paper he authored that he felt would enable the Reagan administration to keep the nation's attention focused on the drug issue as a continuing crisis.  The paper, titled, "Focus on the User," serves as the conceptual foundation for the religious zeal of a crusade that characterized all subsequent federal drug policy.  It begins with MacDonald reiterating the success enjoyed by the Reagan administration during its first seven years in changing attitudes about recreational drug use and significantly decreasing the number of people using drugs.  However, MacDonald explained that the number of remaining users remained far too high.  For such users, "education and prevention efforts are less likely to be successful."[69]  Pointing to remarks Reagan made at an August 4, 1986 press conference—where the President argued, "[W]e will refuse to let the drug user blame their behavior on others; we will

insist they take responsibility for their own actions"[70]—MacDonald suggested that "User Accountability" be the theme of the new crusade era of the drug war.

The first task necessary for such a change in attitude, MacDonald argued, was to overcome the "erroneous perception of the drug user as powerless," and instead iterated that "in fact, nearly all drug use starts with a willful act," and "most illegal drug users can choose to stop."[71] This strategy of attacking the idea of powerlessness went against the very foundation of how addiction had come to be defined, in both medical and policy circles. In fact, cocaine was cited as strongest among all drugs in producing compulsive continued use that the individual was powerless to resist. Only three years prior, in a report on cocaine prepared for the National Drug Enforcement Policy Board (NDEPB),[72] the drug is described as "one of the most powerfully addictive drugs known to man," where "addictive in this case means that an individual has lost voluntary control over the use of the drug."[73]

Another strong point that MacDonald argued was that drug use was not a "victimless crime," and instead provided a long list of societal ills caused by an individual's drug use. They included the arguments that drug use finances organized crime, fosters street crime, drives up the cost of law enforcement, fosters drops in productivity and drives up health care costs, poses a threat to worker and public safety, tempts non-drug users with bad habits and sets a bad example for children, helps spread the AIDS virus, and finally, that drug use is an "insidious force for illiteracy, child abuse, poverty, corruption, and a general degradation of our society."[74]

"Previous demand reduction policies," MacDonald continued, "have emphasized the health risks of drug use and suggested compassion for the drug user, including ample

opportunities to stop drug use and, if necessary, to receive medical treatment."  In a sly twist of words, MacDonald then made it seem as if his new 'user accountability' crusade was actually a different form of empathy for the drug user.  "The emphasis on compassion is as it should be," MacDonald argued reassuringly, but "unfortunately, individuals have great difficulty in changing established behavior, especially when the reinforcing power of drugs tends to override health considerations and the psychological effects of the drugs themselves often conceal the real consequences from the user." Therefore, MacDonald continued, "solid accountability for stopping one's own drug use can be an effective stimulus to help individuals overcome drug-using behavior."  Here, MacDonald used almost precisely the language of the behavioral and brain disease models—employing the theme of powerlessness to stop using drugs in the face of negative consequences, and the term 'reinforcing'—to argue for a penal approach rather than a treatment one, all while he claimed to have the addict's best interests in mind. MacDonald continued with this line of thinking, asserting that "a sound policy must, in fact, administer compassion with a firm hand if it is not to 'enable' the very behavior which it seeks to avoid."[75]

     MacDonald then cleverly invoked the treatment philosophy of Alcoholics Anonymous to help support his position in favor of a strict penal federal policy instead of a treatment, healthcare approach.  "AA maintains that people are not ready to quit drug use until they 'hit bottom'—until the logical consequences of use far outweigh any perceived pleasures of use…We agree with AA," MacDonald argued surprisingly, "that the 'bottom' can and should be raised to reach the user long before he or she is

physically, socially, and economically destroyed by the drug use.  Early intervention is much more compassionate than allowing drug use to continue."[76]

MacDonald concluded that "a national policy of holding the users accountable for their illegal drug use is the next logical step in the ongoing crusade for a drug-free America," such that "individuals who continue to ignore the personal dangers and illegality associated with drug use [face] the risk of swift and certain sanctions."  The goal of this policy, MacDonald explained, "is not to punish the users, but to cause them to stop their destructive behavior and to prevent other individuals from ever starting."[77] With these words, MacDonald set the White House on a course to launch an urban military drug crusade and did so in a manner where policymakers could actually feel as if they were acting compassionately and in a drug user's best interest.

Following the positive reception of his position paper, MacDonald circulated memos to all White House offices informing staff members of the new "Focus on the User" crusade and instructing them to tailor their programs and public addresses accordingly.  It was this "crusade," more than any other factor, that ensconced the hysteria surrounding crack cocaine and crack babies into American history in terms of the policy initiatives enacted to fight these specters of the American psyche.

The "Focus on the User" crusade, and its conceptual foundation of "user accountability," was part of a larger American racialized discourse of "personal responsibility" that has characterized national politics over the past two decades. Political Scientist Adolph Reed explains that "for quite some time race's force in national politics has been as a vehicle for … in the supposedly benign, liberal Democratic version – teaching Blacks 'personal responsibility.'"[78]  Far from being benign or neutral, Martin

Gilens illuminates how the discourse on "personal responsibility" has always been a thinly veiled condemnation of the Black lower classes. In his text, *Why Americans Hate Welfare: Race, Media, and the Politics of Antipoverty Policy,* Gilens takes the Personal Responsibility and Work Opportunity Reconciliation Act – otherwise known as the Welfare Reform Act signed by Bill Clinton – as his point of departure, and analyzes the racial disparities between sympathetic and non-sympathetic media representations of welfare recipients. In doing so, he explains how those representations have fortified in the American consciousness the perception that welfare primarily benefits Blacks who lack a suitable work ethic.[79] Despite the fact that the majority of U.S. welfare recipients are White, media representations helped foster the perception in the American consciousness that most welfare recipients were lazy urban Blacks. This perception drove policy and thereby helped determine historical events. The same can be said about the "myth" of the crack baby.

By far the most significant policy initiatives to emanate from the late 1980s drug hysteria were the Omnibus Drug Abuse Acts of 1986 and 1988. Enacted on October 27, 1986, shortly before the congressional and gubernatorial elections, the Omnibus Anti-Drug Abuse Act of 1986 was a blueprint for the new federal drug control strategy that would emphasize punishment and incarceration above educational awareness to fight the drug war. It authorized $1.7 billion in new drug war funding, adding to the previous federal drug control budget of $2.2 billion. It called for increased mandatory sentencing for sale and possession, eliminated probation and parole for certain sellers and repeat offenders, and instituted an automatic sentence of death for any murder committed by a person involved in the drug enterprise. In line with its theme of "strong domestic law

enforcement," the bill established a "good faith" exception to the evidence exclusionary rule.  This provision meant that evidence illegally seized by officers would no longer be excluded from a criminal case due to a lack of a search warrant or probable cause—officers needed only to testify that they conducted illegal searches in good faith that, in time, a proper search warrant would be granted.  The law also increased fines and expanded the forfeiture powers of law enforcement agencies—a development that eventually led to a $500 billion per year profit motive for sustaining the drug war.[80] Treatment and prevention took a back seat to enforcement, new prison construction and interdiction.  The law also established the bloc grant program to which state and local law enforcement agencies could apply for use in fighting the drug war and apply in ways specific to their local needs.  In this respect, the law made the distribution of federal funding—even for projects not related to law enforcement like, for instance, highway grants—contingent on states passing similar "zero tolerance" legislation so that even states where there was democratic support for a different or more tempered approach had no choice but to join the crusade.  The law even declared that drugs were a threat to national security, and therefore made large-scale trafficking violations federal offenses.  To this end, it allocated $278 million for the Department of Defense (DOD) to aid in its interdiction efforts along the southern U.S. border.

The Omnibus Anti-Drug Abuse Act of 1988 represented the legislative height of "Focus on the User" crusade era of the drug war, as demonstrated by the billions of new dollars allocated for state and local law enforcement agencies.  The bill was initially titled the Comprehensive Anti-Drugs Act of 1988, and Title I was initially called "Demand Reduction and User Accountability."  Subtitle A, dubbed the User Accountability Act of

*The Birth of the Crack Baby and the History that Myths Make*

1988, stipulated that any individual convicted of a drug offense be ineligible for federal benefits, including Social Security and Medicare; authorized the Attorney General to exact civil penalties against drug offenders; and authorized the withholding of federal highway funds to any state that did not revoke the driver's licenses of people convicted of drug charges.  It even directed the Attorney General "to study the feasibility of prosecuting Federal drug-related offenses in a manner alternative or supplemental to the current criminal justice system," or, in other words, a way of prosecuting accused federal drug offenders without affording them their constitutional rights.[81]

The joint House and Senate legislative version that finally passed provided $1.5 billion in bloc grants for state and local law enforcement organizations through 1991, in addition to over $300 million for hiring 3,830 new federal law enforcement officers.  It also allocated $200 million for new federal prison construction, along with $600 million in international aid as conditional grants for source countries to eradicate drug crops. Furthermore, the act imposed the death penalty for anyone "who intentionally kills or counsels, commands, induces, procures, or causes an intentional killing of: (A) any person while (1) engaging in or (2) working in furtherance of any continuing criminal enterprise, or (3) while engaging in a major Federal drug felony; or (B) any law enforcement officer during or in relation to a Federal drug felony."[82]

The law also set a federal distinction between crack and powder cocaine, establishing the 100-to-1 ratio of mandatory minimum sentencing for cocaine offenses. Under this rubric, possession of five grams or more of crack cocaine carries a mandatory five year minimum sentence; 50 grams or more carry a ten-year mandatory sentence, even for a first offense.  It takes *500* grams or more of powder cocaine to receive the

same five-year sentence, or *5,000* grams for the mandatory ten-year sentence, even though powder cocaine serves as the manufacturing base of crack. The law represents the only federal penalty for a first offense of simple possession of a controlled substance.[83] The overwhelming majority of those prosecuted for crack cocaine offenses are Black. Despite the fact that a 1995 US Sentencing Commission report on *Cocaine and Federal Sentencing Policy* found that this statue was gravely and egregiously racially discriminatory, so strongly was crack cocaine associated with the social pariah of the Black, urban, criminal gang-member that there was no congressional, judicial, or executive branch support for correcting the racial bias in the law.[84]

Most importantly, perhaps, is that the bill streamlined the process for asset forfeiture, making it easier for the proceeds from confiscated assets to go directly to the operating budgets of local law enforcement agencies, and lifted the restrictions on the amount of money law enforcement agencies could collect in forfeitures. Essentially, these new regulations meant that law enforcement organizations no longer had to hand over their forfeiture proceeds to the federal government and wait until the end of the year for a partial return. Instead, it turned the drug war into a cash cow with immediate gratification, as every car, boat, house, bundle of cash and tract of property seized went directly into the operating budgets of state and local police agencies; this meant higher salaries for officers and millions of dollars worth of new vehicles and equipment. This provision has created powerful, financially vested interested groups whose financial futures depend on maintaining the War on Drugs.

