# EXHIBIT 4

Page 1

1

        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
                  EASTERN DIVISION

3

    ------------------------------

4

    IN RE NATIONAL PRESCRIPTION     MDL No. 2804

5   OPIATE LITIGATION               Case No.
                                    17-md-2804

6   ------------------------------
7   This Document Relates to:
8   SALMONS v. PURDUE PHARMA LP, et al
    MDL Case No. 1:18-op-45268

9

    FLANAGAN v. PURDUE PHARMA LP, et al
10  MDL Case No. 1:18-op-45405
11  DOYLE v. PURDUE PHARMA, LP, et al
    MDL Case No. 1:18-op-46327

12  ------------------------------
13
14
15         Zoom Deposition of Lewis P. Rubin, M.D.
16                  Washington, D.C.
17                September 10, 2020
18                   10:05 a.m.
19
20
21

    Reported by:  Bonnie L. Russo

22  Job No. 4242152

Page 68

1    question, but I'm sorry, I felt it was a bit

2    vague, and I needed to qualify.  There are

3    prescriptions and there are prescriptions.

4            BY MR. BILEK:

5        Q.    I understand.  My point is, is that

6    the prescription would be -- when a woman is

7    taking a prescribed opioid and she has a child

8    that is born with NAS, that prescription would

9    be a cause of the NAS in the child.

10           MR. EHSAN:  Object to the form.

11           THE WITNESS:  Yes.  With the

12   qualifier that the two main reasons for

13   prescribing opiates to women in the latter part

14   of pregnancy are either they have some medical

15   condition that has required or like now

16   requires opioids, or they have been essentially

17   hooked to opioids on, you know, illicitly and

18   are coming into a treatment program.

19           In both cases, yes, the proximate

20   cause of the NAS, perhaps you could say is the

21   fact that the prescription was written, but the

22   real cause is that this was required because of

1      earlier events often preceding the pregnancy.

2              BY MR. BILEK:

3          Q.    Now, going back to Dr. Anand, you

4      have relied on his expertise in the past,

5      correct?

6              MR. EHSAN:  Object to the form.

7              THE WITNESS:  I certainly admire his

8      expertise and find it useful in specific areas.

9              BY MR. BILEK:

10         Q.    And what are those areas?

11         A.    Those areas have been the importance

12     of providing analgesia, meaning pain control,

13     to avoid physical and other stresses during

14     human development after birth.

15         Q.    And you -- have you ever cited to

16     his published work?

17         A.    I'm sorry.  Zoom.  Could you repeat

18     the question.

19         Q.    In any of your articles, have you

20     ever cited to Dr. Anand?

21         A.    I don't recall.

22         Q.    But it's certainly possible,

1    but I realize that --

2              BY MR. BILEK:

3         Q.    So --

4         A.    No.  You've got to let me finish.

5    But I realize that, as I have said enumerable

6    times, we have so much evidence that shows what

7    is and isn't a cause of a later problem.

8         Q.    Now, you -- have you ever diagnosed

9    a NAS child and listed a possible cause of the

10   NAS diagnosis as opioid?

11        A.    Yes.

12        Q.    When have you done that?

13        A.    Frequently.

14        Q.    Okay.  And what -- how do you make

15   that diagnosis?

16        A.    So there are definitions of all

17   diagnoses.  A definition that is very commonly

18   accepted currently in medicine is the

19   definition that appears in what are called the

20   ICD currently 10 codes, the criteria for making

21   a diagnosis.  And because I practice according

22   to the standards of my profession, I adhere to

Page 122

1    those definitions.

2            I have lost track of the specific

3    question.  I'm sorry.

4        Q.    I said:  How do you make a diagnosis

5    of NAS resulting -- that is caused in part by

6    opioids?

7            MR. EHSAN:  Object to the form.

8            THE WITNESS:  So that's actually

9    straightforward.  Thank you for a

10   straightforward question.

