# EXHIBIT 5

Page 1

```
 1              STATES UNITED COURT DISTRICT
 2               NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4   _____
 5   IN RE NATIONAL PRESCRIPTION    )
     OPIATE LITIGATION              )
 6                                  )
     This documents relates to:     )
 7                                  )
     Salmons v. Purdue Pharma L.P. )
 8   et al., MDL Case No. 1:18      )
                                    ) MDL No. 2804
 9   Flanagan v. Purdue Pharma L.P.)
     et al. MDL Case No.            ) No. 17-md-2804
10   1:18-op45405;                  )
                                    )
11   Doyle v. Purdue Pharma L.P.    )
     et al, MDL Case No.            )
12   1:18-op-46327                  )
                                    )
13   _____
14
15       DEPOSITION OF CHRISTINA A. PORUCZNIK, PhD, MSPH
16             September 22, 2020  9:01 a.m.
17         Location: Utah of Utah School of Medicine
                 375 Chipeta Way, Suite A
18                 Salt Lake City, Utah
19
20
21
22
23   Reported by:
     HEIDI HUNTER, RPR, CSR
24
25
```

1   this case.  I presume that they looked at my

2   publications and gave me a call.

3       Q    Do you have any reason why -- out of all the

4   people that are working on opioid issues why they picked

5   you?

6            MS. FUJIMOTO:  Object to form.

7       A    No.  I think you'd have to ask them that.

8            MS. HENNING:  This is Nicole Henning.  Can we

9   agree that Michi's objections are for all defendants?

10           MR. BILEK:  Yes.

11           MS. FUJIMOTO:  Great.  Thanks for the

12  reminder, Nicole.

13  BY MR. BILEK:

14      Q    So how -- what was the circumstances of them

15  hiring, when did that occur?

16      A    I first had interaction with Ms. Fugimoto in

17  winter of 2019, I believe.  I'm trying to remember if it

18  was before or after I broke my leg, and I think it was

19  right around that time, and it was -- I think she was

20  exploring my potential willingness to serve as an

21  epidemiologist to really review the literature and make

22  an assessment about what I thought the state of the

23  science was.

24      Q    And the -- so this was in the winter of 2019

25  you're contacted by Ms. Fugimoto.  And what did you tell

```
 1   her?
 2          MS. FUJIMOTO:  Object to form.  Do not answer
 3   anything with regard to attorney-client or attorney work
 4   product privilege.  No communications directly --
 5          MR. BILEK:  I'll restate that.
 6   BY MR. BILEK:
 7     Q    I'm just asking the issues surrounding the
 8   retention.  Was there any discussion on your background?
 9          MS. FUJIMOTO:  Same objection.  I'm going to
10   instruct her not to answer.
11          Tom, you can ask her when we contacted her,
12   the method of communication, all of that, what she may
13   consider her qualifications to be, all of that.  But you
14   can't get into the substance of our communications and
15   you know that.
16     Q    Let's approach it a different way.  You
17   were -- what is the Opioid Working Group?
18          MS. FUJIMOTO:  Object to form.
19     A    Can you be more specific?
20     Q    Well, are you a member of an opioid working
21   group that is involved in guidelines for the CDC?
22     A    So are you asking about on my CV from 2016?
23     Q    I'm going to ask a lot more about it than
24   that, but you can start there, yes.
25     A    Sure.  So in 2016 I was chairman of the
```

1    working group through the Board of Scientific Counselors

2    for the CDC on reviewing the CDC's proposed opioid

3    prescribing guidelines for chronic pain in primary care.

4         Q    And you still serve on that committee, right?

5         A    Well, that committee is done.  I still serve

6    on the Board of Scientific Counselors for the National

7    Center for Injury Prevention and Control.

8         Q    And what does that group do?

9         A    So that group serves as an external advisory

10   board for that center at CDC.

11        Q    And what is their primary responsibilities

12   of -- what do they advise on?

13        A    Since this is for the Injury Center at CDC,

14   the Board of Scientific Counselors advises about

15   scientific direction of research priorities and things

16   like that for related to injury.

17        Q    Well, isn't one of the big things that it's

18   related to is opioid prescribing?

19             MS. FUJIMOTO:  Object to form.

20        A    Well, one of the big things that the injury

21   center has been doing in recent years has been related

22   to harms related to opioid drugs.  They have had the

23   guidelines.  But remember CDC is not a regulatory

24   agency.

25        Q    But they send out advisories on to the medical

Page 14

1    establishment, correct, on what the guidelines should be

2    on prescribing opioids?

3        A    They promulgated guidelines that was based on

4    a synthesis of the evidence at that time and input from

5    the various scientific stakeholders.  And subsequent to

6    that, they have issued many statements to help clarify

7    what is in the guidelines, and then scientific reports

8    based on analyses of public health data.

9        Q    And these guidelines are directly related to

10   opioids, right?

11            MS. FUJIMOTO:  Object to form.

12       A    Well, the title is about prescribing opioids

13   for chronic pain in primary care.

14       Q    And have you disclosed to anyone on the

15   payments from McKesson in connection with your opioid

16   work for CDC?

17       A    As a member of the Board of Scientific

18   Counselors, I complete the OGE 450 form each year, and I

19   have not done that yet for this year.  I disclosed in

20   2019 that I was working with McKesson.

21       Q    So when did you disclose -- you did disclose

22   that you were working for McKesson?

23       A    Uh-huh.

24       Q    When?

25       A    When I last filed my OGE 450, which was --

1    group, you're also the chair of that, aren't you?

2         A    Are you talking about the new recently formed

3    workgroup?

4         Q    Correct.

5         A    Yes.

6         Q    How many people on the new working group are

7    there?

8         A    I think 20-something, 23 maybe.

9         Q    How many people are getting paid by the

10   pharmaceutical industry?

11             MS. FUJIMOTO:  Object to form.

12        A    I do not know the answer to that.

13        Q    Has there been -- as a chairman, have you done

14   any investigation of how many people the pharmaceutical

15   companies have hired?

16             MS. FUJIMOTO:  Object to form.

17        A    I have not.

18        Q    Is there -- do you see any problem taking --

19   working for the opioid pharmaceutical companies while

20   you're serving as chair of this advisory group?

