# EXHIBIT 6

```
                                              Page 1
 1              UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                     ---o0o---
 5   IN RE NATIONAL PRESCRIPTION
     OPIATE LITIGATION
 6
     Salmons v. Purdue Pharma L.P.,     MDL No. 2804
 7   et al., MDL No. 1:18-op-45268
 8   Flanagan v. Purdue Pharma L.P.,    Case No. 17-md-2804
     et al., MDL No. 1:18-op-45405
 9
     Doyle v. Purdue Pharma L.P.,
10   et al., MDL No. 1:18-op-46327
                  _____/
11
12
13
14
15          DEPOSITION OF TRICIA E. WRIGHT, M.D.
16
17
18          Taken before Kimberly L. Avery
19                 CSR No. 5074
20              September 17, 2020
21
22
        Aiken Welch Court Reporters/A Veritext Company
23             One Kaiser Plaza, Suite 250
               Oakland, California 94612
24            (510) 451-1580/(877) 451-1580
                  Fax (510) 451-3797
25                www.aikenwelch.com
```

Page 23

1          In your advocacy for women, you -- well, let's

2     get back to the opioid epidemic.  The opioid epidemic,

3     do you -- do you consider that the doctors or the

4     physicians are to blame for this epidemic?

5               MS. FUJIMOTO:  Object.  Form.

6               THE WITNESS:  I think there are many, many

7     people to -- we could argue about the use of the term

8     "epidemic," but as I've used it before, there are many

9     factors, and I have talked at length of this.  There

10    are many factors that have led to the overprescription

11    of opioids, doctors being educated by a -- different

12    people, the American Pain Society, the JCAHO

13    Hospital -- you know, Press Ganey scores that give

14    hospitals higher ranking and doctors higher ranking if

15    they give pain medication.

16         So there are many, many factors if you want me

17    to have blame.  And then there's also the whole factors

18    of, you know, poverty and the crisis of lack of

19    interconnectedness, as the former Surgeon General would

20    say.

21    BY MR. BILEK:

22         Q.  Well, first of all, would you agree that one of

23    the causes of the opioid epidemic is that there are too

24    many prescriptions for opioids?

25               MS. FUJIMOTO:  Object.  Form.

1          THE WITNESS:  I think there was definitely some

2     incidences of unscrupulous clinics that overprescribed.

3     I think -- and this is one of the things I talk about,

4     is that we needed more education for our physicians to

5     prescribe less, to be able to treat pain better without

6     the use of opioids.  It's one of the things I advocate

7     for a lot.

8          One of the problems with the overprescription

9     of opioids is the insurance coverage.  Insurance

10    coverage will cover opioids, but they won't cover

11    physical therapy.  They won't cover massage.  They

12    won't cover a lot of things that are better treatment

13    for pain.  And it's much easier to get an opioid

14    prescription than it is any of these other treatments

15    that work better.

16    BY MR. BILEK:

17         Q.  You would agree that one -- I mean, first of

18    all, have you done any investigation or studies with

19    linking the fact that the opioid -- increased opioid

20    use is directly linked to the increased number of

21    opioid prescriptions over the last 20 years?

22         A.  I'm sorry, could you repeat that question.

23         Q.  I was asking whether you have done any

24    investigations on whether or not the increase of opioid

25    use in our country is linked to the increase of -- of

Page 25

1   opioid prescriptions being written?

2       A.  So you are saying the -- you are asking me if

3   the increase in the amount of opioids used is because

4   of the increase in prescriptions; is that what you are

5   asking?

6       Q.  As one of the reasons for it -- the increased

7   prescriptions.

8       A.  Okay.  One of --

9           MS. FUJIMOTO:  Object.  Form.

10          THE WITNESS:  So your -- I would say that

11  definitely, there was an increase in prescription --

12  prescriptions written, which therefore would increase

13  the amount of opioids being used; that is a correct

14  statement.  Whether that increase is directly

15  responsible for the entirety of this epidemic, as you

16  call it, there is many other factors leading to this

17  besides just prescriptions.

18  BY MR. BILEK:

19      Q.  The issue that I'm just asking, is it -- is it

20  one of the factors that is in part the cause?

21          MS. FUJIMOTO:  Object to form.

22          THE WITNESS:  Increased prescriptions will

23  definitely increase the amount of opioids around,

24  definitely.  And there is -- you know, nobody is

25  arguing that there was an increase in prescriptions

Page 26

1   written.  There are many reasons for that, and looking

2   in hindsight, we can say that was probably not the

3   wisest thing.

4           And again, I lecture and I talk about how we

5   can do safer prescribing and decrease the amount of

6   opioids written.  But we also need to get insurance

7   companies to cover alternative treatments that don't

8   rely on opioids.

9   BY MR. BILEK:

10      Q.  With respect to women, is there anything that,

11  as far as unique issues, in your opinion, for women

12  being prescribed opioids, in that they may react

13  differently --

14          MS. FUJIMOTO:  Object.  Form.

15  BY MR. BILEK:

16      Q.  -- than to men?

17      A.  So for women being prescribed opioids, there

18  are several issues.  Women -- as several articles have

19  pointed out, women are prescribed opioids more often

20  for causes, and women also have a less tolerance for

21  opioids.  Does that mean that women should never be

22  prescribed opioids?  No.

