# EXHIBIT 7

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   _____
     IN RE NATIONAL PRESCRIPTION    : MDL No. 2804
 4                                  :
     OPIATE LITIGATION              :
 5                                  : Case No. 17-md-2804
     This document relates to       :
 6                                  : Judge Dan Aaron Polster
     Salmons v. Purdue Pharma       :
 7   L.P., et al.                   :
     MDL Case No. 1:18-op-45268;    :
 8                                  :
     Flanagan v. Purdue Pharma      :
 9   L.P., et al.                   :
     MDL Case No. 1:18-op-45405;    :
10                                  :
     Doyle v. Purdue Pharma L.P.,   :
11   et al.                         :
     MDL Case No. 1:18-op-46327     :
12
13
                       DEPOSITION OF
14
                  PRADEEP K. CHINTAGUNTA
15
                      March 9, 2020
16
                     Chicago, Illinois
17
18
19
20
21
22
23
24
```

Page 19

1      appropriate, inappropriate, whatever.
2                    The point that I'm trying to make
3      is that whatever marketing happened, to figure
4      out the effects of that marketing, you need to
5      do an individualized inquiry.  That's the extent
6      of my report.  And beyond that, I haven't
7      clearly studied all the issues, so I won't be
8      able to comment on that.
9   BY MR. BILEK:
10       Q.     Okay.  Well, we're just trying to get you
11  sitting here today and figure out what you did and
12  what you didn't, sir, okay?
13       A.     Absolutely.
14       Q.     And so it is fair to state you have no
15  opinions on the appropriateness of the marketing
16  activities of the opioid defendants in causing the
17  opioid crisis?
18       A.     That would be fair.
19       Q.     Do you think there's an opioid crisis in
20  this country right now?
21       A.     From what I read in -- in the press, it
22  is characterized as a crisis, and I have no reason to
23  believe otherwise.
24       Q.     Okay.  Now, the marketing activities that

Page 23

1  consumers?
2      A.    You know, I considered all the factors
3  that could have affected.  There could be other
4  factors beyond the ones I considered, and that's
5  precisely the reason why, as I point out in my
6  report, you need an individualized inquiry, because
7  we really don't know who was exposed to what, how
8  much of it they were exposed to and how often they
9  were exposed to it.
10     Q.    Well, this issue of -- let's -- let's
11 just be specific, though.  Answer my question.
12           You didn't consider any of the opioid
13 manufacturers direct marketing to consumers'
14 campaigns?
15     A.    Yeah, you bring up Facebook.  I certainly
16 did not -- I was not aware of that.  So, you know,
17 it's not -- I think it's not one of the factors that
18 I mentioned.
19     Q.    Okay.  What about direct marketing that
20 were common to all doctors were sent on Facebook?
21 Did you consider that?
22     A.    Do we know for a fact that all physicians
23 received this advertising?
24     Q.    Just asking you.  Did you consider their

Page 31

1       A.      I would agree.
2       Q.      Correct?  Right?
3       A.      I would agree.
4       Q.      They have special obligations, right?
5       A.      For sure.
6       Q.      One of the things is they have to -- they
7  have to put in -- they have some obligations -- your
8  understanding is they have some obligations to
9  control the way their product is being sold, correct?
10              MR. HENRY:  Object to form of the
11      question.
12              THE WITNESS:  My understanding is that
13      these are drugs classified into different
14      schedules, and depending upon which schedule
15      your drug falls under, there are some
16      requirements that you have to follow.
17 BY MR. BILEK:
18      Q.      Sure.  And the name of one of the acts is
19 the Controlled Substances Act, right?
20      A.      This I don't know.  I mean, I am not an
21 expert in the controlled substances.
22      Q.      You're not an expert.  You're holding
23 yourself out as an expert in marketing for opioid
24 manufacturing, right?

Page 32

1   A. Yeah, of pharmaceutical products.
2   Q. Of all pharmaceutical products.  And you
3   don't have any understanding of the -- what the
4   Controlled Substances Act, it would apply under -- do
5   you know whether it has any obligations as far
6   as -- well, strike that.
7        MR. HENRY:  Tom, I don't want you to
8     misrepresent what the Controlled Substances Act
9     is --
10        MR. BILEK:  You can talk when it's your
11     turn.  Right now, I don't need to hear --
12        MR. HENRY:  I'm talking with you because
13     I want to make sure that you're going to ask him
14     questions about it, you don't misrepresent what
15     the Act says.
16        MR. BILEK:  I don't need to hear a
17     lecture right now.
18   BY MR. BILEK:
19   Q. Okay.  So the issue of -- you don't know
20   any obligations, as far as opioid manufacturers, as
21   it relates to controlling the distribution of their
22   product?
