# EXHIBIT 26

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1     HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
2
3                UNITED STATES DISTRICT COURT
4                 NORTHERN DISTRICT OF OHIO
5                     EASTERN DIVISION
6     _____
      IN RE:  NATIONAL              )
7     PRESCRIPTION OPIATE           )
      LITIGATION,                   )
8                                   )
      This document relates to:     )
9                                   )MDL No. 2804
      Jennifer Artz v. Endo Health )Case No. 17-md-2804
10    Solutions, Inc., et al.       )
      Case No. 1:19-OP-45459        )Judge Dan Aaron
11                                  )Polster
      Darren and Elena Flanagan v. )
12    McKesson Corporation, et al. )
      Case No. 1:18-OP-45405        )
13                                  )
      Michelle Frost, et al., v.    )
14    Endo Health Solutions Inc.,   )
      et al.                        )
15    Case No. 1:18-OP-46327        )
                                    )
16    Walter and Virginia Salmons, )
      et al., v. McKesson           )
17    Corporation, et al.           )
      Case No. 1:18-OP-45268        )
18                                  )
19            DEPOSITION OF JACQUELINE RAMIREZ
20                   Oxnard, California
21              Wednesday, February 5, 2020
22
23    Reported by:
      Lori M. Barkley
24    CSR No. 6426
      Job No. 3971225-B
25

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 17

1      A.    No, previous.

2      Q.    Ms. Ramirez, do you know who you have sued

3   in this action?

4      A.    Basically the pharmaceutical companies.

5   Basically the ones that knew and distributed the

6   meds.  So I guess that would be pharmaceutical

7   companies, the distributors, I guess possibly some of

8   the pharmacists that, I guess gave the meds --

9      Q.    Okay.  Your understanding is that you sued

10  pharmaceutical manufacturers, distributors, and

11  pharmacists?

12     A.    No, not pharmacists.  Pharmacy companies.

13     Q.    Pharmacy companies.

14     A.    Yes.

15     Q.    Can you name any of the distributors you've

16  sued in this case?

17     A.    I believe there's Purdue, I believe there

18  is, I think at the call Activist, Janssen.

19     Q.    Not looking at the complaint, are you aware

20  of --

21     A.    Oh.  So don't look --

22     Q.    I'm just asking about your personal

23  knowledge if you can name the defendants that you've

24  sued in this case.

25     A.    I believe one was Mallinckrodt.  I believe

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

```
 1   there's Janssen, who's -- which is part of
 2   Johnson & Johnson, I believe, which makes Dueagesics.
 3             I believe there was -- oh, gosh.  Some
 4   Walmarts were in there, some Walgreen's were in
 5   there, Von's.
 6             And I can't remember the rest that I read.
 7        Q.   One more question about that.
 8             Do you know what relief you are seeking in
 9   this lawsuit?  And do you know what I mean by that
10   when you say the relief you're seeking?
11        A.   Can you explain it a little further?
12        Q.   Sure.
13             What are you looking to get out of the
14   lawsuit?
15        A.   Basically monitor, surveillance for the
16   children that are younger than my son.  My son is 14.
17   I'm hoping -- and I hate to say the word "hoping,"
18   there's other children older than my son that's gone
19   through that, because I wouldn't want any children
20   going through this.
21             But I'm hoping so that he can be helped and
22   everything that my son's gone through, so no other
23   parents have to guess.  They would have, like, some
24   kind of monitoring where they can basically learn
25   from what I have learned about the help from anybody
```

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 19

1   else, I didn't get.

2        Q.   You mentioned that your son is 14, but what

3   you're looking for would cover children that are

4   younger than 14?

5        A.   Yes.  Younger children that are being

6   born -- 'cause there are still children being born

7   with NAS.  I'm -- real quick.

8             MR. DANN:  Tissues.

9             THE WITNESS:  There's a lot of families out

10  there that when my child was born with NAS, it wasn't

11  really, I guess acknowledged that or it wasn't --

12  maybe it was acknowledged, but it wasn't told that

13  they can be born addicted and withdrawals and the

14  developmental problems that they would go through

15  throughout their life.

16            So I did a lot of research on my own.

17  BY MS. DESH:

18       Q.   You did that research, when did you do that

19  research?

20       A.   After my child was born and I knew he wasn't

21  reaching his developmental skills and milestones, I

22  would search Google, go to the library, and try to

23  find anything that would correlate with what he's

24  got.

25            A lot of times, there wasn't no answers.  I

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1   taking it.  You guess the embarrassment.  Because it

2   thinned out my hair, my hair would fall out and I

3   would get blanches and I was very skinny.

4           And I just -- I just stopped taking it -- I

5   mean, I just went off of it.  Told my mom I'm not

6   taking this no more.

7       Q.   So I know that you had custody until she was

8   maybe an adult of your niece; is that right, Josalyn?

9       A.   Correct.

10      Q.   Okay.  Have any other children lived with

11  you in your home?

12          I saw a name Romero Ramirez.  Is that

13  somebody that you know?

14      A.   No.  Probably Roman Ramirez.

15      Q.   Maybe it was a misspelling.

16          So you've been married to Roman since 1998.

17  Have you been separated from Roman?

18      A.   No legal separation, just you get kind of

19  like an upset kind of thing, which having a special

20  needs child can -- when you're doing a lot of

21  multiple work -- yes, I understand he works.

22          But yes, there was -- yeah, separation for

23  two weeks, a week, where it's like, okay, we're going

24  to separate, he would go to his mom's and he would

25  stay for a short period of time, like I said, a week

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 31

1   or two, and come back.

2          So if you call that separation, I guess

3   it's -- you know.

4      Q.   Did that happen on and off for several

5   years?

6      A.   Yes.  I think it was more so me saying, you

7   know, I'm overwhelmed, I just -- and you guess you

8   would say, I was a little younger and when you put in

9   the mix trying to raise a special needs child.  And I

10  kind of felt I was doing most of the work.

11         But now that I'm older, I can kind of

12  understand why I was doing most of the work because

13  he was going to work to provide for the family and

14  especially because we needed his health insurance for

15  ███.

16     Q.   Have you had health insurance continuously

17  since you were married to Roman?

18     A.   Yeah.

19     Q.   So you think the separation is due to your

20  feelings of being overwhelmed with your ability to

21  care for ███ and sort of the stressors in the home

22  related to that?

23     A.   Yes.

24     Q.   Roman was a little unclear about his work

25  schedule.