# Exhibit A

1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

    _____

3   IN RE: NATIONAL PRESCRIPTION  |

4   OPIATE LITIGATION             | MDL No. 2804

5   This document relates to:     | Case No. 17-md-2804

6   Jennifer Artz v. Endo Health  | Judge Dan Aaron Polster

7   Solutions Inc., et al.        |

8   Case No. 1:19-OP-45459        |

9   Darren and Elena Flanagan v.  |

10  McKesson Corporation, et al.  |

11  Case No. 1:18-OP-45405        |

12  Michelle Frost, et al., v.    |

13  Endo Health Solutions Inc.,   |

14  et al.                        |

15  Case No. 1:18-OP-46327        |

16  Walter and Virginia Salmons,  |

17  et al., v. McKesson           |

18  Corporation, et al.           |

19  Case No. 1:18-OP-45268        |

20

21            VIDEOTAPED DEPOSITION OF

22           DR. KANWALJEET ANAND, M.D.

23                January 28, 2020

24                Chicago, Illinois

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   ON BEHALF OF PLAINTIFFS:

 4   THOMPSON BARNEY LAW FIRM

 5        2030 Kanawha Boulevard, East

 6        Charleston, West Virginia 25311

 7        304.343.4401

 8   BY:  KEVIN W. THOMPSON, ESQ.

 9        kwthompson@gmail.com

10   - also -

11        THE BILEK LAW FIRM, L.L.P.

12        700 Louisiana, Suite 3950

13        Houston, Texas 77002

14        713.227.7720

15   BY:  THOMAS E. BILEK, ESQ.

16        tbilek@bileklaw.com

17   - also -

18   MARTZELL, BICKFORD & CENTOLA

19        338 Lafayette Street

20        New Orleans, Louisiana 70130

21        504.581.9065

22   BY:  SCOTT R. BICKFORD, ESQ.

23        srb@mbfirm.com

24
```

Page 3

1   A P P E A R A N C E S:   (Continued)

2

3   ON BEHALF OF DEFENDANT McKESSON CORPORATION:

4       SHOOK, HARDY & BACON L.L.P.

5       Jamboree Center

6       5 Park Plaza, Suite 1600

7       Irvine, California 02614-8502

8       949.475.1500

9   BY:  MICHELLE M. FUJIMOTO, ESQ.

10       mjfujimoto@shb.com

11  - also -

12       COVINGTON & BURLING LLP

13       One CityCenter

14       850 Tenth Street, NW

15       Washington, DC 20001-4956

16       202.662.6000

17  BY:  EMILY S. ULLMAN, ESQ.

18       eullman@cov.com

19

20

21

22

23

24

Page 4

1   A P P E A R A N C E S:   (Continued)

2

3   ON BEHALF OF DEFENDANT H.D. SMITH:

4        BARNES & THORNBURG LLP

5        11 South Meridian Street

6        Indianapolis, Indiana46204-3535

7        317.236.1313

8   BY:  KATHLEEN L. MATSOUKAS, ESQ.

9        kmatsoukas@btlaw.com

10

11   ON BEHALF OF DEFENDANT ALLERGAN:

12        KIRKLAND & ELLIS LLP

13        300 North LaSalle

14        Chicago, Illinois 60654

15        312.862.2000

16   BY:  MARIA PELLEGRINO RIVERA, ESQ.

17        mrivera@kirkland.com

18

19

20

21

22

23

24

Page 5

1  A P P E A R A N C E S: (Continued)

2

3  ON BEHALF OF DEFENDANTS MALLINCKRODT LLP and

4  SPECGX LLC:

5      ROPES & GRAY LLP

6      Prudential Tower

7      800 Boylston Street

8      Boston, Massachusetts 0219903600

9      617.951.7000

10 BY:  JENNIFER PANTINA, ESQ.

11      jennifer.pantina@ropesgray.com

12

13 ON BEHALF OF DEFENDANT TEVA PHARMACEUTICALS USA

14 and RELATED ENTITIES:

15      BLANK ROME

16      One Logan Square

17      130 North 18th Street

18      Philadelphia, Pennsylvania 19103

19      215.569.5500

20 BY:  TERRY M. HENRY, ESQ.

21      thenry@blankrome.com

22      LAUREN O'DONNELL, ESQ.

23      (Telephonic appearance)

24      odonnell@blankrome.com

Page 6

1   A P P E A R A N C E S:   (Continued)

2

3   ON BEHALF OF DEFENDANT CARDINAL HEALTH:

4        WILLIAMS & CONNOLLY LLP

5        725 Twelfth Street NW

6        Washington, DC 20005

7        202.434.5000

8   BY:   MICHAEL R. FISHMAN, ESQ.

9        mfishman@wc.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                            Page 7

 1   A P P E A R A N C E S:   (Continued)

 2

 3   ON BEHALF OF DEFENDANT WALGREENS:

 4        BARTLIT BECK LLP

 5        Courthouse Place

 6        54 West Hubbard Street, Suite 300

 7        Chicago, IL 60654

 8        312.494.4400

 9   BY:  SHARON DESH, ESQ.

10        sharon.desh@bartlitbeck.com

11

12   ON BEHALF OF ENDO and PARR DEFENDANTS:

13        ARNOLD & PORTER KAYE SCHOLER LLP

14        250 West 55th Street

15        New York, New York 10019-9710

16        212.836.8000

17   BY:  ANGELA R. VICARI, ESQ.

18        angela.vicari@arnoldporter.com

19

20

21

22

23

24
```

```
                                          Page 8
 1    A  P  P  E  A  R  A  N  C  E  S:  (Continued)

 2

 3    ON  BEHALF  OF  DEFENDANT  AMERISOURCEBERGEN:

 4         REED  SMITH  LLP

 5         Three  Logan  Square

 6         1717  Arch  Street,  Suite  3100

 7         Philadelphia,  Pennsylvania  19103

 8         215.851.8100

 9    BY:   JENNIFER  B.  JORDAN,  ESQ.

10         jennifer.jordan@reedsmith.com

11         KRISTEN  ASHE,  ESQ.

12         kashe@reedsmith.com

13

14    ON  BEHALF  OF  DEFENDANT  WALMART:

15         JONES  DAY

16         77  West  Wacker,  Suite  3500

17         Chicago,  Illinois  60601-1692

18         312.782.3939

19    BY:   NICOLE  C.  HENNING,  ESQ.

20         nhenning@jonesday.com

21

22

23

24
```

