1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3    ------------------------------------X
     **IN RE: NATIONAL PRESCRIPTION**    : *Case No. 1:17-md-2804*
4    **OPIATE LITIGATION**               : *Cleveland, Ohio*
                                         :
5                                        :
     **THIS DOCUMENT RELATES TO:**       : *Wednesday,*
6                                        : *December 2, 2020*
     ***All Cases***                     : *1:02 p.m.*
7                                        :
                                         :
8    ------------------------------------X

9

10       TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDINGS

11            BEFORE THE HONORABLE DAN AARON POLSTER

12                 UNITED STATES DISTRICT JUDGE

13                          - AND -

14             BEFORE THE HONORABLE DAVID A. RUIZ

15               UNITED STATES MAGISTRATE JUDGE

16

17   SPECIAL MASTER:           DAVID R. COHEN

18

19
     Court Reporter:           Donnalee Cotone, RMR, CRR, CRC
20                             United States District Court
                               801 West Superior Avenue
21                             Court Reporters 7-189
                               Cleveland, Ohio 44113
22                             donnalee_cotone@ohnd.uscourts.gov

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.

```
 1      APPEARANCES (ALL PARTICIPANTS APPEARING TELEPHONICALLY):

 2

 3          On behalf of Plaintiffs:

 4
                    PETER H. WEINBERGER, ESQ.
 5                  Spangenberg, Shibley & Liber
                    1001 Lakeside Avenue, Suite 1700
 6                  1900 East Ninth Street
                    Cleveland, Ohio 44114
 7                  216-696-3232
                    pweinberger@spanglaw.com
 8

 9                  HUNTER J. SHKOLNIK, ESQ.
                    400 Broadhollow Road, Suite 305
10                  Melville, New York 11747
                    212-397-1000
11                  hunter@napolilaw.com

12
                    JOSEPH F. RICE, ESQ.
13                  Motley Rice LLC
                    28 Bridgeside Boulevard
14                  Mount Pleasant, South Carolina 29465
                    843-216-9140
15                  jrice@motleyrice.com

16
                    PAUL T. FARRELL, JR., ESQ.
17                  Greene, Ketchum, Farrell, Bailey & Tweel LLP
                    419 Eleventh Street
18                  Huntington, West Virginia 25701
                    304-525-9115
19                  paul@greeneketchum.com

20
                    W. MARK LANIER, ESQ.
21                  The Lanier Law Firm
                    6810 FM 1960 West
22                  Houston, Texas 77069
                    813-659-5200
23                  wml@lanierlawfirm.com

24

25
```

1    **APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):**

2

3         On behalf of Plaintiffs (Continued):

4

5                    **STEVEN SKIKOS, ESQ.**
                     Skikos, Crawford, Skikos & Joseph, LLP
                     One Sansome Street, Suite 2830

6                    San Francisco, California  94104,
                     (415) 546-7300

7                    sskikos@skikos.com

8

9                    **TROY RAFFERTY, ESQ.**
                     Levin, Papantonio, Thomas, Mitchell, Rafferty &
                     Proctor, P.A.

10                   316 South Baylen Street, Suite 600
                     Pensacola, Florida 32502

11                   850-435-7500
                     trafferty@levinlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     **APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):**

2

3          On behalf of Defendants Walgreen Co. and Walgreen
           Eastern Co.:
4
                    **KASPAR J. STOFFELMAYR, ESQ.**
5                   (*CHAIN PHARMACY LIAISON COUNSEL*)
                       - and -
6                   **KATHERINE M. SWIFT, ESQ.**
                    Bartlit Beck LLP
7                   54 West Hubbard Street, Suite 300
                    Chicago, Illinois  60654
8                   312-494-4400
                    kaspar.stoffelmayr@bartlitbeck.com
9                   kate.swift@bartlitbeck.com

10         On behalf of Defendants CVS Pharmacy, Inc. and Ohio
           CVS, L.L.C. ("CVS"):
11
                    **ERIC R. DELINSKY, ESQ.**
12                  **SASHA MILLER, ESQ.**
                    **GRAEME W. BUSH, ESQ.**
13                  Zuckerman Spaeder
                    1800 M Street, NW
14                  Washington, DC 20036
                    202-778-1831
15                  edelinsky@zuckerman.com
                    smiller@ zuckerman.com
16                  gbush@zuckerman.com

17

18         On behalf of Defendants HBC Service Company, an
           unincorporated operating division of Giant Eagle,
19         Inc. ("HBC/Giant Eagle"):

                    **ROBERT M. BARNES, ESQ.**
20                  **JOSH A. KOBRIN, ESQ.**
                    **SCOTT D. LIVINGSTON, ESQ.**
21                  Marcus & Shapira
                    35th Floor
22                  One Oxford Centre
                    301 Grant Street
23                  Pittsburgh, PA 15219
                    412-471-3490
24                  rbarnes@marcus-shapira.com
                    kobrin@marcus-shapira.com
25                  livingston@marcus-shapira.com

1   **APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):**

2

3       On behalf of Defendants Rite Aid of Maryland, Inc.
        d/b/a Mid-Atlantic Customer Support Center, Rite Aid
4       of Ohio,Inc. and Rite Aid Hdqtrs. Corp. ("Rite Aid"):

5           **KELLY A. MOORE ESQ.**
            Morgan, Lewis & Bockius
6           101 Park Avenue
            New York, NY 10178
7           212-309-6612
            kelly.moore@morganlewis.com

8             - and -

9           **JOHN P. LAVELLE, JR., ESQ.**
10          Morgan, Lewis & Bockius LLP
            1701 Market St.
11          Philadelphia, PA 19103-2921
            215-963-5000
12          john.lavelle@morganlewis.com

13            - and -

14          **GREGORY T. FOUTS, ESQ.**
            Morgan, Lewis & Bockius LLP
15          77 West Wacker Dr.
            Chicago, IL 60601-5094
16          312-324- 1776
            gregory.fouts@morganlewis.com

17

18      On behalf of Defendant Walmart, Inc.:

19          **TINA M. TABACCHI, ESQ.**
            **TARA A. FUMERTON, ESQ.**
20          **JOHN M. MAJORAS, ESQ.**
            Jones Day
21          77 West Wacker
            Suite 3500
22          Chicago, Illinois 60601
            312-782-3939
23          ttabacchi@jonesday.com
            tfumerton@jonesday.com
24          jmajoras@jonesday.com

25

```
 1                  AFTERNOON SESSION, WEDNESDAY, DECEMBER 2, 2020

 2                       (Proceedings commenced at 1:02 p.m. )

 3                              - - -

 4                  JUDICIAL ASSISTANT NORTON:  I'm just going to

 5       start shouting out names.

 6            Do I have Joe Rice?

 7            How about Paul Hanly?

 8            Paul Farrell?

 9            Pete Weinberger?

12:57:57 10                  MR. WEINBERGER:  Yes, I'm on.  Thank you.

11                  JUDICIAL ASSISTANT NORTON:  Thank you.

12            Steve Skikos, are you on?

13            Troy Rafferty?

14                  MR. WEINBERGER:  Troy is not going to be on

12:58:31 15       the call.

16                  JUDICIAL ASSISTANT NORTON:  Okay.

17            Then I'm going to start with CVS.

18            How about Eric Delinsky?

19                  MR. DELINSKY:  I'm here.  Thanks.

12:58:42 20                  JUDICIAL ASSISTANT NORTON:  Perfect.

21            Sasha Miller?

22                  MS. MILLER:  Yes, I'm here.

23                  JUDICIAL ASSISTANT NORTON:  Graeme Bush?

24                  MR. BUSH:  Yes, I'm on.  Thank you.

12:58:55 25                  JUDICIAL ASSISTANT NORTON:  Robert Barnes?
```

1              MR. BARNES:  Here.

2              JUDICIAL ASSISTANT NORTON:  Oh.

3         Josh Kobrin?  Kobrin, sorry.

4              MR. KOBRIN:  I'm here.  Thank you.

12:59:13  5              JUDICIAL ASSISTANT NORTON:  Thank you.

