**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL 2804 |
| ***This document relates to:*** | Case No. 17-md-2804 |
| *Track Three Cases* | Hon. Dan Aaron Polster |

**PLAINTIFFS' OPPOSITION TO PHARMACY DEFENDANTS' MOTION TO STRIKE UNTIMELY IDENTIFIED PRESCRIPTIONS THAT PLAINTIFFS CONTEND CAUSED HARM FOR WHICH THEY SEEK RELIEF**

Defendants' motion is entirely baseless and should be denied. Contrary to Defendants' assertions, Plaintiffs' experts have not identified sixteen new "red flags" in their reports. Rather, they have slightly modified the *computations* used to identify "red flag" prescriptions based on discovery and data produced by Defendants after June 2020. Plaintiffs' modified computations are based on the same six broad categories of red flags used for their June 2020 disclosures. Moreover, Defendants will suffer no prejudice. As Plaintiffs have repeatedly stated, they do not intend to prove their case by showing that any particular prescriptions were improperly dispensed. Rather, Plaintiffs intend to prove that Defendants (i) did not have sufficient policies or procedures in place to identify red flags, and (ii) failed to perform due diligence when red flags were discovered. Special Master Cohen recently ordered that Defendants must produce all due diligence records related to a random sampling of identified prescriptions (250 prescriptions per Defendant per year). Plaintiffs have requested that this random sampling be performed on the universe of approximately 840,000 overlapping prescriptions which were flagged *both* by the 27 computations set out in Plaintiffs' June 2020 red flag submission *and* the additional computations arising from Carmen Catizone's expert report. In other words, every prescription identified through the random

sampling will be one that was disclosed to Defendants in June 2020. Thus, their Motion is much ado about nothing.

## ARGUMENT

As a preliminary matter, Defendants are conflating the term "red flags" with the computations used to identify red flag prescriptions. Reading Defendants' Motion one would think that Plaintiffs had identified 16 brand new, never before contemplated red flags in their expert reports. That simply is not the case. There are, and have always been, six broad categories of red flags which can be analyzed based on available data:

1. Doctor Shopping;
2. Pharmacy Shopping;
3. Pattern Prescribing;
4. Excessive Dispensing (*e.g.*, frequency, volume, high doses, days' supply, early refills);
5. Suspicious Combinations (*e.g.*, cocktails, two short acting opioids dispensed together); and
6. Cash Payments.[1]

*See* **Ex. 1** (Red Flag Computation Chart). Both the computations used in Plaintiffs' June 2020 disclosures and those used in Plaintiffs' recently submitted expert reports are based on these same six categories of red flags. *Id.* Indeed, the pharmacy defendants and their trade organization, the National Association of Chain Drug Stores, recognized these core categories of red flags as early

[1] Suspicious patient behavior is also a red flag which may be exhibited through signs of intoxication, use of slang to refer to prescription opioids such as "M's" or "Blues" etc. These behaviors, however, are not reflected in the dispensing data.

as January 2013. *See, e.g.,* **Ex. 2** (CVS-MDLT3-000030675-681); **Ex. 3** (WAGMDL00496407-418). These documents were produced during discovery after June 2020.

In accordance with the Court's scheduling order, on June 19, 2020, approximately nine months before the close of fact discovery and ten months before the expert disclosure deadline, Plaintiffs identified 1,106,170 prescriptions that would have been flagged by a series of computations based on the six categories of red flags. *See* **Ex. 4** (Ps' 6/19/20 Discovery Submission Excerpts). These six types of red flags were operationalized into 27 specific computations to generate the list of prescriptions. *Id.* at Exhibit A. As part of their response at that time, Plaintiffs specifically stated:

