IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE:                          Case No. 1:17-MD-2804
NATIONAL PRESCRIPTION           Cleveland, Ohio
OPIATE LITIGATION
                                May 7, 2021
                                1:04 p.m.



- - - - -



TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

BEFORE THE HONORABLE DAN A. POLSTER,

UNITED STATES DISTRICT JUDGE, AND

DAVID A. RUIZ, UNITED STATES MAGISTRATE JUDGE.



- - - - -



Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                         7-189 U.S. Court House
                         801 West Superior Avenue
                         Cleveland, Ohio  44113
                         216-357-7087
                         Susan_Trischan@ohnd.uscourts.gov

```
 1    APPEARANCES:

 2
      For the Plaintiffs:      Peter H. Weinberger, Esq.
 3                             Hunter J. Shkolnik, Esq.
                               W. Mark Lanier, Esq.
 4                             Salvatore C. Badala, Esq.
                               Joseph Rice, Esq.
 5                             Jayne Conroy, Esq.
                               Steven J. Skikos, Esq.
 6

 7

 8    For Walgreen Defendants: Kaspar J. Stoffelmayr, Esq.
                               Kate Swift, Esq.
 9

10    For CVS Defendants:      Eric R. Delinsky, Esq.
                               Sasha Miller, Esq.
11                             Graeme Bush, Esq.

12    For HBC/Giant Eagle
      Defendants:              Robert M. Barnes, Esq.
13                             Josh Kobrin, Esq.

14
      For Rite Aid Defendants: Kelly A. Moore, Esq.
15                             John Lavelle, Esq.

16    For Walmart Defendants:  John Majoras, Esq.
                               Tina M. Tabacchi, Esq.
17                             Tara Fumerton, Esq.

18

19    ALSO PRESENT:            Special Master David Cohen

20

21

22

23

24    Proceedings recorded by mechanical stenography;
      transcript produced by computer-aided transcription.
25
```

<u>FRIDAY, MAY 7, 2021, 1:04 P.M.</u>

THE COURT:  All right.  Dan Polster calling in.

THE CLERK:  Hi, Judge.  I've made sure we have everyone we need.

Do you want a roll call or should we just go ahead?

THE COURT:  No.  No.  I just want to make sure everyone on my team is on.

THE CLERK:  I have verified Carrie, Julian, Scott, David Cohen, Judge Ruiz and the court reporter.

THE COURT:  All right, fine.

All right.

THE CLERK:  There's some buzzing and I've asked that person to mute.  I don't think they know they're buzzing, but go ahead.

THE COURT:  All right.  Good afternoon, everyone.

This is our monthly Track Three status conference.

I've been obviously reviewing all the filings in the last week about -- started by the defendants' motion to strike.

I guess I'd like to know from the plaintiffs when, when did you know that your -- your

1   case, your case had changed from implicating one million

2   prescriptions to implicating two million?

3                When did you know this?

4                MR. WEINBERGER:  Judge, this is Pete

13:05:20  5   Weinberger.

6                I will address your question directly.

7                We knew it when we engaged in discovery

8   depositions, which began in, my recollection is, sometime

9   in February and ended sometime in March.

13:05:45 10                And what I -- you know, without rehashing

11  our opposition brief, what was revealed during the course

12  of that document discovery and deposition discovery was

13  red flag analysis policies information and how red flags

14  were or would be analyzed that were gleaned from a number

13:06:18 15  of different sources.

16                I cited to one of those sources, which is a

17  trade organization, the National Association of Chain

18  Drug Stores, which all the defendants belong to or

19  serve -- fund and serve on, which included information

13:06:40 20  about categories of red flags that were published,

21  discussed and ultimately decisions were made about in

22  2013.

23                And that was discovered and -- in document

24  production from the defendants and depositions were taken

13:07:11 25  about that, and I think from the document that you -- the

1    two documents that I attached to our opposition, you can

2    see how -- how it tracks the categories of red flags that

3    we have utilized, particularly with respect to the report

4    of our pharmacy expert Carmen Catizone.

13:07:37  5         In addition to that, our discovery

6    depositions revealed how the defendants themselves --

7    albeit very late in the timeline of this case --

8    developed their own written policies regarding red flag

9    analysis, and subsequently -- again late in the

13:08:06 10  timeline -- you know, implemented those red flags both

11   from the standpoint of addressing them through the

12   pharmacist, but also finally addressing them in terms of

13   how their own dispensing data, and an analysis of that

14   dispensing data and algorithms run on that dispensing

13:08:37 15  data, would be relevant to identifying red flags that

16   would be provided in terms of tools to their pharmacist

17   about prescriber history, prescriber profiles, and

18   patterns, patient patterns and profiles.

19        And general prescription patterns would

13:09:02 20  assist pharmacists based upon nation -- their own

21   nationwide data to address potential red flags associated

22   with individual prescriptions.

23        And then, thirdly -- and this is personally

24   revealed by the NACDS documents that I -- that I attached

13:09:30 25  to this opposition -- it reveals what the

1    defendants -- what discovery produced in this case

2    revealed regarding the defendants' knowledge of the

3    importance, breadth and criteria that should be used for

4    a red flag system based upon DEA enforcement actions and

13:10:05  5    other DEA publications published by the DEA in, for

6    example, the *Federal Register*.

7            So --

8            THE COURT:  Well --

9            MR. WEINBERGER:  That, so the timeline,

13:10:19 10    again, back to what I said initially, the timeline was

11    when we got into the intensive deposition and document

12    discovery that, you know, occurred about -- or culminated

13    or terminated about three or four weeks before we

14    produced the expert reports of Carmen Catizone and Craig

13:10:44 15    McCann.

16            THE COURT:  All right.  Look, it's not for

17    me to dictate or tell the plaintiffs what case to bring

18    or what case to try, and it's not for me to dictate how

19    the plaintiffs defend the plaintiffs' case.

13:11:04 20    That's -- that's up to all of you.

