1        UNITED STATES OF AMERICA
         FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3                - - - - -

4  _____
                              )
5  IN RE:  NATIONAL PRESCRIPTION )
   OPIATE LITIGATION            )
6                              )   Case No.
   THIS DOCUMENT RELATES TO:    )   1:17-MD-2804
7                              )
   Case Track 3                )   Honorable
8                              )   Dan A. Polster
   _____)
9

10               - - - - -

11    TRANSCRIPT OF PROCEEDINGS VIA TELECONFERENCE

12    BEFORE JUDGE DAN A. POLSTER, JUDGE OF

13   SAID COURT, ON WEDNESDAY, JUNE 2ND, 2021,

14       COMMENCING AT 1:00 O'CLOCK P.M.

15               - - - - -

16

17  Court Reporter:          GEORGE J. STAIDUHAR
                             801 W. SUPERIOR AVE.,
18                           SUITE 7-184
                             CLEVELAND, OHIO 44113
19                           (216) 357-7128

20               - - - - -

21

22

23

24

25

1    P R O C E E D I N G S

2         JUDICIAL ASSISTANT:  Judge, do you want a

3    roll call or --

4         THE COURT:  No.  That's okay.

5         All right.  Good afternoon.  This is our

6    monthly Track 3 status call.  I appreciate the status

7    report that was filed the other day.  There are a few

8    things I want to cover.

9         First, I want to talk about the jurors for

10   our October trial.  I wanted to put out the possibility

11   that we pick only jurors who have been vaccinated.  It

12   strikes me that everyone else who is going to be in that

13   courtroom daily I am sure will be vaccinated.

14        I am sure all the lawyers will be

15   vaccinated, the Court staff will be vaccinated, most of

16   the witnesses, but again, the witnesses are going to be

17   in and out.  The people that have been here daily have

18   been vaccinated.  I see no reason not, you know, no

19   reason to pick jurors who have not been vaccinated.

20        First, they are potentially putting people

21   at risk, but also, I think it is far more likely we will

22   get jurors to be willing to serve for five, six weeks,

23   whatever, if they know that the other jurors who they

24   will be with each day have been vaccinated because my

25   hope is that I will be able to operate normally in this

1    trial;

2              That I will be able to use the jury box and

3    my deliberation room and pick the jury in my courtroom.

4    It seems to me we can do that far more readily if we

5    simply pick jurors who have been vaccinated.

6              And obviously, we will be on the honor

7    system, but I don't think too many people will lie about

8    vaccination to get on the jury.  So I am throwing that

9    out, you know, if anyone has any thoughts, but it seems

10   to me that's something lawyers should talk among

11   themselves if there is -- I can probably impose that

12   requirement myself, but I would rather have agreement on

13   it.

14             MR. LANIER:  Your Honor, Mark Lanier for the

15   Plaintiffs.  I guess the main trial lawyer on this, and

16   it falls in my lap.  While others may throw rocks at me,

17   I agree a hundred percent, and I will stick my neck out

18   and say that the Plaintiffs will agree.

19             THE COURT:  Okay.  Thanks, Mark.

20             MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr.

21   Obviously, I had the same thought at one point and

22   certainly understand the appeal.  There is something

23   about it that I will say just kind of feels odd.

24             What if there is somebody because of a

25   medical condition who wasn't able to get vaccinated, are

1   they -- is it proper for them to be excluded?  I don't

2   know the answer to any of these questions.  I would just

3   ask that the Court not make a rush decision and give it

4   time to think it through.

5              THE COURT:  No, I wasn't -- Kaspar, I was

6   not demanding the decision today.  It is not so much

7   excluding but -- well, I would not think that someone

8   that has a medical condition and can't be vaccinated

9   would want to be around a crowd everyday for five or six

10  weeks.

11             MR. STOFFELMAYR:  Yeah.  I understand

12  completely.

13             THE COURT:  We can't use that person.  I

14  would excuse that person.

