# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>TRACK THREE | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

### DEFENDANTS' MOTION TO RECONSIDER ORDER REQUIRING JURORS TO BE VACCINATED OR, IN THE ALTERNATIVE, MOTION FOR APPROPRIATE RELIEF FOR SUBSTANTIAL FAILURE TO COMPLY WITH THE JURY SELECTION AND SERVICE ACT

The Pharmacy Defendants[1] (Defendants) hereby move that the Court reconsider its June 14 Civil Jury Trial Order and vacate that Order on fairness grounds to the extent it requires that all prospective jurors in this case be vaccinated. In the alternative, to the extent the Court declines to reconsider its Order as a discretionary matter, Defendants move pursuant to 28 U.S.C. § 1867(c) to stay the proceedings for substantial failure to comply with the provisions of the Jury Selection and Service Act, 28 U.S.C. §§ 1861 to 1878, and request a hearing pursuant to 28 U.S.C. §§ 1867(d) and (f).[2]

Defendants have been at the forefront of the nationwide vaccination effort and this motion is not intended to suggest any change in Defendants' ongoing commitment to administering and facilitating vaccination. Rather, this motion concerns only the composition of a jury in this case and whether the Court's Order comports with law and fairness.

---

[1] CVS Pharmacy, Inc., Ohio CVS Stores, LLC, CVS TN Distribution, L.L.C., CVS Rx Services, Inc., CVS Indiana, L.L.C., Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., Inc., Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center, Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center, Giant Eagle, Inc./HBC Service Company, and Walmart Inc.

[2] Defendants do not seek to delay the trial to adjudicate this motion, but a stay appears to be the exclusive procedural tool available to enforce the provisions of the Act. *See* 28 U.S.C. § 1867(d). To avoid delay, defendants are willing to adjudicate the motion on an expedited basis, or upon stipulations of fact if the parties can agree.

I. **MATERIAL FACTS**

During a status conference on June 2, 2021, the Court asked whether the parties would consent to a requirement that all jurors in this matter be vaccinated against COVID-19. *See* ECF No. 3753 at 2–3. The issue had not been raised before, and Defendants had no notice that the Court was considering it. Plaintiffs consented during the status conference. Defendants did not consent. Instead, Defendants' liaison counsel raised potential concerns. *Id.* at 3–4. In response, the Court stated that it was not demanding a decision that day and asked Defendants to "talk about it and get back to Special Master Cohen with your thoughts." *Id.* at 4–5. The Court set no deadline, other than to say that jury summonses would be sent out in seven weeks. *Id.* at 5. One week later, on June 9, 2021, the Special Master emailed liaison counsel, who was selecting a jury in the New York opioids trial, seeking Defendants' position. The email set no deadline for Defendants to respond.

Three business days later, on June 14, 2021, without waiting to hear Defendants' position, the Court issued a Track Three Civil Jury Trial Order. ECF No. 3758. The pertinent provision (the "Vaccination Order") states that "to ensure the safety of everyone involved in the trial, the Court will only allow individuals who have been fully vaccinated against COVID-19 to serve as jurors." *Id.* at 3. Unbeknown to the Court, Defendants had finalized their position on such a limitation and were on the cusp of communicating it to the Special Master when the Vaccination Order issued.

As far as Defendants can tell, a vaccination requirement for jurors is not required by any statute, rule, or policy. To the contrary, the Administrative Office of the U.S. Courts recently issued a statement to a reporter providing that, "[w]hile courts may ask jurors COVID-19-related questions as part of their safety protocols, providing litigants with a jury selected at random from a fair cross section of the community remains of greatest importance." Decl. of John J. Connolly,

2

June 21, 2021 ("Connolly Decl."), Ex. B at 3 (copy of Madison Alder, *Next Pre-Trial Question for Jurors: Are You Vaccinated?*, U.S. Law Week (May 28, 2021 4:45AM)); *see also id.* ("The Administrative Office of the U.S. Courts … said courts might ask virus-related questions for court safety, but getting the vaccine isn't a legal qualification for service on a jury."). Nothing in this Court's Juror Selection Plan requires vaccination for jurors. *See* Am. General Order No. 2005-21-1, Aug. 8, 2019 (redirecting to Juror Selection Plan at https://www.ohnd.uscourts.gov/jury-service); U.S Dist. Ct., N.D. Ohio Juror Selection Plan, Parts C, D (Apr. 8, 2021) [hereafter, "Juror Selection Plan"] (stating policy of random selection from fair cross section of the community in each division and requirement that "all citizens resident within the District shall have the opportunity to be considered for service on grand and petit juries and shall have an obligation to serve as jurors when summoned for that purpose").

