# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>Case No. 1:18-op-45817-DAP<br><br>COBB COUNTY,<br><br>               Plaintiff,<br><br>    vs.<br><br>PURDUE PHARMA, ET AL.,<br><br>               Defendants. | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster<br><br><br>**PLAINTIFF COBB COUNTY'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO "SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND"** |

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 2

JURISDICTION AND VENUE ........................................................................... 8

PARTIES ............................................................................................................. 8

I.      PLAINTIFF ............................................................................................ 8

II.     DEFENDANTS ...................................................................................... 8

        A.      CVS ............................................................................................ 8

        B.      Walgreens ............................................................................... 10

        C.      Rite Aid ................................................................................... 11

        D.      Walmart ................................................................................... 14

        E.      Kroger ..................................................................................... 15

        F.      Publix ...................................................................................... 16

        G.      Related Entities; Agency and Authority ................................ 16

DEFENDANTS' CONDUCT AND PLAINTIFF'S INJURIES ................................. 17

I.      COMMON FACTS ............................................................................... 17

        A.      Opioids and Their Effects ...................................................... 17

        B.      Defendants' Conduct Created an Abatable Public Nuisance ............................ 19

        C.      Defendants Deliberately Disregarded Their Duties to Maintain Effective
                Controls Against Diversion ..................................................... 20

                1.      The Chain Pharmacies Were on Notice of and Contributed to
                        Illegal Diversion of Prescription Opioids ................................. 20

                2.      Defendants Have a Duty to Report Suspicious Orders and Not to
                        Ship Those Orders Unless Due Diligence Disproves Their
                        Suspicions .............................................................................. 23

                3.      Defendants Were Aware of and Have Acknowledged Their
                        Obligations to Prevent Diversion and to Report and Take Steps to
                        Halt Suspicious Orders ........................................................... 33

                4.      Defendants Were Uniquely Positioned to Guard Against Diversion ....... 46

                5.      Defendants Failed to Maintain Effective Controls Against
                        Diversion ................................................................................ 49

                        a.      CVS ............................................................................. 49

                                i.      CVS Lacked a Genuine Suspicious Order
                                        Monitoring System for Much of the Relevant Time ........ 49

                                ii.     CVS Failed to Remedy Fatal Flaws in the System it
                                        Slowly Developed ............................................... 52

                                iii.    CVS Failed to Perform Due Diligence ............................ 56

**TABLE OF CONTENTS**

                                                                              **Page**

iv.   CVS Conspired with Cardinal and McKesson to
      Prevent Suspicious Order Monitoring of Its Retail
      Pharmacies ........................................................................ 57

v.    CVS Failed to Maintain Effective Controls Against
      Diversion in the County .................................................. 59

vi.   CVS Failed to Implement Effective Policies and
      Procedures to Guard Against Diversion from its
      Retail Stores ..................................................................... 63

b.  Walgreens ................................................................................. 65

i.    Walgreens Dragged Its Feet on Developing a SOM
      Program, Instead Relying on After-the-Fact Reports
      of "Excessive" Orders While Ignoring Red Flags ........... 65

ii.   Walgreens Knew its After-the-Fact Excessive
      Purchase Reports Failed to Satisfy Its Obligations to
      Identify, Report, and Halt Suspicious Orders ................. 69

iii.  Walgreens Lacked Meaningful Additional Systems
      to Address the Failures in Its System of After-the-
      Fact Reporting of Certain Orders .................................... 73

iv.   Even as it Rolled Out its New SOM Program,
      Walgreens Left Significant Gaps and Loopholes in
      Place and Failed to Report and Perform Due
      Diligence on Orders It Flagged ........................................ 75

v.    Walgreens Failed to Put in Place Adequate Polices
      to Guard Against Diversion at the Pharmacy Level ........ 82

vi.   Walgreens Assumed Greater Responsibility for
      Controlling Against Diversion by Discouraging
      Outside Vendors from Exercising Their Own
      Oversight .......................................................................... 87

vii.  Walgreens Failed to Maintain Effective Controls
      Against Diversion in the County ...................................... 89

c.  Rite Aid ..................................................................................... 94

i.    Rite Aid Failed to Maintain Effective Controls
      Against Diversion at the Wholesale Level ....................... 94

ii.   Rite Aid Conspired with McKesson to Avoid
      Scrutiny of Outside Vendor Orders and Adjust or
      Avoid Thresholds ............................................................. 97

iii.  Rite Aid Failed to Guard Against Diversion in
      Distributing to the County .............................................. 98

iv.   Rite Aid Failed to Guard Against Diversion in
      Dispensing to the County ................................................ 99

# TABLE OF CONTENTS

Page

v.  Rite Aid Failed to Maintain Effective Controls Against Diversion and Instead Fueled a Black Market in the County ...................................................... 108

d.  Walmart ............................................................................................. 110

i.  Walmart Lacked a Suspicious Order Monitoring System for Most of the Relevant Time Period ............... 110

ii.  Walmart Failed to Guard Against Diversion in Distributing into the County ............................................ 113

iii.  Walmart Failed to Maintain Effective Controls Against Diversion from its Pharmacies in the County 116

e.  Kroger ................................................................................................. 124

i.  Kroger Failed to Maintain Effective Controls Against Diversion of Opioids It Distributed, Instead Oversupplying Its Stores ................................................. 124

ii.  Kroger Failed to Implement Effective Policies and Procedures to Prevent Diversion from Its Pharmacy Stores  126

f.  Publix ................................................................................................. 129

i.  Publix Failed to Maintain Effective Controls Against Diversion at the Wholesale Level .................... 129

ii.  Publix Failed to Maintain Effective Controls Against Diversion in the County ................................... 131

iii.  Publix Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores ................................................................. 134

iv.  Publix Failed to Guard Against Diversion in Dispensing to the County ............................................ 135

D.  Defendants' Performance Metrics Put Profits Before Safety ............................ 138

E.  Defendants Worked Together to Increase Their Profits and Lobbied Against Restrictions on Opioid Use and DEA Enforcement ............................ 152

F.  Defendants Also Entered into Joint Ventures that Further Undermined their Outside Vendors' Incentive to Conduct Due Diligence, While Increasing their Own Access to Information. ...................................................... 159

G.  Defendants Worked with Opioid Manufacturers to Promote Opioids and Improperly Normalize Their Widespread Use .................................................. 160

## TABLE OF CONTENTS

Page

a.   Spreading false messages to pharmacists and patients through provider and patient "education" campaigns designed to improperly normalize widespread use of opioids; ............................................................ 161

b.   Direct marketing of opioids to patients, pharmacists and healthcare providers; ............... 161

c.   In-store advertisements and advertising campaigns designed to drive sales of prescription opioids; ........................................... 161

d.   Use of financial incentives such as coupon programs, rebate programs, and loyalty programs designed to drive opioid sales; and .... 161

e.   Driving the sale of opioid products through patient adherence programs designed to generate long-term opioid use ............................ 161

H.   Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement ............................................................ 184

I.   Multiple Enforcement Actions Against the Chain Pharmacies Confirm Their Compliance Failures ............................................................ 189

1.   CVS ............................................................ 190

2.   Walgreens ............................................................ 195

3.   Rite Aid ............................................................ 200

4.   Walmart ............................................................ 201

5.   Kroger ............................................................ 202

J.   The Opioids the Defendants Sold Migrated into Other Jurisdictions ............... 203

K.   The Defendants Conspired to Engage In The Wrongful Conduct Complained Of Herein and Intended To Benefit Both Independently and Jointly From Their Conspiracy. ............................................................ 207

II.  Georgia-Specific Facts ............................................................ 209

A.   Defendants Breached Their Duties in Georgia ................................ 209

B.   The Devastating Effect of the Opioid Epidemic in Georgia ................ 211

C.   Facts Specific to Cobb County ............................................................ 214

III. Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses. ............................................................ 217

A.   Continuing Conduct ............................................................ 217

B.   Equitable Estoppel and Fraudulent Concealment ............................ 218

## TABLE OF CONTENTS

**Page**

CAUSES OF ACTION ................................................................................................... 219

PRAYER FOR RELIEF .................................................................................................. 225

JURY DEMAND ............................................................................................................. 225

CERTIFICATE OF SERVICE ....................................................................................... 227

1.     Plaintiff Cobb County, Georgia, ("County") brings this action to prevent future harm and to redress past wrongs against the following Defendants ("Chain Pharmacies" or "Pharmacy Defendants"): the Walgreens Defendants,[1] the CVS Defendants,[2] the Publix Defendants,[3] the Kroger Defendants,[4] the Rite Aid Defendants,[5] and the Walmart Defendants.[6] [7]

2.     Plaintiff seeks to hold accountable the Chain Pharmacies that reaped enormous financial rewards by helping to expand the market for prescription opioids beyond all reasonable limits, by failing to comply with their gatekeeping obligation to protect the public, and by refusing to monitor and restrict the improper sale and distribution of opioids, causing a public nuisance in the Cobb County community.

3.     IN ADDITION TO THE ALLEGATIONS SET FORTH HEREIN, THE COUNTY EXPRESSLY ADOPTS AND INCORPORATES BY REFERENCE THE ALLEGATIONS AND CLAIMS SET FORTH IN ITS COMPLAINT AND "SHORT FORM FOR SUPPLEMENTING

---

[1] The Walgreens Defendants are Walgreen Co., Walgreens Boots Alliance, Inc.; Walgreen Co.; and Walgreen Eastern Co., Inc.

[2] The CVS Defendants are CVS Health Corporation; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS TN Distribution, LLC; CVS Pharmacy, Inc.; and Georgia CVS Pharmacy, L.L.C.

[3] The Publix Defendants are Publix Super Markets, Inc.

[4] The Kroger Defendants are The Kroger Co.; Kroger Limited Partnership I; and Kroger Limited Partnership II.

[5] The Rite Aid Defendants are Rite Aid Corporation; Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center; Rite Aid Hdqtrs. Corp.; Rite Aid of Georgia, Inc.; and Eckerd Corporation.

[6] The Walmart Defendants are Walmart Inc., f/k/a Wal-Mart Stores, Inc., Wal-Mart Stores East, LP; WSE Management, LLC; WSE Investment LLC; Wal-Mart Stores East, LLC (formerly known as Wal-Mart Stores, Inc.); Sam's East, Inc.; and Sam's West, Inc.

[7] The newly added defendants in this pleading are: Walgreen Co.; Walgreen Eastern Co., Inc; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS TN Distribution, LLC; CVS Pharmacy, Inc.; Georgia CVS Pharmacy, L.L.C.; Kroger Limited Partnership I; Kroger Limited Partnership II; Rite Aid Hdqtrs. Corp.; Rite Aid of Georgia, Inc.; Eckerd Corporation; Wal-Mart Stores East, LP; WSE Management, LLC; WSE Investment LLC; Wal-Mart Stores East, LLC (formerly known as Wal-Mart Stores, Inc.); Sam's East, Inc.; and Sam's West, Inc.

COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND," ("SHORT FORM COMPLAINT") INCLUDING ALL CLAIMS AND ALLEGATIONS AGAINST OTHER DEFENDANTS NAMED IN THAT SHORT FORM COMPLAINT.

## INTRODUCTION

4.      This case arises from the worst man-made epidemic in modern medical history— an epidemic of addiction, overdose and death caused by Defendants' flooding the United States, including Plaintiff's community with prescription opioids.

5.      By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.

6.      This crisis arose not only from the opioid manufacturers' deliberate marketing strategy, but from distributors' and pharmacies' equally deliberate efforts to evade restrictions on opioid distribution and dispensing, while also helping spread the manufacturers' false marketing messages about prescription opioids and encourage their widespread use.  These distributors and pharmacies acted without regard for the lives that would be trammeled in pursuit of profit.

7.      Sadly, the opioid epidemic has hit particularly hard in Cobb County.  Indeed, in 2017 Cobb County led the state of Georgia in overdose deaths and was second in 2018.  During that time period, opioid overdose deaths became twice as common as deaths from car crashes.  The epidemic of opioid addiction has severely impacted the public health and safety in the County and strained government resources to the breaking point.

8.      This devastation in the County was created by opioid manufacturers, distributors, and Chain Pharmacies, who worked together to systematically dismantle the narcotic conservatism that had existed around prescription opioids for decades, opened the floodgates to an unreasonably large and unsafe supply of opioids, improperly normalized the widespread use of opioid drugs, violated laws and regulations designed to protect the public from the dangers of narcotic drugs like

opioids, and worked to dismantle protections designed to protect the public so more opioid drugs could be sold and the manufacturers, distributors, and Chain Pharmacies could reap the profits therefrom.

9.      Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing.  The number of opioid overdoses in the United States rose from 8,000 in 1999 to over 20,000 in 2009, and over 33,000 in 2015.  In the twelve months that ended in September 2017, opioid overdoses claimed 45,000 lives.  Another 46,000 opioid overdose deaths occurred in 2018, and in 2019 the number of opioid overdose deaths rose to over 49,000.



10.      Preliminary data indicates that the number of opioid related overdose deaths will be in excess of 65,000 for 2020.

11.      From 1999 through 2016, more than 350,000 people died from an overdose involving any opioids.  Well over half of those deaths—over 200,000 people—involved opioids prescribed by doctors to treat pain.  These opioids include brand-name prescription medications

like OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

12.     As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans under 50.

13.     In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this.  Certainly not in modern times."  On October 27, 2017, the President declared the opioid epidemic a public health emergency.

14.     Most of the overdoses from non-prescription opioids are also directly related to prescription pills.  As soon as prescription opioids took hold on a population, the logical and devastating progression to illicit drugs followed.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids or trapped in a cycle of addiction that causes those who suffer from the disease to need stronger and more potent drugs, have turned to heroin, fentanyl, and other illicit drugs.  According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin.  In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.

15.     The conduct of the manufacturers, distributors, and Chain Pharmacies caused the nation, and the County, to be awash in a flood of prescription opioids.  This has had a profound impact on both morbidity and mortality, and these drugs have created an epidemic of addiction that has had severe and wide-ranging effects on public health and safety in the County and in

communities across the country.  Indeed, from those suffering with the disease of addiction themselves, to children whose parents who suffer from addiction, to employers who employ an addicted population, to the first responders, law enforcement, the court system and the prison system who cannot handle the burdens placed on them, there is almost no area of the community that has not been significantly impacted.

16.     This suit takes aim at a substantial contributing cause of the opioid crisis:  the Chain Pharmacies, the last link in the opioid supply chain and the critical gatekeeper between dangerous opioid narcotics and the public, who utterly failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and dismantled and disregarded measures designed to protect the public health and safety.  The Chain Pharmacies failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, and instead actively contributed to the oversupply of such drugs and fueled an illegal secondary market.  They also played an active role in helping the manufacturers promote their false marketing about opioids to health care providers, their own pharmacists, and the public.

17.     The mission of pharmacy practice is "to serve society as the profession responsible for the appropriate use of medications, devices, and services to achieve optimal therapeutic outcomes."[8]  Defendants subverted that role and instead played a significant role in a public health epidemic in the County.

18.     Defendants have contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with far greater

---

[8] Vision and Mission for the Pharmacy Profession, American Pharmacists Association, adopted by the APhA House of Delegates (March 1991).

quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders and sales, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

19.     In 2014, almost two million Americas were addicted to prescription opioids and another 600,000 to heroin.  From 1999 to 2015, more than 183,000 people died in the U.S. from overdoses related to prescription opioids—more than the number of Americans who died in the Vietnam War.  From 1999 to 2016, more than 200,000 people died in the U.S. from overdoses related to prescription opioids.  Overdose deaths involving prescription opioids were five times higher in 2017 than 1999.  The number of drug overdose deaths increased by nearly 5% from 2018 to 2019.

20.     As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes of opioid prescriptions under the guise of medical treatment.  Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of the Defendants, if not their knowing support.

21.     As a direct and foreseeable result of Defendants' conduct, cities and counties across the nation, including Plaintiff, are now swept up in what the Centers for Disease Control ("CDC") has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[9]  The increased volume of opioid prescribing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted

---

[9] *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, Ctrs. For Disease Control and Prevention (Apr. 29, 2014), http://www,cdc,give.washington/testimony/2014/t20140429.htm; *see also*, Letter from Vivek H. Murthy, Surgeon General, Tide RX (Aug. 2016), http://turnthetiderx.org.

prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or could not afford prescription opioids.

22.      This explosion in opioid use and Defendants' profits has come at the expense of patients and residents and has caused ongoing harm to and a public nuisance in the County.  As the then CDC director concluded:  "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."

23.      Defendants' conduct in promoting opioid use and fueling diversion has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin.  The costs are borne by Plaintiff and other governmental entities.  These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

24.      The burdens imposed on Plaintiff are not the normal or typical burdens of government programs and services.  Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions.  The Defendants' conduct has created a public nuisance and a blight.  Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

25.      Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

26.      Within the next hour, six Americans will die from opioid overdoses; two babies will be born addicted to opioids and begin to go through withdrawal.

27.     Plaintiff brings this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## JURISDICTION AND VENUE

28.     This Court has subject-matter jurisdiction of this action under 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

29.     This Court has supplemental jurisdiction of the County's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

30.     This Court has personal jurisdiction over all Defendants.

31.     Venue is proper in this district under 28 U.S.C. § 1407.

## PARTIES

I.     **PLAINTIFF**

32.     The County is a political subdivision of the State of Georgia which may sue and plead in its own name.

II.     **DEFENDANTS**[10]

A.     **CVS**

33.     Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island. CVS Health, through its various DEA registered

---

[10] The County has made its best efforts, based on the information available, to identify all of the corporate entities with responsibilities related to the sale and distribution of opioids in or affecting the County.  If information that becomes available to the County alters its understanding or discloses additional entities, the County reserves the right to seek to join any such entities as defendants.  Furthermore, the County recognizes that corporate entities affiliated with the Defendants may possess discoverable information relevant to the County's claims, even though those entities have not been named as defendants.  The County reserves the right to seek all information relevant to these claims.

subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and also operates retail stores, including in and around Plaintiff's geographical area, that sell prescription medicines, including opioids.

34.     Defendant CVS Indiana L.L.C. is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.  For much of the period the identification of and due diligence on suspicious orders for the entire country was to be performed at CVS Indiana L.L.C.

35.     Defendant CVS Rx Services, Inc. is a New York corporation with its principal place of business in Chemung, New York.

36.     Defendant CVS TN Distribution, LLC is a Tennessee limited liability company with its principal place of business in Knoxville, Tennessee.

37.     Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy, Inc. is a wholly owned subsidiary of CVS Health.  Defendant CVS Pharmacy, Inc. is both a DEA registered "distributor"[11] and a DEA registered "dispenser"[12] of prescription opioids and cocktail drugs and is registered to do business in Georgia.

38.     Defendant Georgia CVS Pharmacy, L.L.C. is a Georgia limited liability company with its principal place of business in Woonsocket, Rhode Island.

39.     Defendants CVS Health Corporation; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS TN Distribution, LLC; CVS Pharmacy, Inc.; and Georgia CVS Pharmacy, L.L.C., are collectively referred to as "CVS."  CVS conducts business as a licensed wholesale distributor and

---

[11] 21 U.S.C. §802(11) and §822(a)(1).

[12] 21 U.S.C. §802(10) and §822(a)(2).

dispenser.  At all times relevant to this Complaint, CVS distributed and/or dispensed prescription opioids throughout the United States, including in the County specifically.

    **B.**    **Walgreens**

    40.    Defendant Walgreen Co. acted as a retail pharmacy in the United States, until Walgreen Co. completed the acquisition of Alliance Boots, a British pharmacy giant, in 2014. After this acquisition, the company simply became Walgreens Boots Alliance, Inc. traded on NASDAQ under the symbol WBA.

    41.    Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation that describes itself as the successor of Walgreen Co., an Illinois corporation.  Both Walgreens Boots Alliance, Inc. and Walgreen Co. have their principal place of business in Illinois.

    42.    Walgreen Co. is portrayed as a subsidiary of Walgreens Boots Alliance, Inc. and does business under the trade name "Walgreens."

    43.    During the relevant time period, Walgreens self-distributed opioids and cocktail drugs to its own pharmacies from distribution centers which it owned and operated. At least between 2006 and 2014, Walgreens distributed opioids and cocktail drugs from its distribution centers, including those in Jupiter, Florida, Perrysburg, Ohio, and Mount Vernon, Illinois, to Walgreens retail pharmacies located in Georgia, including the County.

    44.    Defendant Walgreen Eastern Co., Inc. is a New York corporation with its principal place of business in Deerfield, Illinois.  Walgreen Eastern Co., Inc. is a subsidiary of Walgreens Boots Alliance, Inc.

    45.    Defendants Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc. are collectively referred to as "Walgreens."

    46.    Walgreens conducted business as a licensed wholesale distributor, as described above.  Throughout the relevant time period, and as further alleged below, Walgreens entities also

owned and operated pharmacies in the County.  At all times relevant to this Complaint, Walgreens distributed and/or sold prescription opioids throughout the United States, including in Georgia and the County specifically.

47.      The DEA distribution registrations for Walgreens's controlled substances distribution centers that distributed opioids and cocktail drugs into the County were held by Walgreen Co. and/or Walgreen Eastern Co.

48.      Walgreen Co. created, implemented, and had the power to enforce policies, practices, and training regarding distribution and sales in all Walgreens distribution and pharmacy sales operations.

49.      The DEA dispensing registrations for Walgreens's pharmacies in the County were held by Walgreen Co., which operated each pharmacy as a "d/b/a/" entity.

50.      Expanding its chain pharmacy operations, Walgreens also acquired a number of former Rite Aid stores, including in the County.  Walgreens is liable as a successor for these stores' prior conduct, as well as for its own operations.

**C.      Rite Aid**

51.      Defendant Rite Aid Corporation ("RAC") is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania.

52.      Defendant Rite Aid Hdqtrs. Corp. is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania.  Defendant Rite Aid Hdqtrs. Corp. and Defendant Rite Aid Corporation, by and through their various DEA registered subsidiaries and affiliated entities, conduct business as licensed wholesale distributors and pharmacy operators.

53.      Defendant Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., is a subsidiary of Rite Aid Corporation and is itself a Maryland corporation with its principal office located in Camp Hill, Pennsylvania.  At least until September 2014, Rite

Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. distributed prescription opioids throughout the United States, including in Georgia and the County specifically.

54.     Defendant Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center is a subsidiary of Rite Aid Corporation and is itself a Delaware corporation with its principal office located in Camp Hill, Pennsylvania.  At all times relevant to this Complaint, Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. and Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center distributed prescription opioids throughout the United States, including in Georgia and the County specifically.

55.     During the relevant time period, and as further alleged below, Rite Aid entities also owned and operated pharmacies in the County through Defendant Rite Aid of Georgia, Inc. Defendant Rite Aid of Georgia, Inc. is a Georgia corporation with its principal place of business in Pennsylvania.  Rite Aid of Georgia, Inc. was in the business of holding and operating retail pharmacies in Georgia, including in the County, on behalf of its parent company Rite Aid Corporation.  Rite Aid of Georgia, Inc. orders of controlled substances came from Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. and Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center and other wholesalers.  These controlled substances are distributed and dispensed according to practices and procedures established by Rite Aid Corporation and Rite Aid Hdqtrs. Corp.

56.     Defendants Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc., Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center, and Rite Aid of Georgia, Inc. are collectively referred to as "Rite Aid."

57.     Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.  Rite Aid also operates retail stores, including in and around Plaintiff's geographical area that sell prescription medicines, including opioids.

58.     RAC is an alter ego of Rite Aid Hdqtrs. Corp. and may be an alter ego of other Rite Aid subsidiaries.

59.     RAC and Rite Aid Hdqtrs. Corp. share the same address in Camp Hill, Pennsylvania.

60.     Although RAC contends that it has no employees, it produced numerous documents in the MDL that identify key witnesses as employees of RAC, including in internal and external emails, performance reviews, and other formal corporate documents.  These documents identify RAC employees with titles such as "Specialist, DEA Compliance" and "Director, Pharmacy Loss Prevention."

61.     Other documents produced in the MDL show that RAC requested threshold increases from McKesson on behalf of Rite Aid pharmacies. By requesting and submitting threshold increases, RAC effectively engaged in the business enterprise of prescription opioid distribution.  By doing so on behalf of its subsidiaries, RAC may be exerting control over their operations.

62.     Documents produced in the MDL also show that RAC had bonus plans for its stores, again demonstrating control over Rite Aid stores and that it engages in the same business enterprise as its stores.  Documents also show that RAC is involved in supply operations at its distribution centers.

63.     Documents produced in the MDL further show that RAC directs and implements policies and procedures for dispensing controlled substances in its stores, and that RAC has direct involvement in directing, managing, or supervising the operations or the employees of at least some of its subsidiary companies.

64.     RAC engages in the same business enterprise as Rite Aid Hdqtrs. Corp. and other of its subsidiaries and/or exerts control over their operations such that they are alter egos of one another.  RAC and Rite Aid Hdqtrs. Corp. disregard corporate formalities such that they are alter egos of one another.

**D.     Walmart**

65.     Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

66.     Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Arkansas.

67.     Defendant Sam's East, Inc., d/b/a Sam's Club, is an Arkansas corporation with its principal place of business in Arkansas.  Sam's East, Inc. is an indirectly, wholly owned subsidiary of Walmart Inc. The sole shareholder of Sam's East, Inc. is Defendant Sam's West, Inc. d/b/a Sam's Club, which is a wholly owned direct subsidiary of Walmart Inc. and an Arkansas corporation. Defendants Sam's East, Inc. and Sam's West, Inc. jointly operate Sam's Club stores.

68.     Walmart Inc. is the sole owner of Sam's West, Inc.  Sam's West, Inc. is the sole shareholder of Sam's East, Inc.

69.     Defendant WSE Management, LLC, is a Delaware limited liability company, and owns one percent of Wal-Mart Stores East, LP.

70.     Defendant WSE Investment, LLC, is a Delaware limited liability company, and a ninety-nine percent owner of Wal-Mart Stores East, LP.

71.     The sole owner and member of both WSE Management, LLC and WSE Investment, LLC is Wal-Mart Stores East LLC (formerly known as Wal-Mart Stores East, Inc.), an Arkansas limited liability company.

72.     The sole owner and member of Wal-Mart Stores East, LLC (formerly known as Wal-Mart Stores East, Inc.) is Walmart Inc., f/k/a Wal-Mart Stores, Inc.

73.     Defendants Walmart Inc., f/k/a Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment LLC, Wal-Mart Stores East, LLC (formerly known as Wal-Mart Stores East, Inc.), Sam's East, Inc., and Sam's West, Inc., are collectively referred to as "Walmart."

74.     Walmart, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a registered wholesale distributor and as a pharmacy.

75.     At all times relevant to this Complaint, Walmart distributed and/or sold prescription opioids throughout the United States, including in Georgia and the County specifically.

**E.     Kroger**

76.     Defendant Kroger Co. is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Defendant Kroger Limited Partnership I is an Ohio limited partnership with its principal place of business in Cincinnati, Ohio.  Defendant Kroger Limited Partnership II is an Ohio limited partnership with its principal place of business in Columbus, Ohio.  Kroger Co., Kroger Limited Partnership I, and Kroger Limited Partnership II are collectively referred to herein as "Kroger."

77.     Kroger operates approximately 2,200 pharmacies across the country.[13]

---

[13] https://www.reuters.com/companies/KR

78.     At all relevant times, Kroger dispensed prescription opioids in Georgia and in the County.  Until at least 2014, Kroger self-distributed certain drugs, including one of the most widely diverted opioids, hydrocodone, in Georgia and the County.

**F.      Publix**

79.     Defendant Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida.

80.     Publix, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a registered wholesale distributor and as a pharmacy.

81.     Publix operates approximately 1,264 supermarkets across Florida, Georgia, Alabama, North and South Carolina, Tennessee, and Virginia. Of these supermarkets, 191 are located in Georgia and 25 of those are located in the County. Most, if not all, of Publix supermarkets include a pharmacy.

82.     As of 2014, Publix operated 929 pharmacies in the southeastern United States, with sales exceeding $2.2 billion annually.

83.     At all times relevant to this Complaint, Publix distributed and sold prescription opioids through the southeastern United States, including in Georgia and the County specifically.

**G.      Related Entities; Agency and Authority**

84.     Defendants include the entities named above as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

85.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of

Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

86.     Plaintiff alleges that the corporate parents named as Defendants in this Complaint are liable as a result of their own actions and obligations in distributing and selling opioids, and not solely because of their vicarious responsibility for the actions of their pharmacy stores.

## DEFENDANTS' CONDUCT AND PLAINTIFF'S INJURIES

### I.      COMMON FACTS[14]

#### A.      Opioids and Their Effects

87.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids.  Natural opioids are derived from the opium poppy.  Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

88.     The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction.  The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today:  morphine, codeine, and thebaine.  Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today.  Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

89.     In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine.  During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions.  By 1900, an estimated 300,000 people were addicted to opioids in the United

---

[14] The allegations in this Complaint are made upon information and belief, including upon information immediately available to Plaintiff from the ARCOS database.

-17-

States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms.  The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent.  Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[15]

90.     In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin."  Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

91.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids.  Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

92.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

93.     Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME").  According to the CDC, doses at or above 50 MME/day double

---

[15] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago*, The Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/?utm_term=.7832633fd7ca.

the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

94.     Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the "high."  However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

95.     Discontinuing opioids after more than just a few weeks will cause most patients to experience withdrawal symptoms.  These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

### B.     Defendants' Conduct Created an Abatable Public Nuisance

96.     As alleged throughout this Complaint, Defendants' conduct has created a public health crisis and a public nuisance.

97.     The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by taking measures such as providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

98.     Defendants have the ability to act to help end the public nuisance, and the law recognizes that they are uniquely well positioned to do so.  All companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and

sold to appropriate patients and not diverted.  These responsibilities exist independent of any Food and Drug Administration ("FDA") or Drug Enforcement Administration ("DEA") regulation, to ensure that their products and practices meet both federal and state laws and regulations.  As registered distributors and dispensers of controlled substances, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a key line of defense.  Defendants, however, instead abused their position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

### C.  Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion

#### 1.  The Chain Pharmacies Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids

99.    Retail pharmacy chains earned enormous profits by flooding the country with prescription opioids.  They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and retail sellers of opioids.  Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

100.    Each of the Chain Pharmacies does substantial business across the United States. This business includes the distribution and sale of prescription opioids.

101.    Statewide ARCOS data confirms that the Chain Pharmacies distributed and dispensed substantial quantities of prescription opioids in the County.  In addition, they distributed and dispensed substantial quantities of prescription opioids in other states and other counties, and these drugs were diverted from these other states and counties to the County.  The Chain Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it, and thus contributed substantially to the diversion problem.

102.     The Chain Pharmacies developed and maintained extensive data on the opioids they distributed and dispensed.  Through this data, Chain Pharmacies had direct knowledge of patterns and instances of improper distribution, prescribing, sale, and use of prescription opioids in communities throughout the country, and in the County in particular.  They used the data to evaluate their own sales activities and workforce.  The Chain Pharmacies also provided data regarding, *inter alia*, individual doctors to drug companies, which targeted those prescribers with their marketing, in exchange for rebates or other forms of consideration. The Chain Pharmacies' data is a valuable resource that they could and should have used to help prevent diversion, but they failed to do so.  Defendants facilitated the supply of far more opioids that could have been justified to serve a legitimate market.  The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, as well as to maintain effective policies and procedures to guard against diversion from their retail stores, breached both their statutory and common law duties.

103.     For over a decade, Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.

104.     Each participant in the supply chain of opioid distribution, including the Chain Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

105.     According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S.

Not all of these prescriptions were legitimate.  Yet Defendants systemically ignored red flags that they were fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level.  Instead, they put profits over the public health and safety. Despite their legal obligations as registrants under the CSA, the Chain Pharmacies allowed widespread diversion to occur—and they did so knowingly.

106.    Upon information and belief, this problem was compounded by the Chain Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate and what measures and/or actions to take when a prescription is identified as potentially illegitimate.

107.    Upon information and belief, the Chain Pharmacies also failed to put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market, and to conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled, or if they conducted such reviews, they failed to take any meaningful action as a result.

108.    Upon information and belief, even where Chain Pharmacies enacted policies and procedures to prevent stores from facilitating diversion and selling into a black market, such policies were merely window-dressing and were not employed in any meaningful way.

109.    Upon information and belief, the Chain Pharmacies also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.  Instead, Chain Pharmacies put in place policies that required and rewarded speed and volume over safety and the care necessary to ensure that narcotics

were distributed and sold lawfully.  Defendants consistently put profits over safety in their distribution and sale of prescription opioids.

110.     The Chain Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd. But they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

### 2.     Defendants Have a Duty to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions

111.     Multiple sources impose duties on the Defendants to report suspicious orders and further not to ship those orders unless due diligence disproves those suspicions.

112.     First, under the common law, Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances.  By flooding Georgia, and the County, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, and by failing to maintain effective controls against diversion from their retail stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

113.     Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

114.     Third, distributors and chain pharmacies are required to register with the DEA to distribute and/or dispense controlled substances under the federal Controlled Substances Act.  *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71.  Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.  The CSA and its implementing regulations created a closed-system of distribution for all controlled

substances and listed chemicals.  Congress specifically designed the closed chain of distribution
to prevent the diversion of controlled substances into the illicit market.  Congress was concerned
with the diversion of drugs out of legitimate channels of distribution and acted to halt the
"widespread diversion of [controlled substances] out of legitimate channels into the illegal
market."  Moreover, the closed-system was specifically designed to ensure that there are multiple
ways of identifying and preventing diversion through active participation by registrants within the
drug delivery chain.  All registrants must adhere to the specific security, recordkeeping, monitoring
and reporting requirements that are designed to identify or prevent diversion.  Maintaining the
closed system under the CSA and effective controls to guard against diversion is a vital public
health concern.  Controlled substances, and prescription opioids specifically, are recognized as as
posing a high degree of risk from abuse and diversion.  When the supply chain participants at any
level fail to fulfill their obligations, the necessary checks and balances collapse.  The result is the
scourge of addiction that has occurred.

115.    As registrants, Defendants were required to "maint[ain] . . . effective controls
against diversion" and to "design and operate a system to disclose . . .  suspicious orders of
controlled substances."  21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74.  Defendants were further
required to take steps to halt suspicious orders.  Defendants violated their obligations under federal
law.  Defendants have additional duties under Georgia's controlled substances laws and common
law.

116.    Further, under the CSA, pharmacy registrants are required to "provide effective
controls and procedures to guard against theft and diversion of controlled substances."  *See* 21
C.F.R. § 1301.71(a).  In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper
prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a

corresponding responsibility rests with the pharmacist who fills the prescription." Thus, regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).  The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."[16]

117.    "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice."  21 C.F.R. § 1306.06.  As the Department of Justice's recent lawsuit against Walmart alleges, 21 C.F.R. § 1306.06 requires that a pharmacist's conduct, when filling controlled-substance prescriptions adhere to the usual course of a pharmacist's professional practice.  The obligation to identify any red flags relating to a controlled-substances prescription, to resolve them before filing the prescription, and to document any resolution of red flags is a well-recognized responsibility of a pharmacist in the professional practice of pharmacy.  *United States of America v. Walmart Inc. et al.*, 1:20-cv-01744, (D. Del. Dec. 22, 2020).  Former DEA diversion investigator Demetra Ashley confirmed this proposition in her testimony in a deposition in this MDL.  And, as the Department of Justice's complaint alleges, when 'Walmart pharmacists failed to comply with their own professional pharmacy standards' in this respect, 'Walmart ... violated 21 C.F.R. § 1306.06.'"  *United States of America v. Walmart Inc. et al.*, 1:20-cv-01744, (D. Del. Dec. 22, 2020).

