UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION ) ) ) THIS DOCUMENT RELATES TO: ) ) *All Cases* ) ) | MDL 2804 Case No. 1:17-md-2804 Judge Dan Aaron Polster **ORDER** |

This Order addresses contingent attorney fee contracts between all States and political subdivisions eligible to participate in the Opioid Settlement Agreements and their counsel.

**For the reasons stated below, the Court hereby notifies all eligible participants to the July 21, 2021 Settlement Agreements, and also notifies their private counsel, that a contingent fee in excess of 15% of the participant's award under the Settlement Agreements is presumptively unreasonable. Accordingly, the Court caps all applicable contingent fee agreements at 15%.**

**This fee cap order applies *only* if counsel seeks to enforce a fee contract.[1] It does not apply to limit fees that may be received from the Settlement Agreement Attorney Fee Fund and any applicable "State Back-Stop."[2]**

The Court **ORDERS** all counsel for any client that is eligible to participate in the recently-announced Settlement Agreements to share this Order with all of those clients. Further, the Court **ORDERS** the Plaintiffs Executive Committee to broadly publicize this Order.

---

[1] Further, this percentage cap applies *only* to distributions received by a State or subdivision under the two Settlement Agreements discussed below. The Court does not now decide whether this or any other fee cap will apply to any future settlement agreement (global or otherwise), or to any verdict in any case. That said, it is extremely likely a similar cap will apply to any global settlement between the Settling Defendants and any Indian Tribe.

[2] *But see* footnote 17.

## The Settlement Agreements

Recently, AmerisourceBergen, Cardinal Health, McKesson, and Johnson & Johnson (the "Settling Defendants") reached Settlement Agreements with: (a) a group of State Attorneys General ("AGs") (representing the interests of the 50 States and U.S. territories), and (b) the MDL Plaintiffs' Executive Committee ("PEC") (which represents the interests of, among others, political subdivisions – *e.g.,* individual cities and counties within the States) to resolve the lawsuits against those Defendants related to the opioid crisis.[3] The Agreements are virtually unprecedented in their size and complexity and represent years of difficult negotiation among the several parties, having required hundreds of thousands of hours of work by various stakeholders, their representatives, and counsel, as well as the Court and Special Masters.

The Settlement Agreements provide for total payments of $26.0 Billion, assuming full participation by all States and political subdivisions (payments may be reduced if States and political subdivisions opt out of the Agreements). Of this amount, $2.3 Billion, or about 8.8%, is reserved for payment of attorney fees. Specifically, $1.6 Billion will be placed into an Attorney Fee Fund, from which privately-retained counsel ("Individually-Retained Plaintiff's Attorneys" or "IRPAs") can receive payment upon application to an independent fee-panel. The $1.6 Billion is divided into a sub-fund of 60% ($960 Million) to pay for common benefit fees and 40% ($640 Million) to pay for contingent fees otherwise owed to IRPAs by participating subdivisions. Another $350 Million is reserved for reimbursement and payment of attorney fees incurred by State Attorneys General for outside-counsel; and $350 Million is also reserved for reimbursement

---

[3] Specifically, the parties entered into two Settlement Agreements: (1) the "Distributors Master Settlement Agreement," settling claims against the "Big Three Distributor Defendants," AmerisourceBergen, Cardinal Health, and McKesson, dated July 21, 2021; and (2) the "J&J Master Settlement Agreement," settling claims against Manufacturer Defendant Johnson & Johnson, dated July 21, 2021. These two Agreements are posted at www.NationalOpioidSettlement.com. The general discussion below of settlement amounts refers to the combined amounts under both Settlement Agreements.

of attorney fees and costs incurred by State Attorneys General for in-house-counsel.[5] Various other amounts are designated for payment of litigation costs, administrative costs, and so on. Ultimately, about $23.5 Billion will be allocated to plaintiffs for abating social ills caused by the opioid crisis. Roughly half of this amount will be paid to States and Territories, and the other half to political subdivisions.[7]

The amounts set aside for payment of attorney fees are the result of a multiple-years-long negotiation between the Settling Defendants, the AGs, and the PEC, with additional input from plaintiffs' counsel nationwide (including those litigating Opioid cases only in State courts). The amounts reflect a consensus, after significant deliberation and with this Court's assistance, on what is a reasonable amount for attorney's fees payable to IRPAs in this case.

