# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

**PLAINTIFFS' OMNIBUS MOTION IN LIMINE AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

No. 44:    Exclude any reference to prescription opioids as "legal" drugs, or distinguishing them from "illegal" drugs.....................................................................1

No. 45:    Exclude any reference to efforts or actions of any Defendant, or its affiliates or employees, in connection with in-store "good deeds" or corporate conduct unrelated to opioids..........................................................................................3

No. 46:    Exclude any reference to the *Frye* hearing testimony of Dr. David Kessler on August 14, 2020 in the New York opioid litigation.......................................4

No. 47:    Admit Plaintiffs' Rule 1006 Summaries...................................................6

        A.  Summaries of Voluminous Data are Admissible under Rule 1006. .......................9

            1.    The summaries meet the first three *Bray* factors. ....................................10

            2.    The Summaries Meet the Fourth *Bray* Factor as they are accurate and non-prejudicial. ..................................................................................12

            3.    Dr. McCann will be available for cross-examination in compliance with *Bray's* fifth factor.........................................................................16

        B.  The Summaries are Separately Admissible under Rule 611................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliant Tax Credit Fund 31-A, Ltd. v. Murphy,*
    494 F. App'x 561 (6th Cir. 2012) ........................................................10

*Colvin v. Veterans Admin. Med. Ctr.,*
    390 F. App'x 454 (6th Cir. 2010) ........................................................11

*Dykes v. Raymark Indus., Inc.,*
    801 F.2d 810 (6th Cir. 1986) ..........................................................4, 5

*Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,*
    803 F.2d 250 (6th Cir. 1986) ...........................................................16

*In re Nat. Prescription Opiate Litig.,*
    927 F.3d 919 (6th Cir. 2019) .............................................................8

*In re Polyurethane Foam Antitrust Litig. Direct Purchaser Class,*
    No. 1:10 MD 2196, 2015 WL 12747961 (N.D. Ohio Mar. 6, 2015).........................6

*Louzon v. Ford Motor Co.,*
    718 F.3d 556 (6th Cir. 2013) .............................................................1

*Martin v. Funtime, Inc.,*
    963 F.2d 110 (6th Cir. 1992) ..........................................................9, 10

*Murphy v. Owens-Illinois, Inc.,*
    779 F.2d 340 (6th Cir. 1985) .............................................................5

*PHI, Inc. v. Off. & Pro. Emps. Int'l Union,*
    No. CIV. A. 06-1469, 2009 WL 1530939 (W.D. La. May 28, 2009) ....................14

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    610 B.R. 197 (Bankr. S.D.N.Y. 2019) ..................................................14

*United States v. Bray,*
    139 F.3d 1104 (6th Cir. 1998) ..................................................... *passim*

*United States v. Brown,*
    820 Fed. App'x 191 (4th Cir. 2020) .....................................................13

*United States v. Hofstetter,*
    No. 3:15-CR-27-TAV-DCP, 2019 WL 5057176 (E.D. Tenn. Oct. 8, 2019).........12, 13, 15, 16

*United States v. Jackson-Randolph,*
    282 F.3d 369 (6th Cir. 2002) .............................................................5

*United States v. Jamieson,*
 427 F.3d 394 (6th Cir. 2005) ....................................................................................10, 12

*United States v. Kilpatrick,*
 798 F.3d 365 (6th Cir. 2015) ....................................................................................13, 16

*United States v. Lynch,*
 735 F. App'x 780 (3d Cir. 2018) ......................................................................................13

*United States v. Moon,*
 513 F.3d 527 (6th Cir. 2008) ...........................................................................................10

*United States v. Nivica,*
 887 F.2d 1110 (1st Cir. 1989) ..........................................................................................13

*United States. v. Oloyede,*
 933 F.3d 302 (4th Cir. 2019) ...........................................................................................15

*United States v. Walsh,*
 654 Fed. App'x. 689 (6th Cir. 2016) ..................................................................................1

*Warstler v. Medtronic, Inc.,*
 No. 3:16CV385, 2016 WL 10459786 (N.D. Ohio Aug. 15, 2016) .......................................11

**Rules**

FED. R. EVID. 401 .................................................................................................................6

FED. R. EVID. 403 .............................................................................................................2, 6

FED. R. EVID. 611 ...................................................................................................15, 16, 17

FED. R. EVID. 802 .................................................................................................................6

