UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>TRACK THREE | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE
OHIO BOARD OF PHARMACY REPORT ON WORKLOAD SURVEY**

Defendants[1] hereby move *in limine* to exclude a report (the "Report") by the Ohio Board of Pharmacy (the "Board") regarding a survey that was recently conducted on workplace conditions (copy attached hereto as Exhibit A). The Report—which is on Plaintiffs' exhibit list and includes the survey results as well as an appendix of anonymous comments from pharmacists—should be excluded for at least three reasons. First, the Report is inadmissible in its entirety as double hearsay under Federal Rule of Evidence ("Rule") 802. Second, the survey results are inadmissible under Rules 702 and 703. The survey was not conducted for litigation purposes, it is not sponsored by an expert witness, and virtually no information is available about its methodology. The standards required for expert evidence simply cannot be met. And third, the survey is not relevant: it does not relate to the dispensing of prescription opioids, it is not clear whether the survey reflects any responses from pharmacists working in the Plaintiff counties, and it is not clear which responses to the survey were from pharmacists employed by

---

[1] CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., CVS Indiana, L.L.C., Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., Inc., Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center, Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center, Giant Eagle, Inc./HBC Service Company, and Walmart Inc.

Defendants.  In addition, any probative value the survey could have is far outweighed by the danger of unfair prejudice.  For these reasons, the Report should be excluded in its entirety.

**I.      BACKGROUND**

The Board released the Report on April 20, 2021. The Report summarizes responses to a survey the Board sent to pharmacists working in Ohio in July 2020 regarding workplace conditions. Ex. A at 1. The Report discloses virtually no information about the survey's design, methodology, or data integrity. The Report does not attach a copy of the survey in the form it was disseminated, nor does it indicate how the survey was disseminated (by mail, e-mail, or some other method). It is not even clear that the exact questions sent to pharmacists are included in the Report. The Report features virtually no indicia of a professionally designed and implemented survey.

The little we know about the survey undermines its reliability. The Report states that the survey was sent to 15,747 pharmacists working in Ohio and that 4,159 pharmacists responded—a response rate of only 26 percent. Ex. A at 5. The survey does not provide any information on the characteristics of the pharmacists who did not respond. It also gives no indication that any effort was made to account for or correct nonresponse bias.

As for the substance of the survey, pharmacists reportedly were asked to rate their level of agreement (strongly agree, agree, neutral, disagree, and strongly disagree) with nine statements about workplace conditions in their pharmacies. Examples include "I feel that I have adequate time to complete my job in a safe and effective manner," and "I feel that inadequate staffing at my pharmacy results in delays in patients receiving medications in a timely manner." Ex. A at 6, 14. Pharmacists reportedly also were asked to provide basic information about their

background or their employment conditions, such as how many hours per week they work and how many years they have been a pharmacist. Ex. A at 29, 31.[2]

The bulk of the Report (144 of 177 pages) consists of an appendix of raw, unverified, and entirely anonymous responses to a request for "[a]ny additional comments on this topic that you think would be helpful to the Board." *See* Ex. A at 33-177. These anonymous responses contain extremely prejudicial comments that have no relevance to the issues in this case. *See*, *e.g.*, *id.* at 48 (entire comment: "CVS is the worst"); *id.* at 65 ("we all really want to take care of our patients and make a difference in their lives but we [can't] due to the greed of our corporations").

Few comments address the dispensing of prescription opioids, but those comments that do focus on opioid *stewardship* (or compliance) obligations as contributing to pharmacists' complaints about workplace conditions. *See, e.g.*, Ex. A at 97 ("vast amounts of time spent on Opioids and policing doctors"); *id.* at 119 ("Opioid use issues should be a medical board issue since we can't dispense without a prescription. Following up on these take[s] a lot of time, we are being used to do police work.") *id.* at 149 (including "opioid stewardship" among the many tasks that complicate pharmacists' jobs). In other words, pharmacists expressed that they spend significant amounts of time evaluating opioid prescriptions.

