# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................1

II.    IN LIMINE RULINGS REQUESTED.................................................................2

    1.    The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages." ..................................................................2

    2.    The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant." ...........................5

    3.    The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others. ..........................9

    4.    The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use....................................................11

    5.    The Court should preclude evidence concerning lobbying and other protected petitioning activity. ...............................................................................13

    6.    The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions. ...........................16

    7.    The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations....................................................18

    8.    The Court should require plaintiffs to establish the necessary foundation for their experts' testimony...........................................................................22

    9.    The Court should not allow use of certain charts presenting misleading and irrelevant data...........................................................................................25

    10.    The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct. ........................................28

    11.    The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability......................................................31

    12.    The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis. .................................................................................34

    13.    The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers..............................35

14.     The Court should preclude any comment regarding the absence of a
        corporate representative at trial.............................................................................36

# TABLE OF AUTHORITIES

<div align="right"><strong>Page(s)</strong></div>

**Cases**

*Andler v. Clear Channel Broad., Inc.,*
670 F.3d 717 (6th Cir. 2012) ...................................................................23

*Atanus v. S&C Elec. Co.,*
454 F. Supp. 2d 753 (N.D. Ill. 2006) .......................................................21

*BE & K Constr. Co. v. Nat'l Labor Relations Bd.,*
536 U.S. 516 (2002)..................................................................................14

*Bedford v. Collins,*
567 F.3d 225 (6th Cir. 2009) ....................................................................31

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Trans.,*
596 F.3d 357 (6th Cir. 2010) ......................................................................4

*Bhandari v. VHA Southwest Community Health Corp.,*
778 F. Supp. 2d 1155 (D. N.M. 2011) ......................................................32

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,*
113 F. Supp. 2d 345 (E.D.N.Y. 2000) ........................................................3

*Boggs v. Divested Atomic Corp.*
1997 WL 33377790 (S.D. Ohio Mar. 24, 1997).......................................10

*Boler Co. v. Watson & Chalin Mfg., Inc.,*
372 F. Supp. 2d 1013 (N.D. Ohio 2004).....................................................8

*Bouchard v. American Home Products Corp.,*
213 F. Supp. 2d 802 (N.D. Ohio 2002).......................................................1

*Campbell v. PMI Food Equip. Grp., Inc.,*
509 F.3d 776 (6th Cir. 2007) ....................................................................14

*Chambers v. St. Mary's Sch.,*
697 N.E.2d 198 (Ohio 1998).....................................................................21

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
538 F. Supp. 1257 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984) ...........................15

*City of Cleveland v. Cleveland Elec. Illuminating Co.,*
734 F.2d 1157 (6th Cir. 1984) ..................................................................15

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 749 (6th Cir. 1980) ...................................................................................32

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)..................................................................................................14

*Davis v. Clark Cty. Bd. of Comm'r*,
994 N.E.2d 905 (Ohio Ct. App. 2013)......................................................................21

*Davis v. Marathon Oil Co.*,
528 F.2d 395 (6th Cir. 1975) ....................................................................................10

*In re DePuy Orthopaedics, Inc.*,
888 F.3d 753 (5th Cir. 2018) ..........................................................................1, 29, 30

*Dippin' Dots, LLC v. Travelers Prop. Cas. Co. of Am.*,
322 F.R.D. 271 (W.D. Ky. 2017)..............................................................................33

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)..................................................................................................13

*Eaton v. Newport Bd. of Educ.*,
975 F.2d 292 (6th Cir. 1992) ....................................................................................13

*Feminist Women's Health Ctr., Inc. v. Mohammad*,
586 F.2d 530 (5th Cir. 1978) ....................................................................................15

*Ferrarelli v. Federated Fin. Corp. of Am.*,
253 F.R.D. 432 (S.D. Ohio 2008) .............................................................................33

*Flying J, Inc. v. Central CA Kenworth*,
45 Fed. App'x 763 (9th Cir. 2002) ..............................................................................4

*Gomez v. Schoenbeck*,
2019 WL 3887128 (S.D. Ill. Aug. 19, 2019) ...........................................................36

*Helminski v. Ayerst Labs.*,
766 F.2d 208 (6th Cir. 1985) ....................................................................................34

*Henry v. Quicken Loans, Inc.*,
2011 WL 13208621 (E.D. Mich. Jan. 31, 2011).......................................................31

*Hirst v. Inverness Hotel Corp.*,
544 F.3d 221 (3d Cir. 2008).....................................................................................35

*Hitachi Medical Systems America, Inc. v. Horizon Medical Group*,
2008 WL 11380203 (N.D. Ohio, Oct. 30, 2008) ......................................................10

*Hodge v. Hurley*,
   426 F.3d 368 (6th Cir. 2005) ....................................................................30

*Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*,
   530 F. Supp. 1098 (E.D. Pa. 1982) ..........................................................13

*Iron Workers Local Union No. 17 Ins. Fund & its Trustees v. Philip Morris Inc.*,
   29 F. Supp. 2d 801 (N.D. Ohio 1998) ...............................................32, 33

*In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*,
   635 F.2d 67 (2d Cir. 1980)........................................................................26

*In re Lewis*,
   845 F.2d 624 (6th Cir. 1988) ......................................................................5

*Louzon v. Ford Motor Co.*,
   718 F.3d 556 (6th Cir. 2013) ......................................................................1

*Malone v. Courtyard by Marriott L.P.*,
   659 N.E.2d 1242 (Ohio 1996)...................................................................33

*Marzullo v. J.D. Pavement Maintenance*,
   975 N.E.2d 1 (Ohio Ct. App. 2011) ............................................................3

*McLean v. 988011 Ontario, Ltd.*,
   224 F.3d 797 (6th Cir. 2000) .......................................................22, 23, 24

*Mitroff v. Xomox Corp.*,
   797 F.2d 271 (6th Cir. 1986) ....................................................................35

*Ohio ex rel. Morrison v. Wiener*,
   83 N.E.3d 292 (Ohio Ct. App. 2017)........................................................21

*Myles v. Meineke*,
   82 Ohio App. 126 (Ohio Ct. App. 1948) ....................................................5

*Niskanen v. Giant Eagle, Inc.*,
   912 N.E.2d 595 (Ohio 2009)....................................................................33

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014).................................................................................13

Opdyke Inv. Co. v. City of Detroit,
   883 F.2d 1265 (6th Cir. 1989) ..................................................................13

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)...................................................................................8

*Potters Med. Ctr. v. City Hosp. Ass'n*,
  800 F.2d 568 (6th Cir. 1986) ........................................................................14

*R.C. Olmstead, Inc., v. CU Interface, LLC*,
  606 F.3d 262 (6th Cir. 2010) ..........................................................................4

*Roddy v. Monsanto Co.*,
  6 Fed. App'x 549 (8th Cir. 2001) ...................................................................26

*Saint-Gobain Autover v. Xinyi Glass N. Am.*,
  2009 WL 10689369 (Oct. 23, 2009) ..............................................................10

*Scott v. Condo*,
  2002 WL 832210 (Ohio Ct. App. May 3, 2002) .............................................3

*Shahid v. City of Detroit*,
  889 F.2d 1543 (6th Cir. 1989) .......................................................................23

Snyder v. Phelps,
  562 U.S. 443 (2011) ......................................................................................14

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) ........................................................................................20

*State v. Clay*,
  181 Ohio App. 3d 563 (8th Dist. 2009) .........................................................30

*Taylor v. City of Cincinnati*,
  143 Ohio St. 426 (Ohio 1944) .......................................................................21

*Tovey v. Nike, Inc.*,
  2014 WL 3510636 (N.D. Ohio July 10, 2014) ..........................................24, 25

*United States Football League v. Nat'l Football League*,
  634 F. Supp. 1155 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ............15

*United States v. Alghazouli*,
  517 F.3d 1179 (9th Cir. 2008) .......................................................................19

*United States v. Brawner*,
  173 F.3d 966 (6th Cir. 1999) ...........................................................................1

*United States v. Daniel*,
  329 F.3d 480 (6th Cir. 2003) .........................................................................19

*United States v. Dimora*,
  879 F. Supp. 2d 718 (N.D. Ohio 2012) ..........................................................32

*United States v. Freeman*,
730 F.3d 590 (6th Cir. 2013) .............................................................35

*United States v. Gessa*,
971 F.2d 1257 (6th Cir. 1992) ...........................................................17

*United States v. Jobson*,
102 F.3d 214 (6th Cir. 1996) .........................................................16, 17

*United States v. Kilpatrick*,
798 F.3d 365 (6th Cir. 2015) .............................................................11

*United States v. McFadyen-Snider*,
552 F.2d 1178 (6th Cir. 1977) .......................................................17, 18

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) ............................................................37

*United States. v. Murray*,
784 F.2d 188 (6th Cir. 1986) ..............................................................1

*United States v. Nixon*,
694 F.3d 623 (6th Cir. 2012) ............................................................37

*United States v. Palma*,
473 F.3d 899 (8th Cir. 2008) ............................................................36

*United States v. Phillips*,
872 F.3d 803 (6th Cir. 2017) ............................................................35

*United States v. Pits*,
85 F.3d 629 (6th Cir. 1996) .............................................................37

*United States v. Ring*,
513 F.2d 1001 (6th Cir. 1975) ..........................................................17

*United States v. Schimmel*,
943 F.2d 802 (7th Cir. 1991) ............................................................36

*United States v. Semak*,
536 F.2d 1142 (6th Cir. 1976) ..........................................................17

*United States v. Signer*,
482 F.2d 394 (6th Cir. 1973) ............................................................37

*United States v. Solivan*,
937 F.2d 1146 (6th Cir. 1991) ..........................................................29

*VIBO Corp. v. Conway*,
   669 F.3d 675 (6th Cir. 2012) ................................................................14

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
   641 F.2d 457 (7th Cir. 1981) ...........................................................13, 15

*Wilbon v. Plovanich*,
   2016 WL 3922906 (N.D. Ill. July 21, 2016) ..........................................26

**Statutes**

18 U.S.C. § 1341 .......................................................................................19

18 U.S.C. § 1343 .......................................................................................19

18 U.S.C. § 1961 ...............................................................................*passim*

21 U.S.C. §§ 801–904, 951–971 ...............................................................19

21 U.S.C. § 843(a)(4) ................................................................................18

Ohio Rev. Code § 119.03 ..........................................................................20

Ohio Rev. Code § 2315.21 ........................................................................33

Ohio Rev. Code § 2913.05 ........................................................................20

Ohio Rev. Code § 2923.31 ...................................................................19, 20

Ohio Rev. Code § 2923.32(A)(1) ..............................................................19

Ohio Rev. Code § 4729 .............................................................................20

**Other Authorities**

Fed. R. Civ. P. 26 ..........................................................................4, 11, 12

Fed. R. Civ. P. 37 .......................................................................................4

Fed. R. Civ. P. 42 .....................................................................................33

Fed. R. Evid. 401 ................................................................................36, 37

Fed. R. Evid. 402 ..............................................................................*passim*

Fed. R. Evid. 403 ..............................................................................*passim*

Fed. R. Evid. 404 ..........................................................................16, 17, 29

Fed. R. Evid. 602 ...................................................................................................................10

Fed. R. Evid. 701 ...........................................................................................................11, 12, 35

Fed. R. Evid. 702 ...........................................................................................................11, 12, 35

Ohio Rule of Professional Conduct 3.4(e)........................................................................28, 30

## I.     INTRODUCTION

Motions *in limine* are a gateway mechanism to ensure the efficient and fair administration of trial.  They allow the Court to "ensure evenhanded and expeditious management of trial[] by eliminating evidence that is clearly inadmissible for any purpose." *Bouchard v. American Home Products Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002) (internal citation omitted).  Granting such motions can streamline the trial. *See United States v. Brawner,* 173 F.3d 966, 970 (6th Cir. 1999).  Early resolution of evidentiary issues also avoids needless interruption at trial by reducing arguments over evidence and setting clear expectations for the parties. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013).

Streamlining is particularly important here.  The Court has provided time allocations for this trial that presumptively permit each defendant just 12.5 hours to present its defenses.[1]  It is therefore critical that the parties focus their attention on the evidence and issues that are admissible and germane to the issues to be tried, without unnecessary side-shows on collateral issues.

Motions *in limine* also preserve trial integrity.  Ruling on certain critical questions now will reduce the risk that a jury will be tainted by improper references to inadmissible matters in opening statements or elsewhere. *See United States. v. Murray*, 784 F.2d 188, 189 (6th Cir. 1986) (finding that a judge's prompt instruction to disregard improper evidence was "very close to an instruction to unring a bell" despite the diligence of the objection).  As explained below, that risk has already played out in at least one prior case involving the same counsel who represent plaintiffs in this case. *See In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 785-87 (5th Cir. 2018) (new trial required).

---

[1] Defendants do not waive their objection to the insufficient time allotted to them for trial.

As this Court has observed on multiple occasions, these are important cases that have garnered unprecedented public attention. The stakes are high, and all parties deserve a neutral forum. Yet plaintiffs and their counsel may be tempted to divert the jury's attention away from the core facts and evidence with irrelevant and prejudicial spectacle. Prudence dictates taking steps at the outset to ensure the integrity of the trial by precluding inadmissible evidence and improper argument.

This brief (and other *in limine* briefs filed by industry groups and individual defendants) reflects a good-faith effort to identify important evidentiary issues that merit resolution pre-trial. Where appropriate, this brief identifies specific examples of evidence that plaintiffs may offer. In most instances, however, defendants still have no meaningful notice of the *specific* evidence plaintiffs intend to offer at trial. Plaintiffs served several hundred hours of deposition designations, an exhibit list with more than 150,000 documents, and a witness list with hundreds of names. Although some reductions have since been made, these lists still massively exceed what plaintiffs can possibly present at trial. Defendants reserve all objections to all evidence and arguments plaintiffs actually seek to present.

## II.     IN LIMINE RULINGS REQUESTED

### 1.     The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

In a telephonic conference with the Court on September 16, 2019, plaintiffs suggested for the first time that they would pursue "future" damages at trial on their RICO, OCPA, and conspiracy claims – separate and apart from their proposed "abatement" remedy. That sudden announcement came after many months of expert disclosures, depositions, and motions, during which plaintiffs had every opportunity to develop their damages theories but failed to put forward any evidence supporting a future damages claim. It is no coincidence that plaintiffs raised this issue only after the Court stated that it, not the jury, would determine the

appropriateness, structure, and amount of any "abatement" remedy. The belated assertion that plaintiffs are seeking future damages is a transparent attempt to make an end-run around that decision. It is too late to inject intricate, underdeveloped issues into an extraordinarily complex trial now less than one month away. Doing so would violate federal discovery rules and unfairly prejudice defendants. It would also create a risk of double recovery between a jury award and the prospective compensation plaintiffs have said they intend to seek under the mantle of nuisance "abatement."[2] This Court should therefore bar plaintiffs from presenting future damages evidence in connection with any of their claims.

As a threshold matter, neither of plaintiffs' operative Complaints mention or seek future damages. (Dkt. 1465 at ¶ 1138; Dkt. 1630 at ¶ 1179). Indeed, plaintiffs expressly say that they brought these actions to "prevent future harm and redress past wrongs" – not to obtain future damages.

Plaintiffs also failed to provide any expert disclosures addressing future damages. Because damages must be "reasonably certain to follow the injury complained of," *Marzullo v. J.D. Pavement Maintenance*, 975 N.E.2d 1, 10 (Ohio Ct. App. 2011), Ohio law typically requires future damages to be proved using expert evidence, *see, e.g.*, *Scott v. Condo*, 2002 WL 832210, at *2 (Ohio Ct. App. May 3, 2002) ("[W]ithout expert evidence on the future course of medical treatment, a jury is not permitted to simply infer from the expense of past treatment an amount of damages for future treatment."); *cf. also*, *e.g.*, *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 383 (E.D.N.Y. 2000) (rejecting speculative future damages under RICO). But the report of plaintiffs' damages expert, Thomas McGuire, calculated only *past* damages for 2006-2018.[3] Nor can plaintiffs claim that their abatement experts (Alexander

---

[2] Defendants maintain their position that the prospective compensation plaintiffs seek for public nuisance is not recoverable as "abatement."

[3] McGuire's only references to future damages were in footnotes, one of which stated that his methodology could theoretically be used to calculate future damages "[t]o the extent any bellwether government seeks damages at trial

and Liebman) provide what is needed on future compensatory damages because both experts stated unequivocally that they offer no such opinion.  Dkt. 1979-20 (Liebman Dep.) at 63:7-64:2; Dkt. 1974-04 (Alexander Dep.) at 64:8-16.

Plaintiffs' failure to satisfy basic expert disclosure obligations requires such evidence to be excluded from trial.  Allowing plaintiffs to advance a future compensatory damages theory would unfairly prejudice defendants.  With no expert analysis on plaintiffs' purported claim for future damages, defendants would have to go into trial blind on a potentially massive damages demand – precisely the kind of "trial by ambush" that federal discovery rules are designed to avoid.  *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010).  The Court should not allow that profoundly prejudicial result.  *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or harmless."); *see also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Trans.*, 596 F.3d 357, 366-69 (6th Cir. 2010) (affirming exclusion of future damages evidence for violation of discovery obligations); *Flying J, Inc. v. Central CA Kenworth*, 45 Fed. App'x 763, 767 (9th Cir. 2002) ("The court prohibited evidence of future damages . . . because Flying J's damages expert failed to include calculations of future damages in his expert report and concluded that the failure operated to the prejudice of defendants.").

Plaintiffs' eleventh-hour request to present evidence to the jury regarding "future damages" should also be rejected because it would impermissibly duplicate the relief plaintiffs claim they are entitled to collect for public nuisance "abatement."  Plaintiffs' "future damages" presumably consist of increased governmental expenditures, *i.e.*, money that they will need to

---

beyond 2018."  Dkt. 1911-5 at 7 n. 12.  *See also id.* at 44 n.90 ("Note that the fact that my calculation of damages is limited to 2006 through 2018 should not be interpreted as a conclusion that damages to the Bellwether governments ended in 2018, as these costs likely will continue in the future.").

spend in the future to deal with the problem of opioid use and abuse. But that is precisely the relief that plaintiffs seek under the guise of the "abatement" remedy. Permitting plaintiffs to seek both "future damages" and "abatement" poses an incurable risk of double recovery. *See Myles v. Meineke*, 82 Ohio App. 126, 129 (Ohio Ct. App. 1948) ("It is elementary that plaintiff is entitled to but one satisfaction of his wrong. Recovery if allowed the plaintiff here would amount to an additional satisfaction for the one wrong.").[4]

Plaintiffs made a strategic litigation decision to produce an expert damages report focused exclusively on past damages, and then allowed *Daubert* and summary judgment motions to go by without hinting at a claim for future damages. Because of these choices, the parties have not had an opportunity to litigate the adequacy of any future damages evidence plaintiffs might offer. This Court should exclude any future damages evidence from the trial of plaintiffs' RICO, OCPA, and conspiracy claims.

> **2.    The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

From the beginning of this litigation, plaintiffs have insisted that they intend to prove their claims through "aggregate" proof. They successfully resisted defendants' efforts to obtain discovery that would look behind plaintiffs' generalized allegations to determine, for example, *which orders* shipped by *which distributors* plaintiffs contend were "suspicious" and might have been diverted to improper use, *which prescriptions* plaintiffs contend were improperly written because of the manufacturers' marketing activities, and *which incidents* of misuse of prescription opioids plaintiffs contend actually caused them harm.

---

[4] Allowing plaintiffs to seek future damages from the jury also would impede the Court's adjudication of plaintiffs' proposed "abatement" remedy. If the jury were to award future damages, this Court would have no way of knowing what future expenses the jury included in its award (such that "abatement" compensation would be duplicative) or what expenses it rejected (such that "abatement" compensation would violate the Seventh Amendment). *See In re Lewis*, 845 F.2d 624, 629 (6th Cir. 1988) ("[T]he judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."(internal citation omitted)).

Defendants sought this information to establish that the facts of individual shipments, prescriptions, and incidents of misuse that plaintiffs seek to blur over with "aggregate" proof tell a very different story. To develop such facts, defendants needed to know *which* shipments were alleged to be wrongful; *which* prescriptions were under attack; and *which* persons suffered addiction, required intervention from child protective services, or otherwise caused plaintiffs to incur costs for which they seek damages. Plaintiffs, in response, asserted that such individualized information was *irrelevant*, because they intended to prove their case through aggregate, statistical evidence that would not address individual incidents. *See, e.g.*, Dkt. 606 at 2-3 (Special Master Cohen's summary of plaintiffs' objections).

In a series of discovery orders, the Special Master and the Court took plaintiffs at their word that they intended to prove their claims at trial through "aggregate" evidence and denied defendants nearly all of the individualized discovery that would have enabled them to develop evidence showing, for example, that allegedly "suspicious" orders went to fill legitimate prescriptions and were not diverted, or that allegedly improper prescriptions went to alleviate genuine suffering without negative long-term effects on the patients who received them.

Discovery Ruling No. 1 was the seminal ruling on this subject. In that Order, the Special Master largely accepted plaintiffs' argument that discovery concerning individual instances of inappropriate prescribing "has 'no relevance to the claims and defenses in this litigation.'" Dkt. 606 at 3. Given plaintiffs' representation that they intended to rest on "aggregate evidence and statistics showing defendants caused doctors' overall prescribing practices to become … medically unnecessary," the Special Master agreed that discovery concerning individual improper prescriptions would be "of limited relevance," and that plaintiffs needed to provide only enough information about individual cases to permit defendants to "understand" their aggregate proof. *Id.* at 3, 5. The Special Master warned, however, that "[w]hen Plaintiffs later

seek to prove causation or damages at trial, whether through expert testimony regarding a statistical model or otherwise, ***Plaintiffs may not rely affirmatively or defensively on any evidence or data they did not produce during discovery***." *Id.* at 6 (emphasis added).

In subsequent orders, the Special Master and the Court applied the same reasoning to allow plaintiffs to limit their production of discovery concerning allegedly improper prescriptions, "suspicious" orders allegedly shipped by distributors, pharmacies allegedly involved in diversion, persons who allegedly suffered from addiction, and individual case files for minors allegedly removed because of parents' opioid abuse. *See* Dkt. 1027, 1047, 1051 (as modified by Ex. 1), 1425, 1535. In each instance, plaintiffs either were allowed to limit their responses and production to a small number of samples selected at their discretion,[5] or were allowed to provide placeholder responses that would not correspond to the evidence they would offer at trial. *See* Dkt. 1051 at 6. In some instances, moreover, defendants were prohibited from following up on the limited information that was provided. *See id.* at 3 (providing, with respect to claims data, that "no person shall, without leave of Court, use any material produced pursuant to this *Ruling* in connection with any formal or informal third-party discovery").

In fact, plaintiffs have repeatedly affirmed that they will not present individualized evidence on these key issues. For instance, plaintiffs have stated that, because they will rely upon aggregate proof, they "will not assert, either in expert opinions or factual presentations at trial, that any specific prescription was caused by defendants' deceptive marketing";[6] they "do not intend to assert, either in expert opinions or factual presentations at trial, than any specific prescription was unauthorized, medically unnecessary, ineffective, or harmful"; and they will not

---

[5] *See, e.g.*, Dkt. 1027 at 2-3. Because plaintiffs had discretion to select the samples, there was no assurance that they were typical; nor did defendants have any way to test that question.

[6] *See* Ex. 2 (Plfs.' Suppl. Am. Resp. & Objs. to Mfr. Defs.' First Set of Interrogatories Submitted Pursuant to Disc. Ruling No. 13).

argue that the "filling of any specific prescription caused or led to harm for which Plaintiffs seek to recover."  Dkt. 1058 at 3-4.

Given these admissions, and having successfully secured orders limiting defendants' ability to obtain individualized evidence that would undermine plaintiffs' "aggregate" proof, plaintiffs should not now be permitted to present to the jury cherry-picked individualized instances of allegedly improper prescriptions, shipments, and patient outcomes that plaintiffs believe will *bolster* their case.  *See Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *Boler Co. v. Watson & Chalin Mfg., Inc.*, 372 F. Supp. 2d 1013, 1020 (N.D. Ohio 2004) ("[j]udicial estoppel preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship").  Plaintiffs succeeded in convincing the Special Master and the Court to accept their contention that the specifics of individual incidents of prescribing, individual shipments to pharmacies, individual pharmacies that received such shipments, and individual adverse impacts on patients or others were insufficiently relevant even to satisfy the liberal standard for discovery.  Plaintiffs should be compelled to abide by that position at trial, as Special Master Cohen warned them they would have to do.

Accordingly, plaintiffs should be precluded from offering testimony or other evidence purporting to address:

- Specific instances of medically unnecessary prescriptions;

- Specific instances of suspicious orders;

- Specific pharmacies allegedly involved in diversion;

- Specific persons who have suffered from addiction; and

- Specific instances of children being removed or otherwise served by child protective services.

This bar should apply to *all* individualized evidence plaintiffs might offer in these categories, including the limited examples they cherry-picked for disclosure in discovery, as defendants were precluded from obtaining broader discovery that would have uncovered counter-examples. The examples were provided only to help defendants "understand" plaintiffs' planned aggregate proof and were *not* approved as a permissible way to bolster it.

### 3. The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.

For multiple reasons, plaintiffs should be precluded from offering witness testimony relating to anecdotal personal stories about opioid abuse and related harms. First, as discussed above, plaintiffs should be estopped from offering testimony purporting to establish that particular individuals received inappropriate prescriptions and/or became addicted, after they successfully avoided providing such individual information in discovery.

Second, the Court should bar such testimony because plaintiffs routinely blocked defendants from questioning deposition witnesses about this subject – including questions addressing the *positive* benefits most patients gain from taking lawfully prescribed opioid medications. Plaintiffs regularly instructed deponents not to answer questions about their personal experiences with opioids or those of friends and family members.[7] Moreover, no witnesses who had anecdotal testimony to offer about experiences with opioids, addiction, or related matters were identified in response to defendants' interrogatories seeking identification of persons with knowledge of plaintiffs' claims. *See, e.g.*, Ex. 3 at 6-9. Only *after* the close of discovery – when the period for noticing and taking depositions was long concluded – did

---

[7] *See, e.g.*, Ex. 4 (Paolino Dep.) at 260:1–261:6; Ex. 5 (Murray Dep.) at 346:24–347:8; Ex. 6 (Parfejewiec Dep.) at 181:6–182:8. Plaintiffs regularly gave such instructions not to answer based on privacy grounds even though there is a Protective Order in this case that overrides any claim under HIPAA and provides appropriate protections for confidential information provided in discovery. Dkt. 441 at 32, 74. When a witness had a story plaintiffs wished to have told, they would occasionally refrain from instructing the witness not to answer, or the witness would even volunteer the information. But in most instance all questioning on the subject was blocked by instructions not to answer.

plaintiffs serve "supplemental" responses to these interrogatories that added hundreds of additional names, including witnesses who plaintiffs apparently seek to call at trial to testify about personal experiences with opioids. It is well settled that a party who fails to provide or obstructs discovery of evidence cannot then turn around and offer that same evidence at trial.[8]

Third, insofar as plaintiffs intend to offer anecdotal testimony from witnesses about drug abuse by family members or others, such testimony would in any event be inadmissible on foundational and hearsay grounds. A witness cannot testify about prescriptions made to another person, about that other person's use or abuse of drugs, or about the cause of any overdose or death of that other person, unless the witness has "*personal* knowledge" of those facts. Fed. R. Evid. 602 (emphasis added).

Finally, any such testimony should be barred under Rules 402 and 403. These witnesses and any other persons about whose experiences the witnesses would be called to testify are not parties, and plaintiffs have disclaimed any effort to assert damages for the harms such persons allegedly suffered. And although defendants have been deprived of the ability to depose these witnesses as a result of plaintiffs' discovery tactics, it is predictable that *none* of the witnesses will be able to tie any prescription pills that were used or abused in any individual situation to the conduct of any of the specific defendants involved in this trial.[9] Such testimony would serve only to arouse the jurors' sympathies, with no proof tying any incident to a particular defendant.

---

[8] *See Davis v. Marathon Oil Co.*, 528 F.2d 395, 404 (6th Cir. 1975) (affirming order precluding witness that had not been timely disclosed); *Saint-Gobain Autover v. Xinyi Glass N. Am.*, 2009 WL 10689369, at *10 (Oct. 23, 2009) (excluding testimony and other evidence party refused to provide during discovery); *Hitachi Medical Systems America, Inc. v. Horizon Medical Group*, 2008 WL 11380203, at *3 (N.D. Ohio, Oct. 30, 2008) (barring party from presenting at trial evidence not provided in discovery).

[9] *See Boggs v. Divested Atomic Corp.* 1997 WL 33377790, at *8 (S.D. Ohio Mar. 24, 1997) (granting motion *in limine* to exclude anecdotal evidence in the absence of proof that the incidents at issue were caused by defendants' operations).

The probative value of such evidence is "substantially outweighed" by its potential for "unfair prejudice." Fed. R. Evid. 403.

###       4.       The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Plaintiffs intend to present evidence to the jury of a supposed causal connection, or "gateway," between prescription opioids and illicit opioid use. In addition to the three experts plaintiffs have disclosed to opine on this so-called "gateway" theory, plaintiffs have identified several lay witnesses who may testify concerning the theory, including Dr. Thomas Gilson, Cuyahoga's Medical Examiner, who has formed opinions on the theory but does not claim to be – and was not identified in plaintiffs' expert disclosures as – an expert on the subject. The Court should prohibit plaintiffs from introducing lay opinion testimony about their gateway theory that is (1) inconsistent with the narrow scope of lay opinion testimony authorized under Rule 701 and (2) based on unbridled speculation, inadmissible hearsay, or both.

First, Rule 701 permits opinion testimony from lay witnesses only when it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This rule "is designed to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in … [Rule 26]." *United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015); *see* Fed. R. Evid. 701, Advisory Committee Note (explaining that 701(c) was added in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing"). Therefore, "if the opinion testimony draws on scientific, technical, or other specialized knowledge, then its admissibility should be assessed under Rule 702, not Rule 701." *Kilpatrick*, 798 F.3d at 381.

Opinions suggesting that there is a "gateway" from prescription to illicit opioids necessarily require "specialized knowledge within the scope of Rule 702." Plaintiffs do not dispute this; they disclosed *three* experts to address this theory – Anna Lembke, M.D., Katherine Keyes, Ph.D, and Jonathan Gruber, Ph.D. As the Court found in denying defendants' *Daubert* challenge to these experts, they based their opinions upon "epidemiological studies and [their] own published literature and clinical experience." Dkt. 2518 at 14. Because opinions suggesting the existence of a gateway from prescription to illicit opioids are based on "specialized knowledge within the scope of Rule 702," lay witnesses, including Dr. Gilson, may not offer such opinions.[10]

Second, to the extent the lay testimony of these witnesses is based on anything other than rank speculation, it relies on inadmissible hearsay. Lay witnesses who were able to identify any basis at all for their "gateway" opinions could cite only to "conversations" or "discussions" they had had with unidentified individuals. For example, Jerry Craig, Executive Director of Summit County's Alcohol, Drug and Mental Health Board, identified the basis for his conclusions about the gateway theory as: "discussions . . . with individuals who've been affected by this and people who study this."[11] Keith Martin, the Assistant Special-Agent-in-Charge of the DEA's Cleveland Field office, testified that his conclusions about the gateway theory were based on his conversations with parents.[12]

In light of the scientific, specialized nature of the theory and the tendency of lay witnesses to adopt the theory based on inadmissible hearsay, the Court should preclude plaintiffs

---

[10] Although Dr. Gilson is a physician, he is a lay witness on this topic. As he admitted at his deposition, he is not an expert in either opioids or addiction. Dkt. 1977-16 (Gilson Dep.) at 25:3–11; 30:18–22. If plaintiffs contend that Dr. Gilson, or any other lay witness, is in fact an expert, their testimony should have been disclosed pursuant to Rule 26(a)(2)(C), and the absence of such a disclosure would be independent grounds for excluding the testimony.

[11] Dkt. 1976-7 (Craig Dep.) at 383:10–18.

[12] Ex. 7 (Martin Dep.) at 189:18–190:8.

12

from offering lay opinion testimony about the alleged gateway from prescription opioids to illicit opioids.

### 5. The Court should preclude evidence concerning lobbying and other protected petitioning activity.

The First Amendment protects the right of citizens to petition the government. Allowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). And permitting jurors to hear such evidence makes it more likely that jurors will be confused and inappropriately conflate the defendants' constitutionally protected behavior with illegal actions. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403.

Lobbying and other efforts to influence government action are protected by the First Amendment. The *Noerr–Pennington* doctrine protects persons from liability for their speech and conduct in exercising their First Amendment right to petition the government. *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition"). The doctrine likewise extends to "publicity campaign[s] to influence governmental action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961), as well as to concerted action designed to influence the government, *see id.* at 135-36 (doctrine applies to "associating together in an attempt to persuade the legislature or executive to take particular action"); *Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment). The Sixth Circuit has explained that "[a]lthough the *Noerr-Pennington* doctrine

was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims . . . ." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007).

The "intent . . . of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*." *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012). That is true for both legislative and administrative lobbying. As to legislative lobbying, the First Amendment permits liability *only* where lobbying is "'not genuinely aimed at procuring favorable government action' at all." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (*quoting Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988)). This "sham exception" has nothing to do with whether the communication contains untruths or otherwise employed "improper means." *Id.* at 380. Rather, it applies only if the defendant does not genuinely seek the *result* it advocates. *See VIBO*, 669 F.3d at 686 (defendant files frivolous objections to the license application of a competitor solely to delay). The same general principles that immunize legislative lobbying apply to administrative lobbying. *See BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524-25 (2002).[13]

Plaintiffs do not contest that the defendants intended to procure favorable government action through their petitioning efforts. Evidence of such activity is accordingly inadmissible under *Noerr-Pennington*.

In accordance with Supreme Court precedent, plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy. *See Snyder v. Phelps*, 562 U.S. 443, 460 (2011) (holding that where allegedly tortious conduct is protected by the First Amendment, a

---

[13] Some courts have recognized a fraud exception to the *Noerr-Pennington* doctrine where knowing and willful misrepresentations are made to an agency, but only in the context of an *adjudicatory* proceeding. *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

plaintiff "cannot recover for civil conspiracy based on those torts").[14]  And the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984). A party may not circumvent *Noerr-Pennington* by asking questions "solely designed to create an inference which may be dispelled by disclosure of the protected activity."  *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257, 1278 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984).  Allowing such questioning would "gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a 'chilling effect' upon the exercise of First Amendment rights."  *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171.

The Court should therefore exclude evidence of lobbying activity under Rule 403, given that the likelihood of unfair prejudice and confusion substantially outweighs any probative value of the evidence.  Fed. R. Evid. 403; *Weit*, 641 F.2d at 467. Indeed, because of its inherent chilling effect and its likelihood to confuse jurors, evidence of lobbying activity is considered presumptively prejudicial.  *United States Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("[E]xclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case."); *see also Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978).  Cautionary instructions are insufficient to forestall confusion and unfair prejudice, as the *Noerr-Pennington* doctrine is complicated and difficult for lay jurors to fully comprehend in the context of complex litigation.  *Weit*, 641 F.2d at

---

[14] *See, e.g.*, Dkt. 2182 (Pls.' Consolidated Mem. in Opp. to Mot. for Summ. Judgment on Pls. Civil Conspiracy, RICO, and OCPA Claims) at 83, 86-87 (pointing to protected lobbying as evidence of existence of unlawful enterprise).

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or evidence regarding defendants' lobbying activities.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West Virginia without identifying a connection between such shipments and the Track One jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One jurisdictions might be relevant because some of the pills in those shipments could have "migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence of allegedly wrongful shipments to other locations would constitute classic "other bad acts" evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited allowable purposes for such evidence, none are applicable here.  The allowable purposes recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid. 404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy."  *Id.*

whether the factor identified to justify admission is material to the claims, (2) whether the evidence is probative on that factor, and (3) whether prejudice substantially outweighs that probative value. *See United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996).

Most of the Rule 404(b)'s permitted uses are clearly not available here because they are immaterial to the plaintiffs' claims. *See Jobson*, 102 F.3d at 220-21 (6th Cir. 1996) (exception applies when evidence of prior misconduct tends logically to prove an element of offense charged). The defendants' identity is not at issue. No defendant contests that it has the opportunity to distribute opioids or knows that it does so. Not have defendants alleged that they distributed opioids by mistake or accident, so there is no basis to present evidence of shipments elsewhere to prove *absence of* mistake or *lack of* accident. *See United States v. Semak*, 536 F.2d 1142, 1144 (6th Cir. 1976).

While scienter is a required element of plaintiffs' RICO claims, outside shipments are not probative on that issue. First, the fact that a defendant may have purportedly shipped suspicious orders at another time or place does not make it more likely that it intended to commit similar acts as alleged in the instant case. *See United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) (prior threatening letters inadmissible to prove intent behind threatening phone calls). Second, unproven allegations of misconduct have a lower probative value generally – plaintiffs would need to prove not just that a shipment occurred, but that it was wrongful – a contention defendants would be entitled to rebut. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir. 1992). Thus, opening the door to evidence of shipments to other locations would require an inordinate amount of trial time to be expended on what is *at best* a collateral issue.

Finally, any limited probative value of such evidence is clearly outweighed by the unfair prejudice it would create. *See Ring*, 513 F.2d at 1007 (evidence of prior bad acts may not be introduced as a pretext for placing highly prejudicial evidence before the jury). Evidence of

other unproven allegations may put a party "on trial for . . . other bad acts" in a way that prejudices the right to a fair trial. *United States v. McFadyen-Snider*, 552 F.2d 1178, 1184 (6th Cir. 1977). Plaintiffs should not be permitted to cherry-pick purportedly wrongful shipments elsewhere rather than focusing on shipments that actually could have affected them. *See id.* at 1182 (improper to introduce evidence of prior prostitution that "served only to cater to the passions of the jury").

### 7. The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

The Court should exclude as irrelevant evidence purporting to demonstrate that defendants' conduct violated duties this Court has ruled arise under the Controlled Substances Act or its regulations – namely, to identify, inform DEA of, and not ship, "suspicious" orders. *See* Dkt. 2483.[16] Even if plaintiffs are permitted to introduce any type of evidence of an allegedly inadequate monitoring system, or not reporting, or not halting shipment of "suspicious orders," plaintiffs should not be permitted to introduce evidence or argument, or to suggest in cross-examination, that such conduct violated "suspicious" order duties, the CSA, or implementing regulations. Any such noncompliance or violation is irrelevant to the causes of action to be tried.

**Federal RICO.** To prove a "[p]attern of racketeering activity," a plaintiff must prove at least two acts of "racketeering activity." 18 U.S.C. § 1961(5). RICO limits "racketeering activity" to the criminal offenses listed in 18 U.S.C. § 1961(1)(A)–(G).

Even if a violation of 21 U.S.C. § 843(a)(4)(A) "can," in theory, constitute a predicate racketeering act under RICO, 18 U.S.C. § 1961(1)(D), as this Court held, *see* Dkt. 2580 at 3, a § 843(a)(4)(A) violation based on failure to comply with "suspicious" order duties is not the same

---

[16] Defendants maintain that the Court's rulings on alleged "suspicious" order duties and on a violation of 21 U.S.C. § 843(a)(4) as a possible RICO predicate are erroneous as a matter of law for reasons previously set forth. However, these motions assume their validity for the sake of argument here.

thing as knowingly or intentionally furnishing false or fraudulent material information in, or omitting material information from documents under § 843(a)(4)(A), which includes only documents that are "required to be made, kept, or filed under this subchapter or subchapter II," *i.e.,* 21 U.S.C. §§ 801–904 (subchapter I), §§ 951–971 (subchapter II). Moreover, failure to comply with "suspicious" order duties could not itself constitute predicate racketeering activity because plaintiffs have identified no evidence that would make the alleged noncompliance criminal, let alone "felonious" as required to constitute racketeering activity under 18 U.S.C. § 1961(1)(D). Nor does it constitute one of the acts specified in § 1961(1)(D) (requiring "felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . punishable under any law of the United States"). Such failure to comply with suspicious order duties would amount, at most, to a regulatory violation. And "the Supreme Court [has] made clear . . . that a criminal conviction for violating a regulation is permissible only if a statute explicitly provides that violation of that regulation is a crime." *United States v. Alghazouli*, 517 F.3d 1179, 1184 (9th Cir. 2008). The statute here does not do so.

Because evidence that conduct violated "suspicious" order duties is not evidence of felonious conduct, it does not establish an "indictable" act for federal mail or wire fraud, 18 U.S.C. §§ 1341, 1343, as required to constitute racketeering under 18 U.S.C. §1961(1)(B). And such evidence does not establish intent to defraud a victim of money or property, as required for mail and wire fraud. *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). Plaintiffs do not allege that defendants intended to defraud plaintiffs of money or property through violation of any "suspicious" order duties, and the Court rejected any reading of the allegations that would add up to a fraud-on-the-DEA claim. Dkt. 2565 at 4–5, 9–10, 22.

**Ohio Corrupt Practices Act ("OCPA").** To prove a "pattern of corrupt activity," Ohio Rev. Code § 2923.32(A)(1), plaintiffs must prove two or more incidents of "corrupt activity," which is defined as engaging in or conspiring to engage in conduct specifically listed in Ohio Rev. Code § 2923.31(I). Plaintiffs rely on four purported "corrupt activities" –the three alleged federal RICO predicates discussed above, *see* Ohio Rev. Code § 2923.31(I)(1) (cross-referencing federal RICO predicates) and conduct that violates the analogous Ohio fraud statute, Ohio Rev. Code § 2913.05, listed in Ohio Rev. Code § 2923.31(I)(2)(a). *See* Dkt. 1631 ¶¶ 987, 998, 1004-1006. The analysis above regarding federal RICO predicates demonstrates that evidence that conduct purportedly violated "suspicious" order duties is not relevant to establishing those RICO predicates, and it is not relevant to the analogous Ohio fraud statute for similar reasons.

**Ohio Statutory Public Nuisance.** Plaintiffs must prove "[t]he violation . . . of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse." Ohio Rev. Code § 4729.35. Any violation of "suspicious" order duties is premised on federal registration regulations that created that definition; any such violation is not a *statutory* violation as required to constitute a violation of the "laws" of the United States within the meaning of § 4729.35. The public nuisance statute specifically lists *state* agency rules separately from "laws" of the state, demonstrating that the statute's use of the term "laws" does not encompass agency rules, even though state board of pharmacy rules are promulgated via notice-and-comment rulemaking and have the force and effect of law. *See* Ohio Rev. Code §§ 119.03, 4729-1 *et seq.* If "laws" were read to include agency rules, that would render superfluous the express reference in the same provision to state agency rules. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002) (rejecting broad interpretation of word "law" where it would render word "regulation" superfluous in provision applicable to state "law

or regulation"). The statute's failure to list *federal* agency rules means that a violation of a federal agency rule is not relevant to proving a statutory public nuisance.

**Ohio Common Law Absolute Public Nuisance *Per Se* Claim.** Plaintiffs must prove that defendants violated a "safety statute." A statute is a "safety statute" only if it sets forth a "specific legal requirement for the protection of others," rather than merely establishing a general rule of conduct. *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 433 (Ohio 1944); *see also* 1 OJI-CV 621.01. And *per se* liability may be premised on a statutory violation only where "a jury may determine whether there has been a violation thereof by finding a single issue of fact." *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998). But any "suspicious" order duty is not a safety statute because it does not set forth a "specific legal requirement" as opposed to a general rule of conduct, and a jury would be required to make much more than a single finding of fact to determine if defendants' conduct violated such a duty, as this Court held when it identified a list of remaining issues of material fact on the issue, *see* Dkt. 2483 at 29. *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998). In addition, the Ohio Supreme Court has rejected attempts to rely on a failure to comply with a regulation as a violation of a safety statute. *Id.* at 202-03.

**Ohio Civil Conspiracy.** Evidence that conduct violated "suspicious" order duties is not relevant because such a violation does not "recognize an independent cause of action," as required by Ohio law. *See* Dkt. 491-1 at 36-38; 1079 at 14; 2149 at 12-13. *See Davis v. Clark Cty. Bd. of Comm'r*, 994 N.E.2d 905, 909 (Ohio Ct. App. 2013) ("claim for conspiracy cannot be made the subject of a civil action unless something is done which, in the absence of the conspiracy allegations, would give rise to an independent cause of action." (internal citation omitted)). Such evidence also is not relevant because Ohio law requires, for civil conspiracy, that "the underlying unlawful act must be a tort." *See, e.g., Ohio ex rel. Morrison v. Wiene*r, 83

N.E.3d 292, 296 (Ohio Ct. App. 2017); *see also* 1 OJI-CV 443.01 ("case law defines 'unlawful act' as a tort"); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) ("violation of a federal regulation is not a tort . . . [and] is not an unlawful act that could form the basis of [a] conspiracy claim" under similar Illinois law.).

In sum, any evidence or argument that plaintiffs violated "suspicious" order duties under federal law is irrelevant to the claims to be tried and should be excluded. Alternatively, to the extent that the Court concludes that such evidence is relevant to any cause of action, the Court should limit admissibility to that cause of action, and admonish the jury that it is irrelevant to the other causes of action. The Court should accompany that with an instruction on the definition of "suspicious" order according to the federal regulation, and instruct the jury that "suspicious" orders are not evidence of diversion or likely diversion.

Finally, both on this and all other issues, the Court should preclude – as it did in ruling on certain *Daubert* motions – any expert or other testimony that purports to set out, or opine on, the content of the law, whether on "suspicious" order duties or any other subject. This Court recognized that an "evidentiary problem" exists "if 'testimony containing a legal conclusion is allowed, as it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury.'" Dkt. 2551 at 16–17 (quoting *United States v. Smith*, 70 Fed. App'x 804, 809 (6th Cir. July 15, 2003)). The Court should therefore exclude any evidence on the meaning of law.

### 8. The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.

An expert may base his or her opinions on assumptions, but at trial the expert "must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000). The Court denied certain of defendants' motions to exclude expert testimony in part on the ground that, although some of the assumptions of plaintiffs' experts appeared to lack support in the record, plaintiffs could attempt to prove those assumptions at

trial.[17] Defendants ask that the Court implement procedures to ensure that plaintiffs meet that burden in advance of any irrelevant, unfounded, and confusing expert testimony being allowed before the jury.

"[A]n expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known." *McLean*, 224 F.3d at 800-01 (citation omitted). "[I]t would prejudicially confuse the jury to hear an expert witness base his opinion . . . on facts that were for the jury to determine" for which there is no basis. *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989); *see also Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012) (expert testimony should be excluded if based on unreasonable assumptions or facts contradicted by the record).

This is a genuine concern for several of plaintiffs' experts. For example:

Plaintiffs' expert Lacey Keller's opinions rest on a variety of assumptions that plaintiffs are highly unlikely to be able to prove at trial. For instance, Keller claims that had a manufacturer with a small market share "reported suspicious activity, prescriptions for millions of dosage units could have been stopped in Summit and Cuyahoga counties." Dkt. 1914-1 at 8 (quoting Dkt. 1914-4 (Keller Report) at 11, ¶ 34). As Keller herself admitted, this opinion assumes that "each prescriber would have been stopped from prescribing all opioids immediately after his or her first prescription was reported to law enforcement and immediately after being flagged by any of Keller's 16 criteria." *Id.* at 9 (emphasis omitted). For Ms. Keller's testimony to be admissible, therefore, there must be evidence that would allow a reasonable juror to conclude that, in fact, the moment a prescriber is reported to law enforcement, that prescriber

---

[17] *See, e.g.*, Dkt. 2492 (Op. & Order Denying Mot. to Exclude Keller); Dkt. 2558 (Op. & Order Granting in Part & Denying in Part Mot. to Exclude Perri); Dkt. 2495 (Order Denying Mot. to Exclude Rosenthal); Dkt. 2542 (Order Denying Mot. to Exclude Cutler). Although the discussion below explicitly addresses proffered experts Keller, Perri, Rosenthal, and Cutler, defendants ask the Court to ensure that plaintiffs prove up the assumptions upon which expert testimony rests for both those and all plaintiffs' other expert witnesses.

never writes another prescription.  Because "revocation of prescribers' DEA licenses and other enforcement actions are not instantaneous and diversion investigations take significant time," Dkt. 2492 at 17, this is highly unlikely to happen.  Either way, as the Court already has held "Plaintiffs [are required to] . . . establish that their hypothetical(s) present an accurate summation of the evidence present in the record" before such testimony is admitted.  *Id.* at 18.

Plaintiffs' experts Perri and Rosenthal start with the unsupportable assumption that not just some, but all of the manufacturer defendants' marketing was false and misleading.  Dkt. 2558 at 14.  The Court acknowledged the legitimacy of defendants' concern that Perri's assumption amounts to an unsupportable hypothetical.  *Id.* at 14-15.  The Court ultimately held that "[a]t trial, prior to the introduction of Perri's testimony dependent on this assumption, the Court will require plaintiffs to establish that there is sufficient evidentiary support in the record for Perri's testimony."  *Id.* at 15.

The Court likewise agreed that Rosenthal's analysis necessarily assumes that all of the manufacturer defendants' marketing was false and misleading, but concluded that "whether Plaintiffs are able to prove their claims about the extent of Defendants' alleged unlawful promotion remains to be seen."  Dkt. 2495 at 15.  Plaintiffs claim that they will prove "that *all* of Defendants' promotional activity was fraudulent." *Id.* at 13.  If plaintiffs cannot do this, the Court should exclude all portions of Rosenthal's testimony that rest on that false assumption.  *McLean*, 224 F.3d 797, 800-01; *Tovey v. Nike, Inc.*, 2014 WL 3510636, at *13 (N.D. Ohio July 10, 2014).

Because plaintiffs' expert David Cutler relies on Rosenthal's opinions and analysis for his own testimony concerning the manufacturer defendants, Cutler's testimony must be submitted to the same scrutiny.  Dkt. 1901 at 8-9; Dkt. 2460 at 8-9.  Other assumptions of Cutler also must be established before his testimony concerning distributor and pharmacy defendants

may be admitted.  For example, in "step three" of his analysis, Cutler multiplies his "average impact" of shipments on mortality by the percentages of prescriptions provided by Rosenthal for the manufacturers.  Dkt. 1895-4 (Cutler Report) at 60–62 & Tbl. III.9.  He did no comparable analysis for distributors but asserts that he could have done so using percentages, supplied to him by plaintiffs' counsel, of shipments that purportedly should have been blocked by distributors. *Id.* at App'x III.J ¶¶ 5–6 & Tbl. J.1.  Those assumed percentages provided to Cutler by counsel are unsupported by any facts or expert testimony in the record.[18]  Cutler's opinion as to the distributors cannot be admissible until and unless the assumed percentages are proven.

Given the complexity of this trial, and the legitimate concerns that many of plaintiffs' experts' opinions are based on assumptions entirely unsupported by any evidence, an orderly process is needed to ensure that plaintiffs have proven the assumptions their experts rely upon before these experts are allowed to take the stand.  Before permitting testimony from any expert witness whose testimony relies on assumptions requiring independent proof, the Court should hold a hearing outside the presence of the jury to hear argument on whether plaintiffs have presented sufficient evidence that would allow a reasonable jury to conclude that those assumptions have been confirmed.

### 9. The Court should not allow use of certain charts presenting misleading and irrelevant data.

Defendants move *in limine* to preclude certain charts that are attached to plaintiffs' expert Craig McCann's report from being shown to the jury or admitted in evidence.[19]  These charts present aggregated data, in some cases aggregated from disparate sources, that is both misleading

---

[18] Cutler testified at deposition that "[t]hese percentages were given to me by counsel who said that they were the output of Mr. McCann's analysis," Dkt. 1976-10 (Cutler Dep.) at 594:11–595:3, but the percentages appear nowhere in McCann's report.  Distributors are not aware of any other source.

[19] In particular, defendants seek to exclude the charts in McCann's Appendix 9 at pages 1-216 and all of McCann's Appendix 10.  *See* Dkt. 1999-13, 1999-14, 1999-15.  Defendants will send copies of these charts to the Special Master.

and irrelevant. The charts create the false impression that each distributor defendant's volume of relevant opioid shipments was greater than it actually was, and that the volume of defendants' shipments to each customer over time increased more dramatically than it actually did. Because these charts present only aggregated data, it is impossible to tell from them how many orders each trial defendant shipped to any customer, much less whether any of those orders were "suspicious" or diverted for unlawful use. As plaintiffs' DEA expert Jim Rafalski acknowledged, "you can't tell anything about any individual pharmacy" from McCann's aggregated charts. Dkt. 1983-16 (Rafalski Dep.) at 514:8-515:4.

Because these charts are misleading and will not help the jury decide any material fact, they should not be admitted as evidence or used as demonstrative aids. *See, e.g.*, *Wilbon v. Plovanich*, 2016 WL 3922906, at *3 (N.D. Ill. July 21, 2016) (affirming exclusion of demonstrative due to "risk that the jury might construe the map as Thornton's accurate description of the events"); *Roddy v. Monsanto Co.*, 6 Fed. App'x 549, 552 (8th Cir. 2001) (affirming exclusion of demonstrative because it included information "irrelevant to discrete instances of discrimination in rates of pay" and "facts underlying the chart ultimately came into evidence" in another form); *In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67, 73 (2d Cir. 1980) (affirming exclusion of chart that "could have misled the jury").

**Appendix 9, pp. 1-7**: These charts purport to show oxycodone and hydrocodone shipments per capita, by state, from 1997 to 2017. In addition to showing data for states outside of Ohio that are irrelevant to the Track One trial, these charts lump together *all* shipments from *all* distributors, including *non-party distributors*, so that it is impossible to tell what portions were shipped by any trial defendant. This presentation would confuse and mislead the jury by suggesting conclusions about the trial defendants that the charts do not actually support. It is

impossible to determine from charts like this what portion of the shipments were from any defendant to any customer. In addition, none of the charts in Appendix 9 display the orders that plaintiffs claim should have been flagged as "suspicious." It is therefore impossible to connect these charts to diversion, or failure to maintain controls against diversion, at any pharmacy.

**Appendix 9, pages 8-12, 13-216**: In addition to the problems identified above, these charts combine data from disparate sources − the ARCOS database (2006-2014) and defendants' transactional data (pre-2006 and post-2014). By combining different datasets for different timeframes, these charts give the misleading impression that defendants' shipments increased more dramatically over time than they actually did. For example, Cardinal Health's transactional data dates back to 1996, while others had no data for the early part of that period. As later data is added to the dataset, it gives the false impression of a jump in shipment volume, when in reality what is shown is just a jump in available data. *See, e.g.*, Appendix 9 at 9, 14. These charts also include data for opioids other than oxycodone and hydrocodone − the only medications for which plaintiffs have offered expert opinions about "suspicious" orders. The inclusion of irrelevant drugs gives the false impression that defendants' oxycodone and hydrocodone shipments were larger than they actually were. These charts also include data for many severed or settled parties, again creating the misleading impression that the trial defendants' shipment volumes were greater than they actually were.

**Appendix 10:** The charts in Appendix 10 show, in the aggregate, orders that McCann flagged as "suspicious." Again, it is impossible to tell how many orders were flagged for any specific pharmacy, and it is therefore impossible to identify any diversion – or any failure to prevent diversion – from these charts. As above, these charts would also mislead the jury to think the volume of shipments increased more dramatically than it actually did for any defendant.

### 10. The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.

This Court has cautioned the parties and counsel about the need for this case to be tried

based on the evidence and for full compliance with the Ohio Rules of Professional Conduct.

Thus, in an order entered last February, the Court stated:

> "[It is imperative that this case be tried in the courtroom, and not in the media. The Court reminds *all* attorneys . . . admitted to practice before the Court in this MDL, that they are subject to the Ohio Rules of Professional Responsibility . . . Thus, all attorneys who are participating or have participated in any aspect of this case may not conduct themselves in any way that would violate Ohio Rule of Professional Conduct 3.6 or one of this Court's prior orders . . . This includes making extrajudicial statements to the media regarding: (1) settlement negotiations, (2) "the character, credibility, [or] reputation . . . of a party" or their counsel, (3) any 'information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial," [or] (4) any information designated . . . pursuant to the Protective Order issued in this case . . . Additionally, the Court directs all attorneys subject to this order to counsel their clients that it is in their best interest to adhere to this order as well."

Dkt. 1360 (emphasis in original; citations omitted).

The Court will presumably expect full compliance with this order in the coming weeks

and during trial. Defendants ask the Court also to make clear that full compliance with Ohio

Rule of Professional Conduct 3.4(e) will be required,[20] and bar certain conduct that plaintiffs'

counsel already have a demonstrated practice of pursuing, in this litigation and elsewhere. The

jury should consider evidence untainted by lawyers' purported personal opinions or theatrical

efforts at manipulation.

**References to unrelated alleged bad acts.** Counsel should be precluded from

attributing to defendants alleged "bad acts" that are unrelated to the claims in this case. In

---

[20] That rule states: "A lawyer shall not . . . in trial, allude to any matter that the lawyer does not *reasonably believe* is relevant or that will not be supported by admissible evidence or by a good-faith belief that such evidence may exist, assert personal *knowledge* of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, or the culpability of a civil litigant, or the guilt or innocence of an accused." (Emphasis in original.)

general, the Federal Rules prohibit introduction of evidence of prior bad acts for the purpose of suggesting a propensity for misconduct. Fed. R. Evid. 404(b). This is particularly true for unrelated prior acts introduced to create a spectacle that has no purpose beyond inflaming the passions of the jury. *United States v. Solivan*, 937 F.2d 1146, 1152 (6th Cir. 1991) (finding mistrial because the lawyer's comments were "calculated to inflame passion and prejudice").

There are concrete reasons for concern about this here. An appellate court recently chastised lead counsel for plaintiffs, Mr. Lanier, for improper remarks creating a "spectacle" requiring a retrial. *In re Depuy Orthopaedics, Inc.*, 888 F.3d 753, 787 (5th Cir. 2018). In that case, counsel referred to bribes defendants' subsidiaries paid to the Iraqi government – events that had absolutely nothing to do with the case being tried. *Id.* at 784. Despite its irrelevance, the incident was repeatedly "wafted before the jury to trigger their punitive instinct." *Id.* at 785. During closing, counsel invited the jury to use it "as a proxy for [the defendant's] liability." *Id.* The Fifth Circuit held that a curative instruction was inadequate and that a new trial was needed because "the taint is unmistakable." *Id.* at 786.

In another tactic in that case, counsel introduced a letter with allegations of racism against the president of the defendant company and referred to the "filthy . . . racial email" in his closing argument to the jury. *Id.* at 786. This focused jurors' "attention on serious, and seriously distracting, claims of racial discrimination that defendants had no meaningful opportunity to rebut." *Id.* at 787. Such tactics seek a jury verdict guided by emotion, not evidence, and force the opposing party to expend resources defending against charges that are unrelated to the claims.

**Conduct designed to offer personal opinions on, bolster or belittle, or improperly influence a witness.** Counsel should be precluded from offering their personal opinions on evidence at trial and from related conduct that has the effect of conveying such opinions. The

Ohio Rules of Professional Conduct expressly prohibit counsel from introducing their "personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused." Rule 3.4(e). Counsel argument is limited to the evidence and "reasonable inferences." *State v. Clay*, 181 Ohio App. 3d 563, 575 (8th Dist. 2009).

Counsel should be cautioned against attempting to bolster the credibility of plaintiffs' witnesses by expressing counsel's personal approval of a witness's testimony or a statement or implication of fact that is not true. In *Depuy Orthopaedics*, counsel introduced two doctors as "non-retained" experts and repeatedly emphasized to the jury that they were trustworthy because they were not being paid. *See, e.g.*, 888 F.3d at 791. But that was not true; counsel provided both a general charitable donation and post-trial "generous checks" to the witnesses. *Id.* at 789. The Fifth Circuit found that presenting the witnesses as "'non-retained' neutral part[ies]" was "deception, plain and simple." *Id.* at 791.

Conversely, counsel should be prohibited from using nicknames or ad hoc drawings or other visual aids during examination of witnesses to belittle a witness, to mischaracterize testimony, or to prompt a witness's answers. Ad hominem attack on witnesses through nicknames or visual aids designed to comment on credibility is an inadmissible form of attorney commentary. *See Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) (attorneys may not "comment on the credibility of a witness or . . . express a personal belief that a particular witness is lying"). Again, there is reason for concern based on prior conduct. Plaintiffs' counsel have used ad hoc notes and drawings in exhibits created during depositions in this case for exactly such improper purposes, characterizing one witness's employment history, for example, as a "revolving door" (Ex. 8 (Mapes Dep.) at 337:8−339:24; Ex. 9 at 37) and his testimony as "muddy waters" (Ex. 8 at 537:10−538:2; Ex. 9 at 39), or commenting on his personal

appearance (Ex. 8 at 336:10−14)   At other times during this same deposition, counsel wrote

down his questions and then wrote down his desired answers before the witness had a chance to

respond, seeking to prompt the desired responses.  *See* Ex. 8 at 343:5−345:4.

 Because such tactics are designed to influence improperly a witness's testimony, to

belittle a witness, and/or to communicate to the jury a belief that the witness is not credible, they

should be precluded as the improper performative spectacle that they are.

**Golden Rule Arguments.**  Counsel should be precluded from making "Golden Rule"

arguments asking the jury to place itself in the position of plaintiffs or members of their

communities.  *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009).  This includes

statements intended to appeal to jurors' fears, like "it could have been you" or "it could have

been your children," when talking about alleged harms.  *Id.*  Such arguments invite decisions

based on emotion rather than evidence and reason and are accordingly improper.

### 11. The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability.

The Court should preclude plaintiffs from offering evidence or argument about

defendants' overall financial condition, assets, revenues, or profitability.  It should also exclude

reference or argument about punitive damages unless and until the jury determines – after the

close of evidence – that plaintiffs have met their burden to seek punitive damages.

Defendants anticipate that plaintiffs will attempt to paint defendants as large, wealthy

companies capable of paying a large judgment.  Allowing such evidence or argument would be

unduly prejudicial and confusing to the jury.  This evidence has nothing to do with liability and

will lead to time-consuming and unfairly prejudicial side-shows on collateral issues.  The Court

should exclude it under Rule 403 for at least three reasons.

First, "[c]ourts have consistently held that evidence of a party's financial condition

should be excluded as irrelevant or unduly prejudicial."  *Henry v. Quicken Loans, Inc.*, 2011 WL

31

13208621, at *3 (E.D. Mich. Jan. 31, 2011) (collecting Sixth Circuit cases). Federal courts abide by the principle that "justice is not dependent upon wealth or poverty." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 757 (6th Cir. 1980) (citation omitted). Evidence "designed to convey to the jury the image of the defendant as a giant in the field" is excludable on the grounds that it is "obviously an appeal to passion and prejudice." *Id.* at 756-57; *see also*, *e.g.*, *Bhandari v. VHA Southwest Community Health Corp.*, 778 F. Supp. 2d 1155, 1163-64 (D. N.M. 2011) (excluding evidence of defendant's overall revenues, profits, and wealth to protect against unfair prejudice).

Second, mini-trials on collateral issues such as a defendant's financial condition would waste time that is plainly not available in this trial. To rebut such evidence, defendants would need to present evidence on their profit margins on opioid medications and other complex details. But the Court has allotted defendants only 100 hours – presumptively just 12.5 hours to each of the eight defendants remaining in the Track One trial – for their *entire* defense. Dkt. 2594 at 1-2. That is patently insufficient to defend against the main issues in the case, much less to address issues that are collateral to, and would distract from, those main issues. *See e.g.*, *United States v. Dimora*, 879 F. Supp. 2d 718, 742-43 (N.D. Ohio 2012) (evidence of financial disclosures properly excluded under Rule 403 to avoid mini-trials on collateral issues that would confuse and mislead the jury).

Finally, to the extent plaintiffs argue that evidence of wealth is relevant to determining punitive damages, that is incorrect. Plaintiffs are not entitled to punitive damages as a matter of law on any of their claims. RICO and OCPA do not allow for punitive damages. *See Iron Workers Local Union No. 17 Ins. Fund & its Trustees v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 819 (N.D. Ohio 1998) (recognizing that RICO and OCPA claims allow for treble damages, but not punitive damages). Nor can plaintiffs obtain punitive damages on their public nuisance

claim, because they have abandoned all relief but for "equitable abatement relief." (Dkt. 2212 at 1 n.2.). Lastly, because their civil conspiracy claim is based upon RICO, OCPA, and public nuisance theories (Dkt. 2568 at 12), and none of those underlying causes of action of action allow for punitive damages in this case, punitive damages are simply unavailable here. *See Iron Workers Local Union No. 17 Ins. Fund*, 29 F. Supp. 2d at 819 (recognizing that plaintiffs "cannot bring their civil conspiracy claim as a separate tort or claim without the underlying torts" and granting summary judgment on punitive damages claim because "none of these underlying causes of action provide for punitive damages").[21]

Moreover, even if punitive damages were available, such evidence is not admissible in the liability phase of the trial. *See Ohio Rev. Code § 2315.21(B); Niskanen v. Giant Eagle, Inc.*, 912 N.E.2d 595 (Ohio 2009). Before the Court may allow such evidence to be presented to the jury – or any suggestion that punitive damages are appropriate – the jury must first find, after the close of the evidence, that (1) compensatory damages are appropriate, and (2) the defendant in question has acted with "either malice or aggravated or egregious fraud." *Niskanen*, 912 N.E.2d at 599 (citing Ohio Rev. Code 2315.21(C)(1) and (2)); *see also Dippin' Dots, LLC v. Travelers Prop. Cas. Co. of Am.*, 322 F.R.D. 271, 273, 275 (W.D. Ky. 2017) (bifurcating trial under Fed. R. Civ. P. 42(b) to prevent prejudice to defendant).

For all of these reasons, even if the Court finds that punitive damages are potentially available, it should bifurcate the trial and exclude from the first phase any reference to defendants' financial condition, revenues, profits, or punitive damages. *See Ferrarelli v. Federated Fin. Corp. of Am.*, 253 F.R.D. 432, 433 (S.D. Ohio 2008) (bifurcation avoids the

---

[21] Moreover, there can be no punitive damages award without any underlying compensatory damages award. *See* Ohio Rev. Code 2315.21(C)(1)-(2); *Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1242, 1248 (Ohio 1996) ("As we have held time and again, punitive damages may not be awarded when a jury fails to award compensatory damages."). Compensatory damages are not available on the civil conspiracy claim based upon public nuisance because plaintiffs have disclaimed any such damages in connection with their public nuisance theory. They cannot try to use a civil conspiracy claim to circumvent that decision.

possibility of prejudice that could result from evidence of a defendant's financial condition, which though relevant to punitive damages, is irrelevant to liability); *see also Helminski v. Ayerst Labs.*, 766 F.2d 208, 212 (6th Cir. 1985) (bifurcation is appropriate when evidence relevant to damages may have prejudicial impact on jury's liability determination).

> ### 12.  The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.

Plaintiffs may seek to elicit testimony from individual witnesses affiliated with defendants concerning their personal feelings of personal responsibility or guilt relating to the opioid epidemic or their opinions about whether they or their employers violated legal requirements.  In depositions, counsel for plaintiffs often asked such witnesses whether they believe personally that their conduct or that of their employers was responsible for the alleged increase in opioid abuse.  Testimony of this nature should be excluded because it is irrelevant and prejudicial; it is also inadmissible under Federal Rule of Evidence 701.

Plaintiffs bear the burden of proving that defendants' alleged conduct caused the plaintiffs' damages.  To carry that burden, plaintiffs must marshal *facts* concerning what defendants did and how that conduct ultimately caused plaintiffs harm.  Individual employees' personal feelings, beliefs or opinions that they or their employers may bear "responsibility" for the opioid epidemic are irrelevant to whether the defendants are in fact legally responsible for harms to plaintiffs.  Given the irrelevance of such testimony and the unfairly prejudicial impact it would have on the jury, plaintiffs should be precluded from asking individual lay witnesses about their personal feelings or opinions on the subject.  Witnesses should not be put on the spot, challenged to admit to feelings of concern or remorse in a manner that prejudges the ultimate question of fault that is for the jury to decide.  Deposition testimony of this kind – often elicited through argumentative, repetitive, and harassing questioning – should also be excluded on grounds of lack of relevance and unfair prejudice.

Even apart from its lack of relevance and unfairly prejudicial impact, such testimony would be inadmissible under Federal Rule of Evidence 701.  Rule 701 provides that lay opinion testimony is admissible only when that opinion is "rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Witnesses' views on their or their employers' "responsibility" amounts to legal conclusion. But, as this Court has already recognized, testimony presenting interpretations of the law is inadmissible:  "if testimony containing a legal conclusion is allowed, . . . it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury."  Dkt. 2551 at 17 (internal marks and citation omitted).

More generally, opinion testimony from lay witnesses about "responsibility" for harms would be inappropriate because it goes to an ultimate issue – causation.  Under settled Sixth Circuit precedent, "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013). "Seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'"  *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986); *see also United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) (same); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226–27 (3d Cir. 2008) (quoting *Mitroff*) (holding that lay testimony "as to the ultimate issue of causation" should not have been admitted).

### 13. The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.

Plaintiffs and their counsel should be barred from making remarks to suggest either that the cost of governmental services allegedly provided in response to the opioid crisis was paid by

taxpayers, or that jurors as taxpayers would benefit from ordering defendants to pay money to plaintiffs.

"Remarks involving the individual pecuniary interests of jurors as taxpayers are universally viewed as improper." *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2008) (citing cases). After all, given that "pecuniary interests would necessarily disqualify a prospective juror from service," it is "patently improper to make an appeal to that interest." *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991) (marks and citation omitted); *see also Gomez v. Schoenbeck*, 2019 WL 3887128, at *3 (S.D. Ill. Aug. 19, 2019) (granting motion *in limine* to bar "arguments to jurors relating to their status as taxpayers").

In this case, any reference to taxpayers' role in funding government services would be legally irrelevant and calculated to inflame the jury, and thus in clear violation of Rules 401 and 403. Plaintiffs complain of "extraordinary costs and losses" that are allegedly "related directly to Defendants' illegal actions," and plaintiffs charge that these costs were "borne by Plaintiffs and other governmental entities." Dkt. 1465 at ¶¶ 20-21. Because the plaintiffs have sued based on their own alleged injuries and not based on any injury allegedly sustained by the taxpaying public, any suggestion that these costs were ultimately paid by taxpayers would be legally irrelevant. Worse, such remarks would carry a high risk of unfair prejudice, as they would suggest that a portion of these costs was ultimately paid by the very jurors sitting to decide this case, and implicitly encourage them to decide the case based on their own pecuniary interests instead of based on the evidence and instructions presented at trial.

### 14. The Court should preclude any comment regarding the absence of a corporate representative at trial.

The Court should preclude counsel for plaintiffs from advancing argument, comment, or innuendo to the jury, or soliciting testimony regarding, the fact that a defendant's corporate representative might not attend all or part of the trial. Comments concerning the absence of

defendants' corporate representatives at trial are irrelevant and thus inadmissible.  Fed. R. Evid. 401, 402; *United States v. Nixon*, 694 F.3d 623, 636 (6th Cir. 2012).  The trial judge has full authority to "exclude irrelevant matters," *United States v. Pits*, 85 F.3d 629, *1 (6th Cir. 1996) (table), and the presence of corporate representatives has no bearing on any of the claims or issues in this action.  Moreover, such comments are unfairly prejudicial to the defendants, Fed. R. Evid. 403, because they improperly imply to the jury that the defendants do not take the proceedings seriously or may otherwise exploit potential jury bias against large corporations. Accordingly, counsel's statements (including opening and closing statements), as well as the testimony counsel solicits from witnesses, must focus on the issues and admissible evidence, not recite irrelevant and prejudicial observations to "poison the minds of the jury," *United States v. Signer*, 482 F.2d 394, 398 (6th Cir. 1973); *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011).  The Court should accordingly prohibit counsel from making any comments or arguments, or soliciting testimony, at trial regarding the absence of any defendant's corporate representatives.

Dated:      September 25, 2019

Respectfully Submitted,

 _/s/ Geoffrey E. Hobart_
Geoffrey E. Hobart
Mark H. Lynch
Sonya D. Winner
Paul W. Schmidt
Phyllis A. Jones
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com
pschmidt@cov.com
pajones @cov.com

*Counsel for McKesson Corporation*

 _/s/ Enu Mainigi_
Enu Mainigi
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Cardinal Health, Inc.*

 _/s/ Robert A. Nicholas_
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation and AmerisourceBergen Corporation*

 _/s/ John P. McDonald_
John P. McDonald
C. Scott Jones
Lauren M. Fincher
Brandan J. Montminy
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Tel: (214) 740-8000
Fax: (214) 756-8758
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc. and Henry Schein Medical Systems, Inc.*

_/s/ Steven A. Reed_____
Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
Harvey Bartle
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
harvey.bartle@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
Fax: (412) 560-7001

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc.,
Cephalon, Inc., Watson Laboratories, Inc., Actavis
LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.,
Warner Chilcott Company, LLC, Actavis South Atlantic
LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC,
Actavis Totowa LLC, Actavis Kadian LLC, Actavis
Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-
Salt Lake City, Actavis Laboratories FL, Inc., f/k/a
Watson Laboratories, Inc.-Florida, and appearing
specially for Teva Pharmaceutical Industries Ltd.*[22]

_/s/ Charles C. Lifland_____
Charles C. Lifland
Sabrina H. Strong
**O'MELVENY & MYERS LLP**
400 S. Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
clifland@omm.com
sstrong@omm.com

Daniel M. Petrocelli
Amy R. Lucas
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
dpetrocelli@omm.com
alucas@omm.com

*Counsel for Janssen Pharmaceuticals,
Inc., Johnson & Johnson, Janssen
Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc., and Ortho-
McNeil-Janssen Pharmaceuticals, Inc.
n/k/a Janssen Pharmaceuticals, Inc.*

_/s/ Kaspar Stoffelmayr_
Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

_Counsel for Walgreen Co. and Walgreen Eastern Co._

---

[22] Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is an Israeli corporation that is not subject to and contests personal jurisdiction for the reasons explained in its motions to dismiss for lack of personal jurisdiction; Teva Ltd. is specially appearing to join this motion as a result of the Court's deadline to file motions in limine, and, thus, they do not waive and expressly preserve their pending personal jurisdiction challenges.

**CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

# EXHIBIT 1

From: **David R. Cohen** Dav d@Spec a Master.Law
Subject: Agenda Item 7 REDUX
Date: November 29, 2018 at 3:57 PM
To: xALLDEFENDANTS-MDL2804-Serv ce@arno dporter.com, md 2804d scovery@mot eyr ce.com



Dear Counsel:

In light of the additional arguments and discussion we had during yesterday's telecon, I have reconsidered my ruling regarding agenda item no. 7, which raises the issue of Plaintiffs' answer to Distributor Interrogatory no. 3.

As both sides noted, Discovery Ruling no. 8 allowed Plaintiffs to discovery only certain data related to dispensing of opioids by retail pharmacies. To oversimplify, DR8 directed the retail pharmacy defendants to produce dispensing information related to their Suspicious Order Monitoring Systems (e.g., written policies designed to prevent unlawful dispensing of opioids, and specific prescriptions a defendant examined when deciding whether to ship a suspicious order), but DR8 did not allow Plaintiffs to discover other, more detailed dispensing information (e.g., every opioid prescription the pharmacies filled). I sustained defendants' objection to producing additional discovery in DR8 because, among other reasons, plaintiffs have "specifically disclaimed any claim against the National Retail Pharmacy Defendants based on their retail dispensing [of] opioids."

Distributor Interrogatory No. 3 asks Plaintiffs to "[i]dentify each pharmacy within Your geographical boundaries that diverted or wrongfully dispensed Prescription Opioids for each year of the Timeframe." The problem, however, is that DR8 sustained the Pharmacies' objection to producing detailed dispensing information; therefore, Plaintiffs do not have at least some of the information they need -- and perhaps the most important information -- to identify every pharmacy that "diverted or wrongfully dispensed prescription opioids."

During argument and discussion on the telecon, the Pharmacies recast what it is they are seeking with this Interrogatory, stating the Plaintiffs should at least produce **information they already have** on **which** pharmacies diverted or wrongfully dispensed opioids -- for example, investigations by the police or health departments into "pill mills." This question is different, however, from what the Distributors asked: the original interrogatory requires Plaintiffs to identify **each and every** pharmacy that diverted opioids, as a final matter. To repeat, the Pharmacies' recast version asks Plaintiffs to identify those pharmacies **they know about** that diverted opioids, <u>without benefit of detailed dispensing information</u>. As Plaintiffs note, if they **did** have the retail Pharmacies' detailed dispensing information, they could better identify, as a final matter, which specific pharmacies (at least, those owned by defendants) wrongfully dispensed opioids.

The upshot of this discussion is that it is inappropriate to order Plaintiffs to answer Interrogatory no. 3 as it is currently phrased. Moreover, my original attempt at rewriting the interrogatory was a poor one, and missed the point.

Instead, the Special Master orders that Plaintiffs must answer Distributor Interrogatory no. 3 as rewritten below:

• Interrogatory No. 3: "Identify those pharmacies within Your geographical boundaries that you investigated for, or learned were being investigated for, or learned were engaged in, possible diversion or wrongful prescription of Prescription Opioids during the Timeframe."

Finally, the Special Master further that the Plaintiffs must also answer Distributor Interrogatory no. 3 as originally phrased, **IF** the Pharmacy Defendants provide Plaintiffs with all of the discovery regarding dispensing information the Plaintiffs originally sought. More specifically, if a specific defendant (say, CVS) provides Plaintiffs with its detailed dispensing information, Plaintiffs must respond by telling CVS which of its own pharmacies, within each Plaintiff's geographical boundaries, diverted or wrongfully dispensed Prescription Opioids for each year of the Timeframe. If a Pharmacy defendant chooses this option, it must produce its detailed dispensing information on or before December 10, 2018.

-David

============================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
**www.SpecialMaster.law**

-------- Original Message --------
Subject: Agenda Item 7
From: "David R. Cohen" <David@SpecialMaster.Law>
Date: Tue, November 27, 2018 4:32 pm
To: xALLDEFENDANTS-MDL2804-Service@arnoldporter.com,
mdl2804discovery@motleyrice.com

With regard to tomorrow's agenda item no. 7, which raises the issue of Plaintiffs' answer to Distributor Interrogatory 3, the Special Master rules as follows.

For essentially the same reasons that support Discovery Ruling No. 5, where I concluded the Plaintiffs had to identify a certain number of prescriptions or persons, rather than "all prescriptions" and "every person," I conclude that Plaintiffs should be required at this juncture to identify only a certain number of pharmacies that diverted or wrongfully dispensed opioids, and not "each pharmacy" for "each year of the Timeframe" that did so.

Accordingly, Plaintiffs must answer Distributor Interrogatory no. 3 as rewritten below:

• Interrogatory No. 3: "Identify 300 pharmacies within Your geographical boundaries that diverted or wrongfully dispensed Prescription Opioids during the Timeframe."

These pharmacies may, but need not, be the same pharmacies as the ones listed in plaintiffs' response to Manufacturers' Interrogatories 7 & 10.

-David

============================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
**www.SpecialMaster.law**

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>*City of Cleveland, et al. v. Purdue Pharma L.P.*, *et al.*, Case No. 18-OP-45132;<br><br>*County of Cuyahoga, et al. v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004;<br><br>*County of Summit, et al. v. Purdue Pharma, L.P. et al.*, Case No. 18-OP-45090 | MDL 2804<br><br>Case No. 17-md-2804<br>Hon. Dan Aaron Polster<br>Mag. Judge David A. Ruiz |

## PLAINTIFFS THE CITY OF CLEVELAND, COUNTY OF CUYAHOGA, COUNTY OF SUMMIT AND CITY OF AKRON'S SUPPLEMENTAL AMENDED RESPONSES AND OBJECTIONS TO THE MANUFACTURER DEFENDANTS' FIRST SET OF INTERROGATORIES, SUBMITTED PURSUANT TO DISCOVERY RULING NO. 13

Set out below, on behalf of Plaintiffs Cuyahoga and Summit Counties and the Cities of Akron and Cleveland ("Plaintiffs") is the supplemental response to the Manufacturer Defendants' Interrogatory No. 6, which was the subject of Discovery Ruling 5, as amended by the Court on October 16, 2018, and Discovery Ruling No. 13.

While maintaining their objections to the interrogatories and to Discovery Ruling No. 5, as set forth in Plaintiffs' prior letters, briefing, and oral argument, Plaintiffs respond below. In particular, and without waiving any other objections,

This response is provided only with respect to the Bellwether jurisdictions listed above, and is not binding on any other plaintiff in the MDL.

**Manufacturer Interrogatory No. 6**

Identify and describe 500 prescriptions of opioids that were written in [Plaintiff's jurisdiction] in reliance on any alleged misrepresentations, omissions, or other alleged wrongdoing by any Defendant. Include in the response the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the specific misrepresentation, omission, or wrongdoing that allegedly caused the prescription to be written; the Defendant and the specific sales representative(s), employee(s), or agent(s) of the Defendant that made or committed the

1

alleged misrepresentation, omission, or wrongdoing; the person or persons to whom the alleged misrepresentation or omission was made or to whom the alleged wrongdoing was directed; and whether, by whom, and for how much the prescription was approved for reimbursement. Your response must include at least 10 prescriptions for an opioid sold by each manufacturing defendant.

**Plaintiffs' Supplemental Amended Response:**

Bellwether Plaintiffs will not assert, either in expert opinions or factual presentations at trial, that any specific prescription was caused by Defendants' deceptive marketing. Plaintiffs intend to rely, at trial and in expert opinions, on a theory of aggregate proof in asserting that Defendants' conduct violated the law and caused their damages and/or created a public nuisance, as alleged more fully in their Complaints and proved at trial. Notwithstanding this response, and solely for the purpose of preserving Plaintiffs' right to present additional evidence in expert opinions and at trial to address the harm alleged to Plaintiffs, as opposed to individuals, and to address any contingencies that come to light during discovery, Bellwether Plaintiffs revise and supplement their prior response to Manufacturer Interrogatory No. 6 as follows. This response supersedes the prior response submitted by Plaintiffs.

Plaintiffs reassert all objections and reservations in their prior responses and submissions in response to Discovery Ruling No. 5 as if asserted here. Plaintiffs also note and preserve their objections to being required to answer all of the interrogatories subject to Discovery Ruling 5, *see* Plaintiffs' Memorandum in Opposition to Manufacturer Defendants' Motion to Compel Compliance with Discovery Ruling No. 5, Doc. 1071 (Nov. 1, 2018).[1] *See* Order Regarding Discovery Ruling #5, Doc. 1047 (Oct. 16, 2018). Plaintiffs were authorized, under the Court's October 16, 2018 Order, to choose among the alternatives offered, and expressly preserve their position that the Court's Order Regarding Discovery Ruling #5 (Doc. 1047) is clear in this respect. Each Interrogatory is a separate request, and Plaintiffs may choose to answer those related to the harm caused by Defendants' conduct, preserving their ability to present individualized proof of these substantial harms, while relying solely on aggregate proof in proving the impact of Defendants' marketing on the prescribing and use of opioids. *See* Order Regarding Discovery Ruling #5, Doc. 1047 (Oct. 16, 2018) (amending Discovery Ruling No. 5 "as follows: Instead of answering the disputed interrogatories as required by the Discovery Ruling, Plaintiffs may instead elect not to answer them **on the condition** that Plaintiffs instead categorically and affirmatively respond to the disputed interrogatories by stating that: (1) they will not assert, either in expert opinions or factual presentations at trial, that any specific prescriptions "were unauthorized, medically unnecessary, ineffective, or harmful" or that "the filling of [any specific prescriptions] that caused or led to harm for which [Plaintiffs] seek to recover," and (2) Plaintiffs instead will rely, at trial and in expert opinions, solely on a theory of aggregate proof.") (footnote omitted); Letter from M. Dearman, on behalf of Bellwether Plaintiffs, to Special Master David R. Cohen, Re: *In re National Prescription Opiate Litigation, MDL No. 2804*, Plaintiffs' Response In Opposition to Manufacturer Defendants' Motion to Compel Immediate and Full Compliance With Discovery Ruling 5, dated November 14, 2018 (Nov. 26, 2018). This is especially true because the other interrogatories that are the subject of Discovery Ruling 5 seek information about prescriptions that were harmful or unnecessary, while Interrogatory 6 seeks information about the extent to which doctors relied on Defendants' wrongful conduct. Given that these are distinct

---

[1] Unless otherwise noted, all references to "Doc. __" refer to the master docket in this MDL.

subjects, relating to different elements of Plaintiffs' claims, there is no reason why Plaintiffs should be required to make the same election with respect to proof of the one subject as they make with respect to proof of the others.

Bellwether Plaintiffs further renew their objections to responding to this reformulated interrogatory for the reasons laid out in their briefing and oral argument related to Discovery Ruling 5 and in their Memorandum in Opposition to Manufacturer Defendants' Motion to Compel Compliance with Discovery Ruling No. 5. *See* Letter from M. Dearman, on behalf of Bellwether Plaintiffs, to Special Master David R. Cohen, Re: *In re National Prescription Opiate Litigation, MDL No. 2804*, Plaintiffs' Response In Opposition to Manufacturer Defendants' Motion to Compel Immediate and Full Compliance With Discovery Ruling 5, dated November 14, 2018 (Nov. 26, 2018) and oral arguments on behalf of Bellwether Plaintiffs. Without narrowing or limiting those objections here, Bellwether Plaintiffs note that Defendants have failed to answer the same discovery request (Interrogatory No. 17 to the Manufacturer Defendants, and No. 21 for the Purdue Pharma Defendants), yet demand Bellwether Plaintiffs do so without an adequate record and/or the benefit of expert witness testimony. In addition, responding to this Interrogatory requires Bellwether Plaintiffs to obtain and analyze information outside of Plaintiffs' custody and control. Pursuant to Federal Rule of Civil Procedure 33(d), this question can be answered, to the extent practicable, from business records already produced to Defendants or within Defendants' custody and control. Nonetheless, the Plaintiffs are complying with the Court order in good faith and with the limitations laid out below.

The discovery request is a contention interrogatory. "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims. *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, fn. 2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999). To be clear, it is the position of the Plaintiffs answering herein, that the answer to this contention interrogatory does not, consistent with Discovery Ruling 7, limit Plaintiffs' experts from using different criteria to identify prescriptions written in reliance on Defendants' misrepresentations, omissions, or other wrongdoing, or from contending that there are existing additional prescriptions that would be responsive, in addition to those identified herein. Discovery Ruling No. 7, p. 6.

Responding to this Interrogatory does not waive Bellwether Plaintiffs' rights to prove their claims, in whole or in part, through aggregate proof or statistical evidence. Bellwether Plaintiffs reserve their rights to assert that the use of any individualized prescription information is inappropriate, irrelevant, or inadmissible. *See* Report and Recommendation, *In re: National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (DAP), Doc. 1025 (N.D. Ohio) (Magistrate Judge David A. Ruiz); *In re Neurontin Litigation*, 712 F.3d 21, 29-39 (1st Cir. 2013); *United States v. Life Care Centers of Am., Inc.*, 114 F. Supp. 3d 549 (E.D. Tenn. 2014); *United States v. Life Care Centers of Am., Inc.*, 1:08-CV-251, 2015 WL 10987029, at *3 (E.D. Tenn. Feb. 18, 2015); Order Regarding Discovery Ruling No. 5, *In re: National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (DAP), Doc. 1047 (N.D. Ohio). In short, by responding, Bellwether Plaintiffs do not concede that this information is relevant or admissible.

Further, Bellwether Plaintiffs also object to this Interrogatory as overly broad and unduly burdensome as propounded. Plaintiffs object on the grounds that this Interrogatory seeks

3

information not relevant to any party's claim or defense or the legal theories in this case. Bellwether Plaintiffs note that they are not representing or seeking recovery on behalf of any individuals who were harmed by opioids or any payer of opioid prescription costs (other than Bellwether Plaintiffs); nor have Plaintiffs alleged any claims for restitution for their own spending or other individual claims that justify the burden of interrogatories this broad in scope. Plaintiffs further object to the Interrogatory because they are not proportional to the needs of the case considering (1) the lack of relevance or importance of the materials to the claims and defenses in this litigation, as described above, and (2) the substantial burden they place on the Bellwether Plaintiffs to identify and describe all individual prescriptions that would cause substantial harm to the privacy interests and rights held by the individuals whose private medical files are the subject of this request. Plaintiffs further object to the extent these interrogatories call for Confidential Information not in the Plaintiff's possession and protected by privacy laws, including but not limited to, the federal Health Insurance Portability and Accountability Act ("HIPAA") Title 42, Part 2 of the Code of Federal Regulations.

In responding, Bellwether Plaintiffs disclaim any reliance on or reference to their own claims data. Instead, Bellwether Plaintiffs rely upon other information produced by the parties in discovery, and information obtained from public records and a Rule 45 subpoena.

Bellwether Plaintiffs produce this highly sensitive identified health information subject to the Special Master's prior order limiting the disclosure of this information to Defendants' attorneys and their experts only and preventing the use of such information for further discovery without separate order of the Court. *See* Track One Discovery Order Regarding Health-Related Information, *In re: National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (DAP), Doc. 703 (N.D. Ohio) (Special Master Cohen). Plaintiffs' production of data in response to this Interrogatory is subject to prior rulings limiting the disclosure and use of claims and health related information.

Despite repeated requests that Defendants provide prescription and sales tracking data, Defendants have failed to produce all or, in some instances, *any* of that information. In addition, to Plaintiffs' knowledge, Defendants have not provided all or, in some instances, *any* documents responsive to Request for Production No. 13 to the Manufacturer Defendants (No. 14 for the Purdue Pharma Defendants), which seeks documents and data "regarding prescribing, sales, distribution, use, consumer or medical community perceptions, insurance coverage of, or diversion, misuse or abuse (including overdoses, hospitalizations, or other injuries or fatalities) of Opioids . . ." When the Pharmacy Defendants refused to produce dispensing data, Bellwether Plaintiffs raised the issue with Special Master Cohen, who issued Discovery Ruling 8, requiring these Defendants to produce data related to the prescriptions they dispensed in the bellwether jurisdictions. *See* Discovery Ruling No. 8, *In re: National Prescription Opiate Litig.*, Case No. 1:17-MD-2804 (DAP), Doc. 1055, (N.D. Ohio) (Special Master Cohen). Plaintiffs have not yet received that data from the majority of Defendants. Thus, because of Defendants' own failure to provide prescription-level data, Bellwether Plaintiffs are responding to this Interrogatory without the benefit of full discovery.

Bellwether Plaintiffs reserve the right to supplement these answers when or if Defendants fully and proportionately respond to discovery and once expert reports and opinions are disclosed.

4

For the purposes of responding to this contention Interrogatory, and consistent with the Court's Order, Bellwether Plaintiffs have not attempted to identify every prescription that was caused or influenced by Defendants' unlawful, improper, and deceptive marketing, Plaintiffs, nor all deceptive statements or omissions made to prescribers in the jurisdictions. Thus, identifying prescriptions as written in reliance on Defendants' misrepresentations, omissions, or other alleged wrongdoing does not mean that these prescriptions were not also medically unnecessary or unauthorized. Likewise, in contending that Defendants misrepresented the risk of addiction to opioids (and identifying prescriptions to patients who developed opioid use disorder), Bellwether Plaintiffs do not contend that Defendants only misrepresented the risk of addiction; they may also have misrepresented the benefits or superiority of opioids, or understated other risks.

Subject to and without waiving the foregoing objections and limitations, Bellwether Plaintiffs contend that all prescriptions of opioids for chronic pain in the Bellwether Jurisdictions were written in reliance on the misrepresentations, omissions, and wrongdoing alleged in their complaints. Plaintiffs contend that, based on misrepresentations and omissions of material fact regarding their products and opioids more generally, prescribers initiated and/or maintained patients on opioids, often at increasingly and dangerously high doses, switched them to extended-release or purportedly abuse-deterrent formulations, added immediate-release and/or rapid-onset opioids for "breakthrough" pain, and failed to monitor for or recognize signs of addiction or abuse. Defendants' deceptive marketing also increased the comfort level of doctors and patients in converting opioids prescribed for acute pain— surgery or injuries, for example— to long-term use by patients who experienced or reported ongoing pain.

As explained in the Bellwether Plaintiffs' complaints, historically, opioids were used only to treat short-term acute pain or for palliative (end-of-life) care because they were considered too addictive and debilitating for the treatment of chronic pain, like back pain, migraines, and arthritis. Purdue, joined by the other "Manufacturing" or "Marketing" Defendants, set out to change this practice, and to maintain this shift with false and deceptive messages. As a doctor who became a "key opinion leader" or "KOL" for Manufacturing Defendants, Dr. Russell Portenoy wrote in 1994 — before the launch of OxyContin and marketing campaign that attended it — the prevailing attitudes regarding the dangers of long-term use of opioids were as follows:

> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects,*

> *avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[2]

*See* Corrected Second Amended Complaint and Jury Demand, *The County of Summit, Ohio, et al. v. Purdue Pharma, L.P. et al.*, No. 18-op-45090 ("Summit/Akron SAC") ¶ 406.[3]  According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[4]  *Id.*

Given the history of opioid abuse in the U.S. and the medical profession's resulting wariness, the commercial success of the Marketing Defendants' prescription opioids would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.  Defendants devoted massive resources to accomplishing and, as concerns began to surface, to maintaining, this fundamental shift in perception.  Each Defendant spent, and some continue to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids and overstate the benefits of opioids.  Meanwhile, they also promoted themselves as compassionate, concerned corporate citizens who sought to solve a public health problem of undertreated pain while keeping their drugs out of the hands of "bad apple" patients or others who might seek to divert them into illicit uses or channels.

For example, and without waiving any additional conduct described in Bellwether Plaintiffs' Complaints or developed through investigation and/or discovery, Plaintiffs contend Defendants disseminated these misrepresentations and omissions through:

- Sales representatives who visited prescribers in the Bellwether jurisdictions and through medical liaisons who responded to questions from these prescribers,[5] and at programs and conferences that prescribers in the Bellwether jurisdictions attended.  Visits and attendance at these programs are reflected in Defendants' call notes, ride-along-reports, and other documents, along with the sales representations' descriptions of these visits.  In addition, Defendants' marketing plans, scripts, talking points, FAQs, and similar documents Defendants provided to their sales representatives and medical liaisons also reflect the messages that Defendants directed their employees and key opinion leaders to provide.

---

[2] Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields & J.C. Liebeskind eds., 1994) (emphasis added).

[3] For the sake of brevity, the Bellwether Plaintiffs have provided citations to the Summit/Akron SAC only.  The same allegations also appear in the respective Corrected Second Amended Complaint and Jury Demands filed in *County of Cuyahoga, et al. v. Purdue Pharma L.P., et al.*, Case No. 17-op-45004 and *City of Cleveland, et al. v. Purdue Pharma L.P., et al.*, Case No. 18-op-45132.  The contentions cited herein are made by each of the Bellwether Plaintiffs.

[4] *Id.*

[5] This includes prescribers outside of the Bellwether jurisdictions whose prescribing caused the Bellwether Plaintiffs damages or contributed to the public nuisance in the jurisdictions.

- Publications and websites funded, published, edited, approved, and/or disseminated by Defendants that were provided to or visited by prescribers and patients in the Bellwether jurisdictions. These include, for example, Purdue's "Partners Against Pain," Janssen's "Let's Talk Pain," books such as Mallinckrodt's C.A.R.E.S. Alliance's "Defeat Chronic Pain Now!," Responsible Opioid Prescribing, and brand-specific leave behinds for Defendants' drugs. These publications were handed out to prescribers by sales representatives, given out at programs, and featured in catalogs or lists of references promoted or distributed by Defendants.

Continuing Medical Education ("CME") and "speakers" programs. A CME is a professional education program provided to doctors, dentists, pharmacies, pharmacists, nurses, and other allied medical providers. These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications, and /or contractual agreements with other Defendants. Doctors, dentists, pharmacies, pharmacists, nurses, and other allied medical providers rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors. The Marketing Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in the Bellwether Plaintiff's complaints. These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects. Among Defendants' specific misrepresentations and omissions distributed to prescribers in the Bellwether jurisdictions, and reserving the right to present additional misrepresentations and omissions identified through discovery and expert reports and opinions, were claims that:

    a. The risk of addiction from chronic opioid therapy is low

    b. To the extent there is a risk of addiction, it can be easily identified and managed

    c. Signs of addictive behavior are "pseudoaddiction," requiring more opioids

    d. Opioid withdrawal can be avoided by tapering

    e. Opioid doses can be increased without limit or greater risks

    f. Long-term opioid use improves functioning

    g. Alternative forms of pain relief pose greater risks than opioids

    h. OxyContin provides twelve hours of pain relief

    i. New formulations of certain opioids successfully deter abuse

Summit/Akron SAC ¶ 179.  These nine categories of misrepresentations are offered to organize the numerous statements the Marketing Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Marketing Defendant's liability.  The following chart identifies examples from the Bellwether Plaintiffs' complaints, without waiving the right to rely on or prove any additional conduct described in the complaint or developed through investigation and/or discovery:

| Falsehood | Explanation |
|---|---|
| The risk of addiction from chronic opioid therapy is low | When it launched OxyContin, Purdue cited in promotional and educational materials a single paragraph from a letter published in 1980 by Dr. Hershel Jick and Jane Porter in the New England Journal of Medicine as evidence of the low risk of addiction to opioids.  In fact, Purdue included reference to this letter in a 1998 promotional video entitled, "I got my life back," in which Dr. Alan Spanos states, "In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%." |
| | Until April 2012, Endo stated on its website that "…patients treated with prolonged opioid medicines usually do not become addicted;" a statement echoed on the website of its close affiliate, APF.  Endo also published and distributed multiple pamphlets and brochures downplaying addiction as it related to opioids. For example, "Living with Someone with Chronic Pain", stated, "Most health care providers who treat people with pain agree that most people do not develop an addiction problem.[6]  Other publications, include but not limited to "Pain: Opioid Facts," "Understanding Your Pain: Taking Oral Opioid Analgesics" and "Pain: Opioid Therapy." |
| | Janssen claimed on its unbranded website – www.PrescribeResponsibility.com – that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."  Janssen also published a patient education guide entitled "Finding Relief: Pain Management for Older Adults" describing opioid addiction as a myth and that "many studies show opioids are *rarely* addictive…" which, until recently, was available online. |
| | Cephalon sponsored a 2007 publication from APF entitled "Treatment Options: A Guide for People Living with Pain" which taught that opioid addiction is rare. |
| | Actavis published material that claimed it is "less likely" to become addicted to opioids in those who "have never had an |

---

[6] ENDO-CHI_LIT-00195455.

| Falsehood | Explanation |
|---|---|
| | addiction problem." The same publication notes that a need for a "dose adjustment" is the result of tolerance, and "not addiction." A 2007 guide for prescribers published under Actavis's copyright states that Kadian is more difficult to abuse and less addictive than other opioids.[7] |
| | Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance in 2010 which promoted a book entitled "Defeat Chronic Pain Now!" in which opioids were stated to "rarely" cause addiction. |
| To the extent there is a risk of addiction, it can be easily identified and managed | Purdue and Cephalon sponsored the APF's publication, "Treatment Options: A Guide for People Living with Pain" in 2007, which falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed." Janssen stated on its website – www.PrescribeResponsibly.com – that opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors. Purdue also sponsored a 2011 webinar taught by Dr. Lynn Webster entitled "Managing Patient's Opioid Use: Balancing the Need and Risk" wherein prescribers were told that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." Endo paid for a 2007 supplement for continuing education credit in the "Journal of Family Practice" entitled "Pain Management Dilemmas in Primary Care: Use of Opioids" which recommended screening patients and the use of the Opioid Risk Tool. |
| Signs of addictive behavior are "psuedoaddiction," requiring more opioids | Cephalon, Endo and Purdue sponsored the Federation of State Medical Board's ("FSMB") publication entitled "Responsible Opioid Prescribing" in 2007 which stated that such behaviors as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids and hoarding are all signs of "pseudoaddiction" (not genuine addiction). Purdue published an unbranded pamphlet entitled "Clinical Issues in Opioid Prescribing" in 2005 which was circulated through 2007 and available on its website through 2013. This pamphlet stated that "illicit drug use and deception" were not evidence of true addiction, but rather "pseudoaddiction." Endo sponsored a CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which promoted pseudoaddiction. Janssen sponsored, funded and edited a website entitled "Let's Talk |

---

[7] ACTAVIS0006823.

| Falsehood | Explanation |
|---|---|
| | Pain" which in 2009 stated that pseudoaddiction "…refers to patient behaviors that may occur when pain is undertreated…" |
| Opioid withdrawal can be avoided by tapering | Endo sponsored an educational program entitled "Persistent Pain in the Older Adult" which claimed that withdrawal symptoms could be avoided by simply tapering a patient's opioid dose over ten days.  Similarly, Purdue sponsored APF's publication "A Policymaker's Guide to Understanding Pain & Its Management" which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation."  Neither Defendant explained the significant hardships associated with cessation of use. |
| Opioid doses can be increased without limit or greater risks | Purdue omitted the increased risk of respiratory distress and death from increasing opioid dosage from its 2010 "Risk Evaluation and Mitigation Strategy" for OxyContin.  Endo published on its website a patient education pamphlet entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" that responds to the question, "If I take the opioid now, will it work later when I really need it?" with "The dose can be increased…You won't 'run out' of pain relief."  Purdue and Cephalon also sponsored APF's 2007 "Treatment Options: A Guide for People Living with Pain" which taught patients that opioids have "no ceiling dose" and are therefore safer than NSAIDs. |
| Long-term opioid use improves functioning | Janssen promoted Duragesic through an ad campaign as improving a patient's functioning and work productivity.  Janssen's "Let's Talk Pain" website featured a video interview claiming that opioids were what allowed a patient to "continue to function."  Similarly, Purdue ran a full-page ad for OxyContin in the Journal of the American Medical Association stating, "There Can Be Life With Relief" and implying that OxyContin would help users' function; however the FDA noted that Purdue failed to warn that patients could die from taking OxyContin.  Purdue also ran advertisements in medical journals in 2012 touting that OxyContin would help a "writer with osteoarthritis of the hands" work more effectively.  Since May 2011, Endo has distributed and made available on its website – www.Opana.com – a pamphlet implying that patients with physically demanding jobs would achieve long-term pain relief and functional improvement.  Mallinckrodt's website claims that "[t]he effective pain management offered by our [opioids] helps enable patients to stay in the workplace, enjoy |

10

| Falsehood | Explanation |
|---|---|
| | interactions with family and friends, and remain an active member of society." |
| Alternative forms of pain relief pose greater risks than opioids | Purdue and Cephalon sponsored APF's publication entitled "Treatment Options: A Guide for People Living with Pain" warning of increased risks if NSAIDs are "taken for more than a period of months;" falsely attributing 10,000 to 20,000 deaths annually to NSAID overdoses when the figure is closer to 3,200. In 2009, Janssen sponsored a publication entitled, "Finding Relief: Pain Management for Older Adults" which listed dose limitations as "disadvantages" of other pain medicines. It also listed a number of serious health effects as disadvantages of NSAIDs while only listing "upset stomach or sleepiness" and constipation as disadvantages of opioids. Purdue and Endo sponsored a CME issued by the AMA in 2003, 2007, 2010 and 2013 entitled "Overview of Management Options" which taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |
| OxyContin provides twelve hours of pain relief | In 2000, Purdue advertised that OxyContin provides "Consistent Plasma Levels Over 12 Hours;" however the oxycodone does not enter the body at a linear rate, releasing a greater proportion upon administration and gradually tapering over 12 hours. These 12-hour dosing advertisements ran in the *Journal of Pain* in February 2005 and the *Clinical Journal of Pain* in 2006. |
| New formulations of certain opioids successfully deter abuse | Purdue presented an article in 2013 based on a review of data from poison control centers concluding that its ADF OxyContin can reduce abuse, but failed to acknowledge that abuse merely shifted to other drugs and that there were actually more harmful exposures to opioids after the reformulation. In 2016, Dr. J. David Haddox, VP of Health Policy for Purdue, falsely claimed that the evidence does not show Purdue's ADF opioids are being abused in large numbers.<br><br>Endo's promotion of its Opana ER also tended to omit material facts according to a May 2012 letter from the FDA to Endo. Endo submitted a citizen petition asking the FDA for permission to label Opana ER as abuse-resistant, and also went so far as to sue the FDA to force expedited consideration of this change. Endo falsely promoted Opana ER as having been designed to be crush-resistant, knowing that this would (falsely) imply that it was actually crush-resistant and less likely to be abused (as stated in a June 14. 2012 press release). Endo initiated journal advertisements that appears in April 2013 stating Opana ER was "designed to be crush resistant." |

| Falsehood | Explanation |
|---|---|
| | Likewise, Actavis copyrighted a guide for prescribers representing that Kadian is more difficult to abuse and less addictive than other opioids.[8] Mallinckrodt promoted both Exalgo and Xartemis XR as specifically formulated to reduce abuse, going so far as to state, "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients." |
| Endo: "[M]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted." *Taking a Long-Acting Opioid: What Does It Mean to Me* (2008); Caregiver Booklet (2009). | This is demonstrably false and misleading. |

Further, public statements by the Defendants and their agents or proxies created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact. Purdue serves as a hallmark example of such wrongful conduct. At the heart of Purdue's public outreach is the claim that it works closely with law enforcement and government agencies to combat opioid abuse and diversion. Mallinckrodt similarly claims to be "committed . . . to fighting opioid misuse and abuse," and further asserts that: "In key areas, our initiatives go beyond what is required by law. We address diversion and abuse through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances, . . . ." Additional public statements were made on Defendants' behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations. *See, e.g.*, Summit/Akron SAC ¶¶ 594-606.

In fact, however, Defendants failed to report suspicious orders and prescribers, prevent diversion, or otherwise control the supply of opioids following into communities across America. Despite the notice described above, and in disregard of their duties, Defendants continued to pump massive quantities of opioids despite their obligations to control the supply, prevent diversion, report and take steps to halt suspicious orders and report suspicious prescribers. *See, e.g.*, Summit/Akron SAC ¶¶579-593.

---

[8] ACTAVIS0690598.

In addition, as noted above, Bellwether Plaintiffs contend that these prescriptions were written in reliance on the false, fraudulent, and misleading effort by Defendants to distort the standard of care to favor prescribing opioids for chronic pain. As alleged in Plaintiffs' Complaints, Defendants funded, suggested, edited, cited, and distributed articles and publications written by key opinion leaders, including Russell Portenoy, Scott Fishman, and Lynn Webster, which deceptively represented the risks, benefits, and superiority of opioids for chronic pain. Similarly, both directly and through these key opinion leaders, Defendants funded, influenced, edited, cited, and distributed treatment guidelines, patient education materials, studies, and other publications in ways that overstated the benefits of long-term opioid use and trivialized its risks. These included, for example, the 1997 American Academy of Pain Medicine ("AAPM") "consensus statement," which also formed the foundation of the Federation of State Medical Boards ("FSMB") Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines"), the 2009 Guidelines issued by AAPM and the American Pain Society ("APS"), and the guidelines for "Pharmacological Management of Persistent Pain in Older Persons" disseminated by the American Geriatrics Society ("AGS") in 2002 and 2009, and books such as *A Clinical Guide to Opioid Analgesia* and *Responsible Opioid Prescribing*. Defendants also used existing guidelines, like Pain as a Fifth Vital Sign and the World Health Organization's cancer pain ladder to suggest that opioids, including extended relief and rapid onset opioids, were an appropriate first line treatment for chronic pain and that doctors, even outside of the hospital setting, should routinely ask about and treat pain with their opioids. The CDC has recognized that treatment guidelines can "change prescribing practices."[9]

As described in their Complaints, Bellwether Plaintiffs contend that Defendants hid their involvement in these efforts, depriving prescribers of the ability to critically evaluate the recommendations, and frequently misrepresented the strength or nature of the recommendations, for instance, citing the AAPM/APS Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines or their financial backing of the authors of these Guidelines," or citing a letter to the editor in the *New England Journal of Medicine* as sole support for their assertion that patients rarely become addiction to opioids if it were a credible, peer-reviewed study. [10] As one of Defendants' KOLs, Dr. Portenoy later admitted: "I gave so many lectures to primary care audiences in which the [letter to the editor in the New England Journal of Medicine] was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*." [11]

_____

[9] Deborah Dowell, M.D., *et al*., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States 2016,* 65(1) Morbidity & Mortality Wkly. Rep. 1, 21 (Mar. 18, 2016) (hereinafter, "CDC Guideline"), at 2.

[10] Jane Porter & Herschel Jick, M.D., *Addiction Rare in Patients Treated with Narcotics*, 302(2) New Engl. J. Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

[11] Harrison Jacobs, *This 1-Paragraph Letter May Have Launched the Opioid Epidemic,* AOL (May 26, 2016, 1:39 PM), https://www.aol.com/article/2016/05/26/letter-may-have-launched-opioid-epidemic/21384408/. Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011).

Plaintiffs further contend that Defendants' scheme was not a haphazard effort, but a carefully orchestrated campaign designed to produce a return on their massive investment. Defendants planned their messages in advance and expected their efforts to pay off in increased prescriptions. For example, a marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase. *See* Summit/Akron SAC ¶ 155. Internal documents also reflect that they monitored the success of their efforts. Internal emails from Endo staff, for example, attributed increases in Opana ER sales to the aggressiveness and persistence of sales representatives. As another example, according to an internal Janssen training document, sales representatives were told that sales calls and call intensity have high correlation to sales. *See* Summit/Akron SAC ¶ 490. Defendants also had detailed prescription data from both third-party data vendors and financial arrangements with distributors that allowed them to target their marketing to maximize its impact.

Plaintiffs also note that the effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. *See* Summit/Akron SAC ¶ 493. Studies also show that drug marketing techniques are so refined and advanced that many prescribers persuaded by the companies will not necessarily even recognize that they have been influenced. Thus, denial by a physician that his or her prescribing conduct was influenced by Defendants' statements and/or omissions in no way establishes that there was no influence or reliance.

Individually and, especially, collectively, these misrepresentations and omissions caused prescribers and patients in the Bellwether jurisdictions to prescribe and take, respectively, opioids in instances, at higher doses, and for durations that they would not have been considered prior to Defendants' deceptive marketing. Plaintiffs refer Defendants to the list of prescriptions previously produced in connection with their October 24 2018 and November 1, 2018 submissions in response to Discovery Ruling No. 5 and with their Amended Responses to the Manufacturer Defendants' First Set of Interrogatories and the National Retail Pharmacy Defendants' First Set of Interrogatories, served November 2, 2018, as sufficient to identify and describe 500 prescriptions of opioids that were written in each Plaintiff's jurisdiction in reliance on any alleged misrepresentations, omissions, or other alleged wrongdoing by any Defendant, including at least 10 prescriptions for an opioid sold by each manufacturing defendant. *See* Discovery Ruling No. 13 Regarding Various Matters at 7 (Doc. 1215) ("Plaintiffs have sufficiently identified the connections between the prescriptions and misstatements at issue.").

As explained in Plaintiffs' Amended Responses to the Manufacturer Defendants' First Set of Interrogatories and the National Retail Pharmacy Defendants' First Set of Interrogatories, served November 2, 2018, Bellwether Plaintiffs contend that each prescription in the previously-provided Exhibit A was the result of Manufacturer Defendants' deceptive marketing. Based upon a review of relevant call notes, Bellwether Plaintiffs contend that Manufacturer Defendants systematically omitted or misrepresented the risk of addiction, failed to accurately disclose the risk of addiction, provided false assurance that addiction is rare among patients taking opioids for pain and/or

can be identified or managed, and failed to disclose that the risk of addiction increased with longer duration of opioid use or at higher doses, including, upon information and belief, to each of these prescribers. In addition to sales representatives' visits to prescribers, Manufacturer Defendants communicated this misinformation through written publications, websites, and programs that were available to or disseminated in the jurisdictions.[12]

Exhibit A includes individuals who were prescribed reformulated OxyContin, Hysingla ER, Opana ER, Exalgo, and Xartemis XR as abuse-deterrent formulations of Defendants' opioids. Bellwether Plaintiffs contend that the Manufacturers of these products systematically misrepresented to prescribers that these products were actually abuse-deterrent, when they were not approved as abuse-deterrent and did not actually deter abuse, misrepresented that these products could not be tampered with or reduced abuse, and/or failed to disclose that abuse-deterrent formulations had no impact on oral abuse, the primary means of abusing opioids.

The prescriptions for Actiq, Fentora, and Subsys included in Exhibit A were prescribed to individuals who did not have a recent diagnosis of cancer. Bellwether Plaintiffs contend that Defendants Teva and Insys pervasively and unlawfully marketed Actiq, Fentora, and Subsys for off-label use for chronic pain, and to doctors who did not regularly treat cancer pain, even though the drugs were approved only for breakthrough cancer pain for opioid-experienced patients. Teva and Insys failed to disclose that Actiq, Fentora, and Subsys were not approved or appropriate for chronic pain, or were not to be used by opioid-naïve patients.[13]

Dated: December 31, 2018

*/s/ Linda Singer*
Linda Singer
Joseph F. Rice
Jodi Westbrook Flowers
Anne McGinness Kearse
David I. Ackerman
Lisa Saltzburg
Motley Rice LLC
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: (202) 232-5504

---

[12] In identifying specific deceptive statements, in addition to the description set forth above, Bellwether Plaintiffs also incorporate by reference their 3rd Amended Responses to Manuf. 1st Set of Interrogatories (10/8/2018) and the Response to Distr. 4th Set of Interrogatories (8/31/2018): which describe specific statements made to identified prescribers in the jurisdictions, including prescribers identified in Exhibit A.

[13] Where Bellwether Plaintiffs have not provided information, such as prescription information for individuals listed in Exhibit B, Plaintiffs do not presently have or have access to this information. To the extent that such information becomes available to Bellwether Plaintiffs, Plaintiffs will supplement this response.

*Counsel for Plaintiffs County of Summit and City of Akron*

Mark Pifko
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 214-520-1181
mpifko@baronbudd.com

Stephen S. Zashin (Ohio Bar No. 0064557)
Ami J. Patel (Ohio Bar No.0078201)
Christopher S. Caspary (Ohio Bar No. 0091350)
ZASHIN & RICH CO. LPA
950 Main Avenue, 4th Floor
Cleveland, Ohio 44113
Tel: 216-696-4441
Fax: 216-696-1618
ssz@zrlaw.com; ajp@zrlaw.com;
cdc@zrlaw.com

Peter J. Mougey
Jeffrey Gaddy
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR,
P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com;
jgaddy@levinlaw.com

*Counsel for Plaintiff City of Cleveland*

Plevin & Gallucci
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804


Napoli Shkolnik PLLC

16

Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

Scott Elliot Smith L.P.A.
Scott Elliot Smith (0003749)
5003 Horizons Dr., Suite 200
Columbus, Ohio 43220
Phone: (614) 846-1700
ses@sestriallaw.com
Thrasher Dinsmore & Dolan L.P.A.

Leo M. Spellacy, Jr. (0067304)
1111 Superior Avenue
Suite 412
Cleveland, Ohio 44114
Phone: (216) 255-5450

*Counsel for Plaintiff County of Cuyahoga*

## <u>CERTIFICATE OF SERVICE</u>

I, David I. Ackerman, certify that on December 31, 2018, I caused the foregoing to be served via electronic mail on Defendant's Liaison Counsel pursuant to the Case Management Order in this case (Dkt. No. 232).

*/s/ David I. Ackerman*

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL No. 2804** |
| | **Case No. 17-md-2804** |
| This document relates to: | |
| | **Judge Dan Aaron Polster** |
| Case No. 17-OP-45004 (N.D. Ohio) | |
| THE COUNTY OF CUYAHOGA, OHIO, and STATE OF OHIO EX REL., PROSECUTING ATTORNEY OF CUYAHOGA COUNTY, MICHAEL C. O'MALLEY, | |
| Plaintiffs, | **PLAINTIFFS THE COUNTY OF CUYAHOGA, OHIO AND THE STATE OF OHIO _EX REL._ PROSECUTING ATTORNEY OF CUYAHOGA COUNTY, MICHAEL C. O'MALLEY'S RESPONSES AND OBJECTIONS TO DISTRIBUTOR DEFENDANTS' SECOND SET OF INTERROGATORIES** |
| vs. | |
| PURDUE PHARMA L.P., PURDUE PHARMA INC., THE PURDUE FREDERICK COMPANY, INC., ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC., NORAMCO, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., ALLERGAN PLC f/k/a ACTAVIS PLC, ALLERGAN FINANCE LLC, f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ACTAVIS LLC, ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., INSYS THERAPEUTICS, INC., MALLINCKRODT PLC, MALLINCKRODT LLC, CARDINAL HEALTH, INC., McKESSON | |

CORPORATION, AMERISOURCEBERGEN
CORPORATION, HEALTH MART
SYSTEMS, INC., H. D. SMITH, LLC d/b/a
HD SMITH, f/k/a H.D. SMITH
WHOLESALE DRUG CO., H. D. SMITH
HOLDINGS, LLC, H. D. SMITH HOLDING
COMPANY, CVS HEALTH
CORPORATION, WALGREENS BOOTS
ALLIANCE, INC. a/k/a WALGREEN CO.,
and WAL-MART INC. f/k/a WAL-MART
STORES, INC.,

                Defendants.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case

Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232),

The County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga

County, Michael C. O'Malley, ("Plaintiff") hereby responds to Distributor Defendants[1] Second Set

of Interrogatories (the "Interrogatories" and, each individually, a "Interrogatory"), as follows:

## OBJECTIONS

The following objections apply to each Interrogatory. To the extent that certain specific

objections are cited in response to an individual Interrogatory, those specific objections are provided

because they are applicable to that specific Interrogatory and are not a waiver of the objections

applicable to information falling within the scope of such Interrogatory.

1.       Plaintiff objects to each Interrogatory to the extent they are overly broad, vague,

unduly burdensome, seek information that is not relevant to any party's claim or defense, or seeks to

impose obligations or require actions beyond those required by the Rules of Civil Procedure, the

---

[1] The Distributor Defendants are Amerisource Drug Corporation, Cardinal Health, and McKesson Corporation (collectively, "Distributors").

ESI Protocol entered in this matter or the Local Rules of the United States District Court of the Northern District of Ohio.

2.      Plaintiff objects to each Interrogatory to the extent they seek information restricted from dissemination pursuant to court order, statute or regulation, without the entry of an appropriate Protective Order. Further, Plaintiff's responses to the Interrogatories are not intended to waive, and does not constitute any waiver of, any objection to the admissibility, authenticity, competency or relevance of the information identified.

3.      These responses are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained provided herein. All such objections and the grounds therefore are hereby reserved.

4.      No admission of any nature whatsoever is to be implied or inferred in these responses. The fact that any of the Interrogatories herein may have been answered should not be taken as an admission or a concession of the existence of any facts set forth or assumed by the Interrogatories, or that such answer constitutes evidence of any fact thus set forth or assumed.

5.      Plaintiff objects to each Request to the extent Plaintiff has not yet completed its investigation of the facts relating to this action and has not yet completed its preparation for trial. Accordingly, these responses are necessarily limited in nature, and reflect only that information known to Plaintiff at this time.

6.      Plaintiff objects to each Interrogatories to the extent they purport to require Plaintiff to provide information that is in the public domain or otherwise available to Distributors as easily from other sources as from Plaintiff.

7.      Plaintiff objects to each Interrogatory to the extent they purport to state facts, assumptions, or characterizations that are disputed.

8.      Plaintiff objects to each Interrogatory to the extent they seek information more appropriately obtained through other methods of discovery.

9.      Plaintiff objects to each Interrogatory to the extent that they seek information that is proprietary or confidential or that is protected from discovery as attorney work product and attorney-client communication, information gathered or prepared in anticipation of litigation, the public interest privilege, law enforcement privilege, public official privilege, and/or by any other privilege or immunity from disclosure (collectively, "Privileged Information").

10.     Plaintiff objects to each Interrogatory to the extent they seek confidential investigative, personal, or health information in Plaintiff's possession, custody, or control (collectively, "Confidential Information").

11.     Whenever in the responses Plaintiff employs the phrase "subject to and without waiving all objections," Plaintiff is responding to the Interrogatory as it may be narrowed by its objections and without waiver of any objection.

12.     Any response stating that Plaintiff will provide information shall be deemed followed by the phrase "as are within Plaintiff's possession, custody, or control."

13.     Plaintiff objects to each Interrogatory to the extent that they imply the existence of facts or circumstances that do not or did not exist, and to the extent that it states or assumes legal conclusions.  In providing these objections and responses, Plaintiff does not admit the factual or legal premise of any Interrogatory.

14.     Plaintiff objects to each Interrogatory to the extent they seek information that is not within Plaintiff's possession, custody, or control, seek documents that do not already exist, or which purport to require a response by Plaintiff on behalf of an entity or individual other than Plaintiff.

15.     Plaintiff reserves the right to supplement, revise, correct, or clarify its responses and objections in the event that additional information becomes available.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

16.     Plaintiff intends to complete its responses by the time agreed upon by the parties for the completion of discovery, or by the date ordered by the Court. Upon request by the requesting party, Plaintiff is willing to meet and confer regarding its responses to the Interrogatory. All final decisions regarding whether any information will be withheld pursuant to any objection shall be made, and notice thereof provided, before the completion of written discovery.

## NON-WAIVER

1.     Plaintiff's responses are made without waiving its right to object (on the grounds of relevancy, hearsay, materiality, competency or any other ground) to the use of its responses in any subsequent stage or proceeding in this Action or any other action.

2.     If Plaintiff, in response to any Interrogatory, inadvertently produces information that is or could be the subject of the objections stated herein, such information is not intended to be, nor is it deemed to be, a waiver of the objections with respect to such information produced or withheld.

3.     Plaintiff's failure to object to a specific Interrogatory on a particular ground or grounds shall not be construed as a waiver of its rights to object on any additional grounds.

4.     Plaintiff responds herein based upon information it has been reasonably able to gather at the time of making these responses.  Plaintiff reserves its right to amend and/or to supplement its objections and responses to the Interrogatories, consistent with further investigation and discovery.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## SPECIFIC RESPONSES AND OBJECTIONS

**Interrogatory No. 12:**

Identify every Person likely to have discoverable information related to Your claims, including, but not limited to, every Person upon whom You intend to rely in proving Your claims on summary judgment or at trial, and every Person likely to have discoverable information that supports or contradicts a position or claim that You have taken or intend to take in this action. For every Person named in response to this Interrogatory, state the subject matter of the information possessed by that Person.

**Response to Interrogatory No. 12:**

Plaintiff objects that this Interrogatory as overly broad and unduly burdensome in that it seeks "every Person likely to have discoverable information that support or contradicts a position or claim that You have taken or intend to take in this action." Read literally, this Interrogatory could include every employee and citizen of Cuyahoga County, as well as every employee of the Distributors.

Plaintiff further objects in that this interrogatory asks for witness lists in advance of the completion of fact discovery that is underway, expert discovery that is upcoming and deadlines set pursuant to Case Management Order No. 1, paragraphs 3(e)(ii), 3(f), 3(h), and 3(i). Plaintiff objects based on undue burden to the extent this interrogatory seeks the disclosure and discovery of fact and expert witnesses prior to the express provisions of Case Management Order No. 1. Plaintiff objects in that this interrogatory seeks to require Plaintiff to disclose witnesses contrary to the discovery procedures set forth in Case Management Order No. 1, paragraph 9(b). Plaintiff objects to the extent this interrogatory asks for persons already identified in Plaintiff's prior discovery responses.

Subject to and without waiving all objections, Plaintiff responds as follows: the table provided below identifies document custodians, employees, or representatives who are likely to have discoverable information.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Department | Custodian | Title | Subject Matter |
|---|---|---|---|
| Health and Human Services | Dave Merriman | Assistant Director | Knowledge of the impact of the opioid crisis on Cuyahoga County Health and Human Services |
| Health and Human Services | Walter Parfejewiec | Director | Knowledge of the impact of the opioid crisis on Cuyahoga County Health and Human Services |
| Economic Opportunity and Growth | Matt Carroll | Chief Economic Opportunity and Growth Officer | Knowledge of the impact of the opioid crisis on Cuyahoga County |
| Office of Early Childhood | Rebekah Dorman | Director | Knowledge of the impact of the opioid crisis on the Office of Early Childhood |
| Health and Human Services – Family Services | Cynthia Weiskittel | Director | Knowledge of the impact of the opioid crisis on the Office of Health and Human Services – Family Services |
| Office of Homeless Services | Ruth Gillette | Director | Knowledge of the impact of the opioid crisis on the Office of Homeless Services |
| Office of Child Support | Deborah Watkins | Director | Knowledge of the impact of the opioid crisis on the Office of Child Support |
| Benefits and Compensation | Holly Woods | Director | Knowledge of the impact of the opioid crisis on the Office of Benefits and Compensation |
| Justice – Medical Examiner | Hugh Shannon | Administrator | Knowledge of the impact of the opioid crisis on the Office of the Medical Examiner |
| Justice – Public Safety and Justice Services | Brandy Carney | Director | Knowledge of the impact of the opioid crisis on the Office of Public Safety and Justice Services |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Department | Custodian | Title | Subject Matter |
|---|---|---|---|
| Justice – Public Safety and Justice Services | Melinda (Lindy) Burt | Deputy Director | Knowledge of the impact of the opioid crisis on the Office of Public Safety and Justice Services |
| Operations – Fiscal Office | Maggie Keenan | Director | Knowledge of the impact of the opioid crisis on the Fiscal Office |
| Operations – Fiscal Office | Wendy Feinn | Budget Analyst | Knowledge of the impact of the opioid crisis on the Fiscal Office |
| Operations – Treasurer | Patricia Cooney | Deputy Treasurer | Knowledge of the impact of the opioid crisis on the Office of the Treasurer |
| Operations – OBM | Maggie Kennan | Director | Knowledge of the impact of the opioid crisis on the Office of OBM |
| Drug Court | Molly Lechler | Drug Court Coordinator | Knowledge of the impact of the opioid crisis on the Drug Court |
| Corrections Planning Board | Martin Murphy | Assistant Director | Knowledge of the impact of the opioid crisis on the Office of Corrections |
| Corrections | Brian Ely | Substance Abuse Case Manager | Knowledge of the impact of the opioid crisis on the Office of Corrections |
| Drug Lab | Shannon Gray | Lab Manager | Knowledge of the impact of the opioid crisis on the Drug Lab |
| County Medical Examiner | Thomas Gilson, M.D. | Medical Examiner | Knowledge of the impact of the opioid crisis on the Office of the Medical Examiner |
| County Opiate Task Force | Vince Caraffi | Supervisor | Knowledge of the impact of the opioid crisis on the Opiate Task Force |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Department | Custodian | Title | Subject Matter |
|---|---|---|---|
| Corrections | Ken Mills | Director | Knowledge of the impact of the opioid crisis on the Office of Corrections |

Also, Plaintiff identifies the following individuals:

| Name | Department | Subject Matter |
|---|---|---|
| Scott S. Osiecki | ADAMHS Board Executive Director | Knowledge of the impact of the opioid crisis on ADAMHS |
| Terry Allan, MPH | County Board of Health Commissioner | Knowledge of the impact of the opioid crisis on the Board of Health |

Plaintiff reserves the right to supplement and amend this response upon further investigation. In addition, discovery is ongoing and will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Dated:  July 2 , 2018

Respectfully submitted,

Plevin & Gallucci

*/s Frank Gallucci*
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804

Napoli Shkolnik PLLC

*/s Hunter J. Shkolnik*
Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

Scott Elliot Smith L.P.A.

*/s Scott Elliot Smith*
Scott Elliot Smith (0003749)
5003 Horizons Dr., Suite 200
Columbus, Ohio 43220
Phone: (614) 846-1700
ses@sestriallaw.com

Thrasher Dinsmore & Dolan L.P.A.

*/s Leo M. Spellacy, Jr.*
Leo M. Spellacy, Jr. (0067304)
1111 Superior Avenue
Suite 412
Cleveland, Ohio 44114
Phone: (216) 255-5450

**CERTIFICATE OF SERVICE**

I, Salvatore C. Badala, certify that on this 2nd day of July 2018, I caused the foregoing to be served via electronic mail on Defendant's Liaison Counsel pursuant to the Case Management Order. *See* Dkt. No. 232.

*s/ Salvatore C. Badala*

## VERIFICATION

I, Robin Wilson, declare:

I am Chief Trial Counsel for the County of Cuyahoga, Ohio. I am authorized to make this verification on behalf of the Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley (together, "Plaintiff").

The foregoing Plaintiff's Responses and Objections to Distributor Defendants' Second Set of Interrogatories represents a municipal corporate response, based on information, in part, assembled by Plaintiff's employees and/or representatives. Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual. Subject to these limitations, the information contained in the foregoing response is, to the best of Plaintiff's knowledge, true and correct. Plaintiff reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Cuyahoga, Ohio on this _____2nd_____ day of July, 2018.

Robin Wilson

# EXHIBIT 4

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4            ~~~~~~~~~~~~~~~~~~~~~~
 5   IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
 6                                    Case No.
                                      17-md-2804
 7
                                      Judge Dan Aaron
 8                                    Polster
 9   This document relates to:
10   The County of Cuyahoga v. Purdue Pharma, et
     al., Case No. 17-OP-45004
11
     City of Cleveland, Ohio v. Purdue Pharma L.P.,
12   et al., Case No. 18-OP-45132
13   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al., Case No. 18-OP-45090
14
                  ~~~~~~~~~~~~~~~~~~~~~
15
16
                 Videotaped Deposition of
17                   MATTHEW PAOLINO
18                  December 5, 2018
                       9:02 a.m.
19
20                     Taken at:
21               Akron Bar Association
                57 South Broadway Street
22                    Akron, Ohio
23
24
25               Stephen J. DeBacco, RPR
```

1     Q.   Okay.  Sir, have you ever used a

2  prescription opioid?

3     A.   I have.

4         MR. LEDLIE:  I'm going to instruct

5  the witness not to answer as to any of his

6  personal use.  It's a privacy issue.

7         MR. DAVISON:  And -- and what's the

8  basis for that?

9         MR. LEDLIE:  HIPAA.

10        MR. DAVISON:  Sorry.  Just to make

11  sure I understand the basis.

12        MR. LEDLIE:  Health information

13  protection.  His personal medical usage is not

14  relevant and has been the same objection that's

15  come up.  I understand it hasn't been an issue,

16  but.

17        MR. DAVISON:  Okay.  I just wanted

18  to make sure that the objection was -- was

19  clear on the record, that you're saying it's

20  a -- it's a HIPAA issue for his personal,

21  whether or not he has used an opioid; not any

22  question about the actual prescription, the

23  reason, or anything like that.  But the mere

24  question of yes or no you say is protected by

25  HIPAA?

1          MR. LEDLIE:  His personal use of an

2    opioid, I believe, whether he used or did not

3    use an opioid, is protected by HIPAA, yes.

4          MR. DAVISON:  Okay.  Just wanted to

5    make sure the record was clear.

6          MR. LEDLIE:  Sure.

7          MR. DAVISON:  Thank you.

8          MR. LEDLIE:  No problem.

9          MR. DAVISON:  I have nothing

10   further at this time.  I do believe that one of

11   my other cocounsel has a question.

12         MR. LEDLIE:  Sure.

13         MR. DAVISON:  Can we go off the

14   record?

15         THE VIDEOGRAPHER:  Off the record

16   at 3:02 p.m.

17              (Off the record.)

18         THE VIDEOGRAPHER:  Back on the

19   record at 3:03 p.m.

20         EXAMINATION OF MATTHEW PAOLINO

21   BY MR. BREWER:

22       Q.    Good afternoon.

23       A.    Good morning -- afternoon.

24       Q.    My name is Matt Brewer.  I

25   represent Walgreens, and I'll ask a few more

# EXHIBIT 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4
                ~~~~~~~~~~~~~~~~~~~~
5
6      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
       OPIATE LITIGATION
7                                  Case No. 17-md-2804
8                                  Judge Dan Aaron
       This document relates to:      Polster
9
       The County of Summit, Ohio, et al.
10     v. Purdue Pharma L.P., et al.
11     Case No. 17-OP-45004
12     The County of Cuyahoga v. Purdue
       Pharma L.P., et al.
13     Case No. 18-OP-45090
14     City of Cleveland, Ohio v. Purdue
       Pharma L.P., et al
15     Case No. 18-OP-45132
16            ~~~~~~~~~~~~~~~~~~~~
17              Videotaped deposition of
                W. CHRISTOPHER MURRAY, II
18
19                 August 3, 2018
                     9:00 a.m.
20
21                  Taken at:
       Climaco, Wilcox, Peca & Garofoli Co., L.P.A.
22           55 Public Square, Suite 1950
                  Cleveland, Ohio
23
24
25         Renee L. Pellegrino, RPR, CLR

```
 1   of McKesson?
 2        A.    No, I have not.
 3        Q.    Have you ever heard of
 4   AmerisourceBergen?
 5        A.    No.
 6        Q.    Do you know the names of any of the
 7   other defendants in this lawsuit or anything
 8   about the conduct that's alleged in the lawsuit?
 9             MR. BADALA:  Objection to form.
10        A.    No, I do not.
11        Q.    Have you ever personally known
12   anybody addicted to opioids?
13             MR. BADALA:  Objection to form.
14             What are you asking, family,
15   friends?  What are you asking here?
16             MR. BOEHM:  The question, I think,
17   speaks for itself.
18             MR. BADALA:  Can you restate that
19   question?
20                  (Record read.)
21             MR. BADALA:  I'm still objecting to
22   form.
23        A.    Personally, no.
24        Q.    Have you ever been prescribed opioid
25   medication?
```

```
 1              MR. BADALA:  I'm going to object and
 2     direct you not to answer that question.
 3              MR. BOEHM:  I take it you'll tell
 4     him not to answer a question if I ask about his
 5     family's use?
 6              MR. BADALA:  Yes, same thing.
 7              MR. BOEHM:  Well, I'll spare
 8     everybody the time of actually asking it then.
 9              Okay.  Let's go off the record, if
10     we can.
11              THE VIDEOGRAPHER:  Going off the
12     record at 5:23 p.m.
13          (Discussion had off the record.)
14              THE VIDEOGRAPHER:  Back on the
15     record at 5:24 p.m.
16              MR. BOEHM:  Mr. Murray, I very much
17     appreciate your time here today.  I know it's
18     not necessarily fun to sit for a deposition, but
19     we appreciate you doing that for us and being
20     willing to testify.  Thank you very much.  I
21     don't have any other questions for you at this
22     time.
23              I do, for the record, need to state
24     that, as counsel knows, we have not received
25     Mr. Murray's custodial file or I think a lot of
```

# EXHIBIT 6

1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

                 ~~~~~~~~~~~~~~~~~~~~

5

6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION

7                                 Case No. 17-md-2804

8                                 Judge Dan Aaron
      This document relates to:      Polster

9

      The County of Cuyahoga v. Purdue

10    Pharma L.P., et al.
      Case No. 18-OP-45090

11

12               ~~~~~~~~~~~~~~~~~~~~

13           Videotaped deposition of

                 WALTER PARFEJEWIEC

14

15               November 8, 2018

16                  9:00 a.m.

17

18

19                  Taken at:

20        Climaco, Wilcox, Peca & Garofoli

21         55 Public Square, Suite 1950

22               Cleveland, Ohio

23

24

25        Renee L. Pellegrino, RPR, CLR

Page 181

1   about what you consider to be the opioid problem

2   earlier today, you referenced your concern about

3   your sons a number of times.

4                Do you recall that?

5        A.     Yes.

6        Q.     And I'd like to know, have you

7   personally ever taken an opioid?

8                MR. BADALA:  Objection to form.

9                I'm going to instruct you not to

10  answer that question.

11       Q.     Are you going to follow your

12  counsel's instruction?

13       A.     Yes.

14       Q.     Yes, you're going to follow it or

15  yes, you're answering my question?

16       A.     Yes, I'm going to follow his

17  instruction.

18       Q.     As far as you know, have your sons

19  or any family member ever taken an opioid?

20               MR. BADALA:  Objection.

21               I'm going to instruct you again not

22  to answer that question.

23               THE WITNESS:  Okay.

24               MR. LONERGAN:  Notwithstanding that

25  he referenced his sons voluntarily a number of

Page 182

```
 1   times today as the basis of his concern about

 2   opioids, you're going to tell him that he can't

 3   answer the question?

 4              MR. BADALA:  Taking the pill and his

 5   concern are completely different.

 6        Q.    Are you going to follow your

 7   counsel's advice and not answer my question?

 8        A.    Yes.

 9        Q.    Do you know anyone -- and this is a

10   yes or no question.  Do you know anyone who has

11   ever been addicted to opioids?

12        A.    No.

13        Q.    This is, again, a yes or no

14   question.  Do you know anyone who has died or

15   been hospitalized due to opioid use?

16              MR. BADALA:  Objection to form.

17        A.    No.

18              MR. LONERGAN:  Why don't we take a

19   break.  I might be done.

20              MR. BADALA:  Okay.

21              THE VIDEOGRAPHER:  Off the record,

22   1:44.

23                  (Recess had.)

24              THE VIDEOGRAPHER:  Back on the

25   record, 1:54.
```

# EXHIBIT 7

1       IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF OHIO
3               EASTERN DIVISION
4

            ~~~~~~~~~~~~~~~~~~~~~~
5

6   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION
7                               Case No. 17-md-2804
8                               Judge Dan Aaron
    This document relates to:      Polster
9

10  The County of Cuyahoga v. Purdue
    Pharma L.P., et al.
11  Case No. 18-OP-45090
12  City of Cleveland, Ohio v. Purdue
    Pharma L.P., et al
13  Case No. 18-OP-45132
14  The County of Summit, Ohio, et al.
    v. Purdue Pharma L.P., et al.
15  Case No. 17-OP-45004
16          ~~~~~~~~~~~~~~~~~~~~~~
17          Videotaped Deposition of
                KEITH MARTIN
18
19              April 3, 2019
                  9:11 a.m.
20
21                 Taken at:
               Ulmer & Berne
22      1660 W. 2nd Street, Suite 1100
               Cleveland, Ohio
23
24
25      Renee L. Pellegrino, RPR, CLR

1    acquired outside the performance of your

2    official duties, you can give an opinion, you

3    can give your personal opinion.

4         A.   Again, it's my opinion that, you

5    know, we -- we got to this place somehow, and it

6    wasn't just through heroin or fentanyl.

7         Q.   But my question was a little more

8    specific than that.  My question was, without

9    heroin, without fentanyl, without carfentanil,

10   wouldn't you agree that -- would there be an

11   opioid epidemic in Ohio today?

12           MR. LEDLIE:  Object to the form of

13   the question.  Asked and answered.  Calls for a

14   legal conclusion.

15           MR. BENNETT:  Objection.

16   Speculation.  Same instruction.

17         A.   My personal belief is we would.

18         Q.   What is that personal belief based

19   on?

20         A.   I've talked to many parents who have

21   lost a child to an overdose, and to be quite

22   honest, it makes me sick because I'm tired of

23   talking to these parents.  And in many, many

24   cases they started out taking an opiate and they

25   didn't start out using heroin or fentanyl, it

Page 190

1    started some other way.  And in almost -- in
2    many of those cases it started with either
3    OxyContin, oxycodone, Vicodin, Percocet,
4    something, whether it was a sports injury,
5    whether it was somebody giving it to their
6    child.  So, you know, I'm basing that on my
7    conversations with parents who have buried their
8    children in Ohio.
9         Q.    Let me ask you if you're familiar
10   with the Controlled Substance Act.
11        A.    Yes.
12        Q.    Are you familiar with the closed
13   system of pharmaceutical distribution under the
14   CSA?
15        A.    No, I'm not.
16        Q.    You've never heard of the closed
17   system of distribution?
18        A.    No.
19        Q.    Okay.  Do you agree that most
20   diversion of prescription opioids happens
21   outside of this closed system?
22              MR. LEDLIE:  Object to the form of
23   the question.
24              MR. BENNETT:  Objection.  Calls for
25   speculation.

# EXHIBIT 8

```
 1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION

 3

      IN RE: NATIONAL        )
 4    PRESCRIPTION           )  MDL No. 2804
      OPIATE LITIGATION      )
 5    _____  )  Case No.
                             )  1:17-MD-2804
 6                           )
      THIS DOCUMENT RELATES  )  Hon. Dan A.
 7    TO ALL CASES           )  Polster

 8

               FRIDAY, JULY 12, 2019
 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                    VOLUME II
                       - - -
12

13           Videotaped deposition of Michael
14    Mapes, held at the offices of The Mining
15    Exchange, A Wyndham Grand Hotel & Spa, 8
16    South Nevada Avenue, Colorado Springs,
17    Colorado, commencing at 8:01 a.m., on the
18    above date, before Carrie A. Campbell,
19    Registered Diplomate Reporter and Certified
20    Realtime Reporter.
21

22

23                     - - -
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
25
```

1    lawyer had you tell the jury that you'd never

2    met her before, the truth of the matter is

3    you've been working with their lawyers,

4    haven't you?

5              MS. MCCLURE:  Form.

6              THE WITNESS:  Yes.

7    QUESTIONS BY MR. LANIER:

8         Q.    So you may not have met that

9    lawyer for AmerisourceBergen, but you were

10   working for other lawyers, weren't you?

11        A.    Yes.

12        Q.    And that's all part of what you

13   did with the company as their man helping

14   them with the diversion control program,

15   right?

16             MS. MCCLURE:  Form.

17             THE WITNESS:  That's correct.

18   QUESTIONS BY MR. LANIER:

19        Q.    Well, we'll get into that in a

20   little bit, but I want to start out with a

21   roadmap and show you what I plan on asking

22   you today.

23             Okay?

24        A.    Okay.

25        Q.    I call your roadmap -- that's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you, right there, Michael Mapes, right?

 2        A.     Yes.

 3        Q.     Tried to get a good picture.

 4               You okay with that picture?

 5        A.     It is what it is.

 6        Q.     Oh, it's not bad.

 7               How old do you think that

 8    picture is?

 9        A.     Three years maybe.

10        Q.     Okay.  You shaved for that

11    picture.  You didn't shave for the jury

12    today, did you?

13        A.     I did not.

14        Q.     That's all right.

15               U-turn road.

16               Your career has taken a lot of

17    twists and turns, hasn't it?

18               MS. MCCLURE:  Form.

19               THE WITNESS:  In what regard?

20    QUESTIONS BY MR. LANIER:

21        Q.     Well, I mean, you're all over

22    the map.  You've done work for the

23    government.  You've done work for industry,

24    lots of different parts of industry.  You've

25    got companies that you've kind of helped
```

1    start and help get off the ground.  You've

2    got -- you claim expertise in a lot of

3    different areas, right?

4            MS. MCCLURE:  Form.  Compound.

5        Characterization.

6            THE WITNESS:  I have experience

7        in a lot of areas, yes.

8    QUESTIONS BY MR. LANIER:

9        Q.    And so here's what I'd like to

10    do.  I'd like to look at this road, and I'd

11    like to consider your personal background

12    first.  We'll make a stop there.

13            Then we're going to make a stop

14    at your time with the DEA, and then we're

15    going to make a stop at your time doing work

16    for industry.

17            And let's see if maybe your

18    testimony kind of rotates around based upon

19    where you are and who you're working for.

20            Okay?

21        A.    Okay.

22            MR. BENNETT:  Objection.

23    QUESTIONS BY MR. LANIER:

24        Q.    Now, in that regard, the first

25    stop we're going to make is personal

Highly Confidential - Subject to Further Confidentiality Review

```
 1    background.  And I'm going to keep a sheet of

 2    your personal background, and we're going to

 3    mark these documents that I'm showing to the

 4    jury as an exhibit so that both sides have

 5    them and we've got the benefit of them as a

 6    demonstrative exhibit for the jury.

 7              Your personal background, you

 8    gave us a lot of it yesterday, but what I'd

 9    like to do is sort of go in and look at you

10    from another angle.

11              Are you familiar with the

12    concern that has been expressed about a

13    revolving door between government and

14    industry?

15         A.    Yes.

16         Q.    And a revolving door -- you

17    know, most doors are just a door that's, you

18    know, this, with a doorknob.  But a revolving

19    door is one of those doors that tends to

20    revolve around, such that you've got an

21    ability to go in one way and out the other.

22              Do you follow me?

23         A.    Yes.

24         Q.    And the concern has been one

25    because there seem to be people who work for
```

1    the DEA and spend their time making

2    connections, learning the ins and outs,

3    learning the niceties of how things work, but

4    then they'll retire or take their pension

5    from the DEA and go to work for industry, the

6    very companies that they were supposed to be

7    looking over, right?

8                    MS. MCCLURE:  Form.

9                    MR. EPPICH:  Objection.

10        Argumentative.

11                   THE WITNESS:  And could you

12        restate the question again?

13   QUESTIONS BY MR. LANIER:

14        Q.     Sure.

15               The reason the revolving door

16   is a concern is because there seems to be a

17   pattern of folks working for the DEA who then

18   go to work for the very industries they were

19   supposed to be overseeing, correct?

20                   MS. MCCLURE:  Form.

21        Argumentative.

22                   THE WITNESS:  Yes, I went to

23        work with the industries after

24        retiring from DEA.

25

Highly Confidential - Subject to Further Confidentiality Review

1    going to work for industry, didn't you?

2              MS. MCCLURE:  Form.

3              THE WITNESS:  Yes, I did work

4         for industry.

5    QUESTIONS BY MR. LANIER:

6         Q.    In fact, there's an expression

7    that y'all use; you were hired up --

8              MS. MCCLURE:  Form.

9    QUESTIONS BY MR. LANIER:

10        Q.    -- by industry, weren't you?

11             MS. MCCLURE:  Foundation.

12             THE WITNESS:  I haven't heard

13        that expression.

14   QUESTIONS BY MR LANIER:

15        Q.    You've never heard the

16   expression "hired up"?

17        A.    No, I haven't.

18        Q.    Okay.

19             MS. MCCLURE:  Mr. Lanier,

20        consistent with the practice during

21        the Rannazzisi deposition, I do note

22        that you are writing information on

23        the sheet of paper you have in front

24        of me in advance of asking the witness

25        the question and in advance of the

1          witness confirming that yes or no he's

2          familiar with the concept of "hired

3          up."

4                   So I would request, again, that

5          you refrain from writing information

6          on the sheet which suggests that it

7          is, in fact, information obtained from

8          Mr. Mapes until Mr. Mapes has, in

9          fact, provided you with that

10         information.

11                  MR. LANIER:  I'm allowed --

12         he's an adverse witness.  I'm allowed

13         to lead him, so I'm allowed to write

14         questions that may be leading in that

15         way.

16                  I'm also allowed to write any

17         note I want to in terms of "look at

18         this, please, and tell me if you agree

19         with that statement."

20                  You show him a document; I show

21         him a demonstrative.  Nobody, no

22         lawyer in any trial I've ever been in,

23         has to ask questions before they use a

24         demonstrative or show a demonstrative

25         to a witness, and this is no

1    different.

2              MS. MCCLURE:  I continue to

3         maintain my objection.

4              MR. LANIER:  Okay.

5    QUESTIONS BY MR. LANIER:

6         Q.    So you've not heard that

7    expression "hired up" by industry?

8         A.    No, I have not.

9         Q.    All right.  Let's see if we can

10   find some of where it may come from.

11             You read the New York -- I mean

12   the Washington Post ever?

13        A.    I have in the past.

14        Q.    Are you familiar with the

15   article "The Drug Industry's Triumph Over the

16   DEA"?  I'm going to mark it as Exhibit

17   Number 21.

18             (Mapes Exhibit 21 marked for

19        identification.)

20   QUESTIONS BY MR. LANIER:

21        Q.    Put it up here for the jury to

22   see.

23             Are you familiar with this

24   article, sir?

25             MS. MCCLURE:  Mr. Lanier, while

1    Marino Bill?

2                    MS. MCCLURE:  Vague.

3                    THE WITNESS:  No.

4    QUESTIONS BY MR. LANIER:

5         Q.    It was subject to that article

6    that we looked at earlier that had the yellow

7    dots, the Marino Bill -- I think there's just

8    one N in Marino -- that took away some of the

9    powers of the DEA.

10                   You're not familiar with that?

11                   MS. MCCLURE:  Form.

12            Foundation.  Mischaracterizes.

13                   THE WITNESS:  I had not heard

14            of that name, but I've heard of a bill

15            that has different requirements than

16            they had in the past.

17   QUESTIONS BY MR. LANIER:

18        Q.    So you don't have any knowledge

19   of whether or not the DEA still has today all

20   of the same tools at its disposal that it had

21   when you were there?

22        A.    No, I don't know.

23                   MR. LANIER:  Okay.  Brings me

24            to the end of the road.  I'll pass the

25            witness.

```
 1                   MS. MCCLURE:  Off the record.

 2                   VIDEOGRAPHER:  We're going off

 3        record.  The time is 11:36.

 4                   (Mapes Exhibit 32 marked for

 5        identification.)

 6        (Off the record at 11:36 a.m.)

 7                   VIDEOGRAPHER:  We're going back

 8        on the record.  Beginning of Media

 9        File Number 6.  The time is 12:59.

10                   RE-EXAMINATION

11   QUESTIONS BY MS. MCCLURE:

12        Q.    Good afternoon, Mr. Mapes.

13        A.    Good afternoon.

14        Q.    Just a reminder, my name is

15   Shannon McClure.  I represent

16   AmerisourceBergen Drug Corporation.  I just

17   have a few follow-up questions for you today.

18               I'm going to be talking about

19   certain things that Mr. Lanier talked to you

20   about, so it may seem less like the roadmap

21   that Mr. Lanier had and a little more

22   scattershot.  So if at any time you'd like me

23   to clarify a little bit more about where I

24   am, that's the nature of conducting this part

25   of the examination, which is a response to
```

```
 1              (Mapes Exhibit 35 marked for

 2        identification.)

 3              VIDEOGRAPHER:  Going off record

 4        at 1:40.

 5         (Off the record at 1:40 p.m.)

 6              VIDEOGRAPHER:  We're going back

 7        on record.  Beginning Media File 8.

 8        The time is 1:59.

 9              RE-EXAMINATION

10   QUESTIONS BY MS. FITZPATRICK:

11        Q.    Good afternoon, Mr. Mapes.  We

12   met briefly yesterday, but my name is Laura

13   Fitzpatrick, and I'm here on behalf of the

14   plaintiffs, and I'm going to take over for

15   Mr. Lanier for a little bit.

16              I want to just kind of reorient

17   you and the jury here.  I'd like to talk --

18   just a second.

19              I'd like to kind of redirect

20   us, call this my redirect roadmap that

21   Ms. Lanier made for me here.

22              I'd like to take us from the

23   muddy waters that you were brought into over

24   the last, I think, 45 minutes or so, back on

25   to what I'm going to call clarity road.
```

1        Okay?

2        A.      Okay.

3        Q.      All right.  Now, you were shown

4     by the ABDC lawyer the document that we've

5     referred to as the methamphetamine document,

6     and there were some suggestions that ABDC had

7     a policy that the DEA approved of.

8              Do you recall that?

9              MS. MCCLURE:  Form.

10             THE WITNESS:  Yes.

11    QUESTIONS BY MS. FITZPATRICK:

12       Q.      Okay.  Now, would you agree

13    with me that a policy is no good if a company

14    doesn't follow it?

15       A.      Yes.

16       Q.      And would you agree that if

17    someone doesn't put their seat belt on and

18    they get into a car wreck, they may not be

19    protected by the seat belt?

20             MS. MCCLURE:  Form.

21             THE WITNESS:  Correct.

22    QUESTIONS BY MS. FITZPATRICK:

23       Q.      Okay.  Thank you.

24             Now, with respect to

25    Ms. McClure's questions to you about the ABDC

# EXHIBIT 9





# AMERISOURCE BERGEN

## DETERMINING SUSPICIOUS ORDERS IS SUBJECTIVE

→ This is a reason to be hyper vigilant, true?

TRUE

→ This is the LEGAL RESPONSIBILITY OF THE DISTRIBUTOR true?

TRUE

DEA May answer a specific question about whether part of a system is appropriate, the DEA will give its opinion

DEA doesn't do legal work for industry. TRUE?

TRUE

Industry is required to interpret & follow the law

TRUE?

TRUE

# Amerisource Bergen

"In the course of your role as a diversion investigator and a group supervisor, you accepted these excessive purchase reports as compliant w/ the Controlled Substances Act?"  <u>YES</u>

BUT  AFTER THE FACT reporting of suspicious orders has NEVER been in compliance w/ federal law according to the DEA's guidance provided to registrants

True?  <u>TRUE</u>

**MCKESSON**

Distributors can't control what happens to pills once the pills are delivered to the customer of the pharmacy

But lots of control BEFORE that TRUE

# McKESSON

Other causes of opioid crisis (e.g. illegal prescribing).

A good Suspicious Order Monitoring system can help catch that

true? TRUE

**MCKESSON**

Req of 1301.74 A is "only to see if customer is registered."

But that's not the only section that applies to registrants

**MCKESSON**

Does § 1301.74 say distributors can't ship suspicious orders?

What's most important, health & safety or company profits?

_____

Plus other sources re-inforce no shipping

Walmart

Walmart lawyer asked about rogue internet pharmacies as the "greatest threat of diversion."

Internet pharmacies shut down by ~2009 BUT problem continued...

**Walmart**

Did Joe Rannazzisi or DEA share the ARCOs data w/ companies?

*Each company has data*

- The companies won't agree to sharing **Never seen agree**

- The DOJ won't agree to share

- Each company has their own data

- Enforcement always comes from a company's own data **YES w/ other sources**



## "THE DEA CAN USE HIDDEN ROOM BUGS"

- WALMART SELLS HIDDEN ROOM BUGS!
- WALMART HIDES CAMERAS
- WALMART HAS SECURITY FORCES TRAINED TO PICK UP & STOP SHOPLIFTERS

# WALMART

"THE DEA CAN USE
UNDERCOVER FOLKS"

- **Walmart** CAN TOO!

- "Mystery shoppers"



# LOTS OF DEA TOOLS FOR FIGHTING DIVERSION

- WALMART CAN SEE IN REAL TIME AN EXCESSIVE FLOOD OF PILLS SHOULD BE THAT'S A VALUABLE TOOL?

YES



**"DEA CAN GET A SEARCH WARRANT"**

- DOES WALMART NEED A SEARCH WARRANT TO LOOK IN ITS OWN CLOSET? **NO**

- DOES WALMART NEED A GRAND JURY? **NO**

- A subpoena? **NO**

- The FBI? **NO**



IF THEY ARE BLAMING THE DEA FOR NOT DISCLOSING THEIR INFORMANTS & OTHER SOURCES -

DOES THAT EXCUSE WALMART FOR BREAKING THE LAW? NO

**Walmart**

"You're not aware of any deadline that DEA set that changed this practice related to shipping of the suspicious orders"

MB
1970's

DEA NEVER TOLD COMPANIES TO SHIP SUSPICIOUS OR EXCESSIVE ORDERS — THAT WAS THE COMPANY'S DECISION TRUE? TRUE

**Walmart** "WOULD YOU AGREE THAT DRUG TRAFFICKERS & DIVERTERS ARE THE ONES WHO POTENTIALLY BENEFIT IF DEA DECIDES TO ISOLATE ITSELF FROM INDIVIDUALS WHO HELP ADVANCE DEA'S DIVERSION INVESTIGATIONS WHO ARE OUTSIDE OF DEA?"

— Drug "traffickers" are the sellers of opioids — the Walmarts, etc. make $ off the sales

Walmart

"Do you agree that good leaders hold themselves accountable for the decisions they make?'

THAT SHOULD BE TRUE FOR WALMART TOO

YES

WALMART:

"Do you agree the American public has a right to expect that the leaders of our law enforcement agencies will lead their teams in a fashion consistent with the standards ... "

Do you agree the American public has a right to expect that the leaders of huge companies like Walmart will lead their teams to follow the law, and not try to get away with actions that endanger our communities & people.'





Michael Mapes









"DISTRIBUTORS / MAN. / PHAR WERE CONFUSED"

- COMPANIES HAVE IN-HOUSE OUT SIDE & LAWYERS

Agree

- DEA doesn't give legal counsel

Agree

- Some companies hired former employees from DEA

Agree

- IF confused, stop selling until questions answered

Agree

ROAD BLOCK



Joseph Rannazzisi



Acting Admin
ROSENBERG

"DEA is part of
the problem"

— Disagree. DEA tried
to stop diversion
& clean up supply
chain

— If companies stop
diversion — DEA is or
isn't the issue?



ROAD BLOCK



Joseph
Rannazzisi









Joseph Rannazzisi

# WHAT
# COMPLIANCE REQUIRED?

REGISTRNTS TO MAINTAIN
EFFECTIVE CONTROL AGAINST
DIVERSION

2/06 NOTE for ALL
N.M. Agree

— REGISTRANT REQ'D TO
  REPORT A SUSPICIOUS
  ORDER TO DEA

Agree

Agree — MAINTAIN SYSTEM TO DETECT
       SUSPICIOUS ORDERS
       — BUSINESS DECISION BUT
         MUST IDENTIFY SUSPICIOUS
         ORDERS

Agree

— DON'T SHIP SUSPICIOUS ORDERS
  w/o FULL DUE DILIGENCE
  RESOLVED SUSPICIONS

Agree



**Joseph Rannazzisi**

# DIVERSION CONTROL 101

IF **COMPANY** SEES
SUSPICIOUS ORDER:

☐ SHIP/SELL?

or

☐ HOLD &
INVESTIGATE

HOLDING SHIPMENTS THAT WERE SUSPICIOUS WAS NEW FOR AmeriSource in 2007

BEFORE THAT, THEY WOULD BE SUSPICIOUS & SHIP ANYWAY?

HOLD orders?
susp. since 1943

We have our suspicions
But we sell anyway

NOTES ON DISTRIBUTOR MEETINGS (Ex 18)

It says you met w/ the volume/source problems first.

Who did you prioritize?

THE BIG 3

Amerisource

Cardinal

McKesson

# Internet Pharmacies &
## CARDINAL HEALTH

→ MET w/ DEA

→ NEVER CONFESSED

→ Ea SELLING pills
    any way

MEETING w/ McKESSON RE
Internet pharmacies

- McKesson was participating
in this problem too
true?  **TRUE**

SEE THE WHOLE TRUTH

- WOULD NOTE IF "MORE
SAID" AT Mtgs -

So no distributor
"confessed"?
**TRUE**

Amerisource
lawyer:

"WE'VE NEVER MET BEFORE"

BUT YOU SURE MET HER
CLIENT- Amerisource
Bergan.    TRUE?

TRUE

You do privileged work
for them, right?

YES (did)

WORKING for lawyers

Amerisource Bergan mtg re
Internet pharmacies (ex 7)

THIS SHOWS THE GLARING
PROBLEMS w/ Amerisource's
business
True? TRUE 1/3d

SEE THE WHOLE TRUTH

# INTERNET PHARMACY ISSUES

- THIS WAS A HUGE PROBLEM true? **YES**

- WHERE DID THEY GET DRUGS? "DISTRIBUTORS"

- Did the major distributors bring the problem to the DEA's attention? **—NO—**

- AREN'T DISTRIBUTORS required to "know their customers"?

  DIVERSION CONTROL 101      **YES**

# INTERNET PHARMACY
## concerns

- THE LAW IS THE LAW IS THE LAW
  SAME LAW TO ALL PHARM.
- THERE IS NO SPECIAL LAW FOR
  INTERNET PHARMACIES TRUE

- HOW DO "ROGUE INTERNET
  PHARMACIES" GET PILLS?
  DISTRIBUTORS
- ARE WE TO BELIEVE Amerisource
  Bergon / Cardinal / McKesson
  can't figure out a fake pharmacy?
  "ignorance is no excuse"



"Consulting"

CARDINAL
HEALTH
NOW

$ from Industry
$100 per hr
now
$ 300 per hr

200K-600K
per yr

D.E.A.

REVOLVING
DOOR

INDUSTRY

RETIRED @
55

$ 120-125K per yr

SALARY

"HIRED" by Industry

NOT
HEARD OF

RET $75K per yr



PERSONAL
BACKGROUND

Michael
Mapes

# AMERISOURCE BERGEN

THE LAWYER TOLD YOU THE DEA approved THEIR SUSPICIOUS order monitoring system at one point in time

- Approved method of providing info (Ex 5)

- This was methamphetamines, not opioids

- AND THEY HOLD SHIPPING WHILE CONTACTING & REPORTING TO DEA

CLARITY ROAD

MUDDY WATERS

RE-DIRECT ROAD MAP

# ABDC'S LAWYER SAYS "GRADUAL CHANGE"

DID THE QUESTIONS THE ABDC LAWYER ASKED YOU CHANGE ANYTHING AB YOUR TESTIMONY TODAY THE THIS HAS ALWAYS BEEN THE LAW SINCE 1970'S

# INTERNET PHARMACY GOT REGISTRATION

## — BLAME DEA/GOV —

- Δ HAVE DUTY TO KNOW THEIR CUSTOMERS
  DEA ≠ same REGISTRANT
- WHERE DO INTERNET PHARMACIES GET THEIR PILLS?
  DEA? GOV?
- IF COMPANY MAINTAINS EFFECTIVE CONTROL, NOT MUCH TO INSPECT?

# RELYING ON STATE INSPECTORS

— DEA ≠ MULTI MILLION DOLLAR CORP?

— IF COMPANIES MAINTAIN EFFECTIVE CONTROL, NOT MUCH TO INSPECT!

# HIPPA: COMPANIES DON'T HAVE PATIENT MED Rx

---

— THE WHOLE TRUTH:

↳ MANUFACTURERS HAVE DATA OF THEIR TOP PRESCRIBERS

↳ COMPANIES CAN DO THE RED FLAGS TEST W/O RXs

METH DOCUMENT &
SUGGESTION THAT ABDC
HAD A "POLICY"
DEA APPROVED OF

— A POLICY IS NO
GOOD IF A COMPANY
DOESN'T FOLLOW IT

— SEATBELT

# RE: ABDC AUDITS & PRIVILEGE LOG

YOU SAID

- YOU FOUND COMPANY WAS "GENERALLY COMPLIANT?"

- IF YOU ONLY SHOPLIFT ONCE A MONTH INSTEAD OF EVERY TIME YOU ENTER A STORE, THAT'S STILL AGAINST LAW, RIGHT?

# RE: DUTY NOT TO SHIP

- REGULATIONS
- ESA SAYS REPORT WHEN DISCOVERED.

c WHEN: @ OR DURING THAT TIME

# "MCKESSON REACTED PROMPTLY"

- THEY GOT BUSTED!
- AND DID IT AGAIN
- COST OF DOING BUSINESS

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... VII

INTRODUCTION ......................................................................................................................... 1

LEGAL STANDARD ................................................................................................................... 2

ARGUMENT ................................................................................................................................ 4

    A.    PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661). ................................................................................................................ 4

        1.    Defendants' Omnibus MIL No. 1: The Court should not permit Plaintiffs to present evidence or argument to the jury concerning "future damages." ................................................................................. 4

            i.    *Plaintiffs long ago disclosed that they are seeking future damages.* ........................ 4

            ii.    *Defendants offer no argument to support the exclusion of future damages evidence other than the McGuire and Liebman Supplemental Tables.* ................ 6

            iii.    *Plaintiffs properly supplemented the expert reports of Profs. Liebman and McGuire to separate future damages from abatement costs.* ............................... 8

        2.    Defendants' Omnibus MIL No. 2: The Court should preclude Plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant." ................................................................. 12

        3.    Defendants' Omnibus MIL No. 3: The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others. ................................................................................... 15

        4.    Defendants' Omnibus MIL No. 4: The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use. ......................................................................................................... 17

        5.    Defendants' Omnibus MIL No. 5: The Court should preclude evidence concerning lobbying and other protected petitioning activity. ....................... 21

        6.    Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions. .................................................................................. 31

7.      Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations...........................................................................34

8.      Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony. ....................41

9.      Defendants' Omnibus MIL No. 9: The Court should not allow use of certain charts presenting misleading and irrelevant data..................................43

10.     Defendants' Omnibus MIL No. 10: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct..............................................................................................44

11.     Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability.........................................................................................................47

12.     Defendants' Omnibus MIL No. 12: The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.........48

13.     Defendants' Omnibus MIL No. 13: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers. ................................................................................51

14.     Defendants' Omnibus MIL No. 14: The Court should preclude any comment regarding the absence of a corporate representative at trial. ..........51

B.      PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666)..............................53

1.      Distributors' MIL No. D-1: The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia. ................................................................................53

2.      Distributors' MIL No. D-2: The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge. ...............................................................................................59

3.      Distributors' MIL No. D-3: The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction. .........................................................................62

4.      Distributors' MIL No. D-4: The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found. ...............................63

5.       Distributors' MIL No. D-5: The Court should prohibit Plaintiffs from presenting evidence or making arguments suggesting Distributors committed a "fraud on the DEA."......................................................65

6.       Distributors' MIL No. D-6:  The Court should prohibit counsel and witnesses from making references broadly and generally to "Defendants" when the statement, argument, or testimony relates only to certain specific Defendants or groups of Defendants. ................................67

7.       Distributors' MIL No. D-7: The Court should preclude Plaintiffs from offering evidence of, and arguments about RICO predicates that Plaintiffs did not identify in their discovery responses.....................................68

8.       Distributors' MIL No. D-8: The Court should issue an order excluding any evidence of, or reference to, Distributor-run programs that allowed Manufacturers to communicate product information to Pharmacies or other parties. ...........................................................................................70

C.    PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE (DKT. #2645). .................................................................................................72

1.       Henry Schein MIL No. HS-1: References to the Henry Schein Defendants having engaged in any alleged activities with respect to Cuyahoga County....................................................................................72

2.       Henry Schein MIL No. HS-2: References to Henry Schein Medical Systems, Inc. as having distributed any opioid medications into Summit County or otherwise caused or contributed to any alleged opioid epidemic. .................................................................................................73

3.       Henry Schein MIL No. HS-3: References to sales or distribution of opioid medications to retail, chain, Internet pharmacies, or "pill mills." .......74

4.       Henry Schein MIL No. HS-4: References to opioid medications distributed by Henry Schein, Inc. to Dr. Brian Heim.......................................74

5.       Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should not have shipped opioid medications following Dr. Heim's May 2012 indictment. ...........................................................................................75

6.       Henry Schein MIL No. HS-6: References to opioid medications distributed by Henry Schein, Inc. to Dr. Adolph Harper. ...............................77

7.       Henry Schein MIL No. HS-7: References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System

without first identifying whether any orders that HIS sold into Summit County were diverted. .......................................................................................77

8.  Henry Schein MIL No. HS-8: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County .........78

9.  Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County. ..............................................79

10.  Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc. .................................................................................................79

11.  Henry Schein MIL No. HS-11: References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014. ......................................................................................................80

12.  Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiff's lawsuit. ...............................81

D.  PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648) ...........82

1.  Walgreens' MIL No. W-1: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen. ....................................82

2.  Walgreens' MIL No. W-2: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement. ............84

3.  Walgreens' MIL No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man." .........86

E.  PLAINTIFFS' RESPONSE TO CARDINAL HEALTH INC'S MOTIONS *IN LIMINE* (DKT. #2653). ................................................................................................87

1.  Cardinal MIL No. 1: 14,000 Orders Not Shipped. .............................................87

2.  Cardinal MIL No. 2: "Interesting Gossip" Email. ...............................................90

3.  Cardinal MIL No. 3: Misleading Data Comparisons (McCann Data Analysis). ....................................................................................................91

F.  PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663). ................................92

1.  McKesson MIL No. MCK-1: The Court should prohibit any reference to baseless accusations. ......................................................................................92

2.     McKesson MIL No. MCK-2: The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation. ...................................................93

     *i.*     *The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.* ......................................................................93

     *ii.*     *The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.* .................................................................................................95

     *iii.*     *Testimony Provided to the Committee is Also Admissible.* ..............96

     *iv.*     *Letters from members of Congress to McKesson Are Admissible.* ....96

3.     McKesson MIL No. MCK-3: The Court should prohibit the introduction of nationwide trends in drug deaths.............................................97

4.     McKesson MIL No. MCK-4: The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ. .........................................................................98

5.     McKesson MIL No. MCK-5: The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct. ...........................................................98

6.     McKesson MIL No. MCK-6: The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance. ........................................................................... 102

G.     PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE (DKT. #2668). .................................... 104

1.     Teva MIL No. TAD-1: The Court should exclude reference to the Cephalon misdemeanor plea. ........................................................... 104

2.     Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion. ........................................................................... 105

3.     Teva MIL No. TAD-3: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government. ...... 106

4.     Teva MIL No. TAD-4: The Court should exclude evidence of opioid-related harm that occurred outside of the counties. ...................................... 106

5.      Teva MIL No. TAD-5: The Court should exclude evidence of
        marketing-related statements or opioid shipments outside of the
        counties.............................................................................................................. 108

6.      Teva MIL No. TAD-6: The Court should exclude evidence regarding
        Teva Defendants' financial support of third-party groups. .......................... 109

7.      Teva MIL No. TAD-7: The Court should exclude testimony from
        Russell Portenoy about any improper conduct by Moving Defendants...... 112

8.      Teva MIL No. TAD-8: Plaintiffs should be precluded from arguing that
        the Actavis Generic Defendants should have made additional warnings
        regarding their generic medicines or should have stopped selling them. .... 114

9.      Teva MIL No. TAD-9: The Court should exclude reference to the
        purchase price paid by Teva Pharmaceutical Industries Ltd. for the
        Actavis Generic Defendants.............................................................................. 115

10.     Teva MIL No. TAD-10: The Court should exclude reference to the
        settlement agreement between Teva Ltd. and Allergan. ................................. 116

CONCLUSION ....................................................................................................................... 117

# TABLE OF AUTHORITIES

*Page*

**CASES**

*Adams v. U.S.*,
03-0049-E-BLW, 2009 WL 1259019 (D. Idaho May 3, 2009) ........................................24, 25, 67

*Alexander v. Natl. Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) ..................................................................................................23

*Almanza v. United Airlines, Inc.*,
851 F.3d 1060 (11th Cir. 2017) ..............................................................................................113

*Anderson v. Westinghouse Savannah River Co.*,
406 F.3d 248 (4th Cir. 2005) ....................................................................................................95

*Andler v. Clear Channel Broadcasting, Inc.*,
670 F.3d 717 (6th Cir. 2012) ..............................................................................................42, 43

*Anthony v. DeWitt*,
295 F.3d 554 (6th Cir. 2002) ....................................................................................................97

*Antioch Co. Litig. Tr. v. Morgan*,
No. 3:10CV156, 2014 WL 2117450 (S.D. Ohio May 21, 2014) ................................................68

*Atanus v. S&C Elec. Co.*,
454 F. Supp. 2d 753 (N.D. Ill. 2006) ........................................................................................40

*Baker v. Elcona Homes Corp.*,
588 F.2d 551 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979) ..........................................94

*Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.*,
959 F.2d 606 (6th Cir. 1992) ....................................................................................................94

*Bankers Trust Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ......................................................................................................6

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988) ..................................................................................................................94

*Bell v. Consol. Rail Corp.*,
299 F. Supp. 2d 795 (N.D. Ohio 2004) ....................................................................................57

*Brazos River Auth. v. GE Ionics, Inc.*,
469 F.3d 416 (5th Cir. 2006) ..............................................................................................60, 61

*Bridgeport Music, Inc. v. WM Music Corp.*,
    508 F.3d 394 (6th Cir. 2007)..................................................................................70

*Brooks v. Caterpillar Glob. Mining Am. LLC*,
    No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017)............................116, 117

*Buckman Co. v. Plaintiffs' Leg. Comm.*,
    531 U.S. 341 (2001) ......................................................................................66, 67

*Cadence Educ., LLC v. Vore*,
    No. 17-CV-2092-JTM-TJJ, 2018 WL 690993 (D. Kan. Feb. 2, 2018) .........................84

*Cal. Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) .......................................................................................22

*Campbell v. PMI Food Equip. Group, Inc.*,
    509 F.3d 776 (6th Cir. 2007)..............................................................................22

*Chambers v. St. Mary's Sch.*,
    697 N.E.2d 198 (Ohio 1998) ..............................................................................40

*Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*,
    No. 10-CV-02349-WJM-KMT, 2014 WL 1583993 (D. Colo. Apr. 21, 2014) ..................62

*Chism v. CNH Am., LLC*,
    638 F.3d 637 (8th Cir. 2011).............................................................................104

*Christopher Seri v. Crosscountry Mortg., Inc.*,
    No. 1:16-CV-01214-DAP, 2016 WL 5405257 (N.D. Ohio Sept. 28, 2016) ......................68

*Cincinnati Ins. Co. v. Omega Flex, Inc.*,
    No. 3:10-CV-00670-H, 2013 WL 1403493 (W.D. Ky. Apr. 5, 2013) ...........................45

*Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ............................................................................39

*Cipollone v. Liggett Group, Inc.*,
    668 F. Supp. 408 (D.N.J. 1987) ......................................................................23, 24

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
    538 F. Supp. 1257 (N.D. Ohio 1980)..............................................................26, 27, 28, 29

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
    734 F.2d 1157 (6th Cir. 1984) ....................................................................26, 27, 28, 29

*City of Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980)............................................................................117

*Community Action League v. City of Palmdale,*
    CV 11-4817 ODW VBKX, 2012 WL 10647285 (C.D. Cal. Feb. 1, 2012) ......................................24

*Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.,*
    CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5, 2003) ..........................................................24

*Cooley v. Lincoln Elec. Co.,*
    693 F.Supp.2d 767 (N.D. Ohio 2010) .......................................................................................63

*Croskey v. BMW of North America, Inc.,*
    532 F.3d 511 (6th Cir. 2008) ....................................................................................................56

*CSX Transp., Inc. v. Exxon/Mobil Oil Corp.,*
    401 F. Supp. 2d 813 (N.D. Ohio 2005) ..............................................................................56, 57

*Daniels v. Northcoast Anesthesia Providers, Inc.,*
    2018-Ohio-3562 (Ct. App. 2018) ...........................................................................................6, 8

*Davis v. Clark Cty. Bd. of Commrs.,*
    994 N.E.2d 905 (Ohio App. 2d Dist. 2013) .............................................................................40

*DeLoach v. Philip Morris Companies, Inc.,*
    1:00CV01235, 2001 WL 1301221 (M.D.N.C. July 24, 2001) ...................................................22

*DIRECTV, Inc. v. Cavanaugh,*
    321 F. Supp. 2d 825 (E.D. Mich. 2003) ..................................................................................22

*Doe v. United States,*
    253 F.3d 256 (6th Cir. 2001) ...................................................................................................48

*Dortch v. Fowler,*
    588 F.3d 396 (6th Cir. 2009) .................................................................................................2, 35

*Feinstein v. Resolution Tr. Corp.,*
    942 F.2d 34 (1st Cir. 1991) ......................................................................................................70

*Feminist Women's Health Ctr., Inc. v. Mohammad,*
    586 F.2d 530 (5th Cir. 1978) ..............................................................................................30, 31

*Flir Sys., Inc. v. Fluke Corp.,*
    No. 3:10-CV-00971-HU, 2012 WL 13054267 (D. Or. Nov. 29, 2012) .......................................69

*Galayda v. Lake Hosp. Sys., Inc.,*
    1994-Ohio-64, 71 Ohio St. 3d 421 .............................................................................................6

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
    458 U.S. 375 (1982) ........................................................................................................111, 112

*Gillis v. Murphy-Brown, LLC,*
7:14-CV-185-BR, 2018 WL 5928010 (E.D.N.C. Nov. 13, 2018) ...............................23

*Gjokaj v. United States Steel Corp.,*
700 F. App'x 494 (6th Cir. 2017) .....................................................................55

*Globetti v. Sandoz Pharm. Corp.,*
CV98-TMP-2649-S, 2001 WL 419160 (N.D. Ala. Mar. 5, 2001) ...............................67

*Goldman v. Healthcare Mgmt. Sys., Inc.,*
559 F. Supp. 2d 853 (W.D. Mich. 2008) ......................................................45, 93

*Gomez v. Rivera,*
344 F.3d 103 (1st Cir. 2003) .....................................................................19, 20

*Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.,*
No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015) .............................117

*Harris v. Goins,*
No. 6: 15-151-DCR, 2017 WL 4080692 (E.D. Ky. Sep. 14, 2017)...............................102

*Hilton Hotels Corp. v. Dunnet,*
No. 00–2852–GV, 2002 WL 1482543 (W.D.Tenn. Mar. 15, 2002) ...........................101

*Hobson v. Wilson,*
556 F. Supp. 1157 (D.D.C. 1982), *aff'd in part, rev'd in part,* 757 F.2d 1 (D.C. Cir. 1985) .............95

*Hochstein v. Microsoft Corp.,*
04-73071, 2009 WL 2022815 (E.D. Mich. July 7, 2009) .........................................83

*Homoki v. Rivers Edge Tree Stands,*
No. 1:12-CV-2926, 2012 WL 6631043 (N.D. Ohio Dec. 19, 2012)............................55

*Howe v. City of Akron,*
801 F.3d 718 (6th Cir. 2015) ..........................................................................11

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,*
538 U.S. 600 (2003) ....................................................................................22

*In re Air Crash at Lexington, KY,*
No. 5:06-CV-316-KSF, 2008 WL 2782827 (E.D. Ky. July 8, 2008)...........................91

*In re Air Crash Disaster,*
86 F.3d 498 (6th Cir. 1996) .......................................................................91, 92

*In re Asbestos Sch. Litig.,*
46 F.3d 1284 (3d Cir. 1994) .........................................................................113

*In re Cathode Ray Tube Antitrust Litig.*,
　　MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891 (N.D. Cal. 2016) ..............................82

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*,
　　295 F. Supp. 3d 927, 973 ..................................................................................................24

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
　　888 F.3d 753 (5th Cir. 2018) ....................................................................................46, 47

*In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*,
　　14 C 1748, 2018 WL 305503 (N.D. Ill. Jan. 6, 2018) ............................................23, 24

*In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*,
　　181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) ..............................................24, 66, 67

*In re Vioxx Products Liab. Litig.*,
　　MDL 1657, 2005 WL 3164254 (E.D. La. Nov. 21, 2005) ........................................67

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
　　MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ..................23, 24

*In re Welding Fume Products Liab. Litig.*,
　　1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) ............................23, 24

*In re Welding Fume Products Liab. Litig.*,
　　526 F. Supp. 2d 775 (N.D. Ohio 2007) ..............................................................110, 112

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*,
　　No. 3:09-CV-10012-DRH, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ........................ passim

*In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*,
　　No. 2:13-CV-170, 2016 WL 659112 (S.D. Ohio Feb. 17, 2016) ..............................55, 56

*In re: Gen. Motors LLC Ignition Switch Litig.*,
　　14-MD-2543 (JMF), 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ..............................24, 25

*Indiana Ins. Co. v. Gen. Elec. Co.*,
　　326 F. Supp. 2d 844 (N.D. Ohio 2004) ..................................................................... passim

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
　　451 U.S. 557 (1981) ...........................................................................................................8

*Jackson v. O'Reilly Auto. Stores, Inc.*,
　　131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ..................................................49

*Jacobs v. Tricam Industries, Inc.*,
　　10-11469, 2013 WL 950969 (E.D. Mich. Mar. 12, 2013) ........................................16, 17

*Jones v. Pramstaller*,
No. 1:09-CV-392, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013) ............................................19

*Jordan v. John Soliday Fin. Group, LLC*,
1:09CV0707, 2010 WL 4281807 (N.D. Ohio Oct. 20, 2010)........................................2, 3, 4, 32

*KCH Services, Inc. v. Vanaire, Inc.*,
CIV.A. 05-777-C, 2010 WL 3245243 (W.D. Ky. June 2, 2010) ...........................................16, 17

*King v. Pratt & Whitney, a Div. of United Technologies Corp.*,
161 F.R.D. 475 (S.D. Fla. 1995).....................................................................................102

*Koloda v. General Motors Parts Div., General Motors Corp.*,
716 F.2d 373 (6th Cir. 1983)..........................................................................................91

*Kottle v. N.W. Kidney Centers*,
146 F.3d 1056 (9th Cir. 1998).........................................................................................22

*Lloyd v. Midland Funding, LLC*,
No. 15-5132, 639 Fed. Appx. 301 (6th Cir. Jan. 22, 2016) .....................................60, 61

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013)......................................................................................3, 35

*Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*,
835 F. Supp. 2d 299 (W.D. Ky. 2011) ........................................................................66, 67

*Marcilis v. Twp. of Redford*,
693 F.3d 589 (6th Cir. 2012)..........................................................................................68

*Martin v. Thrifty Rent A Car*,
145 F.3d 1332 (6th Cir. 1998)........................................................................................57

*Mascarenas v. Cooper Tire & Rubber Co.*,
CV208-009, 2010 WL 11534359 (S.D. Ga. Jan. 11, 2010) .........................................52

*McAuliffe v. United States*,
514 F. App'x 542 (6th Cir. 2013) ..............................................................................55, 56

*McConnell v. Fed. Election Commn.*,
540 U.S. 93 (2003), *overruled by Citizens United v. Fed. Election Commn.*, 558 U.S. 310 (2010)........110

*McFarlane v. Ben–Menashe*,
No. 93–1304, 1995 WL 129073 (D.D.C. March 16, 1995), *reconsideration granted,* 1995 WL
799503 (D.D.C. June 13, 1995) ..................................................................................95

*McLean v. 988011 Ontario*,
224 F.3d 797 (6th Cir. 2000)..........................................................................................42

*McWilliams v. S.E., Inc.*,
  581 F. Supp. 2d 885 (N.D. Ohio 2008)........................................................................112

*Miles v. Scutt*,
  No. 07-15068, 2008 WL 2949240 (E.D. Mich. July 29, 2008) ....................................21

*Mitchell v. City of Tukwila*,
  C12-238RSL, 2013 WL 6631791 (W.D. Wash. Dec. 17, 2013)...................................52

*Morningstar v. Circleville Fire & EMS Dept.*,
  2:15-CV-3077, 2018 WL 3721077 (S.D. Ohio Aug. 6, 2018)..............................2, 3, 35

*Nat.-Immunogenics Corp. v. Newport Tr. Group*,
  SACV1502034JVSJCGX, 2018 WL 6137597 (C.D. Cal. May 16, 2018) ....................24

*Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ...................................................................................................112

*O'Dell v. Hercules, Inc.*,
  904 F. 2d 1194 (8th Cir. 1990).....................................................................................94

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) .....................................................................................................25

*Okuda v. Wyeth*,
  1:04-CV-80 DN, 2012 WL 12337860 (D. Utah July 24, 2012) ...................................52

*Pearce v. E.F. Hutton Group, Inc.*,
  653 F. Supp. 810 (D.D.C. 1987) ...................................................................................95

*Pfahler v. Nat'l Latex Prod. Co.*,
  517 F.3d 816 (6th Cir. 2007).........................................................................................7

*Potters Med. Ctr. v. City Hosp. Ass'n*,
  800 F.2d 568 (6th Cir. 1986).......................................................................................22

*PPM Finance, Inc. v. Norandal USA, Inc.*,
  392 F.3d 889 (7th Cir. 2004).......................................................................................61

*Pugh v. City of Attica, Ind.*,
  259 F.3d 619 (7th Cir. 2001)..................................................................................61, 62

*Quillen v. Safety-Kleen Sys., Inc.*,
  No. CIV.A. 07-67-EBA, 2010 WL 8357353 (E.D. Ky. May 27, 2010) ......................45

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*,
  2:13-CV-213-JRG-RSP, 2015 WL 627430 (E.D. Tex. Jan. 31, 2015) .........................52

*Reo v. Caribbean Cruise Line, Inc.*,
　No. 1:14 CV 1374, 2016 WL 1109042 (N.D. Ohio Mar. 18, 2016) ............................................68

*Rheinfrank v. Abbott Labs., Inc.*,
　No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015) ............................................115

*Robinson v. Runyon*,
　149 F.3d 507 (6th Cir. 1998)......................................................................................................2

*Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*,
　2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018).........108

*Rui He v. Rom*,
　No. 1:15-CV-1869, 2017 WL 1054814 (N.D. Ohio Mar. 21, 2017)........................................68

*Sara Lee Corp. v. Kraft Foods, Inc.*,
　276 F.R.D. 500 (N.D. Ill. 2011) ...............................................................................61, 62, 63

*Securities and Exch. Commn. v. Jacobs*,
　1:13 CV 1289, 2014 WL 12597832 (N.D. Ohio Feb. 25, 2014) ...................................................3

*Shahid v. City of Detroit*,
　889 F.2d 1543 (6th Cir. 1989) ....................................................................................................43

*Snyder v. Phelps*,
　562 U.S. 443 (2011) ........................................................................................................25, 26

*Sperberg v. Goodyear Tire & Rubber Co.*,
　519 F.2d 708 (6th Cir. 1975) ..................................................................................................2, 49

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
　537 U.S. 51 (2002) ....................................................................................................................38, 39

*St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*,
　1:06CV2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)................................................2, 3

*Stanton v. Vasbinder*,
　No. 06-10432, 2009 WL 996955 (E.D. Mich. Apr. 13, 2009) ...................................................21

*State ex rel. Morrison v. Wiener*,
　83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) ...............................................................40

*State v. Craig*,
　110 Ohio St. 3d 306, 853 N.E.2d 621 (2006) .........................................................................21

*State v. Toudle*,
　2013-Ohio-1548 ........................................................................................................................21

*Stewart v. Hooters of Am., Inc.,*
No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873 (M.D. Fla. June 18, 2007) ................................ 69

*Stringer v. N.F.L.,*
749 F. Supp. 2d 680 (S.D. Ohio 2010) .......................................................................... 17, 73, 83

*Taylor v. AirCo, Inc.,*
CV 02-30014-MAP, 2003 WL 27382684 (D. Mass. Aug. 4, 2003), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003) ................... 26, 110, 111

*Taylor v. Checkrite, Ltd.,*
627 F. Supp. 415 (S.D. Ohio 1986) ............................................................................. 112, 113

*Taylor v. City of Cincinnati,*
55 N.E.2d 724 (Ohio 1944) .................................................................................................... 39

*Telecor Commun., Inc. v. S.W. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) .............................................................................................. 23

*TJX Companies, Inc. v. Hall,*
2009-Ohio-3372, 183 Ohio App. 3d 236 ............................................................................... 7, 8

*Tovey v. Nike, Inc.,*
1:12CV446, 2014 WL 3510636 (N.D. Ohio 2014) ................................................................... 43

*Tucker v. Union of Needletrades, Indus., & Textile Emps.,*
407 F.3d 784 (6th Cir. 2005) .................................................................................................. 70

*U.S. Football League v. Natl. Football League,*
634 F. Supp. 1155 (S.D.N.Y. 1986) ............................................................................ 29, 30, 31

*U.S. Football League v. Natl. Football League,*
842 F.2d 1335 (2d Cir. 1988) ................................................................................................. 30

*U.S. v. Alghazouli,*
517 F.3d 1179 (9th Cir. 2008) ................................................................................................ 37

*U.S. v. Boyd,*
640 F.3d 657 (6th Cir. 2011) .................................................................................................. 97

*U.S. v. Daniel,*
329 F.3d 480 (6th Cir. 2003) .................................................................................................. 37

*U.S. v. Kerley,*
784 F.3d 327 (6th Cir. 2015) .................................................................................................. 50

*U.S. v. Lopez-Ortiz,*
736 F. Supp. 2d 469 (D.P.R. 2010) ......................................................................................... 88

*U.S. v. Moore,*
651 F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom., Smith v. U.S.*, 568 U.S. 106 (2013) ................53

*U.S. v. Nixon,*
694 F.3d 623 (6th Cir. 2012) ...............................................................................................53

*U.S. v. Pits,*
85 F.3d 629, 1996 WL 254655 (6th Cir. 1996) ........................................................53

*U.S. v. Signer,*
482 F.2d 394 (6th Cir. 1973) ................................................................................53

*U.S. v. Smith,*
70 Fed. Appx. 804 (6th Cir. 2003) ...............................................................41, 42

*U.S. v. Turning Bear,*
357 F.3d 730 (8th Cir. 2004) ...............................................................................88

*Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.,*
111 F.3d 1284 (6th Cir. 1997) ..............................................................................54

*Union Pump Co. v. Centrifugal Tech. Inc.,*
Nos. 10–30040, 10–30072, 2010 WL 5186616 (5th Cir. Dec. 16, 2010) ....................................63

*United Mine Workers of Am. v. Pennington,*
381 U.S. 657 (1965) ...........................................................................23, 26, 29

*United States v. Amr,*
132 F. Appx. 632 (6th Cir. 2005) .........................................................................48

*United States v. Asher,*
910 F.3d 854 (6th Cir. 2018) ...............................................................................59

*United States v. Fleming,*
902 F.2d 1570 (6th Cir. 1990) ........................................................................72, 73

*United States v. Foster,*
376 F.3d 577 (6th Cir. 2004) ..........................................................................113, 114

*United States v. Fowler,*
932 F.2d 306 (4th Cir. 1991) ..............................................................................51

*United States v. Gupta,*
747 F.3d 111 (2d Cir. 2014) ...............................................................................84

*United States v. Midwest Fireworks Mfg. Co.,*
248 F. 3d 563 (6th Cir. 2001)..............................................................................94

*United States v. Mohammad,*
    No. 1:10CR389, 2012 WL 4483544 (N.D. Ohio, Sept. 27, 2012) ..............................73

*United States v. Rea,*
    958 F.2d 1206 (2d Cir. 1992) ..............................................................................51

*United States v. Robinson,*
    763 F.2d 778 (6th Cir. 1985).................................................................................84

*United States v. Schrock,*
    855 F.2d 327 (6th Cir. 1988).................................................................................59

*United States v. Smith,*
    550 F.2d 277 (5th Cir. 1977).................................................................................51

*United States v. Valdez-Reyes,*
    No. 03-3737, 2006 WL 126733 (6th Cir. Jan. 18, 2006) ..........................................50

*Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.,*
    68 F. Supp. 3d 917 (N.D. Ill. 2014) .......................................................................61

*Vystrcil v. Mercy Health,*
    No. 17CV781, 2019 WL 2076035 (N.D. Ohio May 10, 2019) ...................................70

*Watson Carpet & Floor v. Mohawk Indus.,*
    648 F. 3d 452 (6th Cir. 2011)................................................................................82

*Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago,*
    641 F.2d 457 (7th Cir. 1981).................................................................................31

*Widmer v. Warden, Corr. Reception Ctr.,*
    2017 WL 447237 (S.D. Ohio Feb. 2, 2017) ..........................................................104

*William F. Shea, LLC v. Bonutti Research, Inc.,*
    No. 2:10-CV-615, 2012 WL 5077701 (S.D. Ohio Oct. 18, 2012) ..............................55

*Wise v. Zwicker & Associates, P.C.,*
    780 F.3d 710 (6th Cir. 2015).................................................................................22

*Wolfe v. McNeil-PPC, Inc.,*
    CIV.A. 07-348, 2012 WL 38694 (E.D. Pa. Jan. 9, 2012)...................................24, 25

**STATUTES**

5 U.S.C. § 551 ................................................................................................................22

5 U.S.C. § 552 ................................................................................................................22

5 U.S.C. § 553 ...................................................................................................22

5 U.S.C. § 554 ...................................................................................................22

5 U.S.C. § 555 ...................................................................................................22

5 U.S.C. § 556 ...................................................................................................22

5 U.S.C. § 557 ...................................................................................................22

5 U.S.C. § 558 ...................................................................................................22

5 U.S.C. § 559 ...................................................................................................22

18 U.S.C. § 545 .................................................................................................37

18 U.S.C. § 1343 ...............................................................................................37

18 U.S.C. § 1961 ...............................................................................................36

21 U.S.C. § 801 ...........................................................................................39, 40

21 U.S.C. § 821 .................................................................................................38

21 U.S.C. § 826 .................................................................................................22

21 U.S.C. § 843 .....................................................................................36, 37, 39

21 U.S.C. § 871 .................................................................................................38

21 U.S.C. § 877 .................................................................................................22

OHIO REV. CODE § 313.10 ..............................................................................21

OHIO REV. CODE § 4729.35 ......................................................................37, 38

## OTHER AUTHORITIES

1 CV Ohio Jury Instructions 443.01 ...............................................................40

1 CV Ohio Jury Instructions 621.05 ...............................................................39

21 C.F.R. § 1303.11 ..........................................................................................22

21 C.F.R. § 1303.12 ..........................................................................................22

21 C.F.R. § 1303.13 ..........................................................................................22

21 C.F.R. § 1303.31 ..........................................................................................22

21 C.F.R. § 1303.32 ...................................................................................................22

21 C.F.R. § 1303.33 ...................................................................................................22

21 C.F.R. § 1303.34 ...................................................................................................22

21 C.F.R. § 1303.35 ...................................................................................................22

21 C.F.R. § 1303.36 ...................................................................................................22

21 C.F.R. § 1303.37 ...................................................................................................22

21 C.F.R. § 1316.41 ...................................................................................................22

21 C.F.R. § 1316.42 ...................................................................................................22

21 C.F.R. § 1316.43 ...................................................................................................22

21 C.F.R. § 1316.44 ...................................................................................................22

21 C.F.R. § 1316.45 ...................................................................................................22

21 C.F.R. § 1316.46 ...................................................................................................22

21 C.F.R. § 1316.47 ...................................................................................................22

21 C.F.R. § 1316.48 ...................................................................................................22

21 C.F.R. § 1316.49 ...................................................................................................22

21 C.F.R. § 1316.50 ...................................................................................................22

21 C.F.R. § 1316.51 ...................................................................................................22

21 C.F.R. § 1316.52 ...................................................................................................22

21 C.F.R. § 1316.53 ...................................................................................................22

21 C.F.R. § 1316.54 ...................................................................................................22

21 C.F.R. § 1316.55 ...................................................................................................22

21 C.F.R. § 1316.56 ...................................................................................................22

21 C.F.R. § 1316.57 ...................................................................................................22

21 C.F.R. § 1316.58 ...................................................................................................22

21 C.F.R. § 1316.59 ...................................................................................................20

21 C.F.R. § 1316.60 ............................................................................................22

21 C.F.R. § 1316.61 ............................................................................................22

21 C.F.R. § 1316.62 ............................................................................................22

21 C.F.R. § 1316.63 ............................................................................................22

21 C.F.R. § 1316.64 ............................................................................................22

21 C.F.R. § 1316.65 ............................................................................................22

21 C.F.R. § 1316.66 ............................................................................................22

21 C.F.R. § 1316.67 ............................................................................................22

21 C.F.R. § 1316.68 ............................................................................................22

2 MCCORMICK ON EVIDENCE § 214 (7th ed.) ......................................................46

FED. R. CIV. P. 1 ................................................................................................42

FED. R. CIV. P. 26 ..........................................................................10, 11, 19, 20

FED. R. CIV. P. 30 ...................................................................................... passim

FED. R. CIV. P. 37 ................................................................................................11

FED. R. CIV. P. 56 ................................................................................................61

FED. R. EVID. 401 ..........................................................................................2, 58

FED. R. EVID. 402 ...................................................................................... passim

FED. R. EVID. 403 ...................................................................................... passim

FED. R. EVID. 404 ............................................................................................106

FED. R. EVID. 406 ...................................................................................56, 57, 58

FED. R. EVID. 408 ...................................................................................... passim

FED. R. EVID. 602 ...................................................................................60, 61, 75, 79

FED. R. EVID. 613 ............................................................................................113

FED. R. EVID. 701 ...................................................................................50, 51

FED. R. EVID. 702 ............................................................................................50

FED. R. EVID. 704 .................................................................................................51

FED. R. EVID. 801 .................................................................................................97

FED. R. EVID. 803 ........................................................................................ 21, 62, 93, 94

https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-
distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-
fb56c5522e1c_story.html ................................................................................. 63, 64

https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-
federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-
d7f0e60391e9_story.html ......................................................................................85

*In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation,*
N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final
Assessment, pp. 7-8) ...........................................................................................47

RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) ........................................................39

# INTRODUCTION

Plaintiffs submit this omnibus response to the following motions *in limine* filed by Defendants: Omnibus Memorandum of Law in Support of All Track One Bellwether Trial Defendants' Motion in Limine (Dkt. #2661); Omnibus Memorandum of Law in Support of Distributor Defendants' Motions in Limine (Dkt. #2666); Henry Schein Defendants' Motions in Limine (Dkt. #2645); Walgreens' Motions *in Limine* (Dkt. #2648); Cardinal Health Inc.'s Motions *in Limine* (Dkt. #2653); McKesson Corporation's Motion in Limine to Exclude Certain Evidence and Argument (Dkt. #2663); and Teva Defendants' and Actavis Generic Defendants' Omnibus Motion in Limine (Dkt. #2668).[1]  This omnibus response is designed to reduce the documents on this Court's docket and promote brevity.

The MILs proposed by Defendants should be denied.[2]  As a preliminary matter, Plaintiffs are unclear if Defendants have not read this Court's summary judgment rulings, or have simply chosen to ignore them, but many of their MILs seek to re-litigate issues on which they have already lost.  This is not an appropriate use of a motion *in limine*.  Additionally, Defendants' legal and factual arguments in support of exclusion are without merit.  Many of the cases Defendants cite do not even address motions *in limine* or evidentiary issues, and those that do are easily distinguishable.  Defendants do not come close to satisfying their burden to demonstrate that the evidence sought to be excluded is clearly inadmissible on all grounds.  And most of their MILs are overly broad and vague.  Accordingly, Defendants' MILs should be denied and any evidentiary ruling should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context.

---

[1]  All Exhibits referenced herein as are attached to the Appendix in Support of Plaintiffs' Omnibus Response to Defendants' Motions *in Limine*, filed contemporaneously herewith.

[2]  There are two exceptions.  Plaintiffs will agree to the Teva/Actavis Defendants' MIL No. TAD-10.  *Infra* at § G.10.  Additionally, the parties have agreed to stipulate to a modified version of Defendants' Omnibus MIL No. 13 (*infra* at § A.13) and informed Special Master Cohen of this agreement by e-mail on September 30, 2019.

**LEGAL STANDARD**

The Sixth Circuit states: "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).[3] Thus, the Court "has the power to exclude evidence in limine only when evidence is *clearly inadmissible* on all potential grounds." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (emphasis added).[4] Relevant evidence is generally admissible. FED. R. EVID. 402. "Evidence is relevant if: (a) it has *any* tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401 (emphasis added). This is an " 'extremely liberal' " standard. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)(citation omitted). Courts may exclude relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. To be excluded on prejudice grounds, the evidence cannot just be prejudicial; it must be *unfairly* prejudicial. *Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998). " 'Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.' " *Id.* at 515 (citation omitted). Even when the evidence is "shaky," " 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking' such evidence, not exclusion." *Id.* (citation omitted).

The moving party bears the burden of demonstrating that the evidence sought to be excluded is clearly inadmissible. *See Jordan*, 2010 WL 4281807, at *1 (" 'A court will generally not grant a motion in limine unless the moving party meets its burden of showing that the evidence in

---

[3]    *See also Morningstar v. Circleville Fire & EMS Dept.*, 2:15-CV-3077, 2018 WL 3721077, at *1 (S.D. Ohio Aug. 6, 2018) (same).

[4]    *See also Jordan v. John Soliday Fin. Group, LLC*, 1:09CV0707, 2010 WL 4281807, at *1 (N.D. Ohio Oct. 20, 2010) (same); *St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*, 1:06CV2781, 2009 WL 10689369, at *1 (N.D. Ohio Oct. 23, 2009).

question is clearly inadmissible.' ") (citation omitted). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins.*, 326 F. Supp. 2d at 846.[5] The Court has broad discretion in determining whether to grant or deny a motion *in limine. St.-Gobain*, 2009 WL 10689369, at *1 ("Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court.").

Moreover, motions *in limine* are meant to address evidentiary issues; they should not be used to resolve non-evidentiary factual or legal disputes. As the Sixth Circuit explained:

> [A] mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion. Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment.

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). Thus, when a motion *in limine* "is no more than a rephrased summary-judgment motion, the motion should not be considered. *Id.* at 563. *See also Morningstar*, 2018 WL 3721077, at *7 (same).

The fact that the Court denies a motion *in limine* "does not necessarily mean that all evidence contemplated by the motion will be admitted at trial." *Indiana Ins.*, 326 F. Supp. 2d at 846.[6] It simply means that "without the context of trial, the [C]ourt is unable to determine whether the evidence in question should be excluded." *Indiana Ins.*, 326 F. Supp. 2d at 846.[7] The movant may still raise objections to the introduction of the evidence during the trial.[8]

---

[5]  *See also Jordan*, 2010 WL 4281807, at *1 ("If this burden is not met, evidentiary rulings should be deferred and resolved in the context of the trial."); *St.-Gobain*, 2009 WL 10689369, at *1 ("If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in the proper context.").

[6]  *See also Securities and Exch. Commn. v. Jacobs*, 1:13 CV 1289, 2014 WL 12597832, at *2 (N.D. Ohio Feb. 25, 2014); *Jordan*, 2010 WL 4281807, at *1.

[7]  *See also Securities*, 2014 WL 12597832, at *2 ("Where a court denies a motion *in limine*, it is, in essence, a finding that the court cannot determine whether it can exclude the evidence without the context of trial."); *Jordan*, 2010 WL 4281807, at *1.

[8]  *Indiana Ins.*, 326 F. Supp. 2d at 846 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine."); *Jordan*, 2010

# ARGUMENT

A.   **PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTION IN LIMINE (DKT. #2661).**

1.   <u>**Defendants' Omnibus MIL No. 1**</u>: The Court should not permit Plaintiffs to present evidence or argument to the jury concerning "future damages."

Defendants seek to exclude evidence of Plaintiffs' future damages on the ground that Plaintiffs failed timely to disclose that they were seeking these damages. The record shows otherwise: Plaintiffs specifically identified future damages in their interrogatory responses as a category of damages they were seeking and specifically noted the overlap between their claims for future damages and their claim for abatement. When Plaintiffs learned that the two remedies would not be tried together, they promptly provided supplemental tables from their previously-disclosed experts, Prof. Jeffrey Liebman and Prof. Thomas McGuire, to separate the two forms of relief, and offered the experts who provided the supplemental tables for additional deposition time. Under these circumstances, Defendants cannot fairly claim surprise or prejudice to justify exclusion of this evidence.

   *i.   Plaintiffs long ago disclosed that they are seeking future damages.*

On November 30, 2018, Plaintiffs served their Second Supplemental Response and Objections to Distributor Defendants' Interrogatory No. 18. In those responses, Summit County and Cuyahoga County each stated: "Plaintiff seeks, *inter alia*, damages in the amounts as set forth below, which reflect both past damages from at least 2006 to present, *and future damages for at least 10 years*. Plaintiff's investigation of both its past and future costs, expenditures, damages, losses or harms caused by Defendants is ongoing. . . ." *See* **Ex. 1** [Summit Rog Resp.] at p. 6; **Ex. 2** [Cuyahoga Rog Resp]. at p. 7 (emphasis added). Each response further disclosed:

> To the extent Plaintiff is seeking future damages as set forth above, various components and subparts may either overlap, be a component part of, or be incidental to the equitable remedy sought as part of a comprehensive abatement plan

---

WL 4281807, at *1 (same).

should the Court enter such a plan, including the provision of funds necessary to implement the abatement plan.

**Ex. 1** [Summit Rog Resp.] at p. 8; **Ex. 2** [Cuyahoga Rog Resp]. at p. 9. Finally, each response identified by name "the following persons with knowledge of such damages. . . ." *Id.* Thus, Defendants were informed 11 months before the start of the trial both that Plaintiffs were seeking future damages and that the components of future damages would overlap with the components of any comprehensive abatement plan. They were also provided with the names of fact witnesses concerning Plaintiffs' damages.

Plaintiffs also timely disclosed expert witnesses concerning damages. In March 2019, Plaintiffs disclosed their expert reports, including reports from Prof. Jeffrey Liebman and Prof. Thomas McGuire. Prof. Liebman's report set forth a detailed abatement plan to address the opioid crisis in Summit and Cuyahoga Counties over the period 2020-2034. Prof. Liebman quantified the cost of the abatement plan, offering the opinion that

> In Cuyahoga, the 15-year costs for the elements of the Abatement Plan evaluated to date range from $3.5 billion to $4.5 billion. In Summit, the 15-year costs range from $1.5 billion to $2.0 billion.

Dkt. #2000-11 (Liebman Expert Rep.) at p. 30. There was, of course, no doubt that all of this money would be expended in the future. In the meantime, Prof. Thomas McGuire quantified the past costs of the opioid epidemic, offering the opinion that "[i]n total for both Bellwether governments, damages from 2006 through 2018 range from to $194.4 - $223.4 million." Dkt. #2000-17 (McGuire Expert Report) at p. 7. Prof. McGuire noted, as well that, "[t]o the extent any Bellwether government seeks damages at trial beyond 2018 attributable to defendants' misconduct, the same methodology set forth herein would be extended to those future years, subject to the assumption that there would be no material changes in the scope and extent of harms." *Id.* at p. 7 n.12.

Although Defendants focus on the McGuire and Liebman supplemental tables, their motion sweeps more broadly and asks the Court to exclude *all* evidence of future damages. To the extent that Plaintiffs rely on previously disclosed material, including previously disclosed fact witnesses and

previously disclosed expert testimony, to prove their future damages, there can be no possible claim of surprise or prejudice and no basis to complain about a "trial by ambush." None of this evidence of future damages should be excluded.

        ii.   *Defendants offer no argument to support the exclusion of future damages evidence other than the McGuire and Liebman Supplemental Tables.*

Defendants' entire argument for the exclusion of all evidence pertaining to future damages is based on the purported untimeliness of the McGuire and Liebman supplemental tables. But Plaintiffs have other evidence of future damages, including testimony of fact witnesses and testimony of expert witnesses as disclosed in March 2019. Defendants offer no basis to exclude any of that evidence.

Under Ohio state law (applicable to Plaintiffs' conspiracy and OCPA claims) or federal law (applicable to Plaintiffs' RICO claims), "a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future." *Galayda v. Lake Hosp. Sys., Inc.*, 1994-Ohio-64, 71 Ohio St. 3d 421, 425; *see also Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562, ¶ 57 (Ct. App. 2018); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (future damages recoverable under RICO unless the fact of their accrual is speculative or their amount and nature unprovable). Significantly, however, expert testimony is not required to prove future damages. *See Daniels*, 2018-Ohio-3562, ¶ 56 (*citing Sahrbacker v. Lucerne Prods., Inc.*, 52 Ohio St.3d 179, 179 (1990)). The authorities cited by Defendants do not show otherwise, under Ohio law or federal law; they merely provide illustrations of the potential use of expert testimony to establish the certainty of future damages in particular cases. So long as a jury can find and quantify future damages with the requisite level of certainty, there is no specific requirement of expert testimony.

In this case, Plaintiffs have sufficient evidence, besides the supplemental tables, so that the existence of future damages cannot be found, as a matter of law, to be speculative, nor the amounts unprovable. The testimony of Plaintiffs' addiction experts and of fact witnesses regarding the opioid epidemic in Ohio will sufficiently establish that, in the absence of treatment, opioid abuse problems persist. In light of this testimony, it hardly requires speculation to conclude that the Counties will

continue to incur losses in the future arising from the opioid epidemic. (Indeed, the entire predicate of Plaintiffs' abatement claim is that the nuisance will continue to inflict harm until it is abated.) As for the amount of future damages, that information, too, may be provided by fact witnesses from the Counties with knowledge of how much it costs to provide the services needed address the opioid abuse problem in the Counties. This is especially true because Plaintiffs' claims for future damages are in the alternative, not in addition, to their claim for an abatement remedy.[9] For this reason, the premise of this claim is that there is no abatement plan in place, so the amount of future damages need not account for the kinds of improvements one would expect an abatement plan to produce. And even without their supplemental charts, the expert testimony of Profs. Liebman and McGuire provides sufficient information about the services required to address the opioid crisis, the ongoing need for such services, and the cost of providing them that a jury could with reasonable certainty award future damages based on this information.[10] The McGuire report provides sufficient information for the jury to determine the ongoing damages to be incurred in the future, and the Liebman report provides sufficient information for the jury to identify the overlap between Plaintiffs' future damages and their abatement plan. No more is required. *See Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) ("Damages cannot be speculative, but this only means that the fact of damages, not their amount, cannot be uncertain."); *TJX Companies, Inc. v. Hall*, 2009-Ohio-3372, ¶ 32, 183 Ohio App. 3d 236, 245 ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."). Indeed, "[a] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as

---

[9]   To the extent they are awarded both, Plaintiffs have already recognized a set-off will be necessary to avoid double recovery. *See* Dkt. #2660 (Plaintiffs' Trial Brief) at p. 4.

[10]   The Court has already found that the testimony of Profs. Liebman and McGuire is reliable and admissible. *See* Dkt. #2577 (denying motion to exclude testimony of Prof. McGuire); Dkt. #2519 (denying motion to exclude expert testimony regarding abatement costs).

would otherwise be possible." *TJX Companies*, 2009-Ohio-3372, ¶ 33, 183 Ohio App. 3d at 245; *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (citation and internal quotation marks omitted).

In *Daniels*, the Ohio Court of Appeals held that, although the plaintiff's future damages had to be reduced to present value, the plaintiff was not required to offer expert testimony on that issue. 2018-Ohio-3562, ¶ 57. If a jury can make its own present value computation without expert guidance, so, too, a jury can determine the Counties' future damages from the testimony of the County's employees, the evidence of the ongoing nature of addiction and opioid misuse, the evidence of the costs of addressing the crisis in the past, and the evidence of what it would take to abate the problem going forward. Defendants cannot show that no jury could find the fact of future damages to be reasonably certain or make a reasonable estimate of what those damages will be.

In any event, the issue on this motion is not the sufficiency of Plaintiffs' future damages evidence, but its admissibility. As discussed above, no arguments of prejudice or surprise apply to evidence of future damages as presented by Plaintiffs' fact witnesses or as presented in expert reports that were disclosed in March 2019. Not only were Defendants informed that Plaintiffs would be seeking future damages, they were provided the names of Plaintiffs' fact witnesses with respect to damages and they were provided with the original Liebman and McGuire reports, which included, as noted above, the methodology that would be used to calculate future damages. Plaintiffs may properly rely on this evidence to prove their future damages at trial.

     iii.    *Plaintiffs properly supplemented the expert reports of Profs. Liebman and McGuire to separate future damages from abatement costs.*

Although Plaintiffs believe their fact and original expert evidence is sufficient to establish their future damages, the Counties should also be permitted to present testimony based on the supplemental tables prepared by Profs. Liebman and McGuire. Because Plaintiffs expected to try their legal claims together with their equitable abatement claim, Plaintiffs did not separately quantify their future damages. Rather, Plaintiffs believed that the jury would hear all of the evidence

concerning past damages and abatement, and could then determine all elements of damages based on that evidence. On September 16, 2019, however, the Court suggested that it might bifurcate the trial and hear evidence pertaining to nuisance abatement in a separate proceeding from the trial in which Plaintiffs will present their damages evidence. On September 24, 2019, the Court ordered such bifurcation. *See* Dkt. #2629. Prior to September 16, Plaintiffs had no notice that the Court intended to hear evidence pertaining to legal remedies separately from evidence pertaining to equitable abatement and had not planned to separate the evidence pertaining to those remedies.

At the September 16 conference the Court explained its concerns about allowing Plaintiffs to present their nuisance abatement evidence in same proceeding with the rest of their evidence:

> It seems to me what I am proposing is that a jury decide whether or not any of the Defendants are liable for public nuisance. And that's all the jury will decide with respect to public nuisance. There is not going to be any evidence or testimony about what any relief or abatement would be in the event there is nuisance, how much it would cost, who would do what, whatever.
>
> We are not going to take the time in the trial for that because the jury isn't going to decide it, and my concern is, it may confuse them, and they may jumble things up and conflate that with past damages.

**Ex. 3** [9/16/19 transcript]. Thus, the Court made clear that the jury could not use the abatement plan to compute future damages or to offset future damages from abatement, because, in order to prevent confusion and prejudice to the Defendants, the full abatement plan would not be presented to the jury.

This change in the trial plan required Plaintiffs to adapt the presentation of their evidence.[11] In order to present their legal damages in a separate proceeding from their equitable abatement plan,

---

[11] Defendants' suggestion that Plaintiffs sought to introduce evidence of future damages only when they learned that the Court, rather than the jury, would be the fact-finder with respect to the amount of the abatement remedy, *see* Dkt. #2661 at pp. 2-3, is entirely unfounded and contradicted by the record. First, as discussed above, Plaintiffs had identified future damages as a component of their damages on their legal claims in November, 2018. Second, Plaintiffs had always assumed that the Court would be the fact-finder with respect to the cost of the abatement remedy. Indeed, in Plaintiffs' Position Statement Regarding a Jury Trial on the Public Nuisance Claim (Dkt. #2598) (a well as in the corrected version of that document, *see* Dkt. #2601), Plaintiffs took the position that "there is no right to a jury trial on a public nuisance claim for abatement." Dkt. #2601 at p. 1. Plaintiffs also stated that they "take no position and defer to the Court's decision as to whether to use an advisory jury regarding that claim." *Id.* Thus, Plaintiffs neither expected nor sought a jury with respect to their nuisance abatement claim. What

on September 30, Plaintiffs provided three supplemental tables to Prof. Liebman's expert report and one supplemental table to the Prof. McGuire's report. *See* **Ex. 4** [supplemental tables]. The supplemental table to the McGuire report presents a computation of damages since the time of his original report as well as future damages,[12] while the supplemental tables to the Liebman report assess the overlap between future damages and abatement. Plaintiffs have offered to provide Profs. Liebman and McGuire for deposition to answer questions about the computations in these tables. Plaintiffs do not seek to introduce new experts or new reports – rather, their "new" evidence consists solely of a single table that projects Plaintiffs' past damages into the future (as Prof. McGuire explained in his March, 2019 report could be done) and three tables that show how future damages can be subtracted from the amount needed for abatement. These tables simply extend the methodologies already found by this Court to be reliable.

Defendants seek specifically to exclude testimony based on these supplemental tables, but their arguments are unpersuasive and should be rejected. Plaintiffs had no advance knowledge that the trial would be bifurcated and thus had no reason to separate their future damages from their abatement plan. Once they learned of the bifurcation plan, they promptly supplemented their experts' reports. Rule 26(e) requires that a party supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . ." FED. R. CIV. P. 26. Here, Plaintiffs learned that their disclosures were incomplete when they learned that, because of the bifurcated structure of the trial, Prof. Liebman's abatement plan could not be presented to the jury for its consideration in assessing future damages. They provided the supplemental tables less than one week after the Court ruled that it would, in fact, bifurcate the trial. This constitutes a timely supplement.

Even if the Court concludes that the supplemental tables were not timely under Rule 26(e), the tables should still not be struck or excluded because any delay was both "substantially justified"

---

Plaintiffs did expect was that all of their damages evidence would be submitted in a single proceeding.

[12] The computations in Prof. McGuire's supplemental table are based on the corrected numbers from his errata, rather than the numbers in his original report.

and also is harmless. *See* FED. R. CIV. P. 37(c)(1). Untimely disclosure does not automatically warrant preclusion. Rather, Rule 37 provides that a party may be precluded from using material that was not timely disclosed "unless the failure was substantially justified or is harmless." Either ground is sufficient, under Rule 37, to preclude the sanction of exclusion Defendants seek, but in this instance, both factors are present.

In assessing whether a late disclosure is substantially justified or harmless, the Sixth Circuit uses a five-factor test: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). All of these factors weigh in favor of admitting the supplemental tables.

First, as discussed above, the surprise to the Defendants is limited because Defendants have known for eleven months that Plaintiffs are seeking future damages and have had other disclosures, including the testimony of fact witnesses and the original disclosures of Profs. Liebman and McGuire on that subject. Second, to the extent Defendants were surprised by the supplemental tables, that surprise can be readily cured by brief pretrial examination of each of the witnesses, limited to questioning about the supplemental tables. Third, the evidence will not disrupt the trial because Prof. McGuire, who provides the future damages information, will testify to the Counties' past damages in any event. The only question is whether he will also be permitted to explain how his past damage numbers may be extrapolated to calculate future damages. Moreover, the supplemental tables do not alter Defendants' overall exposure at trial. The future damages shown on Prof. McGuire's supplemental table are less than the cost of the abatement plan covering the same period and there would be an offset to prevent double recovery. Thus, although the supplemental table permits a jury to identify future damages separate and apart from the cost of abatement, it does not affect the total amount Plaintiffs are seeking to recover. Fourth, the evidence is important because with information from the Liebman abatement plan, the jury may lack sufficient guidance about the nature of future expenditures. Finally, as discussed above, Plaintiffs

have explained the reason for the late disclosure of these supplemental tables. For these reasons, the disclosure of the supplemental tables on September 30 was both substantially justified and, in light of Plaintiffs' offer to provide the witnesses for additional deposition, harmless. Defendants' motion to exclude them should be denied.

> **2.** **Defendants' Omnibus MIL No. 2: The Court should preclude Plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

Defendants' Omnibus MIL No. 2 is an improper attempt to sanitize the record of all evidence of individual prescriptions, shipments, or use of prescription opioids. This request sweeps far too broadly by conflating the disputed relevancy of individual prescriptions or shipments to *causation* with the relevancy of the very existence of these prescriptions or shipments. The Court's rulings only limited the former, while also *requiring* Plaintiffs, at Defendants' demand, to either identify individual prescriptions and individuals or to forego presentation of evidence at trial. Plaintiffs identified the prescriptions and produced associated claims data, and this Court confirmed the propriety of Plaintiffs' responses in Discovery Rulings 13 and 18. Defendants cannot now categorically exclude this evidence that they demanded be produced.

The Court's discovery rulings that Defendants rely upon for this request did not prohibit all use of individualized evidence or declare it *per se* irrelevant. Just the opposite, in what Defendants call the "seminal" ruling on this subject, *see* Dkt. #2661 at p. 6, the Special Master ruled that:

> Plaintiffs must now produce all available statistical and aggregate evidence, *and enough supporting particulars* to allow the Court and Defendants and the parties' experts to understand the fundamental bases for those statistics and aggregated data; but Plaintiffs need not produce *all* discovery regarding *every* patient or *every* opioid prescription.
>
>             \*\*\*
>
> Plaintiffs . . . must produce to defendants all relevant aggregated data and statistics. Plaintiffs must also undertake a good faith effort to produce sufficient supporting particularized evidence to allow Defendants and their experts to understand the fundamental bases for these statistics and aggregated data. . . . When Plaintiffs later

> seek *to prove causation or damages at trial . . . Plaintiffs may not rely affirmatively or defensively on any evidence or data they did not produce during discovery.*

Dkt. #606 (Discovery Ruling No. 1) at pp. 4-5 (first and last emphases added; middle emphases in original). This discovery ruling thus both required Plaintiffs to produce some (though not all) individual prescription and shipment evidence and then limited their use of individualized evidence at trial only by holding that they cannot prove causation or damages with evidence not produced during discovery. This ruling is far narrower than the blanket exclusion of individual prescription or shipment evidence Defendants now seek.

And Defendants' request seemingly ignores Plaintiffs' interrogatory responses served during discovery, which were presented to the Special Master at least three times for rulings. In the first ruling, the Special Master ordered Plaintiffs to identify certain medically unnecessary prescriptions and individuals harmed by prescriptions, ruling:

> The plaintiffs' objections are upheld in part, to the extent that plaintiffs do not have to identify **all** prescriptions and **every** person, as requested in the Interrogatories. Rather, the Special Master rules that plaintiffs must respond to the five Interrogatories at issue *as rewritten below*.

Dkt. #1027 (Discovery Ruling No. 5) at pp. 1-2 (emphasis in original). The ruling rewrote the interrogatories to replace the phrase "all prescriptions" with "500 prescriptions," and included other criteria (*e.g.*, 10 prescriptions per manufacturer, etc.). *Id.* at pp. 2-3. Plaintiffs objected to this ruling, and the Court modified it as follows:

> Instead of answering the disputed interrogatories as required by the Discovery Ruling, Plaintiffs may instead elect not to answer them **on the condition** that Plaintiffs instead categorically and affirmatively respond to the disputed interrogatories by stating that: (1) they will not assert, either in expert opinions or factual presentations at trial, that any specific prescriptions 'were unauthorized, medically unnecessary, ineffective, or harmful' or that 'the filling of [any specific prescriptions] caused or led to harm for which [Plaintiffs] seek to recover,' and (2) Plaintiffs instead will rely, at trial and in expert opinions, solely on a theory of aggregate proof.

Dkt. #1047 at pp. 1-2 (emphasis in original) (internal footnote omitted).

Plaintiffs in fact did produce individual prescription evidence pursuant to the Court's Orders and at Defendants' demand, as follows:

- Manufacturer Interrogatory No. 6 (*identify 500 prescriptions written in reliance on alleged wrongdoing*): Plaintiffs answered that *all* prescriptions in their respective jurisdictions were influenced by Defendants' deceptive marketing, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 7 (*identify 300 persons who became addicted or were harmed as a result of any opioid prescription*): Plaintiffs identified 300 such persons, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Manufacturer Interrogatory No. 10 (*identify 500 prescriptions that were unauthorized, medically unnecessary, ineffective, or harmful*): Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 2 (*identify 500 prescriptions alleged to support claims*): Plaintiffs identified more than 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms;

- Pharmacy Interrogatory No. 3 (*identify 500 prescriptions which caused or led to harm*): Plaintiffs identified 500 such prescriptions, and produced over a million lines of corresponding claims data for those patients, while reaffirming their intent not to assert that any specific prescription caused or led to Plaintiffs' harms.

Dkt. #1058 (Bellwether Plaintiffs' Submission in Response to Discovery Ruling No. 5) at pp. 2-6.[13]

Defendants, having demanded and obtained individual-level prescription evidence from Plaintiffs, cannot now turn tail and preclude all use of such evidence at trial.[14] Nor may Defendants preclude Plaintiffs' use of this evidence on the ground that it is "cherry-picked." Dkt. #2661 at

---

[13] In late October and mid-November of 2018, Plaintiffs served interrogatory responses that identified prescriptions in response to some, but not all of the interrogatories. Defendants challenged Plaintiffs' responses. On December 22, 2018, the Special Master ordered Plaintiffs to choose between answering all five of the interrogatories fully, or electing not to answer them at all. Dkt. #1215 (Discovery Ruling No. 13) at p. 6. In that same ruling, the Special Master rejected Defendants' complaint that Plaintiffs had not sufficiently identified the alleged misstatements that led to the prescription. *Id.* at p. 7. On December 31, 2018, Plaintiffs amended their responses to identify prescriptions and individuals in response to *all five* interrogatories, in compliance with the Special Master's order. Defendants once again challenged Plaintiffs' response, and the Special Master rejected their challenge in his Discovery Ruling No. 18. Dkt. #1476.

[14] Plaintiffs also have produced millions of lines of information associated with individual prescriptions. For example, pursuant to the Order Regarding Production of Medical and Pharmacy Claims Data in Track One Cases (Dkt. #1421), Plaintiffs produced claims data for: (i) all individuals who received prescriptions Plaintiffs' identified as "medically unnecessary" in response to the interrogatories; and (ii) all individuals insured through the bellwethers who received an opioid prescription.

pp. 8-9 ("This bar should apply to *all* individualized evidence plaintiffs might offer in these categories, including the limited samples they cherry-picked for disclosure in discovery . . . .") (emphasis in original). The Court specifically ruled in Discovery Ruling No. 5 that Plaintiffs did *not* have to produce *all* prescriptions and identify *every* person in response to Defendants' interrogatories. Moreover, Defendants have subpoenaed insurers seeking production of claims data for all residents of Summit and Cuyahoga counties. Defendants thus already have the information they need.

Similarly, Plaintiffs identified suspicious orders or shipments throughout discovery. Discovery Ruling No. 7 directed Plaintiffs to identify suspicious orders, and Plaintiffs did so. In Discovery Ruling No. 12, the Court rejected Defendants' attempt to compel further answers, but directed Plaintiffs to identify additional suspicious orders, which Plaintiffs did. Further, the expert reports of James Rafalski, Craig McCann, and Lacey Keller all identified suspicious orders and the methodology used to identify the orders. The Court denied Defendants' motions to exclude these expert opinions, and those decisions are dispositive of this issue. Dkt. #2492; Dkt. #2494.

In sum, the Court limited but did not prohibit use of individual-level opioid prescription, shipment, and use evidence and since Plaintiffs produced substantial amounts of this evidence at Defendants' demand, Defendants' Omnibus MIL No. 2 for a categorical exclusion of this type of evidence at trial should be rejected.

3.    **Defendants' Omnibus MIL No. 3: The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.**

Defendants' Omnibus MIL No. 3 is another improper attempt to sanitize the record of evidence of individual-level harms from opioid abuse. Defendants repeat through incorporation their incorrect arguments from MIL No. 2 for exclusion of all individual-level opioid prescription, shipment, and use evidence. Dkt. #2661 at p. 9. The Court should reject these arguments for the same reasons set forth above (*supra* at § A.2), *i.e.*, that the Court's prior rulings did not prohibit all use of individual level opioid prescription, shipment, and use evidence and that Plaintiffs produced

substantial amounts of this evidence at Defendants' demand, thus making categorical exclusion at trial impermissible.

The Court also should reject Defendants' argument that Plaintiffs' attempts to prohibit questioning on certain deponents' or their family members' private medical treatment information prohibits *all* testimony about opioid abuse.  Dkt. #2661 at p. 9.  The examples Defendants cite where Plaintiffs' counsel instructed witnesses not to answer involved questions about the witnesses' own medical treatment.  Dkt. #2661-4 at 260:1-9; Dkt. #2661-5 at 346:24-347:1-2; Dkt. #2661-6 at 181:7-182:5.  Defendants acknowledge, however, that they also obtained testimony about some individuals' use of opioids.  Dkt. #2661 at p. 9 n.7.  Defendants again therefore cannot categorically preclude all use of this type of evidence at trial.

Nor may Defendants obtain a blanket preclusion on "foundational and hearsay grounds." Dkt. #2661 at p. 10.  These are context-specific objections that should be raised and ruled upon not in a vacuum, but with respect to particular evidence if and when it is introduced.  *See*, *e.g.*, *Jacobs v. Tricam Industries, Inc.*, 10-11469, 2013 WL 950969, at *2 (E.D. Mich. Mar. 12, 2013) ("[I]t is premature to rule on Plaintiffs' motion prior to Plaintiffs establishing their proofs at trial and before the Court can consider and resolve any evidentiary issues regarding foundation, relevancy, jury confusion, and potential prejudice."); *KCH Services, Inc. v. Vanaire, Inc.*, CIV.A. 05-777-C, 2010 WL 3245243, at *1 (W.D. Ky. June 2, 2010) ("[T]he defendants' motion in limine to exclude documents or require authentication and foundation prior to admission (R. 340) is DENIED as premature.").

Finally, the Court also should reject Defendants' argument that this testimony should be categorically excluded because the witnesses are not parties.  Dkt. #2661 at p. 10.  A non-party witness may be a source of relevant evidence.  *See*, *e.g.*, *Stringer v. N.F.L.*, 749 F. Supp. 2d 680, 704 (S.D. Ohio 2010) ("[W]here an employee is injured while using a product at work, Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").  Whether a particular non-party witness's testimony is founded, relevant, and/or fairly or unfairly prejudicial should, again, be raised and decided not in a vacuum, but with

respect to particular evidence if and when it is introduced at trial. *See, e.g., Jacobs*, 2013 WL 950969, at *2; *KCH Services*, 2010 WL 3245243, at *1.[15]

For all of these reasons, the Court should deny Defendants' Omnibus MIL No. 3 as both substantively incorrect and procedurally premature.

### 4.    Defendants' Omnibus MIL No. 4: The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Defendants, having failed in their attempt to exclude expert testimony about the Gateway Effect, now attempt to exclude the particularly important testimony on that subject from Thomas Gilson, the Cuyahoga County Medical Examiner.[16]  However, Defendants' MIL No. 4 completely omits reference to Dr. Gilson's extensive and ground-breaking demonstration of the Gateway Effect with actual data that he reviewed in his official capacity as Medical Examiner.  Defendants' arguments, which do not address this important factual evidence, are insufficient to exclude it.

The Gateway Effect, which refers to the transition from prescription opioids to illicit drugs such as heroin/fentanyl, is a widely acknowledged phenomenon in both scientific literature and common understanding.  *See, e.g.,* Dkt. #2197 (Plaintiffs' Opp. to Defendants' Gateway *Daubert* Motion).  While the Gateway Effect has been a proper subject of scientific literature and may be addressed by expert testimony, as the Court found in denying the Defendants' *Daubert* motion (Dkt. #2518), the admissibility of expert testimony does not render factual testimony on the issue

---

[15]    Notably, during discovery, Plaintiffs argued that individual prescription records should not be produced because those individuals were not parties and had not put their treatment at issue or consented to disclosure.  Defendants vehemently opposed Plaintiffs' position, and each Defendant sought interrogatory responses, for example, on individuals harmed by opioid prescriptions, which Plaintiffs provided.  *Supra* at § A.2.  Defendants cannot have it both ways by now seeking to categorically preclude as irrelevant evidence they previously and successfully argued was relevant.

[16]    Plaintiffs do not plan to call Jerry Craig, Executive Director of Summit County's Alcohol and Mental Health Board, or Keith Martin, Assistant Special-Agent-in-Charge of the DEA's Cleveland Field Office, to testify in the upcoming trial.  Accordingly, Defendants' Omnibus MIL No. 4 is moot as to these witnesses.  Plaintiffs note, however, that both of these witnesses appear on Defendants' witness lists.  To the extent Defendants call them at trial, these witnesses are certainly permitted to testify as to their factual knowledge arising from their personal experiences and any objections should be assessed in the context of their overall testimony.

irrelevant or inadmissible.  Instead, Dr. Gilson's testimony complements and reinforces the opinions of Plaintiffs' experts concerning the pathway from prescription opioids to heroin/fentanyl and provides direct and specific experience of this effect in Cuyahoga County.

On January 14, 2019, Dr. Gilson testified at a deposition in this case. His testimony established that, in his capacity as Medical Examiner, he reviewed Cuyahoga County records that identified heroin/fentanyl as cause of death, and then investigated the Ohio Automated Rx Reporting System (OARRS), a State-wide prescription monitoring database, to determine which of these heroin/fentanyl decedents had prior opioid pain reliever prescriptions.  Dr. Gilson "cross-check[ed] our heroin overdoses against the OARRS database," due to a "spike in heroin mortality, and the function of going back to look at that was to firm up, to our satisfaction, that this was in fact, the relationship."  Dkt. #2163-2 (1/14/19 Gilson Dep.) at 176:7-177:10.  Dr. Gilson testified: "We identified, through our Poison Death Review Committee, through our task forces, that there was a role for the prescription opiates in the subsequent evolution into heroin and fentanyl addiction…"  *Id.* at 163:9-164:18.  Dr. Gilson and his staff "collected good data to make that association," and, as a result, "We were one of the first counties to recognize is [sic] that *people are going from OPRs [opioid pain relievers] to heroin.*"  *Id.* at 170:1-171:12; 173:2-174:3 (emphasis added).  At Dr. Gilson's second deposition session on January 22, 2019, defense counsel inquired at length about the OARRS program, and Dr. Gilson reiterated that the OARRS data was used to verify the sequence of prior prescription opioids and subsequent fatal overdoses on heroin or fentanyl.[17] These facts are relevant, admissible, and supportive of the opinions of Plaintiffs' experts, previously found to meet *Daubert* standards by this Court.

Defendants raise a red herring as to whether Dr. Gilson's testimony constitutes "expert" opinion, and further misrepresent his qualifications.  Plaintiffs maintain that the testimony referenced above constitutes reliable, relevant *factual* evidence of the transition from OPRs to

---

[17]  Dkt. #1977-16 (1/22/19 Gilson Dep.) at 127:5 – 146:8; *see especially,* 132:8-133:4 and 135:1-15 which affirm the use of OARRS data to confirm the factual sequence of opioid pain relievers followed by heroin/fentanyl overdose.

heroin/fentanyl in Cuyahoga County. However, to the extent that qualifications are at issue, Dr. Gilson testified in response to a direct question at his deposition that he is an expert on "the opioid crisis."[18] The fact that he is an expert on this subject in no way impairs the admissibility of his testimony regarding the facts regarding the prior use of opioid prescriptions by heroin/fentanyl decedents. Under Federal Rule of Civil Procedure 26, "[t]he relevant inquiry is the nature of the testimony rather than the status of the witness." FED. R. CIV. P. 26, Commentary; *Jones v. Pramstaller*, No. 1:09-CV-392, 2013 WL 12249827, at *1 (W.D. Mich. Jan. 14, 2013) (holding that where witnesses had both factual and expert knowledge, expert disclosure rules would not apply if the witness would "present eyewitness testimony" rather than expert testimony). Accordingly, "[t]he fact that an individual has expertise does not require him to be disclosed as an expert so long as his testimony is going to be limited to that of a fact witness." *Id.*; *see also Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003) (overturning exclusion of testimony of "fact witness" with specialized knowledge, finding the definition of an expert under Rule 26 "does not encompass a percipient witness who happens to be an expert"). There was no need for an expert report to testify as to factual evidence regarding heroin/fentanyl deaths among OPR users in Cuyahoga County. Nor can Defendants claim unfair surprise, since their own counsel asked whether Dr. Gilson held himself out as an expert on opioids and inquired at length on the very topic they now seek to exclude.

Defendants' changing position as to Dr. Gilson's testimony is particularly ironic. As the Court may recall, Defendants affirmatively cited and relied on an outdated version of Dr. Gilson's views on the Gateway Effect in their misleading reference to his 2014 article stating that "there is a dearth of firm evidence establishing the role of OPR [opioid pain relievers] as a gateway to heroin."

---

[18] Dkt. #2163-2 (1/14/19 Gilson Dep.) at 103:12-20. Defendants' reference to Dr. Gilson's testimony at his January 22, 2019 deposition is misleading, in that Dr. Gilson was asked only about opioids and their pharmacologic properties, rather than about the "opioid crisis." As to the latter, Dr. Gilson has published articles in scientific journals, and his employment on the opioid crisis would qualify him as an expert. Such expertise is not necessary to admissibility of the factual testimony about the OARRS database/death certificate evidence of prescription opioid use before heroin/fentanyl overdose; nevertheless, it is worth noting that Defendants' motion misstates Dr. Gilson's qualifications and testimony.

Dkt. #1857-1, at pp. 5-6. However, as pointed out in Plaintiffs' Opposition to the *Daubert* motion, Defendants had failed to inform the Court that Dr. Gilson published a follow-up article in 2017, which stated: "While this crisis appears to have its *roots in the overprescribing of opioid pain relievers (OPR)*, more recent years have seen *a transition to illicit drugs*, primarily heroin and fentanyl."[19] Having cited Dr. Gilson's statements on the Gateway Effect when they believed them to support their position, Defendants are in a poor position to seek to exclude his testimony when it turns out that their earlier reliance was misplaced.

Dr. Gilson's 2017 article also states, "The Cuyahoga County Medical Examiner's Office (CCMEO) has a *statutory responsibility* to investigate all deaths that are unnatural, suspicious, or involve the sudden, unexpected death of a person in apparent good health."[20] Dr. Gilson's review pursuant to statute confers the status of public records upon the work product of his office. Dr. Gilson also reviewed the official records found in the OARRS, and those records provided data summarized in his article (*id.*), as well as those described in his deposition testimony, above. These reports are official records, and testimony about them is admissible under FED. R. EVID. 803(6) (Records of Regularly Conducted Activity) and/or 803(8) (Official Records).[21] Dr. Gilson may

---

[19] Dkt. #2197-29 (T. Gilson, *et al. The Evolution of the Opiate/Opioid Crisis in Cuyahoga County.* Acad. Forensic Pathology) 7:41-49, at p. 42 (2017) (emphasis added); Dkt. #2197 (Plaintiffs' Gateway *Daubert* Opposition Brief) at pp. 20-21.

[20] Dkt. #2197-29 at p. 42 (emphasis added). "All DRD in our jurisdiction underwent intensive case review and from 2011 through the third quarter of 2016 (with full-year projections where appropriate), cases were analyzed for basic demographic information (i.e., age, gender, race) and residency status (i.e., urban vs. suburban). More recent years (2015 and 2016) were also analyzed for education level and occupation based on death certificate entries for these variables. The more recent DRD were further stratified by lethal intoxicant represented by heroin, fentanyl, cocaine, OPR, and all others. In our earlier study, we used oxycodone data as a surrogate for OPR, as this has been the major driver of OPR trends in our region [citation omitted]. *Id.*

[21] *See State v. Toudle*, 2013-Ohio-1548, ¶ 20 ("[W]e find that an OARRS report is an official record of the state pharmacy board and is admissible under Evid.R. 803(8)."); OHIO REV. CODE ANN. § 313.10 (designating records of coroners, including medical examiners, as public records, with some exceptions); *Stanton v. Vasbinder*, No. 06-10432, 2009 WL 996955, at *10 (E.D. Mich. Apr. 13, 2009) ("[T]he factual observations in a medical examiner's autopsy report have sufficient 'indicia of reliability' to be admitted as a business record regardless of whether or not the examining pathologist testifies at trial."); *Miles v. Scutt*, No. 07-15068, 2008 WL 2949240, at *4 (E.D. Mich. July 29, 2008) (noting that "autopsy reports are business records" and are therefore admissible); *State v. Craig*, 110 Ohio St. 3d 306, 322, 853 N.E.2d 621, 639 (2006) (same).

testify to the evolution of these reports during the course of his tenure, showing the transition from prescription opioids to illicit heroin/fentanyl, as stated in the records kept pursuant to statute. Supplementing his deposition testimony, Dr. Gilson's article shows that prescription opioid mortality peaked in 2011, and that there was an inflection point from that year forward, in which heroin deaths rose and surpassed the declining numbers of prescription opioid deaths in Cuyahoga County, followed by a fentanyl spike beginning in 2014. Dkt. #2197-29 at p. 43, Figure 1. Dr. Gilson's article cites a trend toward lower numbers of death cases of patients with an opioid prescription within the preceding year, suggesting the possibility that "addicts may be circumventing the previously *well-established progression route from OPR to illicit drugs like heroin and fentanyl.*" *Id.* at p. 48 (emphasis added). This progression was "well-established" by the factual data evaluated by Dr. Gilson, as summarized above.

For these reasons, Defendants' Omnibus MIL No. 4 should be denied as to Dr. Gilson, and denied as moot as to Mr. Craig and Mr. Martin.

5. **Defendants' Omnibus MIL No. 5**: The Court should preclude evidence concerning lobbying and other protected petitioning activity.

As a preliminary matter, Plaintiffs dispute the underlying premise of Defendants' argument in support of this MIL (*i.e.*, that the lobbying and petitioning activities at issue in this case are constitutionally protected). It is well-established that neither the First Amendment nor the *Noerr-Pennington* doctrine immunizes fraud.[22] Regardless, Plaintiffs have clearly stated that they are not

---

[22] *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600, 606, 612 (2003); *Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513-15 (1972); *Wise v. Zwicker & Associates, P.C.,* 780 F.3d 710, 719 n.5 (6th Cir. 2015); *Potters Med. Ctr. v. City Hosp. Ass'n,* 800 F.2d 568, 580 (6th Cir. 1986). Defendants claim the fraud exception to *Noerr-Pennington* applies only in the context of an adjudicatory proceeding (Dkt. #2661 at p. 14 n.13). But at least some of Defendants' fraudulent communications with the government were made in an adjudicatory context, such as during enforcement-related proceedings or rulemakings. Additionally, the DEA's quota-setting process is unquestionably adjudicatory in nature, as it conducts public hearings, accepts evidence and argument from interested parties, makes findings of fact and conclusions of law, and its actions are guided by enforceable standards subject to review (21 C.F.R. §§ 1303.11 – 1303.13, 1303.31 – 1303.37, 1316.41 – 1316.68; 5 U.S.C. §§ 551-559; 21 U.S.C. §§ 826, 877). *Cf. Kottle v. N.W. Kidney Centers,* 146 F.3d 1056, 1062 (9th Cir. 1998) ("The CON determination by the Department [of Health] bears many indicia of a true adjudicatory proceeding. The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses. The Department must

attempting "to impose liability upon the Defendants for their lobbying or petitioning activities, nor do [they] argue that these activities were unlawful conduct." Dkt. #2090-1 at p. 3; Dkt. #2562 at p. 6 n.7. Thus, the question of whether or not these activities are constitutionally protected need not be decided here.[23]

Even assuming, *arguendo*, that Defendants' lobbying and petitioning conduct is constitutionally protected such that those activities could not directly give rise to liability, this does not mean evidence of that conduct is inadmissible at trial. Far from it. Rather, the United States Supreme Court, and courts throughout the country, have recognized that such evidence is still relevant and admissible to show the purpose and character of Defendants' wrongful activities. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.'"); *In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010) ("*Welding Fume II*") (noting that it previously declined to

---

issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case."); *DeLoach v. Philip Morris Companies, Inc.*, 1:00CV01235, 2001 WL 1301221, at *12 (M.D.N.C. July 24, 2001) (no *Noerr-Pennington* immunity for defendants who intentionally submitted false purchase intentions to the USDA that resulted in lower annual tobacco quotas).

[23] Although Plaintiffs are not seeking to impose liability on Defendants for their petitioning conduct, Plaintiffs do not waive any argument they may have at trial that certain petitioning conduct of Defendants is not constitutionally protected under the First Amendment or the *Noerr-Pennington* doctrine. Plaintiffs also do not concede that the *Noerr-Pennington* doctrine applies outside the antitrust context. Although the Sixth Circuit recognizes that other federal courts have applied the doctrine to common law claims, it has not yet definitively resolved the issue. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (acknowledging other federal courts have applied *Noerr-Pennington* to common law claims, but stating that it "need not decide that issue here because the Workers failed to state such a claim"); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) ("Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine.").

issue a pretrial, blanket ruling excluding all evidence of the defendants' lobbying activities, and in fact had "admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contain[ed] statements directly relevant to issues central to every *Welding Fume* case").[24]  For example, such evidence demonstrates

---

[24]  *See also Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136-39 (10th Cir. 2002) (district court did not abuse its discretion admitting evidence of defendant's misleading statements to Oklahoma Corporation Commission where offered "for the proper purpose of supporting the claim that [the defendant] acted for an improper monopolistic purpose"); *Alexander v. Natl. Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982) ("Exempt conduct may be considered, however, to the extent it tends to show the 'purpose or character' of other, nonexempt activity.  Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative.  While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.") (internal citations omitted); *Cipollone v. Liggett Group, Inc.*, 668 F. Supp. 408, 410-11 (D.N.J. 1987); *Gillis v. Murphy-Brown, LLC*, 7:14-CV-185-BR, 2018 WL 5928010, at *1 (E.D.N.C. Nov. 13, 2018) (noting that the *Noerr-Pennington* doctrine does not operate "in the manner in which defendant seeks to do here—[to] bar otherwise admissible evidence in a state law private nuisance lawsuit"); *In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) ("The Court disagrees that the *Noerr–Pennington* doctrine is applicable.  Nolte does not seek to hold AbbVie *liable* for its alleged petitioning activity; he intends to offer evidence of that activity to demonstrate AbbVie's motive or intent.  There is no general rule that evidence of activity that is protected by the First Amendment—speech, for example—is inadmissible.") (internal citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *15 n.4 (N.D. Cal. Oct. 30, 2017) ("The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. . . .  Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful.  Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2015 WL 8130449, at *1-2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Community Action League v. City of Palmdale*, CV 11-4817 ODW VBKX, 2012 WL 10647285, at *8 (C.D. Cal. Feb. 1, 2012); *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled the exclusion of evidence of two citizen's petitions one defendant submitted to the FDA and noting that the petitions were "relevant to defendants' knowledge regarding the safety of ibuprofen and the adequacy of its labeling"); *Adams v. U.S.*, 03-0049-E-BLW, 2009 WL 1259019, at *2 (D. Idaho May 3, 2009) (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington* because, among other things, such evidence was "relevant to plaintiffs' claims of misbranding and failure to warn, and shows the state of [the defendant's] knowledge which is relevant to many claims"); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, CV 00-1693-PA, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) ("[E]ven if the state lands transaction could not itself have been a basis for liability [under *Noerr-Pennington*], evidence regarding that transaction would likely have been admissible for other purposes, such as showing market share, the extent of any log sources available to competitors, the scope of the relevant market or markets, the manner in which Weyerhaeuser allegedly obtained and maintained its monopoly, the company's motives and intent, and to impeach credibility").

Defendants' knowledge and intent to participate in a RICO enterprise.[25]  For these reasons, courts

regularly deny motions *in limine* seeking to preclude evidence of lobbying and petitioning activities.[26]

Moreover, evidence of Defendants' lobbying activities will be particularly probative in this

case since Defendants, as they have already indicated, plan to argue that the DEA did not do enough

to enforce the law.  Plaintiffs are entitled to rebut this argument with evidence that, for example,

Defendants and their trade association (i) lobbied to limit the DEA's enforcement authority, and

(ii) influenced their Congressional allies to criticize the DEA in order to undermine the agency's

authority and effectiveness.

Defendants' cases do not support granting their *limine* request.  First, they cite *Octane Fitness,*

*LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), for the proposition that "[a]llowing

evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that

right."  Dkt. #2661 at p. 13.  In *Octane*, which involved the appropriateness of an attorney's fee

---

[25]  *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) ("Plaintiffs are not asserting that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*."); *Nat.-Immunogenics Corp. v. Newport Tr. Group*, SACV1502034JVSJCGX, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) ("While the evidence may ultimately be inadmissible under the <u>Noerr-Pennington</u> doctrine as a basis for liability, it may be admissible for some other purpose such as to show intent to participate in a RICO enterprise, in which case <u>Noerr-Pennington</u> would not be a bar to admissibility.").

[26]  *See, e.g., Welding Fume II*, 2010 WL 7699456, at *93; *In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (denying defendants' motion *in limine* to exclude lobbying evidence; "[T]he plaintiff seeks to offer evidence about how the defendants attempted to influence, petition, or communicate with Congress and/or the FDA to show their knowledge, state of mind, or intent.  It would be a stretch to say that <u>Noerr-Pennington</u> bars any use of any evidence of the defendants' petitioning of the government, and its agencies, or evidence of any communications with the FDA."); *Cipollone*, 668 F. Supp. at 410-11 (denying defendants' motion *in limine* to exclude evidence that defendants provided false and misleading information to Congress; court deferred decision of "whether the specific evidence to be offered is probative of a continuing course of conduct that corroborates plaintiff's direct allegations" until trial so that it could be "decided in context"); *Testosterone*, 2018 WL 305503, at *10 (denying defendant's motion *in limine* to exclude all evidence of defendant's lobbying efforts with the FDA); *Gen. Motors*, 2015 WL 8130449, at *1-2 (denying defendants' motion *in limine* to exclude evidence that it intentionally misled or concealed information from, or tried to influence, NHTSA); *Wolfe*, 2012 WL 38694, at *6 (denying defendants' motion *in limine* to exclude citizen's petitions submitted to the FDA); *Adams*, 2009 WL 1259019, at *2 (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington*).

award in a patent litigation case, the Supreme Court briefly discussed the *Noerr-Pennington* doctrine because the plaintiff had attempted (unsuccessfully) to analogize the standard for baseless litigation under that doctrine with the standard applicable under the Patent Act. 572 U.S. at 548, 555-56. The Court noted that it had "crafted the *Noerr-Pennington* doctrine . . . to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Id.* at 556. The case has absolutely nothing to do with the admissibility of petitioning-related evidence.

Defendants then cite *Snyder v. Phelps*, 562 U.S. 443 (2011), to support their argument that "plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy." Dkt. #2661 at pp. 14-15. But *Snyder* is entirely distinguishable. In that case, the plaintiff asserted various tort claims, including civil conspiracy, against the Westboro Baptist Church and some of its members based on their picketing of a military funeral. 562 U.S. at 447. At trial, the jury found in favor of the plaintiff. *Id.* The Supreme Court affirmed the reversal of the jury's verdict, holding that "the First Amendment shield[ed] the church members from tort liability for their speech in th[at] case." *Id.* at 447, 451-60.[27] Significantly, the defendants' picketing formed the *entire basis* for the plaintiff's tort claims in that case. *Id.* at 447.[28] Because the underlying torts upon which the alleged conspiracy was based failed, the civil conspiracy claim also failed. *Id.* at 460. This case does not address the admissibility of lobbying or petitioning evidence.[29]

---

[27] Notably, the Supreme Court noted that none of the defendants' statements were "provably false[.]" *Id.* at 451. And it also emphasized that its holding was "narrow." *Id.* at 460 ("We are required in First Amendment cases to carefully review the record, and *the reach of our opinion here is limited by the particular facts before us*.") (emphasis added).

[28] In the present case, to the contrary, Plaintiffs' claims are based on Defendants' (i) unlawful marketing and distribution of opioids through fraud and misrepresentation, and (ii) unlawful failure to prevent diversion and failure to monitor for, report, and prevent shipment of suspicious orders of opioids. It is the entirety of that wrongful conduct that forms the basis of Plaintiffs' civil conspiracy claims. *See, e.g., Taylor v. AirCo, Inc.*, CV 02-30014-MAP, 2003 WL 27382684, at *16 n.8 (D. Mass. Aug. 4, 2003) (rejecting defendants' argument that they were immune from liability based on their lobbying efforts under *Noerr-Pennington*; "Plaintiffs do not seek to have liability imposed solely on the basis of lobbying efforts. Rather, Plaintiffs allege 'a continuing course of deceptive conduct of which this activity was just one small part.' "), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003).

[29] Nor does this case address the *Noerr-Pennington* doctrine at all.

Defendants also claim "the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct[,]" citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157 (6th Cir. 1984) ("*Cleveland II*") and *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257 (N.D. Ohio 1980) ("*Cleveland I*"). Dkt. #2661 at p. 15. Of course neither of these opinions, which arise from the same *antitrust* case,[30] addresses the admissibility of petitioning evidence in cases involving nuisance, RICO, OPCA, or common-law conspiracy claims. Moreover, neither case even stands for the proposition that such evidence is *per se* inadmissible in antitrust cases.

In *Cleveland I*, the City of Cleveland brought an antitrust suit against an electric utility. 538 F. Supp. 1257. There were two trials, the first of which ended in a hung jury. *Cleveland II*, 734 F.2d at 1160. Prior to the second trial, the defendant sought to preclude the plaintiff from "enter[ing] upon a [specific] course of inquiry" in its examination of the "defendant's general attorney, the *sole purpose* of which [wa]s to elicit testimony" that would trigger the introduction of certain *Noerr-Pennington*-protected evidence that the court had *already determined* should be excluded based on the first trial. *Cleveland I*, 538 F. Supp. at 1278 (emphasis added). After noting that the protected conduct of which the plaintiff was seeking to introduce evidence was not relevant to the plaintiff's claims,[31] the court precluded the plaintiff from initiating that course of inquiry unless the defendant opened the door.[32] In other words, the court analyzed specific pieces of evidence of the defendant's *Noerr-Pennington*

---

[30] It is well established that, subject to certain exceptions, petitioning conduct, even if undertaken for anti-competitive purposes, is not sanctionable *under the Sherman Act*. *See Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

[31] *Id.* at 1279 ("In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit *which, the City concedes, did not actually affect the construction of the 69KV intertie*, the plaintiff may not inquire as to activity undertaken by CEI which was merely 'designed' to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection.") (emphasis added).

[32] *Id.* at 1279 ("Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of Noerr-Pennington conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may 'open the door' for the introduction of such conduct, as occurred during the first trial.").

protected conduct, determined that this evidence should be excluded, and then prohibited the plaintiff from questioning a witness in its case-in-chief with the sole purpose of triggering the introduction of the previously-excluded evidence. Contrary to Defendants' assertions otherwise, *Cleveland I* does not support granting Defendants' overly-broad MIL No. 5. In fact, that court explicitly stated that determinations as to the admissibility of petitioning-related evidence *should be deferred until trial*:

> [T]he weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the Noerr-Pennington doctrine, are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

*Id.* at 1265 (internal citations omitted).[33]

Defendants cite *Cleveland II* as affirming the *Cleveland I* decision (Dkt. #2661 at p. 15), but in actuality *Cleveland II* affirmed the district court's judgment on the jury's defense verdict from the second trial. 734 F.2d at 1160, 1169.[34] The plaintiff appealed, arguing, among other things, that the trial judge erred by refusing to admit into evidence information regarding the defendant's secret sponsorship of a lawsuit challenging an order by the Federal Power Commission requiring the defendant to interconnect with the plaintiff's utility company. *Id.* at 1161-62. The plaintiff claimed the evidence demonstrated the defendant's "anticompetitive intent to exclude [the plaintiff's utility

---

[33] The court also recognized that courts are "vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine." *Id.* at 1277.

[34] Defendants also purport to quote certain language from *Cleveland II* in their motion, implying that this was a direct quote by the Sixth Circuit's majority opinion. Dkt. #2661 at p. 15 ("Allowing such questioning would 'gut the constitutional protection afforded under the Noerr-Pennington doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.' *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171."). In fact, this is a direct quote from the district court in *Cleveland I* (538 F. Supp. at 1279), which is then re-quoted in a parenthetical to a citation to *Cleveland I* in the *dissent* to *Cleveland II*. 734 F.2d at 1171.

company] from the retail electric power market." *Id.* at 1161. The district court ruled that the evidence was "inadmissible on the basis of the *Noerr-Pennington* Doctrine." *Id.* at 1161-62. The Sixth Circuit held that the district court had not abused its discretion in excluding the evidence because the conduct was "not the kind of antitrust activity that is admissible to prove a Sherman Act violation" and the plaintiff's purpose in introducing the evidence "was to show the anticompetitive character and nature of [the defendant's] conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers[,]" which was "not an admissible basis for its introduction[.]" *Id.* at 1162-63. The court further noted that the evidence was cumulative because the defendant had already admitted at trial that its objective was "to reduce and *eliminate* competition with its competitor" and the plaintiff had introduced considerable other evidence of the defendant's anti-competitive conduct. *Id.* at 1164. Thus, *Cleveland II,* similar to *Cleveland I*, simply reiterates that the balancing test for whether a particular piece of petitioning-related evidence is admissible requires a fact-specific inquiry that should be deferred until trial.

Defendants' Rule 403 arguments are also without merit. They claim that "evidence of lobbying activity is considered presumptively prejudicial." Dkt. #2661 at p. 15. But the cases they cite for this proposition—all of which, not surprisingly, arise in the antitrust context—are entirely distinguishable. In *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986) ("*U.S. Football I*"), the plaintiffs brought various antitrust claims against the NFL. *Id.* at 1158. The NFL sought summary judgment on certain of these claims that related to the NFL's actions "directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities." *Id.* at 1176. The NFL argued that the stadium-related claims were barred under the *Noerr-Pennington* doctrine because the conduct at issue almost entirely consisted of the NFL's lobbying of state and local governments on issues related to stadium lease approvals. *Id.* at 1177-78. The court held that such conduct could not "give rise to liability under the federal antitrust laws." *Id.* at 1180. It recognized, however, that evidence of stadium-related conduct could potentially be "probative of the 'purpose and character' of the transactions" that formed the basis of some of the

plaintiffs' other claims. *Id.* at 1180 (quoting *Pennington*, 381 U.S. at 670 n.3). And it expressly acknowledged that the admissibility of this evidence should be determined *during the trial*: "Since the admissibility or exclusion of such 'purpose or character' evidence will be within this Court's discretion at trial, *it would be premature to rule on such matters at this time*." *Id.* (internal citation omitted) (emphasis added). Despite this acknowledgement, the court proceeded *in dicta* to make some "preliminary observations" regarding the potential admissibility of such evidence at trial. *Id.* The court emphasized the need to weigh the probative value of the evidence against the risk of undue prejudice. *Id.* at 1180-81. The court noted that the evidence was largely irrelevant to the plaintiffs' remaining claims and had significant evidentiary problems, including that most of it was hearsay. *Id.* at 1181 & n.13. It was during this *dicta* analysis that the court stated: "Given such risks, the exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception *in an antitrust case*." *Id.* at 1181 (emphasis added).[35] But even if the present case was an antitrust case (which it is not), and even if the 33-year-old *dicta* of a district court outside this circuit was binding on this Court (which it is not), *U.S. Football I* does not support granting Defendants' *limine* request. To the contrary, it *reaffirms* Plaintiffs' argument that such determinations should be deferred until trial, where the Court will have the benefit of a developed record in order to analyze whether a specific piece of lobbying-related evidence is admissible. 634 F. Supp. at 1180.

---

[35] In their motion, Defendants cite *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988) ("*U.S. Football II*") as affirming the district court's *U.S. Football I* opinion. Dkt. #2661 at p. 15. In actuality, the Second Circuit's opinion affirmed the district court's denial of the plaintiffs' *post-trial* motions which dealt with issues that arose *during* the trial. *Id.* at 1340-41. In fact, the appellate court noted that the district court's summary judgment ruling "in favor of the NFL on the USFL's stadium-related claims on *Noerr-Pennington* grounds" had "not been appealed." *Id.* at 1350 n.13. The Second Circuit acknowledged that the district judge actually admitted some lobbying evidence at trial, but also held that he had not abused his discretion in excluding certain other lobbying evidence during the trial based on the specific circumstances of that case. *Id.* at 1373-75. Notably, the appellate court did not state that such evidence was "presumptively prejudicial"; rather, it acknowledged that lobbying evidence "may be admitted . . . 'if it tends reasonably to show the purpose and character of the particular transactions under scrutiny,' and that evidence is more probative than prejudicial." *Id.* at 1374 (internal citation omitted); *see also id.* ("Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence.").

In *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), which is also an antitrust case, the court never said lobbying/petitioning evidence is "presumptively prejudicial." Rather, in determining whether the district court properly granted summary judgment on one of the plaintiff's antitrust claims, the Fifth Circuit acknowledged that "[e]vidence of activity that is protected by the Noerr doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defendants." *Id.* at 543 n.7. The court determined that a specific piece of petitioning evidence was inadmissible in that case because "[i]ts evidentiary value to the plaintiff [wa]s far outweighed by the defendants' first amendment interests." *Id.* Specifically, the court found that "the probative value of this evidence [wa]s low" because "[a]s evidence of the alleged conspiracy it [wa]s cumulative" and "[a]s evidence of [the defendant's] state of mind it [wa]s exceedingly weak[.]" *Id.* As with *U.S. Football I*, this case does not support the granting of Defendants' broad *limine* request; rather, it reaffirms that the admissibility of lobbying evidence is a fact-specific inquiry that is best reserved for trial.

Finally, *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) is yet another antitrust case in which the appellate court analyzed whether the district court erroneously declined to consider evidence of the defendants' lobbying activities when deciding whether to grant the defendants' summary judgment motion. *Id.* at 458, 466-67. In *Weit*, the plaintiffs alleged that the defendant banks "conspired to fix the interest rate paid by consumer credit cardholders on extended payments[.]" *Id.* at 548. After *eight years* of discovery, the plaintiffs "failed to produce any significant probative evidence to support the[ir] complaint[,]" leading the district court to grant summary judgment in favor of the defendants. *Id.* On appeal, the plaintiffs argued, among other things, that the district court erred by not considering evidence of the defendants' lobbying efforts to influence the passage of a bill in the legislature that would allow the banks to charge an increased interest rate. *Id.* at 461, 466-67. The district court did not exclude that evidence because the conduct was immunized from antitrust liability under *Noerr-Pennington*, but rather because "the prejudicial quality of this evidence outweighed its probative value." *Id.* at 466. The Seventh Circuit held that the district court "correctly excluded this evidence from consideration on

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id. See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

 **6.** **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

In fact, there is abundant evidence in the record that the opioids Defendants shipped migrated beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.[37] The Ohio Department of Mental Health and Addiction Services was aware of the migration of opioids into Ohio.[38] Defendants were regularly alerted to the migration phenomenon by the DEA,[39] and their personnel acknowledged the reality of diversion and migration in their depositions.[40] With respect to Walgreens, Plaintiffs' expert James Rafalski opined that Walgreens was familiar with the Florida phenomenon in part because its pharmacy managers alerted their supervisors to the high volume of prescriptions coming from out of state:

> Walgreens's also knew opioids it distributed in Florida were migrating into Ohio. Because Walgreens failed to maintain many pre-2012 documents outside of those produced to the DEA during the Jupiter DC investigation, many of the pre-2012 documents Walgreens produced relate to Walgreens distribution in Florida. This information is highly relevant to CT1, however, because not only does the evidence show that Walgreens's distribution failures were "systemic", as noted by the DEA in the 2013 MOA, but the evidence further shows that Walgreens knew and/or should have known that the high-volume Florida prescriptions were traveling out of state, including to Ohio. For example, Pharmacy managers in Florida alerted their supervisors and the distribution center that they were ordering 55+ bottles a week (where 30 bottles was an admitted red flag) and that many of the prescriptions were coming from out of state. Walgreens was well familiar with the "Florida migration"

---

[37] See, e.g., **Ex. 5** [CAH_MDL_2804_031944472] at p. 118 (vast majority of Florida pain clinic patients came from out-of-state, including Ohio); **Ex. 6** [FTIMDL00039536] (most drug customers travel to Florida from Ohio and elsewhere); **Ex. 7** [HDS_MDL_00455124] (travelers seeking opioids come "by the thousands" to Florida from Ohio and elsewhere); **Ex. 8** [ABDCMDL00360134] at Slide 7(2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to Ohio and other states); **Ex. 9** [MCKMDL00407451] at 465(McKesson presentation depicting "Drug Diversion Migration Out of Florida" to Ohio and elsewhere); **Ex. 10** [WAGMDL00441398—1431] (describing case studies of diverted opioids migrating to Ohio); **Ex. 11** [WAGMDL00049752] at 759 ("this is not just a Florida problem").

[38] See **Ex. 12** [*Ohio Substance Abuse Monitoring Network Surveillance of Drug Abuse Trends in the State of Ohio*, CUYAH_001656831] at 834, 840, 913, 924 (Cleveland region law enforcement and others note influx of prescription opioids from outside Ohio).

[39] See, e.g., **Ex. 13** [CAH_MDL_02448227] at 378—80; **Ex. 14** [US-DEA 00000001 – 141]; **Ex. 15** [WAGMDL00289068] at 153.

[40] See, e.g., Dkt. #1962-24 (8/1/18 Hartle Dep.) at 318:24 – 321:2.

phenomenon, in which prescription opioids were being dispensed in Florida and transported north to states include Ohio, and knew that "Interstate 95 has been renamed the Oxycodone Express because of the brisk travel of people from Kentucky, Tennessee, [and] Ohio to South Florida to obtain medications." When the DEA issued Orders to Show Cause to Walgreens's Jupiter Distribution Center and six Florida Walgreens pharmacies, the DEA specifically noted likely migration to Ohio."

Dkt. #1895-19 (Rafalski Expert Rep.) at p. 121; *see also* Dkt. #1969-19 (5/14/19 Rafalski Dep.) at 552:13-554:6 (testifying as to the basis for his opinion and observing that "by this time period, everybody knew there was a problem in Florida").

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped tens of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them. Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Dkt. #1895-19 (Rafalski Expert Rep.) at pp. 46-186. Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. *See id.* at p. 62 (noting that DEA enforcement actions against Cardinal in Maryland and Florida involved increasing thresholds despite evidence indicating potential diversion, and that these actions identified a systematic problem in Cardinal's nationwide distribution operations); *id.* at p. 79 (observing that the DOJ recognized that there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective

controls against diversion); *id.* at p. 85 (ABDC's settlement with the DOJ arose from failures in its SOM program, which were systematic because ABDC maintained national SOM policies and procedures); *see also, e.g.,* Dkt. #1971-2 (10/16/18 Stahmann Dep.) at 94-96. Because the SOM programs were implemented nationally, not regionally, each suspicious order filled by Defendants is also evidence of the flaws in Defendants' SOM programs, wherever it shipped to. For this reason, as well, Defendants' efforts to exclude this highly probative evidence must be denied.

### 7. **Defendants' Omnibus MIL No. 7: The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.**

In their Omnibus MIL No. 7, Defendants argue that evidence of their CSA violations is irrelevant because it does not establish certain elements of Plaintiffs' claims. First, that is not true, as discussed in greater detail below.[41] Moreover, Defendants are attempting to use this MIL to re-litigate issues decided on summary judgment, which the Sixth Circuit has held is improper. *See Louzon*, 718 F.3d at 558, 563 (defendant moved *in limine* to exclude plaintiff's "evidence of comparable employees on the basis that none were similarly situated as a matter of law[,]" arguing this evidence was irrelevant to plaintiff's discrimination claims; court held this was an improper motion *in limine*: "[T]his argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings. Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant. Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.").

This Court has determined that whether Defendants violated their duties under the CSA or its implementing regulations must be resolved by the jury in the upcoming trial:

---

[41] And, regardless, "a piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dortch*, 588 F.3d at 401. *See also Morningstar*, 2018 WL 3721077, at *1 (same).

> The Court . . . finds the record is replete with disputes of material fact as to whether each Defendant complied with its obligations under the CSA, which preclude summary judgment. In these circumstances, it is a jury that must determine the credibility of the evidence, the weight to be given to the evidence, and any inferences to be drawn from the facts presented. Put simply, while the Defendants had a duty not to ship suspicious orders, there are disputes of fact as to whether, and when, each Defendant's SOMS was adequate, whether orders were suspicious, and whether each Defendant did actually ship suspicious orders (or instead, identified it as suspicious but then, through due diligence, dispelled that suspicion.

Dkt. #2483 at pp. 20-21 (internal citations omitted). *See also id.* at p. 32 ("[T]he Court finds the record is replete with material factual disputes regarding whether Defendants furnished false information or omitted material information, and, if so, whether they did so knowingly or intentionally."). By arguing that Plaintiffs cannot submit evidence of Defendants' CSA violations at trial, Defendants are effectively seeking to invalidate this Court's summary judgment rulings. This they cannot do.

Additionally, Defendants are simply wrong when they argue that their CSA violations are not relevant to Plaintiffs' claims. They largely reiterate the same erroneous arguments they made on summary judgment. These arguments were refuted in Plaintiffs' summary judgment briefing, which is incorporated by reference as if fully set forth herein. Dkt. #2545 at pp. 68-81; Dkt. #1924 at pp. 20-25. However, a number of their arguments bear some additional discussion here.

For example, Defendants claim that a violation of 21 U.S.C. § 843(a)(4)(A) "based on failure to comply with 'suspicious' order duties" cannot serve as a racketeering predicate act in this case. Dkt. #2661 at pp. 18-19. The Court has rejected this argument numerous times. Dkt. #2580 at p. 3 ("[T]he Court reaffirms its legal conclusion that a violation of 21 U.S.C. § 843(A)(4)(a) can constitute a predicate act under 18 U.S.C. § 1961(1)(D); and the Court further concludes that, at a minimum, Distributors have failed to demonstrate there is no genuine dispute of material fact regarding whether they violated § 842, § 843."); Dkt. #1025 at pp. 45-47; Dkt. 1203.[42]

---

[42] Additionally, Defendants' CSA violations are clearly felonious pursuant to § 841(a) and § 843(a)(4)(A). *See, e.g,* Dkt. #2545 at pp. 73-76.

Defendants also, yet again, argue that a violation of CSA *regulations* is not a violation of law punishable as a crime for purposes of 18 U.S.C. § 1961(1)(D).[43]  But this Court has flatly rejected the argument that the relevant CSA regulations do not have force of law.  Dkt. #2483 at p. 15 ("As a regulation promulgated pursuant to Congressional authority, Section 1301.74 is legislative in nature and has the full force and effect of law.") (citing cases).  Defendants cite *U.S. v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), in support of their argument, but that case is distinguishable.  In *Alghazouli*, which did not involve RICO at all, the court decided whether a regulatory violation satisfied the "contrary to law" requirement in 18 U.S.C. § 545, a statute prohibiting the fraudulent or knowing importation of merchandise "contrary to law[.]"  *Id.* at 1182-83.  After analyzing the statutory history, the court determined "that Congress intended 'law', *as used in § 545*, to include a regulation only if a statute specifies that the violation of that regulation is a crime."  *Id.* at 1187 (emphasis added).  Unlike the statutes at issue in *Alghazouli*, CSA §§ 841 and 843 do not criminalize conduct that is "contrary to law," but rather conduct that violates "this subchapter" (*i.e.*, Subchapter I of the CSA and regulations promulgated thereunder).

Next, Defendants claim that evidence of their CSA violations "does not establish intent to defraud a victim of money or property, as required for mail and wire fraud[,]" citing *U.S. v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003).  The cited portion of *Daniel* simply provides the elements of a wire fraud claim; that case does not involve or discuss violations of the CSA.  329 F.3d at 485.  Defendants' CSA violations are certainly relevant to the issue of intent to defraud.  Defendants intended to induce the medical community and individual patients to purchase more opioids than they otherwise would have purchased "by means of false or fraudulent pretenses, representations, or promises[.]"  18 U.S.C. § 1343; *Daniel*, 329 F.3d at 488 ("It is sufficient that the defendant by material misrepresentations intend the victim to accept a substantial risk that otherwise would not have been taken").  In order to serve that purpose, Defendants violated the CSA and made

---

[43]   They further argue that because these violations are not relevant to establishing RICO predicates, they are not relevant to establishing "corrupt activities" for purposes of OCPA.  Because the violations *are* relevant to establishing RICO predicates, Defendants' OCPA-related arguments also fail.

misrepresentations regarding same. Thus, evidence of Defendants' violations is relevant to Plaintiffs' wire and mail fraud allegations. Of course, even if Defendants' CSA violations were not relevant to their intent to defraud, they are relevant to various elements of Plaintiffs' other claims, as described herein.

Moving on to Plaintiffs' statutory public nuisance claim, Defendants reiterate their argument that CSA regulations do not constitute "laws . . . of the United States of America . . . controlling the distribution of a drug of abuse" for purposes of OHIO REV. CODE § 4729.35. Dkt. #2661 at p. 20. Again, this argument has already been rejected by this Court. *See* Dkt. #2483 at p. 15; Dkt. #2578 at p. 8 ("[T]he Court recently determined that the record demonstrates material issues of fact as to whether each Defendant complied with CSA obligations, and that conclusion applies here. Manufacturers' contention that no violation supporting the statutory nuisance claim has been identified in this litigation is without merit and does not warrant summary judgment.") (internal citation omitted). Defendants now try to argue that the fact that § 4729.35 separately lists "any rule of the board of pharmacy controlling the distribution of a drug of abuse" means that its reference to "laws" cannot be interpreted to include regulations. But "rules" are not the same thing as "regulations." Even the Controlled Substances Act differentiates between the two. *See, e.g.,* 21 U.S.C. § 821 ("The Attorney General is authorized to promulgate rules *and* regulations . . . relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances . . .") (emphasis added); 21 U.S.C. § 871(b) ("The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his function under this subchapter."). Under Defendants' interpretation, violating a "rule of the board of pharmacy controlling the distribution of a drug of abuse" is sufficiently "inimical, harmful, and adverse to the public welfare of the citizens of Ohio . . . to constitute a public nuisance[,]" but violating federal regulations controlling the distribution of a drug of abuse is not.[44] This makes no sense and is not consistent with the purpose of the statute, which is

---

[44] Presumably, if the Ohio legislature intended this interpretation, it could have easily used the word "statutes" instead of "laws."

to penalize "unlawful" distribution of "drug[s] of abuse," such as opioids.  OHIO REV. CODE § 4729.35.

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51 (2002), is inapposite.  In that case, the Supreme Court was determining whether an express preemption clause in the Federal Boat Safety Act of 1971, which states that it applies to "a [state or local] law or regulation[,]" encompassed common-law claims.  *Id.* at 63.  The Court determined it did not, reasoning:

> [B]ecause "a word is known by the company it keeps," the terms "law" and "regulation" *used together* in the pre-emption clause indicate that Congress pre-empted only positive enactments.  If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render *the express reference to "regulation" in the pre-emption clause* superfluous.

*Id.* (internal citation omitted) (emphasis added).

Defendants next claim that their CSA violations are irrelevant to Plaintiffs' common law absolute public nuisance claims because Plaintiffs are required to prove that Defendants "violated a 'safety statute' " in order to recover on those claims.  To begin with, that is not true.  Defendants may also be held liable for intentional and unreasonable conduct causing the public nuisance. *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 n.4 (Ohio 2002) ("With an absolute nuisance, the wrongful act is either intentional *or* unlawful . . .") (emphasis added); CV 621.05 Absolute nuisance–intentional acts [Rev. 3-18-02], 1 CV Ohio Jury Instructions 621.05 ("Ohio has recognized that an intentional act can form the basis for an absolute nuisance.").[45]  Moreover, the Ohio Supreme Court has clearly stated that violations of statutes *or regulations* involving public health or safety can establish a public nuisance: "[A] 'public nuisance' is 'an unreasonable interference with a right common to the general public.'  'Unreasonable interference' includes . . . conduct that is contrary to a statute, *ordinance or regulation* . . ."  *Beretta*, 768 N.E.2d at 1142 (internal citations omitted) (emphasis added); *see also id.* (noting it has "often applied public nuisance laws to actions

---

[45]  In *Taylor v. City of Cincinnati*, 55 N.E.2d 724 (Ohio 1944), the Ohio Supreme Court merely stated that the violation of a safety statute is one way to establish an absolute nuisance.  *Id.* at 728.  But the court also noted that an absolute nuisance can be established when "the actor commits and intentional act involving a culpable wrong."  *Id.* at 727.

connected . . . to statutory *or regulatory* violations involving public health or safety") (emphasis added)).[46]  Regardless, Plaintiffs have alleged violations of the CSA itself (*e.g.*, § 841, § 843) in Defendants' failure to maintain effective controls against diversion.  The CSA is clearly a statute setting forth specific legal requirements for the protection of others.  *See* 21 U.S.C. § 801 (in the introductory provisions to the CSA, Congress finds and declares that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people").  Finally, *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198 (Ohio 1998), is entirely inapposite as it addressed negligence *per se* claims, not nuisance claims.  *Id.* at 200-03 (holding "the violation of an administrative rule does not constitute negligence *per se*").

Defendants' CSA violations also are relevant to Plaintiffs' civil conspiracy claims.  In its order denying Defendants' summary judgment motion as to those claims, this Court explained that the "unlawful act" element of civil conspiracy "requires existence of an underlying unlawful act that is actionable in the absence of a conspiracy"[47] and that the unlawful act of any one member of the conspiracy is sufficient to satisfy this element.  Dkt. #2562 at p. 4.  The Court noted that Plaintiffs had alleged "unlawful acts of fraudulent marketing and Defendants' 'near uniform CSA noncompliance[,]' " and held that these issues "present[ed] factual disputes that must be evaluated by a jury."  *Id.*  Defendants' CSA violations are some of the unlawful activities on which Plaintiffs' underlying tort claims are based.  Specifically, these violations form the basis of Plaintiffs' nuisance, RICO, and OPCA claims, all of which are torts separate from the conspiracy itself that Plaintiffs are pursuing against each Defendant.  For that reason, Defendants' cases are inapposite.[48]

---

[46] *See also* RESTATEMENT (SECOND) OF TORTS § 821B(2)(b) (unreasonable interference with a public right may be shown by "conduct [that] is proscribed by a statute, ordinance, *or administrative regulation*") (emphasis added).

[47] *See also* CV 443.01 Civil conspiracy [Rev. 12-1-07], 1 CV Ohio Jury Instructions 443.01 ("The unlawful act must be an unlawful act 'independent' of the existence of the conspiracy.  In other words, there must be an underlying unlawful act actionable in the absence of the conspiracy.").

[48] *See State ex rel. Morrison v. Wiener*, 83 N.E.3d 292, 295-99 (Ohio App. 9th Dist. 2017) (granting summary judgment on plaintiffs' civil conspiracy claim because plaintiffs failed to allege any underlying torts

As Defendants' CSA violations are relevant to all of Plaintiffs' claims, Defendants' request for an instruction to the jury as to the limited relevance of this evidence to particular causes of action should be denied. Dkt. #2661 at p. 22. Plaintiffs have no objection to the jury being instructed as to the definition of "suspicious orders" under CSA regulations. *Id.* However there is no basis, and Defendants fail to offer any justification, for "instructing the jury that 'suspicious' orders are not evidence of diversion or likely diversion." *Id.* The very purpose of monitoring for suspicious orders is to prevent diversion. Certainly evidence of an order that was, or should have been, flagged as suspicious is *some* evidence of likely diversion. If Defendants have proof that a particular suspicious order was not diverted, they are certainly able to make such an argument at trial. Defendants' requested instruction seeks to prevent the jury from weighing such evidence and is therefore improper and unwarranted.

Finally, Defendants ask the Court to preclude any testimony "that purports to set out, or opine on, the content of the law, whether on 'suspicious' order duties or any other subject." Dkt. #2661 at p. 22. Presumably, since Defendants request this relief, they will have no objection to Plaintiffs' *limine* request #13, which seeks to preclude "[a]ny argument or suggestion that the [CSA] and its implementing regulations do not impose, or have not always imposed, on registrants an identification duty, reporting duty, and no-shipping duty with respect to suspicious orders[,]" since such argument or suggestion would not only address the content of the law but directly contradict this Court's prior summary judgment rulings. Dkt. #2652 at pp. 10-11. Of course, Plaintiffs' *limine* request identified specific statements regarding the law that should be excluded because they would conflict with the Court's prior rulings. Defendants' request, on the other hand,

---

supporting the conspiracy claim in their complaint and noting that even if the plaintiffs had pled the underlying torts they raised for the first time in their summary judgment response, they failed to meet their burden of pointing to any triable issues of material fact with respect to civil conspiracy based on those underlying torts); *Davis v. Clark Cty. Bd. of Commrs.*, 994 N.E.2d 905, 909-11 (Ohio App. 2d Dist. 2013) (dismissing plaintiff's civil conspiracy claim because the underlying torts on which he based that claim were barred by the statute of limitations); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) (noting that, in that case, the "success of [the plaintiff's tort] claims d[id] not depend upon a determination of whether defendants violated the regulation").

is overly broad, vague, and would encompass all legal conclusions (regardless of whether they conflicted with the law as determined by the Court). Dkt. #2661 at p. 22 ("The Court should therefore exclude any evidence on the meaning of law."). Whether certain testimony or evidence offers an inadmissible legal conclusion depends on the content of such testimony or evidence, and the context in which it is offered. As the Sixth Circuit noted in *U.S. v. Smith*, 70 Fed. Appx. 804 (6th Cir. 2003) (unpublished), when deciding whether testimony containing a legal conclusion should be allowed, " '[t]he best resolution . . . is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' " *Id.* at 809 (citation omitted).[49] Thus, Defendants' blanket *limine* request should be denied.

### 8. **Defendants' Omnibus MIL No. 8: The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.**

Defendants' request for a hearing prior to the presentation of any expert's testimony should be denied. While a party must establish the necessary foundation for their experts' testimony, pre-testimony hearings are neither required by the Federal Rules of Evidence nor necessary in this case, particularly given the significant resources this Court has already expended ruling on dozens of *Daubert* and summary judgment motions. *Cf.* FED. R. CIV. P. 1 (mandating that the parties and Court refrain from wasting resources).[50] Defendants' proposal would serve only to interrupt the trial and allow Defendants to re-litigate issues which they previously lost.

---

[49] In that case, for example, the court held that a witness's opinion that the firearm at issue "belonged" to the defendant based on its location was admissible in an unlawful possession case. *Id.* ("Though Kurowski twice stated that he believed that the gun belonged to Smith, the term 'belong' does not have a meaning identical to the legal term 'possession' contained in the statute. Moreover, even if Kurowski had used the term "possession," in the present context, there is no distinction between the legal term of art and the common vernacular usage that would render the testimony inadmissible under [Federal] Rule [of Evidence] 704.").

[50] Plaintiffs proposed to stipulate to Defendants' language that: "The Parties shall be required to establish the necessary foundation for their experts' testimony." Defendants declined, instead indicating that for their motion to be mooted, an additional sentence would be required: "Before any expert is called to testify, the opposing side may request a hearing outside the presence of the jury to address whether the requirement has been satisfied." Such an additional mechanism not contemplated by the Federal Rules is not necessary to address Defendants' concerns in this case.

Defendants' cases do not support a different conclusion. Most instead emphasize that expert testimony is liberally admitted before a jury. *See McLean v. 988011 Ontario*, 224 F.3d 797, 806 (6th Cir. 2000) (reviewing a grant of summary judgment finding that the lower court had erred by prohibiting the expert testimony which was "sufficiently rooted in the available evidence to make out a reasonable theory . . . and [] plaintiffs should have been allowed to take their negligence theory to a jury"); *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (applying the *Daubert* standards to the "district court's initial decision to exclude [Plaintiffs expert's] testimony was an abuse of discretion"); *Torey v. Nike, Inc.*, 1:12CV446, 2014 WL 3510636, at *14 (N.D. Ohio 2014) (applying the *Daubert* standards to expert testimony). Given that this Court has already evaluated these experts' qualifications and opinions under the *Daubert* standard, there is no need to predetermine there is a need for a hearing in each case. To the extent such a need arises, if it arises, the Court is more than capable of making that determination during trial.

Another of Defendants' cases, *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989), also supports permitting the court to make this determination at trial and discusses the proper method for objections to testimony based on assumptions not in evidence. The Sixth Circuit found that the district court did not err in excluding prior expert testimony via *videotape* "based on assumptions not in evidence, but rather assumptions based on plaintiff's version of events." *Id.* In doing so, the district court reasoned: "If you were asking these questions at this time there would be objections in terms of foundation or assumes a fact not in evidence, and I would have to sustain that objection, so we have a problem with this testimony." *Id.* Here, Plaintiff's experts will be testifying live and Defendants will have every opportunity to make such objections should Plaintiffs not lay the proper foundation for their expert's testimony.

Defendants also assert a variety of hypothetical arguments that Plaintiffs will ultimately be unable to demonstrate at trial that certain of their expert's assumptions are valid. Setting aside that Defendants are incorrect, what matters for present purposes is the point made above: Plaintiffs either will or will not lay a proper foundation for their experts, just as Defendants either will or will not lay a proper foundation for theirs. Additional hearings are wasteful. Indeed, the Court has

1845586 1   42

already ruled that any purported assumptions will be properly tested at trial, not that another *Daubert* hearing be held before the expert can testify. *See, e.g.*, Dkt. #2558 at p. 14 (Op. & Order Granting in Part and Denying in Part Mot. to Exclude Kessler and Perri) ("If this is a faulty assumption, as Defendants allege, they will have the opportunity for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack Perri's opinions." (citing *Burgett v. Troy–Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014)); Dkt. #2492, at p. 18 (Op. & Order Denying Mot. to Exclude Keller) ("If the party positing the hypothetical fails to independently prove the facts assumed, the jury is free to disregard the conclusion of the witness." (citing *United States v. McCafferty*, 801 F. Supp. 2d 605, 621 (N.D. Ohio 2011)); Dkt. #2495, at p. 13 (Op. & Order Denying Mot. to Exclude Rosenthal) ("Of course, Defendants are free to challenge Rosenthal's assumption – and Defendants may well convince a jury it is not true that all of defendants' detailing was fraudulent and tainted by misrepresentations – but her central assumption does not render her opinion inadmissible." (citing *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002)).

As noted, in the event Defendants later continue to disagree with a particular expert's testimony, they are able to address it by *inter alia* (i) cross-examination, (ii) their own case-in-chief, (iii) a Rule 50 motion, or (iv) another motion made at trial. The Court is perfectly capable of addressing any issues that may arise at trial without the need for further evidentiary hearings to ensure proper foundation. Defendants' Omnibus MIL No. 8 should be denied.

9. **Defendants' Omnibus MIL No. 9**: The Court should not allow use of certain charts presenting misleading and irrelevant data.

Defendants seek to exclude certain charts that are attached to Plaintiffs' expert Dr. Craig McCann's report[51] on the basis that they are potentially misleading. But Defendants identify nothing that is actually or inherently misleading about these charts. Each of the points raised by Defendants, that the charts include data relating to shipments outside the CT-1 jurisdictions and/or by non-

---

[51] Dkt. #2661 at p. 25 n. 19 (listing the charts Defendants seek to exclude).

defendants, and that charts do not identify specific pharmacies or specific diverted orders, is a matter that Defendants can readily address through objections to any direct examination of Dr. McCann that they believe is misleading and through their own cross-examination. Indeed, Defendants' challenges regarding the purported methodological flaws regarding Dr. McCann's processing of the ARCOS data and Defendants' own transactional data have already been rejected at the *Daubert* phase, with the Court specifically recognizing that Dr. McCann's methodological choices go to weight rather than admissibility, and permitting Defendants to cross-examine Dr. McCann on the choices he made. Dkt. #2494 at pp. 15-21.

The subject charts provide valuable background information in support of Dr. McCann's opinions, including information that Plaintiffs will use to show what orders – based on non-controversial data from ARCOS and Defendants' own production – should have been flagged as suspicious and therefore ultimately caused the harm Defendants are responsible for. Defendants' generalized concerns regarding how this data was analyzed or whether they are an appropriate methodological fit do not warrant their exclusion. *See, e.g., Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 871 (W.D. Mich. 2008) ("Factual questions should not be resolved through motions in limine."); *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No. 3:10-CV-00670-H, 2013 WL 1403493, at *1 (W.D. Ky. Apr. 5, 2013) (denying motion *in limine* where cross examination would be sufficient to address deficiencies in expert testimony or opinions); *Quillen v. Safety-Kleen Sys., Inc.*, No. CIV.A. 07-67-EBA, 2010 WL 8357353, at *1 (E.D. Ky. May 27, 2010) (denying motion *in limine* where alleged errors in expert opinion could be the subject of cross examination).

**10.** **Defendants' Omnibus MIL No. 10: The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.**

As the Court has repeatedly noted, the parties in this litigation are represented by some of the most experienced and accomplished trial attorneys in the country. They all know how to try cases. Defendants' Omnibus MIL No. 10 is an attempt to improperly curtail proper, and long-standing, trial advocacy. Defendants' MIL seeks to preclude, among other things, "ad hoc drawings

or other visual aids during examination of witnesses," alleging that such tactics "belittle" witnesses or "mischaracterize" testimony. This assertion is wrong, and the MIL should be denied.

In the first place, the motion is overly broad and vague, making it practically unenforceable. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) ("The Court finds that the request is too broad and will handle any individual objections at trial."). In *Yasmin*, the court denied two requested motions *in limine* because they were overly broad – one seeking to exclude "all evidence regarding unrelated corporate controversies," and one seeking to exclude "media reports." The court correctly concluded that those matters were better addressed during trial, when the relevance and admissibility of particular items could be more appropriately evaluated.

The same is true here. Lawyers have used visual aids in trial for decades – flip charts, white boards, and presumably chalk boards before those. The "ELMO" document projector is merely the latest iteration of the chalk board. There is nothing inappropriate or unusual about using such visual aids during witness examination. In fact, such aids are very useful in assisting the jury who are trying to follow complex testimony covering subject areas about which they likely have no prior experience. As one authoritative evidence treatise notes,

> It is today increasingly common to encounter the use of demonstrative aids throughout a trial. These aids are offered to illustrate or explain the testimony of witnesses, including experts, or to present a summary or chronology of complex or voluminous documents. Counsel also rely on such aids during opening and closing statements. Demonstrative aids take many forms; the types discussed in this Section are duplicates, models, hand drawn maps, charts, drawings, diagrams, and computer-generated pedagogic aids. *Unlike real evidence, the availability of which will frequently depend upon circumstances beyond counsel's control, opportunities for the use of demonstrative aids are limited only by counsel's ingenuity and ability to generate them. The potential of these aids for giving clarity and adding interest to spoken statements has brought about their widespread use, which will undoubtedly continue in the future.*

§ 214.Demonstrative aids, 2 MCCORMICK ON EVIDENCE § 214 (7th ed.). Defendants should be required to make specific and timely objections during trial, where the Court can rule on them in context rather than based on non-specific hypotheticals.

This MIL also attempts to impugn Mr. Lanier regarding evidence that a long-serving and well-regarded federal district judge determined was admissible to rebut misleading evidence adduced by the defendants in the trial. The court of appeals disagreed with the district court's evidentiary rulings, but that is no reflection on Mr. Lanier. The opinion omits the fact that the challenged evidence was only introduced after a series of lengthy sidebar discussions with the district court about whether the evidence should be admitted. As the court of appeals' opinion observes, "[t]he *district court* admitted several pieces of inflammatory character evidence against defendants—including claims of race discrimination and bribes to Saddam Hussein's Iraqi 'regime'—reasoning the defendants had 'opened the door' by repeatedly presenting themselves as 'wonderful people doing wonderful things.'" *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 764 (5th Cir. 2018) (emphasis added).

This portion of Defendants' Omnibus MIL is also too vague to be enforced. Every trial is unique. Even in the Pinnacle Hip Implant MDL, where the MDL court tried four lengthy bellwether trials (and started a fifth), each trial was different and the evidence that was admitted varied depending on the circumstances. Significantly, that court also explicitly recognized the high caliber of the plaintiffs' counsel's legal representation in that MDL. *See In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*, N.D. Tex., No. 3:11-md-02244-K, Dkt. No. 1031 (Order Granting Motion for Final Assessment, pp. 7-8) ("The skill requisite to perform the legal services properly was exceptional. Defendants were ably represented by multi-national law firms. At one point, Defendants asserted they had 50 lawyers working on this case. To fight Defendants to a draw—or, in reality, better—Plaintiffs' legal skill was readily apparent to even a casual observer."). Defendants' Omnibus MIL effectively could be read as requesting that Plaintiffs be precluded from doing anything at trial that could constitute reversible error. That is not the purpose of a motion *in limine*.

Next, the portion of this MIL regarding "references to unrelated bad acts" should be denied for the same reasons expressed by the court in *Yasmin*:

> Bayer asks that the Court prohibit any and all evidence regarding unrelated corporate controversies. Plaintiff counters, arguing that while most of the disputed controversies are likely irrelevant, the request is overbroad, vague, and not capable of enforcement.
>
> The Court could just as easily grant this motion because the request incorporates the language "unrelated." Thus, it would presume that the Court is only precluding that which is irrelevant. However, relevance is in the eye of the beholder. So while the Eli Lily example provided by the plaintiff in her response is in her view relevant, Bayer undoubtedly would disagree. The Court finds that the request is too broad and will handle any individual objections at trial.

*Yasmin*, 2011 WL 6740391, at *12.

With regard to "Golden Rule" arguments, Plaintiffs have no intention of making such arguments, and in fact agreed to a more specifically worded MIL proposed by Defendants that precludes "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers." *See infra* at § A.13.

In sum, Defendants' Omnibus MIL No. 10 should be denied because it is overly broad and vague, and the items which it seeks to exclude can only be properly considered in the context of the trial.

### 11. **Defendants' Omnibus MIL No. 11: The Court should exclude evidence and argument concerning Defendants' financial condition, revenues, or profitability.**

Defendants seek to exclude evidence about "defendants' overall financial condition, assets, revenues, or profitability." This motion is overbroad. Plaintiffs agree that they will not seek to introduce evidence of Defendants' overall financial condition or assets, as they are not seeking punitive damages, and neither RICO trebling nor OCPA trebling, which Plaintiffs do seek, depends on the defendant's ability to pay. But the request to exclude evidence of revenues and profitability stands on a different footing. Plaintiffs should be permitted to introduce and refer to evidence of the revenues and profits Defendants earned *from their opioid sales*. Evidence of profits earned from the conduct at issue is admissible to show the defendants' motive for engaging in that conduct. *See United States v. Amr*, 132 F. App'x 632, 635 (6th Cir. 2005); *Doe v. United States*, 253 F.3d 256, 269 (6th Cir. 2001). The evidence is probative of Defendants' willingness to engage in illegal conduct, and

thus of the likelihood that they did.  Neither the jury nor the Court can properly assess whether, or understand how, Defendants could engage in the callous conduct at issue, involving indiscriminate dissemination of addictive drugs, without understanding the profits that were at stake.  This evidence also shows the extent to which Defendants had the resources from their opioid business to design and maintain appropriate suspicious order monitoring and due diligence systems.  It is thus probative of the extent to which their failure to do so was a deliberate choice, rather than reflecting, for example, a lack of resources.  Because evidence of Defendants' opioid profits is highly relevant to both motive and intent, it should be not excluded.

12. **Defendants' Omnibus MIL No. 12**: **The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.**

Defendants seek to preclude witness testimony concerning "personal feelings of personal responsibility or guilt relating to the opioid epidemic or their opinions about whether they or their employers violated legal requirements."  Dkt. #2661 at p. 34.  This request should be denied because it is vague, overbroad, and devoid of any specific context.

Defendants complain that "counsel for plaintiffs often asked" witnesses about their personal beliefs in depositions, yet fail to identify any examples of testimony they claim should be excluded.  In the absence of specifically identified testimony, the Court cannot properly assess the potential relevance or prejudice of the evidence.  *See Jackson v. O'Reilly Auto. Stores, Inc.*, 131 F. Supp. 3d 756, 760, 761 (M.D. Tenn. 2015) ("[W]e are unable to resolve Plaintiff's motion because he has not identified any particular piece of evidence that should be excluded.  As a result, we cannot assess the likely relevancy or prejudice of the challenged evidence.").

Defendants' motion is also vague and overbroad.  Terms such as "personal feelings" and "responsibility" could conceivably encompass a vast array of testimony, and Defendants' broad reference to those terms does little to provide the Court with any specific context upon which to base its rulings.  *See Sperberg*, 519 F.2d at 712 ("Orders in limine which exclude broad categories of evidence should rarely be employed.").  Without providing some minimal context for their motion

to exclude this broad category of testimony, Defendants are asking this Court to blindly exclude such evidence.

Further, the Court "has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.* Defendants cannot satisfy that standard here.

To the extent Plaintiffs can offer a response to Defendants' motion as it is presented, "testimony from individual witnesses affiliated with defendants" concerning their personal perception of their own or their employers' "responsibilities" is not inherently irrelevant or prejudicial. Such testimony would certainly be probative and relevant to central issues in this case, such as notice, standard of care, and causation. Defendants cite no case law supporting exclusion of the testimony under Rule 403, and they have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice.

Additionally, Defendants cannot show that such testimony is "clearly inadmissible" under Rule 701. *See Indiana Ins.*, 326 F. Supp. 2d at 846. Rule 701 permits lay witness testimony if it is rationally based on the witness's perception, helps the factfinder to understand the witness's testimony or to determine a fact in issue, and does not depend on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. 701. In applying Rule 701, "the modern trend among courts favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *United States v. Valdez-Reyes*, No. 03-3737, 2006 WL 126733, *4 (6th Cir. Jan. 18, 2006) (internal quotation marks and citation omitted). The Sixth Circuit has established that lay opinion testimony is proper where it is drawn from the witness's personal knowledge and experience gained through employment. *See U.S. v. Kerley*, 784 F.3d 327, 337-39 (6th Cir. 2015). Such testimony includes a witness's personal knowledge of his or her employer's policies and procedures, as well as the witness's experience in applying those procedures. *See id.* at 338.

Here, there can be no doubt that testimony regarding "personal feelings" is susceptible of firsthand knowledge. Witnesses affiliated with Defendants possess particularized knowledge about their own or their employers' policies and procedures by virtue of their employment. *See* FED. R. EVID. 701 adv. comm. note ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."). Because those procedures and policies are a central issue in this case, such testimony would facilitate understanding of a factual issue. Indeed, lay opinion testimony is particularly helpful "when the inference of knowledge is based on . . . such factors as the defendant's history or job experience." *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). *See also, e.g.*, *United States v. Fowler*, 932 F.2d 306, 312 (4th Cir. 1991) (permitting Department of Defense officials to opine that a person with defendant's experience in the department would know rules forbidding giving certain documents to contractors); *United States v. Smith*, 550 F.2d 277, 281 (5th Cir. 1977) (allowing witness to testify to her belief that defendant who ran federally funded program understood certain federal regulations).

Finally, Defendants argue that such testimony impermissibly amounts to a legal conclusion and addresses an ultimate issue. Again, the absence of specifically identified testimony precludes a proper assessment of the testimony. Nevertheless, lay witnesses may testify as to their personal perception about certain responsibilities and procedures. Rather than constituting a legal conclusion, such testimony will provide factual information that will aid the factfinder in determining the ultimate legal issues in this case. Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704.[52]

In sum, determinations regarding the admissibility of particular testimony are best left for trial, once such testimony has been identified and the purpose for which it is offered has been explained. If Defendants have an objection to specific deposition testimony that Plaintiffs have

---

[52] Defendants cite several cases for the general proposition that lay opinion on an ultimate issue must be helpful to the trier of fact. As explained above, the testimony Defendants challenge would facilitate understanding of a factual issue and is admissible under Rule 701.

designated for trial, it is appropriate for Defendants to object to that testimony in accordance with the Court's instructions. That would provide the appropriate context for the Court to make a specific evidentiary ruling.

13. **Defendants' Omnibus MIL No. 13**: The Court should bar Plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.

The parties conferred regarding this MIL and agreed to stipulate to a modified version. Specifically, both sides have agreed not to make "[a]ny reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers" in the presence of the jury.

14. **Defendants' Omnibus MIL No. 14**: The Court should preclude any comment regarding the absence of a corporate representative at trial.

Defendants' Omnibus MIL No. 14 should be denied because it is overbroad and premature. Whether or not a particular witness's absence is relevant depends on who the witness is and the relevant circumstances. This analysis should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context. For this reason, courts regularly deny similar motions *in limine*. *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 2:13-CV-213-JRG-RSP, 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying defendant's motion to exclude reference to the absence of any its witnesses at trial); *Yasmin*, 2011 WL 6740391, at *11 ("The Court concludes, if no corporate representative is present at counsel table, said absence is fodder for comment by plaintiff since it is customary for such a person to be present. Certainly, if plaintiff was never present in the court room Bayer would feel compelled to comment. There are circumstances when a missing witness instruction is appropriate and that will not be precluded prior to trial.").[53]

---

[53] *See also Mitchell v. City of Tukwila*, C12-238RSL, 2013 WL 6631791, at *4 (W.D. Wash. Dec. 17, 2013) (denying plaintiff's motion *in limine* to preclude arguments "regarding the absence of specific witness testimony"; "[T]he parties will be allowed to present arguments regarding the absence of evidence. Whether the parties will be permitted to argue why certain witnesses have not testified cannot be determined in the absence of information regarding particular witnesses and the evidence presented at trial."); *Okuda v. Wyeth*, 1:04-CV-80 DN, 2012 WL 12337860, at *3 (D. Utah July 24, 2012) (denying defendants' motion *in limine* to preclude plaintiff "from making any reference to the absence of a corporate representative for [d]efendants at trial"; "The presence or absence of a corporate representative (or a fact witness) is not evidence but is a fact of the procedure of trial. It may

Significantly, not one of the cases cited by Defendants involved references to the absence of corporate representatives, or even motions *in limine*. *See U.S. v. Nixon*, 694 F.3d 623, 635-36 (6th Cir. 2012) (district court did not err in excluding the testimony of a witness in a criminal trial because that testimony was irrelevant); *U.S. v. Signer*, 482 F.2d 394, 398-400 (6th Cir. 1973) (in criminal trial for attempted income tax evasion and for making and signing false income tax returns, prosecutor's opening and closing arguments suggesting defendant committed a crime for which he was not on trial constituted reversible error); *U.S. v. Pits*, 85 F.3d 629, 1996 WL 254655, at *1 (6th Cir. 1996) (district court did not abuse its discretion in sustaining objections to statements made by defense counsel in his opening statement about the defendant regarding irrelevant matters, including that she is the mother of two small children, lived with her mother, had never before been arrested, and only recently learned the identity of her father); *U.S. v. Moore*, 651 F.3d 30, 51-55 (D.C. Cir. 2011) (addressing whether prosecutor committed prosecutorial misconduct during his opening and closing arguments in a criminal trial; although prosecutor crossed the line on several occasions, "the misconduct did not impermissibly and prejudicially interfere with the jury's ability to assess the evidence"), *aff'd in part sub nom. on other grounds*, *Smith v. U.S.*, 568 U.S. 106 (2013).

Because the factual circumstances of the absence of the specific witness should be considered, this category is not appropriate for a motion *in limine* and should be handled by individual objections during trial.[54] Defendants' Omnibus MIL No. 14 should be denied.

---

be argued, and counter-argument may be made."); *Mascarenas v. Cooper Tire & Rubber Co.*, CV208-009, 2010 WL 11534359, at *10 (S.D. Ga. Jan. 11, 2010) (denying defendant's motion to exclude "any reference to the fact that it may not have a representative at trial at any particular time or to [the defendant's] choice of its corporate representative not being the appropriate person to respond to Plaintiffs' allegations").

[54] The risk of unfair prejudice is particularly low with respect to any such references made by Plaintiffs' counsel. What an attorney says is not evidence and the jury will be instructed accordingly. *Moore*, 651 F.3d at 54. If Defendants believe any additional instruction is necessary with respect to a particular reference made at trial, they should request it at that time, so the Court will have the full context necessary to decide their request.

## B. PLAINTIFFS' RESPONSE TO OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE (DKT. #2666).

### 1. **Distributors' MIL No. D-1**: The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia.

Defendants have filed several motions *in limine* that seek to exclude evidence regarding their resolution of various enforcement actions taken by federal and state governments. The arguments asserted by Defendants in these MILs are very similar, so rather than repeat them in response to each MIL, Plaintiffs will address the legal standards and argument regarding these topics once, and will refer back to this argument on the specific points. If any specific additional information is necessary in response to a particular MIL, that will be addressed separately.

The argument and legal standards addressed here are applicable to the following MILs:

- Dkt. #2666 – Distributors' MIL No. D-1:  Distributor settlements with the DEA and West Virginia.

- Dkt. #2645 – Henry Schein MIL Nos. HS-9 and HS-10:  DEA fines, investigations, and Ohio Board of Pharmacy cease and desist letter (*infra* at § C.9-10).

- Dkt. #2648 – Walgreens' MIL No. W-2:  DEA enforcement action and related settlement with Walgreens (*infra* at § D.2).

- Dkt. #2663-1 – McKesson MIL No. MCK-4:  Allegations contained in letters from the DEA and DOJ to McKesson (*infra* at § F.4).

- Dkt. #2668-1 – Teva MIL No. TAD-1:  Cephalon misdemeanor off-label promotion plea agreement (*infra* at § G.1).

- Dkt. #2668-1 – Teva MIL No. TAD-3:  Cephalon settlement with DOJ (*infra* at § G.3).

**The agreements are not precluded by Rule 408.**  Federal Rule of Evidence 408 generally prohibits the use of evidence of statements or conduct to compromise a claim "to prove or disprove the validity or amount of a disputed claim."  However, "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, *not some other claim*."  *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (citing Wright, et al., FEDERAL PRACTICE & PROCEDURE:  EVIDENCE § 5314, 5308 (1st ed. 1980)

(internal citations omitted, emphasis added); *see also Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 501 (6th Cir. 2017). So Rule 408 does not even apply to the evidence Defendants seek to exclude, since that evidence does not involve the specific claims asserted by Cuyahoga and Summit Counties in this case.[55]

Moreover, even when Rule 408 applies, evidence of settlements *is* admissible where it is offered for "another purpose," such as "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R. EVID. 408(b). The burden of establishing the application of Rule 408 is on the party invoking its protection. *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-CV-615, 2012 WL 5077701, at *5 (S.D. Ohio Oct. 18, 2012).

Rule 408 is therefore "not a blanket rule that wholly precludes the consideration of settlement discussions." *Homoki v. Rivers Edge Tree Stands*, No. 1:12-CV-2926, 2012 WL 6631043, at *2 (N.D. Ohio Dec. 19, 2012). Instead, "evidence of such discussions may be admitted for any purpose not specifically excluded by the Rule." *Id.* As the rule makes clear, a settlement may be admissible where "it is offered for a purpose other than to prove liability or disprove a claim." *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *54 (S.D. Ohio Feb. 17, 2016). Accordingly, "the principal inquiry that determines whether Rule 408 bars introduction of evidence of [this evidence] must be toward the purpose for which the evidence is being offered." *McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013).

The Sixth Circuit and Ohio district courts have recognized several purposes allowing for the admission of settlement evidence. One such purpose is establishing a party's knowledge or notice of potential harm. *See E.I Du Pont*, 2016 WL 659112, at *54 (consent decree was properly admitted when it was offered "as evidence of [Defendant] DuPont's knowledge and/or notice of C-8's

---

[55] This is also plain from the language of the rule, which repeatedly references "prov[ing] or disprov[ing] the validity or amount of **a** disputed claim" by offering evidence of conduct that occurred while attempting to resolve "**the** claim." *See* FED. R. EVID. 408(a)(1) and (2) (emphasis added).

potential for harm, not as evidence that DuPont acted negligently"). In this case, the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate and were likely to cause harm – not just in the specific locations where the enforcement actions focused, but throughout the country. That is particularly true in this case, where Defendants have claimed that they lacked understanding of their legal duties.

Another permissible purpose is to prove a party's state of mind. *See Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 519 (6th Cir. 2008) ("settlement evidence was not offered as a defense to plaintiff's negligence claims against BMW, but instead was offered to show the state of mind of the witnesses"); *McAuliffe*, 514 F. App'x at 549-50 ("It is plain from the record that the contents of the conversation were not offered in McAuliffe's criminal trial to prove the liability of either one in the civil dispute or the amount of those claims. Instead, the evidence was offered for the other purpose of showing McAuliffe's knowledge of and participation in illegal acts—in other words, his state of mind, which Rule 408 allows.").

With regard to Plaintiffs' nuisance claims, the Court identified as disputed issues of fact for trial in its rulings on the parties' motions for summary judgment: (1) whether a public nuisance exists (Dkt. #2572 at p. 4); (2) whether the opioid epidemic interferes with public health and public safety rights (Dkt. #2578 at p. 4); (3) whether Defendants' conduct substantially contributed to Plaintiffs' injuries (*id.* at p. 5); and (4) whether Defendants' conduct was intentional or unlawful (*id.* at pp. 5-7). The enforcement actions demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time, which goes to the heart of Plaintiffs' claims.

**The agreements are admissible under Rule 406.** Evidence of "an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice" is admissible. FED. R. EVID. 406; *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*, 401 F. Supp. 2d 813, 818 (N.D. Ohio 2005) (finding the evidence of performing inspections and "observations made during the inspections, [are] admissible under Fed. R. Evid. 406 as proof of habit or routine practice"). "Rule 406 evidence must rest on an analysis of instances numerous

enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation." *Bell v. Consol. Rail Corp.*, 299 F. Supp. 2d 795, 800 (N.D. Ohio 2004) (internal citations and quotations omitted). Courts may consider three elements to determine whether the organization's routine practice is admissible under Rule 406: (1) whether "it is unlikely that the individual instance can be recalled or the person who performed it can be located," (2) whether the "specific conduct … is engaged in frequently by the group," and (3) whether "the number of instances of such behavior [is] large enough that doubt about a single instance does not destroy the inference that the practice existed." *Martin v. Thrifty Rent A Car*, 145 F.3d 1332 (6th Cir. 1998).

Defendants' conduct that forms the bases of the DEA/DOJ agreements occurred "with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Bell*, 299 F. Supp. 2d at 800. The agreements and related documents establish that Defendants engaged in "systematic, particularized, and repetitive conduct" by selling prescription opioids without proper, effective controls to prevent diversion and to identify, report, and stop shipment of suspicious orders. As the agreements describe, the temporal and geographic scope of this systematic conduct (covering millions of transactions) was so extensive that it cannot be evaluated by a singular instance, nor can a single instance destroy the inference that this was a routine practice.

Both Cardinal Health and McKesson agreed to pay significant fines in 2008 relating to their failure to comply with their obligations under the Controlled Substances Act. Despite agreeing to comply with those obligations, both companies continued to ignore them and were the subject of later enforcement actions by the federal government roughly a decade later, reflecting their persistent failure to conform their conduct to the law. In connection with those later enforcement actions, Cardinal and McKesson acknowledged that they had not lived up to their prior agreements. This history of repeated violations of their legal duties shows that Defendants' violations were not the result of mere oversight, but reflected Defendants' intentional and ongoing business practices.

As a result, the agreements are admissible under Rule 406 because they prove Defendants acted in accordance with their routine practice.

**The agreements are relevant.**  Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  FED. R. EVID. 401.  Generally, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible."  FED. R. EVID. 402.

Defendants' meritless relevance arguments are wholly divorced from an analysis of the substantive law governing the claims and defenses at issue.  The DEA/DOJ agreements are relevant evidence for several claims at issue.  For instance, as part of Plaintiffs' RICO and Ohio Corrupt Practices Act (OCPA) claims against McKesson, Cardinal, and AmerisourceBergen, Plaintiffs seek to establish that these Defendants formed and operated an opioid supply chain to expand their sales of prescription opioids through repeated violations of the CSA.  Defendants failed to maintain effective controls to prevent diversion and filled suspicious orders for opioids.  The DEA/DOJ agreements describe investigations and findings by the DEA and the DOJ concerning the same violations alleged here.  The agreements also describe the multiple suspension orders and ISOs which provided notice to Defendants that their suspicious order systems were ineffective and were being abused.

Evidence regarding Defendants' repeated violations of their duties under the CSA demonstrates that Defendants continued the conduct in the face of confirmed proof that such conduct was contributing to the opioid epidemic.  These agreements are therefore relevant to establish Defendants' RICO and OCPA violations.

Distributor Defendants argue that the settlement agreements are not relevant because some of them "disclaim any admission or concession of liability," and even those that contain "narrow admissions" do not implicate the distribution of opioids into Summit and Cuyahoga Counties.  Dkt. # 2666 at p. 5.  Defendants therefore attempt to cabin the relevance of the agreements to the distribution centers at issue there.  Yet, the agreements make it clear that they apply to all (or at least most) distribution centers.  The McKesson 2017 Agreement, for example, expressly states that

"[t]his Agreement shall be applicable to McKesson and any facility owned or operated by McKesson US Pharmaceutical registered, or who may become registered, with DEA to distribute, or otherwise handle controlled substances." Dkt. #2212-29; Dkt. #2557-3. AmerisourceBergen's obligations are similarly not limited to any particular Distribution Centers.

These arguments also fail to acknowledge that the conduct about which Plaintiffs complain is not limited to conduct that occurred in Cuyahoga and Summit Counties. Instead, Plaintiffs' allege that the harm they suffered was caused by conduct that occurred all across the nation, over many years, which was a substantial factor in causing the nuisance condition that persists in those counties and also gives rise to Plaintiffs' other claims. This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

**The agreements are not unfairly prejudicial.** Although relevant evidence is generally admissible, "Rule 403 carves out a narrow exception to this broad rule of admissibility." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*; FED. R. EVID. 403. As the permissive language of the rule makes clear, a court may admit evidence even where there is potential prejudice, and "[this] decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court." *Id.* "When the district court admits evidence over a party's undue-prejudice objection, [the 6th Circuit] review[s] the admitted evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (citation omitted).

Here, any danger of unfair prejudice or confusion is quite limited because the practices described in the DEA/DOJ agreements pertain directly to Defendants' controls to prevent diversion and the filling of suspicious orders for opioids. Thus, this evidence will not confuse the

issue nor inject extraneous factual matters into the trial. Nor would a jury be likely to take this evidence as a concession of liability – although the evidence is factually on point, the *legal* context of the agreements is so distinct that a jury is not likely to believe that an agreement with the government to settle what are in effect charges for CSA violations amount to an admission of liability to the alleged RICO, OCPA, and public nuisance claims. And, to the extent that the jury credits the factual statements in the agreements, this does not constitute "unfair" prejudice. Even if that were the case, the Court can ensure, through trial rulings and jury instructions, that the context in which the facts were developed does not overwhelm the import of the evidence itself.

For these reasons, Distributor Defendants' arguments that their distributor settlements with the DEA and West Virginia are irrelevant, prejudicial, or inadmissible under Rule 408, are without merit. Distributor Defendants' MIL No. D-1 should be denied.

## 2. **Distributors' MIL No. D-2**: The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge.

Distributor Defendants broadly seek to preclude the admission of non-party 30(b)(6) witness testimony "on matters outside the witness' personal knowledge," arguing such evidence is inadmissible hearsay and lacks foundation. For the following reasons, Distributor Defendants' MIL No. D-2 should be denied.

Contrary to Distributor Defendants' assertion, Rule 602's personal knowledge requirement does not preclude the introduction of 30(b)(6) testimony at trial that is beyond the witness' direct personal knowledge. It is well established that a corporate designee testifying pursuant to Rule 30(b)(6) "does not testify as to his personal knowledge or perceptions [but rather] testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). *See also Lloyd v. Midland Funding, LLC*, No. 15-5132, 639 Fed. Appx. 301, 305 (6th Cir. Jan. 22, 2016) (citing *Brazos*). As such, Rule 30(b)(6) provides a recognized exception to the personal knowledge requirement set forth in Rule 602.

Although Rule 30(b)(6) refers by its terms to depositions, courts have recognized that a 30(b)(6) witness may testify at trial despite a lack of personal knowledge about the matters described.

*See Brazos*, 469 F.3d at 434 (permitting 30(b)(6) trial testimony concerning "the collective knowledge or subjective belief of [the corporation] . . . even if it is not within his direct personal knowledge"); *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) ("[A] Rule 30(b)(6) witness may testify both in a deposition and at trial to matters as to which she lacks personal knowledge, notwithstanding the requirements of Federal Rule of Evidence 602."). Relatedly, numerous courts, including the Sixth Circuit, have permitted 30(b)(6) witness testimony addressing corporate matters outside of the witness' personal knowledge in summary judgment proceedings. *See, e.g., Lloyd*, 639 F. App'x at 305 (finding corporate representative's testimony based on his review of corporate records satisfied personal knowledge requirement under Federal Rule of Civil Procedure 56); *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894 (7th Cir. 2004) (holding non-party 30(b)(6) witness "was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric").

With respect to *non-party* 30(b)(6) witness testimony, the court in *Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500 (N.D. Ill. 2011) specifically rejected the argument that a non-party 30(b)(6) witness could not testify at trial regarding matters outside his or her personal knowledge. *See id.* at 503 ("This Court . . . will not limit . . . testimony strictly to matters within [his] personal knowledge"). The court reasoned that to rule otherwise "would only recreate the problems that Rule 30(b)(6) was created to solve." *Id.* "For example, a party might force a corporation to 'take a position' on multiple issues through a Rule 30(b)(6) deposition, only to be left with the daunting task of identifying which individual employees and former employees will have to be called at trial to establish the same facts." *Id.* The court concluded that proper areas of testimony for non-party Rule 30(b)(6) witnesses include "topics . . . about which the corporation's official position is relevant . . . ." *Id.* at 503.

Second, 30(b)(6) testimony that is beyond personal knowledge is not inherently inadmissible hearsay. *See, e.g., Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 n.7 (7th Cir. 2001) (finding, in the summary judgment context, that City Attorney O'Conner's "answers to the interrogatories were not hearsay because the City had designated O'Connor to testify to matters known or reasonably

available to the City."). While the *Sara Lee* court acknowledged the risks of admitting non-party 30(b)(6) testimony based on hearsay, it reasoned that limiting such testimony to matters "particularly suitable for Rule 30(b)(6) testimony" sufficiently mitigated the risk. 276 F.R.D. at 503.

Here, Distributor Defendants' motion is overbroad and completely devoid of context. They seek a blanket evidentiary ruling based on hearsay and lack of foundation and mistakenly assume that if Plaintiffs offer non-party 30(b)(6) testimony beyond a witness' direct personal knowledge, then such evidence must be offered for the truth of the matter. Determinations regarding the admissibility of a particular third-party statement are best left for trial, once such statement has been identified and the purpose for which it is offered has been explained. *See Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-CV-02349-WJM-KMT, 2014 WL 1583993, at *3 (D. Colo. Apr. 21, 2014) ("Defendant's Motion identifies no specific evidence it seeks to exclude from Plaintiffs' Rule 30(b)(6) designees. Instead, Defendant makes general reference to evidence that may be inadmissible hearsay, and asks the Court to restrict the testimony of Plaintiffs' witnesses without any indication of what such evidence will show, or for what purpose it will be offered. The Court will not issue such a blanket evidentiary ruling, particularly where a fact-intensive evaluation of hearsay exceptions may be necessary.") (internal citation omitted).

Distributor Defendants offer two examples of testimony they claim should be excluded from the 30(b)(6) deposition of DEA employee, Thomas Prevoznik, in which he identified a DEA report and DEA presentation.[56] However, such testimony addresses "matters about which the corporation's official position is relevant" and therefore falls squarely within the realm of permissible trial testimony for non-party 30(b)(6) witnesses. *See Sara Lee*, 276 F.R.D. at 503.

---

[56] These DEA documents could be admitted for a number of non-hearsay reasons, such as to prove (i) that the statement was made, (ii) the falsity of the matter asserted, (iii) the knowledge of the declarant, (iv) notice to, or knowledge of, the recipient of the statement, (v) motive, intent, bias, or state of mind, or (vi) association among persons or entities. And *if* Plaintiffs offered the evidence for the truth of the matter, the documents could fall within a hearsay exception in Rule 803, such as: a record of regularly conducted activity under Rule 803(6); a public record or report under Rule 803(8); or, a statement in an ancient document under Rule 803(16).

Further, the official DEA report and presentation Mr. Prevoznik identified sharply contrast with the type of evidence excluded in the cases Distributor Defendants cite. For instance, in *Cooley v. Lincoln Elec. Co.*, 693 F.Supp.2d 767, 791 (N.D. Ohio 2010), the defendant's 30(b)(6) witness sought to explain the company's position at trial using a recent conversation he had with the CEO. The court barred the proposed explanatory testimony on the basis of hearsay. *Id.* at 791-92. Significantly, the hearsay at issue in *Cooley* was of questionable reliability. Stephen J. O'Neil, *Rule 30(b)(6) Witnesses at Trial*, 60 Fed. Law. 70, 73 (September 2013) ("[T]he result in *Cooley* might be different if the Rule 30(b)(6) witness had learned of additional information in the discovery record as opposed to the undiscoverable water-cooler conversation with the CEO, or if the Rule 30(b)(6) witness had learned new information at trial that was not in the discovery record but was verifiable and reliable."). Similarly, the testimony found to be improper in *Union Pump Co. v. Centrifugal Tech. Inc.*, Nos. 10–30040, 10–30072, 2010 WL 5186616, at *6-7 (5th Cir. Dec. 16, 2010) involved facts the 30(b)(6) witness learned "solely through conversations with others" and of which there were no written reports. *Cf. Sara Lee*, 276 F.R.D. at 503-04 (considering "whether the underlying corporate knowledge is *sufficiently reliable* to substitute for personal knowledge") (emphasis added).

For all these reasons, the Court should deny Distributor Defendants' MIL No. D-2 in its entirety and defer ruling on issues regarding the foundation for admitting Mr. Prevoznik's and other 30(b)(6) witness' testimony until trial.

3. **Distributors' MIL No. D-3**: **The Court should exclude any evidence of criminal indictments and investigations without corresponding proof of a final judgment of conviction.**

In March of 2019, David Gustin, the former compliance officer for McKesson's warehouse in southern central Ohio, was indicted on one count of conspiracy for allegedly violating the Controlled Substances Act.[57] Mr. Gustin's lawyer described the charge as follows: "The United

---

[57] *See* "Feds probe manager of McKesson narcotics distribution warehouse in Ohio," *The Washington Post*, Sept. 18, 2019, available at https://www.washingtonpost.com/health/feds-probe-manager-of-mckesson-narcotics-distribution-warehouse-in-ohio/2019/09/18/0878fd26-d644-11e9-9610-

States' theory seems to be that Mr. Gustin was so woefully negligent in overseeing his compliance responsibilities that his conduct was criminal." The article reports that McKesson has received subpoenas from the federal government and is cooperating with the government's investigation, and that "documents [filed in the criminal case] also show that Gustin and McKesson have an agreement to work together on the legal case." So McKesson is obviously fully aware of the circumstances and conduct giving rise to Mr. Gustin's indictment.

Although the indictment and related documents are included on Plaintiffs' exhibit list, Plaintiffs do not intend to introduce these documents unless necessary for some other purpose, such as impeachment. However, Plaintiffs are not precluded from inquiring about the *conduct* at issue in the indictments. Whether the former director of regulatory affairs for McKesson's warehouse in Ohio engaged in conduct that violated the Controlled Substances Act involving the distribution of prescription opiates is certainly relevant to Plaintiffs' claims.

### 4. **Distributors' MIL No. D-4**: The Court should prohibit Plaintiffs from stating expressly or suggesting that the jury may infer that an older document never existed just because it cannot be found.

Distributor Defendants' MIL No. D-4 seeks to preclude Plaintiffs, or any of their experts, from "suggesting" that the "fact that suspicious order reports and due diligence files from five, ten, or twenty years ago cannot be located today does not mean they never existed." Dkt. #2666 at p. 13. Their purported basis is that there is no "requirement to maintain such records for any period of time," and Plaintiffs have failed to satisfy the Sixth Circuit's adverse inference test. *Id.*

This argument is virtually identical to the argument Defendants raised in their *Daubert* motion against Mr. Rafalski, which has already been rejected by this Court:

> Defendants reply that, if the law does not require them to maintain due diligence records, Rafalski has no basis to conclude they did not conduct due diligence based on the absence of those records. Based on his experience as a DEA Diversion Investigator, however, Rafalski may opine as to what the absence of due diligence records indicates to him. *Moreover, it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it.*

---

fb56c5522e1c_story.html (accessed on 10/6/19).

Dkt. #2494 (Opinion and Order Regarding Defendants' Motion to Exclude Opinions of James Rafalski and Craig McCann) at p. 13 (emphasis added).

Moreover, in bringing this motion, Distributor Defendants once again incorrectly argue that the absence of documents is the "sole" basis for Mr. Rafalski's conclusion that they failed to perform due diligence. But as pointed out in Plaintiffs' *Daubert* opposition brief (Dkt. #2253 at pp. 13-14), the bases for Mr. Rafalski's conclusions are his detailed review of Defendants' SOM program, Defendants identification of an absurdly trivial number of suspicious orders, and policies and practices that allowed certain Defendants to ship orders before any due diligence could be carried out. In light of this evidence, it falls to Defendants to establish that their purported due diligence nonetheless took place. As Mr. Rafalski found, Defendants' files are devoid of any such evidence, and as the Court itself emphasized, "it is notable that Defendants do not contradict Rafalski by explaining they did conduct due diligence but don't have any documents to support it." Dkt. #2494 at p. 13.

Distributor Defendants' reliance on the Sixth Circuit's adverse inference test is also inapposite. There is a difference between asking the fact-finder to draw inferences adverse to a party from the evidence presented (which presumably both parties intend to do at trial) and asking the Court to issue an adverse inference instruction. Distributor Defendants' test applies in the latter case, and at this time, Plaintiffs are not seeking such an instruction. In fact, Plaintiffs are not arguing that documents were necessarily destroyed, as opposed to never existing in the first place because Defendants failed to perform any due diligence. One can infer from the absence of due diligence materials that no due diligence was performed, or that if due diligence was performed, but not documented, this is an indication of an inadequate due diligence program. There is nothing improper about Plaintiffs, or their experts, advocating for such an inference. In rejecting Defendants' *Daubert* argument, the Court has already ruled that Mr. Rafalski can offer this as an expert opinion:

> As a former Diversion Investigator, Rafalski clearly has experience and expertise regarding the components and characteristics he would expect to be included in an

effective SOMS and due diligence program. Indeed, Defendants do not challenge his credentials in this regard . . .

Defendants ask the Court to preclude Rafalski from stating that the law requires registrants to document and retain forever suspicious order reports and due diligence records. It is Rafalski's position that, while the regulations do not require a registrant to retain these documents for any specific length of time, in his opinion, permanent retention is important to maintaining effective control and preventing diversion. See Rafalski Depo. at 125:11 to 126:3. *For the reasons stated above, Rafalski may opine as to the need for documentation to maintain effective control; however he may not state what the law requires in this regard.*

Dkt. #2494 at pp. 8, 10 (emphasis added).

For these reasons, Distributor Defendants' MIL No. D-4 should be denied.

5. **Distributors' MIL No. D-5**: The Court should prohibit Plaintiffs from presenting evidence or making arguments suggesting Distributors committed a "fraud on the DEA."

Through their MIL No. D-5, Distributor Defendants attempt to re-litigate their preemption argument in the guise of a motion *in limine*. Indeed, the vast majority of their argument is that Plaintiffs' due-diligence based claims are preempted under *Buckman Co. v. Plaintiffs' Leg. Comm.*, 531 U.S. 341 (2001). But as this Court has held several times, Plaintiffs are not asserting claims for fraud on the DEA (or FDA), and thus, their claims are not preempted under *Buckman*. Dkt. #2565 at pp. 9-10, 22; Dkt. #1025 at pp. 50-51; Dkt. #1203 at p. 2.

However, this does not render evidence regarding their interactions with the DEA irrelevant or inadmissible.[58] To the contrary, this evidence is highly relevant to a wide range of issues, including Defendants' knowledge, motive, intent, and state of mind, as well as their violations of the CSA, fraudulent misstatements to the public and the medical community, and their conspiratorial conduct and objectives. *See, e.g., Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 318 (W.D. Ky. 2011) ("[T]he fact that Plaintiff intends to introduce evidence that NPC violated FDA regulations does not automatically implicate the holdings of *Buckman* and *Kemp*. State-law

---

[58] *See Tylenol*, 181 F. Supp. 3d at 289 n.9 (noting that "whether the evidence related to the defendants' interactions with the FDA is admissible for purposes other than establishing liability or breach of duty" is "a different inquiry than whether the plaintiff's claims are preempted").

causes of action that track federal regulatory regimes have not been preempted by these decisions . . . . Evidence of violations of the FDA's regulations that are introduced to support the state-law torts is admissible."), *order vacated in part on other grounds on reconsideration sub nom. Mahaney on behalf of estate of Kyle v. Novartis Pharm. Corp.*, 1:06-CV-00035-R, 2012 WL 12996015 (W.D. Ky. Jan. 4, 2012); *Tylenol*, 181 F. Supp. 3d at 289–90 (denying defendants' motion *in limine* to exclude evidence or argument relating to fraud on the FDA because "evidence that the defendants attempted to manipulate the regulatory process, failed to comply with regulatory duties, or adhere to guidance provided by the FDA can be used to show other elements of the plaintiff's claims[,]" including "the defendants' state of mind, motive, or knowledge of a defect"; "It also would be relevant to the plaintiff's fraud claims if the information the defendants sent to or received from the FDA was different from what the defendants were communicating to consumers[.]").[59] Moreover, as Defendants have indicated that they intend to argue that the DEA failed to vigorously enforce the law, their misstatements regarding their SOMS programs, reporting of suspicious orders, and efforts to prevent diversion are directly relevant to facts that Defendants themselves are putting at issue.

Distributor Defendants' sole argument against the admissibility of this evidence is their conclusory statement, citing nothing but Rule 402 and 403, that "testimony, evidence, or argument that Distributor Defendants have misled the DEA by failing to report suspicious orders, or

---

[59] *See also Yasmin*, 2011 WL 6740391, at *2 (denying similar motion *in limine* implicating fraud-on-the-FDA; "In a case such as this, the jury must be fully informed of any information withheld from the FDA that could have effected decisions regarding the label."); *Adams*, 2009 WL 1259019, at *1 ("The Court has ruled in a prior decision . . . that evidence of communications between DuPont and the agencies is not excludable simply because the Court dismissed the fraud-on-the-agency claim. The evidence of such communications is relevant for other purposes, such as proving the claims of misbranding or failure to warn."); *In re Vioxx Products Liab. Litig.*, MDL 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (denying defendant's motion *in limine* to exclude evidence or argument preempted by federal regulations, including that the defendant "committed 'fraud' on the FDA, misled the FDA, did not cooperate with the FDA, or otherwise violated the Food, Drug, and Cosmetic Act and its implementing regulations[,]" noting that "[t]his is an issue of proof and will have to be dealt with at time of trial"); *Globetti v. Sandoz Pharm. Corp.*, CV98-TMP-2649-S, 2001 WL 419160, at *3 (N.D. Ala. Mar. 5, 2001) (denying defendant's motion *in limine* based on *Buckman*; "While plaintiff may not offer evidence simply to show misrepresentations to or concealment from the FDA, such evidence may be relevant to showing the defendant's knowledge relating to the adequacy of the warning or the truth of information represented to or concealed from plaintiff or her physician.").

otherwise failing to submit the required information" is "irrelevant, prejudicial, and would risk confusing the jury." Dkt. #2666 at p. 15. This does not come close to satisfying their high burden of demonstrating such evidence is clearly inadmissible on all potential grounds. *Supra* at pp. 2-3. Distributor Defendants' MIL No. D-5 should be denied.

      **6.**     **Distributors' MIL No. D-6**: **The Court should prohibit counsel and witnesses from making references broadly and generally to "Defendants" when the statement, argument, or testimony relates only to certain specific Defendants or groups of Defendants.**

Distributor Defendants seek to prohibit Plaintiffs' counsel and witnesses from referring to "defendants" generally at trial, contending it will violate Federal Rule of Evidence 403. Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FED. R. EVID. 403. "Exclusion under Rule 403 is an extraordinary measure that should be exercised sparingly." *Antioch Co. Litig. Tr. v. Morgan*, No. 3:10CV156, 2014 WL 2117450, at *1 (S.D. Ohio May 21, 2014) (citing *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996)).

None of the cases Defendants cite demonstrate that categorical references to defendants are improper in the context of a motion *in limine* or under Rule 403. Instead, they discuss concerns related to "lumping" defendants in a jury charge or complaint.[60] Of course, those concerns are not implicated at this stage of the litigation, and Plaintiffs have no intention of "lumping" Defendants together in the jury charge.

Distributor Defendants' motion is also overbroad and highly impractical, and its enforcement would unduly police the speech of Plaintiffs' counsel and witnesses at trial. Requiring

---

[60]   *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (noting damage claims against government officials arising from constitutional rights violations must allege particular facts against each defendant); *Rui He v. Rom*, No. 1:15-CV-1869, 2017 WL 1054814, at *4-5 (N.D. Ohio Mar. 21, 2017) (finding lumping of defendants on jury form was proper); *Christopher Seri v. Crosscountry Mortg., Inc.*, No. 1:16-CV-01214-DAP, 2016 WL 5405257, at *4 (N.D. Ohio Sept. 28, 2016) (dismissing complaint); *Reo v. Caribbean Cruise Line, Inc.*, No. 1:14 CV 1374, 2016 WL 1109042, at *1 (N.D. Ohio Mar. 18, 2016) (holding that lumping defendants in complaint did not require dismissal).

Plaintiffs' counsel to approach the bench before using the word "defendants" would inevitably impede the flow of trial and interfere with the presentation of evidence. And given the breadth of the restriction, it would necessitate numerous side bars addressing whether various statements, arguments, or testimony relate to certain Defendants. Plaintiffs' counsel and witnesses should be permitted in their discretion to reference certain subsets of defendants or defendants generally at trial. *See Flir Sys., Inc. v. Fluke Corp.*, No. 3:10-CV-00971-HU, 2012 WL 13054267, at *5 (D. Or. Nov. 29, 2012) ("It would be highly impractical to enforce this motion at trial. Absent a legitimate basis to preclude the use of a particular term . . . it is for counsel to choose the words they prefer to describe it.").

Further, any potential prejudice or confusion will be minimized through cross-examination and clarifying jury instructions. Distributor Defendants have not met their burden of demonstrating that the probative value of such testimony would be substantially outweighed by a risk of unfair prejudice. Distributor Defendants' MIL is an inappropriate method of addressing the word choice of Plaintiffs' counsel and witnesses, and should be handled by individual objections at trial. *See Stewart v. Hooters of Am., Inc.*, No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007) ("Motions In Limine are disfavored; admissibility questions should be ruled upon as they arise at trial.").

7. **Distributors' MIL No. D-7: The Court should preclude Plaintiffs from offering evidence of, and arguments about RICO predicates that Plaintiffs did not identify in their discovery responses.**

Distributor Defendants' MIL No. D-7 must be denied because it rests on a misapplication of the law and misstatements of the facts. Specifically, Distributor Defendants argue that the Court should exclude evidence of any racketeering activities not disclosed in Plaintiffs' discovery responses. But their cited authority does not support exclusion. Instead of addressing exclusion of evidence at trial after a purported failure to identify racketeering activities, Distributor Defendants' cases involve exclusion of evidence about legal claims alleged in a complaint or amended

complaint.[61]  *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("Bridgeport's first amended complaint alleges liability on the part of Universal based solely on the inclusion of *Change Gone Come* in 'Well Connected' and 'Dead Man Walkin.'  To the extent Bridgeport seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal"); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787 (6th Cir. 2005) ("Tucker contends that the district court erred when it refused to consider her promissory estoppel claim.  The court took this action after determining that she had neglected to include such a claim in her complaint"); *Vystcil v. Mercy Health*, No. 17CV781, 2019 WL 2076035, at *4 (N.D. Ohio May 10, 2019) ("Plaintiffs argue that the April 7, 2017 telephone calls also violated 15 U.S.C. § 1692c(a)(2).  Plaintiffs did not allege any violations of that subsection in the Amended Complaint.  Plaintiffs may not expand the scope of their claims in an opposition to a summary judgment motion").

Here, setting aside the lack of authority regarding Distributor Defendants' position, their request for exclusion also fails because Plaintiffs identified the racketeering activities (and corrupt activities)[62] upon which they intend to rely at trial in their Complaints including:  (1) mail fraud, (2) wire fraud; and (3) the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance.  *See, e.g.,* Dkt. #1466 (Summit Third Amended Complaint) at ¶ 914.  Indeed, Defendants made this same argument in the motion to dismiss phase of the case and the Court rejected it, confirming that each of the racketeering activities was sufficiently alleged.  Dkt. #1025 at pp. 39-48; Dkt. #1203 at pp. 38-39.  Plaintiffs did not identify any new racketeering activities in their opposition to Defendants' summary judgment motions.

---

[61]  *Feinstein v. Resolution Tr. Corp.*, is different than the above cases and even further afield because in *Feinstein*, the plaintiff failed to adequately plead the details of mail and wire fraud to overcome a Rule 9(b) argument.  942 F.2d 34, 42 (1st Cir. 1991) ("It is well settled in this circuit that Fed. R. Civ. P 9(b) . . . extends to pleading predicate acts of mail and wire fraud under RICO. . . . Neither in this part of the complaint nor in count 1 proper did the plaintiffs supply any additional details as to when the communications occurred, where they took place, or what they contained").

[62]  Plaintiffs also identified telecommunications fraud as a corrupt activity in support of their OCPA claim.  As this claim is not addressed in Distributor Defendants' motion, any ruling arising from it should not be applied to that aspect of Plaintiffs' OCPA claims.

Finally, Distributor Defendants' motion also fails because they mischaracterize Plaintiffs responses to their discovery requests. When asked to identify the racketeering activity at issue, Plaintiffs not only identified mail and wire fraud and violations of the CSA, including a broad range of misrepresentations and omissions that form the basis of those violations, they cited to documents supporting their claims. *See* **Ex. 16** [Plaintiffs' 12/14/18 Supplemental Objections and Responses to Distributor Defendants' Interrogatory Nos. 24, 25, 26, and 27]. In sum, Plaintiffs provided ample information to Defendants regarding the racketeering activity at issue and Defendants fail to provide any authority showing that more is required.

8. **Distributors' MIL No. D-8: The Court should issue an order excluding any evidence of, or reference to, Distributor-run programs that allowed Manufacturers to communicate product information to Pharmacies or other parties.**

Distributor Defendants seek to exclude evidence that Manufacturers use Distributors as a conduit to convey marketing information based on a misplaced argument under Rules 402 and 403. Dkt. #2666 at pp. 18-20. The evidence that Manufacturers used Distributors to market opioids is *not* being offered to support marketing-based claims against Distributors, but rather to demonstrate their overall motive and knowledge. Distributors profited from these marketing services and were aware of Manufacturers' marketing efforts and claims. This evidence is particularly relevant given Distributors' intent to blame Manufacturers, doctors, and patients as potentially superseding causes of Plaintiffs' injuries. The evidence further supports Plaintiffs' marketing RICO and conspiracy claims *against the Manufacturers,* as it is relevant to show how Manufacturers used their relationships with Distributors in order to further disseminate the Manufacturers' marketing messages.

In support of their erroneous arguments, Distributors misrepresent both statements made by Plaintiffs and the testimony of Plaintiffs' expert, Dr. Perri.[63] First, though Plaintiffs' conspiracy claims "*against the Pharmacy and Distributor Defendants* are not based on opioid marketing," Plaintiffs'

---

[63] Plaintiffs have not listed Dr. Perri as a testifying witness on their witness list, but mention him herein simply to correct Distributor Defendants' mischaracterization of his testimony in their motion.

RICO and Conspiracy claims against Manufacturers expressly *are*.[64]  As discussed in Plaintiffs'
summary judgment briefing, different coconspirators may have different roles in the conspiracy.
Dkt. #2182 at p. 114-115.  The evidence of Manufacturers' agreements with Distributors to use the
Distributors to facilitate distribution of the Manufacturers' advertisements and marketing materials
are directly relevant to Plaintiffs' claims *against the Manufacturers* who created the advertisements and
who were well versed in the flaws in the marketing materials.  Second, the testimony of Plaintiffs'
expert Dr. Perri confirms that the Manufacturers' use of Distributors to convey the Manufacturers'
marketing messages is an important fact in support of Plaintiffs' marketing claims, contrary to
Defendants' inaccurate summary of Dr. Perri's testimony.[65]

Not only are these facts relevant to Distributors' motive and knowledge, as well as Plaintiffs'
marketing claims against Manufacturers, such that exclusion under Rule 402 is not warranted, but
they are hardly so prejudicial that they warrant exclusion under Rule 403.  Any purported "spill over
prejudice" may be resolved through jury instructions and does not warrant exclusion of this
evidence.  *See United States v. Fleming*, 902 F.2d 1570 (6th Cir. 1990) (evidence properly admitted
where alleged "jury confusion and spill over prejudice were made less likely by the trial court's jury
instructions."); *United States v. Mohammad*, No. 1:10CR389, 2012 WL 4483544, at *5 (N.D. Ohio,
Sept. 27, 2012) (rejecting defendant's "spill-over prejudice argument" where "instructions to the jury
directing them to consider the evidence and charges against each defendant separately" could
"eliminate any possible prejudice").  Distributor Defendants' ill-founded MIL to exclude this
evidence is due to be denied.

---

[64]  Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary
Judgment on Plaintiffs' Civil Conspiracy, RICO, and OCPA Claims) at p. 114 (emphasis added).  *See also
id.* at p. 114 ("the conspiracy began with the Manufacturer Defendants' false marketing efforts . . . ), and
pp. 7-27 (discussing the Manufacturers' marketing conspiracy).

[65]  Dkt. #1969-7/#1983-4 (4/23/19 Perri Dep.) at 217-222 (testifying that distributors were "integral" to
manufacturers' functioning in the supply chain, that, in addition to conveying information on "price and
availability" for the manufacturers, the distributors also conveyed marketing messages "beyond that"
including "unbranded marketing messages," that "marketing behaviors … are interrelated" such that "the
overall marketing and all the things [the defendants] did contributed to the marketing success," and that
"the marketing of opioids was inappropriate" with the distributors being "part of that process").

C. **PLAINTIFFS' RESPONSE TO HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE (DKT. #2645).**

      1.     <u>**Henry Schein MIL No. HS-1**</u>: **References to the Henry Schein Defendants having engaged in any alleged activities with respect to Cuyahoga County.**

Through MIL No. HS-1, the Henry Schein Defendants ("Henry Schein") seek a blanket prohibition of references to any Henry Schein entities or to "Defendants" or "Distributor Defendants" when referencing Plaintiff Cuyahoga County's claims because Cuyahoga did not sue the Henry Schein companies. Dkt. #2645 at p. 2. The Court should reject this request as both unwarranted and unworkable.

It is unwarranted because the mere fact that Cuyahoga did not sue Henry Schein does not mean *either* that Henry Schein's conduct in neighboring Cuyahoga County cannot be relevant to Plaintiff Summit County's claims against it *or* that Henry Schein's conduct as a non-party is irrelevant to Cuyahoga's claims. *See, e.g., Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim."). For example, there is evidence that Henry Schein engaged in the "alleged activities" in Cuyahoga County since as early at 2010. A November 12, 2012 letter from HSI to the Ohio State Board of Pharmacy informs the Board that, with the exception of products containing two non-opioid substances, HSI failed to report sales of controlled substances as required by the state's Prescription Monitoring Program since as early as 2010. *See* Dkt. #2302-31/#2307-2 (Ex. 32 to Plaintiffs' Opp. to Non-Rico Small Distributors' MSJ). Defendants explain in the letter that HSI "operates six (6) distribution centers licensed to sell prescription drugs in Ohio. The primary customers for [their] distribution services are office based dental and medical practitioners." *Id.* Based on this language a reasonable juror could conclude that Henry Schein did distribute and fail to report the distribution of opioid products throughout the entire state of Ohio including Cuyahoga County from at least 2010-2012.

This MIL is also unworkable because this blanket requirement that any party not refer to "Defendants" or "Distributor Defendants" when discussing Cuyahoga's claims could not be enforced without an endless series of objections raised every time these words are spoken and

ensuing colloquies over whether the claims of Cuyahoga-only, Summit-only, or both were being discussed when the verboten word or words were spoken. Finally, a party's reference to "Defendants" or "Distributor Defendants" would not be prejudicial to Henry Schein under FED. R. EVID. 403 in any event because the jury may be instructed that Cuyahoga has no claims against Henry Schein and therefore it could not find Henry Schein liable to Cuyahoga. Henry Schein's MIL No. HS-1 therefore should be denied.

    2.    **<u>Henry Schein MIL No. HS-2</u>: References to Henry Schein Medical Systems, Inc. as having distributed any opioid medications into Summit County or otherwise caused or contributed to any alleged opioid epidemic.**

Henry Schein's MIL No. HS-2 addresses Defendant Henry Schein Medical Systems, Inc. ("HSMS") and seeks to prohibit Plaintiffs "from referencing HSMS as having distributed opioids generally or to Summit County specifically causing or contributing to any alleged opioid epidemic." Dkt. #2645 at p. 2. This request is contrary to Plaintiff Summit County's claims, *see* Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 117 (HSMS's "symbiotic" arrangement with Defendant Cardinal Health generated hundreds of millions of dollars in sales), and to the Court's Order denying summary judgment for HSMS. Dkt. #2559 (Order Denying Small Distr. MSJ) at p. 5 ("[T]he Court is unable to conclude that no reasonable jury could find that Schein's market activities were *de minimus*."). Since sufficient evidence supports Summit's claims against HSMS, the Court should deny Henry Schein's MIL No. H-2 to preclude Plaintiffs from referencing Defendant HSMS as having caused harms to Summit County.

3. **Henry Schein MIL No. HS-3**: **References to sales or distribution of opioid medications to retail, chain, Internet pharmacies, or "pill mills."**

Neither Plaintiffs nor their counsel have any intention of making or eliciting factual misrepresentations at trial. Thus, if Defendant Henry Schein, Inc. ("HSI") truly did not distribute opioids to chain, retail, or internet pharmacies,[66] Plaintiffs and their counsel will not claim they did. To the extent Henry Schein believes that Plaintiffs have offered at trial specific evidence or argument on this issue that is factually inaccurate or lacks foundation, they should raise their objections at that time so that the Court can resolve the matter in context. A blanket motion *in limine* is not appropriate.

Henry Schein also inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that the "probative value of such references is contrary to the evidence, lacks foundation, and would otherwise confuse the jury and unfairly prejudice Henry Schein, Inc." Dkt. #2645 at p. 3. Rule 602 states:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

FED. R. EVID. 602. It is not clear how this rule is relevant to MIL No. H-3, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-3 should be denied.

4. **Henry Schein MIL No. HS-4**: **References to opioid medications distributed by Henry Schein, Inc. to Dr. Brian Heim.**

Henry Schein's MIL No. H-4 seeks to prohibit Plaintiffs from referencing HSI's distribution of prescription opioids to Dr. Brian Heim after he pled guilty and lost his medical license for felony

---

[66] Although Henry Schein claims that the "undisputed evidence shows that [HSI's] distribution of opioids in Summit County was limited to individual prescribers (*i.e.*, doctor and dentists)[,]" they failed to cite to, or attach, any such evidence to their motion *in limine*.

drug theft and again after he was indicted for drug trafficking, unless Plaintiffs show that the drugs sold were diverted.  Dkt. #2645 at pp. 3-4.

The Court should reject this request as contrary to its recent Order denying summary judgment on causation.  In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9.  So it is here.  Plaintiffs may introduce evidence of Henry Schein's sales to Dr. Heim after his guilty plea, loss of licensure, and later drug trafficking indictment as evidence of its complete failure to maintain effective controls *whether or not* those sales are shown to have been diverted.  Henry Schein's MIL No. H-4 concerning Dr. Heim therefore should be denied.

5.    **Henry Schein MIL No. HS-5: References that Henry Schein, Inc. should not have shipped opioid medications following Dr. Heim's May 2012 indictment.**

Henry Schein also seeks to exclude evidence regarding HSI's continued shipments of opioid medications to Dr. Heim after he was indicted in May 2012 for destroying business records and trafficking in the stimulant drug Adderall.  Henry Schein argues that such evidence is inadmissible unless Plaintiffs can show HSI knew or should have known of the indictment.

As a distributor of dangerous drugs with a known risk of diversion, HSI had a duty to know and monitor their customers.  For new customers seeking to purchase opioids, HSI should have exercised due diligence to determine whether there were any potential "red flags" with that new customer.  HSI failed to adequately inquire about Dr. Heim's background when it approved him to purchase opioid medications.  A simple verification of Dr. Heim's medical license in Ohio would have revealed that in 1998, Dr. Heim entered a guilty plea to twenty-four felony counts of theft of drugs and twenty-one felony counts of illegal processing of drug documents, which resulted in his

license being revoked. A reasonable distributor, knowing this information, would have realized that any sales to Dr. Heim would result in a likelihood of diversion and would have not sold opioid medications to him. From January 2010 to December 2011, Dr. Heim was listed as the 11th top prescriber of Oxycodone/APAP in the Akron, Ohio area, yet HSI's due diligence file for Dr. Heim does not reflect a single visit to his office.

Henry Schein designed and operated a grossly inadequate screening system for customers that allowed customers, including Dr. Heim, to place and receive large orders of opioids despite warning signs. HSI's witnesses repeatedly testified that their due diligence inquiry for opioid customers has never included either criminal background checks or medical license disciplinary checks. In this particular case, based on a license check HSI conducted in June of 2011, Henry Schein knew Dr. Heim had previously faced disciplinary actions. **Ex. 17** [HSI-MDL-00001198-HSI-MDL-00001210] at 1210. Despite this red flag, HSI made no additional effort beyond the license check and a simple questionnaire to determine whether Dr. Heim should be allowed to order and receive large quantities of opioids. In addition, Dr. Heim identified his areas of medical practice as Family Practice and Obstetrics & Gynecology. This should have been another red flag.

Instead, HSI shipped approximately 11,500 hydrocodone pills to Dr. Heim over fourteen transactions between August 17, 2011, and June 5, 2012. *See* Dkt. #2200 (Plaintiffs' Opp. to Non-RICO Small Distributors' De Minimis MSJ) at p. 10. Two thousand of those pills were shipped on May 21, 2012 and June 5, 2012, after Dr. Heim was indicted on May 18, 2012 for drug trafficking. Whether Henry Schein knew about the indictment at the time of the May and June shipments is irrelevant - they already had plenty of warning signs about Dr. Heim by that time. In addition, the orders Henry Schein filled for Dr. Heim were during the timeframe and of materials that were not reported to the Ohio Prescription Monitoring Program as previously discussed in above (*supra* at § C.1). Dkt. #2200 at p. 10. All of this information is relevant the question of Henry Schein's liability.

Had HSI performed the due diligence the law requires, it would have known about Dr. Heim's history of criminal activity. Consequently, HSI cannot claim ignorance of his indictment when minimal effort would have disclosed it. Henry Schein's MIL No. H-5 should be denied.

6.   **Henry Schein MIL No. HS-6**: References to opioid medications distributed by Henry Schein, Inc. to Dr. Adolph Harper.

Henry Schein's MIL No. H-6 seeks to prohibit Plaintiffs from referencing HSI's distribution of opioids to Dr. Adolph Harper—who was convicted of drug trafficking, health care fraud, and conspiracy to distribute oxycodone, in effect operating a pill mill, and eight of whose patients died of overdose-related deaths—unless Plaintiffs show that the pills HSI sold to Dr. Harper were diverted. Dkt. #2645 at pp. 4-5.

The Court should reject this request, too, as contrary to its recent Order denying summary judgment on causation. In that ruling, the Court rejected Defendants' argument that Plaintiffs must show whether each suspicious order shipped was in fact diverted, holding instead that:

> [G]iven the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer that these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs.

Dkt. #2561 (Order re MSJs on Causation) at p. 9. So it is here. Plaintiffs may introduce evidence of HSI's sales to Dr. Harper as evidence of its complete failure to maintain effective controls. Although these sales pre-dated Dr. Harper's criminal conviction, the frequency and strength of the opioid prescriptions he wrote support Summit County's claim that Schein should have flagged his orders as suspicious. Dkt. #1999-7/#2000-7 (Keller Rep.) at ¶¶ 104-105. Henry Schein's MIL No. H-6 concerning Dr. Harper therefore should be denied.

7.   **Henry Schein MIL No. HS-7**: References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System without first identifying whether any orders that HIS sold into Summit County were diverted.

It is not entirely clear whether Henry Schein is arguing that evidence of HSI's insufficient

SOMS is itself irrelevant and unfairly prejudicial, or whether it is only irrelevant and unfairly prejudicial if Plaintiffs do not first demonstrate "that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County." Regardless, both arguments are without merit. First, evidence of HSI's insufficient SOMS is highly probative to Plaintiffs' claims and is not unfairly prejudicial for the reasons discussed above as to Defendants' Omnibus MIL No. 7. *Supra* at § A.7. Additionally, Plaintiffs have already made an initial showing that Henry Schein's conduct substantially contributed to the public nuisance, which the Court considered sufficient to withstand summary judgment. Dkt. #2561 at p. 9 ("As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."); Dkt. #2559 (order denying small distributors' summary judgment motion). Plaintiffs understand that they will have to establish causation at trial, and fully intend to do so. Whether Plaintiffs have laid an adequate foundation for a particular piece of evidence or testimony is a determination that should be made at trial so that it can be resolved in context. *See Indiana Ins.*, 326 F. Supp. 2d at 846.

Finally, Henry Schein again inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that this evidence "lacks foundation and is otherwise irrelevant and unfairly prejudicial." Dkt. #2645 at p. 5. It is not clear how this rule, which requires witnesses to have personal knowledge of matters on which they testify (FED. R. EVID. 602), is relevant to MIL No. H-7, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-7 should be denied.

**8.** **Henry Schein MIL No. HS-8**: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.

Henry Schein's MIL No. HS-8 should be denied for the same reasons discussed above with

respect to Defendants' Omnibus MIL No. 6. *Supra* at § A.6.

> **9.** **Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

Henry Schein argues that evidence regarding fines imposed by other states is not relevant in this case because those fines did not involve HSI's distribution of opioids in Ohio. As discussed in § A.6, *supra*, however, Henry Schein's argument improperly seeks to limit the scope of Plaintiffs' proof. The opioid crisis and harm experienced by Cuyahoga and Summit Counties did not result solely from conduct by Defendants that specifically occurred in those counties or in Ohio. Rather, the problem caused in these counties by Defendants' oversupply, inadequate monitoring, and diversion resulted from conduct by Defendants that occurred all over the country. This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

> **10.** **Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

Henry Schein seeks to exclude evidence regarding a "purported" letter "supposedly" sent in 1998 from the Ohio Board of Pharmacy to HSI. The MIL specifically references meeting minutes of the Ohio Board of Pharmacy from November 1998 that reference the letter. Henry Schein argues "[a]s an initial matter, there is no evidence that any such letter was actually sent to or received by HSI." Dkt. #2645 at p. 6.

Henry Schein is wrong. Its own documents reflect receipt of the very same letter referenced in the meeting minutes. In a PowerPoint presentation discussing HSI's due diligence requirements, there is a slide summarizing various "penalties" imposed by governmental entities on distributors, including HSI. The first item on the slide references a "Warning Letter" sent by the "Ohio State BOP" in 1998 to HSI regarding the "Sale of dangerous drugs to persons/entities not

licensed/authorized to possess them." **Ex. 18** [HSI-MDL-00176719] at p. 4.  This could not be clearer.  As has been discussed previously, this evidence is relevant and admissible to show that Henry Schein was aware that there were deficiencies in its oversight of sales of dangerous opioid medications, which is probative of its intent in causing the nuisance condition in Cuyahoga and Summit Counties.

11.     <u>Henry Schein MIL No. HS-11</u>: **References to alleged conduct supportive of Plaintiff's conspiracy claim, which took place, if at all, prior to May 18, 2014.**

Henry Schein requests that Plaintiffs be prohibited from referencing, or introducing evidence of, Henry Schein's pre-May 18, 2014 conduct to support their conspiracy claim.   In support, Defendants argue "Plaintiff has acknowledged that its conspiracy claim against the Henry Schein Defendants…is governed by a four (4) year statute of limitations." Dkt. #2645 at p. 7.  This argument is not only unsupported in the motion, it is simply not true.  Henry Schein's MIL No. HS-11 should be denied for multiple reasons.

First, as Plaintiffs argued and the Court has held, there is no statute of limitations for Plaintiffs' RICO claims for equitable relief and they "are exempt from the operations of a limitations period."  Dkt. #2568 at p. 11.  Second, to the extent Defendants contend that a four year statute of limitations is applicable to Plaintiffs' public nuisance claim, Plaintiffs have consistently argued there is no limitations period applicable to public nuisance claims.  More importantly, this Court also held there is no limitations period for absolute nuisance claims. *Id.* at p. 5.  Third, since "the applicable statute of limitations for filing a civil conspiracy cause of action is the relevant limitations statues for the underlying cause of action," *id.* at p. 12 (citation omitted), and the underlying cause of action is public nuisance there is likewise no conspiracy statute of limitations at issue here.  Fourth, as set forth in Plaintiffs' prior arguments submitted in opposition to the Defendants' motion for partial summary judgment on statute of limitations grounds, pre-May 18, 2014 conduct remains relevant and admissible as it relates to post-May 18, 2014 damages and liability.  Dkt. #2212 at pp. 55-56.  Indeed, unless Henry Schein demonstrates that it has *affirmatively withdrawn* from a conspiracy, it remains exposed to liability for post-May 18, 2014 damages for the acts of its co-conspirators.  To

the extent Henry Schein seek to temporally limit the scope of its participation in the conspiracy, it has not pointed to any action taken to affirmatively withdraw from the conspiracy.[67]

Finally, this Court held that there are "material fact questions concerning the claim's accrual dates, whether Plaintiffs exercised reasonable diligence to discover facts necessary to bring suit, and the applicability of tolling doctrines." Dkt. #2568 at p. 1; *see also* Dkt. #2212. The Court further ruled that questions about "the dates these [civil conspiracy] claims accrued or the periods they were tolled," can only be answered after a presentation of all the evidence at trial. Dkt. #2568 at p. 3.

There are multiple factual disputes involving Henry Schein the jury will need to consider. For example there is evidence that, despite recommendations to the contrary, Henry Schein willfully failed to design a system that would detect suspicious orders until at least October 2009.[68] In addition, there is evidence that Henry Schein failed to report suspicious orders to the DEA when discovered until at least 2017 and that, in the meantime, Henry Schein was aware it lacked due diligence files for 27,000 customers.[69] Whether and the extent to which these actions impact the statute of limitations and/or the date(s) Plaintiffs' claims accrued must be determined at trial.[70]

Henry Schein's MIL No. HS-11 should be denied for these reasons.

12.  **Henry Schein MIL No. HS-12: References to Henry Schein Animal Health, which is not a named party to Plaintiff's lawsuit.**

Henry Schein's MIL No. HS-12 seeks to prohibit any reference to or evidence concerning Henry Schein Animal Health ("HSAH"), which is not a named defendant. Dkt. #2645 at pp. 7-8.

---

[67] "[O]nce a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." *Watson Carpet & Floor v. Mohawk Indus.*, 648 F. 3d 452 (6th Cir. 2011). "At a minimum, 'affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." *In re Cathode Ray Tube Antitrust Litig.*, MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891, *3 (N.D. Cal. 2016) (citing *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 464-5 (1978)).

[68] *See* Dkt. #1956-2 (12/13/18 Abreu Dep.) at 237:21-239:1, 259:17-261:19, 454:12-456:24.

[69] *Id.* at 261:9-19, 294:21-295:7, 308:10-310:24.

[70] Dkt. #2568 at p. 3.

Henry Schein asserts that any reference or evidence about HSAH "is irrelevant as to whether HSI or HSMS substantially caused or contributed to the alleged public nuisance in Summit County. *Id.* at p. 7. This is incorrect. An entity's status as a non-party is not determinative of whether its conduct is relevant to a claim. *See, e.g., Stringer*, 749 F. Supp. 2d at 704 ("Minnesota courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim.").

Here, Plaintiffs allege that HSAH was investigated for distribution of wholesale dangerous drugs to an unlicensed entity in Ohio in 2014. Dkt. #513 (Corrected 2d Am. Compl.) at ¶ 590. Although Defendant HSI asserts that it "no longer holds an interest" in HSAH, Dkt. #2645 at p. 7, it does not dispute that it did when the conduct at issue took place. Henry Schein's request concerning HSAH therefore is either baseless or else premature. *See, e.g., Hochstein v. Microsoft Corp.*, 04-73071, 2009 WL 2022815, at *6 (E.D. Mich. July 7, 2009) (denying motion *in limine* to exclude "any reference to third party games for which discovery was not sought" as "premature," to which the parties agreed). In either event, Henry Schein's MIL No. H-12 should be denied.

**D.     PLAINTIFFS' RESPONSE TO WALGREENS' MOTIONS *IN LIMINE* (DKT. #2648).**

> **1.     Walgreens' MIL No. W-1: To preclude evidence or argument about Walgreens' ownership interest in AmerisourceBergen.**

Walgreens's argument that evidence of its ownership interest in AmerisourceBergen should be excluded under Rules 402 and 403 is based on a misconstruction of the purpose for which Plaintiffs propose to rely on the evidence. Plaintiffs do not seek to hold Walgreens liable for the actions of AmerisourceBergen as a legal control person or parent entity. Rather, Plaintiffs seek to enter evidence of Walgreens' ownership interest in AmerisourceBergen as being relevant to Plaintiffs' conspiracy claims.

The financial relationships between Defendants, including Walgreens's ownership interest in AmerisourceBergen, are relevant to show the continuing conspiracy among the Defendants and should not be excluded under Rule 402. Plaintiffs' summary judgment briefing concerning Plaintiffs' RICO and conspiracy claims set out the significant financial interests implicit in the

relationships among and between the Defendant coconspirators.  *See, e.g.,* Dkt. #2182 at pp. 63-68.  This evidence of Defendants' financial interests and connections is relevant to Plaintiffs' conspiracy claims.  *See United States v. Robinson*, 763 F.2d 778, 783 n.8 (6th Cir. 1985) ("evidence tending to establish. . . . an ownership interest . . . would be relevant as tending to show . . . a motive for entering into the conspiracy"); *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (evidence establishing ownership were relevant to establish "financial stake in the profitability" of an entity in context of alleged conspiracy); *Cadence Educ., LLC v. Vore*, No. 17-CV-2092-JTM-TJJ, 2018 WL 690993, at *7 (D. Kan. Feb. 2, 2018) (defendants ordered to produce documents concerning ownership interest in corporate entities and relationships between corporate entities as being relevant to conspiracy claims).

Walgreens has repeatedly taken the position that its liability ended when it ceased self-distribution.  However, as set out in Plaintiffs' summary judgment briefing regarding Plaintiffs' conspiracy claims, Walgreens did not withdraw from the Conspiracy at that time – or ever – and has continued to work with other Defendants, including AmerisourceBergen, to continue to support the conspiracy's objectives.  Dkt. #2182 at pp. 116-117.  Walgreens remains liable for the actions of its coconspirators in furtherance of the conspiracy, regardless of its cessation of distribution.  The jury should be permitted to consider Walgreens' near simultaneous decision to stop self-distribution, entry of an exclusive distribution relationship with coconspirator AmerisourceBergen, its corporate involvement in the AmerisourceBergen SOM review of Walgreens orders, and the beginning of Walgreens acquisition of significant amounts of AmerisourceBergen stock, which also provided Walgreens with a seat on AmerisourceBergen's Board.

Walgreens's continued participation in the conspiracy and financial relationships to conspirators are relevant to show Walgreens's continued corporate involvement in and support of the conspiracy, including Walgreens's involvement in the SOM procedures applied by AmerisourceBergen to orders for prescription opioids placed by Walgreens's pharmacies, and do not transform Plaintiffs distribution and conspiracy based claims into claims based on Walgreens pharmacy level dispensing.  Walgreens' MIL No. W-1 should be denied.

2.    **Walgreens' MIL No. W-2**: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement.

The arguments asserted by Walgreens regarding admissibility under Rule 408 and 403 are addressed in § B.1, *supra*.  Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

With regard to Walgreens' argument that evidence concerning the Florida DEA enforcement action should be excluded because it occurred in Florida, rather than Ohio, this argument ignores the well-known problem of opioid "migration" from one location to another.  As the Washington Post recently reported,

> During the past two decades, *Florida became ground zero for pill mills* — pain management clinics that served as fronts for corrupt doctors and drug dealers. They became so brazen that some clinics set up storefronts along I-75 and I-95, advertising their products on billboards by interstate exit ramps. So many people traveled to Florida to stock up on oxycodone and hydrocodone, they were sometimes referred to as "prescription tourists."
>
> *The route from Florida to Georgia, Kentucky, West Virginia and Ohio became known as the "Blue Highway."* It was named after the color of one of the most popular pills on the street — 30 mg oxycodone tablets made by Mallinckrodt, which shipped more than 500 million of the pills to Florida between 2008 and 2012.
>
> When state troopers began pulling over and arresting out-of-state drivers for transporting narcotics, drug dealers took to the air. *One airline offered nonstop flights to Florida from Ohio and other Appalachian states, and the route became known as the Oxy Express.*

"76 billion opioid pills:  Newly released federal data unmasks the epidemic," The Washington Post, July 16, 2019 (emphasis added).[71]

There is abundant evidence in the record – including in Walgreens' own internal documents – that the opioids the Defendants shipped migrated far beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.  *Supra* at fn.37.  Defendants were regularly alerted to the migration phenomenon

---

[71]    *Available at* https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html (accessed on 10/3/19).

by the DEA, and their personnel acknowledged the reality of diversion and migration in their depositions. *Supra* at fns.39-40.

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Walgreens' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped hundreds of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come long distances from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every diverted pill posed a risk to localities throughout the nation was not only foreseeable to Walgreens, it was observed and known by them. Each shipment Walgreens made in disregard of the potential for diversion is evidence of damages caused by Walgreens to localities throughout the nation, including Cuyahoga and Summit Counties.

Because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a SOM program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Each Defendant's SOM was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. Because of the uniform national character of Defendants' SOMs, each wrongful order filled by Defendants is further evidence of the flaws in Defendants' SOMs, and of the consequences of those flaws. Defendants' efforts to exclude this highly probative evidence, including by Walgreens' MIL No. W-2, should be denied.

3.     __Walgreens' MIL No. W-3__: **To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man."**

Walgreens' motion to preclude evidence or argument that former DEA Deputy Administrator Joseph Rannazzisi's credibility is bolstered by his appearance on "60 Minutes," or by reporting by other news outlets, has no merit. Walgreens specifically seeks to preclude such references – and in particular, reference to Mr. Rannazzisi as the "60 Minute Man" – on the grounds that such references would invade the jury's role as factfinder, as well as mislead and confuse the jury. These purported concerns cannot be taken seriously.

First, Walgreens' objection to the specific phrase "60 Minute Man" – to reference a man who appeared on "60 Minutes" – has no legal basis. The parties have listed hundreds of names to appear as potential witnesses at trial, and each witness called by the parties will testify in varying levels of detail as to their backgrounds, educational history, employment history, as well as their involvement and interactions with the opioid epidemic. Brief, accurate references to a relevant and undisputed part of a witness's history are thus necessary at trial. Instead of reciting a witness's full name, full job title, and dates of employment, counsel routinely instead refers to "the Walgreens' CEO," "the ABDC Consultant," or "the Mallinckrodt Investigator." "The 60 Minute Man" is no different, and this phrase includes no commentary or argument as to Mr. Rannazzisi's credibility. It simply references a critical part of one witness's relevant history in a neutral, shorthand phrase. Forbidding such references at trial would result in bizarre affirmative rules mandating the use of each witness's full name and title each time counsel references that witness. Walgreens' request here is unreasonable and untenable, and must be denied.

Second, actual references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, do nothing to invade the jury's role as a factfinder to weigh the strength of the evidence. In fact, such references affirmatively provide additional evidence for the jury to weigh. With this evidence – and any admissible impeachment evidence offered by Defendants – the jury is free to determine whether it finds Mr. Rannazzisi to be a

credible witness.[72]  Indeed, a reputable news outlet's use and reliance on Mr. Rannazzisi's comments in a national broadcast or publication constitutes valid and admissible evidence of his credibility. And Walgreens cites no authority that such evidence is typically excluded.

Finally, references to Mr. Rannazzisi's credibility in connection with either his "60 Minutes" interview, or other news reports, also do nothing to mislead or confuse the jury.  The decision of various news outlets to broadcast and publish Mr. Rannazzisi's statements is useful information the jury should consider in weighing the strength of his testimony.  This inference does not mislead the jury as to any facts (and Walgreens identifies none), nor does it confuse the jury as to any facts (and Walgreens identifies none).  Walgreens' MIL No. W-3 should accordingly be denied.

## E.   PLAINTIFFS' RESPONSE TO CARDINAL HEALTH INC'S MOTIONS *IN LIMINE* (DKT. #2653).

### 1.   <u>Cardinal MIL No. 1</u>: 14,000 Orders Not Shipped.

Cardinal erroneously seeks to exclude evidence that it failed to report more than 14,000 suspicious orders nationwide under Rule 402 and pursuant to a misplaced and repeatedly rejected preemption argument.  Dkt. #2653-1 at pp. 1-4.  Cardinal's MIL is due to be denied on both grounds.

Cardinal's admitted failure to report suspicious orders is relevant to Plaintiffs' claims that Cardinal failed to maintain effective controls against the diversion of opioids.  This evidence presents another example of Cardinal's failures both in CT1 counties specifically and nationally. Even after the DEA took action against Cardinal in 2008 and 2012, Cardinal continued to fail to establish an effective SOM program.  Over at least six years[73] Cardinal was failing to report

---

[72]  *See U.S. v. Turning Bear*, 357 F.3d 730 (8th Cir. 2004) (admitting evidence of witness's character for truthfulness over Rule 403 objection, that was neither substantially outweighed by unfair prejudice nor needlessly cumulative, where credibility of the testimony was at issue); *U.S. v. Lopez-Ortiz*, 736 F. Supp. 2d 469, 471 (D.P.R. 2010) ("Allowing defense counsel to introduce admissible testimony or other evidence bearing on the government witnesses's character would not result in unfair prejudice to the government's case or unfairly influence the jury.").

[73]  Cardinal told the DEA that the "vast majority" of the unreported suspicious orders were placed during the time period of 2012-2015, but that 23 have occurred since January 1, 2017. **Ex. 19** [CAH_MDL2804_02101803].

suspicious orders of the most highly abused opioids and only disclosed their failures in 2018 because of pending litigation with an attorney general.

The seriousness of Cardinal's failure to report these suspicious orders is underscored by the fact that, according to Cardinal, the "vast majority" of the suspicious orders were for formulations of opioids most likely to be diverted and abused.[74] Cardinal sets sub-base code thresholds only for the most highly abused strengths of certain opioids. These formulations, according to Cardinal, "are more susceptible to diversion and abuse," including in particular 15 and 30 milligram doses of oxycodone and 10 milligram doses of hydrocodone.[75] If it was not egregious enough that Cardinal failed to report thousands of suspicious orders over the course of at least six years, the fact that most of those orders were for the most dangerous versions of opioids is astounding given the company's history with DEA administrative actions. The unreported suspicious orders are directly relevant to whether Cardinal was able to maintain effective controls against diversion after 2012.

While Cardinal contends that four of the more than 14,000 unreported suspicious orders originated from Summit and/or Cuyahoga Counties, Cardinal advised the DEA that 887 of the orders were placed by customers in the Wheeling, West Virginia Distribution Center's service area, which includes Summit and Cuyahoga Counties.[76] Even if the orders were not shipped, it is undisputed that pharmacies in this region placed nearly 900 suspicious orders, the vast majority of which were for the most abused and diverted opioids.[77] Cardinal's failure to report allows these bad pharmacies to continue to operate without further investigation.

Cardinal attempts to downplay the number of suspicious orders it failed to report by stating that it was reporting "tens of thousands of orders a year" from 2012 to 2015. However, in his 2012 Annual Quality and Regulatory Report to the Cardinal Board of Directors' Audit Committee, Chief

---

[74]  *Id.*

[75]  **Ex. 20** [CAH_MDL2804_00069435] at 48.

[76]  **Ex. 19** [CAH_MDL2804_02101803] at 4.

[77]  Dkt. #1959-14 (9/26/18 Cameron Dep.) at 269:12-270:13 (produced at CAH_MDL2804_02953369); **Ex. 20** [CAH_MDL2804_00069435] at 48.

Legal and Compliance Office Craig Morford reported that Cardinal had reported only 3,020 suspicious orders to the DEA nationwide in fiscal year 2012.[78] The ratio of unreported suspicious orders versus reported suspicious orders is much larger than Cardinal presents.

Finally, Cardinal recycles again here the preemption arguments this Court has repeatedly rejected.[79] Those arguments are made no more persuasive in their third iteration. Cardinal's MIL No. 1 should be denied.

---

[78] **Ex. 21** [CAH_MDL2804_03262274] at 438.

[79] Dkt. #1025 (Report and Recommendation) at pp. 48-54 (rejecting preemption arguments); Dkt. #1203 (Opinion and Order) at p. 2 (adopting R&R decision on preemption); Dkt. # 2565 (Opinion and Order re: Preemption) (rejecting all preemption arguments).

2.    **Cardinal MIL No. 2: "Interesting Gossip" Email.**[80]

Cardinal bases its argument that MCKMDL00545341 should be excluded under Rules 402 and 403 (Dkt. #2653-1 at p. 4) on a misconstruction of the purpose for which Plaintiffs propose to use the email at trial. The email, and the notes attached thereto, contain the report from Cardinal's Director of Regulatory Affairs of a "Huddle" meeting among Cardinal, McKesson, AmerisourceBergen, and HD Smith (the self-styled "Big Four") and the issues discussed therein, including those related to CSA compliance. Plaintiffs do not intend to cite the email as evidence that Cardinal failed to report suspicious orders, but rather as evidence of the nature of the relationships between these Defendants and the types of CSA compliance related issues they discussed and coordinated together.[81]

The evidence is relevant and should not be excluded under Rule 402. The email Cardinal moves to exclude contains notes from a Big Four "Huddle" meeting that occurred during and after an HDA conference. During this Huddle, these Defendants all discussed CSA compliance issues, including intentional failure to comply. This document (among others) shows that Big Four Huddles in conjunction with HDA conferences occurred and further shows the kinds of discussions that occurred at the meetings. This evidence is particularly relevant to Plaintiffs' RICO and conspiracy claims because it shows, as Plaintiffs alleged in their TAC,[82] that Defendants used the HDA as a forum in which to form agreements, to discuss issues related to suspicious order compliance, and to coordinate their activities. The document is also relevant to show Defendants' knowledge of – and failure to report - the noncompliance of direct competitors. Moreover, the

---

[80]    Though Cardinal's motion refers to MCKMDL0054341, based on the first page of the email, which Cardinal attaches to the motion, and the context of the argument, Plaintiffs believe Cardinal made a typographical error and respond regarding MCKMDL00545341. Further, Cardinal only includes the cover page of MCKMDL00545341 as an exhibit to its motion, depriving the Court of the full context of the document. Plaintiffs attach the complete document – including the attached notes – here. *See* **Ex. 22** [MCKMDL00545341-347].

[81]    The purpose for which Plaintiffs intend to offer the email is confirmed in Plaintiffs' omnibus summary judgment opposition briefing regarding Plaintiffs' Conspiracy, RICO, and OCPA claims (Dkt. #2182 at pp. 37 and Exhibit 291).

[82]    *See* Dkt. #1466 (Summit Third Amended Complaint) at ¶¶ 540-546, 763-767, 854, 910.

"interesting gossip" section of the Huddle notes is also relevant to show that the relationships between these Defendants were so secure that Cardinal felt comfortable disclosing intentional regulatory violations.

Rule 403 does not justify exclusion of the Big Four Huddle document. While all evidence is prejudicial, Rule 403 requires that the probative value of the document be outweighed by the prejudice. *See Koloda v. General Motors Parts Div., General Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'"). Exclusion under Rule 403 is an "extraordinary remedy and carries a strong presumption in favor of admissibility." *In re Air Crash at Lexington, KY*, No. 5:06-CV-316-KSF, 2008 WL 2782827, at *1 (E.D. Ky. July 8, 2008) (citing *U.S. v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). *See also In re Air Crash Disaster*, 86 F.3d 498, 538 (6th Cir. 1996) ("Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant—the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or inappropriate. The truth may hurt, but Rule 403 does not make it inadmissible on that account."). Here, there are multiple reasons why this Big Four Huddle document has probative value regarding the defenses and claims at issue in this case, as discussed above. Cardinal's only argument about prejudice is their presumption (without supporting evidence) that the document contains an allegedly inaccurate statement that would require rebuttal and take time. Cardinal's position is simply not enough to overcome the significant probative value of the Big Four Huddle document. Cardinal's MIL No. 2 should be denied.

### 3. <u>Cardinal MIL No. 3</u>: Misleading Data Comparisons (McCann Data Analysis).

Cardinal seeks to prohibit Plaintiffs' expert Dr. Craig McCann from testifying based upon data produced by Cardinal for the years 1996-2005. Cardinal argues that because it retained and produced data for several years prior to the period covered by other Distributor Defendants' productions, the jury may be confused when comparing Dr. McCann's opinions regarding Cardinal to his opinions regarding the other Distributor Defendants. Plaintiffs dispute Cardinal's contentions

regarding the potential for juror confusion and do not believe any limiting instruction is necessary. Should the need arise for any clarification, Defendants can make a request for a properly worded instruction at the time the evidence is offered and a determination as to the appropriateness of said instruction can be made at that time.

**F.     PLAINTIFFS' RESPONSE TO MCKESSON CORPORATION'S MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT (DKT. #2663).**

**1.     McKesson MIL No. MCK-1: The Court should prohibit any reference to baseless accusations.**

McKesson asks the Court to prohibit Plaintiffs from making "baseless accusations." Dkt. #2663-1 at p. 1.  This request is one part specific, and one part general.  As to the general, of course, Plaintiffs do not believe their allegations of McKesson's widespread and rampant misconduct are baseless, and indeed, the parties' disagreement on this score is the reason for the trial.  Thus, McKesson's vague request that Plaintiffs be precluded from referencing "unfounded accusations" in "opening, closing, or during examination of witnesses" should be rejected. Dkt. #2663-1 at p. 2.

As to the specific, McKesson complains about certain deposition questions regarding former Attorney General Eric Holder.  Plaintiffs dispute that the questions were baseless, but this testimony was not designated by Plaintiffs for trial, and so the request to strike reference to them is now moot. McKesson also complains about deposition questions pertaining to whether McKesson Chief Executive Officer John Hammergren knowingly provided false information during Congressional testimony when he stated that McKesson did not market opioids to, among others, pharmacists.  *Id.* This is an entirely appropriate area of inquiry in light of McKesson's marketing agreements with other Defendants, including Teva, Purdue, and Actavis.  *See, e.g.,* Dkt. #2169-32/#2173-50 (7/19/18 Oriente Dep.) at 278-287, 305-313.  McKesson has every right to argue that Hammergen's testimony was the whole truth, but Plaintiffs have the equal right to present witnesses with evidence that suggests otherwise and question the bases of McKesson's public statements.  *See, e.g., Goldman,* 559 F. Supp. 2d at 871 ("Factual questions should not be resolved through motions in limine.").

For these reasons, McKesson's MIL No. MCK-1 should be denied.

2. **McKesson MIL No. MCK-2**: The Court should prohibit evidence or argument about the U.S. House of Representatives Energy and Commerce Committee's Investigation.

McKesson's MIL No. MCK-2 seeks to preclude Plaintiffs from offering evidence or argument regarding the U.S. House of Representatives Energy and Commerce Committee's Investigation. Dkt. #2663-1 at p. 2. This MIL should be denied for the following reasons.

     *i.* *The House Report is admissible under Rule 803(8) because it is factual findings from a legally authorized investigation and there are no indications of untrustworthiness.*

The U.S. House of Representatives, Committee on Energy and Commerce Report, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (the "House Report") (**Ex. 23**) clearly is admissible under Rule 803(8) of the Federal Rules of Evidence. Rule 803(8) provides, in relevant part:

> A record or statement of a public office [is not excluded by the rule against hearsay] if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED. R. EVID. 803(8). Rule 803(8) is intended to encompass investigative or "evaluative reports" generated in the course of a public agency's duties. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 166 (1988). Examples of the types of agency investigative reports admissible under Rule 803(8) include accident reports prepared by specialized agencies, consumer safety studies, and diagnostic studies relating to issues of public health.[83] Conclusions and opinions, as well as facts, are admissible under Rule 803(8) as long as they are based on a factual investigation and satisfy the Rule's trustworthiness requirement. *Beech Aircraft*, 488 U.S. at 170.

---

[83] *See, e.g., id.* at 170 (Air Force accident report on cause of plane crash in training exercise); *United States v. Midwest Fireworks Mfg. Co.*, 248 F. 3d 563, 566-67 (6th Cir. 2001) (reports of Consumer Product Safety Commission); *O'Dell v. Hercules, Inc.*, 904 F. 2d 1194, 1204-06 (8th Cir. 1990) (CDC report on health risks from environmental exposure to dioxin).

In light of this presumption of admissibility, the party opposing the admission of the report must prove that the report is not trustworthy. *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978), *cert. denied*, 441 U.S. 933 (1979). To determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems. *Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.*, 959 F.2d 606, 616–17 (6th Cir. 1992). McKesson has failed to show that the House Report lacks trustworthiness under any of these factors.

The House Report was the result of an in-depth, bipartisan investigation into the distribution of prescription opioids by wholesale distributors, which was undertaken as part of the Committee's legislative responsibilities. The report itself contains factual findings. The Subcommittee on Oversight and Investigations held hearings and received sworn testimony from, and posed questions to, representatives of each of the wholesale drug distributors involved in the investigation. The Subcommittee examined the role that each company may have played in contributing to the opioid epidemic. In addition, the five distributors (Cardinal Health, AmerisourceBergen, McKesson, Miami-Luken and H.D. Smith) provided thousands of pages of documents to the Committee, including due diligence files, suspicious order reports and policy manuals. **Ex. 23** [House Report] at p. 40. In all, the Committee, through its members and staff, sent twelve letters requesting documents and information, reviewed more than 20,000 pages of material obtained from the DEA and wholesale distributors, participated in numerous briefings with the DEA and wholesale distributors, and held two hearings. *Id.* at pp. 43-44.

McKesson bases its challenge on possible motivational problems, arguing that the investigation was "highly charged" and involved matters already a subject of litigation (and thus subject to influence by the litigants). Dkt. #2663-1 at p. 2. The cases McKesson cites for its proposition mostly involve draft reports and partisan investigations.[84] In contrast, here the House

---

[84] *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005) (affirming exclusion on the grounds that "the Department of Energy's assessment was only a draft report"); *Pearce v. E.F. Hutton*

Report is a final report which resulted from a bipartisan investigation. Where, as here, members of both parties joined in the report, courts have been more likely to reject challenges to the admissibility of Congressional reports.[85] McKesson has not pointed to anything in either the House Report or the hearings that would indicate that the report was prepared primarily or even partially to assist in ongoing opioid-related litigation. McKesson alleges that Plaintiffs' counsel in this litigation played an active role in the investigation process, including by briefing congressional staff and providing them with "factsheets" about the opioid epidemic. Dkt. #2663-1 at p. 2 n.4. McKesson fails to state that Defendants also had input into the investigation, including briefing congressional staff and providing documents and testimony. **Ex. 24** [MCKMDL00373829]; **Ex. 25** [ABDCMDL00320377]; **Ex. 26** [CAH_MDL_PRIORPROD_HOUSE_0004057]; **Ex. 27** [CAH_MDL_PRIORPROD_HOUSE_0004068]; **Ex. 28** [ABDCMDL00321879]; **Ex. 29** [MCKMDL00373814].

> ii. *The findings of the House Report are probative into the issues at the core of the claims in this case and its inclusion is unlikely to unfairly prejudice the jury.*

The investigation that led to the House Report sought to "evaluate the extent that distributors implemented controls to prevent diversion of opioids." **Ex. 23** [House Report] at p. 4. Further, while the House Report "focused on a narrow part of West Virginia, the report raises grave concerns about practices by the distributors and the DEA nationwide." *Id.* at p. 9. The House Report notes that its findings "raise questions about the effectiveness of distributors' anti-diversion efforts outside West Virginia, as the same policies were implemented across the country." *Id.* at p. 105. Thus, the House Report's probative value is not limited to conduct that occurred in West

---

*Group, Inc.*, 653 F. Supp. 810, 813–15 (D.D.C. 1987) (excluding House committee report that was "dissented to directly along party lines" and that failed "to isolate or distinguish any factual findings from its subjective criticisms and conclusions").

[85] *See McFarlane v. Ben–Menashe,* No. 93–1304, 1995 WL 129073, at *4–*5 (D.D.C. March 16, 1995) (admitting the report of a joint Congressional task force in which members of both parties joined), *reconsideration granted on other grounds,* 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson,* 556 F. Supp. 1157, 1181 (D.D.C. 1982) (admitting committee report that "reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness"), *aff'd in part, rev'd in part on other grounds,* 757 F.2d 1 (D.C. Cir. 1985).

Virginia. The House Report is directly relevant to the litigation, going to Defendants' due diligence, suspicious order monitoring and reporting practices. Further, Defendants' own experts relied on the House Report and it was included on at least one Defendant exhibit list.[86]

Thus, there is no doubt that this evidence is highly probative on a number of issues and Defendants have not met their burden to demonstrate a risk of prejudice, much less a risk that is so substantial that outweighs their probative value.

### iii. *Testimony Provided to the Committee is Also Admissible.*

McKesson also challenges the admissibility of testimony given by McKesson Chairman, President and CEO John Hammergren to the Subcommittee on Oversight and Investigations Committee on Energy and Commerce United States House of Representatives. The statements made by Mr. Hammergren were made while he was the McKesson Chairman, President and CEO of McKesson and related to McKesson's role in the supply chain and its SOM system, unquestionably matters within the scope of his employment. These statements are therefore admissible as party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Additionally, to the extent that Defendants' experts relied on this testimony it is relevant to challenge their opinions.[87]

### iv. *Letters from members of Congress to McKesson Are Admissible.*

McKesson argues that the February 15, 2018 letter sent from members of Congress to McKesson is inadmissible hearsay. However, the letter to McKesson is not offered to prove the truth of the matters asserted in the letter, but rather as background for the House investigation and to show McKesson's awareness of the investigation and that the statements in the letter were

---

[86]  *See* Dkt. #2174-2/#2172-2 (Bell Expert Rep.) at p. 70 and n.329; Dkt. #2544-1/#2546-1 (Cantor Expert Rep.) at pp. 95-96 and Attachment 3 – Materials Considered at p. 8; **Ex. 30** [Purdue Exhibit list of September 10, 2019].

[87]  John Dombrowski, MD, and expert for distributor defendants McKesson Corporation, AmerisourceBergen Drug Corporation, and Cardinal Health included Mr. Hammergren's testimony in his report as material he considered in forming his opinions. *See* **Ex. 31** [Expert Report of John Dombrowski, MD, Exhibit C P. 3].

made. Evidence is not hearsay when it is not offered to prove the truth of the matter asserted. *See Anthony v. DeWitt,* 295 F.3d 554, 563 (6th Cir. 2002). "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." FED. R. EVID. 801, Advisory Committee Note to Subdivision (c), 1972 Proposed Rules. Further, "[s]tatements to prove the listener's knowledge are not hearsay." *U.S. v. Boyd,* 640 F.3d 657, 664 (6th Cir. 2011).

3. **McKesson MIL No. MCK-3**: The Court should prohibit the introduction of nationwide trends in drug deaths.

McKesson seeks to exclude certain Centers for Disease Control ("CDC") maps on the basis that Plaintiffs may inaccurately characterize the data depicted on the maps. But McKesson's expressed concerns do not warrant the remedy of exclusion of this evidence. If in fact McKesson believes that an inaccurate or misleading suggestion is made by Plaintiffs at trial regarding these maps, McKesson can object at the time and/or address the matter through cross-examination.

No more availing is McKesson's argument that the maps should be excluded as irrelevant because, in McKesson's view, Plaintiffs lack evidence that McKesson caused any death, and Plaintiffs may not "seek damages beyond their borders." Dkt. #2663-1 at p. 4. But these maps are relevant to numerous other issues, including by providing useful background with respect to the scope and nature of the opioid crisis, and showing (with appropriate qualification) the relationship between increased prescription opioid shipment and harms, including mortality—a subject of extensive expert testimony. As Plaintiffs' causation and damage experts make clear, increased shipments led to increased harms, and Plaintiffs' experts use mortality as the primary proxy for these harms – an analysis this Court has already blessed in rejecting Defendants prior complaints about the purported irrelevance of mortality in their *Daubert* motions. Indeed, as explained in Prof. Cutler's expert report, the field of health economics routinely studies how the use of substances—including addictive ones such as tobacco, alcohol, and more recently, opioids—are related to personal harms such as mortality. Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶ 14. The use of mortality trends and statistics is hardly controversial, and in fact is of fundamental

relevance in measuring the magnitude of the harms caused by defendants' misconduct. Information of this type will greatly assist the jury in understanding the issues presented at trial.

Accordingly, McKesson's MIL No. MCK-3 should be denied.

> 4.   **McKesson MIL No. MCK-4: The Court should prohibit Plaintiffs from introducing evidence or argument about allegations contained in letters from the DEA or DOJ.**

McKesson argues that allegations contained in enforcement letters from the DEA and DOJ should be excluded "[f]or substantially the same reasons that the Court should exclude settlement agreements." Dkt. #2663-1 at pp. 4-5. For the same reasons discussed in § B.1, *supra*, that evidence is not precluded by Rule 408 or any other rule of evidence. That evidence is relevant, among other reasons, to prove that McKesson engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs, and that they were on notice of the ways in which its conduct violated the law.

> 5.   **McKesson MIL No. MCK-5: The Court should prohibit introduction of testimony from McKesson witness Nathan Hartle because of Plaintiffs' badgering and abusive conduct.**

McKesson improperly seeks to exclude the entirety of the 30(b)(6) testimony[88] from its designated witness Nathan Hartle based only on a couple of areas of questioning undertaken by Plaintiffs, which covered a small portion of a day long deposition that spanned nearly 400 pages of testimony. Dkt. #2663-1 at pp. 6-7. In reality, Plaintiffs' questioning of Mr. Hartle in his capacity as a 30(b)(6) witness was reasonable and tailored to the broad range of topics Mr. Hartle was designated to discuss. Mr. Hartle directly answered these questions and McKesson's belated

---

[88]   Mr. Hartle was deposed in two different capacities in this case. On July 31, 2018, he testified as a 30(b)(6) designee. On August 1, 2018, he provided fact witness testimony as well. Given that McKesson's arguments in its motion *in limine* focus solely on Mr. Hartle's 30(b)(6) testimony, Plaintiffs respond only to the baseless accusations made as to that testimony. While there is equally no basis to exclude Mr. Hartle's fact testimony, Plaintiffs reserve the right to separately oppose exclusion of that testimony should that remedy be sought by McKesson in the future.

attempts to unpack that credible and admissible testimony should not be rewarded. Thus, McKesson's MIL should be denied in its entirety.[89]

First, McKesson's complete failure to seek assistance from the Special Master or the Court at or following Mr. Hartle's deposition demonstrates that Plaintiffs did not act in a "wasteful" and "abusive" manner as McKesson now contends. Dkt. #2663-1 at p. 6. Rather, McKesson's motion is nothing more than an improper attempt to exclude admissible testimony that is simply contrary to the liability picture it now intends to portray to the Court and the jury. Routinely throughout the discovery phase of this case Special Master Cohen was heavily involved in the conduct of depositions, and in fact, actually attending some of the depositions that were taken. Despite the Special Master's active involvement in the deposition process, McKesson never once asked for relief from the Special Master related to Mr. Hartle's deposition. This is telling, given that Mr. Hartle's 30(b)(6) deposition was only the third of twenty depositions taken of current or former McKesson employees during the discovery phase. If McKesson truly believed Plaintiffs acted in an abusive and wasteful fashion during Mr. Hartle's 30(b)(6) deposition it surely would have sought relief from the Special Master and/or the Court before Plaintiffs continued with seventeen additional depositions of McKesson witnesses, including the fact witness deposition of Mr. Hartle himself.

Second, the questioning addressed by McKesson was completely legitimate and consistent with the subject matter areas for which McKesson designated Mr. Hartle. McKesson designated Mr. Hartle on ten different topics that spanned broad areas concerning McKesson's duties under the CSA, the company's efforts to comply with the CSA, data concerning opioid orders supplied to CT1 pharmacies, and information concerning suspicious orders identified for CT1 pharmacies.[90]

---

[89]  Although its criticisms of Mr. Hartle's deposition have no merit, McKesson could easily avoid having his deposition played at trial by simply making him available to testify live.

[90]  Specifically, Mr. Hartle was designated to cover the entirety of Plaintiffs' first 30(b)(6) notice and topics 9, 14, and 16-22 of Plaintiffs' second 30(b)(6) notice. *See* Dkt. #2663-4 (Amended First Notice of Deposition); Dkt. #2663-5 (Amended Second Notice of Deposition).

The testimony cited by McKesson concerning opioids being a gateway to heroin use certainly relates to McKesson's duties under the CSA and why those duties are important. McKesson concedes the relatedness of this inquiry, but instead complains that answering this question requires "specialized medical and public health knowledge." Dkt. #2663-1 at p. 6. As an expert in controlled substances generally, and opioids specifically, McKesson should have such specialized knowledge to be able to answer questions on this topic. Thus, McKesson alone had the ability and responsibility to select the appropriate person to address this inquiry. Moreover, Mr. Hartle had no problem answering the question posed of him on this subject because, in fact, he does possess such specialized knowledge himself.[91] Mr. Hartle has presented data on opioids being a gateway to heroin use to various McKesson pharmacy customers and to McKesson employees in his capacity as Senior Regulatory Affairs Director at McKesson.[92] The fact that McKesson trusted Mr. Hartle's expertise to discuss opioids being a gateway to heroin use in presentations to its own customers and its own employees alone completely undercuts the validity of McKesson's argument that Mr. Hartle lacks the requisite knowledge on this subject now.

Similarly, Mr. Hartle readily acknowledged, as the company's 30(b)(6) designee, McKesson's role in contributing to the opioid epidemic.[93] Given that Mr. Hartle was designated by McKesson to broadly speak to the company's compliance, or lack thereof, with its regulatory and societal responsibilities concerning opioid distribution, this testimony is well within the scope of topics Mr. Hartle could reasonably be expected to discuss. Moreover, McKesson is undoubtedly in an excellent position to judge its own culpability in contributing to the opioid epidemic, and as the company's designated spokesperson on those topics, Mr. Hartle is precisely the person that should be expected to answer this central question. *See* e.g., *Hilton Hotels Corp. v. Dunnet,* No. 00–2852–GV, 2002 WL 1482543, *2 (W.D.Tenn. Mar. 15, 2002) (30(b)(6) deponents are expected to speak as to

---

[91] Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 320:14-321:13.

[92] *See* **Ex. 32** [MCKMDL00430424] at 425; **Ex. 33** [MCKMDL00448596] at 611; Dkt. #1962-24/#1978-4 (8/1/18 Hartle Dep.) at 34:16 – 40:3.

[93] Dkt. #1962-23/#1978-3 (7/31/18 Hartle Dep.) at 285:6-286:15.

"the knowledge of the corporation and the corporation's subjective beliefs and opinions and interpretation of documents and events"). While McKesson no doubt dislikes the testimony Mr. Hartle offered on this point, that distaste does not justify the exclusion of this vitally important testimony.

Third, despite the fact that Plaintiffs' examination was tailored to the confines of the 30(b)(6) notices, Plaintiffs were not necessarily limited to questioning Mr. Hartle on matters specifically included in those notices. As outlined in *King v. Pratt & Whitney, a Div. of United Technologies Corp.,* 161 F.R.D. 475, 476 (S.D. Fla. 1995):

> Rule 30(b)(6) should not be read to confer some special privilege on a corporate deponent responding to this type of notice. … Rather, the Rule is best read as follows:
>
> 1) Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice.
>
> 2) If the designated deponent cannot answer those questions, then the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions, etc. The corporation has an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are "known or reasonably available" to the corporation. Rule 30(b)(6) delineates this affirmative duty.
>
> 3) If the examining party asks questions outside the scope of the matters described in the notice, the general deposition rules govern (i.e. Fed.R.Civ.P. 26(b)(1)), so that relevant questions may be asked and no special protection is conferred on a deponent by virtue of the fact that the deposition was noticed under 30(b)(6).
>
> 4) However, if the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem.

This interpretation of the scope of examinations under Rule 30(b)(6) has been explicitly followed by courts in the Sixth Circuit. *See e.g., Harris v. Goins*, No. 6: 15-151-DCR, 2017 WL 4080692, *2 (E.D. Ky. Sep. 14, 2017) (citing *King*, 161 F.R.D. 475) ("Rule 30(b)(6) does not limit what can be asked at a deposition"). Thus, McKesson's contention that Plaintiffs somehow strayed from the 30(b)(6) topics is immaterial, as the notices themselves did not serve to limit the topical areas that could be addressed with Mr. Hartle.

Finally, even assuming the portions of the examination pinpointed by McKesson were improper – which they were not – McKesson has offered no justification or authority for excluding the entirety of Mr. Hartle's 30(b)(6) testimony based on the narrow set of issues it has identified. The glaring lack of authoritative support for this remedy speaks volumes to the futility of the motion itself. In fact, the more appropriate approach would be to deal with these issues through the process already in place to deal with objections to deposition designations. Wholesale exclusion of the entirety of Mr. Hartle's 30(b)(6) testimony is simply not the appropriate answer under any circumstances. McKesson's MIL No. MCK-5 should be denied.

6. **McKesson MIL No. MCK-6**: The Court should prohibit introduction of documents related to McKesson's relationship with CVA and Rite Aid in light of severance.

McKesson asks the Court to prohibit introduction of documents related to McKesson's relationship with CVS and Rite Aid because CVS and Rite Aid were severed from the Track I Trial. The Court should deny this MIL because: (1) evidence about McKesson's "relationship" with CVS and Rite Aid is central to Plaintiffs' civil conspiracy claim, so that evidence poses no danger of a "trial within a trial" – it is the trial itself; and (2) severance of defendants is not a basis for excluding any evidence about those defendants in a conspiracy case.

A critical component of Plaintiffs' conspiracy claim is the many actions and inactions by Distributor Defendants, including McKesson, to ensure that they and their pharmacy customers, including CVS and Rite Aid, could avoid having to report suspicious orders.[94] Far from creating a "trial within a trial," evidence about McKesson's relationship with CVS (McKesson's largest customer from 2008-2018) and Rite Aid goes directly to Plaintiffs' allegations that Distributor and Pharmacy Defendants conspired to protect and grow the opioids market by, inter alia, avoiding their reporting obligations to the DEA. One of the key provisions of McKesson's Controlled Substance Monitoring Program was creation of appropriate thresholds for opioid sales to pharmacy

---

[94] *See, e.g.*, Dkt. #2182 (Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment of Plaintiffs' Civil Conspiracy, RICO and OCPA Claims) at pp. 68-70.

customers.[95]  Yet, McKesson repeatedly and automatically increased thresholds for both CVS and Rite Aid, without adequate due diligence, and failed to investigate or report suspicious orders by these chain pharmacies in order to advance their common purpose to avoid suspicious order reporting.[96]  Such evidence does not pose any risk of a "trial within a trial" – it is evidence that will support Plaintiffs' conspiracy claim.[97]  This evidence will not cause McKesson to defend CVS and Rite Aid's internal SOM processes, but its role in abdicating its own duties,[98] which again is evidence going directly to Plaintiffs' claims.

Second, McKesson cites no authority for the proposition that a defendant's severance precludes introduction of evidence regarding the relationship between that defendant and a non-severed defendant.  Even assuming such a rule exists (which it does not), its application here would improperly hamstring Plaintiffs in presenting their conspiracy claim.  Granting this motion would unduly prejudice Plaintiffs by preventing them from presenting direct evidence of McKesson's role in the conspiracy.  Indeed, McKesson acknowledged that evidence regarding the relationship between Distributor Defendants and Pharmacy Defendants would be central to Plaintiffs' conspiracy claims when opposing severance.  Dkt. #2143 at pp. 6-7.  Under these circumstances McKesson's MIL No. MCK-6 should be denied.

---

[95]  Dkt. #1959-4 (1/17/19 Boggs Dep.) at 88:19–89:18.

[96]  *See, e.g.,* Dkt. #1971-19 (1/10/19 D. Walker Dep.) at 279:4-24, 288:6–291:1; Dkt. #2261-10 (MCKMDL00632825); Dkt. #2261-26 (MCKMDL00627723); Dkt. #2261-25 (MCKMDL00629858); Dkt. #2261-28/#2371-86 (MCKMDL00632923); Dkt. #2261-27 (MCKMDL00646634).

[97]  The cases McKesson cites do not support exclusion of evidence in this trial of McKesson's involvement with other actors as part of a conspiracy.  *Chism v. CNH Am., LLC*, 638 F.3d 637, 642 (8th Cir. 2011) (in personal injury case against manufacturer of hay baler, excluding evidence of other accidents involving hay balers because of lack of substantial similarity); *Widmer v. Warden, Corr. Reception Ctr.*, 2017 WL 447237, at *49 (S.D. Ohio Feb. 2, 2017) (in habeas corpus action seeking relief from murder conviction, refusing to allow inmate to cross-examine investigator based on alleged prior instance of untruthful conduct where authenticity of document on which request was based was questionable).  In both instances, evidence was excluded for other reasons besides the "trial within a trial" rationale.  More importantly, in neither instance was the evidence sought to be excluded directly relevant to the plaintiff's claim, like the evidence McKesson seeks to exclude here.

[98]  Dkt. #2169-32/#2713-50 (7/19/18 Oriente Dep.) at 548:22-550:1.

### G. PLAINTIFFS' RESPONSE TO TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE (DKT. #2668).

#### 1. <u>Teva MIL No. TAD-1</u>: The Court should exclude reference to the Cephalon misdemeanor plea.

Moving Defendants[99] seek to exclude evidence regarding a criminal plea agreement entered into by one of their related companies, Cephalon. The motion attempts to minimize the severity of the criminal activity, describing it as "a single misdemeanor count of off-label promotion of three medicines, only one of which was an opioid) limited to an eight-month period in 2001." Dkt. #2668-1 at p. 1. The reality is far more serious. The opioid drug in question was Actiq, which was approved by the FDA in 1998 solely for the management of "breakthrough pain" in opioid-tolerant cancer patients. The FDA restricted its use because Actiq was a powerful narcotic – fentanyl – in the form of a fast-dissolving lollipop, also known as a Transmucosal Immediate-Release Fentanyl product (TIRF).

In 2000, Actiq generated a relatively modest $16 million in revenue for its then-owner Anesta. That same year Cephalon purchased Anesta. Cephalon set extremely high sales goals for Actiq, pressuring employees to generate volume sales. The pressure tactics worked spectacularly well. By 2006, Cephalon's Actiq sales were $590.7 million, more than 36 times the amount sold in 2000. The massive increase in sales was driven largely by fraudulent marketing – criminal acts that were later admitted by Cephalon. The "single misdemeanor count of off-label promotion" resulted in $425 million in fines and settlements. Cephalon and its successors were also required to adhere to a five-year "Corporate Integrity Agreement" governing marketing practices. The evidence supporting these facts was included in Plaintiffs' Opposition to Teva/Actavis' Motion for Summary Judgment. Dkt. #2220 at pp. 5-6.

For the same reasons discussed in § B.1, *supra*, this evidence is relevant and admissible, and not properly excluded under Rule 403. It is relevant, among other reasons, to prove that Moving

---

[99] "Moving Defendants" are the Teva Defendants and the Actavis Generic Defendants, as defined in their motion *in limine*. Dkt. #2668-1 at p. 1 & n.1.

Defendants engaged in intentional conduct, over many years and across the country, that was a substantial factor in causing the harm to Plaintiffs.

Moving Defendants argue the Cephalon plea is inadmissible character evidence, but they are wrong. If they were being prosecuted for off-label promotion of a different drug, or at a later time, and the government sought to prove their guilt by introducing evidence of this prior conviction, that evidence would likely be barred by Rule 404. But that is not the purpose for which the evidence will be offered here. Rather, as Rule 404(b) notes, character evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). In this case, these Defendants' intent is an element of Plaintiffs' claims, and their ongoing and repetitive conduct improperly and falsely promoting the use of dangerous opioid medications is central to those claims. Accordingly, Moving Defendants MIL No. TAD-1 should be denied.

### 2. Teva MIL No. TAD-2: The Court should exclude reference to "off-label" promotion.

Moving Defendants' MIL No. TAD-2 seeks to preclude Plaintiffs from offering any testimony, evidence, or argument that Cephalon, Teva USA, or any other Moving Defendant's conduct constituted off-label promotion. Dkt. #2668-1 at pp. 4-6. Moving Defendants assert that any reference to off-label promotion is irrelevant and would confuse the jury. Both of these arguments should be rejected as red herrings.

Moving Defendants argue that evidence and testimony about off-label promotion is irrelevant be-cause promoting the off-label use of drugs is not inherently false or misleading. *Id.* at p. 4. But even if misleading messaging were not part of Moving Defendants' off-label promotion, false marketing is not the only basis for Plaintiffs' claims. Evidence regarding off-label promotion is relevant to Plaintiffs' argument that the massive overpromotion of opioid use led to the creation of the public health crisis confronting their communities. Evidence or testimony that Actiq and Fentora, for example, were promoted for noncancer pain caused by migraines and injuries when they were only approved for cancer pain in opioid-tolerant patients is relevant to the argument that

excessive promotion of opioids created a public health crisis. Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful. Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case. *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4. But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic. Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6. The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs. Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations. Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

3.  **Teva MIL No. TAD-3**: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

4.  **Teva MIL No. TAD-4**: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred. As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

evidence Moving Defendants are seeking to exclude.  To the degree that Moving Defendants have specific evidence in mind, and that they are simply choosing not to identify it at this time, the appropriate course is for them to object when that evidence is offered at trial, as opposed to seeking an unspecified adjudication in a vacuum.

But more importantly, the fact that Plaintiffs cannot recover for harm incurred outside Ohio does not mean that the impact of Defendants misconduct outside of Ohio is irrelevant or should be ignored.  Moving Defendants reference, by way of example, national studies on opioid abuse relied on by Plaintiffs' experts.  Dkt. #2668-1 at p. 9.  These studies are relevant to numerous issues, including providing the context and background with respect to the scope and nature of the opioid crisis.  This is a crisis which many Defendants are disputing actually exists.  Further, evidence of the national scope and nature of the crisis will be pertinent to any attempt by Defendants to blame the Plaintiffs for the harms by suggesting bellwether-specific failures are the cause of the harms.  Indeed, the Court has already rejected Defendants' arguments seeking to exclude Plaintiffs' causation and damage experts who analyze national and aggregate trends to create their models.  As Plaintiffs' expert reports make clear, and explained by Plaintiffs in their opposition briefs to Defendants' *Daubert* motions, national trends and statistics make Plaintiffs' analyses more reliable and relevant, and strengthen the reliability of the relationship between increased shipments of prescription opioids and increased harms. *See, e.g.,* Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶¶ 81-100 (explaining the most appropriate way to assess the relationship between shipments and mortality is based on regression-based comparisons across a robust sample of counties across the nation, not just one or two counties viewed in isolation); *see also* Dkt. #2000-6/#1999-6 (Gruber Expert Rep.) at ¶ 84, Fig. 1.18 (showing that in counties with the highest per capita shipments between 1997 and 2010, the prescription opioid mortality rate increased over 3.75 times more than it did in the counties with the lowest per capita shipments); *see also Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2017 WL 4748054, at *3 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018) ("[I]t seems axiomatic that the more data points that are available, the more reliable the ultimate damage calculation").  As such, information on the opioid crisis and its national scope is directly relevant to

both claims and defenses at issue in the litigation, and will greatly assist the jury in understanding the issues presented at trial. *See also supra* at § A.6.

5. **Teva MIL No. TAD-5**: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties.

Moving Defendants also seek to exclude "evidence of marketing activity" where there is no showing that the marketing materials were distributed, published, or read in either County, as well as any evidence of shipments of opioids manufactured by Defendants that have no connection to Ohio. Moving Defendants' arguments regarding shipments outside of Ohio are addressed in Plaintiffs' response to Defendants' Omnibus MIL No. 6. *Supra* at § A.6. With respect to Moving Defendants' marketing arguments, the factual premise underpinning these arguments is false. The evidence in the record demonstrates that both Teva and Actavis engaged in nationwide marketing. There was no state-specific marketing, including state-specific marketing in Ohio, and any national marketing would have been used in all 50 states. *See, e.g.,* Dkt. #1962-26/#1978-06 (11/16/18 Hassler Dep.) at 275:12 – 276:17 (confirming that for Teva, Cephalon and Actavis, marketing, sales and advertising pieces were national in scope, in that "they are able to be used all over America," and that these materials were not tracked, such that defendants have no way showing that such materials were not used in Ohio); **Ex. 34** [Hassler Dep. Vol II] at 621:10-19 (testifying that Teva and Cephalon did not release materials that were specific to geographic areas for their marketing or educational messages, and that "[t]he messages were approved nationwide, and they would have been available and used in Ohio, just as they would have been in any other state in the country."); Dkt. #2177-5 (11/2/18 Snyder Dep.) at 271:5 – 272:3 (testifying that Kadian marketing materials were national in that the same marketing materials were provided and used by sales reps across the country).

Finally, Moving Defendants' constitutional argument—that it is unconstitutional to "project Ohio's regulatory regime into another state"—is simply misplaced. Dkt. #2668-1 at pp. 10-11. Plaintiffs are not seeking to project Ohio's regulatory regime into another state, nor are they seeking to "penalize" Moving Defendants for conduct outside of Ohio. Defendants' misconduct violated

not only Ohio law, but also federal law and the local laws of any non-Ohio jurisdiction within which the conduct occurred. As Plaintiffs will demonstrate at trial, the evidence in the record establishes that Moving Defendants have engaged in misconduct, and caused significant injury, within Plaintiffs' jurisdictions. But Plaintiffs are also entitled to introduce evidence showing the systemic nature of Moving Defendants' misconduct, and the degree to which this conduct caused a national opioid crisis that impacted the bellwether jurisdictions.

6. **Teva MIL No. TAD-6**: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups.

Moving Defendants claim Plaintiffs should be precluded from offering evidence or argument of their funding of third-party trade groups because such conduct is protected by the First Amendment's right to freedom of association.[100] Not so. Plaintiffs are not arguing that Moving Defendants' mere participation in, and funding of, various trade and advocacy organizations, in and of themselves, subject them to liability. Rather, Plaintiffs allege, and will demonstrate at trial, that Moving Defendants worked together, through their trade associations and otherwise, (i) to unlawfully deceive and mislead the public, the medical community, and the government regarding the risks of their opioids and their purported efforts to prevent diversion, and (ii) to unlawfully avoid their legal duties to monitor for, report, and prevent shipment of suspicious orders of opioids. Evidence of Moving Defendants' participation and funding of these trade associations is relevant to demonstrate that they participated in this conspiracy with the intention of furthering this wrongful conduct. *See In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775, 803 (N.D. Ohio 2007)

---

[100] In their motion, Moving Defendants quote the following language from the Supreme Court: " 'The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.' " Dkt. #2668-1 at pp. 11-12 (quoting *McConnell v. Fed. Election Comm.*, 540 U.S. 93, 255 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm.*, 558 U.S. 310 (2010)). They fail to mention this language was taken from Justice Scalia's *dissent* in that case. *McConnell*, 540 U.S. at 247-48, 255. (In *McConnell*, Justice Scalia concurred in part and dissented in part, but the quoted language is in a section of his opinion in which he is criticizing the majority opinion. *Id.* at 250, 255-56.).

("*Welding Fume I*") (recognizing that there are circumstances in which "joint activity undertaken through a trade association" can be "evidence of a conspiracy").[101]

Moving Defendants also claim that Plaintiffs should be precluded from arguing that they are responsible for statements made by these third-party groups because Plaintiffs have not and cannot demonstrate that any third-party group was acting as their agent. Dkt. #2668-1 at p. 12. This Court already rejected this argument in its opinion denying the Teva Defendants' summary judgment motion:

> The Court rejects the Teva Defendants' argument that Plaintiffs cannot show an agency relationship existed between the Teva Defendants and the third parties they "partially" funded. In the "Pain Matters" presentation, Gudin told the audience: "this program was developed by Teva Pharmaceuticals, . . . the three of us are presenting on behalf of Teva, and . . . we've been compensated by Teva to give this presentation." Clearly, material fact issues exist in this regard.

Dkt. #2564 at pp. 3-4 n.5 (internal citations omitted). *See also* Dkt. #2565 at p. 19 ("Whether groups like APF were truly independent third parties or merely front groups, remains an issue of fact for the jury. Though Teva contends that funding to these third-party organizations was conditional on their independence, it is the jury's province to decide whether third-party agreements requiring independent were actually followed; and this, to large extent, may depend on the credibility of the witnesses called. . . . A reasonable finder of fact could conclude . . . that the Teva entities directly, as well as through front groups and CME programs, falsely represented the risk of opioid addiction, and that these representations were not tied to specific brand names, but applied to opioids generally.") (internal citation omitted).[102]

---

[101] *See also AirCo, Inc.*, 2003 WL 27382684, at *16 (rejecting defendants' argument that dismissal of plaintiff's civil conspiracy claim was warranted because members of a trade association cannot be held liable "for simply exercising their first amendment rights by attending meetings[,]" because the complaint did "not seek to hold Defendants responsible merely for attending trade association or scientific meetings[,]" but rather "allege[d], beyond mere membership, that they . . . took specific affirmative acts at meetings in which specifically-named entities agreed to perpetrate a series of frauds").

[102] Thus, Plaintiffs have already made an evidentiary proffer that the Court considered sufficient to withstand summary judgment.

The cases cited by Moving Defendants, none of which involved motions *in limine*, are factually inapposite. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 395 (1982) (in a § 1981 racial discrimination action, defendants could not be held vicariously liable, under *respondeat superior*, for the discriminatory conduct of third party where there was no evidence in the record that the third party was acting as the defendants' agent; "That the employers fund the activities of the JATC does not render the JATC the employers' servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. The employers must also enjoy a right to control the activities of the JATC, and there is no record basis for believing that to be the case."); *Natl. Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451 (1958) (addressing whether the state of Alabama could compel the NAACP "to reveal to the State's Attorney General the names and addresses of all its Alabama members and agents, without regard to their positions or functions in the Association"); *McWilliams v. S.E., Inc.*, 581 F. Supp. 2d 885, 893 (N.D. Ohio 2008) (plaintiff failed to allege "any agency relationship between the pilot and the aircraft owner[,]" and therefore could "not impute [the pilot's] alleged negligence to [the owner]"; bare allegation in complaint that "[a]ll acts of [the aircraft owner] were done by its agents" was "insufficient to establish agency");[103] *Welding Fume I*, 526 F. Supp. 2d at 803 ("There is no evidence that would allow a jury to conclude that Caterpillar actually joined any conspiracy by agreeing to cooperate with other defendants, intending to help them achieve the objective of hiding the hazards of manganese in welding fume. This is so because, from the beginning, Caterpillar's actions and statements reveal that, in most regards, it was actually working at cross-purposes from the supposed objectives of the conspiracy."); *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416-18 (S.D. Ohio 1986) (holding franchisor had sufficient right of control over

---

[103] In their motion, Moving Defendants describe *McWilliams* as holding a "defendant not liable for third-party statements because [there was] no evidence that [the] third party acted as defendant's agent with respect to the challenged statements[.]" Dkt. #2668-1 at p. 13 n.11. But that case does not address liability for third-party statements. Rather, the issue was whether the owner of a skydiving plane owed a duty to the skydiver "to inspect the harness or ensure its safety" based on the owner's relationship with the pilot. 581 F. Supp.2d at 893. The court held that the pilot's negligence could not be imputed to the owner because the plaintiff had failed to allege an agency relationship between the two. *Id.*

franchisee check collection company under their contract to make franchisee its "agent" in regard to franchisee's acts giving rise to check drawer's action against franchisor for liability under the Fair Credit Reporting Act and the Fair Debt Collection Practices Act); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1072 (11th Cir. 2017) ("Of course, *alone*, membership in a trade organization like CANAERO does not make Defendants part of an enterprise.") (emphasis added); *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1290-94 (3d Cir. 1994) (former manufacturer of asbestos products could not be held civilly liable for any wrongful conduct committed by [the trade association] SBA or its members in the years after SBA's formation unless it can be shown that [the manufacturer's] actions taken in relation to the SBA were specifically intended to further such wrongful conduct" and "[h]ere, there is simply no evidence that [the manufacturer] had such an intent"; critically, the court noted that there was no evidence that the manufacturer "had 'tacitly or overtly agreed' with the other defendants to continue selling its product without warnings or had been a party to 'written agreements, meetings, and other communications among asbestos defendants to conceal their knowledge of the dangers of asbestos from the public' ").

For these reasons, Moving Defendants' MIL No. TAD-6 should be denied.

### 7. **Teva MIL No. TAD-7**: The Court should exclude testimony from Russell Portenoy about any improper conduct by Moving Defendants.

Moving Defendants' MIL No. TAD-7 is an improper attempt to evade possibly adverse relevant testimony by a witness whom the Court expressly permitted Teva to depose, but Teva declined to do so. Moving Defendants argue that Plaintiffs should be precluded from eliciting testimony from witness Dr. Russell Portenoy about any improper conduct by Teva because he allegedly testified in the State of Oklahoma prescription opioid litigation that he was unaware of any such conduct. Dkt. #2668-1 at 13-14. The Court should reject this argument as procedurally improper.

Moving Defendants have not demonstrated that Dr. Portenoy's trial testimony here would contradict his prior testimony in the Oklahoma case. Even assuming it did, the remedy would not be exclusion under FED. R. EVID. 402, as Moving Defendants aver, *see* Dkt. #2668-1, but

impeachment under FED. R. EVID. 613(b).  *See, e.g.*, *United States v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004) ("Glover's prior inconsistent statement is admissible under Federal Rule of Evidence 613(b), which permits the impeachment of a witness . . . .").  Since Moving Defendants may try to impeach Dr. Portenoy using any allegedly contrary prior testimony, the Court should reject this motion to preemptively limit his trial testimony here.

An *in limine* ruling would be particularly inappropriate here because the Court issued an Order expressly permitting Teva and all Defendants to depose Dr. Portenoy.  Dkt. #1577 (Order re Discovery Order No. 19) at p. 8 ("[T]he Court concludes that a more appropriate sanction is to allow Defendants to take Dr. Portenoy's deposition at Plaintiffs' counsel's expense.  Further, should Defendants deem it necessary, the Court will consider, on a motion by Defendants, allowing a small amount of supplemental discovery and deposition testimony from additional fact witnesses that Defendants sincerely believe could 'challenge Dr. Portenoy's specific claims about Defendants' supposedly misleading marketing. . . .").  The Court placed no substantive limits on Defendants' deposition of Dr. Portenoy, thus permitting Moving Defendants to probe the full range of his factual knowledge and also to obtain additional rebuttal evidence as needed.

Moving Defendants chose not to do so.  At one point, Defendants expressed an intent to exercise their right to depose Dr. Portenoy.  A dispute then arose concerning the scope of his deposition, particularly over whether questioning would or would not be limited to the scope of his Oklahoma testimony and over whether Plaintiffs, too, would be permitted to question him.  Special Master Cohen ruled in a telephonic hearing that questioning of Dr. Portenoy *would not* be limited to the scope of his Oklahoma testimony, which he found to be "incomplete," and that *all parties* including Plaintiffs would be permitted to question him.  *See* **Ex. 35** [Transcript of July 18, 2019 Teleconference with Special Master Cohen re Dr. Portenoy Deposition].  After the Special Master so ruled, Teva and its co-Defendants backpedaled and chose to decline the Court's invitation to depose Dr. Portenoy.  Having done so, Moving Defendants may not now obtain an order precluding allegedly inconsistent testimony that they could have fully probed and rebutted through discovery and may still try to impeach at trial.

For all of these reasons, the Court should deny Moving Defendants' MIL No. TAD-7 concerning Dr. Portenoy.

**8.** **Teva MIL No. TAD-8: Plaintiffs should be precluded from arguing that the Actavis Generic Defendants should have made additional warnings regarding their generic medicines or should have stopped selling them.**

Moving Defendants' joint motion to preclude argument that the Actavis Generic Defendants should have made additional warnings regarding generic opioids is an improper attempt to re-litigate the preemption theory Defendants already lost. Dkt. #2565 (Opinion and Order Re: Preemption) ("Preemption Order"). In the Preemption Order, the Court summarized Plaintiffs' theory that "*all* manufacturers engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12 (emphasis in original). "[A]ny distinction . . . between those defendants who manufactured brand name opioids, those who manufactured generic opioids, or, as appears to be most common, those who manufactured both, would be rendered largely immaterial." *Id.* As the Court found, because "Plaintiffs' state law claims are *not* predicated upon violations of the FDA or CSA, nor are they accurately characterized as 'fraud on the FDA' or 'fraud on the DEA' claims," preemption simply does not apply. Dkt. #2565 at p. 10 (emphasis in original).

Moving Defendants' reliance on *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5258858 (S.D. Ohio Sept. 10, 2015), is inapt. Dkt. #2668-1 at p. 15. In *Rheinfrank*, the Court granted a motion *in limine* on plaintiff's failure to warn claim because the FDA had affirmatively found the warning at issue "'should not be incorporated'" into defendant's drug label. 2015 WL 5258858 at *2 (citation omitted). No parallel exists here.

Moving Defendants also argue they had no duty to "correct[] alleged impressions *by others* about opioids." Dkt. #2668-1 at p. 15 (emphasis added). But that straw man does not address Plaintiffs' claim; Plaintiffs allege that Teva/Actavis engaged in affirmative misrepresentations in their branded and unbranded marketing, and failed to correct their *own* representations, not others'.

Second, Actavis Generic Defendants' employees, including some that designated to testify at trial here, were active participants on the boards that conducted non-branded marketing.[104] As such, Plaintiffs have put forward evidence sufficient to show that the Actavis Generic Defendants themselves "engaged in the false marketing of opioids generally, frequently through unbranded promotion." Dkt. #2565 at p. 12. Such promotional activities are not preempted. *Id.* at p. 10; *see also* Dkt. #1499, *The Muscogee (Creek) Nation v. Purdue Pharma L.P.*, Report and Recommendation re: Motion to Dismiss, at p. 35 n.29 (denying motion to dismiss marketing claims because "some of the Generic Manufacturers or their corporate affiliates are also alleged to sell name-brand prescription opioids"). Plaintiffs have never advanced any argument that Moving Defendants needed to "stop selling" opioids (Dkt. #2668-1 at p. 15), just that they could not do so with false and misleading marketing.

For these reasons, Moving Defendants' MIL No. TAD-8 should be denied.

9.   **Teva MIL No. TAD-9: The Court should exclude reference to the purchase price paid by Teva Pharmaceutical Industries Ltd. for the Actavis Generic Defendants.**

Moving Defendants move to exclude reference to the purchase price Teva Pharmaceutical Industries Ltd. paid for the Actavis Generic Defendants in 2016 on grounds that the price is irrelevant and unduly prejudicial. It is neither. The purchase price is relevant because it indicates that, as of 2016, the acquisition of the Actavis Generic Defendants and their portfolio of generic opioids was worth approximately $40.5 billion. Opioids were massively profitable for Defendants, due in substantial part to extensive marketing based on misrepresentations and the failure to comply with the CSA's SOM requirements. Teva's willingness to pay tens of billions dollars in order to acquire the rights to sell a large number of generic opioids, including oxycodone, oxymorphone, morphine sulfate, and fentanyl, is relevant to the jury's understanding of the value of and expectations for sales of generic opioids.

---

[104]   Dkt. #2383-1/#2290-1 at 391:22-393:5 (Michael Perfetto on NACDS planning board); Dkt. #2380-20/#2287-20 at 431:3-14 (Douglas Boothe on GPhRMA board).

Moving Defendants' reliance on *Brooks v. Caterpillar Glob. Mining Am. LLC*, No. 4:14-cv-00022-JHM, 2017 WL 3401476 (W.D. Ky. Aug. 8, 2017), is inapt. Dkt. #2668-1 at p. 16. The claim in that case concerned a design defect claim concerning a single accident sustained by a coal miner; as such, defendant's financial condition was properly found irrelevant. 2017 WL 3401476, at *1. This case, concerning decades of misrepresentations and failures to meet regulatory requirements, could not be more different. *Gonzalez Prod. Sys. Inc. v. Martinrea Int'l Inc.*, No. 13-cv-11544, 2015 WL 4934628 (E.D. Mich. Aug. 18, 2015), is more informative. There, the court denied in part defendant's motion *in limine* to exclude the financial condition of defendant because it determined that such evidence "pertain[ed] to [defendant's] knowledge and potential motives for [defendant's] actions." *Id.* at *11. Similarly, the amount paid by Teva to acquire the Actavis Generic Defendants is relevant and probative of how valuable generic opioids were viewed by a pharmaceutical company.

Nor is the purchase price unduly prejudicial. Moving Defendants posit a strawman fallacy, contending that Plaintiffs will use the purchase price to communicate Teva's "current financial health" to the jury. Dkt. #2668-1 at p. 17. Not so. In fact, the Teva entity that purchased the Actavis Generic Defendants – Teva Pharmaceutical Industries Ltd. – is not a defendant at the trial for which Moving Defendants seek exclusion of the sale price. Dkt. #2673. Contrary to *City of Cleveland v. Peter Kiewit Sons' Co.*, on which Moving Defendants rely (Dkt. #2668-1 at p.), references to the purchase price will *not* be "'clearly calculated to direct the jury's attention to . . . compensation rather than the real issues in the case.'" 624 F.2d 749, 756-57 (6th Cir. 1980). Rather, as set forth above, the purchase price is probative of the market value of a portfolio including generic opioids in 2016 – even after the role of prescription opioids in creating the opioid crisis was a matter of national discussion. The purchase price is, therefore, indicative of "the real issues in the case." It is not unduly prejudicial.

## 10. Teva MIL No. TAD-10: The Court should exclude reference to the settlement agreement between Teva Ltd. and Allergan.

Plaintiffs have no objection to Moving Defendants' MIL No. TAD-10.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny each of Defendants' joint and individual MILs, except as otherwise indicated above.

Dated: October 7, 2019

                    Respectfully submitted,

                    /s/Paul J. Hanly, Jr.
                    Paul J. Hanly, Jr.
                    SIMMONS HANLY CONROY
                    112 Madison Avenue, 7th Floor
                    New York, NY 10016
                    (212) 784-6400
                    (212) 213-5949 (fax)
                    phanly@simmonsfirm.com

                    Joseph F. Rice
                    MOTLEY RICE
                    28 Bridgeside Blvd.
                    Mt. Pleasant, SC  29464
                    (843) 216-9000
                    (843) 216-9290 (Fax)
                    jrice@motleyrice.com

                    Paul T. Farrell, Jr., Esq.
                    GREENE KETCHUM, LLP
                    419 Eleventh Street
                    Huntington, WV 25701
                    (304) 525-9115
                    (800) 479-0053
                    (304) 529-3284 (Fax)
                    paul@greeneketchum.com

                    *Plaintiffs' Co-Lead Counsel*

                    /s/ Peter H. Weinberger
                    Peter H. Weinberger (0022076)
                    SPANGENBERG SHIBLEY & LIBER
                    1001 Lakeside Avenue East, Suite 1700
                    Cleveland, OH  44114
                    (216) 696-3232

(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX  77069-3804
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Lead Trial Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY  10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

**CERTIFICATE OF SERVICE**

I certify that the foregoing instrument was served via email to defense counsel and to Special Master Cohen on October 7, 2019.

s/Peter H. Weinberger
Peter H. Weinberger

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

## TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   REPLIES IN SUPPORT OF MOTIONS IN LIMINE ..................................... 1

1.   The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages." ................................................. 1

2.   The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant." .......................... 5

3.   The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others. ......................... 7

4.   The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use. ..................................... 9

5.   The Court should preclude evidence concerning lobbying and other protected petitioning activity. ................................................................ 12

6.   The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions. ......................... 16

7.   The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations. .................................... 18

8.   The Court should require plaintiffs to establish the necessary foundation for their experts' testimony. .............................................................. 21

9.   The Court should not allow use of certain charts presenting misleading and irrelevant data. ........................................................................ 23

10.  The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct. ........................... 24

11.  The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability. ..................................... 25

12.  The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis. .............................................................. 25

13.  The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers. .............. 26

14. The Court should preclude any comment regarding the absence of a corporate representative at trial ............................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) ...............................................................15

*Ashtabula River Corp. Grp. II v. Conrail, Inc.*,
  549 F. Supp. 2d 981 (N.D. Ohio 2008)...................................................20

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
  229 F.3d 1135 (2d Cir. 2000)............................................................13, 15

*Cal. Motor Transp. v. Trucking Unlimited*,
  404 U.S. 508 (1972)...........................................................................13, 14

*Campbell v. PMI Food Equip. Grp., Inc.*,
  509 F.3d 776 (6th Cir. 2007) ..................................................................12

*Chambers v. St. Mary's Sch.*,
  697 N.E.2d 198 (Ohio 1998)....................................................................20

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab.*
  *Litig.*, 295 F. Supp. 3d 927, 973............................................................15

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
  734 F.2d 1157 (6th Cir. 1984) ................................................................14

*City of Columbia v. Omni Outdoor Advert., Inc.*,
  499 U.S. 365 (1991)..................................................................................13

*Davis v. Clark Cnty. Bd. of Commrs.*,
  994 N.E.2d 905 (Ohio 2013).....................................................................20

*Eaton v. Newport Bd. of Educ.*,
  975 F.2d 292 (6th Cir. 1992) ...................................................................12

*Francis v. Clark Equip. Co.*,
  993 F.2d 545 (6th Cir. 1993) ...................................................................22

*In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*,
  2010 WL 8334226 (N.D. Ohio Dec. 6, 2010), *aff'd sub nom. Decker v. GE*
  *Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) ........................................5

*Gomez v. Rivera*,
  344 F.3d 103 (1st Cir. 2003)....................................................................11

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ....................................................................13, 15

*Johnson v. Advanced Bionics, LLC,*
2011 WL 1323883 (W.D. Tenn. Apr. 4, 2011)........................................................22

*Jones v. Pramstaller,*
2013 WL 12249827 (W.D. Mich. Jan. 14, 2013) ..................................................11

*Krulewitch v. United States,*
336 U.S. 440 (1949) (Jackson, J., concurring).......................................................22

*Marshall v. Lonberger,*
459 U.S. 422 (1983)................................................................................................22

*Nat.-Immunogenics Corp. v. Newport Tr. Group,*
2018 WL 6137597 (C.D. Cal. May 16, 2018) ........................................................15

*Pluck v. BP Oil Pipeline Co.,*
2009 WL 10679665 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir. 2011) .......................................................................................................................5

*Potters Med. Ctr. v. City Hosp. Ass'n,*
800 F.2d 568 (6th Cir. 1986) ..................................................................................14

*R.C. Olmstead, Inc. v. CU Interface, LLC,*
657 F. Supp. 2d 905 (N.D. Ohio 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) ............5

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.,*
2015 WL 627430 (E.D. Tex. Jan. 31, 2015)...........................................................27

*Sahrbacker v. Lucerne Prods., Inc.,*
52 Ohio St. 3d 179 (1990)........................................................................................1

*Shannon v. State Farm Ins.,*
2016 WL 3031383 (E.D. Mich. May 27, 2016)........................................................5

*Smith v. Hickenlooper,*
164 F. Supp. 3d 1286, 1290 (D. Colo. 2016), *aff'd sub nom. Safe Sts. All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017).......................................................20

*Sosa v. DIRECTV, Inc.,*
437 F.3d 923 (9th Cir. 2006) ...........................................................................13, 15

*Telecor Commun., Inc. v. S.W. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) ..............................................................................15

iv

*United Mine Workers of America v. Pennington*,
381 U.S. 657 (1965) ................................................................15

*United States v. Alghazouli*,
517 F.3d 1179 (9th Cir. 2008) ................................................19

*United States v. Freeman*,
730 F.3d 590 (6th Cir. 2013) ................................................26

*United States v. Phillips*,
872 F.3d 803 (6th Cir. 2017) ................................................26

*VIBO Corp. v. Conway*,
669 F.3d 675 (6th Cir. 2012) ................................................13

*Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
641 F.2d 457 (7th Cir. 1981) ................................................16

*In re Welding Fume Products Liability Litigation*,
2010 WL 7699456 (N.D. Ohio June 4, 2010) ........................15

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab.
Litig.*, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ................27

**Statutes**

18 U.S.C. § 1961(1)(D) ................................................................19

21 U.S.C. §§ 801–904, 951-971 ..................................................19

21 U.S.C. §§ 823, 841, 842 ..........................................................18

21 U.S.C. § 843 ............................................................................19

**Other Authorities**

21 C.F.R. § 1301.74(b) ................................................................19

Andrew J. Wistrich et. al., *Can Judges Ignore Inadmissible Information? The
Difficulty of Deliberately Disregarding*, 153 U. Pa. L. Rev. 1251, 1253 (2005) ................22

Fed. R. Civ. P. 26 ........................................................................11

Fed. R. Evid. 104 ....................................................................21, 23

Fed. R. Evid. 403 ....................................................................16, 26

Fed. R. Evid. 404(b) ................................................................16, 17

Fed. R. Evid. 701 ...........................................................................................9, 11, 12, 26

Fed. R. Evid. 702 ................................................................................................ *passim*

# I.    INTRODUCTION

Plaintiffs' Opposition to defendants' motions *in limine* is long on pages but short on substance.  This brief offers short replies on the joint motions presented by all defendants remaining in the Track One trial.[1]  For all or portions of some motions, plaintiffs' Opposition offers no substantive response.  Those motions should be granted to the extent conceded.  The remaining motions should also be granted, as plaintiffs' arguments are without merit.

# II.    REPLIES IN SUPPORT OF MOTIONS IN LIMINE

### 1.    The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

After plaintiffs filed their Opposition and before this Reply was due, the Special Master entered an order stating the "Plaintiffs may not pursue future damages at trial."  Ex. 1 (October 10, 2019, Email from David R. Cohen).  That order renders this motion moot.  However, because the formalization of this ruling has not yet occurred as of this writing, *see id.*, the following discussion is provided for the record:

**Plaintiffs failed timely to disclose their future damages claim.**  Plaintiffs' claim that they adequately disclosed their claim for future damages during discovery is simply untrue.

First, plaintiffs' fact witnesses do not disclose a basis for their future damages claim.  As plaintiffs admit, they are required to prove their entitlement to future damages with "reasonable certainty."  *See* Dkt. 2727 (Plaintiffs' Omnibus Response to Defendants' Motions in Limine) at 7 ("Pl. Opp.").  While in certain circumstances (*e.g.*, a case involving lost wages) future damages may be proved without expert evidence, *see Sahrbacker v. Lucerne Products, Inc.*, 52 Ohio St.

---

[1] The distributor defendants are submitting a separate short reply on their joint motions, as provided in the Special Master's order on briefing of pretrial motions.  *See* Dkt. 1709 at 6.  Each defendant is submitting a reply addressing its individual motion as authorized by that same order.

3d 179, 179 (1990), that is not the case here, where even plaintiffs' claims for past damages are founded upon expert evidence. *See generally* Dkt. 1911-5 (McGuire Report).[2] In any event, plaintiffs cannot point to any non-expert testimony supporting their claim for future damages. Indeed, plaintiffs' fact witnesses were extensively deposed concerning plaintiffs' damages as reflected in their interrogatory responses (*see, e.g.*, Dkt. 2727-2, Ex. 2), and not a single one had an inkling as to how they were derived or calculated, pointing instead to expert reports that they claimed would later address that issue.[3]

Second, plaintiffs' interrogatory responses did *not* properly disclose a claim for future damages. While those responses generically referenced "future damages," they also stated that plaintiffs' "investigation" regarding "future costs" was "ongoing" and objected on the ground that the interrogatory "call[ed] for an expert opinion that will be the subject of a fully-supported and detailed expert opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure." Dkt. 2727-1 at 6; Dkt. 2727-2 at 7. The interrogatory responses did not disclose the basis for any future damages claim or how any future damages would be calculated; nor were the responses later supplemented to provide that information.

---

[2] Plaintiffs' claim for future damages is premised entirely on an extrapolation from their experts' calculation of past damages. *See* Dkt. 2727-4 at 1.

[3] *See, e.g.*, Dkt. 1982-14 (Nelsen 30(b)(6) Dep. Tr.) at 177-78, 185; Dkt. 2173-35 (Kearns Dep. Tr.) at 24-25; Dkt. 1979-5 (Keenan Dep. Tr.) at 431-33 ("Q. If you turn to the next to last page, there's a spreadsheet that attempts to estimate damages based on various categories. Have you ever seen this before? A. No, I have not. Q. Are you able to determine how this is computed? A. This document doesn't even detail what these numbers are? Q. What do you mean? A. I don't know what's being reported here. Is this total expenses? Is this revenue? Is this expenses related to opiates? There's no real detailing on the spreadsheet. . . . Q. Ms. Keenan, are you able to determine how these numbers were computed? A. I am not able to determine that, no. Q. Would you have any ability, based on the spreadsheet, to go and fact check this? A. No."); Dkt. 1979-4 (Keenan 30(b)(6) Dep. Tr.) at 101-02, 104, 107-08; Dkt. 1977-21 (Gutierrez Dep. Tr.) at 260-61.

Third, despite plaintiffs' promises in their interrogatory responses, they also did not disclose the basis for their future damages claim in their expert reports. Plaintiffs' damages expert, McGuire, did not disclose any future damages in his report. Rather, McGuire merely noted in a footnote that he *could* calculate future damages if asked to do so. *See* Dkt. 1911-5 at 7 n.12. While plaintiffs point to the report and testimony of their "abatement expert," Liebman, his report also did not purport to quantify future damages. Rather, he purported to quantify the amount of money that would be required to "abate the opioid crisis." Dkt. 2000-12 ¶ 14; *see also id.* at 2 n.3 (distinguishing McGuire's estimates of "the costs faced by Bellwether governments due to the opioid crisis"). These are legally distinct remedies. Tellingly, the amounts that McGuire now identifies as "future damages" are not set forth in, or broken out as a subset of, Liebman's "abatement" figures. *See id.* at 28–29 Tbls. 1–2.

Contrary to plaintiffs' suggestion, the mere fact that the money needed to implement the abatement plan "would be expended in the future," Pl. Opp. at 5, does not convert Liebman's abatement opinion into a quantification of future damages. While (as plaintiffs appear to acknowledge) any future damages would be duplicative of the so-called abatement remedy, *see id.* at 7 n.9, the two remedies are analytically distinct and not co-extensive.[4] The disclosure of an abatement opinion is no substitute for the timely disclosure of a future damages opinion.

**Defendants would be prejudiced if plaintiffs are permitted to add a claim for future damages on the eve of trial.** Plaintiffs' assertion that their belated attempt to inject an $800-million future damages claim into the impending trial would not prejudice defendants is absurd.

---

[4] Because McGuire now calculates "future damages" for 2019 – a year not covered by Liebman's abatement estimates – plaintiffs' future damages increase the total amounts plaintiffs are seeking by $42 million. For this reason, plaintiffs' assertion that their last-minute expert submissions "do not alter Defendants' overall exposure at trial," Pl. Opp. at 11, is wrong.

As a threshold matter, plaintiffs' failure to offer timely expert opinions on their claim for future damages was not substantially justified. Plaintiffs do not argue that their experts were unable to offer their future damages opinions in accordance with the expert disclosure schedule in this case – nor could they. Indeed, McGuire's expert report affirmatively acknowledged that he could have calculated future damages, but he did not do so. *See* Dkt. 1911-5 at 7 n.12.

For this reason, plaintiffs' assertion that defendants have "known for eleven months that Plaintiffs are seeking future damages" ignores reality. Plaintiffs' interrogatory responses stated that any claim for future damages would be set forth in "detailed expert opinion(s)." Dkt. 2727-1 at 6; Dkt. 2727-2 at 7. When the March 25, 2019, expert disclosure deadline came and went without any disclosure by plaintiffs of future damages, defendants reasonably concluded that plaintiffs were not moving forward with a future damages theory.

Plaintiffs' suggestion that their failure to timely produce expert evidence regarding future damages is "harmless," Pl. Opp. at 10–11, also strains credulity. Just days before trial, they seek to assert a brand new, $880 million damages theory based on new expert opinions. In order to respond, defendants would need to re-open both fact and expert discovery – a process that would likely take many months. First, because plaintiffs' "future damages" estimate is based on a projection from purported 2018 costs, defendants would need to obtain document and deposition discovery regarding plaintiffs' actual 2018 costs.[5] Second, defendants would need to re-depose not only McGuire and Liebman (as plaintiffs themselves concede, *see* Pl. Opp. at 10), but also

---

[5] Cuyahoga County has not produced *any* data regarding its 2018 expenditures, and the limited data produced by Summit County is woefully incomplete.

other experts – including Rosenthal, McCann and Cutler – regarding plaintiffs' future damages estimate.[6] Third, defendants' experts would need to formulate their own opinions.

Without an opportunity to interrogate the basis for plaintiffs' eleventh-hour future damages claim and to develop a responsive expert case, defendants will be substantially prejudiced at trial. With jury selection set to commence this week, there is insufficient time for the requisite fact and expert discovery. The Court should strike plaintiffs' last-minute expert submissions on future damages and preclude them from offering evidence of such damages.[7]

2. **The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."**

Defendants' Motion No. 2 seeks to bar plaintiffs from offering certain individualized evidence, not because it is irrelevant, but because plaintiffs successfully argued that it was and thereby avoided producing it in discovery. Plaintiffs have asserted throughout this case that they would be proving their claims through aggregate proof, and that the individualized evidence

---

[6] For example, McGuire's new "future damages" estimate is premised on the implicit assumption that harm to the plaintiff counties will remain steady over the next decade. *See* Dkt. 2727-4 at 1. But McGuire has never explained or justified this assumption. Nor has he ever opined on the extent of plaintiffs' harm; rather, he relies on the opinions of Cutler for that. *See* Dkt. 1911-5 ¶ 11 ("[D]amages are estimated by applying the estimates of the percent of harms attributable to defendants' misconduct presented in the Cutler Report … to the identified affected costs in each division…."). Defendants thus would be entitled to depose Cutler on questions such as whether – notwithstanding the *decrease* in opioid mortality in the plaintiff counties – it is appropriate to project into the future based upon estimated 2018 harms. Cutler in turn purports to rely on information he received from counsel and other experts. *See* Dkt. 2000-4 (Cutler Report) at 60–62 & App'x III.J. Defendants would need discovery on that information as well.

[7] *See, e.g.*, *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 914 (N.D. Ohio 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) (rejecting declaration filed after due date for disclosure of expert reports); *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 2010 WL 8334226, at *1 (N.D. Ohio Dec. 6, 2010), *aff'd sub nom. Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) (striking portion of supplemental report not based on new information); *Pluck v. BP Oil Pipeline Co.*, 2009 WL 10679665, at *7 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir. 2011) (striking new expert testimony submitted months after the deadline); *Shannon v. State Farm Ins.*, 2016 WL 3031383, at *3 (E.D. Mich. May 27, 2016) (listing Sixth Circuit decisions upholding orders striking experts).

underlying that aggregate proof is not relevant. Defendants' opening brief demonstrated, with citations to the record and applicable case law, that plaintiffs succeeded in obtaining orders that severely limited their obligation to produce such discovery in several categories. Dkt. 2661 at 5-9. Plaintiffs cannot use those orders as both a sword and a shield.

**Specific persons who have suffered from addiction and children served by child protective services.** Plaintiffs' response offers no opposition whatsoever with respect to these two categories. *See* Pl. Opp. at 12-15. The motion should accordingly be granted as to those categories, and plaintiffs should be precluded from offering any individualized evidence about people who have suffered addiction or children served by child protective services.

**Specific instances of medically unnecessary prescriptions**. Plaintiffs stress that they produced *some* individualized evidence in this category, but they do not (and cannot) dispute that these examples, which are all that the Special Master ordered them to provide, were their own cherry-picked selections, and that defendants were *not* given full discovery of evidence in this category, including evidence that could have shown plaintiffs' selected examples to be atypical.[8] They do not (and cannot) dispute that they objected to defendants' discovery requests about prescriptions on grounds of relevance due to their plan to rely on aggregate proof, and that the Special Master's Discovery Ruling 1, taking plaintiffs at their word, ordered the production of examples solely for purposes of assisting defendants to "understand" that aggregate proof. Dkt. 606 at 5. Plaintiffs should be estopped from using these cherry-picked prescriptions at trial.

---

[8] Plaintiffs take issue with defendants' use of the term "cherry-picked" (Pl. Opp. at 14-15) – but not because it is inaccurate. Rather, they emphasize that they were not ordered to do more. *Id.* But that is exactly the point. They succeeded in obtaining orders that severely limited discovery to items they were allowed to select at their own discretion.

**Specific instances of suspicious orders and pharmacies involved in diversion.**

Finally, with respect to the remaining two categories, plaintiffs do not (and cannot) dispute that the order requiring them to identify suspicious orders did not require them to identify the actual orders on which they intended to base their claims at trial. Dkt. 1051 at 6. But neither did their suspicious order monitoring expert "look at any particular order to see whether it was diverted" or to see "what happened to any of the drugs that were distributed to each of the pharmacies." Dkt. 1969-19/1983-16 (Rafalski Dep. Tr.) at 508:1-12, 582:9-19. Plaintiffs should be precluded from offering evidence at trial of *any* particular suspicious order, or *any* pharmacy they allege was involved in diversion, that they failed to identify in discovery. They also should be precluded from arguing that they can identify any additional suspicious orders beyond those they identified during discovery.[9] Defendants reserve the right to object to any evidence plaintiffs might offer in these categories that *was* identified in discovery on any applicable ground, including positions plaintiffs took in discovery.

3. **The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.**

Plaintiffs want to have their cake and eat it, too. On the one hand, they do not want to have to prove – and the Court has relieved them of the burden to prove – that any individual became addicted or overdosed as a result of any defendant's conduct, and, in turn, caused the County Governments to expend resources. To forestall arguments raised in defendants' motions to dismiss and summary judgment motions, plaintiffs disclaimed recovery on behalf of

---

[9] To be clear, this motion seeks to bar *plaintiffs* from offering evidence in these categories, as they are properly estopped from doing so by the positions they took in limiting discovery, to the prejudice of defendants. Defendants, of course, have the due process right to point to whatever individualized evidence they have been able to obtain to challenge plaintiffs' aggregate proof, as well as to cross-examine plaintiffs' experts on their failure to consider such evidence.

individuals who suffered addiction-related harms.[10]  Yet, on the other hand, plaintiffs now want

to tell individual stories of addiction and loss.  Their purpose is improper: to imply, without

having to prove, that those stories somehow are connected to defendants' alleged misconduct, to

arouse the jury's sympathies, and to make it more likely that the jury will base a verdict on the

suffering of those individuals.

Take, for example, plaintiffs' proposed witness, Travis Bornstein.  Mr. Bornstein's son

died of a fentanyl and heroin overdose, reportedly after first becoming addicted to prescription

opioids.  There is no evidence connecting any of the pills taken by his son with any defendant,

much less with the failure of any defendant to report or not ship a suspicious order.  Accordingly,

the story of Mr. Bornstein's son's addiction and death is not relevant to any issue in this case.

His personal story does not help establish that defendants engaged in any wrongdoing, much less

any wrongdoing that caused injury to plaintiffs.[11]

---

[10] Dkt. 654 at 10–11 ("While it is true that thousands of people in Akron and Summit County have been personally touched by the opioid crisis, the Plaintiffs' public nuisance claim does not seek recovery based on, or for, the personal injuries of individual residents."); Dkt. 1203 at 20 (Plaintiffs may not recover for "the personal injuries of their citizens."); *see also id.* at 10 ("Plaintiffs' asserted damages are not recoverable by any other party."); Dkt. 2580 at 7 (re-adopting motion to dismiss holding that "Plaintiffs ha[ve] sufficiently alleged 'categories of costs . . . that cannot be said to arise directly out of Plaintiffs' residents' personal injuries.'"); Ex. 2 (Ltr. from the Honorable Dan A. Polster to D. Hunt, Clerk, United States Court of Appeals for the Sixth Circuit (Oct. 1, 2019)) ("[T]he bellwether Plaintiffs have consistently stated, and I have likewise repeatedly concluded, that the city and county Plaintiffs do not seek recovery based on injuries to individual residents ….") (citing Dkts. 654, 1115, 1203).

[11] Plaintiffs now claim that "Mr. Bornstein will testify regarding his experiences in the community with individuals and families whose lives have been ravaged by opioid addiction, and regarding his organization's efforts to address the opioid crisis caused by Defendants' actions."  Dkt. 2756 at 10–11.  There is no more relevance to those individuals' stories' than Mr. Bornstein's; plaintiffs cannot tie any defendant's conduct to any addiction or loss suffered by those individuals.  Nor is there relevance to the efforts of Mr. Bornstein's non-profit organization "to address the opioid crisis."

Plaintiffs tacitly admit this, for they do not explain why Mr. Bornstein's story, or any other, is relevant.  Nor do plaintiffs refute any of defendants' other arguments.[12]  Without defending the admissibility of any particular evidence, they simply assert that this type of evidence cannot be categorically excluded.  But given plaintiffs' failure to identify any respect in which such evidence *is* relevant and admissible, this argument necessarily fails.

Mr. Bornstein is a parent who lost his son.  His story is heartbreaking, as is that of any parent who has endured the death of a child, no matter the cause.  Any juror listening to his story – or others like it – is sure to be moved and may be motivated to "do something" to prevent other parents from suffering as he did, feeling the need to blame someone for what happened.  Plaintiffs are banking on those types of purely emotional reactions motivating the jury to find in their favor.  That purpose is patently improper and unfairly prejudicial to defendants.  Permitting this type of evidence also will give plaintiffs all the benefits of these individual stories without putting them to the burden of proving up the required connections – if any – to any defendant's conduct.  The Court should exclude these anecdotal personal stories about opioid abuse and related harms from the Track One trial.

### 4.    The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Under Federal Rule of Evidence 701(c), "*if a witness is not testifying as an expert*, testimony in the form of an opinion is limited to one that is … *not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702" (emphasis added).  Whether there

---

[12] Plaintiffs do not deny, for example, that they routinely instructed witnesses not to answer questions concerning personal use of opioids, instead pointing only to the fact that there were a few instances in which they chose not to do so.  Pl. Opp. at 16.  But a party cannot preserve its right to present evidence at trial on a subject merely by providing the limited discovery it finds convenient, while blocking the opposing party from obtaining related evidence that might undermine or contradict it.

is a causal connection between prescription and illicit opioid use is plainly within the scope of Rule 702. Indeed, plaintiffs designated *three* experts to opine on the alleged connection. The time to designate any additional experts on this subject expired months ago.

Plaintiffs concentrate their opposition to this motion on the proposed testimony of Dr. Thomas Gilson, the Cuyahoga County Medical Examiner. They suggest that the motion is otherwise moot because two witnesses discussed as examples in defendants' motion, Jerry Craig and Keith Martin, are no longer on plaintiffs' witness list. Pl. Opp. at 17 n.16. But this does not moot defendants' motion to exclude lay witness testimony about the gateway theory from *any* witness. Defendants cited Craig and Martin merely as illustrative examples; other witnesses who purported to testify on this subject in their depositions remain on plaintiffs' list.[13]

As for Dr. Gilson, who has not been designated as an expert and so will be testifying only as a fact witness, plaintiffs have offered no justification for permitting him to testify about an alleged causal connection between prescription and illicit opioid abuse. Dr. Gilson's opinions are based on a "study" he allegedly performed in which he reviewed autopsy reports from a non-representative sample of Cuyahoga County residents, cross-referenced their identities with a database containing opioid prescription information (OARRS), and then drew conclusions about the relationship between prescription and illicit opioids. That is precisely the sort of analytical exercise that expert witnesses perform and that is subject to challenge under *Daubert*.

Gilson's testimony about the gateway theory is not factual, lay testimony merely because he reached his conclusions while acting "in his capacity as Medical Examiner." Pl. Opp. at 17.

---

[13] *See, e.g.*, Dkt. 1978-18 (Johnson Dep. Tr.) at 73:12-74:5 (testifying that "we know that 80 percent of our heroin users start with prescription opioids," based on "articles that I've read that talk about when folks self-report, in talking with Donna Skoda, in being at Opiate Task Force meetings … [and] presentations done by Dr. Doug Smith,"); Ex. 3 (Weiskittel Dep. Tr. at 50:4-52:15) (opinions about gateway connection based on discussions with her direct reports).

Medical examiners, including Dr. Gilson, routinely testify in an expert capacity; they cannot circumvent the expert disclosure requirements by testifying as percipient fact witnesses about scientific, technical, and specialized matters. Indeed, such a result would be especially troubling here, given that Dr. Gilson's statistical analysis strayed far beyond his own area of expertise. Dkt. 1977-16 (Gilson Dep. Tr.) at 68:24-69:3 ("I know some statistics. I -- I don't hold a degree in statistics. And I would not say that I would be somebody consulted as an expert in statistics.").

There can be circumstances in which an individual with specialized knowledge is also a percipient fact witness. *See, e.g.*, *Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003); *Jones v. Pramstaller*, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013). Whether Rule 26 applies depends on "the essence of the proffered testimony." *Gomez*, 344 F.3d at 113. For example, the witness in *Gomez* was a lawyer who participated in a meeting with the defendant in which he explained the defendant's legal obligations. The Court held that the witness's testimony "was not admissible for the purpose of proving what obligations the law imposed upon the [defendant]," only "to show the [defendant's] understanding at the time and his ensuing state of mind." *Id.* at 115. In other words, the witness's opinions were not themselves admissible; the witness could testify only as to information about those opinions that had been conveyed to the defendant for purposes of establishing the defendant's state of mind.

Here, in contrast, it is Dr. Gilson's conclusions themselves that are being offered. Nothing prevents plaintiffs from eliciting testimony from Dr. Gilson about *facts* on which he is a percipient witness, such as his personal observations in autopsies he conducted. But as the Advisory Committee Notes to Rule 701 explain, "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is

governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil … Rules." Those standards are not satisfied here, either substantively or procedurally.

If plaintiffs had disclosed Dr. Gilson as an expert, full disclosure would have been required of his analysis and all supporting data. Defendants would have had the opportunity to conduct an expert deposition, produce a responsive expert, and challenge Gilson's conclusions under *Daubert*.[14] Plaintiffs cannot "evade the expert witness disclosure requirements … by simply calling an expert witness in the guise of a layperson." Rule 701 Notes of the Advisory Committee. Dr. Gilson's testimony about the "gateway theory," like those of plaintiffs' other lay witnesses who purport to have opinions on that subject, should be excluded.

5.    **The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

Allowing plaintiffs to introduce evidence of defendants' lobbying efforts or other petitioning activity would violate defendants' First Amendment rights. None of plaintiffs' arguments on this issue have merit.

*First*, plaintiffs are wrong to suggest that the *Noerr-Pennington* doctrine is limited to the antitrust context. Pl. Opp. at 22 n.23. As decisions of both the Sixth Circuit and numerous other courts of appeals make clear, *Noerr-Pennington* broadly applies "to claims brought under both state and federal laws, including common law claims." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (holding that the First Amendment bars suits seeking to impose liability on petitioning

---

[14] To survive *Daubert*, plaintiffs would have had the burden of defending, among other things, Gilson's admitted lack of expertise on the kind of statistical analysis he purported to perform, as well as his highly skewed sample, the limitations of the OARRS database, and his failure to consider control or other variables. The OARRS data set that Gilson used, which was critical to his conclusions, was not even produced, and no expert has had an opportunity to evaluate its reliability or limitations.

in the civil rights context).[15]   Accordingly, the *Noerr-Pennington* doctrine precludes plaintiffs

from introducing evidence of such petitioning activity to establish liability.

    *Second*, plaintiffs' invocation of *Noerr-Pennington*'s "sham" exception, and their

assertion that the *Noerr-Pennington* doctrine does not "immunize[] fraud," are unavailing.

While defendants dispute plaintiffs' allegation that their petitioning activity was fraudulent, that

is not relevant under the *Noerr-Pennington* doctrine, which applies irrespective of a party's

motive or intent in petitioning the government.  *See City of Columbia v. Omni Outdoor Advert.,*

*Inc.*, 499 U.S. 365, 380 (1991) (holding that even if defendants lobbied for improper motives or

used "improper means" in seeking "favorable government action," the First Amendment protects

that petitioning); *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012) (The "intent … of

private actors seeking government action is irrelevant to the application of *Noerr-Pennington*.").

Rather, the "sham" exception applies only where a defendants' petitioning activity was not

actually intended to achieve favorable government action, but was instead a pretext for achieving

some other improper end – for example, blocking a competitor's access to the courts.  *See, e.g.*,

*Cal. Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972) (*Noerr-Pennington* "sham"

exception applied where judicial and administrative proceedings were brought to "harass and

deter" the plaintiffs so as to deny them "'free and unlimited access' to those tribunals," rather

---

[15] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("[T]he *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr–Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.")

than to influence government action in favor of defendants).[16] The First Amendment protects evidence of the petitioning activity that plaintiffs seek to introduce here.

*Third*, plaintiffs' Opposition makes clear that they intend to use evidence of defendants' protected lobbying and other petitioning activities to establish liability – a result the First Amendment forbids. Plaintiffs suggest that evidence of defendants' petitioning activity may be "relevant and admissible to show the purpose and character of defendants' wrongful activities." Pl. Opp. at 21-22 (citing *Pennington*). As an initial matter, this argument makes no sense; the "purpose and character" of defendants' marketing or suspicious order monitoring programs can be assessed without reference to any lobbying conduct.

Plaintiffs' suggestion that evidence of lobbying can be used to show "knowledge and intent to participate in a RICO enterprise," Pl. Opp. at 23-24, only proves that they want to use protected activity to prove an essential element of their claim – a result the Constitution forbids. *See Cal. Motor Transport Co.*, 404 U.S. at 510–11 ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a -vis their competitors.").[17] In *Pennington*, the Supreme Court noted that evidence

---

[16] As defendants pointed out in their initial Motion, Dkt. 2661 at 14 n.13, some courts have recognized a narrow fraud exception to the *Noerr-Pennington* doctrine where a defendant makes knowing and willful misrepresentations to an agency, but *only* in the context of an *adjudicatory* proceeding. *See Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

[17] To the extent plaintiffs suggest that evidence of lobbying can be used to show the "purpose" or "character" of that lobbying, evidence of protected petitioning activity may be introduced only to show the "purpose" or "character" of conduct *that is not itself protected by the First Amendment*. *See, e.g.*, *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984) (rejecting plaintiff's argument that it could introduce petitioning-related evidence to show

of petitioning activity might be admissible *if otherwise* "probative and not unduly prejudicial" on a disputed issue *other* than liability purportedly arising from the protected activity. But *Pennington* is clear that First Amendment petitioning activity may not be used, as plaintiffs seek to do here, as a basis for imposing liability. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 671 n.3 (1965) (petitioning activity is "barred from forming the basis for a suit").[18]

 *In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 (N.D. Ohio June 4, 2010), which plaintiffs cite, illustrates the point. There, the defendants' lobbying materials were admitted, not to show that lobbying was evidence of any wrongdoing, but instead because the materials contained admissions showing the defendants knew of adverse medical effects of their products. *Id.* at *93. Indeed, the court admonished the plaintiffs that they "may not suggest to the jury that defendants were engaged in any improper activity by lobbying." *Id.*; *see also Pennington*, 381 U.S. at 671 (reversing trial court instruction that lobbying activity could be considered for "whatever bearing it may have on the overall picture"). The other cases cited by plaintiffs are no different.[19] In short, plaintiffs' attempt to rely on protected petitioning activity

---

the "'purpose' or the 'character' of [defendant's] action" because the underlying conduct itself was shielded).

[18] The two district court decisions cited by plaintiffs – *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) and *Nat.-Immunogenics Corp. v. Newport Tr. Group*, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) – do not call into question either the Supreme Court's clear directive that protected activity cannot form the basis for liability or the multiple appellate decisions affirming dismissal of RICO claims based on the *Noerr-Pennington* doctrine. *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d at 942 (affirming dismissal of RICO claim that relied on evidence protected by *Noerr-Pennington*); *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135 (same); *see also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund*, 196 F.3d at 826 (protected lobbying activity "cannot be a source of [RICO] liability directly under the *Noerr–Pennington* doctrine").

[19] *See, e.g.*, *Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136–37 (10th Cir. 2002) (evidence held admissible because it was not offered for the "improper purpose of showing that [defendant] violated antitrust laws"); *Alexander v. Nat'l Farmers Org.*, 687 F.2d

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct. Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67. The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties. Shipments made elsewhere, even if wrongful, are otherwise irrelevant. Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17. Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24. Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence. Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal." *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).

and found its way into either county. The most they offer are a couple of sources suggesting the possibility of "migration" of prescription opioids from Florida "into Ohio" and various other states. Pl. Opp. at 32-33. They identify no evidence that even suggests the existence of "migration" into Cuyahoga or Summit Counties (as opposed, for example, to Southern Ohio).

Moreover, the only specific defendant plaintiffs' Opposition attempts to connect to migration of any kind is Walgreens; plaintiffs identify no evidence whatsoever as to any other defendant. And plaintiffs have provided no basis to deny this motion even as to Walgreens. Plaintiffs quote a paragraph from the expert report of James Rafalski, who relies almost exclusively on a settlement agreement (which is itself the subject of a separate motion *in limine*) that in turn cites unproven and untested allegations of a handful of instances (fewer than five) of Walgreens pharmacies in Florida *dispensing* opioid medications to Ohio residents. Even if these allegations had identified prescriptions dispensed to residents of Cuyahoga or Summit Counties – and they did not – they would be irrelevant. As the Court has found, "Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids." Dkt. 1203 at 2. Plaintiffs' claims are limited to alleged harm from *distribution* into Cuyahoga and Summit Counties. Plaintiffs have no evidence, and their experts do not opine, that opioids distributed elsewhere – by Walgreens or anyone else – caused injury to plaintiffs.

Plaintiffs' only other argument on this point – that they should be allowed to offer evidence of wrongful shipments elsewhere because defendants' SOM programs were national in scope – is precisely the kind of argument for admissibility that Rule 404(b) rejects. If a defendant made a wrongful shipment to a pharmacy in Utah, that is *not* admissible evidence of whether that defendant made wrongful shipments to Cuyahoga or Summit Counties that caused

injury to plaintiffs, any more than evidence of a prior automobile accident would be admissible in a personal injury case merely because the prior accident involved the same car and driver.

###### 7. The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

Plaintiffs' primary argument in opposition to defendants' Motion No. 7 is that this Court has already ruled against defendants on the evidentiary question this motion presents. That is incorrect. The order plaintiffs cite, Dkt. 2483, was a ruling on general "duties" and specified that it did *not* "address the scope of possible liability [to plaintiffs] for breach of those duties," *id.* at 14. At the time of that order, plaintiffs were pressing a negligence claim and asserted that such general duties and "breach of those duties" were relevant to that claim, but they have since elected to drop the negligence claim. As defendants have demonstrated, any breach of the "duties" that the Court addressed in that order are not relevant to the remaining claims.

Plaintiffs' substantive arguments are also without merit. Once again, plaintiffs seek to rely on allegations of vague, undefined "CSA violations." *See* Pl. Opp. at 35. But there is no general "CSA violation" that has uniform legal force, including with respect to plaintiffs' claims. Plaintiffs must establish the relevance of any alleged failure to abide by a statutory or regulatory section by identifying that section and its relevance to an element of a claim to be tried. Plaintiffs' Opposition fails entirely to satisfy this burden.

**RICO and OCPA.** Defendants' motion demonstrated that plaintiffs cannot rely on any failure to abide by provisions of 21 U.S.C. §§ 823, 841, or 842 to establish a RICO or OCPA predicate act. Plaintiffs offer no substantive refutation of that point. This is unsurprising, as plaintiffs did not identify these sections in their interrogatory response listing the predicate acts on which their RICO and OCPA claims are based. *See* Dkt. 2666 at 18.

18

As for the remaining statutory provision they cite, 21 U.S.C. § 843, plaintiffs skip a critical step.  The Court held that a violation of section 843 can be a predicate act under 18 U.S.C. § 1961(1)(D), but it did not rule that the allegations against defendants include conduct that would violate section 843.  They do not.  Section 843 applies only to documents that are "required to be made, kept, or filed under … subchapter [I] or subchapter II," *i.e.,* 21 U.S.C. §§ 801–904 (subchapter I), §§ 951–971 (subchapter II).  Any failure by plaintiffs to "inform [DEA] of suspicious orders," 21 C.F.R. § 1301.74(b), does not involve any such document, and thus cannot constitute a predicate act.

Plaintiffs' attempt to distinguish *United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), falls flat.  *See* Pl. Opp. at 36.  Whether 21 C.F.R. § 1301.74(b) is a "law" or has the "force of law" does not determine whether a failure to abide by that regulation would also violate section 843.  Section 843 is specific and clear, and plaintiffs offer no support for their wide-reaching argument that Congress made it a felony to omit *any* material information from *any* document required to be filed by *any* DEA-promulgated regulation.  The specificity Congress applied in enacting section 843 refutes any such suggestion.[21]

**Ohio Public Nuisance.**  Plaintiffs have indicated they are not pressing a statutory public nuisance claim at trial, *see* Dkt. 2715-3 at 77 n.12; Dkt. 2715-2 at 2, so any argument on that claim is moot.  As for common law public nuisance, plaintiffs fail to demonstrate how any failure to comply with duties related to suspicious orders is relevant to either their "unlawful" or "intentional" public nuisance variants.  The Court has not found any specific provision of law at

---

[21] Plaintiffs do not dispute that the Court has ruled that plaintiffs cannot rely on any fraud on the DEA to prove their claims, including those under RICO and OCPA.  *See* Pl. Opp. at 36-37; Dkt. 2565 at 4-5, 9-10, 22.  They do not demonstrate how failure by defendants to comply with any statutory or regulatory obligation would be relevant to fraud on anyone *other than* the DEA.

issue here to be a "safety statute" under Ohio law, and plaintiffs' *ipse dixit* that the whole of the

CSA is a "safety statute" – without any supporting authority – is insufficient. As defendants

have demonstrated, the statutory sections plaintiffs cite are not "safety statutes," because they do

not provide specific legal requirements for the protection of others that provide for a private right

of action. *See* Dkt. 2661 at 21; Dkt. 2667 at 2; *Ashtabula River Corp. Grp. II v. Conrail, Inc.*,

549 F. Supp. 2d 981, 989 (N.D. Ohio 2008). Plaintiffs cite no case in which a *regulation* was

found to be a "safety *statute*," and the Ohio Supreme Court has ruled that failure to comply with

a regulation (as opposed to a safety statute) cannot give rise to *per se* liability. *Chambers v. St.*

*Mary's Sch.*, 697 N.E.2d 198, 202-03 (Ohio 1998).

**Ohio Civil Conspiracy.** Plaintiffs fail to identify any provision of the CSA or

regulations they cite as one that could "give rise to an independent cause of action," which is

required to prove a civil conspiracy claim. *See Davis v. Clark Cnty. Bd. of Commrs.*, 994 N.E.2d

905, 909 (Ohio 2013). Plaintiffs do not point to a single purported violation that plaintiffs would

have the right to bring an independent action to enforce. *See, e.g.*, *Smith v. Hickenlooper*, 164 F.

Supp. 3d 1286, 1290 (D. Colo. 2016), *aff'd sub nom. Safe Sts. All. v. Hickenlooper*, 859 F.3d 865

(10th Cir. 2017).

**Testimony about the law.** Finally, plaintiffs do not provide grounds for denying

defendants' request that they be barred from presenting evidence purporting to opine on the law

– a prohibition this Court has already articulated. *See* Dkt. 2551 at 16-17. As to the unrelated

question of whether contemporaneous DEA approvals communicated to defendants are

admissible at trial, defendants have addressed that issue in their opposition to plaintiffs' Motion

in Limine No. 15.  *See* Dkt. 2725 at 16-21.[22]

### 8. The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.

Defendants' motion asked for a common-sense procedure to confirm – outside the

presence of the jury – that plaintiffs have established a sufficient evidentiary foundation for

certain assumptions underlying expert testimony prior to that testimony being admitted.  Given

that their experts are prepared to offer numerous opinions that have no evidentiary basis,

plaintiffs naturally oppose any such procedure, arguing that "pre-testimony hearings are neither

required by the Federal Rules of Evidence nor necessary in this case" and that such hearings

"would serve only to interrupt the trial."  Pl. Opp. at 41.  In fact, the Federal Rules *do*

contemplate such hearings, which are important to ensure that improper and prejudicial

testimony is not presented to the jury.

Federal Rule of Evidence 104(a) states that "[t]he court must decide any preliminary

question about whether a witness is qualified, a privilege exists, or evidence is admissible."

Rule 104(b) mandates that "[w]hen the relevance of evidence depends on whether a fact exists,

proof must be introduced sufficient to support a finding that the fact does exist."  And Rule

104(c) requires that "[t]he court must conduct any hearing on a preliminary question so that the

---

[22]  Plaintiffs argue that the jury should be instructed that suspicious orders are evidence of "likely diversion."  Pl. Opp. at 40.  There is no basis for such an instruction, which would be legally wrong and wholly prejudicial.  Even under the reading of the CSA and regulations set forth in Dkt. 2483, with which defendants respectfully disagree, the Court has recognized a distinction between "suspicious orders" and orders that are "likely to be diverted," explaining that orders meeting the "suspicious order" definition may be shipped if they are "not likely to be diverted." *See, e.g.*, Dkt. 2483 at 9–10.  Plaintiffs clearly seek to avoid their causation burden by relying upon argument about hypothetical "likely diversion," not actual diversion of specific alleged suspicious orders tied to defendants.  The jury should be instructed that suspicious orders are *not* evidence of likely diversion to avoid juror confusion on this important distinction.

jury cannot hear it if . . . justice so requires."  Holding a hearing outside the presence of the jury on these preliminary questions is particularly critical where, as here, there is a risk of exposing the jury to unreliable and speculative opinions that are devoid of evidentiary foundation.  This Court has already ruled that plaintiffs must demonstrate that their experts' hypothetical and speculative testimony rests upon some reliable foundation before it is admissible.  *See, e.g.*, Dkt. 2492 at 18 (ruling that "at trial, *prior to the introduction of Keller's testimony on this topic*, the Court will require Plaintiffs to clearly articulate the assumptions underlying their hypothetical(s) and establish that their hypothetical(s) present an accurate summation of the evidence present in the record" (emphasis added)).

Plaintiffs suggest that any expert testimony that is admitted despite lacking in foundation can be cured through objections or other procedural mechanisms *after* the jury has already heard it.  Pl. Opp. at 42-43.  The unwarranted prejudice flowing from such an approach is self-evident. *See Francis v. Clark Equip. Co.*, 993 F.2d 545, 551 (6th Cir. 1993) (finding that the trial "court's limiting instruction to the jury to 'disregard' the testimony 'that relates to [the risk-benefit] theory' could not effectively eliminate the prejudice and confusion caused by allowing the risk-benefit theory to be presented by plaintiff" and granting motion for new trial); *Johnson v. Advanced Bionics, LLC*, 2011 WL 1323883, at *5 n.6 (W.D. Tenn. Apr. 4, 2011) ("the risk that the jury will misapply some evidence despite a limiting instruction is too great to ignore").  Courts and academic studies alike have concluded that highly prejudicial testimony cannot be erased from jurors' consciousness through "curative" instructions.[23]  It is for this reason that

---

[23] *See, e.g.*, *Francis*, 993 F.2d at 551; *Marshall v. Lonberger*, 459 U.S. 422, 452 (1983) (recognizing that "a jury instruction is simply inadequate to ensure that a jury will disregard highly prejudicial evidence"); *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."); Andrew J. Wistrich et.

Rule 104(c) requires the Court to hold preliminary hearings on admissibility of evidence outside the presence of the jury whenever "justice so requires." Justice requires such a procedure here.

### 9. The Court should not allow use of certain charts presenting misleading and irrelevant data.

Motion No. 9 explained that certain charts offered by plaintiffs' data expert Craig McCann are prejudicially misleading. Dkt. 2661 at 25-27. These charts aggregate shipping data from a large number of distributors and from disparate sources. The charts include distributors that are not in the Track One trial. They include shipments outside the Track One jurisdictions. They include medications on which plaintiffs have no expert testimony. Plaintiffs do not deny any of this. Nor do they deny that the effect of this aggregated data will be to mislead the jury into thinking that the trial defendants shipped significantly more oxycodone and hydrocodone to their communities than they actually did. Plaintiffs also do not deny that, because these charts present this data in aggregated form, there is no way to tell from the charts which shipments relate to which pharmacies, and therefore no way to identify any diversion that may be associated with any of those shipments.

Plaintiffs' Opposition fails to address the misleading nature of these charts. Indeed, they do not deny – and therefore concede – that defendants' description of these charts is accurate. Plaintiffs also make no attempt to demonstrate that these charts are relevant to show that any trial defendant's shipments to Cuyahoga or Summit County led to diversion. And plaintiffs say nothing about the obvious prejudice to defendants from the use of misleading, irrelevant charts.

---

al., *Can Judges Ignore Inadmissible Information? The Difficulty of Deliberately Disregarding*, 153 U. Pa. L. Rev. 1251, 1253 (2005) ("The best way to prevent inadmissible information from influencing jurors is to shield them from it altogether.")

Instead of rebutting defendants' arguments, plaintiffs merely assert that defendants can "readily address" these issues "through objections to any direct examination of Dr. McCann" and in "cross-examination." Pl. Opp. at 44. That is no response to a motion *in limine*, particularly where defendants have specified exactly what should be excluded and why. Addressing these objections at trial will waste valuable trial time. These charts should be excluded now.

### 10. The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.

The principal focus of Motion No. 10 is, as the title indicates, a request for an order "prohibit[ing] counsel from offering personal opinions" about this litigation. Plaintiffs' Opposition does not address this point at all; plaintiffs do not contest the incontestable fact that the Ohio Rules of Professional Conduct, to which this Court adheres, prohibit such conduct. As that part of the motion is conceded, defendants ask that the Court order that much at least.

The Court should also bar plaintiffs' counsel from using demonstratives and other theatrical gestures to improperly belittle or bolster witnesses. Contrary to the suggestion in plaintiffs' Opposition (at 45), defendants have not asked for a general ban on the use of demonstratives, which have a time-honored and appropriate role in trial presentation. What defendants *have* requested – citing examples that plaintiffs make little effort to defend[24] – is a bar on *misuse* of demonstratives and other theatrical gestures to improperly belittle or intimidate an opposing witness – or to improperly bolster plaintiffs' own witnesses. Dkt. 2661 at 29-31.

---

[24] Defendants cited multiple examples in their motion, including from depositions in this case. Plaintiffs make no effort to defend the latter; the only examples they address in their opposition are those from the *DePuy* case. As for those, plaintiffs state only that the evidence and argument condemned by the Fifth Circuit was admitted by the district court in that case. Pl. Opp. at 46. That does not change the fact that this and other conduct by plaintiffs' counsel was found to be so far out of bounds that the Fifth Circuit held that a new trial was required.

This is a serious case that merits serious treatment from all parties and their counsel. Plaintiffs' protestations about the "high caliber" of their "accomplished" counsel (Pl. Opp. at 44, 46) does not negate this fundamental truth. To the contrary, such "accomplished" counsel are surely more than capable of presenting their clients' case in a responsible manner.

**11. The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability.**

Motion No. 11 seeks to "preclude plaintiffs from offering evidence or argument about defendants' overall financial condition, assets, revenues, or profitability," and any "reference or argument about punitive damages." Dkt. 2661 at 31. Plaintiffs concede that "they will not seek to introduce evidence of Defendants' overall financial condition or assets, as they are not seeking punitive damages." Pl. Opp. at 47. The Court should grant the motion to exclude that evidence.

**12. The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.**

Plaintiffs' Opposition offers no substantive response to most of defendants' arguments on Motion No. 12, citing defendants' alleged failure to offer "examples" of the kinds of questions they seek to bar. But defendants' motion clearly described the types of questions at issue – questions about personal feelings and opinions of personal responsibility, guilt or sympathy concerning the opioid crisis. Notably, plaintiffs do not deny that they regularly asked defendants' witnesses such questions during deposition, and they certainly do not disclaim any intention of doing so at trial. Such questions have ranged from "Do you think that you have any responsibility for the opioid crisis?" to the likes of "Is that your testimony, that you don't believe that [company] had any responsibility in the death catastrophe related to narcotics that they sold throughout the country?" Such questions, which have no probative value and are clearly

designed to intimidate and harass the witness, are inadmissible under Rule 403. Plaintiffs do not cite a single case to the contrary.

Such testimony is also inadmissible as improper lay opinion testimony under Rule 701. Plaintiffs themselves have identified the subject of causation as one properly addressed by expert opinion under Rule 702. The opinion of lay witnesses on this subject is inadmissible under Federal Rule of Evidence 701(c). And to the extent plaintiffs seek to offer such testimony as evidence of "fault," "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Plaintiffs argue that defendants' witnesses' "particularized knowledge about their own or their employers' policies and procedures" is relevant. Pl. Opp. at 50. But that is beside the point; this motion does not address such testimony. There is no basis to question defendants' employees about whether they feel responsible for overdose deaths, whether they feel their employers are responsible for overdose deaths, or whether they feel guilt about their conduct or their employers' conduct, as plaintiffs regularly did in depositions. *United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) ("Seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact. …" (internal marks omitted)).

### 13. The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.

This motion has been mooted by stipulation. *See* Dkt. 2724 at 1.

### 14. The Court should preclude any comment regarding the absence of a corporate representative at trial.

Although plaintiffs ask the Court to defer ruling on the questions of relevance and potential prejudice raised by Motion No. 14, they do not (and cannot) seriously maintain that any argument, comment, or innuendo about the presence or absence of defendant corporate

representatives would ever be relevant to findings of fact in this case, or that any such comment would be anything but improperly prejudicial.

The handful of cases that plaintiffs cite on this point are out-of-circuit, unpublished, and conclusory, and most are off-point. The court in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, for instance, offered no reasoned basis for its order that the plaintiff was permitted to make reference to a corporate representative who was "customar[ily]" present at a trial. *See* 2011 WL 6740391, at *11 (S.D. Ill. Dec. 22, 2011). Other cases refer to witnesses, not corporate representatives. *See, e.g.*, *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying motion to exclude "reference to … the absence of any Samsung witnesses at trial"). The presence or absence of corporate representatives has no bearing on the issues to be tried.

Dated:  October 14, 2019  Respectfully Submitted,


 _/s/ Geoffrey E. Hobart_

Geoffrey E. Hobart
Mark H. Lynch
Sonya D. Winner
Paul W. Schmidt
Phyllis A. Jones
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com
pschmidt@cov.com
pajones @cov.com


*Counsel for McKesson Corporation*



 _/s/ Robert A. Nicholas_

Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com


*Counsel for AmerisourceBergen Drug Corporation and*
*AmerisourceBergen Corporation*

 _/s/ Enu Mainigi_

Enu Mainigi
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com


*Counsel for Cardinal Health, Inc.*



 _/s/ John P. McDonald_

John P. McDonald
C. Scott Jones
Lauren M. Fincher
Brandan J. Montminy
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Tel: (214) 740-8000
Fax: (214) 756-8758
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com


*Counsel for Henry Schein, Inc. and*
*Henry Schein Medical Systems, Inc.*

  /s/ Steven A. Reed
Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
Harvey Bartle
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
harvey.bartle@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
Fax: (412) 560-7001

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc.,
Cephalon, Inc., and Actavis LLC*

  /s/ Kaspar Stoffelmayr
Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreen Co.*

## <u>CERTIFICATE OF SERVICE</u>

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

<div align="right">

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

</div>

# EXHIBIT 1

| From: | David R. Cohen (David@SpecialMaster.Law) |
|---|---|
| To: | Flahive Wu, Laura; Andrea Bierstein; 2804 Discovery, MDL; MDL 2804; "xALLDEFENDANTS-MDL2804-Service@arnoldporter.com" |
| Subject: | Re: EXTERNAL-RE: MDL 2804: Request for relief -- plaintiffs" noncompliance with pretrial deadlines |
| Date: | Thursday, October 10, 2019 7:17:00 PM |
| Attachments: | image005.jpg |
| | image006.jpg |
| | image001.jpg |

**[EXTERNAL]**
External E-mail

The errata are stricken.

Plaintiffs may not pursue future damages at trial.

These rulings will be formalized by me on Monday.  Objections will be due on Tuesday at the FPT.

I will also enter rulings on Monday regarding undeposed witnesses (e.g. pharmacists, and Bornstein/Howard/Johnson) if a deal has not been struck.

We will meet on Monday at 1:00p in the Courthouse with a court reporter present so that these and other rulings can be recorded and to address other trial matters.

-David

========================
This email sent from:
David R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
www.SpecialMaster.law

**From:** Flahive Wu, Laura <lflahivewu@cov.com>
**Sent:** Thursday, October 10, 2019 8:06 PM
**To:** Andrea Bierstein <abierstein@simmonsfirm.com>; 2804 Discovery, MDL <mdl2804discovery@motleyrice.com>; MDL 2804 <MDL2804@motleyrice.com>; David R. Cohen (David@SpecialMaster.Law) <david@specialmaster.law>; 'xALLDEFENDANTS-MDL2804-Service@arnoldporter.com' <xALLDEFENDANTS-MDL2804-Service@arnoldporter.com>
**Subject:** RE: EXTERNAL-RE: MDL 2804: Request for relief -- plaintiffs' noncompliance with pretrial deadlines

Special Master Cohen,

# EXHIBIT 2

October 1, 2019

Deborah S. Hunt, Clerk
United States Court of Appeals for the Sixth Circuit
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, OH 45202-3988

Re:  Case No. 19-3827, In re: State of Ohio
     Originating Case No. 1:17-md-02804; 1:18-op-45090; 1:17-op-45004

Dear Ms. Hunt:

Thank you for the opportunity to respond to the petition for mandamus filed by Ohio Attorney General Yost.

As the Court of Appeals is aware, "mandamus relief is an extraordinary remedy, only infrequently utilized" by the Sixth Circuit. *John B. v. Goetz*, 531 F.3d 448, 457 (6th Cir. 2008) (quoting *In re Perrigo Co.*, 128 F.3d 430, 435 (6th Cir. 1997)). The relief sought by the State of Ohio in its mandamus petition is even more extraordinary in this instance, for at least three reasons. First, the State of Ohio's request is untimely in the extreme. Second, the State of Ohio bases its petition entirely upon a clearly faulty premise. And third, the State of Ohio does not challenge any specific ruling by me, but rather seeks to have the Sixth Circuit delve broadly into State-specific policy by "[i]ssuing a writ that prevents [all] subdivisions from getting ahead of their respective States in litigating state-wide issues." Pet. at Page: 39.

**Timeliness**

The State of Ohio files its petition on the eve of the first MDL bellwether trial, with opening statements scheduled for October 21, 2019.  The petition comes nearly **two years** after bellwether Plaintiff Cuyahoga County first filed its complaint (in November of 2017); **17 months** after the Court set Cuyahoga County's claims for trial (in April of 2018) (*see* Doc. #: 232); and **9 months** after I ruled the bellwether Plaintiffs had standing to bring their claims (*see* Doc. #: 1203).

When Cuyahoga County filed its complaint, former Ohio Attorney General Mike DeWine had already filed one opioid lawsuit against many of the same defendants on behalf of the citizens of Ohio. Notably, then-Attorney General DeWine chose not to attempt to prevent Cuyahoga County, or any other Ohio city or county, from pursuing their own opioid cases.[1] On December 19, 2018, I issued an order concluding that the bellwether Plaintiffs had standing to bring their

---

[1] Nor, apparently, would former Attorney General DeWine want to prevent these cases if he still held that office. Governor DeWine has made public statements rejecting Attorney General Yost's position. *See* Andrew J. Tobias, *Gov. Mike DeWine calls Yost's opioid lawsuit takeover plan a 'serious mistake'*, Cleveland.com (updated Aug. 28, 2019), https://www.cleveland.com/open/2019/08/gov-mike-dewine-calls-yosts-opioid-lawsuit-takeover-plan-a-serious-mistake.html.

claims.[2] Again, neither then-Governor-elect DeWine nor then-Attorney General-elect Yost made any attempt to challenge that decision. On January 14, 2019, Attorney General Yost was sworn in, and still no attempt was made to overturn my conclusion until the eve of trial.

Laches can apply to petitions for writ of mandamus and clearly should in this instance. *Cheney v. U.S. District Court for D.C.*, 542 U.S. 367 (2004); *U.S. v. Olds*, 426 F. 2d 564 (3rd. Cir 1970). Other circuits have rejected attempts to obtain mandamus on the eve of trial. *See, e.g., In re Sea Ray Boats, Inc.*, 695 F. App'x 543, 544 (Fed. Cir. 2017).

For nearly two years, the State of Ohio remained silent while Ohio's cities and counties conducted tens of millions of dollars' worth of discovery, engaged in massive amounts of legal briefing, and even reached settlement agreements with some defendants. Only after the bellwether plaintiffs reached settlement agreements with some defendants did Attorney General Yost file his petition. Indeed, Attorney General Yost accepted my invitation to attend settlement conferences regarding defendant Purdue, over which I presided. Just because the new Attorney General now feels differently than the former Attorney General does not give the State of Ohio a new chance to upend the imminent bellwether trial.

**Faulty Premise**

The State's petition is based on a faulty premise. The Ohio Attorney General's petition states repeatedly that only the Attorney General's Office can litigate on behalf of its citizens. While it may be true that "a political subdivision 'may not sue to enforce its residents' rights," Pet. at Page: 18, the bellwether Plaintiffs have consistently stated, and I have likewise repeatedly concluded, that the city and county Plaintiffs do not seek recovery based on injuries to individual residents; rather the Plaintiffs seek recovery *for direct injuries suffered by the Plaintiffs themselves*. *See* Doc. #: 654 at PageID #: 15721; Doc. #: 1115 at PageID #: 27541; Doc. #: 1203 at PageID #: 29034. That the relief sought by the Plaintiff cities and counties for their own injuries, if granted, will also tend to collaterally benefit their residents, does not mean that Plaintiffs seek to litigate on behalf of those residents.

Moreover, many of Ohio's statutes at issue in the bellwether case expressly authorize the type of actions that the State of Ohio is now suddenly trying to prevent. *See, e.g.*, Ohio Rev. Code § 715.44(A) ("A municipal corporation may abate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist."); *see also* Ohio Rev. Code § 3767.03 ("Whenever a nuisance exists . . . the prosecuting attorney of the county in which the nuisance exists . . . may bring an action in equity . . . to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it.").

---

[2] My ruling on Article III standing was made on December 19, 2018. The State of Ohio could have intervened and requested the relief it now seeks from the Circuit. Despite the State of Ohio's protestations that it is not required and cannot be made to intervene, it is clear that the State could have done so. *See Stringfellow v. Concerned Neighbors in Action*, 480 U. S. 370 (1987). Furthermore, the State could have intervened in a limited capacity. *See U. S. v. City of Detroit*, 712 F. 3d 925 (6th Cir. 2013). Instead, however, the State of Ohio elected to pursue the extraordinary writ in lieu of raising the issue with me.

**State-Specific Policy**

To the extent the State of Ohio now contends the current laws of the State prohibit the claims of the bellwether Plaintiffs, the Attorney General should seek relief in State court, not this Court.[3] As the Attorney General points out, "[s]tructurally, of course, only state courts can make 'authoritative' interpretations of state law." Pet. at Page: 35 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 395 (1988)). "Federal courts should 'pause' before 'intrud[ing] into the proper sphere of the States.'" *Id.* at Page: 40 (quoting *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring)).

The State of Ohio effectively asks the Sixth Circuit to throw out roughly 2,000 cases on the eve of the first bellwether trial. Purportedly for the sake of "vindicating federalism," the State of Ohio asks the Sixth Circuit to determine the substantive relationships, not just between Ohio and its cities and counties, but also of *all other* States and their own cities and counties, as well—a task which, under those same principles of federalism, individual State courts are better suited to address.[4]

For all these reasons, the petition for mandamus should be denied.

Sincerely,


Dan Aaron Polster


---

[3] It is not clear that even Attorney General Yost believes Ohio law prohibits these cases. In addition to not bringing an action to prevent these cases in state court, he is currently backing legislation that will give his office exclusive control over these cases. *See* Jeremy Pelzer, *Bill seeks to give Ohio AG Dave Yost control over local opioid lawsuits*, Cleveland.com (updated Aug. 28, 2019), https://www.cleveland.com/open/2019/08/bill-seeks-to-give-ohio-ag-dave-yost-control-over-local-opioid-lawsuits.html. If Attorney General Yost believes he needs to change Ohio law to give his office control over these cases, he cannot credibly argue that I committed legal error by allowing them to go forward under the current laws.

[4] For example, the Tennessee Attorney General moved to intervene in similar actions in Tennessee state courts. *See, e.g.*, March 20, 2018 Letter of 14 DAs to Tenn. AG at 1-3 (referring to the Tenn. AG's several motions to intervene in each pending lawsuit and citing Tenn. state cases describing the authority of the Tenn. Attorney General and defining the relationship between the Tenn. AG and municipality District Attorneys) (available at https://tnbabydoe.com/wp-content/uploads/2018/03/3-20-18-Letter-to-Slatery-from-DAs.pdf).

# EXHIBIT 3

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF OHIO

3                         EASTERN DIVISION

4

                     ~~~~~~~~~~~~~~~~~~~~

5

6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION

7                                     Case No. 17-md-2804

8                                     Judge Dan Aaron
      This document relates to:       Polster

9

      The County of Cuyahoga v. Purdue

10    Pharma L.P., et al.
      Case No. 18-OP-45090

11

12                   ~~~~~~~~~~~~~~~~~~~~~

13                  Videotaped deposition of
                    CYNTHIA G. WEISKITTEL

14

15                    November 13, 2018

16                        8:59 a.m.

17

18

19                       Taken at:

20           Climaco, Wilcox, Peca & Garofoli

21            55 Public Square, Suite 1950

22                    Cleveland, Ohio

23

24

25           Renee L. Pellegrino, RPR, CLR

Page 50

1    A.    Specific numbers?
2    Q.    Yes.
3    A.    No.
4    Q.    Do you have an impression as to the
5  role of illegal heroin compared to prescription
6  drugs that are being dispensed according to a
7  prescription to somebody who is actually taking
8  them?
9    A.    Yes.  I believe most people start
10  out taking prescription drugs, and when they can
11  no longer get the drugs, they turn to a street
12  drug to get the -- the support that they need.
13    Q.    And what is that impression based
14  on?
15    A.    My work.
16    Q.    Is there any analysis, any writing
17  anywhere that talks about that sort of
18  transition, the concept of a gateway drug being
19  seen in your work?
20        MR. GALLUCCI:  Object to form.
21    A.    I can't give you anything specific.
22    Q.    I can tell you that we've had
23  produced by the Plaintiff's lawyers for Cuyahoga
24  County documents that have your name on them,
25  including a handful of documents over the last

Page 51

1  basically four and a half years that you've
2  authored.  We really have relatively few
3  documents you've ever authored, but from the
4  ones that we have, there's no analysis, no
5  discussion whatsoever about people transitioning
6  from a prescription drug to street drugs like
7  heroin.  Do you think that you've ever written
8  that up in some document in your official
9  capacity, an e-mail, a memo, any kind of
10  document?
11    A.    I don't know.
12    Q.    What about your staff; have you ever
13  received any kind of analysis or discussion from
14  your staff that talks about this idea of
15  transition from a legal prescription to illegal
16  street drug use like heroin?
17    A.    We have certainly engaged in
18  conversation about it.  I do not know if there's
19  a document that exists.
20    Q.    Who have you talked about that with?
21    A.    My direct reports.
22    Q.    Who are those?
23    A.    Christopher Cabot, Tamara
24  Chapman-Wagner would be two specific people that
25  I've spoken with about it.

Page 52

1    Q.    Is there some reason why there
2  wouldn't have been any documents memorializing
3  that sort of discussion and analysis?
4    A.    Our work and scope of our work is
5  wide.  There are a lot of discussions that we
6  have that aren't necessarily memorialized in a
7  memo.
8    Q.    Do you recall when you first started
9  having discussions like that with Mr. Cabot or
10  Ms. Wagner-Chapman?
11    A.    Chapman-Wagner.
12    Q.    Chapman-Wagner.
13        MR. GALLUCCI:  Object to form.
14    A.    I would say we've been having that
15  discussion for several months.
16    Q.    Have you asked that any kind of
17  analysis be done within your patient
18  population -- how do you refer to them?  I'm
19  sorry.  How do you --
20    A.    We call them families or we call
21  them clients.
22    Q.    Clients.  Clients seems to be more
23  consistent with how some other parts of the
24  overall department have referred to them.  Is it
25  okay if I refer to them as clients?

Page 53

1    A.    Yes.
2    Q.    For your clients, has there been any
3  analysis that you've requested be done that
4  looks at the issue of whether people are
5  transitioning from a legal prescription for an
6  opioid that is written for them and taken by
7  them pursuant to prescription to some sort of
8  transition over time to illegal street drugs?
9        MR. GALLUCCI:  Object to form.
10    A.    Efforts have been made to document
11  that information, but I don't have a report for
12  you to look at.
13    Q.    And so there are individual case
14  files, correct, where there might be some notes
15  about this?
16    A.    Yes.
17    Q.    Has there been any kind of effort to
18  look at case files collectively to see how often
19  this is going on?
20    A.    The reality is there are thousands
21  of case files, and so we have limited resources.
22  Our need is to meet the needs of families.  We
23  are documenting when we can, but we do not have
24  a quantitative report for you.
25    Q.    So case files are one way that

14 (Pages 50 - 53)