# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO: *Track One-B Trial* | |

**PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE, ARGUMENT OR COMMENTS REGARDING: 1) THE MILITARY SERVICE, EMPLOYMENT, RELIGIOUS AFFILIATION OR PERSONAL EXPERIENCES OF COUNSEL AND STAFF, AND 2) THE WAIVING OR DONATION OF ATTORNEY'S OR EXPERT FEES, OR ANY PORTION OF ANY RECOVERY, TO CHARITY OR FOR THE BENEFIT OF THE COMMUNITY**

Plaintiffs may seek to introduce evidence, testimony or argument, or comment upon: 1) their counsel's or staff's military experience, employment, religious affiliation or personal experiences; and/or 2) the waiving or donation of attorney's fees or expert fees, or any portion of any recovery, to charity or for the benefit of the community. All of this should be excluded as irrelevant and prejudicial.

**MILITARY SERVICE, EMPLOYMENT, RELIGIOUS AFFILIATION OR PERSONAL EXPERIENCES OF COUNSEL AND STAFF**

Recognizing the lack of relevance and likely prejudicial impact, the parties in Track 1-A stipulated and agreed that "neither party, their counsel, or their witnesses shall offer evidence or argument" regarding: "2. Any reference to or mention of military service, other or prior employment, religious affiliations or positions, or other personal experience of the parties' counsel (including staff)." Doc #2647-*In Limine* Evidentiary Stipulations at 1. Plaintiffs have now changed positions and refuse to agree to the same stipulation without explanation other than "Plaintiffs do not believe that this stipulation is necessary in this trial." *See* 8/13/20 Email from P.

- 1 -

do Amaral to R. Barnes, attached as Exhibit 1. This change is position is particularly troubling given Mr. Lanier's position as a Baptist pastor and preacher, *see* https://www.lanierlawfirm.com/attorney/w-mark-lanier/, and may indicate that Plaintiffs now plan to highlight and/or refer to such position(s) or similar positions of other counsel at trial. Due to the lack of relevance of such information and likely prejudice, as recognized by the Track 1A parties, the Court should enter an order precluding evidence, argument or comments regarding the military service, employment, religious affiliation or personal experiences of counsel or staff. *See, e.g., Whitfield v. Harris*, 474 F. Supp. 2d 822, 825 (N.D. Miss. 2007)(granting in part motion in limine and prohibiting "any counsel to mention or refer to any deity or make any religious reference in such a manner as can reasonably be construed to indicate that the jury should consider the teachings or beliefs of the deity or any religious references in addition to or to the exclusion of the law" and further prohibiting counsel "from making any reference to the religious beliefs or affiliations of any party or counsel in such a manner as can reasonably be construed to indicate that the jury should consider the religious beliefs or affiliations of the party, unless such matters are probative of an issue raised at trial.").

The Court should therefore enter an order precluding any evidence, argument or comments regarding the military experience, employment, religious affiliation or personal experience of counsel or staff.

## WAIVING OR DONATION OF ATTORNEY'S OR EXPERT FEES, OR ANY PORTION OF ANY RECOVERY, TO CHARITY OR FOR THE BENEFIT OF THE COMMUNITY

The Court should also preclude any evidence or argument regarding the waiving or donation of attorney's or expert fees, or any portion of any recovery, to charity or community purposes, all of which is not relevant, any marginal probative value is substantially outweighed by

the danger of confusing the issues and/or misleading the jury. Further, such evidence improperly appeals to the personal and community interests of the jury.

Evidence or argument that counsel or an expert is waiving or donating fees, offered in an effort to bolster a party's position or a witness or expert's credibility, is irrelevant and improper. *Kuhne v. Reynolds*, No. 3:01cv1090 (WWE), 2017 U.S. Dist. LEXIS 222664, at *6 (D. Conn. Feb. 27, 2017) (granting motion in limine to exclude evidence that plaintiff's expert donates a portions of his fees); *cf. In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Product Liability Litig.*, 888 F.3d 753, 788-92 (5th Cir. 2018) (new trial ordered in part as a result of "counsel's misrepresentations" about plaintiffs' experts' alleged pro bono compensation arrangements). Even if such evidence had some marginal probative value, it would be substantially outweighed by the danger of confusing the issues, misleading the jury, undue delay, or wasting time. Fed. R. Evid. 403. Further, Rule 608(a) allows the credibility of a witness to be bolstered in the form of opinion or reputation "only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." *Cousins v. Bray,* No. 2:03-cv-1071, 2005 U.S. Dist. LEXIS 63160, at *10 n.7 (S.D. Ohio Feb. 28, 2005).

The same reasoning applies to evidence or argument regarding the planned use of any portion of any award for charity or community purposes. Such evidence is an improper appeal to the personal and community interests of the jury. Plaintiffs already recognized that such appeals are improper in their Track 1-A *In Limine* Evidentiary Stipulations, Doc #2647 ("any reference to jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers"). Such evidence should be excluded as irrelevant and unduly prejudicial under Rule 403. *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001) (improper to incite the passions and prejudices of the jury by appealing to the national or community interests of jurors).

The Court should therefore enter an order precluding any evidence, argument or comments regarding the waiving or donation of attorney's or expert fees, or any portion of any recovery, to charity or community purposes.

Dated:  August 14, 2020

Respectfully submitted,

   /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax:  (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

 /s/ Timothy D. Johnson  (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN,
CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758

E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and*
*HBC Service*
*Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

*/s/ Kaspar J. Stoffelmayr* (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email:
kaspar.stoffelmayr@bartlitbeck.com
Email:
brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

- 5 -

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

 /s/   Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# Exhibit 1

| From: | do Amaral, Paulina |
|---|---|
| To: | Robert M. Barnes |
| Cc: | EXT Track1BDefendants; Peter H. Weinberger (pweinberger@spanglaw.com); Michelle Carreras |
| Subject: | RE: Opioids - MIL Stipulations |
| Date: | Thursday, August 13, 2020 1:41:52 PM |

Bob,

Regarding #11, Plaintiffs understand that the Court granted a similar (but narrower) MIL in the CT1A trial, and we are noting our objection to that ruling in our MILs, based on the arguments set forth in our prior MIL briefing.

Regarding #2, Plaintiffs do not believe that this stipulation is necessary in this trial. We understand you may wish to proceed with this MIL.

Thanks.

Paulina

**From:** Robert M. Barnes [mailto:rbarnes@marcus-shapira.com]
**Sent:** Thursday, August 13, 2020 12:30 PM
**To:** do Amaral, Paulina
**Cc:** EXT Track1BDefendants; Peter H. Weinberger (pweinberger@spanglaw.com); Michelle Carreras
**Subject:** RE: Opioids - MIL Stipulations

Paulina: What is the basis for deleting of #2 (military service or prior employment or religious affiliation or personal experience of parties' counsel) and #11 (corporate representative's presence/absence at trial or identity)? Ps previously agreed to #2 in 1A (Doc #2647). And the Court granted Ds' MIL #14 re no commenting on absence of corporate representative at trial (Doc #3058) citing caselaw that says "the presence, absence or identity of defendant's corporate representative is wholly irrelevant to plaintiffs' claims. We would prefer to avoid unnecessary MILs on these points.

**From:** do Amaral, Paulina <Pdoamaral@lchb.com>
**Sent:** Thursday, August 13, 2020 7:05 AM
**To:** Robert M. Barnes <rbarnes@marcus-shapira.com>
**Cc:** EXT Track1BDefendants <EXT_Track1BDefendants@jonesday.com>; Peter H. Weinberger (pweinberger@spanglaw.com) <pweinberger@spanglaw.com>; Michelle Carreras <Michelle.Carreras@LanierLawFirm.com>
**Subject:** RE: Opioids - MIL Stipulations

Good morning Bob,

Please see our edits attached.

Paulina



LCHB

**Paulina do Amaral**
**Partner**
pdoamaral@lchb.com
t 212.355.9500
f 212.355.9592
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
www.lieffcabraser.com

---

**From:** Robert M. Barnes [mailto:rbarnes@marcus-shapira.com]
**Sent:** Tuesday, August 11, 2020 7:31 PM
**To:** do Amaral, Paulina
**Cc:** EXT Track1BDefendants
**Subject:** RE: Opioids - MIL Stipulations

Paulina: Attached is a draft of our still-in-progress In Limine Evidentiary Stipulations. We may have a few additional items.

---

**From:** Robert M. Barnes
**Sent:** Friday, August 7, 2020 7:57 PM
**To:** 'do Amaral, Paulina' <Pdoamaral@lchb.com>
**Subject:** RE: Opioids - MIL Stipulations

Paulina: Yes, with some needed modifications (take out references to treble and punitive damages) and some other modifications that I will get to you on Monday.

---

**From:** do Amaral, Paulina <Pdoamaral@lchb.com>
**Sent:** Friday, August 7, 2020 1:58 PM
**To:** Robert M. Barnes <rbarnes@marcus-shapira.com>
**Subject:** RE: Opioids - MIL Stipulations

Dear Bob,

Please see attached the *In Limine* Evidentiary Stipulations the parties entered into prior to the CT1A trial. Are the CT1B defendants willing to enter into the same stipulations?

Paulina

**Paulina do Amaral**
**Partner**



pdoamaral@lchb.com
t 212.355.9500
f 212.355.9592
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
www.lieffcabraser.com

This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

Robert M. Barnes
**Marcus & Shapira LLP**

301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Direct Dial: 412-338-5224
Fax: 412-391-2315

THIS MESSAGE AND ANY ATTACHED DOCUMENTS CONTAIN INFORMATION FROM THE LAW FIRM OF MARCUS & SHAPIRA LLP WHICH MAY BE CONFIDENTIAL AND/OR PRIVILEGED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU MAY NOT READ, COPY, DISTRIBUTE, OR USE THIS INFORMATION. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY REPLY E-MAIL AND THEN DELETE THE MESSAGE.

This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

Robert M. Barnes
**Marcus & Shapira LLP**

301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219-6401
Direct Dial: 412-338-5224
Fax: 412-391-2315

THIS MESSAGE AND ANY ATTACHED DOCUMENTS CONTAIN INFORMATION FROM THE LAW FIRM OF MARCUS & SHAPIRA LLP WHICH MAY BE CONFIDENTIAL AND/OR PRIVILEGED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU MAY NOT READ, COPY, DISTRIBUTE, OR USE THIS INFORMATION. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY REPLY E-MAIL AND THEN DELETE THE MESSAGE.

This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

## PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO PRECLUDE TESTIMONY OR ARGUMENT NEGATIVELY CHARACTERIZING DEFENDANTS AS LARGE CORPORATIONS

Defendants anticipate that Plaintiffs will attempt to argue or suggest that the jury should be more harsh in its judgment of Defendants because they are large corporations, whether based on their status as national retail pharmacy chains or simply based on their number of stores, employees, or other similar metrics. Such testimony or argument is irrelevant; it does not tend to prove or disprove any fact of consequence that is at issue in the Track 1B trial. *See* FED. R. EVID. 401, 402. It is also highly prejudicial to Defendants and would have a tendency to inflame jurors' emotions and/or appeal to their biases. *See* FED. R. EVID. 403.

The Sixth Circuit has stated that such evidence as irrelevant and prejudicial. *See Cleveland v. Peter Kiewitt Sons' Co.*, 624 F.2d 749, 756-57 (6th Cir. 1980) (finding statements were "obviously an appeal to passion and prejudice" and improperly allowed where plaintiff's counsel "sought to plant the seed in the mind of the jurors that [defendant] was a very large corporation with international operations, . . . made several other remarks, and asked other questions designed to convey to the jury the image of the defendant as a giant in the field"); *see also Guardian Life Ins. Co. of Am. v. Andraos*, CV 07-05732, 2009 WL 10674144, *3 (C.D. Cal. Sept. 10, 2009) (finding that "any slight probative value that evidence of Guardian's wealth and size may have . .

. is outweighed by the danger that such evidence might unfairly prejudice the jury into finding for [plaintiffs] based in part on Guardian's status as a large, wealthy corporation"); *Pearson v. Ill. Central R.R.*, No. 06-cv-0822, 2008 WL 905915, *1 (S.D. Ill. March 28, 2008) (excluding "any reference to the Defendant being a large corporation or the difference in the status of Plaintiff as an individual and this Defendant as a corporation" as "irrelevant and immaterial"); *King v. Lowe's HIW, Inc.*, CV-03-146, 2006 WL 8435705, *1 (D. Mont. April 20, 2006) (excluding "[a]ny evidence or attempts to characterize Lowe's as a 'large' corporation").

Indeed, this Court has already found that evidence or argument about Defendants' overall financial condition, assets, and profits—except as relates specifically to profits from prescription opioid medications—should be excluded as "irrelevant or unduly prejudicial."  Dkt. No. 3058 at 58-59.  This motion seeks only to extend this Court's existing ruling to explicitly encompass any general references to or characterizations of Defendants as "large corporations," imply that they are somehow more culpable because they have many employees, that they can afford to pay any award because they are large, or that they bear more responsibility because of their size.[1]

### CONCLUSION

Defendants respectfully request that the Court enter an order precluding argument or testimony referring to or characterizing Defendants as large corporations.

Dated:  August 14, 2020

Respectfully submitted,

 /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000

---

[1] As this Court has held, each Defendant is allowed to "introduce and describe themselves accurately to the jury and explain how many people it employs and the work they do to ensure the safe . . . delivery of necessary medication to the people living in the Track One counties."  Dkt. No. 3058 at 68.  This motion seeks only to preclude improper attempts by Plaintiffs to appeal to jurors' emotions by negatively characterizing Defendants as large corporations.

Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

_/s/ Timothy D. Johnson_  (consent)_____
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio 44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*


/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendant Walgreen Co.*

/s/ Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

**PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 4 TO PRECLUDE
EVIDENCE, ARGUMENT, AND TESTIMONY COMPARING DEFENDANTS'
CONDUCT TO WARS, NATIONAL TRAGEDIES, TERRORIST ATTACKS, THE
TOBACCO INDUSTRY, OR ANY COMPARISON OF DEFENDANTS TO SUCH
<u>ACTORS</u>**

The Court should bar any testimony or argument during any phase of the trial—including voir dire, opening statement, witnesses' testimony, and closing argument—comparing Defendants' conduct or the alleged consequences of it to wars, national tragedies, terrorist attacks, the tobacco industry or other corporate scandals (e.g. Exxon Valdez, Enron, Tyco, British Petroleum, Ford Motor Company, Toyota, etc.), or any actors that participate in that other conduct (*i.e.* terrorists, instigators of national tragedies, tobacco companies or executives, etc.). Such testimony or argument is irrelevant; it does not tend to prove or disprove any fact of consequence at issue in this case. *See* Fed. R. Evid. 401, 402. It is also highly prejudicial to Defendants and would have a tendency to inflame jurors' emotions. *See* Fed. R. Evid. 403.

Only relevant evidence—that is, evidence that "has any tendency to make a fact more or less probable"—is admissible at trial. Fed. R. Evid. 401; *see also United States v. Sosa-Baladron*, 800 F. App'x 313, 325 (6th Cir. 2020) ("Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without that evidence."). The same rule applies to arguments of counsel. *See, e.g.*, *Ervin v. Desert View Reg'l Med. Ctr. Holdings, LLC*,

2017 WL 4038858, at *4 (D. Nev. Sept. 13, 2017) (limiting arguments of counsel "to relevant and proper facts and evidence of the case and the applicable governing law"). Indeed, an attorney's role in closing argument is limited "to assist[ing] the jury in analyzing, evaluating and applying [t]he evidence," and to the extent an attorney's argument "ranges beyond these boundaries it is improper." *United States v. Garza*, 608 F.2d 659, 662–63 (5th Cir. 1979) (citation omitted); *see also United States v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981) (same).

In this case, Plaintiffs seek damages for Defendants' alleged conduct related to the distribution of prescription opioids. Wars, national tragedies, terrorist attacks, or the tobacco industry have no bearing on the issues in this case and would not aid the jury's understanding of those issues. Any comparisons between Defendants and those situations would have no "tendency to make a fact more or less probable," and should be excluded from trial as irrelevant under Fed. R. Evid. 401 and 402.

Testimony or argument comparing Defendants' conduct to wars, national tragedies, terrorist attacks, or the tobacco industry should also be excluded under Fed. R. Evid. 403, which provides that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Any discussion of the inherently emotional topics of wars, national tragedies, terrorist attacks, or the tobacco industry or other negatively perceived corporate actors, would have no purpose but to bias and inflame jurors against Defendants. Indeed, any comparison of Defendants' conduct to such other conduct could only be interpreted as both an attempt to obscure the issues in this case and as an impermissible invitation for the jury to render its verdict based on emotion instead of fact. *See, e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) (stating "appeals to the jury" that are "calculated to incite the passions and prejudices of the jurors" are inadmissible);

*Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983) (concluding district court did not abuse its discretion in barring evidence that "might have inflamed or confused the jury"); *United States v. Akers*, 2019 WL 4934948, at *5 n.9 (E.D. Ky. Oct. 7, 2019) ("Of course, arguments or evidence intended specifically to inflame the jury or produce an emotional response would be improper and/or inadmissible."). The evidence should be precluded.

## CONCLUSION

Defendants respectfully request that the Court enter an order precluding argument or testimony comparing Defendants' conduct or the alleged effects of it to wars, national tragedies, terrorist attacks, the tobacco industry or other corporate scandal, or any actors that participate in such conduct.

Dated: August 14, 2020

Respectfully submitted,

   /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

  /s/ Timothy D. Johnson   (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

*/s/ Kaspar J. Stoffelmayr* (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street

- 4 -

Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/   Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

**PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 5 TO PRECLUDE EVIDENCE
OR ARGUMENT THAT DEFENDANTS COULD HAVE STOPPED DISTRIBUTING
<u>SCHEDULE II CONTROLLED SUBSTANCES</u>**

The Court should bar Plaintiffs from offering evidence or argument that Defendants' mere

act of distributing opioid medications provides a basis for imposing liability. Plaintiffs should not

be able to argue that Defendants could have avoided liability by either choosing never to start

distributing opioids or by voluntarily ceasing that distribution. The Supreme Court, the Sixth

Circuit, and courts across the country have rejected "stop-selling" or "never-start-selling" theories

of liability, and this Court should do the same.[1] Plaintiffs should not be allowed to argue or imply

to the jury that it can base liability merely on the fact that Defendants distributed opioid

medications, even if they did so in substantial compliance with the Controlled Substances Act.

In *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), the Supreme Court

considered whether federal law, which "prohibit[ed] generic drug manufacturers from

independently changing their drugs' labels," preempted a state law that would have required the

generic drug manufacturer to change its drugs' labels (and thus violate federal law). *Id.* at 475.

---

[1] Indeed, in the Track 1-A litigation, this Court granted Teva's motion *in limine* to preclude argument that certain Defendants "should have stopped selling generic opioids." Evidentiary Order at 50, *In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804 (N.D. Ohio Jan. 3, 2020)). This motion is based on the same logic, but reaches distribution, not manufacturing, conduct.

The Court concluded such state laws were preempted, and in reaching that conclusion it rejected the argument that the drug manufacturer could have avoided liability by choosing "not to make [the drug] at all." *Id.* at 488. The Court "reject[ed] this 'stop-selling' rationale as incompatible with [its] pre-emption jurisdiction," which presumed that actors are "not required to cease acting altogether in order to avoid liability." *Id.*

In the wake of that precedent, the Sixth Circuit has recognized that the so-called "stop-selling" theory is not a valid theory of liability. *See In re Darvocet, Darvon, & Propoxyphene Prods. Liability Litig.*, 756 F.3d 917, 925 (6th Cir. 2014) ("The *Bartlett* court rejected the 'stop selling' theory, namely that a generic manufacturer could have avoided the conflict between state and federal law by refraining from selling the drug."); *Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 398 (6th Cir. 2013) ("Nor can the plaintiffs proceed on a failure-to-withdraw or stop-selling theory, a theory recently rejected by the Supreme Court in *Bartlett*."). So too have other federal courts. *See, e.g.*, *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 477 (4th Cir. 2014) ("[T]he stop selling rationale is an impermissible means of avoiding preemption under *Bartlett*."); *Beswick v. Sun Pharm. Inds., Ltd.*, 2018 WL 704399, at *7 (W.D.N.Y. Jan. 30, 2018) ("Insofar as Plaintiff's [claims] can be construed as alleging Defendant should have . . . pulled [its drug] products from the market, in *Bartlett* . . . . the Court flatly rejected the so-called 'stop-selling' rationale . . . .").

The Sixth Circuit and other federal courts have recognized for similar reasons that a "never-start-selling" theory (*i.e.* a theory of liability resting on the notion that the defendant could have chosen never to start an activity allowed by federal law) is also invalid. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015) (rejecting argument that "defendants should never have sold" the challenged product "for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling" theory of liability); *Utts v. Bristol-Myers Squibb Co.*,

226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016) (rejecting argument "that the defendants should never

have sold" the at-issue drug); *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1364

(N.D. Ga. 2016) (rejecting argument that "[d]efendants should have never sold [the drug]").

As in *Bartlett*, federal law expressly allowed Defendants to distribute Schedule II

controlled substances, including the opioid medications at issue in this case, so long as they

substantially complied with the Controlled Substances Act in the process.  *See, e.g.*, 21 U.S.C.

§ 822(b).  Consequently, based on the logic of *Bartlett* and its progeny, Defendants may not be

held liable based on the mere fact that they chose to exercise their lawful right to distribute the

opioid medications at issue in this case.  Plaintiffs should not be allowed to argue that Defendants

could have avoided liability simply by electing not to distribute opioid medications, irrespective

of whether they complied with the Controlled Substances Act while distributing.  *See, e.g.*,

*Bartlett*, 570 U.S. at 488; *Yates*, 808 F.3d at 300; *Strayhorn*, 737 F.3d at 398.

## CONCLUSION

For these reasons, Defendants request respectfully that the Court enter an order barring

Plaintiffs from offering evidence or argument that Defendants' mere act of distributing Schedule

II controlled substances—instead of halting distribution or declining to distribute in the first

instance—as a basis for imposing liability.

Dated:  August 14, 2020               Respectfully submitted,

   /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax:  (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

  /s/ Timothy D. Johnson   (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*


/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/   Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601

Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

## PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 6 TO PRECLUDE EVIDENCE OF CIVIL OR CRIMINAL INVESTIGATIONS OR OTHER LITIGATION

The Court should bar evidence, testimony, or argument related to: (1) civil or criminal investigations involving a Defendant or its employees; (2) other litigation involving a Defendant or its employees; and (3) media coverage or other secondhand accounts of the aforementioned evidence. Most if not all such evidence is hearsay and may not appropriately be offered for the truth of any matter asserted. *See* Fed. R. Evid. 803. Nor does such evidence have any relevance to any facts at issue in this trial. *See* Fed. R. Evid. 401, 402. And any alleged probative value would be far outweighed by the unfair prejudice caused by exposing the jury to such information. *See* Fed. R. Evid. 403. It should therefore be precluded.

A pre-trial, *in limine* ruling on this issue is critical. The Fifth Circuit has been forced to vacate a jury verdict because the same Plaintiffs' counsel in this case argued to the jury that it could decide in his client's favor based solely on a deferred prosecution agreement relating to Foreign Corrupt Practices Act allegations. *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liab. Litig.*, 888 F.3d 753, 785 (5th Cir. 2018) (calling claim that deferred prosecution agreement was offered not as evidence of liability, but as evidence of knowledge and intent, "as dubious as it is vague," and holding that Mr. Lanier's argument relating to the agreement "alone

provides grounds for a new trial"). The same result should be avoided here, particularly for investigations that never culminated in any sort of official action.

## I. THE COURT SHOULD PROHIBIT EVIDENCE OF INVESTIGATIONS INVOLVING DEFENDANTS

Plaintiffs should be precluded from offering evidence, asking questions, and making arguments related to investigations involving Defendants or their employees for any purpose.

It is well-settled that government investigations, whether criminal or civil, are inadmissible because they do not reflect a conclusion.[1] Instead, they reflect only that an authority **investigated** whether, in the investigating body's view, wrongdoing occurred. Unlike a conviction in a criminal case, the fact of an investigation does nothing to show whether any particular conduct occurred, let alone whether it was wrongful.

In part for this reason, courts have consistently held that evidence of indictments is inadmissible. *See, e.g.*, *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002) ("an arrest or indictment" is "not any evidence of guilt"); *Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins. Co.*, 243 F.2d 949, 953 (2d Cir. 1957) ("The indictment, since it was only hearsay, was clearly inadmissible for any purpose."); 3 Fishman & McKenna, Jones on Evidence § 17:34 (7th ed.) (stating an indictment amounts to "no more than an accusation, *i.e.*, alleging that the defendant committed the crime"). Not surprisingly, if **formal charges** are not relevant to showing that underlying conduct occurred, courts have not hesitated to rule that **investigations that have not lead to charges** are also irrelevant. *See, e.g.*, *Park W. Galleries, Inc. v. Global Fine Art Registry*,

---

[1] In the Track 1-A litigation, the Court prohibited "references to criminal investigations and indictments that did not result in a conviction," as well as references to grand jury proceedings. Evidentiary Order at 16–17, *In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804 (N.D. Ohio Jan. 3, 2020)). Defendants agree with that ruling and file this motion to clarify that the Court should similarly exclude civil investigations.

2010 WL 848689, at *2 (E.D. Mich. Mar. 8, 2010) ("That the FBI, or any other governmental entity . . . commenced an investigation does not assist Defendants in their truth defense, as there is no evidence that any conclusions or findings have been made in any such investigation. Presenting such evidence would therefore require the jury to predict the outcome of the pending investigations.").

For the same reasons, evidence of an investigation of a Defendant or its employees is not probative of any underlying allegations in the investigation. *See, e.g.*, *United States v. Heine*, 2017 WL 4423408, at *23 (D. Ore. Oct. 5, 2017) (excluding "evidence, reference, or argument relating to the FDIC's civil investigation to the extent that it seeks to show that the FDIC decided to bring a civil enforcement action"); *Keys v. Wash. Metro. Area Transit Auth.*, 272 F.R.D. 243, 245 (D.D.C. 2011) (dismissing action for failure to abide by motion *in limine* ruling excluding evidence of investigation by the Equal Employment Opportunity Commission).

Not only are investigations irrelevant to prove that any underlying misconduct occurred, any minimal relevance they might have is handily outweighed by the substantial risk of unfair prejudice. Such evidence should be excluded for that reason as well. *See* Fed. R. Evid. 403. For example, courts have concluded that the official nature of investigations, particularly where misconduct is never charged, is unfairly prejudicial. *See, e.g., Spencer v. McDonald*, 705 F. App'x 386, 390 (6th Cir. 2017) (affirming decision to exclude evidence of a criminal investigation because "[e]ven if the investigation were relevant" to the issues in the civil case, the district court did not abuse its discretion in excluding it as unduly prejudicial under Rule 403); *Fed. Ins. Co. v. Mertz*, 2016 WL 1572995, at *4 (S.D.N.Y. Apr. 18, 2016) ("Even if relevant, the probative value of the testimony would be significantly outweighed by the danger of unfair prejudice in that it risks the jury concluding that Sorge has a propensity to be involved in fraudulent conduct."); *TVT*

*Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 346–47 (S.D.N.Y. 2003) ("With respect to evidence of a putative criminal investigation . . . the Court sees minimal or no relevance of these events to the matters in dispute and recognizes the serious potential for prejudice . . . ."). *See also Baxter Health Care Corp. v. Spectramed Inc.*, 1992 WL 340763, at *3 (C.D. Cal. Aug. 27, 1992) ("official nature" of an indictment lends an undeserving imprimatur of credibility to its allegations that risks misleading and confusing the jury). It is to prevent precisely such conclusions that courts and investigative agencies often do not publicly reveal the targets of investigations. *John Doe Co. No. 1 v. Consumer Financial Protection Bureau*, 195 F. Supp. 3d 9, 13 (D.D.C. 2016) (sealing names of investigation targets due to "debilitating injury" that information could cause them, noting that such prejudice is particularly unfair where an investigating agency has "yet to make any allegations of wrongdoing—and may never do so," and has not "exercised its [own] administrative discretion to disclose the identities of the subjects of its investigations").

Accordingly, evidence of the fact of any investigation—whether civil or criminal, and regardless of which government body is the investigator—should be excluded, along with any media or other secondhand accounts of such investigations.

## II. THE COURT SHOULD PROHIBIT EVIDENCE OF OTHER LITIGATION INVOLVING DEFENDANTS

The Court should similarly preclude Plaintiffs from offering evidence of or making arguments about other litigation involving Defendants.[2] As a gateway issue, Plaintiffs should be barred from offering evidence of other litigation involving Defendants because "[a]llegations in

---

[2] A ruling on this aspect of Defendants' motion *in limine* is particularly important here, where Plaintiffs' counsel has previously referenced other lawsuits and litigation before a jury in a different case. *See In re DuPuy*, 888 F.3d at 785, 787 n.71 (noting counsel's prior reference to the "'thousands' of pending Ultamet suits" and encouraging the district court on remand to "carefully consider" Rules 403 and 404 and "issue specific instructions to avoid undue prejudice").

prior lawsuits are clearly hearsay, and should . . . be excluded if offered to prove the truth of the matter asserted." *Insignia Sys., Inc. v. News Am. Marketing In-Store, Inc.*, 2011 WL 382964, at *2 (D. Minn. Feb. 3, 2011); *see also T. I. Constr. Co. v. Kiewit E. Co.*, 1992 WL 382306, at *4 (E.D. Pa. Dec. 10, 1992) ("Complaints, and the charges and allegations they contain, are hearsay under the Federal Rules of Evidence.").

Additionally, because evidence of other lawsuits does not have "any tendency to make the existence of any fact that is of consequence . . . more or less probable," Fed. R. Evid. 401, it should be excluded as irrelevant. Other lawsuits involving Defendants necessarily involve different geographic locations, different alleged misconduct, and were brought by different plaintiffs. They say nothing about whether any alleged misconduct occurred in Cuyahoga or Summit Counties. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting Plaintiffs' attempt to submit evidence of extraterritorial misconduct to show "if it happened there, it could have happened here"); *Palmer v. Bd. of Regents of Univ. Sys. of Ga.*, 208 F.3d 969, 973 (11th Cir. 2000) (affirming district court's decision to exclude "evidence of the existence of other lawsuits against the [defendant]"); *Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992) (stating "[e]vidence relating to previous litigation involving the parties . . . [is a] likely subject[] of exclusion").

Moreover, just as evidence regarding investigations involving Defendants would be unduly prejudicial, so too would evidence of other litigation involving Defendants be unduly prejudicial given "the risk that the jury will draw improper conclusions from other incidents in which the [defendant]'s actions allegedly caused injuries." *Ross v. Am. Red Cross*, 2012 WL 2004810, at *5 (S.D. Ohio June 5, 2012). For example, in *McLeod v. Parsons Corp.*, 73 F. App'x 846 (6th Cir. 2003), the Sixth Circuit affirmed the exclusion of evidence of other litigation in part because "the

potential for prejudice that would have accompanied this evidence would have substantially outweighed its probative value, and this evidence would have misled the jury." *Id.* at 854. *See also, e.g.*, *Johnson v. Land O'Lakes, Inc.*, 181 F.R.D. 388, 390 (N.D. Ill. 1998) (evidence of other similar lawsuits filed against defendant "is only marginally relevant and, if relevant at all, is unfairly prejudicial, because it presents a serious potential for confusion and for decisions on an improper basis, such as conformance with other cases, rather than upon evaluation of the evidence and arguments in th[e] case"); *Nwegbo v. Borough*, 2013 WL 3463504, at *3 (E.D. Pa. July 10, 2013) (concluding "[t]o the extent [other] cases are relevant . . . the probative value of any testimony regarding these cases or their factual allegations . . . would be far outweighed by the risk of unfair prejudice, as well as the risk of confusing the jury and wasting time").

Accordingly, evidence of the fact of other lawsuits or allegations made in those lawsuits should be excluded as irrelevant and unduly prejudicial.

## III. MEDIA COVERAGE OF INVESTIGATIONS OR OTHER LITIGATION SHOULD ALSO BE EXCLUDED

Plaintiffs should also be precluded from offering media coverage relating to any of the aforementioned categories of evidence.

Media-coverage evidence, if offered for the truth of the matter asserted, is inadmissible hearsay. *Turner v. City of Taylor*, 412 F.3d 629 (6th Cir. 2005) (stating newspaper articles are "inadmissible hearsay"); *Williams v. City of Lansing*, 2011 WL 5553782, at *3 (W.D. Mich. Nov. 15, 2011) (concluding "[t]he newspaper article itself is not admissible" and "the statements in the newspaper article are hearsay"); *Park W. Galleries, Inc.*, 2010 WL 987772, at *3 ("If offered for the truth of the matter asserted, newspaper articles and television clips constitute inadmissible hearsay."); *Barbo v. Kroger Co.*, 2007 WL 2350183, at *2 (W.D. Ky. Aug. 13, 2007) ("A

newspaper article is considered hearsay, and the general rule is that it is not admissible to prove the facts stated therein.").

Furthermore, media coverage involving Defendants' investigations or other litigation should be excluded as irrelevant and unfairly prejudicial. If presented to a jury, it would be highly prejudicial and could erroneously be viewed as proof that Defendants have already been adjudged as having responsibility for the opioid crisis. *See, e.g.*, *Griffith v. Goodyear Dunlop Tires N. Am. Ltd.*, 2018 WL 4658721, at *8 (W.D.N.Y. Sept. 28, 2018) (precluding plaintiffs "from introducing evidence pertaining to media coverage of the accident . . . on the basis that such media-coverage evidence is irrelevant, unfairly prejudicial, and constitutes inadmissible hearsay"). Admitting such coverage into evidence would create a substantial risk that the jury will decide this trial based on unsworn news articles—not based on the parties' proof.

## CONCLUSION

For all the foregoing reasons, Defendants request respectfully that the Court grant their motion in limine to exclude evidence—including media coverage—relating to: (1) investigations involving a Defendant or its employees; (2) other litigation involving a Defendant or its employees; (3) media coverage regarding any of the above.

Dated: August 14, 2020

Respectfully submitted,

    /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

_/s/ Timothy D. Johnson_ (consent)__
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio 44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*


/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001


John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/ Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585

E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

**PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 7 TO PRECLUDE EVIDENCE OF SETTLEMENTS**

Throughout this litigation, Plaintiffs have cited to civil and administrative settlement agreements entered into by certain Defendants. The Court should exclude any evidence of, reference to, or arguments about these settlements (or consent decrees or fines), and media coverage or other secondhand accounts of the aforementioned evidence at trial. Not only does Rule 408 bar introduction of settlements to show liability, plaintiffs also have not and cannot show any basis for their introductions for any other purpose, such as "knowledge," "notice," or "bias."

Defendants recognize that the Court ruled to the contrary in its Evidentiary Order. Although Defendants object to that ruling (as detailed below), this motion emphasizes certain related issues, including issues unique to Defendants who had been severed from Track 1-A and who therefore were not involved in the prior briefing. Accordingly, even if the Court adheres to its prior ruling on Rule 408, the following evidence should be excluded under Rules 401, 403 and 408:

1. Evidence of the dollar amount of any settlements;

2. Evidence of settlements that pertained to dispensing (not distribution) conduct of pharmacies outside of Cuyahoga and Summit counties;

3. Evidence of settlements that were reached after a Defendant stopped distributing relevant prescription opioids, which therefore could not be relevant to state of mind or "notice" at the relevant time;

4. Evidence of settlements by corporate entities who are not parties to this case; and

5. Evidence of settlements concerning non-opioid medications.

Such settlement-related evidence not only is irrelevant and prejudicial, it will give rise to distracting and irrelevant "mini-trials" over the validity of the allegations that gave rise to that agreement. Such evidence should therefore be precluded.

## A.   Admitting Evidence of Settlement Agreements Violates Rule 408

Admitting evidence or allowing argument related to settlements contravenes the text and purpose of Rule 408:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fed. R. Evid. 408.

Accordingly, it is axiomatic that evidence of settlements is not admissible "as evidence of liability for [a] claim," *Lindsay v. Yates*, 578 F.3d 407, 415 n.8 (6th Cir. 2009), or "to prove or disprove the validity or amount of a disputed claim," *United States v. Tevis*, 593 F. App'x 473, 476 (6th Cir. 2015). This rule exists "to encourage settlements which would be discouraged if such evidence were admissible." Fed. R. Evid. 408 advisory committee notes, 1974 Enactment; *see also Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 805 (6th Cir. 2007) ("[T]he purpose underlying Rule 408 . . . is 'the promotion of the public policy favoring the compromise and

settlement of disputes that would otherwise be discouraged with the admission of such evidence.'" (quoting *Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996))).

This principle extends to both the existence *and* content of settlement agreements. For example, in *Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc.*, 251 F. Supp. 3d 329 (D. Mass. 2017), the court barred the plaintiff from relying on "certain facts set forth and acknowledged by Credit Suisse in a settlement agreement" with the Department of Justice to establish liability. *Id.* at 331. "[T]he letter, policy, and development of Rule 408" demonstrated that the DOJ settlement agreement, including the statement of facts expressly acknowledged by Credit Suisse therein, was "inadmissible" to establish liability. *Id.* at 332; *see also*, *e.g.*, *Hobart Corporation v. Dayton Power & Light Co.*, 2017 WL 5956911 at *21 (S.D. Ohio Nov. 30, 2017) (rejecting purported "admission[s]" by predecessor in a settlement agreement because "making the content of prior settlement agreements available for use in related litigation contravenes the very purpose of Rule 408."); *City of Mishawaka v. Uniroyal Holding, Inc.*, 2009 WL 499105, at *5 (N.D. Ind. Feb. 26, 2009) (rejecting plaintiff's attempt to use "prior settlement agreements" to "establish . . . liability by admission" because such a use of the agreements would be "precisely for the reasons prohibited by [Rule 408]").

Accordingly, under Rule 408, settlement agreements are inadmissible, and plaintiffs may not introduce them. While the Court ruled in the Track 1-A litigation that "prior enforcement actions and settlements" could potentially be admissible, despite Rule 408, "to show a particular Defendant's knowledge or notice of potential harm," Defendants believe this ruling to be incorrect, and ask the Court to reconsider. Evidentiary Order at 12–13, *In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804 (N.D. Ohio Jan. 3, 2020)); *see also id.* at 14–15 (stating DEA enforcement actions and civil settlements could be admissible to show "knowledge or notice of potential harm"). Such

a "notice" exception is not set forth in Rule 408 and defeats the public policy it serves.  If the Court nevertheless adheres to this ruling over Defendants' objection, it should require Plaintiffs to establish a foundation for such evidence at a hearing outside the jury's presence.

**B.  Certain Categories of Settlement-Related Evidence Should Be Excluded**

Even if the court should allow evidence, over Defendants' objection, to show a party's "notice" of alleged wrongful conduct, it still should not admit certain categories of settlement-related evidence.  These categories, which the Court did not consider when making its Track 1-A ruling, are patently irrelevant, could not possibly establish notice, and can be excluded wholesale before trial ever begins.

**1.  Dollar Amounts of Settlements Should Be Excluded**

Even if settlements are admitted into evidence to show notice, there is no basis to admit the dollar amount of those settlements. It is the fact of the settlements themselves that might put defendant on notice, not the dollar amounts.  This is especially so where, as here, the dollar amounts reflect per-violation amounts fixed by statute and not any estimation of damages suffered. *See* 21 U.S.C. § 842(c)(1)(A).  To the extent that such amounts were marginally probative, their minimal relevance is far outweighed by the risk of undue prejudice.

For these reasons, courts regularly exclude evidence of settlements, and more specifically settlement amounts.  *White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc*., 647 F.3d 684, 689 (7th Cir. 2011) (plaintiff could not use amount that parties "discussed during settlement negotiations" [two million dollars] as "benchmark for an award under the rubric of quantum meruit or unjust enrichment"); *Schmerling v. LM Gen. Ins. Co*., 2018 WL 5848981, at *3 (E.D. Pa. Nov. 8, 2018) ("The settlement amount is irrelevant to the extent of [plaintiff]'s injuries and would not assist the jury in reaching a verdict.  Moreover . . . any minimal probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading

the jury."); *In re E.I. Du Pont De Nemours & Co. C-8 Personal Injury Litig.*, 2016 WL 659112, at
*53 (S.D. Ohio Feb. 17, 2016) (noting that prior EPA consent decree had been admitted, but "with
the Court's guidance, all references to the amount of the $16.5 million settlement were redacted");
*Blair v. Nelson*, 2016 WL 10803753 (M.D. Tenn. July 21, 2016) (concluding although evidence
of a settlement was admissible to prove "bias or prejudice," "the amount of settlement . . . is not
relevant, and therefore is not admissible"); *Yue v. Chordiant Software, Inc.*, 2020 WL 11575579,
at *4 (N.D. Cal. Apr. 22, 2010) (granting motion in limine because "evidence of the value of
Plaintiffs' settlements . . . are not relevant"); *Cooper Tire & Rubber Co. v. Farese*, 2008 WL
4285546, (N.D. Miss. Sept. 12, 2008) ("The admissibility of a settlement amount would be very
prejudicial to the [settling party], and a jury would likely be biased after hearing the figure.");
*Pucci v. Litwin*, 1993 WL 405448, at *1 (N.D. Ill. Oct. 4, 1993) (granting motion *in limine* "to
preclude the fact of other settlements or the amount of those settlements" because "[s]uch evidence
would be irrelevant and prejudicial").

The dollar value of all settlements must therefore be excluded.

## 2. Settlements Reached After the Relevant Time Period In This Case Should Be Excluded

Settlements that were entered into or involve alleged conduct that occurred after the
relevant time frame in this dispute are patently irrelevant. Such settlements could not even
arguably have given a party notice, for example, of wrongful conduct, or at least not in any sense
that is relevant to the issues the jurors will be asked to decide.

Most defendants in this case stopped distributing relevant opioids some time ago. Some
stopped distributing them nearly six years ago. A settlement reached by a defendant *after*
distribution had ceased, by definition, is not relevant to show the defendant's state of mind before
that time, when it was still distributing.

### 3. Settlements Relating to Pharmacies Outside of Cuyahoga or Summit Counties Should Be Excluded

In Track 1-A, the Court ruled that distribution settlements were admissible in distribution cases. Most of the settlements involving Defendants, however, concern dispensing exclusively, and the Court has not ruled whether dispensing settlements are relevant to distribution claims. They are not.

In Track 1-B, the jury will be required to assess, *inter alia*, the Plaintiffs' allegation that Defendants lack effective systems to monitor for suspicious wholesale orders of prescription opioids that were of unusual size, pattern or frequency. Settlements relating to Defendants' alleged dispensing activities do not address these systems. And the conduct they do concern is subject to different regulations and different standards of care.

Moreover, none of the settlements concern pharmacies in Cuyahoga or Summit Counties; accordingly, their relationship to the distribution issues in this case (i.e, to the alleged suspicious orders placed by pharmacies in Cuyahoga and Summit Counties) is even more attenuated. They are patently irrelevant. Any reference to any such settlement agreements would necessarily depend on an "if it happened there, it must be happening here" premise—which is, as Plaintiffs have acknowledged, invalid.[1] ECF Doc. 2212 at 9, 30 ("[I]f Plaintiffs had brought an action based upon an 'if it happened there, it must be happening here' premise, such a complaint likely would have been dismissed."); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–03 (3d Cir. 2015) (rejecting attempt to introduce "if it happened there, it could have happened here"

---

[1] To the extent that Plaintiffs allege that the conduct giving rise to a settlement relating to distribution outside of Track One counties directly resulted in opioids coming to Track One counties, they should be required to lay a foundation before offering such theory. *See* Pharmacy Defs.' Mot. in Lim. No. 8 to Preclude Evidence of Extraterritorial Conduct Without Establishing a Specific Nexus to Cuyahoga or Summit County and a Defendant. But even in the event they can do so, only the *conduct* need be discussed; the settlement itself would remain irrelevant, prejudicial, and subject to Rule 408.

evidence). *See also, e.g.*, *Salinero v. Johnson & Johnson,* 2019 WL 7753445 at *2 (S.D. Fla. Sept. 25, 2019) (concluding evidence that other products or company conduct has "been the subject of fines, consent decrees, recalls, and misdemeanor guilty pleas' is plainly inadmissible under Rule 402"); *In re Ethicon, Inc., Pelvic Repair Sys. Pelvic Repair Sys. Prods. Liab. Litig.*, 2014 WL 505234 at *4 (S.D.W.V. Feb. 5, 2014) (declining to admit evidence of "settlements or fines with the [Department of Justice]" because that evidence "is clearly irrelevant").

By way of example, CVS's Florida settlement concerned the dispensing conduct of two particular pharmacies in one Florida town. Such a settlement provided no notice to a distributor regarding distributing to pharmacies hundreds of miles away in Ohio, which were operated by entirely different pharmacists. Even if a dispensing settlement could in theory be relevant to show notice in a distribution case, that is not the case where the dispensing conduct occurred elsewhere and bore no relationship to the conduct in the venue at issue.

### 4. Settlements Relating to Corporate Entities Other Than Defendants In This Case Should Be Excluded

Plaintiffs brought this case against specific corporate entities, alleging that *those entities'* conduct was a substantial factor in causing a public nuisance in the Track 1 counties. Those entities are now the Defendants in this action. Settlements related to any other corporate entity are irrelevant to whether Plaintiffs' allegations against *Defendants* are true.

### 5. Settlements Unrelated to Opioid Medications Should Be Excluded

Finally, settlements involving medications other than opioids—including over-the-counter medications—should be excluded. This includes, for instance, settlements for medications such as pseudoephedrine (i.e., Sudafed), which are not even controlled substances, which do not require prescriptions, and which were handled by different persons both at the distribution and pharmacy level. Settlements that do not concern medications at all are even further afield. Such settlements

could not possibly have provided notice to a Defendant or show anything else relevant to the issues the jury will be tasked with deciding.

## C. Evidence of Settlements Should Also Be Excluded Under Rule 403 as Unduly Prejudicial

Settlements—particularly those in the categories listed above—are also inadmissible under Rule 403, which requires the exclusion of evidence "if its probative value is substantially outweighed" by the "danger" of "unfair prejudice" or "confusing the issues." Fed. R. Evid. 403. As the Sixth Circuit has explained, "the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound" and would, if allowed, undermine the "'strong public interest' in encouraging settlement negotiations." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007) (quoting *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003)). Similarly, in *Ross v. American Red Cross*, the Southern District of Ohio concluded that "[e]vidence of settlement negotiations can . . . be viewed as a concession of liability, which is unfairly prejudicial for the same reasons as those underlying [Rule] 408." 2012 WL 2004810, at *4 (S.D. Ohio June 5, 2012), *aff'd* 567 F. App'x 296 (6th Cir. 2014). In short, "[t]he failure to exclude evidence of an offer or a completed agreement, after proper and timely objection, is sufficiently prejudicial to warrant a mistrial, even if there has been an admonition" to the jury. 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.11[1][a] (2d ed. 2017).

Not only that, introducing evidence of settlements invites distracting disputes about collateral issues as the parties argue about whether the settlement actually shows liability. Each settlement involves different language, new sets of allegations, pharmacies and/or personnel not at issue here, and disputed facts. Indeed, many expressly state that the settlement does not admit liability. These are exactly the sort of sideshows Rule 403 was designed to eliminate.

Risk of undue prejudice also exists if evidence regarding consent decrees or fines is allowed. Again in *Ross*, the Southern District of Ohio excluded evidence of a consent decree under Rule 403, explaining:

> Presenting the Consent Decree to the jury would very likely confuse the issues and lead the jury to believe that Plaintiff's claims derive from the Decree itself. The parties would then be forced to explain and relitigate old issues that have, at best, only minimal relevance to the present case.

*Id.*

*Ross* similarly prohibited evidence of "fines[] or penalties involving the [defendant] but not involving [plaintiffs]" in part because there was "a substantial risk that the jury" would look at those fines or penalties and "draw an improper conclusion regarding the [defendant]'s conduct in this case." *Id.* at *4–5; *see also In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liability Litig.*, 2017 WL 9807464, at *4 (N.D. Tex. Sept. 19, 2017) (prohibiting plaintiffs "from offering evidence or making arguments" regarding "any other civil or criminal action or investigation involving [defendants] . . . undertaken by any agency or branch of any state or national government, including . . . any fines, monetary penalties, or disgorgements of any sums of money by [defendants]" without "first asking for a ruling from the Court").

As in those cases, here evidence of settlements, consent decrees, or fines involving Defendants would be unduly prejudicial. Evidence about them should accordingly be excluded.

## CONCLUSION

For all the foregoing reasons, Defendants request respectfully that the Court grant their motion in limine to exclude evidence relating to settlements, consent decrees, or fines entered into or imposed on a Defendant or its employees and media coverage regarding same.

Dated:  August 14, 2020

Respectfully submitted,

   /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax:  (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

  /s/ Timothy D. Johnson   (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*


/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kelly A. Moore (consent)

Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

*/s/ Kaspar J. Stoffelmayr* (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/    Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

# OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF
# DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE

# I.   INTRODUCTION

The Omnibus Memorandum Of Law In Support Of All Track One Bellwether Trial Defendants' Motions In Limine contains an overview of the controlling law governing motions in limine.  AmerisourceBergen, Cardinal Health, McKesson, and Henry Schein (collectively, "Distributors") incorporate that discussion here.

# II.   IN LIMINE RULINGS REQUESTED

### 1.   [D-1] The Court Should Preclude Plaintiffs From Offering Evidence Of, Or Arguments About, Distributors' Settlements With The DEA And West Virginia

Between 2007 and 2017, AmerisourceBergen Drug Corporation ("ABDC"), Cardinal Health, and McKesson each entered into one or more settlement agreements with the U.S. Drug Enforcement Administration.  They also entered into settlements with the State of West Virginia in 2017 and 2019.  Throughout this litigation, Plaintiffs have repeatedly cited these civil and administrative settlement agreements as evidence that Distributors failed to comply with a purported duty to report and block suspicious orders and, as a consequence, Defendants are liable to Plaintiffs.  The Court should exclude any evidence of, reference to, or arguments about these settlements because they are inadmissible under (1) Rule 408 of the Federal Rules of Evidence, which prohibits the use of settlement evidence to prove the validity of disputed claims, (2) Rules 401 and 402, because they irrelevant since they do not concern Distributor facilities that serviced Summit and Cuyahoga counties, and (3) Rule 403, because the any minimal probative value the settlements might have (and there is none) is far outweighed by the unfair prejudice that would result if the jury were exposed to these settlements.

**Background.**  In every iteration of their Complaints, Plaintiffs allege that Distributors did not maintain effective controls against diversion in connection with their distribution of controlled substances to pharmacies in Cuyahoga and Summit counties.  More recently, in their

Motion for Partial Summary Adjudication That Defendants Did Not Comply With Their Duties Under The Federal Controlled Substances Act (Dkt. No. 1910), Plaintiffs sought a ruling that Distributors violated certain duties under the Controlled Substances Act ("CSA") and implementing regulations—in particular, 21 C.F.R. § 1301.74—regarding suspicious order monitoring. *See* Plaintiffs' Mem. of Law (Dkt. No. 1910-1) at 2 (arguing that "[t]he Court can and should find, based on the undisputed evidence, that each of the Defendants repeatedly violated the Controlled Substances Act in their shipments to Summit and Cuyahoga Counties."). In support of that contention, Plaintiffs repeatedly cited Distributors' prior settlements with DEA. *See*, *e.g.*, Dkt. No. 1910-1 at 69-71, 81-82, 88, 93, 105-11, 113, 119-122.

Three of the six DEA settlements, however, contain no admissions of wrongdoing. Dkt. No. 1964-3 (Cardinal Health 2008 (Ex. 215)); Dkt. No. 1964-37 (McKesson 2008 (Ex. 249)); Dkt. No. 1964-86 (ABDC 2007 (Ex. 298)). Three others contain narrow admissions that do not implicate the Track One Plaintiffs or their claims. In its 2012 Memorandum of Agreement (MoA), "Cardinal admits that its due diligence efforts for some pharmacy customers and its compliance with the 2008 MOA, in certain respects, were inadequate." Dkt. No. 1960-103 (Ex. 209) at 3. The 2012 MoA does not identify what those failures were, when or where they occurred, or whether the inadequacies were violations of the CSA. In its 2017 Settlement, McKesson acknowledged that "at various times" from January 2009 to January 2017 "it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters about the requirements set forth in 21 C.F.R. § 1301.74(b) and 21 U.S.C. § 8942(a)(5)." Dkt. No. 1964-24 (Ex. 236). None of the settlements has anything to do with distributions of opioid medications to Cuyahoga or Summit pharmacies specifically, or to Ohio pharmacies generally.

The same is true of Cardinal Health's 2016 settlement with West Virginia, ABDC's 2017 settlement with West Virginia, and McKesson's 2019 settlement with West Virginia: they expressly disclaim any admission of wrongdoing.

**The Settlements Are Inadmissible Under Rule 408.**  Admission of evidence or arguments about the settlements would contravene both the text and purpose of Rule 408, which "bars the admission of settlement agreements when offered 'to prove or disprove the validity or amount of a disputed claim.'"  *United States v. Tevis*, 593 F. App'x 473, 476 (6th Cir. 2015) (quoting Fed. R. Evid. 408(a)(1) (evidence of "accepting . . . a valuable consideration in compromising . . . [a] claim" is "not admissible . . . to prove . . . the validity or amount of a disputed claim")); 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.03[5] (2d ed. 2017) ("Rule 408 applies . . . to completed compromises when offered against a compromiser.").  "The purpose of this rule is to encourage settlements which would be discouraged if such evidence were admissible."  Fed. R. Evid. 408 advisory committee notes, 1974 Enactment; *see Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 444 (6th Cir. 2010).

Under Rule 408, evidence of both the existence and content of prior settlement agreements is inadmissible for purposes of proving liability on a later civil claim.  For example, in *Hobart Corporation v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2017 WL 5956911 (S.D. Ohio Nov. 30, 2017), the court rejected plaintiffs' effort to establish that the defendant had assumed certain environmental liabilities because its corporate predecessor had made certain "admission[s]" in a settlement agreement resolving a separate case involving a different site.  *Id.* at *19-20.  Because the plaintiffs were "attempting to use evidence of a prior settlement agreement to establish . . . liability and prove the validity of a disputed . . . claim," the court held that the evidence was "inadmissible under Rule 408."  *Id.* at *21.  As the court explained,

"making the content of prior settlement agreements available for use in related litigation contravenes the very purpose of Rule 408." *Id.*

Likewise, in *Massachusetts Mutual Life Insurance Co. v. DLJ Mortgage Capital, Inc.*, 251 F. Supp. 3d 329 (D. Mass. 2017), the court precluded the plaintiff from relying on "certain facts set forth and acknowledged by Credit Suisse in a settlement agreement" with the Department of Justice to establish liability. *Id.* at 331. "[T]he letter, policy, and development of Rule 408" demonstrated that the DOJ settlement agreement, including the statement of facts expressly acknowledged by Credit Suisse therein, was "inadmissible" to establish liability. *Id.* at 332; *see also*, *e.g.*, *City of Mishawaka v. Uniroyal Holding, Inc.*, No. 3:04-cv-125, 2009 WL 499105, at *5 (N.D. Ind. Feb. 26, 2009) (rejecting plaintiff's attempt to use "prior settlement agreements" to "establish . . . liability by admission" because such a use of the agreements would be "precisely for the reasons prohibited by [Rule 408]").

Plaintiffs here clearly intend to rely on the settlements to prove Distributors' alleged failure to maintain adequate controls against diversion. *See*, *e.g.*, Plaintiffs' Mem. of Law (Dkt. No. 1910-1) at 20 (arguing that "a finding from this Court" that Distributors "shipped opioids in violation of the CSA has consequences for particular elements of many of Plaintiffs' claims"). Because the settlements represent the acceptance of a compromise of disputed claims, Plaintiffs' attempt to use the settlements to establish liability in the present cases is barred by Rule 408.[1] That is reason enough to bar any evidence of, reference to, or arguments about the settlements.

**The Settlements Are Irrelevant Under Rules 401 And 402.** The settlements also are irrelevant to Plaintiffs' claims and, therefore, are inadmissible under Rules 401 and 402. To

---

[1] Although Plaintiffs do not offer settlements for purposes of establishing the amount of damages they seek to recover, Rule 408 would bar their admission for that purpose as well. *See* Fed. R. Evid. 408(a)(1) (evidence of "accepting . . . a valuable consideration in compromising . . . [a] claim" is "not admissible . . . to prove . . . the validity *or amount* of a disputed claim") (emphasis added). Distributors reserve the right to object at trial if Plaintiffs seek to introduce the DEA Settlements to establish the amount of their claims or for any other purpose.

establish relevance, Plaintiffs must show that evidence of the settlements make any "fact . . . of consequence" in these cases "more or less probable than it would be without the evidence." Fed. R. Evid. 401 (test for relevant evidence); *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). To begin with, three of the six settlements with the DEA expressly disclaim any admission or concession of liability. Dkt. No. 1964-3 (Cardinal Health 2008 (Ex. 215)); Dkt. No. 1964-37 (McKesson 2008 (Ex. 249)); Dkt. No. 1964-86 (ABDC 2007 (Ex. 298)). Of the three agreements that do contain narrow admissions, *none* implicates distribution of opioids into Summit and Cuyahoga counties.

- Cardinal's 2012 MoA arose out of a DEA investigation of seven specific facilities in California, Colorado, Florida, Georgia, New Jersey, Texas, and Washington, Ex. 215 at 1-2—*none* of which distributes to Ohio pharmacies. The MoA mentions Cardinal Health's Ohio facilities only as part of a list of facilities **not** investigated. Ex. 215 at 13.

- McKesson's 2017 settlement contains allegations relating to twelve distribution centers, none of which is the New Castle, PA facility that services Summit and Cuyahoga counties. The settlement also does not identify any particular pharmacies or shipments in Ohio, nor are there any admissions concerning McKesson's operations in Ohio.

- Neither ABDC's April 19, 2007 Initial Suspension Order nor the June 22, 2007 Settlement Agreement contains allegations concerning distribution of opioid medications to Cuyahoga or Summit pharmacies specifically, or to Ohio pharmacies generally.

Similarly, Cardinal Health, ABDC, and McKesson's settlements with West Virginia neither admit fault nor concern shipments of prescription opioids to any place other than West Virginia.

And, notwithstanding the narrow admissions contained in three of the settlements, the agreements are not relevant, because any reference to them would necessarily depend on a "if it happened there, it must be happening here" premise—which is, as Plaintiffs have acknowledged, invalid. Dkt. No. 2212 at 9, 30 (citing *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402 (3d Cir. 2015) (quoting Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF

ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1421a, at 160); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d Cir. 2007)).

The narrow admissions are also irrelevant because they do not establish any element of Plaintiffs' claims. For the RICO claims, Plaintiffs must establish (inter alia) a *knowing or intentional* violation of the CSA statute—and none of the settlements admits to any such knowing or intentional wrongdoing.[2] Similarly, for the nuisance claim, violation of the CSA is irrelevant because the CSA is not a safety statute.[3]

**The Settlements Are Inadmissible Under Rule 403.** Even if the settlements had some relevance (which they do not), they still would be inadmissible under Rule 403, which requires the exclusion of evidence "if its probative value is substantially outweighed" by the "danger" of "unfair prejudice" or "confusing the issues." Fed. R. Evid. 403. Admission of the settlements would unfairly prejudice the Distributors and cause jury confusion. As the Sixth Circuit has explained, "the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound" and would, if allowed, undermine the "'strong public interest' in encouraging settlement negotiations." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007) (quoting *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003)).[4]

---

[2] 21 U.S.C. §§ 841, 843 ("[I]t shall be unlawful for any person knowingly or intentionally . . . ."); *see* 18 U.S.C. § 1961(1)(D) (predicate acts limited to "felonious" conduct).

[3] *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 433 (1944) (a statute is a "safety statute" only if it sets forth a "specific legal requirement for the protection" of the plaintiff and those similarly situated); *see* Opinion & Order (Dkt. No. 1680) at 24 (CSA "was not intended to protect [governments] from spending more on addiction-related public services").

[4] Underscoring both the importance of the bar on the admission of settlement agreements, the Sixth Circuit has explained that the public interest in settlement negotiations would be undermined if settling parties enjoyed only thin "veneer of protection" offered by curative instructions. *Id.* at 805. The Court, accordingly, has "reject[ed] the proposition that any amount of evidence supporting liability, . . . coupled with a limiting instruction read at any time during the trial is sufficient to cure the wrongful admission" of settlement evidence. *Id.*; *see also* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.11[1][a] (2d ed. 2017) ("The failure to

Case: 1:17-md-02804-DAP Doc #: 2825 Filed: 10/14/19 1 of 141. PageID #: 424180

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

**B.** **Plaintiffs' Response to Omnibus Memorandum of Law in Support of Distributor Defendants' Motions in Limine (Dkt. #2666).**

    1.   <u>Distributors' MIL No. D-1</u>: **The Court should preclude Plaintiffs from offering evidence of, or arguments about, Distributors' settlements with the DEA and West Virginia.**

Defendants have filed several motions *in limine* that seek to exclude evidence regarding their resolution of various enforcement actions taken by federal and state governments. The arguments asserted by Defendants in these MILs are very similar, so rather than repeat them in response to each MIL, Plaintiffs will address the legal standards and argument regarding these topics once, and will refer back to this argument on the specific points. If any specific additional information is necessary in response to a particular MIL, that will be addressed separately.

The argument and legal standards addressed here are applicable to the following MILs:

- Dkt. #2666 –Distributors' MIL No. D-1: Distributor settlements with the DEA and West Virginia.

- Dkt. #2645 – Henry Schein MIL Nos. HS-9 and HS-10: DEA fines, investigations, and Ohio Board of Pharmacy cease and desist letter (*infra* at § C.9-10).

- Dkt. #2648 – Walgreens' MIL No. W-2: DEA enforcement action and related settlement with Walgreens (*infra* at § D.2).

- Dkt. #2663-1 – McKesson MIL No. MCK-4: Allegations contained in letters from the DEA and DOJ to McKesson (*infra* at § F.4).

- Dkt. #2668-1 – Teva MIL No. TAD-1: Cephalon misdemeanor off-label promotion plea agreement (*infra* at § G.1).

- Dkt. #2668-1 – Teva MIL No. TAD-3: Cephalon settlement with DOJ (*infra* at § G.3).

<u>**The agreements are not precluded by Rule 408.**</u> Federal Rule of Evidence 408 generally prohibits the use of evidence of statements or conduct to compromise a claim "to prove or disprove the validity or amount of a disputed claim." However, "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, *not some other claim*." *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (citing Wright, et al., Federal Practice & Procedure: Evidence § 5314, 5308 (1st ed. 1980)

(internal citations omitted, emphasis added); *see also Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 501 (6th Cir. 2017).  So Rule 408 does not even apply to the evidence Defendants seek to exclude, since that evidence does not involve the specific claims asserted by Cuyahoga and Summit Counties in this case.[55]

Moreover, even when Rule 408 applies, evidence of settlements *is* admissible where it is offered for "another purpose," such as "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  FED. R. EVID. 408(b).  The burden of establishing the application of Rule 408 is on the party invoking its protection.  *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-CV-615, 2012 WL 5077701, at *5 (S.D. Ohio Oct. 18, 2012).

Rule 408 is therefore "not a blanket rule that wholly precludes the consideration of settlement discussions."  *Homoki v. Rivers Edge Tree Stands*, No. 1:12-CV-2926, 2012 WL 6631043, at *2 (N.D. Ohio Dec. 19, 2012).  Instead, "evidence of such discussions may be admitted for any purpose not specifically excluded by the Rule."  *Id.*  As the rule makes clear, a settlement may be admissible where "it is offered for a purpose other than to prove liability or disprove a claim."  *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *54 (S.D. Ohio Feb. 17, 2016).  Accordingly, "the principal inquiry that determines whether Rule 408 bars introduction of evidence of [this evidence] must be toward the purpose for which the evidence is being offered."  *McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013).

The Sixth Circuit and Ohio district courts have recognized several purposes allowing for the admission of settlement evidence.  One such purpose is establishing a party's knowledge or notice of potential harm.  *See E.I Du Pont*, 2016 WL 659112, at *54 (consent decree was properly admitted when it was offered "as evidence of [Defendant] DuPont's knowledge and/or notice of C-8's

---

[55]  This is also plain from the language of the rule, which repeatedly references "prov[ing] or disprov[ing] the validity or amount of **a** disputed claim" by offering evidence of conduct that occurred while attempting to resolve "**the** claim."  *See* FED. R. EVID. 408(a)(1) and (2) (emphasis added).

potential for harm, not as evidence that DuPont acted negligently"). In this case, the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate and were likely to cause harm – not just in the specific locations where the enforcement actions focused, but throughout the country. That is particularly true in this case, where Defendants have claimed that they lacked understanding of their legal duties.

Another permissible purpose is to prove a party's state of mind. *See Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 519 (6th Cir. 2008) ("settlement evidence was not offered as a defense to plaintiff's negligence claims against BMW, but instead was offered to show the state of mind of the witnesses"); *McAuliffe*, 514 F. App'x at 549-50 ("It is plain from the record that the contents of the conversation were not offered in McAuliffe's criminal trial to prove the liability of either one in the civil dispute or the amount of those claims. Instead, the evidence was offered for the other purpose of showing McAuliffe's knowledge of and participation in illegal acts—in other words, his state of mind, which Rule 408 allows.").

With regard to Plaintiffs' nuisance claims, the Court identified as disputed issues of fact for trial in its rulings on the parties' motions for summary judgment: (1) whether a public nuisance exists (Dkt. #2572 at p. 4); (2) whether the opioid epidemic interferes with public health and public safety rights (Dkt. #2578 at p. 4); (3) whether Defendants' conduct substantially contributed to Plaintiffs' injuries (*id.* at p. 5); and (4) whether Defendants' conduct was intentional or unlawful (*id.* at pp. 5-7). The enforcement actions demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time, which goes to the heart of Plaintiffs' claims.

**The agreements are admissible under Rule 406.** Evidence of "an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice" is admissible. FED. R. EVID. 406; *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*, 401 F. Supp. 2d 813, 818 (N.D. Ohio 2005) (finding the evidence of performing inspections and "observations made during the inspections, [are] admissible under Fed. R. Evid. 406 as proof of habit or routine practice"). "Rule 406 evidence must rest on an analysis of instances numerous

enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation." *Bell v. Consol. Rail Corp.*, 299 F. Supp. 2d 795, 800 (N.D. Ohio 2004) (internal citations and quotations omitted). Courts may consider three elements to determine whether the organization's routine practice is admissible under Rule 406: (1) whether "it is unlikely that the individual instance can be recalled or the person who performed it can be located," (2) whether the "specific conduct … is engaged in frequently by the group," and (3) whether "the number of instances of such behavior [is] large enough that doubt about a single instance does not destroy the inference that the practice existed." *Martin v. Thrifty Rent A Car*, 145 F.3d 1332 (6th Cir. 1998).

Defendants' conduct that forms the bases of the DEA/DOJ agreements occurred "with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Bell*, 299 F. Supp. 2d at 800. The agreements and related documents establish that Defendants engaged in "systematic, particularized, and repetitive conduct" by selling prescription opioids without proper, effective controls to prevent diversion and to identify, report, and stop shipment of suspicious orders. As the agreements describe, the temporal and geographic scope of this systematic conduct (covering millions of transactions) was so extensive that it cannot be evaluated by a singular instance, nor can a single instance destroy the inference that this was a routine practice.

Both Cardinal Health and McKesson agreed to pay significant fines in 2008 relating to their failure to comply with their obligations under the Controlled Substances Act. Despite agreeing to comply with those obligations, both companies continued to ignore them and were the subject of later enforcement actions by the federal government roughly a decade later, reflecting their persistent failure to conform their conduct to the law. In connection with those later enforcement actions, Cardinal and McKesson acknowledged that they had not lived up to their prior agreements. This history of repeated violations of their legal duties shows that Defendants' violations were not the result of mere oversight, but reflected Defendants' intentional and ongoing business practices.

As a result, the agreements are admissible under Rule 406 because they prove Defendants acted in accordance with their routine practice.

**The agreements are relevant.**  Evidence is relevant where it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401.  Generally, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402.

Defendants' meritless relevance arguments are wholly divorced from an analysis of the substantive law governing the claims and defenses at issue.  The DEA/DOJ agreements are relevant evidence for several claims at issue.  For instance, as part of Plaintiffs' RICO and Ohio Corrupt Practices Act (OCPA) claims against McKesson, Cardinal, and AmerisourceBergen, Plaintiffs seek to establish that these Defendants formed and operated an opioid supply chain to expand their sales of prescription opioids through repeated violations of the CSA.  Defendants failed to maintain effective controls to prevent diversion and filled suspicious orders for opioids.  The DEA/DOJ agreements describe investigations and findings by the DEA and the DOJ concerning the same violations alleged here.  The agreements also describe the multiple suspension orders and ISOs which provided notice to Defendants that their suspicious order systems were ineffective and were being abused.

Evidence regarding Defendants' repeated violations of their duties under the CSA demonstrates that Defendants continued the conduct in the face of confirmed proof that such conduct was contributing to the opioid epidemic.  These agreements are therefore relevant to establish Defendants' RICO and OCPA violations.

Distributor Defendants argue that the settlement agreements are not relevant because some of them "disclaim any admission or concession of liability," and even those that contain "narrow admissions" do not implicate the distribution of opioids into Summit and Cuyahoga Counties. Dkt. # 2666 at p. 5.  Defendants therefore attempt to cabin the relevance of the agreements to the distribution centers at issue there.  Yet, the agreements make it clear that they apply to all (or at least most) distribution centers.  The McKesson 2017 Agreement, for example, expressly states that

"[t]his Agreement shall be applicable to McKesson and any facility owned or operated by McKesson US Pharmaceutical registered, or who may become registered, with DEA to distribute, or otherwise handle controlled substances." Dkt. #2212-29; Dkt. #2557-3. AmerisourceBergen's obligations are similarly not limited to any particular Distribution Centers.

These arguments also fail to acknowledge that the conduct about which Plaintiffs complain is not limited to conduct that occurred in Cuyahoga and Summit Counties. Instead, Plaintiffs' allege that the harm they suffered was caused by conduct that occurred all across the nation, over many years, which was a substantial factor in causing the nuisance condition that persists in those counties and also gives rise to Plaintiffs' other claims. This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

**The agreements are not unfairly prejudicial.** Although relevant evidence is generally admissible, "Rule 403 carves out a narrow exception to this broad rule of admissibility." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*; FED. R. EVID. 403. As the permissive language of the rule makes clear, a court may admit evidence even where there is potential prejudice, and "[this] decision to admit relevant, but potentially prejudicial, evidence is committed to the sound discretion of the trial court." *Id.* "When the district court admits evidence over a party's undue-prejudice objection, [the 6th Circuit] review[s] the admitted evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (citation omitted).

Here, any danger of unfair prejudice or confusion is quite limited because the practices described in the DEA/DOJ agreements pertain directly to Defendants' controls to prevent diversion and the filling of suspicious orders for opioids. Thus, this evidence will not confuse the

issue nor inject extraneous factual matters into the trial. Nor would a jury be likely to take this evidence as a concession of liability – although the evidence is factually on point, the *legal* context of the agreements is so distinct that a jury is not likely to believe that an agreement with the government to settle what are in effect charges for CSA violations amount to an admission of liability to the alleged RICO, OCPA, and public nuisance claims. And, to the extent that the jury credits the factual statements in the agreements, this does not constitute "unfair" prejudice. Even if that were the case, the Court can ensure, through trial rulings and jury instructions, that the context in which the facts were developed does not overwhelm the import of the evidence itself.

For these reasons, Distributor Defendants' arguments that their distributor settlements with the DEA and West Virginia are irrelevant, prejudicial, or inadmissible under Rule 408, are without merit. Distributor Defendants' MIL No. D-1 should be denied.

2.  **Distributors' MIL No. D-2**: **The Court should preclude non-party corporate representatives from testifying to matters outside their personal knowledge.**

Distributor Defendants broadly seek to preclude the admission of non-party 30(b)(6) witness testimony "on matters outside the witness' personal knowledge," arguing such evidence is inadmissible hearsay and lacks foundation. For the following reasons, Distributor Defendants' MIL No. D-2 should be denied.

Contrary to Distributor Defendants' assertion, Rule 602's personal knowledge requirement does not preclude the introduction of 30(b)(6) testimony at trial that is beyond the witness' direct personal knowledge. It is well established that a corporate designee testifying pursuant to Rule 30(b)(6) "does not testify as to his personal knowledge or perceptions [but rather] testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). *See also Lloyd v. Midland Funding, LLC*, No. 15-5132, 639 Fed. Appx. 301, 305 (6th Cir. Jan. 22, 2016) (citing *Brazos*). As such, Rule 30(b)(6) provides a recognized exception to the personal knowledge requirement set forth in Rule 602.

Although Rule 30(b)(6) refers by its terms to depositions, courts have recognized that a 30(b)(6) witness may testify at trial despite a lack of personal knowledge about the matters described.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

## OMNIBUS REPLY IN SUPPORT OF
## DISTRIBUTOR DEFENDANTS' MOTIONS IN LIMINE

# I.    INTRODUCTION

AmerisourceBergen, Cardinal Health, McKesson, and Henry Schein (collectively, "Distributors") hereby reply to Plaintiffs' responses to Distributors' Motions in Limine.  As with their opposition to the omnibus Defendants' motions in limine, Plaintiffs' opposition (while long on pages) is short on substance and contains nothing that calls into question the correctness of the in limine rulings Distributors request.

# II.    REPLIES IN SUPPORT OF MOTIONS IN LIMINE

### 1.    [D-1] The Court Should Preclude Plaintiffs from Offering Evidence of, or Arguments about, Distributors' Settlements with the DEA and West Virginia.

Distributors' motion seeks a ruling that precludes evidence and arguments about settlements with the DEA and West Virginia.  In response, Plaintiffs say that, of course, a settlement may be admissible if it is offered for a purpose *other than to prove liability*.  Opp. 54. But it is plain as day that Plaintiffs intend to offer the DEA and other settlements to prove liability because whenever Plaintiffs have cited the settlements—most notably in their Complaints and summary judgment motions—it has been as evidence that Defendants failed to implement effective systems to prevent diversion.  Distributors' motion cited seven examples of this from Plaintiffs' summary judgment papers alone.[1]    Thus, there is no mystery about Plaintiffs' purpose in discussing the settlement agreements, and Federal Rule of Evidence ("Rule") 408 forbids the use of settlements for that purpose.

---

[1] Distrib. MIL at 2 (citing Dkt. Nos. 1910-1 at 69–71, 81–82, 88, 93, 105–11, 113, 119–22).  At these pages, Plaintiffs assert that Cardinal Health's 2012 DEA settlement "admitted that it failed to comply with the requirements of the CSA"; that McKesson's 2008 DEA settlement "Confirms the Lack of CSA Compliance"; that McKesson's 2017 DEA settlement "Admitted It Violated the Requirements of the CSA from 2009-2017"; that ABDC's 2007 DEA settlement was an agreement "to stop shipping suspicious orders in violation of the 'shipping duty'"; and that Walgreen's 2013 DEA settlement "admitted that it had failed to comply with its obligations under the CSA."

- 1 -

Plaintiffs argue that the DEA settlements were about "some other claims" than those at issue in this trial, and that Rule 408 therefore does not even apply. Opp. 53 (citing *Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 11 F.3d 1284 (6th Cir. 1997).[2] Distributors agree that the settlements were about "some other claims," but that does not help Plaintiffs—instead, it underscores that the settlements are irrelevant and any reference to them would be based on a "if it happened there, it must be happening here" premise. Distrib. MIL at 4–5. As noted, Plaintiffs repeatedly cite the settlements as evidence that Defendants did not have compliant suspicious-order monitoring systems—the very claim in this case.[3]

Nor does Rule 406 provide a backdoor to admissibility. ***First***, the settlements do not establish that Distributors "engaged in 'systematic, particularized, and repetitive conduct' by selling prescription opioids without proper, effective controls to prevent diversion." Opp. 56. Settlements are not adjudications, and these settlement agreements did not contain factual findings. Three of the six settlements did not include admissions of any kind, and the other three contained narrow admissions that did not implicate distribution of opioids to Cuyahoga or Summit Counties. Distrib. MIL at 5. ***Second***, even if the settlements did "establish" facts, neither one settlement (in the case of ABDC and Walgreens) nor two (Cardinal Health and McKesson) over a period of 20 years reflects a "routine" practice.[4] And the settlements, which do not concern distributions to Cuyahoga and Summit Counties, certainly do not establish that

---

[2] The *Uforma/Shelby* decision (and the excerpt from Wright & Miller on which it relies) concerned a very different issue—whether Rule 408 protects a wrong committed in the course of the settlement discussions. Specifically, in *Uforma/Shelby*, the issue was whether evidence of management's threats of retaliation in the course of settlement discussions of a labor grievance could be used, apart from the grievance, to prove an unfair labor practice claim for retaliating against the union's filing of the grievance. 111 F.3d at 1293–94.

[3] As noted below, Plaintiffs' argument regarding the settlement agreements is internally inconsistent. If it is true, as Plaintiffs claim later in their opposition, that the settlements "*concern*[] *the same violations alleged here*," then Rule 408 plainly prohibits their admissibility.

[4] *See* Opp. 56 (noting that Cardinal Health's and McKesson's second DEA settlements were "roughly a decade later"). In the case of McKesson, moreover, its SOM system changed materially in the intervening decade, further undermining any assertion of a "pattern."

the particular conduct of any Distributor was routine practice as to either county.[5]  ***Third***,
Plaintiffs misunderstand the purpose of Rule 406, which is to use proof of routine practice to
show what happened in a particular case.  Thus, in the case cited by Plaintiffs, the defendant
sought to prove that it gave the negligent driver its standard rental agreement by showing that it
was a matter of routine practice to provide that document to rental customers.  *Martin v. Thrifty
Rent A Car*, 1998 WL 211786, at *5 (6th Cir. Apr. 23, 1998) (citation omitted).  Here, by
contrast, Plaintiffs have disclaimed any intention to prove that a particular prescription was
medically unwarranted or that a particular pharmacy order was suspicious, electing to proceed
with aggregate proof.

Plaintiffs' next argument—that the settlements are relevant—contradicts its initial
arguments, Opp. 53–54, that Rule 408 does not apply because the settlements concern "some
other claim" and are offered for a purpose other than to prove liability.  Plaintiffs argue that the
DEA settlements describe "investigations and findings … *concerning the same violations
alleged here*."  Opp. 57 (emphasis added).[6]  And Plaintiffs misleadingly add that the agreements
"apply to all (or at least most) distribution centers."  Opp. 57–58 (citing only one McKesson and
one ABDC settlement).  But while the prospective aspects of the settlement agreements may in
some instances have applied to all of the Distributor's distribution centers, the investigations that
gave rise to the agreements did not concern all centers—and did not concern the centers that
distributed to Cuyahoga and Summit Counties.  Distrib. MIL at 5.

---

[5] The very case that Plaintiffs rely on makes clear that the Rule 406 inquiry "require[s] some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place," and further instructs that "before a court may admit evidence of habit, the offering party must establish … more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature."  *Bell v. Consol. Rail Corp.*, 299 F. Supp. 2d 795, 800 (N.D. Ohio 2004).  For that very reason, the *Bell* court excluded generalized evidence that the defendant routinely provided locomotives with inoperable defrosters or required trains to run at track speed in foggy conditions.  *Id.* at 801.

[6] In making their relevance argument, Plaintiffs refer once to "findings" and twice to "violations" of CSA "duties."  Opp. 57.  The settlement agreements do not make findings and did not adjudicate violations.

Plaintiffs also argue that the settlements are admissible to prove "state of mind"—that "Defendants' conduct was intentional and persisted over a lengthy period of time." Opp. 55. But none of the settlements admits any *intentional* conduct and, as explained above, the small number of isolated agreements over a 20-year period hardly establishes a lengthy course of conduct. Plaintiffs' argument that the settlements are admissible to show Distributors' "state of mind"—*i.e.*, an alleged "pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate"—is similarly unavailing: the settlement do not contain admissions of any conduct relevant to Cuyahoga and Summit Counties and do not establish a pattern.

Finally, Plaintiffs argument that admission of the settlement agreements would not be unfairly prejudicial is flat-out wrong. Although inaccurate, it is plain that Plaintiffs intend to portray the settlement agreements as establishing that Distributors violated the CSA. While they blithely assert that "the jury is not likely to believe that an agreement with the government to settle what are in effect charges for CSA violations amount to an admission of liability to the alleged RICO [and] OCPA" claims, Plaintiffs have made clear that they intend to argue to the jury that supposed "CSA violations" *are* RICO/OCPA predicate acts.[7] It is difficult to imagine anything more prejudicial than the (false and misleading) suggestion to the jury that the federal government already has found Distributors liable for the very statutory violations that lie at the heart of Plaintiffs' claims (as they conceive them). *See, e.g.*, *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007) (noting the "profound" impact "of evidence regarding a settlement agreement with regard to a determination of liability").

---

[7] Distributors do not agree that Plaintiffs have identified any provisions of the CSA whose violation would constitute a RICO predicate act.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-d-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## WALGREENS' MOTIONS *IN LIMINE*

## II. Motion No. W-2: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement

Walgreens moves *in limine* to preclude plaintiffs from offering evidence or argument about a DEA enforcement action and administrative settlement agreement involving a single Walgreens distribution center in Florida that last shipped controlled substances to Ohio in 2007. Walgreens also moves to exclude reference to the $80 million Walgreens paid to the DEA to settle the DEA's allegations while litigation was pending and before any adjudication of the allegations by a court or other factfinder.

Plaintiffs allege that Walgreens improperly distributed prescription opioid medication to its retail pharmacy stores in Cuyahoga and Summit Counties and thereby contributed to an oversupply of opioids that caused them harm. Given their near-exclusive reliance in their complaint and summary judgment papers on allegations specific to Florida, it is apparent that plaintiffs intend to argue that the unproven (and disputed) allegations in an Order to Show Cause/Immediate Suspension Order issued to a Walgreens distribution center in Jupiter, Florida ("Florida OTSC") somehow show that Walgreens improperly distributed prescription opioid medications in Ohio.[2] Walgreens further anticipates that plaintiffs will suggest—and the jury may infer—that Walgreens' settlement of DEA's allegations is an admission of fault. Any such evidence or argument would be irrelevant and improper. Allowing plaintiffs to inject it into the trial would be unfairly prejudicial to Walgreens and confusing to the jury. It will lead to a

---

[2] Walgreens also moves to exclude evidence or argument about (1) Orders to Show Cause issued by DEA to six Walgreens pharmacies in Florida for alleged dispensing violations and (2) a 2011 settlement agreement involving alleged dispensing violations at a Walgreens pharmacy in California. In addition to the other arguments set forth in this motion, plaintiffs do not assert any **dispensing** claims against Walgreens in Track One, further eliminating any relevance and dramatically increasing the risk of unfair prejudice and confusion.

lengthy trial-within-a-trial about issues that have nothing to do with plaintiffs' Ohio distribution claims. The Court should exclude it under Rules 402, 403, and 408.

*First*, this is exactly the kind of evidence that courts routinely reject under Rules 408 and 403. Rule 408 directly "bars the admission of settlement agreements when offered 'to prove or disprove the validity . . . of a disputed claim.'" *United States v. Tevis*, 593 F. App'x 473, 476 (6th Cir. 2014) (quoting Fed. R. Evid. 408). Under Rule 408, evidence of both the existence and content of prior settlement agreements is inadmissible to prove liability on a later civil claim. In *Hobart Corp. v. Dayton Power & Light Co.*, the court rejected plaintiffs' attempt to establish that the defendant had assumed certain liabilities because its corporate predecessor had made "admission[s]" in a settlement agreement resolving a separate case involving a different site. 2017 WL 5956911, *19-20 (S.D. Ohio Nov. 29, 2017). Because plaintiffs were "attempting to use evidence of a prior settlement agreement to establish . . . liability and prove the validity of a disputed . . . claim," the evidence was "inadmissible under Rule 408." *Id.* at *21. As the court explained, "making the content of prior settlement agreements available for use in related litigation contravenes the very purpose of Rule 408." *Id.*[3]

Evidence about settlement agreements is likewise inadmissible under Rule 403 as unduly prejudicial. As the Sixth Circuit has recognized, "the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800 (6th Cir. 2007). The same is true here. Were evidence of Walgreens' settlement with DEA admitted, the jury would likely conclude that

---

[3] Rule 408's clear bar on settlement evidence also serves to prevent the introduction of irrelevant evidence under Rule 402, since "disputes are often settled for reasons having nothing to do with the merits of a claim." *Korn, Womack, Stern & Assocs., Inc. v. Fireman's Fund Ins. Co.*, 27 F.3d 566, 1994 WL 264263, at *6 (6th Cir. 1994); *see also Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 480 (6th Cir. 2007) ("[A] settlement offer or the fact of settlement negotiations is not direct evidence regarding the factual issues in a case.").

Walgreens must have acted improperly if it paid a significant sum of money to resolve DEA's allegations, without ever determining whether plaintiffs have proved their actual claims in this case. No limiting instruction is sufficient to cure the resulting prejudice. *Id.* at 805 (rejecting the proposition "that any amount of evidence supporting liability, . . . coupled with a limiting instruction . . . is sufficient to cure the wrongful admission" of settlement evidence).

The Florida OTSC is similarly inadmissible. The document contains preliminary unproven allegations and improper legal conclusions, about a single distribution center in Florida, that were never tested in adversarial proceedings before an administrative law judge. These very same characteristics have led courts to reject the suggestion that government "investigation[s]" or "sanctions" against one member of a corporate family are "indicative of [wrongdoing] on a company-wide scale," *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014), and to hold that "an SEC enforcement action" is "not evidence of fraud, or even negligence or mistake," *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016). The Florida OTSC "do[es] not prove that any of the conduct described therein actually occurred or, if it did occur, the conduct was [unlawful]." *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 923 (N.D. Ill. 2004). As for the Florida OTSC's legal opinions, "questions of law are not a proper subject for evidentiary proof." *Id.*; *see also* Dkt. No. 2494 (granting in part defendants' motion to exclude opinions of James Rafalski as legal conclusions).

***Second,*** the Florida OTSC and settlement agreement are irrelevant and misleading for a separate reason: plaintiffs have not established any evidentiary nexus, through expert testimony or otherwise, between distribution activity in Florida and either of the Track One counties. It is not disputed that the distribution center in Florida that was the subject of the Florida OTSC did not distribute any controlled substances to Ohio after January 2007—years before any of the

events in Florida that led to the Florida OTSC. Unsurprisingly, Plaintiffs and their experts do not identify a single allegedly "suspicious order" shipped from Florida into either Cuyahoga or Summit County. Even if they had, Plaintiffs have never identified any even remotely similar issues involving Walgreens stores in Cuyahoga or Summit County, much less in the relevant time period. Any hypothetical connection is attenuated beyond the point of speculation.

Whether the policies and procedures at the distribution center in Florida were the same as at other Walgreens distribution centers does not change the analysis. Plaintiffs will have to prove at trial what the systems were at the relevant distribution centers that shipped prescription opioid medications to Walgreens pharmacies in Track One during the relevant time period. They will also have to demonstrate that the systems at the relevant distribution centers did not comply with the law. The DEA's disputed opinions about whether the systems at a Florida distribution center violated the law—at a time when that distribution center was not shipping to the Track One counties—are neither relevant nor proper. *See Chen*, 315 F. Supp. 2d at 923.

***Finally***, if the Court were to permit evidence and argument regarding the Florida OTSC and subsequent settlement, Walgreens would be forced to introduce the evidence necessary to rebut the DEA's allegations, requiring a whole trial in itself. In fact, prior to settlement, the allegations in the Florida OTSC were set to be tried ***for 18 days*** in a hearing before an administrative law judge in agency proceedings with hundreds of exhibits and dozens of fact and expert witnesses specific to the circumstances in Florida. *See* **Exhibit C** (Notice of Hearing in DEA ALJ Proceedings); *see also* **Exhibit D** (Government Prehearing Statement); **Exhibit E** (Walgreens Prehearing Statement). To litigate these factual disputes now, years later, would be a massive distraction and misuse of the jury's time. Moreover, with eight defendants remaining in the Track One trial, and only 100 hours for all defendants to put on their defense, Dkt. No. 2594 at 1-2, there is simply no time for evidence related to collateral issues in other states.

7

The Court should exclude all evidence and argument relating to DEA's OTSC and Walgreens' subsequent settlement agreement.

## III. Motion No. W-3: To preclude, e.g., evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man"

Walgreens moves *in limine* to preclude evidence or argument suggesting that former DEA Deputy Administrator Joseph Rannazzisi's credibility or character is bolstered by the fact of his appearance on 60 Minutes, in articles published by the Washington Post, or in reporting by any other news organization. At deposition, plaintiffs' counsel repeatedly referred to Mr. Rannazzisi as the "60 Minute Man," going so far as to create a hand-drawn demonstrative "Roadmap" that started on "60 Minute Man Road," and continued from there to focus extensively on Mr. Rannazzisi's appearance on the television news program, as well as his interviews in the Washington Post. *E.g.*, **Exhibit F**, Rannazzisi Dep. 376:19-377:9; 396:11-399:6.

Walgreens anticipates that plaintiffs may seek to paint Mr. Rannazzisi as an honest whistleblower by virtue of these news appearances, including in opening statement. Such references would trade on the credibility of respected news organizations—and those organizations' purported commitment to finding and reporting the truth—to suggest that Mr. Rannazzisi is also credible by virtue of the fact that these organizations reported what he said. (By the same token, the fact that 60 Minutes or any news article criticized a company or individual should not be used to impeach that person.) That improperly invades the jury's role as factfinder to weigh the strength of the evidence. It also threatens to mislead and confuse the jury in a way that is prejudicial to Walgreens and other defendants. Any such evidence or argument should be excluded under Rule 403.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

2. **Walgreens' MIL No. W-2**: To preclude evidence or argument about Walgreens' Florida DEA enforcement action and related settlement.

The arguments asserted by Walgreens regarding admissibility under Rule 408 and 403 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

With regard to Walgreens' argument that evidence concerning the Florida DEA enforcement action should be excluded because it occurred in Florida, rather than Ohio, this argument ignores the well-known problem of opioid "migration" from one location to another. As the Washington Post recently reported,

> During the past two decades, *Florida became ground zero for pill mills* — pain management clinics that served as fronts for corrupt doctors and drug dealers. They became so brazen that some clinics set up storefronts along I-75 and I-95, advertising their products on billboards by interstate exit ramps. So many people traveled to Florida to stock up on oxycodone and hydrocodone, they were sometimes referred to as "prescription tourists."
>
> *The route from Florida to Georgia, Kentucky, West Virginia and Ohio became known as the "Blue Highway."* It was named after the color of one of the most popular pills on the street — 30 mg oxycodone tablets made by Mallinckrodt, which shipped more than 500 million of the pills to Florida between 2008 and 2012.
>
> When state troopers began pulling over and arresting out-of-state drivers for transporting narcotics, drug dealers took to the air. *One airline offered nonstop flights to Florida from Ohio and other Appalachian states, and the route became known as the Oxy Express.*

"76 billion opioid pills: Newly released federal data unmasks the epidemic," The Washington Post, July 16, 2019 (emphasis added).[71]

There is abundant evidence in the record – including in Walgreens' own internal documents – that the opioids the Defendants shipped migrated far beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon. *Supra* at fn.37. Defendants were regularly alerted to the migration phenomenon

---

[71] *Available at* https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html (accessed on 10/3/19).

84

by the DEA, and their personnel acknowledged the reality of diversion and migration in their depositions. *Supra* at fns.39-40.

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Walgreens' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped hundreds of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come long distances from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every diverted pill posed a risk to localities throughout the nation was not only foreseeable to Walgreens, it was observed and known by them. Each shipment Walgreens made in disregard of the potential for diversion is evidence of damages caused by Walgreens to localities throughout the nation, including Cuyahoga and Summit Counties.

Because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a SOM program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Each Defendant's SOM was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. Because of the uniform national character of Defendants' SOMs, each wrongful order filled by Defendants is further evidence of the flaws in Defendants' SOMs, and of the consequences of those flaws. Defendants' efforts to exclude this highly probative evidence, including by Walgreens' MIL No. W-2, should be denied.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>Track One Cases | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

## WALGREENS' REPLIES IN SUPPORT OF ITS MOTIONS *IN LIMINE*

evidence of Walgreens' equity ownership interest in ABDC under Rule 403.

## II.     W-2: To exclude Walgreens' Florida DEA action and related settlement[1]

Plaintiffs' response to Walgreens' second motion *in limine* fails for several reasons.

**First**, Rule 408 directly bars use of Walgreens' Florida settlement with DEA to prove plaintiffs' claims.  MIL at 5-6.  Plaintiffs attempt to avoid Rule 408 by suggesting that the DEA settlement involved "some other claim."  Opp. at 53-54.  But plaintiffs do not deny that they intend to use the settlement to prove liability ***in this case***.  In fact, they admit it just a few pages later in an effort to show that the settlement is relevant.  Opp. at 57 (arguing that the settlement "concern[s] the same violations alleged here"); *id.* at 85 (arguing that Walgreens' shipments to Florida caused harm in Ohio).  Plaintiffs are wrong about relevance, but there is no question that the ***purpose*** for which they seek to use this evidence is impermissible under Rule 408.

**Second**, Plaintiffs cannot save their intended misuse of Florida settlement evidence by appealing to Rule 406.  Fundamentally, a rule about ***relevance*** cannot supersede a policy-based bar on ***admissibility***.  The Federal Rules plainly contemplate the exclusion of relevant evidence. *See, e.g.*, FED. R. EVID. 403 ("The court may exclude relevant evidence if . . . .").  In any event, a **single** settlement in ***Florida*** could never amount to a "routine practice" in Ohio.  For the same reason, plaintiffs' attempt to suggest that the settlement shows that Walgreens' conduct "was intentional and persisted over a lengthy period of time" falls flat.  *See* Opp. at 54-57.  Unlike other distributors, Walgreens did not enter multiple settlements over any length of time.[2]

---

[1] Walgreens also moved to exclude six Orders to Show Cause issued to Florida pharmacies and a 2011 settlement involving a California pharmacy—each of which involved ***dispensing*** allegations only.  MIL at 4 n.2.  Plaintiffs have not opposed that request.  That aspect of Walgreens' motion should be granted regardless of the Court's ruling on the settlement and Order to Show Cause relating to Walgreens' Florida distribution center.

[2] Plaintiffs incorporate by reference their arguments in § B.1 of their omnibus response.  Opp. at 84.  Walgreens likewise incorporates the distributors' reply in support of Dkt. 2666, MIL D-1.

**Third**, the Florida settlement and OTSC are, in fact, **irrelevant**.  The fact of settlement says nothing about the merits of the underlying allegations.  MIL at 5 n.3 (collecting authority).  Courts have rejected the suggestion that government investigations or even sanctions are evidence of wrongdoing.  *Id.* at 6 (collecting authority).  And that is on top of the fact that the allegations about conduct in Florida have no connection to plaintiffs' Ohio claims.  Plaintiffs' response involves generalized assertions about pill "migration," Opp. at 84-85, and a truly remarkable notion that **any** evidence that Walgreens' improperly shipped a suspicious order **anywhere** is evidence of damages **everywhere**, *id.* at 85.  But plaintiffs do not (and cannot) dispute that neither they nor their experts have established any evidentiary nexus between distribution in Florida and either of the Track One counties.  MIL at 6-7.

**Fourth**, plaintiffs' answer to Walgreens' arguments about prejudice under Rule 403 is to baldly assert that jurors are unlikely to conclude that Walgreens' settlement of alleged "CSA violations" is an admission of liability for plaintiffs' claims **based on alleged CSA violations**.  *See* Opp. at 59.  Plaintiffs' argument makes no sense, and flies directly in the face of the Sixth Circuit's view that the impact of settlement evidence is "profound" and no amount of evidence of liability, even with a "limiting instruction," is "sufficient to cure [its] wrongful admission." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800, 805 (6th Cir. 2007).

**Finally**, plaintiffs offer no response at all to the unfair prejudice of introducing the Florida OTSC's preliminary, unproven allegations and improper legal conclusions.  MIL at 6.  Nor do they dispute that the introduction of evidence about the OTSC or subsequent settlement would require a whole trial in itself, wasting valuable time and confusing the jury.  *Id.* at 7.

## III.  W-3: To exclude references to Joseph Rannazzisi as the "60 Minute Man"

In response to Walgreens' motion to exclude evidence or argument referring to DEA witness Joseph Rannazzisi as the "60 Minute Man," plaintiffs admit that they plan to use such

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:17-op-45004 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    MDL No. 2804<br>     Hon. Judge Dan A. Polster |

## TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE

Pursuant to Federal Rules of Evidence 402, 403, 404, and 408, and for the reasons set forth in the Teva Defendants' and Actavis Generic Defendants' (collectively, "Moving Defendants") attached Memorandum of Law, Moving Defendants move for the following to be excluded at trial:

- TAD-1: reference to the Cephalon misdemeanor plea;

- TAD-2:  reference to "off-label" promotion;

- TAD-3: reference to the 2008 civil settlement between Cephalon and the Office of Inspector General (along with the settlement of the opioid action brought by the Oklahoma Attorney General);

- TAD-4: evidence of any opioid-related harm that occurred outside of the Counties;

- TAD-5: evidence of marketing-related statements or opioid shipments outside of the Counties;

whether Defendants' conduct constituted off-label activity is to force the jury into an irrelevant, confusing and highly prejudicial mini-trial.

Accordingly, any testimony, evidence, and argument that Cephalon, Teva USA, or any of the other Moving Defendants engaged in off-label promotion should be excluded.

### C. The Court Should Exclude Any Reference To The 2008 Civil Settlement Between Cephalon And The Federal Government (TAD-3).

Plaintiffs have made repeated references to a settlement that Cephalon entered into with the Department of Justice in 2008 for claims of off-label marketing (the "Cephalon Settlement"). *See* Summit TAC ¶ 787; Opp., at 10. There was no admission of liability. *See* Cephalon Settlement, attached as Ex. 3, at II.L. Evidence of that settlement, along with any other civil settlements,[4] must be excluded for two separate and independent reasons.

First, Rule 408 precludes introduction of settlement agreements "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408; *see also Korn, Womack, Stern & Assocs., Inc. v. Fireman's Fund Ins. Co.*, 27 F.3d 566, 1994 WL 264263, at *6 (6th Cir. June 15, 1994) (evidence tending to show acceptance of valuable consideration in compromise of a disputed claim "is inadmissible if it is offered to show the invalidity of the plaintiff's claim or the liability of the defendant."). By the plain language of Federal Rule of Evidence 408(a), evidence of the Cephalon Settlement is inadmissible to show liability, because that settlement involved paying "consideration in compromising . . . the claim[s]" against it. Fed. R. Evid. 408(a)(1); *see also United States v. Robinson*, No. 5:11CR00584, 2012 WL 5386037, at *3 (N.D. Ohio Nov. 2, 2012)

---

[4] This includes the settlement that the Moving Defendants entered into with the Oklahoma AG in connection with the Oklahoma Action (the "Oklahoma Settlement"). That Oklahoma Settlement is also barred by Rule 408, Rule 402, and Rule 403.

(applying Rule 408 to exclude evidence of settlement); *Day v. NLO, Inc.*, 798 F. Supp. 1322, 1330

(S.D. Ohio 1992) ("Rule 408 bars evidence of both settlement and settlement negotiations.").

Recognizing the critical purpose of promoting settlements, the Sixth Circuit has explained

that "[i]t would be unreasonable to expect a party to ever make a settlement offer if doing so forced

it into choosing between conceding one or more elements of liability or damages or having the

offer admitted against it." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 798–99 (6th Cir.

2007). If Plaintiffs had their way, however, the Cephalon Settlement (and any other settlement

agreement involving the Moving Defendants), would become fodder for liability determinations

in this trial, thus removing the cloak of protection that attaches to settlements in order to promote

the efficient resolution of disputes.

Second, the Cephalon Settlement is irrelevant. The Cephalon Settlement resolved civil

claims (pertaining to alleged off-label promotion) based upon different allegations, legal theories,

and time periods than are at issue in this case. It did not have anything to do with conduct specific

to Summit or Cuyahoga County. Moreover, there was no admission of liability. Thus, the

Cephalon Settlement is not relevant to any determination to be made by the jury. *See Bridgeport

Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 480 (6th Cir. 2007) (quoting *Urseth v. City of

Dayton*, 680 F. Supp. 1084, 1098 (S.D. Ohio 1987) ("[A] settlement offer or the fact of settlement

negotiations is not direct evidence regarding the factual issues in a case.").); *Cent. Reg'l Emps.

Ben. Fund v. Cephalon, Inc.*, No. 09-3418 MLC, 2009 WL 3245485, at *4 (D.N.J. Oct. 7, 2009)

(dismissing false marketing claims against pharmaceutical manufacturer of opioid medicines

notwithstanding allegation that manufacturer previously entered into settlement).

Lastly, even if the evidence of the Cephalon Settlement were otherwise admissible (and it

is not), the evidence should be excluded under Fed. R. Evid. 403. *See Stockman*, 480 F.3d at 799

(holding settlement evidence inadmissible under Rule 403 in addition to Rule 408); *see also Goodyear*, 332 F.3d at 982–83 ("the statement [made in furtherance of settlement] would likely be inadmissible under Rules 403 and 408"). Rule 403 permits the Court to exclude even "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403.

That is precisely the case here. If evidence of the Cephalon Settlement were admitted, the jury is likely to conclude—wrongly—that Cephalon acted improperly because it paid significant sums of money to resolve civil actions regarding marketing practices, without ever determining whether the plaintiffs proved their **specific** claims **in this case**. This unwarranted conclusion also may be extended to the other Moving Defendants by affiliation. Indeed, a jury may believe—wrongly—that if Cephalon did nothing wrong, it would not have settled. This risk of unfair prejudice is "profound." *See United States v. Hays*, 872 F.2d 582, 589 (5th Cir. 1989) ("[T]he potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound. It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back."), *cited with approval in Stockman*, 480 F.3d at 800. The Cephalon Settlement (as well as the Oklahoma Settlement) should be excluded.

### D.    The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

This Court should prohibit any evidence regarding any harm that occurred outside of Ohio. As a matter of law, the Counties can only recover for any harm that **they** incurred.[5] As a result,

---

[5]    18 U.S.C. § 1962(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

### PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

1845586 1

excessive promotion of opioids created a public health crisis. Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful. Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case. *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4. But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic. Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6. The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs. Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations. Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

3. **Teva MIL No. TAD-3**: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

4. **Teva MIL No. TAD-4**: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred. As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *Track One Cases* | Hon. Dan Aaron Polster |

## TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' REPLY IN SUPPORT OF THEIR OMNIBUS MOTION IN LIMINE

Manufacturers' cases holding that claims of off-label marketing were preempted, because in those cases courts "held that a claim based solely on off-label promotion was preempted, but claims for fraud not"); *see also Summit* R. & R., ECF No. 1025 at 50 (denying off-label preemption argument because Plaintiffs "contend that Defendants misrepresented the risks associated with off-label opioid use."). Now, Plaintiffs contend that evidence of off-label marketing is relevant to their theory that Moving Defendants engaged in "overpromotion" of opioid medications. Opp. at 105. Plaintiffs cannot have it both ways. They cannot avoid dismissal and summary judgment by arguing that their claims are not based upon off-label promotion, yet now argue that such conduct is relevant. It is not. *See Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. 13-71672014 WL 2115498, at *6 (E.D. Pa. May 21, 2014) (rejecting claims based upon allegations of off-label promotion against Cephalon and Teva USA).

## C. The Court Should Exclude Any Reference To The 2008 Civil Settlement Between Cephalon And The Federal Government (TAD-3).

Plaintiffs' Opposition does not respond specifically to TAD-3; instead, it refers to its response to Distributors' motion to preclude Plaintiffs from offering evidence of certain settlements. Opp. at 106. Plaintiffs' arguments have no application to the Moving Defendants. Because they do not address this argument, the motion should be granted. *Estate of Ardt by Parker v. Allstate Ins. Co.*, No. 09-14247, 2011 WL 13208693, at *1 (E.D. Mich. Nov. 9, 2011) ("To the extent that plaintiff failed to present any argument in response to a particular issue, plaintiff has conceded the point.").

As an initial matter, Plaintiffs argue that Rule 408 does not bar evidence of settlement of a claim from being used to prove a distinct claim in the future. Opp. at 53–54. Plaintiffs, however, conflate the standard for admissibility of statements made during the course of compromise

4

negotiations with the standard for admissibility of settlement agreements. While the former (compromise negotiations) may be used in some limited instances to prove the validity of a distinct claim (such as one that arises during the negotiations themselves),[3] the latter (settlement) may not be used to prove the validity of a distinct claim. *See Korn, Womack, Stern & Assocs., Inc. v. Fireman's Fund Ins. Co.*, 27 F.3d 566 (6th Cir. 1994) (evidence of the settlement of claims would be inadmissible to prove the validity of "distinct" claims); *United States v. Robinson*, No. 5:11CR00584, 2012 WL 5386037, at *3 (N.D. Ohio Nov. 2, 2012) (applying rule). Accordingly, this principle has no bearing on the instant motion, which seeks to exclude a settlement agreement, with no admission of liability, unconnected to the Counties. Rule 408 prohibits Plaintiffs from introducing evidence of the Cephalon Settlement to prove their claims in this case.

Plaintiffs argue that courts have recognized several purposes allowing for the admission of settlement evidence; namely, establishing a party's knowledge of potential harm and proving a party's state of mind. Opp. at 54–55. However, Plaintiffs do not argue (nor can they) that either purpose is served through the Cephalon Settlement. As to knowledge of potential harm, Plaintiffs argue that "the multitude of enforcement actions and settlements establish a pattern of conduct demonstrating knowledge by Defendants that their SOM systems were inadequate." *Id.* at 55. Cephalon's single settlement for off-label marketing is entirely unrelated to any SOM systems, any knowledge about SOM systems, or even any relevant conduct in the Counties; it certainly cannot be said to establish a pattern. The same failing befalls Plaintiffs' argument that the "enforcement actions demonstrate that Defendants' conduct was intentional and persisted over a lengthy period of time." *Id.* Thus, the only explanation that remains is the obvious one—that

---

[3]     Plaintiffs' cases support this rule. *See Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293 (6th Cir. 1997); *Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 501 (6th Cir. 2017).

Plaintiffs intend to introduce the Cephalon Settlement to prove their clams, in violation of Rule 408.

### D. The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

Plaintiffs do not dispute that their experts do not cite to any studies regarding opioid-related harms that occurred *in* the Counties and instead rely on documents and studies examining *other* municipalities and states, or national studies with generalized conclusions that cannot be extrapolated to the Counties. Opp. at 107; *see also* Mot. at 8–9. Nor do Plaintiffs dispute that they plan to rely at trial on documents, statistics, and studies demonstrating harms that are *entirely outside* of Cuyahoga and Summit Counties as evidence of the "national scope and nature of the crisis" in order to prove their alleged injuries. *Id.* Instead, Plaintiffs appear to argue that they should be allowed to introduce such evidence because '[t]his is a crisis which many Defendants are disputing actually exists" and "Defendants [may] blame the Plaintiffs for the harms." *Id.*[4] But Plaintiffs do not cite to anything on the record to support those assertions. Moreover, those arguments make little sense and are simply a red herring.

At trial, the Counties can only recover for any harm that ***they*** incurred.[5] The Court has made abundantly clear that only harm to the Counties is at issue. Dkt. No. 2561, at 4-6 (denying summary judgment based upon alleged "increase in the supply of prescription opioids in the *Track One* Counties"). And Plaintiffs even concede in their Opposition that they "cannot recover for

---

[4] Plaintiffs rely on *Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14CIV2590VMJCF, 2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), but that case is neither controlling nor is it applicable as the issue there was valuation of a bank's assets for damages and did not consider whether damages of non-party banks should be included.

[5] 18 U.S.C. § 1964(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages from the underlying unlawful act, there can be no successful civil conspiracy action") (citation and quotation omitted); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (common law public nuisance claim requires injury to plaintiff).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

## PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 8 TO PRECLUDE EVIDENCE OF EXTRATERRITORIAL CONDUCT WITHOUT ESTABLISHING A SPECIFIC NEXUS TO CUYAHOGA OR SUMMIT COUNTY AND A TRACK 1-B DEFENDANT

Plaintiffs may seek to introduce evidence, testimony, or argument concerning alleged conduct that occurred outside of Cuyahoga or Summit Counties ("the Counties"). The Court should bar such evidence, testimony, or argument unless Plaintiffs first establish—outside of the presence of the jury—a foundation showing a specific nexus connecting that extraterritorial conduct to harm suffered by one of the Counties **and** a specific Defendant's distribution conduct. Without an evidentiary nexus to Plaintiffs' claims, any extraterritorial-conduct evidence should be excluded as irrelevant to the facts at issue in this trial, *see* Fed. R. Evid. 401, 402, inadmissible "other bad acts," *see* Fed. R. Evid. 404(b), and unfairly prejudicial, *see* Fed. R. Evid. 403.

As an initial matter, evidence is inadmissible if it does not have a "tendency to make the existence of any fact that is of consequence . . . more or less probable." Fed. R. Evid. 401. Without question, evidence involving different geographic locations and different alleged misconduct involving different parties does not inform whether the Defendants in this case engaged in any misconduct affecting Cuyahoga or Summit Counties. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–03 (3d Cir. 2015) (rejecting attempt to introduce "if it happened

there, it could have happened here" evidence); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (same).

Accordingly, Plaintiffs should be barred from introducing evidence of any conduct outside of Cuyahoga or Summit Counties without first establishing a foundation demonstrating that extraterritorial conduct caused harm or is relevant to harm within one of the Counties **and** that the evidence concerns the distribution conduct of a Track 1-B Defendant. *See, e.g.*, *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 2003 WL 21750835, at *5 (S.D. Ohio July 11, 2003) (granting motion *in limine* to the extent plaintiffs sought to introduce evidence that "a non-party . . . has suffered harm"). Put simply, without those nexuses, the evidence would have no "tendency to make a fact more or less probable." Fed. R. Evid. 401.

The Track 1-A defendants sought to exclude all evidence of shipments outside of the Plaintiff counties. In response to that motion in limine, Plaintiffs identified two kinds of purported evidence that they argued should be admitted in support of their claims. ECF Doc. 2805 at 32. The first (and primary) support was evidence concerning prescriptions from or filled at unscrupulous pain clinics or "pill mills" in Florida that Plaintiffs alleged had "migrated" to Ohio. *See* ECF Doc. 2815 at 32 n.37. The second kind of evidence was the expected expert testimony of James Rafalski. Based on that limited evidence, this Court ruled that it would allow evidence of shipments outside of Plaintiff counties that might show that a Track 1-A Defendant "knew that opioids distributed in Florida were migrating to Ohio." ECF Doc. 3058 at 9.

But Track 1-B is materially different from Track 1-A, and Plaintiffs' purported nexus between extraterritorial conduct and the Track 1-A defendants simply does not apply to Track 1-B claims and defendants. Here, Rafalski does not offer *any* opinions about most Track 1-B defendants. While aspects of his testimony are objectionable for all manner of reasons, even

setting those objections aside, his testimony cannot possibly support the admission of extraterritorial conduct for those defendants about whom he offers no opinions.

As for evidence involving unscrupulous third-party "pill mills" and pain clinics in Florida, such evidence simply does not implicate *the distribution conduct* of *Track 1-B Defendants*. Track 1-B Pharmacy Defendants distributed only to themselves, and not to third-party "pill mills" or pain clinics. While certain "pill mills" and pain clinics undoubtedly dispensed opioids created by the manufacturers, some of which were allegedly distributed by the "Big 3" distributors—all of whom were defendants in Track 1-A—there is no connection between any of the Track 1-B Defendants and those actors.

Most fundamentally, if Plaintiffs seek to introduce any evidence of opioids distributed to Florida migrating to Ohio, they must first be required to tie that specific opioid distribution conduct to a particular Defendant, and explain how that specific distribution conduct outside of Cuyahoga or Summit County caused harm in and to Cuyahoga or Summit County. Without that evidentiary foundation, there is no connection between the out-of-state distribution and Plaintiffs' alleged harm. *See, e.g.*, *Bispo v. Robertshaw Controls Co.*, 2012 WL 13048223, at *3 (D. Or. Mar. 14, 2012) (concluding evidence of Plaintiff's code violations was inadmissible unless Defendant "lays a foundation to establish a causal connection between such a code violation and [the conduct at issue in the lawsuit] before introducing the evidence").

Indeed, while evidence of third-party actions are irrelevant to proving the liability of *Defendants,* to the extent evidence concerns a Defendant's conduct, but has no connection to the Plaintiff counties, it is classic inadmissible "other bad acts" evidence offered to prove that if a Defendant acted in a way at a different time and place, it likely did so on this occasion as well. *See* Fed. R. Evid. 404(b)(1) (stating "[e]vidence of a crime, wrong, or other act" is generally

- 3 -

inadmissible).  Although Rule 404 specifies limited permissible purposes for such evidence, none apply here.  Most of the exceptions are, on their face, not applicable.[1]  Rule 404(b)(2) permits evidence of "other bad acts" only to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  Before admitting evidence of "other bad acts" for one of these purposes, a court must determine (1) "whether one of the factors justifying the admission of "other acts" evidence is material, that is, 'in issue,' in the case"; (2) "whether the "other acts" evidence is probative of such factors"; and (3) "whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect."  *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996) (citation omitted).  To Defendants' knowledge, Plaintiffs have no extraterritorial evidence that would meet *any* of those factors but again, if they do, they should be required to lay that foundation outside of the jury's presence.

Lastly, evidence of conduct that occurred outside the Counties and lacks any connection to one of the Counties ***and*** a Defendant's distribution conduct would be unduly prejudicial.  Such evidence would concern different geographic locations, different alleged misconduct, different injured parties, and—most importantly—no connection to the specific conduct at issue in this case.  It would confuse the issues and mislead the jury.  *See, e.g.*, *Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983) (concluding district court did not abuse its discretion in barring evidence that

---

[1] The Defendants' identities are not at issue.  *See, e.g., Lucijanic v. Ball*, 2006 WL 8442257, at *4 (S.D. Ohio Aug. 30, 2006) (concluding Rule 404(b)(2) exception did not apply where the defendant's identity "is not an issue in th[e] case").  It is not at issue in the case whether Defendants had the opportunity to distribute opioids or knew that they did.  *See, e.g., United States v. Ward*, 190 F.3d 483, 489 (6th Cir. 1999) (concluding district court erred in admitting Rule 404(b) evidence to demonstrate "opportunity" when that was not at issue); *United States v. Johnson*, 27 F.3d 1186, 1193–94 (6th Cir. 1994) (concluding district court erred in admitting Rule 404(b) evidence to demonstrate "knowledge" when that "was not at issue").  Nor have Defendants claimed that they distributed opioids by mistake or accident, so there is no basis to present evidence of shipments elsewhere to prove absence of mistake or lack of accident.  *See United States v. Semak*, 536 F.2d 1142, 1144 (6th Cir. 1976) (stating Rule 404(b) evidence may be admitted to show "absence of mistake" if the issue is "material . . . and there exists a dispute about it"); *see also, e.g., United States v. Shannon*, 766 F.3d 346, 352 n.9 (3d Cir. 2014) (stating Rule 404(b) evidence may only be admitted to prove "absence of mistake" or "lack of evidence" if it "is at issue in the case" (citation omitted)).

"might have inflamed or confused the jury"). Without connecting the extraterritorial conduct to a specific Defendant, Plaintiffs would effectively be asking the jury to attribute the alleged conduct of third parties (including some Track 1-A parties) to the Defendants in this case. Any probative value of such evidence (there is none) is "substantially outweighed" by its potential for "unfair prejudice." Fed. R. Evid. 403. Indeed, any testimony or evidence conduct that *can* be attributed to a specific Defendant should be narrowly tailored toward the case against *that Defendant.* It should not be used as evidence against "Defendants" generally.

In sum, Plaintiffs should not be permitted to rest their case against Defendants on purportedly wrongful conduct in other jurisdictions without first establishing, outside of the presence of the jury, a connection to *both* the Counties *and* the distribution conduct of the Defendant against whom the evidence is offered.

## CONCLUSION

For all the foregoing reasons, Defendants request respectfully that the Court bar Plaintiffs from introducing evidence of extraterritorial conduct without first establishing—at a hearing outside the presence of the jury—a foundation tying such conduct to both (1) a concrete harm in Cuyahoga or Summit County, *and* (2) a specific Defendant's distribution conduct.

Dated: August 14, 2020

Respectfully submitted,

  /s/ Eric R. Delisnksy (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

_/s/ Timothy D. Johnson_ (consent)_
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN,
CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug
Mart, Inc.*


/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-
shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and
HBC Service
Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP

- 6 -

1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

*/s/ Kaspar J. Stoffelmayr* (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email:
kaspar.stoffelmayr@bartlitbeck.com
Email:
brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/   Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi

Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

## OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or

evidence regarding defendants' lobbying activities.

> **6.    The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful

shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint

offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West

Virginia without identifying a connection between such shipments and the Track One

jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One

jurisdictions might be relevant because some of the pills in those shipments could have

"migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that

theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had

any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other

evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is

no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence

of allegedly wrongful shipments to other locations would constitute classic "other bad acts"

evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited

allowable purposes for such evidence, none are applicable here.  The allowable purposes

recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid.

404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy." *Id.*

whether the factor identified to justify admission is material to the claims, (2) whether the evidence is probative on that factor, and (3) whether prejudice substantially outweighs that probative value. *See United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996).

Most of the Rule 404(b)'s permitted uses are clearly not available here because they are immaterial to the plaintiffs' claims. *See Jobson*, 102 F.3d at 220-21 (6th Cir. 1996) (exception applies when evidence of prior misconduct tends logically to prove an element of offense charged). The defendants' identity is not at issue. No defendant contests that it has the opportunity to distribute opioids or knows that it does so. Not have defendants alleged that they distributed opioids by mistake or accident, so there is no basis to present evidence of shipments elsewhere to prove *absence of* mistake or *lack of* accident. *See United States v. Semak*, 536 F.2d 1142, 1144 (6th Cir. 1976).

While scienter is a required element of plaintiffs' RICO claims, outside shipments are not probative on that issue. First, the fact that a defendant may have purportedly shipped suspicious orders at another time or place does not make it more likely that it intended to commit similar acts as alleged in the instant case. *See United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) (prior threatening letters inadmissible to prove intent behind threatening phone calls). Second, unproven allegations of misconduct have a lower probative value generally – plaintiffs would need to prove not just that a shipment occurred, but that it was wrongful – a contention defendants would be entitled to rebut. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir. 1992). Thus, opening the door to evidence of shipments to other locations would require an inordinate amount of trial time to be expended on what is *at best* a collateral issue.

Finally, any limited probative value of such evidence is clearly outweighed by the unfair prejudice it would create. *See Ring*, 513 F.2d at 1007 (evidence of prior bad acts may not be introduced as a pretext for placing highly prejudicial evidence before the jury). Evidence of

other unproven allegations may put a party "on trial for . . . other bad acts" in a way that prejudices the right to a fair trial. *United States v. McFadyen-Snider*, 552 F.2d 1178, 1184 (6th Cir. 1977). Plaintiffs should not be permitted to cherry-pick purportedly wrongful shipments elsewhere rather than focusing on shipments that actually could have affected them. *See id.* at 1182 (improper to introduce evidence of prior prostitution that "served only to cater to the passions of the jury").

### 7. The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

The Court should exclude as irrelevant evidence purporting to demonstrate that defendants' conduct violated duties this Court has ruled arise under the Controlled Substances Act or its regulations – namely, to identify, inform DEA of, and not ship, "suspicious" orders. *See* Dkt. 2483.[16] Even if plaintiffs are permitted to introduce any type of evidence of an allegedly inadequate monitoring system, or not reporting, or not halting shipment of "suspicious orders," plaintiffs should not be permitted to introduce evidence or argument, or to suggest in cross-examination, that such conduct violated "suspicious" order duties, the CSA, or implementing regulations. Any such noncompliance or violation is irrelevant to the causes of action to be tried.

**Federal RICO.** To prove a "[p]attern of racketeering activity," a plaintiff must prove at least two acts of "racketeering activity." 18 U.S.C. § 1961(5). RICO limits "racketeering activity" to the criminal offenses listed in 18 U.S.C. § 1961(1)(A)–(G).

Even if a violation of 21 U.S.C. § 843(a)(4)(A) "can," in theory, constitute a predicate racketeering act under RICO, 18 U.S.C. § 1961(1)(D), as this Court held, *see* Dkt. 2580 at 3, a § 843(a)(4)(A) violation based on failure to comply with "suspicious" order duties is not the same

---

[16] Defendants maintain that the Court's rulings on alleged "suspicious" order duties and on a violation of 21 U.S.C. § 843(a)(4) as a possible RICO predicate are erroneous as a matter of law for reasons previously set forth. However, these motions assume their validity for the sake of argument here.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id. See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

In fact, there is abundant evidence in the record that the opioids Defendants shipped migrated beyond the borders of the states to which the shipments were made, including, oftentimes, to Ohio, and that Defendants were well aware of this phenomenon.[37] The Ohio Department of Mental Health and Addiction Services was aware of the migration of opioids into Ohio.[38] Defendants were regularly alerted to the migration phenomenon by the DEA,[39] and their personnel acknowledged the reality of diversion and migration in their depositions.[40] With respect to Walgreens, Plaintiffs' expert James Rafalski opined that Walgreens was familiar with the Florida phenomenon in part because its pharmacy managers alerted their supervisors to the high volume of prescriptions coming from out of state:

> Walgreens's also knew opioids it distributed in Florida were migrating into Ohio. Because Walgreens failed to maintain many pre-2012 documents outside of those produced to the DEA during the Jupiter DC investigation, many of the pre-2012 documents Walgreens produced relate to Walgreens distribution in Florida. This information is highly relevant to CT1, however, because not only does the evidence show that Walgreens's distribution failures were "systemic", as noted by the DEA in the 2013 MOA, but the evidence further shows that Walgreens knew and/or should have known that the high-volume Florida prescriptions were traveling out of state, including to Ohio. For example, Pharmacy managers in Florida alerted their supervisors and the distribution center that they were ordering 55+ bottles a week (where 30 bottles was an admitted red flag) and that many of the prescriptions were coming from out of state. Walgreens was well familiar with the "Florida migration"

---

[37] *See, e.g.,* **Ex. 5** [CAH_MDL_2804_031944472] at p. 118 (vast majority of Florida pain clinic patients came from out-of-state, including Ohio); **Ex. 6** [FTIMDL00039536] (most drug customers travel to Florida from Ohio and elsewhere); **Ex. 7** [HDS_MDL_00455124] (travelers seeking opioids come "by the thousands" to Florida from Ohio and elsewhere); **Ex. 8** [ABDCMDL00360134] at Slide 7(2009 AmerisourceBergen presentation describing distribution from Florida pain clinics to Ohio and other states); **Ex. 9** [MCKMDL00407451] at 465(McKesson presentation depicting "Drug Diversion Migration Out of Florida" to Ohio and elsewhere); **Ex. 10** [WAGMDL00441398—1431] (describing case studies of diverted opioids migrating to Ohio); **Ex. 11** [WAGMDL00049752] at 759 ("this is not just a Florida problem").

[38] *See* **Ex. 12** [*Ohio Substance Abuse Monitoring Network Surveillance of Drug Abuse Trends in the State of Ohio*, CUYAH_001656831] at 834, 840, 913, 924 (Cleveland region law enforcement and others note influx of prescription opioids from outside Ohio).

[39] *See, e,g,,* **Ex. 13** [CAH_MDL_02448227] at 378—80; **Ex. 14** [US-DEA 00000001 – 141]; **Ex. 15** [WAGMDL00289068] at 153.

[40] *See, e.g.,* Dkt. #1962-24 (8/1/18 Hartle Dep.) at 318:24 – 321:2.

phenomenon, in which prescription opioids were being dispensed in Florida and transported north to states include Ohio, and knew that "Interstate 95 has been renamed the Oxycodone Express because of the brisk travel of people from Kentucky, Tennessee, [and] Ohio to South Florida to obtain medications." When the DEA issued Orders to Show Cause to Walgreens's Jupiter Distribution Center and six Florida Walgreens pharmacies, the DEA specifically noted likely migration to Ohio."

Dkt. #1895-19 (Rafalski Expert Rep.) at p. 121; *see also* Dkt. #1969-19 (5/14/19 Rafalski Dep.) at 552:13-554:6 (testifying as to the basis for his opinion and observing that "by this time period, everybody knew there was a problem in Florida").

Against this robust record of diversion and migration, of which the above-cited materials are only examples, Defendants' assertion of the lack of a nexus between their irresponsible shipment practices and harm to the CT-1 Plaintiffs rings hollow. Defendants shipped tens of millions of opioid pills to resellers throughout the U.S. They knew that those resellers could, and often did, sell those opioids to individuals who had come from Ohio or elsewhere to obtain pills they could in turn sell at a substantial profit back home. That every pill that was diverted posed a risk to localities throughout the nation was not only foreseeable to Defendants, it was observed by them. Each shipment Defendants made in disregard of the potential for diversion is evidence of damages caused by Defendants to localities throughout the nation.

In addition, because the potential for diversion is so great and its consequences so pernicious, each Defendant was required to establish and maintain a suspicious order monitoring ("SOM") program. Plaintiffs have catalogued the numerous flaws in the SOMs operated by Defendants. Dkt. #1895-19 (Rafalski Expert Rep.) at pp. 46-186. Each Defendant's SOM program was implemented nationally; no special procedures were followed with respect to the CT-1 jurisdictions or elsewhere. *See id.* at p. 62 (noting that DEA enforcement actions against Cardinal in Maryland and Florida involved increasing thresholds despite evidence indicating potential diversion, and that these actions identified a systematic problem in Cardinal's nationwide distribution operations); *id.* at p. 79 (observing that the DOJ recognized that there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective

controls against diversion); *id.* at p. 85 (ABDC's settlement with the DOJ arose from failures in its SOM program, which were systematic because ABDC maintained national SOM policies and procedures); *see also, e.g.,* Dkt. #1971-2 (10/16/18 Stahmann Dep.) at 94-96. Because the SOM programs were implemented nationally, not regionally, each suspicious order filled by Defendants is also evidence of the flaws in Defendants' SOM programs, wherever it shipped to. For this reason, as well, Defendants' efforts to exclude this highly probative evidence must be denied.

7. **Defendants' Omnibus MIL No. 7**: **The Court should exclude as irrelevant evidence that Defendants violated alleged duties under the CSA or its regulations.**

In their Omnibus MIL No. 7, Defendants argue that evidence of their CSA violations is irrelevant because it does not establish certain elements of Plaintiffs' claims. First, that is not true, as discussed in greater detail below.[41] Moreover, Defendants are attempting to use this MIL to re-litigate issues decided on summary judgment, which the Sixth Circuit has held is improper. *See Louzon*, 718 F.3d at 558, 563 (defendant moved *in limine* to exclude plaintiff's "evidence of comparable employees on the basis that none were similarly situated as a matter of law[,]" arguing this evidence was irrelevant to plaintiff's discrimination claims; court held this was an improper motion *in limine*: "[T]his argument rests entirely on the presumption that Louzon would not be able to make out a prima facie case of discrimination, which if true would render null the need for any evidentiary rulings. Additionally, if these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant. Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.").

This Court has determined that whether Defendants violated their duties under the CSA or its implementing regulations must be resolved by the jury in the upcoming trial:

---

[41] And, regardless, "a piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball." *Dortch*, 588 F.3d at 401. *See also Morningstar*, 2018 WL 3721077, at *1 (same).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL NO. 2804 |
| | Civ. No. 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: *Track One Cases* | HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct. Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67. The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties. Shipments made elsewhere, even if wrongful, are otherwise irrelevant. Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17. Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24. Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence. Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal." *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).

and found its way into either county.  The most they offer are a couple of sources suggesting the possibility of "migration" of prescription opioids from Florida "into Ohio" and various other states.  Pl. Opp. at 32-33.  They identify no evidence that even suggests the existence of "migration" into Cuyahoga or Summit Counties (as opposed, for example, to Southern Ohio).

Moreover, the only specific defendant plaintiffs' Opposition attempts to connect to migration of any kind is Walgreens; plaintiffs identify no evidence whatsoever as to any other defendant.  And plaintiffs have provided no basis to deny this motion even as to Walgreens. Plaintiffs quote a paragraph from the expert report of James Rafalski, who relies almost exclusively on a settlement agreement (which is itself the subject of a separate motion *in limine*) that in turn cites unproven and untested allegations of a handful of instances (fewer than five) of Walgreens pharmacies in Florida *dispensing* opioid medications to Ohio residents.  Even if these allegations had identified prescriptions dispensed to residents of Cuyahoga or Summit Counties – and they did not – they would be irrelevant.  As the Court has found, "Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids."  Dkt. 1203 at 2.  Plaintiffs' claims are limited to alleged harm from *distribution* into Cuyahoga and Summit Counties.  Plaintiffs have no evidence, and their experts do not opine, that opioids distributed elsewhere – by Walgreens or anyone else – caused injury to plaintiffs.

Plaintiffs' only other argument on this point – that they should be allowed to offer evidence of wrongful shipments elsewhere because defendants' SOM programs were national in scope – is precisely the kind of argument for admissibility that Rule 404(b) rejects.  If a defendant made a wrongful shipment to a pharmacy in Utah, that is *not* admissible evidence of whether that defendant made wrongful shipments to Cuyahoga or Summit Counties that caused

injury to plaintiffs, any more than evidence of a prior automobile accident would be admissible in a personal injury case merely because the prior accident involved the same car and driver.

### 7. The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.

Plaintiffs' primary argument in opposition to defendants' Motion No. 7 is that this Court has already ruled against defendants on the evidentiary question this motion presents. That is incorrect. The order plaintiffs cite, Dkt. 2483, was a ruling on general "duties" and specified that it did *not* "address the scope of possible liability [to plaintiffs] for breach of those duties," *id.* at 14. At the time of that order, plaintiffs were pressing a negligence claim and asserted that such general duties and "breach of those duties" were relevant to that claim, but they have since elected to drop the negligence claim. As defendants have demonstrated, any breach of the "duties" that the Court addressed in that order are not relevant to the remaining claims.

Plaintiffs' substantive arguments are also without merit. Once again, plaintiffs seek to rely on allegations of vague, undefined "CSA violations." *See* Pl. Opp. at 35. But there is no general "CSA violation" that has uniform legal force, including with respect to plaintiffs' claims. Plaintiffs must establish the relevance of any alleged failure to abide by a statutory or regulatory section by identifying that section and its relevance to an element of a claim to be tried. Plaintiffs' Opposition fails entirely to satisfy this burden.

**RICO and OCPA.** Defendants' motion demonstrated that plaintiffs cannot rely on any failure to abide by provisions of 21 U.S.C. §§ 823, 841, or 842 to establish a RICO or OCPA predicate act. Plaintiffs offer no substantive refutation of that point. This is unsurprising, as plaintiffs did not identify these sections in their interrogatory response listing the predicate acts on which their RICO and OCPA claims are based. *See* Dkt. 2666 at 18.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

## <u>HENRY SCHEIN DEFENDANTS' MOTIONS IN LIMINE</u>

Defendants Henry Schein, Inc. and Henry Schein Medical Systems, Inc. (together, "Henry Schein Defendants") hereby move the Court, prior to the commencement of trial, for an order directing that Plaintiffs Summit County and Cuyahoga County, and their attorneys and witnesses, not mention or bring before the jury panel or the jury, either directly or indirectly, upon voir dire, opening or closing statements, interrogation of any witnesses, the offer or reading of any exhibit, deposition, or other discovery response in the case, arguments or objections before the jury, or by any other manner or means inform the jury or bring to the jury's attention any of the matters set forth below, unless and until such matters have first been called to the Court's attention outside the presence and hearing of the jury, and a favorable ruling received as to the admissibility thereof.

The Henry Schein Defendants further move the Court to order attorneys for Plaintiffs to inform and counsel their clients and witnesses not to volunteer, inject, disclose, state or mention to the jury any of the matters set forth below until specifically questioned thereon after a prior ruling by the Court.[1]

---

[1] The Omnibus Memorandum of Law In Support Of All Track One Bellwether Trial Defendants' Motions In Limine, and the Memorandum of Law In Support Of Distributor Defendants' Motions in Limine set forth the applicable and

sentenced to ten years in prison. Again, these events took place after HSI had discontinued distributing medications to Dr. Harper. Because Plaintiff cannot show that Dr. Harper diverted any of the opioid pills distributed to him by HSI, or furnished such pills to the referenced deceased patients, and because the conduct for which Dr. Harper was indicted and convicted involved the unlawful dissemination of prescriptions (not pills), Plaintiff should be prohibited from referencing HSI's distribution of opioid medications to Dr. Harper. Such evidence is irrelevant, misleading, and unfairly prejudicial. *See* Fed. R. Evid. 401, 403. Such evidence also lacks foundation. *See* Fed. R. Evid. 602.

AGREED: _____     GRANTED: _____     DENIED: ____

7.      **[HS-7] References to purported inadequacies regarding Henry Schein, Inc.'s Suspicious Order Monitoring System without first identifying whether any orders that HSI sold into Summit County were diverted.**

Plaintiff intends to offer evidence regarding purported deficiencies with respect to HSI's Suspicious Order Monitoring System. Plaintiff should be prohibited from offering such evidence absent an initial showing that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County. Such evidence lacks foundation and is otherwise irrelevant and unfairly prejudicial. *See* Fed. R. Evid. 401, 403, 602.

AGREED: _____     GRANTED: _____     DENIED: ____

8.      **[HS-8] References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.**

Plaintiff should be prohibited from making references or otherwise eliciting witness testimony that opioid medications that HSI may have distributed to locations outside of Summit County "migrated" or otherwise found their way into Summit County. Plaintiff possesses no

evidence that any single pill that HSI distributed or otherwise delivered to a customer outside of Summit County was later re-shipped to and diverted within Summit County. Permitting Plaintiff (or any of its witnesses) to make such reference lacks foundation and is otherwise unfairly prejudicial to HSI. *See* Fed. R. Evid. 401, 403, 602.

AGREED: _____     GRANTED: _____          DENIED: ____

## 9.     [HS-9] References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.

From Plaintiff's exhibit list it is apparent that it intends to offer testimony or otherwise reference in front of the jury certain fines imposed by other states regarding HSI's distribution of opioid medications *in those states*. Notably, any such isolated incidents did not involve in any way HSI's distribution of opioids into Ohio generally, or Summit County specifically. Accordingly, any such evidence or references are irrelevant to whether or not HSI's conduct was a substantial factor in creating, or maintaining a public nuisance in Summit County, and is otherwise unfairly prejudicial to HSI. *See* Fed. R. Evid. 401, 403.

AGREED: _____     GRANTED: _____          DENIED: ____

## 10.     [HS-10] References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.

According to Plaintiff's exhibits, it intends to offer into evidence a set of Ohio Board of Pharmacy meeting minutes from November 1998 whereby mention was made regarding the issuance of a cease and desist letter to Henry Schein, Inc. regarding the "sale of dangerous drugs to persons and/or facilities which are not licensed by the Board nor otherwise authorized to possess dangerous drugs." As an initial matter, there is no evidence that any such letter was actually sent to or received by HSI. Furthermore, the minutes reference "dangerous drugs" and make no mention of whether the subject drugs consisted of or included opioids, let alone to whom the drugs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT

October 7, 2019

SOMS is itself irrelevant and unfairly prejudicial, or whether it is only irrelevant and unfairly prejudicial if Plaintiffs do not first demonstrate "that any of the opioid medications distributed by HSI into Summit County were diverted, or otherwise shown to have substantially caused or contributed to any public nuisance in Summit County." Regardless, both arguments are without merit. First, evidence of HSI's insufficient SOMS is highly probative to Plaintiffs' claims and is not unfairly prejudicial for the reasons discussed above as to Defendants' Omnibus MIL No. 7. *Supra* at § A.7. Additionally, Plaintiffs have already made an initial showing that Henry Schein's conduct substantially contributed to the public nuisance, which the Court considered sufficient to withstand summary judgment. Dkt. #2561 at p. 9 ("As with the SOMS claims against the Manufacturers, given the massive increases in the supply of prescription opioids into the *Track One* Counties, combined with evidence that suggests a complete failure by the Distributors and Pharmacies to maintain effective controls against diversion, a factfinder could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."); Dkt. #2559 (order denying small distributors' summary judgment motion). Plaintiffs understand that they will have to establish causation at trial, and fully intend to do so. Whether Plaintiffs have laid an adequate foundation for a particular piece of evidence or testimony is a determination that should be made at trial so that it can be resolved in context. *See Indiana Ins.*, 326 F. Supp. 2d at 846.

Finally, Henry Schein again inexplicably cites Federal Rule of Evidence 602 to support its conclusory argument that this evidence "lacks foundation and is otherwise irrelevant and unfairly prejudicial." Dkt. #2645 at p. 5. It is not clear how this rule, which requires witnesses to have personal knowledge of matters on which they testify (FED. R. EVID. 602), is relevant to MIL No. H-7, and Henry Schein provides no explanation. If Henry Schein has a Rule 602 objection to specific testimony, it should make that objection at trial.

For these reasons, Henry Schein's MIL No. H-7 should be denied.

8.  **Henry Schein MIL No. HS-8**: References to alleged opioid medications distributed by Henry Schein, Inc. to locations outside Summit County.

Henry Schein's MIL No. HS-8 should be denied for the same reasons discussed above with

respect to Defendants' Omnibus MIL No. 6.  *Supra* at § A.6.

9.    **Henry Schein MIL No. HS-9: References to DEA fines, investigations, or admonitions concerning Henry Schein, Inc.'s distribution of opioids to locations other than those in Summit County.**

Henry Schein argues that evidence regarding fines imposed by other states is not relevant in this case because those fines did not involve HSI's distribution of opioids in Ohio.  As discussed in § A.6, *supra*, however, Henry Schein's argument improperly seeks to limit the scope of Plaintiffs' proof.  The opioid crisis and harm experienced by Cuyahoga and Summit Counties did not result solely from conduct by Defendants that specifically occurred in those counties or in Ohio.  Rather, the problem caused in these counties by Defendants' oversupply, inadequate monitoring, and diversion resulted from conduct by Defendants that occurred all over the country.  This issue is discussed more fully in response to Walgreens' MIL No. W-2, *infra* at § D.2, regarding a 2007 DEA enforcement action in Florida, which explains how Defendants' failures to adequately monitor sales to prevent diversion in one geographic location affects other locations, including the Plaintiff counties.

10.   **Henry Schein MIL No. HS-10: References to a purported 1998 cease and desist letter supposedly sent by Ohio Board of Pharmacy to Henry Schein, Inc.**

Henry Schein seeks to exclude evidence regarding a "purported" letter "supposedly" sent in 1998 from the Ohio Board of Pharmacy to HSI.  The MIL specifically references meeting minutes of the Ohio Board of Pharmacy from November 1998 that reference the letter.  Henry Schein argues "[a]s an initial matter, there is no evidence that any such letter was actually sent to or received by HSI."  Dkt. #2645 at p. 6.

Henry Schein is wrong.  Its own documents reflect receipt of the very same letter referenced in the meeting minutes.  In a PowerPoint presentation discussing HSI's due diligence requirements, there is a slide summarizing various "penalties" imposed by governmental entities on distributors, including HSI.  The first item on the slide references a "Warning Letter" sent by the "Ohio State BOP" in 1998 to HSI regarding the "Sale of dangerous drugs to persons/entities not

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:17-op-45004 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  MDL No. 2804<br>)  Hon. Judge Dan A. Polster<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' OMNIBUS MOTION IN LIMINE

Pursuant to Federal Rules of Evidence 402, 403, 404, and 408, and for the reasons set forth in the Teva Defendants' and Actavis Generic Defendants' (collectively, "Moving Defendants") attached Memorandum of Law, Moving Defendants move for the following to be excluded at trial:

- TAD-1: reference to the Cephalon misdemeanor plea;

- TAD-2: reference to "off-label" promotion;

- TAD-3: reference to the 2008 civil settlement between Cephalon and the Office of Inspector General (along with the settlement of the opioid action brought by the Oklahoma Attorney General);

- TAD-4: evidence of any opioid-related harm that occurred outside of the Counties;

- TAD-5: evidence of marketing-related statements or opioid shipments outside of the Counties;

(holding settlement evidence inadmissible under Rule 403 in addition to Rule 408); *see also Goodyear*, 332 F.3d at 982–83 ("the statement [made in furtherance of settlement] would likely be inadmissible under Rules 403 and 408").  Rule 403 permits the Court to exclude even "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."  Fed. R. Evid. 403.

That is precisely the case here.  If evidence of the Cephalon Settlement were admitted, the jury is likely to conclude—wrongly—that Cephalon acted improperly because it paid significant sums of money to resolve civil actions regarding marketing practices, without ever determining whether the plaintiffs proved their ***specific*** claims ***in this case***.  This unwarranted conclusion also may be extended to the other Moving Defendants by affiliation.  Indeed, a jury may believe— wrongly—that if Cephalon did nothing wrong, it would not have settled.  This risk of unfair prejudice is "profound."  *See United States v. Hays*, 872 F.2d 582, 589 (5th Cir. 1989) ("[T]he potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound.  It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back."), *cited with approval in Stockman*, 480 F.3d at 800.  The Cephalon Settlement (as well as the Oklahoma Settlement) should be excluded.

### D.    The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

This Court should prohibit any evidence regarding any harm that occurred outside of Ohio.

As a matter of law, the Counties can only recover for any harm that ***they*** incurred.[5]  As a result,

---

[5]    18 U.S.C. § 1962(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages

any opioid-related harm experienced by other counties in Ohio, or that occurred elsewhere in the United States, is entirely irrelevant. For instance, Plaintiffs seek to utilize expert testimony and documents relating to opioid-related harms, including studies and instances of opioid-related addiction, outside of the Counties. *See*, *e.g.*, Mark Schumacher Expert Report ¶¶ 53-56, ECF No. 2000-24 (discussing studies about a "national" epidemic but none that examine the Counties); Anna Lembke Expert Report, at 81-85, ECF No. 2000-10 (citing national studies and studies on opioid abuse in "Los Angeles . . . San Diego, Seattle, and New York" but none examining the Counties). But that says nothing about any harm that has occurred in the Counties. To the extent Plaintiffs seek to introduce such evidence, it should be precluded as irrelevant under Rule 402.

Moreover, even if such evidence were relevant, it is unduly prejudicial and Rule 403 precludes its admission. The case is brought by two Counties in Ohio, based upon alleged false marketing made to doctors in the Counties and alleged excessive shipments of opioids into the Counties. If the jury is allowed to hear testimony about opioid-related harm in other parts of the United States, it will unduly influence its decision-making. Jurors may wrongly believe that because other areas of the country have experienced significant opioid-related harm, so must have Summit and Cuyahoga, without the Counties having to prove their legally cognizable injuries and damages. The prejudice clearly outweighs the risk.

### E. The Court Should Exclude Evidence Of Marketing-Related Statements Or Opioid Shipments Outside Of The Counties (TAD-5).

Plaintiffs' false marketing claims rest upon the theory that the Teva and Actavis Generic Defendants misled doctors in the Counties into writing prescriptions that were harmful to residents

---

from the underlying unlawful act, there can be no successful civil conspiracy action") (citation and quotation omitted); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (common law public nuisance claim requires injury to plaintiff).

of the Counties. *See Summit* TAC, ¶¶ 10-11, 15, 71, 674-79, 715, 722. As a result, evidence of marketing activity, either branded or unbranded, should be excluded where there is no showing that the marketing materials were distributed, published, or read in either County. For example, Plaintiffs seek to use a "Pain Matters" program sponsored by Teva USA in support of their claims (Opp., at 14-15), but there is no evidence that this program was viewed by any doctor, patient, or person in Cuyahoga or Summit County. Nor have any of Plaintiffs' causation experts even considered it. Thus, even if certain statements in that video were false, they have no relevance to the claims brought by Plaintiffs. Fed. R. Evid. 402. At a minimum, any such relevance is substantially outweighed by the prejudice of allowing marketing statements with no nexus to the Counties. Fed. R. Evid. 403.

Likewise, as explained in greater detail in the Joint Brief, any evidence of shipments of opioids manufactured or sold by the Teva or Actavis Generic Defendants should be excluded where those shipments have no connection to Ohio. For instance, Plaintiffs have argued that Teva USA purportedly released a suspicious order placed by a Publix store in Florida. (Opp., at 18). Putting aside that Plaintiffs are wrong, this order has no connection to the Counties; it was never shipped into the Counties, thus, it has no bearing on any of the claims brought by Plaintiffs for harm in the Counties. *See Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, No. 2:00-CV-1439, 2003 WL 21750835, at *5 (S.D. Ohio July 11, 2003) (excluding evidence relating to non-party that suffered harm). It is entirely irrelevant.[6]

In fact, allowing Plaintiffs to base liability on this evidence would be a constitutional violation. Under the Commerce Clause, the Counties cannot project Ohio's regulatory regime into

---

[6]     As explained in the Joint Brief, evidence of opioid shipments outside of the Counties is also inadmissible under Fed. R. Evid. 404(b). *See* Joint Brief at Section II(6).

another state—even if the Counties can point to some downstream effect they want to prevent. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).[7] This means that the Counties cannot rely upon Moving Defendants' out-of-state conduct to satisfy the elements of Ohio state-law claims; indeed, the Supreme Court has held that the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State*." *Id.* (citations omitted) (emphasis added). Nor can the Counties rely upon out-of-state conduct to try to impose punitive damages (which, as described in the Joint Brief, are unavailable here anyway). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003). The Counties' attempt to penalize Moving Defendants under Ohio law, based on conduct outside of Ohio, is unconstitutional.[8]

### F. The Court Should Exclude Evidence Regarding Teva Defendants' Financial Support Of Third-Party Groups (TAD-6).

Plaintiffs seek to hold Moving Defendants liable for the conduct of trade organizations that they funded, such as the American Pain Foundation. (Opp., at 13-14).[9] But the First Amendment shields Moving Defendants' right to associate with trade and advocacy organizations. U.S. Const. amend. I (protecting "the right of the people peaceably to assemble"). That protection extends across a broad range of activities, including funding: "The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial

---

[7] *See also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986).

[8] Likewise, the Supreme Court has made clear that the application of state law to out-of-state conduct violates the Due Process Clause unless the out-of-state conduct has significant contacts with the state and implicates significant state interests. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985). Here, the Counties cannot meet their burden to establish that that Moving Defendants' marketing conduct outside of Ohio has any pertinent contact with Ohio or implicates any state interest, much less a significant one.

[9] *See, e.g.*, Summit TAC, ¶¶ 360-71 (seeking to hold Defendants responsible for statements made by the American Academy of Pain Medicine and the American Pain Society in their consensus statements about and guidelines for the use of opioids).

11

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

excessive promotion of opioids created a public health crisis. Aggressive overpromotion of dangerous drugs need not be fraudulent to be unlawful. Evidence regarding Moving Defendants' promotion of their opioids for a multitude of uses beyond those approved is fundamentally relevant to Plaintiffs' claims in this case. *See* Dkt. #2000-8 (Kessler Expert Rep.).

Moving Defendants also argue that FDA regulations are "arcane," *id.* at p. 5, and "risk sucking the jury down an irrelevant rabbit hole of confusion and side issues." *Id.* at p. 4. But the jury is not tasked with determining whether Moving Defendants' conduct violated FDA regulations surrounding off-label promotion or whether certain communications were protected speech, and it need not do so in order to determine whether Defendants' conduct substantially contributed to the opioid epidemic. Moving Defendants raise the specter of "an irrelevant, confusing and highly prejudicial mini-trial," but the jury need not "assess[] whether Defendants' conduct constituted off-label activity[.]" *Id.* at pp. 5-6. The question is whether Moving Defendants' conduct in aggressively over-promoting their opioid products (whether for approved or off-label uses) was a substantial factor in causing the harms caused by overprescribing alleged by Plaintiffs. Answering this question does not require determining whether Defendants' off-label promotion complied with FDA regulations. Evidence, testimony, and argument regarding Moving Defendants' promotion of drugs for uses beyond the approved indications are relevant and should not be excluded.

   **3.     Teva MIL No. TAD-3: The Court should exclude any reference to the 2008 civil settlement between Cephalon and the Federal Government.**

The arguments asserted by Moving Defendants in their MIL No. TAD-3 are addressed in § B.1, *supra*. Rule 408 does not preclude this evidence, and it is both relevant and not unfairly prejudicial.

   **4.     Teva MIL No. TAD-4: The Court should exclude evidence of opioid-related harm that occurred outside of the counties.**

Moving Defendants seek to prohibit any evidence regarding harm that occurred outside of Ohio, on the theory that the Plaintiffs can only recover for harm that they incurred. As initial matter, it is unclear what Moving Defendants mean by "evidence of harm," and hence exactly what

evidence Moving Defendants are seeking to exclude. To the degree that Moving Defendants have specific evidence in mind, and that they are simply choosing not to identify it at this time, the appropriate course is for them to object when that evidence is offered at trial, as opposed to seeking an unspecified adjudication in a vacuum.

But more importantly, the fact that Plaintiffs cannot recover for harm incurred outside Ohio does not mean that the impact of Defendants misconduct outside of Ohio is irrelevant or should be ignored. Moving Defendants reference, by way of example, national studies on opioid abuse relied on by Plaintiffs' experts. Dkt. #2668-1 at p. 9. These studies are relevant to numerous issues, including providing the context and background with respect to the scope and nature of the opioid crisis. This is a crisis which many Defendants are disputing actually exists. Further, evidence of the national scope and nature of the crisis will be pertinent to any attempt by Defendants to blame the Plaintiffs for the harms by suggesting bellwether-specific failures are the cause of the harms. Indeed, the Court has already rejected Defendants' arguments seeking to exclude Plaintiffs' causation and damage experts who analyze national and aggregate trends to create their models. As Plaintiffs' expert reports make clear, and explained by Plaintiffs in their opposition briefs to Defendants' *Daubert* motions, national trends and statistics make Plaintiffs' analyses more reliable and relevant, and strengthen the reliability of the relationship between increased shipments of prescription opioids and increased harms. *See, e.g.*, Dkt. #2000-4/#1999-4 (Cutler Expert Rep.) at ¶¶ 81-100 (explaining the most appropriate way to assess the relationship between shipments and mortality is based on regression-based comparisons across a robust sample of counties across the nation, not just one or two counties viewed in isolation); *see also* Dkt. #2000-6/#1999-6 (Gruber Expert Rep.) at ¶ 84, Fig. 1.18 (showing that in counties with the highest per capita shipments between 1997 and 2010, the prescription opioid mortality rate increased over 3.75 times more than it did in the counties with the lowest per capita shipments); *see also Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 2017 WL 4748054, at *3 (S.D.N.Y. Oct. 19, 2017), *aff'd*, 349 F. Supp. 3d 298 (S.D.N.Y. 2018) ("[I]t seems axiomatic that the more data points that are available, the more reliable the ultimate damage calculation"). As such, information on the opioid crisis and its national scope is directly relevant to

both claims and defenses at issue in the litigation, and will greatly assist the jury in understanding the issues presented at trial. *See also supra* at § A.6.

   **5.    Teva MIL No. TAD-5: The Court should exclude evidence of marketing-related statements or opioid shipments outside of the counties.**

   Moving Defendants also seek to exclude "evidence of marketing activity" where there is no showing that the marketing materials were distributed, published, or read in either County, as well as any evidence of shipments of opioids manufactured by Defendants that have no connection to Ohio.   Moving Defendants' arguments regarding shipments outside of Ohio are addressed in Plaintiffs' response to Defendants' Omnibus MIL No. 6. *Supra* at § A.6.  With respect to Moving Defendants' marketing arguments, the factual premise underpinning these arguments is false.  The evidence in the record demonstrates that both Teva and Actavis engaged in nationwide marketing. There was no state-specific marketing, including state-specific marketing in Ohio, and any national marketing would have been used in all 50 states.  *See, e.g.,* Dkt. #1962-26/#1978-06 (11/16/18 Hassler Dep.) at 275:12 – 276:17 (confirming that for Teva, Cephalon and Actavis, marketing, sales and advertising pieces were national in scope, in that "they are able to be used all over America," and that these materials were not tracked, such that defendants have no way showing that such materials were not used in Ohio); **Ex. 34** [Hassler Dep. Vol II] at 621:10-19 (testifying that Teva and Cephalon did not release materials that were specific to geographic areas for their marketing or educational messages, and that "[t]he messages were approved nationwide, and they would have been available and used in Ohio, just as they would have been in any other state in the country."); Dkt. #2177-5 (11/2/18 Snyder Dep.) at 271:5 – 272:3 (testifying that Kadian marketing materials were national in that the same marketing materials were provided and used by sales reps across the country).

   Finally, Moving Defendants' constitutional argument—that it is unconstitutional to "project Ohio's regulatory regime into another state"—is simply misplaced.  Dkt. #2668-1 at pp. 10-11. Plaintiffs are not seeking to project Ohio's regulatory regime into another state, nor are they seeking to "penalize" Moving Defendants for conduct outside of Ohio.  Defendants' misconduct violated

not only Ohio law, but also federal law and the local laws of any non-Ohio jurisdiction within which the conduct occurred.  As Plaintiffs will demonstrate at trial, the evidence in the record establishes that Moving Defendants have engaged in misconduct, and caused significant injury, within Plaintiffs' jurisdictions.  But Plaintiffs are also entitled to introduce evidence showing the systemic nature of Moving Defendants' misconduct, and the degree to which this conduct caused a national opioid crisis that impacted the bellwether jurisdictions.

6. **Teva MIL No. TAD-6: The Court should exclude evidence regarding Teva Defendants' financial support of third-party groups.**

Moving Defendants claim Plaintiffs should be precluded from offering evidence or argument of their funding of third-party trade groups because such conduct is protected by the First Amendment's right to freedom of association.[100]  Not so.  Plaintiffs are not arguing that Moving Defendants' mere participation in, and funding of, various trade and advocacy organizations, in and of themselves, subject them to liability.  Rather, Plaintiffs allege, and will demonstrate at trial, that Moving Defendants worked together, through their trade associations and otherwise, (i) to unlawfully deceive and mislead the public, the medical community, and the government regarding the risks of their opioids and their purported efforts to prevent diversion, and (ii) to unlawfully avoid their legal duties to monitor for, report, and prevent shipment of suspicious orders of opioids.  Evidence of Moving Defendants' participation and funding of these trade associations is relevant to demonstrate that they participated in this conspiracy with the intention of furthering this wrongful conduct.  *See In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775, 803 (N.D. Ohio 2007)

---

[100]  In their motion, Moving Defendants quote the following language from the Supreme Court: " 'The freedom to associate with others for the dissemination of ideas—not just by singing or speaking in unison, but by pooling financial resources for expressive purposes—is part of the freedom of speech.' " Dkt. #2668-1 at pp. 11-12 (quoting *McConnell v. Fed. Election Comm.*, 540 U.S. 93, 255 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm.*, 558 U.S. 310 (2010)).  They fail to mention this language was taken from Justice Scalia's *dissent* in that case.  *McConnell*, 540 U.S. at 247-48, 255.  (In *McConnell*, Justice Scalia concurred in part and dissented in part, but the quoted language is in a section of his opinion in which he is criticizing the majority opinion.  *Id.* at 250, 255-56.).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *Track One Cases* | Hon. Dan Aaron Polster |

**TEVA DEFENDANTS' AND ACTAVIS GENERIC DEFENDANTS' REPLY IN
SUPPORT OF THEIR OMNIBUS MOTION IN LIMINE**

Plaintiffs intend to introduce the Cephalon Settlement to prove their clams, in violation of Rule 408.

### D. The Court Should Exclude Evidence Of Opioid-Related Harm That Occurred Outside Of The Counties (TAD-4).

Plaintiffs do not dispute that their experts do not cite to any studies regarding opioid-related harms that occurred *in* the Counties and instead rely on documents and studies examining *other* municipalities and states, or national studies with generalized conclusions that cannot be extrapolated to the Counties. Opp. at 107; *see also* Mot. at 8–9. Nor do Plaintiffs dispute that they plan to rely at trial on documents, statistics, and studies demonstrating harms that are *entirely outside* of Cuyahoga and Summit Counties as evidence of the "national scope and nature of the crisis" in order to prove their alleged injuries. *Id.* Instead, Plaintiffs appear to argue that they should be allowed to introduce such evidence because '[t]his is a crisis which many Defendants are disputing actually exists" and "Defendants [may] blame the Plaintiffs for the harms." *Id.*[4] But Plaintiffs do not cite to anything on the record to support those assertions. Moreover, those arguments make little sense and are simply a red herring.

At trial, the Counties can only recover for any harm that *they* incurred.[5] The Court has made abundantly clear that only harm to the Counties is at issue. Dkt. No. 2561, at 4-6 (denying summary judgment based upon alleged "increase in the supply of prescription opioids in the *Track One* Counties"). And Plaintiffs even concede in their Opposition that they "cannot recover for

---

[4]    Plaintiffs rely on *Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14CIV2590VMJCF, 2017 WL 4748054 (S.D.N.Y. Oct. 19, 2017), but that case is neither controlling nor is it applicable as the issue there was valuation of a bank's assets for damages and did not consider whether damages of non-party banks should be included.

[5]    18 U.S.C. § 1964(c) (under RICO, plaintiff must be injured "in his business or property"); Ohio Rev. Code Ann. § 2923.34 (OCPA limits standing to "person who is injured"); *Lawyers Title Co., LLC v. Kingdom Title Sols., Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014) ("if a plaintiff suffers no actual damages from the underlying unlawful act, there can be no successful civil conspiracy action") (citation and quotation omitted); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (common law public nuisance claim requires injury to plaintiff).

harm incurred outside of Ohio." Opp. at 107. Accordingly, under Rules 402 and 403, only evidence of harm that Cuyahoga and Summit Counties experienced should be admitted in order for the Counties to prove their legally cognizable injuries and damages.

Plaintiffs do not and cannot dispute that the only alleged "crisis" at issue is what exists in the Counties. As a result, any opioid-related harm experienced by other counties in Ohio, or that occurred elsewhere in the United States, is irrelevant, would confuse the jury into associating harms outside of the Counties as harms to the Counties, and would be highly prejudicial to the Moving Defendants—indeed, the jury may wrongly believe that because other areas of the country have experienced significant opioid-related harm, so too must have Summit and Cuyahoga. Under Rules 402 and 403, this evidence should be excluded.

### E. The Court Should Exclude Evidence Of Marketing-Related Statements Or Opioid Shipments Outside Of The Counties (TAD-5).

Plaintiffs do not dispute that, as part of their false marketing claims, they must prove that the Moving Defendants made false marketing statements to physicians *in the Counties*, thereby causing those physicians to improperly write a medically inappropriate prescription that caused harm in the Counties.[6] Opp. at 108. Nor do Plaintiffs cite to any authority contrary to the common-sense argument that evidence of marketing activity by the Moving Defendants should be excluded where there is no showing those marketing materials were actually *distributed, published, or read in either County*. *Id*. The motion should be granted based upon these concessions alone.

Ignoring these points, Plaintiffs argue that because "[t]here was no state-specific marketing" and marketing materials might have been "approved nationwide" or were "able to be

---

[6] Plaintiffs do not address the Moving Defendants' arguments regarding the inadmissibility of evidence of shipments outside of the Counties and instead refer to Plaintiffs' opposition to the Joint Motion in Limine. Opp. at 108. As explained in the Joint Reply, evidence of opioid shipments outside of the Counties is also inadmissible under Fed. R. Evid. 404(b). *See* Joint Reply at Section II(6).

used all over America," they should be introduced even if they were *never actually used in Cuyahoga or Summit counties*. *Id.* But marketing statements or materials (whether Ohio-specific or national) that were never actually disseminated to physicians in either of the Counties are irrelevant to proving the Counties' claims. Someone in the Counties must have actually received and been misled by those marketing materials. Introducing evidence of marketing materials where there is no showing they were ever used in the Counties would serve no other purpose than to mislead the jury into assuming that any allegedly false marketing material used elsewhere must have reached physicians in the Counties.

In addition, the Counties' attempt to penalize Moving Defendants under Ohio law, based on conduct outside of Ohio, is unconstitutional. Mot. at 9–11. Although Plaintiffs state they are not "seeking to 'penalize' Moving Defendants for conduct outside of Ohio," they fail to address how introducing evidence of marketing used elsewhere that has no ties to either of the Counties would not constitute an impermissible reliance on out-of-state conduct to satisfy Ohio state-law claims. Liability based on such evidence is unconstitutional and should be excluded. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). Under Rules 402 and 403, such evidence is irrelevant, misleading, and prejudicial and should be excluded.

### F.     The Court Should Exclude Evidence Regarding Moving Defendants' Financial Support of Third-Party Groups (TAD-6).

Allowing Plaintiffs to introduce evidence of Moving Defendants' financial support of third-party groups would violate Moving Defendants' First Amendment rights. Plaintiffs' argument on this issue is unavailing.

Plaintiffs do not dispute that the First Amendment protects the activity of funding trade organizations. Opp. at 109. Even so, Plaintiffs argue that such evidence is relevant because they

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

**PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 9**
**TO LIMIT TESTIMONY OF CRAIG MCCANN**

Pharmacy Defendants respectfully ask this Court to exclude portions of Craig McCann's opinion, which other evidence has revealed to be irrelevant and likely to confuse the jury.

The report of Plaintiffs' expert Craig McCann includes five different calculations based on "a non-exhaustive set of algorithms" that he applied to DEA's ARCOS shipping data. Ex. A, McCann Rpt. at 6; Ex. B, McCann Second Supp. Rpt. at 3. From these five different calculations, McCann offers five alternative opinions regarding numbers of flagged orders.

McCann did not develop these algorithms, and he does not personally offer an opinion that any of these algorithms is a valid methodology for identifying suspicious orders. The algorithms were given to McCann by Plaintiffs' counsel. McCann acknowledges that he is simply "a calculator" and "a computer" who "took these approaches and implemented them." Ex. C, McCann Tr. 129:6–15; 135:14–24.

Because McCann offers no opinion that these calculations measure anything relevant to this case, Plaintiffs attempt to fill the gap with another expert: James Rafalski. Rafalski offers *no* opinion as to many of the Track 1-B Defendants. But unlike McCann, Rafalski offers an opinion regarding the proper methodology for identifying suspicious orders. He vouched, however, for only one of the five algorithms applied by McCann: the Six-Month Trailing Threshold. See Ex.

D Rafalski Tr. 480:17–481:20 (describing it as "potentially suitable" for identifying suspicious orders).  The other four methodologies, he testified, "aren't suitable suspicious order systems." Ex. E, Rafalski Tr. 174:5–10; 356:19–357:2.

As a result, McCann's calculations based on these four methodologies are irrelevant.  No witness—neither McCann, nor Rafalski, nor anyone else—will opine that these calculations are based on a reliable methodology for identifying suspicious orders.

In light of Rafalski's testimony, it is unclear whether Plaintiffs still seek to offer McCann's opinions regarding calculations based on algorithms other than the Six-Month Trailing Threshold. Should they attempt to do so, the testimony should be excluded as irrelevant.  This Court's *Daubert* ruling recognized that McCann's opinion regarding "application of . . . methods" was relevant only because of "Rafalski's opinions regarding [those] methods."  Doc. 2944.  Given this link, this Court should limit McCann to the method that Rafalski opined would be "potentially suitable." Calculations based on other methods do not have "any tendency to make a fact more or less probable than it would be without the [calculations."  Fed. R. Evid. 401.

In the alternative, even if McCann's calculations under the other algorithms had some marginal probative value, it would be substantially outweighed by the danger of confusing the issues, misleading the jury, undue delay, or wasting time.  Fed. R. Evid. 403.  Because no witness would testify that these calculations reliably measure suspicious orders, the presentation of the evidence to the jury would waste time and confuse the issues.  The jury might also be misled and confuse McCann's calculations under the Sixth-Month Trailing Threshold (somewhat supported by Rafalski) with his other calculations (which are unsupported by anyone).

## CONCLUSION

Pharmacy Defendants acknowledge that in light of this Court's *Daubert* ruling, McCann will be permitted to testify, but his opinions should be limited to his calculations based on the Six-Month Trailing Threshold, the only potentially relevant algorithm in light of Rafalski's testimony.

Dated:  August 14, 2020                Respectfully submitted,

/s/ Kelly A. Moore  (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

/s/ Timothy D. Johnson (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin

MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/ Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939

Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# EXHIBIT A

Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | : | MDL No. 2804 |
| | : | CASE NO. 17-MD-2804 |
| | : | (DAP) |
| | : | |

EXPERT REPORT OF CRAIG J. MCCANN, PH.D., CFA
March 25, 2019

Confidential - Subject to Protective Order

compare the processed ARCOS Data to Retail Drug Summary Reports published by the DEA to verify that the shipments of opioids to dispensing outlets in the ARCOS Data is consistent with the amount of each opioid the DEA calculates was shipped into each 3-digit zip code each quarter. I also compare the ARCOS Data to the opioid transaction data produced in discovery by the Defendants.

19.     In Section VII, I explain the information I used to supplement the ARCOS Data.

20.     In Section VIII, I report summary statistics for subsets of the processed ARCOS Data covering Cuyahoga County and Summit County in Ohio. These summary statics show that that between 2006 and 2014, Dispensers in Cuyahoga County received 8.55 billion MME of opioids. Given the county's 1.28 million average population, Dispensers received enough opioids for every resident in the County to consume 742 MME every year from 2006 to 2014. These summary statistics also show that between 2006 and 2014, Dispensers in Summit County received 5.16 billion MME of opioids. Given the County's average population of 542,000, Dispensers received enough opioids for every resident in the county to consume 1,057 MME every year from 2006 to 2014.

21.     In Section IX, I describe a non-exhaustive set of algorithms that can be systematically applied to the ARCOS Data and present a check on the various estimates presented. In Section X, I provide certain estimates regarding the total aggregate shipments of opioids into Ohio from 1997 to 2018. In Section XI, I describe certain charts and tables that are attached to this report.  In Section XII I give my conclusions.

# EXHIBIT B

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | : | MDL No. 2804 |
| | : | CASE NO. 17-MD-2804 |
| | : | (DAP) |
| | : | |

SECOND SUPPLEMENTAL EXPERT REPORT OF
CRAIG J. MCCANN, PH.D., CFA
April 15, 2019

Defendants which ultimately led to opioid transactions with Dispensers in Cuyahoga County and Summit County.

5.    I have now been asked by Counsel to document how I further processed and validated opioid transaction data produced by the DEA, to attribute transactions with Dispensers to Manufacturers in this Second Supplemental McCann Report.[2]

6.    I have been asked to summarize transactions in the ARCOS Data, especially those transactions into Cuyahoga County and Summit County attributable to Manufacturer Defendants.

7.    I have also been asked to report the results of applying certain algorithms to the ARCOS Data attributable to Manufacturer Defendants.

## II.    Summary of Opinions

8.    I previously concluded that the ARCOS Data produced by the DEA reflecting opioid shipments from January 2006 through December 2014 is reliable. I further concluded that the transaction records produced in discovery by the Distributor Defendants other than AmerisourceBergen are a reliable source of transactions data before 2006 and after 2014 for the varied time periods covered by the Distributor Defendants' transactions productions.

9.    In the next section, I explain how the ARCOS Data can be used to identify the Manufacturer for virtually all the transactions in the ARCOS Data. In Section IV and Section V, I report the results of attributing

---

[2] On April 3, 2019, I filed a brief supplemental report (the "McCann Supplemental Report") to insert some Figures and Tables which had been inadvertently excluded from the McCann Report.

transactions flagged by a non-exhaustive set of algorithms applied to the ARCOS Data in the McCann Report to Manufacturer Defendants.

## III. Attributing Transactions With Dispensers to Manufacturers

### A. ARCOS Data

#### 1. NDC Labeler Field

10.     Drug packages are uniquely identified in the ARCOS Data by a National Drug Code, or NDC. The NDC has three segments, the first of which identifies the drug product's Labeler which is typically but not always the drug's Manufacturer.[3] For example, 00603-3882-28 identifies hydrocodone/acetaminophen tablets manufactured by Par Pharmaceutical.

11.     There are 23,280 unique NDCs in the ARCOS Data and 1,991 unique NDCs in transactions with Dispensers in Cuyahoga County and Summit County. There were 1,462,630 opioid transactions to Dispensers in Cuyahoga County from 2006 to 2014 containing 465,121,322 dosage units and 8,553,177,070 MME.[4] There were 823,049 opioid transactions to Dispensers in Summit County from 2006 to 2014 containing 275,807,920 dosage units and 5,158,182,360 MME.[5]

12.     Each record for the 2,285,679 transactions to Dispensers in Cuyahoga County and Summit County from 2006 to 2014 includes an NDC code.[6]

---

[3] "NDC Dictionary Instructions," Drug Enforcement Administration, October 2010. Current version available at https://www.deadiversion.usdoj.gov/arcos/ndc/readme.txt.

[4] See McCann Report, §VIII.A, Table 16.

[5] See McCann Report, §VIII.B, Table 20.

[6] From this point forward, my analysis deals with twelve non-treatment opioids.

3

# EXHIBIT C

```
  1        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
  2                  EASTERN DIVISION
                      -  -  -
  3    IN RE:  NATIONAL           :  HON. DAN A.
       PRESCRIPTION OPIATE        :  POLSTER
  4    LITIGATION                 :  MDL NO. 2804
                                  :
  5    This document relates to:  :  Case No. 17-MD-2804
                                  :
  6    The County of Summit, Ohio :
       Ohio et al. v. Purdue Pharma :
  7    L.P., et al., Case No.     :
       17-OP-45004                :
  8                               :
       The County of Cuyahoga v.  :
  9    Purdue Pharma Purdue Pharma :
       L.P., et al., Case No.     :
 10    18-OP-45090                :
 11                    -  -  -
 12         - HIGHLY CONFIDENTIAL -
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 13
                     VOLUME I
 14                   -  -  -
                  May 9, 2019
 15
 16           Videotaped deposition of
       CRAIG J. McCANN, Ph.D., CFA, taken
 17    pursuant to notice, was held at the law
       offices of Morgan Lewis & Bockius, LLP,
 18    1111 Pennsylvania Avenue, NW, Washington,
       D.C., beginning at 10:03 a.m., on the
 19    above date, before Michelle L. Gray, a
       Registered Professional Reporter,
 20    Certified Shorthand Reporter, Certified
       Realtime Reporter, and Notary Public.
 21
                      -  -  -
 22
           GOLKOW LITIGATION SERVICES
 23    877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
 24
```

1        Q.    Yep.

2        A.    I'm just saying that you

3  take the -- the data that we've prepped,

4  and apply these formulas to it, you get

5  particular results.

6        Q.    And is that also true not

7  only about whether those algorithms, the

8  assumptions, are appropriate, but also

9  true that you are not making any opinion

10  as to whether they are legally required?

11       A.    Right.  I think all of these

12  issues are being handled by other

13  experts.  I -- as you said a minute ago.

14  And I didn't take it as a pejorative.

15  I'm just serving as a calculator.

16       Q.    And in this Paragraph 21 you

17  use the -- the phrase "algorithms" to

18  discuss what's being applied in

19  Section 9.  But you also use the word

20  "approaches" later I believe.

21            Are you saying the same

22  thing?

23            So are -- in -- calling it

24  algorithms here in Paragraph 21, are you

```
 1          Q.     Anyone come to mind?

 2          A.     It would be -- it would be

 3    something like that list and perhaps

 4    more.

 5          Q.     Anyone in particular that

 6    you think you left out earlier that comes

 7    to mind?

 8          A.     No.

 9          Q.     Did you get any input on

10    these five approaches from any of your

11    discussions with current or former DEA

12    agents?

13          A.     No.

14          Q.     Did you take any other step

15    to verify with the DEA that any or all of

16    these approaches are appropriate in this

17    setting?

18          A.     I'm sorry.  I don't know

19    what you mean by any other, but I didn't

20    do anything other than serve as the

21    computer, you referred to me as earlier.

22    I took these approaches and implemented

23    them, applied them to the data.  That's

24    what I did.
```

# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES               )   Polster
                              )
 7
 8
 9                       __ __ __
10              Tuesday, May 14, 2019

                         __ __ __
11

12        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW

                         __ __ __
13

14

15

16        Videotaped Deposition of JAMES E.
     RAFALSKI, VOLUME 2, held at Weitz &
17   Luxenburg PC, 3011 West Grand Avenue, Suite
     2150, Detroit, Michigan, commencing at
18   8:25 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21
22
23                       __ __ __
24           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

1    distributor, when you were working as a

2    diversion investigator -- strike the

3    question.  Hold on a second.

4         A.    Can I speak to my counsel about

5    the --

6         Q.    No, that's okay.  We can move

7    on.

8         A.    -- Touhy authorization --

9         Q.    We can move on.

10        A.    -- that I have a question, with

11   him?

12        Q.    I don't have a lot of time, so

13   I'll just withdraw the last partial question

14   that I was just trying to ask --

15        A.    Okay.

16        Q.    -- and we'll move on.

17              Yesterday I believe you

18   testified that none of the five flagging

19   methods identified in your report are

20   suitable for suspicious order monitoring

21   systems.

22              Do you remember using the word

23   "suitable"?

24        A.    I do.  And I thought about that

25   testimony after I left yesterday, and I'd

Highly Confidential - Subject to Further Confidentiality Review

1    like to maybe correct it or make a statement

2    in regards to it.

3        Q.    Well, let me just ask you.

4    What did you mean when you said none of the

5    five flagging methods that you identify in

6    your report are suitable for suspicious order

7    monitoring systems?

8        A.    Well, specifically how they

9    would identify a suspicious order, two times,

10   three times, the 8,000 and the pickers and

11   packers program or the -- I think I don't use

12   that particular name -- the one -- the one

13   that I think that statement would indicate

14   that I would say that the Masters was not

15   suitable, and I -- I would disagree.

16            If I made that statement and

17   said that one was, I'd like to correct that

18   and say that I -- this would be a suitable --

19   potentially suitable suspicious order

20   program.

21       Q.    The Masters method that

22   identified 95% of Walgreens orders as

23   suspicious, that one is suitable?  Is that

24   your testimony, sir?  But none of the other

25   ones?

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

## PHARMACY DEFENDANTS' MOTION *IN LIMINE* NO. 10 TO PRECLUDE EVIDENCE OR ARGUMENT RELATING TO PARTICIPATION IN TRADE ASSOCIATIONS

The Court should preclude any evidence or argument concerning Defendants' participation in trade associations and protected petitioning activity. Any such evidence or argument is irrelevant to Plaintiffs' public nuisance claim and is also barred by the First Amendment. Further, the danger of unfair prejudice, confusion, misleading the jury, and wasting trial time substantially outweighs any probative value. Fed. Rs. Civ. P. 401-403.

Plaintiffs may seek to introduce evidence or argument concerning the Healthcare Distribution Alliance ("HDA") (f/k/a Healthcare Distribution Management Association) or the National Association of Chain Drug Stores ("NACDS"), two industry trade associations, in an effort to show that Defendant engaged in improper conduct. Although certain Defendants may have participated in events and other forums hosted by HDA, no Defendant was a member.[1] Rather, HDA was a trade association in which other distributor defendants (who did not have affiliated pharmacy stores) were members. Pharmacy Defendants or their parent corporations were members of NACDS.

---

[1] Caremark Rx Inc. was an affiliate member of HDA (or its predecessor) prior to its acquisition by CVS Corporation in 2008. Since that time, the CVS Defendants' direct or indirect parent corporation has maintained that affiliate membership, but has not held any position within HDA.

First, any participation by Defendants here in trade association activities is irrelevant to the public nuisance claim here.  Unlike in Track 1A, where Plaintiffs alleged that certain manufacturer and distributor defendants engaged in a conspiracy and racketeering activity, there are no such claims here.[2]  Rather, the Track 1B trial is limited to a public nuisance claim – whether a Pharmacy Defendant's distribution to its own stores involved intentional and unreasonable conduct that was intended to cause an interference with a public right, on the one hand, or involved certain, specific kinds of unlawful conduct, on the other.  The claim also requires Plaintiffs to prove that a Defendant's conduct proximately caused an unreasonable interference with a public right.

In Track 1A, the Court denied without prejudice those defendants' Motion in Limine No. 5 seeking to exclude evidence about lobbying and other petitioning activities.  Plaintiffs claimed that they did not seek "to impose liability for lobbying or petitioning activity, and instead [sought] to introduce this evidence to show purpose, character, motive, or intent."  The Court found that lobbying or petitioning activity is "admissible for other purposes," but allowed that the defendants there "may argue that the probative value of any particular evidence on this matter is outweighed by a danger of unfair prejudice."  (ECF 3052 at 50-51)  Purpose, character and motive simply are not at issue here for Plaintiffs' nuisance claim.  *Cf. United States Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("[E]xclusion of 'purpose and character' evidence consisting of conduct clearly embraced by

---

[2] *See, e.g.*, Dkt. 3021 at 294, ¶ 929 (Cuyahoga Third Am. Compl.) ("each of the RICO Marketing Defendants … had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities."); *id.* at 164, ¶ 514 ("Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum and the HDA."); *id.* at 165, ¶ 517 ("Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA."); *id.* at 184, ¶ 575 ("Defendants, through their trade associations, HDMA and NACDS, filed an amicus brief in *Masters Pharmaceuticals*, which made the following statements …." concerning Defendants' statutory and regulatory responsibilities to prevent diversion and report suspicious orders).

*Noerr-Pennington* should be the rule rather than the exception in an antitrust case."). Participation in a trade association also does not demonstrate the intent necessary for a public nuisance claim.

Nor can Plaintiffs seek to impute public statements by the HDA or NACDS to a Defendant. These trade associations are separate entities from the Defendants and mere participation in a trade association does not render the association's public statements an admission by a member, much less a non-member.[3] *In re: Asbestos School Litig.*, 46 F.3d 1284, 1290 (3d Cir. 1994) ("A member of a trade group or other similar organization does not necessarily endorse everything done by that organization or its members."); *In re Welding Fume Prod. Liab. Litig.*, 526 F. Supp. 2d 775, 805 (N.D. Ohio 2007) ("Attendance at a meeting of an organization does not necessarily signify approval of any of that organization's activities.") (quoting *In re: Asbestos School Litig.*, 46 F.3d at 1290).

Second, participation in trade associations, including lobbying activity through trade associations, represents constitutionally protected conduct under the First Amendment and the *Noerr–Pennington* doctrine. "Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection." *In re: Asbestos School Litig.*, 46 F.3d at 1294. As a result, "[c]ivil liability may not be imposed merely because an individual belonged to a group …. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *N.A.A.C.P. v. Claiborne Hardware Co.* 458 U.S. 886, 920 (1982); *Eaton v. Newport Bd. of*

---

[3] *See, e.g.,* Dkt. 3021 at 160, ¶ 506 (alleging that the HDA "has long taken the position that distributors have responsibilities to 'prevent diversion of controlled prescription drugs' not only because they have statutory and regulatory obligations [to] do so, but 'as responsible members of society.' … [D]istributors … are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."); Dkt. 3021 at 185, ¶ 576 ("Through statements made on their behalf by their trade associations …," Defendants acknowledge their obligations under the law and affirmed their conduct complied with the law.).

*Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition"); *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989) (explaining that liability can be imposed on the basis of lobbying and litigation only if such activity was a "sham"). It is improper to impose liability on a defendant based on a trade association's constitutionally protected activity. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961) (extending protection to "publicity campaign[s] to influence governmental action").

Trade association activity thus is irrelevant and inadmissible under Rules 401 and 402. To the extent Plaintiffs seek to introduce evidence of such activity, they would first need to establish a foundation that (1) the trade association engaged in illegal activity; and (2) a defendant specifically intended to support such illegal activity. *Claiborne Hardware Co.* 458 U.S. at 920. In the absence of such a foundation, any evidence or argument impermissibly infringes on Defendants' First Amendment rights. And because Plaintiffs have never presented any evidence that would support either prong of the *Claiborne* test, the Court should preclude such argument entirely.

Third, any evidence of trade association activity unfairly prejudices Defendants as it is likely to mislead and confuse jurors and cause them to use Defendants' constitutionally protected behavior against them. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403. The Court should therefore exclude evidence of trade association activity under Rule 403, given that the danger of unfair prejudice and confusion, as well as waste of trial time, substantially outweighs any probative value of the evidence or argument. Fed. R. Evid. 403; *Weit,* 641 F.2d at 467.

## **CONCLUSION**

For the foregoing reasons, the Court should exclude any evidence or argument concerning

Defendants' participation in any trade association activities.

Dated:  August 14, 2020                          Respectfully submitted,

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

/s/ Timothy D. Johnson (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860
(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street

Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email: kaspar.stoffelmayr@bartlitbeck.com
Email: brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/ Tara A. Fumerton
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi

- 6 -

Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE**

from offering lay opinion testimony about the alleged gateway from prescription opioids to illicit opioids.

   **5.    The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

The First Amendment protects the right of citizens to petition the government.  Allowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).  And permitting jurors to hear such evidence makes it more likely that jurors will be confused and inappropriately conflate the defendants' constitutionally protected behavior with illegal actions. *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403.

Lobbying and other efforts to influence government action are protected by the First Amendment.  The *Noerr–Pennington* doctrine protects persons from liability for their speech and conduct in exercising their First Amendment right to petition the government.  *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition").  The doctrine likewise extends to "publicity campaign[s] to influence governmental action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961), as well as to concerted action designed to influence the government, *see id.* at 135-36 (doctrine applies to "associating together in an attempt to persuade the legislature or executive to take particular action"); *Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment).  The Sixth Circuit has explained that "[a]lthough the *Noerr-Pennington* doctrine

was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims . . . ." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007).

The "intent . . . of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*." *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012). That is true for both legislative and administrative lobbying. As to legislative lobbying, the First Amendment permits liability *only* where lobbying is "'not genuinely aimed at procuring favorable government action' at all." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (*quoting Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988)). This "sham exception" has nothing to do with whether the communication contains untruths or otherwise employed "improper means." *Id.* at 380. Rather, it applies only if the defendant does not genuinely seek the *result* it advocates. *See VIBO*, 669 F.3d at 686 (defendant files frivolous objections to the license application of a competitor solely to delay). The same general principles that immunize legislative lobbying apply to administrative lobbying. *See BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524-25 (2002).[13]

Plaintiffs do not contest that the defendants intended to procure favorable government action through their petitioning efforts. Evidence of such activity is accordingly inadmissible under *Noerr-Pennington*.

In accordance with Supreme Court precedent, plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy. *See Snyder v. Phelps*, 562 U.S. 443, 460 (2011) (holding that where allegedly tortious conduct is protected by the First Amendment, a

---

[13] Some courts have recognized a fraud exception to the *Noerr-Pennington* doctrine where knowing and willful misrepresentations are made to an agency, but only in the context of an *adjudicatory* proceeding. *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

plaintiff "cannot recover for civil conspiracy based on those torts").[14]  And the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984). A party may not circumvent *Noerr-Pennington* by asking questions "solely designed to create an inference which may be dispelled by disclosure of the protected activity."  *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257, 1278 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984).  Allowing such questioning would "gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a 'chilling effect' upon the exercise of First Amendment rights."  *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171.

The Court should therefore exclude evidence of lobbying activity under Rule 403, given that the likelihood of unfair prejudice and confusion substantially outweighs any probative value of the evidence.  Fed. R. Evid. 403; *Weit*, 641 F.2d at 467. Indeed, because of its inherent chilling effect and its likelihood to confuse jurors, evidence of lobbying activity is considered presumptively prejudicial.  *United States Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("[E]xclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case."); *see also Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978).  Cautionary instructions are insufficient to forestall confusion and unfair prejudice, as the *Noerr-Pennington* doctrine is complicated and difficult for lay jurors to fully comprehend in the context of complex litigation.  *Weit*, 641 F.2d at

---

[14] *See, e.g.*, Dkt. 2182 (Pls.' Consolidated Mem. in Opp. to Mot. for Summ. Judgment on Pls. Civil Conspiracy, RICO, and OCPA Claims) at 83, 86-87 (pointing to protected lobbying as evidence of existence of unlawful enterprise).

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or evidence regarding defendants' lobbying activities.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West Virginia without identifying a connection between such shipments and the Track One jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One jurisdictions might be relevant because some of the pills in those shipments could have "migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence of allegedly wrongful shipments to other locations would constitute classic "other bad acts" evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited allowable purposes for such evidence, none are applicable here.  The allowable purposes recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid. 404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy."  *Id.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS *IN LIMINE* (DKTS. #2645, #2648, #2653, #2661, #2663, #2666, #2668) AND MEMORANDUM IN SUPPORT**

October 7, 2019

testify to the evolution of these reports during the course of his tenure, showing the transition from prescription opioids to illicit heroin/fentanyl, as stated in the records kept pursuant to statute. Supplementing his deposition testimony, Dr. Gilson's article shows that prescription opioid mortality peaked in 2011, and that there was an inflection point from that year forward, in which heroin deaths rose and surpassed the declining numbers of prescription opioid deaths in Cuyahoga County, followed by a fentanyl spike beginning in 2014. Dkt. #2197-29 at p. 43, Figure 1. Dr. Gilson's article cites a trend toward lower numbers of death cases of patients with an opioid prescription within the preceding year, suggesting the possibility that "addicts may be circumventing the previously *well-established progression route from OPR to illicit drugs like heroin and fentanyl.*" *Id.* at p. 48 (emphasis added). This progression was "well-established" by the factual data evaluated by Dr. Gilson, as summarized above.

For these reasons, Defendants' Omnibus MIL No. 4 should be denied as to Dr. Gilson, and denied as moot as to Mr. Craig and Mr. Martin.

5. **Defendants' Omnibus MIL No. 5: The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

As a preliminary matter, Plaintiffs dispute the underlying premise of Defendants' argument in support of this MIL (*i.e.*, that the lobbying and petitioning activities at issue in this case are constitutionally protected). It is well-established that neither the First Amendment nor the *Noerr-Pennington* doctrine immunizes fraud.[22] Regardless, Plaintiffs have clearly stated that they are not

---

[22] *See, e.g., Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600, 606, 612 (2003); *Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513-15 (1972); *Wise v. Zwicker & Associates, P.C.,* 780 F.3d 710, 719 n.5 (6th Cir. 2015); *Potters Med. Ctr. v. City Hosp. Ass'n,* 800 F.2d 568, 580 (6th Cir. 1986). Defendants claim the fraud exception to *Noerr-Pennington* applies only in the context of an adjudicatory proceeding (Dkt. #2661 at p. 14 n.13). But at least some of Defendants' fraudulent communications with the government were made in an adjudicatory context, such as during enforcement-related proceedings or rulemakings. Additionally, the DEA's quota-setting process is unquestionably adjudicatory in nature, as it conducts public hearings, accepts evidence and argument from interested parties, makes findings of fact and conclusions of law, and its actions are guided by enforceable standards subject to review (21 C.F.R. §§ 1303.11 – 1303.13, 1303.31 – 1303.37, 1316.41 – 1316.68; 5 U.S.C. §§ 551-559; 21 U.S.C. §§ 826, 877). *Cf. Kottle v. N.W. Kidney Centers,* 146 F.3d 1056, 1062 (9th Cir. 1998) ("The CON determination by the Department [of Health] bears many indicia of a true adjudicatory proceeding. The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses. The Department must

attempting "to impose liability upon the Defendants for their lobbying or petitioning activities, nor do [they] argue that these activities were unlawful conduct." Dkt. #2090-1 at p. 3; Dkt. #2562 at p. 6 n.7. Thus, the question of whether or not these activities are constitutionally protected need not be decided here.[23]

Even assuming, *arguendo*, that Defendants' lobbying and petitioning conduct is constitutionally protected such that those activities could not directly give rise to liability, this does not mean evidence of that conduct is inadmissible at trial. Far from it. Rather, the United States Supreme Court, and courts throughout the country, have recognized that such evidence is still relevant and admissible to show the purpose and character of Defendants' wrongful activities. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) ("It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."); *In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *93 (N.D. Ohio June 4, 2010) ("*Welding Fume II*") (noting that it previously declined to

---

issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case."); *DeLoach v. Philip Morris Companies, Inc.*, 1:00CV01235, 2001 WL 1301221, at *12 (M.D.N.C. July 24, 2001) (no *Noerr-Pennington* immunity for defendants who intentionally submitted false purchase intentions to the USDA that resulted in lower annual tobacco quotas).

[23]  Although Plaintiffs are not seeking to impose liability on Defendants for their petitioning conduct, Plaintiffs do not waive any argument they may have at trial that certain petitioning conduct of Defendants is not constitutionally protected under the First Amendment or the *Noerr-Pennington* doctrine. Plaintiffs also do not concede that the *Noerr-Pennington* doctrine applies outside the antitrust context. Although the Sixth Circuit recognizes that other federal courts have applied the doctrine to common law claims, it has not yet definitively resolved the issue. *See Campbell v. PMI Food Equip. Group, Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (acknowledging other federal courts have applied *Noerr-Pennington* to common law claims, but stating that it "need not decide that issue here because the Workers failed to state such a claim"); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) ("Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine.").

issue a pretrial, blanket ruling excluding all evidence of the defendants' lobbying activities, and in fact had "admitted several such documents over defendants' objection because, even though the document was arguably created for lobbying purposes, it also contain[ed] statements directly relevant to issues central to every *Welding Fume* case").[24]  For example, such evidence demonstrates

---

[24]  *See also Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136-39 (10th Cir. 2002) (district court did not abuse its discretion admitting evidence of defendant's misleading statements to Oklahoma Corporation Commission where offered "for the proper purpose of supporting the claim that [the defendant] acted for an improper monopolistic purpose"); *Alexander v. Natl. Farmers Org.*, 687 F.2d 1173, 1196 (8th Cir. 1982) ("Exempt conduct may be considered, however, to the extent it tends to show the 'purpose or character' of other, nonexempt activity.  Here, the district court's findings are noteworthy because they show CMPC, AMPI and Mid-Am acting in concert with the specific intent to block NFO from competing as a qualified cooperative.  While not illegal because of the exemption, this conduct does have evidentiary value as to the purpose and concerted character of these co-ops' contemporaneous nonexempt activities.") (internal citations omitted); *Cipollone v. Liggett Group, Inc.*, 668 F. Supp. 408, 410-11 (D.N.J. 1987); *Gillis v. Murphy-Brown, LLC*, 7:14-CV-185-BR, 2018 WL 5928010, at *1 (E.D.N.C. Nov. 13, 2018) (noting that the *Noerr-Pennington* doctrine does not operate "in the manner in which defendant seeks to do here—[to] bar otherwise admissible evidence in a state law private nuisance lawsuit"); *In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings*, 14 C 1748, 2018 WL 305503, at *10 (N.D. Ill. Jan. 6, 2018) ("The Court disagrees that the *Noerr–Pennington* doctrine is applicable.  Nolte does not seek to hold AbbVie *liable* for its alleged petitioning activity; he intends to offer evidence of that activity to demonstrate AbbVie's motive or intent.  There is no general rule that evidence of activity that is protected by the First Amendment—speech, for example—is inadmissible.") (internal citation omitted); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 4890594, at *15 n.4 (N.D. Cal. Oct. 30, 2017) ("The *Noerr-Pennington* doctrine does not bar consideration of Bosch's lobbying activities. . . .  Here, the Franchise Dealers are not asserting that Bosch's lobbying activity was unlawful.  Instead, they contend that Bosch's lobbying activity proves its knowledge of, and intent to participate in, the emissions fraud."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2015 WL 8130449, at *1-2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Community Action League v. City of Palmdale*, CV 11-4817 ODW VBKX, 2012 WL 10647285, at *8 (C.D. Cal. Feb. 1, 2012); *Wolfe v. McNeil-PPC, Inc.*, CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting defendants' argument that the *Noerr-Pennington* doctrine compelled the exclusion of evidence of two citizen's petitions one defendant submitted to the FDA and noting that the petitions were "relevant to defendants' knowledge regarding the safety of ibuprofen and the adequacy of its labeling"); *Adams v. U.S.*, 03-0049-E-BLW, 2009 WL 1259019, at *2 (D. Idaho May 3, 2009) (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington* because, among other things, such evidence was "relevant to plaintiffs' claims of misbranding and failure to warn, and shows the state of [the defendant's] knowledge which is relevant to many claims"); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, CV 00-1693-PA, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) ("[E]ven if the state lands transaction could not itself have been a basis for liability [under *Noerr-Pennington*], evidence regarding that transaction would likely have been admissible for other purposes, such as showing market share, the extent of any log sources available to competitors, the scope of the relevant market or markets, the manner in which Weyerhaeuser allegedly obtained and maintained its monopoly, the company's motives and intent, and to impeach credibility").

Defendants' knowledge and intent to participate in a RICO enterprise.[25]  For these reasons, courts regularly deny motions *in limine* seeking to preclude evidence of lobbying and petitioning activities.[26]

Moreover, evidence of Defendants' lobbying activities will be particularly probative in this case since Defendants, as they have already indicated, plan to argue that the DEA did not do enough to enforce the law.  Plaintiffs are entitled to rebut this argument with evidence that, for example, Defendants and their trade association (i) lobbied to limit the DEA's enforcement authority, and (ii) influenced their Congressional allies to criticize the DEA in order to undermine the agency's authority and effectiveness.

Defendants' cases do not support granting their *limine* request.  First, they cite *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), for the proposition that "[a]llowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right."  Dkt. #2661 at p. 13.  In *Octane*, which involved the appropriateness of an attorney's fee

---

[25]  *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) ("Plaintiffs are not asserting that the Bosch Defendants' lobbying activity was unlawful.  Instead, they assert that the lobbying activity helps prove knowledge and intent to participate in the RICO enterprise.  Use of the Bosch Defendants' lobbying activity in this manner is not barred by *Noerr-Pennington*."); *Nat.-Immunogenics Corp. v. Newport Tr. Group*, SACV1502034JVSJCGX, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) ("While the evidence may ultimately be inadmissible under the <u>Noerr-Pennington</u> doctrine as a basis for liability, it may be admissible for some other purpose such as to show intent to participate in a RICO enterprise, in which case <u>Noerr-Pennington</u> would not be a bar to admissibility.").

[26]  *See, e.g., Welding Fume II*, 2010 WL 7699456, at *93; *In re Tylenol (Acetaminophen) Mktg., Sales Practices and Products Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016) (denying defendants' motion *in limine* to exclude lobbying evidence; "[T]he plaintiff seeks to offer evidence about how the defendants attempted to influence, petition, or communicate with Congress and/or the FDA to show their knowledge, state of mind, or intent.  It would be a stretch to say that <u>Noerr-Pennington</u> bars any use of any evidence of the defendants' petitioning of the government, and its agencies, or evidence of any communications with the FDA."); *Cipollone*, 668 F. Supp. at 410-11 (denying defendants' motion *in limine* to exclude evidence that defendants provided false and misleading information to Congress; court deferred decision of "whether the specific evidence to be offered is probative of a continuing course of conduct that corroborates plaintiff's direct allegations" until trial so that it could be "decided in context"); *Testosterone*, 2018 WL 305503, at *10 (denying defendant's motion *in limine* to exclude all evidence of defendant's lobbying efforts with the FDA); *Gen. Motors*, 2015 WL 8130449, at *1-2 (denying defendants' motion *in limine* to exclude evidence that it intentionally misled or concealed information from, or tried to influence, NHTSA); *Wolfe*, 2012 WL 38694, at *6 (denying defendants' motion *in limine* to exclude citizen's petitions submitted to the FDA); *Adams*, 2009 WL 1259019, at *2 (denying motion *in limine* to exclude evidence of defendant's communications with the EPA under *Noerr-Pennington*).

award in a patent litigation case, the Supreme Court briefly discussed the *Noerr-Pennington* doctrine because the plaintiff had attempted (unsuccessfully) to analogize the standard for baseless litigation under that doctrine with the standard applicable under the Patent Act. 572 U.S. at 548, 555-56. The Court noted that it had "crafted the *Noerr-Pennington* doctrine . . . to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Id.* at 556. The case has absolutely nothing to do with the admissibility of petitioning-related evidence.

Defendants then cite *Snyder v. Phelps*, 562 U.S. 443 (2011), to support their argument that "plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy." Dkt. #2661 at pp. 14-15. But *Snyder* is entirely distinguishable. In that case, the plaintiff asserted various tort claims, including civil conspiracy, against the Westboro Baptist Church and some of its members based on their picketing of a military funeral. 562 U.S. at 447. At trial, the jury found in favor of the plaintiff. *Id.* The Supreme Court affirmed the reversal of the jury's verdict, holding that "the First Amendment shield[ed] the church members from tort liability for their speech in th[at] case." *Id.* at 447, 451-60.[27] Significantly, the defendants' picketing formed the *entire basis* for the plaintiff's tort claims in that case. *Id.* at 447.[28] Because the underlying torts upon which the alleged conspiracy was based failed, the civil conspiracy claim also failed. *Id.* at 460. This case does not address the admissibility of lobbying or petitioning evidence.[29]

---

[27] Notably, the Supreme Court noted that none of the defendants' statements were "provably false[.]" *Id.* at 451. And it also emphasized that its holding was "narrow." *Id.* at 460 ("We are required in First Amendment cases to carefully review the record, and *the reach of our opinion here is limited by the particular facts before us*.") (emphasis added).

[28] In the present case, to the contrary, Plaintiffs' claims are based on Defendants' (i) unlawful marketing and distribution of opioids through fraud and misrepresentation, and (ii) unlawful failure to prevent diversion and failure to monitor for, report, and prevent shipment of suspicious orders of opioids. It is the entirety of that wrongful conduct that forms the basis of Plaintiffs' civil conspiracy claims. *See, e.g., Taylor v. AirCo, Inc.*, CV 02-30014-MAP, 2003 WL 27382684, at *16 n.8 (D. Mass. Aug. 4, 2003) (rejecting defendants' argument that they were immune from liability based on their lobbying efforts under *Noerr-Pennington*; "Plaintiffs do not seek to have liability imposed solely on the basis of lobbying efforts. Rather, Plaintiffs allege 'a continuing course of deceptive conduct of which this activity was just one small part.' "), *report and recommendation adopted,* CV 02-30014-MAP, 2003 WL 27382685 (D. Mass. Sept. 26, 2003).

[29] Nor does this case address the *Noerr-Pennington* doctrine at all.

Defendants also claim "the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct[,]" citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157 (6th Cir. 1984) ("*Cleveland II*") and *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257 (N.D. Ohio 1980) ("*Cleveland I*"). Dkt. #2661 at p. 15. Of course neither of these opinions, which arise from the same *antitrust* case,[30] addresses the admissibility of petitioning evidence in cases involving nuisance, RICO, OPCA, or common-law conspiracy claims. Moreover, neither case even stands for the proposition that such evidence is *per se* inadmissible in antitrust cases.

In *Cleveland I*, the City of Cleveland brought an antitrust suit against an electric utility. 538 F. Supp. 1257. There were two trials, the first of which ended in a hung jury. *Cleveland II*, 734 F.2d at 1160. Prior to the second trial, the defendant sought to preclude the plaintiff from "enter[ing] upon a [specific] course of inquiry" in its examination of the "defendant's general attorney, the *sole purpose* of which [wa]s to elicit testimony" that would trigger the introduction of certain *Noerr-Pennington*-protected evidence that the court had *already determined* should be excluded based on the first trial. *Cleveland I*, 538 F. Supp. at 1278 (emphasis added). After noting that the protected conduct of which the plaintiff was seeking to introduce evidence was not relevant to the plaintiff's claims,[31] the court precluded the plaintiff from initiating that course of inquiry unless the defendant opened the door.[32] In other words, the court analyzed specific pieces of evidence of the defendant's *Noerr-Pennington*

---

[30] It is well established that, subject to certain exceptions, petitioning conduct, even if undertaken for anti-competitive purposes, is not sanctionable *under the Sherman Act. See Pennington*, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

[31] *Id.* at 1279 ("In light of the fact the only instance of protected conduct sought to be introduced herein relates to a lawsuit *which, the City concedes, did not actually affect the construction of the 69KV intertie*, the plaintiff may not inquire as to activity undertaken by CEI which was merely 'designed' to delay, impede, or make more costly the construction of the 69KV temporary emergency interconnection.") (emphasis added).

[32] *Id.* at 1279 ("Although plaintiff may not, at this juncture, initiate inquiry designed solely to trigger admission of Noerr-Pennington conduct, the Court recognizes, of course, that the evolution of the defendant's evidence may 'open the door' for the introduction of such conduct, as occurred during the first trial.").

protected conduct, determined that this evidence should be excluded, and then prohibited the plaintiff from questioning a witness in its case-in-chief with the sole purpose of triggering the introduction of the previously-excluded evidence. Contrary to Defendants' assertions otherwise, *Cleveland I* does not support granting Defendants' overly-broad MIL No. 5. In fact, that court explicitly stated that determinations as to the admissibility of petitioning-related evidence *should be deferred until trial*:

> [T]he weighing process embodied in Rule 403, and the similar balancing analysis which governs the admissibility of evidence relating to activities protected by the Noerr-Pennington doctrine, are more appropriately undertaken in the context of the evidence theretofore adduced. To exclude broad categories of evidence in this action, prior to the presentation of any proof, might appear in a controversy of this nature to risk depriving the plaintiff of what may ultimately be demonstrated to be the "legitimate moral force" of its evidence. The Court is thus constrained to conclude that the extent to which the litigants may properly adduce evidence which pertains to the substance of the tendered admission is a matter which must await the actual presentation of proof in this case.

*Id.* at 1265 (internal citations omitted).[33]

Defendants cite *Cleveland II* as affirming the *Cleveland I* decision (Dkt. #2661 at p. 15), but in actuality *Cleveland II* affirmed the district court's judgment on the jury's defense verdict from the second trial. 734 F.2d at 1160, 1169.[34] The plaintiff appealed, arguing, among other things, that the trial judge erred by refusing to admit into evidence information regarding the defendant's secret sponsorship of a lawsuit challenging an order by the Federal Power Commission requiring the defendant to interconnect with the plaintiff's utility company. *Id.* at 1161-62. The plaintiff claimed the evidence demonstrated the defendant's "anticompetitive intent to exclude [the plaintiff's utility

---

[33] The court also recognized that courts are "vested with broad discretion in determining the admissibility of evidence of conduct falling within the protection of the Noerr-Pennington doctrine." *Id.* at 1277.

[34] Defendants also purport to quote certain language from *Cleveland II* in their motion, implying that this was a direct quote by the Sixth Circuit's majority opinion. Dkt. #2661 at p. 15 ("Allowing such questioning would 'gut the constitutional protection afforded under the Noerr-Pennington doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.' *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171."). In fact, this is a direct quote from the district court in *Cleveland I* (538 F. Supp. at 1279), which is then re-quoted in a parenthetical to a citation to *Cleveland I* in the *dissent* to *Cleveland II*. 734 F.2d at 1171.

company] from the retail electric power market." *Id.* at 1161. The district court ruled that the evidence was "inadmissible on the basis of the *Noerr-Pennington* Doctrine." *Id.* at 1161-62. The Sixth Circuit held that the district court had not abused its discretion in excluding the evidence because the conduct was "not the kind of antitrust activity that is admissible to prove a Sherman Act violation" and the plaintiff's purpose in introducing the evidence "was to show the anticompetitive character and nature of [the defendant's] conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers[,]" which was "not an admissible basis for its introduction[.]" *Id.* at 1162-63. The court further noted that the evidence was cumulative because the defendant had already admitted at trial that its objective was "to reduce and *eliminate* competition with its competitor" and the plaintiff had introduced considerable other evidence of the defendant's anti-competitive conduct. *Id.* at 1164. Thus, *Cleveland II,* similar to *Cleveland I*, simply reiterates that the balancing test for whether a particular piece of petitioning-related evidence is admissible requires a fact-specific inquiry that should be deferred until trial.

Defendants' Rule 403 arguments are also without merit. They claim that "evidence of lobbying activity is considered presumptively prejudicial." Dkt. #2661 at p. 15. But the cases they cite for this proposition—all of which, not surprisingly, arise in the antitrust context—are entirely distinguishable. In *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986) ("*U.S. Football I*"), the plaintiffs brought various antitrust claims against the NFL. *Id.* at 1158. The NFL sought summary judgment on certain of these claims that related to the NFL's actions "directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities." *Id.* at 1176. The NFL argued that the stadium-related claims were barred under the *Noerr-Pennington* doctrine because the conduct at issue almost entirely consisted of the NFL's lobbying of state and local governments on issues related to stadium lease approvals. *Id.* at 1177-78. The court held that such conduct could not "give rise to liability under the federal antitrust laws." *Id.* at 1180. It recognized, however, that evidence of stadium-related conduct could potentially be "probative of the 'purpose and character' of the transactions" that formed the basis of some of the

plaintiffs' other claims. *Id.* at 1180 (quoting *Pennington*, 381 U.S. at 670 n.3). And it expressly acknowledged that the admissibility of this evidence should be determined *during the trial*: "Since the admissibility or exclusion of such 'purpose or character' evidence will be within this Court's discretion at trial, *it would be premature to rule on such matters at this time*." *Id.* (internal citation omitted) (emphasis added). Despite this acknowledgement, the court proceeded *in dicta* to make some "preliminary observations" regarding the potential admissibility of such evidence at trial. *Id.* The court emphasized the need to weigh the probative value of the evidence against the risk of undue prejudice. *Id.* at 1180-81. The court noted that the evidence was largely irrelevant to the plaintiffs' remaining claims and had significant evidentiary problems, including that most of it was hearsay. *Id.* at 1181 & n.13. It was during this *dicta* analysis that the court stated: "Given such risks, the exclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception *in an antitrust case*." *Id.* at 1181 (emphasis added).[35] But even if the present case was an antitrust case (which it is not), and even if the 33-year-old *dicta* of a district court outside this circuit was binding on this Court (which it is not), *U.S. Football I* does not support granting Defendants' *limine* request. To the contrary, it *reaffirms* Plaintiffs' argument that such determinations should be deferred until trial, where the Court will have the benefit of a developed record in order to analyze whether a specific piece of lobbying-related evidence is admissible. 634 F. Supp. at 1180.

---

[35]    In their motion, Defendants cite *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988) ("*U.S. Football II*") as affirming the district court's *U.S. Football I* opinion. Dkt. #2661 at p. 15. In actuality, the Second Circuit's opinion affirmed the district court's denial of the plaintiffs' *post-trial* motions which dealt with issues that arose *during* the trial. *Id.* at 1340-41. In fact, the appellate court noted that the district court's summary judgment ruling "in favor of the NFL on the USFL's stadium-related claims on *Noerr-Pennington* grounds" had "not been appealed." *Id.* at 1350 n.13. The Second Circuit acknowledged that the district judge actually admitted some lobbying evidence at trial, but also held that he had not abused his discretion in excluding certain other lobbying evidence during the trial based on the specific circumstances of that case. *Id.* at 1373-75. Notably, the appellate court did not state that such evidence was "presumptively prejudicial"; rather, it acknowledged that lobbying evidence "may be admitted . . . 'if it tends reasonably to show the purpose and character of the particular transactions under scrutiny,' and that evidence is more probative than prejudicial." *Id.* at 1374 (internal citation omitted); *see also id.* ("Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence.").

In *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530 (5th Cir. 1978), which is also an antitrust case, the court never said lobbying/petitioning evidence is "presumptively prejudicial." Rather, in determining whether the district court properly granted summary judgment on one of the plaintiff's antitrust claims, the Fifth Circuit acknowledged that "[e]vidence of activity that is protected by the Noerr doctrine may be admitted to show the purpose and character of other activity if doing so is not overly prejudicial to the defendants." *Id.* at 543 n.7. The court determined that a specific piece of petitioning evidence was inadmissible in that case because "[i]ts evidentiary value to the plaintiff [wa]s far outweighed by the defendants' first amendment interests." *Id.* Specifically, the court found that "the probative value of this evidence [wa]s low" because "[a]s evidence of the alleged conspiracy it [wa]s cumulative" and "[a]s evidence of [the defendant's] state of mind it [wa]s exceedingly weak[.]" *Id.* As with *U.S. Football I*, this case does not support the granting of Defendants' broad *limine* request; rather, it reaffirms that the admissibility of lobbying evidence is a fact-specific inquiry that is best reserved for trial.

Finally, *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981) is yet another antitrust case in which the appellate court analyzed whether the district court erroneously declined to consider evidence of the defendants' lobbying activities when deciding whether to grant the defendants' summary judgment motion. *Id.* at 458, 466-67. In *Weit*, the plaintiffs alleged that the defendant banks "conspired to fix the interest rate paid by consumer credit cardholders on extended payments[.]" *Id.* at 548. After *eight years* of discovery, the plaintiffs "failed to produce any significant probative evidence to support the[ir] complaint[,]" leading the district court to grant summary judgment in favor of the defendants. *Id.* On appeal, the plaintiffs argued, among other things, that the district court erred by not considering evidence of the defendants' lobbying efforts to influence the passage of a bill in the legislature that would allow the banks to charge an increased interest rate. *Id.* at 461, 466-67. The district court did not exclude that evidence because the conduct was immunized from antitrust liability under *Noerr-Pennington*, but rather because "the prejudicial quality of this evidence outweighed its probative value." *Id.* at 466. The Seventh Circuit held that the district court "correctly excluded this evidence from consideration on

the motion for summary judgment" because such evidence would likely confuse the jury at trial *given the lack of any other evidence of an antitrust conspiracy*:

> We believe that confusion of issues is the probable result of admission of this evidence. *Given the lack of any substantial evidence of an antitrust conspiracy in the instant case*, the threat of prejudice from admission of this evidence is considerable. *The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence.* This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which Noerr-Pennington protects.

*Id.* at 467 (emphasis added). It was for this reason that the court determined a cautionary instruction would not be sufficient to avoid confusion in that particular case. *Id. See also id.* at 464 ("We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.").

Accordingly, even if certain petitioning conduct of Defendants is immunized under the First Amendment or *Noerr-Pennington*, evidence of that conduct may still be admitted if relevant to Plaintiffs' claims. Defendants have failed to demonstrate that this evidence is clearly inadmissible on all potential grounds. *Jordan*, 2010 WL 4281807, at *1. Defendants' Omnibus MIL No. 5 should be denied.

6. **Defendants' Omnibus MIL No. 6: The Court should bar Plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Defendants seek an order barring admission of evidence and argument concerning wrongful shipment to locations other than Cuyahoga and Summit Counties.[36] They argue that there is no evidence that such shipments had any material impact on Cuyahoga or Summit Counties and therefore there is no basis for their admission at trial. Defendants are wrong on the facts and the law.

---

[36] This issue is raised by multiple Defendant motions *in limine*, including Defendants' Omnibus Motion *in Limine* (MIL No. 6), Henry Schein's Motion *in Limine* (MIL No. HS-8), and Teva and Actavis's *Motion in Limine* (MIL Nos. TAD-4 and TAD-5).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

governed by the standards of Rule 702 and the corresponding disclosure requirements of the
Civil … Rules." Those standards are not satisfied here, either substantively or procedurally.

If plaintiffs had disclosed Dr. Gilson as an expert, full disclosure would have been
required of his analysis and all supporting data. Defendants would have had the opportunity to
conduct an expert deposition, produce a responsive expert, and challenge Gilson's conclusions
under *Daubert*.[14] Plaintiffs cannot "evade the expert witness disclosure requirements … by
simply calling an expert witness in the guise of a layperson." Rule 701 Notes of the Advisory
Committee. Dr. Gilson's testimony about the "gateway theory," like those of plaintiffs' other lay
witnesses who purport to have opinions on that subject, should be excluded.

5.    **The Court should preclude evidence concerning lobbying and other
      protected petitioning activity.**

Allowing plaintiffs to introduce evidence of defendants' lobbying efforts or other
petitioning activity would violate defendants' First Amendment rights. None of plaintiffs'
arguments on this issue have merit.

*First*, plaintiffs are wrong to suggest that the *Noerr-Pennington* doctrine is limited to the
antitrust context. Pl. Opp. at 22 n.23. As decisions of both the Sixth Circuit and numerous other
courts of appeals make clear, *Noerr-Pennington* broadly applies "to claims brought under both
state and federal laws, including common law claims." *Campbell v. PMI Food Equip. Grp., Inc.*,
509 F.3d 776, 790 (6th Cir. 2007); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th
Cir. 1992) (holding that the First Amendment bars suits seeking to impose liability on petitioning

---

[14] To survive *Daubert*, plaintiffs would have had the burden of defending, among other things,
Gilson's admitted lack of expertise on the kind of statistical analysis he purported to perform, as
well as his highly skewed sample, the limitations of the OARRS database, and his failure to
consider control or other variables. The OARRS data set that Gilson used, which was critical to
his conclusions, was not even produced, and no expert has had an opportunity to evaluate its
reliability or limitations.

in the civil rights context).[15]  Accordingly, the *Noerr-Pennington* doctrine precludes plaintiffs

from introducing evidence of such petitioning activity to establish liability.

*Second*, plaintiffs' invocation of *Noerr-Pennington*'s "sham" exception, and their

assertion that the *Noerr-Pennington* doctrine does not "immunize[] fraud," are unavailing.

While defendants dispute plaintiffs' allegation that their petitioning activity was fraudulent, that

is not relevant under the *Noerr-Pennington* doctrine, which applies irrespective of a party's

motive or intent in petitioning the government.  *See City of Columbia v. Omni Outdoor Advert.,*

*Inc.*, 499 U.S. 365, 380 (1991) (holding that even if defendants lobbied for improper motives or

used "improper means" in seeking "favorable government action," the First Amendment protects

that petitioning); *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012) (The "intent … of

private actors seeking government action is irrelevant to the application of *Noerr-Pennington*.").

Rather, the "sham" exception applies only where a defendants' petitioning activity was not

actually intended to achieve favorable government action, but was instead a pretext for achieving

some other improper end – for example, blocking a competitor's access to the courts.  *See, e.g.*,

*Cal. Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972) (*Noerr-Pennington* "sham"

exception applied where judicial and administrative proceedings were brought to "harass and

deter" the plaintiffs so as to deny them "'free and unlimited access' to those tribunals," rather

---

[15] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("[T]he *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr–Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.")

than to influence government action in favor of defendants).[16]  The First Amendment protects evidence of the petitioning activity that plaintiffs seek to introduce here.

*Third*, plaintiffs' Opposition makes clear that they intend to use evidence of defendants' protected lobbying and other petitioning activities to establish liability – a result the First Amendment forbids.  Plaintiffs suggest that evidence of defendants' petitioning activity may be "relevant and admissible to show the purpose and character of defendants' wrongful activities." Pl. Opp. at 21-22 (citing *Pennington*).  As an initial matter, this argument makes no sense; the "purpose and character" of defendants' marketing or suspicious order monitoring programs can be assessed without reference to any lobbying conduct.

Plaintiffs' suggestion that evidence of lobbying can be used to show "knowledge and intent to participate in a RICO enterprise," Pl. Opp. at 23-24, only proves that they want to use protected activity to prove an essential element of their claim – a result the Constitution forbids. *See Cal. Motor Transport Co.*, 404 U.S. at 510–11 ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a -vis their competitors.").[17]  In *Pennington*, the Supreme Court noted that evidence

---

[16]  As defendants pointed out in their initial Motion, Dkt. 2661 at 14 n.13, some courts have recognized a narrow fraud exception to the *Noerr-Pennington* doctrine where a defendant makes knowing and willful misrepresentations to an agency, but *only* in the context of an *adjudicatory* proceeding.  *See Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

[17]  To the extent plaintiffs suggest that evidence of lobbying can be used to show the "purpose" or "character" of that lobbying, evidence of protected petitioning activity may be introduced only to show the "purpose" or "character" of conduct *that is not itself protected by the First Amendment*. *See, e.g.*, *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984) (rejecting plaintiff's argument that it could introduce petitioning-related evidence to show

of petitioning activity might be admissible *if otherwise* "probative and not unduly prejudicial" on a disputed issue *other* than liability purportedly arising from the protected activity. But *Pennington* is clear that First Amendment petitioning activity may not be used, as plaintiffs seek to do here, as a basis for imposing liability. *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 671 n.3 (1965) (petitioning activity is "barred from forming the basis for a suit").[18]

    *In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 (N.D. Ohio June 4, 2010), which plaintiffs cite, illustrates the point. There, the defendants' lobbying materials were admitted, not to show that lobbying was evidence of any wrongdoing, but instead because the materials contained admissions showing the defendants knew of adverse medical effects of their products. *Id.* at *93. Indeed, the court admonished the plaintiffs that they "may not suggest to the jury that defendants were engaged in any improper activity by lobbying." *Id.*; *see also Pennington*, 381 U.S. at 671 (reversing trial court instruction that lobbying activity could be considered for "whatever bearing it may have on the overall picture"). The other cases cited by plaintiffs are no different.[19] In short, plaintiffs' attempt to rely on protected petitioning activity

---

the "'purpose' or the 'character' of [defendant's] action" because the underlying conduct itself was shielded).

[18] The two district court decisions cited by plaintiffs – *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) and *Nat.-Immunogenics Corp. v. Newport Tr. Group*, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) – do not call into question either the Supreme Court's clear directive that protected activity cannot form the basis for liability or the multiple appellate decisions affirming dismissal of RICO claims based on the *Noerr-Pennington* doctrine. *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d at 942 (affirming dismissal of RICO claim that relied on evidence protected by *Noerr-Pennington*); *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135 (same); *see also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund*, 196 F.3d at 826 (protected lobbying activity "cannot be a source of [RICO] liability directly under the *Noerr–Pennington* doctrine").

[19] *See, e.g.*, *Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136–37 (10th Cir. 2002) (evidence held admissible because it was not offered for the "improper purpose of showing that [defendant] violated antitrust laws"); *Alexander v. Nat'l Farmers Org.*, 687 F.2d

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct.  Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67.  The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties.  Shipments made elsewhere, even if wrongful, are otherwise irrelevant.  Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17.  Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24.  Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence.  Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal."  *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

THIS DOCUMENT RELATES TO:
*Track One-B Trial*

Case No. 1:17-MD-2804

**RITE AID'S MOTION *IN LIMINE*
TO EXCLUDE ORDERS FROM NON-DEFENDANT DISTRIBUTORS**

Defendant Rite Aid of Maryland, Inc. respectfully files this motion *in limine* asking this Court to exclude evidence of opioid orders by Rite Aid pharmacies from non-defendant distributors.[1]  Rite Aid of Maryland does not object to general evidence regarding the total volume of opioids distributed in the Plaintiff Counties and the market share of each distributor (party and non-party), but evidence regarding specific orders placed by Rite Aid pharmacies for opioids from non-defendant distributors should be excluded.  Evidence of these orders would have no relevance to the claims against Rite Aid of Maryland, would prejudice Rite Aid of Maryland, and would confuse the issues before the jury and unduly delay the trial.

---

[1] Giant Eagle, Inc. and its distribution warehouse divisions HBC Service Company ("HBC") and Giant Eagle Rx Distribution Center ("GERX"), both of which exclusively supplied Giant Eagle pharmacies, join in this motion with respect to orders placed directly by Giant Eagle pharmacies to McKesson.  McKesson was Giant Eagle's exclusive supplier of all opioid products at issue to Giant Eagle pharmacies prior to November of 2009 (when HBC opened), the substantially exclusive supplier of opioid products at issue from November 2009 to October 2014 (during which time period HBC only distributed generic HCP products to Giant Eagle pharmacies while they were on Schedule 3), again the exclusive supplier of all opioid products at issue from October 2014 to March of 2016, and from March 2016 (when GERX opened) to May 2018 a large supplier of opioid products at issue.  None of the orders submitted by Giant Eagle pharmacies to McKesson were distributed by HBC or GERX and therefore are not at issue and should be excluded from evidence.

As this Court is aware, liability in this case will focus solely on the conduct of Defendants as distributors of opioid medications. Plaintiffs allege that Defendants caused diversion of opioids by failing to adequately monitor for "suspicious orders" placed by their affiliated pharmacies (i.e., orders that created a risk of diversion). Liability will concern whether the Defendant complied with its obligations under the CSA to adequately monitor and report "suspicious" orders placed to it.

"Rite Aid of Maryland, dba the Mid-Atlantic Customer Support Center" is the only Rite Aid entity that is a defendant in the Track 1 cases. Dkt. 3020; Dkt. 3021. The "Mid-Atlantic Customer Support Center" is a distribution center owned by Rite Aid of Maryland[2] and holds a registration with the DEA as a *distributor*. Rite Aid of Maryland's distribution of opioids into the Plaintiff counties is the conduct at issue at trial. The evidence is undisputed that Rite Aid of Maryland never distributed *any* Schedule II controlled substances. Rite Aid of Maryland distributed only to pharmacies operated by Rite Aid of Ohio, Inc., but these pharmacies also ordered opioids from McKesson, including Schedule II opioids—such as oxycodone—that Rite Aid of Maryland never distributed to anyone.

Orders placed by Rite Aid of Ohio pharmacies with McKesson could have no relevance to Plaintiffs' distribution claims against Rite Aid of Maryland. Evidence that a pharmacy ordered drugs from McKesson—particularly orders of drugs that were never distributed by Rite Aid of Maryland—would not demonstrate that Rite Aid of Maryland failed to monitor suspicious orders. Because these orders are irrelevant, evidence related to them should be excluded. Fed. R. Evid.

---

[2] Rite Aid of Maryland also owns pharmacies in Maryland that are registered with the DEA as pharmacies, but none of those pharmacies ever dispensed opioids in Ohio or anywhere outside of Maryland.

401, 402; *see also Surface v. Conklin*, No. 1:15-CV-40, 2018 WL 6257984, at *6 (S.D. Ohio Nov. 30, 2018) (excluding evidence that "relate[s] to claims against parties that have been dismissed" because it "is irrelevant"). Even if evidence of these orders would have been relevant to claims against McKesson, now that those claims have been settled, it is no longer relevant and should be excluded. *Davis v. Siemens Med. Sols. USA, Inc.*, 279 Fed. Appx. 378, 380 (6th Cir. 2008) (affirming the exclusion of evidence that is relevant only to dismissed claims).

Even if evidence of these orders had some marginal probative value, it would be substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time and should be excluded under Rule 403. Permitting Plaintiffs to introduce evidence of these orders would risk misleading the jury into believing that Rite Aid of Maryland can be held liable for alleged misconduct of McKesson and would prejudice Rite Aid of Maryland if the jury held it liable based on orders distributed by McKesson.

Plaintiffs' response to Rite Aid of Maryland's motion for summary judgment illustrates the likelihood of confusion. In that response, Plaintiffs stated, "Rite Aid did not identify or report, as suspicious, orders from stores dispensing opioids to customers of a notorious, convicted Ohio pill-mill doctor." Dkt. 2184 at 4. As support for this proposition, Plaintiffs cite, *inter alia*, documents related to orders for oxycodone distributed by McKesson. Rite Aid of Maryland— which never distributed oxycodone—had nothing to do with those orders and could not possibly have reported orders that it did not receive or ship as "suspicious." Plaintiffs cannot hold Rite Aid of Maryland liable for McKesson's distribution, and introducing evidence regarding McKesson's distribution of oxycodone to Rite Aid of Ohio pharmacies would confuse the jury about the source of these opioids and lead to unnecessary mini-trials regarding the drugs dispensed by McKesson and whether the orders distributed by McKesson were suspicious. Evidence of orders from

McKesson—particularly orders of oxycodone (and other Schedule II substances) never distributed by Rite Aid of Maryland—would confuse the issues and waste time with issues not relevant to claims against Rite Aid of Maryland.

## CONCLUSION

To be clear, Rite Aid of Maryland does not object to evidence regarding the total volume of various opioid medications distributed to the Plaintiff counties and each distributor's market share, but this Court should exclude evidence of specific orders placed by non-defendant Rite Aid of Ohio pharmacies with non-defendant McKesson (or any argument that the orders placed with McKesson were suspicious).

Dated: August 14, 2020

Respectfully submitted,

*/s/ Kelly A. Moore* (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland*

4

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was served electronically to all counsel of record on August 14, 2020.

*/s/ Kelly A. Moore*
Kelly A. Moore

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One-B Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO PHARMACY DEFENDANTS' MOTIONS *IN LIMINE***
**(DOCS. #3411, #3413-3418, #3420-3423, #3425-3426) AND MEMORANDUM IN SUPPORT**

September 14, 2020

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................... III

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ............................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

    A.   PLAINTIFFS' RESPONSE TO PHARMACY DEFENDANTS' JOINT MOTIONS *IN LIMINE*. ..3

        1.   Pharmacy Defendants' MIL No. 1: To preclude evidence, argument or comments regarding: 1) the military service, employment, religious affiliation or personal experiences of counsel and staff, and 2) the waiving or donation of attorney's or expert fees, or any portion of any recovery, to charity or for the benefit of the community.  (Doc. #3413) ........3

            i.    *Military Service, Employment, Religious Affiliation or Personal Experiences of Counsel and Staff.* ...................................................................4

            ii.   *Waiving or Donation of Attorney's or Expert Fees, or Any Portion of Any Recovery, to Charity or for the Benefit of the Community* ...........................6

        2.   Pharmacy Defendants' MIL No. 2: To preclude evidence, argument or comments regarding the absence, presence or identity of Defendant's corporate representatives at trial.  (Doc. #3414) ................................................8

        3.   Pharmacy Defendants' MIL No. 3: To preclude testimony or argument negatively characterizing Defendants as large corporations.  (Doc. #3415) ....................................................................................................9

        4.   Pharmacy Defendants' MIL No. 4: To preclude evidence, argument, and testimony comparing Defendants' conduct to wars, national tragedies, terrorist attacks, the tobacco industry, or any comparison of Defendants to such actors.  (Doc. #3416) ............................................................12

        5.   Pharmacy Defendants' MIL No. 5: To preclude evidence or argument that Defendants could have stopped distributing Schedule II controlled substances.  (Doc. #3417) ................................................................15

        6.   Pharmacy Defendants' MIL No. 6: To preclude evidence of civil or criminal investigations or other litigation.  (Doc. #3418) ...............................17

            i.    *Evidence of Investigations Involving Defendants* ...............................................18

i

     *ii.*  *Evidence of Other Litigation Involving Defendants* ..........................................22

     *iii.*  *Media Coverage of Investigations or Other Litigation* ......................................26

   7.  Pharmacy Defendants' MIL No. 7: To preclude evidence of settlements. (Doc. #3420) ...............................................................................................................28

     *i.*  *Dollar Amounts of Settlements*.......................................................................31

     *ii.*  *Settlements Reached After the Relevant Time Period in this Case*...................31

     *iii.*  *Settlements Relating to Pharmacies Outside of the Counties*............................32

     *iv.*  *Settlements Relating to Corporate Entities Other than Defendants in this Case* ................................................................................................................36

     *v.*  *Settlements Unrelated to Opioid Medications*....................................................37

   8.  Pharmacy Defendants' MIL No. 8: To preclude evidence of extraterritorial conduct without establishing a specific nexus to Cuyahoga or Summit County and a Track 1-B Defendant. (Doc. #3421) ...37

   9.  Pharmacy Defendants' MIL No. 9: To limit testimony of Craig McCann. (Doc. #3425) ...............................................................................................................44

   10.  Pharmacy Defendants' MIL No. 10: To preclude evidence or argument relating to participation in trade associations. (Doc. #3426) ..........................47

 B.  PLAINTIFFS' RESPONSE TO RITE AID'S MOTION *IN LIMINE* TO EXCLUDE ORDERS FROM NON-DEFENDANT DISTRIBUTORS (DOC. #3423)..............................................52

 C.  PLAINTIFFS' RESPONSE TO THE PHARMACY DEFENDANTS' PRESERVED OBJECTIONS TO THE COURT'S PRIOR EVIDENTIARY RULINGS. (DOC. #3411, 3422) ......................54

CONCLUSION .....................................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barbo v. Kroger Co.*,
   No. 3:07-CV-14-S, 2007 WL 2350183 (W.D. Ky. Aug. 13, 2007) .......................................28

*Baxter Health Care Corp. v. Spectramed Inc.*,
   No. SA CV 89-131 AHSRWRX, 1992 WL 340763 (C.D. Cal. Aug. 27, 1992)....................20

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988)...........................................................................................................23

*Beswick v. Sun Pharm. Indus., Ltd.*,
   No. 10-CV-00357A(F), 2018 WL 704399 (W.D.N.Y. Jan. 30, 2018), *report and
   recommendation adopted,* No. 10-CV-00357A(F), 2018 WL 4858746 (W.D.N.Y.
   Mar. 30, 2018)............................................................................................................15, 16

*Bispo v. Robertshaw Controls Co.*,
   No. 3:05-CV-01223-BR, 2012 WL 13048223 (D. Or. Mar. 14, 2012) ............................44, 45

*Blancha v. Raymark Indus.*,
   972 F.2d 507 (3d Cir. 1992)...............................................................................................26

*Brazil v. Janssen Research & Dev. LLC*,
   196 F. Supp. 3d 1351 (N.D. Ga. 2016) ..............................................................................16

*City of Cleveland v. Peter Kiewit Sons' Co.*,
   624 F.2d 749 (6th Cir. 1980) .............................................................................................11

*Cohen v. Jaffe Raitt Heuer & Weiss, P.C.*,
   768 F. App'x 440 (6th Cir. 2019), *reh'g denied* (Apr. 23, 2019) ............................................24

*Cousins v. Bray*,
   No. 2:03-CV-1071, 2005 WL 8161508 (S.D. Ohio Feb. 28, 2005) ........................................7

*Davis v. Siemens Med. Sols. USA, Inc.*,
   279 F. App'x 378 (6th Cir. 2008)........................................................................................54

*Dortch v. Fowler*,
   588 F.3d 396 (6th Cir. 2009) ..............................................................................................2

*Drager v. PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014) .........................................................................................15, 16

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961).........................................................................................................52

*Eaton v. Newport Bd. of Educ.*,
 975 F.2d 292 (6th Cir. 1992) ...................................................................52

*Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*,
 No. 210CV1494JCMGWF, 2017 WL 4038858 (D. Nev. Sept. 13, 2017) ..............14

*Evans v. Troutman*,
 817 F.2d 104, 1987 WL 37221 (6th Cir. 1987) ....................................................30

*Fed. Ins. Co. v. Mertz*,
 No. 12-CV-1597-NSR-JCM, 2016 WL 1572995 (S.D.N.Y. Apr. 18, 2016) ..........20

*Francois v. Colonial Freight Sys., Inc.*,
 No. CIV.A.3:06CV434WHB-L, 2007 WL 4564866 (S.D. Miss. Dec. 21, 2007) ...............4, 5

*Fujisawa Pharm. Co. v. Kapoor*,
 No. 92 C 5508, 1999 WL 543166 (N.D. Ill. July 21, 1999) .......................................22, 32, 33

*Griffith v. Goodyear Dunlop Tires N. Am. Ltd.*,
 No. 11-CV-761S, 2018 WL 4658721 (W.D.N.Y. Sept. 28, 2018) .......................11, 14, 15, 28

*Guardian Life Ins. Co. of Am. v. Andraos*,
 No. CV0705732SJOFMOX, 2009 WL 10674144 (C.D. Cal. Sept. 10, 2009) .................11, 12

*Hedge v. Walt's Drive-A-Way Serv. Inc.*,
 No. 06-CV-0498, 2008 WL 11508968 (S.D. Ill. Jan. 16, 2008).....................................22

*In re Actos® (Pioglitazone) Prod. Liab. Litig.*,
 No. 6:11-MD-2299, 2014 WL 12653759 (W.D. La. Jan. 14, 2014) .....................................46

*In re Asbestos Sch. Litig.*,
 46 F.3d 1284 (3d Cir. 1994).........................................................................51

*In re Chocolate Confectionary Antitrust Litig.*,
 801 F.3d 383 (3d Cir. 2015).....................................................................35, 44

*In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*,
 756 F.3d 917 (6th Cir. 2014) ....................................................................15

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
 888 F.3d 753 (5th Cir. 2018) ..............................................................7, 18, 25

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
 No. MDL 3:11-MD-2244-K, 2017 WL 9807464 (N.D. Tex. Sept. 19, 2017) .....................29

*In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*,
 No. 2:13-CV-170, 2016 WL 659112 (S.D. Ohio Feb. 17, 2016) ..............................54

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)........................................................................25, 44

*In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*,
    No. 2:12-CV-4301, 2014 WL 505234 (S.D.W. Va. Feb. 5, 2014)..........................................35

*In re Natl. Prescription Opiate Litig.*,
    406 F. Supp. 3d 672, 675 (N.D. Ohio 2019)........................................................51

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010)........................................................44

*In re Richardson-Merrell, Inc. Bendectin Prod. Liab. Litig.*,
    624 F. Supp. 1212 (S.D. Ohio 1985), *aff'd sub nom. In re Bendectin Litig.*, 857 F.2d
    290 (6th Cir. 1988)........................................................4

*In re Vioxx Prod. Liab. Litig.*,
    No. MDL 1657, 2005 WL 3164254 (E.D. La. Nov. 21, 2005) ................................................6

*In re Welding Fume Products Liab. Litig.*,
    526 F. Supp. 2d 775 (N.D. Ohio 2007)........................................................51

*Indiana Ins. Co. v. Gen. Elec. Co.*,
    326 F. Supp. 2d 844 (N.D. Ohio 2004)...................................................... passim

*Infinity Prod., Inc. v. Premier Plastics, LLC*,
    No. CIV.00-36, 2001 WL 1631423 (D. Minn. Aug. 20, 2001) ................................................11

*John Doe Co. No. 1 v. Consumer Fin. Prot. Bureau*,
    195 F. Supp. 3d 9, 19 (D.D.C. 2016)........................................................20, 21

*Johnson v. Land O' Lakes, Inc.*,
    181 F.R.D. 388 (N.D. Iowa 1998) ........................................................26

*Jordan v. John Soliday Fin. Group, LLC*,
    1:09CV0707, 2010 WL 4281807 (N.D. Ohio Oct. 20, 2010) ......................................1, 2, 3, 5

*Keys v. Washington Metro. Area Transit Auth.*,
    272 F.R.D. 243 (D.D.C. 2011), *aff'd*, 523 F. App'x 727 (D.C. Cir. 2013) ............................20

*King v. Lowe's HIW, Inc.*,
    No. CV-03-146-BLG-RFC, 2006 WL 8435705 (D. Mont. Apr. 20, 2006) ..........................12

*Knight v. Boehringer Ingelheim Pharm., Inc.*,
    323 F. Supp. 3d 837 (S.D.W. Va. 2018)........................................................46

*Kuhne v. Reynolds*,
    No. 3:01CV1090 (WWE), 2019 WL 959678 (D. Conn. Feb. 27, 2019)................................7

*Lindsay v. Yates*,
   578 F.3d 407 (6th Cir. 2009) ............................................................29

*Louzon v. Ford Motor Co.*,
   718 F.3d 556 (6th Cir. 2013) ........................................................3, 46

*Lucijanic v. Ball*,
   No. 2:04-CV-751, 2006 WL 8442257 (S.D. Ohio Aug. 30, 2006) .................................43, 44

*Lupescu v. Napolitano*,
   No. 07 C 4821, 2011 WL 1342996 (N.D. Ill. Apr. 6, 2011).....................................4

*Manko v. United States*,
   87 F.3d 50 (2d Cir. 1996)...............................................................29

*Mascarenas v. Cooper Tire & Rubber Co.*,
   No. CV208-009, 2010 WL 11534359 (S.D. Ga. Jan. 11, 2010).............................9, 43

*McLeod v. Parsons Corp.*,
   73 F. App'x 846 (6th Cir. 2003)........................................................25

*Michael v. Caterpillar Fin. Servs. Corp.*,
   496 F.3d 584 (6th Cir. 2007) ...........................................................23

*Morningstar v. Circleville Fire & EMS Dept.*,
   2:15-CV-3077, 2018 WL 3721077 (S.D. Ohio Aug. 6, 2018) .............................1, 3

*Mut. Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013)............................................................15, 16, 17

*N. A. A. C. P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)...............................................................51, 52

*Niles v. Owensboro Med. Health Sys., Inc.*,
   No. 4:09-CV-00061-JHM, 2011 WL 3205369 (W.D. Ky. July 27, 2011)...........................4, 5

*Nuutinen v. CBS Corp.*,
   No. 97-C-678, 2015 WL 3645899 (E.D. Wis. June 9, 2015) .............................9, 27

*Nwegbo v. Borough*,
   No. 12-CV-05063, 2013 WL 3463504 (E.D. Pa. July 10, 2013).........................26

*Opdyke Inv. Co. v. City of Detroit*,
   883 F.2d 1265 (6th Cir. 1989) ..........................................................52

*Palmer v. Bd. of Regents of Univ. Sys. of Ga.*,
   208 F.3d 969 (11th Cir. 2000) ..........................................................26

*Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*,
    No. 2:08-CV-12247, 2010 WL 848689 (E.D. Mich. Mar. 8, 2010) ....................................20

*Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*,
    No. 2:08-CV-12247, 2010 WL 987772 (E.D. Mich. Mar. 12, 2010) ..............................23, 28

*Pearson v. Illinois Cent. R.R.*,
    No. 06-CV-0822-DRH, 2008 WL 905915 (S.D. Ill. Mar. 28, 2008) ....................................12

*Reeder v. Cty. of Wayne*,
    No. 15-CV-10177, 2016 WL 3548217 (E.D. Mich. June 30, 2016) ....................................25

*Regalado v. City of Chicago*,
    No. 96 C 3634, 1998 WL 919712 (N.D. Ill. Dec. 30, 1998) ....................................14

*Riley v. Ford Motor Co.*,
    No. 2:09-CV-148, 2011 WL 3273592 (S.D. Miss. July 29, 2011)......................................8, 9

*Robinson v. Runyon*,
    149 F.3d 507 (6th Cir. 1998) ....................................2, 5

*Ross v. Am. Red Cross*,
    No. 2:09-CV-00905-GLF, 2012 WL 2004810 (S.D. Ohio June 5, 2012), *aff'd,* 567 F.
    App'x 296 (6th Cir. 2014) ....................................25, 29

*Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins. Co.*,
    243 F.2d 949 (2d Cir. 1957)....................................19

*Salinero v. Johnson & Johnson*,
    No. 1:18-CV-23643-UU, 2019 WL 7753445 (S.D. Fla. Sept. 25, 2019) ..............................35

*Schram v. Schwan's Sales Enterprises, Inc.*,
    No. C-1-02-241, 2006 WL 8442815 (S.D. Ohio Sept. 1, 2006)............................................24

*Securities and Exch. Commn. v. Jacobs*,
    1:13 CV 1289, 2014 WL 12597832 (N.D. Ohio Feb. 25, 2014) .........................................3

*Smith v. Pfizer Inc.*,
    714 F. Supp. 2d 845 (M.D. Tenn. 2010)....................................24, 25, 46

*Smith Wholesale Co., Inc. v. R. J. Reynolds Tobacco Co.*,
    No. 2:03-CV-30, 2005 WL 8162569 (E.D. Tenn. Feb. 23, 2005)....................................10, 11

*Spencer v. McDonald*,
    705 F. App'x 386 (6th Cir. 2017)....................................19

*Sperberg v. Goodyear Tire & Rubber Co.*,
    519 F.2d 708 (6th Cir. 1975) ....................................1

*St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*,
    1:06CV2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009) ...........................................1, 2

*Stern v. Shouldice*,
    706 F.2d 742 (6th Cir. 1983) ...........................................................................13, 43

*Strayhorn v. Wyeth Pharm., Inc.*,
    737 F.3d 378 (6th Cir. 2013) ...........................................................................15, 16

*Surface v. Conklin*,
    No. 1:15-CV-40, 2018 WL 6257984 (S.D. Ohio Nov. 30, 2018) ...........................................54

*Turner v. City of Taylor*,
    412 F.3d 629 (6th Cir. 2005) ...............................................................................27

*TVT Records v. Island Def Jam Music Grp.*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003)...............................................................19, 20

*U.S. Football League v. Natl. Football League*,
    634 F. Supp. 1155 (S.D.N.Y. 1986).........................................................................51

*U.S. Football League v. Natl. Football League*,
    842 F.2d 1335 (2d Cir. 1988).............................................................................51

*U.S. v. Sanon*,
    738 Fed. Appx. 655 (11th Cir. 2018)...................................................................23

*United States ex rel. George v. Fresenius Med. Care Holdings, Inc.*,
    No. 2:12-CV-00877-AKK, 2016 WL 5361666 (N.D. Ala. Sept. 26, 2016)..........................46

*United States v. Akers*,
    No. 7:19-CR-7-REW-EBA, 2019 WL 4934948 (E.D. Ky. Oct. 7, 2019) ...................... passim

*United States v. Ayers*,
    924 F.2d 1468 (9th Cir. 1991) ...............................................................................32

*United States v. Bozeman*,
    No. 3:11-CR-129, 2012 WL 1071207 (E.D. Tenn. Mar. 29, 2012) .......................................43

*United States v. Chance*,
    306 F.3d 356 (6th Cir. 2002) ...............................................................................19

*United States v. Emuegbunam*,
    268 F.3d 377 (6th Cir. 2001) ...............................................................................4, 8

*United States v. Franks*,
    511 F.2d 25 (6th Cir. 1975) ...............................................................................32

*United States v. Garza*,
 608 F.2d 659 (5th Cir. 1979) ................................................................14

*United States v. Goffer*,
 721 F.3d 113 (2d Cir. 2013) ...............................................................32

*United States v. Hadaway*,
 681 F.2d 214 (4th Cir. 1982) ..............................................................32

*United States v. Hathaway*,
 798 F.2d 902 (6th Cir. 1986) ..............................................................23

*United States v. Heine*,
 No. 3:15-CR-238-SI, 2017 WL 4423408 (D. Or. Oct. 5, 2017) ..................15, 21

*United States v. Holbrook*,
 34 F.3d 1068, 1994 WL 419585 (6th Cir. 1994) ....................................23

*United States v. Johnson*,
 27 F.3d 1186 (6th Cir. 1994) ..............................................................43

*United States v. Johnson*,
 71 F.3d 539 (6th Cir. 1995) ................................................................23

*United States v. Mancuso*,
 444 F.2d 691 (5th Cir. 1971) ..............................................................32

*United States v. Merriweather*,
 78 F.3d 1070 (6th Cir. 1996) ..........................................................42, 43

*United States v. Poulsen*,
 655 F.3d 492 (6th Cir. 2011) ..............................................................43

*United States v. Segal*,
 649 F.2d 599 (8th Cir. 1981) ..............................................................14

*United States v. Semak*,
 536 F.2d 1142 (6th Cir. 1976) ............................................................43

*United States v. Shannon*,
 766 F.3d 346 ....................................................................................44

*United States v. Solivan*,
 937 F.2d 1146 (6th Cir. 1991) ............................................................13

*United States v. Thomas*,
 593 F.3d 752 (8th Cir. 2010) ..............................................................32

*United States v. Ward*,
190 F.3d 483 (6th Cir. 1999) ...............................................................43

*Utts v. Bristol-Myers Squibb Co.*,
226 F. Supp. 3d 166, 178 (S.D.N.Y. 2016)...........................................15

*Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*,
641 F.2d 457 (7th Cir. 1981) ...............................................................51

*Whitfield v. Harris*,
474 F. Supp. 2d 822 (N.D. Miss. 2007).................................................5

*Williams v. City of Lansing*,
No. 1:10-CV-1028, 2011 WL 5553782 (W.D. Mich. Nov. 15, 2011) ............................27, 28

*Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*,
No. 2:00-CV-1439, 2003 WL 21750835 (S.D. Ohio July 11, 2003)......................................44

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
808 F.3d 281 (6th Cir. 2015) .........................................................15, 16

STATUTES

21 U.S.C. § 822(b) ............................................................................17

OTHER AUTHORITIES

1 CV Ohio Jury Instructions 305.03 ...........................................................4

3 Fishman & McKenna, Jones on Evidence § 17:34 (7th ed.) ....................................20

"At height of crisis, Walgreens handled nearly one in five of the most addictive opioids,"
*The Washington Post*, Nov. 9, 2019, *available at*
https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-
handled-nearly-one-five-most-addictive-opioids/...................................................37

FED. R. EVID. 401 ............................................................................1, 2

FED. R. EVID. 402 ...............................................................................1

FED. R. EVID. 403 ......................................................................... passim

FED. R. EVID. 404 .................................................................18, 42, 43

FED. R. EVID. 408 .....................................................................28, 29

FED. R. EVID. 608 .........................................................................6, 7

FED. R. EVID. 801 .....................................................................22, 23

FED. R. EVID. 803 ........................................................................................................23

FED. R. EVID. 804 ........................................................................................................23

FED. R. EVID. 807 ........................................................................................................23

*Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.,*
  2016 WL 1321983 (D.C. Cir. April 4, 2016) ........................................................24

RESTATEMENT (SECOND) OF TORTS § 825      51

## INTRODUCTION

Plaintiffs submit this omnibus response to the Pharmacy Defendants' motions *in limine* nos. 1-10 (Doc. #3413-3418, #3420-3421, #3425-2426) and Rite Aid's motion *in limine* (Doc. #3423). This omnibus response is designed to reduce the documents on this Court's docket and promote brevity.

As set forth below, Plaintiffs agree to several of the Pharmacy Defendants' MILs in part. The remaining MILs proposed by the Pharmacy Defendants should be denied. Their legal and factual arguments in support of exclusion are without merit. Many of the cases they cite do not even address motions *in limine* or evidentiary issues, and those that do are easily distinguishable. The Pharmacy Defendants do not come close to satisfying their burden to demonstrate that the evidence sought to be excluded is clearly inadmissible on all grounds. And most of their MILs are overly broad and vague. Accordingly, these MILs should be denied and any evidentiary ruling should be deferred until trial so that questions of relevancy and potential prejudice may be resolved in proper context.

## LEGAL STANDARD

The Sixth Circuit states: "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).[1] Thus, the Court "has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).[2] Relevant evidence is generally admissible. FED. R. EVID. 402. "Evidence is relevant if: (a) it has **any** tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401

---

[1]  *See also Morningstar v. Circleville Fire & EMS Dept.*, 2:15-CV-3077, 2018 WL 3721077, at *1 (S.D. Ohio Aug. 6, 2018) (same).

[2]  *See also Jordan v. John Soliday Fin. Group, LLC*, 1:09CV0707, 2010 WL 4281807, at *1 (N.D. Ohio Oct. 20, 2010) (same); *St.-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*, 1:06CV2781, 2009 WL 10689369, at *1 (N.D. Ohio Oct. 23, 2009).

(emphasis added). This is an "'extremely liberal'" standard. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (citation omitted).

Courts may exclude relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. To be excluded on prejudice grounds, the evidence cannot just be prejudicial; it must be **unfairly** prejudicial. *Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998). "'Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.'" *Id.* at 515 (citation omitted). Even when the evidence is "shaky," "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking' such evidence, not exclusion." *Id.* (citation omitted).

The moving party bears the burden of demonstrating that the evidence sought to be excluded is clearly inadmissible on all potential grounds. *See Jordan*, 2010 WL 4281807, at *1 ("'A court will generally not grant a motion in limine unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible.'") (citation omitted). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins.*, 326 F. Supp. 2d at 846.[3] The Court has broad discretion in determining whether to grant or deny a motion *in limine*. *St.-Gobain*, 2009 WL 10689369, at *1 ("Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court.").

Moreover, motions *in limine* are meant to address evidentiary issues; they should not be

---

[3]   *See also Jordan*, 2010 WL 4281807, at *1 ("If this burden is not met, evidentiary rulings should be deferred and resolved in the context of the trial."); *St.-Gobain*, 2009 WL 10689369, at *1 ("If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in the proper context.").

used to resolve non-evidentiary factual or legal disputes.  As the Sixth Circuit explained:

> [A] mechanism already exists in civil actions to resolve non-evidentiary matters prior to trial—the summary-judgment motion.  Allowing a party to litigate matters that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of the procedural protections that attach at summary judgment.

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013).  Thus, when a motion *in limine* "is no more than a rephrased summary-judgment motion, the motion should not be considered.  *Id*. at 563.  *See also Morningstar*, 2018 WL 3721077, at *7 (same).

The fact that the Court denies a motion *in limine* "does not necessarily mean that all evidence contemplated by the motion will be admitted at trial."  *Indiana Ins.*, 326 F. Supp. 2d at 846.[4]  It simply means that "without the context of trial, the [C]ourt is unable to determine whether the evidence in question should be excluded."  *Indiana Ins.*, 326 F. Supp. 2d at 846.[5]  The movant may still raise objections to the introduction of the evidence during the trial.[6]

## ARGUMENT

A.    PLAINTIFFS' RESPONSE TO PHARMACY DEFENDANTS' JOINT MOTIONS *IN LIMINE*.

1.    **Pharmacy Defendants' MIL No. 1**: **To preclude evidence, argument or comments regarding: 1) the military service, employment, religious affiliation or personal experiences of counsel and staff, and 2) the waiving or donation of attorney's or expert fees, or any portion of any recovery, to charity or for the benefit of the community.  (Doc. #3413)**

In their MIL No. 1, the Pharmacy Defendants seek to preclude evidence, testimony or argument, or comment upon: (i) "their counsel's or staff's military experience, employment, religious affiliation or personal experiences;" and (ii) "the waiving or donation of attorney's fees

---

[4]    *See also Securities and Exch. Commn. v. Jacobs*, 1:13 CV 1289, 2014 WL 12597832, at *2 (N.D. Ohio Feb. 25, 2014); *Jordan*, 2010 WL 4281807, at *1.

[5]    *See also Securities*, 2014 WL 12597832, at *2 ("Where a court denies a motion *in limine*, it is, in essence, a finding that the court cannot determine whether it can exclude the evidence without the context of trial."); *Jordan*, 2010 WL 4281807, at *1.

[6]    *Indiana Ins.*, 326 F. Supp. 2d at 846 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine."); *Jordan*, 2010 WL 4281807, at *1 (same).

or expert fees, or any portion of any recovery, to charity or for the benefit of the community." Doc. #3413 at p. 1. They claim such evidence is irrelevant and prejudicial. *Id.*

      i.   *Military Service, Employment, Religious Affiliation or Personal Experiences of Counsel and Staff*

Although Plaintiffs previously stipulated to an MIL precluding reference to the military service, employment, religious affiliation or personal experiences of counsel and staff, upon reconsideration Plaintiffs believe this MIL is overly broad and may unduly restrain counsel's presentation at trial. As a preliminary matter, what an attorney says is not evidence, and the jury will be instructed accordingly. *See, e.g.,* 1 CV Ohio Jury Instructions 305.03; *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001) (noting that instructing the jury that the lawyers' arguments were not evidence "generally cure[s] any improprieties in a closing argument"). Counsel should be given some leeway to use personal stories or anecdotes to connect with the jury and make their arguments relatable. *See, e.g., In re Richardson-Merrell, Inc. Bendectin Prod. Liab. Litig.*, 624 F. Supp. 1212, 1226 (S.D. Ohio 1985) (court did not err by allowing defense counsel to relate his medical school experience during argument; "Final argument has traditionally been just that—argument—an opportunity for counsel to persuade, cajole or convince jurors. Plaintiffs' counsel were not limited in any anecdotes that they told. Plaintiffs' counsel were not limited as to any experience that they might bring to the Courtroom. A defense counsel, in seeking to persuade the jury, should be given the same entitlement."), *aff'd sub nom. In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988); *Niles v. Owensboro Med. Health Sys., Inc.*, No. 4:09-CV-00061-JHM, 2011 WL 3205369, at *5 (W.D. Ky. July 27, 2011) ("Generally, courts afford counsel great latitude in making opening and closing argument to the jury. Anecdotes and personal experiences, including those involving counsel's family members, are common place in both opening and closing arguments.").[7]

---

[7]   *See also Lupescu v. Napolitano*, No. 07 C 4821, 2011 WL 1342996, at *6 (N.D. Ill. Apr. 6, 2011) ("The court will not micromanage the parties' arguments via a motion *in limine* ruling[.]"); *Francois v. Colonial Freight Sys., Inc.*, No. CIV.A.3:06CV434WHB-L, 2007 WL 4564866, at *8 (S.D. Miss. Dec. 21, 2007) (denying without prejudice motion to prevent plaintiffs' counsel from including

The Pharmacy Defendants seem particularly concerned with the possibility that Mr. Lanier will mention his position as a Baptist pastor and preacher.  Doc. #3413 at p. 2.  But the case they cite in support of their argument simply prohibited counsel from referring to

> the religious beliefs or affiliations of any party or counsel **in such a manner as can reasonably be construed to indicate that the jury should consider the religious beliefs or affiliations of the party**, unless such matters are probative of an issue raised at trial.

*Whitfield v. Harris*, 474 F. Supp. 2d 822, 825 (N.D. Miss. 2007) (emphasis added).  Plaintiffs' counsel has no intention of making any argument of that sort.  Notably, the *Whitfield* court acknowledged that "references to religion are often proper during voir dire" and that "parables, stories or religious aphorisms may be appropriate when used in argument to promote an idea, rather than to unfairly bias or prejudice the jury or counsel."  *Id.* at 824.  *See also Niles*, 2011 WL 3205369, at *5 (denying motion to preclude defense counsel from informing the jury "that his father is a retired Lutheran minister and his mother teaches brain damaged children").

Finally, although the Pharmacy Defendants state, in conclusory fashion, that such arguments or evidence would be "prejudicial" (Doc. #3413 at pp. 1-2), they provide no explanation as to why they would be **unfairly** prejudicial.  *See Robinson*, 149 F.3d at 514 (Rule 403 "prohibits the admission of evidence if there is a danger of unfair prejudice, not mere prejudice").  Thus, they have not satisfied their high burden of demonstrating that the evidence is clearly inadmissible on "unfair prejudice" grounds.  *See Jordan*, 2010 WL 4281807, at *1.  For these reasons, a blanket pretrial ruling is inappropriate.  *Cf.* Doc. #3058 (Evidentiary Order) at pp. 66-67 (denying without prejudice defendants' MIL seeking "to preclude counsel from offering personal opinions or using visual aids or other conduct to belittle or improperly influence witnesses"; "The Court agrees with Plaintiffs that this motion is overly broad and vague and raises matters that can only be properly addressed in the context of trial.  Accordingly, the Court will not make a blanket ruling at this time.  The Court expects all counsel to adhere strictly to the Ohio Rules of Professional

---

religious references in the arguments made at trial; "'Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument.'") (citation omitted).

Conduct . . . and high standards of courtroom decorum.") (internal citation omitted).

> ii. *Waiving or Donation of Attorney's or Expert Fees, or Any Portion of Any Recovery, to Charity or for the Benefit of the Community*

Similarly, a blanket ruling precluding "any evidence or argument regarding the waiving or donation of attorney's or expert fees, or any portion of any recovery, to charity or community purposes" is not warranted. The Pharmacy Defendants claim such evidence must be excluded because: (i) it is "not relevant[;]" (ii) "any marginal probative value is substantially outweighed by the danger of confusing the issues and/or misleading the jury[;]" and (iii) "such evidence improperly appeals to the personal and community interests of the jury." Doc. #3413 at pp. 2-3.

So long as the Pharmacy Defendants do not attack Plaintiffs' attorneys' fees in front of the jury, Plaintiffs have no intention of referencing any waiver or donation of those fees. However, the remainder of the Pharmacy Defendants' request is overly broad. To the extent any of Plaintiffs' experts are waiving or donating a portion of their fee, Plaintiffs do not intend to offer such evidence during the expert's **direct** examination. However, such evidence may become relevant to the extent the Pharmacy Defendants attempt to portray the expert as a hired gun or biased based on the amount he or she was paid in this case. As this Court previously noted, "issues relating to the direct and indirect compensation received by experts . . . are relevant and fair game for the jury's consideration[.]" Doc. #3058 (Evidentiary Order) at p. 58. Accordingly, the Pharmacy Defendants' MIL No. 1 should be denied to the extent it seeks to preclude evidence of an expert's waiver or donation of his or her fee. *See In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (reserving ruling on motion *in limine* seeking to preclude "the fact that certain experts chose to donate their fees to charity"; "Contextual. Will have to be dealt with on an issue by issue basis at trial.").

The legal authority upon which the Pharmacy Defendants rely is either inapposite or supports Plaintiffs' position. Rule 608(a) "applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness." FED. R. EVID. 608, Advisory Comm. Notes, 2003 Amendments. Plaintiffs would be introducing such evidence, if at

all, to rebut any claims of expert bias. *Id.* (noting the "admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) [is left] to Rules 402 and 403").[8] Moreover, even if Rule 608(a) applied, Plaintiffs would satisfy its requirements as they would only introduce evidence of the waiver or donation of expert fees, if at all, **after** the expert has been attacked for bias. FED. R. EVID. 608(a) ("[E]vidence of truthful character is admissible only after the witness's character for truthfulness has been attacked."). Notably, in one of the cases cited by the Pharmacy Defendants, the court indicated that this was a proper use of such evidence. *See Kuhne v. Reynolds*, No. 3:01CV1090 (WWE), 2019 WL 959678, at *2 (D. Conn. Feb. 27, 2019) (granting motion to exclude evidence that plaintiff's expert donates a portion of his fees "as to direct examination but may allow the evidence if the door is opened on cross examination"). Finally, *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753 (5th Cir. 2018), is distinguishable. In that case, the issue was not whether testimony regarding an expert's donation of fees is admissible in and of itself, but rather whether certain payments made post-trial rendered the experts' testimony that they donated their fees inaccurate. *Id.* at 792.

The rest of MIL No. 1, seeking exclusion of "evidence or argument regarding the planned use of any portion of any award for charity or community purposes[,]" is overly broad. Doc. #3413 at p. 3. Arguably the entirety of any recovery will be used for "community purposes," as it is meant to abate the public nuisance the Pharmacy Defendants created in Plaintiffs' communities. As the only issue to be decided in the upcoming trial is nuisance liability, Plaintiffs do not intend to offer evidence of the costs of abatement. However, in demonstrating the existence of a public nuisance, Plaintiffs may offer evidence of the impact of the Pharmacy Defendants' conduct on

---

[8]    The Pharmacy Defendants also cite *Cousins v. Bray* in support of their Rule 608(a) argument, but that case is factually distinguishable. No. 2:03-CV-1071, 2005 WL 8161508, at *3-5 (S.D. Ohio Feb. 28, 2005) (in employment discrimination case, defense counsel repeatedly "questioned Plaintiffs' witnesses so as to deliberately elicit testimony prohibited by the Court and evidentiary rules[,]" including testimony regarding one plaintiff's son's criminal background and another plaintiff's alleged child support arrearage).

community-based programs related to opioids within the Counties.[9]  To the extent the Pharmacy Defendants' MIL No. 1 encompasses such evidence, it should be denied as overbroad.

2. **Pharmacy Defendants' MIL No. 2: To preclude evidence, argument or comments regarding the absence, presence or identity of Defendant's corporate representatives at trial.  (Doc. #3414)**

Plaintiffs understand that this Court previously granted the Track 1A defendants' motion *in limine* to preclude any comments regarding the absence of a corporate representative at trial. Doc. #3058 (Evidentiary Order) at pp. 67-68 ("The Court grants Defendants' request to preclude argument or comment about whether a corporate representative does not attend all or part of the trial.  The Court agrees this information is not relevant to the merits of Plaintiffs' claims."). Plaintiffs have preserved their objection to this ruling, for the reasons set forth in their prior motion *in limine* briefing, but have not sought reconsideration.  Doc. #3419 (CT1B Ps' MILs) at p. 9; Doc. #2815 (Ps' CT1A MIL Opp.) at pp. 51-52.

However, the Pharmacy Defendants now seek to expand the Court's ruling to preclude references to the presence or identity of their corporate representatives at trial.  Doc. #3414.  Their sole basis for this expansion is one case cited by the Court in its Evidentiary Order for the proposition that "the presence, absence, or identity of defendant's corporate representative is wholly irrelevant to plaintiffs' claims[.]"  Doc. #3058 at p. 68 n.141 (citing *Riley v. Ford Motor Co.,* No. 2:09-CV-148, 2011 WL 3273592, at *3 (S.D. Miss. July 29, 2011)).  In *Riley*, the defendants asked the court to exclude "any reference to their corporate representatives."  2011 WL 3273592, at *3.  The plaintiffs appear to have only contested the portion of this motion *in limine* that would have precluded them from commenting on the absence of the defendants' corporate

---

[9]  Such evidence cannot be construed as an "improper" appeal to the personal or community interests of the jury.  The case cited by the Pharmacy Defendants (*Emuegbunam*) is not only factually distinguishable, but in that case the Sixth Circuit ultimately held that the prosecutors' arguments did not rise to the level of inciting the passions or prejudices of the jury.  268 F.3d at 406-07 (prosecutor's closing argument in defendant's drug trial which extolled the virtues of the American criminal justice system and his rebuttal remarks referring to defendant, a Nigerian citizen, exchanging Nigerian currency in Canada for U.S. currency did not appeal to jury's nationalism).

representatives at trial. *Id.* The court granted the defendants' motion in its entirety, stating that "[t]he presence, absence, or identity of Defendants' corporate representatives is wholly irrelevant to Plaintiffs' claims." *Id.*

Here, unlike in *Riley*, Plaintiffs do contest the portion of this MIL that seeks to preclude references to the presence or identity of the Pharmacy Defendants' corporate representatives at trial because it is vague and overly broad. First, it is unclear whether the request refers to "corporate representatives" in the Rule 30(b)(6) sense, or if it refers to any individual representative of the corporation. Certainly if any party presents the deposition testimony of a Rule 30(b)(6) corporate representative at trial, counsel should be permitted to identify the witness as such so that the jury understands that he or she is testifying on behalf of the corporation itself. And if the MIL is to be interpreted in its broadest sense, any employee or executive of a Pharmacy Defendant that testifies at trial is arguably representing the company. Counsel should certainly be permitted to identify corporate witnesses and the corporations they work for. The Pharmacy Defendants' request is so broad, it arguably precludes their own counsel from introducing the corporate representatives sitting at counsels' table to the jury.

Thus, Pharmacy Defendants' request to prelude reference to the presence or identities of corporate representatives is overbroad and impractical. For these reasons, their MIL No. 2 should be denied. *See, e.g., Nuutinen v. CBS Corp.*, No. 97-C-678, 2015 WL 3645899, at *6 (E.D. Wis. June 9, 2015) (denying in part defendant's motion to preclude reference to the absence or identity of its corporate representative "because plaintiff intends to call a designated witness from Westinghouse"); *Mascarenas v. Cooper Tire & Rubber Co.*, No. CV208-009, 2010 WL 11534359, at *10 (S.D. Ga. Jan. 11, 2010) (denying defendant's motion to preclude reference to the absence and/or identity of its corporate representative).

### 3. Pharmacy Defendants' MIL No. 3: To preclude testimony or argument negatively characterizing Defendants as large corporations. (Doc. #3415)

In their MIL No. 3, the Pharmacy Defendants seek to preclude "argument or testimony referring to or characterizing [the Pharmacy] Defendants as large corporations." Doc. #3415 at

p. 2. Although they claim in a footnote to only be seeking to preclude "improper attempts by Plaintiffs to appeal to jurors' emotions by negatively characterizing Defendants as large corporations" (*id.* at p. 2 n.1), their request is worded much more broadly than that. Because their MIL is overly broad and vague, it should be denied.

Plaintiffs have no intention of improperly inflaming the jury's emotions or appealing to its biases by negatively characterizing the Pharmacy Defendants as large corporations.[10] However, evidence of their large size is certainly relevant to various issues in this case. For example, Walmart is the largest private employer in the United States, with over 1.5 million employees. Yet it assigned only three employees to review orders from its approximately 4,000 Walmart pharmacies nationwide. Doc. #1956-1 (Abernathy Tr.) at 75:23 – 76:10, 219:12-21. This evidence demonstrates the insufficiency of Walmart's SOMS program and indicates that its failure to implement effective controls against diversion was intentional. *Cf.* Doc. #3058 (Evidentiary Order) at p. 59 (agreeing that "information regarding the revenues and profits that Defendants earned from opioid sales is relevant to show . . . Defendants had the resources from their opioid business to design and maintain appropriate SOMS (and thus their failure to do so was by deliberate choice)). Additionally, pointing out that a Pharmacy Defendant has numerous pharmacies in the Counties to which it distributed opioids is arguably a reference to its size, but it is clearly relevant to determining whether that defendant's distribution conduct constituted a substantial interference with a public right in those Counties. Just as the Pharmacy Defendants are permitted to "introduce and describe themselves accurately to the jury, including *relevant* information about the people they employ and the work they do" (Doc. #3058 (Evidentiary Order) at p. 68), so to should Plaintiffs be permitted to introduce comparable evidence.[11] Any objections

---

[10] Moreover, the jury will not be making any determination as to remedies, so there is no risk of it inflating a damage award based on a defendant's large size.

[11] Indeed, it should come as no surprise to the jury that Walmart, Walgreens, CVS, and Rite Aid are "large" corporations. *See Smith Wholesale Co., Inc. v. R. J. Reynolds Tobacco Co.*, No. 2:03-CV-30, 2005 WL 8162569, at *11 (E.D. Tenn. Feb. 23, 2005) ("Hiding the fact that defendant is a 'large' corporation is tantamount to hiding an ostrich in a hen house.").

the Pharmacy Defendants have to this evidence should be deferred until trial when they can be resolved in the proper context. *See Smith Wholesale*, 2005 WL 8162569, at *11 ("[C]ommon sense and the nuances of how the evidence develops at trial will indicate the relevance of the defendant's 'size' depending upon the context.").[12]

The cases cited by the Pharmacy Defendants are factually distinguishable. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756–57 (6th Cir. 1980) (in case seeking recovery for property damage, plaintiff's counsel improperly referenced defendant's large size and sought to convey defendant as a "giant" in the field of marine engineering "**almost continuously**"; "Since the Kiewit name is not, among the general public, synonymous with a 'corporate giant,' as, for example, IBM or General Motors would be, it is unlikely that the jurors would have been aware of defendant's size had [counsel] not strived to so inform them **at every opportunity**. It was obviously an appeal to passion and prejudice.") (emphasis added);[13] *Guardian Life Ins. Co. of Am. v. Andraos*, No. CV0705732SJOFMOX, 2009 WL 10674144, at *1, 3 (C.D. Cal. Sept. 10, 2009) (in case involving breach-of-contract and other business tort claims, court precluded evidence of plaintiff's wealth and size where defendants provided minimal explanation and cited no authority supporting the relevance of such evidence in that case); *Pearson v. Illinois Cent. R.R.*, No. 06-CV-

---

[12]  *See also Griffith v. Goodyear Dunlop Tires N. Am. Ltd.*, No. 11-CV-761S, 2018 WL 4658721, at *9 (W.D.N.Y. Sept. 28, 2018) (denying motion to preclude plaintiffs from referencing defendant's size or financial status; "Because this Court cannot make such a determination without knowing the specific evidence, testimony, or argument at issue, it cannot enter a pretrial ruling. If Defendant has an objection to a specific piece of evidence based on relevance and prejudice, it should raise it at trial."); *Infinity Prod., Inc. v. Premier Plastics, LLC*, No. CIV.00-36 (PAM/JGL), 2001 WL 1631423, at *3 (D. Minn. Aug. 20, 2001) (denying motion to preclude references to company size; "Again, individual determinations of the admissibility of particular references to . . . the relative size of Prodesign and Infinity can be more appropriately made during the trial of this case.").

[13]  In determining a new trial was warranted based on those and other errors, the court noted: "This, as alluded to previously, was not a case of a single, isolated, or inadvertent comment. Rather, the improprieties permeated the entire trial, from opening statement through closing argument, in 'a continuing pattern of misconduct.' The remarks 'were persistently made over the recurring and almost constant objection of counsel for the appellant,' and were repeated even though Judge Green sustained the objections and admonished the jury. Indeed, plaintiff's counsel even persisted after the trial court explicitly reprimanded him for his misconduct. The cumulative effect of counsel's remarks undoubtedly served to leave the intended, indelible impression upon the minds of the jurors." *Id*. at 758 (internal citations omitted)

0822-DRH, 2008 WL 905915, at *1 (S.D. Ill. Mar. 28, 2008) (in personal injury action, court granted defendant's **unopposed** motion *in limine* to preclude "any reference to the Defendant being a large corporation or the difference in the status of Plaintiff as an individual and this Defendant as a corporation[,]" noting "[t]his evidence is irrelevant and immaterial"); *King v. Lowe's HIW, Inc.*, No. CV-03-146-BLG-RFC, 2006 WL 8435705, at *1 (D. Mont. Apr. 20, 2006) (precluding plaintiff from offering evidence or attempting to characterize defendant as a "large" company, noting such evidence "has no probative value" to his wrongful discharge and wage claims against his former employer).

The Pharmacy Defendants certainly have not demonstrated all evidence of their large size is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. Accordingly, the Pharmacy Defendants' MIL No. 3 should be denied.

4. **Pharmacy Defendants' MIL No. 4: To preclude evidence, argument, and testimony comparing Defendants' conduct to wars, national tragedies, terrorist attacks, the tobacco industry, or any comparison of Defendants to such actors. (Doc. #3416)**

In their MIL No. 4, the Pharmacy Defendants seek to preclude

> any testimony or argument during any phase of the trial . . . comparing Defendants' conduct or the alleged consequences of it to wars, national tragedies, terrorist attacks, the tobacco industry or other corporate scandals (e.g. Exxon Valdez, Enron, Tyco, British Petroleum, Ford Motor Company, Toyota, etc.), or any actors that participate in that other conduct (*i.e.* terrorists, instigators of national tragedies, tobacco companies or executives, etc.).

Doc. #3416 at p. 1. They argue such testimony or argument is irrelevant, highly prejudicial, and would have a tendency to inflame jurors' emotions. *Id.*

The Pharmacy Defendants' request is overly broad. Plaintiffs have no intention of improperly inflaming the jury with irrelevant comparisons. However, their MIL would also encompass relevant documents in which opioid distributors made similar comparisons themselves. For example, in a powerpoint presentation entitled "State of Prescription Drug Abuse," McKesson's Vice President of Regulatory Affairs and former DEA employee, Gary Boggs, included imagery of wars, terrorist attacks, and national tragedies. Doc. #2397-4 (PSJ2 Ex. 137)

at 7199 (planes crashing), 7208 (collapsed building), 7211 (explosion), 7212 (providing "Historical Comparison" to BP oil spill), 7214 (corpses in body bags). These images illustrate how serious a former DEA employee found the opioid epidemic to be.[14] This presentation is relevant to a number of issues in this case, including the existence of a nuisance.

The cases cited by the Pharmacy Defendants do not support granting such an overly broad motion *in limine* in this case. *See United States v. Solivan*, 937 F.2d 1146, 1151-55 (6th Cir. 1991) (in criminal case, prosecutor's appeal to community conscience in context of war on drugs and suggestion that drug problem facing jurors' community would continue if they did not convict defendant constituted reversible error);[15] *Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983) (in professor's suit against college based on professor's termination which allegedly resulted from professor's advice that student seek legal counsel about his suspension, trial court did not abuse its discretion in excluding evidence that marijuana was found in the car the student took from college during the episode which gave rise to the student's suspension on ground that it would inflame or confuse the jury); *United States v. Akers*, No. 7:19-CR-7-REW-EBA, 2019 WL 4934948, at *4–5 & n.9 (E.D. Ky. Oct. 7, 2019) (noting that "arguments or evidence intended specifically to inflame the jury or produce an emotional response would be improper and/or inadmissible[,]" but ultimately denying defendant's motion *in limine* to categorically preclude evidence about the effect of prescription drug abuse on individuals or the community; "[W]ithout specific testimony or other evidence before it, the Court cannot make particularized determinations as to ultimate admissibility."); *United States v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981)

---

[14]  Moreover, many of the Pharmacy Defendants worked closely with McKesson on SOM-related issues. *See, e.g.,* Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at pp. 68-71 (and exhibits cited therein).

[15]  In rendering its decision, the court focused extensively on the heightened standard of conduct required of government prosecutors in criminal cases: "Because the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses. . . . 'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id*. at 1150-51 (citation omitted).

(prosecutor's explanation in closing argument of decision to grant immunity to particular government witnesses did not constitute expression of personal assurances of their veracity or bolster their credibility by reference to matters outside the record, nor did he improperly express his personal opinion on the merits of the case); *United States v. Garza*, 608 F.2d 659, 662–63 (5th Cir. 1979) (prosecutor's closing argument expressing his view as to the credibility of two government witnesses and implying that the prosecution would not have commenced unless it had already been determined that defendant was guilty amounted to plain error; "It is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction. The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says."); *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, No. 210CV1494JCMGWF, 2017 WL 4038858, at *4 & n.5 (D. Nev. Sept. 13, 2017) (granting defendants' motion "to exclude inappropriate arguments of counsel[,]" noting that "the 'limitation' defendants request in essence asks the court to enforce the rules and law governing procedure and evidence at trial").

Because the Pharmacy Defendants have not demonstrated all such comparison evidence is "clearly inadmissible on all potential grounds[,]" their MIL No. 4 should be denied. *Indiana Ins.*, 326 F. Supp. 2d at 846. Any objections they may have to this evidence are more properly raised at trial. *See, e.g., Regalado v. City of Chicago*, No. 96 C 3634, 1998 WL 919712, at *2 (N.D. Ill. Dec. 30, 1998) (denying defendant's motion to preclude reference to current events, noting its unwillingness to muzzle plaintiff's counsel at this early stage; "Again defense counsel have sought to obtain a bar order in advance of trial on a subject that far better lends itself to consideration in the trial environment.").[16]

---

[16] *See also Griffith*, 2018 WL 4658721, at *9 ("In this Court's view, a pretrial order constraining the arguments of counsel is unnecessary. This Court expects all counsel to comport themselves within the applicable rules. If either side has an objection to a specific argument, it should raise it at trial."); *United States v. Heine*, No. 3:15-CR-238-SI, 2017 WL 4423408, at *13 (D. Or. Oct. 5, 2017) (denying motion to preclude government from using "inflammatory language" regarding defendant during jury addresses and witness examinations; "The Court declines to rule on this issue in the abstract. The

5. **Pharmacy Defendants' MIL No. 5**: To preclude evidence or argument that Defendants could have stopped distributing Schedule II controlled substances. (Doc. #3417)

In their MIL No. 5, the Pharmacy Defendants seek to preclude Plaintiffs from offering evidence or argument that their "mere act of distributing opioid medications provides a basis for imposing liability[,]" or that they "could have avoided liability by either choosing never to start distributing opioids or by voluntarily ceasing that distribution." Doc. #3417 at p. 1. They claim that "stop-selling" or "never-start-selling" theories of liability have been rejected by the Supreme Court, the Sixth Circuit, and courts across the country. *Id*. Their arguments are without merit and should be rejected. As a preliminary matter, Plaintiffs do not intend to argue that the Pharmacy Defendants are liable based merely on the fact that they distributed opioids. It is their distribution of opioids **without implementing effective controls against diversion** that forms the basis of their liability in this case.

More importantly, this MIL should be denied because the legal authority upon which the Pharmacy Defendants rely is not applicable here. In **all** the cases cited by the Pharmacy Defendants, the issue was whether the plaintiff's claims were preempted. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013); *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 293-300 (6th Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 924-29 (6th Cir. 2014); *Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 383 (6th Cir. 2013); *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 473 (4th Cir. 2014); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 178 (S.D.N.Y. 2016); *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016); *Beswick v. Sun Pharm. Indus., Ltd.*, No. 10-CV-00357A(F), 2018 WL 704399, at *3, 6-7 (W.D.N.Y. Jan. 30, 2018), *report and recommendation adopted,* No. 10-CV-00357A(F), 2018 WL 4858746 (W.D.N.Y. Mar. 30, 2018). Specifically, the Supreme Court and others held that claims that were otherwise preempted under the impossibility-preemption doctrine could not be saved by arguing that there is no conflict between state and federal law

---

parties may raise any specific objection at trial.").

because the defendant could have stopped selling, or never started selling, its defective product:

> The Court of Appeals reasoned that Mutual could escape the impossibility of complying with both its federal- and state-law duties by "choos[ing] not to make [sulindac] at all." We reject this "stop-selling" rationale **as incompatible with our pre-emption jurisprudence**. Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability. Indeed, if the option of ceasing to act **defeated a claim of impossibility**, **impossibility pre-emption** would be "all but meaningless."

*Bartlett*, 570 U.S. at 488 (internal citation omitted) (emphasis added).[17] The context in which this issue typically arises is when a plaintiff sues a manufacturer of generic drugs for failure to warn or defective design. Because generic drug manufacturers are not permitted to change the labels or the active ingredients of their drugs, these state law claims are typically preempted, as it is impossible for the generic manufacturer to comply with both federal and state law. *See, e.g.*, *Bartlett*, 570 U.S. at 477, 480, 483-87; *Yates*, 808 F.3d at 296 ("Important to the preemption findings in *Bartlett* . . . is the fact that generic drug manufacturers are prohibited from making any unilateral changes to the drug's composition or label[.]").[18] The cases cited by the Pharmacy Defendants simply hold that a plaintiff cannot **overcome preemption** by arguing that the

---

[17] *See also, e.g., Yates*, 808 F.3d at 296, 300 ("[T]he *Bartlett* Court did not reach the sweeping conclusion that all design defect claims are preempted by federal law, but rather applied the impossibility preemption analysis to the plaintiff's design defect claim regarding a generic drug, and clarified that preemption cannot be avoided if the only way a manufacturer can comply with both federal and state law is to exit the market."; "We reject this never-start selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale[.]"); *Strayhorn*, 737 F.3d at 390 (in *Bartlett*, "the Supreme Court rejected the First Circuit's 'stop-selling' rationale as a basis for finding that the generic manufacturer could comply with both state and federal laws"); *Drager*, 741 F.3d at 476 ("In other words, courts may not avoid preempting a state law by imposing liability on a generic manufacturer for choosing to continue selling its product.").

[18] This was precisely the context in which this Court granted Teva's motion *in limine* in the Track 1A case. Doc. #3058 (Evidentiary Order) at p. 50 ("Citing the Court's previous rulings on preemption, Teva seeks to preclude arguments that, with respect to the sale of generic medicines, the Actavis Generic Defendants should have given additional warnings or communications, or should have stopped selling generic opioids. The Court agrees that preemption applies to any claims that generic manufacturers should have stopped selling opioids or given additional warnings. Thus, the Court will exclude any evidence or argument that Defendants should have given additional warnings or stopped selling generic opioids.") (internal citations omitted).

defendant could have exited the market or never started selling the drug in the first place.

That is simply not an issue here. In this case, the Court has already held that Plaintiffs' claims against the Pharmacy Defendants are not preempted. Doc. #2565 (Preemption MSJ Order) at p. 22. It was not impossible for the Pharmacy Defendants to comply with both state and federal law, nor have they ever argued as much.[19] The Pharmacy Defendants point out that 21 U.S.C. § 822(b) authorized them to distribute opioids "so long as they substantially complied with the [CSA] in the process." Doc. #3417 at p. 3. No one disputes that. The point is that the Pharmacy Defendants **did not** comply with the CSA when distributing their opioid products. There is no preemption issue, and thus, the "logic of Bartlett and its progeny" does not apply. *Id*. Significantly, the Pharmacy Defendants fail to cite a single case where a "stop-selling" theory or "never-start-selling" theory was rejected outside the context of preemption. Accordingly, Plaintiffs should be permitted to argue that if a Pharmacy Defendant was not able to implement effective controls against diversion, it should not have been distributing opioids at all. For these reasons, the Pharmacy Defendants' MIL No. 5 should be denied.

### 6.     <u>Pharmacy Defendants' MIL No. 6</u>: To preclude evidence of civil or criminal investigations or other litigation.  (Doc. #3418)

In their MIL No. 6, the Pharmacy Defendants seek to preclude "evidence, testimony, or argument related to: (1) civil or criminal investigations involving a Defendant or its employees; (2) other litigation involving a Defendant or its employees; and (3) media coverage or other secondhand accounts of the aforementioned evidence." Doc. #3418 at p. 1. Notably, the Pharmacy Defendants do not identify any specific pieces of evidence they seek to preclude. Their MIL No. 6 seeking blanket preclusion of all investigation- or litigation-related evidence should be denied as overbroad, vague, and premature.

---

[19]   The Pharmacy Defendants never argued impossibility preemption in this case; they have only ever argued obstacle preemption. Doc. #1772-5 (Pharmacies' Preemption MSJ); Doc. #2565 (Preemption MSJ Order) at p. 22 ("Pharmacy and Distributor Defendants contend the imposition of state tort liability would stand as an obstacle to DEA's ability to regulate and enforce the [CSA].").

The Pharmacy Defendants argue that a "pre-trial, *in limine* ruling on this issue is critical[,]" citing a Fifth Circuit opinion in another case involving one of Plaintiffs' counsel. Doc. #3418 at pp. 1-2 (citing *DePuy Orthopaedics*, 888 F.3d 753). In *DePuy Orthpaedics*, the Fifth Circuit granted a new trial based in part on the trial court's admission of a deferred prosecution agreement ("DPA") relating to Foreign Corrupt Practices Act allegations involving certain non-party subsidiaries of the defendant. *Id.* at 784-86. The Fifth Circuit held that such evidence was inadmissible under Rule 404(b) because it involved the conduct of non-defendants and products not at issue in the litigation and the jury could have inferred liability based solely on certain admissions by the defendant in the DPA. *Id.* at 784-86. Its ruling was fact-specific as to the admissibility of that particular piece of evidence in the context of that particular trial. *Id.* The Fifth Circuit's ruling provides no basis for this Court to grant a sweeping motion *in limine* precluding all evidence of investigations or litigation involving the Pharmacy Defendants.

As explained below, certain investigation-related or litigation-related evidence may be highly probative to Plaintiffs' claims. The Pharmacy Defendants certainly have not demonstrated that all such evidence is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. The admissibility of any particular piece of such evidence should be determined at trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.* Accordingly, the Pharmacy Defendants' MIL No. 6 should be denied.

     *i.*   *Evidence of Investigations Involving Defendants*

In Track 1A, this Court denied in part and granted in part a motion *in limine* filed by the distributor defendants seeking to exclude evidence of criminal investigations and indictments, absent corresponding proof of a final judgment of conviction. Doc. #3058 at p. 19. The Court ruled:

> [A]bsent proof of a corresponding final judgment or conviction, the Court will exclude evidence of the *fact* of an indictment or criminal investigation. However, the Court will allow evidence of criminal *investigative reports*, unless the opponent demonstrates that the source of information or other circumstances indicate a lack of trustworthiness under Rule 803(8).

*Id.*; *see also id.* at pp. 15-17. Plaintiffs recently noted their partial objection to this ruling in their affirmative motions *in limine*, but did not seek reconsideration of the ruling. Doc. #3419 (CT1B Ps' MILs) at p. 9.

The Pharmacy Defendants now seek to expand the Court's ruling beyond criminal investigations and indictments to include civil investigations as well. Doc. #3418 at pp. 2 n.1, 4. Yet they provide no legal authority justifying a blanket preclusion of evidence of all civil investigations. Presumably their request includes evidence of DEA investigations, yet this Court has already ruled that "it intends to have 'a very wide strike zone for evidence about what the federal government, the DEA and the [FDA] did or did not do in connection with opioid regulation, as this information is an essential part of the story regarding the claims and defenses in this case." Doc. #3058 at pp. 11-12 ("Consistent with this 'very wide strike zone,' the Court will generally admit evidence relating to action or inaction taken by the DEA or other governmental entities, subject to objections of undue prejudice raised in the context of trial.").[20]

The majority of the cases cited by the Pharmacy Defendants involve evidence of **criminal** investigations and indictments. *See United States v. Chance*, 306 F.3d 356, 382, 385 (6th Cir. 2002) (criminal indictments and prosecutions of other employees of the sheriff's department); *Spencer v. McDonald*, 705 F. App'x 386, 387 (6th Cir. 2017) (unrelated sexual assault investigation); *Ruffalo's Truck. Serv. v. Nat'l Ben-Franklin Ins. Co.*, 243 F.2d 949, 953–54 (2d Cir. 1957) (criminal indictment and conviction); *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 346–47 (S.D.N.Y. 2003) (criminal investigation); *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 1572995, at *4 (S.D.N.Y. Apr. 18, 2016) (criminal investigation); *Baxter Health Care Corp. v. Spectramed Inc.*, No. SA CV 89-131 AHSRWRX, 1992 WL 340763,

---

[20]  *See also id.* at pp. 9-10 (denying Schein's MIL to preclude references to DEA fines, investigations or admonitions concerning HIS's opioid distributions to locations other than Summit County), pp. 20-21 (denying McKesson's MIL seeking to preclude evidence about investigation by U.S. House of Representatives Energy and Commerce Committee), p. 22 (denying McKesson's MIL to exclude evidence or argument about allegations contained in letters from the DEA or DOJ; "The Court agrees the letters are relevant to show McKesson's knowledge of the investigation and the statements contained therein.").

at *2–3 (C.D. Cal. Aug. 27, 1992) (criminal indictment); 3 Fishman & McKenna, Jones on Evidence § 17:34 (7th ed.) ("[A] prior arrest or indictment should not be admitted as proof that the defendant committed underlying act . . . . [b]ut such evidence may be admissible for other purposes."). However, not all government investigations implicate the same risks of unfair prejudice as a criminal investigation. *See John Doe Co. No. 1 v. Consumer Fin. Prot. Bureau*, 195 F. Supp. 3d 9, 19 (D.D.C. 2016) ("The disclosure of an ongoing criminal investigation, for example, is more likely to inflict severe reputational damage on the subject than the disclosure of a garden-variety regulatory investigation.").

The few cases they cite dealing with evidence of civil investigations are entirely distinguishable. In *Park W. Galleries, Inc. v. Glob. Fine Art Registry*, the court granted a motion to preclude "evidence regarding **ongoing** criminal or governmental investigations" in a defamation action. No. 2:08-CV-12247, 2010 WL 848689, at *1-2 (E.D. Mich. Mar. 8, 2010) (emphasis added). The court reasoned that where "there is no evidence that any conclusions or findings have been made in any such investigation[,]" admitting such evidence would "require the jury to predict the outcome of the pending investigations." *Id*. at *2. In *Keys v. Washington Metro. Area Transit Auth.*, the court dismissed plaintiff's case after she repeatedly violated the court's evidentiary orders on a number of issues during trial. 272 F.R.D. 243, 244–45 (D.D.C. 2011), *aff'd*, 523 F. App'x 727 (D.C. Cir. 2013). Among her many violations, the plaintiff introduced evidence of the transit authority's Office of Civil Rights (OCR) investigation, which the court had previously deemed irrelevant. *Id*. at 245. Indeed, "[m]ultiple court orders, issued over the course of several years, prohibited [the] plaintiff from introducing such evidence." *Id*. The court never held that all civil investigation evidence is inadmissible in all cases.

In *John Doe*, the issue was whether the plaintiffs' identities should remain under seal in their lawsuit against the Consumer Financial Protection Bureau (CFPB). 195 F. Supp. 3d at 12. The court had sealed this information based on the plaintiffs' argument that "revealing that they were subject to an ongoing CFPB investigation would cause them reputational and economic damage." *Id*. Upon the CFPB's motion for reconsideration, the court determined that this

20

information should remain sealed "while the investigation remains ongoing." *Id.* at 13 (noting that "the subjects of **ongoing** government investigations often have a legitimate interest in ensuring that the existence of **otherwise confidential** government investigations are not publicly disclosed **while they are ongoing**") (emphasis added). The CFPB investigation was otherwise confidential and the plaintiffs had submitted sufficient evidence that public disclosure "would likely cause them debilitating reputational and financial hardship." *Id.* at 19, 21, 23-24 ("This is not to say that this balance cannot—or will not—change over time. If the CFPB were to commence a public enforcement action, for example, the need for confidential treatment would likely recede.").

Finally, in *Heine*, two bank officers (Heine and Yates) were criminally charged with "conspiring to commit bank fraud and making false bank entries, reports, or transactions[.]" 2017 WL 4423408, at *1. Yates moved to preclude Heine from offering evidence of a prior FDIC investigation of the transactions at issue in which the FDIC ultimately issued sanctions against Yates, but not Heine. *Id.* at *7-8, 23. The court granted this motion in part, excluding "any evidence, reference, or argument relating to the FDIC's civil investigation to extent that it seeks to show that the FDIC decided to bring a civil enforcement action against Yates **but not Heine**." *Id.* at *23 (emphasis added). The court deferred its ruling on other evidence relating to the FDIC investigation until trial. *Id.* at *7 ("The Court will wait until trial to rule on objections to specific questions or exhibits."), *23.

Unlike in those cases, here, evidence of certain investigations conducted by the DEA or other government agencies may be highly probative to Plaintiffs' nuisance claims in this case. For example, they can demonstrate the Pharmacy Defendants' knowledge of their noncompliance with the CSA and the resulting diversion that was occurring, and provide context for why they took certain actions with respect to their SOMS programs.[21] This evidence is certainly relevant to the

---

[21] *See, e.g.,* Doc. #2205 (PSJ18 WAG MSJ Opp.) at pp. 6-7 (and exhibits cited therein) (discussing April 2012 DEA investigation of Walgreens and the actions taken by Walgreens as a result of that investigation); Doc. #2208 (PSJ11 CVS MSJ Opp.) at p. 8 (and exhibits cited therein) (discussing 2013 investigation of CVS distribution center); Doc. #2169-30 (Nicastro Tr.) at 65:3 – 78:20 (discussing actions taken by CVS in response to 2010 DEA audit); Doc. #1971-15 (Vernazza Tr.) at 292:2 – 298:24, 300:2 - 351:8 (same); Doc. #1971-8 (Swords Tr.) at 66:21 – 67:19, 91:23 – 92:7, 254:6 – 255:22;

question of whether they intentionally or unlawfully contributed to a public nuisance. For these reasons, the Pharmacy Defendants' MIL on this issue should be denied as overbroad and premature. *See, e.g., Hedge v. Walt's Drive-A-Way Serv. Inc.*, No. 06-CV-0498, 2008 WL 11508968, at *4 (S.D. Ill. Jan. 16, 2008) (denying motion to preclude unrelated disciplinary proceedings or investigations involving defendant "as over broad and lacking required specificity" and noting that "the admissibility of this evidence substantially depends upon the facts developed at trial and the laying of an appropriate foundation; thus a ruling at this juncture would be premature"); *Fujisawa Pharm. Co. v. Kapoor*, No. 92 C 5508, 1999 WL 543166, at *12 (N.D. Ill. July 21, 1999) (denying motion to bar evidence of FDA's investigations of plaintiff for regulatory violations where such evidence was relevant to "a central issue in this case").

### ii.    Evidence of Other Litigation Involving Defendants

The Pharmacy Defendants also seek to preclude Plaintiffs "from offering evidence of or making arguments about other litigation involving Defendants" because it is irrelevant, unduly prejudicial, and constitutes inadmissible hearsay. Doc. #3418 at pp. 4-6. This request is both overly broad and premature.

Plaintiffs do not dispute that allegations in other lawsuits are typically considered hearsay. But out-of-court statements only constitute hearsay if they are offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). They would not be considered hearsay if they were offered for another purpose, such as to provide context to the responses or statements of the recipient, or to prove: (i) the statement was made; (ii) the falsity of the matter asserted; (iii) notice to, or knowledge of, the declarant or recipient of the statement; (iv) motive, intent, bias, or state of mind; or (v) association among persons or entities.[22] Nor would they constitute hearsay

---

Doc. #1968-2 (Mills Tr.) at 124:9-23.

[22]    *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 173 n.18 (1988) (rejecting hearsay objection when statement "was offered simply to prove what Rainey had said about the accident six months after it happened, and to contribute to a fuller understanding of the material the defense had already placed in evidence"); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (rejecting hearsay objection when statements offered to demonstrate state of mind and motive); *United States v.*

if they were statements of a party-opponent pursuant to Rule 801(d)(2).  FED. R. EVID. 801(d)(2).
And even if offered for its truth, hearsay evidence may still be admissible if it falls within one of
the many hearsay exceptions.  FED. R. EVID. 803-804, 807.

"In order to determine if a statement constitutes inadmissible hearsay, facts must be
presented regarding the purpose for which the statement will be introduced and the identity of the
declarant."  *Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*, No. 2:08-CV-12247, 2010
WL 987772, at *1 (E.D. Mich. Mar. 12, 2010) ("*Park II*").   For these reasons, hearsay
determinations are best left for trial, once such statement has been identified and the purpose for
which it is offered has been explained.  *See id.* at *2 ("Here, Plaintiff raises the blanket assertion
that all first party narratives constitute inadmissible hearsay and that no exception to the hearsay
rule applies.  However, Plaintiff has not provided the Court with any of the statements it seeks to
redact, the purposes for which the statements will be introduced, or the identity of any of the
declarants.  Without this information, the Court is unable to evaluate the merits of Plaintiff's
arguments.");  *Akers*,  2019  WL  4934948,  at  *6  ("[W]ithout  context  or  specific
testimony/statements before it, the Court has insufficient information to conclusively resolve the
raised hearsay questions.").

The Pharmacy Defendants next argue that evidence of other lawsuits should be precluded
as irrelevant.  They claim that "[o]ther lawsuits involving Defendants necessarily involve different
geographic locations, different alleged misconduct, and were brought by different plaintiffs" and,
thus, "say nothing about whether any alleged misconduct occurred in Cuyahoga or Summit

---

*Johnson*, 71 F.3d 539, 543 (6th Cir. 1995) (statement not hearsay when offered as "evidence of
defendant's knowledge that he was prescribing medication without a legitimate medical purpose and
outside the course of professional practice"); *United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir.
1986) ("We therefore join those courts which have concluded that statements offered to prove the falsity
of the matter asserted are not hearsay."); *United States v. Holbrook*, 34 F.3d 1068, 1994 WL 419585,
at *5 (6th Cir. 1994) (evidence "'which is not offered to prove the truth of an out-of-court statement,
but is offered instead for the more limited purpose of providing relevant context or background, is not
considered hearsay.'"); *U.S. v. Sanon*, 738 Fed. Appx. 655, 659 (11th Cir. 2018) ("[T]he government
offered the Google Earth evidence not to prove that Sanon lived at the address marked on the
screenshot, but to show an association between Huang and Sanon.  That was a non-hearsay purpose.").

Counties." Doc. #3418 at p. 5. However, as explained in detail below (*infra* at § A.8), evidence of extraterritorial conduct may be relevant to numerous issues in this case. Similarly, evidence of other litigation involving the Pharmacy Defendants (whether in or outside of the Counties) may be relevant to demonstrating their intent, knowledge, motive, or purpose.[23] *Cf. Cohen v. Jaffe Raitt Heuer & Weiss, P.C.*, 768 F. App'x 440, 445–46 (6th Cir. 2019), *reh'g denied* (Apr. 23, 2019) (trial court did not abuse its discretion admitting evidence of separate lawsuit involving plaintiffs where it "had at least some probative value and only questionable prejudicial effect when viewed in light of the other financial evidence in the record suggesting mismanagement at [company]"); *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 855 (M.D. Tenn. 2010) (noting that other lawsuits may be relevant to show notice). Whether a particular piece of evidence is relevant, and whether its probative value is outweighed by the risk of undue prejudice, are context-specific determinations that should be made at trial. *See*, *e.g.*, *Schram v. Schwan's Sales Enterprises, Inc.*, No. C-1-02-241, 2006 WL 8442815, at *2 (S.D. Ohio Sept. 1, 2006) (denying defendant's motion to preclude evidence of other discrimination claims because "this matter is contextual" and defendant "has directed the Court to no specific evidence which it seeks to exclude"); *Smith*, 714 F. Supp. 2d at 855 (denying motion to preclude evidence of other claims or lawsuits because "the specifics of the proposed evidence is unclear—for example, the court does not know the number of lawsuits at issue, the specific subject matter of the suits, or when they were filed"); *Reeder v. Cty. of Wayne*, No. 15-CV-10177, 2016 WL 3548217, at *4 (E.D. Mich. June 30, 2016) (denying motion to preclude evidence of prior litigation involving plaintiff; "Here, there is not sufficient information provided

---

[23] For example, many of the Pharmacy Defendants (through their trade associations) filed an amicus brief in the *Masters Pharmaceuticals* litigation in which they acknowledged their duties to prevent diversion under the CSA and the "public health dangers associated with the diversion and abuse of controlled prescription drugs[.]" *See, e.g., Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.,* 2016 WL 1321983, at *3-4 (D.C. Cir. April 4, 2016); Doc. #1963-9 (Kaleta Tr.) at 398:1 – 399:3, 412:14 – 413:19; Doc. #1962-31 (1/23/19 Hiland Tr.) at 152:16 – 153:17. Moreover, evidence of other lawsuits may be relevant to the extent the Pharmacy Defendants were aware of them, discussing them internally or with others, and/or taking action based on such litigation. *See, e.g.,* Doc. #1956-20 (Belli Tr.) at 179:21 – 180:16, 187:20 – 188:3; Doc. #1962-22 (1/31/19 Hart Tr.) at 244:7 – 245:5; Doc. #2169-31 (Novack Tr.) at 393:3 – 394:4; Doc. #1956-16 (Beam Tr.) at 119:18 – 123:18; Doc. #1961-18 (Ducote Tr.) at 126:11-20, 129:7-19.

about the suits for the Court to make a decision as to their relevance to the present suit, or the prejudice they might engender in a jury.").

The cases cited by the Pharmacy Defendants do not support the granting of this sweeping motion *in limine* in the present case. *See McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003) (in employment discrimination case, trial court did not err in excluding evidence of other employment discrimination lawsuits filed against employer where it was "not apparent" that such evidence "was relevant, because there was no clear nexus between these lawsuits and this case"); *Ross v. Am. Red Cross*, No. 2:09-CV-00905-GLF, 2012 WL 2004810, at *5–6 (S.D. Ohio June 5, 2012) (in personal injury action, court granted motion to exclude evidence of the filing or content of other lawsuits against defendant where plaintiff failed to explain how such evidence was relevant to her negligence claim; "Unsubstantiated allegations from other individuals, in other cases and under different circumstances, are of minimal probative value in determining whether the Red Cross's alleged negligence proximately caused Plaintiff's injuries in this case."), *aff'd,* 567 F. App'x 296 (6th Cir. 2014); *DePuy Orthopaedics*, 888 F.3d at 787 n.71 (declining to address various evidentiary challenges by defendants, including the admission of evidence regarding other lawsuits involving the defective product, because the case would be remanded for a new trial on other grounds); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51–52 (2d Cir. 2007) (trial court properly dismissed plaintiffs' antitrust conspiracy claims because plaintiffs failed to provide a sufficient "factual basis for their assertions of a worldwide conspiracy affecting a global market for elevators and maintenance services"; "Allegations of anticompetitive wrongdoing in Europe— **absent any evidence of linkage between such foreign conduct and conduct here**—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'") (emphasis added); *Palmer v. Bd. of Regents of Univ. Sys. of Ga.*, 208 F.3d 969, 972-73 (11th Cir. 2000) (in religious discrimination action, trial court did not abuse its discretion in precluding plaintiff from offering evidence of other lawsuits filed against defendant for discriminating against Jewish people; plaintiff "sought to introduce such evidence in order to bolster the credibility of her witness, and to prove that the [defendant's] stated reasons for not hiring her were pretextual" but

the complaints "she sought to introduce involved different decision-makers, different departments, and different hiring processes"); *Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992) (in discussing Rule 403 generally, the court mentioned as an example that "[e]vidence relating to previous litigation involving the parties" is typically excluded under the Rule; the court also noted that "in determining the probative value under Rule 403, 'we must consider not only the extent to which it tends to demonstrate the proposition which it has been admitted to prove, but also the extent to which that proposition was directly at issue in the case'") (citation omitted); *Johnson v. Land O' Lakes, Inc.*, 181 F.R.D. 388, 390 (N.D. Iowa 1998) (granting plaintiffs' motion to preclude evidence of other "hedge-to-arrive" contract lawsuits where defendant had "no objection to this evidentiary limitation" and court had previously "observed that each HTA case is dependent upon the specific contracts and circumstances involved"); *Nwegbo v. Borough*, No. 12-CV-05063, 2013 WL 3463504, at *2-3 (E.D. Pa. July 10, 2013) (granting motion to preclude evidence of other lawsuits involving defendants, noting that "the relevance of the issues involved in these other actions to determining Plaintiff's claims of malicious prosecution, false arrest, false imprisonment and a First Amendment violation is questionable, at best" and that these other lawsuits were "all in their preliminary stages and have not been decided on their merits"; the court specifically analyzed the four lawsuits at issue and explained why each was not relevant to the case before it).

### iii.    *Media Coverage of Investigations or Other Litigation*

Finally, the Pharmacy Defendants argue that Plaintiffs should be precluded from offering evidence of media coverage or other secondhand accounts of other investigations or litigation involving the Pharmacy Defendants. Doc. #3418 at pp. 6-7. They claim such evidence is irrelevant and unduly prejudicial, and constitutes inadmissible hearsay. *Id*. As explained above, hearsay determinations are context-specific and should deferred until trial. *Supra* at § A.6.ii. Similarly, the probative value and risk of prejudice depends on the specific evidence at issue and the purpose for which it is offered. *Id*.; *see also Nuutinen*, 2015 WL 3645899, at *6 (motion to preclude reference to media reports regarding the parties, other cases, or issues with asbestos "[d]enied in

the absence of a more specific proffer of evidence"). For example, a Pharmacy Defendant's awareness or internal discussion of certain media coverage may be relevant to demonstrate its knowledge of diversion or the opioid epidemic generally.[24]

The Pharmacy Defendants' cases are distinguishable, as they all involved the preclusion of media coverage when offered to prove the truth of the matter asserted. *See Turner v. City of Taylor*, 412 F.3d 629, 651–52 (6th Cir. 2005) (in support of his claim against city for engaging in a pattern of permitting or condoning the use of excessive force against prisoners at city jail, detainee offered on summary judgment a newspaper article that referred to unidentified individuals who were allegedly treated poorly at the jail; "[T]he newspaper article contains information about the experiences of anonymous persons, and Plaintiff submitted no other corroborating documentation that the incidents had occurred. Because the newspaper article was inadmissible hearsay and Defendants have not conceded its evidentiary reliability, it could not create a genuine issue of material fact for trial."); *Williams v. City of Lansing*, No. 1:10-CV-1028, 2011 WL 5553782, at *3 (W.D. Mich. Nov. 15, 2011) (in gender discrimination action, newspaper article detailing circumstances of a male employee not being discharged for similar conduct was not competent summary judgment evidence to establish that plaintiff was treated differently than a similarly situated, non-protected employee); *Park II*, 2010 WL 987772, at *3 ("Plaintiff's motion [*in limine*] is GRANTED to the extent newspaper articles and television segments are offered into evidence to prove the truth of the matter asserted, and Plaintiff's motion **is DENIED to the extent such evidence falls within one of the exceptions to the hearsay rule**.") (emphasis added); *Barbo v. Kroger Co.*, No. 3:07-CV-14-S, 2007 WL 2350183, at *1–2 (W.D. Ky. Aug. 13, 2007) (in

---

[24] *See, e.g.,* Doc. #1968-2 (Mills Tr.) at 26:7-14, 218:17-25; Doc. #2169-16 (George Tr.) at 103:4-19, 211:8 – 213:5, 238:20 – 241:11; Doc. #2169-26 (Merritello Tr.) at 74:3 – 75:14; Doc. #1961-21 (Dymon Tr.) at 256:11-15, 260:17-20, 328:4-16; Doc. #2169-11 (Daugherty Tr.) at 75:20 – 76:21, 77:22 – 78:5, 79:5-17, 83:1 – 84:19, 91:9-20, 92:17 – 93:9, 231:1-10, 346:21 – 348:7; Doc. #2169-4 (10/22/18 Barnes Tr.) at 139:15 – 140:2, 162:15 – 168:15, 201:4-21; Doc. #1962-22 (1/31/19 Hart Tr.) at 241:19 – 242:9, 245:6-22; Doc. #2169-31 (Novack Tr.) at 148:5 – 149:8, 213:3-9, 391:14 – 394:4, 400:3-16; Doc. #1956-16 (Beam Tr.) at 119:18 – 125:4, 188:21 – 189:23, 355:21 – 358:17; Doc. #1961-18 (Ducote Tr.) at 127:2-22, 128:9-14; Doc. #1962-31 (1/23/19 Hiland Tr.) at 219:1 – 221:16.

premises liability action, newspaper articles submitted on summary judgment to prove defendant owned and operated the premises were inadmissible hearsay because they were offered "to prove the facts stated therein" and "none of [the hearsay] exceptions apply here"); *Griffith*, 2018 WL 4658721, at *8 (in product liability action arising out of motorcycle accident, court granted defendant's motion to preclude plaintiffs from introducing evidence pertaining to media coverage of the accident where plaintiffs responded that they were "unaware of any media coverage of the specific accident at issue" and had "no intention of introducing any media-coverage-type evidence").[25]

### 7. <u>Pharmacy Defendants' MIL No. 7</u>: To preclude evidence of settlements. (Doc. #3420)

In their MIL No. 7, the Pharmacy Defendants seek to preclude "any evidence of, reference to, or arguments about [civil and administrative] settlements [entered into by certain Defendants] (or consent decrees or fines), and media coverage or other secondhand accounts of the aforementioned evidence at trial." Doc. #3420 at p. 1. They argue such evidence is inadmissible under Rule 408 and there is no basis to introduce it for any other purpose. *Id*. They further argue that such evidence is irrelevant and unduly prejudicial. *Id*. at 3-9.

The Pharmacy Defendants acknowledge that this Court has already rejected these arguments in its Evidentiary Order from Track 1A. *Id*. at pp. 1, 3-4. Specifically, the Court stated:

> Here, Plaintiffs assert that evidence of prior enforcement actions and settlements establish a pattern of conduct that demonstrates: (1) Defendants knew their SOM systems were inadequate and likely to cause harm; and (2) Defendants' conduct was intentional and persisted over a lengthy period of time. The Court agrees this evidence is relevant and permissible and therefore denies these motions.

---

[25] Contrary to the Pharmacy Defendants' parenthetical description of this case, there is no indication the court granted this motion *in limine* "on the basis that such media-coverage evidence is irrelevant, unfairly prejudicial, and constitutes inadmissible hearsay." Doc. #3418 at p. 7 (quoting *Griffith*, 2018 WL 4658721, at *8). The quoted language describes the arguments **the defendant made** as to why such evidence should be excluded. *Griffith*, 2018 WL 4658721, at *8. However, it appears that the court granted this motion because the plaintiffs indicated they had no intention of introducing such evidence. *Id*. ("Plaintiffs respond that they are unaware of any media coverage of the specific accident at issue and they express no intention of introducing any media-coverage type evidence. **Accordingly**, Defendant's motion . . . is granted[.]") (emphasis added)

Doc. #3058 (Evidentiary Order) at p. 13; *see also id.* at pp. 12, 14-15.[26]

In their MIL, the Pharmacy Defendants first note their objection to the Court's ruling regarding Rule 408, stating it is "incorrect, and ask[ing] the Court to reconsider." *Id.* at pp. 1, 3. In support of their position, however, the Pharmacy Defendants simply make the same arguments (citing almost all of the same cases)[27] that the Track 1A defendants made. *Compare* Doc. #3420 at pp. 2-3 *with* Doc. #2666 (CT1A Distributors' MILs) at pp. 3-4, Doc. #2648 (CT1A WAG MILs) at p. 5, and Doc. #2668 (CT1A Teva MILs) at pp. 6-7. The Court previously rejected these arguments and the Pharmacy Defendants provide no explanation as to why it should reconsider its ruling with respect to Rule 408.

Similarly, in arguing that settlement evidence is unduly prejudicial under Rule 403, the Pharmacy Defendants repeat the same arguments (citing almost all of the same cases)[28] that the Track 1A defendants made. *Compare* Doc. #3420 at pp. 8-9 *with* Doc. #2666 (CT1A Distributors' MILs) at p. 6, Doc. #2648 (CT1A WAG MILs) at pp. 5-6, and Doc. #2668 (CT1A Teva MILs) at pp. 7-8. The Court implicitly rejected these arguments when it denied the Track 1A defendants'

---

[26] Moreover, as previously noted, the Court separately ruled that "it intends to have 'a very wide strike zone for evidence about what the federal government, the DEA and the [FDA] did or did not do in connection with opioid regulation, as this information is an essential part of the story regarding the claims and defenses in this case." Doc. #3058 at pp. 11-12.

[27] The only new cases they cite are *Lindsay v. Yates*, 578 F.3d 407, 416 n.8 (6th Cir. 2009), which merely states the general proposition that Rule 408(a) prohibits "the use of offers to compromise a claim as evidence of liability for that claim[,]" and *Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996), which states the general public policy considerations underlying Rule 408. Doc. #3420 at pp. 2-3.

[28] The only new cases they cite are *Ross*, 2012 WL 2004810, and *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. MDL 3:11-MD-2244-K, 2017 WL 9807464 (N.D. Tex. Sept. 19, 2017). In *Ross*, the court granted a motion to preclude evidence of a consent decree involving the defendant because the risk of unfair prejudice and jury confusion substantially outweighed the minimal probative value of such evidence in that particular case. 2012 WL 2004810, at *3-4 ("The existence or nonexistence of the Consent Decree does not inform the key issue of whether the Red Cross was negligent in attempting to draw Plaintiff's blood on September 12, 2008, or in its 'aftercare' following the needlestick injury."). In *Depuy*, the court granted the defendants' motion to preclude evidence of other civil or criminal actions or investigations involving defendant Johnson & Johnson or its non-defendant affiliates, including "any fines, monetary penalties, or disgorgements of any sums of money by Johnson & Johnson or any of its subsidiaries or affiliated entities." 2017 WL 9807464, at *4. The court did not explain the basis for its ruling in its opinion. *Id.*

motions *in limine*. Except as set forth below (*infra* at § A.7.i-v), the Pharmacy Defendants provide no explanation as to any circumstances particular to this case warranting reconsideration.

Finally, the Pharmacy Defendants argue that, regardless of the Court's prior ruling, "certain categories of settlement-related evidence . . . . which the Court did not consider when making its Track 1-A ruling" should be excluded because they "are patently irrelevant, could not possibly establish notice, and can be excluded wholesale before trial ever begins." Doc. #3420 at p. 4. As explained below, their arguments are without merit and should be denied. *Infra* at § A.7.i-v. As a preliminary matter, although the Pharmacy Defendants appear to assume the Court denied the Track 1A defendants' MILs solely on the basis that settlement evidence could be relevant to notice, the Court's order is not so limited. Doc. #3058 at pp. 12-13 (noting that, under Rule 408(b), "the Court may admit this evidence for 'another purpose,' **such as** to show a particular Defendant's knowledge or notice of potential harm") (emphasis added); *see also id.* at p. 13 (agreeing that "evidence of prior enforcement actions and settlements establish a pattern of conduct that demonstrates: (1) Defendants knew their SOM systems where inadequate and likely to cause harm; **and** (2) Defendants' conduct **was intentional and persisted over a lengthy period of time**") (emphasis added). Thus, notice is not the only purpose for which settlement evidence may be relevant. *See, e.g., Evans v. Troutman*, 817 F.2d 104, 1987 WL 37221, at *3 (6th Cir. 1987) (trial court did not abuse its discretion in admitting evidence of reinstatement offer because it was relevant to defendants' discriminatory intent"); *Akers*, 2019 WL 4934948, at *2–4 (denying defendant's motion to exclude evidence of Agreed Order entered into between defendant and the Kentucky Board of Medical Licensure because certain "factual and legal stipulations [contained therein] regarding his controlled substance prescribing conduct, patient management and oversight procedures, and record-keeping practices" were highly probative to government's claim that defendant "conspired to distribute opioids outside the scope of his professional practice and not for any legitimate purpose").[29]

---

[29] Specifically, the court held that such evidence: (i) was "exceptionally probative of [defendant's] course of prescribing conduct and patient oversight/management during the relevant period and, consequently,

i. *Dollar Amounts of Settlements*

Plaintiffs agree that the parties should not reference the dollar amount of any settlements. However, Plaintiffs should be permitted to generally reference the size of a settlement (*e.g.*, that the settlement was "substantial," etc.) to rebut any argument the Pharmacy Defendants may make that their violations were minor or immaterial.

ii. *Settlements Reached After the Relevant Time Period in this Case*

The Pharmacy Defendants next argue that evidence of settlements "that were entered into or involve alleged conduct that occurred after the relevant time frame in this dispute are patently irrelevant" because they "could not even arguably have given a party notice, for example, of wrongful conduct, or at least not in any sense that is relevant to the issues the jurors will be asked to decide." Doc. #3420 at p. 5. They further argue that any settlement reached by a defendant after it ceased distributing opioids, "by definition, is not relevant to show the defendant's state of mind before that time, when it was still distributing." *Id*. The Pharmacy Defendants cite no legal authority in support of their arguments.

Contrary to the Pharmacy Defendants' assertions, evidence of settlements reached or involving conduct after the relevant time period can be relevant to demonstrating "a pattern of conduct that demonstrates . . . [the Pharmacy] Defendants' conduct was intentional and persisted over a lengthy period of time." Doc. #3058 (Evidentiary Order) at p. 13. Courts regularly admit evidence of subsequent acts to demonstrate earlier intent or other issues. *See United States v. Franks*, 511 F.2d 25, 36 (6th Cir. 1975) (where defendant charged with unlawful interstate transportation of explosives, evidence of later interstate transportation of explosives "was proper

---

centrally relevant to whether [his] conduct was within usual professional scope and for legitimate medical purposes[;]" (ii) "further illuminate[d] [his] record-keeping practices during the at-issue timeframe and [we]re similarly probative of practice legitimacy[;]" and (iii) "probative of his knowledge and intent and, thus, directly relevant to the criminal charges in this case[,]" given his "entrance into the Agreed Order and adoption of its content—including consulting doctors' characterizations of his practice and prescribing habits, and [his] own concession of statutory/regulatory violations[.]" *Id*. at *3. The court further noted that "[t]he admitted statutory violations . . . surely make it more probable that [defendant] engaged in conduct equal to the crimes charged in the Indictment." *Id*. at *3 n.7.

as showing 'scheme or plan, motive, knowledge, intent, absence of mistake or accident, (or) identity'") (citation omitted); *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982) ("[S]ubsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion.").[30]

The Pharmacy Defendants have not demonstrated that all evidence of settlements reached after the relevant time period is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. The admissibility of any particular piece of such evidence should be determined at trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id.* This portion of the Pharmacy Defendants' MIL should be denied. *See, e.g., Fujisawa*, 1999 WL 543166, at *14 (denying in part plaintiff's motion to preclude reference to certain post-acquisition events because despite such evidence not being relevant to damages, "it might be relevant to other issues"; "At this point, it cannot be said that such evidence 'is clearly inadmissible for any purpose.'") (citation omitted).

### iii. Settlements Relating to Pharmacies Outside of the Counties

The Pharmacy Defendants next argue that evidence of settlements related to their dispensing activities outside the Counties should be excluded as "patently irrelevant." Doc. #3420 at pp. 6-7. They note that the Court's prior ruling only addressed the admissibility of distribution

---

[30] *See also United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) ("Subsequent acts are frequently probative as to intent."); *United States v. Thomas*, 593 F.3d 752, 758-59 (8th Cir. 2010) ("Additionally, the mere subsequency of an act to that charged in an indictment does not on that ground alone make it incompetent to establish intent or motive. . . . Considering the similarities between the crimes charged and the subsequent-acts evidence, we cannot say the mere passage of four years' time renders the evidence irrelevant to show knowledge or intent.") (citations and internal quotation marks omitted); *United States v. Ayers*, 924 F.2d 1468, 1473–74 (9th Cir. 1991) ("We have previously held that 'acts both prior and subsequent to the indictment period may be probative of the defendant's state of mind.' While most of the cases addressing other acts evidence, admitted pursuant to Rule 404(b), involve prior crimes or acts of misconduct, it is clear that evidence of subsequent crimes or acts of misconduct is admissible if it is relevant to an issue at trial.") (internal citation omitted); *United States v. Mancuso*, 444 F.2d 691, 695 (5th Cir. 1971) ("[S]ubsequent acts of a similar nature are admissible as proof of intent as they indicate the intent and motive of appellants during the acts charged in the indictment.").

settlements in a distribution case, "and the Court has not ruled whether dispensing settlements are relevant to distribution claims." *Id.* at p. 6. They further claim that dispensing settlements do not address the sufficiency of their SOM systems "[a]nd the conduct they do concern is subject to different regulations and different standards of care." *Id.* Finally, they argue that these dispensing settlements concerned pharmacies outside the Counties, so "their relationship to the distribution issues in this case (i.e., to the alleged suspicious orders placed by pharmacies in Cuyahoga and Summit Counties) is even more attenuated." *Id.*

Each of the Pharmacy Defendants' arguments is without merit and should be rejected. First, some of the settlements at issue involved **both** dispensing and distribution activities.[31] But even settlements that solely involved dispensing conduct are relevant to Plaintiffs' claims in this case. Evidence of diversion occurring in their retail pharmacies is certainly relevant to the Pharmacy Defendants' distribution obligations. *See, e.g.,* Doc. #2816-1 (WAGMDL00049752) at 767 ("DEA regulations require that distributors (i.e.; the Walgreen distribution centers) *must* take reasonable measures to identify its customers, understand the *normal and expected* transactions conducted by those customers, and identify transactions that are *suspicious* in nature.") (emphasis in original). These settlements show that they knew diversion was occurring from their own retail pharmacies.[32] They also refute the Pharmacy Defendants' repeated defense that they cannot have caused a public nuisance because they did not distribute to unscrupulous pain clinics and pill mills.[33] To the extent the Pharmacy Defendants intend and are permitted to argue that they relied

---

[31] *See, e.g.,* Doc. #2213-25 (PSJ11 Ex. 25) at 799-801 (CVS settlement); Doc. #2205-9 (PSJ18 Ex. 9) at PageID #333309-310 (WAG settlement).

[32] *See, e.g.,* Doc. #2213-25 (PSJ11 Ex. 25); Doc. #2213-24 (PSJ11 Ex. 24); Doc. #2205-9 (PSJ18 Ex. 9); Doc. #3009-11 (PSJ13 Ex. 10) at 003-005 (GE settlement); Doc. #1962-21 (1/30/19 Hart Tr.) at 64:13 – 67:2 (RA settlement); Doc. #1962-22 (1/31/19 Hart Tr.) at 191:7 – 194:20; Doc. #1968-4 (Mitchell Tr.) at 116:17 – 117:12, 118:3-12; Doc. #1968-5 (Mollica Tr.) at 92:8-22, 94:7-24, 99:19 – 101:21, 201:9 – 202:24.

[33] *See, e.g.,* Doc. #3141-1 (WAG MSJ) at p. 1 ("Unlike wholesale distributors, Walgreens never distributed to any independent pharmacy, internet pharmacy, pain clinic, or 'pill mill.' That undisputed fact is a big reason why . . . Plaintiffs still have not identified any evidence to establish liability against Walgreens on any of their claims.") (internal citation omitted); Doc. #3118-2 (CVS MSJ) at p. 4 ("CVS only distributed HCPs to its own CVS pharmacies; it did not distribute to rogue internet pharmacies,

on their pharmacies to monitor for suspicious orders (*e.g.*, Doc. #2000-22 (Rafalski Rep.) at p. 25), evidence of the multitude of settlements involving their pharmacies demonstrates that they knew their pharmacies were not monitoring for suspicious orders sufficiently. Moreover, evidence that some of the Pharmacy Defendants were repeatedly sanctioned by the DEA around the country with respect to their obligations under the CSA is evidence that they had undertaken a deliberate and long-running course of conduct to evade their responsibilities to prevent diversion.[34] Doc. #3058 (Evidentiary Order) at p. 13 ("Here, Plaintiffs assert that evidence of prior enforcement actions and settlements establish a pattern of conduct that demonstrates: (1) Defendants knew their SOM systems were inadequate and likely to cause harm; and (2) Defendants' conduct was intentional and persisted over a length period of time. The Court agrees this evidence is relevant and permissible and therefore denies these motions."). Such evidence also provides context for why the Pharmacy Defendants took certain actions with respect to their SOMS programs or other efforts to prevent diversion.[35]

Contrary to the Pharmacy Defendants' assertions, Plaintiffs are not relying on an "if it happened there, it must be happening here" premise to justify admission of extraterritorial settlements. As explained in further detail below (*infra* at § A.8), evidence of the Pharmacy Defendants' extraterritorial conduct (including settlements) is probative to a number of material issues in this case. For these reasons, the cases cited by the Pharmacy Defendants are distinguishable. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–04 (3d Cir. 2015) (in antitrust case, court concluded that plaintiffs had "not adequately linked the Canadian

---

rogue pain clinics, or dispensing practitioners."); Doc. #1864-3 (Walmart MSJ) at pp. 1, 3, 7, 13; Doc. #1888-1 (RA MSJ) at pp. 2, 6; Doc. #1862-1 (DDM MSJ) at p. 1.

[34] In some of these settlements, a Pharmacy Defendant expressly admitted that it had not complied with its CSA obligations. *See, e.g.,* Doc. #2205-9 (PSJ18 Ex. 9) at PageID #333309-310; Doc. #2213-25 (PSJ11 Ex. 25) at 798; Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at p. 42 n.242 & n.243.

[35] *See, e.g.,* Doc. #1971-2 (Stahmann Tr.) at 40:16-23 (Walgreens formed pharmaceutical integrity group as part of settlement with DEA); Doc. #1968-2 (Mills Tr.) at 124:15-23; Doc. #1962-21 (1/30/19 Hart Tr.) at 67:4 – 68:6; Doc. #1968-4 (Mitchell Tr.) at 127:19 – 131:11; Doc. #1968-5 (Mollica Tr.) at 105:24 – 107:4, 204:12 – 207:6; Doc. #1962-30 (1/22/19 Hiland Tr.) at 73:18 – 79:5.

conspiracy to the purported U.S. conspiracy to justify using the former to support an inference of the latter"); *Salinero v. Johnson & Johnson*, No. 1:18-CV-23643-UU, 2019 WL 7753445, at *2-3 (S.D. Fla. Sept. 25, 2019) (in product liability action, evidence that certain products or conduct of non-defendant affiliates "have been the subject of fines, consent decrees, recalls, and misdemeanor guilty pleas" would be excluded as irrelevant; however, court also noted that plaintiffs "may introduce any relevant admissions made by [defendant] in other lawsuits, claims, or investigations, to the extent the admissions would be admissible, including under Rules 801or 803"); *In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 505234, at *4 (S.D.W. Va. Feb. 5, 2014) (declining to admit evidence of unrelated settlements or fines with government agencies "because it is clearly irrelevant").

The Pharmacy Defendants reference one extraterritorial settlement in their motion: "CVS's Florida settlement concern[ing] the dispensing conduct of two particular pharmacies in one Florida town." Doc. #3420 at p. 7. They do not attach or cite to the specific settlement, nor do they even identify the date of the settlement. *Id.* Plaintiffs presume they are referring to CVS's 2015 settlement with the U.S. Attorney's Office for the Middle District of Florida, acting on behalf of the DEA. Doc. #2213-25 (PSJ11 Ex. 25). But that settlement covered not only CVS's dispensing failures in Florida in 2011, but also the failures of CVS's Florida distribution center in distributing controlled substances to its Florida pharmacies. *Id.* at 799-801; *see also* Doc. #3007-21 (Rafalski Rep.) at p. 26. This settlement agreement, and the 2012 Orders to Show Cause and Immediate Suspension of Registration upon which it is based, demonstrate that CVS knew that diversion of its opioids was occurring and that the DEA had determined that CVS had failed to maintain effective controls against diversion. Doc. #2213-25 (PSJ11 Ex. 25); Doc. #2213-24 (PSJ11 Ex. 24). Moreover, as explained in greater detail below, the fact that the conduct addressed in the settlement occurred outside of the Counties does not negate its relevance in this case. *Infra* at § A.8.[36]

---

[36] For example, Walgreens' 2013 settlement with the DEA and DOJ related in part to the SOM failures of its Jupiter, Florida distribution center. Doc. #2205-9 (PSJ18 Ex. 9) at PageID #333309-310. That

The Pharmacy Defendants have not demonstrated that all evidence of settlements relating to pharmacies outside the Counties is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. The admissibility of any particular piece of such evidence should be determined at trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id*. This portion of the Pharmacy Defendants' MIL should be denied.

    *iv.*   *Settlements Relating to Corporate Entities Other than Defendants in this Case*

In conclusory fashion, and citing no legal authority, the Pharmacy Defendants next argue that settlements related to corporate entities that are not defendants in this action should be precluded because they "are irrelevant to whether Plaintiffs' allegations against *Defendants* are true." Doc. #3420 at p. 7. It is not entirely clear, but Plaintiff presume the Pharmacy Defendants are referring to any settlements relating to non-Track 1 defendants (as opposed to any settlements relating to non-Pharmacy Defendants). Either way, this request should be denied. Settlements or fines involving other corporate entities may be relevant to the extent the Pharmacy Defendants were aware of them, discussing them internally or with others, and/or taking actions based on such settlements.[37]

The Pharmacy Defendants have not demonstrated that all evidence of settlements involving non-defendants is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. The admissibility of any particular piece of such evidence should be determined at trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper

---

particular distribution center is one of several that distributed opioids into the Counties. Doc. #2000-22 (Rafalski Rep.) at p. 114.

[37]  *See, e.g.,* Doc. #2169-38 (Schiavo Tr.) at 277:6-22 (CVS discussing DEA investigations and penalties against other distributors and pharmacies); Doc. #1956-20 (Belli Tr.) at 186:11 – 187:18 (RA internally discussing recent DEA fines against other distributors); Doc. #2169-10 (R. Chapman Tr.) at 179:18 – 180:21 (same); Doc. #1962-22 (1/31/19 Hart Tr.) at 241:14 – 244:3 (same); Doc. #2169-31 (Novack Tr.) at 387:5-22, 390:4 – 391:12, 392:20 – 393:2; Doc. #1971-5 (Strang Tr.) at 209:1-13; Doc. #1968-15 (Nameth Tr.) at 331:24 – 334:13; Doc. #1956-1 (Abernathy Tr.) at 243:23 – 245:7; Doc. #1959-20 (G. Chapman Tr.) at 233:1-15, 325:14 – 326:5; Doc. #1961-3 (Coleman Tr.) at 287:13 – 291:13; Doc. #1961-18 (Ducote Tr.) at 125:15 – 126:5, 127:2-22, 129:7-19; Doc. #1962-31 (1/23/19 Hiland Tr.) at 190:25 – 194:13, 203:17 – 206:5, 210:12 – 214:19, 217:21 – 221:16.

context." *Id*. This portion of the Pharmacy Defendants' MIL should be denied.

       *v.*   *Settlements Unrelated to Opioid Medications*

Plaintiffs have no intention of presenting evidence of settlements that are not related to opioid medications.[38] To the extent Plaintiffs believe any such settlement has become relevant based on the evidence adduced at trial, they will seek leave from the Court outside the presence of the jury before offering any such evidence.

**8.**    **<u>Pharmacy Defendants' MIL No. 8</u>: To preclude evidence of extraterritorial conduct without establishing a specific nexus to Cuyahoga or Summit County and a Track 1-B Defendant. (Doc. #3421)**

In their MIL No. 8, the Pharmacy Defendants seek to preclude Plaintiffs from introducing "evidence, testimony, or argument concerning alleged conduct that occurred outside of Cuyahoga and Summit Counties" unless "Plaintiffs first establish—outside the presence of the jury—a foundation showing a specific nexus connecting that extraterritorial conduct to harm suffered by one of the Counties *and* a specific Defendant's distribution conduct." Doc. #3421 at p. 1 (emphasis in original). Notably, the Pharmacy Defendants do not identify any specific pieces of evidence they seek to preclude, although they generally reference evidence of opioid migration from Florida to Ohio. *Id.* at pp. 2-3.

This MIL should be denied because it is overbroad, vague, and premature. The amount of evidence this MIL could potentially encompass would make it highly impractical and inefficient

---

[38] To be clear, a settlement may be related to opioids even if the term "opioids" is not used in the settlement agreement itself. For example, in 2011, Walgreens entered into a settlement with the DEA regarding its dispensing and diversion prevention practices. Doc. #2205-9 (PSJ18 Ex. 9) at PageID #333326-332. The Administrative Memorandum of Agreement references "controlled substances" but not opioids specifically. *Id.* However, as the DEA noted in its investigation, the underlying conduct giving rise to this settlement involved the dispensing of opioids. *See* "At height of crisis, Walgreens handled nearly one in five of the most addictive opioids," *The Washington Post*, Nov. 9, 2019, *available at* https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/ (accessed on 9/11/20) ("[A San Diego Walgreens] had dispensed prescriptions to people the pharmacy 'knew or should have known were diverting the controlled substances,' agency enforcement records show. One customer over seven months obtained prescriptions for hydrocodone issued by four Florida physicians—an indication that she was 'doctor-shopping' to procure pain pills, the DEA record shows.").

to enforce at trial.  Indeed, much of the conduct that created a nuisance within the Counties actually occurred outside of the Counties.  For example, the Pharmacy Defendants' corporate policies and procedures regarding suspicious order monitoring typically were created and implemented outside of the Counties.[39]  And often the distribution centers ("DCs") from which they shipped their opioids, and at which they were obligated to monitor suspicious orders, were located outside of the Counties.[40]  Moreover, evidence relating to their knowledge and intent typically involved conduct of the Pharmacy Defendants that occurred outside of the Counties (*e.g.*, communicating with the DEA, enforcement actions, attending conferences, etc.).[41]

Given the sheer breadth of evidence arguably encompassed within this overly broad MIL, granting it would unnecessarily prolong the trial.  Plaintiffs would be forced to request numerous

---

[39] *See, e.g.,* Doc. #2169-1 (K. Baker Tr.) at 70:13 – 71:5, 72:19-23, 167:24 – 168:4, 218:17-22; Doc. #1959-13 (Burtner Tr.) at 52:4-9; Doc. #2169-30 (Nicastro Tr.) at 154:24 – 155:14; Doc. #2169-3 (Bancroft Tr.) at 118:15-24; Doc. #1959-2 (Bish Tr.) at 34:1 – 37:17; Doc. #1956-1 (Abernathy Tr.) at 14:3-16, 75:23 – 76:10, 219:12-21; Doc. #1956-16 (Beam Tr.) at 62:16-23; Doc. #1956-20 (Belli Tr.) at 16:3 – 17:3, 27:19 – 28:14, 42:20-25, 44:10-15, 99:18-24, 102:11-12, 113:17-22, 173:17-19; Doc. #2169-10 (R. Chapman Tr.) at 43:5-21; Doc. #1959-21 (Chase Tr.) at 47:20-22, 122:9 – 123:5; Doc. #2169-14 (Frost Tr.) at 49:8-18, 62:8-16, 302:7 – 303:2; Doc. #1968-4 (Mitchell Tr.) at 26:10-18, 27:4-22; Doc. #2169-5 (Bianco Tr.) at 102:11 – 103:2; Doc. #1959-18 (Carlson Tr.) at 19:25 – 20:4, 58:17 – 59:1, 199:8-9, 218:16 – 219:4, 252:18 – 253:1; Doc. #1961-20 (Durr Tr.) at 63:4-16, 87:22 – 88:1; Doc. #1962-27 (Heiser Tr.) at 18:15 – 20:8, 28:8-15, 36:16-21, 38:3-11, 53:17-24; Doc. #1971-12 (Tsipakis Tr.) at 99:1-18; Doc. #1959-11 (Briscoe Tr.) at 34:24 – 35:17, 144:6-9, 253:14-18; Doc. #1971-5 (Strang Tr.) at 14:21 – 15:13; Doc. #1968-15 (Nameth Tr.) at 25:10-23, 66:11-13.

[40] *See, e.g.,* Doc. #2000-22 (Rafalski Rep.) at p. 114 (Walgreens distributed prescription opioids to the Counties from DCs located in: Perrysburg, Ohio; Mt. Vernon, Illinois; Jupiter, Florida; Bethlehem, Pennsylvania; and Orlando, Florida); Doc. #1959-11 (Briscoe Tr.) at 34:24 – 35:17 (DDM's sole DC located in Medina County, Ohio); Doc. #2169-30 (Nicastro Tr.) at 18:8 – 20:12 (CVS pharmacies in Counties supplied by DCs in Pennsylvania and Indiana); Doc. #1956-1 (Abernathy Tr.) at 34:25 – 35:8, 259:8-13 (Walmart pharmacies supplied by DC in Arkansas); Doc. #1956-16 (Beam Tr.) at 320:21-24; Doc. #1959-20 (G. Chapman Tr.) at 71:7-24; Doc. #1956-20 (Belli Tr.) at 22:24 – 23:2 (Rite Aid pharmacies in Ohio serviced by DC in Perryman, Maryland); Doc. #1959-21 (Chase Tr.) at 18:24 – 19:3; Doc. #1961-20 (Durr Tr.) at 62:1-3, 121:24 – 122:4 (HBC warehouse located in Washington, Pennsylvania).

[41] *See, e.g,* Doc. #2205 (PSJ18 WAG MSJ Opp.) at pp. 4, 6-11 (and exhibits cited therein); Doc. #1956-1 (Abernathy Tr.) at 30:21-23; Doc. #1956-16 (Beam Tr.) at 64:19 – 65:11, 88:7-17, 297:12-17; Doc. #1968-15 (Nameth Tr.) at 356:21 – 357:24; Doc. #1956-20 (Belli Tr.) at 14:14-23, 148:22-24; Doc. #2169-10 (R. Chapman Tr.) at 89:22 – 91:3, 92:23 – 93:7; Doc. #1962-21 (1/30/19 Hart Tr.) at 76:16-23; Doc. #1959-18 (Carlson Tr.) at 47:25 – 48:6; Doc. #1970-8 (Rogos Tr.) at 26:17 – 30:22; Doc. #1959-10 (12/16/18 Bratton Tr.) at 242:11 – 243:23; *see also supra* at §§ A.6-7; *infra* at § A.10.

disruptive and time-consuming hearings or conferences outside the jury's presence every time an evidentiary issue encompassed by this MIL arises. This Court can address the issues sufficiently and much more efficiently at trial without unfairly prejudicing Defendants.

Notably, this Court previously denied similar MILs filed by the Track 1A defendants that were much narrower in scope than the MIL proposed here. Doc. #3058 (Evidentiary Order) at pp. 8-10 (denying: Defendants' MIL No. 6, "seeking to exclude evidence of alleged wrongful shipments to places outside the *Track One* Counties;" Schein's MIL No. 8, "seeking to preclude references to opioid distributions to places outside Summit County;" Schein's MIL No. 9, "seeking to preclude references to DEA fines, investigations, or admonitions concerning HIS's opioid distributions to locations other than Summit County;" and Teva's MIL No. 5, "seeking to exclude evidence of shipments and marketing-related statements directed to areas outside the *Track One* Counties").[42]

In their Motion, the Pharmacy Defendants acknowledge the Court's ruling on the Track 1A defendants' MIL No. 6, but claim that the Court denied that MIL based only on two types of evidence presented in Plaintiffs' response: "evidence concerning prescriptions from or filled at unscrupulous pain clinics or 'pill mills' in Florida that Plaintiffs alleged has 'migrated' to Ohio[;]" and "the expected expert testimony of James Rafalski." Doc. #3421 at p. 2. They argue that such evidence does not apply for the upcoming trial because (i) "Rafalski does not offer *any* opinions about most Track 1-B defendants[,]" and (ii) "evidence involving unscrupulous third-party 'pill mills' and pain clinics in Florida . . . simply does not implicate *the distribution conduct* of *Track 1-B Defendants*" because they "distributed only to themselves, and not to third-party 'pill mills' or pain clinics." *Id*. at pp. 2-3 (emphasis in original).

The Pharmacy Defendants' arguments are without merit. As a preliminary matter, the Court denied the CT1A Defendants' MIL No. 6 because those defendants "provide[d] no valid

---

[42] Plaintiffs hereby incorporate by reference the arguments set forth in their prior briefing opposing those CT1 MILs as if fully set forth herein. Doc. #2815 (CT1A Ps' MIL Opp.) at pp. 31-34 (and exhibits cited therein).

grounds to exclude evidence of these shipments [to places outside the *Track One* Counties]." Doc. #3058 at p. 9. Although the Court noted that the Plaintiffs had presented evidence of "Rafalski's expert testimony that Defendants had a 'nationwide' and 'systemic' failure to report suspicious orders and maintain effective controls against diversion, and knew that opioids distributed in Florida were migrating to Ohio[,]" it never stated that these were the only types of evidence that would warrant denial of that MIL. *Id.* Rather, in denying multiple MILs on this issue, the Court stated generally:

> [E]vidence of what occurred outside the Track One Counties is generally relevant to Defendants' conduct within the *Track One* Counties, and the damages allegedly caused therein. For example, the shipment of suspicious orders to locations outside the *Track One* Counties tends to show (and is thus relevant to) whether Defendants shipped suspicious orders to the *Track One* Counties. This is particularly true because there is evidence that Defendants acted pursuant to practices and policies that were national in scope.

*Id.* at p. 8; *see also id.* at p. 8 n.15 ("The Court has previously also ruled that evidence of national trends and national shipments is relevant to demonstrate the national scope of the opioid crisis."), pp. 9-10 (citing Doc. #2542 (Cutler Daubert Order) at pp. 4-5).

Here, there is substantial evidence that many of the Pharmacy Defendants' SOMS policies and procedures, to the extent they had them, were national (or company-wide)[43] in scope.[44] Moreover, contrary to their assertions otherwise, Rafalski's expert testimony and evidence of pill

---

[43] Two of the Pharmacy Defendants (DDM and Giant Eagle) had only regional businesses. Doc. #1959-11 (Briscoe Tr.) at 87:5-16 (DDM only does business in Ohio); Doc. #1959-18 (Carlson Tr.) at 29:23 – 30:5 (Giant Eagle had pharmacies in five states: Pennsylvania; Ohio; West Virginia; Maryland; Indiana).

[44] *See, e.g.,* Doc. #3013-1 (Ps' CSA Compliance MSJ) at pp. 133-135 (and exhibits cited therein); Doc. #1971-2 (Stahmann Tr.) at 34:5-13, 288:10-25; Doc. #1959-2 (Bish Tr.) at 34:1 – 37:17; Doc. #2169-3 (Bancroft Tr.) at 118:15-24; Doc. #2213 (PSJ11 Ex. 11) at 76115; Doc. #2169-1 (K. Baker Tr.) at 42:17 – 43:4, 70:13 – 71:5, 72:19-23; Doc. #2169-30 (Nicastro Tr.) at 137:17 – 138:1; Doc. #1956-1 (Abernathy Tr.) at 75:23 – 76:10, 219:12-21; Doc. #1956-20 (Belli Tr.) at 99:18-24, 100:12-18, 173:17-19; Doc. #2169-10 (R. Chapman Tr.) at 43:5-21, 99:14-24; Doc. #1959-21 (Chase Tr.) at 119:14-20, 125:24 – 126:9; Doc. #1968-4 (Mitchell Tr.) at 99:6-21, 220:2-8; Doc. #2169-5 (Bianco Tr.) at 102:11 – 103:2; Doc. #1970-8 (Rogos Tr.) at 76:18 – 77:18; Doc. #1959-11 (Briscoe Tr.) at 34:24 – 35:17, 144:6-9, 253:14-18; Doc. #1968-15 (Nameth Tr.) at 25:10-23, 66:11-13.

migration from Florida are just as applicable in the Track 1B trial.  Although Rafalski does not analyze the SOMS programs of every Pharmacy Defendant, he provides extensive opinions regarding the SOMS programs of Walgreens and CVS.  Doc. #2000-22 (Rafalski Rep.) at pp. 40-46, 94-135.  And pill migration from Florida or elsewhere is not limited to prescriptions filled at "pill mills" and pain clinics; it can also occur with prescriptions filled at chain pharmacies, a fact of which at least some of the Pharmacy Defendants were aware.[45]

For example, as part of the Orders to Show cause leading up to the 2013 Memorandum of Agreement and $80 million fine, the DEA cited Walgreens for multiple "'red flags' of controlled substance diversion" in Florida which included "individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy… individuals residing long distances from the pharmacy; and individuals residing long distances from the practitioners from whom the prescriptions were obtained."  Doc. #2205-9 (PSJ18 Ex. 9) at PageID #333412.  The DEA listed as examples Walgreens for Florida dispensing to persons who lived in geographically distant locations, including Kentucky, Tennessee, Georgia, Alabama, and multiple locations in Ohio.  *Id*. at PageID #333412-414.  In the summary of the testimony the DEA planned to give at the regulatory hearing, the DEA stated it planned to provide testimony that Florida Walgreens had "dispensed controlled substances to customers residing in numerous states and commonwealths outside of Florida," including "the Appalachia regions of Kentucky, Ohio and Tennessee" in a manner that was:

> particularly problematic when one considers information developed by DEA that as a result of long-standing prescription monitoring programs in Kentucky and Ohio, and with the increased difficulty in obtaining controlled substances from

---

[45]  *See, e.g.,* Doc. #2815 (CT1A Ps' MIL Opp.) at pp. 32-33 (quoting Doc. #2000-22 (Rafalski Rep.) at p. 121 and Doc. #1969-19 (5/14/19 Rafalski Tr.) at 552:13 – 554:6); Doc. #2816-1 (WAGMDL00049752) at 758-759; Doc. #2816-5 (WAGMDL00289068-178) at 153, 165; Doc. #2816-4 (US-DEA-00000001-141) at 019, 028-030, 032-033, 051-053, 063-067, 071-072; Doc. #1971-2 (Stahmann Tr.) at 207:2-21, 227:8-24, 228:18 – 229:2; Doc. #2169-11 (Daugherty Tr.) at 346:21 – 348:7, 349:7-24; Doc. #1961-21 (Dymon Tr.) at 66:22 – 67:7, 144:7 – 145:1; Doc. #1963-9 (Kaleta Tr.) at 126:8-19, 126:24 – 127:5; Doc. #2397-4 (PSJ2 Ex. 137) at 7242 ("Pain clinic issue became a retail pharmacy issue"); Doc. #1966-6 (Little Tr.) at 401:10 – 402:16; Doc. #1968-15 (Nameth Tr.) at 60:12-19; Doc. #2169-31 (Novack Tr.) at 159:20 – 160:1, 166:17 – 167:9.

licensed physicians in these jurisdictions, many individuals have found creative ways to circumvent state prescription monitoring programs. As a result of the restricted access to controlled substances in their states, many individuals from Ohio, Kentucky and other states have travelled by the carloads to "pain" clinics located Florida to obtain prescriptions for oxycodone, alprazolam, and carisoprodol. This troublesome trend is particularly acute in the Appalachia region where individuals return to the region with drugs dispensed or prescribed by physicians working at Florida clinics. Because of the easy availability of drugs from these cash-only clinics, drug seeking individuals in the Appalachia region have obtained these drugs and abuse or sell them on the streets both to support drug habits and finance later car trips to Florida. The financing of these trips include the costs charged by the clinics for doctor visits and for drugs dispensed by the clinics.

*Id.* at PageID #333441-442; *see also id.* at PageID #333448.

Finally, the Pharmacy Defendants argue that evidence of extraterritorial conduct is inadmissible because it is unfairly prejudicial and constitutes inadmissible "other bad acts" evidence under Rule 404. Doc. #3421. Again, they identify no specific evidence that they seek to exclude, making it impossible for this Court to determine the applicability of Rule 404 and its exceptions, or balance the evidence's probative value against the risk of unfair prejudice, at this time. *See, e.g., United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996) ("It is true that whether 404(b) evidence is admissible for a particular purpose will sometimes be unclear until late in the trial because whether a fact is 'in issue' often depends on the defendant's theory and the proofs as they develop."); *United States v. Bozeman*, No. 3:11-CR-129, 2012 WL 1071207, at *11 (E.D. Tenn. Mar. 29, 2012) (noting that "the majority of 404(b) issues must be decided within the context of the trial"); *Mascarenas*, 2010 WL 11534359, at *6 (denying defendant's motion to preclude evidence related to shock absorbers in foreign countries, holding the "admissibility of this evidence will be determined at trial"). Certainly not all evidence of extraterritorial conduct constitutes "other bad acts" evidence, and even if a particular piece of evidence falls within Rule 404's scope, it may still be admissible if offered for another purpose under Rule 404(b). *See United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011) ("Other bad acts are probative and admissible if relevant to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake of accident.' This list is 'neither exhaustive nor conclusive.'") (internal citations

omitted).[46]

None of the cases cited by the Pharmacy Defendants support granting this sweeping MIL. *See United States v. Ward*, 190 F.3d 483, 489–90 (6th Cir. 1999) (trial court erred in instructing jury as to all the purposes for which the jury could consider Rule 404(b) evidence when the only purpose relevant in that case was intent); *Merriweather*, 78 F.3d at 1074-79 (same); *United States v. Johnson*, 27 F.3d 1186, 1193-94 (6th Cir. 1994) (same); *Stern*, 706 F.2d at 750 (in professor's suit against college based on professor's termination which allegedly resulted from professor's advice that student seek legal counsel about his suspension, trial court did not abuse its discretion in excluding evidence that marijuana was found in the car the student took from college during the episode which gave rise to the student's suspension on ground that it would inflame or confuse the jury); *United States v. Semak*, 536 F.2d 1142, 1144–45 (6th Cir. 1976) ("[E]vidence of a defendant's prior misconduct is admissible to show motive, intent, or absence of mistake whenever any one of these is material in a prosecution, and there exists a dispute about it."); *Lucijanic v. Ball*, No. 2:04-CV-751, 2006 WL 8442257, at *4 (S.D. Ohio Aug. 30, 2006) (granting motion to preclude evidence of defendant's prior uses of mace or force; the only purpose for which plaintiff offered such evidence was to show identity, but identity was not an issue in the case); *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, No. 2:00-CV-1439, 2003 WL 21750835, at *1, 5 (S.D. Ohio July 11, 2003) (prior to permanent injunction hearing, court denied in part and granted in part defendant's motion *in limine* to exclude testimony from plaintiffs lacking standing to sue; "The Court finds that in order to seek relief, the Plaintiffs must be able to establish that they have suffered harm. To the extent that Plaintiffs can provide such evidence, the Defendant's motion is without merit. If, however, testimony is elicited from one who has suffered no harm as a promoter of events, the Defendant may raise the issue at the hearing. Obviously, a non-party which has suffered harm is entitled to no relief in this action."); *Chocolate*, 801 F.3d at

---

[46] Even if some of these other purposes are not applicable in this case (*e.g.*, identity), others are (*e.g.*, intent, knowledge, motive, etc.).

402–04 (in antitrust case, court concluded that plaintiffs had "not adequately linked the Canadian conspiracy to the purported U.S. conspiracy to justify using the former to support an inference of the latter"); *United States v. Shannon*, 766 F.3d 346, 348 n.1, 352 n.9 (3d Cir. 2014) (declining to decide whether trial court abused its discretion by admitting evidence of defendant's two prior convictions despite their being more than twenty years old because case was being remanded for new trial on other grounds, but observing that when prior bad act evidence is admitted for another purpose under Rule 404(b), that purpose must be at issue in the case); *Elevator*, 502 F.3d at 51–52 (trial court properly dismissed plaintiffs' antitrust conspiracy claims because plaintiffs failed to provide a sufficient "factual basis for their assertions of a worldwide conspiracy affecting a global market for elevators and maintenance services"; "Allegations of anticompetitive wrongdoing in Europe—**absent any evidence of linkage between such foreign conduct and conduct here**—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'") (emphasis added);[47] *Bispo v. Robertshaw Controls Co.*, No. 3:05-CV-01223-BR, 2012 WL 13048223, at *2–3 (D. Or. Mar. 14, 2012) (denying plaintiff's motion exclude evidence of his misuse of water heater in violation of California codes "with leave to renew if Defendant fails to establish an adequate foundation for admitting such evidence" at trial).

The Pharmacy Defendants certainly have not demonstrated all evidence of their extraterritorial conduct is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. Accordingly, the Pharmacy Defendants' MIL No. 8 should be denied.

9. **Pharmacy Defendants' MIL No. 9**: To limit testimony of Craig McCann. (Doc. #3425)

To support his opinions as to the estimated number of suspicious orders shipped by the Pharmacy Defendants into the Counties, Dr. McCann analyzes ARCOS shipping data using five

---

[47]  As noted by one district court in this circuit, the *Elevator* court "did not hold that such a theory could never be viable, only that it hadn't been sufficiently alleged[.]" *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1010 (E.D. Mich. 2010). "[U]nder certain circumstances, the 'if there, then here' argument certainly can have merit." *Id.* at 1011.

different methodologies provided by Mr. Rafalski. The Pharmacy Defendants claim that Dr. McCann's calculations based on four of these methodologies "are irrelevant" because Plaintiffs have no witness to "opine that these calculations are based on a reliable methodology for identifying suspicious orders." Doc. #3425 at p. 2. They note that Mr. Rafalski vouched for only one of these methodologies and testified that the other four were not suitable suspicious order systems. *Id*. at pp. 1-2. Thus, according to the Pharmacy Defendants, any testimony from Dr. McCann regarding those four methodologies would confuse the issues, mislead the jury, and waste time. *Id*. at p. 2.

The Pharmacy Defendants' arguments are entirely without merit and should be rejected. As a preliminary matter, the Track 1A defendants, including Walgreens, previously made similar arguments in their motion to exclude McCann's testimony. Doc. #1783-3 at pp. 2-3, 7-8. Significantly, the Court **denied** that motion in relevant part, stating:

> Rafalski's opinions regarding methods that are *available* to Distributors to flag potentially suspicious orders, including McCann's application of those methods to Defendants' data, are both relevant and helpful to resolving issues in this case, including: (1) whether Defendants employed reasonable measures to identify potentially suspicious orders; (2) the number of orders Defendants could have reasonably flagged; and (3) whether Defendants conducted adequate due diligence to stop shipment of suspicious orders. Of course, at trial, Defendants may show, based on individual circumstances, why Rafalski's methods may not have been appropriate for them to use, or why other methods were equally or more effective. On this record, the Court finds that McCann's opinions are relevant and would aid the jury's determination of material issues in the case.

Doc. #2494 (Rafalski/McCann Daubert Opinion) at pp. 18-19.[48] The Pharmacy Defendants are attempting to re-litigate an issue the Court has already decided, without providing any new basis for why the Court should reconsider its prior ruling. This is not an appropriate use of a motion *in limine*. *cf. Louzon*, 718 F.3d at 558, 563.

Moreover, the Pharmacy Defendants' arguments are substantively without merit. As

---

[48] *See also id.* at p. 12 ("Moreover, in determining whether Defendants employed effective measures to identify, investigate, and stop shipment of suspicious orders, it would be helpful to the finder of fact to hear evidence about the number of suspicious orders that each methodology would have flagged.").

explained in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion to Exclude Craig McCann and James Rafalski (PD4, Doc. #2997-1),[49] the other four methodologies are variations of methodologies **used by several of the defendants in this litigation** at various times. *Id* at pp. 16-21.[50][51] In fact, one of the algorithms is meant to approximate the test set forth in Appendix E-3 to the Chemical Handler's Manual, **which Walgreens itself used from 2006 until at least 2012**.[52] Certainly if Walgreens wishes to point out at trial that the methodology it used for years is unreliable, it is welcome to do so. However, Dr. McCann's testimony regarding that methodology is certainly relevant to demonstrating the number of suspicious orders Walgreens could have, and should have, flagged. Similarly, methodologies used by other distributors in the industry are relevant to demonstrating the number of suspicious orders any of the Pharmacy Defendants could have, and should have, flagged. This is especially true where many of the Pharmacy Defendants worked closely with other distributors with respect to their SOMS

---

[49] The unredacted/less redacted version of this motion and several of its exhibits were filed as Doc. #2997-1-5. The original redacted version with all its exhibits were filed as Doc. #2260, 2262-2264.

[50] *See also, e.g.,* Doc. #2000-22 (Rafalski Rep.) at pp. 40-41, 59-60 (Cardinal), 71 (McKesson), 82 (ABDC), 162-164 (Mallinckrodt); Doc. #1969-18 (5/13/19 Rafalski Tr.) at 163:8-13, 164:4-12, 173:9-17, 174:12-16, 352:4-11, 353:4-10, 391:3-6; Doc. #1969-19 (5/14/19 Rafalski Tr.) at 571:20 – 572:6; Doc. #2262 (PD4 Ex. 8); Doc. #2262-1 (PD4 Ex. 9) at 345; Doc. #2262-6 (PD4 Ex. 14); Doc. #2997-5 (PD4 Ex. 15); Doc. #1970-4 (Reardon Tr.) at 429:3-14; Doc. #1972-16 (8/3/18 Zimmerman Tr.) at 121:12-21, 122:18-23, 131:7 – 133:22.

[51] Experts often rely on a defendant's internal data and records in forming their opinions. *See, e.g., Smith*, 714 F. Supp. 2d at 857 (expert "may properly testify as to his interpretation of internal marketing-related documents that he relied on in forming his opinions"); *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 848 (S.D.W. Va. 2018) ("Not only did Dr. Baruch offer a thorough, amply supported opinion, but he also relied, in large part, upon information, studies, and models published by Defendant and its researchers."); *United States ex rel. George v. Fresenius Med. Care Holdings, Inc.*, No. 2:12-CV-00877-AKK, 2016 WL 5361666, at *9 (N.D. Ala. Sept. 26, 2016) (rejecting defendant's argument that expert's "testimony is unreliable simply because he relied on [the defendant's] own internal documents that are, apparently, inaccurate"); *In re Actos® (Pioglitazone) Prod. Liab. Litig.*, No. 6:11-MD-2299, 2014 WL 12653759, at *7 (W.D. La. Jan. 14, 2014) ("[The expert's] opinions are directed to conclusions about what the Defendants knew, or should have known, *based on their own documents*, and how that did effect, or, in her opinion, should have affected, the Defendants' marketing, regulatory, and promotional activities") (emphasis in original).

[52] *See, e.g.,* Doc. #2000-22 (Rafalski Rep.) at pp. 36, 125-128, 130; Doc. #1969-19 (5/14/19 Rafalski Tr.) at 465:18 – 466:6, Doc. #2260-7 (PD4 Ex. 7); Doc. #2262-2 (PD4 Ex. 10) at pp. 14-16.

programs.[53]

The Pharmacy Defendants emphasize that Mr. Rafalski only vouched for one of these methodologies, stating the other four were not suitable.  But the reason Mr. Rafalski deems these methodologies unsuitable is because they would significantly **undercount** "suspicious orders."[54] Mr. Rafalski does not opine, and Plaintiffs do not concede, that any of these metrics necessarily would have satisfied the Pharmacy Defendants' obligations under the CSA.  But they are still relevant to show the large numbers of orders that would have been flagged even under the inadequate systems used by distributors in the industry, which demonstrates how far below the threshold of compliance the Pharmacy Defendants' actual conduct fell.  Seeing the number of suspicious orders that each methodology would have flagged will help provide the jury with a reasonable range of the total number of orders each Pharmacy Defendant should have identified as suspicious and investigated.  For these reasons, the Pharmacy Defendants' MIL No. 9 should be denied.

10.    **Pharmacy Defendants' MIL No. 10**: **To preclude evidence or argument relating to participation in trade associations.  (Doc. #3426)**

In their MIL No. 10, the Pharmacy Defendants seek to preclude "any evidence or argument concerning [their] participation in trade associations and protected petitioning activity." Doc. #3426 at p. 1.  They largely repeat the same legal arguments posited by the Track 1A defendants in their previous motions *in limine*.  *Id.* at pp. 3-4.  The Court properly rejected these arguments in Track 1A and should do so again in Track 1B.  Doc. #3058 (Evidentiary Order) at pp. 51-53; *see also* Doc. #2815 (CT1A Ps' MIL Opp.) at pp. 21-31, 109-112.

The Pharmacy Defendants argue that the circumstances are different in this case because

---

[53]    *See, e.g.,* Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at pp. 39, 59-73 (and exhibits cited therein); Doc. #2208 (PSJ11 CVS MSJ Opp.) at pp. 9-11 (and exhibits cited therein); Doc. #2205 (PSJ18 WAG MSJ Opp.) at pp. 12-14 (and exhibits cited therein).

[54]    *See, e.g,* Doc. #2000-22 (Rafalski Rep.) at pp. 36, 54-62, 71, 75-76, 78-84, 86-87, 92-93, 125-130; Doc. #1969-18 (5/13/19 Rafalski Tr.) at 356:20 – 357:2; Doc. #1969-19 (5/14/19 Rafalski Tr.) at 477:4-7, 477:22 – 478:6, 478:15 – 479:1, 504:2-14, 669:18-20.

the only claim at issue is public nuisance; there are no RICO or conspiracy claims being asserted in Track 1B. Doc. #3426 at p. 2. They claim this evidence is irrelevant because: (i) "[p]urpose, character and motive simply are not at issue here for Plaintiffs' nuisance claim[;]" and (ii) "[p]articipation in a trade association also does not demonstrate the intent necessary for a public nuisance claim." *Id*. at pp. 2-3. Not so. Plaintiffs intend to demonstrate at trial that the Pharmacy Defendants deliberately facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market and that the opioid epidemic was a necessary consequence of their intentional conduct. As part of their plan, the Pharmacy Defendants used various trade associations as front groups to coordinate a number of joint strategies to protect the supply chain, influence policy related to opioid drug abuse and diversion, and subvert their CSA duties.[55]

For example, the National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies. Almost all of the Pharmacy Defendants were members of the NACDS.[56] Indeed, many of the Pharmacy Defendants have their own representatives serving on NACDS's Board of Directors, which determines the "strategic vision" of the organization.[57] Their representatives have also served on and run key governing committees and working groups within the organization, including the Policy Council (which "helps establish policy positions and makes recommendations to the Board of Directors"),[58] the DEA compliance working group, the legal

---

[55] *See, e.g.*, Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at pp. 6-7, 30-31, 42-57 (and exhibits cited therein); Doc. #2169-16 (George Tr.) at 242:16 – 246:14, 256:15 – 259:5; Doc. #1963-9 (Kaleta Tr.) at 397:4 – 399:12; Doc. #2169-28 (Moffatt) at 146:11 – 151:6; Doc. #1962-31 (1/23/19 Hiland Tr.) at 152:16 – 153:17, 156:11 – 159:4, 160:9 – 171:25, 177:18 – 179:17, 180:12 – 182:11, 184:14 – 224:14, 226:2-17, 234:7-20.

[56] *See, e.g.*, Doc. #1963-9 (Kaleta Tr.) at 176:2-7, 390:18 – 391:2, 421:4-20; Doc. #1961-21 (Dymon Tr.) at 289:8-17; Doc. #2169-28 (Moffatt) at 140:7-10; Doc. #1962-30 (1/22/19 Hiland Tr.) at 342:16-20, 352:2-5, 459:18-21; Doc. #1962-31 (1/23/19 Hiland Tr.) at 149:5-21, 159:10 – 160:8; Doc. #1971-12 (Tsipakis Tr.) at 260:2-8.

[57] *See, e.g.*, Doc. #1963-9 (Kaleta Tr.) at 402:23 – 403:15, 414:8 – 415:1; Doc. #2169-28 (Moffatt) at 143:21 – 144:20; Doc. #1962-31 (1/23/19 Hiland Tr.) at 174:1 – 177:17.

[58] Doc. #1963-9 (Kaleta Tr.) at 403:17 – 404:1; *see also id.* at 408:2-12 ("We help determine policy priorities and policy positions for NACDS and make recommendations to the board. The board then

working group, the federal working group, and the controlled substance report group.[59]

The Pharmacy Defendants were active participants in the NACDS. They have contributed millions of dollars over the years to fund the organization.[60] They regularly attended NACDS meetings and events.[61] They provided input and edits as to NACDS's policy decisions and positions.[62] And the NACDS provided them with information, resources, and guidance related to their roles and responsibilities as distributors.[63] Additionally, the NACDS often worked hand-in-hand with the Healthcare Distribution Alliance ("HDA"), formerly known as the Healthcare Distribution Management Association ("HDMA"), a national trade association representing the interests of distributors.[64] As the Pharmacy Defendants themselves acknowledge, "the CVS

---

decides whether to approve or decline those . . . recommendations.").

[59] *See, e.g.*, Doc. #1963-9 (Kaleta Tr.) at 176:8-10, 402:15-22, 403:17 – 404:1, 408:2-12, 408:16-22, 409:5-16, 410:14 – 413:19, 416:6 – 417:11; Doc. #2169-16 (George Tr.) at 44:24 – 45:9, 283:12 – 287:3; Doc. #1971-8 (Swords Tr.) at 26:24 – 27:4, 72:7 – 74:2, 94:11 – 95:13; Doc. #1959-20 (G. Chapman Tr.) at 320:8 – 322:23, 323:18 – 324:25, 326:6-17; Doc. #1962-30 (1/22/19 Hiland Tr.) at 343:21 – 344:6; Doc. #1962-31 (1/23/19 Hiland Tr.) at 103:22 – 104:8, 149:25 – 151:10, 152:16 – 153:17, 156:11 – 160:8, 172:23 – 173:12, 235:13 – 239:4; Doc. #1962-21 (1/30/19 Hart Tr.) at 241:4 – 242:9.

[60] *See, e.g.*, Doc. #1963-9 (Kaleta Tr.) at 18:11-15, 417:21 – 421:3 (Walgreens has paid approximately $10.2 million to NACDS over the last decade); Doc. #2169-28 (Moffatt) at 140:19 – 143:13.

[61] *See, e.g.*, Doc. #1969-10 (Polster Tr.) at 376:9-15 ("We were part of the opioid task force with NACDS. We went to numerous meetings."); Doc. #1959-20 (G. Chapman Tr.) at 320:8 – 322:23, 323:18 – 324:25; Doc. #1962-30 (1/22/19 Hiland Tr.) at 351:10-13; Doc. #1962-31 (1/23/19 Hiland Tr.) at 149:25 – 151:10; Doc. #1962-21 (1/30/19 Hart Tr.) at 217:2-12, 241:4 – 242:9.

[62] *See, e.g.*, Doc. #1963-9 (Kaleta Tr.) at 176:11-13, 177:8 – 178:21, 180:3-14; Doc. #1961-21 (Dymon Tr.) at 289:18 – 290:6; Doc. #2169-16 (George Tr.) at 46:20 – 47:9; Doc. #1962-31 (1/23/19 Hiland Tr.) at 221:17 – 224:14.

[63] *See, e.g.*, Doc. #1959-10 (12/16/18 Bratton Tr.) at 242:11 – 243:23; Doc. #1959-20 (G. Chapman Tr.) at 60:4-18 ("Q: And how do you help represent Walmart at the NACDS? A: It would be by learning what topics are going on, either within state legislation, federal legislation, billing practices, Medicaid changes. It could be a variety of issues that are discussed."), 325:14 – 327:6; Doc. #1962-30 (1/22/19 Hiland Tr.) at 459:24 – 465:2; Doc. #1962-31 (1/23/19 Hiland Tr.) at 154:3-9, 183:3 – 184:5, 239:7 – 241:20; Doc. #1962-21 (1/30/19 Hart Tr.) at 69:23 – 70:10, 75:12-23, 241:4-8 ("Q: You mentioned NACDS before as a resource that you used to determine how Rite Aid was to comply with various regulations regarding controlled substances, though. Right? A: Yes."); Doc. #1971-12 (Tsipakis Tr.) at 260:9-14.

[64] *See, e.g.*, Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at p. 7 & n.21, 30-31, 44-45, 48-51, 53-57 (and exhibits cited therein); Doc. #1963-9 (Kaleta Tr.) at 396:9-15 ("Q: Through your association and

Defendants' direct or indirect parent corporation" has been an affiliate member of the HDA (f/k/a HDMA) since 2008. Doc. #3426 at p. 1 n.1. Indeed, in 2010, the HDMA stated: "The continued support and participation of CVS Caremark is critical to our success and enable HDMA to provide a wide variety of services that inform your key business decisions and help facilitate connections with your clients and trading partners[.]" **Ex. A** (CVS-MDLT1-000099537-540) at 539. *See also* **Ex. B** (CVS-MDLT1-000099569-570) at 569.

Thus, evidence of the Pharmacy Defendants' participation in trade associations and lobbying efforts demonstrates their intent, knowledge, purpose, and motives as it relates to their distribution of opioids. These issues are certainly relevant to the ultimate question the jury will decide: whether the Pharmacy Defendants engaged in unlawful **or intentional** conduct that caused a substantial interference with a public right.[65] Accordingly, the Pharmacy Defendants' argument that such evidence is irrelevant is entirely without merit.[66]

As previously noted, Plaintiffs have already addressed most of the Pharmacy Defendant's legal arguments (Doc. #3426 at pp. 2-4) in their prior motion *in limine* briefing. Doc. #2815 (CT1A Ps' MIL Opp.) at pp. 21-31 (addressing First Amendment, *Noerr-Pennington*, and

---

membership in NACDS, do you ever interact with HDA and HDMA as it comes to common interest in lobbying? A: So, Walgreens interacts, has historically, with HDA on different issues, yes.") (internal objection omitted), 396:17-24 ("Q: Has Walgreens interacted with HDA on issues related to opioids? A: I would say the answer is yes in that we have spent extensive time working with HDA on the Drug Supply Chain Security Act that passed in 2014 that was dealing with trying to update the technology in the supply chain and, so, on a de facto basis that impacts opioids. So, yes.").

[65] "Intentional" conduct "'means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance.'" *In re Natl. Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 675 (N.D. Ohio 2019) (quoting *Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 863 (N.D. Ohio 2017)). In other words, "'[w]here the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies." *Id.* (quoting *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944)). Moreover, a defendant will be considered to have intentionally contributed to a public nuisance if it becomes aware that harm is resulting from its conduct and continues to act in the same manner. *See* RESTATEMENT (SECOND) OF TORTS § 825, cmt. d ("[W]hen the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.").

[66] That this evidence is also relevant to demonstrate a conspiracy does not negate its relevance to Plaintiffs' public nuisance claim.

Rule 403 arguments and distinguishing *Weit v. Contl. Illinois Nat. Bank and Tr. Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981); *U.S. Football League v. Natl. Football League*, 634 F. Supp. 1155 (S.D.N.Y. 1986); and *U.S. Football League v. Natl. Football League*, 842 F.2d 1335 (2d Cir. 1988)), pp. 109-112 (addressing trade association arguments and distinguishing *In re Welding Fume Products Liab. Litig.*, 526 F. Supp. 2d 775 (N.D. Ohio 2007) and *In re Asbestos Sch. Litig.*, 46 F.3d 1284 (3d Cir. 1994)).

The Pharmacy Defendants do cite a few new cases in their current motion, but none of them justify granting this MIL. In all these cases, none of which deal with evidentiary issues, the plaintiffs were seeking to impose liability on the defendants based solely on their lobbying or trade association activity. *See N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920, 924 (1982) (holding that individuals' mere attendance and participation at NAACP meetings was "an insufficient predicate on which to impose liability" where there was no suggestion "that any illegal conduct was authorized, ratified, or even discussed at any of the meetings"; "Civil liability may not be imposed **merely** because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed **by reason of association alone**, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.") (emphasis added); *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129, 138-45 (1961) (defendant railroads could not be held liable for antitrust conspiracy based on their publicity campaign to influence legislative action; "[W]e think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws."); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 297-99 (6th Cir. 1992) (public lobbying by teachers' union and local managing agent labeling principal as racist and urging his dismissal was not actionable under § 1983; "Under the *Noerr-Pennington* doctrine, **liability** may not be assessed under § 1983 or the anti-trust laws except in very limited circumstances, for actions taken when petitioning authorities to take official action, regardless of the motives of the petitioners, even where the petitioning activity has the intent or effect of

depriving another of property interests.") (emphasis added); *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989) (city's non-frivolous prosecution of lawsuit regarding its effort to keep professional hockey team at city stadium could not form the basis for antitrust liability). But as Plaintiffs have repeatedly stated, they are not seeking to impose liability on the Pharmacy Defendants based on their mere participation in trade associations or lobbying efforts; rather, they seek to use evidence of such conduct for other purposes, including to demonstrate the Pharmacy Defendants' knowledge, motive, and intent.

The Pharmacy Defendants certainly have not demonstrated that all trade association and lobbying evidence is "clearly inadmissible on all potential grounds." *Indiana Ins.*, 326 F. Supp. 2d at 846. The admissibility of any particular piece of such evidence should be determined at trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Id*. Accordingly, the Pharmacy Defendants' MIL No. 10 should be denied.

**B.** **PLAINTIFFS' RESPONSE TO RITE AID'S MOTION *IN LIMINE* TO EXCLUDE ORDERS FROM NON-DEFENDANT DISTRIBUTORS (DOC. #3423).**

In this MIL, Defendant Rite Aid, joined by Defendants Giant Eagle and HBC (Doc. #3423 at p. 1 n.1), (collectively, the "Moving Defendants") seek to preclude evidence of opioid orders by Rite Aid or Giant Eagle pharmacies from non-defendant distributors (*i.e.*, McKesson). *Id*. at p. 1. They claim such evidence is irrelevant, unfairly prejudicial, and "would confuse the issues before the jury and unduly delay the trial." *Id*. at p. 1. Specifically, the Moving Defendants claim that evidence of their pharmacies' opioid orders from McKesson is irrelevant because such evidence does not demonstrate that the Moving Defendants failed to monitor suspicious orders. Id. at pp. 1-3 & n.1. Their arguments are groundless and should be rejected.

In addition to self-distributing, the Moving Defendants knew their pharmacies also received shipments of opioids from outside distributors, like McKesson.[67] And because they had complete visibility into all dispensing-level data from their own pharmacies, they had access to

---

[67] *See, e.g.*, Doc. #2169-10 (R. Chapman Tr.) at 29:24 – 30:23; Doc. #2169-5 (Bianco Tr.) at 18:13-20; Doc. #1961-20 (Durr Tr.) at 133:17-21; Doc. #1966-18 (McClune Tr.) at 123:25 – 124:15.

data regarding the amount of opioids their pharmacies were receiving from these outside distributors.[68]  In order to properly monitor suspicious orders, they should have been taking into consideration the **total** amount of opioids (Schedule II and Schedule III) received by their pharmacies.  Instead, they worked closely with McKesson to circumvent any meaningful limit on opioid distribution to their pharmacies.  For example, McKesson would notify the Moving Defendants when their pharmacies were approaching or exceeding McKesson's thresholds and regularly granted threshold increases without conducting any due diligence.[69]  This evidence is directly relevant to the sufficiency of the Moving Defendants' SOMS programs, as well as to their knowledge and intent.  There is no risk of unfair prejudice or jury confusion, as Plaintiffs have no intention of arguing at trial that the Moving Defendants are liable for McKesson's distribution misconduct.  If and when this evidence is introduced at trial, the Moving Defendants can request a reasonable limiting instruction if they believe further clarification is needed.  *See, e.g., In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *53 (S.D. Ohio Feb. 17, 2016); *Akers*, 2019 WL 4934948, at *4.

For these reasons, the cases cited by the Moving Defendants are inapposite.  In *Davis v. Siemens Med. Sols. USA, Inc.*, the plaintiff sued his former employer, asserting a number of claims, including breach of contract, fraudulent misrepresentation, and intentional infliction of emotional distress.  279 F. App'x 378, 378-79 (6th Cir. 2008).  All but his fraudulent misrepresentation claim were dismissed on summary judgment.  *Id.* at 379.  At trial, the plaintiff sought to introduce evidence that one year after the purported fraud took place, the plaintiff and certain fellow

---

[68]  *See, e.g.*, Doc. #1962-21 (1/30/19 Hart Tr.) at 151:4 – 153:2; Doc. #2169-10 (R. Chapman Tr.) at 153:11-25; Doc. #1956-20 (Belli Tr.) at 138:8 – 139:9; Doc. #2169-14 (Frost Tr.) at 162:18 – 164:6, 170:20 – 171:20; Doc. #1966-18 (McClune Tr.) at 127:12-17; Doc. #1971-12 (Tsipakis Tr.) at 222:20 – 223:5, 223:18-25, 225:2-22.

[69]  *See, e.g.*, Doc. #2182 (PSJ3 Conspiracy MSJ Opp.) at pp. 69-71 (and exhibits cited therein); Doc. #2169-10 (R. Chapman Tr.) at 152:14 – 153:10; Doc. #2169-31 (Novack Tr.) at 99:4-13, 149:9 – 151:16, 152:16-21, 190:8-20, 282:8 – 283:7, 296:8-19, 359:19 – 360:14, 362:15-22, 363:9-13, 364:14-19, 369:12 – 370:8; Doc. #2169-5 (Bianco Tr.) at 171:4-16, 172:7 – 179:5; Doc. #1959-18 (Carlson Tr.) at 105:22 – 106:10, 234:2-16; Doc. #1966-18 (McClune Tr.) at 190:16 – 194:17.

employees were mistreated by a management official not involved in the underlying fraud.  *Id*. at 380-81.  The Sixth Circuit held that such evidence was properly excluded because it was irrelevant to the plaintiff's misrepresentation claim.  *Id*.  Although the evidence may have been relevant to the plaintiff's claim for intentional infliction of emotional distress, that claim had already been dismissed.  *Id*. at 380.  Similarly, in *Surface v. Conklin*, the defendant sought to preclude five opinions of the plaintiff's expert witness, arguing they were "irrelevant because they concern dismissed parties and claims no longer before the Court."  No. 1:15-CV-40, 2018 WL 6257984, at *6 (S.D. Ohio Nov. 30, 2018).  After noting that "[c]ourts will exclude expert testimony where it applied **only** to already dismissed claims[,]" the court determined that four of the expert's opinions should be excluded as irrelevant because they "all relate to claims against parties that have been dismissed." *Id*. (emphasis added).  The court declined to exclude the fifth opinion, noting that it was still relevant to the plaintiff's remaining claims.  *Id*.

Unlike in *Davis* and *Surface*, in the present case evidence of pharmacy orders from non-defendant distributors **is** relevant to Plaintiffs' nuisance claims against the Moving Defendants. Thus, as the Moving Defendants have not demonstrated that this evidence is "clearly inadmissible on all potential grounds[,]" their MIL should be denied.  *Indiana Ins.*, 326 F. Supp. 2d at 846.

**C.    PLAINTIFFS' RESPONSE TO THE PHARMACY DEFENDANTS' PRESERVED OBJECTIONS TO THE COURT'S PRIOR EVIDENTIARY RULINGS. (DOC. #3411, 3422)**

In accordance with the Special Master's order (Doc. #3398), the Pharmacy Defendants jointly, and Walgreens individually, filed documents preserving their objections to certain evidentiary rulings previously made by the Court (i) denying, in whole or in part, certain Track 1A defendants' motions *in limine*, and (ii) granting, in whole or in part, Plaintiffs' prior motions *in limine*.  Doc. #3411 (Pharmacy Defendants' Omnibus Motion Preserving Objections to Prior Motions *in Limine*); Doc. #3422 (Walgreen Co.'s Omnibus Document to Preserve Arguments and Objections Related to Prior Motions *in Limine*).  Plaintiffs request that the Court enforce its prior rulings on these motions *in limine* for the reasons set forth in its Evidentiary Order and in Plaintiffs' prior *limine* briefing.  Doc. #3058 (Evidentiary Order); Doc. #2652 (CT1A Ps' MILs); Doc. #2815

(CT1A Ps' MIL Opp.); Doc. #2805 (CT1A Ps' MIL Reply).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny each of the

Pharmacy Defendants' joint and individual MILs, except as otherwise indicated above.


Dated: September 14, 2020


                                    Respectfully submitted,

                                    /s/Paul J. Hanly, Jr.
                                    Paul J. Hanly, Jr.
                                    SIMMONS HANLY CONROY
                                    112 Madison Avenue, 7th Floor
                                    New York, NY 10016
                                    (212) 784-6400
                                    (212) 213-5949 (fax)
                                    phanly@simmonsfirm.com

                                    Joseph F. Rice
                                    MOTLEY RICE
                                    28 Bridgeside Blvd.
                                    Mt. Pleasant, SC  29464
                                    (843) 216-9000
                                    (843) 216-9290 (Fax)
                                    jrice@motleyrice.com

                                    Paul T. Farrell, Jr.
                                    FARRELL LAW
                                    422 Ninth Street
                                    Huntington, WV 25701
                                    (304) 654-8281
                                    paul@farrell.law

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX 77069-3804
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Lead Trial Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

56

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*

Peter H. Weinberger

# EXHIBIT A

## Augustine , Diana

| | |
|---|---|
| **From:** | Parvu, Adela [Adela.Parvu@CVSCaremark.com] |
| **Sent:** | Tuesday, January 18, 2011 12:41 PM |
| **To:** | Spink, Amy |
| **Cc:** | Augustine , Diana |
| **Subject:** | FW: QUESTION?   FW: PLEASE ADVISE:  HDMA Invoice |
| **Attachments:** | Scann001.pdf |

Amy,

Please process ... manager approval attached ...

Thank you,

Adela Parvu | CVS Caremark | Financial Analyst - Accounts Payable - PBM | Phone 401-770-7950 | Fax 401-733-0711 | One CVS Drive MC0287, Woonsocket, RI 02895 | Adela.Parvu@CVSCaremark.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

**From:** Augustine , Diana [mailto:Diana.Augustine@caremark.com]
**Sent:** Tuesday, January 18, 2011 1:37 PM
**To:** Parvu, Adela
**Subject:** QUESTION? FW: PLEASE ADVISE: HDMA Invoice

I have attached an electronic, scanned and signed copy by Deb Farrell approving payment of $7,500.. Is this acceptable?
Thanks.

**From:** Parvu, Adela [mailto:Adela.Parvu@CVSCaremark.com]
**Sent:** Tuesday, January 18, 2011 11:26 AM
**To:** Spink, Amy
**Cc:** Augustine , Diana
**Subject:** FW: PLEASE ADVISE: HDMA Invoice

Hello Amy,

Please see below.

Diana, you will still to have the manager approve the invoice (sign on the invoice or send an electronic approval stating the amount that he approves).
Please keep this handy ...



PLAINTIFF
EXHIBIT
**GRAY-78**
7/31/2020

1

CVS-MDLT1-000099537

**PBM Accounts Payable Department** 99563
**Phone List as of 10-29-09**

| Last, First Name | Ext. | Full = | Vendors |
|---|---|---|---|
| Gregory, Kate | 7979 | (401)770-7979 | D , J-P |
| Sweatt, Dorothy | 3819 | (401)770-3819 | E, F,  Q-Z |
| Spink, Amy | 7993 | (401)770-7993 | A-C, G, I, H |
| | | | |
| Matkowski, Robert | 7985 | (401)770-7985 | CHECK REQUESTS |
| Parvu, Adela | 7950 | (401)770-7950 | UPLOADS |
| | | | |
| | | | |
| | | | |
| | | | |
| Ward, Kara | 7963 | (401)770-7963 | Expense Reports |

Thank you,

Adela Parvu | CVS Caremark | Financial Analyst - Accounts Payable - PBM | Phone 401-770-7950 | Fax 401-733-0711 | One CVS Drive MC0287, Woonsocket, RI 02895 | Adela.Parvu@CVSCaremark.com

CONFIDENTIALITY NOTICE: This communication and any attachments may contain confidential and/or privileged information for the use of the designated recipients named above.  If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.  If you have received this communication in error, please notify the sender immediately by telephone and destroy all copies of this communication and any attachments.

**From:** Augustine , Diana [mailto:Diana.Augustine@caremark.com]
**Sent:** Tuesday, January 18, 2011 11:47 AM
**To:** Parvu, Adela
**Subject:** PLEASE ADVISE: HDMA Invoice

Good Morning, Adela

Can you process the attached invoice for a quick payment of member dues in the amount of $7,500.  It is due by the end of this month to avoid a suspension of benefits.  It is approved for payment by Deb Farrell.
Thank you.

Diana Augustine | CVS Caremark | Administrative Assistant | Phone: 847-559-3832 | Fax: 847-559-5702 | 35 — Sanders Road, Northbrook, Il  60062  MC NB193 | email:
diana.augustine@caremark.com

CONFIDENTIAL

CVS-MDLT1-000099538



**CHDMA**
*Healthcare Distribution*
*Management Association*

October 27, 2010

Ms. Debra L. Farrell
Vice President, Pharmaceutical Procurement
CVS Caremark
2211 Sanders Rd
Northbrook, IL 60062

Dear Ms. Farrell:

As 2010 comes to a close, we can look back on a truly eventful year — one focused on execution and implementation at the Association, within our government and in the industry.

For HDMA, it was a year for implementing elements of our strategic plan. We consolidated our two major meetings into one successful event, the Business & Leadership Conference, which was held back in June. Thirty distributor member companies and more than 100 manufacturer companies attended this program, represented by 395 people. And, more than 4,000 one-on-one business appointments were scheduled between our distributor and manufacturer members, and they took advantage of the opportunity to visit with Allied members in the Service Provider Pavilion. We look forward to further enhancing this premier distribution industry event for 2011.

Another element of our strategic plan was a new focus on the growth of specialty medicines. After months of planning, HDMA and the Specialty & Biotech Distributors Association — an association dedicated to advancing policies that promote efficient, secure distribution of specialty pharmaceuticals and biologics — integrated associations and operations on July 1. The integration has harmonized efforts to address specialty distribution issues related to regulation, legislation and industry; leveraged the organizations' combined resources; and provided a unified voice for the healthcare distribution industry on issues related to specialty pharmaceuticals. Led by the new HDMA Specialty & Biotech Distributors Council, these specialty distribution issues will become a critical part of HDMA's ongoing agenda.

The continued support and participation of CVS Caremark is critical to our success and enable HDMA to provide a wide variety of services that inform your key business decisions and help facilitate connections with your clients and trading partners:

**HDMA provides opportunities for participants across the supply chain to come together to build business and exchange ideas.** HDMA's major meetings and seminars bring participants together to discuss unique distribution issues, forge new partnerships and enhance existing relationships.

**HDMA continues to lead the discussion on supply chain security issues.** Our mission is to protect patient safety and access to medicines through the safe and efficient distribution of healthcare products and services. Through the development of new resources and education, HDMA remains at the forefront of industry discussions surrounding in-transit cargo security, track and trace, reverse logistics, barcoding and more.

901 North Glebe Road • Suite 1000 • Arlington, VA 22203
(703) 787-0000 • (703) 812-0539 (Confidential Fax) • www.HealthcareDistribution.org

**HDMA partners with the Center for Healthcare Supply Chain Research to deliver industry-defining research.** In 2010 the Center enhanced its focus on the specialty channel by launching a new study on the *Role of the Specialty Distributor* and completing the second edition of *Specialty Pharmaceuticals: Facts, Figures and Trends*. The Center also completed a study assessing the requirements of Risk Evaluation and Mitigation Strategies (REMS) on the supply chain. Next year, the Center will update the landmark report, *The Role of the Distributor in the U.S. Healthcare Industry*.

**HDMA develops critical industry resources and education to help manufacturers and distributors enhance the safety and efficiency of their supply chains.** HDMA develops resources and guidelines that support Electronic Data Interchange (EDI), in-transit security, barcode labeling and reverse logistics. An expanded education program highlights the issues that matter most to the distribution industry, such as product lifecycle management, cold chain management and emergency preparedness.

For your reference I have included materials that address Allied member dues for 2011. I am pleased to let you know that HDMA Allied member dues rates are unchanged from 2010.

As ever, we truly appreciate your participation and continued support. Please do not hesitate to contact me should you have questions about this process or need any assistance or additional information from HDMA.

2011 promises to be another exciting year for both HDMA and its Allied members. I look forward to working with you in the year to come.

Sincerely,

John M. Gray
President and CEO

**Enclosure :**
*HDMA Dues Invoice*

CVS-MDLT1-000099540

# EXHIBIT B



**Healthcare Distribution**
**Management Association**

November 14, 2012

Ms. Debra L. Farrell
Vice President, Pharmaceutical Procurement
CVS Caremark Corporation
2211 Sanders Road
Northbrook, IL 60062

Dear Ms. Farrell:

As I noted in a January 2012 article for *Chain Drug Review*, the only predictable constant in this industry is change. The pharmaceutical marketplace continues to shift through mergers and acquisitions, major patent expirations that move volume into generic drugs and the continued growth of specialty medicines. The legislative and regulatory environment also remains fluid, with hope of a federal traceability framework on the horizon, as well as controlled substance regulations and the search for solutions to address drug shortages dominating the landscape.

Through the changes of the past year, HDMA has worked to represent its members by maintaining an aggressive policy agenda, communicating the value of our industry to a variety of stakeholders and policymakers and developing education programs and forums to advance the operational excellence of our business.

With the support of CVS Caremark Corporation, HDMA in 2012 was able to:

- Educate industry, policymakers and other public officials about the healthcare distribution channel — in light of issues surrounding controlled substance abuse, drug shortages and gray market diversion — and inform the public of the everyday steps our industry takes to ensure patient safety and a secure supply chain.

- Host the Business & Leadership Conference, the industry's signature networking event, with more than 720 executives from over 150 distributor, manufacturer and service provider member companies participating in nearly 3,000 one-on-one business appointments.

- Partner with the International Federation of Pharmaceutical Wholesalers (IFPW) to co-host the annual Distribution Management Conference & Technology Expo this past March, with a record 450 executives in attendance and sold-out exhibit floor.

- Work with our members and other healthcare stakeholders to lead an advocacy effort and gain consensus for a federal pedigree and traceability framework to replace the current patchwork of state pedigree and licensure requirements across the country.

> **PLAINTIFF**
> **EXHIBIT**
> **GRAY-79**
> 7/31/2020

901 North Glebe Road · Suite 1000 · Arlington, VA 22203
(703) 787-0000 · (703) 812-5282 (Fax) · www.HealthcareDistribution.org

 CVS-MDLT1-000099569

- Support industry efforts to mitigate drug shortages by updating and releasing the *HDMA White Paper on Product Availability: Communications Guidelines for Managing Product Shortages in the Healthcare Supply Chain.*

- Launch new projects aimed at reducing returns of products facing loss of exclusivity, enhancing facility security and better understanding shopper insights into the front-of-store in independent pharmacies.

- Deliver education programming across major events and seminars, such as our popular "Track-and-Trace Technology Seminar," that featured outstanding keynote speakers and insightful breakout sessions.

In addition, HDMA's research foundation, the Center for Healthcare Supply Chain Research, released the 84th edition of the *HDMA Factbook* and *2012 Specialty Pharmaceuticals: Facts, Figures and Trends*; hosted seminars focused on specialty medicines and supply chain security; and, held a successful fourth annual CEO Roundtable Fundraiser.

Now more than ever, distributors are manufacturers are looking to meet their challenges with the help of companies like yours. As ever, we truly appreciate your participation and continued support. Please find enclosed your allied member dues invoice for 2013. I am pleased to let you know that, like last year, HDMA associate member dues rates will not increase.

We expect another exciting year for both HDMA and its distributor members in 2013. I look forward to working with you in the year to come.

Sincerely,

John M. Gray
President and CEO

Enclosure:
*2013 Dues Invoice*

CONFIDENTIAL

CVS-MDLT1-000099570

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One-B Trial* | Case No. 1:17-MD-2804 |

**PHARMACY DEFENDANTS' REPLY TO PLAINTIFFS' OMNIBUS RESPONSE TO
PHARMACY DEFENDANTS' MOTIONS *IN LIMINE***

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

REPLIES IN SUPPORT OF MOTIONS IN LIMINE ..................................................... 2

I.   The Court Should Preclude Evidence, Argument, Or Comments Regarding: 1) The
     Military Service, Employment, Religious Affiliation or Personal Experiences of
     Counsel and Staff, and 2) The Waiving or Donation of Attorney's or Expert Fees,
     or Any Portion of Any Recovery, to Charity or for the Benefit of the Community............. 2

     A.   Argument involving military service, employment, religious affiliation, or
          personal experiences of counsel and staff .................................................... 2

     B.   Evidence or Argument regarding waiving or donation of attorney or expert fees ....... 3

II.  The Court Should Preclude Evidence, Argument, Or Comments Regarding the
     Absence, Presence, or Identity of Defendant's Corporate Representatives at Trial............. 5

III. The Court Should Preclude Testimony or Argument Negatively Characterizing
     Defendants as Large Corporations...................................................................... 6

IV.  The Court Should Preclude Evidence, Argument, and Testimony Comparing
     Defendants' Conduct to Wars, National Tragedies, Terrorist Attacks, the Tobacco
     Industry, or Any Comparison of Defendants to Such Actors ..................................... 8

V.   The Court Should Preclude Evidence or Argument that Defendants Could Have
     Stopped Distributing Schedule II Controlled Substances.......................................... 10

VI.  The Court Should Preclude Evidence of Civil or Criminal Investigations or Other
     Litigation.................................................................................................... 11

VII. The Court Should Preclude Evidence of Settlements............................................... 16

VIII. The Court Should Preclude Evidence of Extraterritorial Conduct Without
     Establishing a Specific Nexus to Cuyahoga or Summit County and a Track 1B
     Defendant.................................................................................................... 20

IX.  The Court Should Limit Testimony of Craig McCann............................................. 22

X.   The Court Should Preclude Evidence or Argument Relating to Participation in
     Trade Associations......................................................................................... 25

CONCLUSION.................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Choice v. Coleman,*
2009 WL 4113936 (E.D. Mich. Nov. 23, 2009)....................................................................19

*Dear v. Crown Castle S., LLC,*
2016 U.S. Dist. LEXIS 198750 (S.D. Miss. June 16, 2016) ...................................................5

*Fed. Ins. Co. v. Mertz,*
2016 WL 1572995 (S.D.N.Y. Apr. 18, 2016).......................................................................13

*Guardian Life Ins. Co. of Am. v. Andraos,*
2009 WL 10674144 (C.D. Cal. Sept. 10, 2009) ....................................................................6

*Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.,*
772 F.3d 1031 (5th Cir. 2014) .............................................................................................19

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.,*
888 F.3d 753 (5th Cir. 2018) .................................................................................................4

*John Doe Co. No. 1 v. Consumer Fin. Prot. Bureau,*
195 F. Supp. 3d 9 (D.D.C. 2016) ...................................................................................13, 14

*Keys v. Wash. Metro. Area Transit Auth.,*
272 F.R.D. 243 (D.D.C. 2011)..............................................................................................14

*Kline v. Checker Notions Co.,*
2010 WL 750149 (N.D. Ohio Mar. 1, 2010) ......................................................................8, 9

*Mascarenas v. Cooper Tire & Rubber Co.,*
2010 U.S. Dist. LEXIS 157533 (S.D. Ga. Jan. 11, 2010)....................................................2, 6

*McLeod v. Parsons Corp.,*
73 F. App'x 846 (6th Cir. 2003) ...........................................................................................15

*Mut. Pharm. Co. v. Bartlett,*
570 U.S. 472 (2013)..............................................................................................................11

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886 (1982)..............................................................................................................25

*Nuutinen v. CBS Corp.*,
    2015 U.S. Dist. LEXIS 75134 (E.D. Wis. June 9, 2015) ........................................................... 6

*Park W. Galleries, Inc. v. Glob. Fine Art Registry*,
    2010 WL 848689 (E.D. Mich. Mar. 8, 2010) .................................................................. 13, 14

*United States v. Franks*,
    511 F.2d 25 (6th Cir. 1975) ........................................................................................... 17

*United States v. Hadaway*,
    681 F.2d 214 (4th Cir. 1982) ......................................................................................... 17

*United States v. Heine*,
    2017 WL 4423408 (D. Or. Oct. 5, 2017) ....................................................................... 14

*United States v. Solivan*,
    937 F.2d 1146 (6th Cir. 1991) ................................................................................... 9, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(a)(2)(B)(ii) .......................................................................................... 23

Fed. R. Evid. 401 ................................................................................................. 8, 11, 24

Fed. R. Evid. 402 ........................................................................................................... 11

Fed. R. Evid. 403 ..................................................................................................... 11, 15

Fed. R. Evid. 407 ........................................................................................................... 14

Fed. R. Evid. 801 ................................................................................................. 8, 11, 15

Fed. R. Evid. 802 ..................................................................................................... 8, 11

Fed. R. Evid. 803 ..................................................................................................... 8, 11

Fed. R. Evid. 804 ............................................................................................................. 8

## INTRODUCTION

Plaintiffs' omnibus response to Pharmacy Defendants' motions *in limine*, Dkt. 3464, reveals that Plaintiffs do not dispute the core premises of Pharmacy Defendants' motions. In many instances, Plaintiffs do not even offer any substantive legal argument for why a motion *in limine* should be denied. And to the extent Plaintiffs disagree with aspects of the Pharmacy Defendants' motions, for the most part, they cannot point to a single, concrete piece of evidence or argument that would be wrongly precluded by granting the motion. That failure is telling, given that by this point in the litigation, the parties have exchanged witness lists and exhibit lists. Yet, Plaintiffs repeatedly insist that the motions *in limine* are premature and should be decided at trial—presumably after the Plaintiffs have already raised before the jury the very evidence or argument the motion seeks to prohibit.

Plaintiffs' plea for delay rings hollow. Dkt. 3464 at 1. If at this stage of trial planning Plaintiffs are unable to identify a single exhibit or likely testimony that both falls within the category of information that one of Pharmacy Defendants' motions *in limine* seeks to preclude and is otherwise admissible, then they have tacitly conceded that Pharmacy Defendants' motions are well-founded. At a minimum, if any of Pharmacy Defendants' motions *in limine* are to be deferred to trial, Plaintiffs should be required to raise issues subject to the motion first outside of the presence of the jury and with full opportunity for Pharmacy Defendants to be heard on the issue.

Pharmacy Defendants' additional, specific replies in support of their joint motions *in limine*, *see* Dkts. 3413–18, 3420–21, 3425–26, are set out below.

## REPLIES IN SUPPORT OF MOTIONS *IN LIMINE*

I.  **The Court Should Preclude Evidence, Argument, Or Comments Regarding: 1) The Military Service, Employment, Religious Affiliation or Personal Experiences of Counsel and Staff, and 2) The Waiving or Donation of Attorney's or Expert Fees, or Any Portion of Any Recovery, to Charity or for the Benefit of the Community.**

A.  **Argument involving military service, employment, religious affiliation, or personal experiences of counsel and staff**

Plaintiffs' response admits that they have reversed course from the stipulation they entered into in Track 1A and now plan to delve into the military service, other or prior employment, religious affiliations or positions, or other personal experience of the parties' counsel or staff during the Track 1B trial.  Dkt. 3464 at 3–5.  Plaintiffs had it right the first time: such evidence is not relevant, is prejudicial, and should be excluded.

Plaintiffs' about-face relies on the unremarkable propositions that counsels' statements are not evidence and that some leeway should be allowed in opening and closing statements.  *Id.* at 4.  But these general propositions are no answer to the fundamental question of whether references to, for instance, counsel's military service should be excluded due to its lack of relevance and/or its prejudicial impact.  Plaintiffs' response fails to offer any legitimate reason why counsels' (or staffs') military service, employment, religious affiliation or other personal experience have any relevance to their claims.[1]  With a Baptist preacher as lead trial counsel, it is likely (and Plaintiffs do not deny) that Plaintiffs plan to refer to such religious position in order to appeal to the passions and/or prejudices of the jury.

---

[1] Plaintiffs cite *Mascarenas v. Cooper Tire & Rubber Co.*, 2010 U.S. Dist. LEXIS 157533 (S.D. Ga. Jan. 11, 2010) in their brief on the corporate representative issue, *see infra*, but that case supports Defendants' argument here, because in that case the court granted the defendant's motion *in limine* and precluded the parties from "making improper comments to the jury and from referencing the size of the law firms involved or the number of attorneys or legal assistants in these law firms." *Id.* at *28.  *Mascarenas* highlights the lack of relevance of information about a party's counsel.

As Plaintiffs likely recognized when entering into the Track 1A stipulation that they now disavow, opening the door to these types of statements invites irrelevant and prejudicial comparisons of counsels' military record, prior employment, or religious affiliation, as well as irrelevant and potentially prejudicial inferences by the jury based on, for example, counsel's particular religious affiliation (whether that be positive or negative feelings about a particular affiliation).  The Court should head this off by granting Pharmacy Defendants' motion *in limine*.[2]

**B.   Evidence or Argument regarding waiving or donation of attorney or expert fees**

Plaintiffs state in their response that they "have no intention of referencing any waiver or donation of [their attorney's] fees" but only "[s]o long as the Pharmacy Defendants do not attack Plaintiffs' attorneys' fees in front of the jury."   Dkt. 3464 at 6.   This aspect of Pharmacy Defendants' motion *in limine* is therefore agreed because Defendants have no intention of attacking Plaintiffs' attorney's fees at trial unless Plaintiffs somehow open the door to such an issue.

Plaintiffs' position is different, however, with respect to their experts' fees: "To the extent any of Plaintiffs' experts are waiving or donating a portion of their fee, Plaintiffs do not intend to offer such evidence during the expert's **direct** examination.  However, such evidence may become relevant to the extent the Pharmacy Defendants attempt to portray the expert as a hired gun or biased based on the amount he or she was paid in this case."  *Id.*  In other words, if Defendants cross examine Plaintiffs' experts with respect to their fees, Plaintiffs plan to elicit testimony that their experts are donating all or a portion of their fees to charity.  Notably, Plaintiffs provide no

---

[2] The Court can, of course, deal with the appropriate amount of "leeway" to be granted to counsel during opening and closing statements at trial, having established appropriate guideposts by granting this motion *in limine*.

details about any such fee-donation arrangements, and instead simply state that they plan to raise that issue if Defendants cross examine their experts about fees.

The dangers of attempting to bolster the credibility of experts by eliciting testimony and arguing in closing argument that plaintiffs' experts are donating their fees is best exemplified by *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Product Liability Litig*., 888 F.3d 753, 788–92 (5th Cir. 2018), where the Fifth Circuit Court of Appeals reversed a jury verdict for half-a-billion dollars and ordered a new trial as a result of "counsel's misrepresentations" about plaintiffs' experts' alleged pro bono compensation arrangements.  In *DePuy*, Mark Lanier elicited testimony and argued in closing that plaintiffs' experts were more credible than defendants' hired experts because they were working pro bono, but it was discovered after trial that the experts were in fact paid before and after the trial.

Plaintiffs' response, which could have simply stated (but does not) that none of their experts have any pro bono or charitable fee arrangements, raises the likelihood that Plaintiffs plan to argue that one or more of their experts is more credible than Defendants' experts because of undisclosed fee arrangements. As noted by the Firth Circuit in *DePuy*, an analysis of such arrangements is required in order to determine whether, in fact, they are actually disguised compensation.  As a result, Pharmacy Defendants' motion *in limine* should be granted to preclude any such evidence.

Finally, while Plaintiffs claim that they do not plan on introducing evidence regarding the costs of abatement, in the same breath they state that they "may offer evidence of the impact of the Pharmacy Defendants' conduct on community-based programs within the Counties".  *See* Dkt. 3464 at 7–8.  But such "impact" evidence is only relevant to the abatement phase and the use of such evidence in the liability trial would be nothing more than an improper appeal to the personal

and community interests of the jury which the Plaintiffs have previously recognized in their Track 1A Evidentiary Stipulations.  *See* Dkt. 2724 (stipulating that plaintiffs shall make no reference to the jurors' self-interest in the outcome of the litigation based on the jurors' status as taxpayers).

## II.  The Court Should Preclude Evidence, Argument, Or Comments Regarding the Absence, Presence, or Identity of Defendant's Corporate Representatives at Trial.

Plaintiffs acknowledge the Court's prior ruling that evidence or argument about whether a corporate representative does or does not attend all or part of the trial is precluded because such information "is not relevant to the merits of Plaintiffs' claims," Dkt.  3058 at 67–68, and simply state that they object to that prior ruling.  *See* Dkt. 3464 at 8.

Plaintiffs, however, take issue with the cases the Court cited in support of its ruling which hold that "the presence, absence, or identity of defendant's corporate representative is wholly irrelevant to plaintiffs' claims[.]"  Dkt. 3058 at 68 n.141 (citing *Riley v. Ford Motor Co.,* 2011 WL 3273592, at *3 (S.D. Miss. July 29, 2011)).  But the issue of the presence or identity of a corporate representative is nearly identical to the absence issue—neither has any relevance to the merits of Plaintiffs' claims.  *See Dear v. Crown Castle S., LLC*, 2016 U.S. Dist. LEXIS 198750, at *3 (S.D. Miss. June 16, 2016) (granting motion *in limine* because: "The Court finds that as '[t]he presence, absence, or identity of Defendants' corporate representatives is wholly irrelevant to [the Dear] Plaintiffs' claims.'" (citing *Riley*, 2011 WL 3273592, at *3)).

Plaintiffs protest that the requested ruling is too broad with respect to commenting on the presence or identity of a corporate witness because it could be interpreted to apply to the identification of Rule 30(b)(6) witnesses or a trial witness' testimony about their relationship to a Pharmacy Defendant. This argument is a red herring.  The purpose of the motion *in limine* is to prevent commentary or argument about whether a corporate party did or did not have a representative at all or part of the trial, and who that person was, because such information is

entirely irrelevant. The identification of testifying witnesses at trial is not impacted.[3] Therefore, Pharmacy Defendants' motion *in limine* should be granted.

## III. The Court Should Preclude Testimony or Argument Negatively Characterizing Defendants as Large Corporations.

Plaintiffs concede that negatively characterizing the Pharmacy Defendants as large corporations would "improperly inflame[e] the jury's emotions" and "appeal[] to its biases." Dkt. No. 3463 at 12. The parties are thus in agreement that any such evidence is inadmissible under Rule 403. In fact, Plaintiffs' only argument in opposition to this motion is that the Pharmacy Defendants have not demonstrated that "all evidence of their large size is 'clearly inadmissible on all potential grounds.'" *Id.* (quoting *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)).[4] But, of course, the Pharmacy Defendants never argued it was. *See* Dkt. 3415 at 2 n.1 ("As this Court has held, each Defendant is allowed to 'introduce and describe themselves accurately to the jury and explain how many people it employs and the work they do to ensure the safe . . . delivery of necessary medication to the people living in the Track One counties.' Dkt.

---

[3] Plaintiffs' reliance on *Nuutinen v. CBS Corp.*, 2015 U.S. Dist. LEXIS 75134, at *16 (E.D. Wis. June 9, 2015) is misplaced because that case merely addressed whether plaintiffs could identify a witness as defendant's corporate representative when calling him at trial, a point that is not disputed here. And, Plaintiffs' reliance on *Mascarenas*, 2010 U.S. Dist. LEXIS 157533, at *28 is also no help because, unlike here, the defendant in that case failed to support its motion *in limine* with appropriate argument or case law.

[4] In a footnote, Plaintiffs also suggest that, because the jury "will not be making any determination as to remedies," there is "no risk of it inflating a damage award based on a defendant's large size"—as if that somehow minimizes any risk of unfair prejudice. Dkt. 3464 at 10 n.10. But, of course, improperly inflaming the jury's emotions and appealing to its biases by negatively characterizing Pharmacy Defendants as large corporations would not affect only a determination of remedies but also the threshold determination of liability. *See, e.g.*, *Guardian Life Ins. Co. of Am. v. Andraos*, 2009 WL 10674144, *3 (C.D. Cal. Sept. 10, 2009) (describing "danger that such evidence might unfairly prejudice the jury **into finding for [plaintiffs]**") (emphasis added).

No. 3058 at 68.  This motion seeks only to preclude improper attempts by Plaintiffs to appeal to jurors' emotions by negatively characterizing Defendants as large corporations.").

Indeed, Plaintiffs' lead example of why the motion is purportedly "overbroad" shows exactly why it is necessary.  Plaintiffs insist that they should be allowed to argue to the jury that "Walmart is the largest private employer in the United States, with over 1.5 million employees. Yet, it assigned only three employees to review orders from its approximately 4,000 Walmart pharmacies nationwide."  Dkt. 3464 at 10.  That argument is inappropriate, first and foremost, because it is wrong.[5]  But it is also inappropriate because it invites the exact prejudicial inferences the motion *in limine* seeks to avoid. The number of employees serving other aspects of a defendant's business (e.g. home office, retail, grocery, distribution, logistics, and other work wholly unrelated to pharmacy operations) has absolutely no bearing on the adequacy of the Pharmacy Defendants' SOM programs. The only purpose in mentioning them is to imply to the jury that the defendants has deep pockets and therefore (1) should have done even more than the law requires or (2) should be held liable regardless of whether or not they were a substantial factor in causing the nuisance Plaintiffs allege.  Both of these highly prejudicial inferences are barred by Rule 403.

---

[5] As Plaintiffs are well aware at this point, throughout the time that Walmart self-distributed controlled substances, Walmart devoted significant resources to maintaining effective controls and procedures to guard against theft and diversion of controlled substances. Every employee at each pharmacy distribution center played a role in monitoring and reviewing orders for controlled substances, including orders of interest, and preventing diversion. Walmart also used a myriad of suspicious order monitoring systems during the time it self-distributed which also leveraged many different departments and countless employees, from employees in the field to employees at Home Office, including Global Investigations and Asset Protection, Logistics, the Pharmacy Order Monitoring team, and Practice Compliance.  Plaintiffs cannot change these facts through one, out-of-context snippet of deposition testimony.

The Court should grant the Pharmacy Defendants' motion *in limine* to preclude testimony or argument negatively characterizing them as large corporations.  *See* Dkt. 3415.

## IV. The Court Should Preclude Evidence, Argument, and Testimony Comparing Defendants' Conduct to Wars, National Tragedies, Terrorist Attacks, the Tobacco Industry, or Any Comparison of Defendants to Such Actors.

Plaintiffs agree with Pharmacy Defendants that any comparison of Pharmacy Defendants' conduct to wars, national tragedies, terrorist attacks, the tobacco industry or other corporate scandals, or any actors that participate in such other conduct would "improperly inflam[e] the jury with irrelevant comparisons."  Dkt. 3464 at 12.  And they do not even attempt to argue that comparing Pharmacy Defendants' conduct to such situations would have a "tendency to make a fact more or less probable."  Fed. R. Evid. 401(a).  They have thus tacitly conceded that any such evidence is inadmissible under Rules 401, 402, and 403.

Plaintiffs only argument in opposition to this motion is that a single PowerPoint presentation, produced by McKesson, who is not a party to Track 1B, and purportedly authored by a former DEA agent, Gary Boggs, contains "imagery of wars, terrorist attacks, and national tragedies." Dkt. 3464 at 12–13.  Plaintiffs argue that this document may be admissible to "illustrate how serious a former DEA employee found the opioid epidemic to be."  *Id.*  This is a distraction. For one thing, irrespective of Pharmacy Defendants' motion, this document is at best inadmissible and unreliable hearsay.[6]  *See* Fed. R. Evid. 801–04; *see also, e.g.*, *Kline v. Checker Notions Co.*, 2010 WL 750149, at *3 n.1 (N.D. Ohio Mar. 1, 2010) (refusing to admit testimony that was "contained in an unauthenticated document" and was "unsworn hearsay that does not fall within any exception").

---

[6] Mr. Boggs is not on Plaintiffs' exhibit list, and could not possibly be cross examined regarding the statements and sentiments Plaintiffs attribute to him through this presentation.

For another thing, the "imagery" in the presentation referenced in Plaintiffs' response, *see* Dkt. 3464 at 12–13, does not reference any national tragedies.  Instead, the "planes crashing," "collapsed building," and "explosion" imagery, *see id.*, are illustrating words in the presentation. The "planes crashing" imagery illustrates the title of a presentation slide: "***Collision*** Course."  *See* Dkt. 2397-4 (PSJ2 Ex. 137) at 7199 (emphasis added).  The "collapsed building" imagery illustrates a presentation slide titled "When can happen when these checks and balances ***collapse***?" *See id.* at 7208 (emphasis added).  And the "explosion" imagery illustrates a presentation slide referencing an "***Explosion*** of 'Pain Clinics.'"  *See id.* at 7211 (emphasis added).  Plainly, this imagery is not "comparing" anything, let alone Pharmacy Defendants, to a war, national tragedy, terrorist attack, or corporate scandal.

That being said, the portions of the presentation that Plaintiffs fail to discuss illustrate exactly why this motion *in limine* is necessary.  The presentation contains two highly inflammatory slides that (1) make a "Historical Comparison" of the opioid epidemic to the BP oil spill, and (2) discuss oxycodone deaths in Florida accompanied by an unrelated image of an apparent outdoor morgue populated by numerous corpses in body bags, apparently taken during some sort of mass casualty event.  *See* Dkt. 2397-4 at 7212, 7214.  The only purpose for such comparison and imagery would be to bias and inflame the jury against Pharmacy Defendants.  Rule 403 prohibits such tactics.  *See, e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) (stating "appeals to the jury . . . calculated to incite the passions and prejudices of the jurors" are inadmissible).

Plaintiffs also attempt to distinguish the case law cited in Pharmacy Defendants' motion on the facts, but they ignore the unifying underlying legal principle in those cases.  *See* Dkt. 3464 at 13–14.  If anything, the factual distinctions show that other courts have excluded evidence much less prejudicial than the sort of evidence that the Pharmacy Defendants' motion seeks to exclude.

For example, in *Solivan* the Sixth Circuit concluded that a new trial was necessary after plaintiffs' counsel compared "defendant's participation in the drug trade in northern Kentucky" to the "all of the other drug dealers like her" during closing argument.  937 F.2d at 1148, 1153.  The Sixth Circuit concluded that this statement prejudicially "appeal[ed] to the community conscience in the context of the War on Drugs."  *Id.* at 1153.  Here, by contrast, Pharmacy Defendants seek to bar explicit references to unrelated wrongful conduct, references that are even more overt, less relevant, and at least as prejudicial as those made in *Solivan*.

In short, Plaintiffs offer no plausible explanation for how comparing Pharmacy Defendants' alleged conduct to a war, national tragedy, terrorist attack, or the tobacco industry or other corporate scandal would be relevant, nor do they make any effort to explain how such comparison would be anything but unduly prejudicial.  On the contrary, all Plaintiffs can muster in response is a tenuous explanation of how one inadmissible and unfairly prejudicial third-party hearsay document could in theory be relevant and barred by the motion *in limine*, while ignoring the myriad other reasons that document is inadmissible.  The Court should grant the Pharmacy Defendants' motion *in limine* in full.  *See* Dkt. 3416.

## V. The Court Should Preclude Evidence or Argument that Defendants Could Have Stopped Distributing Schedule II Controlled Substances.

Plaintiffs concede, as they must, that they are precluded from arguing that the mere fact that the Pharmacy Defendants distributed FDA-approved medications is the basis for nuisance liability.  Dkt. 3464 at 15 (Plaintiffs representing that they "do not intend to argue that the Pharmacy Defendants are liable based merely on the fact that they distributed opioids"); *see also* Dkt. 3417.  Nor do they question that, as the Court has recognized, such preempted theories of liability must be excluded.  *See* Dkt. 3058 at 50 ("The Court agrees that preemption applies to any claims that generic manufacturers should have stopped selling opioids . . . .").  They emphasize

that they plan to rest liability on Pharmacy Defendants' alleged failure to "comply with the CSA when distributing their opioid products."  Dkt. 3464 at 17.

If that is the case, Pharmacy Defendants' motion *in limine* is uncontested.  All parties agree that Plaintiffs cannot, consistent with Supreme Court or Sixth Circuit precedent, argue that the Pharmacy Defendants should be held liable merely for distributing the legal products at issue in this case.  While the Court's prior rulings give Plaintiffs the right to argue that the Pharmacy Defendants were not in substantial compliance with the CSA, that alleged noncompliance is the only hook for their nuisance claim.  "Stop-selling" and "never-start-selling" theories cannot be tolerated.  Pharmacy Defendants' motion *in limine* should be granted.[7]

## VI. The Court Should Preclude Evidence of Civil or Criminal Investigations or Other Litigation.

The Court should bar evidence, testimony, or argument related to: (1) civil or criminal investigations involving a Defendant or its employees; (2) other litigation involving a Defendant or its employees; and (3) media coverage or other secondhand accounts of that evidence.  Such evidence is hearsay, irrelevant, and would be unduly prejudicial.  *See* Fed. R. Evid. 401–03, 801–03.  Plaintiffs offer no meaningful explanation as to why any of these categories of evidence is admissible.

*First*, and tellingly, Plaintiffs do not seek reconsideration of the Court's prior Track 1A ruling prohibiting "references to criminal investigations and indictments that did not result in a conviction," as well as references to grand jury proceedings. Dkt. 3058 at 16–17.  Thus, the aspect

---

[7] To the extent Plaintiffs argue that *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), is inapposite because it is a preemption case, *see* Dkt. 3464 at 16–17, that argument falls flat because *Bartlett*'s key holding that when an action is authorized by law, a party is "not required to cease acting altogether in order to avoid liability," 570 U.S. at 488, is plainly applicable outside the preemption context.

of Pharmacy Defendants' motion that seeks to bar evidence, testimony, or argument regarding criminal investigations is unopposed.

But Plaintiffs attempt to differentiate between criminal and civil investigations, arguing that civil investigations "may be highly probative to Plaintiffs' nuisance claims" by purportedly "demonstrat[ing] the Pharmacy Defendants' knowledge of their noncompliance with the CSA and the resulting diversion."  Dkt. 3464 at 21.[8]  But Plaintiffs never explain how the fact of the investigation—as opposed to the ***facts underlying*** the investigation—is relevant to their claims or how any relevance would outweigh the substantial risk of unfair prejudice.

If Plaintiffs are permitted to suggest that the fact a civil investigation ***occurred***, in and of itself, was relevant to show Pharmacy Defendants' liability, that will confusingly suggest to the jury that investigated conduct was ***necessarily unlawful***.  That is exactly the inference that numerous courts have held is impermissible, and it is particularly unfair when the investigating agency never obtained a judgment in its favor on the issue.  *See* Dkt. 3418 at 3–4 (collecting cases).  Any legitimate arguments to be made about conduct that was subject to civil investigation can be made through admissible evidence of the conduct itself and/or a Pharmacy Defendant's knowledge of that conduct.  It is those alleged facts—to the extent they are otherwise admissible—that Plaintiffs can use to argue that Pharmacy Defendants had "knowledge of their noncompliance with the CSA and [] resulting diversion," not the fact of the investigation itself.  Any evidence or argument regarding the fact of investigation is irrelevant and unfairly prejudicial.

---

[8] At least some of the "investigations" to which Plaintiffs cite are in fact routine DEA inspections of Pharmacy Defendants' distribution centers.  *Id.* at 21 & n. 21.  Pharmacy Defendants' motion does not seek to exclude evidence related to such routine inspections.  However, to the extent the DEA, as the result of a routine inspection, then opened an investigation into a Pharmacy Defendant, the fact of the investigation—as opposed to the facts underlying the investigations—should be excluded as irrelevant and unfairly prejudicial.

Plaintiffs' argument that the case law precluding evidence of civil investigations is "entirely distinguishable" is without merit.  Dkt. 3464 at 20.  For example, Plaintiffs argue that *Park West Galleries, Inc. v. Global Fine Art Registry*, 2010 WL 848689 (E.D. Mich. Mar. 8, 2010), is different because in that case "there [wa]s no evidence that any conclusions or findings ha[d] been made in any such investigation," and admitting such evidence would "require the jury to predict the outcome of the pending investigations."  Dkt. 3464 at 20 (quoting *Park W. Galleries*, 2010 WL 848689, at *2).  They attempt to draft a similar distinction with respect to *John Doe Co. No. 1 v. Consumer Financial Protection Bureau*, 195 F. Supp. 3d 9 (D.D.C. 2016).  *See* Dkt. 3464 at 20–21.  But the fact that an investigation is ongoing, as opposed to concluded without any resolution in the Government's favor, is a distinction without a difference.  The core holding of those cases—that introducing the fact of an investigation incorrectly suggests wrongdoing—is true for both ongoing cases and those that were abandoned without any adverse finding against a Pharmacy Defendant.  Indeed, the *John Doe* court emphasized that releasing evidence of an ongoing investigation "would likely cause [a defendant] debilitating reputational and financial hardship."  195 F. Supp. 3d at 21.

The Pharmacy Defendants' motion is even more justified where an investigation has concluded without any final finding of wrongdoing or judgment in the government's favor.  Investigations that do not result in a finding of wrongdoing cannot show noncompliance or knowledge of noncompliance.  However, jurors might mistakenly conclude that if there was an investigation then wrongdoing must have occurred.  *See, e.g.*, *Fed. Ins. Co. v. Mertz*, 2016 WL 1572995, at *4 (S.D.N.Y. Apr. 18, 2016) (concluding "[e]ven if relevant," testimony regarding an investigation was inadmissible under Rule 403 because "it risks the jury concluding that [defendant] has a propensity to be involved in [the alleged wrongdoing]").  Such a conclusion

would be unfairly prejudicial.  Plaintiffs vaguely argue that closed investigations would "provide context" to a Pharmacy Defendant's actions with respect to their SOMS programs, Dkt. 3464 at 21, but they do not explain how, or why the minimal relevance of providing "context" outweighs the unfair prejudice associated with mentioning the closed investigation.[9]  If Plaintiffs believe that the ***conduct being investigated*** provides context, nothing in the motion *in limine* would prevent them from discussing that conduct.

In short, the fact of a government investigation, whether criminal or civil, is inadmissible because that fact reflects only that an authority ***investigated*** whether wrongdoing occurred.  It does nothing to show whether any particular conduct occurred, let alone whether that conduct was wrongful.  *See, e.g.*, *United States v. Heine*, 2017 WL 4423408, at *23 (D. Or. Oct. 5, 2017); *John Doe Co. No. 1*, 195 F. Supp. 3d at 13; *Keys v. Wash. Metro. Area Transit Auth.*, 272 F.R.D. 243, 245 (D.D.C. 2011); *Park W. Galleries*, 2010 WL 848689, at *2.

As for evidence regarding litigation with third parties, Plaintiffs concede that "allegations in other lawsuits are typically considered hearsay."  Dkt. 3464 at 22; *see also* Dkt. 3418 at 4–6.  Nevertheless, Plaintiffs argue that "evidence of other litigation involving the Pharmacy Defendants (whether in or outside of the Counties) may be relevant to demonstrating their intent, knowledge, motive, or purpose."  Dkt. 3464 at 24.  But Plaintiffs cannot point to a single instance where the fact of a lawsuit, as opposed to the circumstances underlying the lawsuit, would provide such information to the jury.

---

[9] To the extent Plaintiffs would argue that changes to Pharmacy Defendants' SOM systems over time (whether in response to investigations or not) suggest that earlier versions did not comply with the CSA, such an argument is foreclosed by Rule 407, which provides that "evidence of [] subsequent measures is not admissible to prove . . . culpable conduct."

Moreover, because allegations in other lawsuits are unproven and necessarily hearsay, even if the fact of a lawsuit were somehow relevant (and it is not), the content of the allegations in that lawsuit are independently inadmissible and prejudicial (as the jury could wrongly conclude that simply because allegations have been made, they must be true).  *See* Fed. R. Evid. 403, 801; *see also, e.g.*, *McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003) (concluding the district court did not err in excluding evidence of other lawsuits where "there was no clear nexus between th[o]se lawsuits and this case").[10]

Finally, Plaintiffs largely ignored Pharmacy Defendants' argument that evidence of media coverage or other secondhand accounts of investigations or other litigation would be inadmissible hearsay.  Instead, Plaintiffs argue that "a Pharmacy Defendant's awareness or internal discussion of certain media coverage may be relevant to demonstrate its knowledge of diversion or the opioid epidemic generally."  Dkt. 3464 at 27.  But Plaintiffs do not provide a single example of an otherwise admissible document showing a Pharmacy Defendant discussing a hearsay article, let alone explain how they would solve the double-hearsay problem in any such document, or how that document would show knowledge of anything relevant to this case.  Moreover, Plaintiffs fail to address the fact that, even setting hearsay issues aside, media coverage of investigations or other litigation involving Pharmacy Defendants would be unfairly prejudicial, as it could erroneously be

---

[10] Plaintiffs argue that allegations in lawsuits may be used for a purpose other than the truth of the matter asserted, but they fail to provide any example of how an unproven allegation by a plaintiff in a lawsuit unrelated to these cases could be used to "provide context" to anything relevant to these cases or otherwise fall within a hearsay exception.  Nor do Plaintiffs explain how an allegation in a complaint could be admitted as a statement of a party-opponent.  To the extent Plaintiffs are referring to alleged statements by any Pharmacy Defendant contained in any complaint, Plaintiffs should use the underlying testimony or document itself, not a complaint that quotes from the testimony or document.

viewed by jurors as proof that Pharmacy Defendants have already been determined responsible for the opioid crisis.

The Court should grant Pharmacy Defendants' motion *in limine* to exclude evidence, including media and other secondhand coverage, relating to criminal or civil investigations involving a Pharmacy Defendant or its employees or other litigation involving a Pharmacy Defendant or its employees.

## VII. The Court Should Preclude Evidence of Settlements.

It is well-settled that evidence of civil and administrative settlement agreements, consent decrees, or fines, as well as media coverage or other secondhand accounts of such evidence, are not admissible under Rule 408.  *See* Dkt. 3420.  Pharmacy Defendants thus requested respectfully that, in light of the weight of authority, *see id.* at 1–4, 8–9, the Court reconsider its ruling in the Track 1A litigation regarding the admissibility of settlement evidence.

But even if the Court adheres to its prior ruling on Rule 408, Plaintiffs offer no convincing argument why the Court should not rule in the Pharmacy Defendants' favor on the arguments that were raised for the first time during the Track 1B motions *in limine*.

*First*, Plaintiffs concede that they should not be permitted to "reference the dollar amount of any settlements."  Dkt. 3464 at 31.  But the Court should also bar Plaintiffs from "generally referenc[ing] the size of a settlement," *id.*, because describing a settlement as "substantial" or "large" implicates the same dangers of unfair prejudice, issue confusion, and misleading the jury as would identifying a specific dollar amount.  *See* Dkt. 3420 at 4–5.  Indeed, Plaintiffs provide no authority for their claim that referencing the general size of a settlement is permissible.

*Second*, Plaintiffs offer no authority to support their argument that "evidence of settlements reached or involving conduct after the relevant time period"—that is, settlements dated *after* a defendant stopped distributing—may be admissible to show notice in an earlier time frame.

Plainly, a document created after conduct occurred cannot itself provide notice at the time the earlier conduct occurred, when the document did not even exist.  To the extent Plaintiffs seek to use settlements for reasons other than notice, i.e., "to demonstrate earlier intent or other[, undefined] issues," Dkt. 3464 at 31, they go far beyond the Court's prior ruling and run headlong into Rule 408's prohibition on using settlement agreements for the truth of the matter asserted.  Moreover, Plaintiffs do not identify any settlements that would provide insight into a Pharmacy Defendant's earlier intent, or explain how that would even be possible.  Nor do they cite a single case admitting evidence of a settlement agreement reached after the conduct at issue in the case.[11]

*Third*, Plaintiffs' arguments for why settlements relating to pharmacies outside of the Counties may be admissible are not persuasive.

Plaintiffs begin by arguing that extraterritorial "settlements that solely involved dispensing conduct are relevant" because those settlements "show that [Pharmacy Defendants] knew diversion was occurring from their own retail pharmacies." Dkt. 3464 at 21.  But isolated conduct by particular pharmacies in other, far away jurisdictions—staffed by altogether different pharmacists—are irrelevant to whether diversion occurred at any particular pharmacy in Cuyahoga or Summit county.  In other words, the fact that conduct of three or four particular pharmacists at two pharmacies in Sanford, Florida led to a settlement[12] does not mean that diversion occurred in

---

[11] Neither of the cases Plaintiffs cite, *United States v. Franks*, 511 F.2d 25, 36 (6th Cir. 1975), and *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982), involved the issue of whether to allow evidence of the fact of a subsequent settlement, whether to prove earlier intent or for any other purpose.  Instead, each allowed evidence of subsequent acts under Rule 404(b)'s exceptions regarding "other acts" evidence.  *See* Dkt. 3464 at 32 & n.30.  But as Pharmacy Defendants have established, most of the Rule 404(b) exceptions are, on their face, inapplicable here.  *See* Dkt. 3421 at 4 & n.1.

[12] Plaintiffs incorrectly characterize a settlement involving two CVS retail pharmacies in Sanford, Florida as relating to both dispensing and distribution activities.  Dkt. 3464 at 35; *id.* at 33 & n.31.  While the settlement agreement includes a broad *release* covering all CVS retail pharmacies and distribution centers in Florida, *see* Dkt. 2213-25 at ¶¶ 2, 5, there is no mention in

any other pharmacies, especially pharmacies hundreds of miles away that never have been the subject of an enforcement action.[13]  Moreover, even assuming that pharmacies in other jurisdictions knew that some third parties diverted prescriptions after they were dispensed, that would not show that Pharmacy Defendants lacked effective systems to monitor for suspicious wholesale orders of prescription opioids in Plaintiffs' jurisdictions.  The fact that Plaintiffs would suggest otherwise shows why this motion *in limine* is necessary. Such evidence is patently inadmissible under Rule 403.[14]

Plaintiffs argue that evidence of extraterritorial settlements are admissible to show that Pharmacy Defendants "had undertaken a deliberate and long-running course of conduct to evade their responsibilities to prevent diversion," as well as "a number of material issues in this case."[15] Dkt. 3464 at 34.  But even assuming that this argument is something more than an "if it happened there, it could have happened here" argument, *see* Dkt. 3464 at 34, Plaintiffs have failed to explain why evidence of the *settlement*, as opposed to the underlying conduct, is necessary.  The only

---

the recitals of any conduct by any CVS distribution center or relating to any distribution activities, including suspicious order monitoring.

[13] Moreover, the dispensing conduct at issue in those settlement agreements involved different regulations and different standards of care than the regulations and standards that allegedly apply to Pharmacy Defendants' distributing conduct.

[14] Plaintiffs also argue that settlements relating to dispensing activity might "refute the Pharmacy Defendants' repeated defense that they cannot have caused a public nuisance because they did not distribute to unscrupulous pain clinics and pill mills." Dkt. 3464 at 33.  But tellingly, Plaintiffs do not identify a single dispensing settlement that involved a Track 1B Defendant distributing to a pill mill or pain clinic.  And in any event, Plaintiffs could not "refute the Pharmacy Defendants' repeated defense" without relying on the settlements or their contents to prove liability—exactly what Rule 408 prohibits.

[15] Plaintiffs cite to their response to Pharmacy Defendants' motion *in limine* #8 as elaborating on these supposed "material issues." Dkt. 3464 at 34.  But as explained in Pharmacy Defendants' reply in support of motion *in limine* #8, evidence of conduct (including settlements) outside of the Counties that lacks a nexus to both a specific Pharmacy Defendant's conduct and an alleged County injury is both irrelevant to any "material issue" in this case and unduly prejudicial. *See infra* Section VIII.

purpose of mentioning the settlement would be to imply that the settling defendant had committed wrongdoing.  That is precisely why other courts have excluded settlement evidence.  *See, e.g.*, *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 103–34 (5th Cir. 2014) (concluding district court did not abuse discretion in granting new trial where "the close fit between the jury's damages award and the settlement offer left it with no fair assurance that the jury had ignored the inadmissible [settlement] evidence"); *Choice v. Coleman*, 2009 WL 4113936, at *3 (E.D. Mich. Nov. 23, 2009) (granting motion *in limine* "to the extent it requests that evidence of the . . . settlement be excluded pursuant to Rule 408 if offered to prove that Defendant acted badly or was liable for wrongdoing").

*Fourth*, without citing any authority, Plaintiffs argue that some unidentified, hypothetical "[s]ettlements or fines involving other corporate entities may be relevant to the extent the Pharmacy Defendants were aware of them, discussing them internally or with others, and/or taking actions based on such settlements."  Dkt. 3464 at 36.  But the mere fact that Pharmacy Defendants were aware of other settlement agreements has no bearing on the question whether a particular defendant knew that a violation had occurred at another company, let alone whether an individual Pharmacy Defendant's own distribution conduct complied with the application regulations and standards of care.  Any limited probative value in demonstrating knowledge to one defendant by showing the settlement of another is far outweighed by the prejudice to the settling defendant of admitting the fact of the settlement.  In any event, Plaintiffs cannot point to any specific settlement agreement involving a non-party that has any connection to a Pharmacy Defendants' conduct. Plaintiffs' argument for denying this aspect of Pharmacy Defendants' motion is based entirely on logically flawed conjecture and speculation, and should be rejected.

*Fifth*, and finally, Plaintiffs represent that they "have no intention of presenting evidence of settlements that are not related to opioid medications," Dkt. 3464 at 37, so this aspect of Pharmacy Defendants' motion has been conceded.

The Court should grant Pharmacy Defendants' motion to exclude evidence relating to settlements, consent decrees, or fines entered into or imposed on a Defendant or its employees and media coverage regarding the same.  At minimum, the Court should prohibit Plaintiffs from offering evidence regarding the five specific categories of settlement-related evidence discussed above and in Plaintiffs' opposition.  *See* Dkt. 3420 at 4–8.

## VIII. The Court Should Preclude Evidence of Extraterritorial Conduct Without Establishing a Specific Nexus to Cuyahoga or Summit County and a Track 1B Defendant.

The Court should bar evidence, testimony, or argument regarding alleged conduct that occurred outside of Cuyahoga or Summit Counties unless Plaintiffs first establish, outside the presence of the jury, a foundation connecting that evidence to both (1) a Defendants' distribution conduct and (2) an alleged harm suffered by one of the Counties.[16]  *See* Dkt. 3421.

In response, Plaintiffs misconstrue and overstate the scope of Pharmacy Defendants' motion.  Plaintiffs argue that granting the motion would result in barring evidence of "the conduct that created a nuisance within the Counties [but] actually occurred outside of the Counties," and activities at distribution centers that "were located outside of the Counties."  Dkt. 3464 at 38.  Not so.  Pharmacy Defendants' motion is clear—it would not exclude conduct that occurred outside the Counties ***provided such conduct is connected*** "to harm suffered by one of the Counties ***and*** a specific Defendant's distribution conduct."  Dkt. 3421 at 1 (emphasis added).

---

[16] Pharmacy Defendants reserve the right to object on an individualized basis to extraterritorial conduct that does have a nexus to a harm suffered by one of the Counties and a Defendants' distribution conduct, should that evidence otherwise be inadmissible.

Plaintiffs' purported evidence that a Pharmacy Defendant's extraterritorial distribution conduct "created a nuisance within the Counties" would plainly fall outside the scope of Pharmacy Defendant's motion.  For example, Plaintiffs cite page 114 of Doc. #2000-22 (Rafalski Rep.) as an example of evidence that, in Plaintiffs' view, would be barred by the motion.  *See* Dkt. 3464 at 38 n.40.  But that document purportedly shows that "Walgreens distributed prescription opioids ***to the Counties*** from [distribution centers] located" outside the Counties.  *Id.* (emphasis added).  If true, that is clearly a specific nexus to a Plaintiff and a Pharmacy Defendant, even though the distribution originated extraterritorially.

Similarly, Plaintiffs argue that Pharmacy Defendants' motion would bar the admission of "corporate policies and procedures regarding suspicious order monitoring [that] were created and implemented outside of the Counties."  Dkt. 3464 at 38.  But if Pharmacy Defendants' policies are truly nationwide, as Plaintiffs contend, it is self-evident that such policies have a nexus to the Counties—they would govern the conduct of Pharmacy Defendants ***in those Counties*** that allegedly harmed Plaintiffs.  And to the extent there is a dispute over whether a specific Pharmacy Defendant's policy or policies were nationwide, or were otherwise in effect in one or both Counties, that dispute may be resolved quickly by the parties or, if necessary, the Court outside the presence of the jury.

Plaintiffs also claim that granting this motion would create an unworkable trial procedure.  But that concern is not grounded in reality.  It will be challenging for Plaintiffs to discuss all of the events that occurred ***inside*** their counties under the time constraints imposed by the Court for trial.  There should not be a need for significant discussion of extraterritorial conduct.  And many categories of extraterritorial events that will likely be discussed (*e.g.* creation of nationwide policies, distribution centers that deliver to the Counties, etc.) can be easily agreed to by the parties

ahead of time. Indeed, a handful of rulings from the Court on certain key categories of disagreement can likely give the parties sufficient guidance to agree on most issues that might come up. To the extent it is unworkable for Plaintiffs to clearly and succinctly articulate why extraterritorial evidence has a nexus to their case, that shows why this motion *in limine* is necessary.

For these reasons, the Court should bar Plaintiffs from introducing evidence of extraterritorial conduct without first establishing, by agreement or at a hearing outside the presence of a jury, a foundation tying such conduct to both a concrete harm in one of the Counties **and** a specific Defendant's distribution conduct.

## IX. The Court Should Limit Testimony of Craig McCann.

As Pharmacy Defendants described in their motion, McCann describes himself as only "a calculator" and "a computer," without any expertise in suspicious order monitoring and who performed calculations according to methods devised by others. MIL Ex. C, McCann Tr. 129:6–15; 135:14–24. Unless there is testimony from another expert that the underlying methodologies are reliable methods for detecting suspicious orders, then McCann's testimony regarding the estimated number of suspicious orders based on those methodologies is irrelevant and should be excluded.

Plaintiffs do not dispute that James Rafalski testified that only one of the five methods used by McCann is "potentially suitable" for detecting suspicious orders. Ex. E, Rafalski Tr. 174:5–10; 356:19–357:2. The other four methodologies, he testified, "aren't suitable suspicious order systems." Ex. E, Rafalski Tr. 174:5–10; 356:19–357:2.

In response, Plaintiffs fail to identify any reason that the jury should hear McCann's testimony based on these other methodologies. No one—not Plaintiffs, not Rafalski, and not

Pharmacy Defendants—will present evidence that these methodologies should have been used to identify suspicious orders.

Plaintiffs misstate the record (apparently relying on Track 1A briefing) when they assert that the other four methodologies "are variations of methodologies **used by several of the defendants in this litigation**."  *See* Dkt. 3464 at 46 (emphasis in original).  Even if McCann's calculations were based on variations of methodologies used by Cardinal, McKesson, ABDC, or Mallinckrodt, *id.* at 46 n.50, they have no relevance to any claims against current Pharmacy Defendants. Allowing Plaintiffs to present this evidence would merely confuse the jury.

Nor do Plaintiffs actually identify any evidence that these methodologies are "meant to approximate" methodologies used by Pharmacy Defendants.  Neither McCann nor Rafalski testified in this case that McCann's calculations are based on methodologies used by various defendants in their SOM systems.  To the contrary, McCann testified that he did not even look at any Defendant's SOM system.  MIL Ex. C, McCann Tr. 273:19-22.  And McCann never discussed his work in this case with Rafalski, so Rafalski cannot testify one way or the other regarding McCann's calculations.  *Id.* at 414:6-7 ("I didn't discuss the report with Mr. Rafalski in any way."). Plaintiffs have only attorney argument connecting McCann's calculations to anything relevant to the case—this is not enough for reliable expert testimony.

Plaintiffs try to confuse the issue by arguing that experts can "rely on a defendant's own internal documents and records in forming their conclusions."  *Id.* at 46 n.51.  But McCann did no such thing.  McCann knows only that he was told to use these methodologies by Plaintiffs' counsel, MIL Ex. C, McCann. Tr. 134:16-17 ("From discussions with counsel."), and he cannot testify otherwise at trial.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring that an expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them.").

If Plaintiffs had an expert to testify that McCann's calculations were based on and thus comparable to some defendant's internal documents and records, perhaps McCann's testimony would be relevant and admissible.  But without such expert testimony, McCann's calculations applying these methodologies must be excluded.

Plaintiffs' arguments also fail factually.  According to Plaintiffs, Rafalski testified that these methods were unreliable because they undercount suspicious orders (compared to the one methodology that he vouched for).  Dkt. 3464 at 47 ("But the reason Mr. Rafalski deems these methodologies unsuitable is because they would significantly undercount 'suspicious orders.'").  But this argument is demonstrably false.  Under McCann's calculations, the fifth method, for example, identifies more suspicious orders than the first, purportedly reliable, method in Cuyahoga County.  *See* McCann Report at 75; *see generally* McCann Report at 56–75.  Admitting evidence of McCann's calculations—which no expert will testify are based on reliable methods of identifying suspicious orders—would confuse the issues before the jury and delay the trial unnecessarily.

Nor are Plaintiffs correct to accuse Defendants of attempting to evade this Court's *Daubert* order.  Defendants are not seeking to limit the admission of Rafalski's opinions or challenging McCann's application of Rafalski's opinions.  Instead, Defendants seek only to limit the admission of McCann's calculations to those methodologies that, based on Rafalski's testimony, might have "any tendency to make a fact more or less probable than it would be without the [calculations." Fed. R. Evid. 401.  In the alternative, even if McCann's calculations under the other algorithms had some marginal probative value, it would be substantially outweighed by the danger of confusing the issues, misleading the jury, undue delay, or wasting time.  Fed. R. Evid. 403.

McCann's opinions should be limited to his calculations based on the Six-Month Trailing Threshold, the only potentially relevant algorithm in light of Rafalski's testimony.

## X. The Court Should Preclude Evidence or Argument Relating to Participation in Trade Associations.

In seeking to exclude trade association activity, the Pharmacy Defendants made two basic arguments, neither of which Plaintiffs address: (1) trade association activity is not relevant to purpose, character, motive and intent; and (2) the First Amendment fully protects their participation in political activity through trade associations.

As to the former issue, Plaintiffs never identify *any* specific trade association activity or explain how that undisclosed activity relates to—much less supports—intent, knowledge, purpose, and motive, or how any of those is relevant to their public nuisance claim. At most, Plaintiffs generically say they "intend to demonstrate at trial that the Pharmacy Defendants *deliberately facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market* and that the opioid epidemic was a necessary consequence of their intentional conduct." Dkt. 3464 at 48 (emphasis added). The relevant "intent" thus is "deliberately" facilitating *and* encouraging the flow and diversion of opioids *into* an "illegal, secondary market." But Plaintiffs never explain how any trade association activity relates to that putative intent, and certainly not how any such activity could be imputed to individual Pharmacy Defendants consistent with the standard the Supreme Court set forth in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

Their suggestion of concerted activity concerning trade associations likewise lacks a relevant, admissible evidentiary predicate. Plaintiffs argue: "*As part of their plan*, the Pharmacy Defendants used various trade associations as front groups to *coordinate a number of joint strategies to protect the supply chain, influence policy related to opioid drug abuse and diversion*, and subvert their CSA duties." Dkt. 3464 at 48 (emphasis added). But, in contrast to the

Manufacturer Defendants, Plaintiffs have never alleged that the Pharmacy Defendants "used various trade associations as front groups." Rather, Plaintiffs' Third Amended Complaint accuses Manufacturer Defendants, "Marketing Defendants," and the "Opioid Marketing Enterprise" of using front groups, not the Pharmacy Defendants.[17]  *See, e.g.,* Cuyahoga Compl., Dkt. 3021, ¶¶ 159, 172, 189, 334–40, 374–75, 391, 396, 424, 430, 795, 818, 859, 861–66, 870, 879, 923–25. Plaintiffs thus are trying to force-fit a theory onto the Pharmacy Defendants that Plaintiffs asserted against other, differently situated defendants.  Moreover, the Track 1B trial will not include any conspiracy claims against the Pharmacy Defendants, and Plaintiffs' supposed "joint strategies" is in any case unfounded.  Plaintiffs have no evidentiary basis to use Pharmacy Defendants' trade association activity to show that they "engaged in unlawful or intentional conduct that caused a substantial interference with a public right," and so Pharmacy Defendants' motion *in limine* cannot be avoided on that basis.  Dkt. 3464 at 50.

As for the Pharmacy Defendants' First Amendment argument, Plaintiffs purportedly seek to introduce evidence of how the Pharmacy Defendants sought to "influence policy related to opioid drug abuse and diversion," which activity plainly is protected by the First Amendment. Dkt. 3464 at 48.  Plaintiffs seek to distinguish Pharmacy Defendants' case authorities by suggesting that "[i]n all these cases, … the plaintiffs were seeking to impose liability on the defendants based solely on their lobbying or trade association activity."  Dkt. 3464 at 51.  That does not distinguish those cases from this one. Plaintiffs focus is also on Pharmacy Defendants' membership and constitutionally protected activity.  *Id.* at 48–49 ("Almost all of the Pharmacy Defendants were … active participants in the NACDS" who "provided input and edits as to

---

[17]  The Third Amended Complaint alleges that the Distributor Defendants, Marketing Defendants and RICO Supply Chain Defendants participated in HDA.  *See* Cuyahoga Compl., Dkt. 3021 ¶¶ 517–18, 523, 897, 953.

NACDS's policy decisions and positions.")  Plaintiffs' claim that "they are not seeking to impose liability on the Pharmacy Defendants based on their mere participation in trade associations or lobbying efforts," *id*. at 52, rings hollow, given that they defended against this motion relying on Defendants' participation in NACDS and lobbying efforts.

Conclusory rhetoric aside, Plaintiffs' opposition does not warrant deferral of this issue until the time of trial.  *Id*.  The Court should preclude Plaintiffs from misleading and confusing the jury with evidence relating to protected trade association activity.

## CONCLUSION

For all the foregoing reasons, Pharmacy Defendants request respectfully that the Court grant Pharmacy Defendants' motions *in limine* Nos. 1–10.  *See* Dkts. 3413–18, 3420–21, 3425–26.

Dated:  September 28, 2020

Respectfully submitted,

/s/ Eric R. Delinsky (consent)
Eric R. Delinsky
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax:  (202) 822-4106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Attorneys for CVS Indiana, L.L.C. and CVS Rx Services, Inc.*

/s/ Timothy D. Johnson  (consent)
Timothy D. Johnson (0006686)
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
(216)621-7860

- 27 -

(216)621-3415 Fax
tjohnson@cavitch.com

*Attorney for Defendant Discount Drug
Mart, Inc.*

/s/ Robert M. Barnes (consent)
Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-
shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and
HBC Service Company*

/s/ Kelly A. Moore (consent)
Kelly A. Moore, Esq.
kelly.moore@morganlewis.com
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001

John P. Lavelle, Jr., Esq.
John.lavelle@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001

*Counsel for Rite Aid of Maryland, Inc.
d/b/a Rite Aid Mid-Atlantic Customer
Support Center*

/s/ Kaspar J. Stoffelmayr (consent)
Kaspar J. Stoffelmayr

Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
Email:
kaspar.stoffelmayr@bartlitbeck.com
Email:
brian.swanson@bartlitbeck.com
Email: kate.swift@bartlitbeck.com
Email: sharon.desh@bartlitbeck.com
Email: sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
Email: alex.harris@bartlitbeck.com

*Counsel for Defendants Walgreen Co.*

/s/   John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*