# EXHIBIT 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 352

```
 1        IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4
              ~~~~~~~~~~~~~~~~~~~~
 5
 6   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
         OPIATE LITIGATION
 7                                   Case No. 17-md-2804
 8                                   Judge Dan Aaron
         This document relates to:   Polster
 9
         The County of Cuyahoga v. Purdue
10       Pharma L.P., et al.
         Case No. 18-OP-45090
11
         City of Cleveland, Ohio v. Purdue
12       Pharma L.P., et al
         Case No. 18-OP-45132
13
         The County of Summit, Ohio, et al.
14       v. Purdue Pharma L.P., et al.
         Case No. 17-OP-45004
15
              ~~~~~~~~~~~~~~~~~~~~
16
                    Volume III
17              Continued deposition of
                   PATRICK LEONARD
18
                   May 23, 2019
19                    8:01 a.m.
20
                     Taken at:
21                 Ulmer & Berne
         1660 W. 2nd Street, Suite 1100
22                Cleveland, Ohio
23        Renee L. Pellegrino, RPR, CLR
24    THIS TRANSCRIPT HAS BEEN DEEMED HIGHLY
     CONFIDENTIAL, ATTORNEYS' EYES ONLY AND MAY BE
25     SUBJECT TO A PROTECTIVE ORDER OR OTHER
                    STIPULATIONS
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 426

1  shows that 97 percent of his billing codes were
2  fake.  So no, I don't believe any of
3  Dr. Harper's patients, once he became a pain
4  management physician, quote, unquote, were
5  legitimate.
6       Q.   How about Dr. Heim; were any of
7  Dr. Heim's prescriptions legitimate?
8            MR. BENNETT:  Objection.  Vague.
9  Objection.  Scope.
10           You can answer.
11      A.   I believe some of his could have
12  been, yeah, because he was getting hydrocodone
13  delivered to his office and what he was doing
14  with that medication was separate from how he
15  was treating some of his patients.  I don't know
16  that he was giving those out to patients per se.
17  So I think some of his prescriptions may have
18  been legitimate.
19      Q.   And Dr. Heim, is it H-e-i-m?
20      A.   E-i-m or I-e-m.
21      Q.   However it's spelled.  He was
22  registered with the DEA?
23      A.   He had a DEA registration.
24      Q.   Which allowed him under the law to
25  have scheduled substances delivered to his

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 427

1 office, right?
2     MR. LEDLIE: Objection to form.
3     MR. BENNETT: Objection. Calls for
4 a legal conclusion.
5   A. Yes, sir.
6   Q. Have you ever opened an
7 investigation based solely -- into a
8 physician -- well, let me rephrase it. I'll
9 make it even more general.
10     Have you ever started an
11 investigation related to diversion based solely
12 on the volume of prescriptions being written?
13   A. I personally have not, no.
14   Q. Have you ever started an
15 investigation related to diversion based solely
16 on the volume of prescription opioids being
17 dispensed?
18     MR. BENNETT: Objection. Scope.
19   A. No. There's always more factors
20 that are looked at before an investigation is
21 opened.
22   Q. Volume alone can't tell you that
23 something is necessarily wrong?
24     MR. LEDLIE: Object to form.
25     MR. BENNETT: Objection. Scope.

1      You can answer.
2      A.   No.
3      Q.   In any of your investigations at TDS
4  have you worked with the IRS?
5      A.   I don't think so.
6      Q.   How about local law enforcement?
7      A.   Yes.
8      Q.   And is local law enforcement always
9  cooperative with TDS?
10          MR. BENNETT:  Objection.  Vague.
11     A.   Yeah.  I think it's just based on --
12 you know, in my dealings with local law
13 enforcement, because I am local law enforcement,
14 I have a good rapport with most individuals, so
15 yeah, I think our communication and our
16 cooperation is pretty good with local law
17 enforcement.
18     Q.   Let me just probe that a little bit
19 because I watch TV and I see these shows,
20 they're on my turf and stuff.  So if you're
21 doing an investigation outside of Akron, maybe
22 somewhere where you don't regularly work, have
23 you ever got the vibe that people weren't
24 thrilled that the task force was there?
25          MR. BENNETT:  Objection.  Vague.

1  Objection. Scope.
2          You can answer.
3       A.   No. Normally what I like to do is
4  reach out to whatever department it is, if
5  possible, and bring one of them on board and
6  say, Hey, listen, we're going to be working this
7  in your area, can you supply somebody to assist
8  us, or at least let them know we're there. We
9  don't always do that, but it's beneficial when
10 we do.
11              - - - - -
12          (Thereupon, Leonard Deposition
13          Exhibit 30, E-Mail String Beginning
14          Bates Number AKRON_000368859, was
15          marked for purposes of
16          identification.)
17              - - - - -
18      Q.   I hand you what has been marked as
19 Leonard Exhibit 30. This is an e-mail with an
20 attachment. It bears Bates label
21 AKRON_000368859 through 368861. And the e-mail
22 is -- I think the original e-mail is dated May
23 5th, 2015.
24          Detective Leonard, do you recognize
25 the e-mail?