# Exhibit 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11  THIS DOCUMENT RELATES TO:

12  TRACK THREE CASES

13

14                   VOLUME I

15           REMOTE VIDEO DEPOSITION OF

16                 JAMES RAFALSKI

17   (CONTAINS TESTIMONY DESIGNATED HIGHLY CONFIDENTIAL)

18                 June 10, 2021

19

20

21

22  REPORTED BY:  Laura H. Nichols

23                Certified Realtime Reporter,

24                Registered Professional

25                Reporter and Notary Public

Page 26

1  yes, sir.

2          Q.      And incidental to that business, they

3  have at some point in time, at least some them, had

4  warehouses that they distributed some of the drugs

5  that they sold to their own pharmacies, correct?

6          A.      Yes.  I would agree with that,

7  Mr. Livingston.

8          Q.      They did not distribute any drugs to

9  any pharmacies other than their own?

10         A.      That is a correct statement.

11         Q.      And there are other defendants in

12 this case who were pure distributors, meaning that

13 they distributed to all kinds of customers who were

14 not a part of their own businesses, correct?  For

15 example, McKesson, Cardinal, AmerisourceBergen,

16 correct?

17         A.      If you mean that they did not own,

18 self-own the pharmacies they were distributing to,

19 yes, I would agree with that.

20         Q.      They were third-party distributors,

21 correct?

22         A.      I don't know that I would call them

23 third-party.  They are just distributors, and they

24 are a standalone, and they don't distribute to

25 their own entities, other than for -- to each of

Page 45

1    distributor, correct?

2          A.     I have not.

3          Q.     But you have offered opinions about

4    distribution, correct?

5          A.     Well, I shut down distributors also

6    in my employment.

7          Q.     Yeah, right.  And you have offered

8    opinions in these various opioid cases about the

9    conduct of distributors, including the defendant

10   pharmacies in this case, correct?

11         A.     Yeah, that is a correct statement.

12   Just clarification --

13         Q.     Okay.  So a lack of --

14                MS. KNIGHT:  Scott -- Scott --

15         Q.     (BY MR. LIVINGSTON:)  The fact that

16   you were never a distributor did not prevent you

17   from offering an opinion about distribution,

18   correct?

19                MS. KNIGHT:  Mr. Livingston, you have

20   got to let him finish answering his questions.  You

21   don't get to cut him off.

22         A.     Just to finish the -- when I was

23   answering, I have not been asked to provide an

24   opinion in regards to a pharmacy.  So I didn't

25   conduct that analysis or do any research or review

Page 46

```
 1   any records to formulate an opinion related at a
 2   pharmacy level, and I was not asked to do that.
 3               I only provided opinions on the
 4   distributors, and that is because that is what I
 5   was asked to do.
 6        Q.     (BY MR. LIVINGSTON:)  That is what I
 7   suspected.  So you could have provided an opinion
 8   about the pharmacy -- the defendant pharmacies'
 9   conduct as pharmacies, but you were not asked to do
10   that and, therefore, you did not do that, correct?
11        A.     That is a correct statement.
12        Q.     Now, so far in all of the opioids
13   cases in which you have offered any opinions and
14   ultimately some testimony, you have always
15   concluded that every suspicious order monitoring
16   system that you examined was -- did not comply with
17   the applicable DEA regulations; is that correct?
18        A.     Generally speaking, I would answer
19   yes.  I think I may have provided testimony that
20   there were certain time periods later -- later in
21   the time frames that I reviewed that they had
22   systems that had the potential to be effective
23   systems.
24        Q.     And we are talking at this point
25   fifteen, twenty defendants whose distribution
```

Page 47

1   activities you have offered opinions about; is that

2   in the ballpark?

3          A.     Yes, I think that would be -- that

4   would be potentially accurate, yes, sir.

5          Q.     Okay.  So, so far the defendants are

6   batting zero with you; is that fair to say?

7                 MS. KNIGHT:  Object to form.

8          A.     Yes, sir, that would be an accurate

9   statement.

10         Q.     (BY MR. LIVINGSTON:)  Okay.  Given --

11  you are aware that we are still in the midst of an

12  opioids crisis, correct?

13         A.     I would agree, yes, sir.

14         Q.     Given that you have concluded that,

15  in your view, all of these various defendants, many

16  of whom are still operating today, do not have

17  systems that comply with DEA regulations, have you

18  reported them to the DEA?  Have you called any of

19  your old colleagues up and said you might want to

20  examine so and so and take a quick look at, you

21  know, this company or that company?

22         A.     I have not, Mr. Livingston.

23         Q.     Now, do you know Dr. McCann?

24         A.     I do.

25         Q.     And you have worked with him to some

Page 81

1    inspections had not identified any issue.

2            Q.    (BY MR. LIVINGSTON:)  And -- yeah,

3    I'm not talking about situations where, you know,

4    the registrant tells you, here's our system, but

5    they don't actually follow their system.  They

6    don't actually operate it the way they tell you.

7                I'm just talking -- assuming that the

8    registrant actually operates the system in the

9    manner in which they've described it to you.  And

10   you say, sounds good to me, shouldn't the

11   registrant -- and as a matter of all fairness -- be

12   able to rely on that representation that they're

13   fine?

14           MS. KNIGHT:  Objection to form.

15       A.    I don't fully disagree with what

16   you're saying.  But I'd have to say that a

17   registrant is bound to comply with the regulations,

18   and that's not dependent on whether or not an

19   inspection is conducted, and an issue is not found

20   or discovered or detailed by a diversion

21   investigation, it doesn't relinquish the

22   responsibilities to comply with the regulations.

23           Q.    (BY MR. LIVINGSTON:)  Oh, no.  Of

24   course, the law is the law.  The question is

25   whether they can rely, in all fairness, on what

Page 82

1   you're telling them as an expert.  Right?  These

2   are DEA regulations.  You're a DEA investigator

3   whose job it is to enforce those regulations.

4   Nobody knows those regulations, presumably, when

5   you're on the job, any better than you, and you're

6   coming in to a registrant and you're telling them

7   that they're okay, shouldn't they be able to rely

8   on that?

9           MS. KNIGHT:  Objection to form.

10      A.     As I answered earlier, I generally

11  agree with that.  But there are certain areas that

12  a registrant should -- would seek a higher

13  approval.

14      Q.     (BY MR. LIVINGSTON:)  Let's now --

15  I'd like to just give me a little road map here.

16  Let's now focus on the DEA regulations that you've

17  described in some detail so far this morning.

18          Let's -- to do that, let's --

19          MS. KNIGHT:  Mr. Livingston, if we're

20  switching gears, can we just take a quick

21  five-minute comfort break?  Is this --

22          MR. LIVINGSTON:  Sure.

23          MS. KNIGHT:  Okay.  Real quick.

24          THE VIDEOGRAPHER:  The time is now

25  approximately 9:18 a.m.  We're off the record.

Page 85

1   you asked me earlier.

2          Q.     So the answer is no?

3          A.     That's correct.  The answer is no.

4          Q.     Okay.  And remember when we were

5   talking before about the various levels of

6   enforcement that were available to you as a DEA

7   inspector, if a registrant was not in compliance

8   with the regulations?  Do you remember when we

9   talked about that a minute ago?

10         A.     Yes.  Available to the agency, not to

11  me specifically.  But, yes, I remember the

12  conversation.

13         Q.     Right.

14                When you inspected distributors while

15  you were with the DEA, how often did you conclude

16  that they were in full compliance with all

17  applicable DEA regulations?  Roughly, percentage,

18  you know, ten percent, sixty percent, a hundred

19  percent, ninety percent, whatever it is.

