# Exhibit 2

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4
5   MDL NO. 2804
6   CASE NO. 17-md-2804
7   Hon. Dan A. Polster
8
9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION
10
11  THIS DOCUMENT RELATES TO:
12  TRACK THREE CASES
13
14
15
16            REMOTE VIDEO DEPOSITION OF
17              CALEB ALEXANDER, M.D.
18                  May 27, 2021
19
20
21
22  REPORTED BY:   Laura H. Nichols
23                 Certified Realtime Reporter,
24                 Registered Professional
25                 Reporter and Notary Public

Page 122

1  of these programs, your knowledge or framework for
2  any -- this report and other reports of the
3  programs that you identified, are you aware of any
4  programs, that you're recommending, that the
5  pharmacies have implemented already in Lake and
6  Trumbull County?  Are you aware of any?
7         A.    Well, I think, as it applies to this
8  case, a major opportunity for the pharmacies is
9  with respect to the institution of measures to
10  reduce the oversupply, and unnecessary oversupply
11  of opioids in the supply chain.  And I believe that
12  there's an appendix to my report that discusses in
13  detail the public health rationale for these
14  measures.
15              But my development of that appendix
16  did not require me to evaluate the specific actions
17  of pharmacies to date.  And I would leave it to
18  Mr. Catizone or other experts to do so.
19         Q.    So as you sit here today, you do not
20  know -- not looking forward, but existing,
21  preexisting programs by pharmacies as to whether
22  they do anything that is outlined in your report,
23  you don't know sitting here today, correct?
24         A.    No, that's not correct.
25         Q.    Okay.  What programs do you know that

Page 141

1  review the literature on certain potential
2  indicators of high-risk opioid distribution and
3  describe their evidence base.  See Appendix F."
4           And is that what led you to prepare
5  Appendix F, what you describe there in Paragraph 14
6  of your report?
7       A.   Yes.  Yes, it is.
8       Q.   Now, in Appendix F -- let's look at
9  this twelve-page document, which includes several
10 pages.  About half of that is citations.  You speak
11 of indicators that are identified in the Catizone
12 report, correct?
13      A.   Yes, that's correct.
14      Q.   And I think you say -- yeah, about
15 the fifth line down in your Appendix F, you say, "I
16 reviewed the portion of Carmen Catizone's expert
17 report in which he identifies indicators that are
18 triggered based on information about prescriptions,
19 patients and prescribers."
20           And it goes on further, but I just --
21 so you reviewed a portion of his report.
22           Do you know when you reviewed the
23 portion of his report that you reference there?
24      A.   Well, I've reviewed it recently, but
25 believe that I also reviewed it sometime ago.  And

Page 143

1      Q.    All right.  The Catizone report
2  includes a list of what you call "indicators,"
3  correct?
4      A.    Yes.  I believe that it does.
5      Q.    And did you -- is it your
6  understanding that Dr. -- I don't know if he's a
7  doctor -- but Carmen Catizone prepared that list of
8  indicators?
9      A.    Well, ultimately, Mr. Catizone has to
10 speak for them.  I don't know the process that was
11 used to derive that list.  I don't know the details
12 of the process that was used to derive that list.
13     Q.    Okay.  Were you involved in the
14 development of that list?
15     A.    Again, I have a hard time answering
16 that question.  What I can say is that I shared my
17 knowledge regarding the evidence base to support
18 these types of indicators.  And, you know, my
19 report includes seventy-four studies or references.
20 And -- and many of these are studies that I am --
21 have significant familiarity with.  And so I may
22 well have discussed these with Mr. Catizone in an
23 effort to try to be of service.
24     Q.    Okay.  But as to whether you had
25 discussions with him, you attempted to be of

