**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL No. 2804** |
| | **Case No. 17-md-2804** |
| **This document relates to**: | **Judge Dan Aaron Polster** |
| *Track Three Cases* | |

**DECLARATION OF TARA A. FUMERTON**
**IN SUPPORT OF DEFENDANTS'MOTION TO EXCLUDE**
**THE OPINIONS AND TESTIMONY OF DANIEL C. MALONE**

I, Tara A. Fumerton, declare as follows:

1.      I am an attorney at Jones Day, counsel for Defendant Walmart Inc. in the above-captioned case.

2.      I submit this Declaration in support of Defendants' Motion to Exclude the Opinions and Testimony of Daniel C. Malone.

3.      Attached as Exhibit 1 is a true and correct copy of An Expert Report for the National Prescription Opiate Litigation, dated April 15, 2021 ("Malone Report").

4.      Attached as Exhibit 2 is a true and correct copy of Excerpts from the Transcript of the Deposition of Daniel Charles Malone, dated May 28, 2021 ("Malone Tr.").

5.      Attached as Exhibit 3 is a true and correct copy of Excerpts from the Transcript of the Deposition of Walmart 30(b)(6) designee, Darren Townzen, dated February 12, 2021.

Dated: July 23, 2021                              Respectfully Submitted,

                                                  /s/    *Tara A. Fumerton*
                                                  JONES DAY
                                                  Tara A. Fumerton
                                                  77 West Wacker
                                                  Chicago, IL 60601
                                                  Phone: (312) 269-4335
                                                  tfumerton@jonesday.com

                                                  *Counsel for Defendant Walmart Inc.*

### **CERTIFICATE OF SERVICE**

    I hereby certify that, this 23rd Day of July 2021, I served a copy of the foregoing via electronic mail on all Track 3 parties, the Court, and Special Master Cohen.

                                   */s/   Tara A. Fumerton*
                                   Tara A. Fumerton

# Exhibit 1

**Declaration of Tara A. Fumerton**
**In Support Of Defendants' Motion to Exclude**
**The Opinions and Testimony of Daniel C. Malone**

 **HEALTH**
UNIVERSITY OF UTAH

**College of Pharmacy**
**L.S. Skaggs Pharmacy Institute**
Department of Pharmacotherapy

30 South 2000 East
Salt Lake City, Utah 84112
Office 801–587–3472
Fax 801–587–7923

An Expert Report

for the

# National Prescription Opiate Litigation

**MDL 2804**

Provided by:

Daniel C. Malone, BS Pharmacy, MS, PhD, FACMP
Professor
Department of Pharmacotherapy
University of Utah

April 15, 2021

## Expert Experience and Qualifications

Details regarding my professional career with respect to education, training, and research can be found in my curriculum vitae (CV) (See Attachment Figure 1).  In summary, I received a bachelor of science (magna cum laude) in pharmacy from the University of Colorado in 1987. Shortly thereafter, I passed the State of Colorado pharmacist license examination (#12379) and practiced as a pharmacist in both hospital and community settings.  In 1988 I became licensed as pharmacist in the State of Texas (#30390). Up through 1993 I was employed as a pharmacist for various hospitals and community pharmacies, including both Walgreens and Walmart. Since 1993 I have pursued an academic career but kept my licenses active until 2019 (Colorado) and 2020 (Texas).

My research career over the past 29 years has been focused on improving medication and patient safety. This work has largely been supported by the Agency for Healthcare Research and Quality  (AHRQ), but I have also received funding from the Centers for Disease Control and Prevention, various state agencies, and also the pharmaceutical industry. The balance of my research has been federally supported, starting in 2001 with the  Arizona Center for Education and Research on Therapeutics (AzCERT) (1U18HS017001 (Principal Investigator (PI): Woosley)), with a principal focus on preventing drug-drug interactions. Within the AzCERT, I led multiple investigations to evaluate health-system issues concerning preventing drug interactions from 2001 to 2011. In 2009, I also  successfully secured funding for a conference grant (**R13HS18307 (Malone-PI)**) to assemble a group of world-renowned experts on drug interactions. Building the that success, I led a large conference grant supported by AHRQ (**1R13HS021826; (PI: Malone**)) to develop standards for drug interaction evaluation, classification, and  communication for clinical decision support systems. My research currently includes an R01 (**1R01HS025984; (PI:Malone)** and a previously funded R21 (**1R21HS023826; (PI:Malone**)) studies to identify risk factors for drug interactions, develop algorithms to implement such risk factors within clinical health records, and conduct studies in a learning healthcare network to reduce excessive alerts while appropriately identifying patients at risk of harm. In fall of 2019 I obtained a U18 award (**1U18HS027099; (PI:Malone**)) to develop a smart app to prevent drug interactions that will reside within electronic health records. I am also PI on a R18 dissemination grant (**1R18HS026662-01: Malone PI**) focused on reducing exposure to medications that prolong the QTc cardiac signal using a validated risk score and clinical decision support in 28 hospitals. In addition to these successful research projects, I was the PI on iAdapt – Innovative Diffusion of Comparative Effectiveness Research (CER) (**1R18HS19220**) that educated Pharmacy & Therapeutic committee members about CER methods and AHRQ's Effective Healthcare Program. Over my career I have published more than 210 papers (more than 195 peer-reviewed) and have obtained over $23 million in extramural support as PI or co-Investigator.

With respect to the issues associated with the National Prescription Opiate Litigation, I have significant experience using data from pharmacies, pharmacy administrative claims data, prescriber DEA registration files, electronic health record data, and various healthcare databases including data from insurance companies and various payers such as Medicare,

Department of Veterans Affairs, and Medicaid. I have spent 20 years studying the issue of drug-drug interactions and how to provide useful information to both prescribers and pharmacists to reduce exposure to harmful combination. This work includes studies evaluating knowledge of drug-drug interactions (DDIs), evidence supporting existence of harm, human factors engineering as it relates to warning about potential interactions, and various other issues related to DDIs. Myself and my research team have developed algorithms and written computer code to identify medication-related safety issues, especially as it relates to drug-drug interactions.

