**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 Case No. 17-md-2804 Judge Dan Aaron Polster |
| **This document relates to**: | |
| *Track Three Cases* | |

**DECLARATION OF STEVEN N. HERMAN IN SUPPORT OF THE PHARMACY
DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS
AND TESTIMONY OF DR. KATHERINE KEYES**

EXHIBIT 1

**EXPERT REPORT OF KATHERINE KEYES, PHD**

**April 16, 2021**

# TABLE OF CONTENTS

**Page**

I.    Background and Qualifications.........................................................................1

    A.    Summary ............................................................................................1

    B.    Education ...........................................................................................1

    C.    Field of specialty and employment history.........................................1

    D.    Research areas and publications ........................................................1

    E.    Professional Organizations/Professional Societies/Awards .................2

II.   Opinions .......................................................................................................3

III.  Methodology .................................................................................................5

    A.    Definitions of methodological and substantive terms...........................5

    B.    What role does epidemiology play in describing opioid-related harm? ...............9

    C.    Methodology for review of the evidence ...........................................11

        1.    Literature search methodology ...............................................11

        2.    Levels of evidence evaluated .................................................12

IV.   Detailed Discussion of General Opinions and Reasons and Bases for Them..................14

    A.    Distribution, sales, and marketing of opioids increased in the 1990s.................14

    B.    Opioids were diverted and used by individuals with opioid use disorder and for non-medical use..................................................................24

    C.    The incidence and prevalence of both medical and non-medical opioid use increased in concert with the increased supply of opioids..................28

    D.    The increase in the prescription opioid supply, coupled with opioid use disorders and increases in non-medical use and non-medical opioid use disorder, resulted in an exponential increase in prescription opioid overdose as well as many other non-fatal consequences. ...................30

    E.    Polydrug use on toxicology in drug overdose deaths: implications for causal attribution..............................................................................34

    F.    Prescription opioid use is causally related to heroin use .....................35

    G.    The impact of diverted opioids was not random, but part of a complex system that involved community level economic conditions ..............................39

    H.    Availability principles and the relationship with harms related to prescription opioids...........................................................................41

    I.    Comparison of deaths due to prescription opioids with NSAIDs......................42

    J.    Summary ...........................................................................................43

**TABLE OF CONTENTS**
(continued)

**Page**

**SCHEDULE 1 – Case Track 3 – Lake and Trumbull Counties**

I.    Case-Specific Opinions ................................................................. 45

II.    Lake and Trumbull Counties: evidence of burden of the opioid epidemic ..................... 45

    A.    Opioid-related harm in Lake and Trumbull Counties, and Ohio, have increased greatly between 1999 and 2019, including the death rates due to prescription opioids .......................................................... 45

        (a)    Rates of opioid-related harm in Ohio have largely been increasing since 1999. ................................. 46

        (b)    Rates of opioid-related harm in Lake County and in Trumbull County have also increased since 1999 ...................... 48

    B.    Increases in neonatal abstinence syndrome, emergency department visits, admissions for treatment, and non-medical opioid use among adults and adolescents are additional key harms due to opioids in the population .............. 50

    C.    Need for treatment in Lake and Trumbull Counties ........................................... 53

    D.    Consequences of opioid use, disorder, and overdose for children in Lake County and Trumbull County .......................................................... 57

    E.    Quantifying the proportion of opioid death that is attributable to prescription opioids .......................................................... 59

## I. BACKGROUND AND QUALIFICATIONS

### A. Summary

I am an Associate Professor of Epidemiology at Columbia University, specializing in substance use and substance use disorders epidemiology.

### B. Education

I received a Masters degree in Public Health from Columbia University in 2004, and a PhD in Epidemiology from Columbia University in 2010.

### C. Field of specialty and employment history

My field of specialty is substance use and substance use disorders, as well as related comorbidity, focusing on psychiatric disorders, and consequences of substance use including intentional and unintentional injury. After receiving my PhD in Epidemiology in 2010, I completed a post-doctoral fellowship in Epidemiology at Columbia University from 2010 through 2012, and then was recruited by Columbia University to join the faculty in 2012 as a tenure-track Assistant Professor. I was promoted to Associate Professor in 2016, and received tenure at Columba University in 2020. I also hold academic appointments at various other universities. I am a Research Assistant Professor at the University of Michigan, and an Adjunct Associate Professor at the Society for Health and Research at Universidad Mayor in Santiago, Chile.

### D. Research areas and publications

I have published 300 peer-reviewed articles, editorials, and book chapters, more than 80 of which are first-authored. Much of this research has been published in the leading, highest impact epidemiology, psychiatry, and substance use journals, including in *Pediatrics, JAMA Psychiatry, Lancet Psychiatry, Nature Communications, British Medical Journal, British Journal of Psychiatry, American Journal of Psychiatry, American Journal of Epidemiology,* and *International Journal of Epidemiology,* among others. My articles have been cited in numerous disciplines, including psychiatry, epidemiology, public health, and pediatrics. My *h*-index is 78[*] on Google Scholar. Currently, 50 of my articles have been cited more than 100 times; 15 of my articles have been cited more than 200 times; and 4 have been cited more than 500 times. Since obtaining my doctoral degree, I have led and sustained numerous grant-funded projects as Principal Investigator, and have successfully competed for grant funding from the National Institutes of Health to conduct my research. I have received numerous grants from Columbia University for my work, including the Calderone Prize for junior faculty, and the Tow scholarship (awarded to high-achieving mid-career scientists). I serve as a co-Investigator on numerous federally-funded projects both at Columbia and at other institutions (including University of Michigan and New York University). In 2019, I was named as a "Highly Cited Researcher" by Web of Science, which recognizes "the world's most influential researchers of the past decade, demonstrated by the production of multiple highly-cited papers that rank in the top 1% by citations for the field and year in Web of Science."

---

[*] An *h*-index is a measure of productivity and research impact. It measures the correlation between the number of peer-reviewed papers and the number of times each paper. An *h*-index of 78 indicates that I have published a median of 78 papers that have been cited at least 68 times. Benchmarks for *h*-indices vary; at Columbia University the standards for promotion in the department of epidemiology, are an *h*-index of at least 15 for promotion to Associate Professor, and at least 25 for promotion to professor. My *h*-index is more than twice that needed for a full professor rank in my department at Columbia University, indicative of high productivity and impact.

I have published two textbooks on epidemiological methods, and I am well-qualified to assess the literature on opioid-related harm. The first is *Epidemiology Matters: A New Introduction to Methodological Foundations*, published by Oxford University Press in 2014, which is currently being used to teach graduate students about epidemiological methods in more than 20 universities. The second is *Population Health Science*, also published by Oxford University Press, which details the theoretical and methodological foundations of the science of public health.

My expertise on opioid-related harm includes large scale survey data and vital statistics analyses, as well as the development of theories, hypotheses, and publishing findings concerning the role of macro-social factors in producing opioid epidemics. Specifically, I have extensively used high-quality survey data collected at the national level in order to estimate incidence, prevalence, and trends in risk factors for opioid use disorders, and trends in opioid use. Further, I have utilized data on fatal and non-fatal overdose to estimate determinants of variation in overdose across communities. My work focuses on community-based sampling strategies as well as hospital records to document epidemiological correlates and determinants of risk. I have published 28 peer-reviewed journal articles on opioid use and related harms (and many more on drug use disorders more generally), detailing trends over time in prescription opioid misuse, birth cohort trends in nonmedical opioid use and overdose, risk factors for non-medical prescription opioid use, and consequences of use across developmental periods, including consequences related to overdose. I have particularly focused on elucidating drivers of population-level trends, including literature reviews, synthesis, and empirical analyses of urban-rural differences in nonmedical opioid use and overdose. This work is aided by the 2019 inauguration of the Policy and Health Initiatives on Opioids and Other Substances (PHIOS) center at Columbia University based in the department of epidemiology, where I serve as a faculty member and also as a steering committee member of the Substance Abuse Epidemiology Training Program (SAETP), by which I train and mentor doctoral and post-doctoral scholars in substance abuse epidemiology. I am an investigator on the HEALing Communities Study, a large, $350 million dollar NIH-funded initiative aiming to reduce opioid overdose by 40 percent in four states, including New York, Ohio, Kentucky, and Massachusetts through implementation and dissemination of evidence-based prevention and intervention efforts, including expanded access to medication for opioid use disorder, distribution of naloxone to reverse overdose, and efforts to reduce high-risk prescribing. My role on the project is to develop mathematical simulations of the cycle of opioid use in New York State, and to estimate the anticipated reduction in overdose deaths by simulating combinations of intervention initiatives taking into account the system dynamics of counties in New York State.  I am also a co-investigator of an NIH grant-funded project focused on estimating the impact of policies that target opioid use (e.g., prescription drug monitoring programs, prescribing and clinic laws, Good Samaritan laws, etc.) on opioid and benzodiazepine co-prescribing and overdose. Thus, I am well-qualified to review the literature and offer opinions based on the evidence and my own experience. I have no conflicts of interest in making these assessments, and have never consulted on behalf of any entities that stand to profit from drug or medical device sales.

### E. Professional Organizations/Professional Societies/Awards

I have assumed national and international leadership roles in my areas of expertise. I am currently on the executive board of the *Society for Epidemiological Research*, to which I was elected by my peers. I am on the executive board of the *World Psychiatric Association Epidemiology and Public Health* section, and, in 2018, hosted the bi-annual meeting of the section at Columbia University. I serve on committees and boards for numerous other societies, including the *Research Society on Alcoholism* (program committee), *International Association of Population Health Science* (program committee), and

2

*Society for Research on Adolescents* (dissertation award committee) among others, and each year I actively participate as a symposium chair and speaker on multiple workshops and roundtables at each of these meetings. In 2017, I was invited to join a National Academies of Sciences committee on accelerating the progress to reduce alcohol-impaired driving and contributed to the consensus report with evidence-based policy recommendations.[1] I have served on numerous NIH review committees for several study sections and institutes, and I joined the Epidemiology, Prevention and Behavior Research Review subcommittee of the National Institute of Alcohol Abuse and Alcoholism in 2019. Finally, I serve as Associate Editor of the journal *Drug and Alcohol Dependence* and as field editor for *Alcoholism: Clinical and Experimental Research*, both of which are highly regarded journals for original research on alcohol and drug use disorders and related harms.

My career achievements have been recognized with numerous awards. I was given the early career achievement award by three scientific societies (*Research Society on Alcoholism, American Psychopathological Association,* and *the World Psychiatric Association Epidemiology and Public Health Section*), as well as the *NIH Office of Disease Prevention Early-Stage Investigator* award, a competitive award recognizing two scholars per year, from any NIH institute, who are poised to become leaders in the field. I was awarded the Carol J. Rowland Hogue Mid-Career Award by the Society for Epidemiologic Research in 2020, which is awarded to "a mid-career scientist who has made an exceptional contribution to the practice of epidemiology." I have been and continue to be invited as a speaker nationally and internationally, with approximately 40 invited lectures, including 26 between 2017 and 2020.

## II. OPINIONS

For the detailed reasons stated in this report and the attachments, I intend to offer the following opinions in this case:

1.  In the United States, almost 50,000 people died of a drug overdose in 2018 for an opioid-involved overdose death rate of 15 per 100,000,[2] an almost 8-fold increase since 1999.[3–5] The beginning of the opioid crisis was marked by a rise in prescription opioid overdose deaths. Approximately three quarters of those who use opioids extra-medically, and those fatally injured by opioids, began their opioid use with prescription opioids.

2.  The epidemic of opioid-related harm began with a rapid increase in prescription opioid overdose death. The opioid supply increased dramatically in the United States beginning in the mid-1990s, and a direct consequence of the increased supply of opioids was an increase in the incidence and prevalence of opioid use disorder among both medical patients and non-patients (among non-patients, over-supply of opioids was diverted to illicit marketplaces), and an increase in prescription opioid-related deaths (late 1990s and early 2000s). The epidemic then transitioned to heroin use being identified more frequently in opioid overdose deaths (while prescription opioids remained high), and in the mid- to latter half of the 2010s (depending on the region), synthetic opioids (primarily fentanyl) have been increasingly identified in opioid deaths. The expansion of prescription opioid distribution and availability laid the foundation for the increase in heroin and fentanyl deaths, and my report details the existing literature on the extensive evidence that prescription opioids modally precede heroin and fentanyl use, providing a basis for the opinion that prescription opioid use is a cause of subsequent heroin and fentanyl use, morbidity, and mortality.

3.  Prescription opioid overdose increased exponentially in the United States in the past 20 years, and these increases strongly correlate with rates of prescription opioid supply for medical

3

use both in terms of geographic variation in supply as well as year-to-year variation, in both observational and quasi-experimental studies, providing an evidence base that supports this opinion that supply and availability of opioids caused an increase in the rate of prescription opioid overdose.

4.     Medical use of opioids is associated with the development of opioid use disorder at higher rates than were reported by drug manufacturers. This assessment is based on standard principles and methods in the field of epidemiology, including confounding assessments, as well as consistency with biological knowledge, replication, dose response and length of opioid use among medical users.

5.     Opioid use disorder is prevalent and disabling. Mild to severe OUD occurs in approximately 21-29% of individuals who are prescribed opioids, and  moderate to severe OUD occurs in approximate 8-12% of individuals who are prescribed opioids. These are likely underestimates given that systematic assessments are not routinely done, and that tolerance and withdrawal after medical prescription cannot be diagnosed as opioid use disorder under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria, a change from the DSM IV criteria that was industry-supported and relies on no statistical evidence of which I am aware.

6.     The expansion of non-medical prescription opioid use would not have occurred without the widespread availability of prescription opioids that were originally dispensed supposedly (but not always actually) for medical uses, often in greater quantities and doses than needed, leaving a surplus of opioids that could be diverted for non-medical uses.

7.     Prescription opioid use is causally associated with harm across the lifecourse, especially when it is initiated at critical developmental windows such as adolescence, and during fetal development due to maternal use.

8.     Prescription opioid use is causally related to subsequent heroin use. Approximately 70-80% of heroin users since the turn of the 21st century used prescription opioids before heroin use, and while the proportion of prescription opioid users who progress to heroin use is relatively small, even a small increases in the proportion who progress can explain the majority of the increase in heroin use in the United States. There is substantial overlap in medical and non-medical use of opioids; those who use medically are at higher risk for non-medical use, and those who use non-medically are more likely to also subsequently use medically. However, even among those who use medically only (no non-medical use), there is a higher risk of transition to heroin use than among those who have never used prescription opioids.  Because the heroin supply has been contaminated with high-potency synthetic opioids (e.g., fentanyl) in the mid- to latter half of the 2010s (depending on the region), prescription opioid use is also causally related to the increase in synthetic opioid morbidity and mortality, since prescription opioids frequently precede the transition to heroin, including heroin contaminated with fentanyl.

9.     Prescription opioids cause accelerated and increased risk of harm when used in conjunction with other drugs such as other opioids, benzodiazepines, stimulants, and alcohol. When multiple drugs are listed as part of the contributing causes of death in an overdose death, the preponderance of evidence indicates that certain combinations of drugs, especially those that include opioids, are associated with multiplicative increases in the risk of death; that is, without the prescription opioid, the individual would not have died when and how they did. Thus, multiple drugs present in a toxicology report are likely indicative of synergistic interactions for which prescription opioids are attributed as a cause when listed as per the current available evidence in epidemiological and toxicological sciences. For these reasons, CDC and other authoritative sources

4

correctly report overdose deaths that include prescription opioids as prescription-opioid deaths, even when additional drugs are identified.[6]

10.     Prescription opioid and other opioid mortality disproportionately affected economically deprived areas; however, the available evidence indicates that economic conditions played a relatively small part in increased opioid-related morbidity and mortality. The driving force in increasing opioid-related morbidity and mortality was, and continues to be, access to and wide-spread availability of opioids.

11.     Compared with other commonly used pain relievers, such as non-steroidal anti-inflammatory drugs (NSAIDs), the adverse health and addiction consequences are substantially and significantly greater from opioids than from NSAIDs, including for cardiovascular events, fractures, and falls, as well as poisoning and overdose.

In addition to the above general opinions, I offer the opinions with respect to the specific Counties at issue in this case, which are set forth in the attached Schedule 1 along with the jurisdiction-specific bases and reasons for them.

To summarize, there is compelling evidence of harm from the oversupply of prescription opioids, both for medical users, and to non-medical users because of diversion. The counties at issue in this case have experienced a high burden of harm due to opioids. These harms include opioid use disorders and overdose; these harms are greater than those associated with other pain relief drugs, and are causally related to additional harms from opioids including transition to addiction with illicit opioids.

## III.     METHODOLOGY
### A.     Definitions of methodological and substantive terms

Before detailing the scientific evidence that underlies my opinions, it is useful to describe a set of terms that I will be using throughout the report.

1.     *Prescription opioids.* Drugs approved for medical use in the United States for the control of moderate to severe pain that are either natural opiate analgesics derived from opium (morphine and codeine), semi-synthetic opioid analgesics (oxycodone, hydrocodone, hydromorphone, and oxymorphone), synthetic opioids (methadone), or synthetic opioid analgesics (e.g., tramadol and fentanyl).[7]

2.     *Medical use of prescription opioids.* Medical use will refer to use of prescription opioids prescribed by a physician and used as directed by that physician exercising professional judgment acting within the scope of his or her license.

3.     *Non-medical use of prescription opioids.* Non-medical use refers to both using prescription opioids more often or longer than prescribed, or use of prescription opioids without a prescription. These definitions are commonly used in large scale surveys of prescription opioid use in the population. For example, the National Survey on Drug Use and Health asks, "Have you ever, even once, used any prescription pain reliever in any way a doctor did not direct you to use it?" Examples given to respondents include use without a prescription, use in greater amounts, more often, or longer than prescribed, or use in any other way that a doctor did not direct. This question and similarly worded questions on other large-scale surveys are the commonly used assessment of non-medical prescription opioid use. Some reports also label this as "prescription opioid misuse"; however, I will use the term 'non-medical prescription opioid use' for consistency. Non-medical

5

prescription opioid use is also referred to as '*opioid misuse*' in much of the literature, although definitions and measurement assessments differ in what is included as opioid misuse. For example, some measures of opioid misuse include using opioids for euphoria, or for the experience or feeling that using opioids caused, which could conflate some medical and non-medical reasons for use.[8]

4.    *Opioid misuse.* For the purposes of this report, opioid misuse is synonymous with "non-medical prescription opioid use", and refers to use of prescription opioids in ways other than prescribed, including taking more than prescribed, or using prescription opioids that were not prescribed by a physician. As noted above, however, throughout this report I will detail the definitions that studies use when using the term "misuse" to highlight variation in the definition in the literature, and will primarily rely on the term "non-medical use of prescription opioids" when discussing the literature and findings related to use of opioids that is outside the medical oversight and prescription of a physician.

5.    *Tolerance and physical opioid dependence.* Individuals who use opioids can develop tolerance to the medication. Tolerance develops when the endogenous opioid system acclimates to the medication and more is needed to produce the desired effects. Dependence on opioids also occurs in medical uses of opioids, in which more opioids are needed to achieve the desired effects (tolerance) and when the cessation of opioids produces symptoms of withdrawal and craving for opioids. Physical opioid dependence can occur even at low doses, but is increased with dose and duration of use. Physical opioid dependence does not currently meet the criteria for opioid use disorder, with changes to the DSM in the most recent revision. Physical opioid dependence is expected even when opioids are used medically; yet physical opioid dependence is clinically challenging, and increases the risk for transition of patients to opioid use disorders and addiction.

6.    *Opioid use disorders.* Opioid use disorder is a diagnosis in the DSM, as well as the International Classification of Disease (ICD). It is important to point out from the outset of this description that opioid use disorder is distinct from the physical opioid dependence (defined above) that would be expected to occur with repeated administration of opioids. Medical use of opioids would be expected to produce symptoms such as tolerance (needing more opioids to achieve the same effect) and withdrawal (uncomfortable and painful physical and psychological symptoms during cessation of opioids). However, opioid use disorders involve a maladaptive pattern of use from which there are serious consequences in domains of functioning. The fourth version of the DSM was published in 1994, and included two diagnoses that together comprised opioid use disorders: opioid abuse and opioid dependence. Opioid abuse was diagnosed if there was "a maladaptive pattern of use leading to clinically significant distress or impairment" as indexed by at least one of four symptoms in a 12-month period, including recurrent failure to fulfill major role obligations (e.g., repeated absences from work, neglect of children), recurrent use in physically hazardous situations (e.g., driving under the influence), continued use despite social or interpersonal problems because of use (e.g., arguments with family, physical fights while intoxicated), and legal problems due to use.[9] Opioid dependence was diagnosed if there was "a maladaptive pattern of use leading to clinically significant distress or impairment" as indexed by at least three of seven symptoms in a 12-month period including tolerance (needing more opioids to achieve intoxication or desire effect, or diminished effect with continued use of the same amount of opioids), withdrawal (defined via a substance specific syndrome), using the substance in larger amounts or over a longer period than intended, persistent desire or unsuccessful efforts to cut down or control use, physical or emotional problems caused or exacerbated by use, excessive time spent in activities to obtain or use substance, and social/occupational/recreational activities given up in order to use.[9] Tolerance and withdrawal are symptoms of opioid use disorder; tolerance and withdrawal alone were excluded

6

as a sole set of criteria for OUD diagnosis in DSM-5. This change to exclude individuals from diagnosis when based on tolerance and withdrawal alone underestimates the total burden of opioid use disorder in the population, given that psychometric and epidemiological evidence indicates that tolerance and withdrawal are valid indicators on the dimension of opioid use disorder (discussed further on Page 20 of this report). In DSM-IV, opioid abuse could only be diagnosed if the criteria for opioid dependence were not met. In DSM-5, opioid abuse and dependence criteria were combined for a single diagnosis of "opioid use disorder"; craving was added as a criterion (strong desires to use opioids); and "legal problems" was removed as a criterion. Diagnoses could be made at three levels: mild (2-3 symptoms); moderate (4-5 symptoms); and severe (6+ symptoms). Opioid use disorder diagnoses are sometimes made based on ICD-9 and ICD-10 criteria. These criteria overlap substantially with DSM criteria

7.    *Addiction.* Addiction is a concept often synonymous with opioid use disorder, but is not a clinical term available for diagnosis in major nosology such as the DSM or the ICD. However, it is used frequently in the literature with various definitions, sometimes used to refer to physical opioid dependence, but most often to refer to individuals who use opioids non-medically for their euphoric effect, and/or those who exhibit harms due to opioids that include important social, occupational, physical, and relationship impairments due to non-medical prescription opioid use. Because addiction is not a well-defined clinical diagnosis, throughout this report I will detail how "addiction" is defined in studies that use the term, and will focus on opioid use disorder primarily when discussing the literature on opioid-related harms.

8.    *Overdose.* An injury to the body caused by poisoning from excessive opioid use. Symptoms of an overdose include shallow breathing, weak pulse, loss of consciousness, and constricted pupils. An overdose can be fatal or non-fatal.

9.    *Incidence.* Incidence, or incidence rates, refers to new diagnosis over a population at risk for developing the outcome during a specified time interval or per a specified time scale. For example, the incidence of opioid use disorder would be an assessment of newly developed cases among those who did not previously have a diagnosis across a specified time interval.

10.    *Prevalence.* Prevalence, or prevalence rates, refers to the total number of cases over a well-described population. For example, the prevalence of opioid use disorder in a given year would be estimated as the total number of cases of opioid use disorder (both new and persistent) over the total population size.

11.    *Relationship between incidence and prevalence.* Prevalence and incidence are both used to demonstrate total burden of harm for health outcomes in the United States. Prevalence rates provide essential information regarding the counts of cases and are a combination of new and existing over time, and can be used to assess risk factors and correlations. Because prevalence includes both new and existing cases, the prevalence of an outcome in a given population at a given time is estimated by the incidence rate multiplied by the average duration of the outcome (given a steady state population). Prevalence is critical for determining total burden of health outcomes, especially to assess surveillance of trends over time. Incidence of an outcome is critical for documenting emerging epidemics and the existence of new cases. The assessment of risk factors for incident cases is of interest because it can establish the extent to which exposures generate new cases of a health outcome; risk factors for prevalent cases combine risk factors for new cases plus risk factors for cases that are chronic or un-resolving. This report will include information on both incidence and prevalence.

7

12.     *Diversion.* Diversion of opioids has been defined in various ways across a variety of sources, including the transfer of opioids obtained through legal medical sources to the illicit marketplace. I will use a broader definition of diversion, which is consistent with numerous other scholars, which is that diversion occurs when opioids are diverted from their intended recipient, for example, when traded for monetary value, barter, or for no cost among family and individuals in a shared social network, or when sold for money by illicit dealers and traffickers. Opioids that are prescribed to individuals who knowingly deceive prescribers to obtain opioids, as well as by physicians who knowingly prescribe to individuals with no legitimate medical need, have a high likelihood of being diverted for non-medical use.

13.     *Morbidity.* Morbidity refers to specific health conditions. In the context of this report, morbidity refers to conditions subsequent to opioid use such as opioid use disorder, non-fatal overdose and hospitalization, and other acute and chronic health conditions that arise from opioid use.

14.     *Comorbidity.* Comorbidity refers to two or more specific health conditions of interest occurring concurrently. For example, individuals who have more than one drug use disorder simultaneously have comorbid drug use disorders.

15.     *Systematic review.* A systematic review is designed to carefully summarize existing evidence on a specific topic. Systematic reviews provide defined search criteria in the peer-reviewed literature, report articles that were included an excluded with transparent criteria, and the relevancy of the studies included for generating conclusions about the research question under consideration. Judgments are made from systematic reviews about the quality of evidence that has been gathered, existing gaps in the research, and quantitative as well as qualitative assessments of the strength of the evidence. The purpose of a systematic review is to summarize the strength of the evidence for a particular topic. However, systematic reviews can be well or poorly executed, and their utility and reliability needs to be assessed carefully just like any other peer-reviewed publication.

16.     *Meta-analysis.* Meta-analysis quantitatively combines evidence across studies to provide summary estimates for the association between exposures and outcomes. Meta-analyses take published and in some cases unpublished estimates from across studies and uses them to generate a summary estimate with more statistical power because of the combined effect across studies. Methods in meta-analysis allow researchers to weight studies based on quality or informativeness, such that studies that have a higher quality of evidence can be given a greater weight in determining the summary estimate. Meta-analyses are considered a higher level of evidence than single studies, because while single studies may have particular bias or confounding, a large number of studies analyzed together generally provide a more rigorous estimate of the true relationship. Studies that are included in a meta-analysis should be sufficiently similar to warrant summarizing estimates of magnitudes of association together, while simultaneously estimating heterogeneity in effect sizes across studies. As in the case of systematic reviews, meta-analyses can be well or poorly executed, and their utility and reliability needs to be assessed carefully just like any other peer-reviewed publication.

17.     *Confounding.* Confounding occurs when risk factors that are causes of the outcome are unequally distributed between exposed and unexposed persons. Study estimates that are confounded do not reflect the true causal relationship between exposures and outcomes. For example, consider the relationship between prescription opioid use (exposure) and heroin use (outcome), which is evaluated in this report. Men are more likely to both use prescription opioids and to use heroin. Thus, the estimate of the relationship between prescription opioid use and heroin

8

use is confounded by sex, and control for sex in statistical analyses of the relationship would be appropriate.

18.     *Bias and misclassification.* Bias can arise in the study design and analysis of epidemiological studies from a variety of sources. Among the most pernicious forms of bias in epidemiological studies is information bias, also called misclassification. For example, a common source of misclassification in studies of substance use disorder occurs when reporting on the presence of substance use disorder among a group of research subjects, any substance use disorder that is missed among research subjects would be characterized as misclassification. With regard to opioid use disorders, the presence of disorder is often underestimated due to misclassification of opioid dependent individuals as non-dependent. Misclassification is magnified when opioid use disorders are not assessed with structured, validated instruments for measurement of opioid use disorder, or with objective assessments of the presence of opioids and other drugs through urine toxicology. Further, misclassification has been assessed in vital statistics designations of causes of death for which opioids may be involved.[10] Death certificate procedures vary by state and local region within a state, in terms of the training of the individual completing and certifying the death certificate, and with regard to the quality and completeness of the information presented on the death certificate. Death certificate validity on overdose is maximized with investigations that include toxicological assessments.

### B.     What role does epidemiology play in describing opioid-related harm?

Epidemiology is the "science of understanding the causes and distributions of population health."[11] To understand causes and distributions, epidemiologists examine the dynamic nature of populations and how health and disease arise within them, as well as the conditions that shape population health over time and space, including policies, practices, and politics that create conditions that improve or deteriorate population health. Whereas a physician examines each patient that enters her clinic, asking what caused a particular health outcome for this particular patient, an epidemiologist looks over the landscape of a population across time to determine why the burden of a particular health outcome is greater or worse in some areas, at some time points, and among some subgroups, and queries what in the social, political, and environmental landscape create the distributions and their changes over time.

When evaluating a body of literature to draw conclusions about causation, epidemiologists rely on sets of criteria to determine the extent to which the evidence is consistent with a causal effect of exposures such as opioid medications on outcomes such as opioid use disorder and death. The most well-known and well-documented set of criteria are Bradford Hill's causal criteria.[12] These are not a 'check-list' of criteria, but rather a framework that aids in decision-making about the strength of evidence. I have written on and contributed to the epidemiological evidence base of the use of Hill's causal criteria in modern epidemiology and how these criteria correspond to other causal frameworks.[13] Hill's causal criteria include the following:

- Temporality: the exposure must precede the outcome

- Strength of association: the larger the magnitude of an association, the more likely it is to be causal

- Dose-response: if the outcome increases in risk with an increasing amount of the exposure, it is less likely to be explained by confounding and more likely to be causal

- Consistency: if the relationship between exposure and outcome is observed across many studies in many settings, it is more likely to be causal

9

- Biological plausibility: there should be a plausible biological explanation for how the exposure influences the outcome

- Specificity: associations are more likely to be causal if they are specific, that is, if the exposure causes a single outcome

- Coherence: closely linked to biological plausibility, associations are more likely to be casual if they are coherent with known facts and science

- Experiment: randomly assigning exposures and observing whether the outcome occurs increases likelihood that associations are causal

- Analogy: causation is supported if there are clear and compelling analogies to other causal associations in the literature

In evaluating the literature, assessing the extent to which exposures and outcomes meet Hill's causal criteria is a well-documented and acceptable methodology to establish scientific opinion and conclusion about casual relationships. Particularly important causal criteria include the strength of the association, dose response, and biological plausibility, especially in observational epidemiology, in which exposures cannot be ethically randomized.

