**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>**This document relates to**:<br><br>*Track Three Cases* | **MDL No. 2804**<br>**Case No. 17-md-2804**<br>**Judge Dan Aaron Polster** |

**DECLARATION OF STEVEN N. HERMAN IN SUPPORT OF THE PHARMACY
DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS
AND TESTIMONY OF DR. KATHERINE KEYES**

# EXHIBIT 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14

15

16     REMOTE VIDEO DEPOSITION OF KATHERINE KEYES, PH.D.

17

18                 June 3, 2021

19

20

21   REPORTED BY:    Laura H. Nichols

22                   Certified Realtime Reporter,

23                   Registered Professional

24                   Reporter and Notary Public

25

Page 13

1              I, Laura H. Nichols, a Certified

2   Realtime Reporter and Registered Professional

3   Reporter of Birmingham, Alabama, and a Notary

4   Public for the State of Alabama at Large, acting as

5   Commissioner, certify that on this date, as

6   provided by the Federal Rules of Civil Procedure of

7   the United States District Court, and the foregoing

8   stipulation of counsel, there came before me

9   remotely via Zoom, on June 3, 2021, commencing at

10  11:09 a.m. EDT, KATHERINE KEYES, PH.D., witness in

11  the above cause, for oral examination, whereupon

12  the following proceedings were had:

13

14                  *       *       *

15              THE VIDEOGRAPHER:  Good morning.  We

16  are going on the record at 11:09 a.m., EST, on June

17  3rd, 2021.

18              When you are not speaking, please

19  mute your audio input as your microphone is

20  sensitive and can pick up whispering and background

21  noise.  Please turn off all cell phones or place

22  them away from your computer as they can interfere

23  with the deposition audio.  Audio and video

24  recording will continue to take place unless all

25  parties agree to go off the record.

1              This is Media Unit 1 of the

2    video-recorded deposition of Dr. Katherine Keyes,

3    taken by counsel for defendant in the matter of In

4    Re:  National Prescription Opiate Litigation Track

5    3 Cases, filed in the United States District Court

6    for the Northern District of Ohio, Eastern

7    Division.  Case Number 17-MD-804.

8              This deposition is being held via

9    videoconference with the witness located in New

10   York.  My name is Stephen Kent from the firm

11   Veritext Legal Solutions, and I am the

12   videographer.  The court reporter is Laura Nichols,

13   also from Veritext Legal Solutions.

14              I am not authorized to administer an

15   oath.  I am not related to any party in this

16   action, nor am I financially interested in the

17   outcome.  All appearances will be noted on the

18   stenographic record.

19              Will the court reporter please swear

20   in the witness.

21

22              KATHERINE KEYES, PH.D.,

23   having been first duly sworn, was examined and

24   testified as follows:

25

Page 17

1          Q.      If you need to take a break at any

2     time, please just let me know and we can take a

3     break as long as there's not a question pending,

4     okay?

5          A.      Yes.

6          Q.      Did you do anything to prepare for

7     your deposition today?

8          A.      I had meetings with plaintiffs'

9     counsel.

10         Q.      About how many meetings did you have

11     with plaintiffs' counsel?

12         A.      Two.

13         Q.      And how long did those meetings last?

14         A.      Approximately two hours each.

15         Q.      Have you done the work that you feel

16     you need to do in order to testify here today?

17         A.      I believe so.

18         Q.      Have you done the work you need to do

19     in order to be able to testify before the jury at

20     trial?

21         A.      I believe so.

22         Q.      Is there any data that you wanted

23     that you did not have in writing your report?

24         A.      No.

25                 (Exhibit 1 was marked for

1          identification.)

2          Q.     (BY MR. HERMAN:)  Let's go ahead and

3    mark Exhibit 1, which will be a copy of your

4    report, dated April 16th, 2021.

5                  Exhibit 2, which is the exhibits to

6    your report.  And those should be in the sealed

7    envelopes marked CVS 1 and CVS 2.

8                  (Exhibit 2 was marked for

9                  identification.)

10         Q.     (BY MR. HERMAN:)  If you want to go

11   ahead.

12         A.     Go ahead --

13         Q.     Yeah, thank you.

14                 (Exhibit 3 was marked for

15                 identification.)

16                 MR. HERMAN:  And we are also going to

17   mark as Exhibit 3 -- and I am not sure -- it won't

18   be there in paper copy, but it is a supplemental

19   materials considered list that was sent to us last

20   night.

21         Q.     (BY MR. HERMAN:)  Dr. Keyes, have you

22   opened --

23         A.     I am opening Exhibit 2.

24         Q.     Just let me know when you have them.

25   It is not as easy as when I can hand it across the

Page 19

1    table.

2            A.      The tape is really tight.

3            Q.      I did not tape it, but I apologize.

4            A.      I have the exhibit.

5            Q.      Okay.  And is Exhibit 1 a copy of

6    your expert report that you submitted on April

7    16th, 2021?

8            A.      Yes.

9            Q.      And that is a report you wrote for

10   this case?

11           A.      Yes.

12           Q.      Do you understand that when you wrote

13   the report, dated it and signed it that it was to

14   include all the opinions that you intend to offer

15   at trial?

16           A.      Yes.

17           Q.      Does your report contain all the

18   opinions you intend to offer in this case?

19           A.      Yes.

20           Q.      Do you have any corrections to make

21   to your report at this time?

22           A.      I don't at this time.

23           Q.      In your report, you cite with end

24   notes a number of materials.  And my understanding

25   is those citations are to the materials that

1   materials that you cited as end notes in the

2   report, correct?

3                    MR. ARBITBLIT:   Objection, vague.

4          A.      I would say both the end notes and

5   the materials considered list would be potential

6   sources that informed my opinions.

7          Q.      (BY MR. HERMAN:)   Okay.  Exhibit D is

8   a list of the cases where you -- Exhibit D to

9   Exhibit 2 of this deposition is a list of the cases

10  where you provided testimony.  Is that correct?

11         A.      Is that in a separate -- I only have

12  through Exhibit C as part of Exhibit 2.

