UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>**This document relates to**:<br><br>*Track Three Cases* | MDL No. 2804<br>Case No. 17-md-2804<br>Judge Dan Aaron Polster |

**DECLARATION OF STEVEN N. HERMAN IN SUPPORT OF THE PHARMACY
DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS
AND TESTIMONY OF DR. KATHERINE KEYES**

# EXHIBIT 6

```
 1                                                                    1
 2      SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF SUFFOLK: PART 48
 3      -----------------------------------------------------x
 4      IN RE: OPIOID LITIGATION
 5
 6                                      INDEX NO.:400000/2017
 7      -----------------------------------------------------x
 8                                      September 10, 2020
                                        Central Islip, New York
 9
10                    MINUTES OF FRYE HEARING
                        (Testimony of Dr. Keyes)
11
12      B E F O R E:        HON. JERRY GARGUILO
                            Supreme Court Justice
13
        A P P E A R A N C E S:
14
        SIMMONS HANLY CONROY, LLC
15      Attorneys for Suffolk County
        112 Madison Avenue
16      New York, New York 10016
        BY:  JAYNE CONROY, ESQ.
17           THOMAS I. SHERIDAN, III, ESQ.
             (212) 784-6401
18           jconroy@simmonsfirm.com
             tsheridan@simmonsfirm.com
19
20      NAPOLI SHKOLNIK, PLLC
        Attorneys for Nassau County
21      400 Broadhollow Road, Suite 305
        Melville, New York 11747
22      BY:  SALVATORE C. BADALA, ESQ.
             (212)397-1000
23           sbadala@napolilaw.com
24
25
```

```
 1                    Frye Hearing - Dr. Keyes              102
 2     information on the dollars that were -- the payments
 3     to doctors for opioid products.
 4             Q.    Do you know who maintains Open Payments?
 5             A     I'm not sure off the top of my head.
 6             Q.    Is it a federal agency?
 7             A     I believe so.  I believe it was the
 8     result of a -- there was a law that was passed
 9     saying that these data had to be made public.
10             Q.    Did Hadland in this study interview
11     doctors?
12             A     No.
13             Q.    Did Hadland review marketing materials?
14             A     Not as far as I know, not based on the
15     published paper.
16             Q.    Let's look at the next study from
17     Hadland and colleagues.  This is --
18                   THE COURT:  By the way, go back to the
19             last one for one second.
20                   MR. REISMAN:  Yes.
21                   THE COURT:  It reads:  "These findings
22             should prompt the examination of industry
23             influences on opioid prescribing."
24                   It says it should prompt this kind of an
25             examination/investigation.
```

```
 1                  Frye Hearing - Dr. Keyes                103
 2            Was there a follow-up on that?
 3            THE WITNESS:  There were several other
 4       studies published from the same data that
 5       examines the industry influences.
 6            THE COURT:  But the only conclusion is
 7       that the findings should prompt an
 8       examination.
 9            THE WITNESS:  Yes.
10            THE COURT:  Okay.  Thank you.  By the
11       way, does the article say who was to conduct
12       the examination?
13            THE WITNESS:  That's not specified in
14       the paper.
15            THE COURT:  Okay.  Thank you.
16  BY MR. REISMAN:
17       Q.   So this is Demo 49.  I correct myself.
18  It's Demo 51.
19            Is this study -- was this done,
20  published by Hadland in 2018, a year after --
21  actually, you know, let's hold this for a moment.
22  And I want to ask you about the prior study.
23            MR. REISMAN:  Can we bring the slide
24       back up.  Yeah, if we can skip to the end.
25            Okay.  So, Sal, if you could hand out
```

```
 1                  Frye Hearing - Dr. Keyes              104
 2          Demo 49.
 3   BY MR. REISMAN:
 4          Q.   So is this study that was published in
 5   2018 in JAMA Internal Medicine, is it titled,
 6   "Association of Pharmaceutical Industry Marketing of
 7   Opioid Products to Physicians With Subsequent Opioid
 8   Prescribing"?
 9          A    Yes.
10          Q.   And this is the same Hadland who
11   published the study that we just looked at a year
12   earlier; is that right?
13          A    The same first author, yes.
14          Q.   So what did Hadland do in this study in
15   2018?
16          A    So this study linked two different
17   databases.  One is the same Open Payments database
18   that we were -- that was the topic of the American
19   Journal of Public Health paper.
20               And then they looked at that in
21   association with the Medicare Part D opioid
22   prescriber summary file to correlate the marketing
23   practices with prescription claims for Medicare
24   beneficiaries.
25          Q.   What did Hadland find in this study?
```

```
 1                    Frye Hearing - Dr. Keyes              105
 2         A     They found an association between the,
 3    the amount of money that doctors received from
 4    opioid manufacturers with subsequent opioid
 5    prescribing.
 6         Q.    The slide that we're showing right now
 7    is drawn from the article itself.
 8               Can you explain to the Court what this
 9    slide shows?
10         A     Yes.  This is the association between
11    the number of meals received in 2014 and the number
12    of opioid claims in 2015 from those same physicians
13    based on the number of meals that they received.
14         Q.    Does it show that the more meals that
15    physicians received from opioid industry sales
16    representatives, the more opioids they prescribed?
17         A     Yes.  This would be consistent with
18    dose-response.
19         Q.    Does this study, the 2018 study mention
20    any specific manufacturers of opioids?
21         A     Yes.
