SJ-EXHIBIT 9

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4

                ~~~~~~~~~~~~~~~~~~~~
5
6      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
       OPIATE LITIGATION
7                                     Case No. 17-md-2804
8                                     Judge Dan Aaron
       This Document Relates To:      Polster
9
10     The County of Lake, Ohio v.
       Purdue Pharma L.P., et al.
11     Case No. 18-op-45032
12
       The County of Trumbull, Ohio v.
13     Purdue Pharma L.P., et al.,
       Case No. 18-op-45079
14
15     Track 3 Cases
16
                ~~~~~~~~~~~~~~~~~~~~
17
18          Remote videotaped deposition of
                  LEWIS COLOSIMO
19
20
21               March 15, 2021
                   9:31 a.m.
22
23
24       Renee L. Pellegrino, RPR, CLR
             (Appearing Remotely)
25

                                                    Page 14

1    office as a diversion investigator, and most

2    recently, approximately two weeks ago, I have

3    been the group supervisor, group supervisor for

4    the diversion group in the Pittsburgh district

5    office.

6         Q.    And as a group supervisor, do you --

7    I assume you supervise other diversion

8    investigators for the DEA?

9         A.    Correct.

10        Q.    And would it be fair to say that one

11   of the DEA's missions is to try to prevent the

12   use and sale of illegal drugs?

13        A.    I can explain as a diversion

14   investigator one of our duties involves the

15   prevention of the diversion of pharmaceutical

16   controlled substances.

17        Q.    Okay.  And I mean prescription drugs

18   essentially.  Is that what you're talking about

19   with respect --

20        A.    Prescription drugs as well as

21   scheduled listed chemicals, such as

22   pseudoephedrine and ephedrine.

23        Q.    But does the DEA also try to prevent

24   the use and sale of illegal drugs, like, for

25   example, heroin and cocaine?

1       Q.    But generally a doctor needs to

2    obtain -- in order to prescribe medication as

3    part of their practice, they need to obtain a

4    DEA license to do that?

5       A.    Generally, yes.

6       Q.    And the same would be true with

7    respect to a pharmacy; that if a pharmacy is

8    going to be dispensing controlled substances,

9    they would need to obtain a DEA license to do

10   that?

11      A.    Correct.

12      Q.    And I think you mentioned hospitals.

13   Hospitals would likewise have to have a license

14   to prescribe controlled substances?

15      A.    Yes, or administer or dispense to a

16   patient.

17      Q.    And with respect to distributors who

18   distribute drugs to doctors and pharmacies for

19   ultimate dispensing to the public, do they have

20   to have a DEA license if they're distributing

21   controlled substances?

22      A.    They do.

23      Q.    Now, in order to or as part of DEA's

24   efforts to enforce these controlled substance

25   regulations, does the DEA require someone who's

Page 20

```
 1   applying for a license essentially, like a
 2   distributor -- let's take a distributor, for
 3   example.  If a distributor is applying for a
 4   license, do you do a -- sort of a
 5   pre-authorization inspection of their facilities
 6   and everything to make sure that they're in
 7   compliance or going to be in compliance with all
 8   the applicable regulations?
 9        A.    Yes, we do an investigation to
10   determine that they're eligible to engage in
11   that activity.
12        Q.    What do you call that?  Is that a
13   pre-registration inspection or pre-authorization
14   inspection?  I'm not sure.  What terminology do
15   you use?
16        A.    I personally and others that I work
17   with refer to that as a pre-registrant
18   investigation.
19        Q.    And are those inspections important
20   in terms of trying to make sure that anybody who
21   has -- any distributor who has a DEA license is
22   going to be able to comply with all of the
23   controlled substance regulations?
24             MS. CARROLL:  Objection.  Form.
25             The witness may answer.
```

Page 21

1     A.    Could you repeat the question?  I'm

2  sorry.

3     Q.    Yes.

4           Well, is that pre-registrant

5  inspection an important tool that the DEA uses

6  to make sure that somebody who is going to be

7  distributing controlled substances with a DEA

8  license is going to be able to comply with the

9  applicable DEA controlled substances

10  regulations?

11     A.    That investigation is certainly

12  part of what I'm tasked or a diversion

13  investigator might be tasked to do, certainly.

14     Q.    Now, we didn't talk about this

15  earlier when you were mentioning that, you know,

16  you've been with the DEA for many years.  Have

17  you always been geographically in western

18  Pennsylvania as a DEA agent?

19     A.    A DEA investigator would be the

20  proper -- a diversion investigator.  I have

21  worked I indicated exclusively in the

22  Pittsburgh district office, covering western

23  Pennsylvania is our area of responsibility.

24     Q.    How many pre-registrant inspections

25  have you either performed or at least been

Page 22

1   involved with since you've been with the DEA,

2   just roughly, just a general idea?

3          A.     That would be a difficult question

4   to answer.  These are investigations that I've

5   done throughout the course of my career, but it

6   would be difficult to even give a rough

7   estimate of how many of these I've done.

8          Q.     Well, maybe how about in the last

9   year how many have you done, if you can recall?

10         A.     You know what, I don't know.  Part

11  of this -- part of these investigations involve

12  a gamut of different types of activities.  I

13  think any of those probably would have been for

14  a researcher that was using controlled

15  substances for research purposes.

16         Q.     Do you have a sense of how many

17  distributors of controlled substances are in

18  your geographical area, the western Pennsylvania

19  area?

20         A.     I don't know the exact number.  I'm

21  not sure how many that would be.  I can't

22  answer that accurately.

23         Q.     You're familiar with Giant Eagle?

24         A.     Yes.

25         Q.     And Giant Eagle is a distributor of

Page 23

1   controlled substances?

2        A.    Yes.

3        Q.    And they distribute the controlled

4   substances to their own pharmacies in their

5   grocery stores?

6              MR. MOUGEY:  Objection.

7        A.    That's my understanding.

8        Q.    Meaning that they don't distribute

9   to like other company -- pharmacies owned by

10  other companies, correct?

11       A.    To my knowledge, that's correct.

12  I -- I can't say definitively if they don't,

13  but my understanding is that they sell

14  exclusively to Giant Eagle pharmacies.

