SJ-EXHIBIT 10

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4

5    MDL NO. 2804

6    CASE NO. 17-md-2804

7    Hon. Dan A. Polster

8

9    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14                       VOLUME I

15              REMOTE VIDEO DEPOSITION OF

16                    JAMES RAFALSKI

17    (CONTAINS TESTIMONY DESIGNATED HIGHLY CONFIDENTIAL)

18                    June 10, 2021

19

20

21

22   REPORTED BY:  Laura H. Nichols

23                    Certified Realtime Reporter,

24                    Registered Professional

25                    Reporter and Notary Public

Page 41

1   sections of the deposition that I should focus on

2   versus reading the entire deposition.

3          Q.     Okay.  Mr. Rafalski, it is kind of

4   early in your deposition to be violating the New

5   York court's instruction.  Remember just answer --

6   if it is a yes or no question, please answer yes or

7   no so we can keep this thing moving as quickly as

8   possible.

9          MS. KNIGHT:  That is totally

10  inappropriate.  He is answering your questions.  He

11  can explain his answers.

12         Q.     (BY MR. LIVINGSTON:)  Now, you have

13  no opinion at all in this case about the conduct of

14  any pharmacies in Lake and Trumbull Counties other

15  than the five defendant pharmacies in Track 3; is

16  that correct?

17         A.     Yeah, that is a correct statement,

18  sir.

19         Q.     And you have no opinion about whether

20  any of those pharmacies who you didn't examine or

21  offer any opinions about acted lawfully or

22  unlawfully with respect to their filling of opioid

23  prescriptions?

24         A.     I believe that is a correct

25  statement.  I am not offering an opinion on

Page 43

1    Pharmacy for filling illegal -- filling

2    illegitimate opioid scripts?

3         A.    I know there were some pharmacies

4    closed.  I don't know the number, sir.

5         Q.    Can you even identify for the record

6    a single pharmacy that was closed down by the Ohio

7    Board for illegally filling opioid scripts?

8         A.    No, sir.

9         Q.    And you also in your report offer no

10   opinions at all about whether the defendant's

11   pharmacy stores acted lawfully or unlawfully in any

12   way, shape or form with respect to the filling of

13   opioid prescriptions, correct?

14        A.    Contained in my opinion, in my

15   report, I don't specifically cite any pharmacies

16   that were operating unlawfully, if that is your

17   question, sir.

18        Q.    Maybe I am missing something, but

19   when I read your report, I only saw opinions

20   relating to the defendant pharmacies' distribution

21   activities, correct?

22        A.    Yes, sir.  That is an accurate

23   statement.

24        Q.    Okay.  There is nothing at all in

25   your report relating to the defendant pharmacies'

Page 44

1    activities as pharmacies, i.e., filling

2    prescriptions?

3            A.      That's a correct statement, sir.

4    There's nothing in my report on that matter.

5            Q.      Now, you certainly have the

6    expertise, sir, to offer opinions about the

7    defendant pharmacies' operations at the pharmacy

8    level, correct?

9                   MS. KNIGHT:  Object to form.

10           A.      I'm not sure that I have the

11   expertise of a pharmacist.  I think with my

12   previous employment, I have done cases dealing with

13   pharmacies at a certain level.  But the question

14   you asked was kind of broad.

15                   So I don't have the ability to make

16   judgments on the actual filling of prescriptions.

17   It would be more of a pharmacist expert.

18                   So potentially in certain aspects

19   maybe but not the way I think you have described it

20   or asked the question.

21           Q.      (BY MR. LIVINGSTON:)  Well, didn't

22   you investigate and shut down -- I will say bad

23   pharmacies in the Detroit area?

24           A.      Yes, sir.

25           Q.      And you have never been a

Page 60

1          A.      A diversion program manager, that is

2    a GS15.

3          Q.      In those thirteen years, you did not

4    advance to group supervisor, is that correct?

5          A.      No, sir.  I had no desire to be in

6    management.

7          Q.      When you applied to the DEA -- well,

8    before I ask that question, are you aware of the

9    fact that the DEA also has special agents?

10         A.      Yes, I am aware of that.

11         Q.      And unlike a diversion investigator,

12   a special agent has the ability to arrest people,

13   conduct surveillance, serve subpoenas and that sort

14   of thing and arrest people?

15         A.      That would be a correct statement.

16   As a diversion investigator, I am not a law

17   enforcement officer, and the difference would be

18   that special agents are, so they carry guns, have

19   authority to make arrests, search warrants, handle

20   confidential informants, do surveillance.  I am

21   restricted from doing those type of things.

22         Q.      And over the course of your years

23   while you were with the DEA as a diversion

24   investigator, you would oftentimes work with

25   special agents when you were investigating a bad

Page 64

1          A.     I --

2          Q.     You were asked about your geography

3    and you said, "In the Detroit office, I would cover

4    the lower peninsula of Michigan, the upper

5    peninsula of Michigan, and I would cover six

6    counties in Ohio, six northern east counties in

7    Ohio."

8               Toledo is northwest, correct?

9          A.     Yes.  Yes.  Thinking about that

10   testimony, not -- not right when I said it, but as

11   you brought it up, and then thinking about the map

12   of Ohio and being aware that it goes quite farther

13   east than Michigan, it would be more correct to say

14   that the northwest -- northwest areas that border

15   Michigan.

16         Q.     All right.  Would you go to Page 7 of

17   your expert report, which is our Exhibit 2?

18               Do you see in the first full

19   paragraph at the top, you say, "As a DEA Diversion

20   Investigator with thirteen years of experience

21   (2004 - 2017), I am uniquely qualified to offer

22   expert opinions regarding compliance with federal

23   regulations governing the distribution of

24   controlled substances."

25               Do you see that statement?

Page 65

1          A.      I do.

2          Q.      You're not telling the jury that

3    you're the only former or current DEA person who is

4    qualified to offer expert opinions regarding the

5    defendants' compliance with DEA regulations, are

6    you?

7          A.      I don't think that statement implies

8    that, Mr. Livingston.

9          Q.      Well, what did you mean by

10   "uniquely"?

11         A.      Well, I've done a couple of

12   significant cases.  The Masters case, the Harvard

13   case and the Mallinckrodt case, that all was

14   related to the distribution of oxycodone,

15   thirty-milligram products to Florida.

16                 And as far as I'm aware, the

17   Mallinckrodt case was the first case that was ever

18   done regarding a manufacturer.

19                 So I think there's some uniqueness to

20   my experience, but I don't mean that to mean that

21   there's not another person that can't testify or be

22   in the same capacity that I'm in.

23         Q.      Yeah.  I mean, the DEA has brought

24   hundreds of cases since you started, if not

25   thousands of cases, against pharmacies and

Page 66

1    distributors throughout the United States since you

2    became a DEA employee in 2004, correct?

3            A.     Well, I think that's accurate,

4    although not many of those cases went to an order

5    of show cause hearing and then rose through the

6    administrator's ruling and then to the federal

7    appellate court.  I think that's one of the unique

8    things about my experience.

9            Q.     Now, when you were at -- in order to

10   become a -- or when you became a DEA diversion

11   investigator, you had to go to a twelve-week

12   training course at Quantico in Virginia, correct?

13           A.     That's correct, sir.

14           Q.     And special agents also have to go to

15   Quantico to be taught about all of the regulations

16   that the DEA has and how to conduct themselves as a

17   special agent, correct?

18           A.     That's a correct statement.  I

19   believe it's longer than twelve weeks, though.

20           Q.     Right.  It's actually six months, as

21   opposed to three months, correct?

22           A.     I don't know the exact number of

23   weeks, but it is longer, sir.

24           Q.     Now, when you were with the DEA, you

25   performed what are called "preregistration

Page 70

1    regulation?

2           A.      That's not accurate.

3           Q.      What other -- yeah.  So let me

4    just -- so what other regulation, other than the

5    SOM regulation, do you claim that they did not

6    comply with?

7           A.      Well, within the maintenance of

8    effective controls, it's -- I guess you

9    characterize it as -- it's an umbrella or an

10   overarching -- there's activities that registrants

11   conduct within -- specifically in a compliance

12   program would be due diligence.  And the lack of

13   due diligence would be a failure that would lead to

14   the maintenance of -- the loss of the maintenance

15   of effective controls to prevent diversion.

16                  It's not specifically in a

17   regulation, but it encompasses the activity to

18   ensure the holding of a registration.

19          Q.      Okay.  The due diligence requirement

20   that you speak of is not anywhere in any

21   regulation.  But you believe that that obligation

22   does apply to the defendants with respect to the

23   operation of their SOM systems, correct?

24          A.      It's not just the operation of their

25   SOMs.  It's an activity they do to maintain their

Page 71

1    effective controls to prevent diversion.  I think

2    the ruling in the Masters case would confirm that,

3    in that that's what the Court held, is that due

4    diligence was an essential part of the compliance

5    with the regulation.

6            Q.    All right.  We'll get to those

7    regulations in a little more detail in a little

8    bit.

9                  But during these investigations, both

10   preregistration and cyclic, one of the things that

11   you always make sure that you check is the SOM

12   system, if you're dealing with a distributor,

13   correct?

14           A.    I would make sure that -- are we

15   speaking a new registrant?

16           Q.    Well, I -- in both situations, you're

17   going to make sure that they either are going to

18   have a SOM system that complies with the DEA

19   regulations, or that they currently have and are

20   operating a SOM system that complies with the DEA

21   regulations.

22           A.    Generally speaking, I agree with

23   that, yes, sir.

24           Q.    I mean, that's right in the diversion

25   investigator manual, that you're supposed to check

Page 75

1          MS. KNIGHT:  That's exactly what I

2     said.

3          THE REPORTER:  Thank you.

4     A.     Mr. Livingston, I would say that I

5     would -- I would do preparations prior to going

6     on-site.  But I am a little cautious about exactly

7     answering what I would do, what specific things I

8     would do prior to conducting an investigation.

9     Q.     (BY MR. LIVINGSTON:)  All right.  And

10    was it DEA policy and practice, when you were with

11    the DEA, for DEA diversion inspectors to prepare a

12    report after they've completed their

13    preregistration and/or their cyclic inspection as

14    well, correct?

15    A.     That's correct, sir.

16    Q.     And those reports would at least be

17    available for the next inspection that the

18    registrant might have; is that correct?

19    A.     Generally speaking, yes.

20    Q.     And those reports were not given to

21    the registrant, right, after the inspection was

22    over?  That was something that the DEA would just

23    keep in its files, correct?

24    A.     I never provided one to a registrant.

25    Q.     Okay.  But you would have a

Page 76

1   discussion with management, and you would let the

2   registrant know whether, in your view, they were in

3   compliance or not in compliance with all of the

4   applicable DEA regulations, correct?

5           A.      There would definitely be a

6   management meeting.  And depending on the outcome

7   of the investigation, would kind of dictate the

8   kinds of conversation.

