SJ-EXHIBIT 12

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION
3                   CAUSE NO. 17-md-2804
                      MDL NO. 2804
4
       IN RE: NATIONAL            )
5      PRESCRIPTION OPIATE        )
       LITIGATION                 )
6                                 )
       THIS DOCUMENT RELATES TO:  )
7      TRACK THREE CASES          )
8
              REMOTE VIDEO DEPOSITION OF
9           CARMEN A. CATIZONE, MS, RPh, DPh
                     VOLUME I
10
11
12        The deposition upon oral examination of
   CARMEN A. CATIZONE, MS, RPh, DPh, a witness produced
13 and sworn before me, Amy Doman, Registered Merit
   Reporter, Certified Realtime Reporter, Certified
14 Shorthand Reporter, Notary Public in and for the County
   of Hamilton, State of Indiana, taken on behalf of the
15 Defendants, in Mount Pleasant, South Carolina,
   scheduled to begin at 8:10 A.M., on Tuesday,
16 June 15, 2021, pursuant to the Federal Rules of Civil
   Procedure.
17
18
19
20
21
22
23
24
25

Page 120

1       BY MS. FUMETON:

2    Q   Okay.  And so at least from a policies and

3        procedures standpoint, if the VAWD is giving

4        accreditation, it is concluding that their policies

5        and procedures are compliant with the CSA, correct?

6            MR. ELSNER:  Objection.

7    A   Along the distribution lines, yes.

8       BY MS. FUMETON:

9    Q   When you left the executive director position at

10       NABP in May of 2020, did you receive a type of

11       severance or retirement package?

12   A   I was an employee of the association, and so I

13       received a pension and 401(k) like the other

14       employees did, yes.

15   Q   And was that something you had already paid into?

16   A   Yes.

17   Q   Other than the compensation benefits that we've

18       already discussed, did you ever receive any other

19       remuneration from the NABP, any other benefits?

20   A   Yes.

21   Q   What are those?

22   A   Whenever there was an increase or bonus provided to

23       me, I deposited that money into a deferred income

24       account so that I would not then take that money

25       for that year, and then at the end of my time with

Page 167

1           not to fill the prescription?

2    A      Yes, sir.

3    Q      Would you agree with me that just because a

4           prescription flags under one of your 16 red flags,

5           that does not mean that it was written for an

6           illegitimate medical purpose?

7    A      Yes, sir.

8    Q      And would you agree with me that it also does not

9           mean that the drugs that were dispensed to fill

10          that prescription were diverted?

11   A      Yes, sir.

12   Q      And you have not made any effort in your -- if you

13          have, tell me.  But as I understand it, you've not

14          made any effort to determine how many of the

15          prescriptions that flagged under your flags 1

16          through 16 were actually diverted?

17             MR. ELSNER:  Objection.

18   A      Not the individual numbers, sir, no.

19     BY MR. BUSH:

20   Q      And you haven't made any effort to determine how

21          many of the prescriptions that flagged under your

22          16 red-flag methodologies were not written for a

23          legitimate medical purpose?

24   A      Not individually, sir.

25   Q      And you would agree with me, would you not, that

Page 168

1          many of the prescriptions that flagged are likely

2          to have been written for a legitimate medical

3          purpose?

4               MR. ELSNER:  Objection.

5     A    No, sir.

6       BY MR. BUSH:

7     Q    Do you think any of them were?

8     A    Yes, sir.

9     Q    And would you agree with me that many of the

10         prescriptions that have flagged in your red flags 1

11         through 16 were most likely not diverted to a

12         purpose other than not for which the prescription

13         was written?

14    A    No, sir, I would not agree with that.

15    Q    You would agree with me that some were?

16    A    Yes, sir.

17    Q    Can you tell me what your definition of diversion

18         is?

19    A    The Controlled Substances Act was designed to

20         create a closed system of distribution for

21         controlled substances.  Now, starting with the

22         manufacturer through the distributor, through the

23         prescriber, through the pharmacy, and ultimately to

24         the patient.  Anything outside of that closed

25         system is what I would consider diversion because

Page 318

1          said the same training that qualifies me to look at

2          a prescription and make a decision as to whether

3          that's appropriate therapy or not?

