# SJ-EXHIBIT 13

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                        * * *
 5
 6   IN RE:  NATIONAL PRESCRIPTION
             OPIATE LITIGATION
 7
     This document relates to:
 8
     THE COUNTY OF LAKE, OHIO,
 9   et al. V. PURDUE PHARMA L.P.,   MDL No. 2804
     et al., Case No. 18-op-45032
10
     THE COUNTY OF TRUMBULL, OHIO,   CASE No. 17-md-2804
11   et al., v. Purdue Pharma L.P.,
     et al., Case No. 18-op-45079
12
     Case Track 3
13
14
                          * * *
15
16             Remote Videotaped Deposition of
17   TREY EDWARDS, a witness herein, called by the
18   defendants for examination pursuant to the
19   Rules of Civil Procedure, taken before me,
20   Patti Stachler, RMR, CRR, a Notary Public
21   within and for the State of Ohio, at Mentor,
22   Ohio, on December 11, 2020, at 9:01 a.m.
23                        * * *
24
25
```

Page 147

1  understand these reports a little bit.
2              When you went out to do
3  inspections of pharmacies, did you refresh your
4  memory regarding the prior inspection of that
5  pharmacy, whether you did it or somebody else
6  did it?
7        A.   I oftentimes -- I don't know if I
8  did it every time, but often I would.
9        Q.   Okay.  Do you recall specifically
10 inspecting Giant Eagle Pharmacies in Lake and
11 Trumbull County?
12       A.   I recall, yes.
13       Q.   On a general basis, do you recall
14 the inspections generally being favorable in
15 terms of Giant Eagle's pharmacies were doing
16 what they were supposed to be doing under the
17 Board rules?
18       A.   Yes, generally.
19       Q.   Is that true of the other pharmacy
20 defendants, did they -- did their inspections,
21 to your knowledge, generally -- were they
22 generally favorable from the Board's
23 perspective?
24       A.   Yes.
25       Q.   When you did the inspections and,

Page 157

1  Q.  -- is it you just got to read it
2  and --
3  A.  No, it's either corrective action
4  required or not.
5  Q.  All right.  So after you
6  identified four issues and Giant Eagle
7  responded, were you satisfied your inspection
8  issues had been addressed and, therefore, the
9  inspection was a successful one as resolved?
10  A.  I believe so, yes.
11  Q.  Okay.  Did that happen often with
12  the Giant Eagle Pharmacies, that you would find
13  items that you wanted follow-up on, they would
14  follow up on, and the inspection would be fine?
15  A.  Yes.  I can't say it happened
16  often or not often, I don't recall how often it
17  happened.  But my recollection is that I don't
18  recall any instances where an issue was not
19  resolved.
20  Q.  All right.  Go to the next
21  inspection report at store 1225 on 5/19 of '09.
22  And I see compared to the prior inspection
23  report you got different items circled.  So on
24  this inspection of this Giant Eagle store, you
25  decided to inspect in certain areas that were

Page 166

1  sometimes our inspections resulted from a
2  complaint, for instance, an error, and then we
3  would go in and check -- you know, check what
4  the person was telling us and see what
5  happened.  So I'm not sure in this case if I
6  identified that during the inspection or if
7  that was something that came into us as a
8  complaint which then prompted the inspection.
9           Q.   All right.  And on page 2587
10 there's -- the Giant Eagle pharmacist responds,
11 right, explaining what happened with the
12 improper dispensing?
13           Do you see that?
14      A.   Yes.
15      Q.   2587?
16      A.   Yes.
17      Q.   It says, The error occurred at
18 data entry but was missed at data verification.
19 And then it explains the new workflow system
20 including a 7-point check.
21           Was that an adequate resolution of
22 this issue in this inspection?
23      A.   I don't -- I don't recall that
24 there was any other follow-up data.
25      Q.   Okay.  And so that's number 11.

Page 167

1  You also found an issue with, I guess,
2  refrigeration, number 9?
3       A.   Yes.
4       Q.   Was that fixed to your
5  satisfaction?
