SJ-EXHIBIT 14

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

                    ~~~~~~~~~~~~~~~~~~~~

5

6      IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
       OPIATE LITIGATION

7                                      Case No. 17-md-2804

8                                      Judge Dan Aaron
       This Document Relates To:      Polster

9

10     The County of Lake, Ohio v.
       Purdue Pharma L.P., et al.

11     Case No. 18-op-45032

12
       The County of Trumbull, Ohio v.

13     Purdue Pharma L.P., et al.,
       Case No. 18-op-45079

14

15     Track 3 Cases

16

                    ~~~~~~~~~~~~~~~~~~~~

17

18          Remote videotaped deposition of
                 GEORGE P. PAVLICH

19

20

21               December 14, 2020
                     9:01 a.m.

22

23

24       Renee L. Pellegrino, RPR, CLR

25            (Appearing Remotely)

Page 156

```
 1   Eagle pharmacist, 9853 and 9855 and 57.  So this
 2   was an inspection of -- a full inspection where
 3   you wanted follow-up, correct?
 4        A.    Yep, I did.
 5        Q.    And did you get the follow-up that
 6   you wanted in writing from Pharmacist Daugherty?
 7        A.    Yes, I did.
 8        Q.    And were you satisfied with his
 9   response?  I guess there was an issue involving
10   a copy of a prescription that was found in the
11   copier or something.  Do you recall this
12   incident?
13        A.    Yes, I do, as a matter of fact.
14        Q.    And did the Giant Eagle pharmacist
15   provide you the information you needed in order
16   to resolve the matter?
17        A.    Yes.  He provided me with a written
18   answer.  As a matter of fact, he even
19   apologized.  Yep, he did.  I remember that
20   incident.
21        Q.    You also had some follow-up requests
22   for the labeling on the third page of this
23   report.  You wanted more information concerning
24   the computerized labeling?
25        A.    I don't remember this part.
```

www.veritext.com                                    888-391-3376

Page 163

1    recognize Mike.

2         Q.    Was Mike Madgar a cooperative

3    pharmacist?

4         A.    Yes.

5         Q.    Did he behave professionally in your

6    experience and provide you with investigative

7    leads?

8         A.    Very good.

9         Q.    The second to last inspection report

10   is on page 0766.

11        A.    Okay.

12        Q.    Now, there's two pink sheet items,

13   29 and 12, and there's a Giant Eagle response on

14   page 0778.  Now, you wanted some documentation

15   follow-up from the Giant Eagle pharmacy at this

16   time, for example, for an inventory.  You

17   couldn't find some inventory in the records?

18        A.    I see it.  I couldn't find it.  I

19   don't recall this particular -- either one of

20   those pharmacists.  I don't remember them.

21        Q.    Barbara McAnany, M-c-A-N-A-N-Y, or

22   Brenton Cornwell?

23        A.    I don't recall.  I don't remember

24   either one of them.

25        Q.    But did you -- were you satisfied

Page 164

1   with the Giant Eagle pharmacists' follow-up?

2        A.    Apparently.  Replied within 20

3   days.  This must be it right here.

4        Q.    Page 0778 is the reply?

5        A.    Yes, it is.

6        Q.    Were you satisfied with that reply

7   and did it resolve the items that you wanted

8   followed up on?

9        A.    Must have been.

10        Q.    And then the last inspection, Agent

11   Pavlich, is on page 0684 dated 12-1 of '11.

12   This is store 1419 in Warren, Ohio.  Is this a

13   clean inspection?

14        A.    Yes, it was clean, and I remember

15   Linda Rhodes.

16        Q.    And Linda Rhodes, R-H-O-D-E-S?

17        A.    Right.  Good pharmacist.

18        Q.    Was she cooperative with you and did

19   she provide investigative leads to you?

20        A.    She was cooperative with me during

21   this inspection.  Like I say, I don't recall

22   each pharmacist that ever called me, but I

23   recall her, so, and I recall nothing bad about

24   her.

25        Q.    I have a few follow-up questions,

Page 166

1          Q.    Is it a fair statement that as far

2    as you know, based upon your inspections, that

3    Giant Eagle pharmacies met the security

4    requirements imposed by Ohio law?

5          A.    Yes.

6          Q.    In fact, in some ways did the Giant

7    Eagle pharmacies have better controls than those

8    required by the Ohio security requirement?

9          A.    They met the standard.

10         Q.    In your multiple visits to Giant

11   Eagle stores, did you ever observe in any way

12   that they were not adequately staffed with

13   professional pharmacists and pharmacy

14   technicians?  Did you ever see anything that

15   caused you concern about the staffing levels?

16         A.    Well, put it this way, sometimes I

17   saw pharmacy levels of dispensing that they

18   could have sure used another pharmacist in

19   there at times than be overworked and burden

20   pharmacists or couple of pharmacists that were

21   in there.  But that wasn't my call.  I'm just

22   giving my opinion.

