SJ-EXHIBIT 15

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF OHIO
3  EASTERN DIVISION
4
~~~~~~~~~~~~~~~~~~~~
5
6  IN RE:   NATIONAL PRESCRIPTION   MDL No. 2804
   OPIATE LITIGATION
7                                   Case No. 17-md-2804
8                                   Judge Dan Aaron
   This Document Relates To:        Polster
9
10 The County of Lake, Ohio v.
   Purdue Pharma L.P., et al.
11 Case No. 18-op-45032
12
   The County of Trumbull, Ohio v.
13 Purdue Pharma L.P., et al.,
   Case No. 18-op-45079
14
15 Track 3 Cases
16
~~~~~~~~~~~~~~~~~~~~
17
18     Remote videotaped deposition of
              WILLIAM DiFRANGIA
19
20
21         January 14, 2021
              9:03 a.m.
22
23
24     Renee L. Pellegrino, RPR, CLR
            (Appearing Remotely)
25

Page 65

1  activities?
2      A.   Yes.
3      Q.   And were those good leads in the
4  sense that he was, you know, being cooperative
5  with you and initiating law enforcement
6  involvement by saying we've got X problem at Y
7  pharmacy, we want you to be involved?
8      A.   Yes.
9      Q.   Okay.  And was that the same for the
10 other pharmacy Defendants, their loss prevention
11 heads or members would, similarly, provide leads
12 to you and the other board members related to
13 diversion activities?
14     A.   All except for Walmart.  I don't
15 think I've ever had an instance of any type of
16 diversion regarding a Walmart employee or -- I
17 take that back.  I have been notified in my
18 prior career of improper prescribing by a
19 Walmart pharmacist and pharmacy tech.  So I
20 stand corrected.  I would say everyone has
21 contacted me at some point within my entire
22 career.
23     Q.   Did that -- did you view that type
24 of activity, being contacted by the pharmacy
25 Defendants, to be a positive indication to you

Page 66

1  of pharmacies attempting to comply with the
2  rules by engaging with agents at the board and
3  providing leads and notice of potential
4  diversion?
5           MR. WEINBERGER:  Objection.
6       A.   Yes.
7       Q.   With respect to the interactions
8  with the Giant Eagle loss prevention department,
9  do you recall any specific examples of Rick
10 Shaheen providing leads to you concerning
11 activities at Giant Eagle pharmacies?
12      A.   Yes.  We've -- him and I have
13 investigated a few individuals that were
14 stealing drugs from pharmacies.  I've requested
15 his assistance on several other investigations
16 regarding, you know, a video for suspects of
17 illegal processing or anything of that nature,
18 or even sometimes I've asked for information
19 of, you know, Giant Eagle Advantage cards that
20 was used to purchase a fraudulent prescription.
21      Q.   Okay. And did Mr. Shaheen -- did
22 you find him to be competent and -- as an
23 investigator himself?
24      A.   Yes.
25      Q.   Did he assist you from time to time

Page 67

1  in setting up video surveillance to detect
2  illegal activities?
3      A.   Yes.
4      Q.   And did that result in successful
5  investigations and prosecutions of individuals?
6      A.   Yes.
7      Q.   And did he provide, when requested,
8  Giant Eagle Advantage Card information to assist
9  in your investigations?
10     A.   Yes.
11     Q.   Do you recall any notable incidents
12 that you worked with Mr. Shaheen involving
13 illegal activities?  Does anything come to mind?
14     A.   We've had several cases and he's
15 helped me out.  I had -- had a doctor that was
16 writing prescriptions to his wife for
17 controlled substances.  I believe he provided
18 the video for that.  And, you know, recently I
19 had a physician that was doing something
20 similar, and he provided the Advantage Card
21 information.  He's contacted me countless
22 amounts of times when his pharmacists have --
23 have found an illegal prescription or a
24 fraudulent prescription.  Generally, depending
25 on the instance, I direct them to -- I direct

Page 68

1 them to local law enforcement, but we've also
2 investigated pharmacy technicians that have
3 been diverting drugs, and, you know, him and I
4 have successfully interviewed them and
5 successfully obtained, you know,
6 acknowledgments of individuals doing that
7 activity.
8     Q.   I see.
9     In your engagements with Rick
10 Shaheen and the loss -- Giant Eagle loss
11 prevention department, did you find them to be
12 cooperative and proactive in attempting to
13 avoid diversion and investigate and prosecute
14 diversion?
15     A.   Yes.
16     Q.   Would the same be true of the other
17 pharmacy Defendants?
18     A.   Yes.
19     Q.   Do you recall at any time ever
20 believing that any of the pharmacy Defendants
21 were causing diversion themselves?
22     A.   Could you rephrase that?
23     Q.   Sure, and I'll break it down.
24     You gave us a nice description of
25 your work with Rick Shaheen and the Giant Eagle

