SJ-EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION )
OPIATE LITIGATION            )
                             ) MDL No. 2804
THIS DOCUMENT RELATES TO:    ) Case No. 17-md-2804
                             )
Track Three Cases            )

VIDEOTAPED DEPOSITION OF DAMIAN BLAKELEY
Conducted via Zoom
Painesville, Ohio
Monday, December 7th, 2020

REPORTED BY: GREG S. WEILAND, CSR, RMR, CRR
JOB NO.:     4351892

Page 58

1  I'd say four.
2  Q. Did Giant Eagle personnel provide
3  prescriptions as well as video when available to
4  you?
5  A. Yes. Again, I'm not sure on the video,
6  but prescriptions, yes.
7  Q. Did you consider the Giant Eagle personnel
8  to be cooperative?
9  A. Yes.
10  Q. Did you consider the Giant Eagle personnel
11  to be -- and the information you received to be
12  helpful in the course of your investigations of
13  pharmaceutical diversion?
14  A. Right, yes.
15  Q. In terms of Walmart, did you ever seek
16  assistance from any Walmart pharmacies?
17  A. Yes, there was a Walmart in Mentor for a
18  long time.
19  Q. Any others?
20  A. If I did, I can't remember. But, yes, the
21  one that existed, the one in Mentor.
22  Q. Did Walmart personnel from time to time
23  provide prescriptions or video when available?
24  A. Yes.
25  Q. Did you consider the Walmart personnel to

Page 62

```
 1   diversion?
 2        A.   No.
 3        Q.   Did you ever believe that Rite Aid was
 4   engaged in pharmaceutical diversion?
 5        A.   No.
 6        Q.   Did you ever believe that CVS was engaged
 7   in pharmaceutical diversion?
 8        A.   No.
 9        Q.   Did you ever investigate Walgreens for
10   pharmaceutical diversion?
11        A.   No.
12        Q.   Did you ever believe that Walgreens was
13   engaged in pharmaceutical diversion?
14        A.   No.
15        Q.   Did you ever investigate Giant Eagle for
16   pharmaceutical diversion?
17        A.   No.
18        Q.   Did you ever believe that Giant Eagle was
19   engaged in pharmaceutical diversion?
20        A.   No.
21        Q.   Did you ever investigate Walmart for
22   pharmaceutical diversion?
23        A.   No.
24        Q.   Did you ever believe that Walmart was
25   engaged in pharmaceutical diversion?
```

Page 76

1  A. We'd follow up, follow up with them, talk
2  to them. In some cases, you know, it's hard to
3  respond anywhere like a normal policeman would in
4  unmarked cars. And, you know, we used to wear ties,
5  and it was a real white-collar thing, you know. I
6  mean, it wasn't lights and sirens and all that
7  stuff.
8         So, like I said, these cases are mostly
9  paper trails, so they're not going anywhere, you
10 know. So we would get there as fast as we could,
11 you know, within reason. And it wasn't, you know,
12 we weren't lights and sirens or any of that.
13     Q. Did you receive complaints from Walmart?
14     A. Yes, yes.
15     Q. What kind of complaints from Walmart?
16     A. Same, same type of stuff. Maybe not the
17 same as the CVS example or the Walgreens example,
18 but they did call us with stuff occasionally.
19     Q. Did the Walmart complaints result in
20 investigation by the Lake County Narcotics?
21     A. Yes.
22     Q. Did Giant Eagle make complaints to
23 Lake County Narcotics?
24     A. Yes.
25     Q. Did the Giant Eagle complaints result in

Page 77

1  investigations by Lake County Narcotics?
2       A.   Yes.
3       Q.   And then going back, please, to Exhibit 1,
4  there's a 2010 task organization where both you and
5  Mr. Begley are shown in diversion; is that right?
6       A.   Yes.
7            MR. GISLESON:  And then, Mr. Ladd, if you
8       could please go to Tab 4.  And mark that as
9       Exhibit 2.
10                     (Exhibit 2 was marked for
11                     identification.)
12           MR. LADD:  Tab 4 is marked as Exhibit 2.
13           MR. GISLESON:  Thank you.
14  BY MR. GISLESON:
15      Q.   Mr. Blakeley, I'd like to show you what's
16  been marked as Exhibit 2.  I'll represent to you
17  that these are organizational charts from 2011 to
18  2020.
19           Have you seen any of these organizational
20  charts before?
21      A.   Yeah, I've seen these.
22      Q.   Have you seen all of them?
23      A.   I haven't looked at all of them.  I just
24  looked at the one, the first one for 2011.  Yeah, I
25  think I've seen versions of these that were made

