SJ-EXHIBIT 17

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                     -   -   -
 5
        IN RE:  NATIONAL       :   HON. DAN A.
 6      PRESCRIPTION OPIATE     :   POLSTER
        LITIGATION              :
 7                              :
        APPLIES TO ALL CASES    :   NO.
 8                              :   1:17-MD-2804
                                :
 9

             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    VOLUME I
12
                     -   -   -
13
                 April 17, 2019
14
                     -   -   -
15
16          Videotaped deposition of
     THOMAS PREVOZNIK, taken pursuant to
17   notice, was held at the law offices of
     Williams & Connolly, 725 12th Street,
18   Washington, D.C., beginning at 9:11 a.m.,
     on the above date, before Michelle L.
19   Gray, a Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
20   Realtime Reporter, and Notary Public.
21                   -   -   -
22
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

1    system in use by wholesale drug

2    distributors for controlled substances,

3    do you see that reference that you just

4    read?

5         A.    Yes.

6         Q.    Is it fair to say then,

7    there was in fact at this point in time,

8    in 1998, a DEA-approved suspicious order

9    monitoring system for controlled

10   substances?

11        A.    I would say no, because

12   there was never a -- DEA never had an

13   approved system.  The system that the

14   statute requires and the regulations

15   require is the registrant is to design

16   and operate that system.

17             They come to us and they

18   say, here's our system, and we may have

19   discussions with them about it.  So you

20   can have a great system in paper, but

21   when you implement it, are you actually

22   implementing what you say.

23             So that's part of our job,

24   when we go out there for schedule

Highly Confidential - Subject to Further Confidentiality Review

1    investigation, is to look at that program

2    and are they doing what they're saying,

3    is it actually detecting suspicious

4    orders.

5        Q.    So, Mr. Prevoznik, try to

6    listen to my question and answer it.  I

7    realize that you would like to speechify

8    a little bit and get out your talking

9    points, but please restrain --

10            MR. FINKELSTEIN:  Try not to

11        argue with the witness.

12   BY MS. MAINIGI:

13        Q.    -- from doing that.

14            MR. FINKELSTEIN:  You can

15        ask your questions.  And you're

16        not here to abuse him.

17   BY MS. MAINIGI:

18        Q.    So, Mr. Prevoznik, let's

19   back up.  The DEA helped to write this

20   report, right?

21        A.    Correct.

22        Q.    And someone from the office

23   of diversion control at the DEA was in

24   fact the chair of the group that wrote

1         Q.    And did you read far enough

2  in the report to see that there was, in

3  fact, an algorithm that was contained as

4  an exhibit to the report?

5         A.    Do you have a page number?

6         Q.    Sure:  Bates Number 2247.

7         Did you review this page

8  previously?

9         A.    Yes.

10         Q.    Okay.  And -- and this page

11  essentially contains a calculation or

12  algorithm for both List I chemicals and

13  Schedule II controlled substances,

14  correct?

15         A.    Correct.

16         Q.    Now, DEA did not require

17  distributors to use a particular

18  algorithm or metric to identify excessive

19  purchases of controlled substances,

20  correct?

21         A.    Could you please repeat

22  that?

23         Q.    DEA did not require that a

24  distributor use a particular calculation

1    or algorithm to identify excessive

2    purchases of controlled substances,

3    correct?

4          A.    Correct.

5          Q.    But, the DEA was aware that

6    certain registrants were using a

7    calculation or metric or algorithm to

8    identify an excessive purchase, correct?

9                MR. FINKELSTEIN:  Objection.

10          Vague as to time.

11               THE WITNESS:  I -- I just

12          want to make sure I'm clear on

13          this.  We're talking about

14          excessive purchases or are we

15          talking about suspicious orders?

16    BY MS. MAINIGI:

17          Q.    Well, right now I'm talking

18    about excessive purchase reports in this

19    time period.

