SJ-EXHIBIT 18

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3    IN RE:  NATIONAL            :  MDL No. 2804
      PRESCRIPTION OPIATE         :
 4    LITIGATION                  :  Case No. 17-md-2804
                                  :
 5    APPLIES TO ALL CASES        :  Hon. Dan A. Polster
                                  :
 6                                :
 7
 8                     HIGHLY CONFIDENTIAL
 9         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11                         - - - -
12                     JANUARY 22, 2019
13                         - - - -
14       VIDEOTAPED DEPOSITION OF WALTER WAYNE DURR,
15    taken pursuant to notice, was held at Marcus &
16    Shapira, One Oxford Center, 35th Floor, Pittsburgh,
17    Pennsylvania 15219, by and before Ann Medis,
18    Registered Professional Reporter and Notary Public in
19    and for the Commonwealth of Pennsylvania, on Tuesday,
20    January 22, 2019, commencing at 8:57 a.m.
21                         - - - -
22                 GOLKOW LITIGATION SERVICES
              877.370.3377 ph | 917.591.5672 fax
23                     deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 11?
 2         A.    To a small degree.
 3         Q.    Do you know -- assuming that any of
 4    these numbers are correct, and I'm qualifying
 5    that, but we're not sure -- what happened to these
 6    hydrocodone combination products shipped by HBC to
 7    the Giant Eagle pharmacies?
 8         A.    They would have gone into our
 9    pharmacies.
10         Q.    And what happened to them after they
11    went to the pharmacies?
12         A.    They would have filled legal
13    prescriptions.
14         Q.    So, to your knowledge, were they
15    diverted in any way?
16         A.    Not to my knowledge.
17         Q.    Do you know the difference between -- or
18    do you know what the term diversion means?
19         A.    I do.
20         Q.    What does it mean to you?
21         A.    I believe that something is being pulled
22    in a different direction than its intended purpose
23    or intended sale or use.
24         Q.    You mentioned a couple of times in your
25    testimony that HBC -- it's a single warehouse; is
```

```
 1    that correct?
 2         A.    Yes.
 3         Q.    Located in Washington, PA?
 4         A.    Yes.
 5         Q.    Do you know what the size of that
 6    warehouse is?
 7         A.    305,000 square feet.
 8         Q.    And of that 305,000 square feet, how
 9    much is dedicated to pharmacy operations?
10         A.    There was 12,000 square feet and an
11    additional 2,000 for a receiving area.  So 14,000
12    total.
13         Q.    14,000 for pharmacy?
14         A.    Yes.
15         Q.    Including all pharmaceutical products,
16    even noncontrolled?
17         A.    Yes.
18         Q.    What portion of that 12,000 square feet
19    were dedicated -- was the narc room, so-called
20    narc room?
21         A.    Maybe 2,000 square feet.
22         Q.    Was the narc room partitioned off in
23    some secure way from even the pharmacy room?
24         A.    Yes.
25         Q.    And was the pharmacy room partitioned
```

```
 1   off from the rest of the warehouse?
 2        A.   Yes.
 3        Q.   And what was the rest of the warehouse,
 4   the other 292,000 square feet, what was that
 5   dedicated to?
 6        A.   That's health/beauty care items,
 7   cigarettes, tobacco, candy, mints.
 8        Q.   Okay.
 9        A.   General merchandise.
10        Q.   And was all that product shipped to
11   Giant Eagle grocery stores?
12        A.   Yes.
13        Q.   Did the HBC warehouse ship to any
14   entities other than affiliated Giant Eagle grocery
15   stores and Giant Eagle pharmacies?
16        A.   Pharmacies, only Giant Eagle.  For the
17   grocery side, we did have some nonbanners and
18   independent stores.
19        Q.   Independent Giant Eagle stores?
20        A.   Yes.
21        Q.   All right.  But for the pharmacy --
22        A.   Giant Eagle only.
23        Q.   -- was that Giant Eagle only?
24        A.   Yes.
25        Q.   And would that be to pharmacies
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    throughout the Giant Eagle regional chain?
 2         A.    Yes.
 3         Q.    Do you know approximately how many
 4    pharmacies are in the Giant Eagle regional chain?
 5         A.    I believe 200.
 6         Q.    About 200?
 7         A.    Yeah.
 8         Q.    Did Giant Eagle ever -- did the HBC
 9    warehouse ever supply any internet pharmacies?
10         A.    No.
11         Q.    Did the HBC pharmacy ever supply
12    Schedule II opioids to any entity, including Giant
13    Eagle?
14         A.    No.
15         Q.    Did the HBC warehouse -- with respect to
16    the drugs at issue in this case, do you understand
17    those to be Schedule II opioids?
18         A.    Yes.
19         Q.    And when Giant Eagle distributed --
20    well, let me back up.
21         Giant Eagle never or the HBC warehouse never
22    distributed Schedule II opioids; is that correct?
23              MR. HUDSON:  Object to form.
24              THE WITNESS:  No.
25
```

```
 1   BY MR. BARNES:
 2        Q.   Did you understand hydrocodone
 3   combination products to be a Schedule III for a
 4   period of time before it was reclassified as a II?
 5        A.   Yes.
 6        Q.   And did the HBC warehouse, while it was
 7   a Schedule III, distribute hydrocodone combination
 8   products to Giant Eagle pharmacies only?
 9        A.   Yes.
10        Q.   And when it was reclassified to a
11   Schedule II, did HBC stop distributing that
12   product?
13        A.   Yes.
14        Q.   Was that approximately in October of
15   2014?
16        A.   I believe so.  Again, I was not there at
17   that time.
18        Q.   You talked a lot about the so-called
19   inbound and outbound controls at the HBC
20   warehouse.  And I want to follow up a little bit
21   on that.
22        By inbound, do you mean the purchasing into
23   the warehouse?
24        A.   Yes.
25        Q.   Now, I want you to focus solely on
```

```
 1      A.   Again, getting rusty, but yes.
 2      Q.   What is the main purpose of the security
 3  requirement, in your understanding?
 4           MR. HUDSON:  Object to the form.  Lack
 5  of foundation.
 6  BY MR. BARNES:
 7      Q.   What does it require?
 8      A.   Theft diversion and suspicious order.
 9      Q.   And do you know whether or not
10  compliance with that regulation is something that
11  is dependent upon the specific facts of each
12  specific distributor?
13           MR. HUDSON:  Object to the form.
14           THE WITNESS:  I would say yes.
15  BY MR. BARNES:
16      Q.   In working with the DEA and during their
17  multiple inspections before, during, and after the
18  HBC narcotics room was set up or any of their
19  surprise audits, did they at any time ever give
20  you any indication that HBC was not in full
21  compliance with the security requirement?
22      A.   No, they did not.
23           MR. HUDSON:  Object to the form.
24  BY MR. BARNES:
25      Q.   What is your understanding of whether or
```