SJ-EXHIBIT 19

```
1              IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3   IN RE:  NATIONAL        :  MDL No. 2804

    PRESCRIPTION OPIATE     :

4   LITIGATION              :  Case No. 17-md-2804

                            :

5   APPLIES TO ALL CASES    :  Judge Dan Aaron Polster

                            :

6                           :

7

8               HIGHLY CONFIDENTIAL

9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12                 DECEMBER 13, 2018

13                    - - - -

14   VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S

15        DESIGNATED 30(B)(6) REPRESENTATIVE,

16                JAMES TSIPAKIS,

17   taken pursuant to notice, was held at Marcus & Shapira,

18   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania

19   15219, by and before Ann Medis, Registered Professional

20   Reporter and Notary Public in and for the Commonwealth

21   of Pennsylvania, on Thursday, December 13, 2018,

22   commencing at 9:09 a.m.

23                    - - - -

24             GOLKOW LITIGATION SERVICES

         877.370.3377 phone | 917.591.5672 fax

25                 deps@golkow.com
```

 1      A.    From late 2009 to early 2016.

 2      Q.    And to what businesses or entities did

 3   HBC distribute controlled substances?

 4      A.    To our own stores, Giant Eagle

 5   pharmacies.

 6      Q.    Did HBC distribute to any other

 7   businesses, pharmacies, hospitals, physicians,

 8   other than Giant Eagle stores?

 9      A.    No.

10      Q.    During the time period that HBC

11   distributed Schedule III controlled substances,

12   would it be accurate to say that opioids, and,

13   more specifically, hydrocodone combination

14   products was one of the drugs that HBC

15   distributed?

16      A.    HBC only distributed hydrocodone

17   products as a Schedule III.  Once it was

18   reclassed, they no longer distributed those

19   products.

20      Q.    So the answer is, yes, from 2009 until

21   200- -- or, excuse me, until hydrocodone was

22   reclassified, HBC did distribute hydrocodone

23   combination products?

24      A.    From -- potentially from '09 through the

25   reclass, yes.

1    experts within Giant Eagle or HBC about the topics

2    that you needed to testify on today?

3         A.   Yes.

4         Q.   And as a result of that preparation, you

5    don't know whether or not HBC ever had a written

6    suspicious order monitoring policy or procedure in

7    place from 2006 through July 31, 2014; is that

8    correct?

9              MR. BARNES:  Object to form.  Asked and

10   answered about three times.

11        Go ahead.

12             THE WITNESS:  I couldn't find whether

13   there was or there wasn't written policies.  For

14   that timeframe that you're asking me, I'll answer

15   it again, I don't know.

16   BY MR. GADDY:

17        Q.   When did HBC begin distributing Schedule

18   III controlled substances?

19        A.    HBC began distributing Schedule III in

20   late 2009.

21        Q.   And when did HBC stop distributing

22   Schedule III controlled substances?  Let me back

23   up and reask that.

24        When did HBC stop distributing hydrocodone

25   combination products that were rescheduled to

Highly Confidential - Subject to Further Confidentiality Review

1    Schedule II?

2        A.    The effective date of when hydrocodone

3    was rescheduled from class III to class II, which

4    I believe was around October of 2014.

5        Q.    So HBC distributed hydrocodone

6    combination products from November 2009 through

7    approximately October 2014; correct?

8        A.    Correct.

9        Q.    And the first written suspicious order

10   monitoring policy or procedure that HBC is aware

11   of went into effect August 1, 2014; correct?

12       A.    I'll answer again that those are the

13   policies we were able -- I was able to find.  I

14   don't know if there was or there wasn't, but...

15       Q.    As far as you know, as far as HBC knows,

16   the first suspicious order monitoring policy or

17   procedure that they had was August 1, 2014?

18       A.    Again, the first one that I'm able to

19   produce written was August 2014.

20       Q.    But it's more than that.  It's the first

21   one you know about that's written; correct?

22       A.    It's the first written policy.  It

23   doesn't mean there wasn't others.  I don't know.

