# DD7 McCann Exh 4

Page 1

1              THE UNITED STATES DISTRICT COURT
2             FOR THE NORTHERN DISTRICT OF OHIO
3                      EASTERN DIVISION
4
5    IN RE NATIONAL PRESCRIPTION      )
     OPIATE LITIGATION,               )
6                                     )MDL No. 2804
     County of Lake, Ohio v          )
7    Purdue Pharma L.P., et al.,      )Case No. 1:17-md-2804
     Case No. 18-op-45032            )
8                                     )Judge Dan Aaron
     County of Trumbull, Ohio v.      )Polster
9    Purdue Pharma, L.P., et al.,     )
     Case No. 18-op-47079             )
10                                    )
     Track 3 Cases                    )
11
12            The videotaped videoconference deposition
13    of CRAIG J. McCANN, Ph.D., called for examination
14    pursuant to the Rules of Civil Procedure for the
15    United States District Courts pertaining to the
16    taking of depositions, taken in McLean, Virginia,
17    on the 11th day of June, 2021, at the hour of
18    8:05 a.m.
19
20
21
22
23    Reported by:  Gina M. Luordo, CSR, RPR, CRR
24    License No.:  084-004143
25    APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

Page 88

1          THE WITNESS:  Yes.

2     BY MS. SWIFT:

3          Q.    Dr. McCann, do you see that Exhibit 8

4     includes 27 red flag criteria?

5          A.    Yes.

6          Q.    Have you seen this document before?

7          A.    I don't believe so, not in this form

8     anyway.

9          Q.    Do you have any idea where these 27 red

10    flags came from?

11         A.    Well, generally in my initial expert

12    report, there's a footnote that just gives my

13    general understanding.

14         Q.    And we'll get to your April report in a

15    little bit, but focusing on these 27 red flags that

16    the plaintiffs disclosed to us in June of 2020, do

17    you know who put those red flag criteria together?

18         A.    No, not in any complete sense.

19         Q.    Do you know in an incomplete sense?

20         A.    Well, they were provided to my office --

21    to my office by counsel.  So how they assembled

22    those 27 from different sources, I don't know.

23    Ultimately, I attribute the 27 methods to counsel

24    who provided them to me.

25         Q.    Do you know whether plaintiffs' lawyers

1  drafted these 27 red flag criteria?

2      A.   I don't know who all contributed to the

3  drafting, but clearly counsel would have

4  contributed to the drafting.  After all, it's an

5  exhibit to their brief or their response.

6      Q.   Who among the plaintiffs' lawyers provided

7  you with these 27 red flag criteria?

8      A.   I don't know.  I would have to go back and

9  check the correspondence.

10     Q.   Do you know whether these 27 red flag

11  criteria that are marked as Exhibit 8 were drafted

12  by another hired consultant who is working for the

13  plaintiffs' lawyers?

14     A.   I don't know.

15     Q.   Do you know whether someone with expertise

16  in pharmacy practice put together these 27 red flag

17  criteria?

18     A.   I don't know.

19     Q.   Have you ever talked to the plaintiffs'

20  pharmacy consultant, Carmen Catizone, about these

21  27 red flag criteria?

22     A.   Not in any detail.  There was some

23  discussion of these, perhaps, in one or two or

24  three calls with Mr. Catizone -- not one or two or

25  three.  Three or four calls over the last year with

Page 90

1    Mr. Catizone. I don't recall whether -- I don't

2    recall to what extent these 27 were discussed, but

3    the discussion was primarily on the first 16 that

4    are in my report.

5         Q. And we'll get to this in more detail, but

6    just to try to make sure we're on the same page,

7    your April 16 report lists 43 red flags, correct?

8         A. Correct.

9         Q. The first 16 red flags are the ones that

10   came from Mr. Catizone; is that right?

11        A. That's my understanding. We also got them

12   from counsel, but my understanding is they came

13   ultimately from Mr. Catizone.

14        Q. And we can go one by one and compare them

15   if you'd like, but do you know sitting here without

16   doing that that Flags 17 through 43 in your report

17   are the same as the 27 red flags we're looking at

18   right now?

19        A. I don't know with certainty because I

20   haven't seen Exhibit 8 before, but they very likely

21   are.

