UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*County of Lake, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-op-45032<br><br>*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*, Case No. 18-op-45079 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

## WALGREENS' TRIAL BRIEF

Defendants Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co. (together, "Walgreens") submit this trial brief to outline the evidence that Plaintiffs will need to present at trial, the evidence that Walgreens intends to offer at trial, and some of the most significant evidentiary issues that Walgreens anticipates the Court may need to address during the course of the trial.

Pursuant to the Court's instructions, this brief does not address legal issues addressed in briefing to the Court related to Track 1 and Track 3 motions to dismiss, motions for summary judgment, motions *in limine*, and motions to exclude expert testimony. Walgreens does, however, anticipate advancing many of the same legal arguments (and others) in a Rule 50 motion at the close of Plaintiffs' case and, if necessary, in Rule 50 and Rule 59 motions after trial. Walgreens reserves the right to make all appropriate legal arguments at the appropriate time.

Walgreens does not intend the description of its defense in this trial brief to be binding. It submits this brief without prejudice to its right to revise its trial presentation and to offer

different or additional evidence at trial as the needs of the case develop and in light of Plaintiffs' evidence and arguments.

## Plaintiffs' Claims Against Walgreens at Trial

Plaintiffs Lake County and Trumbull County asserted any number of confused and contradictory legal theories against other defendants before they landed on the idea to sue retail pharmacy chains.  This trial, however, concerns only Plaintiffs' late attempt to pin the blame for the opioid crisis in Lake and Trumbull Counties on Walgreens and four other chain pharmacies.  Plaintiffs are not asserting any causes of action other than public nuisance, and they are not asserting any claims for past damages.  As a remedy, Plaintiffs seek only the abatement of a public nuisance related to prescription opioid medications that Plaintiffs allege exists in the counties today.  They assert this claim even though their own expert says that all of the relevant conduct occurred before 2011.[1]

Despite their persistent attempts to conflate the issues, Plaintiffs cannot carry their burden at trial with evidence about the opioid crisis in Lake and Trumbull Counties in its broadest sense, which has been driven to a large extent by the widespread availability of heroin, illicit fentanyl, and other illicit drugs trafficked by criminal drug gangs.  Nor can they carry their burden with evidence about well-meaning doctors who wrote legitimate prescriptions for patients in need of pain control, even if some of those patients eventually became dependent on the medications that their doctors provided with terrible consequences.

Rather, Plaintiffs must demonstrate at trial a currently existing public nuisance specifically related to opioid medications Walgreens distributed or dispensed, which were then

---

[1] Because Plaintiffs' causation expert, Professor David Cutler of Harvard University, has opined that post-2010 conduct by retail pharmacies is irrelevant to current conditions in Lake and Trumbull Counties, Defendants have filed a motion *in limine* to exclude evidence of alleged wrongdoing after 2010.

diverted to the illicit market.  Plaintiffs must find a way to show that the criminals involved in such diversion flocked to Walgreens pharmacies, where they supposedly persuaded pharmacists to fill bogus prescriptions, as opposed to obtaining drugs for diversion from the scores of other locations that dispensed prescription opioids in the two counties but are not named as defendants; from the known pill mills, crooked doctors, and pill traffickers in the area; or from the medicine cabinets of friends and family members.

While Plaintiffs' lawyers have poured untold resources into an attempt to develop a theory of liability based on Walgreens' activities as a self-distributor of prescription opioid medications to its own pharmacies (which it ceased in 2014), it is now apparent that those distribution claims are entirely derivative of Plaintiffs' dispensing claims.  That is, even if Plaintiffs could show that a Walgreens distribution center ever "oversupplied" opioid medications to any local Walgreens pharmacy, it would have no bearing on Plaintiffs' claims of a public nuisance unless Plaintiffs could also find a way to show that the medications did not simply sit on pharmacy shelves under lock and key until properly dispensed to fill legitimate prescriptions.  Plaintiffs would still have to show that criminal actors subsequently diverted those same medications to the illicit market, contributing to a public nuisance of diverted prescription opioids.  Critically, Plaintiffs have never alleged that theft from Walgreens pharmacies or distribution centers played any role in the local opioid crisis.  And Plaintiffs' own DEA expert agrees that a busy pharmacy's sales volume alone is not enough to show diversion.

As to dispensing by Walgreens pharmacists, Plaintiffs will attempt to prove at trial: (1) that a large percentage of prescriptions for opioid medications filled by Walgreens pharmacists in Lake and Trumbull Counties bore "red flags of diversion"; (2) that Walgreens' pharmacists did not identify and "clear" these "red flags" before dispensing; (3) that these "red flag"

3

prescriptions were *in fact* illegitimate, sham prescriptions written by corrupt doctors and/or presented by criminals masquerading as patients; and (4) that Walgreens pharmacists filled enough of these bad prescriptions to permit a conclusion that medications supposedly dispensed at Walgreens pharmacies pursuant to sham prescriptions—rather than pills dispensed by the huge number of other outlets where prescription opioids can be obtained in Lake and Trumbull Counties—played a substantial role in a current prescription opioid public nuisance.

