# EXHIBIT A

Page 87

| | | |
|---|---|---|
| 1 | Q | So you went to work for NABP in 1985, correct? |
| 2 | A | Correct. |
| 3 | Q | Did you continue practicing as a pharmacist from |
| 4 | | 1985 to 2004 while you were working at NABP? |
| 5 | A | Yes. |
| 6 | Q | And so did you do that part-time? |
| 7 | A | Yes. |
| 8 | Q | Did you ever work full-time as a pharmacist? |
| 9 | A | Yes. |
| 10 | Q | For how many years? |
| 11 | A | From 1983 through 1985. |
| 12 | Q | So two years? |
| 13 | A | Yes. |
| 14 | Q | You didn't ever work in any capacity for one of the |
| 15 | | defendant pharmacies in this action, correct? |
| 16 | | MR. ELSNER:  Objection. |
| 17 | A | I'm trying to think of all the mergers that have |
| 18 | | occurred.  I worked for a large chain, but I |
| 19 | | believe it's not one of the defendants. |
| 20 | | BY MS. FUMETON: |
| 21 | Q | What was the large chain? |
| 22 | A | At the time it was Osco Drug.  I believe now it's |
| 23 | | Albertsons. |
| 24 | Q | And what years was that? |
| 25 | A | That was from 1981 through 2004. |

Page 88

| | | |
|---|---|---|
| 1 | Q | And so you didn't graduate as a pharmacist or did |
| 2 | | not get your degree in pharmacy until 1983, |
| 3 | | correct? |
| 4 | A | Correct. |
| 5 | Q | So were you working as an intern from 1981 to 1983 |
| 6 | | part-time? |
| 7 | A | No, I was working as a technician from 1981 to |
| 8 | | 1982.  And then from 1982 to 1983, I was working as |
| 9 | | a graduate pharmacist.  From 1983 to 1984, I was a |
| 10 | | staff pharmacist, and then from 1984 to 1985, I was |
| 11 | | the pharmacist in charge. |
| 12 | Q | And then did you continue to work at the same place |
| 13 | | part-time after you took the position at NABP? |
| 14 | A | No.  I worked as a floater and worked at different |
| 15 | | locations. |
| 16 | Q | In what geographic area? |
| 17 | A | Primarily initially the south side of Chicago and |
| 18 | | then afterwards, the northwest suburbs of Illinois. |
| 19 | Q | Did you ever work as a pharmacist in Ohio? |
| 20 | A | No. |
| 21 | Q | And so just so we're clear, to the best of your |
| 22 | | knowledge, you've never worked for any of the |
| 23 | | pharmacy defendants in this litigation, correct? |
| 24 | A | Correct. |
| 25 | Q | Do you hold any other professional certifications |

Page 159

| | | |
|---|---|---|
| 1 | A | Based on the aggregate data that I looked at, sir, |
| 2 | | I would say if it had a red flag, then that red |
| 3 | | flag needed to be resolved. |
| 4 | Q | So what was the pharmacist who was presented with |
| 5 | | each of these prescriptions that flagged under your |
| 6 | | 16 red flags supposed to do? |
| 7 | A | Resolve the red flag and substantiate that the |
| 8 | | prescription was a legitimate prescription and |
| 9 | | whatever the issue was that the red flag was |
| 10 | | pointing to, that that was resolved and if the |
| 11 | | pharmacist could proceed and know that that was a |
| 12 | | legitimate prescription. |
| 13 | Q | Okay. And in particular, what was the pharmacist |
| 14 | | supposed to do in order to resolve the red flag? |
| 15 | A | It would again upon the red flag. Some red flags |
| 16 | | would involve calling the prescriber directly. |
| 17 | | Other red flags would involve looking at the PDMP. |
| 18 | | Other red flags might be a complete review of the |
| 19 | | patient information or behaviors of the patient, |
| 20 | | activities of the prescriber. So each red flag may |
| 21 | | have its own set of actions that would be required. |
| 22 | Q | So is it your opinion that each of the |
| 23 | | prescriptions that is identified under your 16 red |
| 24 | | flags was, in fact, a red flag? What I mean by |
| 25 | | that, is it correct that your opinion is that there |

