# EXHIBIT C

Page 399

1    BY MR. SWANSON:
2    Q    So when you say that it's a red flag if a patient
3         travels more than 25 miles to see his or her
4         prescriber, you're saying if somebody said I
5         think it's more reasonable to be -- to set it at
6         35 miles, you'd say no, reasonable minds can't
7         disagree about this, it's 25 miles?
8              MR. ELSNER:  Objection.
9    A    The question as you've posed it, the DEA in their
10        guidance in other documents have pointed out
11        specific red flags.  So distance is a red flag.
12        25 miles is a parameter that, as I've determined,
13        is a safe parameter to utilize.  So a pharmacist
14        may, in their professional and independent
15        judgment, make a determination that 30 miles or
16        20 miles may not be a red flag.  But it's still a
17        red flag for them to conduct further due diligence.
18             The red flags the DEA have identified, those
19        are not things that are discussed or debatable.
20        They are actually standards of care in that
21        highway.
22   BY MR. SWANSON:
23   Q    But my question was a bit more basic.  Can
24        reasonable minds differ as to what constitutes a
25        red flag?

Page 418

```
 1        you can't tell me what percentage of those 37,066
 2        prescriptions you claimed were written for an
 3        illegitimate reason, true?
 4            MR. ELSNER:  Objection.
 5   A    My answer is significant and significant would be
 6        far greater than 10, 20, or 30 percent.  Probably
 7        more in the range of between 70 and 80 or
 8        90 percent, sir.
 9      BY MR. SWANSON:
10   Q    Oh, so your opinion -- your opinion is that 70 to
11        90 percent of those 37,066 prescriptions were
12        written for an illegitimate reason?
13   A    No, sir.  You asked me to define just sitting in
14        the chair today what I thought would be a
15        significant number.  And to me, a significant
16        number is somewhere to 70, 80 percent.  Again,
17        lacking the documentation, I cannot quantify
18        whether or not those 37,000 prescriptions fell into
19        that category.  But if you ask me what's the
20        difference between significant and others, for me a
21        significant number of prescriptions would be 70,
22        80 percent if I could make that determination, sir.
23   Q    So a significant quantity of controlled substances
24        at 70 to 80 percent to you?
25            MR. ELSNER:  Objection.
```

Page 509

1    Short of some PHI, you have the dispensing -- you
2    have the dispensing pharmacist's name, you have the
3    prescriber's name, you are have the dosage amount.
4    You have all that information.  Why can't you make
5    the assessment?
6         MR. ELSNER:  Objection.
7    BY MR. KOBRIN:
8    Q    Why are you only dealing with this in aggregate?
9         MR. ELSNER:  Objection.
10   A    The only data I received in that regard were sample
11        data from the individual defendants, but I did not
12        look at the entire prescription database.
13   BY MR. KOBRIN:
14   Q    So you're saying that you can't judge the percent
15        of prescriptions for any particular opioid that
16        were paid for in cash because every prescription
17        has to be looked at individually, correct?
18        MR. ELSNER:  Objection.
19   A    Let me explain and see if I understand the question
20        correctly, sir.
21            What I'm saying is that the percentages of the
22        red flags that each of the defendants had in regard
23        to what is significant or how many of those were
24        actually red flags, I don't have that
25        information -- I don't have that information absent