# EXHIBIT B

Page 22

1  opioids for minor and chronic pain conditions as a
2  result of being duped by the opioid pharmaceutical
3  industry.
4      Q.  What percentage of doctors, in your view, were
5  duped by the opioid pharmaceutical industry?
6          MR. ARBITBLIT:  Objection.  Vague.
7  BY MR. GISLESON:
8      Q.  Take a step back.
9      Dr. Lembke, have you done anything to try and
10  quantify the number of doctors who in your view were
11  duped by the opioid pharmaceutical industry?
12      A.  The research that I did for my book included
13  qualitative interviews with multiple providers who had
14  trained in different settings, across different years,
15  who had different specialties, and the majority of them
16  reported being duped by the opioid pharmaceutical
17  industry.
18      Q.  Is it your belief that a majority of doctors
19  who were prescribing opioid medications were duped by
20  the opioid pharmaceutical industry?
21      A.  Yes, it is.
22      Q.  Were any doctors in Lake County or Trumbull
23  County, Ohio, duped into prescribing opioid
24  medications?
25      A.  Since the campaigns to mislead doctors were

Page 23

1  national campaigns, I have no reason to believe that
2  the doctors in Lake and Trumbull County were an
3  exception.  So I think it's very likely that they too
4  were duped into overprescribing.
5      Q.  Now, in terms of the standards for prescribing
6  opioid medications, we're obviously talking about
7  doctors.  Do the same standards apply to nurse
8  practitioners, dentists, and physician assistants who
9  had prescriptive privileges to opioid medications as
10  applied to doctors?
11          MR. ARBITBLIT:  Objection.  Compound.
12  BY MR. GISLESON:
13      Q.  Let me rephrase the question.
14      In terms of the prescription of opioid
15  medications for pain, how did the standards that
16  applied to doctors compare to the standards that
17  applied to other prescribers of opioid medications?
18      A.  Could you define "other prescribers"?
19      Q.  Sure.  Nurse practitioners, physician
20  assistants, dentists, and anyone else who had a DEA
21  license that permitted them to prescribe opioid
22  medications.
23          MR. ARBITBLIT:  Same objection.
24          THE WITNESS:  The paradigm shift that
25  occurred in opioid prescribing beginning late 1990s was

Page 24

1  a national paradigm shift.  It shifted the culture in
2  medicine across the board around opioid prescribing,
3  and as such, I believe that anybody who prescribed
4  opioids was affected by that paradigm shift.
5  BY MR. GISLESON:
6      Q.  When you talk about a paradigm shift, do you
7  mean that the medical standard of care for prescribing
8  opioid medications changed?
9          MR. ARBITBLIT:  Objection.
10          THE WITNESS:  No, I wouldn't use that
11  language.
12  BY MR. GISLESON:
13      Q.  What do you mean by a paradigm shift?
14      A.  I mean that it became commonly accepted for
15  opioids to be first-line treatment for many different
16  types of pain conditions, and that doctors were shamed
17  through the use of terms like "opioid phobia" and
18  quote, unquote, undertreatment of pain, into
19  prescribing more opioids and they were also misled into
20  believing that opioids are more effective than they
21  actually are and less risky than they actually are.
22      In particular, they were told that as long as
23  they were prescribing to a patient with a bona fide
24  pain condition, it was very unlikely or very rare that
25  that patient would become addicted to the opioid that

Page 25

1  they were prescribing.
2      Q.  What do you mean by first-line treatment?
3      A.  Opioids became the go-to remedy for all
4  different types of pain.
5      Q.  When you say it was commonly accepted for
6  opioids to be the first-line treatment for many
7  different types of pain conditions, does that mean that
8  there was a national practice in terms of the
9  circumstances under which prescription opioids
10  medications could be prescribed for pain?
11          MR. ARBITBLIT:  Object to form.
12      (Reporter clarification.)
13  BY MR. GISLESON:
14      Q.  Sorry.
15      With a paradigm shift, what was the medical
16  standard of care based on your research and analysis
17  for prescribing opioid medications for pain?
18          MR. ARBITBLIT:  Objection.
19          THE WITNESS:  I'm not sure how you're
20  defining the term "standard of care" or how you're
21  using that term in this question.
22  BY MR. GISLESON:
23      Q.  Under what circumstances, once this paradigm
24  shift occurred, were doctors consistent, with their
25  professional medical responsibilities, permitted to

7 (Pages 22 - 25)

Page 26

1  prescribe opioid medications for pain?
2       MR. ARBITBLIT:  Objection.
3       THE WITNESS:  Again, the way you frame
4  the question in terms of "permitted to prescribe," I'm
5  not quite sure what you're getting at or how best to
6  answer that.
7  BY MR. GISLESON:
8       Q.  Did doctors violate any professional codes
9  applicable to the practice of medicine by prescribing
10  opioid medications for pain?
11       MR. ARBITBLIT:  Objection.  Overbroad.
12       THE WITNESS:  Could you be more specific
13  about what codes you're referring to?
14  BY MR. GISLESON:
15       Q.  Sure.  Were there standards that applied to
16  doctors once this paradigm shift changed for when
17  opioid medications could be prescribed for pain?
18       MR. ARBITBLIT:  Objection.
19       THE WITNESS:  Yeah, what do you mean by
20  "standards"?
21  BY MR. GISLESON:
22       Q.  As a medical doctor, you don't know what a
23  standard is when it comes to prescribing opioid
24  medications for patients?
25       MR. ARBITBLIT:  Object to form.

Page 27

1  Argumentative.
2       THE WITNESS:  To me, that's a vague term
3  that is not commonly used among doctors.  We don't talk
4  about standards.
5  BY MR. GISLESON:
6       Q.  What word or phrase do you use to describe
7  what the protocol or practice is for prescribing opioid
8  medications for pain?
9       A.  We talk about evidence-based medicine.  We
10  talk about guidelines.  We talk about quality measures.
11       Q.  Once this paradigm shift occurred, in your
12  view, did doctors at that point have discretion to
13  prescribe opioid medications as a first-line treatment
14  for pain?
15       MR. ARBITBLIT:  Objection.  Overbroad.
16       THE WITNESS:  Yeah, I'm not sure quite
17  what you mean by "did they have discretion."
18  BY MR. GISLESON:
19       Q.  Did the medical profession, once this paradigm
20  shift occurred, make any effort to standardize the
21  prescribing of opioid medications for pain?
22       MR. ARBITBLIT:  Objection.  Overbroad.
23       THE WITNESS:  It wasn't so much a matter
24  of standardizing.  It was a matter of what the messages
25  were around the benefits and harms of opioids as well

Page 28

1  as other incentives that would influence prescribing
2  one way or another.
3  BY MR. GISLESON:
4       Q.  Your view was that the paradigm shift in
5  medicine toward liberal opioid prescribing has been a
6  major factor contributing to the increased supply that
7  fueled, in your view, the opioid epidemic; is that
8  right?
9       A.  Yes.
10       Q.  When you say that the paradigm shift was a
11  major factor contributing to the increased supply of
12  opioid medications, what do you mean?
13       A.  I mean that through false and misleading
14  messages on the part of defendants, prescribers were
15  misled into believing that opioids are more effective
16  for the treatment of pain than they actually are, in
17  particular chronic pain, and that the risks of
18  prescribing, even at very high doses, even for very
19  long duration, were minimal.
20       Doctors were also told that pain was
21  undertreated, that it was essentially their fault
22  because they were not prescribing enough opioids; they
23  were opioid phobic.  And doctors were furthermore
24  educated that because the chances of their patients
25  getting addicted to the opioids, they were prescribing

Page 29

1  was very low, that they essentially needn't pay much
2  attention to that problem, and that if a patient
3  presented looking as if they might be developing an
4  addiction, they were actually pseudo-addicted and the
5  proper response was to go up on the opioids.
6       Q.  So the change in -- strike that.
7       This paradigm shift then resulted in a larger
8  number of opioid medications being prescribed?
9       A.  Yes.
10       Q.  And in your view, were doctors acting in the
11  belief that there was a legitimate medical purpose for
12  prescribing opioids medications for pain?
13       MR. ARBITBLIT:  Objection.  Overbroad.
14       THE WITNESS:  I do believe that the
15  majority of doctors believed that they were prescribing
16  for a legitimate medical purpose.
17  BY MR. GISLESON:
18       Q.  When you say a majority, approximately how
19  many?
20       A.  I couldn't really put a number on it.
21       Q.  Can you estimate it in any way?
22       MR. ARBITBLIT:  Objection.
23       THE WITNESS:  Not beyond saying
24  majority.
25

8 (Pages 26 - 29)

Page 50

1 that to initially 30 patients and then later more than
2 100 patients in recognition of the fact that specific
3 limits do have an impact on the public nuisance or the
4 harm to the public health.
5     Q. So there should be a regulation that the
6 plaintiffs can point to in this case that would
7 identify what that specific volume is of prescriptions
8 that is so high the prescriber's prescriptions can no
9 longer have legitimate medical purpose?
10         MR. ARBITBLIT:  Object to form.
11         THE WITNESS:  Sorry, could you repeat
12 the question to me?  It was hard to understand.  I
13 wasn't sure how it linked to what I said previously.
14 BY MR. GISLESON:
15     Q. Based on your answer, there should be a
16 regulation issued by the DEA someplace that identifies
17 what the standard is for when a prescriber's volume of
18 opioid prescriptions is so high that the prescriber can
19 no longer have a legitimate medical purpose for issuing
20 the prescriptions?
21         MR. ARBITBLIT:  Objection.
22 Argumentative.  Misstates the record.
23         THE WITNESS:  No, I didn't say that.
24 BY MR. GISLESON:
25     Q. Now, you mentioned a couple of times a

