1                     **UNITED STATES OF AMERICA**

              **FOR THE NORTHERN DISTRICT OF OHIO**

2                    **EASTERN DIVISION**

3                        - - - - -

4

5   IN RE:  NATIONAL PRESCRIPTION     )

6   OPIATE LITIGATION              )

                                 )  Case No.

7   THIS DOCUMENT RELATES TO:     )  1:17-MD-2804

8   Track Three Cases            )  Honorable

                                 )  Dan A. Polster

9   _____)

10

11                        - - - - -

12      TRANSCRIPT OF DAUBERT HEARING VIA ZOOM PLATFORM

13        BEFORE JUDGE DAN A. POLSTER, JUDGE OF

14      SAID COURT, ON FRIDAY, SEPTEMBER 10TH, 2021,

15         COMMENCING AT 9:30 O'CLOCK A.M.

16                        - - - - -

17

18   Court Reporter:            GEORGE J. STAIDUHAR

                            801 W. SUPERIOR AVE.,

19                         SUITE 7-184

                            CLEVELAND, OHIO 44113

20                         (216) 357-7128

21                        - - - - -

22

23

24

25

1    APPEARANCES:

2        On behalf of the Plaintiffs:

3            SPANGENBERG SHIBLEY & LIBER
             BY:  PETER H. W   , AUSA
4            1001 Lakeside Avenue East, Suite 1700
             Cleveland, OH 44114
5

6        On behalf of Defendant CVS:

7            ZUCKERMAN SPAEDER, LLP
             BY:  GRAEME W. BUSH, ESQ.
8            485 Madison Avenue
             10th Floor
9            New York, New York 10022-5871

10                        - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     WITNESSES:                              EXAMINATION

3        By the Court                         5

4        By Mr. Bush                         20

5        By the Court                        29

6        By Mr. Bush                         50

7        By Mr. Weinberger                   58

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2              THE COURT:  All right.  This is a Daubert

3     hearing in MDL 2804, the Track Three case that is set to

4     go to trial the end of this month.  I requested to ask

5     some questions of Dr. Anna Lembke, who is one of the

6     Plaintiffs' witnesses, and the Defendants had filed a

7     Daubert motion challenging some or all of Dr. Lembke's

8     proposed testimony.

9              My plan is that I will conduct most of the

10    questioning because I am the one who is going to have to

11    make a decision, and I think I know the questions I have.

12    I have got several areas I am going to cover.

13             And then, when I complete an area, I will

14    allow some brief questioning by the Plaintiffs and with

15    one counsel for the Plaintiffs and one counsel for the

16    Defendants, and then I will move on to another area.

17             I have got a hard stop at 11:30, so this is

18    not going to drag on.  I want to focus on the areas that

19    are of my concern.  So focusing on the screen, do we have

20    Dr. Lembke?

21             JUDICIAL ASSISTANT:  Your Honor, she is in

22    the waiting room.  I was just waiting for you to take the

23    bench.  I will admit her now.  One moment.

24             THE COURT:  Okay.  I just want --

25             JUDICIAL ASSISTANT:  Your Honor, Dr. Lembke

1    is now in the meeting with a white background.

2                    Dr. Lembke, if you could just say hello?

3                    THE COURT:  Oh, right in the center.  Fine.

4    Thank you, Doctor.

5                    And I appreciate your getting up so early.

6    When I had scheduled this, I was not focusing on the fact

7    we might have witnesses on the West Coast.  So thank you

8    very much.  So I need to swear you in, so if you could

9    raise your right hand, please?

10                       DR. ANNA LEMBKE

11   called as a witness by and being first duly sworn,

12   was examined and testified as follows:

13                   EXAMINATION BY THE COURT

14                   THE COURT:  All right.  Thank you.

15   BY THE COURT:

16   Q.    All right.  Starting with a general question,

17   Doctor, in your role as a physician, do you regularly

18   interact with pharmacists?  So I would like you to

19   describe how and what those interactions entail and how

20   often you interact with pharmacists.

21   A.    Yes.  I regularly interact with pharmacists.  I

22   interact with pharmacists on multiple times, on most

23   clinic days, which constitute currently about half of the

24   days in my week but through various points in my career

25   constituted every work day, Monday through Friday.

1          On any given day, I will interact with

2     pharmacists typically by phone.  Multiple times in a day

3     around the prescription with the advent of the electronic

4     medical records, I also have many interactions, probably

5     on the order of 10 to 20 interactions electronically with

6     pharmacists.

7          Over the past two decades those interactions

8     have qualitatively and quantitatively changed vis-a-vis

9     opioid prescribing, but I can give you an example of an

10    interaction I had with a pharmacist on Tuesday to give

11    you a real-time example of an interaction.

12    Q.    That would be helpful.  Thank you.

13    A.    Okay.  So on Tuesday, I got a call from a pharmacist

14    leaving a message on my phone letting me know that she

15    was concerned about an opioid prescription for

16    buprenorphine.  Trade name is Suboxone.  Under my name,

17    she had received a call from somebody calling in the

18    prescription and giving my DEA number and my name but was

19    obviously a male voice?

20          And so she took the prescription, but then,

21    after hanging up with that person called me and left a

22    message and said "can you just verify this is, indeed, a

23    real and true prescription from you?"

24          So I called her back, and I asked the name

25    of the patient and when it was called in, and I let her

1    know that I had not made that phone call, and that I was

2    concerned, and that I appreciated she had called me about

3    that, and that I thought there was a possibility I

4    thought it was one of my fellows who had used my DEA

5    instead of his DEA, and that she should not dispense

6    until I investigate it further.

7              I touched base with my fellow who is new

8    here to the Clinic and has not yet gotten his DEA and

9    said it was, indeed, him and that he had called it in

10   under my DEA.

11             So I then called her back and said it is

12   okay to dispense.  That is a patient of ours.  He is

13   switching pharmacies because he is moving.  I was aware

14   that he had been moving?

15             But he is a person with severe opioid use

16   disorder, and people can relapse at any point in their

17   trajectory, even though he has been in recovery for

18   several years knew?

19             And then I thanked the pharmacist for doing

20   her due diligence and confirming that it was, indeed, a

21   legitimate prescription.  So that is one example of the

22   kinds of interactions I will have with pharmacists.

23             I am having many more of those kind of

24   interactions around opioid dispensing and double checking

25   for red flags around opioid dispensing in the past two to

1    five years than I had prior to that, so it is good to see

2    there is a see-change happening.

3    Q.    All right.  So your interactions with pharmacists in

4    your practice generally center around particular

5    prescriptions that you prescribed, either you are

6    contacting them or like in the example you just cited,

7    when they received a prescription purportedly from you to

8    double check it?

9    A.    Yes.

10   Q.    That's the way your interactions -- okay.  That's

11   what I thought.

12                   Let me follow up on what you just said.  You

13   said that there has been a see change in the last two to

14   five years around interactions pertaining to

15   prescriptions for opioids.

16                   Will you elaborate on that a little more,

17   please?

18   A.    Yes.  So in our clinic, we made checking the PDMP

19   prior to checking a controlled substance mandatory around

20   2013, and once we started doing that, we saw many

21   instances of, for example, doctor shopping, patients

22   going around to multiple prescribers to get the same or a

23   similar prescription.

24                   We also saw examples of pharmacy shopping,

25   patients going to various pharmacies to try to obtain

1  additional opioids, and we then would call the pharmacies

2  and alert them to this problem when we encountered it as

3  well as other red flags that we were concerned about?

4        And it was very seldom in that time period

5  that we heard from pharmacists regarding these types of

6  problems that we were detecting when we checked our

7  prescription drug monitoring database or when we detected

8  other red flags.

9        Of course, to some extent, we are prohibited

10  by privacy laws from sharing too much with anybody

11  outside of our clinical care.  So there were instances

12  when we were concerned but could not necessarily

13  communicate that with pharmacists unless it was around a

14  specific prescription.

15  Q.    Well, I thought your interactions with pharmacists

16  only revolved around particular prescriptions?

