## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL 2804** |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) ) | |
| | ) | **Judge Dan Aaron Polster** |
| ***Track Three Cases*** | ) ) | |
| | ) | **EVIDENTIARY ORDER** |
| | ) | |

The *Track Three* trial on Plaintiffs' (Ohio's Lake and Trumbull Counties') public nuisance claims against the Pharmacy Defendants[1] is scheduled to begin on October 4, 2021.[2] The parties have filed various motions *in limine* seeking: (1) modification of the Court's previously issued evidentiary rulings; and (2) new rulings on evidentiary matters not previously raised by the parties or addressed by the Court.  The Court's rulings on these motions are set forth below.

As with the Court' previous evidentiary rulings, the rulings set forth below will normally apply to all future cases in the MDL tried by this Court. *See Evidentiary Orders,* Doc. #: 3058 at 1, Doc. #: 3546 at 1-2. Additionally, as a general matter, these rulings will apply to remanded cases

---

[1] The Pharmacy Defendants remaining for trial are: (1) Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc. (collectively, "Walgreens"); (2) CVS Indiana, L.L.C., CVS Rx Services, Inc., CVS Pharmacy, Inc., CVS TN Distribution, L.L.C., and Ohio CVS Stores, L.L.C. (collectively, "CVS"); (3) Giant Eagle, Inc. and HBC Service Company (collectively, "Giant Eagle"); and (4) Walmart Inc.  The Rite Aid defendants (Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Support Center, and Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center) have been severed from these proceedings. *See* 08/26/21 Order granting Doc.#: 3894 (Joint Motion to Sever).

[2] The *Track Three* claims will be tried in two phases: In Phase One, a jury will decide: (1) whether a public nuisance exists; and (2) if so, whether any Defendant was a substantial factor in causing it.  *T3 Order re Apportionment* at 3-4 (Doc. #: 3479).  If the Phase One jury finds in favor of Plaintiffs, the Court, in Phase Two, will then determine remedies, including: (1) whether and how the nuisance can be abated; (2) whether the costs of abatement can be apportioned among defendants; and (3) if so, what the apportionment should be.  *Id.* at 4.

tried by transferor courts. *See id.* (citations omitted).[3] In future MDL cases, the parties should generally not file a motion (including one for reconsideration) addressing an evidentiary issue already addressed herein or in the Court's prior *Evidentiary Orders* (Docs. #: 3058 and 3546). Going forward, a party may file a motion in an MDL case to modify the contours of prior rulings only if that party can show that the particular circumstances of an individual case warrant a revision.

### A.    Motion Seeking Clarification or Extension of Prior Rulings.

In the Motion discussed below, Plaintiffs request a clarification or extension of rulings previously set forth in the Court's *Evidentiary Orders* (Docs. #: 3058 and 3546). As stated, the Court will adhere to those rulings unless a party shows the circumstances of this case warrant a revision. *See* Doc. #: 3058 at 1-2; Doc. #: 3546 at 1-2. The motion will rule separately on related "MIL preservation motions" (e.g. Docs. # 3830, 3838, & 3841), which seek to preserve certain arguments and objections.

---

[3] *See* David F. Herr, Multidistrict Litigation Manual § 10:5 (May 2019 update) ("The transferor court (court to which the actions are remanded) receives the cases in the condition they are in at the time of remand   Decisions that have been made in the case continue to apply unless circumstances change warranting their modification. The decisions made by the transferee court are considered 'law of the case.'") (footnotes omitted); *see also* Manual for Complex Litigation, Fourth § 20.132 at 224-25 (2004) (before remand of cases to transferor courts, the transferee court should enter "a pretrial order that fully chronicles the proceedings, summarizes the rulings that will affect further proceedings, outlines the issues remaining for discovery and trial, and indicates the nature and expected duration of further pretrial proceedings"); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456 (N.D. Ohio June 4, 2010) (entering this type of order).

2

- **Plaintiffs' MIL No. 45 to Exclude any Reference to Efforts or Actions of Any Defendant, or its Affiliates or Employees, in Connection with In-Store "Good Deeds" or Corporate Conduct Unrelated to Opioids[4] – GRANTED.**

Plaintiffs move to exclude any reference to efforts or actions of any Defendant, or its affiliates or employees, in connection with in-store "good deeds" or corporate conduct. The Court previously found similar "good deeds" evidence to be irrelevant to the issues in this case unless evidence to the contrary is offered.[5] Plaintiffs now ask the Court to clarify that those rulings extend to "non-opioid-related in-store activities or promotions, such as 'Walgreens' 'Red Nose Day' . . . or corporate policies or decisions regarding non-opioid products, such as 'carding' everyone who is attempting to purchase alcohol or cigarettes or similar products irrespective of their apparent age." Motion at 3; Reply at 2-3.

Defendants contend, without further development, that the testimony Plaintiffs seek to exclude "is obviously not the equivalent of testimony regarding corporate 'good deeds.'" Response at 4. The Court disagrees. In-store activities not related to opioids and corporate policies or decisions concerning non-opioid products are analogous to the "good deeds" evidence excluded in the Court's prior decisions and, therefore, fall within the purview of those rulings.

Defendants further challenge the Motion by offering a hypothetical scenario in which Plaintiffs *might* open the door to this "good deeds" evidence, for example, by offering evidence to demonstrate Defendants prioritized profits over patients or other evidence unrelated to the distribution or dispensing of prescription opioids. If that were to happen, Defendants argue, then

---

[4] Motion (Doc. #: 3830 at 3); Response (Doc. #: 3927 at 4-5); Reply (Doc. #: 3937 at 2-3).

