# EXHIBIT 2

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4
5  MDL NO. 2804
6  CASE NO. 17-md-2804
7  Hon. Dan A. Polster
8
9  IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION
10
11 THIS DOCUMENT RELATES TO:
12 TRACK THREE CASES
13
14              VOLUME I
15       REMOTE VIDEO DEPOSITION OF
16             JAMES RAFALSKI
17  (CONTAINS TESTIMONY DESIGNATED HIGHLY CONFIDENTIAL)
18             June 10, 2021
19
20
21
22 REPORTED BY:  Laura H. Nichols
23              Certified Realtime Reporter,
24              Registered Professional
25              Reporter and Notary Public

Page 82

1  you're telling them as an expert.  Right?  These
2  are DEA regulations.  You're a DEA investigator
3  whose job it is to enforce those regulations.
4  Nobody knows those regulations, presumably, when
5  you're on the job, any better than you, and you're
6  coming in to a registrant and you're telling them
7  that they're okay, shouldn't they be able to rely
8  on that?
9         MS. KNIGHT:  Objection to form.
10      A.   As I answered earlier, I generally
11  agree with that.  But there are certain areas that
12  a registrant should -- would seek a higher
13  approval.
14      Q.   (BY MR. LIVINGSTON:)  Let's now --
15  I'd like to just give me a little road map here.
16  Let's now focus on the DEA regulations that you've
17  described in some detail so far this morning.
18         Let's -- to do that, let's --
19         MS. KNIGHT:  Mr. Livingston, if we're
20  switching gears, can we just take a quick
21  five-minute comfort break?  Is this --
22         MR. LIVINGSTON:  Sure.
23         MS. KNIGHT:  Okay.  Real quick.
24         THE VIDEOGRAPHER:  The time is now
25  approximately 9:18 a.m.  We're off the record.

Page 83

1         (Whereupon, a break was had from 9:18
2         a.m. until 9:32 a.m. EDT)
3         THE VIDEOGRAPHER:  The time is now
4  approximately 9:32 a.m.  We're on the record.
5      Q.   (BY MR. LIVINGSTON:)  Now,
6  Mr. Rafalski, when you were conducting cyclic
7  investigations of -- inspections of distributors
8  back in the day when you were a DEA diversion
9  inspector, you never had a Dr. McCann at your side
10  to use the ARCOS data to run the methodologies that
11  he ran on the registrant, correct?
12      A.   No.  I would have access to analysts
13  that worked in headquarters in ARCOS.
14      Q.   And did you ever have them run all
15  these methodologies for a registrant?
16      A.   No.  You were -- I thought you were
17  speaking in terms of doing a regulatory
18  investigation.
19      Q.   Yeah.  I'm just asking that -- I know
20  that to test the Defendants' compliance in this
21  case, you used Dr. McCann to assist you in running
22  the data through your methodologies.
23         Did you ever do that, or something
24  similar to that, when you were a DEA diversion
25  inspector?

Page 84

1      A.   Yes.
2      Q.   What did -- when did you do it and
3  with respect to whom?
4      A.   I think that's going to be another
5  Touhy issue, Mr. Livingston.
6      Q.   Well, you just said that you did it,
7  so I don't think it's a Touhy issue.  We need to
8  know --
9         MS. KNIGHT:  Mr. -- Mr. Livingston,
10  if he invokes Touhy, and believes that that's his
11  obligation under the law, then you can't override
12  that.  You're very familiar with that rule.
13         MR. LIVINGSTON:  I don't agree with
14  your position on it.
15      A.   But I think to acknowledge it was
16  done is different than telling what I did or who I
17  did it with and who I did it for.
18      Q.   (BY MR. LIVINGSTON:)  Well, no.  The
19  question was -- we know what you did because -- so
20  the question is:  Did you ever take the seven
21  methodologies that are in your report and hand it
22  to somebody with a Ph.D. in data analysis to run
23  those methodologies through the registrant's data?
24      A.   To that specific question, I would
25  answer no.  I don't think that's the same question

