IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE:                          Case No. 1:17-md-2804
NATIONAL PRESCRIPTION           Cleveland, Ohio
OPIATE LITIGATION
                                October 4, 2021
CASE TRACK THREE                1:00 P.M.




- - - - -

**VOLUME 1**

- - - - -


TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

BEFORE THE HONORABLE DAN A. POLSTER,

UNITED STATES DISTRICT JUDGE,

AND A JURY.


- - - - -



Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                         7-189 U.S. Court House
                         801 West Superior Avenue
                         Cleveland, Ohio  44113
                         216-357-7087
                         Susan_Trischan@ohnd.uscourts.gov


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   APPEARANCES:
     For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                Spangenberg, Shibley & Liber
                                  1001 Lakeside Avenue, Ste. 1700
 3                                1900 East Ninth Street
                                  Cleveland, Ohio    44114
 4                                216-696-3232

 5                                W. Mark Lanier, Esq.
                                  Rachel Lanier, Esq.
 6                                M. Michelle Carreras, Esq.
                                  Maria Fleming, Esq.
 7                                The Lanier Law Firm
                                  6810 FM 1960 West
 8                                Houston, Texas    77069
                                  813-659-5200
 9
                                  Frank L. Gallucci, III, Esq.
10                                Plevin & Gallucci Company, LPA
                                  The Illuminating Building
11                                Suite 2222
                                  55 Public Square
12                                Cleveland, Ohio    44113
                                  216-861-0804
13
                                  Salvatore C. Badala, Esq.
14                                Napoli Shkolnik
                                  360 Lexington Ave., 11th Floor
15                                New York, New York   10017
                                  212-397-1000
16
     For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
17                                Brian C. Swanson, Esq.
                                  Katherine M. Swift, Esq.
18                                Alex Harris, Esq.
                                  Sharon Desh, Esq.
19                                Bartlit Beck LLP
                                  54 West Hubbard Street, Ste.300
20                                Chicago, Illinois   60654
                                  312-494-4400
21
     For CVS Defendants:          Graeme W. Bush, Esq.
22                                Eric R. Delinsky, Esq.
                                  Alexandra W. Miller, Esq.
23                                Paul B. Hynes, Jr., Esq.
                                  Zuckerman Spaeder - Washington
24                                Suite 1000
                                  1800 M Street, NW
25                                Washington, DC    20036
                                  202-778-1831
```

```
 1    For HBC/Giant Eagle
      Defendants:                 Robert M. Barnes, Esq.
 2                                Scott D. Livingston, Esq.
                                  Marcus & Shapira
 3                                35th Floor
                                  One Oxford Centre
 4                                301 Grant Street
                                  Pittsburgh, PA   15219
 5                                412-471-3490

 6                                Diane P. Sullivan, Esq.
                                  Chantale Fiebig, Esq.
 7                                Weil Gotshal & Manges
                                  Suite 600
 8                                2001 M Street NW
                                  Washington, DC   20036
 9                                202-682-7200

10    For Walmart Defendants:     John M. Majoras, Esq.
                                  Jones Day - Columbus
11                                Suite 600
                                  325 John H. McConnell Blvd.
12                                Columbus, Ohio   43215
                                  614-281-3835
13
                                  Tara A. Fumerton, Esq.
14                                Tina M. Tabacchi, Esq.
                                  Jones Day - Chicago
15                                Suite 3500
                                  77 West Wacker
16                                Chicago, Illinois   60601
                                  312-782-3939
17