By the late 1980s, the War on Drugs became the main contributing factor for the largest exponential growth of inmates in the history of the U.S. prison system. (see

*The Birth of the Crack Baby and the History that Myths Make*

Figures 1 and 2, below.)  In the 30 years since the War on Drugs began, the U.S. prison population has grown to ten times its size in 1971, from about 200,000 inmates to over 2 million.  This 30-year period also saw a total transformation of the demographics of the U.S. inmate population.  Up until the beginning of the War on Drugs, Whites were the majority in commensurate with their percentage of the general population.[85]  Since the War on Drugs started in the aftermath of the Civil Rights movements, Blacks now make up 49 percent of all prison inmates, with Latino/as comprising another 27 percent.  By 1989-90, twenty-three states had a racial disparity in drug-arrest rates of more than five Blacks to every one non-Black.[86]  Though Blacks account for only 13 percent of monthly drug users according to NIDA, they comprise 35 percent of all arrests for drug possession, 55 percent of all convictions for possession, and 74 percent of all prison sentences for possession.[87]

The primary factor in the increase of the prison population and the drastically shifting racial demographics is the anti-drug legislation passed in the last three decades.  Prior to 1970, drug offenders made for roughly 16% of the prison population.[88]  Now, of the slightly over 2 million people incarcerated in U.S. prisons and jails, roughly 60% are there on drug-related charges.  Of those in prison on drug offenses, 45% are in for charges related to the sale and/or possession of crack cocaine.  Of those convicted for the possession or sale or crack cocaine, 88.3% of them are Black.[89]  The narrative of the crack baby played a powerful role in generating public support for such drastic crack cocaine sentencing.  Mandatory sentencing is also a huge factor: the California "three strikes" law, which requires life in prison for third-time offenders, has sentenced more people for drug possession (not sale) than for all violent offenses combined, and it has

*The Birth of the Crack Baby and the History that Myths Make*

sentenced twice as many marijuana users to life sentences as murderers, rapists, and kidnappers combined.[90]

**Figure 1: Number and rate (per 100,000 resident population in each group) of sentenced prisoners under jurisdiction of State and Federal correctional authorities on December 31, by sex, United States, 1925-2003.**

(Rate per 100,000 resident population in each group)

| Year | Total | Rate | Male Number | Male Rate | Female Number | Female Rate | | Year | Total | Rate | Male Number | Male Rate | Female Number | Female Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1925 | 91,669 | 79 | 88,231 | 149 | 3,438 | 6 | | 1970 | 196,429 | 96 | 190,794 | 191 | 5,635 | 5 |
| 1926 | 97,991 | 83 | 94,287 | 157 | 3,704 | 6 | | 1971 | 198,061 | 95 | 191,732 | 189 | 6,329 | 6 |
| 1927 | 109,983 | 91 | 104,983 | 173 | 4,393 | 7 | | 1972 | 196,092 | 93 | 189,823 | 185 | 6,269 | 6 |
| 1928 | 116,390 | 96 | 111,836 | 182 | 4,354 | 8 | | 1973 | 204,211 | 96 | 197,523 | 191 | 6,004 | 6 |
| 1929 | 120,496 | 98 | 115,876 | 187 | 4,620 | 8 | | 1974 | 218,466 | 102 | 211,077 | 202 | 7,389 | 7 |
| | | | | | | | | 1975 | 240,593 | 111 | 231,918 | 220 | 9,675 | 8 |
| 1930 | 139,453 | 104 | 134,786 | 200 | 4,668 | 8 | | 1976 | 262,833 | 120 | 252,794 | 239 | 10,039 | 9 |
| 1931 | 137,082 | 110 | 132,638 | 211 | 4,444 | 7 | | 1977a | 278,141 | 126 | 267,097 | 249 | 11,044 | 10 |
| 1932 | 137,997 | 110 | 133,573 | 211 | 4,424 | 7 | | 1977b | 285,456 | 129 | 274,244 | 255 | 11,212 | 10 |
| 1933 | 136,810 | 109 | 132,520 | 209 | 4,290 | 7 | | 1978 | 294,396 | 132 | 282,813 | 261 | 11,583 | 10 |
| 1934 | 138,316 | 109 | 133,769 | 209 | 4,547 | 7 | | 1979 | 301,470 | 133 | 289,465 | 264 | 12,005 | 10 |
| 1935 | 144,180 | 113 | 139,278 | 217 | 4,902 | 8 | | | | | | | | |
| 1936 | 145,038 | 113 | 139,990 | 217 | 5,048 | 8 | | 1980 | 315,974 | 139 | 303,643 | 275 | 12,331 | 11 |
| 1937 | 152,741 | 118 | 147,375 | 227 | 5,366 | 8 | | 1981 | 353,673 | 154 | 339,375 | 304 | 14,298 | 12 |
| 1938 | 160,285 | 123 | 154,826 | 236 | 5,459 | 8 | | 1982 | 395,516 | 171 | 379,075 | 337 | 16,441 | 14 |
| 1939 | 179,818 | 137 | 173,143 | 263 | 6,675 | 10 | | 1983 | 419,346 | 179 | 401,870 | 354 | 17,476 | 15 |
| | | | | | | | | 1984 | 443,398 | 188 | 424,193 | 370 | 19,205 | 16 |
| 1940 | 173,706 | 131 | 167,345 | 252 | 6,361 | 10 | | 1985 | 480,568 | 202 | 459,223 | 397 | 21,345 | 17 |
| 1941 | 165,439 | 124 | 159,228 | 239 | 6,211 | 9 | | 1986 | 522,084 | 217 | 497,540 | 426 | 24,544 | 20 |
| 1942 | 150,384 | 112 | 144,167 | 217 | 6,217 | 9 | | 1987 | 560,812 | 231 | 533,990 | 459 | 26,822 | 22 |
| 1943 | 137,220 | 103 | 131,054 | 202 | 6,166 | 9 | | 1988 | 603,732 | 247 | 573,587 | 482 | 30,145 | 24 |
| 1944 | 132,456 | 100 | 126,350 | 200 | 6,106 | 9 | | 1989 | 680,907 | 276 | 643,643 | 535 | 37,264 | 29 |
| 1945 | 133,649 | 98 | 127,609 | 198 | 6,040 | 9 | | | | | | | | |
| 1946 | 140,079 | 99 | 134,075 | 191 | 6,004 | 8 | | 1990 | 739,980 | 297 | 699,416 | 575 | 40,564 | 32 |
| 1947 | 151,304 | 105 | 144,961 | 202 | 6,343 | 9 | | 1991 | 789,610 | 313 | 745,808 | 608 | 43,802 | 34 |
| 1948 | 155,977 | 106 | 149,739 | 205 | 6,238 | 8 | | 1992 | 846,277 | 332 | 799,776 | 642 | 46,501 | 36 |
| 1949 | 163,749 | 109 | 157,663 | 211 | 6,086 | 8 | | 1993 | 932,074 | 359 | 878,037 | 698 | 54,037 | 41 |
| | | | | | | | | 1994 | 1,016,691 | 389 | 956,566 | 753 | 60,125 | 45 |
| 1950 | 166,123 | 109 | 160,309 | 211 | 5,814 | 8 | | 1995 | 1,085,022 | 411 | 1,021,059 | 789 | 63,963 | 47 |
| 1951 | 165,680 | 107 | 159,610 | 209 | 6,070 | 8 | | 1996 | 1,137,722 | 427 | 1,069,123 | 819 | 68,599 | 51 |
| 1952 | 168,233 | 107 | 161,994 | 208 | 6,239 | 8 | | 1997 | 1,194,581 | 444 | 1,120,787 | 853 | 73,794 | 54 |
| 1953 | 173,579 | 108 | 166,909 | 211 | 6,670 | 8 | | 1998 | 1,245,402 | 461 | 1,167,802 | 885 | 77,600 | 57 |
| 1954 | 182,901 | 112 | 175,907 | 219 | 6,994 | 8 | | 1999 | 1,304,074 | 463 | 1,221,611 | 913 | 82,463 | 59 |
| 1955 | 185,780 | 112 | 178,655 | 217 | 7,125 | 8 | | | | | | | | |
| 1956 | 189,565 | 112 | 182,190 | 219 | 7,375 | 9 | | 2000 | 1,331,278 | 469 | 1,246,234 | 915 | 85,044 | 59 |
| 1957 | 195,414 | 113 | 188,113 | 221 | 7,301 | 8 | | 2001 | 1,345,217 | 470 | 1,260,033 | 909 | 85,184 | 58 |
| 1958 | 205,643 | 117 | 198,206 | 229 | 7,435 | 9 | | 2002 | 1,380,516 | 476 | 1,291,450 | 900 | 89,066 | 60 |
| 1959 | 208,105 | 117 | 200,469 | 229 | 7,636 | 8 | | 2003d | 1,409,280 | 482 | 1,316,495 | 915 | 92,785 | 62 |
| 1960 | 212,953 | 117 | 205,265 | 230 | 7,688 | 8 | | | | | | | | |
| 1961 | 220,149 | 119 | 212,268 | 234 | 7,881 | 8 | | | | | | | | |
| 1962 | 218,830 | 117 | 210,823 | 229 | 8,007 | 8 | | | | | | | | |
| 1963 | 217,283 | 114 | 209,538 | 225 | 7,745 | 8 | | | | | | | | |
| 1964 | 214,336 | 111 | 206,632 | 219 | 7,704 | 8 | | | | | | | | |
| 1965 | 210,895 | 108 | 203,327 | 213 | 7,568 | 8 | | | | | | | | |
| 1966 | 199,654 | 102 | 192,703 | 201 | 6,951 | 7 | | | | | | | | |
| 1967 | 194,896 | 98 | 188,561 | 195 | 6,335 | 6 | | | | | | | | |
| 1968 | 187,914 | 94 | 182,102 | 187 | 5,812 | 6 | | | | | | | | |
| 1969 | 196,007 | 97 | 190,413 | 192 | 5,594 | 6 | | | | | | | | |

Note: Prison population data are compiled by a yearend census of prisoners in State and Federal institutions. Data for 1925 through 1939 include sentenced prisoners in State and Federal prisons and reformatories whether committed for felonies or misdemeanors. Data for 1940 through 1970 include all adult felons serving sentences in State and Federal institutions. Since 1971, the census has included all adults or youthful offenders sentenced to a State or Federal correctional institution with maximum sentences of over 1 year.