11           I make the diagnosis in that

12   instance by having a baby who exhibits sign

13   symptoms consistent with the profile, the

14   behavioral repertoire of neonatal abstinence

15   syndrome, and I draw the link to the

16   possibility that maternal opioids are involved

17   by having one or both of the following:  A

18   documented or suggestive maternal history.  The

19   second is a toxicology screening either on the

20   mother or the newborn or both.

21           BY MR. BILEK:

22       Q.    And on the maternal history, is one

Page 124

1    attributable reason from the fact that there is

2    documentation of the baby when a fetus being

3    exposed to opioids or other drugs that can

4    induce this clinical spectrum.

5              BY MR. BILEK:

6         Q.    And when opioids are prescribed, my

7    point is, that could be one of the causes of

8    the NAS?

9              MR. EHSAN:  Object to the form.

10             THE WITNESS:  Certainly.  NAS is

11   neonatal abstinence.  The abstinence has to

12   come from being abstinence of something.

13             BY MR. BILEK:

14        Q.    Right.  Now in your diagnosing, do

15   you use the Finnegan test?

16             MR. EHSAN:  Object to the form.

17             THE WITNESS:  I do, because it is by

18   far the most common screening form that is

19   utilized and has been utilized for several

20   decades in the United States.

21             BY MR. BILEK:

22        Q.    And it is widely used throughout by

Page 145

1              THE WITNESS:  Yes.  That should seem

2     obvious.

3              BY MR. BILEK:

4         Q.    Okay.  Let's turn to the second

5     page, first full paragraph underneath the box.

6     It says -- well, actually, the last paragraph

7     -- let's see here.

8              Actually, why don't I just have you

9     read what you -- what you wrote, the last

10    sentence of the first paragraph.

11        A.    "Reports of long-term adverse

12    behavioral effects in children of

13    narcotic-addicted mothers and in animal studies

14    are disturbing."

15        Q.    Is that -- do you take that as a

16    true statement?

17             MR. EHSAN:  Object to the form.

18             THE WITNESS:  In September of 1998,

19    when this paper was published, that is a

20    reasonable statement.  In -- what month are we

21    in?  In September of the year 2020, that

22    statement would need to be amended.

Page 175

1            MR. EHSAN:  I object to the form.

2            Doctor, if you can give me one

3     second because of this lag, I have to wait to

4     make sure he is done before I can object, so

5     just give me one second.  Thank you.

6            BY MR. BILEK:

7       Q.    So does this study cause you any --

8     does it disturb you in any way that there may

9     be long-term additional problems for NAS

10    children versus children that are in the same

11    economic circumstance?

12            MR. EHSAN:  Object to the form.

13            THE WITNESS:  Does it disturb me?

14    I'm not sure how to answer that.

15            BY MR. BILEK:

16      Q.    Yes.

17      A.    But I will answer you about whether

18    I am disturbed by the quality of the

19    conclusions, and I am not, because to be a bit

20    more granular and accurate, let me just point

21    out several things that are said that are

22    alighted by, you know, the conclusion that you

1              MR. EHSAN:  Objection.

2              BY MR. BILEK:

3      Q.    And it's fair to say that you didn't

4   consider this opinion in drafting your report.

5      A.    Incorrect.

6              MR. EHSAN:  Object to the form.

7              BY MR. BILEK:

8      Q.    Well, you have no evidence that you

9   did.

10     A.    You have no evidence that I didn't.

11  What I said is that I have -- you have got to

12  let me finish a brief -- you cut me off when I

13  try and answer you.

14              I am not being argumentative.  I am

15  trying to finish a sentence.  I realize that

16  Zoom makes everything much more difficult.

17              What I said is that, you can't, you

18  know, rule out that I didn't, simply because,

19  like I said, I have looked at an enormous

20  number of papers.  I frankly offhand do not

21  recall one way or the other whether this is one

22  of them.  Period.  That's all.

Page 190

1              MR. EHSAN:  How about we take a

2      five-minute break whenever you are ready.

3              MR. BILEK:  Okay.  Fine by me.

4              MR. EHSAN:  All right.

5              (A short recess was taken.)

6              MR. BILEK:  Court Reporter, could

7      you hand Exhibit 19 to the witness, please.