21             MS. FUJIMOTO:  Object to the form.

22        A    When the work -- for each workgroup meeting

23   there are disclosures.  So that as we call the role,

24   then people re-announce their disclosures.  And in order

25   to have subject-matter experts from various areas, you

Page 17

1    know, many of whom might have had research grants or

2    have been on pharmaceutical speakers' bureaus in the

3    past, for a workgroup such as this, the conflict of

4    interest rules are not as maybe strict as one would

5    consider for a federal advisory committee.

6            And so the way that we manage such potential

7    conflicts would be that in -- on a day when we're

8    discussing something that is more related to what

9    somebody might have had funding for in the past, then

10   that person would be recused from that part of the

11   discussion.

12      Q    Well, you understand -- you're getting --

13   you're being retained by McKesson, right?

14      A    I've been retained by McKesson to do an

15   evaluation of the scientific literature about the

16   epidemiology of neonatal abstinence syndrome.

17      Q    I mean, do you think that your role as

18   chairman as the advisory committee to the CDC had any

19   role in you being hired by McKesson?

20           MS. FUJIMOTO:  Object to form.

21      A    You'd have to ask them.

22      Q    What do you think?

23           MS. FUJIMOTO:  Object to form.

24      A    It's on my CV.  This was information of which

25   they might have been aware.  I have also been recruited

1   includes prescribing for chronic pain by women?

2        A    Sorry, could you repeat that?  A lot of things

3   happened at once.

4        Q    Well, one of the things you're concerned about

5   in the guidelines is prescribing pain -- prescribing

6   opioids to women for chronic pain during the period that

7   they're pregnant?

8            MS. FUJIMOTO:  Object, form.

9        A    The primary audience for the guidelines is

10  primary care management, and pregnant women constitute a

11  special population who are not part of the target

12  audience for the -- from those guidelines.

13       Q    Who's the target audience?

14       A    Adults with chronic pain who are being managed

15  in primary care.

16       Q    Aren't some of those people going to be

17  pregnant women?

18            MS. FUJIMOTO:  Object to form.

19       A    Certainly women can become pregnant.

20       Q    Isn't it true that one of the issues that

21  you're considering on in connection with your scientific

22  advisory is the question of the risk benefits of

23  neonatal abstinence syndrome --

24            MS. FUJIMOTO:  Object to form.

25       Q    -- in connection with prescribing opioids?

Page 26

1           MS. FUJIMOTO:  Same objection.

2      A     The focused population for the guidelines does

3   not include pregnant women.

4      Q     Well, it includes -- it includes all adults,

5   right?

6      A     It includes adults who are being managed for

7   chronic pain in primary care.  It specifically does not

8   include pregnant women, does not include cancer

9   patients, does not include pediatric populations.

10     Q     I think we'll get to some documents and maybe

11  refresh your memory a little bit on that.  But let's

12  go -- but the response to the question here is -- would

13  you read the next sentence.

14          MS. FUJIMOTO:  What page are you on, Tom?

15          MR. BILEK:  Right after financial conflicts of

16  interest.

17          MS. FUJIMOTO:  Does it have a page number?

18          MR. BILEK:  I just downloaded this from the

19  CDC.  It doesn't really have page numbers on the

20  downloads.

21          THE WITNESS:  It's page 6.

22          MS. FUJIMOTO:  All right.

23  BY MR. BILEK:

24     Q     Would you read that, please.

25     A     "Generally you may not work a committee that

Page 32

1   recommended prescribing, right?

2            MS. FUJIMOTO:  Object to form.

3       A    The 2016 guidelines are for chronic -- opioid

4   prescribing for chronic pain managed in primary care.

5   The question that is going to be -- that is coming up,

6   there's been new research evidence, and there is

7   consideration on whether there will be modifications to

8   the guidelines.

9       Q    And what's the modifications that are being

10  considered?

11      A    I don't know.

12      Q    You're the chair of the group.  What -- why

13  don't you know?

14           MS. FUJIMOTO:  Object, form.

15      A    The group has not met.

16      Q    Why has the group not met?

17      A    It just hasn't.  It has only recently been

18  convened.  And trying to schedule a lot of people to

19  have a meeting, particularly during a pandemic, is a

20  challenging thing.

21      Q    I agree with that, but somehow we're finding a

22  way here.  Why aren't there -- like, you're the chair.

23  Why aren't you trying to do like Zoom conferences or

24  something like that?

25           MS. FUJIMOTO:  Object to form.

1          MS. FUJIMOTO:  Object to form.

2     A    I do not believe that that is part of the

3     charge of the workgroup.

4     Q    So these guideline recommendations that were

5     here in this report, were all of these made?

6          MS. FUJIMOTO:  Object to form.

7     A    Say that again.  I didn't understand the

8     question.

9     Q    You've got, looks like, how many guidelines?

10    Twelve guideline recommendations in here.

11         Were these guidelines -- what happened to

12    these guideline recommendations?

13    A    So ultimately the observations from this

14    workgroup were used to -- probably to edit and modify a

15    bit on wording and to provide the recommendation

16    categories and evidence types that were ultimately in

17    the CDC prescribing guidelines for chronic pain in

18    primary care.

19    Q    Let's turn to your qualifications for a little

20    bit.  You're not a medical doctor, correct?

21    A    I am not a medical doctor.  I have a Ph.D. in

22    epidemiology.

23    Q    And you are not qualified to diagnose NAS?

24    A    As an epidemiologist, I do not diagnose

25    anything, including neonatal abstinence syndrome.