23          And this is one of the things I talk about a

24  lot, is safe prescribing of opioids for women.  And,

25  you know, during pregnancy, there's very few other

Page  27

1    options that could be used for pain for women, because

2    the other alternatives are less safe.

3            We always do a risk/benefit analysis whenever

4    we prescribe any medication during pregnancy.  And so,

5    you know, the risk of undertreated pain is -- is

6    possibly worse than the risk of the pain medication.

7            So, yes, there's always considerations for

8    women being prescribed medications.

9        Q.  Well, you would agree for whatever reason,

10   women seem to have -- to become more likely to become

11   addicted to opioids than men; is that correct?

12           MS. FUJIMOTO:  Object.  Form.

13           THE WITNESS:  Women tend to become more -- they

14   have a telescoping effect, so that any substance that

15   is used by women and misused has a greater propensity

16   to cause a use disorder.  So even alcohol, if women use

17   alcohol, they are more likely to develop a use disorder

18   earlier in the course of their treatment.

19           So it's not just with opioids.  And I don't

20   think there's any -- we know that women, you know, at

21   smaller doses, because they have smaller body mass,

22   tolerate less.  And so it's not that it's specifically

23   more addicting, it's women in general, if they are to

24   become addicted, become addicted sooner to any

25   substance, not just opioids.

```
                                                   Page 28
```

1   BY MR. BILEK:

2        Q.   The -- so the point is, you'd agree that there

3   are special issues in prescribing women opioids,

4   correct?

5             MS. FUJIMOTO:  Object to form.

6             THE WITNESS:  Again, there are special issues

7   about prescribing any medications to women.  It's not

8   specific to opioids.  And, you know, a lot of studies

9   haven't been done on women because of the risk of --

10  that they may become pregnant.  So we don't know a lot

11  of the differential effects of a lot of medications in

12  women and in women during pregnancy, because they

13  haven't been studied before in that particular case.

14            So, say, blood pressure medications, we don't

15  know that they work differently for women.  There is

16  some evidence that opioids maybe need to be prescribed

17  differently; there's some evidence that it doesn't.

18            So to say that there are special issues is not

19  entirely correct.

20  BY MR. BILEK:

21       Q.   Would you agree that there needs to be more

22  studies on prescribing women opioids while they are

23  pregnant?

24       A.   I don't think --

25            MS. FUJIMOTO:  Object.  Form.

1  limited period of time, and trying to reduce the dose

2  or anything like that; is there any type of guideline

3  that you follow in your practice?

4          MS. FUJIMOTO:  Object.  Form.

5          THE WITNESS:  Again, if it's, you know, an

6  acute -- treating an acute pain condition, there is the

7  CDC guidelines for the treatment of acute pain and

8  acute postoperative pain.  And, yeah, I've actually

9  given lectures on guidelines to treat postoperative

10  pain and post C-section pain, looking at the amount of

11  requirements while the woman is in the hospital and

12  tailoring it to that.

13          So there's no -- I mean, it's very

14  woman-centered and what she is requiring.  So some

15  women need no medications and some women need more.

16          So, yes, there are guidelines, and those are

17  the ones that I follow.

18  BY MR. BILEK:

19     Q.  What about for chronic pain, what's your

20  procedure for prescribing opioids for chronic pain?

21          MS. FUJIMOTO:  Object.  Form.

22          THE WITNESS:  So the -- I -- the chronic pain

23  that I treat are the ones that I inherit when they

24  become pregnant.  I don't start anybody on opioids for

25  chronic pain.  Generally, I will keep them on what they

1          Also encourage breast feeding and other rooming

2     in and advocating for themselves to help prevent NAS.

3          Q.   Why do you -- why do you explain the risks of

4     having NAS to women that are being prescribed opioid

5     prescriptions?

6          A.   Well, NAS is a risk --

7               MS. FUJIMOTO:  Objection.  Form.

8               THE WITNESS:  NAS is a risk of a woman taking

9     opioids during pregnancy.  You know, approximately 50

10    to 60 percent of babies will have some degree of NAS.

11    Not all of them will require treatment.  And so women

12    need to know this risk so that they can be prepared,

13    and also be able to advocate for themselves so that

14    they can be allowed to room in, so they can get

15    prepared to breast feed, which helps reduce the risk.

16          I talk to them about smoking cessation, which

17    reduces the risk of having a baby with NAS.  And a lot

18    of women already know these risks and are very afraid

19    of these risks.  And so sometimes, it's really a matter

20    of debunking some of their -- not debunking, but

21    allaying some of their fears, and really educating them

22    about what the treatment looks like and what they can

23    expect.

24    BY MR. BILEK:

25          Q.   When you talk about the "treatment," are you

```
                                            Page 49
```

1  BY MR. BILEK:

2      Q.  Dr. Wright, do you agree that the physicians

3  and the users are the ones that are the cause of the

4  opioid epidemic in California?