23   A. The distribution of their product?
24   Q. Yes.

Page 35

1         MR. BILEK:  You let me know if we need
2     to, like, get rules on this.
3         MR. HENRY:  I'm fine.  If you want to
4     call him, call him.
5         MR. BILEK:  I will.  But the issue is are
6     you going to start limiting your objections to
7     "form" instead of speaking objections?
8         MR. HENRY:  My objections are
9     appropriately limited.
10        MR. BILEK:  Okay.  Well, we'll go on for
11    a while, and if we have to go somewhere else --
12        THE WITNESS:  I'm trying to answer your
13    question, but you'll have to be a bit more
14    specific.
15             If they're not saying anything to
16    anybody, how will I know what they said or did
17    not say, right?  Because you're saying -
18  BY MR. BILEK:
19    Q.    Well, I'm asking you that in marketing,
20  the issue is drug manufacturers have the obligation
21  in marketing to not omit to tell important material
22  information to the doctors, correct?
23        MR. HENRY:  Object to the form of the
24    question.

Page 36

1              THE WITNESS:  Yeah, in general, if you're
2       saying if there's important information, I would
3       say yeah, yes.
4   BY MR. BILEK:
5       Q.    And then if they failed to disclose
6   important information, that would apply to all the
7   doctors in the country, correct?
8              MR. HENRY:  Object to the form of the
9       question.
10             THE WITNESS:  I have no way of knowing
11      that.
12  BY MR. BILEK:
13      Q.    Well, just by definition, they did it,
14  they did it across the board.  They did not -- they
15  didn't tell every doctor what was important material
16  facts.
17      A.    Are you stipulating that somehow that
18  that's -- you know that that's what they did or did
19  not do?
20  BY MR. BILEK:
21      Q.    Yeah, I am.  Assume the evidence shows --
22      A.    Okay.
23      Q.    -- shows that the drug manufacturers
24  omitted to tell material facts to the doctors.

Page 45

1            THE WITNESS:  Yeah, the ultimate
2      objective would be to increase prescriptions.
3                But, importantly, the idea is to
4      communicate information to physicians as well,
5      right?
6   BY MR. BILEK:
7      Q.    Right.  And what's important is for that
8   information that's being conveyed to physicians to be
9   truthful, correct?
10     A.    Sure.
11     Q.    Not to omit material information to the
12  doctors, right?
13     A.    Sure.
14     Q.    And do you have any -- any -- these
15  payments, have you done any investigation whether
16  these caused a conflict of interest with the doctors?
17     A.    No, I have not.
18     Q.    Going to the next page, on the right-hand
19  paragraph:
20             There was a statistically significant
21  association per capita opioid-related industry
22  payments and per capita opioid-related deaths by
23  county.
24             Do you see that?

Page 46

1      A.    Yeah.
2      Q.    An increase in $10,000 opioid-related
3  industry payments for -- for 100,000 population was
4  associated with an increase of .89 opioid-related
5  deaths per 100,000 population.
6            Do you see that?
7      A.    Yes.  The keyword here is "associated."
8  It's not caused.
9      Q.    So this issue is that we're seeing an
10 association between the number of money spent and
11 number of opioid deaths, correct?
12     A.    Yes.  But the association, again, I want
13 to emphasize is not causation.
14     Q.    We're going to get to more.
15     A.    Okay, sure.  I'm just reacting to what
16 you're showing me.
17     Q.    Right.  I understand your position.
18           But one of the things is, in rendering
19 your report, you didn't even look at this issue of
20 payments to physicians with regard to what
21 was -- whether that was increasing the number of neo
22 abstinent syndrome children being born?
23     A.    Yeah, that was not my remit -- I keep
24 bringing you back to what I was required to do.  That

Page 48

1  prescribing for chronic non-cancer pain published
2  between 2007 and 2013, the peak of opioid
3  prescribing.
4           Do you see that first paragraph?
5      A.   I do.
6      Q.   That would be an important thing to try
7  to look at to see whether the guidelines that are
8  being sent to all physicians, right, are being
9  influenced by the conflict of interest that the
10 opioid manufacturers are paying these doctors?
11          MR. HENRY:  Object to the form of the
12      question.
13          THE WITNESS:  Maybe I -- again, I have no
14      real expertise in commenting upon this.  I don't
15      know what this -- the rest of the article is
16      about.  I don't even know, you know, the
17      specifics of what this article is looking at, or
18      some of these terms that are used here.  So --
19 BY MR. BILEK:
20     Q.   You'd agree that guidelines for the
21 prescribing, that's common to all physicians,
22 correct?