Page 9

```
 1   A P P E A R A N C E S:   (Continued)

 2

 3   ON BEHALF OF THE RITE AID DEFENDANTS:

 4        MORGAN LEWIS & BOCKIUS LLP

 5        77 West Wacker Drive

 6        Chicago, Illinois 60601-5094

 7        312.324.1000

 8   BY:  GREGORY T. FOUTS, ESQ.

 9        (Telephonic appearance)

10        gregory.fouts@morganlewis.com

11

12   ON BEHALF OF DEFENDANTS GIANT EAGLE and HBC:

13        MARCUS & SHAPIRA LLP

14        301 Grant Street, 35th Floor

15        One Oxford Centre

16        Pittsburgh, Pennsylvania 15219-6401

17        412.471.3490

18   BY:  MATTHEW MAZGAJ, ESQ.

19        (Telephonic appearance)

20        mazgaj@marcus-shapira.com

21

22

23

24
```

Page 10

1    A P P E A R A N C E S: (Continued)

2

3    ON BEHALF OF DEFENDANT PRESCRIPTION SUPPLY, INC.

4        FOX ROTHSCHILD LLP

5        2700 Kelly Road, Suite 300

6        Warrington, Pennsylvania 18976

7        215.345.7500

8    BY:  STEPHANIE B. FINEMAN, ESQ.

9        (Telephonic appearance)

10       sfineman@foxrothschild.com

11

12   ON BEHALF OF DEFENDANTS JANSSEN and JOHNSON &

13   JOHNSON:

14       O'MELVENY & MYERS LLP

15       400 South Hope Street, 18th Floor

16       Los Angeles, California 90071-2899

17       213.430.6000

18   BY:  HOUMAN EHSAN, MD, ESQ.

19       hehsan@omm.com

20

21

22

23   ALSO PRESENT:

24       Mr. Kevin Duncan, Videographer

*   *   *

Page 55

1   until you get there.

2        A.    Yes.

3        Q.    And it has an execution date of

4   December 8, 2019, correct?

5        A.    That is correct.

6        Q.    Is this document a significant work

7   product you submitted in this litigation in

8   December of 2019?

9        A.    That is correct.

10       Q.    When submitting this declaration,

11  did you have an understanding of what were the

12  requirements, not the subject matter but the

13  requirements of what goes in -- into the

14  declaration?

15       A.    Yes, I did.

16       Q.    Okay.  What were your understandings

17  of those requirements?

18       A.    My understanding was that this

19  declaration was requested in order to define a

20  class of individuals that had been damaged due

21  to opioid exposure during their prenatal period

22  through use by the mother, by the birth mother.