6         Scott Livingston?

7         I'm going to go down to Rite Aid now.

8         How about John Lavelle?

9              MR. LAVELLE:  Yes, I'm here.

12:59:34  10              JUDICIAL ASSISTANT NORTON:  Greg Fouts?

11              MR. FOUTS:  Yes, here.

12              JUDICIAL ASSISTANT NORTON:  I am moving on to

13   Walgreens after I get my highlight function to work.  There

14   it is.

12:59:43  15         How about Kaspar Stoffelmayr?

16              MR. STOFFELMAYR:  I'm here, Helen.

17              JUDICIAL ASSISTANT NORTON:  Thanks.

18              THE COURT:  Kate Swift?

19              MS. SWIFT:  I'm on.  Thank you.

12:59:54  20              JUDICIAL ASSISTANT NORTON:  For Walmart, do I

21   have John Majoras?

22              MR. MAJORAS:  I'm on.

23              JUDICIAL ASSISTANT NORTON:  Tina Tabacchi?

24              MS. TABACCHI:  Yes.  Thank you.

13:00:07  25              JUDICIAL ASSISTANT NORTON:  Tara Fumerton?

1          MS. FUMERTON:  Yes.  Thank you.

2          MS. YANNI:  Hi.  It's Cathy.

3          JUDICIAL ASSISTANT NORTON:  Hi, Cathy.

4     David -- is David Cohen on yet?

13:00:22  5          SPECIAL MASTER COHEN:  I am on.  Hi.

6          JUDICIAL ASSISTANT NORTON:  Okay.  Do I have

7  Scott Livingston for HBC/Giant Eagle?

8     Not yet.

9     I'm going to go back to plaintiffs.

13:00:41 10     Joe Rice, are you on?

11          MR. RICE:  Yes, ma'am.  I'm on.

12          JUDICIAL ASSISTANT NORTON:  Here.

13     Paul Hanly?

14     Paul Farrell?

13:00:54 15          MR. FARRELL:  Present and accounted for.

16          JUDICIAL ASSISTANT NORTON:  Thank you.

17     Steve Skikos?

18          MR. SKIKOS:  Good morning.

19          JUDICIAL ASSISTANT NORTON:  Good morning.

13:01:05 20     Troy Rafferty is not going to be on.  Okay.

21          MR. RAFFERTY:  Actually, I was able to get on.

22          JUDICIAL ASSISTANT NORTON:  Oh, great.  Then I

23  got you.

24     I know I have counsel for everyone that's on here on

13:01:21 25  my list of expected participants.

1          The only person I've not yet heard from is

2     Scott Livingston.

3          Scott, are you on?  Okay.

4               MR. BARNES:  Okay.  This is Bob Barnes for

13:01:36  5     Giant Eagle.

6               JUDICIAL ASSISTANT NORTON:  Okay.

7               MR. BARNES:  We can proceed without Scott.

8               JUDICIAL ASSISTANT NORTON:  Perfect.

9          I am going to save this.  Then I'll email it out

13:01:48 10     later.

11          Okay.  I am going to let Judge Polster know in one

12     second that we are on and ready.

13          I am going to remind everyone now that there's a court

14     reporter on the line.  Her name is Donnalee Cotone.  For

13:02:19 15     Donnalee's sake, please identify yourself every time you

16     speak.  Speak slowly and clearly and give her a chance to

17     keep up.  If you're not speaking, mute your phone, please.

18          Thank you.

19          Judge is dialing on now.

13:02:56 20               THE COURT:  Okay.  Dan Polster calling in.

21               JUDICIAL ASSISTANT NORTON:  Hi, Judge.

22          On the list of expected participants, everyone is on

23     the line with the exception of Scott Livingston who

24     represents HBC/Giant Eagle.

13:04:20 25          Donnalee is --

1          MR. LIVINGSTON:  Actually, I'm on the line.

2     I'm on the line.

3               JUDICIAL ASSISTANT NORTON:  Oh, you are.

4               MR. LIVINGSTON:  I just came in late, yeah.

13:04:27   5     Sorry.

6               JUDICIAL ASSISTANT NORTON:  So you can go

7     ahead, Judge.  I'm going to mute this call.

8               THE COURT:  All right.  Good afternoon,

9     everyone.  I hope everyone is staying safe and had a good

13:04:38  10     Thanksgiving.

11          I went over the status report.  There were only a

12     couple of things I wanted to cover.

13          First, there's one thing that wasn't on the status

14     report.  My recollection is that there's a -- some sort of a

13:04:56  15     jurisdictional motion relative to Rite Aid.

16          There may have -- Rite Aid may have filed a motion to

17     dismiss one of its entities, and there was some discovery.

18     I don't know what's -- what is -- is that still live?

19          Do people care about it, and if so, what is happening?

13:05:19  20               MR. FOUTS:  Your Honor, this is Greg Foust on

21     behalf of Rite Aid.

22          That motion is still pending.  Your Honor ruled on

23     Rite Aid's objections to Special Master Cohen's order on the

24     scope of jurisdictional discovery.  That ruling was, I

13:05:37  25     think, early last month.  Discovery is ongoing and has not

1    been completed.  I think the parties have been, frankly,

2    very focused on the fact discovery and meeting the deadline.

3    But that --

4                    THE COURT:  Does anyone really care about --

13:05:51  5    does anyone really care about this?

6                    MS. MOORE:  Yes, Your Honor.

7          This is Kelly Moore for Rite Aid, and we care about

8    this.

9                    THE COURT:  All right.  Well, fine.  I, you

13:05:58 10    know --

11          Well, so when is discovery supposed to be completed on

12    this?

13                   MS. MOORE:  I -- Your Honor, it depends on

14    the -- it pretty much is -- there's not much left to do

13:06:09 15    based on your recent ruling, so I think it's -- yeah.

16                   THE COURT:  Are there more briefs that need to

17    be filed?  What --

18                   MS. MOORE:  Well, I think, Your Honor, then

19    the plaintiffs need to file an opposition to our motion to

13:06:24 20    dismiss, and we'll file a reply.