> This discovery submission is based solely on Bellwether Plaintiffs' red flag analysis of the Defendants' dispensing data *currently available*. The Bellwether Plaintiffs reserve the right to supplement this response if, or when, the Pharmacy Defendants fully and transparently respond to discovery, including the production of additional transactional dispensing data fields. For the purposes of this submission, Plaintiffs have not attempted to identify every suspicious or "red flag" prescription, nor applied every reasonable method for identifying suspicious or "red flag" prescriptions. The Bellwether Plaintiffs also reserve the right to supplement this response with additional prescriptions based upon further review of the dispensing data. The Bellwether Plaintiffs reserve the right to supplement this response with additional dispensing data sources and to the extent that additional information becomes available. The Bellwether Plaintiffs further reserve the right to supplement this response if, or when the Pharmacy Defendants disclose the system(s) designed, maintained and operated sufficient to detect suspicious or "red flag" prescriptions using Pharmacy Defendants' own metrics. In addition, the Bellwether Plaintiffs reserve the right to supplement this response through expert witnesses pursuant to the Scheduling Order entered by the Court.

*Id.* at p. 2 (emphasis added). Thus, Defendants have been aware at all times since June 2020 that the additional discovery to come over the remainder of the discovery period, as well as the reports to be prepared by Plaintiffs' experts, could result in supplemental or amended computations and additional identified prescriptions. Notably, Defendants did not object to Plaintiffs' June 2020 submission.

Since June 2020, Plaintiffs have received additional data production, as well as additional

document and deposition discovery from Defendants and third parties, and have reviewed additional case-law and regulatory authority. Based upon this additional discovery, and particularly on the red flag systems that Defendants themselves created and/or utilized primarily later in the timeline of this case, Plaintiffs learned that Defendants endorsed broadly described categories of red flags.[2] These red flag categories are reflected and described in Carmen Catizone's expert report and are the basis for the sixteen new computations disclosed in the Catizone and McCann April 2021 expert reports. Many of the originally run 27 computations, which were narrower, are subsumed within these broader computations.

The integrated analysis in Plaintiffs' April 2021 expert reports identifies slightly more than 2 million red flagged prescriptions, based on 43 computations of the same six red flag categories used in June 2020. These 43 computations include the 27 original computations, plus the sixteen new computations using the same red flags. While some of the defining language and specific algorithms have been refined to integrate Defendants' own red flag definitions, the fundamental red flags underscoring the tests and analyses have not changed. *See* **Ex. 1** (Red Flag Computation Chart). These 43 computations heavily overlap with each other, such that some computations are largely or wholly subsumed within other computations (meaning that in certain cases, all the prescriptions identified by a particular computation are also identified by another, slightly broader, computation). *Id*. Furthermore, among the sixteen additional computations, eleven of those subsume the remaining five. (For example, computation #7 flags overlapping opioid and benzodiazepine scripts, so all of the prescriptions flagged by computation #5, which adds overlapping prescriptions for muscle relaxers, are necessarily subsumed within the prescriptions

---

[2] Presumably, Defendants are familiar with their own flagging methods and, thus, already know "whether those methods actually identify prescriptions with red flags" or "whether those methods [were] applied correctly." Motion, p. 5.

flagged by computation #7.) *See id.* at p. 3. These are the eleven "highlighted" computations referred to in Plaintiffs' expert reports. These eleven "highlighted" computations capture a little more than 2 million red flagged prescriptions. Approximately 840,000 of those prescriptions are also captured by the set of 27 computations that were identified in June 2020.