21            The case implicating one million --

22            MR. WEINBERGER:  Judge, I'm sorry, at least

23    from my perspective, you are breaking up significantly.

24            THE COURT:  I'm doing the best I can.

13:11:23 25            The case implicating one million

1    prescriptions is not the same as a case implicating two

2    million prescriptions, and there's no way that it's fair

3    for the plaintiffs to change their case at this late date

4    and not give the defendants a time -- time to, you know,

13:11:43  5    develop a defense.

6                So I'm not going to do that.

7                You know, I know the plaintiffs are saying

8    this case isn't about individual prescriptions, and it's

9    not, but the defendants have a right to know what

13:11:58 10    the -- what prescriptions the plaintiffs believe are

11    suspect and should have been, you know, kicked out,

12    monitored, flagged, whatever, by a valid system or at

13    least some checks, some inquiry.

14                And this is now a totally different case.

13:12:18 15    So --

16                MR. WEINBERGER:  Can I -- I'm sorry, Your

17    Honor.

18                THE COURT:  Go ahead.

19                MR. WEINBERGER:  Can I respond?  Can I

13:12:24 20    respond?

21                THE COURT:  You can.

22                MR. WEINBERGER:  So --

23                THE COURT:  I've made my conclusion, but go

24    ahead.

13:12:28 25                MR. WEINBERGER:  Well, I appreciate that,

1    Your Honor.

2              So what's -- what's -- what I've been

3    trying to communicate, perhaps not very well, is the fact

4    that, you know, we did what -- we did what we said we

13:12:45  5    would do.  We identified, as best as we could, the

6    red -- the red flags that we thought were well-recognized

7    back in June of 2020, and we ran those red flags through

8    algorithms to -- onto the data and came up with the

9    problematic prescriptions.

13:13:15  10             What we didn't know was -- and the

11   defendants, you know, wouldn't agree, I mean fought us in

12   these conferences about what red flags really meant and,

13   you know, we formulated that answer as best we could at

14   the time that we had very limited information about what

13:13:44  15   we've later discovered.

16             And what we later discovered is exactly

17   what I've described, and that -- defendants knew very

18   well these categories are red flags.

19             And even with respect to the red flags that

13:14:07  20   we identified in 2000 -- in June of 2020, you know, these

21   sophisticated large Fortune 50 companies for the most

22   part, you know, would have had the ability -- and I'd be

23   surprised if they didn't do this themselves -- to run the

24   very -- and we gave them the code on the algorithms -- to

13:14:32  25   run the very algorithms against their own data.

1          So this is their data.  This is, you know,

2     what the -- this is data that the CSA has required them

3     to maintain and utilize for as long as they've been

4     registrants.

5          So to suggest, Your Honor, that they

6     are -- that -- or for them to argue that they are

7     prejudiced because we've identified another batch of

8     prescriptions based upon the very red flag policies that

9     they ultimately came to, you know, in 2015 or '16 or '17

10    as opposed to 2006, '7 or '8 when they should have been

11    doing it, you know, I appreciate your concern that

12    they're claiming prejudice, but I'm having trouble

13    understanding where the true prejudice is.

14          So I appreciate the opportunity to respond

15    to your comments, Your Honor, and I'll just end there.

16          THE COURT:  All right.  Well, thank you.

17          MS. SWIFT:  Your Honor, this is Kate --

18          THE COURT:  All right.  Now, I'm not

19    hearing.

20          I want to hear from the defendants why you

21    think the plaintiffs' case has changed and what

22    additional -- what -- what discovery -- you say you need

23    five, six months more discovery -- what you would do.

24    Again this is your data.  I mean, what you would -- what

25    you would propose to do or redo in this five, six months.

1          MS. SWIFT:  Your Honor, this is Kate Swift

2     for Walgreen's.

3          Can you hear me okay?

4          THE COURT:  Yes.  Yes, Kate.

13:16:33  5          MS. SWIFT:  Thank you, Your Honor.

6          With respect to your question about what we

7     would do with the data, we would do the same thing we did

8     throughout fact discovery with the original one million

9     prescriptions the plaintiffs initially identified, which

13:16:47 10    was already an enormous number to address, which is to

11    say our data analysts would look at those flagged

12    prescriptions to determine whether they agreed that they

13    were applying the algorithms correctly.  That even by

14    itself is a time-consuming effort.

13:17:14 15         Other experts spent an enormous amount of

16    time evaluating the criteria of the flags and individual

17    prescriptions that flagged onto those flags to determine

18    whether they agreed whether they were actually flagging

19    prescriptions that should have been flagged or not.

13:17:29 20         And we also spent a very large amount of

21    time discussing with our fact witnesses -- and conducting

22    other discovery in depositions and otherwise -- to

23    address what plaintiffs were calling red flags.

24         If I -- if I may also, please, respond to a

13:17:49 25    couple of the things that Mr. Weinberger said with

1   respect to why it took them so long to identify another

2   brand new one million prescriptions that were not

3   identified previously, he made basically two points.

4               One, and the two documents that are cited

5   in the plaintiffs' opposition briefs, those documents

6   relate to industry-wide discussions in the 2013 time

7   frame about proper controlled substances dispensing.

8   Those discussions involved Mr. Catizone, plaintiffs'

9   expert, his own organization, the National Association of

10   Boards of Pharmacy, and there's no reason at all to think

11   he didn't know.  He participated in those discussions.

12               Secondly, Mr. Weinberger referred to the

13   pharmacy defendants' policies and procedures on flagging

14   prescriptions.  Plaintiffs have had those policies for

15   years and, in fact, the very first time the parties

16   discussed the issue of an early disclosure of red flag

17   prescriptions in the December, 2019 status that the

18   defendants cited in the motion to strike, plaintiffs

19   cited a Walgreen's policy and said they were going to use

20   it to identify their red flags.

21               So we're having trouble understanding the

22   suggestion that this is new information.