15             MR. STOFFELMAYR:  Right.

16             THE COURT:  We all would.  I mean, that's a

17  no brainer.  So I got to think that person when they get

18  -- we are going to follow the same procedures we did two

19  years ago, two years, send out summons to about a

20  thousand people inquiring about their willingness and

21  availability to, you know, serve in a trial that could go

22  five, six, seven weeks, whatever, starting October the

23  4th.

24             And a whole lot of people obviously will say

25  no.  But I was thinking in that summons I want to be able

1    to say something about what the protocols are going to be

2    in the trial, and if we are only going to have jurors who

3    are vaccinated, I would put that in there, and I think

4    the summons will probably go on, summons inquiry,

5    whatever, to the initial thousand people around July

6    23rd.  So you got a little time, but I thought I would

7    raise it.

8               MR. STOFFELMAYR:  Thank you, Judge.

9               THE COURT:  One, you talk about it, and I --

10    I think it is the sensible thing to do.  So you can talk

11    about it and get back to Special Master Cohen with your

12    thoughts.  All right.

13               So again, my plan is to have the jury

14    department send out those initial summons inquiries

15    around July 23rd, and we will send the detailed

16    questionnaire around August 23rd, the ones, the jurors

17    who say they are available, willing and able to serve for

18    a lengthy trial will get the detailed questionnaire and

19    that's -- I think I looked at the schedule -- that's due

20    to Special Master Cohen July the 10th.  I will go through

21    it, we will finalize it, and that will go out in August.

22               All right.  These are things I wanted to

23    cover.

24               What I am calling the zero market share

25    cases, the Plaintiffs filed a report today, and it shows

1      that things are moving along, and a number of cases have

2      been dismissed or will be dismissed shortly.

3               I guess the only thing that was a little

4      vague was the last one, Plaintiffs' counsel continued to

5      analyze the causes for Giant Eagle.

6               My guess is there are far fewer cases

7      involving Giant Eagle because they are only in Ohio.  So

8      there are not many, but is there a particular problem

9      with Giant Eagle or just that there are a lot fewer

10     cases, so there is not much to report.

11               MR. WEINBERGER:  Your Honor, this is Peter

12     Weinberger.  We are not giving Giant Eagle priority.  We

13     are just -- we are just sorting through it.

14               THE COURT:  Okay.  They are only in Ohio, so

15     there are fewer cases.  All right.

16               MR. BARNES:  Also, your Honor, this is

17     Bob Barnes, Giant Eagle, there is one case and one case

18     only, and that's filed by Pete's firm in April, was filed

19     by Pete's firm in late 2018.  We asked to be dismissed in

20     mid April, and that was the subject of back and forth

21     e-mails, so there is only one case is my point.

22               THE COURT:  All right.  There is only one

23     case, so fine.

24               MR. WEINBERGER:  And I can report subject to

25     some finalization of discussions, it probably occur.

1          THE COURT:  Okay.  Fine.  Thank you.

2          MS. MOORE:  Your Honor, this is Kelly Moore

3   for Rite Aid.  So the status report does indicate that

4   Plaintiff intends -- it has been two months, and so far

5   you can see from our status report very few have been

6   dismissed and even fewer with prejudice as the Court

7   directed or ordered I should say.

8          And the status report the Plaintiffs filed

9   indicates there are hundreds of cases that Plaintiffs

10  have -- has said that they intend to pursue despite the

11  lack of market share.  I don't think that's consistent

12  with the Court's order or the intent of the Court's

13  order.

14         And I think when this was last discussed on

15  April 7th, the Court indicated if it had to it would

16  issue an order to show cause for why Plaintiffs are

17  refusing to dismiss those cases with prejudice, and once

18  again, I know that the status report indicates there is

19  some movement, but there is obviously hundreds of cases

20  where Plaintiffs have gotten back to the PEC and said

21  they do not intend to dismiss the cases.