Moreover, under this Court's general Coronavirus Phased-In Recovery Plan, persons will be denied entrance to the courthouse "if they have a temperature of 100.4 degrees or higher or respond affirmatively to any COVID-19 screening question," but will not be denied access based on their vaccination status. *See* Am. General Order No. 2020-08-8 at 2, June 7, 2021. The Plan requires mask-wearing, but "[a]t the discretion of the presiding judge and upon inquiry of vaccination status, a participant(s) in a proceeding in the judge's courtroom may be permitted to remove his/her mask. Spectators and jurors must remain masked at all times." *Id.* at 3. Unvaccinated employees are already permitted to work in the courthouse and are even permitted to remove their face masks "when alone in their private office/cubicle which permits at least six feet of physical distance from other persons." *Id.* at 4. *See also* Dist. Colo. Jury Trial Protocols (June 2, 2021) (setting forth additional screening measures for unvaccinated jurors but not excluding them).

According to the Ohio Department of Health, as of June 16, 2021, only 42.6 percent of Ohio's population is fully vaccinated.[3] Connolly Decl., Ex. A at 1. That number will rise to some extent by September 29, but the rate of new vaccinations has slowed considerably. By all appearances a substantial portion of the potential jury pool—possibly 40 percent or more—will not be fully vaccinated at the time of jury selection. Eliminating all those people would not only reduce the size of the eligible jury pool, it would also skew the pool in ways that would likely affect the parties' ability to pick a fair and impartial jury.

The current data establishes that the statewide vaccinated population differs from the unvaccinated population in key geographic and demographic metrics: by gender (44.6 percent of women vs. 38.4 percent of men, *see* Connolly Decl., Ex. A at 4); by race (40.9 percent of "White" and 54.2 percent of "Asian" vs. 25.7 percent of "Black or African American"; *see id.* at 3); and by age (much higher percentages of vaccinations among older individuals, *see id.* at 1).

Vaccination rates also vary substantially by counties within this District and Division. *Compare* Connolly Decl., Ex. A at 5 (overall vaccination rate of 29.8 percent in Ashland County) *with id.* at 17 (47.1 percent in Cuyahoga). And within counties, significant disparities exist by race, age, and gender. *See id.* at 17 (age distribution in Cuyahoga); *id.* at 19 (showing Cuyahoga vaccination rates of 51.5 percent for White Americans, 26.6 percent for Black Americans, and 59.4 percent for Asian Americans).

Ample evidence suggests that vaccination rates also vary substantially based on political and social views. *See* Connolly Decl., Ex. C (pre-COVID article concluding that political conservatives were less likely to obtain vaccines). A New York Times analysis in April

---

[3] The Ohio Department of Health appears to use total population as the denominator in these calculations. Because children are not eligible for jury service and persons over 70 are often excused, *see* Juror Selection Plan Part L, the percent of vaccinations among all persons eligible for jury service cannot be stated precisely. But the percent of vaccinated persons between ages 20 and 69 can be calculated from the numbers provided by the Department of Health. That number equals 49.3 percent. *See* Connolly Decl. ¶ 9.

4

concluded that "[t]he disparity in vaccination rates has so far mainly broken down along political lines." Connolly Decl., Ex. D at 1. Indeed, "both willingness to receive a vaccine and actual vaccination rates to date were lower, on average, in counties where a majority of residents voted to re-elect former President Donald J. Trump in 2020." *Id.*; *see also* Connolly Decl., Ex. E (article in The Hill suggesting that vaccine rates vary among red and blue states). Other analyses have concluded that vaccinations vary significantly along other socioeconomic lines, with vaccination rates correlating positively with education and income. *See* Connolly Decl., Ex. F. And at least some individuals have declined the vaccine for religious reasons.