118.    Under the CSA, the duty to prevent diversion lies with the Chain Pharmacies, not the individual pharmacist.  As such, although it acts through its agents, the pharmacy is ultimately

---

[16] 2012 Dear Registrant letter to pharmacy registrants, http://ppsconline.com/articles/2012/FL_PDAC.pdf.

responsible to prevent diversion, as described above.[17]  Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration holder or not.  It is unlawful for any person knowingly to distribute or dispense controlled substances other than in accordance with the requirements of the federal CSA and its implementing regulations, or in violation of state controlled substances laws and regulations. Chain pharmacies are responsible "persons" under the CSA.  They also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled substances.  Pharmacy chains cannot absolve themselves of their own obligations by attempting to place unilateral responsibility on their agents.

119.    In addition to their duties as distributors, the Chain Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  The Chain Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions suggestive of potential diversion.  They also have a crucial role in creating chain-wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

120.    Pharmacy Defendants' obligations extend to monitoring, and documenting, the steps they take in accessing state prescription drug monitoring programs, often referred to as

---

[17] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014)  (emphasis added); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration,* 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration for, *inter alia,* dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

"PDMPs."  Yet, the Chain Pharmacies, upon information and belief, generally relied on their pharmacists' discretion in this area rather than setting forth requirements concerning PDMP searches and implementing systems, at least for many years, to track and document PDMP searches and their results.

121.    The CSA requires distributors and pharmacies, along with other participants in the supply chain of controlled substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of controlled substances like opioids; (b) register to distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) identify suspicious orders of controlled substances and halt such sales.

122.    To ensure that even drugs produced within quota are not diverted, federal regulations issued under the CSA mandate that all registrants "design and operate a system to disclose to the registrant suspicious orders of controlled substances."  21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  *Id*.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.  *Id*.  Other indicia of potential diversion may include, for example, "[o]rdering the same controlled substance from multiple distributors."

123.    These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious.  The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.  The determination of whether an order is

suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

124.    The DEA has testified in this MDL that:

- DEA registrants are required to block all suspicious orders of prescription opioids.

- Shipping a suspicious order is a *per se* violation of federal law.

- If a wholesale distributor blocks a suspicious order, they should terminate all future sales to that same customer until they can rule out that diversion is occurring.

- After the fact reporting of suspicious orders has never been in compliance with federal law.

125.    Of course, due diligence efforts must also be thorough.  The investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor inform the DEA about the order. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed.  Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them without performing adequate due diligence.

126.    To comply with the law, wholesale distributors, including Defendants, must know their customers and the communities they serve.  Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017).

127.    Pharmacy order data provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders.  This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use with opioids can be indicative of diversion.

128.    As acknowledged in an article CVS published in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular."  Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12., 2013, at 989-991.  The DEA has identified "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.*

129.    The Chain Pharmacies have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing."  *Id*. at 990.  For example, a chain pharmacy should properly use its chainwide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id*.  This "[a]nalysis of aggregated data" from chain pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths."  *Id.*  Accordingly, as CVS touts, "innovative use of transparent data is only prudent."  *Id.*

130.     As CVS counseled, Defendants may not ignore red flags of illegal conduct and must use the information available to them to identify, report, and not fill prescriptions that seem indicative of diversion.  That would include reviewing their own data, relying on their observations of prescribers, pharmacies, and customers, and following up on reports or concerns of potential diversion.

131.     In addition to their duties as distributors, Defendants also had a duty to monitor and report suspicious activity in their retail pharmacy operations.  Specifically, Defendants had a duty to analyze data and store-level information for known red flags such as (a) multiple prescriptions to the same patient using the same doctor; (b) multiple prescriptions by the same patient using different doctors; (c) prescriptions of unusual size and frequency for the same patient; (d) orders from out-of-state patients or prescribers; (e) an unusual or disproportionate number of prescriptions paid for in cash; (f) prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose.

132.     The CSA also imposes important record-keeping obligations on pharmacies, including pharmacy chains.  "[E]very registrant . . . dispensing a controlled substance or substances shall maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him." 21 USC 827(a).  "[A] registrant's accurate and diligent adherence to [its recordkeeping] obligations is absolutely essential to protect against the diversion of controlled substances."  Paul H. Volkman, 73 FR 30,630, 30,644 (2008). An important component of an anti-diversion system is the documentation Chain Pharmacies posses.  They must utilize their information to identify patterns of diversion and for auditing,

training, and investigation of suspicious activity in an effort to prevent diversion of controlled substances.

133.    According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the Board of Pharmacy and DEA must be contacted.

134.    As distributors and as pharmacies, Defendants have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

135.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent distributors and pharmacies would not fall.  Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

136.    Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

137.    The privilege of holding a license to distribute and dispense controlled substances comes with the responsibility of ensuring that the controlled substances distributed or sold are not diverted and/or subject to abuse and misuse.  State and federal laws also have developed fairly uniform standards of practice across the country.  It is both intuitive and understood that selling drugs for non-medical purposes, or drugs which the dispenser knows or should know present a significant risk for diversion falls outside the standards of care and is not a legitimate practice.  As

part of usual and customary practice, prescriptions must be evaluated and determined to be valid and issued for a legitimate medical purpose.

138.    Pharmacies' evaluation process includes with what is known as "Drug Utilization Review" or "DUR."  This practice is both part of traditional roles and duties and codified in federal and state statutes.  Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990 (OBRA 90), a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy.  In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR."  States, seeking to assure uniformity, have taken action to require the same mandates as this federal law.  The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids.  This process would have provided the Chain Pharmacies information about potential diversion as well.

139.    Accordingly, states, including Georgia, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs (PDMPs), which continued to grow over time.

140.    Defendants themselves recognized the value of the tools available to them through PMDPs.  An internal CVS document, for example, characterized PDMPs as an "invaluable tool for Pharmacists to prevent controlled substances from being diverted or dispensed for non-medical purposes …."  It also described PDMPs as "cut[ting] down on prescription fraud and 'doctor shopping' by providing Prescribers and Pharmacists with more complete information about a

patient's controlled substance prescription history."  Separately, data also suggests that PDMP utilization assists in detecting possible misuse and diversion of controlled substances.

141.    Additionally, Chain Pharmacies have operating systems and methods to store and retain prescription dispensing data and records.  The information they possess must be readily retrievable, and they have an obligation to use it to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances.  Their hiring, training, and management of pharmacy personnel, and their supporting policies, procedures, and systems should and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

### 3. Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders

142.    The regulations aim to create a "closed" system in order to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.  Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical.  Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

143.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

144.    Indeed, the DEA has repeatedly informed Defendants about their legal obligations, including obligations that were so obvious that they simply should not have required additional clarification.  As former DEA agent Joseph Rannazzisi recently explained during a deposition in this MDL:

> Q.  Someone says "Don't steal," do you have to put in there "from a supermarket"?
>
> A.  No.
>
> Q.  Someone says "Don't trespass on the property," do you have to put "wearing tennis shoes"?
>
> A.  No.
>
> Q.  Next, you got asked: "Well, you never instructed the companies to keep their files."  Do you remember that?
>
> A.  Yes, sir.
>
> Q.  Would old files be important in monitoring—in your ongoing monitoring? Would it be important that a company keep their files so that they can look back at them?
>
> A:  Absolutely. That's the—the whole idea behind maintaining a due diligence file is you have a history of purchases. That way you could see what they're doing and where they're going with their purchases.

145.    For example, it is not an effective control against diversion to identify a suspicious order, ship it, and wait as long as weeks to report it to law enforcement, potentially allowing those pills to be diverted and abused in the meantime.

146.    During a 30(b)(6) deposition in this MDL, the DEA's Unit Chief of Liaison was asked whether the DEA made it "clear to industry that the failure to prevent diversion was a threat to public safety and the public interest."  In response, he testified:

> Yes, I think it's established in 823 [the Controlled Substances Act] where it's part of our -- part of the registrant that is applying to be a registrant understands that they have to maintain effective controls .
> .  .  . they  also  know  that  these  drugs  themselves  are  scheduled

controlled substances for a particular reason, because they're addictive, psychologically and physically they're addictive, so they know that these drugs have these properties within themselves. **So they would understand that these drugs are categorized or scheduled in that manner because they have the potential to hurt**.

147.    And Defendants did understand.  As described below, at least Walgreens has itself acknowledged (internally) its understanding of the potential consequences of its failure to report and cease shipping suspicious orders.

148.    In fact, trade organizations in which Defendants have actively participated have acknowledged that distributors have been responsible for reporting suspicious orders for more than 40 years.  The National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies.  Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors and other trade organizations as well.  Most of the Defendants serve on the Board of Directors of NACDS. As controlling members of NACDS, the Chain Pharmacy Defendants have served on and run key governing committees within the organization.  Chain Pharmacies have repeatedly chaired NACDS's Board of Directors, which determines the "strategic plan and positions" of the organization.  During the last 12 years, representatives of CVS, Rite Aid, and Walgreens have always held Board of Directors or officer seats.

149.    The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA"), and prior to 2000, known as the National Wholesale Druggists' Association ("NWDA")), is a national trade association representing distributors that has partnered with NACDS.  The two groups viewed their relationship as a strategic "alliance."  CVS also has been a member of the HDA.

150.    In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.  The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:

- Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

- Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.

- Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

151.    In 2007 and 2008, the HDA, began developing "Industry Compliance Guidelines" ("ICG") that aimed to outline certain "best practices" for distributors of controlled substances.  As part of its development of the ICG, the HDA met with the DEA on at least three occasions.  The HDA also sought extensive input from its membership, as well as other groups such as the Pain Care Forum.  Internal discussions concerning the ICG further demonstrate the industry's knowledge of what was expected of them.  For example, when deciding whether or not the guidelines should permit a distributor to still ship a part of an order identified as suspicious, the HDA noted that one potential downside of this approach was that "DEA correspondence/interpretation do not support this practice."

152.    The HDA released the ICG in 2008 and, in doing so, it emphasized that distributors were "[a]t the center of a sophisticated supply chain" and "uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."[18]

153.    More recently, in the appeal that arose from DEA's enforcement action against wholesaler Masters Pharmaceuticals, Inc. for its distribution of opioids, the HDA and NACDS submitted a joint amicus brief regarding the legal duty of distributors that acknowledged that "HDMA and NACDS members" had a duty to prevent diversion." *See Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*, 2016 WL 1321983 (D.C. Cir. April 4, 2016).  As described below, both the HDA and NACDS have both long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."

154.    The requirement to report suspicious orders at the time (not after the fact) has always been clear and Defendants themselves have acknowledged as much through their various trade groups and associations.  As described above, correspondence between the NWDA and the DEA, as early as 1984, illustrates that the DEA provided clear guidance well before the opioid crisis was unleashed.  For example, in one letter to the NWDA, DEA Section Chief Thomas Gitchel emphasized that "the submission of a monthly printout of after-the-fact sales will not relieve a registrant from the responsibility of reporting excessive or suspicious orders," noting **"DEA has interpreted 'orders' to mean prior to shipment."**  Consistent with that understanding, the NWDA's 1984 Guidelines repeated the same directive.

---

[18] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B at 1).

155.    In addition, the DEA, for example, in April 1987, sponsored a three-day "Controlled Substances Manufacturers and Wholesalers Seminar" that was attended by "over fifty security and regulatory compliance professionals representing forty-three major pharmaceutical manufacturers and wholesalers."   According to the executive summary of the event, Ronald Buzzeo held a session on "excessive order monitoring programs," wherein he explained:

> [A]ny system must be capable of both detecting individual orders which are suspicious, or orders which become suspicious over time due to frequency, quantity, or pattern.  The NWDA system, for example, provides an excellent lookback, or trend system, but the ability to identify one time suspicious orders should not be overlooked as an element of the program.  Another area at issue was whether DEA would take action against a registrant which reported an order and then shipped it.  DEA pointed out that the company is still responsible under their registrations for acting in the public interest.  Reporting the order does not in any way relieve the firm from the responsibility for the shipment.

156.    The DEA also repeatedly reminded Defendants of their obligations to report and decline to fill suspicious orders.  Responding to the proliferation of internet pharmacies that arranged illicit sales of enormous volumes of opioids, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.

157.    Specifically, in August 2005, the DEA's Office of Diversion Control launched the "Distributor Initiative."  The Distributor Initiative did not impose any new duties on distributors, but simply reminded them of their duties under existing law.  The stated purpose of the program was to "[e]ducate and inform distributors/manufacturers of their due diligence responsibilities under the CSA by discussing their Suspicious Order Monitoring System, reviewing their [Automation of Reports and Consolidated Orders System ("ARCOS")] data for sales and purchases of Schedules II and III controlled substances, and discussing national trends involving the abuse of prescription controlled substances."   The CSA requires that distributors (and

manufacturers) report all transactions involving controlled substances to the United States Attorney General.  This data is captured in ARCOS, the "automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level—hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions,"[19] described above, from which certain data was recently made public.

158.    As part of the Distributor Initiative, the DEA gave several presentations to distributors both individually and through presentations and discussions at Defendants' trade groups meetings directly targeted at some of the red flags of diversion that the Defendants were obligated to consider and monitor as part of their requirements under the law.



159.    The DEA has hosted many different conferences throughout the years, including Pharmacy Diversion Awareness Conferences, to provide registrants with updated information

---

[19] U.S. Dept. of Justice, Drug Diversion Administration, Diversion Control Division website, https://www.deadiversion.usdoj.gov/arcos/index.html.

about diversion trends and their regulatory obligations.  The DEA also frequently presented at various other conferences for registrants at the national, state, or local level.

160.    Through presentations at industry conferences and on its website, the DEA provided detailed guidance to distributors on what to look for in assessing their customers' trustworthiness.  As an example, the DEA published "Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances"[20]

161.    In addition, the DEA sent a series of letters, beginning on September 27, 2006, to every commercial entity registered to distribute controlled substances, including chain pharmacy distributors.  The 2006 letter emphasized that distributors are:

> one of the key components of the distribution chain.  If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.[21]

162.    The letter also warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[22]

---

[20] U.S. Dept. of Justice, DEA, Diversion Control Division website, Pharmaceutical Industry Conference (Oct 14 & 15, 2009), *Suggested Questions a Distributor should ask prior to shipping controlled substances*, Drug Enforcement Administration *available at* https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr., Kathleen H. Dooley, Esq., *Pharmaceutical Production Diversion:  Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC, *available at* https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

[21] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Off. of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in *Cardinal Health, Inc. Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51 ("2006 Rannazzisi Letter"); *see also* CVS-MDLT1000091513; WAGMDL00757797.

[22] *Id.*

163.    The DEA sent a second letter to distributors on December 27, 2007.  Again, the letter instructed that, as registered distributors of controlled substances, they must each abide by statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[23]  DEA's letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting ARCOS data to the DEA).

164.    In September 2007, the NACDS, among others, also attended a DEA conference at which the DEA reminded registrants that not only were they required to report suspicious orders, but also to halt shipments of suspicious orders.  Walgreens, specifically, registered for the conference.

165.    The DEA's regulatory actions against the three largest wholesale distributors further underscore the fact that distributors such as Defendants were well aware of their legal obligations.  There is a long history of enforcement actions against registrants for their compliance failures.  For example, in 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against three of Cardinal Health's distribution centers and on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York. Similarly, on May 2, 2008, McKesson entered into an Administrative Memorandum of Agreement ("AMA") with the DEA related to its failures in maintaining an adequate compliance program.  Subsequently, in January 2017,

---

[23] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in Cardinal Health, Inc. v. Holder, No. 1:12-cv00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8 ("2007 Rannazzisi Letter").

McKesson entered into an AMA with the DEA wherein it agreed to pay a $150 million civil penalty for, *inter alia*, failure to identify and report suspicious orders at several of its facilities.

166.    The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[24]  The DEA, among others, also has provided extensive guidance to pharmacies on how to identify suspicious orders and other evidence of diversion.

167.    DEA has repeatedly emphasized that retail pharmacies, such as Defendants, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion.  When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[25]  DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist.  These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription

---

[24] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order); Holiday CVS, L.L.C. v. Holder, 839 F.Supp.2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

[25] *Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

168.    DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time.  Most of the time, these attributes are not difficult to detect and should be easily recognizable by Defendants' diversion control systems.

169.    The DEA has also explained these red flags in individual meetings with Defendants. For example, in December 2010, DEA hosted a meeting with CVS's representatives and counsel and advised CVS of the "red flags . . . that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose."[26]

170.    Examples of red flags that the DEA identified during its meeting with CVS include:

- many customers receiving the same combination of prescriptions (*i.e.*, oxycodone and alprazolam);

- many customers receiving the same strength of controlled substances (*i.e.*, 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam);

- many customers paying cash for their prescriptions;

- many customers with the same diagnosis codes written on their prescriptions (*i.e.*, back pain, lower lumbar, neck pain, or knee pain); and

- individuals driving long distances to visit physicians and/or to fill prescriptions.[27]

---

[26] Declaration of Joe Rannazzisi in *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012).

[27] *Id.*

171.    Similarly, in 2011, the DEA took Walgreens "to the woodshed" over its dispensing cocktail drugs and opioids to questionable out of state customers, customers with the duplicate diagnoses, young people, and customers only paying cash.  Many of these same red flags were highlighted in the 2009 Walgreens Order to Show Cause and resulting 2011 Memorandum of Agreement.

172.    As another example, in a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as: large numbers of customers who: receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

173.    Red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies. Relevant guidance concerning narcotics dispensing dates back to at least since the 1930's and 1940's there has been guidance given to pharmacies and pharmacists related to the creation of systems and programs to guard against diversion and lists of don'ts when dispensing narcotics. DEA enforcement actions such as the *Holiday* decision, *Medicine Shoppe-Jonesborough* and *United Prescription Services, Inc*. also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the CSA.

174.    Many of many of the Chain Pharmacies, including CVS, Rite Aid, and Walgreens, and their trade organizations, including the HDMA and the NACDS, also participated in creating a "Stakeholders" memorandum that acknowledges many of these red flags.  These include for example, traveling unexplainable and/or unreasonably long distance to a physician office and/or the pharmacy, a controlled substance refill pattern inconsistent with regular refill patterns for non-

controlled substances, or a prescription that a pharmacist knows or reasonably believes another pharmacy refused to fill.   The "Stakeholders" memorandum acknowledges the danger of "therapeutic duplication of two or more long-acting and/or two or more short-acting opiates (cocktails)" and "patient presents prescriptions for highly abused 'cocktails' (combination of opiate, benzodiazepine, and muscle relaxant) of controlled substance medications (cocktails)."  The "cocktail" often referred to as the "Holy Trinity" consists of an opioid, a benzodiazepine, and a muscle-relaxer such as carisoprodol.   A "trinity" combination can also refer to different combinations of opioid/non-opioid prescriptions intended for abuse and to create a euphoric feeling similar to heroin and other illicit drugs.   Medical literature has long recognized the special dangers posed by cocktails composed of drugs of abuse which lack any documented medical efficacy."  Similarly, the *East Main Street Pharmacy* action acknowledged that "the combination of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."

175.    As a DEA administrative decision from 2008 explains, "[w]hile carisoprodol [was] not controlled under Federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a benzodiazepine."  *See Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1 (DEA Dec. 2008).  Other DEA and judicial decisions likewise acknowledge well-known and highly abused cocktails.  *See, e.g., U.S. v. Evans*, 892 F.3d 692, 706 (5th Cir. 2018).

176.    As described above, red flags indicative of diversion include suspicious behavior of patients, such as stumbling while walking, slurred speech, appearance of intoxication, or of customers coming and appearing like they may not need the medication, or requesting drugs by brand name or street slang such as "blues" (a term referencing Mallinckrodt opioids ).  Pharmacies'

training materials and controls should  assist pharmacists and technicians in the identification of such behaviors.

177.    Pharmacies must resolve red flags before a prescription for addictive and dangerous drugs, such as opioids, are dispensed.

### 4.    Defendants Were Uniquely Positioned to Guard Against Diversion

178.    Not only do Chain Pharmacies often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information – but they also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with other distributors, these data points give the Chain Pharmacies insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

179.    Indeed, CVS Health president and CEO Larry Merlo has described the company as "America's front door to health care with a presence in nearly 10,000 communities across the country," which allowed it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."[28]

180.    Chain Pharmacies not only make observations through their local front doors, but have extensive data to which an individual pharmacist would not have access.  They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve.  This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of over-dose and death.

---

[28] *See, e.g.*, David Salazar, *CVS Health Unveils New PBM, Pharmacy Efforts to Curb Opioid Abuse*, (Sept. 21, 2017), https://drugstorenews.com/pharmacy/cvs-health-unveils-new-pbm-pharmacy-efforts-curb-opioid-abuse

They could also use this information to monitor potentially suspicious prescribers.  Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it.  A former DEA diversion investigator, whose testimony is also referenced above, agreed in a deposition in this MDL that as part of their obligation under Section 1301.71, pharmacies corporately have an obligation to develop policies to train pharmacists to comply the CSA regulations.  She further agreed that the defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

181.    As explained above, in addition to their duties as distributors, the Chain Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  Specifically, the Chain Pharmacies had a duty to analyze data and the personal observations of their employees for known red flags such as those described above.  The Chain Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that suggested potential diversion.

182.    They were particularly well-positioned to do so given the dispensing data available to them, which they could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Each could and should have also developed tools and programs to alert their pharmacists to red flags and to guard against diversion.

183.    As described above and further below, the Chain Pharmacies also possessed sufficiently detailed and valuable information that other companies were willing to pay them for it.  In 2010, for example, Walgreen's fiscal year 2010 SEC Form 10-K disclosed that it recognizes

"purchased prescription files" as "intangible assets" valued at $749,000,000.[29]   In addition, Walgreens's own advertising has acknowledged that Walgreens has centralized data such that customers' "complete prescription records" from Walgreens's "thousands of locations nationwide" are *"instantly available."*

184.    Similarly, CVS's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some consulting services." He also testified that CVS would provide the vendors with "prescriber level data, drug level data, plan level data, [and] de-identified patient data."

185.    Each of the Chain Pharmacies had complete access to all prescription opioid dispensing data related to its pharmacies in the County, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around the County, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around the County.  Each of the Chain Pharmacies likewise had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around the County, complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around the County, and complete access to information revealing the opioids prescriptions dispensed by its pharmacies in and around the County.  Further, each of the Chain Pharmacies had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around the County and complete access to

_____

[29] https://www.sec.gov/Archives/edgar/data/104207/000010420710000098/exhibit_13.htm

information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around the County.

### 5.    Defendants Failed to Maintain Effective Controls Against Diversion

186.    As described further below, the Chain Pharmacies failed to fulfill their legal duties and instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.  The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing the County.

#### a.    CVS

##### i.    CVS Lacked a Genuine Suspicious Order Monitoring System for Much of the Relevant Time

187.    CVS distribution centers, in tandem with outside wholesalers, such as Cardinal and McKesson, supplied opioids to CVS pharmacy stores until October 2014.  CVS self-distributed hydrocodone and hydrocodone combination products and cocktail drugs to its own stores, of which CVS had approximately 6,000 by 2006 and 9,700 by 2014.  Hydrocodone combination products (HCPs) were previously classified as Schedule III controlled substances, but rescheduled to Schedule II status as of October 6, 2014.  CVS ceased self-distributing hydrocodone and HCPs the same day the rescheduling took effect but continued to distribute controlled substances including cocktail drugs to its CVS pharmacies.

188.    CVS pharmacies nationwide placed orders with CVS distribution centers through CVS's central mainframe computer ordering system.

189.    Before 2009, CVS, which stocked and sold opioids at more than 9,000 stores across the country, lacked any meaningful suspicious order monitoring ("SOM") system.  Instead, CVS relied on the gut instincts of "pickers and packers" of the drugs in the distribution center – workers responsible for pulling items off distribution shelves for delivery to pharmacy stores – to identify

"really big" orders that they believed were simply too large.  This, of course, was not an effective SOM system.

190.    Moreover, CVS lacked a training program to train its pickers and packers how to identify unusual orders of size, frequency, or pattern.  CVS also did not have any written policies, procedures, or protocols with respect to the pickers' and packers' obligations until August, 2013.  And, there were no formal job requirements to be employed as a picker and packer.

191.    In 2007, with the help of an outside consultant, CVS began work on a Standard Operating Procedure Manual ("SOP") that was intended to cover all facets of DEA controlled substances compliance, including suspicious order monitoring.  However, by the Summer of 2010, neither the final manual nor the SOM section was complete.  Internal documents from that time acknowledge that CVS was "still in the process of writing the suspicious order monitoring section of this standard operating procedure."  In fact, the section of the Standard Operating procedures for Suspicious Order Monitoring states **BEING DEVELOPED AND WRITTEN."**

192.    Drafts of the SOP Manual, meanwhile, show CVS understood, or should have understood, that this was unacceptable. The draft manual provides that: "CVS is responsible for ensuring compliance with DEA regulatory requirements, and that responsibility cannot be abdicated or transferred to anyone else."  Despite this acknowledgement, when the first version of the SOP Manual was issued in December 2007 and for multiple revisions thereafter, the SOM section still remained incomplete.  It was not completed until August of 2010.  Completion of the Manual in 2010 did not equate to compliance, however.

193.    As John Mortelliti, CVS's Director of Loss Prevention, wrote in November 2009, this had become "a big issue with CVS and the DEA," and he was "trying to get a rough draft

SOM SOP" before a DEA meeting. CVS only incorporated the final missing SOMS section because of the need to fulfill an apparent promise to provide it to the DEA.

194.    CVS's Indiana distribution center was audited and investigated by the DEA for its distribution practices on August 24, 2010. The distribution center was responsible for portions of the relevant period for identifying and performing due diligence on nationwide orders that were flagged as suspicious. The day after the DEA's audit of CVS's distribution practices began, CVS Pharmacy, Inc. sent a new Standard Operating Procedure, which included for the very first time a policy on suspicious order monitoring. CVS Pharmacy, Inc. internally posted the SOP at 1:35 pm on August 26, 2010. The document was hastily put together.

195.    On September 1, 2010, John Mortelliti sent an e-mail to Terrance Dugger who was present during the DEA audit. The subject of the e-mail and the attachment is "DEA Speaking Points," the importance was listed as high. He writes: "Terrence, This is for the DEA. The corrections listed below have been updated. It is ok to review this with the agents."

196.    Mr. Mortelliti then sent the same presentation on the same day to another group of CVS employees writing: "These are the final approved speaking points for the DEA agents if they come to one of your facilities and question suspicious monitoring. It is ok to share this document. Please be sure your team understands it before presenting so it **doesn't look like a prop instead of a tool.**" The presentation sent by Mr. Mortelitti to be shared with the DEA was not correct and was not the procedure being used by CVS.

197.    In a September 2010 e-mail, Mr. Mortelliti circulated an August 27, 2010 document titled "Suspicious Order Monitoring for PSE/Control Drugs: Summary of Key Concepts & Procedures," which he described as "final approved speaking points for the DEA" should DEA agents question suspicious order monitoring at a CVS facility. In the correspondence, he asked

that the recipients "be sure [their team] understands [the material] before presenting so it doesn't look like a prop instead of a tool."

198.    CVS had a "CVS DEA compliance coordinator" in name only.  A CVS employee who held the position from 2008 to 2014 said that her title was only "for reference in SOPs," not her real job.  For "personnel purposes," she was never considered the CVS DEA compliance coordinator.  Moreover, she had nothing to do with suspicious order monitoring, other than "updating the SOP with what was provided for the program."  This is according to CVS's "DEA Compliance Coordinator."

> **ii.    CVS Failed to Remedy Fatal Flaws in the System it Slowly Developed**

199.    CVS claims that in 2009 it began using a computer algorithm that flagged potentially suspicious orders needing additional investigation.  The automated program was delivered by an outside vendor to CVS in December of 2008.

200.    CVS called the output of the flagged orders an Item Review Report ("IRR").

201.    The SOM algorithm delivered in December of 2008 was designed to "pend" (or identify) an order with a score of 0.15 or higher as potentially suspicious.  The higher the score the more likely the order was potentially suspicious.  In July, 2009 CVS reported to the algorithm designer that the SOM model was pending a large number of orders that CVS believed were "not suspicious on their face" and it requested that the model be changed.  As a result, revised coefficients for the algorithm were delivered to CVS on August 27, 2009 and the pend score of .15 remained the same.  Between June, 2010 and August, 2010, Mortelliti adjusted the IRR pend score from .15 to .65.  The higher the score, the less sensitive the model, flagging fewer potentially suspicious orders for investigation.  On February 8, 2011, the algorithm designer delivered a

completely retuned SOM algorithm with another set of coefficients.  The February, 2011 changes returned the pend score to .15.  CVS again changed the pend score to .65.

202.    IRRs were the primary SOM process.  A CVS corporate representative explained, on behalf of the company, "for the most part," if an order was not flagged as suspicious under the IRR system, there would be no due diligence of that order.  Yet, CVS neglected to provide written instructions to its employees for how to perform that critical review until February 29, 2012.

203.    CVS's IRR system was deficient and failed in many respects to meet CVS's obligations as a distributor.

204.    CVS also learned in 2010 that its SOM algorithm was not working properly because it monitored by drug, not active ingredient, meaning that changes in a drug's description or name caused historical data to be lost.  Thus, the system was unable to determine that orders for these drugs exceeded or diverged from prior volumes or patterns.

205.    CVS's SOM algorithm also failed to consider outside vendor orders.  In other words, CVS's SOM system would not track how many opioids CVS was ordering from third-party distributors such as Cardinal when evaluating whether to distribute opioids to one of its pharmacies.  CVS knew this was a problem, as a "[s]tore may order a little from both the OV [outside vendor] and DC [CVS distribution center] to stay under the radar."  It also knew that excluding outside vendor data meant CVS "may ship a potentially reportable suspicious order from [its] DC."  Stores, including one that had a "68,000 hydrocodone pill loss," could also place telephone orders to outside vendors, into which there was "no visibility . . . until a later time."  This deficiency is particularly glaring because, at a corporate level, CVS had full access to the orders its pharmacies placed to outside vendors.

206.    Acknowledging the ineffectiveness and deficiencies within its SOM system, CVS hired new consultants in 2012 to troubleshoot its existing SOM systems for the purpose of either fixing the deficient system or developing a new SOM system so as to attempt to become compliant with the law.

207.    Still, as late as July 2013, internal e-mail reflects that CVS's primary tool for investigating suspicious orders relied on data that was months or even years old and made any analysis, "for the most part, irrelevant and pointless."

208.    Not until mid to late 2014 did CVS fully implement a new SOM system.  Even then, CVS encountered problems in evaluating suspicious orders for opioids and its SOMS was entirely lacking.   The deployment was further delayed due to system data feed issues that created inaccuracies in the SOM historical data.  A risk analysis of the new system was conducted in June 2014.  The risk level was determined to be high for the SOM system in the following categories covering seemingly every aspect of its operation: inconsistent due diligence in SOM analysts reaching out to stores to investigate suspicious orders; inconsistency in documenting due diligence investigations of suspicious orders; lack of engagement by the Management Team; lack of communication between the SOM Management Team and SOM Analysts; lack of resources to handle the rollout of the new SOM system to all distribution centers; and lack of clarity in how the new SOM system is identifying suspicious orders.  Essentially, these are the key components of a compliant and effective SOM system.  That same year, CVS stopped distributing opioids at the wholesale level, but it did continue to distribute cocktail drugs.

209.    Meanwhile, on August 5, 2013 the DEA began another audit and investigation of the CVS distribution center in Indiana.  CVS's own documents acknowledge that the DEA's investigation was focused on its failure to maintain a SOM program for controlled substances.

210.    In response to queries from the DEA, CVS wrote a letter to the DEA revealing that it had only stopped seven suspicious orders across the entire country.  Right before sending the letter, the author, Mark Nicastro, head of the CVS distribution center in Indiana, conceded internally that "I wish I had more stopped orders that went back further."  Sadly, while Mr. Nicastro was writing the letter on CVS's behalf to the DEA, he could not even locate the SOP for the SOM, writing to Pam Hinkle, "For the life of me I can't find the SOP for SOM.  Can you send me an electronic copy please?  I have been on the logistics website, looked through hundreds of e-mails, nothing.  I'm surprised it is not on the website."  Ms. Hinkle, Sr. Manager for Logistics, Quality and Compliance for CVS, responds that she too is unsure of the final version of the SOP SOM. CVS sent the wrong version of the SOP SOM to the DEA.

211.    In May of 2014, CVS had a closing meeting with the DEA related to the distribution center audit.  According to handwritten notes from a CVS employee who attended the meeting, the "most serious" violation is "failure to design" a SOM system.  An internal CVS e-mail summarizing the meeting made a similar statement: DEA determined that CVS "faile[d] to maintain an [sic] SOM program."  The head of CVS's distribution center in Indiana described Betsy Ferguson's, CVS's in-house counsel, confrontation with the DEA during the meeting, writing: "Dan [DEA Agent] finally pushed Betsy's button and the gloves came off. . . . Betsy made it very clear that a letter of admonishment was one thing.  Anything other than that and she wanted an opportunity to do a presentation to his boss and her boss about what we do with SOM.  Anything more than a letter and we would meet in D.C. in courts just like Walgreens did."

212.    The DEA issued its closing letter concluding that CVS failed to design and maintain a system to detect and report suspicious orders for Schedule III-V Controlled Substances as

required by Title 21 United States Code (USC) 821, Title 21 USC 823(e)(1), and Title 21 Code of Federal Regulations (CFR) 1301.74(b) in violation of Title 21 USC 842(a)(5).

### iii.  CVS Failed to Perform Due Diligence

213.    All orders that appeared on the IRR required a thorough due diligence investigation, but only a very small percentage were subjected to appropriate due diligence.  From early/mid-2009 through early 2011, one employee, John Mortelliti, the Director of Loss Prevention, "was taking the first pass through the IRR himself."  According to CVS's corporate witness, "Mr. Mortelliti's practice would have been to review the report on a daily basis and determine whether items on the report warranted further review and due diligence and conduct review and due diligence as he deemed appropriate."  At select times in 2013, CVS had only one full-time employee in the position of "SOM analyst" reviewing all potentially suspicious orders for every pharmacy in the country.  The SOM system would identify orders as potentially suspicious based on a number of factors and "pend" the order.  Even though the orders had been identified as potentially suspicious, the CVS SOM analysts would conduct an "in depth" dive on only select orders.  In fact, even though the SOM program could identify as many as 1,000 suspicious orders a day, the CVS employee would only do a "deep dive" on one to six orders per day.

214.    Even as late as 2012 CVS's SOM policy was clearly little more than window dressing. For example, CVS's own SOM policy specified that if multiple orders for the same store are flagged during the same month, all orders after the first order will *not* be investigated and will be ***automatically released*** based on the release of the first order.