To be eligible for payment from the Attorney Fee Fund, an IRPA must submit an application and also waive any right to enforce a contingent fee contract with their subdivision-client.[8] Given that an IRPA may have a contingent fee contract calling for the subdivision-client to pay 20% (or 25%, or an even-higher share) of any recovery the subdivision ultimately receives, an IRPA is very likely to receive from the Attorney Fee Fund an amount far less than the contract would otherwise require.[9] All of the firms that are members of the PEC have agreed to this

---

[5] *See* Distributors Master Settlement Agreement, Exhs. S, T.

[7] More precisely, the Settlement Agreements have a "default allocation" providing that 15% will go to States, 15% will go to subdivisions, and 70% will go to a fund shared by States and subdivisions. *See* Distributors Master Settlement Agreement §V.C.1, at 29. A given State and its subdivisions can agree to modify this allocation. This raises the question of what should be the amount against which an IRPA may charge their contingent fee. For ease of calculation, the Court assumes the amount against which a contingent fee is charged by an IRPA representing a political subdivision would be 50% of the total default allocation—that is, the 15% the subdivision receives directly, plus half of the 70% shared fund. *See also* footnote 28, below.

[8] *See* Distributors Master Settlement Agreement, Exh. R §§G.2 & G.3.a.

[9] Of the 35,000 or so political subdivisions in the United States that are eligible to participate in the Settlement Agreements, about 75% by population entered into contingent fee contracts with IRPAs. If every one of these contracts calls for payment of only a 20% contingent fee (which is clearly a low estimate), and assuming half of the $23.5 Billion is allocated to the subdivisions (with the rest allocated to the States), then total contingent fees owed

arrangement.[10] This last sentence is worth repeating – the plaintiffs' attorneys who have actually shouldered the enormous load in obtaining the Settlement Agreements (and expended well over $100 Million in out-of-pocket expenses) have committed to waiving all of their contingent fee contracts and accepting instead the amount of contingent fees available from the Attorney Fee Fund. This amount is almost certain to be less than 10%.[11]

That said, a few States have put into place what the parties refer to as a "Back-Stop," which may provide additional funds to further compensate IRPAs who represent participating subdivisions within that State.[12] The Back-Stop is designed to further incentivize IRPAs to waive their right to enforce contingent fee contracts and instead apply to the Attorney Fee Fund, by making additional funds available to compensate IRPAs. Thus, for example, an IRPA representing a State subdivision may: (1) waive their right to enforce their 25% contingent fee contract; (2) apply for payment from the Attorney Fee Fund and receive a 7.5% fee; and (3) also apply for payment from the State Back-Stop and receive an additional 7.5% fee.[14] Alternatively, the IRPA

---

would be roughly $1.76 Billion ($23.5 Billion x 75% x 20% x 50%)—which is more than the entire Attorney Fee Fund.

[10] PEC attorneys have agreed to waive their contingent fee contracts with subdivision clients who, as a group, stand to be allocated over half of the settlement funds.

[11] Back-of-the-envelope calculations suggest an IRPA who applies to the Attorney Fee Fund for payment of fees otherwise owed by a client-subdivision under a contingent fee contract may receive in the range of 6-10% of the amount allocated to the subdivision. Specifically: (1) 40% of the Attorney Fee Fund ($640 Million) is reserved for payment of IRPAs' contingent fees; (2) assuming half of the $23.5 Billion is allocated to the subdivisions, they will receive $11.75 Billion; (3) about 75% of the $11.75 Billion ($8.8125 Billion) is subject to a contingent fee contract; and (4) the resulting ratio is 7.3% ($640M / $8.8125B). Allocation of contingent fees from the Attorney Fee Fund, however, will not be uniformly pro rata, so a given IRPA's percentage will fall within a range near 7%.

[12] See Distributors Master Settlement Agreement, Exh R §I.R (defining "State Back-Stop Agreement" as "Any agreement by a Settling State and private counsel for Participating Subdivisions in that State (or legislation enacted in that State) to provide, adjust, or guarantee attorneys' fees and costs, whether from the Attorney Fee Fund or any other source recognized in the agreement or legislation.").