FED. R. EVID. 803 ...........................................................................................................11, 12

FED. R. EVID. 804 .............................................................................................................4, 11

FED. R. EVID. 807 ...........................................................................................................11, 12

FED. R. EVID. 1006 ...................................................................................................... *passim*

**Other Authorities**

2 McCormick on Evidence § 233 (John W. Strong ed., 4th ed. 1992) ............................................9

6 Weinstein's Federal Evidence § 1006.04[2] (Joseph M. McLaughlin ed., 2d ed. 1997) .............9

Before the voir dire examination of the jury panel and, in an effort to avoid prejudice, a possible mistrial, and unnecessary trial interruptions, Plaintiffs make this motion *in limine*.  *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) ("'[A] motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'") (citation omitted); *United States v. Walsh*, 654 Fed. App'x. 689, 693 (6th Cir. 2016) (unpublished) (same). Plaintiffs seek to increase efficiencies at trial by obtaining rulings on these matters prior to trial and outside the presence of the jury.

With a few exceptions, Plaintiffs reassert MIL Nos. 1-43 that the CT1 plaintiffs raised in the Track 1A and Track 1B cases.[1]  Doc. #2652 (plaintiffs' CT1A MIL Nos. 1-37), Doc. #2805 (plaintiffs' CT1A MIL Reply); Doc. #3419 (plaintiffs' additional CT1B MIL Nos. 38-42); Doc. #3448 (plaintiffs' additional CT1B MIL No. 43).  Plaintiffs also reassert the objections raised by the CT1 plaintiffs to the Court's rulings (*see* Doc. #3058; #3546) for purposes of preserving them. Doc. #3419.  Otherwise, Plaintiffs request the Court enforce its prior rulings and add the additional motions *in limine* as follows.

**No. 44:  Exclude any reference to prescription opioids as "legal" drugs, or distinguishing them from "illegal" drugs.**

Plaintiffs seek to preclude Defendants from characterizing prescription opioids and other controlled substances as "legal," or distinguishing them from "illegal" drugs, as such characterizations are misleading and state a legal conclusion.  Although there are certain drugs that have no accepted medical use in the United States and are therefore unlawful to manufacture,

---

[1]  Plaintiffs do not reassert MIL No. 32 (references to the indictment of Ken Mills), MIL No. 33 (references to investigations of former Cuyahoga County Sheriff Pinkney), and MIL No. 35 (references to investigation into death of Aniya Day Garrett), as those MILs were uniquely specific to the CT1 counties.  Plaintiffs do, however, reassert the more general county-specific MILs (MIL Nos. 28-31, 34, 36-37), but with Lake and Trumbull Counties substituted for Summit and Cuyahoga Counties.

distribute, sell, prescribe, or use (*e.g.*, heroin, LSD, etc.), the legality of most drugs depends upon whether the manufacture, sale, or use of those drugs complies with the Food Drug and Cosmetics Act, the Controlled Substances Act (CSA), and/or state law. Legality of most drugs, therefore, does not turn on what the specific drug is, but how it is manufactured, distributed, sold, or dispensed (and to whom).

For example, prescription opioids are "legal" only if prescribed for an approved use and an intended patient, and not diverted. Prescription opioids are "illegal" if diverted, or if distributed or dispensed in a manner inconsistent with state or federal controlled substance laws and regulations. In the latter circumstances, prescription opioids are just as illegal as drugs that are always illegal, such as heroin. Indeed, the fact that prescription opioids can be illegal, depending upon the context, is demonstrated by, among other things, numerous DEA enforcement actions against manufacturers and distributors of prescription opioids for failure to adhere to the CSA's requirements.

Permitting Defendants to characterize prescription opioids as "legal" drugs, or to distinguish prescription opioids from "illegal" drugs, therefore, obscures the fact that prescription opioids may be legal or illegal, depending upon the circumstances. As a result, jurors could be misled that, because prescription opioids are FDA-approved, prescription opioids are always legal and that Defendants cannot be held liable based on the distribution or dispensing of those drugs. FED. R. EVID. 403. Moreover, Defendants' references to prescription opioids as "legal" drugs attempt to cloak Defendants' actions as lawful, regardless of the circumstances, and improperly prejudice the jury in their favor. *Id.* In addition, referring to prescription opioids as "legal" necessarily states a legal conclusion as to whether the manufacture, distribution, sale, or dispensing of the drugs complies with the law. This Court has previously stated that "'[w]e're obviously not

going to have witnesses purporting to tell the jury what the law is[.]'" Doc. #3058 at 12 (quoting Doc. #2828 at 5:11-18). Reference to prescription opioids as "legal" should therefore be excluded on that basis, as well.