The comments section also contains irregularities that undermine the Report's probative value. For example, some of the comments are total gibberish. *See id.* at 134 (a full paragraph of "jkljlsjdafkljsdaklfjaskl" or similar nonsense strings). Many are hard to decipher because of HTML conversion errors. *E.g.*, *id.* at 34 ("With Covid, there is additional &amp;quot;services&amp;quot; that our company offers, but again with no additional help.").

---

[2] The survey made no effort to determine whether workplace conditions are affected by outside factors such as the COVID-19 pandemic, excessive or inadequate government regulation, or the Board itself. Some respondents, however, raised outside factors such as these in the comments section.

Others are cryptic or entirely unhelpful. *Id.* at 61 ("I am willing to work and relocate anywhere in Ohio but it is extremely difficult to find employment."); *id.* at 73 ("I have been able to increase my efficiency and productivity by working from home. I would like to board to consider continuing allowance to work from home indefinitely."); *id.* at 163 ("This has to stop."). The Report includes all of the comments, without context or analysis, much less attribution.

## II. ARGUMENT

### A. The Report is inadmissible hearsay under Rule 802.

The Report is inadmissible in its entirety as double hearsay under Rule 802. It not only is an out-of-court statement in itself, it also is based on a second layer of anonymous, out-of-court statements purportedly made to the Board by unidentified pharmacists. The survey results are comprised of this second layer of out-of-court statements, as are the 144 pages of unverified and anonymous comments.

The public records exception to the hearsay rule cannot be met here. It applies only to statements "based on evidence *actually observed by the preparer*" of the report. *Miller v. Field*, 35 F.3d 1088, 1091-92 (6th Cir. 1994) (emphasis in original); *see also Reynolds v. Green*, 184 F.3d 589, 596 (6th Cir. 1999) (admissibility of ombudsman's report did not extend to statement of party to ombudsman); *Knotts v. Black & Decker, Inc.*, 204 F. Supp. 2d 1029, 1037 (N.D. Ohio 2002) ("witness statements contained in an investigative report are not admissible under 803(8)"). The Report is not based on the first-hand observations of the Board; rather, it purportedly is based on the observations of pharmacists, who then apparently answered a survey sent to them by the Board. This form of double hearsay is not subject to the public records exception. *See Abascal v. Fleckenstein*, 820 F.3d 561, 566-67 (2d Cir. 2016) (comments in survey inadmissible as hearsay within hearsay); *Solarchick v. Metropolitan Life Ins. Co.*, No. 01-444, 2006 WL 8457721, at *1-2 (W.D. Pa. May 11, 2006) (same). And there is particularly good

4

reason for that result here—the survey is based on out-of-court statements reportedly made by pharmacists to the Board that are presented *anonymously* in the Report. This completely strips defendants of their cross-examination rights.

Separately, the Report also is not subject to the public records exception because, as discussed below, "the source of the information or other circumstances indicate a lack of trustworthiness." *See* Rule 803(8)(B); *see also United States v. 478.34 Acres of Land*, 578 F.2d 156, 159 (6th Cir. 1978).

### B. The Report is inadmissible under Rules 403, 702, and 703 because it is unreliable.

In addition to being inadmissible hearsay, the Report is separately inadmissible under Rules 403, 702, and 703 because it is unreliable. Although properly conducted surveys may be admitted in some types of federal litigation for narrow purposes (such as Lanham Act cases that require a showing of confusion in the marketplace), those surveys typically are conducted and presented by expert witnesses. The Board's survey was not conducted by an expert witness who will be offered by Plaintiffs at trial. And even if it had, surveys conducted by expert witnesses that "suffer[] from substantial methodological flaws" are "excluded under both Rule 403 and Rule 702." *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 370, 285 (W.D.N.Y. 2019); *Menasha Corp. v. News America Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1029-30 (N.D. Ill. 2003) (striking survey report for failure to meet reliability requirements of Rule 702), *aff'd*, 354 F.3d 661, 664-65 (7th Cir. 2004). Similarly, surveys conducted by expert witnesses, like all other evidence, also are not admissible if they are unreliable or more prejudicial than probative. *See* Fed. R. Evid. 703; *Menasha Corp.* 238 F. Supp. 2d at 1031 (striking portion of expert report quoting or otherwise referencing unreliable survey), *aff'd*, 354 F.3d 661, 664-65 (7th Cir. 2004).