20                MS. KNIGHT:  Objection to form.

21         A.     Are you -- in regards to your

22  question, was that specific to distributors?

23         Q.     (BY MR. LIVINGSTON:)  Yes.

24         A.     I think generally speaking, off the

25  top of my head, distributors -- there's a large

Page 86

1    volume of regulations.  So I would say that there

2    was generally at least maybe fifty percent, maybe a

3    little less of time where there would be some kind

4    of violation.

5            Q.    Okay.  All right.  Would you turn to

6    Exhibit 6, Page 9?  Giant Eagle Exhibit 6.

7                    (GE Exhibit 6 was marked for

8                    identification.)

9            Q.    (BY MR. LIVINGSTON:)  And the pages

10   are at the top.  See, this is Section 1301.71 of

11   the DEA's Controlled Substance Act regulations?

12                   MS. KNIGHT:  Mr. Livingston, that's

13   not what's behind his tab.

14           A.    6?  You said 6?

15           Q.    (BY MR. LIVINGSTON:)  Yes.

16           A.    Tab 6 I have "Linden Barber" --

17           Q.    Yeah.  No.  It -- yeah, but just go

18   to the Page 9 at the top.  It's a compilation of

19   various -- yeah.  Yeah.  It was a trick question.

20   Sorry about that.

21           A.    No.  I didn't hear the "Page 9."  I'm

22   sorry.

23                   Okay.  I'm there.

24           Q.    Yeah.  You're familiar with this

25   regulation, correct?

Page 87

1          A.      Yes, sir.

2          Q.      Okay.  And when you would inspect

3   registrants, you would try to make sure that they

4   were complying with 1301.71, correct?

5          A.      Among many other regulations, yes.

6          Q.      I didn't mean it to be exclusive.

7   But among -- that you would make sure they were in

8   compliance at least with 1301.71?

9          A.      Yes.

10         Q.      And this regulation says, "All

11  applicants and registrants shall provide effective

12  controls and procedures to guard against theft and

13  diversion of controlled substances."

14                 That is one of the regulations that

15  you believe the defendants did not comply with in

16  this case, correct?

17         A.      That's correct.

18         Q.      Now, the next sentence says, "In

19  order to determine whether a registrant has

20  provided effective controls against diversion, the

21  administrator" -- that's really the DEA, right --

22  "shall use the security requirements set forth in

23  Sections 1301.72 through 1301.76," correct?

24         A.      Yes.

25         Q.      Okay.  So if we want to know whether

Page 88

1    the defendants are complying with this overarching

2    requirement for having effective controls, the DEA

3    says we're supposed to look at the -- all the

4    regulations between 72 and 76, correct?

5           A.     That's what this says, yes, sir.

6           Q.     Yeah.  And that's what you did when

7    you were a DEA investigator, correct?

8           A.     It's one of the things I did, yes,

9    sir.

10          Q.     Okay.  And the SOM regulation is one

11   of the regulations, but just one of the regulations

12   between 1301.72 and 1301.76, correct?

13          A.     That's correct.

14          Q.     And then if we skip down to

15   1301.71(b), it says, "Substantial compliance with

16   the standards set forth in Sections 1301.72 to

17   1301.76 may be deemed sufficient by the

18   administrator after evaluation of the overall

19   security needs -- or system -- overall security

20   system and needs of the applicant or registrant."

21                 Do you see that?

22          A.     Yes, sir.

23          Q.     What does "substantial compliance"

24   mean?

25          A.     Well, it -- the word "substantial"

Page 89

```
 1    would mean in compliance, substantial, more than
 2    just trying.  It would be substantial in
 3    compliance.
 4         Q.    Well, doesn't it mean less -- at
 5    least less than one hundred percent?
 6         A.    That may be your interpretation.  I
 7    think "substantial" would mean in compliance.
 8         Q.    Well, are you saying that your
 9    definition of "substantial" is there has to be
10    perfect compliance?
11         A.    I don't know that I'm saying there's
12    perfect.  But I think you couldn't find any obvious
13    faults.  It would be in compliance.
14         Q.    Well, I mean, let's just assume that
15    you're -- you get -- you're in compliance with nine
16    out of ten or ten out of eleven.  I mean, is that
17    substantial?  Or do you have to have perfect
18    compliance?  You can't be noncompliant with any
19    regulation to be "in substantial compliance with
20    the regulations"?
21              MS. KNIGHT:  Objection to form.
22         A.    I think substantial -- because if we
23    look down at the column of different items to be in
24    compliance with, they're broad and they give
25    various descriptions.  So I think "substantial
```

Page 90

1   compliance" would mean you can't find any faults of

2   noncompliance.

3              I'm not sure I would say it has to be

4   perfect.  But if you were to find that there were

5   an obvious failure to be in compliance, that would

6   not be substantial.

7              I think substantial is more than just

8   average or trying.  I think it shows a high level

9   attempt to be in compliance.

10             Q.    (BY MR. LIVINGSTON:)  Now, you're

11  very familiar with the SOM regulation, correct?

12             A.    Yes, sir.

13             Q.    And that regulation says that you

14  have to have a Suspicious Order Monitoring system

15  that's going to identify orders of unusual size,

16  pattern or frequency, correct?

17             A.    Well, in the beginning it says, "You

18  must design and operate."

19             Q.    Yeah.  But the system is supposed to

20  be able to identify unusual orders from a size,

21  pattern and frequency perspective, correct?

22             A.    But I don't -- yeah, it does say

23  that, but I don't believe that's an exclusive

24  statement.  That doesn't say that's the only things

25  that it should identify.  But I would agree it does

1    the quota is.  Just that if the -- you've already

2    told me that you know that the quota is supposed to

3    be a forecast of the coming medical and research

4    demand for the drug, correct?

5           A.    Yeah.  But my answer is in regards to

6    your hypothetical, is you said some percentages and

7    some drug types and some expectations at a pharmacy

8    level.  And I just don't have -- that's a pretty

9    broad question, hypothetical question.

10               It's -- the manufacturing is much

11   more complex.  And to make it a specific drug at a

12   specific pharmacy, I just don't -- I don't think

13   that's an accurate hypothetical, and I just don't

14   have the expertise or the knowledge to answer that

15   or agree with that or disagree with that.

16          Q.    Okay.  And when you asked Dr. McCann

17   to run his methodologies, you did not ask him to

18   take into consideration what the annual increases

19   in the DEA quotas were for the drugs that he looked

20   at, correct?

21          A.    That's a correct statement.  I did

22   not do that.

23          Q.    Let's try another hypothetical that's

24   a little -- hopefully a little easier.

25               Let's assume that a pharmacy -- and

Page 97

1   let's say Giant Eagle.  It's folks at the corporate

2   headquarters know that a pharmacy across the street

3   from one of its pharmacies in Lake County is

4   closing its doors.  Its biggest competitor in the

5   area is closing its doors.

6                   And they do an analysis and they say,

7   we think our prescriptions for controlled

8   substances are probably going to go up by twenty

9   percent because of that closure.  And, in fact, the

10  scripts for that drug go up twenty percent or less.

11                  You would agree that, from Giant

12  Eagle's perspective, that that increase was not

13  unexpected, correct?

14                  MS. KNIGHT:  Object to form.

15          A.    That's another complex hypothetical.

16  Generally speaking, that could occur, but -- so

17  what we're talking about there, the essence would

18  be the Suspicious Order Monitoring system and due

19  diligence.

20                  So my expectations is that there

21  would actually be some confirmation of that

22  happening, and some due diligence investigation.