Page 144

1  service, whether he used that to develop this list
2  or not, you don't have firsthand knowledge, as you
3  weren't involved in that particular process of the
4  development of the list; is that fair?
5        A.    That's correct.  I'm not aware of the
6  precise methods that Mr. Catizone used to derive
7  the list that he has included in his report.
8        Q.    Do you -- other than recent dealings
9  with him, were those all in 2021, you think, or did
10 you have communications with him before that?
11       A.    I think it's likely I spoke with him
12 during 2020, as well as 2021.
13       Q.    The end of 2020 you think?
14       A.    Well, I doubt it was the first half,
15 but it could have been Quarter 3.
16       Q.    Got it.
17             Prior to having discussions with him
18 in the third quarter of 2020 and 2021, did you have
19 any dealings with Mr. Catizone before that?
20       A.    Well, just to be clear, I don't know
21 precisely when these discussions took place, so I'm
22 sorry if I misconstrued that they definitely took
23 place during the third quarter of 2020.
24             But if you're asking whether I spoke
25 with him or interacted with him prior to this case,

Page 156

1  Q. Did you study, in relation to
2  Appendix F, and what you've placed in your -- the
3  contents of Appendix F, did you study the specific
4  actions of any of the defendant pharmacies and
5  their pharmacists related to Appendix F?
6  A. Well, I reviewed Mr. Catizone's
7  report, and I believe he does so. But the
8  development of my Appendix F did not require me or
9  wasn't predicated on having studied the specific
10 actions of defendants in this case.
11 Q. Okay. So I just want to break that
12 down. I understand you looked at his report, and
13 his report says what it says. And if you reviewed
14 that, you saw what was in there.
15         But as far as you personally
16 investigating studying the actions of the defendant
17 pharmacies in this case, you know, in Lake and
18 Trumbull County, as I understand, the answer is you
19 did not do that; is that correct?
20 A. To develop my Appendix F, my -- my
21 development -- you know, in Appendix F, I outline
22 the evidence base supporting the use of indicators
23 or flags for high-risk use. And this didn't
24 require me, nor did I, undertake a study of the
25 specific actions of specific defendants in this

Page 157

1  case.
2        Q.    So you're not opining in Appendix F,
3  or anywhere else in your report, that the defendant
4  pharmacies failed to follow the standard of care in
5  dispensing opioids; is that fair?
6        A.    In my report, I outlined the evidence
7  base to support a number of different flags or
8  indicators of high-risk prescription drug
9  distribution or -- or use.  But I did not opine on
10 the actions of specific defendants with respect to
11 how they may have failed to adhere to standards of
12 care.
13       Q.    In Appendix F, we talked a little bit
14 about Paragraph 1.  And then Paragraphs 2 through
15 10 appear to add some more description to the
16 headings in Tab 1 generally, right?
17       A.    I'm sorry.  You said the headings in
18 Tab 1?
19       Q.    Yeah.  You know, in Paragraph 1 you
20 say -- you say what you say there.  But you say
21 also, I listed indicators in Tab 1.
22             We look back at Tab 1.  We see what
23 the -- under the column of "Concept," what the
24 various indicators are, the first one being
25 "Frequency, dose and duration."

Page 170

1  that proposition; is that right?
2      A.   Yes, that's correct.
3      Q.   And then you go on further to state,
4  "Pharmacies are also well-positioned to implement
5  drug disposal or deactivation packets for
6  individuals filling prescriptions for controlled
7  substances (See also Section 1C of Expert Report),
8  as well as harm reduction initiatives such as
9  naloxone prescribing and dispensing."
10          Do you see that?
11     A.   Yes.
12     Q.   And you have -- you have four
13 articles cited there, correct?
14     A.   Well, again, if you include the first
15 part of the sentence, there are a total of five
16 articles.  But, yes, I see those.
17     Q.   Perfect.  Okay.
18          I think we've talked about before,
19 you have not assessed whether or not the pharmacy
20 defendants have implemented these -- any of these
21 types of programs in Lake and Trumbull County; is
22 that right?
23     A.   My report and what I was asked to do
24 didn't require me to evaluate whether or not the
25 defendants have implemented specific programs in