As a part of my research, I have purchased data files from Medi-Span (A drug knowledge database) and Drug Enforcement Agency (DEA) prescriber and pharmacy registration data from NTIS.

I have taught a required statistics course for pharmacists from 2004 to 2015, 2018-2019, at the University of Arizona. In addition, I taught an elective course in pharmacy informatics at the University of Arizona at various points in time from 2013 to 2018.

## Issues Addressed

The scope of this expert review focusses on the technological capabilities of pharmacy organizations to provide useful information to pharmacists and pharmacy staff regarding potentially inappropriate of use opiate and other medications. The key questions this report addresses are was it possible using data available to chain pharmacy organizations to:

1. Conduct drug utilization analyses and provide meaningful metrics to assist pharmacists and pharmacy staff to identify and prevent inappropriate use of opiates and other medications both within and across pharmacies within their organization?;

2. Provide pharmacists with alerts/warnings about over-prescribing by certain licensed prescribers?;

3. Detect inappropriate prescribing and consumption using geospatial data analysis?;

4. Detect excessive dose and quantity accounting for prescriber specialty and practice?;

5. Identify potential pharmacy shopping by consumers seeking opiates and other medications?;

6. Identify use of drug combinations, so-called "Holy Trinity" using pharmacy data?; and

2

7.   Detect overuse through early refills or new prescriptions?

## Materials Reviewed:

### CVS
*RX2000 (old) and RxConnect are the names of CVS's Pharmacy Software*

(1) testimony and exhibits from the deposition of CVS's designated "data" expert (located in a subfolder under William Boyd who was the deponent)
(2) an 1998 Internet article from CVS's corporate website on the $200 million CVS spent on it's first system
(3) a 2001 Internet article from ADT magazine on CVS's data warehouse
(4) a 2012 SAS program written by CVS's vendor AGI computing red flags from their dispensing data, see Bates: SAAGI00069454
(5) a 2012 CVS corporate PPT outlining Prescriber Red Flag Reports (ex: magnify pg 6), see Bates: CVS-MDLT3-000034324
(6) a 2013 CVS corporate PPT outlining all Red Flags used in their Enhanced Program (ex: see page 12), see Bates: CVS-MDLT3-000034325
(7) a 2013 CVS corporate PPT (see page 7 of the pdf), see Bates: CVS-MDLT1-000129873
(8) a 2014 SAS program written by CVS's vendor AGI computing red flags from their dispensing data, see Bates: CVS-MDLT1-000026070
(9) an article appearing in New England Journal of Medicine 2013: 269:11: see Bates: CVS-MDLT!-000000418

### Walgreens
*Intercom Connect Plus or IC+ is the name of Walgreens's Pharmacy Software*

(1) testimony and exhibits from the deposition of Walgreens's designated "data" expert (located in a subfolder under Jon Arends who was the deponent)
(2) a 2010 Walgreens corporate PPT walking through the DUR screens in IC+, see Bates: WAGMDL00784104
(3) a 2013 Walgreens corporate PPT walking through the basic screens in IC+, see Bates: WAGMDL01166502

### Walmart
*ConnexUs is the name of Walmart's Pharmacy Software*

(1) testimony and exhibits from the deposition of Walmart's designated "data" expert (located in a subfolder under Darren Townzen who was the deponent )
(2) a 2009 Walmart corporate manual on ConnexUs DUR process with screenshots, see Bates: WMT_MDL_000405150
(3) a 2010 Walmart corporate manual on ConnexUs updates with screenshots, see Bates: WMT_MDL_000418530
(3) a 2012 Walmart corporate PPT going through all the screens in ConnexUs, see Bates: WMT_MDL_000376862

3

**Rite Aid**
*NexGen is the name of Rite Aid's Pharmacy Software*

(1) testimony and exhibits from the deposition of Rite Aid's designated "data" expert (located in a subfolder under Lynne Shirk who was the deponent )
(2) a 2003 document detailing data captured by the Rite Aid system (ex: page 6), see Bates: Rite_Aid_OMDL_0037229
(3) a 2014 Rite Aid corporate manual with screenshots on NexGen, see Bates: Rite_Aid_OMDL_0134769
(4) a 2015 Rite Aid corporate manual on NexGen Red Flag documentation process containing screenshots, see Bates Rite_Aid_OMDL_0103082

**Giant Eagle**
*PDX Classic or EPS or Enterprise Pharmacy Software is Giant Eagle's Pharmacy Software (from a 3rd party vendor called PDX)*

(1) testimony and exhibits from the deposition of Giant Eagle's designated "data" expert (located in a subfolder under Christopher Miller who was the deponent )
(2) a manual circa 2011 on the Internet for PDX (downloaded in multiple parts - originally from https://documentation.help/PDX-WorkstationConfig/documentation.pdf but no longer online)
(3) a 2008 Giant Eagle corporate PPT with some screenshots of the earlier PDX Classic system (ex: pages 69, 70 of the pdf), see Bates HBC_MDL00191107
(4) a 2019 Giant Eagle corporate document with screenshots of the DUR screen, see Bates HBC_MDL00191231


In addition to these materials, I reviewed the National Council for Prescription Drug Programs's (NCPDP) technical standard documentation called "Script V5.0".  NCPDP is responsible for creating and maintaining data standards used by every pharmacy to file third-party claims to pharmacy benefit managers and various other data processors. Script Version 5.0 was implemented in approximately 2005 and the data elements relevant to this litigation have largely remained constant since then.  Those data elements broadly include:

> a. Pharmacy information
> b. Patient and patient insurance information
> c. Drug product information
> d. Prescriber identification information
> e. Pricing information

Because of the third-party programs, the data elements contained in this standard are collected and maintained by every pharmacy in the nation, although individuals state regulations and legislation may require additional data elements.