Epidemiology has played a key role in understanding the increases in opioid use and related harm in the population. A central role for epidemiology is surveillance. Using a variety of methods, epidemiologists examine the incidence and prevalence of opioid use, non-medical opioid use, and consequences of use such as opioid use disorders, overdose, and neo-natal abstinence syndrome across time and place, as well as factors that influence opioid prescribing, use, and misuse. Epidemiological studies have documented changes in the incidence and prevalence of these outcomes across time, heterogeneity in the incidence and prevalence by state and county, and correlations with factors such as availability and access of opioids, individual-level risk factors, and policy changes. Further, epidemiological studies are critical in documenting the longitudinal short- and long-term consequences of inter-individual variation in risks associated with opioid use. That is, epidemiological studies compare individuals with and without specific opioid use patterns to determine the longitudinal associations between use and health and mortality. Epidemiologists are particularly trained to control for and examine confounding, which is commonly used to mean common causes of an exposure and an outcome that are being assessed. When confounding is present, groups are not comparable to each other on causes of the outcomes other than exposure. For example, individuals who do and do not use opioids (both medically and non-medically) may have different underlying risk factors for long-term health and mortality risks, and thus the science of epidemiology involves testing the extent to which relationships between exposures and outcomes are robust to statistical controls for these risk factors. Epidemiologists use a variety of methods to control for confounding in estimates, including statistical controls in regression models, propensity scores estimation, randomization, and quasi-experimental methods such as instrumental variable analysis. In summary, the role of epidemiology in describing opioids is to quantify the extent to which use and harms associated with use are changing over time, the determinants of those changes, as well as individual-level risk factors for non-medical use and harm.

Key to epidemiological assessments is the concept of risk factors. Risk factors are variables that, when present, increase the frequency with which an outcome occurs, but need not be necessary or sufficient for the occurrence of the outcome to be fully determined. A useful example is that of cigarette smoking and lung cancer. It is now widely accepted that cigarette smoking is a cause of lung cancer. However, not all cigarette smokers will develop lung cancer (thus, cigarette smoking is

10

not sufficient to cause lung cancer in and of itself), and not all lung cancers occur among smokers (thus, cigarette smoking is not fully necessary to cause lung cancer). Yet, cigarette smoking increases the risk that lung cancer will occur, and thus it is considered a cause of lung cancer if there are cases of lung cancer that would not have occurred in the absence of cigarette smoking. I will apply the same "risk factor" framework to my assessment of the causes of the opioid crisis, considering factors to be causes of opioid use disorders, overdose, and related harm if some cases would not have occurred in the absence of prescription opioid use. This framework does not preclude or ignore that addiction and related harms are multi-factorial in their etiology, but rather asks whether there are cases for which the outcome would not have occurred without the presence of prescription opioid use.

### C.    Methodology for review of the evidence

I undertook a review of the evidence to assess the impact of opioid sales and distribution in the United States, as well as harms incurred from opioid use, opioid use disorders, diversion, and transition to heroin on opioid-related outcomes and among families and children. I also estimate unmet need for treatment in the Counties at issue in this case, as discussed in Schedule 1.

#### 1.    Literature search methodology

My review of the evidence began with a literature search. In order to conduct this literature search. I relied on methodology that is considered standard in the scientific process, as outlined below.

First, I used search terms in the peer-reviewed literature related to the areas of my literature search. For this I used PubMed (https://www.ncbi.nlm.nih.gov/pubmed/), a search engine produced and maintained by the US National Library of Medicine National Institutes of Health. Full texts of scientific articles produced in the searches were available by subscription through my faculty appointment at Columbia University. Search terms were entered into the search bar, and titles were then reviewed for relevance to each particular topic. Full- texts were then reviewed to determine if there was original data and information within each specific category that related to topics covered in the expert report. Full-text articles in journals that are indexed in PubMed are considered to be reputable; journals that are indexed by PubMed have long histories of publication, and are included only if they meet well-recognized standards including editorial oversight by recognized experts in the field as well as peer-review by experts.

Peer-review is considered to be the gold-standard of the scientific process; peers are experts in the field who evaluate each submitted paper for flaws in design and logic and make quality assessments. However, while peer-review is an important component of the scientific process, peer-review is not sufficient alone to establish quality and validity of a scientific study. Limitations in the peer-review system have long been documented in the scientific literature, including that inadequate study design and statistical analysis flaws go unnoticed by peer-reviewers,[14] publication biases lead to scientific studies with statistically significant results more likely to be published and cited than studies with null results,[15] incorrect and inaccurate reporting of study outcomes and results,[16] and the pernicious influence of conflicts of interest among study researchers that leads to bias in the conduct and reporting of research.[17] For example, the British Medical Journal found that financial ties of study investigators were associated with a 3-fold increase in positive study results, based on analysis of 190 clinical trials that were published in 2013.[18] While the scientific literature has made advances in the peer-review system through rigorous development of reporting guidelines, more clarity and specificity in the reporting of conflicts of interest, and the inclusion and compensation of editors who additionally review papers for quality, peer-reviewed studies should still be rigorously evaluated

11

when deciding whether to cite them for a particular piece of evidence. In this report I have included studies assessed by peer-review and done additional review of the articles based on my own expertise in order to discern whether they meet quality benchmarks. As an associate editor for multiple scientific journals, I have over a decade of experience evaluating the quality of the scientific literature for publication. I have served as a peer reviewer for hundreds of scientific papers in the field of substance use and substance use disorder epidemiology, and I am thus well qualified to evaluate the literature for papers that demonstrate a sufficient level of quality to be relied upon in my review of the evidence.

Second, within full-text reviews, additional studies that were relevant to each topic were identified based on the reference lists and citations of articles identified by PubMed search. Reference lists were reviewed and additional articles extracted based first on title review for broad relevance to the topic of study. Then, full texts were studied and evaluated, and included in the evidence review if the article contained original information that was reliable and relevant to the topic under study.

Finally, I also studied and evaluated the non-peer-reviewed "gray" literature relevant to the topics under study. Specifically, I reviewed government and agency reports from the following: Centers for Disease Control and Prevention, Substance Abuse and Mental Health Services Administration, and Agency for Healthcare Research and Quality. These reports included assessments of time trends in opioid poisoning and overdose, rates of opioid use disorder, and hospitalizations for opioid-related causes. Other gray literature was included in my evidence review based on review of reference lists from PubMed searches when relevant to the topic of study. I have also, where appropriate, considered new and novel data contained in Letters published in top tier journal where submissions are peer reviewed. I also considered materials provided by the Plaintiff's counsel, and they are included in the materials considered list.

2.   *Levels of evidence evaluated*

Throughout this report, I make assessments of the rigor of the evidence that has been used to support conclusions and opinions. This includes assessing the extent to which the observed literature is consistent with causal criteria such as Hill's causal criteria. There are two general categories of studies that I will include in this report: the first are studies that examine associations, and the second are studies that examine trends over time.

With regard to studies that examine associations, I considered the following levels of evidence. First, I considered randomized controlled trials to be a high level of evidence, given that the possibility of confounding and bias to influence the results is most likely to be mitigated in randomized controlled trials. For example, in sections on evidence for opioid use disorder after medical use of opioids, I included randomized controlled trials that included information on outcomes such as "aberrant drug use behavior." However, for many of the associations reported in this statement, randomized controlled trials are unfeasible or unethical, or uninformative for the question of interest. For example when assessing the transition from prescription opioid to heroin use, it is highly unethical and would never be considered to randomize individuals to high levels of prescription opioids in order to observe the transition to heroin once prescription opioids were tapered. Indeed, for much of the literature cited in this report, randomized controlled trials would never be conducted. Furthermore, randomized controlled trials are not *de facto* strong evidence, as publication bias, conflicts of interest, specifics of the study design, study population assessed, outcome measurement, study duration, statistical power, and rigor of statistical analysis should all be considered when evaluating a particular randomized controlled trial for the level of evidence that it

12

brings to a particular study question. For example, many randomized trial of prescription opioids are uninformative for relevant questions of opioid use disorder incidence due to the lack of systematic measures of opioid use disorder and psychiatric diagnoses, exclusions from participation in trials among those with prior substance use disorders, and low dose/short duration of opioid exposure. In the circumstances that randomized controlled trials were not available, rigorous, or applicable to the question at hand (e.g., risk of opioid use disorders among those prescribed opioids), I considered meta-analysis and systematic reviews to be high levels of evidence, and cite them as well as discuss their findings when they are available. Systematic reviews and meta-analysis are considered high levels of evidence because they quantitatively and qualitatively assess the overall body of the literature and provide quality assessments that weight evidence, but are subject to limitations if not conducted rigorously and are not taken as strong evidence without careful review. I consider studies that had prospective follow-up of patients or participants, a well-described strategy for statistical control of confounders, and well-designed comparison groups to be the next level of evidence. Prospective follow-up is an important study design because it reduces biases in epidemiological studies from retrospective reporting of symptoms or events. Further, statistical controls are necessary to overcome the potential for bias from confounding. Prospective studies often involve comparison groups (e.g., prescription opioid users and a comparison group of non-prescription opioid users). Study designs with comparison groups provide evidence regarding opioid-related harm that is over and above harm in patient and general population samples across varying levels of opioid exposure. Studies of patient populations without comparison groups, however, are also informative particularly for research questions germane to the prevalence of opioid use disorders and related harm among patients prescribed opioids (especially high doses in long duration), as well as questions related to the proportion of drug users who previously used prescription opioids. Well-designed studies of single populations without explicit comparison groups are thus also considered by me as relevant evidence for characterization of prescription opioid-related harms.

With regard to studies that assess trends over time, I considered three data sources to be the highest levels of evidence. First, I relied on death records that are collected and harmonized by the national vital statistics surveillance system. While death records can have misclassification of causes of death, they are considered by experts to be a reliable indicator of national and local burden of specific causes of death, especially when examining trends over time. Second, I relied on data sources with a national reputation for transparency in reliability and validity that assess hospitalization and other clinical records, such as large electronic health databases, as well as national studies such as the National Inpatient Sample. Again, while such records can include misclassification, data sources gathered from reputable organizations such as the Agency for Healthcare Research and Quality include reliability and validity assessments that allow the researcher using them to be able to draw conclusions based on the best available evidence. Third, I relied on survey data that is routinely collected in the general population of households in the United States over time. Surveys are essential parts of surveillance, given that many cases of substance use disorder do not come to clinical attention, and thus relying on clinically ascertained records can give a biased assessment of trends and burden in the population. Survey data source methodology involves clustered sampling so that samples are representative of the entire United States, and respondents are interviewed with validated instruments that are designed to elicit diagnoses and information with maximum accuracy in the survey context. Generally, I do not include surveys that are not representative of the population, as they are not strong evidence for an assessment of the total burden and trends over time.

13

IV.   **DETAILED DISCUSSION OF GENERAL OPINIONS AND REASONS AND BASES FOR THEM**
   A.   **Distribution, sales, and marketing of opioids increased in the 1990s**

There is voluminous evidence regarding the increased distribution, sales, and marketing of opioids beginning in the 1990s. This evidence is the subject of other expert reports, and I will not repeat all of that evidence here. Instead, I will summarize some points for context. Opioid pain relievers became an increasingly widely-used option starting in the mid-1990s, particularly for chronic non-cancer pain, a use that had rarely been seen previously. Estimates from the Automation of Reports and Consolidated Orders System (ARCOS), which tracks prescription distribution and sales, indicate that prescription opioids were dispensed at an estimated 96 mg per person in 1997, and increased to 700 mg per person by 2007 (greater than 600% increase).[19,20]  In 1995, the year OxyContin entered the market, the number of opioid prescriptions filled in the United States increased by 7 million, and continued to increase over the next two decades before peaking in the fourth quarter of 2012 at 62 million prescriptions dispensed.[21,22] From 1997 to 2002, prescriptions for OxyContin for non-cancer pain increased from approximately 670,000 in 1997 to about 6.2 million in 2002.[23] The increase in opioid prescribing was driven by a multitude of factors, including direct marketing to physicians using data that underestimated opioid use disorder risks in patients, which I will detail in Section B. Evidence shows that pharmaceutical marketing of prescription drugs increases prescribers' likelihood of prescribing the marketed drug in the future.[24,25] That is also true for prescription opioids; as a result, increasing marketing of opioid drugs led to increased sales of the marketed drugs.[26–28]

As discussed in detail below, based on the available evidence, including multiple studies, the rapid increase in total opioid prescribing levels after the introduction of OxyContin in 1996 correlates with marketing of opioids to physicians which downplayed the risks of harms associated with prescribing, including opioid use disorder and overdose.

Evidence published in 2019 indicates that the number of opioid prescriptions filled has declined in recent years,[29] and yet the number of opioid prescriptions filled remains high—and significantly higher than it was in the mid-1990s. Data from outpatient prescribing records from the IQVIA Xponent database, covering 59,400 pharmacies (representing 92% of retail prescriptions dispensed in the United States), reflects trends from 2006 through 2017 in milligrams of prescribed opioids, duration per prescription, high-dosage prescription fills (defined as a dosage equal to or greater than 90 morphine milligram equivalents [MMEs] per day), prescriptions filled for 3 days or fewer and 30 days or longer, and extended-release/long-acting formulation prescriptions.[29] While there are overall declines in opioid prescribing, and high-dose prescribing, the volume of opioids prescribed remains high and prescription length continues to increase. Opioid prescriptions per person in the United States increased annually at an average rate of 6.9% per year until 2010, and decreased at an average rate of 3.8% per year from 2010 through 2015. In 2017, there remained a high level of opioid prescribing in the United States, with 191,218,266 prescriptions dispensed, leading authors to conclude that still in 2017 "pharmacies filled enough opioid prescriptions to theoretically provide every US resident with 5 mg of hydrocodone bitartrate every 4 hours around the clock for 3 weeks."[29]  Hydrocodone bitartrate has several formulations, including hydrocodone bitartrate with acetaminophen, commonly known as Vicodin. Risks of opioid use disorder following medical use of prescription opioids follow a "dose-response" pattern.

Early studies cited in marketing materials to physicians underestimated the addiction potential of prescription opioids, and included claims that risks of opioid use disorders are rare among those prescribed opioids. Much of the material provided to physicians on the risks of opioid

14

use disorders after medical prescription of opioids, however, was based on studies that were inadequate epidemiologically, such as Porter and Jick (1980),[30] which did not examine risk of use disorder or dependence based on dose or length of use of opioids, and did not use validated or objective assessments of opioid use disorder. Further, the doses, conditions, and range of medications actually provided to patients often differed from what was cited in these studies. The lack of attention to the to the risk of opioid use disorder with increasing dose and duration of opioids is particularly appalling given that before, during, and after the time period in which opioid distribution rapidly accelerated, there was a literature base to draw on regarding the risks of opioid use disorder indicating substantially higher risk of disorder symptoms among those under medical care than reported by industry,[23,31] with variation in the reported rates of OUD based on condition, dose, and duration of opioid use.[32–35] From early research, the epidemiological science supported the opinion that OUD rates increased with dose and duration of opioid use.

For this report I reviewed six systematic reviews and/or meta-analyses that assessed opioid use disorder among medical users of opioids, as well as additional relevant literature that is not included among the systematic reviews and meta-analyses.

Vowles et al. (2015)[36] provides the most transparent and high-quality review of the evidence of opioid use disorder among patients prescribed opioids for chronic pain. Vowles et al. (2015), unlike other reviews, calculated estimates of prevalence of three outcomes: (1) misuse, described by Vowles et al. as using opioids contrary to directed or prescribed; (2) abuse, described as intentional use of opioids for euphoric effects; (3) addiction, described as continued use with experience of, or demonstrated potential for, harm. Among studies reviewed, 38 studies met inclusion criteria, which is more comprehensive than comparable reviews also discussed in this report. An important qualification is that Vowles et al. used the term "misuse" to describe a range of underlying studies that themselves assessed a broader range of criteria that indicated clear indications of opioid use disorder that ranged from mild to severe as consistent with DSM-IV criteria. While Vowles et al. defines "misuse" as any use outside that which is prescribed by a physician, the actual studies that comprise the "misuse" category in the Vowles et al. analysis include studies with data that corresponds to a range of levels of opioid use disorder when the underlying data that is used in the Vowles et al. paper is carefully reviewed.

I will focus on those studies that estimate opioid "misuse" and opioid "addiction". Given that the measurement of opioid misuse includes criteria of opioid use disorder (use more than intended or prescribed; difficulties with responsibilities as to work, school, appointments, etc.), the most reasonable analysis of the Vowles study in relation to DSM-5 criteria is that Vowles' 8-12% "addiction" rate corresponds to moderate-to-severe OUD, and Vowles' 21-29% category of "misuse" includes the full spectrum of DSM-5 categories, from mild (defined as 2-3 criteria met), moderate (4-5 symptoms) to severe OUD (6+ criteria met).[37,38] These studies measured addiction with a range of assessment tools, including diagnostic interviews and urine toxicology. Given that a higher threshold was indicated for "addiction" versus "misuse", the disorders assessed as "addiction" in the Vowles et al. (2015) review generally correspond to opioid use disorders that range from moderate (5-7 symptoms) to severe (8+ symptoms). The highest rates of addiction in Vowles et al. (2015) were documented by Jamison et al. (2010),[39] a sample of over 600 patients that were taking long-term prescribed opioids for non-cancer pain. Individuals in the study completed a series of questionnaires to measure opioid misuse, including patient and provider questionnaires, as well as urine toxicology tests. Opioid use disorder assessments were based on patients scoring above cut-points on the self-reported scale, and in the case that patients were below the cut-off, criteria for opioid use disorder were also considered to be met if the patient scored above a cut-point on the

15

physician-reported aberrant behavior scale and the urine toxicology was positive for an illicit substance or an additional opioid medication that was not prescribed. Individuals in the study had been using opioids for an average of 5-6 years; 34.1% of the sample had evidence of opioid use disorder, including 31% of men and 36.7% of women, indicating a high level of opioid use disorders when patients are assessed with validated instruments, as well as objective measures of the presence of opioids such as urine toxicology. The study with the lowest reported rate of opioid use disorder or "addiction" cited in Vowles et al. (2015) was Edlund et al. (2007),[40] based on estimates from a nationally-representative survey of over 9,000 individuals in the community. Authors used several questions that map on to DSM-IV criteria for opioid use disorder. They did not include all criteria, however, and thus the reported evidence is for symptoms of opioid use disorder. Among those who had received a prescription for an opioid, the prevalence of opioid use disorders symptoms was more than 10 times higher than those who had not, at an estimated 7.3%,[†] which is in line with other literature on the range of addiction estimates among medical users of opioids. Controlling for a range of confounders, Edlund et al. (2007) documented that those who used prescription opioids had 3.07 times higher risk of opioid misuse, and 6.11 times higher rates of "addiction". These risk ratios were higher than for other known risk factors for substance use disorders such as mental health diagnoses. Further, the risk of "non-opioid illegal drug use" was not higher among prescription opioid users, suggesting specificity in the relationship between prescription opioid use, and subsequent opioid-related harms. It is important to note, however, that assessments of opioid use disorder based on questionnaires may be an underestimate due to patient reluctance to admit non-medical or aberrant drug use, and that urine toxicology may also be an underestimate because non-medical or aberrant use of prescribed opioid medications may not appear as aberrant on a urine toxicology.



Figure 1. Estimates of misuse, abuse, and addiction of opioids among chronic pain patients

Total opioid treated patients

Opioid use disorder from mild to severe 21-29%

Opioid use disorder from moderate to severe 8-12%

* Estimated from a systematic review of 38 studies published by Vowles et al. (2015)

Another way to examine the studies in the Vowles review is to focus on those that are among the highest quality studies. Studies in Vowles et al. (2015) were rated by the authors based on the quality of the evidence, as assessed by sampling and data quality, adequate description of methods, and potential influence of the raters on the identification of opioid misuse and addiction. Note that the assessment of quality was not necessarily correlated to the primary purpose of the study; that is, whether or not assessment of opioid use disorder was the primary research question underlying the analytic framework. Indeed, high quality studies that assess opioid use disorder should be given higher inferential weight regardless of whether opioid use disorder was the primary endpoint. Among these studies, the prevalence estimates of

[†] Close reading of the Edlund text indicates that the 0.7% incidence in the article applied to the entire database, the vast majority of whom had no evidence of having used opioids. Since the other data points in the Vowles analysis were taken from populations that had all been exposed to prescription opioids, that should have been the source for the Edlund data set as well. The 7.3% incidence rate is found in the Edlund (2007) study, based upon the correct population of opioid-exposed individuals.

16

addiction vary but generally are in the range of at least 5-15%. Cowan et al. (2003) reported a rate of "addiction" of 2.8% in a sample of 104 pain clinic patients in the UK who were prescribed opioids – although the authors did not assess "addiction" based on DSM or ICD criteria, but instead on their own assessment of maladaptive consequences of use, which did not include well-validated criteria such as tolerance and physical dependence. However, it should be noted that 59 of the 104 patients dropped out of the study before study completion. The rate of "addiction" – using the authors' definition – among those who remained in the study was more than double what was reported in the abstract, at 6.5%.[41] Further, this is likely an underestimate given that well-validated symptoms of opioid use disorder were not included in the definition. The highest rates of opioid use disorder, assessed based on a questionnaire that included some DSM substance use disorder symptoms, was 15.7% in a pain clinic sample of 197 patients whose charts were reviewed.[42] The summary of the evidence presented by Vowles et al. (2015) is that among chronic pain patients, an estimated 21-29% of patients meet criteria that would be characterized as between mild to severe opioid use disorder, and an estimated 8-12% of patients meet criteria that would be consistent with moderate to severe opioid use disorders. This summary is included as Figure 1 of this report. Of note, the ranges of opioid use disorder given medical use of opioids in the Vowles et al. review are supported and cited in a range of other scientific literature and consensus statements from experts.[43]

The studies in Vowles et al. (2015) overlap, though not completely, with other reviews of the topic of opioid use disorders after medical prescription.

Fishbain et al. (2008)[44] reviewed 24 studies with various definitions of "addiction" to report an average prevalence of "addiction" of 3.3%, with a range of 0 to 45%; however, there are three central limitations to the Fishbain et al. (2008) review that together suggest that the prevalence of addiction was underestimated. First, the authors assessed "aberrant drug-related behaviors" as a marker for opioid use disorder, and studies with low prevalence of aberrant drug-related behaviors were based on designs that did not allow for comprehensive assessment of addiction. For example, Appendix 1 of Fishbain et al. (2008) includes data from 23 studies that assessed aberrant drug-related behavior as assessed by clinical opinion. Of the 5 studies that reported 0% prevalence of addiction, 2 excluded anyone with a current or former history of drug use disorders, and one defined addiction as physical dependence rather than on recommended opioid use disorder nosologies. In contrast, five studies in the review assessed aberrant drug-related behavior based on opioids other than prescribed in urine, or no opioids in urine; the range of prevalences for some indicators of aberrant drug-related behavior was 13% to 40%. Five other studies assessed illicit drugs in urine and found prevalence ranges of 1.1% prevalence of cocaine use through 57% prevalence of cannabinoids or cocaine. In summary, low prevalence of estimated "addiction" are documented in the review when using measures of addiction that are known to underestimate prevalence (e.g., clinical opinion); measures such as urine toxicology find higher rates of addiction. Second, Fishbain et al. (2008) included an assessment of levels of evidence, from the highest levels (meta-analysis of multiple well-designed controlled studies) through the lowest (case reports and clinical examples). Of studies reporting aberrant drug-related behaviors, there were no studies that were rated as the highest levels of evidence. Authors rated each study based on a series of 23 criteria that assessed quality that could be converted into a total score from 0-100. While studies below 50 were considered "low quality", the authors used a cut-off of 65 for inclusion in the review though no validity assessment was done regarding the cut-off score, which omitted several studies that have been included in previous reviews that reported prevalence of addiction from 16-19%.[32,45,46] Indeed, these omitted studies were included in a previous review by the same authors (Fishbain et al. in 1992),[47] reporting a higher rate of prevalence of opioid use disorders following medical use, from

approximately 3 to 18.9%. It is also worth noting that the lead author had undisclosed ties to opioid pharmaceutical manufacturers, which may have influenced the analysis and presentation of results as well as the decision to omit studies reporting higher rates of addition.

Hojsted & Sjogren (2007) reviewed 36 studies focused on individuals with chronic non-malignant pain and with cancer pain, and found a range in prevalence of opioid use disorders from 0-50% among non-cancer pain patients, and 0-7.7% among cancer pain patients.[48] However, the wide range of definitions that were considered as part of "misuse" in the narrative review made for a vague summary of potential rates of harm, and as such the review is of little clinical and public health relevance.

Noble et al. (2010)[49] conducted a systematic review of 10 bibliographic databases through May 2009 assessing opioid use disorder among patients prescribed opioids for chronic non-cancer pain after at least 6 months of treatment. In total, 26 studies met inclusion criteria. Investigators reported that the rate of "addiction" was 0.27%, which for several reasons is not a credible estimate for the general patient population receiving opioids. First, of the 27 treatment groups assessed in the 26 studies, 18 excluded individuals with any history of substance use disorders from participation, and the remaining 9 did not state whether patients with a history of substance use disorders were excluded or not. Further, 18 studies did not assess opioid use disorders as an outcome, and thus they are not relevant to the question of opioid use disorder risk among patients. Among the 2,613 combined patients drawn across the studies reviewed as having been assessed for addiction potential, Noble et al. inappropriately concludes that addiction is rare based on a calculated "event rate" 0.27%. Among the 7 studies that reported addiction among patients, 2 reported non-zero cases, for a total of 7 cases. A closer look at the 2 studies that were used to comprise these 7 cases reveals the flawed methodology for this event rate estimate. Portenoy et al. (2007),[50] in an industry-sponsored study, reported "problematic drug-related behavior" in 13 patients among 227 who were treated with controlled-release Oxycodone for 1-3 years, for an incidence of 5.7%; an expert review panel of those 13 patients concluded that 6 had probable opioid use disorder. Problematic drug-related behaviors included symptoms of drug use disorder, seeking prescriptions from other doctors, withdrawal symptoms upon discontinuation of medication (although no other criteria for opioid use disorder was used), and other patients with suspected symptoms of opioid use disorder but without definitive evidence for a diagnosis. These reports are likely an underestimate, given that urine toxicology was not performed, and that patients receiving opioids under-report opioid use disorder symptoms. Further, the sponsorship of the study by industry suggests that there was a financial interest in reporting a low number of opioid use disorders in the patient population, suggestive of bias due to financial conflicts of interest. The other study cited by Noble et al. (2010) as evidence for low risk of opioid use disorders was Anderson et al. (1999),[51] a study of 30 individuals prescribed intraspinal morphine and followed for 24 months on average. One patient among the 30 was described as having "drug-seeking behavior", and was thus included in the Noble et al. (2010) review as a case of addiction. However, it should be noted that within this 30 person trial, 3 persons died and 5 more had only partial follow-up data; the remainder were not systematically assessed for opioid use disorder. Thus the actual event rate is unknown. To infer an event rate of 0.27% based on 7 cases reported in 257 patients, many of whom were not systematically assessed for opioid use disorder or assessed with urine toxicology, based predominantly on one industry-funded study, is inappropriate and not scientifically rigorous.

Minozzi et al. (2012) reviewed 17 studies involving 88,235 patients that subsumed systematic reviews, one randomized trial, eight cross-sectional studies and four case series.[52] The majority of studies included patients with non-cancer chronic pain who had been treated with opioids for long

18

periods of time. Recorded incidence of opioid use disorders across these studies ranged from 0 to 24%, and prevalence ranged from 0 to 31%. However, again, many of the studies assessing non-medical opioid use, and opioid use disorders, among medical users likely had underreporting and undercounting of opioid use disorder symptoms, as they were based primarily on chart review rather than structured diagnostic interviews and/or urine toxicology. Further, the length of opioid duration varied substantially, including periods of only 3 days duration or 10 days or more within a month after which opioid use disorder would not be expected to occur at substantial rates (because of intermittent rather than continuous use). The strong evidence base is that opioid use disorder occurs with increased frequency as dose and duration increase, thus assessing opioid use disorder when combining short episodes of use with longer episodes obscures this important finding. Further, Minozzi et al. included data that overlapped with Noble (2010) and Fishbain 2008), which I found unreliable for reasons that are previously described.

Martell et al (2007)[53] focused on patient populations with chronic back pain. The authors reviewed 4 studies that reported prevalence rates of aberrant drug using behavior which ranged from between 3 and 43%, which is in line with the review by Vowles et al., which focused on a broader patient population but had prevalence estimates of addiction in the same range. Further, Martell et al. (2007) also included analysis of 5 studies that reported substance use disorders, which were reported by approximately 36% to 56% of patients included in the studies.