13         Q.      Okay.  Well, let me just try it this

14  way, then.  I don't know why that last two pages is

15  not attached to yours, but -- you testified in a

16  case involving Cuyahoga and Summit County, correct?

17         A.      Correct.

18         Q.      Okay.  And you testified there under

19  oath?

20         A.      Yes.

21         Q.      And did you have an opportunity to

22  review that transcript after your deposition?

23         A.      I did.

24         Q.      And you also testified in a case that

25  involved Suffolk County, Nassau County and the

Page 25

1    State of New York?

2           A.      Yes.

3           Q.      And you gave a deposition in that

4    case?

5           A.      I did.

6           Q.      And you also testified at a hearing

7    before Judge Garguilo?

8           A.      I did.

9           Q.      And your testimony in that case, both

10   at your deposition and at the hearing, were under

11   oath?

12          A.      Yes.

13          Q.      Did you review your transcripts?

14          A.      Yes.

15          Q.      And you have also testified at a case

16   involving Cabell County and the City of Huntington,

17   West Virginia; is that correct?

18          A.      Yes.

19          Q.      And in that case you gave two

20   depositions?

21          A.      Yes.

22          Q.      And both of those depositions were

23   under oath?

24          A.      Yes.

25          Q.      And did you have a chance to review

Page 26

1    your transcript for both those depositions?

2           A.     Yes.

3           Q.     Going back to your report in this

4    case, your report in this case doesn't mention CVS,

5    Rite Aid, Walgreens, Walmart or Giant Eagle,

6    correct?

7           A.     That's correct.

8           Q.     You didn't consider any document

9    produced by CVS in this case or any other, correct?

10          A.     As far as I know, no document

11   produced by the -- the defendants.

12          Q.     Okay.  And when you say "the

13   defendants," you are including in that CVS,

14   Walgreens, Walmart, Rite Aid and Giant Eagle?

15          A.     Yes.

16          Q.     You didn't review any -- the

17   deposition of any CVS employee, correct?

18          A.     That's correct.

19          Q.     You didn't review the deposition of

20   any Walgreens, Walmart, Rite Aid or Giant Eagle

21   employee, correct?

22          A.     That's correct.

23          Q.     I searched your report for the words

24   "CVS," "Rite Aid," "Walgreens," "Walmart" and

25   "Giant Eagle," and they don't appear anywhere in

Page 27

1    your report, correct?

2           A.    I include various data sources that

3    provide aggregate information on retail pharmacies

4    across the United States.

5           Q.    Any pharmacy, correct, any retail

6    pharmacy?

7           A.    On a wide variety of pharmacies.

8           Q.    That is true, the word "pharmacy"

9    does appear six times in your report.  Does that

10   sound about right?

11                MR. ARBITBLIT:  Objection, vague.

12          A.    I have not done -- right.  I have not

13   done a check on the word "pharmacy," but there is

14   considerable information about pharmacies in the

15   report.

16          Q.    (BY MR. HERMAN:)  But you don't

17   specifically mention CVS, Rite Aid, Walgreens,

18   Walmart or Giant Eagle in your report, correct?

19          A.    That is correct.

20          Q.    You don't intend to offer any

21   opinions specific to CVS, correct?

22          A.    To the extent that I offer opinions

23   about pharmacies, I would include CVS as one of

24   them.  But I don't have any specific opinions about

25   CVS uniquely.

Page 28

1          Q.      Well, I think we are saying the same
2    thing.  You are not going to offer opinions
3    specific to CVS in this case, correct?
4                  MR. ARBITBLIT:  Objection.  Asked and
5    answered.
6          A.      I offer opinions about the pharmacies
7    overall.  There is nothing that is specific to any
8    particular pharmacy chain.
9          Q.      (BY MR. HERMAN:)  And just so the
10   record is clear, when you say "specific to any
11   pharmacy chain," you are including in that
12   Walgreens, Walmart, Rite Aid and Giant Eagle?
13         A.      That's correct.
14         Q.      Professor Keyes, this may be a
15   somewhat silly question, but have you ever worked
16   in a pharmacy?
17         A.      I have never worked in a pharmacy.
18         Q.      You don't hold yourself out as an
19   expert in the practice of pharmacy?
20         A.      I have expertise in the epidemiology
21   of pharmacological distribution and harms
22   associated with medications that are dispensed from
23   pharmacies.
24         Q.      Okay.  But you yourself have never
25   practiced pharmacy?

Page 71

1    that I do not believe it would have occurred if

2    opioids did not become standard practice, because

3    it led to this oversupply.

4         Q.     (BY MR. HERMAN:)  But do you believe

5    that the prescribing of opioids for the treatment

6    of pain as standard practice led to the oversupply

7    of prescription opioids?

8              MR. ARBITBLIT:  Object to form.

9         A.     It was one of the factors that led to

10   oversupply.

11        Q.     (BY MR. HERMAN:)  Okay.  And going

12   back to Exhibit 6, CVS 5 for you, the article says,

13   "The second, related force involved the

14   pharmaceutical industry's concerted effort to

15   advocate for long-term use of opioids as a safe,

16   nonaddictive, effective, and humane alternative to

17   treat noncancer pain.  These marketing efforts

18   accelerated the shift in treatment approaches for

19   chronic noncancer pain."

20              Did I read that correctly?

21        A.     Yes.

22        Q.     Okay.  And the example you go on to

23   give in the next few sentences is about Purdue,

24   right?

25        A.     Yes.

Page 72

1      Q.      Purdue is a manufacturer, correct?

2      A.      That's correct.

3      Q.      When you refer to the pharmaceutical

4  industry in this sentence, were you referring to

5  Purdue and other manufacturers?

6      A.      I believe several sentences later I

7  define the pharmaceutical industry as including the

8  production, distribution and prescription of

9  opioids proliferated due to the removal of

10  physician sanctions.  So the pharmaceutical

11  industry is broadly conceived.

12      Q.      Okay.  What is your basis for saying

13  that the marketing efforts that accelerated the

14  shift in treatment approaches for chronic noncancer

15  pain was caused by entities other than

16  manufacturers?