22         Q.    Which ones?
23         A     It mentions the three companies with the
24    highest payment totals: Insys Therapeutics, Teva
25    Pharmaceuticals, and Janssen Pharmaceuticals.
```

```
 1                    Frye Hearing - Dr. Keyes              106
 2           Q.   Let's move to the last slide, and we
 3     already marked this for demonstrative purposes.  The
 4     study is Demo 51.
 5                Is this a study that Hadland published
 6     last year in JAMA Open?
 7           A    Yes.
 8           Q.   And is this one titled, "Association of
 9     Pharmaceutical Industry Marketing of Opioid Products
10     With Mortality From Opioid-Related Overdoses"?
11           A    Yes.
12           Q.   What did Hadland and colleagues do in
13     this study?
14           A    So similar to the prior study where
15     different databases were linked, this study used the
16     same Open Payments database and linked it with the
17     CDC WONDER data, the same mortality data that I
18     published in my report.
19           Q.   What did the researchers conclude?
20           A    They concluded that there was an
21     association between the amount of money spent on
22     opioid marketing and opioid-related harms in terms
23     of prescription opioid overdoses in those same areas
24     that were highly saturated with marketing dollars.
25           Q.   So in this Hadland 2019 study, did the
```

```
 1                  Frye Hearing - Dr. Keyes              107
 2    researchers build on the articles they published in
 3    2018 and 2017?
 4         A    Yes.
 5         Q.   Did you, in your work on this case,
 6    evaluate the marketing materials of any manufacturer
 7    Defendant?
 8         A    No.
 9         Q.   Why not?
10         A    Because that's not part of the
11    epidemiological science that I relied on.
12         Q.   Did Hadland and colleagues in these
13    studies that we just looked at evaluate the
14    marketing materials of any manufacturer?
15         A    It's not in the study.
16         Q.   What did they evaluate?
17         A    They evaluated the Open Payments
18    database.
19              THE COURT:  By the way, these authors in
20         Demo 51, are they epidemiologists or
21         something else?
22              THE WITNESS:  I am familiar with several
23         of the authors who are -- who have Ph.D.s in
24         epidemiology.  I don't know the
25         qualifications of all the authors, but many
```

```
 1                  Frye Hearing - Dr. Keyes              148
 2           Q.    Yes.
 3           A     No.
 4           Q.    Have you done any analysis of whether
 5    any of the distributor Defendants, take McKesson, if
 6    they had decided not to ship prescription opioids
 7    and another distributor had stepped in, whether the
 8    level of opioid harm would have been any different
 9    in the State of New York?
10           A     I'm sorry, can you breakdown --
11           Q.    Sure.
12           A     Okay.  So one distributor stops --
13           Q.    Yes, and another distributor steps in,
14    would the level of opioid harm had been any
15    different?
16           A     No.
17           Q.    You haven't done that analysis?
18           A     No.
19           Q.    And you talked about marketing at the
20    end of your opinions, I just want to ask you a
21    couple of questions on marketing.
22                 You don't know of a single time when
23    McKesson, Cardinal, ABDC, one of the chain
24    pharmacies gave marketing materials to a doctor in
25    New York State, correct?
```

```
 1                    Frye Hearing - Dr. Keyes              149
 2          A    No.
 3          Q.   "No," you don't no that?
 4          A    I don't know that.
 5          Q.   You don't know of a single time when
 6     McKesson, Cardinal, ABDC, a chain pharmacy prepared
 7     specific marketing materials for doctors or
 8     patients, correct?
 9          A    That's correct.
10          Q.   And the literature you've seen in terms
11     of talking about marketing and points to entities
12     other than McKesson, Cardinal, ABDC and chain
13     pharmacies as conducting marketing to physicians
14     regarding prescription opioids; is that correct?
15          A    That's right.
16          Q.   Do you agree that the opioid crisis was
17     caused by multiple different factors?
18          A    Yes.
19          Q.   Would you agree that there are multiple
20     interrelated and deeply rooted social and economic
21     determinants of the U.S. opioid overdose crisis?
22          A    Among others, yes.
23          Q.   And in your work you've not attempted to
24     assign percentages of responsibility for the opioid
25     crisis in New York to Cardinal or McKesson or ABDC
```

```
 1                    Frye Hearing - Dr. Keyes              164
 2     adolescents.
 3              By the way, is this study performed, in
 4     your view, using generally accepted methods?
 5          A    Yes.
 6          Q.   It says:  "Adolescents who indicated
 7     medical use without a history of --" and I'm going
 8     to fill in the acronyms, tell me if I get it wrong.
 9     So let's start again.
10              "Adolescents who indicated medical use
11     without a history of nonmedical use of prescription
12     opioids did not differ from adolescents with no
13     history of medical use of prescription opioids or
14     nonmedical use of prescription opioids in the odds
15     of alcohol use disorder, cannabis use disorder or
16     other drug use disorder."
17              Did I read that correctly?  Fill in any
18     acronyms.
19          A    Generally.
20          Q.   And do you agree with that finding in
21     this study, is that a reasonable interpretation of
22     the data in the study; yes or no?
23          A    Um, I think that I would have written it
24     differently, so no.
25          Q.   Is it wrong in your view?
```

```
                    Frye Hearing - Dr. Keyes              165
```