15       Q.    Are you familiar with McKesson as a

16  drug distributor?

17       A.    McKesson drug, yes.

18       Q.    Okay.  And they have a distribution

19  facility in New Castle; is that correct?

20       A.    Correct.

21       Q.    Have you inspected their facility in

22  New Castle?

23       A.    I have.

24              MS. CARROLL:  Objection.  This is

25  an objection as to the scope of the testimony.

Page 24

1        Q.    Mr. Colosimo, has the DEA trained
2    you in terms of trying to make sure you
3    understand all the controlled substances
4    regulations and what they require?  Have you
5    received any training from the DEA with respect
6    to that?
7        A.    I have received training, yes.
8        Q.    And what has that training involved?
9        A.    Well, initially upon hire by DEA, I
10    received training at DEA's academy.  It was
11    considered a basic diversion investigator
12    class, and periodically, throughout the course
13    of my career, I received training from DEA.
14        Q.    Now, after a registrant obtains a
15    DEA license with respect to controlled
16    substances, does that licensing or registrant
17    have to undergo periodic inspections to make
18    sure that they have remained in compliance with
19    the applicable DEA controlled substance
20    regulations?
21        A.    Yes.  These registrants, such as a
22    distributor, would be subject to inspections.
23        Q.    Are they called cyclic
24    investigations, or inspections?  I'm sorry.
25        A.    That's -- that's one phrase that

Page 25

1    has been used.

2         Q.    When you do a pre-registrant

3    inspection, what -- can you tell us what that

4    entails, what that involves, what you look at,

5    and how you conduct the inspection?

6              MS. CARROLL:  Objection.  Form.

7              The witness may answer.

8         A.    Pardon me?

9         Q.    Yes.  I'm just asking you, can you

10   tell the jury what a pre-registrant inspection

11   involves, what do you do as part of that

12   inspection?

13             MS. CARROLL:  Objection.  Form.

14             The witness may answer.

15        A.    Part of that pre-registrant

16   investigation would involve a review of the

17   applicant's security procedures they have in

18   place, any history they may have with the

19   handling of controlled substances or listed

20   chemicals, any proposed recordkeeping that they

21   have in place.  It would require an on-site

22   inspection of the facility and a meeting with

23   certain personnel, you know, that would be

24   employed by the applicant that would be able to

25   address questions regarding security,

Page 26

1   recordkeeping, personnel issues.  That would be
2   a general criteria that we consider.
3        Q.    And how many diversion investigators
4   typically are involved in a pre-registrant
5   inspection?
6        A.    I mean, I could only speak to
7   myself.  I don't know how many typically are
8   involved, but from one to several.
9        Q.    And does -- is a group supervisor
10  typically involved or does a group supervisor
11  have to approve the inspection?
12            MS. CARROLL:  Objection.  Form.
13            The witness may answer.
14       A.    A group supervisor may or may not
15  be involved.  That would be at their
16  discretion.
17       Q.    And if you find that there's
18  anything that is not in compliance with the DEA
19  regulations during a pre-registrant inspection,
20  what do you do about that?
21       A.    What I have done would be to bring
22  that to the attention of the group supervisor
23  for discussion.
24       Q.    Okay.  And then what -- with respect
25  to the registrant or proposed registrant, do you

1  bring that to the registrant's attention, that

2  there's an issue regarding compliance?

3       A.    Well, that would be something that

4  would need to be addressed with the applicant.

5       Q.    And do you withhold the grant of the

6  license until the proposed registrant has, you

7  know, remedied the non-compliance?

8       A.    The decision for that would be the

9  group supervisor's decision whether to approve

10  or to deny the application.

11       Q.    Just if you recall -- I know you've

12  been with the DEA for many years, but has that

13  situation ever arisen where a registrant's

14  application was denied that you were involved

15  with?

16       A.    That has happened on occasion.

17       Q.    Can you identify the -- what you

18  view as sort of the principal sources of

19  diversion that you're on the watch for when

20  you're inspecting registrants?

21       A.    Could you be more specific with

22  that question, please?

23       Q.    Well, maybe I'll just ask it

24  slightly differently.  What, in your view as a

25  DEA inspector, diversion inspector, do you

Page 29

1       Q.      Do you know a Rick Shaheen?

2       A.      Yes.

3       Q.      How do you know Mr. Shaheen?

4       A.      I know of Mr. Shaheen through his

5    employment with the Pennsylvania Office of

6    Attorney General as well as his position with

7    Giant Eagle.

8       Q.      How did you come to know him when he

9    was with the Pennsylvania Attorney General's

10   Office?  Did you work on some investigations

11   together?

12      A.      Yes.  My understanding is that

13   Mr. Shaheen was an agent with the Medicaid

14   fraud unit with the Office of Attorney General,

15   and then later was employed there as a

16   supervisor, supervising other agents within

17   that unit.

18      Q.      Okay.  And did you actually work on

19   any drug investigation, you know, drug

20   investigations with Mr. Shaheen when he was with

21   the Office of Attorney General?

22      A.      Yes.

23      Q.      And then you mentioned his position

24   with Giant Eagle.  Did he obtain that position

25   around 2013?  Does that sound right?

Page 30

1          MS. CARROLL:  Objection.  Form.

2          The witness may answer.

3      A.    I don't know when he accepted that

4  position.  I would be guessing.

5      Q.    Well, when do you first recall

6  working with him when he was in his new position

7  with Giant Eagle?

8      A.    It's been -- I know he's been

9  employed there for several years.  I can't

10  recall the first time that I worked with him.

11     Q.    And do you know what his position is

12  with Giant Eagle?

13     A.    My understanding, pharmacy

14  investigator.

15     Q.    Would you agree that one of

16  Mr. Shaheen's jobs is to help prevent drug

17  diversion?

18     A.    That's my understanding of part of

19  what his role is with Giant Eagle.

20     Q.    So part of his job is to try to make

21  sure that no drug diversion occurs with respect

22  to Giant Eagle's distribution or pharmacy

23  facilities, right?

24          MS. CARROLL:  Objection.  Form.

25          The witness may answer.

1      A.    I don't know all of his

2  responsibilities of -- what Giant Eagle has

3  tasked him to do.