9                   I don't -- sometimes -- I would

10  generally be a little more cautious on being too

11  complimentary or two negative.  It's kind of a pass

12  or fail.

13          Q.      Okay.  When you say "pass or fail,"

14  meaning they either were in compliance or they were

15  not in compliance, correct?

16          A.      Sure.  And if they were not in

17  compliance at the time of the management

18  conference, I didn't have the ability to tell them

19  what was going to occur based on my findings that

20  they were not in compliance.

21                  So it wouldn't be a closed

22  conversation at the end because I -- sitting there,

23  I didn't have the ability to tell them.  That's a

24  management decision.

25          Q.      Okay.  So if they weren't in

Page 77

1    compliance, you wouldn't necessarily tell them

2    immediately.  You would then go back to your

3    superiors at the DEA and discuss what next steps

4    might be?

5            A.    That's a correct statement.  As far

6    as in Detroit, that's how we did that.

7            Q.    Okay.  And, you know, in terms of DEA

8    enforcement efforts, when a registrant is not in

9    compliance with its regulations, what's the first

10   lowest level of enforcement that the DEA might

11   undertake?

12           A.    Well, in some rare instances, there's

13   an actual on-site correction.  So an example would

14   be some minor recordkeeping issue that can be

15   corrected on site, would be listed and would be

16   detailed, but not what -- it would be a corrective

17   action.

18                 The next level up -- the next formal

19   level up, or the lowest formal level, would be a

20   letter of admonition.

21           Q.    Okay.  And then would the letter of

22   admonition essentially give the registrant a

23   certain period of time to try to get their act

24   together and get into compliance?

25           A.    It generally gave them thirty days to

1    inspections had not identified any issue.

2            Q.      (BY MR. LIVINGSTON:)  And -- yeah,

3    I'm not talking about situations where, you know,

4    the registrant tells you, here's our system, but

5    they don't actually follow their system.  They

6    don't actually operate it the way they tell you.

7                    I'm just talking -- assuming that the

8    registrant actually operates the system in the

9    manner in which they've described it to you.  And

10   you say, sounds good to me, shouldn't the

11   registrant -- and as a matter of all fairness -- be

12   able to rely on that representation that they're

13   fine?

14                   MS. KNIGHT:  Objection to form.

15           A.      I don't fully disagree with what

16   you're saying.  But I'd have to say that a

17   registrant is bound to comply with the regulations,

18   and that's not dependent on whether or not an

19   inspection is conducted, and an issue is not found

20   or discovered or detailed by a diversion

21   investigation, it doesn't relinquish the

22   responsibilities to comply with the regulations.

23           Q.      (BY MR. LIVINGSTON:)  Oh, no.  Of

24   course, the law is the law.  The question is

25   whether they can rely, in all fairness, on what

1    you're telling them as an expert.  Right?  These

2    are DEA regulations.  You're a DEA investigator

3    whose job it is to enforce those regulations.

4    Nobody knows those regulations, presumably, when

5    you're on the job, any better than you, and you're

6    coming in to a registrant and you're telling them

7    that they're okay, shouldn't they be able to rely

8    on that?

9              MS. KNIGHT:  Objection to form.

10       A.    As I answered earlier, I generally

11   agree with that.  But there are certain areas that

12   a registrant should -- would seek a higher

13   approval.

14       Q.    (BY MR. LIVINGSTON:)  Let's now --

15   I'd like to just give me a little road map here.

16   Let's now focus on the DEA regulations that you've

17   described in some detail so far this morning.

18              Let's -- to do that, let's --

19              MS. KNIGHT:  Mr. Livingston, if we're

20   switching gears, can we just take a quick

21   five-minute comfort break?  Is this --

22              MR. LIVINGSTON:  Sure.

23              MS. KNIGHT:  Okay.  Real quick.

24              THE VIDEOGRAPHER:  The time is now

25   approximately 9:18 a.m.  We're off the record.

Page 83

1               (Whereupon, a break was had from 9:18

2               a.m. until 9:32 a.m. EDT)

3               THE VIDEOGRAPHER:  The time is now

4     approximately 9:32 a.m.  We're on the record.

5               Q.    (BY MR. LIVINGSTON:)  Now,

6     Mr. Rafalski, when you were conducting cyclic

7     investigations of -- inspections of distributors

8     back in the day when you were a DEA diversion

9     inspector, you never had a Dr. McCann at your side

10    to use the ARCOS data to run the methodologies that

11    he ran on the registrant, correct?

12              A.    No.  I would have access to analysts

13    that worked in headquarters in ARCOS.

14              Q.    And did you ever have them run all

15    these methodologies for a registrant?

16              A.    No.  You were -- I thought you were

17    speaking in terms of doing a regulatory

18    investigation.

19              Q.    Yeah.  I'm just asking that -- I know

20    that to test the Defendants' compliance in this

21    case, you used Dr. McCann to assist you in running

22    the data through your methodologies.

23              Did you ever do that, or something

24    similar to that, when you were a DEA diversion

25    inspector?

Page 84

1          A.     Yes.

2          Q.     What did -- when did you do it and

3    with respect to whom?

4          A.     I think that's going to be another

5    Touhy issue, Mr. Livingston.

6          Q.     Well, you just said that you did it,

7    so I don't think it's a Touhy issue.  We need to

8    know --

9               MS. KNIGHT:  Mr. -- Mr. Livingston,

10   if he invokes Touhy, and believes that that's his

11   obligation under the law, then you can't override

12   that.  You're very familiar with that rule.

13              MR. LIVINGSTON:  I don't agree with

14   your position on it.

15         A.     But I think to acknowledge it was

16   done is different than telling what I did or who I

17   did it with and who I did it for.

18         Q.     (BY MR. LIVINGSTON:)  Well, no.  The

19   question was -- we know what you did because -- so

20   the question is:  Did you ever take the seven

21   methodologies that are in your report and hand it

22   to somebody with a Ph.D. in data analysis to run

23   those methodologies through the registrant's data?

24         A.     To that specific question, I would

25   answer no.  I don't think that's the same question

Page 85

1   you asked me earlier.

2           Q.      So the answer is no?

3           A.      That's correct.  The answer is no.

4           Q.      Okay.  And remember when we were

5   talking before about the various levels of

6   enforcement that were available to you as a DEA

7   inspector, if a registrant was not in compliance

8   with the regulations?  Do you remember when we

9   talked about that a minute ago?

10          A.      Yes.  Available to the agency, not to

11  me specifically.  But, yes, I remember the

12  conversation.

13          Q.      Right.

14                  When you inspected distributors while

15  you were with the DEA, how often did you conclude

16  that they were in full compliance with all

17  applicable DEA regulations?  Roughly, percentage,

18  you know, ten percent, sixty percent, a hundred

19  percent, ninety percent, whatever it is.

20                  MS. KNIGHT:  Objection to form.

21          A.      Are you -- in regards to your

22  question, was that specific to distributors?

23          Q.      (BY MR. LIVINGSTON:)  Yes.

24          A.      I think generally speaking, off the

25  top of my head, distributors -- there's a large

Page 86

1   volume of regulations.  So I would say that there

2   was generally at least maybe fifty percent, maybe a

3   little less of time where there would be some kind

4   of violation.

5          Q.     Okay.  All right.  Would you turn to

6   Exhibit 6, Page 9?  Giant Eagle Exhibit 6.

7                 (GE Exhibit 6 was marked for

8                 identification.)

9          Q.     (BY MR. LIVINGSTON:)  And the pages

10  are at the top.  See, this is Section 1301.71 of

11  the DEA's Controlled Substance Act regulations?

12                MS. KNIGHT:  Mr. Livingston, that's

13  not what's behind his tab.

14         A.     6?  You said 6?

15         Q.     (BY MR. LIVINGSTON:)  Yes.

16         A.     Tab 6 I have "Linden Barber" --

17         Q.     Yeah.  No.  It -- yeah, but just go

18  to the Page 9 at the top.  It's a compilation of

19  various -- yeah.  Yeah.  It was a trick question.

20  Sorry about that.

21         A.     No.  I didn't hear the "Page 9."  I'm

22  sorry.

23                Okay.  I'm there.

24         Q.     Yeah.  You're familiar with this

25  regulation, correct?

Page 89

1   would mean in compliance, substantial, more than

2   just trying.  It would be substantial in

3   compliance.

4          Q.     Well, doesn't it mean less -- at

5   least less than one hundred percent?

6          A.     That may be your interpretation.  I

7   think "substantial" would mean in compliance.

8          Q.     Well, are you saying that your

9   definition of "substantial" is there has to be

10  perfect compliance?

11         A.     I don't know that I'm saying there's

12  perfect.  But I think you couldn't find any obvious

13  faults.  It would be in compliance.

14         Q.     Well, I mean, let's just assume that

15  you're -- you get -- you're in compliance with nine

16  out of ten or ten out of eleven.  I mean, is that

17  substantial?  Or do you have to have perfect

18  compliance?  You can't be noncompliant with any

19  regulation to be "in substantial compliance with

20  the regulations"?

21              MS. KNIGHT:  Objection to form.

22         A.     I think substantial -- because if we

23  look down at the column of different items to be in

24  compliance with, they're broad and they give

25  various descriptions.  So I think "substantial

Page 90

1    compliance" would mean you can't find any faults of

2    noncompliance.

3                  I'm not sure I would say it has to be

4    perfect.  But if you were to find that there were

5    an obvious failure to be in compliance, that would

6    not be substantial.

7                  I think substantial is more than just

8    average or trying.  I think it shows a high level

9    attempt to be in compliance.

10               Q.     (BY MR. LIVINGSTON:)  Now, you're

11   very familiar with the SOM regulation, correct?

12               A.     Yes, sir.

13               Q.     And that regulation says that you

14   have to have a Suspicious Order Monitoring system

15   that's going to identify orders of unusual size,

16   pattern or frequency, correct?

17               A.     Well, in the beginning it says, "You

18   must design and operate."

19               Q.     Yeah.  But the system is supposed to

20   be able to identify unusual orders from a size,

21   pattern and frequency perspective, correct?

22               A.     But I don't -- yeah, it does say

23   that, but I don't believe that's an exclusive

24   statement.  That doesn't say that's the only things

25   that it should identify.  But I would agree it does

Page 101

1    you are saying, you are clarifying that Giant

2    Eagle's purported noncompliance only was from 2009

3    when they first started distributing Schedule 3

4    drugs, you say, through 2016?

5                    THE REPORTER:  You are getting a

6    little soft, Mr. Livingston.

7                    MR. LIVINGSTON:  Okay.  Is that

8    better?

9                    THE REPORTER:  Yes, sir.

10                   MR. LIVINGSTON:  Thank you.

11        A.    Well, they -- so there was two

12   facilities.  The first facility stopped

13   distributing this 2014.