4     A    Yes, sir.  Earlier you asked me a question about

5          whether or not I had specialized training or went

6          to medical school.  That specialized training that

7          all the defendant pharmacists have are the training

8          that qualifies pharmacists to be able to evaluate

9          prescriptions and conduct drug utilization review

10         in regard to the appropriateness of a medication.

11    Q    But you at least agree with me that the pharmacist

12         that's presented with a prescription has less

13         information about the patient's health and health

14         history than does the doctor who wrote that

15         prescription?  We can agree there, right?

16    A    Yes, sir.

17    Q    Okay.  Now, all of the pharmacists who practice in

18         the state of Ohio, they get their licensure from

19         the Ohio State Board of Pharmacy, right?

20    A    Yes, sir.

21    Q    And the -- well, let me withdraw that.

22              As the licensing body for pharmacists in the

23         state of Ohio, is the Ohio Board of Pharmacy

24         responsible for ensuring that pharmacists that it

25         licenses comply with the relevant laws and

Page 319

1          regulations?

2     A    Yes, sir.

3     Q    Is the Ohio Board of Pharmacy responsible for

4          disciplining pharmacists who fail to comply with

5          the relevant laws and regulations?

6     A    Yes, sir.

7     Q    What I'm getting at, in other words, the Ohio Board

8          of Pharmacy, they don't just hand out licenses to

9          pharmacists who pass the exam when they graduate

10         pharmacy school and then pay them no more mind,

11         right?  That's not how it works?

12              MR. ELSNER:  Objection.

13    A    Correct, sir.

14      BY MR. SWANSON:

15    Q    What is the Ohio State Board of Pharmacy do to

16         ensure that the pharmacists that it licenses are

17         qualified to maintain their license?

18    A    The requirement for continuing education is

19         something that the Ohio Board of Pharmacy monitors,

20         as well as any complaints they may receive about

21         that pharmacist, and as part of their routine

22         inspections or monitoring of pharmacies, if they

23         detect a problem or suspect a problem, the Ohio

24         Board of Pharmacy uses that as another evaluation

25         tool.

1    Q    Got it.  So I guess I didn't ask the relevant

2         question first.  The license that a pharmacist gets

3         in Ohio, that needs to be periodically renewed,

4         right?

5    A    Yes, sir.

6    Q    Okay.  And what you were just describing, I guess,

7         are kind of the steps that the State Board of

8         Pharmacy takes to ensure that renewal of a pharmacy

9         license is proper, right?

10   A    I think the question that you asked me is what does

11        the Ohio Board of Pharmacy do to make sure that

12        that pharmacist remains competent and current.

13             So the answer to that is yes, as well as the

14        second question you asked me.

15   Q    Understood.

16             So you mentioned that the State Board of

17        Pharmacy, they have investigators who go out and

18        visit pharmacies in their jurisdiction, right?

19   A    Yes, sir.

20   Q    And they'll conduct inspections of those pharmacies

21        to make sure they are compliant, right?

22   A    Yes, sir.

23   Q    And they can interview the pharmacist to make sure

24        the pharmacist is complying with the appropriate

25        state and federal laws and regulations, right?

Page 321

1     A    Yes, sir.

2     Q    They provide continuing pharmacy education programs

3          so the pharmacists can make sure they are updated

4          and kept up-to-date on important issues, legal and

5          otherwise, right?

6     A    Not exactly, sir.  The Ohio Board of Pharmacy

7          requires continuing education.  They may provide

8          some sort of CE, but the bulk of CE is provided by

9          approved continuing education providers, and they

10         are approved by the American Council on

11         Pharmaceutical Education.

12    Q    Right.  I guess what I'm saying is the State Board

13         of Pharmacy, they mandate that the pharmacists

14         comply and complete continuing education courses,

15         right?

16    A    Correct.  But you'd asked me before you if they

17         provide CEs, and that's what I was clarifying.

18    Q    Got it.  So they don't provide it, but they mandate

19         that you do it?