6       A.   Yes, I believe so.
7       Q.   Go to page 2378, please.  This is
8  an inspection of a Giant Eagle store 1225 on
9  2/16 of '11 performed by you; am I correct?
10      A.   Yes.
11           MR. APPEL:  One quick question,
12 since you're at a natural breaking point, when
13 do you want to take lunch?
14           MR. BARNES:  12:30.  Is that okay?
15           MR. APPEL:  That will work.
16           MR. BARNES:  Okay.  How about you,
17 Mr. Edwards, can you go to 12:30?
18           THE WITNESS:  Yep.
19           MR. BARNES:  All right.  Thank
20 you.
21 BY MR. BARNES:
22      Q.   Is this a clean inspection of a
23 Giant Eagle Pharmacy 1225 in February of 2011?
24      A.   I believe, yes, it appears so.
25 There was no written warning.

Page 173

1  hadn't seen such a report before?
2  　　　　A.　Correct.
3  　　　　Q.　Did you ask for any follow-up on
4  that?
5  　　　　A.　I don't recall.
6  　　　　Q.　Okay.  For improper dispensing on
7  page 3 you note that a certain prescription was
8  filled for furosemide?
9  　　　　A.　Furosemide.
10 　　　　Q.　Furosemide.  And then it was
11 refilled three days later, filled too early.
12 You say, unacceptable for a technician to
13 bypass DUR warning without informing the
14 pharmacist.
15 　　　　　　So there you found an instance
16 where a tech had overridden the DUR and you're
17 telling the Giant Eagle store, don't allow that
18 to happen?
19 　　　　A.　Right.
20 　　　　Q.　And there's a response on page
21 2357.  Was that a satisfactory response as far
22 as you were concerned?
23 　　　　A.　I believe so.
24 　　　　Q.　Okay.  And then apparently, item
25 number 26, you wanted follow-up because you

Page 174

1  couldn't find a hard copy of the prescription,
2  and Giant Eagle's response was it was found
3  after the prescription and misfiled and they
4  enclosed a copy of it.  So was that a
5  satisfactory response?
6           A.    Yes.
7           Q.    Page 9864 is another inspection,
8  this time in Trumbull County.  It looks like --
9  I can't tell if it's full or partial.  Can you
10 tell us what the nature and purpose of this
11 inspection was?
12          A.    Looks like I was conducting an
13 investigation and I was requesting hard copy
14 prescriptions and signature logs to aid in the
15 investigation.
16          Q.    So you went to the store and you
17 recorded the fact that you were taking these
18 records out of the store?
19          A.    Correct.
20          Q.    All right.  This was an
21 investigation that had something to do with
22 some other individuals or entities?
23          A.    Right.
24          Q.    Okay.  And then the last one we'll
25 cover before lunch is the next one, 2589.  This

Page 192

1  A.  I believe so.  I don't recall an
2  instance where that wasn't the case.
3  Q.  No license was ever suspended or
4  revoked by the Board for any Giant Eagle
5  pharmacy, as far as you know?
6  A.  As far as I know, no.
7  Q.  Did the Giant Eagle Pharmacies
8  comply with the Ohio security requirements at
9  all times?
10  A.  As far as I know.
11  Q.  Did Giant Eagle stores, in fact,
12  have in some instances more or better controls
13  than were required by the Board?
14  A.  Yes.
15  Q.  Is it true that Giant Eagle was
16  never cited or disciplined by the Board for
17  failing to meet any of their requirements?
18  A.  You're speaking specifically to
19  Lake and Trumbull?
20  Q.  Yes.
21  A.  To my knowledge, no, they were
22  not.
23  Q.  We talked about staffing before.
24  From your involvement with the inspections,
25  were the Giant Eagle pharmacists educated,

Page 193

1  hard-working pharmacists who were attempting to
2  do the best job they could?
3       A.   As far as I could tell.
4       Q.   Did they adequately train and
5  supervise pharmacy techs and others working in
6  the pharmacy?