23         Q.    Is that something, if you observed

24   it, you would have put it in your inspection

25   reports?

Page 167

1      A.      No, not necessarily.  That was an

2   opinion.  Didn't say anything ever in a code

3   that I know of that they had to have a certain

4   number of pharmacists for a certain volume of

5   prescriptions.  My sister-in-law is a

6   pharmacist also.  And I would walk in stores

7   and see hundreds of prescriptions being

8   dispensed in a day and they would have one

9   pharmacist working in the store.  To me, in my

10   opinion, it was extra pharmacists needed on

11   that staff, but that was my opinion.

12      Q.      Are you speaking specifically of

13   some pharmacy or a Giant Eagle pharmacy?  I'm

14   trying to make sure I understand.

15      A.      I'm not -- I'm speaking in

16   generality because I can't recall a specific

17   location as to, oh, wow, they did a thousand

18   scripts and they had one pharmacist working

19   during an eight-hour shift.  I'm just telling

20   you in general what I would see at times, and I

21   would go, man, I feel sorry for this pharmacist

22   working in here doing all of this, all of this

23   responsibility and everything with five, four,

24   three techs running around.  And they're

25   responsible for all of this.  They don't get

Page 168

1    paid enough to do all of that in my opinion.

2         Q.    I just want to make sure I

3    understand that these are some unknown

4    pharmacies in your general experience?

5         A.    All pharmacies in general.  All

6    pharmacies that I would walk in, I would see

7    high volumes of scripts, whether it was a chain

8    or even an independent, and I would see one

9    pharmacist trying to maintain all of this, do

10   all these records and deal with me.  I know it

11   was in my head many a times saying, man, I feel

12   sorry for this pharmacist.

13        Q.    But there's nothing in the code or

14   the regulations --

15        A.    No.

16        Q.    -- that say --

17        A.    That's why it was not noted in my

18   inspection report.  They filled a thousand

19   prescriptions on January 2nd and there was only

20   one pharmacist in here filling them all.  There

21   was nothing noted because there was nothing in

22   the code that I can recall, administrative

23   or -- well, more administrative than anything,

24   specific to prescriptions and how many

25   pharmacists.  You asked me and I'm telling you

Page 169

```
1    what I think -- what I thought.
2         Q.    Agent Pavlich, in your experience in
3    inspecting Giant Eagle pharmacies, is it a fair
4    statement that Giant Eagle pharmacies complied
5    with the manner of processing prescription
6    requirements, including the drug utilization
7    reviews that we went over earlier today?
8         A.    Yes.
9         Q.    Did you ever see any evidence that
10   Giant Eagle pharmacists were filling
11   illegitimate prescriptions?
12        A.    Oh, I'm sure there was, but I just
13   don't recall.  I mean, that was 25 years of
14   work.  I just don't recall off the top of my
15   head.  You'll have to be more specific.
16        Q.    Were Giant Eagle pharmacies ever the
17   targets of a criminal investigation as far as
18   you know?
19        A.    Giant Eagle pharmacies?
20        Q.    Right.
21        A.    So you're asking me whether
22   corporate was involved, and I would say no,
23   involving me.
24        Q.    Is it your view that, based upon
25   your inspections of Giant Eagle pharmacies, that
```

Page 170

1    Giant Eagle pharmacies were operating lawfully

2    at all times?

3          A.     If they weren't, I would have taken

4    a case number or I would have documented it.  I

5    don't recall anything specific.

6          Q.     Did you ever see any evidence that

7    Giant Eagle or its pharmacists were knowingly

8    filling prescriptions that were not legitimate?

9          A.     I mean, there could have been.  I

10   just don't -- you're going to have to bring me

11   a specific case number or something.  I'm not

12   going to say every single pharmacy I walked in

13   I never found a false prescription, I never

14   found a problem.  I couldn't answer that that

15   way.

16         Q.     Would you have to look at your

17   inspection reports in order to find that?

18         A.     Yeah.  I would have to go through

19   25 years of inspection reports and

20   investigative reports to find out if I had a

21   pharmacist in there that caused me grief.

22   Right off the top of my head I'm not thinking

23   of one.

24         Q.     All right.  But sitting here today,

25   can you recall ever an incident where a Giant

Page 171

1    Eagle pharmacist knowingly filled a prescription

2    that was not legitimate?

3         A.    I can't recall one.

4         Q.    Did Giant Eagle and its pharmacists

5    actively assist you and the board with

6    anti-diversion efforts?

7         A.    They did what I requested of them.

8         Q.    Do you hold similar conclusions for

9    the other pharmacy Defendants, CVS, Rite-Aid

10   Walgreens and Rite-Aid?  Were they generally

11   cooperative with you in your investigations?