Page 69

1  loss prevention department.  My follow-up
2  question is, did you at any time believe that
3  Giant Eagle was itself violating any of the
4  pharmacy rules and regulations itself and
5  causing diversion itself?
6           MR. WEINBERGER:  Objection.
7      Q.   You can answer.
8      A.   Okay.  No.  There was nothing that
9  I -- that I could think of that led me to
10 believe that.
11     Q.   What about with respect to the other
12 pharmacy Defendants?
13          MR. WEINBERGER:  Objection.
14     A.   And, again, I -- I -- you know,
15 there's, again, nothing that comes to mind for
16 them.
17               -  -  -  -  -
18          (Thereupon, Deposition Exhibit 3,
19          E-Mail String, Beginning Bates
20          Stamp LAKE000068980, was marked for
21          purposes of identification.)
22               -  -  -  -  -
23     Q.   I'm going to direct your attention
24 to DiFrangia Exhibit 3, which is at the end of
25 your second binder.  It's an e-mail marked

Page 163

1  with you?
2       A.   Yes.
3       Q.   Have you inspected Giant Eagle
4  pharmacies outside of Trumbull County?
5       A.   Yes.
6       Q.   And am I correct that those
7  inspections were generally good inspections with
8  cooperative pharmacists, complying with whatever
9  you wanted and cooperating with you?
10      A.   Yeah.  As far as I can recall, the
11 pharmacists are always compliant and helpful.
12 You know, there probably was a written warning
13 issued or a verbal warning to the best that I
14 can recall.
15      Q.   Agent DiFrangia, as far as you're
16 concerned, did Giant Eagle meet the requirements
17 for the licenses for its store and the renewal
18 of its licenses at all times with no license
19 ever being suspended or revoked?
20      A.   Yeah.  As far as I'm concerned,
21 they have.
22      Q.   Did Giant Eagle pharmacies, from
23 your perspective, meet the security requirements
24 of the regulations at all times?
25      A.   Yes.  And if -- if there was a

Page 164

1  minor portion where they didn't, corrective
2  action was given and they would address that.
3       Q.   In your experience, did you observe
4  Giant Eagle pharmacies having even better
5  controls than those required by the regulations?
6            MR. WEINBERGER:  Objection.
7       A.   Yeah, as -- as far as I can recall,
8  you know, they were conducting their controlled
9  substance inventories when required.  I can't
10 recall if they were doing it more.
11      Q.   All right.  Do you recall, in your
12 experience with Giant Eagle pharmacies, ever
13 being sanctioned or suspended or cited for
14 failure to meet the Ohio regulatory
15 requirements?
16      A.   As far as I'm aware, no.
17      Q.   Were Giant Eagle pharmacies
18 adequately staffed based upon your involvement
19 with them?
20      A.   Yes.  From what I recall, they
21 were.
22      Q.   Did they have licensed pharmacists
23 who -- who were experienced and qualified to
24 work as pharmacists in the Giant Eagle
25 pharmacies?

Page 165

1      A.   Yes.
2      Q.   Did they have trained and supervised
3  pharmacy technicians in the pharmacies based
4  upon your inspections?
5      A.   Yes.
6      Q.   Did the Giant Eagle pharmacies
7  comply with the manner of processing
8  prescription regulatory requirements, including
9  performing drug utilization reviews, as far as
10 you know?
11     A.   As far as I'm aware, they have.
12     Q.   Based upon your experience, do you
13 have any evidence that Giant Eagle pharmacies
14 ever filled illegitimate prescriptions?
15          MR. WEINBERGER:  Objection.
16     Q.   You can answer.
17     A.   Well, I guess -- yeah, they would
18 have because I'm sure -- I believe I've seized
19 prescriptions from a Giant Eagle that -- now
20 specifically, Dr. Prommersberger prescriptions,
21 that after reviewed by a medical expert and
22 deemed issued for no legitimate medical reason,
23 you know, we seized those because they were
24 dispensed at a Giant Eagle pharmacy or, you,
25 know, instances of that.

1  Q. So is that what you mean, that in
2  some instances you were able to later determine
3  that some prescriptions were illegitimate
4  because your investigation showed that that
5  doctor was behaving inappropriately?
6  A. Yes.
7  Q. Agent DiFrangia, based upon your
8  experience with the Giant Eagle pharmacies and
9  pharmacists, were the Giant Eagle pharmacies
10 operating lawfully as far as you know?
11      MR. WEINBERGER: Objection.
12 A. Yes. As far as I know, they were.
13 Q. And were Giant Eagle and its
14 pharmacists actively assisting law enforcement
15 and the board with anti-diversion efforts?
16      MR. WEINBERGER: Objection.
17 A. Yes. As far as I've been involved
18 with, they have.
19 Q. I have similar questions for the
20 other pharmacy Defendants, CVS, Walgreens,
21 Walmart and Rite-Aid. Were those pharmacies and
22 pharmacists at those pharmacies actively
23 assisting law enforcement with anti-diversion
24 efforts?
25      MR. WEINBERGER: Objection.