Page 106

1            MR. PIFKO: Objection, vague.
2    BY MR. GISLESON:
3        Q.   Did you ever work with any pharmacists
4    within Lake County while they were involved with
5    filling a patient's prescription?
6        A.   Yeah, they were all filling patients'
7    prescriptions.
8        Q.   Would they alert you in advance at any
9    time before filling it that they had received a
10   script that they were asked to fill for somebody
11   they considered to be suspicious?
12       A.   I can think of a handful of times where we
13   were able to respond right away and we arrested the
14   person in the drive-through, particularly --
15       Q.   Do you recall any of those pharmacies?
16       A.   Yeah, Giant Eagle, and I think Walgreens,
17   too, to be specific.
18       Q.   Do you recall the Giant Eagle store?
19       A.   There were a couple. There were a couple;
20   Giant Eagles, Painesville and Willowick.
21       Q.   Did Lake County Narcotics then bring
22   criminal charges against that individual or
23   individuals?
24       A.   Yes.
25       Q.   Which Walgreens stores reported suspicious

Page 111

1  doctor was doing the right thing.
2       Q.   Taking a step back, you mentioned
3  complaints that you'd received from Giant Eagle in
4  Painesville and Willoughby, I think, where a
5  pharmacist called in a complaint involving a
6  prescription that was still on site.
7            Do you recall any of the details of those
8  Giant Eagle experiences, complaints?
9       A.   Yes.
10           The one in Painesville was my first day on
11 the job, and Chris was in communication with the
12 Painesville Giant Eagle.  It was getting towards the
13 end of the day.  There was a chance that these
14 people would show up to fill a prescription.  Chris
15 asked them to notify him when they showed up.  They
16 did.
17           And while they were waiting in the
18 drive-through, we kind of blocked the drive-through
19 with our cars, nothing fancy or, you know, cool or
20 anything like that.  It's just -- we arrested them
21 there.  They had a prescription that was illegal in
22 some way.  I don't remember exactly how it was a bad
23 prescription, but it was.
24           And then the one in Willowick, I received
25 a call from a pharmacist that said they had someone

```
                                                      Page 112
 1   in the drive-through with a -- or they had someone
 2   come through the drive-through that was supposed to
 3   come back in 15 minutes.  The script turned out to
 4   look odd.  The pharmacist called the doctor.  The
 5   doctor confirmed that it was a bad script.
 6            We were waiting for him when he got back
 7   to the drive-through, same thing.
 8        Q.   Did that result in criminal charges?
 9        A.   Yes, both did.  Yes.
10        Q.   And did both instances result in
11   convictions or pleas?
12        A.   Yes, yes.
13            MR. GISLESON:  I'm making good progress,
14       but, Mark, I didn't know if you wanted to take
15       a short break and Mr. Blakeley, a short break
16       for lunch.
17            THE WITNESS:  I'm good.  Whatever you guys
18       want.
19            MR. PIFKO:  Do you want to go off the
20       record?
21            MR. GISLESON:  Sure.  Why don't we go off
22       the record.
23            THE VIDEOGRAPHER:  Off the record, 12:49.
24                 (Whereupon, a recess was taken
25                  from 12:49 p.m. to 1:10 p.m.)
```

Page 230

```
 1  BY MR. GISLESON:
 2      Q.  Then if you please go to Tab 49.
 3      A.  Is that in another thing?  I don't have
 4  Tab 49.
 5      Q.  Is that -- do you have a different
 6  envelope or another envelope there?
 7      A.  I did -- I think I have some more, maybe
 8  in this thing.
 9      Q.  Yes, please.
10      A.  Okay.
11          We're getting there.
12          All right.  I've got 49.  Okay.
13          MR. LADD:  Tab 49 is marked as Exhibit 22.
14                  (Exhibit 22 was marked for
15                  identification.)
16  BY MR. GISLESON:
17      Q.  Mr. Blakeley, is this a true and correct
18  copy of an email exchange that you had with
19  D. Porter at Richmond Heights on the subject "Lynn
20  Lombardo Report/Dr. Beach"?
21      A.  Yes.
22      Q.  Were you involved with investigating
23  criminal activity associated with Dr. Beach's
24  office?
25      A.  Associated with the doctor's office?
```

Page 231

1  Q. Yes.
2  A. Oh, I remember this name. Yeah, I think
3  she worked for the doctor, correct, yeah. She was
4  on the staff somewhere and she was up to no good. I
5  remember this.
6  Q. Mr. Porter -- strike that.
7  What position did Mr. Porter have?
8  A. Mr. Porter.
9  Q. He was a detective sergeant at the
10 Richmond Heights Police; is that right?
11 A. Yeah.
12 Q. And he sent his report to you, and then
13 you wrote back, "This is what I got so far"; is that
14 right?
15 A. Yes.
16 Q. And are you able to tell what it was that
17 you had to provide him?
18 A. Looks like I sent him my report.
19 Q. Does your report appear in here?
20 A. Yes.
21 Q. Oh, which page is your report?
22 A. It's after the email.
23 Q. Does this indicate that you personally
24 were involved with investigating Lynn Lombardo, who
25 was a former employee in Dr. Beach's office?