20               Was the DEA aware that in

21    approximately the 1998 time period, that

22    distributors were using a particular

23    algorithm or calculation to identify

24    excessive purchases of controlled

Highly Confidential - Subject to Further Confidentiality Review

1              We -- we established before
2      that the DEA today does not review
3      reporting systems, right?
4              MR. FINKELSTEIN:  Objection.
5          Mischaracterizes the witness's
6          testimony.
7              THE WITNESS:  I mean, we --
8          we reviewed McKesson's, the new
9          one.
10     BY MS. MAINIGI:
11         Q.    And you left it --
12         A.    -- we reviewed it, we -- we
13     did not -- we --
14             MR. FINKELSTEIN:  Let the
15         witness answer the question.
16             THE WITNESS:  I don't know
17         what you mean by the term
18         "blessing it."
19     BY MS. MAINIGI:
20         Q.    Okay.
21         A.    Because as I had said
22     previously, that you -- you can write the
23     best system in the world, but if you
24     don't implement it and you don't stick to

1    it, it doesn't mean anything.

2              So that's part of our

3    review, when we go out and do schedule

4    investigations, is to review, are they

5    factually, in fact -- did -- is -- are

6    they operating a system that can detect a

7    suspicious order.

8    BY MS. MAINIGI:

9         Q.    And that's something that

10   the DEA reviews periodically as part of

11   its auditing process, correct?

12        A.    Correct.

13        Q.    So as part of the audit

14   process, operating systems that are

15   designed to review suspicious orders are

16   reviewed by the DEA?

17        A.    Well, it's not just the

18   schedule.  I mean it could be a

19   pre-registration, somebody is coming on

20   and they have -- we have to go through

21   the whole public interest of, you know,

22   what do you have in place to operate and

23   detect a system.  So it's not just a

24   schedule investigation.  There are

Highly Confidential - Subject to Further Confidentiality Review

1  schedule investigations that we follow

2  up, and we do that as well.  So it comes

3  in -- it comes in various times that

4  we're going to review somebody's

5  operating system, whether we're on

6  schedule investigation, or whether we're

7  doing an investigation on a pharmacy or

8  something like that, where we're going to

9  look at how many SORs were submitted or

10 not submitted, or we're going to look at

11 the ARCOS data, how much did they buy.

12         We're going to look at

13 various things to make the determination

14 on what is going on.

15      Q.    And if either in the

16 pre-registration process or in the audit

17 process the DEA determines that a

18 registrant's system is not adequately

19 detecting suspicious orders, is that

20 something that is conveyed to the

21 registrant?

22      A.    Yeah, we -- we would tell

23 them, you need to add something.

24      Q.    It's clear in the Rannazzisi

1    be a phone call?  What forms do you

2    recall?

3                    MR. FINKELSTEIN:  Objection.

4          Vague as to time.

5                    THE WITNESS:  I don't -- I

6          don't remember off the top of my

7          head what it looked like.  It was

8          usually -- back then it was paper.

9    BY MS. MAINIGI:

10         Q.    Is it fair to say that from

11   time to time you might get a report of a

12   suspicious order via a telephone call

13   from a distributor?

14                   MR. FINKELSTEIN:  Objection.

15         Vague as to time.

16                   THE WITNESS:  I'm not aware.

17   BY MS. MAINIGI:

18         Q.    When you say --

19         A.    It could be chemical, we

20   might have somebody call.

21         Q.    But you don't think a

22   suspicious order for a controlled would

23   come in via a telephone call?

24                   MR. FINKELSTEIN:  Objection.

1    distributor initiative meetings through

2    today, right?

3          A.    I don't know if we have any

4    today.  But we've done some recently,

5    yes.

6          Q.    Okay.  The more recent ones,

7    where is the focus and where is the

8    trends?

9          A.    Well, I think what we've

10   been showing, and as it's been reported,

11   we're seeing a decline in the number of

12   opioid prescriptions.  We've seen

13   increase in amphetamines and

14   methylplenidate.  We're seeing -- the one

15   opioid we still see an increase in is

16   Suboxone, buprenorphine, for drug

17   treatment.  We're seeing a little bit of

18   shift of the drugs.