24       Q.    It's the first written policy that you

25   know about?

```
 1    the same policy as before, same effective date of

 2    8/1/14.  Do you see that?

 3         A.   Yes.

 4         Q.   And if you look over there, this is now

 5    the third version of the policy.  This is updating

 6    what we just looked at; right?

 7         A.   Yes.

 8         Q.   And the date of this update is

 9    February 26, 2016.  Do you see that?

10         A.   Yes.

11         Q.   As far as I could tell, the only

12    substantive update here is under scope where it

13    talks about who the policy applies to, and this is

14    the first time we see the acronym GERXDC.

15         Do you see that?

16         A.   Yes.

17         Q.   What does that mean?

18         A.   It's the Giant Eagle RX DC.

19         Q.   DC for distribution center?

20         A.   Yes.

21         Q.   So is this entity a Giant Eagle entity?

22         A.   It's owned by Giant Eagle, yes.

23         Q.   And is this entity licensed to

24    distribute Schedule II, III, IV and V narcotics?

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And does it, in fact, distribute

 2   Schedules II, III, IV and V narcotics to Giant

 3   Eagle pharmacies?

 4        A.    Yes.

 5        Q.    And is this timeframe, February of 2016,

 6   approximately when that facility went online?

 7        A.    Yes.

 8        Q.    Would this also be the time period that

 9   HBC stopped distributing prescription medication

10   to Giant Eagle pharmacies?

11        A.    Yes.

12        Q.    And that's why if we look at who this

13   applies to, we don't see anybody from HBC anymore?

14        A.    Yes.

15        Q.    Go to -- I'm on .7 of the same document.

16   And this looks like a slightly different policy.

17   Again, this is a Giant Eagle document.  Do you see

18   that?

19        A.    Yes.

20        Q.    And the title listed is Order Monitoring

21   System Policy.  Do you see that?

22        A.    Yes.

23        Q.    And the effective date is February 2,

24   2017; is that correct?

25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    they pick up the bottle?  Break it down for me,

2    please.

3         A.   There's a system certainly that there's

4    an order well that generates what each store needs

5    or has requested.  And then there's assistance, a

6    device that they -- I don't know the exact name

7    for it, but there's certainly a warehouse

8    management system that they use.  And it's

9    different slotting in the warehouse and they know

10   which slot to go to and how many to pick.

11        Q.   And then what?  They drop it in the tote

12   and put it on a truck?

13        A.   Yes.

14        Q.   And approximately -- let me back up.

15        How many different warehouses did HBC have

16   that were responsible for distributing Schedule

17   III narcotics?

18        A.   There's only one warehouse.

19        Q.   And what's the address for that

20   warehouse, for HBC's warehouse?

21        A.   I can't give you the exact -- I don't

22   know the exact address.

23        Q.   You know do the name of the road?

24        A.   No.

25        Q.   Approximately how many pickers would

1    are some of the things that were laid out in the

2    policies that we saw that Giant Eagle adopted in

3    2015 and -- I'm sorry -- 2014 and then 2015;

4    correct?

5         A.   Yes, but I will tell you these type of

6    inquiries would be happening all along as far as

7    from talking to investigative folks and the folks

8    that were involved.  It would not be uncommon for

9    something to trigger and then someone from

10   corporate or the warehouse talking to the field.

11   So that's what you're seeing here.

12        Q.   Well, are you aware of any investigation

13   such as this that happened at any time from 2009

14   to 2014?

15        A.   As far as written ones that I could find

16   in preparation?

17        Q.   Correct.

18        A.   I didn't have any I could find.

19        Q.   If you go to .20 of this same document,

20   we see an email from Jason Mullen.  Do you see

21   that?

22        A.   Yes.

23        Q.   Who is Jason Mullen and what does he do?

24        A.   Jason was one of the folks that worked

25   on the compliance team.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Can you ask that again?

 2        Q.    You in getting ready for this deposition

 3   haven't undertaken any personal investigation to

 4   make sure all of these orders that totaled 10

 5   million units to Cuyahoga County and 8 million to

 6   Summit County were all valid orders, have you?

 7             MR. BARNES:  I object to form.  Nor was

 8   he required to do so.

 9             THE WITNESS:  I did not.

10             MR. ROTTINGHAUS:  I think that's all I

11   have.

12             MR. BARNES:  I have some.

13                    EXAMINATION

14   BY MR. BARNES:

15        Q.    Mr. Tsipakis, you were asked some

16   questions about the so-called suspicious order

17   regulation of 1301.74(b).  Do you remember that?

18        A.    Yes.

19        Q.    Were you shown during your deposition at

20   any time the security regulation in 1301.71 of the

21   Code of Federal Regulations?

22        A.    I was not.

23        Q.    What do you understand the security

24   regulation to be?

25        A.    The security regulation in its entirety
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is meant to -- for a registrant to have proper

 2    controls to prevent diversion and theft.

 3         Q.   And do you understand that to be the

 4    main requirement that distributors are supposed to

 5    meet?

 6              MR. GADDY:  Object to the form.

 7              THE WITNESS:  Yes.

 8    BY MR. BARNES:

 9         Q.   Did HBC meet that requirement at all

10    times?

11         A.   Yes.

12              MR. GADDY:  Objection to form.

13    BY MR. BARNES:

14         Q.   Did Giant Eagle meet that requirement if

15    it was required to do so at all times?

16              MR. GADDY:  Objection to form.

17              THE WITNESS:  Yes.

18    BY MR. BARNES:

19         Q.   Now, do you understand that the one part

20    of the regulation that was shown to you, the

21    1301.74, the one that says design and operate a

22    system to disclose to the registrant suspicious

23    orders of controlled substances, do you understand

24    that to be the only factor taken into

25    consideration for the security requirement?
```

```
 1            MR. GADDY:  Objection to form.
 2            THE WITNESS:  It's not the only factor,
 3    no.
 4    BY MR. BARNES:
 5        Q.   What are some of the other factors?
 6        A.   Physical security, record keeping,
 7    basically multiple controls at all levels in the
 8    distribution chain.
 9        Q.   So it's not a simple question of meeting
10    the security requirement.  Just go 1301.74(b) and
11    say, well, did you meet this requirement.  It's
12    more a comprehensive requirement; is that
13    accurate?
14            MR. GADDY:  Objection to form.
15            THE WITNESS:  It's a much more
16    comprehensive process that's needed.  That's one
17    piece of a total system.
18    BY MR. BARNES:
19        Q.   And is it your understanding under the
20    security requirement regulation that you're
21    supposed to look at the registrant's overall
22    security system, or do you just look at the piece
23    called suspicious order monitoring system?
24        A.   The overall system, the overall system,
25    a lot of different factors is listed on the type
```