22        Q. You said you think you talked to

23   Mr. Catizone a little bit, but not in detail about

24   these 27 flags.

25             What specifically did you discuss with him

Page 91

1    about the 27?

2        A.    I don't know whether we did or not.  We

3    may have had some fleeting discussion of the 27.

4    As I said, the discussion that I recall was really

5    about the first 16.

6        Q.    Did you ever discuss with Mr. Catizone the

7    27 red flag criteria reflected in Exhibit 8 before

8    June 19th of 2020?

9        A.    I'm sorry.  I missed a little part of

10   that.  Can you ask that again?

11       Q.    Sure.  Did you ever discuss with

12   Mr. Catizone the 27 red flag criteria that are

13   reflected in Exhibit 8 before June 19, 2020?

14       A.    Almost definitely not, but I can't be

15   100 percent sure, but almost certainly not.

16       Q.    Have you ever talked to any other hired

17   consultant working for the plaintiffs' lawyers

18   about the 27 red flag criteria?

19       A.    I don't think so, not that I recall and

20   certainly not in any substantive way.

21       Q.    Now I'd like you to open what's WAG 11 in

22   your box and will be Exhibit 9.

23                          (Whereupon, McCANN Deposition

24                          Exhibit No. 9 was marked for

25                          identification.)

Page 92

1    BY MS. SWIFT:

2         Q.   This is the Exhibit B that was referenced

3    in the plaintiffs' discovery responses that we

4    looked at a few minutes ago that talked about the

5    25 percent of prescriptions being flagged.

6              Do you recognize it?

7         A.   No.

8         Q.   Do you know whether this document reflects

9    your work or the work of your firm?

10        A.   Well, I believe it reflects our work.

11        Q.   Why do you believe it reflects your work?

12        A.   Well, because in the past, I have seen

13   Excel files or PDF printouts that included what you

14   have in Column 1 here, the Red Flag Method

15   identified as Red Flag 1 through Red Flag 27.  And

16   I've seen the number of flagged prescriptions and

17   the percentages.  So I've seen data that looks like

18   this.

19              As I said, I haven't seen this particular

20   document or this format, but I've seen work like

21   this.  And it's actually a lot of work to get to

22   here.  So I don't think someone else did it.  I

23   think we probably created the numbers that go into

24   this particular exhibit.

25        Q.   There are numbers of flagged prescriptions

Page 102

1    little bit more information.  I didn't pause on

2    every one that we've gone through, but 41, you can

3    see it says that the two prescriptions were

4    dispensed to a patient within a single day on two

5    different days.  I guess that is the same as 25.  I

6    had to pause on that for a second, but yes, I

7    believe they're the same.

8        Q.  Do you know why there are differences in

9    the wording of some of these?

10       A.  Well, because the response was written by

11   lawyers, and my expert report was written by me and

12   my staff.  And as we were writing up how the code

13   is implemented, there might be some slight detail

14   that needed to be said a little more precisely or

15   said differently, or in any case, we used slightly

16   different language.  I think it just reflects that

17   one set of people wrote the interrogatory answers

18   trying to explain these 27 flags, and my staff and

19   I were trying to explain the same flags and wrote

20   those explanations in our words.

21       Q.  Do you know whether anyone with pharmacy

22   expertise reviewed either the 27 red flags

23   reflected in Exhibit 8 or the same ones we've been

24   going through in your report to confirm that they

25   were, in fact, the same and would flag the same

Page 103

1    prescriptions?

2         A.    Well, I don't see what expertise that

3    person would have to make that judgment.  I think

4    that's a different issue, but in any case, I don't

5    know who reviewed or had input into the Exhibit A

6    that we're looking at or who, for that matter,

7    reviewed our descriptions.

8         Q.    Is No. 42 in your April 2021 report the

9    same as No. 26 in Exhibit 8?

10        A.    Yes.

11        Q.    Is No. 43 the same as No. 27?

12        A.    Yes.

13        Q.    The red flags 17 through 43 in your April

14   2021 report are the same as the 27 red flags

15   described in the June 2020 interrogatory responses

16   and attached to those responses as Exhibit A,

17   correct?