Plaintiffs have devoted great energy to developing a litigation theory that is supposed to support the first showing (that Walgreens pharmacists dispensed despite "red flags" telling them not to), in the teeth of all evidence to the contrary.[2] But they have never given any indication how they could possibly make showings (2)-(4) on the basis of a factual record that shows exactly the opposite. At best, Plaintiffs have a hired expert's ludicrous and unsupported litigation position that the residents of Lake and Trumbull Counties who fill their prescriptions at Walgreens pharmacies are practically all criminals, such that more than 90% of all shipments of opioid medications to Walgreens pharmacies in those counties were promptly diverted to the illicit market.

## **Walgreens' Defense at Trial**

At trial, Walgreens will show that Plaintiffs cannot present evidence sufficient to show any connection between a prescription opioid nuisance in the two counties and how Walgreens

---

[2] For example, Plaintiffs' trial theory would flag as a potential criminal involved in illegal drug diversion every patient who travels from Trumbull County to the Cleveland Clinic for specialty oncology care, simply because of the distance between the two places; every resident of the two counties without prescription drug coverage who must pay cash for their prescriptions; every orthopedic surgeon who routinely writes the same initial prescription for patients who need pain control following a knee replacement surgery; doctors who write refill prescriptions for pain medication following an initial prescription by a partner in the same medical practice; and doctors who write a prescription for pain control when seeing a patient for follow-up care after an ER doctor writes an initial, short-duration pain prescription. As Plaintiffs would have it, pharmacists must treat each of these patients and prescribers as a likely criminal attempting to commit a drug felony, regardless of the actual circumstances that may make a particular prescription unremarkable and regardless of how well the pharmacist already knows a patient and their individual situation.

pharmacists dispensed medications. If the trial gets past Plaintiffs' case in chief, the specific evidence Walgreens will present in support of its defense will necessarily depend on what evidence and theories Plaintiffs decide to pursue before the jury. Topics on which Walgreens may present evidence include the following.

Against all of Plaintiffs' failures of proof, Walgreens will show at trial that its pharmacists are highly trained healthcare professionals who care deeply about their patients and about the communities where they live and work, and who are supported by some of the best resources in the business. Walgreens will show that the real regulators on the ground in Ohio—not profit-seeking contingent fee lawyers and their hired-gun experts—never saw Walgreens as a source of diverted controlled substances in Lake and Trumbull Counties. While Trumbull County was home to a well-known pill mill whose pharmacist-owner has been criminally prosecuted and pleaded guilty to drug trafficking offenses, Walgreens will show that its own local operations have always been in compliance with all state and federal regulations regarding controlled substances. And Walgreens will show that Walgreens and its pharmacists in Lake and Trumbull Counties have always been strong allies, not adversaries, to local regulators and law enforcement in the fight against drug diversion.

Plaintiffs cannot get around any of this by caricaturing Walgreens pharmacists as uncaring and unthinking pill-dispensing machines. Pharmacists are highly trained professionals who play a critical role in the delivery of healthcare to Americans. Patients, doctors, and regulators look to pharmacists to make sure that patients have access to the medications that their doctors prescribe, to ensure that prescriptions are timely and accurately filled, to identify drug interactions and allergies of which prescribers and patients may be unaware, and to counsel patients on their medications. When it comes to controlled substances, pharmacists take the

appropriate steps under the circumstances of each prescription to guard against filling illegitimate prescriptions, while still working to make sure that patients suffering in real pain are able to obtain the medications their doctors have prescribed.

But pharmacists are not trained as doctors and do not make prescribing decisions.  Except under the narrowest of circumstances that are not relevant here, Ohio law forbids pharmacists from making prescribing decisions.[3]  It would be entirely inappropriate for pharmacists to refuse to fill legitimate prescriptions written by legitimate doctors simply because they disagree with the prescriber's medical judgment—a state of affairs that regulators, doctors, patients, and the public at large would rightly refuse to tolerate.  Pharmacists do not examine patients; they do not have access to a patient's full medical history; they do not diagnose patients; and they do not have the long years of medical education and training and the clinical expertise that doctors use to make prescribing decisions.  While pharmacists may always refuse to fill a prescription if they doubt its legitimacy, they may not stand between patients and their doctors by depriving patients of legitimately prescribed medicines simply because the pharmacist disagrees with a doctor's professional medical judgment about the best treatment options for an individual patient.