Page 161

```
 1          was diverted to a use that was not intended?
 2     A    I can't comment to say that each individual
 3          prescription, but I could say based upon the other
 4          data that I reviewed, a significant number of those
 5          prescriptions were diverted.
 6     Q    And is it the opinion that each of the
 7          prescriptions identified by each of your red flags
 8          was written by a prescriber not for a legitimate
 9          medical purpose?
10               MR. ELSNER:  Objection.
11     A    I believe that some of the red flags indicated
12          that, and other red flags may have indicated that
13          it was the patient's behavior that signaled that
14          the prescription was not for legitimate medical
15          purpose.
16       BY MR. BUSH:
17     Q    And in that situation, the second situation, is
18          that a situation in which you say that it's your
19          opinion that the prescription or the drugs
20          dispensed to fill the prescription were diverted?
21     A    Yes, sir.  Anytime the prescription was not used as
22          intended or for legitimate medical purpose, then
23          that would have been considered diverted.
24     Q    Is it your opinion that the pharmacists who filled
25          each of the prescriptions flagged by your red flag
```

Page 167

```
 1        not to fill the prescription?
 2   A    Yes, sir.
 3   Q    Would you agree with me that just because a
 4        prescription flags under one of your 16 red flags,
 5        that does not mean that it was written for an
 6        illegitimate medical purpose?
 7   A    Yes, sir.
 8   Q    And would you agree with me that it also does not
 9        mean that the drugs that were dispensed to fill
10        that prescription were diverted?
11   A    Yes, sir.
12   Q    And you have not made any effort in your -- if you
13        have, tell me.  But as I understand it, you've not
14        made any effort to determine how many of the
15        prescriptions that flagged under your flags 1
16        through 16 were actually diverted?
17            MR. ELSNER:  Objection.
18   A    Not the individual numbers, sir, no.
19      BY MR. BUSH:
20   Q    And you haven't made any effort to determine how
21        many of the prescriptions that flagged under your
22        16 red-flag methodologies were not written for a
23        legitimate medical purpose?
24   A    Not individually, sir.
25   Q    And you would agree with me, would you not, that
```

Page 172

```
 1          clear so that we're talking the same language, a
 2          legitimate prescription that the patient doesn't
 3          use all of and is ultimately taken by somebody else
 4          from that patient's medicine cabinet and used in a
 5          way that isn't in accordance with the prescription?
 6              MR. ELSNER:  Objection.
 7     A    In the context of a legitimate prescription, sir,
 8          the answer is no.
 9       BY MR. BUSH:
10     Q    Now, I also asked you earlier about diversion that
11          occurs after a prescription is dispensed because
12          the patient who received the prescription gives
13          some of it to family members or friends who were
14          not on the prescription.
15              Is your answer the same, that there's none of
16          your red flags that identifies that kind of
17          diversion?
18              MR. ELSNER:  Objection.
19     A    For a legitimate prescription, the answer is none
20          of the red flags identify that activity.
21       BY MR. BUSH:
22     Q    Are you aware of any assessments of how much --
23          withdrawn.
24              Are you aware of any studies that assess what
25          percentage of people who end up misusing opioids
```

Page 173

```
 1        got their opioids from friends and family?
 2   A    No, sir, I can't recall.  I'm not aware of any.
 3   Q    You're not familiar with the SAMHSA study that says
 4        over 50 percent of people who were studied and were
 5        engaged in opioid abuse said that they got their
 6        opioids from friends and familiar?
 7   A    Yes, sir, I'm aware of the SAMHSA.  I'm sorry.  I
 8        didn't realize that was a study.  I'm aware of that
 9        SAMHSA data.
10   Q    Do you agree with that or disagree with that?
11            MR. ELSNER:  Objection.
12   A    I would have no way or no reason to disagree with
13        it, sir.
14     BY MR. BUSH:
15   Q    And are you aware of studies that have been cited
16        that approximately 70 percent of people who report
17        nonmedical use of prescription medications,
18        including opioid pain relievers, say that they got
19        their drugs from a friend or family member?
20            MR. ELSNER:  Objection.
21   A    I've seen statistics like that, sir, yes.
22     BY MR. BUSH:
23   Q    And do you agree or disagree with those?
24            MR. ELSNER:  Objection.
25   A    I think coming from credible sources, I would agree
```