Page 51

1 "legitimate medical purpose."  What, in your
2 experience -- and we'll talk about since the paradigm
3 shift -- was a legitimate medical purpose based on the
4 pronouncements of the various medical organizations for
5 issuing an opioid medical prescription for pain?
6         MR. ARBITBLIT:  Objection.  Vague.
7 BY MR. GISLESON:
8     Q. Do you know what a legitimate medical purpose
9 is when it comes to prescribing opioid medications?
10         MR. ARBITBLIT:  Objection.  Vague.
11         THE WITNESS:  I do have a section in my
12 report where I talk about the legitimate use of opioids
13 based on the evidence.
14 BY MR. GISLESON:
15     Q. I'm not talking about the evidence.  I'm
16 talking about the paradigm shift.  Under the paradigm
17 shift, what were legitimate medical purposes for
18 prescribing opioid medications for pain?
19         MR. ARBITBLIT:  Objection.
20 Argumentative.  Vague.
21         THE WITNESS:  The way that opioids have
22 been prescribed since the late 1990s have been, in many
23 instances, not legitimate because they were not
24 informed by science.
25

Page 52

1 BY MR. GISLESON:
2     Q. I understand that's your position, but the
3 question is, for these different medical specialties
4 who were issuing prescriptions for pain, what were the
5 legitimate medical purposes that were recognized among
6 those different specialties for issuing opioid
7 prescriptions?
8         MR. ARBITBLIT:  Objection.  Vague.
9 Argumentative.  Asked and answered.
10         THE WITNESS:  Yeah, I feel like I
11 answered that question.
12 BY MR. GISLESON:
13     Q. But you didn't.
14         MR. ARBITBLIT:  Argumentative.  Not a
15 question.
16 BY MR. GISLESON:
17     Q. You said before that you believe the majority
18 of prescribers were issuing prescriptions because they
19 believed that there was a legitimate medical purpose
20 for the opioid prescription; is that right?
21     A. Yes.
22     Q. And from your research and analysis, what were
23 the legitimate medical purposes that those prescribers
24 were using in connection with issuing the
25 prescriptions?

Page 53

1         MR. ARBITBLIT:  Objection.  Vague.
2 Misstates the record.  Do you want to rephrase it so
3 that they believe they were legitimate, that would be
4 different from trying to mislead the witness into
5 saying they were legitimate without the belief.
6         MR. GISLESON:  Please stop coaching the
7 witness.
8         MR. ARBITBLIT:  Please stop asking
9 repetitive, argumentative questions.
10 BY MR. GISLESON:
11     Q. Dr. Lembke?
12     A. Yes.
13     Q. You said that in your view at least the
14 majority of prescribers nationally were writing opioid
15 prescriptions because they believed that those
16 prescriptions had a legitimate medical purpose.  What
17 did you understand those legitimate medical purposes to
18 be?
19         MR. ARBITBLIT:  Objection.
20 Argumentative.
21         THE WITNESS:  As I said before, they
22 believed that they were writing opioid prescriptions
23 for a legitimate medical purpose because they were
24 duped, when in fact, their prescribing was not
25 legitimate because it was not informed by the science.

14 (Pages 50 - 53)

Page 66

1 Baristas"; is that correct?
2     A.  Yes.
3     Q.  And these are your views based on your
4 education, training, and experience as a doctor who
5 speaks publicly as well as researches extensively
6 issues relating to the opioid epidemic; is that right?
7         MR. ARBITBLIT:  Objection.  Object to
8 form.
9         THE WITNESS:  I'm sorry.  Could you
10 restate the question?
11 BY MR. GISLESON:
12     Q.  Sure.  Are the views that you express in the
13 first paragraph under "Doctors as Baristas" ones that
14 are based on your education, training, experience, and
15 research relating to the prescription of opioid
16 medications?
17     A.  Can you just give me a moment to read the
18 paragraph?
19     Q.  Actually, why don't you read it out loud,
20 please?
21         MR. ARBITBLIT:  Why don't you read the
22 whole thing.  She's got the right to read it before she
23 starts reading out loud, Counsel.  Take your time.
24         THE WITNESS:  Would you like me to read
25 it out loud now?

Page 67

1 BY MR. GISLESON:
2     Q.  Please.
3     A.  "The current prescription drug epidemic is not
4 the result of the small population of deviant doctors
5 willfully harming patients, although those doctors
6 exist.  Rather, it is the result of a large population
7 of well-intended doctors working in healthcare
8 factories that prioritize throughput of body parts on
9 an assembly line over whole patient health.  The result
10 is overprescribing, which is faster and better
11 reimbursed than educating or empathizing with patients.
12         "Pills that are addictive are particularly
13 likely to be overprescribed because they provide
14 patient customers with short-term satisfaction and a
15 proxy for human attachment, but not necessarily
16 improved health.
17         "When autonomy is truncated and professional
18 status is linked to" --
19         (Reporter clarification.)
20     A.  -- "earning power, in patient satisfaction
21 surveys, doctors are vulnerable to objectifying
22 patients as commodities rather than seeing them as
23 people.  Patients are vulnerable to utilizing doctors
24 as nothing more than a source of drugs."
25     Q.  You refer to the concept of the Toyotaization

Page 68

1 of medicine.  Is that what you're describing here?
2     A.  Yes, in part.
3     Q.  Could you describe what you mean by the
4 Toyotaization of medicine?
5     A.  What I mean is that doctors -- the majority of
6 doctors now work as salaried employees for large
7 institutions and their practice is very heavily
8 dictated by many pressures inside that institution,
9 including pressures to see patients more quickly,
10 pressures to have satisfied customers with rating
11 surveys.
12         It is very common that a patient will have
13 multiple doctors for multiple different healthcare
14 problems, making it difficult to know, despite you
15 know, electronic medical record, exactly what kind of
16 care a patient is receiving from another provider or
17 exactly what kind of medication they're being
18 prescribed, which can result inadvertently in dangerous
19 drug-drug combinations or overprescribing.
20         The bottom line is that in many ways, doctors
21 have lost an enormous amount of autonomy.  They're
22 subject to Joint Commission quality measures, pain
23 guidelines and other guidelines promulgated by
24 professional medical societies and other different
25 entities that essentially dictate how doctors practice

Page 69

1 and how they prescribe medications.
2     Q.  Does that apply to how they prescribe opioid
3 medications for pain?
4     A.  Yes.
5     Q.  Do you blame those institutions for creating
6 that environment for doctors and other prescribers?
7     A.  As I've stated in my book and in my report,
8 there is lots of blame to go around, but the opioid
9 pharmaceutical industry was really the key instigating
10 factor for this paradigm shift.
11     Q.  Move to strike.  Nonresponsive.  Doctor, I'm
12 not trying to be rude.
13         You're talking about those institutions that
14 were putting pressure on doctors to prescribe opioid
15 medications.  What were the institutions?
16     A.  Well, the institutions included the opioid
17 pharmaceutical industry that essentially both directly
18 targeted doctors with an aggressive sales force and
19 aggressive marketing campaign, but also targeted
20 patients and targeted the various institutions that I
21 mentioned inside of medicine that were promoting
22 opioids.
23     Q.  When you wrote that "the current prescription
24 drug epidemic is not the result of a small population
25 of deviant doctors willfully harming patients, although

18 (Pages 66 - 69)

Page 74

1 Strike that.
2     That does not involve any Walgreens employee
3 speaking with a doctor to encourage that doctor to
4 prescribe opioid medications, correct?
5     A. Well, Walgreens pharmacists speak with doctors
6 on a daily basis, so what drug reps disseminate to
7 pharmacists is very likely to be further disseminated
8 to doctors.
9     Q. What factual basis do you have to say that a
10 pharmacist for any of the chain pharmacy defendants in
11 Ohio in fact communicated a manufacturer's message
12 concerning opioid medications to a prescriber in Ohio?
13     MR. ARBITBLIT: Object to form.
14     THE WITNESS: On page 97 of my report, I
15 talk about how Rite Aid pharmacy "collaborated with the
16 American Pain Foundation, a patient advocacy
17 organization funded largely by the pharmaceutical
18 opioid industry to create a patient-facing educational
19 pamphlet on pain to ensure customers receive the kind
20 of information that will make a difference and" --
21 BY MR. GISLESON:
22     Q. That does not involve targeting doctors with
23 an aggressive sales force, is it?
24     Doctor, the only aggressive sales force you
25 can identify is the one that was the drug reps working

Page 75

1 for an opioid manufacturer, correct?
2     A. As I've stated before, the pharmacy defendants
3 closely collaborated with the opioid manufacturers
4 including the drug reps to propagate the same false and
5 misleading messages.
6     Q. Move to strike as nonresponsive.
7     Doctor, the only aggressive sales force you
8 can identify is the one where the drug reps were
9 working for an opioid manufacturer, correct?
10     MR. ARBITBLIT: Object to form.
11     THE WITNESS: Again, I would argue that
12 the pharmacies themselves became an aggressive sales
13 force.
14 BY MR. GISLESON:
15     Q. You have no factual basis to say that any
16 chain pharmacy defendant in fact made sales calls on
17 prescribers in Ohio encouraging those prescribers to
18 prescribe more opioid medications, correct?
19     A. I'm not aware of pharmacy defendant employees
20 themselves going to doctors' offices, but in other ways
21 by direct to patient promotion, and frankly, by
22 promoting the false and misleading messages to their
23 own pharmacists, they did propagate this
24 misinformation.
25     Q. Move to strike the second part of the answer

Page 76

1 as nonresponsive.
2     Doctor, if you look at page 27 of your report,
3 you have the heading "For Aggressive Sales Force"?
4     A. Yes, I do.
5     Q. You wrote, "As explained below, the
6 pharmaceutical opioid industry retained an aggressive
7 sales force incentivized to target doctors' offices and
8 pharmacies to increase sales, thereby increasing the
9 number of people exposed to opioids." Is that correct?
10     A. That's what I wrote there, yes.
11     Q. And by the reference to "incentivized to
12 target pharmacies," that includes chain pharmacy
13 defendants, correct?
14     A. Yes.
15     Q. In the next paragraph you wrote, "In 2012, the
16 pharmaceutical industry spent $15 billion on
17 face-to-face sales and promotional activity. These
18 face-to-face promotional activities rely primarily on
19 sales representatives and" --
20     A. I'm sorry, you cut out in the last little bit.
21     Q. After sales --
22     (Reporter clarification.)
23     Q. How about now? Can you hear me? Sometimes
24 when I click on mute and then unmute, that helps.
25     If you look at the second paragraph that you

Page 77

1 wrote under "aggressive sales force," you wrote that
2 "In 2012, the pharmaceutical industry spent $15 billion
3 on face-to-face sales and promotional activity. These
4 face-to-face promotional activities rely primarily on
5 sales representatives," in parentheses you wrote drug
6 reps, "who market their products directly to doctors'
7 offices and pharmacies." Is that right?
8     A. Yes, that's what I wrote there.
9     Q. If you turn, please, to page 37, you made
10 reference to key opinion leaders as being ones who were
11 trying to drive this paradigm shift; is that right?
12     A. Yes.
13     Q. And the key opinion leaders were ones who were
14 hired by the opioid manufacturers in your view,
15 correct?
16     A. The key opinion leaders were also hired by the
17 pharmaceutical defendants.
18     Q. Well, you wrote, "to encourage doctors to
19 prescribe more opioids, opioid manufacturers promoted
20 the careers of physicians who were sympathetic to their
21 cause"; is that right?
22     A. That's what I wrote there, yes, but on page 83
23 of my report I talk about, for example, Walgreens'
24 Brody, a pharmacist, being promoted as a key opinion
25 leader to create pharmacy superstores."