17  A.    Yes.  My interactions with pharmacists and

18  interactions in general and physicians pertain to the

19  prescriptions that we write for the patient, but in

20  checking the prescription drug monitoring database, what

21  we can see is all the prescriptions for controlled

22  substances that that individual is receiving, which can

23  raise red flags with you, which we can't necessarily

24  discuss with a pharmacist, unless it is our specific

25  prescription that is the prescription of concern.

1    Q.    Okay.  So you are saying starting in 2013 you were

2    -- it was mandatory to check the PDMD.  I think, Doctor,

3    you said that starting in 2013 you were required to check

4    the PDMP before filling a prescription, and at that time,

5    you were getting very few calls that were initiated from

6    pharmacies.  Has that changed?

7    A.    So let me just clarify my prior statement.

8              Starting in 2013, we set up requirements

9    specifically in my clinic.  It wasn't that it was a state

10   mandate that we check the PDMP, but starting at that

11   time -- and I supervise a lot of trainees, residents, and

12   fellows -- it became a requirement in our clinic to check

13   the PDMP before prescribing the controlled substance.  It

14   was not mandatory at the state level at that time.  It

15   didn't become mandatory in California until later.

16   Q.    Do you recall when it became mandatory in

17   California?

18   A.    Yes.  I believe it became mandatory in California in

19   2018 to have access to the PDMP and shortly after to

20   check the PDMP prior to initiating a new prescription for

21   a controlled substance.

22   Q.    Okay.  All right.  Have you seen a change since 2013

23   in terms of the frequency that you would get calls, calls

24   or electronic communications, communications through

25   pharmacies about particular prescriptions that you or

1    your practice had written?

2    A.    Yes.  Particularly in the last couple of years, I

3    have seen a much more heightened vigilance around opioid

4    prescriptions on the part of pharmacists, and we have

5    been getting more calls from pharmacists double checking

6    red flags in the past couple of years.

7    Q.    All right.  And what are the most frequent red flags

8    that pharmacists are identifying when they call where you

9    practice if you are able to answer?

10   A.    Yeah.  So the most frequent kind of calls we have

11   been getting or getting from pharmacists when they are

12   concerned about a forged prescription, an illegitimate

13   prescription or in the example I gave you, a patient

14   calling in impersonating, potentially impersonating a

15   prescriber.

16              Also, on Tuesday, I received a call from a

17   pharmacist who was concerned about a case of doctor

18   shopping.  She had checked the PDMP prior to dispensing

19   Sublocade, which I had prescribed for a patient.

20              It is an injectable form of buprenorphine

21   and she had seen that he had received a hydrocodone

22   prescription from not one but two other prescribers, but

23   I was able to reassure her that he had had a recent

24   surgery, and that the hydrocodone was appropriate in

25   addition to the buprenorphine-Sublocade as a brief

1    analgesic in the context of his surgery and the fact that

2    he had two prescribers was something that we had already

3    seen and investigated and had confirmed that the one

4    prescriber was covering for the other prescriber.  It was

5    not a case of doctor shopping.

6              I have had pharmacists call and tell me that

7    the patient came in intoxicated and appeared to be under

8    the influence, and that they were concerned about

9    dispensing opioids or benzodiazepines to that individual.

10   Those kinds of calls we would get.

11   Q.   My last general question in this area:  Are you able

12   to quantify, you know, calls, inquiries from pharmacists

13   on a weekly or a monthly basis, comparing the present,

14   say, the last two years versus, you know, 2013-2014.  I

15   know you probably haven't kept detailed records but sort

16   of from your recollection.

17   A.   Yes.  I can tell you in the first decade of this

18   century I almost never received a call from pharmacists,

19   and in fact, my first awareness of a patient of mine who

20   was doctor shopping came to my attention because the

21   insurance company sent me a letter expressing concern.

22             This was in the days prior to my having

23   access or even knowing about the PDMP.  This was in the

24   early 2000s.  I can think of a single instance between

25   2000 and 2012 or '13, in which I received a call from a

1   pharmacist who expressed concern about a patient who

2   appeared to be intoxicated and about whom this pharmacist

3   was concerned and felt uncomfortable dispensing --

4   Q.   Okay.  In the last --

5   A.   -- compared to just this week I have already had two

6   calls from pharmacists specifically relating to opioid

7   prescribing and opioid dispensing.

8   Q.   Okay.  Couple more general questions, and then, I

9   will take a break from mine and see if counsel want any

10   follow-up.

11          Have you gained an understanding of the

12   separate obligations of doctors and pharmacists regarding

13   opioid prescribing and dispensing, and has your research

14   and teaching included the role of pharmacies in the

15   prescription-opioid epidemic?

16   A.   Yes.

17   Q.   Okay.  If you can elaborate, please.

18   A.   I am familiar with the Controlled Substances Act and

19   the fact that every entity and individual in the supply

20   chain has an independent and corresponding responsibility

21   to prevent misuse and diversion and the harms caused by

22   controlled substances.

23          Pharmacies and physicians, in particular,

24   have an independent but corresponding responsibility that

25   depends on their close communication and interaction with

1    each other to the extent that they are able afforded by

2    the law.

3              These independent and corresponding

4    responsibilities are vital because pharmacists and

5    physicians have access to different kinds of information,

6    and without all of those kinds of information, an

7    individual who is misusing or diverting controlled

8    substances could go undetected.

9              So for example, pharmacists have access to

10   whether or not a patient is intoxicated or under the

11   influence when they go to pickup their prescription.  The

12   pharmacist has access to information whether that

13   customer paid in cash or traveled a far distance to

14   pickup that prescription.

15             The pharmacist has information as to whether

16   or not that individual is impersonating someone else or

17   using a forged prescription.  Those are all things I do

18   not have access to.

19             Correspondingly, I have access to

20   information the pharmacist doesn't have.  I have a deeper

21   and broader information of that individual's diagnosis,

22   how they are presenting in clinical care, of their past

23   history.  I have access to labs:  I have access to urine

24   drug screens?

25             And another really important point regarding

1    this independent but corresponding responsibility between

2    physicians and pharmacists is that physicians really only

3    have access to the information based on one individual

4    patient, whereas pharmacists, and more importantly,

5    pharmacies have access to much more data than an

6    individual physician might, including data about not just

7    patients and their behavior patterns but also

8    prescribers.

9         Pharmacies, for example, have access to

10   data, which would allow them to know whether or not a

11   certain prescriber is prescribing large quantities of a

12   controlled substance prescribing in a pattern that is

13   suggestive of a pill mill, and pharmacies could use this

14   information and create tools to assist pharmacists in

15   detecting red flags.

16   Q.   Okay.  Has your specific research in teaching

17   included the role of pharmacies in mitigating or

18   addressing the misuse of prescription opioids?

19   A.   Yes.

20   Q.   Okay.  If you could elaborate on that, please?

21   A.   So my research has delved into the disease of

22   addiction, which gives me an understanding, an expertise

23   in knowing the kinds of behaviors that people engage in

24   when they become addicted and the kinds of manipulative

25   techniques that they use?

1        And I write about that in my book "Drug

2   Dealer, M.D." prior to being involved in litigation.  I

3   have researched and taught on prescription drug

4   monitoring databases and the way that they can and should

5   be used to monitor for misuse and diversion as well as

6   the epidemiologic literature on the impact that checking

7   the PDMP has had on opioid-related misuse addiction and

8   overdose stats.

9        I have published on the PDMP and the

10  importance of checking the PDMP, not just when red flags

11  already exist, but even in cases that's in pristine

12  precisely because a patient's outward appearance can be

13  very different from their internal disease process?

14       And it is very difficult to really know

15  patients' behaviors based on their outward appearance.

16  We do need to check these objective data points, and the

17  PDMP is one of the best tools we have.  And I have

18  written about the PDMP prior to being involved in this

19  litigation, and I have researched, and I have taught on

20  the PDMP.

21       So, you know, my research in my 25 years of

22  clinical experience have given me the expertise and

23  knowledge to be able to evaluate the pharmacies' policy

24  and procedures for investigating red flags and have

25  allowed me the expertise to determine whether or not

1    those policies and procedures were adequate.