[5] *See* Doc. #: 3058 at 68-69 ("evidence that the parties and/or their employees are 'good citizens' and do good deeds such as providing scholarships, community service, or charitable contribution is not relevant to the issues in this case (unless another party offers evidence to the contrary"); Doc. #: 3546 at 16-17 (concluding the Court's prior ruling (Doc. #: 3058 at 68-69) sufficiently addresses the narrow issue that "Defendants 'good deeds' related to Covid-19 similarly are irrelevant unless Plaintiffs offer evidence to the contrary.").

they should be permitted to introduce counter evidence on these subjects. *Id.* at 5. The Court declines to engage in the hypothetical exercise. Defendants' objections to specific evidence may be raised at trial, where the Court will rule on the evidence in context.

The "good deeds" evidence Plaintiffs seek to exclude is not relevant to the issues in this case unless Plaintiffs offer evidence to the contrary. Accordingly, Plaintiffs' Motion *In Limine* No. 45 (Doc. #: 3830) is **GRANTED.**

### B.     New Motions.

The following rulings involve new issues not previously raised by the parties or addressed by the Court.

- ▪ **Plaintiffs' MIL No. 44 to Exclude any Reference to Prescription Opioids as "Legal" Drugs, or Distinguishing Them from "Illegal" Drugs[6] – DENIED.**

Plaintiffs seek to "preclude Defendants from characterizing prescription opioids and other controlled substances as 'legal,' or distinguishing them from 'illegal' drugs." Motion at 1.[7] Plaintiffs assert that this sort of characterization states a legal conclusion and is potentially misleading. For the following reasons and with the caveat stated below, Plaintiffs' motion is denied.

Plaintiffs draw the Court's attention to the distinction between prescription opioids, themselves, and Defendants' conduct with respect to distribution or dispensing of those

---

[6] Motion (Doc. #: 3830 at 1-3); Response (Doc. #: 3927 at 1-3); Reply (Doc. #: 3937 at 1-2).

[7] In their response, Defendants ask the Court to rule that Plaintiffs should "be precluded from arguing, falsely and misleadingly, that the pain medications at issue are not legal and that they are comparable to heroin and other illegal street drugs." Response at 3. For the reasons stated below and with the same caveat, that request is also denied.

prescription opioids. The Court agrees that the distinction is important to identify. It is true that prescription opioids, *absent some conduct with respect to their manufacture, handling, sale, or use*, are neither legal nor illegal *per se*. However, the Court believes that outright exclusion of the modifiers "legal" or "illegal" as they pertain to opioids would cause more confusion than it would cure. As Plaintiffs, themselves, point out in their response to another of Defendants' motions, "The balancing test required under Rule 403 is highly context-specific. To the extent Movants believe that a particular piece of evidence [or, in this instance, a specific characterization of opioids] is unfairly prejudicial, needlessly cumulative, confusing, or a waste of time, they should make those objections at trial where the Court will have the necessary context to make its decision." Doc. #: 3837 at 9 (Plaintiffs' response to Defendants' motion *in limine* regarding remote shipments). The Court believes this is the best way to carefully draw out this distinction.

Therefore, the Court will not prohibit the use of the qualifiers "legal" or "illegal" with respect to prescription opioids. Instead, the Court will be receptive to objections from either party regarding an opposing party's attempts to classify prescription opioids, rather than the conduct at issue in this litigation, as inherently legal or illegal. That said, the Court adds this caveat: it is the Court's very strong preference that the parties refrain, whenever possible, from using the modifiers "legal" or "illegal," and instead use more factually-accurate modifiers such as "FDA-approved," "illicit," or "diverted" (as appropriate).   Accordingly, Plaintiffs' Motion *In Limine* No. 44 (Doc. #: 3830) is **DENIED**.

- **Plaintiffs' MIL No. 47 to Admit Plaintiffs' Rule 1006 Summaries[8] – GRANTED.**

Plaintiffs move the Court to admit into evidence, under Fed. R. Evid. 1006, summaries prepared and presented as charts by their expert, Craig McCann. They assert the charts summarizing Defendants' voluminous opioid distribution and dispensing data, ARCOS data, and government data[9] offer "the only practical means of making their contents available to judge and jury." Motion at 6-17 (quoting Fed. R. Evid. 1006 Advisory Committee Notes); Ex. A. at 2-14 (Doc. #: 3830-1).[10] Plaintiffs urge the Court to render the admissibility ruling prior to trial and thereby avoid consuming trial time to prove foundation and admissibility while the jurors wait for the issues to be resolved. Reply at 5-6. Defendants contend the Court should defer a decision, which they argue must come only after a proposed summary has been introduced and a foundation laid at trial, and the Court should determine admissibility on a "chart by chart basis and in the context of how each is presented at trial." Response at 7-8.

The Court's determination of this "rule now or later" dispute is guided by the Sixth Circuit's five preconditions to admitting Rule 1006 summary charts. *See U.S. v. Bray*, 139 F.3d 1104, 1109-1010 (6th Cir. 1998). Applied here, the preconditions counsel strongly in favor of a pretrial ruling that the proposed charts and underlying data are admissible. Further supporting that conclusion is Judge Faber's analysis and decision ("Faber Opinion") overruling the *Track Two* Defendants' objection to admitting the charts introduced by the Plaintiffs. *See* Motion at 10-15; Ex. B (Doc. #: 3830-2). Judge Faber admitted the summary charts following "several days" of

---

[8] Motion (Doc. #: 3830 at 6-17); Response (Doc. #: 3927 at 6-9); Reply (Doc. #: 3937 at 3-7).

[9] Government sources of the data include the Food and Drug Administration, the Centers for Disease Control and Prevention, Centers for Medicare and Medicaid Services, and the U.S. Census Bureau.  Motion at 8-9.

[10] *See also*, Expert Report of Craig J. McCann, PH.D., CFA (April 16, 2021).

testimony by, and cross-examination of, McCann. Response at 7; Ex. G at 86:3-10 (Doc. #: 3927-7).