Page 85

1  you asked me earlier.
2      Q.   So the answer is no?
3      A.   That's correct.  The answer is no.
4      Q.   Okay.  And remember when we were
5  talking before about the various levels of
6  enforcement that were available to you as a DEA
7  inspector, if a registrant was not in compliance
8  with the regulations?  Do you remember when we
9  talked about that a minute ago?
10      A.   Yes.  Available to the agency, not to
11  me specifically.  But, yes, I remember the
12  conversation.
13      Q.   Right.
14         When you inspected distributors while
15  you were with the DEA, how often did you conclude
16  that they were in full compliance with all
17  applicable DEA regulations?  Roughly, percentage,
18  you know, ten percent, sixty percent, a hundred
19  percent, ninety percent, whatever it is.
20         MS. KNIGHT:  Objection to form.
21      A.   Are you -- in regards to your
22  question, was that specific to distributors?
23      Q.   (BY MR. LIVINGSTON:)  Yes.
24      A.   I think generally speaking, off the
25  top of my head, distributors -- there's a large

Page 86

1  volume of regulations. So I would say that there
2  was generally at least maybe fifty percent, maybe a
3  little less of time where there would be some kind
4  of violation.
5      Q.   Okay. All right. Would you turn to
6  Exhibit 6, Page 9? Giant Eagle Exhibit 6.
7           (GE Exhibit 6 was marked for
8           identification.)
9      Q.   (BY MR. LIVINGSTON:) And the pages
10 are at the top. See, this is Section 1301.71 of
11 the DEA's Controlled Substance Act regulations?
12          MS. KNIGHT: Mr. Livingston, that's
13 not what's behind his tab.
14     A.   6? You said 6?
15     Q.   (BY MR. LIVINGSTON:) Yes.
16     A.   Tab 6 I have "Linden Barber" --
17     Q.   Yeah. No. It -- yeah, but just go
18 to the Page 9 at the top. It's a compilation of
19 various -- yeah. Yeah. It was a trick question.
20 Sorry about that.
21     A.   No. I didn't hear the "Page 9." I'm
22 sorry.
23          Okay. I'm there.
24     Q.   Yeah. You're familiar with this
25 regulation, correct?

Page 87

1      A.   Yes, sir.
2      Q.   Okay. And when you would inspect
3  registrants, you would try to make sure that they
4  were complying with 1301.71, correct?
5      A.   Among many other regulations, yes.
6      Q.   I didn't mean it to be exclusive.
7  But among -- that you would make sure they were in
8  compliance at least with 1301.71?
9      A.   Yes.
10     Q.   And this regulation says, "All
11 applicants and registrants shall provide effective
12 controls and procedures to guard against theft and
13 diversion of controlled substances."
14          That is one of the regulations that
15 you believe the defendants did not comply with in
16 this case, correct?
17     A.   That's correct.
18     Q.   Now, the next sentence says, "In
19 order to determine whether a registrant has
20 provided effective controls against diversion, the
21 administrator" -- that's really the DEA, right --
22 "shall use the security requirements set forth in
23 Sections 1301.72 through 1301.76," correct?
24     A.   Yes.
25     Q.   Okay. So if we want to know whether

Page 88

1  the defendants are complying with this overarching
2  requirement for having effective controls, the DEA
3  says we're supposed to look at the -- all the
4  regulations between 72 and 76, correct?
5      A.   That's what this says, yes, sir.
6      Q.   Yeah. And that's what you did when
7  you were a DEA investigator, correct?
8      A.   It's one of the things I did, yes,
9  sir.
10     Q.   Okay. And the SOM regulation is one
11 of the regulations, but just one of the regulations
12 between 1301.72 and 1301.76, correct?
13     A.   That's correct.
14     Q.   And then if we skip down to
15 1301.71(b), it says, "Substantial compliance with
16 the standards set forth in Sections 1301.72 to
17 1301.76 may be deemed sufficient by the
18 administrator after evaluation of the overall
19 security needs -- or system -- overall security
20 system and needs of the applicant or registrant."
21          Do you see that?
22     A.   Yes, sir.
23     Q.   What does "substantial compliance"
24 mean?
25     A.   Well, it -- the word "substantial"

Page 89

1  would mean in compliance, substantial, more than
2  just trying. It would be substantial in
3  compliance.
4      Q.   Well, doesn't it mean less -- at
5  least less than one hundred percent?
6      A.   That may be your interpretation. I
7  think "substantial" would mean in compliance.
8      Q.   Well, are you saying that your
9  definition of "substantial" is there has to be
10 perfect compliance?
11     A.   I don't know that I'm saying there's
12 perfect. But I think you couldn't find any obvious
13 faults. It would be in compliance.
14     Q.   Well, I mean, let's just assume that
15 you're -- you get -- you're in compliance with nine
16 out of ten or ten out of eleven. I mean, is that
17 substantial? Or do you have to have perfect
18 compliance? You can't be noncompliant with any
19 regulation to be "in substantial compliance with
20 the regulations"?
21          MS. KNIGHT: Objection to form.
22     A.   I think substantial -- because if we
23 look down at the column of different items to be in
24 compliance with, they're broad and they give
25 various descriptions. So I think "substantial