18                              - - - - -

19

20

21

22

23

24

25
```

```
 1              (testing testing testing testing))
 2              MONDAY, OCTOBER 4, 2021, 1:01 P.M.
 3                   THE COURT:  Okay.  Good afternoon.
 4                   Please be seated.
 5                   Okay.  I've been advised that all 14 jurors
 6    are present so I assume both sides are ready to go.
 7                   MR. LANIER:  Yes for plaintiffs, Your
 8    Honor.
 9                   THE COURT:  Is this better?  Yeah, the
10    shield is no -- well, I'm far enough away, I'll take the
11    shield off.
12                   Do we have some more chairs here?  Someone
13    is bringing in some more chairs?
14                   Okay.  Let's bring in the jury, please,
15    then.
16                   (Jury in.)
17                   THE COURT:  Okay.  Thank you.
18                   Please be seated.
19                   All right.  Good afternoon, ladies and
20    gentlemen.  I hope you all had a good weekend.
21                   Before we begin, I introduced you to the
22    lawyers last week.
23                   At times, the parties, the two plaintiff
24    counties and the four defendant corporations, will have
25    party representatives in court.
```

1            I've made it optional so sometimes they'll

2    be here, sometimes not.  If they're not here you're not

3    to draw no negative inference.  This case is very

4    important to both counties and all four defendants.

13:10:39  5            So I don't know if we have any party

6    representatives here.  I thought we would start out as a

7    courtesy to introduce them.  So, I guess, Mr. Lanier, if

8    there are any representatives of either Lake or Trumbull

9    County.

13:10:53 10            MR. LANIER:  Thank you, Your Honor.

11            May it please the Court.  Your Honor, we

12    have a representative for both counties here today,

13    Ms. Kim Fraser.  If you would stand up, please, Kim.

14            She's the Executive Director of the Lake

13:11:03 15    County, it's ADAM, it's Alcohol Drug Addiction and Mental

16    Health Board so we have Ms. Fraser here.

17            And Ms. Caraway is here from Trumbull

18    County and she's the Executive Director of the Mental

19    Health and Recovery Board, and they'll be here throughout

13:11:20 20    the trial, Your Honor.

21            THE COURT:  Okay.  Thank you, Mr. Lanier.

22            All right.  Are there any defendant party

23    representatives?

24            MR. STOFFELMAYR:  Yes, Your Honor.

13:11:26 25            Kaspar Stoffelmayr for Walgreen's, and we

1    have with us here Peter Wilson, who is one of the senior

2    lawyers in the Law Department at Walgreen's.

3                    THE COURT:  Good afternoon, Mr. Wilson.

4                    Anyone else?

13:11:41  5         MR. DELINSKY:  Good afternoon, Your Honor.

6    Good afternoon, ladies and gentlemen of the jury.

7                    With us today is Andrea Zollett from CVS.

8                    THE COURT:  Good afternoon, Ms. Zollett.

9                    MS. SULLIVAN:  Good afternoon, Your Honor.

13:11:55 10   Good afternoon, jurors.  Thanks for coming in.  Diane

11   Sullivan for Giant Eagle with Chantale Fiebig, also an

12   attorney working with me for Giant Eagle.  And today we

13   have Emily Mooney from Painesville Ohio Pharmacy, a Giant

14   Eagle pharmacy in Lake County, and she's here

13:12:10 15   representing the company today.

16                    A FEMALE SPEAKER:  Good afternoon.

17                    THE COURT:  Good afternoon, Ms. Mooney.

18                    MR. MAJORAS:  Good afternoon, Your Honor.

19   Good afternoon, folks.

13:12:18 20                    My name is John Majoras.  I'm one of the

21   lawyers for Walmart, and with us today is Mr. Roger

22   Schultheis.  Mr. Schultheis is the Vice President of

23   Health and Wellness Operations at Walmart, which is

24   responsible for its pharmacy operations.

13:12:33 25                    A MALE SPEAKER:  Good afternoon.

1          THE COURT:  Good afternoon, sir.

2          Okay.  Members of the jury, now that you

3     were sworn in last week, I want to give you some

4     preliminary instructions to guide you in your

13:12:45  5     participation in this trial.

6          This is merely a summary and not the

7     complete statement of the law that I'll give you at the

8     end of the case, which instructions will control your

9     deliberations and verdicts, and each of you will have a

13:12:59  10    copy of my final instructions.

11         But to help you follow the evidence, I'll

12    give you a brief summation of what plaintiffs must prove

13    to establish their claims.

14         First, however, it is my duty to give you

13:13:13  15    what is called the admonition.  This is a standing Court

16    order that applies throughout the trial.  I will try to

17    remind you of the admonition at every recess, but if I

18    forget to remind you, it still applies.

19         Ladies and gentlemen, you have been

13:13:28  20    selected as jurors in this case.  We've taken the time, a

21    lot of time last Wednesday and Thursday, to seat a

22    neutral jury so that this case can be decided just on

23    what goes on in this courtroom and not on any outside

24    influences.

13:13:43  25         You are required to decide this case based

1    solely on the evidence that is presented to you in this

2    courtroom.  It is my role as the Judge to determine what

3    evidence is admissible and what is not admissible.

4             It would be a violation of your duties and

5    unfair to the parties if you should obtain other

6    information about the case which might be information

7    that is not admissible as evidence.

8             You must carefully listen to all of the

9    evidence, and evaluate all of it.  Do not reach any

10   conclusions until you have heard all the evidence, the

11   arguments of the attorneys, and my final instructions of

12   law.  Otherwise, you will have an incomplete picture of

13   this case.

14            Do not discuss this case among yourselves

15   or with anyone outside the jury until the case is over,

16   and do not discuss it at all outside of the jury

17   deliberation room.

18            The reason for this is you might be given

19   information or an opinion that could alter the way in

20   which you view the evidence or the instructions or even

21   how the case should come out.

22            Such an opinion or conclusion would be

23   based on an incomplete or inaccurate view of the

24   evidence, and, therefore, would be clearly unfair.

25            In addition, you absolutely must not try to

get information from any source outside the courtroom. This ban on sources outside the courtroom applies to information from all sources, such as family, friends, the Internet, reference books, newspapers, magazines, TV, radio, an iPhone, Android, Blackberry, or other Smartphone, iPad, and any other electronic device.

This ban on outside information also includes any personal investigation looking into news accounts, talking to possible witnesses, reenacting the allegations in the complaint, or any other act that would otherwise affect the fairness and impartiality that you must have as jurors.

If you see anything in the print media about this case, do not read it.  If something on the TV comes in about the case, change the channel.

This effort to exclude misleading information and outside influences information also puts a limit on getting legal information through TV entertainment.

This would apply to popular TV shows, such as Law and Order, Suits, Judge Judy, older shows such as Boston Legal, Perry Mason or Matlock, and any other fictional show dealing with the legal system.  In addition, this would apply to shows such as CSI and NCIS, which use scientific procedures to resolve criminal

1    investigations.

2              This and other shows may leave you with an

3    improper preconceived idea about our legal system.

4              As far as this case is concerned, you're

13:16:33  5    not prohibited from watching such shows if you want to

6    watch them.  However, there are many reasons why you

7    cannot rely on TV legal programs, including the fact that

8    these shows, first, are not subject to the Rules of

9    Evidence and legal safeguards that apply in this

13:16:49 10    courtroom; and, second, they are works of fiction that

11    present unrealistic situations for dramatic effect.

12              While they are or may be entertaining, TV

13    legal dramas condense, distort, or even ignore many

14    procedures that take place in real cases and real

13:17:08 15    courtrooms.  No matter how convincing they try to be,

16    these shows simply cannot depict the reality of an actual

17    trial or investigation.

18              You must put aside anything you think you

19    know about the legal system that you saw or see on TV.

13:17:21 20              On top of legal dramas, there are also TV

21    programs specifically related to opioid addiction in the

22    United States.  News programs, such as 60 Minutes, have

23    broadcasted segments on this topic.  If you have seen any

24    such programs, you are not to consider them during this

13:17:39 25    trial.

1          Additionally, on or about the second week

2     of this trial, Hulu will be releasing a mini series

3     called, "Dope Sick," about opioid addiction.  You are

4     instructed to avoid this and similar programs throughout

13:17:54  5     the duration of the trial and to not consider any such

6     programming during your deliberations.

7          Finally, you must not have contact with

8     anyone about this case other than the Judge and Court

9     employees.  This includes sending or receiving e-mail,

13:18:11 10     Twitter, text messages or other updates using blogs and

11     chat rooms and the use of Facebook, Instagram, LinkedIn,

12     and other social media sites of any kind regarding this

13     case or any aspect of your jury service during the trial.

14          Again, you're not prohibited from using any

13:18:28 15     of these sources, devices, channels of communication,

16     whatever, but you are prohibited from using them in any

17     way about the trial, what you see, what you hear.

18          If anyone tries to contact you about this

19     case directly or indirectly, do not allow that person to

13:18:46 20     have contact with you.  If any person persists in

21     contacting you or speaking with you, that could be jury

22     tampering, which is a very serious crime.  If anyone

23     contacts you in this manner, report this to my Courtroom

24     Deputy as quickly as possible.

13:19:00 25          And I want to add, you may encounter some

1    of the lawyers, some of the party representatives outside

2    the courtroom, in the restroom, whatever.  If you see

3    them, they're going to walk away, they're not going to

4    talk to you, and your first reaction is they're being

5    rude.

6              They're not being rude.  They're under

7    strict orders not to talk to you.  And you may say what's

8    wrong with saying hi or good morning or good afternoon.

9    Obviously nothing's wrong with that, but that could lead

10   to a response or someone could see them talking to you

11   and that could be a big problem.

12             So they're not being impolite.  They're

13   just following Court orders and you should do the same.

14             You should know that if this admonition is

15   violated, there could be a mistrial.  A mistrial means

16   that the case is stopped before it's finished and must be

17   retried at a later date.

18             This can lead to a great deal of expense

19   for the parties and for taxpayers; namely, you and your

20   neighbors.  No one wants to see money, especially tax

21   dollars, wasted.  If a mistrial were to be declared based

22   on a violation of this admonition, the juror responsible

23   could be required to pay the cost of the first trial and

24   could also be punished for contempt of court.

25             It will be your duty to find from the

1    evidence what the facts are.  You and you alone are the

2    Judges of the facts.  You will then have to apply those

3    facts to the law as I will give you and I'm summarizing

4    now, and I'll give more detailed instructions at the end

5    of the case.

6              You must follow that law whether you agree

7    with it or not.

8              Nothing that I may say or do during this

9    trial is intended to indicate, nor should be taken by you

10   as indicating, what your verdict should be.  The evidence

11   from which you will find the facts will consist of the

12   testimony of witnesses, documents and other things

13   received into the record as exhibits, and any facts the

14   lawyers agree or stipulate to or that I instruct you to

15   find.

16             Certain things are not evidence and must

17   not be considered by you.  I'll list them for you now.

18             Statements, arguments and questions by the

19   lawyers are not evidence.  The answers of the witnesses

20   are the evidence.  The questions are not.

21             Objections to questions are not evidence.

22   Lawyers have an obligation to their client to make an

23   objection when they believe evidence being offered is

24   improper under the Rules of Evidence or whether a

25   question is objectionable.  These objections serve to

1   help me.

2            The purpose of objections is to ensure the

3   presentation of evidence that is proper and to keep out

4   all irrelevant matters.  As jurors, you should not hold

5   objections against either party or feel that either side

6   is trying to keep something from you.  And you should not

7   be influenced by my -- by the objection or by my ruling

8   on it.  If the objection is sustained, just ignore the

9   question.  And the lawyer will ask another one.  If it's

10   overruled, treat the answer like any other.  If you're

11   instructed that some item of evidence is received for a

12   limited purpose only, you must follow that instruction.

13            And if an objection is made and I feel I

14   need to hear a little more from the lawyers, and it's

15   going to be relatively short, what we're all going to do,

16   we're going to put on our headphones, there will be some

17   white noise and we'll be having a brief conversation

18   about that, and I'll make my legal ruling.  Then we'll

19   take our headphones off and then the examination of the

20   witness will continue.

21            And that's a quick way so we can handle

22   things outside of the presence of the jury but do it in a

23   safe way.  Before COVID, we would all sort of huddle up

24   at the side-bar, but obviously no one is doing that, so

25   we're using the headphones.

1           Testimony that I exclude or tell you to

2      disregard is not evidence and must not be considered.

3           All right.  Delays during trial should not

4      be considered by you or held against any party.  When a

13:23:04  5      case on trial is recessed or adjourned and the trial

6      doesn't commence right at the designated time, the delay

7      most likely is caused by either something I had to do on

8      this case that had to be done right then, or some

9      emergency on one of my other many, many cases.  I'm going

13:23:23 10      to try to avoid those as much as possible, but over six,

11      seven weeks, it's likely that something of an emergency

12      nature will come up.

13           So don't hold it against either side.  Hold

14      it against me.  And don't feel that your time is being

13:23:35 15      wasted.

16           Again, as I said in my admonition, anything

17      you may have seen or heard outside the courtroom is not

18      evidence and you must disregard it.

19           You as jurors must decide this case based

13:23:51 20      solely on the evidence presented right here within the

21      four walls of this courtroom.  This means that during the

22      trial, you must not conduct any independent research

23      about this case, the matters in the case, the individuals

24      or corporations involved in the case.

13:24:04 25           In other words, you should not consult

1    dictionaries or reference materials, such as the

2    Internet, websites, blogs, or use any other electronic

3    tools, such as Smartphones and iPads, to obtain

4    information about this case or to help you decide this

13:24:19  5    case.

6              I know it's hard.  We all use them.  But

7    you just cannot do it.  So don't try to find out any

8    information from any source outside the confines of this

9    courtroom.

13:24:29  10              All right.  There are two kinds of

11    evidence:  There's direct evidence, there's

12    circumstantial evidence.

13              Direct evidence is simply evidence, like

14    the testimony of an eyewitness, which, if you believe it,

13:24:42  15    directly proves a fact.

16              For example, if a witness testified that he

17    saw it raining outside, and you believed him, that would

18    be direct evidence it was raining.

19              Circumstantial evidence, by contrast, is

13:24:54  20    simply a chain of circumstances that indirectly proves a

21    fact.  If someone walks into the courtroom wearing a

22    raincoat covered with drops of water and carrying a wet

23    umbrella, that would be circumstantial evidence from

24    which you could conclude that it was raining outside.

13:25:09  25              I'm going to give you further instructions

1    on these, as well as other matters, at the end of the

2    case, but keep in mind that there's no legal difference

3    between direct or circumstantial evidence.  One is not

4    better than the other.  You should consider both kinds of

13:25:24  5    evidence.

6                    I'm sure you're going to hear the lawyers

7    talk about the credibility or the believability of

8    witnesses.  These words mean the same thing.  Part of

9    your job as jurors is to decide how believable each

13:25:36 10    witness is.  That's your job, it's not mine.

11                    It's up to you to decide if a witness's

12    testimony is believable and how much weight you think it

13    deserves.  You're free to believe everything that a

14    witness says, or only part of it, or none of it at all,

13:25:52 15    but you should, of course, act reasonably and carefully

16    in making those decisions.

17                    Let me suggest some things for you to

18    consider in evaluating each witness's testimony.

19                    First, ask yourself if the witness was able

13:26:05 20    to clearly see or hear the events.  Sometimes even an

21    honest witness may not have been able to clearly see or

22    hear what was happening and might make a mistake.

23                    Next, ask yourself how good the witness'

24    memory seems to be.  Does the witness seem able to

13:26:19 25    accurately remember what happened?

1          Next, ask yourself how the witness looks

2   and acts while testifying.  Does the witness seem honest

3   in trying to tell you what happened, or does the witness

4   seem to be lying?

13:26:30  5          Next, ask yourself if the witness has any

6   relationship to either side of the case or anything to

7   gain or lose that might influence the witness' testimony.

8   Does the witness have any bias, prejudice, or reason for

9   testifying that might cause him or her to lie or to slant

13:26:47 10   testimony in favor of one side or the other?

11          Ask yourself if the witness testifies

12   inconsistently while on the witness stand or if the

13   witness says or does anything off the stand that is

14   inconsistent with what the witness said while testifying.

13:27:02 15   If you believe that the witness is inconsistent, ask

16   yourself if this makes the witness' testimony less

17   believable.  Sometimes it may.  Other times it may not.

18          Consider whether the inconsistency is about

19   something important, or about some unimportant detail.

13:27:19 20          Ask yourself if it seems like an innocent

21   mistake, or if it seems deliberate.

22          Finally, ask yourself how believable the

23   witness' testimony is in light of all the other evidence.

24   Is the witness' testimony supported or contradicted by

13:27:34 25   other evidence that you find believable?

1            If you believe that a witness' testimony is

2       contradicted by other evidence, remember that people

3       sometimes forget things, and that even two honest people

4       who witness the same event may not describe it in exactly

13:27:48  5       the same way.

6            These are only some of the things that you

7       may consider in deciding how believable each witness is.

8       You may also consider other things that you think shed

9       some light on the witness' believability.  Use your

13:28:03 10       common sense and your everyday experience in dealing with

11       other people, and then decide what testimony you believe

12       and how much weight you think it deserves.

13            During the trial, it's possible that I may

14       ask questions of a witness to bring out facts not then

13:28:19 15       fully covered in the testimony.  Please do not assume

16       that I hold any opinion on the matters to which my

17       questions may have related.  Remember, that you, as

18       jurors, are at liberty to disregard all of my comments or

19       questions in arriving at your own factual findings.

13:28:34 20            I want to touch on burden of proof, and

21       this was mentioned, I think, during jury selection.

22            In a civil action like this case, the

23       burden of proof on the plaintiffs is by a preponderance

24       of the evidence.  To establish something by a

13:28:52 25       preponderance of the evidence means to prove that

1    something is more likely true than not.

2              Another term for "Preponderance of the

3    evidence" is greater weight of the evidence.  If you want

4    to think of a teeter totter, it's just enough evidence to

13:29:06 5    tip it to one side or the other as opposed to completely

6    level.

7              This standard does not require proof to an

8    absolute certainty since proof to an absolute certainty

9    is seldom possible in any case or it doesn't require

13:29:24 10    proof beyond a reasonable doubt.  That's the proof we

11    require in a criminal case.

12              This is a civil case.  Preponderance of the

13    evidence, just remember, like a teeter totter, the

14    plaintiffs have to put in enough evidence that tips that

13:29:37 15    teeter totter towards their side.

16              In determining whether any fact in issue

17    has been proved by a preponderance of the evidence, you

18    may, unless otherwise instructed, consider the testimony

19    of all witnesses, regardless of who may have called them,

13:29:49 20    and all exhibits received in evidence, regardless of who

21    may have produced them.

22              The plaintiffs in this case, as you know,

23    are Lake County and Trumbull County.  There are four

24    defendants, three of which are national pharmacy chains

13:30:03 25    and one of which is a regional pharmacy chain.

1           The defendants are in alphabetical order

2    CVS, HBC Giant Eagle, Walgreen's and Walmart.

3           The four pharmacy defendants each bought

4    prescription opioids from pharmaceutical manufacturers

13:30:22  5    and then distributed those prescription opioids to their

6    pharmacy stores or bought and received prescription

7    opioids from other distributors.

8           The pharmacy stores then used these opioids

9    to fill prescriptions for patients written by doctors and

13:30:39 10    other health care practitioners.

11           The pharmacy defendants each played two

12    related roles during their business dealings with

13    prescription opioids.  One is a distributor and one is

14    dispenser.  First, they acted as a distributor when they

13:30:56 15    bought opioids from manufacturers or other third-party

16    distributors and then distributed the drugs to their own

17    pharmacy stores.

18           Second, they acted as a dispenser when

19    their pharmacy stores filled prescriptions for patients.

13:31:09 20           The two counties, Lake County and Trumbull

21    County, allege that each pharmacy defendant failed to

22    monitor, detect, investigate, report, and stop certain

23    suspicious shipments and illegitimate prescriptions of

24    opioids which allowed the opioids to be diverted to

13:31:27 25    illegal use.

1          The counties allege these suspicious

2     shipments and illegitimate prescriptions caused a public

3     nuisance, which is defined as an ongoing substantial

4     interference with the public health in their counties.

13:31:40  5          The pharmacy defendants deny the counties'

6     claims that they caused a public nuisance.  The

7     defendants contend that they complied with their legal

8     obligations, violated no duties, and that if a public

9     nuisance exists today in these two counties, it was

13:31:56 10     caused by persons other than the pharmacy defendants.

11          I will give you detailed instructions on

12     the law at the end of the case, and those instructions

13     will control your deliberations and decision.

14          But to help you follow the evidence, I will

13:32:10 15     now give you a brief summary of what plaintiffs must

16     prove in order to establish their claim.

17          Note that my summary of -- note that my

18     summary of the claim -- in my summary of the claim, I

19     will use the word "Person" or "Persons."

13:32:26 20          Please bear in mind that for this claim,

21     corporations are considered persons.

22          A public nuisance is an unreasonable

23     interference with a right held by the public in common.

24     A public nuisance includes an unreasonable interference

13:32:42 25     with public health or public safety.

1            A right common to the general public is a

2       right or an interest that belongs to the community at

3       large.  It is a right that is collective in nature.  A

4       public right is different from an individual right that

13:32:58   5       everyone has, like the right not to be assaulted or

6       defrauded.

7            For a defendant to be held liable for

8       creating a public nuisance, a plaintiff must show by the

9       greater weight of the evidence that the defendant did one

13:33:10  10       or both of the following two things:

11            One, the defendant engaged in intentional

12       conduct that caused a significant and ongoing

13       interference with a public right to health or safety; or,

14       two, that the defendant engaged in unlawful conduct that

13:33:28  15       caused a significant and ongoing interference with a

16       public right to health or safety.

17            For this claim, the plaintiffs must prove

18       that the conduct of one or more defendants was a

19       substantial factor in creating an ongoing public

13:33:44  20       nuisance.

21            And remember, you must consider the

22       evidence against each of the four defendants separately,

23       and you'll be asked to make a separate decision at the

24       end of the case.

13:33:53  25            This concludes the summary of the law that

1       will help guide you as you hear the evidence.

2                       Now, a few words about your conduct as

3       jurors.  Again, first, during the trial, you are not to

4       discuss the case with anyone or permit anyone to even

13:34:09  5     attempt to discuss it with you or in your presence.

6                       As to anyone who you may come to recognize

7       as having some connection with this case, such as the

8       attorneys, the parties, the witnesses or members of my

9       staff, to avoid even the appearance of impropriety, you

13:34:26 10     should have no conversation whatsoever with them while

11      you're serving on the jury.

12                      If you see any of these people in the hall,

13      the elevator, stairway, on the street, just ignore them.

14      They will understand that you are not being impolite but

13:34:38 15     you're obeying my instructions.  They've also been given

16      the same instructions.

17                      The point of this is that if someone sees

18      you talking with anyone connected with this case, even if

19      you're only exchanging greetings, the Court may have to

13:34:56 20     hold a hearing to find out what was said and that becomes

21      cumbersome.  So just don't have any conversation

22      whatsoever with anyone connected with this case.  Do not

23      discuss this case with anyone.  Obviously if you have a

24      question or an issue, you'll see either Mr. Pitts or

13:35:09 25     Ms. King.  You can ask them and they will communicate

1        with me.

2                    All right.  If anyone tries to communicate

3        with you outside of this jury room, the courthouse or

4        whatever, bring it to the Court's attention promptly.

13:35:21  5                    Again, you've got to decide this case

6        solely on the evidence presented here.  You are not to

7        conduct any independent research, reading or

8        investigation about this case.

9                    Don't listen or read anything, anything

13:35:37 10       touching on this case in any way.  Consult dictionaries

11       or reference material, anything on on the Internet,

12       social media whatsoever to help you decide it.

13                    Everything you need to know, you're going

14       to see and hear right here.  So if you come across an

13:35:52 15       article that you think is touching on the case, just put

16       it aside.  Read it after the trial.

17                    And until you retire to deliberate, you may

18       not discuss this case with anyone, even your fellow

19       jurors, because once you start discussing the case,

13:36:05 20       you're going to start forming conclusions and it's unfair

21       to the plaintiffs, it's unfair to the defendants to reach

22       conclusions until you've heard all of the evidence.

23                    So again, don't form any conclusion or form

24       opinions as to whether the plaintiff has met its burden

13:36:24 25       at all until all the case is open -- is closed and ended.

1       So keep an open mind until you start your deliberations

2       at the end of the case.

3                    In my courtroom, I allow jurors to take

4       notes.  You've got notepads.  If you wish, you may take

13:36:39  5     notes.  If you don't take -- if you do take notes, please

6       leave them in the jury room when you go home at night.

7       These notes are for your own personal use and will not be

8       distributed or read by anyone else for any purpose.

9       After the trial is concluded, they'll be destroyed.

13:36:55 10                   And we do this, some people, it helps their

11      memory and recollection to take notes.  I'm one of those.

12      But for some people, it's a distraction.  So you know

13      what works best for you, and if you want to take notes,