Beginning on Dec. 31, 1978, a distinction was made between prisoners "in custody" and prisoners "under jurisdiction." As defined in a 1978 report (U.S. Department of Justice, Bureau of Justice Statistics, ***Prisoners in State and Federal Institutions on December 31, 1978***, NPS Bulletin SD-NPS-PSF-6 (Washington, DC: USGPO, 1980)), "in custody" refers to the direct physical control and responsibility for the body of a confined person. "Under jurisdiction" is defined as follows: A State or Federal prison system

*The Birth of the Crack Baby and the History that Myths Make*

has jurisdiction over a person if it retains the legal power to incarcerate the person in one of its own prisons. Jurisdiction is not determined by the inmate's physical location; jurisdiction is determined by the legal authority to hold the inmate. Examples of prisoners under the jurisdiction of a given system, but not in its custody, are those housed in local jails, in other States, or in hospitals (including mental health facilities) outside the correctional system; inmates on work release, furlough, or bail; and State prisoners held in Federal prisons or vice versa. Both custody and jurisdiction figures are shown for 1977 to facilitate year-to-year comparison. The rates for the period before 1980 are based on the civilian population. The civilian population represents the resident population less the armed forces stationed in the United States. Since 1980, the rates are based on the total resident population provided by the U.S. Census Bureau. Some data have been revised by the Source and may differ from previous editions of SOURCEBOOK. For information on methodology and definitions of terms, see Appendix 15 of *Sourcebook of criminal justice statistics Online,* <http://www.albany.edu/sourcebook/pdf/t622.pdf>, Table 6.22.  a = Custody counts; b = Jurisdiction counts; c = Rates have been revised and are now based on population estimates from the 2000 decennial census; d = Preliminary, subject to revision.

### Figure 2: Federal Prison Population, and number and percent sentenced for drug offenses.

United States, 1970-2004.

| | Total sentenced and unsentenced population | Sentenced population | | |
|---|---|---|---|---|
| | | Total | Drug offenses | |
| | | | Number | Percent of total |
| 1970 | 21,266 | 20,686 | 3,384 | 16.3% |
| 1971 | 20,891 | 20,529 | 3,495 | 17.0 |
| 1972 | 22,090 | 20,729 | 3,523 | 16.9 |
| 1973 | 23,336 | 22,038 | 5,652 | 25.6 |
| 1974 | 23,690 | 21,769 | 6,203 | 28.4 |
| 1975 | 23,566 | 20,692 | 5,540 | 26.7 |
| 1976 | 27,033 | 24,135 | 6,425 | 26.6 |
| 1977 | 29,877 | 25,673 | 6,743 | 26.2 |
| 1978 | 27,674 | 23,501 | 5,981 | 25.4 |
| 1979 | 24,810 | 21,539 | 5,468 | 25.3 |
| 1980 | 24,252 | 19,023 | 4,749 | 24.9 |
| 1981 | 26,195 | 19,765 | 5,076 | 25.6 |
| 1982 | 25,193 | 20,938 | 5,518 | 26.3 |
| 1983 | 30,214 | 26,027 | 7,201 | 27.0 |
| 1984 | 32,317 | 27,622 | 8,152 | 29.5 |
| 1985 | 36,042 | 27,623 | 9,491 | 34.3 |
| 1986 | 37,542 | 30,104 | 11,344 | 37.7 |
| 1987 | 41,609 | 33,246 | 13,897 | 41.8 |
| 1988 | 41,342 | 33,758 | 15,087 | 44.7 |
| 1989 | 47,568 | 37,758 | 18,852 | 49.9 |
| 1990 | 54,613 | 46,575 | 24,297 | 52.2 |
| 1991 | 61,028 | 52,176 | 29,667 | 56.9 |
| 1992 | 67,768 | 59,516 | 35,398 | 59.5 |
| 1993 | 76,531 | 68,183 | 41,393 | 60.7 |
| 1994 | 82,269 | 73,958 | 45,367 | 61.3 |
| 1995 | 85,865 | 76,947 | 46,669 | 60.7 |
| 1996 | 89,672 | 80,872 | 49,096 | 60.7 |
| 1997 | 95,513 | 87,294 | 52,059 | 59.6 |
| 1998 | 104,507 | 95,323 | 55,984 | 58.7 |
| 1999 | 115,024 | 104,500 | 60,399 | 57.8 |
| 2000 | 123,141 | 112,329 | 63,898 | 56.9 |
| 2001 | 131,419 | 120,829 | 67,037 | 55.5 |
| 2002 | 139,183 | 128,090 | 70,009 | 54.7 |
| 2003 | 148,791 | 137,536 | 75,801 | 55.1 |
| 2004 d | 154,708 | 143,864 | 77,867 | 54.1 |

Note: These data represent inmates housed in Federal Bureau of Prisons facilities; inmates housed in contract facilities are not included. Data for 1970-76 are for June 30; beginning in 1977, data are for September 30. Some data have been revised by the Source and may differ from previous editions of SOURCEBOOK.  As of November 2004.  Source: U.S. Department of Justice, Federal Bureau of Prisons

*The Birth of the Crack Baby and the History that Myths Make*

[Online]. Available: http://www.bop.gov/fact0598.html [Sept. 9, 2003]; and data provided by the U.S. Department of Justice, Federal Bureau of Prisons.

— From the **Sourcebook of criminal justice statistics Online**
http://www.albany.edu/sourcebook/pdf/t654.pdf  , Table 6.54.

In other words, a prison system that had consistently been 75% white with around 200,000 inmates is now 75% Black and Latino with over 2 *million* inmates.[91]  What is to be made of the fact that this drastic transformation takes place at a time when the U.S. was, at least in name and on paper, struggling to put behind it the era when Blacks functioned in the American consciousness as the antithesis to what it meant to be American, to be human?  As Stephen Steinberg argues, this period during the Reagan and Bush presidencies represented not only a "retreat from racial justice" but also a period where the nation's anti-black discourse was actually refocused into a nebulous anti-crime rhetoric.[92]  Such rhetoric was reinforced by deindustrialization and its disproportionate impact on Blacks,[93] a rising income inequality between the upper and working classes,[94] a prevailing discourse of racialized welfare stereotypes,[95] as well as dramatized media and political responses to the burgeoning trend of crack use.[96]  The result was that the image of the criminal was further associated with the inner-city, street crime of poor, i.e. *Black,* areas.[97]

David Garland's *The Culture of Control* provides one conceptual framework for understanding this expansion of prisons in recent years.  Garland illustrates how the public's response to crime has drastically changed since the 1970s, and focusing upon United States and Great Britain, he argues that a new cultural ethos has "meshed with the social and economic policies that have come to characterize" these two countries.[98]  Specifically, he cites the decline of the "rehabilitative ideal," the reinvention of the prison

as a "means of incapacitation and punishment that satisfies popular political demands for public safety and harsh retribution," and the emergence of a victim's rights movement as evidence of this new cultural ethos.[99]  However, Garland argues that the "increased salience of crime" in the post Nixon era is due mainly to the middle class's greater proximity to street crime and criminals, affecting their point of view about the prevalence of violent crime.  However, national crime statistics show that violent crime was actually in steady decline throughout the 1980s and 1990s,[100] in stark contrast to a public perception that crime was on the rise.  The argument presented here is that this new middle class proximity to crime was only imagined, heightened by the rhetorical strategies of political pundits and a profit-driven, sensationalist ethic in news media organizations that lent extra focus to violent crime to boost ratings.

Christian Parenti argues that the United States underwent a social crisis in the aftermath of the 1960s and an economic crisis after 1973, the response to which was an increase in state-sanctioned control as a way of disciplining poor labor.[101]  Ruth Wilson-Gilmore contends that the new prisons provide a "spatial fix" for "overaccumulations resulting from changes in the forces, relations, and geography of production" because they are filled with an inmate population consisting of surplus labor from de-industrialized cities.[102]  She further argues that the predominantly rural placement of the new prisons represent a form of reinvestment in areas no longer sustainable through agriculture.  These arguments suggest that the exponential growth in the U.S. prison population is primarily a class issue.  However, if the boom in prison building and incarceration rates was only a class issue and a response to poor, surplus labor, then Whites from de-industrialized regions of the country should be experiencing a similar

pattern of rising incarceration.  This is simply not the case.  Relative to their percentage of the population, the percentage of White prisoners has *not* grown as it has for Blacks, and neither has it grown relative to the total number of Whites in America.  If these trends in prison growth are a response to surplus labor, they are a response to *Black* surplus labor.  The argument put forth here is that the War on Drugs and the dramatic rise in incarceration does have a class element but that race and class cannot be analyzed apart in this context.  The American historical tendency to separate race from class usually results in class-based policies that primarily only benefit poor whites.[103]

The War on Drugs, as a subset of the larger War on Crime, was a nuanced way to refocus racial attitudes in an ambiguous, post civil rights discourse of "being tough on crime" and "taking back our streets."  After more than a decade of relaxed attitudes toward drug use, it was an indication that the social upheaval of the 1960s and 70's—as far as the new Reagan-Bush administration was concerned—was over.  It was time for America to get back to good, conservative family values.  As the 1970s drew to a close, the U.S. was passing more than two decades of crisis.  An era of violent protests, race riots, the war in Vietnam, mass political assassinations, Watergate, and, most recently, a recession had sapped the rebellious energy out of the nation.  Most Americans seemed to want to put the traumas of the two previous decades behind them.  The decisive election of Ronald Reagan to the office of the president was perceived by Reagan and his advisors as a mandate for change,[104] and it brought with it the promise that the traumatic, countercultural fighting of the previous era could officially be laid to rest.