8              (Deposition Exhibit 19 was marked

9      for identification.)

10             BY MR. BILEK:

11     Q.    Can you identify this exhibit for

12     the record.

13     A.    A publication in the journal, JAMA,

14     J-A-M-A, Network Open from 2019 entitled:

15     "Cognitive and Motor Outcomes of Children With

16     Prenatal Opioid Exposure, a Systematic Review

17     and Meta-Analysis."

18     Q.    What is a meta-analysis?

19     A.    So a meta-analysis is a technique by

20     which individual studies, in this case,

21     individual clinical trials usually are

22     aggregated.  It's not a straightforward

Page 242

1          A.    Yes.   It is an article published in

2     Frontiers in Pediatrics in June of 2020.   It is

3     entitled:   "Perinatal opioid exposure primes

4     the peripheral immune system towards

5     hyperreactivity."

6               I am listed as -- I am listed as the

7     editor.   I did not review it.   The reviewers

8     are listed, but I certainly looked at the

9     article, looked at the reviews, and I was the

10    editor.

11         Q.    And you approved the article for

12    publication.

13         A.    Yeah.   That's the meaning of what I

14    just said.

15              MR. EHSAN:   Object to the form.

16              BY MR. BILEK:

17         Q.    Did you submit the article for

18    publication as editor?

19              MR. EHSAN:   Object to the form.

20              THE WITNESS:   No.   I approved the

21    article for publication.

22              BY MR. BILEK:

Page 251

1    alarming rates."

2              Do you agree with that?

3    A.    Yes.

4              MR. EHSAN:  Object to the form.

5              BY MR. BILEK:

6    Q.    What?

7    A.    Yes.

8    Q.    You do?  Okay.

9              Let's go to the second paragraph, go

10   to the middle.  It says:  "Recent studies

11   showing an association between opioid use

12   during pregnancy and poor health outcomes for

13   both pregnant women and infants highlight

14   prenatal opioid exposure as a serious public

15   health concern."

16             Do you see that?

17   A.    I see everything that you are asking

18   me to look at, yes.

19   Q.    Do you agree with that statement?

20   A.    Sure.

21   Q.    "Opioid exposed infants represent

22   extremely vulnerable patient population with 50

Page 252

1    to 80 percent experienced neonatal abstinence

2    syndrome."

3              Do you see that?

4        A.    Yes.

5        Q.    Do you agree with that statement

6    that you edited?

7        A.    Well, yes.  In the same sense that

8    in terms of quantifying this, these are

9    ballparks.  A previous article that you asked

10   me about a statement that I agree or disagree,

11   quoted 75 to 90 percent.  Now it's 50 to

12   80 percent.  Certainly it's the majority.

13   Difference in different populations.

14       Q.    "The prenatal opioid exposures

15   associated with an increased risk of fetal

16   growth restriction, preterm birth, and lifelong

17   motor and cognitive deficits."

18             Do you see that?

19       A.    I do.

20       Q.    Do you now agree with that

21   statement?

22       A.    I don't agree with all of the

Page 254

1    and make some of that language a little bit

2    more precise in the ways that I have elaborated

3    here today.

4              I had for myself two options.  One

5    is I could say, gee, although I know a lot

6    about this topic, maybe I shouldn't review this

7    even though it's on rats, not humans.  The

8    other is that I would look critically at the

9    methods and the conclusions, specifically the

10   methods and that I would leave it to the

11   reviewers to make comments as long as they

12   generally agreed with them about specific

13   wording.

14             So what I am trying to say is that,

15   yes, I'm the editor.  Yes, my name is on here

16   and yes, I agree with this paper.  But had I

17   been one of the reviewers, I might have

18   suggested a bit more qualification granularity.

19   I hope that clarifies my stance about this

20   paper.

21        Q.    But you didn't, sir, did you?

22        A.    I didn't what?

Page 259

1          BY MR. BILEK:

2          Q.     Let's go to the last sentence in

3     that same paragraph.  Would you read that.