1      Q    And you're not qualified to review -- well,
2  strike that.
3           Not only are you not qualified to diagnose
4  NAS, you would not hold yourself out as an expert as far
5  as questioning any individual doctor's diagnosis of NAS?
6           MS. FUJIMOTO:  Object to form.
7      A    As an epidemiologist, I would not get in
8  between a doctor caring for a particular patient.
9      Q    And this would include diagnosing NAS?
10     A    As an epidemiologist, I would not get in
11 between a doctor diagnosing a patient with NAS.
12     Q    You have never published any literature on the
13 use of opioids in newborns or pregnant women?
14          MS. FUJIMOTO:  Object to form.
15     A    I believe that is a correct statement.
16     Q    You have never published any peer-reviewed
17 literature in the clinical outcomes resulting from
18 prenatal or postnatal opioids?
19     A    I have not published on clinical outcomes
20 related from prenatal or postnatal exposure to opioids.
21     Q    You have not published on the mechanisms
22 associated with analgesia tolerance or withdrawal?
23     A    I have not --
24          MS. FUJIMOTO:  Object to form.
25     A    I have not published on the mechanisms

Page 58

1    associated with opioid analgesia tolerance or

2    withdrawal.

3        Q    You have not published any peer-reviewed

4    article in the development of the fetal neonatal brain

5    with or without exposure to opioids and/or other

6    recreational drugs?

7        A    I have not published in the peer-reviewed

8    literature about fetal brain development related to

9    exposure to anything, including opioid drugs, other

10   drugs of use or any other substance.

11       Q    You have not done any peer-reviewed study on

12   neuro-development outcomes following prenatal opioid

13   exposure or prenatal alcohol or other prenatal drugs or

14   their fetal brain development in pregnancy?

15       A    That is correct.  I have not published

16   anything about neuro-development following exposure to

17   substances in~utero.

18       Q    Let's -- are you aware of states trying to

19   pass legislation to limit the prescribing of opioids?

20           MS. FUJIMOTO:  Object to form.

21       A    I believe that I recall that Ohio had a

22   regulation.  I cannot -- I don't remember if it was a

23   law or a regulation about limiting opioid prescribing,

24   particularly in the emergency room or an urgent care

25   situation.  I can't be any more specific than that.

Page 65

1   guidelines.

2       Q    So you didn't even look at the NAS issue in

3   connection with the guidelines?

4           MS. FUJIMOTO:  Object to form.

5       A    None of the guideline statements are about

6   management of pregnant women.

7       Q    Why not?

8           MS. FUJIMOTO:  Object to form.

9       A    The audience for the guidelines is managing

10  chronic pain in primary care.

11      Q    Well, I mean -- I'm going to be honest with

12  you, Doctor, I'm confounded by this of the issue of why

13  pregnant women aren't being considered as an adult that

14  is being prescribed opioids?

15          MS. FUJIMOTO:  Object to form.  Is there a

16  question?

17      Q    Yeah.  Why aren't you doing it?

18          MS. FUJIMOTO:  Object to form.  Go ahead.

19      A    So this is going to be a little bit rambly but

20  patient with me for a second because it fits.

21          One of the heads headlines in the New York

22  Times this morning was about vaccines for coronavirus

23  for children may not be available at the same time as

24  they are for adults.  And the reasoning for this is that

25  children are not included in clinical trials the same

Page 66

1    way that adults are.

2              As we were reviewing the evidence considered

3    as a part of the workgroup for chronic pain prescribing

4    in primary care, turns out that pregnant women are

5    another group that are frequently not included.

6              They're excluded from research studies, which

7    means that the -- they were not necessarily a part of

8    the studies that we were reviewing.  They're considered

9    a special population.

10   Q    Well, was the harm of -- possible long-term

11   harms of a child born with NAS, was that considered?

12   A    So a child born with NAS is not part of the

13   population intended to be addressed by the guidelines.

14   Q    Do you have any evidence -- the plaintiffs'

15   experts have determined there are approximately 500,000

16   NAS births in the last 18 years.  Do you have any

17   disagreement with those numbers?

18             MS. FUJIMOTO:  Object to form and foundation.

19   A    So neonatal abstinence syndrome is a

20   diagnosis.  And in order for that diagnosis to have been

21   made, then there needed to be some sort of clinical

22   suspicion, and then proceeding through the steps of

23   applying a case definition.  And so before I really

24   accept that number, I would want to be sure about

25   consistent application of a case definition over space

Page 72

1    Q    So you don't see any value in trying to --
2    these states passing laws to reduce the number of
3    prescriptions that are being written?
4         MS. FUJIMOTO:  Object to form.
5    A    I am concerned about legislation that might
6    interfere with patients getting healthcare that they and
7    their doctors think is appropriate for them.
8    Q    Let's go to the second page of Exhibit 6.
9    A    Okay.
10   Q    The last paragraph says, "Improving
11   prescribing practices for the way pain is treated is one
12   avenue to help prevent misuse, addiction, overdose while
13   ensuring legitimate access to pain management."
14        Do you see that?
15   A    I see that sentence.
16   Q    Do you agree with that statement?
17        MS. FUJIMOTO:  Object to form.
18   A    I think that improving prescribing practices
19   in the way we treat pain is one avenue to help prevent
20   misuse, addiction, and overdose while ensuring
21   legitimate access to pain management.
22   Q    Do you agree that using opioids to treat acute
23   pain can lead to long-term use?
24   A    The literature suggests that physical
25   dependence on opioids can begin relatively quickly, such

1   marketing to encourage people to smoke.

2       Q    Do you think that pharmaceutical companies

3   have done a lot of marketing to encourage use of

4   opioids?

5           MS. FUJIMOTO:  Object to form.

6       A    I think pharmaceutical companies do a lot of

7   marketing.  And yet, as controlled substances, access to

8   opioids is still something that happens in a

9   doctor-patient relationship.

10      Q    But we know that -- we know several things

11  about this opioid epidemic, we know that there are

12  prescriptions being diverted, right?

13          MS. FUJIMOTO:  Object to form.

14      A    I -- I'm thinking about what data there are

15  about prescription diversion.  I can't dispute that it

16  happens and yet I also can't estimate how much that

17  there might be.

18      Q    I mean, was the issue of diversion of

19  prescriptions ever considered in your -- any of your two

20  working advisory groups?

21      A    I'm going back to the observations.  I'm not

22  really looking at these other exhibits.  I'm just trying

23  to pull out the one that we already looked at of the

24  observations from the workgroup, because I don't believe

25  any of the guideline statements beyond those about safe

1      Q    Well, you'd -- I mean -- as you probably know,

2   I've got a few studies here that we could go over.  But

3   the issue, you would agree, that there were a number of

4   studies that have been written which questioned the

5   prescribing of opioids for long-term chronic pain?