5          MS. FUJIMOTO:  Object to form and foundation.

6          THE WITNESS:  Again, I don't think there's any

7  one person that is responsible for the opioid epidemic.

8  I think there's many causes.  I would say this article

9  looks bad on the surface, but I don't know the story

10  behind it, and I know that quotes can be taken out of

11  context, having been misquoted many times.

12          So until I know the whole story behind it, I'm

13  not going to form an opinion one way or the other.

14  BY MR. BILEK:

15      Q.  Well, let's just say that -- let's put the

16  article aside.  Let's say McKesson in the litigation is

17  taking the position that the users and physicians are

18  the ones responsible for the opioid epidemic.

19          Would you agree that that is a fair statement?

20      A.  I would not.

21          MS. FUJIMOTO:  Objection to form.

22          THE WITNESS:  Again, I'm not familiar with the

23  background behind this.  I would not agree that the

24  users are responsible entirely for their -- the

25  epidemic.  And I would not agree that the physicians

Page 50

1   are responsible entirely for the epidemic.  I think

2   there are many causes, going back, you know, 20 years

3   or more, including, you know, the hospital systems and

4   everything else.

5           To say that, you know, McKesson would be

6   directly responsible for syringes on the street, I can

7   see why they would say that.  But again, this kind of

8   article does blame the victims to some extent.  But

9   again, I don't know the story behind it.

10  BY MR. BILEK:

11      Q.  But certainly, as you as being involved in

12  addiction medicine, you would not lay the primary blame

13  on physicians and the users of the opioid epidemic,

14  would you?

15          MS. FUJIMOTO:  Object.  Form.  Asked and

16  answered.

17          THE WITNESS:  Again, I -- agreed.  I told you

18  that -- I answered that question already, that I do not

19  believe that users and physicians are completely

20  responsible for the epidemic.  And I wouldn't call them

21  users because that's very stigmatizing language.

22          People who use drugs are -- they are victims,

23  not causes.

24  BY MR. BILEK:

25      Q.  Well, McKesson -- have you done any

Page 54

1      Q.  Well, one of the issues on prescriptions now is

2   that they made a law that you have to show an ID to get

3   a opioid prescription, right, in California?

4           MS. FUJIMOTO:  Object to form.

5           THE WITNESS:  That's been the issue -- I mean,

6   that's been the reality since I've been practicing

7   medicine, so I don't know --

8   BY MR. BILEK:

9      Q.  This issue of trying to control the number of

10  prescriptions being written, you would agree that the

11  states have been trying to prevent the number or lower

12  the number of prescriptions for opioids; would you

13  agree with that?

14     A.  I have seen -- or I have heard of having limits

15  in certain areas of the amount of opioids given to

16  pharmacists from the states, and I have seen actually

17  that causing harm to patients.

18           As far as requiring an identification to pick

19  up an opioid, that is to prevent the wrong person from

20  picking up the opioid and, you know, diverting it to

21  another use.

22     Q.  Well, diversion of opioid prescriptions is a

23  huge problem, right?

24           MS. FUJIMOTO:  Object to form.

25           THE WITNESS:  Again, there are -- there are

Page 55

1    issues with diversion in many, many areas.  So, yes,

2    that can be a large problem if opioids are -- if

3    there's an excess of opioids prescribed, that they can

4    be sold or given to others without a prescription.

5    BY MR. BILEK:

6        Q.  Now, just -- before you took this case as an

7    expert, did you do any investigation at all of

8    McKesson's role in this opioid epidemic?

9            MS. FUJIMOTO:  Object to form.  Asked and

10   answered.

11           THE WITNESS:  When I took this case, I looked

12   into the role of a drug distributor.  But again, I'm

13   not a lawyer, so I'm not sure, you know, exactly what

14   the allegations and whether they have merit.  I

15   looked -- I know -- you know, somewhat familiar with

16   the distribution system just from the physician's point

17   of view, and so I am looking at it from a physician's

18   point of view and not from a lawyer's point of view.

19   BY MR. BILEK:

20       Q.  Well, I'm asking you from a physician's point

21   of view.  Did you look into it, at the physician's

22   point of view, any of the distributors' role in the

23   opioid epidemic?

24           MS. FUJIMOTO:  Object to form.  Asked and

25   answered.

1   by certain manufacturers that -- again, not -- sorry, I

2   lost my train of thought.

3          The role of the opioid manufacturers, yeah,

4   just from reading some lay articles on -- you know,

5   some of the manufacturers' marketing to physicians and

6   using, you know, the (inaudible) half-page article and

7   things like that to justify prescribing medications;

8   whereas, you know, before pain was probably

9   undertreated, we've now gone to overtreating pain, and

10  so -- or not treating pain appropriately, I should say,

11  by using multimodal pain relief and other options.

12         MS. FUJIMOTO:  And, Tom, whenever -- whenever a

13  break time is good, subject matter-wise, let's do that,

14  because we've been going probably almost an hour and a

15  half.

16  BY MR. BILEK:

17     Q.  Okay.  So marketing activities to doctors by

18  opioid manufacturers, have you seen any of -- have you

19  personally been marketed to by any opioid

20  manufacturers?