23     A.   Yes.
24     Q.   Okay.  And if that has been improperly

Page 50

```
 1   BY MR. BILEK:
 2       Q.    Well, but the guidelines go to all
 3   physicians, correct?
 4             MR. HENRY:  Object to the form of the
 5       question.
 6             THE WITNESS:  Yes, I'm assuming that if a
 7       physician prescribed a medication, they knew the
 8       guidelines under which one had to prescribe the
 9       medication.
10   BY MR. BILEK:
11       Q.    Thank you.
12             Okay.  Go to Conclusion.  Why don't you
13   read the first sentence of the conclusion there.
14       A.    The last?
15       Q.    First page on the abstract.
16       A.    The findings reveal that the guidelines
17   for opioid prescribing chronic non-cancer pain from
18   2007 to 2013 were at risk of bias because of
19   pervasive conflicts of interest with the
20   pharmaceutical industry and the positive mechanisms
21   to address bias.
22       Q.    Do you have any reason to disagree with
23   this finding?
24             MR. HENRY:  Object to the form of the
```

Page 54

1  Q.  Well, tell me.  You're a marketing
2  professor at University of Chicago, big school, great
3  school.  Why are they making these payments to
4  doctors?
5  A.  One of the reasons, obviously, is to get
6  information about the drug to the larger physician
7  and HCP community.
8  Q.  Well, one of the things that they want to
9  make these payments to doctors, wouldn't you agree,
10 is to influence their behavior, right?  I mean,
11 that's Marketing 101.
12 A.  Sure.
13 Q.  So one of the reasons why they're doing
14 the payments is to influence the doctors, right?
15 A.  But whether they're influenced or not is
16 a completely different issue.
17 Q.  Okay.  And so this issue of whether the
18 payments have influenced the doctors, you have not
19 even looked at?
20 A.  No, I was not asked to look at that.
21 Q.  Not surprised.
22     Okay.  Now, last two sentences:
23     Other pharmaceutical companies filed
24 suit -- and they're talking about the -- and in

Page 56

1  harms.
2        Do you see that?
3    A.    I see that.
4    Q.    So this is an association saying
5  "linked," right?
6    A.    A link -- an association is a linkage.
7    Q.    Okay.  So then going to the top of the
8  second page:
9        Critical practice guidelines is another
10 mechanism that the pharmaceutical industry may have
11 used to influence physicians' opioid-prescribing
12 practice.
13        Do you see that?
14    A.    Sure.
15    Q.    Do you agree or disagree with that?
16    MR. HENRY:  Object to the form of the
17 question.
18    THE WITNESS:  Yeah, I mean, again, I have
19 not done any study, right?  You're asking me to
20 agree or disagree to a conclusion, no?
21    MR. BILEK:  Let's mark this one as
22 Exhibit 3.
23    (Chintagunta Exhibit 3 marked
24    for identification.)

Page 58

1  THE WITNESS:  Again, the operating word
2  here is "associated."  Again, it says:
3  Associated with increased opioid
4  prescribing.
5  And you're asking me to draw a
6  conclusion about causality.  Finally --
7  BY MR. BILEK:
8  Q.  You're seeing a lot of associations,
9  though, with the opioid crisis in the marketing,
10  correct?
11  A.  You have shown me three articles that
12  show an association, sure.
13  Q.  How many do you think there are that
14  people have studied this opioid crisis with
15  marketing?
16  A.  I have --
17  MR. HENRY:  Object to the form of the
18  question.
19  THE WITNESS:  -- no idea.
20  BY MR. BILEK:
21  Q.  But you haven't looked at all, have you,
22  with this issue of the appropriateness of the
23  marketing of your -- of the company.
24  A.  Well, I have not -- I was not asked to

Page 88

1  one of the reasons could be that they just had access
2  to cross-sectional data, which is what a survey is
3  all about.
4      Q.    I mean, it's at least data where they're
5  asking what the effects are versus -- I mean, I'm
6  struggling to find anywhere where you've got data for
7  your opinions.
8      A.    I was not asked to look at data.
9              (Chintagunta Exhibit 11 marked
10                 for identification.)
11 BY MR. BILEK:
12     Q.    Could you identify that document for the
13 record?
14     A.    Yeah.  It says:
15            Pro Market, The Blog of the Stigler
16       Center at the University of Chicago.
17            Says:
18            Purdue circumvented the regulator to
19       promote OxyContin hiding its real risk of
20       addiction.
21 BY MR. BILEK:
22     Q.    So this is, again, the Chicago Booth
23 School of Business, correct?
24     A.    This is a blog.