23       Q.    Is this declaration intended to be a

24  complete statement of all the opinions you

Page 56

1   intend to express related to NAS as risk

2   factors and as long-term consequences?

3        A.    That is correct.

4        Q.    And -- I apologize, go ahead.

5        A.    I'd just like to direct your

6   attention to the last paragraph of this

7   declaration saying that:

8             With the Court's permission, I would

9   like to reserve the right to update this report

10  in order to reflect the accumulating scientific

11  and medical evidence as necessary.

12       Q.    I appreciate the clarification,

13  Doctor.

14            At the time you submitted this

15  declaration, was it intended to be complete as

16  of that point in time?

17       A.    Yes, it is.

18       Q.    Do you have opinions you have formed

19  but chosen about NAS, its risk factors and it's

20  long-term consequences, that you have chosen

21  not to include in this declaration?

22       A.    No.  For the most part, this is an

23  accurate summary of my opinions.

24       Q.    And let me ask the question slightly

Page 57

1    differently:

2              Are there any opinions you've

3    already formed and intend to provide that you

4    chose not to include in this declaration?

5         A.    I have reviewed additional evidence

6    that I became aware of and provided that

7    evidence as of January 24th, so other than its

8    relationship to the content of this

9    declaration, there was, you know, perhaps minor

10   changes, mostly semantic or of a minor nature

11   that may have occurred in the light of that new

12   evidence.

13        Q.    The January 24, 2020, submission

14   that you're speaking of had substance additions

15   from your December 2019 declaration?

16        A.    So the declaration itself has not

17   been changed, but the additional evidence that

18   I have reviewed may have affected my opinions

19   to a minor degree.

20        Q.    Have you thought about whether or

21   not -- strike that.

22              Let me ask the question differently:

23              Have you thought about how the

24   additional evidence in 2020 has impacted any

Page 58

1  specific opinions you've given in your

2  December 2019 declaration?

3      A.    As I stated, this was probably of a

4  minor nature, simply confirming or adding

5  additional references, which was

6  related -- which is reported in those five

7  documents that I had e-mailed to counsel on the

8  24th.

9          MR. BILEK:  And for the record, I

10     e-mailed them to Emily that day.

11          MR. EHSAN:  Understood.

12 BY MR. EHSAN:

13     Q.    I'm not suggesting that you did not

14 provide additional literature but my question

15 was simply:

16          To the extent you know that those

17 five articles have changed any of your

18 opinions, sitting here today, can you

19 articulate that?  Or you may not know how it's

20 changed any of your opinions.  I'm just asking

21 that question more generally.

22     A.    Yeah, so, in general, like I said,

23 there has been no substantial change in my

24 opinions.  Some of those opinions have been

Page 59

1   validated and confirmed by the accumulating

2   data.

3          Q.    To the extent that you have

4   references in this declaration and you provided

5   some additional supporting material, does that

6   collective body of citations represent a

7   complete list of all the external, meaning not

8   in your head from your training, information

9   you intend to rely on in supporting the

10  opinions you provide?

11         A.    That is correct.

12         Q.    Did you consider any facts or data

13  outside what's listed in your declaration in

14  forming your opinions?

15         A.    Other than what's listed in the

16  references of this document, I relied on my

17  clinical experience.

18         Q.    You didn't perform any data analysis

19  that's not identified in this declaration; is

20  that correct?

21         A.    That is correct.

22         Q.    Did you provide -- let me strike

23  that.

24                In connection with preparing your

\*    \*    \*

Page 77

1  neonatal opioid withdrawal syndrome are terms

2  used to denote a group of problems that occur

3  in children who are exposed to opioids or

4  opiate drugs in the mother's womb.

5            Do you see that?

6      A.    Yes.

7      Q.    What is your understanding of the

8  distinction between NAS and NOWS?

9      A.    They're essentially the same thing.

10  There are -- they describe a clinical diagnosis

11  manifesting the signs and symptoms of opiate

12  withdrawal.

13      Q.    Are opioids the only class of

14  medication that can cause an abstinence

15  syndrome in a child?

16      A.    No, there are other classes of drugs

17  that can cause an abstinence syndrome.

18      Q.    And those abstinence syndromes,

19  would they present in a clinically unique way

20  that's distinguishable from opioid withdrawal

21  syndrome in a neonate?

22      A.    Yes, to a great extent, they would.

23      Q.    Are there any other characteristics

24  that overlap between abstinence syndrome from

Page 78

1    opioids and abstinence syndrome from some other

2    drug of abuse?