21                   THE COURT:  All right.  Well, again, I don't

22    really even see why it's important.  But if it is, I'll get

23    to it.  I'll get to it.

24          Okay.  Then there is this pending discovery dispute on

13:06:51 25    the October 30th CMO -- the CMO -- the CMO required by

1    October 30th.  Each side was to designate persons with

2    relevant knowledge.

3         The plaintiffs designated approximately 100.

4    According to the plaintiffs, the defendants designated

13:07:15  5    something like 75,000.  I've read the letters back and

6    forth.

7         Can someone -- what do the defendants think that that

8    provision in the CMO was for?

9         What do you think it was for?  And what do you think

13:07:39 10    you accomplished?  And what message were you sending by

11    saying there's 75,000 persons with relevant knowledge?

12              MR. DELINSKY:  Good afternoon, Your Honor.

13    This is Eric Delinsky on behalf of CVS.

14              THE COURT:  Yes, Eric.

13:08:02 15              MR. DELINSKY:  Judge, in candor, we weren't

16    focused on the -- you know, what it was for.  We don't know

17    what it was for.  I think that was a provision that

18    plaintiffs wanted.  We were just focused on complying with

19    it.

13:08:19 20         Part of that is that we -- and I think it's

21    self-explanatory.  We weren't trying to send a message in

22    any way whatsoever.

23         But we were faced with a real quandary, Your Honor, in

24    that we had this deadline.

13:08:38 25         And were mindful that it's a really big list.  I don't

1    want you to think we're suggesting something otherwise,

2    Judge.  We're mindful of that.

3         And we by no means believe that this is -- this will

4    be the list that reflects -- a witness list.  When the

13:08:58  5    witness list becomes due in spring, we know it will have

6    been to be winnowed down.  I just want to let you know that,

7    that we're understanding of that.

8         But when we were put to the test of identifying

9    relevant witnesses, we were just really put in a quandary.

13:09:14 10   And the source of the quandary is plaintiffs' own analysis.

11   Because they've identified 3 million prescriptions that we

12   filled.  Between 2.9 million and 3 million prescriptions

13   that we filled that form the foundation of their public

14   nuisance calling.

13:09:41 15        Obviously, Your Honor, any prescriber, doctor, or

16   practitioner who wrote any one of those prescriptions is a

17   person with relevant knowledge.  And what we attempted to do

18   was to do what was necessary to, on one hand, comply with

19   the order, and on the other hand, protect ourselves from

13:10:08 20   having witnesses struck from testifying at trial down the

21   road because we didn't identify them.

22        And the fact is, Your Honor, the case continues to be

23   at a very early stage.

24        So we have plaintiffs' red flag analysis.  We don't

13:10:30 25   have their expert reports.  They haven't examined or deposed

1    any of our witnesses yet.  We really don't know but from a

2    statistical analysis how they're going to put these

3    prescriptions to use.  We don't know if they're going to

4    narrow the list.  We don't know if they're going to, you

13:10:51  5    know, focus on a subset or use precise examples with experts

6    or with our own witnesses.  We just don't know.

7        So I can go into more depth on this, Your Honor.  But

8    faced with 3 million prescriptions, faced with attempts by

9    plaintiffs in the past to strike trial witnesses because

13:11:12  10    they didn't think we identified them at an early enough

11    juncture, we really just tried to do our best, being at an

12    early stage of the case, to identify people who, in fact, to

13    have relevant knowledge -- I don't think there's any dispute

14    about that -- and to protect ourselves moving forward.

13:11:32  15        Again, we appreciate that as we get closer to trial

16    and actual witness lists are -- those lists are going to be

17    winnowed down considerably.  They'll have to be.  We get

18    that.

19                THE COURT:  Well, everyone knows that.

13:11:45  20        The point -- the point is that --

21                MR. WEINBERGER:  Your Honor, can I respond?

22    Perhaps I can --

23                THE COURT:  Well, I mean -- I mean, the

24    plaintiffs designated 100 people.  All right?  It was my

13:11:57  25    CMO, all right, and then with Special Master Cohen.  I

1    thought the whole point was to focus the case and give each

2    side a sense of who they might need to depose.

3         I mean, there's a limit -- there's a limited number of

4    depositions, and it makes sense to focus those depositions

13:12:21   5    on people who are likely to be witnesses at the trial.

6         Now, we've already deposed people in Track 1A and

7    Track 1B.  They don't have to be redeposed.  But new people,

8    that's what everyone is going to focus on.  And by

9    designating 75,000 people, you gave plaintiffs no idea or no

13:12:43  10    clue of anything.  All right?  You said there's 75,000

11    people with relevant knowledge.  Well, that may be, but

12    that's meaningless.  The plaintiffs didn't do that.

13         So what do you think -- what do you think I should

14    require the defendants to do now?

13:13:04  15              MR. DELINSKY:  Your Honor, this is Eric again.

16         The -- my answer to that is nothing, and there's a

17    reason why.

18         We obviously read the CMO differently, and the reason

19    why we did is because there's a provision -- and Judge, I

13:13:22  20    just can't remember off the top of my head whether -- I

21    believe it's in March, maybe March 26th of next year --

22    where we have to provide witness lists.  Part of those

23    witness lists is an identification of the 50 most likely

24    trial witnesses.  And at that point, plaintiffs have the

13:13:45  25    ability to seek to depose any of those witnesses who have

1    not been deposed to date upon a showing of good cause.

2         So when we read the CMO, we read the identification of

3    likely trial witnesses as something from March, because

4    that's what the CMO said.

13:14:01  5         What we were put upon to respond to here was just

6    identify relevant persons.  And in candor, we didn't think

7    we had the right to strike people from our list who we

8    believed had relevant knowledge.

9              THE COURT:  Wait a minute.  On March 26th,

13:14:21 10  each side has to, you know, designate, you know, winnow it

11   down, 50 people.  Again, there's no way you can call

12   anywhere near 50, but it's 50.  And then each side has this

13   safe harbor provision.  Upon a showing of good cause, they

14   can move to depose any of the 50 who they previously didn't

13:14:42 15  depose.  All right?

16        The whole point of that, the good cause would be, you

17   know, they couldn't reasonably have anticipated that that

18   person would be a witness, and that's why they didn't depose

19   them in October, November, December.  That would be good

13:15:02 20  cause.

21        Well, what you -- what you've done is, you know,

22   you've completed obviated that.  There would be no reason to

23   have that if the prior designations hadn't been designed to

24   give both sides a pretty good sense of who was likely to be

13:15:23 25  a witness.

1    The point is, if someone is on the October 30 list --

2    all right?  The plaintiffs had put 100 people on their -- on

3    their list for October 30th.  All right?  Come March 26th,

4    you know, the plaintiffs' 50, if every single one of them is

13:15:42  5    on that -- you know, from that list, defendants are going to

6    have to make a pretty good showing, good cause why they

7    didn't depose those people.  All right?