As they have repeatedly stated throughout this litigation, Plaintiffs do not intend to prove their nuisance claim against Defendants by arguing that any individual prescription was improperly dispensed.[3] Instead, Plaintiffs will demonstrate that Defendants (i) did not have sufficient policies or procedures in place to identify red flags, and (ii) failed to perform due diligence when red flags were discovered. With respect to the latter issue, Defendants have consistently fought against producing the due diligence documents associated with all their red flag prescriptions, claiming undue burden. For that reason, discovery was separated into several phases, with Plaintiffs being ordered to provide a list of flagged prescriptions approximately nine months before the close of fact discovery (and ten months before the expert disclosure deadline) in order to inform Defendants of the red flags at issue and narrow the universe of questionable prescriptions for which Defendants would need to produce further discovery. Defendants were ordered to produce due diligence notes to the extent they intended to rely on information to prove that they actually performed an investigation of any of the prescriptions which Plaintiffs flagged. They responded that they were not relying on any notes and chose not to produce any.[4] Notwithstanding their position, Defendants went on to repeatedly reference the notes fields

3 Nor are Plaintiffs seeking damages based on specific prescriptions. Rather, they are seeking abatement of the nuisance caused by Defendants' conduct, an equitable prospective remedy.

4 There is one exception—Walgreens indicated it would be relying on, and has produced, its Targeted Drug GFD checklist.

generally as support for their robust due diligence, but continued to refuse to produce any of the notes.

On May 2, 2021, Special Master Cohen ordered "[e]ach Defendant [to] produce to Plaintiffs the Notes Fields that are associated with 250 of Plaintiffs' Red Flag Prescriptions ("RFRx") per year, chosen randomly." **Ex. 5** (5/21 E-mail Communications with Attachment) at p. 1 (emphasis in original). He further ordered Plaintiffs to "identify for Defendants what they choose for their RFRx universe by COB Wednesday 5/5." *Id*. at p. 2. In accordance with the Special Master's instructions, Plaintiffs submitted their Revised Proposal for Due Diligence Notes Production Pursuant to 5.02.2021 Ruling. *Id*. at Attachment. Plaintiffs requested that the sampling

> be performed on the universe of approximately 840,000 prescriptions which are flagged both by the 27 calculations first set out in Plaintiffs' June 2020 red flag submission and the additional calculations arising from Catizone's expert report (i.e., the overlapping set of prescriptions between both sets).

*Id*. (emphasis in original). Thus, the only prescriptions for which Defendants will have to produce due diligence documents are ones that were identified in Plaintiffs' June 2020 submission. Defendants have had ample time to conduct fact discovery as to these prescriptions. Motion, pp. 5-6 (acknowledging they had nine months "to investigate and develop their defenses against the more than 1 million prescriptions Plaintiffs identified in June 2020 as having 'red flags'").

Defendants' request for sanctions or a delay of the trial or any remaining discovery deadlines should be denied. Plaintiffs have complied with the Court's scheduling order, both as to their June 2020 disclosures and their expert reports.[5] The eleven red flag computations

---

[5] Pursuant to Rule 16, courts are permitted, but not required, to "modify the timing of disclosures under Rules 26(a) and 26(e)(1)" in their scheduling orders. FED. R. CIV. P. 16(b)(3)(B)(i). In the present case, the Court's scheduling order (as amended), modified the timing of certain disclosures under Rule 26(a). Dkt. Nos. 3325, 3329, 3595. But there is no indication from the scheduling order that the Court modified the parties' obligations under Rule 26(e), which requires "a party who has made a disclosure under Rule 26(a)—or who has responded to [a discovery request]" to "supplement or correct its
(footnote continues on next page)

highlighted in their experts' reports are merely modified versions of the computations disclosed on June 2020. They are based on the same six categories of red flags. Moreover, the computation modifications are based on discovery received after June 2020 describing Defendants' own red flag metrics. Finally, the prescriptions for which Defendants will be required to produce related due diligence documents, and through which Plaintiffs intend to demonstrate at trial that Defendants failed to perform due diligence when red flags were discovered, were all identified in June 2020. For these reasons, the cases cited by Defendants supporting the imposition of sanctions are entirely inapposite. *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 843-45 (6th Cir. 2020) (district court erred in allowing plaintiffs, without good cause, to amend their complaints to add new claims, for which no discovery had been done, nineteen months after the deadline provided in the court's scheduling order, and more than ten months after the close of discovery on plaintiffs' original claims);[6] *Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (district court did not abuse its discretion in disregarding proposed testimony of plaintiff's