23               In the reply brief that we filed this

24   morning, Your Honor, that's Document 3722, we laid all of

25   this out and also made the point that if the plaintiffs

1    are going to be allowed this very, very late new opinion

2    on a totally different new universe of red-flagged

3    prescriptions, they should be precluded from talking

4    about any of those prescriptions except the overlapping

13:19:46  5    ones, the 840,000 that were flagged both by their earlier

6    disclosure and the new untimely disclosure.

7                    THE COURT:  All right.  Look, I -- I'm not

8    happy with any of this.  I mean, I'm not happy with the

9    plaintiffs, and I'm not happy with the defendants.  But

13:20:08  10   again it's not for me to tell the plaintiffs what case to

11   try or what you want to use or what theory or what

12   prescriptions you think are suspect.

13                    Candidly, I thought, you know, a million

14   out of four million, roughly 25 percent, you know, to

13:20:27  15   convince the jury that the plaintiff -- the defendants

16   should have a system which would have identified 25

17   percent of the prescriptions given by doctors were

18   suspect was really stretching it.

19                    Now you're saying they should have seen

13:20:44  20   that half the prescriptions were suspect, I think that's

21   a huge reach, but, you know, if you want to do it, you

22   want to do it.

23                    But this is a -- this is a significantly

24   different case, and so I can't -- I'm not going -- I'm

13:21:00  25   not going to let you bring a case saying there are two

1  million suspicious prescriptions and do it in October.

2         So, I mean, the parties have got -- you've

3  got to -- plaintiffs have a choice.  I mean, if

4  you -- you want to go back to the original one million,

13:21:21  5  you know, fine, you'll have to, you know, redo your

6  expert reports and you may have to move those dates a

7  little bit back, and so be it.

8         The defendants have offered another

9  possibility which, you know, you want to go with the

13:21:37  10  840,000 prescriptions that are identified both in the

11  June 20th, 2020 disclosure and the April, 2021, that's

12  fine, too.

13         But if you want to go forward with the two

14  million, you have that right, but we're not going to

13:21:54  15  trial in October.  And candidly, I don't know when it

16  will be.  I'm not going to try, you know, try and pull

17  off a complex jury trial in Cleveland in the winter, so

18  we're talking about spring; probably May.

19         All right?  You know, I don't really care.

13:22:11  20  I'm getting frustrated with this whole pharmacy thing and

21  maybe, candidly, it's time to end the MDL with the

22  pharmacies.

23         I mean, I, you know, I don't understand

24  what the pharmacies are doing.  I mean, if you want to

13:22:26  25  try thousands of these cases, fine.

1          I can understand why Walmart wants to

2    because everyone else will go bankrupt and they will be

3    the only, only pharmacy in the country, but again Walmart

4    has chosen to go to war with the Department of Justice,

13:22:39  5    and I think they should understand that if the Department

6    of Justice decides to suspend your DEA license, your

7    pharmacies are out of business.

8          So, you know, but whatever.  So I've got

9    to -- you know, the plaintiffs, I'm going to give you a

13:22:58 10    very short period of time to decide what you want to do

11    because if I'm not going to trial in October, I've got a

12    ton of criminal trials that are backed up and I'll put

13    them in.

14          I did my first one in 14 months just this

13:23:11 15    week.  I've got six, seven, eight, nine -- I've lost

16    count, and I've told a bunch of them they're not going to

17    get their trials until 2022, and I'm not happy about

18    that.  So I'll put them in, if this trial gets kicked.

19          And at the same time, I want the

13:23:31 20    defendants -- I think I want you all to understand that

21    every other defendant in this MDL is at least making a

22    sincere effort to try and resolve these cases.

23          Whether they will or not remains to be

24    seen, but they're trying.

13:23:50 25          If the pharmacies don't, then there's

1    really no reason to have an MDL for the pharmacies.  My

2    colleagues around the country can have all these cases

3    and, you know, try them until either the plaintiffs drop

4    or the pharmacies drop.  They don't need me.

13:24:09  5             So I'm urging the pharmacies to take up my

6    offer to at least help you explore resolution, but, you

7    know, if you don't want to, that's up to you, but again I

8    don't -- this Track Three doesn't seem to be going

9    anywhere.

13:24:27  10            So I guess, Mr. Weinberger, what, you

11   know -- how much -- when can you make your decision?  You

12   want to make a reasoned one and decide what you want to

13   do.

14             MR. WEINBERGER:  Well, Your Honor, I think

13:24:49  15   we should -- today is Friday.

16             I think we can probably get back to you

17   with our decision by close of business on Wednesday.

18             That -- some of my colleagues that I have

19   to consult with are in the middle of the West Virginia

13:25:11  20   trial, and --

21             THE COURT:  All right.  Well, that's fine.

22   I mean, I was going to give you --

23             MR. WEINBERGER:  Let -- go ahead.

24             THE COURT:  Yes.

13:25:19  25             MR. WEINBERGER:  Next Friday actually is

         1   probably better.  Next Friday.

         2                  THE COURT:  Why don't you take -- why don't

         3   you make it noon Friday, all right?

         4                  MR. WEINBERGER:  Okay.

13:25:28 5                  THE COURT:  Make it noon.  Noon.  That's

         6   the 14th.  Take a week.  It's an important decision and

         7   you don't want to wing it, so talk to -- you know, again

         8   you've got -- you've got three choices as I see it.

         9                  One, you -- you go back to your 4/20 -- I'm

13:25:51 10  sorry, June, 2020 --

        11                  MR. WEINBERGER:  June, right.

        12                  THE COURT:  -- disclosures and go with

        13   that.

        14                  Option two is -- it's the defendants'

13:26:03 15  suggestion; it seems, you know, reasonable to me -- you

        16   go with the 840,000 that's in the overlap between

        17   8 -- between June, 2020 and April, 2021.

        18                  Or, three -- and in both one and two we

        19   keep our October trial.

13:26:21 20                 Or, number three, if you want to go with

        21   the two million, then we postpone the trial until next

        22   spring.

        23                  So you just need to let me and the

        24   defendants know.

13:26:37 25                 And then either way, I also want to discuss

1    this -- this idea of the field issue.

2                    MR. WEINBERGER:  The sampling.

3                    THE COURT:  All right.  This is something

4    I've just become aware of recently.

13:27:00  5                    I believe -- I believe that the sampling of

6    the notes field would be very probative to a jury.  I

7    have no idea what it's going to show.  I don't know if

8    it's going to help the plaintiffs.  I don't know if it's

9    going to help the defendants.  There may be pluses and

13:27:17 10    minuses for each.

11                    But this would -- this would show, you

12    know, what due diligence the defendants did.  All right?

13                    Now, we're obviously not going to hold it

14    out for millions of prescriptions.  If we have some

13:27:38 15    random sample, that seems fair.  And I don't know what

16    the number is.

17                    Special Master Cohen has identified a

18    certain number.  I don't know what the parties think

19    about whether that's too large or too small, but it

13:27:51 20    should be a fair number that's also not too burdensome.

21    But again, clearly, it's got to be a sample of this -- of

22    the universe that we're talking about.

23                    At the moment I don't know if the universe

24    is a million, 840,000, or two million.

13:28:13 25                    It's got to be the same -- the universe of

1    the plaintiffs' case.  So when we know what that universe

2    is, I'm going to order some sample.

3              Now, I mean, I'd like to hear from the

4    parties what you think a -- what a reasonable number is.

13:28:34  5    It's got to be reasonable in terms of, you know, that

6    someone's going to say it's enough, but it can't be so

7    much to be burden -- you know, unduly burdensome, both to

8    produce and analyze.

9              So what do you think a fair number is?

13:28:55 10              MR. WEINBERGER:  So, Your Honor, this is

11   Pete again.

12             Thanks for bringing this issue before us,

13   because it is -- it is an important and pending issue.

14             First of all, I'm not sure to what extent

13:29:07 15   you're up-to-date, but the defendants have filed a motion

16   for reconsideration.

17             THE COURT:  Yes, I'm cutting through all

18   this.

19             MR. WEINBERGER:  Okay.

13:29:16 20             THE COURT:  I'm cutting through all this.

21             This is me.  This is not Special Master

22   Cohen.  I'm ordering it because I think to a jury it

23   could be very probative.  It will show -- I have no idea

24   what's in the -- what it's going to show.

13:29:32 25             I mean, it may be very helpful to the

1    defendants.  If it shows that, you know, your pharmacists

2    were, you know, checking things out and noting down

3    whatever they check, that's what a conscientious

4    pharmacist should do.  If they're all blank, well, then

13:29:49    5    that doesn't look so good.

6                    MR. WEINBERGER:  So let me answer your --

7                    THE COURT:  What is a fair number?

8                    MR. WEINBERGER:  Let me answer your

9    question directly.

13:29:57    10                   So we have -- we have a concrete proposal

11    that we submitted to Special Master Cohen, and it asks or

12    it suggests that we identify 250 red-flagged

13    prescriptions per year per defendant from 2006 to 2019.

14                   And we actually, in anticipation or because

13:30:27    15    of the motion to strike that was filed, we -- we actually

16    said "Let's run that against the 840,000 prescriptions

17    that were flagged both in June of 2020 and the additional

18    calculations arising from our expert's report."

19                   So we've already -- we've already made our

13:30:52    20    proposal and we've also, on a technical matter, suggested

21    how it is that we do that random sampling, and there are

22    others much more technical than I that could describe it.

23                   But it's in writing, Your Honor.  It was

24    submitted to Special Master Cohen, and again it's 250

13:31:17    25    red-flagged prescriptions per year per defendant for the

1    13 years from 2006 to 2019.

2                    THE COURT:  All right.  From the

3    defendants' standpoint, do you think that's -- I mean,

4    it's not -- that's not too -- that's not a lot.

13:31:32 5                    Do you think it's too large?  Do you think

6    it's too small?  What do you think?

7                    MR. DELINSKY:  Your Honor, this is Eric.

8                    THE COURT:  Yeah.

9                    MR. DELINSKY:  And, Judge, I know you don't

13:31:46 10   want to hear it, but I would be remiss if I -- if I just

11   didn't state it at the outset -- and I won't devote time

12   to it -- that we do object to this line of discovery as

13   having been waived by plaintiffs, and it's late timing.

14                    THE COURT:  It --

13:32:03 15                    MR. DELINSKY:  It came up a year-and-a-half

16   ago and plaintiffs withdrew their request for it, so it

17   puts us in an extremely difficult posture, given the

18   burdens associated with culling this evidence.

19                    But let me move on, Your Honor.

13:32:21 20                    THE COURT:  Why -- obviously, look, we're

21   not talking about -- I mean, it's a relatively small

22   number of documents, all right?  I mean, 250 per year per

23   defendant times 13.  Okay?  It's -- each defendant,

24   that's 250 times 13, so we're talking about four or 5,000

13:32:45 25   documents.

1              MR. DELINSKY:  Right.

2              THE COURT:  Four or 5,000 documents.

3              MR. DELINSKY:  Your Honor, for CVS it's

4    3,500, given the date range.

13:32:56  5              THE COURT:  Okay.

6              MR. DELINSKY:  And let me explain to you.

7    There's several complexities.  Some are technological.

8    They hit different defendants in different ways.  It's

9    just time-consuming, that's all.

13:33:06  10             But I want to focus your attention on one

11   part of this and that's the actual paper prescriptions

12   themselves because it has always been custom for many

13   pharmacists to take notes -- take their notes on the back

14   side usually of the prescriptions.

13:33:26  15             And while prescriptions are scanned in the

16   system, the back sides are not.  It's only the front

17   sides.

18             So much of the burden, Your Honor, is

19   extracting, going back to 2006, these hard copies so that

13:33:43  20   the sample is complete.  And so I'm most familiar with

21   CVS.  Let me tell you what that would entail, Judge.

22             The documents are maintained in up to

23   different -- 15 different facilities.  Those would be,

24   for recent years, our 14 pharmacies in Lake and Trumbull

13:34:05  25   County, and then for beyond the last few years to varying

1    degrees they are at Iron Mountain.  They are in archived

2    storage.

3                    It's hard to know for sure until we see the

4    actual prescriptions, but we anticipate that it could

13:34:24  5    require us to retrieve approximately 3,500 boxes, either

6    from the pharmacies themselves or from archived storage.

7                    And then it's a manual review process.  It

8    can't be done with computers.  You know, a person has to

9    sit there and sort through the boxes to pull the

13:34:49 10    prescriptions.  It's an extremely time-consuming exercise

11    to do that.  It's not like, you know, running search

12    queries on e-mails.  It's not electronic, Judge.  It's --

13    Judge, it's different.

14                    And so mindful that we do object to any of

13:35:11 15    this discovery, the issue for us to a large degree is

16    time and burden.

17                    We put forth a proposal, and the proposal

18    when it follows the sample, 100 per defendant going back

19    five years.

13:35:35 20                    The time component's important, Your Honor,

21    for a number of reasons.

22                    The first reason is that obviously more

23    recent documents, there's a higher chance that they're

24    easier to collect and that we may not have to dip into

13:35:50 25    archival storage.

1          The second reason is that any suggestion

2     that pharmacists should document due diligence is a

3     relatively new creation, so by way of example,

4     plaintiffs' expert cites documents beginning in around

13:36:12  5     2012 indicating suggestions that this kind of work should

6     be reduced to paper.

7          So we think, given the time crunch and the

8     burdens, it should be a very small sample.  And it really

9     should be limited to later years because, Your Honor,

13:36:34 10     it's obviously -- if nobody was talking about

11     documentation in, say, 2010 or 2008, that a pharmacist

12     didn't write something down obviously is not very

13     probative.

14          So we think it only makes sense to do it in

13:36:49 15     the recent years, and it needs to be small.

16          This all feeds into the trial date, Your

17     Honor, and we were working to an October trial date, what

18     we felt we could reasonably and fairly accomplish with an

19     October trial date.

13:37:05 20          Obviously, there's a degree of a sliding

21     scale.

22          And there's one other issue, Your Honor,

23     and I've already droned on too long, but there's one

24     other issue and that is that given that this is new

13:37:19 25     discovery and that we've gone from an aggregate

1    collection of prescriptions that we understood would be

2    assessed in the aggregate to a specific body, we are

3    entitled to and require the opportunity for some

4    responsive discovery based on what the sample shows.

13:37:40  5              We have that right, limited to that

6    universe of prescriptions, which we don't know yet, and

7    we need time for that, too.

8              So that's what's figured into our proposal

9    for 100.  We were trying to come up with a number that we

13:37:55  10   felt we could accomplish before October, and where we

11   would get the right for fair reciprocal discovery on it.

12             THE COURT:  All right.  Well, I have a

13   little question here.

14             Again, I -- you know, my gut feeling is

13:38:21  15   that is five years may be a bit short and, you know, a

16   hundred may be a little, you know, a little low, but I,

17   you know, one of the --

18             MR. WEINBERGER:  Your Honor, he's talking a

19   hundred -- he's talking a hundred per defendant; not a

13:38:41  20   hundred per year.

21             THE COURT:  No, he's talking about a

22   hundred for each of five years.

23             MR. WEINBERGER:  That's -- Your Honor --

24             MR. DELINSKY:  I'm sorry if I was unclear,

13:38:51  25   Your Honor.

1           We -- our proposal, given the difficulty in

2      locating or the time-consuming nature of locating the

3      hard copies, among other difficulties, was 100 per

4      defendant.

13:39:03  5           THE COURT:  Eric, that's 20 per year.

6      That's not meaningful.

7           There isn't any -- I mean, no one

8      would -- that's worthless.  That's too small to be of

9      value at all.

13:39:16 10           MR. WEINBERGER:  And, Your Honor --

11           THE COURT:  That -- that's no good.

12           The --

13           MR. DELINSKY:  The complexity, Your

14      Honor -- I'm sorry, Peter.

13:39:28 15           MR. WEINBERGER:  In terms of how far back,

16      you know, I do not agree to their interpretation of our

17      expert report.

18           And so, you know, the discovery time frame

19      for this case with respect to SOMS and with respect to

13:39:46 20      the distribution case and with respect to the dispensing

21      case has always been back to 2006.

22           And then just one other point.  An

23      important part of the corresponding responsibility of the

24      pharmacist to review a prescription for red flags --

13:40:12 25      which has been the law since the beginning of the CSA in

1    1971, Your Honor, and which the DEA representatives in

2    this case have testified is where the red flag

3    investigation comes in in terms of their fulfilling their

4    corresponding responsibility -- the documentation of that

13:40:42  5    is extremely important because when a pharmacist gets a

6    prescription that's flagged, and clears that prescription

7    based upon some investigation that was done -- they call

8    the physician, they look at other prescriptions of that

9    physician, they do other investigations -- the

13:41:07 10    documentation for that ultimately becomes relevant the

11    next time that doctor -- doctor's prescription gets

12    presented for another patient or that same patient

13    presents another prescription, either written by that

14    same doctor or by a different doctor.

13:41:28 15                    And so, you know, if the answer is, "Well,

16    we did -- we did document due diligence" -- and, by the

17    way, they say there's no limitation on that in terms of

18    time frame -- "and we wrote on the back of a hard copy

19    prescription and it ended up in a box somewhere," how

13:41:49 20    does a subsequent pharmacist for a subsequent

21    prescription, confronted potentially with a prescription

22    that they are flagging for some reason, get to the prior

23    information that was generated from the prior

24    prescription?

13:42:09 25                    Now, part of it is -- because we took

1      30(b)(6) depositions of their document and data

2      representatives, part of it is that there was some

3      documentation of due diligence within a computerized

4      system in that there were fields that could be -- where

13:42:33   5      you could create narrative notes.  There were prescriber

6      fields, there were patient fields, et cetera.

7                 And some of the information presumably that

8      would be written on the back of the prescription would

9      end up in these notes fields in the -- in the data

13:42:48  10      itself.  But be that as it may, you know, we're

11      taking -- we're dealing with a representation that,

12      "Well, we scanned the front but we didn't scan the back

13      and so, therefore, you know, we have -- it's so

14      burdensome to pull these documents."

13:43:09  15                 I mean, recognizing or giving them the

16      benefit of the doubt that that's true, that's why we came

17      up with the numbers that we did, which was, you know, a

18      very, very small fraction of the total prescriptions that

19      we've identified.

13:43:30  20                 THE COURT:  Well --

21                 MR. DELINSKY:  Your Honor, if I could just

22      make two quick points.

23                 Number one -- and I think there's really

24      two critical ones here.

13:43:38  25                 Number one is just time.  Plaintiffs raised

        1    this late.  It originally was raised by them in January

        2    of 2020, so roughly 18 months ago, and they decided at

        3    that point to withdraw their request.

        4                    Then they --

13:43:53 5                    MR. WEINBERGER:  I'm sorry, we did not.  We

        6    did not.  I'm sorry.

        7                    THE COURT:  Look, I'm not -- I'm beyond

        8    that.

        9                    I think it's --

13:43:59 10                   MR. DELINSKY:  Okay.  Fair enough, Your

       11    Honor.

       12                    THE COURT:  I think a jury -- I mean, I

       13    don't know -- the jury is going to have a hard time

       14    following this, but I think a juror would find this very

13:44:12 15   relevant.  It's firsthand evidence of what the

       16    defendant -- what the pharmacist did.  Okay?

       17                    I mean, you know, no one -- no one's

       18    guessing.  Here it is.  If it's a statistical sample, all

       19    right, it is what it is, and both sides can argue from

13:44:30 20   it.

       21                    MR. DELINSKY:  Your Honor, I think the two

       22    issues driving the defendants, given that and subject to

       23    our objections, are, number one, time and fairness, which

       24    is we have an October date.

13:44:41 25                   THE COURT:  All right.

1          MR. DELINSKY:  And that makes this very

2      difficult and introduces real fairness issues, that's

3      number one.

4          And number two, Your Honor -- and this is

5      why I really would ask that we abide by the process we've

6      ordinarily gone through -- some of these issues that

7      Mr. Weinberger has raised and they are not ones that are

8      reduced to DEA guidance or Board of Pharmacy guidance,

9      and that's why I do believe -- we have a letter pending

10      before Special Master Cohen -- I would ask that we let

11      this unfold with a ruling by Special Master Cohen on a

12      reconsideration request.  If there's objection, get them

13      to you promptly.

14          These are serious issues.  The fairness

15      issues are significant.  The timing issues are

16      significant, the burden issues.

17          This whole issue of documentation and is it

18      even fair to look at evidence before 2012 or 2013, that's

19      a very significant issue, too, especially with the burden

20      and the time issues.

21          So my request would be we let the process

22      unfold so that these issues can really be fleshed out and

23      be given -- sort of be addressed in writing and decided

24      in that fashion.

25          THE COURT:  Well, I appreciate that, but I

1    don't think we have -- I have a limited amount of time.

2    The lawyers have a limited amount of time.  I'm going to

3    order this, and the sooner it's done and everyone knows,

4    they can start working on it.

5              So this is what we're going to do.

6              I think we're going to have 10 years, 2010

7    to 2019.  I don't think we need 2006, '7, '8 and '9.  If

8    this doesn't show anything, you know, 2010 is far enough

9    back.

10             And I'm going to make it 200 prescriptions

11   per defendant per year for 10 years.  All right.  Again,

12   this is just a randomized sample.

13             All right.  So it's 200 per defendant per

14   year for 10 years, 2010 to 2019.

15             Now, the only thing we have to -- we'll

16   have to wait for a week to know if the universe is the

17   original one million, what I'll call the hybrid 840,000,

18   or the new two million.  That will be the universe.

19             And we've got to wait a week until the

20   plaintiffs make their election.  But once we know that,

21   then that's where we will be.  Whatever it shows, it

22   shows.

23             If we need to do a little more discovery on

24   that, you know, so be it.

25             I think it will be very probative to a

1    jury, whatever it shows, and I have no clue what it's

2    going to show.  But that will be -- that's the decision.

3                    SPECIAL MASTER COHEN:  Judge, this is

4    David.

13:48:07  5                    The other issue that I think you should

6    address, as long as you're addressing everything, is

7    Eric's request for what he terms responsive discovery.

8    And I'm not really sure what that means.

9                    THE COURT:  I don't know what -- I don't

13:48:20  10    know what it is, but --

11                    SPECIAL MASTER COHEN:  Well, I think it

12    includes doctor -- deposing doctors was suggested as part

13    of it.

14                    THE COURT:  We're not going to -- you don't

13:48:30  15    need to depose doctors.  Again, no one -- the issue is

16    not, you know, what the doctors ever did.  It's what the

17    pharmacies did, at least what they documented.  And it's

18    there or it's not there, so that's it.

19                    Nothing that a doctor said or did is going

13:48:51  20    to be responsive to this.

21                    MR. DELINSKY:  Your Honor, this is a very

22    important point for us.  It is a very important point.

23                    We are now at a universe of 2,000

24    prescriptions.  If you pull out any one of those, and

13:49:05  25    let's suppose hypothetically that it's riddled

1    with -- suppose we pull one of those prescriptions and it

2    has plaintiffs' red flags on its face and zero

3    documentation on it -- this is just a hypothetical,

4    Judge -- but it was written by a doctor at the Cleveland

13:49:52  5    Clinic, and that doctor were to testify, "All my

6    prescriptions, including that one, were written for a

7    legitimate medical purpose in the ordinary course of my

8    medical practice," in that case red flags are

9    superfluous.  They're meaningful -- they're meaningless,

13:50:12  10    excuse me.  Documentation is meaningless.

11                    That script is out of the case.  There can

12    be no liability for a prescription that was written by a

13    licensed doctor for a legitimate medical reason in the

14    ordinary course of her practice or his practice.

13:50:25  15                    So we believe this is very responsive.  If

16    each of those 2,000 prescriptions were supported by

17    testimony from the prescribing doctors -- and I

18    appreciate we couldn't depose all of them, even though

19    we'd like to, or anywhere near all of them -- but let's

13:50:44  20    suppose they were, all of those prescriptions, the red

21    flag issue becomes beside the point as a legal matter.

22                    So we see this as central, necessary

23    discovery, essential to our defense.

24                    And, Your Honor, you have been resolute

13:50:59  25    from the inception of the MDL that we get to meet

1      plaintiffs' evidence in the manner that we choose,

2      subject to the rules of admissibility.  And there's no

3      doubt this would be admissible evidence.  And this is a

4      really big, important issue to us.  It goes, in our

13:51:20  5      opinion, to just the basic fairness if plaintiffs get to

6      discover new items of evidence, we get to take discovery

7      just as to those items, not beyond that, and the

8      discovery we take would be, among other things, of the

9      doctors who wrote them, whose names are affixed to them.

13:51:36  10             And we see this as a very significant

11      issue, Your Honor.  I cannot understand it -- understate

12      it.  And if there's any question about it, we'd ask for

13      the opportunity to brief this issue.

14             THE COURT:  Wait a minute.

13:51:49  15             You're talking about, I mean, depose 2,000

16      doctors, you can depose a million doctors and presumably

17      most of these doctors -- I mean, Eric, I can't imagine

18      any doctor taking the stand and saying anything other

19      than what you just said about any of his or her

13:52:05  20      prescriptions.

21             Otherwise, they're going to lose their

22      medical license and probably be prosecuted.

23             MR. DELINSKY:  And, Your Honor, I

24      think -- that is the fallacy of plaintiffs' case.

13:52:19  25             MR. WEINBERGER:  No, it isn't.  No, it

```
 1    isn't, Your Honor.

 2                 THE COURT:  Hold it.

 3                 MR. WEINBERGER:  I'm sorry.

 4                 THE COURT:  You don't need any depositions

 5    for that.

 6                 The issue is there are certain

 7    prescriptions, certain things that don't -- that look

 8    strange, they look odd, they look like maybe those things

 9    didn't happen.

10                 So you should have a system to check them,

11    all right, and presumably each pharmacy had them.

12                 If you had no system at all, this case is

13    going to be very simple.  You could have every doctor

14    come in, parade every doctor in, it's not going to help

15    you.

16                 The issue is what system did you have and

17    did you use it, and that's all this random sample is

18    going to show.

19                 Who cares what --

20                 MR. DELINSKY:  But, Your Honor, that's

21    plaintiffs' theory of the case.  That's plaintiffs'

22    presentation.  It's not ours.

23                 We are pursuing a defense that looks

24    different from that, and we're entitled to it, and you

25    have said all along we are.
```

1            And if we are not to get this discovery,

2       Your Honor, then we would ask that there be a jury

3       instruction that says "None of these 2,000 prescriptions

4       can be at issue as to whether or not they were written

13:53:33 5       for legitimate medical reasons.  In fact, you need to

6       assume they were and this is just a sampling, you can

7       look at documentation practices."

8            But if we're not going to be able to

9       collect this discovery, these issues can't be in front of

13:53:46 10       the jury.

11            THE COURT:  Wait a minute.  Wait a minute.

12            The pharmacist didn't -- you know, if your

13       pharmacist talked to the doctor, that's going to be

14       on -- that's going to be in the field, in the notes.

13:54:02 15            MR. DELINSKY:  Not necessarily, Your Honor.

16       And it's also beside the point, because our position is

17       if a script was written for a legitimate medical reason

18       by the doctor, the case is over for that script.  It

19       matters not --

13:54:14 20            THE COURT:  But you don't -- if you want to

21       just parade in a bunch of doctors from, you know, Lake

22       and Trumbull County to just say, you know, "I'm a good

23       doctor, and when I write a prescription it's for a valid

24       reason," I guess you can do that, just generally.

13:54:32 25       Doesn't matter what individual prescriptions are because

```
 1        the plaintiffs -- the plaintiffs aren't saying that any

 2        individual prescription is per se a bad one.

 3                    All right.  So --

 4                    MR. DELINSKY:  But, Your Honor, I believe

 5        they are.

 6                    They have answered discovery requests --

 7        and I could be corrected on this -- where they have now a

 8        large universe of prescriptions as not having been

 9        written for legitimate medical reasons so this is

10        squarely at issue.  It would be at issue even if they

11        hadn't.

12                    And we do believe that as to this universe,

13        it's a new universe, it's new discovery, we have the

14        right to conduct some reciprocal discovery back.

15                    It's only fair.

16                    THE COURT:  Well, I need to know, before

17        you do it, what you're proposing.

18                    I've ordered 2,000 -- 200 prescriptions per

19        year for 10 years for each defendant, so that's 2,000

20        prescriptions per defendant.

21                    Now, presumably, I mean, that could be as

22        many as 2,000 doctors times five defendants, so a

23        thousand doctors.

24                    You're not proposing to do a thousand

25        doctor depositions, I wouldn't permit it, and it's not
```

1     feasible and it wouldn't be relevant.

2                    MR. WEINBERGER:  Your Honor, can I

3     address -- can I address a couple --

4                    THE COURT:  I'll just say this.

13:56:01  5            This is what I've ordered.  If after these

6     documents are produced you feel, you know, you want to

7     propose some additional discovery, propose it.  I'll see

8     what the plaintiffs say and I'll -- then I'll make a

9     decision.

13:56:20 10                    MR. DELINSKY:  Okay.  Thank you, Your

11    Honor.

12                    THE COURT:  I'm not going to do it in the

13    hypothetical because if you said "I propose to do 2,000

14    doctor depositions," the answer's no.

13:56:33 15                    MR. DELINSKY:  Okay.

16                    THE COURT:  Five, I might do that, I might

17    say yes, so I'm not going to make a theoretical ruling.

18                    MR. DELINSKY:  Okay.  Thank you, Your

19    Honor.  I understand.

13:56:45 20                    MR. WEINBERGER:  You know, we can't leave

21    this subject, Your Honor, without our going back many

22    months when we heard the exact same argument in response

23    to a colloquy we had with the Court on what the

24    plaintiffs' theory of the case was in terms of aggregate

13:57:04 25    proof.

1           And we heard, "Well, we need to depose all

2    these doctors."  And at the time you, Your Honor, said,

3    "Well, depose whoever you want to depose."  And so they

4    issued subpoenas to 50 or 60 doctors in Lake and Trumbull

13:57:26  5    County.  Do you know how many of those depositions

6    actually went forward?  I think three.

7           So we've heard this same argument time and

8    again in this case.  It's all about -- it's all about,

9    you know, this threat that they're going to be prejudiced

13:57:48 10    because they have a limited amount of time before this

11    trial.

12           THE COURT:  You know, I'm not going to

13    order, allow thousands of depositions.  If they say, you

14    know, we want to do five or six, I may permit that.

13:57:59 15           Okay?  I mean, I permitted a limited number

16    before.  They noticed 60.  They did three.  Okay, fine.

17    It ended up being no big deal.  It wasn't a big

18    imposition on the lawyers or on the medical community.

19           So I'll let them produce these documents,

13:58:22 20    see what they show, and if the defendants feel that,

21    "Judge, we want to depose some small number of doctors

22    and here's what we propose," I'll let the plaintiffs

23    respond and I'll make a very fast ruling.

24           We'll just do it that way.

13:58:40 25           MR. WEINBERGER:  Thank you, Your Honor.

 1          THE COURT:  All right.  You're welcome.

 2              I don't think there was anything else,

 3     other matters that I needed to address, but I'm quickly

 4     looking at it, other than on Page 4 I think I already

13:59:07 5     moved back those deadlines, the May 12th and May 21st.

 6              So what are the new deadlines?  I think I

 7     communicated that to Special Master Cohen.  I thought he

 8     had communicated it to the parties.

 9              MR. WEINBERGER:  Yes.  Your Honor, my

13:59:21 10     notes, I don't mean to speak for him, but I think we

 11     moved the amended complaint deadline to May 19th, and

 12     then there was some proposal about a CMO date changing

 13     and --

 14          THE COURT:  Early June.

13:59:37 15          MR. WEINBERGER:  Yes, I believe so.

 16          THE COURT:  Does anyone have that date,

 17     just so we are all on the same date?  It was one day in

 18     the first week of June.

 19          MR. WEINBERGER:  I apologize, Judge.  I

13:59:47 20     don't have that correspondence.

 21          MS. FUMERTON:  Your Honor, this Tara

 22     Fumerton.

 23              It's June 3rd.

 24          THE COURT:  All right.  I knew it was one

13:59:56 25     day that first week.  So those dates are 5/19 and 6/3.

1          All right.  And again, again I would

2     reiterate that I would hope that the pharmacy defendants

3     would consider my offer to at least help the parties

4     explore some potential global resolution.

14:00:28    5          I mean, every other defendant in the case

6     that hasn't gone bankrupt has at least -- is at least

7     exploring it.  And I think I'm in the best position to

8     help all sides, and this is largely -- it's largely the

9     PEC.  There's -- the state AG involvement with the

14:00:54   10     pharmacies is very limited, I think it's fewer than 10,

11     so that offer remains open.

12          All right.  Anything else that anyone wants

13     to bring up?

14          MR. WEINBERGER:  Next -- next status

14:01:08   15     conference, Your Honor.

16          THE COURT:  I have to set the next status

17     conference.

18          Thank you, Pete.  I meant to do that.

19          All right.  We've been generally doing them

14:01:17   20     on Wednesdays.  We went to Friday because I was in trial

21     so -- well, I was going to go with June 9th but I've got

22     an all-day Court meeting.

23          Well, how is Wednesday, June 2nd?

24     That's -- that's a little quicker, but I can't do it the

14:01:52   25     9th.

1      MR. WEINBERGER:  That's fine with us, Your

2  Honor.

3      THE COURT:  All right.  1:00 o'clock?  That

4  seems as good as any.  So let's go 1:00 o'clock on the

14:02:03  5  2nd, and that would mean the status report Tuesday, the

6  1st of June.

7      MR. WEINBERGER:  Yes, sir.

8      MR. DELINSKY:  Thank you, Judge.

9      THE COURT:  Okay.  All right.  Thanks,

14:02:24 10  everyone.

11      Stay safe, and we'll proceed the way we've

12  talked about.

13      MR. WEINBERGER:  Thank you, Judge.

14      THE COURT:  All right.  Thank you.

14:02:31 15      (Proceedings concluded at 2:02 p.m.)

16                  -  -  -  -

17              C E R T I F I C A T E

18      I certify that the foregoing is a correct

19  transcript from the record of proceedings in the

20  above-entitled matter.

21

22  **/s/Susan Trischan**
   /S/ Susan Trischan, Official Court Reporter
23  Certified Realtime Reporter

24  7-189 U.S. Court House
   801 West Superior Avenue
25  Cleveland, Ohio 44113
   (216) 357-7087