22         MR. WEINBERGER:  So Kelly, if I can respond,

23  your Honor, Weinberger for the record --

24         THE COURT:  Yes.

25         MR. WEINBERGER:  I don't know exactly what

8

1    you are reading, and I know you just got it this morning,

2    but here is what it says.  We have received responses

3    noting that 141 cases will be dismissed, and an

4    additional 64 will be dismissed subject to client

5    approval.  It goes on to say that 37 cases are being

6    fully further investigated while 70 Plaintiffs intend to

7    pursue their claims against Rite Aid.  So there are --

8                   MS. MOORE:  And so --

9                   MR. WEINBERGER:  Wait, wait.  Wait a minute.

10                  So we have not -- I know there is more than

11   that on your list, and we have reached out to all of the

12   Plaintiffs' counsel on that list, and clearly, we haven't

13   heard back from everyone, but we are continuing to work

14   through that.

15                  So I don't think.

16                  MS. MOORE:  But I --

17                  MR. WEINBERGER:  Can I finish, please?

18                  THE COURT:  Let him finish.

19                  MR. WEINBERGER:  So I don't think there is

20   any reason for any show cause motions or orders to be

21   issued at this point.  I can tell you that I and my

22   office, particularly Sheila, my able assistant, is

23   continually communicating with the lawyers on those cases

24   out there and asking for information, and I think you can

25   see from our report that we've made progress.

1        It has been 60 days, but you know, there is

2   a lot that has to go into the decisions by each OF these

3   Plaintiffs' counsel in consultation with their clients

4   before decisions are made on these cases, and I think

5   what I've laid out in the first paragraph of my report is

6   that, you know, there are -- there is additional

7   information that, if we had it, we could be, say, more

8   timely in deliberating on what exactly it is that these

9   lawyers, the Plaintiffs' lawyers, are going to do.  I

10  think we have shown progress, and I will just leave it at

11  that.

12        THE COURT:  All right.  Look, progress is

13  being made.  This is complicated.  I am not going to

14  issue any further orders.  It is moving ahead, but trust

15  me, I am not just -- if at the end of this process the

16  PEC reports that hundreds of cases are proceeding against

17  Defendants with zero market shares in that county, that

18  isn't going to stick, fit.

19        I am going to require some specific showing

20  from the Plaintiffs in those cases why they are

21  proceeding, and I will have to evaluate it.  So this is

22  just the first cut.  Just so we understand, just because

23  a lawyer comes back and says we want to proceed, you

24  can't just accept that on face value.

25        They are going to have to make a showing as

1    to why, as to what is their basis for proceeding against

2    a pharmacy that has zero market share in that county.

3            Now, if there is a large market share in a

4    neighboring county and the stores are close, well, okay.

5    That would be a good reason.  So I will just let that --

6    we will let that continue.

7            MR. WEINBERGER:  Your Honor, thank you.

8            If I can just add to the mix here, I can't

9    emphasize enough, and I have had these kind of

10   conversations with counsel from all over the country, the

11   difficulty in assessing on behalf of a particular client,

12   this market share issue when the dispensing data has not

13   been produced.

14           I think I've laid out in our report the

15   difficulty of analyzing the situation just based upon

16   Arco's data because it doesn't provide us information to

17   whom and -- to whom the customer was dispensed and where

18   that customer lived or resided, which is, as the Court

19   knows from just seeing what has been developed in CT 3

20   the importance of the dispensing data to issues

21   associated with market share, contribution to the

22   epidemic, and other issues.

23           And as I suggested in my report, in terms of

24   any Plaintiff, any Plaintiffs' counsel, whether they are

25   within the PEC or outside of the PEC, fairly evaluate a

1    county where, let's just say a Wal-Mart does not exist

2    geographically within the county and Wal-Mart's

3    involvement in terms of dispensing pills from outside the

4    county, from stores outside the county to customers

5    within the county without the dispensing data, which the

6    Defendants all have is -- it is a difficult task and to

7    some extent un fair to Plaintiffs' counsel and to that

8    client whose case has been stayed if they are in the MDL,

9    who cannot make a request for the dispensing data, other

10   than whatever request the PEC makes on behalf of the

11   entire MDL.

12          And we haven't revisited that subject, which

13   we originally filed a motion on, you know, six or eight

14   months ago, but we may come to a point on behalf of

15   the Plaintiffs in the MDL where we have to renew that

16   motion if we get -- if these Plaintiffs are getting

17   pushed to make decisions that -- where they need this

18   information.

19          THE COURT:  All right.  Well, it may be that

20   I will have to either, you know, let it go or selectively

21   direct the Defendants to submit dispensing data for those

22   counties if they want the case dismissed.

23          MR. STOFFELMAYR:  Your Honor, may I respond?

24   It is Kelly Moore.

25          THE COURT:  Yeah.  All right.  But I don't

1    want to spend a lot of time on this, but go ahead, Kelly,

2    I just --

3                   MS. MOORE:  But what the Plaintiffs appear

4    to be saying, they know they have not adequately pled

5    these cases, and they have not had a factual basis to do

6    so, and they would like discovery first.

7                   But that's not how the federal pleadings --

8    rules regarding federal pleadings go.  That's not what is

9    required.  If they don't have a factual basis or basis to

10   file these complaints, they shouldn't have filed them.

11   They don't get to do discovery first.

12                  Furthermore, on the issue of nationwide

13   dispensing data, which they are seeking to pursue a

14   migration theory, that is not the way they perceive these

15   cases.  The entire cases and how they work them up is

16   based on Arco's data.  Their assessment of what market

17   share is is based on chill Phipps' jurisdiction, not

18   where those pills went thereafter.  That's what they base

19   market share on.

20                  So to switch gears and say we need

21   nationwide dispensing data, they wouldn't just need it

22   for a particular Defendant.  That's only to get them the

23   enumerator.  To get the denominator for that new

24   database, they would need dispensing data from every

25   pharmacy in the entire country for all of the nationwide

1    dispensing data to figure out what your new denominator

2    is.

3            And that's just not the way they have been

4    doing these cases.  They can't have it both ways and rely

5    on Arco's data when they give the market share and then

6    say no, we need discovery to actually plead a case before

7    they do.

8            MR. WEINBERGER:  Your Honor, we are happy, I

9    don't want -- you know, I don't want the waste the

10   Court's time -- we are happy to -- you know, if it calls

11   for a renewed motion, we will do it.

12           We are happy to brief this issue because I

13   couldn't disagree more strongly with Ms. Moore about how

14   she is couching what we base cases on or what we base

15   market share on.

16           With respect to the dispensing obligations

17   and liability, it has always been based upon dispensing

18   data, which is why we wanted the national dispensing

19   data in the first place, but we are happy to brief this

20   issue.

21           THE COURT:  I have neither the time nor the

22   interest in wading into this.  I thought we would try to

23   clean up some of these pleadings.  If we can do it, fine.

24   If it is going to be just too big a production, you know,

25   considering these case aren't being litigated and who

1    knows when and if they will be litigated, we won't.  So

2    we will just see how this continues.

3              All right.  The CMO for the five bellwethers

4    was due tomorrow.  There was some correspondence that

5    came in today that I started looking at.  The Defendants

6    wanted some additional time until next Wednesday, the

7    9th.  You know, another week doesn't seem to be -- the

8    world is not going to end if you have another week.

9              MS. TABACCHI:  Thank you, your Honor.

10   Tina Tabacchi from Jones Day.  We appreciate that, your

11   Honor.

12             THE COURT:  So I will extend it to July --

13   to June -- what is June --

14             MS. TABACCHI:  It was June 9th, your Honor.

15   That was next Wednesday.

16             THE COURT:  All right.  June 9th.  All

17   right.

18             MS. MORALES:  Your Honor, Paulina Morales in

19   regards to the Plaintiffs.  Just one note on that, one of

20   the reasons why we were in discussions on this point was

21   because the briefing schedule with the CT 3 dispositive

22   and Daubert motions, our efforts have been to try and

23   schedule these motions to dismiss so they don't overlap

24   with that.

25             So our hope is that we can reach agreement

1    with the Defendants to --

2                THE COURT:  Rightfully so, and I am

3    directing the parties to enter into stipulations.  We

4    don't need the same issues briefed.  I mean, just enter a

5    stipulation that the Defendants in these five cases would

6    make the same arguments they made in CT 3, and the

7    Plaintiffs would do the same thing, and the Court would

8    issue the same ruling.  So we only -- I only am going to

9    entertain motions to dismiss on new grounds or new

10   theories.

11               MS. MORALES:  Thank you, your Honor.

12               THE COURT:  And I got -- if the pharmacy

13   Defendants will commit to June 23rd as the deadline to

14   file motions to dismiss in Montgomery, Ohio, I take it

15   this is on some new ground.  It wasn't raised in Track 3.

16   Is that correct?

17               MS. MORALES:  We understand your rulings,

18   your Honor.  There are a number of new Defendants that

19   have been included in these cases, and there may be some

20   personal jurisdiction arguments or other motions to

21   dismiss.

22               But we understand the rulings that you've

23   set out and your request that we not rehash issues that

24   you ruled on, and we will work towards an objective to

25   that end as we set the schedule for these cases.

1            THE COURT:  Okay.

2            MS. MORALES:  Your Honor, we would ask if

3    the date could be June 18th to avoid the overlap with the

4    CT 3 briefing.

5            MS. MOORE:  Your Honor, I am just requesting

6    that we get an opportunity to exchange these schedules

7    and work with Special Master Cohen to work out a

8    particular date.

9            THE COURT:  The only thing I'm extending is

10   the June 3rd to June 9th.  All right?

11           MS. MORALES:  Understood.

12           THE COURT:  Now, while we are on that, the

13   Defendants opposed the Plaintiffs' motion to bifurcate.

14           Let me go back before I get to that.

15           The motion to strike, the Defendants filed a

16   motion to strike reference to millions of other

17   prescriptions, and one of the experts Plaintiffs opposed,

18   the Defendants replied.  I agree with the Defendants.

19   You can't refer to these millions of other prescriptions.

20           However, I am going to caution the

21   Defendants if somehow in your cross examination of the

22   Plaintiffs' expert or in your case you somehow open the

23   door, the Plaintiffs can seek approval from me to make

24   reference to these other prescriptions.

25           So you know, I am not -- I am saying the

1    Plaintiffs and their experts can't refer to them in their

2    case in chief, but you know, I have no idea what kind of

3    cross examination is going to be and what kind of defense

4    the Defendants are going to put on.

5              And if they somehow open the door and the

6    Plaintiffs make that argument to me and I agree, then

7    they can, you know, they can use that, but I am not going

8    to allow the experts to talk about prescriptions beyond

9    the -- I can't remember the exact number, 884,000,

10   whatever it is you are limited to.

11             MR. LANIER:  Your Honor, Mark Lanier for the

12   Plaintiff.  We understood that to be exactly what you

13   told us already, and we will abide by that.

14             I will represent to you on the record right

15   now that will not come out in our case in chief.  We will

16   not be using those numbers.  They are simply there as

17   that math because who knows what the Defendants may wind

18   up doing.

19             And if it comes up, I would obviously

20   approach the bench, and I would make my case for you to

21   allow me if it has opened the door, but I will not be

22   affirmatively offering that into evidence.  I understand

23   your ruling a hundred percent.

24             THE COURT:  All right.

25             MS. SWIFT:  Your Honor, this is Kate Swift

1    for Walgreens if I may respond.

2                    THE COURT:  All right.

3                    MS. SWIFT:  As we understand what Plaintiffs

4    are trying to do with these millions of additional

5    prescriptions, they are not distinguishable from the

6    884,000 that they claim caused them harm, and therefore,

7    we do not understand how they could ever be proper

8    rebuttal.

9                    THE COURT:  I am not -- I don't know if they

10   could be, but I am not saying that there is no possible

11   scenario where they couldn't be.  They are not coming in

12   in the Plaintiffs' case in chief, but Defendants have to

13   understand, I don't know what cross examination you are

14   going to do or what kind of defense you are going to put

15   on.

16                    MS. SWIFT:  I understand.

17                    THE COURT:  And if Plaintiffs argue that you

18   opened the door or somehow made them relevant, I will

19   certainly entertain the argument, and they might be

20   right.  So that's all I am saying now.

21                    MS. SWIFT:  Thank you, your Honor.

22                    THE COURT:  All right.  The motions to

23   bifurcate, Defendants have opposed -- candidly, I don't

24   understand the Defendants' argument, the suggestion that

25   I leave all these other Defendants and maybe other --

1    other Defendants in the cases, these five cases, and

2    letting the five other judges ultimately decide who is

3    going to be in or out makes no sense because I will be

4    the one who is supervising discovery and motions to

5    dismiss.

6           And everyone needs to know who is in the

7    case now, who is going to be doing the discovery and who

8    can file a motion.

9           So that has to be decided at the outset, and

10   we -- I imagine the MDL, and at the moment the only

11   entities, the only entities who have not settled or are

12   not actively trying to negotiate settlements are the

13   pharmacies.

14          So the bellwethers are needed for the

15   pharmacies, and that's why I set up and structured it

16   that way.  So I am going to grant the Plaintiffs'

17   motions.

18          Everyone understands that, you know, if the

19   Plaintiffs are only going on one or two theories, that's

20   the only theories they are going to be able do, they

21   can't come back and have another bite at the apple

22   against these Defendants with different theories.

23          As to Defendants who are dismissed without

24   prejudice, basically, they are still in the case for

25   global settlement purposes, but there is not any real

1    likelihood there will ever be a separate trial against

2    them, but they are still there just dismissed without

3    prejudice.

4              So the whole purpose was to have bellwethers

5    against the pharmacies, and we are including, you know,

6    what I will call local or regional pharmacies if the

7    Plaintiffs want to have them, these bellwethers.  It is

8    up to them.

9              So as I just mentioned, it is only the

10   pharmacies who in this MDL, who don't seem to be

11   interested in exploring resolution and they don't want me

12   to be involved at all, I respect that.

13             So it makes it difficult for me to decide

14   how to manage the MDL and how to proceed.  I can only

15   guess or speculate and make my best decision as I can,

16   and I don't get any information or feedback from the

17   pharmacies.

18             I have a lot of feedback from the

19   Plaintiffs' lawyers because I am talking to them all the

20   time, not about resolving these cases but resolving other

21   ones.

22             So I understand a lot about how they are

23   looking at this MDL, how they look at cases, what their

24   approach is.  I can only guess or speculate as to the

25   pharmacies.

1          You know, Wal-Mart -- I will share what the

2     pharmacies and, you know, on the record here, my guess,

3     my speculation, and if you want to tell me I am wrong,

4     that's okay.  If not, you ought to know what I'm

5     thinking.

6          Wal-Mart has enough money to litigate for a

7     hundred years.  Wal-Mart can litigate these cases for the

8     next hundred years and still be one of the biggest

9     companies, if not one of the largest companies in the

10    country, if not the largest in the world.  So they are

11    going to be here.

12         And Wal-Mart is going to the mat against the

13    Department of Justice pretty hard, and they can do that.

14    Everyone understands that the Department of Justice has

15    one big stick that no one else has, which is, well, they

16    have got to approve the DEA license.

17         And a pharmacy without DEA license isn't

18    much of a pharmacy, but Wal-Mart is going to be Wal-Mart,

19    whether they are in the pharmacy business or not.  They

20    could -- other pharmacies could be shut down, and that's

21    just a drop in the bucket for Wal-Mart.  So they are in a

22    class of their own.  The other pharmacies are not.

23         All you are is pharmacies, and none of the

24    other pharmacies have the kind of resources Wal-Mart has.

25    Wal-Mart may figure, well, they are litigating, and

1    eventually, the other pharmacies go out of business, and

2    they will be the only one in the country.  So -- but the

3    other pharmacies are in a different posture.

4              So all I can do is keep raising this, and if

5    anyone is interested in trying to resolve their case and

6    they want my help, they can contact me or Special Master

7    Cohen, but in the absence of anything, I just have to

8    assume that the pharmacies intend to keep litigating

9    these cases until they drop or the Plaintiffs drop, you

10   know, drop by obviously -- if pharmacies win all the

11   cases, eventually, the Plaintiffs say "all right.  We

12   give up, and we will just proceed against everyone else."

13             But if that doesn't happen, well, it is who

14   drops first.  So that's why we have to keep having

15   bellwethers.  You know, at some point if that's what is

16   happening, there won't be any reason to keep the MDL.  I

17   will just remand all the cases.  There won't be anything

18   further for me to do.

19             So I am suggesting, if I am reading the

20   pharmacies wrong and they are interested in sharing

21   anything with me, you can always contact me or Special

22   Master Cohen.  Otherwise, I will just have to manage the

23   MDL and this track as best I can.

24             So I think I covered everything other than

25   setting a date for the next status conference that I had

1    on my list.

2                Is there anything else that I've missed or

3    that someone wants to bring up?

4                MR. WEINBERGER:  Your Honor, this is Peter

5    Weinberger.  I just noted this is partly my fault.  I

6    just noted that our status report, which we recently

7    filed, shows that it is a joint status report as of May

8    6th, 2021, and obviously, it is a status report as of

9    June 1, 2021.

10               So I just wanted to make that correction for

11   the record.

12               THE COURT:  Okay.  Well, oh, I see, in the

13   headlines.  Sure.  I just jumped right over it.

14   Obviously, it was June 1, thank you.

15               MR. WEINBERGER:  I did too, your Honor.

16               THE COURT:  All right.  Okay.  How is

17   Wednesday, July the 7th at 1:00 o'clock.  We have been

18   going in the first or second Wednesday of the month.  I

19   have got a couple of mediations that day, but I have got

20   one in the morning and one starting at 1:30.

21               And I thought if that works for everyone, we

22   will do it at 1:00 o'clock on Wednesday, the 7th.

23   Wednesday seems to be a good day.  So that would make the

24   status reports due Tuesday at noon.  That's the day after

25   July 4th.  I guess the other -- yeah.  The following week

1    I've got a criminal trial that is definitely going.

2              So I would rather do it July 7th than the

3    14th, so we will just say the status report -- I mean, if

4    you want a little -- quite frankly, I can get it at 3:00

5    o'clock on the 6th.  That's fine.

6              MR. STOFFELMAYR:  Thank you, Judge.

7              THE COURT:  3:00 o'clock on the 6th is fine.

8    I can read it in an hour or so.  Okay.  All right.

9              Thanks, everyone.  Stay safe, and we will

10   talk to you in a month.

11             MR. WEINBERGER:  Thank you, Judge.

12             (Status hearing concluded at 1:45 p.m.)

13                    - - - -

14                C E R T I F I C A T E

15             I, George J. Staiduhar, Official Court

16   Reporter in and for the United States District Court,

17   for the Northern District of Ohio, Eastern Division,

18   do hereby certify that the foregoing is a true

19   and correct transcript of the proceedings herein.

20

21                  s/George J. Staiduhar
                    George J. Staiduhar,
22                  Official Court Reporter

23                  U.S. District Court
                    801 W. Superior Ave., Suite 7-184
24                  Cleveland, Ohio 44113
                    (216) 357-7128
25