The National Center for State Courts, in a publication from May 2021, cautioned against restrictions like the Vaccination Order:

> **What impact will the use of vaccine status information have on the integrity of the jury system?** Restricting the jury pool to persons who are fully vaccinated may make it more difficult to secure enough prospective jurors to select juries. Along with the coronavirus' differential impact on people of color, public health experts have noted ongoing challenges in making vaccine distribution accessible to these communities, including higher rates of vaccine hesitancy in these communities. Excluding persons who are not fully vaccinated may make the jury pool less likely to reflect a fair cross section of the community, which in turn may also increase the risk of jury challenges.

Connolly Decl., Ex. G at 2.

In short, requiring vaccinations for all jurors will drastically reduce the eligible jury pool, and the remaining pool of eligible jurors is highly unlikely to reflect the community as a whole.

## II.     ARGUMENT

The Court's Vaccination Order is interlocutory and therefore may be revised or amended at any time prior to final judgment. *See* Fed. R. Civ. P. 54(b); *Stringer* v. *NFL*, 749 F. Supp. 2d 680, 699 (S.D. Ohio 2009). Although Defendants have styled this submission as a motion for

reconsideration at the direction of the Special Master, the usual standard for reconsideration[4] should not apply here, where the Court issued its order without briefing, before hearing Defendants' position, without setting a deadline for Defendants to provide their position, and where less than 14 days had passed from the time that the Court first raised the issue.

### A. The Court Should Reconsider and Vacate the Order on Discretionary and Prudential Grounds.

Section B below argues that the Court's Vaccination Order violates the Jury Selection and Service Act (JSSA) and therefore must be vacated as a matter of law. But the Court need not reach that argument. Nothing *requires* the Court to insist on a fully vaccinated jury, and fairness and justice counsel against it.

*First*, the Vaccination Order is inconsistent with the Court's existing policies—amended as recently as June 7—which do not require vaccinations among jurors or employees and which require random selection of jurors from a fair cross section of the community. Instead, Amended General Order No. 2020-08-8 minimizes risk by requiring temperature checks, mask-wearing, and physical distancing. Those measures should be sufficient to ensure the safety of all participants at the trial of this matter.

*Second*, by both tradition and statute, "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor* v. *Louisiana*, 419 U.S. 522, 526 (1975); 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein

---

[4] *See Stringer*, 749 F. Supp. 2d at 700 (noting that courts have "significant discretion" in resolving a motion to reconsider an interlocutory order, although ordinarily courts exercise that discretion "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice" (citations omitted)). That standard does not logically apply when the movant is making substantive arguments for the first time.

6

the court convenes."); Juror Selection Plan Parts C, D. The "fair cross section" standard promotes justice by assuring that serious disputes are decided by a representative sample of the whole community. As the Supreme Court has explained:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.

*Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 220 (1946) (citations omitted).

This foundational policy would be severely undermined if 40 to 50 percent of the eligible population is removed from the pool—for *any* reason. *See Peters* v. *Kiff*, 407 U.S. 493, 503 (1972) ("the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases"). Of course, if the 40–50 percent cohort were removed at random, the remaining pool might still reflect a fair cross section of the community. But wholesale removal of all unvaccinated individuals is a far cry from random removal of persons from the pool. The vaccinated population is unquestionably different from the full community; the only question is whether the vaccinated population by itself is a fair cross section of that community.

The Court should conclude that it is not. The available data on vaccination rates in Ohio show substantial differences by race, gender, and age. *See supra* Part I. These state-wide patterns are also seen in the individual counties in this District and Division—sometimes at even greater

variances. *Id.* In addition, vaccination has become a divisive political and social issue. Data available to date indicates that vaccination rates are higher among persons who identify as liberal rather than conservative, Democratic rather than Republican, professional rather than nonprofessional, and college-educated rather than not. *See supra* Part I. Accordingly, there is a substantial risk that a jury pool drawn solely from fully vaccinated persons will not fully reflect the community along ideological and socioeconomic dimensions (as well as racial, gender, and ethnic dimensions, as discussed above). The only way to ensure fairness is to permit vaccinated and unvaccinated persons to serve on the jury.

*Third*, jury service is both an obligation and a right of citizenship. *E.g.*, *Powers* v. *Ohio*, 499 U.S. 400, 402 (1991) ("Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life."); Juror Selection Plan Part C. It seems extraordinary to exclude nearly half the population from jury service—for any reason—and as far as Defendants can tell no other court has imposed a similar restriction. Excluding identifiable groups from jury service eliminates their participation in one key feature of our democratic tradition. Persons who decline a governmental request to inject an mRNA or other vaccine into their arms may have a useful perspective about a governmental claim that pharmaceutical companies should pay for harms caused by persons who abused prescription opioids. At any rate, Defendants respectfully suggest that the Vaccination Order is not a precedent the Court should set.

Defendants and their counsel are certainly cognizant of safety issues and they do not want to create an unreasonable risk for any participant in the trial. Defendants are prepared to work with the Court, its staff, and Plaintiffs to ensure that all participants are safe. But the Court should not promote safety over fairness in jury selection when both are achievable. If safety

cannot be ensured by methods other than a vaccination requirement, the trial should be postponed until it can.

For these reasons, Defendants respectfully request that the Court exercise its discretion and vacate its Vaccination Order.

> **B.     In the Alternative, Because the Vaccination Order Is Likely to Contravene the Jury Selection and Service Act, Defendants Move to Stay Under 28 U.S.C. § 1867(c) and Request a Hearing Under Sections 1867(d) and (f).**

> **1.     The JSSA Permits Civil Litigants to Challenge Unrepresentative Jury Pools.**

Most challenges to the representativeness of a jury pool in civil cases are governed by the Jury Selection and Service Act, 28 U.S.C. §§ 1861 to 1878. *See* 28 U.S.C. § 1867(e). As noted, under § 1861 of the Act, federal policy requires that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community." Moreover, "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States … on account of race, color, religion, sex, national origin, or economic status." *Id.* § 1862. District Courts are required to have a written plan for random selection of grand and petit jurors designed to achieve these objectives. *Id.* § 1863(a). The plan must "specify detailed procedures to be followed by the jury commission or clerk in selecting names" for jury service and "[t]hese procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes." *Id.* § 1863(b)(3). The jury selection plan must "deem any person qualified to serve on grand and petit juries in the district court unless" that person does not satisfy one of five conditions not applicable here. *See id.* § 1865(b); *cf.* 28 U.S.C. § 1869(i) (defining "undue hardship or extreme inconvenience"). And the jury commission or the clerk from time to time "shall draw at random from the qualified jury wheel such number of names of

persons as may be required for assignment to grand and petit jury panels." *Id.* § 1866(a); *see also id.* § 1866(c) (except as provided in § 1865 or any jury selection plan, "no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors," although a court may exclude any "person summoned for jury service" for certain defined reasons).

Under § 1867(c), "[i]n civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury." A substantial failure to comply has been interpreted to mean one that "frustrates one of the three principles underlying the Act: (1) the random selection of jurors, (2) culling of the jury from a fair cross-section of the community, and (3) determination of disqualifications, exemptions, and exclusions based on objective criteria." *United States* v. *Stein*, 985 F.3d 1254, 1263 (10th Cir. 2021) (citations omitted); *see also United States* v. *Savides*, 787 F.2d 751, 754 (1st Cir. 1986).

Upon motion filed under § 1867(c)

> containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence.

28 U.S.C. § 1867(d). The movant is entitled to "inspect, reproduce, and copy such records or papers at all reasonable times during preparation and pendency of such a motion." 28 U.S.C. § 1867(f). A litigant "need not show prejudice to establish a 'substantial failure to comply' with the Act." *United States* v. *Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977). "If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the

petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title." 28 U.S.C. § 1867(d).

### 2. The Exclusion of All Unvaccinated Individuals from the Jury Pool Is Likely to Result in a Jury That Is Not a Fair Cross Section of the Community.

The wholesale exclusion of all unvaccinated persons from the jury pool would violate the statutory requirement that the jury be drawn from a fair cross section of the community. "In order to demonstrate a violation of the statutory fair cross section standard, a defendant must show that a distinctive group, that is, a cognizable group, was excluded from the jury selection process; that such group was systematically excluded; and that because of such exclusion the jury pool failed to be reasonably representative of the community." *United States* v. *Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (citations omitted).[5] The sworn statement of facts attached hereto establishes at least a *prima facie* case that satisfies each of these requirements.

*First*, the Court's June 14 Order establishes that an identifiable group will be excluded from the jury selection process. Whether unvaccinated individuals constitute a "distinctive" or "cognizable" group has not previously been decided as far as Defendants can tell. But courts generally agree that groups based on gender, race, ethnicity, and religious affiliation qualify as distinctive. *See United States* v. *Cook*, No. CR 06-2403 RB, 2008 WL 11362043, at *4–5 (D.N.M. Oct. 2, 2008). Thus, to the extent exclusion of unvaccinated individuals creates a significant variance from community averages of persons in those groups, the unvaccinated group would be legally distinctive. As to other groups, such as those based on age, class, political

---

[5] Although the Sixth Amendment does not apply in this civil case, jury-pool challenges under the Sixth Amendment also require a showing that a "distinctive group" was excluded, and the Sixth Amendment cases interpreting that phrase are sometimes applied in JSSA cases. *E.g.*, *United States* v. *Royal*, 174 F.3d 1, 6 (1st Cir. 1999).

affiliation, and education, courts usually require some proof of a "common thread or basic similarity in attitude, ideas or experiences." *Ford* v. *Seabold*, 841 F.2d 677, 683 (6th Cir. 1988).

In the current environment, unvaccinated persons meet these tests. Initially, the currently available data indicate that the unvaccinated group varies significantly from the general community based on race, gender, and ethnicity. In particular, the statewide data shows a substantial disparity in vaccination rates among White, Asian, and Black Ohioans, with the latter significantly less likely to be vaccinated. The state-wide percentage difference is roughly 15 points between vaccinated White and Black Ohioans and almost 30 points between Asian and Black Ohioans. Connolly Decl., Ex. A at 3. In Cuyahoga County, the most populous county in this Division, the absolute disparity in vaccination rates among White and Black citizens is almost 25 points. *See id.* at 19. As a result, Black citizens are very likely to be underrepresented in the jury pool when compared with the community at large; defendants estimate the absolute disparity (statewide) at 4.3 percent and the comparative disparity at 33.0 percent.[6] *See* Connolly Decl. ¶ 10. These differences may qualify as substantial. *See Smith* v. *Berghuis*, 543 F.3d 326, 337-38 (6th Cir. 2008) (negligible absolute disparity and 18 to 34 percent comparative disparity), *rev'd on other grounds*, 559 U.S. 314 (2010);[7] *Garcia-Dorantes* v. *Warren*, 801 F.3d 584, 600-02 (6th Cir. 2015) (3.45 percent absolute disparity and 42 percent comparative disparity); *Omotosho* v. *Giant Eagle, Inc.*, 997 F. Supp. 2d 792, 800 (N.D. Ohio 2014) (6.04 absolute disparity and 63.7 percent comparative disparity).[8]

---

[6] The Sixth Circuit has explained that depending on circumstances courts may look to "absolute disparity" (percent eligible in the population less percent in pool) or "comparative disparity" (decreased likelihood that underrepresented group will be called for jury service). *E.g.*, *Garcia-Dorantes* v. *Warren*, 801 F.3d 584, 601-02 (6th Cir. 2015). In this case, these disparities might be calculated in different ways and a final result would have to await a hearing, but defendants have made an estimate for disparities among races in the Connolly Declaration at paragraph 10.

[7] Although the Supreme Court reversed *Smith*, courts in the Sixth Circuit continue to cite its analysis of absolute and comparative disparities. *See Garcia-Dorantes*, 801 F.3d at 601; *Omotosho*, 997 F. Supp. 2d at 800.

[8] The *Smith* and *Omotosho* courts both rejected challenges to the panel for other reasons.

12

Apart from disparities in recognized distinctive groups such as race and gender, there is clearly a common thread or basic similarity in attitude, ideas, and experience among the unvaccinated population. Evidence both empirical and anecdotal suggests that unvaccinated individuals skew conservative and Republican, *see* Connolly Decl., Exs. C, D, E, and those trends are likely to continue. By September 29, the unvaccinated group is likely to consist largely of traditional conservatives, libertarians, and government skeptics, along with a disproportionate percentage of nonprofessionals and lower-wage workers. *Compare Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 224-25 (1946) (impermissible to exclude all persons who work for a daily wage). Members of the anti-vaccination community might well have different views about prescription-opioid use and abuse when compared with the vaccinated population.

*Second*, the Vaccination Order unquestionably establishes that unvaccinated people will be "systematically excluded" from jury service. *See United States* v. *Jackman*, 46 F.3d 1240, 1248 (2d Cir. 1995) ("the existence of systematic underrepresentation turns on the process of selecting venires, not the outcome of that process in a particular case"); *Garcia-Dorantes*, 801 F.3d at 600 (inadvertent computer glitch that ended up excluding disproportionate number of African Americans deemed systematic when argument waived by State). That portion of the test should not be in dispute.

*Finally*, for the reasons set forth above, the exclusion of all unvaccinated people almost certainly will result in a jury pool that is not reasonably representative of the community. Before the jury pool is actually drawn, of course, Defendants cannot determine whether Black Americans or other discrete groups will be under- or over-represented when compared to the community at large. For that reason, if the Court is not inclined to vacate the Vaccination Order based on its anticipated effects, Defendants request a hearing pursuant to 28 U.S.C. §§ 1867(d)

and (f) after the jury pool is drawn but before the Court selects a jury. As the Supreme Court has held, subsection (f) "makes clear that a litigant has essentially an unqualified right to inspect jury lists. It grants access in order to aid parties in the 'preparation' of motions challenging jury-selection procedures. Indeed, without inspection, a party almost invariably would be unable to determine whether he has a potentially meritorious challenge." *Test* v. *United States*, 420 U.S. 28, 30 (1975); *see also United States* v. *Shader*, 472 F. Supp. 3d 1, 4-5 (E.D.N.Y. 2020). In addition to jury records and testimony from the jury commissioner, Defendants anticipate that such a hearing will include expert testimony analyzing the jury pool and the excluded class of unvaccinated persons in light of community characteristics.

### III.  CONCLUSION

For the reasons stated, Defendants respectfully request that the Court vacate its Vaccination Order and permit vaccinated and unvaccinated persons to be eligible to serve as jurors in this matter. In the alternative, Defendants move to stay this matter under 28 U.S.C. § 1867(c) and request an evidentiary hearing under § 1867(d) and (f).

Dated: June 21, 2021                                       Respectfully submitted,

/s/ Kaspar J. Stoffelmayr_____                 /s/ Eric R. Delinsky_____
Kaspar J. Stoffelmayr                                      Eric R. Delinsky
Katherine M. Swift                                         Alexandra W. Miller
BARTLIT BECK LLP                                           ZUCKERMAN SPAEDER LLP
54 West Hubbard Street                                     1800 M Street NW, Suite 1000
Chicago, IL 60654                                          Washington, DC  20036
(312) 494-4400                                             Tel: (202) 778-1800
kaspar.stoffelmayr@bartlitbeck.com                         E-mail: edelinsky@zuckerman.com
kate.swift@bartlitbeck.com                                 E-mail: smiller@zuckerman.com

*Counsel for Walgreens Boots Alliance, Inc.,*              *Counsel for CVS Pharmacy, Inc., Ohio CVS*
*Walgreen Co. and Walgreen Eastern Co., Inc.*              *Stores, LLC, CVS TN Distribution, L.L.C., CVS*
                                                           *Rx Services, Inc., and CVS Indiana, L.L.C.*

/s/ Robert M. Barnes_____
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
(412) 471-3490
rbarnes@marcus-shapira.com
livingston@marcus-shapira.com
kobrin@marcus-shapira.com

*Counsel for Giant Eagle, Inc. and HBC Service Company*

/s/ Kelly A. Moore_____
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6612
kelly.moore@morganlewis.com

Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5917
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center and Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center*

/s/ Tina M. Tabacchi_____
Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
(312) 782-3939
tmtabacchi@jonesday.com
tfumerton@jonesday.com

*Counsel for Walmart Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record on June 21, 2021.

/s/ Eric R. Delinsky
Eric R. Delinsky