> 5.  If order is cleared on 1ˢᵗ of month and cleared, and store then orders again that month it won't be looked at
>    a.  If System flags it, we are required to look at it and document why it was released, currently we are simply releasing order based on past due diligence on a different order.

215.    As noted above, as of November 21, 2013, CVS had only reported seven suspicious orders to the DEA across all of its distribution centers and pharmacies in the United States. The first suspicious order CVS ever reported was on February 29, 2012.

> ### iv.    CVS Conspired with Cardinal and McKesson to Prevent Suspicious Order Monitoring of Its Retail Pharmacies

216.    CVS's collaboration with distributors went from lobbying to actually preventing adequate due diligence investigations of suspicious opioid orders. CVS knew that Cardinal and McKesson have independent due diligence obligations under the CSA to monitor all sales of controlled substances for orders which deviate in size, pattern or frequency. CVS understood that, to do so effectively, Cardinal and McKesson would require access to its dispensing information. CVS did not provide dispensing information to Cardinal or McKesson. In an email from Paul Farley to Michael Mone, both Cardinal employees, Farley wrote, "I spoke with Brian Whalen at CVS a couple of times this morning… They will not provide the doctor or patient information you requested unless it is requested by the DEA. He was quite adamant about this." CVS prevented Cardinal and McKesson from obtaining access to critical dispensing information for its pharmacies to enable Cardinal and McKesson to conduct adequate due diligence of its pharmacies. Prior to 2013, Cardinal and McKesson did not investigate CVS by calling its pharmacists or visiting CVS stores as they did with other pharmacies. Instead, distributors were instructed to contact CVS's loss prevention offices at corporate headquarters to inquire about suspicious orders, ensuring that any investigation into CVS ordering of opioids was conducted by CVS alone.

217.    As a result, CVS controlled all "due diligence investigations" of its opioid orders. This chart produced by Cardinal depicts the due diligence "investigations" of CVS orders:



218.    Beginning in 2008, with the implementation of the McKesson Controlled Substance Monitoring Program (CSMP), CVS represented to McKesson that:

- It had a controlled substance monitoring program;

- It had a dedicated regulatory control/compliance resource that was responsible for monitoring pharmacy purchases of controlled substances; and

- It had the process and tools used to monitor controlled substances made by individual pharmacies.

219.    Specifically, CVS represented the existence of a more comprehensive "Viper" regulatory program that it claimed the "DEA is very well aware of."  The Viper program was further represented to be a monitoring program.  Don Walker, Senior Vice President of Distribution at McKesson, felt comfortable allowing opioid thresholds by McKesson, without CVS explanation, because of McKessson's incorrect belief that "CVS is also co-managing on their side with Viper and their regulatory team."

220.    When McKesson attempted to monitor CVS pharmacies, those efforts were resisted by CVS.  In 2008 and 2010 CVS refused to provide McKesson sales or dispensing information for individual stores in order to establish accurate opioid thresholds.  In March of 2012, Don Walker, the Senior Vice President of Distribution at McKesson and Tom McDonald, Director of Regulatory Affairs, met with CVS.  At that meeting, CVS was requested to provide information with regard to "cash sales ratio per store."  Don Walker of McKesson acknowledged that this was "important information" to have to identify diversion.  CVS refused to provide this information.  Mr. Walker described this as a "business decision" on the part of CVS.

221.    CVS also prevented Cardinal from independently determining the appropriate order thresholds for opioids at CVS stores.  CVS contractually protected its right to establish and change its threshold requirement for Schedule II controlled substances with Cardinal.  The agreement expressly states that CVS has the discretion under the contract to set its threshold quantities for controlled substances at any level CVS deems appropriate:

> CVS requires the ability to adjust (up or down) the quantity of product our stores receive, this adjustment will be made on an NDC by NDC basis and will include a Threshold Quantity and an Adjustment Percentage. ***Both the Threshold Quantity and Adjustment Percentage can be set to any value CVS deems appropriate***.

### v.    CVS Failed to Maintain Effective Controls Against Diversion in the County

222.    21 different CVS stores purchased more than 28 million dosage units of oxycodone and hydrocodone from 2006 to 2014, the years for which ARCOS data is available.[30]  Of that, CVS distribution centers shipped approximately 15 million dosage units to their stores, and CVS

---

[30] The opioid purchases disclosed in the ARCOS data serve as an effective proxy for the opioids dispensed by the retail pharmacies, which have no incentive to purchase drugs they do not plan to sell.

stores in the County ordered an additional 13 million dosage units from other distributors.  During that same time frame, CVS was responsible for over 19% of the volume of these drugs dispensed in the County.

223.    As a vertically integrated distributor and dispenser of prescription opioids, CVS knew or should have known that an excessive volume of pills was being sold into Georgia and the County and ultimately, onto its streets.  CVS's activities as a distributor and a seller or dispenser of opioids are inextricably linked.

224.    CVS violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

225.    The sheer volume of prescription opioids distributed to and dispensed by CVS pharmacies in and around the County, with a population of approximately 675,000 residents during the same time period, is indicative of potential diversion and required appropriate due diligence.

226.    CVS funneled far more opioids into Georgia and the County, and out of its pharmacy doors, than could have been expected to serve legitimate medical use, and ignored other red flags of diversion, including but not limited to suspicious orders.

227.    It cannot be disputed that CVS was aware of the suspicious orders that flowed from its distribution facilities into its own stores.  CVS simply refused to identify, investigate, and report suspicious orders even though CVS knew, or should have been fully aware, that opioids it distributed and sold were likely to be diverted.  Conversely, CVS failed to report suspicious orders, failed to meaningfully investigate or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Georgia and the County.

228.    Upon information and belief, CVS failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

229.    CVS was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted.  Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

230.    Given CVS's retail pharmacy operations, in addition to its role as a wholesale distributor, CVS knew, or reasonably should have known, about the disproportionate flow of opioids into Georgia and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

231.    In addition, CVS knew, or deliberately turned a blind eye to, its pharmacies' role in diversion of dangerous drugs.  At the pharmacy level, discovery will reveal that CVS knew, or should have known, that its pharmacies in Georgia and the surrounding area, including Tennessee, Kentucky, Alabama, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently

abused with opioids, like benzodiazepines, or prescription "cocktails";[31] (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. CVS had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

232. Failures regarding dispensing in CVS's Florida stores also allowed diverted opioids to be funneled into Georgia and the County and demonstrated the failures of CVS systems. The well-travelled path between Florida and Georgia is described further below, and Interstate 75 – the "Blue Highway" – runs right through the County. And CVS saw huge increases in the quantity of oxycodone it dispensed in Florida from 2006 to 2010. For example, starting with an already high baseline, a single CVS store ordered in 2006 approximately four times the amount of oxycodone a typical pharmacy orders in one year. By 2010, the same pharmacy's 10-month history showed quantities more than thirty times the amount of oxycodone a typical pharmacy orders in one year, and the pharmacy's supervisor could not explain why the volume was so high. During that time, Cardinal was the pharmacy's main distributor, and two of CVS's Florida pharmacies were among Cardinal's top four retail pharmacy customers, dispensing a staggering amount of oxycodone compared to Cardinal's other Florida customers. Interviews with employees of these pharmacies revealed that they routinely observed red flags and obvious signs that they were filling illegitimate prescriptions. One set a daily limit of oxycodone 30mg prescriptions the pharmacy would fill each day, basing the limit on the amount in stock that day, so as to ensure that the "real pain patients"

---

[31] According to definitions applied by CVS for suspicious order monitoring purposes, "cocktails for opioids are methadone, muscle relaxants, stimulants and benzodiazepines."

could get their prescriptions filled.[32]  The pharmacy usually reached its limit by lunchtime each day, and at times within 30 minutes of opening.  Customers, aware that prescriptions were first come, first served, would line up outside the store as early as 7:45 AM.  An employee acting as a "bouncer" included among his job duties escorting off the premises customers who were "hooked" on opioids and became belligerent if their prescriptions were refused.[33]  Although CVS had in place dispensing guidelines for controlled substances prescriptions, these guidelines were not followed at these stores.  Rather, they dispensed controlled substances prescriptions despite the existence of "warning signs" in the guidelines.[34]

233.    Because of its vertically integrated structure, CVS has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but CVS chose not to utilize this information and failed to effectively prevent diversion.

### vi.    CVS Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores

234.    By 2009, CVS Pharmacy, Inc. owned and/or operated more than 9,000 pharmacies in the United States.  According to its website, CVS now has more than 9,900 retail locations.  At all times relevant herein, CVS pharmacies sold controlled substances, including FDA Schedule II and FDA Schedule III controlled substances otherwise known as opiate narcotics or opioids.

235.    "CVS Corporation," not any individual CVS store, is the DEA registrant for each of CVS's pharmacies across the country.   CVS renews the DEA licenses for its pharmacies through a "Registration Chain Renewal."  From October 2013 through December 2016, CVS

---

[32] Declaration of Joseph Rannazzisi, *Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191, Doc. 19-6 ¶¶ 38-41 (D.D.C. Feb. 24, 2012).

[33] *Id.* ¶ 41.d.

[34] *Id.* ¶¶ 48 & 56.

headquarters paid more than $5 million to renew the licenses for 7,597 CVS locations, including the CVS locations in the County.

236.    As described above, until October 6, 2014, CVS pharmacies ordered and were supplied FDA Schedule III hydrocodone combination products (HCPs) from a combination of outside vendors and CVS distribution centers.  CVS pharmacies also received Schedule II opioids from outside vendors, with Cardinal and McKesson acting as its outside suppliers for the entire period for which ARCOS is available.

237.    CVS Pharmacy, Inc. instituted, set-up, ran, directed and staffed with its own employees the majority of the SOM functions for its pharmacy stores.

238.    CVS also lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved over time.  Not until 2012 did CVS create guidelines explaining in more detail the "red flags" or cautionary signals that CVS pharmacists should be on the lookout for to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances are issued for a legitimate medical purpose.

239.    Even so, CVS's conduct, and the volume it dispensed in the County thereafter indicates that its policies were not applied.  In addition, as discussed further below CVS had performance metrics in place that pressured pharmacists to put profits ahead of safety.

240.    CVS failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion. CVS's later dispensing policies and procedures make clear that for the majority of the time CVS had been engaged in the sale and dispensing of opioids, there was no meaningful integration of data and information that was within the possession and control of CVS corporate personnel.

241.    Notably, with respect to CVS's suspicious order monitoring system for its wholesale distribution, the MDL Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of its SOM system in that litigation.  *See* Opinion and Order Denying CVS's Motion for Summary Judgment, MDL No. 2804, Doc. 3099 (N.D. Ohio Jan. 27, 2020).

### b.    Walgreens

242.    Acting as both a distributor and a retail pharmacy chain, Walgreens self-distributed opioids to its own individual Walgreens pharmacies.  Although Walgreens had visibility into indicia of diversion due to its vertically integrated distribution and dispensing practices, it failed to take these factors into account in its SOM program during the vast majority of the time it was distributing prescription opioids.  Moreover, its program was wholly inadequate and did not fulfill its duties to prevent diversion.  Likewise, Walgreens also failed to maintain effective controls against diversion from its pharmacy stores.

### i.    Walgreens Dragged Its Feet on Developing a SOM Program, Instead Relying on After-the-Fact Reports of "Excessive" Orders While Ignoring Red Flags

243.    Though Walgreens had access to significant information about indicia of diversion due to its vertical integration with its stores, Walgreens failed to use available information to monitor and effectively prevent diversion.

244.    At least as early as 1998, and perhaps as early as 1988, Walgreens began to utilize a series of formulas to identify orders that Walgreens deemed to be suspicious based on the orders' extraordinary size.  These orders were listed on a report called the Suspicious Control Drug Order report.

245.    Walgreens used two different formulas: one formula from (at least) 1998-2007 and one formula from March 2007 through 2012.  These formulas were alike in that they each utilized

an average number based on historical orders, applied a three times multiplier to that base number, and then deemed certain orders which were greater than that number to be suspicious.  Under the later formula, orders were only listed on the report as being suspicious if the orders exceeded the three times multiplier for two consecutive months in a given time period.  Walgreens based this second formula on the DEA's Chemical Handler's Manual's order monitoring system for listed chemicals.

246.    The first variation on this formula was in place until March 2007, even though the DEA warned Walgreens that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient," *via* a May 2006 Letter of Admonition.  The Letter cited Walgreens for controlled substances violations at its Perrysburg, Ohio Distribution Center, but highlighted problems that went far beyond that particular facility.

247.    The DEA also reminded Walgreens that its suspicious ordering "formula should be based on (size, pattern, frequency)," though Walgreens failed to even examine anything other than the size of an order.  When Walgreens did update its program some ten months later, however, it still did not perform the size, pattern, and frequency analysis prescribed by the DEA, continuing to use another "three times" formula. ███████████████████████████

███████████████████████████████████████████████████

248.    Even with its ample threshold, each Walgreens Suspicious Control Drug Order report could be thousands of pages or more in length.

249.    Walgreens did not perform any due diligence on the thousands of orders identified as "suspicious" on the Suspicious Control Drug Order reports, but instead shipped the orders without review.

250.    Walgreens did not report the suspicious orders listed on the Suspicious Control Drug Order report until *after* the orders were already filled and shipped.  The report was generated on a monthly, nationwide basis, directly contravening the regulatory requirement that suspicious orders be reported *when discovered.*  21 C.F.R. 1301.74(b).  In some instances, months may have elapsed between an order's shipment and its subsequent reporting to the DEA, given the requirement, described above, of two consecutive months of exceeding the three times multiplier to trigger reporting.

251.    In September 2012, the DEA issued an immediate suspension order ("ISO") regarding one of Walgreens's three Schedule II distribution centers, finding Walgreens's distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest."  The DEA further found that Walgreens's Jupiter distribution center failed to comply with DEA regulations that required it to report to the DEA suspicious drug orders that Walgreens received from its retail pharmacies, resulting in at least tens of thousands of violations, particularly concerning massive volumes of prescription opiates.  There, the DEA stated: "Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at [its] customer pharmacies."

252.    In the ISO, the DEA also specifically considered the Suspicious Control Drug Order reports and made the following further findings of fact and conclusions of law regarding the reports and Walgreens's suspicious order monitoring system—applicable across Walgreens's operations:

- "[Walgreens's] practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled 'Suspicious Control Drug Orders.'"

- "[The Suspicious Control Drug] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens] attached to these reports."

- Upon review of an example of the Suspicious Control Drug Order report for December 2011, "[Walgreens's] suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for just suspicious orders of Schedule II drugs is 1712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico."

- Finding that the reports failed to appropriately consider the population and area being served by the pharmacy: "This report from the Jupiter [Florida] Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area."

- "As made clear in 21 CFR§ 1301.74(b), *Southwood,* and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported *as discovered,* not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place *before* the order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded."

- "DEA's investigation of [Walgreens] ... revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. §1301.74(b). 21 C.F.R. § 1301.74(b)."

- ". . . DEA investigation of [Walgreens's] distribution practices and policies ... demonstrates that [Walgreens] has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. 55 823(b)(l and (e)(l). [Walgreens] failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those

controlled substances pursuant to prescriptions written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice. . . . [Walgreens has not] recognized and adequately reformed the systemic shortcomings discussed herein."

- "[DEA's] concerns with [Walgreens'] distribution practices are not limited to the six Walgreens pharmacies [for which DEA suspended Walgreens' dispensing registration]."

### ii. Walgreens Knew its After-the-Fact Excessive Purchase Reports Failed to Satisfy Its Obligations to Identify, Report, and Halt Suspicious Orders

253.     Walgreens knew its procedures were inadequate well before the 2012 ISO issued. In addition to the guidance described above, in 1988, the DEA specifically advised Walgreens that "[t]he submission of a monthly printout of after-the-fact sales does *not* relieve the registrant of the responsibility of reporting excessive or suspicious orders."  The DEA further advised Walgreens that, while "[a]n electronic data system may provide the means and mechanism for complying with the regulations...the system is not complete until the data is carefully reviewed and monitored by the registrant."

254.     Despite this instruction, there is no evidence that Walgreens ever took any action related to the Suspicious Control Drug Order report besides generating it and mailing it out. Walgreens has admitted that there is no evidence that Walgreens ever performed a due diligence review on any of the orders listed on the Suspicious Control Drug Order report before shipment. One of the managers for Walgreens's Pharmaceutical Integrity ("RX Integrity") Department stated that, when he was with the Loss Prevention Department, he "basically burned the data on a CD and sent it off. I didn't dive into each individual report or CD" and that he "would look at it briefly, but just to see if the data transferred to the CD, but that's about the extent." In an errata submitted in connection with a deposition in the MDL, Walgreens acknowledged that it "is currently unaware of due diligence that was performed based on orders being flagged . . ."

255.    As described above, in May 2006, the DEA told Walgreens again that the formula Walgreens was using to identify suspicious orders for the Suspicious Control Drug Order reports was "insufficient" and "inadequate."

256.    Moreover, in September 2007, three Walgreens's senior employees (Dwayne Pinon, Senior Attorney; James Van Overbake, Auditor; and Irene Lerin, Audit Manager) attended the DEA Office of Diversion Control's 13th Pharmaceutical Industry Conference in Houston, Texas.  Michael Mapes, Chief, DEA, Regulatory Section, gave a presentation at this Conference relating to suspicious orders, which included the reminder that the CSA "requirement is to report suspicious orders, not suspicious sales after the fact."  Participant notes from this meeting indicate that Mr. Mapes advised the audience not to "confuse suspicious order report with an excessive purchase report.  They are two different things."

257.    Similarly, handwritten notes on an internal document from July 2008 state that "DEA really wants us to validate orders and only report true suspicious orders or what was done to approve orders."  They go on to state that "[j]ust reporting these orders is not good enough – need to document what happened."

258.    Though Walgreens claims that it implemented the three times formula based on DEA guidance, DEA never approved Walgreens's SOM system, or any use of the Appendix E-3 formula, during the course of DEA's cyclic or scheduled investigations of Walgreens's distribution centers.  As DEA 30b6 witness Clare Brennan testified, while DEA investigators are trained to ensure a SOM system is in place, they are also trained not to approve any SOM system.  This non-approval, the impropriety of any attempt by Walgreens to rely on prior purported approval, and the compliance failures of Walgreens's then utilized system, were re-emphasized by the letter Walgreens—and all controlled substance distributors—received from the DEA in 2007.



█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

262.  ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

263.  ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████

264.    The Walgreens controlled substances Distribution Center personnel who spoke to the DEA during the DEA's inspections of Walgreens's controlled substances distribution centers did not recall ever telling the DEA that Walgreens internally determined that Walgreens's SOM system contained no monitoring process, that the SOM system did not stop suspicious orders from

being shipped, that Walgreens could be filling illicit orders, or that the orders Walgreens was reported to the DEA as suspicious had already been shipped.

265.    Additionally, in November 2012, the Walgreens's Divisional Vice President of Pharmacy Services reported to Kermit Crawford, Walgreens's President of Pharmacy, Health and Wellness, his notes from meeting with the DEA about reporting suspicious orders, which included the note, "[i]f suspicious - you don't ship."

### iii.    Walgreens Lacked Meaningful Additional Systems to Address the Failures in Its System of After-the-Fact Reporting of Certain Orders

266.    Walgreens nominally employed additional procedures within its distribution centers; however, these systems did not address the failings of the Suspicious Control Drug Order reports. These distribution center systems were not designed to detect suspicious orders of controlled substances, but rather were designed to detect typos or errors in order entry by the stores. Walgreens admits that its Distribution Centers are "more akin to supply warehouses," are "not designed to be a backstop to pharmacists," and that they are not well "equipped to ensure compliance" or to "assist in combatting controlled substance abuse," and "do not have the ability to detect trends in local markets."

267.    The Distribution Center ("DC") level procedures are documented in a 2006 Questionable Order Quantity policy, which had two facets: first, it instructed DC personnel to review orders and contact the pharmacy with questions regarding quantities.  The policy did not mention reporting suspicious orders until 2010, when it was updated to state that the Corporate Office Internal Audit Department would handle suspicious store orders and inquiries.  There is no evidence that the Internal Audit department had any involvement in reporting suspicious orders.

268.    The second aspect of this DC level procedures required "pickers," the DC personnel who actually retrieved pill bottles off the shelves and placed them into totes for shipping, to look for "questionable" orders while picking.

269.    The only review of the orders identified by the DC level procedures was calling the pharmacy to make sure the order had not been entered in error.  Walgreens admitted this procedure was not intended to detect suspicious orders.

270.    There is no evidence that any orders were ever reported as suspicious or halted as a result of Walgreens's distribution-center level policies.  There is no evidence these procedures resulted in timely reporting of, due diligence on, or non-shipment of any order, including those listed as being "suspicious" on the Suspicious Control Drug Order reports.

271.    Walgreens's documents effectively acknowledge that these were not true anti-diversion measures, and it recognized internally that it did not begin creating a SOM system until March 2008.  Specifically, in March 2008, Walgreens finally formed a five department "team" to "begin creating" a SOM program.  The new SOM program was not piloted until more than a year later, in August 2009, and even then, the pilot included orders form just seven stores.  Not until September 2010 would the program, implemented in pieces and phases, be rolled out chain-wide, and from that point it took several more years to fully implement.

272.    Through 2012, Walgreens continued to populate the Suspicious Control Drug Order report with thousands of orders that exceeded Walgreens's "three times" test, showing that Walgreens's post-2009 SOM program did little to mitigate the extraordinary volume of controlled substances being shipped by Walgreens to its pharmacies.

> iv.  **Even as it Rolled Out its New SOM Program, Walgreens Left Significant Gaps and Loopholes in Place and Failed to Report and Perform Due Diligence on Orders It Flagged**

273.    Walgreens did not prioritize compliance when instituting its SOM system. MDL testimony from the Senior Director of the Walgreen's Pharmaceutical Integrity Department, which is charged with supervising Walgreens's SOM system, revealed that even as late as 2012, 2013, and 2014, Walgreens's viewed the SOM system as an inventory control mechanism rather than as a compliance control mechanism:

> Q:  Now, Walgreens's system, similar to my alarm, is there to detect a potential red flag. Would you agree with that?
>
> A:  It was put in place to ensure that the stores had the proper quantities.  Not necessarily to . . . detect a red flag.  The whole idea was to make sure that the stores were getting the quantities that they needed based on their peer group.

274.    Perhaps because keeping supply moving, as opposed to preventing diversion, was Walgreens's primary focus, the SOM program Walgreens slowly developed had significant gaps or loopholes. For example, for the first few years, the program did not include orders that Walgreens stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping.  It also did not prevent stores from placing an order to an outside vendor if the store attempted to place the order to a Walgreens DC, but was rejected by the new SOM system.

275.    The new SOM-lite system also allowed Walgreens's stores to transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, so that these transfers were not factored into SOM analytics.  Additionally, stores could also place ad hoc "PDQ" ("pretty darn quick") orders for controlled substances outside of

their normal order days and outside of the SOM analysis and limits.  Walgreens could even remove a store entirely from SOM review.

276.    Further, although the new SOM algorithm identified more than 389 pages of suspicious orders per week as of August 2010, it failed to identify all the orders that Walgreens had marked as suspicious under its "three times" formulas and previously listed on its Suspicious Control Drug Order reports and submitted to the DEA "on a monthly basis."  This "discrepancy" prompted an internal email from an employee in Walgreens's Loss Prevention Department, to Walgreens's Vice President, Distribution Centers and Logistics, suggesting that "the new system should be tested further and enhanced to provide broader coverage of controlled substance activity. The same e-mail stated that "we are not equipped to handle the 389+ pages of ADR4 [suspicious order monitoring] data which are compiled nationwide each week," and asked if his department had "a resource available" to assist.  An email in response "recall[ed] the old paper report as being inches thick" and an instruction "in 1985 not to review or contact anyone on the data," and inquired, among other things, "[w]ho from your group has been reviewing the data collected for the past twenty-five years?" and "[a]t present is anyone doing any review on what would be considered suspicious quantities that are physically ordered and are releasing to stores?"

277.    Starting in 2010, certain orders that exceeded store-based limits imposed by Walgreens's new SOM system were reduced to the store limit and shipped out.  These orders were not reported to the DEA as suspicious, nor were they halted for review. The DEA found that Walgreens's policy of reducing and then filling and shipping suspicious orders without reporting them violated the law:

> This policy ignores the fact that the reporting requirement of 21 CFR
> § 1301.74(b) applies to *orders,* not shipments. A suspicious order
> placed by a customer pharmacy is made no less suspicious by
> application of a system designed to reduce or eliminate such orders

prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement, which, as I stated in *Southwood,* is "to provide investigators in the field with information regarding potential illegal activity in an expeditious manner." 72 FR at 36501.

278.    Walgreens's post-2009 SOM system flagged thousands of items per month as being suspicious. Internal Walgreens documents indicate that, in July 2011 alone, as many as 20,699 orders for controlled substances were "marked suspicious" by the new algorithm.  However, very few of these orders received any review, and any review performed was nominal at best. Meanwhile, Walgreens failed to adequately staff the program and to train its employees regarding its requirements.

279.    Walgreens cited two people as being primarily responsible for performing due diligence on suspicious orders in the 2009-2012 time period under the new SOM system.   The first was a representative from the Loss Prevention department who said her department was "not equipped" to handle review and data analysis for the hundreds of pages of reports being compiled nationwide each week.  The second was Barbara Martin, who estimated that she spent somewhere between one and three hours a week reviewing suspicious orders, reviewing only between 10 to 100 of the thousands of orders that were deemed suspicious under the new algorithm.  Walgreens did not provide Ms. Martin access to information about the area the store was serving, the order history for comparable stores, or any other data beyond the sales and order history for that store. If an order did not "make sense" to her based on those limited resources, she testified that she would call the store or district manager or pharmacy supervisor.  She lacked authority to take "direct action" on an order.

280.    Walgreens has previously cited to a series of email exchanges with Ms. Martin and her deposition testimony as exemplars of its due diligence procedures under the post-2009 SOM program.  In the emails, which date from January 10–11, 2011, and are between Ms. Martin and a

Walgreens DC employee, the DC employee notes that "several stores that are ordering huge quantities of 682971 [30 mg oxycodone] on a regular basis."  The DC employee continued, with respect to a single store, "we have shipped them 3271 bottles [of 30 mg oxycodone] between 12/1/10 and 1/10/11.  I don't know how they can even house this many bottles to be honest.  How do we go about checking the validity of these orders?"  Ms. Martin noted that the store had average weekly sales of 36,200 dosage units, which was equal to 362 bottles per week, stating, "I have no idea where these stores are getting this type of volume.  The last pharmacy I was manager at did about 525 rxs/day and we sold about 500 tabs a month (5 bottles)."  Ms. Martin then told the DC employee that she could call the district pharmacy supervisor to see if he "may be able to shed some light on the subject."  Despite the fact that questions had been raised about this store ordering volume in January 2011, the very next month, Walgreens filled and shipped orders totaling another 285,800 dosage units of 30 milligram oxycodone to the same pharmacy, which was located in a town of less than 3,000 people.

281.    In her deposition, Ms. Martin stated that she never even attempted to determine the size of the community that was receiving these "huge quantities" of oxycodone. She further testified that she was not near that store, did not have access to the store's prescriptions or patient information, and as noted above, couldn't take any "direct action."  Approximately 18 months after this email exchange, as a result of DEA action, Walgreens agreed to surrender its DEA registration for this same store that Ms. Martin reviewed as part of her exemplary "due diligence."

282.    In the ISO regarding the Distribution Center, the DEA found specifically regarding the orders that were the subject of these email exchanges, that "[b]ased on the evidence available to DEA, none of these orders were reported to DEA as suspicious and all appear to have been shipped, without any further due diligence to verify their legitimacy."  The DEA further found

regarding this purported "due diligence," that Walgreens "failed to conduct any meaningful investigation or analysis to ensure that the massive amounts of commonly abused, highly addictive controlled substances being ordered by these pharmacies were not being diverted into other than legitimate channels."  The DEA noted that "[Walgreens] has been unable to provide any files related to any effort to adequately verify the legitimacy of any particular order it shipped to its customer stores."

283.    These failures were not limited to the specific Florida pharmacies and distribution center described above; instead, they reflect systemic failures of Walgreens's SOM system that impacted its distribution in the County as well.  Walgreens admits that the SOM systems and procedures at all of its DCs were the same, including those at the facilities that continued shipping opioids into the County.  Accordingly, it is not surprising that, in February 2013, the DEA issued similar Subpoenas and Warrant of Inspection on the Perrysburg DC in Ohio to those issued to the Jupiter DC in Florida.  Walgreens employees made plans in preparation for the Perrysburg DC being "shut down" by the DEA, like the Jupiter DC.  Within weeks of receiving the six subpoenas and warrant, Walgreens decided to "discontinue distribution of controlled substances from the Perrysburg facility" in order to "eliminate any immediate need for further DEA administrative action" regarding the Perrysburg facility.

284.    Further, after the DEA began its investigation, Walgreens held meetings with and informed the DEA that it was implementing "new changes" to "enhance" its SOM program. Internal documents reveal that Walgreens improved its SOM program only "in an effort to convince the DEA that the proposed penalty is excessive."

285.    Even so, by November 2012, the program still did not halt the orders for due diligence evaluation or report the orders as suspicious.  Further, at that time, the program began to automatically reduce orders that violated ceiling thresholds.

286.    There also is no evidence that these flagged or cut orders were reported as suspicious to the regulatory authorities.

287.    As a result of the DEA investigation, Walgreens formed the "Rx Integrity Team" in 2012, purportedly to make sure that those types of failures did not continue.  However, the group's true role was protecting Walgreens's Distribution Centers and stores from losing their DEA licenses.  The effort was only for show.  Walgreens never provided the Rx Integrity group the resources needed to achieve due diligence on the large number of orders identified by Walgreen's SOM program for the company's 5,000 plus stores.

288.    In December 2012, the further enhanced SOM system flagged "14,000 items that the stores ordered across the chain that would have to be investigated" before they could be shipped.  Walgreens admitted that yet again it did not have sufficient resources to timely review these orders.  Walgreens noted that "[t]he DEA would view this as further failures of our internal processes, which could potentially result in additional pharmacies and distribution centers being subjected to regulatory actions and ultimately prohibited from handling controlled substances." At the time these 14,000 orders were flagged Walgreens Rx Integrity Team was comprised of fewer than five people.  Even at its height, Rx Integrity had only eleven employees.   Instead of sufficiently staffing the SOM program, Walgreens recognized it had the ability to control its due diligence workload by increasing the stores' ceiling levels, and thereby reducing the number of orders that would hit that ceiling and result in a flag.

289.    As described below, Walgreens admits to failures in its suspicious order monitoring prior to 2012.  Comparing the 2013 SOM system to the previous system, one of Walgreens's Pharmaceutical Integrity Managers in August 2013 explained:

> The Controlled Substances Order Monitoring system now in place sets limits for each item based on the chain average for that item for stores of similar size. If a particular store fills more of this item than normal and needs additional product we would need to document the reason and increase via a CSO Override .... The purpose for this is to ensure we have performed adequate review before sending in additional inventory.
>
> **The previous system would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone, that played a roll [sic] in the DEAs investigation of Walgreens**.

290.    Yet, even in 2013, orders being flagged as suspicious for review before shipment were "a week old" before they made it to the review team, often "ha[d] already been shipped," and were not being reported.

291.    Walgreens never equipped its distribution operations to properly monitor for, report, and halt suspicious orders, or otherwise effectively prevent diversion.  When it became clear Walgreens would need to devote significant resources to achieve compliance, Walgreens chose instead to cease controlled substance distribution all together.  Walgreens stated that "while the financial impact of no longer . . . [self distributing] from the Walgreens DCs was taken into consideration, there is a greater risk to the company in fines and loss of licenses if we continue to sell these items in our warehouses."

292.    Indeed, with respect to Walgreens's suspicious order monitoring system for its wholesale distribution, the MDL Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of its SOM system in that litigation.  *See* Order Denying Walgreen's Motion for Summary Judgment, MDL No. 2804, Doc. 2569 (N.D. Ohio Sept. 4, 2019).

v.      **Walgreens Failed to Put in Place Adequate Polices to Guard Against Diversion at the Pharmacy Level**

293.     Although Walgreens purported to have in place "Good Faith Dispensing" ("GFD") Policies for many years, it failed to meaningfully apply policies and procedures, or to train employees in its retail pharmacies on identifying and reporting potential diversion.

294.     Despite knowing that prescribers could contribute to diversion, and having a separate and corresponding duty with respect to filling prescriptions, from at least 2006 through 2012, Walgreens's dispensing policies, which it titled "Good Faith Dispensing", or "GFD", explicitly instructed pharmacists who "receive[] a questionable prescription" or otherwise were "unable to dispense a prescription in good faith" to "contact the prescriber" and, if "confirm[ed]" as "valid" by the prescriber, to then "process the prescription as normal."  Further, though Walgreens's policies listed a handful of "questionable circumstances," such as "increased frequency of prescriptions for the same or similar controlled drugs by one prescriber[,] for large numbers of patients [,] for quantities beyond those normally prescribed," it is unclear what, if any, resources Walgreens made available to its pharmacists for checking these vague criteria, which, in any event, became meaningless if a prescriber "confirm[ed]" the prescription as "valid," by calling the prescriber.  For example, in 2010 when a pharmacy manager expressed concern about significant numbers of opioid prescriptions from pain clinics, and being help responsible for "excessive c2 rx dispensing," her district supervisor instructed her "not [to] refuse script for large quantities" but simply to "call the MD's, document it on the hard copy[,] and that is all that is needed to protect your license."  Despite internally recognizing that "a prescriber of a controlled substance prescription [may be] involved in diversion", Walgreens's GFD policies continued to endorse calling the doctor as a greenlight to any "questionable" prescription.

295.    In 2012, Walgreens finally removed the "process the prescription as normal" language from its formal GFD policies, admitting that under the law "it is not enough to get confirmation that the prescriber wrote the prescription."  However, Walgreens still failed to ensure it complied with its duties.

296.    Walgreens failed to adequately train its pharmacists and pharmacy technicians on how to prevent diversion, including what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when other suspicious circumstances are present, and failed to provide them the means of doing so.  To be clear, this required no inquiry into whether an opioid prescription was the proper treatment for a particular patient; instead, as a registrant, Walgreens was obligated, and failed, to implement policies and procedures at a corporate level to identify and address signs of diversion.

297.    Indeed, during the course of a 2009 DEA investigation into Walgreens dispensing noncompliance, Walgreens internally noted that it currently had "no training" for employees dispensing controlled substances.  Meanwhile, Walgreens corporate officers turned a blind eye to these abuses. In fact, a Walgreens corporate attorney suggested, in reviewing the legitimacy of prescriptions coming from Florida, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with the law or protecting public health.

298.    Ultimately, in 2011, Walgreens and the DEA entered a Memorandum of Agreement regarding all "Walgreens . . . pharmacy locations registered with the DEA to dispense controlled substances," requiring Walgreens to implement significant nationwide controls lacking in its operations.  Walgreen Co. was required to create a nationwide "compliance program to detect and

prevent diversion of controlled substances **as required by the … (CSA) and applicable DEA regulations**." Pursuant to the MOA, the "program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills" as well as "routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA."  Further, Walgreens was required to "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations."

299.    Walgreens would also make more promises in a 2013 Memorandum with the DEA, described further below, related to failures to that lead to the ISOs described above.

300.    Even after development and a relaunch of its GFD policy in response to settlements with the DEA, however, Denman Murray, Director of Rx Supply Chain Retail, stated in an MDL deposition that, "traditionally, we've always treated a controlled substance like any other, [a] widget's a widget to the system."

301.    Further, after the June 2012 GFD "relaunch" in April 2014, a Walgreens "RxIntegrity" presentation focused on Walgreens "Market 25," but also assessing "average market" trends, reported that "pharmacists [were] not being too strict with GFD, nor [were] they losing volume."

302.    As with distribution, Walgreens failed to allocate appropriate resources to dispensing compliance and supervision.  Walgreens has approximately 26,000 pharmacists, each of whom may receive as many as 400-500 prescriptions a day.  In 2013, however, Walgreens internally reported that its District Managers and Pharmacy Supervisors were "challenged to get

into the stores" and in a 90-day period, more than a thousand stores did not receive a visit from the managers or supervisors. These supervisory personnel were assigned a "high number of stores" and their time was consumed with "people processes, business planning, market and district meetings," such that supervision in store was being handled informally by "community leaders" who have "limited formal authority."

303.    Even where Walgreens's policies recognized red flags, Walgreens failed to provide its pharmacists with effective tools for assessing them.  For example, Walgreens's policies and internal documents acknowledged that distance between the patient, pharmacists, and/or prescriber constituted a red flag, however, Walgreens did not even begin piloting an automated process for flagging such distances through common and long available technological solutions until the Spring of 2021.

304.    Walgreens knew its much touted good faith dispensing, or "GFD," policies were ineffective, and, in 2013, it launched a "Target Drug GFD" program to purportedly "put teeth around GFD for high risk products."  The policies required pharmacists to perform extra checks on red flags and to complete TD GFD checklists when presented with certain opioid prescriptions. However, the TDGFD procedures were largely window dressing.  Walgreens deliberately omitted hydrocodone from its TDGFD process, despite knowing in 2013 that HCPs were the most abused of all prescription opioids, and in 2019 was still considering whether to add hydrocodone, even though it had been a Schedule II opioid since 2014.  Walgreens further failed to make the TDGFD checklist an electronic form until 2020, despite knowing that doing so would make compliance and supervision more effective.  A review of Walgreens's TDGFD forms in certain jurisdictions reveals Walgreens failed to even complete a TDGFD form for as many as half of the prescriptions for which Walgreens's own policies stated such a form was required.

305.    A Walgreens internal audit performed after the 2013 DEA settlement confirms that Walgreens's supervision and compliance failures continued.  Among other failings, the audit team noted no formal monitoring program existed to confirm that pharmacies across the chain are complying with controlled substance documentation and retention requirements, no monitoring outside of the deficient "store walk program" existed to monitor target drug good faith dispensing requirements and no corporate reporting was being generated, and employees were failing to timely complete Good Faith Dispensing training, such that, at the time of the audit, over 35,000 employees had not completed their required training for that year.  Management's response largely was to seek to incorporate additional compliance measures into the store walk procedure. However, documents from 2016 regarding monthly store compliance walks indicate that during the monthly "Compliance Walks" to "verify compliance … [with] regulatory requirements in… pharmacy areas," substantially no dispensing compliance supervision occurred, outside of ensuring the pharmacy was verifying the patient's address on five sample prescription fills.

306.    Unsurprisingly, compliance with GFD and TD GFD has been poor.  For example, in 2014 Walgreens discovered a pharmacist who failed to follow GFD for five to six months without being discovered by supervisors.  In 2014, Rx Integrity noted dozens of stores dispensing opioids without performing the required checks.  In certain cases, the pharmacists were unaware of the GFD procedures or had been told by supervisors to disregard them.

307.    In 2015, Walgreens performed a "business continuity" audit of a random sample of approximately 2,400 pharmacies to determine whether Walgreens was "compliant with the policies/procedures put in place" regarding dispensing pursuant to Walgreens's agreement with the DEA.  As the audit progressed, Walgreens internally noted "put your seatbelts on" because the audits were "not going great" and they would need to implement a "mitigation plan … to satisfy

the MOA" for the non-compliance revealed by the audit.  In Walgreens's own words, "Results were unfavorable."  Fewer than 60% of stores were complying with TD GFD with respect to filled prescriptions, 1,160 stores did not have a single refused prescription, and an additional 1,182 stores had refused fewer than 25 prescriptions total in a nine-month period.  Only 63 out of 2,400 pharmacies had refused 26 or more prescriptions during that same nine months in 2015.

308.    Walgreens's determination to bury evidence of noncompliance in the service of profit goals has continued. When a Walgreens consultant interviewed Walgreens pharmacy employees, they drafted a report finding that employees "sometimes skirted or completely ignored" proper procedures to meet corporate metrics and committed "errors resulting from stress." The consultants reported that they "heard multiple reports of improper behavior" that was "largely attributed to the desire" to meet a corporate metric known as "promise time," which ensures that patients get prescriptions filled within a set amount of time.  Upon reviewing a draft of the report, senior leaders at Walgreens directed the consultants to remove some of the damaging findings, which the consultant company ultimately did, even though the consultant's employees stated requests to remove information from slides conflicted with their business ethics.  At around this same time, Walgreens awarded the consultant company a $1.5 billion contract.

### vi. Walgreens Assumed Greater Responsibility for Controlling Against Diversion by Discouraging Outside Vendors from Exercising Their Own Oversight

309.    The "Big Three" wholesalers, Cardinal, McKesson, and AmerisourceBergen, gave deferential treatment to chain pharmacies.  An internal Cardinal document for example, stresses that "certain chain pharmacies refuse to allow any sort of administrative inspection by Cardinal or to make certifications" and that large, national chains can "take their billions upon billions of dollars in business to any wholesaler in the country."

310.    Thus, for example, in 2008, Cardinal prepared talking points for a NACDS Conference about its planned retail chain SOM program, making it clear that the program would "minimize the disruption" to retail chains and that they would "work together" with the pharmacies "to ensure that our Suspicious Order Monitoring program for retail chains does not interrupt" business.  Cardinal also provided warnings to chain pharmacies, including Walgreens, that they were approaching thresholds so that the chains could avoid triggering SOM reporting and adjust ordering patterns by, for example, delaying orders or, more often, obtaining a threshold increase. Such "early warnings" were so helpful to Walgreens that as of 2012 Walgreens adopted the concept for its own SOM system for self-distribution, noting internally that by "flagging the stores at 75%," it could "avoid cutting/reducing orders and subsequently not have to report a SOM to the DEA."

311.    Preferential treatment of Walgreens ultimately was not enough for Cardinal to keep Walgreens's business, however.   In 2013, Walgreens entered a ten-year agreement with AmerisourceBergen Drug Company.  The shift to AmerisourceBergen as its exclusive supplier prompted Cardinal to complain: "we bailed you guys out when you had your [DEA] issues."

312.    By 2017, Walgreens accounted for 30% of AmerisourceBergen's revenue.[35] AmerisourceBergen was similarly deferential, allowing Walgreens to "police their own orders and block any order to [AmerisourceBergen ("ABC")] that would exceed ABC's threshold thus triggering a suspicious order being sent to DEA from ABC.  Additionally, when AmerisourceBergen received orders from Walgreens "outside the expected usage," Walgreens and AmerisourceBergen

---

[35] As a part of its distribution agreement, Walgreens gained purchase rights to AmerisourceBergen equity, allowing it to further participate in the prescription opioid shipment boom in America. Walgreens subsequently exercised these purchase rights, ultimately owning approximately 26% of AmerisourceBergen.  As part of the transaction, Walgreens has the ability to nominate up to two members of the Board of Directors of AmerisourceBergen.  Currently, Walgreen's Co-Chief Operating Officer sits on the AmerisourceBergen Board of Directors.

met to discuss adjusting thresholds or using "soft blocking."  Contrary to DEA guidance and its own stated policy, AmerisourceBergen also shared the threshold limits set by its "order monitoring program" with Walgreens, and also provided Walgreens with weekly SOM statistics. AmerisourceBergen generally would not take action on Walgreens orders that exceeded its thresholds without first talking to Walgreens.[36]

313.    Walgreens also owns 26% of AmerisourceBergen's stock.  In 2018, after a coalition of AmerisourceBergen shareholders sought greater transparency from its Board related to the "financial and reputational risks associated with the opioid crisis," Walgreens, together with other insiders, reportedly leveraged this position to defeat the proposal, which enjoyed majority support among the independent shareholders.

### vii.    Walgreens Failed to Maintain Effective Controls Against Diversion in the County

314.    As described above and further below, as both a distributor and a dispenser, Walgreens ignored indicia of diversion in Georgia and the County.

315.    In the County, as a distributor, Walgreens shipped more than 24 million dosage units of oxycodone and hydrocodone.  Even this supply, however, was not enough for its 22 stores in the County.  In total, at the pharmacy level, Walgreens purchased more than 28 million dosage units of oxycodone and hydrocodone shipped to six pharmacies from 2006 to 2014.  Over the same time frame, Walgreens was responsible for over 19% of the volume of these drugs dispensed in the County.

---

[36] Rite Aid received similar accommodations from McKesson, which forwarded it dialed monitoring reports so that Rite Aid could "let [McKesson know] if it needed to make any adjustments to its thresholds.

316.    Walgreens violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

317.    The volume of opioids Walgreens shipped into, and dispensed from locations in, the County was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

318.    Yet, upon information and belief, Walgreens <u>did not make any suspicious order report of an order in the County</u> between 2007 and 2014.  Instead, Walgreens funneled far more opioids into Georgia and the County than could have been expected to serve legitimate medical use, and ignored other indicia of suspicious orders.  This information, along with the information known only to distributors such as Walgreens (especially with its pharmacy dispensing data), would have alerted Walgreens to potential diversion of opioids.

319.    In addition, Walgreens also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Georgia.  Walgreens failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Georgia.

320.    Walgreens also developed and maintained highly advanced data collection and analytical systems.  These sophisticated software systems monitor the inventory and ordering needs of customers in real-time and depicted the exact amounts of pills, pill type, and anticipated order threshold for its own stores.

321.    Through this proprietary data, Walgreens had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in Georgia,

including in the County.  It used this data to evaluate its own sales activities and workforce. Walgreens also was in possession of extensive data regarding individual doctors' prescribing and dispensing to its customers, the percentage of a prescriber's prescriptions that were controlled substances, individual prescription activity across all Walgreens stores, and the percentages of prescriptions purchased in cash.  Such data are a valuable resource that Walgreens could have used to help stop diversion, but it did not.

322.    Walgreens, by virtue of its data analytics, was actually aware at a corporate level of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails," known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Walgreens failed to effectively make the data demonstrating these obvious flags available to its pharmacists and failed to properly address the red flag dispensing patterns.

323.    Walgreens also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.  While Walgreens periodically implemented programs that would identify the most suspicious prescribers, it failed to make this data readily available to its pharmacists, and either terminated or failed to act on them at the corporate level.

324.    Upon information and belief, Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies relative

to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

325.    At the store level, Walgreens did not make any controlled substance metrics available to pharmacists for specific prescribers.   Further, despite the fact that at the corporate level Walgreens utilized many tools, including IMS, for descriptive statistics around prescriber patterns, Walgreens was not aware of any consistent reports written using that data.  Instead, when a pharmacist or Walgreens team member had a concern about a particular prescriber ad hoc prescriber profiles were pulled.  However, these reports were difficult to interpret so corporate would have to assist with the analysis and interpretation of the reports.

326.    Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.  For example, Walgreens ran reports known as "GFD Opportunities reports," generated from data on its individual pharmacies and pharmacists.  A "GFD Opportunities" tool included information such as "Cash rank, Oxycodone IR rank, "target" drug quantity rank, and target drug rate rank.  With the information available to it, Walgreens thus knew which pharmacists filled more controlled substances prescriptions that others, however, Walgreens failed to meaningfully act to curtail red flag dispensing.

327.    Upon information and belief, based on other enforcement actions against the company, Walgreens also failed to conduct adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

328.    Discovery will reveal that Walgreens knew or should have known that its pharmacies in Georgia, and the surrounding area, including Alabama, Tennessee, Kentucky, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Walgreens had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

329.    Walgreens admits its role in the opioid epidemic, stating it has the "ability – and [] critical responsibility – to fight the opioid crisis" as the "nation's largest pharmacy chain" in a time when "[a]ddiction to prescription painkillers, heroin, and other opioids has surged, with opioid overdoses quadrupling in this decade" and "drug overdose deaths – the majority from prescription and illicit opioids" resulting in "more fatalities than from motor vehicle crashes and gun homicides combined."  Walgreens also admits the "opioid crisis" is caused by "misuse, abuse and addiction" that result from the "flow of opioids that fuel the epidemic."

c.      **Rite Aid**

i.      **Rite Aid Failed to Maintain Effective Controls Against Diversion at the Wholesale Level**

330.    Rite Aid distributed Schedule III ("CIIIs") controlled substances (*e.g.*, hydrocodone combination products) to its own Rite Aid stores until late 2014.  Rite Aid distributed to the County through its Perryman Distribution Center (Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center) and its Liverpool Distribution Center (Eckerd Corporation d/b/a Rite Aid Liverpool Distribution Center), both DEA registrants.

331.    Rite Aid's controlled substance distribution process was fairly simple.  Rite Aid used a computerized "auto-replenishment system" (ARS) through which individual Rite Aid pharmacies would generate orders that were sent to the distribution center (DC).  This ARS relied directly on dispensing data and the dispensing patterns of individual Rite Aid stores.  If the ARS generated an order that was above Rite Aid's universal 5,000 dosage-unit (DU) threshold, the DC employees filling the order were supposed to manually recognize that the order was above threshold.  If they did observe an order over threshold, the only "review" of the order was an attempt to call the pharmacy that placed the order to verify the order amount was correct (*i.e.*, that it was not a "fat-finger" error).  If the pharmacy confirmed that the above-threshold order amount was correct, or if the DC simply could not contact the pharmacy, the order was cut to the threshold and shipped.  All the above-threshold orders were supposed to be maintained on a handwritten log containing only basic information about the order.

332.    After the orders had shipped, Rite Aid monitored its inventory through its Navicase/Naviscript system.  The Rite Aid Asset Protection Department used "key performance indicators" (KPIs) to analyze data about ordering from the Rite Aid stores to identify diversion through theft.  Yet, as numerous Rite Aid witnesses have testified, Rite Aid did not use the

Navicase/Naviscript system to identify—much less report—suspicious orders.  Furthermore, assuming that the Navicase/Naviscript could identify suspicious orders, the Navicase/Naviscript data analysis only took place *after* shipment.  Moreover, Rite Aid's 30(b)(6) representative in the MDL, Janet Getzey Hart, testified that the "asset protection KPIs were utilized to review orders and then lead to diversion cases if there were some issues with it," but "*they were not used to report suspicious orders*."

333.    Rite Aid maintained a small, inadequate list of suspicious prescribers but did not make any efforts to identify or report any suspicious orders from stores Rite Aid knew were dispensing prescriptions for those suspicious prescribers.  Further, given that orders would have already shipped, Rite Aid did not incorporate "suspicious prescriber" information that it may have collected in determining whether an order from any location was suspicious.

334.    Ultimately, Rite Aid's distribution system made it nearly impossible for any order to be identified, much less reported, as suspicious.  As a result of the company's policies and procedures, Rite Aid did not—and indeed, could not—identify what was unusual because all Rite Aid DCs had a static, blanket threshold for all Rite Aid stores above which Rite Aid would cut the order. The threshold, which never changed, was set at of 5,000 DUs, per national drug code (NDC), per order (although Rite Aid does not know why it was set at 5,000 DUs).  Rite Aid stores typically ordered once per week, but some stores ordered twice per week and others ordered every two weeks.  That means that at its lowest, the Rite Aid threshold was 10,000 DUs per month, per store, and at its highest it was 40,000 DUs per month, per store.

335.    Rite Aid also had little to no records about past order history to determine if an order was suspicious. All Rite Aid distribution centers kept what was called a "Threshold Log," which contained in hard copy only basic information about orders that exceed the threshold: date

of order, store number, item number, item description, quantity ordered, allowable quantity, and the reason for the allowable quantity.  But any use of the log to potentially identify suspicious orders was only done sporadically and after the above-threshold orders were cut and shipped.

336.    Additionally, Rite Aid placed the responsibility to identify orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency on employees whom the DEA coordinator at the Rite Aid's distribution center, testified were not able to actually do so.

337.    Recognizing its failure to have a system, Rite Aid did begin to develop a suspicious order monitoring system for the first time in 2013.  In documenting such efforts, Rite Aid stated as follows:

> *The purpose of this project is to develop effective controls against the diversion of controlled substances* and conduct adequate due diligence to ensure that controlled substances distributed from the Distribution Centers are for legitimate patient needs. Rite Aid must ensure compliance with 21 U.S.C. 823 and/or C.F.R. 1307.74(b) to detect and report suspicious orders of controlled substances through the Distribution Centers.

338.    In the end, however, Rite Aid never adopted the new SOM system because it stopped distributing controlled substances before this system could be implemented.

339.    With respect to Rite Aid's suspicious order monitoring system for its wholesale distribution, the MDL Court has denied a motion for summary judgment contesting the evidence regarding the inadequacy of its SOM system in that litigation.  *See* Opinion and Order Denying Rite Aid's Motion for Summary Judgment, MDL No. 2804, Doc. 3100, 2020 WL 425940 (N.D. Ohio Jan. 27, 2020).

ii.  **Rite Aid Conspired with McKesson to Avoid Scrutiny of Outside Vendor Orders and Adjust or Avoid Thresholds**

340.  Rite Aid conspired with McKesson to avoid suspicious order reporting.  McKesson was Rite Aid's exclusive wholesaler for Schedule II controlled substances, including opioids, during the relevant time period.  Rite Aid also ordered CIIIs from McKesson during the relevant time period.  Rite Aid ordered CIIIs from McKesson not only when it stopped self-distributing in late 2014, but McKesson also supplemented Rite Aid stores' supply of Schedule III controlled substances during the period when Rite Aid self-distributed controlled substances.

341.  McKesson provided Rite Aid with notification of stores hitting McKesson's thresholds and regularly granted threshold increases without conducting any due diligence.  For example, when a McKesson report revealed a number of Rite Aid stores were at 90% of their threshold and about to be flagged, McKesson offered to—and did—increase the thresholds for *all* Rite Aid locations by 50%.  McKesson also forwarded daily monitoring reports to Rite Aid so that Rite Aid could "let [McKesson] know" if McKesson "need[ed] to make any adjustments to current thresholds."

342.  On one occasion, Rite Aid noted that over 10% of its stores came close to being blocked, and McKesson simply asked Rite Aid how high it wanted the thresholds increased.  McKesson also prompted Rite Aid to delay its orders until the next month in order to avoid hitting monthly thresholds when they were getting close.

343.  Rite Aid allowed its stores to order from McKesson without any restriction and failed to take those orders into account in Rite Aid's self-distribution SOM system, negating any constraints from Rite Aid's even limited internal controls.

### iii. Rite Aid Failed to Guard Against Diversion in Distributing to the County

344.　In the County, Rite Aid violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

345.　Rite Aid self-distributed more than 15 million dosage units, of oxycodone and hydrocodone from 2006 to 2014 to pharmacies in the County, the years for which ARCOS data is available.  The volume of opioids Rite Aid shipped into, and dispensed from locations in, the County is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

346.　Rite Aid funneled far more opioids into Georgia and the County than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders. This information, along with the information known only to distributors such as Rite Aid (especially with its pharmacy dispensing data), would have alerted Rite Aid to potential diversion of opioids.  Yet, Rite Aid admits that it *never* identified any suspicious orders before or after shipment, much less reported any suspicious orders to the DEA.

347.　Upon information and belief, Rite Aid, by virtue of the data available to it, was actually aware of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Rite Aid ignored these obvious red flags.

-98-

348.    Rite Aid, therefore, was aware of the suspicious orders that flowed from its distribution facilities.  Rite Aid refused to identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion.  Rather, Rite Aid failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Georgia and the County.

349.    Upon information and belief, Rite Aid failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

350.    Rite Aid was, or should have been, fully aware that the opioids it distributed and dispensed were likely to be diverted; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to identify and report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

351.    Given Rite Aid retail pharmacy operations, in addition to its role as a wholesale distributor, Rite Aid knew or reasonably should have known about the disproportionate flow of opioids into Georgia and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

### iv.    Rite Aid Failed to Guard Against Diversion in Dispensing to the County

352.    Rite Aid pharmacies routinely have dispensed opioids in violation of the Controlled Substances Act and accompanying regulations.  Such conduct was a result of Rite Aid's lack of robust policies and procedures regarding dispensing controlled substances as well as Rite Aid's focus on profitability over its legal obligations and public safety.

-99-

353.    Rite Aid's dispensing policies and procedures used at all its Rite Aid pharmacies nationally were deficient in many ways.  A few examples are illustrative.

354.    Despite acknowledging the opioid epidemic many years earlier, Rite Aid implemented a policy for dispensing "high-alert" controlled substances—including opioids—for the first time in 2013.  The policy was little more than a piece of paper consisting of six steps: 1) Receive the prescription; 2) Validate the Prescription; 3) Validate the Prescriber: 4) Validate the Patient; 5) Decide to dispense or not to dispense; and 6) Report any suspicious activity.  Yet Rite Aid provided little to no guidance on how to perform the vague tasks and the policy was little more than words on a page.

355.    It was not until 2015 that Rite Aid integrated its High Alert process into its dispensing software. The 2015 update was the first time Rite Aid was able to systematically document due diligence—to the extent any was actually done—performed before dispensing.

356.    2015 was also the first time Rite Aid started to track refusals to fill.  The number of refusals, however, was extremely small.

357.    Rite Aid also did nothing to ensure that even its pro forma policies were being followed.  Rite Aid did not meaningfully audit its pharmacies for compliance with its own controlled substances dispensing policies or compliance with the CSA's requirements regarding legal dispensing.

358.    As a sophisticated, national chain pharmacy, Rite Aid had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations.  Its own data would have allowed Rite Aid to observe patterns or instances

of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.[37]

359.    Yet, Rite Aid only started tracking "High Alert data" in September 2015 at the corporate level.  Even then, between 2015 and 2018, the corporate monitoring of prescriptions was limited only to certain drugs (oxycodone 30mg, methadone 10mg, and hydrocodone combination products 10/325 mg) and prescriptions paid for with high amounts of cash (more than $1,000).  Even for those limited drugs, Rite Aid only tracked when 500 dosage units were dispensed at one time for oxycodone products and 240 dosage units were dispensed at one time for hydrocodone products.  These extremely limited parameters meant that Rite Aid's corporate monitoring only identified an extremely small subset of suspicious dispensing activity.

360.    Rite Aid did not use the data to effectively comply with its legal obligations to prevent diverison and ensure only legal prescriptions were being filled at its pharmacies.  For example, a review of the top pharmacies' percentage controlled to non-controlled was not something that was done before 2018.

361.    Rite Aid provided its pharmacists no visibitlity into the data it collected, thereby depriving them of an invaluable resource when evaluating prescriptions.

362.    Rite Aid did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, and suspicious patients.  For example, despite Rite Aid instructing pharmacists that it is a red flag for a prescriber not to take insurance, the only way a pharmacist would know the existence of such a red flag is "through word of mouth."  In addition, Rite Aid did not provide pharmacists any analytics from its system to identify cocktail

---

[37] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

prescription trends.  Rite Aid pharmacists also did not have any way to identify pattern prescribing beyond the pharmacist's own personal knowledge.  Rite Aid pharmacists could not even look up the prescriptions filled for a prescriber at Rite Aid pharmacies.  Rite Aid did not provide any assistance to assist pharmacists to recognize pattern prescribing.  Rite Aid pharmacists could also not look up things such as the "top oxycodone/methadone/hydrocodone prescribers" at a pharmacy or a "prescriber's rank in the dispensing quantity, script count and patient out-of-pocket expenses for the base code."

363.    Rite Aid also did not track refusals to fill before 2015.  Before 2015, the only place pharmacists were supposed to document a refusal was on the hard copy prescription itself.  But because the hard copy prescription was given back to the patient after the refusal was notated on it, there was no record of that refusal at Rite Aid.  Only after Rite Aid incorporated the red flag verification questions into NexGen as part of the 2015 update to the High Alert process did Rite Aid have any records of refusals to fill.  Even then, pharmacists would refuse prescriptions "every day" without using the NexGen process, and have no record of them.

364.    This lack of refusal information meant even if a prescription was routinely denied by numerous pharmacists because of the illegitimacy of the prescription, a Rite Aid pharmacist would not necessarily know that key fact or be able to take that information into account when performing due diligence.

365.    Even when it did start to record refusals to fill through the red flag verification questions, Rite Aid pharmacies only refused to fill extremely small numbers of prescriptions.  Rite Aid did not leverage the information about refusals to fill to help identify diversion.  While a pharmacist could see in an individual patient's profile if a prescription was denied through the six step process after 2015, it was still a manual process for a pharmacist to look at a patient's profile.

Also, there was no way for a pharmacist to determine if a prescriber was routinely having prescriptions denied by Rite Aid pharmacies. There was also no process for reviewing the refusal to fill data to look for patterns or other pertinent information.

366. Rite Aid also did little to identify suspicious prescribers such as those who operated pill mills. Before 2013, there was not a formal process for how pharmacists were to report prescribers whose prescribing was suspicious.

367. After 2013, pharmacists could report a potentially suspicious prescriber via a "RACS ticket" and the corporate government affairs office would investigate the issue. Besides responding to acknowledge the RACS ticket was received, however, none of the corporate analysis was ever shared with pharmacists. As part of the prescriber investigation process, Rite Aid would determine a prescriber to be high, medium, or low risk. Yet pharmacists were never told a prescribers risk ranking. Additionally, the prescriber activity reports generated by the corporate office as part of the investigation were not shared with the pharmacist. The prescriber review process also looked at IQVIA/IMS data starting in late 2013 but Rite Aid pharmacies and pharmacists cannot access the IMS/IQVIA data. All while the investigation was happening—which could take months—the pharmacies were still able to fill prescriptions for doctors under investigation. Thus, Rite Aid pharmacists were kept in the dark about information that would help them evaluate prescriptions.

368. Rite Aid blocked an extremely low number of prescribers. As of 2018, Rite Aid only blocked 108 prescribers. The blocked prescribers were a small fraction of the total of 2,367 prescriber files Rite Aid maintained and nearly 4,600 prescribers Rite Aid had on its master prescriber monitoring spreadsheet. So despite allegedly empowering its pharmacists to make the

ultimate decision whether to dispense a prescription, Rite Aid nearly simply ignored pharmacists' concerns about prescribers.

369.    In contrast to its lack of robust policies to ensure only prescriptions issued for a legitimate medical purpose were dispensed, Rite Aid had numerous and detailed policies regarding metrics to ensure its profitability.  These policies ensured that Rite Aid pharmacists did not have the time, resources, or support to adequately discharge not only their legal duties as pharmacists, but also their alleged duties under Rite Aid's own policies and procedures.

370.    Rite Aid drove its pharmacists to fill higher rates of prescriptions across the board, leading up to its 2009 settlement with the DEA, in which it paid $5 million in civil penalties for its improper dispensing practices.  For example, in 2007, an internal Rite Aid email described 52 stores that filled 10 or less Schedule II prescriptions over a 12 week period as "store opportunities here that are being missed" in the context of "our emphasis on prescription growth."

371.    Even after the 2009 settlement and civil penalty fine, Rite Aid continued its emphasis on increased prescription fill rates.  In an internal 2010 Rite Aid email, Rite Aid corporate employees describe discussions with the "EBITDA Focus Team" on opportunities to grow Schedule II prescriptions.  The email notes, "we would then target stores that fell below the average and have discussions…surrounding future CII opportunities."  Rite Aid targeted these stores despite the fact that some stores were not processing Schedule II prescriptions because "pharmacists are not comfortable with the potential LP type issues that may occur."

372.    In 2011, Rite Aid released an internal memo entitled its "2011 Game Plan."  In that memo, Rite Aid expressed its push to fill more prescriptions as its singular, driving focus:  "We must fill more prescriptions, our future as a company is dependent on this fact…Staffing our stores with the right Pharmacist and Technicians dedicated to growing the business and being the best

Health Care Provider is non-negotiable."  Rite Aid thus prioritized staffing of pharmacy personnel with people specifically dedicated to filling more prescriptions, rather than to patient care. Conspicuously absent from Rite Aid's "2011 Game Plan" is a plan to address the abuse and addiction of opioids in the communities Rite Aid served.

373.    That same year, an internal Rite Aid PowerPoint presentation described the role of Rite Aid's Pharmacy District Managers, explaining, "Driving Top-line prescription sales through aggressive prescription growth – This is **YOUR NUMBER 1 JOB!**" (emphasis in original).  That slide emphasized the direct pressure Rite Aid put on that role by adding, "You and your pharmacy manager are accountable for prescription count exceeding plan."  That presentation further identified Pharmacy District Manager responsibilities to "maximize profits" and "work with a Sense of Urgency to drive financial performance" (emphasis in original).  Rite Aid acknowledged that increasing prescription counts year over year was the top priority Rite Aid placed on each of its pharmacies.

374.    Rite Aid also placed strict emphasis on its pharmacists filling prescriptions as quickly as possible.  According to the findings of a 2011 study, Rite Aid pharmacists spent 3.22 minutes total on any given prescription fill, being able to fill 18.66 scripts in a single hour.  Under that analysis, there was no apparent time allocated for pharmacists to conduct any kind of meaningful red flag analysis to validate the legitimacy of prescriptions of controlled substances.

375.    In 2011, Rite Aid adopted a policy whereby it promised to fill prescriptions in 15 minutes or less.  If a prescription took more than 15 minutes to fill, the patient would get a $5 gift card.  In fact, in a 2013 internal Rite Aid email, Karen Staniforth, the Senior Vice President of Pharmacy, emailed to indicate the time spent verifying DEA licenses of prescribers "is going to affect the 15 minute promise…**especially once the other steps for prescription validation are**

in place" (emphasis added).  Her concern suggests that pharmacists were not actually spending meaningful time validating controlled substance prescriptions before the six-step process was formalized in 2013.

376.    Rite Aid touted the program as something consumers wanted, but many others recognized the danger such a program was to patients and the practice of pharmacy. Numerous State Boards of Pharmacy objected to the program.  As the chair of the Illinois State Board of Pharmacy said: "This is 180 degrees away from everything we are trying to do in moving the pharmacy profession toward being patient information-focused rather than product-focused. And it's counter to our many efforts to improve patient safety."

377.    Despite eventually doing away with the 15 minute or less promise, Rite Aid continued to carefully track its pharmacists' prescription fill speeds, thereby ensuring that the pharmacists were not able to exercise their corresponding responsibility under the law.  In fact, Rite Aid pharmacies routinely filled prescriptions at a pace of multiple prescriptions per minute.

378.    Rite Aid's compensation policies also discouraged pharmacists from preventing illegitimate prescriptions from being dispensed.  Rite Aid's compensation policies provided bonuses that depended on the number of prescriptions—including opioids—dispensed from Rite Aid pharmacies.

379.    From fiscal years 2006-2008, Rite's annual Store Bonus Program Summaries structured staff pharmacist bonuses weighted 80% from store profits (including profits from controlled substance prescriptions), and 20% from customer satisfaction.  In fiscal year 2009, Rite Aid altered its Store Bonus Program Summary to specify that "script achievement" itself is "one of two criteria used to determine and calculate bonus awards for all eligible Pharmacy participants."  This new formulation weighted bonuses by 50% for prescription achievement  and

50% for customer satisfaction.  Also in fiscal year 2009, Rite Aid honed this pharmacist incentive policy in its "Prescription Incentive Bonus Program," specifically noting, "Participation in this program is designed to reward our pharmacy & front end associates for increasing their overall prescription business."  That policy even went so far as to encourage pharmacists to contact patients to pick up orders for "pain medicine" to increase prescription sales.

380.    Rite Aid's 2009 bonus incentive policy, which emphasized "script achievement" for its pharmacists, continued through 2013.  In 2013, Rite Aid transitioned to a "Pay for Performance (P4P)" model, which adjusts compensation based on whether the pharmacy met certain business goals, such as increasing prescription counts.  That policy specifies, "Overall Compensation Performance Summary will reflect an increase in compensation as a result of increasing store designation through increased prescription counts."  It was not until 2015 that Rite Aid expressly excluded controlled substances from prescription counts for its pharmacist bonus calculations.  Despite excluding controls from its calculations, however, incentives to fill illegitimate prescriptions remained folded into Rite Aid's policy.  Specifically, 20% of a staff pharmacist bonus is comprised of the "Customer Service and Associate Experience Indicator." That means customer complaints for a pharmacist's refusal to fill a suspicious prescription may negatively impact that pharmacist's bonus.  Rite Aid continued this policy structure through at least fiscal year 2019.  Rite Aid accordingly continues to financially incentivize its pharmacists to fill as many prescriptions as possible, even if a pharmacist suspects a prescription is likely subject to diversion.

381.    Rite Aid's compensation structure presented a conflict of interest for pharmacists on two fronts:  (1) to fill as many prescriptions as possible to increase the store profit metric, and (2) to fill as many prescriptions as possible to avoid complaints from patients seeking to fill even

illegitimate prescriptions, so as to increase the customer satisfaction metric.  In this structure, a pharmacist would necessarily receive a higher bonus for filling illegitimate prescriptions (by increasing store profits and maintaining high customer satisfaction rates).  On the other hand, rejecting illegitimate prescriptions would decrease the metrics of both bonus components, and decrease the final bonus amount a pharmacist could receive.

382.    The problem of illegal dispensing caused by Rite Aid's focus on quickly filling prescriptions and increasing the number of prescriptions dispensed was also exacerbated by Rite Aid's inadequate pharmacy staffing.  Often, single pharmacists were left as the only pharmacist at a location for entire shifts.  This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.[38]

383.    The effect of Rite Aid's actions was all too predictable and tragic.  Rite Aid purchased more than 15 million dosage units of oxycodone and hydrocodone at 44 stores in the County from 2006 to 2014, the years for which ARCOS data is available.  Over the same time frame, Rite Aid was responsible for over 10% of the volume of these drugs dispensed in the County.

### v.    Rite Aid Failed to Maintain Effective Controls Against Diversion and Instead Fueled a Black Market in the County

384.    As a vertically integrated distributor and dispenser of prescription opioids, Rite Aid knew or should have known that an excessive volume of pills was being sold into Georgia and the County.

---

[38] Some states have tried to outlaw pharmacists from working alone.  California, for example, passed a law saying no pharmacist could be required to work alone. Regrettably, however, it has been largely ignored since taking effect in 2019, according to leaders of a pharmacists' union.  *See* Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

385.    The sheer volume of prescription opioids distributed to and dispensed by Rite Aid pharmacies in and around the County is indicative of potential diversion and required appropriate due diligence.

386.    Discovery will reveal that Rite Aid knew or should have known that its pharmacies in Georgia, and the surrounding area, including Alabama, Tennessee, Kentucky, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Rite Aid had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

387.    Because of its vertically integrated structure, Rite Aid has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but Rite Aid failed to utilize this information to effectively prevent diversion.

### d.    Walmart

388.    During most of the time period relevant to Plaintiff's claims, Walmart acted as both a distributor of controlled substances to its own Walmart pharmacies and a retailer dispensing controlled substances at Walmart pharmacies and Sam's Club pharmacies.  While operating under different brand names, both Walmart and Sam's Club pharmacies were subject to the same flawed policies, lack of oversight, and inadequate implementation emanating from Walmart's Home Office.  In both its capacity as a distributor and as a dispenser of controlled substances, Walmart failed to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community.  By the time Walmart implemented a system for monitoring suspicious orders or policies allowing corporate blocks of known pill mill doctors, the opioid epidemic had already claimed hundreds of thousands of American lives.

389.    Walmart is the largest private employer in the United States, employing over 1.5 million people.  But for years, Walmart chose not to assign a single employee to design or operate a system to detect suspicious orders of controlled substances.  Despite Walmart's obligations as a distributor of controlled substances, it was not until 2014 that Walmart began to take any meaningful steps toward developing a system for monitoring suspicious orders.

### i.    Walmart Lacked a Suspicious Order Monitoring System for Most of the Relevant Time Period

390.    Walmart operated registered distribution centers to supply its own pharmacies with controlled substances from the early 2000s until 2018.

391.    Prior to 2011, Walmart did not have any written policy or procedure in place to monitor orders of controlled substances shipped by its pharmacy distribution centers.

392.    In the absence of an established policy or procedure, Walmart relied on its hourly employees and associates filling orders at the distribution centers to subjectively monitor the orders

they were filling for anything unusual.  These associates were responsible for filling and reviewing several hundred orders a day.

393.    Walmart did not provide any guidance or training to its associates as to what constitutes a suspicious order or how to evaluate an order for unusual size, frequency, or pattern. On information and belief, no Walmart employee ever flagged an order as suspicious prior to 2011.

394.    Although Walmart did create a procedure for identifying suspicious orders of controlled substances beginning in 2011, this procedure was insufficient to identify suspicious orders of controlled substances.  Walmart's program flagged only very large orders of controlled substances.  Specifically, it flagged weekly orders for controlled substances of 50 bottles (5,000 dosage units) or more and orders for more than 20 bottles (2,000 dosage units) that were 30% higher than a rolling four-week average for that item.  Orders under 2,000 dosage units per week were never flagged, meaning that a pharmacy could order 8,000 dosage units per month without ever being flagged.  Moreover, that meant that even if an order was more than 30% greater than the four-week average, it could not draw an alert unless it also was more than 20 bottles.

395.    Under this system, an alert did not mean Walmart would report the order to the DEA or halt it pending necessary due diligence.  To the contrary, upon information and belief, Walmart *never* reported an order flagged by its monitoring program to the DEA as suspicious.  In addition, rather than halting the order, Walmart simply cut the order to the amount of the 50-bottle threshold and shipped it.  Walmart never reported cut orders to the DEA.  Although the distribution centers sent information regarding flagged orders daily to Walmart's corporate headquarters in Arkansas (the "Home Office"), no system existed for follow-up on flagged orders by employees at the Home Office .

-111-

396.    In mid-2012, Walmart implemented a "hard limit" on orders of a single opioid product, 30 mg oxycodone ("Oxy 30").  Under this approach, an order for over twenty bottles of Oxy 30 was automatically reduced to twenty bottles.  Walmart would not report these excessive orders of Oxy 30 to the DEA.

397.    At the same time, Walmart's distribution center began generating a daily report of all the pharmacies placing orders for over twenty bottles of various oxycodone medications, although Walmart did not place a "hard limit" on any dosage strength or product other than Oxy 30.  This report, called the "Over 20 Report" later included other controlled substances as well.  Although the report was generated and circulated on a daily basis, Walmart did not have an adequate system in place to review and follow up on these excessive orders beyond investigating for indicators of internal theft, and it did not have a system in place to address stores that repeatedly appeared on the Over 20 Report.  Regardless of having been identified on the Over 20 Report, these orders were filled and shipped.  Upon information and belief, there is no evidence of any order in fact being held or halted pursuant to this practice.

398.    Even if Walmart's distribution center reduced an order to a smaller number of bottles, nothing prevented a Walmart or Sam's Club pharmacy from making up the difference by ordering opioids from an outside distributor, such as McKesson and AmerisourceBergen.  Not only could Walmart pharmacies place another order with these outside vendors to make up the difference, they could have orders fulfilled by both Walmart and a third-party distributor at the same time.  Even though Walmart had the ability to monitor orders to outside vendors for suspicious orders, it did not, which allowed Walmart pharmacies to exceed the already high thresholds simply by ordering drugs from a third party.

399.    Walmart knew that these policies and procedures were insufficient to fulfill its obligations to prevent diversion of controlled substances.  For example, in 2013, Walmart acknowledged in an internal presentation that it had not yet designed a compliant system for suspicious order identification, monitoring, and reporting.  It also stated that it was "TBD" when Walmart would develop such a system.  In 2014, Walmart acknowledged that it still lacked a compliant monitoring program and that it had "no process in place" to comply with government regulations and that this created the "severe" risk of "financial or reputational impact to the company."  At this point, Walmart still had no written policies and procedures required orders of interest to be held and investigated.

400.    In 2015, Walmart enhanced its suspicious order monitoring policy by implementing store-specific thresholds.  Upon information and belief, it based these thresholds on the standard deviation of a specific pharmacy's order history for each controlled substance.  The thresholds also included minimum amounts, below which no orders were flagged under any circumstance, regardless of pattern or frequency.

401.    For almost all Walmart pharmacies, this minimum was set at 2,000 dosage units per week (or 8,000 dosage units per month).  An order under this minimum threshold would not be flagged regardless of changes in ordering patterns.  A pharmacy could, for example, go from ordering 10 dosage units of Oxycodone 10 mg per month to 7,999 per month without any order being flagged or reviewed.  Thus, even Walmart's "enhanced" order monitoring program failed to provide effective controls against diversion.

ii.    **Walmart Failed to Guard Against Diversion in Distributing into the County**

402.    According to data from the ARCOS database, between 2006 and 2014, Walmart ordered more than 8 million dosage units of oxycodone and hydrocodone for 12 Walmart

pharmacies in the County, and another more than 1 million dosage units of these drugs to its Sam's Club pharmacy in the County.  In total, Walmart distributed 9 million dosage units of oxycodone and hydrocodone into the County.  The volume of opioids Walmart brought into the County—and then sold from just 13 Walmart-owned pharmacy locations in the County—was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

403.    Yet, upon information and belief, Walmart did not report a single suspicious order in the County between 2007 and 2014.  Instead, Walmart funneled far more opioids into Georgia and the County than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders.  This information, along with the information known only to distributors such as Walmart (especially with its pharmacy dispensing data), would have alerted Walmart to potential diversion of opioids.

404.    In addition, Walmart, upon information and belief, also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Georgia.  Walmart failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Georgia.

405.    In the County, Walmart violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

406.    As a vertically integrated, national retail pharmacy chain, Walmart had the ability to detect diversion in ways third-party wholesale distributors could not by examining the dispensing data from their own retail pharmacy locations.

407.    Given the volume and pattern of opioids distributed in Georgia and in the County, Walmart was, or should have been aware that opioids were being oversupplied into the state and should have detected, reported, and rejected suspicious orders.  Yet, the information available shows it did not.

408.    Upon information and belief, Walmart, by virtue of the dispensing data available to it, had actual knowledge of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals arriving together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Walmart ignored these obvious red flags.

409.    Walmart, therefore, was aware of the suspicious orders that flowed from its distribution facilities.  Walmart refused to identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion.  Rather, Walmart failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Georgia and the County.

410.    Upon information and belief, Walmart failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

411.    Walmart was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted; yet, it did not take meaningful action to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

412.    Given Walmart's retail pharmacy operations, in addition to its role as a wholesale distributor, Walmart knew or reasonably should have known about the disproportionate flow of opioids into Georgia and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, diversion.

### iii.    Walmart Failed to Maintain Effective Controls Against Diversion from its Pharmacies in the County

413.    Walmart, throughout the relevant time period, owned and operated pharmacies throughout the United States, including pharmacies in the County.  Through its wholly owned or controlled subsidiary companies, Walmart operates over 4,500 retail pharmacies across the U.S., a mail-order pharmacy, a specialty pharmacy, and six pharmacy distribution centers that distribute to other Walmart entities.

414.    Walmart set policies for its pharmacies at the corporate level.  Walmart also presented, through nationwide advertising, a public image of the safety and excellence of all the pharmacists the company hired.  In a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity."[39]  The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[40]

415.    Walmart pharmacies in and around the County received distributions of prescriptions from Walmart's distribution centers and from other wholesale distributors, which

---

[39] Walmart, *Your Career as a Walmart Pharmacist* (Sept. 25, 2014), available at https://www.youtube.com/watch?v=9VD12JXOzfs (last visited May 13, 2020).

[40] *Id.*

enabled these pharmacies to have the same orders filled by both Walmart and a third-party distributor.

416.    The volume of prescription opioids dispensed by Walmart pharmacies in and around the County is indicative of potential diversion and required appropriate due diligence.

417.    As a vertically integrated distributor and dispenser of prescription opioids, Walmart had unique insight into all distribution and dispensing level data, and knew or should have known that it was dispensing an excessive volume of pills into Georgia and the County.

418.    Discovery will reveal that Walmart knew or should have known that its pharmacies in Georgia, and the surrounding area, including Alabama, Tennessee, Kentucky, and South Carolina, were:  (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Walmart had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

419.    Walmart had complete access to all prescription opioid distribution data related to Walmart pharmacies in and around the County.

420.    Walmart had complete access to all prescription opioid dispensing data related to Walmart pharmacies in and around the County.

421.    Walmart had complete access to information revealing the doctors who prescribed the opioids dispensed in Walmart pharmacies the County.

422.    Walmart had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in Walmart pharmacies in and around the County.

423.    Walmart had complete access to information revealing the opioids prescriptions dispensed by Walmart pharmacies in and around the County.

424.    Walmart had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by Walmart pharmacies in and around the County.

425.    Walmart had complete access to information revealing the size and frequency of prescriptions written by specific doctors across Walmart pharmacies in and around the County.

426.    Yet, on information and belief, Walmart did not begin to use this information to identify prescribers of concern or signs of diversion until 2017.  Walmart, however, always had the ability to do so.  Walmart also failed to put in place effective policies and procedures for the identification of red flags when dispensing opioids and failed to provide adequate guidance or training to its pharmacists on identification of red flags.

427.    Even when Walmart pharmacists suspected that an individual prescriber was consistently writing prescriptions for other than a legitimate medical purpose, they could not, for most of the relevant time period, use a "blanket" refusal to fill to refuse all prescriptions from that

prescriber.  Instead, Walmart pharmacists were required to evaluate and refuse to fill prescriptions on a case-by-case basis.  A 2011 document from Walmart Regulatory Affairs regarding the "Proper Prescriber-Patient Relationship" stated, "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or a valid medical reason before refusing to fill."  The prescription-by-prescription refusal to fill procedure was time-consuming and placed the burden on Walmart and Sam's Club pharmacists, who were already under pressure to fill prescriptions quickly.  Moreover, many red flags for diversion are based on prescribing patterns that are readily apparent from aggregate data—for example, the percentage of controlled substance prescriptions compared to non-controlled substances written by a prescriber—but not apparent based on an individual prescription.

428.    Finally, in 2017, Walmart implemented a policy by which individual pharmacists could request such blanket refusals, which would permit the pharmacist to refuse to fill future prescriptions from that prescriber without evaluating each prescription individually.  In addition, Walmart also always had the ability to "centrally block" problematic prescribers across all Walmart and Sam's Club pharmacies, but did not establish a procedure to do so until 2017.  In the "Practice Compliance" document describing this policy, Walmart recognized that its Home Office may, "in certain situations," have information about prescribing practices that is not available to individual pharmacists:

> While pharmacists are in the best position to determine whether individual prescriptions are appropriate, *additional information may be obtained that is not available to our pharmacists*.  Therefore, in certain situations, a prescriber may be identified whose prescribing practices raise concerns about prescribing controlled substances for legitimate medical purposes.  After a thorough review, these additional insights may lead Walmart to place a block in Connexus on controlled substance prescriptions from these prescribers.

-119-

429.     Moreover, Walmart's pressure on pharmacists to fill more prescriptions quickly was at odds with a culture and practice of compliance.  Incentive awards were tied to the number of prescriptions a pharmacy filled and profit that the pharmacy generated.  Upon information and belief, controlled substances were included in Walmart's pharmacy incentive program for most of the relevant time period.  In addition, pharmacists were under constant pressure to increase the number of prescriptions they filled, and to increase the overall percentage of pharmacy sales.  As a result, upon information and belief, because of Walmart's drive for speed, pharmacists often did not have enough time to sufficiently review a prescription and conduct the appropriate due diligence.

430.     These systemic issues are reflected in numerous enforcement actions and investigations that demonstrate the Walmart put profits and sales ahead of compliance, its customers and communities, and public safety.  In 2009, for example, the DEA issued a Show Cause order seeking to revoke the registration of a Walmart pharmacy in California.  The order alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California; (2) dispensed controlled substances . . . based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice . . . ; and (3) dispensed controlled substances to individuals that [the pharmacy] knew or should have known were diverting the controlled substances.

431.     In addition, a 2011 Memorandum of Agreement ("2011 MOA") arising out of the investigation states that the DEA also learned that the same pharmacy was allegedly dispensing controlled substances based on prescriptions that lacked valid DEA numbers and allegedly refilling controlled-substances prescriptions too early.

432.    Upon information and belief, the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level.  Indeed, the 2011 MOA, which required Walmart to maintain a "compliance program" states that it is applicable to "all current and future Walmart Pharmacy locations."

433.    Following the 2011 MOA, Walmart was supposed to revamp its dispensing compliance program, but still, its policies and procedures remained deficient.

434.    Instead, systemic failures continued, and Walmart's national corporate office not only failed to insist that Walmart implement adequate controls against diversion, they ignored concerns raised by Walmart pharmacists.

435.    One internal document from 2015, for example, notes concerns from a Walmart pharmacist that "his leadership would not support his refusing to fill any 'legitimate' (written by a Dr) prescriptions and he stated that his current volume/staffing structure doesn't allow time for individual evaluation of prescriptions[.]"  When this pharmacist refused to fill a customer's controlled substance prescription because the customer was attempting to fill it too soon, the Market Health & Wellness Director for that store complained to management that the pharmacist "sent a customer to a competitor" and "expressed significant concern about how 'sending customers away' would impact the sales figures for the store," and insisted that "the store needs to fill every available prescription."

436.    In December 2020, the U.S. Department of Justice ("DOJ") filed a lawsuit against Walmart over its opioid dispensing and distribution practices.  *United States of America v. Walmart Inc. et al.*, No. 1:20-cv-01744, ECF No. 1 (D. Del. December 22, 2020) ("DOJ Compl."). After a multi-year investigation, and based on a review of millions of pages of documents, much of which was recently produced to the MDL, the DOJ alleged that Walmart pharmacists filled

prescriptions issued by "known pill-mill prescribers" and filled "numerous prescriptions that, on their face, showed such obvious red flags . . . that Walmart pharmacists would have known that the prescriptions had a very high probability of being invalid," in addition to Walmart having a "grossly inadequate suspicious-order monitoring program."  *Id.* ¶¶ 22-23, 35.  Pharmacists or pharmacy managers would contact Walmart's central compliance personnel for guidance on handling suspected pill mill doctors but felt that their "concerns are falling upon deaf ears."  *Id.* ¶ 237.  Pharmacists repeatedly sought help from Walmart's corporate office, to no avail.  Walmart compliance officials failed to take action in response to these alarms.  Instead, they repeatedly sent the same boilerplate response, stating that pharmacists must use their professional judgment but that they must continue to evaluate and refuse to fill on an individual, prescription-by-prescription basis, even in situations where other retail pharmacies had stopped filling any prescriptions from particular prescribers.  As a result, Walmart and Sam's Club pharmacies often became channels for illegitimate controlled substance prescriptions from known pill mills.  Even in circumstances where a prescriber was under investigation by the DEA, Walmart's compliance department informed pharmacists that would not be a reason to refuse to fill that prescriber's controlled substance prescriptions.

437.    The practice of filling prescriptions suspected of being illegitimate, including prescriptions for large quantities of opioids and prescriptions for known "drug cocktails" frequently diverted and abused, was not limited to handful of Walmart and Sam's Club pharmacies.  Rather, Walmart had a systemic, national problem.  Walmart pharmacists from across the country, including Maine, Massachusetts, Kanas, Washington, Texas, and North Carolina, contacted Walmart's national compliance directors about problem prescribers and suspect prescriptions.  One Walmart pharmacist in North Carolina wrote to a Market Health and Wellness

Director, in an email subsequently sent to the national compliance department, that "there is no way that many 25 year olds need 120 to 240 oxycodone per month."  DOJ Compl. ¶ 324. Regarding one Texas doctor who was later convicted of illegal distribution of opioids, a Walmart pharmacy manager wrote; "Other chains are refusing to fill for him which makes our burden even greater. *Please help us*." *Id.* ¶174 (emphasis added).  Another described the same doctor as a "risk that keeps [him] up at night." *Id.* ¶ 236.  Similarly, in September 2016, a Walmart pharmacy manager in Pennsylvania advised that a doctor was "under investigation by the DEA for what we believe is a pill mill operation," and that Rite Aid had begun refusing to fill his prescriptions. *Id.* ¶ 296.  The pharmacy manager requested that Walmart put in place a similar "blanket denial," but Walmart's compliance department responded that all prescriptions from that doctor must be evaluated individually. *Id.*  Before this particular doctor was indicted in 2017 on nineteen counts including unlawful distribution and dispensing of controlled substances and violations of federal drug laws resulting in the death of five patients, Walmart pharmacies dispensed over 8,000 of his controlled substance prescriptions. *Id.* ¶ 297.

438.    Upon information and belief, Walmart also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

439.    Upon information and belief, Walmart also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

e.      **Kroger**

440.    Although Kroger had access to significant information about red flags due to its vertical integration with its stores, it failed to use this information in order to more effectively prevent diversion.

i.      **Kroger Failed to Maintain Effective Controls Against Diversion of Opioids It Distributed, Instead Oversupplying Its Stores**

441.    Kroger failed to implement an effective suspicious order monitoring program.

442.    Kroger distributed more than 16 million dosage units of oxycodone and hydrocodone from 2006 to 2014 to 19 pharmacies in the County, the years for which ARCOS data is available.  The volume of opioids it shipped into, and dispensed from locations in, the County is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.  During that same time frame, Kroger dispensed approximately 10% of the oxycodone and hydrocodone in the County.

443.    Kroger funneled far more opioids into Georgia and the County than could have been expected to serve legitimate medical use, and ignored other indicia of suspicious orders.  This information, along with the information known only to distributors such as Kroger (especially with its pharmacy dispensing data), would have alerted Kroger to potential diversion of opioids.  Yet, upon information and belief, Kroger did not report a single suspicious order in the County between 2007 and 2014.

444.    Kroger appears to have assigned responsibility for reviewing "unusual orders" to the Pharmacy Manager, who had the ability to release the order.  Kroger had computer-assisted ordering systems aiming to ensure it had enough supply of controlled substances and other drugs on hand.  "Excessive purchase" information about individual pharmacies was forwarded to a

"Pharmacy Coordinator," who would either file a report internally or alert the Division Merchandiser to start an internal investigation.

445.    It is unclear when Kroger developed a "computerized statistical information" for purposes of "pending" orders for evaluation, but it contracted with an outside consultant in 2013. Even with that system in place, however, it still appears to allow release of orders based simply on contacting the pharmacy coordinator and obtaining a reason such as "[n]ew customers" to clear an order.  This occurred even though Kroger understood that its "SOM system will fail if individuals clear orders without adequate investigation."  As of October 2013, an internal document described "rolling out the SOM program to all" distribution centers and acknowledged it currently lacked any system to prevent a pharmacy from going to Kroger's outside vendor, Cardinal Health, to order items "pended" by the SOM program.

446.    A Suspicious Order Monitoring Training Material notes the ability of analysts to review "Business Objects" reports with sales trends and purchase history, and to clear orders based on that history.

447.    Upon information and belief, Kroger by virtue of the data available to it, was actually aware of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails," known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Kroger ignored these obvious red flags.

448.    ██████████████████████████████████████

████████████████████████████████████████████

its actual knowledge of drug diversion. Rather, Kroger failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Georgia and the County.

449. Upon information and belief, Kroger failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

450. Kroger was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

451. Given Kroger's retail pharmacy operations, in addition to its role as a wholesale distributor, Kroger knew or reasonably should have known about the disproportionate flow of opioids into Georgia and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

<blockquote>
<b>ii.      Kroger Failed to Implement Effective Policies and Procedures to Prevent Diversion from Its Pharmacy Stores</b>
</blockquote>

452. Before 2005, the inadequacy of Kroger's policies and procedures was particularly glaring. DEA began investigating King Soopers and City Market, part of the "Kroger Co. Family of Stores" in response to information concerning potential diversion. Audits at seven Colorado pharmacies revealed "a pattern of non-compliance" with the CSA and federal regulations. Because of record-keeping and security problems, the DEA could not determine from the audit "how many

drugs had been lost or diverted," but could tell that "many of the CSA violations were the result of systemic weaknesses present in all King Soopers and City Market pharmacies."

453.    Ultimately, the parent corporation, Kroger Co., agreed in October 2005 to a then-record $7 million settlement for the "systemic violations of the Controlled Substances Act (CSA) by the company's pharmacies."  Kroger also "agreed to implement a pharmacy compliance program estimated to cost over $6 million dollars in all 1,900 of its pharmacies nationwide."  The changes included the Kroger stores in the County.  Upon information and belief, Kroger promised national reforms because it imposed its procedures at a national level across its "family" of stores, such that the same systemic failures also existed in Georgia and the County.

454.    A DEA press release concerning the settlement highlighted the trust Americans place in "corporations like Kroger" to "ensure that controlled substances aren't diverted to the illicit market."  Kroger understood the vital importance of its role as the last line of defense.  "As the last person that has the opportunity to speak with a patient or caregiver prior to handing over a medication that has been known to end the lives of so many when diverted or misused, no one can overestimate the responsibility of the pharmacist."  Kroger also recognized the "legislative and social intent of regulating controlled substances" as consistent with its mission in "serving the public good."

455.    █████████████████████████████████
███████████████████████████████████
██████ ██ ████ █ ████ █ █████ ████ ████ █ ████ █ ████
███████████████████████████████████
███████████████████████████████████
█████████████████████████████████ .

456. 

457.

458.

459.    Discovery will reveal that Kroger knew or should have known that its pharmacies in Georgia and the surrounding area, including Tennessee, Alabama, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued

for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Kroger had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

### f.  Publix

460.    In both its capacity as a distributor and as a dispenser of controlled substances, Publix failed to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community.

461.    During the time period relevant to Plaintiff's claims, Publix acted as both a distributor of controlled substances to its own pharmacies and a retailer dispensing controlled substances. Publix warehoused and self-distributed controlled substances to its stores, including opioids, from a warehouse devoted to pharmacy products in Orlando, Florida ("Orlando Warehouse").

### i.  Publix Failed to Maintain Effective Controls Against Diversion at the Wholesale Level

462.    Publix failed to implement an effective suspicious order monitoring program.

463.    Publix distributed and continues to distribute controlled substances to its own Publix stores.  Publix distributed to the County through its Orlando Warehouse, a DEA registrant. As of 2012, the Orlando Warehouse shipped to all Publix pharmacies two to three times per week.

464.    Publix supplemented its own self-distribution of opioids with distribution by industry players, including McKesson and AmerisourceBergen. Even if Publix's distribution

center reduced an order to a smaller number of bottles, nothing prevented a Publix pharmacy from making up the difference by ordering opioids from third party distributor, such as McKesson and AmerisourceBergen.  Not only could Publix pharmacies place another order with these outside vendors to make up the difference, they could have orders fulfilled by both Publix and a third-party distributor at the same time.

465.    Ultimately, Publix's distribution system made it nearly impossible for any order to be identified, much less reported, as suspicious. Publix placed orders of controlled substances from manufacturers and distributors who prioritized sales goals over suspicious order monitoring duties. Publix also gave significant latitude to its employees to manipulate order size and thresholds.  As a result of the company's policies and procedures, Publix did not—and indeed, could not—identify what was unusual.

466.    In 2015, a Teva employee, Joe Tomkiewicz, identified a potentially suspicious order by Publix through Anda, Inc., which was then one of Teva's wholesaler customers. Tomkiewicz identified "serious red flags" with regard to the Publix order, including:

1. This is high-strength oxycodone ultimately going to Florida, a well-established hot spot for oxycodone abuse in the U.S.
2. The total quantities in the Publix forecast put them significantly above their peers as far as size and class of trade are concerned.
3. The breakdown by strength, with an emphasis on 40mg does not appear to be normal for a retail pharmacy. I would expect the breakdown to be closer to that of Thrifty White, where the emphasis is on lower strengths.

467.    Tomkiewicz was ultimately pressured by Teva's Director of National Accounts, Jocelyn Baker, to overlook the "serious red flags" in Publix's order and permit the order to process. Ms. Baker highlighted Publix's importance as customer as the reason, "Publix is an established customer who sells some of our other control[led substances]," and "[t]his was not presented to them in advance and may put this award at risk."

468.     Distributor McKesson provided Publix with notification of stores hitting McKesson's thresholds and regularly granted threshold increases without conducting any due diligence.

469.     For example, in 2009, McKesson alerted Publix employees Chris Hewell, Paul Hines, and Ivonne Leon, that several of its accounts were over 80% of their authorized threshold, with "[s]everal stores already at 100%." Publix employee Chris Hewell, Manager of Procurement, responded, requesting "amnesty" from the ordering threshold program, thus permitting Publix to exceed the standard 80% threshold for ordering Oxycodone. While Ms. Martindale's initial internal response was, "I'm pretty sure this isn't something we can do," McKesson ultimately granted Publix a temporary 2000 dosage unit increase "across the board."

470.     Publix allowed its individual stores to order from third party distributors without any, or limited, restrictions and, upon information and belief, did not sufficiently take those orders into account in Publix's self-distribution SOM system, negating any constraints from Publix's internal controls.

471.     For example, in 2013, Lucy Bard, National Account Manager at Purdue, reported to her superiors at Purdue that after calling on several Publix pharmacies in St. Petersburg, Florida, "[n]ot one pharmacist has experience a push back with ordering OxyContin or maximizing their quantities per McKesson/DEA regulations."

> **ii.     Publix Failed to Maintain Effective Controls Against Diversion in the County**

472.     In the County, Publix violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

473.     The 22 Publix pharmacies in the County purchased and dispensed more than 17 million dosage units of oxycodone and hydrocodone from 2006 to 2014, the years for which ARCOS data is available.  The volume of opioids it shipped into, and dispensed from locations in, the County is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.  During that same time frame, Publix dispensed approximately 12% of the oxycodone and hydrocodone in the County.

474.     As a vertically integrated distributor and dispenser of prescription opioids, Publix knew or should have known that an excessive volume of pills was being sold into Georgia and the County and ultimately, onto its streets.  Publix's activities as a distributor and a seller or dispenser of opioids are inextricably linked.

475.     The sheer volume of prescription opioids distributed to and dispensed by Publix pharmacies in and around the County, with a population of about 650,000 residents during the same time period, is indicative of potential diversion and required appropriate due diligence.

476.     Publix funneled far more opioids into Georgia and the County, and out of its pharmacy doors, than could have been expected to serve legitimate medical use, and ignored other indicia of diversion, including but not limited to suspicious orders.

477.     It cannot be disputed that Publix was aware of the suspicious orders that flowed from its distribution facilities into its own stores.  Publix simply refused to identify, investigate, and report suspicious orders even though Publix knew, or should have been fully aware, that opioids it distributed and sold were likely to be diverted.  Conversely, Publix failed to report suspicious orders, failed to meaningfully investigate or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Georgia and the County.

478.    Upon information and belief, Publix failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

479.    Publix was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted.  Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

480.    Given Publix's retail pharmacy operations, in addition to its role as a wholesale distributor, Publix knew, or reasonably should have known, about the disproportionate flow of opioids into Georgia and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

481.    In addition, and upon information and belief, Publix knew, or deliberately turned a blind eye to, its pharmacies' role in diversion of dangerous drugs.  At the pharmacy level, discovery will reveal that Publix knew, or should have known, that its pharmacies in Georgia and the surrounding area, including Florida, Alabama, Tennessee, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines,

or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Publix had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

482.    Failures regarding dispensing in Publix's Florida stores also allowed diverted opioids to be funneled into Georgia and the County and demonstrated the failures of Publix systems. The well-travelled path between Florida and Georgia is described further below.

483.    Because of its vertically integrated structure, Publix has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but Publix chose not to utilize this information and failed to effectively prevent diversion.

> iii.    **Publix Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores**

484.    At all times relevant herein, Publix pharmacies sold controlled substances, including FDA Schedule II and FDA Schedule III controlled substances otherwise known as opiate narcotics or opioids.

485.    "Publix Supermarkets, Inc," not any individual Publix store, is the DEA registrant for each of Publix's pharmacies across the country.

486.    As described above, Publix pharmacies ordered and were supplied opioids from a combination of outside vendors and Publix's own Orlando Warehouse.

487.    Upon information and belief, Publix lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion.

488.     Publix's conduct, and the volume it dispensed in the County thereafter indicates that, to the extent any policies existed, those policies were not consistently and reliably applied. In addition, as discussed further below Publix, pressured pharmacists to put profits ahead of safety.

489.     Upon information and belief, Publix failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion.

### iv.     Publix Failed to Guard Against Diversion in Dispensing to the County

490.     Upon information and belief, Publix pharmacies routinely have dispensed opioids in violation of the Controlled Substances Act and accompanying regulations.  Such conduct was a result of Publix's lack of robust policies and procedures regarding dispensing controlled substances as well as Publix's focus on profitability over its legal obligations and public safety.

491.     As a sophisticated chain pharmacy, Publix had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations.  Its own data would have allowed Publix to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.[41]

492.     Publix did not use data available to it to effectively comply with its legal obligations to prevent diversion and ensure only legal prescriptions were being filled at its pharmacies.

493.     Upon information and belief, Publix provided its pharmacists no or limited visibility into the data it collected, thereby depriving them of an invaluable resource when evaluating prescriptions.

---

[41] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

494.    Publix did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, and suspicious patients.

495.    To the extent Publix did provide its pharmacists with any visibility into the data it collected, Publix deprived its pharmacists of the ability to meaningfully review and apply this data by making such significant demands on its pharmacists that it effectively prevented them from properly evaluating potential red flags, suspicious prescribers, and suspicious patients.

496.    For example, a current job posting for a "Pharmacist – 30-hour Floater" in a Marietta, Georgia Publix store lists an overwhelming list of skills needed for an applicant:

- provide dedication to each pharmacies success, by executing strategy, motivating and inspiring staff as the pharmacist-on-duty
- set priorities to maximize contribution, executing daily tasks, supporting the team and building rapport with both customers and associates
- provide best-in-class pharmacy service to patients, empower your staff in providing value and service through counseling, building personalized relationships, promoting customer loyalty, offering pharmacist led clinical services to improve health and wellness and preventative care through services available at Publix
- inspire each team you work with to do the right thing, gaining buy in, and empowering the team to be accountable
- provide enthusiasm for all new pharmacy initiatives at your assigned location
- manage team performance, such as prescription promised time, by assigning tasks to ensure complex operational activities are met in a timely and efficient manner in the absence of the pharmacist-in-charge
- use best practices to make sound business decisions while covering as the pharmacist-on-duty
- be regarded as an expert on the pharmacy technology system and how it is used for both routine and complex prescription processing
- mentor others on Publix pharmacy best practices to maximize sales, minimize shrink while meeting customers' needs, using programs such as auto refill and Sync Your Refills
- proactively advance pharmacy clinical initiatives including Medication Therapy Management (MTM), pharmacist point-of-care testing, immunizations, and diabetes management

497.    The laundry list of responsibilities included in the "Pharmacist – 30-hour Floater" posting repeatedly highlights a pharmacist's role in pharmacy success, maximizing sales, meeting customers' needs, and gaining customer loyalty, still, the responsibilities list makes no mention of

a pharmacists' role in identifying and evaluating potential red flags, suspicious prescribers, and suspicious patients.

498.    In addition, Publix placed strict emphasis on its pharmacists filling prescriptions as quickly as possible while Publix simultaneously limited resources available to assist pharmacists.

499.    While the above job description details that the pharmacist must inspire staff and team work, in reality many Publix pharmacists lament publicly that Publix pharmacists often work without the aid of a pharmacy technician or other staff. When pharmacy technicians are unavailable or pulled away to other areas in the supermarket, Publix pharmacists are forced to work alone, and to act as both pharmacist and technician. This lack of resources or aid impairs a pharmacist's ability to address patient safety and patient care, including his or her ability evaluate potential red flags, suspicious prescribers, and suspicious patients.

500.    The problem of illegal dispensing caused by Publix's focus on quickly filling prescriptions and increasing the number of prescriptions dispensed was exacerbated by Publix's inadequate pharmacy staffing.  This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.[42]

501.    In addition, the job posting for "Pharmacist – 30-hour Floater" position states the position is eligible for a "Retail bonus" benefit which is paid quarterly, and is "based on sales and profits that are calculated at the end of each inventory period."

502.    Publix's compensation structure presents a conflict of interest for pharmacists on at least one front as it incentivizes pharmacists to fill as many prescriptions as possible to increase

---

[42] Some states have tried to outlaw pharmacists from working alone.  California, for example, passed a law saying no pharmacist could be required to work alone. Regrettably, however, it has been largely ignored since taking effect in 2019, according to leaders of a pharmacists' union.  *See* Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE NEW YORK TIMES (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

the store profit metric. In this structure, a pharmacist would necessarily receive a higher bonus for filling illegitimate prescriptions (by increasing store profits).  On the other hand, rejecting illegitimate prescriptions would decrease overall sales and profits, and decrease the final bonus amount a pharmacist could receive.

### D.    Defendants' Performance Metrics Put Profits Before Safety

503.    Not only did the Chain Pharmacies lack (and fail to implement) adequate policies and procedures to guard against diversion, but CVS, Rite Aid, and Walgreens, and upon information and belief, the other Chain Pharmacies compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to supplying of a black market, including in the County.

504.    Defendants also had a responsibility to create a work environment that enables its pharmacy staff to detect and prevent diversion, or at the very least does not undermine the ability of staff to carry out these functions or direct emphasis toward increased sales instead of legal compliance.  Former DEA diversion investigator Demetra Ashley testified that the duty to provide tools to prevent diversion under Section 1301.71 includes providing a work environment that allows pharmacists to fulfill their corresponding responsibility to fill only legitimate prescriptions. She further agreed as to the importance of adequate staffing and testified that both strict time limits that deprived pharmacists of enough time to investigate red flags and requiring quotas on prescriptions filled sounded unreasonable.

505.    Former DEA diversion investigator Demetra Ashley testified that the duty to provide tools to prevent diversion under Section 1301.71 includes providing a work environment that allows pharmacists to fulfill their corresponding responsibility to fill only legitimate prescriptions.  Adequate staffing is also important.  Further, both strict time limits that deprived pharmacists of enough time to investigate red flags and requiring quotas on prescriptions filled

sounded unreasonable to her.  Corporate performance metrics focused on increasing dispensing of prescriptions, increasing sales, and lowering customer wait times can place pharmacists in conflict with legal requirements.

506.    In connection with the DEA's investigations described above, the DEA found evidence that Walgreens had a corporate policy encouraging increased sales of oxycodone.  As the DEA's September 2012 Order to Show Cause and Immediate Suspension of Registration explains:

> In July 2010, Walgreens's corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies and produced an 11 page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June. The spreadsheet was sent to Walgreens's market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "*look at stores on the bottom end .... We need to make sure we aren't turning legitimate scripts away. Please reinforce*." A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "*busiest store in Florida*" was filling almost 18 oxycodone prescriptions per day, yet "We also have stores doing about 1 a day. Are we turning away good customers?"

507.    In 2011, a Walgreens project to "Increase Rx Sales and prescription Counts" instructed pharmacies to "improve C2 business" – i.e. dispense more Schedule 2 controlled substances. This focus on *increasing* controlled substance dispensing – including opioids – continued even after the DEA investigation and $80 million fine.  For example, in 2014, the RX Integrity department created a "Pharmacist Controlled Substance Dispensing Opportunities" tool to "identify pharmacists that are dispensing a low rate of controlled substances," and help pharmacists "feel more comfortable in filling controlled substances," specifically focusing on pharmacists dispensing low rates of opioids like "hydromorphone, oxycodone, methadone… hydrocodone," and the cocktail drugs comprising the rest of the "holy trinity" of abuse, such as "carisoprodol… [and] alprazolam."

508.    Walgreens also had a bonus program that factored prescription volume into bonus calculations, and served as an incentive for pharmacies and pharmacy technicians to ignore the "red flags" of diversion.  The corporate push for speed (or volume) deterred pharmacists from taking the time to properly examine the prescriptions before them and exercising their corresponding responsibility to prevent diversion.

509.    Walgreens emphasized in its policies for pharmacist and pharmacy managers: "The best evidence of a well-run pharmacy is the increase in prescriptions and pharmacy sales."  One former Walgreens pharmacist described management critiques for "not going fast enough" in dispensing prescriptions and believed "[t]hey'd like you to fill one a minute if you could." She recalled there was even a timer to alert her if she was falling behind, and threats of reduced hours or a move to a different store or location.[43] Indeed, Walgreens had a tool, the "PhLOmometer" that tracked the time to fill a prescription.  A March 2013 memo confirms that volume targets included controlled substances as late as 2013 and even after the adopting of the GFD policy. Specifically, the memo states, as the response to an "[a]nticipated question" that "GFD concerns doesn't relieve you from trying to attain the numbers that have been set for you."  When considering high schedule 2 dispensing at a particular pharmacy in New Jersey in 2012, as the opiate crisis raged, the pharmacy supervisor pushed back against any attempt to reduce supply of oxycodone, focusing on the impact the reduction would make on filled prescriptions and "the bonus tied to" one pharmacy employee.

510.    Such corporate goals obstruct the performance of pharmacists' professional obligations.  There is an inherent conflict between performance metrics that pressure pharmacists

---

[43] *Are Business Tactics at Some Pharmacies Risking Your Health?* (Nov. 8, 2017), https://reachmd.com/news/are-business-tactics-at-some-pharmacies-risking-your-health/1610793/

to fill certain volume of prescriptions, limit customers' wait time, or base pharmacists' incentive pay on customer satisfaction, on the one hand, and the  ability to conduct appropriate due diligence to guard against diversion of controlled substances and refuse to fill illegitimate prescriptions even if a customer is dissatisfied, on the other. Defendants have a duty to maintain a corporate culture that promotes and ensures compliance with the law.

511.    Defendants maintained no such corporate cultures.  Walmart even pushed back when, in 2013, the DEA expressed concerns that bonus incentives for dispensing controlled substances could "lead to bad pharmacist decisions because they know they get will something out of filling scripts."  Even though Walmart agreed it should not provide "special" incentives particular to filling controlled substance prescriptions, it resisted excluding controlled substances from incentives also applied with respect to other drugs and does not appear to have excluded controlled substance prescriptions from bonus calculation formulas.

512.    In February 2012, Richard Ashworth, then the Vice President of Walgreens' Western Division, supervising over 2,000 Walgreens stores, encouraged stores "to drive for the activities that drive incremental scripts.  There are metrics we can improve, today, that we will demonstrate the 'doing whatever it takes' to achieve 100% of FY2011 Script volume," noting "we are not doing whatever it takes," and particularly that in the "Top 2 complaints" was "Pharmacy Fill was denied."

513.    As described further below, pharmacists were expected to meet volume and speed goals.  With respect to the volume-based bonus policy, a March 2013 memo confirms that volume targets included controlled substances as late as 2013 and even after the adopting of the GFD policy.  Specifically, the memo states, as the response to an "[a]nticipated question" that "GFD concerns doesn't relieve you from trying to attain the numbers that have been set for you."

514.   Only as part of its 2013 settlement with the DEA did Walgreens agree to exclude controlled substances calculations from bonus calculations from 2014 forward.  This resulted in a 21% reduction in the number of stores purchasing the 80mg OxyContin – evidence that a minimal effort to implement common sense controls had a tangible impact on sales of the most potent controlled substances (although that reduction did not last, as described above, and Walgreens's volume by 2014 had increased again).

515.   Even though controlled substances were removed from direct bonus calculations for pharmacists, pharmacists still felt pressured by management to fill prescriptions they were uncomfortable filling, as refusals to fill would impact other store metrics – like customer satisfaction – that impacted management compensation.  As one Walgreens pharmacist noted "As long as Walgreens allows their pharmacists to be evaluated by store managers (who are trained by the Company to be concerned with profit, customer service, and resolving customer complaints), store managers will assert their authority over the pharmacists and will naturally confuse good faith dispensing issues with customer service issues. This is a clear conflict of interest."

516.   Walgreens also lobbied against imposition of caps or limits on the volume of prescriptions a pharmacist may fill.  As the New York *Times* recently reported, pharmacists at chain pharmacies, including Walgreens have "said it had become difficult to perform their jobs safely, putting the public at risk of medication errors," as they "struggle to fill prescriptions, give flu shots, tend the drive-through, answer phones, work the register, counsel patients, and call doctors and insurance companies … all the while racing to meet corporate performance metrics that they characterized as unreasonable and unsafe …."[44]  Instead of reducing performance targets,

---

[44] *See* Ellen Gabler, *How Chaos at Pharmacies Is Putting Patients at Risk*, New York Times, (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

chain pharmacies including Walgreens seek to assign more dispensing tasks to less qualified—and less expensive—pharmacy technicians.

517.    Walgreens Pharmacy Managers provided feedback stating that pharmacists did not have enough time to do their work effectively and that a lack of resources kept them from being effective and consistent. The feedback also indicated that pharmacy managers were "[s]truggling to keep our heads above water let alone manage." A consultant hired by Walgreens interviewed pharmacy staff and reported "High Stress" and "errors resulting from stress" and stated "we heard multiple reports of improper behavior" that was "largely attributed to the desire" to meet a corporate metric known as "promise time," which ensures that patients get prescriptions filled within a set amount of time.

518.    As early as 2006 CVS judged a pharmacist's performance based on metrics that would motivate employees to exceed top line results and maximize store profits.  These metrics, would rely, in part, upon the number of prescriptions dispensed.  By 2010, CVS had implemented performance metrics that remain publicly available online.  CVS's metrics system lacked any measurement for pharmacy accuracy or customer safety.  They did, however, prioritize speed and volume, including by requiring pharmacists to meet wait- or fill-time expectations.  Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year.   Opioid prescriptions were even included in the volume goals until 2013, and after that time, the pressure from the metrics' focused on profitability remained.  These policies remained in place even as the epidemic raged.  Even in 2020, pharmacists described CVS as the "most aggressive chain in imposing performance metrics."

519.    As noted above, former pharmacists at both Walgreens and CVS have publicly complained about pressure to put speed ahead of safety.  Concerning the metrics at CVS, one

pharmacist commented that "You get stressed, and it takes your mind away from the actual prescriptions."  Another former CVS pharmacist recalled that "[e]very prescription [wa]s timed," and a backlog would pop up in color on pharmacists' computer screens if they fell behind. Additionally, CVS has faced discrimination complaints alleging that the company's "Metrics" system set unobtainable goals—or at least, goals that could not be obtained without violating the laws and practice rules governing pharmacists' professional responsibilities, edging out older pharmacists.

520.    More recently, a former CVS pharmacist in North Carolina described being driven to leave his position and open his own pharmacy, where he could work safely.  He described working a 13-hour shift with no breaks for lunch or dinner at CVS the day before he left in December 2018; a day on which he filled "552 prescriptions—about one every minute and 25 seconds—while counseling patients, giving shots, making calls and staffing the drive-through." In departing, he let his manager know that he would not "work in a situation that is unsafe."  One pharmacist was so alarmed that he wrote anonymously to the Texas State Board of Pharmacy to caution: "I am a danger to the public working for CVS."

521.    As further evidence of the complaints by CVS pharmacists, the State of Ohio Board of Pharmacy ("Board of Pharmacy") disseminated in July of 2020 a workload survey to all pharmacists working in Ohio.  The Board of Pharmacy published its survey results, described below, in April of 2021.

522.    One survey comment from a CVS pharmacist states: "As a pharmacist for CVS the working conditions are very dangerous. They are constantly cutting hours and expecting us to do more with less. I feel like there are at least 1-2 dispensing errors every month in my pharmacy. If we were allowed to work at a safe pace, this would be completely avoidable. All of the retail

pharmacists I work with feel like they need to cut corners to finish all of the work in time. Many cvs [sic]stores had over a hundred pages in their queues at the beginning of 2020 because they were so far behind (15 prescriptions per page so this equates to over a weeks [sic] worth of work)."

523.    Another CVS pharmacist comments:  "At CVS, work load increase every year and staffing don't [sic] increase always decreasing hours on staffing, we pharmacists are counted to help techs on their jobs to be able to make the pharmacy work and try to finish work load for the day.  No breaks or lunchs [sic] for pharmacist. No time to do a proper counsel, mtm [sic] and patient care.  I think with the work load we should have over lap [sic] with pharmacist. Some days we work 13hr shifts, too much with no lunch or break."

524.    Still another CVS pharmacist complains about CVS's metrics:  "I do want to point out several years ago I worked at CVS and that was the worst experience I had as a retail pharmacist. Too much focus on metrics and each Rx ends up not being given due attention. Extreme workload , [sic] corporate pressure , [sic]low staff resulted in RPh having not even 5 mins in a day of 10hrs [sic] to eat! [sic] Its time someone stopped CVS making a factory out of Pharmacy."

525.    While another CVS pharmacist complains about the work hours and a lack of a break:  "CVS makes pharmacist work 14 hrs [sic] days with no lunch break or schedule break. If you complain they warn that there are hundreds of new grads who can't find a job bc [sic] there are so many pharmacy schools opened in Ohio who they can pay less to do your job d/t [sic] over saturation."

526.    Another CVS pharmacist asserts CVS cares only about money:  "CVS only cares about money and numbers. Their customers and employees are the least of their concern. They cut technician hours to the point where pharmacists are working alone on a consistent basis processing,

-145-

filling, checking, and dispensing a prescription every 2 minutes while also answering the phone, assisting customers with questions out in the aisles and managing all the administrative requirements on a day to day[sic]."

527.    It is difficult to contemplate how any pharmacist could and/or would be able to meaningfully comply with any corporate policy regarding red flag analyses or any anti-diversion analysis under such draconian pressures.

528.    Walgreens and CVS were not alone in this regard.  As described above, Rite Aid had performance metrics in place that exacerbated its failures.  Without describing individual pharmacies, Daniel Hussar, a nationally-known expert and teacher of pharmacology at Philadelphia's University of the Sciences, commented in the media that the pace and pressure of prescription quotas appeared to be having an impact on accuracy.  "The frequency of these errors is increasing greatly," Hussar said; "I've heard some pharmacists say, 'It's a blur as to what happened during the day and I can only pray I didn't make any serious mistakes.'"

529.    This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

530.    Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."

531.    In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which

measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."

532.    Still, according to a 2016 investigation by the Chicago *Tribune*, as chain pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews—or skip them altogether," missing dangerous drug combinations in the process.[45]  A pharmacist too rushed to check for a potentially deadly drug interaction is also likely to be too rushed to check for red flags of diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

533.    According to the *Tribune's* coverage, "Wal-Mart, operator of 4,500 U.S. pharmacies, failed 43 percent of its tests."  Walgreens, meanwhile, failed a test of whether pharmacists would dispense dangerous drug combinations without warning patients 30 percent of the time.  Further, a Walmart pharmacist commented that she typically filled 200 prescriptions in her daily nine-hour shift, and an even higher volume when working at a different store, equating to two prescriptions per minute.

534.    In reporting on the results of its investigation, the *Tribune* quoted Bob Stout, president of the New Hampshire Board of Pharmacy, stating that "'They're cutting corners where

---

[45] Sam Roe, Ray Long, and Karisa King, Contract Reporters, *Pharmacies Miss Half of Dangerous Drug Combinations*, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy-met-20161214-story.html.

they think they can cut."  As the report itself explained: "some pharmacies emphasize fast service over patient safety. Several chain pharmacists, in interviews, described assembly-line conditions in which staff hurried to fill hundreds of prescriptions a day.

535.    "The National Coordinating Council for Medication Error Reporting and Prevention (NCCMERP), also passed a statement advocating for the "elimination of prescription time guarantees and a strengthened focus on the clinical and safety activities of pharmacist within the community pharmacy setting."[46]

536.    More recently, a January 2020 New York *Times* article, referenced above, revealed that the problematic performance metrics remain, and have remained, in place.  One South Carolina pharmacist advised:

> We are being asked to do things that we know at a gut level are dangerous. If we won't or can't do them, our employers will find someone else who will, and they will likely try to pay them less for the same work.

537.    In March 2020, journalists also revealed that Walmart not only ignored reports of suspicious activity from pharmacists concerned that they were filling prescriptions for pill mills, but the company considered these pharmacists' focus misdirected.  One internal email, reviewed by ProPublica, showed that in response to a question from a regional manager in 2015 about documenting pharmacists' concerns about doctors believed to be operating pill mills, Walmart Health and Wellness Practice Compliance director Brad Nelson wrote that "We have not invested a great amount of effort in doing analysis on the data since the agreement [requiring such reporting]

---

[46] National Coordinating Council for Medication Error Reporting and Prevention. Statement Advocating for the Elimination of Prescription Time Guarantees in Community Pharmacy, http://www.nccmerp.org/statement-advocating-elimination-prescription-time-guarantees-community-pharmacy.

is virtually over. *Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.*"[47]

538.    As described above, until 2017, Walmart refused to allow pharmacies to block all prescriptions from doctors whose prescriptions raised red flags that they were running pill mills. Not only did pharmacists have to refuse each prescription on a case-by-case basis, to do so, a pharmacist had to fill out a form that could take as long as twenty minutes, a significant burden when pharmacists were faced with multiple prescriptions from problematic prescribers and the pressure to fill prescriptions quickly.

539.    An April 2021 workload survey from the Ohio Board of Pharmacy[48] revealed a contrast between the responses of pharmacists at chain pharmacies and pharmacists at other locations concerning the time available to do their job safely:

---

[47] Jesse Eisinger and James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (March 25, 2020).
https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment.

[48] https://www.pharmacy.ohio.gov/Documents/Pubs/Reports/PharmacistWorkloadSurvey/2020%20Pharmacist%20Workload%20Survey.pdf



540.    The same was true concerning whether standards or metrics were perceived as interfering with patient care:



541.    The overwhelming majority of pharmacist comments reported in the survey reflected a belief that chain pharmacies place profit over safety.  A common refrain heard from pharmacists was being asked to do more with less—carrying more responsibilities, and facing increased prescription volumes, while, staffing levels have decreased.  In a job market filled with new graduates, pharmacists were reminded that they were replaceable.  Pharmacists disclosed troubling information not only about their own employers, but also competing chains.  A Walmart pharmacist complained that "CVS and Rite [A]id will fill anything" and expressed frustration that Walmart was "under the microscope for filling opioids and benzodiazepines" and being told by DEA to "do more," because it was "buying too many controls."

542.    Walgreens pharmacists reported the following: "I received my first lunch break last week in the 7 years I have been a pharmacist. I literally have almost passed out multiple times from lack of breaks." "Anytime I would ask for more help or complain, I was told if you don't want this job there are plenty of unemployed pharmacists who will do your same job for less money." "The supervisors are always bending the rules to achieve certain metrics for the company. For instance, Pharmacists make patient calls throughout the day and are expected to reach a certain percentage of people. To help reach this number we are asked to leave messages on patient voicemails telling them if they don't call us back we are to call them again later that day. Many compliance issues are ignored."

543.    Kroger pharmacists reported the following: "I specifically left retail pharmacy at Kroger because of the complete and utter disregard for patient safety."  Kroger pharmacies lacked staffing, inadequately trained their employees, and committed "abundant" errors, which "lead to punishment" when reported.  Concerns about "unsafe" staffing levels were rebuffed.  "The culture within Kroger is to look the other way."  "The workload is unrealistic and unsafe."

**E.**     **Defendants Worked Together to Increase Their Profits and Lobbied Against
Restrictions on Opioid Use and DEA Enforcement**

544.    Beginning as early as the 1990s, outside distributors, largely through the HDA,
began to get together with the Chain Pharmacies through NACDS to discuss "concerns regarding
statutory requirements to report to DEA what are commonly referred to as suspicious orders."

545.    The DEA's suspensions of the registrations of three major distributors in 2007 lit a
fuse within the industry.   The very real threat of DEA enforcement prompted a flurry of
communications between NACDS members and members of the HDA, described above, as well
as the now-notorious Pain Care Forum ("PCF"), a forum run by opioid manufacturers.  A goal of
HDA, which it shared with NACDS, was to "develop a comprehensive DEA strategy" to avoid
enforcement actions against distributors.

546.    The NACDS and Defendants' other trade groups saw their role in influencing
diversion policy as being one that was absolutely critical, considering all that was at stake. At
times, these groups adopted militaristic strategies and used terminology ironically similar to the
"War on Drugs," developing "task forces" and viewing the DEA's crackdown on distributors and
chain pharmacies as an assault on the companies themselves.  Only this time, the war was being
waged against the very regulatory authorities and government entities fighting to deal with the
ever-growing problem of abuse and diversion in this country.

To follow up from last week's Pain Care Forum meeting, NACDS is interested in organizing a Task Force to respond to efforts to reschedule combination hydrocodone products into Schedule II.  At a minimum, NACDS would like to organize to prepare for the October FDA hearing on this topic, but also would like to be prepared for any additional legislation that may be considered.

NACDS has scheduled a conference call to organize the Task Force on July 26 at 10:30 a.m.   The conference call number is:  888-450-5996, pass code: 608936#.  Please email Kevin Nicholson at knicholson@nacds.org  if you are interested in joining the Task Force but have a conflict for that time.

Kevin N. Nicholson, R.Ph., J.D.
Government Affairs and Public Policy
National Association of Chain Drug Stores
Tel: 703-837-4183

Manufacturers' participation in Defendants' trade groups as a means to effectuate favorable policies is clear when evaluated in the context of how Defendants and other stakeholders viewed the DEA's attempts to curb the opioid epidemic.

I wanted to say hello and I'm sorry that DEA is being so aggressive with this Suspicious Orders stuff.

I heard about your Lakeland, Florida distribution center effective next Monday. They're not going after your Jackson, MS distribution center, are they?

I wish there was something I could do to help in this situation  -  we are all in the same boat.

Best regards,

Jack

Jack Crowley
Executive Director
CSA Compliance
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
203-588-8613 (w)
203-273-2656 (c)

547.    Walgreens, like the other Defendants, recognized the importance of being able to control and influence trade groups such as the NACDS in the context of influencing policy related to opioid drug abuse and diversion. The efforts taken by the NACDS and other trade groups on behalf of Defendants were so important to their bottom line that Defendants spared no expense in

supporting such groups. Walgreens took a particularly aggressive view of this mutually beneficial relationship, at times, being its top donor across the country.

548.    NACDS worked with the HDA, the Alliance to Prevent the Abuse of Medicines ("APAM"), and the PCF to support the Marino Blackburn Bill, also known as S.483 or the "Marino Bill."  NACDS and Defendants intended the Marino Bill to "tie the hands" of the DEA to actively and aggressively address diversion and compliance with the CSA."  NACDS worked together with others in the opioid supply chain to influence the language in the bill to make it most favorable for them and more restrictive on the DEA.  Notably, masking the influence of industry, when the APAM was asked to sign on to a 2014 letter of support it was "signed by the Alliance, *not the individual members*."  The final letter that was sent to Senators Hatch and Whitehouse was signed by the members of the Pain Care Forum as well as the Alliance, the NACDS, American Academy of Pain Management, and U.S. Pain Foundation.

549.    The Marino Bill effectively removed the DEA's ability to issue immediate suspension orders regarding manufacturer or distributor registrations.  It also permitted a non-compliant registrant an opportunity to cure its noncompliance before the DEA could take enforcement action and changed the standard upon which revocation occurred.  In the midst of a growing opioid crisis, the Marino Bill removed the most effective deterrent and constrained DEA enforcement actions.  With respect to its efforts to tie the hands of the DEA in its ability to pursue and hold accountable Defendants and other stakeholders for violations of law related to the sale and distribution of prescription opioids, CVS appreciated NACDS's influence.

| From: | Schlaifer, Marissa C </O=CVSCAREMARK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARISSAC.SCHLAIFER> |
|---|---|
| To: | Kevin Nicholson |
| CC: | Eric Juhl; Gibbons, Thomas J.; Burton, Larry |
| Sent: | 10/28/2013 8:27:06 AM |
| Subject: | RE: No Policy Council Call this Week - Additional Items and Materials |

Kevin –

Good work on the changes to the Marino bill.  After reviewing the revised bill, our attorneys identified that it would still require drug testing/background checks of distribution center employees.  So, we'd still prefer that it be limited to new employees only.

Thanks for your work on this!
Marissa

550.    CVS as a member of the HDA, NACDS and the APAM was actively involved in efforts to curb the enforcement power of the DEA in its support of the Marino Bill.  Its history and ties to the HDA and NACDS run deep.

551.    The APAM is a trade group launched in the fall of 2013 and compromised of members of the American Medical Association, Cardinal, CVS, HDMA, Prime Therapeutics and Teva Pharmaceuticals.



552.     CVS and Defendants used trade groups like the HDA, NACDS and APAM to gain favorable results when it came to regulations and roadblocks that were seen as being in the way of the Defendants ability to capitalize on the opioid business. In particular CVS would often hide behind the APAM when it knew its position could be controversial as it related to abuse and diversion.  This particular letter was one in support of the controversial Marino Bill, a bill that CVS fought hard to push through, supporting it on three different fronts.

| From: | Schlaifer, Marissa C </O=CVSCAREMARK/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARISSA.SCHLAIFER> |
| To: | Jenkins, Ann |
| Sent: | 7/15/2014 5:16:24 PM |
| Subject: | RE: Alliance: HR 4709 Sign On Letter to Speaker Boehner - Deadline tomorrow at 3p |

Back to your question about whether the Alliance has signed rather than individual members:
It looks like they are proposing this because it's signing on to a group letter.  If it's a letter from the Alliance, it's always signed by the individual members.

This might work for us since our name won't be on it ... but that's your call.

Marissa Schlaifer, R.Ph. I CVS Caremark I Head of Policy I 1300 I Street, N.W., Suite 525 West, Washington, DC 20005 I 202-772-3538 I marissa.schlaifer@cvscaremark.com

553.     In August of 2011, NACDS worked with others on a joint letter opposing DEA fee increases for registrants that were intended to fund the "hir[ing of] more agents and do[ing] more inspections."

554.     HDA's Crisis Playbook, developed in 2013, was a direct response to the "threats" perceived by HDA's members and affiliates, including Defendants, to their bottom line: profits derived from the distribution and sale of prescription opioids.  Defendants did and continue to rely on and employ the strategies discussed in the Crisis Playbook. Curiously, there are no slides on how best HDA and its members, including Defendants, might work to curb the crisis that is the opioid epidemic.





555.    In 2016, the NACDS Policy Council discussed ongoing efforts to shape opioid legislation, including their success in removing a requirement that pharmacists have to check their state drug monitoring program before filling controlled prescriptions.  NACDS also fought regulatory efforts to require Defendants to use available dispensing related data and red flags to prevent diversion, opposing what it described as "recent DEA actions in which DEA is expecting pharmacists to be enforcement agents with respect to prescriptions for pain medications.

556.    NACDS and HDA sought to slow down and impede DEA enforcement activities by requiring the DEA to "work with the [Food and Drug Administration] FDA on all drug diversion issues," ostensibly on the grounds that the DEA's diversion enforcement activities – including "clos[ing] drug distribution centers and pharmacies" and "actions against pharmacies" were harmful in ""leading to patients not being able to receive their medications."  This purported concern, however, was industry code for impediments to sales.

557.    NACDS and HDA agreed that the pharmacies should "be more aggressive" and "lead the charge" with respect to certain DEA issues.  NACDS members coordinated regarding pharmacy diversion and "DEA red flags" through a "DEA Compliance Workgroup." Defendants further used a NACDS "Pharmacy Compliance Roundtable" to discuss avoiding criminal and civil liability for issues related to controlled substances, SOM, and diversion.  And, in May 2012, the NACDS formed a Policy Council "Task Group" to "discuss issues and develop strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions," through which it sought to influence the government and media set meetings with legislators seeking to "address the problems with DEA actions," and "collaborate with, and support others' efforts" including HDA.

558.    NACDS members coordinated regarding pharmacy diversion and "DEA red flags" through a "DEA Compliance Workgroup."  Defendants further used a NACDS "Pharmacy Compliance Roundtable" to discuss avoiding criminal and civil liability for issues related to controlled substances, SOM, and diversion.  And, in May 2012, the NACDS formed a Policy Council "Task Group" to "discuss issues and develop strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions," through which it sought to influence the government and media· set meetings with legislators seeking to "address the problems with DEA actions," and "collaborate with, and support others' efforts" including HDA.

**F.     Defendants Also Entered into Joint Ventures that Further Undermined their Outside Vendors' Incentive to Conduct Due Diligence, While Increasing their Own Access to Information.**

559.    The collaboration between Defendants and other industry partners extended beyond their mutual interest in limiting regulations and enforcement that constrained their ability to sell opioids. Indeed, the companies had direct financial relationships that, quite literally, invested them in each other's success.

560.    As described above, Walgreens entered into an exclusive arrangement with AmerisourceBergen as its supplier, with Walgreens obtaining both equity in AmerisourceBergen and a seat on its Board.  As part of a three-year extension of that arrangement, in 2016, the two agreed to include a requirement that AmerisourceBergen "make certain working capital investments in the relationship and will proceed with additional capital investments in its distribution network."

561.    The merger between Walgreens and AmerisourceBergen had begun in 2012, when the two formed Walgreens Boots Alliance Development, a joint venture based in Switzerland. AmerisourceBergen was described as being able to gain from Walgreens's "purchasing synergies," through the companies' relationship.

562.    In 2014, CVS entered into a 50/50 joint venture with Cardinal to create Red Oak Sourcing, LLC ("Red Oak").  Red Oak uses the combined generic purchasing power of CVS and Cardinal to negotiate with generic drug manufacturers, and its website touts its management of a "multi billion dollar pharmaceutical portfolio."  To fund the venture, Cardinal would make quarterly payments of *$25.6 million* to CVS, and also would contribute additional funds if the joint venture reached certain milestones.

563.    In 2016, McKesson and Walmart formed ClarusOne Sourcing Services LLP to source generic pharmaceuticals for their respective U.S. operations.  As part of this "partnership," McKesson and Walmart "established an organization in London to provide strategic sourcing services for both companies," according to a job posting on McKesson's website.

564.    Given that Walgreens, CVS, Walmart, on the one hand, the largest wholesalers, on the other, considered themselves partners invested in one another's success, they had even less incentive to turn away from the blind deference the Chain Pharmacies received when buying and selling controlled substances.

### G.    Defendants Worked with Opioid Manufacturers to Promote Opioids and Improperly Normalize Their Widespread Use

565.    The Chain Pharmacies not only failed to check the oversupply of opioids by violating laws and ignoring available safety measures, they were also a critical participant in the manufacturers' and distributors' campaign to create a sea change in the way opioid were utilized in the United States.  This campaign included spreading false messaging about the addictive nature of prescription opioids, creating the false perception that opioids should be widely utilized, actively promoting widespread opioid utilization, improperly increasing opioid sales beyond legitimate uses, and dismantling and undermining the last line of defense that was supposed to exist at the pharmacy level.

566.    As Purdue astutely recognized, the Chain Pharmacies were critical to the campaign to promote prescription opioid us, noting in internal documents:

> The pharmacist plays a vital role in pain management, as they are the last piece of the puzzle in getting patients prescriptions filled.  If the pharmacist is not educated in the use of OxyContin or has any misconceptions about the use of opioids, it can result in a prescription not getting filled and a patient suffering from needless pain.

> The pharmacist is the ultimate gate keeper.  At times, they can make or break the effective use of Oxycontin.  We are running into several cases of legal and regulatory issues, which has resulted in counter detailing of Oxycontin. Much of this is borne out of ignorance.

> The absolute last thing we want is for the OxyContin prescription to be bounced out at the pharmacy level because of unfounded fears from the "uneducated" pharmacist.

567.    Instead of playing the critical gatekeeper role that the Chain Pharmacies were supposed to play, they instead helped open the floodgates of dangerous opioid narcotics flooding into communities like the County.  The Chain Pharmacies participated in the multi-faceted campaign to spread misinformation about opioids and improperly increase the utilization and supply of opioids including by:

a.    Spreading false messages to pharmacists and patients through provider and patient "education" campaigns designed to improperly normalize widespread use of opioids;

b.    Direct marketing of opioids to patients, pharmacists and healthcare providers;

c.    In-store advertisements and advertising campaigns designed to drive sales of prescription opioids;

d.    Use of financial incentives such as coupon programs, rebate programs, and loyalty programs designed to drive opioid sales; and

e.    Driving the sale of opioid products through patient adherence programs designed to generate long-term opioid use.

568.    Starting in the 1990s, opioid manufacturers created a carefully orchestrated campaign to change the utilization of prescription opioids in the United States.  The Chain Pharmacies played a critical role in that campaign.  Indeed, for that campaign to work, the

thousands of pharmacists employed by the Chain Pharmacies and the patients they serviced had to be conditioned to accept the sea change in the use of opioids and be "re-educated" about their dangers.  In order for prescription opioids to achieve the blockbuster sales that occurred, their widespread had to be normalized not only with doctors but also with patients and pharmacists.

569.    Defendants worked as partners and conduits to spread the misinformation campaign orchestrated by opioid manufacturers to pharmacists and patients across the country, including the false messaging surrounding the use of opioids for the treatment of chronic pain and the true addictive nature of opioids, all in an effort to increase profits for all stakeholders.

570.    For example, as early as 2001, CVS worked closely with Purdue and its un-branded marketing arm, Partner's Against Pain ("PAP") to "fight back" against allegations (later proved to be true) that Purdue's Oxycontin was being abused at alarming rates.   It was Purdue's Partner's Against Pain website that Purdue, and its "Partners", including CVS, utilized to make the claims that the risk of addiction associated with Oxycontin was very small.

**PURDUE**

Stephen L. Seid
Sr. Director, National Accounts
and Trade Relations
(203) 588-7315

TO:    Jim Lang

FROM:    Steve Seid

RE:    CVS Pharmacy

DATE:    May 11, 2001

Jim, on May 2, 2001 Don Tasser and I met with three of the key pharmacy people at CVS.  They were:

—    Barry Jasilli, R.Ph., J.D., Director, Quality Improvement
—    Susan DelMonico, R.Ph., J.D., Director, Regulatory Compliance
—    Sharon Galzarano, R.Ph., Manager of Professional Practices

The goal of the meeting was to talk about mutually beneficial initiatives with CVS to improve education with their pharmacists.  We also wanted to reiterate our position on ensuring availability of OxyContin® for appropriate patients.  I think overall the entire meeting was very productive and the CVS people were extremely supportive.

Key issues discussed were as follow:

1    They were resolute in their commitment to good pharmacy practice.  Part of that good pharmacy practice is ensuring availability of OxyContin for appropriate patients.  Their goal is good patient care.

2    As a group they were vocal, particularly Barry Jasilli, indicating that they felt that Purdue was in many ways being victimized by the situation.  That the product is not the issue, but that the abuser is the issue.  He indicated that, from his perspective, we should be fighting back even harder.  We should be pointing out the benefits of our brand.

3    CVS will be sending out a copy of our Abuse and Diversion Brochure to 4,100 pharmacies.  Our letter will be personalized for the CVS pharmacist and cosigned by Barry Jasilli and Susan DelMonico.  They will also be sending out a version of the Abuse and Diversion Brochure with their logo.

4    CVS will also put a copy of the Abuse and Diversion Brochure on their intranet site called RxNet.

5    They will be looking to utilize both of our written CE Programs, in particular, for new grads coming to work for CVS.

6    They talked about being more preemptive with our joint educational efforts.  We will be setting up at least five programs at this time through CVS.

7    They talked about the possibility of co hosting programs in areas of healthcare professionals.  I don't know if there was a unanimous agreement among the CVS people, but we will follow up to see if that is possible.  Susan DelMonico will be the point person for CE Programs.

I believe we are garnering some significant support with CVS.  Don Tasser will ensure follow up on these key programs.

571.    Purdue worked together with CVS to ensure that CVS's own pharmacists were trained by Purdue on many of the misleading marketing messages that would later form the basis for a 2007 criminal guilty plea and $600 million fine between Purdue and the Department of Justice for misleading regulators, doctors, and patients about Oxycontin's risk of addiction and its potential for abuse.  CVS's ties to PAP were so deep that CVS even went so far as to put CVS's logo communications from its "partner".



572.    CVS was so eager to ally itself with Purdue and its profits that it solicited Purdue for its participation in co-hosting Continuing Education programs for healthcare providers and pharmacists regarding training on diversion of prescription opioids.



*Request for Support:*
*CVS "Quality First™ Communication Skills"*
*Continuing Education Program*

Over the last decade, and continuing today, pharmacy practice has evolved dramatically. As part of this evolution, we have witnessed a pharmacist's role change from one of a dispenser of products to that of a supplier of information, deliverer of medication, clinical reviewer of drug therapy, and even disease state manager. In order to be prepared for this enhanced role, we must continue to educate our pharmacists on the importance of superior communication skills, especially in light of new, often aggressive therapies, including that of pain management therapy. These communication skills are not limited to patients, and apply just as significantly to interactions with other health care professionals. We all recognize the challenges that often accompany community practice, and thus we must also educate pharmacists and technicians on topics that include time efficient patient counseling, and even conflict resolution.

We have always enjoyed a positive relationship with Purdue Pharma, and most recently our productive and pleasant interactions with Mr. Stephen Seid and Mr. Donald Tasser, have allowed us to work together to share the informational brochure entitled *"How to Stop Drug Diversion, and Protect Your Pharmacy"* with our pharmacists. This joint initiative was advantageous to both of our organizations. Based on this success, and our productive history with Purdue, we are offering what we believe will be another mutually beneficial opportunity. As part of our Quality First™ program, a comprehensive program that addresses quality related issues, we are hosting a series of Continuing Education sessions for our pharmacists. This series will contribute significantly to our strategic business goals, and thus we anticipate nearly 100% attendance by our pharmacists. This program is considered a critical part of our business plan, and thus we'll be presenting and promoting it at our annual Operations/Marketing Conference in Nashville, this September.

In Nashville, our Regional Healthcare Managers (who are all pharmacists) will be trained by Dr. Daniel Teat, of Campbell University School of Pharmacy, who has designed a multiple-hour Communication and Conflict Resolution CE program, and Barry Jasilli, R.Ph., J.D. Dr. Jasilli has produced a three-hour CE that addresses prescription accuracy. Incorporated into the CE would be examples (role playing opportunities) of how to handle situations which are often associated with Purdue's products. By way of example: how to communicate effectively with patients and physicians about appropriate pain management therapy, and how to resolve potential conflict with a drug "seeker".

573.



574. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



575.

576.    CVS's refusal to take responsibility for its role in the crisis, including pointing the finger at manufacturers like Purdue, has been part of its game plan all along.

577.    One would have to seriously question the accuracy of any training CVS pharmacists received from Purdue and Partners Against Pain on abuse and diversion, yet there has been no evidence provided by Defendants that CVS undertook any measures to re-educate its pharmacists

on how or why Purdue and PAP training might be lacking in the area of diversion and abuse of opioids.

578.    CVS's role was not limited to expanding the market for prescription opioids.  CVS worked hard to ensure that demand for prescription opioids was not only sustained, but multiplied. It did so through its marketing, advertising and promotion efforts both on its own and in concert with other stakeholders.

579.    Contrary to what CVS has stated under oath in written discovery in the MDL, CVS helped to grow the demand for prescription opioids and contributed to the public nuisance by participating in the marketing, advertising and promotion of opioid products with and on behalf of the opioid manufacturers.

> **INTERROGATORY NO. 20**:  State whether You have ever had any involvement, role or relation, directly or indirectly, financial or otherwise, with the marketing, advertising and/or promotion of any Opioid or Opioid Products conducted and/or directed by any manufacturer of Opioids or Opioid Products, from 1990 to the present.  If so, state the manufacturer, the date or dates of any such advertising, marketing and/or promotion and the nature of Your involvement.

> Subject to and without waiving these objections, the CVS Distributors did not market Schedule II Opioids during the Subject Period.

580.    CVS's marketing and promotion of opioids was not limited to its involvement with Purdue and Partners Against Pain. CVS did not draw lines when it came to promoting opioids, and there were no brand boundaries.

581.    One example can be found in CVS's work with Endo to increase patient adherence to continuing their use of opioids. In fact, CVS had such an important role in the promotion of

Endo's Opana ER, that it was included as having a crucial role in carrying out one of key sales

tactics in Endo's 2012 Business Plan.



582.    Through a company called Catalina Health ("Catalina"), Endo Pharmaceutical

("Endo") helped CVS to target Oxycontin patients in areas where Opana ER, a highly abused

opioid manufactured by Endo, had preferred formulary status.  Catalina in turn worked to create a brand loyalty program that kept new patients on their opioids.  CVS, through its pharmacy retention programs, sent letters to the patients' homes to encourage them to stay on Opana – even though prolonged use of opioids increases the risk of addiction, and even though patients in pain presumably need no reminder to continue to take their pain medications.  CVS formalized its agreement to promote, market and advertise Endo's opioid products via its "CVS Carecheck Plus Patient Education Service"



Under this Agreement, CVS not only contractually agreed to promote Opana ER to its customers (patients) at the point of sale, but it even insisted upon reviewing and ***approving*** the specific messaging used.



583.    Similarly,  CVS  contracted  with  manufacturers  like  Endo  to  ***prepare***  and disseminate materials promoting Opana ER nationwide.



584.     CVS likewise helped Actavis promote its opioids by participating with Cardinal's

Marketing and Business Development team in programs designed to offer rebates and off-invoice

discounts on products, with the aim being to "move … product."

> Beneficial for both new and existing products, the *RxDeals* offering is customized to meet your
> unique needs and is designed to provide special offers – rebates or off-invoice discounts – to
> retail chain and independent pharmacies, including CVS and Walgreen's, to help move your
> product.
>
> Contact your Marketing and Business Development Sales Representative today and *RxDeal*
> your way to maximizing your sales!
>
> ⇒View this week's *Service Flash*
>
> Thanks and have a great week!
>
> *The Marketing and Business Development Sales Team*
>
> **Jeff Foreman, RPh**
> Vice President, Strategic Purchasing / Branded Purchasing
> Office: 614.757.6674
> jeff.foreman@cardinalhealth.com

585.     Marketing, advertising and promoting opioids was not a new practice for CVS. In

fact, CVS had been advertising these services to manufacturers for years. For example, CVS made

at least one pitch to Insys, a company whose senior executives were recently criminally convicted

for their unlawful marketing, to help sell its incredibly potent opioid, Subsys, a liquid form of

fentanyl.



586.    CVS also touted the reach of its communications and explained the science behind its sophisticated marketing, advertising and promotional services.





587. Hardly novices, CVS recognized its expertise in ensuring that opioid manufacturers like Insys were able to reach their intended market by using CVS's promotional programs which are designed to "deliver results."



588. Through CVS's NEWScript program, CVS claimed to be perfectly poised to assist with new product launches and a truly impressive reach.



CVS even offered Insys the chance at having a literature display in its patient waiting rooms and to help Insys "target patients" using its signature ExtraCare consumer loyalty card database.



589.     Working with Purdue as early as 2001, Walgreens played a pivotal role in expanding the market and ensuring the demand and supply for prescription opioids would grow to tragic proportions. Purdue was particularly interested in using what Walgreens described to Purdue as its Regional Level Market Programs to educate pharmacists and patients on the benefits of Purdue's OxyContin.



In fact, Purdue leveraged its relationship with Walgreens and their mutually beneficial goal of growing the opioid business to ensure that Purdue had input into Walgreens "*corporate guidelines*" to which Walgreens pharmacists were "expected to follow" when it came to the dispensing of prescription opioids.

590.    Walgreens also used its corporate oversight abilities to identify stores it believed were not filling enough oxycodone to make sure they weren't "turning away good customers" and encouraging stores to utilize continuing education created by opioid manufacturers to inform their decisions regarding dispensing.

591.    Starting in at least 1999, Purdue sponsored Walgreens's Pharmacy continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon."[49] Purdue was thrilled with the response and assistance it received from Walgreens when Purdue presented on "Pain Management for the Pharmacist." At the beginning of each Purdue sponsored meeting, a Walgreens pharmacist made a presentation on his store and the program implemented.  His store actively advertised to area doctors and patients that they were a "full-service" pain management pharmacy.  This service included providing a list to physicians' offices of all CIIs they had in stock (and they had everything), accepting "verbal orders" for Class II analgesics prior to presentation of the original prescription at the store to decrease "waiting time", allowing partial fills on CII prescriptions in terminal patients, and accepting after hours "emergency CII prescriptions" without a hassle.  Purdue praised the pharmacist's actions as "fantastic".

592.    Walgreens's use of pro-opioid continuing education continued as the opioid crisis grew. For example, Walgreens's Market Director of Pharmacy Operations recommended that Walgreens District Managers and Pharmacy Supervisors attend a continuing education program titled ""The Pharmacists' Role in Pain Management: A Legal Perspective," which was available on-line at RxSchool.com.  This program was one in a long line of pharmacist "education" programs, or CEs, that opioid manufacturer Purdue developed as part of its strategy to disseminate

---

[49] PPLPC025000005258.

"a new school of thought" about opioids. Through these programs, Purdue and the Chain Pharmacies disseminated fraudulent information that redefined the red flags of abuse or diversion in an effort to correct pharmacists' "misunderstanding" about pain patients and the practice of pain management.  Purdue took what it called an "aggressive role" in the education of Walgreens's and other pharmacists on pain management issues.

593.    Walgreens's Market Director of Pharmacy Operations also recommended a second continuing education program titled "Navigating the Management of Chronic Pain: A Pharmacist's Guide."   The second "CE" incorporated into Walgreens's dispensing training program, "Navigating the Management of Chronic Pain: A Pharmacist's Guide" was sponsored by opioid manufacturer Endo Pharmaceuticals and disseminated manufacturer messaging designed to broaden the market for opioids.  For example, it stated "according to most reports, approximately 30% of the population lives with chronic pain" and citing, *inter alia*, another CE presentation sponsored by the American Pain Society (another known front-group).  It also claimed that "most opioid adverse effects can be managed with careful planning and patient education."  It went on to discuss "fears and prejudices" related to addictive behaviors that "unnecessarily limit" opioid use, described as "opiophobia" which the piece claimed was the result of "misunderstandings regarding the concepts of addiction, physical dependence, and tolerance."

594.    One of the presenters for this Endo sponsored CE was Kenneth C. Jackson.  Mr. Jackson was a frequent speaker and Key Opinion Leader ("KOL") for Purdue. Mr. Jackson also co-authored the CE program titled "Use of Opioids in Chronic Noncancer Pain", which was sponsored by Purdue.  Released in April 2000, it was designed to eliminate "misconceptions about addiction, tolerance and dependence" and contained many of the same messages as the pharmacist guide he authored.

595.    Walgreens also presented the video, The Pharmacist's Role in Pain Management -
A Legal Perspective, at mandatory meetings for pharmacy managers.  This continuing education
program ("CE") was also sponsored by Purdue, was similar to the earlier presentations, and was
further disseminated to Walgreens pharmacists in June 2011.  Released in 2009, the program was
presented by Jennifer Bolen, JD.  Ms. Bolen was a frequent speaker for Purdue and other opioid
manufacturers, served as Special Counsel for the American Academy of Pain Medicine (a known
front group for opioid manufactures), acted as a Key Opinion Leader ("KOL") for Purdue, and
was described by Purdue as "a pain patient who takes opioids."

596.    Armed with information gleaned from Purdue sponsored CE, the Walgreens
pharmacists who had temporarily stopped filling controlled substances prescriptions began to
accept them again.  It is no surprise that in 2013 Walgreens acknowledged that several of the stores
that touted this CE as part of their controlled substance action plan dispensed "certain controlled
substances in a manner not fully consistent with its compliance obligations under the CSA."

597.    Rite Aid also helped to expand the market and increase the demand for prescription
opioids by working in concert with manufactures like Purdue. Capitalizing on Rite Aid's reach,
Purdue worked with Rite Aid as early as 2001 to promote its highly addictive, OxyContin.  The
return on investment ("ROI") of such a program was clear to both Purdue and Rite Aid, as
described below.

> **To:** Stup, Sharlene
> **Cc:** Geiwitz, Dr. Allen; Terifay, Terrence
> **Subject:** Rite Aid Program
>
> Sharlene:
>
> I wanted to follow up regarding today's pharmacy program with Dr. Al Geiwitz at the Rite-Aid Corporate Office. Dr. Al addressed in great detail an overview of pain management, the JCAHO pain standards, and most importantly the abuse and diversion issues. Dr. Al's discussion was well received and greatly appreciated by all in attendance, especially John Boyle, Regional Pharmacy Development Manager.
>
> Our ROI will best be defined by John, whose regional coverage extends to over 120 stores in Northeast Philadelphia, North Philadelphia, Mt. Airy, Bucks County, and other outreaches within our district. This is of great importance because prior to this program, John and many other pharmacists had concerns with regulatory issues surrounding purchasing quantities of OxyContin and identifying appropriate patients. Now, John has made himself available as an advocate and is willing to assist in our efforts in proper pain management education.
>
> Sharlene, I am personally pleased with the efforts put forth by myself regarding this program. As you know, Rite-Aid has presented numerous challenges to the Philadelphia District in the past. I believe that by creating the need for proper education, I have the opportunity to make significant progress with the key Rite-Aid pharmacies in my territory.
>
> Sincerely,
> Heather

Both Purdue and Rite Aid recognized the importance of a chain pharmacy and pharmacist in the efforts to expand and sustain the demand for prescription opioids. As the last line of defense, "[Purdue's] pharmacists at the retail level" were the "most important audience. . . in highly sensitive areas" – presumably those already impacted, even in 2001, by the opioid epidemic.

> -----Original Message-----
> **From:** Lombardo, Ralph
> **Sent:** Wednesday, April 18, 2001 10:29 PM
> **To:** Cook, Dr. Mary; Geiwitz, Dr. Allen; Cramer, Phil
> **Cc:** Richards, Tim; Gasdia, Russell; DaBronzo, Dr. Joseph
> **Subject:** FW: Rite Aid Program
>
> I want to thank Dr. Al, Dr. Mary Cook and Dr. Dabronzo for supporting our efforts in the Philadelphia area. This paid off. I received a voice mail today from Heather Peterson through Sharlene Stup informing us the Rite Aid DM asked her to be there today to do inservices for 25 more pharmacists and arranged for her to come back in the near future to address the rest of the pharmacists who were unable to attend. Our pharmacists at the retail level may be our most important audience right now, especially in the highly sensitive areas.
>
> Thanks again
>
> Ralph

598.    Kroger welcomed Purdue's marketing into its stores.  Following an NACDS conference, a Purdue employee described Kroger's Pharmacy Procurement Manager in attendance as "very positive as to what Purdue is doing" and "interested in doing programs . . . a regional level" and with Purdue's "various brochures included."  He also described making another new contact at Kroger, who had agreed to send Purdue's brochure and letter out electronically.  An "account contact report" from Purdue further described the results of communication with Purdue's Pharmacy Category Manager, who "was very supportive and understanding" about Purdue's "ongoing OxyContin media battle" in 2001.  Not only would Purdue's "Pharmacy brochure and letter" be sent out to all Kroger Pharmacy Directors in each division and when Kroger's employee's "co-sign the letter" it would have "better impact."  Purdue would also send out its continuing education ("CE") programs on pain management.

599.    Similarly, Walmart teamed up with Purdue to spread misinformation about prescription opioids.  As early as 1995, Purdue and Walmart launched presentations utilizing pro-opioid key opinion leaders to pharmacists across the country.  As Purdue described, "The Program [on pain management] will originate from Walmart's Studios in Bentonville, AR and sent by satellite to more than 2,000 stores across the country.  It is expected that as many as 4,000 pharmacists and district managers will either attend the session or view the video tape."

600.    The Chain Pharmacies coordinated marketing efforts to their pharmacists and staff regarding opioids at trade shows, through email blasts, mailers, brochures to promote the idea that opioids were safe for widespread utilization, that pain was undertreated, and the appropriate treatment of pain were opioid drugs.

601.    Opioid manufacturers paid the Chain Pharmacies to conduct internal marketing to pharmacists and pharmacy staff.  For example, internal documents illustrate the reach the Chain Pharmacies could offer for opioid manufacturers' marketing messages:

## Walgreens Communication Program

**Walgreens**

**Purpose:** The program is designed to provide a communication mechanism for pharma mfg. to distribute key changes to their products to our store pharmacists and technicians.

**Audience:** Walgreens store pharmacists and Technicians.

**Services:** The program has two components. First, ¼ to 1/3 page message will be placed one time in the weekly pharmacy update that is distributed to all of Walgreens retail stores. Second, a 2 page monograph will be posted on storenet, Walgreens Intranet for pharmacist and technician reference for 6 months.

**Development:** WHS Clinical team will develop both the key message for the stores and the 2 page monograph. The manufactures will be responsible for providing information to WHS that will be used to develop the messages to go into the weekly pharmacy update and intranet overview. Manufacturers will be able to review message before sending to the field.

**Price:** The fee for the service is $15,000 to be paid net 30 days after communication is posted in the weekly update.

Breakdown of expenses:        $5,000 for development

## Rite Aid Communication Programs

**Virtual Trade Show** is an internet portal that is available to over 30,000 pharmacy associates. This portal will serve as the access point for viewing pharmaceutical manufacturer promotional videos that detail current products.  Each month a select group of manufacturer videos will be made available for pharmacy associate viewing. Each video can contain up to four minutes of content with the option to include multiple products.  Each video segment will be followed by a manufacturer-provided questionnaire to confirm content understanding.  Upon completion of each video segment, the associate will receive one credit towards an entry into a monthly drawing for select giveaways. To qualify for credits the videos need to be watched by the end of the designated month.  Completion of a manufacturer-supplied quiz will be required to receive credit for watching each video.  Videos will be made available for repeat viewing for 90 days post-publication.

**Medication Minute -** Rite Aid Drug Information Center publishes a monthly Clinical Update with unbiased, factual and relevant news and timely educational themes for their stores. Also offered to manufacturer is a Clinical Update Special Product Edition. This publication addresses awareness of a therapy issue or change in strategy which is critical to a manufacturer during launch or when a new feature or result is discovered.

**Product Announcement (Electronic) -** Product specific message sent electronically to all dispensing Rite Aid Pharmacists (full and part-time) and Pharmacy Field Management to communicate important product information.  The product description, NDC number, pack size, Rite Aid order number, AWP price, information regarding availability, stocking and/or distribution and a brief note of the product use would be included.

602.    These are but some examples.  Since acting as a key participant in the expansion of the market and normalization of prescription opioids in the 1990s and 2000s, for decades, the Chain Pharmacies continued to offer "education" programs designed to grow and maintain the market for prescription opioids by changing perceptions of pharmacists and staff so that the "last line of defense" to increased opioid supply would be relaxed and sales would occur without restriction.

603.    This pervasive misinformation campaign was critical to the dramatic shift in the way opioids were utilized in the United States and was a key factor in creating the dramatic oversupply of opioids into the United States and Plaintiffs' community.  The Chain Pharmacies played a key role in that campaign.

**H.**   **Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement**

604.   When a distributor does not report or stop suspicious orders, or a pharmacy fails to maintain effective policies and procedures to guard against diversion, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse.  This, in turn, fuels and expands the illegal market and results in opioid-related overdoses. Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action—or may not know to take action at all.

605.   Despite their conduct in flooding Georgia and other states with dangerous and unreasonable amounts of opioids, Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion.

606.   In its 2011 MOA, Walgreens agreed to undertake several different anti-diversion measures.  Yet, as a DEA official explained in a subsequent Order to Show Cause and Immediate Suspension of its registration that was issued a mere month later and pertained to Walgreens's Jupiter Florida Distribution Center, Walgreens's "anti-diversion" measures appeared to be primarily self-serving:

> [W]hen a company undertakes to survey its stores for regulatory compliance, then selectively edits that survey for the explicit purpose of avoiding evidence of its own non-compliance, as Walgreens apparently did in May 2011, claims of effective remedial measures have less credibility. I gave significant weight to the fact that Walgreens appears to have deliberately structured certain of its antidiversion measures to avoid learning about and/or documenting evidence consistent with diversion. At best, I regard this as deliberate indifference on Walgreens'[s] part as to its obligations as a DEA registrant.
>
> My confidence in Walgreens'[s] remedial measures is lessened further by the fact that this manipulation of the compliance survey occurred just one month after Walgreens entered into a nationwide Memorandum of Agreement (MOA) with DEA to resolve an Order to Show Cause issued to a San Diego Walgreens pharmacy based on

allegations of unlawful dispensing. . . . Walgreens'[s] effort to enact
. . . [a compliance] program in Florida appears to have been, in part,
intentionally skewed to avoid actually detecting certain evidence of
possible diversion.

607.     Despite the behavior described above, Walgreens nevertheless publicly portrayed itself as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.

608.     In August of 2018, after journalists at the Washington *Post* disclosed information gleaned from the ARCOS data regarding the staggering number of opioids Walgreens distributed and sold, Walgreens again publicly promoted itself as being and "ha[ving] been an industry leader in combatting this crisis in the communities where our pharmacists live and work." Walgreens further asserted that "Walgreens pharmacists are highly trained professionals committed to dispensing legitimate prescriptions that meet the needs of our patients."[50]

609.     Yet, in January 2020, Walgreens released a Board Report on Oversight of Risks Related to Opioids. There, it claimed that: "In recent years, the Company has implemented a number of operational changes that it believes have helped to reduce its risk with respect to its dispensing of prescription opioids. The Company is focused on the continuous improvement of its controlled substances compliance program, implementing enhancements to prevent, identify and mitigate the risk of non-compliance with federal and state legal requirements."[51] It went on to tout its "Good Faith Dispensing policy," as "provid[ing] the foundation for our pharmacists to

---

[50] Aaron C. Davis & Jenn Abelson, *Distributors, pharmacies and manufacturers respond to previously unreleased DEA data about opioid sales*, Washington Post (Aug. 8, 2019), https://www.washingtonpost.com/investigations/distributors-pharmacies-and-manufacturers-respond-to-previously-unreleased-dea-data-about-opioid-sales/2019/07/16/7406d378-a7f6-11e9-86dd-d7f0e60391e9_story.html.

[51] https://s1.q4cdn.com/343380161/files/doc_downloads/governance_guidelines/Board-Report-on-Oversight-of-Risk-Related-to-Opioids-June-2019-rev.-August-2019.pdf.

understand their roles and responsibilities when dispensing prescriptions for controlled substances."  It also claimed that "the Company conducts its own voluntary, independent review of controlled substance purchase orders placed by our pharmacies, providing an additional layer of review above and beyond the legally required monitoring performed by the wholesalers." There, Walgreens's Board acknowledged that the "fundamental elements of an effective compliance program include," among other things, "[w]ritten policies, procedures, and standards of conduct setting forth the Company's expectations and requirements for operating all business activities in an ethical and compliant manner"; "[o]versight of the Compliance Program by the Global Chief Compliance and Ethics Officer, Compliance and Ethics Officers for each operating division, and Compliance and Governance Committees"; and, "[a]uditing and monitoring."

610.    With respect to compensation, the Board stated: "[w]e have a strong pay-for-performance philosophy."    Accordingly, its "Compensation and Leadership Performance Committee," the Board explained, "aims to incent leaders to support the Company's culture and model desired behaviors, ensuring ethical behavior and mitigating risks, through ongoing monitoring, reviewing and governance of all incentive plans."

611.    Yet, at the end of January 2020, the New York *Times* revealed that Walgreens had not reformed its policies putting speed ahead of safety and pharmacists continued to feel pressed to do more with less.  According to the article, pharmacists at Walgreens and Rite Aid stores "described understaffed and chaotic workplaces where they said it had become difficult to perform their jobs safely, putting the public at risk of medication errors."[52]  The article explained that these pharmacists  "struggle to fill prescriptions, give flu shots, tend the drive-through, answer phones,

---

[52] Ellen Gabler, *How Chaos at Pharmacies Is Putting Patients at Risk*, New York Times, (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html.

work the register, counsel patients and call doctors and insurance companies," while "racing to meet corporate performance metrics that they characterized as unreasonable and unsafe in an industry squeezed to do more with less."

612.    Citing company documents, the article showed that Walgreens continues to tie bonuses to achieving performance metrics.  Walgreens, in response stated that errors were rare and that "it made 'clear to all pharmacists that they should never work beyond what they believe is advisable.'"  Similarly, CVS assured that "[w]hen a pharmacist has a legitimate concern about working conditions, we make every effort to address that concern in good faith."

613.    Meanwhile, the New York *Times*'s coverage disclosed that a CVS form for staff members to report errors internally asked whether the patient poses "a 'media threat.'"  According to the article, "[t]he American Psychiatric Association is particularly concerned about CVS, America's eighth-largest company, which it says routinely ignores doctors' explicit instructions to dispense limited amounts of medication to mental health patients."  The group's president further observed that ""[c]learly it is financially in their best interest to dispense as many pills as they can get paid for[.]

614.    Following its Texas settlement, Walmart claimed that the agreement pertained to a small number of stores in that state and claimed that Walmart was "eager to comply with the law."[53]  A Walmart spokesperson further claimed that: "We take record keeping seriously[,]" and "[w]e continuously review our processes at our pharmacies to ensure they are accurate and in full compliance with the law."

---

[53] Associated Press, *Wal-Mart Settles Drug Records Accusation*, (Jan 7, 2009), http://prev.dailyherald.com/story/?id=262762.

615.    More recently, Walmart reportedly claimed to be cooperating with a federal investigation and "taking action to fix its opioid dispensing practices."[54]  In fact, however, Walmart subsequently "acknowledged that it halted its cooperation in mid-2018."  And as noted above, the DOJ has filed suit against Walmart for its opioid distribution and dispensing practices.

616.    Rite Aid similarly claims to be committed to working with "both federal and state agencies to help reduce the opioid epidemic that is impacting our communities throughout the United States."[55]

617.    Kroger, too, claims to be "committed to partnering with our associates, customers, communities and" other "companies like" its outside supplier "Cardinal Health to help solve the opioid epidemic."[56]

618.    Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, all Defendants through the joint amicus brief filed by the HDA and NACDS in *Masters Pharmaceuticals*, described above, made the following statements:[57]

> "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

> "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

---

[54] Jesse Eisinger and James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (March 25, 2020), https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment.

[55] Rite Aid, Pharmacy, Health Information, https://www.riteaid.com/pharmacy/health-information

[56] https://www.cardinalhealth.com/en/about-us/corporate-citizenship/combating-opioid-misuse/news/kroger-and-cardinal-health-to-co-host-drug-take-back-events.html

[57] Brief for HDMA and NACDS, 2016 WL 1321983, at *3-4, 25.

619.    NACDS, in response to media coverage concerning pharmacy working conditions and safety concerns, said that "'pharmacies consider even one prescription error to be too many' and 'seek continuous improvement.'"[58]  NACDS also claimed one should not "assume cause-effect relationships" between errors and the workload of pharmacists" such as "distraught pharmacists" who conveyed concerns to state boards and associations "in at least two dozen states."

620.    The NACDS also filed an amicus brief supporting Walmart's motion to dismiss in the DOJ action described above.

621.    Through the above statements made on their behalf by their trade association, and other similar statements assuring its continued compliance with their legal obligations, Defendants not only acknowledged that they understood their obligations under the law, but further affirmed that their conduct was in compliance with those obligations. In doing so, Defendants further delayed efforts to address the growing opioid epidemic.

I.    **Multiple Enforcement Actions Against the Chain Pharmacies Confirm Their Compliance Failures**

622.    The Chain Pharmacies have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the Chain Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. Upon information and belief, based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, the failures of national policies and practices of the Chain Pharmacies.

---

[58] Ellen Gabler of the New York Times, Pharmacists at CVS, Rite Aid and Walgreens Are Struggling With Understaffed and Chaotic Workplaces, Chicago Tribune (Feb. 3, 2020), https://www.chicagotribune.com/business/ct-biz-nyt-pharmacy-mistakes-20200201-wp2ftrt2sjhfvjwnmwbtnl3y3i-story.html

1.    **CVS**

623.    CVS is one of the largest companies in the world, with annual revenue of more than $250 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants, CVS sought profits over people.

624.    CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States DOJ. It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

625.    Confirming its systemic failures to implement and adhere to adequate controls against diversion, CVS has repeatedly faced enforcement actions. In May 2020, CVS's Omnicare subsidiary agreed to pay a $15.3 million civil penalty as part of a settlement with the DEA resolving allegations that it improperly dispensed opioids and other controlled substances to long-term care facilities without a valid prescription.

626.    In March 2019, CVS Pharmacy, Inc. (including all of its relevant subsidiaries and affiliates) entered into a $535,000 settlement with the U.S. Attorney's Office for the District of Rhode Island, acting on behalf of the United States and the DEA's Providence Office. In connection with the settlement, a DEA agent stated: "Pharmacies put patients at risk when they dispense Schedule II narcotics, which have the highest potential for abuse, without a valid and legal prescription."[59]

---

[59] https://www.dea.gov/press-releases/2019/04/16/cvs-pay-535000-filling-invalid-prescriptions.

627.     In August of 2018, CVS paid $1 million to resolve allegations that CVS pharmacies throughout the Northern District of Alabama violated record-keeping requirements under the CSA and its implementing regulations, the largest civil fine paid in Alabama by a DEA registrant.

628.     In June of 2018, CVS paid $1.5 million to resolve allegations that CVS pharmacies in Long Island, New York failed to timely report the loss or theft of controlled substances, including hydrocodone, recognized as one of the most commonly diverted controlled substances.

629.     In July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[60]

630.     This fine was preceded by numerous others throughout the country.

631.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

632.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

633.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

---

[60] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't of Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act.

634.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

635.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug.   Additionally, the government alleged that CVS had recordkeeping deficiencies.

636.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

637.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

638.    In 2013, CVS agreed to pay $11 million to resolve allegations it violated the CSA and related federal regulations at its retail stores in Oklahoma and elsewhere by: (1) creating and using "dummy" DEA registration numbers on dispensing records, including records provided to

state prescription drug monitoring programs; (2) filling prescriptions from prescribers who lacked current or valid DEA numbers; and (3) substituting the DEA number of non-prescribing practitioners for the DEA numbers of prescribers on prescription records.

639.　Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

640.　DEA hosted a December 8, 2010, meeting attended by CVS' Head of Pharmacy Professional Services, Papatya Tankut, and the CVS district supervisor before initiating an enforcement action.  CVS's counsel acknowledged at that time "that CVS was aware of the pill mill and/or pain clinic situation and the diversion of controlled substances, primarily oxycodone, in Florida," and that it received an October 2010 plea from a local sheriff "to work with law enforcement and closely scrutinize the prescriptions they receive."[61]  The DEA advised CVS "that the diversion of oxycodone, primarily originating from purported pain clinics, involves fraudulent prescriptions, doctor shoppers, and unethical doctors. CVS was further advised of the typical 'red flags' associated with the diversion of controlled substances that a pharmacy should be familiar with in order to carry out its corresponding responsibility to ensure that the controlled substances are dispensed for a legitimate medical purpose. Some of the 'red flags' discussed included: (a) many customers receiving the same combination of prescriptions (i.e., oxycodone and alprazolam); (b) many customers receiving the same strength of controlled substances (i.e., 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam); (c) many customers paying cash for their prescriptions; (d) many customers with the same diagnosis

---

[61] Decl. of Joseph Rannazzisi, *Holiday CVS, L.L.C., v. Holder*, Civ. No. 1:12-cv-191 (D. D.C Feb. 24, 2012).

codes written on their prescriptions ([e.g.], back pain, lower lumbar, neck pain, or knee pain); and

(e) individuals driving long distances to visit physicians and/or to fill prescriptions."[62]

641.    CVS also acknowledged its awareness of an increase in oxycodone prescriptions at

Florida CVS stores during the December 2010 meeting.  DEA discussed with CVS an ARCOS

summary which showed a "huge" increase at one CVS store, which was already ordering "more

than four times the amount of oxycodone a typical pharmacy orders in one year" in 2006; a more

recent 10-month history showed that it ordered "more than thirty times what a typical pharmacy

ordered in one."[63]  During the same meeting, DEA also made clear that CVS's instruction to its

pharmacists to call the prescriber to verify that a physician wrote the prescription was not the same

thing as making an independent determination that the prescription was written for a legitimate

medical purpose in the usual course of professional practice.

642.    DEA then hosted a second meeting with CVS at the DEA Weston Resident Office

On August 12, 2011.  Some 24 supervisors/managers from various South Florida CVS pharmacies

attended that meeting.  At that meeting, the DEA again reminded CVS of its corresponding

responsibility under the CSA and:

> the typical 'red flags' associated with the diversion of controlled
> substances that a pharmacy should be familiar with in order to carry
> out its corresponding responsibility to ensure that the controlled
> substances are dispensed for a legitimate medical purpose.  Some of
> the 'red flags' discussed included: (a) many customers receiving the
> same combination of prescriptions; (b) many customers receiving
> the same strength of controlled substances; (c) many customers
> paying cash for their prescriptions; (d) many customers with the
> same diagnosis codes written on their prescriptions; (e) individuals
> driving long distances to visit physicians and/or to fill prescriptions;
> (f) customers coming into the pharmacy in groups, each with the
> same prescriptions issued by the same physician; and (g) customers

---

[62] *Id.* ¶ 28.

[63] *Id.* ¶ 31.

with prescriptions for controlled substances written by physicians not associated with pain management (i.e., pediatricians, gynecologists, ophthalmologists, etc.)."[64]

643.    The meeting also stressed the importance of CVS's obligations: a presentation included "statistical information' that "showed drastic increases in prescription drug overdose deaths."[65]

644.    After the DEA executed Administrative Inspection Warrants at two Florida CVS stores discussed in the meetings, interviews with CVS pharmacists revealed that no one spoke with the pharmacist in charge of one store about the staggering amounts of oxycodone discussed in CVS's December 2010 meeting with the DEA and the pharmacist was unfamiliar with multiple red flags.  Further, other CVS employees believed that "polic[ing] the patients" was outside their job description and they were filling prescriptions that were "probably were not legitimate."[66]  The CVS employees "consistently ignored the red flags of controlled substance diversion,' and, until CVS faced heightened DEA scrutiny, filling prescriptions for more than twenty prescribers who later faced enforcement action themselves, none of whom were located in the same city as the stores, and most of whom were some distance away."[67]

### 2.    Walgreens

645.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion.  According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

---

[64] *Id.* ¶¶ 35-36.

[65] *Id.* ¶ 34.

[66] *Id.* ¶ 41.

[67] *Id.* ¶¶ 43 & 54-55.

646.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history at the time—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.  These actions demonstrate Walgreens's knowledge of, and disregard for, its obligations to prevent diversion.

647.    On September 30, 2009, the DEA issued an Order to Show Cause against a Walgreens retail facility in San Diego, California based in part on allegations that it was dispensing controlled substances, including opioids, to individuals that it knew or should have known were diverting the controlled substances.  Although the Order addressed this specific location, the response, including Walgreens's internal assessment of its compliance, or lack thereof, revealed systemic failures from which its pharmacies in the County would not have been exempt.

648.    In April 2011, Walgreens entered into an Administrative Memorandum of Agreement ("2011 MOA") with the DEA arising from the San Diego OTSC and expressly agreed that it would "maintain a compliance program to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations" including regarding the dispensing practices at all of its nationwide pharmacies.

649.    On September 14, 2012, however, the DEA also issued an *Order to Show Cause and Immediate Suspension Order* ("ISO"), described above against Walgreens's Distribution Center in Jupiter, Florida, as well as Orders to Show Cause related to certain Walgreens pharmacies.  Evidencing the existence of systemic failures, the ISO stated that, "[DEA's] concerns

with [Walgreens'] distribution practices are not limited to the six Walgreens pharmacies [discussed in the ISO]."

650.    In 2013, Walgreens agreed to the largest settlement in DEA history at the time— $80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black-market sales.  In addition to the monetary payment, the Jupiter, Florida distribution center lost its authority to distribute or dispense controlled substances, including opioids, for two years.  The Department of Justice, in describing the settlement, explained that the conduct at issue included Walgreens's "alleged failure to sufficiently report suspicious orders was a systematic practice that resulted in at least tens of thousands of violations and allowed Walgreens's retail pharmacies to order and receive at least three times the Florida average for drugs such as oxycodone."[68]

651.    The settlement resolved investigations into, and allegations of, CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

652.    As part of the 2013 MOA described above, Walgreens "acknowledge[d] that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations."  The 2013 MOA required Walgreens to, among other things, "maintain

---

[68] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled.

a compliance program in an effort to detect and prevent diversion of controlled substances" as required by law.

653.    Walgreens's Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids.  Walgreens's Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.

654.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period.  Yet Walgreens corporate officers not only turned a blind eye, but provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy.  Yet Walgreens corporate officers turned a blind eye to these abuses.  In fact, the long term Controlled Substance Compliance Officer at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with the CSA or the health of communities.

655.    Walgreens's settlement with the DEA stemmed from the DEA's investigation into Walgreens's distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens's corporate headquarters pushed to increase the number of oxycodone sales to Walgreens's Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales.  In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that

year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day.  All of these prescriptions were filled by the Jupiter Center, a distribution center that also distributed into the County.

656.    An August 2013 email shows Walgreens understood the consequences of its actions, explaining that Walgreens's "previous system would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing products like Oxycodone."

657.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

658.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

659.    In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

660.    The actions against Walgreens as both a distributor and a retail pharmacy demonstrate it routinely, and as a matter of standard operating procedure, violated its legal obligations under the CSA and other laws and regulations governing the distribution and dispensing of prescription opioids.

3.    **Rite Aid**

661.    With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the largest drugstore chain on the East Coast and the third largest in the United States, with annual revenue of more than $21 billion.

662.    Confirming its systemic failures to implement and adhere to adequate controls against diversion, Rite Aid has repeatedly faced enforcement actions.  As recently as January 2019, it paid $177,000 into the Naloxone Fund for the State of Massachusetts to resolve allegations that failed to follow regulations designed to prevent substance use disorder in its dispensing of controlled substances, including opioids.  Evidencing the systemic nature of the problem, Rite Aid, as part of the agreement, agreed to improve its dispensing practices.

663.    In 2018, Rite Aid also agreed to pay a $300,000 settlement for filling Schedule III controlled substances prescriptions in excess of the maximum dosage units allowed to be dispensed at one time.

664.    In 2017, Rite Aid paid $834,200 in civil penalties to resolve allegations by the DEA that Rite Aid pharmacies in Los Angeles dispensed controlled substances in violation of the CSA. The DEA's "investigation revealed the incorrect or invalid registration numbers were used at least 1,298 times as a result of Rite Aid's failure to adequately maintain its internal database."[69]  Further evidencing the lack of internal controls, the settlement also "resolve[d] allegations that Rite Aid pharmacies dispensed, on at least 63 occasions, prescriptions for controlled substances written by a practitioner whose DEA registration number had been revoked by the DEA for cause."

---

[69] DEA, *Rite Aid Pays $834,200 Settlement for Alleged Controlled Substances Act Violations in Los Angeles* (March 9, 2017), https://www.dea.gov/press-releases/2017/03/09/rite-aid-pays-834200-settlement-alleged-controlled-substances-act.

665.     In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

666.     The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R 1301.76(b).

### 4.     Walmart

667.     In addition to the actions described herein against Walmart, a prosecution against a Virginia prescriber revealed failures at Walmart pharmacies from 2007 to 2012.  A Decision and Order in that case revealed that a Walmart pharmacy would fill prescriptions pursuant to a telephone message from a staff member of the prescriber, purportedly on behalf of the prescriber, even though she failed to provide the prescriber's DEA number.  Despite the absence of information required by DEA regulations, the Walmart pharmacy would fill the prescription.[70]  By mid-November of 2008, three Walmart pharmacies had dispensed more than 200 hydrocodone prescriptions and refills on behalf of the prescriber.  In 2012, the prescriber learned that someone was fraudulently using his DEA number. He called a Walmart pharmacy regarding refill requests faxed from his office, and advised "that somebody was fraudulently using [his] DEA number."[71] Although he asked that his DEA number be blocked, the same pharmacy still filled two prescriptions on his behalf after this alert.  Although Walmart did not face sanctions for its conduct,

---

[70] DOJ, DEA, Docket No. 15-26, [FR Doc. No. 2017-13158] Peter F. Kelly, D.P.M.; Decision and Order, https://www.deadiversion.usdoj.gov/fed_regs/actions/2017/fr0623.htm.

[71] https://www.deadiversion.usdoj.gov/fed_regs/actions/2017/fr0623.htm

the Opinion and Order described "the fact that prescriptions which were missing [the] Respondent's DEA number were routinely filling notwithstanding that they were facially invalid," and "that the prescriptions were for hydrocodone in quantities and dosings that were clearly outside the scope of what is usually prescribed by podiatrists" as "deeply disturbing."

668.    Federal prosecutors had also taken action against five Walmart and Sam's Club Pharmacies in Texas, alleging that they failed to keep records required to help prevent diversion of controlled substances as required by the CSA.  Specifically, "accountability audits did not match the drugs on hand, revealing major overages and shortages in the accountability of controlled substances, and there were missing invoices for controlled substances all in violation of the CSA."[72]  A U.S. Attorney further explained that "[b]ecause of the pharmacies' lack of proper record keeping, a variety of Schedule II, III, IV and V controlled substances were lost or stolen and possibly diverted."

669.    As recently as September 2018, minutes of an Oklahoma State Board of Pharmacy meeting reflect that an Oklahoma "Wal-Mart Pharmacy was charged with multiple violations of state and federal regulations and rules including establishing and maintaining effective controls against diversion of prescription drugs."[73]   Walmart agreed to pay a fine to resolve the seven alleged violations.

### 5.    **Kroger**

670.    In addition to the 2005 settlement described above, Kroger in 2019 reached another settlement arising out of its failure to control against unlawful diversion and use of dangerous

---

[72] Associated Press, *Wal-Mart Settles Drug Records Accusation*, (Jan 7, 2009), http://prev.dailyherald.com/story/?id=262762

[73] https://www.ok.gov/pharmacy/documents/Min%20September%202018.pdf.

opioid drugs,"[74]   The settlement resolved allegations at a Virginia store violated the CSA 16 separate times in 2015-2016 "by improperly filling 'office use only' prescriptions for Schedule II controlled substances," failing "to make and keep DEA 222 order forms[,] improperly distributed a Schedule II controlled substance absent the required DEA 222 form" and "fail[ing] to provide effective controls and procedures to guard against diversion of controlled substances."

J.     **The Opioids the Defendants Sold Migrated into Other Jurisdictions**

671.   As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

672.   First, prescriptions written in one state may, under some circumstances, be filled in a different state.  But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

673.   When authorities in states such as Ohio and Kentucky cracked down on opioid suppliers, out-of-state suppliers filled the gaps.  Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills.  Residents of Ohio and other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell.   The practice became so common that authorities dubbed these individuals "prescription tourists."

674.   The facts surrounding numerous criminal prosecutions illustrate the common practice.  For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription

---

[74] https://www.justice.gov/usao-wdva/pr/kroger-pay-us-government-225000-settle-civil-allegations-it-violated-controlled

for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price. In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."[75] When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash. In 2015, another Columbus man was sentenced for the same conduct— paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[76]

675.    Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states, including North Carolina, Kentucky, Tennessee, Ohio, South Carolina, and Florida. Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy; many of those customers were from other states, including Ohio and Alabama.

676.    In yet another case, defendants who operated a pill mill in south Florida were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations. As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits. To earn this sum required more business than the local market alone could provide. Indeed, only about half of the [Pain Center of Broward]'s customers

---

[75] *16 Charged in 'Pill Mill' Pipeline*, Columbus Dispatch (June 7, 2011), http://www.dispatch.com/content/stories/local/2011/06/07/16-charged-in-pill-mill-pipeline.html.

[76] *Leader of Ohio pill-mill trafficking scheme sentenced*, Star Beacon (July 16, 2015), http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html.

came from Florida.  Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts."[77]  The court further noted that the pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents."

677.    The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the "Blue Highway," a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.  The "Blue Highway" runs right through Cobb County.

678.    Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted.  They rented cars just over the Georgia state line to avoid the telltale out-of-state tag.  If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over.  Or they avoided the roads altogether:  Allegiant Air, which offered several flights between Appalachia and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[78,]

---

[77] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

[78] *Id.*; *see also* Andrew Welsh-Huggins, *States Take on 'Tourists' Trafficking Painkillers,* Republican Herald (July 9, 2012).  Note that Interstate 75 is also called the "Oxy Express"; for example, the Peabody Award-winning documentary by that name focuses on the transport of prescription opioids along I-75. https://www.youtube.com/watch?v=wGZEvXNqzkM.



679.    While the I-75 corridor was well utilized, prescription tourists also came from other states.  The director of the Georgia drugs and narcotics agency observed that visitors to Georgia pill mills come from as far away as Arizona and Nebraska.

680.    Similar pipelines developed in other regions of the country.  For example, the I-95 corridor was another transport route for prescription pills.  As the director of the Maine Drug Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida, Georgia and California.  And according to the FBI, Michigan plays an important role in the opioid epidemic in other states; opioids prescribed in Michigan are often trafficked down to West Virginia, Ohio, and Kentucky.

681.    Along the West Coast, over a million pills were transported from the Lake Medical pain clinic in Los Angeles and cooperating pharmacies to the City of Everett, Washington.  Couriers drove up I-5 through California and Oregon, or flew from Los Angeles to Seattle.  The Everett-based dealer who received the pills from southern California wore a diamond necklace in

the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram OxyContin—connecting Los Angeles and Washington state.



682.    Abundant evidence, thus, establishes that prescription opioids migrated between cities, counties, and states, including into Georgia from Florida, Kentucky, Tennessee, and South Carolina.  As a result, prescription data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area.  As the criminal prosecutions referenced above show, if prescription opioid pills were hard to get in one area, they migrated from another.  The manufacturers and distributors were fully aware of this phenomenon and profited from it.

**K.    The Defendants Conspired to Engage In The Wrongful Conduct Complained Of Herein and Intended To Benefit Both Independently and Jointly From Their Conspiracy.**

683.    In addition, and on an even broader level, all Defendants took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage. Defendants agreed among themselves to increase the supply of opioids and fraudulently increase the quotas that governed the manufacture and supply of prescription opioids. Defendants did so to increase sales, revenue, and profit from their opioid products.

684.    The interaction and length of the relationships between and among the Defendants reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

685.    Defendants collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, as set forth more fully below, including, for example, membership in the NACDS and HDA.

686.    Defendants utilized their membership in the NACDS and HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. The Defendants overwhelmingly agreed on the same approach—to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as Defendants were thus collectively responsible for each other's compliance with their reporting obligations. Defendants were aware, both individually and collectively, of the suspicious orders that flowed directly from Defendants' facilities.

687.    Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

688.    The Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had not basis for refusing to increase or decrease production quotas due to diversion.

689.    The desired consistency, and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

## II.    Georgia-Specific Facts

### A.    Defendants Breached Their Duties in Georgia

690.    The Chain Pharmacies all distributed and dispensed opioids in Georgia and failed to meet their regulatory obligations while doing so.

691.    In addition to the duties imposed by federal law, under Georgia law, those who distribute opioids have a duty to detect, investigate, refuse to fill or ship, and report suspicious orders of opioids.  And pharmacies who dispense opioids are required to refuse to fill and report prescriptions that have indicia of diversion as well.

692.    Georgia regulations further mandate that suspicious orders, defined as unusual in size or frequency or deviation from buying patterns, be reported.  Any of the indicia of diversion identified by law trigger a duty to report, but this list is not exhaustive.  Other factors—such as whether the order is skewed toward high dose pills, or orders that are skewed toward drugs valued for abuse, rather than other high-volume drugs, such as cholesterol medicines—also should alert distributors to potential problems.

693.    All distributors, including Chain Pharmacies when acting in that role, also have a duty to know their customers and the communities they serve.  To the extent that, through this process of customer due diligence, a distributor observes suspicious circumstances—such as cash transactions or young and seemingly healthy patients filling prescriptions for opioids at a pharmacy they supply—those observations can also trigger reasonable suspicion.  A single order can warrant scrutiny, or it may be a pattern of orders, or an order that is unusual given the customer's history or its comparison to other customers in the area.

694.    The Chain Pharmacies knew, or should have known, that their pharmacies in Georgia and the surrounding area, including Florida, Alabama, Tennessee, and South Carolina, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  The Chain Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

695.    The Chain Pharmacies were required by Georgia law to operate in compliance with federal laws, including the federal CSA, 21 U.S.C. § 801 *et seq*. and its implementing regulations.

696.    A number of Georgia counties had an opioid prescription rate exceeding their population for extended periods of time.

697.    The Chain Pharmacies either were on notice, or should have been on notice, that the diversion of opioids was likely occurring in Georgia communities, should have investigated, ceased filling orders for opioids, and reported potential diversion.

698.    In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years.  Georgia has faced a spike in fatal drug overdoses, the majority of which are attributable to prescription opioids or the illicit opioids that patients often began abusing

after becoming addicted to prescription opioids. The CDC estimates that for every opioid-related death, there are 733 non-medical users. The Pharmacy Defendants thus had every reason to believe that illegal diversion was occurring in Plaintiff's communities.

699.    The Chain Pharmacies had information about suspicious orders that they did not report, and also failed to exercise due diligence before filling orders from which drugs were diverted into illicit uses in communities across Georgia.

700.    Each of the Chain Pharmacies disregarded their reporting and due diligence obligations under federal law and Georgia law. Instead, they consistently failed to report or suspend suspicious orders, deepening the crisis of opioid abuse, addiction, and death in Georgia.

701.    Each of the Chain Pharmacies participated in growing the market for prescription opioids in the United States and in Georgia far beyond reasonable limits, and fueling the improperly expanded market with opioids.

### B.  The Devastating Effect of the Opioid Epidemic in Georgia

702.    By helping to improperly inflate the opioid market, continuing to fill and failing to report suspicious orders of opioids, and by continuing to dispense opioids and "cocktails" of opioids and other drug despite indicia of diversion, the Chain Pharmacies have contributed to an oversupply of opioids in Georgia generally, and in Cobb County specifically. This oversupply allowed non-patients to become exposed to opioids, and facilitated access to opioids for both patients who could no longer access or afford prescription opioids and individuals struggling with addiction and relapse. The Chain Pharmacies had financial incentives to sell higher volumes of opioids and not to report suspicious orders or guard against diversion, and to dispense opioids despite indicia of diversion.

703.    Opioid-involved overdose deaths rapidly increased in Georgia starting in 2010, driven largely by increased prescription opioids (*e.g.*, Oxycodone and Hydrocodone). Beginning

in 2013, illicit opioids, such as heroin and fentanyl, drove the sharp increase in opioid-involved overdose deaths through 2017.  Opioid-involved overdose deaths decreased from 2017 to 2019.

704.    From 2010 to 2019, the total number of opioid-involved overdose deaths occurring in Georgia increased by 78%, from 514 to 913 deaths.  From 2010 to 2016, the total number of opioid-related overdose deaths in Georgia increased 117%, from 426 to 929 deaths, killing Georgian citizens at an average rate of 4 per day.

705.    From 2018-2019, all drug overdose death categories decreased except for synthetic opioids and fentanyl.  In 2019, Any opioid-involved overdoses accounted for 4,858 ED visits, 2,174 hospitalizations, and 860 deaths; heroin-involved overdoses accounted for 1,416 ED visits, 339 hospitalizations, and 307 deaths; and Fentanyl-involved overdoses accounted for 360 deaths.



706.    Georgia's Prescription Drug Monitoring Program (PDMP) describes opioid prescribing patters in Georgia.  The PDMP reports that, in 2017, there were 8,001,050 opioid prescriptions dispensed to 2,177,640 patients in Georgia.  These prescriptions averaged 18.1 days of opioids dispensed per prescription.  The number of patients receiving opioid prescriptions decreased by 6.6% from 2016 to 2017, but the average number of days dispensed per opioid prescription increased by 1.3%.

| Top Ten Opioids Prescribed, Georgia, 2016–2017 | | | |
|---|---|---|---|
| Rank | Opioid drug | No. prescriptions 2016 | No. prescriptions 2017 |
| 1 | Hydrocodone SA* | 3,300,114 | 2,913,553 |
| 2 | Oxycodone SA | 1,893,115 | 1,847,378 |
| 3 | Tramadol SA | 1,730,785 | 1,675,260 |
| 4 | Codeine | 474,798 | 470,132 |
| 5 | Buprenorphine | 279,592 | 287,696 |
| 6 | Morphine LA* | 204,310 | 192,654 |
| 7 | Fentanyl LA | 158,802 | 140,721 |
| 8 | Methadone | 105,608 | 99,393 |
| 9 | Oxycodone LA | 100,775 | 91,746 |
| 10 | Morphine SA | 80,515 | 82,086 |
| *SA: short-acting, LA: long-acting | | | |

707.    High opioid dosages are associated with an increased risk of opioid use disorder and overdose; the 2016 CDC opioid prescribing guidelines recommended that daily opioid dosages should not exceed 90 morphine milligram equivalents (MME). While there were some quarterly increases in Georgia overall, the percentage of patients receiving an average daily dose of opioids exceeding 90 MME remained fairly steady, with a slight downward trend.

708.    As of 2017, an estimated 180,000 Georgians have an opioid use disorder, and these individuals are an increasing portion of those served in family treatment and adult felony drug courts, supervised in probation/parole treatment centers, and involved in child removal cases.  In fiscal year 2017, fewer than 30,000 Georgians received MAT with methadone and buprenorphine.

709.    Moreover, data from the CDC shows that drug overdose deaths have increased significantly during the COVID-19 pandemic.[79]  The CDC estimates that drug overdose deaths in

---

[79] See "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," *New York Times*, April 14, 2021, available at https://www.nytimes.com/2021/04/14/health /overdose-deaths-fentanyl-opiods-coronaviurs-pandemic.html (accessed on 5/6/21).

Georgia increased by 24% from September 2019 to September 2020, and opioid-related drug overdoses increased dramatically during that time as well:[80]



### C.   **Facts Specific to Cobb County**

710.     Plaintiff Cobb County has been deeply affected by the opioid crisis.

711.     Cobb County is one of the largest diverse counties in Georgia and currently home to more than 750,000 residents among seven municipalities.

712.     Sadly, in 2017 Cobb County led the state as having the highest number of reported overdose deaths (146 deaths up from 112 in 2016).   Based on the Cobb County Medical Examiner's 2018 annual report (published June 21, 2019), in 2018 there were 112 drug deaths, of which 82 (73%) were opioid-related.  In 2019, there were 75 opioid related deaths in Cobb County.

---

[80] *See* "Vital Statistics Rapid Release: Provisional Drug Overdose Death Counts," CDC/National Center for Health Statistics, available at https://www.cdc.gov/nchs/ nvss/vsrr/drug-overdose-data.htm (accessed on 5/6/21).



713.    The Cobb County Opioid Task Force was developed as a multi-discipline task force to address the local opioid crisis in Cobb County by reducing opioid related use, overdose, and death in Cobb County.  The Task Force was created in 2016 with seven committees to address Provider Education & Policy Reform, Community Education & Prevention, Families and Consumer Support & Advocacy, REAP, Treatment Providers, Hospitals/ER, and Naloxone Access.  The Task Force works in conjunction with local, state, and federal partners and stakeholders to unify and enhance efforts designed to address and diminish the local opioid crisis by augmenting those programs in place as well as establishing new programs.

714.    The Opioid Fatality Review Project of the Cobb County District Attorney's Office operates under a 36-month grant awarded March 2019 by the federal Bureau of Justice Administration.  Its strategic objectives are to combat the opioid epidemic, reduce fatal overdoses and protect the American people.  This project encourages and supports cross-system planning and collaboration among the criminal justice system, behavioral health, public health, and a variety of

other systems and agencies.  Partners in this project include: the Cobb County Board of Commissioners, the Cobb Department of Community Supervision, the Division of Family and Children Services, the Cobb Community Service Board, the Davis Direction Foundation/The Zone, The Extension, His House, MUST Ministries, Someone Cares, Alana Recovery, Ser Familia, Cobb and Douglas Public Health, Kennesaw State University, the Georgia.  Department of Behavioral Health and Developmental Disabilities, St. Jude, liveSAFE Resources, NAMI, Harmony House, Cobb County Sheriff's Office, U.S. Department of Justice, United States Attorney General, Northern District of Georgia, the Department of Public Safety, the Marietta-Cobb-Smyrna Narcotics Task Force, Cobb Fire, City of Smyrna Police Department, the Cobb County Police Department, Georgia Drug and Narcotics Agency (GDNA), Metro Atlanta Ambulance Services, Puckett EMS, Cobb Community Alliance to Prevent Substance Abuse, and Applied Research.

715.    The opioid crisis has reshaped daily reality for Cobb County in numerous ways, including but not limited to increased and intensified emergency medical responses to overdoses; increased drug-related offenses affecting law enforcement, jails, and courts; enormous resources spent on community and social programs to treat those with opioid use disorders; higher workers' compensation costs for prescription opioids and opioid-related claims; and ultimately prevalent opioid abuse throughout the County, including in public places.

716.    Furthermore, the opioid crisis has evolved over time, and now heroin, fentanyl, and carfentanil use is the latest evolution in the opioid crisis in Cobb County. Fentanyl and carfentanil are incredibly lethal.  Adding to the danger, in some instances fentanyl has been made to look exactly like oxycodone tablets.

717.     Some of Cobb County's most vulnerable residents have also become victims of the epidemic as the number of children currently in foster care in Cobb County continues to increase. This is directly related to the opioid epidemic, as parents struggling with opioid addiction may end up unable to care for their children, leading to children being removed from the home.

718.     Additionally, in the past several years there has been a significant increase in babies born addicted to opioids.  These infants spend their first months of life suffering from withdrawal, a condition known as "Neonatal Abstinence Syndrome" (NAS).  These children often need years of long-term care and monitoring due to NAS.

719.     Opioid related stories describe a public health crisis of epidemic proportions in Cobb County.  As a practical and financial matter, the County has been saddled with an enormous economic burden.  Nearly every department in the County is affected by the opioid crisis in some manner.

720.     While the County has committed substantial resources to address the crisis, the opioid epidemic is nowhere near contained.  Fully addressing the crisis requires that those responsible for it pay for their conduct and to abate the nuisance and harms they have created in the County.

### III.     Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses.

#### A.     Continuing Conduct

721.     The County continues to suffer harm from the unlawful actions by the Defendants.

722.     The continued tortious and unlawful conduct by the Chain Pharmacies causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by the Chain

Pharmacies has not ceased.  The public nuisance remains unabated.  The conduct causing the damages remains unabated.

### B.    Equitable Estoppel and Fraudulent Concealment

723.    The Chain Pharmacies are also equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive the County and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the County, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered distributor and/or dispenser status and to continue generating profits.  Notwithstanding the allegations set forth above, the Chain Pharmacies affirmatively assured the public, including the County, that they are working to curb the opioid epidemic.

724.    The Chain Pharmacies were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

725.    The Chain Pharmacies also concealed from the County the existence of the County's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that their legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic.  They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including the County, and deprived the County of actual or implied knowledge of facts sufficient to put the County on notice of potential claims.

726.     The County did not discover the nature, scope and magnitude of the Chain Pharmacies' misconduct, and its full impact on the County, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

727.     The Chain Pharmacies intended that their actions and omissions would be relied upon, including by the County.  The County did not know and did not have the means to know the truth, due to the Chain Pharmacies' actions and omissions.

728.     The County reasonably relied on the Chain Pharmacies' affirmative statements regarding their purported compliance with their obligations under the law.

## CAUSES OF ACTION

729.     The County incorporates by reference all other paragraphs of its Original Complaint (ECF 1), Plaintiff's Amended Short Form Complaint (ECF 6), and this Supplemental and Amended Allegations to be Added to "Short Form for Supplementing Complaint and Amending Defendants and Jury Demand" as if fully set forth herein.

730.     For avoidance of doubt, the County hereby asserts all causes of action alleged in its Original Complaint (ECF 1), Plaintiff's Amended Short Form Complaint (ECF 6), and this Supplemental and Amended Allegations to be Added to "Short Form for Supplementing Complaint and Amending Defendants and Jury Demand" against all Defendants newly named herein, and reserves all rights to revise and amend those causes of action if and when the Court lifts the applicable stay and proceeds with those claims.

731.     This Supplemental and Amended Allegations to be Added to "Short Form for Supplementing Complaint and Amending Defendants and Jury Demand" is filed in accordance with the MDL Court's March 11, 2021 Order (ECF No. 3649), in which the Court stated that the five designated cases (including this case) "will be set for bellwether trials against pharmacies

only…. Each case should have only one cause of action, presumably either public nuisance or RICO."

732.  Consequently, as noted below, the County is proceeding at this time with its Fourth Claim for Relief:  Public Nuisance against the Chain Pharmacies under the Court's order.  The County reserves all rights to prosecute its other claims for relief against all Defendants, including the Defendants that are newly named in this pleading.  (*See* fn. 7 above).

### FOURTH CLAIM FOR RELIEF
Public Nuisance
(Supplemental Allegations Against Pharmacy Defendants)

733.  The County incorporates by reference all other paragraphs of its Original Complaint (ECF 1), Plaintiff's Amended Short Form Complaint (ECF 6), and this Supplemental and Amended Allegations to be Added to "Short Form for Supplementing Complaint and Amending Defendants and Jury Demand" as if fully set forth herein, and further alleges with respect to Plaintiff's public nuisance claim against the Chain Pharmacies:

734.  The County Attorney of Cobb County, Georgia brings this claim on behalf of the citizens of Cobb County pursuant to the statutory authority granted under O.C.G.A. § 41-2-2 to abate a public nuisance.

735.  Georgia statutory law provides that "[a] nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man." O.C.G.A. § 41-1-1.  Georgia law further defines "[a] public nuisance [as] one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." O.C.G.A. § 41-1-2.

736.    The Georgia nuisance statute also provides that "[u]pon filing of a petition as provided in Code Section 41-2-2, any nuisance which tends to the immediate annoyance of the public in general, is manifestly injurious to the public health or safety, or tends greatly to corrupt the manners and morals of the public may be abated . . . ." O.C.G.A. § 41-2-1.

737.    The improper efforts to grow the opioid market and the unlawful, unreasonable, and improper distribution, dispensing, and sale of excessive quantities of prescription opioids, and "cocktails" of opioids and other drugs, in Cobb County and surrounding communities has led to dramatic increases in opioid addiction and mortality, as well as associated increases in crime and human suffering, which has resulted in an ongoing public nuisance in Cobb County that has strained the County's resources.

738.    The Chain Pharmacies market, distribute, dispense, and sell prescription drugs, including opioids, that the Chain Pharmacies know to be dangerous because these drugs are defined under federal and state law, and are generally recognized, as substances posing a high potential for abuse, addiction, and death.

739.    Each Chain Pharmacy defendant voluntarily decided to market, distribute, dispense, and sell opioids in Cobb County and the surrounding communities.

740.    Each Chain Pharmacy defendant intended to earn a profit from the business of marketing, distributing, dispensing, and selling opioids in Cobb County and the surrounding communities.

741.    Each Chain Pharmacy defendant had control over the manner in which it marketed, distributed, dispensed, and sold opioids in Cobb County and the surrounding communities, subject to complying with federal and state law requirements with respect to distribution, dispensing, and sales of controlled substances.

742. Each Chain Pharmacy defendant gathered enormous amounts of data about its business of distributing, dispensing, and selling opioids in Cobb County and the surrounding communities, including data on who it did business with and how many opioids it distributed, dispensed, and sold in Cobb County and the surrounding communities. The Chain Pharmacies used this data to enhance their profitability but failed to use it to identify and prevent diversion or to identify and prevent the distribution, dispensing, and sale of unreasonably large quantities of opioids, and "cocktails" of opioids and other drugs, in Cobb County and the surrounding communities.

743. The Chain Pharmacies have created and maintained a public nuisance in Cobb County by distributing, dispensing, and selling opioids, and "cocktails" of opioids and other drugs, in ways that significantly interfere with the health, welfare, and safety of the public. The Chain Pharmacies' conduct caused distribution, dispensing, and sales of opioids in Cobb County and the surrounding communities to skyrocket, flooding Cobb County and the surrounding communities with unreasonable quantities of dangerously addictive drugs, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the County and the residents of Cobb County.

744. The Chain Pharmacies worked in concert with opioid manufacturers and distributors to ensure that the false messaging surrounding the treatment of pain and the addictive nature of opioids was consistent and geared to increase profits for all stakeholders. The Chain Pharmacies invited manufacturers to train and provide messaging to the Chain Pharmacies' pharmacists to ensure that those pharmacists would continue to fill as many prescriptions as possible despite indicia of diversion. The Chain Pharmacies worked with manufacturers and others to make sure opioid drugs had preferred formulary status, and then used their own marketing

tools, such as loyalty and retention programs, but also at the point of sale, to encourage patients to continue to use opioids.  These efforts, which go far beyond merely distributing and dispensing prescription opioids in the face of indicia of diversion, also contributed to the massive increase in the number of opioids that were distributed and dispensed by the Chain Pharmacies and others, and they contributed to the public nuisance that currently exists in Cobb County.

745.  The conduct of the Chain Pharmacies has resulted in an ongoing, significant, unlawful, and unreasonable interference with the public health, public safety, public peace, public welfare, and the public comfort of the citizens of Cobb County.  The Chain Pharmacies' conduct has obstructed and caused inconvenience and annoyance to the citizens of Cobb County and is manifestly injurious to public health and safety.

746.  The significant interference with rights common to the public is described in detail throughout the County's pleadings and includes:

a.  The creation and fostering of an illegal, secondary market for prescription opioids;

b.  Easy access to prescription opioids by children and teenagers;

c.  A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

d.  Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

e.  Employers have lost the value of productive and healthy employees; and

f.  Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

747.  The Chain Pharmacies' conduct that created, continued and/or maintained the public nuisance in Cobb County includes, but is not necessarily limited to, the following:

a.  Knowingly and unlawfully distributing, dispensing, and selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

b. Knowingly and unlawfully distributing, dispensing, and selling far more opioids in Cobb County and the surrounding communities than was reasonably necessary;

c. Knowingly and unlawfully distributing, dispensing, and selling opioids without maintaining effective controls against diversion;

d. Failing to use the data available to them to identify suspicious orders, suspicious red flag prescriptions, and to otherwise prevent or reduce the risk of diversion;

e. Not stopping or suspending shipments of suspicious orders;

f. Not adequately investigating suspicious orders;

g. Not reporting suspicious orders;

h. Not effectively monitoring suspicious orders;

i. Knowingly and unlawfully dispensing opioids, and "cocktails" of opioids and other drugs, despite red flags indicating that the opioids may flow into the illegal, secondary market or otherwise be diverted; and

j. Acting in concert with opioid manufacturers to promote the false messaging about the treatment of pain and the addictive nature of opioids, to encourage their use by health care providers and patients, and to encourage their pharmacists to fill as many opioid prescriptions as possible in the face of indicia of diversion.

748. When the Chain Pharmacies engaged in the conduct described herein, each Chain Pharmacy defendant either knew, was substantially certain, or should have known that by failing to act reasonably and lawfully with respect to the distribution, dispensing, and sale of opioids, and "cocktails" of opioids and other drugs, and by participating in the false marketing of opioids, in Cobb County and the surrounding communities, diversion and the associated harms and resulting interference with public health, safety, and welfare would occur.

749. Each of the Chain Pharmacies' conduct, individually and concurrently, was a proximate or other legal cause of the public nuisance that exists in Cobb County.

750. Each of the Chain Pharmacies' conduct giving rise to the opioid crisis is of a continuing nature and has produced a continuing, long-lasting, and significant effect on the entire community.

751.    The public nuisance in Cobb County is abatable.  However, the Chain Pharmacies lack the infrastructure and expertise needed to abate the public nuisance they created, contributed to, and/or maintained in Cobb County.  The Chain Pharmacies' conduct – including their lack of regard for the well-being of the citizens of Cobb County and surrounding communities by elevating their own business interests and profit over the safety and health of the communities in which they distributed, dispensed, and sold opioids – also renders them unfit to oversee the abatement of the public nuisance they created, contributed to, and/or maintained.

752.    The County asserts this cause of action seeking a judgment that the Chain Pharmacies fund the abatement of the ongoing public nuisance each of them created, contributed to, and/or maintained in Cobb County; injunctive relief to prevent or lessen future harm; and all other relief in equity or at law to which they may be entitled.

## PRAYER FOR RELIEF

753.    The County respectfully requests that this Court enter an order of judgment granting all relief requested herein, and/or allowed at law or in equity, including:

a.    abatement of the nuisance;

b.    equitable and injunctive relief in the form of Court-enforced corrective action;

c.    attorneys' fees;

d.    costs and expenses of suit;

e.    pre- and post-judgment interest; and

f.    such other and further relief as this Court deems appropriate.

## JURY DEMAND

754.    The County demands trial by jury on all questions so triable.

Dated:   May 19, 2021

> /s/ Jayne Conroy
> Jayne Conroy
> SIMMONS HANLY CONROY LLC
> 112 Madison Avenue
> New York, NY 10016
> (212) 784-6401
> jconroy@simmonsfirm.com
>               -and-
>
> Sarah Burns
> One Court Street
> Alton, IL 62002
> (618) 259-2222
> sburns@simmonsfirm.com
>
>
> Charles J. Crueger
> Erin K. Dickinson
> Krista K. Baisch
> CRUEGER DICKINSON LLC
> 4532 N Oakland Avenue
> Whitefish Bay, WI 53211
> (414) 210-3868
> cjc@cruegerdickinson.com
> ekd@cruegerdickinson.com
> kkb@cruegerdickinson.com
>
>
> COBB COUNTY ATTORNEY'S OFFICE
> H. William Rowling, Jr.
> County Attorney
> GA State Bar No. 617225
> Lauren Bruce
> Assistant County Attorney
> GA State Bar No. 796642
> 100 Cherokee Street, Suite 350
> Marietta, GA 30090
> (770) 528-4000
> H.William.Rowling@cobbcounty.org
> Lauren.Bruce@cobbcounty.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of May, 2020, I electronically filed the

foregoing as a Sealed Document with the Clerk of Court by using the CM/ECF System.  The

foregoing will be served on counsel of record subject to the applicable Protective and

Confidentiality Orders.  A redacted version of the foregoing will be filed in the CM/ECF system

and will be served upon counsel of record.

<i>/s/ Jayne Conroy</i>                          