[14] This example is hypothetical. The Court does not know exactly how much an attorney might expect to receive from the Attorney Fee Fund for contingent fees, or from any State Back-Stop, because multiple factors go into those calculations. Further, different States have put into place, or are contemplating, different Back-Stop provisions with different payout rates, different Back-Stop fee caps, and so on. Indeed, it may even be the case (for example) that a State Back-Stop allows for payment of additional contingent fees up to another 15% (on top of the 7.5% from the

may choose to forgo compensation from the Attorney Fee Fund and State Back-Stop and instead enforce their 25% contingent fee contract—which, of course, would lead to the subdivision-client ultimately receiving 25% less for abatement of opioid-related social ills than if the IRPA waived the contract and applied to the Attorney Fee Fund.[15]

Finally, it is critical to note that, *even taking into account State Back-Stops*, the Settlement Agreements still provide for an over-all attorney fee cap: "In no event may less than eighty-five percent (85%) of the [total settlement funds] . . . be spent on Opioid Remediation."[16]

With all of those mechanisms and considerations in mind, and for the reasons discussed below, the Court now orders that contingent fee contracts for all IRPAs representing entities that participate in the Settlement Agreements shall be capped at 15% – which is still a much higher percentage than PEC attorneys will receive.[17] In other words, IRPAs who represent any subdivision that **opts in** to the Settlement Agreements have the following choice: (1) forgo payment of any kind from the Attorney Fee Fund and any State Back-Stop, and instead enforce their contingent fee contract, *but the contingent amount is hereby capped at 15%*; or (2) waive

---

Attorney Fee Fund), but State funds earmarked to pay for those additional contingent fees are sufficient to pay only a supplemental 10%.

The fundamental reason for a State's adoption of a Back-Stop is that the Settlement Agreements call for different payment levels to the States and subdivisions depending upon participation rates; and subdivision participation rates will be higher if subdivisions know they will not have to pay a percentage of their recovery to an IRPA (even though they agreed to do so). Put simply, the Attorney Fee Fund and Back-Stops combine to incentivize greater subdivision participation and thus higher ultimate payouts by the Settling Defendants to both the States and subdivisions. A State may therefore rationally conclude that a portion of the settlement funds it receives is well-spent on payment of a portion of contingent fees otherwise owed to attorneys representing subdivisions within the State.

[15] Because the Settlement Agreements provide for payment to subdivisions over 18 years, IRPAs who choose to enforce their contingent fee contract will receive their fees over that same time period. In contrast, IRPAs who choose to waive their contingent fee contract and apply to the Attorney Fee Fund will be paid their contingent fees over seven years. *See* Distributors Master Settlement Agreement, Exh. R §II.A.

[16] Distributors Master Settlement Agreement §V.B.1, at 28.

[17] As did the court in *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, this Court addresses contingent attorney fees now, prior to final consummation of the settlement agreement, so that subdivisions contemplating participation can fully weigh their options and the parties can more quickly gauge participation levels. *See* 2012 WL 2236737, at *1, n.1 (E.D. La. June 15, 2012).

their right to enforce their contingent fee contract, apply to the Attorney Fee Fund for contingent and common benefit fees, and also apply for any applicable State Back-Stop funding.[18]

A subdivision may choose not to participate in the Settlement Agreements at all (that is, **opt out**), in which case this Order has no effect on any contingent fee contract the subdivision may have with an IRPA. If the subdivision does participate in the Settlement Agreements, however, then any contingent fee contract that subdivision has with an IRPA is hereby capped at 15%.[19] Stated differently, the 15% cap the Court imposes with this Order applies to all contingent fee contracts any IRPA has with any entity that chooses to participate in the Settlement Agreements—including subdivisions that have not filed any litigation against the Settling Defendants, those that have filed litigation pending in State courts, and those that have cases pending in this MDL.[21] The Court's reasons and jurisdictional basis for this Order are set out below.

---

[18] This Order does ***not*** prohibit an IRPA from receiving more than a total of a 15% fee ***if received from the Attorney Fee Fund and/or a State Back-Stop***. Those funds have already been reserved for payment of fees and an IRPA's receipt of payment through that mechanism will not work directly to decrease the amount of funds the IRPA's subdivision-client finally obtains for abatement of the opioid crisis. This Order only prohibits an IRPA from receiving more than a total of a 15% fee if subtracted directly from the settlement proceeds received by the subdivision-client (which would, of course, work to decrease what the subdivision-client can ultimately spend on abatement of the opioid crisis). The reason for this difference is that what makes for a "reasonable fee" depends in large part on how the fee affects the client's net recovery. All of that said, **the Court further believes it begins to become unreasonable if the total contingent fees an attorney receives from the Attorney Fee Fund and any State Back-Stop combined exceeds 15%.** But the Court chooses not to strictly cap contingent fees available from State Back-Stops at this time. In any event, it appears the State Back-Stop agreements currently in place generally provide for supplemental funding that yields a total fee at or below 15% of the local governments' total share of the settlement.

[19] This Order does not address an IRPA's contractual right to recover costs. It addresses only attorney fees.

[21] This Order also caps contingent fees owed to attorneys who have contracted with State Attorneys General, although those attorneys will receive a portion of their fees from a different settlement fund. *See* Distributors Master Settlement Agreement Exh. S (creating a "State Outside Counsel Fee Fund"). The Court is quick to confirm, however, as it has before, that it is not exercising jurisdiction over any case filed by any Attorney General; it is exercising jurisdiction only over attorneys who come to the MDL Court to seek attorney fees pursuant to the Settlement Agreements. *See* docket no. 146 at 1 ("The Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting."). Of course, all of the attorneys who will seek fees from the State Outside Counsel Fee Fund will also be seeking fees from the Attorney Fee Fund, which this Court is administering.

**Discussion**

Mass tort MDLs, such as this Opioid Crisis Litigation, can serve an invaluable public good.[22] As Judge Weinstein observed, "[l]itigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled." *In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 494 (2006).

Recognizing the value of mass torts, contingent fee contracts are accepted in the American legal system to incentivize attorneys to bring these cases. Contingent fee contracts are often viewed skeptically by the public, however, especially when the amounts earned by plaintiffs' attorneys are extremely large. Because mass tort MDLs, by definition, affect vast numbers of individuals in our society—which is undeniably the case in the opioid crisis—these MDLs are closely followed and highly scrutinized by the media and the public. This is even more true with the Opioid MDL, because plaintiffs are, in large part, governmental entities stewarded by politicians who are obligated to share the progress of the case with their constituents.

When attorneys' contingent fee contracts yield unreasonable or excessive amounts, the outsized payments to lawyers can undermine public faith in the judicial system. *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* 2008 WL 682174, at *17 (D. Minn. Mar. 7, 2008) ("The fairness of the terms of such agreements reflects directly on the Court and the legal profession."); *see also Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145, 1149-50 (Fla. 1985), *holding modified by Standard Guar. Ins. Co. v. Quanstrom*, 555 So. 2d 828 (Fla. 1990) (quoting *Baruch v. Giblin*, 122 Fla. 59, 63, 164 So. 831, 833 (1935)) ("The attorney's fee is, therefore, a

---

[22] *See Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 111 (2006) ("The purposes of mass tort litigation are to deter activities that harm people and to compensate people who are harmed.").

7

very important factor in the administration of justice, and if it is not determined with proper relation to that fact it results in a species of social malpractice that undermines the confidence of the public in the bench and bar. It does more than that. It brings the court into disrepute and destroys its power to perform adequately the function of its creation."). This is why rules of professional conduct invariably impose upon contingency fee contracts a "requirement of reasonableness." *In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549, 559 (2009) (citing Model Rules of Professional Conduct R. 1.5(a)).

It is incumbent, then, upon this Court to maintain public confidence in the legal system by ensuring the contingent fee contracts applicable to funds distributed under the Settlement Agreements are "reasonable under the circumstances." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996). The Court is also cognizant that "the circumstances" include the economic realities of bringing mass tort cases such as the Opioid Crisis Litigation. Aggregation of large numbers of cases can be expensive to administer and prosecute. There are enormous overhead costs in the early stages of litigation. And the contingent nature of the fee arrangements can make the cases risky to bring. Given these factors, the Court must carefully balance appropriate compensation for high-quality attorneys against those same lawyers' ethical obligation to charge no more than a reasonable fee.[23]

Although orders capping fees are often unpopular with the plaintiffs' bar,[24] it is indisputable that the Court has the authority to examine and modify attorneys' contingent fee

---

[23] For a thorough discussion of the competing incentives that must be balanced when contemplating the regulation of contingent fee contracts, see *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105 (2006) (cited favorably by J. Fallon in his opinions in *In re Vioxx*, 574 F.Supp.2d 606 (2008), and 650 F.Supp.2d 549 (2009)).

[24] *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 379 (2014) ("At the outset, it is important to recognize that judicial review of the fee arrangements of the attorneys appearing before the court is not only controversial but unpleasant.").

contracts. Specifically, "[i]n the context of mass tort litigation, 'a court that exercise[s] inherent power to prevent a violation of the lawyers' professional responsibility to charge only reasonable rates would be acting within the parameters of inherent authority as described by the Supreme Court.'" *In re Vioxx*, 650 F.Supp.2d at 560 (quoting *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 127 (2006)). *See also In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 492 (2006) ("The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions. This authority includes the power to review contingent fee contracts for fairness."); *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 WL 780512, at *20 (E.D. Mich. Dec. 20, 1996) ("It is well-settled that the court has the inherent authority to regulate contingency fees to ensure that they are not excessive or unreasonable.") (quoting *In re A.H. Robbins Co., Inc.*, 86 F.3d 364 (4th Cir. 1996)).[25]

In addition to this inherent supervisory authority to regulate contingent fees, several courts have relied upon their equitable powers under a quasi-class action theory. *See In re Vioxx*, 650 F.Supp.2d at 558-59; *In re Zyprexa*, 424 F.Supp.2d at 491-92; *In re Guidant*, 2008 WL 682174, at *17. The Opioid MDL is not a class action and the Settlement Agreements are not class action settlements.[26] Other MDL courts overseeing cases that also were not class actions, however, found equitable authority for fee cap orders in the text of the MDL statute, 28 U.S.C. § 1407. Judge Fallon again:

> Admittedly, the Federal Rules of Civil Procedure expressly provide that district courts may require reasonable fees in class actions while the MDL statute lacks an analogous provision. *Compare* Fed. R. Civ. P. 23(g)(1)(C)(iii), *and* Fed. R. Civ. P.

---

[25] *See also In re Guidant*, 2008 WL 682174, at *18 (same); Expert Report of William B. Rubenstein, MDL No. 2323, Doc. No. 9526 (Dec. 11, 2017) (adopted by *In re Nat'l Football League Players' Concussion Inj. Litig.*, 2018 WL 1658808, at *3 (E.D. Pa. Apr. 5, 2018) ("Myriad prior class action and non-class action MDL courts have concluded that a court's inherent authority over lawyers practicing before it enables the court to cap contingent fee contracts.") (listing cases).

[26] *See In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664 (6th Cir. 2020) (Doc. 3509) (reversing certification of a settlement "negotiation class").

23(h), *with* 28 U.S.C. § 1407. This statutory difference, however, is not the end of the story. First, the MDL statute requires that transferee courts "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). In the context of contingent fee arrangements, implementing a reasonable cap promotes justice for all parties by allowing claimants to benefit (as their attorneys have) from the economies of scale and increased efficiency that an MDL provides. Certainly, this statutory language lends support to the proposition that MDL courts, like class action courts, can exercise equitable authority to examine the reasonableness of fees.

*In re Vioxx*, 650 F.Supp.2d at 558.

Although not a class action, the Opioid MDL retains many important characteristics of a class action, so treatment as a quasi-class action is appropriate. Most notably, while many mass-tort MDL settlements define eligible claimants as those with pending cases filed by a date certain, the Settlement Agreements here contemplate virtually **all** States and their political subdivisions as eligible claimants, even if they have not filed a case and regardless of whether they have retained counsel. As a practical matter, the Settlement Agreements function much like a class action settlement, where the rights of non-MDL claimants (and non-litigating claimants) are affected. Thus, the Court has the equitable authority and responsibility to carefully monitor the Settlement Agreements and all related fee agreements to ensure they are fair to all potential stakeholders.[27]

---

[27] In sum, the Court's authority to enter this fee cap Order derives from: (1) the Court's inherent supervisory authority to regulate contingent fees and to superintend attorney professional conduct; and (2) its equitable powers under a quasi-class action theory. Judge Fallon also identifies a third source of authority: express authority granted in the agreement itself by the parties to the settlement agreement. This third source of the Court's authority is also present here. *See, e.g.,* Distributors Master Settlement Agreement, Exh. R, §I.C (defining the "Attorney Fee Fund" as "An account consisting of funds allocated to pay attorneys' fees approved pursuant to Section II of this Fee Agreement established by Order of, and under the ongoing jurisdiction of, the MDL Court"). Even without this express authority, however, the Court would still be allowed and obligated to cap contingent fee contracts as appropriate.

The Court notes these sources of authority are similar to those frequently cited in common benefit cases*, see* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 379 (2014) ("By and large, the legal bases relied on by courts that have reviewed and altered contingent fee contracts in MDL cases for reasonableness are similar to the justifications for creating a common benefit fee fund."), and common benefit fee assessments on attorneys with cases not before the MDL judge is an unsettled issue. *Compare In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3d Cir. 2015) and *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 180 (S.D.N.Y. 2020) (allowing the assessment); with *In re Roundup Prods. Liab. Litig.,* No. 16-md-02741-VC (N.D. Cal. Jun. 22, 2021) (ECF. 13192) and *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at

In light of all of these considerations, the Court concludes a cap on individual contingent fee contracts of 15% of the client's total award[28] yields a maximum, reasonable fee under the circumstances of this case. Participating subdivisions and their counsel can, of course, agree to something less than the Court's cap under the unique circumstances of their relationship. But the Court is convinced of the reasonableness of its cap for several reasons: (1) it prevents subdivisions from effectively paying attorney fees twice; (2) it promotes equity in the distribution of the fund; (3) the PEC attorneys who negotiated the settlement have indicated to the Court they intend to waive their contingent fee contracts and utilize the Attorney Fee Fund; and (4) the proposed settlement amount is so large that customary contingent fee percentages would disproportionately over-compensate attorneys and reflect poorly on the legal profession. The Court explicates each of these reasons below.

---

*1 (E.D. Mo. Feb. 24, 2010), *aff'd*, 764 F.3d 864 (8th Cir. 2014) (stating the court did not have jurisdiction to make such an assessment).

While the justifications for the Court's authority are similar and the reasoning of those cases is enlightening, assessment of a common benefit fee to reimburse attorneys who perform common benefit work is not the issue addressed here. In each of those cases, the court determined it had some level of jurisdiction (or not) over non-MDL cases by virtue of counsel in those cases having used common benefit work. *Compare In re Gen. Motors*, 477 F. Supp. 3d at 180 ("If Common Benefit Work Product is used in non-Common Benefit claims or actions, they shall be subject to the assessment."); with *In re Roundup,* No. 16-md-02741-VC at 23-24, 30-31 (ECF. 13192). Here, the Court asserts its authority by virtue of the Settlement Agreements Attorney Fee Fund, and the Court caps contingent fee contracts for subdivisions who opt in to the Agreements and receive funds from the Settlement administered by the Court.

[28] It is not entirely clear to the Court how IRPAs representing subdivisions will calculate the amount against which a contingent fee is charged. As noted earlier, the Settlement Agreements have a "default allocation" providing that 15% of the settlement funds will go to States, 15% will go to subdivisions, and 70% will go to a fund shared by States and subdivisions. *See, e.g.,* Distributors Master Settlement Agreement §V.C.1 at 29. Thus, there is room for argument that the contingent fee should be charged against: (a) only the 15% portion that goes directly to the subdivisions; *or* (b) this 15% portion *plus* half (or some other fraction) of the 70% portion shared by the subdivisions with the State; *or* (c) some other division of the settlement payment. Further, State-specific agreements between the State and its subdivisions may alter the default allocation and/or clarify what the share is against which a contingent fee should be charged. The Court takes no firm position on this question here, but it appears the fairest and most equitable result, absent explicit agreement otherwise, is that an IRPA should charge the contingent fee against, at most, 50% of the total allocation. *See* Distributors Master Settlement Agreement, Exh. S, ¶5.b (stating the multiplicand against which the contingency percentage will be applied by IRPAs retained by States will be 50% of the total allocation).

**Double Payment**

The Attorney Fee Fund, which amounts to $1.6 Billion, contains a $640 Million sub-fund specifically for payment of IRPA fees. In other words, money that would otherwise go to political subdivisions to abate the opioid crisis in their communities has already been reserved to pay their individual attorneys as part of the structure of the deal. The same is true for the State Outside Counsel Fee Fund – $350 Million has been reserved to pay individual attorneys hired by States; this is money that would otherwise go to the States to abate the opioid crisis. This totals nearly $1 Billion earmarked to pay IRPA fees.

Were the Court to allow IRPAs to collect their *uncapped* contingent fees from their clients' settlement distribution, those clients would effectively be paying attorney fees twice: (1) $1 Billion of settlement funds otherwise available to participating States and subdivisions under the Settlement Agreements is automatically reserved instead to pay for contingent fees; and (2) if the IRPA opts to enforce their contingency fee contract, then the client must pay the IRPA's fee out of the client's disbursement from the remaining $23.7 Billion in settlement funds. The fee cap works to limit the second payment, to the extent that payment is required.

While attorneys are still entitled, under the settlement agreement, to forgo the Attorney Fee Fund and instead seek fees from their subdivision-clients' share of the settlement distribution, counsel's contingent fee is now capped to ensure an appropriate share of the money intended for abatement of the opioid crisis is actually used for that purpose. The Court's cap is necessary to ensure that client-subdivisions, and not just their attorneys, benefit from the economies of scale provided by aggregation. *See In re Vioxx*, 650 F.Supp.2d at 558 ("In the context of contingent fee arrangements, implementing a reasonable cap promotes justice for all parties by allowing claimants to benefit (as their attorneys have) from the economies of scale and increased efficiency that an MDL provides.").

In sum, the Settlement Agreements already provide for payment of a fair portion of an IRPA's contingent fee; this Order ensures an IRPA will not over-reach and require their client to pay still more contingent fees beyond a reasonable amount.

**Equitable Distribution**

The Court again makes clear that the 15% fee cap applies to ***all*** contracts between ***all*** participating States and political subdivisions and their IRPAs, not just those who may have cases already transferred into the MDL. Any entity that opts in to the Settlement Agreements subjects its counsel to the jurisdiction of this Court for the limited purpose of ensuring counsel receives no more than reasonable fees.

Indeed, to hold otherwise would produce deeply inequitable and even absurd results. Consider the following hypothetical. Two similarly-sized and -populated counties in the same State—County A and County B—opt in to the proposed settlement agreement and are each entitled to receive $1 Million of settlement funds. Both Counties signed 25% contingent fee contracts with an IRPA. County A's IRPA drafted and filed a complaint in the MDL, reviewed ARCOS data, and amended County A's complaint appropriately. In contrast, County B's IRPA did nothing beyond entering into a contingent fee contract for 25% of his client's settlement proceeds.

If the Court were to cap the contingent fees of only those attorneys with cases in the MDL, then:

- **County A's attorney** would choose between: (1) a capped 15% contingent fee of $150,000; or (2) payment from the Attorney Fee Fund and State Back-Stop, amounting to (say) $160,000; but

- **County B's attorney** could enforce his contingent fee contract for $250,000, receiving almost twice the fees for virtually no work.

13

This result not only provides compensation far in excess of a reasonable fee for the work County B's attorney performed, it is also terribly inequitable between the two attorneys and their client-subdivisions. County A would ultimately receive either $850,000 (if the IRPA enforced the capped contingent fee contract) or $1 Million (if the IRPA waived his contract and obtained payment under the Settlement Agreements) to abate the opioid crisis. County B, which received far fewer services from its attorney, would receive only $750,000.[29] The Court's contingent fee cap, therefore, adds a deep measure of uniformity and equity to the extraordinarily complicated Settlement Agreements. The fee cap will work to benefit IRPAs who worked diligently on behalf of their clients, the clients themselves, and also the individuals in this country who are suffering the social ills caused by the opioid crisis.

Ultimately, the fee cap ensures local governments will receive more resources to address and abate the opioid crisis, so that the general public is the true beneficiary of the Settlement Agreements.

**PEC Attorneys**

The Court is also persuaded of the reasonableness of its cap by the fact that all of the PEC attorneys, who have worked diligently for well over three years to attain these extraordinary settlements, negotiated the structure of the Attorney Fee Fund and have committed to using it themselves. The Court puts great weight on the judgment of those attorneys—all of whom have their own individual subdivision-clients—who have invested immense amounts of time and money into this MDL. That they believe the Attorney Fee Fund is reasonable and intend to use it themselves in lieu of their own contingent fee agreements indicates to the Court that the percentage

---

[29] Notably, a hypothetical, similarly-situated County C, which did not retain counsel at all, would receive the entire $1 Million settlement distribution.

they implicitly negotiated (roughly 6-10%) is reasonable. The Court is skeptical, therefore, of the reasonableness of contingent fee contracts that would allow IRPAs to receive fees far in excess of what they could receive through the Attorney Fee Fund.  From this perspective, a 15% cap is generous.

**Proportionality**

The settlement in this case easily qualifies as a "mega fund."[30] It is among the largest in our nation's history. Were the Court to allow IRPA contingent fees to exceed the Court's capped percentage, total attorney fee awards would be enormous. This would reflect poorly on the legal profession and the judicial system.[31] Further, the fees would be "in excess of a *reasonable* fee" measured against the work performed, and so would violate an IRPA's ethics rules. Ohio Rules of Professional Conduct, R. 1.5(a) (2020) (emphasis in original). This conclusion is buttressed most strongly by the fact that **all parties** to the Settlement Agreements concurred that at least 85% of the total settlement funds must be spent on remediation of the opioid crisis.

Having carefully considered all of the factors discussed above, the various positive and negative incentives engendered by a fee cap, and the ultimate goal of the MDL, the Court concludes a 15% fee cap is reasonable to compensate IRPAs for their work. A contingent fee in

---

[30] As the value of the monetary relief in a settlement goes up, contingent fees should generally go down. *See* FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION (Fourth) §14.121 at 188-89 (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 339-40 (3d Cir. 1998)) ("Accordingly, in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate. One court's survey of fee awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%."); *see also In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 495-96 (2006) (reviewing state laws that reduce the percentage an attorney can accept on contingency as the value of the award goes up).

[31] *See* Dennis E. Curtis & Judith Resnik, *Contingency Fees in Mass Torts: Access, Risk, and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients*, 47 DePaul L. Rev. 425, 434 n.27 (1998) (discussing how "a one-third attorney fee in million and billion dollar cases stuns even professionals accustomed to large payments.") (citing Fight over Attorney Fees Overshadows Tobacco Deal, Orlando Sentinel, Oct. 5, 1997).

excess of 15% of the client's total award under the Settlement Agreements is presumptively unreasonable.

\* \* \* \* \* \*

Finally, the Court allows that some IRPAs may have performed extraordinary work on behalf of their subdivision-clients and taken on substantial risk that is far beyond the norm in these opioid cases. A 15% fee cap is reasonable to compensate IRPAs for the work actually performed litigating against the Settling Defendants in the vast majority of opioid cases, but it is conceivable, in rare circumstances, that a 15% capped contingent fee would not adequately compensate an IRPA for work actually performed. *See In re Vioxx Prods. Liab. Litig.*, 650 F.Supp.2d 549, 564-65 (2009). In those rare cases, the Court will permit an IRPA who forgoes application to the Attorney Fee Fund and instead enforces their contingent fee contract to move for an upward departure from the fee cap and present evidence of exceptional work, extraordinary risk, and insufficient compensation.

**IT IS SO ORDERED.**

                                                           /s/ Dan Aaron Polster  August 6, 2021
                                                           **DAN AARON POLSTER**
                                                           **UNITED STATES DISTRICT JUDGE**