**No. 45:   Exclude any reference to efforts or actions of any Defendant, or its affiliates or employees, in connection with in-store "good deeds" or corporate conduct unrelated to opioids.**

This Court has previously granted in part the Track 1 plaintiffs' MIL No. 6 to exclude any comment or reference to philanthropy or good deeds or acts carried out by the parties or their employees that are unrelated to preventing opioid addiction. *See* Doc. #3058 at 68-69 ("[E]vidence that the parties and/or their employees are 'good citizens' and do good deeds such as providing scholarships, community service, or charitable contributions is not relevant to the issues in this case (unless another party offers evidence to the contrary)."). The Court also granted the Track 1 plaintiffs' later MIL No. 42 to preclude the Pharmacy Defendants from mentioning any acts by them, their affiliates, or their employees in connection with COVID-19, noting that "[t]he prior ruling [on good deeds or acts] sufficiently addresses this narrower issue, as Defendants' 'good deeds' related to COVID-19 similarly are irrelevant unless Plaintiffs offer evidence to the contrary." Doc. #3546 at 16-17.

Plaintiffs ask the Court to reaffirm these prior rulings and to clarify that they also extend to non-opioid-related in-store activities or promotions, such as Walgreens' "Red Nose Day" [*see* https://www.walgreens.com/topic/promotion/rednoseday.jsp, last visited Aug. 4, 2021], or corporate policies or decisions regarding non-opioid products, such as "carding" everyone who is attempting to purchase alcohol or cigarettes or similar products irrespective of their apparent age.

**No. 46:   Exclude any reference to the *Frye* hearing testimony of Dr. David Kessler on August 14, 2020 in the New York opioid litigation.**

Plaintiffs seek to preclude Defendants from using or admitting into evidence any of the expert testimony of Dr. David Kessler at his *Frye* Hearing in *In re: Opioid Litigation*, No. 400000/2017, (N.Y. Sup. Ct. Aug. 14, 2020) ("the New York litigation").  Defendants have designated many excerpts from this August 14, 2020 hearing as part of their deposition designations.  This is improper.  Under the Federal Rules, Dr. Kessler's expert testimony in the New York litigation is inadmissible in this matter.

Dr. Kessler's testimony in the New York case is clearly inadmissible because it is hearsay that does not satisfy any exception to the hearsay rule.   Federal Rule of Evidence 804(b)(1) states:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> **(1) Former Testimony.** Testimony that:
>
> > **(A)** was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
> >
> > **(B)** is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

FED. R. EVID. 804(b)(1).  There is no question that Plaintiffs here are not a party to the New York litigation, or that the New York plaintiffs—the State of New York and two New York counties— are not traditional predecessors in interest to Plaintiffs.

Plaintiffs' interests were also not otherwise represented by the parties who were present at Dr. Kessler's *Frye* hearing.  In the Sixth Circuit, parties who are not legally related may still be predecessors in interest under FRE 804 if "the [other party] had an opportunity and similar motive to develop the testimony by cross-examination."  *Dykes v. Raymark Indus., Inc.*, 801 F.2d 810, 817 (6th Cir. 1986).  But the New York plaintiffs did not have the same motives as Plaintiffs here

4

do.[2]  *See United States v. Jackson-Randolph*, 282 F.3d 369, 381–82 (6th Cir. 2002) (affirming exclusion of testimony from prior case because the parties "had different motives in the proceedings, and different outcomes were at stake").

The plaintiffs in the New York action did not have a sufficiently "similar motive" to that of Plaintiffs here to develop testimony, and therefore the testimony is inadmissible against Plaintiffs.  *Dykes*, 801 F.2d at 817.  The New York plaintiffs at the *Frye* hearing were seeking to establish the methodology for Dr. Kessler's opinion that the manufacturers' marketing and promotion of opioids deviated from FDA standards and endangered patient safety.  The New York plaintiffs had no reason to develop testimony relating to the culpability of Pharmacy Defendants, or to ask about the multifactorial nature of the opioid crisis.  If Plaintiffs in this action had been afforded an opportunity to take cross-examination testimony at Dr. Kessler's *Frye* hearing, Plaintiffs would have developed testimony establishing that Dr. Kessler's manufacturing opinions were not conclusive as to the roles entities other than manufacturers played in the opioid crisis.[3] The New York plaintiffs had no motivation to develop testimony on the liability and roles of non-manufacturer entities during Dr. Kessler's *Frye* hearing examination, and were motivated only to develop Dr. Kessler's testimony on the methodology for his opinion regarding the manufacturers' role in the crisis.  Thus, the New York plaintiffs' motives were not the same as Plaintiffs', and the testimony is not admissible against Plaintiffs.  *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 343–44 (6th Cir. 1985) (affirming trial court ruling to exclude deposition from prior case because "the

---

[2] Defendants have only designated testimony conducted on direct examination by the plaintiffs in the New York litigation.

[3] Indeed, when asked in a deposition in the New York action about the Pharmacy Defendants' role, Dr. Kessler testified that his report in that action was limited to Manufacturer Defendants' liability, and that he did not intend for the report to suggest any minimization of Pharmacy Defendants' role.  *See* 1/17/20 Kessler Dep. 270:13-24.

cross-examiners in [the prior case] had a dissimilar motive"); *In re Polyurethane Foam Antitrust Litig. Direct Purchaser Class*, No. 1:10 MD 2196, 2015 WL 12747961, at *14 (N.D. Ohio Mar. 6, 2015) (finding testimony inadmissible because plaintiffs had no predecessor or other representative at depositions of witnesses in companion case, and because the parties had different motives and interests).  Because Dr. Kessler's *Frye* hearing testimony does not fall under a recognized hearsay exception, it must be excluded.  FED. R. EVID. 802.

In addition, Dr. Kessler's testimony in the New York litigation is not relevant to this case. Dr. Kessler's testimony in the New York case was focused on the manufacturers' marketing practices, while this case concerns, *inter alia*, Pharmacy Defendants' alleged failure to prevent diversion as required by the CSA in their distribution and dispensing of opioids.  Proffering Dr. Kessler's testimony here would misleadingly conflate these two issues, particularly where, as discussed above, Plaintiffs were denied an opportunity to cross-examine. Introducing Dr. Kessler's hearing testimony from the New York litigation will only serve to waste time and confuse the jury. *See* FED. R. EVID. 401, 403.

**No. 47:  Admit Plaintiffs' Rule 1006 Summaries**

Plaintiffs submit this Motion in Limine regarding the admissibility under Federal Rule of Evidence 1006 of certain charts summarizing Defendants' distribution and dispensing of opioids prepared by Plaintiffs' expert, Craig McCann, Ph.D.  *See* Exhibit A, attached hereto.  These charts comprise core summaries of the voluminous dispensing and distribution data at the heart of this case that this Court ordered to be produced.  While additional summaries are forthcoming on August 27, 2021, pursuant to the stipulated deadline for exchange of Rule 1006 summaries,[4]

---

[4] On August 27, 2021, pursuant to the stipulated deadline, Plaintiffs will submit additional Rule 1006 summaries to assist the Court and the jury with understanding both the voluminous dispensing and distribution data, Defendants' notes fields productions (to the extent that information has been produced and has been able to be analyzed), and other voluminous data

Defendants' refusal to stipulate to the admissibility of the underlying dispensing and distribution data, the importance of the data, and the significant amount of trial time consumed in the CT2 bellwether trial on similar data summaries, all militate in favor of bringing these issues before the Court now.

As the Court is aware, Dr. McCann is an economist and a data computation and analysis expert.  These summaries show the amounts of certain opioids distributed and dispensed from 2006 to 2014 in the United States, Ohio, and Lake and Trumbull Counties.  To prepare the distribution summaries, Dr. McCann took the ARCOS data in the raw form in which it was produced by the DEA, incorporated the distribution data produced by the Defendants, added some additional fields to the data to make it more useful, including through incorporation of other government data, employed some "quality control" measures as a check to validate the accuracy of the data, removed some irrelevant or obviously erroneous transactions, and made some minor corrections to the data.  To prepare the dispensing summaries, Dr. McCann utilized the dispensing data produced by the Defendants themselves. The procedures that Dr. McCann utilized are described in detail in his report produced in this case.  *See, e.g.*, Expert Report of Craig J. McCann, Ph.D., CFA, April 16, 2021 ("McCann Rep.") at 20-25, Appendices 2, 4, 5 and 9.  Defendants have had multiple opportunities to cross-examine Dr. McCann on these procedures and the ARCOS data, including the benefit of the CT2 defendants' extensive cross-examination with regard to the procedures used with the distribution and dispensing data and their own cross examination on the procedures used with dispensing data in Track 3.

---

sources and documents produced by Defendants and third parties.  Although the attached exhibits do not include the complete set of finalized potential Rule 1006 summaries, Plaintiffs are submitting the attached summaries to the Court now to obtain threshold rulings on these issues.

The amount of ARCOS data produced by the DEA is massive. It contains over 500 million records of shipments reflecting transactions involving fourteen different opioid drugs for the years 2006 through 2014 in all fifty states.[5] "The ARCOS database 'includes supplier name, registration number, address and business activity; buyer name, registration number and address; as well as drug code, transaction date, total dosage units, and total grams.'" *In re Nat. Prescription Opiate Litig.*, 927 F.3d 919, 924 (6th Cir. 2019).  The distribution and dispensing data files produced by Defendants are similarly voluminous.  For example, Defendants' dispensing data for Lake and Trumbull county includes data for more than 3.3 million opioid prescriptions alone.  *See* McCann Report at pp. 120-146.

In order to present this information at trial in a digestible format, Dr. McCann has prepared a number of summary charts.  These charts are relevant to this case and will assist the jury.  They summarize subsets of data from the ARCOS data produced by the DEA, the associated government data, and distribution and dispensing data produced by the Defendants.  Specifically, with respect to the associated governmental data, they include information from the following sources:

- The Food and Drug Administration's (FDA) published list of drug labelers to add names to the ARCOS data.[6]

- The "morphine milligram conversion factors" (i.e. "MME") published by the Centers for Disease Control and Prevention in order to standardize the dosage strengths of the various opioids in the ARCOS database.[7]

---

[5] *See* Memorandum Opinion of Judge Faber, *City of Huntington v. AmerisourceBergen Drug Corporation*, 17-cv-1362, ECF No. 1458, (S.D.W.V. July 9, 2021), at 4 (hereinafter "Faber Op."). The Order is attached as Exhibit  B.

[6] *See* "NDC/NHRIC Labeler Codes," available at https://www.fda.gov/industry/structured-product-labeling-resources/ndcnhric-labeler-codes.

[7] *See* CDC, National Center for Injury Prevention and Control. CDC compilation of benzodiazepines, muscle relaxants, stimulants, zolpidem, and opioid analgesics with oral morphine milligram equivalent conversion factors, 2018 version. Atlanta, GA: Centers for Disease Control and Prevention; 2018; available at https://www.cdc.gov/drugoverdose/resources/data.html.

- Data published by the federal Centers for Medicare and Medicaid Services regarding the "National Provider Identifiers" which better identifies mail-order pharmacies, long-term care pharmacies, and managed care pharmacies.[8]

- Data published by the U.S. Census Bureau.

The Court should admit the summaries under FED. R. EVID. 1006 for the reasons set forth below.  The summaries are relevant and will assist the jury and the Court in this case.

### A. Summaries of Voluminous Data are Admissible under Rule 1006.

Federal Rule of Evidence 1006 governs the admissibility of summaries. The rule provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

FED. R. EVID. 1006.  As the Advisory Committee Notes to the rule recognize, "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury."  Under Rule 1006, the underlying documents are not admitted into evidence; instead, "it is plain that a summary admitted under Rule 1006 is itself the evidence that the trier of fact should consider."  *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (citing 2 McCormick on Evidence § 233, p. 68 (John W. Strong ed., 4th ed. 1992); 6 Weinstein's Federal Evidence § 1006.04[2], p. 1006-7 (Joseph M. McLaughlin ed., 2d ed. 1997)).

"The admission of summary charts is a matter within the discretion of the district court[.]"  *Bray*, 139 F.3d at 1109; *Martin v. Funtime, Inc.*, 963 F.2d 110, 115–16 (6th Cir. 1992).  Charts and summaries are frequently used in trials to summarize voluminous data or information. *See,*

---

[8] See "Full Replacement Monthly NPI File," Centers for Medicare and Medicaid Services, November 2018 (current version available at https://download.cms.gov/nppes/NPI_Files.html) (last accessed on August 10, 2021).

e.g., *United States v. Moon*, 513 F.3d 527, 545-46 (6th Cir. 2008) (admitted drug purchase and administration comparison charts based on raw data provided by drug companies and health programs for overbilling of chemotherapy); *United States v. Jamieson*, 427 F.3d 394, 411 (6th Cir. 2005) (admitted summaries of escrow rates used for 969 life insurance policies); *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 494 F. App'x 561, 572 (6th Cir. 2012) (admitted summaries that showed calculations to determine the amount of damages); *Martin*, 963 F.2d at 116 (admitted transcriptions and summaries of defendants' personnel records).

The Sixth Circuit in *Bray* interpreted Rule 1006 to impose five "preconditions" to admitting a summary chart: (1) the documents must be so voluminous that they cannot conveniently be examined in court by the factfinder, but it is not necessary that the documents be so voluminous as to be literally impossible to examine; (2) the summary's proponent must have made the documents available for examination or copying by other parties at a reasonable time and place; (3) the summary's proponent must establish that the underlying documents are admissible, such that a summary based on documents that are inadmissible for irrelevancy, unfair prejudice, lack of authenticity, or some other reason would also be inadmissible; (4) the summary must be accurate and non-prejudicial, meaning that it summarizes the underlying data accurately, correctly, and in a non-misleading way and does not contain conclusions or inferences; and (5) the summary must be properly introduced, meaning the proponent should present the testimony of the witness who supervised its preparation. *Bray*, 139 F.3d at 1109-10. All five of these conditions are met here.

### 1.  The summaries meet the first three *Bray* factors.

First, there is no question that the ARCOS data produced by the DEA, and the distribution data and dispensing data produced by the Defendants, is "voluminous."  It would not be possible to admit the ARCOS database itself into evidence–it only exists in electronic form.  It would not

be feasible to try to print out the ARCOS database, which would fill approximately 20,000 banker boxes.[9]  Similarly, Defendants' distribution data and dispensing data is too large to admit into evidence in any comprehensible form.  It would be more than "difficult and ... inconvenient" for the jury to examine or comprehend the ARCOS data, the distribution data, or the dispensing data. *See Bray*, 139 F.3d at 1109; Faber Op. at 4 ("The only way to comprehend this admissible evidence in a meaningful way is to summarize it.").

Second, the underlying ARCOS data, in both its raw and processed form, has been made available to Defendants on numerous occasions well before this trial, including in CT1A and here. The distribution data and dispensing data is produced by Defendants and meets this factor since it is their own data.

Third, the underlying documents are admissible.  The parties have stipulated that the ARCOS data is admissible[10] and Defendants have no reason to dispute the admissibility of their own data, nor do they have grounds for doing so.  The other underlying data and the data sources from which the summaries were prepared are all public records and, therefore, admissible.  *See, e.g., Warstler v. Medtronic, Inc.*, No. 3:16CV385, 2016 WL 10459786, at *1 (N.D. Ohio Aug. 15, 2016) ("The Court may take judicial notice of public and government documents because their sources 'cannot reasonably be questioned.'"); *Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 456 (6th Cir. 2010).  These data sources are also admissible under FRE 803(8)(A)(ii) as public records that set out matters the office has a legal duty to report, and Rule 807, the residual hearsay rule.[11]  For example, the ARCOS data produced in this case is not publicly available, but it is

---

[9]  Faber Op., at 4.

[10]  *See* Doc. #2675, Parties' Joint Stipulation, at ¶ 16 (ARCOS data "shall be deemed authentic and presumed admissible for the purpose of this litigation.").

[11]  Under FRE 807 evidence can be admitted if it: (1) has equivalent circumstantial guarantees of trustworthiness as evidence admitted under Rules 803 and 804; (2) goes to a material fact; and (3)

nevertheless a "record of a public office," the federal Drug Enforcement Administration. The other information included by Dr. McCann, as described above, is all publicly available and also constitutes records of public offices. FED. R. EVID. 803(8).

### 2. The Summaries Meet the Fourth *Bray* Factor as they are accurate and non-prejudicial.

Fourth, the summaries are accurate and non-prejudicial. The calculations Dr. McCann made in the summaries based on the underlying documents are allowed, according to the plain language of Rule 1006. FED. R. EVID. 1006 (allowing "calculation[s] to prove the content of voluminous writings").

It is not considered prejudicial that the 1006 summaries were based on subsets of available data. "[N]either Rule 1006, nor *United States v. Bray* indicates that a summary document must summarize all available data of the same type as that underlying the proposed submission." *United States v. Hofstetter*, No. 3:15-CR-27-TAV-DCP, 2019 WL 5057176, at *4 (E.D. Tenn. Oct. 8, 2019). The fact that the information included in the summaries is not comprehensive of the entirety of the underlying data goes to "evidentiary weight, not the threshold question of admissibility." *Bray*, 139 F.3d at 1113. Indeed, *Bray* upheld the admissibility of summaries based on different time periods where the summaries "clearly delineated" this fact. *Id.* at 1112-1113 (charts focusing on different time periods, including one that was consistent with the government's embezzlement case theory, were admissible under Rule 1006, and the different focuses of the chart went to weight and not admissibility). Judge Faber in the CT2 trial ruled that similar summaries

---

is more probative than any other evidence that reasonably could have been procured. Finally, (4) the admission of the evidence must support the general purposes of the Rules of Evidence and the interests of justice. FED. R. EVID. 807. The Sixth Circuit has confirmed that summaries made from documents admissible under Rule 807 are similarly admissible. *Jamieson*, 427 F.3d at 411 ("if evidence is admissible under Rule 807, it should also be appropriate material for a Rule 1006 summary.").

(which he called charts) were admissible despite not using all the underlying data.  Faber Op. at 8 ("Charts are admissible despite their encompassing less than all the underlying data.") (cit. om.); *see also United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015) (defendants could challenge the accuracy of summary that included only 151 of over 370,000 text messages via cross examination); *Hofstetter*, 2019 WL 5057176, at \*4-5 (the fact that the government created summary of only a subset of certain pain clinic files, instead of all of the records, goes to weight and not admissibility, because Rule 1006 does not mandate "that a summary document must summarize all available data of the same type"); *United States v. Nivica*, 887 F.2d 1110, 1125-26 (1st Cir. 1989) (holding incompleteness of data underlying a Rule 1006 summary goes to weight rather than admissibility and admitting summaries of business records that arguably failed to reflect total financial activity); *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018) ("A Rule 1006 summary chart need not accurately reflect all the facts in the case; it merely must accurately represent the facts that it purports to summarize.").

The inclusion of additional data and information in the summaries also does not render them inaccurate and thus inadmissible.  Judge Faber carefully considered this argument and explained why the inclusion of data from various other sources did not warrant the exclusion of the summaries.  Faber Op. at 15-18.  "What McCann did with information outside the four corners of the underlying materials was permissible. He applied statements in government publications to narrow his subject of summary and to make the data more comprehensible."  Faber Op. at 15.  Judge Faber also found that "McCann did not so much add to the underlying data with the government sources as use those sources to translate the data into additional categories, for better comprehension."  Faber Op. at 16.  This is consistent with the rulings of other courts that have faced this issue.  *See, e.g., United States v. Brown*, 820 Fed. App'x 191, 195-96 (4th Cir. 2020)

(summaries of "meal count sheets [and] other documents" admissible under Rule 1006); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197, 225-226 (Bankr. S.D.N.Y. 2019) (summary charts of various data sources were admissible 1006 summaries); *PHI, Inc. v. Off. & Pro. Emps. Int'l Union*, No. CIV. A. 06-1469, 2009 WL 1530939, at *3 (W.D. La. May 28, 2009) (1006 summary charts could incorporate data from various government agencies, as long as the sources were delineated).  Consistent with *Bray*, the additional data does not cause the summaries to be embellished by, or annotated with, Plaintiffs' conclusions or inferences they want the jury to draw.

In addition, the slight changes and corrections that Dr. McCann made to the data are permissible because they make the data more understandable.  "In some cases, corrections to underlying data may render summaries inaccurate and inadmissible.  But this is not such a case." Faber Op. at 22.  Judge Faber found this to be so for several reasons.  First, "McCann was completely transparent about the corrections he made." Faber Op. at 22.  Second, "the corrections were appropriate."  *Id*.  "Dr. McCann excluded duplicate transactions, erroneous transactions, transactions with obvious errors in quantity, and transactions reported as lost in transit. Additionally, McCann corrected miscalculated weight figures."  *Id*.  Third, "[p]erhaps most significantly … the corrections were microscopic, and no magnification of them renders the charts inadmissible."  *Id*.  As Judge Faber concluded, the notion "that any correction to summarized material, no matter how miniscule, infects the material such that no summary based upon it is admissible" would take the teeth and meaning out of Rule 1006 in many situations.  *Id*. at 23. "Rule 1006 is not so impractical."  *Id*.  All *Bray* requires is that the underlying information be summarized accurately and in a non-misleading manner.  *Bray*, 139 F.3d at 1110 (rejecting claim

14

that charts were misleading and should have been excluded because fact that various charts covered different time periods went to weight, not admissibility).

Judge Faber found that the summaries actually made the information presented more understandable. Faber Op. at 6 ("The charts tabulate or illustrate a morass of data to make it comprehensible."); at 15 (McCann "applied statements in government publications to narrow his subject of summary and to make the data more comprehensible."); *see also Hofstetter*, 2019 WL 5057176, at *5 (rejecting argument that government allegedly "cherry picked" files rendering related summaries misleading because "[t]he non-comprehensive nature of the data underlying a summary goes to 'evidentiary weight, not the threshold question of admissibility.'") (quoting *Bray*, 139 F.3d at 1113). Judge Faber also considered Dr. McCann's summaries in light of *Bray* and found them admissible. Faber Op. at 16 ("McCann did not so much <u>add</u> to the underlying data with the government sources as <u>use</u> those sources to <u>translate</u> the data into additional categories, for better comprehension. And '[n]othing [was] lost in the translation.'") (emphasis in original) (quoting *Bray*, 139 F.3d at 1110).

The summaries also do not include improper inferences or conclusions. Instead, the summaries simply tabulate a standard set of transactional information in the databases and depict the information in a way that will allow the jury to see, and hopefully understand, this important evidence. Dr. McCann summarized uniform data sets in a consistent manner. This is not a circumstance where different summary processes were applied to different data sets which Plaintiffs then sought to treat in the same manner, nor is it a circumstance in which Plaintiffs are seeking to apply a conclusory label to nonapplicable data. *See United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019) (finding summaries which treated different data sets in different manners, excluded some data sets regarding some defendants but not others, and which implied that all listed

transactions related to fraudulent activity when that had not been proven, should be treated as Rule 611(a) summaries instead of Rule 1006 summaries); *see also* Faber Op. at 15, 17-18 (distinguishing between this case and examples in which summaries "introduce argumentative inferences").

Thus, the summaries meet *Bray's* fourth requirement and should be admitted.

### 3. Dr. McCann will be available for cross-examination in compliance with *Bray's* fifth factor.

Fifth, the summaries will be properly introduced as part of Dr. McCann's testimony, as the person who prepared the charts. Defendants will be able to cross-examine him as to any issue. *See, e.g., Kilpatrick*, 798 F.3d at 383; *Hofstetter*, 2019 WL 5057176, at *6.

### B. The Summaries are Separately Admissible under Rule 611.

In addition to being admissible under Rule 1006, the summaries are admissible under FRE 611(a). Rule 611(a) provides that the court can "exercise reasonable control over the mode … of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth." FED. R. EVID. 611(a)(1). The Sixth Circuit allows for the admission of certain types of evidence as "pedagogical devices." *Bray*, 139 F.3d at 1111 (citing *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986)). These types of summaries or charts "organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence." *Id*. In many circumstances such a pedagogical device is "an illustrative aid … that (1) is used to summarize or illustrate evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." *Id*. Although they are often not admitted into evidence, these

demonstrative or "pedagogical" summaries, can themselves be admitted into evidence when the summary "is so accurate and reliable a summary illustration or extrapolation of testimonial or other evidence in the case as to reliably assist the factfinder in understanding the evidence, although not within the specific requirements of Rule 1006." *Id*. at 1111-12.  Here, because the summaries are accurate and reliable, and will assist the jury in understanding the ARCOS data, distribution data, dispensing data, and related evidence, they should be admitted.

Whether under Rule 1006 or Rule 611, the Court should admit the charts.  Admission of these summaries is well within the Court's discretion and is the only practicable means of making this critical evidence available and understandable to the jury.

Dated: August 12, 2021                    Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR 00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

17

W. Mark Lanier
THE LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, TX 77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Trial Counsel*


*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*


Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113
(216) 861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com


Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of August, 2021, the foregoing has been served via CM/ECF to all counsel of record.

*/s/ Peter H. Weinberger*
Peter H. Weinberger
Plaintiffs' Liaison Counsel