Surveys conducted by nonexperts for nonlitigation purposes, like the Board's survey here, typically are not designed to meet admissibility standards for evidence in court. Nonlitigation surveys "frequently ask irrelevant questions or select inappropriate samples of respondents for study." Shari Seidman Diamond, *Reference Guide on Survey Research* 373 [hereafter, "Reference Guide"] (reprinted in Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011)). They also may not be formulated and implemented by survey experts; may not employ clear, precise, and unbiased questions; may not organize the questions to avoid order or context effects; may not account for nonresponse bias; and may not provide sufficient detail on methodology. The Board's survey appears to suffer from some and possibly all of these flaws, although the lack of information available about the survey's methodology makes it difficult to know for sure.

What is certain, however, is that the Board's survey is tainted by extreme nonresponse bias. Nonresponse bias occurs when the respondents to a survey are materially different from the nonrespondents. As the Federal Judicial Center has explained, the problem is that "nonresponse often is not random," Reference Guide at 383, such that the responding group's answers may not reflect the population as a whole. "The key to evaluating the effect of nonresponse in a survey is to determine as much as possible the extent to which nonrespondents differ from the respondents in the nature of the responses they would provide if they were present in the sample." *Id.* When the nonresponse rate is nearly **75 percent**, as it was for the Board's survey, the need for rigorous analysis of nonrespondents is critical. *See, e.g.*, *In re Autozone, Inc.*, No. 3:10-md-02159-CRB, 2016 WL 4208200, at *18 (N.D. Cal. Aug. 10, 2016) ("red flag" when refusals outnumber surveys responded to by almost two-thirds); *Security Alarm Fin. Enters. v. Alder Holdings, LLC*, No. 3:13-cv-00102-SLG, 2017 WL 5248181, at *4-5 (D. Alaska Feb. 21, 2017). Yet the Report

6

contains no analysis whatsoever of nonrespondents. *Cf. Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008) (rejecting survey in part because interviewer did not analyze reasons for nonresponses), *aff'd*, 639 F.3d 942, 949 (9th Cir. 2011); *In re Autozone*, 2016 WL 4208200, at *18 (same). The likelihood of nonresponse bias is particularly pronounced here because common sense dictates that dissatisfied pharmacists are much more likely than their satisfied counterparts to respond to a survey that essentially asks pharmacists to rate their dissatisfaction with their jobs for the purpose of determining whether regulation is necessary to make their jobs easier.

The Board's survey also violated another general rule of survey science designed to prevent bias by disclosing who was asking the questions and for what purpose. *See* Reference Guide at 374 ("potential bias is minimized by having interviewers and respondents blind to the purpose and sponsorship of the survey"). Responses might have been very different if the questions came from a market research firm without disclosing who was paying for the survey and the reasons it was being conducted.

While the likelihood of significant bias alone is enough to exclude the Report, other factors support that conclusion. The Report lacks virtually all of the data and analysis that typically accompany professional surveys and permit both adversaries and factfinders to challenge and weigh the survey's results. *See, e.g.*, Reference Guide at 374 (objectivity controls); *id.* at 375 (use of skilled and experienced experts to design and conduct the survey); *id.* (skilled and experienced testifying experts); *id.* at 378-85 (sampling analyses and nonresponse bias); *id.* at 386-87 (precautions to ensure only qualified respondents were included); *id.* at 387-88 (testing of questions for bias); *id.* at 391-92 (analysis of open-ended vs. closed-ended questions); *id.* at 395-96 (precautions against order or context effects); *id.* at 401-09 (limitations on data

collection); *id.* at 415-16 (including complete and detailed information on all relevant characteristics). And as discussed above, the Report contains an abundance of irrelevant and inflammatory comments that will only confuse the jury and needlessly prolong the trial. For these reasons, the Court should rule that the Report is inadmissible both as substantive evidence and as a basis for expert opinion.

> C. **The Report should be excluded because it is not relevant and because any probative value it has is substantially outweighed by the danger of unfair prejudice.**

The basic question to be tried in this case is whether Defendants created a public nuisance by wrongfully distributing or dispensing prescription opioids in the Plaintiff counties. Yet the Board's survey asked no questions at all about prescription opioids and collected no data whatsoever on that topic. This case is not about pharmacist workplace conditions, and admission of the Report would require a mini-trial on staffing and workplace conditions at Defendants' pharmacies—something the Court's restrictions on trial time and witnesses simply does not allow for. While the Report raises vague concerns about "safety," it did not seek information on whether safety concerns resulted in pharmacists filling opioid prescriptions that should not have been filled.[3] Moreover, the Report does not indicate which responses, if any, were received from pharmacists working at Defendants' pharmacies, much less pharmacists working at Defendants' pharmacies in the Plaintiff counties.

Even if the Report were relevant, however, it should be excluded under Rules 403 and 703 because any probative value it may have (none) is substantially outweighed by the danger of unfair prejudice. It cannot be disputed that anonymous comments like "CVS is the worst" are

---

[3] Indeed, as discussed *supra*, the sparse references to prescription opioids that appear in the 144 pages of anonymous comments indicate that pharmacists were spending substantial amounts of time evaluating prescriptions for opioid medications.

highly inflammatory and unfairly prejudicial. *Cf. Weinstein v. Siemens*, No. 2:07-CV-15000, 2010 WL 4790915, at *4 (E.D. Mich. Nov. 17, 2010) (anonymous call, although highly probative of claim that defendant driver was intoxicated at work and had a drinking problem, was inadmissible under Rule 403 because of unreliability and inability to cross-examine); *Menasha Corp.*, 238 F. Supp. 2d at 1031 (striking portions of expert report that quoted or referenced unreliable survey). The Report is filled with other inflammatory statements, including some that attack the Board. Thus, even if the Report has some marginal relevance, it should be excluded to ensure that the jury is not improperly influenced.

### III.  CONCLUSION

For the foregoing reasons, the Court should enter an order precluding Plaintiffs and their experts from introducing, citing, or relying on the Report.

Dated: August 12, 2021

Respectfully submitted,

/s/ *Kaspar J. Stoffelmayr*
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
Bartlit Beck LLP
54 West Hubbard Street
Chicago, Illinois 60654
Phone: (312) 494-4400
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
sharon.desh@bartlitbeck.com
sten.jernudd@bartlitbeck.com

/s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, LLC, CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*

Alex J. Harris
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202

Phone: (303) 592-3100
alex.harris@bartlitbeck.com

*Attorneys for Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc.*

/s/ Robert M. Barnes
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
(412) 471-3490
rbarnes@marcus-shapira.com
livingston@marcus-shapira.com
kobrin@marcus-shapira.com

*Counsel for Giant Eagle, Inc. and HBC Service Company*

/s/ Kelly A. Moore
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6612
kelly.moore@morganlewis.com

Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5917
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center and Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center*

/s/ Tina M. Tabacchi
Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
(312) 782-3939
tmtabacchi@jonesday.com
tfumerton@jonesday.com

*Counsel for Walmart Inc.*

10

## CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that the foregoing motion was served on all counsel of record via the Court's ECF system on August 12, 2021.

                                              /s/ Eric R. Delinsky
                                              Eric R. Delinsky