23  But it could happen and I would agree with your

24  hypothetical.

25          Q.    (BY MR. LIVINGSTON:)  And you did not

1  your report in Exhibit 2?  Do you see this is where

2  you say that the defendants' supposedly

3  noncompliant SOM systems, which you characterize as

4  sort of systemic failures, were a "Substantial

5  cause of the opioid epidemic plaguing the country

6  and specifically in Lake County and Trumbull

7  County"; do you see that?

8          A.      Yes, sir.

9          Q.      That is your opinion, correct?

10         A.      It is.

11         Q.      And what do you mean by substantial?

12         A.      I mean it wasn't a close call.  It

13  was obvious.

14         Q.      Well, what about in comparison to

15  others that contributed to the opioid crisis in

16  these two counties?

17         A.      What others are you speaking of,

18  Mr. Livingston?

19         Q.      Well, we talked about it earlier.

20  You didn't analyze what the big three distributors'

21  contribution, if anything, was to the opioid crisis

22  in these counties, correct?

23         A.      That's correct.

24         Q.      You didn't look at any pill mill

25  doctors who were writing illegal scripts for

Page 108

1    opioids in those two counties, did you?

2         A.     That's correct.

3         Q.     You didn't look at any independent

4    pharmacies who were ultimately shut down for

5    writing illegal scripts in these two counties,

6    correct?

7         A.     That's correct.

8         Q.     You didn't look at what the amount of

9    theft from medicine cabinets or what have you after

10   scripts were filled in -- legitimate scripts were

11   filled in those two counties for opioids, correct;

12   you didn't try to figure that out?

13        A.     That is correct, Mr. Livingston,

14   because I wasn't asked to form an opinion on those

15   things.

16        Q.     And you weren't asked to look at what

17   contribution, if any, manufacturers of opioids made

18   by any conduct that they were responsible for,

19   including their marketing efforts, correct?

20        A.     Not contained within this specific

21   opinion, that is correct.

22        Q.     And in order to contribute to the

23   opioid epidemic in these two counties, the

24   defendant pharmacies had to have had problems at

25   the pharmacy level, correct?

Page 109

```
 1               MS. KNIGHT:  Objection to form.
 2         A.     I do not disagree with that
 3    statement.
 4         Q.     (BY MR. LIVINGSTON:)  Right.  I mean
 5    just, this is, I think, pretty simple logic that
 6    your focus was entirely on the defendants' conduct
 7    as distributors, correct?
 8         A.     In concert with the distribution to
 9    their pharmacies, yes.
10         Q.     And even if the defendants were, you
11    know, as you claim, not doing a good job of
12    complying with DEA regulations at the distribution
13    level, if their pharmacies were exemplary
14    pharmacies with respect to controls against
15    diversion, and their pharmacies were doing
16    everything that a good pharmacy should be doing, at
17    the end of the day, there's -- it doesn't matter,
18    because there's not going to be any diversion as a
19    result of what the pharmacies were doing at the
20    distribution level, correct?
21               MS. KNIGHT:  Object to the form.
22         A.     Well, in that hypothetical, because
23    of the failures of the company, and not doing due
24    diligence and not providing me with the information
25    to see that that was actually accurate, there's no
```

Page 110

1  way that I could use that to formulate my opinion.

2          Q.     (BY MR. LIVINGSTON:)  No, we already

3  know -- we have already covered, you are not

4  offering the jury any opinions about the

5  defendants' conduct as pharmacies; you didn't look

6  at it, and it is not in your report, and you are

7  not going to testify about it.

8               I am just saying that, as a matter of

9  logic, unless the defendants were doing something

10  wrong at the pharmacy level -- if they were doing

11  everything they were supposed to be doing,

12  exercising their corresponding duty, they had good

13  controls against theft, you know, whatever you want

14  to dream up, come up with your dream pharmacy with

15  respect to anti-diversion measures, if that is the

16  case, then at the end of the day, it doesn't matter

17  what their warehouses are doing with respect to

18  compliance because those drugs are not going to end

19  up being diverted, correct?

20               MS. KNIGHT:  Objection to form.

21          A.     I don't agree with that hypothetical.

22  That is why the regulations are in place to

23  operate -- I mean to design and operate a SOMs.

24  And that is why there's due diligence in effect.

25  And I don't think -- if I understand your

Page 111

1    hypothetical, you are saying that essentially, the

2    drugs don't need to be monitored if all of the

3    pharmacies are perfect.

4                    And I don't think that is actually

5    what occurred in this case.  So I just don't agree

6    with that hypothetical.

7         Q.     (BY MR. LIVINGSTON:)  You are

8    fighting my hypothetical.  Let me make it even

9    simpler.

10                   Okay.  I am not suggesting that if

11   the pharmacies aren't complying with the

12   regulations that they are supposed to as

13   distributors, they can't get letters of

14   admonishment, get fined, get in trouble with the

15   DEA.  I'm not saying that.  I am just saying that

16   in terms of contributing to diversion in a

17   particular area, which is your opinion that you

18   have in your report on Page 7, that can't happen

19   and won't happen if, despite their noncompliance as

20   distributors, they are doing everything that a good

21   pharmacy is supposed to do and there is no

22   diversion going on at their pharmacies, correct?

23                   MS. KNIGHT:  Object to form.

24        A.     Well, in regards to that

25   hypothetical, I guess before I comment on it, in a

                                        Page 112

1    perfect world, I don't think that your hypothetical

2    is possible.  But in listening to your

3    hypothetical, if everything was absolutely perfect

4    with every pharmacy, then it is, hypothetically,

5    potentially it could be true.

6            Q.    (BY MR. LIVINGSTON:)  Now, when you

7    try to analyze whether a distributor is complaining

8    with the SOM regulation, you have to look at the

9    nature of the -- of the distributor's business,

10   correct?  That is right in the regs, you are

11   supposed to take those sorts of things into

12   consideration?

13           A.    Generally I agree with that, yes,

14   sir.

15           Q.    And that is why the DEA -- you know,

16   there's no one-size-fits-all for SOM regulations,

17   correct?

18           A.    I believe we touched on that earlier.

19   I believe that is why the regulation is good as it

20   stands, because it allows the ability for a

21   registrant to design their own system to meet their

22   own needs and their own customer base, and it is

23   fluid and allows them to change it.  I don't think

24   there's a one-size-fits-all that could ever handle

25   the totality of distributor activities in there.

Page 113

1      Q.     Now, no matter how many times we look

2  at the DEA's some regulation, we won't find any of

3  the seven methodologies that you asked Mr. --

4  Dr. McCann to use when he crunched the data,

5  correct?

6      A.     The DEA regulations never contained a

7  methodology or an algorithm.

8      Q.     Okay.  And, in fact, the DEA doesn't

9  even require that a registrant have an automated

10  threshold system.  They can use a manual system if

11  they desire?

12     A.     If they can -- if it can be designed

13  and operated and identify suspicious orders, yes,

14  sir.

15     Q.     Okay.  When you were inspecting

16  distributors, you know, while you were with the

17  DEA, did you ever recommend to any of them that

18  they use any of the methodologies that you are now

19  embracing in your report?

20     A.     No, sir.  It would have been improper

21  for me to do that.  I think the farthest guidance,

22  probably the only guidance I can recall is there

23  was a period of time when the HDMA had a suspicious

24  order monitoring draft or a guide policy, and I

25  wouldn't direct a registrant to that, especially a

Page 114

1   new registrant.  But I may say that if they did

2   some Google research, they may get some good ideas

3   off the internet.  But I never specifically

4   directed any registrant to any type of a suspicious

5   order monitoring system.

6           Q.     Okay.  Now, the results that

7   Dr. McCann came up varied greatly for each one of

8   the defendants under the methodologies that you

9   gave him to use, correct?

10                 MS. KNIGHT:  Object to form.

11          A.     In your question, are you asking me

12  the results varied greatly?

13          Q.     (BY MR. LIVINGSTON:)  Yes, the

14  results.

15          A.     Yes.

16                 MR. LIVINGSTON:  Let's go to

17  Exhibit -- Giant Eagle Exhibit 24.

18                 (GE Exhibit 24 was marked for

19                 identification.)

20          Q.     (BY MR. LIVINGSTON:)  This is a chart

21  that we had our version of a Dr. McCann put

22  together which is just really taking the results

23  from his report and your report for Giant Eagle.

24  This is a comparison of the methodologies for

25  flagging distribution orders, you know, seven

Page 115

1   methodologies that you use.  And here are the

2   numbers that were flagged for hydrocodone for Giant

3   Eagle's pharmacies in Lake County.

4               And do you see that, depending on

5   which flavor you pick, the numbers go anywhere from

6   zero percent to a hundred percent, correct?

7        A.    I agree.  I see that.

8        Q.    Yeah.  And that is -- I mean this is

9   an accurate comparison of the results that you

10  relied on, correct?

11       A.    Well, if this is your expert that

12  prepared this --

13       Q.    All they did was cut and paste it

14  from Dr. McCann.  We can go back.  Don't these

15  results look familiar to you?

16       A.    I would have to go to the charts.

17  Not off the top of my head.  I don't memorize them.

18  I'm not disputing you, but if you wanted, I would

19  have to compare them to his results.  These are bar

20  graphs.  I think mine are in actual percents and

21  numbers.

22       Q.    Right.  We wanted to make this a

23  little easier for the jury to see.

24               You would agree that if these numbers

25  are correct, that the error rate, depending on

Page 123

1          A.     Yes.  But I am not sure how you are

2    drawing a correlation to the chart.  But when I

3    look at this chart, just for informational

4    purposes, I do see an escalation of the dispensing

5    of hydrocodone by the Giant Eagle pharmacies,

6    leading up to 2012 when many declines occurred

7    throughout the industry.  So that would be a

8    concern, the years of 2009, '10, 11, exceeding the

9    quota, comparison quota.  So that also would be

10   alarming to me or would be of concern to me.

11         Q.     What factors would you look at --

12   look for to try to determine whether you have a

13   good pharmacy or a bad pharmacy?

14         A.     I would look at ordering patterns and

15   I would look at -- I would review prescribing

16   patterns, prescriber patterns.  That would be a

17   preliminary.

18         Q.     What about, you know, Oxy A, that is

19   a high dose form of oxycodone --

20              MS. KNIGHT:  Let him finish.

21         A.     I wasn't quite finished, sir, I am

22   sorry.

23              I would look at the types of drugs

24   that were dispensed in relation to all drugs.  I

25   would look at all drugs compared to controlled

Page 124

1    substances.  I would look at cash and noncash

2    payments.  I would look at the volume.  I would

3    look at the geographic area.  I would look at other

4    pharmacies nearby.  I would look at a bunch of

5    different factors in helping to draw a conclusion

6    on that issue we are talking about.

7           Q.    (BY MR. LIVINGSTON:)  Okay.  And I

8    think -- I already know the answer, but you didn't

9    look at any of these factors with respect to any of

10   the pharmacies in this case, correct?

11          A.    I wasn't asked to provide an opinion

12   on pharmacies, so I did not.

13          Q.    Yeah.  No, I don't care why you

14   didn't.  I just want to know whether you did or you

15   didn't.  You did not, correct?

16          A.    I said I did not.

17                MS. KNIGHT:  Asked and answered.

18          A.    I was not asked to.

19          Q.    (BY MR. LIVINGSTON:)  Now, controls,

20   one of the things you suggested was your percentage

21   of controls versus noncontrols, correct?

22          A.    That's correct, sir.

23          Q.    And I think SafeScript, didn't they

24   have like ninety percent controls?

25          A.    Yes.  But I don't know the exact

Page 145

1          Q.     All right.  So essentially,

2     Mr. Crowley is asking you for some advice about

3     when he -- when he investigates a pharmacy, you

4     know, what he should look for as potentially signs

5     that, you know, there's a problem, correct?

6          A.     Yes.

7          Q.     And then you -- you provided him with

8     some guidance, correct?

9          A.     Yes.

10          Q.     And the first thing you say is you

11     would want to observe the pharmacy for a while.

12     You say, "I might also take some time and drive

13     around the surrounding area.  Generally in Detroit

14     most of these problem pharmacies will have illegal

15     sales or transfer of pills from the purchaser to

16     someone outside.  It is a fairly common activity."

17               I mean are you essentially saying you

18     want to be on the lookout for long lines of people

19     who are zombie-like or out-of-state licenses in the

20     parking lot of the pharmacy, that sort of thing?

21          A.     Yeah, generally speaking.  I don't

22     recall the names, but I recall the locations of a

23     couple of the pharmacies, and they were a

24     concerning area to go to in the city of Detroit.

25     So I am just giving him some general guidance about

Page 156

1              MR. LIVINGSTON:  Okay.  We're almost

2      there.

3              Q.    (BY MR. LIVINGSTON:)  Now, you did

4      make this comparison with respect to Safe Script.

5      You looked at Safe Script's oxy dispensing compared

6      to what other pharmacies were doing, correct?  You

7      specifically looked at that?

8              A.    Yes, sir.

9              Q.    Okay.  That's the exercise we just

10     went through.  We looked at how much some of the

11     independents were dispensing, all defendants,

12     nondefendants, Giant Eagle, right, we just went

13     through that exercise?

14             MS. KNIGHT:  Objection to form.

15             A.    Yes, but again, it's just one

16     specific drug for a broad timeline.  So it's a very

17     limited picture of the activity of the pharmacy.

18             Q.    (BY MR. LIVINGSTON:)  Did you review

19     any of the testimony in this case that was provided

20     under oath by several Ohio Board of Pharmacy agents

21     who were responsible for Lake and Trumbull

22     Counties, did you look at that testimony?

23             A.    No, sir.  I did not.

24             Q.    So you're not aware of the fact that

25     Agent Pavlich testified under oath that

Page 158

1    better scope out Giant Eagle and Rite Aid?  It

2    wouldn't cause you to do that, would it?

3                  MS. KNIGHT:  Objection to form.

4           A.     That's totally outside of the

5    previous question.  I just wouldn't come to make

6    that conclusion.  It's such a limited amount of

7    facts why a doctor would say, don't fill them

8    across the street.  Obviously maybe something

9    occurred and he directed them somewhere else, or he

10   already had a prearranged agreement with Overholts.

11                  So just that broad statement, I can't

12   draw any conclusions from that.

13          Q.     (BY MR. LIVINGSTON:)  Are you aware

14   that the three agents all testified that all of the

15   defendants, to their knowledge and information,

16   were always in compliance with the Ohio Board of

17   Pharmacy regulations, including their many SOM

18   regulation and their corresponding duty

19   obligations, are you aware of that?  Did you factor

20   that into your analysis?

21          A.     I did not read their depositions and

22   I am not aware of that testimony.

23          Q.     So the plaintiffs' attorneys did not

24   suggest to you that you should read those

25   depositions?

Page 159

1                MS. KNIGHT:  Object to form.

2          A.      They don't suggest what to read or

3    what not to read.  I -- I request documents to draw

4    my opinion.

5                My experience in dealings with boards

6    of pharmacies and the types of inspections they

7    conduct are more at a pharmacy level and typically

8    don't look at the same type of issues that I look

9    at.

10         Q.      (BY MR. LIVINGSTON:)  So are you

11   telling us that you didn't think it was important,

12   before you issued your opinion that these

13   pharmacies substantially contributed to the opioid

14   crisis in these two counties, it wasn't important

15   for you to look at what the Ohio Board of Pharmacy

16   agents had to say about whether those pharmacies

17   were acting lawfully or unlawfully?

18               MS. KNIGHT:  Objection to form.

19         A.      I don't qualify it as important or to

20   be unimportant.  It is just something I didn't look

21   at in formulating my opinion.

22         Q.      (BY MR. LIVINGSTON:)  Well, we know

23   it wasn't important enough to be included on your

24   Schedule I, correct, as something that you

25   reviewed?

```
                                              Page 160

  1              A.      I did not review those documents,

  2    sir.

  3                      MR. LIVINGSTON:  I think we can take

  4    a break.

  5                      MS. KNIGHT:  Thank you.

  6                      THE VIDEOGRAPHER:  The time is now

  7    11:05 a.m.  We're off the record.

  8                      MR. LIVINGSTON:  Ten minutes.

  9                      (Whereupon, a break was had from

 10                      10:05 a.m. until 11:18 a.m. EDT)

 11                      THE VIDEOGRAPHER:  The time is now

 12    approximately 11:18 a.m.  We're on the record.

 13                      MR. LIVINGSTON:  I have still a

 14    number of questions that I would like to ask this

 15    witness.  But as a matter of courtesy, I'm going to

 16    now turn it over to my colleagues so that they can

 17    get their questions in before the end of the day,

 18    and then I will reserve my rights when they're

 19    done, if there's time left, which I believe there

 20    will be, to finish my questioning.

 21

 22    EXAMINATION BY MS. SWIFT:

 23              Q.      Mr. Rafalski, this is Kate Swift.

 24    Can you hear me okay?

 25              A.      I can hear you, ma'am.
```

1  of conduct.  It's just they failed it -- they

2  failed in the suspicious order monitoring system

3  and maintenance of effective controls.

4              So I have no intentions of coming in

5  and saying they're hypothetically thirty-three

6  percent responsible.

7        Q.    Or any other level of responsibility?

8        A.    Correct.

9        Q.    Quantified?

10       A.    Correct.  It's just a failure as I

11  pointed out in my report.

12       Q.    You're not connecting any failure

13  that you identify in your report to a level of

14  contribution to an opioids crisis in Lake or

15  Trumbull County, correct?

16             MS. KNIGHT:  Object to form.

17       A.    Well, I'm saying there's a

18  contribution.  I am just not putting a figure on

19  it.

20       Q.    (BY MS. SWIFT:)  You can't quantify

21  the contribution; is that fair?

22       A.    I did not try to do that, that's

23  correct.

24       Q.    And you can't do it; is that fair?

25             MS. KNIGHT:  Object to form.

Page 176

1          A.      Yeah, I think that would be outside

2     of my expertise other than just doing the raw

3     numbers.  That would be a correct statement.

4          Q.      (BY MS. SWIFT:)  Right.  We talked a

5     little bit about the Overholts Pharmacy that

6     received -- well, let's go back to the chart and

7     look at it.  You can see the Overholts Pharmacy

8     received a hundred and seventy-six million MME,

9     compared to that biggest Walgreens on the list, the

10    one at 804 West Market which received about

11    forty-eight million MME, right, sir?

12         A.      So now I'm seeing like a multitude of

13    screens.  Do you --

14                 MS. KNIGHT:  Yeah, I think we're

15    seeing your background, Kate.

16                 MS. SWIFT:  Got it.

17                 MR. FULLER:  But thank you for the

18    realtime, Kate.

19                 MS. SWIFT:  Mike, anytime.

20         A.      Appreciate that.

21         Q.      (BY MS. SWIFT:)  I appreciate your

22    letting me know.

23         A.      It's so small --

24                 MS. KNIGHT:  I thought it was my

25    screen or I would have spoken up sooner.  I was

Page 208

1          A.      I do not.

2          Q.      Paragraph 6 -- or, sorry, 86, tells

3    us -- you can see the last sentence says, "Patients

4    from Tennessee accounted for approximately 18.4

5    percent."  Do you see that?

6          A.      Do.

7          Q.      And then it says, "Patients from Ohio

8    accounted for approximately 11.5 percent" of the

9    prescriptions we are talking about.  Do you see

10   that?

11         A.      I do.  Now, is that -- is that -- and

12   this is specific for American Pain, correct?

13         Q.      This is specific for American Pain.

14         A.      Okay.

15         Q.      You didn't conduct any analysis of

16   this pain clinic or any other in Florida for

17   purposes of your Lake and Trumbull report, right,

18   sir?

19         A.      I did not.

20         Q.      You haven't conducted any analysis of

21   any Florida pain clinic for any of your reports

22   that you have issued in the opioids litigation,

23   right, sir?

24         A.      I have not provided an opinion or

25   done any analysis in Florida.

Page 209

1          Q.      You don't have any opinion about the
2     extent to which the doctors and pain clinics
3     described in this federal indictment contributed to
4     the opioids epidemic anywhere in America, correct,
5     sir?
6          A.      Well, I have an opinion that they
7     contributed significantly, but I -- it would just
8     be through my experience of working in the DEA and
9     having knowledge of the migration of the pills.
10               But I didn't -- I did not offer an
11    opinion on that, yeah, an expert opinion on that,
12    I'm sorry.
13         Q.      Do you know how many doctors wrote
14    prescriptions for opioids in Lake and Trumbull
15    County during the relevant time period, from 2006
16    to the present?
17         A.      I do not.
18         Q.      Do you know how many of those
19    prescriptions were illegitimate, meaning they
20    weren't for a legitimate medical purpose?
21         A.      I do not.
22         Q.      You don't have any opinion on how
23    many prescriptions filled by one of the pharmacies
24    in this case were diverted?
25         A.      So a part of -- so in forming my

Page 210

1    expert opinion, I wasn't asked to review any

2    materials, documents or information related to

3    that, so I don't offer an opinion on that.

4              Q.    You have no idea if any prescriptions

5    filled by a Walgreens pharmacy were diverted; is

6    that fair, because you didn't look?

7              A.    I did not review prescriptions for --

8    specific prescriptions at any Walgreens, so I guess

9    that would be generally a correct statement.

10             Q.    Do you know how many prescriptions

11   filled by any of the other pharmacies in Lake and

12   Trumbull were diverted after they were filled?

13             A.    I do not.

14             Q.    That is true, whether we are talking

15   about somebody taking a prescription bottle from a

16   friend's medicine cabinet or any other form of

17   diversion, you don't have any idea what those

18   numbers are?

19             A.    No.  I wasn't asked to provide an

20   opinion on that, so I don't have any information to

21   form an opinion on that or to --

22             Q.    And you are not --

23             A.    -- or to provide you with any numbers

24   or any direct knowledge of that.

25             Q.    You are not aware of any pills that

Page 239

1          Q.     Yes.

2          A.     No, I did not.

3          Q.     Did you ever visit a pharmacy in Lake

4    or Trumbull County for purposes of preparing your

5    report?

6          A.     I did not.

7          Q.     And you never did the kind of

8    investigation you recommended to Mr. Crowley at

9    Purdue, correct?

10         A.     That would be a much earlier time

11   frame, but, no, I did not go and sit and do any

12   observations at a Walgreens, that is a correct

13   statement.

14         Q.     Or any other pharmacy in Lake or

15   Trumbull County, right, sir?

16         A.     That's correct.

17         Q.     You don't have any idea how many of

18   your flagged orders went to fill legitimate

19   prescriptions, right, sir?

20         A.     Well, my flagged orders were flagged

21   for a specific reason.  So it didn't make a

22   determination of what was diverted or what was not

23   diverted, but just my opinion is, based on the lack

24   of the due diligence on the first flagged order,

25   that more likely than not that those flagged orders

Page 254

1                   So how do you think Rite Aid's
2      pharmacies got oxycodone?
3            A.     I'm not saying they have oxycodone.
4      If I understood your question, you asked about the
5      obligations, correct?
6            Q.     On the pharmacy entities, correct.
7            A.     Well, I think corporately there's
8      some responsibility for Rite Aid because they're a
9      chain facility, they have chain pharmacies, and
10     they're purchasing Schedule II products from an
11     outside vendor, but they're well aware of what
12     their pharmacies are purchasing.
13                  So under the maintenance of effective
14     controls, I believe they have some responsibility
15     to monitor those drugs also.
16           Q.     So let's take a look -- let's break
17     that down a little bit more.  So we're going to go
18     within your report to Page 46.  So we're going
19     to -- I think this is what you're referring to, if
20     I'm not mistaken, as an example.  Tell me when
21     you're there.
22           A.     Talking about the charts?
23           Q.     Yep, talking about the charts.  So
24     let's look at the first one there for Lake County
25     on Page 46, and this is under your methodology A.

Page 319

1        Q.     Your report references seven

2  suspicious order methodologies, some of which were

3  utilized by one or more of the defendants, correct?

4        A.     That is a correct statement.

5        Q.     Walmart did not utilize any of those

6  seven methodologies, right?

7        A.     That is correct.

8        Q.     And you agree that a distributor did

9  not need to use one of those seven methodologies to

10  have a sufficient suspicious order monitoring

11  program, correct?

12        A.     Yeah.  A distributor could have

13  designed one different from one of the

14  methodologies and potentially be effective.

15        Q.     And, in fact, you think it would be

16  wrong for the DEA, for example, to suggest to

17  Walmart that it should have used one of those seven

18  methodologies, correct?

19        A.     As part of my training as a diversion

20  investigator, it would have been wrong for me to

21  advocate the use of any specific system.

22        Q.     Including the seven that you have in

23  your report, correct?

24        A.     That would be any.  That would be

25  correct.  That would be encompassed to any.

Page 326

1   from relying on employee experience to fulfill

2   their regulatory obligations, correct?

3           A.     In certain -- in certain

4   circumstances, I believe that it is possible to

5   have a manual system.  Depending on the type of

6   activity and the volume, it may not be sufficient.

7   But at the same time, the regulation requires that

8   you design and operate.  And I'm not sure when you

9   have no policies, no procedures, no documentation,

10  that that is a design, outside of just it appears

11  to me kind of everybody telling everybody what to

12  do.  It is difficult for me to say that that would

13  be in compliance with the regulation.

14                 MS. FUMERTON:  I move to strike that

15  as nonresponsive, so I will ask my question again.

16          Q.     (BY MS. FUMERTON:)  The Controlled

17  Substance Act and the regulations promulgated under

18  it do not prohibit registrants from relying on

19  employee experience to fulfill the regulatory

20  obligations, correct?

21                 MS. KNIGHT:  You can answer.

22          A.     You will have to repeat that.  That

23  is a different question, I believe.

24          Q.     (BY MS. FUMERTON:)  I read it

25  verbatim, but I will read it again.

1          You agree that the Controlled
2  Substances Act and the regulations promulgated
3  under it do not prohibit registrants from relying
4  on employee experience to fulfill their regulatory
5  obligations, correct?
6               MS. KNIGHT:  Asked and answered.
7          A.    I don't think the regulation speaks
8  specifically to that.  I believe earlier we were
9  discussing a manual system.  That is what I was
10  responding to earlier.
11         Q.    (BY MS. FUMERTON:)  And a manual
12  system is not prohibited either, correct?
13         A.    It is not what?  I'm sorry.
14         Q.    Prohibited, correct?
15         A.    A manual system is not as long as it
16  is sufficient to meet the needs of the registrant.
17         Q.    You also mentioned the twenty bottle
18  limit that Walmart instituted for oxy 30 in 2012;
19  do you recall that?
20         A.    I do.
21         Q.    Sorry.  2012.  I said it right.  Do
22  you know why Walmart implemented that policy?
23         A.    Yeah, I recall seeing an email.  It
24  was in response to concerns about diversion of
25  oxycodone 30 in West Virginia and Florida.

Page 374

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11  THIS DOCUMENT RELATES TO:

12  TRACK THREE CASES

13

14                   VOLUME II

15

16          REMOTE VIDEO DEPOSITION OF

17                 JAMES RAFALSKI

18               June 11, 2021

19

20

21

22  REPORTED BY:  Laura H. Nichols

23              Certified Realtime Reporter,

24              Registered Professional

25              Reporter and Notary Public

Page 408

1   report, did you?

2               MS. KNIGHT:  Objection to form.

3        A.     I did not.

4        Q.     (BY MR. LIVINGSTON:)  You also didn't

5   factor into your analysis the effect that any

6   internet pharmacies had on the opioid crisis in

7   Lake and Trumbull County, correct?

8        A.     That is correct.

9        Q.     And that is despite the fact that you

10  knew from your time with the DEA that a major

11  contributor to the opioid crisis was internet

12  pharmacies, correct?

13       A.     I am well aware of the effect of the

14  internet pharmacies.  I don't know how it is

15  relevant to Lake and Trumbull County unless you are

16  indicating that maybe some of the residents there

17  were utilizing ordering those prescriptions online.

18  I'm not aware of any internet pharmacies that were

19  located in Lake and Trumbull County during the time

20  period of my review.

21       Q.     Who said an internet pharmacy had to

22  be located physically in the county?  Isn't that

23  the whole point, that you can just order on the

24  internet and have the drugs delivered to you?

25       A.     That is the point.

Page 409

1          Q.     Okay.

2          A.     So that is why I made that -- that's

3    why I gave that reply, because there would be no

4    way for me to know what residents of those two

5    counties ordered from the internet, other than if

6    there was -- in doing my review, there was never

7    any material that would provide me with that

8    information.

9          Q.     But you are not suggesting that Lake

10   and Trumbull County residents didn't have the

11   internet available to them during the relevant

12   period, are you?

13         A.     No.  I think what I'm indicating,

14   there's no way I would know that they utilized the

15   internet to order internet opioid prescriptions and

16   have it delivered to those specific counties.  That

17   information wouldn't be available to me.

18         Q.     When you were with the Detroit office

19   of the DEA, was Detroit considered a major drug

20   supplier via drug gangs to neighboring states?

21              MS. KNIGHT:  Objection to form.

22         A.     Early in my career, I believe that

23   would be a correct statement.

24         Q.     (BY MR. LIVINGSTON:)  When you say

25   "early in your career," what do you -- what do you

Page 410

1    mean by that?  What time period are you talking

2    about?

3           A.    I would say 2004.  And it would have

4    been declining sometime prior to 2010.  Maybe the

5    first three or four years I think there was quite a

6    bit of migration to a couple of different states.

7           Q.    Well, one of those states was Ohio,

8    correct?

9           A.    Ohio primarily only because it was a

10   bordering.  But the actual illicit distribution in

11   my investigations, what I was aware was

12   predominantly it was mainly to Kentucky and then

13   secondly to Tennessee.

14          Q.    Well, were you aware that a lot of

15   these Detroit-located drug gangs would pay elderly

16   citizens to get opioid scripts filled in -- at

17   Detroit pharmacies right down the street from your

18   office and then travel on Greyhound buses and

19   rented cars to Lake and Trumbull County to sell

20   those drugs there because they could get more per

21   pill than they could in Detroit?  Were you aware of

22   that problem?

23                MS. KNIGHT:  Objection to form.

24          A.    I did not work any cases that

25   involved Lake and Trumbull County, and I did not

Page 411

1    have any discussions from any investigators in that

2    region of the country.  All of my cases had links

3    to, as I stated earlier, Kentucky and Tennessee.

4                I was aware that there was some

5    bouncing back and forth across the state borders

6    because the maps or the PMP programs didn't link

7    between each state.  But I'm not aware of any case

8    that was worked out of the Detroit office that was

9    specifically tied to those two counties.

10             Q.     (BY MR. LIVINGSTON:)  Well, one thing

11   for sure we know from reading your report is that

12   you did not take into consideration the impact that

13   drug gangs had on selling illegitimately obtained

14   opioid scripts in Lake and Trumbull County,

15   correct?

16             A.     No.  My report, Mr. Livingston,

17   focuses on the distribution from the distributor

18   down to the pharmacy.  My analysis doesn't focus on

19   the illicit conduct outside of that action.

20             Q.     Okay.  And -- well, you also didn't

21   review any of the law enforcement depositions that

22   were taken in this case in which testimony was

23   given that Detroit was a major supplier of

24   illegally obtained opioid pills to Lake and

25   Trumbull County, correct?

Page 431

1  that have occurred where they are published on the

2  Federal Register or on the DEA website in regards

3  to pharmacies and their corresponding

4  responsibility.  So I think there's plenty of

5  information available.

6            Have they specifically sent a list

7  out of red flags?  I'm not aware of that.

8       Q.    You didn't do any analysis to

9  determine to what extent the defendant pharmacists

10 in Lake and Trumbull County properly discharged

11 their duty to exercise their corresponding

12 responsibility?

13      A.    I did not.

14      Q.    And you did not endeavor to try to

15 determine whether any suspicious order at the

16 distribution level with respect to any of the

17 defendant pharmacies ultimately was used to fill an

18 illegitimate or not legitimate prescription,

19 correct?

20      A.    That was not part of my analysis, no,

21 sir.

22      Q.    Turn to Exhibit 2, your report,

23 Schedule I.

24            MS. KNIGHT:  So Mr. Livingston, I

25 believe that is the -- I don't know what was wrong

Page 440

```
 1            A.      That's correct.

 2                    MS. KNIGHT:  Objection to form.

 3            Q.      (BY MR. LIVINGSTON:)  And unlike

 4     Mr. Colosimo and the other folks at the DEA

 5     Pittsburgh office who inspected Giant Eagle's

 6     facilities, you never actually physically inspected

 7     either HBC or GERX; is that correct?

 8            A.      I never was physically present at

 9     either of those locations, sir.

10            Q.      Did you ever ask plaintiffs' counsel

11     for that opportunity?

12            A.      To go there and inspect them?

13            Q.      Yes.

14            A.      I did not.

15            Q.      Did they ever tell you that that was

16     an option, that under the Federal Rules, a party

17     can request and obtain the right to physically

18     inspect the other parties' facilities?

19            A.      They did not tell me that.  I am not

20     aware of that, sir.

21            Q.      Now that you are aware of it, is that

22     something that you wish you had had the opportunity

23     to do before you rendered your opinions in this

24     matter?

25            A.      Well, I think anything that I could
```

Page 451

1    never kept records to be able to accurately answer
2    that, and I don't want to guess.
3              Q.    And did you ever find that a
4    distributor's SOMS system that you inspected was in
5    compliance?
6              A.    I believe there were some, yes.
7              Q.    Okay.  And what kind of threshold
8    system did they have?
9              A.    Without disclosing the registrant,
10   one that I recall, because I had concerns going in,
11   was a manual system.  And I actually found that to
12   be compliant, but it was based on a business
13   activity and the abilities and knowledge of the
14   employees.
15             I can recall a couple of smaller
16   companies that had compliance systems.  I can also
17   recall some that did not.  But off the top of my
18   head, I didn't really keep records or I don't have
19   a recollection specifically of the different
20   companies and what they had and didn't have.
21             Q.    Without disclosing the name of the
22   registrant, the one that was a manual system, can
23   you tell us what was the nature of the business?
24   You said based on business activity.  What did you
25   mean by that?

Page 452

1          A.      They were unique.  They distributed

2    to dispensing doctors and specific kinds of -- like

3    dentists operating at clinics, and there were some

4    distributions I had concern with, but going onsite

5    and having a discussion with the compliance people

6    and the owner, I was -- I believed that they were

7    compliant in the knowledge of their registrants and

8    what they were dispensing in their business

9    activities.  But it was -- the scope of their

10   business wasn't as large as a distributor like, for

11   example, Giant Eagle.

12          Q.      My next question is, how many

13   customers, different customers, just roughly,

14   fifty, a hundred, a thousand, ten thousand?

15          A.      Not thousands.  I don't specifically

16   recall.  I don't want to guess on that.  I don't

17   believe it was even over a hundred.  I believe it

18   was under a hundred, but I don't remember

19   specifically how many.  It wasn't a large

20   distribution because it was a unique type of

21   business.

22          Q.      Do you know how many pharmacies Giant

23   Eagle has in Ohio?

24          A.      Just in the two counties overall, I

25   have seen a document about that, but I don't recall

Page 454

1   aware if there were increases.  It was a system

2   that I didn't find any faults with on that

3   particular inspection.  I don't know moving forward

4   if it changed, but --

5          Q.     All right.  So you are aware that

6   Giant Eagle never received a letter of admonition,

7   correct?

8          A.     I believe that is an accurate

9   statement, yes, sir.

10         Q.     There was never any kind of

11  administrative action of any kind ever taken

12  against Giant Eagle for violating any DEA

13  regulations, correct?

14         A.     Not that I am a aware of.

15         Q.     And Giant Eagle never was penalized

16  or entered into any kind of memorandum of

17  understanding for any violation of any DEA

18  regulations, correct?

19         A.     That's correct.

20         Q.     And you at least know -- you would at

21  least acknowledge that Giant Eagle was found to be

22  in full compliance at the conclusion of every

23  inspection that I mentioned to you earlier?

24                MS. KNIGHT:  Objection to form.

25         A.     I'm not sure that I reviewed every

Page 455

1    inspection, the results, but I'm not going to

2    dispute your comment.  But I don't have personal

3    knowledge of that.

4            Q.    (BY MR. LIVINGSTON:)  Are you saying

5    that, in the preparation of your opinion regarding

6    whether Giant Eagle's SOMS system was complying

7    with DEA regulations, you didn't think it was

8    material for you to consider, at least review and

9    consider the outcome of the inspection report,

10   inspections that were done by your DEA colleagues?

11           MS. KNIGHT:  Objection to form.

12           A.    I wouldn't say it wasn't important,

13   but I didn't put a high value on it only because in

14   my experience with the cases I have worked,

15   generally there would be clean inspections during

16   the time frame where I took action, in regarding,

17   specifically, Masters and Mallinckrodt.

18           Q.    Well, you identify in your report

19   some instances where our co-defendants may have had

20   some minor violations of DEA regulations, correct?

21   You identify those in your report, correct?

22           MS. KNIGHT:  Object to form.

23           A.    Yes, sir.

24           Q.    (BY MR. LIVINGSTON:)  Okay.  But in

25   your report, you don't mention that Giant Eagle had

Page 459

1          Q.     Do you see that we have just sort of

2    highlighted sort of the ultimate conclusion of the

3    reports and which inspections each one of these DEA

4    inspectors was involved with?

5                You see in 2009 when Mr. Colosimo did

6    the preregistration inspection for HBC and he

7    approved HBC's facility for a Schedule 3 license,

8    correct?

9                MS. KNIGHT:  Objection to form.

10         A.     It doesn't give all of those details.

11   And that is what your cheat sheet says, but I would

12   like to read the report where it says deemed

13   adequate, the security system to see specifically

14   what it says.  But I acknowledge that your chart

15   says that.

16         Q.     All right.  Well, like I said, I kind

17   of suspected we probably would have to go back.  We

18   will do that.

19                Just when you get to 2013, Mr. Conlon

20   concludes "no discrepancies with respect to

21   recordkeeping or security.  Both recordkeeping and

22   security are in full compliance with..."

23                And when you do -- when the DEA does

24   these cyclic investigations, one of the major

25   things that they look at is the SOMS system,

Page 460

1    correct, that is part of the security and

2    recordkeeping regulations?

3         A.    Well, it is part of being -- doing

4    the onsite inspection.  I don't know that it is

5    more important than any other section, but it is

6    something that they should review and comment on.

7         Q.    Right.  And Mr. -- I want to ask you,

8    remember we talked yesterday about how the

9    regulation refers to requiring registrants to be in

10   substantial compliance with the security

11   regulations; we went over that?

12        A.    Yes, sir.

13        Q.    And here we have a finding that Giant

14   Eagle was not substantially in compliance but

15   rather in full compliance, correct?

16        A.    If that is what the statement of Mr.

17   Sousa says, then I agree that is what that

18   statement says.

19        Q.    Okay.  And in 2014, Mr. Sousa reaches

20   the same conclusion.  He says "No discrepancies

21   with respect to recordkeeping or security.  Both

22   recordkeeping and security are in full compliance."

23   Do you see that?

24             MS. KNIGHT:  Object to form.

25        A.    I do see that statement.  But to say

Page 461

1    recordkeeping and security are in full compliance,

2    it is a pretty broad statement without looking at

3    the report.

4           Q.    (BY MR. LIVINGSTON:)  Yes.

5           A.    Not that I need to read them all, but

6    I wouldn't disagree that the report may say that.

7    Maybe in summary at the beginning, I am guessing.

8           Q.    And when you go -- and your opinion

9    that is in your report is that from 2009, when HBC

10   first was granted a license for Schedule 3 drugs,

11   until hydrocodone was reclassified in 2014, during

12   that entire period of time, Giant Eagle was not

13   even in substantial compliance; it wasn't in

14   compliance at all, right?

15          A.    In regards to their SOMS system,

16   that's correct.

17          Q.    In other words, you disagree with the

18   conclusions reached by all of these DEA agents,

19   correct?

20                MS. KNIGHT:  Object to the form.

21          A.    Well, that is why I would like to

22   review the documents to ensure that they even

23   inquired about those things in their investigation.

24   It is not a mandate that they be required.  So I

25   would like to see what description they had and

Page 462

1   what awareness they had of the system.  But I am in

2   disagreement if it says full compliance with

3   security, I do not disagree -- I do not agree with

4   that statement.

5           Q.     (BY MR. LIVINGSTON:)  So you publish

6   your report in April, which contains all of your

7   final opinions for this case, and now we are taking

8   your deposition in June.  And you haven't taken the

9   time to review any of these inspection reports,

10  correct?

11               MS. KNIGHT:  Objection to the form.

12          A.     That's correct.

13          Q.     (BY MR. LIVINGSTON:)  Well, I guess

14  now is as good a time as any to finally look at

15  these reports.  Let's go to Exhibit 34.

16               (GE Exhibit 34 was marked for

17               identification.)

18          Q.     (BY MR. LIVINGSTON:)  Page, at the

19  top, we will go to Page 9.

20               MS. KNIGHT:  Just a moment.  Sorry,

21  Mr. Livingston.  He is getting there.

22          A.     Go ahead.

23          Q.     (BY MR. LIVINGSTON:)  Okay.  You see

24  this is a report by Mr. Colosimo regarding the

25  approval of HBC's request for a Schedule 3 license

Page 468

```
1   substantial amount of time.  I didn't keep a

2   specific amount of time.  I know the total time I

3   wrote -- went -- spent on the report.  I didn't

4   keep specific records for each of the companies.

5   So, no, I am not going to guess or ballpark it.

6          Q.     All right.  And then it says that

7   they had a meeting with management.  You didn't

8   meet with Giant Eagle's management, did you?

9          A.     I did not.

10         Q.     Okay.  Let's go down to the last

11  paragraph on this page.  It says, "HBC was approved

12  as a distributor of List 1 chemicals on August 27,

13  1997, and was assigned DEA Registration Number.

14  The subject firm was the subject of in-depth cyclic

15  investigations in 2002, 2004 and 2008."

16                Now, you see that this report is

17  looking retrospectively at prior inspections of the

18  facility, correct?

19                MS. KNIGHT:  Objection to form.

20         A.     Yes.  And that statement is specific

21  to a List 1 chemical.

22         Q.     (BY MR. LIVINGSTON:)  Right.  Right.

23  Yeah, I wasn't suggesting otherwise.  And that was

24  a common practice for you and other DEA inspectors

25  that in these reports, you would look -- you would
```

Page 469

1   include what the outcome was of prior inspections,

2   correct?

3           A.      Generally speaking, yes.  I am not

4   sure that it would -- that it would cross over to

5   do other business activities, but that is just the

6   style of this writer.

7           Q.      And then the next sentence says, "No

8   violations were uncovered during these

9   investigations.  HBC was approved as a distributor

10  of controlled substances in October of 2009."  Do

11  you see that?

12          A.      I do.

13          Q.      Okay.  So again this is like probably

14  the, you would agree, the first cyclic inspection

15  of the HBC facility after it obtained, you know,

16  its Schedule 3 license, correct?

17                  MS. KNIGHT:  Object to the form.

18          A.      By looking at the date and you

19  producing no other document, yes.

20          Q.      (BY MR. LIVINGSTON:)  All right.

21  Would you go to Page 33028 or Number 13 at the top?

22          A.      Okay.

23          Q.      It says, "After a thorough review and

24  analysis of the required records, it was determined

25  that all of the controlled substances were

1          So you see that Mr. Rogos is advising

2    and describing to the DEA inspectors that Giant

3    Eagle had a manual system at the time for

4    identifying suspicious orders in compliance with

5    1301.74(b).

6          MS. KNIGHT:  Objection to form.

7          A.    This statement that you highlighted

8    here, I would agree that it is manual and it only

9    identifies orders of unusual high orders.  I don't

10   know what "high" means unless it means by size.  It

11   does not say any compliance with pattern or

12   frequency.  And then the last statement is -- I am

13   concerned by what issue is going to be brought to

14   the attention of Mr. Carlson and Ms. Remas.

15         Q.    (BY MR. LIVINGSTON:)  Yeah, we are

16   going to get there in a second.

17         A.    Okay.

18         Q.    Before we do -- and you yourself have

19   approved or at least found a manual system, a

20   manual SOM system to be in compliance with the SOM

21   regulation, correct?

22         A.    Based on the business activity and

23   the scope of the that registrant, that is a correct

24   statement.

25         Q.    Okay.  Lets go to the next page of