Page 171

1  Lake and Trumbull County thus far.
2       Q.   And then the last sentence here says,
3  "However, pharmacists report that time constraints
4  that result from organizational policies, such as
5  those that arise from insufficient staffing or time
6  requirements for filling a prescription, hinder
7  their review of concerning patient behavior or
8  prescribing practices."
9            Do you see that?
10      A.   Yes, I do.
11      Q.   And that's based on -- I'm going to
12  get this one correct.  I'm going to look at the
13  rest of the sentence, not just the last -- you cite
14  two articles there, right?
15      A.   Correct.
16      Q.   And -- all right.  And these are
17  not -- and these were articles that studies were
18  done, correct?
19      A.   Yes, I believe that's correct.
20  Although I would want to review them specifically
21  in more detail in order to provide a definitive
22  answer to that question.
23      Q.   And you were not involved in those
24  studies, were you?
25           And you didn't conduct the interviews

Page 174

1  information you don't have.
2          What are -- what's an example -- or
3  what -- not just an example, but what information
4  do you understand a pharmacist has access to that
5  you don't have access to for a particular patient?
6          MR. ARNOLD:  Objection to form.
7       A.    I believe pharmacists typically will
8  have information regarding the -- a patient's fill
9  history, you know, within a given pharmacy or
10 pharmacy chain.  And these days may well have
11 information about the broader use, the broader fill
12 history for a patient beyond the pharmacy in
13 question.
14      Q.    (BY MR. MANNIX:)  Now, in preparing
15 Appendix F, we were talking about the defendants'
16 conduct.  And I think you indicated that you did
17 not -- you weren't asked to and weren't required
18 to, in order to prepare Appendix F, study the exact
19 practices of each pharmacy defendant.
20         Did you, in any way, review the
21 written policies related to dispensing of any of
22 the pharmacies in preparing Appendix F, or any
23 other part of your report?
24      A.    I have broad familiarity with some of
25 the policies that pharmacies have put in place in

Page 175

1  an effort to try to improve the safe distribution
2  of pharmaceuticals.  But I didn't -- but the
3  preparation of my report didn't require me to look
4  at the defendants' policies in this particular
5  instance.
6          Q.    So you don't have an opinion as to
7  whether or not their policies need to change or not
8  in connection with their dispensing -- and your
9  position is Appendix F -- considering you haven't
10 reviewed their policies; is that fair?
11         A.    Well, I think Mr. Catizone's report
12 highlights many opportunities for improved, safe
13 dispensing and distribution of pharmaceuticals.
14 And so I -- and I did review those as part of my
15 preparation for -- as part of the materials that I
16 reviewed in developing my own opinions.
17               But my report focuses on the evidence
18 base to support these indicators, rather than their
19 institution, or lack thereof, by the defendants in
20 question.
21         Q.    Would you agree that it is not the
22 goal of your opinions in your report, including
23 Appendix F, to have a specific impact on the
24 dispensing patterns that exist?
25         A.    Based on the totality of evidence

Page 176

1  I've reviewed, I believe there are enormous
2  opportunities for pharmacies to improve the safe
3  distribution of controlled substances, such as
4  opioids, in the supply chain.
5      Q.   And that's a totality for pharmacies
6  in general, not -- you haven't looked at the
7  specific conduct of these defendants; is that
8  right?
9      A.   That's correct.
10     Q.   If you look at -- I want to review
11 with you some of the information in your redress
12 models.  So let's go to what I've marked as Exhibit
13 3.
14          I think we'll be able --
15          MR. MANNIX:  Lauren, are you able to
16 pull that up onto Exhibit Share?
17     A.   I'm comfortable without doing so, as
18 long as it's something that I can find.
19     Q.   (BY MR. MANNIX:)  Okay.  All right.
20 Let's see if we can go without it.  And then, if we
21 need to, we will.
22          MS. CATANZARITE:  Exhibit 3 is
23 currently on Exhibit Share.  But if you want me to,
24 I can share my screen.
25          MR. MANNIX:  Yeah.  We'll see if we