## Evaluation of Key Questions

Drug Utilization Review at the Prescription Level: Each of the pharmacy organizations indicated in testimony that drug utilization review (DUR) analyses were conducted, often using data

provided by Medi-Span.  DUR activities supported by such programs are largely based on medication-related attributes, such as chemical entity and strength.  DDI warnings are specific to the unique product, so are drug-allergy, and drug-disease alerts. However, these vendors don't provide warnings based on aggregate prescription use or at the prescriber level. Algorithms by Medi-Span and First DataBank may account for age of the patient, known drug allergies, and conditions (i.e. diagnoses). Most DUR warnings are therefore not relevant to inappropriate opiate use. Additional data is required to assess so-called "red-flags."

Creating Opioid Specific "Red Flags": Each pharmacy organization (CVS, Giant Eagle, Rite Aid, Walgreens, and Walmart) had a mechanism to move store level prescription dispensing data to a central server or computer system that could have been used to assist pharmacists and pharmacy staff identify inappropriate opioid use. Red flags related to pharmacy shopping, doctor shopping, pattern prescribing, early fills/refills, and frequent cash payment could have been implemented within each organization using available data.  It was well known by the early 2000's that there was an opioid prescription epidemic in our country.  With the dispensing data on opioid dispensing accumulated in the central server or computer system, these pharmacy organizations had valuable information which could have been analyzed and communicated  to the store level pharmacists as an important tool to identify red flags that only the nationally accumulated data would really reveal.

Walgreens was likely the first pharmacy to create a computer system that allowed remote storage of prescription drug dispensing information, going back to at least 1988.  Because the information about the patient, prescriber, and medication were stored in identical formats across stores within the same organization, the analysis of this data was possible. Indeed, this data (excluding patient information) was often sold to other organizations (i.e., IMS Health/ IQVIA) to track physician prescribing habits and track utilization of every medication. IMS Health/IQVIA would sell reports based on this data to drug manufacturers who utilized the data to drive sales.

Based on depositions provided by representatives of the various pharmacy organizations, it is clear that this data was accessed to track pharmacy store performance and sometimes performance of specific individuals. Because of data standardization, analyses could have been performed using measures of variance to identify outlier behavior  with respect to:
   a. Quantity per prescription by medication product and strength
   b. Days supply (anticipated duration of prescription)
   c. Number of prescriptions written for opiate and other medications by prescriber
   d. Evidence of doctor shopping by consumers
   e. Distance from patient to provider
   f. Distance from patient to pharmacy
   g. Frequent fills or refills of opiate and other medications
   h. Prior refusals to fill

Rationale for why each of these attributes were technically possible with existing data frameworks are discussed in detail below.

The number of unique prescriptions for specific products dispensed as an individual pharmacy is relatively low based on my previous research. Therefore, it is challenging for pharmacists to assess the degree of "excessive" quantity on a medication order for a given product. "Professional judgement" is highly variable when assessing medication orders/refills. However, it would have been easy for pharmacy organizations to provide dashboard statistics about measures of central tendency and dispersion for a given opioid medication based on prior prescriptions. In addition, given that the prescriber was known and linked to prescriber characteristics provided by Lexis/Nexus, data could be provided according to prescribers with the same credentials, specialty, and subspecialty. Extreme values for dose, duration, or morphine equivalents per prescription, such as top 5% or 1% could have been displayed to pharmacist's and pharmacy staff when evaluating a prescription order. These dashboard statistics could have been created for days supply as well.  These measures would have provided pharmacists with near real-time "peer" data about what would be an appropriate vs. inappropriate medication order. It should be noted, that the earlier such a system would have been put in place, the more data would be accumulated and the algorithms run on the data would have increased the accuracy and validity of the red flags.  This would have enhanced the tools for the pharmacists at the store level and likely would have prevented the dispensing of opioids that led to diversion.

Opioid prescribing is associated with prescriber specialty, with prescribers working in departments of emergency medicine (ERs) and urgent care facilities associated with greater percent of opioid prescriptions as compared to other specialists, such as a dermatologist. Each pharmacy organization had the necessary data elements to evaluate proportion of opioid prescriptions relative to other prescriptions by specialty and subspecialty to identify "outlier" prescribers. This information could have been provided to pharmacists and pharmacy staff when they were evaluating a prescription order for inappropriateness.

Data at the patient level that was linked across prescriptions could have been used to identify potential doctor shopping behavior by patients. While prescription drug monitoring programs (PDPM) aggregate across pharmacies, more real-time data could have been provided by pharmacy organizations to pharmacists and would be useful in jurisdictions where PDPM is not mandated or was slow to be mandated, or in pharmacy organizations where PDMP utilization was not mandated or compliance not monitored. Pharmacy chain organizations had data at their disposal that could have made it easier to identify consumers using multiple pharmacies within the same chain who were doctor shopping.

The geospatial analysis of prescription orders could have also been accomplished at the pharmacy chain level using programs like SAS (implemented by CVS) or other SQL programs to calculate the distance from the consumer to the pharmacy based on address or zip code. Data could have been summarized across all prescription orders dispensed to determine measure of central tendency and dispersion to assist pharmacists and pharmacy staff in identifying potentially inappropriate use. The same techniques could have also identified illogical distances between prescribers and patients, accounting for specialty and subspecialty care. In addition,

6

warnings based on geospatial analysis could have been configured based on local availability of prescribers (e.g. different maximum distances for urban vs. rural pharmacy locations).

The feasibility of the chain pharmacies to create the very systems I have described was ably described by the authors of an article published in the NEJM entitled "Abusive Prescribing of Controlled Substances-A Pharmacy View."  The co-authors were employed by CVS.

Assessment of emerging inappropriate use through multiple medications could have been developed by each of the pharmacy organizations using existing data. While Medi-Span and drug knowledge bases have created DUR flags (similar to DDI warnings) for concomitant use of opioids, muscle relaxants, and benzodiazepines, it would have been possible for each organization to develop such algorithms independently. Admittedly, incorporation of such algorithms within "off-the-shelf" dispensing software such as PDX is more challenging than organizations who developed their own dispensing software systems. Because of Medi-Span and other drug knowledge databases, identification of products that would trigger such an alert can be based on therapeutic classifications. Also, algorithms can consider date ranges to determine if use is concurrent or not based on days supply. Finally, pharmacy organizations could have requested such algorithms be included in Medi-Span or other drug knowledge data vendors.

Finally, data on the frequency of fill and refill of opiates and other inappropriate medications could have been provided to pharmacists using dashboards to give pharmacists information on which to exercise their professional judgement about the legitimacy of dispensing a medication. Third-party insurance companies provide this information to pharmacies for prescriptions submitted for insurance coverage.  Similar programs could have been implemented by pharmacy chain organizations for prescriptions not covered by insurance programs or not submitted for electronic adjudication.

## Previous Expert Service

I have not provided a deposition or given trial testimony in any litigation in the previous 4 years.

## Compensation Statement

My hourly compensation rate for expert evaluation is $380 per hour.

## Summary

In summary, pharmacy chain organizations created, purchased, or aggregated data that could have been used to reduce the inappropriate use of opiates and other medications. The data elements required for the above activities has long resided (since at least 2006 and likely years

7

before that time) within databases and accumulation of such data across multiple pharmacies permitted the opportunity to inform pharmacists and pharmacy staff to potential illegitimate opioid use.


_____

Daniel C. Malone, PhD, FAMCP


April 15th, 2021
_____
Date

# **Exhibit 2**

**Declaration of Tara A. Fumerton
In Support Of Defendants' Motion to Exclude
The Opinions and Testimony of Daniel C. Malone**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                     EASTERN DIVISION

4

5    MDL NO. 2804

6    CASE NO. 17-md-2804

7    Hon. Dan A. Polster

8

9    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14

15

16              REMOTE VIDEO DEPOSITION OF

17             DANIEL CHARLES MALONE, PH.D.

18

19                    May 28, 2021

20

21

22   REPORTED BY:    Laura H. Nichols

23                   Certified Realtime Reporter,

24                   Registered Professional

25                   Reporter and Notary Public

Page 25

1    than -- less than two hours, between one and two

2    hours.

3            Q.      What about your meeting last week,

4    how long was that?

5            A.      Similar duration, yeah.  Between one

6    and two hours.

7            Q.      And yesterday?

8            A.      It was less than two hours, probably

9    about an hour and a half.

10           Q.      And for the last two meetings, it was

11   just yourself and Mr. Weinberger again?

12           A.      That is correct.

13           Q.      And for all four meetings, nobody

14   participated in the phone or otherwise listened in,

15   to your knowledge?

16           A.      To my knowledge, no.

17           Q.      Okay.  You said that in preparation

18   for your deposition, you were provided a list of

19   documents that were in your report.  Who were you

20   provided those documents -- or who provided you

21   those documents?

22           A.      I was given a link to the documents

23   via -- I believe it was a cloud service.  And those

24   materials came from, I believe, a law firm -- I

25   could tell you exactly who that is if I was allowed

Page 33

1  your report?

2          A.      No, they did not.

3          Q.      Before you signed your report, you

4  reviewed it carefully and ensured that you agreed

5  with all its contents, correct?

6          A.      Yes.

7          Q.      Do you take full responsibility for

8  all the words that are contained in your report?

9          A.      I do.

10         Q.      Do you understand all the terms that

11  are used in your report?

12         A.      Yes, I do.

13         Q.      You issued your report on University

14  of Utah letterhead, correct?

15         A.      That is right, as my employer.

16         Q.      The University of Utah is not

17  endorsing this report, correct?

18         A.      That is correct.  That is correct.

19         Q.      Have you ever testified as an expert

20  before?

21         A.      No, ma'am.

22         Q.      Has the Court ever found you

23  qualified to testify as an expert in any capacity?

24                 MR. WEINBERGER:  Objection to form.

25  Go ahead.

Page 34

1          A.     No.

2          Q.     (BY MS. FUMERTON:)  Have you ever

3    consulted as an expert before?

4          A.     Yes, I have.

5          Q.     In what context?

6          A.     It was a medication error or adverse

7    event, and I was contacted by a potential

8    plaintiff's lawyer to review the contents of that

9    Complaint.

10          And I rendered an opinion to the

11    plaintiff's attorney about the legitimacy of the

12    Complaint with regards to that medication safety

13    issue.

14          Q.     When was this?

15          A.     1994.

16          Q.     Do you recall what medication was at

17    issue?

18          A.     Yeah, it was an antibiotic called

19    gentamicin.

20          Q.     And what ultimately was your opinion,

21    do you recall?

22          MR. WEINBERGER:  Objection.  But go

23    ahead.

24          A.     The plaintiffs had asked if the

25    pharmacist had been contributory to the

Page 70

1   entities in any other capacity, correct?

2           A.      Correct.

3           Q.      And with respect to Walmart, other

4   than a few months, less than twenty shifts, back in

5   the late '80s, you have never worked for Walmart in

6   any other capacity, correct?

7           A.      That's correct.

8           Q.      And other than what you described as

9   your work for Walgreens, you have never worked for

10  them in any other capacity, correct?

11          A.      That's correct.

12          Q.      You have never worked in the home

13  office of any pharmacy company, correct?

14          A.      That's correct.

15          Q.      And you have never worked in a data

16  governance function of any pharmacy company,

17  correct?

18          A.      Correct.

19          Q.      You were not relying on your

20  experience at Walmart in forming any of your

21  opinions in this case, correct?

22          A.      That is correct.

23          Q.      And you are similarly not relying

24  on --

25          A.      I'm sorry.  Let me restate that.

Page 71

1          Except for at the time I worked for

2    Walgreens, and I think it is still true today, they

3    used a centralized computer system for processing

4    prescriptions and have continued to use a

5    centralized computer system for processing

6    prescriptions.

7          So that knowledge, I don't think --

8    which I gained in 1988, I think still remains

9    relevant to my opinions.

10         Q.    So let me make sure the record is

11   clear.  When we did this the first time, this

12   happened that Walmart and Walgreens got confused.

13   So my question was originally that you were not

14   relying on any of your experience at Walmart in

15   forming any of your opinions in this case, correct;

16   and you said that's correct.  You are not changing

17   that testimony, correct?

18         A.    You are stating that correctly, yes.

19   I am stating -- I was trying to clarify my

20   experience at Walgreens and the fact that

21   Walgreens, in -- when I worked for that

22   organization, began working for that organization,

23   and up through the materials that I reviewed for

24   this case, it appears that they have maintained a

25   central pharmacy server to maintain pharmacy

Page 183

1    dispens -- as to whether a particular opioid

2    prescription was legitimate or not.

3           Q.    (BY MS. FUMERTON:)  Can you point to

4    any particular pharmacy that has done what you

5    think should have been done in the entire industry?

6           A.    Well, IMS Health provided -- whether

7    they have done, implemented it or not is another

8    matter.  I cannot point to a particular pharmacy.

9                 But IMS Health provided such a

10   dashboard, offered such a dashboard to one of the

11   defendants in 2012, I believe.  And it had those

12   elements that I am referring to, you know, those

13   red flags and an approach to presenting that

14   information.

15                So is it -- to me the question is was

16   it technically feasible to create such a dashboard?

17   Yes, it was.  It is up to the defendants to ask

18   the -- answer the question of why they did or

19   didn't do it.  So --

20          Q.    And you have no opinion as to whether

21   or not they did or did not do that, correct; you

22   don't know one way or the other?

23          A.    Based upon what I have seen, I have

24   seen no evidence that they did that.  So if the

25   materials that I reviewed -- so the materials I

Page 184

1    reviewed didn't provide evidence that they had done

2    that in the time frame that I was instructed to

3    consider my comments or my expert opinion, which

4    was --

5            Q.    What is the time frame that you were

6    asked to consider?

7            A.    I believe it was up through 2018.

8            Q.    Okay.  So, for example, we are going

9    to get there in a second, but I am sure you noticed

10   there weren't that many that you looked at.  The

11   last Walmart document you looked at was from 2012.

12   Did you ask to look at any Walmart documents after

13   2012?

14           A.    I didn't note the date of the

15   materials that were presented to me.

16           Q.    You don't know --

17           A.    So if the date was --

18           Q.    Well --

19           A.    If the date was on the document, I

20   noted that.  But I don't know what other documents

21   Walmart has generated since 2012 that would be

22   relevant to this case.  That is information I don't

23   have at my disposal.  I only know that what was

24   provided to me.

25           Q.    Who provided --

Page 185

1          A.     So if they had -- well, I am assuming
2     that was part of the discovery process, so --
3          Q.     Okay.  So let's stop here for a
4     second.  Why don't you pull out your report, and we
5     are going to come back to this other stuff, but I
6     want you to turn to Page 3 of your report.
7          A.     Okay.
8          Q.     These are listed -- Page 3 of your
9     report, you list the materials reviewed that you
10    relied on as a basis for your report, correct?
11         A.     Yes.
12         Q.     And it goes on to Page 4 for other
13    defendants as well, right?
14         A.     That is correct, yes.
15         Q.     For Walmart, you relied on four
16    documents; is that right?
17         A.     Yes.
18         Q.     Is it your understanding that those
19    were the only four documents that Walmart has
20    produced in this litigation?
21         A.     No, I'm sorry.  You said Walmart?
22    I'm sorry.
23              MR. WEINBERGER:  Tara, it is --
24    Number 1 is testimony and exhibits, right?  You are
25    talking about there's --

1          MS. FUMERTON:  Hey, Pete, I'm asking

2    him the question.  You can't answer the question

3    for him.  I am asking him.  Please don't answer the

4    question for the witness.

5          A.    So under Number 1 for Walmart,

6    testimony and exhibits under deposition, under the

7    deposition for Mr. Townzen, there were probably

8    twenty or thirty different PDFs of the ConnexUs

9    software system that were displayed there.  So

10   those were usually manual -- manuals about how

11   those systems work.

12         Q.    (BY MS. FUMERTON:)  You think there

13   were twenty or thirty manuals, that is your

14   testimony, produced by Walmart?

15         A.    No.  No.  No.  Well, there's probably

16   not twenty -- probably not twenty documents but

17   there were a large number of documents, PDF files,

18   of different sections of the manual for ConnexUs.

19         Q.    So is it your understanding that this

20   document that you listed here, the testimony and

21   exhibits from Darren Townzen's deposition and the

22   three other ConnexUs documents, are the only

23   documents that were produced in litigation?

24         MR. WEINBERGER:  Objection, form.

25         A.    I have no knowledge.

Page 187

1          Q.      (BY MS. FUMERTON:)  If there had been

2     documents that were relevant after 2012, would you

3     have wanted to see those?

4                   MR. WEINBERGER:  Objection, form.

5          A.      Sure.

6          Q.      (BY MS. FUMERTON:)  Did you ask

7     plaintiffs to see them?

8                   MR. WEINBERGER:  Objection, form.

9          A.     I did not.

10         Q.      (BY MS. FUMERTON:)  Did you tell

11    plaintiffs what type of documents you would like to

12    see?

13                  MR. WEINBERGER:  Objection, form.

14         A.      The main piece of evidence I was

15    looking for was information about the operations of

16    the organization, so to the extent that that was

17    provided to me, that is what I relied on.

18         Q.      (BY MS. FUMERTON:)  Are you aware

19    that there were hundreds of policy and manuals that

20    were produced by Walmart in this litigation, none

21    of which you cite here?

22                  MR. WEINBERGER:  Objection, form.

23         A.      I have no knowledge.

24         Q.      (BY MS. FUMERTON:)  So plaintiff

25    selected which documents you should review and base

Page 188

1   your opinions, is that correct?

2                   MR. WEINBERGER:  Objection, form.

3           A.      I don't know.

4           Q.      (BY MS. FUMERTON:)  How did you

5   select the documents that you were to review, then?

6           A.      I don't know who came up with this

7   list.

8           Q.      You did not come up with this list;

9   is that right?

10          A.      No.  I did not come up with this

11  list.  This is what I was provided.

12                  MR. WEINBERGER:  We will stipulate

13  that we came up with a list of documents and

14  provided them to him.

15          Q.      (BY MS. FUMERTON:)  So you did not

16  have any understanding of who was selecting the

17  documents that were being provided to you?

18          A.      What do you mean by "understanding"?

19          Q.      Did you understand who was selecting

20  the documents for you to review and base your

21  opinions on?

22                  MR. WEINBERGER:  Objection, form.

23          A.      Again, I am trying to understand your

24  question.  My apologies.  Could you please rephrase

25  that question?

Page 189

1       Q.    (BY MS. FUMERTON:)  What was your

2  understanding of who selected the documents for you

3  to review?

4       A.    I -- hmm.  I am trying to recall the

5  conversation about --

6          MR. WEINBERGER:  Anything that you

7  and I discussed, I don't want you to disclose.

8  They are privileged.

9          Tara, I have already told you that we

10  are stipulating that I selected, you know, as part

11  of the plaintiff's team, the documents to be

12  provided to Dr. Malone for his review.

13         MS. FUMERTON:  I am entitled to

14  understand what the expert's understanding was of

15  the documents on which he is basing his opinion.

16      Q.    (BY MS. FUMERTON:)  So, Dr. Malone,

17  are you telling me that you had no understanding of

18  what documents or what universe of documents you

19  were looking at?

20         MR. WEINBERGER:  Objection.  Form.

21       A.    I was -- so I was not given a list of

22  potential documents to examine and then selected

23  only certain documents.  So the focus of my expert

24  witness testimony has to deal with the feasibility

25  to generate warnings to the pharmacists.  So my --

Page 190

1   my expectation was that I was provided materials

2   that would allow me to assess the feasibility of

3   generating those warnings.

4         Q.      (BY MS. FUMERTON:)  Generating what

5   warnings?

6         A.      The feasibility.  So we have been

7   talking about red flags alerts, although I know you

8   haven't used the term.  That is, I guess, the

9   general premise here is that the DEA has come out

10  with warnings that pharmacists should -- pharmacies

11  and pharmacists and prescribers should all be

12  cognizant of when dispensing -- prescribing and

13  dispensing opioids and other medications that could

14  contribute to abuse of these controlled substances,

15  these dangerous substances.

16              So my scope of work was determining

17  whether the systems were in place to be able to

18  generate algorithms that would help the pharmacist

19  fulfill that duty and help the pharmacy fulfill

20  that duty, because it is not just the pharmacist.

21  Many times pharmacists don't even see the warnings.

22  They are presented to a technician.

23        Q.      What is your basis for asserting that

24  the DEA has come out with warnings that pharmacies

25  and pharmacists and prescribers should be cognizant

Page 191

1   of when dispensing and prescribing opioids?

2         A.     The Controlled Substances Act --

3   well, I may not -- there is a document that I have

4   seen that part of my former profession, pharmacy,

5   that had a series of warnings that should not be --

6   that should be considered when dispensing opioid

7   medication.  And, in fact, I think it is within

8   these documents as well.

9         Q.     Which document are you relying on for

10  that?

11        A.     I would have to investigate.  So if

12  you go under CVS, Item Number 5, 2012, the CVS

13  Corporate PowerPoint outlining red flag reports and

14  also the next document, PowerPoint outlining red

15  flags and their enhanced program.

16        Q.     And so your understanding is that

17  those documents represented what the DEA said were

18  appropriate red flags, and you designed the system

19  to flag --

20        A.     Those are consistent with what the

21  DEA -- I'm sorry.  I talked on top of you.  Please

22  restate.

23        Q.     You said they are consistent with

24  what the DEA said.  How do you know that?  How do

25  you know that those are consistent with what the

1   DEA said?  To answer that question, wouldn't you

2   have to know what the DEA said?

3          A.     Yes, you would.  And those are

4   consistent with other documents, other professional

5   trade publications that I have seen associated with

6   red flag warnings.

7                 I am looking to see if there's

8   another document that had it.

9          Q.     You testified earlier that all the

10  documents that you relied upon --

11                MR. WEINBERGER:  I think he was

12  still -- I think he was not finished with his

13  answer, Tara.  He was looking for additional

14  information.  Let him finish his answer.

15                THE REPORTER:  Somebody is not muted.

16  I hear something in the background.

17                MR. WEINBERGER:  There's some noise

18  outside my window.  Let me just see if that -- is

19  that better?

20                THE REPORTER:  Yes.  It is not

21  interfering with me hearing it.  We are okay.

22         A.     I probably need to go to the

23  deposition materials for the various defendants.  I

24  believe there was information within those

25  documents, but I don't recall which of them had

Page 193

1    that information.

2         Q.     (BY MS. FUMERTON:)  Do you know how

3    many documents the pharmacy defendants produced in

4    this case?

5         A.     I do not.

6         Q.     Would you be surprised to learn that

7    there were hundreds of thousands, if not millions

8    of pages of documents produced by the pharmacy

9    defendants?

10        A.     No, I would not be surprised.  These

11   are very large organizations.

12        Q.     How many pages do you think you

13   looked at?

14        A.     Oh, more than five hundred.  I

15   probably looked at closer to a thousand pages of

16   documents across the various depositions and

17   groups.

18        Q.     And it took you seventeen hours to do

19   that, right?

20        A.     Uh-huh.

21        Q.     Did you understand that you were

22   provided with all relevant documents you would need

23   to form your opinions in this case?

24        A.     I was -- whether it was all, no.

25        Q.     Do you feel comfortable giving an

Page 201

```
 1   We have already covered that.

 2           Q.      (BY MS. FUMERTON:)  Right.  So you

 3   are not offering any opinion as to whether or not

 4   Walmart was correctly evaluating the relevant

 5   attributes, correct?

 6           A.      That is not what I said.  You said --

 7   please restate the question to make sure I

 8   understood.

 9           Q.      You said I am not saying -- this is

10   quote, "I am not saying that those are the right

11   attributes or the wrong attributes; you have

12   already covered that."  I agree we have already

13   covered that.

14                   So you are not offering opinions one

15   way or the other as to whether Walmart was

16   appropriately identifying attributes?

17           A.      That is correct.

18           Q.      And that is true for all the other

19   pharmacy defendants in this case too?

20           A.      That is correct.

21           Q.      You mentioned the NCPDP standard,

22   correct?

23           A.      Yes, I did.

24           Q.      And specifically, you referenced

25   Script 5.0, right?
```

Page 202

```
 1            A.      I did, yes.
 2            Q.      And you suggested that that data
 3     standard is related to the submission of third
 4     party claims to PBMs, right?
 5            A.      Yes, I did.  Well, Script 5.0 --
 6            Q.      But Script 5.0 is the electronic --
 7                    MR. WEINBERGER:  You are talking
 8     over --
 9                    THE REPORTER:  I didn't hear you.
10                    MR. WEINBERGER:  You are talking over
11     him.  He was trying to answer your question, finish
12     his answer.
13            A.      NCPDP does a fairly lousy job of
14     delineating what is their electronic prescribing
15     initiative and what is their dispensing initiative,
16     in my opinion.
17                    The version of the document that I
18     have, which 5.0 is dated, it is no longer in
19     practice, but as I indicated in my statement, that
20     they have updated that.
21                    I don't subscribe to NCPDP, so I am
22     not familiar with the data elements in the latest
23     version of their third-party claims processing
24     standard.
25                    But, yeah, they do -- to answer your
```

Page 203

1   question, they do have an electronic prescribing

2   standard as well as a third-party claims standard.

3           Q.      (BY MS. FUMERTON:)  You just don't

4   know which is which, right?

5           A.      Well, as I have indicated, NCPDP does

6   a poor job of naming their standards.  I know which

7   is which, but how they refer to them has varied

8   over time.

9           Q.      Okay.  So -- okay.  So what does

10  NCPDP call the standard relating to the submission

11  of the claims to PBM?

12          A.      They had a very -- I am trying to

13  recall off the top of my head.  The -- because they

14  have changed that name over time.

15                  Like I said, they had a very generic

16  name for a while.  So off the top of my head, I'm

17  not sure what they are doing.  I would have to go

18  back and look.

19          Q.      Is your report accurate?

20          A.      As I stated in the report, the

21  document I have from 2005 called it Script Version

22  5 --

23          Q.      Okay.

24          A.      I know there was Version 5.1, Version

25  5.2, Version 5.3, etcetera.  So what version they

Page 204

1    are currently on, I am not sure.  The reason I

2    mentioned this particular standard is it is, and

3    has been, the pharmacy claims data standard, or

4    variants thereof, since this period of time and

5    probably even before that.

6            Q.    Just so the testimony is clear, it is

7    your position in your expert testimony that Script

8    Version 5.0 at some point in time was the NCPDP

9    standard relating to the submission of third-party

10   claims to PBM; is that correct?

11           A.    It is -- I want the ability to

12   clarify that later.

13           Q.    Well, okay.  This is your expert

14   report.

15           A.    So -- I recognize that.  I may have a

16   technical error there.

17           Q.    You are unsure of whether that

18   information that you reviewed and how you describe

19   it is accurate; is that true?

20           A.    Not how I describe it.  It is what it

21   is called.  So whether it is considered Script or

22   another name was applied to it -- early on, they --

23   as I mentioned early on -- this is before

24   electronic prescribing.  Electronic prescribing has

25   only been around for like since the last -- the

Page 205

1    last fifteen years or so.  So this document refers

2    to a standard that was in use well before then.

3              Q.      You just don't know what the standard

4    was called?

5              A.      Yeah.  I may have misrepresented the

6    name of the standard.  But the data elements are --

7    the version that I referred to is accurate, and the

8    data elements that are in that version are

9    accurate.

10             Q.      What do you mean the version that you

11   referred to is accurate?

12             A.      Well, the document that I had had

13   Version 5.0.  So NCPDP used a -- used a -- used a

14   different naming convention than it uses now, as

15   far as I can recall, so --

16             Q.      You agree that when you come up with

17   a hypothetical algorithm in an academic setting

18   that you have to apply it to the real world setting

19   to see if it actually works, correct?

20             A.      That is part of the validation

21   process, yes.

22             Q.      So the system you claim that the

23   pharmacies should have had, how have you tested to

24   see if those work in the real world?

25             A.      So clarify -- please make your

Page 250

1    went on to talk about some other random state or

2    hypothetical -- that is the problem here, right.  I

3    mean, technically, this entire report is based on

4    hypotheticals.

5                    THE REPORTER:  I can't understand

6    you.  Hold on.  Hold on.  I can't understand you.

7    "Exactly.  No, I didn't at all.  He went on to talk

8    about some other random" --

9                    MS. FUMERTON:  PDMP.  He has

10   testified he does not know anything about what

11   OARRS can and cannot do.  Full stop.

12            A.      And you --

13                    MS. FUMERTON:  So I am just saying

14   having him testify about what some hypothetical

15   other PDMP might do is completely irrelevant to

16   this case, and that is why it is completely

17   nonresponsive to my question, and I am going to

18   move to strike it.

19            Q.      (BY MS. FUMERTON:)  But going back to

20   this dashboard, again, you can't point to any

21   examples of this dashboard ever being utilized in

22   practice that has all of these elements that you

23   describe, correct?

24            A.      That is correct.

25            Q.      With respect to the dashboard, this

Page 311

1          Q.      So in your expert report on Page 4,

2     you say that you reviewed the National Council for

3     Prescription Drug Programs, NCPDP, Technical

4     Standard documentation called Script V5.0.

5                    And that is on Page 4 of your report,

6     correct?

7          A.      Yes.  And that is the error I was

8     trying to correct.

9          Q.      And so what is the correct statement

10    that you think it should say?

11         A.      It should say Telecommunications

12    Standard Version 5.1.

13         Q.      And you are certain that is the right

14    one this time?

15         A.      Yes, ma'am.

16         Q.      What is Telecommunications Standard

17    D.0?

18         A.      I'm sorry.  I think you cut out.

19         Q.      What is Telecommunications Standard

20    D.0?

21         A.      D, as in delta, .0?

22         Q.      Uh-huh.

23         A.      Are you deriving that from what is on

24    my screen?

25         Q.      Nope.

Page 312

1          A.       I am not familiar with D.O.

2                   MS. FUMERTON:  You can take down this

3     document.  But as I said before, I would request a

4     copy.  So if you can send a copy of that to

5     Mr. Weinberger, we are marking that as Exhibit 10.

6     So if the court reporter would like us to do it a

7     different way, we can talk off the record about how

8     to make sure we get it on the record.

9          Q.       (BY MS. FUMERTON:)  During the course

10    of your deposition today, is there any other

11    documents that you researched?

12         A.       No.

13         Q.       Mr. Weinberger, during his lengthy

14    direct examination of you, asked you a series of

15    questions about your methodology with respect to

16    your research involving DDI, correct?

17         A.       Yes, he did.

18         Q.       You have never developed the specific

19    algorithms that you say that the pharmacies in this

20    case could have developed, correct?

21         A.       No, I have not written that code, no.

22         Q.       You have never attempted to write

23    that code, correct?

24         A.       That's correct.

25         Q.       You are not aware of anybody else

# **Exhibit 3**

**Declaration of Tara A. Fumerton
In Support Of Defendants' Motion to Exclude
The Opinions and Testimony of Daniel C. Malone**

```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )  MDL No. 2804
      OPIATE LITIGATION        )
 5    _____  )  Case No.
                               )  1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES TO: )  Hon. Dan A.
 7    CASE TRACK THREE          )  Polster
 8
               FRIDAY, FEBRUARY 12, 2021
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                   - - -
12            Remote videotaped deposition of
13    Walmart Stores 30(b)(6) designee Darren
14    Townzen, held at the location of the witness
15    in Little Rock, Arkansas, commencing at
16    10:35 a.m. Central Time, on the above date,
17    before Carrie A. Campbell, Registered
18    Diplomate Reporter and Certified Realtime
19    Reporter.
20
21
22                   - - -
23
             GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

1  this is where a third party will audit a

2  pharmacy; and our third-party plant

3  maintenance as well.

4      Q.    Okay.  And prior to your

5  position as the director of health and

6  wellness, what was your previous position at

7  Walmart?

8      A.    It was primarily a lot of the

9  same responsibilities.  I had, in addition,

10  some of the innovations in our internal

11  system, updates and upgrades.  But billing

12  operations has been my primary role in one

13  form or fashion since 2005.

14      Q.    Okay.  And can you just briefly

15  describe for me what upgrades and updates you

16  were involved with?

17      A.    Just from time to time we will

18  update our internal practice management

19  system, and it goes by the term Connexus.  So

20  just the normal maintenance and updates that

21  we would provide to that practice management

22  system.

23      Q.    Okay.  And, sir, did you have

24  any responsibility for managing and storing

25  and maintaining pharmacy dispensing data at

Highly Confidential - Subject to Further Confidentiality Review

1    the 2013 to the 2018 set?

2         A.     The main difference was some of

3    the data supporting the times, the dropoff

4    and pickup times.  Prior to 2013, that data

5    was just not stored and retrieved at that

6    point in time.

7         Q.     And Mr. Townzen, was that data

8    originally collected?

9              MS. FUMERTON:  Objection.

10        Form.

11             THE WITNESS:  It was not.

12   QUESTIONS BY MR. ELSNER:

13        Q.     It was not.

14             Are there other differences

15   between the two data sets, other than the

16   dropoff times and pickup times?

17             MS. FUMERTON:  Objection.

18        Form.

19             THE WITNESS:  I believe there's

20        differences in -- most of it is going

21        to be the pickup and dropoff time.

22   QUESTIONS BY MR. ELSNER:

23        Q.     And you had mentioned to us

24   Connexus.

25             Can you please tell us what

1    Connexus is?

2         A.    Yes, it is a -- it is a -- a

3    system that Walmart developed.  Its intention

4    is to manage the work flow prescriptions for

5    our pharmacy associates.

6         Q.    And has that system been in

7    place at Walmart pharmacies since 2006?

8         A.    Yes.

9         Q.    Has Walmart used any other

10   system than Connexus to manage its

11   dispensing-related information at the

12   pharmacy stores?

13               MS. FUMERTON:  Objection.

14        Form.

15               THE WITNESS:  We did use a

16        system called PDX prior to Connexus,

17        and in 2000 moved to that proprietary

18        system.

19   QUESTIONS BY MR. ELSNER:

20        Q.    Okay.  So PDX was a system in

21   use until the year 2000, and then you

22   switched to Connexus; is that correct?

23        A.    Yes.

24               MS. FUMERTON:  Objection.

25        Form.

Highly Confidential - Subject to Further Confidentiality Review