Finally, Higgins, Smith, and Matthews (2018)[54] purportedly aims to review the incidence of opioid use disorder among patients in pain who were prescribed opioid analgesics. My assessment of this review is that it does not address the research question that it aimed to address, and lacks methodological rigor to the extent that it is not a reliable assessment of opioid use disorder risk. I make these assessments for the following reasons. Higgins et al. include studies that do not meet their stated inclusion criteria. Among the stated criteria included populations in which interventions with opioid analgesics were performed, and incidence of opioid use disorder was assessed. Yet several studies do not meet these criteria. For example, Dersh et al.[55] assessed previous opioid use disorder at the time of entry into the study population, and did not introduce any opioid intervention; the study does not assess opioid use disorder incidence, nor do they claim to do so. Opioid use disorder prevalence at entry was incorrectly reported as the study incidence in Higgins et al.[54] Additionally, Adams et al. (2006)[56] excluded patients with a current substance abuse "problem" (based on physician judgment), but not past history of opioid use disorder, which would be the correct exclusion to estimate incidence. Similarly, Cowan et al. (2002),[57] a pilot study of only 22 patients, does not exclude patients with prior opioid use disorder. Thus, the systematic review does not assess the stated goal of estimating incidence. Most problematically, the article reports on an overall association between any opioid use and opioid use disorder, but this association is uninformative and essentially pointless. It is well-documented that risks of opioid-related adverse outcomes are heterogeneous by dose and duration of use. Without assessment of these two factors, the review paper is far from what is standard in the literature at this point in opioid epidemiology. Higgins et al. use an assessment of "strong" versus "weak" opioids, based on product, without considering dose and duration of MME based on any standard conversion. This is not a valid or well-accepted assessment of opioid strength. Further, several studies included in Higgins' review (e.g. Edlund et al. 2014)[58] have critical information on both dose and duration that could be used to inform a more accurate assessment of the risk of opioid use disorder, but such information was omitted from the Higgins manuscript. For example, authors cite an opioid use disorder incidence rate of 0.2%, purportedly derived from Edlund, but this is largely (almost 95%) based on patients who had acute (short duration) opioids, thus not an appropriate assessment of the overall effect of

opioid therapy on opioid use disorder at all doses and durations. The Edlund article itself points out that it is inappropriate to present overall rates, where the data show a 50-fold difference between the rate for low-dose, acute opioid users compared to high dose chronic opioid users. This same issue underlies Cepeda et al. (2013),[59] which was also included in the Higgins review; the study includes data for almost 40,000 patients from insurance claims databases and reports an overall association between opioid prescriptions and claims-recorded opioid use disorder, without disaggregating the dose or duration. Such information is uninformative for assessment of opioid use disorder risk with prescription opioid use, given the known heterogeneity. Further, the outcome of opioid use disorder is inadequately assessed in many of the studies included in the review. For example, several studies used the presence of ICD-9 or ICD-10 codes in patient charts as an assessment of study outcome. These chart diagnoses are known to underestimate opioid use disorder. Further, there may be changes in the coding of opioid use disorder when using administrative data sources that changed coding schemes from ICD-9 to ICD-10, although careful analysis of available data suggest that this change would have small but limited impact on rates of disorders over time.[60,61] Additionally, there are several areas where scientific rigor is undermined throughout the Higgins et al. review in terms of framing limitations and comparing results with more rigorous work. Studies routinely disclose that their incidence estimates are likely underestimates due to generally accepted limitations of such data (e.g. those of Edlund et al.); Higgins et al. does not list the underestimation of outcomes as a limitation, which is concerning for the scientific accuracy of the work. Higgins inaccurately discusses consistency with the Vowles 2015[36] study as evidence of the strength of Higgins' analysis. However, Higgins incorrectly states that Vowles reached a conclusion similar to their own, as to the rates of addiction (4.3 v. 4.7%), when in fact Vowles reported a much higher rate of addiction (8-12%), or approximately 21-29% when the spectrum of mild through severe OUD is included. In summary, this systematic review is largely uninformative. There are errors in article inclusion, coupled with the lack of informativeness of the exposure category, and the lack of validity of the outcome assessments, which in total render the systematic review of little scientific value.

In summary, the range of reviews available on the risks of "misuse" and "addiction" of prescription opioids from medical use vary because of differences in inclusion criteria and definitions. However, the results of multiple studies with a wide range of designs indicate that risks are high when opioids are prescribed in large doses for long periods of time, with available and reliable estimates indicating that opioid misuse rates range from 21-29% (corresponding to opioid use disorder ranging from mild to severe), and that opioid addiction risk among this group ranges from approximately 8-12% (corresponding to opioid use disorder ranging from moderate to severe), with even higher rates when assessing individuals who are on high doses of opioids for long periods of time.

More recent studies that were not included in aforementioned reviews also provide evidence that risks of opioid use disorders are substantial after medical use. As previously noted, using a large pharmacy and medical claims database from 2000 to 2005, Edlund et al. (2014) documented that the risk of chart-documented opioid use disorders increased with both dose and duration of opioid use in a large health services database of adults.[62] The majority of the sample were either non-opioid users (65% of the sample), or those who had been prescribed opioids for acute pain (94.1% of those prescribed opioids). Among those who had high dose opioids for a greater number of days, the risk of opioid use disorders was in line with what previous reviews and meta-analyses suggest is the range of prevalence estimates for opioid use disorders among medical users, at 6.1% incidence of new opioid use disorder. The level of risk of incident opioid use disorder varied according to the dose and length of opioid use, and there was a dose-response relationship between dose and length of

opioid use and incident opioid use disorder diagnosis including high daily dose ($\geq$100 MME), and long-term opioid use (>3 months), with highest risk of opioid use disorders observed among persons prescribed high doses ($\geq$120 MME) for long-term use (91+ days). Indeed, among these patients, the risk of incident opioid use disorders was 122.5 times higher than those with no opioid use, after adjustment for age, sex, indicators of pain and mental disorders, and the estimated incidence was around 6% for these individuals. These results are compelling evidence with respect to the Hill's causal criteria of dose-response, strength of association, and specificity. Indeed, risk ratios that are over 100 fold in magnitude are extraordinarily strong associations that are unlikely to be explained by confounding, and the fact that there is dose response in addition to strong associations is very compelling evidence. Further, the fact that the prescriptions used were opioid medications and the outcome is disordered use of the same pharmacological product provides compelling evidence of biological plausibility and specificity.

Edlund et al. also provides important evidence that prescribed opioid use increases the risk of opioid use disorder even at low levels of use. At very low levels of use, the risk of opioid use disorder diagnoses was significant. Among those with acute (1-90 days of use) opioid use at a low dose (1-36 MME), risk of incident opioid use disorders was 3.03 times higher than those with no opioid use. There is also undercounting of opioid use disorders using clinical records. Edlund et al. (2014) relied on incident diagnoses with a relatively short window after opioids use, which would not capture those with recurrent opioid use disorder symptoms or those who did not develop symptoms shortly after use. Thus, as the authors acknowledged, total burden is likely underestimated, and may be considered a lower bound of all potential harm.  Of note, as summarized in the definitions section of this report, the DSM-V changed the diagnosis of opioid use disorder diagnoses to exclude those who have tolerance and withdrawal but no additional symptoms when under 'appropriate' medical supervision. As outlined in Section B of the report, this decision was not based on empirical evidence, and thus to the extent that DSM-5 diagnoses were used in studies that assess opioid use disorder, prevalence is likely underestimated even further.

Further, Boscarino et al. (2015)[63] utilized data on patients randomly selected from outpatient clinical records who were receiving care for non-cancer conditions such as pain, arthritis, and orthopedic conditions and had been prescribed five or more prescription opioid medications in a 12 month period. Patients consented to structured interviews for opioid use disorder based on DSM-IV and DSM-5 criteria (N=705). Among these patients, 28.1% had 2-3 symptoms of opioid use disorder (designated in DSM-5 as "mild" disorder), 9.7% had 4-5 symptoms ("moderate" disorder), and 3.5% had 6+ symptoms ("severe" disorder), for a total prevalence of any opioid use disorder from mild to severe of 41.3%. These rates are remarkably consistent with Vowles et al. (2015), in that the prevalence of "addiction" was estimated between 8-12%, which is consistent with the total of moderate and severe opioid use disorder reported by Boscarino et al., in that moderate and severe opioid use disorder together would be an estimated 13.2%. Further, Vowles et al. (2015) estimated that the prevalence of opioid "misuse" was between 21-29%, which is consistent with the 28.1% prevalence from Boscarino et al. for "mild" opioid use disorder. Such evidence of consistency provides additional support for the reliability of the results.

Finally, Vowles et al. as well as some other reviews estimated the prevalence of opioid use disorder among medical users of opioids. Existing evidence also establishes that there is an increased incidence of opioid use disorder among medical users of opioids, and that incidence of opioid use disorder increases with dose-response with prescribed opioid medication as well. This is important to establish, because it shows that even among patients who have no history of opioid use disorder and no history of taking opioid medications, new prescriptions increase the risk for new opioid use

disorder incidence. Papadomanolakis-Pakis et al. (2021)[64] utilized data from over 1.6 million individuals who were naïve to opioids, had no history of opioid use disorder and initiated a prescription within the study period. There was a clear dose-response relationship between the morphine milligram equivalent of opioids prescribed and the likelihood of an opioid use disorder diagnosis, ranging from an increased hazard of 1.11 for those prescribed 20-50 MME versus <30 MME, and up to 4.15 times the hazard of opioid use disorder among those prescribed >200 MME compared to those prescribed <20 MME. This design is strong for drawing conclusions about causation, including using Hill's causal criteria given that incidence and temporality are firmly established, and dose response and strength of association are established as well.

Risks of opioid use disorder after prescription opioid use are not solely determined by dose and length of opioid use. Individual risk-factors for opioid use disorders include younger age (e.g., 18-30), lifetime history of psychoactive illicit drug use, and lifetime psychiatric or substance use disorder. However, risks for opioid use disorder based on dose and length of opioid prescription persist even when controlling for these risk factors, and the magnitude of the association for dose and duration of opioid use are greater than individual-level risk factors for opioid use disorders, even when taking them all into consideration together. Nevertheless, the burden of opioid use disorders following medical prescription of opioids, especially at high doses and for long duration, is especially greater among those who already have vulnerabilities to addiction. Indeed, results of studies that exclude those with a history of drug use disorders from inclusion in the study sample are not generalizable to the total patient population of individuals receiving opioid medication therapies due to the higher baseline risk for addiction.

Generally, the existing evidence likely underestimates the total burden of opioid use disorders. Even in the setting of high-quality evidence and structured diagnostic interviews with adjunctive evidence through urine toxicology, existing studies routinely underestimate opioid use disorder. Less than half of substance use disorders identified in community samples are even diagnosed and/or treated in medical settings, and thus a substantial portion, upwards of half, of total diagnoses are likely missed throughout studies that recruit and treat patients in medical settings. Further, studies using urine toxicology screens, validated instruments for opioid use disorder, and other high-quality objective indicators demonstrate a higher proportion of opioid use disorder than studies relying on administrative records that are not collected for research purposes.[65,66] Studies that use diagnostic questionnaires provide assessment of opioid use disorder that are more valid than case files, though may still underestimate rates of opioid use disorder, especially in medical settings where patients may not want to disclose problems related to medication usage. Diagnostic interviews coupled with urine toxicology identify more cases than either alone. For example, Katz et al. documented that 21% of patients with no behavioral symptoms of substance use disorder had positive urine screens for illicit drugs or non-prescribed controlled medication, and 14% of those without positive urine toxicology had evidence of substance use disorders in a sample of 122 patients maintained on long-term opioids for non-cancer pain.[67] Additional studies have also provided evidence that urine toxicology identifies individuals with drug use disorders among those who deny such use in interviews among medical opioid users,[65] suggesting that the combination of urine toxicology plus structured, validated self-report measures, together provide rigorous data to assess drug use disorders among medical users of opioids.

Further, opioid use disorder is likely underestimated when using DSM-5, because the criteria of "tolerance" (needing more of the drug to get the same effect) and "withdrawal" (manifesting symptoms when the drug is not taken) were generally considered diagnostic of OUD, but those criteria could *not* be considered diagnostic of OUD when they were observed among individuals

taking opioids solely under 'appropriate' (based on the DSM-5 definition) medical supervision. This distinction, however, is fraught with error that renders this decision from DSM-5 to be an erroneous one that results in misclassification. There is no scientific evidence that individuals with these two criteria have a different pathology or course of disorder compared to individuals with any other two criteria, or that individuals who have these two criteria and who use opioids non-medically have any differences in course or consequences than individuals who have these two criteria who use opioids under medical supervision. The very notion that the medical supervision of opioid use would have any impact on the course of opioid use disorder among those who the same symptoms of opioid use disorder defies logic. Further, 'appropriate' medical supervision is not defined, and presumes that physicians have scientifically accurate and independent information about the risks and benefits of opioid prescribing which previous research has demonstrated is far from ubiquitous. Indeed, as well documented in other sections of this report, opioid use disorder is common among individuals who obtain opioid prescriptions from a physician, with approximately 21-29% of patients exhibiting mild to severe opioid use disorder. Mikosz et al. (2020) indicate that physicians prescribing opioids at quantities and durations beyond recommended guidelines for many indications remains a significant problem in the US, thus the notion that currently prescribing practices are 'appropriate' is not consistent with the available evidence.[68] Further, there is evidence that industry influence played a role in creating this hierarchical exclusion, as the committee included a consultant for pharmaceutical companies that produce opioids,[69] thus representing a conflict of interest,[70] and, as a result the decision to restrict the diagnoses from those patients with these two criteria, erroneously supported an industry-favored narrative. I have contributed extensively to the literature on psychometric properties of substance use disorder criteria,[71–76] in evaluating the scientific evidence for the structure and dimensionality of substance use disorder criteria in both general population and clinical samples. I did this work primarily during the years in which potential changes from DSM-IV in preparation for DSM-V were being evaluated (I had no role on the committee).[77] My work, as well as others' (reviewed here[77]), demonstrated that substance use disorder criteria (including tolerance and withdrawal) are unidimensional, indicating that they are statistically correlated and underlie graduations in a similar underlying spectrum of substance use disorder severity. There is no statistical evidence to indicate that those who experience tolerance and withdrawal alone have a fundamentally different disorder or set of outcomes compared with individuals who experience any two other symptoms, especially based on where the opioids were obtained. Indeed, numerous epidemiological studies indicate that they are reliable indicators of substance use disorder and statistically corrected with other indicators of substance use disorder. Thus, the scientific rationale behind excluding individuals who experience tolerance and withdrawal from medical prescriptions of opioids is unpersuasive; the fact that tolerance and withdrawal are expected consequences of continued use of opioids has no bearing on their validity as symptoms of dysfunction. It is my opinion that withholding a diagnosis of substance use disorder based on tolerance and withdrawal alone is not consistent with the epidemiological literature concerning substance use disorders.

In summary, there is a wide range of reported prevalence and incidence estimates of opioid use disorders. The reasons for this range include the characteristics of the samples (e.g., pain conditions, amount and types of opioids used, individual-level patient characteristics that predispose individuals to developing opioid use disorder) as well as the measurement of opioid use disorder, sample size and study design. However, the high-quality evidence across reviews indicates that the risk of incident opioid use disorders, as well as recurrence of opioid use disorders, increases in a dose-response fashion with the dose of opioids and the length of opioid use, even after controlling for individual-level predisposing factors, and that 21-29% of chronic opioid users have mild, moderate or severe OUD. Importantly, the evidence is clear that risks of opioid use disorder

following medical use of prescription opioids follow a "dose-response" pattern, supporting my opinion that there is a causal relationship between prescription opioid exposure and opioid use disorder.

**B.**     **Opioids were diverted and used by individuals with opioid use disorder and for non-medical use**

Diversion of opioids occurs at many points along the supply and distribution pipeline, and generally is considered to occur when opioids are transferred from an intended recipient to an unintended recipient.  This broad definition underlies multiple pathways in which opioid diversion occurs; the end result in all mechanisms of diversion is non-medical use of opioids. Two common pathways to diversion are those that are due to: (a) pervasive overprescribing to consumers, and (b) pervasive oversupply from high volume facilities and pharmacies distributing extraordinary quantities of opioids.

*Pervasive overprescribing resulted in unused prescribed opioid medications diverted for monetary value, barter, or for no cost among family and individuals in a shared social network.* Receipt of prescription opioids from a friend or family member is a common mechanism, which is the result of a high level and volume of prescribing of opioids that are unnecessary to control pain in many patients. Available estimates indicate that 90% of patients prescribed opioids after surgery have unused medication,[78–80] most of which is not disposed of or stored safely.[81] Thus, the high volume of opioid prescriptions, both in routine prescribing and through high volume prescribers and facilitates that were unchecked in distributing massive quantities of opioid pills, became the foundation for the overall expansion in the opioid supply and opioid related harm. This is evident in that that close to 98 million Americans receive prescription pain relievers every year, a much larger number than the estimated 12.5 million who use opioids non-medically,[8] suggesting that the expansion of opioid sales and distribution served as a catalyst for the overall ability of these medications to be diverted through social networks. Data from the National Survey on Drug Use and Health (NSDUH) from 2013-2014 indicates that among non-medical opioid users interviewed about where they obtain their opioids, 50.5% report from a friend or relative.[82] Other data sources on drug diversion converge in supporting the fact that the common routes for opioid prescriptions on the illicit marketplace are drug dealers as well as family and friends. Inciardi et al. (2009)[83] reviewed a number of studies that estimated illicit sources of prescription opioids. Data from the NSDUH, a national sample primarily from households in the general population, show that 57% of non-medical opioid users in 2007 obtained opioids from a friend or relative for free, with another 9% reporting that friend or relative for purchase was also a source of opioids. Of those reporting their source as a friend or family member, approximately 80% of these friends or family members are reported to have received opioids from a single prescriber, indicating that at least a fifth of individuals who received opioid prescriptions did so from a friend or family member who was receiving opioids from multiple prescribers. In contrast to users in treatment, a relatively small proportion of individuals in the NSDUH obtained opioids from a drug dealer (individual or group who explicitly sell illicit opioids for profit). Data sources focused on adolescents and young adults support these findings; a large survey of college students found that peers and family were the most common sources of prescription opioids.[84,85] Further, availability of prescriptions from a family member is associated with harms due to opioids; for example, a large case-control study using data on prescribed opioids from a commercial insurance database linked to hospital records indicated that opioid dispensing to family members is associated with 3 times the risk of prospective individual hospitalized overdose, and that the relationship increased with the dose prescribed to a family member.[86]

24

*Pervasive oversupply led to diversion of opioids through medical providers for the purpose of non-medical use, including individuals obtaining multiple prescriptions across providers, as well as through high-volume prescribers that were not properly regulated.* Medical sources of prescription opioids that are diverted for non-medical use are also common. Shei et al (2015)[87] analyzed data among 9,291 commercially insured patients aged 12-64 who had a recorded diagnosis of opioid abuse or dependence (per medical record, thus unclear whether based on DSM criteria or clinical judgment), and 395,901 comparison individuals with no diagnosis. It is important to note that a record of opioid abuse/dependence is likely a drastic undercount of the actual proportion of individuals who would meet criteria for OUD, given that there was no systematic validated interview of individuals in the study and no toxicology performed. Nevertheless, allowing for this limitation, Shei et al. (2015) document a high proportion of medical sources of opioids for diversion.  Among those with an opioid abuse/dependence diagnosis in the medical record, 79.9% had at least one claim for a prescription opioid prior to diagnosis. The high rate of medical sources of opioids among those with opioid use disorder also support my opinion that patients using opioids under medical supervision are at risk for developing opioid use disorder. Furthermore, among those with no prior prescription for an opioid, an additional 10% had a family member with at least one prior prescription for an opioid, suggesting that diversion from family or friends could also contribute to OUD diagnoses within this sample. Indeed, overall, 50.8% had a family member with an opioid prescription claim, compared with 42.2% of patients with no diagnosis. Additional evidence for diversion having occurred is that 20.1% of those with an opioid abuse/dependence diagnosis had no record of a prescription opioid.  Overall prescribing rates in the sample were high; among this group of individuals who were receiving medical treatment of some kind, even among those with no OUD diagnosis, 56.8% of patients had a prescription for opioids. However, it is worth noting that while these individuals did not have an OUD diagnosis on their medical record, under-ascertainment of OUD in medical settings is common. Also of note, the study was not able to distinguish whether those with OUD who had no record of prescription opioids used prescription opioids, heroin, or other forms of opioids. Importantly, however, the study was industry funded and the authors of Shei et al. (2015) are comprised of pharmaceutical manufacturer employees and consultants; thus the finding that medical sources of opioids are found in the vast majority of individuals with OUD, even more than individuals without a notation of OUD in their medical record, could be considered likely conservative given that they indicate strong overlap between the supply-side sources of prescription opioids and the development of OUD.

Individuals who misuse opioids and/or develop OUD are likely to obtain them from multiple available sources, including physicians and other providers, sometimes multiple physicians. Data from the NSDUH from 2013-2014 indicate that while family/relative is the most common source of non-medical prescription opioids, 25.1% obtain opioids from at least one physician.[82] Among the various samples of users reported by Cicero and colleagues (2011),[88] medical sources of prescription opioids were commonly reported. For example, among 1,983 individuals in treatment for opioid dependence, 25% reported that their primary method of obtaining access was through doctors, and more than 50% reported that doctors were among the various methods of obtaining opioids. Among the sample of 782 individuals in substance abuse treatment collected in South Florida, 13.8% reported obtaining opioids from a medical practice (however, it should be noted that these results were assessed prior to the restrictions on high-volume prescribing in Florida, thus may not be generalizable to more recent years).[88] In a study of 346 individuals with prescription opioids as a primary drug of abuse and in methadone maintenance, 20% reported doctors as a primary source, and 9% reported emergency rooms.[83] Data from the NSDUH study indicated that among

25

those who reported non-medical prescription opioid use, 18% reported that they obtained opioids for non-medical use from a doctor.

Further, another mechanism through which individuals obtain opioids for non-medical use is the practice of visiting multiple providers, so-called 'doctor shopping'. The practice of obtaining multiple prescriptions across providers is frequently reported among individuals with prescription opioid use disorder.[89] The prevalence of multiple-provider visits for the purpose of obtaining opioids for non-medical use is complicated to estimate given that there is no empirical flag in the data for the purpose or medical need for prescription opioids. Multiple prescribing can indicate individuals who are recklessly seeking opioids for non-medical personal use and sale, or could be indicative of poorly managed care.[90] McDonald and Carlson (2013) estimated prevalence using a probabilistic algorithm that took into account the number of unique providers within a given time period that prescribed opioids per person using data on commercially insured patients in the United States, including more than 146.1 million prescriptions for opioids written in 2008. On average, among patients who received opioid prescriptions, 14% received additional prescriptions from at least one more provider, 3% of these patients obtained additional prescriptions from between 5-9 providers, 0.35% from 10-19 providers, and 0.04% from 20 or more.[91] In a follow-up analysis, McDonald and Carlson (2014) also estimated the extent to which there is geographic variation in the estimated predicted prevalence of multiple provider use. Using a predicted estimate of probable 'doctor shoppers' based on outlier data on individuals who used a suspiciously high number of providers to obtain multiple prescriptions, investigators determined that the prevalence varied across counties from 0.6 per 1,000 and 2.5 per 1,000. The overall mean prevalence across states indicated that doctor shopping is relatively rare in comparison to the high quantity of opioids that have flowed into the medical market, with a mean of 0.7 per 1,000. The prevalence of probable 'doctor shopping' increased with the prevalence of the general prescribing practices of various geographic locations, indicating that as the supply of opioids increased, so too did diversion for non-medical use, including through individuals 'doctor shopping'.[92] The population estimates of multiple-prescribing episodes generally range from <1% to between 7-9%, depending on the criteria used to define 'doctor shopping'. The variation in the population estimates of multiple prescribing indicate substantial variability, and studies that were funded by the pharmaceutical industry generally publish lower estimates of 'doctor shopping' than independent scholars,[93] indicative of the industry's financial interest in suggesting low rates of diversion. Among Tennessee Medicaid recipients from 2003 to 2010,[94] 7.6% of patients prescribed opioids received medication from 4 or more pharmacies within a one-year window, and these patients had almost 7 times the odds of a subsequent overdose death. Data from Medicaid recipients in 2016 estimated the prevalence of 'doctor shopping' to be 3.9% among 66,328 patients, defining shopping as the receipt of opioid prescriptions with greater than 1-day overlap filled at 3 or more pharmacies within a 6-month period. While the expansion of prescription drug monitoring programs in most states is intended to reduce the practice of uncoordinated care that can result in multiple provider visits and the potential for individuals intentionally obtaining opioids for the purpose of misuse, there is wide variation in the strength and implementation of prescription drug monitoring program (PDMP) policies and questionable effectiveness in many jurisdictions.[95–97] Data on PDMP policies have been specifically evaluated for Ohio, including policy mandates on health care licensing based on adoption of PDMP use, as well as PDMP usage requirements for pain-relieving controlled substances for chronic non-malignant pain. Strickler et al. (2019)[98] examined prescribing data from the Prescription Behavior Surveillance System from 2010 to 2017. Using regression discontinuity approaches, Strickler et al. (2019) document that the prescriber enrollment and use of PDMPs increased substantially in Ohio after legal mandate, and reduced inappropriate opioid prescribing to some degree. However, effects were

generally small and some evidence indicated that they wane over time, underscoring the need for additional resources in the state to combat the opioid overdose crisis.

In summary, there is variation in the literature in the definition of 'doctor shopping', but despite variation, there is consistent evidence that diversion of opioids through individuals obtaining multiple prescriptions for the purpose of non-medical use or sale occurs with regularity. Further, that 'doctor shopping' increases in prevalence as the overall supply and dispensing of opioids increases across jurisdictions in the United States. While prescribing of opioids has declined in Ohio since 2011, overall prescribing patterns remains extraordinarily high.

In addition to patients who intentionally visit multiple prescribers to obtain opioids in order to divert them, there is also evidence of diversion of prescription opioids through high-volume providers who inappropriately prescribe opioids for profit (often referred to as "Pill Mills"). Available evidence indicates that Pill Mills created considerable damage to population health in many areas of the United States throughout the 1990s and 2000s, although in a context of an extraordinary and voluminous increase in opioid prescribing across almost all medical specialties. Indeed, studies of high-volume prescribing indicate that there are certainly prescribers with an extraordinary volume of prescriptions, both in Ohio and elsewhere; those in Ohio can be identified through IQVIA and other prescribing data that include prescriber and prescriber identifiers. Guy & Zhang (2018) reported that, of the 209.5 million opioid prescriptions dispensed in the United States between July 2016 and July 2017, the average yearly prescription volume was 215.8 prescriptions per provider, but that some specialties prescribed on average up to 1,314.9 per provider.[99] County level data from IQVIA indicates substantial and ongoing high rates of prescribing throughout the US, including Ohio.[100] Similarly to PDMP policies, there has been a concentration of legislative work to regulate and close high-volume prescribers,[101] with variable implementation and effectiveness across states.[96,102–105] These laws typically include requirements for annual licensing, place limits on the number of patients to providers, and include prohibitions on dispensing of opioids at the same location as the provider. Numerous studies have examined high-volume prescribing laws in diverse states such as Florida,[105,106] Texas,[107] Ohio and Tennessee,[108] and such laws are generally associated with reductions in prescribing, overdose death and other harms, although they are typically packaged with other laws, such as PDMPs, and thus these studies typically capture their combined effects. Despite these legislative and law enforcement efforts, high-volume prescribing remains an important source of opioid-related harm. Available data indicate that prescribing of opioids increased across many specialties in medicine, and while some specialties of medicine have a more concentrated prescription practice for opioids (e.g., pain, anesthesia, and physical therapy), general practitioners in family and internal medicine dispense the greater number of opioids, widespread across geographic areas of the United States.[109]

*Summary*. A substantial portion of the opioid crisis has arisen due to the diversion of prescription opioids from medical to non-medical uses. These include the vast availability of opioids in American homes due to oversupply and over-prescription, from which opioids were traded, given, or sold within social networks. It also includes individuals who sought multiple prescriptions in order to use non-medically and/or sell, as well as high-volume prescribers who did not prescribe based on legitimate medical need. All three of these streams of over-supply have contributed to the increase in opioid use disorder, overdose, and related harms in the United States.

C.      **The incidence and prevalence of both medical and non-medical opioid use increased in concert with the increased supply of opioids**

The evidence is clear that the opioid supply increased dramatically in the United States beginning in the mid-1990s; that medical use of opioids is causally associated with the development of opioid use disorder; and that diversion of opioids occurred. The increased supply of opioids contributed substantially to an increase in the incidence and prevalence of non-medical opioid use and non-medical opioid use disorder in the general population. Evidence regarding non-medical prescription opioid use in the general population is not generally available before the early 2000s for adults. Among adolescents, data can be drawn from the Monitoring the Future study, a large, annually conducted survey of high-school attending adolescents. Among students in the 12th grade, for example, use of "narcotics other than heroin" increased annually beginning in 1992, from 3.3% to a peak of 7.0% in 2000. In 2002, the question wording and example changed, thus trends before and after 2002 cannot be directly compared. McCabe et al. reported these trends in prevalence in both medical and nonmedical use in a 2017 publication in *Pediatrics*, noting that adolescent non-medical use of opioids is frequently preceded by medical use.[110] The prevalence of narcotics other than heroin has been generally declining among adolescents since the early 2000s.[111] Further examinations of the Monitoring the Future data have confirmed these trends. McCabe et al. (2020) reported that schools vary widely in the proportion of students who report using opioids for medical reasons, and that students in schools with high levels of medical use are at increased risk of non-medical use as well, reflecting the high levels of diversion and the overlap between medical and non-medical users.[112]

While prescription opioid use has been declining among adolescents, among adults, trends indicate that prescription opioid use is stable, with generally low magnitude declines since 2012 but still a high burden of harm for heavy use and addiction. Martins et al. (2010) documented birth-cohort trends in non-medical prescription opioid use and opioid use disorder by comparing two surveys: one conducted in 1991-1992, and another, using the same sampling frame and measurement questions, in 2001-2002. The study found that among adults, past-year non-medical prescription opioid use increased by 44% (from 0.9 to 1.3%) across the decade, and that past year prescription opioid use disorder increased by 55% (from 0.2 to 0.3%). Among those who reported non-medical prescription opioid use in their lifetime, the prevalence of past-year opioid use disorder increased 89.6% (from 4.8 to 9.1%).[113]

Other data can be drawn from to infer trends in non-medical prescription opioid use during the 1990s and 2000s. Crane (2015), for example, documented that emergency department (ED) visits for non-medical prescription opioids use from 2005 to 2009 increased over 200% among those aged 18-34 years old, a greater increase than any other age group.[114] Analyses of the Drug Abuse Warning Network (DAWN) data have found increases in ED mentions of opioid analgesic misuse through 2011; for example, the number of ED mentions of oxycodone increased from 41,701 in 2004 to 151,218 in 2011. Total for all pharmaceutical opioids, ED mentions increased from 152,827 in 2004 to 404, 829 in 2011.[115] Finally, data from the Treatment Episode Data Set indicate that from 2005 to 2015, the proportion of individuals entering treatment with prescription opioid use as the principal drug for services increased from 18% to approximately 38%.[116]

More recent data generally show that the prevalence of non-medical prescription opioid use is stabilizing or beginning to decline, depending on the population and outcome, but that burden remains substantial. For example, data from the NSDUH indicate that among those 18 through 64, the prevalence of non-medical prescription opioid use decreased from 5.4% in 2003 to 4.4% in

2018.[117] However, the same study documented that harms related to opioid use remained on the rise, with increased prescription opioid use disorders, frequency of use, and mortality (mortality will be reviewed in detail in Section E).[118] Indeed, from 2003 through 2018, the prevalence of opioid use disorders, among the surveyed population as a whole, increased from 0.6% to 0.8%, and among users the prevalence of opioid use disorder increased from 11.9% to 17.0%. From 2003 to 2013, high frequency use increased from 0.3% to 0.4%, and among users high frequency use increased from 5.0% to 8.2%, and mean days of use increased from 40.0 to 54.2 days. Between 2003 and 2013, comorbidity with other drug use disorders ranged from risk ratios of approximately 1.50 to 2.0.

Important to consider in interpreting the evidence are limitations of survey data sources, which consistently underestimate the populations at highest risk of opioid-related harm. Existing survey data sources capture rates of non-medical opioid use and opioid use disorder among those living in households and group quarters as the explicit sampling frame. Such surveys do not include high risk populations, such as those incarcerated and homeless. Existing research demonstrates that survey responders are generally healthier than the general population,[119] and thus fewer individuals using opioids non-medically and those with opioid use disorder will be captured in these data systems compared to the actual burden in the population. Indeed, heavy opioid use is associated with criminal justice involvement and homelessness;[120–122] thus I would expect that those with the highest burden of use would be least likely to be captured in household-based surveys. However, higher opioid use among these at-risk groups (housing insecure, incarcerated individuals) also would not occur without access to opioids through an increased supply that began with the widespread pharmaceutical distribution; thus the exclusion of these groups from the sampling of survey sources does not change my conclusions. Nevertheless, while estimates of prevalence are likely underestimated, the trends over time should not be affected as long as the methodology remains consistent across time, that is, as long as the same high-risk groups are consistently excluded from the surveys at each time point, which they are in the case of household survey data.

Further, survey data sources regularly query explicitly non-medical prescription opioid use, and do not collect information on the portion of respondents who also used opioids medically, either prior to or concurrently with non-medical prescription opioid use. However, data indicate that a substantial portion of non-medical users obtain opioids at some point from physicians for medical uses (see Section C for discussion of and reference to patterns of physician contact among non-medical users).

Recent data indicates that the expansion of the supply of opioids also underlies the increases in overdose from non-opioid drug as well, including psychostimulants such as methamphetamines and ecstasy. Using data provided by the CDC, Cano & Huang (2020) documented that state-level differences in rates of opioid prescribing in 2012, opioid overdose from 1999-2012, and opioid use disorder in 2015-2018 were significantly correlated with increases in psychostimulant overdose from 2015 to 2018, indicative of the expansion of the opioid supply creating a population at increased risk and vulnerability for non-medical use of opioids and progression to other drugs as well, including psychostimulants.[123]

In summary, the expansion of non-medical prescription opioid use would not have occurred without the widespread availability of prescription opioids, often prescribed in extraordinarily high quantities for a wide range of indications for which they were unnecessary based on assessment of the epidemiological evidence,[68,124] leaving a surplus of opioids that could be diverted for non-medical uses. There is clear and unambiguous evidence to conclude that non-medical prescription opioid use, prescription opioid disorder, and ED visits for prescription opioid use increased in the US

population from the 1900s through the late 2000s. Available evidence indicates declines in overall non-medical prescription opioid use in recent years among both adolescents and adults, but there remain steady increases in heavy use and opioid use disorders, indicating that the burden of harm remains high.

> **D.     The increase in the prescription opioid supply, coupled with opioid use disorders and increases in non-medical use and non-medical opioid use disorder, resulted in an exponential increase in prescription opioid overdose as well as many other non-fatal consequences.**

Data on the increase in prescription drug overdose deaths in the United States are primarily drawn from the National Vital Statistics Surveillance System. In 2000, the overdose death rate attributed to prescription opioids was 1.4 per 100,000 (representing 4,030 designated deaths). By 2003 the rate had more than doubled to 2.9 per 100,000 (representing 8,517 designated deaths), and the rate continued to increase yearly until approximately 2010 (at a rate of 5.4 per 100,000, representing 16,651 deaths).[125] From 2010 to 2014, the rate remained relatively stable, albeit a quadrupling of the rate that was observed in 1999, after which increases in the overdose death rate renewed. Heroin and synthetic opioids began an exponential increase after 2010, and overdose rates due to heroin and synthetic opioids continued to climb. However, it is important to note that prescription opioid deaths remain an important contributor to overall overdose deaths, even as heroin and synthetic opioid deaths rise exponentially. I examined the rates of opioid overdose from 2016 to 2019 based on two sets of causes of death: (1) all natural, semisynthetic, and methadone opioids; and (2) natural and semisynthetic opioids alone. The rate of natural, semisynthetic category mortality, when including methadone overdose, has declined from its peak of 5.29 per 100,000 representing 17,087 deaths in 2016 to 4.31 per 100,000, representing 14,139 deaths in 2019.[126] Considering those deaths designated as natural and semisynthetic opioids alone (i.e. excluding methadone deaths), death rates are falling slightly from 2016 to 2019, but still indicating a high burden of harm.[127] In 2016, the death rate for natural and semisynthetic opioids peaked at 4.48 per 100,000 (representing 14,487 deaths), and was 3.84 per 100,000 in 2019 (representing 12,552 deaths). Of note, CDC reporting of overdose death for specific categories reports each drug associated with a given death regardless of other drugs present at the time of death; thus each death can contribute to multiple categories of drug death when multiple drugs are present. This is the standard for reporting and the one that I use in this Report as well.

There have been rapid increases in opioid overdose death due to heroin and synthetic opioids, with heroin deaths beginning to increase in approximately 2011-2013, and synthetic opioids beginning in approximately 2013-2015.[128] Data from the CDC indicate that from 2013 to 2019, the death rate due to synthetic opioids increased more than 1,000% nationally, from 1.0 to 11.4 per 100,000 persons in the US, age-adjusted. These increases are devastating, and it is important to note that prescription opioid overdose deaths remain a substantial public health burden. Indeed, while synthetic opioid deaths have increased substantially, the rate of prescription opioid deaths in 2019 was 4.2 per 100,000, which was three times higher than the rate of 1.4 per 100,00 in the year 2000. Examining the total number of overdose deaths due to natural and semisynthetic opioids, which would exclude heroin and fentanyl deaths, there have been a total of 246,664 deaths between 1999 and 2019. This number of deaths is greater than the recorded deaths from heroin over the same time period (N=132,347) or the recorded number of deaths due to non-methadone synthetic opioids (N=160,845). When considering semisynthetic opioids and methadone, a recent CDC publication indicated that the number of prescription opioid deaths was 17,029 in 2017 and 14,975 in 2018,[2] suggesting that the burden of prescription opioid overdose in the United States remains high,

underscoring the public health burden of prescription opioid overdose. Provisional data released by the CDC in July 2020 indicate that over 70,000 individuals in the US died of overdose in 2019, an increase from the death rate in 2018, suggesting that the devastation to human life caused by the overdose crisis continues.[6]

The empirical literature demonstrates a strong and statistically significant association between the opioid supply and the increase in prescription opioid deaths. In the United States, Paulozzi & Ryan (2006),[129] documented the distribution of prescription opioids, based on data from the ARCOS. Scholars estimated the total rate of prescription opioid dispensing per 100,000 in each state in 2002, and correlated it across states with the drug poisoning death rate per 100,000 based on vital statistics data. Two findings are noteworthy. First, there was wide variation in opioid prescribing across states. For example, hydrocodone distributions ranged over 12-fold across states, and oxycodone distributions ranged over 7-fold; such variations are noteworthy because, to my knowledge, there is not sufficient data to conclude that the pain need for such medications varies by 7 to 12-fold across the United States. Further, this variation across states was highly correlated with drug poisoning rates; all prescription opioids combined were correlated with drug poisoning deaths at 0.73 for the correlation coefficient, which indicates a high correlation. Investigators reported the total amount of variation, that is, differences between state-level overdose rates and the national average, that was explained by each drug. Note that variance explained is not the same as the risk of overdose, or the proportion of overdose deaths due to a particular drug; rather, it is another way to express correlation. Oxycodone dispensing alone explained 43% of the variation in drug poisoning mortality; methadone dispensing explained 46%. While the death rates from methadone substantially contributed to mortality variation in Paulozzi & Ryan (2006), it should be noted that death rates from methadone have declined precipitously since the time period of the study. Methadone death in the United States reached a height in 2006/2007 at 1.8 per 100,000, and has declined annually since then, stabilizing at 1.0 per 100,001 in 2015-2017, [128] which is a 44% decrease in just one decade. Methadone now contributes a relatively small proportion of drug overdose events, with most recent data suggesting that 14.7% of overdose deaths are attributable to methadone. These declines are attributable to Food and Drug Administration warnings and guidelines for methadone prescribing, as well as voluntary limits on the distribution of high milligram formulations of methadone among manufacturers.[130] Given the declines in methadone use, the findings on methadone in Paulozzi & Ryan (2006) regarding the proportion of variance explained in geographical death rates do not generalize to methadone-related harm in recent years. However, prescription opioid overdose deaths are higher than methadone rates of death and have remained relatively stable in recent years, suggesting that geographic variation explained in prescription opioid overdose deaths is more generalizable than methadone death rates.

Further, Wisniewski et al. (2008)[131] examined the relationship between prescribing of opioids and non-medical opioid use, as well as emergency department visits related to opioids. Data on prescribing were drawn from the National Hospital Ambulatory Medical Care Survey and the National Ambulatory Medical Care Survey; opioid prescriptions were based on medication codes indicating whether hydrocodone, oxycodone, or a morphine-containing product were prescribed at each patient encounter (including 576,178 patient encounters). Prescription rates increased from 2-fold for hydrocodone, 2.64 for morphine, and 3.21 for oxycodone products from 1995 to 2004. Concomitantly, opioid-related emergency department visits based on Drug Abuse Warning Network (DAWN) data and respondent reports of non-medical opioid use based on NSDUH data increased across the same time period. Correlations between rates of prescription and rates of opioid-related ED visits and non-medical use were significant for hydrocodone (correlations ranged between 0.73

31

to 0.79) and oxycodone (correlations ranged from 0.76 to 0.87). Taken together, these data indicate strong and statistically significant correlations between opioid supply and opioid-related harm in the US population.

The relationship between opioid supply and opioid-related harm has been examined more recently as well. Ghertner (2019)[132] examined the relationship between opioid sales based on data from ARCOS with county-level opioid-related hospitalization rates based on counties in the states that report data to the Healthcare Cost and Utilization Program (HCUP) program. In a modeling strategy that used variation in Medicare Part D prescriptions as an instrumental variable to increase study rigor, as well as models that controlled for economic factors, there was a 9% increase in opioid-related hospitalizations for each one morphine kilogram equivalent increase in opioid sales. Further, results indicated that each morphine kilogram equivalent in sales resulted in a 14% increase in maternal and neonatal mortality. The relationship was specific to opioid-related hospitalizations, and was not associated with alcohol-related hospitalizations, underscoring the specificity of the association and increasing confidence in the validity of the results. In totality, the multiple sources of evidence, cited above, consistently support the high correlation between opioid supply and opioid-related harm.

Further, the consistency of the association across other studies that measure opioid dispensing and sales with opioid related harm and mortality support my opinion that supply of opioids is causally associated with harm.[133]  In 2009, Fisher et al. (2013) documented statistically significant and high correlations between the rate of hydromorphone dispensing and deaths due to hydromorphone, as well as the rate of oxycodone dispensing and deaths due to oxycodone. These correlations were high within-province, which is important because the base rates of overdose and dispensing varied by province and yet the correlations remained strong in each. Similar associations with non-fatal outcomes, such as substance abuse treatment admissions, have been published by the same investigators, indicating that the association between prescription opioid supply and opioid-related harms in Canada extends across outcomes related to opioid use disorder, as well as opioid overdose.[134]

These studies also support the Hill criteria of 'dose-response'. Across the studies that have examined the association between opioid dispensing and prescribing and opioid related death, there is an association whereby with increasing opioid dispensing, there are more and more deaths, indicative of dose-response. In sum, a number of the important Hill's causal criteria are established in the existing studies of opioid dispensing and prescribing and opioid-related harm and death. There are strong associations, consistent across time and location, and there is a dose-response association as well. These associations are plausible and coherent with the known facts and literature. There is a high degree of evidence that increased opioid prescribing and dispensing leads to more harm to individuals and communities.

The studies cited in the material above are based on associations, and alone are not sufficient in isolation to conclude a casual role of opioid distributions and opioid-related harm. This fact is acknowledged in the discussion section of these publications, however, building a scientific evidence base is not about the conclusion of one paper. I base my conclusion on the totality of evidence from across studies examining a variety of opioid prescribing and distribution measures, opioid-related morbidity and mortality outcomes, across a wide variety of geographic areas. The reliability of the observed association supports the opinion that there is a causal relationship. There are many of Hill's causal criteria that are met in these studies, as described above, further strengthening the ability to draw inferences.

The supply of opioids was also facilitated by pharmaceutical promotional activity to physicians. While I did not evaluate the specific marketing materials of the manufacturers, I did evaluate peer-reviewed epidemiological studies that document the association between opioid marketing with sales, which is germane to my expertise. Epidemiological evidence using statistical methods is routinely used to assess the association between exposure to pharmaceutical marketing and sales efforts with changes in prescribing, and has reliably found across many studies in many populations that exposure to pharmaceutical marketing and sales is significantly associated with increases in prescribing of the marketed drugs. Indeed, available epidemiological evidence using rigorous quasi-experimental designs, such as difference-in-difference models, as well as controlling for numerous potential confounders, has consistently documented an association between the industry payments, meals, and sales outreach to physicians, as well as pharmaceutical promotions, with increases in requests to add specific products to hospital formularies[135] as well as increases in rates of prescribing the marketed product.[136–139] These broader literatures provide a consistent evidence base when examining the associations between opioid marketing and opioid sales. Empirical evidence has demonstrated that industry payments to physicians as part of the marketing of prescription opioids were associated with increased opioid prescriptions,[140] and that 1 in 12 physicians in the US, and 1 in 5 family physicians, received opioid-related marketing.[25,140–142] Hadland et al. (2019)[143] used data from the Centers for Medicare & Medicaid Services Open Payments database to assess the monetary value of payments to physicians for opioid products in all US counties over time, as well as data on dispensing of opioids in available counties in the US, and examined the spatial and temporal correlations with prescription opioid deaths as designated in the vital statistics records. The authors used a rigorous statistical model that included controls for a range of county-level factors such as economic environment (e.g., unemployment, income, income inequality), as well as demographics. Results demonstrated that even with statistical controls in place, each one standard deviation increase in payments to physicians was associated with statistically significant increases in prescription opioid overdose, including when marketing was assessed by marketing value in dollars per capita (each standard deviation increase associated with 1.09 times the rate of death), number of payments to physicians per capita (each standard deviation increase associated with 1.18 times the rate of death), and number of physicians receiving marketing per capita (each standard deviation increase associated with 1.12 times the rate of death). Further, these authors conducted mediation analysis to quantitatively demonstrate that the association between marketing to physicians and prescription opioid overdose was mediated by (that is, explained by) the increase in opioid prescribing and increased distribution.

While the authors note that each study was not causal in and of itself, they also note that the body of evidence, including the results of the studies, are consistent with many of Hill's causal criteria that epidemiologists use to base conclusions on causality. In particular, Hadland et al. note, and my assessment of these studies concurs, that they meet many of the important, influential Hill's causal criteria, including dose-response (increased marketing efforts associated with increased deaths), plausibility and coherence (the entire purpose of marketing to physicians is to increase sales, plus mediation analysis demonstrated that marketing is associated with opioid death through opioid prescription sales and distribution), temporality (marketing efforts preceded deaths), consistency across studies (numerous studies have demonstrated an association between increased sales and distribution of opioids with opioid death), and strength of association. Further, it is important to note that payments to physicians are only one type of promotional activity, and accounted for only a proportion of the overall promotion strategy for opioid pharmaceuticals. These specific studies do not preclude potential effects of other kinds of marketing efforts; they do, however, provide

empirical evidence for the marketing efforts for which data are available to academic researchers. These results confirm through independent epidemiological analysis that outreach and payments to physicians through the pharmaceutical companies was an important way in which the distribution of opioids across the United States was facilitated.

Finally, Powell et al. (2020)[144] examined the introduction of the Medicare Prescription Drug Benefit (Part D) program in 2006 as a potential driver of opioid use among those aged 65+. This paper is particularly informative given the quasi-experimental design of using an exposure with exogenous variation to assess the effects of changes in opioid use. "Exogenous variation" is a term that is commonly used in epidemiological and economics literature to mean that there is no possibility that confounding factors such as increased prevalence of pain, or increased risk factors for addiction, could explain changes in the exposure. Thus, changes in the Medicare insurance coverage cannot be caused by factors related to use, and for that reason, associations between changes in Medicare and changes in opioid use can be interpreted as causal. Using data from 1999 through 2016, the authors documented that the Medicare insurance expansion affected the opioid use, with states that had a relatively larger proportion of individuals gaining access to prescription drug coverage exhibiting an increase in opioid use based on ARCOS data. Further, the authors examined correlations with drug overdose deaths (specifically those with codes that indicate prescription opioid poisoning), as well as substance abuse treatment admissions (which is an indicator of the occurrence of opioid use disorders). For both prescription deaths and treatment admissions, there was evidence that the increase in the exogenous increase in opioid use caused by the insurance expansion was associated with increases in deaths and treatment admissions; results were robust to a range of sensitivity analyses, alternative modeling of the statistical associations, and a range of quasi-experimental statistical models. These data reinforce the conclusion that opioid use directly results in increased opioid-related harm, and provide a strong design and test of the hypothesis using the quasi-experimental instrument of changes in Medicare prescription coverage.

In summary, the available evidence, including temporal and geographic covariance of opioid supply, as well as quasi-experimental changes in opioid availability, strongly correlate with rates of prescription opioid overdose, providing an evidence base to demonstrate that supply and availability of opioids caused an increase in the rate of prescription opioid overdose.

### E.    Polydrug use on toxicology in drug overdose deaths: implications for causal attribution.

Available evidence from national epidemiological studies, confirmed via local data including data drawn from Ohio, indicates that in the early days of the epidemic around the mid- to late 1990s, opioid overdose deaths primarily involved prescription opioids,[145] frequently without the presence of other drugs. For example, as recently as 2010, analyses of death certificates indicated that among drug overdose deaths involving pharmaceuticals, opioids were the most frequently implicated drug listed, and of deaths involving psychotherapeutic and central nervous system pharmaceuticals, opioids were the single class of drugs in 30% of cases.[146] As the epidemic progressed towards the second and third stages, in which heroin and high-potency synthetic opioids as a cause of death significantly increased as contributors to the overdose death causes, polydrug use on toxicology became more frequent in the majority of drug overdose deaths involving opioids.

Given that the prevalence of multiple drugs listed on death certificates involving opioid overdose has increased, it is critical to note that deaths in which prescription opioids are listed, even in the presence of multiple other drugs listed, are attributable to prescription opioids through drug-

drug interactions. That is, there is substantial epidemiological, toxicological, and clinical literature that indicates that the adverse respiratory depressant, seizure, and other consequences of opioid use are accelerated and exacerbated when other drugs are present,[145,147–150] so much so that guidelines warn against prescribing a variety of medications such as benzodiazepines with opioids.[151,152] The mechanisms underlying these interactions include inhibiting metabolism as well as other pathways.[153] The most common drugs that in conjunction cause drug overdose include opioids and benzodiazepines, often in combination with alcohol. While benzodiazepines alone rarely cause overdose death,[154] they potentiate harm when used in combination with other drugs such as opioids. Other drugs that are prevalent in toxicological screening when overdose occurs in conjunction with opioids include skeletal muscle relaxants,[155] cocaine and other stimulants such as methamphetamine, as well as tranquilizers and other depressants. In cases of drug-drug interaction, the opioid was a necessary component cause of the overdose death.[156] That is, without the opioid present, these deaths would not occur. The addition of other drugs such as benzodiazepines potentiates the overdose potential of the opioids; indeed, given that benzodiazepines alone rarely cause death, cases in which opioids and benzodiazepines are present may have been caused by both, but the opioid is a necessary component for death to occur. Available epidemiological literature highlights the extent and damage of drug-drug interactions involving opioids. Tori et al. (2020) documented that from 1999 through 2017, benzodiazepines were present in 33.1% of prescription overdose deaths and alcohol was present in between 9-14% prescription opioids overdose deaths.[157] Thus, deaths in which multiple drugs are listed remain attributable to opioids given the strong evidence of harm and overdose associated with use, and accelerated but not replaced by use of other drugs. Thus, prescription opioids are highly likely to be the most significant contributing cause when listed on death certificates. Further, this underscores how CDC reports on overdose deaths by specific substances;[158] deaths that are attributable to opioids are reported as opioid deaths regardless of other drugs that are positive at the time of the opioid death, given that the lethality of opioids is potentiated by other drugs; thus often both are necessary for a death to occur.

### F.      Prescription opioid use is causally related to heroin use

The available evidence establishes that prescription opioid use causally increases the risk for heroin use.[‡] Heroin and prescription opioids have similar pharmacological properties; thus there is the potential for substitution with one for the other when one is unavailable or available at lower cost.

The number of individuals who use heroin has been increasing in the United States.[159] Estimates of the number of individuals who use heroin in the United States were approximately 100,000 in the 1960s and 1970s, and heroin use was considered largely a problem of urban, low-income areas.[160] However, that has fundamentally changed in the US; as of 2010, available estimates were that there were 1.5 million individuals in the United States using heroin at least 4 times per month or more,[161] and there have been increases thereafter in heroin use as well. The demographics of heroin use are also changing, with increases in use across race, social class, gender, and urbanicity.[159,162] The increases in heroin use largely occurred among individuals who are or were prescription opioid users. Among individuals who use prescription opioids, heroin use increased by 138% from 2002-2004 to 2011-2013, and the connection is particularly strong among young adults.[163] Cross-sectional studies of samples recruited based on non-medical prescription opioid use

---

[‡] It is not ethical or possible, of course, to conduct randomized controlled trials to demonstrate this effect. But where such studies are not possible, epidemiologists routinely rely on other kinds of evidence, including other types of studies such as those described in this Report.

and/or heroin use consistently find strong signals of a relationship. I reviewed 16 studies that found that individuals who use prescription opioids non-medically have higher rates of injecting and snorting heroin than individuals who do not use prescription opioids, even after controlling for health and mental health, as well as demographics.[89,162,164–177] While these studies are observational rather than experimental, in that no randomized clinical trial or experimental evidence has examined risk of heroin use following prescription opioid use, the studies are sufficiently diverse in population, valid in design and consistent in their results in order to draw the conclusion that prescription opioid use is causally related to heroin use.

Numerous studies show that approximately 70-80% of individuals who used heroin in the last 20 years started their opioid use with prescription opioids. The most extensive report is from Cicero et al. (2014), reporting on data collected from 2,797 individuals seeking treatment for opioid use disorders.[162] Cicero et al. (2014) demonstrated that among those who initiated opioids in the 1960s through 1980s, less than one third used prescription opioids before heroin. From the 1990s on, as the supply of opioids increased, so too did the proportion of individuals who use heroin who began opioid use with prescription opioids based on the analysis in Cicero et al (2014) (among those initiating in the 1990s, 50%; 2000s, 85%; 2010s, 78%). The figure that approximately 70-80% of individuals who use heroin began with prescription opioids has been replicated in numerous other studies among those who began using opioids in the last 20 years. Lankenau et al. (2012)[176] examined drug use histories among 50 individuals who inject drugs who had non-medically used opioids in the three months prior to the study, and documented that 86% of the sample used opioids non-medically prior to heroin use. Further, while individuals who use non-medically obtained opioids from a variety of sources including dealers, family, and friends, 75% of these individuals who use non-medically had obtained a prescription for opioids during their lifetime, and 2/5 of those reported that their own prescription was the initial source of opioid misuse. Pollini et al. (2011)[177] studied 123 individuals who inject heroin, documenting that 39.8% reported prescription opioid use prior to heroin use. Mateu-Gelabert et al. (2015)[164] interviewed 46 individuals who inject heroin, 70% of whom initiated opioid use with prescription opioids; mean age of first prescription opioid use was 17.9, and heroin use was 18.8 years; among individuals who use prescription opioids and heroin, the average difference in mean age of initiation between prescription opioids and heroin was 1.3 years. Ethnographers in New York, Philadelphia, San Francisco, Wilmington, and Ohio documented trajectories from medical and non-medical prescription opioid use to heroin, especially among younger cohort members.[89,165,166]

While studies of individuals who use heroin and other opioid interviewed about their drug use histories provide another signal, still more evidence from large-scale surveys and cohort studies has documented the relative risk of initiating heroin given prescription opioid use, compared to individuals who do not use prescription opioids. I cited above the evidence among adolescents and young adults that has found strikingly high estimated incidence rate ratios for the transition to heroin given non-medical prescription opioid use, even when controlling for individual-level risk factors that underlie a proclivity for drug use overall. There are also numerous studies



Figure 2. Fitted HRs of heroin initiation associated with prior nonmedical prescription opioid use, by age of nonmedical prescription opioid use initiation (NSDUH, 2004-2011)

that demonstrate strong relationships between non-medical prescription opioid use and heroin use among adults. Muhuri et al.[167] documented the association between prescription opioid use and heroin initiation estimated from age of onset reports across 9 years of the NSDUH. Pooled analyses indicated that the risk of heroin initiation was 19 times higher among those with prior non-medical prescription opioid use compared to those who did not use, even after controlling for a range of factors involved in the drug taking behavior. Banerjee et al. (2016)[168] found that non-medical prescription opioid use was associated with a more than 5 times increased hazard of heroin initiation compared to no use, even after adjusting for multiple risk factors. Data from Cerda et al. (2015)[169] are shown in Figure 2, and indicate that nonmedical prescription opioid use is associated with 10-15 times faster rate of transition to heroin use, across all ages of adolescence to young adulthood. Of those who reported new onset non-medical prescription opioid use, 27% subsequently initiated heroin.

Some studies of the transition from prescription opioids to heroin have only analyzed such transition among subjects who used prescription opioids "*non-medically.*" For example, the Muhuri study, cited above, assessed such transitions among the respondents to a NSDUH survey which only inquired about prior use outside the parameters of a doctor's prescription. However, where investigators have evaluated the transition from *medical* use to heroin, as in the study by Mars et al., it is clear that the same transition to heroin does occur. Most convincingly, McCabe et al. (2020) reported that nearly one-third of nonmedical prescription opioid users in adolescence transitioned to heroin use, using nationally-representative longitudinal panel data. An increased risk of heroin use after prescription opioid use in adolescence was observed for adolescents **_who had only reported using medically_** (among all cohorts, those who reported using only medically were 1.65 times more likely to use heroin than those who never were prescribed an opioid, and among more recent cohorts, those who only used medically were 2.7 times more likely to transition to heroin than those who never were prescribed an opioid).[178] Risks of transition to heroin use were also elevated among adolescents who used opioids nonmedically before medical use (among all cohorts, they were 4.3 times more likely to transition to heroin use) as well as those who used medically and subsequently non-medically (among all cohorts, they were 1.93 times more likely to transition to heroin use). Those students who reporting using non-medically without a history of medical prescriptions (e.g., through diverted sources due to over-prescription of family and friend), were almost 5 times more likely to transition to heroin than those who never used an opioid. The rigor of this study was enhanced by the robust statistical control for confounding, and the longitudinal design.[178] It should be noted that a previous publication from these same data (McCabe et al. (2019))[179] reported that those adolescents who only reported using medically had an elevated, but lower, risk of transition to any substance use disorder by age 35. However given the non-specificity of the 'any substance use disorder' category (that is primarily comprised by alcohol and cannabis use disorders, rather than opioid or heroin use disorder), the paper was not germane to the question of whether those adolescents who use medically have an increased risk of non-medical opioid use and/or heroin use. The results from the more recent study (McCabe et al. (2020)) confirm that use of opioids, whether originally prescribed by a physician or not, place adolescents at increased risk of transition to heroin use. Gaines et al. (2020)[180] documented in a sample of at least 330 individuals who used pharmaceutical opioids that 49.4% had obtained their first pharmaceutical opioid from a medical provider, and that the transition to heroin was common among both those who obtained opioids from a medical provider as well as those who did not. Indeed, *9.5% of those who initiated heroin use never used pharmaceutical opioids in a non-prescribed manner before initiating heroin use*.

37

It is also important to note when interpreting existing evidence that there is substantial overlap between the "non-medical" and "medical" use populations. For example, McCabe et al. (2020)[112] showed that *non-medical* use of prescription opioids was significantly greater at high schools where a higher degree of *medical* use of such drugs was reported. The authors commented that these data were consistent with previous data showing that the most frequent sources of prescription opioids among non-medical users were their peers with medical prescriptions. This overlap is consistent with other findings that indicate that the expansion of prescription opioids underlay the increase in other harms associated with non-opioid substances as well. Cano & Huang (2020) documented that county-level differences in prescription opioids distribution, opioid use disorder, and opioid overdose in 2012 were strongly associated with increases in psychostimulant overdose across US counties, including Ohio counties, from 2015-2018. These data indicate that the distribution of opioids created large populations with drug use disorders, vulnerable for transition to numerous substances, including psychostimulants.[123]

That prescription drug use is neither necessary nor sufficient to predict heroin use does not mean there is no causal relationship. In fact, the same can be said for many risk factors that are neither necessary nor sufficient to produce particular health outcomes, and yet have been shown to be causes of those outcomes. Examples include smoking and cancer; seat belts and deaths in automobile accidents; sedentary lifestyle and heart disease; and obesity and diabetes.

Several additional points are worth keeping in mind. A small but significant proportion of individuals who use prescription opioids progress to heroin use.[167] However, heroin use does not need to be common in order to be causally related to prior use of prescription opioids. For example, all scientists would agree that smoking is a cause of lung cancer. In 2016 there were 218,229 new lung cancer cases in the United States (56 per 100,000 persons),[181] which makes lung cancer a rare disease. Yet smoking is no less a cause of lung cancer because lung cancer is rare than if it were common. By comparison, there were at minimum four times more heroin users (estimated 948,000 based on NSDUH data, which is likely an underestimate, thus at least a rate of 293.1 per 100,000)[182] in the United States than lung cancer cases; thus by comparison, heroin use is much more common. The existence of a causal relationship between risk factors and outcomes does not depend on prevalence. The number of individuals who use prescription opioids is approximately seven times larger than the number of individuals who use heroin; thus, while the absolute risk of transitioning to heroin given prescription opioid use is relatively small, the vast majority of individuals who use heroin began with prescription opioid use, and even small increases in progression to heroin use create a significant public health burden.[163] Reasons cited for the transition to heroin use given prescription opioid use based on the research cited above are most often cost and convenience; prescription opioids are more expensive to obtain illegally than heroin, and more difficult in many geographic areas. Numerous factors predict transition from prescription opioid use to heroin use, including individual-level and community-level characteristics. However, the inverse association between age of first prescription opioid use and hazard of heroin use being dose-response (i.e. the younger the age of onset, the higher the likelihood of transition)[169] suggests that the proportion initiating heroin increases in a dose-response relationship with length of prescription opioid use, providing further support for a causal relationship. Further, existing evidence indicates that there are greater rates of heroin use, and increases in heroin use across time, among non-medical opioid users, and that these relationships are consistent with a dose-response relationship;[183] rates of heroin use increase with increasing amount of prescription opioids used. Based on the evidence, it is reasonable to conclude that there is a causal relationship between prescription opioid and heroin use, and that

the increases in population-level heroin use in the United States are due, at least in significant part, to individuals who use prescription opioids transitioning to heroin use.

Another indicator that prescription opioid use is causally related to heroin use is the accumulating evidence that restricting prescription opioid supply among those who are dependent on opioids leads to an increase in heroin use and with risky patterns of use that cause opioid-associated death. A systematic review of 17 studies that evaluate the effectiveness of prescription drug monitoring programs indicated three of six studies found increase in heroin-associated death when supply is restricted through PDMPs, although noting that more research was needed given that methodological limitations precluded firm inference. Since then, additional studies with rigorous methodology confirm that, across different PDMP programs, as well as other restrictions on opioid supply, such as OxyContin reformulation, an increase in heroin overdose is a consequence of some supply restrictions, due to the restriction of prescription opioids among individuals who are dependent on them. For example, Martins et al. (2019) found that states with certain PDMP features had increases in heroin overdose by 19%.[104] Importantly, not all PDMP programs were associated with an increase in heroin overdose death, indicating that transition is not inevitable if additional supports are in place for drug users. Additionally, Alpert et al. (2018) analyzed variation in OxyContin misuse across states to demonstrate that those states with the highest OxyContin misuse prior to reformulation had the highest increases in heroin overdose after the reformulation.[184] This evidence certainly points to a mechanism in which individuals who are dependent on prescription opioids transition to heroin after supply or potency is curtailed. Of note, a connection between reductions in opioid prescribing and increases in heroin overdose should not be interpreted as a signal that opioid supply policies are misguided; rather, they are indicative that: 1) the reduction in opioid supply is not sufficient to curtail the extensive harm associated with the initial public health burden of widespread opioid oversupply; 2) there is a causal connection between opioid products (prescription opioids to subsequent heroin use); and 3) the need for a robust and integrated system of treatment and services for those affected has never been more urgent.

Finally, since approximately 2013, overdose deaths due to synthetic opioids (e.g., fentanyl) have been exponentially increasing in the United States. These synthetic opioids are much more potent than heroin; less than 2 mg of fentanyl, equivalent to approximately two grains of salt, can cause overdose.[185] Available evidence indicates that fentanyl and other high-potency opioids have been adulterating the supply of both heroin and illicitly manufactured prescription opioids.[186] Given the evidence that prescription opioid use is causally related to heroin use, prescription opioid use is also responsible for the increase in fentanyl and other synthetic opioid harms. Indeed, individuals who use prescription opioids who both obtain illicitly manufactured prescription opioids as well as heroin will be potentially exposed to fentanyl, increasing the risk of overdose and death. In terms of the magnitude and scope of the relationship, given that available estimates indicate that approximately 70-80% of individuals who use heroin begin their opioid-using trajectories with prescription opioids, I estimate that approximately 70-80% of fentanyl-involved opioid deaths are attributable to prescription opioid use.

### G.    The impact of diverted opioids was not random, but part of a complex system that involved community level economic conditions

The exponential increases in the opioid supply, and the resulting opioid diversion and related harms, did not occur in isolation. It is important to put in context that opioid use disorder and overdose disproportionately affected economically deprived areas, and also interacted with

individual-level risk factors for use. However, ready access to prescription opioids was a necessary precondition to their widespread availability and uptake.

The relationship between shifting macroeconomic conditions and drug poisonings has received considerable attention since the publication of Case and Deaton's widely-discussed paper.[187] In their 2015 paper, Case and Deaton reported a recent spike in mortality rates among less-educated non-Hispanic Whites, and posited that long-term shifts in the labor market, reduced employment opportunities, and overall life prospects for persons with a high school degree or less have driven increases in "deaths of despair" (i.e., deaths from suicides, cirrhosis of the liver, and drug poisonings). This model suggests that the increased rates of opioid-related mortality over the past three decades are attributed to shifting macroeconomic conditions. However, several studies contradict the narrative that the rise of deaths in the United States is due to a common source such as "despair". In a working paper by Ruhm (2018),[188] known measures of economic factors predicted drug and opioid overdose, but explained very little of the variation in rates over time. Further, Masters et al. (2018)[189] reanalyzed vital statistics data by gender, age, and birth cohort, and concluded that drug overdose rates increased across a wide range of age groups, especially those in young and middle adulthood, and did not mirror trends for other "despair"-related death such as suicide, indicating that the drivers of opioid-related deaths in the United States were factors that could influence a broad range of age groups simultaneously. Indeed, the evidence that prescription opioids have an independent effect on risk of death, and that availability was the principal driver of prescription opioid use rather than economic conditions, is supportive of the role of availability rather than economic factors as the principal causal factor in driving increases in opioid-related harm. Indeed, this conclusion is supported by consensus expertise in the scientific literature. A 2021 publication based on numerous committee areas of expertise in the National Academies of Science, Engineering, and Medicine reviewed the literature and conducted independent analyses assessing the contribution of opioid supply and the intersection with economic factors in the United States underlying increases in opioid-related harm.[190] Authors cited the "flooding" of the market with "highly addictive yet deadly substances", and the "aggressive and highly effective marketing tactics on the part of the pharmaceutical industry (manufacturers, distributors, and pharmacies)" as well as other groups, as underlying the increases in conjunction with vulnerabilities in the population that created the "perfect storm" of factors leading to the crisis (section 7-19, page 176).

While there is considerable literature on macroeconomic conditions and opioid-related mortality, four studies form the highest rigor of the evidence base.[188,191–193] One of these studies[191] found that average drug-related mortality rates were higher in counties with greater economic and family distress and in counties with greater population share dependent on mining compared to other areas of the labor market, and lower in counties with more religious establishments, higher percentage of recent in-migrants, and counties with greater population share dependent on public sector employment. Two other studies[187,192] found that a 1% increase in county unemployment rate was associated with a 0.19 per 100,000 increase in opioid-related mortality rate (3.6%) and that the estimated change in mortality accounted for by worsening economic conditions ranged from 5 to 7% for prescription opioid-related mortality and from 2 to 5% for illicit opioid-related deaths at the 3-digit ZIP code level, indicating that economic conditions account for less than one-tenth of the rise in mortality rates over time. Finally, Pear et al.[193] found that two area-level indicators, percent in poverty and percent of adults with less than a high school education, were associated with higher rates of prescription opioid related mortality, while median household income was associated with lower rates. However, urbanicity modified the association between macroeconomic conditions and rates of heroin-related mortality, with poverty and unemployment associated with increases in

40

heroin-related mortality in metropolitan areas and low educational attainment alone associated with heroin-related mortality in rural areas. Limitations of the extant research are that publicly released files do not include all deaths (to reduce the potential for confidentiality violations),[191] inadequate measure of outcome,[191] failure to account for area-level prescription opioid supply,[191,193] and no investigation of the stability of effect estimates at different levels of organization.[188,191–193]

In summary, there is evidence that the population distributions of prescription opioid and other opioid mortality disproportionately affected economically deprived areas; however, the available evidence indicates that economic conditions played a relatively small part in increased opioid-related morbidity and mortality. The driving force in increasing opioid-related morbidity and mortality was access to and widespread availability of opioids.[§]

### H.    Availability principles and the relationship with harms related to prescription opioids

Arguments have been made that the increases in prescription opioid overdose and addiction in the United States are largely driven by individuals who use non-medically, and that as prescription opioids have become more difficult to obtain because of changes to the changes to prescription opioid supply (e.g., prescription drug monitoring programs, physician education), those who use drugs have progressed to heroin and other more available and less expensive opioids to satiate addiction. While certainly there are data that rates of overdose, addiction, and harm among those who use opioids non-medically are high, there is evidence that harm among those who use opioids medically is also high. Further, as the data cited in this Report show, the proportion of individuals with opioid use disorder that receive a prescription at some point from a physician is more than half, and the risk of addiction given medical use of opioids at high doses for long periods of time is many times higher for high dose than low dose prescriptions (e.g., Edlund et al.[58] estimate that rates of opioid use disorder among those prescribed high doses is 50 times that of those who receive low doses). Rates of opioid distribution and opioid-related death vary substantially across geographic areas, and all available evidence indicates that prescription opioids harms, due to medical use as well as diversion, increase with the supply of opioids. With regard to recent decreases in the opioid supply, there is evidence that restricting the prescription opioid supply is associated with greater transition to heroin,[97] and that this transition has influenced death rates due to the contamination of heroin with fentanyl and other synthetic opioids. As such, abatement that is broad ranging in scope is necessary. However, the notion that the current opioid epidemic is due to economic conditions or despair/depression is not supported by data. There is no evidence that depression has increased across time among adults in the US, and available evidence from economic studies of the role of the economy in drug overdose have suggested that there is a limited role for economic conditions; based on the studies and data discussed above, the role of opioid supply is so much more strongly correlated that no reasonable interpretation of the data would support the conclusion that economic conditions are more important than supply in producing the observed trends. The validity of the principle that addiction increases as availability increases has been established in multiple contexts, and it is highly probable that increased availability of prescription opioids is the driving force contributing to OUD, overdose morbidity and mortality, and NAS.

Indeed, there are decades of public health research that have a strong analogy to the current opioid epidemic. The relationship between supply of an addictive substance and subsequent rates of

---

§ It is beyond the scope of this report to review or discuss the impact of economic conditions on treatment and abatement needs, which may be important to consider in the remedial context.

substance use disorder has been well established in the public health literature for years through principles of availability.[194] Succinctly, this principle posits that one driver of population burden related to substance use harm is the availability and cost of the substance.[195,196] The relationship between availability/cost and harm has been extensively documented for decades for alcohol and tobacco, and it is one reason that alcohol and cigarette taxes, minimum pricing, and other public health efforts aimed at availability and price are among the most effective population level interventions to reduce alcohol-related harms, such as alcohol-impaired driving fatalities.[197–199] In summary, as prescription opioids became more commonly available in the market, decades of prior work across numerous substances would predict a rise in opioid-related harm, and in fact, supportive evidence has been shown across numerous substances and time periods and populations.

## I.      Comparison of deaths due to prescription opioids with NSAIDs

Among the threads of inquiry related to the increases in opioid-related harm in the United States are comparisons to harm associated with other pharmaceutical products that also cause harm in some users. For comparison, non-steroidal anti-inflammatory drugs (NSAIDs) are commonly prescribed for a range of conditions, including pain, but also arthritis and other inflammatory conditions, as well as fever. Common forms of NSAIDs are available over-the-counter, such as aspirin and ibuprofen, but a range of products are available by prescription as well. NSAIDs are prevalent, and their use varies across age. Data from the National Health and Nutrition Examination Surveys from 1999-2004 indicated a past-year prevalence of 26.1% of the US population for all NSAID use, and 9.5% for prescription NSAID use.[200] While use is common, it comes with health risks, including, for example, cardiovascular events. Available reviews and meta-analysis suggests that the risk of serious GI events with extended NSAID treatment is between 1-3%, which is approximately 10 times higher than the background rate in the population.[201–205]

Given their potential for harm and that both are used to treat pain, it is worth comparing the deaths due to NSAIDs with the deaths due to prescription opioids. It has been estimated that 16,500 per year are due to GI bleeding from NSAID use. This estimate, however, is not reliable. It is based on a single article that extrapolated from 19 deaths among 4,258 patients in an administrative database,[206] multiplying the 19 deaths by estimated population size. Such extrapolation is not quantitatively specific due to measurement error in death rates, and further, the cohort from which the 19 deaths were observed was among a sample with rheumatoid arthritis, among whom the baseline mortality rates are higher than the general population. Another study estimated deaths due to NSAIDs to be closer to 3,200 deaths,[207] but this too is not a reliable estimate. The estimate of 3,200 deaths is based on the estimate of the attributable fraction for NSAID and death. The attributable fraction (an estimate of the proportion of deaths that are causally related to an exposure) varies based on the baseline prevalence of exposure. Thus, the authors multiplied the attributable fraction in the study sample by the proportion of the US population that used any NSAID in the previous week (regardless of dose or duration), based on a phone survey of 2,590 individuals, which is not a large sample size for total population extrapolation. Further, applying a summary attributable fraction is incomplete, as it does not take into consideration type and dose (e.g., any NSAID use counts at the same level of risk as long-term use); it is well known that the prevalence of NSAID use varies widely by race, sex, and age,[200] such that applying one average to the whole population without incorporating subgroup heterogeneity will include substantial error.

Solomon et al. (2010)[208] directly compared the risks associated with NSAID to those with prescription opioids as well as cyclooxygenase 2 inhibitors (coxibs) among a large claims database of low-income older adults who were Medicare beneficiaries in Pennsylvania and New Jersey and had

diagnoses of osteoarthritis or rheumatoid arthritis on 2 separate visits (N=36,414). Authors used a propensity score to balance potential confounding factors among those using NSAIDs, coxibs, and opioids. The use of a propensity score in this analysis is important and rigorous, as it controls for the potential reasons why an individual would be prescribed, for example, NSAIDs over opioids. Once matched on propensity scores, the three groups were balanced on over 40 covariates including demographics, clinical characteristics, health history, and use of other medications. Further, the authors included incident use of medications in the comparison groups, which further helps to establish causality, and examined incident health events. Comparing prescribed NSAIDS to prescribed opioids, those prescribed opioids had higher rates of a range of adverse events including cardiovascular events, fractures, kidney injury and falls, and approximately equivalent rates of events such as GI bleeding. And finally, the mortality rate among opioid users was 75 per 1000 patient years among prescribed opioid users, compared to 47 per 1000 patient years among prescription NSAID users over the course of the study, for an increased hazard of death of 1.87 times that of NSAID users. While the particular hazard ratios may differ in other populations, there is no *a priori* reason to doubt the applicability of Solomon et al.'s general conclusion that prescription opioids are associated with greater incidence of adverse events and mortality. With that in mind, however, Solomon et al. (2010) remains the most rigorous study to date that has directly compared the harm of medical prescription opioid use with medical NSAID use, and determined that mortality as well as a wide range of medical morbidities were higher, substantially so, for opioids compared with NSAIDs.

## J.     Summary

In this Report, I have outlined an overview of the scientific evidence and provided the reasons and bases for my opinions. I have used well-accepted epidemiological methodology and principles in evaluating this literature, including Hill's causal criteria to determine the evidence for causation. Through this evaluation, it is my opinion that there is evidence to conclude that prescribed opioid use is casually related to opioid use disorder, based on strength of association, consistency, dose-response evidence, and temporality. Further, there is substantial evidence for the conclusion that overprescribing of opioids leads to diversion and harm to populations, and that this underscores how the increase in the supply of opioids was directly and causally related to harm to populations, including opioid use disorder, overdose, and other adverse outcomes associated with increased morbidity and mortality. Opioids were causally responsible for hundreds of thousands of overdose deaths, and were potentiated when other drugs were also present, but these deaths would not have occurred without opioids present as well. Prescription opioids use, both medical and non-medical, is causally related to subsequent heroin use, and thus the pervasive overprescription of opioids set the stage for the coming heroin and fentanyl crisis that is still rampant in the US population. While opioid use is part of a complex system that also involves economic factors, the overwhelming body of evidence indicates that the supply of opioids was the cause of the opioid crisis, not economic factors. Such a conclusion is in line with public health principles that have been established for decades; making harmful substances more available, through cost and access, will result in more harm. This is certainly the case in the emergence and persistence of the opioid epidemic in the US, and began with the supply of opioids.

43

**Schedule and Exhibits to this Report**

Attached as Schedule 1 are my case-specific opinions and the reasons and bases for them.

Attached as Exhibit A is a copy of my current curriculum vitae and a list of all publications I have authored in the past 10 years.

Attached as Exhibit B is a list of data or other information I have considered in forming the opinions expressed herein.

Attached as Exhibit C is a statement of my compensation for services performed in this case.

Attached as Exhibit D is a list of all the cases in which I have testified as an expert at trial or by deposition during the past four years.

Executed on:   April 16, 2021

_____
Katherine Keyes

44

SCHEDULE 1 – Case Track 3 – Lake and Trumbull Counties

**Case-Specific Opinions and the Reasons and Bases For Them**

In addition to the opinions offered in the body of this Report at pp. 3-5, below I provide my opinions which are specific to Lake County and Trumbull County, Ohio.

## I.     CASE-SPECIFIC OPINIONS

12.     Prescription opioid dispensing increased dramatically in the US in the 1990s when aggressive marketing and distribution practices began, including in Ohio and in Lake and Trumbull Counties. Overall prescribing increased 2- to 4-fold from the late 1990s through 2012; prescribing then began decreasing although remains extraordinarily high. For example, the opioid prescribing rate in Lake County increased from 72.3 to 90.2 prescriptions per 100 persons from 2006 to 2012, and the rate in Trumbull County increased from 99.1 to 114.1 prescriptions per 100 persons from 2006 to 2010 (note, this indicates that there was more than one prescription for *every resident* of Trumbull County between 2007-2015). Prescribing has since declined from 2012 levels but nevertheless remains extraordinarily high.

13.     There is a significant and ongoing public health burden of opioid use disorder and overdose in Ohio, and in Lake and Trumbull Counties. Ohio has the sixth highest rate of opioid overdose in the nation, and among counties that report overdose rates, both Lake and Trumbull have been among the top 200 counties (out of over 3,000) in the nation with the highest overdose death rate for the last nine out of nine years.

14.     Data from Lake and Trumbull Counties indicate that fentanyl mortality began increasing after 2015; the increase in fentanyl mortality deaths can be largely attributed to the oversupply of prescription opioids that began in the 1990s and continues to the present time.

15.     In 2019, the last year of data available, I estimate that the prevalence of opioid use disorder is approximately 2-4% in the Lake and Trumbull Counties.

In addition to fatal overdose, other consequences to Lake and Trumbull effected by opioid oversupply include emergency department visits for overdose, increased burden in the treatment and chemical dependency provider system, opioid use disorder and opioid use among both adults and adolescents, and neonatal abstinence syndrome (NAS).

## II.     LAKE AND TRUMBULL COUNTIES: EVIDENCE OF BURDEN OF THE OPIOID EPIDEMIC

In the sections below, I provide an overview of opioid-related overdose and other consequences related to opioid use in Lake and Trumbull Counties as well as Ohio as a whole. These sources document an exceptionally high burden of harm in these communities well beyond mortality, including ongoing morbidity from opioid use.

### A.     Opioid-related harm in Lake and Trumbull Counties, and Ohio, have increased greatly between 1999 and 2019, including the death rates due to prescription opioids

45



Figure 3. Overdose death rates, all drugs

The National Vital Statistics Surveillance System (NVSS) provides publicly available county-level data on death, allowing for a quantification of the risk of overdose death in the counties of Lake and Trumbull in years where deaths are sufficient to report without violating data suppression requirements. The data provided by the NVSS are consistent with other sources of data that I reviewed regarding overdose in Ohio; I rely as a principal source of my opinions upon the NVSS data given that they are routinely used for epidemiological surveillance. Of particular relevance are trends in opioid-related deaths in Ohio as a whole and Lake and Trumbull counties in particular. The death rates from 1999 through 2019 for: drug-related, opioid-related, and prescription opioid-related deaths from the vital statistics records are shown in Figure 3 (note, data from Lake in 2001 and 2003 are excluded due to data suppression requirements), Figure 5, and Figure 7 respectively. These figures are based on my own analysis of the vital statistics data.

*Data suppression.* I use publicly available mortality data accessed through the NVSS, specifically the CDC Wonder Multiple Cause of Death 1999-2019 database. Death counts and corresponding rates are suppressed for sub-national data representing zero to nine deaths, as the relatively small size of these estimates may yield unreliable inference. Throughout I will note in figures and text when data are "suppressed" per these CDC reporting and data dissemination guidelines.

(a)      Rates of opioid-related harm in Ohio have largely been increasing since 1999.



Figure 4. Overdose deaths, crude rate per 100,000 population, 2014-2019, Ohio

*Rates of drug overdose.* The rate of drug overdose in Ohio has increased from 4.12 per 100,000 to 38.28 per 100,000 from 1999 through 2019. In terms of absolute deaths, from 1999 to 2019 there have been a total of 43.957 drug overdose deaths in Ohio. Figure 4 shows the map of Ohio drug overdose deaths in 2014-2019. The blue color of the map becomes darker as the overdose rate increases. The rates of overall drug overdose from 2014-2019 were 33.68 per 100,000 in Lake County and 49.27 per 100,000 in Trumbull County.

*Rates of opioid overdose.* Deaths in Ohio that were adjudicated as due to opioids have also increased, from 1.26 per 100,000 in 1999 to 29.13 per 100,000 in 2019, with some evidence of non-linear variation in the years in between.

46



Figure 5. Overdose death rates, all opioids

ICD-Codes: Underlying Cause: X40-X44, X60-X64, X85, Y10-Y14, Contributing Cause: T40.0-T40.4

Indeed, from 1999 to 2019, there have been a total of 29,119 opioid overdose deaths in Ohio.

The available evidence indicates that there were distinct contributors to the increase in overdose in Ohio. From 1999 to 2011, prescription opioids were the largest contributor to the increase in overdose deaths over other opioids such as heroin. Figure 6 provides the number of drug overdose deaths in Ohio across three categories: prescription opioids, heroin, and synthetic opioids other than methadone, by year, from 1999 through 2018 (data through 2019 not yet available). In accordance with CDC practice with these data, these categories are not mutually exclusive; deaths for which more than one drug was listed were counted in each category; thus the category totals represent counts of events of drugs, and do not sum to the total number of deaths. Data are sourced from CDC WONDER and the graph was generated and published by the National Institute on Drug Abuse.[209] As is clear from the graph, natural and semisynthetic opioids were listed more often than heroin or synthetic opioids as involved in overdose death from 1999 through 2011. In recent years, heroin deaths have increased as being involved in overdose deaths, beginning in approximately 2012-2014; my analysis of the CDC WONDER data indicated that in 2015 to 2016, heroin was counted as contributing to overdose 1,444 and 1,478 times, respectively, in Ohio (as an important note, the listing of heroin does not preclude prescription opioids from also being involved, again, as these categories are not mutually exclusive). Synthetic opioid (e.g. fentanyl) deaths began exponentially increasing as having involvement in overdose deaths in recent years as well. Of note, increases in heroin and fentanyl deaths are a result of the increase in prescription opioid use in the



Figure 6. Number of overdose deaths involving opioids in Ohio, by opioid category (Source: CDC WONDER, graph generated and published the National Institute on Drug Abuse)

United States to the extent that prescription opioid use is concurrent with, or temporally prior and causally related to subsequent heroin and fentanyl use. As I detail in Section I, there is sufficient evidence to conclude that prescription opioid use is a cause of heroin and fentanyl use, and approximately 70-80% of individuals who use heroin in the last 20 years begin with prescription opioids.

*Rates of opioid overdose due to prescription opioids.* I used ICD-10 codes including X40-X44, X60-X64, X85, Y10-14, and T-codes T40.2, T40.3, and a portion of T40.4 to estimate the rate of overdose due to natural, semisynthetic opioids and methadone, and synthetic opioids, all categories that would

47

include prescription opioids to some degree. Given the evidence that illegally manufactured synthetic opioids began contributing to overdose death in the US around 2013-2015, I included all overdoses due to synthetic opioids (T40.4) prior to 2013 as prescription opioid overdose deaths. Then, I estimated the average number of synthetic opioid overdose deaths from 1999 to 2012, and applied that number to synthetic opioid overdose deaths from 2013 and onwards as an estimate of the number of synthetic opioid overdose deaths that are reasonably attributable to prescription opioids. Rates of estimated prescription opioid overdose in Ohio ranged from 1.44 per 100,000 in 1999 to 5.72 in 2016.



*Opioid-related suicide.* Suicide using opioids is an additional source of harm that has impacted mortality in Ohio. Suicide generally refers to intentional self-harm that results in death, and requires a designation of the intentionality of the decedent by the death certificate certifier. In the case of opioid overdose, whether the overdose was intentional or not can be difficult to determine. Suicide may be the designated cause if there is confirmatory evidence such as a suicide note that describes the intentionality, acute suicidal behavior proximal to the death, or other indicators based on investigation. Suicide using opioids has more than doubled in the United States from 1999-2014, from 0.3 per 100,000 to 0.7 per 100,000.[210] In Ohio the count of suicides due to opioids from 2000 to 2019 from vital statistics is provided in Figure 8. Data indicate the number of suicide deaths that were designated to be attributable to opioids ranged from 23 in 2000 to 65 in 2011.

(b) Rates of opioid-related harm in Lake County and in Trumbull County have also increased since 1999



*Rates of drug overdose.* Per the CDC WONDER data, the rate of drug overdose in has increased from 4.83 per 100,000 in 1999 to 34.33 per 100,000 in 2019 in Lake County, and 8.40 per 100,000 in 1999 to 52.03 per 100,000 in 2019 in Trumbull County. These rates comprise a high degree of harm; indeed, overall from 1999 to 2019, 848 mortalities in Lake County and 1,145 in Trumbull County have been recorded in NVSS due to drug overdose. Compared to the national average, Lake and Trumbull Counties have substantially higher rates of drug overdose per capita, although the absolute number of deaths is indicative of a high burden of harm, with 79 overdose deaths in Lake and 103 in Trumbull in 2019 alone.

*Rates of opioid overdose.* Per the CDC WONDER data, deaths in both Lake County and Trumbull County that were adjudicated as due to opioids have also increased substantially. From

2004 to 2019, the death rate in Lake County more than sextupled from 4.39 per 100,000 to 29.55 per 100,000. In the same period, the rate in Trumbull County more than quintupled, going from 8.65 per 100,000 to 44.96 per 100,000. The number of opioid overdose deaths reported in CDC WONDER in Lake County have increased from 10 to 68 and in Trumbull County from 19 to 89 from 2004 to 2019. The rate per capita in Trumbull County was between 1.27 and 4.10 times higher than national average in all years for which data are available; the heightened risk compared to the national average peaked in 2015 with a rate of opioid overdose that was 4.10 times the national average. Much like in Ohio, opioid overdose death in recent years has increased in recent years concomitant with heroin overdose and high-potency synthetic opioids, which are attributable to individuals who also use or have used prescription opioids to the extent that prescription opioids were temporally prior to and caused subsequent heroin and synthetic opioid use. The available literature cited in Section I indicate that approximately 70-80% of heroin users first used prescription opioids, indicating that a similar proportion of deaths due to heroin and synthetic opioid use are attributable to prescription opioids.

*Rates of prescription opioid overdose.* Deaths that are categorized as prescription opioid related (T40.2, T40.3, and a portion of T40.4 as described above) were higher in both Lake County and Trumbull County compared with the national average for the years in which available NVSS estimates are released. In total from 1999 to 2019, I estimate that there were 287 deaths in Lake and 279 deaths in Trumbull attributed to prescription opioids (note that some years are not included in this estimate due to small numbers in particular years), per my estimate including the number of synthetic opioid overdose deaths that are reasonably attributable to prescription opioids based on deaths before illicitly manufactured synthetic opioids began to be detected in the drug supply. I included moving averages in analyses of prescription opioid overdose in Figure 7. Simple moving averages were estimated using a rolling mean over a period defined by 4 time points, and allow for statistical summaries that average out noise in the data. While data are suppressed for certain years in the publicly available vital statistics data, for years in which data are available, based on the moving averages, these prescription drug overdose deaths increased from 5.90 deaths per 100,000 in 2008 to a height of 11.31 per 100,000 in 2013 in Lake and from 9.42 deaths per 100,000 in 2008 to a height of 10.60 per 100,000 in 2017 in Trumbull. These rates are indicative of a large degree of burden. In Lake and Trumbull Counties, prescription opioid overdose deaths are higher than the national average for the years in which reliable county level estimates could be extracted from NVSS. In Lake County, the heightened risk compared to the national average peaked in 2011 with a rate of opioid overdose that was 1.90 times the national average, while in Trumbull County, the heightened risk peaked in 2007, with a rate that was 3.02 times the national average.

Important in interpreting the death rates attributed in the vital statistics system to prescription opioids are a number of limitations. Designation of opioid-related harm in the CDC WONDER data due to overdose is complicated by the heterogeneous ways in which death certificates are completed across jurisdictions. The designation of an opioid-related death in CDC WONDER is assessed statistically with "T-codes" found in the ICD-10 to identify the drug(s) involved; however, these codes are sometimes inconsistently used and applied, and changes in coding from ICD-9 to ICD-10 impact the assessment of mortality related to opioids.[60,61] The publication by Slavova et al. (2015)[10] details the methodological issues with respect to counting overdose cases using death certificates and T-codes. Nevertheless, these data at the county-level are regularly used in both governmental and academic reports and publications to assess the burden and trends in mortality, including mortality related to opioids.

Further, I have had the opportunity to meet with and interview professionals in Lake and Trumbull Counties regarding the processes for death investigation and certification, and I also reviewed deposition transcripts and material. In Lake County, I met with Mark Komar, the County Coroner, and Mary Pshock; and in Trumbull County, I met with Kathleen Mezsaros in the Trumbull Medical Examiner's office. In each interview, I confirmed that the process for certifying deaths as an overdose death, as well as the processes for identifying the opioid involvement in the death, was reliable and comparable to other counties in the US with high quality death information. I also reviewed documents that were produced by various county government offices on overdose death, including information on the number of deaths, manner of death, and opioid involvement. While there are incremental differences between county estimates and CDC WONDER (which is expected), the data that were produced by the county are consistent with the CDC WONDER estimates of death in terms of the trends over time. For example, deaths recorded by Trumbull County from 2006-2016 indicate that prescription opioids were the most common opioid found in overdose deaths from 2006 to 2010; after 2010, heroin began being rapidly identified in overdose deaths from 2011 through 2015, wherein deaths involving fentanyl began rapidly contributing to overdose.[211] Such confirmation is also available in the data and reports produced by Lake County; I reviewed the ADAMHS Board minutes and Ohio Substance Abuse Monitoring Network reports that include Lake County, wherein the progression from prescription opioids, to heroin, to synthetic opioids is described, as well as the substantial unmet need for treatment services. Such trends in the county's own data confirm the CDC WONDER data, which show similar trends and transitions.

### B. Increases in neonatal abstinence syndrome, emergency department visits, admissions for treatment, and non-medical opioid use among adults and adolescents are additional key harms due to opioids in the population

*Neonatal abstinence syndrome.* Neonatal abstinence syndrome (NAS) occurs when infants are born exposed to opioids *in utero* and experience withdrawal symptoms after birth. The majority of neonatal abstinence syndrome among US infants is due to opioid exposure *in utero*.[212] Withdrawal symptoms develop in an estimated 55-95% of opioid-exposed infants, depending on the extent of exposure as well as a range of clinical and demographic predictors, and 30-65% of infants require pharmacological treatment for withdrawal symptoms.[213] NAS is associated with significant medical morbidity, from low birthweight and general discomfort and pain for the infant to medically serious issues such



as respiratory disorders and seizures. Cases of NAS can have long-lasting effects on infants, as the clinical literature has documented increased incidence of developmental delays and child behavior problems into childhood.[214] Several large-scale databases have been used to assess trends in NAS, including the Kids' Inpatient Database (KID) and the Nationwide Inpatient Sample (NIS), part of the HCUP family of databases. Available estimates indicate that the rate of NAS per 1,000 hospital births increased from 1.2 in 2000 to 3.39 per 1,000 live births in 2009.[215] An updated publication from the NIS data indicated an increase in NAS from 1.2 per 1,000 in 2004 to 7.5 per 1,000 in 2013 among rural infants, and 1.4 in 2004 to 4.8 per 1,000 in 2013 among urban infants.[216] Further, these data also provided estimates of deliveries complicated by maternal opioid use among delivering

mothers, indicating an increase from approximately from 1.3 per 1,000 deliveries in 2004 to 8.1 per 1,000 deliveries in 2013 among rural mothers, and approximately 1.6 per 1,000 in 2004 to 4.8 in 2013 among urban mothers. These estimates are consistent across other data sources. Data from the State Inpatient Databases, also housed in HCUP, documented a 300% increase in the incidence of NAS from 1999 through 2013, from an incidence rate of 1.5 per 1,000 hospital births to 6.0 per 1,000 hospital births in 2013.[217] Thus, these data together show that NAS is dramatically increasing in the United States because of increases in maternal opioid use at the time of delivery. Children with NAS will require long-lasting monitoring and increased supports through development, long after treatment for NAS and release from hospital care.

Neonatal abstinence syndrome continues to be a heavy burden in Ohio and within its counties; it is challenging clinically to treat and remains associated with adverse long-term outcomes.[218–220] As shown in Figure 9, the rate of NAS in Ohio more than quadrupled from 2008 to 2018, from 2.48 per 1,000 births in 2008 to 11.61 per 1,000 births in 2018. These estimates are based on HCUP data from 2008 to 2018. In terms of absolute numbers, in Ohio there were a total of 134,461 births where the mother's state of residence is Ohio in 2018;[221] with an NAS rate of 11.61 per 1,000 in 2018, this would indicate approximately 1,568 children with NAS and in need of NAS-related care in Ohio per year in recent years. Also shown on Figure 9 is the prevalence of NAS in the US as a whole based on the years available in HCUP data, and as shown NAS in Ohio is always higher than the US as a whole. Table 1 shows the estimated number of infants with NAS in Lake and Trumbull Counties based on what we would expect given the rate of NAS in Ohio multiplied by the number of live births reported in the counties by year for 2006 through 2011. Figure 10 provides a map of NAS in Ohio, indicating high rates of NAS throughout the state, including Lake County and Trumbull County, indicative of ongoing harm.

| Table 1. Estimated Number of NAS Births | | |
|---|---|---|
| | Lake | Trumbull |
| 2008 | 6 | 6 |
| 2009 | 8 | 8 |
| 2010 | 11 | 10 |
| 2011 | 13 | 12 |
| 2012 | 17 | 17 |
| 2013 | 21 | 20 |
| 2014 | 23 | 22 |
| 2015 | 27 | 24 |
| 2016 | 25 | 24 |
| 2017 | 24 | 23 |
| 2018 | 26 | 24 |



Figure 10. Neonatal abstinence syndrome hospitalizations, crude rate per 100,000 population, 2014-2018, Ohio

*Opioid-related hospital use.* Another way to quantify the contribution of opioids to harm in Ohio is to examine the burden and trends in hospital use, including inpatient, outpatient, and emergency visits. Data are drawn from the HCUP, a reliable and well-characterized source of surveillance data in almost all states regarding healthcare use and expenditures. In Ohio, as shown in Figure 11, opioid-related inpatient hospital stays more

than doubled in less than 15 years, from 128 per 100,000 in the second quarter of 2005 to 355 per 100,000 total population in the second quarter of 2019.

*Non-medical opioid use in Ohio.* Data on non-medical opioid use in primarily household populations, both prescription opioid and heroin use, can be drawn from the National Survey on Drug Use and Health (NSDUH), which is conducted annually in the United States and draws a representative sample of a primarily household sampling frame. Understanding the sampling frame is important, because populations with high levels of opioid use are excluded from the sampling frame, such as those incarcerated and homeless. Thus, the NSDUH estimates should be considered an underestimate of the total state burden. With that caveat, available evidence indicates that non-medical pain reliever use (which is primarily opioids) is declining among non-institutionalized mostly household populations in Ohio overall, from 1.40% of those in Ohio in the sampling frame reporting past-month use in 2015-2016 to 1.30% in 2017-2018. Drug



Figure 11. Opioid-related hospital use

use disorder, however, has increased; available Ohio data indicate that 2.40% of those in the sampling frame in Ohio met criteria for past-year illicit drug use disorders in 2015-2016, which increased in 2017-2018 to 3.30% prevalence.[222] The Ohio NSDUH report comparing 2016-2017 to 2017-2018[223] indicates that among those 18 and older, the prevalence is increasing, with 2.96% prevalence in 2016-2017, and 3.26% prevalence in 2017-2018.

*Non-medical opioid use among adolescents in Ohio.* Data on trends and current burden of opioid use among adolescents in Ohio can be drawn from two sources, including the NSDUH, as well as the Youth Risk Behavior Surveillance Survey (YRBS), which is also state-level representative of adolescents in schools (and thus, again an underestimate of total burden given that adolescents who drop out of school are at higher risk for drug use than those who remain in school). In the NSDUH data, evidence indicates that non-medical use of prescription pain relievers has decreased in recent years, from 3.49% to 2.87% in 2016-2017 and 2017-2018, respectively, and reports of heroin use in the past year among adolescents in Ohio remained stable at 0.07% in both 2016-2017 and 2017-2018.[223] Data from the YRBS indicates the proportion of adolescents in Ohio who have *ever* used heroin in their lifetime has decreased in the past decade, from 3.8% in 2003 to 2.0% in 2013.[224,225] Further, the proportion of adolescents using drugs through injection has remained relatively constant, from 2.3% in 2003 to 2.2% in 2013.[224,225]

*Other opioid-related harms in the Lake and Trumbull Counties.* While the total number of non-fatal overdoses is difficult to empirically quantify because many do not come to clinical attention, a study based on medical records of 9,940 insured individuals who received 3+ opioid prescriptions within 90 days for noncancer pain found that the rate of non-fatal to fatal overdoses was approximately 7 non-fatal overdoses for each fatal overdose.[226] Given that there were 86 fatal overdoses in Lake County and 110 in Trumbull County in 2017, I estimate that at least 602 individuals in Lake and 770 in Trumbull experienced at least one non-fatal overdose in 2017 (at least 1-2 individuals per day per county), a ratio that is likely to be similar in other years as well. This number of non-fatal overdoses

is a number that is certainly a conservative underestimate given that overdose has increased with the adulteration of the drug market with highly potent synthetic opioids.

Other harms due to opioids in Lake County and Trumbull County include the wide range of medical and psychiatric disorders that are concomitant as a result of opioid use. For example, excluding cases diagnosed in state correctional facilities, the incidences of acute Hepatitis B and C were 1.5 per 100,000 and 2.5 per 100,000, respectively, in Trumbull, with 3 new cases of Hepatitis B and 5 new cases of Hepatitis C in 2018.[227,228] In Lake County, the incidence of new cases of acute Hepatitis C was 1.3 per 100,000 in 2018, with 3 new cases. These in coupling with the array of other medical and psychiatric conditions that co-occur with opioid use disorder indicate a heavy burden to the community. Furthermore, there are other conditions that can be a consequence of opioid use including endocarditis, congenital syphilis, and others that render available estimates of the harms caused in Lake and Trumbull Counties by opioids an underestimate of the total harm.

## C.    Need for treatment in Lake and Trumbull Counties

There is need for treatment and recovery services for opioid use disorder across the country, with many communities struggling to scale up capacity and providers with sufficient training in order to meet demand.[229–232] Understanding the total needs for treatment in Lake and Trumbull Counties is another metric of the harm to communities for the continued opioid crisis. I provide some conservative estimates of the need for treatment in this section, as well as information on the needs of services for families and children. Of note, there are a range of current services that are provided in Lake and Trumbull Counties that aim to provide treatment services to individuals with OUD, including emergency services, inpatient and outpatient OUD recovery, peer support, MOUD, services for women and families, and neonatal care. These have been described to me in meetings with local city and county officials, including April Caraway and Lauren Thorp from Trumbull County Mental Health and Recovery Board, and Kim Fraser, who directs the ADAMHS Board in Lake County. The consensus among local officials and experts is that while the community provides services for those affected by OUD, they are insufficient because of the magnitude of the public health issue. This was also confirmed in reviewing documents produced in the litigation that overview the unmet need for families and communities. Thus, in this section I provide my estimate of the total treatment needs, and note that my discussion with local officials and experts indicate that these needs are insufficiently met by current treatment and service availability.

*Number of individuals with opioid use disorder.* I estimated the number of individuals with opioid use disorder (OUD) in the US, Ohio, Lake County, and Trumbull County in order to obtain an estimate of the number who should have access to services to treat OUD, under the assumption that any individual who has mild, moderate, or severe OUD may have significant symptoms of discomfort, withdrawal, and additional distressing and medically-serious symptoms upon reduction or discontinuation use, and thus should have accessible and available services in a medically supervised way through appropriate evidence-based treatment.  Of note, this estimate of OUD numbers is an underestimate of the total number of individuals who may need medically supervised resources to manage reduction or cessation of opioid use, including those who use opioids in medically-supervised settings who may have tolerance to medication and experience withdrawal upon cessation given that continued opioids use and reductions in use often require additional medical supervision and can be associated with morbidity and mortality even in the absence of meeting criteria for OUD.

Estimating the number of people with opioid use disorder is a challenge given that there is no systematic way to count this population. However, we can rely on a variety of data sources that

inform epidemiologically regarding the plausible range of dependent or regular opioid users in a given area. A well-accepted method in epidemiology for many years for estimating population sizes for difficult to count groups to use multiplier methods: divide the known rate of an outcome for the difficult to count group by the number of individuals in the population of interest with the outcome to estimate the size of the difficult to count group. For individuals with OUD, available systematic review and meta-analyses have estimated the overdose mortality rate of individuals who are ascertained as having OUD, in treatment for OUD, or otherwise can be reasonably assumed to experience OUD based on duration and extent of opioid use. The most recent meta-analysis was published in 2019 in JAMA Psychiatry,[233] among the most prestigious and high-impact journals in the field. This systematic review included 124 cohort studies that assessed mortality rates among "extramedical" opioid users (defined as "use of heroin or other illicitly manufactured opioids and the use of pharmaceutical opioids outside the bounds of a medical prescription"), including 56 that assessed drug overdose rates, and of those, including 6 studies that were conducted within the United States. The meta-analysis included samples of individuals with heterogeneous underlying inclusion criteria, including community-based studies of individuals using opioids, those in treatment for opioid use disorder (including residential treatment, methadone maintenance and other medications for opioid use disorder (MOUD)), and individuals utilizing other kinds of medical care for ongoing medical need related to opioid use. Note that among the studies included in the meta-analysis, there were no studies that specifically focused on mortality rates among those using opioids only as prescribed within medical supervision (see Appendix 5 of Larney et al.), although the inclusion criteria do not preclude individuals who used opioids in this way if they, for example, underwent detoxification or OUD treatment; thus it is important to underscore that the estimates of the size of the OUD populations in Lake and Trumbull may be undercounts of those who may have symptoms of OUD but have not been ascertained in the specific inclusion criteria of the meta-analysis. The common linkage was history of non-medical opioids use or dependent use of opioids. However, individuals who use opioids medically at high doses for sustained periods of time often develop painful withdrawal and craving during cessation of use,[234,235] which in many cases calls for increased services including opioid substitution therapy, as well as other opioid-related services as necessary.[236,237] The estimated overdose death rate, averaged across all studies, was 0.52 per 100 person-years, with a confidence interval from 0.46 to 0.59 per 100 person-years. When examined just among those studies conducted in the United States, the range of drug overdose death rates was comparable to the overall rate, ranging from 0.21 per 100 person-years to 0.61 per 100 person-years, thus estimation was done with the overall meta-analyzed drug overdose rate of 0.52 per 100 person-years. Given an event rate of 0.52 per 100 person-years, we can estimate the number of people who have OUD if we know the number of drug overdoses in a particular area, and divide that number by 0.52 per 100 person-years, to provide an estimate of the OUD population.

Note that Larney et al. examined the risk for all overdose deaths regardless of the drug that caused the overdose (the majority of the overdose deaths among individuals with OUD include opioids, but other drugs may cause or contribute to opioids when used contemporaneously);[238] thus, the rate of 0.52 per 100 person-years would include overdose deaths from opioids, as well as other drugs. To summarize, 0.52 per 100 person-years is the overall overdose death rate among those with OUD; thus, dividing the number of total overdose deaths (including but not limited to opioids) by 0.52 per 100 person-years, I obtain an estimate of the size of the population with OUD.

However, the application of the 0.52 per 100 person-years estimate needs to be adjusted for the increase in the death rate that occurred after fentanyl adulteration. The studies included in the Larney et al. study were published before the outbreak of fentanyl-induced deaths, so the estimated

54

overdose death rate of 0.52 per 100 person-years is likely an underestimate of the total mortality risk among those with OUD. Therefore, it is appropriate to apply a correction to the estimate in Larney et al. Specifically, that the estimated overdose event rate from synthetic opioid use is approximately three times that of heroin based on available literature (the overdose rate due to heroin and synthetic non-methadone opioids increased by a factor of three from 2011 to 2015).[239,240] With the available evidence regarding the proportion of overdose deaths that are due to synthetic opioids versus other drugs, I applied a death rate three times higher than what is reported in Larney et al. for the proportion of cases that is attributable to synthetic opioids. Based on the CDC Wonder Multiple Cause of Death 1999-2019 database, in 2019 in Lake and Trumbull Counties respectively, approximately 78% and 81% of the overdose deaths were due to synthetic opioids (compared to, for example just 38% and 31% in 2015) based on publicly available vital statistics data.

In Lake County, the number of drug overdoses in 2019, the most recent year of available data, is 79, and an estimated 78% of those deaths are attributable to synthetic opioids. Thus, assuming a death rate of 0.52 per 100 person-years for 22% the underlying population of opioid users and a death rate of 1.56 among 78% of the underlying population individuals with OUD, I estimate that there are approximately 5,934 individuals who have OUD in Lake County, who may be in need of treatment services. Using the confidence interval provided by Larney et al. (2019), we can estimate a plausible range of the number of individuals who have OUD as 5,867 to 5,994. There are an estimated 230,149 people in Lake, thus this estimate indicates that the prevalence of OUD in Lake County is approximately 2.6%. In Trumbull County, the number of drug overdoses in 2019 is 103, and an estimated 81% of those deaths are attributable to synthetic opioids. Thus, assuming a death rate of 0.52 per 100 person-years for 19% the underlying population of opioid users and a death rate of 1.56 among 81% of the underlying population individuals with OUD, I estimate that there are approximately 7,560 individuals who have OUD in Trumbull County, who may be in need of treatment services. Using the confidence interval provided by Larney et al. (2019), we can estimate a plausible range of the number of individuals who have OUD as 7,487 to 7,624. There are an estimated 197,974 people in Trumbull; thus this estimate indicates that the prevalence of OUD in Trumbull County is approximately 3.8%.

It should be noted that even an estimate of 2-4% prevalence is likely an underestimate, given that Larney et al. reports on death rates among "extramedical" opioid users. In 2017, 61.4 opioid prescriptions were dispensed for every 100 people in Lake County and 80.4 opioid prescriptions were dispensed for every 100 people in Trumbull County based on IQVIA estimates provided by the CDC.[241] Even among those who are prescribed opioids who do not concurrently or subsequently use non-medically, credible reviews and meta-analyses suggest that approximately 8-12% of individuals who use opioid analgesic prescriptions for prolonged periods of time will develop moderate to severe opioid use disorder, and 21-29% will develop mild to severe disorders.[36] It is accepted epidemiologic practice to base projections on reasonable inferences from the data, especially where multiple data sources and analytic methods are employed.

*Number of individuals with opioid use disorder across time.* Based on the methodology above, I can estimate the total number and prevalence of opioid use disorder in the US, Ohio, Lake County and Trumbull County by year.  By way of summary, I used the death rate among individuals with OUD from the most recent meta-analysis of cohort studies in order to anchor my estimation the best available literature. This meta-analysis includes a number of cohorts that are based in the US and North America, and estimates are generalizable. I made an additional modification to the estimates in order to examine prevalence data across time, based on higher death rate from opioids that is commensurate with the adulteration of the opioid supply with high-potency synthetic opioids.

Specifically, for each year, I estimated the proportion of overdose deaths in which synthetic opioids were listed as a contributing cause. I then weighted each year for the higher death rate from synthetic opioids that would be expected. That is, an individual using non-synthetic opioids has a lower risk of death given each use than an individual using high-potency synthetic opioids. The meta-analytic estimate provided by Larney et al. (2019) is based on cohorts prior to the introduction of high-potency synthetic opioids into the opioid supply, thus the death rate from opioids is likely lower in the meta-analysis than in recent years of opioid users.  Therefore, I adjusted each estimate for the death rates

| | US | | Ohio | | Lake County | | Trumbull County | |
|---|---|---|---|---|---|---|---|---|
| | N | Moving average | N | Moving average | N | Moving average | N | Moving average |
| 1999 | 2,990,919 | | 81,294 | | 1,923 | | 3,322 | |
| 2000 | 3,095,085 | | 96,669 | | 1,717 | | 2,747 | |
| 2001 | 3,386,189 | | 123,988 | | N/A | | 2,699 | |
| 2002 | 4,032,624 | 3,376,204 | 159,856 | 115,452 | 2,232 | 1,957 | 5,151 | 3,480 |
| 2003 | 4,502,448 | 3,754,087 | 132,898 | 128,353 | N/A | N/A | 3,606 | 3,551 |
| 2004 | 4,703,468 | 4,156,182 | 191,633 | 152,094 | 3,205 | 2,719 | 7,254 | 4,678 |
| 2005 | 5,111,092 | 4,587,408 | 205,570 | 172,489 | 3,813 | 3,083 | 5,802 | 5,453 |
| 2006 | 5,700,763 | 5,004,443 | 250,497 | 195,150 | 5,139 | 4,052 | 6,300 | 5,741 |
| 2007 | 6,177,370 | 5,423,173 | 268,219 | 228,980 | 5,229 | 4,347 | 11,302 | 7,665 |
| 2008 | 6,249,141 | 5,809,592 | 297,218 | 255,376 | 4,979 | 4,790 | 7,727 | 7,783 |
| 2009 | 6,236,336 | 6,090,903 | 208,502 | 256,109 | 2,868 | 4,554 | 5,229 | 7,640 |
| 2010 | 6,347,812 | 6,252,665 | 294,071 | 267,003 | 6,891 | 4,992 | 7,853 | 8,028 |
| 2011 | 7,093,750 | 6,481,760 | 335,544 | 283,834 | 8,289 | 5,757 | 9,947 | 7,689 |
| 2012 | 7,122,596 | 6,700,124 | 358,468 | 299,146 | 8,266 | 6,579 | 6,242 | 7,318 |
| 2013 | 7,412,955 | 6,994,278 | 395,749 | 345,958 | 7,928 | 7,844 | 7,254 | 7,824 |
| 2014 | 7,292,649 | 7,230,488 | 366,052 | 363,953 | 7,612 | 8,024 | 8,013 | 7,864 |
| 2015 | 7,406,957 | 7,308,789 | 365,606 | 371,469 | 5,682 | 7,372 | 11,159 | 8,167 |
| 2016 | 7,552,707 | 7,416,317 | 404,033 | 382,860 | 8,230 | 7,363 | 9,868 | 9,074 |
| 2017 | 7,415,786 | 7,417,025 | 412,734 | 387,106 | 7,803 | 7,332 | 11,572 | 10,153 |
| 2018 | 6,673,870 | 7,262,330 | 318,830 | 375,301 | 5,709 | 6,856 | 6,868 | 9,867 |
| 2019 | 6,654,789 | 7,074,288 | 332,317 | 366,979 | 5,934 | 6,919 | 7,560 | 8,967 |

Table 2. Estimated number of individuals with OUD in the US, Ohio, Lake County and Trumbull County

56



Figure 12. Prevalence of opioid use disorder in the United States, Ohio, Lake County, and Trumbull County

of synthetic and non-synthetic opioids to provide a more accurate total estimate of the number of opioid users. Adjustments for death rates and extrapolation from meta-analyses to estimate population sizes is a common and well-accepted practice in simulation techniques, including many simulations of opioid use and overdose in US and other populations.[242] Thus, the present methodology is standard practice in my field, and this type of methodology, using available literature estimates to extrapolate to population sizes, is one that I have used in numerous studies that are published in peer-reviewed journals.[243–245] Using this methodology, Figure 12 provides my estimate of the prevalence of OUD in the US, Ohio, Lake County, and Trumbull County from 1999 through 2019. Table 2 provides the numbers of OUD cases, multiplying the prevalence by estimates of population size. Both Table 2 and Figure 12 show the estimate of the prevalence of OUD cases, and the moving averages, which were estimated by calculating the rolling average of rates over a period of 4 years. Based on the moving averages, cases in Lake County are estimated to range between 1,957 in 2004 to 8,024 in 2014 and cases in Trumbull County are estimated to range between 3,480 in 2002 to 10,153 in 2017.

Figure 13 below provides the distribution of my estimate of OUD cases in Lake and Trumbull Counties stratified by the proportion that I estimate are directly attributable to prescription opioids (opioid use disorder due to prescription opioids), and indirectly attributable to prescription opioids (opioid use disorder due to heroin, multiplied by the minimum estimate of the proportion of heroin OUD cases that initiated opioid use with prescription opioids) using the minimum estimate of the initiation of opioid use with non-medical prescription opioids based on analysis of NSDUH data described in Section I. This approach provides a conservative estimate of the indirect attribution of heroin use to prescription opioids.

### D. Consequences of opioid use, disorder, and overdose for children in Lake County and Trumbull County



Figure 13. Number of individuals with opioid use disorder overall, directly attributable to prescription opioids, and indirectly attributable to prescription opioids

We estimated the burden of harm for Lake County and Trumbull County. US Census estimates that the population size of Lake County is 230,149 individuals as of 2019.[246] Approximately 19.7% of the population is under 18, thus there are approximately 45,339 children. US Census estimates that the population size of Trumbull County is 197,974 individuals as of 2019.[246] Approximately 20.3% of the population is under 18; thus

there are approximately 40,189 children Available evidence suggests that a significant number of children have, and will, experience substantial harm.

Given that I estimated that 5,934 individuals in Lake County and 7,560 individuals in Trumbull County experience mild to severe OUD, there are likely serious consequences of opioid use to children in these counties. While it is unknown what proportion of Lake and Trumbull County opioid users are parents, planning for public health would suggest that administrators should be inclusive when estimating burden. Census data indicates that approximately 60% of Lake residents and 58% of Trumbull residents are between 18-64, a reasonable range for individuals parenting dependents 0-17 years old, thus, if 60% of the 5,934 individuals in Lake and 58% of the 7,560 individuals in Trumbull are parents of at least one child, then an upper bound estimate is that approximately 3,560 children in Lake County and 4,385 children in Trumbull County are potentially exposed to parental opioid use during development.[247] In terms of consequences to developing fetuses and neonates, available data from Lake County and Trumbull County suggests a substantial burden of NAS in both counties, as detailed in Table 1.

Children in Lake County and Trumbull County are expected to experience a large burden of psychiatric disorders and learning disorders throughout pre-school and school-age developmental periods due to in utero exposure to opioids as well as parental opioid use during development. Available estimates indicate that rates of psychiatric and learning disorders are approximately 2-3 times higher among children who experience parental drug use and parental separation or death, with ADHD, depression/anxiety, and PTSD among the leading disorders of children associated with parental drug use. The table below provides the US estimates[248] of any child mood disorder (including major depression, dysthymia, and bipolar), any anxiety disorder (including agoraphobia, generalized anxiety disorder, social phobia, specific phobia, panic disorder, post-traumatic stress disorder, and separation anxiety disorder), attention deficit hyperactivity disorder (ADHD), substance use disorder (including alcohol abuse/dependence and drug abuse/dependence), and any learning disability (based on a general population survey of parents querying whether a doctor, health professional, or school official ever told a parents that their child has a 'learning disability').[249] Given that the literature review conducted above indicates that in general, children who experience parental substance use have rates of disorders that are 2x to 3x times higher than other children, and that I estimate an upper bound for the number of children exposed to parental opioid use in Lake County of 3,560 and Trumbull County of 4,385, Table 3 provides the estimated number of children in each county who should be provided counseling, psychiatric and learning services during school age.

| Table 3. Approximate number of children in Lake County and Trumbull County in need of psychiatric and other services to manage symptoms | | | | |
|---|---|---|---|---|
| | Prevalence in the general population[248] | Estimated prevalence among children exposed to parental drug use (2x to 3x higher risk) | Number of children in Lake County potentially needing psychiatric or other services to manage symptoms due to parental opioid | Number of children in Trumbull County potentially needing psychiatric or other services to manage symptoms due |

| | | | use | to parental opioid use |
|---|---|---|---|---|
| Any mood disorder | 14.3% | 28.6 to 42.9% | 1,018 to 1,527 | 1,254 to 1,881 |
| Any anxiety disorder | 31.9% | 63.8 to 95.7% | 2,271 to 3,407 | 2,798 to 4,196 |
| ADHD | 8.7% | 17.4 to 26.1% | 619 to 929 | 763 to 1,144 |
| Any substance use disorder | 11.4% | 22.8 to 34.2% | 811 to 1,218 | 1,000 to 1,500 |
| Learning disability | 9.7% | 19.4 to 29.1% | 691 to 1,036 | 851 to 1,276 |

In summary, due to the high burden of opioid use, opioid use disorder, and the sequelae of these disorders for families and children, there is a high burden of need in Lake County and Trumbull County at each point in development. Pregnant women require evidence-based prenatal care including medication for opioid use disorder as needed; neonates require monitoring for congenital abnormalities, neonatal withdrawal, and growth and weight restriction; developing children need support for potential parental death, incarceration, abuse and neglect, as well as psychiatric disorders and learning problems as a result of parental substance use.

These estimates were supported in interviews with local officials in Lake and Trumbull Counties, including April Caraway and Lauren Thorp from the Trumbull County Mental Health and Recovery Board, and Kim Fraser, who directs the ADAMHS Board in Lake County. They confirmed that families are in need of additional support services throughout the counties, and that the children of individuals with opioid use disorders remain in need of extensive supports. This was also confirmed in reviewing documents produced to me in the litigation. For example, the executive director of the Children's Service for Trumbull County noted that in 2017, the number of children in care in Trumbull county increased "at an alarming rate of 11%" from 2016 to 2017, and increase that he attributes to parents with untreated opioid use disorder.[250]

E.     **Quantifying the proportion of opioid death that is attributable to prescription opioids.**

Given that approximately 70-80% of individuals who use opioids will first use prescription opioids before other drugs such as heroin, and that the preponderance of evidence support the conclusion that prescription opioid use is causally associated with heroin and other opioid use, it is reasonable to conclude that a substantial proportion of heroin and other opioid deaths in the United States, and in Lake and Trumbull Counties, are attributable to prescription opioid use.  That is, prescription opioid distribution and the first wave of the opioid epidemic set the stage for all that has followed, and the evidence indicates that had the prescription opioid epidemic not occurred, there would be no heroin and high-potency synthetic overdose crisis.  I designate between deaths that are directly attributable to prescription opioids, which include those for which prescription opioids were listed as a contributing factor on the death certificate. Deaths indirectly attributable to prescription opioids include opioid deaths for which prescription opioids were not listed on the death certificate, but that we can conservatively estimate can be attributed to the initiation of opioid use with prescription opioids.

Indeed, using the estimates that I derived from existing studies to estimate the total proportion of regular and dependent opioid users in Lake County and Trumbull County, I can

provide a conservative estimate of the extent to which these cases are directly attributable to prescription opioids (prescription opioid listed as a contributing factor) as well as indirectly attributable to prescription opioids (prescription opioids not listed as a contributing factor to the death, but the death remains attributable based on the estimate that opioid use most often begins with prescription opioids). The causal attribution of these cases to an initial set of causes and conditions follows the epidemiological standard of component causes theories, articulated by both Rothman and others in well-accepted epidemiological textbooks,[251] including my own.[11,252] A factor is a component cause if it is a necessary but insufficient cause of at least some cases of the outcome, in this case regular or dependent use of opioids. That is, among those who are currently using a non-prescription opioid such as heroin, prescription opioids are a component cause if among some of those individuals, the heroin use would not have occurred without the initial use of prescription opioids.

First, the proportion of individuals with opioid use disorder that are directly attributable to prescription opioids in each year can be estimated by applying the annual ratio of prescription opioid use disorder to total opioid use disorder based on NSDUH data. Specifically, this ratio is calculated using rates of prescription opioid use disorder and heroin use disorder for Ohio (NSDUH restricted-use data analysis system [RDAS]), the 10.4% overlap of heroin use disorder and prescription opioid use disorder (NSDUH RDAS), and the populations of Lake County and Trumbull County (CDC Wonder). Second, for those cases that are not directly attributable to prescription opioids, I estimate that a substantial proportion remain attributable to prescription opioids. Indeed, available literature reliably indicates that 70-80% of individuals who use heroin and other opioids also used prescription opioids prior to the start of heroin and other opioid use. In



Figure 14. Number of deaths attributable to opioids overall, directly attributable to prescription opioids, and indirectly attributable to prescription opioids

providing an estimate for the proportion of OUD and opioid deaths indirectly attributable to prescription opioids, I selected the most conservative approach that would provide the lower bound of the proportion that can be attributed to prescription opioids. To do so, I used the percentage of respondents reporting lifetime heroin use who first used prescription drugs before or at the same age as first use of heroin, and averaged this across NSDUH years with available data (2008-2014). The coding follows that of the Cerda et al. 2015 paper, "Nonmedical Prescription Opioid Use in Childhood and Early Adolescence Predicts Transitions to Heroin Use in Young Adulthood: A National Study."[169] However, this methodology provides a conservative estimates compared to the existing literature, for several reasons. First, as discussed throughout this report, the NSDUH is primarily a household sample and does not include individuals who are incarcerated or in other institutional settings, and under-represents heroin and other drug users. Indeed, as noted in other sections of this report, the estimate of individuals with OUD is substantially under-estimated in the NSDUH data, and as such, the reports of non-medical prescription opioid use are likely under-reports as well. Second, the NSDUH data that I analyzed asked survey respondents specifically about their history of non-medical prescription opioid use,

thus under-counting initiation with prescription opioids obtained in a medical setting. Thus, estimating the proportion of non-medical prescription opioid use that preceded heroin use among NSDUH respondents provides the most conservative, or minimum-bound, approach to estimating the proportion of OUD cases and deaths for which prescription opioids were not listed as a contributing factor that are indirectly attributable to prescription opioids in Ohio and Lake and Trumbull Counties. Using this methodology, I estimated the proportion of heroin users who report non-medical prescription opioid use at an age equal to or prior to the age in which they began using heroin. Across years, this prevalence estimate ranged from 45.5 in 2006 to 62.8 in 2014. Averaging across those years, a minimum of 53.4% of opioid use disorder cases and deaths in Lake County and Trumbull County are indirectly attributable to prescription opioids, averaged across years from 2006 to 2014. Figure 14 provides the number of individuals with opioid use disorder that I estimate to due directly to prescription opioids, indirectly due to prescription opioids, and the total attributable to prescription opioids. The average of 53.4% is lower than the broader literature estimate that 70-80% of individuals who use heroin and other illicit opioids begin with prescription opioids; this is expected, given the undercounting of these cases in the NSDUH data, thus the two estimates are quite comparable – at minimum, more than half of heroin OUD cases and deaths are attributable to prescription opioids, and the broader literature supports that had all heroin and other illicit opioid cases been sampled, the true proportion is close to three quarters.

Using the same methodology outlined above, I can estimate the minimum of the total number of deaths from opioid overdose in Lake County and Trumbull County that are directly and indirectly due to prescription opioids, as well as deaths due to non-prescription opioids. Opioid overdose deaths for which a prescription opioid was listed on the death certificate as a contributing cause are deemed directly due to prescription opioids. Among other deaths, I estimate that a minimum of 53.4% of deaths are indirectly due to prescription opioids, given the NSDUH data estimates of the proportion of non-prescription opioid use disorder for which prescription opioids were a preceding substance use. Therefore, Figure 14 provides the total number of opioid overdose deaths in Lake County and Trumbull County for each year from 2006 through 2019, with the number directly attributable and minimum number indirectly attributable to prescription opioids.

*Summary*. Both Lake and Trumbull County experienced a high burden as result of the opioid epidemic. This is evident through examination of drug poisoning deaths, including prescription opioids, heroin, and synthetic opioids. There remains a substantial burden of unmet treatment need in Lake and Trumbull Counties, and a high prevalence of opioid use disorder. The collateral damage of the opioid epidemic is experienced throughout Lake and Trumbull Counties, including by children and families of those affected by overdose, who have higher rates of psychiatric disorders and other detrimental health outcomes.

Executed on:   April 16, 2021

Katherine Keyes

61

**References**

1. Negussie Y, Geller. Getting to Zero Alcohol-Impaired Driving Fatalities: A Comprehensive Approach to a Persistent Problem. Negussie Y, Geller A, Teutsch SM, eds. Published online January 2018. doi:10.17226/24951

2. Wilson N, Kariisa M, Seth P, Smith H, Davis NL. Drug and Opioid-Involved Overdose Deaths — United States, 2017–2018. *MMWR Morb Mortal Wkly Rep.* 2020;69(11):290-297. doi:10.15585/mmwr.mm6911a4

3. Hedegaard H, Warner M, Miniño AM. *Drug Overdose Deaths in the United States, 1999–2015.*; 2017.

4. Rudd RA, Aleshire N, Zibbell JE, Matthew Gladden R. Increases in Drug and Opioid Overdose Deaths - United States, 2000-2014. *Am J Transplant.* 2016;16(4):1323-1327. doi:10.1111/ajt.13776

5. Centers for Disease Control and Prevention. Wide-ranging online data for epidemiologic research (WONDER) data: Multiple cause of death data for years 1999-2019. Published online 2020.  Available at http://wonder.cdc.gov.

6. Ahmad F, Rossen L, Sutton P. Provisional drug overdose death counts. *Natl Cent Heal Stat.* Published online 2020.

7. Centers for Disease Control and Prevention. Opioid overdose - commonly used terms. Published online 2019.

8. Hughes A, Williams M, Lipari RN, Bose J, Copello EAP, Kroutil LA. Prescription Drug Use and Misuse in the United States: Results from the 2015 National Survey on Drug Use and Health. *NSDUH Data Rev.* Published online 2016.

9. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (DSM-IV-TR). Published online 2000.

10. Slavova S, O'Brien DB, Creppage K, et al. Drug Overdose Deaths: Let's Get Specific. *Public Health Rep.* 2015;130(4):339-342. doi:10.1177/003335491513000411

11. Keyes KM, Galea S. *Epidemiology Matters: A New Introduction to Methodological Foundations.* Oxford University Press; 2014.

12. Hill AB. The environment and disease: Association or causation? *Proc R Soc Med.* 1965;58(5):295-300.

13. Shimonovich M, Pearce A, Thomson H, Keyes K, Katikireddi SV. Assessing causality in epidemiology: revisiting Bradford Hill to incorporate developments in causal thinking. *Eur J Epidemiol.* Published online December 2020. doi:10.1007/s10654-020-00703-7

14. Callaham ML, Baxt WG, Waeckerle JF, Wears RL. Reliability of editors' subjective quality ratings of peer reviews of manuscripts. *JAMA.* 1998;280(3):229-231.

15. DeVito NJ, Goldacre B. Catalogue of bias: publication bias. *BMJ Evidence-Based Med.* Published online December 2018. doi:10.1136/bmjebm-2018-111107

16. Goldacre B, Drysdale H, Marston C, et al. COMPare: Qualitative analysis of researchers' responses to critical correspondence on a cohort of 58 misreported trials. *Trials.* 2019;20(1):124. doi:10.1186/s13063-019-3172-3

17. Fontanarosa P, Bauchner H. Conflict of Interest and Medical Journals. *JAMA.* 2017;317(17):1768-1771. doi:10.1001/jama.2017.4563

18. Ahn R, Woodbridge A, Abraham A, et al. Financial ties of principal investigators and randomized controlled trial outcomes: cross sectional study. *BMJ.* 2017;356:i6770. doi:10.1136/bmj.i6770

19. Paulozzi LJ, Baldwin GT, Franklin GM, et al. CDC Grand Rounds: Prescription Drug

Overdoses—a U.S. Epidemic. *Morb Mortal Wkly Rep.* 2012;61(01):10-13.

20.  US Department of Justice; Drug Enforcement Administration. Automation of Reports and Consolidated Orders System (ARCOS).

21.  Dart RC, Surratt HL, Cicero TJ, et al. Trends in Opioid Analgesic Abuse and Mortality in the United States. *N Engl J Med.* 2015;372(3):241-248. doi:10.1056/NEJMsa1406143

22.  Volkow ND. *America's Addiction to Opioids: Heroin and Prescription Drug Abuse.*; 2014.

23.  Van Zee A. The promotion and marketing of OxyContin: Commercial triumph, public health tragedy. *Am J Public Health.* 2009;99(2):221-227. doi:10.2105/AJPH.2007.131714

24.  Fickweiler F, Fickweiler W, Urbach E. Interactions between physicians and the pharmaceutical industry generally and sales representatives specifically and their association with physicians' attitudes and prescribing habits: a systematic review. *BMJ Open.* 2017;7(9):e016408. doi:10.1136/bmjopen-2017-016408

25.  DeJong C, Aguilar T, Tseng C-W, Lin GA, Boscardin WJ, Dudley RA. Pharmaceutical Industry–Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries. *JAMA Intern Med.* 2016;176(8):1114-1122. doi:10.1001/jamainternmed.2016.2765

26.  Hadland SE, Cerda M, Li Y, Krieger MS, Marshall BDL. Association of pharmaceutical industry marketing of opioid products to physicians with subsequent opioid prescribing. *JAMA Intern Med.* 2018;178(6):861-863. doi:10.1001/jamainternmed.2018.1999

27.  Hadland SE, Krieger MS, Marshall BDL. Industry payments to physicians for opioid products, 2013–2015. *Am J Public Health.* 2017;107(9):1493-1495. doi:10.2105/AJPH.2017.303982

28.  Hadland SE, Rivera-Aguirre A, Marshall BDL, Cerdá M. Association of pharmaceutical industry marketing of opioid products with mortality from opioid-related overdoses. *JAMA Netw Open.* 2019;2(1):e186007-e186007. doi:10.1001/jamanetworkopen.2018.6007

29.  Schieber LZ, Guy GPJ, Seth P, et al. Trends and patterns of geographic variation in opioid prescribing practices by state, United States, 2006-2017. *JAMA Netw Open.* 2019;2(3):e190665. doi:10.1001/jamanetworkopen.2019.0665

30.  Porter J, Jick H. Addiction rare in patients treated with narcotics. *N Engl J Med.* 1980;302(2):123.

31.  ASPPH Task Force on Public Health Initiatives to Address the Opioid Crisis. Bringing science to bear on opioids: report and recommendations from the ASPPH task force on public health initiatives to address the opioid crisis. Published online 2019.

32.  Evans P. Narcotic addiction in patients with chronic pain. *Anaesthesia.* 1981;36(6):597-602.

33.  Maruta T, Swanson DW, Finlayson RE. Drug abuse and dependency in patients with chronic pain. *Mayo Clin Proc.* 1979;54(4):241-244.

34.  Bouckoms AJ, Masand P, Murray GB, Cassem EH, Stern TA, Tesar GE. Chronic nonmalignant pain treated with long-term oral narcotic analgesics. *Ann Clin Psychiatry.* 1992;4(3):185-192. doi:10.3109/10401239209149570

35.  Manchikanti L, Pampati V, Damron KS, Beyer CD, Barnhill RC, Fellows B. Prevalence of prescription drug abuse and dependency in patients with chronic pain in western Kentucky. *J Ky Med Assoc.* 2003;101(11):511-517.

36.  Vowles KE, McEntee ML, Julnes PS, Frohe T, Ney JP, van der Goes DN. Rates of opioid misuse, abuse, and addiction in chronic pain: a systematic review and data synthesis. *Pain.* 2015;156(4).

37.  Meltzer EC, Rybin D, Saitz R, et al. Identifying prescription opioid use disorder in primary care: diagnostic characteristics of the Current Opioid Misuse Measure (COMM). *Pain.* 2011;152(2):397-402. doi:10.1016/j.pain.2010.11.006

38.    Substance Abuse and Mental Health Services Administration. *Impact of the DSM-IV to DSM-5 Changes on the National Survey on Drug Use and Health*. Substance Abuse and Mental Health Services Administration; 2016.

39.    Jamison RN, Butler SF, Budman SH, Edwards RR, Wasan AD. Gender Differences in Risk Factors for Aberrant Prescription Opioid Use. *J Pain*. 2010;11(4):312-320. doi:https://doi.org/10.1016/j.jpain.2009.07.016

40.    Edlund M, Sullivan M, Steffick D, Harris K, Wells K. Do users of regularly prescribed opioids have higher rates of substance use problems than nonusers? *Pain Med*. 2007;8(8):647-656. doi:10.1111/j.1526-4637.2006.00200.x

41.    Cowan D, Wilson-Barnett J, Griffiths P, Allan L. A survey of chronic noncancer pain patients prescribed opioid analgesics. *Pain Med*. 2003;4(4):340-351.

42.    Schneider J, Kirsh K. Defining clinical issues around tolerance, hyperalgesia, and addiction: a quantitative and qualitative outcome study of long-term opioid dosing in a chronic pain practice. *J Opioid Manag*. 2010;6(6):385-395.

43.    Association of Schools and Programs of Public Health. Bringing science to bear on opioids: report and recommendations from the ASPPH task force on public health initiatives to address the opioid crisis. Published online 2019.

44.    Fishbain D, Cole B, Lewis J, Rosomoff H, Rosomoff R. What percentage of chronic nonmalignant pain patients exposed to chronic opioid analgesic therapy develop abuse/addiction and/or aberrant drug-related behaviors? A structured evidence-based review. *Pain Med*. 2008;9(4):444-459. doi:10.1111/j.1526-4637.2007.00370.x

45.    Turner JA, Calsyn DA, Fordyce WE, Ready LB. Drug utilization patterns in chronic pain patients. *Pain*. 1982;12(4):357-363. doi:10.1016/0304-3959(82)90180-4

46.    Katon W, Egan K, Miller D. Chronic pain: lifetime psychiatric diagnoses and family history. *Am J Psychiatry*. 1985;142(10):1156-1160. doi:10.1176/ajp.142.10.1156

47.    Fishbain DA, Rosomoff HL, Rosomoff RS. Drug abuse, dependence, and addiction in chronic pain patients. *Clin J Pain*. Published online 1992. doi:10.1097/00002508-199206000-00003

48.    Højsted J, Sjøgren P. Addiction to opioids in chronic pain patients: a literature review. *Eur J Pain*. 2007;11(5):490-518. doi:10.1016/j.ejpain.2006.08.004

49.    Noble M, Treadwell JR, Tregear SJ, et al. Long-term opioid management for chronic noncancer pain. *Cochrane Database Syst Rev*. 2010;(1). doi:10.1002/14651858.CD006605.pub2

50.    Portenoy RK, Farrar JT, Backonja M-M, et al. Long-term use of controlled-release oxycodone for noncancer pain: results of a 3-year registry study. *Clin J Pain*. 2007;23(4):287-299. doi:10.1097/AJP.0b013e31802b582f

51.    Anderson VC, Burchiel KJ. A prospective study of long-term intrathecal morphine in the management of chronic nonmalignant pain. *Neurosurgery*. 1999;44(2):281-289.

52.    Minozzi S, Amato L, Davoli M. Development of dependence following treatment with opioid analgesics for pain relief: A systematic review. *Addiction*. 2013;108(4):688-698. doi:10.1111/j.1360-0443.2012.04005.x

53.    Martell BA, O'Connor PG, Kerns RD, et al. Systematic review: Opioid treatment for chronic back pain: Prevalence, efficacy, and association with addiction. *Ann Intern Med*. Published online 2007. doi:10.7326/0003-4819-146-2-200701160-00006

54.    Higgins C, Smith BH, Matthews K. Incidence of iatrogenic opioid dependence or abuse in patients with pain who were exposed to opioid analgesic therapy: a systematic review and meta-analysis. *Br J Anaesth*. 2018;120(6):1335-1344. doi:10.1016/j.bja.2018.03.009

55.    Dersh J, Mayer TG, Gatchel RJ, Polatin PB, Theodore BR, Mayer EAK. Prescription opioid

dependence is associated with poorer outcomes in disabling spinal disorders. *Spine (Phila Pa 1976)*. 2008;33(20):2219-2227. doi:10.1097/BRS.0b013e31818096d1

56. Adams EH, Breiner S, Cicero TJ, et al. A comparison of the abuse liability of tramadol, NSAIDs, and hydrocodone in patients with chronic pain. *J Pain Symptom Manage*. 2006;31(5):465-476. doi:10.1016/j.jpainsymman.2005.10.006

57. Cowan DT, Allan L, Griffiths P. A pilot study into the problematic use of opioid analgesics in chronic non-cancer pain patients. *Int J Nurs Stud*. 2002;39(1):59-69. doi:10.1016/s0020-7489(01)00003-7

58. Edlund MJ, Martin BC, Russo JE, DeVries A, Braden JB, Sullivan MD. The role of opioid prescription in incident opioid abuse and dependence among individuals with chronic noncancer pain: the role of opioid prescription. *Clin J Pain*. 2014;30(7).

59. Cepeda MS, Fife D, Ma Q, Ryan PB. Comparison of the risks of opioid abuse or dependence between tapentadol and oxycodone: results from a cohort study. *J Pain*. 2013;14(10):1227-1241. doi:10.1016/j.jpain.2013.05.010

60. Lagisetty P, Garpestad C, Larkin A, et al. Identifying individuals with opioid use disorder: Validity of International Classification of Diseases diagnostic codes for opioid use, dependence and abuse. *Drug Alcohol Depend*. 2021;221:108583. doi:10.1016/j.drugalcdep.2021.108583

61. Yang H, Pasalic E, Rock P, Davis JW, Nechuta S, Zhang Y. Interrupted time series analysis to evaluate the performance of drug overdose morbidity indicators shows discontinuities across the ICD-9-CM to ICD-10-CM transition. *Inj Prev*. 2021;27(S1):i35-i41. doi:10.1136/injuryprev-2019-043522

62. Edlund MJ, Martin BC, Russo JE, DeVries A, Braden JB, Sullivan MD. The Role of Opioid Prescription in Incident Opioid Abuse and Dependence Among Individuals With Chronic Noncancer Pain: The Role of Opioid Prescription. *Clin J Pain*. 2014;30(7).

63. Boscarino JA, Hoffman SN, Han JJ. Opioid-use disorder among patients on long-term opioid therapy: impact of final DSM-5 diagnostic criteria on prevalence and correlates. *Subst Abuse Rehabil*. 2015;6:83-91. doi:10.2147/SAR.S85667

64. Papadomanolakis-Pakis N, Moore KM, Peng Y, Gomes T. Prescription opioid characteristics at initiation for non-cancer pain and risk of treated opioid use disorder: A population-based study. *Drug Alcohol Depend*. 2021;221:108601. doi:10.1016/j.drugalcdep.2021.108601

65. Fleming MF, Balousek SL, Klessig CL, Mundt MP, Brown DD. Substance Use Disorders in a Primary Care Sample Receiving Daily Opioid Therapy. *J Pain*. 2007;8(7):573-582. doi:10.1016/j.jpain.2007.02.432

66. Butler SF, Budman SH, Fernandez K, Jamison RN. Validation of a screener and opioid assessment measure for patients with chronic pain. *Pain*. 2004;112(1-2):65-75. doi:10.1016/j.pain.2004.07.026

67. Katz NP, Sherburne S, Beach M, et al. Behavioral monitoring and urine toxicology testing in patients receiving long-term opioid therapy. *Anesth Analg*. 2003;97(4):1097-1102.

68. Mikosz CA, Zhang K, Haegerich T, et al. Indication-specific opioid prescribing for US patients with Medicaid or private insurance, 2017. *JAMA Netw Open*. 2020;3(5):e204514-e204514. doi:10.1001/jamanetworkopen.2020.4514

69. O'Brien C. Addiction and dependence in DSM-V. *Addiction*. 2011;106(5):866-867. doi:10.1111/j.1360-0443.2010.03144.x

70. Cosgrove L, Krimsky S. A comparison of DSM-IV and DSM-5 panel members' financial associations with industry: A pernicious problem persists. *PLOS Med*. 2012;9(3):e1001190.

71. Keyes KM, Geier T, Grant BF, Hasin DS. Influence of a drinking quantity and frequency

measure on the prevalence and demographic correlates of DSM-IV alcohol dependence. *Alcohol Clin Exp Res*. 2009;33(5):761-771. doi:10.1111/j.1530-0277.2009.00894.x

72. Keyes KM, Hasin DS. Socio-economic status and problem alcohol use: the positive relationship between income and the DSM-IV alcohol abuse diagnosis. *Addiction*. 2008;103(7):1120-1130. doi:10.1111/j.1360-0443.2008.02218.x

73. Hasin DS, Keyes KM, Alderson D, Wang S, Aharonovich E, Grant BF. Cannabis withdrawal in the United States: Results from NESARC. *J Clin Psychiatry*. 2008;69(9):1354-1363.

74. Keyes KM, Krueger RF, Grant BF, Hasin DS. Alcohol craving and the dimensionality of alcohol disorders. *Psychol Med*. 2011;41(3):629-640. doi:10.1017/S003329171000053X

75. Shmulewitz D, Keyes K, Beseler C, et al. The dimensionality of alcohol use disorders: Results from Israel. *Drug Alcohol Depend*. 2010;111(1-2). doi:10.1016/j.drugalcdep.2010.04.002

76. Shmulewitz D, Keyes KM, Wall MM, et al. Nicotine dependence, abuse and craving: dimensionality in an Israeli sample. *Addiction*. 2011;106(9):1675-1686. doi:10.1111/j.1360-0443.2011.03484.x

77. Hasin DS, O'Brien CP, Auriacombe M, et al. DSM-5 criteria for substance use disorders: Recommendations and rationale. *Am J Psychiatry*. 2013;170(8):834-851. doi:10.1176/appi.ajp.2013.12060782

78. Bartels K, Mayes L, Dingmann C, Bullard K, Hopfer C, Binswanger IA. Opioid use and storage patterns by patients after hospital discharge following surgery. *PLoS One*. 2016;11(1):e0147972.

79. Maughan BC, Hersh E V, Shofer FS, et al. Unused opioid analgesics and drug disposal following outpatient dental surgery: a randomized controlled trial. *Drug Alcohol Depend*. 2016;168:328-334. doi:10.1016/j.drugalcdep.2016.08.016

80. Hill M, McMahon M, Stucke R, Barth R. Wide variation and excessive dosage of opioid prescription for common general surgical procedures. *Ann Surg*. 2017;265(4):709-714.

81. McDonald EM, Kennedy-Hendricks A, McGinty EE, Shields WC, Barry CL, Gielen AC. Safe storage of opioid pain relievers among adults living in households with children. *Pediatrics*. 2017;139(3):e20162161. doi:10.1542/peds.2016-2161

82. Lipari RN, Hughes A. How poeple obtain the prescription pain relievers they misuse. *CBHSQ Rep*. Published online 2017.

83. Inciardi JA, Surratt HL, Cicero TJ, Kurtz SP, Martin SS, Parrino MW. The "black box" of prescription drug diversion. *J Addict Dis*. 2009;28(4):332-347. doi:10.1080/10550880903182986

84. McCabe SE, Boyd CJ. Sources of prescription drugs for illicit use. *Addict Behav*. 2005;30(7):1342-1350. doi:10.1016/j.addbeh.2005.01.012

85. Boyd CJ, McCabe SE, Cranford JA, Young A. Prescription drug abuse and diversion among adolescents in a southeast Michigan school district. *Arch Pediatr Adolesc Med*. 2007;161(3):276-281. doi:10.1001/archpedi.161.3.276

86. Khan NF, Bateman BT, Landon JE, Gagne JJ. Association of opioid overdose with opioid prescriptions to family members. *JAMA Intern Med*. 2019;179(9):1186-1192. doi:10.1001/jamainternmed.2019.1064

87. Shei A, Rice JB, Kirson NY, et al. Sources of prescription opioids among diagnosed opioid abusers. *Curr Med Res Opin*. 2015;31(4):779-784. doi:10.1185/03007995.2015.1016607

88. Cicero TJ, Kurtz SP, Surratt HL, et al. Multiple Determinants of Specific Modes of Prescription Opioid Diversion. *J Drug Issues*. 2011;41(2):283-304.

89. Inciardi JA, Surratt HL, Cicero TJ, Beard RA. Prescription opioid abuse and diversion in an urban community: the results of an ultra-rapid assessment. *Pain Med*. 2009;10(3):537-548.

66

doi:10.1111/j.1526-4637.2009.00603.x

90.   Yang Z, Wilsey B, Bohm M, et al. Defining risk of prescription opioid overdose: pharmacy shopping and overlapping prescriptions among long-term opioid users in medicaid. *J Pain*. 2015;16(5):445-453. doi:10.1016/j.jpain.2015.01.475

91.   McDonald DC, Carlson KE. Estimating the prevalence of opioid diversion by "doctor shoppers" in the United States. *PLoS One*. 2013;8(7):e69241-e69241. doi:10.1371/journal.pone.0069241

92.   McDonald DC, Carlson KE. The ecology of prescription opioid abuse in the USA: geographic variation in patients' use of multiple prescribers ("doctor shopping"). *Pharmacoepidemiol Drug Saf*. 2014;23(12):1258-1267. doi:10.1002/pds.3690

93.   Cepeda MS, Fife D, Chow W, Mastrogiovanni G, Henderson SC. Opioid shopping behavior: how often, how soon, which drugs, and what payment method. *J Clin Pharmacol*. 2013;53(1):112-117. doi:10.1177/0091270012436561

94.   Gwira Baumblatt JA, Wiedeman C, Dunn JR, Schaffner W, Paulozzi LJ, Jones TF. High-risk use by patients prescribed opioids for pain and its role in overdose deaths. *JAMA Intern Med*. 2014;174(5):796-801. doi:10.1001/jamainternmed.2013.12711

95.   Cerda M, Ponicki W, Smith N, et al. Measuring relationships between proactive reporting state-level prescription drug monitoring programs and county-level fatal prescription opioid overdoses. *Epidemiology*. Published online October 2019. doi:10.1097/EDE.0000000000001123

96.   Smith N, Martins SS, Kim J, et al. A typology of prescription drug monitoring programs: a latent transition analysis of the evolution of programs from 1999 to 2016. *Addiction*. 2019;114(2):248-258. doi:10.1111/add.14440

97.   Fink DS, Schleimer JP, Sarvet A, et al. Association between prescription drug monitoring programs and nonfatal and fatal drug overdoses: a systematic review. *Ann Intern Med*. 2018;168(11):783-790. doi:10.7326/M17-3074

98.   Strickler GK, Zhang K, Halpin JF, Bohnert ASB, Baldwin GT, Kreiner PW. Effects of mandatory prescription drug monitoring program (PDMP) use laws on prescriber registration and use and on risky prescribing. *Drug Alcohol Depend*. 2019;199:1-9. doi:https://doi.org/10.1016/j.drugalcdep.2019.02.010

99.   Guy Jr. GP, Zhang K. Opioid prescribing by specialty and volume in the U.S. *Am J Prev Med*. 2018;55(5):e153-e155. doi:10.1016/j.amepre.2018.06.008

100.  Guy Jr GP, Zhang K, Schieber LZ, Young R, Dowell D. County-level opioid prescribing in the United States, 2015 and 2017. *JAMA Intern Med*. 2019;179(4):574-576. doi:10.1001/jamainternmed.2018.6989

101.  Rutkow L, Vernick JS, Alexander GC. More states should regulate pain management clinics to promote public health. *Am J Public Health*. 2017;107(2):240-243. doi:10.2105/AJPH.2016.303568

102.  Chang H-Y, Murimi I, Faul M, Rutkow L, Alexander GC. Impact of Florida's prescription drug monitoring program and pill mill law on high-risk patients: a comparative interrupted time series analysis. *Pharmacoepidemiol Drug Saf*. 2018;27(4):422-429. doi:10.1002/pds.4404

103.  Rutkow L, Smith KC, Lai AY, Vernick JS, Davis CS, Alexander GC. Prescription drug monitoring program design and function: a qualitative analysis. *Drug Alcohol Depend*. 2017;180:395-400. doi:https://doi.org/10.1016/j.drugalcdep.2017.08.040

104.  Martins SS, Ponicki W, Smith N, et al. Prescription drug monitoring programs operational characteristics and fatal heroin poisoning. *Int J Drug Policy*. 2019;74:174-180. doi:10.1016/j.drugpo.2019.10.001

105. Kennedy-Hendricks A, Richey M, McGinty EE, Stuart EA, Barry CL, Webster DW. Opioid overdose deaths and Florida's crackdown on pill mills. *Am J Public Health*. 2015;106(2):291-297. doi:10.2105/AJPH.2015.302953

106. Rutkow L, Chang HY, Daubresse M, Webster DW, Stuart EA, Alexander GC. Effect of Florida's Prescription Drug Monitoring Program and pill mill laws on opioid prescribing and use. *JAMA Intern Med*. 2015;175(10):1642-1649. doi:10.1001/jamainternmed.2015.3931

107. Lyapustina T, Rutkow L, Chang HY, et al. Effect of a "pill mill" law on opioid prescribing and utilization: The case of Texas. *Drug Alcohol Depend*. 2016;159:190-197. doi:10.1016/j.drugalcdep.2015.12.025

108. Brighthaupt SC, Stone EM, Rutkow L, McGinty EE. Effect of pill mill laws on opioid overdose deaths in Ohio & Tennessee: A mixed-methods case study. *Prev Med (Baltim)*. 2019;126:105736. doi:10.1016/j.ypmed.2019.05.024

109. Chen JH, Humphreys K, Shah NH, Lembke A. Distribution of Opioids by Different Types of Medicare Prescribers. *JAMA Intern Med*. 2016;176(2):259-261. doi:10.1001/jamainternmed.2015.6662

110. McCabe SE, West BT, Veliz P, McCabe V V, Stoddard SA, Boyd CJ. Trends in Medical and Nonmedical Use of Prescription Opioids Among US Adolescents: 1976–2015. *Pediatrics*. 2017;139(4):e20162387. doi:10.1542/peds.2016-2387

111. Miech RA, Johnston LD, O'Malley PM, Bachman JG, Schulenberg JE, Patrick ME. Monitoring the Future national survey results on drug use, 1975–2016: Volume I, secondary school students. Published online 2017.

112. McCabe SE, Schulenberg J, McCabe V V, Veliz PT. Medical use and misuse of prescription opioids in US 12th-grade youth: School-level correlates. *Pediatrics*. 2020;146(4). doi:10.1542/peds.2020-0387

113. Martins SS, Keyes KM, Storr CL, Zhu H, Grucza RA. Birth-Cohort Trends in Lifetime and Past-Year Prescription Opioid-Use Disorder Resulting From Nonmedical Use: Results From Two National Surveys. *J Stud Alcohol Drugs*. 2010;71(4):480-487. doi:10.15288/jsad.2010.71.480

114. Crane EH. Emergency department visits involving narcotic pain relievers. *CBHSQ Rep*. Published online 2015.

115. Atluri S, Sudarshan G, Manchikanti L. Assessment of the trends in medical use and misuse of opioid analgesics from 2004 to 2011. *Pain Physician*. 2014;17(2):E119-28.

116. *Treatment Episode Data Set (TEDS): 2005-2015. National Admissions to Substance Abuse Treatment Services*. Substance Abuse and Mental Health Services Administration; 2017.

117. U.S. Department of Health and Human Services: Substance Abuse and Mental Health Services Administration - Center for Behavioral Health Statistics and Quality. National Survey on Drug Use and Health. Published online 2018. https://datafiles.samhsa.gov/

118. Han B, Compton WM, Jones CM, Cai R. Nonmedical Prescription Opioid Use and Use Disorders Among Adults Aged 18 Through 64 Years in the United States, 2003-2013. *JAMA*. 2015;314(14):1468-1478. doi:10.1001/jama.2015.11859

119. Keyes KM, Rutherford C, Popham F, Martins SS, Gray L. How Healthy Are Survey Respondents Compared with the General Population?: Using Survey-linked Death Records to Compare Mortality Outcomes. *Epidemiology*. 2018;29(2):299-307. doi:10.1097/EDE.0000000000000775

120. Albizu-Garcia CE, Caraballo JN, Caraballo-Correa G, Hernandez-Viver A, Roman-Badenas L. Assessing need for medication-assisted treatment for opiate-dependent prison inmates. *Subst Abus*. 2012;33(1):60-69. doi:10.1080/08897077.2011.620462

68

121. Chandler RK, Fletcher BW, Volkow ND. Treating drug abuse and addiction in the criminal justice system: improving public health and safety. *JAMA*. 2009;301(2):183-190. doi:10.1001/jama.2008.976

122. Baggett TP. Overdose Fatality and Surveillance as a Method for Understanding Mortality Trends in Homeless Populations—Reply. *JAMA Intern Med*. Published online 2013. doi:10.1001/jamainternmed.2013.7766

123. Cano M, Huang Y. Overdose deaths involving psychostimulants with abuse potential, excluding cocaine: State-level differences and the role of opioids. *Drug Alcohol Depend*. Published online October 2020:108384. doi:10.1016/j.drugalcdep.2020.108384

124. Delgado MK, Huang Y, Meisel Z, et al. National variation in opioid prescribing and risk of prolonged use for opioid-naive patients treated in the emergency department for ankle sprains. *Ann Emerg Med*. 2018;72(4):389-400.e1. doi:10.1016/j.annemergmed.2018.06.003

125. *Number and Age-Adjusted Rates of Drug-Poisoning Deaths Involving Opioid Analgesics and Heroin: United States, 1999–2014*.; 2015.

126. Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G. Drug and Opioid-Involved Overdose Deaths—United States, 2013–2017. *Morb Mortal Wkly Rep*. 2019;67(5152):1419-1427.

127. Hedegaard H, Miniño AM, Warner M. Drug Overdose Deaths in the United States, 1999-2017: data tables for figures. NCHS Data Brief.

128. Hedegaard H, Miniño AM, Warner M. *Drug Overdose Deaths in the United States, 1999-2017*.; 2018.

129. Paulozzi LJ, Ryan GW. Opioid Analgesics and Rates of Fatal Drug Poisoning in the United States. *Am J Prev Med*. 2006;31(6):506-511. doi:10.1016/j.amepre.2006.08.017

130. Paulozzi LJ, Mack KA, Jones CM. Vital Signs: Risk for Overdose from Methadone Used for Pain Relief—United States, 1999-2010. *Morb Mortal Wkly Report2*. 2012;61.

131. Wisniewski AM, Purdy CH, Blondell RD. The epidemiologic association between opioid prescribing, non-medical use, and emergency department visits. *J Addict Dis*. 2008;27(1):1-11. doi:10.1300/J069v27n01_01

132. Ghertner R. U.S. county prevalence of retail prescription opioid sales and opioid-related hospitalizations from 2011 to 2014. *Drug Alcohol Depend*. 2019;194:330-335. doi:https://doi.org/10.1016/j.drugalcdep.2018.10.031

133. Brandenburg MA. Prescription opioids are associated with population mortality in US deep south middle-age non-hispanic whites: an ecological time series study. *Front Public Heal*. 2019;7:252.

134. Fischer B, Nakamura N, Urbanoski K, Rush B, Rehm J. Correlations between population levels of prescription opioid use and prescription-opioid-related substance use treatment admissions in the USA and Canada since 2001. *Public Health*. 2012;126(9):749-751. doi:10.1016/j.puhe.2012.04.010

135. Chren MM, Landefeld CS. Physicians' behavior and their interactions with drug companies. A controlled study of physicians who requested additions to a hospital drug formulary. *JAMA*. 1994;271(9):684-689.

136. Spurling GK, Mansfield PR, Montgomery BD, et al. Information from pharmaceutical companies and the quality, quantity, and cost of physicians' prescribing: a systematic review. *PLoS Med*. 2010;7(10):e1000352.

137. Carey CM, Lieber EMJ, Miller S. Drug firms' payments and physicians' prescribing behavior in Medicare Part D. Published online 2017:1-55.

138. Larkin I, Ang D, Steinhart J, et al. Association between academic medical center pharmaceutical detailing policies and physician prescribing. *JAMA*. 2017;317(17):1785-1795.

doi:10.1001/jama.2017.4039

139. DeJong C, Aguilar T, Tseng C-W, Lin GA, Boscardin WJ, Dudley RA. Pharmaceutical industry–sponsored meals and physician prescribing patterns for Medicare beneficiaries. *JAMA Intern Med*. 2016;176(8):1114-1122. doi:10.1001/jamainternmed.2016.2765

140. Hadland SE, Cerda M, Li Y, Krieger MS, Marshall BDL. Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians With Subsequent Opioid Prescribing. *JAMA Intern Med*. 2018;178(6):861-863. doi:10.1001/jamainternmed.2018.1999

141. Yeh JS, Franklin JM, Avorn J, Landon J, Kesselheim AS. Association of Industry Payments to Physicians With the Prescribing of Brand-name Statins in Massachusetts. *JAMA Intern Med*. 2016;176(6):763-768. doi:10.1001/jamainternmed.2016.1709

142. Hadland SE, Krieger MS, Marshall BDL. Industry Payments to Physicians for Opioid Products, 2013–2015. *Am J Public Health*. 2017;107(9):1493-1495. doi:10.2105/AJPH.2017.303982

143. Hadland SE, Rivera-Aguirre A, Marshall BDL, Cerda M. Association of Pharmaceutical Industry Marketing of Opioid Products With Mortality From Opioid-Related Overdoses. *JAMA Netw Open*. 2019;2(1):e186007. doi:10.1001/jamanetworkopen.2018.6007

144. Powell D, Pacula RL, Taylor E. How increasing medical access to opioids contributes to the opioid epidemic: e vidence from Medicare Part D. *J Health Econ*. 2020;71:102286. doi:10.1016/j.jhealeco.2019.102286

145. Centers for Disease Control and Prevention. Vital signs: overdoses of prescription opioid pain relievers - United States, 1999-2008. *Morb Mortal Wkly Rep*. 2011;60(43):1487-1492.

146. Jones CM, Mack KA, Paulozzi LJ. Pharmaceutical overdose deaths, United States, 2010. *JAMA*. 2013;309(7):657-659. doi:10.1001/jama.2013.272

147. Park TW, Saitz R, Ganoczy D, Ilgen MA, Bohnert ASB. Benzodiazepine prescribing patterns and deaths from drug overdose among US veterans receiving opioid analgesics: case-cohort study. *BMJ*. 2015;350:h2698. doi:10.1136/bmj.h2698

148. Larochelle MR, Zhang F, Ross-Degnan D, Wharam JF. Trends in opioid prescribing and co-prescribing of sedative hypnotics for acute and chronic musculoskeletal pain: 2001-2010. *Pharmacoepidemiol Drug Saf*. 2015;24(8):885-892. doi:10.1002/pds.3776

149. Saunders KW, Von Korff M, Campbell CI, et al. Concurrent use of alcohol and sedatives among persons prescribed chronic opioid therapy: prevalence and risk factors. *J Pain*. 2012;13(3):266-275. doi:10.1016/j.jpain.2011.11.004

150. Jones CM, McAninch JK. Emergency department visits and overdose deaths from combined use of opioids and benzodiazepines. *Am J Prev Med*. 2015;49(4):493-501. doi:10.1016/j.amepre.2015.03.040

151. Warner M, Chen LH, Makuc DM, Anderson RN, Miniño AM. Drug poisoning deaths in the United States, 1980-2008. *NCHS Data Brief*. 2011;(81):1-8.

152. Dowell D, Haegerich TM, Chou R. CDC guideline for prescribing opioids for chronic pain—United States, 2016. *JAMA*. 2016;315(15):1624-1645. doi:10.1001/jama.2016.1464

153. Jones JD, Mogali S, Comer SD. Polydrug abuse: a review of opioid and benzodiazepine combination use. *Drug Alcohol Depend*. 2012;125(1-2):8-18. doi:10.1016/j.drugalcdep.2012.07.004

154. Overdose Death Rates. National Institute on Drug Abuse.

155. Munzing T. Physician guide to appropriate opioid prescribing for noncancer pain. *Perm J*. 2017;21:16-169. doi:10.7812/TPP/16-169

156. Geissert P, Hallvik S, Van Otterloo J, et al. High-risk prescribing and opioid overdose: prospects for prescription drug  monitoring program-based proactive alerts. *Pain*.

2018;159(1):150-156. doi:10.1097/j.pain.0000000000001078

157. Tori ME, Larochelle MR, Naimi TS. Alcohol or benzodiazepine co-involvement with opioid overdose deaths in the United States, 1999-2017. *JAMA Netw Open*. 2020;3(4):e202361-e202361. doi:10.1001/jamanetworkopen.2020.2361

158. Mattson CL, Tanz L, Quinn K, Kariisa M, Patel P, Davis N. Trends and geographic patterns in drug and synthetic opioid overdose deaths — United States, 2013–2019. *MMWR*. 2021;70(6):202-207.

159. Martins SS, Sarvet A, Santaella-Tenorio J, Saha T, Grant BF, Hasin DS. Changes in US Lifetime Heroin Use and Heroin Use Disorder: Prevalence From the 2001-2002 to 2012-2013 National Epidemiologic Survey on Alcohol and Related Conditions. *JAMA Psychiatry*. 2017;74(5):445-455. doi:10.1001/jamapsychiatry.2017.0113

160. Ball JC, Englander DM, Chambers CD. The Incidence and Prevalence of Opiate Addiction in the United States. In: Ball JC, Chambers CD, eds. *The Epidemiology of Opiate Addiction in the United States*. Charles C. Thomas; 1970:68-78.

161. Kilmer B, Everingham S, Caulkins J, et al. *What America's Users Spend on Illegal Drugs: 2000-2010*.; 2014.

162. Cicero TJ, Ellis MS, Surratt HL, Kurtz SP. The changing face of heroin use in the United States: a retrospective analysis of the past 50 years. *JAMA Psychiatry*. 2014;71(7):821-826. doi:10.1001/jamapsychiatry.2014.366

163. Compton WM, Jones CM, Baldwin GT. Relationship between nonmedical prescription-opioid use and heroin use. *N Engl J Med*. 2016;374(2):154-163. doi:10.1056/NEJMra1508490

164. Mateu-Gelabert P, Guarino H, Jessell L, Teper A. Injection and sexual HIV/HCV risk behaviors associated with nonmedical use of prescription opioids among young adults in New York City. *J Subst Abuse Treat*. 2015;48(1):13-20. doi:10.1016/j.jsat.2014.07.002

165. Mars SG, Bourgois P, Karandinos G, Montero F, Ciccarone D. "Every 'Never' I Ever Said Came True": Transitions from opioid pills to heroin injecting. *Int J Drug Policy*. 2014;25(2):257-266. doi:https://doi.org/10.1016/j.drugpo.2013.10.004

166. Siegal HA, Carlson RG, Kenne DR, Swora MG. Probable relationship between opioid abuse and heroin use. *Am Fam Physician*. 2003;67(5):942,945.

167. Muhuri PK, Gfroerer JC, Davies C. Associations of nonmedical pain reliever use and initiation of heroin use in the United States. Published online 2013.

168. Banerjee G, Edelman EJ, Barry DT, et al. Non-medical use of prescription opioids is associated with heroin initiation among US veterans: a prospective cohort study. *Addiction*. Published online 2016. doi:10.1111/add.13491

169. Cerdá M, Santaella J, Marshall BDL, Kim JH, Martins SS. Nonmedical prescription opioid use in childhood and early adolescence predicts transitions to heroin use in young adulthood: A national study. *J Pediatr*. 2015;167(3):605-612. doi:10.1016/j.jpeds.2015.04.071

170. Grau LE, Dasgupta N, Harvey AP, et al. Illicit Use of Opioids: Is OxyContin® a "Gateway Drug"? *Am J Addict*. 2007;16(3):166-173. doi:10.1080/10550490701375293

171. Becker WC, Sullivan LE, Tetrault JM, Desai RA, Fiellin DA. Non-medical use, abuse and dependence on prescription opioids among U.S. adults: Psychiatric, medical and substance use correlates. *Drug Alcohol Depend*. 2008;94(1-3):38-47. doi:10.1016/j.drugalcdep.2007.09.018

172. Khosla N, Juon HS, Kirk GD, Astemborski J, Mehta SH. Correlates of non-medical prescription drug use among a cohort of injection drug users in Baltimore City. *Addict Behav*. 2011;36(12):1282-1287. doi:10.1016/j.addbeh.2011.07.046

173. Havens JR, Stoops WW, Leukefeld CG, et al. Prescription opiate misuse among rural stimulant users in a multistate community-based study. *Am J Drug Alcohol Abuse*.

2009;35(1):18-23. doi:10.1080/00952990802326298

174. Davis WR, Johnson BD. Prescription opioid use, misuse, and diversion among street drug users in New York City. *Drug Alcohol Depend.* 2008;92(1-3):267-276. doi:10.1016/j.drugalcdep.2007.08.008

175. Surratt HL, Inciardi JA, Kurtz SP. Prescription opioid abuse among drug-involved street-based sex workers. *J Opioid Manag.* 2006;2(5):283—289.

176. Lankenau SE, Teti M, Silva K, Bloom JJ, Harocopos A, Treese M. Initiation into prescription opioid misuse among young injection drug users. *Int J Drug Policy.* 2012;23(1):37-44. doi:10.1016/j.drugpo.2011.05.014

177. Pollini RA, Banta-Green CJ, Cuevas-Mota J, Metzner M, Teshale E, Garfein RS. Problematic use of prescription-type opioids prior to heroin use among young heroin injectors. *Subst Abuse Rehabil.* 2011;2(1):173-180. doi:10.2147/SAR.S24800

178. McCabe SE, Boyd CJ, Evans-Polce RJ, McCabe V V, Schulenberg JE, Veliz PT. Pills to powder: A 17-year transition from prescription opioids to heroin among US adolescents followed into adulthood. *J Addict Med.* Published online September 2020. doi:10.1097/ADM.0000000000000741

179. McCabe SE, Veliz PT, Boyd CJ, Schepis TS, McCabe V V, Schulenberg JE. A prospective study of nonmedical use of prescription opioids during adolescence and subsequent substance use disorder symptoms in early midlife. *Drug Alcohol Depend.* 2019;194:377-385. doi:10.1016/j.drugalcdep.2018.10.027

180. Gaines TL, Wagner KD, Mittal ML, et al. Transitioning from pharmaceutical opioids: A discrete-time survival analysis of heroin initiation in suburban/exurban communities. *Drug Alcohol Depend.* 2020;213:108084. doi:10.1016/j.drugalcdep.2020.108084

181. Centers for Disease Control and Prevention. Lung cancer statistics. Published online 2019.

182. National Institute on Drug Abuse. What is the scope of heroin use in the United States? Published online 2018.

183. Jones CM. Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers - United States, 2002-2004 and 2008-2010. *Drug Alcohol Depend.* 2013;132(1-2):95-100. doi:10.1016/j.drugalcdep.2013.01.007

184. Alpert A, Powell D, Pacula RL. Supply-side drug policy in the presence of substitutes: evidence from the introduction of abuse-deterrent opioids. *Am Econ J Econ Policy.* 2018;10(3):1-35.

185. Hess R, Stiebler G, Herz A. Pharmacokinetics of fentanyl in man and the rabbit. *Eur J Clin Pharmacol.* 1972;4(3):137-141.

186. *Influx of Fentanyl-Laced Counterfeit Pills and Toxic Fentanyl-Related Compounds Further Increases Risk of Fentanyl-Related Overdose and Fatalities.* Centers for Disease Control Health Alert Network; 2016.

187. Case A, Deaton A. Rising morbidity and mortality in midlife among white non-Hispanic Americans in the 21st century. *Proc Natl Acad Sci.* 2015;112(49):15078-15083. doi:10.1073/pnas.1518393112

188. Ruhm CJ. Deaths of Despair or Drug Problems? *NBER Work Pap Ser.* 2018;24188.

189. Masters RK, Tilstra AM, Simon DH. Explaining recent mortality trends among younger and middle-aged White Americans. *Int J Epidemiol.* 2018;47(1):81-88. doi:10.1093/ije/dyx127

190. National Acadamies of Sciences Engineering and Medicine. *High and Rising Mortality Rates Among Working-Age Adults.* (Harris KM, Majmundar M, Becker T, eds.). The National Academies Press; 2021. doi:10.17226/25976

191. Monnat SM. Factors Associated With County-Level Differences in U.S. Drug-Related

Mortality Rates. *Am J Prev Med*. 2018;54(5):611-619. doi:10.1016/j.amepre.2018.01.040
192. Hollingsworth A, Ruhm CJ, Simon K. Macroeconomic conditions and opioid abuse. *J Health Econ*. 2017;56:222-233. doi:https://doi.org/10.1016/j.jhealeco.2017.07.009
193. Pear VA, Ponicki WR, Gaidus A, et al. Urban-rural variation in the socioeconomic determinants of opioid overdose. *Drug Alcohol Depend*. 2019;195:66-73. doi:10.1016/j.drugalcdep.2018.11.024
194. Single EW. The availability theory of alcohol-related problems. *Theor Alcohol*. Published online 1988:325-351.
195. Skog O -J. The Collectivity of Drinking Cultures: A Theory of the Distribution of Alcohol Consumption. *Br J Addict*. 1985;80(1):83-99. doi:10.1111/j.1360-0443.1985.tb05294.x
196. Babor T. *Alcohol: No Ordinary Commodity: Research and Public Policy*. Oxford University Press; 2010.
197. Anderson P, Chisholm D, Fuhr DC. Effectiveness and cost-effectiveness of policies and programmes to reduce the harm caused by alcohol. *Lancet*. 2009;373(9682):2234-2246. doi:10.1016/S0140-6736(09)60744-3
198. Campbell CA, Hahn RA, Elder R, et al. The Effectiveness of Limiting Alcohol Outlet Density As a Means of Reducing Excessive Alcohol Consumption and Alcohol-Related Harms. *Am J Prev Med*. 2009;37(6):556-569. doi:10.1016/j.amepre.2009.09.028
199. Popova S, Giesbrecht N, Bekmuradov D, Patra J. Hours and Days of Sale and Density of Alcohol Outlets: Impacts on Alcohol Consumption and Damage: A Systematic Review. *Alcohol Alcohol*. 2009;44(5):500-516. doi:10.1093/alcalc/agp054
200. Davis JS, Lee HY, Kim J, et al. Use of non-steroidal anti-inflammatory drugs in US adults: changes over time and by demographic. *Open Hear*. 2017;4(1):e000550. doi:10.1136/openhrt-2016-000550
201. Schaffer D, Florin T, Eagle C, et al. Risk of serious NSAID-related gastrointestinal events during long-term exposure: a systematic review. *Med J Aust*. 2006;185(9):501-506. doi:10.5694/j.1326-5377.2006.tb00665.x
202. Henry D, Lim LL, Garcia Rodriguez LA, et al. Variability in risk of gastrointestinal complications with individual non-steroidal anti-inflammatory drugs: results of a collaborative meta-analysis. *BMJ*. 1996;312(7046):1563-1566.
203. Gabriel SE, Jaakkimainen L, Bombardier C. Risk for serious gastrointestinal complications related to use of nonsteroidal anti-inflammatory drugs. A meta-analysis. *Ann Intern Med*. 1991;115(10):787-796.
204. Hernandez-Diaz S, Rodriguez LA. Association between nonsteroidal anti-inflammatory drugs and upper gastrointestinal tract bleeding/perforation: an overview of epidemiologic studies published in the 1990s. *Arch Intern Med*. 2000;160(14):2093-2099.
205. Richy F, Bruyere O, Ethgen O, et al. Time dependent risk of gastrointestinal complications induced by non-steroidal anti-inflammatory drug use: a consensus statement using a meta-analytic approach. *Ann Rheum Dis*. 2004;63(7):759-766. doi:10.1136/ard.2003.015925
206. Singh G, Triadafilopoulos G. Epidemiology of NSAID induced gastrointestinal complications. *J Rheumatol Suppl*. 1999;56:18-24.
207. Tarone RE, Blot WJ, McLaughlin JK. Nonselective nonaspirin nonsteroidal anti-inflammatory drugs and gastrointestinal bleeding: relative and absolute risk estimates from recent epidemiologic studies. *Am J Ther*. 2004;11(1):17-25.
208. Solomon DH, Rassen JA, Glynn RJ, Lee J, Levin R, Schneeweiss S. The Comparative Safety of Analgesics in Older Adults With Arthritis. *Arch Intern Med*. 2010;170(22):1968-1978. doi:10.1001/archinternmed.2010.391

209. NIDA. Ohio: Opioid-involved deaths and related harms. Published online 2020.
210. Braden JB, Edlund MJ, Sullivan MD. Suicide deaths with opioid poisoning in the United States: 1999-2014. *Am J Public Health*. 2017;107(3):421-426. doi:10.2105/AJPH.2016.303591
211. Document TRUM003646880. *Accidental Drug Related Deaths, 2006-2015*.
212. Kocherlakota P. Neonatal abstinence syndrome. *Pediatrics*. 2014;134(2):e547 LP-e561. doi:10.1542/peds.2013-3524
213. Wexelblatt SL, McAllister JM, Nathan AT, Hall ES. Opioid Neonatal Abstinence Syndrome: An Overview. *Clin Pharmacol Ther*. 2018;103(6):979-981. doi:10.1002/cpt.958
214. Hall ES, McAllister JM, Wexelblatt SL. Developmental Disorders and Medical Complications Among Infants with Subclinical Intrauterine Opioid Exposures. *Popul Health Manag*. 2019;22(1):19-24. doi:10.1089/pop.2018.0016
215. Patrick SW, Schumacher RE, Benneyworth BD, Krans EE, McAllister JM, Davis MM. Neonatal Abstinence Syndrome and Associated Health Care Expenditures: United States, 2000-2009Trends in Neonatal Abstinence Syndrome. *JAMA*. 2012;307(18):1934-1940. doi:10.1001/jama.2012.3951
216. Villapiano NLG, Winkelman TNA, Kozhimannil KB, Davis MM, Patrick SW. Rural and Urban Differences in Neonatal Abstinence Syndrome and Maternal Opioid Use, 2004 to 2013. *JAMA Pediatr*. 2017;171(2):194-196. doi:10.1001/jamapediatrics.2016.3750
217. Ko JY, Patrick SW, Tong VT, Patel R, Lind JN, Barfield WD. Incidence of Neonatal Abstinence Syndrome—28 States, 1999–2013. *Morb Mortal Wkly Rep*. 2016;65(31):799-802.
218. American College of Obstetricians and Gynecologists. Opioid use and opioid use disorder in pregnancy. Committee opinion No. 711. *Obstet Gynecol*. 2017;130:e81-e94.
219. Maguire DJ, Taylor S, Armstrong K, et al. Long-term outcomes of infants with neonatal abstinence syndrome. *Neonatal Netw*. 2016;35(5):277-286. doi:10.1891/0730-0832.35.5.277
220. Harder HJ, Murphy AZ. Early life opioid exposure and potential long-term effects. *Neurobiol Stress*. 2019;10:100156. doi:10.1016/j.ynstr.2019.100156
221. Centers for Disease Control and Prevention. Natality public-use data on CDC WONDER online database for years 2007-2018. Published online 2019.
222. Substance Abuse and Mental Health Services Administration. Restricted-use Data Analysis System (RDAS).
223. Substance Abuse and Mental Health Services Administration. Comparison of 2016-2017 and 2017-2018 NSDUH population percentages (50 states and the District of Columbia). *Natl Surv Drug Abus*. Published online 2019.
224. Grunbaum JA, Kann L, Kinchen S, et al. Youth risk behavior surveillance - United States, 2003. *MMWR Surveill Summ*. Published online 2004.
225. Kann L, McManus T, Harris WA, et al. Youth risk behavior surveillance - United States, 2013. *MMWR Surveill Summ*. Published online 2014.
226. Dunn KM, Saunders KW, Rutter CM, et al. Opioid prescriptions for chronic pain and overdose: A cohort study. *Ann Intern Med*. 2010;152(2):85-92. doi:10.7326/0003-4819-152-2-201001190-00006
227. Ohio Department of Health Hepatitis Surveillance Program. Ohio Hepatitis B Cases, 2015-2018. Published online 2018. https://odh.ohio.gov/wps/wcm/connect/gov/5c9e0fec-cf4b-4426-87ac-b574c1352b0d/HBV+4+Year+Report_2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-5c9e0fec-cf4b-4426-87ac-b574c1352b0d-mLRwdyM
228. Ohio Department of Health Hepatitis Surveillance Program. Ohio Hepatitis C Cases, 2014-

2018. Published online 2019. https://odh.ohio.gov/wps/wcm/connect/gov/a85bd075-e2e9-4cd3-bd72-480ea66279b2/HCV+5+Year+Report_2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-a85bd075-e2e9-4cd3-bd72-480ea66279b2-mLRwTqK

229.  Jones CM, Campopiano M, Baldwin G, McCance-Katz E. National and state treatment need and capacity for opioid agonist medication-assisted treatment. *Am J Public Health*. 2015;105(8):e55-e63. doi:10.2105/AJPH.2015.302664

230.  Mark TL, Lubran R, McCance-Katz EF, Chalk M, Richardson J. Medicaid coverage of medications to treat alcohol and opioid dependence. *J Subst Abuse Treat*. 2015;55:1-5. doi:10.1016/j.jsat.2015.04.009

231.  Burns RM, Pacula RL, Bauhoff S, et al. Policies related to opioid agonist therapy for opioid use disorders: the evolution of state policies from 2004 to 2013. *Subst Abus*. 2016;37(1):63-69. doi:10.1080/08897077.2015.1080208

232.  Hansen H, Siegel C, Wanderling J, DiRocco D. Buprenorphine and methadone treatment for opioid dependence by income, ethnicity and race of neighborhoods in New York City. *Drug Alcohol Depend*. 2016;164:14-21. doi:10.1016/j.drugalcdep.2016.03.028

233.  Larney S, Tran LT, Leung J, et al. All-cause and cause-specific mortality among people using extramedical opioids: a systematic review and meta-analysis. *JAMA Psychiatry*. Published online December 2019. doi:10.1001/jamapsychiatry.2019.4170

234.  Henry SG, Paterniti DA, Feng B, et al. Patients' experience with opioid tapering: a conceptual model with recommendations for clinicians. *J Pain*. 2019;20(2):181-191. doi:10.1016/j.jpain.2018.09.001

235.  Chou R, Ballantyne J, Lembke A. Rethinking opioid dose tapering, prescription opioid dependence, and indications for buprenorphine. *Ann Intern Med*. 2019;171(6):427-429. doi:10.7326/M19-1488

236.  Frank JW, Lovejoy TI, Becker WC, et al. Patient outcomes in dose reduction or discontinuation of long-term opioid therapy: a systematic review. *Ann Intern Med*. 2017;167(3):181-191. doi:10.7326/M17-0598

237.  Eccleston C, Fisher E, Thomas KH, et al. Interventions for the reduction of prescribed opioid use in chronic non-cancer pain. *Cochrane Database Syst Rev*. 2017;11:CD010323. doi:10.1002/14651858.CD010323.pub3

238.  Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. *Morb Mortal Wkly Rep*. 2016;65(50-51):1445–1452. doi:http://dx.doi.org/10.15585/mmwr.mm655051e1

239.  Centers for Disease Control and Prevention. Synthetic opioid overdose data. Published online 2019.

240.  Dowell D, Noonan RK, Houry D. Underlying factors in drug overdose deaths. *JAMA*. 2017;318(23):2295-2296. doi:10.1001/jama.2017.15971

241.  Centers for Disease Control and Prevention. U.S. county prescribing rates. Published online 2016.

242.  Sharareh N, Sabounchi SS, McFarland M, Hess R. Evidence of modeling impact in development of policies for controlling the opioid epidemic and improving public health: A scoping review. *Subst Abus Res Treat*. 2019;13:1178221819866211. doi:10.1177/1178221819866211

243.  Keyes KM, Hamilton AD, Swanson JM, Tracy M, Cerdá M. Simulating the suicide prevention effects of firearms restrictions based on psychiatric hospitalization and treatment records:

Social benefits and unintended adverse consequences. *Am J Public Health*. 2019;109(S3):S236-S243.

244. Keyes KM, Shev A, Tracy M, Cerdá M. Assessing the impact of alcohol taxation on rates of violent victimization in a large urban area: an agent-based modeling approach. *Addiction*. 2019;114(2):236-247. doi:10.1111/add.14470

245. Cerdá M, Tracy M, Keyes KM. Reducing urban violence: a contrast of public health and criminal justice approaches. *Epidemiology*. 2018;29(1):142-150. doi:10.1097/EDE.0000000000000756

246. United States Census Bureau. QuickFacts: Lake County, OH and Trumbull County, OH. Published online 2020. https://www.census.gov/quickfacts/fact/table/trumbullcountyohio,lakecountyohio/PST045219

247. United States Census Bureau. Annual County and Resident Population Estimates by Selected Age Groups and Sex: April 1, 2010 to July 1, 2019 (CC-EST2019-AGESEX). Published online 2020.

248. Merikangas KR, He JP, Burstein M, et al. Lifetime prevalence of mental disorders in U.S. adolescents: results from the National Comorbidity Survey Replication--Adolescent Supplement (NCS-A). *J Am Acad Child Adolesc. Psychiatry*. 2010;49(10):980-989. doi:10.1016/j.jaac.2010.05.017

249. Altarac M, Saroha E. Lifetime prevalence of learning disability among US children. *Pediatrics*. 2007;119(Supplement 1):S77 LP-S83. doi:10.1542/peds.2006-2089L

250. Document TRUM000002987. *Trumbull County Children's Services, 2017 Annual Report*.

251. Rothman KJ, Greenland S, Lash TL. *Modern Epidemiology*. 3rd ed. Lippincott Williams & Wilkins; 2008.

252. Keyes KM, Galea S. *Population Health Science*. Accessed June 21, 2018. https://global.oup.com/academic/product/population-health-science-9780190459376?cc=us&lang=en&