17      A.      Can you point me to where you are

18  looking?

19      Q.      The second force -- so it's at the

20  top of the paragraph, the second force --

21      A.      Uh-huh.

22      Q.      -- "involved the pharmaceutical

23  industry's concerted efforts to advocate for the

24  long-term use of opioids as safe, nonaddictive,

25  effective, and humane alternative to treat

1   noncancer pain.  These marketing efforts

2   accelerated the shift in treatment approaches for

3   chronic noncancer pain."

4        A.    Yes, that is what it says.

5        Q.    Okay.  And -- well -- okay.  Well,

6   the only example you give is Purdue, a

7   manufacturer.  So I am wondering, what basis do you

8   have to say that other -- any part of the

9   pharmaceutical industry other than manufacturers

10  engaged in marketing efforts that accelerated the

11  shift in treatment approaches for chronic noncancer

12  pain?

13             MR. ARBITBLIT:  Object to form.

14  Misstates.

15        A.    I guess I am still not understanding

16  the question.  The --

17        Q.    (BY MR. HERMAN:)  Well --

18        A.    I say in here that there were

19  "concerted efforts to advocate for the long-term

20  use of opioids as" -- and that those concerted

21  efforts involved the pharmaceutical industry.

22  Several sentences later, I provide context for that

23  statement, saying that -- that the Intractable Pain

24  Act "removed physician sanctions for the use of

25  opioids" and that "the production, distribution,

Page 74

1    prescription, and use of opioids proliferated."

2              So all entities that would be

3    involved in the production, distribution,

4    prescription and use of opioids would be implicated

5    in that statement.

6         Q.    Okay.  Well, your report discusses --

7    and going back to Exhibit 1, your report discusses

8    how direct marketing to physicians increased

9    prescribing, correct?

10             MR. ARBITBLIT:  Objection.  Vague.

11        A.    So that section in the report

12   describes three papers that have used data on

13   payments to physicians and associations with

14   various outcomes.

15        Q.    (BY MR. HERMAN:)  Okay.  And on Page

16   14, I think that is where you are talking about,

17   you are discussing how direct marketing to

18   physicians increased prescribing, right, and you

19   cite -- I think you just said three papers for that

20   proposition?

21        A.    I am -- I am on Page 14 of the

22   report, but I think it is actually later in the

23   report, just so it is accurate in the record.

24        Q.    So you talk about it at Page 14 and

25   then again at Page 33?

1          A.      Oh, I see.  The marketing -- I state

2     in the -- in the report that the "marketing of

3     opioid drugs led to increased sales of the marketed

4     drugs."

5          Q.      Well, you say on Page 14,

6     "Evidence" -- "The increase in opioid prescribing

7     was driven by a multitude of factors, including

8     direct marketing to physicians using data that

9     underestimated opioid use disorder risks in

10     patients, which I detail in Section B.  Evidence

11     shows that pharmaceutical marketing of prescription

12     drugs increases prescribers' likelihood of

13     prescribing the marketed drug in the future,"

14     right?

15          A.      That is a general statement about

16     prescription drugs and marketing.  The next

17     sentence is about opioids.

18          Q.      Yeah.  "That is also true for

19     prescription opioids; as a result, increased

20     marketing of opioids led to increased sales of the

21     marketed drugs," right?  And you cite a couple of

22     studies?

23          A.      Correct.

24          Q.      The literature that you cite about

25     marketing discusses marketing activities by

Page 76

1    pharmaceutical manufacturers to physicians,

2    correct?

3          A.      Is there a specific study that you

4    are referring to?

5          Q.      I am asking about all of them at the

6    moment.  The literature that you cite in your

7    report about marketing activities to physicians

8    discusses marketing activities by manufacturers to

9    physicians, correct?

10          A.      Are the articles in the exhibits,

11    because I would just like to confirm that that is

12    what the articles state?

13          Q.      You don't know off the top of your

14    head whether the articles are discussing marketing

15    activities that pharmaceutical manufacturers engage

16    in?

17          A.      There -- the articles refer to a

18    database called the Sunshine Open Payments

19    database, I believe, and I would like to -- I would

20    feel more comfortable giving correct testimony if I

21    could look at the article and make sure that I am

22    describing what is included in the contents of the

23    Open Payments database accurately.

24          Q.      Okay.  Well, why don't we look at --

25    why don't we try 7 -- did you tell me you already

Page 77

1    opened 7-12?

2         A.     I did open 7-12, yes.

3              MR. HERMAN:  Why don't we mark it --

4    mark that as Exhibit 8.

5              (Exhibit 8 was marked for

6              identification.)

7              MR. HERMAN:  And --

8              THE VIDEOGRAPHER:  Counsel, your

9    screen sharing is in the video.

10             MR. HERMAN:  When -- I am sorry.  The

11   screen sharing is in the video.  Can you see me?

12             THE VIDEOGRAPHER:  No, the screen --

13   the screen being shared is in the video.  I was

14   just letting him know, whoever was sharing.

15             MR. HERMAN:  Oh.

16        Q.    (BY MR. HERMAN:)  Exhibit 8 is an

17   article titled, "Association of Industry Payments

18   to Physicians with the Prescribing of Brand-name

19   Statins in Massachusetts."

20        A.     Yes, that is correct.

21        Q.     Okay.  And do you see on Page 763 --

22   well, let me ask you this:  This is one of the

23   articles you cite in your report, correct?

24        A.     Yes, but I don't think it is on -- I

25   don't cite this on Page 14.  I believe I cite this

Page 78

1   in the other section that discusses the Hadland

2   article.  So if I could just pull up that section

3   to make sure I am -- is that correct?  To make

4   sure -- do you know which number --

5          Q.     It -- I believe this is Reference

6   141, so maybe it is --

7          A.     Yeah.

8          Q.     You cite some of them in both places,

9   but I think this is one cite on Page --

10         A.     This is only -- I just wanted to pull

11  up the correct section.  Okay.

12         Q.     Okay.  Do you see on Page 763, it

13  says, "Payment by pharmaceutical manufacturers to

14  physicians outside the research context may be

15  problematic, because they can be perceived as

16  conflicts of interest that could interfere with

17  physicians' responsibilities to their patients"?

18         A.     This is on Page 763?

19         Q.     Yep, first paragraph.

20         A.     Oh, I see.  Yes.  I see that.

21         Q.     You see above it says, "In the United

22  States" -- the paragraph begins, "In the United

23  States, many physicians have financial

24  relationships with pharmaceutical manufacturers."

25         A.     I see that.

Page 79

1       Q.      Okay.  Did I read that correctly?

2       A.      You did.

3       Q.      Is it your understanding that this

4   article about payments to physicians relates to

5   manufacturers?

6       A.      That this particular article about

7   statins?  You are asking -- you are asking

8   whether --

9       Q.      Well, I am asking -- this is -- you

10  said you would like to see an article.  I am --

11  I -- well, I am asking you, does this article deal

12  with payment by manufacturers?

13      A.      This article does -- the methods

14  section of this paper says that they used two data

15  sources.  This -- the data source that was used on

16  payments was the Massachusetts physician Open

17  Payments database, which is derived from

18  pharmaceutical manufacturer reports.  But the

19  article does not include opioids, as far as I can

20  tell.

21      Q.      Okay.  I -- well, we are short on

22  time.  I'm not sure I am going to be able to go

23  through every article.

24              But sitting here today, do you

25  believe that the literature you cite in your report

Page 80

1    about marketing to physicians discusses marketing

2    activities by pharmaceutical manufacturers?

3                    MR. ARBITBLIT:  Object to form.

4         A.    I cite a variety of studies.  If

5    there's a specific study that you are asking about,

6    I can look at the study and see what was included.

7         Q.    (BY MR. HERMAN:)  All right.  Let's

8    look at 72-26.  Oh, I'm sorry.  This is 7-2.  we

9    will mark that as Exhibit 9.

10                   (Exhibit 9 was marked for

11                   identification.)

12        A.    So it is 7-26?

13        Q.    (BY MR. HERMAN:)  Well, 7-2, I'm

14   sorry, and it is Reference 26 in your --

15        A.    Okay.  7- --

16        Q.    -- report.  And this is an article

17   entitled, "Association of Pharmaceutical Industry

18   Marketing of Opioid Products to Physicians With

19   Subsequent Opioid Prescribing."  Is that correct?

20        A.    That is correct.

21        Q.    And this is one of the papers you

22   cite in your report at both Page 14 and Page 33?

23        A.    Yes.

24        Q.    Okay.  And this looked at the Open

25   Payments database that you were asking about?

Page 81

1           A.      Yes.

2           Q.      And the authors obtained information

3      from the Open Payments database on all transfer of

4      value from pharmaceutical companies to physicians

5      during 2014, right?

6           A.      That's correct.

7           Q.      Okay.  And if you would look at Page

8      862, the "Results" column, do you see where it

9      says, "The three companies with the highest payment

10     totals were INSYS Therapeutics (which manufactures

11     Subsys, the fentanyl sublingual spray), Teva

12     Pharmaceuticals USA, and Janssen Pharmaceuticals"?

13          A.      I see that.

14          Q.      Okay.  And do you understand that

15     INSYS, Teva and Janssen are all manufacturers?

16          A.      I do understand that.

17          Q.      And if you turn to Page 863, do you

18     see the first full paragraph, where it says, "Our

19     findings add to prior studies of industry marketing

20     to physicians by examining" -- oh, sorry.  Strike

21     that.

22                  Do you see the last paragraph?  After

23     the introductory clause, it says, "our findings

24     suggest that manufacturers should consider a

25     voluntary decrease or complete cessation of

Page 82

1  marketing to physicians"?

2           MR. ARBITBLIT:  Object to reading a

3  partial sentence.

4           MR. HERMAN:  Okay.  I will read the

5  full sentence.

6       Q.    (BY MR. HERMAN:)  "Amidst national

7  efforts to curb the overprescribing of opioids, our

8  findings suggest that manufacturers should consider

9  a voluntary decrease or complete cessation of

10 marketing to physicians."  Did I read that

11 correctly?

12      A.    You did.

13      Q.    Okay.  And is it your understanding

14 that this article relates to marketing by

15 manufacturers?

16      A.    My understanding is that the data

17 source as described in the Methods section says

18 "pharmaceutical companies."

19      Q.    Well, do you have an understanding --

20      A.    The three top companies that you

21 cited were three opioid manufacturers, but I have

22 not looked into the Open Payments database in

23 enough detail to know that every company included

24 in the Open -- Open Payments database is a

25 manufacturer.

Page 83

1          Q.      Sorry.  So you don't know -- I mean,

2     the recommendation certainly is about

3     manufacturers, correct?

4          A.      In -- in the Discussion section, it

5     says there's a national effort to curb

6     overprescribing and that one way to do that would

7     be to suggest manufacturers cease marketing to

8     physicians.

9          Q.      Okay.

10         A.      It does not preclude other efforts.

11         Q.      Tell me everything you know about

12    marketing by pharmacies.

13             MR. ARBITBLIT:  Object to form.

14    Vague.  Overbroad.

15         A.      Everything I know about -- if there's

16    a specific document that you would like me to

17    review, I can -- I can do that.  Otherwise, I would

18    prefer to stick to what is in my report.

19         Q.      (BY MR. HERMAN:)  Okay.

20         A.      In terms of my general knowledge

21    about marketing by pharmacies, pharmacies market

22    all kinds of products.

23         Q.      Do you know if any of these studies

24    apply to pharmacies?

25             MR. ARBITBLIT:  Objection.  Vague.

Page 84

1       A.      I believe what I have testified is

2   that what is written in the Methods section of this

3   Hadland article is that the Open Payments database

4   includes information from pharmaceutical companies.

5   And I have not looked at every company that is in

6   the Open Payments database.  And that's as much

7   information as I can -- I can give.

8       Q.      (BY MR. HERMAN:)  Sitting here today,

9   do you know if any of the opinions you are giving

10  about marketing are applicable to pharmacies?

11          MR. ARBITBLIT:  Objection.  Vague.

12  Overbroad.

13      A.      I think all of the opinions that I

14  have given are applicable to all -- they are --

15  they are -- they are -- the opinions are what they

16  are.  And they are applicable -- for example, I say

17  that there is overprescribing and oversupply.  I

18  think that certainly applies to pharmacies.

19      Q.      (BY MR. HERMAN:)  Okay.  Sticking to

20  marketing, I asked specifically about whether your

21  opinions -- whether any of these studies about

22  marketing relate to pharmacies.

23          MR. ARBITBLIT:  Objection.  Vague,

24  interrupted the witness and misstates the prior

25  question.

1        A.     I think what I have written here is

2   the amount of information that I have, which is

3   that these articles apply to pharmaceutical company

4   marketing.  And I would have to look at the extent

5   to which -- I don't know what companies are -- the

6   totality of companies that are included in the Open

7   Payments database.

8        Q.     (BY MR. HERMAN:)  So in the course of

9   your work, you haven't analyzed the materials in

10  your report to determine who is marketing?  That is

11  your testimony?

12             MR. ARBITBLIT:  Object to the form.

13  Argumentative.

14       A.     Determine who is marketing?  I don't

15  know what you mean by "who is marketing."

16       Q.     (BY MR. HERMAN:)  Well, in the course

17  of your work, you are offering opinions about

18  marketing.  In this report, you haven't analyzed

19  the materials that you cite in your report to

20  determine who is engaged in marketing?

21             MR. ARBITBLIT:  Object to form.

22  Vague.  Overbroad.

23       Q.     (BY MR. HERMAN:)  True or false?

24       A.     I have reviewed the epidemiological

25  evidence and reported it in this report to the best

Page 86

1   of my ability.  And what I reported is that

2   pharmaceutical companies are in the Open Payments

3   database.

4           Q.     But you don't know what

5   "pharmaceutical companies" actually refers to, and

6   you would agree with me that this article only

7   discusses manufacturers, correct?

8                   MR. ARBITBLIT:  Objection.  Compound.

9           A.     What I can testify is that, in the

10  Results section of this paper, three companies are

11  mentioned, and those three companies are

12  manufacturers.

13          Q.     (BY MR. HERMAN:)  And in the

14  recommendation that the study makes at the end, it

15  only mentions manufacturers, correct?

16                  MR. ARBITBLIT:  Objection.  Misstates

17  the record.

18          A.     No, that is not correct.  The

19  sentence says that there are national efforts to

20  curb overprescribing, which is not specific to

21  manufacturers.  And the second part of the sentence

22  suggests that manufacturers curb marketing to

23  physicians.

24          Q.     (BY MR. HERMAN:)  In an article about

25  marketing to physicians, their "findings suggest

Page 87

1    that manufacturers should consider a voluntary

2    decrease or complete cessation of marketing to

3    physicians."  You don't agree that is only about

4    manufacturers?

5              MR. ARBITBLIT:  Object to form.

6    Argumentative.  Misstates the record.

7         A.    I think I would consider the whole

8    sentence together, which starts, "Amid national

9    efforts to curb the overprescribing of opioids."

10   And I think that that is a more general statement.

11        Q.    (BY MR. HERMAN:)  Okay.  You don't --

12   you don't agree with me that this article that

13   cites manufacturers, three manufacturers as the

14   largest payors and then makes a recommendation only

15   as to manufacturers is about manufacturers?

16             MR. ARBITBLIT:  Objection.  Asked and

17   answered.  Compound.  Argumentative.

18        A.    I think that is a narrow

19   interpretation of the data.

20        Q.    (BY MR. HERMAN:)  Okay.  You actually

21   don't know, as you previously testified, what the

22   data in the Open Source Payment reflects, correct?

23             MR. ARBITBLIT:  Objection.  Asked and

24   answered.

25        A.    I have -- sorry.  I have not reviewed

Page 88

1    every company that is in the Open Payments

2    database.

3         Q.    (BY MR. HERMAN:)  Have you reviewed

4    any companies?

5         A.    I have reviewed the epidemiological

6    literature, of which this article is one of

7    several, and reported its results faithfully.

8         Q.    Okay.  So you made no effort to

9    identify who was responsible for the marketing of

10   opioids?

11            MR. ARBITBLIT:  Object to form.

12   Misstates the record.  Argumentative.

13        A.    The effort that I made was to review

14   the evidence and report it, and that is what I have

15   done in my report.

16        Q.    (BY MR. HERMAN:)  Well, tell me

17   everything you know about pharmacies' marketing of

18   prescription opioids.

19            MR. ARBITBLIT:  Objection.

20   Previously asked.  Argumentative.  Overbroad.

21   Vague.

22        A.    In my report, I discuss various

23   marketing efforts, as they have been reported in

24   the epidemiological literature.  I'm not offering

25   opinions about specific companies' marketing, as I

1  note in the report.

2          Q.      (BY MR. HERMAN:)  You don't know --

3  you don't know which companies engaged in which

4  activities, if any at all, correct?

5                  MR. ARBITBLIT:  Objection.  Vague.

6          A.      I am not offering -- I -- in terms of

7  what is reported in these articles, there are

8  specific companies mentioned.  And so to the extent

9  that specific companies are mentioned in the

10  epidemiological literature, that is what I feel

11  like I have the expertise to report on.

12                  But I am not offering opinions about

13  specific pharmacy marketing.

14          Q.      (BY MR. HERMAN:)  All those companies

15  that are specifically mentioned are manufacturers,

16  correct?

17          A.      The three companies mentioned in

18  Hadland's 2018 are manufacturers.

19          Q.      I meant -- I am -- I am talking in

20  any article.  Like we just looked at one where you

21  discussed Purdue, correct?  That is a manufacturer.

22                  MR. ARBITBLIT:  Object to form.

23  Compound.  Vague.

24          A.      I would not offer testimony about

25  every article.  I can speak to each article at the

1    time.

2          Q.      (BY MR. HERMAN:)  Did you review

3    those articles carefully before using them in your

4    report?

5          A.      I did.

6          Q.      Do you recall any mention of

7    marketing by pharmacies?

8               MR. ARBITBLIT:  Object to form.

9          A.      I would need to review each article

10   again.

11         Q.      (BY MR. HERMAN:)  Okay.  So sitting

12   here today, you don't know what companies engaged

13   in marketing activity?

14              MR. ARBITBLIT:  Object to form.

15         A.      Sitting here today, I can report on

16   the companies that are specifically mentioned in

17   these articles.

18         Q.      (BY MR. HERMAN:)  And those are all

19   manufacturers?

20              MR. ARBITBLIT:  Object to form.

21   Asked and answered.  Overbroad.

22         A.      The company -- the three companies

23   that I mentioned in Hadland 2018 are manufacturers.

24   And we can look at the other Hadland articles to go

25   through the companies that are mentioned in those

1    as well.

2            Q.      (BY MR. HERMAN:)  And the marketing

3    activities that -- the studies you are looking at

4    are marketing to prescribers, correct?

5            A.      They are marketing to physicians.

6            Q.      Okay.  And when you are talking about

7    factors that led to increased prescribing, you are

8    speaking about the general population of

9    prescribers, not specific prescribers, correct?

10           A.      There is information on specific

11   types of prescribers in various articles, but there

12   was an overall increase in opioid prescriptions

13   across many different types of prescribers, I

14   guess.  If that -- if I am -- I might be

15   misunderstanding the question, so I am sorry if I

16   am.

17           Q.      I will try to do it a little

18   differently.

19                   You don't know what caused a

20   particular prescriber to write a particular

21   prescription, correct?

22                   MR. ARBITBLIT:  Object to form.

23           A.      I have not evaluated particular

24   prescribers.

25           Q.      (BY MR. HERMAN:)  Okay.  You don't

1   know a particular prescriber's knowledge about the

2   potential risks of prescription opioids, correct?

3               MR. ARBITBLIT:  Object to form.

4        A.      I can -- I can speak in generalities

5   about what the epidemiological literature says

6   about prescribers, but I have not evaluated any

7   singular prescriber.

8        Q.      (BY MR. HERMAN:)  You don't know

9   whether a particular prescriber saw marketing

10  materials, correct?

11       A.      I don't have any -- I don't have any

12  expertise on particular prescriber, so I do not

13  know whether they saw marketing materials.

14       Q.      Okay.  And I think you have already

15  answered this, but you don't know what, if any,

16  marketing materials doctors who prescribed opioids

17  in Trumbull and Lake Counties saw, correct?

18       A.      That's correct.

19       Q.      Okay.  Can I ask you to turn to Page

20  40 of your report?  And can you see at the end of

21  the first full paragraph where there's a reference

22  to "'aggressive and highly'" -- it is a quote,

23  "'aggressive and highly effective marketing tactics

24  on the part of the pharmaceutical industry

25  (manufacturers, distributors and pharmacies)'"?

Page 93

1          A.      Yes, I see that.

2          Q.      And you cite to Reference 190 and

3   specifically Section 719 for that proposition.

4          A.      Yes.

5          Q.      Okay.

6                  (Exhibit 10 was marked for

7                  identification.)

8                  MR. HERMAN:   Can -- Jason, can we

9   pull up -- what exhibit are we on, 9?

10                  MR. ACTON:   Yeah.

11          Q.      (BY MR. HERMAN:)   Can I ask you to

12   open Exhibit -- CVS Exhibit 6, Professor Keyes?

13   And Exhibit 9 [sic] is a document called "High and

14   Rising Mortality Rates Among Working-Aged Adults."

15   And is that what you referenced as Reference 190 in

16   your report?

17          A.      It is.

18          Q.      Okay.  And if I could ask you to turn

19   to 7-19.  And do you see where you pulled that

20   quote from, there's a citation in support of it to

21   an article by Kolodny, et al., 2015?

22          A.      Page 7-19.

23          Q.      Do you see at the top it says --

24          A.      Oh, I was looking in the wrong

25   section.

1           Q.     Quoted at the top, "Aggressive and

2    highly effective marketing tactics on the part of

3    pharmaceutical industry (manufacturers,

4    distributors, pharmacies)."  And there's a citation

5    to Kolodny et al. --

6           A.     Yes.

7           Q.     -- in support of that.  Okay.

8                  MR. HERMAN:  Can I ask you, Jason, to

9    pull up Exhibit 10 -- well, it's going to be

10   Exhibit 10 --

11                 MR. ACTON:   11.

12          Q.     (BY MR. HERMAN:)  Oh, Exhibit 11.

13   And, Professor Keyes, can I ask you to open

14   Exhibit -- CVS Exhibit 8?

15          A.     I'm sorry.  I -- the Kolodny article

16   is citing actions of the legal and illegal drug

17   suppliers and regulatory failures of government

18   agencies.

19          Q.     Well, I believe, though, it is also

20   the only citation in support of "aggressive and

21   highly effective marketing tactics on the part of

22   the pharmaceutical industry (manufacturers,

23   distributors, and pharmacies)"?

24          A.     Oh, I see.  In the second paragraph.

25          Q.     Yeah.  Okay.

1          A.      Okay.

2                  MR. HERMAN:  Can we pull up that

3     Kolodny article, if you could open CVS 8?  And that

4     is going to be Exhibit 11.

5                  (Exhibit 11 was marked for

6                  identification.)

7          A.      CVS 7-8 or CVS 8?

8          Q.      (BY MR. HERMAN:)  CVS 8.

9          A.      Okay.

10         Q.      Okay.  And CVS 8 is an article

11    entitled "The Prescription Opioid and Heroin

12    Crisis:  A Public Health Approach to an Epidemic of

13    Addiction," and the authors are Andrew Kolodny,

14    David T. Courtwright, Katherine Hwang, Peter

15    Kreiner, John L. Eadie, Thomas W. Clark, and G.

16    Caleb Alexander, and this was an article published

17    January 12th, 2015; is that correct?

18         A.      Yes.

19         Q.      Okay.  Are you aware that Professor

20    Alexander has been retained by and identified as an

21    expert witness by plaintiffs in this opioid

22    litigation?

23                 MR. ARBITBLIT:  Object to form.

24    Vague as to time.

25         A.      Could you specify what you mean by

1    "this opioid litigation"?

2         Q.     (BY MR. HERMAN:)  Well, in the case

3    that you are here testifying in today, the Trumbull

4    and Lake County case.

5                 MR. ARBITBLIT:  Same objection.

6         A.     I have -- I have been vaguely aware

7    that Dr. Alexander has been -- I think I have

8    supplied him with some estimates.  And that is my

9    knowledge of his involvement.

10        Q.     (BY MR. HERMAN:)  Okay.  So as part

11   of your work with the plaintiffs, you have provided

12   Dr. Alexander estimates?

13        A.     Yes.

14        Q.     Okay.  Are you aware that Professors

15   Courtwright and Kolodny have been retained by and

16   identified as expert witnesses by plaintiffs in

17   other opioid litigation cases?

18                 MR. ARBITBLIT:  Same objection.

19   Vague as to time.  Misleading.

20        A.     I have seen Dr. Kolodny's name in

21   other litigation, and I don't recall seeing

22   Dr. Courtwright.

23        Q.     (BY MR. HERMAN:)  Okay.  Okay.  And

24   if I direct your attention to, "In addition to

25   minimizing risks of OPRs, the campaign" -- well, I

1    direct your attention to 562, the bottom of the

2    page.  Do you see where it says, "In addition to

3    minimizing the risks of OPRs, the campaign advanced

4    by opioid manufacturers and pain organizations

5    exaggerated the benefits of long-term opioid use"?

6    Do you see that?

7            A.    "In" -- yeah, "the campaign advanced

8    by opioid manufacturers and pain organizations" --

9    yes, I see it.

10           Q.    Okay.  And that only discusses opioid

11   manufacturers, correct?

12                 MR. ARBITBLIT:  Object to form.

13   Misstates.

14           A.    That sentence refers to "opioid

15   manufacturers and pain organizations."

16           Q.    (BY MR. HERMAN:)  Well, okay.  Does

17   it discuss pharmacies?

18           A.    That particular sentence or the

19   article?

20           Q.    Well, before quoting "High and Rising

21   Mortality Rates Among Working-Age Adults" about

22   aggressive and effective -- or marketing by

23   manufacturers, distributors and pharmacies, did you

24   look to see whether it or the article it cited

25   provided any support for the idea that pharmacies

Page 98

1  engaged in, quote/unquote, aggressive and effective

2  marketing of prescription opioids?

3            MR. ARBITBLIT:  Object to form.

4  Argumentative.

5       A.    Yes.

6       Q.    (BY MR. HERMAN:)  Okay.  Tell me what

7  in either of those discusses marketing by

8  pharmacies.

9            MR. ARBITBLIT:  Object to form.

10      A.    In that sentence or the whole

11  article?

12      Q.    (BY MR. HERMAN:)  Well, you said you

13  checked.  So if you could point me to where there's

14  discussion of marketing by pharmacies, I would ask

15  that you do so.

16            MR. ARBITBLIT:  Object to form.

17  Argumentative.

18      A.    I'm not sure where -- I can read the

19  article again.

20      Q.    (BY MR. HERMAN:)  Well, tell me

21  everything -- I have asked you a couple of times

22  now.  I have asked you to tell me everything you

23  know about marketing by pharmacies from this

24  article or otherwise, and I haven't gotten a

25  response.

Page 99

1              MR. ARBITBLIT:  Object to form.

2   Argumentative.  Misstates.

3         A.     Yeah, I mean, just glancing over this

4   article, it mentions opioid companies a number of

5   times.

6         Q.    (BY MR. HERMAN:)  Do you know if

7   those companies are pharmacies?

8              MR. ARBITBLIT:  Object to form.

9   Interrupting the witness.

10        A.     I don't see specific pharmacies

11  mentioned in this article.  But there is discussion

12  of a range of opioid companies, or companies that

13  are involved in the distribution of opioids.  And

14  this article, as well as many others, have

15  discussed the distribution of opioids as part of an

16  oversupply problem.

17        Q.    (BY MR. HERMAN:)  Okay.  Where does

18  it discuss marketing -- I mean, you're -- it seems

19  to me that you are changing the question.  But

20  where does it discuss marketing by pharmacies to

21  support the idea that pharmacies engaged in

22  aggressive and effective marketing?

23             MR. ARBITBLIT:  Object to the form.

24  Argumentative.

25        A.     I -- so the sentence that is cited

1  with regard to the National Academies report is

2  broader than just marketing activities.  It

3  includes flooding the market with highly addictive,

4  yet deadly substances.  And I think that the

5  Kolodny article provides pretty solid evidence of

6  the flooding of the market --

7          Q.     (BY MR. HERMAN:)  Well, that -- go

8  ahead.

9          A.     -- so it is an appropriate citation

10  for that sentence.

11          Q.     Well, if you're talking --

12          A.     With regard to specific marketing

13  activities, no specific marketing activities are

14  discussed in this article, but a broad range of

15  activities by these companies is discussed in the

16  article.  And there's discussion of marketing by

17  various companies.

18          Q.     But you would agree with me, I mean

19  the sentence that you quote in your report is, "On

20  the supply side, weak government regulations and

21  aggressive and highly effective marketing tactics

22  on the part of the pharmaceutical industry

23  (manufacturers, distributors, pharmacies)," that

24  neither of these sources provide support for the

25  ideas that pharmacies engaged in aggressive and

Page 101

1    highly effective marketing?

2              MR. ARBITBLIT:  Object to form.

3         A.    That -- the citation of the Kolodny

4    article is a -- is a larger sentence.  It is -- it

5    is not just the --

6         Q.    (BY MR. HERMAN:)  Well, but I am

7    asking you about the portion of the sentence that

8    says "aggressive and highly effective marketing."

9    You would agree with me that the Kolodny article

10   does not provide support for the idea that the

11   pharmacies engaged in highly effective and

12   aggressive marketing, correct?

13        A.    I would not agree with that broad of

14   a statement.

15        Q.    Well, what is your basis that the

16   pharmacies engaged in aggressive and highly

17   effective marketing?

18        A.    My testimony is that the Kolodny

19   article describes overall industry marketing and

20   distribution practices that were deceptive and that

21   the pharmacies would be included in that.

22        Q.    Well, let's limit it to marketing.

23   We will put aside your editorializing about

24   distribution.  But what -- I mean, the marketing

25   example discussed, again, is Purdue.  The only

1    campaign advance discussed is by opioid

2    manufacturers and pain organizations.  What are you

3    basing your assertion that pharmacies engaged in --

4    that the Kolodny article discusses the fact that

5    pharmacies engaged in any marketing, let alone

6    aggressive and highly effective marketing?

7             MR. ARBITBLIT:  Objection.  Vague.

8    Argumentative.

9        A.    My testimony is the same as the

10   previous question.  I think, in citing the Kolodny

11   article, there is discussion of a broad range of

12   activities by companies.

13        Q.    (BY MR. HERMAN:)  Well, what --

14        A.    And that is my -- that is the

15   expertise that I am offering.

16        Q.    Okay.  But I want to zero in on the

17   marketing aspect.  I am only asking you about the

18   activity of marketing.

19        A.    Can you define what you mean by

20   "marketing"?

21        Q.    Well, what did you mean by it when

22   you used it in your report and you cited this

23   sentence in your report?

24        A.    I -- what I meant by "marketing" is

25   activities that increased the oversupply and

Page 103

1    overprescription of opioids.

2         Q.    Okay.  And, I mean, when you are

3    talking about marketing to physicians, what

4    marketing activities were you aware of, if any,

5    engaged in by pharmacies?

6              MR. ARBITBLIT:  Object to form.

7         A.    Neither the report, the National

8    Academies article, or the Kolodny article specifies

9    marketing to physicians when talking about

10   marketing.

11        Q.    (BY MR. HERMAN:)  But your report --

12        A.    That is a separate issue.

13        Q.    I mean -- okay.  Well, let's just

14   talk about marketing generally.  Are you redefining

15   "marketing" to mean distribution, dispensing?  Are

16   you including those in marketing now?

17              I mean, I think "marketing" has a

18   pretty -- I mean, what do you mean by "marketing"?

19              MR. ARBITBLIT:  Object to form.

20   Compound.  Confusing.  Vague.

21        A.    Yeah, I am not -- what is the

22   specific question?

23        Q.    (BY MR. HERMAN:)  Let's start on Page

24   14, "direct marketing to physicians."  Are you

25   aware of any activities by pharmacies that entail

                                                    Page 104

1    direct marketing to physicians?

2                MR. ARBITBLIT:  Object to the form.

3         A.      Page 14 of my report?

4         Q.      (BY MR. HERMAN:)  Yes.

5                MR. ARBITBLIT:  Object to form.

6         A.      That goes back to the Hadland article

7    and the testimony I have already provided about the

8    Open Payments database.

9         Q.      (BY MR. HERMAN:)  Okay.  So -- and

10   your testimony was you don't know one way or

11   another whether that relates to pharmacies?

12               MR. ARBITBLIT:  Object to form.

13        A.      We can go back and read the

14   testimony.  I mean, I didn't say I don't know one

15   way or the other.  What I said was that the Hadland

16   article is based on the Open Payments databases,

17   and that what is reported in the Methods section is

18   that pharmaceutical companies are in the Open

19   Payments database.  I have not analyzed the Open

20   Payments database to derive what industry each

21   company that is in the Open Payments database is

22   from.

23        Q.      (BY MR. HERMAN:)  Okay.  And then on

24   Page 33 it says, "exposure to pharmaceutical

25   marketing" -- Page 33 of your report, "exposure to

1  pharmaceutical marketing and sales efforts" --

2  or -- it says, "association between exposure to

3  pharmaceutical marketing and sales efforts with

4  changes in prescribing."  And do you know --

5       A.    I mean, pharmacies are involved in

6  opioid sales, are they not?

7            MR. ARBITBLIT:  Wait for a question.

8       A.    Sorry.

9       Q.    (BY MR. HERMAN:)  Well, I think it is

10  talking about sales efforts with changing in

11  prescriber behaviors, and that is what the studies

12  you cite are about.  So are you aware of

13  pharmaceutical marketing efforts and sales efforts

14  that change prescriber behavior that pharmacies

15  engaged in?

16            MR. ARBITBLIT:  Object to form.

17       A.    Again, this -- I think the articles

18  that are cited there refer to the Open Payments

19  database.  So my testimony would be the same, that

20  the Open Payments database, from my understanding,

21  includes pharmaceutical companies, and I am not --

22  I don't know all of the companies that are included

23  in the database.

24       Q.    (BY MR. HERMAN:)  Okay.  So sitting

25  here today, you couldn't give an opinion one way or

Page 106

1    another whether this relates to your opinions about

2    marketing on Page 14 and Page 33 of your report

3    relate to pharmacies?

4          A.     I am not offering opinions about

5    specific marketing activities of specific

6    pharmacies or pharmacy chains.  I am offering

7    opinions about these articles in generality, in

8    aggregate.

9          Q.     Do you know if CVS engaged in any

10   direct marketing activities to prescribers?

11              MR. ARBITBLIT:  Objection.  Vague.

12         A.     Again, I am not offering opinions

13   about CVS's marketing activities in --

14   specifically.

15         Q.     (BY MR. HERMAN:)  Okay.  So that same

16   answer would apply to Walmart, Walgreens, Rite Aid

17   and Giant Eagle?

18         A.     Yes.

19              MR. HERMAN:  Okay.  We have been

20   going about an hour.  Do people want to take a

21   break?

22         A.     Sure.

23              MR. ARBITBLIT:  All right.  We will

24   break for like five minutes.

25              THE VIDEOGRAPHER:  Stand by.  We are