A   It's not wrong.

Q.   Can you point me to a contrary study showing individuals who use prescription opioids only medically have higher rates of heroin use?

A   Sorry, say that again.

Q.   Can you point me to a contrary cite showing individuals -- actually, no. I think I just asked you this question, so I'm going to move on.

I've asked you now about medical use prescription opioids, so I want to move over to nonmedical use of prescription opioids. Those 16 studies that you cited.

Do you consider each of those studies to be reliable when conducted using generally accepted methods?

A   Yes.

Q.   Going back to that distinction we drew between causation and association, am I accurate that none of those studies make the step of going beyond association to causation?

A   No one study alone, no.

Q.   None of them collectively, correct?

A   Collectively, I think that's up to the epidemiologist.

```
 1                    Frye Hearing - Dr. Keyes              166
 2          Q.   Does anyone of those studies say,
 3   looking at our study and all other studies, we're
 4   now willing to conclude causation?
 5          A    Not those words.
 6          Q.   Do any of them go beyond association?
 7          A    I think they generally accept the well-
 8   accepted principle that prescription opioid use is a
 9   risk factor for heroin use.
10          Q.   Do they go beyond association; just yes
11   or no?
12          A    Um, I would say yes.
13          Q.   Okay.  Well, let's look at what they say
14   now.
15               MR. SCHMIDT:  May I approach, your
16        Honor.
17               THE COURT:  Yes.
18          Q.   I'm going to give you two things.  One
19   is a demonstrative that I prepared, and I don't
20   think that you need to look at the study, but if you
21   would like to look at the study, I've given you a
22   set of the studies on this demonstrative --
23          A    Thank you.
24          Q.   -- and they're tabbed.
25               The demonstrative is four of the 16
```

```
 1                    Frye Hearing - Dr. Keyes              167
 2    studies, you cite language from the studies.  If you
 3    can put it up on the screen, Demonstrative Exhibit
 4    1, and I think we were using letters, so I'll mark
 5    this as Defendant's Exhibit A -- I guess I'll mark
 6    it as Defendant's Exhibit B, Exhibit A would be the
 7    New York document encouraging opioid use that we
 8    looked at earlier.
 9              Do you recognize these four studies as
10    four of the 16 studies you looked at?
11         A    Yes.
12         Q.   And just very quickly (READING:)
13              (Khosla) 2011.  Temporality and causal
14    associations could not be determined.
15              (Becker) 2008.  While we were able to
16    describe associations, we are not able to ascribe
17    causality.
18              (Grau) 2007.  A second limitation is the
19    cross-sectional nature of this study, which
20    precludes the possibility of establishing causal
21    relationships.
22              (Havens) 2009.  Causal inferences could
23    not be made.
24              Did I read those excerpts right?
25         A    Yes.
```

```
                      Frye Hearing - Dr. Keyes                168
     Q.   Do you agree with those statements as
made in the context of those studies; yes or no?
     A    Yes.
     Q.   And are you aware of any study that goes
farther and says we do find causation, we do find
more than an association?
     A    I think if you look at the language of
the discussion section, you know, limitations of the
studies aside, I think there is generally accepted
language that prescription opioid use is a risk
factor for heroin use.
     Q.   It's important to consider the
limitations, right?
     A    Yes.
     Q.   Do you know of any study that actually
says we believe there is causation between earlier
nonmedical prescription opioid use and later heroin
use, where it comes to a specific conclusion, it
goes beyond association and concludes causation?
     A    No.
     Q.   Can you point me to any study that
states there's general acceptance that nonmedical
prescription opioid use causes heroin use or illegal
fentanyl use?
```

```
 1                    Frye Hearing - Dr. Keyes              169
 2           A    I would need to go back to the studies.
 3    I mean, off the top of my head, I don't have
 4    specific sentences.
 5           Q.   Is there one you can point me to from
 6    your work; just yes or no?
 7           A    Not off the top of my head.
 8                MR. SCHMIDT:   Let me show you one other
 9           study you looked at.   I'll mark this -- if I
10           may approach -- Defendant's Exhibit C.
11                THE COURT:   Yes.
12           Q.   Do you recognize this as a 2016 New
13    England Journal of Medicine, that's one of your 16
14    studies that you cite?
15           A    Yes.
16           Q.   This one, the lead author is Compton,
17    and if you look at the heading it's actually a
18    review article, correct?
19           A    Yes.
20           Q.   It's reviewing the literature that
21    existed at the time of this publication.
22           A    Yes.
23           Q.   Are you aware that it reviews 14 of the
24    16 studies that you cite in your report?
25           A    Yes.
```

```
 1                   Frye Hearing - Dr. Keyes              170
 2        Q.   If we look at page 3 of this document
 3   there's a heading that says:  Heroin Use Among
 4   People Who Use Prescription Opioids Nonmedically; do
 5   you see that?
 6        A    Yes.
 7        Q.   Then a little further down, or actually
 8   right below that, I'm sorry, it says:  "Studies that
 9   address the patterns of heroin use in nonmedical
10   users of prescription opioids are mostly
11   observational and descriptive; i.e.,
12   nonexperimental.  Thus, conclusions about cause and
13   effect are uncertain.
14             Yet, certain consistent findings of a
15   positive association between nonmedical use of
16   prescription opioids and heroin use are highly
17   suggestive and plausible, given the common
18   pharmacologic principles described above?"
19             Did I read that correctly?
20        A    Yes, you did.
21        Q.   I want to point you to their later
22   conclusion and ask you about that.  Can you go to
23   the fifth page of this article, please.  And right
24   before the heading on the right, down at the bottom
25   of this page, if we could pull out the -- yeah, it
```

```
 1                    Frye Hearing - Dr. Keyes              171
 2    says:  "Taken in total, the available data suggests
 3    that nonmedical prescription opioid use is neither
 4    necessary nor sufficient for the initiation of
 5    heroin use and that other factors are contributing
 6    to the increase in the rate of heroin use and
 7    related mortality."
 8              Did I read that correctly?
 9         A    You did.
10         Q.   Do you agree with that; yes or no?
11         A    Yes.
12         Q.   Is that a generally accepted view, in
13    your opinion?
14         A    Yes, absolutely.
15         Q.   And "necessary" means all cases of the
16    outcome have a risk factor, correct?
17         A    That's right.
18         Q.   "Sufficient" means by itself it can
19    bring it about, correct?
20         A    That's right.
21         Q.   We talked earlier about one of the other
22    factors or some of the other factors:  the price of
23    heroin, the availability of heroin, the purity of
24    heroin; do you recall us touching on that?
25         A    Yes.
```

```
                    Frye Hearing - Dr. Keyes              264
```

1
2      minutes ago, you asked a question about 2000
3      -- going back to 2007, and see if I have this
4      right, I believe you put a question to the
5      doctor that based upon the -- we'll call it
6      the comments or statements of the, I believe
7      the FDA, right, whether or not that had a
8      connection to the marketing activities of the
9      Defendants; was that about it?
10           MR. REISMAN:  I'm not sure that was it.
11     I was referring to marketing statements by
12     the manufacturer Defendants.
13           THE COURT:  Which came from where?
14           MR. REISMAN:  It came from the
15     manufacturers themselves.
16           THE COURT:  What spawned, in your line,
17     what spawned these marketing statements in or
18     about 2007?
19           MR. REISMAN:  Well, they were in
20     materials, and they were in studies that were
21     sponsored by the manufacturers.
22           THE COURT:  And what allowed -- what was
23     the license, let's say, for the Defendant
24     manufacturers to issue those statements?
25           MR. REISMAN:  Well, I don't think they