4      Q.    In your dealings with Mr. Shaheen

5  have you found him to be a conscientious and

6  competent with respect to trying to prevent drug

7  diversion?

8      A.    I can't -- could you be more

9  specific with that question, please?

10      Q.    Well, let me -- have you worked with

11  Mr. Shaheen in trying to catch any bad guys with

12  respect to drug diversion?

13          MS. CARROLL:  Objection.  Form.

14      Q.    You know, any investigations where

15  maybe, you know, Mr. Shaheen has called you up

16  and said, I think we have a bad script here or

17  something like that, you know, has given you

18  information about a potential issue?

19          MS. CARROLL:  Objection.

20      A.    Yes.  I've worked many times with

21  Mr. Shaheen on those types of scenarios,

22  correct.

23      Q.    And with respect to your dealings

24  with Mr. Shaheen when you guys are both working

25  together to try to prevent diversion, have you

Page 32

1  found him to be, you know, conscientious, hard
2  working and devoted toward preventing diversion?
3          MS. CARROLL:  Objection.  Form.
4          The witness may answer.
5      A.    From my perspective, Mr. Shaheen
6  has provided cooperation with -- with DEA, with
7  myself personally on the types of diversion
8  investigations that I have -- that I have
9  worked on.  He has offered cooperation.
10      Q.    Would it be fair to say that he's
11  always cooperated with you?
12      A.    I can't recall of any specific
13  cases where he did not cooperate with me at
14  least outwardly, if that's -- that could be a
15  way to put it.  I don't know of any cases where
16  he was not cooperative with me.
17      Q.    And would it be fair to say that
18  sometimes he calls you with sort of some
19  information or a tip with respect to an issue
20  and sometimes you call him asking him for some
21  help with respect to an investigation, the
22  relationship goes both ways?
23          MS. CARROLL:  Objection to form.
24          The witness may answer.
25      A.    I have asked for his cooperation

Page 33

1   specifically with regard to activity that has

2   occurred at Giant Eagle pharmacies and

3   Mr. Shaheen has provided information, concerns

4   or suspicions regarding diversion to me.

5          Q.   Has he sometimes just called you out

6   of the blue with some information about a

7   potential problem or issue relating to drug

8   diversion?

9          A.   I don't know that I would say out

10  of the blue, but he has called me with

11  information.

12         Q.   And information that you did not

13  previously have?

14         A.   I would say that on occasion that's

15  correct.

16         Q.   Has Mr. Shaheen always been

17  responsive to any requests you've made of him?

18         A.   My understanding is he has been

19  responsive to requests for information for --

20  yes, for information, correct.

21         Q.   Now, does the DEA have a diversion

22  investigator's manual?

23         A.   Yes.

24         Q.   Are you familiar with that manual?

25         A.   I'm somewhat familiar with that.

1           Do you see that?

2      A.    Yes.

3      Q.    So, again, that's really one of the

4   things that your -- one of the overarching goals

5   is to make sure that a pre-registrant is going

6   to be able to -- is going to have effective

7   controls against diversion, correct?

8      A.    That's something that we consider

9   in doing that pre-registrant investigation.

10      Q.    And then it goes on to say, "In

11   order to determine whether a registrant has

12   provided effective controls against diversion,

13   the administrator shall use the security

14   requirements set forth in Sections

15   1301.72-1301.76 as the standards for the

16   physical security controls and operating

17   procedures necessary to prevent diversion."

18           So those are the key security

19   regulations that every proposed registrant must

20   be able to comply with, correct?

21      A.    Yes.

22      Q.    It then goes on to say that there's

23   a number of factors that have to be taken into

24   consideration regarding whether a registrant is

25   meeting or can meet the security requirements,

1  correct?

2       A.    Yes.

3       Q.    And it also says that strict

4  compliance is not required but rather

5  substantial compliance is what is required with

6  these security regulations, correct?

7       A.    That's what it says.

8       Q.    And that's what you look for,

9  correct, you look for substantial compliance

10  with these regulations when you do an

11  inspection, correct?

12            MS. CARROLL:  Objection.  Form.

13            The witness may answer.

14       A.    That is what we consider when we do

15  our inspection.

16       Q.    The first factor -- we're not going

17  to go through all these, thankfully, but the

18  first one is the type of activity conducted in

19  processing of bulk chemicals, preparing dosage

20  forms, packaging, labeling, cooperative buying,

21  et cetera.  Would this also take into

22  consideration whether you're a self-distributor

23  like Giant Eagle, where you only distribute to

24  your own stores, or whether you distribute to

25  third-party strangers as well?

```
1              MS. CARROLL:  Objection.  Form.
2              The witness may answer.
3         A.    I don't know if that addresses
4    specifically what you asked.  I look at that
5    and it seems to be the type of activity,
6    whether it's a distributor, manufacturer,
7    repackager, relabeler.
8         Q.    Well, let me ask you this:  Do you
9    take that into consideration when you inspect a
10   distributor, whether they're a self-distributor,
11   like Giant Eagle, or whether they are a
12   distributor, like McKesson, where they
13   distribute to a third party?
14        A.    In my experience, that is something
15   that I consider, yes.
16        Q.    And would you agree that there is --
17   you know, just as a general matter, there would
18   be less risk of diversion if a distributor is
19   only distributing to its own stores as opposed
20   to a situation where they're distributing to
21   anybody who places an order with them?
22        A.    I can't answer that, whether it's
23   less -- less potential for diversion, but that
24   is something that -- that I do personally on an
25   inspection.  That is what I do consider.
```

Page 41

1        Q.    Let me ask you this then:  Why do
2    you consider it?  What is the relevance of that
3    fact?
4             MS. CARROLL:  Objection.  Form.
5             The witness may answer.
6        A.    And, again, this is based upon my
7    experience, but we look at as far as a
8    distributor goes, they are to know who their
9    customers are and, as best as they can, the
10   customer of their customers, so that would be
11   something that I would consider.
12        Q.    Right.  And would you agree that if
13   you're only distributing to your own pharmacies,
14   then you obviously know your customers very well
15   because they're your own customers, correct?
16        A.    That would depend upon what -- what
17   that applicant has in place.  I don't know
18   necessarily how well they know their -- their
19   customer.
20        Q.    Well, they would have hired the
21   pharmacist, who is placing the order, correct?
22        A.    I'm not sure that I could speak to
23   who actually hired that -- that pharmacist.
24        Q.    Well, not who individually -- let's
25   talk about Giant Eagle.  Not who individually at

Page 45

1    year the current one I'm working with would be,

2    so I can't answer that.

3         Q.    Would you go to page 13 at the top

4    of this manual?  You see the heading here is

5    Cyclic Investigations of Nonpractitioner CSA

6    Registrants?  Do you see that?

7         A.    Yes.

8         Q.    A nonpractitioner would include a

9    distributor of controlled substances?

10        A.    That's my understanding.

11        Q.    And then if you skip down, there's a

12   paragraph beginning, "Full in-depth

13   investigations shall be conducted at least once

14   every three years for nonpractitioners."

15             Is that your understanding, that

16   every -- at least every three years you try to

17   perform a cyclic investigation on all

18   distributors in your area?

19             MS. CARROLL:  Objection.  Form.

20             Witness may answer.

21        A.    I don't know what the current

22   policy is.  In my experience, this -- this rate

23   of inspection has changed over the course of

24   time, so I don't know what the current --

25   current schedule is, whether it's once every

Page 46

1    three years or longer.

2         Q.    Well, generally, how often did you

3    do cyclic investigations of distributors since

4    you've been with the DEA?  How often do you

5    generally try to do that; once every five years,

6    once every two years, you know, once every

7    three, whatever it might be?

8         A.    I can't recall specifically.  I

9    know it's -- from my memory, it would be once

10   every -- once every few years.  So I can't

11   recall specifically that.  It may depend upon,

12   you know, certain factors.  So I don't know

13   what -- I don't know exactly.

14        Q.    It says, "Emphasis shall be given to

15   inventory/recordkeeping, follow-up verification

16   of customers and orders, security, intelligence

17   collection and case support."

18             Does security include the SOM

19   system that the distributor has?  Is that

20   something that you look at when you do a cyclic

21   investigation?

22        A.    I believe that that SOM that you

23   referred to is in the security part of the

24   investigation.

25        Q.    So that is something that you

Page 47

1    yourself, when you do a cyclic inspection, look

2    at?

3         A.    Yes.

4         Q.    Could you go to page 130?  Do you

5    see this is the section of the manual that

6    applies to pre-registration investigations?

7         A.    I see that.

8         Q.    And in the middle of that first

9    introductory paragraph it says, "The purpose of

10   the pre-registration investigation is to

11   determine the fitness and suitability of

12   registration investigation" -- I'm sorry, "of

13   the applicant to engage in the activities for

14   which registration is requested."

15              Would you agree with that statement

16   of purpose?  Is that your understanding as well

17   for pre-registration inspections?

18              MS. CARROLL:  Objection.  Form.

19              The witness may answer.

20        A.    That's what it states in the

21   manual.

22        Q.    And that's your understanding as

23   well?

24              MS. CARROLL:  Objection.  Form.

25              Witness may answer.

Page 48

1          A.      That's my understanding, yes.

2          Q.      At the bottom of that page under the

3    heading Pre-Registration Investigations, it

4    says, "An on-site investigation is required for

5    each applicant."

6                  Do you see that statement?

7          A.      Yes.

8          Q.      Is that true that, in fact, whenever

9    you do a pre-registration inspection, it always

10   includes -- at least a portion of it is on-site?

11         A.      For a distributor pre-registration

12   investigation, it would be in my experience.

13         Q.      And do you try to be -- when you go

14   on-site and you do your inspection, do you try

15   to be as thorough as possible when you do that

16   inspection?

17         A.      Personally, I make sure that I'm

18   thorough, yes.

19         Q.      If you go to the next page, page

20   131, paragraph number 1, it indicates, "All

21   pre-registration investigative reports will

22   include information concerning the specific

23   controlled substances to be handled," and, you

24   know, it goes on to list a number of things.

25   And then it says, "The investigative report

Page 49

1    should include a description of the security

2    maintained by the applicant, a description of

3    the recordkeeping and any other special

4    requirements planned by the applicant, and a

5    summary of an interview conducted with the

6    researcher's supervisor, verifying the

7    researcher's approval to conduct research."

8    Again, the security -- the reference to a

9    description of the security to be maintained,

10   does that include the suspicious order

11   monitoring system that the registrant plans to

12   use?

13          A.    This particular site here, it looks

14   like it's just addressing researchers to me.

15          Q.    As opposed to a distributor?

16          A.    Yes.

17          Q.    Well, let me just ask you this:

18   When you do a pre-registration inspection, you

19   do always look at the distributor's proposed SOM

20   system to make sure that it complies or will

21   comply with the SOM regulation?

22          A.    We would look at the -- I would

23   want to know if they have a -- if they have a

24   system that they're going to be using to detect

25   suspicious orders.

Page 59

1    circumstances."

2              Have you ever been involved in any

3    situation like that, where there's a

4    revocation, denial or surrender of registration

5    and, as a result, you've done an investigation,

6    a further investigation?

7              MS. CARROLL:  Objection.  Form.

8              Witness may answer.

9         A.    Again, this would be what --

10   similar to what I answered just a moment ago,

11   was that I may have been party to such an

12   investigation, but I don't recall being the

13   primary investigator on -- specifically with

14   regard to a distributor, revocation, denial or

15   surrender for controlled substances.

16        Q.    Number 4, it says, "Failure to

17   maintain adequate controls against theft and

18   diversion."  And is it your understanding that

19   can be one of the reasons for the DEA seeking to

20   revoke, deny or cause the surrender of a

21   registrant's license?

22        A.    My understanding is that is

23   something that we would consider, yes.

24        Q.    If you do uncover any shortcomings

25   in a security system used by a distributor when

Page 60

1   you're inspecting them, do you have a discussion

2   with management about that?  Is that something

3   that you would discuss with them?

4               MS. CARROLL:  Objection.  Form.

5               Witness may answer.

6        A.    Whether it's a pre-registrant or a

7   scheduled investigation, that is something that

8   we would -- that I would want to discuss with

9   management.

10       Q.    Would you go to page 162 of Exhibit

11  6?  There's a heading there, Discussion with

12  Management.  "At the discretion of the group

13  supervisor, the investigators should discuss

14  their findings with him/her prior to discussing

15  the alleged violations with the firm's

16  management.  Significant recordkeeping

17  discrepancies should be supported with

18  documentation."

19               And then number 2, it says, "The

20  firm should be informed of what courses of

21  action against it are possible but not the

22  specific action the investigators intend to

23  recommend."

24               Do you see that?

25       A.    Yes.

Page 74

1   when they opened for business?

2                   MS. CARROLL:  Objection.  Form.

3                   Witness may answer.

4        A.     Ask the question again.  I'm sorry.

5        Q.     Yes.  So one of the things that you

6   were looking closely at was whether Giant Eagle

7   was going to be able to comply with the SOM

8   regulation when it opened for business?

9        A.     Well, since they had not handled

10  controlled substances at that point, I don't

11  know that they were able to comply, but I was

12  notifying them of the specific CFR requirement

13  to design and operate the suspicious order

14  system.

15       Q.     If you go to the next page, at the

16  very top, page 3, it says, "DI Colosimo reviewed

17  each of these items with Carlson, Zelaski,

18  Fleming, and Beiter" from Giant Eagle.  So you,

19  in fact, had a discussion with them about, among

20  other things, the SOM regulation, correct?

21       A.     Yes.

22       Q.     And then if you go down to the

23  middle of the page, there's a paragraph that

24  says, "According to Carlson, HBC will store all

25  original purchase and sales information at their

Page 86

1   have to report your findings to your group

2   supervisor, correct?

3       A.    Yes.

4       Q.    And he or she is going to rely on

5   the findings that you provide him or her,

6   correct?

7       A.    That's my understanding.

8       Q.    And, in addition, you're going to

9   report those findings to the registrant

10  applicant, correct?

11      A.    What do you mean by that?

12      Q.    Again, if you thought that there was

13  an issue or there was a problem with compliance,

14  you would want to let the registrant know so

15  that hopefully they can correct the problem,

16  correct?

17      A.    Yes, that would be part of it.

18      Q.    So -- and wouldn't it be -- wouldn't

19  you agree that it would be reasonable for the --

20  if you do your investigation and you have a

21  meeting with management and you say from

22  everything I've seen, you meet all of the

23  requirements, you're good to go, they should be

24  able to rely on what you're telling them, right,

25  that their systems, their security systems that

Page 87

1   they have in place are at least adequate, if not

2   more than adequate, under the DEA regulations?

3               MS. CARROLL:  Objection.  Form.

4               The witness may answer.

5        A.    I mean, insofar as what I'm able to

6   determine on that pre-registrant investigation,

7   I would agree with that.

8                    -   -   -   -   -

9               (Thereupon, Defendants' Deposition

10              Exhibit 20, Report of Investigation

11              dated January 11, 2016, Beginning

12              Bates Stamp DEA-T1BCC-00001846, was

13              marked for purposes of

14              identification.)

15                   -   -   -   -   -

16       Q.    Would you turn to Exhibit 20, page

17   1?  You see this is another report of

18   investigation by yourself, and it says, "Other

19   officers:  Kurt Dittmer, RPS Patricia Robison,"

20   and "Kayla" -- I'm probably going to butcher the

21   name -- "Solonichne."  Can you tell us what this

22   investigation -- which investigation this was

23   that you were involved in?

24       A.    This was a pre-registrant

25   investigation of the Giant Eagle Rx

Distribution Center that proposed -- that applied to open a distributor of Schedules 2 through 5 controlled substances in Freedom, Pennsylvania.

Q. Was it your understanding that this was a -- going to be a new warehouse for Giant Eagle that was going to also distribute Schedule 2 controlled substances to Giant Eagle's own pharmacies?

A. Yes, Schedules 2 through 5.

Q. Were you involved in any cyclic investigations that the DEA performed on HBC between 2009, when you did the pre-registrant inspection, and the time of this investigation of the proposed GERx facility in 2015?

A. I don't recall being involved with any of those scheduled or cyclic investigations.

Q. When you do a -- an investigation like -- where there's a pre-registrant investigation or a cyclic investigation, do you talk to any of your colleagues who may have been involved in other earlier investigations of the registrant?

A. Sometimes I do that.

Page 89

1        Q.    And don't you usually try to note in
2    your report what the outcome of prior
3    investigations of that registrant have been, you
4    know, whether they passed or whether they had
5    issues or anything like that?
6                 MS. CARROLL:  Objection.  Form.
7                 The witness may answer.
8        A.    We would include -- I would
9    personally include the results of any prior
10   inspections that took place.
11                MR. LIVINGSTON:  I'd like to just
12   take a short restroom break, if that's okay
13   with everyone.
14                THE WITNESS:  That's fine with me.
15                THE VIDEOGRAPHER:  We're off the
16   record.
17                    (Recess had.)
18                THE VIDEOGRAPHER:  We're on the
19   record.
20   BY MR. LIVINGSTON:
21       Q.    Mr. Colosimo, from time to time did
22   Giant Eagle ever ask you for any advice
23   regarding any of the security requirements
24   relating to controlled substances?
25       A.    I believe after the -- after the

Page 90

1    second Giant Eagle Rx Distribution Center
2    application was approved, I believe I did
3    contact them with -- or they -- one of the
4    Giant Eagle representatives contacted me
5    regarding some physical security aspect.  I
6    can't recall specifically what that was, but I
7    think there was discussion about a physical
8    security issue.
9            Q.    Okay.  And did you provide any
10   guidance?
11           A.    I can't recall specifically.  Yeah,
12   I don't recall specifically, but I do remember
13   the request, but I can't remember what the
14   request was about.
15           Q.    Okay.  Well, let's turn back to
16   Exhibit 20, page 1, which was your investigation
17   report for the GERx facility before it opened.
18              Under the heading Subject Firm's
19   Background, you refer to the fact that HBC
20   currently -- you know, that currently, since
21   October of 2009, Giant Eagle's HBC facility was
22   a distributor of Schedule 3 through 5.
23              Do you see that?
24           A.    Yes.
25           Q.    And then below that you indicate

Page 91

1   that "HBC has been the subject of three in-depth

2   cyclic investigations by the Pittsburgh D.O.,"

3   and then there's some redactions, but it says,

4   "None of which resulted in any administrative

5   actions."

6           So did you look back on those prior

7   in-depth cyclic investigations to see what the

8   outcome of those investigations was?

9      A.    Yes.

10     Q.    Do you remember which years those

11  cyclic investigations took place?

12     A.    I believe the first one would have

13  been within a few years of the -- of their

14  approval.  The others, I can't recall

15  specifically when those would have been.

16     Q.    And did you just look at written

17  records of those prior investigations or did you

18  talk to the DEA folks who were involved in those

19  investigations or both?

20     A.    I would have reviewed the written

21  file.  I can't recall if I spoke with -- with

22  the investigators.  I can't recall

23  specifically.

24     Q.    Would you go to the next page?  At

25  the very top it's talking about HBC.  It says,

Page 92

1   "The subject firm was the subject of in-depth
2   chemical regulatory cyclic investigations in
3   2002, 2004, 2008 and 2014.  No violations were
4   uncovered during these investigations."
5           Now, you're referring here to the
6   List 1 chemical inspections; is that correct?
7           A.    Yes.
8           Q.    And, again, I mean, so -- when you
9   went out to the GERx facility to inspect it
10  before it opened, at that time you knew that
11  Giant Eagle's HBC facility had not had any
12  issues with respect to compliance with DEA
13  regulations during any of these audits going
14  back all the way to 2002, correct?
15          A.    Could you ask that question again?
16          Q.    Yes.
17          I mean, your report refers to every
18  single DEA inspection of HBC's facility, some
19  of which go back to 2002.  You knew at the time
20  you went out to the GERx facility to check that
21  facility out before it opened that Giant
22  Eagle's HBC facility had essentially passed
23  every single inspection that the DEA had
24  conducted going all the way back to 2002?
25          MS. CARROLL:  Objection.  Form.

Page 93

1    Mischaracterizes his statement.

2              Witness may answer.

3         A.    I believe on page 1 of that report

4    I indicated that the three inspections of the

5    HBC facility did not result in any

6    administrative action, such as a letter of

7    admonition.

8         Q.    Well, again, not to quibble, but you

9    reviewed those reports and one of those reports

10   was -- or a couple of those reports were

11   actually ones you authored, and all of those

12   reports indicated that there were no violations

13   discovered during those inspections going all

14   the way back to 2002, correct?

15             MS. CARROLL:   Objection.  Form.

16             The witness may answer.

17        A.    You're distinguishing between the

18   controlled substance investigations that's

19   scheduled in the List 1 chemicals --

20        Q.    I'm including both.

21        A.     -- and as I indicated earlier, the

22   investigation of the controlled substance

23   facility, HBC, did not result in any

24   administrative action.  I did not say that

25   there was not -- there were not issues that --

Page 100

1   says, "As noted above, prior cyclic

2   investigations conducted at HBC have not

3   resulted in any administrative actions.  HBC was

4   the subject of its first regulatory

5   inspection/cyclic investigation in May 2011, and

6   documented under DEA file number," which is left

7   blank.  "The result of this investigation

8   revealed minor recordkeeping violations (an

9   overage due to computer software malfunction)."

10  And "This issue was resolved on-site."

11             Do you see that?

12       A.    Yes.

13       Q.    The reference to "This issue was

14  resolved on-site," meaning that there was -- it

15  was not considered to be a real violation, that

16  it was just a software malfunction and it was

17  resolved at the time?

18             MS. CARROLL:  Objection.  Form.

19             Witness may answer.

20       A.    That did not result in a formal

21  administrative action.  That issue was resolved

22  on-site and I included that in my report.

23       Q.    And you reviewed this May -- did you

24  review this May 2011 investigation report?

25       A.    Yes.

Page 106

1   my experience, I recommend more frequent, more

2   routine physical counting to eliminate or to

3   mitigate against diversion.

4        Q.    Would you go to page 10 of your

5   report under the heading Due Diligence?  It

6   says, "Because the supplier (GERxDC) and

7   customers (Giant Eagle pharmacies) are owned by

8   Giant Eagle Inc., GERxDC will have access to

9   customer information that will assist them in

10  enacting the following 'due diligence' actions."

11            Again, so it was your understanding

12  that Giant Eagle, because it was only

13  distributing to its own customers, would have

14  very in-depth information relating to its

15  customers?

16       A.    Well, that they would have -- that

17  they would have dispensing ordering information

18  for their -- for their customers, prescription

19  information.

20       Q.    Well, let's just take some for

21  examples.  They would know if, for example, a

22  competitor pharmacy across the street either

23  just opened or just closed, right, which might

24  affect how much prescriptions they would end up

25  needing to fill?

Page 107

1              MS. CARROLL:  Objection.  Form.

2              Witness may answer.

3         A.    I don't know.  You would have -- I

4    would have to ask that pharmacy, that, you

5    know, representative in their headquarters if

6    they knew about that specifically.  I don't

7    know.  I'd be speculating as to what they would

8    know.

9         Q.    But you do think it's important to

10   note this information in your reports, correct?

11        A.    Which information is that?

12        Q.    The fact that Giant Eagle's only

13   customers for its GERx facility were its

14   pharmacies.

15        A.    Yes.  It's important to put in

16   there.

17        Q.    If you go down to under Customer

18   Authentication, the paragraph in the middle, it

19   says, "The GERxDC only services Giant Eagle

20   pharmacies which are owned by Giant Eagle, Inc.

21   If, for any reason, a Giant Eagle pharmacy is

22   not licensed to receive Legend drug products or

23   controlled substances, the GERxDC will no longer

24   service the pharmacy."

25              Now, you understood from this that

1    Giant Eagle, again, was going to be monitoring

2    its own pharmacies to make sure that they were

3    at all times -- that they at all times had a

4    current DEA license, and if for some reason

5    they didn't, GERx would immediately stop

6    shipping controlled substances to that

7    pharmacy, correct?

8         A.    That's what I stated in my report.

9    That's my understanding.

10        Q.    Then on the next page, 11, there's a

11   section called -- a whole section on Suspicious

12   Orders, correct?

13        A.    Yes.

14        Q.    Okay.  And we're not going -- for

15   time reasons, we're not going to go through this

16   whole thing -- it goes on for a few pages -- but

17   you ultimately concluded that the proposed

18   suspicious order system was -- that it would be

19   compliant with DEA regulations?

20        A.    In my report I described the system

21   as represented to me by Giant Eagle.  I did not

22   evaluate its effectiveness.  I just -- I

23   completely described it as they represented to

24   me in -- with the handout that they gave me.

25        Q.    I'm just -- I mean, at the end --

Page 113

 1   sense.

 2              MR. MOUGEY:  Objection.

 3        Q.    I mean, if I'm wrong about that,

 4   please let me know.

 5              MS. CARROLL:  Objection.

 6              Witness may answer.

 7        A.    There was a series of questions

 8   that you asked there.

 9        Q.    I was trying to just explain the one

10   question that I asked, but maybe I'll try it

11   again.  Isn't it true that if an applicant has a

12   SOM system that the DEA knows does not comply

13   with the regulations, that either they're going

14   to require the applicant to comply, or if the

15   applicant is adamant and won't comply, the DEA

16   will take some sort of administrative or other

17   action against the applicant or registrant?

18              MS. CARROLL:  Objection to form.

19              The witness may answer.

20        A.    In my experience, I would take

21   administrative action and ensure that there was

22   compliance.  That would be corrected on-site.

23        Q.    So can't we rest assured that at the

24   time you went out to GERxDC in 2015, that HBC's

25   SOM system was viewed by the DEA at that time as

Page 116

```
 1                 The witness can answer.
 2        A.    My understanding is that there was
 3   oversight of the warehouse by -- at the
 4   corporate level by Giant Eagle.
 5                       -   -   -   -   -
 6                 (Thereupon, Defendants' Deposition
 7                 Exhibit 3, Reports of Investigation
 8                 Beginning Bates Stamp
 9                 US-DEA-00033016, was marked for
10                 purposes of identification.)
11                       -   -   -   -   -
12        Q.    Would you turn to Exhibit 3, page 9?
13   Do you see that this is a report of
14   investigation by Michael Kupchick from your
15   office and it was prepared on May 20, 2011?  Is
16   this one of the investigation reports of HBC's
17   facility that you reviewed?
18        A.    Yes.
19        Q.    And it says -- this was a cyclic
20   investigation, correct?
21        A.    Yes.
22        Q.    And it says that Mr. Kupchick had
23   some assistance from Vincent Tomei from your
24   office as well?
25        A.    Yes.
```

1      Q.    You would agree that both of those

2   individuals are very competent and highly

3   dedicated DEA inspectors, correct?

4      A.    I work with both Investigator

5   Kupchick and Investigator Tomei.

6      Q.    And they're both competent and

7   conscientious, correct?

8           MS. CARROLL:  Objection to form.

9           The witness may answer.

10     A.    I'm not the supervisor of either of

11  those investigators.

12     Q.    Well, do you trust their work?  I

13  mean, do you trust their work?

14     A.    What do you mean by that?

15     Q.    Well, you reviewed this work product

16  that they produced, this report, and you seem to

17  rely on it at least to some extent.  Did you

18  trust the accuracy of the report when you

19  reviewed it?

20     A.    The accuracy of the report?

21     Q.    Yes.

22     A.    I don't recall that there was

23  anything in there that I disagreed with that

24  was not accurate.

25     Q.    A little further down it says, "This

Page 118

1    investigation revealed no discrepancies with

2    respect to security."  The security regulations

3    include the SOM regulation, correct?

4              MS. CARROLL:  Objection.

5         A.    This is not my report.  This is

6    Investigator Kupchick's report.

7         Q.    Right, I know, but you read the

8    report.  And what did you understand this

9    reference to be referring -- to mean, "This

10   investigation revealed no discrepancies with

11   respect to security"?

12        A.    After reading the report, and this

13   is my perspective, no discrepancies with regard

14   to physical security at the facility, at the

15   warehouse.

16        Q.    Was it your understanding that at

17   this time HBC was still using the Vocollect scan

18   system for inventory control?

19        A.    I don't know if that was mentioned

20   in this report.

21        Q.    Why don't you go to page 19.  At the

22   top it says, "All selections are performed using

23   Vocollect directed activity."  Does that refresh

24   your recollection that in 2011 HBC was still

25   using the Vocollect system?

Page 119

1          A.     Yes.

2          Q.     What does the report mean when it

3     says "no discrepancies"?  Is that the same as no

4     violations?  What does that mean?

5                 MS. CARROLL:  Objection.  Form.

6                 Witness may answer.

7          A.     I don't -- I'm not sure of the

8     distinction.  In my opinion, the violation

9     would be something that would rise to the

10    issuance of a formal administrative letter or

11    administrative action.  The discrepancy could

12    be -- and, again, this is my perspective,

13    discrepancy could be some issue that was

14    resolved on-site where it did not rise to the

15    level of an administrative action.

16         Q.     In your mind, the violation is more

17    serious than just a discrepancy, which is a very

18    minor issue, correct?

19                 MS. CARROLL:  Objection.  Form.

20                 The witness may answer.

21         A.     They would be both issues that need

22    to be resolved in my perspective.

23         Q.     Could you go to page 40, please?

24    This is a report of investigation by John Conlon

25    from your office prepared August 13, 2013

Page 120

1   relating to the HBC facility.  Did you review

2   this report?

3        A.    Yes.

4        Q.    And then at the very bottom of the

5   synopsis on the first page, it says, "This

6   investigation revealed no discrepancies with

7   respect to recordkeeping or security."

8             Do you see that?

9        A.    Yes.

10        Q.    So this -- again, we have another

11   indication here that HBC essentially has a clean

12   inspection report, correct?

13             MS. CARROLL:  Objection.  Form.

14             The witness may answer.

15        A.    That's what Investigator Conlon

16   indicated, no discrepancies with respect to

17   recordkeeping or security.

18        Q.    And this report would have also, as

19   part of this -- of the inspection, would have

20   looked at HBC's SOM system at the time, correct?

21        A.    I believe this did.

22        Q.    Would you go to page 42?  The

23   heading is "Subject Firm's Background.  At the

24   very bottom of that first paragraph it says,

25   "HBC Service Company had 157 million dollars in

Page 124

1          Q.    Okay.  So is it your understanding
2     that essentially the DEA is saying, hey, you
3     know, you've been in compliance with the reg but
4     we think you can improve it possibly by going to
5     an automated system, right?  Was that your
6     understanding of what was being suggested to
7     Giant Eagle at this time?
8                  MS. CARROLL:  Objection.  Form.
9                  The witness may answer.
10                 MR. MOUGEY:  Objection.
11         A.    That's -- my understanding is that
12    the DI Investigator Conlon made suggestions,
13    noted that there was no computerized system to
14    detect that and made a suggestion to Mr. Rogos
15    to have that implemented.
16         Q.    If you go to the next page, 53,
17    under Meeting with Management, it says, "During
18    this meeting, investigators advised Rogos that
19    both recordkeeping and security are in full
20    compliance with the requirement set forth in
21    Title 21 Code of Federal Regulations."
22                 That includes the SOM regulation,
23    correct?
24                 MS. CARROLL:  Objection.  Form.
25                 Witness may answer.

Page 125

1          A.    The SOM regulation, I mean, insofar

2     as that is under security, that's accurate.

3          Q.    So he says that, Giant Eagle, you're

4     in full compliance, tells Giant Eagle you're in

5     full compliance with all the security regs,

6     including the SOM regs, but then he says, but,

7     you know, I advised Mr. Rogos to develop a

8     better system of due diligence, correct?  So

9     he's saying we think you can improve your

10    system, here's our advice, and then Mr. Rogos

11    said he would follow up, correct?

12               MS. CARROLL:  Objection.  Form.

13               The witness may answer.

14         A.    Those are your words.  I'll read

15    it.  "Investigator Conlon advised Rogos to

16    develop a better system of due diligence,"

17    period.

18         Q.    Right after he told Mr. Rogos, and I

19    assume he was being a hundred percent honest,

20    that Giant Eagle, with all of the security

21    requirements, which, of course, includes the SOM

22    requirement, correct?

23               MS. CARROLL:  Objection.  Form.

24               The witness may answer.

25         A.    And, again, my understanding is

Page 126

1    that the suspicious orders would fall under

2    security.

3        Q.    Let's take a look at to see if Giant

4    Eagle tried to follow up with what Mr. Conlon

5    had recommended.

6                    -    -    -    -    -

7                (Thereupon, Defendants' Deposition

8                Exhibit 16, E-Mail String Beginning

9                Bates Stamp HBC_MDL00136952, was

10               marked for purposes of

11               identification.)

12                   -    -    -    -    -

13       Q.    Would you go to Exhibit 16?  Just

14   for reference, we were just looking at the

15   report from August of 2013.  You see Exhibit 16

16   is an e-mail from Joseph Millward at Giant Eagle

17   to some other folks at Giant Eagle dated

18   November 14, 2013 regarding daily HBC suspicious

19   purchasing report.

20               Do you see that?

21       A.    Yes.

22       Q.    If you skip down to the bottom, this

23   is an e-mail response to another e-mail from

24   Kayla Voelker at Giant Eagle, and she says, "We

25   had two pharmacies exceed the purchasing

Page 127

1   thresholds of certain controlled products so far

2   this month."  So do you see that Giant Eagle a

3   few months later already had the automated

4   threshold system in place for suspicious order

5   monitoring?

6               MS. CARROLL:  Objection.  Form.

7               The witness may answer.

8       A.    I don't know what they had in

9   place.  This is an e-mail that you're referring

10  to that addresses thresholds.

11      Q.    Right.  Which is what an automated

12  threshold system does, right?  It has --

13  automatically when you hit a certain threshold

14  at a store for purchasing a certain item, it's

15  flagged, right?

16              MS. CARROLL:  Objection.  Form.

17              The witness may answer.

18      A.    I'm familiar with the term

19  "threshold," but I don't know what Giant Eagle

20  had in place at this time to detect that.

21      Q.    Hasn't Giant Eagle -- didn't Giant

22  Eagle report some suspicious orders to you

23  telephonically or by e-mail?

24              MS. CARROLL:  Objection.  Form.

25  Vague.

                                         Page 134

1          A.    I reviewed this report among others

2     before it was approved.

3          Q.    And the report concludes that --

4     says, "This investigation revealed no

5     discrepancies with respect to recordkeeping or

6     security," correct?

7          A.    Yes.

8          Q.    And that would have included no

9     discrepancies with respect to Giant Eagle's SOM

10    system at its GERx facility?

11              MS. CARROLL:  Objection.  Form.

12              The witness may answer.

13         A.    Again, the SOM system would be

14    under -- my understanding, it would be under

15    the security portion.

16              MR. LIVINGSTON:  I'll pass the

17    witness and reserve any time I may still have

18    left.

19              MS. CARROLL:  Is this a good time

20    to take a short break?

21              MR. LIVINGSTON:  Sure.

22              THE VIDEOGRAPHER:  We're off the

23    record.

24                   (Recess had.)

25              THE VIDEOGRAPHER:  We're on the

1  and security are in full compliance with the

2  requirements in Title 21 CFR"?  That tells you,

3  sir, that Giant Eagle was told at this time that

4  it was meeting all of the security requirements,

5  including the SOM regulation, correct?

6            MS. CARROLL:  Object to the form.

7            The witness may answer.

8       A.    Yeah.  According to that sentence,

9  it does indicate that Investigators Conlon and

10  Sousa advised Rogos and Kuchta that

11  recordkeeping and security are in full

12  compliance.  That's what it says.

13       Q.    Okay.  And, sir, if you go back to

14  the previous page -- I guess it's actually page

15  69 of this exhibit -- this is that discussion

16  that -- between Mr. Rogos and the DEA

17  investigators about Giant Eagle's SOM system at

18  the time, correct?  You were just asked some

19  questions about this from Mr. Mougey.

20       A.    Yes.

21            MS. CARROLL:  Objection.  Form.

22            The witness may answer.

23       Q.    Sir, isn't this literally word for

24  word identical to what was in the previous

25  report from August of 2013 that we looked at