14        Q.    (BY MR. LIVINGSTON:)  Right.  When

15   there was a reclassification from hydrocodone from

16   Schedule 3 to 2, correct?

17        A.    Correct.  And then they did not

18   self-distribute for a couple of years, and then

19   they started back self-distributing in 2016.  So my

20   opinion definitely goes from 2009 to 2014 and then

21   when they started to self-distribute again from the

22   GERX DC, I have some information contained in my

23   report, but I did not have enough information to

24   make a definitive opinion on their conduct post

25   2016.

Page 102

1          Q.      All right.  So let's just focus on

2    the gap period between 2014 and '16 when the second

3    facility known as GERX was opened up.  You have no

4    opinion obviously that Giant Eagle was doing

5    anything wrong as a distributor because they were

6    not a distributor, correct?

7          A.      No, I don't agree with that.

8          Q.      So even though they were not a

9    distributor after 2014, you are saying they were

10   still not complying with the SOM regulation?

11         A.      I didn't say the SOM regulation.

12   That wasn't -- I don't believe that was the

13   question you asked.

14         Q.      Yeah, I think you are getting me -- I

15   am starting to chase my tail here or feel like it.

16              So are you saying yes or no that you

17   have an opinion post 2014 about Giant Eagle?

18         A.      I believe the period between 2014 and

19   2016, there's a maintenance of effective controls

20   issue with the distribution from I believe it was

21   McKesson that distributed to them.  But in

22   regards -- if we are just talking specifically

23   SOMs, I do not have an opinion past 2014 on the

24   SOMs issue.

25         Q.      So in the period that you mentioned

Page 108

1    opioids in those two counties, did you?

2            A.      That's correct.

3            Q.      You didn't look at any independent

4    pharmacies who were ultimately shut down for

5    writing illegal scripts in these two counties,

6    correct?

7            A.      That's correct.

8            Q.      You didn't look at what the amount of

9    theft from medicine cabinets or what have you after

10   scripts were filled in -- legitimate scripts were

11   filled in those two counties for opioids, correct;

12   you didn't try to figure that out?

13           A.      That is correct, Mr. Livingston,

14   because I wasn't asked to form an opinion on those

15   things.

16           Q.      And you weren't asked to look at what

17   contribution, if any, manufacturers of opioids made

18   by any conduct that they were responsible for,

19   including their marketing efforts, correct?

20           A.      Not contained within this specific

21   opinion, that is correct.

22           Q.      And in order to contribute to the

23   opioid epidemic in these two counties, the

24   defendant pharmacies had to have had problems at

25   the pharmacy level, correct?

Page 109

1              MS. KNIGHT:  Objection to form.

2         A.     I do not disagree with that

3     statement.

4              Q.    (BY MR. LIVINGSTON:)  Right.  I mean

5     just, this is, I think, pretty simple logic that

6     your focus was entirely on the defendants' conduct

7     as distributors, correct?

8              A.     In concert with the distribution to

9     their pharmacies, yes.

10             Q.     And even if the defendants were, you

11    know, as you claim, not doing a good job of

12    complying with DEA regulations at the distribution

13    level, if their pharmacies were exemplary

14    pharmacies with respect to controls against

15    diversion, and their pharmacies were doing

16    everything that a good pharmacy should be doing, at

17    the end of the day, there's -- it doesn't matter,

18    because there's not going to be any diversion as a

19    result of what the pharmacies were doing at the

20    distribution level, correct?

21             MS. KNIGHT:  Object to the form.

22             A.     Well, in that hypothetical, because

23    of the failures of the company, and not doing due

24    diligence and not providing me with the information

25    to see that that was actually accurate, there's no

Page 112

1   perfect world, I don't think that your hypothetical

2   is possible.  But in listening to your

3   hypothetical, if everything was absolutely perfect

4   with every pharmacy, then it is, hypothetically,

5   potentially it could be true.

6           Q.    (BY MR. LIVINGSTON:)  Now, when you

7   try to analyze whether a distributor is complaining

8   with the SOM regulation, you have to look at the

9   nature of the -- of the distributor's business,

10  correct?  That is right in the regs, you are

11  supposed to take those sorts of things into

12  consideration?

13          A.    Generally I agree with that, yes,

14  sir.

15          Q.    And that is why the DEA -- you know,

16  there's no one-size-fits-all for SOM regulations,

17  correct?

18          A.    I believe we touched on that earlier.

19  I believe that is why the regulation is good as it

20  stands, because it allows the ability for a

21  registrant to design their own system to meet their

22  own needs and their own customer base, and it is

23  fluid and allows them to change it.  I don't think

24  there's a one-size-fits-all that could ever handle

25  the totality of distributor activities in there.

1          Q.      Now, no matter how many times we look

2     at the DEA's some regulation, we won't find any of

3     the seven methodologies that you asked Mr. --

4     Dr. McCann to use when he crunched the data,

5     correct?

6          A.      The DEA regulations never contained a

7     methodology or an algorithm.

8          Q.      Okay.  And, in fact, the DEA doesn't

9     even require that a registrant have an automated

10    threshold system.  They can use a manual system if

11    they desire?

12         A.      If they can -- if it can be designed

13    and operated and identify suspicious orders, yes,

14    sir.

15         Q.      Okay.  When you were inspecting

16    distributors, you know, while you were with the

17    DEA, did you ever recommend to any of them that

18    they use any of the methodologies that you are now

19    embracing in your report?

20         A.      No, sir.  It would have been improper

21    for me to do that.  I think the farthest guidance,

22    probably the only guidance I can recall is there

23    was a period of time when the HDMA had a suspicious

24    order monitoring draft or a guide policy, and I

25    wouldn't direct a registrant to that, especially a

Page 114

1    new registrant.  But I may say that if they did

2    some Google research, they may get some good ideas

3    off the internet.  But I never specifically

4    directed any registrant to any type of a suspicious

5    order monitoring system.

6            Q.    Okay.  Now, the results that

7    Dr. McCann came up varied greatly for each one of

8    the defendants under the methodologies that you

9    gave him to use, correct?

10                 MS. KNIGHT:  Object to form.

11           A.    In your question, are you asking me

12   the results varied greatly?

13           Q.    (BY MR. LIVINGSTON:)  Yes, the

14   results.

15           A.    Yes.

16                 MR. LIVINGSTON:  Let's go to

17   Exhibit -- Giant Eagle Exhibit 24.

18                 (GE Exhibit 24 was marked for

19                 identification.)

20           Q.    (BY MR. LIVINGSTON:)  This is a chart

21   that we had our version of a Dr. McCann put

22   together which is just really taking the results

23   from his report and your report for Giant Eagle.

24   This is a comparison of the methodologies for

25   flagging distribution orders, you know, seven

Page 122

1    other things we have got to look at, but just
2    looking at this chart, this would suggest to you
3    that Giant Eagle's pharmacies are good pharmacies
4    that have proper controls and they are not engaged
5    in massive diversion, correct?
6           A.    I couldn't draw that conclusion from
7    looking at this.
8           Q.    Let me just -- you have examined or
9    you did examine when you were a DEA inspector many
10   pharmacies, correct?
11          A.    I don't know that I would
12   characterize it many, but as part of my job I have
13   done that, yes, sir.
14          Q.    Well, just for example, you examined
15   SafeScript, right?
16          A.    That is correct.
17          Q.    And that turned out to be a bad
18   pharmacy, correct?
19          A.    That's correct.
20          Q.    And when you investigate a
21   potentially a bad pharmacy, there are certain
22   things you look for, certain factors that you
23   consider to try to determine whether you have got a
24   good pharmacy or a bad pharmacy on your hands,
25   correct?

1      A.     Yes.  But I am not sure how you are

2  drawing a correlation to the chart.  But when I

3  look at this chart, just for informational

4  purposes, I do see an escalation of the dispensing

5  of hydrocodone by the Giant Eagle pharmacies,

6  leading up to 2012 when many declines occurred

7  throughout the industry.  So that would be a

8  concern, the years of 2009, '10, 11, exceeding the

9  quota, comparison quota.  So that also would be

10  alarming to me or would be of concern to me.

11      Q.     What factors would you look at --

12  look for to try to determine whether you have a

13  good pharmacy or a bad pharmacy?

14      A.     I would look at ordering patterns and

15  I would look at -- I would review prescribing

16  patterns, prescriber patterns.  That would be a

17  preliminary.

18      Q.     What about, you know, Oxy A, that is

19  a high dose form of oxycodone --

20              MS. KNIGHT:  Let him finish.

21      A.     I wasn't quite finished, sir, I am

22  sorry.

23              I would look at the types of drugs

24  that were dispensed in relation to all drugs.  I

25  would look at all drugs compared to controlled

Page 124

1   substances.  I would look at cash and noncash

2   payments.  I would look at the volume.  I would

3   look at the geographic area.  I would look at other

4   pharmacies nearby.  I would look at a bunch of

5   different factors in helping to draw a conclusion

6   on that issue we are talking about.

7           Q.    (BY MR. LIVINGSTON:)  Okay.  And I

8   think -- I already know the answer, but you didn't

9   look at any of these factors with respect to any of

10  the pharmacies in this case, correct?

11          A.    I wasn't asked to provide an opinion

12  on pharmacies, so I did not.

13          Q.    Yeah.  No, I don't care why you

14  didn't.  I just want to know whether you did or you

15  didn't.  You did not, correct?

16          A.    I said I did not.

17                MS. KNIGHT:  Asked and answered.

18          A.    I was not asked to.

19          Q.    (BY MR. LIVINGSTON:)  Now, controls,

20  one of the things you suggested was your percentage

21  of controls versus noncontrols, correct?

22          A.    That's correct, sir.

23          Q.    And I think SafeScript, didn't they

24  have like ninety percent controls?

25          A.    Yes.  But I don't know the exact

Page 126

1    versus noncontrols.  And then as time went by, up

2    until 2012, it might get up as close as into the

3    twenties.  And just based on the prescribing and

4    dispensing of controlled substances.  And it

5    wouldn't just be opioids; it would be all controls.

6              But it would generally be around

7    twenty at the height.  Unless there was some kind

8    of a reason that they were a specialty pharmacy,

9    they had contracts or special relationships that

10   were verified to be legitimate, that number could

11   be higher.  We are just talking a general,

12   full-service pharmacy.

13        Q.    Yeah.  So I just want to make sure I

14   understand.  You are saying that roughly around

15   twenty percent, if it was more than twenty percent,

16   you would start to get concerned about the level of

17   controls versus noncontrols?

18        A.    I guess concern could be a good word.

19   It would be something that I might look at a little

20   closer, and that would be at the height.

21        Q.    Well, what was the average level of

22   controls versus noncontrols?  Was that something

23   that you knew when you were a DEA inspector?

24        A.    Yeah, there would be published

25   reports or there would be information available or,

Page 132

1    present, correct?

2            A.      Yes.

3            Q.      Okay.  During that time frame, is

4    fifteen percent -- is that a reasonable number to

5    use for when you should start to get concerned

6    about whether there's diversion going on at a

7    pharmacy?

8            A.      I don't think it is unreasonable.

9    Again, I'm just going to say unless there's some

10   kind of other reason for it to be above that level,

11   a justifiable reason.

12           Q.      And then you also mentioned looking

13   at cash transactions, correct?

14           A.      That would be another one of the

15   factors.

16           Q.      What was the percentage, the usual

17   percentage that a good pharmacy would have of cash

18   transactions for controlled substances?

19                   MS. KNIGHT:  Objection to the form.

20           A.      I think it -- and I'm not drawing a

21   direct -- I haven't really dealt with this topic

22   recently.  I believe it would be low -- lower than

23   twenty percent.  Just generally speaking.

24           Q.      (BY MR. LIVINGSTON:)  Okay.  Fair

25   enough.  Would you go to Exhibit, Giant Eagle

Page 134

1    about?

2                    MS. KNIGHT:  Objection to the form.

3            A.      Yeah.  But I think in the totality of

4    my answer, I think that was one of the factors was

5    the percentage or within the percent of these.  For

6    example, Newton Falls maybe could be all oxycodone

7    thirty milligram tablets.  Just hypothetical.

8                    (Reporter clarification.)

9            A.      So I would agree, looking at the

10   percents, I don't see one here that is alarming,

11   but that is not definitively saying it is a good

12   pharmacy.

13           Q.      (BY MR. LIVINGSTON:)  Well, I think

14   our data consultants might have guessed where you

15   were going with your testimony.  So let's go to

16   Exhibit 20, Giant Eagle Exhibit 20.

17                   (GE Exhibit 20 was marked for

18                   identification.)

19           Q.      (BY MR. LIVINGSTON:)  Do you see this

20   is a market share analysis of Giant Eagle's

21   opioids -- all opioids -- for all opioids at issue

22   in this case versus the Oxy 30s or greaters.  That

23   is what you just mentioned, right, the Oxy 30s;

24   that is a higher dose Oxy?

25           A.      Yes.  But just for clarification,

Page 145

1          Q.     All right.  So essentially,
2    Mr. Crowley is asking you for some advice about
3    when he -- when he investigates a pharmacy, you
4    know, what he should look for as potentially signs
5    that, you know, there's a problem, correct?
6          A.     Yes.
7          Q.     And then you -- you provided him with
8    some guidance, correct?
9          A.     Yes.
10         Q.     And the first thing you say is you
11   would want to observe the pharmacy for a while.
12   You say, "I might also take some time and drive
13   around the surrounding area.  Generally in Detroit
14   most of these problem pharmacies will have illegal
15   sales or transfer of pills from the purchaser to
16   someone outside.  It is a fairly common activity."
17                I mean are you essentially saying you
18   want to be on the lookout for long lines of people
19   who are zombie-like or out-of-state licenses in the
20   parking lot of the pharmacy, that sort of thing?
21         A.     Yeah, generally speaking.  I don't
22   recall the names, but I recall the locations of a
23   couple of the pharmacies, and they were a
24   concerning area to go to in the city of Detroit.
25   So I am just giving him some general guidance about

Page 146

1    what he might observe in the parking lots.

2           Q.     And neither you nor Dr. McCann did

3    anything like that, neither of you ever went to any

4    of the pharmacies that are owned and operated by

5    the defendants in Lake and Trumbull Counties,

6    correct?

7           A.     That is a correct statement, sir.

8           Q.     And, to your knowledge, nobody --

9    none of the other experts or nobody, to your

10   knowledge, on plaintiffs' side did that, correct?

11                 MS. KNIGHT:  Object to form.

12          A.     I do not know, sir.

13          Q.     (BY MR. LIVINGSTON:)  But to your

14   knowledge, you are not aware of anyone, correct?

15                 MS. KNIGHT:  Object to form.

16          A.     As I stated, I don't know if anyone

17   did or did not do that.

18          Q.     (BY MR. LIVINGSTON:)  All right.  The

19   next thing you list is "A good visual check of the

20   pharmacy says a lot.  Pills, bottles, records

21   laying all around and disorganization is the norm

22   for most of the bad pharmacies."  Do you see that?

23          A.     Yes.

24          Q.     And again, this is not something that

25   you and Dr. McCann or anyone else on the

Page 148

1   case, if you were to make that inquiry, you would

2   be talking to the corporate office of these

3   pharmacies because they are all -- this is a

4   self-distribution situation where all the

5   pharmacies are owned by the same company, correct?

6          A.    I am speaking about Mr. Crowley and

7   his visit to Detroit.

8          Q.    Right, yeah.  Purdue is a

9   manufacturer, so it is just a completely different

10  situation, right?

11         A.    Well, it is a distribution from a

12  distributor to a pharmacy.  It is not a chain, but

13  it is the same business.  But I will agree with

14  you.

15         Q.    Let's get to the more important

16  paragraph, the next one.  It says, "You may already

17  know this, but a general pharmacy average for

18  ordering the eighty milligram" -- you are referring

19  to Oxy here, right, eighty milligram product?

20         A.    Yes.

21         Q.    -- "is approximately three hundred to

22  one thousand dosages units per month.  If any

23  pharmacy you visit is ordering a larger amount and

24  not proportionate to the OxyContin strengths, then

25  you might want to investigate the totals more in

Page 149

1   depth to ensure it is legitimate."

2                   Do you see that?

3           A.      Yes.

4           Q.      So basically what you are telling

5   Mr. Crowley to be on the lookout for is, hey, if

6   you see that they are ordering, the pharmacy is

7   ordering more than a thousand doses, you know, it

8   is a red flag for you.  And you might want to do

9   your due diligence to see if there really is

10  something amiss with the pharmacy, correct?

11          A.      Conceptually, that would be a good

12  description of doing due diligence, by looking at

13  the distributions of strengths of drugs, I agree,

14  yes.

15          Q.      Right.  And conversely you are

16  telling Mr. Crowley that if the pharmacy has less

17  than a thousand dosage units per month, and

18  especially substantially less, then that shouldn't

19  raise his eyebrow, that would not be a red flag,

20  and he doesn't need to do any further due

21  diligence?

22                  MS. KNIGHT:  Object to form.

23          A.      I don't think it would completely

24  preclude it, but generally speaking if it was much

25  less, a hundred couple dosage units a month, I

Page 150

1    would tend to agree with that statement.

2          Q.    (BY MR. LIVINGSTON:)  Now I would

3    like you to turn to Exhibit 50.

4                (GE Exhibit 50 was marked for

5                identification.)

6          Q.    (BY MR. LIVINGSTON:)  And again, this

7    is something that our data consultants, using the

8    data that has been produced in this case, the OARRS

9    data, performed at our request.  And this is

10   basically the average monthly oxycodone eighty

11   milligram dosage units dispensed by Overholts

12   Pharmacy.  Do you know who Overholts Pharmacy is?

13         A.    It's -- yes, generally speaking.

14         Q.    Who is Overholts?

15         A.    Well, it's an independent pharmacy.

16   I --

17         Q.    And do you know what happened to

18   Overholts?

19                MS. KNIGHT:  Mr. Livingston, you need

20   to let Mr. Rafalski finish his answer.

21                MR. LIVINGSTON:  I'm sorry.  I

22   thought he was finished.  I'm just trying to move

23   it along.

24                MS. KNIGHT:  Well, we've spent all

25   morning talking about areas that he doesn't have

Page 155

1   dosage units dispensed.  This is for Giant Eagle's

2   pharmacies in these two counties on a pharmacy by

3   pharmacy basis.

4                And do you see that for the most

5   part, most months for most pharmacies, literally

6   there was -- there was not one dosage of -- dose of

7   eighty milligram oxy that was dispensed and filled?

8   Do you see that?

9        A.    I see that's what these charts show.

10       Q.    And again, just looking at this, if I

11  just put this in front of you, said would this

12  cause you any concern, you know, about this

13  pharmacy, you would say no, this looks exemplary;

14  this looks like this pharmacy is hardly involved in

15  dispensing this drug at all, correct?

16            MS. KNIGHT:  Object to form.

17       A.    I don't know that I would use that

18  terminology, but if I saw those dispensing numbers

19  I obviously wouldn't rush to take a look at it, if

20  that was your question.

21       Q.    (BY MR. LIVINGSTON:)  That was the

22  question.  Thank you for clarifying.

23            MS. KNIGHT:  Mr. Livingston, when we

24  get to a good breaking point, let me know.  It

25  would be great.

Page 156

1              MR. LIVINGSTON:  Okay.  We're almost

2    there.

3         Q.     (BY MR. LIVINGSTON:)  Now, you did

4    make this comparison with respect to Safe Script.

5    You looked at Safe Script's oxy dispensing compared

6    to what other pharmacies were doing, correct?  You

7    specifically looked at that?

8         A.     Yes, sir.

9         Q.     Okay.  That's the exercise we just

10   went through.  We looked at how much some of the

11   independents were dispensing, all defendants,

12   nondefendants, Giant Eagle, right, we just went

13   through that exercise?

14              MS. KNIGHT:  Objection to form.

15        A.     Yes, but again, it's just one

16   specific drug for a broad timeline.  So it's a very

17   limited picture of the activity of the pharmacy.

18        Q.     (BY MR. LIVINGSTON:)  Did you review

19   any of the testimony in this case that was provided

20   under oath by several Ohio Board of Pharmacy agents

21   who were responsible for Lake and Trumbull

22   Counties, did you look at that testimony?

23        A.     No, sir.  I did not.

24        Q.     So you're not aware of the fact that

25   Agent Pavlich testified under oath that

1  Dr. Franklin, who was ultimately -- well, he

2  ultimately was killed by his wife, but before that

3  happened, he got in trouble with the Ohio board for

4  dispensing, writing bad scripts for opioids.

5            You didn't know that Mr. Pavlich

6  testified that Dr. Franklin would write scripts for

7  opioids and he would tell his customers, do not

8  fill at the Giant Eagle and Rite Aids across the

9  street, go to Overholts; you're not aware of that

10  testimony, are you?

11            MS. KNIGHT:  Objection to form.

12       A.    As I stated, I had not read those

13  depositions.

14       Q.    (BY MR. LIVINGSTON:)  And isn't that

15  kind of information the sort of thing, the sort

16  of -- it would be a factor to you that would

17  suggest that those pharmacies were good pharmacies

18  and were not bad pharmacies with respect to the

19  diversion of opioids in these counties?

20            MS. KNIGHT:  Objection to form.

21       A.    I wouldn't draw that conclusion from

22  that.

23       Q.    (BY MR. LIVINGSTON:)  Well, would you

24  draw the conclusion that you should get on your

25  phone and call up the local police and say, you

Page 158

1    better scope out Giant Eagle and Rite Aid?  It

2    wouldn't cause you to do that, would it?

3                    MS. KNIGHT:  Objection to form.

4          A.     That's totally outside of the

5    previous question.  I just wouldn't come to make

6    that conclusion.  It's such a limited amount of

7    facts why a doctor would say, don't fill them

8    across the street.  Obviously maybe something

9    occurred and he directed them somewhere else, or he

10   already had a prearranged agreement with Overholts.

11                   So just that broad statement, I can't

12   draw any conclusions from that.

13         Q.     (BY MR. LIVINGSTON:)  Are you aware

14   that the three agents all testified that all of the

15   defendants, to their knowledge and information,

16   were always in compliance with the Ohio Board of

17   Pharmacy regulations, including their many SOM

18   regulation and their corresponding duty

19   obligations, are you aware of that?  Did you factor

20   that into your analysis?

21         A.     I did not read their depositions and

22   I am not aware of that testimony.

23         Q.     So the plaintiffs' attorneys did not

24   suggest to you that you should read those

25   depositions?

Page 159

1                    MS. KNIGHT:  Object to form.

2          A.      They don't suggest what to read or

3    what not to read.  I -- I request documents to draw

4    my opinion.

5                    My experience in dealings with boards

6    of pharmacies and the types of inspections they

7    conduct are more at a pharmacy level and typically

8    don't look at the same type of issues that I look

9    at.

10         Q.      (BY MR. LIVINGSTON:)  So are you

11   telling us that you didn't think it was important,

12   before you issued your opinion that these

13   pharmacies substantially contributed to the opioid

14   crisis in these two counties, it wasn't important

15   for you to look at what the Ohio Board of Pharmacy

16   agents had to say about whether those pharmacies

17   were acting lawfully or unlawfully?

18                   MS. KNIGHT:  Objection to form.

19         A.      I don't qualify it as important or to

20   be unimportant.  It is just something I didn't look

21   at in formulating my opinion.

22         Q.      (BY MR. LIVINGSTON:)  Well, we know

23   it wasn't important enough to be included on your

24   Schedule I, correct, as something that you

25   reviewed?

```
                                              Page 160

  1            A.      I did not review those documents,

  2     sir.

  3                    MR. LIVINGSTON:  I think we can take

  4     a break.

  5                    MS. KNIGHT:  Thank you.

  6                    THE VIDEOGRAPHER:  The time is now

  7     11:05 a.m.  We're off the record.

  8                    MR. LIVINGSTON:  Ten minutes.

  9                    (Whereupon, a break was had from

 10                    10:05 a.m. until 11:18 a.m. EDT)

 11                    THE VIDEOGRAPHER:  The time is now

 12     approximately 11:18 a.m.  We're on the record.

 13                    MR. LIVINGSTON:  I have still a

 14     number of questions that I would like to ask this

 15     witness.  But as a matter of courtesy, I'm going to

 16     now turn it over to my colleagues so that they can

 17     get their questions in before the end of the day,

 18     and then I will reserve my rights when they're

 19     done, if there's time left, which I believe there

 20     will be, to finish my questioning.

 21

 22     EXAMINATION BY MS. SWIFT:

 23            Q.      Mr. Rafalski, this is Kate Swift.

 24     Can you hear me okay?

 25            A.      I can hear you, ma'am.
```

Page 174

1    had an opportunity to look at, you can't say

2    whether Walgreens is one percent responsible for

3    the opioids crisis, ninety-nine percent responsible

4    or anything in between, correct?

5              A.    I did not do an analysis that would

6    have quantified or given an amount of each

7    particular defendant in regards to their dispensing

8    or their activity.  I didn't look at it that way.

9    It was just the two opinions that are in my report

10   are the only things that I focused on.

11             Q.    You can't offer any assessment of the

12   level of responsibility that any of the five

13   pharmacies in the case have for any opioids crisis

14   in Lake or Trumbull County, correct?

15             MS. KNIGHT:  Objection to form.

16             A.    Well, what do you mean by level of

17   responsibility?

18             Q.    (BY MS. SWIFT:)  I mean what I was

19   asking you before, are you going to come in and say

20   Walgreens is one percent responsible for the

21   opioids crisis in Lake and Trumbull Counties?  You

22   are not going to do that, right?

23             A.    Well, I'm not going to put a percent

24   on there.  I mean, my opinions are pretty well

25   stated in my report.  It doesn't provide a percent

Page 175

1    of conduct.  It's just they failed it -- they

2    failed in the suspicious order monitoring system

3    and maintenance of effective controls.

4                   So I have no intentions of coming in

5    and saying they're hypothetically thirty-three

6    percent responsible.

7            Q.     Or any other level of responsibility?

8            A.     Correct.

9            Q.     Quantified?

10           A.     Correct.  It's just a failure as I

11   pointed out in my report.

12           Q.     You're not connecting any failure

13   that you identify in your report to a level of

14   contribution to an opioids crisis in Lake or

15   Trumbull County, correct?

16                  MS. KNIGHT:  Object to form.

17           A.     Well, I'm saying there's a

18   contribution.  I am just not putting a figure on

19   it.

20           Q.     (BY MS. SWIFT:)  You can't quantify

21   the contribution; is that fair?

22           A.     I did not try to do that, that's

23   correct.

24           Q.     And you can't do it; is that fair?

25                  MS. KNIGHT:  Object to form.

Page 194

1    pharmacists refusing to fill prescriptions from

2    suspicious and known intentional overprescribers."

3    Did I read that part correctly?

4            A.    You did.

5            Q.    It goes on to say, "It is also

6    recognized that direct dispensing by prescribers of

7    controlled substances is not submitted to the of

8    Ohio's prescription monitoring system, OARRS."  Did

9    you know that there was ever a period of time where

10   dispensing of controlled substances directly by

11   doctors was not reported in the OARRS system?  Was

12   that something you were aware of?

13           A.    I was not.

14           Q.    But you do know that sometimes

15   doctors dispense directly to patients, right, sir?

16           A.    Practitioners have the ability to

17   dispense as long as they comply with some of the

18   regulations required.  I know that in Michigan they

19   report, just I did not know at least in 2009 that

20   they did not report in Ohio.

21           Q.    The next sentence reads, "In 2009,

22   Ohio prescribers dispensed prescription opioids at

23   a much higher rate than neighboring states."  Did

24   you know that?

25           A.    I did not.

Page 195

1          Q.      And then it refers to Figures 12 and

2     13, and you can see the figures there on the page,

3     right?

4          A.      I can.

5          Q.      Figure 12 shows that in 2009, Ohio

6     prescribers dispensed nine hundred and sixty-nine

7     thousand, three hundred and two dosage units of

8     oxycodone.  Do you see that?

9          A.      I do.

10          Q.      And I am not going to take the time

11     to look at it, but if you look at this -- the

12     footnotes in this report on Page 75 of the PDF, you

13     can see that Footnotes 95 and '6 show that this

14     information comes from ARCOS data, and that is data

15     from the DEA, right, sir?

16          A.      If it says it comes from ARCOS, that

17     would come from the DEA, that's correct.

18          Q.      You recall that the document we were

19     looking at a moment ago, Dr. McCann's chart,

20     regarding the largest Walgreens in both Lake and

21     Trumbull County, the one on SOM Center Road, in

22     2009, that Walgreens received just three hundred

23     and twenty-five thousand doses of oxycodone.  Do

24     you remember that?

25          A.      I do.

1    were filled for either oxycodone or alprazolam."

2    Did you know that?

3          A.    No, I did not know that specific

4    number.

5          Q.    You didn't do any analysis of what

6    that number would be for any of the pharmacies,

7    stores in Lake and Trumbull County, correct, sir?

8                MS. KNIGHT:  Objection to form.

9    Only -- Ms. Swift, I didn't hear your whole

10   question.  I'm sorry.

11         Q.    (BY MS. SWIFT:)  You didn't conduct

12   any analysis of what that number would be, what the

13   percentage of prescriptions filled that were either

14   oxycodone or alprazolam, you didn't do that

15   analysis for any of the pharmacies in Lake and

16   Trumbull County, right, sir?

17         A.    I did not.

18         Q.    Paragraph 85 of the superseding

19   indictment says that, "The prescriptions filled at

20   American Pain reflect that approximately eighty

21   percent were for individuals who listed an address

22   outside of Florida."  Were you aware of that?

23         A.    I was not.

24         Q.    All right.  Do you have any idea how

25   many of those were for Ohio residents?

Page 208

1           A.      I do not.

2           Q.      Paragraph 6 -- or, sorry, 86, tells

3    us -- you can see the last sentence says, "Patients

4    from Tennessee accounted for approximately 18.4

5    percent."  Do you see that?

6           A.      Do.

7           Q.      And then it says, "Patients from Ohio

8    accounted for approximately 11.5 percent" of the

9    prescriptions we are talking about.  Do you see

10   that?

11          A.      I do.  Now, is that -- is that -- and

12   this is specific for American Pain, correct?

13          Q.      This is specific for American Pain.

14          A.      Okay.

15          Q.      You didn't conduct any analysis of

16   this pain clinic or any other in Florida for

17   purposes of your Lake and Trumbull report, right,

18   sir?

19          A.      I did not.

20          Q.      You haven't conducted any analysis of

21   any Florida pain clinic for any of your reports

22   that you have issued in the opioids litigation,

23   right, sir?

24          A.      I have not provided an opinion or

25   done any analysis in Florida.

1          Q.     You don't have any opinion about the

2     extent to which the doctors and pain clinics

3     described in this federal indictment contributed to

4     the opioids epidemic anywhere in America, correct,

5     sir?

6          A.     Well, I have an opinion that they

7     contributed significantly, but I -- it would just

8     be through my experience of working in the DEA and

9     having knowledge of the migration of the pills.

10               But I didn't -- I did not offer an

11    opinion on that, yeah, an expert opinion on that,

12    I'm sorry.

13         Q.     Do you know how many doctors wrote

14    prescriptions for opioids in Lake and Trumbull

15    County during the relevant time period, from 2006

16    to the present?

17         A.     I do not.

18         Q.     Do you know how many of those

19    prescriptions were illegitimate, meaning they

20    weren't for a legitimate medical purpose?

21         A.     I do not.

22         Q.     You don't have any opinion on how

23    many prescriptions filled by one of the pharmacies

24    in this case were diverted?

25         A.     So a part of -- so in forming my

Page 210

1    expert opinion, I wasn't asked to review any

2    materials, documents or information related to

3    that, so I don't offer an opinion on that.

4           Q.    You have no idea if any prescriptions

5    filled by a Walgreens pharmacy were diverted; is

6    that fair, because you didn't look?

7           A.    I did not review prescriptions for --

8    specific prescriptions at any Walgreens, so I guess

9    that would be generally a correct statement.

10          Q.    Do you know how many prescriptions

11   filled by any of the other pharmacies in Lake and

12   Trumbull were diverted after they were filled?

13          A.    I do not.

14          Q.    That is true, whether we are talking

15   about somebody taking a prescription bottle from a

16   friend's medicine cabinet or any other form of

17   diversion, you don't have any idea what those

18   numbers are?

19          A.    No.  I wasn't asked to provide an

20   opinion on that, so I don't have any information to

21   form an opinion on that or to --

22          Q.    And you are not --

23          A.    -- or to provide you with any numbers

24   or any direct knowledge of that.

25          Q.    You are not aware of any pills that

Page 211

1   Walgreens shipped to one of its pharmacies that

2   went on to fill a prescription written by a doctor

3   who had prescribed that drug improperly, you

4   haven't done -- haven't done any analysis to match

5   that up; is that fair?

6          A.    That is a fair statement.  I have not

7   looked at the prescribing and matched it with some

8   of the doctors that were engaged in illicit

9   activity.

10         Q.    Are you aware of any prescription

11  dispensed by a Walgreens or any of the other

12  pharmacies in this case where a licensed pharmacist

13  wasn't involved in the dispensing?

14         A.    I haven't done a review to provide an

15  opinion on that, Ms. Swift.

16         Q.    Are you aware, Mr. Rafalski, that the

17  DEA conducts routine investigations of distributors

18  every few years or so?  I think actually you

19  testified a little bit about that earlier today; is

20  that right?

21         A.    Cyclic or work-plan investigations

22  you are speaking of, that would be correct.

23         Q.    And those routine investigations are

24  meant to insure compliance with the DEA's

25  regulations; is that fair?

Page 212

1          A.     That is -- yes, that is one of the

2     aspects.

3          Q.     All right.  You conducted

4     investigations like that when you were a diversion

5     investigator at DEA, right?

6          A.     I did.

7          Q.     I want to ask you a couple of

8     questions about some testimony from the DEA on how

9     the DEA conducts those investigations.  But my

10    first question is, did you read the deposition

11    transcript of Claire Brennan in this case?

12         A.     I did.

13         Q.     Did you read the entire thing?

14         A.     I did.

15         Q.     You understand that Ms. Brennan is a

16    section chief in Diversion Control -- in the

17    Diversion Control Division of the DEA?

18         A.     Yes, I am aware of that.

19         Q.     All right.  I am happy to show you

20    the testimony, but I am going to see if we can do

21    this quicker.

22              Would you agree with me that DEA

23    investigators can talk to whoever they want to at a

24    company to get their questions answered?

25                  MS. KNIGHT:  Objection to form.

Page 239

1          Q.     Yes.

2          A.     No, I did not.

3          Q.     Did you ever visit a pharmacy in Lake

4    or Trumbull County for purposes of preparing your

5    report?

6          A.     I did not.

7          Q.     And you never did the kind of

8    investigation you recommended to Mr. Crowley at

9    Purdue, correct?

10         A.     That would be a much earlier time

11   frame, but, no, I did not go and sit and do any

12   observations at a Walgreens, that is a correct

13   statement.

14         Q.     Or any other pharmacy in Lake or

15   Trumbull County, right, sir?

16         A.     That's correct.

17         Q.     You don't have any idea how many of

18   your flagged orders went to fill legitimate

19   prescriptions, right, sir?

20         A.     Well, my flagged orders were flagged

21   for a specific reason.  So it didn't make a

22   determination of what was diverted or what was not

23   diverted, but just my opinion is, based on the lack

24   of the due diligence on the first flagged order,

25   that more likely than not that those flagged orders

Page 240

1    were diverted, but not specific to any specific

2    prescription.

3              Q.    Sir, I would like you to listen to my

4    question.  That wasn't my question at all.

5                   My question was whether you have any

6    idea how many of the orders that you flagged in

7    your flagging analysis on the distribution side

8    went to fill legitimate prescriptions?

9                   MS. KNIGHT:  Asked and answered.

10             A.    I don't have any specific knowledge

11   to answer that specific question, Ms. Swift.

12             Q.    (BY MS. SWIFT:)  You never made any

13   attempt to connect your flagged orders with any

14   specific prescription?

15             A.    That is a correct statement.  I did

16   not.

17             Q.    All right.

18                  MS. KNIGHT:  Are we at a good

19   stopping place?

20                  MS. SWIFT:  I have got one more

21   question.  I know that is a dangerous thing for a

22   lawyer to say.

23                  MS. KNIGHT:  Okay.

24             Q.    (BY MS. SWIFT:)  I will try to do

25   without pulling up the document to make it go

1     file would go and search all these other entities

2     to try to find any records related to due

3     diligence.

4             Q.     Does the DEA define what needs to be

5     maintained in the customer file?  Is that something

6     I can go look up in a code somewhere?

7             A.     You cannot.

8             Q.     In your report, you talk about

9     certain enforcement actions against Rite Aid,

10    against other entities and whatnot.  Do you

11    remember having that in your report?

12            A.     They are, enforcement actions are

13    here, yes, ma'am.

14            Q.     Did you do any research to see if

15    there was a factual nexus between the alleged

16    conduct in the enforcement actions that you listed

17    and the allegations against the defendants in this

18    case?

19            A.     I'm not sure I understand that

20    question.

21            Q.     So let me ask it a little

22    differently.  Did you go through and check that

23    each of the enforcement actions you listed, for

24    example, pertained to actual stores in the

25    jurisdictions in this case?

1           You agree that the Controlled

2    Substances Act and the regulations promulgated

3    under it do not prohibit registrants from relying

4    on employee experience to fulfill their regulatory

5    obligations, correct?

6              MS. KNIGHT:  Asked and answered.

7         A.    I don't think the regulation speaks

8    specifically to that.  I believe earlier we were

9    discussing a manual system.  That is what I was

10   responding to earlier.

11        Q.    (BY MS. FUMERTON:)  And a manual

12   system is not prohibited either, correct?

13        A.    It is not what?  I'm sorry.

14        Q.    Prohibited, correct?

15        A.    A manual system is not as long as it

16   is sufficient to meet the needs of the registrant.

17        Q.    You also mentioned the twenty bottle

18   limit that Walmart instituted for oxy 30 in 2012;

19   do you recall that?

20        A.    I do.

21        Q.    Sorry.  2012.  I said it right.  Do

22   you know why Walmart implemented that policy?

23        A.    Yeah, I recall seeing an email.  It

24   was in response to concerns about diversion of

25   oxycodone 30 in West Virginia and Florida.

Page 344

1           A.      A little less but approximately, yes.

2           Q.      Would you agree with me that a lot of

3    your opinions relating to CVS's SOMS system are

4    based on the absence of records or documentation?

5                   MS. KNIGHT:  Objection to form.

6           A.      Specifically on the SOMS, I don't

7    totally agree with that.  If it is in regards to

8    the maintenance of effective controls -- that would

9    be a more accurate answer or more accurate

10   question -- I would say I do.

11          Q.      (BY MR. RUIZ:)  Can you parse that

12   out for me?  What do you mean?

13          A.      Well, I think I have a good

14   understanding of the SOMS, how it is designed and

15   how it operated.  So I don't think, in regards to

16   your question, my opinion is not because I don't

17   have sufficient information.  I think the area

18   where I didn't see any sufficient information would

19   have been the due diligence that would have been

20   conducted in a more formal and systematic way.

21          Q.      I understand.  Okay.  So you are

22   basing your opinion relating to due diligence on

23   the lack of documentary evidence today based on

24   events that occurred in 2010, 2011, 2012; is that

25   right?

Page 345

1          A.     Yes.  So just for clarification,

2     documentary -- I am looking for a total -- a total

3     number of things, not just -- not just some pieces

4     of paper and documents.  Policies, procedures, some

5     evidence that due diligence was conducted, how

6     pharmacies were open, all the due diligence that

7     would occur, not just related to a suspicious order

8     but in just conducting the business activity of a

9     distributor in a pharmacy -- with the pharmacy.  I

10    am sorry.

11         Q.     And my question is that you are

12    basing your opinion relating to that due diligence

13    based on the lack of evidence that you see in the

14    paper record on those points?

15         A.     That is a correct statement, sir,

16    yes.  I would agree generally with that.

17         Q.     And you testified earlier that in

18    your opinion, distributors should retain records

19    related to their distribution of hydrocodone, even

20    after -- even years after they have stopped

21    distributing that product, correct?

22         A.     Yes, I did state that earlier, and I

23    do believe that.

24         Q.     So if a pharmacy has been open since

25    the 1980s, is it your opinion that CVS should have

Page 346

1    kept documentation relating to orders that were

2    shipped more than thirty years ago?

3            A.    I don't know if I would be as

4    definitive thirty years ago.  But even records,

5    when they stopped distributing, which would be six

6    and a half or almost seven years ago, I still think

7    they should retain those records.  Because I could

8    see a need where, you know, they are now conducting

9    business using Cardinal, where Cardinal may rely on

10   some of that activity prior to their distribution.

11           So I am not advocating they keep

12   records forever, but I think there's a

13   reasonableness to that also.

14           Q.    What is the -- what is the cutoff for

15   you between six and thirty years?  When can a

16   distributor get rid of records?

17           A.    I think it would be more specific to

18   the type of due diligence.  If it was something

19   severe, some kind of activity involving a pharmacy

20   and some employees and personnel, I think that

21   would be more significant in a longer time period.

22           If it was some due diligence that

23   was, say, for example, some people do site -- not

24   site visits, they do a monitoring where they sit

25   outside and watch for out-of-state license plates.

Page 347

1    If one of those was thirty years old, I am not so

2    sure that would need to be retained.

3                    But it would be up to the distributor

4    to, you know, provide those records that would show

5    what actions they took.

6         Q.    What you just testified to there, has

7    that been provided in any DEA guidance to

8    registrants?

9                    MS. KNIGHT:  Objection to form.

10        A.    That specific guidance, I am not

11   aware that it was ever provided by the DEA.  I

12   think the only guidance that I was aware of is in

13   the distributor briefings.  I attended two of them,

14   and the comment was made, "If it is not written

15   down, it didn't happen."  That would be the exact

16   statement that they say at the distributor

17   briefing.  And I am aware that also is not in the

18   law.

19        Q.    (BY MR. RUIZ:)  And you also don't

20   know whether or when CVS received a distributor

21   briefing, right?

22        A.    I do not, sir.

23        Q.    In your report, you discussed a 2013

24   DEA inspection of CVS's Indiana distribution

25   center.  Do you recall that?

1          Q.     So instead of saying "I have been

2      informed that a random spot-check," it should say

3      "I conducted a random spot-check," because you did

4      it yourself?

5                      MS. KNIGHT:  Object to the form.

6          A.     I don't know that I would write it

7      like that.  I think the documents could inform me.

8                      But I think there was some

9      collaboration on this particular part of the

10     report.

11         Q.     (BY MR. RUIZ:)  Is that true for the

12     next sentence where you also write, "I have also

13     been informed"?

14         A.     I believe so.  I don't have a direct

15     recollection, but I believe so, sir.

16         Q.     Let's turn to the next page, Page 78.

17     And at the bottom paragraph, the last sentence

18     says, "Additional investigation could include

19     review of patient profiles, such as the age,

20     distance traveled and method of payment, review of

21     ratios" -- do you see where I am reading?

22         A.     No.  I'm sorry.  What page again?

23         Q.     Page 78.

24         A.     Oh, I'm sorry.  Wrong page.

25         Q.     And it is the last paragraph at the

Page 352

1  bottom.

2          A.      I see that.

3          Q.      And it says there that "Additional

4  investigation could include review of," and then it

5  lists a number of things.  Do you see that?

6          A.      I do.

7          Q.      Did you conduct any of these analyses

8  that you list here?

9          A.      No, I did not.  I put these in the

10  report because these are things that would be

11  readily available for CVS to do.  It is not

12  something I did in writing my opinion, preparing my

13  opinion.

14          Q.      Did you ask to review any of this

15  information for any CVS pharmacies in Lake or

16  Trumbull County?

17          A.      I did not.  And I -- and so, in

18  second to that, this would be some of the things

19  that I might expect to see in due diligence records

20  in regards to a review of materials for a pharmacy

21  for a suspicious order for other reasons, and I did

22  not see that.  That is the other purpose for being

23  in the report.

24          Q.      I didn't ask why you included it in

25  your report.  My question is, did you ask to review

Page 374

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5    MDL NO. 2804

6    CASE NO. 17-md-2804

7    Hon. Dan A. Polster

8

9    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14                      VOLUME II

15

16            REMOTE VIDEO DEPOSITION OF

17                  JAMES RAFALSKI

18                  June 11, 2021

19

20

21

22   REPORTED BY:  Laura H. Nichols

23                   Certified Realtime Reporter,

24                   Registered Professional

25                   Reporter and Notary Public

Page 398

1    deposition what the basis of this order being

2    blocked was, other than Giant Eagle's SOMS system?

3                   MS. KNIGHT:  Objection to form.

4            Q.     (BY MR. LIVINGSTON:)  Are you just

5    going to -- you're going to sit there and just

6    throw out some guesses for us?

7                   MS. KNIGHT:  Objection to form.  And

8    that is an entirely inappropriate question.

9                   MR. LIVINGSTON:  No, it is not

10   inappropriate because it is clear --

11           Q.     (BY MR. LIVINGSTON:)  Do you have any

12   basis at all for telling the jury that this was not

13   blocked pursuant to Giant Eagle's existing SOMS

14   system back in 2014?

15           A.     I will repeat my answer earlier.  I

16   read the email and acknowledge it is being held by

17   the company.  There's nothing in here that

18   definitively tells me it was blocked by the SOMS

19   system.

20           Q.     Right.  And there's nothing

21   definitively in here that tells you that it was not

22   blocked by the SOMS system, right?

23           A.     That's correct.

24           Q.     While we are on the topic of due

25   diligence in connection with your expert report,

Page 399

1   one of the things that you did not investigate

2   before you rendered your opinion that somehow the

3   defendants contributed substantially to the opioid

4   crisis in Lake and Trumbull County was what impact,

5   if any, bad doctors had on the opioid crisis in

6   those two counties, correct?

7          A.      Generally, that is correct, sir.

8          Q.      And I won't replow old territory from

9   yesterday, but I think you did acknowledge that you

10  did not review any of the Ohio Board witness

11  deposition transcripts, correct?

12         A.      That is a correct statement.  That is

13  what I stated yesterday, sir.

14         Q.      Would you go, turn to Exhibit --

15  Giant Eagle Exhibit 15?

16                 (GE Exhibit 15 was marked for

17                 identification.)

18         Q.      (BY MR. LIVINGSTON:)  And just the

19  first page, just to orient you -- and again, I know

20  that you didn't review this.  You just

21  acknowledged --

22         A.      One second, sir.  One second.

23                 (Pause.)

24         A.      Okay.  I am there.

25         Q.      (BY MR. LIVINGSTON:)  All right.  You

Page 403

1          But I didn't specifically investigate

2    Dr. Franklin's prescribing, if that is the question

3    you are asking.

4          Q.    Okay.  So previously I thought you

5    just told me this morning that you had not tried to

6    investigate to see what the impact of the bad

7    doctors writing bad scripts in Label and Trumbull

8    Counties were on the opioid crisis.  But yet you

9    did do some research on these doctors?  Is that

10   what you are telling us?

11         A.    Only in to identify the existence of

12   some doctors that had been under investigation,

13   indicted or identified through a Google search.

14   That is correct.

15         Q.    But for what purpose?  Why were you

16   trying to identify them?

17         A.    Predominantly, I was looking in the

18   areas of pharmacies that had high prescribing to

19   see if some of these doctors had offices specific

20   to those areas.  Another one -- that would be the

21   general reason.  And just that they existed.

22              There was -- I recall reviewing an

23   Attorney General press release that gave a

24   number -- a number of doctors and pharmacies that

25   had been -- lost their medical license.  So I did

1   dispensing at the pharmacy level.  I wasn't asked

2   to do an analysis of the pharmacies, so it wasn't

3   data that I requested.  Because I did not need it

4   because I was not doing an opinion on that matter.

5           Q.    (BY MR. LIVINGSTON:)  All right.

6   Would you go to Page 187?

7           A.    I am there.

8           Q.    In the middle of that page, there's a

9   question asked.  "And in your search warrant, on

10  the next paragraph you state that the review

11  confirmed that Dr. Franklin authorized fifteen

12  thousand two hundred ninety-eight controlled

13  substance prescriptions during the period of 4-10

14  of '06 through 6- 4 of '08, so a little more than

15  two years, these fifteen thousand controlled

16  substance prescriptions.  Was that the time window

17  that you had narrowed your investigation down to?"

18           "Yes."

19           So Mr. Pavlich is telling us that

20  this one bad doctor alone during only a two-year

21  period -- remember, this case, the period for this

22  case goes from 2006 to the present.  But this is

23  only two of those years, one bad doctor writing

24  fifteen thousand -- over fifteen thousand bad

25  scripts.  And you didn't factor this into your

Page 408

1    report, did you?

2                    MS. KNIGHT:  Objection to form.

3           A.     I did not.

4           Q.     (BY MR. LIVINGSTON:)  You also didn't

5    factor into your analysis the effect that any

6    internet pharmacies had on the opioid crisis in

7    Lake and Trumbull County, correct?

8           A.     That is correct.

9           Q.     And that is despite the fact that you

10   knew from your time with the DEA that a major

11   contributor to the opioid crisis was internet

12   pharmacies, correct?

13          A.     I am well aware of the effect of the

14   internet pharmacies.  I don't know how it is

15   relevant to Lake and Trumbull County unless you are

16   indicating that maybe some of the residents there

17   were utilizing ordering those prescriptions online.

18   I'm not aware of any internet pharmacies that were

19   located in Lake and Trumbull County during the time

20   period of my review.

21          Q.     Who said an internet pharmacy had to

22   be located physically in the county?  Isn't that

23   the whole point, that you can just order on the

24   internet and have the drugs delivered to you?

25          A.     That is the point.

Page 411

1   have any discussions from any investigators in that

2   region of the country.  All of my cases had links

3   to, as I stated earlier, Kentucky and Tennessee.

4                I was aware that there was some

5   bouncing back and forth across the state borders

6   because the maps or the PMP programs didn't link

7   between each state.  But I'm not aware of any case

8   that was worked out of the Detroit office that was

9   specifically tied to those two counties.

10          Q.    (BY MR. LIVINGSTON:)  Well, one thing

11  for sure we know from reading your report is that

12  you did not take into consideration the impact that

13  drug gangs had on selling illegitimately obtained

14  opioid scripts in Lake and Trumbull County,

15  correct?

16          A.    No.  My report, Mr. Livingston,

17  focuses on the distribution from the distributor

18  down to the pharmacy.  My analysis doesn't focus on

19  the illicit conduct outside of that action.

20          Q.    Okay.  And -- well, you also didn't

21  review any of the law enforcement depositions that

22  were taken in this case in which testimony was

23  given that Detroit was a major supplier of

24  illegally obtained opioid pills to Lake and

25  Trumbull County, correct?

Page 412

1               MS. KNIGHT:  Object to the form.

2          A.     I didn't review those reports.  I

3     would be interested to look at one if you have one

4     available or in the binder.

5          Q.     (BY MR. LIVINGSTON:)  You -- I don't

6     want to leave you in anticipation.  Let's go to

7     Exhibit -- Giant Eagle Exhibit 25.

8                    (GE Exhibit 25 was marked for

9                    identification.)

10         Q.     (BY MR. LIVINGSTON:)  This is --

11    Exhibit 25 is Ohio State Highway Patrol, Critical

12    Information and Communications Center, Criminal

13    Intelligence Unit, Issue Date -- and it has

14    "Awareness:  Prescription Drug Interdiction."  And

15    it is dated August 9, 2012.  Do you see that?

16         A.     I do.

17         Q.     Okay.  This is during the relevant

18    time frame upon which your opinion is based,

19    correct?

20         A.     It is.

21         Q.     Okay.  Did you review this document

22    in connection with the preparation of your report?

23         A.     I don't recall looking at this

24    specific document, sir.

25         Q.     Okay.  When you were a DEA agent,

Page 431

1    that have occurred where they are published on the

2    Federal Register or on the DEA website in regards

3    to pharmacies and their corresponding

4    responsibility.  So I think there's plenty of

5    information available.

6                     Have they specifically sent a list

7    out of red flags?  I'm not aware of that.

8         Q.     You didn't do any analysis to

9    determine to what extent the defendant pharmacists

10   in Lake and Trumbull County properly discharged

11   their duty to exercise their corresponding

12   responsibility?

13        A.     I did not.

14        Q.     And you did not endeavor to try to

15   determine whether any suspicious order at the

16   distribution level with respect to any of the

17   defendant pharmacies ultimately was used to fill an

18   illegitimate or not legitimate prescription,

19   correct?

20        A.     That was not part of my analysis, no,

21   sir.

22        Q.     Turn to Exhibit 2, your report,

23   Schedule I.

24                MS. KNIGHT:  So Mr. Livingston, I

25   believe that is the -- I don't know what was wrong

```
                                              Page 440

  1            A.       That's correct.

  2                     MS. KNIGHT:   Objection to form.

  3            Q.       (BY MR. LIVINGSTON:)   And unlike

  4    Mr. Colosimo and the other folks at the DEA

  5    Pittsburgh office who inspected Giant Eagle's

  6    facilities, you never actually physically inspected

  7    either HBC or GERX; is that correct?

  8            A.       I never was physically present at

  9    either of those locations, sir.

 10            Q.       Did you ever ask plaintiffs' counsel

 11    for that opportunity?

 12            A.       To go there and inspect them?

 13            Q.       Yes.

 14            A.       I did not.

 15            Q.       Did they ever tell you that that was

 16    an option, that under the Federal Rules, a party

 17    can request and obtain the right to physically

 18    inspect the other parties' facilities?

 19            A.       They did not tell me that.  I am not

 20    aware of that, sir.

 21            Q.       Now that you are aware of it, is that

 22    something that you wish you had had the opportunity

 23    to do before you rendered your opinions in this

 24    matter?

 25            A.       Well, I think anything that I could
```

Page 441

1   do to further gain information would be -- not

2   critical but important.  If I had a choice to do

3   anything, I wish I could interview the people

4   myself versus the deposition.  That is what I would

5   wish to do first.  But anything would be important,

6   sir.

7                 If I could go onsite, I'm not sure I

8   could -- it would be relevant as far back as my

9   review is, but I wouldn't preclude doing anything

10  that would gain further information.

11         Q.     Now, to try to set the scene a little

12  bit, were you aware that Giant Eagle, before it

13  opened up its H -- or obtained its license,

14  Schedule 3 license for HBC in 2009, that prior to

15  that, it had a List 1 chemical distribution

16  license?

17         A.     I generally recall seeing something

18  about that in the document review, yes.

19         Q.     And that in order to obtain that

20  license, there's similar requirements, not

21  necessarily identical but somewhat similar to the

22  requirements for -- a distribution license for

23  Schedule 3 drugs, correct?

24                 MS. KNIGHT:  Objection to form.

25         A.     I think a List 1 chemical distributor

Page 448

1    myself and thinking about that number and being a

2    guess, and I wasn't comfortable with it.

3            Q.     All right.  Did you ever have trouble

4    after you gave the New York testimony?  Did you

5    ever recant that testimony?

6            A.     I did not.

7                   MS. KNIGHT:  Objection to the form.

8            A.     I did not.

9            Q.     (BY MR. LIVINGSTON:)  Well,

10   regardless of what the exact percentage is or is

11   not for how often the DEA would issue letters of

12   admonition after an inspection to a distributor,

13   you would agree that Giant Eagle's record of all

14   clean inspections for three preregistration

15   inspections and eight cyclic inspections is

16   exemplary, correct?

17                  MS. KNIGHT:  Objection to form.

18           A.     I would say that is expected.

19           Q.     (BY MR. LIVINGSTON:)  Well, you said

20   it was expected, but you also have said that it

21   was -- forget the percentage, that it certainly

22   wasn't uncommon for even a single -- for

23   distributors to get letters of admonition for not

24   being in compliance after an inspection?

25           A.     I did say that.  And doing

Page 451

1   never kept records to be able to accurately answer

2   that, and I don't want to guess.

3           Q.     And did you ever find that a

4   distributor's SOMS system that you inspected was in

5   compliance?

6           A.     I believe there were some, yes.

7           Q.     Okay.  And what kind of threshold

8   system did they have?

9           A.     Without disclosing the registrant,

10  one that I recall, because I had concerns going in,

11  was a manual system.  And I actually found that to

12  be compliant, but it was based on a business

13  activity and the abilities and knowledge of the

14  employees.

15              I can recall a couple of smaller

16  companies that had compliance systems.  I can also

17  recall some that did not.  But off the top of my

18  head, I didn't really keep records or I don't have

19  a recollection specifically of the different

20  companies and what they had and didn't have.

21          Q.     Without disclosing the name of the

22  registrant, the one that was a manual system, can

23  you tell us what was the nature of the business?

24  You said based on business activity.  What did you

25  mean by that?

Page 453

1    it off the top of my head.

2         Q.    And how did the manual system work?

3    Was there just people who were fairly familiar with

4    the customers who would, you know, identify

5    unusually large orders or suspicious orders of some

6    sort?

7         A.    There was a multitude of things they

8    did.  There was more of an intimate relationship

9    with the sales.  The CEO was in the field a lot and

10   sales.  And they used -- actually used people to

11   evaluate some companies.  They had questioned some

12   outside consultants.  The compliance people had

13   pretty intimate knowledge of who their customers

14   were and what they were ordering.

15              During my interview, I didn't find

16   any areas where they weren't -- didn't have

17   knowledge of the customers that I reviewed or the

18   questions that I had.

19        Q.    So one of the things that gave you

20   comfort was their familiarity that the compliance

21   people had with their customers?

22        A.    Well, it was a multitude of things,

23   but that was one.  You know, they had an

24   onboarding, they had customer files.  They had a

25   knowledge of what they were ordering.  They were

Page 454

1    aware if there were increases.  It was a system

2    that I didn't find any faults with on that

3    particular inspection.  I don't know moving forward

4    if it changed, but --

5            Q.     All right.  So you are aware that

6    Giant Eagle never received a letter of admonition,

7    correct?

8            A.     I believe that is an accurate

9    statement, yes, sir.

10           Q.     There was never any kind of

11   administrative action of any kind ever taken

12   against Giant Eagle for violating any DEA

13   regulations, correct?

14           A.     Not that I am a aware of.

15           Q.     And Giant Eagle never was penalized

16   or entered into any kind of memorandum of

17   understanding for any violation of any DEA

18   regulations, correct?

19           A.     That's correct.

20           Q.     And you at least know -- you would at

21   least acknowledge that Giant Eagle was found to be

22   in full compliance at the conclusion of every

23   inspection that I mentioned to you earlier?

24                  MS. KNIGHT:  Objection to form.

25           A.     I'm not sure that I reviewed every

Page 461

1   recordkeeping and security are in full compliance,

2   it is a pretty broad statement without looking at

3   the report.

4          Q.    (BY MR. LIVINGSTON:)  Yes.

5          A.    Not that I need to read them all, but

6   I wouldn't disagree that the report may say that.

7   Maybe in summary at the beginning, I am guessing.

8          Q.    And when you go -- and your opinion

9   that is in your report is that from 2009, when HBC

10  first was granted a license for Schedule 3 drugs,

11  until hydrocodone was reclassified in 2014, during

12  that entire period of time, Giant Eagle was not

13  even in substantial compliance; it wasn't in

14  compliance at all, right?

15         A.    In regards to their SOMS system,

16  that's correct.

17         Q.    In other words, you disagree with the

18  conclusions reached by all of these DEA agents,

19  correct?

20              MS. KNIGHT:  Object to the form.

21         A.    Well, that is why I would like to

22  review the documents to ensure that they even

23  inquired about those things in their investigation.

24  It is not a mandate that they be required.  So I

25  would like to see what description they had and

Page 462

1   what awareness they had of the system.  But I am in

2   disagreement if it says full compliance with

3   security, I do not disagree -- I do not agree with

4   that statement.

5           Q.      (BY MR. LIVINGSTON:)  So you publish

6   your report in April, which contains all of your

7   final opinions for this case, and now we are taking

8   your deposition in June.  And you haven't taken the

9   time to review any of these inspection reports,

10  correct?

11              MS. KNIGHT:  Objection to the form.

12          A.      That's correct.

13          Q.      (BY MR. LIVINGSTON:)  Well, I guess

14  now is as good a time as any to finally look at

15  these reports.  Let's go to Exhibit 34.

16              (GE Exhibit 34 was marked for

17              identification.)

18          Q.      (BY MR. LIVINGSTON:)  Page, at the

19  top, we will go to Page 9.

20              MS. KNIGHT:  Just a moment.  Sorry,

21  Mr. Livingston.  He is getting there.

22          A.      Go ahead.

23          Q.      (BY MR. LIVINGSTON:)  Okay.  You see

24  this is a report by Mr. Colosimo regarding the

25  approval of HBC's request for a Schedule 3 license

Page 465

1    investigation has been concluded.

2           Q.     Okay.  And that means at that point

3    from the DEA's perspective, the registrant is in

4    compliance, correct?

5           A.     No.  It just means the matter is

6    closed.

7           Q.     Why would you close the matter if the

8    registrant is still not in compliance?  Wouldn't

9    you -- I mean that doesn't sound like the DEA would

10   be doing its job in that situation, right?

11                MS. KNIGHT:  Objection to form.

12          A.     Well, until -- if there's a pending

13   action with the registrant, it should remain open.

14   And that is the training.  But I don't draw that

15   assumption.  With some -- you know, in my career, I

16   know that some were closed prior to that conclusion

17   and they were supplemented.  But generally speaking

18   when it says "case closed," the matter has had a

19   final resolution.

20          Q.     (BY MR. LIVINGSTON:)  Okay.  Why

21   don't we skip down on to the third paragraph under

22   "Synopsis."  And it says, "This investigation

23   revealed no discrepancies with respect to

24   security."  That is just another way of saying

25   there was no finding of a violation of the DEA

Page 479

1    thought it was, you know, important to know that

2    Giant Eagle wasn't a McKesson type distributor but

3    rather a self-distributor, correct?

4              MS. KNIGHT:  Objection to form.

5         A.    I don't know that's the purpose for

6    the comment.  I think it is just part of preparing

7    a report, to give a base of information about the

8    registrant.

9         Q.    (BY MR. LIVINGSTON:)  But why include

10   that information if it is not important?  Why would

11   you want to know whether they distribute to Giant

12   Eagle supermarkets or maybe Giant Eagle's HBC

13   supplying Rite Aid?  I mean why wouldn't you -- why

14   would you note that if it is not important?

15        A.    Well, I think it is important.  But I

16   believe your statement was it was put on this

17   report to make a comparison to other larger

18   distributors.  I think it is just a good

19   description of the registrant that is being

20   investigated.  Maybe I misunderstood your earlier

21   statement.

22        Q.    Okay.  And let me just ask you,

23   typically, what percentage of a distributor like a

24   McKesson or, you know, I don't know,

25   AmerisourceBergen, Cardinal, what percentage of

Page 488

1    diligence.  I said they had good documentation of

2    due diligence.  I don't know that a registrant

3    could be in full compliance and at the same time

4    get a corrective statement like that in the report.

5                  I guess that may go back to the

6    earlier statement where they -- that I brought up

7    where they are going to notify management.

8          Q.    And you know -- okay.  Just to orient

9    ourselves, the date of this meeting with management

10   or this investigation and report is August of 2013,

11   correct?

12         A.    That's correct.

13         Q.    And isn't it true, sir, that in your

14   own report, you indicate that by the fall, late

15   fall of 2013, Giant Eagle had begun to use an

16   automated computerized threshold system to go along

17   with its manual SOMS system?

18         A.    Yes, sir, mid October.

19         Q.    Okay.  So within two months, Giant

20   Eagle acted on this recommendation that they

21   received from Investigator Conlon, correct?

22                MS. KNIGHT:  Object to the form.

23         A.    I don't know that that was a reaction

24   to this.  I didn't see a criticism of the manual

25   system, just a criticism of the due diligence.