20    A    They may provide some classes, sir.

21    Q    And do they -- do they have other educational tools

22         that they can provide to pharmacists to make sure

23         that pharmacists are able to keep up to speed on

24         important laws and issues?

25              MR. ELSNER:  Objection.

Page 322

1    A    Yes.  A newsletter program that you referenced

2         earlier is one way, as well as any correspondence

3         or contact with a pharmacist through email or

4         mailings to alert them of changes or important

5         things in Ohio.

6      BY MR. SWANSON:

7    Q    And I noticed as I was looking at your materials

8         reviewed, I didn't -- well, let me take a step

9         back.

10             Were you aware that in this case, several

11        Ohio -- State of Ohio Board of Pharmacy

12        investigators provided depositions in this case?

13             Did you know that?

14   A    I'm sorry.  I did not.

15   Q    And I guess you did know that one of the things

16        that the State Board of Pharmacy does is they go

17        out and they conduct inspections of pharmacies in

18        their jurisdiction, right?

19   A    Yes, sir.

20   Q    And when they do those inspections, they complete

21        reports about their findings from those

22        inspections.

23             You knew that, right?

24   A    The standard operating procedure for all boards of

25        pharmacy so yes, sir.

1  Q    And I didn't see it in your materials reviewed that

2       you'd looked at any inspection reports for any of

3       the retail chain pharmacies in this case.

4            Is that true you didn't look at any of those?

5  A    Yes, sir.  I'm not sure I would have access to

6       those if they are legally able to provide them to

7       me, but I did not review them.

8  Q    Well, it is something that you knew existed from

9       your time at the NABP.  Didn't you ask the lawyers

10      what the Ohio State Board of Pharmacy had to say

11      about the retail chain pharmacies?

12           MR. ELSNER:  Objection.

13  A    Based upon my experience, many of the states

14      prohibit or will not release the inspection

15      reports, and so I did not ask for that.  I did not

16      think it was available, sir.

17    BY MR. SWANSON:

18  Q    Got it.  Okay.

19           Returning to your report -- and bear with me.

20      I have to find what I'm quoting here.

21           On page 7, continuing on to page 8, you say

22      pharmacists -- so we're talking about the standard

23      of care.  You say "Pharmacists are not mere sellers

24      of tablets and capsules prescribed by doctors.

25      They are licensed professionals with independent

Page 324

1       duties and obligations which have evolved over the

2       past century.  Those practices and their standard

3       of care are reflected in national and state laws

4       and regulations."

5            I just want to pause there, okay.

6            In your section on the standard of care, you

7       cite to the Controlled Substances Act, three

8       provisions of the Controlled Substances Act and the

9       Ohio Administrative Code.

10           Do you see that?

11   A   On the same page, sir?  I don't see a footnote.

12       Are you saying --

13   Q   Well, yeah, that was my question.  I mean, you have

14       450 footnotes in your report, but when it comes to

15       the section on the standard of care, you don't cite

16       a whole lot of documents, statutes, regulations,

17       etcetera, that you're relying on.

18           Would you agree with that?

19           MR. ELSNER:  Objection.

20   A   There are so many standards available that I could

21       not list them all, and that's why they are not

22       included.

23     BY MR. SWANSON:

24   Q   Well, I want to focus not on standards.  I want to

25       focus on federal and state laws.  If you look at

Page 325

1        the last paragraph on that page, on page 8, you

2        cite to three separate provisions of the Controlled

3        Substances Act.

4             Do you see that?

5    A    Yes, sir.

6    Q    And then you cite to a single provision of the Ohio

7        Administrative Code.

8             Do you see that?

9    A    Yes, sir.

10   Q    So beginning with the Controlled Substances Act,

11       are there any other federal laws or regulations or

12       sections of the CSA that you rely on for your

13       opinions regarding your definition of the standard

14       of care?

15            MR. ELSNER:  Objection.

16   A    Yes, sir.

17     BY MR. SWANSON:

18   Q    Okay.  Can you tell me what they are?

19   A    I'd have to go through the document because in this

20       first section, I simply provide a broad overview of

21       what those documents or citations were.  And then

22       as those specific citations pertain to a topic or

23       issue of my opinion, they are further cited,

24       including DEA actions or what parts of 1306.04 or

25       1306.06 would be relevant to that particular

1      section, sir.

2   Q   I understand.  But I want to know -- well, let me

3        just ask it more broadly, then.

4            Have you in your report identified every

5        provision of the CSA that you believe is relevant

6        to your opinion in this case?

7            MR. ELSNER:  Objection.

8   A   No, sir.

9     BY MR. SWANSON:

10  Q   You have not?

11  A   No, sir.

12  Q   Why not?

13           MR. ELSNER:  Objection.

14  A   Based upon the reports and the narrative and the

15       explanation of how it applied, I didn't feel it was

16       necessary to cite every single paragraph, sentence,

17       or provision.  Instead, quoted the necessary ones

18       but assumed that as a total document, the CSA was

19       applicable and that it would be applicable in this

20       situation in the context of the report and what the

21       activities of the defendants in the case -- the

22       assumption was made that the CSA, the entire

23       document, the entire provision was applicable.

24           (Stenographer requested clarification.)

25  Q   At the bottom of page 8, you state -- and I'll

```
                                                Page 327

 1        start reading.  Tell me if you don't see where I

 2        am.  You say:  "For a controlled substance

 3        prescription to be valid, a pharmacist is obligated

 4        to determine whether the prescription was issued

 5        for a legitimate medical purpose."

 6             Do you see that?

 7   A    Yes, sir.

 8   Q    Okay.  And then you cite the CSA at 1306.04(a),

 9        right.

10   A    Yes, sir.

11   Q    And that's a corresponding responsibility

12        provision?

13             MR. ELSNER:  Objection.

14   A    Yes, sir.

15      BY MR. SWANSON:

16   Q    Now, earlier in your testimony in response to a

17        question -- I can't recall who posed it -- you

18        testified that a primary requirement -- those were

19        your words -- primary requirement of a pharmacist's

20        corresponding responsibility is documenting red

21        flags or resolution of red flags.

22             Do you recall that testimony?

23   A    Yes, sir.

24   Q    If I wanted to find where that specific requirement

25        exists in the Controlled Substances Act, where
```

1      would you point me?

2  A  I would point you to two places, sir.  One would be

3      the general provision of 1306.04.  And then I would

4      point to clarification of that provision that was

5      provided in the Hills Pharmacy case in Superior I

6      and II, in which the ALJ, the administrative law

7      judge or the findings in that case stated very

8      specifically that documentation was the standard of

9      care and something that would be required.

10  Q  Okay.  So let's start.  You said you would point me

11      to 1306.04(a).  And I believe if you turn to

12      page 25 of your report, you have -- you've quoted

13      that provision.  So why don't you turn to 25.

14         Are you there?

15  A  Yes, sir.

16  Q  Okay.  And you can see in the second paragraph

17      under the section on "Corresponding

18      Responsibility," you've quoted 1306.04?

19  A  Yes, sir.

20  Q  And can you show me where in that provision it

21      discusses what you call the requirement of

22      documenting resolution of red flags?

23  A  Sure.  Based upon my experience and knowledge in

24      this area, that first sentence:  "The

25      practitioner's responsible for the proper

Page 329

1          prescribing and dispensing of controlled

2          substances."  My interpretation based upon my

3          experience and all of the matters I've been

4          involved with on this issue, the proper dispensing

5          of controlled substances involves documentation as

6          a standard of care and something that's been

7          spelled out or explained more clearly by the DEA in

8          other actions.

9     Q    All right.  So let's start with the Controlled

10         Substances Act.  I take it you can't identify any

11         provision in the Controlled Substances Act that

12         specifically requires a pharmacist to document the

13         resolution of red flags, true?

14              MR. ELSNER:  Objection.

15    A    No, sir.  The provision I just read is basis for me

16         to make that statement and opinion.

17       BY MR. SWANSON:

18    Q    Well, you would agree with me that there's nothing

19         on the face of that language that says anything

20         about documenting red flags or resolution of red

21         flags.

22              You would at least agree with that, right?

23    A    No, sir.  On the face, the proper dispensing says

24         to me as the pharmacist documentation included.

25    Q    All right.  Well, then let me just ask.  Is there

Page 330

```
 1         anywhere other than -- anywhere other than what
 2         you've just stated where the Controlled Substances
 3         Act in the Act itself clarifies or elucidates what
 4         it means when it says proper prescribing, that it
 5         must include documentation of red flags?
 6     A   The cases that I cited are very clear and very
 7         explicit in clarifying that requirement;
 8         Hills Pharmacy and Superior I and II.
 9     Q   And what year were those?
10     A   I believe -- I can't recall, but I'd have to look
11         those up, sir.
12     Q   Okay.  And are they cited in your report?  I was
13         just doing a search.
14     A   They are -- I think they are one of the documents
15         as well.  I would have to check as well.
16     Q   Okay.  Other than the language about proper
17         prescribing, is there anywhere else in the
18         Controlled Substances Act that you would point me
19         to that you claim makes clear that documentation of
20         the resolution of red flags is a requirement under
21         the CSA?  Anywhere else?
22     A   Sections I gave you and the citations are very
23         clear, and that's what I base it on.  I don't see
24         any need for anywhere else for it to be mentioned.
25         It's very clear and very explicit.
```

Page 331

1    Q     Well, I guess you'd agree with me there's nothing

2          else that stopped the DEA from saying, you know

3          what, we're having these cases pop up where

4          pharmacists aren't documenting a resolution of red

5          flags.  Maybe we should be more clear in the

6          statute about what's required.

7                That's something the DEA could have done,

8          right?

9                MR. ELSNER:  Objection.

10   A     Outside of my scope, sir.

11     BY MR. SWANSON:

12   Q     What about -- can you point me to any Ohio State

13         law that specifically requires a pharmacist to

14         document resolution of red flags?

15   A     I don't have the laws here, but I believe if you

16         want me to research that, I would be willing to do

17         so to determine if that's there or not.

18   Q     Well, I'm trying to figure out the basis for your

19         opinion.  Okay?  And what you've opined and you say

20         in your report is that documentation of the

21         resolution of red flags is required by the

22         Controlled Substances Act, right?

23   A     Yes, sir.

24   Q     Is it also required by Ohio State law?

25   A     Yes, sir.

Page 343

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION
3                   CAUSE NO. 17-md-2804
                    MDL NO. 2804
4

     IN RE: NATIONAL                )
5    PRESCRIPTION OPIATE            )
     LITIGATION                     )
6                                   )
     THIS DOCUMENT RELATES TO:      )
7    TRACK THREE CASES              )
8
9              REMOTE VIDEO DEPOSITION OF
             CARMEN A. CATIZONE, MS, RPh, DPh
10                     VOLUME II
11
12
13

             The deposition upon oral examination of
14   CARMEN A. CATIZONE, MS, RPh, DPh, a witness produced
     and sworn before me, Amy Doman, Registered Merit
15   Reporter, Certified Realtime Reporter, Certified
     Shorthand Reporter, Notary Public in and for the
16   County of Hamilton, State of Indiana, taken on behalf
     of the Defendants, in Mount Pleasant, South Carolina,
17   scheduled to begin at 8:00 a.m., on Wednesday,
     June 16, 2021, pursuant to the Federal Rules of
18   Civil Procedure.
19
20
21
22
23
24
25

Page 417

1          level; even though I can't identify which specific

2          prescriptions were diverted.

3      BY MR. SWANSON:

4   Q   Okay.  You can't tell me what individual

5          prescriptions were, in your view, illegitimate.

6          What percentage of those 37,066 prescriptions were

7          written for an illegitimate reason?

8              MR. ELSNER:  Objection.

9   A   The best way I can qualify that and give you an

10         answer, sir, is a significant number based upon the

11         total of opioids that were dispensed and based on

12         the resulting deaths in overdoses.  Beyond that, I

13         can't give you anything more than "significant" and

14         I can't qualify it beyond "significant."

15     BY MR. SWANSON:

16  Q   So you can't tell me if it's 10 percent or

17         20 percent or 30 percent, you can't tell me that,

18         can you, sir?

19  A   I can if you provide the documentation that whether

20         or not those red flags were resolved.  That would

21         allow me to give you the percentage versus the

22         aggregate totals, the deaths, and the supply of

23         opioids in those two counties.

24  Q   But I have you in front of me today for

25         questioning.  So sitting there in your chair today,

Page 418

1          you can't tell me what percentage of those 37,066

2          prescriptions you claimed were written for an

3          illegitimate reason, true?

4               MR. ELSNER:  Objection.

5     A    My answer is significant and significant would be

6          far greater than 10, 20, or 30 percent.  Probably

7          more in the range of between 70 and 80 or

8          90 percent, sir.

9       BY MR. SWANSON:

10    Q    Oh, so your opinion -- your opinion is that 70 to

11         90 percent of those 37,066 prescriptions were

12         written for an illegitimate reason?

13    A    No, sir.  You asked me to define just sitting in

14         the chair today what I thought would be a

15         significant number.  And to me, a significant

16         number is somewhere to 70, 80 percent.  Again,

17         lacking the documentation, I cannot quantify

18         whether or not those 37,000 prescriptions fell into

19         that category.  But if you ask me what's the

20         difference between significant and others, for me a

21         significant number of prescriptions would be 70,

22         80 percent if I could make that determination, sir.

23    Q    So a significant quantity of controlled substances

24         at 70 to 80 percent to you?

25               MR. ELSNER:  Objection.

```
                                              Page 419

 1    A    A significant number versus not a significant

 2         number, sir.

 3      BY MR. SWANSON:

 4    Q    Okay.  70 to 80 percent is what you qualify as

 5         significant?

 6    A    Yes, sir.

 7             MR. ELSNER:  Objection.

 8      BY MR. SWANSON:

 9    Q    So let's turn back to page 4.  I want to read the

10         second sentence of your opinion again.

11             "The subsequent result of the failure to

12         provide such data, information, and tools was a

13         diversion of significant quantities of controlled

14         substances particularly opioids, outside of the

15         closed distribution and dispensing system for

16         controlled substances."  Right?

17    A    Yes, sir.

18    Q    So if I understand your testimony, it is your view

19         that 70 to 90 percent of the medications that were

20         dispensed by the retail chain pharmacies were

21         diverted outside of the closed distribution and

22         dispensing system for controlled substances?

23             MR. ELSNER:  Objection.

24      BY MR. SWANSON:

25    Q    Right?
```

Page 420

1   A     No, sir.

2   Q     Okay.  Where is my disconnect there?

3   A     The disconnect is, I've said that a significant

4         number of prescriptions were diverted outside of

5         the system.  But absent patient notes and other

6         documentation, I couldn't qualify or quantify what

7         significant meant.  And defining significant as a

8         general term, that term for me means between 70 and

9         90 percent.  If I had the documentation, I would be

10        able then to make a determination beyond how many

11        patients died in Lake and Trumbull County, and how

12        many opiates were distributed per person in opiate

13        [sic] county that, to me, supports "significant"

14        and would help me quantify that beyond just the

15        term "significant."

16  Q     Sitting here today, can you do anything other than

17        speculate as to what percentage of the 37,066

18        prescriptions that hit on flag 2 for Walgreens were

19        for an illegitimate medical purpose?

20        MR. ELSNER:  Objection.

21  A     Again, it's not a speculation, sir.  It's based on

22        the data, the number of opioids that were

23        distributed in those counties, the number of

24        overdoses and deaths indicate to me factually that

25        there was a significant diversion of prescriptions.

Page 424

1      BY MR. GISLESON:

2    Q    Would you expect that some chain pharmacy stores in

3         Lake and Trumbull County have more patients than

4         other stores?

5    A    Yes, sir.

6    Q    Did you do anything to evaluate the demographics of

7         the patients served by each chain pharmacy store in

8         Lake and Trumbull County?

9    A    No, sir.

10   Q    Do you agree that the patient demographics may vary

11        from store to store, depending on the local

12        community?

13   A    I would agree the demographics would vary, but the

14        opioid epidemic cuts across all demographic factors

15        and affects equal -- the populations equally.  So

16        yes and no, sir.

17   Q    As part of your analysis in this case, did you do a

18        specific investigation of the dispensing practices

19        of any particular pharmacy?

20            MR. ELSNER:  Objection.

21   A    Again, Mr. Gisleson, by dispensing practices, can

22        you just help me understand what you mean by that?

23      BY MR. GISLESON:

24   Q    Sure.

25            Did you evaluate the percentage of controlled

Page 425

1       versus noncontrolled prescriptions dispensed by a

2       particular pharmacy store in Lake or Trumbull

3       County?

4           MR. ELSNER:  Objection.

5    A   No, sir.

6    BY MR. GISLESON:

7    Q   Did you evaluate the prescribing -- strike that.

8           Did you evaluate the dispensing practices of

9       any particular pharmacist in either Lake or

10      Trumbull County?

11   A   No, sir.

12   Q   Did you review any patient medical records for any

13      of the prescriptions that you flagged?

14   A   No, sir.

15   Q   Did you speak with any pharmacists in Ohio who

16      worked for one of the chain pharmacy defendants?

17   A   No, sir, but I read the depositions of the

18      pharmacists who practiced in Ohio and supervised

19      pharmacists in Ohio.

20   Q   Did you speak with anyone from the Ohio board of

21      pharmacy concerning dispensing practices in Lake or

22      Trumbull County as part of the work you did in this

23      case?

24   A   No, sir.

25   Q   During the time that you were preparing your report

Page 439

1        looked at did not identify the pharmacist.

2     BY MR. GISLESON:

3  Q    Did you report to anyone with the Ohio Board of

4        Pharmacy, that in your view, a large number of

5        pharmacists at CVS, Rite Aid, Walgreens, Walmart,

6        and Giant Eagle violated their corresponding

7        responsibility based on your review of aggregate

8        data?

9            MR. ELSNER:  Objection.

10 A     Knowing the workings of the state boards of

11       pharmacy, sir, the answer is no, because I'm not

12       sure whether or not the Ohio Board of Pharmacy took

13       action against these pharmacists or has them under

14       investigation.  And I defer to the Ohio Board of

15       Pharmacy.

16          If I'm presented with information to that

17       extent, then it would be my responsibility to

18       report those pharmacists and those companies to the

19       Ohio Board of Pharmacy.

20     BY MR. GISLESON:

21 Q     The Ohio Board of Pharmacy does inspections of

22       pharmacies in Lake and Trumbull County, correct?

23 A     Yes, sir.

24 Q     And they have the ability as part of those

25       inspections to look at a pharmacy's dispensing

1      system, correct?

2           MR. ELSNER:  Objection.

3   A    Yes, sir.

4     BY MR. GISLESON:

5   Q    In fact, isn't it true that the Ohio Board of

6        Pharmacy must approve any dispensing system used by

7        a pharmacy in Ohio?

8           MR. ELSNER:  Objection.

9   A    I believe that was a requirement at one time.  I'm

10       not sure if it still is, but yes, sir.

11    BY MR. GISLESON:

12  Q    As part of your role as executive director of the

13       NABP, did the NABP at any time ever instruct the

14       Ohio Board of Pharmacy or advise the Ohio Board of

15       Pharmacy that it should review a pharmacy's

16       dispensing system to determine whether it analyzes

17       data to identify patterns of diversion?

18          MR. ELSNER:  Objection.

19  A    We're talking about different systems here, sir.

20       So if I can clarify, in a pharmacy, there are

21       numerous systems that the pharmacist has available.

22       There's a dispensing system that may focus on

23       processing a prescription and adjudicating the

24       claim.  And then there's a DUR process, patient

25       profile process, and other patient information.

Page 453

1      in fact, the defendants -- some of the defendants

2      in this case actually use NARxCHECK as an algorithm

3      to help detect red flags and help detect diversion

4      as well.

5   Q   Any other formulas or methodologies you can

6      identify?

7   A   Not specifically beyond NARxCHECK, sir.

8   Q   Did you do any investigation, whether pharmacies

9      who the counties didn't sue, were filling

10     prescriptions for opioid medications without a

11     legitimate medical purpose?

12  A   The scope of the lawsuit was outside of my

13     expertise.  I was simply asked to look at

14     corresponding responsibility red flags.  How the

15     lawyers handled that and proceeded, I had no

16     information, access, or input into that, sir.

17  Q   Did you have any understanding as to how many

18     opioid pills pharmacies other than the chain

19     pharmacies in this case dispensed between 2006 and

20     2020?

21         MR. ELSNER:  Objection.

22  A   In Ohio or nationwide?  The answer --

23    BY MR. GISLESON:

24  Q   I'm sorry, Lake and Trumbull Counties.

25         MR. ELSNER:  Objection.

Page 454

1   A    No, sir.

2      BY MR. GISLESON:

3   Q    Do you know whether any opioid medications were

4        illegally being sold in Lake and Trumbull Counties?

5           MR. ELSNER:  Objection.

6   A    My scope was to look at the red flags corresponding

7        responsibility.  I did not look at that factor,

8        sir.

9      BY MR. GISLESON:

10  Q    Now, you say the dispensing data should have been

11       reviewed by each chain pharmacy to identify

12       patterns of diversion.  Did you identify patterns

13       of diversion in this case based on your review of

14       the aggregate dispensing data?

15          MR. ELSNER:  Objection.

16  A    I identified red flags that indicated the potential

17       for diversion based on the aggregate data, sir.

18  Q    Right.  But you reviewed dispensing data.  Based on

19       your review of that dispensing data, did you

20       identify any patterns of diversion?

21          MR. ELSNER:  Objection.

22  A    For the sample of dispensing data provided to me by

23       each of the defendants, yes.

24     BY MR. GISLESON:

25  Q    What was the pattern?

Page 464

1           to clear a red flag because that pharmacist was

2           under time pressure?

3                MR. ELSNER:  Objection.

4      A    I can't identify individual prescriptions but,

5           again, my report talks about the impact that had

6           based on the aggregate data.

7        BY MR. GISLESON:

8      Q    Is it true that when the Ohio Board of Pharmacy

9           does an inspection of a pharmacy in Lake or

10          Trumbull County, that one of the issues that's

11          evaluated is staffing levels?

12     A    I don't know if that's restricted to just Lake and

13          Trumbull County, sir.  I think it's a metric that

14          they look at all pharmacies.

15     Q    All pharmacies throughout Ohio?

16     A    I believe so, sir.

17     Q    Do you also understand that the Ohio Board of

18          Pharmacy, when doing an inspection, also evaluates

19          whether improper dispensing occurred?

20     A    I'm not specifically aware, but believe that would

21          be one of the tenets, again, that the board of

22          pharmacy would look at.

23     Q    Does the board of pharmacy also look at whether

24          pharmacists for a particular pharmacy have access

25          to OARRS to request reports when needed?

Page 465

1    A    I believe in 2011 and then in 2015, when OARRS

2         became mandatory first for certain drugs, and then

3         for certain drugs with red flags, and then for

4         certain drugs identified by the board of pharmacy,

5         since that was a mandate and a requirement that the

6         Ohio Board of Pharmacy would have looked for that,

7         sir.

8    Q    When was the first time that NABP advised the Ohio

9         Board of Pharmacy that it should be mandatory for

10        pharmacists in Ohio to check OARRS with respect to

11        every single prescription for opioid medications

12        that are presented to the pharmacist?

13             MR. ELSNER:  Objection.

14   A    NABP made that recommendation to all states beyond

15        Ohio that the PDMP should be utilized for all

16        controlled substances prior to dispensing, and that

17        prescribers should also be mandated to check the

18        PDMP.  And that might have been right at the

19        beginning of PDMP's -- when they were first

20        initiated, but I can't recall the specific dates,

21        sir.

22     BY MR. GISLESON:

23   Q    So was that sometime around 2011?

24   A    Again, it was early on in the PDMPs.  I'm not sure

25        if it was 2010, 2011 or so.