7       A.   If I could back up saying with the
8  exception of Mr. Heppner, the fact that --
9            THE REPORTER:  You're trailing
10 off.  I can't hear you.  Please repeat.
11           THE WITNESS:  Sorry.
12      A.   I said, with the exception of
13 Mr. Heppner, that's the only pharmacist I could
14 recall who didn't meet -- didn't meet our
15 standards and was --
16 BY MR. BARNES:
17      Q.   Was disciplinary action taken
18 against him?
19      A.   I don't recall if -- again, I
20 would need to see more documents to see if
21 there was a citation issued or requested.
22      Q.   Okay.  Is it a fair statement that
23 Giant Eagle Pharmacies complied with the manner
24 of processing prescription requirements
25 including performing drug utilization reviews

Page 194

1  at all times?
2        A.   At all times that I'm aware.
3        Q.   Okay.  In any of your inspections,
4  the 26 that you did, did you ever see any
5  evidence that Giant Eagle Pharmacies were
6  filling illegitimate opioid prescriptions?
7        A.   No --
8             MR. CIACCIO:  Objection to form.
9        A.   -- not that I --
10            THE REPORTER:  Is that Joe?  I'm
11 sorry.  Is that Joe?
12            MR. CIACCIO:  Yes.  I'm sorry.
13 Joe Ciaccio.
14            THE REPORTER:  Thank you.
15            MR. BARNES:  Did you get his
16 answer, Patti?
17            THE REPORTER:  Yes.
18            MR. BARNES:  Thank you.
19 BY MR. BARNES:
20       Q.   At any time when you were at the
21 Lake County Narcotics Agency or at the Ohio
22 Board since 2008, to your knowledge, were Giant
23 Eagle Pharmacies ever the subject of criminal
24 investigations or investigations related to
25 diversionary behavior in the pharmacies?

Page 195

1             A.    You're talking about the pharmacy
2     itself, or are you talking about the employees
3     of the pharmacy?
4             Q.    Let's start with the pharmacy
5     itself.  Pharmacies.
6             A.    No, not to my knowledge.  The
7     actual pharmacy itself, we did not take
8     disciplinary action against the terminal
9     distributor, to my knowledge.
10            Q.    Yeah.  Okay.  My question was a
11    little different.  In your years with the LCNA
12    and now with the Board, was Giant Eagle ever
13    the subject of criminal or civil investigation
14    because of alleged diversion of controlled
15    substances?
16            A.    You're referring to Giant Eagle,
17    the corporation itself?
18            Q.    Yes.
19            A.    No.
20            Q.    Okay.  As far as you're concerned,
21    Mr. Edwards, were the Giant Eagle Pharmacies
22    that you inspected over the years 2009 to 2019
23    in Lake and Trumbull Counties, were those
24    pharmacies operating lawfully at all times?
25            A.    As far as I knew.

Page 196

```
 1         Q.   As far as you knew, Mr. Edwards,
 2    from 2009 through 2000 (sic), your time with
 3    the Board, were the Giant Eagle Pharmacies
 4    operating in a manner that was contributing in
 5    any way to the diversion of prescription
 6    opioids in Lake or Trumbull Counties?
 7         A.   Not as far as I knew.
 8         Q.   Did you ever see any evidence that
 9    Giant Eagle or its pharmacists were knowingly
10    filling prescriptions that were invalid or not
11    for a legitimate medical purpose?
12         A.   Not that I recall.
13         Q.   Were Giant Eagle and its
14    pharmacists actively assisting law enforcement
15    with anti-diversion efforts from the time you
16    started at LCNA until now?
17         A.   Yes.  With me, yes.
18         Q.   With respect to the other pharmacy
19    defendants, CVS, Rite-Aid, Walmart, and
20    Walgreens, would your answers be the same with
21    respect to those defendants, their stores
22    meeting the security requirement imposed by the
23    Board of Pharmacy?
24              MR. CIACCIO:  Objection.  Form.  Joe.
25         A.   I don't recall any instances where
```