12        A.    Well, since I'm under oath, I would

13   say I had no problems with Giant Eagle, no

14   problems with CVS, no problems with Walgreens,

15   no problems with Walmart.  I had some issues

16   with Rite-Aid.

17        Q.    Okay.  Is that in connection with

18   the Overholt Pharmacy/Dr. Franklin matter?

19        A.    No.  That involved -- well, for

20   one, it involved one of their supervisors,

21   who's now deceased.  He used to give me a

22   little bit of trouble when I would ask for

23   things and sort of, I guess the term would be,

24   drag his feet, and he was the one that I

25   confronted the one time.  And I was working a

Page 187

1    world that can consume 900 tablets in 30 days

2    of 8 milligram, not counting Methadone, all the

3    other drugs he was getting, oxycodone.  There's

4    no -- I mean, as soon as I heard this, I

5    thought, oh, my God, who the hell wrote this

6    and who the hell dispensed this.

7         Q.    And in your search warrant on the

8    next paragraph you state that the review

9    confirmed that Dr. Franklin authorized 15,298

10   controlled substance prescriptions during the

11   period 4-10 of '06 through 6-4 of '08, so a

12   little more than two years, these over 15,000

13   controlled substance prescriptions.  Was that

14   the time window that you had narrowed your

15   investigation down to?

16        A.    Yes.  I couldn't remember, you

17   know, off the top of my head, but if I put it

18   in this affidavit, that's what it was.

19        Q.    In your experience, is that a

20   massive amount of controlled substance

21   prescriptions?

22        A.    It is in my opinion, from one

23   doctor, it is in my opinion, and this doesn't

24   count patients -- this is only at Overholt

25   Pharmacy.  This doesn't count -- other

Page 189

1        A.    Yes.   That's -- that's just above

2    Trumbull County, up there.

3        Q.    I see.  And Dr. Franklin was

4    specifically directing his patients to Overholt?

5        A.    Right.  He was -- I mean, there was

6    a Giant Eagle -- wait a minute.  Let me think

7    about this.  I'm pretty sure there was a Giant

8    Eagle.  You came down his driveway to the main

9    street there and there was a Giant Eagle right

10   there.  It was a Rite-Aid, and there was a

11   Giant Eagle up the street, or it was a

12   Rite-Aid.  And they weren't really filling

13   them.  I mean, they had a couple in there, a

14   few, but they caught on right away.  But I

15   wasn't going to get the call because that

16   wasn't my county.  Frank Bodi got the call.

17   Hey, we see some suspicious prescriptions.  And

18   obviously, you know, it ended up -- I ended up

19   getting all this.

20       Q.    Your search warrant in the next

21   paragraph references many pharmacists

22   questioning Dr. Franklin's prescriptions.

23             Do you see that?

24       A.    No.

25       Q.    On the bottom of page 5736.

Page 191

1      Q.      In talking to other pharmacists in

2   the area, were you able to determine that

3   pharmacists had complained about Dr. Franklin

4   for some time?

5      A.      Yes.

6      Q.      And were some of those pharmacists

7   from the pharmacy Defendants?

8      A.      Yes.

9      Q.      Do you know whether or not the

10  pharmacists were told to stop dispensing for

11  Dr. Franklin at any point in time in the

12  investigation?

13     A.      Not by me.  They were never told by

14  me to stop dispensing.

15     Q.      Why not?

16     A.      I don't know about anybody else

17  telling them to, whether it was Edwards or Bodi

18  or the Board of Pharmacy.  Not by me.

19     Q.      Why wouldn't you tell a pharmacist

20  to stop dispensing for Dr. Franklin if there

21  was -- if he was under investigation?

22     A.      Because if they can't catch on that

23  I'm in there pulling prescriptions on

24  Dr. Franklin, that's not for me to tell them

25  what to do.  Pharmacists weren't dispensing.  I

1  didn't have to tell them.  They were telling me

2  when I walked in and said, "I'm Agent Pavlich.

3  I'm not assigned to this county but I'm

4  investigating Dr. Franklin, and I'm here to

5  pull profiles and prescriptions on patients."

6  And they knew right then.  But they weren't

7  really dispensing, those chains up there and

8  independents up there.  Why do you think the

9  patients drove, you know, 50 miles down the

10  road to go to Overholt?  Because they weren't

11  getting it dispensed up there.  They were

12  getting it at Overholt.  They were compliant.

13  I didn't charge anybody in any of those chains

14  or independents up there or anywhere else with

15  a crime, only at Overholt Pharmacy, because

16  that's where it was.  There were -- in my

17  opinion, they were all compliant, because if

18  they weren't, I would have charged them,

19  period.

20      Q.    Did you retain a medical expert in

21  your investigation?

22      A.    Dr. Piszel, pain management doctor.

23      Q.    Why did you need a medical expert?

24      A.    Well, based on my college

25  education, I didn't have a medical degree, so