Page 232

1       A.    Yes.
2       Q.    And this shows that you ran a practitioner
3  OARRS report on Dr. Beach.
4             What was a practitioner OARRS report?
5       A.    That is a OARRS report that shows all of
6  the patients' drug history of a certain
7  practitioner.
8       Q.    And for what purpose did you run a
9  prescriber OARRS report?
10      A.    I wanted to show it to the doctor to ask
11 him which prescriptions were real and which ones
12 were done by Lynn Lombardo.
13      Q.    Did you ever run a practitioner OARRS
14 report in order to investigate a prescriber?
15      A.    I don't think so.
16      Q.    If you can go to page that ends in 727,
17 the second-to-last paragraph of your report, you
18 wrote that "All of the prescriptions for
19 10-milligram hydrocodone were not prescribed or
20 authorized by him," meaning Dr. Beach; is that
21 right?
22      A.    That's right.
23      Q.    As part of this investigation, did you go
24 both to Giant Eagle as well as Walgreens to obtain
25 copies of scripts from those pharmacies?

Page 233

1  A. Yes.
2  Q. Were they cooperative with your
3  investigation?
4  A. Yes.
5  Q. And then if you can go, please, to Tab 48.
6  A. Okay.
7  Q. Mark that, please, as an exhibit,
8  Mr. Ladd.
9  MR. LADD: Tab 48 is being marked as
10  Exhibit 23.
11  (Exhibit 23 was marked for
12  identification.)
13  BY MR. GISLESON:
14  Q. I'd like to show you what's been marked
15  Exhibit 23.
16  Is this a true and correct copy of an
17  email exchange that you had with Mr. Porter on
18  February 10, 2014, and February 14, 2014, on the
19  subject "Lynn Lombardo Report/Dr. Beach"?
20  A. Yes.
21  Q. If we look at your email on the top to
22  Mr. Porter, you wrote that you were "finally able to
23  get some video of Lombardo paying for and filling a
24  'Catherine Fleischhauer' script on November 21,
25  2013, and November 24, 2013, at the Giant Eagle

Page 248

1    Yeah, this looks like this is still the
2    nursing board report.
3        Q.   Go, please, to Tab 34.
4        MR. GISLESON:  Mr. Ladd, if you'd mark
5    this as an exhibit.
6        MR. LADD:  Tab 34 has been marked as
7    Exhibit 32.
8                (Exhibit 32 was marked for
9                identification.)
10   BY MR. GISLESON:
11       Q.   I'd like to show you what's been marked as
12   Exhibit 32.  It's a document stamped LAKE3677989 to
13   990.
14            Is this a true and correct copy of an
15   email exchange in which you were involved with
16   Renee Babic on February 15, 2012, on the subject of
17   "Suspicious calls to pharmacies"?
18       A.   Yes.
19       Q.   And if we look in the third email on the
20   first page, this says, "The Bay Village Police
21   Department received reports from Walgreens and CVS
22   stores within the city on two separate days.  Each
23   pharmacy reported receiving suspicious calls where a
24   male caller would ask if the pharmacy carried the
25   prescription drug Opana."

Page 249

1  Does that refer to the Opana drug you
2  referenced before that replaced the second version
3  of Oxy as being a popular drug to divert?
4  A.  That's right.
5  Q.  And this goes on to say that "When CVS
6  told the caller that they did not carry Opana, the
7  caller asked if any other pharmacist in Bay did."
8  Were you involved at all in investigating
9  anything that's described here in terms of these
10 suspicious calls to pharmacies?
11 A.  No, I was made aware of it by the email,
12 but it wasn't my case or anything like that.
13 Q.  In your view -- going back to the two
14 nurse practitioners, in your view, did the
15 Giant Eagle pharmacist stop diversion by refusing to
16 fill the Frycklund prescription and notifying law
17 enforcement?
18 MR. PIFKO:  Objection to the extent the
19    question assumes facts not in evidence, calls
20    for a legal conclusion, speculation.
21 BY MR. GISLESON:
22 Q.  In your view, did the Giant Eagle
23 pharmacist stop diversion by virtue of her actions?
24 A.  Yes.
25 Q.  If you can go to, please, Tab 35.