19         Q.    So the trends and the

20   problem areas are unfortunately always

21   changing and shifting.  Is that fair?

22         A.    Well, there tends to be a

23   shift, yeah.

24         Q.    And the DEA does its best to

1    try to identify the changes and the

2    shifts in the trends, correct?

3              A.    Well, I mean, the data --

4    the data shows that, so it's not DEA

5    doing it.  You know, there's been a lot

6    of hard work by a lot -- a lot of

7    different people, including the industry.

8    So...

9              Q.    The data from the industry

10   helps everyone identify the shifts in the

11   trends, correct?

12             A.    Yeah.

13             Q.    Including the DEA?

14             A.    Yeah.  Yes.

15             Q.    And because of the shifts in

16   the trends and the fact that there is a

17   constant change, is that one of the

18   reasons why the DEA takes the position

19   that registrants must design their own

20   system for suspicious order monitoring

21   and reporting?

22             MR. FINKELSTEIN:  Objection.

23        Vague.

24             THE WITNESS:  I don't think

Highly Confidential - Subject to Further Confidentiality Review

1          the characterization.

2               THE WITNESS:  Nationwide,

3      correct.

4  BY MS. MAINIGI:

5          Q.    Instead, one-off guidance

6  was perhaps provided in the context of

7  individual distributor meetings, correct?

8          A.    Yes.  Along with the MOAs

9  and the settlements that were done.

10         Q.    And is there documentation

11 of what was said at the individual

12 distributor meetings?

13         A.    It would be the PowerPoints

14 and the report -- after report.

15         Q.    And this is an internal DEA

16 report?

17         A.    Yes.

18         Q.    And have you reviewed those

19 internal DEA reports for the purpose of

20 preparing for your testimony today?

21         A.    Some of them.

22         Q.    Now, does the DEA agree that

23 there's more than one way to design and

24 operate a system that can identify and

Highly Confidential - Subject to Further Confidentiality Review

1    report suspicious orders?

2         A.    Yes.

3         Q.    And there's no single

4    feature that makes a suspicious order

5    monitoring system compliant, correct?

6         A.    Correct.

7         Q.    And the DEA leaves it up to

8    the registrant to design a system that

9    works with its own business model and

10   customer base, correct?

11        A.    Correct.

12        Q.    Does it matter to the DEA

13   whether a registrant reviews orders

14   manually or uses an automated system?

15        A.    No, it doesn't matter.

16        Q.    Other than requiring that

17   the report, suspicious order report

18   clearly indicate that the order is

19   suspicious, does DEA require suspicious

20   order reports to follow a particular

21   format?

22        A.    That's correct.

23        Q.    Let me ask the question

24   again.  The DEA does not require

1          that this is outside the scope.

2          I'll let the witness answer for

3          now if you have understanding.

4               THE WITNESS:  Yes.

5    BY MR. STEPHENS:

6          Q.    Is it also true under -- you

7    testified earlier today about the C.F.R.

8    regulations, correct?

9          A.    Correct.

10         Q.    And under Title 21 -- or I'm

11   sorry, under 21 C.F.R. 1301.71(b), it's

12   true that the regulation regarding

13   suspicious order monitoring does not

14   require strict compliance, it requires

15   substantial compliance?

16              MR. FINKELSTEIN:  Did you

17        mean 74?

18              MR. STEPHENS:  It might be

19        74.

20              MR. FARRELL:  1301.74(b)?

21              MR. STEPHENS:  Yes.  No,

22        actually -- here.  Let me just

23        mark it.

24              (Document marked for

1          identification as Exhibit

2          DEA-Prevoznik-13.)

3    BY MR. STEPHENS:

4          Q.    I'll show the witness what's

5    been marked as Exhibit 13.

6          A.    So, (b)?

7          Q.    (B), right.

8          A.    Okay.

9          Q.    So (b) states substantial

10   compliance with the standards set forth,

11   right?

12         A.    Yes.

13         Q.    Okay.  And that could be

14   deemed sufficient, correct?

15         A.    Yes.  That's what it says.

16         Q.    It does not say strict

17   compliance, correct?

18         A.    Correct.

19         Q.    Like manufacturers and

20   distributors, DEA also considers doctors

21   who prescribe opioids to their patients

22   to be registrants?

23         A.    Correct.

24         Q.    Okay.  The prescribing

1          MR. FINKELSTEIN:  Scope.

2          THE WITNESS:  Can you please

3     repeat it.

4  BY MR. STEPHENS:

5     Q.    Sure.  As to prescription

6  opioids, DEA believes that the

7  overwhelming majority of prescribing in

8  America is conducted responsibly?

9     A.    Yes, correct.

10     Q.    And DEA has stated that

11  99.5 percent of prescribers do not

12  overprescribe opioids?

13          MR. FINKELSTEIN:  Scope.

14          You can answer if you know.

15          THE WITNESS:  I don't know

16     that we said 99.5 percent.  I've

17     heard the figure 1 to 2 percent.

18  BY MR. STEPHENS:

19     Q.    Okay.  Well, let me show you

20  the transcript.

21          MR. FARRELL:  Can you

22     reference the transcript, please.

23          MR. STEPHENS:  Yes, sir.

24          (Document marked for

1           identification as Exhibit

2           DEA-Prevoznik-14.)

3    BY MR. STEPHENS:

4           Q.    The transcript is dated

5    April 29, 2014.  It's a subcommittee

6    hearing on oversight investigations by

7    the Committee of Energy and Commerce.

8               MR. FINKELSTEIN:  We're at

9           6:00.  I'll let you ask this

10          question and then we're going to

11          break for the day.

12   BY MR. STEPHENS:

13          Q.    I'd ask you to turn to Page

14   76.

15          A.    Page 76.

16          Q.    Page 76, Mr. Prevoznik.  And

17   we're looking at, like, the

18   second-to-last paragraph where

19   Mr. Rannazzisi is talking.

20              Do you see that?

21          A.    Mm-hmm.

22          Q.    And there's a question from

23   a Mr. Burgess ahead of that, correct?

24              Do you see that?

1    A.    Yes.

2    Q.    Okay.  And Mr. Burgess says

3  something to the effect that

4  Mr. Rannazzisi seems to imply that we are

5  overprescribing.  Mr. Rannazzisi then

6  responds and says, "I think that if you

7  are talking about 99.5 percent of the

8  prescribers, no, they are not

9  overprescribing.  But our focus is in

10  rogue pain clinics and rogue doctors who

11  are overprescribing."

12         Did I read that accurately?

13    A.    Yes.

14    Q.    Okay.  So my question for

15  you, the initial question was, DEA has

16  publicly stated that 99.5 percent of the

17  prescribers are not overprescribing,

18  correct?

19    A.    Correct.

20         MR. STEPHENS:  All right.

21     That's all I have for the day.

22         MR. FINKELSTEIN:  We're

23     going to excuse the witness so we

24     can argue about what's going to

Highly Confidential - Subject to Further Confidentiality Review

1     IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4                 -   -   -
5

6   IN RE:  NATIONAL       :   HON. DAN A.
    PRESCRIPTION OPIATE    :   POLSTER
    LITIGATION             :
7                          :
    APPLIES TO ALL CASES   :   NO.
8                          :   1:17-MD-2804
                           :
9

           - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                   VOLUME II
12
                 -   -   -
13
             April 18, 2019
14
                 -   -   -
15
16          Continued videotaped
    deposition of THOMAS PREVOZNIK, taken
17  pursuant to notice, was held at the law
    offices of Williams & Connolly, 725 12th
18  Street, Washington, D.C., beginning at
    8:16 a.m., on the above date, before
19  Michelle L. Gray, a Registered
    Professional Reporter, Certified
20  Shorthand Reporter, Certified Realtime
    Reporter, and Notary Public.
21
                 -   -   -
22
         GOLKOW LITIGATION SERVICES
23   877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
24

1          A.     Acting administrator.

2          Q.     Acting administrator.

3          A.     Right.

4          Q.     It's the number one position

5    at DEA?

6          A.     Correct.

7          Q.     Okay.  So here Mr. Patterson

8    was asked a question, and in part of his

9    response he says, "But I go back to the

10   fact that I look at the vast majority of

11   doctors, 99.99 percent are all trying to

12   do right by their patients."

13               Do you see that?

14         A.     Correct.

15         Q.     Did I read that accurately?

16         A.     Yes.

17         Q.     Okay.  DEA agrees, as of

18   2018, that 99.9 percent of doctors are

19   all trying to do right by their patients,

20   right?

21               MR. FINKELSTEIN:  Scope.

22               THE WITNESS:  I don't -- I

23        mean, he's stated that, but I

24        don't think it's a static number.

1          So I mean, I think -- it will

2          fluctuate depending on what a

3          prescriber eventually does.

4    BY MR. STEPHENS:

5          Q.    Okay.  As of --

6          A.    As of that date, that's what

7    was said, yes.

8          Q.    Okay.  He was the number one

9    person at DEA when he made that

10   statement, right?

11         A.    Right.

12               MR. FINKELSTEIN:  Asked and

13         answered.

14               MR. FARRELL:  Excuse me.

15         Could you please repeat the

16         exhibit number?

17               MR. STEPHENS:  Sure.  That's

18         number 15, Paul.

19               MR. FINKELSTEIN:  And wait

20         for my objections.

21   BY MR. STEPHENS:

22         Q.    Mr. Prevoznik, if

23   99.99 percent of prescribers acted

24   appropriately, the diversion problems DEA

1    speculating on that, but, yes.

2    BY MR. STEPHENS:

3        Q.    Okay.  I'd like to continue

4    by asking you some additional questions

5    about interpretation enforcement of

6    Title 21 U.S.C. 23, the regulations and

7    how those relate to the design of a

8    reasonable SOMs system.  Okay?

9        A.    Yes.

10       Q.    Okay.  So yesterday you --

11   you testified about different

12   distributors having different business

13   models, right?

14       A.    Correct.

15            MR. FINKELSTEIN:  Objection.

16   Scope.  Characterization.

17   BY MR. STEPHENS:

18       Q.    Is it fair to say that a

19   SOMs systems is not a one-size-all

20   proposition, one-size-fits-all

21   proposition?

22       A.    Correct.

23       Q.    And DEA understands that not

24   all registrants distribute opioids to the

1    same customers, right?

2         A.    Correct.

3         Q.    DEA understands that

4    registrants have different business

5    models?

6         A.    Correct.

7         Q.    And DEA expects that each

8    registrant will review its own business

9    model and design a SOM system that fits

10   its specific method of distribution?

11              MR. FINKELSTEIN:  Objection.

12         Vague.

13              THE WITNESS:  That's correct

14         as -- as per the regulations.

15   BY MR. STEPHENS:

16         Q.    Okay.  Some registrants

17   distribute to hospitals?

18         A.    Correct.

19         Q.    Some don't?

20         A.    Correct.

21         Q.    Some registrants distribute

22   to hospice centers?

23         A.    Correct.

24         Q.    Some don't?

1    right?

2                  MR. FINKELSTEIN:  Wait.

3            Scope, calls for speculation.

4                  THE WITNESS:  Not to my

5            knowledge.

6    BY MR. STEPHENS:

7            Q.    Okay.  CVS, Walgreens, Rite

8    Aid, HBC Giant Eagle, they never had a

9    ratio of controlled to noncontrolled

10   substances that was 95 percent controlled

11   to 5 percent non-controlled, right?

12                  MR. FINKELSTEIN:  Scope.

13           Calls for speculation.

14                  THE WITNESS:  Not to my

15           knowledge.

16                  MR. FINKELSTEIN:

17           Mr. Videographer, what's our

18           on-the-record time?

19                  THE VIDEOGRAPHER:

20           42 minutes.

21                  MR. FINKELSTEIN:  We're past

22           seven hours.  So everybody knows.

23   BY MR. STEPHENS:

24           Q.    DEA has acknowledged and has

Highly Confidential - Subject to Further Confidentiality Review

1    acknowledged in presentations that it

2    gave that no chain pharmacies were rogue

3    pharmacies, right?

4            A.    Correct.

5                MR. FINKELSTEIN:  Hang on

6            one second.  I am just reading the

7            question.

8                Okay.

9    BY MR. STEPHENS:

10           Q.    Your answer was "correct,"

11   right?

12           A.    Yes.

13           Q.    Walmart, CVS, Rite Aid,

14   Walgreens, HBC Giant Eagle are all chain

15   pharmacies, true?

16           A.    True.

17           Q.    DEA is generally aware that

18   Walmart only distributes controlled

19   substances to its own Walmart store

20   pharmacies, right?

21                MR. FINKELSTEIN:  Objection.

22           Scope.  Calls for speculation.

23                THE WITNESS:  Well, that

24           just changed.  But prior to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3

      IN RE: NATIONAL        )
 4    PRESCRIPTION           )   MDL No. 2804
      OPIATE LITIGATION      )
 5    _____)   Case No.
                             )   1:17-MD-2804
 6                           )
      THIS DOCUMENT RELATES  )   Hon. Dan A.
 7    TO ALL CASES           )   Polster
 8
                  FRIDAY, MAY 17, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                     - - -
12          Videotaped deposition of Thomas
13    Prevoznik, Volume III, held at the offices of
14    WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15    NW, Washington, DC, commencing at 8:10 a.m.,
16    on the above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                     - - -
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

```
 1          to Walmart stores.
 2     QUESTIONS BY MS. FUMERTON:
 3          Q.     And your other commentary after
 4     you said "yes" was simply pure speculation on
 5     your part, correct?
 6          A.     Correct.
 7          Q.     Walmart was not a wholesale
 8     distributor of controlled substances,
 9     correct?
10               MR. FINKELSTEIN:  Scope.
11               THE WITNESS:  What do you mean
12          by that?
13     QUESTIONS BY MS. FUMERTON:
14          Q.     Well, various terms have been
15     used by plaintiffs when asking questions, and
16     what I'm distinguishing between are
17     distributors who distribute the wholesale to
18     many different pharmacies, independent and
19     the like, and a distributor like Walmart that
20     only self-distributes controlled substances.
21               Do you understand that
22     distinction?
23          A.     Yes, correct.
24          Q.     Okay.  So under that
25     distinction, Walmart is not a wholesale
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   distributor of controlled substances,

 2   correct?

 3                MR. FINKELSTEIN:  Scope.

 4                THE WITNESS:  Correct.

 5   QUESTIONS BY MS. FUMERTON:

 6        Q.    And that's true for Rite Aid as

 7   well, correct?

 8                MR. FINKELSTEIN:  Scope.

 9                THE WITNESS:  Yes.

10   QUESTIONS BY MS. FUMERTON:

11        Q.    And Walgreens, CVS and HBC

12   Giant Eagle, correct?

13                MR. FINKELSTEIN:  Scope.

14                THE WITNESS:  Yes.

15   QUESTIONS BY MS. FUMERTON:

16        Q.    And would you agree that

17   nonmembers -- well, let me strike that.

18                You would agree that there may

19   be reasons why nonmembers of HDMA do not need

20   to follow HDMA guidelines, correct?

21                MR. FINKELSTEIN:  Scope.

22           Vague.

23                THE WITNESS:  I don't even know

24        that the HDMA members have to follow

25        the guidelines either.  I mean, the
```