Highly Confidential - Subject to Further Confidentiality Review

 1   of controls that are distributed, the type of

 2   chemicals, et cetera.  So there's a whole host of

 3   things that go into that.

 4       Q.   You told us under questioning by

 5   plaintiffs' counsel that HBC was never a

 6   controlled substance II facility; is that correct?

 7       A.   That's correct.

 8       Q.   Are those the most dangerous drugs -- in

 9   terms of the DEA hierarchy, you have controlled Is

10   which are what?

11       A.   Controlled Is, marijuana, peyota,

12   et cetera.  Those are list I chemicals that

13   typically are not in the purview of retail

14   pharmacists.

15       Q.   Would it be fair to say those are

16   illegal drugs.  Nobody is supposed to use them at

17   any time for any purpose?

18            MR. GADDY:  Objection.  Form.

19            THE WITNESS:  Yes.

20   BY MR. BARNES:

21       Q.   And then below that you get into

22   controlled substance Schedule II; is that correct?

23       A.   Correct.

24       Q.   Is that where most opioids exist and

25   have always existed in that category?

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Prescription opioids I'm talking about.

 2              MR. GADDY:  Objection to form.

 3              THE WITNESS:  Yes.

 4    BY MR. BARNES:

 5         Q.   The one exception for purposes of our

 6    case is the HCP products; is that right?

 7         A.   That were later reclassified, yes.

 8         Q.   When HBC distributed that, it only

 9    distributed it when it was classified as Schedule

10    III; is that correct?

11         A.   Correct.

12         Q.   So when determining compliance with the

13    security requirement, did HBC take into account

14    that it was never a controlled substance II

15    distributor?

16              MR. GADDY:  Objection.  Form.

17              THE WITNESS:  Yes.

18    BY MR. BARNES:

19         Q.   Did HBC also consider the quantity of

20    the controlled substances it was handling when it

21    designed its overall security system?

22         A.   Yes.

23         Q.   Did it consider its internal controls

24    over the receipt, manufacture, distribution and

25    disposition of the controlled substances it was
```

Highly Confidential - Subject to Further Confidentiality Review

1    handling?

2        A.   Yes.

3        Q.   Did it consider the physical security

4    facilities that it had?

5        A.   Of course, yes.

6        Q.   While HBC was distributing controlled

7    substance IIIs, IVs and Vs, did it get visited

8    frequently by the DEA to perform audits and other

9    inspections?

10           MR. GADDY:  Objection to form.

11           THE WITNESS:  Yes.  It was visited by

12   the DEA, yes.

13   BY MR. BARNES:

14       Q.   Did the DEA ever say to HBC you're not

15   meeting the security requirement under the

16   regulations?

17           MR. GADDY:  Objection.  Form.

18           THE WITNESS:  Not to my knowledge, no.

19   BY MR. BARNES:

20       Q.   Are you aware of any DEA regulation that

21   says you're supposed to use a threshold-based

22   system to monitor for suspicious orders?

23       A.   No.

24       Q.   Are you aware of any DEA regulation that

25   requires you to set a threshold at any level?

```
 1        A.    No.

 2        Q.    Now, we're talking about or we covered

 3   in your direct testimony the fact that Giant Eagle

 4   had two separate warehouses, is that correct, the

 5   HBC warehouse and then the GE RX warehouse?

 6        A.    Yes.

 7        Q.    And are they both separately licensed by

 8   the DEA?

 9        A.    Yes.

10        Q.    Are they both separate physical

11   facilities?

12        A.    Yes.

13        Q.    And unlike HBC, which only had a license

14   for IIIs, IVs and V, did the GE RX facility also

15   do some Schedule IIs?

16        A.    Yes.

17        Q.    And do both warehouses only and have

18   they only ever supplied Giant Eagle pharmacies?

19        A.    That's correct.

20        Q.    Did either warehouse ever supply an

21   internet pharmacy?

22        A.    No.

23        Q.    Are you aware of the DEA's efforts for

24   many years in the late '08, '09, '10 period with

25   respect to internet pharmacies?
```

```
 1        A.    Yes.

 2        Q.    Can you just briefly summarize those for

 3   us?

 4              MR. GADDY:  Objection to form.

 5              THE WITNESS:  Certainly there was a lot

 6   of pop-up pharmacies on the internet that the DEA

 7   was cracking down on and certainly there wasn't a

 8   valid patient/prescriber relationship, and the DEA

 9   had ramped up regulatory efforts against those to

10   curb them or shut them down.

11   BY MR. BARNES:

12        Q.    Did HBC or Giant Eagle at any time ever

13   supply an internet pharmacy at any time?

14              MR. GADDY:  Objection to form.

15              THE WITNESS:  No.

16   BY MR. BARNES:

17        Q.    Now, with respect to the physical

18   structure of the HBC warehouse, did you have a

19   locked cage?

20        A.    Yes.

21        Q.    Was there controlled access to that

22   locked cage?

23        A.    Yes.

24        Q.    Was that locked cage inspected and

25   approved by the DEA?
```

```
 1      A.    Yes.

 2      Q.    Was admittance to the locked cage

 3   limited to only certain personnel?

 4      A.    Yes.

 5      Q.    Was there limited entry for the number

 6   of personnel?

 7      A.    Yes.

 8      Q.    What was that number, do you recall?

 9      A.    Three or four individuals only.

10      Q.    Were they using any type of digital

11   inventory system with scanners and wrist bands and

12   things of that nature while they were inside the

13   controlled substance locked area?

14      A.    Yes.

15      Q.    Do you know the name of that system?

16      A.    I believe Volcom.  I think it's Volcom.

17      Q.    Can you spell that, please?

18      A.    V-O-L-C-O-M.

19      Q.    And is that system a form of a perpetual

20   inventory system?

21      A.    Yes.

22      Q.    Is that a type of internal control at

23   the warehouse?

24            MR. GADDY:  Objection to form.

25            THE WITNESS:  Sure, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARNES:

 2         Q.   The controlled substance orders that

 3    were picked at the warehouse, the HBC warehouse,

 4    were they doublechecked before shipping?

 5         A.   Yes.

 6         Q.   Were there physical safeguards to

 7    prevent theft and diversion at that warehouse?

 8         A.   Yes.

 9         Q.   Even while picking the orders?

10         A.   Yes.

11         Q.   Can you just describe a few of them?

12         A.   So there would be daily audits,

13    backcounts.  The system would make sure that all

14    of the inventory would tie up.

15         Q.   So if there was any product missing,

16    would it be found fairly promptly?

17         A.   Oh, yes.

18         Q.   Was there a daily warehouse inventory

19    for controlled substances?

20         A.   Yes.

21         Q.   Were there security guards and cameras

22    throughout the facility?

23         A.   Yes, multiple.

24         Q.   Besides the daily inventories, were

25    their yearly inventories and biannual DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   inventories?

 2        A.   Yes.

 3        Q.   Was the warehouse overseen by the Giant

 4   Eagle audit and accounting department?

 5        A.   Sure, yes.

 6        Q.   You were asked a lot of questions about

 7   due diligence performed in the 2009 to 2013 time

 8   period.  In fact, Exhibit 12 you were shown a few

 9   minutes ago and you were asked whether you could

10   identify specific investigations for line items on

11   these reports.

12        Do you recall those questions?

13        A.   Yes.

14        Q.   How many transactions like that are we

15   talking about in any given -- any given month and

16   year?

17        A.   Thousands, millions, many items.

18        Q.   And you can't remember every one of

19   them?

20        A.   No.

21        Q.   And you didn't attempt to memorize every

22   one of them in preparation for your deposition?

23        A.   No.

24        Q.   Have you ever heard of the term CSOS

25   ordering system?
```

```
 1        A.   Yes.

 2        Q.   Is that something that was used for the

 3   warehouse facilities?

 4        A.   Yes.

 5        Q.   When did that program start being used?

 6        A.   I believe 2015.

 7        Q.   Does that program have the ability to

 8   stop an order if it exceeds a threshold?

 9        A.   Yes.

10        Q.   Are you familiar with the Supply Logic

11   software program?

12        A.   Yes.

13        Q.   Is that another program that Giant Eagle

14   used at these warehouses?

15        A.   Yes.

16        Q.   And what did that allow Giant Eagle or

17   the warehouses to do?

18        A.   It would allow for us to see the ins and

19   outs of inventory and flag anything that had any

20   risk or things to look at out of the ordinary.

21        Q.   Is that a form of an internal control?

22             MR. GADDY:  Objection to form.

23             THE WITNESS:  Yes.

24   BY MR. BARNES:

25        Q.   Was that part of the overall security
```

1    system that HBC considered when it was trying to

2    comply and complying with the security

3    requirement?

4              MR. GADDY:  Objection to form.

5              THE WITNESS:  Yes.  More further, they

6    would look at patterns.  They would look at pretty

7    holistically the patterns and any deviations.

8    BY MR. BARNES:

9         Q.   You're a pharmacist; is that correct?

10        A.   Yes.

11        Q.   What kind of degrees in pharmacy do you

12   have?

13        A.   Bachelor of science in pharmacy.

14        Q.   And were you a practicing pharmacist in

15   a store for a period of time?

16        A.   Yes.

17        Q.   Was that for a different chain,

18   Albertsons?

19        A.   Yes.

20        Q.   Are you familiar with dispensing

21   practices and things of that nature?

22        A.   Yes.

23        Q.   In your direct testimony upon

24   questioning by Mr. Gaddy, you referenced this

25   integrated control system, and you referenced

Highly Confidential - Subject to Further Confidentiality Review

```
 1   three parts to it, at the warehouse, at corporate

 2   and at the stores.  Do you recall that testimony?

 3        A.   Yes.

 4        Q.   At the stores are there internal

 5   controls over controlled substances?

 6        A.   Sure, yes.

 7        Q.   Are there physical controls over

 8   controlled substances?

 9        A.   Yes.

10        Q.   Does that include vaults -- I'm sorry --

11   not vaults, but safes and things of that nature?

12        A.   Locked cabinets and safes, yes.

13        Q.   And who's allowed access to those locked

14   cabinets and safes?

15        A.   Only the pharmacist.

16        Q.   Does Giant Eagle have a mechanism to

17   train pharmacists to keep tight control over

18   controlled substances?

19        A.   Yes.

20        Q.   And is that monitored by loss prevention

21   and internal audit?

22        A.   Yes.

23        Q.   And are pharmacists and pharmacy techs

24   trained and supervised?

25             MR. GADDY:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.
 2    BY MR. BARNES:
 3         Q.   Does Giant Eagle at the store level
 4    impose policies and procedures on the pharmacists
 5    and the pharmacy techs with respect to dispensing
 6    prescriptions?
 7         A.   Yes.
 8         Q.   Are you familiar with the DEA pharmacist
 9    manual?
10         A.   Of course, yes.
11         Q.   Is that something that's kept at every
12    Giant Eagle pharmacy?
13         A.   Yes.
14         Q.   And are the pharmacists required to
15    review it and sign off on it?
16         A.   Yes.
17         Q.   Does Giant Eagle have controlled
18    substance dispensing guidelines?
19         A.   Yes.
20         Q.   Do those guidelines include red flags,
21    things to watch for in terms of whether a
22    prescription is legitimate or not?
23         A.   Yes.
24         Q.   And are they required to review those
25    and sign off that they've been trained on it and
```

Highly Confidential - Subject to Further Confidentiality Review

1    understand them?

2         A.   Yes.

3         Q.   And are all of Giant Eagle's pharmacists

4    licensed pharmacists with experience?

5              MR. GADDY:  Objection to form.

6              THE WITNESS:  Yes.

7    BY MR. BARNES:

8         Q.   Are there other manuals containing

9    policies at the store level related to controlled

10   substance other than the DEA pharmacist manual and

11   the controlled substance dispensing guidelines?

12        A.   Yes.

13        Q.   And do those policies include controls

14   over all controlled substances?

15        A.   Yes.

16        Q.   Do the stores interface with any

17   statewide systems to make sure that incoming

18   prescriptions are legitimate?

19        A.   Yes.

20        Q.   In the state of Ohio, is there a name

21   for that system?

22        A.   Sure.  It's the prescription drug

23   monitoring program, the OARRS program.

24        Q.   And is that something that the

25   pharmacists are trained to consult?

```
 1        A.   Yes.

 2        Q.   Will that provide some information about

 3   things like doctor shopping and people coming in

 4   from out of state, things of that nature?

 5             MR. GADDY:  Objection to form.

 6             THE WITNESS:  Yes.

 7   BY MR. BARNES:

 8        Q.   And do Giant Eagle pharmacists use that

 9   system?

10        A.   Regularly, yes.

11        Q.   Is the activity at the store level

12   reported to the DEA in terms of prescriptions

13   filled?

14        A.   Yes, yes.

15        Q.   Is the DEA -- does the DEA from time to

16   time visit the stores?

17        A.   Sure, yes.

18        Q.   Do they perform surprise audits and

19   things of that nature?

20             MR. GADDY:  Objection to form.

21             THE WITNESS:  Audits or if they're

22   coming in for investigations or other things that

23   they're working on, sure, yes.

24   BY MR. BARNES:

25        Q.   Do of the boards of pharmacy of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   states also interface with the stores?

 2        A.   Yes.

 3        Q.   Does the Ohio Board of Pharmacy

 4   interface with the Giant Eagle stores in these two

 5   counties at issue?

 6             MR. GADDY:  Objection to form.

 7             THE WITNESS:  Yes.

 8   BY MR. BARNES:

 9        Q.   Do they perform surprise audits and

10   inspections?

11             MR. GADDY:  Objection to form.

12             THE WITNESS:  Absolutely, yes.

13   BY MR. BARNES:

14        Q.   To your knowledge, has there ever been a

15   problem raised by the DEA or the Ohio Board of

16   Pharmacy related to any of the Giant Eagle

17   pharmacies in these two jurisdictions?

18             MR. GADDY:  Objection to form.

19             THE WITNESS:  Not to my knowledge, no.

20   BY MR. BARNES:

21        Q.   Are there controls over incoming orders

22   into the stores, including orders from the other

23   distributors?  McKesson, I guess, was the main

24   distributor of controlled substance IIs for this

25   time period; is that correct?
```

```
1        A.    Correct.

2        Q.    And when those came into the stores,

3   were there special procedures over those incoming

4   orders?

5        A.    Yes.

6        Q.    Were they treated differently than other

7   incoming orders?

8        A.    Absolutely, yes.

9        Q.    Give us some samples of that.

10        A.    So those orders would need to be checked

11   in by a pharmacist, signed off on the pharmacist.

12   Right away when the couriers would drop off, it's

13   the expectation that the pharmacist would -- it

14   would be segregated.  They come in different totes

15   and they're handled differently.  And any

16   discrepancies are immediately noted or called in.

17        Q.    Is the pharmacist required to

18   immediately input -- update the store's controlled

19   substance inventory for incoming orders?

20        A.    Their onions?

21        Q.    Yes.

22        A.    Yes.

23        Q.    And when controlled substance

24   prescriptions are filled, is the inventory, the

25   store inventory immediately credited for the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    outgoing prescription?

 2         A.   Yes.

 3         Q.   At the end of the day, is there a check

 4    of the remaining balance of controlled substances

 5    at the store?

 6         A.   Yes, and especially even more so on

 7    CIIs.  They're backcounted on every fill.

 8         Q.   What does it mean to backcount every

 9    fill?

10         A.   The system will prompt for how many

11    pills are left in the bottle.  So if you had a

12    hundred pills to start and you filled 50, you

13    would expect to have 50 left in that bottle.  So

14    the backcount would be to ensure that you had 50

15    left in that bottle and inputting that that you do

16    have, in fact, 50.

17         Q.   Are you familiar with the term monthly

18    narc audit?

19         A.   Yes.

20         Q.   What is that?

21         A.   The requirement that all of our

22    pharmacies do a full inventory of CII narcotics in

23    our stores and some other products as well, not

24    just can CIIs, but some CIIIs.

25         Q.   So you have the daily perpetual
```

1   inventory and the monthly narc audits?

2       A.   Yes.

3       Q.   You also have the annual audits or

4   inventories of controlled substances at every

5   store?

6       A.   The DEA requires an biannual inventory.

7   We do an annual inventory on top, yes.  We do a

8   yearly inventory instead of biannual.

9       Q.   Can you tell us what a PDL is?

10      A.   PDL is a pharmacy district leader.

11      Q.   And what do they do?

12      A.   They supervise the stores.  They're

13  basically a district manager that oversees the

14  stores for all aspects of ensuring Pharmacy

15  Practice Act, DEA, company policy.  They're the

16  oversight for the stores, direct oversight for the

17  stores.

18      Q.   Do they regularly visit the stores?

19      A.   Yes.

20      Q.   Do they conduct audits or inquiries

21  concerning their procedures and things of that

22  nature?

23      A.   They do audits.  We also have an

24  internal audit that quarterly visits the stores

25  for a myriad of things, but yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Is there any supervision of training of

 2   pharmacists?

 3        A.   Yes.

 4        Q.   Is that something a PDL does?

 5        A.   A PDL would definitely make sure any

 6   training that needs to be done or computer-based

 7   training is completed, and if there's any

 8   remediation that's needed, that's their job to

 9   make sure.

10        Q.   Do the stores work with local law

11   enforcement, police, board of pharmacy inspectors,

12   DEA agents?

13        A.   Oh, yes, all the time.

14             MR. GADDY:  Objection to form.

15   BY MR. BARNES:

16        Q.   Is that cooperative working

17   relationship?

18             MR. GADDY:  Objection to form.

19             THE WITNESS:  Very much so, yes.

20   BY MR. BARNES:

21        Q.   In working with local law enforcement

22   and DEA, have you been able to uncover people

23   attempting to pass bad scripts, things of that

24   nature?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Is there a pharmacy investigator?

 2        A.    Yes.

 3        Q.    Who is that?

 4        A.    Rick Shaheen.

 5        Q.    If how much experience does he have?

 6        A.    He has a lot of experience.  He has a

 7   background in law enforcement, attorneys general's

 8   office, a very -- has a lot of contacts with DEA,

 9   boards of pharmacy.  So he's been -- he's been in

10   the business a long time.

11        Q.    Does he spend a lot of time in the

12   stores?

13              MR. GADDY:  Objection to form.

14              THE WITNESS:  Yes.

15   BY MR. BARNES:

16        Q.    Does he also work individually with

17   local law enforcement and DEA?

18        A.    Yes.

19        Q.    Are you familiar with the term or the

20   acronym BOLO, B-O-L-O?

21        A.    Yes.

22        Q.    What is it?

23        A.    Be on the lookout for.  So he will send

24   out bulletins to the pharmacists when either law

25   enforcement will tell him that there's bad scripts
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on the street or a prescription pad, for example,

 2    if it's stolen or something, either if we have

 3    information -- so Rick is involved with -- Rick

 4    and Andrew, who work for Rick, are involved with

 5    all of those activities and alert our stores as

 6    soon as they know something and we disseminate

 7    very quickly to all our stores.

 8         Q.   And is that the type of information

 9    that's also in the OARRS database, or is that

10    different?

11              MR. GADDY:  Objection to form.

12              THE WITNESS:  Different.

13    BY MR. BARNES:

14         Q.   Are there daily counts of certain drugs?

15         A.   Yes.

16         Q.   Does that include HCP, hydrocodone, or

17    HCP products?

18         A.   Yes.

19         Q.   Is there an electronic prescription

20    system with perpetual logs at the stores?

21         A.   Yes.

22         Q.   Is that a form of internal control?

23         A.   Yes.

24         Q.   Is there diversion training for pharmacy

25    employees on a yearly basis?
```

```
 1              MR. GADDY:  Objection to form.

 2              THE WITNESS:  Yes.

 3  BY MR. BARNES:

 4      Q.   Now, you were asked a lot of questions

 5  about so-called suspicious orders.  And I didn't

 6  hear a lot of questioning about diversion.

 7      Do you understand the term diversion?

 8              MR. GADDY:  Objection to the question,

 9  form of the question.

10              THE WITNESS:  Yes.

11  BY MR. BARNES:

12      Q.   What does the term diversion mean to

13  you?

14      A.   Diversion, theft, loss, things being

15  routed to folks that shouldn't have access to the

16  drugs or prescriptions.

17      Q.   If an order is suspicious, does that

18  mean it was diverted?

19              MR. GADDY:  Objection to form.

20              THE WITNESS:  No, not necessarily, no.

21  BY MR. BARNES:

22      Q.   In fact, what has HBC's and Giant

23  Eagle's experience been with respect to so-called

24  suspicious orders or flagged orders?  Have they

25  resulted in uncovering diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. GADDY:  Objection to form.

 2              THE WITNESS:  No.

 3   BY MR. BARNES:

 4        Q.   What happens to -- you were asked

 5   questions on Exhibit 15 of these 10 million dosage

 6   units in Cuyahoga County.  What happened to those

 7   10 million units?  Where did they go?

 8              MR. GADDY:  Objection to form.

 9              THE WITNESS:  Assuming those were the 10

10   million units that we dispensed out of HBC, they

11   were dispensed to patients that were pursuant --

12   on a valid prescription.

13   BY MR. BARNES:

14        Q.   And how about the dosage units that went

15   out to Summit County presuming that these numbers

16   are correct?

17              MR. GADDY:  Same objection.

18              THE WITNESS:  The same.  Every single

19   one of them would have been dispensed pursuant to

20   a prescription by a licensed practitioner for

21   those patients.

22   BY MR. BARNES:

23        Q.   In your direct questioning today, were

24   you shown at any time any evidence, any document,

25   any piece of paper by plaintiffs' counsel
```

Highly Confidential - Subject to Further Confidentiality Review

1   suggesting that any single one of these

2   prescriptions was anything other than a legitimate

3   prescription issued by a doctor who had a

4   legitimate license to issue it?

5           MR. GADDY:  Objection to form.

6           THE WITNESS:  No.

7   BY MR. BARNES:

8       Q.   Were you shown any evidence at any time

9   that any of these prescriptions caused anybody any

10  harm at any time in any jurisdiction?

11          MR. GADDY:  Objection to form.

12          THE WITNESS:  No.

13  BY MR. BARNES:

14      Q.   Did the DEA at any time inform HBC or

15  Giant Eagle that it was required to keep records

16  of every call, every conversation that was made

17  with respect to following up on orders of

18  interest?

19          MR. GADDY:  Objection to form.

20          THE WITNESS:  No.

21  BY MR. BARNES:

22      Q.   Did HBC and Giant Eagle keep those

23  records and emails in other types of files?

24      A.   Yes.

25      Q.   Is Giant Eagle's integrated system

Highly Confidential - Subject to Further Confidentiality Review

1   designed to maintain the integrity of the closed

2   system of distribution from incoming at the

3   warehouse to outgoing at the stores?

4       A.   Yes.

5            MR. GADDY:  Objection to form.

6   BY MR. BARNES:

7       Q.   The system that was designed by Giant

8   Eagle, did you expect it to ever produce a

9   suspicious order?

10           MR. GADDY:  Objection to form.

11           THE WITNESS:  No.

12  BY MR. BARNES:

13      Q.   Before you had the threshold-based

14  system, you've already testified, I think, there

15  was one suspicious order?

16      A.   Yes.

17      Q.   And after you had the threshold-based

18  system, you had one suspicious order?

19      A.   One more, yes.

20      Q.   What does that tell you?

21           MR. GADDY:  Objection to form.

22           THE WITNESS:  That we had adequate

23  controls from the beginning.  Adding more layers

24  of controls didn't materially change the outcome

25  of the system we had in place.

1    BY MR. BARNES:

2        Q.   Do you understand that the plaintiffs in

3    this case are the City of Cleveland, City of Akron

4    and the counties of Summit and Cuyahoga?

5        A.   Yes.

6        Q.   To your knowledge, did any of those

7    plaintiffs ever approach Giant Eagle or HBC and

8    say, we think we have a problem, we'd like your

9    assistance, or this doctor is bad or there's a

10   pill mill down the street, don't fill these

11   prescriptions?  Did they ever do anything like

12   that?

13           MR. GADDY:  Objection to form.

14           THE WITNESS:  No; not to my knowledge,

15   no.

16   BY MR. BARNES:

17       Q.   The employees that work in the Giant

18   Eagle pharmacies in these jurisdictions, do they

19   live in those communities?

20       A.   Yes.

21           MR. GADDY:  Objection to form.

22           THE WITNESS:  Absolutely, yes.

23           MR. BARNES:  I've got no further

24   questions.

25                   RE-EXAMINATION