18        A.    Correct.

19        Q.    The slight wording variations that you

20   identified as we went through those, is it your

21   understanding that those didn't have any effect on

22   the numbers of prescriptions that would be flagged

23   by any of those 27 flags?

24        A.    Correct.  There is -- in some of the early

25   ones we looked at, there was a little bit of

Page 104

1    ambiguity over whether the window, the 20-day

2    window or 45-day window or 60-day window, referred

3    to the fill dates or the written dates.  There's

4    just a little bit of ambiguity there.  I think our

5    description is clear what we are referring to.

6         And so with that possible quibble to use

7    your term from earlier, they should result -- they

8    should -- if you implement my 17 through 43 or

9    Exhibit 8, 1 through 27, you should get the same

10   results implementing it on the same data.

11        Q.   Do you know, sitting here today, whether

12   that ambiguity that you just referenced makes a

13   difference in the number of flagged prescriptions?

14        A.   Well, it will make a difference if you use

15   fill dates rather than dispense dates.  I'm sorry.

16   Fill dates rather than written dates.

17        Q.   Do you know whether the original 27 flags

18   that were identified in June 2020, whether the

19   analysis using those flags used a different date

20   than you did in your April 2021 report?

21        A.   No.  I'm just sitting here with you

22   comparing the descriptions in these two documents.

23        Q.   You can't identify anyone with pharmacy

24   expertise who provided the plaintiffs' lawyers with

25   these 27 red flags that we just walked through,

```
                                          Page 120
 1        A.    Yes.
 2        Q.    And do you see where it says at the top of
 3   245 flagged for any reason, and it reflects
 4   2.4 million prescriptions?
 5        A.    Correct.
 6        Q.    53.6 percent of the total prescriptions
 7   produced in the case?
 8        A.    Correct.
 9        Q.    That's a different number of prescriptions
10   than were disclosed in June of 2020, correct?
11        A.    Correct.
12        Q.    In the May report, the combination red
13   flags identify 884,000 prescriptions, correct?
14        A.    Correct.
15        Q.    Would you agree with me, and we can do the
16   math, that that represents about 19 percent of the
17   total prescriptions in the case, which are also
18   reflected in Appendix 12 that we were just looking
19   at?  Do you need me to point -- it's Page 245 of
20   Appendix 12 again shows that the total number of
21   prescriptions produced in the case is about
22   4.5 million.
23        A.    Yes.  Thank you.
24        Q.    Would you agree with me that 884,000 is
25   about 19 percent of 4.6 million?
```

Page 121

1      A.   Yes.

2      Q.   Is it your opinion that 19 percent of the

3   prescriptions produced in this case should not have

4   been filled?

5      A.   No.

6      Q.   You didn't do anything to try to determine

7   whether any of those prescriptions were improperly

8   filled.  Is that a fair statement?

9      A.   Correct.  Yes.

10      Q.   You don't have any idea whether any

11   prescription produced in this case was improperly

12   filled, correct?

13      A.   Correct.

14      Q.   You didn't do anything to try to determine

15   whether any prescription produced in this case was

16   illegitimate, meaning not written for a legitimate

17   medical purpose?

18      A.   Correct.

19      Q.   You have no idea whether any prescription

20   produced in this case was illegitimate?

21      A.   Correct.

22      Q.   And it's certainly not your opinion that

23   884,000 prescriptions in Lake and Trumbull County

24   were diverted, correct, sir?

25      A.   Correct.

Page 122

1    Q.   Would you agree that it would be a

2  caricature to say that those 884,000 prescriptions

3  were diverted?

4    A.   I don't know if I would say it was a

5  caricature, but I don't know of any basis for

6  saying that.  I wouldn't say it.

7    Q.   You did not look to see whether any

8  prescription produced by the pharmacies in this

9  case was diverted?

10    A.   Correct.

11    Q.   You have not seen any evidence of

12  illegitimate prescriptions filled by any of the

13  pharmacies in this case in the course of your work?

14    A.   Correct.

15    Q.   You also haven't seen any evidence that

16  any prescription filled by any of the pharmacies in

17  this case was diverted, correct?

18    A.   Correct.

19    Q.   Your work identifying red flagged

20  prescriptions did not involve figuring out whether

21  any prescriptions were illegitimate or diverted,

22  correct?

23    A.   Correct.

24    Q.   You have no opinion in this case that any

25  prescriptions were diverted, fair?

Page 123

1          A.    Correct.

2          Q.    Your combination red flags as described in

3     the May 19th report flagged 19 percent of the

4     prescriptions produced in the case.  Yet, in your

5     distribution analysis that we talked about first

6     thing this morning, we talked about the fact that

7     for some methods, you flagged 100 percent of

8     orders, correct?

9          A.    There's a great big disconnect between

10    those two, but I think the two factual statements

11    are correct.

12         Q.    So long as those flagged orders went to

13    fill legitimate prescriptions, could you agree that

14    there is no resulting harm from the fact that the

15    order was flagged?

16         A.    No, that definitely would be untrue.

17         Q.    Why?

18         A.    Well, my understanding, and it's just a

19    layman's understanding having worked in the ARCOS

20    data and this litigation now for three plus years,

21    is that any sort of flagging method that would have

22    been implemented, including these six or seven

23    illustrations, identify shipments or, perhaps,

24    prescriptions in this context as well that ought to

25    have been subject to some due diligence before the

1    order was shipped or the prescription was filled.

2         That doesn't mean that every order that

3    would trigger such a flag or every prescription

4    that would trigger such a flag would, if shipped or

5    filled, with certainty have been diverted.  It's

6    only that a system that effectively surveilled

7    orders and prescriptions being filled would have

8    been useful in stopping orders to problematic

9    pharmacies or stopped pharmacies from filling

10   prescriptions written by bad doctors or submitted

11   by bad patients.  The fact that the particular

12   order that is flagged by one of these methods

13   didn't result itself in a bad prescription and a

14   drug being diverted doesn't mean that there was no

15   harm by virtue of these sorts of systems not being

16   in place and extensive due diligence being done on

17   orders or on prescriptions.

18        So I think what you said is exactly wrong,

19   although, I'm not a subject matter expert, and I

20   haven't offered any opinions along the lines of the

21   question you just asked me.

22   Q.   Well, I appreciate that.  I understand

23   you're not the one who is going to offer an opinion

24   about the actual harm that the plaintiffs claim to

25   have suffered; is that fair?

Page 137

1  doctors and patients with Mr. Catizone?

2      A.   No.

3      Q.   Did you ever talk about this section of

4  your May 19th report on unique doctors and patients

5  with any other hired consultants for the

6  plaintiffs?

7      A.   No.

8      Q.   This section of your May 19th report on

9  doctors and patients identifies more than 4 million

10 prescriptions written by the doctors who wrote

11 prescriptions identified by your red flag -- strike

12 that.

13         This section of your May 19th supplemental

14 report identifies more than 4 million prescriptions

15 written by the doctors who wrote prescriptions

16 identified in the combination red flags, correct?

17     A.   Yes.

18     Q.   It also identifies hundreds of thousands

19 of prescriptions filled by patients who initially

20 filled prescriptions identified by your combination

21 red flags, correct?

22     A.   Correct.

23     Q.   Would you agree with me that this section

24 of your May 19th report identifies more than

25 90 percent of all the prescriptions produced in the

Page 138

1    case?

2         A.   Yes.

3         Q.   You don't have any opinion that any of

4    those prescriptions should not have been filled,

5    correct?

6         A.   Correct.

7         Q.   No opinion that any of them are

8    illegitimate?

9         A.   Correct.

10        Q.   No opinion that any of them were diverted?

11        A.   Correct.

12        Q.   You have no opinion that there was

13   anything at all wrong with those prescriptions?

14        A.   Correct.

15        Q.   Did you look at any of the individual

16   prescriptions written by the doctors that are

17   reflected at very high level in this section of

18   your report?

19        A.   No.

20        Q.   Did you look at any of the individual

21   prescriptions filled by these patients?

22        A.   I'm sorry.  I may have read more into your

23   prior question than you intended.  I reviewed the

24   dispensed prescription data.  So in that sense, I

25   reviewed prescriptions written by at least some

Page 139

1    prescribers and filled by at least some --

2    submitted by some patients and filled by some

3    pharmacies.

4            I thought in the prior question, you were

5    asking me whether I reviewed a physical

6    prescription written by a doctor like my doctor

7    might write out a prescription for me, and I said

8    that I did not do that.  If what you meant by the

9    prior question was did I look at any individual

10   record in the data, the answer is yes.  So that

11   answer would be yes also to this most recent

12   question.

13       Q.   Beyond coming up with the numbers that are

14   reflected in your May 19th report, did you perform

15   any analysis on individual doctors?

16       A.   Not that I recall.

17       Q.   What about individual patients?

18       A.   Again, not that I recall.  I looked at the

19   data and sorted it as I was reviewing the data to

20   see how it looked when you grouped by patient or by

21   prescriber, but that didn't rise to the level of

22   some analysis of the prescriptions written by any

23   prescriber or filled by any patient.

24       Q.   All right.  Turn back, if you would,

25   please, to the excerpt of Appendix 12, and take a

Page 273

1    Walmart's market share of the total opioids

2    distributed into Trumbull County by MME is

3    1.93 percent, correct?

4        A.    Correct.  I'm sorry.  Before we leave this

5    one, this is the ARCOS data, and this is Trumbull

6    County.  So this doesn't include a Walmart pharmacy

7    that's in Trumbull County.  So that number would

8    change very slightly if we include that pharmacy

9    that ARCOS describes as being in Mahoning County, I

10   think, but it will still be a small number like

11   1.93 percent.  It will just be a little bit bigger.

12       Q.    All right.  I was going to circle back to

13   this in a minute, but you're there now.  So let's

14   talk about this additional pharmacy that you found.

15            So is that something then that's missing

16   from all of your reports other than Supplemental

17   Appendix 8A?

18       A.    It's not so much missing.  We report these

19   statistics based on what's in the ARCOS data, and

20   that would include the pharmacies that are

21   identified in the ARCOS data in Trumbull County.

22   So I'm not saying I want to change this exhibit to

23   reflect that additional pharmacy, but I mentioned

24   that pharmacy a couple of times.  So I'm just

25   pointing out where it might have an impact if you

1    were to include it.  We only include it for
2    purposes of the SOMS analysis that gets reported in
3    the Supplemental 8A.
4         Q.   Okay.  So you're a numbers guy, right?
5         A.   Yes.
6         Q.   I'm not trying to be cute, but you are
7    here to sort of crunch the numbers.  You've
8    referred to yourself as sort of a human calculator,
9    I think, before, correct?
10        A.   Yes.
11        Q.   So what I'm trying to understand is for my
12   client, what numbers to rely on or what numbers
13   you're intending to give opinions on.  So can we
14   then understand and rely that the opinions that
15   you're going to be offering at trial are going to
16   relate to the three reports that you submitted in
17   Track 3 understanding that Supplemental Appendix 8A
18   replaces Supplemental -- I'm sorry, replaces
19   Original Appendix 8C, and then we can otherwise say
20   this is what Dr. McCann is going to testify about
21   with respect to Walmart coming into trial?
22        A.   Yes, I would think so other than the
23   development of some demonstratives or some summary
24   exhibits of the underlying data that would come in
25   as evidence.  I'm not withholding anything from

Page 275

1    you.  I've given you all of the analysis that we've

2    done in these three reports, and I've explained the

3    difference between the first report and the

4    supplemental report and this issue about the

5    pharmacy that is in Trumbull County that isn't

6    identified as such in ARCOS.  I'm likely to give

7    some, you know, explanation of that if I'm asked at

8    trial.

9       Q.   So -- but as far as your opinions and

10   however you decide to treat this one particular

11   pharmacy, as your reports currently stand, with the

12   exception of replacing 8C with Supplemental 8A,

13   that's how you plan to describe your treatment of

14   the Walmart pharmacies in Lake and Trumbull County,

15   correct?

16      A.   Yes, subject to the explanation I gave you

17   a minute ago.  There might be demonstratives that

18   are some distillation, some simplification of these

19   exhibits or tables and maybe some what I understand

20   to be referred to as 1006 exhibits that might be

21   summaries of the data that would be entered as

22   evidence.

23      Q.   Well, actually, let me go to my next set

24   of questions, and it might clear this up a little

25   bit more.