To be sure, throughout this litigation Plaintiffs, their lawyers, and their experts have said that marketing efforts by pharmaceutical manufacturers persuaded competent and well-meaning doctors to write an excessive number of legitimate prescriptions for prescription opioid medications, contributing to overprescribing, subsequent abuse and addiction, and the so-called "medicine cabinet" diversion of properly dispensed medications from the homes of family and friends.  That was, after all, the theory of Plaintiffs' initial complaint in this lawsuit, which made no claims against any pharmacy chain.  And no one would deny that the medical community's

---

[3] *See* Ohio R.C. §§ 4729.01(I), 4729.39.

approach to pain and the standard of care for pain treatment have changed significantly over time.  But criticisms of the marketing practices of absent third parties and the prescribing practices of legitimate healthcare providers are no basis to fault the pharmacists who filled legitimate prescriptions written by doctors in good standing, including physicians at the top of their fields and practicing at the most prestigious local institutions.

Finally, no one disputes that criminals have engaged in the diversion of prescription medications in Lake and Trumbull Counties, just as they do elsewhere.  But there is nothing to tie any of that wrongdoing to the handful of Walgreens pharmacies located in the two counties.  Of over 140 pharmacies, hospitals, and clinics that dispensed opioid medications in Lake and Trumbull Counties during the key time period, only 13 were Walgreens pharmacies.  There is no basis for Plaintiffs' supposition that a vast number of the prescriptions filled at those 13 Walgreens pharmacies were bogus prescriptions presented by criminals, which Walgreens pharmacists then filled despite "red flags" that revealed the impostors' wrongdoing.  Considering Walgreens' record of working with local law enforcement to identify and apprehend drug diverters, it would be odd indeed if those in the area seeking prescription opioids for purposes of diversion preferred to go to Walgreens when they had ready access to so many other outlets, including a notorious pill-mill pharmacy that operated for years in Trumbull County, and a known pipeline of diverted prescription opioids that led from unknown sources in Detroit to northern Ohio.

## **Key Evidentiary Issues**

Walgreens anticipates that the most important evidentiary issues for the Court during trial may include the following:

- Improper efforts by Plaintiffs to describe as "the law," or otherwise reflective of legal obligations, what are in fact non-binding and sub-regulatory guidance documents by DEA employees that are inconsistent with other guidance offered by different employees of the same agency.

- Efforts by Plaintiffs to block the presentation of evidence regarding the actual causes of the opioid crisis in Lake and Trumbull Counties—which are many-faceted and complex; which in many instances do not reflect well on Plaintiffs and other government bodies and agencies; and which involve innumerable actors not before the Court, ranging from well-intentioned prescribing doctors to criminal drug dealers and heroin traffickers, to say nothing of the manufacturers and major distributors against whom Plaintiffs themselves have lodged the most incendiary allegations of wrongdoing.

- Plaintiffs' attempts to conflate evidence regarding different Defendants and to try an improper composite case against an "industry" that includes both Defendants and non-Defendants.[4]

- Impermissible attempts by Plaintiffs to substitute collective proof for evidence against each individual Defendant, despite the inapplicability of any variety of market-share liability under Ohio law.  An expert opinion, for example, that "the industry" caused harm is not a permissible tactic to avoid Plaintiffs' obligation to prove a causal connection to each individual Defendant.

---

[4] For example, Plaintiffs' expert Dr. Anna Lembke insists on talking in terms of a "Pharmaceutical Opioid Industry" that resists any attempt to define the phrase.  Defendants' *Daubert* motion concerning Dr. Lembke raises this issue, among others.

- Attempts by Plaintiffs to overcome their lack of evidence regarding any alleged conduct touching either Lake or Trumbull County with inflammatory claims based on enforcement actions and settlements in other jurisdictions.  Indeed, Plaintiffs' Track 1 summary judgment briefing revealed that essentially their *entire* distribution case against Walgreens rested on allegations that DEA made against the company in 2012 regarding one distribution center and six pharmacies in Florida.  These allegations were never tested before any court or even a neutral administrative adjudicator and have no place at a trial limited to events in two counties in northern Ohio.

## Conclusion

Walgreens looks forward to addressing these issues further with the Court at trial.

Dated: August 19, 2021

/s/  *Kaspar J. Stoffelmayr*
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten A. Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, Illinois 60654
(312) 494-4400
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
sharon.desh@bartlitbeck.com
sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
(303) 592-3100
alex.harris@bartlitbeck.com

*Attorneys for Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August 2021, a notice of the foregoing has been served via CM/ECF to all counsel of record.

*/s/ Kaspar J. Stoffelmayr*
Kaspar J. Stoffelmayr

*Attorney for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*