Page 174

```
 1          with those statistics.
 2     BY MR. BUSH:
 3  Q   Is it your view that one of the indications that
 4      you're relying on that there was diversion in the
 5      two counties that, in your view, there were just
 6      too many opioid medications flooding the counties?
 7  A   That was one of the reasons.
 8          The other reason is that the number of people
 9      who died from drug overdoses, including opiates,
10      were four per day from 2006-2009, and then
11      increased in Trumbull County from 11 in 2009 to
12      2017 to 69 people per hundred thousand, and in Lake
13      County it moved from 9 to 46 people per a hundred
14      thousand.
15          So if all those prescriptions were for
16      legitimate purposes, the data would have been
17      otherwise, so the number of prescriptions dosages
18      mentioned in my report per person in those two
19      counties and then the death rates from drug
20      overdoses are what lead me to believe a significant
21      number of those prescriptions were not for
22      legitimate purposes and were diverted.
23  Q   Now, focusing on the amount of prescription opioids
24      that were placed into the counties, just the sheer
25      number by itself doesn't identify whether any
```

Page 212

1       who was between 25 and 30 miles from the patient?
2 A   No, sir.
3 Q   Same answers for between 30 and 35 miles?
4 A   Yes, sir.
5 Q   And do you believe that 5 miles is a meaningful
6       difference in terms of identifying prescriptions
7       that are not written for a legitimate medical
8       purpose?
9       MR. ELSNER: Objection.
10 A   I think you could be within 5 miles of a pharmacy
11       and still have a prescription that's not
12       legitimate. So the mile is a -- 25 is a parameter,
13       but anything can occur within 5 miles or 10 miles
14       of the pharmacy or prescriber.
15   BY MR. BUSH:
16 Q   But by setting 25 miles, you're trying to identify
17       prescriptions that are likely to have been written
18       for an illegitimate medical purpose or to be
19       diverted, right?
20 A   No, sir.
21 Q   What are you trying to do?
22 A   25 miles presents a red flag which indicates to the
23       pharmacist that further diligence is needed on that
24       prescription because there could be diversion or
25       abuse or a problem.

Page 218

1       really red flags, right?
2           MR. ELSNER:  Objection.
3    BY MR. BUSH:
4    Q   I'm sorry.  What was your answer?
5    A   Yes.
6    Q   And you also say that "these exceptions did not
7        appear to be factors impacting the data."
8           Do you see that in the next sentence?
9    A   Yes.
10   Q   What's the basis for that conclusion?
11   A   I had no documentation on patient notes or anything
12       else that indicate otherwise, and so based upon the
13       data, that was the only conclusion I could reach.
14   Q   You would agree that there are going to be some
15       prescriptions that were flagged under these flags
16       that fall within these exceptions?  You're just
17       saying that you can't identify them; is that right?
18          MR. ELSNER:  Objection.
19   A   Yes, sir.
20   BY MR. BUSH:
21   Q   So let me ask you another question here.  Let's say
22       that we have a prescription that is presented by
23       somebody who lives a thousand miles away from the
24       pharmacy.  Would that flag?
25   A   Yes, sir.

Page 238

1       it still a red flag?
2  A    Yes, sir.
3  Q    Okay.  Doesn't matter if the overlap of the
4       prescription is one day, two days, three days, as
5       opposed to they were filled at the same time and
6       they completely overlapped to you?
7           MR. ELSNER:  Objection.
8  A    If you look at the patient's health, and if that
9       combination caused the patient to have respiratory
10      failure or die, and it could happen with just a
11      combination of two doses, then it's a red flag that
12      the pharmacist needs to resolve.
13   BY MR. BUSH:
14 Q    All right.  But in that a situation, it might be a
15      danger to the patient, but it would not be an
16      illegitimate prescription, right?
17          MR. ELSNER:  Objection.
18 A    Hypothetically, yes, it could not be.
19   BY MR. BUSH:
20 Q    Do you have any idea how many prescribers prescribe
21      this combination of drugs?  And by "this," I'm
22      referring to an opioid and a benzodiazepine in the
23      two counties, Lake and Trumbull County?
24 A    No, sir.
25 Q    Would it trouble you, if, say, 200 or 300