20 (Pages 74 - 77)

Page 126

1    AFTERNOON SESSION
2    11:27 A.M. EDT 12:14 p.m. PDT
3    --o0o--
4    EXAMINATION RESUMED
5  BY MR. GISLESON:
6    Q. Dr. Lembke, have you ever practiced pharmacy?
7    A. If by that you mean am I a pharmacist, no.
8    Q. Did you ever attend pharmacy school?
9    A. No.
10   Q. Do you have a degree in pharmacy?
11   A. No.
12   Q. Have you ever trained as a pharmacy
13 technician?
14   A. No.
15   Q. Have you ever worked in a pharmacy?
16   A. No.
17   Q. Have you ever dispensed opioid medications?
18   A. No.
19   Q. Have you taken any classes with pharmacists?
20   A. Not that I'm aware of.
21   Q. Have you ever trained pharmacists in the
22 dispensing of opioid medications?
23   A. It's possible that in many talks I've given
24 there were pharmacists in the audience.
25   Q. Have you ever trained pharmacists on the

Page 127

1 dispensing of opioid medications?
2    A. Again, I've given many talks on the safety and
3 efficacy of opioids and on the problem of increased
4 supply and exposure as a major risk factor for
5 addiction to opioids, and in those talks, some of which
6 were CME talks and some of which were not, it's very
7 possible that there were pharmacists in the audience.
8    Q. Have you ever given a talk to pharmacists in
9 which you were advising the pharmacists specifically
10 what steps they should follow before dispensing an
11 opioid medication?
12   A. No.
13   Q. Have you ever worked for the Drug Enforcement
14 Administration?
15   A. No.
16   Q. Have you ever worked for a state Board of
17 Pharmacy?
18   A. No.
19   Q. Pharmacists are regulated by a state Board of
20 Pharmacy; is that right?
21   A. Yes.
22   Q. The Board of Medicine does not regulate
23 pharmacists; is that correct?
24   A. That's correct.
25   Q. Before writing the report that we've looked at

Page 128

1 today, have you ever held yourself out as an expert in
2 the practice of pharmacy?
3    A. I am an expert in the practice of detecting
4 misuse, diversion, addiction. I do have expertise in
5 the Controlled Substances Act and scheduled drugs, and
6 I do have expertise in terms of my collaborative
7 responsibility in relationship with pharmacists with
8 whom I have multiple encounters on any given clinic
9 day. I also have expertise in the prescription drug
10 monitoring database which is a tool that pharmacists
11 use.
12   Q. I'll ask again. Have you ever specifically
13 held yourself out as an expert in the practice of
14 pharmacy before you wrote this expert report?
15       MR. ARBITBLIT: Object to form.
16       THE WITNESS: Again, I do think I have
17 expertise in terms of pharmacy practices, vis-a-vis the
18 opioid epidemic, and I have held myself out as such.
19 BY MR. GISLESON:
20   Q. Have you ever given a talk in which you told
21 the attendees that you were an expert in the practice
22 of pharmacies by pharmacists?
23   A. No.
24   Q. Before issuing this report, had you ever
25 evaluated whether a pharmacist complied with the duties

Page 129

1 applicable to a pharmacist in dispensing an opioid
2 medication pursuant to a prescription?
3    A. Yes.
4    Q. When?
5    A. As part of the research for my book, I
6 interviewed multiple stakeholders and representatives
7 within medicine, including pharmacists, and had
8 discussions around their experiences with opioid misuse
9 and diversion.
10   Q. Other than speaking with pharmacists, have you
11 taken any classes on what a pharmacist should do before
12 dispensing an opioid medication?
13   A. Well, pharmacists and doctors have similar
14 responsibilities when it comes to detecting and
15 allowing access to controlled substances, so in that
16 sense, there is an overlapping education.
17   Q. Have you taken any classes that were specific
18 to the steps that a pharmacist must take before
19 dispensing an opioid medication?
20       MR. ARBITBLIT: Object to form.
21       THE WITNESS: My answer to that would be
22 I've actually taught on the subject of what steps
23 pharmacists should take before dispensing an opioid
24 medication. It's part of my -- it's part of my broader
25 expertise in addiction medicine.

33 (Pages 126 - 129)

1 BY MR. GISLESON:

2    Q.  And to whom did you teach that issue?

3    A.  I've given multiple talks within Stanford and
4 outside regarding how to use the prescription drug
5 monitoring database, what constitutes red flags for
6 opioid misuse and diversion.  I have talked outside of
7 Stanford, if I didn't say that already, on the same and
8 I've also published articles on red flags for misuse
9 and diversion of opioids.  Beyond my book, that is.

10    Q.  What training did pharmacists in Ohio receive
11 in pharmacy school concerning their corresponding
12 responsibility?

13    A.  I assume that pharmacists in Ohio received the
14 same training that pharmacists received nationally.

15    Q.  Do you know for a fact what training they
16 received on their corresponding responsibility while in
17 pharmacy school?

18    A.  I don't have specific knowledge about pharmacy
19 schools in Ohio, but I have no evidence to suggest that
20 it's any different from pharmacy training nationally.

21    Q.  And what do you understand pharmacy training
22 is nationally concerning a pharmacist's corresponding
23 responsibility?

24    A.  A pharmacist -- one of the pillars of drug
25 utilization review is to detect for misuse and

1 diversion of controlled substances.  It's a major
2 aspect of a pharmacist's job.  They are taught to look
3 out for red flags, and there is a long list of red
4 flags that pharmacists are trained on.

5    Q.  Do you know what courses pharmacists take in
6 pharmacy school?

7    A.  As I said, pharmacists are trained on
8 detecting misuse and diversion, identifying red flags
9 and doing what is in their corresponding responsibility
10 as outlined by the Controlled Substances Act to prevent
11 misuse and diversion.

12    Q.  Did you do any research on the practice of
13 pharmacy in connection with the report that you've
14 given in this case?

15    A.  Yes.

16    Q.  What was the research?

17    A.  I've reviewed a number of articles on the
18 nature of a pharmacist's job, I've reviewed the
19 regulations and the policies that the defendants put in
20 place regarding the detection of red flags and a
21 pharmacist's role in terms of misuse and diversion.
22 I've researched lay press articles on whether or not
23 pharmacists actually have the time and ability to do
24 their due diligence around detecting and preventing red
25 flags.

1    Q.  Anything else?

2    A.  Can you repeat the question?

3    Q.  What resource did you do on the practice of
4 pharmacy in connection with the report that you've
5 given in this case?

6    A.  Can I review my report for a moment?  I have
7 looked at the medical literature on pharmacists and
8 pharmacy dispensing.  I have looked at DEA decisions on
9 enforcement for pharmacies.  I have looked at documents
10 from the National Association of Chain Drugstores, and
11 again, I have looked at the defendants' policies and
12 procedures over time regarding red flags, PDMP, and
13 dispensing.

14    Q.  Where in your report does it identify the
15 research that you did relating to the practice of
16 pharmacy?

17    A.  On page 103 at romanette 15, I discuss the
18 research on the dangers of opioid and benzodiazapine
19 prescribing and describe that as early as 2002 there
20 were known risks combining opioids and benzodiazepines
21 and that it is the responsibility of pharmacies to be
22 aware of dangers of co-prescribing that are described
23 in the medical literature and incorporate those into
24 their practices.  That literature is described on
25 page 103, 104 of my report onto page 105, again, on

1 page 107.

2    Q.  That's research generally relating to
3 co-prescribing.  I'm asking what research generally you
4 did on the practice of pharmacy by licensed
5 pharmacists.

6    A.  In addition to the many documents I reviewed
7 provided by the defendants in discovery, I also cite a
8 number of different articles in my report at different
9 places regarding pharmacy practice.  For example, on
10 page -- for example, on page 124, I cite an article by
11 Marilyn Bullock called, "The Evolution of the PDMP" in
12 "Pharmacy Times."  And she states, I quote, "mandating
13 that all prescribers and pharmacists enroll in PDMPs
14 and requiring more frequent data reports would create a
15 more unified fight against drug diversion.  Because
16 pharmacists verify countless controlled substances
17 every day, they can greatly affect drug diversion.
18 Reviewing the PDMP prior to dispensing could become a
19 part of the regular workflow regardless of a
20 pharmacist's respected state mandates PDMP query and
21 reporting.  PDMP may not be the sole solution to the
22 opioid crisis or other drug diversion, but they
23 represent progress in combatting the epidemic."
24      Also, again, as stated before in multiple
25 places in my report, I look at articles discussing the

Page 134

1 conditions in which pharmacists work, including
2 specifically an article on page 151 from the University
3 of Cincinnati.  This article describes a study of Rite
4 Aid pharmacy in which they report that Rite Aid
5 pharmacists typically spent far less than 15 minutes on
6 each prescription.  In fact, according to a University
7 of Cincinnati study of Rite Aid's prescription fill
8 rates in 2011, Rite Aid pharmacists spent on average
9 3.22 minutes on any given prescription or 18.66 scripts
10 per hour.  This fill rate is a recipe for prescribing
11 errors, providing inadequate time to investigate red
12 flags or fulfill the corresponding responsibility to
13 dispense controlled substances only for legitimate
14 medical purposes.
15      Q.  Can you identify any other articles you read
16 in connection with your report that relate to the
17 practice of pharmacy?
18      A.  Yes, there are other articles in my report.
19      Q.  How much time did you spend researching
20 articles relating to the practice of pharmacy?
21      A.  I don't have a specific number of hours.
22      Q.  Can you estimate it in any way?
23      A.  Many hours.
24      Q.  And all the research that you described in
25 your report on the practice of pharmacy is research

Page 135

1 that you performed after the plaintiffs' lawyers asked
2 you to express an opinion about the chain pharmacy
3 defendants; is that right?
4      A.  The majority, yes.
5      Q.  Have you published any peer-review articles
6 that address the practice of pharmacy?
7      A.  Well, I have published -- I have published
8 articles on red flags, how to detect them, what
9 constitutes a red flag in terms of opioid prescribing.
10      Q.  Have you published any peer-review articles on
11 any other subject?
12      A.  I've published --
13           MR. ARBITBLIT:  Object to form.
14           THE WITNESS:  -- widely on the opioid
15 epidemic which is pertain to pharmacy practice.
16 BY MR. GISLESON:
17      Q.  Have you published any peer-reviewed articles
18 specific to the practice of licensed pharmacists in
19 dispensing opioid medications?
20      A.  I do believe that much of my writing is
21 relevant to the practice of pharmacy.
22      Q.  I'm not asking about relevance.  Have you
23 published any peer-reviewed articles specific to the
24 practice of licensed pharmacists in dispensing opioid
25 medications?

Page 136

1           MR. ARBITBLIT:  Object to form.
2           THE WITNESS:  My publications are
3 directed broadly to various stakeholders inside of
4 medicine, and that would include pharmacists.
5 BY MR. GISLESON:
6      Q.  Did you review any of the prescriptions in
7 this case to determine whether they contained any red
8 flags?
9      A.  By that, do you mean the specific notes
10 regarding specific prescriptions?
11      Q.  The specific prescription itself.
12      A.  No.  Those are not --
13      Q.  Have you reviewed any prescription data?
14           MR. ARBITBLIT:  Object to form.
15           THE WITNESS:  What do you mean by
16 "prescription data"?
17 BY MR. GISLESON:
18      Q.  Data that is maintained by one of the chain
19 pharmacy defendants that identifies opioid medications
20 that have been dispensed by that pharmacy defendant?
21      A.  Yes.
22      Q.  What data did you review?
23      A.  So if you give me a moment to find it, please.
24 Page 84 of my report contains a table with specific
25 data on Walgreens' income due to the sale of OxyContin

Page 137

1 importantly showing that their annualized income in
2 2010 was roughly the same as their annualized income in
3 2017.
4      Q.  Anything else -- strike that.
5      Any other pharmacy data relating to
6 prescriptions for opioid medications that have been
7 filled?
8      A.  Again, on page 92, there is a table showing
9 the average prescription size and number of OxyContin
10 prescriptions written for Walgreens pharmacies.
11      Q.  Can you tell from that data whether the
12 prescriptions were issued for legitimate medical
13 purpose?
14           MR. ARBITBLIT:  Object to form.
15           THE WITNESS:  Again, I'm reluctant to
16 respond to your use of the term "legitimate medical
17 purpose" because I don't think we're talking about that
18 in the same way.
19 BY MR. GISLESON:
20      Q.  Any other prescription data by one of the
21 chain pharmacy defendants that you've reviewed?
22      A.  Please give me a moment.  And by "data," are
23 you referring to numbers?
24      Q.  Correct.
25      A.  Uh-huh.  On page 101, there was a survey

35 (Pages 134 - 137)

Page 138

1 performed by the National Association of Boards of
2 Pharmacies showing that 83 percent of pharmacies
3 surveyed believed that distractions due to performance
4 metrics or measured wait times contributed to
5 dispensing errors, and that 49 percent felt specific
6 time measurements were a significant contributing
7 factor which could reduce time for drug utilization
8 review and ultimately result in unsafe prescribing.
9     Q. Did you ask plaintiffs' Counsel to give you
10 access to any pharmacy defendant's data to show the
11 specific number of Schedule 2 opioid medication
12 prescriptions that that pharmacy filled?
13         MR. ARBITBLIT: I'll object and instruct
14 not to answer with respect to discussions with Counsel.
15 BY MR. GISLESON:
16     Q. Did you request the opportunity to review any
17 chain pharmacy defendants' prescription data to
18 identify the average duration of any opioid
19 prescription?
20         MR. ARBITBLIT: Same instruction.
21         MR. GISLESON: You instruct her not to
22 answer?
23         MR. ARBITBLIT: Yes.
24 BY MR. GISLESON:
25     Q. Have you written any articles that

Page 139

1 specifically analyze a pharmacist's corresponding
2 responsibility when dispensing an opioid medication?
3     A. No.
4     Q. Have you written any articles that
5 specifically addresses the operation of a pharmacy as
6 applied to prescription opioid medications?
7     A. I do address pharmacies in my book "Drug
8 Dealer M.D.," although briefly.
9     Q. And what you say in your book on pharmacies
10 there was that Internet pharmacies dispensed a very
11 high percentage of controlled substances, correct?
12     A. Well, relative to their total prescribing,
13 yes, but in terms of absolute numbers of prescriptions,
14 those numbers are far higher for the brick-and-mortar
15 pharmacies.
16     Q. And in terms of the percentage of controlled
17 versus non-controlled substances, the brick-and-mortar
18 pharmacies prescribe a much lower percentage of
19 controlled related to non-controlled substances,
20 correct?
21     A. I believe that is true.
22     Q. Have you written any articles about the
23 pharmacy supply chain management?
24     A. I have published on that.
25     Q. What have you published?

Page 140

1     A. I believe in my book I do address -- well, I
2 do address in my book the importance of access as a
3 risk factor and the widespread availability across the
4 country to opioids as a major risk factor for opioid
5 addiction and overdose deaths. And I also have
6 published in the --
7         (Reporter clarification.)
8     A. -- Journal of the American Medical Association
9 an analysis of a Medicare 2013 database to look at
10 opioid prescribing. I have two publications in JAMA on
11 that topic using the Medicare database with the
12 explicit emphasis in those articles of Medicare being a
13 nationally representative sample demonstrating that
14 these effects are widespread through every corner of
15 the United States.
16     Q. Have you written any articles that address the
17 process by which opioid medications specifically go
18 from a manufacturer to a dispensing pharmacy?
19     A. I have not written on the nuts and bolts of
20 that process, no.
21     Q. How many articles, approximately, have you
22 published on the opioid crisis?
23     A. It would depend on whether we're talking about
24 peer-reviewed articles or lay press articles.
25     Q. Both.

Page 141

1     A. I could get my CV out and count if you'd like.
2     Q. Greater than how many?
3     A. Why don't I get my CV out and count.
4     Q. Let me ask you this: So whatever articles
5 you've written, are in your CV, right?
6     A. Yes. Actually, so for example, you proffered
7 today a document that you stated that I wrote but I
8 think that may, in fact, be the result of an oral
9 interview which was then transcribed into written form.
10 I'm not sure because I don't explicitly remember that
11 document or that interview.
12     Q. In how many published articles, whether
13 peer-reviewed or not prior to writing your expert
14 report in this case have you attributed the opioid, in
15 your words, epidemic to the chain pharmacy defendants?
16     A. So prior to me being retained in this case, I
17 had written and taught and spoken publicly on the
18 involvement of the opioid pharmaceutical industry
19 without necessarily specifically calling out the
20 pharmacies.
21     Q. Can you identify even a single article that
22 you've written in which you call out the pharmacies as
23 being the cause or one of the causes of the opioid
24 epidemic?
25     A. Except for that brief mention in my book that

36 (Pages 138 - 141)

1   Q.  And how can we test whether time pressures in
2  fact caused one of the pharmacists for a chain pharmacy
3  to dispense an opioid medication that did not have a
4  legitimate medical purpose?
5        MR. ARBITBLIT:  Object to form.
6        THE WITNESS:  Could you rephrase the
7  question?  I'm not really sure I understood.
8  BY MR. GISLESON:
9   Q.  You claim that time pressures caused
10  pharmacists in Lake and Trumbull County to dispense
11  opioid medications that should not have been dispensed,
12  right?
13   A.  That's not the only factor, but yes, that's
14  one the factors.
15   Q.  How do we determine the extent to which that
16  occurred?
17        MR. ARBITBLIT:  Object to form.
18  BY MR. GISLESON:
19   Q.  Stated differently, what did you do to
20  determine whether time pressures, in fact, caused any
21  of the pharmacists for the chain defendants to dispense
22  an opioid medication that should not have been
23  dispensed?
24   A.  Again, I think that the trends that are
25  documented to be occurring nationally at defendants'

1  pharmacies would also have been occurring at the
2  pharmacies in Lake and Trumbull County.  I'd just refer
3  you to page 102 of my report where I cite a number of
4  different articles saying "pharmacy staffing levels can
5  threaten patients' lives" in the journal drug topics.
6  Also, pharmacists' workload contributes to errors in
7  the "Science Daily."  Those are footnotes 508 and 509.
8   Q.  What did you do, though, to determine whether
9  those findings, in fact, apply to the chain defendants'
10  pharmacies in Lake and Trumbull Counties?
11   A.  Again --
12        MR. ARBITBLIT:  Object to form.  Asked
13  and answered.
14        THE WITNESS:  I don't have any evidence
15  to suggest that what was being practiced nationally
16  according to pharmacy defendants' chain drugstore
17  policies would not be equally applied to pharmacies in
18  Lake or Trumbull County.
19  BY MR. GISLESON:
20   Q.  Do you have any affirmative evidence for any
21  prescriptions in Lake and Trumbull County that time
22  pressures, in fact, caused prescriptions for opioid
23  medications to be issued without a legitimate medical
24  purpose?
25        MR. ARBITBLIT:  Object to form.  Asked

1  and answered multiple times.
2        MR. GISLESON:  She's not answering it.
3        MR. ARBITBLIT:  That's your opinion.
4  BY MR. GISLESON:
5   Q.  Please answer the question.
6   A.  And I feel like I answered the question.
7   Q.  Are you able to quantify in any way the number
8  of pharmacists for chain pharmacy defendants who, in
9  your view, experienced time pressure that caused them
10  to fill an opioid medication prescription without a
11  legitimate medical purpose?
12   A.  Well, on page 102, the investigation of
13  prescribing practices conducted by the "Chicago
14  Tribune" in 2016 found that 49 percent of chain
15  pharmacies committed fundamental errors in dispensing
16  prescription of two medications --
17        (Reporter clarification.)
18   A.  -- that were contraindicated for concurrent
19  use due to risks of severe and potentially fatal
20  adverse effects without warning customers of the
21  danger.  The investigators tested 255 pharmacies and
22  found CVS, the nation's largest pharmacy retailer by
23  store count, had the highest fill rate of any chain in
24  the "Tribune" tests.
25   Q.  Did any of that data apply to Lake or Trumbull

1  Counties?
2        MR. ARBITBLIT:  You're interrupting.
3  It's habitual now.  Stop interrupting her.
4        Finish your sentence, please, Doctor.
5        THE WITNESS:  Dispensing the medications
6  with no warning 63 percent of the time.  Walgreens, one
7  of CVS's main competitors had the lowest failure rate
8  at 30 percent but that's still missing nearly one in
9  three interactions.  And also, Walmart pharmacies
10  committed similar errors at a rate of 43 percent.
11  BY MR. GISLESON:
12   Q.  What does a pharmacist do when performing a
13  drug utilization review?
14        MR. ARBITBLIT:  Objection.  Vague.
15  Overbroad.
16        You can answer if you have an answer.
17        THE WITNESS:  I feel like I answered
18  that before.  Was there an aspect of my prior answer
19  that left something wanting?
20  BY MR. GISLESON:
21   Q.  Before this lawsuit, had you ever evaluated
22  prescriptions that had been dispensed for opioid
23  medications by a pharmacy to determine whether the
24  pharmacist dispensed prescriptions without a legitimate
25  medical purpose?

40 (Pages 154 - 157)

Page 158

1    A. Not in any systematic way, no.
2    Q. Can you identify any pharmacist working for
3  one of the chain pharmacy defendants that dispensed
4  opioid medications without a prescription?
5        MR. ARBITBLIT: Objection. Form.
6        THE WITNESS: There are multiple DEA
7  enforcement actions cited in my report, and those
8  enforcement actions do identify individual prescribers
9  by name as well as pharmacists who dispensed --
10 BY MR. GISLESON:
11   Q. Can you identify any?  Sorry.
12   A. Dispense.
13   Q. Go ahead.
14   A. Yeah, who dispensed opioids not in the context
15 of a legitimate medical condition.
16   Q. Can you identify any pharmacists working in
17 Lake or Trumbull Counties that dispensed opioid
18 medications without a prescription?
19       MR. ARBITBLIT: Objection.
20       THE WITNESS: Again, I think that what
21 was happening nationally was also happening in Lake and
22 Trumbull County.  I don't have any data to the
23 contrary, but I can't identify a specific pharmacist by
24 name in Lake or Trumbull County.
25

Page 159

1  BY MR. GISLESON:
2    Q. Did you speak with any pharmacists in Ohio?
3    A. No.
4    Q. Have you been to either Lake County or
5  Trumbull County?
6    A. I don't -- I may have.  I may have briefly.
7    Q. Do you know how many pharmacy stores Rite Aid
8  has in Lake County?
9    A. I do not.
10   Q. Do you know how many pharmacists Rite Aid has
11 in Lake County?
12   A. No.
13   Q. Do you know how many pharmacy stores Rite Aid
14 has in Trumbull County?
15   A. No.
16   Q. Do you know how many pharmacists Rite Aid has
17 in Trumbull County?
18   A. No.
19   Q. Do you know how many stores or pharmacists any
20 of the chain pharmacy defendants have in either in Lake
21 or Trumbull County?
22   A. No.
23       MR. GISLESON: Mr. Ladd, can you please
24 get Tab 3?  And Dr. Lembke, if you can go to Tab 3,
25 please.

Page 160

1        (Exhibit 3 marked for identification.)
2        MR. LADD: Tab 3 has been marked as
3  Lembke Exhibit 3.
4  BY MR. GISLESON:
5    Q. I'd like to show you what has been marked as
6  Lembke Exhibit 3.  Have you read Section 1306.04,
7  Purpose of Issue of Prescription?
8    A. Yes, I have.
9    Q. Do you understand this is part of the
10 Controlled Substances Act?
11   A. Yes, I do.
12   Q. This says, "A prescription for a controlled
13 substance to be effective, must be issued for
14 legitimate medical purpose by an individual
15 practitioner acting in the usual course of his
16 professional practice."
17       What do you understand the phrase "legitimate
18 medical purpose" to be in that paragraph?
19   A. An evidence-based purpose.
20   Q. What do you mean by "evidence-based purpose"?
21   A. There is evidence in the literature showing
22 the potential benefits in the use of that medication
23 for that condition outweigh the potential harms.
24   Q. Does the same standard for legitimate medical
25 purpose apply to the prescriber as it does to the

Page 161

1  pharmacist dispensing the opioid medication?
2        MR. ARBITBLIT: I'm going to object, and
3  interpose it calls for legal conclusion.  Belated
4  objection to the prior question on the same grounds.
5  BY MR. GISLESON:
6    Q. Do you have an understanding as to whether the
7  reference to legitimate medical purpose has the same
8  meaning for a prescriber as it does under the statute
9  for a pharmacist?
10       MR. ARBITBLIT: Same objection.
11       THE WITNESS: I don't have an opinion on
12 that.
13 BY MR. GISLESON:
14   Q. Do you know how to determine whether a
15 prescription for an opioid medication has a legitimate
16 medical purpose?
17       MR. ARBITBLIT: Objection. Vague. May
18 or may not call for a legal conclusion depending on
19 whether you're referring to the regulation.
20 BY MR. GISLESON:
21   Q. Do you have the technical ability, based on
22 your training, education, and experience, to evaluate
23 whether a prescription for an opioid medication has a
24 legitimate medical purpose?
25       MR. ARBITBLIT: Same objection.

41 (Pages 158 - 161)

Page 170

1    A.  So a pharmacist trying to exercise his or her
2  good clinical judgment on whether or not to dispense,
3  cannot do so unless they have availed themselves of all
4  of the data at their disposal.
5       Now, a pharmacist is not going to have access
6  to every piece of data in the known universe, but what
7  they have access to, they need to check in order to
8  make an informed clinical decision.
9       MR. ARBITBLIT:  Counsel, we've been
10 going for 75 minutes.  That seems to be a reasonable
11 time for a ten-minute break, if you're at a break
12 point.
13      MR. GISLESON:  Yeah, that's fine.
14      THE VIDEOGRAPHER:  We are going off the
15 record at 1:29.
16      (Recess taken 1:29 p.m. to 1:42 p.m.)
17      THE VIDEOGRAPHER:  We are back on the
18 record.  The time is 1:42.  Please proceed.
19 BY MR. GISLESON:
20   Q.  How many years of school does a pharmacist
21 have to complete in order to become a licensed
22 pharmacist?
23   A.  I don't know.
24   Q.  What are the requirements for a pharmacist --
25 strike that.

Page 171

1       What are the requirements for a pharmacist to
2  achieve a Doctorate of Pharmacy?
3    A.  I assume it's additional training.
4    Q.  Specifically, what must a pharmacist do to
5  achieve a doctorate in pharmacy?
6    A.  I don't know.
7    Q.  Do pharmacists take any internships while
8  they're in pharmacy school?
9    A.  Probably.
10   Q.  What?
11   A.  I don't know the specific names.
12   Q.  Do pharmacists receive any training in
13 pharmacy school relevant to satisfying their
14 corresponding responsibility?
15   A.  Yes, I would assume so.
16   Q.  Do you know for a fact whether pharmacists
17 receive any training in pharmacy school on what they
18 must do to satisfy their corresponding responsibility
19 when it comes to dispensing opioid medications?
20   A.  No.
21   Q.  What information is on the licensing exam for
22 pharmacists?
23      MR. ARBITBLIT:  Object to form.
24      THE WITNESS:  I have never looked at a
25 licensing exam so I can't tell you at that specific

Page 172

1  level of detail.
2  BY MR. GISLESON:
3    Q.  What continuing medical education requirements
4  do pharmacists have in Ohio?
5    A.  I don't know what their exact requirement
6  numbers, but like all healthcare providers they have
7  additional continuing education requirements.
8    Q.  Did you do any investigation into what those
9  continuing medical education requirements are in Ohio?
10   A.  No.
11   Q.  What's the difference between a pharmacist and
12 a pharmacy technician?
13   A.  Level of training.
14   Q.  What is a pharmacy technician permitted to do?
15   A.  I don't know exactly the difference in
16 responsibilities.
17   Q.  Can you identify any pharmacists for any of
18 the chain pharmacy defendants who knowingly dispensed
19 an opioid medication without a legitimate medical
20 purpose?
21   A.  Not by name, but my opinion is based on the
22 aggregate.
23   Q.  Go to page 76 in your report, please.  In
24 paragraph 6 you write, "Pharmacies leveraged their
25 unique and pivotal position in the opioid supply chain

Page 173

1  to contribute to the unprecedented and unchecked flow
2  of opioid pain pills into the community."
3       What do you mean by "unchecked flow of opioid
4  pain pills into the community"?
5    A.  By that I mean where pharmacy defendants had
6  an opportunity to assess for misuse and diversion and
7  opioids not dispensed for a legitimate medical
8  condition for a legitimate physician-patient
9  relationship, they did not take those opportunities to
10 the extent that they should have as early as they
11 should have, with as much due diligence as they should
12 have.  And instead, they did the opposite and
13 incentivized the outflow of prescriptions, or as one of
14 the pharmacy defendants, a manager stated their stores
15 became a literal, quote, unquote, "funnel for opioid
16 prescriptions getting out into the community."
17   Q.  Is it your testimony that none of the
18 pharmacists for the chain pharmacy defendants assessed
19 opioid prescriptions for misuse and diversion?
20      MR. ARBITBLIT:  Objection.  Misstates.
21      THE WITNESS:  That's not what I said.
22 BY MR. GISLESON:
23   Q.  Do you agree that the pharmacists for the
24 chain pharmacy defendants assessed whether misuse and
25 diversion would occur with respect to particular opioid

44 (Pages 170 - 173)

Page 174

1 medication prescriptions?
2          MR. ARBITBLIT:  Object to form.
3          THE WITNESS:  The evidence in aggregate
4 shows that pharmacists were disempowered and unable to
5 exercise their clinical judgment because they neither
6 had the time nor access to the necessary information to
7 determine misuse and diversion when dispensing opioids.
8 And furthermore, they were highly incentivized through
9 bonuses, et cetera, to dispense more opioids.  So where
10 pharmacy defendants could have and should have put on
11 the brakes, instead they pressed down on the
12 accelerator.
13 BY MR. GISLESON:
14     Q.  What work did you perform to determine whether
15 pharmacists for the chain pharmacy defendants assessed
16 whether misuse and diversion would occur with respect
17 to particular opioid medication prescriptions in Lake
18 and Trumbull County?
19     A.  Well, I reviewed DEA evidence.  I reviewed
20 internal documents from defendants themselves.  I
21 reviewed the CSA.  I reviewed the messages that went to
22 pharmacists and directly to patient consumers and
23 through that steppingstone to prescribers themselves.
24 I reviewed the collaborations that pharmacy defendants
25 had with distributors and manufacturers, which the

Page 175

1 documents themselves describe as, quote, unquote,
2 "mutually beneficial arrangements."
3          All of those evidence in aggregate speak to a
4 national and systemic policy among defendants'
5 pharmacies for not doing their part to combat the
6 opioid epidemic and contributing to the opioid epidemic
7 including Lake and Trumbull Counties because I have not
8 seen any evidence to suggest that by some miracle Lake
9 and Trumbull Counties are different from the rest of
10 the United States.
11     Q.  What tests did you perform to determine
12 whether any pharmacists for any of the chain pharmacy
13 defendants were financially incentivized to fill opioid
14 medication prescriptions without a legitimate medical
15 purpose?
16     A.  The financial incentive programs across
17 defendants' pharmacies were national types of policies.
18     Q.  Anything specific to the pharmacists in Lake
19 and Trumbull Counties?
20     A.  I don't have any reason to believe Lake and
21 Trumbull Counties are an exception.
22     Q.  Did you perform any tests of any kind or
23 analyses to determine whether the pharmacists in Lake
24 and Trumbull County for the chain pharmacy defendants,
25 in fact, filled opioid prescriptions without a

Page 176

1 legitimate medical purpose because of incentive
2 programs that were made available?
3          MR. ARBITBLIT:  Objection.  Vague.
4          THE WITNESS:  My report is my analysis.
5 The aggregate of all of the information in my report
6 taken together, lead me to the opinion that pharmacists
7 in Lake and Trumbull County were operating in the same
8 conditions as pharmacists in defendants' pharmacies all
9 over the United States.
10 BY MR. GISLESON:
11     Q.  So in terms of your assessment of the chain
12 defendants' pharmacists and pharmacies in Lake and
13 Trumbull County, you are relying on evidence from
14 outside of Lake and Trumbull County to draw your
15 conclusions?
16          MR. ARBITBLIT:  Objection.  Misstates
17 the record.
18          THE WITNESS:  I'm relying on all kinds
19 of different evidence, and I would just add that
20 evidence demonstrating defendant pharmacies dispensing
21 opioids in a way that put the public at-risk also puts
22 Lake and Trumbull County at-risk because we know that
23 these pills migrate from Florida all the way up the
24 Blue Highway to Ohio.
25          In my report, there is a DEA enforcement

Page 177

1 showing that one of the prescribers who the DEA found
2 negligent had patients who were filling prescriptions
3 in Ohio, even though he himself resided in Florida, so
4 these pills travel.
5 BY MR. GISLESON:
6     Q.  When you say that there was an unchecked flow
7 of opioid pain pills into Lake and Trumbull Counties,
8 is it your testimony that the pharmacists for the chain
9 defendants did not evaluate the individual
10 prescriptions to determine whether they had a
11 legitimate medical purpose?
12          MR. ARBITBLIT:  Object to form.
13 Misstates the record.
14          THE WITNESS:  Again, my opinion and my
15 testimony and what's in my report all speaks to the
16 pharmacy defendants not having done enough early enough
17 to really prevent the opioid epidemic.  Although it was
18 within their will and their power to do so, they chose
19 to nibble at the edges, getting away with bear minimum
20 instead of what they really could have done to prevent
21 misuse and diversion.
22 BY MR. GISLESON:
23     Q.  You said that doctors were duped.  Do you
24 believe pharmacists could have been duped as well about
25 the safety and efficacy of opioids?

45 (Pages 174 - 177)

Page 186

1 BY MR. GISLESON
2     Q.  Do you agree that it's wrong for an expert to
3 be totally biased in a lawsuit?
4     A.  That's just rude.
5     Q.  Do you agree that it's wrong for an expert to
6 be totally biased in a lawsuit?
7           MR. ARBITBLIT:  Object to form.
8           THE WITNESS:  If you're implying that
9 I'm totally biased, I'm not.
10 BY MR. GISLESON:
11     Q.  Do you agree that it's wrong for an expert to
12 be totally biased in litigation?
13     A.  I don't have an answer to that question.  You
14 know, you're obviously trying to imply something about
15 me.  I don't think that that question really warrants
16 an answer.
17     Q.  You said that "opioid manufacturers and
18 distributors worked together with pharmacies to market
19 specific opioids at the pharmacy counter."
20       What marketing occurred at the pharmacy
21 counter in Lake and Trumbull Counties?
22     A.  Pharmacists in the defendants' chains were the
23 recipients of promotional messages that were very
24 pro-opioid.  I do talk in my report about the direct
25 ADHERE program in which Butrans and Kadian were

Page 187

1 promoted at the pharmacy counter.  Specifically Walmart
2 and Giant Eagle partnered with McKesson around that.
3     Q.  Did you identify any marketing that occurred
4 at the pharmacy counter in Lake or Trumbull County by
5 any of the pharmacy defendants?
6     A.  Part of the marketing that occurred was the
7 promotion of coupons for discounted opioids and the
8 exchange of those coupons with embedded promotional
9 material occurred at the pharmacy counter.
10     Q.  Whose coupons?
11     A.  Janssen, Nucynta, and Duragesic.
12     Q.  So these were manufacture coupons, not a chain
13 pharmacy defendant's coupon?
14     A.  That's correct.  Although the distributors and
15 the pharmacies collaborated around those coupons.
16 There was also advertising for specific opioid products
17 in the pharmacies.
18     Q.  What do you mean?
19     A.  On page 71 of my report, a 2012 document
20 titled "McKesson Manufacturing Marketing," talks about
21 how, quote, "McKesson partners with pharmaceutical
22 manufacturers such as Cephalon to define and actually
23 customize strategies targeting key awareness, sales,
24 and distribution goals at all stages of the product
25 cycle."

Page 188

1     Q.  So are you faulting, then, the chain pharmacy
2 defendants for accepting from their customers a
3 manufacturer's coupon that made opioid medication more
4 affordable?
5           MR. ARBITBLIT:  Object to form.
6           THE WITNESS:  No.  That is not what I
7 said.
8 BY MR. GISLESON:
9     Q.  Can you identify any chain pharmacy pharmacist
10 in Lake or Trumbull County who dispensed an opioid
11 medication without a legitimate medical purpose because
12 the customer presented a coupon?
13     A.  I do believe that somewhere in my report is
14 evidence for these coupons being used in Ohio, probably
15 including Lake and Trumbull County.  On page 75 of my
16 report, in 2013, McKesson promoted its pharmacy
17 intervention program by letting Purdue know about their
18 pharmacy brand kit.
19       (Reporter clarification.)
20     A.  "The brand-specific pharmacy kit is mailed to
21 each participating pharmacy prior to launch.  This kit
22 includes a cover letter and coaching guide.  Purdue
23 will have the opportunity to participate in the
24 development and review of all pharmacy materials
25 specific to their program.  The brand kit can also

Page 189

1 include any additional resources that pharmacists
2 should read as well as patient brochures to hand out
3 during the coaching session.  Purdue would develop and
4 provide," unquote.
5       It goes on to page 76 and also prior to page
6 74, about how page 71 --
7     Q.  Move to strike as nonresponsive.
8     A.  Also on page 78, CVS CareMark courted opioid
9 manufacturers by promising, quote, "identifying
10 patients who may benefit from your product," unquote,
11 and increasing, quote, "awareness of new treatments of
12 therapies," unquote, including a pharmacy literature
13 display to, quote, "educate patients via literature
14 located adjacent to prescription counter."
15     Q.  Move to strike --
16     A.  The same --
17     Q.  -- nonresponsive.
18     A.  -- for 2011 document states, quote,
19 "Communicate your products --
20     Q.  Thank you.  You've responded, Doctor.
21     A.  Thank you.
22     Q.  You're now just wasting time.
23       Are you able to design a study that could
24 determine the extent to which individuals in Lake and
25 Trumbull County developed an opioid use disorder as a

48 (Pages 186 - 189)

Page 190

1 result of taking an opioid medication under a doctor's
2 care?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  So again, I cite
5 literature in my report that has conducted such studies
6 looking at the risk of becoming addicted to opioids in
7 patients with chronic pain who have become addicted
8 specifically to the opioids their doctors are
9 prescribing, and I detail that study in my report.
10 BY MR. GISLESON:
11     Q.  Are there any studies specific to Lake and
12 Trumbull Counties as to individuals who developed
13 opioid use disorder as a result of taking prescription
14 opioids pursuant to a doctor's prescription?
15          MR. ARBITBLIT:  Object to form.
16          THE WITNESS:  Again, there is no reason
17 to believe that Lake and Trumbull County will be
18 outliers in this case.
19 BY MR. GISLESON:
20     Q.  Does the report in this case contain all of
21 your opinions?
22     A.  Based on the materials reviewed to date, yes.
23     Q.  And does it identify all of the materials on
24 which you relied in forming your opinions?
25     A.  Yes.

Page 191

1     Q.  Is all of the wording in the report yours?
2     A.  Yes.
3     Q.  Did you copy any of the material in your
4 report from another source?
5     A.  Not as far as I know, no.  I mean, this is --
6 I have issued prior reports, and so there is --
7     Q.  Which report which report did you update with
8 this one?
9     A.  I'm sorry.  I don't understand your question.
10     Q.  Did you update a prior report in creating this
11 report?
12     A.  My process of research has been ongoing over
13 many years, and as I review more material, I assess it
14 and I revise the report as I go along based on the
15 information, the new information that I gather.
16 Nothing that I have reviewed has changed my fundamental
17 opinion.
18     Q.  Did you start with a prior report that you
19 supplemented to include allegations against the
20 pharmacy defendants?
21     A.  Yes.
22     Q.  Which report?
23     A.  The MDL report.
24     Q.  For which track?
25     A.  The original MDL report and then a subsequent

Page 192

1 West Virginia report.
2          MR. GISLESON:  Don, I have more
3 questions but to make sure that the other folks have a
4 chance to ask their pharmacy-specific questions, I'm
5 going to pass the witness for now.  Is that all right?
6          MR. ARBITBLIT:  Well, it's okay with me.
7 I'm not saying that there is going to be time left when
8 they're done.
9          MR. GISLESON:  I realize that.  So
10 Kasper?
11          MR. STOFFELMAYR:  I can ask a few
12 questions.  Doctor, are you okay to keep going or do
13 you need a break?
14          THE WITNESS:  I'm okay.
15          MR. STOFFELMAYR:  Okay, thank you.
16          EXAMINATION
17 BY MR. STOFFELMAYR:
18     Q.  Doctor, my name is Kasper Stoffelmayr, and I
19 represent the Walgreens chain.  I want to start with a
20 couple of questions, not about pharmacies but about
21 heroin addiction.  That's also one of your areas of
22 expertise, correct?
23     A.  Yes.
24     Q.  As I understand it, and please correct me if
25 I'm misusing the terminology, there is a group, maybe a

Page 193

1 small group of heroin addicts who are sometimes called
2 high-functioning addicts who can remain -- you know,
3 have heroin use careers that can last many years or
4 decades, correct?
5     A.  Yes.
6     Q.  And am I right that that is relatively unusual
7 for somebody to be able to continue using heroin for
8 decades without having something catastrophic happen?
9     A.  I really couldn't answer that.  There is not a
10 lot of data or much written on that group.  It's known
11 to exist, but there is not a lot of information.
12     Q.  Let me ask it this way:  Among the people you
13 treat or have encountered in your professional career,
14 am I right that most heroin users will use heroin for a
15 period of years and then will either successfully be
16 able to stop using heroin to recover or unfortunately
17 pass away, that it's unusual for someone to have used
18 heroin for a decade by the time you see them?
19     A.  I wouldn't say that's true.  In my clinical
20 experience, I have had patients who have used heroin
21 for a very long time.  The biggest problem with that
22 population is not about the molecule itself because
23 really it's fundamentally the same as a prescription
24 opioid.  The difference is how they can obtain it.  And
25 because heroin is illegal, they have to engage in

49 (Pages 190 - 193)

Page 222

1 not receiving opioids for a legitimate medical purpose.
2    Q. Now, you just described that as a "large
3 percentage." Are you able to put a specific number to
4 it?
5    A. Again, I would say that the quadrupling
6 between -- times four from the late 1990s to the peak,
7 which is around 2011, 2012, would be the increased
8 number that is not explained by legitimate medical
9 condition.
10    Q. All right. I want to jump through to the
11 bottom of the chart on page 3 and look at the same
12 Column 43.1 for 2019.
13       Do you see that?
14    A. Yes.
15    Q. Is that 43.1 prescribing rate, does that
16 represent evidence-based, legitimate medical
17 prescriptions for opioids in Lake County?
18       MR. ARBITBLIT: Object to form.
19       THE WITNESS: So this table starts at
20 2006. It doesn't include information from the late
21 1990s up through 2006. And in general, what national
22 trends show is that although prescribing -- opioid
23 prescribing has decreased since its peak around 2012,
24 it's still higher than the late 1990s levels, implying
25 that a significant percentage of that 43.1 is, let's

Page 223

1 say, legacy prescribing in addition to not prescribing
2 for a legitimate medical condition. And I'm happy to
3 explain that further if it would be helpful.
4 BY MR. CARTER:
5    Q. Compassionate prescribing to titrate users
6 with dependence, that would be considered a legitimate
7 prescribing practice from your perspective, correct?
8    A. Well, I wouldn't use the word "titrate," I
9 would use the word taper. But yes, compassionate
10 tapering would be a legitimate use.
11    Q. Now, I pulled out, for exemplar purposes, the
12 2006 data for Lake County, and the 2019 data for Lake
13 County, if I asked you the same questions for Trumbull
14 County would you provide the same answers in terms of
15 reference to the testimony and the data?
16    A. Yes.
17    Q. And would you provide the same answer if I
18 picked out any of those years in this chart on page 3
19 of Appendix 3?
20       MR. ARBITBLIT: Objection to form.
21 Vague.
22       THE WITNESS: Yes.
23 BY MR. CARTER:
24    Q. All right. So putting the chart aside, in
25 your expert opinion, what is the appropriate level of

Page 224

1 evidence-based opioid prescribing that would be
2 legitimate for Lake County for any year?
3       MR. ARBITBLIT: Object to form. Asked
4 and answered.
5       THE WITNESS: Yes, I do feel I answered
6 that. Is there something different or more that you
7 would like from me?
8 BY MR. CARTER:
9    Q. I'm asking if you could put a prescribing rate
10 per hundred or a percentage or a volume, a quantitative
11 response to what you believe is an appropriate
12 evidence-based, legitimate level of prescribing for
13 Lake County.
14    A. I think legitimate, evidence-based prescribing
15 has to include both quantitative and qualitative
16 assessments. Quantitatively, as I've said before, per
17 person I believe that we need to reduce prescribing
18 back to the pre-1996 levels, and then qualitatively,
19 it's important that opioid prescribing be
20 evidence-based.
21    Q. Would you provide the same answer for Trumbull
22 County?
23    A. Yes.
24    Q. And is that your best answer for both
25 counties?

Page 225

1    A. Yes.
2    Q. Thank you.
3       I want to ask you about pharmacies in Lake
4 County that are not operated by one of the defendant
5 chains in this case, so non-defendant pharmacies. Have
6 you conducted any systematic analysis of the policies,
7 practices related to dispensing of any non-defendant
8 pharmacy in Lake County?
9    A. Again, my assessment is an aggregate looking
10 at national chain policies. I have no reason to
11 believe that pharmacies in Lake and Trumbull County are
12 exempt from that, including pharmacies that are not
13 named in this case.
14    Q. So can you identify for me any pharmacy that
15 is not a defendant in this case for which you have
16 analyzed, on a national level, their policies,
17 procedures, training related to dispensing of opioid
18 medications?
19    A. I have focused on the pharmacies that are
20 named as defendants in this case.
21    Q. You say you've focused on them. Have you
22 conducted a systematic analysis on a national basis of
23 any pharmacy that is not Giant Eagle, Rite Aid,
24 Walmart, Walgreens, or CVS?
25    A. No.

57 (Pages 222 - 225)

Page 250

1    Q. So pharmacist's exercise of professional
2  judgment and skill is not limited to what is written in
3  an official corporate policy, fair?
4         MR. ARBITBLIT: Object to form.
5         THE WITNESS: I think their ability to
6  exercise their professional judgment is going to be
7  very strongly influenced by what is in the POM and what
8  they're incentivized to do.
9  BY MR. CARTER:
10    Q. My question was, is there exercise of
11  professional judgment and skill limited to what is
12  written in an official corporate policy?
13         MR. ARBITBLIT: Objection.  Asked and
14  answered.
15         THE WITNESS: I think I answered that.
16  BY MR. CARTER:
17    Q. Is it your testimony to the jury that if it's
18  not in a corporate policy, a Walmart pharmacist or a
19  Walgreens pharmacist or any other chain defendant
20  pharmacist doesn't know what to do?
21         MR. ARBITBLIT: Objection.  Misstates
22  the testimony.
23         THE WITNESS: My testimony --
24  BY MR. CARTER:
25    Q. I want to be clear; I'm asking a separate

Page 251

1  question.  Is it your testimony to the jury that if
2  it's not in a corporate policy, the chain defendant
3  pharmacists don't know what to do?
4         MR. ARBITBLIT: Object to form.
5         THE WITNESS: Again, I would say that
6  the corporate chain policy has a huge impact on what
7  pharmacies -- pharmacists will do.  And there may be
8  other sources of knowledge, but they will be less
9  influential than the pharmacy chain policy, the
10  management, and the various incentive plans that are in
11  place.
12  BY MR. CARTER:
13    Q. Last question, on page 118 of your report, you
14  quote, in romanette 27, an email that is quoted in a
15  ProPublica story, and it's the last two words of
16  romanette 27, a reference to driving sales.  Do you see
17  that?
18    A. Yes.
19    Q. Do you know that the individual who offered
20  that email was deposed in this litigation?
21    A. No.  I didn't know that.
22    Q. If the author of that email was testifying
23  under oath about that email, would that be relevant
24  information that you would want to consider in forming
25  your opinion?

Page 252

1    A. I would certainly be happy to read the
2  deposition or the testimony of that individual.  It
3  doesn't negate what is here, what was written and what
4  was quoted.
5    Q. And you haven't conducted that review to this
6  point, correct?
7    A. That's correct.
8         MR. CARTER: All right, I yield to Kyle.
9         EXAMINATION
10  BY MR. CRAWFORD:
11    Q. Dr. Lembke, my name is Kyle Crawford, and I'm
12  Counsel for the CVS defendants.
13         On page 6 of your report you write,
14  "Throughout my career I have interacted with pharmacies
15  and pharmacists thousands of times."
16         Is that true today?
17    A. What do you mean?  Is what true today?
18    Q. Is it true that you've interacted with
19  thousands of pharmacies and pharmacists throughout your
20  career?
21    A. Yes, I think that's true.  I've interacted
22  with -- I have a long career.  I've interacted with
23  many pharmacists and pharmacies.
24    Q. And did you interact with thousands of
25  pharmacies and pharmacists before 2019?

Page 253

1    A. Yes.  That's the cumulative interactions over
2  a 25-plus-ear career.
3    Q. Would a prescription opioid epidemic have
4  existed if Purdue did not market opioids?
5    A. That's hard to say.  Certainly Purdue was a
6  major player in creating the paradigm shift which led
7  to increased prescribing, which led to the opioid
8  epidemic.  Whether or not other defendants -- I believe
9  even in the absence of Purdue's role, it's possible and
10  likely that the other defendants would have taken a
11  similar role, but it's hard to say.
12    Q. Would a prescription opioid epidemic have
13  existed had manufacturers did not market opioids?
14    A. I do think the marketing of opioids by opioid
15  manufacturers was a major factor in the creation of the
16  opioid epidemic.  It's hard for me to say one way or
17  the other if the distributors' culpability and the
18  pharmacies' culpability independent of that would have
19  created the opioid epidemic.  I think everybody in the
20  supply chain contributed to the opioid epidemic.
21    Q. Can you name any other company that
22  contributed more to the opioid epidemic than Purdue?
23    A. In terms of opioid manufacturers, certainly
24  Purdue was the major player, but I also think that the
25  distributors and the pharmacies played a huge role.

64 (Pages 250 - 253)

1    A. Well, again, I -- I haven't seen anything to
2  refute that CVS engaged in these collaborations with
3  opioid manufacturers to promote specific products at
4  the counter.
5    Q. Dr. Lembke, what did the signs say in CVS
6  stores that promoted opioids?
7    A. Again, on page 79, CVS promoted the
8  opportunity to advertise specific direct-to-consumer
9  advertising of specific products on --
10    Q. Move to strike.
11       My question is what did the sign say, not was
12  there an opportunity for there to be signs, was there a
13  possibility.  If you don't know what the sign said,
14  that's fine, and we can move on.
15    A. Yeah, I'm not sure what the sign said.
16    Q. Did CVS ever pay key opinion leaders?
17    A. Not that I'm finding.
18    Q. Did CVS ever pay medical schools to influence
19  curriculum regarding the treatment of pain?
20    A. Not that I know of.
21    Q. Does CVS employ sales representatives who
22  marketed prescription opioids to doctors?
23    A. CVS collaborated with opioid manufacturers,
24  sales representatives, and other entities like Partners
25  Against Pain and JCAHO, but as far as I know they did

1  not employ their own drug reps.
2    Q. Have you reviewed the contents of any
3  continuing education presented to CVS pharmacists?
4       Let me withdraw the question; ask it
5  differently.  Are you aware of any false statements
6  contained in continuing education classes that CVS
7  provided its pharmacists about prescription opioids?
8    A. Just give me a moment.  Not that I'm able to
9  identify right now.
10    Q. You mentioned earlier CVS's prescriber
11  monitoring program.  Do you recall that?
12    A. Can you tell me --
13    Q. Let me try and ask -- all right.  You
14  mentioned earlier a CVS prescriber monitoring program,
15  and I'll represent to you that that's a program in
16  which CVS decides whether to suspend pharmacies for
17  filling the prescriptions of certain doctors.  Do you
18  recall that?
19    A. Yes.
20    Q. Is that kind of program required by law?
21    A. No.
22    Q. Would you agree that CVS's prescriber
23  monitoring program was a helpful tool?
24       MR. ARBITBLIT:  Object to form.
25       THE WITNESS:  Are you specifically

1  referring to the 2014 policy on page 128 of my report?
2  BY MR. CRAWFORD:
3    Q. I'm asking -- you're opining in your opinion
4  that CVS failed to have effective controls against
5  diversion, correct?
6    A. Yes.
7    Q. All right.  And my question is, was CVS's
8  prescriber monitoring program a helpful tool in -- let
9  me -- let me rephrase.
10       Was the CVS prescriber monitoring program a
11  helpful tool that contributed to CVS in fact having
12  some effective controls against diversion?
13    A. Yes.
14    Q. And in your opinion you state that CVS could
15  have implemented this program 15 years earlier,
16  correct?
17    A. Yes.
18    Q. And what's the basis of your opinion that CVS
19  could have implemented this program in the year 2000?
20    A. Because CVS would have had this data.
21    Q. Are you offering an opinion that it would have
22  been technically feasible to create this program in the
23  year 2000?
24    A. Maybe not the year 2000, but I believe it
25  would have been technically feasible earlier than 2014.

1    Q. You've never designed an algorithm to identify
2  prescribers --
3       (Reporter clarification.)
4    A. I'm sorry.  Could you say that again?
5    Q. Let me withdraw the question.  Aside from CVSs
6  prescriber monitoring program, has CVS done anything
7  helpful to combat the opioid problem?
8    A. Yes, I do believe CVS has taken some measures
9  to combat the opioid problem.
10    Q. What are those measures?
11    A. Over time, in an iterative process, CVS did
12  change its policies and procedures regarding red flags
13  in their investigation.
14    Q. Anything else?
15    A. I believe that CVS has also sponsored some
16  drug take-back days.  I believe CVS also may have
17  participated in improving access to Naloxone.
18    Q. Anything else?
19    A. Not outside what's in my report.
20    Q. Are you aware that CVS uses data to analyze
21  dispensing trends of its pharmacies?
22    A. Yes.
23    Q. And would that also be something that you
24  would say was helpful for CVS to have done?
25    A. Yes.

66 (Pages 258 - 261)

1 three minutes.

2      THE VIDEOGRAPHER: Sounds like there is

3 nothing further for the record?

4      MR. GISLESON: Can we go off the record

5 and tell me how much time we have left?

6      THE VIDEOGRAPHER: She is correct, three

7 minutes, but we can go off the record. Are we going

8 off the record just for the moment or for the day?

9      MR. GISLESON: We can go back on the

10 record.

11      EXAMINATION

12 BY MR. GISLESON:

13    Q. Dr. Lembke can you get your book, please,

14 "Drug Dealer M.D." and turn to page 126.

15    A. Mr. Gisleson, I can't see you.

16    Q. You're better for it.

17    Can you turn to page 126, please. Under the

18 heading, "Practicing with blinders on, not Toyota after

19 all?" You wrote, "Good communication between doctors

20 today is essentially to good care. Most patients have

21 more than one doctor taking care of them, or they

22 change doctors frequently due to insurance changes and

23 other provisions of the managed care environment. Each

24 doctor is busy prescribing the pills he or she believes

25 will treat the patient while other doctors are

1 prescribing other pills. It is entirely commonplace to

2 encounter a patient who is getting a stimulant from a

3 psychiatrist --

4    (Reporter clarification.)

5    Q. You wrote, "Most patients have more than one

6 doctor taking care of them, or they change doctors

7 frequently due to insurance changes or other provisions

8 of the managed care environment. Each doctor is busy

9 prescribing the pills he or she believes will treat the

10 patient while other doctors are prescribing other

11 pills. It is entirely commonplace to encounter a

12 patient who is getting a stimulant from a psychiatrist

13 for attention deficit disorder, an opioid painkiller

14 from a pain doctor for fibromyalgia, and a

15 benzodiazapine from a primary care doctor for sleep."

16    That's consistent with your research and

17 experience in terms of that being entirely commonplace,

18 correct?

19    A. It being entirely commonplace does not make it

20 right.

21    Q. And lastly, are you familiar with the

22 Substance Abuse and Mental Health Services

23 Administration?

24    A. Yes.

25    Q. Do you consider their published materials to

1 be the kind of materials on which professionals in the

2 substance abuse field rely?

3    A. It would depend on the publication you were

4 talking about.

5    Q. Do you agree with the statement, "PDMP data

6 are best used in conjunction with other sources of

7 information, including clinical assessment before

8 making any determination about aberrant behavior

9 because no validated and standardized criteria for the

10 threshold of questionable activity have been

11 established"?

12      MR. ARBITBLIT: Object to form.

13      THE WITNESS: I'd like to review that

14 document.

15      MR. GISLESON: Why don't we go off the

16 record.

17      MR. ARBITBLIT: We're not going off the

18 record, Counsel, unless we're done. You've used your

19 time.

20      MR. GISLESON: She wants to review the

21 document.

22    Matt, can you show her, please, what was in

23 Tab 8 and mark that as the next exhibit?

24      THE WITNESS: Is there more time or are

25 we out of time?

1      MR. ARBITBLIT: We're out of time, but

2 I'm going to allow this last question since you asked

3 to review the document.

4      MR. LADD: Tab 8 is being marked as

5 Lembke Exhibit 4.

6    (Exhibit 4 marked for identification.)

7 BY MR. GISLESON:

8    Q. You reviewed this SAMHSA In Brief?

9    A. I'm sorry, is this in the documents that were

10 sent to me?

11    Q. Yes, I'm sorry, Tab 8.

12    A. Okay.

13      MR. SHERIDAN: While she's looking, may

14 I request that the pending question be reread?

15      THE WITNESS: Yes, could you reread the

16 question to that I know why I'm looking at this

17 document?

18 BY MR. GISLESON:

19    Q. The first question was have you reviewed this

20 SAMHSA In Brief?

21    A. Okay, and what came after that?

22    Q. And the next question is, which I asked you

23 before, to give it context, if you go to the fourth

24 page, the first full paragraph on the left-hand column

25 says, "Behavior that suggests substance misuse, a