2    Q.    Let me just ask one more follow-up on that:

3              Have you studied the particular policies and

4    procedures of any one of the Defendants in this case?  So

5    that would be the specific policies and procedures of

6    Walgreens, CVS, Wal-Mart, Giant Eagle?

7    A.    Yes, I have.

8    Q.    Okay.  Can you elaborate on that, please?

9    A.    As detailed in my report, I studied the policies and

10   procedures for investigating red flags and drug

11   utilization review for each of the named pharmacy

12   Defendants and followed how those policies and procedures

13   changed over time, compared that to DEA enforcement

14   actions and the peer-reviewed medical literature on which

15   those regulations should be based and determined whether

16   or not those policies and procedures for those individual

17   pharmacy Defendants were adequate and sufficient to meet

18   their corresponding responsibility according to the

19   Controlled Substances Act.

20   Q.    All right.  Is this something you wrote about or

21   you just studied?  I mean, we will just say pick

22   Walgreens, what your study of Walgreens' policies and

23   procedures over time, is this something you wrote or just

24   studied?

25   A.    So my report has an entire section on Walgreens, not

1    just their policies and procedures, their good faith

2    dispensing policy, but how it changed over time, how that

3    compared to the information that was available and should

4    have informed those policies and procedures and,

5    furthermore, what kinds of tools they created to assist

6    pharmacists in detecting red flags and, furthermore, what

7    kind of road blocks they put in place, making it

8    difficult, if not impossible, for pharmacists to do their

9    due diligence and corresponding responsibility to detect

10    red flags.  And that's all in my report, your Honor.

11    Q.    Okay.  And what -- we will just stay with Walgreens

12    because I assume you did the same thing for each

13    Defendant, but let's just focus on Walgreens -- to do

14    this, to generate this portion of your report sort of an

15    examination over time of Walgreens' policies and

16    practices and how they both assisted their pharmacists

17    and in your opinion hindered their pharmacists, imposed

18    road blocks on the individual pharmacists, tracking

19    prescriptions, what exactly did you study or who did you

20    contact to produce that?

21    A.    Most of those documents were documents I obtained in

22    discovery.  I examined their good-faith dispensing

23    policies and exactly what they identified as the roles

24    and responsibilities of pharmacists, what they identified

25    as red flags that should trigger pharmacists to

1    investigate.

2              I compared -- I looked at DEA enforcement

3    actions that were occurring around the same time to

4    determine whether or not their policies and procedures

5    for detecting red flags were informed by DEA enforcement

6    actions that were occurring, that should have informed

7    those policies and procedures.

8              I investigated the medical literature on the

9    risks, for example, of combining opioids and

10   benzodiazepines and determined when in the medical

11   literature it became known that that was a dangerous

12   combination?

13             And their own policies dictate that the

14   medical literature should inform how red flags are

15   defined and what should be investigated and what

16   pharmacists should investigate?

17             So I looked at whether or not they, in fact,

18   utilized the medical literature and allowed that to

19   inform their policies and procedures and the tools that

20   they created for detecting red flags.  I looked at things

21   like their relationship with lobbying organizations, the

22   National Association of Chain Drug Stores, for example,

23   and how they interacted with and took the advice or

24   didn't of those kinds of organizations.

25             I looked at consulting organizations that

1  they interacted with and how they took or didn't take the

2  advice of those consulting organizations so basically

3  looking in aggregate at all of the information that they

4  had, that could have and should have informed their

5  creation of policies to assist pharmacists.

6  Q.   Okay.  Thank you, Doctor.

7            THE COURT:  I think I will take a break from

8  my questioning and maybe no more than 10 minutes for each

9  side to ask any follow-up in what I have asked.

10            So I think I will let the Defendants go

11  first since it was your motion challenging Dr. Lembke.

12  So who would like to question Dr. Lembke from the

13  Defendants.

14            MR. BUSH:  Your Honor, it is Graeme Bush

15  from Zuckerman Spaeder.  I don't know if you can see me?

16            THE COURT:  Yes, Graeme, I see you.

17            MR. BUSH:  I will be conducting the

18  examination of Dr. Lembke for the defense, so I want to

19  follow up on a couple of things.

20    EXAMINATION BY COUNSEL ON BEHALF OF DEFENDANT CVS

21  BY MR. BUSH:

22  Q.   Dr. Lembke, good morning.  It is almost as early for

23  you as me.  I am in the Mountain Time Zone.

24  A.   Good morning.

25  Q.   So one of the questions that Judge Polster asked you

1   related to your interaction with pharmacists, and I want

2   to ask some follow-up questions in that area.  One of the

3   focuses of the questioning was whether your interactions

4   related to particular prescriptions.

5               And in addition to that, there were some

6   circumstances where information came to your attention

7   and you under those circumstances were called upon to

8   assist and about what kinds of information you could

9   disclose beyond the particular prescription that you had

10  written.  Is that right?

11  A.    Yes.

12  Q.    Okay.  So the interactions that you had, those

13  related to the prescription.  You did not conduct any

14  kind of investigation about what other due diligence the

15  pharmacists may have done before calling you or after

16  calling you.

17  A.    I am not sure I understand the question.

18              What do you mean by conducting an

19  investigation for that individual pharmacist?  Did I ask

20  them what else they had done?

21  Q.    When you're asking about a particular prescription,

22  your are finding out what that pharmacist is interested

23  in about that prescription, not what other due diligence

24  the pharmacist may have done other than calling you?

25  A.    No, that's not correct.

1    Q.    All right.

2    A.    These are often conversations between medical

3    professionals where, again, to the extent that we are

4    able, given privacy laws, where we share our information.

5              When the system is working as it should, we

6    have a conversation about the patient and their

7    prescription and the dispensing and where we have

8    overlapping concern.

9              So that conversation might often entail

10   other things that the pharmacist has observed or other

11   information that the pharmacist has access to.  You know,

12   in instances when I can get that kind of information is

13   incredibly helpful.

14   Q.    All right.  So one of the things you testified about

15   has to do with your review policies and procedures?

16   A.    Yes.

17   Q.    And it is accurate, is it not, that the policies and

18   procedures that you reviewed in connection with your

19   report in this case are only the policies and procedures

20   that were provided to you by Plaintiffs' counsel?

21   A.    That is correct.

22   Q.    And they were only the policies and procedures that

23   related to the Defendants in this case?

24   A.    Correct.

25   Q.    And you are not able to make any comparison between

1   these policies and procedures of the Defendants in this

2   case and policies and procedures that may or may not have

3   been in place at other pharmacy companies?

4   A.    Not beyond my own professional experience,

5   interacting with pharmacists from different

6   pharmacies.

7   Q.    And you have not conducted any kind of systematic

8   study or analysis of any pharmacy or pharmacy chain that

9   isn't a Defendant in this case?

10  A.    That's correct.

11  Q.    And so the analysis of the policies and procedures

12  that you have done in this case as an analysis, that was

13  done specifically for the purpose of formulating opinions

14  in this case?

15  A.    As pertains to the evolution of policies and

16  procedures for pharmacy Defendants over time, yes.

17  Q.    You also testified about corresponding

18  responsibility, and first of all, you are not a lawyer.

19  That's right, correct?

20  A.    That is correct.

21  Q.    You would agree with me that the prescriber has a

22  responsibility to write a prescription that is for a

23  legitimate medical purpose in the usual course of his or

24  her practice?

25  A.    Yes.

1    Q.    And the pharmacist has a different obligation called

2    a corresponding responsibility to determine whether the

3    doctor actually lived up to that obligation?

4    A.    Well, that is part of the pharmacist's role, but the

5    pharmacy, more broadly, has a responsibility to create

6    policies and procedures to mitigate the risk of misuse

7    and diversion and harm from dispensing.

8    Q.    That's not in the language of the corresponding

9    responsibility regulation, is it?

10   A.    I believe that it is, if not in the CSA, certainly

11   in many DEA enforcement actions.

12   Q.    All right.  And just to reiterate, you are not a

13   lawyer?

14   A.    No, I am not a lawyer.

15   Q.    So I think only one other subject that I want to ask

16   you some questions about, Dr. Lembke:

17              You have not had any -- actually withdrawn.

18   Let me say it a different way.

19              You have not been involved in whatever

20   training a pharmacist gets with respect to his or her

21   corresponding responsibility.  Is that right?

22   A.    Can you clarify what you mean by "have been involved

23   with"?

24   Q.    Sure.  You understand that pharmacists are trained

25   or you believe that pharmacists are trained in

1    corresponding responsibility at pharmacy school?

2    A.    Yes.

3    Q.    But you haven't been involved in teaching any of

4    those courses?

5    A.    I have not been involved in teaching pharmacists in

6    pharmacy school, no.

7    Q.    And you haven't taken any of those courses?

8    A.    No, I have not.

9    Q.    And you haven't taken any continuing education

10   courses that pharmacists might have with respect to their

11   corresponding responsibility?

12   A.    Well, I have to qualify that answer because much of

13   the education that pharmacists have received in the past

14   two decades regarding the legitimate use of opioids is

15   similar to the education that physicians have received

16   and has been influenced in a similar way by opioid

17   manufacturers.

18            So in fact, I am familiar with education

19   around opioids that pharmacists have received in the

20   last two decades because it is very similar to the types

21   of education received by physicians in the same time

22   period.

23   Q.    And if you haven't taken those courses, how do you

24   know how similar it is or how dissimilar it is,

25   Dr. Lembke?

1   A.   Yeah, because that's part of the research that I

2   have done, that I have investigated what those courses

3   entailed, what kind of power points were used, what kind

4   of educational messages were included in their

5   curriculum.  So I've looked into that.

6   Q.   So do you recall that in your deposition at Track

7   One -- and you know the difference between the tracks in

8   these cases -- but I assume you know the differences?

9   A.   Yes, I do.  Thank you.

10  Q.   Do you remember testifying that you knew that

11  pharmacists had a certification and have schooling and a

12  certification process, but you didn't know a whole lot

13  more about it than that?

14  A.   Yes.  I specifically recall that testimony.

15  Q.   And do you also recall that you are agreeing that

16  you weren't a pharmacist in stating that you haven't

17  studied what pharmacists go through?

18  A.   Yes.  And what I meant by that is, I don't know the

19  specifics of pharmacy certification and education I don't

20  know.  Unlike my familiarity with medical training and

21  physician training, I am not intimately familiar with the

22  hoops that pharmacists jump through to get to be a

23  pharmacist.

24          But I will add that medical education and

25  pharmacy education is ongoing with continuing education

1    beyond pharmacy school, and that is the part of the

2    pharmacists' education that I am familiar with and that I

3    had studied and which, as I have said, has mirrored a

4    physician education in the last two decades vis-a-vis

5    opioids.

6    Q.    Well, when you say it's your position, you have just

7    also said that you agreed that you didn't know what

8    pharmacists go through, and you don't know a whole lot

9    more than they get a certification and have some

10   schooling.  So how can you have the kind of detailed

11   information that you have just talked about?

12              And all I am talking here is specifically

13   what pharmacists are trained in, not what they ought to

14   be trained in.

15   A.    I know that.  I understand.  Let me see if I can

16   clarify.

17              So medical education, like pharmacy

18   education, is long.  It starts with school, and then you

19   graduate, and you get your degree or your certification,

20   and then you go out into practice?  And in practice,

21   there is a process of ongoing education that spans one's

22   entire career.

23              When I said in prior deposition I was not

24   familiar with pharmacist school and pharmacy education,

25   it is just that.  I am not familiar how pharmacists are

1    trained in pharmacy school, but after they graduate and

2    are in practice and the recipient of different forms of

3    education, I have studied that education around opioids,

4    the education of, and I am familiar with the types of

5    education that pharmacists have received, pharmacists who

6    are working in pharmacies have received as part of

7    they're maintenance of education or equivalency.

8    Q.    So the answer that I asked you about before in Track

9    One was in response to a question.  What knowledge do you

10   have about pharmacy training?  It was not limited to

11   pharmacy school.  Do you recall that?

12               MR. WEINBERGER:  Objection, your Honor.

13   A.    Yeah --

14               THE COURT:  I will let her answer the

15   question.  We are about at the end of the time.

16               MR. BUSH:  And I am almost done, your Honor.

17   I would be done anyway if you told me I was, but I am

18   almost done, your Honor.

19   A.    So my interpretation of the question at that time --

20   and I remembered it vividly -- was that I was being asked

21   about pharmacy school, and I don't have much familiarity

22   with pharmacy school.

23               So for example, I can tell you that

24   physicians go to medical school.  They get their license.

25   They sit for their board.  They have board certification.

1    I don't know what the various hoops are that pharmacists

2    go through prior to becoming a pharmacist and working in

3    a pharmacy.  I don't know how long their school is.  You

4    know, I don't know what the tests are that they have to

5    take.

6          So my answer has not changed, but I

7    understood that question several years ago to pertain

8    specifically to pharmacy school.

9    Q.   I won't belabor the point, and I think the record

10   will reflect what the questions were?

11         MR. BUSH:  But with that, your Honor, I am

12   done.

13         THE COURT:  Thank you, Mr. Bush.  Is

14   there someone from the Plaintiffs who wants to ask

15   follow-ups?

16         MR. WEINBERGER:  Your Honor, this is Peter

17   Weinberger on behalf of the Plaintiffs.  I have no

18   questions.

19         THE COURT:  Okay.  All right.  Then I will

20   go back to mine, Doctor.

21         FURTHER EXAMINATION BY THE COURT

22   BY THE COURT:

23   Q.   I was asking you about your study of the prescribing

24   practices and policies of each of the four Defendants,

25   and you were describing that.

1        Was that study and research done only as

2    part of your work as a -- as an expert in this

3    litigation, or had you done some of that research before

4    this litigation as part of your general research?

5    A.    That research was primarily done since I have been

6    involved in this litigation.

7    Q.    Okay.  That's what I figured, but I wanted to

8    clarify.

9        As part of your research, either for this

10   litigation or in general, have you looked into whether

11   there exists any cooperative efforts between

12   manufacturers and pharmacies to ensure access to

13   prescription opioids for patients?

14   A.    Yes.

15   Q.    Okay.  If you can describe what that has been,

16   please?

17   A.    In my research, I have found that pharmacy

18   Defendants -- opioid manufacturers and opioid

19   distributors collaborated together to promote opioids.

20       They did that through collaborative

21   educational efforts of pharmacists, through collaboration

22   around coupons and saving cards, through collaborations

23   with direct-to-pharmacist advertising and also

24   direct-to-patient consumer advertising so, for example,

25   creating patient facing pamphlets, not just in

1   collaboration with manufacturers, but also in

2   collaboration with pro opioid lobbying groups often

3   funded by manufacturers.

4   Q.   All right.  I would like you to detail this a little

5   more.  What have you learned about these specific

6   cooperative efforts with respect to education of

7   pharmacists?  How did the manufacturers of the pharmacies

8   cooperate and collaborate in education of pharmacists and

9   then coupon and saving card programs and then this

10   advertising?

11   A.   So pharmacy Defendants for a fee offered to promote

12   and advertise specific opioid products to their

13   pharmacists and also to patients.

14           Some pharmacy Defendants allowed, for

15   example, Perdue drug reps to come into pharmacy stores

16   and interact directly with pharmacy managers.  Pharmacy

17   Defendants collaborated with the American Pain Foundation

18   and with the Pain Care Forum.  These are loosely

19   affiliated pro opioid lobbying groups largely funded by

20   opioid manufacturers to, for example, create a patient

21   facing pamphlet to, quote unquote, educate patients about

22   the appropriate use of opioids in the treatment of pain.

23           Pharmacies worked together with opioid

24   manufacturers to create so-called opioid super stores

25   where opioids would be more readily dispensed without

1    questioning prescribers.

2    Q.    Okay.  Can you detail for me, explain to me what an

3    "opioid super store" is?  Is this a particular pharmacy,

4    or is it something else?

5    A.    It is a particular pharmacy at which opioids will be

6    stocked in a way that makes them readily available to

7    patients, but opioid super stores really go beyond that.

8          Some of these opioid super stores in my

9    opinion became the equivalent of pharmacy pill mills

10   where they promise opioid manufacturers, for example, not

11   to question prescriptions but to make it guaranteed that

12   a patient showing up there could get that prescription.

13         This was all done in the name of making sure

14   that patients got opioids who needed them, but in fact,

15   the volume of prescribing at these stores really suggests

16   that there was misuse and diversion.

17         There was an instance in which one of the

18   opioid manufacturers promised to resupply one of the

19   pharmacies who had lost prescription -- lost some of

20   their supply -- if they lost their supply through

21   diversion.  So even when there was known diversion, I

22   have reviewed documents stating that pharmacy would be

23   immediately resupplied.

24   Q.    All right.  Let me just pickup on that.

25         Was that particular pharmacy a pharmacy of

1    one of the Defendants in this case or some other

2    pharmacy?

3    A.    Yes, yes.  And that's in my report, your Honor.  I

4    would be happy --

5    Q.    Which company was this?

6    A.    I believe it was Perdue, and I really would have to

7    look at my report to see which pharmacy it was.

8    Q.    But do you recall it was one of the Defendants in

9    this case?

10    A.    Yes.

11    Q.    And these super stores that you've described, were

12    any of -- any of these so-called super stores pharmacies

13    of any of the Defendants in this case?

14    A.    Yes.

15    Q.    I guess I want to follow-up.

16                  Have you examined, done any focused

17    examination of the pharmacies operated by the four

18    remaining Defendants in this case?  That's Walgreens

19    Wal-Mart, CVS, and Giant Eagle, pharmacies operated by

20    those four Defendants in the two counties we are focusing

21    on.  The two Plaintiffs, as you know, are Trumbull County

22    and Lake County, the Northeast part of Ohio.

23                  Have you done any research on practices,

24    policies of the pharmacies that the four Defendants

25    operated in these two counties?

1    A.    My research is based on national policies in

2    aggregate.   I have not looked at specific pharmacies in

3    Lake and Trumbull County.

4    Q.    All right.  Have you formed a specific opinion based

5    upon your medical knowledge and practice and the research

6    you've done in this case as to whether the policies and

7    practices of any of the four individual Defendants was

8    sufficient and adequate to detect and ameliorate

9    diversion of prescription overwrites?  Have you formed an

10   opinion?

11   A.    Yes, I have.

12   Q.    And is your opinion -- do you have a specific

13   opinion as to each of the four Defendants?

14   A.    Yes.

15   Q.    All right.  Is that opinion based on your research

16   and your study of the literature and the documents?

17   A.    Yes.

18   Q.    All right.  I guess I am going to ask you what that

19   opinion is and do it by Defendant because again, as you

20   know, in a court of law, the jury has to consider the

21   evidence against each Defendant separately, and I would

22   not allow anyone just to make a general blanket opinion

23   undifferentiated and say, well, this applies to everyone

24   and just a blanket opinion.  That won't cut it in my

25   Court, and I doubt any other one.

1          So let's start with Wal-Mart.  What is your

2    opinion on Wal-Mart?

3              MR. WEINBERGER:  Your Honor, can I

4    interject?  Do you mind if Dr. Lembke refers to her

5    report?

6              THE COURT:  No, not at all, not at all.

7    BY THE COURT:

8    Q.    And you know, I -- probably shorthand -- but I want

9    to crystallize it, what her opinion is, and if you

10   specifically state it in your report, you can highlight

11   where it is in your report.

12   A.    Well, my report includes all of the supporting

13   evidence that contributed to my opinion.  My opinion is

14   that for each of the pharmacy Defendants individually

15   they lacked policies and procedures to adequately

16   investigate red flags during the first decade or more of

17   the opioid epidemic, and even after certain policies were

18   adopted, they were inadequate.

19              They could have and should have used their

20   own data to assist pharmacies in identifying prescriber

21   red flags and they furthermore more implemented

22   counter-productive measures disempowering pharmacies from

23   enacting their corresponding responsibility such as time

24   limits and incentive programs.

25   Q.    And this is all spelled out in your report?

1    A.    Yes, by individual pharmacy Defendants.

2              MR. WEINBERGER:  Your Honor, for purposes of

3    the record, the report begins to address the specifics as

4    to each of the Defendant pharmacies at page 99 and

5    continues for about 20 or 25 pages thereafter.

6              THE COURT:  Okay.  Thank you,

7    Mr. Weinberger.

8    BY THE COURT:

9    Q.    And your last answer, you referred to the first

10   decade.

11   A.    First decade or more.

12   Q.    Or more.  What years are you talking about when you

13   make that reference?

14   A.    Approximately 1999 to approximately 2013-2015.

15   Q.    So it is really closer to a decade and-a-half --

16   A.    Yes.

17   Q.    -- if you are using that time frame.  Okay.

18              All right.  I have to admit, I haven't read

19   your report page by page.

20              Did you research, for example, whether the

21   corporate practice required individual pharmacists to

22   consult the PDMP before dispensing -- before filling a

23   particular prescription?

24   A.    Yes, your Honor.  That was a specific focus of my

25   research, and my report includes detailed chronology

1    around PDMP checking and what the corporate policy was

2    regarding the PDMP in addition to studying OARRS, Ohio's

3    PDMP, and what their regulations and policies were and

4    how, in my opinion, regarding what pharmacy Defendants

5    could have and should have done regarding requiring

6    pharmacists to check the PDMP in order to fulfill their

7    corresponding responsibility compared to what pharmacy

8    Defendants actually did in that regard.

9    Q.    Did your research and study and report include the

10   policies, practices, and procedures with respect to

11   identifying red flags and what, if any, checking should

12   be done before the prescription would be filled?

13   A.    Yes, your Honor.  In detail in my report, I outlined

14   what the, for example, pharmacy operation manuals, what

15   the training, what the mandates were from the corporate

16   level to individual pharmacists for each pharmacy

17   Defendant regarding what they should be doing in checking

18   for red flags as well as, your Honor, information on

19   prohibiting pharmacists from taking certain actions that

20   pharmacists themselves felt would be important for

21   preventing --

22   Q.    Can you elaborate on that?

23            What did you identify were examples of

24   policy for pharmacists, for example?

25   A.    For example, as I said before, what pharmacies have

1       access to, which physician prescribers do not, is

2       prescriber level data, that is to say, which prescribers

3       out there are essentially pill mill doctors issuing

4       prescriptions not in the course of usual medical practice

5       and not for a legitimate medical indication.

6                   Pharmacists and pharmacies have access to

7       that information; physicians do not.  And there is

8       evidence showing that pharmacy Defendant pharmacists at

9       times wanted to have blanket refusals for dispensing for

10      certain prescribers whom they had sufficient evidence to

11      identify as pill mill doctors?

12                  And they were prohibited by their higher ups

13      in their pharmacies from doing that and told that they

14      need to evaluate each prescription on an individual level

15      when it comes, even in the case of known pill mill

16      doctors.

17                  So even though the pharmacy -- the

18      pharmacists had the ability to look at that data and use

19      that data to help pharmacists meet their corresponding

20      responsibility, they did not do so.

21      Q.   You have used the term "red flags," and I think you

22      identified a few of them, and you gave examples.

23                  How did you come up with your list of red

24      flags?

25      A.   My list of red flags is a combination of my clinical

1    experience, 25 years of seeing patients misusing and

2    getting addicted to and diverting controlled prescription

3    drugs.  It is also based on DEA enforcement actions.  It

4    is also based on the peer-reviewed literature, for

5    example, the evidence showing that combining

6    benzodiazepines and opioids is a very dangerous

7    combination?

8              And it is also based, in part, on the

9    material produced by pharmacy Defendants themselves and

10   their collaborators like the National Association of

11   Chain Drug Stores, indicating a very acute awareness on

12   the part of pharmacy Defendants about what they should be

13   looking for and what constitutes red flags?

14             And my opinion is based on the large

15   discrepancy between what pharmacy Defendants knew they

16   could and should do and what they actually did to assist

17   pharmacists in investigating red flags.

18             So for example, in my report, I talk about a

19   meeting by the National Association of Chain Drug Stores,

20   an organization to which the pharmacy Defendants in this

21   case belonged and have National Association of Chain Drug

22   Stores created a task force and said "we need to be more

23   proactive about determining these red flags and

24   investigating them."

25             And it outlined the three groups of red

1    flags that could be attributable to patient consumers,

2    that could be attributable to prescribers, and that could

3    be attributable to pharmacists, and they talked about the

4    creation of a surveillance system, policies and

5    regulations, that could detect these red flags?

6                 And pharmacy Defendants in this case -- and

7    I outlined one pharmacy Defendant in particular --

8    outright rejected the recommendations of their own

9    organization.

10   Q.    All right.  As you know, there is no Government

11   published list of red flags that say "look, these are the

12   -- these are the things you must look for or check for."

13                 My question is:  In your research, your 25

14   years of clinical practice, research and study for this

15   case, is there significant disagreement over what is and

16   what isn't a red flag, or is it just -- are there a

17   number of red flags, which almost everyone understands

18   are suspicious and should be checked if my question is

19   intelligible?

20                 I just want to know, is there a consensus or

21   is there disagreement, a significant majority and

22   minority opinion?

23   A.    Yes.  I would say there are some red flags for which

24   there is absolute clear consensus, no controversy

25   whatsoever.  I would add that red flags can emerge over

1    time.  And so part of the responsibility of everybody in

2    the opioid supply chain is to pay attention to emerging

3    red flags?

4               And I would also assert that there can be

5    some degree of controversy about a portion of those red

6    flags and whether or not they constitute red flags or the

7    extent to which they constitute red flags or how that red

8    flag should be investigated.

9    Q.   All right.  I am about done.

10              I would like you to -- if you can identify

11   the red flags that you say there is general consensus,

12   that virtually everyone agrees that these things -- you

13   have got to check for these things, or if you see one of

14   these things you, are really being derelict if you don't

15   do some follow-up or checking.

16   A.   So, your Honor, I could do that from memory, but I

17   might leave one or two things out.

18   Q.   If you have identified it specifically in your

19   report, that's fine.

20   A.   Yes.  I do identify it multiple places specifically

21   in my report.  I don't discuss in my report which red

22   flags there is more consensus around than others.  I

23   don't do that.

24              It sounds like that's what you are asking me

25   to do now.

1    Q.    Right.  I would like to know, if you can say, all

2    right.  Here are the five or ten consensus red flags that

3    in your years of practice and your study and your

4    research virtually everyone agrees that if you see

5    something, one of these, you ought to start asking some

6    questions.

7    A.    Yeah.  So I would say that consensus red flags --

8    and again, it is really important to keep in mind a red

9    flag doesn't mean the pharmacist will not dispense.  A

10   red flag means this is something a pharmacist needs to

11   investigate.

12   Q.    Right.  There may be a very good reason like the one

13   you identified where you had a patient who had chronic

14   pain but also had surgery, and that explained it.

15                So that's what we are talking about,

16   something that needs checking.

17   A.    So the consensus red flags are a patient who appears

18   to be under the influence of a controlled substance at

19   the time that they present to the pharmacy or for that

20   matter to the prescribing doctor?

21                But specific to pharmacies and pharmacists,

22   I think consensus red flags include traveling a

23   significant distance to fill a prescription, paying

24   in cash, behavior consistent with being under the

25   influence.

1           Other patient-related red flags that have

2    been described around which I believe there is consensus

3    is large numbers of patients, you know, lining up in a

4    pharmacy to get specific prescriptions, all of which have

5    been written in the same way.

6           Consensus red flags, really a cross

7    dispensing broadly is dangerous drug-drug combinations.

8    So those dangerous drug-drug combinations often emerge

9    over time.  They are not necessarily known prior to, you

10   know, the FDA approving that drug, but once they have

11   been out in the market, they are detected to be a

12   dangerous combination.

13          And then, many times the first alert comes

14   from pharmacies and pharmacists and then trickles in the

15   opposite direction to prescribers when they are alerted

16   by pharmacists that it is a dangerous drug-drug

17   combination, and specifically with opioids, that's

18   benzodiazepines, sedatives, and opioids in combination,

19   those -- because that's a commonly -- that's a

20   combination that people who are addicted use and also

21   because it is a deadly combination, because sedatives and

22   opioids work synergistically to decrease heart rate,

23   decrease respiration, and contribute to the increased

24   overdose risk.

25          Those are often referred to as cocktails in

1    the DEA enforcement literature.

2            And then, other red flags from the pharmacy

3    level are excessive volume and rate of growth of

4    controlled substances at that pharmacy.  You know, how to

5    quantify a concerning rate of growth is -- there is

6    probably some debate about that, but it is very clear

7    that some pharmacies engaged in highly prolific

8    dispensing outside of what could be appropriate medical

9    use.

10    Q.   All right.  And --

11    A.   Other ones -- I'm sorry.

12    Q.   Do you know --

13    A.   Sorry.  Other ones include doctor shopping, so all

14    of the kinds of red flags that you would get from

15    checking the prescription drug monitoring database,

16    doctor shopping, pharmacy shopping.

17            The PDMP is also very useful for dangerous

18    drug-drug combinations because often patients will get a

19    different prescription from different prescribers, so

20    again, the individual prescriber may prescribe an opioid

21    and not know that individual is also getting a

22    benzodiazepine from somebody else or a stimulant from yet

23    somebody else.  There is Soma from their orthopedist, so

24    checking the PDMP is really vital for assessing dangerous

25    drug-drug combinations as well.

1    Q.   Some of the red flags, many or most of the red

2    flags, the consensus red flags you've identified are

3    things that the individual pharmacist would be observing

4    and should follow up and question.

5              Am I correct, you know, excessive volume and

6    rate of growth of opioid prescriptions at a particular

7    pharmacy, that would be something, would it not, that

8    needs to be monitored at the corporate level because the

9    problem there could be you have got an individual

10   pharmacist that is just -- that's become a pill mill, and

11   if that's the problem, obviously, the pharmacist will not

12   be checking on herself or himself.  Wouldn't that be

13   something at the corporate you would see?

14             You have got 2,000 pharmacies over the

15   country and you can see generally what percentage their

16   business is prescription, opioids, and how it has changed

17   over time, and if you have five or ten that seem off the

18   charts, you ought to look.

19             Isn't that something that would need to be

20   checked at the corporate level?

21   A.   Your Honor, I would argue that all of these red

22   flags need to be facilitated at the corporate level.  It

23   cannot be left to the individual pharmacist to

24   independently check all of these red flags without

25   support and tools created at the corporate level and

1  sufficient time granted at the corporate level.  These

2  are labor intensive investigations.

3             I think the average pharmacist has 1.5

4  minutes to fill a prescription.  At the corporate level,

5  if environment is not created to assist pharmacists in

6  this work and the appropriate tools are not given to

7  pharmacists and the appropriate guidance, then, that's

8  not an adequate infrastructure for preventing misuse and

9  diversion.

10  Q.   Well, has your research, study, experience,

11  identified what types of tools and support the

12  corporation needs to give to its individual pharmacists

13  to enable them to do their job?

14  A.   That certainly is implied in my report, yes.

15  Q.   You are saying it is implied.  But I am not

16  sure what that means.  Have you detailed it in your

17  report?

18  A.    I have detailed in my report that pharmacists need

19  to be given the time to investigate red flags.  They need

20  to be incentivized to investigate red flags.  They are

21  currently, commonly incentivized to dispense as many

22  pills as possible in a given day, in the shortest amount

23  of time to meet certain quotas or prom -- what's called

24  promise times or bonus requirements.

25             They need to be given access to not just the

1    PDMP, which should be mandatory or required, in my

2    opinion, for pharmacists to check prior to dispensing and

3    which is labor intensive?

4              So they need to be given sufficient time and

5    infrastructure and tools to check the PDMP, but also at

6    the corporate level, the pharmacy Defendants have the

7    ability to access their own databases to check red flags

8    for prescribers, and pharmacists should not -- should

9    also have access to that information.

10             And of course, their investigation around

11   investigating red flags needs to be much more robust,

12   informed by the literature, the scientific literature,

13   informed by DEA enforcement acts.

14             There really isn't adequate policies and

15   procedures or support of pharmacists in place in order

16   to allow them to uphold their corresponding

17   responsibility.

18   Q.   Okay.  Doctor, what do you think are the limits of

19   your expertise with respect to the policies and

20   dispensing practices of the four pharmacy Defendants?

21   A.   I haven't done any quantitative analyses.  I haven't

22   looked at proportion of blame in any kind of quantitative

23   way.  I haven't specifically looked at individual

24   pharmacies or pharmacists in Lake or Trumbull County.

25   Q.   And I think, as Mr. Bush highlighted, you haven't

1    studied any of the other pharmacies which, of course,

2    exist --

3    A.    That's right, and I am not a lawyer, and I am not a

4    pharmacist.

5    Q.    -- and compared what, if anything, they are doing

6    with the four Defendants here.

7    A.    That's right.

8    Q.    Do you believe there is a difference between a

9    prescription that is not written for legitimate medical

10   purpose and a prescription that is diverted, and if so,

11   what would be the difference?  So the difference between

12   a prescription not written for legitimate medical purpose

13   and a prescription that is diverted.

14   A.    My understanding of diversion is that it is actions

15   that allow a prescription to get into the hands of an

16   individual for whom it was not intended.  Sometimes a

17   prescription that is not written for legitimate medical

18   purpose can be an act of diversion.

19           Other times a prescriber who is well

20   intentioned but duped might believe they are writing a

21   prescription for a legitimate medical purpose when, in

22   fact, that is not an evidence-based indication, or that

23   prescriber may not have access to information that would

24   allow them to make a judgment about whether or not that

25   would be a legitimate medical purpose.

1    So I feel like those are overlapping venn

2    diagrams.

3    Q.    Let me see if I can flush this out a bit.

4    So if I have a condition that justifies a

5    prescription opioid and my doctor examines me and

6    prescribes that prescription to me and somehow that

7    prescription gets to you, Doctor, and you fill it and you

8    get the opioids, that's an example of a prescription that

9    was written for a legitimate medical purpose but was

10   diverted.  Would that be fair?

11   A.    Yes, assuming that the original prescription was for

12   legitimate medical purpose.

13   Q.    Right.  Okay.  I have a legitimate medical need for

14   it, and the doctor believes I have a legitimate medical

15   need, and he or she writes it for me, and the

16   prescription ends up in your hands --

17   A.    Uh-huh.

18   Q.    -- and has been diverted.  How it got diverted,

19   that's an issue, but it is clearly diverted --

20   A.    Yes.

21   Q.    -- whereas if a prescription is written for me and,

22   in fact, I don't have a legitimate medical need for that

23   prescription opioid, that would be a prescription that is

24   not written for a legitimate medical purpose, right?

25   A.    That's right.

1    Q.    There are many ways that that could come about, but

2    that would be a prescription that is not written for a

3    legitimate medical purpose.

4    A.    That's right.

5    Q.    And sometimes there is an overlap.  You can have one

6    but not the other.  You could have both.

7              THE COURT:  Okay.  All right.  I think that

8    that covers what I wanted to cover, and we have got a few

9    minutes.  I guess, Mr. Bush, if you have a few

10   follow-ups, and Mr. Weinberger, if you have any, and then

11   we will be concluded.

12             MR. BUSH:  Thank you, your Honor.

13   FURTHER EXAMINATION BY COUNSEL ON BEHALF OF
     DEFENDANT CVS

14

15   BY MR. BUSH:

16   Q.    You testified, Dr. Lembke, I believe that a number

17   of the policies and procedures that you've addressed in

18   your report evolved over time.  Do you recall that?

19   A.    Yes.

20   Q.    And you also said that red flags, some red flags

21   evolved over time as well.

22   A.    Yes.

23   Q.    And with respect to the PDMP, I think you testified

24   earlier this morning that the Stanford Clinic did not

25   require consultation of the PDMP by the prescribers in

1    2013.   Is my memory right on that?

2    A.    Yes, that's right.

3    Q.    Your opinion in this case, however, is that the

4    pharmacy Defendants should have implemented a mandatory

5    PDMP requirement much earlier than 2013, right?

6    A.    I think in my report I do say that they should have

7    made it mandatory.   I believe that it should be mandatory

8    for pharmacists.   I can't remember what date I assigned

9    to that, if any.

10   Q.    Well, let me ask you some questions about the red

11   flags that you went through in response to Judge

12   Polster's questions.

13               You would agree, wouldn't you, that some of

14   the red flags that you identified might not really be red

15   flags because of what the pharmacist knows about the

16   patient, knows about the Doctor, knows about the

17   circumstances of the prescription that is being presented

18   to that pharmacist?

19   A.    Yes.  I would agree with that.

20   Q.    And you would agree that a pharmacist has an

21   independent professional obligation and responsibility

22   not to fill prescriptions that were not written for a

23   legitimate medical purpose.   Sorry for the double

24   negative.

25   A.    Yes.

1   Q.   And likewise, individual pharmacists have a

2   professional responsibility and a legal responsibility to

3   comply with his or her corresponding responsibility?

4   A.   I would agree with that, but what I emphasize in my

5   report is that, if the corporate infrastructure is not in

6   place to give the pharmacist the necessary tools to enact

7   and uphold their corresponding responsibility, it becomes

8   impossible for the pharmacist to do that.

9   Q.   You also talked about and said something in the

10  context of corporate action, but the pharmacist does have

11  an incentive to live up to his or her professional

12  obligations and legal obligations because if she doesn't,

13  she could lose her license.

14  A.   Well, part of the issue there is that pharmacists

15  were miseducated about the evidence-based use of opioids

16  by opioid manufacturers, collaborated with corporate

17  pharmacy Defendants.

18              And so just as with doctors exercising their

19  clinical judgment and their medical judgment requires

20  having access to true information about legitimate

21  medical use of opioids and having an infrastructure and

22  environment that allows them to do that.

23              And there were significant, you know, my

24  research showed me that there were significant

25  consequences professional, adverse professional

1    consequences for pharmacists who complained about having

2    inadequate time to safely dispense opioids and who, when

3    suggesting, for example, that certain prescribers should

4    have blanket refusals, that that was essentially rejected

5    by corporate, and they were told that they had to

6    continue to dispense.

7              So yes, in some ideal world, pharmacists

8    would be able to exercise their judgment, but if their

9    judgment isn't informed by the information and isn't

10   supported by the environment that they live in, I

11   don't think we can expect that pharmacists, except for a

12   few martyrs, would be able to exercise that

13   responsibility.

14   Q.   If a pharmacist knew that a prescription was written

15   by a doctor or another prescriber and it was not written

16   for legitimate medical purpose, the pharmacist would have

17   an incentive not to fill that prescription, regardless of

18   any of the other information that you are talking about

19   here because she could lose her license.

20   A.   I disagree with your use of the word "incentive"

21   there.  I would say the pharmacist has a responsibility

22   not to dispense, but in the face of all the other

23   incentives from the corporate level, it can be very hard

24   for the individual to go against the tide.

25   Q.   Well, to go back to the PDMP for a second, I know

1  you've expressed some opinions about when pharmacy

2  companies should have mandated that and under what

3  circumstances pharmacy companies should have mandated

4  their pharmacists consult a PDMP, but you have done no

5  evaluation whatsoever to determine how often pharmacists

6  at each of the pharmacy Defendants actually consulted the

7  PDMP?

8  A.    I haven't done any granular analysis at the

9  individual pharmacist level, that's correct.

10  Q.    Regardless whether or not the company had a policy

11  that mandated it, it may well be the case that the

12  pharmacist did consult the PDMP in appropriate

13  circumstances?

14  A.    In my 25-year clinical experience, the number of

15  times I have detected red flags on the PDMP for my

16  patients when the pharmacy did not is very high, so it

17  has not been in my experience until the last couple of

18  years that pharmacists are more regularly checking the

19  PDMP, and the material that I've looked at would attest

20  to that as well given that, uh-huh.

21  Q.    Sorry.  To my question though was whether you have

22  in this case, in the two counties that are the Plaintiffs

23  in this case, you haven't evaluated whether the

24  pharmacists at the pharmacies, the pharmacy Defendants

25  actually consulted the PDMP in appropriate circumstances.

1    You have not done that analysis.

2    A.    Not at the individual pharmacy level, no.

3    Q.    I want to generally stay away from individual

4    Defendants in this examination, but I did want to ask you

5    one question that was CVS specific.

6              And I don't know if I told you this at the

7    outset, but I do represent CVS.

8              When you were -- this has to do with your

9    opinions and testimony about what you consider to be

10   cooperative efforts with the manufacturers and the

11   distributors to enhance access to opioids.  That's the

12   general subject matter.

13             And you cited a variety of things that you

14   believe showed collaboration, and you focused, as a

15   result, I think, of Judge Polster's questions on super

16   stores, but as I read the report, you have cited one

17   document, an educational document that related to CVS,

18   and that was the only thing you had cited to show CVS

19   collaboration.  And I want to ask you about that

20   document.

21             It was an educational services document.  It

22   I think was produced by Incess, not by CVS and you

23   characterized that document as "prescribing a promotional

24   campaign that could be washed by CVS-Caremark pharmacies

25   on behalf of selected opioid manufacturers, "and that

1    "this document illustrates that CVS-Caremark was in the

2    business of promoting opioids, not just dispensing them."

3            Do you remember that general part of

4    your opinion or generally remember that part of your

5    opinion?

6    A.    Yes.

7    Q.    And I can pull that document up if you don't recall

8    it, but do you have any evidence or information to

9    suggest that there was ever an opioid product that was

10    promoted pursuant to this educational program that CVS

11    was talking about?

12    A.    So my recollection of my report -- and I really need

13    to look at my report to answer this question -- is that I

14    cite more than one document.  I cite a number of

15    different documents around CVS' collaboration with

16    Perdue, around the adherence program, CVS' collaboration

17    with other pro opioid lobbying organizations.  I am not

18    specifically remembering that one document.

19    Q.    I want to focus on that document if you don't

20    remember it, and maybe we should just move on, but I

21    would suggest to you that document doesn't say anything

22    about opioids.  It is a document that is generic.  You

23    don't have any --

24            THE COURT:  That isn't productive, your

25    characterization or conclusion.

1          MR. BUSH:  All right.  Well, then, I will

2     pull it up, your Honor.

3               Can I do a sharer screen?

4          THE COURT:  All right.  We have only got a

5     couple more minutes.

6          THE WITNESS:  Can you tell me where in my

7     report I cite the documents, so I can go to my report?

8          MR. BUSH:  Tell you what.  Let's just move

9     on.  As I said, I didn't want to really get into

10    Defendant specific material.

11              It just struck me that that one was, in

12    particular, an interesting use of the document.  We will

13    move on.

14              Let me see if I have anything else, your

15    Honor.

16         THE COURT:  Okay.

17              (Pause.)

18         MR. BUSH:  That's all.  I am done.  Thank

19    you, Dr. Lembke.  I appreciate your time.

20         THE COURT:  Okay.  Thank you, Mr. Bush.

21    Mr. Weinberger, anything you want to ask?

22         MR. WEINBERGER:  Yes, your Honor, just a few

23    questions.

24                    - - - - -

25

1   EXAMINATION BY COUNSEL ON BEHALF OF THE PLAINTIFFS

2   BY MR. WEINBERGER:

3   Q.   Dr. Lembke, at page 112 of your report, you discuss

4   the meeting convened by the National Association of Chain

5   Drug Stores in January of 2013, which was entitled "DEA

6   compliance working group."  Do you recall that?

7   A.   Yes.

8           MR. BUSH:  I'm sorry.  What was the page

9   number?  I didn't hear it.

10          MR. WEINBERGER:  Page 112.

11          MR. BUSH:  Thank you.

12  BY MR. WEINBERGER:

13  Q.   In that report, you indicate that the working group

14  included Walgreens representative as co-chair and

15  representatives of CVS, Rite Aid, and Wal-Mart as

16  participants.  Do you recall that?

17  A.   Yes.

18  Q.   There is an exhibit in this case, which you've

19  referenced, which is a chart created for that working

20  group or by that working group of red flags.  Do you see

21  it?  Do you recall that?

22  A.   Yes.  And I believe I did mention that in my

23  testimony today.

24  Q.   And those red flags are contained -- contain

25  annotations to various DEA enforcement actions and other

1    sources.  Is that true?

2    A.    Yes.

3    Q.    And it is broken down as you did by categories,

4    patient conduct, physician conduct, and pharmacy conduct,

5    correct?

6    A.    Yes.

7    Q.    And the annotations include DEA enforcement actions

8    published in the Federal Register that go back as far as

9    the late '90s.  Is that correct?

10   A.    Yes.

11   Q.    And you reference some of those cases including

12   the --

13   A.    East Main Street document.

14   Q.    Correct.  That is dated back to 2010, correct?

15   A.    Yes.  Actually, I think the East Main Street is

16   2005-2006.

17   Q.    You might be correct there.

18             Now, with respect to your testimony about

19   the Ohio PDMP-OARRS -- and you couldn't recall the date

20   that would be applicable to that PDMP as relates to the

21   pharmacies' conduct -- if I could refresh your memory,

22   although OARRS went into effect in 2006 in Ohio, in 2011,

23   there was a regulation that required review of the

24   OARRS-PDMP under certain circumstances by all

25   pharmacists.  Is that correct?

1    A.    Yes.  That was in 2011.

2    Q.    Okay.  When you check the PDMP at your Clinic,

3    do you document your review of the PDMP and what was

4    found?

5    A.    Yes.

6    Q.    The pharmacies are in the process in this case of

7    producing their notes electronically as well as hard copy

8    of notes pursuant to Court order for our review to

9    determine what, if any, documentation was undertaken with

10   respect to red flags and specifically with respect to

11   checking the PDMP.

12             You have not had an opportunity to review

13   those documents as of yet, correct?

14   A.    No.  But that would be tremendously useful.

15   Q.    Okay.  We are working on a deadline right now, but

16   we will see what happens with that.

17             MR. WEINBERGER:  Thank you, Dr. Lembke.

18   Judge Polster, that's all I have.

19             THE COURT:  All right.  Thank you,

20   Mr. Weinberger.  All right.

21             I think we are concluded.

22             So Dr. Lembke, I appreciate it and again,

23   thank you for taking the time away from your clinical

24   practice and research and, candidly, your sleep because

25   it is pretty darn early, although my guess is you start

1    your professional day early as we all do.  Thank you.

2              This has been very helpful to me, to have

3    this colloquy to better understand what you've done and

4    the basis for your conclusions, so I can address the

5    legal issues I need to.

6              So with that, we are adjourned and stay safe

7    everyone, and I know we have a phone call in about 10 or

8    12 minutes calling in.  So thank you very much.  We are

9    adjourned.

10             (Hearing concluded at 11:20 a.m.)

11                      - - - - -

12

13              C E R T I F I C A T E

14        I, George J. Staiduhar, Official Court

15   Reporter in and for the United States District Court,

16   for the Northern District of Ohio, Eastern Division,

17   do hereby certify that the foregoing is a true

18   and correct transcript of the proceedings herein.

19

20

21

22             s/George J. Staiduhar
               George J. Staiduhar,
23             Official Court Reporter

24             U.S. District Court
               801 W. Superior Ave., Suite 7-184
25             Cleveland, Ohio 44113
               (216) 357-7128