First, under *Bray*, the underlying documents must be "so voluminous that they cannot conveniently be examined in court by the trier of fact." *Bray*, 139 F.3d at 1109 (internal citations and quotation marks omitted). Numbering in the millions, the ARCOS data, transactional data produced by Defendants, and associated governmental data indisputably meet that criterion. *See* Motion at 10-11; Faber Opinion at 4-6 ("The charts tabulate or illustrate a morass of data to make it comprehensible.").

Second, the ARCOS data has been available to Defendants for examination and copying since *Track One-A*, and, of course, Defendants have access to their own transactional data. *See Bray*, 139 F.3d at 1109 (summaries must have been available to parties at a "reasonable time and place"); Motion at 11; Faber Opinion at 12-13 & n.7 ("There appears to be no question . . . that defendants received the McCann charts with ample time to review them, check their accuracy, and prepare to cross-examine their author.").

The third *Bray* precondition requires the proponent of 1006 summaries to "establish that the underlying documents are admissible in evidence." *Bray,* 139 F.3d at 1109-1110. Here, the parties stipulated that the ARCOS data is admissible; Defendants do not deny admissibility of their own data; and the data from government sources is admissible as public records. Motion at 11-12 (citing *Warstler v. Medtronic, Inc.*, No. 3:16CV385, 2016 WL 10459786, at *1 (N.D. Ohio Aug. 15, 2016) ("The Court may take judicial notice of public and government documents because their sources 'cannot reasonably be questioned'")). Defendants do not refute admissibility, but instead argue the ruling must come after Plaintiffs lay a foundation through McCann's testimony, which must be made "at trial." Response at 7-8. They further contend the *Track Two* ruling was based on

"a different set of Rule 1006 summaries created by McCann," *id.* at 6-7; but they do not identify any material differences between the charts reviewed by Judge Faber and the ones Plaintiffs intend to use as evidence in this trial. Nor do they explain why Judge Faber's *Track Two* admissibility ruling would be inapplicable to this Court's determination because it was rendered in a bench trial after a foundation was laid. *See id.* Defendants' arguments do not persuade the Court that a ruling at this time is premature or that the Court's reliance on Judge Faber's comprehensive, well-reasoned analysis is misplaced.

Fourth, *Bray* requires summary documents to be "accurate and nonprejudicial," explaining that means "the information on the document summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner," with nothing "lost in the translation," and "the information on the summary is not embellished by or annotated with the conclusions of or inferences drawn by the proponent." *Bray,* 139 F.3d at 1110. Defendants assert some of the charts do not accurately and correctly summarize the existing data because they are based on "manipulated" expert analysis and "expert-adjusted ARCOS data." Response at 7. Defendants do not, however, identify which of the charts they find inaccurate or incorrect, or where they see any manipulated adjustments.[11]

Finally, under *Bray,* before summary charts may be admitted into evidence, the proponent must lay a proper foundation by presenting "the testimony of the witness who supervised its preparation." *Bray*, 139 F.3d at 1110. Plaintiffs assure the summaries will be properly introduced

---

[11] To the extent Defendants target McCann's use of information beyond the ARCOS data, *e.g.*, from government sources or certain corrections to data, the Court agrees with Judge Faber's reasons for rejecting those arguments. Judge Faber concluded that "[w]hat McCann did with information outside the four corners of the underlying materials was permissible," Faber Opinion at 7, and further found that: (a) McCann did not add to the underlying data, but used government data from the CDC to translate Defendants' transactional data for better comprehension, *id.* at 15; (b) corrections McCann made, such as excluding duplicate or erroneous transactions, were "microscopic" and disclosed by McCann, *id.* at 22; and (c) "no chart presents the product of manipulated data," *id.* at 24. *See* Faber Opinion 13-25.

as part of McCann's testimony, just as they did in *Track Two*. Motion at 6.  Defendants will have the opportunity to cross-examine McCann and to refute Plaintiffs' evidence with their own.

In sum, the charts at issue that were submitted with the briefing fully meet all the *Bray* requirements, and a Court ruling now will save significant time at trial.  Accordingly, the Court rules all of the Rule 1006 summary charts provided in Plaintiffs' Motion are admissible, as is the underlying data (being McCann's processed ARCOS data, Defendants' distributing and dispensing data, and the associated government data).  Regarding other charts the parties refer to, which are still under consideration pursuant to their stipulated process and so were not submitted with the briefing, the Court directs as follows.  In light of the instant ruling, Defendants shall determine whether there is any reason (other than protecting the appellate record) that this ruling should not apply to Plaintiffs' other Rule 1006 summaries.  Defendants can then file a brief if they deem it necessary.

Accordingly, Plaintiffs' Motion *In Limine* No. 45 (Doc. #: 3830) is **GRANTED**.


- ▪ **Defendants' MIL to Exclude Certain Newspaper Articles[12] – GRANTED.**

The Pharmacy Defendants move *in limine* to "exclude two newspaper articles that appear on Plaintiffs' exhibit list and are discussed by certain of Plaintiffs' expert witnesses: (1) 'Pharmacies Miss Half of Dangerous Drug Combinations,' Chicago Tribune (Dec. 15, 2016); and (2) 'How Chaos at Pharmacy Chains Is Putting Patients at Risk,' The New York Times (Jan. 31, 2020)." Motion at 1.

---

[12] Motion (Doc. #: 3832); Response (Doc. #: 3925); Reply (Doc. #: 3940).

The Pharmacy Defendants seek to exclude the two newspaper articles as inadmissible hearsay.[13] Hearsay is a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The matter asserted by these articles is, broadly speaking, that corporate pharmacies pressured pharmacists to fill prescriptions quickly, and this pressure led to mistakes by pharmacists. Plaintiffs assert the articles are not hearsay because they will not introduce the articles to show that pressure actually led to errors as described in the articles; rather, they will introduce the articles to show "Defendants' knowledge and awareness of the fact that their pharmacists were complaining about their working conditions," and that "Defendants were put on notice that the media was questioning the working conditions of their pharmacies, and that allegations were being made that their pharmacists did not have time to safely fill prescriptions." Response at 4.

Further complicating the issue, within each article are numerous quotes by individuals, ranging from Defendants' representatives to regulators to anonymous sources. Defendants assert these quotations constitute an additional layer of hearsay within the article; in other words, "double hearsay" or "hearsay within hearsay." Motion at 3 (quoting *Reynolds v. Green*, 184 F.3d 589, 596 (6th Cir. 1999)). "'[H]earsay within hearsay' is inadmissible unless both levels of hearsay fall within an exception to the hearsay rule." *Reynolds*, 184 F.3d at 596.

In addition to their Rule 801(c) argument, Plaintiffs also respond that the Chicago Tribune article is not hearsay as to CVS, Walgreens, and Walmart, because it constitutes an opposing party's admission. Under Rule 801(d)(2)(B), a statement is not hearsay if it is offered against an

---

[13] The Pharmacy Defendants also assert that the articles are irrelevant and that even if relevant, their probative value is substantially outweighed by their unfairly prejudicial effect. The Court does not address these arguments because the articles will be excluded on hearsay grounds, but notes that the articles are clearly relevant and highly probative.

opposing party and "is one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B). Plaintiffs provide several exhibits they say demonstrate these Pharmacy Defendants' response to the Chicago Tribune article manifests the Defendants "adopted or believed [the article] to be true." *Id.*; *see* Response at 5-6. Plaintiffs further assert Defendants' purported adoption of or belief in the truth of the article necessarily "draws inferences from the underlying hearsay" and, thus, further manifests an adoption of the truth of the quoted statements as well. Response at 6. In other words, Plaintiffs assert that, because the Pharmacy Defendants took immediate action in response to the article's publication, they must have believed the article and the statements quoted therein were true. Defendants reply that, if anything, their responses to the article, as well as "statements in the article[,] show they ***disagreed*** with [the article's] conclusion." Reply at 3 (emphasis added).

Much of the quoted language within both newspaper articles is certainly hearsay, and Plaintiffs have not demonstrated that Defendants adopted or otherwise believed the veracity of those imbedded hearsay statements. While some of the quotes are opposing-party statements (which are not hearsay), the vast majority are out-of-court statements made by third-parties to this litigation. Even if the Court were inclined to allow Plaintiffs to introduce the articles, themselves, for their stated reasons – *i.e.*, other than the truth of the matter asserted, or as an opposing party's admission – the Court is not inclined to engage in the type of line drawing required to determine which double-hearsay statements are admissible and which are not.

In any event, such an exercise is unnecessary. To the extent Plaintiffs want to introduce evidence of the existence and thrust of the articles, they can do so simply by introducing evidence of Defendants' own response to and characterization of the articles, which is not hearsay.  In other

words, Plaintiffs can introduce evidence of what Defendants did and said in response to the newspaper articles without introducing the articles themselves.[14]

Accordingly, the Pharmacy Defendants' motion to exclude newspaper articles (Doc. #: 3832) is **GRANTED**.

- ▪ **Defendants' MIL to Preclude the Use of Misleading Handwritten Notes and Prevent Them from being Admitted as Evidence[15] – DENIED WITHOUT PREJUDICE.**

During the depositions of various witnesses, Plaintiffs' counsel contemporaneously created handwritten notes, summaries, and diagrams – using various colors of ink on a blank sheet of paper – purporting to summarize the topics discussed with and testimony given by the witness. Plaintiffs' counsel's technique was essentially the same as the common practice where an attorney creates handwritten charts or summaries on a whiteboard during live witness testimony at trial.

Defendants seek to preclude Plaintiffs from using or introducing these demonstrative aids at trial, arguing: (1) they are inaccurate and misleading; and (2) the danger of unfair prejudice substantially outweighs any probative value.[16]  Motion at 1, 5-8 (citing Fed. R. Evid. 401, 402, 403).

Plaintiffs state they plan to use counsel's handwritten notes and drawings for pedagogical purposes – that is, as demonstrative aids to support their presentation and aid the jury's understanding.  *Id.* at 2.  Unlike Rule 1006 summaries (which are admitted into evidence and must

---

[14] For example, Plaintiffs cite to a PowerPoint presentation by Walgreens summarizing the Chicago Tribune article and describing actions Walgreens employees should take and have taken in its wake.  Response, Ex. 2 at 5 (Bates # WAGMDL00250895). This evidence adequately characterizes the article, reveals Defendants' reaction to it, and does not suffer the hearsay issues that infect the newspaper articles, themselves.

[15] Motion (Doc. #: 3836); Response (Doc. #: 3923); Reply (Doc. #: 3942).

[16] Because Plaintiffs do not intend to introduce the notes and diagrams as admissible evidence or Rule 1006 summaries, *see* Response at 1, the Court denies as moot Defendants' request to exclude them from evidence at trial.

accurately represent information "taken from underlying documentary proof which is too voluminous for convenient in-court examination"), pedagogical or demonstrative summaries are not admitted into evidence and may be used as illustrative devices to help "organize or aid the jury's examination of [underlying] testimony or documents, which are themselves admitted into evidence at trial." *Bray*, 139 F.3d at 1111 (quoting *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986)).

The Court has broad discretion to allow counsel to use pedagogical summaries "to clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury." *Bray*, 139 F.3d at 1111.  In deciding whether to permit these demonstrative aids, the Court considers Rule 611(a), which instructs: "The Court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a); *see Bray*, 139 F.3d at 1111.

Defendants assert counsel's notes and drawings will be unhelpful and unduly prejudicial because they inaccurately characterize the witness's testimony and include counsel's own statements – and not those of the witness.  Motion at 5-6.  In support of these assertions, Defendants point to specific examples of counsel's notes as compared with the witness's deposition testimony, contending these examples show counsel incorrectly mischaracterized the witness's statements.[17] *Id.* at 2-4. Plaintiffs disagree and point to countering portions of the witness's testimony. Response

---

[17] Defendants contend counsel created misleading and incorrect demonstratives during the depositions of defense witnesses and also to lead the testimony of Plaintiffs' own witnesses.  Motion at 4, 5 n.2.

at 7-15. Plaintiffs state that "counsel has no intention of misleading, or making misrepresentations, to the jury." *Id.* at 5.[18]

Defendants' motion seeks to exclude ***all*** of counsel's existing diagrams and notes for ***every*** deposition witness, and goes even further to request an order prohibiting counsel prospectively from creating "similar drawings" at trial with live witnesses.  Motion at 1.  This request is necessarily premised upon the assertion that every part of the existing demonstrative-aid-documents created during deposition, and every part of any future such document to be created at trial, is unduly misleading or prejudicial.  Of course, this sweeps far too broadly.

As the Sixth Circuit has recognized, pedagogical or illustrative summaries "are more akin to argument than evidence," and "may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." *Bray*, 139 F.3d at 1111 (quotations and citations omitted). In other words, pedagogical exhibits can properly be argumentative and persuasive in nature.  *See Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 707-08 (7th Cir. 2013) (by definition, demonstrative exhibits are less neutral in their presentation).  That said, demonstrative exhibits must be accurate and not misleading.  *See, e.g.,* Fed. R. Evid. 611(a); *United States v. Zeman*, 978 F.2d 1260 (Table), 1992 WL 333106, at *3 (6th Cir. Nov. 9, 1992) (finding the government's demonstrative use of an organization chart that accurately diagrammed the roles of key players did not result in an unfair trial but, rather, facilitated the jury's understanding of trial testimony).

---

[18] As one example, Defendants cite the deposition of Nicole Harrington, a CVS employee, and object to counsel's handwritten note that: "You repeatedly post on the 'opioid epidemic.'"  Motion at 2 (quoting Defs. Ex. A).  Defendants assert Harrington did not agree with this statement and instead testified that, while some of her postings contained language regarding the "opioid epidemic," the posting that counsel inquired about was not written by her.  Motion at 2 (quoting Harrington Depo. at 39:23-40:9, Defs. Ex. B).  Conversely, Plaintiffs assert: "Harrington's testimony establishes that she did in fact repeatedly 'post' on the 'opioid epidemic.'"  Response at 8 (citing Harrington Depo. at 40:15-25, Pls. Ex. 1 ("I post on many topics [and] the words 'opioid epidemic' . . . appears in . . . some of those posts, whether it's language that I've written or it's language from others.")).

At trial, an objection by defense counsel to one "bullet point" written on a whiteboard by plaintiff's counsel may be successful (because the wording of that "bullet point" is misleading), while an objection to the next "bullet point" may fail.  The same is true of the documents created by plaintiff's counsel as demonstrative aids during deposition.  The Court will not prohibit counsel (for plaintiffs *or* defendants) from using or creating such diagrams and notes wholesale. The Court will not rope off all use of such demonstrative aids at trial.

Rather, the Court will entertain objections to specific elements in those demonstrative aids, if appropriate. Counsel may raise objections at trial to a given piece of content in a demonstrative aid created with a live witness, and may raise objections during the deposition designation process to a given piece of content in a demonstrative aid created with a witness presented by deposition.

The Court adds, however, that the examples cited by Defendants generally fall more in line with fair argument and persuasion, as opposed to major mischaracterizations that unfairly risk confusing or misleading the jury.  The alleged inaccuracies are often explained or clarified through other portions of the same witness's deposition testimony.  Moreover, the Court can always instruct the jury that the demonstrative exhibit itself is not evidence, and the jury should listen carefully to what the witness actually says.  *See Bray*, 139 F.3d at 1111-12 (where pedagogical summaries are used, the court should generally give a limiting instruction informing the jury: (1) of the summary's limited purpose as an illustrative aid; and (2) that the summary itself does not constitute evidence).

Accordingly, Defendants' motion to preclude Plaintiffs from using counsel's handwritten notes or "summaries" of deposition testimony as demonstrative exhibits at trial (Doc. #: 3836) is **DENIED**.  This ruling, however, is without prejudice: if Defendants believe a demonstrative aid contains specific inaccuracies or mischaracterizations so significant that the jury will be unduly

misled, confused, or prejudiced, then Defendants may object through the Court's established process for dealing with objections to deposition designations, or at trial.

- ▪ **Defendants' MIL to Exclude Ohio Board of Pharmacy Report on Workload Survey[19] – DENIED WITHOUT PREJUDICE.**

Defendants ask the Court to exclude, in its entirety, an Ohio Board of Pharmacy 2021 Report, which is based on the results of a 2020 survey disseminated to all pharmacists employed in Ohio. The survey sought anonymous replies to a set of questions regarding pharmacy working conditions. To produce the Report, the Board compiled the survey data, created charts illustrating aggregated responses to 16 questions, and appended 114 pages of anonymous comments from pharmacist-respondents. In a cover letter transmitting the results, the Board explained the purpose of the survey was to assemble "feedback on pharmacist working conditions" and "inform discussions regarding pharmacist practice in the state." Defs. Ex. A at ECF p. 5 (Doc. #: 3835-1).

Defendants claim the Report is unreliable, irrelevant, prejudicial, and inadmissible double hearsay. Defendants contend a blanket exclusion is supported by facts showing the Report is based on responses from a scant 25% of surveyed pharmacists, all of whom were anonymous, not subject to cross-examination, and working in unidentified pharmacies across Ohio – which may or may not include Defendants' pharmacies in the *Track Three* Counties or elsewhere in the state.[20] Motion at 1-4.

---

[19] Motion (Doc. #: 3835); Response (Doc. #: 3920); Reply (Doc. #: 3938).

[20] Specifically, Defendants argue the Report is inadmissible double hearsay under Rule 802, identifying two layers of out-of-court statements: (1) the Report itself, which is not based on the Board's first-hand observations; (2) and the anonymous statements of responding pharmacists. Defendants further argue the Report does not satisfy the Rule 803 public record exception, which permits admission of hearsay statements made by a "public office . . . *while under a legal duty to report*." *See Abascal v. Fleckenstein*, 820 F.3d 561, 566-67 (2d Cir. 2016) (finding the public record exception inapplicable where an agency had no legal duty to report prison conditions, and further finding the agency's report inadmissible because it included inmates' responses to anonymous questionnaires) (emphasis added). Nothing in the Report indicates the Board had an *obligation* to survey or report pharmacists' opinions regarding workplace conditions. Motion at 4-5; Reply at 2-5. Defendants also challenge the Report as unreliable under Rules 702 and 703,

Plaintiffs respond that, rather than issue a blanket ruling on the Report, the Court should analyze any evidence they may proffer at trial on a "statement-by-statement" basis, and for each excerpt "determine whether it constitutes hearsay based on the purpose for which it is offered and the identity of the declarant." Response at 2-3 (quoting *Park W. Galleries, Inc. v. Glob. Fine Art Registry, LLC*, No. 2:08-CV-12247, 2010 WL 987772, at *1-2 (E.D. Mich. Mar. 12, 2010)).[21] Plaintiffs also suggest the survey responses are likely admissible "as there is no indication they will be offered for the truth of the matter asserted," and "even if they were, they would likely be subject to an exception such as the responding pharmacists' then-existing state of mind." *Id.* at 4.

Plaintiffs' assertions are only mildly persuasive, but the Court concludes the better approach is to assess at trial Plaintiffs' attempts to use the Report. Although it appears the Report contains copious hearsay material and, therefore, Defendants' arguments may ultimately succeed to exclude the entire Report, the Court cannot render an *in limine* admissibility ruling for the following reasons. "The court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on *all potential grounds*. . . . Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and

---

asserting it fails to follow accepted survey methodology as exemplified by a "nonresponse bias" arising from the survey's low response rate. Motion at 5-8; Reply at 5-7. Invoking Rules 402 and 403, Defendants argue: (i) undue prejudice will result if the Court admits evidence of disparaging remarks regarding working conditions made by anonymous pharmacists; and (ii) the Report is irrelevant because it does not pertain to the basic question of whether Defendants' conduct created a public nuisance in the *Track Three* Counties. Motion at 8-9; Reply at 7-8. Throughout their briefs, Defendants assert that the anonymous nature of the survey strips them of the right to cross-examination. Motion at 5, 9; Reply at 1, 2, 5, 6-7.

[21] Plaintiffs refute Defendants' hearsay arguments by asserting, for example: (a) the Report is admissible under the public record exception of Rule 803, Response at 3-5; (b) Defendants do not satisfy their burden to overcome a presumption of admissibility with proof the Report is not trustworthy, *id.* at 4; (c) Defendants will have an opportunity to raise specific objections and cross-examine witnesses at trial, *id.* at 5; (d) pharmacy working conditions and performance metrics are relevant under Rule 401 as they "go to the heart of the case," being Defendants' failure to comply with anti-diversion obligations and contributing to the creation of a public nuisance in the *Track Three* Counties, *id.* at 6; and (e) the possibility of inflammatory comments in the Report counsels in favor of "addressing the issues on a statement-by-statement basis, and not with a blanket *in limine* ruling," *id.* at 6.

potential prejudice may be resolved in proper context." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp.2d 844, 846-47 (N.D. Ohio 2004) (emphasis added).

Indeed, Plaintiffs do not commit to offering at trial any particular statements in the Report or any pharmacists' comments; nor do Plaintiffs deny an intent to do so. Response at 2. Absent particulars, the Court has no basis to ascertain under Rules 401 and 403 whether there are non-hearsay statements in the Report that would tend to make any fact more or less probable, be a significant factor in determining this action, or result in unfair prejudice to Defendants. Under the circumstances, the Court cannot eliminate *all possible grounds* for admitting all statements within the 178-page Report and, therefore, the ruling is deferred until trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Indiana Ins.,* 326 F. Supp.2d at 846.

Accordingly, Defendants' motion to exclude the Ohio Board of Pharmacy Report (Doc. #: 3835) is **DENIED without prejudice.** Plaintiffs are instructed to request an advance ruling from the Court before seeking to introduce any portion of the Report.

- **CVS's MIL to Exclude Evidence of Remote Shipments and Prescriptions[22] – DENIED.**

CVS moves to exclude evidence of all conduct prior to 2015.[23] Motion at 1. CVS asserts that such conduct is too remote to be material to Plaintiffs' public nuisance claims and this evidence will "waste precious trial time, will be needlessly cumulative and unfairly prejudicial,

---

[22] Motion (Doc. #: 3837); Response (Doc. #: 3919); Reply (Doc. #: 3939).

[23] Rite Aid initially joined CVS in this motion, but has since been severed from this case. *See* 08/26/21 Order granting Doc. #: 3894 (Joint Motion to Sever).

and will confuse the jury;" and also that "the Court has not allotted [CVS] enough time or witnesses to defend" all evidence of misconduct over 15 years. Motion at 1.

CVS's motion borders on frivolity.[24] CVS argues, very briefly, that its misconduct prior to 2015 is "too remote to be relevant." Motion at 3 (quoting *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003)). This argument, however, directly contradicts its own position in another motion *in limine*, discussed below, where Defendants argue that ***only*** evidence of [their] conduct prior to 2010 *is* relevant. *See* Doc. #: 3843 (Defendants' motion *in limine* regarding post-2010 conduct).[25]

There is simply no question that evidence of alleged misconduct by CVS before 2015 is relevant to the existence of a public nuisance in the Plaintiff Counties today. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Furthermore, Plaintiffs' expert, Dr. Cutler, has opined that Defendants' conduct prior to 2010 is, in his estimation, the ***most*** relevant evidence to support Plaintiffs' assertion that the Pharmacy Defendants caused the public nuisance that exists in Plaintiffs' counties today.[26] *See* Doc. #: 3843 (Defendants' motion *in limine* regarding post-2010 conduct).

---

[24] The Court also notes that none of the other Pharmacy Defendants (besides Rite Aid, which has since settled) joined CVS's motion.

[25] CVS also undermines its already-desultory relevance argument in beginning the "Argument" section of its motion by quoting the portion of Federal Rule of Evidence 403 that states, "[t]he court may exclude ***relevant*** evidence . . . ," implying that the pre-2015 evidence *is* relevant, but should be excluded for other reasons. Motion at 3 (quoting Fed. R. Evid. 403); *see also id.* ("[R]ules [403 and 611] give trial courts ample discretion to exclude evidence of remote conduct, even if the evidence satisfies the relevance standards").

[26] In *Track One*, the Court ruled that Dr. Cutler's opinions "are the product of a reliable methodology and their assumptions and estimates rest upon rational bases, well-explained by Cutler." *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4011729, at *4 (N.D. Ohio Aug. 26, 2019) (Doc. #: 2542 at 7). In *Track Three*, the Pharmacy Defendants preserved their objections to the Court's prior ruling, but did not separately move to exclude Dr. Cutler's opinions on any new grounds. *See* Doc. #: 3797 (Defendants' Motion to Exclude Certain Expert Testimony Based on *Track One* Arguments). The Court reaffirmed all its prior *Track One* rulings with respect to these experts, including Dr. Cutler. *See* 9/14/21 Marginal Order denying Doc. #: 3797.

19

CVS also argues, purportedly under Federal Rule of Evidence 403, that "evidence of shipments made or prescriptions filled many years ago will be wasteful, needlessly cumulative, and unfairly prejudicial, especially when considering the compressed trial schedule imposed by the Court." Motion at 4-5. The main thrust of CVS's argument is that "there is not enough trial time or witnesses for Defendants to defend shipments made or prescriptions filled many years ago." *Id.* at 5. In other words, CVS is concerned that Plaintiffs have so much evidence of misconduct, over such a long period of time, that CVS will not have sufficient trial time to defend against it all. *See also id.* at 6 ("it is difficult to imagine a case where the ratio of the volume of available evidence to the time and witnesses allotted for trial is more imbalanced than this one"). This is not a proper reason to exclude huge swaths of relevant, highly probative evidence of CVS's alleged misconduct.

CVS's prejudice argument is also misplaced. "Prejudice" under Rule 403 means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Notes of Advisory Committee. The "prejudice" about which CVS is primarily concerned is not that evidence of its misconduct prior to 2015 will cause a decision on an improper basis, but rather that it has insufficient trial time – an argument the Court has already considered repeatedly and rejected. *Compare* Motion at 6 (asserting that granting the present motion will "mitigat[e] some of the prejudice to be suffered by Defendants as a result of the Court's limitations on trial time and witnesses"), *with* Doc. #: 3773 (asserting the time "limit placed on defendants . . . is arbitrary and prejudicial and does not adequately consider Pharmacy Defendants' witness lists and trial time estimates") (*denied* at Minute Order of 7/7/21 Telephone Conference).

Accordingly, CVS's motion to exclude evidence or argument about its conduct prior to 2015 (Doc. #: 3837) is **DENIED**.

- ▪ **Defendants' MIL to Preclude Evidence or Argument About Alleged Misconduct After 2010[27] – DENIED.**

"Defendants move *in limine* to preclude evidence or argument about alleged misconduct by Defendants after 2010." Motion at 1. The Pharmacy Defendants assert this evidence is irrelevant, unduly prejudicial, and should be excluded "in light of the highly compressed trial schedule." *Id.* at 6.

In the upcoming trial, evidence of alleged misconduct after 2010 is obviously relevant to the existence of a public nuisance in the Plaintiff Counties today. *See* Fed. R. Evid. 401. The Pharmacy Defendants' conduct, throughout the entirety of the relevant time period, is at the very heart of Plaintiffs' case. Any evidence tending to show that Defendants' conduct did not comply with their duties under the CSA, at any point, is highly probative. There is no colorable argument that any such evidence is outweighed, least of all "substantially outweighed," by its prejudice to Defendants. Fed. R. Evid. 403.

The primary thrust of the Pharmacy Defendants' arguments for exclusion of evidence of *all* post-2010 conduct is premised on: (1) the fact that *one* of Plaintiffs' eight experts, Dr. Cutler, does not rely on post-2010 conduct in forming his opinions; and (2) Defendants' contention that "expert testimony is necessary to draw a valid causal link between Defendants' post-2010 distribution and dispensing and Plaintiffs' alleged harms." Motion at 4.

---

[27] Motion (Doc. #: 3843); Response (Doc. #: 3926); Reply (Doc. #: 3943).

It is true that Dr. Cutler does not rely on post-2010 conduct of the Pharmacy Defendants. Dr. Cutler made this choice to show the causal link between "decreased [] supply of prescription opioids [that occurred due to regulatory changes instituted on or about 2010] and increased [] demand for illicit opioids among dependent individuals." Cutler Rpt. at 75. The key takeaway from Dr. Cutler's Report, however, is that "it was the widespread availability of prescription opioids, not other economic and social trends, that caused the large nationwide increases in opioid-related mortality and significant increases in other opioid-related harms, including OUD, HUD, NAS, opioid-related hospital admissions, and foster care placements." *Id.* at 102. Evidence of Pharmacy Defendant misconduct, even after 2010, tends to show that availability of prescription opioids remained high. For example, Dr. Cutler points out that, "although Shipments measured in MMEs per capita in the U.S. fell 53 percent between 2010 and 2019 . . . , ***MMEs per capita in 2019 remained 168 percent higher than in 1997***, the year after OxyContin was launched." *Id.* at 35 (emphasis added). Statistics such as these demonstrate that Dr. Cutler at least reviewed evidence of post-2010 shipments by the Pharmacy Defendants.  And Defendants ignore the fact that many other witnesses – both expert and lay – all cite to and rely upon Defendants' post-2010 conduct.

The Pharmacy Defendants' second point – that expert testimony is necessary to show causation – is also misleading. First, Defendants do not cite any support for their contention that expert analysis is required to show causation.[28] Further, the Notes of the Advisory Committee on

---

[28] Although the Pharmacy Defendants do not cite any, there is some caselaw that supports a conclusion that expert testimony is required to show causation, specifically, in the context of medical questions. *See, e.g., Vargas v. Ortho-McNeil Pharm., Inc.*, No. 1:08 OE 40113, 2013 WL 3776628, at *3 (N.D. Ohio July 17, 2013) ("When the central issue in a products liability case is a medical question, expert testimony is required to establish causation.") (citing *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir.1991)). Although there is a medical angle to the question of whether the increased supply of prescription opioids caused the alleged harms to Plaintiffs stemming from the opioid crisis, the Court is not convinced it is a purely medical question such that it requires medical expert testimony. *Cf., Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (expert testimony not required to show causation in context of unconstitutional conduct causing emotional distress). Increased supply of a product is an economics variable, as are the types of harms of which Plaintiffs complain (*e.g.*, increased costs of responding to the crisis). Further supporting this conclusion is the fact that Dr. Cutler is an economist. No Defendant has ever challenged Dr. Cutler's

22

Federal Rule of Evidence 702 seem to refute it. *See* Fed. R. Evid. 702, Note of Advisory Committee ("The most common source of [scientific, technical, or other specialized] knowledge is the expert witness, ***although there are other techniques for supplying it***.") (emphasis added).

Second, and more importantly, even if expert testimony were required to show a causal link between the Pharmacy Defendants' post-2010 conduct and the opioid crisis existing in Plaintiffs' counties today, Plaintiffs have other experts that rely on post-2010 conduct to help the jury make those causal connections. *See* Response at 1 ("Dr. Lembke, Mr. Catizone, and Dr. Keyes each opine on the connections between failure to control diversion and addiction, overdose deaths, and other aspects of the epidemic."); *see also id.* at 7-11.

Finally, the Pharmacy Defendants argue that "exclusion of evidence or argument about alleged misconduct after 2010 is separately justified in light of the highly compressed trial schedule imposed by the Court." Motion at 6. Defendants assert that Federal Rule of Evidence 611 "demands a reasonable temporal limit on the presentation of evidence." Response at 6. The Court, however, agrees with Plaintiffs and Profs. Wright and Miller that "Rule 611 provides no basis for excluding what is otherwise admissible evidence." Wright & Miller, 28 Fed. Prac. & Proc. Evid. § 6163 (2d ed.); Response at 12. Being otherwise admissible, the Court declines to exclude obviously relevant and highly probative evidence in order to save the Pharmacy Defendants a little time at trial.

Accordingly, the Pharmacy Defendants' motion to exclude evidence or argument about alleged post-2010 misconduct (Doc. #: 3843) is **DENIED**.

---

opinions on the grounds that he is not a medical expert. *See, e.g.,* CT1 Br. in Support of Mot. to Exclude Opinions of Dr. Cutler (Doc #: 1901). In any event, as described below, even if the Court concluded a medical expert is required to show causation here, Plaintiffs have other medical experts that opine on causation.

### C.    Moot Motions.

The motions listed below are denied as moot.

- Plaintiffs' MIL No. 46 to Exclude any Reference to the Frye Hearing Testimony of Dr. David Kessler on August 14, 2020 in the New York Opioid Litigation[29] – DENIED AS MOOT (in light of Defendants' agreement to withdraw their designations of Dr. Kessler's testimony at the *Frey* hearing in New York, *see* Response at 6).

- Rite Aid's MIL to Exclude Plaintiffs' Exhibit P-20533[30] – DENIED AS MOOT (in light of the Court's 08/26/21 Order granting Doc. #: 3894 (Joint Motion to Sever)).

### D.    Conclusion.

These rulings, along with those made in the Court's prior *Evidentiary Orders* (Docs. #: 3058 and 3546), will normally apply to all future MDL cases tried by this Court and any transferor court on remand. The parties' objections to these rulings are preserved for all future trials and any appeals thereof. Accordingly, a party should file a pretrial motion addressing these same evidentiary issues in future trials only if the party sincerely believes the particular circumstances of an individual case warrant a modification.

Further, although this Order documents the Court's rulings, the parties still have an obligation to object at trial if they believe the opposing party is not complying with the Court's conclusions regarding admissibility. As the Court presides over future bellwether trials, it will enter additional evidentiary orders memorializing rulings on issues that are applicable to all MDL cases, so that the parties will not need to file repetitious motions *in limine*.

Finally, in numerous instances the Court has ruled in this Order and in prior *Evidentiary Orders* that it would not enter a blanket ruling before trial excluding certain types of evidence and

---

[29] Motion (Doc. #: 3830 at 4-6); Response (Doc. #: 3927 at 6); Reply (Doc. #: 3937 at 3).

[30] Motion (Doc. #: 3849.

24

instead will address the issues as they arise at trial. The parties are directed to make best efforts to raise these issues with the Court each morning during trial, before presentation to the jury begins, in order to obtain timely contextual rulings.

**IT IS SO ORDERED.**

/s/ Dan Aaron Polster  September 23, 2021
DAN AARON POLSTER
UNITED STATES DISTRICT JUDGE

25