Page 98

1  ask Dr. McCann to take into consideration, when he
2  did his analysis, the closures or any stores, or
3  anything from a market standpoint, that might have
4  affected the demand for drugs at any particular
5  pharmacy that was analyzed, correct?
6      A.   I would agree with that statement,
7  Mr. Livingston.
8      Q.   You were involved in the Dr. Leo
9  Ognen investigation.  He was a bad doctor; is that
10 correct?
11     A.   Dr. Leo Ognen, yes, sir.
12     Q.   Could you go to your report, Exhibit
13 2, at Page 5?  His investigation is one of the ones
14 that you listed in your report.
15     A.   That's correct.
16     Q.   And you also indicated that it was
17 that investigation and resulting criminal
18 conviction that led to the creation of the OARRS
19 database in Ohio; was that correct?
20     A.   No.  I recognized that you could draw
21 that conclusion from that statement.  What I was
22 trying to say in that statement is Dr. Ognen was
23 way pre-OARRS.  So that was one of the first, that
24 I was aware of, where I kind of created my own
25 OARRS, for a better term.

Page 99

1           So to conduct that investigation,
2  literally had to go to multiple pharmacies in Ohio
3  and obtain prescribing reports and create a --
4  similar to the OARRS.  But I did not design the
5  OARRS.
6           (GE Exhibit 46 was marked for
7           identification.)
8      Q.   (BY MR. LIVINGSTON:)  Why don't we
9  look at Exhibit 46, because I want to try to get
10 the timing down right here.
11          This is a 2003 Bill Tracking for
12 the -- what ultimately became the Ohio legislation
13 that created OARRS.
14          And do you see that under "Status" it
15 was first introduced in January of 2004, correct?
16     A.   Yes.
17     Q.   And Dr. Ognen, according to his
18 indictment, he was still engaged in a criminal
19 conspiracy through much of 2004, correct?
20     A.   That's correct.
21          But looking at the bill for Ohio, I
22 think the bill was passed, signed in 2005 by the
23 governor.  But I don't think the actual OARRS
24 became implemented until a much later date.
25     Q.   Right.  But your investigation of

Page 100

1  Dr. Ognen in no way sparked the interest in Ohio
2  for enacting OARRS, correct?
3      A.   Yes.  As I previously stated, I
4  understand reading that, that you could draw that
5  conclusion, but that wasn't my intent.
6           I -- in doing that investigation, we
7  actually created a prescriber database that would
8  have been similar to OARRS, but it was only
9  specific to Dr. Ognen.
10     Q.   Now, your opinion is that Giant Eagle
11 violated the DEA's SOM regulation, correct?
12     A.   Yes, sir.
13     Q.   And for what period of time do you
14 claim that Giant Eagle violated the DEA SOM
15 regulation?
16     A.   All the way through to 2016.  And I
17 don't know further than 2016 because I didn't do an
18 in-depth review post 2016.  I know that they had
19 some issues that brought them -- looked like they
20 appeared to be coming into compliance.  But
21 definitely from the time frame of 2000 -- prior to
22 2009 all the way to 2016.
23     Q.   Okay.  I am -- yeah.  It wasn't clear
24 to me when I read your report what your time frame
25 is for Giant Eagle's purported noncompliance.  So

Page 101

1  you are saying, you are clarifying that Giant
2  Eagle's purported noncompliance only was from 2009
3  when they first started distributing Schedule 3
4  drugs, you say, through 2016?
5           THE REPORTER:  You are getting a
6  little soft, Mr. Livingston.
7           MR. LIVINGSTON:  Okay.  Is that
8  better?
9           THE REPORTER:  Yes, sir.
10          MR. LIVINGSTON:  Thank you.
11     A.   Well, they -- so there was two
12 facilities.  The first facility stopped
13 distributing this 2014.
14     Q.   (BY MR. LIVINGSTON:)  Right.  When
15 there was a reclassification from hydrocodone from
16 Schedule 3 to 2, correct?
17     A.   Correct.  And then they did not
18 self-distribute for a couple of years, and then
19 they started back self-distributing in 2016.  So my
20 opinion definitely goes from 2009 to 2014 and then
21 when they started to self-distribute again from the
22 GERX DC, I have some information contained in my
23 report, but I did not have enough information to
24 make a definitive opinion on their conduct post
25 2016.

Page 102

1  Q. All right. So let's just focus on
2 the gap period between 2014 and '16 when the second
3 facility known as GERX was opened up. You have no
4 opinion obviously that Giant Eagle was doing
5 anything wrong as a distributor because they were
6 not a distributor, correct?
7  A. No, I don't agree with that.
8  Q. So even though they were not a
9 distributor after 2014, you are saying they were
10 still not complying with the SOM regulation?
11  A. I didn't say the SOM regulation.
12 That wasn't -- I don't believe that was the
13 question you asked.
14  Q. Yeah, I think you are getting me -- I
15 am starting to chase my tail here or feel like it.
16  So are you saying yes or no that you
17 have an opinion post 2014 about Giant Eagle?
18  A. I believe the period between 2014 and
19 2016, there's a maintenance of effective controls
20 issue with the distribution from I believe it was
21 McKesson that distributed to them. But in
22 regards -- if we are just talking specifically
23 SOMs, I do not have an opinion past 2014 on the
24 SOMs issue.
25  Q. So in the period that you mentioned

Page 103

1 after 2014 with respect to McKesson, Giant Eagle
2 was a customer of McKesson, correct?
3  A. That's correct.
4  Q. And you are saying that, as a
5 customer, Giant Eagle had an obligation to have a
6 SOMs system?
7  MS. KNIGHT: Objection to form.
8  A. I don't think the regulation requires
9 that -- requires that. I think, as a chain
10 pharmacy, I think they still had the responsibility
11 to monitor the purchases of their -- of their
12 pharmacies.
13  Q. (BY MR. LIVINGSTON:) And do you have
14 any evidence at all that suggests that Giant
15 Eagle's corporate office did not monitor and did
16 not know what its pharmacies were ordering from
17 McKesson?
18  A. I think they did monitor that because
19 they obviously were ordering them and making
20 payments. So I think they were still aware of the
21 levels of drugs that their pharmacies were
22 receiving. They just weren't distributing.
23  Q. Right. And so -- but I thought you
24 mentioned that they were violating the DEA
25 regulations as a customer of McKesson because they

Page 104

1 were not monitoring what their pharmacies were
2 doing.
3  A. Well, the issue is that a level of
4 prescribing continued, and maybe even escalated,
5 after they stopped self-distributing. So the
6 conduct, I don't believe -- I believe that the
7 maintenance of effective controls would require
8 them still to be responsible for what their
9 pharmacies were purchasing from McKesson.
10  Q. Are you saying that Giant Eagle --
11 well, let me -- did you or did you not examine
12 Giant Eagle's dispensing levels for the drugs in
13 question in this case?
14  A. Yes, sir.
15  THE REPORTER: I couldn't understand
16 if you said yes, sir or no, sir.
17  A. I said yes, sir.
18  Q. (BY MR. LIVINGSTON:) Isn't it true
19 that Giant Eagle's dispensing of the drugs in
20 question in this case decreased over time starting
21 in 2012?
22  A. I would have to go to my report to
23 look at least to the chart or some of the McCann
24 charts. So off the top of my head, I don't -- I'm
25 not sure on that, just sitting off the top of my

Page 105

1 head, Mr. Livingston.
2  Q. Isn't it true that Giant Eagle's
3 dispensing of the drugs in question in this case
4 went down at -- at the same time that the DEA
5 quotas for many of these drugs were actually
6 increasing?
7  A. Hold on. Let me look at my report.
8  (Pause.)
9  A. Looking at the charts in my report, I
10 do not agree with you, Mr. Livingston, on that.
11  Q. (BY MR. LIVINGSTON:) What reports --
12 charts are you referring to?
13  A. Looking at the Lake County on Page
14 152. I guess there would be a slight decrease. I
15 wouldn't call it a significant decrease. And then
16 on Page 151, 150, I would say there may be a slight
17 decrease.
18  Q. Well, Mr. Rafalski, you realize that
19 these charts that Dr. McCann produced relate to
20 distribution, correct?
21  A. Yes.
22  Q. They don't -- these are not
23 dispensing charts, correct?
24  A. Well, I think if they were
25 distributed to the pharmacies, they were dispensed.

Page 374

```
 1           IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4
 5   MDL NO. 2804
 6   CASE NO. 17-md-2804
 7   Hon. Dan A. Polster
 8
 9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION
10
11   THIS DOCUMENT RELATES TO:
12   TRACK THREE CASES
13
14                         VOLUME II
15
16             REMOTE VIDEO DEPOSITION OF
17                    JAMES RAFALSKI
18                    June 11, 2021
19
20
21
22   REPORTED BY:  Laura H. Nichols
23              Certified Realtime Reporter,
24              Registered Professional
25              Reporter and Notary Public
```

Page 443

1 typical a business activity for a distributor.
2    Q.    All right. Why don't we go to
3 Exhibit 33, Giant Eagle 33.
4        MS. KNIGHT: Counsel, we have been
5 going a little over an hour. Are we at a good like
6 five-minute stopping break?
7        MR. LIVINGSTON: Yeah, that is fine.
8        MS. KNIGHT: Really, just five
9 minutes should be fine.
10       THE VIDEOGRAPHER: Okay. We will go
11 off the record at 9:13.
12    (Whereupon, a break was had from 9:13
13    a.m. until 9:24 a.m. EDT)
14       THE VIDEOGRAPHER: We are back on the
15 record at 9:24.
16    Q.    (BY MR. LIVINGSTON:) Mr. Rafalski,
17 can you tell me how many preregistration
18 inspections Giant Eagle's HBC and GERX facilities
19 had?
20    A.    I cannot, sir.
21    Q.    Do you know how many cyclic
22 inspections Giant Eagle's HBC and GERX facilities
23 had during the time frame that we have been talking
24 about for this case?
25    A.    No, sir. I do not.

Page 444

1    Q.    All right. Well, let me represent to
2 you that they had three preregistration inspections
3 and eight cyclic inspections between 1997 and 2020.
4        You would agree that that is a
5 significant number of inspections, right?
6        MS. KNIGHT: Objection to the form.
7    A.    Is that specific to the GERX DC or at
8 both facilities? I'm sorry.
9    Q.    (BY MR. LIVINGSTON:) I said both
10 facilities.
11    A.    Both.
12    Q.    Collectively.
13    A.    That would be probably an expected
14 amount.
15    Q.    And I think you testified yesterday
16 that typically distributors end up fifty percent of
17 the time when they have their facilities inspected
18 getting at least a letter of admonishment from the
19 DEA, correct?
20    A.    That is the matter I wanted to
21 discuss with you this morning before starting my
22 testimony.
23    Q.    Well, yes or no, you said that under
24 oath yesterday?
25    A.    I did say that. In rethinking that

Page 445

1 over the night, I'm not comfortable with that
2 answer, mainly because I didn't keep a scorecard.
3 And early in my career, before there was electronic
4 ordering, there was generally record violations.
5 But as time went on, I'm not confident with fifty
6 percent, as that is kind of a guess, and I don't
7 like to guess.
8        So I am not going to stand by the
9 fifty percent. That is what I wanted to correct
10 this morning.
11    Q.    Well, are you telling me that you are
12 uniquely qualified to give opinions about whether
13 distributors are complying with their DEA
14 regulatory obligations, you were with the DEA for
15 twelve, thirteen years, and you can't even ballpark
16 it for us how often you end up, when you were doing
17 your inspections, how often you ended up, you know,
18 at least sending out a letter of admonishment to
19 the distributor?
20        MS. KNIGHT: Object to form.
21    A.    I think that is an important
22 question, and I don't want to guess on that,
23 Mr. Livingston. I don't want to ballpark it.
24    Q.    (BY MR. LIVINGSTON:) And not only
25 did you tell us yesterday under oath that your best

Page 446

1 estimate was fifty percent, but in another opioids
2 case you also testified under oath that it was
3 fifty percent.
4        MS. KNIGHT: Objection to form.
5    A.    I don't recall that. But I am not
6 comfortable, without having the ability to go back
7 and look and give an accurate number, with just
8 using fifty percent.
9    Q.    (BY MR. LIVINGSTON:) Let's go to
10 Exhibit 47.
11    (GE Exhibit 47 was marked for
12    identification.)
13    Q.    (BY MR. LIVINGSTON:) Do you see
14 that -- Exhibit 47 is portions of your videotaped
15 deposition transcript from the New York opioids
16 case.
17    A.    I see that.
18    Q.    And it was taken in February of 2020,
19 correct?
20    A.    Yes, sir.
21    Q.    Would you go to Page 849, 850.
22        At the bottom of Page 849, starting
23 on Line 20, you were asked, "What about for
24 distributors? How common was it that you would
25 issue -- the DEA would issue letters of admonition

Page 447

1 following inspections or audits?"
2         Answer: "I think it would be at
3 least fifty percent," correct?
4     A.   Yes. But that question, I think, is
5 just about inspections, not specific to
6 distributors.
7     Q.   It says "what about for
8 distributors"?
9     A.   Later on it does say fifty cent --
10 fifty percent. I acknowledge that.
11    Q.   And that was your testimony given
12 under oath in the New York case, correct?
13    A.   That is what I stated, yes.
14    Q.   And you also stated it under oath
15 yesterday?
16    A.   I did. I said it was -- I believe I
17 said it was a best guess, and I am not comfortable
18 guessing about that.
19    Q.   And so you just woke up in the middle
20 of the night thinking, oh, my gosh, I better change
21 this testimony, or did you have a conversation with
22 any person about this particular issue?
23    A.   I had no conversations. I did not
24 wake up in the middle of the night. When I got
25 back after my testimony, I was having dinner by

Page 448

1 myself and thinking about that number and being a
2 guess, and I wasn't comfortable with it.
3     Q.   All right. Did you ever have trouble
4 after you gave the New York testimony? Did you
5 ever recant that testimony?
6     A.   I did not.
7         MS. KNIGHT: Objection to the form.
8     A.   I did not.
9     Q.   (BY MR. LIVINGSTON:) Well,
10 regardless of what the exact percentage is or is
11 not for how often the DEA would issue letters of
12 admonition after an inspection to a distributor,
13 you would agree that Giant Eagle's record of all
14 clean inspections for three preregistration
15 inspections and eight cyclic inspections is
16 exemplary, correct?
17        MS. KNIGHT: Objection to form.
18    A.   I would say that is expected.
19    Q.   (BY MR. LIVINGSTON:) Well, you said
20 it was expected, but you also have said that it
21 was -- forget the percentage, that it certainly
22 wasn't uncommon for even a single -- for
23 distributors to get letters of admonition for not
24 being in compliance after an inspection?
25    A.   I did say that. And doing

Page 449

1 inspections, as I have stated just earlier, there's
2 all kinds of violations. Typically early in my
3 career, record violations were pretty common,
4 especially related to distribution because they
5 were paper forms. Later on they became a little
6 more compliant. There's always the potential.
7         But in your statement earlier, I'm
8 not aware of what the DEA in a totality, how many
9 LOAs are issued. Only my experience with my cases
10 and people that I am with in Detroit.
11        But every time I go in, I hope and
12 expect that there's no violations. It is not
13 something that is -- I seek to find. That is -- a
14 good, compliant investigation is good because they
15 are compliant with the regulations.
16    Q.   Well, can you identify, not give us
17 the particular name, but just can you think of any
18 distributor who you inspected that often who -- for
19 whom you found no violations at all?
20    A.   I have never had an inspection as
21 often as what is happening. If Mr. Colosimo was on
22 each one of those, I have never had that situation
23 in Detroit, so wider geographic area and more
24 investigators.
25        There have been some that I have had

Page 450

1 recollection that had no violations. I don't know
2 that they had them every time. And there was no
3 registrants that were exclusive to me that I would
4 do every one. They are generally distributed --
5 they are generally avoided where you don't always
6 go to the same place. That sometimes happens in
7 offices where there's smaller numbers of
8 investigators.
9     Q.   When -- yeah. I didn't suggest that
10 Mr. Colosimo was the agent or investigator,
11 inspector who inspected each time. He just
12 testified about each of those inspections.
13        But let me ask you this: How many
14 times did you investigate or inspect a distributor
15 more than once?
16    A.   There's a couple I can recall doing
17 more than once.
18    Q.   Which one was the more -- more than
19 twice?
20    A.   I'm not going to guess on that. And
21 one of the reasons is sometimes I go as the lead,
22 so it is my assignment. Sometimes I go as a backup
23 or assisting somebody. So I may have visited and
24 been present but not the lead. And I am not going
25 to guess on that because I just don't know. I