14      fine.  If you don't want to, that's fine.

13:37:10 15                   All right.  The trial is now going to

16      begin.  First, plaintiffs will make an opening statement,

17      which is simply an outline to help you understand the

18      evidence as it comes in.

19                   Next, defendants will make an opening

13:37:25 20     statement and you will hear from some or all of them.

21                   Opening statements are neither evidence,

22      nor arguments.  Since plaintiffs have the burden of

23      proof, the plaintiffs go first and they will present

24      their witnesses and physical evidence.  And counsel for

13:37:39 25     the defendants will cross-examine those witnesses.

1          Then it will be the defendants' turn, and

2     they'll present witnesses and physical evidence, and then

3     the plaintiffs may present a short rebuttal case,

4     rebuttal testimony and evidence.

13:37:52  5          In my courtroom, I allow jurors to ask

6     questions, but this is how I work it.  We have direct

7     testimony and then cross, cross-examination.  And after

8     the cross-examination, if any of you has a proposed

9     question, just write it down on one of the slips of paper

13:38:14 10    in your notebook, tear it out and give it to the

11    Courtroom Deputy, either Mr. Pitts or Ms. King, and

12    she'll give the question to me.

13         I'm going to look at it and then I'm going

14    to show it to the lawyers for both sides for their

13:38:28 15    review.  The attorneys may choose to ask the question of

16    that witness when they conduct further questions, or they

17    may not.  If they decide not to ask the question, don't

18    hold it against anyone.  It may be because the answer

19    sought, it isn't relevant to this case, or counsel may

13:38:46 20    believe that the question can best be answered by

21    questioning another witness, and the lawyers know which

22    other witnesses are coming and they may say, "All right,

23    this is a good question but I'm going to ask it of a

24    following witness, not this witness."

13:39:00 25         So it's to let the lawyers know that you've

1    got a question.  So I'll remember to do that, but if I

2    forget and you have a question after cross-examination,

3    just raise your hand and I will address it.

4              After all the evidence is presented, I'm

13:39:13 5    going to instruct you on the law, and then the attorneys

6    will present their closing arguments to summarize and

7    interpret the evidence for you.  And after that, you will

8    retire to deliberate on your verdicts.

9              So we're going to start with the opening

13:39:27 10   statements of the plaintiffs.  I plan to take a

11   mid-morning -- mid afternoon break around 3:00 o'clock.

12   I don't expect we're going to finish all of the opening

13   statements today.  We'll finish those up tomorrow.  And

14   when they're concluded, then the plaintiffs will call

13:39:42 15   their first witness.

16             So I believe Mr. Lanier is going to do the

17   opening for the plaintiffs, so Mr. Lanier.

18

19

20

21

22

23

24

25

1       OPENING STATEMENTS ON BEHALF OF THE PLAINTIFF

2              MR. LANIER:  Thank you, Your Honor.

3              And may it please this Court, ladies and

4       gentlemen, first, Ms. Court Reporter, can you hear me?

13:39:56  5     Is this little mic working?  And it's not working.  Is it

6       working when I hold it up here?  This will be

7       interesting.

8              All right.  I will try to raise my volume

9       level to make it more suitable for you and try not to

13:40:37  10    blast all of y'all out of here.

11             My name is Mark Lanier and I'm really

12      delighted to get to try this case before you.  I've got

13      several people with me that you sort of met, but I need

14      to give you a little more introduction.

13:40:49  15            So I'll start here with Ms. Maria Fleming,

16      and Maria is a local lawyer who is here.  She helps

17      represent Lake and Trumbull Counties.  She's fantastic.

18      I need her here because she keeps up with my exhibits and

19      that becomes really critical in this case so if you see

13:41:07  20    me huddling with her, you'll know what it's about.

21             Sal Badala is the next lawyer here.  Sal is

22      also -- we don't let Sal talk because he's from New York

23      and I'm from Texas, they barely let me talk but, no, Sal

24      is a marvelous lawyer from New York who happens to also

13:41:26  25    represent these counties.

1            And you met Ms. Fraser and Ms. Caraway.

2     You have not met Frank Gallucci, who is a local lawyer

3     and Frank represents the counties as well, and so thank

4     you for being here.

13:41:38  5            Again, Ms. Caraway -- I did Ms. Fraser.

6     I'm saving you.

7            Pete Weinberger is a local lawyer as well.

8     In fact, his office is right down the street and he's

9     here to make sure I don't mess up.

13:41:52 10            So if he's talking to me, you know I've

11    done something wrong.

12            He may take a witness or two in this trial

13    as well, especially if I'm messing up that bad.  So I

14    want you to know it's an honor to get to try the case

13:42:06 15    with him.

16            And last, I want to introduce Rachel

17    Lanier.  You might see me hug on her.  Don't think I've

18    married someone young enough to be my daughter.  She's

19    not my wife, she is my daughter, and it's a joy to get to

13:42:21 20    try this case with my daughter.  And if I'm talking to

21    her, you'll understand either my shirt is untucked or

22    she's saying some things that only a daughter could say

23    to me and nobody else could.

24            So that's our team that we've got here and

13:42:34 25    we're honored to be here but we couldn't make it without

1    Juan Wilson.  Juan is sitting back here.  Mr. Wilson has

2    worked with us for 20 years or so.  He works all the

3    audio/visual.

4                   He's not a lawyer but the Court has

13:42:48  5    graciously allowed him to sit on this side of the bar so

6    that I can switch back and forth between computers and

7    IPs and get the best job I can of communicating to you

8    because that's my role.

9                   My role in this trial is to set forward for

13:43:02 10    you the evidence so that you can do your job and make a

11    determination of whether or not these companies

12    individually have responsibility for the public nuisance

13    in this case.

14                   And so I represent Lake and Trumbull

13:43:24 15    Counties against these companies, and the case itself is

16    about the distribution and the dispensing of opioids.

17    Now, you've got screens all around you.  You've got

18    screens over there, you've got screens over there, you

19    have a screen right here, the Judge has a monitor, the

13:43:39 20    same thing the lawyers do.  The reason why is because we

21    think it helps communicate.

22                   There will be times during the trial where

23    it will also show evidence because some of the evidence

24    is in documents.  It's not all just what people say.

13:43:51 25                   But the case itself is about the

1    distribution and dispensing of opioids, not just in Ohio

2    but it's expansive, as you'll hear.

3                You know, we've got counties that are close

4    to the border of Pennsylvania.  We've got counties that

13:44:10  5    are on a highway up from Florida.  So you're going to

6    hear different testimony about all of this, but the key

7    is, is there a nuisance in Lake and Trumbull Counties and

8    then you have to figure out if there is, indeed, a

9    nuisance.  And nuisance is not in the everyday sense of,

13:44:29 10    you know, my kid sister was a nuisance growing up.

11                No.  Nuisance in this sense is an intrusion

12    in the public right to just enjoy life within the

13    communities in some ways.  The Judge will give you a real

14    specific instruction.

13:44:44 15                But then the question becomes are these

16    companies, any of these companies or all of them, a

17    substantial contributing factor in creating this

18    nuisance?

19                Now, let me be very clear from the very

13:44:59 20    beginning, I believe the evidence will show you that

21    there's a boatload of people responsible.  As I indicated

22    in jury selection, it's voir dire in His Honor's Court.

23    Where I come from we call it voir dire because we don't

24    speak French in Texas, but when we were asking questions,

13:45:22 25    I specifically asked you, you know, do you understand the

1    idea that there might be lots of people involved in

2    creating a problem of this magnitude. And I think that's

3    what you're going to hear from the evidence.

4                This opening statement is just my roadmap.

13:45:38  5    This is me telling you how this evidence is going to

6    unfold in the trial based upon my best understanding.

7                So I'll talk to you about some of the

8    witnesses.  That doesn't mean that everyone that I'm

9    going to put on the stand I've talked about.  I may have

13:45:54 10    to add some.  The Judge has got us on a clock, and so

11    I've only got 75 hours to do my case and my

12    cross-examination, barring something unforetold, and so I

13    may have to delete some witnesses.  I may have to change

14    some things.

13:46:11 15                But this is my best estimate of how it's

16    going to go down right now at this moment.

17                Now, during this COVID time, my daughter

18    introduced me to a word that I should have known before

19    evidently but I didn't.  It's "Binge watching."  Binge

13:46:28 20    watching is evidently watching the same -- a show one

21    after the other until your eyeballs want to explode or

22    something.

23                And I thought since I've learned how to

24    binge watch -- and, yes, I've been guilty.  I've binge

13:46:45 25    watched on Netflix, I've binge watched on Amazon Prime --

1     I thought I might use that as a theme to keep you awake

2     for the two-and-a-half hours His Honor has given me to

3     address you today.

4                     You say, "Oh, mercy, two-and-a-half hours

13:47:02  5     of that guy?"  Sorry.  That's the way it's coming down.

6     And I'm going to do the best I can.

7                     But we're going to do it based on my idea

8     of binge watching.  You're really just going to get three

9     episodes or something.  I mean just think of the time,

13:47:18 10     okay, two-and-a-half hours, we can binge watch that long.

11                     So our binge watching show, though, is not

12     Netflix, it's not Amazon Prime, it's a bunch of witnesses

13     that are going to be coming out.

14                     And when I binge watch, I do it in three

13:47:32 15     different ways or there's three aspects to binge

16     watching, I should say.

17                     Number one, I want to hear about it.  I

18     want to hear about whatever it is I'm going to watch

19     because some things sound pretty good, some things

13:47:44 20     frankly don't.  There are some things that my wife and I

21     enjoy watching.  There are some things that I'd rather

22     watch and she's just not into.

23                     So I want to hear about the show, see if

24     it's one I'm into.

13:47:55 25                     Second thing is that I watch it.  And when

1    I'm done, I tell other people about it.  I'll say, "Hey,

2    this is a great show, you need to watch it," or, "Hey,

3    this show is terrible, don't watch it," or, you know,

4    we'll discuss it, which character reminds you of what.

5              So those three ideas are the way I've

6    structured my opening statement for you.  As I tell you

7    how the evidence will come in, I'm going to do it by

8    talking about the episodes, and then I'm going to watch

9    them with you, and then we'll talk about them at the end.

10             So here we go.  Let's start with "hear

11   about it."

12             If I had a title for this show, I would

13   title the show, "Opioid Epidemic."  I would tell you this

14   is a nonfiction show.  By that, I mean it's a

15   documentary.  This is real, this is truth, this isn't

16   made-up, it's not fairy tail.  The Judge talked about

17   different TV shows that are to be distinct from the

18   courtroom.  Those are little 30-minute, maybe 45-minute,

19   maybe an hour episodes that contain everything

20   soup-to-nuts.  They're fake.

21             This is not one of those shows.  This is

22   the real thing.

23             You're going to actually -- this is why it

24   takes seven weeks or six weeks or however long His Honor

25   will give us.  But this is why.  Because you get it and

1    you get it with the Rules of Evidence that make America

2    what it is and make our court system what it is.

3                    You're going to learn about opioids more

4    than you ever dreamed, although some of you from your

5    training probably have a pretty good grasp of things

6    already.  But you'll hear about drugs we're especially

7    concentrating on; Hydrocodone, which is one of dozens of

8    different types of opiates, and you'll also hear about

9    Oxycodone, which is another one of a group.

10                   Now, when we talk about what opiates are

11   and opioids, it includes a range of legal drugs like

12   Hydrocodone and Oxycodone but there are also illegal

13   opiate drugs.  So, for example, heroin is an opiate drug

14   and heroin's been around for a long time.  But it's an

15   opiate.  It happens to be illegal in the United States,

16   but it's still an opiate.

17                   There's another one that the medical

18   science in a sense has almost even invented.  It's called

19   Fentanyl.  And Fentanyl is this mega powerful opiate that

20   typically is prescribed when someone is at end stage of

21   cancer, and the pain is just unbearable.

22                   But Fentanyl is a drug that can be legal

23   but there's also a street Fentanyl which is illegal.  And

24   we'll hear about all of this.

25                   What makes them opiates?  They come from

1   the poppy plant.  Now, not this pretty little poppy plant

2   here.  You might could get something from it, but this is

3   the kind you can even plant in your garden here in

4   America, and they don't let you plant the kind that's

13:51:16  5   going to turn you into a dope dealer here so this is just

6   the pretty one.

7              The one we're concerned about here is the

8   one that goes by the name Papaver somniferum.  Somniferum

9   from the Latin word for put me to sleep and Papaver is

13:51:28 10   the poppy.

11              And this is the opium poppy.  This is what

12   it looks like.  And what happens with the opium poppy is,

13   after the petals fall off, you've got this bulb or head

14   up at the top and then it looks like a little crown on

13:51:44 15   top of the head.  And if you took a knife or some sharp

16   object and you sliced into that bulb, a latex or a fluid

17   would come out. And it's from that fluid that you get

18   these opiates.

19              Now, we're not the first people to figure

13:52:05 20   this out.  This has been around for a long time.  You can

21   go back and find ancient Sumerians.  The Sumerians were

22   over in the Middle East and their empire was over in

23   Mesopotamia between the Tigres and the Euphrates over in

24   the Iraq area.  But you can go back thousands of years in

13:52:32 25   B.C. and read about their use of the opium plant and the

1      latex, the fluid that came out of it.  They called it hul

2      gill.

3                        And I say that very boldly.  We don't

4      really know how to pronounce the cuneiform script that

13:52:50   5      they had, but that's the scholar's best estimate.  I can

6      tell you that it translates to the happy plant because

7      that's what they thought of it.

8                        And they even would shape some of their

9      jugs to look like it.  You say how does that look like

13:53:02  10      it?  Well, if you took that poppy plant and you turned it

11      upside down, you'd see how these jugs look like it.

12                        I was able to get a place to release the

13      Sumerian poppy jug for you, and it's exactly what it was.

14      And they had ridges built into the pot so they could rub

13:53:24  15      the latex and they would put the opium residue in with

16      wine and it made a good sleeping potion.

17                        I'll tell you, if you go back to Roman

18      times, the Romans -- I've put a vase here.  Let me pull

19      this out.  This is actually a Greek vase, the Greek gods

13:53:47  20      Thanatos is the Greek word for death.  Thanatos was the

21      Greek god of death.  He had a half brother.  His half

22      brother was the god of sleep.  His name is Hupnos.  If

23      you get Hupnotized, you're put to sleep.

24                        Hupnos and Thanatos wore poppy seeds around

13:54:06  25      their head or poppy plants in the wreath because the

1    medicine or the latex or the sap was used, not just to

2    help people sleep, make people happy, but also suicide

3    was not illegal then, also used especially among the

4    older people as a way to choose when you die because it

13:54:24  5    will stop your breathing.

6                So opium's been around for a long time.

7    You can chart through the -- it's referenced in the

8    Bible.  There's a Hebrew word Rosh, which means head, and

9    Rosh is used for a bitter plant.  But a lot of scholars,

13:54:43 10   Gasineus I think, and others, believe that that plant is

11   referencing -- it's translated bitter gall sometimes,

12   sometimes bitter root, but it's referencing the same

13   plant, the opioid plant.

14                So you've got this.  You can bring it into

13:55:00 15   English times.  You can take this book that really hit

16   the market in 1822, '23, Confession of an Opium Eater,

17   and it just talked about how this opium was so

18   destructive to the person who was eating it and

19   biographing it.

13:55:21 20                You've got the Chinese opium dens in the

21   1870s; huge problem.  Heavens, you've got beyond that the

22   Wizard of Oz.  I mean Dorothy, you know, "I'll get you my

23   pretty," and all that stuff.  The Wizard of Oz, the book,

24   not the movie.  The book talks about this.  I don't

13:55:45 25   remember the movie that much.  Maybe the movie does as

1    well.

2              I've got the book here but I've put it into

3    the PowerPoint.  If this is working good enough, I'll

4    throw it up here for you to read it along with me.  Look

13:55:56  5    at this passage.  You'll see the illustrator used the

6    pretty poppies, didn't use the real ones that have the

7    opium in the high enough concentration to make a

8    difference, but it says, "So they kept walking until

9    Dorothy could stand no longer."  She's walking among the

13:56:13 10    poppies.  "Her eyes closed in spite of herself and she

11    forgot where she was and she fell among the poppies fast

12    asleep."

13              It continues, "If we leave here, she will

14    die, said the Lion.  The smell of the flowers is killing

13:56:32 15    us all.  I myself can scarcely keep my eyes open and the

16    dog is asleep already."

17              So this is the idea that this was

18    well-known, such that Frank Baum writes about it in his

19    book, "Run fast said the Scarecrow to the Lion and get

13:56:51 20    out of the deadly flower bed as soon as you can."

21              There's a Journal of Neurology and an

22    abstract was published in the Journal.  This just came

23    out in 2019, but in the abstract, it talks about an

24    8,000-year history of use and abuse of opium and opioids.

13:57:10 25    How that matters for a successful control of the

1    epidemic.

2                    And here's what the writer said.  He said

3    "8,000-year-old hardened Sumerian clay tablets are the

4    earliest prescriptions of opium."  You already knew that

13:57:26  5    because I told you that earlier.

6                    "Ancient Greeks, Indians, Chinese,

7    Egyptians, Romans, Arabs, people in the middle ages,

8    Europeans from Renaissance to now knew opium as an

9    ever-approved, next-door medicine, a panacea for all

13:57:45  10   maladies."

11                    References in the odyssey of the Bible, and

12   use by known leaders and minds like Homer, Franklin,

13   Napoleon, have removed the label of immortality -- or

14   immorality from its use."

13:58:05  15                    "Recognition of subjective pain is the

16   fifth vital sign, with pressure on providers to prescribe

17   scheduled medicines, added additional strokes to this

18   menace of pre-historic dimensions, the opioid epidemic,

19   which shreds 13 percent high school seniors every year."

13:58:28  20                    And one of the main reasons this happens is

21   some people are especially prone and become addicted to

22   opioids.

23                    You will hear the evidence in this case

24   from Dr. Anna Lembke.  Now, I think she's going to be my

13:58:47  25   second witness.  That's my plan right now.  My plan, my

1    very first witness is actually going to be a gentleman

2    that works for the defendants, works for CVS, Mr. Tom

3    Davis, and we'll start with him because I want to

4    challenge him on some of the things about CVS.

5              I want you to hear that challenge fresh

6    from hearing the CVS opening statement and that of the

7    other lawyers.  So he'll be my first witness.

8              But Anna Lembke, Dr. Lembke, will be my

9    next.  Now, she -- you may have heard her podcast.  She

10   did podcasts on Drug Dealer, M.D. and that was before she

11   came out with a book which has just been published, *Drug*

12   *Dealer, M.D.  How Doctors Were Duped, Patients Got*

13   *Hooked, and Why It's So Hard to Stop.*"

14             Dr. Lembke is at Stanford University.

15   She's a psychiatrist, a medical doctor, psychiatrist, and

16   an addiction specialist.

17             And I'm going to ask her to come in here

18   and to testify about how addiction works.  The domino

19   effect of prescription drugs to illegal drugs;

20   not -- I'll explain it in more detail.

21             There's a misused -- no, a multi-used

22   phrase that we'll talk about, about the gateway effect.

23   And it's not valid in the sense of, I think it's been

24   disproven in the sense of gee, you smoke a cigarette so

25   pretty soon, you're going to be mainlining heroin.

 1   That's not it.

 2                   And this, some people use the language here

 3   "gateway effect" but it's a different concept.  This is

 4   one opiate leads to another opiate to another opiate.

14:00:26  5   It's within that family.

 6                   But she'll talk about how that domino

 7   effect has worked even into illegal drugs, and the role

 8   that pharmacies have played in this.

 9                   I think it's easy for all of us to look at

14:00:42 10   the manufacturers of these medicines, like Perdue Pharma

11   and say, "Hey, you played a significant part because you

12   told everybody you invented a drug that wasn't addictive

13   and it was addictive and you told everybody to prescribe

14   this for pain when it shouldn't be prescribed."

14:00:58 15                   I don't think any of the parties are going

16   to fuss that.  I don't think any of the parties are going

17   to fuss that not everybody did their jobs right and there

18   are lots of different parts to this.  But you'll be

19   stunned to find out, I suspect some of you at least, the

14:01:16 20   role the pharmacies play.  And you'll hear about that.

21                   But some of it will come from Dr. Lembke.

22   She will talk about the pleasure/pain balance, how a

23   normal dopamine level allows somebody to balance between

24   pleasure and pain and how important it is that we

14:01:33 25   maintain that balance and how the infiltration into our

bloodstream across the blood brain barrier into the brain
affects that.

Because human beings are designed to seek
out pleasure.  They're designed to avoid pain.  And when
you've got a drug that manipulates your brain and changes
that balance, it does dangerous things to you and to me.

So I've told you about the history of this.
Before we get to the second point that I need in opening,
let me talk to you a little bit more and tell you how the
United States has handled this historically.

Pre-1914, it was the wild west.  It was
anything goes.  It's just like the TV shows where the
fellow takes his carriage out into the wild west town and
stands up and starts hocking his Uncle Joe's medicine,
good for whatever ails you.  You buy a fifth of whiskey
for a dollar but if you pay two dollars, you'll get his
medicine.  And people would buy it and he could put opium
in it, he could put anything he wanted to in it. It was
pretty wide open here in the U.S.

And as a result, there were problems.  So
in December of 1914, the United States passed something
called the Harrison Act.  And the Harrison Act was just
designed to try to get some handle on some of these drugs
that were destructive to Americans.

Among those drugs were some opiates.  And

1    so, for example, you can still find on eBay and other

2    places heroin tablets that were subject to the Harrison

3    Act.  Here's hypodermic tablets that you can use for

4    heroin; crush them up, mix them up, inject them.

5                    And this was something that was regulated

6    by the U.S. Government.  You had to have a license to

7    import it, to sell it, and you had to pay taxes on it.

8                    And so you can even find tax stamps for

9    opiates and that's the way it was.  So if we put it up

10   here on a timeline, we've got the wild west until 1914

11   and then we've got the Harrison Act.

12                   And that lasted up until 1970.  But there

13   were some problems in 1970 that the nation needed to

14   confirm.  We had a lot of people who served the military

15   and served valiantly in Vietnam, especially, and had been

16   exposed to opiate products, and they came back addicted.

17                   And this led to a surge in illegal opium

18   availability through heroin and some other drugs.  And

19   this was before Perdue invents their supposedly

20   nonaddictive opiates that we're talking about in this

21   case.

22                   But what happened then is Richard Nixon

23   came along and he signed into law in 1970 the Controlled

24   Substances Act.  Now, that's a very critical point of law

25   that His Honor will interpret and explain to you in the

1    right measures at the right time.

2                    As he's already told you, everything I'm

3    telling you right now is what I expect the evidence to

4    be.  Not a lick of evidence is coming out of my mouth.

5    Couldn't give it to you if I tried.  If I was to give

6    evidence, I'd be disqualified as a lawyer because I can't

7    do both.

8                    So I'm not giving you evidence and I'm not

9    giving you the law.  Nobody's qualified to do that but

10   His Honor.  So I'm giving you my understanding of what I

11   believe you will hear from him, but that's the best I can

12   do at this point as part of my roadmap.

13                   So when Richard Nixon, President Nixon,

14   signs this, this Controlled Substances Act set out

15   different levels of drugs.  One they called Schedule 1

16   drugs.  Now, these are drugs that really don't have a

17   medicinal use.  This is LSD, this is heroin.  These are

18   drugs that have a high potential for abuse but no

19   medicinal use.

20                   Then there are Schedule II drugs.  These

21   have a limited medical use but a high potential for abuse

22   and addiction.  And this includes Oxycodone, OxyContin,

23   Percocet, Percodan, and since 2014, it includes

24   Hydrocodone, Vicodin.

25                   So level, Schedule III drugs are those that

1      have a limited medicinal use and potential for abuse and

2      dependence.  This includes things like testosterone

3      supplements.  This is where Hydrocodone was until 2014

4      when it got bumped up to Schedule II.  There's Schedule

14:06:55  5      IV, but it's not going to come up in this case, I don't

6      think, same with Schedule V.

7                  Now, the law in the United States

8      authorizes enforcement of this through the Drug

9      Enforcement Administration, which is part of the U.S.

14:07:14 10      Justice Department, DOJ, the Department of Justice.

11                  And this is often abbreviated DEA, the Drug

12      Enforcement Administration.  So the DEA has policing

13      authority in a sense.

14                  And one of the witnesses that I'll be

14:07:33 15      calling probably, depending on timing, either one or two

16      witnesses after Dr. Lembke, is this gentleman right here,

17      his name is Joe Rannazzisi.  Everybody, friend and foe

18      alike, just calls him Joe Ran.  So if you hear someone

19      say Joe Ran, you know they mean Joe Rannazzisi.

14:07:59 20                  Now, Joe Rannazzisi used to be with the

21      DEA, the Drug Enforcement Administration's Office of

22      Diversion Control.  I'm going to talk about what

23      diversion was in a moment.  But he was an agent for the

24      DEA and he became the Director of this.

14:08:17 25                  He's not only -- he's no longer with the

1    DEA.  He's not only someone who was formerly an agent and

2    a Director; he's also a pharmacist.  The guy went to

3    pharmacy school.

4            He's not just a pharmacist; he's a lawyer.

14:08:33  5    The guy went to law school.  He's got more degrees than a

6    thermometer.

7            He is a whistleblower.  And he's got

8    hands-on experience.  If his name didn't ring a bell with

9    you all, but you'll hear about how he's been written up

14:08:52 10    in news reports.  You'll hear about him getting on "60

11    Minutes," you'll hear about him testifying before

12    Congress, you'll hear about all of this.

13            He got his start in the regional office

14    that governs also Ohio.  It's all governed out of the

14:09:11 15    Detroit division of the DEA.  And he's going to come, and

16    part of what he'll testify to, I expect, is that Nixon's

17    law, the Controlled Substances Act, the CSA, it set up

18    what's called a closed system for opioids.

19            Let me explain what I mean.  Under this,

14:09:35 20    this is a really busy slide, I hate busy slides.  I

21    apologize right now.  I apologize.  This violates every

22    rule of slide-making that I know.  But here it is.  Let's

23    live with it, and I made it.  I can't blame anybody else.

24            Everyone inside the circle must be

14:09:53 25    registered.  What does that mean?  It means you've got to

1    file registration papers with the DEA.  You've got to

2    say, "I want to be registered.  I want to do work in this

3    area.  I want to, in a sense, make money off of these

4    drugs."

14:10:08  5         You can't make money off of them unless

6    you're registered.

7         And so this includes people who import the

8    serum, the opium serum, fee bank, whatever it may be, it

9    includes the people who import it into the country

14:10:27  10   because there are quotas of how much can be imported.

11        It includes the manufacturers.  If you want

12   to make the drugs, you got to register.

13        It includes this group I'm calling the

14   middle people, but these are called distributors in the

14:10:46  15   DEA language.  What that means is they buy from the

16   manufacturers, and they sell to the pharmacies.

17        So they're kind of the middle person.

18   They've got to be registered.

19        If a doctor's going to write the

14:11:01  20   prescription to take to the pharmacy, he's got to be

21   registered.

22        If a pharmacy chooses to sell these

23   dangerous drugs, they've got to be registered.

24        And the registration binds you to an

14:11:19  25   understanding of the law and following the law.

1          And it's extremely important.  And it's

2    important because of this word "Diversion" that I told

3    you I would talk to you about earlier.

4          Houston doesn't really have a football

14:11:37  5    team.  We've got the Texans, and they're about playing on

6    the high school level this year, but the Cleveland Browns

7    look pretty good.  And the stadium's right over here.

8    And I suspect if I'm trying to drive around the stadium

9    on game day, I might get diverted.

14:11:57 10          Diversion in an everyday language means not

11    being along the path that you were intending.

12          And it really means basically the same

13    thing in a case like this.  So if you think about a road

14    and if you stay on the road, you're using it properly,

14:12:18 15    that's the proper sales of the product, the proper

16    dispensing, the proper manufacturing, the proper

17    everything.  If you follow the law, that's proper.

18          But anytime you see that word "Diversion,"

19    that means that something unlawful has happened.

14:12:36 20    Somebody is doing something they should not be doing with

21    that drug.

22          And so when I told you that this circle of

23    legal sales is a closed circle, everyone has to be

24    registered.  The people who sell outside of the circle or

14:12:54 25    who don't keep -- don't follow the law properly, and they

1    go outside, that is not only unlawful, but it's also

2    called diversion.

3              Now, it makes common sense that when you've

4    got a product that people are addicted to, and people

14:13:16   5    need it and their bodies crave it and they're willing to

6    do outrageous things to meet the fix, it's not surprising

7    that there's room for people to profit from those folks,

8    sell it when maybe they shouldn't, turn a blind eye to

9    what they ought to be focusing on.

14:13:48   10              But the law says that the registrants, the

11    people within that circle, have a responsibility.  They

12    have a responsibility to prevent diversion, to stop that

13    from happening, to break it apart, and they do that by

14    following the rules.  The rules are written so that

14:14:08   15    diversion will not happen.

16              So, for example, I told you about the

17    middle people, the distributors.  Those distributors,

18    they are supposed to be monitoring how many pills they

19    are shipping to certain stores and how often they ship

14:14:26   20    them.

21              They're supposed to be monitoring for

22    suspicious orders, which might mean an order of an

23    unusual size.  I need, you know, an extra case of Oxy

24    30s.  It might mean a suspicious or unusual pattern where

14:14:47   25    every Tuesday, all of a sudden, they need the new drugs.

1    It might be a frequency.  They used to get

2    them once a month, now they're getting them every third

3    day.

4    There's more, but the distributors, the

5    middle people, taking from the manufacturers, giving it

6    to the pharmacies, those middle folks are supposed to be

7    monitoring for this.

8    By the way, for certain periods of time,

9    these defendants in this case were distributors to

10   themselves as well as pharmacies.  That's one reason I go

11   into this explanation.

12   Now, Joe Rannazzisi, who is going to be

13   here to testify, is going to be able to talk to you about

14   the way he pursued folks and informed folks about these

15   responsibilities so I used for an example here a copy of

16   the letter that was sent to Walgreen's in 2007.  And in

17   it, Joe Ran makes it clear that the law, the Controlled

18   Substances Act, requires that a distributor, that middle

19   person, design and operate a system to disclose to the

20   registrant suspicious orders.

21   They've got to design a system and they

22   have to operate it.  This is going to become relevant in

23   a little bit.

24   He also told them the regulation also

25   requires that the registrant inform their local DEA

1   Division Office if there is a suspicious order.

2               Then he goes on to say that they need to do

3   an independent analysis of that suspicious order before

4   they sell it.  Doesn't do any good to check it out after

14:16:49  5   you throw the pills out on the street or to the

6   pharmacies. But this is what the regulation says.

7               The last thing I'll put out at this point

8   in time, the regulation specifically states suspicious

9   orders include orders of an unusual size, orders

14:17:05 10   deviating substantially from a normal pattern, orders of

11   an unusual frequency.  These, it doesn't take all of

12   them, they're disjunctive, could be one, could be the

13   other, doesn't even have to be those, there could be

14   more.  But that's what the distributors must do; they

14:17:22 15   must develop and operate a system to report suspicious

16   orders, those being orders of an unusual size, frequency,

17   and pattern.

18               And they need to decline to ship until a

19   determination that there is no diversion.

14:17:37 20               Now, you'll notice I left number two out.

21   It's coming.  I just didn't order them well when I got my

22   PowerPoint ready to give you.

23               So put number two up there in your brain.

24   "Identifying suspicious orders." You've got to develop a

14:17:54 25   system to identify these orders, to report these orders,

1    and then decline to ship until the determination is made

2    that there's no diversion because that's the point of the

3    closed loop.

4              You want to make sure that the people

5    bringing prescriptions aren't bringing fake ones.  You

6    want to make sure that you're not supplying pharmacies

7    with way too many pills than they should reasonably need.

8              Now, let me talk to you about the

9    pharmacies.

10             Those middle people are called

11   distributors.  Pharmacies are called dispensers.  They

12   dispense the medicine.

13             So dispensers are known as, not surprising

14   when you look at this picture, the last line of defense

15   to prevent diversion because these are the people who are

16   putting the pills onto the streets.

17             And so the dispenser has obligations as

18   well.  The dispenser's obligations include providing

19   effective controls and procedures to guard against

20   diversion.  In other words, they've got to be effective

21   at keeping the drugs from going where the drugs shouldn't

22   be going.

23             Don't let someone come in with three

24   different prescriptions from three different doctors for

25   the same medicine.  Don't let someone come in if he's a

1     fellow and he's got a prescription for pain medicine from

2     a gynecologist.  Don't let prescriptions come in from

3     someone whose DEA license has been revoked.

4                    Be on your guard.  Be attentive.  Provide

14:19:52  5     effective controls.

6                    I think the evidence is going to show that

7     they also have to exercise, and this is the legal word,

8     "corresponding responsibility."  Think about that for a

9     moment.  It's corresponding responsibility to a doctor.

14:20:08  10    So you're a doctor, you're not supposed to write these

11    prescriptions unless it's legit, but then the pharmacist

12    is not supposed to do fill them unless it's legit.

13                    Pharmacists go to years and years of school

14    to become a doctor of pharmacy.  They study more drug

14:20:32  15    interaction than doctors do in medical school.  Doctors

16    go to medical school.  They're learning how to deliver

17    babies, how to hack off a limb, how to figure out if

18    someone has cancer.  They've got the whole broad

19    spectrum.

14:20:44  20                    Pharmacists, they're zeroed in on drugs.

21    And they have to exercise a corresponding responsibility

22    to the doctors.  That, by the way, makes a lot of sense

23    because there are some things doctors don't see.

24                    If -- I won't use you, Ms. Fleming, but if

14:21:03  25    Ms. -- or I'm using you.  If Ms. Fleming comes into one

1    doctor, she can explain her condition but if Ms. Fleming

2    then goes to a second doctor, he doesn't know she may not

3    have already gone to a first.

4         If she goes to a third doctor, they don't

14:21:19  5    know.  She could walk out with three prescriptions for

6    the same malady.  But the pharmacist ought to know who's

7    filling those prescriptions.

8         So we'll talk about that some more in a

9    minute when we get to the episodes, but the pharmacist,

14:21:34  10    the last thing I put up here, the dispensers, they need

11    to provide suitable tools to pharmacists.

12         For example, you're going to hear about red

13    flags and how important it is to educate the pharmacists

14    about red flags.  Red flags is something that says,

14:21:51  15    "Whoa, trouble here.  Warning, warning."

16         And so the pharmacists need the tools for

17    that.  You'll hear about that.

18         Okay.  Now, you've heard about the show.

19    Let's watch it.

14:22:07  20         So let me tell you about it.  Let me tell

21    you what the evidence is going to show, and what I've

22    tried to do is I think put it into nine episodes is what

23    I wound up with and here's your binge watching.  And His

24    Honor has told me I'm taking a break at 3:00 o'clock so

14:22:25  25    I'm good for about 35, 36 more minutes so if you'll bear

1      with me, please.  And you all are being so patient.

2      Thank you.

3                     So here it is.  The TV show is Opioid

4      Epidemic, and it's one that has been raging across this

14:22:38   5      country.  It's not simply in Ohio.  It's not simply in

6      your counties, ladies.  It's raging across the country.

7                     These are opioid sales in the green line,

8      from 1999 to 2010.

9                     Now, those, the years we're concerned about

14:22:52 10      really are the years going back to 19 -- the late 90s

11      into the 2000s.  Up to 2010, '11, '12, '13, '14, you'll

12      hear how the pharmacists -- pharmacies, the businesses,

13      have been trying to get their acts together some, and

14      you'll hear about that.  But we're looking at where this

14:23:13 15      all really started snowballing.

16                     And so you've got the opioid deaths.  Those

17      are that red line, and they've just gone up as the

18      prescribing has.  And so has opioid treatment, which is

19      the blue line.

14:23:29 20                     So this is the opioid epidemic.  Episode

21      number one is going to be meet the characters.  So this

22      is who we've got in this case.  We've got the national

23      pharmacy, CVS.  And CVS owns thousands and thousands of

24      pharmacies all around the United States.  They've got

14:23:48 25      legal departments, they've got regulation departments,

1     they've got marketing departments, they've got

2     relationships with manufacturers, distributors.

3                 And you'll hear all about them during the

4     trial.  The first witness I'm calling works for CVS.

14:24:05  5                 Now, another party here is, aside from CVS,

6     we've got Walgreen's.  Walgreen's is right here on this

7     table behind me.  And they, of course, are a big national

8     pharmacy in the United States we're looking at.  We're

9     not looking at boots or the foreign issues but we're

14:24:29 10     looking here in the United States at their Walgreen

11     stores.

12                 By the way, I shop at Walgreen's and I shop

13     at CVS.  Not a ton, but I do.  And I'm not holding

14     pharmacists, I'm not pointing my finger at the

14:24:50 15     pharmacists in this case.  I'm pointing my finger at the

16     business.

17                 So we've got a real nice pharmacist from

18     Giant Eagle, for example, and she just seems to be so

19     nice and polite as she stood up and greeted us all.  I'm

14:25:06 20     not accusing her or any individual pharmacist per se of

21     causing this problem.  I'm after the businesses, I'm

22     after the big business that's behind it that empowers or

23     fails to empower their pharmacists; that trains or fails

24     to train or wrongly trains their pharmacists, that adopt

14:25:27 25     the policies that follow the law or don't follow the law.

1    And that's what you're going to hear about.

2                     Walmart, of course Walmart is well-known

3    worldwide, a big company.  You'll hear about Walmart in

4    this case.  There are some Walmart stores.  Those are the

14:25:41  5    three national retailers, as the Judge said.  Then

6    there's Giant Eagle, which is the local one.  And I'm

7    from Texas.  I don't -- I don't buy groceries here really

8    but I'm sure it's probably a great place to go and buy a

9    jar of peanut butter or something.

14:25:57 10                     I'm not looking at their groceries.  I'm

11    not looking at how nice they are.  They've been around

12    for four generations.  I'm not looking at that.  I'm just

13    looking at when they were choosing to make money by

14    selling these registered drugs, did they do it right or

14:26:16 15    not.

16                     So you'll hear from them, I'm sure, that

17    they're a wonderful grocery store, that invites you to

18    come in and they'll smile and greet you and they'll bring

19    a nice pharmacist and they're wonderful people.  I'm not

14:26:31 20    fussing any of that.

21                     I want to know, in the home office, how are

22    they conducting their business and did they contribute in

23    a significant way to the nuisance that's there, the legal

24    nuisance.

14:26:43 25                     So all of that will be measured against

1    this idea they are part of that closed system, and I told

2    you they're actually distributors and dispensers.  So

3    dispensers, CVS, you could go get your prescription

4    filled for Oxycodone.  You could go to Walgreen's and get

14:27:01  5    it filled, Walmart and get it filled, Giant Eagle and get

6    it filled.  That's -- they were making money selling the

7    drugs.

8              And there are times where people need the

9    drugs and ought to be able to get them.  I'm not fussing

14:27:14 10    that.

11              Historically, there are three big

12    distributors.  In fact, McKesson, Cardinal Health, and

13    AmerisourceBergen are called the big three.  And McKesson

14    had a good bit of it -- or, no, AmerisourceBergen had a

14:27:32 15    good bit of it owned for a while at least by Walgreen's,

16    not really getting into that kind of mess, but the big

17    three are well-known distributors.  But there came a time

18    where these pharmacies that we've got in here decided

19    that instead of fully relying on others, they themselves

14:27:51 20    would take some of the role of distributor.

21              And so Walmart, CVS, Walgreen's, Giant

22    Eagle, for a period of time, they're distributing as well

23    as dispensing so they had the legal obligations of both.

24    And I'll explain that to you.  Remember, the distributors

14:28:08 25    have to develop a system to identify suspicious orders,

1    report the suspicious orders, and then decline to ship

2    until they are determining through due diligence that

3    there's no diversion.

4              And then the dispensers, what do they do,

14:28:25  5    they're that last line of defense, have to have effective

6    controls and procedures, exercise corresponding

7    responsibility, and the businesses need to provide the

8    tools.  And that's what we've got.

9              Now, the last two meet the characters, the

14:28:41 10   last two characters you need to know about are Lake

11   County.  I tried to figure out Lake County.  I think one

12   or two of you may live in Lake County.  I did not know,

13   until this case, President Garfield used to live in Lake

14   County.  But evidently stand on his porch and give

14:28:57 15   speeches.

16             You'll hear about Trumbull County.  I tried

17   to find what President came from Trumbull County.  I

18   can't find one.  But the front man for the food fighters

19   came from Trumbull County so I threw him on there.  But

14:29:16 20   you're going to hear from them.  Ms. Fraser will take the

21   stand and she's the Lake County ADAM's Board Executive

22   Director.  She's the state board member for the Mental

23   Health and Advocacy Coalition and she'll talk to you

24   about Lake County and the effects it's had on Lake

14:29:36 25   County.

1          The effects are tremendous.  It's not only

2     costing the lives of people but it affects children who

3     are born to addicted moms.  It affects the court system.

4     It affects the county budget in a lot of different ways

14:29:54  5     that you'll hear about from not only Ms. Fraser but I'll

6     probably call at least one or two other county witnesses

7     if time allows it.

8          You'll hear from the Trumbull County Mental

9     Health and Recovery Board Executive Director,

14:30:08 10     Ms. Caraway.  You should have two Rs in your name, April,

11     and I apologize about that.  It's only one R?  I'm glad I

12     got that right.

13          (Laughter.)

14          MR. LANIER:  Anyway, that was a great

14:30:20 15     error.

16          She's the Executive Director.  She's also a

17     member of the Trumbull County Opiate Death Review

18     Committee.  She'll tell you about that.  She'll tell you

19     about being a founding member for the Alliance For

14:30:33 20     Substance Abuse Prevention.

21          I do expect to call also the commander from

22     the Sheriff's Office, Toni Villanueva.  Captain

23     Villanueva is not only a commander but he headed up the

24     multi-agency, multi-jurisdictional law enforcement task

14:30:52 25     force.

1      Time permitting and His Honor allowing, I

2  will also be calling Nicole McCallion.  Nicole is a

3  foster parent, an Lake County resident who herself is a

4  foster parent and then trains other foster parents who

14:31:09  5  are having to take in some of these opiate babies.  And

6  she'll talk about the effects of the opiate epidemic on

7  children.  So those are the characters.

8      So let's get to the next episode because we

9  are after all binge watching.  Next episode is Failing At

14:31:24 10  the Job.

11      See, now, remember, and I'm going to do

12  this rapidly but you've got to keep this in your brain,

13  the distributors have to develop and operate a system to

14  identify suspicious orders and report those before they

14:31:38 15  dispense, before they ship.  The dispensers, remember,

16  last line of defense, and they have to provide effective

17  controls and procedures to guard against diversion,

18  exercise corresponding responsibility to the doctors and

19  provide suitable tools.  And this becomes important

14:31:56 20  because one of the witnesses you'll hear within the first

21  two weeks is Dr. Carmen Catizone.  He's a pharmacist; a

22  doctor at that time.

23      He's the former head of the National

24  Association of Boards of Pharmacy.  It's a big national

14:32:12 25  group that's really tried to get the pharmacies in line

1    on this stuff.  He's going to testify about how companies

2    failed to regard red flags.  Red flags is a language used

3    by the DEA, used by industry, it's used by lots of folks.

4    A red flag means, "Stop.  Don't dispense until you figure

5    out if it's correct."

6                    And so he's going to talk about how

7    companies failed, how these companies failed regarding

8    red flags and the system to detect them and what to do

9    when you encounter them.

10                   And that's what he's going to be talking

11   about.

12                   He's going to say that defendants should

13   have had in place from the very beginning, not after they

14   get sued, not after they get written up, but from the

15   very beginning, they're supposed to have red flag

16   policies and they didn't.

17                   From the very beginning, they should have

18   trained their pharmacists on red flags and they didn't.

19   From the very beginning, they should have given the

20   pharmacists the tools they need, and they didn't.

21                   And we've done an analysis of these red

22   flags, and some of the red flags you're going to hear

23   about, let me put them up here for you.  One of the ones

24   is doctor-shopping.  If you determined, if you have a

25   computer that will tell you if someone's been filling a

1    prescription for the same thing somewhere else from a

2    different doctor, you don't fill it.  But you've got to

3    have the system to check.

4                   CVS has to be willing to enter the data

14:34:05  5    into the system, and have their computers drawn up in

6    such a way that they're able to detect if someone's

7    doctor shopping.

8                   That's the responsibility of the company,

9    of the business.  It's giving the tools to the

14:34:23 10   pharmacists.

11                  If someone is getting more drugs than the

12   days they're supposed to be taking it, that should tell

13   you something.  That's a red flag.

14                  In other words, if I'm getting drugs for

14:34:44 15   120 days that  I'm supposed to be taking it for a hundred

16   days, there's a red flag that should go up.  Now, the red

17   flag doesn't mean you're not allowed to fill it.  A red

18   flag means, "Time out.  I need to talk to you about this.

19   Can you tell me why you're getting this?  Can you tell me

14:35:01 20   who the doctor is?"  If you've got two doctors writing

21   the same prescription, it's calling up the doctor saying,

22   "Did you know doctor so and so wrote the same

23   prescription just an hour earlier?  Did you do that on

24   purpose or is that something you just didn't know and

14:35:17 25   we're seeing as a pharmacy?"  Or, "He got this

1    prescription filled three days ago and now he has another

2    one.  Is that on purpose?  Did he lose the first drugs?"

3              The prescribing patterns.  99 percent of

4    doctors, I think, are marvelous doctors on this issue.

14:35:35  5    The problem is the one percenters.  The one percenters

6    who will write a prescription for just about anybody who

7    wants one.  They're call pill mill doctors.  And when the

8    DEA finds them, they'll work to revoke their

9    registration.

14:35:55 10              Some of them wind up doing prison time for

11    it.  And by the way, when I said there are lots of folks

12    at fault here, these doctors they are in that line.  They

13    are a significant part of the problem.

14              But how's the pharmacy going to know

14:36:11 15    whether or not to fill that prescription, do the

16    corresponding responsibility?  They've got to have a

17    system to help them identify bad prescribing patterns.

18              You're going to hear about drug cocktails.

19    You shouldn't -- evidently it is a huge red flag if you

14:36:31 20    take an opiate and a Benzodiazepine, a Benzo drug.  If

21    you take those two together, it's like, (gesture) and

22    that should be a red flag to a pharmacist.

23              Those doctors shouldn't be writing those

24    two drugs to go together, and that's been known, I think

14:36:51 25    the first articles on that came out in 2007.  Certainly

 1    by 2010.  Of course the pharmacies need to have a system

 2    so they can see if this person filled a Benzo

 3    prescription the day or week before.

 4                Another red flag, cash.  If you come in and

 5    you're buying an expensive prescription and you're paying

 6    cash, you don't have insurance, doesn't mean it's not

 7    legit.  It may very well be.  But it's a red flag and the

 8    pharmacist should stop and ask you questions and

 9    determine it's not diversion.  That's their job.  So this

10    is episode two, Failing At the Job.

11                Let me give you some of the reasons why I

12    say this is Failing At the Job.  I will grab some of

13    these documents here and show you exactly what I'm

14    talking about.

15                So one of the documents I've got is

16    labeled -- Your Honor, for the record it's Plaintiffs'

17    Exhibit 28124, and this is the Controlled Substances Act

18    itself, and you're going to hear about the Controlled

19    Substances Act, that the whole reason it was written is

20    because of a concern in part on diversion.

21                I won't take the time to put that one up

22    yet, but you'll hear about it and when you do, I want you

23    to remember.

24                Now, these companies are going to stand up

25    here and give an opening statement, and they're going to

1    say they did nothing wrong.  They're going to say, "We

2    are not any part of the problem."  They're going to blame

3    everybody else but themselves.

4                     But I'm going to bring you evidence that

14:38:41  5    they were part of the problem.

6                     And so, for example, I'm going to bring you

7    Plaintiffs' Exhibit 8804.  Mr. Wilson, can you give me,

8    please, the IP?  Thank you.

9                     8804, and this is a document that -- let's

14:39:00 10    see if I can get it where you can see it -- this is an

11    order to show cause that was put out by the U.S.

12    Department of Justice Drug Enforcement Administration.

13    Oops, there we go.

14                     U.S. Department of Justice Drug Enforcement

14:39:18 15    Administration, and it's an order to show cause.  "Notice

16    is hereby given to inform Walgreen Corporation of the

17    immediate suspension of," their registration because the

18    registration, "Constitutes an imminent danger to the

19    public health and safety."

14:39:37 20                     This is concerning a Walgreen's that was in

21    Arlington or they're asking them but it's a Walgreen's

22    that was in Florida.  Walgreen's Jupiter, Florida

23    Distribution Center is the one that it's concerned about.

24                     And what they said is that this center did

14:39:56 25    not have -- it's interesting, look at number four.

1      "Since 2009, Walgreen's' Jupiter, Florida Distribution

2      Center has been the single largest distributor of

3      Oxycodone products in Florida."

4                You can go up before that.

5                 "Since at least 2009, the state of Florida

6      has been the epicenter of a notorious well-documented

7      epidemic of prescription drug abuse."

8                You're going to hear testimony about how

9      there was a drug cartel in Ohio going down to Florida to

10     get their drugs and bring them back up here to sell.

11               And Walgreen's is doing this, and

12     Walgreen's is doing it without a proper program in place.

13     The DEA continues to say, Paragraph 7, "Walgreen's failed

14     to detect and report suspicious orders by its pharmacy

15     customers," and quotes that language.  I've now quoted it

16     so much, you'll be able to quote it soon, "Distributors

17     are required to design and operate a system to disclose

18     to the registrant suspicious orders of controlled

19     substances, orders of unusual size, deviating from a

20     normal pattern, and orders of unusual frequency."

21               And not only did Walgreen's fail to detect

22     and report this but Walgreen's knew or should have known

23     about their obligation to do it.  It's been spelled out

24     in detail in three letters from the DEA's deputy

25     assistant administrator.

1          So I'm going to be giving you evidence that

2    they failed to do this.

3          I'm going to be giving you evidence that

4    they -- I'll give you another one.  It's Plaintiffs'

5    Exhibit 57.  This is not the DEA talking.  This is

6    Walgreen's doing their own internal report.

7          And in 2008, in their internal report, the

8    compliance for the Perrysburg Distribution Center, that's

9    the one that supplied their Ohio stores, the compliance

10   report says the following:

11         Internal investigation by Walgreen's

12   says -- if I can make this a little bigger -- "Walgreen's

13   is required to have a process to disclose to the DEA any

14   suspicious orders of controlled drugs that deviate from

15   the normal size, pattern and frequency."

16         Look at the risk here.  "Walgreen's is not,

17   not verifying the legitimacy of suspicious orders which

18   could lead to the fulfillment of an illicit order."

19         The company knew from its own internal

20   audits it wasn't doing it.  The DEA would send out

21   letters saying this.  It's up to CVS.  We've got the CVS

22   Plaintiffs' Exhibit 10064, CVS says, letter from between

23   the Department of Justice, CVS Indiana, "Investigators

24   from the DEA Indianapolis District Office," that's one

25   that services this region as well, "initiated a

1    regulatory investigation at CVS Indiana.  As a result the

2    following violation was identified."  They failed to

3    design and maintain a system to detect suspicious and

4    report suspicious orders.

14:43:36  5             This is, this is what these companies have

6    failed to do. And it's because of this failure that we've

7    got a number of different understandings.

8             Now, please understand, we're not able to

9    verify every store, every Distribution Center.  That's

14:44:03 10   not the way the DEA works.  It's kind of like a police

11   officer catching folks for speeding; you don't catch

12   everyone speeding.  They catch the ones that are speeding

13   when you're there.

14             But if you find that, you're going to find

14:44:17 15   that the companies were ignoring the red flags they

16   should have followed.  CVS is subject to a situation in

17   Florida.  Again, Florida was where all this stuff was

18   feeding the east coast certainly, and there's a decision

19   that was handed out.  It's going to be hard to read

14:44:38 20   because the print is so small, that if I put it on the

21   screen, you still can't read it so I'm just going to have

22   to tell you that you'll hear about this because it's the

23   *Holiday* case is the name of it, from Holiday, Florida,

24   and in this, an Administrative Law Judge found credible a

14:45:05 25   professor's testimony that controlled substances are

1    high-alert drugs, that drugs such as opioids and Benzos

2    and other depressant drugs require the highest level of

3    scrutiny, that in pharmacy practice, there are various

4    red flags which cause a high level of concern that might

5    cause a pharmacist not to fill a prescription or to take

6    other kinds of actions, and they'll talk about all of

7    that but ultimately, the DEA was going to shut down these

8    CVS stores.

9         You'll hear tales about how they were

10   having to be real careful because they'd get their

11   shipment in on a Tuesday, and they wouldn't have enough

12   drugs to last until the next shipment came in, that

13   people had figured out the drugs came in on a Tuesday,

14   and that's when they'd line up to take the drugs.

15        You'll hear that these Florida things are

16   no lark.  This is a PowerPoint that was put together by

17   Joe Ran, and he actually presented this PowerPoint.  See

18   if I can get the whole thing on the screen.

19        He presented this PowerPoint in 2015 when

20   Joe Ran was the Deputy Assistant Administrator, the

21   Office of Diversion Control for the Drug Enforcement

22   Administration, and here's what he called it in this:

23   The Florida Migration.

24        He said, "The vast majority of patients

25   visiting Florida's pain clinics come from out of state.

1      Out of state, including places like Ohio."

2                 He goes on to put a map out of the

3      migration of pain clinics and talked about the pills from

4      Florida into Georgia, into Tennessee, Kentucky, into Ohio

14:46:52  5      as they made their way over to Missouri.

6                 You're not only going to get this from Joe

7      Ran and his presentation, but this was known by the

8      pharmacy companies.  They knew this stuff was going on.

9                 CVS has a document that's Plaintiffs'

14:47:10  10      Exhibit 11918, and in that document, it's a PowerPoint

11      presentation but they put that migration out of Florida

12      slide that they got from McKesson that shows the same

13      migration pattern.

14                 And this is back in 2014.

14:47:29  15                 So they knew this was going on.  And they

16      didn't only know it this way, you can go all the way back

17      to 2009.  I want to show you a Walmart document that

18      you'll hear about at trial.  It's Plaintiffs' 26699 and

19      it's a 2005 document that's got a whole section on

14:47:49  20      Florida.

21                 And this whole section on Florida, with the

22      pills spelling the word "Help" out to the side, talked

23      about how the top 35 dispensing practitioners of

24      OxyContin nationwide were located in Florida; 25 within

14:48:10  25      Broward County, that according to the DEA ARCOS records

the Florida physicians dispense five times more Oxycodone

than the national average.  Florida has increasingly

become a source state for illegally diverted medications

for residents in Kentucky, Tennessee, Ohio,

Massachusetts, New York and other states.  Again, Ohio.

That's the way it was working, and they

knew that to be the case.

So you'll hear this testimony.  You'll see

these documents.  They'll provide you with a good

understanding of why the Government has dealt with each

of these in some ways rather severely.

You will hear about settlement agreements

these defendants entered into with the Government.

You'll hear about Plaintiffs' Exhibit 8954, which is a

settlement agreement that was entered into between CVS

and the Government.

You'll hear that the policies that were

allowing this to happen in Florida not only affected Ohio

because of the Florida migration, but these were national

policies.  This is the way they were doing business all

over the U.S.

Florida is where they got stung, but they

were doing this everywhere.  So you'll read about how

CVS, in this actual document, acknowledges that they do

have a corresponding responsibility to dispense only

1        prescriptions issued for a legitimate medical purpose.

2                    They knew they had that responsibility and

3        they also admitted there, although not here, to failing.

4        They admitted in Subparagraph K, they acknowledged that

14:50:09  5        certain CVS Pharmacy retailers did dispense controlled

6        substances in a manner not fully consistent with their

7        compliance obligations under that law, the CSA.

8                    And I'd love to say that that only happened

9        once, but such is not the case.

14:50:27 10                    And I don't know what all we'll get into

11        with you but I hope to also get into Plaintiffs' Exhibit

12        8955, this is another settlement, where CVS entered into

13        another agreement to settle with the United States

14        Government.  And this one for Rhode Island.  And in this

14:50:48 15        one, they acknowledged again that their CVS pharmacy

16        retail stores in Maryland did dispense certain controlled

17        substances in a manner not fully consistent with their

18        compliance obligations by not conducting corresponding

19        responsibility between 2008 and 2012 when dispensing

14:51:10 20        certain controlled substances in some instances.

21                    So you're going to get to hear about these

22        things.  You're going to get to hear the excuses.  But I

23        don't think you're going to find that the lawyers will

24        ever accept responsibility.

14:51:28 25                    And that's the problem we've got.  So where

1    does that leave us?  You know, I can do more.  I've just

2    pulled those out.  Walgreen's, they've got the same

3    problem, Plaintiffs' Exhibit 15 is a settlement between

4    Walgreen's where Walgreen's admitted, if you go to

5    Paragraph 6, at the end of the stipulation, thank you,

6    the stipulation and agreement, Walgreen's acknowledges

7    suspicious order reporting for distribution to certain

8    pharmacies did not meet the standards identified by the

9    DEA in three letters from the DEA's Deputy Assistant

10   Administrator that were sent to every registered

11   manufacturer and distributor, including Walgreen's in

12   2006, '7  and '7.

13              Furthermore Walgreen's acknowledges that

14   certain Walgreen's retail pharmacies did on some

15   occasions dispense certain controlled substances in a

16   manner not fully consistent with its compliance

17   obligations.

18              And you're going to hear about this from

19   each of these folks and we'll put on the evidence and I

20   think it's going to be pretty compelling that if we go

21   back to the computer, Juan, thank you, that they failed

22   at the job.  That's not to say they didn't do something;

23   they did something but it was too little too late.

24              I don't know how many of you garden.  We do

25   some gardening in Texas, and we have some weeds that are

1    really pernicious, they're really, really bad, and if you

2    get them in your garden, you don't notice it immediately

3    but once they take over, I mean it's like you get -- we

4    call it nut grass.  I'm sure it's got some fancy name.

14:53:16   5    You get nut grass in your garden, you're like gone for

6    because it spreads by these nuts down under the ground

7    with these real thin little tendrils that grow from one

8    nut to another and you can pull all day long, if you

9    don't get the nut, it just comes back up stronger and

14:53:32  10    just spreads out more.  It's really, really bad.

11            If you've got a nut-grass-ridden garden or

12    you've got an overgrown garden, the odds are it didn't

13    happen yesterday.

14            These are problems that have been long

14:53:43  15    growing.  The problems folks face today is not something

16    that happened because of bad policies yesterday.  The bad

17    policies go back into the 2000s; 1999 to 2010, '11, '12,

18    '13, '14.  And the problem with this is you get a lot of

19    people addicted to some of these opiates that are

14:54:11  20    prescription opiates, and then all of a sudden, you cut

21    off the prescriptions, and that availability is not on

22    the street, and they've got an opiate addiction.  So at

23    that point in time, they've got to seek out the illegal

24    opiates.

14:54:26  25            And you're actually seeing a rise in heroin

1    and Fentanyl deaths now from street Fentanyl and heroin

2    because now the supply of the overabundance of

3    prescription opiates is being cut back.  This is what is

4    a classic snowball effect.

14:54:43  5           It's that cartoon, I looked for it, I

6    couldn't find it, but I remember it as a kid, I don't

7    think I was dreaming it, but it was a snowball at the top

8    of a hill that starts rolling down and as it rolls down

9    it picks up skiers and you can see their skis, you know,

14:54:57 10   sticking out of the snowball as the snowball gets bigger

11   and bigger and then down at the end, it hits the village

12   at the end.

13           This problem started a long time ago and

14   it's snowballed.  It's grown.  And I'll tell you in some

14:55:12 15   ways, COVID made it worse because people are stuck at

16   home and addiction issues got worse for a lot of people

17   during the COVID problem.

18           I think a lot of what happened here is

19   well-explained through screens.  So I'm going to, if the

14:55:38 20   Court would allow me to show you this, I brought some

21   screens here.  If that breaks, we're in really bad

22   trouble.  Can you carefully -- thank you, sweetie.

23           Your Honor, I've got a towel here because I

24   don't want to mess up your courtroom.

14:55:55 25           THE COURT:  Okay.

1          MR. LANIER:  Thank you.

2               So these are screens.  You can use them for

3     cooking, but they're kind of big to use them for cooking.

4     You can use them for gardening to screen different things

14:56:11  5     out and soil.  Heavens, maybe you can use them for gold.

6     I don't know.  But they come with different sized holes

7     in them.  And the tighter the screen, the more careful

8     the screening process and you'll let less things through

9     that shouldn't get through.

14:56:30 10               You can get screens with really big holes,

11     you know?  And so I was -- I was playing around with this

12     trying to figure out a good way to illustrate what the

13     pharmacies need to do with screens, and I thought one way

14     I could do that would be to take, take this screen, and I

14:56:57 15     took some flour -- thank you, Rachel -- I took some flour

16     and I buried within it red candy, Red Hots and -- oh, I

17     got Red Hots in there -- I got some red Nerds, I just

18     went red, but if I wanted the flour, I got to screen out

19     the red, like a pharmacy is supposed to screen out

14:57:22 20     through red flags, bad prescriptions.

21               It doesn't mean everyone that's red is bad

22     but the pharmacies are supposed to.

23               So if you took this, if I'm using screens

24     that have way too big of holes, I can pour it in but

14:57:43 25     you're going to find that a lot of the Red Hots make it

1    through.  And almost all the Nerds.  A couple Red Hots

2    got stuck, but not many.

3            So you can see that this screen was totally

4    ineffective because it didn't screen out the bad stuff.

14:58:00  5            And this is the way the pharmacies started.

6    Their screens, were totally ineffective.  They let

7    everything through.  They didn't -- they just pretended

8    that they're a vending machine where if someone showed a

9    prescription and stuck in the money, they dispensed the

14:58:23 10    medicine, when the law says they're not supposed to be

11    that way.  The law says they're supposed to be a tight

12    screen.

13            So what did they do?  They got in trouble.

14    CVS got in trouble.  They tightened the screen up a

14:58:36 15    little bit.  You'll hear about some of them being under a

16    watchful eye by the DEA for a period of time where the

17    DEA was really focused on them and they cleaned up their

18    act for a while, and it will help them a lot in here they

19    think because they will show you, look, here was our

14:58:51 20    great policy.  Well, yeah, that's when someone's looking.

21            They tightened the holes a little bit and

22    it will catch some, but there's -- even though you catch

23    some, there's still a lot that you miss.

24            And so you'll hear about those policies.

14:59:08 25            Ultimately what you're going to find out is

1      that the law says the screen is supposed to be plenty

2      tight.  That means that it's not always going to catch

3      everything, and that means it's going to take some time

4      with each prescription.  Yes, we recognize time is money,

14:59:27  5      but if you've got a good screen that you can sit there

6      and take the time, you can sift through and let the good

7      prescriptions through and keep the bad prescriptions out.

8              And that's what the law said they're

9      supposed to do.  The problem is time-wise they don't want

14:59:51 10      you to spend -- okay, I saw that.  Yeah, okay, it's a

11      skeleton in a chair.  I didn't make this up.  This is

12      actually one of their documents.  This is a Walgreen's

13      document.

14              Because they figured out quickly that they

15:00:04 15      want to fill your prescription fast enough that you don't

16      leave the store and come back to get it because if you

17      leave the store and come back to get it, you don't shop.

18      But if they can fill it within 10, 15 minutes, you'll

19      spend that time shopping and you'll buy more stuff

15:00:22 20      because you'll just wait for it.

21              So they didn't have enough pharmacists

22      hired to be able to do the screening process that takes

23      some time, and I'll talk more about that after the break,

24      Your Honor, but you asked me to stop at 3:00 and I think

15:00:38 25      I --

 1          THE COURT:  Good time to stop?

 2          All right.  Ladies and gentlemen, we'll

 3   take our mid-afternoon break, 15 minutes, and then we'll

 4   pick up with the balance of plaintiffs' opening.

 5          (Recess taken.)

 6          THE COURT:  Okay.  Please be seated.

 7          And, Mr. Lanier, you may continue.

 8          MR. LANIER:  Thank you, Your Honor.

 9          May it please the Court.

10          So, ladies and gentlemen, I hope you got a

11   good stretch in, got some caffeine.  I'm raring to go

12   through the mid afternoon.

13          You know, there are aspects of this world

14   that you really don't know, I didn't know I should say,

15   until I got into this case.  And a prime example is the

16   evidence that you're going to hear about the way they

17   figure out how long they want you to wait.

18          They don't want you to wait too long.

19   You'll either go take the business somewhere else and

20   you'll leave and get your prescription later so they

21   don't want to give it to you immediately because they

22   want you to have time to shop, and they've figured out

23   the pharmacy is always going to be at the back of the

24   store by and large because that way, you walk through

25   everything to get to it when you go there.

1          And that's okay.  I mean, business exists

2     to do well, and I'm not fussing that, but it's

3     fascinating to see these metrics.  And so the PowerPoint

4     that I drew that from is a Walgreen's PowerPoint in 2016.

15:22:14  5     And, Ms. Fleming, it is 17253.

6          And it's one that just really talks about

7     the problems.  Now, you might say, well, the easy

8     solution to this, if you need the time to check out the

9     prescriptions to make sure they're good, and you don't

15:22:34  10     have the time because it's going to take too long, add

11     another pharmacist. Add a pharmacy tech.  Technician.

12     But they don't add those if they can avoid it, because it

13     costs too much, and it's all a question of how much money

14     do they make versus how much it would cost.  And so

15:23:01  15     that's what they -- that's the position, that's where

16     they get stuck.

17          So when you look at what they've done, what

18     they've done for some periods of time, it's a black hole.

19     They don't have anything really in place.  They're

15:23:20  20     filling prescriptions pell-mell.  I mean it's just

21     there's a void that's out there.

22          Where it comes to policies, the idea of a

23     suspicious order monitoring to design and operate a

24     system, they don't -- not gee, they sold this for a few

15:23:42  25     weeks without doing that or gee, they sold this for a few

1    months without doing that or gee, they sold this for half

2    a year.  No, they went years without a program, even

3    though the law requires it.

4                    You're going to hear about how they ignored

15:24:03  5    red flags like crazy.  Some of their witnesses even said,

6    "I don't know what a red flag is."  And I think we'll be

7    able to bring that testimony to you.

8                    I'll be real interested to hear from

9    Mr. Davis, the first witness.  He didn't know if there's

15:24:24 10    an epidemic or not.  I hope by the time he's gotten here,

11    since I deposed him, he's learned there is an epidemic.

12                    But he wouldn't even admit to that.

13                    So you're going to hear all of this kind of

14    stuff, and this is the part of the case where I'm going

15:24:42 15    to hopefully be showing you that what the company did was

16    too little too late.  It's like the screens, they should

17    have had the right screen from the very beginning, but

18    they only made the screen smaller and smaller when they

19    were forced and forced and forced.

15:25:05 20                    I'll tell you, this was news to us.  When

21    we filed this case on behalf of these counties, first

22    time around we didn't even sue the pharmacies.  We didn't

23    get the documents.  We didn't get the numbers.  We didn't

24    see what all they had done.  We didn't have all of the

15:25:26 25    migratory patterns from Florida.

1          And so once we learned those things, we

2     bring them into the case and they're hear because they

3     won't accept any responsibility.

4          And so that's what we're going to be asking

15:25:45 5     of you is to determine whether or not they have

6     significant responsibility in causing this epidemic in

7     these counties.

8          They'll say not.  We think they are part of

9     the problem.

15:26:03 10          So let me get to episode number four.

11     Episode four, Where Data Makes Money.

12          Now, let's be clear, business exists unless

13     it's a nonprofit business, business exists to make

14     profits.  That's good.  That's the American system.

15:26:26 15     Great.  I'm all for that.

16          I'm a lawyer.  I own my law firm.  We exist

17     to make a profit, but that doesn't mean we're not still

18     supposed to be socially responsible.

19          And the same is true with business.  There

15:26:48 20     are right ways to make a profit and there are ways that

21     aren't right to make a profit.

22          So here's one of the ways they make money.

23     These stores keep track of every prescription that's

24     bought, and while they would not give that information to

15:27:11 25     their pharmacists for a long time, what they did do is

1    they sold it.  This is where data kind of gets lost under

2    the dollar bill, but D-A-T-A, this is where data makes

3    money.

4              Let me tell you what they would do.  You go

15:27:36  5    into a Walgreen's, CVS, and you go buy a prescription or

6    you may have one of those little cards where you do your

7    card.  They keep track of everything you buy.  That's why

8    they'll spew you out those big receipts that have all

9    these coupons targeted to your buying.  They know exactly

15:27:59 10    what you're buying.

11              They'll keep track of it for economics

12    because they will take your prescription data, what

13    prescription you had filled, how many pills, whether or

14    not there were refills, what the dosage was, what your

15:28:21 15    Zip Code is, they'll take the information on the doctor

16    that wrote the prescription, what her DEA registration

17    number is or him, doctors, I guess either gender, what

18    hers or his is.

19              They'll take and keep track of all of that

15:28:41 20    data to sell to another company.

21              It's a vicious circle.  It is -- do you

22    have a piece of paper?  I can use card stock.  Thank you.

23              Your Honor, can I go to the Elmo, please?

24              Here's the way it went down and you all

15:29:04 25    will learn throughout this trial, assuming His Honor lets

1    me draw periodically, that I am a horrible artist.  Okay?

2    I cannot draw my way out of a paper sack.  Don't pick me

3    for Pictionary.

4              But here's the way it will go down.  You've

15:29:23  5    got the store, and the store, I'll put an Rx on because

6    they're a pharmacy.  Okay.  Now, this store, people go

7    into the store and they take their prescriptions and the

8    store fills the prescription.

9              And then let me make that a little bit

15:29:39 10    bigger, the store takes that information and the store

11    sells the information to a company for a long time known

12    as I.M.S, also known as Ocudea (sic), and that company

13    pays money back for the data.  So this drugstore, CVS, I

14    mean makes somewhere north of $5 million selling the

15:30:14 15    data.  They even negotiate the price later on where they

16    are selling it per prescription.  Wait until you hear how

17    much more they got if they sold the data after filling a

18    ninety-day opiate prescription versus a 30-day.

19              But we'll get into that evidence later.

15:30:30 20              I.M.S takes all of that data so the data is

21    going to I.M.S, while the money is going back to the

22    pharmacy.

23              And then I.M.S takes the data, and I.M.S

24    sells the data to the drug manufacturers like Perdue

15:30:57 25    Pharma, who makes the opiates, or did for quite awhile.

1          And so the drug manufacturer is going to

2     give money to I.M.S while I.M.S gives the drug

3     manufacturer your data.

4          Then you know what the drug manufacturer

5     does?  The drug manufacturer says, "Hmm, you know some of

6     these doctors are doing a good job filling prescriptions,

7     some of them aren't.  We need to send our sales force out

8     to these doctors so that our sales force will sell to the

9     doctors and convince the doctors to write more

10    prescriptions."

11          Write more prescriptions for the opiates.

12          So the doctors write more prescriptions.

13    And what does that mean?  More patients going in to get

14    their prescriptions filled so the store winds up making

15    more money on the back end and that's the cycle.

16          And that's what the stores were doing.

17          Now, the best I've been able to look,

18    Walmart was a little bit different.  Walmart looks to me

19    like, as I'm reading the contracts, and you'll get these,

20    but it looks to me like Walmart was more interested in

21    getting some of the data themselves than getting the

22    money because ir wants to be able to figure out what

23    their competitors are doing.

24          And so you've got this vicious system

25    that's set up, and where data makes money, these pharmacy

1    companies are all over that data.  They have got that.

2    In fact, let me just give you a feel for what one of

3    these contracts look like.  This is Plaintiffs' Exhibit

4    23326.  And this is the master data agreement.  That's

15:33:18  5    all this is.  This is the sale of data.

6               The master data agreement, this one dates

7    back to 1998, between CVS Pharmacy and I.M.S, the data

8    company.  All right?  I.M.S.

9               Now, here's what it says.  It says, first

15:33:41  10   of all, CVS gets to keep all of the ownership rights in

11   the data.  CVS owns their data that they're selling, but

12   they're allowing I.M.S to use it for "In development,

13   marketing, distribution of projection, marketing, sales,

14   and promotion analyses."

15:34:03  15              They know that they're taking the data and

16   it's going out there to be used in marketing and sales

17   efforts.

18              CVS knew this.  And CVS even says, in

19   provisions on Page 3, that "For each data month," as long

15:34:22  20   as they give valid records where the rate is equal to or

21   exceeds 70 percent, then they get their guaranteed cash

22   payment.

23              In other words, they've got to get at least

24   70 percent of those prescriptions and that data out

15:34:35  25   there, and that's how they get their cash payment.

 1          And then they also contract and pledge, CVS

 2     does, that they'll use reasonable efforts and exercise

 3     due diligence in collecting and transmitting complete and

 4     accurate data.

15:34:55  5          So they have a contractual obligation where

 6     it makes them money to do an accurate due diligent job of

 7     collecting the data, getting the data right and selling

 8     it because that's what they're doing at the back end.

 9          And they do that, and I'm telling you, you

15:35:17 10    want to know what kind of data they can get?  Let me show

 11    you the data they get on Page 7 of this document.

 12         They're collecting data on your

 13    prescriptions, yours -- not yours, I'm not allowed to

 14    talk about you as a juror -- they're collecting data on

15:35:39 15    prescriptions -- I apologize, Your Honor -- and they're

 16    collecting data of a store number and that Zip Code so

 17    they know where it's being bought and the prescription

 18    number and what date it's being filled, and whether it

 19    was new or refill, so the doctors, the salespeople can

15:35:57 20    figure out which doctors are refilling and which doctors

 21    aren't, which doctors are starting new patients, which

 22    doctors aren't.

 23         It's got the dispensed number and the

 24    product description.  It's got all these other numbers,

15:36:10 25    the quantity dispensed, how many days' supply that is,

1    oh, the costs, whether or not the payment was by

2    insurance or cash, all of this data, what are red flags.

3    It's being collected, it's just being sold and not being

4    provided to their pharmacists to use so that their

5    pharmacists can make reasonable decisions when they

6    exercise their corresponding responsibility.

7                And they get the doctor's last name, they

8    understand how many refills are remaining, how many have

9    been authorized so that the doctors or the sales force

10   can ultimately go to the doctor and say "Hey, you've got

11   some prescriptions coming up.  We've learned that you can

12   increase the dosage and it's going to help."

13               They get the doctor's DEA number, the

14   doctor's Zip Code, so they know if the doctor's writing

15   the prescription in Florida but it's being filled in

16   Ohio.

17               They get the patient's birth date, the

18   patient's sex, the patient's Zip Code.  They get lots

19   more data than this.  And you'll get these agreements and

20   you'll get to look at them and you'll hear me examine the

21   witnesses over them, and you'll see the millions and

22   millions of dollars that were made.  Juan, if we go back

23   to the PowerPoint.  Thank you.

24               You'll see the millions of dollars that

25   were made where it's profitable to collect data.  Even in

1    their annual report, CVS's annual report talks about how

2    important data is.  Let me see if I can blow this section

3    up a little bit.  See if you can read that with me.

4              It says, "It's important to note we have

5    spent 16 years gathering insights and perfecting

6    ExtraCare," that's what they call it, which means that no

7    competitor can match the depth of our customer analytics.

8    They analyze everything their customer does.

9              We've leveraged our ExtraCare insights to

10   convert customers to categories they shop elsewhere, to

11   launch personalized digital circulars.  They have so much

12   of your data, they can figure out what they want to

13   target you to buy there because you're not buying and "To

14   tailor our merchandise mix to better meet our customer

15   needs."

16             That's the reason we get these receipts

17   from some of these stores that have all these tailor-made

18   coupons.

19             You know, where the data makes money, data

20   is king or queen.  But where it doesn't make money, it's

21   the next episode, it's Less Info, Not More.

22             My microphone is doing what?  It went out.

23   I apologize.

24             Less info.  Not more.  See, it -- it wasn't

25   profitable to follow the law.  It was not profitable to

1    follow the law.

2                    The evidence is going to show you that they

3    could make money by selling.  They could make money by

4    selling the pills, they could make money by selling the

15:40:01  5    data, but to put the data together simply for their

6    pharmacists to use, to reject people's purchases, to sell

7    less, not more, that doesn't make money.

8                    There's something you're going to learn

9    about.  We'll put it under the microscope.  PDMP,

15:40:30 10    Prescription Drug Monitoring Program.  I'm sorry to hit

11    you with all of this.  Don't worry about it.  This

12    trial's going to take awhile.  I'll remind you about all

13    of this stuff.  By the time of closing argument, you're

14    going to say this is where he talks about PDMPs.  It will

15:40:45 15    just roll off your tongue.  Won't be a problem.  Okay?

16    You have to bear with me so I don't need to throw things

17    at you too much.

18                    But the Prescription Drug Monitoring

19    Program, PDMP, every state in the union's got one now.

15:41:02 20    Finally.  Thank you, Missouri.  They were slow to come

21    around, but Ohio's had one for a long time and it's

22    changed over the years, but what the PDMP does is it

23    provides data.  It provides data to the pharmacists who

24    can get on a computer and find out if someone's been

15:41:31 25    filling too many prescriptions.

1           Now, I'm not talking about something

2   internal to CVS, Giant Eagle, Walgreen's, Walmart.  I'm

3   not talking about what they could have developed on their

4   own and should have developed alongside with their

15:41:47   5   programs that get you to buy diapers or whatever you're

6   there to buy or not there to buy.

7           But I'm saying that the states themselves

8   even had programs.  Here's what they did.  The states

9   would have a program, and it would be a computerized

15:42:07  10   program where you've got a little bit of a lag time but

11   where you're able to, every pharmacy is supposed to enter

12   into the database information about these prescriptions,

13   these controlled substances specifically here.

14           And then doctors are told before you write

15:42:26  15   a prescription, you should check the program to see if

16   this is a problem patient, to see if there's any

17   information about this situation that should keep you

18   from writing that prescription.  And when she checks or

19   he checks, they find out.

15:42:42  20           But corresponding responsibility, the

21   pharmacists are supposed to check, also.  Of course, that

22   requires that they have a computer that's hooked in.

23           That requires they have the time to do it.

24   That requires that they work for a business who tells

15:43:07  25   them "This is important.  We have a covenant with the

1    community.  We have a community obligation.  We need to

2    do this right."  And you need to work for that kind of a

3    business to do it.

4            Instead, what the evidence is going to be

5    is that these companies fought against this type of

6    information, against PDMPs.  And when Ohio moved, one,

7    from being voluntary to being mandatory, they were not

8    happy.  Great.  Another unfunded mandate from the

9    Government.

10           When there was talk about a national

11   database, you know, you take counties like Lake and

12   Trumbull, each of them just one county removed from

13   Pennsylvania, so to just look at Ohio data and not look

14   at Pennsylvania data?  That's not optimal.  So when there

15   was talk about putting a national program together that

16   would catch Florida, would catch Ohio, what did the

17   companies do?  They don't want to have anything to do

18   with it.

19           Now, they can't comfortably come out real

20   publicly and say that so instead they have other groups

21   that will vote against it and they acknowledge privately

22   in the e-mails, don't worry, our name won't be on it,

23   because this data costs them money, because it costs them

24   time.

25           They don't make money.  So they -- they are

1    all for Less Info, Not More.

2             All right.  I got to move faster.  New

3    episode.  Horse or Zebra?  This episode came to me when I

4    was in the checkout line at the grocery store.  And this

15:45:08  5    lady in front of me had enough groceries to where I was

6    standing there for a long time.  And I started looking at

7    all of the magazines and stuff right there, and I see one

8    of these puzzle booklets and it had a puzzle of connect

9    the dots.  These were complicated.  It's not like this

15:45:31 10    one I'm about to show you.  This one, Rachel found that.

11    That's an easy one.  All right?

12             I'm talking really complicated like you're

13    looking at it, you have no clue what this thing is.

14    You're filling in the dots like number 179, 180, 223, and

15:45:47 15    finally you connect the dots and you have this very

16    elaborate picture.

17             Well, I used to do connect the dots when I

18    was in elementary school, and it's not hard.  You just

19    follow the rule, connect the dots.  If there's a dot with

15:46:06 20    a number, you connect it.

21             If you don't connect all the dots, you

22    don't get the whole picture.  Now, we've got an opioid

23    epidemic.  We've got what I think the law defines as a

24    nuisance, but it's cataclysmic.  And we've got to figure

15:46:27 25    out the whole picture of who all's responsible, and I

1    promise you we can detail a bunch of people and I promise

2    you when they get up here, they are going to be pointing

3    the finger everywhere except themselves.

4                 But you got to connect all the dots to get

15:46:49  5    the picture.

6                 You can connect some of the dots, but if

7    you just connect some of the dots, you might walk away

8    thinking you've got a horse.  Because you left out some

9    of the dots.  You got to pick up the other dots.  And

15:47:04 10    when you pick up the other dots, all of a sudden, you

11    realize you don't have a horse, you've got a zebra.

12                 You can't get the whole picture and leave

13    out the pharmacies.  And they're going to say, "Yeah,

14    but, look, we didn't distribute as much as these other

15:47:23 15    pharmacies did and they're not in here."

16                 That's not the issue.  The issue is did you

17    distribute enough to where you're a significant

18    contributor to the problem.  And if you did, then you

19    need to be in here.

15:47:38 20                 Every time I walk in and out of this

21    courthouse, I see that bridge and it's got, like, blue on

22    the bottom for the trestles or whatever I think they're

23    called, they're blue and I hope to heaven that those

24    folks put the steel in there to code and followed the law

15:47:57 25    because if two or three or four or five percent of those

1   trestles are bad, and that bridge goes out, no one should

2   be allowed to say, "Well, hey, I only did five percent of

3   the trestles."

4               The opioid crisis is one of connected dots,

5   and to get the whole picture, you need these national

6   pharmacies.

7               Now, we're unique here.  We've got three

8   national pharmacies, and we've got a local pharmacy.  The

9   national pharmacies in a sense have an even greater

10   obligation because they are so tough and big that others

11   have to compete with them.  Think about Walmart for a

12   moment.  Here we go, Walmart, back there.  Walmart is

13   able to make money.  Good.  Selling automotive parts,

14   selling furniture, selling groceries, selling clothes,

15   selling electronics, selling sporting goods, selling gas,

16   they're able to make money selling pharmaceuticals.  They

17   can make money selling all of this stuff and they're

18   leaders.

19               And if you take a mom-and-pop pharmacy, how

20   is a mom-and-pop pharmacy going to compete against the

21   big leader if the big leader's cutting corners?  If the

22   big leader doesn't have the programs in place, if the big

23   leader's not putting enough pharmacists in to take their

24   time to screen right, how are the mom-and-pops supposed

25   to compete?  They can't.

1          That might mean more business for the

2     Walmarts and Walgreens, the CVSes, but I'm saying that

3     they, those big national chains have an even greater

4     responsibility in the way they conduct their business.

15:50:01  5     And they are a significant part of this problem, even

6     beyond how many stores are in one county.  And I'll tell

7     you why I believe that later but right now, that's the

8     Horse or Zebra episode.

9          Let me get to episode seven, the Aftermath.

15:50:19 10     The Aftermath of the actions of these companies

11     especially back in the early 2000s, mid 2000s, into the

12     2000, early teens, the aftermath is entirely foreseeable.

13          They knew this was coming.  They knew that

14     this would be a problem.  Plaintiffs' Trial Exhibit

15:50:50 15     19693, Juan, if we could go to this, please.  This is a

16     PowerPoint by Walgreen's.  It is entitled, "The Opioid

17     Crisis."

18          Now, this is their policy discussing PDMPs,

19     Prescription Drug Monitoring Programs.  In the process of

15:51:12 20     this, the company recognizes, "Drug overdose deaths have

21     reached epidemic proportions in the United States."

22          "According to HHS," a Government agency,

23     "175 people die daily from the drug crisis."

24          "Since 1999, the number of American

15:51:36 25     overdose deaths involving opioids quadrupled."

1           "Approximately 6 in 10 drug overdose deaths

2       involved opioids."

3               "Prescription or synthetic opioid pain

4       relievers were implicated in more than two-thirds of

5       those overdose deaths."

6               "Currently, U.S. pharmacies dispense more

7       than 650,000 opioid prescriptions on an average day."

8               Walgreen's went on to say Americans consume

9       more opioids than any other country, and it's not even

10      close.

11              So the companies knew that this was going

12      on.  They knew about the effects of abuse.  This wasn't

13      something that was new to them.  This is something where,

14      in 2013, Walgreen's puts out a PowerPoint that's

15      Plaintiffs' Exhibit 14746, "Pharmaceutical integrity."

16              And in 2013, they talked about the national

17      prescription drug epidemic, how dramatic increases in the

18      use of, and addiction to, controlled substance

19      pharmaceuticals had been seen for two decades.

20              Prescription drug abuse increases traffic

21      accidents, it increases crime, it increases overdoses, it

22      increases death.  You'll hear about this in these

23      counties.  This is the nuisance, or so the law calls it.

24      This is the tragedy, as I call it.  Whether it's doped up

25      people at a traffic accident or doped up people

1    committing crime because they want -- they're having to

2    buy the stuff off the streets, overdoses where you've got

3    first responders who are there having to give the Narcan

4    or give something to try to save the lives and

15:53:46  5    ultimately, sometimes not getting there on time and the

6    deaths.  All of this was foreseeable.  That's a legal

7    word -- not legal, but legal in this sense because the

8    Judge will, I expect, charge you that you need to

9    determine whether or not the actions and the results and

15:54:07 10    consequences were a foreseeable part of those actions.

11                    And I think that you'll find that they are.

12                    If you go back to the PowerPoint, please,

13    Juan.

14                    Over time, a lot of these people have

15:54:23 15    migrated from the opioids they were first able to get

16    quite easy to other opioids that are more difficult to

17    get and more dangerous to take.  And so if you look at

18    the deaths in the last couple of years, more of the

19    opioid deaths are from the illegal drugs.  This is the

15:54:42 20    stuff being hauled over from Mexico or wherever it may be

21    coming from.

22                    And it pipelines up into Ohio just like the

23    Florida stuff does.  But this is where some people are

24    turning because now the spigot has been tightened and

15:55:01 25    there's not enough money to put people into drug

1    treatment programs.

2                  Okay.  But I'm sure people have to want to

3    go into those, first, for those to work.  I'm not an

4    expert in that, but I know that you need those programs

5    and they need to be funded.

6                  And this is the way that these drugs open

7    the door to others.

8                  Now, what we've done is we're bringing in a

9    witness.  His name is Craig McCann.  He's a Ph.D.  He's a

10   numbers geek.  He looks at computer numbers and

11   he's -- we've been able by His Honor's rulings, we've

12   been able to get all of the Government numbers on this

13   stuff and been able to figure out who's been writing the

14   prescriptions and how many they've been writing and where

15   those drugs are from.

16                  And so we've got that information and we've

17   got that, and that's what Dr. McCann does; he analyzes

18   that data to present it in court because I can't just

19   give you a computer program and say here, look at all

20   these ones and zeros and dips and dots.  I mean it's

21   tough to do.

22                  So he's analyzed all of that data.  And

23   he's investigated the distributor defendants, not their

24   behavior.  He's not a behavioralist.  He's not able to

25   say oh, they did wrong here or they did right there.

1    He's just a numbers geek.

2                But he investigated their behavior through

3    the numbers, how many prescriptions were they filling,

4    and he's going to testify to that amount.  He's going to

15:56:36  5    say, all right, someone else tell me what the red flags

6    are.

7                And we'll have Carmen Catizone and others

8    explain the red flags, which prescriptions the pharmacy

9    should have said, "Time out.  Before I just fill this I

15:56:49 10    need to make sure it's legitimate."  And that's like 90

11    percent of these prescriptions.  I mean it's just really

12    high because this is a really dangerous drug, set of

13    drugs.

14                And then they filter through.  They screen

15:57:03 15    through them and figure out what ones are legitimate and

16    which aren't.  And so what Dr. McCann does is he analyzes

17    those amounts and he gives those amounts of their

18    failures, based upon what he's told are the suspicious

19    orders.

15:57:19 20                He's not qualified to testify about

21    suspicious orders.

22                We've also called what's called an

23    epidemiologist.  An epidemiologist is someone who studies

24    large groups and numbers.  Katherine Keyes is an

15:57:36 25    epidemiologist.  She's at Columbia University in New York

City, and she's got a specialty for substance use.  And
she's going to testify how the oversupply led to
diversion, which leads to harm.  In other words, you put
too many pills out there, some of those pills are going
to be diverted, and that diversion is going to lead to
harm.

And she helps link up those chains.  And
that's what she does.

And so this is what you've got.  You've got
a foreseeable situation.  If we go back to the
PowerPoint, please, Juan.

You know, I was interested to see there is
a witness named Nicole Harrington that I believe the
defendants are going to call, and she worked at CVS, and
she is one of the people on this PowerPoint.  It's Nicole
Harrington and Angela Nelson PowerPoint that CVS did.

And in this PowerPoint, "Our communities,
Our Responsibilities," there are some provisions that
you'll get to see and I hope one of them will do this,
and oh, I'm sorry.  For the Court, this would be
Plaintiffs' 459.

This document, "Our Communities, Our
Responsibilities," the company, CVS here, knew that drug
overdoses kill more than cars, guns and falling.  You got
41,000 deaths from drug overdoses.  That's more than

1    traffic, more than guns, more than falling.

2                   You've got 52 million people over the age

3    of 12 have used prescription drugs nonmedically in their

4    lifetime.

15:59:34  5          And what I really find interesting about

6    this presentation as opposed to what you're being told in

7    court is the next slide because it's the talking notes

8    that go with this.  And actually, Ms. Harrington is going

9    to say, "I didn't write those notes."  I don't know which

15:59:54 10  one of them did, which one of them didn't, but I sure

11   hope whoever wrote it will come to court and testify

12   about what they meant when they said it.

13                  "One in four teams have reported that they

14   misused or abused a prescription drug at least once in

16:00:11 15  their lifetimes."

16                  More people die every year than get killed

17   in a car wreck.  Now, look at the bottom here.  "When I

18   started to really understand the tremendous growth of the

19   misuse of prescription drugs, I realized I may have been

16:00:32 20  naive to believe we were doing everything we could to

21   reduce the growth of this tragic problem in the U.S."

22                  They're going to tell you, "We did

23   everything we could," but they internally know they

24   didn't, at least this witness -- bless you -- does.

16:00:50 25                  And so you're going to get to hear this.

1    You're going to get to hear this.  This, by the way,

2    dates back to 2015, dates back to 2015.  You're going to

3    hear how these companies understood what would happen,

4    how foreseeable this was, even the entry into heroin.

5            So, for example, here's a 2013 document,

6    which is Plaintiffs' Exhibit 20757, and this is a Giant

7    Eagle document talking about pharmacy compliance, and

8    even Giant Eagle, though they are regional, they

9    recognized, "Prescription drug abuse epidemic.  In 2009,

10   deaths from prescription drug overdoses exceeded deaths

11   from auto accidents for the first time ever.

12           "Over 20 percent of Americans admit to

13   abusing prescription drugs.

14           "Prescription drugs are now the recognized

15   gateway drugs to heroin and other illegal drugs."

16           Again, different usage of the word

17   "Gateway."  But they recognize that you move from one

18   opiate to another when costs or availability are

19   involved.

20           So these companies, from the biggest to the

21   smallest, understood how predictable this was, and that's

22   where we end up there with the aftermath.

23           Now, episode number eight, as we're drawing

24   our binge watching to a close, is The Blame Game, and

25   this is what you're going to see.  And the Judge requires

1    both sides to exchange their slides for opening

2    beforehand, and so I've seen their slides, and you'll get

3    to see their slides when they present them.  I'm not

4    going to spoil it and tell you what they're going to say.

5    But I am going to tell you to be on the

6    lookout, be on the lookout for slides where they're

7    trying to blame everybody but themselves.  They would

8    almost have you believe that a pharmacist is a gum ball

9    machine.  They would almost have you believe that a

10   pharmacist is simply there to take your money and to spit

11   out your pills.

12   That's not the law.  That's not why

13   pharmacists go to pharmacy school.  That's not why they

14   take these classes.

15   You know, I said before, no doctor should

16   be writing a prescription for a Benzo and an opiate.  One

17   of our lawyers pointed out to me that I said that

18   inartfully.  I was not speaking correctly.  It does

19   happen, and it is appropriate on rare occasions, but it

20   should be a dynamite red flag.  There's three drugs in

21   combination that are called the unholy trinity or some

22   people call it the holy trinity.

23   I can't go there, but this, these drugs,

24   add a muscle relaxant and they just shouldn't be -- I

25   mean people are taking them for a trip, they're not

1    taking them for medicinal reasons.

2              And this is well-known and it's

3    well-published in the literature, but you've got to give

4    the data to the pharmacists for them to be able to figure

16:04:10  5    it out.

6              If people are coming from several different

7    doctors, you've got to get the data to the pharmacists

8    for them to be able to figure it out.

9              And it doesn't matter how big you are or

16:04:20  10    how small you are, if you're going to make money doing

11    this, you've got to be able to figure it out.  And you

12    can't be a Giant Eagle who says, "Yeah, but we're four

13    generations of happiness and community values" when you

14    don't even have a program in place to monitor for

16:04:40  15    suspicious orders until 2013.  Nothing.  Zippo.  Nada.

16              And you can't just start blaming everybody

17    else without also accepting some responsibility.  Don't

18    get me wrong, I'm all for blaming all of them.  Let's

19    figure out what went wrong.  But we don't give a

16:05:09  20    get-out-of-jail-free card and a pass to this group and

21    ignore the zebra.  The Blame Game.

22              Now, our last episode I want to talk to you

23    about is a Seedy Past, because I've looked at their

24    slides and I suspect you will hear evidence and you will

16:05:25  25    hear statements that blame a lot of this on Perdue.

1    Perdue Pharma.  Perdue, who invented OxyContin in a sense

2    and really marketed the dog out of it.  And they did some

3    outrageous stuff in the marketing, and they seduced an

4    entire medical community into thinking for a while these

16:05:50  5    drugs aren't addictive.

6              And what they did in my opinion is

7    fraudulent and it's horrible and it's terrible and I

8    can't say enough bad about it, but they couldn't have

9    done it successfully if other people had followed the

16:06:11 10    rules and the law.

11             And instead, what you've got is you've got

12    people like CVS who jump into partnership with Perdue and

13    actually help sponsor programs where Perdue sends people

14    out to the pharmacists to convince the pharmacists these

16:06:33 15    drugs are okay; just let them go.  It's a gum ball

16    machine, let them go.

17             These companies get into relationships with

18    these drug manufacturers, and you're going to hear about

19    them.  These companies get together, all of them,

16:06:55 20    including Giant Eagle, and join these trade groups like

21    the National Association of Chain Drug Stores that fight

22    against legislation that would make PDMPs out there for

23    everybody, that fight for legislation that put handcuffs

24    on the DEA and their ability to chase and police the

16:07:20 25    Marino Bill you'll hear about.

1     So you're going to hear about all of these

2 things.  You're going to watch all of these episodes

3 unfold.  You're going to see what they have to say.  And

4 then after you watch it, you get to talk about it.

16:07:35 5     You all will go back in the jury room and

6 you'll get to talk about it; not until then.  But when

7 you talk about it, you've got to try and frame this

8 evidence.  And so when I present this evidence, I'm going

9 to try to present it in ways that make it easier for you

16:07:56 10 to discuss it later.

11     So you will hear the evidence coming in in

12 ways, this is like my best friend right here.  This is

13 called an Ipevo because I'm a visual guy and so I like to

14 see things and I draw them and I write them down and I'll

16:08:10 15 just apologize to you now.  Unless you're a visual

16 learner, then you won't mind.

17     If we're questioning from back there, the

18 Court's got their own already hard wired into the system,

19 though it's made by Wolfe, not Optico, but I'll do that

16:08:27 20 because I want you to categorize and listen to this

21 evidence coming in in the ways that will enable you to

22 talk about it.

23     And the Judge has told but the burden of

24 proof.  I don't need to tell you about that anymore but I

16:08:39 25 do need to tell you what's going to happen when I sit

1    down because this is the rest of the opening statement

2    that comes from the other sides.

3              They're entitled to -- look, my view of

4    this is again, not one thing I've said is evidence.

16:08:56  5    These documents, if they're admitted into evidence, will

6    be evidence.  But right now, I've just read them.  They

7    haven't been formally admitted yet.

8              So you're hearing my view of the truth.

9    Now, I'd be a fool to stand up here and tell you

16:09:11 10    something I didn't think I could prove.  But the other

11    side, this is a court system.  They get to tell their

12    side of things.  And we listen and we assess, and that's

13    the right thing to do, to talk about it.

14              But when this is happening, as you're

16:09:29 15    listening to this evidence unfold, I want to give you a

16    couple of things to look at and think about.

17              Juan, if we could go to the -- thank you,

18    you're already ahead of me.

19              One, beware of math.  You say wait, two

16:09:49 20    plus two is four, why do I need to beware of that?  Yes,

21    two plus two is four.  That's fine.  You can grab that

22    math and run all the way to the bank but people start

23    doing things with math where they've got access to data

24    that you don't have.

16:10:06 25              So, for example, if someone is going to get

1    up and compare one of their stores to one of the big

2    local stores, there was a store called Overholt's that

3    for a while, for a couple of years, sold a lot of

4    opiates.  That's a pharmacy.  They sold them badly and

16:10:28  5    wrongly and they'll -- be aware of anybody who tries to

6    compare themselves to Overholt's in ways that make them

7    look good because the math may not be so right.

8                And I'll talk about that as the trial

9    unfolds because you've got to be careful of anybody who

16:10:45 10    is cherry-picking data to talk about.

11                Hold me accountable, but hold everybody

12    accountable because it's going to take me awhile to go

13    through the evidence.  See, the Judge calls -- has us

14    call witnesses and we call those witnesses, but after the

16:11:05 15    opening statement that I give, they get to respond.

16                After their opening statement, I don't

17    respond until closing argument.  So I'll respond by

18    putting it on through the evidence.  So when you hear

19    something, don't hesitate.  If you want to make a note,

16:11:20 20    make a note.  I'll be making notes because I'm going to

21    disassemble it all with the evidence as this trial

22    unfolds.

23                You know, for example, cherry-picking, pick

24    the store that's got the least amount of sales and

16:11:35 25    compare it to the store with the most amount of sales.

1          Pick the year that works best for you, not

2     the year that works worst.  Pick the policy that you

3     followed, not telling them you didn't follow it until it

4     was too little too late.  That type of cherry-picking

16:11:50  5     we'll look at together.

6          I want you to be aware of dosing.  This is

7     something you're going to hear about in this trial.  The

8     difference between an MME and a dose.  So one of the big

9     opiates is Morphine.  And one of the ways you can measure

16:12:10 10    the potency of an opiate is how equivalent it is to

11    Morphine.

12          That's the MME.  But that doesn't really

13    help you if you're trying to count how many doses people

14    sell.  And the reason that becomes important is because I

16:12:26 15    just did a little look-see.  Doses versus MMEs, Morphine

16    Milligram Equivalents.  And here's an example.  There's a

17    store called Franklin.  Bad store.

18          Franklin, an independent store, sold 9.5

19    million doses but that translates into 241 milligrams of

16:12:50 20    Morphine equivalents.  Well, you then take Overholt's

21    which sold 6.5 million and that translates to 176.  Why

22    isn't it the same?  Because sometimes they're selling a

23    dose of Oxy 30.  Sometimes they're selling a dose of Oxy

24    90.  Ninety's got three times as much Morphine

16:13:17 25    equivalents even though it's one dose.  Or they might be

1    selling Fentanyl for a cancer patient and it's got a

2    Morphine equivalent that's huge compared to the

3    OxyContin.

4                    And so these are just different ways of

16:13:28  5    looking at it and you'll hear about it.

6                    You'll hear that CVS in their eleven stores

7    in these two counties sold 27.4 million doses, but if you

8    look at the grass on the other side, they're not going to

9    show you that.  They're going to cherry-pick a store here

16:13:43 10   and a store there.

11                   And so this is the kind of stuff that

12   you'll hear about.  Walgreen's, Giant Eagle, 28.4, more

13   than CVS.  Walgreen's, more than both of them.  Walmart

14   still at 8.9 million, just their four stores.

16:14:01 15                   So we'll walk through that together through

16   the trial.  It's through the trial you'll hear that

17   evidence.

18                   But when you hear it in openings, just keep

19   a list of things like that that you want to talk about.

16:14:14 20   Beware of dates because this is the screen size issue I

21   talked to you about.

22                   They would change screen sizes depending

23   upon how closely the DEA was watching, whether they've

24   been sued, whether they were under an agreement to do

16:14:30 25   some things differently.  Those screens changed with

1    times so beware of the dates.

2                    And finally, beware of the half story.

3    Every witness will take an oath to tell the truth, the

4    whole truth and nothing but the truth and half stories

16:14:49  5    are dangerous.  Half stories are things like "It was a

6    beautiful day and then the tornado hit."  Well, you can't

7    start that sentence with, "It was a great day."

8                    "It was the best of times and it was the

9    worst of times."  You can't start that with, "It was the

16:15:11  10    best of times."  You get the whole picture.

11                    So that's what you'll have a chance to

12    listen to and you'll do it.  And then ultimately, I'll

13    take those charts that I kept putting up there that you

14    heard about, and I'll put them down with the witnesses

16:15:24  15    and I'll ask the CVS witness, "Did you develop a system

16    before you started selling this drug or distributing this

17    drug, did you develop a system to blah, blah, blah," and

18    we'll talk about it, and that's what the evidence will

19    unfold.

16:15:37  20                    So, Your Honor, I think I'm close to my

21    time being out, but I think I've given you back 15

22    minutes and so I'm out of soap.

23                    Ladies and gentlemen, thank you for being

24    attentive.  It's just amazing, and it's hard to do and

16:15:52  25    I'm greatly appreciative on behalf of my clients and on

1    behalf of myself.

2              So with that, Your Honor, I'm done.

3              THE COURT:  Thank you, Mr. Lanier.

4              Okay.  We'll have whichever defendant

16:16:07 5    wishes to begin.

6         OPENING STATEMENTS ON BEHALF OF WALGREEN'S

7              MR. STOFFELMAYR:  Yes, Your Honor.  Kaspar

8    Stoffelmayr for Walgreen's.  We will go first.

9              THE COURT:  Okay.  Mr. Stoffelmayr.

16:16:16 10             MR. STOFFELMAYR:  Let me take one second to

11   get set up, if I may.

12             THE COURT:  That's fine.

13             MR. STOFFELMAYR:  Your Honor, may I ask you

14   are you going until 5:00 or 5:30 today?

16:17:51 15             THE COURT:  Mr. Stoffelmayr, we'll see how

16   it goes and when's a reasonable break.

17             How long you go, I mean, I don't want to

18   cut anyone off in the middle, I don't think that's fair,

19   but how long are you planning to go?

16:18:02 20             MR. STOFFELMAYR:  I may go as long as an

21   hour.  I'd like to be shorter than that.

22             THE COURT:  Okay.  Well, we'll certainly

23   finish yours.

24             MR. STOFFELMAYR:  Okay.  Thank you, Your

16:18:09 25   Honor.

```
 1              THE COURT:  Okay.  And then if you go, if
 2    you take an hour, we'll stop for the day.
 3              MR. STOFFELMAYR:  Great.  Thank you.
 4              All right.  May it please the Court,
 5    counsel, ladies and gentlemen, my name is Kaspar
 6    Stoffelmayr, and I represent Walgreen's.
 7              I want to say something right off the bat.
 8    It is a real honor, a real pleasure to be able to address
 9    you, to stand in front of you.
10              It's especially an honor because I
11    represent a company of pharmacists who minutes ago were
12    compared to gum ball machines.  That's not who Walgreen's
13    is.  That's not how Walgreen's operates.  That's not who
14    our pharmacists are.
15              And you're going to get a chance to meet
16    some of them before this case is over.
17              First people I want you to meet, though,
18    are some of my colleagues.
19              You met earlier Peter Wilson.  He's a
20    lawyer who works at Walgreen's.  Some of you met during
21    jury selection my law partner, Brian Swanson.  He will be
22    here for the whole trial.  Mr. Wilson may -- he'll be
23    here today, he'll be here tomorrow, and then he may come
24    and go as the trial progresses.
25              And also our partner, Kate Swift.  And
```

1    there are some other members of our team who I hope

2    you'll get to know before the case is over.

3              There were a lot of statements made, but

4    one thing I want to make really clear to everybody from

16:19:48  5    the outset, nobody here, not on behalf of Walgreen's or

6    anybody else, is here to tell you that the opioids crisis

7    is unimportant, that it's not serious; that it hasn't had

8    horrifying consequences for some communities.

9              You just saw some PowerPoint presentations,

16:20:06 10    internal PowerPoint presentations from Walgreen's, and I

11    don't know if you noticed the dates.  They go back to

12    2013, one I did notice, long before this stuff was on the

13    front page of the newspaper every day, a long time before

14    anyone was filing lawsuits about it.  The people at

16:20:22 15    Walgreen's were enormously concerned about the misuse of

16    opioid drugs.

17              They were thinking about it and talking

18    about it internally and worried about it and worried

19    about what they needed to do going back years and years

16:20:37 20    and years before you saw it on the front page of the

21    paper every day.

22              I think that's the best evidence that, as I

23    said, nobody's here to try to tell you this isn't a big

24    deal.

16:20:49 25              This trial is about more than that, though,

1    of course, right?  This trial is about more than is there

2    a crisis and is it terrible.  I don't think anyone

3    disagrees with that.

4                What this trial is about is what happened.

5    How did we get here?  And when people come to court and

6    file lawsuits and try to figure out who to blame, are

7    they looking in the right places?

8                There's no question, no dispute that

9    Walgreen's, all these pharmacy chains carry these

10   medicines.  Every pharmacy in America just about carries

11   these medicines and has carried these medicines for ages,

12   but what Judge Polster said, I wrote down the exact words

13   he used, "What you'll need to figure out is were these

14   pharmacy chains," not pharmacies in general, not all of

15   these pharmacies somehow together, but individual, were

16   these pharmacies, the word he used was, "a substantial

17   factor in creating a public nuisance."

18                At the end of the case, the Court's going

19   to give you legal instructions on exactly what counts as

20   a substantial factor versus not a substantial factor,

21   what counts as a public nuisance versus just something

22   that's upsetting but doesn't count legally as a public

23   nuisance.

24                All right.  So this trial, as I was saying,

25   this is not the first time people in Ohio have asked

1    about the reasons we have this crisis of the misuse of

2    prescription drugs.

3                    You have on the screen now, it is this

4    document.  It was the final report of the Ohio

16:23:05  5    Prescription Drug Abuse Task Force.  This came out in

6    2010.  And what happened was that the Governor at the

7    time, it was Governor Strickland, issued an executive

8    order creating this task force and the goal of this task

9    force was to address exactly the question that brings us

16:23:22 10    here today:  Prescription drug abuse.

11                    And the task force members were appointed

12    by the Governor.  They weren't lawyers filing lawsuits.

13    The task force members were representatives from the Ohio

14    Department of Public Safety, from the Ohio

16:23:41 15    Department -- excuse me -- of Health, the Attorney

16    General's Office, the Department of Alcohol and Drug

17    Addiction Services, lots of people from law enforcement,

18    representatives of health care organizations,

19    representatives of county Government.

16:23:55 20                    And when these people all came together,

21    public officials, when they came together, they

22    identified what they thought were the contributing

23    factors to fatal drug overdose death rates.

24                    And what you'll see is they didn't think

16:24:17 25    pharmacies, certainly not well-run chain pharmacies, were

1    a problem in Ohio.  So going counterclockwise from the

2    body, the self medicating habits of Baby Boomers -- I

3    apologize this isn't a better company.  This is what the

4    original looks like, unfortunately.

16:24:31   5           Self medicating habits of Baby Boomers.

6    Direct-to-consumer marketing.  That's like when you see

7    ads on TV or magazines for prescription drugs.

8    Aggressive marketing of opioids.  That's marketing to

9    doctors when drug companies, pharmaceutical manufacturers

16:24:48   10   market to doctors.

11           Then you go on, you've got changes in

12   clinical pain management.  We're going to talk about that

13   a little bit more but that's changes in how doctors, how

14   doctors treated pain.

16:25:02   15          We've got the growing use of prescription

16   opioids.  Doctors were prescribing a lot more

17   prescription opioids by 2010.

18           And then finally you get to diversion.  All

19   right.  Mr. Lanier talked a lot about diversion and I

16:25:17   20   agree with certainly some of the things he said.

21   Diversion, we're talking about drugs getting into the

22   hands of the wrong people, people who shouldn't have them

23   who are going to use them in ways the drugs shouldn't be

24   used.

16:25:27   25          There's a few different things.  The

1    Internet.  Back then people actually used to be able to

2    order opioid medications on the Internet.  People did

3    that.  It was a huge problem.  Congress stopped that.

4              Next we've got pill mills.  So we have pill

16:25:45  5    mills and people use that term a little loosely but we're

6    talking about doctors who will prescribe drugs to anybody

7    for cash.  And back then, a lot of times, the doctor

8    would also give you the pills.  It was a doctor/pharmacy

9    all in one.

16:25:58 10              You heard Mr. Lanier talking about pain

11    clinics in Florida.  That's what was going on.  You would

12    go, get your prescription and get your pills; one-stop

13    shopping.

14              That never happened in one of these

16:26:08 15    pharmacies here in court.

16              If you go down, it is deception and scams.

17    Yeah, there's a lot of scamming that has gone on, people

18    trying to get pills.  Pharmacies are the victims of the

19    scamming.  They're not the ones doing the scamming.

16:26:25 20              Theft, same thing.  There has been theft.

21    Yeah, there's armed robberies at pharmacies.  Pharmacies

22    are the victims; not the people doing the theft.

23              And finally, you get to friends and family

24    and I'm going to talk about that before the -- before the

16:26:38 25    day is over.  But as it turns out, I'll just preview it.

1           There's a lot of unused pills in medicine

2      cabinets in America, and a lot of those pills get into

3      the wrong hands.  It's an unfortunate fact but that's, I

4      think, what they are talking about when they are saying

16:26:57  5      friends and family.

6           So this is what happens when public

7      officials in Ohio come together to try to do their job

8      and try to do their very best to figure out what are the

9      factors that contributed to the misuse of prescription

16:27:11 10     drugs in Ohio.

11           Again, it's not chain pharmacies.

12           With the rest of my time, and I'm not going

13      to go for two-and-a-half hours, I promise you, nothing

14      like that.  For the rest of the time, I want to address

16:27:25 15     three topics with you.

16           The first one, oops, I tripped.  First one

17      is why are there so many pills?  You are going to hear

18      from some of the experts in the case, Mr. Lanier

19      mentioned Dr. Keyes, the epidemiologist from Columbia

16:27:41 20     University.  You are going to hear from some people that

21      when there are more pills, more bad things happen.

22           The more pills there are in a community,

23      the more addiction there can be, the more overdoses there

24      can be, and the terrible things that happen with that.

16:27:59 25     So you have to ask yourself why are there so many pills.

                    The next thing I want to talk about is what
do pharmacists really do?  Who are they?  They are not
gum ball machines.  I promise you.  What do pharmacists
do and how do they do their job and what is their role in
protecting patients and the community?

                    And then the last thing we'll talk about is
where do diverted pills for these two counties, Lake and
Trumbull Counties, that's what we are talking about.
We're talking about diversion, diverted pills available
to people in Lake and Trumbull Counties, where do they
really come from?

                    All right.  Start with why are there so
many pills and Mr. Lanier talked about this a little bit
and it is absolutely true that if you go back to the
1980s, for example, opioid medicines were not used very
much.  They were used, some of the medicines that are
most popular today didn't exist back then, but some of
them did.  There were other opioids.  But these opioid
pain medications were used much less frequently in the
1980s and earlier.  And there are lots of reasons for
that.  I think Dr. Lembke, who is going to testify, may
talk about this.

                    And there's been a big change.  Starting in
the 1990s and early in the 2000s, there was a huge change
in how doctors treat pain.  And at the end of the day,

1       the question is why are there so many pills?  The answer

2       is amazingly simple:  Because doctors write so many

3       prescriptions.

4               They didn't used to, and now they do.  Now

16:29:29  5     they write fewer than they did five or six years ago.

6               Some people, as you heard a little bit

7       about, some people blame pharmaceutical manufacturers.

8       They think the problem is that pharmaceutical

9       manufacturers tricked, deceived doctors into writing way

16:29:46 10     too many of these pills, tricked doctors into thinking

11      that these pills are much safer than they are.

12              And as Mr. Lanier previewed for you,

13      because he had my slides, as Mr. Lanier previewed for

14      you, these lawyers here, before they filed the

16:30:05 15     pharmacies, filed lawsuits against pharmacies, were

16      filing lawsuits against drug manufacturers.

17              In 2000 -- in 2018, both Lake and Trumbull

18      Counties filed lawsuits.  These are 267 pages long.

19      They're identical.  Both counties filed the same lawsuit.

16:30:27 20             The counties filed these lawsuits back in,

21      like I say, 2018 and here's what they were saying before

22      they sued pharmacies.

23              They said that defendants in those cases,

24      the defendants in those cases were pharmaceutical

16:30:42 25     manufacturers, and also some of these big wholesalers but

1       not pharmacies.  "Defendants engaged in a sophisticated

2       and highly deceptive and unfair marketing campaign to

3       sell opioid medicines."

4                   They went on and said that these

16:31:00  5       defendants, these pharmaceutical manufacturers, spent

6       hundreds of millions of dollars on that deceptive

7       marketing campaign.

8                   And it goes on and on with the details.  As

9       I said, these are 267 pages long.  If we had more time

16:31:19 10      today, you could hear more about this but that is what

11      folks were saying, these lawyers were saying before they

12      sued pharmacies.

13                  Now, that marketing campaign is not the

14      only thing going on, obviously that changed the way

16:31:35 15      doctors treat medicine.

16                  I want to show you a few slides and you'll

17      see more and more about them as this case goes on and I

18      think Dr. Lembke may be able to talk about this.

19                  Other things that were going on.  In 1997,

16:31:51 20      the State of Ohio passed this law.  This was the law in

21      Ohio passed by the state legislature.  And here's what

22      they said.  "The State Medical Board shall adopt rules in

23      accordance, at that time, with standards and procedures

24      to be followed by physicians in the diagnosis and

16:32:08 25      treatment of intractable pain."  Later they changed the

1    wording there to "chronic pain."  You can just think of

2    it as pain that doesn't go away, pain that continues for

3    weeks, months, years.

4               The medical board had to come up with

16:32:25  5    standards for treating intractable pain by prescribing,

6    dispensing, administering dangerous drugs.  That's a word

7    the law used to use.  They used to say dangerous drugs.

8    That includes opioid medicines, that includes dangerous

9    drugs when the law used that word.

16:32:42  10              They were supposed to dispense, administer,

11    prescribe dangerous drugs in amounts or combinations that

12    may not be appropriate when treating other medical

13    conditions.

14               Okay.  That was the law in Ohio starting

16:32:54  15    from 1997.  Here's some other things that were happening.

16               You heard a reference along the way, I

17    think, "pain is the fifth vital sign."  Some of you may

18    have heard this expression before, some of you not.  This

19    is an idea where people started talking about in the:

16:33:10  20    1990s.  It really became popular around 2000.  This is

21    the document in front of me, Department of Veterans

22    Affairs.  You know, the agency of the Federal Government

23    that, among other things, runs the V.A. medical system to

24    take care of our veterans.

16:33:24  25              And this was a tool kit to help people in

1    the V.A. system, the doctors, the nurses, the others,

2    understand this idea that pain is the fifth vital sign.

3    And I want to pause for a second.  What does that mean

4    that pain is a vital sign?  What they meant by this is

16:33:45  5    this:  A heart rate is a vital sign, pain is a vital

6    sign.  Anyone who comes into an emergency room or a

7    doctor's office, they will check your pulse.  They need

8    to know your pulse.  And if there's something wrong, if

9    your pulse is very unique or highly elevated for some

16:34:03  10    reason, they're going to address it.  They're not just

11    going to ignore that there's a problem with your pulse.

12           They are saying take the same approach to

13    pain.  Treat pain like a vital sign so if somebody comes

14    into the office, somebody comes into your emergency room,

16:34:19  15    you need to find out if that person is in pain just the

16    way you want to find out what their pulse is.  And if

17    that person is in pain, you need to address it, you need

18    to offer treatment just the way you would never ignore

19    somebody who got a problem with their pulse.

16:34:32  20           That's what this idea was with pain as the

21    fifth vital sign.  It became popular obviously not just

22    at the V.A. Hospitals.

23           In 2000, the Joint Commission, this

24    is -- issues pain standards.  The Joint Commission is the

16:35:15  25    organization that sets the standards to accredit

1    hospitals in America.  Essentially, every hospital in

2    America that wants to be accredited, that's all of them,

3    has to comply with the standards set by the Joint

4    Commission.

16:35:30  5          And in 2001, for the very first time, they

6    issued pain standards.  And the leading point is this:

7    Patients have a right to appropriate assessment and

8    management of their pain.

9          That might seem obvious to some people but

16:35:45 10   in 2001, this was a directive that hospitals hadn't heard

11   before, and they reacted to it.  They needed to come up

12   with training programs so that their doctors and nurses

13   and other providers would know how to do a better job

14   identifying pain and would know how to do a better job

16:36:03 15   treating pain.

16          This is the last slide of the series I want

17   to show you but it's really important.

18          This is a statement that comes out in 2001.

19   It's a joint statement from 21 health organizations and

16:36:18 20   the Drug Enforcement Administration.  Drug Enforcement

21   Administration's role here is not because it's a health

22   care organization.  It's a law enforcement and regulation

23   organization, but they are on board.

24          And here is what they say.  They say,

16:36:42 25   "Undertreatment of pain is a serious problem in the

1    United States, including pain among patients with chronic

2    conditions and those who are critically ill or near

3    death.  And effective pain management is an integral and

4    important aspect of quality medical care, and pain should

16:36:56  5    be treated aggressively."

6              Then they talk about opioid medications

7    specifically.  Make sure I can get this right.

8              They say, "For many patients, opioid

9    analgesics," analgesics means pain medications.  It's not

16:37:17  10    a word you're familiar with.  I was not.

11              Opioid analgesics, when used as recommended

12    by established pain management Guidelines, are the most

13    effective way to treat their pain and often the only

14    treatment option that provides significant relief."

16:37:29  15              Okay.  This is the Drug Enforcement

16    Administration talking.  This is the American Academy of

17    Family Physicians, the American Cancer Society, the

18    American Society of Anesthesiologists.  These are not

19    fringe organizations.  This is what the mainstream

16:37:42  20    medical community and the DEA are telling doctors, it's

21    what they are telling the public at large, and it's what

22    they're telling pharmacists for that matter.  That's what

23    they're telling anyone who will listen.

24              So as you would probably expect, the use of

16:38:00  25    these medications went up a lot, and it went up quickly.

1          Something you -- there was a reference to

2     this earlier, but you may have missed it.  It went by

3     quickly, the DEA sets quotas for opioid medications.

4     What that means is that the companies that make these

5     medicines can't just make as much as they want.  You

6     know, if you're making cars, you're Ford Motor Company,

7     you can make as many cars as you want.  If you can't sell

8     them, that's on you.  But you can make them.  The

9     Government doesn't care.  You can make as many cars as

10    you want.

11          If you're making opioid medications, you

12    can't make as much as you want.  Every year the DEA sets

13    a limit and they say this is the limit for opioid

14    medications that can be made and/or sold in our country.

15    Manufactured, imported, sold.

16          And the way they do that is the DEA looks

17    at these -- this is the language.  They look at the

18    medical, scientific research and industrial needs of the

19    United States.  They look at what are our needs in our

20    country, how much of these medicines does our country

21    need.  They figure out how much they think we need and

22    they say to our manufacturers okay, you can make that

23    much, you can make as much as we need but you can't make

24    more.  You can't make and sell more of these medicines,

25    which are addictive, for sure, which can be abused, for

1    sure.  You can't make more of those medicines than the

2    DEA says we need.

3                    And this is what these quotas look like in

4    much of the time period we're talking about.

16:39:35  5                These are the quotas for Hydrocodone and

6    Oxycodone.  And I'm glad Mr. Lanier said those are the

7    two he's going to concentrate on the case because those

8    are the ones we have this data for and it's true, those

9    are the most widely prescribed opioid medications, I

16:39:53 10    believe, in the U.S.

11                    Look at what happens to the line.  The blue

12    line at the bottom, that's Hydrocodone.  That's used in

13    Vicodin, for example.  If you've ever seen a Vicodin

14    prescription, the medicine in there is a Hydrocodone.

16:40:09 15    Also has Tylenol.

16                    At the beginning of this time period in

17    2000, the quota for Hydrocodone is 20,000 kilograms.

18    That was what they thought we needed.

19                    In 2006, six years later, the need has

16:40:24 20    doubled according to DEA.  More than doubled.  It's over

21    40,000 kilograms.

22                    By 2013, the need, according to DEA, has

23    doubled again to a hundred thousand kilograms.  With

24    Oxycodone, it's even, even starker.  Oxycodone is a more

16:40:41 25    powerful opioid than Hydrocodone.  It's used in Percocet,

1    also used in OxyContin, which is a slower, slow-release

2    version, and you can buy or your doctor prescribes it for

3    you, there are pills with pure Oxycodone with no other

4    ingredient.

16:41:00  5              This is what DEA concluded about the

6    nation's need for Oxycodone.  At the beginning of the

7    time period 2000, it was 35,000 kilograms a year.  By

8    2010, it had tripled to a hundred thousand kilograms per

9    year.  And by 2013, the number, the need according to

16:41:20 10   DEA, had quadrupled.  Now we're up to 150,000 kilograms

11   according to DEA.

12              So where did the pharmacists fit into this

13   story?  This is the demand.  This is the need according

14   to DEA.

16:41:33 15              Pharmacists don't create the demand.  They

16   don't create that need.  Pharmacists don't tell doctors

17   how many pills to prescribe, which pills to prescribe,

18   for what duration a patient needs treatment.

19              Where pharmacists fit in is by filling

16:41:49 20   prescriptions that doctors write.  They do a lot of other

21   things, we're going to talk about some of the other

22   things pharmacists do, but they don't tell doctors which

23   prescriptions to write or how many pills to prescribe.

24              So that brings us to pharmacists.  And I

16:42:06 25   want to talk a little bit about who pharmacists really

1    are and what they do.  I was so pleased that Giant Eagle

2    brought a pharmacist here so you can see one in the

3    flesh, so to speak.  You'll meet some more before the

4    case is done.

16:42:22  5             The pharmacists I want to talk about

6    primarily are the pharmacists who work at Walgreen's.

7    Interestingly enough, this year, Walgreen's is 120 years

8    old.  The very first Walgreen's pharmacy was on the south

9    side of Chicago, and there was a Mr. Charles Walgreen.

16:42:42 10   Mr. Charles Walgreen was a registered pharmacist.  He was

11   working in a pharmacy on the south side of Chicago and

12   decided to take out a loan and buy the store from his

13   boss.  And that was the first Walgreen's.

14             Today you could find a Walgreen's in every

16:42:57 15   state of the union, plus DC and Puerto Rico.

16             As you may well be familiar with, if you're

17   in the front of the store, front area of the store, you

18   can buy snacks, you can buy toothpaste, baby products,

19   all sorts of things.  This time of year, you're probably

16:43:17 20   starting to see Halloween candy, Halloween decorations,

21   that sort of thing.

22             There is also a pharmacy at every

23   Walgreen's.  It was originally, Charles Walgreen's was a

24   pharmacist and to this day, there is a pharmacy at every

16:43:32 25   Walgreen's.

1           And I was a little surprised to learn this

2    myself, but if that Walgreen's pharmacy is open, this is

3    not unique to Walgreen's, what I'm going to tell you, if

4    that Walgreen's pharmacy is open, there is a Walgreen's

16:43:48  5    pharmacist on duty.  You may see other people behind the

6    counter.  There may be pharmacy technicians, for example,

7    and usually there are, but if the pharmacy is open, could

8    be 2:00 o'clock in the morning at a 24-hour pharmacy, if

9    the pharmacy is open, there is a Walgreen's pharmacist on

16:44:04 10   duty.

11          So who are these people?  Who are

12   pharmacists?  The first thing to say about them is that

13   they are health care professionals.  That is their

14   self-identity.  That is their career.

16:44:19 15          A pharmacist is going to typically between

16   six and eight years of between college and pharmacy

17   schools, and if it's a combined program, sometimes they

18   do two programs, but you're looking at between six and

19   eight years of training.

16:44:33 20          They have had hundreds of hours of

21   practical training before they can sit for the boards to

22   get a license.

23          They have to take a licensing exam.  They

24   have to pass their licensing exam.  And they have to get

16:44:46 25   a license from the Board of Pharmacy, just like this is

1    an Ohio Board of Medicine that regulates and licenses

2    doctors.  There is the Ohio Board of Pharmacy that

3    regulates and licenses pharmacists.

4              And if a pharmacist isn't doing their job

5    right, if they are dispensing pills when they shouldn't,

6    the Board of Pharmacy can take that license away.

7              They also have continuing education

8    requirements to keep up their practice, especially the

9    longer they've been out of school.

10             It's an important job, it can be a

11   difficult job, it can be a stressful job.  Pharmacists

12   are pretty well paid for it, by and large.  A new

13   pharmacist coming out of school in Ohio is probably going

14   to make just around $100,000 a year.  Most pharmacists

15   are making somewhere between a hundred and $130,000 a

16   year in Ohio.

17             As you would expect, there are rules for

18   pharmacists.

19             Like there are rules for what pharmacists

20   do, and there are rules for what they may not do.  Those

21   are both rules, of course.  It's important you do the

22   things you're supposed to do.  It's also important you

23   don't do the things you're not supposed to do.

24             And what you're going to find out is that

25   at Walgreen's, pharmacists comply with both kinds of

1    rules.

2                    So let's start with rules for what

3    pharmacists do.

4                    The most important rule for what

16:46:14  5    pharmacists do is they have an obligation for patient

6    care.  You go into a pharmacy, you may just think you're

7    a customer.  From the pharmacist's point of view, you're

8    a patient.  The people they fill prescriptions for are

9    their patients and they have a professional obligation to

16:46:32 10    care for their patients.  That means a lots of things,

11    but first and foremost, it means that if you are a

12    pharmacist, your job is to make sure that people who need

13    medicines prescribed by their doctors are able to get the

14    medicines they need.

16:46:49 15                    If you're a pharmacist and you're not doing

16    that, you're not doing your job as a pharmacist.  If a

17    doctor refuses to take care of people, you're not doing

18    your job as a doctor.  If a pharmacist refuses to help

19    people get prescription medicines that they need, you're

16:47:05 20    not doing your job as a pharmacist.

21                    There are, I should say, a lot of steps a

22    pharmacist takes before filling a prescription.  Their

23    job isn't just handing pills across the counter.  They're

24    not gum ball machines or anything like that.  You're

16:47:26 25    going to hear from pharmacists about all the things they

1    do when they fill a prescription to make sure that they

2    are filling the right prescription, that they are filling

3    it with the right medicine in the right dose to look out

4    for drug allergies and look out for interactions between

16:47:42  5    drugs.

6          This is where, Mr. Lanier said this and

7    it's absolutely true, this is where pharmacists are

8    really specialized.  They know a lot more about

9    interactions between drugs and sometimes drug allergies

16:47:54 10    than anybody else.

11          And that is one of the things they are

12    doing to look out for their patients.

13          There's all sorts of things going on like

14    that.

16:48:01 15          I hope you didn't have the impression from

16    the presentation earlier that there's all this data about

17    a patient's prescriptions that the pharmacist can't see.

18    I thought I heard that at least implied.

19          When the pharmacist is filling a

16:48:17 20    prescription, they have this, and it shouldn't be

21    surprising, access to the prescription records for that

22    patient.

23          Now, they're filling for Patient A, they're

24    not supposed to dig into Patient B's records but if they

16:48:32 25    are filling for Patient A they are looking at all the

1    other prescriptions that Patient A has filled at

2    Walgreen's.  That's not secret information.  It's what

3    pharmacists are able to see.

4                When it comes to controlled substances,

16:48:45  5    that's what brings us here.  There are extra steps.

6    There's even more a pharmacist is going to do.

7                Controlled substances include opioid

8    medications.  That's clear.  You should probably know

9    that's not all that counts.  You know, Valiums, Xanax,

16:49:01 10    those are controlled substances, too.  Sleeping

11    medications, Ritalin, Adderall, there are lots of

12    controlled substances out there.  Opioid medications are

13    the ones we're going to be talking about most, of course.

14                A few things we should talk about at the

16:49:16 15    outset when we think about opioid pain medications.

16                The first one is that most of the time, a

17    doctor has prescribed these medications and they are good

18    doctors doing the right thing.  Yeah, there are some bad

19    doctors out there.  This is a statement by DEA.  I don't

16:49:33 20    think anyone would argue that it's a statement on

21    dispensing controlled substances for pain from 2006.  The

22    DEA recognizes that the overwhelming majority of American

23    physicians who prescribe controlled substances do so for

24    legitimate medical reasons.

16:49:52 25                Yes, there are times when somebody comes in

1   with a bogus prescription.  That is not the usual case.

2           The other thing we can't lose sight of is

3   how important these medicines are.  People talk about

4   these medicines in sort of a flippant way as if all they

16:50:11  5   do is addict people, all they do is make people sicker.

6           These are critically important medicines.

7   Every one of them has been approved by the Food & Drug

8   Administration to treat pain.  You can't just make these

9   medicines because you feel like it.  The drug

16:50:27 10   manufacturers in all cases have gone to FDA and FDA has

11   said, "This is an appropriate medicine to treat pain."

12           And there are people who need these

13   medicines.  Sometimes need them desperately.  There are

14   people recovering from surgeries who need pain control.

16:50:47 15   There are people who have been in serious accidents who

16   need pain control.  There are people in our communities

17   who have a kind of pain from various conditions, they

18   can't get out of bed without their medicine.  They can't

19   get out of bed in the morning, they can't hold a job,

16:51:05 20   they can't join their families for an evening meal.

21   Those people need these medicines.

22           And there are, of course, people with

23   horrible pain from cancer.  There are people in hospice

24   near the ends of -- near the end of their lives who would

16:51:20 25   suffer horribly and unnecessarily if these

1    pains -- excuse me -- if these medicines weren't

2    available to them.

3              Unfortunately, there are people, there are

4    criminals, oops, there are criminals who will try to

16:51:38  5    trick pharmacists into dispensing these medicines to

6    people who don't need them, and they are criminals.

7              These are the major ways that criminals

8    divert people from pharmacists.

9              All right.  We've had bad doctors.  There

16:51:57 10    aren't a lot of them.  They exist.  You'll probably hear

11    about a couple of them before this trial is over.

12              There are bad doctors who take cash and

13    write prescriptions, no questions asked.  Again, very few

14    of them thankfully, but they exist.

16:52:11 15              There are people, I don't even want to call

16    them patients, there are criminals who will trick

17    doctors, good doctors, into writing prescriptions they

18    don't need.  So that might be somebody who fakes their

19    symptoms, who pretends to be in pain when they're not to

16:52:26 20    get a prescription, or it might be somebody who has a

21    real injury but they go to five different doctors with

22    the same injury to get five prescriptions when they need

23    one.

24              That happens, unfortunately, and that is a

16:52:38 25    crime.  It is absolutely a crime.

1                      There are cases where criminals have stolen

2       prescription pads.  Maybe they had someone on the inside

3       who worked at the Doctor's Office, they steal a

4       prescription pad and write their own prescriptions.

5                      Nowadays, this doesn't happen very much

6       because so much prescribing is electronic, but if you go

7       back to 2010, '11, '12, most prescriptions, maybe all

8       prescriptions were written on an old fashioned

9       prescription paper pad.

10                     The last thing over there, I have people

11      who forge prescriptions.  And they have always existed

12      and they will continue to exist.  You know, maybe once

13      everything is electronic, you have to be really

14      sophisticated, but that has always been a big problem.

15                     Because these criminals are out there,

16      there are, of course, steps that pharmacists take to

17      avoid being tricked, to avoid being taken advantage of.

18                     None of these are examples where the

19      pharmacist is a criminal.  In fact, you're not going to

20      hear about that.  You're only going to hear in this case

21      about pharmacists who were taken advantage of by a

22      criminal who tricked them, who wanted these meds.

23                     So pharmacists, you know, they take steps

24      to guard against this.  That is part of their

25      professional obligation, too.

1           They learn about this in pharmacy school.

2      You may have thought this is all on-the-job training or

3      something.  That's not true.  Everybody comes out of

4      pharmacy school knowing about their legal obligations.

16:54:14  5      Mr. Lanier talked about that corresponding

6      responsibility.  They learn all about the law in pharmacy

7      school, they learn about their corresponding

8      responsibilities, the requirements that they have, and

9      they learn how to identify suspicious, suspicious

16:54:29 10      prescriptions.

11           That's what they are learning about in

12      pharmacy school along with everything else.

13           Now, if they come to Walgreen's, they also

14      need to comply with what Walgreen's calls its good faith

16:54:45 15      dispensing policy.  This goes back in different version,

16      this version I'm looking at here is from 2012, I believe.

17           This is a Walgreen's policy that every

18      Walgreen's pharmacist has to comply with.  First thing we

19      say is you must use the elements of good faith dispensing

16:55:06 20      in conjunction with state and federal laws.  This is on

21      top of state and federal law.

22           We tell them that you must comply.  We

23      remind them about their corresponding responsibility, and

24      we tell them at the bottom if you don't comply, if you

16:55:19 25      don't do this, if you don't comply with your

1    corresponding responsibility obligations, if you don't

2    comply with this policy, you can be disciplined,

3    including terminated, including fired out of a six-figure

4    job for not complying with these rules.

5                    Before the case is over, you are going to

6    get a chance to read this in as much detail as you want.

7    I'm sure you don't have time today to go through the

8    whole thing, but you will get to see it all, and you'll

9    get to see every version of it you want to see.  You will

10   get to read the whole thing.

11                   I just want to hit a couple highlights.

12                   The first thing is procedures.  It starts

13   with procedures; things like patient ID, check for ID if

14   you don't know this person.  Make sure, make sure the

15   prescriber has a valid license.  Mr. Lanier talked about

16   how important that is.  We agree, it is important.  Check

17   to make sure the prescriber has a valid license.  Check

18   the PDMP.  Mr. Lanier talked about how important it is to

19   check the PDMP.  That's that database and you can find

20   out if someone is filling prescriptions all over town.

21   We agree.  We tell pharmacists check the PDMP.

22                   That thing at the bottom, DUR, that stands

23   for Drug Utilization Review.  That is a review that will

24   help you identify drug interactions.  A pharmacist is

25   always concerned about is the drug I'm giving someone

1      going to interact with another drug?

2                  That includes those cocktails you heard

3      about.  Cocktails is a drug interaction.  That's the

4      reason it's dangerous, these cocktails, because it's a

16:56:53  5   drug interaction.  That is part of the DUR, Drug

6      Utilization Review.

7                  Then it goes on and says listen pharmacist,

8      you're a professional, you went to school, you know how

9      to do your job, but here are things you should be looking

16:57:06 10   out for, things you should be considering.

11                 And I've got to say virtually all the red

12     flags, maybe all of them, we'll find out, all the red

13     flags Mr. Lanier identified, the doctor shopping, people

14     writing the same prescription over and over again, people

16:57:25 15   paying cash, they're all in here.  It's exactly the

16     things we are telling our pharmacists to look out for.

17                 It doesn't take lawyers to figure that out.

18     Okay?  This is what pharmacists learn in pharmacy school.

19     This is what Walgreen's has been telling them to do for

16:57:42 20   ages.

21                 And here we get to the end, last stint of

22     the process.  If after reviewing the elements of good

23     faith of dispensing, you've got three options:  One,

24     dispense.  If everything checks out, this person needs

16:57:55 25   their medicine, you need to give them their pills.

1      Two, if a doctor says it's not a valid

2  prescription, for example the doctor says that's not my

3  patient, I never heard of this person, you obviously

4  don't fill the prescription.

16:58:07  5      And what I really want to draw your

6  attention to is number three.  Even if the prescriber,

7  the doctor, informs the pharmacist that a prescription is

8  valid -- so if a doctor says it's A-OK, I want you to

9  fill this, even then, if the pharmacist is not

16:58:24  10  comfortable, the pharmacist determines -- I think my

11  battery went out -- the pharmacist, even then -- I think

12  I have to turn this on -- even then, if the pharmacist is

13  uncomfortable, the pharmacist says the elements of good

14  faith -- Jesus, excuse me.  Is that better?

16:58:53  15      Even then if the pharmacist is

16  uncomfortable, so someone comes in with a prescription,

17  the doctor says A-OK, I want you to fill this but because

18  of all those red flag-type considerations, the pharmacist

19  is uncomfortable, Walgreen's tells the pharmacist, "You

16:59:09  20  have a responsibility to refuse to dispense.  You go

21  ahead and refuse to dispense that prescription and the

22  company will back you up.  The company is telling you to

23  do it."

24      What you're going to find out is in real

16:59:26  25  life examples, this is a policy.  Maybe someone's going

1    to say that's a policy, who cares, no one pays attention

2    to policies.  One, you're going to find out that

3    Walgreen's pharmacists take this policy very seriously.

4    Two, you will see examples of how they apply it in real

16:59:43  5    life.  You're going to hear stories and see examples of

6    people turning away prescriptions, sometimes over and

7    over.

8            You will see examples like this.  This is

9    an investigative report, comes out of Lake County.  This

16:59:56 10   one goes back to 1998.  Remember all this stuff about too

11   little, too late?  This is way back in 1998.

12           In 1998, the Lake County Narcotics Agency

13   got a phone call from Melanie Burlinghouse.

14   Ms. Burlinghouse is a registered pharmacist at a

17:00:13 15   Walgreen's in Mentor.  She says she has a fraudulent

16   prescription.  Pharmacist Burlinghouse didn't just call

17   the police.  She took the trouble to identify that the

18   people were in a tan station wagon and she went and wrote

19   down the registration number to give to the police to

17:00:30 20   make sure they could catch these folks.

21           Here's another one from years and years

22   later, 2010, a presentence report.  This person was being

23   sentenced, how did they end up being arrested, what

24   started the investigation?  The pharmacist at Walgreen's

17:00:45 25   contacted Willoughby police in regards to a male and

1    female attempting to pass an altered prescription.

2    That's not a gum ball machine.  That is a licensed

3    professional health care provider.

4            So that takes us through what rules for

5    what pharmacists do.  Some of the rules.  You'll hear

6    more as the case go on.

7            Now, I want to talk to you about rules for

8    what pharmacists may not do.

9            What do they not get to do?  The main one I

10   want to talk to you about is that pharmacists may not

11   write prescriptions.  Pharmacists may not make

12   prescribing decisions.  For the most part, if a

13   pharmacist wrote a prescription, that would be like me

14   writing a prescription.  It's against the law.

15           Pharmacists may not write prescriptions

16   because they may not make prescribing decisions.

17           Kind of makes sense.  Think about it.

18   Pharmacists have a lot of training, a lot of expertise in

19   the practice of pharmacy, not the practice of medicine.

20           They did not go to medical school.  They do

21   not have the clinical training that doctors have,

22   including internships, residencies, sometimes

23   fellowships.

24           Any doctor has to have a medical license

25   from the State of Ohio board of medicine to practice

1    medicine and write prescriptions.  The State of Ohio will

2    take that license away if the doctor is writing bad

3    prescriptions or not practicing properly before a doctor

4    can write prescriptions for controlled substances.  On

5    top of that, they have to have a special registration

6    with the DEA.  And again, the DEA will suspend that

7    registration and revoke that registration if they are

8    concerned that the doctor is not writing correctly.

9             What else do doctors do when they see a

10   patient, things that pharmacists can't do?  Well, a

11   pharmacist, you could go see a doctor.  Your doctor has

12   access to your whole medical history, all of your medical

13   files.  If they don't have those files, they could

14   probably get them.  They'll talk to you about your

15   medical history, talk to you about your family medical

16   history as well.

17            A doctor does a physical exam.  Right?  You

18   go to a doctor, they could do a physical exam, they could

19   talk to you.  They could ask you about your symptoms, how

20   long you've had these symptoms, they'll tell you to

21   describe the symptoms and how they've changed.

22            Doctors can order tests.  They will order

23   blood tests, they'll order x-rays, they can order MRIs,

24   all that sort of thing.  And at the end of the that

25   process if you are sick or injured or have an issue, a

1          doctor makes a diagnosis.

2                    Based on everything they know about the

3          patient, based on their expertise, their clinical

4          judgment, they can say, "Okay, I know what's going on

17:03:36   5          with this patient or I have a good guess or I have

6          something we're going to start with and we'll see how it

7          does," but they make a diagnosis.

8                    Pharmacists can't do any of those things

9          and certainly can't, shouldn't diagnose patients.

17:03:50  10                    And after all that is when a doctor writes

11          a prescription.  Sometimes it's a quick process and

12          simple.  Sometimes it's a long process, a complicated

13          case.  But every time a doctor writes a prescription, at

14          the end of the day, they are saying based on everything I

17:04:06  15          know about this patient, based on my clinical judgment,

16          based on my training and expertise, here's what I think

17          is the best medicine option for this patient.  Knowing

18          what I think are going to be the benefits for the

19          patient, abusing this medicine and also what are the

17:04:21  20          risks, what are the possible side effects, based on all

21          of that they are making a decision that they think this

22          is the best medicine option for that patient.

23                    Pharmacists can't do any of that.

24                    Where do pharmacists fit in?  Where a

17:04:35  25          pharmacist fits in is if somebody comes with that

1    prescription and they think the patient is trying to

2    commit a crime of diversion or any crime, they think the

3    patient is trying to commit a crime, and they think the

4    doctor is in cahoots with the patient through writing

17:04:51   5    bogus prescriptions, yeah, in that case absolutely, the

6    pharmacist should refuse to dispense medication.

7                    But what you're going to hear is that in

8    other cases, in every other case, a pharmacist, as part

9    of their professional obligations, cannot, should not,

17:05:12  10    stand between doctors and their patients by

11    second-guessing the doctor's medical decision, just

12    saying I think I know better what's the right pill for

13    this person.

14                   You would never, nobody would ever accept

17:05:25  15    this.  The Board of Pharmacy would hear about this.  The

16    Board of Pharmacy, anyone else would never accept it if

17    you come to the pharmacy and the pharmacist says, "I know

18    your doctor thinks you should be taking a 30 milligram

19    pill twice a day, but as your pharmacist, I feel I should

17:05:47  20    start you off on ten milligrams and see how you're

21    feeling and come back and see me in two weeks."

22                   So that brings me to the final agenda item.

23    And I'm going to apologize.  I don't mean to be rude

24    looking at my watch.  It is because there is no clock in

17:06:06  25    this room, I've discovered.

1            But let me finish off on this.  And again,

2    this question where do diverted pills in these two

3    counties really come from is critical because at the end

4    of the case, you're going to get instructions on the law

17:06:27  5    from Judge Polster, and one of those instructions is

6    going to be this.  So this is going to be one of the

7    things he's going to tell you the plaintiffs need to

8    prove to make out their case.  Right?

9            They don't make out their case just by

17:06:44 10    saying, you know, I think there's a lot of blame to go

11    around and the opioid crisis is bad.  There are legal

12    requirements that they need to make to make out their

13    case, and one of those is going to be this:

14            That these pharmacies, each of them

17:06:58 15    individually, not just together, not pharmacies as a

16    world, these pharmacies were a substantial factor.  They

17    need to prove that word, were a substantial factor in

18    creating a public nuisance, not in the sense of the

19    opioids crisis generally but a public nuisance of

17:07:18 20    diverted opioid medications in those two counties,

21    diverted opioid medications in these two counties, Lake

22    and Trumbull.

23            So we need to talk about where do the

24    diverted pills in these two counties really come from.

17:07:32 25    And in the presentation earlier today we heard very

1    little about the actual counties, about what actually

2    goes on, you know, on the ground in Lake and Trumbull

3    Counties.

4              There were some discussions of Walgreen's

17:07:50  5    acting as a distributor, and you'll hear much more about

6    this later in the case, but it's getting late in the day

7    and I want to pick a couple points.

8              The first thing to emphasize you're going

9    to find out, if it wasn't clear already, is that when

17:08:05 10    Walgreen's acted as a distributor, it only ever

11    distributed to its own pharmacies.  And when I say its

12    own pharmacies I mean pharmacies that are owned by

13    Walgreen's.  There's no such thing as a franchise

14    Walgreen's.  Sometimes people wonder that.  These are

17:08:21 15    pharmacies that are owned by Walgreen's.  These are

16    pharmacies run by a pharmacy manager, who is a Walgreen's

17    pharmacist.  And they are staffed exclusively by

18    Walgreen's pharmacists who work for the company.

19              You've heard a lot about the system of

17:08:38 20    controls that distributors are supposed to have.  They

21    have to monitor for certain kinds of orders.

22              You're going to hear from this gentleman,

23    Greg Anderson, about that.  Greg Anderson is retired

24    after a 28-year career at the DEA.

17:08:57 25              I hope you get a chance to hear about some

1    of the amazing things that he did during his time at the

2    DEA.  He worked at the Detroit field office, which as you

3    saw, includes responsibility for Ohio.  He worked in

4    Washington, D.C. at the headquarters, and he worked

5    overseas in Pakistan and other places.  He's had a

6    fascinating career.

7              And he is going to be able to explain to

8    you that at the Walgreen's Distribution Centers, they

9    were always doing what DEA expected them to do at the

10   time.  The DEA's expectations.  You may conclude that

11   they changed over time, you may not, but he will explain

12   to you, he will explain to you how that works and that

13   Walgreen's was doing what DEA wanted.

14             You'll hear stories.  There's a lot about

15   Florida in all the highlighting that was going on really

16   quickly.  There's all these references to Florida.

17             You're going to hear from Mr. Anderson and

18   others about a Distribution Center in Ohio, in

19   Perrysburg, and you will hear about times when DEA came

20   to the Perrysburg Distribution Center and said, "We want

21   you to make some changes," and Walgreen's made those

22   changes and there was correspondence.  It was a

23   cooperative back and forth to make sure that DEA was

24   satisfied with how they were doing business.

25             The other thing Mr. Anderson is going to be

1      able to explain to you, and you might hear from some

2      others, is that even though Walgreen's stopped

3      distributing back in 2014 -- so what is that, seven years

4      ago now -- even though Walgreen's stopped distributing,

17:10:43  5      those checks and controls to see what kind of orders are

6      coming out of pharmacies, Walgreen's still does that.

7                  They don't have to.  No one ever told them

8      you should.  No one ever asked them to.  But they still

9      have that monitoring system in place to see what orders

17:10:59 10      Walgreen's pharmacies are placing with the new

11      distributor because if there is a problem at a Walgreen's

12      pharmacy, if there is a Walgreen's pharmacy that's

13      placing orders for Oxycodone that don't make any sense

14      for a pharmacy that size or that community, Walgreen's

17:11:18 15      wants to know.

16                  They've spent a lot of time and money on

17      that system to make sure that if there's a problem at a

18      Walgreen's pharmacy, Walgreen's is going to know about it

19      and Walgreen's is going to do something about it.

17:11:38 20                  I will pull back a little bit to hopefully

21      make it a little easier on the Court Reporter.

22                  But let's talk again about diversion, not

23      in Florida, not in other places, but in Lake and Trumbull

24      Counties.  What do we really know about where do diverted

17:12:03 25      pills really come from?

1             You're not going to hear any stories in

2     this case, I predict and I'm confident, you're not going

3     to hear any stories about theft out of Walgreen's stores

4     being a big problem, theft out of the Perrysburg

17:12:13  5     distribution or any distribution center being a big

6     problem.

7             You're not going to hear about pills that

8     fell off the back of a truck.  You're not going hear

9     about pharmacists selling pills out of the back door of a

17:12:24 10     pharmacy.  Nothing like that.

11             You're not going to hear anyone say, I

12     don't believe, that a Walgreen's pharmacist is a

13     criminal.

14             You are going to hear about other criminals

17:12:39 15     who tricked Walgreen's pharmacists in some occasions;

16     you're going to find out, very, very few.

17             But we've been talking about how criminals

18     divert pills from pharmacies, how they divert pills from

19     pharmacies.  The thing I alluded to you early on that you

17:12:58 20     didn't here anything about this morning -- not this

21     morning -- earlier this afternoon, is that most diversion

22     doesn't involve a pharmacy.  Most diversion does not

23     involve a pharmacy.  It's what they call medicine cabinet

24     diversion.

17:13:13 25             Now, I mentioned this in the beginning when

1    we were looking at the Ohio Task Force report that they

2    identified friends and family as a problem.  Let me spend

3    a few minutes on this.

4                        Most pills, most pain pills that are

17:13:29  5    prescribed in America go unused.  They go unused, which

6    means they're sitting in medicine cabinets available for

7    someone to take them, a friend, a relative, a plumber,

8    anybody who has access to a medicine cabinet.

9                        These are two studies that have been done.

17:13:52 10    The first study looked at opioid pills prescribed after

11    common dental procedures.  They looked at tooth

12    extractions, a relatively common dental procedure that

13    people typically needed some kind of pain control after.

14    The filling, hopefully not, but tooth extraction, you

17:14:11 15    will usually get some kind of pain relief if you want it.

16                        They look at pills prescribed after tooth

17    extractions, and they figured out that 54 percent of them

18    went unused.  And the authors of this study did the math,

19    and they figured out that means there are 100 million

17:14:28 20    unused opioid pills per year in America just from tooth

21    extractions.  That's a lot of pills.

22                        This next study looked at common outpatient

23    surgical procedures.  The study was done at the Dartmouth

24    University Medical Center in Massachusetts.  This is a

17:14:52 25    top hospital.  These are top doctors at the Dartmouth

1       University Hospital, and they looked at the most common

2       outpatient surgical procedures they were doing at this

3       time.  They are listed over on this side.

4                   And they found out that 71 percent of the

17:15:07  5       pills went unused or were left in medicine cabinets

6       unless somebody hopefully knew what to do to dispose of

7       it properly.  71 percent.  Now, these authors didn't do

8       the math.  I suspect the number would be far higher than

9       a hundred million if we're talking about procedures like

17:15:25 10       this, but they didn't give us, they didn't give us that

11       math.

12                   So we got all these pills in medicine

13       cabinets.  Unsurprisingly, a lot of them end up in the

14       wrong hands, unfortunately.  It's not surprising but it's

17:15:40 15       unfortunate.  The Government is studying this question.

16       The Government has asked when people misuse pills, where

17       did they get them.  The Government got people who

18       researched this, were very interested in this question.

19       Of all the places you can get a pill, where do people who

17:15:58 20       misuse pills get them?  And this is what they discovered.

21                   A 50.5 percent, just over half, got the

22       pills free from a friend or relative, for free from a

23       friend or relative.

24                   Four percent took them without asking from

17:16:15 25       a friend or relative.  And then 11 percent bought them,

1  paid the friend or relative.  A much smaller number buy

2  them from drug dealers.

3             It's only those two wedges at the bottom

4  that involve filling a doctor's prescription, that even

5  hypothetically involved a pharmacy.  Now that means -- I

6  think it's 25 percent, 25.2 percent if you add up those

7  two wedges.

8             That's not to say the pharmacist did

9  anything wrong in those cases.  The prescription may have

10  been completely legitimate when it was filled or when the

11  person brought it in.  They just went on to misuse the

12  pills later.  Who knows?  We can't say that 25 percent of

13  that -- 25 percent represents a pharmacy doing anything

14  wrong, but those the only misused pills in this study.

15  From a pharmacy rather than a medicine cabinet, from a

16  friend or relative or from a drug dealer.

17             So in those cases, in those cases which are

18  not that many it turns out, in those cases when criminals

19  doing drug diversion want to go to a pharmacy to get

20  pills, they can't get it from a friend or a relative or

21  they are the supplier, the drug dealer, or they prefer to

22  go, they have a prescription, a bogus prescription, in

23  those cases when those criminals do drug diversion go to

24  a pharmacy, there are a lot of places they can choose to

25  go before going to a Walgreen's.

1          Let me show you some of this, and we will

2     -- or as the case goes on, you'll see sliced and diced,

3     this information, lots of different ways but you won't be

4     able to change, you know, don't be afraid of math.  You

17:18:07  5     can do the math different ways.  You will get to see the

6     math done in a lot of different ways, but the conclusions

7     are always going to be the same.

8          So this is the market share of the two

9     counties.  All four of the pharmacy chains involved in

17:18:21 10     this case, put all four together.  Their market share is

11     37.5 percent.  That means more than 60 percent of the

12     opioids being dispensed were being dispensed by other

13     people who are not here with us in court.

14          Mr. Lanier tried to explain MME, I think he

17:18:41 15     got it roughly right.  It's a way to recognize that some

16     pills are much stronger than others.  So if you have five

17     milligrams of Vicodin, which is Hydrocodone, and five

18     milligrams of Percocet, which is Oxycodone, that Percocet

19     pill is much stronger.

17:18:59 20          So usually when people want to look at

21     which pharmacy is dispensing how much, they want to take

22     into account how strong the pills are.  So for that

23     reason, they tend to talk about MMEs, that a lot of them

24     take into account that one pharmacy may be dispensing the

17:19:18 25     same number of pills as another pharmacy, but much, much

1    stronger pills.  And if you're concerned about comparing

2    pharmacies, depending on what you're trying to figure

3    out, it's a pretty wordy question, are you dispensing

4    lots of very small pills that people tend to use after a

5    dental procedure, or lots of very, very strong pills that

6    are rarely used, much more rarely used and much more

7    attractive to criminals.  People involved in diversion

8    are more interested in diverting these strong pills with

9    more of the drug than tons and tons of weak pills.

10           Who are that 62 percent?  Who are we

11   talking about?  Well, there are 143 pharmacy, clinic and

12   hospital locations in the two counties that fill opioid

13   prescriptions.

14           This is undercounting in a way.  This is

15   only pharmacies, clinics and hospitals.  If you get down

16   to individual doctors, some individual doctors dispense

17   significant amounts.  If you get down to doctors and

18   dentists, vets, people like that, you'd be giving

19   hundreds and hundreds and hundreds.

20           Here, looking only at pharmacy, clinic and

21   hospital locations that dispense, there are 143 of them.

22   And 13 are Walgreen's pharmacies.

23           And even if you included all of the

24   pharmacy chains in this case, it's 45.  Of 143 places to

25   dispense opioids, every one in this lawsuit, 45; 98 other

1    places you can go.

2              What are some of those other places you

3    might go?  There are many, many.  I just to want talk for

4    a minute about these three.

17:21:10   5              First one you see there is a place called

6    Franklin Pharmacy.  It's still there.  Franklin Pharmacy

7    is in Trumbull County.  As you can see, it is physically

8    a relatively small store.  And if you include, if you

9    look at how much dispensing goes on at Franklin Pharmacy

17:21:35  10   compared to Walgreen's pharmacies, Franklin Pharmacy is

11   five times busier than the busiest Walgreen's pharmacy in

12   all of Trumbull County.

13             That little store is dispensing five times

14   as many opioids as the busiest Walgreen's in the entire

17:21:52  15   county.

16             The one in the middle is called Overholt's.

17   I know you can see this, but that's the same building.

18   If you notice, Overholt's and Champion Medicine Shoppe is

19   actually the same.

17:22:08  20             The reason they changed names is that

21   Mr. Overholt lost his license, the Board of Pharmacy.

22   The police shut down Overholt's Pharmacy.  Mr. Overholt

23   was arrested, the other pharmacists were arrested.

24   Mr. Overholt has pled guilty to five counts of criminal

17:22:29  25   drug trafficking.

1          The only reason he is not in jail is

2   because of his -- there is a well known pill mill doctor

3   in the area.  His name was Peter Franklin.  No

4   connection, as far as I know, to Franklin Pharmacy.  He

17:22:48  5   was never prosecuted because he was murdered by his wife,

6   unfortunately, during the investigation.  But Dr. Peter

7   Franklin, this well-known pill mill doctor, he used to

8   write prescriptions.  He would write on prescriptions

9   "Fill only at Overholt's."

17:23:05 10          He didn't want his patients showing up at

11   Walgreen's or around these other pharmacies where the

12   pharmacist was likely to call the police, at least not

13   his questionable prescriptions.  He may have written

14   other prescriptions that he wasn't so worried about.

17:23:24 15   "Fill only at Overholt's."

16          Champion next door is what the new owners

17   called it.  I believe it's closed today.

18          So knowing that, knowing that there are so

19   many other places in these counties where a criminal can

17:23:42 20   get involved in diversion, knowing that, why do the

21   lawyers say that these criminals involved in diversion go

22   to Walgreen's?  What does the evidence show us?

23          We're going to talk about three things and

24   this will be the last thing I talk about.  The first is

17:24:00 25   the red flag theory, and there are all these

1    prescriptions that trigger a red flag.

2              Now, the fact that a prescription had a

3    quote, unquote, red flag, paying cash, for example, that

4    doesn't mean it's a crime.  Like some people pay cash for

17:24:19  5    the very understandable reason that they don't have

6    prescription drug coverage.  Pay cash, might be an issue.

7    Might not.

8              Any one of those red flags might be an

9    issue, might not be.

17:24:33 10              But the red flags, what they did, they take

11    these red flags and say, okay, let's apply a computer

12    program.  Everyone who pays cash, red flag.  Every

13    prescription where someone drove 25 miles to see a

14    doctor, boom, red flag.  Every time a doctor wrote the

17:25:42 15    same prescription more than X many times, boom, red flag.

16    And sure enough, you do it that way, you get a lot of red

17    flags.

18              You get a lot of red flags because you are

19    using a computer program and completely ignoring that

17:26:02 20    pharmacists are licensed professionals expected, required

21    to use their professional judgment when they look at

22    their prescription and decide if they have a concern

23    about it or not.

24              And sure enough, these red flags make no

17:26:20 25    sense when you apply it the way they have.

1          For example, one of their, one of their

2     favorite red flags is somebody who drove 25 miles to see

3     the doctor or to go to the pharmacist.  Everyone in

4     Trumbull County who went to see a specialist at the

5     Cleveland Clinic drove more than 25 miles.  That's not

6     unusual.  That's not suspicious.  That's not even

7     interesting.

8          Think how many people drive to work either

9     to a job site on one day or to their regular office,

10    drive more than 25 miles and prefer to fill a

11    prescription near work than at home because of the hours

12    that they are working.  That's not unusual by itself.

13         Now, if someone shows up from Cincinnati

14    for no reason, yeah, you might want to ask why is that

15    person in Trumbull County from Cincinnati and they can't

16    explain it.

17         Another one is doctors who repeatedly write

18    the same prescription.  Now, when Dr. Franklin wrote the

19    same prescription over and over again, maybe that was

20    cause for a concern.  I'm not going to argue with that.

21    But other doctors who write the same prescription over

22    and over again are, for example, dentists.

23         Most dentists will tell you that everyone

24    who gets a root canal who wants a pain pill, they leave

25    with the same two-day prescription, three-day

1    prescription for pain relief.  That dentist is not

2    writing different prescriptions for every person.

3              Orthopedic surgeons, people who do knee

4    surgeries, it is very common that everyone who gets the

5    same knee procedure leaves the surgery with the same

6    prescription for short-term pain relief.  It's not

7    unusual, it's not even interesting.

8              The red flag doesn't show you anything

9    about any actual diversion in the two counties.  It tells

10   you about a huge number of prescriptions that

11   conceivably, maybe, we don't know, could have been

12   involved in diversion.

13             Next is Mr. James Rafalski.  James Rafalski

14   was a diversion investigator at the DEA.  He spent his

15   entire career with the Drug Enforcement Administration

16   doing exactly what this case is about:  Investigating the

17   diversion of prescription drugs.  That's what he did.

18             Now, he works for the lawyers.  We are told

19   he is going to come and testify.  You will hear from him

20   directly.

21             If you really thought, if somebody really

22   thought there was diversion going on at a Walgreen's

23   store, Mr. Rafalski is the guy you would ask.  He is the

24   guy you would think of asking.  Take a look, is there any

25   diversion going on?  Nobody asked him.

1       You are going to find out that nobody asked

2    Mr. Rafalski and he didn't look.  He is not aware of a

3    single prescription, a single prescription diverted from

4    a Walgreen's in Lake or Trumbull County, although again,

17:29:35 5    if there is somebody in this case at least working for

6    the plaintiffs' lawyers, we would expect to go out and

7    figure that out, you think we'd hear about it from

8    Mr. Rafalski.

9       On the plus side, there are working

17:29:49 10    diversion investigators you are going to hear from,

11    people who don't work for lawyers, people who have spent

12    their careers out in the field in Lake and Trumbull

13    Counties and elsewhere in northern Ohio looking for

14    diversion.

17:30:03 15       You will hear from Lake County law

16    enforcement, Trumbull County law enforcement, they have

17    never investigated or arrested a Walgreen's pharmacist

18    who they thought was doing diversion.

19       You're going to hear from inspectors with

17:30:16 20    the Board of Pharmacy.  The Board of Pharmacy doesn't

21    just license pharmacists.  I talked about that earlier.

22       The Board of Pharmacy inspects pharmacies.

23    They come to pharmacies on a regular basis and inspect

24    pharmacies and they look for signs that the pharmacy is

17:30:32 25    involved in diversion.  That's what they want to know.

1        And you're going to find out that they have
2    never had that concern about a Walgreen's pharmacy.

3        And sure enough, they will write up
4    pharmacies for an infraction.  If they see something at a
5    Walgreen's pharmacy that they don't like, that they think
6    isn't up to code, they will write it up, and they've
7    never had any concerns about diversion.

8        Last thing I want to talk to you about is
9    the data.  This is the math that Mr. Lanier is worried
10   about.  This is the math.  This is the data.  This is
11   hard evidence.  Okay?  There are a lot of people that say
12   a lot of things, what they think, give a lot of opinions.
13   This is hard evidence.

14       What we wanted to do is we wanted to figure
15   out what does Walgreen's look like if you compare it to a
16   real pill mill?  We know pill mills exist.  We know that
17   there was one in Trumbull County.  Overholt's that I
18   talked about.

19       What happens when you look at the data,
20   when you look at the real numbers and you compare
21   Overholt's and other high-volume pharmacies to
22   Walgreen's?  And what you will see is they look nothing
23   like each other.

24       So this is shipments to the pharmacies.
25   This is what these pharmacies were ordering because they

1    needed -- the pills they were ordering so that they could

2    dispense to patients.

3                    Over on the far left, you see Overholt's.

4    This is measured in MMEs.  Again, you could do this with

17:32:11  5    dosage units, although you wouldn't be capturing.  If you

6    did dosage units, what you'd miss is the fact that

7    Overholt's loved to dispense 80-milligram OxyContin, the

8    strongest most dangerous dose of OxyContin.  At

9    Walgreen's, they dispensed a lot of 5 milligram pills for

17:32:33 10    people who had dental procedures.  But you could do it

11    any way you want.

12                    Overholt's and Champion, the new owner,

13    we've had this data for 2006 and 2014.  I want to assure

14    you that's not cherry-picking, that's all the years we

17:32:44 15    have the data for.  If we had more years, we would give

16    it to you, four more years.

17                    Overholt's and Champion, 278 million.

18    Franklin, that's the little store I showed you on the

19    corner, Franklin is 248 million.  These are not

17:33:02 20    cherry-picked.  These are every Walgreen's in Trumbull

21    County.  Every single Walgreen's in Trumbull County.

22                    You could add these up together, pile them

23    all up, it would still be lower than the Franklin number.

24                    Here's another one.  This is cash payments.

17:33:20 25    You heard Mr. Lanier talk about cash payments as a red

1    flag, something to be worried about.  And sure enough,

2    when people are doing diversion, they often pay cash.

3    They don't use Blue Cross.  When people pay cash, it

4    could be diversion.  It could be that they don't have

5    prescription drug coverage.

6              This is what the numbers look like.  At

7    Overholt's, when they dispense opioids, 27 percent of the

8    time people were paying cash.  Champion, the new owners

9    who took over after Mr. Overholt got arrested, almost 17

10   percent.  Franklin is a lot lower, 8.5 percent.  The

11   nearest Walgreen's, this is not a cherry-picked

12   Walgreen's, it was about five, six miles away, we said

13   let's pick the nearest Walgreen's, the one that is most

14   likely to see the same customers.  The nearest

15   Walgreen's, 4.3 percent.

16              As the case goes on, you will see lots more

17   charts and graphs like this, probably more than you want

18   to see.  This is just a selection of the type of evidence

19   you are going to be presented.

20              When this all comes together, I think you

21   will conclude that yeah, there is diversion going on in

22   Trumbull County.  Sure there is, but no evidence that it

23   is at Walgreen's.

24              So let me wrap up.

25              I will repeat what I said at the beginning

1    because it's important and I want you -- I want to make

2    sure that everyone understands.

3    Nobody here, nobody in this room, certainly

4    nobody in Walgreen's is going to tell you that the opioid

17:35:06  5    crisis isn't serious, that it hasn't ruined lives, that

6    it hasn't taken lives.  Nobody will tell you that.

7    Nobody is going to say that there isn't a

8    lot of blame to go around.  Before this case is over, you

9    are going to hear about criminal drug gangs that

17:35:27 10    trafficked heroin up from Mexico.  You're going to hear

11    about that.

12    You're going to hear about illicit Fentanyl

13    coming from China.  Illicit Fentanyl is that super, super

14    strong opioid that gets mixed in with heroin sometimes

17:35:40 15    that has caused so many overdoses.

16    You're going to hear about drug gangs

17    trafficking pills from out of state.  You will hear about

18    a drug gang trafficking pills up from Florida.  You are

19    going to hear about heroin dealers, heroin dealers who

17:35:57 20    prey on some of the most desperate people in our

21    communities.

22    You are going to hear about criminals who

23    fake their symptoms to get good doctors to write

24    prescriptions.  You are going to hear about doctors who

17:36:11 25    became criminals, doctors who violated their oaths, who

1    took money to write fake prescriptions.

2                But at the end of the case, I'm confident

3    that of all the ways people get pills for illegal

4    diversion, of all the ways they get illegal drugs in Lake

17:36:37  5    and Trumbull Counties, you are not going to hear any

6    evidence that persuades you they do it by going to

7    Walgreen's.

8                That's what I have.  I want to thank you

9    for listening to me.  I will ask you at the end of what

17:36:53  10    is already a long afternoon, I can't tell you how much I

11    appreciate it.  My colleagues appreciate it, everyone in

12    this room appreciates the time you have given to this

13    case and the attention you have given to this case.

14                And no one appreciates that more than my

17:37:08  15    client and the pharmacists at Walgreen's.

16                Thank you so much.

17                THE COURT:  All right.  Thank you,

18    Mr. Stoffelmayr.

19                All right.  We will break for the day,

17:37:20  20    ladies and gentlemen.  Again do not read, review,

21    consider anything in the media about this case.  There

22    may be something.  If so, ignore it.

23                Do not discuss this case with anyone, you

24    know, family members, friends.  Say this mean Judge has

17:37:38  25    ordered me not to discuss this case, talk about it until

1    it's over.

2                    Have a good evening, and we'll pick up

3    promptly at 9:00 a.m. tomorrow morning.

4                    (Jury out.)

17:38:28   5              THE COURT:  Okay.  Everyone can be seated

6    for a minute.  Just a couple things I want to pick up.

7                    First, why -- Sue, if you can get someone

8    with IT to work on things before court because I want you

9    to be able to hear.  I don't know if the problem is some

17:38:42  10   sort of interference with this screen, if it was the

11   mics, but it's important that you be able to hear.

12                   So if you can work that out with IT before

13   9:00 o'clock tomorrow morning.

14                   Second, I want to take up the problem that

17:39:00  15   Special Master Cohen was having.  I spent a lot of time

16   with him yesterday about these objections to questions

17   and answers in the deposition excerpts that people want

18   to play.

19                   Look, the simplest thing for me to do, and

17:39:21  20   I thought of doing it and I still might, is just say

21   forget the whole exercise, we're not going to have any

22   depositions played.  Jurors tune it out anyway.  Everyone

23   will testify either live in court or live by video and

24   from some lawyer's office around the country.

17:39:39  25                   That's simple.  The jurors are going to pay

1    a lot more attention to it, so maybe we should just do

2    that.  And I'm putting it out now for suggestion.

3                So what does everyone think about that?

4    Because we're not going to continue to do what went on

17:39:56  5    over the weekend.  That isn't going to happen.

6                MR. LANIER:  Your Honor, plaintiffs would

7    be great with that.

8                THE COURT:  All right.  How about the

9    defendants?  It just may be simpler and easier.

17:40:07 10                Because most of these, most of these

11   objections are going to -- I mean, first of all, if it's

12   done live, forget it.  I'm not going to allow someone to

13   ask a compound question, two or three questions at once.

14                If it's hearsay, it's out.  All right?  If

17:40:22 15   there's a problem with the document, I guess I'll have to

16   deal with it on the fly.

17                I mean, again, if we're -- I mean I'm going

18   to charge the time to someone if I've got to interrupt

19   testimony.

17:40:35 20                MS. SULLIVAN:  Your Honor, Diane Sullivan

21   for Giant Eagle.

22                I hadn't been involved, Your Honor, in the

23   deposition process and the objections but one concern I

24   have about doing what Your Honor suggests is that there

17:40:46 25   are third-party witnesses who are out of our control.

1      Some of them work for the Government and they are in the

2      can, and I think it's appropriate under the Federal Rules

3      that we be able to play those if they're available to us.

4                  THE COURT:  Well, Ms. Sullivan, I'm not

17:41:02  5      saying it's inappropriate.  I mean it's certainly used

6      but if the procedure -- the procedure isn't working.  All

7      right?  People have, you know, put in rafts of objections

8      and in a manner that Special Master Cohen couldn't deal

9      with it.  So we're not doing that anymore.

17:41:14  10                  So if it can't be streamlined so that it

11      can be dealt with efficiently, then it's going to be the

12      other way.  And I suggest everyone notify these witnesses

13      now that they're -- they may have to come in or testify

14      live at a lawyer's office in their hometown, all right,

17:41:31  15      at some facility.

16                  Yes, Mr. Delinsky?

17                  MR. DELINSKY:  Thank you, Your Honor.

18                  I just ask that you give us at least

19      overnight for all defendants to confer.

17:41:46  20                  THE COURT:  All right.  You can confer but

21      I'm making it clear if, if the next deposition that

22      Special Master Cohen has to review has the same problems

23      as the one he reviewed over the weekend, I don't care

24      what anyone says, I'm doing it.

17:42:00  25                  Okay?  So you're all on notice.  Whatever

1    you're giving him tonight, if, if it's like over the

2    weekend, don't do it.

3                Okay?  Don't do it.  It's over.  If you can

4    do it in a way that he can deal with it expeditiously,

17:42:15  5   okay.  All right.

6                No bluff.  I mean, people know me.  This is

7    it.  You don't like it, appeal it.  But I -- but what was

8    being done was totally improper.

9                So it's really all up to you.

17:42:30 10               MR. STOFFELMAYR:  Judge, I'm only

11   tangentially familiar with these issues but I will assure

12   you that we will make sure that message gets back to the

13   people who have been working on this.

14               THE COURT:  All right.  They may be fine

17:42:43 15  lawyers but this isn't law school, this isn't Moot Court.

16               This is show time, and we don't do it this

17   way.  I couldn't care less about leading questions or

18   compound questions.  If the witness answered the

19   question, that moots it.  Okay?  Okay?  If the witness

17:42:59 20  said I don't understand the question, so 99 percent of

21   this stuff is irrelevant.  If you've got a real serious

22   objection, first of all, if the witness was asked for

23   privileged information, guess what?  One of these fine

24   lawyers would have said "Objection, don't answer it."

17:43:13 25               So, okay, anything serious, it wouldn't

1    have been answered.

2              So it's up to you.  If you can do it and

3    streamline it and eliminate about 90 percent of what

4    you've asked him to do and do it in a format, in a way

17:43:27 5    that he can address it, fine.  If not, we're done with it

6    and you'll just have to either just put in the

7    depositions as they are, questions and the answers, or

8    we'll have to do everyone live.

9              Okay.  All right.  Have a good evening and

17:43:47 10   I'll see everyone -- Mr. Delinsky?

11             MR. DELINSKY:  I don't want to be the

12   person standing in the way of everyone going home but

13   very briefly, Your Honor, today was the first time we

14   heard some of the uses Mr. Lanier intended and plaintiffs

17:44:01 15   intended to put to certain documents.

16             I just want to be clear on the record that

17   we've entered evidentiary objections to particular uses

18   of documents.  We didn't interrupt Mr. Lanier.

19             I want to be crystal clear that we will be

17:44:15 20   asserting those objections, and we have not waived them

21   by not interrupting.

22             THE COURT:  You haven't waived anything.

23             MR. DELINSKY:  Okay.  Thank you, Your

24   Honor.

17:44:22 25             And then my only -- my second, second issue

1    I'd like to raise is Mr. Lanier raised one assertion of

2    law.  There's obviously wide disagreement on what the law

3    is.

4                    But there was one in particular that I

17:44:34  5    think we're all in agreement on, and that the insinuation

6    was incorrect, and that is that he made the suggestion

7    that the requirements of the CSA are different for chains

8    than they are for small pharmacies.  And that's not the

9    case.

17:44:50 10                    The regulations are the regulations.

11                    THE COURT:  All right.  I didn't hear him

12    say that the law is somehow different.  Okay.

13                    MR. DELINSKY:  He said the

14    responsibility --

17:44:59 15                    THE COURT:  Well --

16                    MR. DELINSKY:  -- is greater on the

17    larger --

18                    THE COURT:  Well, this is Mr. Lanier's

19    editorial remark that a larger company has -- as a market

17:45:10 20    leader or whatever.

21                    The law doesn't impose any difference on

22    Walmart, Walgreen's, CVS or Giant Eagle than a mom and

23    pop.  And if one of you want to say that, you can say

24    that and that's fine because it's right.

17:45:28 25                    So I -- I didn't take it that way but I can

1    see that someone could have heard it and I suggest one of

2    you get up and correct that and you've got three chances,

3    you know, you don't all have to say it tomorrow but

4    someone, someone should say it and it's a correct

17:45:43  5    statement of the law.

6                         MR. DELINSKY:  Thank you, Your Honor.

7                         THE COURT:  Okay.  All right.  We're

8    adjourned.

9                         Thank you.

17:45:54 10                         (Proceedings concluded at 5:45 p.m.)

11                              -   -   -   -

12                      C E R T I F I C A T E

13                      I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17

18

19    **/s/Susan Trischan**
      /S/ Susan Trischan, Official Court Reporter
20    Certified Realtime Reporter

21    7-189 U.S. Court House
      801 West Superior Avenue
22    Cleveland, Ohio 44113
      (216) 357-7087
23

24

25