This trend was not unique to the realm of drug policy.  In the academic realm, the "New Left" movements that caused an upheaval in the humanities and social sciences in

the 1960s[105] found themselves in retreat during the 1980s, bringing them back in line with their primary role of legitimating and replicating the social order.[106]  In the mental health arena, many of the community mental health treatment clinics (results of the 1963 Federal Community Mental Health Centers Construction Act) opened in the previous two decades had their funding suspended and were closed during the Reagan years.  The 1981 Omnibus Budget Reconciliation Act cut federal mental health and substance abuse allocations by twenty-five percent, forcing states to cut many of their mental health and drug treatment programs.[107]  In the social and political realms, many of the civil rights gains enacted during the previous three decades were being rolled back during Reagan's tenure in the White House.[108]  On the whole, one could characterize the 1980s as a counter-reformation period in American thought and politics, when conservatives sought to reverse the transformations brought about with the Civil Rights and countercultural movements of the 1960s and 1970s.  It was a movement whose ideological foundations were laid with the 1964 presidential campaign of Barry Goldwater,[109] gained momentum under Nixon, and finally came to fruition under the Reagan-Bush presidencies.

The overwhelming popularity of the Reagan presidency demonstrates the extent to which this movement resonated with the American middle class.  Conservatives may have led the charge, but most Democrats and supposed liberals followed without protest. The Clinton Presidency can even be said to be an outgrowth of this movement.[110]  In this sense, the exponential growth in the prison population—focused primarily on Blacks and beginning right after the Civil Rights movement and the height of the Black Power and Nationalist movements—was an American cultural response to Blacks moving out of their place in society.

### A Discourse on Otherness

National discussions about revising illegal drug policy are about as contentious as those about developing a universal healthcare system. For more than half of a century, scholars have meticulously pointed out not only the racial biases, the inhumanity, and the complete and utter failure of the criminal justice approach to fighting illegal drug use,[111] but more importantly how criminalization actually exacerbates the problem.[112] However, as James Morone astutely points out,

> Suggesting, as public health advocates often do, that education or prevention or treatment is "more effective" than punishment misses the crucial political point. It is not the behavior itself that is at issue. It is the popular perceptions of those who engage in it. As long as the focus is on a threatening them, criminalization precisely answers the perceived need. Incarceration fits the policy problem.[113]

Morone suggests that a counter moral crusade – in the tradition of the abolition and Civil Rights movements – may need to be employed to again push the nation toward moral reform. Historically, with every social movement to root out the oppression of one stigmatized, culturally constructed categorical 'them,' the cultural category of exclusion has only been transformed, never demolished. In the period analyzed there, the strict White/Black dichotomy of 'us' and 'them' of the pre-Civil Rights era was refined into a (mostly White) middle-class/(mostly Black) jobless, urban under-class dichotomy of 'us' and 'them' in the Reagan-Bush era. With this transformation, incarceration and the death penalty took the place of segregation and lynching.[114] A policy proposal to fix this particular injustice will be incomplete – historical patterns demonstrate that another will simply emerge to take its place.

The crack baby phenomenon illustrates how historical narratives conveyed by so-called "myths" are just as significant as historical narratives grounded in empirical evidence. The analysis presented in this essay demonstrates how cultural narratives work

to mediate behaviors regardless of whether such narratives are empirically based.  To return to Waswo, he explained for us how the story of the descent from Troy – a narrative about what constituted "civilized" and as such, a metanarrative of Euro-Western culture – mediated the interactions with, and the behaviors Westerners exhibited toward the peoples they encountered from outside of that cosmogony.  "Created as myth," he argues, this "story of civilization in our founding legend… was elaborated as history, and finally became, in the eighteenth and nineteenth centuries, science," i.e., 'truth.'  Similarly in this case, the narrative of the crack baby – at least temporarily, but long enough to have wide-reaching effects – became constructed in scientific journals as fact.  Americans found the narrative of the crack baby so enthralling because it functioned in our society to reaffirm for us who was, and who was not, civilized – a cultural discourse on *Otherness*.[115]

  This understanding is the analytical lesson we must learn from the demonization of drug users in the U.S. and the prison warehouse approach taken over the last 30 years in response.  René Girard argues that "the demonic allows, on the one hand, for every tendency toward conflict in human relations and for the centrifugal force at the heart of the community, and, on the other hand, for the centripetal force that brings men together, the mysterious glue of that same community."[116]  In this respect, Girard further argues, "the same force that divides people by mimetic rivalry also unites them by the mimetic unanimity of the scapegoat."[117]  To understand this force is to comprehend "effortlessly what sociology, anthropology, psychoanalysis, and cultural theory have constantly attempted without success."[118]

*The Birth of the Crack Baby and the History that Myths Make*

In other words, to fully comprehend the religious zeal of the anti-drug crusade, as well as the powerful manner in which the narrative of the minority, hedonistic, and criminal-minded addict resonates with the American psyche, we need to understand how these narratives function generally as a discourse on *Otherness,* inscribing the addict into a liminal space of alterity.  It is through the inscription of certain groups into a space of liminal alterity—that space of conceptual *Otherness*—that a society defines itself and produces its sense of well-being.[119]  The liminal *Other* represents symbolic death,[120] a social category at once both marginalized yet central to the social order, having indeterminate and ambiguous attributes and thereby readily inscribed with the characteristics most feared and reviled by the dominant group.  It is in contrariety to the category of symbolic death that individuals within a society come to realize themselves as fully human.[121]  In other words, it is the space of liminal *Otherness* that generates the symbolic representations that motivate collective behavior.[122]

As a discourse in our society to reaffirm for us who was, and who was not, civilized, a punitive drug policy has functioned as the mechanism by which lower class, inner city drug users are sacrificed in a ritual of justice and retribution that functions to create identity-affirming cohesion for the rest of American society.  It is the history that the "myth" of the crack baby has helped to make.

---

## Bibliography

Acker, Caroline Jean, *Creating the American Junkie: Addiction Research in the Classic Era of Narcotic Control.*  (Baltimore: The Johns Hopkins University Press, 2002).
_____, "Stigma or Legitimation? A Historical Examination of the Social Potentials of Addiction Disease Models," in *Journal of Psychoactive Drugs,* vol. 25, no. 3, (July – September, 1993).

*The Birth of the Crack Baby and the History that Myths Make*

Amaker, Norman C., *Civil Rights and the Reagan Administration,* (Washington D.C.: Urban Institute Press, 1988).

Ambroise, Jason R., "Rethinking 'Race:' Biocentrism and the Origins of Our Time," in Paola Boi and Sabine Broeck, eds., *CrossRoutes – The Meanings of "Race" for the 21st Century,* (New Brunswick, NJ: Transaction Publishers, 2003), 41-66.

Baum, Dan, *Smoke and Mirrors: The War on Drugs and the Politics of Failure,* (Boston: Little, Brown, 1996).

Bauman, Zygmunt, *Modernity and the Holocaust,* (Ithaca, NY: Cornell University Press, 1989).

Belenko, Steven R., *Crack and the Evolution of Anti-Drug Policy,* (Westport, CT: Greenwood Press, 1993).

_____, "The Impact of Drug Offenders on the Criminal Justice System," in Ralph A. Weisheit, ed., *Drugs, Crime, and the Criminal Justice System.* (Cincinnati: Anderson Publishing Co., 1990), 27-78.

Blake, Mariah, "'Crack Babies' Talk Back: Young Writers Take Aim at a Media Myth Built on Wobbly, Outdated Science," in *The Boston Phoenix,* September 17, 2004, 32, reprinted with permission from *Columbia Journalism Review.*

Blakeslee, Sandra, "Adopting Drug Babies: A Special Report; Child-Rearing is Stormy When Drugs Cloud Birth," in *New York Times,* May 19, 1990, A1.

Bovard, James, "Seizure Fever: The War on Property Rights," in *The Freeman,* vol. 46, no. 1, (January 1996).

Bush, George H. W., "Address to the Nation on the National Drug Control Strategy," September 5, 1989, George Bush Presidential Library, available online at: http://bushlibrary.tamu.edu/research/papers/1989/89090502.html.  Accessed September 20, 2006.

Butterfield, F., "More Blacks in their 20s Have Trouble with the Law," in *New York Times,* (November 5, 1995), A18.

Chasnoff, Ira J.; Burns, William J.; Schnoll, S. H.; and Burns, Kayreen A., "Cocaine Use in Pregnancy," in *New England Journal of Medicine,* 313 (1985): 666-69.

_____; Bussey, Mary E.; Savich, Renate; and Stack, Cynthia M., "Perinatal Cerebral Infarction and Maternal Cocaine Use," in *The Journal of Pediatrics,* vol. 108, no. 3, (March 1986): 456-459.

_____; Burns, Kayreen A.; and Burns, William J., "Cocaine Use in Pregnancy: Perinatal Morbidity and Mortality," in *Neurotoxicology and Teratology,* vol. 9 (1987): 291-293.

_____; Griffith, D. R.; MacGregor, S.; Dirkes, K.; and Burns, Kayreen A., "Temporal patterns of Cocaine Use in Pregnancy," *JAMA,* vol. 261, (1989): 1741.

Chavkin, Wendy, "Cocaine and Pregnancy – Time to Look at the Evidence," in *JAMA,* vol. 285, (March 28, 2001): 1626.

Cockburn, Alexander, and Jeffrey St. Clair, *Whiteout: The CIA, Drugs and the Press.*  (London: Verso, 1998).

Comprehensive Anti-Drugs Act of 1988, H.R. 4842, 100th Congress, available: http://thomas.loc.gov/cgi-bin/bdquery/D?d100:9:./temp/~bd39m1:@@@L&summ2=m&.  Accessed Nov. 16, 2004.

*Correctional Populations in the United States.*  (Washington, D.C.: U.S. Department of Justice, Office of Justice programs, Bureau of Justice Statistics, 1995).

Courtwright, David T., *Forces of habit: drugs and the making of the modern world.*  (Cambridge, MA: Harvard University Press, 2001).

Cruse, Harold, *Plural But Equal: A Critical Study of Blacks and Minorities and America's Plural Society,* (New York: William Morrow, 1987).

Days, III, Drew S., "Turning Back the Clock: The Reagan Administration and Civil Rights," in *Harvard Civil Rights, Civil Liberties Law Review,* vol. 19 (Summer 1984), 309-347.

Detlefsen, Robert R., *Civil Rights Under Reagan,* (San Francisco: ICS Press, 1991).

Dixon, Suzanne D. and Bejar, Raul, "Brain Lesions in Cocaine and Methamphetamine Exposed Neonates," in *Pediatric Research,* vol. 23, (April 1988): 405A.

Eberhardt, Jennifer L.; Goff, Phillip Atiba; Purdie, Valerie J.; and Davies, Paul G., "Seeing Black: Race, Crime and Visual Processing," in *Journal of Personality and Social Psychology,* vol. 87, no. 6, (2004): 876-893.

Elwood, William N., *Rhetoric in the War on Drugs: The Triumphs and Tragedies of Public Relations.* (London: Praeger Publishers, 1994).

Eudell, Demetrius L., *The Political Languages of Emancipation in the British Caribbean and the U.S. South,* (Chapel Hill: University of North Carolina Press, 2002).

*The Birth of the Crack Baby and the History that Myths Make*

Foucault, Michel, *The Order of Things: An Archaeology of the Human Sciences,* (New York: Vintage Books, 1973 [1970]).

Frank, Deborah A.; Marilyn Augustyn, Wanda Grant Knight, Tripler Pell, and Barry Zuckerman, "Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review," in *JAMA,* vol. 285, (March 28, 2001): 1613.

Garland, David, *Culture of Control.*  (Chicago: The University of Chicago Press, 2001).

Geertz, Clifford, *Local Knowledge: Further Essays in Interpretive Anthropology,* (New York: Basic Books, 1983).

Gibson, Mary, *Born to Crime: Cesare Lombroso and the Origins of Biological Criminology*, (Westport, Conn.: Praeger, 2002).

Gilens, Martin, *Why Americans Hate Welfare: Race, Media, and the Politics of Antipoverty Policy,* (Chicago: University of Chicago Press, 1999).

Girard, René, *The Scapegoat,* trans. Yvonne Freccero, (Baltimore: The Johns Hopkins University Press, 1986 [1982]).

Greenberger, Allen J., *The British Image of India: A Study in the Literature of Imperialism,* (Oxford: Oxford University Press, 1969).

Greene, Marcia Slacum, "Abuse, Neglect Rising in D.C.; Drugs Ravage Home Life," in *The Washington Post,* September 10, 1989, A1.

Grieder, Katherine, "Crackpot Ideas," in *Mother Jones,* (July/August, 1995).

Hancock, Ange-Marie, *The Politics of Disgust: The Public Identity of the Welfare Queen,* (New York: New York University Press, 2004).

Kaufman, Naomi, "Schools Brace for Drug Babies," in *The Oregonian,* (June 4, 1990), B1, B5.

Koren, Gideon; K. Graham, H. Shear, and T. Einarson, "Bias Against the Null Hypothesis: The Reproductive Hazards of Cocaine," in *The Lancet,* (December 16, 1989), pp. 1440 – 1442.

Krauthammer, Charles, "Children of Cocaine," in the *Washington Post,* (July 30, 1989), c7, op/ed.

Lakoff, George and Mark Johnson, *Metaphors We Live By.*  (Chicago: University of Chicago Press, 1980).

_____, *Philosophy in the Flesh: the Embodied Mind and its Challenge to Western Thought* (New York: Basic Books, 1999).

Langan, Patrick A., *Race of Prisoners Admitted to State and Federal Institutions, 1926 – 1986.* (Washington, D.C.: U.S. Department of Justice, Office of Justice programs, Bureau of Justice Statistics, 1991).

Latour, Bruno, *We Have Never Been Modern,* trans. Catherine Porter, (Cambridge: Harvard University Press, 1993 [1991]).

Legesse, Asmarom, *Gada: Three Approaches to the Study of an African Society,* (New York: Free Press, 1973).

Malisow, Craig, "Deal of a Lifetime: Drug Addicts Can Get Hard Cash to be Sterilized or go on Birth Control," in *The Houston Press,* February 27, 2003.

Mauer, Marc. *Race to Incarcerate.*  (New York: New Press, 1999).

Meier, Kenneth, *The Politics of Sin: Drugs, Alcohol, and Public Policy,* (Armonk, NY: M. E. Sharpe, 1994), 119-121.

Morone, James A., "Enemies of the People: The Moral Dimension to Public Health," in *Journal of Health Politics, Policy and Law,* vol. 22, no. 4, (August, 1997): 993-1020.

Musto, David F., *The American Disease: Origins of Narcotic Control,* expanded ed.  (New York: Oxford University Press, 1987).

_____, "Drug Abuse Research in Historical Perspective," in Committee on Opportunities in Drug Abuse Research, Division of Neuroscience and Behavioral Health, Institute of Medicine, *Pathways of Addiction: Opportunities in Drug Abuse Research.*  (Washington, D.C.: National Academy Press, 1996).

_____, and Pamela Korsmeyer, *The Quest for Drug Control: Politics and Federal Policy in a Period of Increasing Substance Abuse, 1963 – 1981* (New Haven: Yale University Press, 2002).

Novick, Peter, *That Noble Dream: The "Objectivity Question" and the American Historical Profession,* (Cambridge: Cambridge University Press, 1988).

Orfield, Gary, *Turning Back the Clock: The Reagan-Bush Retreat for Civil Rights in Higher Education*, (Washington, D.C.: Joint Center for Political and Economic Studies, 1994).

Ostrea, Enrique M., Jr., Paul Kresbach, David K. Knapp, and Kenneth Simkowski, "Abnormal Heart Rate Tracings and Serum Creatine Phosphokinase in Addicted Neonates," in *Neurotoxicology and Teratology,* vol. 9 (1987): 305-309.

Parenti, Christian, *Lockdown America: Police and Prisons in the Age of Crisis,* (New York: Verso Books, 2000).

Pick, Daniel, *Faces of Degeneration: A European Disorder, 1848 – 1918.* (Cambridge: Cambridge University Press, 1989).

Reagan, Ronald, "Remarks Announcing the Campaign Against Drug Abuse and a Question-and-Answer Session With Reporters," August 4, 1986. The Reagan Presidential Library, available online at: http://www.reagan.utexas.edu/resource/speeches/1986/080486b.htm. Accessed Nov. 12, 2004.

Reagan, Ronald, and Nancy Reagan, "Address to the Nation on the Campaign Against Drug Abuse," September 14, 1986. Ronald Reagan Presidential Library, available online at http://www.reagan.utexas.edu/resource/speeches/1986/091486a.htm. Accessed Nov. 12, 2004.

Reed, Adolph Jr., "Class-ifying the Hurricane," in *The Nation,* (October 3, 2005).

Regan, Diane O.; Ehrlich, Saundra M.; and Finnegan, Loretta, "Infants of Drug Addicts: At Risk for Child Abuse, Neglect, and Placement in Foster Care," in *Neurotoxicology and Teratology,* vol. 9 (1987): 315-319.

Ricoeur, Paul, "The Function of Fiction in Shaping Reality," in *Man and World,* vol. 12, no. 2, (June, 1979): 123-141.

Rosenblatt, Roger, "Special Report, The Enemy Within: A nation wrestles with the dark and dangerous recesses of its soul," in *Time,* (September 15, 1986).

Ryan, Lynn; Saundra Ehrlich, and Loretta Finnegan, "Cocaine Abuse in Pregnancy: Effects on the Fetus and Newborn," in *Neurotoxicology and Teratology,* vol. 9 (1987): 295-299.

Shull, Steven A., *A Kinder, Gentler Racism?: The Reagan-Bush Civil Rights Legacy,* (Armonk, NY: M. E. Sharpe Publishers, Inc., 1993).

Skolnick, Jerome H., "Tough Guys," in *The American Prospect,* vol. 8, no. 30, (February, 1997): 86-91.

Special Report, "Medical Complications of Cocaine Use," in the *New England Journal of Medicine,* vol. 315, no. 23, (1986): 1495-1500.

Steinberg, Stephen, *Turning Back: The Retreat from Racial Justice in American Thought and Policy.* (Boston: Beacon Press, 1995).

The Donald Ian MacDonald, Carlton Turner, and Richard L. Williams files, Ronald Reagan Presidential Library.

Smith, Daniel Scott, "A Perspective on Demographic Methods and Effects in Social History," in *William and Mary Quarterly,* Third Series, vol. 39, no. 3, (July, 1982), 442-468.

Taussig, Michael, *Mimesis and Alterity: A Particular History of the Senses,* (New York: Routledge, 1993).

Trost, Cathy, "As Drug Babies Grow Older, Schools Strive to Meet Their Needs," in *The Wall Street Journal,* (December 27, 1989), A1, A2.

Turner, Victor, *The Ritual Process: Structure and Anti-Structure*, (Chicago: Aldine, 1969).

United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy,* (Washington, D.C.: U.S. Government Printing Office, 1995).

Viadero, Debra, "Study of Drug-Exposed Infants Finds Problems in Learning as Late as Age 3," in *Education Week,* vol. 10, no. 1 (September 5, 1990): 15.

Waswo, Richard, "The History that Literature Makes," in *New Literary History* (Spring 1987): pp. 541-564.

_____, *The Founding Legend of Western Civilization: from Virgil to Vietnam.* (Hanover, NH: Wesleyan University Press [University Press of New England], 1997).

Wilson, William Julius, *When Work Disappears: The World of the New Urban Poor,* (New York: Vintage Books, 1997).

_____, *The Bridge Over the Racial Divide: Rising Inequality and Coalition Politics,* (Berkeley: University of California Press, 1999).

Wilson-Gilmore, Ruth, *From Military Keynesian to Post-Keynesian Militarism*, Ph.D. Dissertation (New Brunswick, NJ: Rutgers University, 1998).

Wolters, Raymond, *Right Turn: William Bradford Reynolds, The Reagan Administration, and Black Civil Rights,* (New Brunswick, NJ: Transaction Publishers, 1996).

*The Birth of the Crack Baby and the History that Myths Make*

Wynter, Sylvia, "But What Does Wonder Do?  Meanings, Canons, too?  On literary Texts, Cultural Contexts, and What it's Like to be One/Not One of Us," in *Stanford Humanities Review,* supplement, *Bridging the Gap: Where Cognitive Science Meets Literary Criticism,* vol. 4, no. 1, (Spring 1994).

Zimring, Franklin E., "Imprisonment Rates and the New Politics of Criminal Punishment," in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences,* (London: Sage Publications, 2001), 145-149.

---

[1] "Enemies of the People: The Moral Dimension to Public Health," in *Journal of Health Politics, Policy and Law,* vol. 22, no. 4, (August, 1997): 993-1020.

[2] See Deborah A. Frank, Marilyn Augustyn, Wanda Grant Knight, Tripler Pell, and Barry Zuckerman, "Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review," in *JAMA,* vol. 285, (March 28, 2001): 1613, as discussed in further detail below.

[3] The aim of U.S. national drug control strategy is to curb demand and to severely limit – if not cut off altogether – supply.  This strategy has failed on both accounts.  In the area of drug demand, between 1979 and 2001, the percentage of all persons over twelve years of age reporting having ever used illicit drugs has increased by ten percent, from 31.3 to 41.7%.  Although light and casual users of drugs like heroin and cocaine have decreased since their peak in 1979, heavy users (associated with chronic addictive drug seeking behavior and crime) of these drugs have continually been on the rise, more than doubling their numbers between 1980 and 1992.  This trend is indicated in the increasing number of emergency room visits for drug-related problems. Marijuana was associated with approximately 10,000 emergency room visits in 1980, up to 30,000 in 1992, and approximately 110,000 in 2001.  Heroine emergency room visits have undergone a similar rise, from around 20,000 in 1980 to approximately 100,000 in 2001.  Cocaine has had the largest spike, from around 7,000 in 1980 to now well over 180,000 emergency room visits.  In the area of drug supply, federal drug seizures have increased from approximately 600,000 pounds in 1980 to 1.1 million pounds in 1992, and most recently to 2.9 million pounds in 2001.  Without any exact indications on the total amount of drugs in circulation, this increase in seizures cannot tell us if it corresponds to an analogous decrease in supply.  However, average street prices of drugs *are* a good indication of their relative supply.  The average street price for one pure gram of cocaine was $800 in 1979 and steadily decreased to just under $200 by 1994.  The average street price for one pure gram of heroine was $2200 in 1979 and had decreased to $500 in 1994.  These numbers indicate that despite the increases in federal drug seizures throughout this period, the total amount of drugs in circulation was outgrowing at a greater percentage the amount being confiscated.  Together, these statistics prove that the U.S. national drug control strategy of curbing both supply and demand has failed.  Sources for these figures are from the White House Office of National Drug Control Policy, "Drug Data Summary" and "Drug Use Trends" in *National Drug Control Strategy* (Washington, D.C.: Office of National Drug Control Policy, the Superintendent of Docs., U.S. G.P.O., 2003); Katherine M. Jamieson and Timothy J. Flanagan, eds., *Sourcebook of Criminal Justice Statistics* (Washington, D.C.: U.S. G.P.O., 1989); U.S. Department of Justice, Drug Enforcement Administration, *Illegal Drug Price/Purity Report* (Washington, D.C.: U.S. G.P.O., 1991, 1994, & 1995); and Susan S. Eveningham and C. Peter Rydell, *Modeling the Demand for Cocaine* (Santa Monica, CA: Rand Corporation, 1993).

[4] Richard Waswo, "The History that Literature Makes," in *New Literary History* (Spring 1987): pp. 541-564.

[5] Full title: *The Founding Legend of Western Civilization: from Virgil to Vietnam.*  (Hanover, NH: Wesleyan University Press [University Press of New England], 1997).

[6] Waswo, "The History that Literature Makes," 557.

[7] Bruno Latour, *We Have Never Been Modern,* trans. Catherine Porter, (Cambridge: Harvard University Press, 1993 [1991]), 10.

[8] Ibid., 39.

[9] Waswo, "The History that Literature Makes," 542.

[10] Allen J. Greenberger, *The British Image of India: A Study in the Literature of Imperialism,* (Oxford: Oxford University Press, 1969), vii.

[11] Paul Ricoeur, "The Function of Fiction in Shaping Reality," in *Man and World,* vol. 12, no. 2, (June, 1979): 123-141, 127.

*The Birth of the Crack Baby and the History that Myths Make*

---

[12] Clifford Geertz, *Local Knowledge: Further Essays in Interpretive Anthropology,* (New York: Basic Books, 1983), 16.

[13] Sylvia Wynter, "But What Does Wonder Do?  Meanings, Canons, too?  On literary Texts, Cultural Contexts, and What it's Like to be One/Not One of Us," in *Stanford Humanities Review,* supplement, *Bridging the Gap: Where Cognitive Science Meets Literary Criticism,* vol. 4, no. 1, (Spring 1994).

[14] Caroline Acker documents how the crime and violence associated with illegal drugs is actually a systemic outgrowth of the drug black market, created as a consequence of making drug use illegal.  It is not the drugs themselves that cause crime and violence, it is drug prohibition.  See Acker, *Creating the American Junkie: Addiction Research in the Classic Era of Narcotic Control,* (Baltimore: The Johns Hopkins University Press, 2002).

[15] See Steven R. Belenko, *Crack and the Evolution of Anti-Drug Policy,* (Westport, CT: Greenwood Press, 1993).

[16] That O'Neill's primary purpose was to win in a political game of one-upmanship with Reagan and the Republicans is recounted in Dan Baum, *Smoke and Mirrors: The War on Drugs and the Politics of Failure,* (Boston: Little, Brown, 1996).

[17] Ronald Reagan, "Address to the Nation on the Campaign Against Drug Abuse," September 14, 1986.  The speech was broadcast live at 8 pm on radio and television nationwide.  The Ronald Reagan Presidential Library makes all of Reagan's speeches available online, at http://www.reagan.utexas.edu/resource/speeches/1986/091486a.htm.   Accessed Nov. 12, 2004.

[18] Alexander Cockburn and Jeffrey St. Clair, *Whiteout: The CIA, Drugs and the Press.*  (London: Verso, 1998), 74.

[19] See United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy,* (Washington, D.C.: U.S. Government Printing Office, 1995), 122.

[20] Office of the Press Secretary for Ronald Reagan, Press Release, "Crack/Cocaine Awareness Month 1986," October 31, 1986, in the files of Richard L. Williams, folder "Crack Cocaine," box OA 19050.

[21] Ibid.

[22] Joe Gfroerer, "Trends in Drug Use Among Adults Age 26 and Over," contained in an ADAMHA Memorandum, "Cocaine-Related Deaths, Washington, D.C.," March 12, 1984, contained in the Ronald Reagan Presidential Library, in the files of Donald Ian MacDonald, folder "Crusade for a Drug Free America, 1 of 4," box OA 19322.

[23] Joe Gfroerer, "Trends in Drug Use Among Adults Age 26 and Over," 3.

[24] "Report of Coca Paste Smoking Field Investigation in South Florida," contained in an ADAMHA Memorandum, "Cocaine-Related Deaths, Washington, D.C.," March 12, 1984, in the files of Donald Ian MacDonald, folder "Crusade for a Drug Free America, 1 of 4," box OA 19322.

[25] Ibid., 1.

[26] See Minutes, Oversight Working Group Meeting, December 11, 1985, in the files of Richard L. Williams, file "Oversight Working Group on drug Abuse Health Issues – Comments from Department of State, 1 of 2," box OA 19324, no. 1.

[27] Charles Krauthammer, "Children of Cocaine," in the *Washington Post,* (July 30, 1989), c7, op/ed.

[28] Besharov coined the term "bio-underclass."

[29] Ibid.

[30] See Mariah Blake, "'Crack Babies' Talk Back: Young Writers Take Aim at a Media Myth Built on Wobbly, Outdated Science," in *The Boston Phoenix,* September 17, 2004, 32, reprinted with permission from *Columbia Journalism Review.*

[31] See Chasnoff, William J. Burns, S. H. Schnoll, and Kayreen A. Burns, "Cocaine Use in Pregnancy," in *New England Journal of Medicine,* 313 (1985): 666-69.

[32] In the medical literature during this period of the late 1980s, Ira Chasnoff has numerous publications on the effects of drug use during pregnancy and its manifestations in newborns.  The numerous publications stem from his position in the Departments of Pediatrics, Obstetrics and Gynecology, Psychiatry and Behavioral Sciences, and Neurology at Northwestern University Medical School, practicing at the Northwestern Memorial Hospital and the Prentice Women's Hospital and maternity Center in Chicago.  His other publications include Ira J. Chasnoff, Mary E. Bussey, Renate Savich, and Cynthia M. Stack, "Perinatal Cerebral Infarction and Maternal Cocaine Use," in *The Journal of Pediatrics,* vol. 108, no. 3, (March 1986): 456-459; Chasnoff, Kayreen A. Burns, and William J. Burns, "Cocaine Use in Pregnancy: Perinatal Morbidity and Mortality," in *Neurotoxicology and Teratology,* vol. 9 (1987): 291-293; and

*The Birth of the Crack Baby and the History that Myths Make*

Chasnoff, D. R. Griffith, S. MacGregor, K. Dirkes, and Kayreen A. Burns, "Temporal patterns of Cocaine Use in Pregnancy," *JAMA,* vol. 261, (1989): 1741.  All these articles have similar themes supporting the crack baby hypothesis.

[33] Special Report, "Medical Complications of Cocaine Use," in *New England Journal of Medicine,* vol. 315, no. 23, (1986): 1495-1500.

[34] Ibid., 1498.

[35] See Lynn Ryan, Saundra Ehrlich, and Loretta Finnegan, "Cocaine Abuse in Pregnancy: Effects on the Fetus and Newborn," in *Neurotoxicology and Teratology,* vol. 9 (1987): 295-299.

[36] See Enrique M. Ostrea, Jr., Paul Kresbach, David K. Knapp, and Kenneth Simkowski, "Abnormal Heart Rate Tracings and Serum Creatine Phosphokinase in Addicted Neonates," in *Neurotoxicology and Teratology,* vol. 9 (1987): 305-309.

[37] See Diane O. Regan, Saundra M. Ehrlich, and Loretta Finnegan, "Infants of Drug Addicts: At Risk for Child Abuse, Neglect, and Placement in Foster Care," in *Neurotoxicology and Teratology,* vol. 9 (1987): 315-319.

[38] As quoted in Blake, "'Crack Babies' Talk Back."

[39] See Roger Rosenblatt, "Special Report, The Enemy Within: A nation wrestles with the dark and dangerous recesses of its soul," in *Time,* (September 15, 1986).

[40] Ronald Reagan, "Address to the Nation on the Campaign Against Drug Abuse," September 14, 1986. The Reagan Presidential Library, available online at http://www.reagan.utexas.edu/resource/speeches/1986/091486a.htm.  Accessed Nov. 12, 2004.

[41] Emanuel Peluso and Lucy Silvay Peluso, "Motherhood & Drugs," in *Sober Times,* 1989.

[42] See Craig Reinarman and Harry G. Levine, "Crack in Context: Politics and Media in the Making of a Drug Scare," in *Contemporary Drug Problems,* vol. 16, no. 4, (Winter, 1989), 535-578.

[43] George H. W. Bush, "Address to the Nation on the National Drug Control Strategy," September 5, 1989, George Bush Presidential Library, available online at: http://bushlibrary.tamu.edu/research/papers/1989/89090502.html.  Accessed September 20, 2006.

[44] Ibid.

[45] See Craig Malisow, "Deal of a Lifetime: Drug Addicts Can Get Hard Cash to be Sterilized or go on Birth Control," in *The Houston Press,* February 27, 2003.

[46] Marcia Slacum Greene, "Abuse, Neglect Rising in D.C.; Drugs Ravage Home Life," in *The Washington Post,* September 10, 1989, A1.

[47] Sandra Blakeslee, "Adopting Drug Babies: A Special Report; Child-Rearing is Stormy When Drugs Cloud Birth," in *New York Times,* May 19, 1990, 1.

[48] As quoted in Katherine Grieder, "Crackpot Ideas," in *Mother Jones,* (July/August, 1995).

[49] Ibid.

[50] Other articles in this genre include Naomi Kaufman, "Schools Brace for Drug Babies," in *The Oregonian,* June 4, 1990, B1, B5; Cathy Trost, "As Drug Babies Grow Older, Schools Strive to Meet Their Needs," in *The Wall Street Journal,* December 27, 1989, A1, A2; and Debra Viadero, "Study of Drug-Exposed Infants Finds Problems in Learning as Late as Age 3," in *Education Week,* vol. 10, no. 1 (September 5, 1990): 15.

[51] Ellen Goodman, "The Myth of the 'Crack Babies'," in *The Boston Sunday Globe,* (January 12, 1992), 69.

[52] Ricoeur, "The Function of Fiction in Shaping Reality," 140.

[53] Deborah A. Frank, Marilyn Augustyn, Wanda Grant Knight, Tripler Pell, and Barry Zuckerman, "Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review," in *JAMA,* vol. 285, (March 28, 2001): 1613.

[54] See Steven R. Belenko, *Crack and the Evolution of Anti-Drug Policy,* (Westport, CT: Greenwood Press, 1993), 26-28.

[55] G. Koren, K. Graham, H. Shear, and T. Einarson, "Bias Against the Null Hypothesis: The Reproductive Hazards of Cocaine," in *The Lancet,* (December 16, 1989), pp. 1440 – 1442.

[56] Ibid, p. 1441.

[57] Blake, "'Crack Babies' Talk Back."

[58] Grieder, "Crackpot Ideas," 5.

[59] See Craig Malisow, "Deal of a Lifetime," in *Houston Press,* February 27, 2003.  The article was about the organization C.R.A.C.K., (Children Requiring a Caring Kommunity), a population control group in

*The Birth of the Crack Baby and the History that Myths Make*

Seattle, that coerces chemically-addicted women who are poor or women of color to take Depo Provera, Norplant, or to undergo a permanent tubal ligation by offering a $200 cash incentive.

[60] Belenko's *Crack and the Evolution of Anti-Drug Policy* does an excellent job of detailing the media hysteria that helped foster public support for tougher drug laws but his text, written in 1993, did not have the benefit of the later analysis that exposed the myth of the crack baby hypothesis, and therefore is unable to make the argument of how the crack baby story appealed to something deep in the American psyche.

[61] See Memorandum, Donald Ian MacDonald to Attorney General, "Drug-Free Pregnancy," June 17, 1988, in the files of Donald Ian MacDonald, folder "National Drug Enforcement Policy Board, 7 of 9," box OA 19364.

[62] See Suzanne D. Dixon and Raul Bejar, "Brain Lesions in Cocaine and Methamphetamine Exposed Neonates," in *Pediatric Research*, vol. 23, (April 1988): 405A.

[63] Ibid.

[64] Macdonald to Thomas Griscom, "Memorandum on Drug Initiative," April 14th, 1987, in the files of Donald Ian MacDonald, folder "Crusade for a Drug Free America, 1 of 4," box OA 19322, p. 1.

[65] In 1979, 49% of those polled in the 26-34-age range reported having ever used drugs, 23% reported using in the past year, and 20.8% reported using in the past 30 days.  In that same year, 14% of those aged 12 – 17, 36% of those 18 – 25, and 20% of those 26 – 34 were regular users of marijuana, while 40% of high school seniors reported that they had used an illegal drug in the past month, almost all of which was marijuana use.  The number of people in the 12 - 17 age range that used heroin was negligible, and heroin disappeared as a major drug category from many of the NIDA survey documents, supplanted by cocaine as the most frequently used drug behind marijuana.  By 1985, 59.5% of those in that same age group reported having ever used, 26.2% reported using in the past year, and 23.1% reported using in the past 30 days.  In the 35 and older age range, 11.8% reported having ever used drugs in 1979, 3.9% reported using in the past year, and 2.8% reported using in the past 30 days.  In 1985, 18.1% of persons 35 and older reported having ever used drugs, 5.5% reported using in the past year, and 3.9% reported using in the past 30 days.  Statistics from the NIDA National Household Survey on Drug Abuse, "Drug Use Trends," (Washington D.C.: Office of National Control Policy, 1979 - 2002).

[66] MacDonald, "Schedule Proposal Request," February 3, 1988, in the files of Donald Ian MacDonald, folder "West Wing Correspondence Drug Policy 9/87-11/88, 3 of 4," box OA 16758.

[67] Reagan, as quoted in MacDonald, "Schedule Proposal Request," February 3, 1988.

[68] MacDonald, "Schedule Proposal Request," February 3, 1988.

[69] Donald Ian MacDonald, "Working Paper: Focus on the User," February 12, 1988, in the Donald Ian MacDonald files, folder "Crusade for a Drug Free America, 1 of 4," box OA 19322, p. 1.

[70] Ronald Reagan, "Remarks Announcing the Campaign Against Drug Abuse and a Question-and-Answer Session With Reporters," August 4, 1986.  The Reagan Presidential Library makes all of Reagan's speeches available online, this one can be found at http://www.reagan.utexas.edu/resource/speeches/1986/080486b.htm.

[71] MacDonald, "Working Paper: Focus on the User," 2.

[72] The National Drug Enforcement Policy Board was created as part of the National Narcotics Act of 1984.  Chaired by the Attorney General, the purpose of the board was to bring together the Secretaries of State, Treasury, Defense, Transportation, Health and Human Services, as well as the Directors of the CIA, FBI, DEA, Customs, Coast Guard, Office of Management and Budget, and the Drug Abuse Policy Office, where each would have equal footing on the board and neither would feel that their authority was being usurped.  Then, as one unified body, the board would be responsible to coordinating all drug war efforts.

[73] See "Cocaine," February 27, 1985, in the files of Donald Ian MacDonald, file "National Drug Enforcement Policy Board, 5 of 9," box OA 19364.

[74] MacDonald, "Working Paper: Focus on the User," 2-3.

[75] MacDonald, "Working Paper: Focus on the User," 3.

[76] MacDonald, "Working Paper: Focus on the User," 4.

[77] MacDonald, "Working Paper: Focus on the User," 4.

[78] Adolph Reed, Jr., "Class-ifying the Hurricane," in *The Nation,* (October 3, 2005).

[79] Martin Gilens, *Why Americans Hate Welfare: Race, Media, and the Politics of Antipoverty Policy,* (Chicago: University of Chicago Press, 1999).

[80] See James Bovard, "Seizure Fever: The War on Property Rights," in *The Freeman,* vol. 46, no. 1, (January 1996), and Baum, *Smoke and Mirrors,* 254.

*The Birth of the Crack Baby and the History that Myths Make*

---

[81] See Comprehensive Anti-Drugs Act of 1988, H.R. 4842, 100th Congress, available:
http://thomas.loc.gov/cgi-bin/bdquery/D?d100:9:./temp/~bd39m1:@@@L&summ2=m&.

[82] See Pub. L. 100-690, Nov. 18, 1988, 102 Stat. 4181.

[83] US Sentencing Commission, *Cocaine and Federal Sentencing Policy,* (Washington, D.C.: US Government Printing Office, 1995), iii.

[84] The law was re-evaluated by the courts and Congress in 1996, an election year.  Morone gives a great analysis of the political conditions that prevented any motivation for justice in changing the law.  See James Morone, "Enemies of the People: The Moral Dimension to Public Health," 1010-1012.

[85] Blacks have always been over-represented in the U.S. prison system post-emancipation.  Up until the period covered here, that over-representation was roughly twice their percentage of the U.S. population, or around 20%.  It was not until the War on Drugs in the post-Civil Rights era that the percentage of Blacks in prison began to approach 50% of the total prison population.

[86] See Kenneth Meier, *The Politics of Sin: Drugs, Alcohol, and Public Policy,* (Armonk, NY: M. E. Sharpe, 1994), 119-121.

[87] See F. Butterfield, "More Blacks in their 20s Have Trouble with the Law," in *New York Times,* (November 5, 1995), A18.

[88] See *Sourcebook of Criminal Justice Statistics Online,* <http://www.albany.edu/sourcebook/pdf/t654.pdf>

[89] *Cocaine and Federal Sentencing Policy,* xi.

[90] See Jerome H. Skolnick, "Tough Guys," in *The American Prospect,* vol. 8, no. 30, (February, 1997): 86-91.

[91] Demographic prison statistics have many complicating factors.  For instance, until roughly 1960, Mexicans and other Latino groups were often counted as white in most states.  Also, Black incarceration rates have always been significantly higher in the American South compared to the Northeast, Midwest, and Western states, anywhere from 43 to 56%.  (Louisiana, Maryland and Mississippi have consistently had the highest Black incarceration rates in the entire nation, at 61-71%, Mississippi always the highest).  However, during at least half of the reporting period, the majority of the U.S. Black population was concentrated in the South.  The major waves of Black migration out of the South and into the North and Western regions have typically coincided with major wars: the Civil War, WWI and WWII – WWII being the period with the highest number of Blacks leaving the South.  Decreases in the national prison population have also coincided with major wars, which, because the demands of major wars call for massive labor mobilization, is also the time when the nation gets closest to having full employment.  A cynic could argue that the Black criminals in the South, after migrating North and West, simply began to fill up the prisons in those regions at the same rate they had done in the South.  Two factors negate that conclusion: 1) even after the great migration waves the South continued to incarcerate Blacks at around 50% of its overall prison population, and 2) the fact that the national prison population goes down in times of war and high employment suggests that crime rates are more tied to the availability of employment opportunities than to any specific set of criminals.  For in-depth statistics on racial ratios in U.S. prisons, see Patrick A. Langan, *Race of Prisoners Admitted to State and Federal Institutions, 1926 – 1986.* (Washington, D.C.: U.S. Department of Justice, Office of Justice programs, Bureau of Justice Statistics, 1991); and *Correctional Populations in the United States.*  (Washington, D.C.: U.S. Department of Justice, Office of Justice programs, Bureau of Justice Statistics, 1995)

[92] See Stephen Steinberg, *Turning Back: The Retreat from Racial Justice in American Thought and Policy.* (Boston: Beacon Press, 1995).  For further evidence of the strong association in the American consciousness of race and crime, see Eberhardt, Jennifer L.; Goff, Phillip Atiba; Purdie, Valerie J.; and Davies, Paul G., "Seeing Black: Race, Crime and Visual Processing," in *Journal of Personality and Social Psychology,* vol. 87, no. 6, (2004): 876-893.

[93] See William Julius Wilson, *When Work Disappears: The World of the New Urban Poor,* (New York: Vintage Books, 1997).

[94] See William Julius Wilson, *The Bridge Over the Racial Divide: Rising Inequality and Coalition Politics,* (Berkeley: University of California Press, 1999).

[95] See Ange-Marie Hancock, *The Politics of Disgust: The Public Identity of the Welfare Queen,* (New York: New York University Press, 2004).

[96] See Steven R. Belenko, *Crack and the Evolution of Anti-Drug Policy,* (Westport, CT: Greenwood Press, 1993).

*The Birth of the Crack Baby and the History that Myths Make*

---

[97] There is historical precedent for this kind of social anxiety being expressed in a discourse of criminality. The work of Cesare Lombroso, recognized as the founding father of criminology, is a prime example. Working in 19th century Italy, Lombroso was one of the first to link crime to the concept of degeneration. He used phrenology, craniology, craniometry, and statistics to establish methods for the immediate visual identification of the degenerate by an examination of physical characteristics. Lombroso viewed degeneration as an aberration, not an inevitable component of evolution, but nevertheless felt that the fate of the degenerate was determined by biology/heredity. At the heart of Lombroso's criminology was the conviction that criminals are born and not made. He therefore argued that the bulk of prior criminological studies were misguided in that their object of inquiry was the general category of 'crime' as a social phenomenon. Instead, he introduced a criminology based on the study of "criminal *man*" as a degenerate life form. {For a good summary of Lombroso's theories, see Mary Gibson, *Born to Crime: Cesare Lombroso and the Origins of Biological Criminology*, (Westport, Conn.: Praeger, 2002). See also Cesare Lombroso, *Crime: Its Causes and Remedies,* trans. H. P. Horton. (New Jersey: Patterson Smith, 1911 [1876]).}

As Daniel Pick demonstrates in his analysis of theories of degeneration across Europe in the 19th century, the physical characteristics that Lombroso focused on as indices of degeneration (and, therefore, of criminality) were actually the distinctions between northern and southern Italians, and thus Lombroso's concern was over the tensions between southern, darker Italians and northern, more "European" ones. See Daniel Pick, *Faces of Degeneration: A European Disorder, 1848 – 1918.* (Cambridge: Cambridge University Press, 1989).

[98] David Garland, *Culture of Control* (Chicago: The University of Chicago Press, 2001), xi.

[99] Ibid., pp 1-26.

[100] For further analysis of crime and incarceration rates during this period, see Franklin E. Zimring, "Imprisonment Rates and the New Politics of Criminal Punishment," in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences,* (London: Sage Publications, 2001), 145-149. See also U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Included as violent crimes are rape, robbery, aggravated and simple assault, and homicide. Violent crime was in steady, gradual decline from 1981-1986, leveled off between 1986 and 1990, experienced a slight rise from 1991-1993, then went into sharp decline after 1993 until the present, reaching its lowest levels in history in 2005. See http://www.ojp.usdoj.gov/bjs/glance/viort.htm, accessed 10/12/06.

[101] Christian Parenti, *Lockdown America: Police and Prisons in the Age of Crisis,* (New York: Verso Books, 2000), xii.

[102] Ruth Wilson-Gilmore, *From Military Keynesian to Post-Keynesian Militarism*, Ph.D. Dissertation (New Brunswick, NJ: Rutgers University, 1998), 26.

[103] For a historical analysis of this trend, see Harold Cruse, *Plural But Equal: A Critical Study of Blacks and Minorities and America's Plural Society,* (New York: William Morrow, 1987).

[104] See Norman C. Amaker, *Civil Rights and the Reagan Administration,* (Washington, D.C.: The Urban Institute Press, 1988), 3.

[105] In history, for instance, see Peter Novick, *That Noble Dream: The "Objectivity Question" and the American Historical Profession,* (Cambridge: Cambridge University Press, 1988) for a discussion on the "crisis" of relativism that History faced in the 1960s and the journey back toward "stable" ground.

[106] See Michel Foucault, *The Order of Things: An Archaeology of the Human Sciences,* (New York: Vintage Books, 1973 [1970]).

[107] To be fair, liberal critiques and challenges to the mental health profession as it had developed after WWII challenged definitions of mental illness and did much to bolster opinions that the mentally ill deserved the freedom not to be involuntarily confined unless they posed a threat to others or themselves. These challenges to the administering of mental health care likely made it politically easier to cut funding from treatment programs, but the end result was a huge spike in homelessness once the centers were closed.

[108] See Drew S. Days, III, "Turning Back the Clock: The Reagan Administration and Civil Rights," in *Harvard Civil Rights, Civil Liberties Law Review,* vol. 19 (Summer 1984), pp. 309-347; Norman C. Amaker, *Civil Rights and the Reagan Administration,* (Washington D.C.: Urban Institute Press, 1988); Robert R. Detlefsen, *Civil Rights Under Reagan,* (San Francisco: ICS Press, 1991); Steven A. Shull, *A Kinder, Gentler Racism?: The Reagan-Bush Civil Rights Legacy,* (Armonk, NY: M. E. Sharpe Publishers, Inc., 1993); Gary Orfield, *Turning Back the Clock: The Reagan-Bush Retreat for Civil Rights in Higher Education,* (Washington, D.C.: Joint Center for Political and Economic Studies, 1994); Stephen Steinberg,

*The Birth of the Crack Baby and the History that Myths Make*

---

*Turning Back: The Retreat from Racial Justice in American Thought and Policy,* (Boston: Beacon Press, 1995); and Raymond Wolters, *Right Turn: William Bradford Reynolds, The Reagan Administration, and Black Civil Rights,* (New Brunswick, NJ: Transaction Publishers, 1996).

[109] See Rick Perlstein, *Before the Storm: Barry Goldwater and the Unmaking of the American Consensus,* (New York: Hill and Wang, 2001).  In his 1964 campaign – whose slogan was "In your heart, you know he's right" – Goldwater championed the themes of a strong national defense, a limited federal government and tax reductions, revising Social Security, moral responsibility, and the need to confront and defeat communism wherever it is encountered.  He also characterized the Civil Rights movement as one of juvenile delinquency, crime and riots.  Reagan himself made a campaign commercial for Goldwater, praising his conservative beliefs.

[110] For this analysis, see Harry Magdoff and John Bellamy Foster, "The Nader Campaign and the Future of U.S. Left Electoral Politics," in *Monthly Review,* vol. 52, no. 9 (February 2001).

[111] See Vernon Coleman, *The Drugs Myth: Why the Drug Wars Must Stop,* (London: Green Print, 1992); Dan Baum, *Smoke and Mirrors: The War on Drugs and the Politics of Failure,* (Boston: Little, Brown, 1996); Alexander Cockburn and Jeffrey St. Clair, *Whiteout: The CIA, Drugs and the Press,* (London: Verso, 1998); .

[112] See Caroline Jean Acker, *Creating the American Junkie: Addiction Research in the Classic Era of Narcotic Control,* (Baltimore: The Johns Hopkins University Press, 2002).

[113] Morone, "Enemies of the People," 1015.

[114] See Charles J. Ogletree, Jr., and Austin Sarat, eds., *From Lynch Mobs to the Killing State: Race and the Death Penalty in America,* (New York: New York University Press, 2006).

[115] For a more in-depth explanation of this concept, see Zygmunt Bauman, *Modernity and the Holocaust,* (Ithaca, NY: Cornell University Press, 1989).

[116] René Girard, *The Scapegoat,* trans. Yvonne Freccero, (Baltimore: The Johns Hopkins University Press, 1986 [1982]), 196.

[117] Ibid.

[118] Ibid, 195.

[119] See Asmarom Legesse, *Gada: Three Approaches to the Study of an African Society,* (New York: Free Press, 1973), 114-115; see also Michael Taussig, *Mimesis and Alterity: A Particular History of the Senses,* (New York: Routledge, 1993), 129.

[120] See Victor Turner, *The Ritual Process: Structure and Anti-Structure*, (Chicago: Aldine, 1969), 94-96.

[121] Legesse, 115; Turner, 110-111.

[122] Turner, 128.