4          A.     Which paragraph were we on again?

5          Q.     We are on -- in the introduction, we

6     are on the second paragraph and start with:

7     "The devastating."

8          A.     "The devastating consequences of

9     opioid exposure are the physical health and

10    developmental outcomes of exposed children

11    strengthen the need to advance scientific

12    understanding of the underpinnings of

13    opioid-induced neural injury and to advance

14    biomarker development of this patient

15    population."

16         Q.     That's contrary to your written

17    report in this case, isn't it?

18              MR. EHSAN:  Object to the form.

19              THE WITNESS:  I don't know if it's

20    contrary.  It's certainly divergent, and as I

21    read through this paper, I perhaps -- and here

22    is my speculation about my own motives:  In

Page 261

1    contrary to your position that you took in this

2    case in which you wrote a slanted report?

3              MR. EHSAN:  Object to the form.

4              THE WITNESS:  Yeah.  If I could, I

5    would object to your saying that it's a slanted

6    report.  I did not write a slanted report, and

7    I do not understand your question aside from

8    the attempt to impute my integrity.

9              BY MR. BILEK:

10        Q.    Well, let's put it this way,

11   something we can agree on.

12              Many long-term studies that were

13   contrary to your position were omitted from the

14   report.

15              MR. EHSAN:  Object to the form.

16              THE WITNESS:  My report cites a

17   small number of papers which in each case were

18   meant to be illustrative of a given point.  I

19   will say for the nth time, my references are

20   anything but comprehensive or all inclusive.

21   No conclusion should be drawn further than

22   that.

Page 265

1      response to perinatal opioid exposure

2      characterized by immune cell reprogramming and

3      priming."

4          Q.     Continue reading.

5          A.     "This evidence may, in part,

6      contribute to the neurological injury following

7      developmental opioid exposure characterized in

8      our previous preclinical study.  The current

9      study and the treating investigations that link

10     developmental and neurological injuries

11     including cerebral palsy and Down syndrome with

12     underlying systemic inflammation resulting from

13     abnormal PBMC activity."

14         Q.     Do you agree with that?

15         A.     Agree with which aspects of it?

16         Q.     The conclusion of the study you

17     edited.

18         A.     Okay.  The entirety of what I just

19     read?  Yeah.  I agree with their results.  I am

20     interested in their connection of the

21     implications of the results to other separate

22     issues of neurodevelopment as they mention,

1              BY MR. BILEK:

2         Q.    Is this something that you have seen

3    before?

4         A.    No.

5         Q.    Were you involved at all with the

6    March of Dimes and their -- in connection with

7    NAS?

8         A.    Yes, obviously.

9         Q.    What did you do for the March of

10   Dimes in connection with NAS?

11        A.    So as I -- you know, my involvement

12   with the March of Dimes goes back to the 1980s

13   and during that time, I was a participant,

14   fund-raiser, spokesperson, scientific and

15   clinical advisor and board member at different

16   times and in different places.

17              From many of those roles, I was

18   involved with their initiatives which as you

19   say are trying to improve the care and outcomes

20   of newborns and infants.  The March of Dimes, I

21   should add, started under FDR's administration

22   and it were the dimes that were placed in order

Page 282

1    right above the box:  "As they grow older."

2         A.    "As they grow older."  Okay.  "As

3    they grow older, children who had NAS may have

4    problems with speech, language and learning."

5         Q.    Continue.

6         A.    "They may need early intervention

7    services to help them learn to walk, talk and

8    interact with others."

9         Q.    Do you agree with this statement by

10   the March of Dimes?

11              MR. EHSAN:  Object to the form.

12              THE WITNESS:  Well, I never did and

13   certainly now, I don't speak for the March of

14   Dimes.  I would say that strictly speaking, I

15   agree with the following sentence:  "As they

16   grow older, children who had NAS may have

17   problems with speech, language and learning."

18   I agree with that and I have given you my --

19   again, critical reading of the literature,

20   which is that, yes, NAS is a marker, and there

21   are many ways of getting to NAS.

22              NAS may mean -- may be a consequence