6           MS. FUJIMOTO:  Object to form.

7      A    I believe that there are such studies in the

8   literature.  If you want to talk about a specific one,

9   we could talk about that.  Because every study is

10  subject to strengths and limitations and needs to be

11  evaluated on its merits.

12     Q    Right.  But when the CDC is doing these

13  guidelines, I mean isn't one of the things that should

14  be considered of what the benefits are of prescribing

15  the opioid for long-term chronic pain?

16     A    There's a guideline -- I mean, the idea of

17  risks and benefits and having conversations and

18  considering possible risks and benefits is woven

19  throughout the CDC guidelines.

20     Q    And if the benefit for long -- treatment

21  long-term chronic pain is negligible, wouldn't that be a

22  big affect on your guideline?

23          MS. FUJIMOTO:  Object to form.

24     A    The -- so guidelines are intended to help be a

25  decision framework to be applied within a doctor-patient

Page 83

1    relationship.  So it's something that individuals need

2    to work out within specific instances.

3        Q    Was there -- have you done any investigation

4    on the differing effects that opioids have on women

5    versus on men?

6        A    I do not believe I've published anything about

7    that research question.

8        Q    I know, Doctor, you haven't.  Right now I'm

9    pretty much -- I know what you've done and what you

10   haven't.  What I'm -- what I'm asking is:  In the

11   committee, did you guys ever consider the different --

12   differences between -- how opioids react between women

13   and men?

14            MS. FUJIMOTO:  Tom, I'm going to object to

15   that admonition.  She answered the question and you

16   don't mean to be snide to her.

17            And this is a different question.  So answer

18   this different question, Doctor.

19       A    Part of evaluating risks and benefits or

20   benefits and harms in a particular doctor-patient

21   interaction could include considerations of sex

22   differences or size differences, you know, any

23   particular features of that patient.  I do not believe

24   any of the guideline statements call out separate

25   recommendations based on patient sex.

Page 84

1      Q     I'm asking you:  Do you recall any

2   investigation by either the scientific panels on the

3   differing effects of opioids on women versus men?

4            MS. FUJIMOTO:  Objection to form, asked and

5   answered.

6      A     Sorry.  Someone was trying to come into my

7   conference room.

8            So our charge was to evaluate the evidence

9   related to the guideline statements.  And as none of the

10   guideline statements were differential by patient sex, I

11   do not recall such discussions.

12      Q     Well, on the committee, was the committee,

13   your scientific advisory committee that you chaired,

14   were they limited to only looking at guidelines that

15   came down from somewhere else that were being proposed,

16   or were you able to have a role in drafting the

17   appropriate guidelines?

18      A     For the Opioid Guideline Workgroup, we were

19   not drafting guidelines.  We were making observations on

20   the proposed guidelines as to the level of evidence.

21      Q     Did you ever decide that:  Hey, we need to

22   investigate this type of issue?

23            MS. FUJIMOTO:  Object to form.

24      Q     Do you recall anything -- anything new to the

25   attention of the -- either the CDC or the main group?

1   section on literature on the impacts of NAS and

2   long-term developmental impacts.

3   BY MR. BILEK:

4        Q    Now, is it -- the way I read your report is

5   that you don't know whether -- your opinion is you don't

6   know whether there's going to be a long-term impact on

7   opioid exposure in utero; is that correct?

8             MS. FUJIMOTO:  Object to form.

9        A    My first sentence is, "The long-term impacts

10  of opioids exposure in utero on child development are

11  uncertain and variable."

12       Q    And so the issue is you don't know what the

13  long-term effects are going to be, long-term

14  developmental effects?

15            MS. FUJIMOTO:  Object, form.

16       A    I think that the -- based on the evidence in

17  the literature now, that long-term impacts are uncertain

18  and variable.

19       Q    Is it something that you think that there

20  should be more study on the long-term developmental

21  impacts on children born with NAS?

22            MS. FUJIMOTO:  Object to form.

23       A    I think that that is a research area that

24  probably a lot of people are working on now.  And for

25  any study of that, I think it's really important to come

Page 88

1    back to the fundamentals about measurement of exposures,

2    and measurement of outcomes, and consideration of

3    potential confounders.

4        Q    Do you think it should be studied more or

5    less?

6              MS. FUJIMOTO:  Object, form.

7        A    I am sure that it is being studied.  As long

8    as it's a research question, then, sure, people are

9    going to study it.

10       Q    What's your understanding of what the

11   plaintiffs are seeking in this lawsuit?

12       A    That they are seeking to define a class of --

13   that would be comprised of babies born with NAS.  And

14   that one of the potential ideas for what to do with that

15   class would be somewhat long-term, like registration

16   into a registry with potential follow-up.

17       Q    So one of the issues in the -- I will

18   represent to you is medical monitoring of children that

19   were born with NAS.  Is that something that you think is

20   appropriate or inappropriate?

21             MS. FUJIMOTO:  Object to form.

22       A    Well, I think that the growth and development

23   of all children is a good idea to pay attention to.

24       Q    Including children born with NAS, right?

25       A    Children born with NAS are part of all

1   children, yes.

2       Q    Now, is the -- one of the other things I would

3   tell you that the plaintiffs are seeking is an

4   appointment of a science panel to study the issue of the

5   affects of the NAS on children.

6            Is that something that you agree with or

7   disagree with?

8            MS. FUJIMOTO:  Object to form.

9       A    I think the notion of a scientific advisory

10  board or a science panel could be a reasonable one.

11      Q    Now, when you're going on -- I note in here

12  that you cited to -- let's see here, on your long-term

13  effects.  You had a couple of studies that you cited to

14  on your long-term effects.

15           There it is.  On page 10, you state:  "A

16  systemic review and meta-analysis of neurobehavioral

17  outcomes following in~utero exposure to opioids found

18  only five studies that had quantitative measures of

19  outcomes.  Based on those five studies, the conclusion

20  was that there were no significant impairment compared

21  to nonexposed children."

22           Do you see that?

23      A    I see those two sentences.

24      Q    Is that a big part of what you're relying upon

25  that the children born with NAS do not have long-term

1    developmental problems?

2           MS. FUJIMOTO:  Object to form.

3       A    I think that the studies that have attempted

4    to quantify have used different measures, have had

5    variable exposure assessment.  And that's one of the

6    things that was noted, for example, in the Conradt paper

7    about that the exposures are heterogeneous, treatment

8    was heterogeneous.  And so trying to collect these

9    babies into a recognizable class and then say that

10   they're all the same is problematic.

11      Q    I understand that, Doctor.  I mean, what I'm

12   getting at, the Baldacchino Arbuckle is what you're

13   relying upon that you believe that that there are no

14   significant impairments compared to nonexposed children,

15   right?

16          MS. FUJIMOTO:  Object to form.

17      A    That was the -- the conclusion from that

18   study, which is part of what informed my report, was

19   that there was no significant impairment compared to

20   nonexposed children.

21      Q    And that study was a key part of what your

22   reliance is, right?

23      A    That study is part of what my report relied

24   upon.

25      Q    Have you looked at whether that study was

1  numbers within the" --

2          MS. FUJIMOTO:  Object.

3      Q    -- "additional studies are needed to improve

4  the power of a future meta-analysis to produce

5  significant results."

6          Do you see that?

7          MS. FUJIMOTO:  Object to form; misreads

8  document and misstates testimony.

9      A    I see those sentences.

10     Q    Okay.  The point is they're saying that there

11  needs to be more future meta-analysis, correct; more

12  studies, which you agree with, right?

13     A    Well, virtually every research study in the

14  conclusion says:  More research is needed on this topic.

15  And in particular, something that is a meta-analysis

16  relies on the existence of other studies, so that then

17  the people who are doing the meta-analysis can combine

18  the previous studies to come up with a single measure of

19  effect.

20     Q    I understand.  But they were more precise in

21  this one.  They said that we need longitudinal studies

22  on children over the age of five, correct?

23         MS. FUJIMOTO:  Object to form.

24     A    Their sentence says -- weirdly starts with the

25  word "and" -- "And longitudinal studies are needed to

1    determine if any neuropsychological impairments appear

2    after the age of five years and to help investigate

3    further the role of environmental risk factors on the

4    effect of core phenotypes."

5        Q    Would you agree with that conclusion that more

6    longitudinal studies were needed for children over the

7    age of five?

8            MS. FUJIMOTO:  Object to form.

9        A    Well, if you go back to their Table 3 where

10   they're describing the populations of the studies that

11   they were looking at for this, you know, they're all

12   infants and preschool, which is the topic of this

13   systematic review and meta-analysis is infants and

14   preschool.

15           So, you know, I don't know if these authors

16   are limited to that population because that's what data

17   were available, and they would like to do something in

18   the future with older children or not.  But they didn't

19   report on, you know, any that were older than age five,

20   according to Table 3.

21       Q    Well, you would agree, though, that this

22   study, 2015 study, one of the things that we should look

23   at is what happens as the child gets older, right?

24           MS. FUJIMOTO:  Object to form.

25       A    I think that if we're interested in outcomes

Page 95

1   that may manifest in older ages than infant and

2   preschool, then there need to be well-designed studies

3   with precise exposure assessment and outcome assessment

4   and ability to control for confounders to try and answer

5   that research question.

6            MR. BILEK:  Let's pull up Exhibit 56 and this

7   will only take a minute and we'll take a lunch break.

8            MS. FUJIMOTO:  Got it.

9                    (PLAINTIFF EXHIBIT 56.)

10  BY MR. BILEK:

11       Q    Can you identify what's been marked as

12  Plaintiffs' Exhibit's 56?

13       A    So this exhibit is an Erratum:

14  "Neurobehavioral Consequences of Chronic Intrauterine

15  Opioid Exposure in Infants and Preschool Children; a

16  Systemic Review and Meta-analysis" from BMC Psychiatry

17  in 2015, and it's by the same authors.

18       Q    What does an erratum mean?

19       A    It means that this is the like the worst day

20  of their scientific lives and they made a mistake, and

21  they are publically acknowledging it.

22       Q    And it says, "Correction:  After publication

23  of this work, we became aware that during our entry of

24  raw data in the Complementary Meta-Analysis Program, we

25  transposed one of the columns of data.  This meant the

Page 96

1    values generated by all the meta-analysis and results

2    produced in the published manuscript, including those

3    displayed in Figures 2 to 7 and Table 4 were incorrect.

4    We subsequently repeated the meta-analysis and updated

5    the figures, table and manuscript to reflect the new

6    results following this reanalysis.

7              "The new conclusions of the paper show

8    significant impairments at significant level of p less

9    than 0.05 for cognitive, psychomotor, and observed

10   behavioral outcomes for chronic intrauterine opioid

11   exposed infants and/or preschool children compared to

12   nonopioid exposed infants and children."

13             Do you see that?

14   A    I do.

15   Q    What does that mean to you?

16   A    It means that their -- in their analysis, they

17   probably had something backwards, and so their initial

18   findings were incorrect.  And then when it was pointed

19   out to them, helpfully by Dr. Nygaard, they went back

20   and did a reanalysis and are presenting their new data,

21   and so now they have -- so they have new tables and

22   figures.

23   Q    And what they found that was significantly --

24   to a significant level that there were cognitive,

25   psychomotor, and observed behavioral outcomes for

1      A    You know, I did not know about this erratum

2    before today and it's -- here's the thing, the majority

3    of papers in the literature do not have subsequent

4    erratum, and so it's not -- like my expectation value

5    would not be for every paper I look at to go look and

6    see if there's a later correction.

7            And also, for many papers where there are

8    corrections or erratums or updates, on what turns out to

9    be like the face page, there will be a notation to say:

10   Oh, there's something else that you should look at.

11   And, you know, that wasn't there.

12           And I agree, I did not, you know, go searching

13   to see if this author had published anything else that

14   might contradict what they had previously published.

15     Q    And the fact of the matter is, you have

16   misstated in your report that -- on this study, that

17   there are problems as a result of opioid exposure in the

18   womb, correct?

19           MS. FUJIMOTO:  Object to form.

20     A    Actually, I take exception to that.  Based on

21   what I'm citing in my report, which was this -- their

22   original document, then I'm -- I am stating their

23   original conclusion correctly.

24           Now, there were -- you know, there was an

25   erratum of which I was not aware that knowledge of which

Page 99

1    might have changed that statement.  But regardless, you

2    know, my report is based on not only this paper, but,

3    you know, several papers put together.

4        Q    Well, for this statement on page 10, you only

5    cite to this article, correct?

6            MS. FUJIMOTO:  Object to form.

7        A    For the statement in contrast, a systemic

8    review and meta-analysis of neurobehavioral --

9        Q    Yes.

10       A    -- I am citing this particular study, because

11   the previous paragraph was about a different study.

12       Q    And if you were having -- if I were your peer

13   review right now on your report, I mean, I'd point this

14   out to you, and you'd have to fix this, wouldn't you?

15           MS. FUJIMOTO:  Object to form.

16       A    That's how science works.

17       Q    And you would agree that this was not your

18   best work right now, right?

19           MS. FUJIMOTO:  Object to form.

20       A    I agree that I did not go and searching to see

21   if these authors had published anything else or if there

22   had been an erratum published to this particular

23   article.

24       Q    And when you are saying that these kids are

25   not developmentally challenged or that the science is

1    uncertain, I mean, this stuff has consequences, right?

2             MS. FUJIMOTO:  Object to form.

3        A    So I feel like you had two things in there of

4    saying that there's no consequence or that the

5    consequence is uncertain and then that has impact.  And

6    I think that that would come to a conclusion that's, you

7    know, similar to the one that you were pointing out from

8    the original Baldacchino article where they specify that

9    the evidence is sparse.

10       Q    Now, the fact that they've changed their

11   conclusion, you're now going to rely on the fact that

12   the evidence is sparse?

13            MS. FUJIMOTO:  Object to form.

14       A    I stated in my report that the evidence was

15   sparse already.

16       Q    And indeed, yesterday I got from your lawyer

17   that you've now reviewed some more studies, correct?

18            MS. FUJIMOTO:  Object to form.

19       A    Do you mean the papers that they gave me

20   yesterday and suggested that I look at because you like

21   them?

22       Q    Yes.

23       A    I took a look at them last night.

24       Q    And those studies were provided by your lawyer

25   in response to stuff that I've done in these

Page 101

1    depositions, right?  That's your understanding?

2              MS. FUJIMOTO:  Object to form.

3        A    That is my understanding.

4        Q    And those were, again, not reports that you

5    independently reviewed or investigated to try to

6    determine whether there are additional studies on

7    long-term effects from being born with NAS?

8              MS. FUJIMOTO:  Object.

9        A    I believe that I had already cited at least

10   one of them, and that I believe another one of them was

11   published after I submitted my report.

12       Q    But two more you do not cite your report,

13   correct?

14       A    If I go grab them, then I can compare it to my

15   work cited list to be sure.

16             MR. BILEK:  We can do that during lunch.

17   Let's take a lunch break.  Let's get started again in an

18   hour.  I think it's 12:15 there, so we'll come back at

19   your time 1:15.  Thank you.

20                       (Recess from 12:13 to 1:12.)

21   BY MR. BILEK:

22       Q    So let's revisit the mistake of missing the

23   erratum to that study.  Is it fair to state that you

24   don't consider yourself -- I mean, let's look at how

25   this could have happened.  You do not -- your expertise

Page 102

1    is not the study of NAS, right?

2        A    That is correct.

3             MS. FUJIMOTO:  Object to form.

4        Q    And so before this deposition you were in the

5    practice of reading studies on NAS, the causes, you

6    know, the problems associated with NAS; is that correct?

7        A    For -- like for the typical practice of my

8    job, I would not necessarily read every study about NAS.

9    If something came across that looked interesting I might

10   read it, but I'm not systemically searching for studies

11   about NAS.

12       Q    Right.  Because, again, this is not your

13   expertise.  It's not NAS.  So it's not something that

14   you're following closely or much at all, right?  You're

15   more concerned with issues -- addiction issues with

16   adults, right?

17            MS. FUJIMOTO:  Object to form.

18       A    Actually, I disagree with that assessment that

19   I wouldn't say that I'm more interested in addiction

20   issues with adults either.  As an epidemiologist, I'm

21   really interested in about appropriate timing of

22   exposure assessment, and how we're measuring exposures

23   in populations.

24       Q    But one of the things you never studied before

25   you were contacted by McKesson in this case, you've

1  never been -- you've never studied the issue of NAS at

2  all?

3      A    I've never done my own research or published

4  about NAS, that is correct.

5      Q    And so to defend you a little bit, this issue

6  of missing the errata is caused by the fact that you're

7  not in the study of NAS?

8          MS. FUJIMOTO:  Object to form.

9      A    I've never published or done my own research

10  about NAS.  I think we agree about that.

11     Q    And the extent of -- the primary reason why

12  you've done research now in NAS is because you were

13  contacted by McKesson, correct?

14         MS. FUJIMOTO:  Object to form.

15     A    I was asked to take a look at the literature

16  and provide my opinion about exposure assessment and

17  outcome assessment in studies relating to NAS as an

18  outcome, and in particular to think about issues related

19  to how we might define a class.

20     Q    Well, the issue of how you define a class in

21  this case has to do with issues intertwined with NAS,

22  right?

23     A    It has everything to do with issues of

24  exposure assessment and outcome assessment, and if we

25  can measure exposures specifically enough and outcome

Page 104

1    specifically enough and with enough homogeneity to

2    define a meaningful class.

3         Q     And you would agree that in connection with

4    your investigation that NAS can be caused by opioids?

5              MS. FUJIMOTO:  Object to form.

6         A     So neonatal abstinence syndrome is something

7    that can be the result of exposures to multiple

8    different substances, including opioids.

9         Q     Now, going to long-term studies on -- well,

10   let's -- I think that you now have reviewed the Yeoh

11   study, this Cognitive and Motor Outcomes of Children

12   with Prenatal Opioid Exposure, correct?

13        A     That's one the studies that was sent to me

14   yesterday and I took a look at it last night.

15        Q     What's your opinion on that study, if

16   anything?

17             MS. FUJIMOTO:  Object to form.

18        A     Is that study included among the exhibits?

19        Q     I can make it.  I'm just asking since you just

20   reviewed it yesterday whether you had any opinions on

21   it.

22             MS. FUJIMOTO:  Object to form.

23        A     So last night I reviewed several studies.  And

24   if I'm going to make comments about a specific one, I'd

25   like to have it in front of me so that I make sure that

                                              Page 106

1   exposure was associated with lower cognitive scores.

2   The largest difference was in between ages six months

3   and six years."

4           Do you see that?

5       A   I see that in the findings box.

6       Q   Do you have any quarrel with this finding?

7           MS. FUJIMOTO:  Object, form.

8       A   My biggest concern with this study comes into

9   the exposure assessment that was done in the source

10  studies as it's described in this systematic review and

11  meta-analysis, that they're limited to the data that

12  were presented in the studies, and so their exposures

13  here for how they measured prenatal opioid use are not

14  specific.

15          So they're comparing groups that used heroin

16  in conjunction with poly drug ingestion, methadone in

17  conjunction with poly drug ingestion, and unspecified

18  opioids.

19          So my biggest concern about this is that we

20  have a pretty broad and not well-specified mix of

21  exposures to these children during their fetal periods.

22      Q   So your quarrel with the study is the study

23  design, or is that what your -- what your concern is?

24          MS. FUJIMOTO:  Object, form.

25      A   I'm saying that trying to draw any inference

1           MS. FUJIMOTO:  Object to form.

2      A    Depending on their research question and the

3  strength of the effect, one may be able to find a

4  statistically significant finding with a really small

5  number of people.  It all depends.

6      Q    So on the long-term -- so you're saying that

7  you, yourself, on this study can draw -- you don't agree

8  that this is evidence of possible long-term -- possible

9  long-term effects stemming from prenatal opioid

10  exposure?

11           MS. FUJIMOTO:  Object to form.

12      A    I think that this study has a place in the

13  literature.  And that as people are evaluating, you

14  know, what can we see?  You know, each study can

15  contribute something, and it's accorded more or less

16  weight in factors related to the quality and design and

17  conduct in the study.

18           So I'm not saying that this should just be

19  tossed out entirely.  I'm saying that, as with any

20  study, even a meta-analysis, that we need to, you know,

21  look carefully at the exposure assessment and the

22  outcome assessment to think about how much weight to

23  give it into our analysis.

24      Q    Would you agree that epidemiologists in your

25  field would rely on a study such as this?

Page 111

1           MS. FUJIMOTO:  Object to form.

2      A    I agree that epidemiologists would read a

3 study such as this, and I think each person would draw

4 her own inference from it.

5      Q    Well, would this be something that you would

6 find something that you would normally look at and rely

7 upon in forming a conclusion on whether there are

8 long-term problems resulting from -- resulting from

9 opioid exposure in the womb?

10          MS. FUJIMOTO:  Object to form.

11     A    A study like this would fall into the full

12 group of evidence that would be used to synthesize and

13 draw a conclusion.

14     Q    Now, your --

15          MS. ULLMAN:  Tom, before you asked a next

16 question, there's a person with a phone number area code

17 786 who I think is not mute. So if that is you, I would

18 mute yourself.

19          MR. BILEK:  It is somewhat exhausting it.

20          I don't think they muted themselves.  I don't

21 think they're on there, I think they're just billing.

22          Yep, that is my suspicio is correct, there's

23 no one there.  Is there any way -- well, I don't know.

24          MS. ULLMAN:  I think you just can't see the

25 icons on the phone.  They may have well muted.

```
                                              Page 114
 1        A     We solved it.

 2        Q     It's a long day.

 3        A     For you too.

 4        Q     This is not easy, Doctor.

 5        A     Okay.

 6              THE WITNESS:  So Michi, do you have

 7   educational --

 8              MS. FUJIMOTO:  I have 17.

 9              THE WITNESS:  I grabbed the wrong one.

10              So this is, "Educational Disabilities Among

11   Children Born with Neonatal Abstinence Syndrome."  This

12   is from the Journal of Pediatrics in 2018, and their

13   conclusions were:  "Results of this novel analysis

14   linking health and education data revealed that children

15   with a history of NAS were significantly more likely to

16   have a subsequent educational disability."

17        Q     This is the study you have reviewed?

18        A     This is a study that I did review.  I did not

19   include on to the list of works that informed my

20   conclusions.  I didn't cite anything from it

21   specifically, but it is something that I remember

22   reading.

23        Q     Why didn't you include it in your report?

24              MS. FUJIMOTO:  Object to form.  Go ahead.

25        A     Honestly, I didn't give it very much weight.
```

1      Q    Why not?

2      A    So they were starting with children who have a

3  history of NAS and comparing them to children not so

4  identified, and then linking to special education

5  services to see if it was more likely in one group or

6  the other.  And when I was thinking about -- again,

7  about exposure and outcome assessment, that I felt like

8  there was a lot of risk for bias in this study.

9      Q    Why?

10     A    Because I'm really concerned that the kids --

11 that there may be a differential chance of some being

12 sent for screening for special ed services because they

13 knew that this child had had a diagnosis of NAS.  So to

14 me, it felt like it was all wrapped up together.

15     Q    So you -- your complaint with the study is

16 that you can't -- did they say that they were -- there

17 was this bias problem that you were identifying?

18          MS. FUJIMOTO:  Object to form.

19     A    So on the last paragraph on page 6 is where

20 they start talking about limitations and that specific

21 limitation is listed.

22     Q    So what's your basis for that limitation that

23 you're identifying when it's not in this study?  Have

24 you talked to the authors?

25     A    I have not talked to the authors about this

1  done the same way for everyone.  So those are good

2  things.

3          But we don't know a whole lot.  I mean, they

4  don't report a whole lot about these prescriptions, just

5  the fact that they happened, right?  So we don't know

6  about duration, you know, we don't know a whole lot of

7  frequency.  They do report if people had it in multiple

8  trimesters.  So I'm saying that they did a nice

9  systematic job of exposure assessment.

10          Is it as precise as would have happened in an

11  ideal prospective study, no.  It's not a quarrel.  It's

12  an observation.

13      Q    So, but one of the things to do that you would

14  agree to try to evaluate opioid exposure to the fetus is

15  to look at the prescription history of the birth mother,

16  right?

17      A    So that's -- I mean, looking at the

18  prescription history of the birth mother is one possible

19  way to try to assess exposure to opioids that came

20  through medical interaction.  It's not complete,

21  because, of course, women might have had exposure to

22  opioids in other ways that are not included on their

23  medical records, and the medical record would rarely

24  have information about how that woman actually took the

25  medication.

1   this that's missing.  But if we go to 2.7.4:  "Central

2   to the unique issues women face in pain management are

3   the differences between men and women with respect to

4   pain sensitivity, response to pain medication, and

5   predisposition to clinical pain conditions."

6           Do you see that first sentence?

7       A   I did see that first sentence.

8       Q   Isn't it, when you're doing the guidelines,

9   something that would make sense to be considering this

10  issue between the differences between the sexes?

11          MS. FUJIMOTO:  Object to form.

12      A   I think that this is noted as a gap and a

13  recommendation.  Well, it looks like it's noted as a

14  gap.  And, you know, the recommendation of this task

15  force is to consider men and women as different

16  populations.

17      Q   Let's go to the 2.7.5, the next page on

18  pregnancy.  Do you see that?

19      A   I see 2.7.5 pregnancy, yes.

20      Q   The statement says, "Managing pain in pregnant

21  women is uniquely challenging because clinical

22  decision-making must account for the pregnant mother and

23  the developing fetus."  Do you see that?

24      A   I see that first sentence, yes.

25      Q   Is that something that you would agree with?

1          MS. FUJIMOTO:  Object to form.

2      A    I think anyone would agree with that

3  statement.  So yes, I agree with that statement.

4      Q    "Further complicating pain management in the

5  peripartum period is the lack of CPGs for

6  nonpharmacological treatments that may decrease the

7  potential adverse outcomes for newborns associated with

8  opioid therapy such as neonatal abstinence syndrome."

9          Do you see that?

10     A    I see that sentence.

11     Q    "Greater research into chronic pain management

12  in pregnancy is needed."  Do you agree?

13         MS. FUJIMOTO:  Object, form.

14     A    It seems like a reasonable statement to say

15  that researching chronic pain management in pregnancy is

16  a good idea.

17     Q    Let's look at the next thing on Recommendation

18  1B says, "Counsel women of childbearing age on the risk

19  of opioids in nonopioid medications in pregnancy,

20  including risks to the fetus and newborns."

21         Do you see that?

22     A    I do see that.

23     Q    Do you agree that that's a recommendation that

24  should be done?

25         MS. FUJIMOTO:  Object to form.

1      A    I think that counseling women of childbearing

2   age on the risks of exposures to all kinds of substances

3   is something that is already routinely done and is part

4   of good clinical care.

5      Q    Don't you think we should be specifically

6   telling the women that if they have a prescription for

7   opioids while they're pregnant that perhaps that their

8   going to have a child with NAS?

9           MS. FUJIMOTO:  Object, form.

10     A    I think that discussing risks and benefits is

11  an important part of everything prescription experience

12  for opioids, for antibiotics, for decongestants.

13     Q    Well, why is it that CDC guidelines that

14  you're involved in not involved with this issue of

15  recommendation of opioid prescription to pregnant women?

16          MS. FUJIMOTO:  Object, form.

17     A    The target population for the guidelines was

18  managing chronic pain in primary care, not specifically

19  pregnant women.

20     Q    Pregnant women are people too, right?

21          MS. FUJIMOTO:  Object to form, asked and

22  answered.

23     Q    I'm just not getting it.  I mean, I'm just

24  being honest with you.  I'm not trying to be difficult

25  with you.  I'm not getting why the issue of pregnancy

Page 143

1    include neonatal opioid withdrawal syndrome."  Would you

2    agree that that is a risk of taking opioid pain

3    medications during pregnancy?

4            MS. FUJIMOTO:  Object to form.

5        A    I think that if you -- if your baby never had

6    an opioid exposure, then they couldn't have neonatal

7    opioid withdrawal syndrome.  So having, you know,

8    exposure puts you -- makes you eligible for that

9    category.

10       Q    Neural tube defects?

11           MS. FUJIMOTO:  Your question?

12       Q    Do you think that neural tube defects are a

13   possible risk to your pregnancy?

14           MS. FUJIMOTO:  Object to form.

15       A    I think that they are citing that Broussard

16   study about maternal treatment with opioid analgesics

17   and the risk for birth defects with that statement.

18       Q    Well, do you agree with this CDC guidance here

19   that:  Neural tube defects, "Serious problems in the

20   development or formation of the fetus brain or spine,

21   may be a possible risk to your pregnancy as a result of

22   taking opioid pain medication"?

23       A    Well, I think, since they have cited one, two

24   above in the superscript, and if you go reference one is

25   maternal treatment with opioid analgesics and risk for

Page 149

1    Department of Agriculture and then kind filters down to

2    the states and to the schools.  And then the question of

3    how it gets operationalized at a school level and -- you

4    know, the people who are the program and the funding for

5    the program probably have very little control over the

6    actual operationalizing of the program and how kids

7    might be stigmatized or not stigmatized by receipt of a

8    school lunch, which you're probably going to say was

9    nonresponsive.

10           But I think that there is potential to provide

11   a service in a way that has respect for persons and can

12   maintain dignity.

13       Q    Actually, Doctor, I agree with you.  So the

14   issue of do you think there's a potential to assess

15   children with -- that were born with NAS, to assess them

16   such a manner in which they're not to be stigmatized?

17           MS. FUJIMOTO:  Object to form.

18       A    You're not going to believe this, but I can

19   actually agree with you.

20           I made you smile, that makes my day.

21           Here's the thing, I think that a thoughtfully

22   developed program, which from the getgo has intention

23   and plans in place to be continually weighing risks and

24   benefits to participants may have the ability to avoid

25   stigma and labeling.