21     A.  I have not.  I've heard the stories, but I have

22  not.  I work for academia, and even before then, when I

23  was in private practice, I did not have any interaction

24  with opioid manufacturers.

25     Q.  The -- did you -- have you ever been taken to

1    lunch or had any other payment from a pharmaceutical

2    company other than the expert payments in this case?

3        A.   Well, because I've been practicing for 20

4    years, back when I was in private practice, there

5    was -- before there was rules against it, we definitely

6    had lunches provided by different, you know, drug

7    companies, usually providing education and pens and

8    other trinkets.  I have not since that became outlawed,

9    and especially since becoming an academic physician.

10       Q.   Do you have any understanding of why that

11   practice isn't going on anymore?

12            MS. FUJIMOTO:  Object.  Form.  Outside scope.

13            THE WITNESS:  My understanding is that any time

14   there could be a conflict of interest, and that when --

15   even something as small as a pen can influence

16   prescribing behavior.

17            MR. BILEK:  We can take a break right now.

18            Take about five, ten minutes?

19            THE WITNESS:  Great.  Thank you.

20            MS. FUJIMOTO:  Sounds good.

21       (Break taken.)

22   BY MR. BILEK:

23       Q.   The issue of long-term health effects on

24   children born with NAS, if the studies showed that

25   there are 24 saying that there is an association of

Page 66

1    scientific conclusion?

2           MS. FUJIMOTO:  Object to form.

3           THE WITNESS:  Again, it was, you know, a

4    limited conclusion as far as that particular population

5    in that particular area, yes.

6           I drew that conclusion based on that data.

7    BY MR. BILEK:

8       Q.  Now, in your methamphetamine studies, you tried

9    to look at this issue of trying to figure out the

10   confounders, as we have discussed, correct?

11      A.  I did my best to try and control for some of

12   those confounders, correct.

13      Q.  What did you do to control for those

14   confounders?

15      A.  I had a control group that was from the same

16   clinic population, and so I tried to control for just

17   the exposure to methamphetamines.  Again found it hard,

18   because, as mentioned in the paper, the limitations did

19   not control for birth weight or weight gain during

20   pregnancy, so could not control for maternal nutrition.

21   And, you know, did the best I could with the

22   information that I had, but cannot control for every

23   confounder.

24          You know, human studies are extremely

25   difficult.  So it's hard to draw conclusions from one

Page 67

1  human study; that's why we look at the preponderance of

2  data over many, many studies.

3      Q.  Many, many studies.  Also, as you said, on how

4  the studies are run and what they are trying to control

5  for, correct?

6      A.  Correct.  We're trying to -- yes.

7      Q.  And, now, with the studies on -- long-term

8  studies on NAS children, have you done an analysis of

9  those studies to see how many people were in the

10  studies and what they controlled for?

11          MS. FUJIMOTO:  Object to form.

12          THE WITNESS:  I've read review articles that

13  have looked at this and looked at the various things,

14  and every time I look at a study, I look at the data

15  and I look at the confounding -- I look for what they

16  look for, I look for their statistical significance,

17  and I read through their limitations.

18  BY MR. BILEK:

19      Q.  So are you saying that there is no -- that as

20  to your opinion, there is no evidence of long-term

21  problems of children being born with NAS, or is this

22  something that you don't agree with the evidence in

23  which studies have found that there are long-term

24  problems from children born with NAS?

25          MS. FUJIMOTO:  Object.  Form.

1     THE WITNESS:  The studies that I've looked at,

2   that I have controlled for as many factors as I can and

3   actually have a good analysis have shown no long-term

4   effects.  Some of the studies that have shown long-term

5   effects are earlier studies and poorly designed

6   studies.  So the preponderance -- I don't look at just

7   one study.  The preponderance of the evidence shows

8   that there are no long-term effects from opioid

9   exposure.

10  BY MR. BILEK:

11     Q.  So in your opinion, the studies that are out

12  there, you are saying that the more recent studies are

13  the ones that show that there are no long-term effects?

14     A.  No, I just said that some of the studies that

15  showed that there were long-term effects were some of

16  the earlier studies.  Some of the more recent studies

17  and some of the studies that did a good job of

18  controlling for the confounders showed no long-term

19  effects.

20     Q.  Okay.  What studies are you relying on that say

21  that there are no long-term effects?

22     A.  The studies noted in my report.

23     Q.  Let's turn to your report.  And if you could

24  just tell me which studies you are relying on.

25     MS. FUJIMOTO:  Tom, that's Exhibit 2, right?

                                                          Page 69

1          THE WITNESS:  Yeah, I'm looking through -- off
2     the top of my head, I'm trying to remember.  I know the
3     Ecker study talks a lot about the long-term effects,
4     and the -- the meta-analysis talks about the different
5     studies throughout that.
6     BY MR. BILEK:
7          Q.  Okay.  So we got the Ecker study that is
8     "Substance Use Disorders in Pregnancy:  Clinical,
9     Ethical, and Research Comparatives of the Opioid
10    Epidemic."
11         A.  That's one of them, and the Merhar study.
12         Q.  I'm sorry, I didn't understand you.
13         A.  The Merhar, "Retrospective" --
14         Q.  So we're talking about Merhar study,
15    "Retrospective Review of Neurodevelopmental Outcomes in
16    Infants Treated for Neonatal Abstinence Syndrome"?
17         A.  I believe so, yeah.
18             Like I said, it's a synthesis of all the
19    information and all of the studies that I've read over
20    the last 15 years in regards to neonatal withdrawal.
21             So it's these studies, and then the other
22    studies that I've -- Baldacchino, Alex,
23    "Neurobehavioral" --
24         Q.  I'm sorry, I'm not understanding you.
25         A.  The Baldacchino study.

Page 70

1      Q.   What?

2      A.   Baldacchino study.  B-A-L-D-A-C -- Baldacchino.

3      Q.   Baldacchino, "Neurobehavioral Consequences of

4   Chronic Intrauterine Opioid Exposures in Infants and

5   Preschool Children:  A Systematic Review and

6   Meta-Analysis."

7           Is that the one you are referring to?

8      A.   Yeah.

9      Q.   Okay.  So we identified three that you are

10  relying on.  Any others?

11     A.   I'm sure there's more.  I'm just -- without

12  having to go into the articles, it's been a while since

13  I've written this report, so not sure exactly which

14  ones support that, without going into the articles

15  themselves.

16     Q.   Well, you understand this is an important point

17  in this litigation, right?

18     A.   Yes, I understand that's an important point in

19  this litigation, and what I'm saying is, there's no one

20  article that I point to -- there's no smoking gun when

21  it comes to any literature.  It's always a synthesis of

22  all of the different literature out there.

23     Q.   Uh-huh.

24          So -- now, have you looked at the -- the -- the

25  study that was -- the meta-analysis that was done in

Page 73

1    sounds familiar.

2         Q.  Okay.  Well, let's -- if you'll pull up

3    Exhibit 19, please.

4             MR. BILEK:  Court Reporter, if you could hand

5    her Exhibit 19.

6             MS. FUJIMOTO:  Okay.  I've got it, Tom, too.

7             (Plaintiffs' Exhibit No. 19 Marked for

8              Identification.)

9    BY MR. BILEK:

10        Q.  Have you reviewed this study?

11        A.  This is not one of the ones that I've reviewed

12   lately.  I might have seen it last year.

13            You said 2019?  Yeah.

14        Q.  Is this report something that you would like to

15   review in connection with trying to determine whether

16   there's no evidence of long-term problems?

17            MS. FUJIMOTO:  (Inaudible).

18            THE WITNESS:  This is something I would take

19   into consideration.

20            Sorry.  What did you say?

21            THE REPORTER:  I didn't get the objection.

22            MS. FUJIMOTO:  Object to form.

23   BY MR. BILEK:

24        Q.  So one of the issues -- well, do you find

25   meta-analysis persuasive in trying to figure out

Page 74

1   whether things are caused?

2          MS. FUJIMOTO:  Object to form.

3          THE WITNESS:  I review meta-analysis just as I

4   would any other piece of the medical literature.  I

5   would look at the strengths and weaknesses.  I would

6   need to know if it was following the guidelines for

7   doing a meta-analysis.  And it has to do also with

8   the -- which it looks like this one does -- it also has

9   to do with the underlying studies and the quality of

10  those studies.  A meta-analysis of poorly designed

11  studies doesn't give you any more information.

12         So the whole point of a meta-analysis is to

13  take something with small amounts of studies and pool

14  them together.  But if the studies themselves are

15  poorly designed, it's impossible to make any sort of

16  conclusion with a meta-analysis.

17  BY MR. BILEK:

18     Q.  Do you recall ever making any type of critical

19  analysis of this study, on trying to find out whether

20  this is evidence or not evidence of long-term health

21  problems resulting from a child born with NAS?

22     A.  I have not looked at this particular article

23  other than probably just glancing through it.

24     Q.  Now, one of the things that I would like to ask

25  you about is in this study on "Introduction," so if

Page 77

1    of women were using opioids during pregnancy is a

2    stretch.

3         Q.  Okay.  How about 20 percent of

4    Medicaid-eligible women, do you think there's some

5    science to that?

6         A.  There was one --

7              MS. FUJIMOTO:  Object to form.

8              THE WITNESS:  There was one study that showed

9    that 20 percent of Medicaid women did receive an opioid

10   prescription.  Did not say whether they took that

11   opioid prescription.  Did not say that they even filled

12   that opioid prescription they were given.  And it

13   didn't say the indications for the opioid prescription.

14             So it's hard to draw any conclusions from one

15   study.

16   BY MR. BILEK:

17        Q.  But wasn't that Medicaid study based upon

18   Medicaid payments, Doctor?

19             MS. FUJIMOTO:  Object to form.

20             THE WITNESS:  Again, sorry, it might have been.

21   I'm only looking at the title of the study.

22             It might have been.

23   BY MR. BILEK:

24        Q.  Right.  So this issue -- the prescriptions were

25   certainly -- the drug companies were receiving the

Page 80

1    written in this -- in this report.  My report is on

2    the -- the necessary treatment of both chronic pain and

3    addiction and -- with opioids during pregnancy, and the

4    lack of literature supporting long-term effects of

5    opioid use.

6    BY MR. BILEK:

7        Q.  Well, is it fair to say that you have no

8    opinion?

9        A.  I have lots of opinions, but, you know, again,

10   this is a hypothetical opinion, and that's not what

11   this -- in my understanding, what the purpose of this

12   proceeding is for.

13       Q.  Well, I'm sorry, Doctor, but as your lawyer

14   will tell you, you get to answer questions and I get to

15   ask them.  And you can either say "I don't have an

16   opinion," "I have an opinion," or -- and if you do have

17   an opinion, I'm entitled to know what it is.

18           MS. FUJIMOTO:  She answered your question,

19   Counsel.

20           Do you have another one?

21           MR. BILEK:  No, she did not.  She said, I am

22   not going to answer the question, and I'm asking, do

23   you have an opinion?

24           THE WITNESS:  I said it's a hypothetical

25   question, and I answered the question.

Page 88

1    other sorts of risks like that.

2            One -- there is a risk of any medication -- you

3    know, there's -- a lot of medications can be misused.

4    A lot of medications can lead to substance dependence,

5    and by that I mean physical dependence.  And then there

6    is the risk of developing a substance use disorder.

7    But that again is a risk of a medication, and then you

8    have to weigh it against the benefits of that

9    medication and any alternatives that exist.

10       Q.  Generally, though, I mean, you would agree one

11   of the risks of an opioid prescription is addiction,

12   right?

13           MS. FUJIMOTO:  Object.  Form.

14           THE WITNESS:  In certain populations, they can

15   develop an opioid use disorder if the medication is

16   taken.

17   BY MR. BILEK:

18       Q.  One of the risks of an opioid prescription is

19   overdose?

20       A.  Again, if it is outside the therapeutic window,

21   it can cause respiratory depression and overdose if --

22   if the patient takes too much.

23       Q.  And one of the risks is an NAS child?

24           MS. FUJIMOTO:  Object.  Form.

25           THE WITNESS:  One of the risks of taking

Page 89

1   opioids during pregnancy is having a baby with NAS,
2   correct.
3   BY MR. BILEK:
4       Q.  Now, Fentanyl, do you think that prescriptions
5   for Fentanyl should be given to women that are
6   pregnant?
7           MS. FUJIMOTO:  Object.  Form.
8           THE WITNESS:  Well, we don't give prescriptions
9   for Fentanyl.  It's not something that's prescribed
10  outside of the hospital.  We give it to pregnant women
11  when they are in labor to treat labor pains, and I
12  think that is a very appropriate order given in the
13  hospital for the treatment of acute pain.
14  BY MR. BILEK:
15      Q.  Well, what about this issue of -- have you seen
16  any evidence in your addiction practice of Fentanyl
17  prescriptions being abused?
18          MS. FUJIMOTO:  Object.  Form.
19          THE WITNESS:  No, I have not seen Fentanyl
20  prescriptions being abused.  I have seen street --
21  patients using Fentanyl-contaminated heroin products
22  that they did not know were existing or have actually
23  sought out Fentanyl illicitly that is imported from
24  China.  But I have not seen abuse of Fentanyl
25  prescriptions.

1   one, right, and there's no others?

2          MS. FUJIMOTO:  Object to form.

3          THE WITNESS:  I'm not -- I'm not a specialist

4   in the treatment of pain, but I do treat pregnant women

5   with pain.  And I know that there are very few other

6   alternative medications that can be used during

7   pregnancy that are more safe than opioids.

8          Again, it's a risk/benefit, and we look at the

9   risk of neonatal abstinence versus the risk of

10  uncontrolled pain.  And the other medications that are

11  generally used to treat chronic pain can cause neonatal

12  abstinence also.

13  BY MR. BILEK:

14     Q.  What other medications are you referring to

15  that cause NAS besides -- that are prescribed to

16  pregnant women?

17     A.  So Gabapentin for one can worsen the effects of

18  NAS, and that is often used.  Duloxetine is often used

19  for chronic pain, and it is an SNRI, and also can

20  worsen NAS symptoms.  Lyrica or pregabalin is another

21  medication used for chronic pain.  Nonsteroidal

22  anti-inflammatories are contraindicated in pregnancy.

23  They can cause premature closure of the ductus

24  arteriosus and can cause hemorrhage during pregnancy,

25  so you can't use it in the first and third trimester.

1      Q.  Now, the -- the issue of -- do you think that

2   the treatment for long-term chronic pain during

3   pregnancy, that using opioids should be discouraged?

4            MS. FUJIMOTO:  Object to form.

5            THE WITNESS:  Again, I don't -- I don't start

6   women on opioids for chronic pain.  I continue them on

7   it when it's been started before.  We can argue that --

8   you know, whether or not opioids for the treatment of

9   chronic pain is appropriate or not.  I am inheriting

10  women who have been on them, and it's sometimes the

11  safest way -- reason to keep them on it.

12  BY MR. BILEK:

13     Q.  Would you agree that you are not an expert on

14  treatment for long-term pain of women?

15           MS. FUJIMOTO:  Object.

16           THE WITNESS:  I would agree that I am not a

17  pain specialist, but I do treat chronic pain in women.

18  And I treat chronic pain in women who have developed

19  substance use disorders, and I've treated chronic pain

20  in pregnant women.  And so I have seen the medications

21  that are used to treat chronic pain, and I have seen --

22  and I have continued women on those medications, and I

23  have also switched women from other opioids on to

24  buprenorphine for the treatment of chronic pain.

25           MR. BILEK:  Let's go to Exhibit 9, please.

Page 95

1    reviewing and treating -- for treating physicians in

2    your field?

3              MS. FUJIMOTO:  Object.  Form.

4              THE WITNESS:  It is something that I would

5    definitely look at.  I just joined pain the control

6    committee at my hospital, so it's something definitely

7    that I would look into as I am developing those

8    guidelines.

9              The Department of Defense and the VA is a very

10   different situation than the one I work in, however, so

11   they would need to be adapted.

12   BY MR. BILEK:

13        Q.  So going to -- going to page 930.

14        A.  930?  Okay.

15        Q.  It says, "A, we recommend against initiation of

16   long-term opioid therapy for chronic pain.  Strongly

17   against."

18              Do you disagree with the statement by the

19   Department of Defense on that you should be -- that

20   they are probably against it?

21              MS. FUJIMOTO:  Object to form and scope.

22              THE WITNESS:  Again, I do not initiate opioids

23   for the treatment of chronic pain.  I only take care of

24   women who have previously been on opioids for the

25   treatment of chronic pain.

Page 96

1          So this is not in the scope of my practice.
2    BY MR. BILEK:
3        Q.   Let's go to maybe something that is strong.
4          Okay.  So would it be fair to state, as far as
5    initiation of long-term opioid therapy, that is not
6    something that you are involved in; your position is
7    continuing while they are pregnant?
8        A.   If it is indicated and they are not wanting or
9    able to taper off, then that is the -- my role is to
10   continue medications that they have already been on or
11   switching them to buprenorphine as a safer alternative.
12       Q.   So -- so going to page 934, where you are, a
13   continuation, if you look up "Dose, Follow-Up, and
14   Taper of Opioids," could you read, "If prescribing
15   opioids," and then "Note," read both of those.
16       A.   "Dose, Follow-Up, and Taper," okay.
17   "Recommendation 10:  If prescribing opioids, we
18   recommend prescribing the lowest dose of opioids as
19   indicated by patient-specific risks and benefits.
20   Strong for."
21       Q.   And that "Note:  There's no absolutely safe
22   dose of opioids."
23          Do you as a clinician agree with these
24   statements?
25       A.   I think I already --

1          MS. FUJIMOTO:  Object to form.

2          THE WITNESS:  I think I already said that

3     our -- one of our tenets of all areas of medicine is to

4     prescribe the lowest dose that's effective for the

5     condition needed and for the shortest amount of time.

6     BY MR. BILEK:

7          Q.  And then what about that there's no absolute

8     low dose of opioids, do you agree or disagree with

9     that?

10         A.  Well, I think there can be.  I think it depends

11    on the patient situation and concurring use of other

12    medications and other drugs.  So there have been

13    adverse effects with any drug at low dose, so I

14    think -- I can't disagree with there is absolute --

15    there is no absolute safety in walking outside.

16         Q.  Well, if there is no safe dose for opioids,

17    isn't that a situation that -- do you think there's a

18    safe dose for a fetus for -- during pregnancy of opioid

19    exposure?

20         MS. FUJIMOTO:  Object to form.  Foundation.

21         THE WITNESS:  Again, as we talked about, any

22    time we give any kind of medication during pregnancy,

23    it's a risk and a benefit.  And as I just stated,

24    there's a risk to everything, including walking outside

25    you can get hit by a car.  Does that mean you don't go

1   children.  So just looking at them specifically and

2   calling them NAS kids serves to completely stigmatize

3   them and could cause long-term effects that are worse

4   than the effects of the -- theoretical effects of the

5   drugs themselves.

6       Q.  Now, what about like school lunches, right?  We

7   provide school lunches for kids.

8           We should not provide food for children?

9           MS. FUJIMOTO:  Object to form.  Foundation.

10  Relevance.

11          THE WITNESS:  Yeah, again, I'm not seeing the

12  relevance to this.  I think -- I think we should

13  provide school lunches to any child that needs school

14  lunches.  And I think we should provide developmentally

15  appropriate pediatric care to any child that needs it.

16          I'm saying we're not supposed to -- we're not

17  supposed to.

18          We're not -- it does not behoove us to separate

19  one group of children out just because of an exposure

20  when they may or may not need those services.  I think

21  all children need a developmentally appropriate child

22  care, and I think all children deserve to be fed.

23  BY MR. BILEK:

24      Q.  What about health care, don't you think all

25  children deserve to have health care?

Page 102

1   that is a Medicaid payment that is to poor children.
2   Isn't it true that poor people are getting stigmatized
3   by a lot of different things?
4           MS. FUJIMOTO:  Object to form.  Foundation.
5           THE WITNESS:  I think there -- I think you are
6   confounding -- I think all children getting healthcare
7   does not have anything to do with singling out a
8   specific group and labeling them as children deserving
9   of special care.  I think providing child care --
10  providing healthcare to all children, to provide food
11  to all children regardless of their ability to pay or
12  not, yes, children can get stigmatized -- people can
13  get stigmatized when they go to the grocery store and
14  have to use their SNAP benefits.
15          That's why they have gone to using more of a
16  debit card as opposed to -- that doesn't look any
17  different, as opposed to, you know, food stamps, which
18  is what they had when I was growing up.
19          So there is a way that care can be provided in
20  a nonstigmatizing manner.
21  BY MR. BILEK:
22      Q.  Well, don't you think that there could be
23  lifelines, that health care could be provided to these
24  children that are born with NAS in a nonstigmatizing
25  manner?

                                        Page 111

1    for women's rights to take drugs during pregnancy;

2    that's what you advocate for?

3         A.   I advocate --

4              MS. FUJIMOTO:  Objection.  Foundation.  Scope.

5              Go ahead.

6              THE WITNESS:  I advocate for the compassionate

7    care of women who have a medical condition who -- of

8    addiction who take drugs during pregnancy and have

9    possible complications resulting from that.

10   BY MR. BILEK:

11        Q.   And you think that women should be given --

12   that they have the right to take opioid prescriptions

13   regardless of what the harm is to the fetus, right?

14        A.   I have -- I have the opinion that women should

15   be treated appropriately for either chronic acute pain

16   with opioids during pregnancy, if that is deemed the

17   right thing and the appropriate medical treatment.  And

18   also, women should be treated appropriately with

19   medication for the treatment of opioid use disorder

20   during pregnancy, as it leads to better outcomes for

21   both the mother and the infant.

22        Q.   But you advocate on behalf of a woman's rights

23   to take opioids during pregnancy, right?

24              MS. FUJIMOTO:  Object to form.

25              THE WITNESS:  I advocate for the appropriate

1  like the crack cocaine babies in the '80s, we are

2  victimizing them.  We are separating them.  We are

3  stigmatizing them.  So if we are calling them victims,

4  we are then also calling their mothers the -- harmful,

5  which is against the whole idea of motherhood and is

6  anathema to motherhood.  So we can't have babies being

7  victims without having mothers being a perpetrator is

8  the point of that statement.

9        (Discussion off the record.)

10 BY MR. BILEK:

11      Q.  Do you have any opinion in this case of whether

12 the guardians are bringing any claims to this lawsuit

13 that -- in which they are arguing that the birth

14 mothers are perpetrators of anything, done anything

15 wrong?

16      A.  I'm not familiar with that.

17      Q.  What is the relief you think -- what is your

18 understanding of what the relief that's being sought in

19 this litigation?

20      A.  I don't have an understanding of the

21 complexities of this lawsuit.  I was asked to render an

22 opinion on the causes and -- of NAS.

23      Q.  The causes -- you were offering an opinion on

24 the causes of NAS; is that what your scope is?

25      A.  Well, the scope is what is said in my report.

Page 118

1   I don't have any opinion about the relief that is -- my
2   understanding of the relief that is being set.
3       Q.  What was the understanding of why you are
4   offering this opinion?
5       A.  Well, my understanding --
6           MS. FUJIMOTO:  Object to form.
7           THE WITNESS:  -- of what I was offering is the
8   understanding of the idea of a class suit, and saying
9   that all women that use opioids are a single class.
10  BY MR. BILEK:
11      Q.  Well, that's your understanding of what the
12  suit is?
13      A.  That's my understanding of what the suit is.
14      Q.  Let's talk about your maternal consultation
15  during pregnancy.  I know we touched on this type of
16  thing before, but I want to be more specific.
17          What types of behavior do you advise pregnant
18  women to avoid?
19          MS. FUJIMOTO:  Object to form.
20          THE WITNESS:  I advise pregnant women to avoid
21  things that would cause them harm during pregnancy,
22  such as horseback riding, scuba diving.  You know,
23  things that could cause them to be injured.
24  BY MR. BILEK:
25      Q.  Okay.  Do you discourage them from the use of

Page 129

1   lives?

2           MS. FUJIMOTO:  Object to form.

3           THE WITNESS:  That's -- I'm not going

4   without -- sorry.

5           That is one thing, that sometimes it is

6   lifelong treatment, and sometimes women need just

7   temporary treatment.  What I usually counsel women is

8   to stay on their opioid replacement for at least a year

9   postpartum.  And sometimes it is lifelong, and women do

10  much better.

11          We know with opioid use disorders that have

12  been on methadone, there are some people that are on

13  methadone for long periods of time, and they do much

14  better when they are on it, just like people need to be

15  on insulin for the rest of their lives.

16  BY MR. BILEK:

17      Q.  So what you are saying, just to be clear, is

18  that for these women that are addicted to opioids --

19  the rest of their lives?

20      A.  We lost you.

21          MS. FUJIMOTO:  Object to form.

22          THE WITNESS:  We lost you.

23          Could you restate that question, please?

24  BY MR. BILEK:

25      Q.  Yes, I can.