3         A.    There may be some overlap.

4         Q.    So just because a neonate is

5    diagnosed with NAS doesn't necessarily mean the

6    birth mother had mild, moderate or severe OUD,

7    correct?

8         A.    So the birth mother may not have an

9    opioid use disorder, may have been prescribed

10   opiates for a particular condition, which then

11   exposed the fetus to significant levels and

12   durations of opiates and resulted in NAS

13   manifesting after birth.

14        Q.    The diagnostic approach to a neonate

15   and whether or not that neonate has NAS is

16   distinct from the diagnostic approach to the

17   mother and whether the mother has OUD, correct?

18        A.    That is correct.

19        Q.    Do you have, sitting here today, an

20   opinion as to what the minimum exposure would

21   be necessary to cause a neonate to undergo an

22   abstinence syndrome from the maternal exposure

23   to an opioid?

24        A.    There is no minimum exposure.



1      Q.    Now, you mentioned this is a

2   clinical diagnosis.

3            Do you -- is that to distinguish it

4   from a laboratory diagnosis or a radiological

5   diagnosis?

6      A.    That is correct.

7      Q.    So, for example, in diabetes, if you

8   have two hemoglobin A1Cs greater than 6 1/2 and

9   3 months apart that would be sufficient to make

10  the diagnosis of diabetes, correct?

11     A.    That is correct.

12     Q.    And here, you want 8 numbers on here

13  or a total score of 8, at least four hours

14  apart though we are not sure how -- what the

15  other end of the spectrum is, correct?

16     A.    That is correct.

17     Q.    You have to get the 8 points the

18  same way, i.e., do you have to check off the

19  same boxes in that 4-hour interval?

20     A.    No, no.  The way this is set up

21  is -- is you reach a score of 8 because the

22  pattern of NAS changes as time goes on.

23     Q.    So you may, at Time Interval 1, you

24  may score 8, let's say with just a GI -- well,

Page 267

1   yeah, you get to just a GI stuff.  You could

2   score an 8 just for the GI stuff, GI

3   symptomatology, and on Time Interval 2, you

4   could score 8 for the central nervous system

5   disturbances?

6        A.    Yeah.

7        Q.    Now, I'm just going to specifically

8   ask about a couple of these.  Here's a -- the

9   first one is high-pitched cry.

10            Do you see that?

11       A.    Yes, I do.

12       Q.    Is that specific to opioid

13  withdrawal?

14       A.    It is indicative.  It's not

15  pathognomonic.  It's not -- you can get a

16  high-pitched cry from, say, other conditions,

17  like there's a Cri du chat syndrome, which is a

18  genetic disorder which has a high-pitched cry,

19  or there are other conditions that lead to a

20  high-pitched cry.

21       Q.    Sleeping less than an hour after

22  feeding, is that specific to opioid withdrawal?

23       A.    No, it's not specific to opioid

24  withdrawal.

Page 268

1      Q.    How about sleeping less than two
2  hours after feeding?
3      A.    Not specific either.
4      Q.    How about sleeping greater than
5  three hours after feeding?
6      A.    That is not specific either.
7      Q.    Fever of -- so going down to the
8  next section, Metabolic Disturbances, fever of
9  37 point -- or 38.3, is that something you
10 can -- a child can have without being exposed
11 to opioids?
12     A.    Yes, they can.
13     Q.    Fever greater than 38.4?
14     A.    Yes.
15     Q.    How about nasal stuffiness?
16     A.    Yes, they can have that from some
17 other cause.
18     Q.    Can a child sneeze greater than
19 three to four times without having been exposed
20 to opioids?
21     A.    Yes, they can.
22     Q.    How about -- how about nasal
23 flaring?
24     A.    They can have nasal flaring from

Page 269

1   other causes.

2       Q.    There's in fact a series of diseases

3   that a mother can pass on to a child that are

4   pneumonically called the TORCH syndromes,

5   correct?

6       A.    That is correct.

7       Q.    And some of those TORCH syndromes

8   could also cause some of the symptoms that are

9   described here, correct?

10      A.    That is correct.

11      Q.    So is it possible for a child

12  without any opioid exposure, by just having the

13  right combination of symptoms, and putting

14  aside the likelihood of whether that occurs or

15  not, but is it possible for a child to hit

16  8 points on this scale without ever having been

17  exposed to opioids?

18      A.    It is possible, yes.

19          MR. EHSAN:  So I don't have any more

20      questions for you, Doctor.  I appreciate

21      your time and your patience with me today.

22      I will only say that -- that I've been told

23      that we are going to get a copy of your --

24      an additional publication that was from

*    *    *

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.