8    So you've completing obviated that on your side by

9    putting 75,000.  Plaintiffs can say, Well, we had no idea

13:16:02 10   what -- the defendants completely hid the ball.  We had no

11   clue what they were doing.  We guessed.  All right.  We

12   guessed wrong.  Good cause.  Let us depose everyone.

13   So I mean, the whole point is --

14            MR. DELINSKY:  Judge, we --

13:16:14 15            THE COURT:  -- not to have everyone running

16   around doing depositions the two weeks before trial.  The

17   trial is May 9th.

18            MR. DELINSKY:  Judge, I think I'm hearing you

19   to say that essentially we should have made trial

13:16:29 20   determinations in late October, and we're just not in the

21   position to do that.  We can't do that.  You know, we've

22   just started depositions.  We have no expert reports.

23   Summary judgment hasn't been decided.

24   We are just not in a position six, seven months out

13:16:47 25   from trial to predict who our trial witnesses can be,

1    especially when plaintiffs are -- have identified as the

2    magnitude of their case 3 million prescriptions, which

3    implicates thousands of doctors.

4         We are just not in a position today to predict who our

13:17:09 5    trial witnesses may be with any degree of precision.  We're

6    not.  It's too early, Judge.  I think there's only been

7    roughly 10, 12 depositions so far in the case.

8              THE COURT:  Well --

9              MR. WEINBERGER:  Your Honor, this is Pete.

13:17:27 10              THE COURT:  The plaintiffs were able to come

11    up with 100.  The plaintiffs were able to -- I mean,

12    presumably most of their witnesses are going to come -- are

13    going to come from that list of 100.  We're also going to

14    have a problem with the Court.  If they designate -- you

13:17:42 15    know, come March 26th, if 80 percent of their witnesses were

16    people they didn't, you know -- didn't indicate on

17    October 30th, the defendants are going to go crazy, with

18    some justification.

19              MR. WEINBERGER:  Judge --

13:17:58 20              MR. DELINSKY:  Your Honor -- Your Honor --

21                   (Overlapping speakers.)

22              THE COURT:  This is --

23              MR. DELINSKY:  Plaintiffs are trying a case

24    that's based on data and statistics.  Our case is going to

13:18:11 25    include fact witnesses.  And you said from the beginning

1    that, you know, each side within the Rules of Evidence has

2    the leeway to try the cases they see fit, and that means we

3    get to defend it as we see fit.

4        So our approach is very, very different from

13:18:35  5    plaintiffs' approach.  And that's okay.  That's perfectly

6    appropriate.  But that explains, you know, to a large degree

7    the difference between the two lists.

8                MR. WEINBERGER:  Your Honor, this is

9    Peter Weinberger.  Can I -- can I say something?

13:18:48 10                THE COURT:  Yes.  Go ahead.  Peter.

11                MR. WEINBERGER:  Yes.  Yes, Your Honor.

12        First of all, to suggest that these seasoned trial

13    lawyers on the other side had no idea what was meant by the

14    provision that they had to identify persons and entities

13:19:05 15    with relevant knowledge on October 30th is, frankly,

16    beyond -- if we were to ask in interrogatory -- this is a

17    standard -- basically an interrogatory in any litigation.

18    This happens to be in the CMO.

19        Everyone who's litigated a case under the federal

13:19:32 20    rules knows that this kind of question allows the other side

21    to understand who are the witnesses that the other side

22    might call, potentially might call, so that they can make a

23    decision as to whether or not to depose them.  That's in

24    addition to the people that are identified under the CMO as

13:19:55 25    custodians of the defendants who we might want to depose in

1    order to make out our -- the liability part of our case.

2         The disclosure of persons with knowledge gives us

3    notice of who they potentially might intend to call to

4    support their case.  And allows us then to make a decision

13:20:18  5    within the 28 fact witnesses that we're allowed to depose,

6    who are defendants' employees or former employees, we get to

7    make then a decision as to who we need to do discovery

8    depositions on so we know what they're going to say at

9    trial.

13:20:37 10         And we had a discussion about this multiple times

11    before Special Master Cohen when we -- when we discussed a

12    provision like this.  And I'm just absolutely dumbfounded

13    that counsel for the -- that Mr. Delinsky can now say he

14    didn't even know -- or they didn't know what this provision

13:21:01 15    meant.

16              MR. DELINSKY:  That's not what we're saying.

17    What we're saying is that we --

18              MR. WEINBERGER:  Well, wait a minute.  Let

19    me --

13:21:07 20              MR. DELINSKY:  We believe that --

21              MR. WEINBERGER:  Let me finish.

22              MR. DELINSKY:  -- what the word --

23              THE COURT:  Hold on.  Eric, Eric, Eric, Eric,

24    Eric.  Come on.  Let Peter finish his comment and then I'll

13:21:17 25    let you respond.

1          MR. DELINSKY:  Okay.  Thank you, Judge.

2     Sorry.

3          MR. WEINBERGER:  It was -- and it should have

4     been no surprise to the defendants that how we intended to

13:21:27  5     pursue this case using aggregate data analysis at the time

6     that this CMO was issued.

7          So, you know, this -- that they can attempt to use

8     this March 25 fallback a couple weeks before trial to

9     finally tell us who they might call as part of their

13:21:53 10     case-in-chief so that we can then depose them puts us at a

11     significant disadvantage.

12          The other point in response to this notion that

13     because we have identified all of these problematic

14     prescriptions that were dispensed, that they have the right

13:22:17 15     to just simply list all of the prescribers on those -- who

16     prescribed those prescriptions as persons with knowledge

17     goes squarely contrary to what this Court has said on

18     multiple occasions, and that is that to the extent that the

19     defendants can demonstrate in their documents that they

13:22:43 20     performed due diligence on a flagged prescription before

21     they filled it, information about that due diligence, for

22     example, calls that were made to the doctor about why he

23     issued the prescription that he did, is evidence that is

24     admissible.

13:23:07 25          But the Court has also said on multiple occasions that

1    what the defendants try to demonstrate after the fact by

2    taking the deposition or using the testimony of a doctor who

3    they never contacted on a particular prescription, who they

4    never did due diligence on, is not the issue in this case.

13:23:36  5    That's what the defendants are attempting to do.  And,

6    in fact, in the last ten days, they've issued subpoenas

7    daily, multiple times a day, on individual physicians

8    presumably to take depositions of them -- depositions of the

9    Cleveland Clinic physicians, depositions of individual

13:24:02  10    physicians -- with no demonstration whatsoever that they

11    ever contacted these prescribers at the time that the

12    prescription was filled.

13    I mean, that's not the way this case -- or the way

14    that liability is going to be framed in this case.

13:24:22  15    THE COURT:  Well, hold it.

16    The plaintiffs can prove their case -- attempt to

17    prove their case any way they want.  It's not --

18    I'm not the trial lawyer, Peter.  You and your group

19    are.  And the defendants can defend it any way they want.

13:24:40  20    If the plaintiffs want to prove their case with

21    statistics and documents, that's fine.

22    And if the defendants want to prove the case by the

23    testimony of a bunch of doctors, they can do it.  They can

24    use their whole time.  However many hours we've got, they

13:24:59  25    can fill it with doctors.  That's okay.  And the jury will

1    call it the way the jury calls it.

2          I'm not going to tell the plaintiffs how to prosecute

3    their case, how the defendants how to defend it.

4          And -- but what I'm hearing -- you know, look.  I

13:25:15  5    don't have a problem -- the defendants now -- they've

6    indicated they plan to call some physicians.  They have made

7    that clear from the beginning.  At this point they don't

8    know which ones.  Okay.  Fine.  All right?

9          It's very clear that I would permit -- if come

13:25:33  10   March 26th the defendants identify 20 physicians, and the

11   plaintiffs haven't taken those physicians' depositions, I'll

12   let you do it.  All right?  There's no way you could guess

13   which of thousands of physicians the plaintiffs -- the

14   defendants might call.  So fine.  I'm not concerned about

13:25:53  15   that because you can always depose them at the end.

16         I'm more concerned about the defendants' designating

17   their current and former employees who their -- and that

18   they ought to know.  They ought to have a pretty good idea

19   now.  Okay?  And they don't have to hide the ball on that.

13:26:15  20        So I think that's where we need to focus on this.  I

21   don't really care about that there are thousands and

22   thousands of potential physicians out there.  The defendants

23   will call a few.  And I don't think the plaintiffs need to

24   know those now.

13:26:32  25        But they do need to have a sense of who the current

1    and former defendant employees the defendants are seriously

2    thinking about calling as witnesses because those are the

3    folks they want to depose.

4         So -- and I don't think the defendants have narrowed

13:26:50  5    that down in any meaningful way.

6         Am I right?

7                    MR. WEINBERGER:  That's correct.

8                    THE COURT:  Well, that --

9                    MR. DELINSKY:  Judge, I --

13:26:58 10                    THE COURT:  That needs to get done.

11                    MR. DELINSKY:  Judge -- Judge, I don't -- I

12    don't think it's fair to say that that's correct.  We have

13    it winnowed it down.  Okay?

14                    THE COURT:  Well, how many -- well, how

13:27:11 15    many -- how many -- how many current and former defendant

16    corporate employees are on that October 30th list?

17                    MR. DELINSKY:  Well, I can speak -- in terms

18    of specifics, Judge, I can speak --

19                    THE COURT:  Let's start with CVS.  All right,

13:27:25 20    Eric?

21                    MR. DELINSKY:  Okay.

22                    THE COURT:  Just go with CVS.

23                    MR. DELINSKY:  Yes.  I believe we have -- and

24    if I can break it down, Judge.  I believe we've identified

13:27:35 25    by name 100 -- I'm trying to do the math here -- 107,

1    Your Honor.

2         That includes -- and just so you understand who that

3    includes.  More than half of those are negotiated

4    custodians, many of whom were custodians way back in Track

13:27:56  5    1, because as you'll recall, Your Honor, this includes not

6    only the dispensing side of the case, but also the

7    distribution side of the case.

8         So it involves all the people who have already been

9    subject to discovery and document production, and then it

13:28:10  10    also includes new people that we've negotiated with

11    plaintiffs who, you know, are custodians for document

12    production purposes.

13         And then, you know, slightly less than half of that

14    number are pharmacists and other people who worked in the

13:28:25  15    field in Lake and Trumble counties.

16         So, Judge, just to frame that out, you know, we --

17    depending on the time frame -- operated as many as 15

18    individual pharmacies in those who counties combined.  I

19    think it's 14 today.  I may be off.  And plaintiffs, of

13:28:45  20    course, have established a discovery period going back 14

21    years.

22              THE COURT:  Yeah.

23              MR. DELINSKY:  So that -- you know, the 50

24    pharmacies -- pharmacists and supervisors from 15 different

13:28:56  25    pharmacies over 14 years, that's -- that's pretty tight,

1    Your Honor.  That's a winnowed number.

2                MR. WEINBERGER:  Well, Judge, if -- to answer

3    your question directly, if you look -- starting on page 4 of

4    our letter to Special Master Cohen, dated November 23rd, you

13:29:20  5    will see that we have broken down for CVS and the other

6    defendants what it is that -- how they've described and who

7    they've actually named as individual people with knowledge.

8        Some -- so for CVS, we have 100 CVS personnel, no

9    titles provided, plus --

13:29:48 10                MR. DELINSKY:  We did provide titles in

11    interrogatory response.

12                MR. WEINBERGER:  Plus --

13        For all 100?

14                MR. DELINSKY:  I believe so, Pete.

13:29:58 15                MR. WEINBERGER:  -- plus categories of unnamed

16    individuals.

17                MR. DELINSKY:  Yeah, but as we said in our --

18    in our briefing on this, we identified all the names that we

19    knew and that we knew at this time who we might ever use at

13:30:16 20    trial.  The categories were an abundance of caution.  Those

21    categories have been used all the way back to Track 1A.

22    There's never been a complaint to now.  We didn't use those

23    as a substitute for identifying names.

24        If we had a name, we identified it, based on the

13:30:34 25    knowledge we had today.

```
 1              THE COURT:  Well, look.  All right.  So let's
 2   just stick with CVS.  I mean, I -- all right?  CVS
 3   is -- they've listed 107 present and former corporate
 4   employees.
 5        Pete, they're saying half are document custodians.  We
 6   know all those people, and they're really not germane for
 7   depositions.
 8        The other half are their pharmacies.  All right?  They
 9   have roughly 50 pharmacists over a 14-year period, that
10   there are 14 or 15 pharmacies.
11        All right?  At this point they don't know which of
12   them they're going to call.  They'll probably -- they'll
13   certainly call some.  All right?  Now, my guess -- my guess,
14   Eric, though, is that you got -- out of those 50
15   pharmacists, you've got -- you've got some sense of who
16   you're likely to call.  And there's no reason you can't
17   designate -- you know, identify those now.  If the
18   plaintiffs want to use some of their depositions on the
19   pharmacists, they can.
20        Otherwise, we'll wait until March 26th, and I'll let
21   them depose any pharmacist you call, because there's no way
22   they would be able to guess out of 50 which one to depose
23   now, so I'll let them depose them in March and April.  I
24   mean, if you want it -- I mean --
25              MR. DELINSKY:  Yeah.  Yeah, the --
```

         1                    MR. WEINBERGER:  Your Honor --

         2                    MR. DELINSKY:  -- problem --

         3                    MR. WEINBERGER:  Your Honor, that sort of

         4      back-end approach -- which I understand is basically a

13:32:25 5      savings clause for us -- really puts us at a disadvantage in

         6      terms of doing the discovery in the case.

         7           I mean, I don't really understand the, you know--

         8                    MR. DELINSKY:  Judge --

         9                    MR. WEINBERGER: -- the --

13:32:45 10                   MR. DELINSKY:  -- the one --

        11           Judge, the one thing I would add, Judge, is all these

        12      pharmacists were identified in our data, which we produced

        13      now many, many months ago.

        14           So plaintiffs, going back now -- Pete may know the

13:33:02 15     date better than me -- maybe June, maybe July, had access to

        16      all our data --

        17                    THE COURT:  Well, there's no --

        18                    MR. DELINSKY:  -- after the --

        19                    THE COURT:  There's no question, these

13:33:10 20     aren't -- these aren't, you know, clandestine people.  I

        21      mean, everyone knows who --

        22                    MR. DELINSKY:  Right.  Exactly, Judge.  Yeah,

        23      exactly.

        24                    THE COURT:  That isn't the issue, Eric, that

13:33:19 25     they're -- that they're clandestine and their identities

1    aren't known.

2         They know who their pharmacists were.  They know who

3    their -- you know, Walmart pharmacists are.  I mean, heck.

4    It's public knowledge.  You can find out -- walk in and see

13:33:34  5    who the pharmacist is.

6         But it's -- the point -- the point is, the way you've

7    handled this, the plaintiffs are going to have really no

8    idea who any of your witnesses are, any of them, until March

9    the 26th.  And then you're each going to designate 50

13:33:56 10    people.  So that's five defendants times 50.

11         They'll be 250 people designated.  And the plaintiffs

12    will be able to say credibly that they, you know, had no

13    good reason to be able to depose any of those.  So they're

14    going to have to run around and, you know, I'll let them

13:34:18 15    take 250 depositions in the few weeks before trial?

16    That's --

17                   MR. WEINBERGER:  Actually, Your Honor --

18                   THE COURT:  That's a crazy way --

19                   MR. WEINBERGER:  Your Honor --

13:34:27 20                   THE COURT:  -- to run this case.

21                   MR. WEINBERGER:  Your Honor, your CMO -- your

22    CMO actually allows the defendants jointly to identify no

23    more than 50 fact witnesses.

24                   THE COURT:  All right.  Well, fine.

13:34:41 25         All right.  How many do the plaintiffs name?

1           MR. WEINBERGER:  And --

2           THE COURT:  Fine.  So they'll have 50.  So

3      even though -- they'll have to take 50 -- they'll literally

4      have to take 50 depositions, and you'll have to be there to

13:34:58 5      defend them in the couple of weeks before trial.

6         Now, think about that.  That's a crazy way to do this

7      case.  But that's what -- that's where we're headed if I

8      don't do something.

9           MR. DELINSKY:  Your Honor --

13:35:14 10           MR. WEINBERGER:  Well, it's not just that,

11      Your Honor.  It's not just that, Your Honor.  It's the fact

12      that we have -- we're not able to prepare, and, for example,

13      provide testimony from these potential witnesses to our

14      experts.

13:35:30 15           MR. DELINSKY:  Your Honor --

16               (Overlapping speakers.)

17           MR. DELINSKY:  I'm sorry, Pete.

18           THE COURT:  Well, all right.  That's

19      another -- that's another concern.  They can't, you

13:35:42 20      know -- it will be way too late to do -- start having all

21      new expert reports.

22           MR. WEINBERGER:  Your Honor --

23           THE COURT:  You'll have essentially trial by

24      ambush, and we don't do that in our country.  So I --

13:35:55 25           MR. DELINSKY:  But, Your Honor, the origin of

1    the problem here -- this is not trial by ambush.  Okay?

2         And the origin of the problem is Plaintiffs 3 million

3    prescriptions.  That is a theory of staggering magnitude.

4    And, frankly, when plaintiffs identify 3 million

13:36:20  5    prescriptions, and each of us identify, you know, 50

6    pharmacists, that's an extremely moderate number in the face

7    of 3 million prescriptions.

8         The table setter here is what plaintiffs have done,

9    and we're trying our best to respond.

13:36:43  10         And in candor, Your Honor -- and I know you don't want

11    to hear it, and now is probably not the place to litigate

12    this.  But in candor, we object to the 50-person -- the

13    50-witness limit.  We object to the four-week trial.  We

14    don't believe that that's adequate for us to defend against

13:37:05  15    3 million prescriptions.

16         If we had our druthers, we would have the time to call

17    much closer to 50 pharmacists.  You said we can't.  We don't

18    have that time.

19         But to call on us to begin to winnow down a list --

13:37:21  20    that's already winnowed -- when plaintiffs have all the data

21    on each of these pharmacists so they can make informed

22    decisions on who they may wish to depose, when we don't even

23    have their expert reports, we don't even know what they're

24    going to focus on, other than a red-flag analysis that

13:37:40  25    identifies by category 3 million scripts, that's really

1    difficult, Judge.

2         And it's just -- I understand the problem.  I don't

3    want you to think I'm insensitive to the problem.  I'm

4    practical minded and see it.  But we're struggling, too.

13:37:57 5         This is not a problem of our creation.  It's -- we are

6    really struggling with 3 million scripts, not having expert

7    reports, not knowing how plaintiffs are going to manifest

8    this evidence, not knowing are plaintiffs going to focus on

9    this store or that store or this period of time or that,

13:38:20 10   that can influence which of the 50 pharmacists we may focus

11   on.  We don't know.  We're groping in the dark, too.  And

12   all that groping is a creation of the 3 million scripts.

13   It's hard, Judge.

14        And I see the practical components of it.  But we have

13:38:41 15   practical problems, too, and they are extremely difficult.

16   And we're doing our very best, our level best, to navigate

17   through them.

18             MR. WEINBERGER:  Your Honor, I don't know

19   where to start.

13:38:58 20             THE COURT:  Well, I have to -- I have a

21   suggestion.

22        I mean, if the plaintiffs now have a -- if the

23   plaintiffs have identified particular pharmacists,

24   pharmacies, stores, all right, that they believe are -- was

13:39:15 25   a real problem, they ought to identify them now, and say,

|  | 1 | you know, this level of all statistical analysis, here are |
|--|---|---|
|  | 2 | pharmacies. |
|  | 3 | MR. WEINBERGER:  Your Honor -- |
|  | 4 | THE COURT:  I -- |
| 13:39:28 | 5 | MR. WEINBERGER:  Your Honor -- |
|  | 6 | Your Honor -- can I -- I have to jump in.  I'm sorry. |
|  | 7 | THE COURT:  All right. |
|  | 8 | MR. WEINBERGER:  I have to respond to that, |
|  | 9 | and I have to respond to Mr. Delinsky. |
| 13:39:38 | 10 | You know, the fact is that these retail pharmacies, |
|  | 11 | they make their living off of their own data.  They have |
|  | 12 | full and complete visibility from the distribution side down |
|  | 13 | to the dispensing side of what is going on in every single |
|  | 14 | one of their pharmacies. |
| 13:39:57 | 15 | I mean, that's what this case is about.  It's about |
|  | 16 | their -- |
|  | 17 | MR. DELINSKY:  You have that, too, Pete. |
|  | 18 | MR. WEINBERGER:  -- visibility. |
|  | 19 | MR. DELINSKY:  You have that too, now.  You |
| 13:40:05 | 20 | have the exact same visibility now that we do.  You have |
|  | 21 | everything. |
|  | 22 | MR. WEINBERGER:  Can you let me finish? |
|  | 23 | MR. DELINSKY:  The data -- |
|  | 24 | MR. WEINBERGER:  Can you -- can you let me |
| 13:40:12 | 25 | finish?  You know, I didn't interrupt you. |

1          THE COURT:  I'm going to end this very soon

2     because it's just a waste of time.  All right?

3                MR. WEINBERGER:  Well, Your Honor --

4     Your Honor -- Your Honor, it's not -- it's not a waste of

13:40:25  5     time because what this story that they're -- that they're

6     giving you about how this is such a complex case because we

7     based it upon the identification of prescriptions from data

8     is a fallacy.  It is data that they know everything there is

9     to know about -- or should have -- from the distribution to

13:40:51 10     the dispensing level.

11          So they -- they are in the best position having gotten

12     our red flags early in the case, our red flags that we're

13     going to analyze early in the case, which is what you and

14     Special Master Cohen ordered us to do before any expert

13:41:10 15     reports.

16          They can look at that data and say, Whoa.  So these

17     are the pharmacies in these very small counties.  We're not

18     talking about hundreds of pharmacies.  Okay?  We're talking

19     about small counties with a limited number of pharmacies.

13:41:29 20     They know exactly what their data shows.

21                THE COURT:  That's true.

22                MR. WEINBERGER:  They know exactly how the --

23                THE COURT:  They can see the number of red

24     flags per pharmacy.

13:41:35 25          So, Eric, you can see, out of your 14 or 15

1      pharmacies -- I mean, you can see -- if there are a few of

2      them that have a whole lot of red flags, you know that the

3      plaintiffs are going to zero in on that.  All right?

4          If you --

13:41:53  5              MR. WEINBERGER:  And, Your Honor -- and, Your

6      Honor, the fact of the matter is is that apparently they've

7      done that analysis because they've selected out a number of

8      physicians who they want to depose.  I think they -- I think

9      the number is probably between 30 and 50 they've already

13:42:09 10     identified and noticed for deposition.

11          So to suggest that they can't figure out where we're

12     going on the case and determine which pharmacists need to

13     be -- that they intend to call so that we can depose them is

14     just -- it's just a complete fallacy, Your Honor.  It's a

13:42:27 15     red herring that is trying to put the burden on us, when, in

16     fact, the burden should be on these defendants to narrow

17     down their list of witnesses now so that we can have an

18     opportunity to make a decision as to whether or not to

19     depose them.

13:42:45 20              MR. DELINSKY:  Your Honor, I'd like to

21     respond, but I have a hunch you're getting upset with us.

22              THE COURT:  Well, this is --

23              MR. DELINSKY:  So if you don't want to

24     hear --

13:42:53 25              THE COURT:  Well, this is going nowhere.

1           You know, we're going to try this case.  And I

2    don't -- you know, and it's going to be roughly one month.

3    I mean, the defendants want years to try the case.  It isn't

4    going to happen.  All right?  If you don't want -- you know,

13:43:05  5    if you want to try and counter their statistics by calling a

6    bunch of physicians and pharmacists, that's okay.

7           But the focus is going to be on where the -- you know,

8    where the problem was, and the plaintiffs will identify

9    where the problem was, and you can -- you know that from the

13:43:22 10   red flag analysis.  You can see, you know, if there are

11   particular pharmacists in particular years that have a big

12   problem.  There it is.  Well, you're going to have to -- I

13   mean, of course, the plaintiffs will know that, too, and

14   they can call those people, but --

13:43:39 15        All right.  Look.  I'm just going to have to figure

16   out -- I'm going to have to do something.  All right?  I

17   can't -- I can't leave it the way it is.

18           Unless the defendants have -- unless the defendants

19   collectively have a suggestion as to how they're going to

13:43:55 20   very quickly amend their response, I will just -- I'll give

21   it some thought.  I'll talk to my group, and I'll just order

22   something.  If the defendants have a suggestion as to what

23   they think they should do, if they do, I'd like to hear it

24   now.

13:44:10 25                    MR. DELINSKY:  Yeah.

1        Your Honor, I don't think we can amend the response

2   because that could lead to a situation down the road where

3   plaintiffs, depending on --

4              THE COURT:  I will just know to do

13:44:20  5   something --

6              MR. DELINSKY:  No --

7              THE COURT:  -- and that will be that.  So you

8   don't have to do it yourself.  I'm open to suggestions.

9              MR. DELINSKY:  No.  No, Your Honor.  If I

13:44:25 10   could -- if I could just finish.  If I could just finish,

11   Your Honor, because that was just sort of a predicatory

12   clause.

13        We are worried about learning things in February and

14   expert reports and moving forward, then realizing we need

13:44:40 15   witnesses, and we can't have a situation where they haven't

16   been identified or they've been withdrawn and so we can't

17   use them.

18        But what I would recommend is let the -- based on the

19   conversation, if the defendants could have an opportunity to

13:44:57 20   discuss this matter amongst themselves and determine if

21   there's a proposal to be made.

22              THE COURT:  Well, I'll give you a very short

23   window to do that, Eric.  I would rather, you know, let me

24   see what you're suggesting based on this conversation.  But

13:45:19 25   I'm going to have to do something, because the way it is now

1    is unfair, unmanageable, unworkable.  So you've got

2    to -- all right.  Now is -- all right.  It's Wednesday

3    afternoon.

4          Well, how much time do you want?  And I'll see if I

13:45:53 5    can give you that much.

6          What are you suggesting?

7                    MR. DELINSKY:  48 hours, Your Honor.

8                    THE COURT:  All right.  I think that's

9    reasonable.  I'll just say, you know, we'll make it

13:46:10 10   3:00 -- 3:00 p.m., Friday, for defendants' proposal.

11         So why don't you send it -- send it to me, Special

12    Master Cohen, and the plaintiffs, and then I think I'd like

13    to have the plaintiffs' response to the defendants'

14    proposal.  And then I'll make the decision as to what I'm

13:46:42 15   going to do.

16         So Peter, if you get the -- if you get the defendants'

17    proposal 3:00 p.m., Friday, when do you want to get your

18    response in?

19                    MR. WEINBERGER:  All right.  Give us until

13:46:54 20   Monday at 3:00 p.m.

21                    THE COURT:  That's fair.  Okay.  That's Monday

22    the 7th, at 3:00 p.m., and then I'll get to it promptly.

23         Again, I want -- you know, this isn't a football game

24    or a fencing game.

13:47:17 25         Everyone has an interest in having this trial be

1    orderly.  Okay?  I have no idea what a jury is going to do,

2    but I want -- I want this trial to be orderly.

3         Plaintiffs can present their case any way they want.

4    The defendants can present their defense any way they want.

13:47:39  5    It will be a totally different defense.  That's fine.

6         But the way we're headed is going to be complete

7    chaos, and that's not way I do things.  All right?  I want

8    to have a good sense of what this trial is going to be

9    about, and each side should have a good sense when they go

13:47:58  10   in what the trial is going to be about, and both sides will

11   be prepared.

12        So we've got the best lawyers in the country, and all

13   of you have done complex cases and trials.  So you know how

14   to do them.  And we're just headed toward chaos here, and

13:48:17  15   we're not going to have that.

16        So I'll -- hopefully over the next few days you can

17   come up with something, some suggestions as to what we do.

18   And I'd rather listen and react to your proposals rather

19   than just coming up with something myself.

13:48:37  20        All right.  Have the parties been meeting individually

21   or jointly with Judge Gandhi?

22             MS. TABACCHI:  Your Honor, it's Tina Tabacchi

23   from Jones Day.

24        Individual pharmacy defendants continue to communicate

13:49:04  25   and meet with Judge Gandhi and the plaintiffs said there

1    were some meetings, you know, earlier this week.

2              THE COURT:  Okay.  All right.  Well, that's

3    good, because, you know --

4              MR. RICE:  Judge, this is Joe.

13:49:23  5      I don't think -- I don't -- I can't agree totally with

6    the report that you were just given.  There were -- there

7    are some pharmacies that are continuing in discussion, but

8    there are some that are not.

9              THE COURT:  All right.  Well, that's okay

13:49:43 10   because, you know, each defendant is a separate entity and

11   they can -- they don't have to take the same position.

12             MR. RICE:  Understand.

13             THE COURT:  So that's fine.  So some are

14   meeting, some are not.  That's fine.

13:49:58 15      All right.  This is all I'm going to say on this.

16   There are approximately ten state Attorney's General who

17   have sued one or more of the pharmacy defendants in

18   their -- in state court in their respective state.  I think

19   it's about ten.

13:50:24 20      I cannot imagine any defendant wanting to settle cases

21   with the subdivisions without settling with the states.  All

22   right?  It just doesn't make sense.

23      I've asked before -- and it's my understanding that no

24   one has yet involved any of the AGs in these discussions

13:50:51 25   with Judge Gandhi.

41

1          I am the one person who speaks directly to Attorney's

2     General.  I have been doing this regularly from the

3     beginning of this MDL.  I speak with -- I've spoken to more

4     than ten of them personally.  I speak to them frequently.

13:51:21  5          And I think if the parties -- any defendants who are

6     serious about resolving their case, I can't imagine would

7     not want to involve the states, and I don't see how you're

8     going to do that without utilizing my involvement.  Maybe

9     Judge Gandhi can do that, but I don't think you can pick up

13:51:42 10     the phone and call an Attorney General.  I can.  I do it all

11     the time.  And if they're not available, they get back to me

12     within 24 hours.

13          So I think any pharmacy that is serious about

14     exploring resolution needs to think about that and figure

13:52:04 15     out what you're going to do.  I know the pharmacies have

16     said they don't want me involved in settlement, so I have

17     not had any discussions with anyone about resolving the case

18     against -- the cases against any pharmacy.

19          But I can't see how you're going to get any resolution

13:52:27 20     without involving the states, and I don't know how you do

21     that without me.

22          So I think over the next month -- because candidly,

23     there's -- I mean, there's been a lot in the paper about a

24     proposed resolution with the big three distributors and

13:52:49 25     Johnson & Johnson that involves all the subdivisions and the

1    states.  And a whole a lot work is going on right now about

2    that.  And I think all the AGs are focussed on that and

3    getting that done.  But when and if that's concluded, I

4    think they'll want to focus on these -- on the remaining

13:53:10   5    defendants, and the remaining defendants include a handful

6    of manufacturers and the pharmacies.

7         So I suggest the pharmacies think about that over the

8    next few weeks, and it will probably be a good time to

9    discuss that in January.

13:53:28  10         So the only other thing I had on my list was to set a

11    time for next month.  And we've been meeting on Wednesday

12    toward the beginning of the month.  I suggest we not meet

13    the first Wednesday because that's so close to New Year's,

14    but we do it the second Wednesday of January, which would be

13:53:53  15    the 13th.  And because I may -- there's a possibility I'll

16    be in trial, I'm suggesting we do it at noon on Wednesday

17    the 13th.

18         Does anyone have a strong problem with noon on

19    Wednesday, January 13th?  And then I'd have the joint status

13:54:24  20    report noon the proceeding day, which would mean 12th.

21              MR. WEINBERGER:  It should be fine for the

22    plaintiffs, Your Honor.

23              THE COURT:  Okay.

24              MR. DELINSKY:  I'll make it work, Your Honor,

13:54:44  25    for the defendants.

1          THE COURT:  I think it's better to meet in the

2     middle, not have it immediately after New Year's.

3          All right.  There wasn't anything -- any other action

4     item that I saw from the status report or anything else.

13:55:03  5     But I -- if there's something that anyone, either side,

6     wants to bring up, now would be the time.

7          MR. FARRELL:  Judge, this is Paul Farrell, and

8     I wanted to provide a quick update.

9          The West Virginia CT2 case is set for trial January 4

13:55:24  10    in West Virginia, and there's a pending motion to continue

11    it with regard to the COVID epidemic.

12          THE COURT:  All right.

13          MR. FARRELL:  I think if I were a betting man,

14    I would probably wager heavily on a continuance.

13:55:43  15          THE COURT:  Yeah.  I would too, Paul.  I would

16    too, Paul.  I mean, our Court -- we had a couple of criminal

17    trials scheduled for next week, and we're not having them.

18    And our Court is meeting on Monday morning.

19          The way it works, we decide, you know, like two months

13:55:59  20    in advance.  So we'll be deciding what, if any, trials we

21    have in January or February and what, if any, restrictions.

22          So, obviously, the numbers are bad in Ohio.  They're

23    pretty bad everywhere, in the whole country.

24          So there's a big article in today's New York Times

13:56:17  25    about the difficulty New York is having with trials.

1        So, yeah.  I would expect that would be postponed, but

2   it's up to that judge or that court.

3        Okay.  You know, I don't -- and I know Judge Garguilo

4   was, you know, planning to go forward, or has been planning

13:56:39  5   to go forward.  That's in the status report.  But, you know,

6   I don't know when -- when he's supposed to be deciding when

7   he's -- if he's going to go forward or not.

8             MR. SHKOLNIK:  Judge Polster, this is

9   Hunter Shkolnik.

13:56:54 10   New York has a stay of all trials right now.  So we

11   don't know -- and I guess we're going to be having a status

12   conference with Judge Garguilo in the coming weeks.

13             THE COURT:  Yeah.  Well, you know, no one is

14   going to have a trial if they don't think they can do it

13:57:14 15   safely and fairly.  So --

16        Okay.  Anything else anyone wanted to raise?

17        All right.  Hearing nothing, I hope everyone has a

18   good holiday and stays safe.  And we'll talk to everyone in

19   January.

13:57:31 20        Thank you.  We're adjourned.

21             PARTICIPANTS EN MASSE:  Thank you, Your Honor.

22                         - - -

23        (Proceedings adjourned at 1:57 p.m.)

24

25

1          **C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     */s/ Donnalee Cotone _____3rd of December, 2020*
      DONNALEE COTONE, RMR, CRR, CRC                    DATE
7     Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25