---

disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." FED. R. CIV. P. 26(e)(1); *cf. Jack Tyler Eng'g Co. v. ITT Flygt Corp.*, No. 03-2060MAV, 2004 WL 2905407, at *3 (W.D. Tenn. June 8, 2004) ("If a court fails to designate an expert supplementation deadline, then Rule 26(e) controls . . ."); *Porter v. Hamilton Beach/Proctor-Silex, Inc.*, No. 01-2970-MAV, 2003 WL 21946595, at *6 (W.D. Tenn. July 28, 2003) (same), *aff'd*, No. 01-2970-MA, 2003 WL 25764929 (W.D. Tenn. Aug. 7, 2003). Plaintiffs have simply supplemented or corrected their prior disclosures based on discovery from Defendants produced after June 2020 that demonstrated that Plaintiffs' June 2020 computations were incomplete. *Cf. KCH Servs., Inc. v. Vanaire, Inc.*, No. CIV.A. 05-777-C, 2010 WL 1416672, at *3 (W.D. Ky. Mar. 31, 2010) (noting that plaintiff's expert's supplemental reports based on newly discovered evidence were proper under Rule 26(e) because they did not fundamentally change expert's damage calculation method); *Porter*, 2003 WL 21946595, at *6 ("Rule 26(e) does not prohibit an expert from supplementing his disclosures based on information thereafter received from the opposing party."). This supplementation was made within Plaintiffs' expert disclosure deadline, before Defendants' expert disclosure deadline, and almost six months before trial is set to begin.

[6] Under Rule 16(b), a court's scheduling order is required to set a deadline for amending pleadings. FED. R. CIV. P. 16(b)(3)(A). This rule " 'ensure[s] that at some point both the parties and the pleadings will be fixed.' " *Nat'l Prescription Opiate*, 956 F.3d at 843 (citation omitted).

expert where plaintiff "submitted his designation of the one liability expert allowed by the court twenty days late, but did not provide the reports and statements of his expert witness as required by Fed. R. Civ. P. 26(a)(2) until he submitted his opposition to the defendants' motions for summary judgment" six weeks after the expert disclosure deadline set forth in court's pretrial order); *Reliance Ins. Co. v. Louisiana Land & Expl. Co.*, 110 F.3d 253, 256-58 (5th Cir. 1997) (district court did not abuse its discretion in denying plaintiff's request to supplement its expert report where supplementation was sought because initial deposition of the expert did not go well and plaintiff wanted expert to offer a new causation opinion that he had disclaimed in his deposition, and plaintiff's request for supplementation occurred ten days after the defendants' expert designation deadline had passed and defendants had chosen not to designate a rebuttal expert in reliance on the deposition testimony of plaintiff's expert); *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 309-12 (M.D.N.C. 2002) (plaintiff sanctioned for untimely expert disclosures in violation of discovery control order, where plaintiff simply was surprised by testimony of defendant's expert and decided to bolster its case by getting a new expert and having its first expert conduct another type of test); *Keener v. United States*, 181 F.R.D. 639, 639-42 (D. Mont. 1998) (expert precluded from testifying to opinions expressed in his "supplemental" disclosure statement where the second statement was untimely, it was "substantially different" than the first opinion, the information on which the second opinion was based was available to the expert before he submitted his initial opinion and he simply chose not to review it, the second statement was prepared after the opposing party submitted its expert disclosure statement, it was an impermissible rebuttal opinion and not truly a supplemental opinion, and no request for extension of time was made).

**CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Strike Untimely Identified Prescriptions That Plaintiffs Contend Caused Harm for Which They Seek Relief in its entirety.

Dated: May 6, 2021

Respectfully submitted,

Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR 00907
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX 77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Trial Counsel*

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017 (212)
397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and Trumbull County, Ohio*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger